Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
Stephany Martinez Tiffer (SBN 341254)
martineztiffer@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou H. MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R., and HENDRINA VIVAS CASTILLO, <br><br> *Plaintiffs*, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA, <br><br> *Defendants*. | Case No. 25-cv-1766 <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:     March 27, 2025 <br> Time:     TBD <br> Place:    TBD |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (pro hac vice pending*)
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

## NOTICE OF MOTION AND MOTION TO POSTPONE
## EFFECTIVE DATE OF AGENCY ACTION

PLEASE TAKE NOTICE THAT, on March 27, 2025, or as soon thereafter as this matter may be heard, before the district judge of the United States District Court for the Northern District of California assigned to this matter, Plaintiffs move under 5 U.S.C. § 705 of the Administrative Procedure Act ("APA") to "postpone the effective date of agency action."[1]

Plaintiffs seek an order postponing the effective date of Defendants' decision of February 3, 2025 at 90 Fed. Reg. 8805. That decision purports to "vacate" the extension of Temporary Protected Status ("TPS") for Venezuela issued on January 17, 2025. Plaintiffs also seek an order postponing the effective date of Defendants' order of February 5, 2025 at 90 Fed. Reg. 9040, purporting to issue a new decision terminating TPS for Venezuela.

To prevent irreparable harm, Plaintiffs request that the Court act ***no later than April 2, 2025*** to postpone the effective date of these decisions, and that it postpone them until such time as the Court can resolve at trial whether the above orders are unlawful. In the alternative, and at a minimum, Plaintiffs request that the Court act ***no later than April 2, 2025*** to postpone the effective date of these decisions until such time as the Court can resolve Plaintiffs' forthcoming motion for summary judgment. Absent postponement of the effective date, the challenged orders will go into effect on April 3, 2025, when employment authorization documents for nearly 350,000 Venezuelan TPS holders who initially registered for TPS under Venezuela's 2023 designation will expire. Those TPS holders will lose their legal status and become subject to deportation (and in some cases detention and summary deportation) on April 7, 2025.

This Motion is based upon this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting declarations and evidence filed concurrently herewith; pleadings and filings in this case; any additional matter of which the Court may take judicial notice; and such further evidence or argument as may be presented before, at, or after the

---

[1] Plaintiffs intend to pursue negotiations with the government to shorten the time for hearing on this motion, and if no agreement can be reached to a motion to shorten time.

1   hearing. Unless otherwise specified, all citations in the Memorandum of Points and Authorities to an

2   "Exhibit," "Exhibits," "Ex." or "Exs." refer to exhibits attached to the Declaration of Emi MacLean.

3

4   Date:  February 20, 2025                    Respectfully submitted,

5
                                                ACLU FOUNDATION
6                                               OF NORTHERN CALIFORNIA

7                                                /s/ *Emilou MacLean*
8                                               Emilou MacLean
                                                Michelle (Minju) Y. Cho
9
                                                Ahilan T. Arulanantham
10                                              Stephany Martinez Tiffer
                                                CENTER FOR IMMIGRATION LAW AND
11                                              POLICY, UCLA SCHOOL OF LAW

12                                              Eva L. Bitran
                                                ACLU FOUNDATION
13                                              OF SOUTHERN CALIFORNIA

14
                                                Jessica Karp Bansal
15                                              Lauren Michel Wilfong (pro hac vice pending*)
                                                NATIONAL DAY LABORER ORGANIZING
16                                              NETWORK

17                                              Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>TABLE OF CONTENTS</u>

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................1

INTRODUCTION ...........................................................................................................1

STATEMENT OF THE ISSUE.........................................................................................2

STATEMENT OF THE RELEVANT FACTS ..................................................................3

ARGUMENT ...................................................................................................................4

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ........................4

        A.      The Secretary Lacked Authority to Vacate the Extension for Venezuela. ...................4

        B.      Even if DHS Had Vacatur Authority, the Vacatur Violated the APA for at Least
                Three Separate and Independent Reasons, Each of Which Warrants Postponement. ...8

                1.      The vacatur is founded upon legal errors.........................................................8

                2.      The vacatur failed to account for alternatives short of termination. ...............10

        C.      The Vacatur and Termination Decisions Violated The Fifth Amendment.................11

                1.      Strict scrutiny applies to Plaintiffs' Equal Protection claims. .........................11

                2.      Discriminatory intent was at least one motivating factor here. ......................12

        D.      The Court Has Jurisdiction to Consider Plaintiffs' Claims. ........................................16

II.     VENEZUELAN TPS HOLDERS FACE PROFOUND AND IRREPARABLE
        HARM.........................................................................................................................19

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN
        FAVOR OF POSTPONEMENT. ......................................................................................24

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995) ................................................................................................. 11

*Am. Methyl Corp. v. EPA*,
    749 F.2d. 826 (D.C. Cir. 1984) ................................................................................... 5

*Am. Trucking Ass'ns v. Frisco Transp. Co.*,
    358 U.S. 133 (1958) ................................................................................................... 5

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) ..................................................................................... 11

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ............................................................................ 22, 24

*Ariz. Dream Act Coal. v. Brewer*,
    855 F.3d 957 (9th Cir. 2017) ..................................................................................... 22

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.*,
    818 F.3d 493 (9th Cir. 2016) ................................................................................ 12, 13

*Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*,
    610 F.2d 621 (9th Cir. 1979) ....................................................................................... 1

*Biden v. Nebraska*,
    600 U.S. ____, 143 S. Ct. 2355 (2023) ..................................................................... 17

*Bolling v. Sharpe*,
    347 U.S. 497 (1954) ................................................................................................... 11

*Bowen v. Mich. Acad. of Fam. Physicians*,
    476 U.S. 667 (1986) ............................................................................................ 18, 19

*California v. HHS*,
    281 F. Supp. 3d 806 (N.D. Cal. 2017) ................................................................ 20, 24

*CASA de Md., Inc. v. Trump*,
    355 F. Supp. 3d 307 (D. Md. 2018) .......................................................................... 14

*Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*,
    524 F. Supp. 3d 919 (N.D. Cal. 2021) ......................................................................... 1

*Centro Presente v. DHS*,
    332 F. Supp. 3d 393 (D. Mass. 2018) ....................................................................... 14

*Chalk v. United States Dist. Ct.*,
  840 F.2d 701 (9th Cir. 1988) ..........................................................................................23

*China Unicom (Ams) Operations Ltd. v. FCC*,
  124 F.4th 1128 (9th Cir. 2024) .....................................................................................5, 6

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ......................................................................................................11

*Civil Aeronautics Bd. v. Delta Airlines Inc.*,
  367 U.S. 316 (1961) ........................................................................................................5

*Cuozzo Speed Techs., LLC v. Lee*,
  579 U.S. 261 (2016) ......................................................................................................19

*DHS v. Regents*,
  591 U.S. 1 (2020) ...................................................................................10, 12, 17, 18

*FEC v. Akins*,
  524 U.S. 11 (1998) ....................................................................................................8, 10

*Gorbach v. Reno*,
  219 F.3d 1087 (9th Cir. 2000) .........................................................................................4

*Grand Canyon Univ. v. Cardona*,
  121 F.4th 717 (9th Cir. 2024) ..........................................................................................8

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ....................................................................................19, 24

*Immigr. Legal Res. Ctr. v. Wolf*,
  491 F. Supp. 3d 520 (N.D. Cal. 2020) ..........................................................................2, 19

*Immigrant Assistance Project of AFL-CIO v. I.N.S.*,
  306 F.3d 842 (9th Cir. 2002) .........................................................................................18

*Jean v. Nelson*,
  472 U.S. 846 (1985) ......................................................................................................17

*Johnson v. Robison*,
  415 U.S. 361 (1974) ......................................................................................................19

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014) .........................................................................................24

*Leiva-Perez v. Holder*,
  640 F.3d 962 (9th Cir. 2011) .........................................................................................22

*McAllister v. United States*,
  3 Cl. Ct. 394 (1983) ........................................................................................................7

*McGinest v. GTE Serv. Corp.*,
  360 F.3d 1103 (9th Cir. 2004) ................................................................................13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .................................................................................................10

*N. Mariana Islands v. United States*,
  686 F. Supp. 2d 7 (D.D.C. 2009) ...........................................................................20

*Norsworthy v. Beard*,
  87 F. Supp. 3d 1164 (N.D. Cal. 2015) ....................................................................23

*NRDC v. Regan*,
  67 F.4th 397 (D.C. Cir. 2023) ..................................................................................5

*Nw. Env't Defense Ctr. v. Bonneville Power Admin.*,
  477 F.3d 668 (9th Cir. 2007) ....................................................................................8

*Padilla v. Kentucky*,
  559 U.S. 356 (2010) ...............................................................................................21

*Petties v. D.C.*,
  881 F. Supp. 63 (D.D.C. 1995) ...............................................................................23

*Poland v. Chertoff*,
  494 F.3d 1174 (9th Cir. 2007) ................................................................................15

*Proyecto San Pablo v. I.N.S.*,
  189 F.3d 1130 (9th Cir. 1999) ................................................................................18

*Ramos v. Nielsen*,
  336 F. Supp. 3d 1075 (N.D. Cal. 2018) ..........................................................*passim*

*Reno v. Catholic Soc. Servs., Inc.*,
  509 U.S. 43 (1993) .................................................................................................18

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) ................................................................................25

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ....................................................................14

*Stanley v. Illinois*,
  405 U.S. 645 (1972) ...............................................................................................22

*The Anti-Defamation League, et. al, Ramos v. Nielson*,
  Case No. 18-16981 (9th Cir Feb. 7, 2019) ..............................................................15

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ...............................................................................................11

*United Gas Improvement Co. v. Callery Props., Inc.*,
  382 U.S. 223 (1965)................................................................................................7

*United States v. Carrillo-Lopez*,
  68 F.4th 1133 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 703 (2024).........................11, 12

*United States v. Seatrain Lines, Inc.*,
  329 U.S. 424 (1947).................................................................................................4

*United States v. Virginia*,
  518 U.S. 515 (1996)................................................................................................11

*Vargas v. Meese*,
  682 F. Supp. 591 (D.D.C. 1987).............................................................................21, 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)................................................................12, 13, 14, 15

*Warsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005) ..................................................................................20

*Washington v. Davis*,
  426 U.S. 229 (1976)................................................................................................11

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ................................................................................22

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..........................................................................................1, 2, 19

**Statutes**

5 U.S.C. § 702................................................................................................................16

5 U.S.C. § 705..........................................................................................................*passim*

28 U.S.C. § 1331......................................................................................................16, 19

**Other Authorities**

8 C.F.R. § 244.2............................................................................................................3, 9

8 C.F.R. § 244.17..........................................................................................................3, 9

8 CFR § 244.14................................................................................................................9

62 Fed. Reg. 16608-1........................................................................................................9

64 Fed. Reg. 61123...........................................................................................................9

66 Fed. Reg. 18111 ..................................................................................................9

73 Fed. Reg. 57128 ..................................................................................................8

76 Fed. Reg. 29000 ..................................................................................................9

77 Fed. Reg. 76503 ................................................................................................11

78 Fed. Reg. 1872 ..............................................................................................9, 10

78 Fed. Reg. 32418 ..................................................................................................8

79 Fed. Reg. 52027 ................................................................................................10

86 Fed. Reg. 13575 ..................................................................................................9

86 Fed. Reg. 13694 ..................................................................................................3

87 Fed. Reg. 55024 ..................................................................................................3

88 Fed. Reg. 5028 ..................................................................................................10

88 Fed. Reg. 68130 ..................................................................................................3

88 Fed. Reg. 68134 ..................................................................................................9

90 Fed. Reg. 5961 ....................................................................................................3

90 Fed. Reg. 5962 ....................................................................................................6

90 Fed. Reg. 8806 ............................................................................................4, 5, 7

90 Fed. Reg. 8807 ....................................................................................................8

90 Fed. Reg. at 8807 ..........................................................................................9, 10

90 Fed. Reg. 9040 ..............................................................................................4, 24

90 Fed. Reg. 9042 ..................................................................................................15

U.S. Const., amend. V....................................................................11, 15, 16, 19

U.S. Const., amend XIV ......................................................................................11

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This case challenges an unlawful decision to "vacate" the January 17, 2025 extension of Temporary Protected Status ("TPS") for Venezuela seventeen days after it became effective via publication in the Federal Register. The vacatur disregards applicable law and procedure, and springs from racial animus against Venezuelan TPS holders—labeled "dirtbags" by the Secretary of Homeland Security. It would rob approximately 600,000 individuals of their lawful right to live and work here for at least the next 18 months, shattering families and communities, including those of the Individual Plaintiffs and members of the National TPS Alliance, an Associational Plaintiff. Absent relief from this Court by April 2, 2025, nearly 350,000 of the targeted Venezuelan TPS holders will lose employment authorization, and face deportation (including in some cases detention and summary deportation) as soon as April 7, 2025. The rest of the Venezuelan TPS community could lose status and employment authorization on September 10, 2025.

The vacatur is illegal for a host of reasons. This motion addresses three, any one of which warrants postponement. Congress has empowered federal courts to step in when reviewing administrative decisions alleged to be lawless, irrational, and arbitrary, and when allowing them to go into effect would cause irreparable harm. The Administrative Procedure Act ("APA") authorizes district courts to "postpone" agency actions:

> On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705 ("Section 705"); *Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*, 610 F.2d 621, 624 (9th Cir. 1979) (under Section 705 "the court may postpone or stay agency action pending such judicial review"); *Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919, 980 (N.D. Cal. 2021) (staying "effectiveness" of rule under Section 705). The factors courts consider for a stay under Section 705 "substantially overlap with the *Winter* factors for a preliminary injunction": likelihood of success on the merits, irreparable harm, balance of the equities, and public interest.

*Immigr. Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529 (N.D. Cal. 2020) ("*ILRC*") (staying effective date under Section 705 based on *Winter* factors).

The Court should exercise that authority here. *First*, DHS has no authority to "vacate" a TPS extension. Congress established fixed time periods and procedures for terminations, which can occur only after "***the expiration*** of the most recent previous extension," not at the whim of Secretaries. 8 U.S.C. § 1254a(b)(3)(B) (emphasis added). *Second*, the asserted reason for the vacatur—that the registration process established by the extension violated the TPS statute because TPS holders who initially applied under Venezuela's 2021 designation were permitted to re-register pursuant to the 2023 designation—is irrational. The consolidation of registration processes for TPS recipients under both designations was perfectly lawful. Secretary Noem's manifest misunderstanding about how TPS works cannot justify the draconian "remedy" of stripping every beneficiary of the protections they received under the January 17, 2025 extension. *Third*, the evidence already confirms that discriminatory intent played a role in Secretary Noem's decisions, and decisions grounded even in part on racial animus cannot stand.

The Court should postpone the agency's lawless action to preserve the rights of nearly 600,000 TPS holders who would otherwise suffer irreparable harm. The balance of equities and public interest overwhelmingly favor preserving the status quo. *ILRC*, 491 F. Supp. at 528–29. A decision declaring the vacatur unlawful *after* it has gone into effect—after massive economic harms from lost employment authorizations and an as-yet-unknown number of illegal deportations—could never restore families and communities. In contrast, postponing the decision to allow judicial review in an orderly fashion will work no discernable harm to the government. Nor could it when, less than a month ago, DHS concluded on the ***very same facts*** that designating Venezuela advanced the public interest. For all of these reasons, relief is warranted.

## STATEMENT OF THE ISSUE

Should the Court postpone the vacatur of the TPS extension for Venezuela and the subsequent termination of Venezuela's 2023 designation under Section 705 in light of Plaintiff's showing of unlawful conduct and manifest irreparable harm?

## STATEMENT OF THE RELEVANT FACTS

Created in 1990, TPS allows the Secretary to designate disaster-stricken countries for protected status for renewable periods of up to eighteen months. DHS must review the designations at least sixty days before the end of each designation period, and extend so long as the conditions for designation continue to be met. Designations remain operative until terminated under procedures specified in the statute. 8 U.S.C. § 1254a(b). Nationals of designated countries are eligible for lawful status and work authorization, provided they prove their presence in the United States as of the designation's effective date, establish continuous residence from a date set by the Secretary, and pass a criminal background check, with more than a single misdemeanor disqualifying. 8 U.S.C. §§ 1254a(c)(1)(A), (2)(B). Applicants must register "during the initial registration period," 8 C.F.R. § 244.2(f)(1), and periodically thereafter "in accordance with USCIS instructions." 8 C.F.R. § 244.17(a); *see also* 8 U.S.C. § 1254a(c)(1)(A)(iv).

The Secretary first designated Venezuela in March 2021, enabling Venezuelans already residing in the U.S. as of that date to apply. 86 Fed. Reg. 13694. In September 2022, Venezuela's designation was extended through March 2024. 87 Fed. Reg. 55024. In October 2023, then Secretary Mayorkas simultaneously announced an extension of the 2021 designation (through September 2025), and a re-designation which granted TPS protection for more recently arrived Venezuelans (effective October 3, 2023 through April 2, 2025). 88 Fed. Reg. 68130. The Secretary instructed eligible applicants—namely, Venezuelans who had resided in the U.S. since July 2023 "who currently do not have TPS"—to file initial applications under the re-designation. *Id.* The October 2023 decision thus created two different tracks for Venezuelan TPS holders: (a) those who initially registered under the 2021 designation, who could re-register under the October 2023 extension to receive TPS protections through September 2025, and (b) those who initially registered under the 2023 redesignation, who would receive TPS protections through April 2025. *Id.*

On January 17, 2025, Secretary Mayorkas announced an extension of the 2023 re-designation, along with a modification to the registration process. 90 Fed. Reg. 5961. To "ensure optimal operational processes" while "maintain[ing] the same eligibility requirements," Secretary Mayorkas permitted Venezuelans who had filed initial applications under either the 2021 or 2023

designations to re-register under the extension and receive lawful status and work permits through October 2026. *Id.* at 5963. Secretary Mayorkas's decision was published in the Federal Register and became effective immediately. *Id.* at 5962, 5967; 8 U.S.C. § 1254a(b)(3)(C).

On January 28, 2025, three days after being sworn in as DHS Secretary, Secretary Noem announced her intention to "vacate" the entire extension decision due to concerns about the "consolidation of filing processes." 90 Fed. Reg. at 8807, 9041. There is neither precedent nor statutory authorization for such a vacatur. Days later, she published a new decision terminating Venezuela's 2023 designation. 90 Fed. Reg. 9040. Her purported justification was that permitting Venezuelan TPS holders to remain in the country is "contrary to the national interest," citing President Trump's directives and allegations about Venezuelan gang activities. *Id.* at 9042.

## <u>ARGUMENT</u>

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Secretary Noem lacked authority to vacate the extension, and her stated reason for the vacatur is arbitrary. The decision is also infected by racism. And the Court has jurisdiction to take measures to prevent lawless agency action from inflicting irreparable harm.

### A. The Secretary Lacked Authority to Vacate the Extension for Venezuela.

Secretary Noem asserts "inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination." 90 Fed. Reg. at 8806. On that basis, she purported to replace an 18-month extension with a termination that takes effect immediately upon the end of the prior designation period. But DHS has no "inherent authority" to vacate TPS extensions. It contravenes the plain language of the TPS statute, which specifies precisely how long extensions must last and when termination decisions take effect.

Contrary to the Secretary's assertions, "[t]here is no general principle that what [an agency] can do, [it] can undo." *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc) (Attorney General lacked inherent authority to denaturalize people allegedly granted citizenship in error). It is "sometimes" true that Congress grants agencies such authority; it is "sometimes not." *Id.*; *United States v. Seatrain Lines*, *Inc.,* 329 U.S. 424 (1947) (agency lacked authority to modify shipping certificate already issued). Whether it is always turns on the statutory scheme.

No provision of the TPS statute explicitly grants DHS authority to reconsider a TPS extension. Secretary Noem relies on three provisions as implicitly granting such authority: Sections 1103(a), 1254a(b)(3), and 1254a(b)(5)(A). 90 Fed. Reg. at 8806 n.2. None even references vacaturs. For instance, Section 1103(a) is just a general grant "for carrying out [Secretary Noem's] authority under the provisions of" the immigration laws. By its terms, Section 1103(a) provides no *additional* authority to do anything. At most, such "broad enabling statute[s]" provide authority to correct "inadvertent ministerial errors." *Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 145–46 (1958). As a result, Secretary Noem must establish that the structure of the TPS statute necessarily grants inherent authority to prematurely vacate extensions. As the Ninth Circuit recently explained:

> An agency's assertion of an implied general revocation authority may . . . be sharply limited, or even foreclosed, when the statutory structure negates that assertion of implied authority. That may be the case, for example, when there is a specific statutory process for altering an agency's grant of a certificate, waiver, or other authorization. Where Congress has provided a particular mechanism, with specified procedures, for an agency to make such alterations, it is not reasonable to infer an implied authority that would allow an agency to circumvent those statutory procedural protections.

*China Unicom (Ams) Operations Ltd. v. FCC*, 124 F.4th 1128, 1149 (9th Cir. 2024) (cleaned up).

Applying this legal framework, courts have consistently rejected power grabs by agencies asserting implied authority to undo decisions without regard to statutory procedures. Pertinent here, where statutes provide "specific instructions," those instructions "are to be followed scrupulously" and "should not be modified by resort to such generalities as 'administrative flexibility' and 'implied powers'…." *Civil Aeronautics Bd. v. Delta Airlines Inc.*, 367 U.S. 316, 325 (1961); *NRDC v. Regan*, 67 F.4th 397 (D.C. Cir. 2023) (holding EPA lacked implicit authority to rescind its position that a contaminant should be regulated where, by statute, that conclusion trigged specific periodic review process); *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 835 (D.C. Cir. 1984) (holding EPA lacked implicit authority to revoke waiver permitting sale of fuel additive where statute established mechanism for prohibiting sale of dangerous additives, including those "mistakenly waived into commerce"). In particular, where a statute authorizes an agency to issue a license or benefit for a "fixed term," it "reflects a clear temporal expectation that, absent contrary indication in the statutory

text, such a license will *endure* for the length of that term. The use of a fixed term is []inconsistent with []an implied power to revoke a license at any time." *China Unicom*, 124 F.4th at 1148.

The fixed terms of TPS designations, extensions, and terminations, and the statutorily prescribed processes governing how the Secretary must proceed after an initial TPS designation, are inconsistent with implicit vacatur authority. Unless otherwise specified in the original notice, an initial designation "take[s] effect upon the date of publication of the designation" and "shall remain in effect until the effective date of the termination of the designation." 8 U.S.C. § 1254a(b)(2). The same is true of extensions. 8 U.S.C. § 1254a(b)(3)(C). "At least 60 days before the end of the initial period of designation, and any extended period of designation," the Secretary "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The Secretary must "provide on a timely basis for the publication of notice of such determination . . . in the Federal Register." *Id.* If the Secretary determines "that a foreign state . . . no longer continues to meet the conditions for designation" the Secretary "shall terminate the designation by publishing a notice in the Federal Register." 8 U.S.C. § 1254a(b)(3)(B). Without such a determination, the designation "is extended." 8 U.S.C. § 1254a(b)(3)(A) & (C). Extensions take effect immediately, and last for the length of time specified in the notice, up to 18 months. *Id.* In contrast, a termination "shall not be effective earlier than 60 days after the date the notice is published *or, if later, the expiration of the most recent previous extension*." 8 U.S.C. § 1254a(b)(3)(B) (emphasis added).

DHS cannot circumvent TPS's clear statutory strictures by pretending to erase the January 17, 2025 extension from the books and proceeding as though it never existed. Under the TPS scheme, there is only one way to terminate a TPS designation: the process described in subsection (b)(3)(B). Moreover, because a termination "shall not be effective earlier than 60 days after the date the notice is published *or, if later, the expiration of the most recent previous extension*," 8 U.S.C. § 1254a(b)(3)(B) (emphasis added), the "expiration of the [January 17, 2025] extension" can occur no earlier than October 2, 2026. *Id.*; 90 Fed. Reg. 5962; 8 U.S.C. § 1254a(b)(3)(B). Thus, the statute's plain language prohibits any attempt to terminate Venezuela's

1    TPS designation before October 2, 2026.

2         The purported vacatur offends still other provisions of the TPS regime. The vacatur purports

3    to negate an extension duly published in the Federal Register, which had already become effective.

4    *See* 8 U.S.C. § 1254a(b)(3)(A) (requiring publication of an extension in the Federal Register). Once

5    DHS published Secretary Mayorkas's decision to extend Venezuela's designation on January 17,

6    2025, the designation was *immediately* extended through October 2, 2026. The re-registration period

7    began *that day*. 90 Fed. Reg. 5962 (re-registration period "runs from January 17, 2025"). The notice

8    instructed TPS holders that "this Federal Register notice automatically extends [certain identified

9    EADs] through April 2, 2026 *without any further action on your part*." *Id.* at 5967 (emphasis added).

10   It likewise instructed employers to "accept" an expired EAD accompanied by a copy of the January

11   17, 2025 Federal Register Notice as proof of work authorization through April 2, 2026. *Id.* at 5969–

12   70. Secretary Noem had no authority to countermand these duly-issued agency notices without

13   regard to TPS's statutorily mandated timetables and procedures.

14        Secretary Noem may point to the fact that her predecessor rescinded a decision terminating

15   TPS for El Salvador. 90 Fed. Reg. 8806 n.2. Of course, even a consistent prior agency practice of

16   vacatur could not render it lawful if it violates express statutory requirements, but there is no such

17   regular practice here. The Biden-era rescissions of June 21, 2023 were the first and only such

18   decisions in the statute's thirty year history, and they rescinded terminations, not extensions.

19   Moreover, those terminations had been *enjoined for five years*; they never took effect. Agencies have

20   flexibility to undo decisions already found unlawful by courts. *United Gas Improvement Co. v.*

21   *Callery Props., Inc.*, 382 U.S. 223, 229–30 (1965) (agency had power to "undo what is wrongfully

22   done" when original decision never became final and was overturned on judicial review). Equally

23   important, those rescissions set aside terminations, which do not implicate the reliance interests

24   underlying TPS. *Cf. McAllister v. United States*, 3 Cl. Ct. 394, 398 (1983) (agency lacked

25   reconsideration authority to correct error where plaintiff relied on initial decision).

26        Finally, any assertion by Defendants that their vacatur was permissible on the theory that the

27   January 17, 2025, extension was premature misreads the statute. The statute required a decision "at

28   least 60 days before" the end of the prior period, which was February 1, 2025. 90 Fed. Reg. 8806; 8

U.S.C. § 1254a(b)(3). DHS has historically published TPS decisions as early as 159 days before expiration of a previous extension. *See, e.g.*, 73 Fed. Reg. 57128 (Oct. 1, 2008) (publishing extension 159 days before expiration); 78 Fed. Reg. 32418 (May 30, 2013) (publishing extension 102 days before expiration). Nor is it unusual to extend protections shortly before a new Administration starts. Indeed, President Trump designated Venezuela for DED on the last day of his first term. *See* Presidential Memo. on Deferred Enforced Departure for Certain Venezuelans (Jan. 19, 2021), *available at* https://trumpwhitehouse.archives.gov/presidential-actions/memorandum-deferred-enforced-departure-certain-venezuelans/.

In short, no matter how one construes the TPS statute, Secretary Noem exceeded her authority by purporting to vacate a duly adopted, and already effective, extension. For this reason alone, Plaintiffs have established a likelihood of prevailing on the merits.

**B.     Even if DHS Had Vacatur Authority, the Vacatur Violated the APA for at Least Three Separate and Independent Reasons, Each of Which Warrants Postponement.**

In her "Reasons for the Vacatur," the Secretary found no error in Secretary Mayorkas's January 17, 2025 determination that Venezuela met the conditions for TPS designation. 90 Fed. Reg. 8807. Instead, she took issue with the registration process he established, relying on reasoning that is contrary to the law and fails to account for obvious and less draconian alternatives. Each of these defects shows that Plaintiffs will likely prevail on their APA claims.

*1.     The vacatur is founded upon legal errors.*

"If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case." *FEC v. Akins*, 524 U.S. 11, 25 (1998); *Grand Canyon Univ. v. Cardona*, 121 F.4th 717 (9th Cir. 2024) (setting aside agency action due to legal error); *Nw. Env't Defense Ctr. v. Bonneville Power Admin.*, 477 F.3d 668 (9th Cir. 2007) (agency decision based on misinterpretation of its own legal authority violated APA). The vacatur rests on two legal errors, which individually and collectively warrant postponement.

*First*, Secretary Noem's order misunderstands TPS redesignations. She objects that "[t]he Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation." 90 Fed. Reg.

8807. But there is nothing novel about a country being designated for TPS multiple times, and every earlier designation is "subsum[ed]" by a later one because redesignation *expands* the pool of potential beneficiaries to include not only those who qualified under an earlier designation, but also those who arrived *after* their country was first designated. *See* 8 U.S.C. § 1254a(c)(1)(A)(i) (TPS applicants must have been "continuously physically present in the United States since the effective date *of the most recent designation* of [their country]").[2] Thus, TPS holders who initially registered for TPS under Venezuela's 2021 designation had to prove they remained continuously present since March 9, 2021. 86 Fed. Reg. 13575. Accordingly, they necessarily also satisfied the later continuous presence requirement in Venezuela's 2023 re-designation. 88 Fed. Reg. 68134 (setting October 3, 2023 continuous presence date); 8 CFR § 244.14(a)(2) (TPS holders must maintain continuous physical presence to remain eligible for TPS).

*Second*, Secretary Noem's order misunderstands the TPS registration process. Secretary Noem critiques Secretary Mayorkas's decision to allow 2021 TPS recipients to register under the 2023 designation as not "consistent with the TPS statute." 90 Fed. Reg. at 8807. But in contrast to the TPS statute's strict, mandatory instructions for designating countries for TPS, the statute gives the Secretary broad flexibility regarding how to register individuals for TPS. It requires only that TPS holders register "during the initial registration period announced by public notice," 8 C.F.R. § 244.2(f)(1), and then periodically thereafter "in accordance with USCIS instructions." 8 C.F.R. § 244.17(a); *see also* 8 U.S.C. 1254a(c)(1)(A)(iv) (requiring that applicants register "to the extent and in a manner which the [Secretary] establishes"). Moreover, all Venezuela 2021 TPS recipients necessarily filed initial applications during the initial registration period established by the 2021 designation. The January 2025 extension merely provided new instructions for *re*-registrations.

Secretary Mayorkas's decision in the January 2025 Extension to instruct beneficiaries who initially registered under the 2021 designation to re-register under the 2023 designation was thus entirely consistent with the statute. Indeed, it is DHS's standard practice to have a single re-

---

[2] The statute "explicitly contemplates more than one designation" for a country. 62 Fed. Reg. 16608-1. *See, e.g.*, 64 Fed. Reg. 61123 (1999 redesignation of Burundi); 66 Fed. Reg. 18111 (2001 redesignation of Angola); 76 Fed. Reg. 29000 (2011 redesignation of Haiti); 78 Fed. Reg. 1872 (2013 redesignation of Sudan).

registration process for TPS beneficiaries who initially registered under different designations of their country. *See, e.g.*, 78 Fed. Reg. 1872 (re-designating Sudan for TPS); 79 Fed. Reg. 52027 (establishing one re-registration process for all TPS beneficiaries from Sudan, regardless which designation they initially registered under); 88 Fed. Reg. 5028 (permitting "[i]ndividuals who [initially registered for TPS under Haiti's 2010 or 2011 designation and] currently retain their TPS [through June 30, 2024] under the *Ramos* injunction" to "re-register" under a later re-designation to receive TPS through August 3, 2024).

That those instructions resulted in an extension of some beneficiaries' TPS beyond the end date of the designation under which they initially registered (and through the end date of the later re-designation) remained "consistent with the TPS statute." 90 Fed. Reg. at 8807. The statute's fixed 6, 12, and 18 month time periods are for country designations, not individual benefits, 8 U.S.C. § 1254a(b), and the statute explicitly authorizes the Secretary to "stagger the periods of validity of [TPS holders'] documentation and authorization in order to provide for an orderly renewal of such documentation," 8 U.S.C. § 1254a(d)(2).

Because the Secretary erred in assuming that the registration procedures in the January 17, 2025 extension were unlawful, her decision must be set aside. *FEC*, 524 U.S. at 25.

### 2. The vacatur failed to account for alternatives short of termination.

"[W]hen an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy," particularly when "serious reliance interests" are implicated. *DHS v. Regents*, 591 U.S. 1, 30 (2020) (cleaned up) (holding DACA recission arbitrary and capricious where reason given was alleged illegality of one aspect of the program and Secretary failed to consider whether agency could rescind just that aspect of it); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency acted arbitrarily when it addressed problems with automatic seatbelts by rescinding airbag-or-seatbelt requirement without considering airbag-only requirement; agency must articulate a "rational connection between the facts found and the choice made").

Secretary Noem, however, failed to consider whether her objections to consolidation of the registration processes could be resolved by *de-consolidating the registration processes*, leaving

undisturbed other aspects of the extension. Even assuming there was a problem with consolidating the registration periods for both cohorts of Venezuelan TPS holders, the Secretary should have considered this obvious alternative, rather than vacating the whole extension, and for both cohorts. This error was particularly egregious because DHS regularly revises TPS registration processes via Federal Register notice. *See, e.g.*, 77 Fed. Reg. 76503 (Dec. 12, 2018) (extending registration period). This defect also independently shows Plaintiffs are likely to prevail.

### C.    The Vacatur and Termination Decisions Violated The Fifth Amendment.

Secretary Noem's decisions to vacate and terminate TPS for Venezuelans are unconstitutional because they were motivated at least in part by impermissible animus against Venezuelan immigrants, including TPS beneficiaries. The Fifth Amendment's Due Process Clause "contains an equal protection component" prohibiting federal government officials from discriminating on the basis of race, ethnicity, or national origin. *Washington v. Davis*, 426 U.S. 229, 239 (1976); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).[3] Courts' "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment," so cases that analyze equal protection claims under one context apply with identical force to the other. *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 703 (2024) (internal quotation marks omitted).

### 1.    Strict scrutiny applies to Plaintiffs' Equal Protection claims.

Courts utilize strict scrutiny to assess plausible allegations of official decisions motivated, even in part, by a discriminatory purpose. *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (decision that "is not facially discriminatory" is still "unconstitutional if its enactment or the manner in which it [is] enforced were motivated by a discriminatory purpose"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (action subject to strict scrutiny "will be sustained only if [it is] suitably tailored to serve a compelling state interest"). The limited exception for deferential review adopted in *Trump v. Hawaii*, 585 U.S. 667 (2018) does not apply to TPS. *Ramos v. Nielsen*,

---

[3] The doctrinal and factual analysis is the same whether this claim is viewed as about race, ethnicity, or national origin discrimination. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 532 n.6 (1996) (strict scrutiny applies to classifications based on national origin); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 223–24 (1995) (strict scrutiny applies to classifications by ethnicity).

336 F. Supp. 3d 1075, 1105–06 (N.D. Cal. 2018) (rejecting deferential review as to TPS); *cf.*

*Regents*, 591 U.S. at 34 (plurality) (applying *Arlington Heights* for equal protection claim about

DACA).

To prove an Equal Protection violation, plaintiffs must offer "[p]roof of racially

discriminatory intent or purpose." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.

252, 265 (1977). It suffices if "direct or circumstantial evidence" indicates a "discriminatory

purpose" was merely one "motivating factor," not the "sole purpose." *Ave. 6E Invs., LLC v. City of*

*Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016). Courts "[c]onsider the totality of the evidence,"

*Carrillo-Lopez*, 68 F.4th at 1140, and evidence of discriminatory intent can include the sequence of

events leading to a decision, departures from normal procedures or substantive conclusions, the

background of a decision, and disparate impact. *Arlington Heights*, 429 U.S. at 266–67. The

"administrative history may be highly relevant, especially where there are contemporary statements

by" decisionmakers. *Id.* at 268. Even when decisionmakers did not "expressly refer[] to race or

national origin," their use of "code words," "racially-loaded" comments, or "veiled" references can

"demonstrate discriminatory intent"; such statements can still "send a clear message and carry the

distinct tone of racial motivations and implications" and "convey[] the message that members of a

particular race are disfavored." *Ave. 6E*, 818 F.3d at 505–07 (internal quotation marks omitted).

Extensive social science corroborates the common-sense conclusion that racial animus often is

conveyed via code-word and stereotypes. Young Dec. ¶¶ 20–33; *see also* Ex. 20 at 22 (documenting

use of racialized stereotypes about "depraved criminal[s] and rapist[s]"); Ex. 21 at 308 (explaining

the use of "code words" to justify the "oppression of Racial/Ethnic Minorities and immigrants").

### 2. *Discriminatory intent was at least one motivating factor here.*

Even without discovery, Plaintiffs already have compelling direct and circumstantial

evidence of discriminatory intent for each and every *Arlington Heights* factor.

*First*, Secretary Noem made numerous contemporaneous statements that prove her decisions

sprung at least in part from racial animus. *Arlington Heights*, 429 U.S. at 266. She has justified

expelling Venezuelan immigrants with racial stereotypes, labeling them as "dirt bags," "criminals,"

and "vicious," supposedly rendering the U.S. unsafe, on the assumption that many, if not all, are

gang members, ex-convicts, or escaped from mental institutions, even though there is no evidence

for these assertions and the TPS statute effectively forecloses them through its criminal history bars.

Exs. 1-6; Ex. 12; Ex. 14 at 2–3, 5; Ex. 15 at 18–19. Courts have not hesitated to find equivalent

statements labeling people "drug dealer[s]," *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th

Cir. 2004), or about "large families, unattended children, parking, and crime," as adequate to prove

racial animus, *id.*; *accord Ave. 6E*, 818 F.3d at 505–07 (internal quotation marks omitted).

Secretary Noem did not bother with "code words" or "veiled" language. She lumped 600,000

Venezuelan TPS beneficiaries with "members of [the] TdA [gang]," Ex. 15 at 18; *see also* Ex. 12 at

104–105, despite the vanishingly small number of alleged TdA members in the U.S., dearth of

evidence that TdA has a "substantial U.S. presence," and not a shred of proof that any TPS holders

have ties to the gang. Dudley Dec. ¶ 22 (organized crime expert finding that TdA "appears to have

no substantial US presence and looks unlikely to establish one"); Watson & Veuger Dec. ¶ 15 (no

evidence of connection to TPS holders); *see also* Exs. 23, 30, 34. Nonetheless, Noem characterized

the decision to extend TPS for "600,000 Venezuelans" as "alarming when you look at what we've

seen in different states . . . with gangs doing damage and harming the individuals and the people that

live there." Ex. 12 at 104–105. And she asserted that Venezuelan immigrants came straight from

prisons or "mental health facilities," Ex. 15 at 18, despite, again, no evidence whatsoever to support

that claim. Ex. 26 (fact check). Nor did she attempt to reconcile these false claims with the fact that

TPS applicants must undergo criminal background checks and are disqualified if they have more

than a single misdemeanor. 8 U.S.C. § 1254a(c)(2)(B)(i).

*Second*, the "specific sequence of events" leading to the vacatur and termination decisions,

including Secretary Noem's "[d]epartures from the normal procedural sequence" and "[s]ubstantive

departures," further "afford evidence that improper purposes are playing a role." *Arlington Heights*,

429 U.S. at 267. Ordinarily, periodic review of a TPS designation for extension or termination takes

months and involves the input of numerous career specialists. *See Ramos*, 336 F. Supp. 3d at 1082.

Typically, the Refugee, Asylum and International Operations Directorate of USCIS prepares a

Country Conditions Memo, and the Office of Policy and Strategy of USCIS prepares a Decision

Memo containing USCIS's recommendation. The DHS Secretary, who also receives input and

1 | recommendations from the State Department and other government sources, reviews this work

2 | product and makes a final decision. *Id.*

3 |   In contrast, Secretary Noem's TPS vacatur and termination decision-making process took

4 | place over a week, at most. On January 17, 2025, presumably following months of factual input and

5 | analysis, Secretary Mayorkas extended TPS for all Venezuelan beneficiaries until October 2026. On

6 | January 28, 2025, only three days after she was confirmed, Secretary Noem vacated the extensions

7 | (after stating in her confirmation hearing that the extensions were "alarming," Ex. 12 at 104, and, the

8 | previous year, that deportations of Venezuelans should start on "DAY ONE" of President Trump's

9 | term, Ex. 2). The January 28, 2025 decision was memorialized in the February 3, 2025 vacatur order.

10 | Then, on February 5, 2025, she terminated TPS for Venezuelans whose TPS will expire in April

11 | 2025. Compressing a process that usually takes months to mere days is an unprecedented

12 | "departure[] from the normal procedural sequence. *Arlington Heights*, 429 U.S. at 267. This charade

13 | of a decision-making process constitutes further evidence of Secretary Noem's improper

14 | discriminatory purpose.

15 |   *Third*, the "historical background of the decision" shows the elimination of TPS for

16 | Venezuelans is the latest in "a series of official actions taken for invidious purposes." *Id.* As this

17 | court and others found, during the first Trump administration the White House relentlessly pressured

18 | DHS Secretaries to terminate TPS for virtually all recipients. This reflected President Trump's view

19 | that TPS beneficiaries were "people from shithole countries," as opposed to people from countries

20 | "such as Norway"—remarks he continues to defend. *Ramos*, 336 F. Supp. 3d at 1098, 1100

21 | (concluding after extensive discovery that Trump "has expressed animus against non-white, non-

22 | European immigrants" and, through surrogates in the White House, sought to influence DHS

23 | decision-makers); Ex. 16 ("shithole countries" comment); Ex. 24 (defending comparisons between

24 | "nice countries . . . like Denmark, Switzerland" and "Norway" and "unbelievable places and

25 | countries"). Other courts to consider the merits also found the decisions pretextual or otherwise

26 | arbitrary. *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 417 (D. Mass. 2018); *Saget v. Trump*, 375

27 | F. Supp. 3d 280, 354–59 (E.D.N.Y. 2019); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 327–

28 | 28 (D. Md. 2018). This historical context further shows that the second Trump administration's TPS

1    decisions, like those of the first, are motivated by "invidious purposes." *Arlington Heights*, 429 U.S.

2    at 267.

3         *Fourth*, the disparate "impact of the official action," and "whether it bears more heavily on

4    one race," is relevant in assessing discriminatory intent. *Id.* at 266 (internal quotation marks

5    omitted). Here, Secretary Noem's decision to vacate and terminate TPS for hundreds of thousands of

6    Venezuelans with that status "bears more heavily" on people perceived in this country as non-white.

7    Every one of the *Arlington Heights* factors thus demonstrate Secretary Noem's vacatur and

8    termination decisions were motivated at least in part by discriminatory animus against Venezuelan

9    immigrants, violating the anti-discrimination guarantee of the Fifth Amendment, and establishing a

10   likelihood of prevailing on the merits.

11        *Finally*, were the evidence of Secretary Noem's own animus insufficient, the decision would

12   still be unconstitutional in light of direct evidence that President Trump's animus directly influenced

13   her decision. *See, e.g.*, *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) (holding "cat's paw"

14   doctrine recognizes that one official's animus may improperly infect a decisionmaker's action). Her

15   termination order relies almost entirely on President Trump's directives—his Executive Order,

16   "Protecting the American People Against Invasion"; his "recent, immigration and border-related

17   executive orders and proclamations [which] clearly articulated an array of policy imperatives bearing

18   upon the national interest"; his declaration of a "national emergency at the southern border"; and his

19   directive to put "America and American citizens first." 90 Fed. Reg. 9042–43. The upshot is clear:

20   President Trump expected Secretary Noem to terminate TPS for Venezuelans and other non-white

21   immigrants, and she was all too glad to comply, and indeed to adopt President Trump's animus as

22   her own. Accordingly, whether President Trump harbors discriminatory animus against Venezuelan

23   TPS beneficiaries properly bears on this Court's equal protection analysis.

24        Like Secretary Noem, President Trump has championed racial animus against TPS holders

25   generally and Venezuelans in particular. *See generally* Exs. 7–11, 13, 16–19. The phrase "America

26   First" itself invokes a tragic history of racial hatred..[4] For nearly a decade, he has denigrated non-

27   _____

[4] This history is well-documented. *See* Brief of Amici Curiae, *The Anti-Defamation League, et. al*,
28   *Ramos v. Nielson*, Case No. 18-16981, ECF No. 31 at 21 (9th Cir Feb. 7, 2019). Defendants could

white, non-European immigrants and expressed his interest in encouraging migration instead from overwhelmingly white countries. One federal court in this district found at least serious questions as to whether his prior administration's attempt to terminate TPS was motivated by racial animus. *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1097 (N.D. Cal. 2018), *vacated and remanded sub nom.*, *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, op. vacated*, 59 F.4th 1010 (9th Cir. 2023).

President Trump has continued making such statements since that finding. He too has falsely claimed, repeatedly, that Venezuela and other countries had "emptied out" their "jails and mental institutions" into the Ex. 9 at 9–10, 32; Ex. 11 at 11; Ex. 13 at 4–5, 22–23; Young Dec ¶ 30. He has repeatedly referred to Venezuelan immigrants as "animals," and labeled them all as criminals. Ex. 9 at 32–34; Exs. 17, 18, 19, 32,. Unfortunately, such statements follow in a long tradition of racist statements by government officials seeking to justify attacks on immigrant communities, and they plainly reveal President Trump's racial animus against Venezuelans. Young Dec ¶ 31. Because—as recounted in her termination order—Secretary Noem acknowledged that she terminated TPS for Venezuelans under President Trump's influence, his discriminatory purpose supports Plaintiffs' equal protection challenge, giving rise to an independent basis to postpone those decisions as infected by racial animus.

### D.    The Court Has Jurisdiction to Consider Plaintiffs' Claims.

Defendants may argue that this Court lacks subject matter jurisdiction to consider Plaintiffs' claims, but such arguments would be meritless. Plaintiffs assert (1) DHS exceeded its statutory authority in purporting to "vacate" a prior TPS extension decision, because the statute provides no such authority; (2) even if DHS had such authority, DHS acted arbitrarily because its reasons do not support the vacatur decision; and (3) the DHS Secretary was motivated by racial animus in violation of the Fifth Amendment. Those claims are cognizable under the Administrative Procedure Act's general provision for judicial review of agency action, 5 U.S.C. § 702; the general grant of federal question jurisdiction, 28 U.S.C. § 1331; and, as to the constitutional claim, under the Constitution

_____

not identify any other meaning in response to questions from this Court in prior litigation concerning TPS terminations which were justified by the same reasoning. *Ramos*, 336 F. Supp. 3d at 1104.

itself. Federal courts have consistently exercised jurisdiction over challenges to agency action on these bases. *See Biden v. Nebraska*, 600 U.S. ____, 143 S. Ct. 2355, 2375 (2023) (holding agency acted in excess of statutory authority); *Regents*, 591 U.S. at, 33 (holding agency decision arbitrary because not supported by adequate reasoning); *Jean v. Nelson*, 472 U.S. 846 (1985) (addressing challenge to race discrimination in border enforcement).

The government may argue that Congress stripped this Court of jurisdiction to hear cases like this one in the TPS statute, which provides:

> There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

8 U.S.C. § 1254a(b)(5)(A). But that provision bars review only of certain "determination[s]"—those respecting designation, termination, or extension of TPS. By its terms the February 3, 2025 order is none of those, but instead a "vacatur" based on implicit statutory authority.

Even if the February 3, 2025 order were one of the actions specified in Section 1254a(b)(5)(A), it would still be reviewable because Plaintiffs' claims do not challenge any "determination." Determination is a term of art in the jurisdiction-stripping context. Both the Supreme Court and the Ninth Circuit have consistently read that term to preserve review over claims like those Plaintiffs raise. Plaintiffs' first APA claim challenges the agency's asserted authority to vacate prior extension decisions, while the second challenges the rationality of this particular vacatur, and the third challenges the Secretary's motivation on constitutional grounds. None of those claims challenges any "determination" made "with respect to the designation, or termination, or extension" of TPS. Indeed, the conclusions they challenge did not take place in a termination at all, but rather in a purported "vacatur," which the Secretary claims implicit authority to issue.

Governing caselaw confirms that the statute's bar on review of "determinations" does not foreclose Plaintiffs' APA claims. In four separate immigration cases, the Supreme Court and this Court have read jurisdiction stripping statutes that constrain review over "determinations" to not preclude claims challenging agency action that is collateral to the determinations themselves. As *McNary v. Haitian Refugee Ctr.*, the first of these cases, explained, "the reference to 'a

1     determination' describes a single act rather than a group of decisions or a practice or procedure

2     employed in making decisions …." 498 U.S. 479, 492 (1991) (challenge to adjudication procedures

3     did not require review of a "determination"); Congress "could easily have used broader language"

4     had it wanted to bar "all causes … arising under" the statute, or "on all questions of law and fact" in

5     such suits, rather than merely review of a "determination." *Id.* at 492–94; *Reno v. Catholic Soc.*

6     *Servs., Inc.*, 509 U.S. 43, 56–58 (1993) ("*CSS*") (applying *McNary* to find jurisdiction over

7     challenges to practice governing legalization applications); *Immigrant Assistance Project of AFL-*

8     *CIO v. I.N.S.*, 306 F.3d 842, 862–63 (9th Cir. 2002) ("*IAP*") (challenge to rule interpreting the

9     statute cognizable); *Proyecto San Pablo v. I.N.S.*, 189 F.3d 1130, 1138 (9th Cir. 1999) (challenge to

10    pre-adjudication practices cognizable).

11       *McNary* and its progeny confirm this Court has jurisdiction. Under the principle they

12    establish, a claim does not challenge a "determination" unless it seeks relief that would *dictate the*

13    *substantive outcome* of the underlying agency decision. Here, nothing in the relief Plaintiffs seek

14    would bar the Secretary from making a termination decision, provided she follows the timeline and

15    procedures required by the statute and acts with permissible motives. Moreover, the claims Plaintiffs

16    raise concern the legality of the Secretary's vacatur order, which is not itself a decision to terminate

17    TPS status at all. In addition, the substance of the vacatur decision focuses on alleged defects in the

18    TPS registration process, which is addressed in subsection (c) of the statute, whereas the jurisdiction-

19    stripping provision concerns determinations made under subsection (b). 8 U.S.C. § 1254a(b)(5)(A)

20    (prohibiting review of certain determinations "under this subsection"). Plaintiffs' claims thus do not

21    challenge any determination made in a designation, extension, or termination decision, but rather

22    only collateral legal defects in the Secretary's TPS decision-making process.

23       Were there any doubt, it would be resolved in Plaintiffs' favor by an important background

24    principle: "The APA establishes a basic presumption of judicial review [for] one suffering legal

25    wrong because of agency action." *Regents*, 591 U.S. at 16 (internal quotation marks omitted). The

26    Court has applied that "strong presumption" to find review available even under statutes with

27    language far more preclusive than that here. *See, e.g.*, *Bowen v. Mich. Acad. of Fam. Physicians*, 476

28    U.S. 667, 678–79, 681 (1986) (construing statute stating "[n]o action … shall be brought under

section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter," as

inapplicable to general statutory and constitutional challenges) (quoting 42 U.S.C. § 405(h)). Even if

Plaintiffs' claims could be understood to challenge a "determination" under Section 1254a(b)(5)(A),

that provision still would not bar Plaintiffs' claims because they are not brought "under this

subsection," but instead under the APA and the Fifth Amendment. *Johnson v. Robison*, 415 U.S.

361, 367 (1974) ("A decision of law or fact 'under' a statute" means only a decision regarding "the

interpretation or application of a particular provision of the statute ***to a particular set of facts***.")

(emphasis added); *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 274–75 (2016) (APA claim did

not arise "under" analogous provision) (quoting 35 U.S.C. § 314(d)).

   Finally, Plaintiffs' constitutional claim is cognizable for the additional reason that Section

1254a(b)(5)(A) does not mention constitutional claims. The Supreme Court has applied an extremely

stringent clear statement rule in this respect; it has *never* read a stripping provision to entirely

foreclose review of a colorable constitutional claim. Reading this statute to accomplish that result

could well render it unconstitutional. *See Bowen*, 476 U.S. at 680–81 (rejecting "extreme" position

interpreting statute to foreclose constitutional claims). Section 1252(a)(2)(B)(ii) also does not

foreclose review because the TPS statute does not "specif[y]" that the Secretary has discretionary

authority to vacate TPS decisions—it makes no reference to vacatur at all. Nor does it specify the

Secretary has discretion to issue terminations. Rather, it mandates termination if the criteria for

designation no longer exist, and mandates extension if the Secretary determines that the criteria

remain satisfied. 8 U.S.C. § 1254a(b)(3).

## II. VENEZUELAN TPS HOLDERS FACE PROFOUND AND IRREPARABLE HARM.

   The factors bearing on whether to grant a postponement under Section 705 "substantially

overlap with the *Winter* factors for a preliminary injunction," *ILRC*, 491 F. Supp. 3d at 529, which

focuses on the likelihood of "irreparable harm in the absence of preliminary relief," *Winter v. Nat.

Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "It is well established that the deprivation of

constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872

F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further

showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (cleaned up). A procedural injury may also "serve as a basis for a finding of irreparable harm . . . ." *California v. HHS*, 281 F. Supp. 3d 806, 829–30 (N.D. Cal. 2017). A party "experiences actionable harm when 'depriv[ed] of a procedural protection to which he is entitled' under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009) (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002)). For the reasons discussed above, Defendants have violated Plaintiffs' constitutional and statutory rights.

But the irreparable injury here extends far beyond the harms associated with ordinary constitutional violations. Defendants' actions will upend the lives of more than 600,000 Venezuelan TPS holders. In a matter of weeks, nearly 350,000 Venezuelan TPS holders will lose their immigration status and work authorizations. Shortly afterward, another 250,000 Venezuelan TPS holders expect to face a similar fate. These TPS holders live lawfully in this country—working, paying taxes, obeying the law, and contributing to society. *See generally* Pérez Dec. Defendants' actions have already inflicted irreparable injury on thousands of TPS holders and their families who fear what will happen to them in the coming weeks and months. As shown below and in Plaintiffs' declarations, they will suffer significant further irreparable harm if this Court does not issue preliminary relief. *Id.*

If TPS holders lose their legal status, many of them will be at immediate risk of detention at the hands of ICE officials and, potentially, immediate deportation. *See* Tolchin Dec. ¶ 23; *see, e.g.*, E.R. Dec. ¶¶ 2, 18; M.R. Dec. ¶¶ 13, 18; M.H. Dec. ¶¶ 11, 16–17, 20; Arape Rivas Dec. ¶ 14; Vivas Castillo Dec. ¶ 21. Those not arrested will be in a state of limbo—undocumented and without legal authorization to live and work in the United States, but with nowhere to go. *See, e.g.*, Guerrero Dec. ¶ 20; E.R. Dec. ¶ 20; Palma Dec. ¶ 33. Many Venezuelan TPS holders simply cannot safely return to Venezuela because they will suffer severe harm at the hands of the Maduro regime, while others could not return even if they wanted to because they cannot renew their passports. *See, e.g.*, Vivas Castillo Dec. ¶¶ 7–9; E.R. Dec. ¶ 20; Guerrero Dec. ¶¶ , 17; Arape Rivas Dec. ¶ 2; M.H. Dec. ¶ 24; Purica Hernandez Dec. ¶ 10.

Many Venezuelan TPS holders who face grave harm if returned have sought asylum, but

those applications have been pending for years due to a severe asylum backlog. Ex. 22 (estimated wait time of over six years for claims before USCIS, and over four years for claims before EOIR). *See, e.g.*, Guerrero Dec. ¶¶ 6, 14 (sought asylum one month after arrival, application has been pending for nine years); González Herrera Dec. ¶ 6; M. González Dec. ¶ 7. Those applications will not protect such individuals from being arrested and jailed by ICE officers, and those who applied affirmatively remain vulnerable to both detention and deportation (including possibly even summary deportation). Tolchin Dec. ¶ 23. Some will lose other alternative pathways to permanent status as a result of their TPS termination. *See, e.g.*, Arape Rivas ¶ 5; Tolchin ¶ 21.

Many other Venezuelan TPS holders fled in recent years not due to targeted threats to their life and safety that would qualify them for asylum, but because their country was in economic and political ruin. Young Dec. ¶¶ 16, 19; Ferro Dec. ¶ 9; Greenslade Dec. ¶ 7; Ex. 27. TPS provides humanitarian protection for such individuals, as people can benefit from it if they cannot safely return, even if they do not fit the stringent legal requirements of asylum. *See* Tolchin Dec. ¶¶ 16–19, 23. Such individuals face the imminent loss of legal status and work authorization as a result of Defendants' actions. These injuries are severe and irreparable. *See Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) (describing "[t]he severity of deportation" as "the equivalent of banishment or exile" (citation omitted)); *Vargas v. Meese*, 682 F. Supp. 591, 595 (D.D.C. 1987) (recognizing denial of "the benefits of protection from deportation and work authorization, as well as the right to travel outside this country without forfeiting these benefits" is irreparable harm).

Most devastating to many TPS holders is the prospect of family separation. Many Venezuelan TPS holders could be separated from their U.S. citizen children and other family members, while others will be forced to bring their U.S. citizen children to an unknown country facing political and economic collapse. M.R., for example, shares custody of her youngest daughter—a U.S. citizen in kindergarten—with her father. Were she to lose TPS status and be forced to leave, she and her daughter's father would face an impossible choice—either separate the girl from her mother or send her to Maduro's Venezuela. M.R. Dec. ¶¶ 17, 19. Many other Venezuelan TPS holders will face similarly impossible choices if the decisions take effect. M.H. Dec. ¶¶ 19, 21–23; Arape Rivas ¶¶ 13, 20; M. Gonazález Dec. ¶¶ 9, 12; Guerrero Dec. ¶ 12. The Ninth Circuit has

1    repeatedly found family separation constitutes irreparable harm. *See, e.g.*, *Stanley v. Illinois*, 405

2    U.S. 645, 647 (1972) ("[P]etitioner suffers from the deprivation of h[er] child[], and the child[]

3    suffer[s] from uncertainty and dislocation."); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir.

4    2017) (identifying "separated families" as irreparable harm); *Leiva-Perez v. Holder*, 640 F.3d 962,

5    969–70 (9th Cir. 2011); *Ms. L v. ICE*, No. 3:18-cv-00428, Dkt. 83 (S.D. Cal. June 26, 2018).

6         The TPS terminations will also inflict severe economic harm on TPS holders. Without

7    employment authorization from TPS, many will no longer be able to support themselves or their

8    families. M.R., for example, lives with her two daughters and mother. She, her mother, and her older

9    daughter hold TPS, while her younger daughter is a U.S. citizen. She supports the whole family by

10   holding down two jobs, one of which is a full-time job in health care. If she loses TPS, and along

11   with it her work authorization, the whole family will face financial ruin. Her mother suffers from

12   high blood pressure, while her elder daughter has diabetes. Both rely on M.R.'s income for their

13   healthcare needs. M.R. Dec. ¶¶ 7-12, 16. She has suffered increasing anxiety as the TPS termination

14   date nears. Thousands of other TPS holders feel the same way. *See, e.g.*, E.R. Dec. ¶ 17; Vivas

15   Castillo Dec. ¶ 25; Guerrero Dec. ¶ 14; Purica Hernandez Dec. ¶ 9; A.V. Dec. ¶ 14. Others will lose

16   the ability to pursue higher education or job training. *See, e.g.*, González Herrera Dec. ¶¶ 9, 14;

17   Guerrero Dec. ¶¶ 15, 22. Without stable employment, some will lose homes or other material assets.

18   *See, e.g.*, M.R. Dec. ¶ 16; E.R. Dec. ¶ 17; Guerrero Dec. ¶ 24; Arape Rivas ¶ 16; M. González Dec.

19   ¶ 13. The "loss of opportunity to pursue one's chosen profession constitutes irreparable harm." *Ariz.*

20   *Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017); *see also Meese*, 682 F. Supp. at 595

21   (recognizing denial of work authorization as irreparable harm).

22        TPS holders will also, in many cases, lose drivers' licenses, which are tied to legal status in

23   many states. M.H. Dec. ¶ 18; Tolchin Dec. ¶ 23. The loss of the legal right to drive limits their

24   ability to work, care for children, and do basic tasks like shop for groceries. *See, e.g.*, Arape Rivas

25   ¶ 17; M.H. Dec. ¶ 18; A.V. Dec. ¶ 14; Vivas Castillo Dec. ¶¶ 15–17, 25. Others will lose access to

26   essential health care. *See, e.g.*, M.R. Dec. ¶¶ 4, 15; M.H. Dec. ¶¶ 8, 22–23; E.R. Dec. ¶ 22; Palma

27   Dec. ¶ 39. Lost freedom of movement and access to health care are irreparable harms. *Ariz. Dream*

28   *Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (loss of driver's licenses as irreparable

1    harm).

2          Lastly, Defendants' termination of TPS for Venezuelans is inflicting severe, continuing

3    emotional harm on TPS holders and their family-members. For both TPS holders and their families,

4    the consequences of the TPS terminations are enormous and multi-faceted. TPS holders have lost the

5    security of knowing they will be able to live and work safely and freely in the United States so long

6    as conditions in Venezuela remain unsafe. As a result, they are already experiencing resulting

7    anxiety, depression, and fear. *See, e.g.*, A.V. Dec. ¶¶ 12–13; M.R. Dec. ¶¶ 14, 18; M.H. ¶¶ 19–20;

8    E.R. Dec. ¶¶ 15–16, 19; Guerrero Dec. ¶¶ 18–20, 23; Arape Rivas Dec. ¶ 21; Vivas Castillo Dec.

9    ¶¶ 20, 24; González Herrera Dec. ¶¶ 11–13, 15–16; Purica Hernandez Dec. ¶ 7; M. González Dec.

10   ¶¶ 12, 16; Palma Dec. ¶¶ 32, 36–37. The U.S. citizen children of TPS-holders are likewise suffering

11   severe emotional stress from the possibility of being uprooted from the only country they have

12   known or being forcibly separated from one or both parents. *See, e.g.*, M.R. Dec. ¶ 19.

13         These harms are compounded because Venezuelan TPS holders recognize that the

14   government's actions against them are motivated by animus. Many describe being fearful of leaving

15   the house, speaking Spanish, or disclosing their nationality due to the stream of racist invective

16   President Trump and others have spewed against them. *See, e.g.*, Guerrero Dec. ¶¶ 19, 26; Arape

17   Rivas Dec. ¶ 23; E.R. Dec. ¶ 23; Purica Hernandez Dec. ¶ 7; González Herrera Dec. ¶ 17. These

18   emotional and psychological injuries indisputably constitute irreparable harm. *See, e.g.*, *Chalk v.*

19   *United States Dist. Ct.*, 840 F.2d 701, 709–10 (9th Cir. 1988) (explaining "emotional stress,

20   depression and reduced sense of well-being" can constitute irreparable injury); *Norsworthy v. Beard*,

21   87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015) ("Emotional distress, anxiety, depression, and other

22   psychological problems can constitute irreparable injury."); *Petties v. D.C.*, 881 F. Supp. 63, 68

23   (D.D.C. 1995) (recognizing stress, anxiety, and deteriorating scholastic performance caused by

24   uncertainty about government action constitutes irreparable harm).

25         Defendants' unlawful termination of TPS imposes and will continue to impose irreparable

26   harms on Venezuelan TPS holders, their families, and their communities. Absent judicial

27   intervention, the severity of the harms Venezuelan TPS holders face will grow.

28

### III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF POSTPONEMENT.

The final two considerations—the balance of the equities and the public interest—merge when the government is a party. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). In assessing these factors, courts consider the impacts of the relief sought on nonparties as well. *Id.* Where plaintiffs establish "a likelihood that Defendants' policy violates the U.S. Constitution, they also "establish[] that both the public interest and the balance of the equities favor" interim relief. *Brewer*, 757 F.3d at 1069. So too for APA violations: the "public interest is served when administrative agencies comply with their obligations under the APA." *HHS*, 281 F. Supp. 3d at 831–32 (finding "the public interest favors the granting of a preliminary injunction") (quoting *N. Mariana Islands*, 686 F. Supp. 2d at 21).

Other public interests and equities overwhelmingly support Plaintiffs' motion. The harms resulting from the termination of TPS extend well beyond the TPS holders and their families, causing myriad social and economic harms to communities across the United States. *See, e.g.*, Ferro Dec. ¶¶ 13–15, 18–19. Venezuelan TPS holders pay millions of dollars in tax and contribute millions more to Social Security every year. Lost employment alone could cost the national economy $3.5 billion dollars annually. Card Dec. ¶ 9(i); *see also* Watson & Veuger Dec. ¶¶ 20–22; Perez Dec. ¶¶ 5–6; Morten Dec. ¶¶ 4–8. Courts may consider "indirect hardship" when issuing injunctive relief. *Hernandez*, 872 F.3d at 996.

In contrast, Defendants will suffer no material harm. Any assertion that the continued presence of TPS holders in the United States causes harm to the national interest[5] is undercut by the recognition that all TPS applications are individually reviewed by USCIS and all applicants submit to a background check.[6] Defendants' reliance on assertions that Venezuelan TPS holders are, or are associated with, a Venezuelan gang rests on a lie. No evidence supports that specious claim. Dudley Dec. ¶¶ 13–19 (TdA "appears to have no substantial U.S. presence and looks unlikely to establish one," and no evidence of TPS holders' involvement with TdA); *see also* Watson & Veuger Dec.

---

[5] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9040-01, 9041 (Feb. 5, 2025).

[6] 8 U.S.C. § 1254a(c)(2)(B)(i).

¶ 15; Young Dec. ¶¶ 3, 11–12 ("characteriz[ation of] Venezuelan TPS holders as dangerous criminals . . . is a false narrative"). Indeed, local government officials pleaded for TPS to be granted more broadly to ensure that the many Venezuelans who had fled to the United States could work legally and would not become dependent on public benefits or private handouts. Defendants' actions would create several hundred thousand new undocumented people in a matter of weeks, thus damaging the public's interest in the economic and social benefits that come with lawful immigration status. *See e.g.*, Watson & Veuger Dec. ¶ 16 (adverse health consequences); Ferro Dec. ¶ 10 (TPS allows Venezuelans to work rather than rely on government benefits, and enhances public safety by reducing fear of interacting with authorities).

Most important for purposes of the equity analysis, if this Court orders a postponement to preserve the status quo, then Defendants' ability to enforce the relevant TPS decisions will merely be delayed pending resolution of this case on the merits. Put another way, if Defendants' conduct was lawful, then the termination decisions will go into effect after a slight delay. In contrast, if Plaintiffs prevail on the merits, then the public interest will have favored them, as Defendants have no interest in enforcing unlawful or unconstitutional decisions. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) ("[The government] cannot suffer harm from an injunction that merely ends an unlawful practice.").

## <u>CONCLUSION</u>

The Court should postpone the effective date of the challenged decisions.

Date:  February 20, 2025

Respectfully submitted,

ACLU FOUNDATION
OF NORTHERN CALIFORNIA

 /s/ *Emilou MacLean*
Emilou MacLean
Michelle (Minju) Y. Cho

Ahilan T. Arulanantham
Stephany Martinez Tiffer
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW

1

2

Eva L. Bitran
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA

3

4

5

Jessica Karp Bansal
Lauren Michel Wilfong (pro hac vice pending *)
NATIONAL DAY LABORER ORGANIZING
NETWORK

6

Attorneys for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28