Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
Stephany Martinez Tiffer (SBN 341254)
martineztiffer@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R., and HENDRINA VIVAS CASTILLO,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA,<br><br>*Defendants*. | Case No. 25-cv-1766<br><br>**DECLARATION OF JOSE A. PALMA JIMENEZ IN SUPPORT OF PLAINTIFFS' MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION** |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Wilfong (*Pro Hac Vice Application Pending*)
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

## DECLARATION OF JOSE A. PALMA JIMENEZ

I, José A. Palma Jimenez, declare:

1. I am Co-Coordinator of the National TPS Alliance (NTPSA). I have worked with the NTPSA in various roles since it was founded in 2017. I served as Co-Coordinator in 2019 and again from June 2023 through the present.

2. As Co-Coordinator, I oversee NTPSA's daily work, including its organizing and advocacy efforts, leadership development, and member relations. I have detailed knowledge about NTPSA's membership, including membership demographics, member needs and priorities, and the role members play in setting NTPSA's mission and advocacy.

3. I make this declaration based on my personal knowledge; files and documents of NTPSA that I have reviewed; and information provided to me by NTPSA leaders who I believe to be reliable, including NTPSA organizers, members of the NTPSA Executive Committee, local Committee Coordinators, and other NTPSA-affiliated staff. These files, documents and information are the type that is generated in the ordinary course of business and that I would customarily rely on in conducting NTPSA business.

**Background on NTPSA**

4. NTPSA is a member-led organization whose mission is to defend the Temporary Protected Status (TPS) program and win a path to permanent residency for TPS holders.

5. NTPSA is a project of, and is fiscally sponsored by, the Central American Resource Center – CARECEN – of California ("CARECEN"), a non-profit organization that has worked for more than four decades to provide immigrant integration programs, deliver immigration legal services, and foster civic participation and community engagement on immigration policy, education reform and workers' rights. CARECEN is incorporated and has its primary address in Los Angeles.

6. The NTPSA is also supported by the National Day Laborer Organizing Network (NDLON), a non-profit organization that improves the lives of day laborers,

migrants, and low-wage workers by building leadership and power among those facing injustice so they can challenge inequality and expand labor, civil, and political rights for all. NDLON provides staffing, mentorship, and other support for the NTPSA. For example, I am employed by NDLON to serve as Co-Coordinator of the NTPSA.

7. Current and former TPS holders, as well as family and other supporters of TPS holders, can become NTPSA members by either joining a local NTPSA committee or submitting an individual membership application. After review and approval, NTPSA notifies individuals whose applications have been accepted. Individuals who are interested in starting a new local NTPSA Committee may do so by sending a letter to the Executive Committee for review and approval.

8. Membership in NTPSA is voluntary and free.

9. NTPSA has TPS holder members from Afghanistan, Burma (Myanmar), Cameroon, El Salvador, Haiti, Honduras, Lebanon, Nepal, Nicaragua, Sudan, Ukraine, Venezuela, and Yemen.

10. NTPSA prioritizes the leadership of TPS holders within our organization and within broader efforts to defend TPS. A slogan we often use is, "Nothing about us without us." We believe that TPS holders need to be at the table for decisions that affect our lives as TPS-holders.

11. I myself am a TPS holder from El Salvador. As a TPS holder, I am able to understand and connect with NTPSA's TPS holder members at a deeply personal level.

12. There are currently 25 local NTPSA committees active in 14 states: Arkansas, California, Florida, Georgia, Illinois, Iowa, Louisiana, Massachusetts, Nebraska, Nevada, New Jersey, New York, North Carolina, Texas, Virginia. Approximately 80 percent of NTPSA's local committee members are TPS holders.

13. In addition, NTPSA has over 84,000 Venezuelan TPS holder members living in all 50 states and the District of Columbia.

14. The NTPSA was founded in June 2017 at a meeting in Washington D.C. called by NDLON and CARECEN to respond to the imminent termination of TPS for

2

Haiti, that had been announced in May of that year.

15. Several hundred people, including myself, attended the June 2017 meeting. At the meeting, attendees—the vast majority of whom were TPS holders—made the decision to form the National TPS Alliance.

16. Today, the NTPSA is led by an Executive Committee, members of which are selected every two years by NTPSA members. The majority of Executive Committee members are TPS holders. The Executive Committee meets regularly throughout the year and makes decisions by majority vote.

17. The NTPSA also maintains working groups on specific subjects, like leadership development and communications. NTPSA members may volunteer to participate in working groups. Working groups meet regularly throughout the year.

18. In addition, the NTPSA generally holds two in-person gatherings a year: a Leaders Assembly, where member leaders participate and elect members of the Executive Committee; and a Coordinators' Meeting, where local committee coordinators meet to strategize.

19. NTPSA operates under a democratic model. Local committees and working groups develop work plans and proposals and send them to the Executive Committee for review and approval via majority vote.

20. When individual members join the NTPSA, they are invited to make suggestions about what they would change about the TPS program. The NTPSA reviews those answers to help determine what projects, campaigns, and other work to take on. NTPSA also continuously gathers feedback from individual members to further shape NTPSA's work.

21. The NTPSA engages in advocacy to defend TPS and win a path to permanent status for TPS holders; organizes actions to raise public awareness about TPS and the contributions TPS holders make to this country; facilitates community and civic engagement by TPS holders; and provides access to timely and accurate TPS-related information and services to its members.

22. For example, in 2018, the NTPSA organized a "Journey for Justice" in which approximately 50 TPS holders, their families, and other civil rights leaders embarked on a journey by bus across the United States to oppose the TPS terminations for El Salvador, Haiti, Honduras, Nepal, Nicaragua and Sudan that were announced in 2017 and 2018. The bus was welcomed by faith and community groups in towns and cities across the country, where riders met with the local community to build support for TPS holders. In 2021, NTPSA organized a similar Journey for Justice, which emphasized both the continuing threat to TPS and the role many TPS holders played in supporting the country through the pandemic as food and healthcare workers. I personally participated in both journeys.

23. The NTPSA has also organized numerous marches, hunger strikes, and teach-ins to defend TPS and call for a path to permanent residency for TPS holders. For example, in 2021, members of the NTPSA held a 43-day rolling hunger strike in Liberty Plaza in Washington, D.C. to call for permanent residency for TPS holders. Throughout the hunger strike, the NTPSA held weekly press conferences, conducted teach-ins, hosted live musical performances, and handed out educational materials.

24. The NTPSA has also kept the TPS community informed about developments in the TPS program via meetings and webinars; social media postings; and a weekly radio show called Radio Alianza TPS.

25. The NTPSA played a key role in explaining the developments in the *Ramos v. Mayorkas* and *Bhattarai v. Mayorkas* litigation, which challenged the 2017 and 2018 terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan (in *Ramos*) and for Honduras and Nepal (in *Bhattarai*), to its members. Throughout the six-year litigation, the NTPSA kept members informed about developments via meetings, conference calls, and written advisories. It also coordinated rallies and press conferences at key hearings, including outside the oral arguments that took place at the Ninth Circuit and *en banc* Ninth Circuit hearings.

26. Since Venezuela was first designated for TPS in 2021, the NTPSA has worked closely with its Venezuelan TPS holder members and the Venezuelan TPS holder

4

community. For example, in 2023 and 2024, NTPSA coordinated approximately 7-10 legal clinics in Baltimore, Boston, California, Georgia, and Houston at which it assisted Venezuelans to register for or renew their TPS.

27. Following DHS's decision to vacate the January 2025 Extension of Venezuela's TPS designation, and terminate Venezuela's 2023 designation, the NTPSA has worked to provide timely, accurate information to Venezuelan TPS holders about the status of Venezuela's designation and to organize a response, including through a virtual community meeting attended by over 1,000 TPS holders that the NTPSA organized just days after the termination order.

**The Vacatur of Venezuela's TPS Extension and the Subsequent Termination of Venezuela's TPS Designation Harm NTPSA's Members**

28. NTPSA's Venezuelan TPS holder members face serious harm from the vacatur of the January 17, 2025 TPS extension and the subsequent decision to terminate Venezuela's 2023 TPS designation.

29. NTPSA's Venezuelan TPS holder members who initially registered under Venezuela's 2023 designation will lose their work authorization on April 3, 2025 and face the prospect of deportation beginning April 7, 2025.

30. NTPSA's Venezulan TPS holder members who initially registered under Venezuela's 2021 designation have seen their period of work authorization and lawful status cut short by 13 months, from October 2, 2026 to September 10, 2025.

31. The vacatur and termination decisions have caused tremendous stress and anxiety for our Venezuelan TPS holder members.

32. Members have called me feeling palpably anxious and desperate, because they do not know what to do. One member began to cry when he told me about his 80-year-old mother, a Venezuelan TPS holder who has been so scared since the termination announcement that she will not leave the house.

33. Many of our members are beginning to make plans for selling their homes and cars, ending their leases, and collecting their belongings in preparation to leave the

5

country. But they do not believe they can safely return to Venezuela because there is no security and the economy is in total collapse. If the United States will not allow them to stay, they do not know where they will go. This problem is even more difficult because many do not have valid passports and are unable to travel.

34. Several of the Individual Plaintiffs in this lawsuit are members of the NTPSA. To further illustrate the harms that Venezuelan NTPSA members face as a result of the actions challenged in this lawsuit, I share below the stories of some of the other individual NTPSA members whom I and other NTPSA-affiliated staff have tried to support during this difficult time:

35. **C.H.,** a NTPSA member in Brooklyn, New York, is a beneficiary of the 2021 Venezuela designation of TPS. She is expecting to lose her TPS in September 2025. She is 42 years old and has lived in the United States since 2019. C.H. applied for asylum soon after she arrived in the United States, but her application has not been processed. An engineer by profession, C.H. has worked for the past four years as a contractor with a prominent electrical company.

36. C.H. has been living in fear since the termination of TPS for Venezuela. She fears that she will lose her legal status and right to remain in the United States; and she cannot safely return to Venezuela due to fear of lack of civil rights, getting jailed, tortured or worse. She has no valid passport and so could not legally travel internationally even if she wanted to leave, because of the lack of a Venezuelan consular office in the United States. While she has a pending asylum application, she is aware that this does not provide her legal status and the right to remain, and that her asylum petition could be denied at any time. She would then have no work authorization, and without that, no ability to pay for her rent, health benefits, and other basic needs, or to provide support to elderly and ailing relatives in Venezuela. C.H. is concerned about the high-level targeting of Venezuelans in particular. She thinks the classification by the president of all Venezuelans as criminals means that people look at her differently and that she will face increasing discrimination. She cancelled recent long-distance travel, and tries to limit her time out of the house, as a

6

result of heightened fears that she will be targeted as a Venezuelan immigrant. She has not slept well, and has suffered ongoing flashbacks to her life in Venezuela—specifically, the destruction of institutions overnight and targeting of vulnerable individuals.

37. **A.N.** lives in Kansas and is a beneficiary of the 2023 Venezuela designation. She is 24 years old and has lived in the United States since 2022. Her parents and boyfriend also have TPS under Venezuela's designation and live in Kansas. A.N. applied for asylum soon after she arrived in the United States, but has not had an interview, or seen any movement on her application. She currently works in the insurance industry, helping elderly people identify their insurance options. A.N. is afraid of losing her TPS because it is all that she is relying on for her legal status. While she has a pending asylum application, which allows her to have work authorization at least so long as her asylum application is not denied, this does not protect her from deportation or immigration detention as her TPS does. As a result, she has felt tremendous fear and vulnerability since the decision by DHS Secretary Noem to terminate TPS for Venezuela. She and her boyfriend have discussed whether they need to leave the country, and they do not know where they could go. They do not feel that they could safely return to Venezuela because they fear being persecuted.

38. A.N. has also felt the painful stigma of President Trump and Secretary Noem's statements labeling all Venezuelans in the United States as criminals. She feels she is between a rock and a hard place—on the one side, she would be persecuted in Venezuela, in part because of her time in the United States, and on the other side, the United States is falsely categorizing her and all Venezuelans as criminals tied to the Tren de Aragua gang, solely by virtue of her nationality. Restoring TPS for Venezuela would alleviate some of the stigma A.N. has felt in connection with the termination of the designation and the President and Secretary's statements about Venezuela.

39. **C.D.**, a 60-year old father of three, holds TPS under Venezuela's 2021 designation. He lives in Houston, Texas, where he and his wife own their own home. They have consistently paid their taxes. C.D. works for a temporary staffing agency and was recently diagnosed with prostate cancer. If he loses his TPS in September 2025 he would

lose his job and be unable to pay for his mortgage and health care, which would be economically devastating for him and his wife. Losing TPS would also expose C.D. to risk of being deported from the United States, which would inflict many harms, including preventing him from accessing the medical care he needs to treat his cancer.

40. **L.G.** holds TPS under Venezuela's 2023 designation. She lives in Houston, Texas with her husband. In Venezuela, L.G. worked as a journalist and, before that, with a professional theatre company. She and her husband came to the U.S. under the CNHV parole program, under sponsorship from her husband's employer. They are now preparing to sell their belongings and return to Venezuela, but they may not be able to afford basic food and medicine if forced to return to Venezuela.

41. **A.G.** lives in South Carolina and has a pending application for TPS under Venezuela's 2023 designation. Under the January 2025 extension, approval of her application would have resulted in TPS and work authorization through October 2026. In Venezuela, A.G. received her degree in engineering and worked in business. A.G. first arrived in the United States in 2021. She fears persecution if she were forced to return to Venezuela, but never filed an asylum application because she believed her partner, a U.S. citizen, would sponsor her for a visa. However, she and her partner have now separated and A.G. is completely dependent on TPS for her lawful status and her work permit. She does not know what she will do if she loses her TPS in April.

42. If this lawsuit were successful in setting aside the vacatur of the January 17, 2025 TPS extension and the subsequent decision to terminate Venezuela's 2023 TPS designation, it would further the interests of the NTPSA's members.

//
//
//
//
//
//

8

1  I declare under penalty of perjury that the foregoing is true and correct, and that this
2  declaration was executed at Los Angeles, California this 19th day of February, 2025.

                                              José A. Palma Jimenez