# EXHIBIT 20

# NOTES

# The Racialization of Crimes Involving Moral Turpitude

Elijah T. Staggers*

## TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

I.   Defining the Phrase "Crime Involving Moral Turpitude" . . . . . .    20
     A.   The Original White Supremacist Trope of Race-Based Morality: The
          Negro "Rascal" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20
     B.   Presumptions of Race-Based Morality in the Immigration Act of
          1917 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23
          1.   Race-Based Morality Shifted During the Progressive Era to
               Target Non-Anglo-Saxon European Immigrants . . . . . . . .    23
          2.   Congress Placed the "Crime Involving Moral Turpitude"
               Section into the Immigration Act of 1917 to Exclude Eastern
               and Southern European Races. . . . . . . . . . . . . . . . . . . . .    24

II.  The Board of Immigration Appeals' Definition of Crime Involving
     Moral Turpitude Improperly Relies on Shifting Societal Views. .    25

III. Exposing the Flaws of the Government's Argument that Criminal
     Street Gang Activity Is a Crime Involving Moral Turpitude  . . .    27
     A.   Hernandez-Gonzalez v. Holder Rejected on Race-Neutral Terms an
          Issue with Clear Racial Implications . . . . . . . . . . . . . . . . . . . . .    27
     B.   Condemnation of Latinness: Creating the MS-13 Animal  . . . . . .    29
     C.   The Latinx Subjugated Knowledge: How U.S. Colonialism Bears
          Moral Responsibility For Creating Latinx Street Gangs . . . . . . . .    31
          1.   The United State as a White Settler Imperialist Machine . .    32
          2.   White Settler Colonialism Prompted Westward Expansion
               and Caused the Displacement and Subjugation of Mexican
               Natives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33
          3.   The United States' Military and Economic Influence Caused
               Mass Migration of Latinx Groups to the United States  . . .    35

   * Editor in Chief, Geo. J. L. & Mod. Crit. Race Pers. (Vol. 11); J.D., Georgetown University Law
Center (2019); M.A., Georgetown University (2016); B.A., University of Georgia (2014). Special thanks to
my mentor, Professor Sherally Munshi, for giving me the courage to write this piece and for guiding me along
the way. © 2020, Elijah T. Staggers.

4. The Ghetto and the Prison: Incubators for Latinx Migrant
   Gangs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38

## INTRODUCTION

The Immigration and Nationality Act ("INA")[1] imposes severe collateral immigration consequences on a non-citizen convicted of a "crime involving moral turpitude."[2] If an individual is convicted of a crime involving moral turpitude within five years of entering the United States and receives a jail sentence of one year or more, the INA permits the deportation or removal of that individual.[3]

The executive branch holds enormous power over the removal of non-citizens. It serves as both the prosecutor and judge during immigration proceedings. The Department of Homeland Security ("DHS"), a creature of the executive branch, initiates and prosecutes removal proceedings against a non-citizen. Immigration judges, appointed by the executive branch, adjudicate these proceedings. Thus, the executive branch enjoys the ability to tilt the scales in its own favor at almost every step of the deportation process.

The United States Courts of Appeals are the saving grace in this system. Under the INA, the courts of appeals possess exclusive statutory jurisdiction to review final orders of removal.[4] Accordingly, the courts of appeals can serve as a check against the executive branch and prevent injustice from occurring. This jurisdiction is particularly important because the courts of appeals have the power to prevent a recent development in immigration jurisprudence—DHS's attempts to categorize criminal gang activities as crimes involving moral turpitude.

DHS recently argued that state statutes criminalizing street gang participation constituted crimes involving moral turpitude, and, in turn, initiated removal proceedings against non-citizens convicted for those crimes in state court.[5] In *Hernandez-Gonzalez v. Holder*, the Ninth Circuit was the first U.S. Court of Appeals to review an immigration court's decision that a criminal street gang participation statute constituted a crime involving moral turpitude for which a non-citizen could be deported under 8 U.S.C. § 1227(a)(2)(A)(i). The Ninth Circuit held that a conviction under California's sentence enhancement statute[6] for a gang-related crime did not constitute a crime involving moral turpitude.[7] The Fourth Circuit reached a similar conclusion in *Cabrera v. Barr*, where it held that a conviction under

---

1. 8 U.S.C. § 1151 *et seq.* (2018).
2. *See* § 1227(a)(2)(A)(i)-(ii).
3. *See* § 1227(a)(2)(A)(i).
4. *See* § 1252(a)(5).
5. *See* Hernandez-Gonzalez v. Holder, 778 F.3d 793, 798 (9th Cir. 2015); Cabrera v. Barr, 930 F.3d 627, 629 (4th Cir. 2019).
6. CAL. PENAL CODE § 186.22(b)(1) (West 2020).
7. *See Hernandez-Gonzalez*, 778 F.3d at 809.

Virginia's criminal street gang participation statute[8] was not a crime involving moral turpitude.[9]

Unfortunately, the decisions in *Hernandez-Gonzalez* and *Cabrera* only serve as persuasive authority among the courts of appeals. Even the Fourth and Ninth Circuits have not decided whether the criminal gang statutes of other states in their circuits are crimes involving moral turpitude. Thus, non-citizen gang members, many of whom are Latinx and black,[10] still face a general risk of deportation if convicted under statutes criminalizing street gang activity.

This Note argues that the executive branch's attempt to remove non-citizens for criminal street gang activity is not an effort to target immoral conduct. Rather, the executive branch is, and has been historically, manipulating the phrase "moral turpitude" to systematically target, condemn, and exclude racial groups deemed socially undesirable. The executive branch pursues this program by relying on longstanding tropes or stereotypes that certain races have inherently immoral traits. Thus, as future courts give legal effect to the INA and determine whether non-citizen racial minorities should be deported for immoral conduct, it is imperative that those courts fully understand the racist presumptions and white supremacist agenda upon which the INA is predicated.

This Note raises two arguments that future courts of appeals ought to consider. First, removing groups of immigrants based on society's judgment of their alleged uniform immorality is an exercise of white supremacy and is patently racist. Second, any moral judgment which a court may levy on minority immigrant gang members must take into account the United States' direct role in creating those gangs through foreign intervention, economic exploitation, and the creation of the Americanized ghetto.

Part I examines the phrase "crime involving moral turpitude" and the racist presumptions inherent therein. Part II argues that the phrase's meaning is unduly influenced by society, politics, media, and the "moral reactions of particular judges," rather than an objective legal standard.[11] Part III illustrates how accepting the government's arguments in *Hernandez-Gonzalez* and *Cabrera* requires accepting propositions about immigrant gang members that are rooted in white supremacy and further a system of colonialism. This section also raises the United States' culpability in creating gangs in the first place. It reveals that the United States seeks to issue moral opprobrium on a group formed through colonialism, economic exploitation, and foreign intervention. The U.S. government's foreign intervention, colonialism, and exploitation that created street gangs ought to mitigate any moral judgment of those gangs that U.S. Courts of Appeals may render.

---

8. VA. CODE ANN. §18.2-46.2 (West 2020).

9. *Cabrera*, 903 F.3d at 638.

10. As of 2011, Latino and black persons comprised more than three quarters of all gang members in the United States; forty-six percent of all gang members were Latino, and thirty five percent were African American. *See Demographics: Age of Gang Members*, NAT'L YOUTH GANG CTR., https://www. nationalgangcenter.gov/Survey-Analysis/Demographics#anchorregm [https://perma.cc/H77F-854Y].

11. *Jordan v. De George*, 341 U.S. 223, 237-38 (1951) (Jackson, J., dissenting).

Geo. J. L. & Mod. Crit. Race Persp.   [Vol. 12:17

## I. Defining the Phrase "Crime Involving Moral Turpitude"

### A. The Original White Supremacist Trope of Race-Based Morality: The Negro "Rascal"

Removing non-citizens for moral transgressions is not new. The United States has done so since slavery, employing tropes of the Negro Rascal, Sambo, and coon.[12] Racists used artfully crafted stereotypes during slavery and Reconstruction to justify the enslavement of blacks or their removal. I suggest those tropes are being repurposed today to justify the government's effort to remove Latinx immigrants through the INA and 8 U.S.C. § 1227(a)(2)(A)(i).

In *Stony the Road: Reconstruction, White Supremacy, and Jim Crow*, Henry Louis Gates, Jr. argues that U.S. society orchestrated a campaign of racial science, journalism, political rhetoric, and folklore to perpetrate a "perverse fiction" of the physical and moral inferiority of blacks in the 1800s during slavery and Reconstruction. This campaign attempted to justify blacks' continued bondage or removal from the United States if freed. Racial pseudoscience during the 1800s laid the foundation for the concept of race-based morality in the United States. The idea originated in 1796 on the European continent when Austrian scientist Franz Joseph Gall's embarked into the field of phrenology, the science of "measuring the skull as a means of measuring personality traits within the brain."[13] The discipline soon spread to the United States. In 1839, physiologist Samuel Morton published *Crania Americana*, a study which correlated skull sizes of various races with their mental capacities.[14] In Morton's scheme, Caucasians ranked at the top of the racial hierarchy because they had the largest skull size, which apparently equated to the "highest intellectual achievements."[15] Caucasians were followed by Mongolians of East Asia, Malaysians of South Asia and the Pacific Islands, Native Americans, and Ethiopians or black people at the bottom.[16] The purported link between a race's skull size and intelligence laid the basis for the body of racist pseudoscience, which concluded that the smaller skull size of darker races meant they had diminished mental capacity and thus the incapacity to make moral decisions.[17]

As the tide began to turn against slavery, pro-slavery American academics and political figures used the allegedly diminished morality and intellectual capacity of black Americans to justify why whites ought naturally to enslave blacks, or remove emancipated blacks from the country.[18] John M. Daniel, the editor of the *Richmond Examiner*, wrote that "[t]he true defense of negro slavery is to be sought in the

---

12. Henry L. Gates, Jr., Stony the Road: Reconstruction, White Supremacy, and the Rise of Jim Crow 56 (2019).

13. Thomas V. DiBacco, *The Frenzy over Phrenology*, Wash. Post (Mar. 8, 1994), https://www.washingtonpost.com/archive/lifestyle/wellness/1994/03/08/the-frenzy-over-phrenology/c7f08143-c219-45fc-b93e-5c85317b3e1a/ [https://perma.cc/W9CY-YCKS].

14. Samuel George Morton, Crania Americana; or, A Comparative View of the Skulls of Various Aboriginal Nations of North and South America 5-7 (John Pennington ed., 1839).

15. *Id.*

16. *Id.*

17. Gates, *supra* note 12, at 60.

18. *Id.* at 63-65.

sciences."[19] In 1851, doctor James Cartwright argued that blacks' "inferior" physical characteristics were symptoms of a disease, "Dyasaethesia Aeothiopica," or "Rascality," which caused them to engage in "much mischief, which appears as if intentional [as] mostly owing to the stupidness of mind and insensibility of the nerves induced by the disease."[20] Cartwright observed, "They break, waste, and destroy everything they handle—abuse horses and cattle—tear, burn or rend their own clothing . . . steal . . . wander about at night, and keep in half nodding sleep during the day. They slight their work . . . for pure mischief."[21] Moreover, Cartwright argued free blacks naturally exhibited these behaviors in an environment absent slavery.[22] Since even free blacks purportedly demonstrated these behaviors, academics believed these characteristics must be inherent within the black race rather than learned or developed. Moreover, the scientific community also thought that blacks would continue to exhibit these destructive behaviors in the United States if freed, and so they must be removed from the country altogether.

President Abraham Lincoln and much of the nation generally shared Cartwright's view about blacks' inferior moral nature. As a result, white supremacists co-opted the pseudo-scientific studies, using their conclusions as evidence to support campaigns to remove blacks from the United States if they were to be emancipated. President Lincoln stated that blacks were a "troublesome presence" in the United States.[23] When Lincoln spoke of his thoughts on the "Negro Problem,"[24] he said, "Free them, and make them politically and socially our equals? . . . My own feelings will not admit of this, and if mine would, we well know that those of the great mass of white people will not."[25] President Lincoln went so far as to spearhead an effort to remove blacks from the United States once freed, naming James Mitchell the Commissioner of Emigration to oversee the colonization or repatriation of freed blacks to Africa, and securing a congressional appropriation of funding for the project.[26]

Failing to eject free blacks after Emancipation, Gates argues that southern "Redemptionists" in the Reconstruction south borrowed racist pseudoscientific findings to create and disseminate stereotypes of blacks that would garner public support for laws that segregated and disenfranchised African Americans as an alternative to removal. Indeed, Gates suggests the Redemptionists were motivated to wage their

---

19. *The True Foundation of Slavery*, NAT'L ERA, Jan. 27, 1853, at 14, https://news.google.com/newspapers?nid=K6kyChav4UkC&dat=18530127&printsec=frontpage&hl=en [https://perma.cc/BU7U-BZC6].

20. Samuel A. Cartwright, *Diseases and Peculiarities of the Negro Race*, *in* 11 DEBOW'S REVIEW 64-74 (July 1851), *reproduced by* PBS, https://www.pbs.org/wgbh/aia/part4/4h3106t.html [https://perma.cc/H7KD-ZSHE].

21. *Id.*

22. *Id.*

23. Nikole Hannah-Jones, *Our Founding Ideals of Liberty and Equality Were False When They Were Written. Black Americans Fought to Make Them True. Without This Struggle, America Would Have No Democracy at All*, N.Y. TIMES, Aug. 18, 2019, at 24.

24. Whether to emancipate enslaved blacks, and if so, whether integrate them into U.S. society or expel them from the United States altogether.

25. Hannah-Jones, *supra* note 23.

26. *Id.*

propaganda campaign to reclaim the legislative halls of southern states because they believed that blacks were intellectually and temperamentally incapable of governing. Henry W. Grady, editor of the *Atlanta Constitution* and namesake of the University of Georgia College of Journalism and Mass Communication, provides a glimpse into the minds of the predicament that white southerners faced—a Reconstruction government led by former slaves turned black statesmen:

> In less than twelve months from the day he walked down the furrow a slave . . . a negro dictated in the legislative halls from which Davis and Calhoun had gone forth, the policy of twelve commonwealths. . .From the proven incapacity of that day has he far advanced? . . . [I]s he a safer, more intelligent citizen now than then?[27]

As Nathaniel S. Shaler bluntly wrote, it was "clear that the inherited qualities of the negroes to a great degree unfit them to carry the burden of our own civilization."[28]

The African American stereotypes employed during Jim Crow laid the foundation for the modern tropes of black and Latinx immigrants, particularly the stereotype of the depraved criminal and rapist. Possibly the most prominent stereotype promulgated during Jim Crow was that black men had a "natural propensity to rape," especially in "packs" of two because of the purported inherent bestial, impulsive, and depraved nature of African Americans. The *Charlotte News* published an article in 1909, describing a "black brute" who attempted to carry out his "fiendish designs . . . on four white women in two days," highlighting the insatiable nature of black men to rape.[29] The article asked: "But what about next time? Because surely there would be a next time."[30] In 1892, the *Memphis Daily Commercial* published an article stating "the frequency of these lynchings calls to attention to the frequency of the crimes which cause lynching," highlighting the "barbarism" with which "roving Negro ruffians" allegedly commit the crime of raping white women.[31]

It is then evident that American conceptions of race-based immorality and inferiority originate from pseudoscientific stereotypes about blacks during slavery and Reconstruction. The U.S. government, academic circles, and mainstream society relied on tropes about the propensities of the "Negro Rascal" to justify removing blacks from the country or keeping them enslaved. Discussed below, many white Americans continue to uniformly categorize all racial minority immigrant gang members as "violent animals" and "rapists" in an effort to generate public fear and support for harsh criminal penalties or deportation. Just as Redemptionist southern states relied on scientifically supported race-traits to remove or subjugate the

---

27. Henry W. Grady, *The South and Her Problems*, *in* THE COMPLETE ORATIONS AND SPEECHES OF HENRY W. GRADY 23, 30 (Edwin DuBois Shurter ed., 1910).

28. Nathaniel S. Shaler, *The Negro Problem*, ATLANTIC (Nov. 1884), https://www.theatlantic.com/magazine/archive/1884/11/the-negro-problem/531366/ [https://perma.cc/Y65P-BF7S].

29. *White Women in Danger*, CHARLOTTE NEWS, *reprinted in* SALISBURY (NC) POST, Dec. 21, 1909.

30. *Id.*

31. Ida B. Wells, *More Rapes, More Lynchings*, *in* SOUTHERN HORRORS AND OTHER WRITINGS: THE ANTI-LYNCHING CAMPAIGN OF IDA B. WELLS, 1892-1900, 62-63 (Jacqueline J. Royster ed., 1997).

"troublesome" Negro race, so would Congress use the proxy of "crimes involving moral turpitude" in the Immigration Act of 1917, and later the INA to exclude those races it thought were predisposed to immoral conduct.

### B. Presumptions of Race-Based Morality in the Immigration Act of 1917

#### 1. Race-Based Morality Shifted During the Progressive Era to Target Non-Anglo-Saxon European Immigrants

Racial pseudoscience and uniform moral judgments about race dominated elitist circles during the early twentieth century Progressive Era. However, Progressive Era racial science shifted focus away from the moral ineptitude of blacks and focused on that of non-Anglo Saxon Europeans. The Progressive Era's racial stereotyping that underlies the INA is distinct from the notion of raced-based morality of Reconstruction in two important ways. First, the eugenics movement characteristic of the Progressive Era transformed racial pseudoscience from studies in academic journals into a full-fledged social theory. British biologist Francis Galton, credited as the originator of the term "eugenics," argued that the human race could and should "shape and control nature through the application of science and technology," particularly by selective breeding and cohabitation to "create a genetically superior race and to eliminate an inferior race."[32] Second, white Americans created a hierarchy of whites into different "races" that originated from various nations in Europe, restructuring the previous divisions of white and nonwhite (i.e., black). Progressive Era eugenics developed in response to a large influx of Eastern and Southern Europeans, who were now viewed as inferior to Western Europeans.

Despite this shift, both Progressive Era and Reconstruction Era race-based morality relied on scientific studies. Progressive Era race stereotypes are rooted in Herbert Spencer's 1863 publication, *Principles of Biology*, where he promulgated a theory of social Darwinism. Subsequently, sociologists looked for data to prove Spencer's theory, that Anglo-Saxons were the inherently superior and dominant race as opposed to whites from other parts of Europe.[33] The 1890 census provided sociologists with the data to support their conclusions. The census revealed, among other things, that the mortality rate of blacks was higher than that of whites.[34] The census also showed that blacks and non-Anglo Saxon Europeans had higher crime rates than Anglo-Saxons.[35] In *Race Traits and Tendencies of the American Negro*, Frederick Hoffman interpreted this raw data by positing that racial minorities' higher mortality rates were caused by their "self-destructive tendencies."[36] These sociological studies provided the basis for the construction of a racial and moral hierarchy where "Anglo-

---

32. Adam S. Cohen, *Harvard's Eugenics Era*, Harv. Mag. (Mar. to Apr. 2016), https://harvardmagazine.com/2016/03/harvards-eugenics-era [https://perma.cc/LL2J-UWEJ].

33. Khalil Muhammad, The Condemnation of Blackness: Race, Crime, and the Making of Modern Urban America 24 (2010).

34. *Id.* at 35.

35. *Id.*

36. Muhammad, *supra* note 33, at 35.

Saxons naturally dominated the Celts and Mediterranean peoples of Europe, and whites naturally dominated blacks in America."[37]

Though the theory began in mostly elitist academic circles, most notably at Harvard University,[38] newspapers and magazines, particularly in the Northeast, soon disseminated the racial hierarchy outside of academia to the mass public. This included writing that "the 'belligerent Irishman,' the 'tight-fisted Scotsman,' and the 'dumb Swede' were inherently less objectionable than the 'lazy, improvident, child-like, irresponsible, chicken-stealing, crap-shooting, policy-playing-razor-toting, immoral and criminal' Negro."[39] Concepts of race-based morality were widely accepted among the general public and would shape the construction of subsequent legislation.

   2.  Congress Placed the "Crime Involving Moral Turpitude" Section into the
       Immigration Act of 1917 to Exclude Eastern and Southern European Races

The legislative history of the Immigration Act of 1917 demonstrates that Congress used the nebulous phrase "moral turpitude" as a proxy to exclude migrants with disfavored "racial vices or habits."[40] A congressional commission recommended ten years prior that Congress pass new legislation to restrict the influx of races deemed undesirable; they were regarded as unskilled laborers, polygamists, intellectually disabled, criminals, or of unfit moral character.[41] Congress looked to race (truly nationality) as a proxy for those qualities. Senator Reed stated in a floor debate, "the purpose of this [Act] is to exclude the peoples from the south of Europe"[42]—those undesirables—and "preserve the purity of our race"[43] from those with inferior qualities. One 1914 House Committee Report took care to note Southern and Eastern European immigrants were generally unskilled laborers, with an "absence of family life."[44] Congress understood that including the moral turpitude clause in the statute would "cut out nearly fifty percent of South Italians, more than thirty-five percent of Greeks, Poles, Syrians, and other of the undesirable classes . . . people that are becoming a menace to the economic conditions of our country," while "those from northwestern Europe will not be affected at all."[45]

Thus, Congress has long used morality as a proxy for race to exclude immigrants of certain "undesirable races." Congress sought to exclude Eastern and Southern Europeans by creating certain standards for admission in the Immigration Act of 1917: skilled laborers of moral character. By excluding immigrants lacking moral

---

37.  *Id.* at 24-25.
38.  *See generally* Cohen, *supra* note 32.
39.  *Id.* at 26.
40.  *Hindu Immigration: Hearing Before the H. Comm. on Immigration*, 63rd Cong. 22 (1914) (statement of Congressman James Manahan).
41.  *Id.*
42.  *Id.*
43.  *Id.*
44.  H.R. Doc. No. 63-149, at 4 (1913). The record also noted that it was particularly true that Italians committed homicides and crimes of violence disproportionately. *Id.* at 3.
45.  H.R. Doc. No. 62-559, at 4 (1912).

turpitude from the United States, Congress sought to exclude Eastern and Southern Europeans while permitting Western Europeans—purportedly skilled laborers of moral character—to enter. As the next section will explore, jurists have long recognized the elusiveness of the phrase "moral turpitude," and the danger in reaching uniform conclusions about morality on a group-wide basis.

## II. THE BOARD OF IMMIGRATION APPEALS' DEFINITION OF CRIME INVOLVING MORAL TURPITUDE IMPROPERLY RELIES ON SHIFTING SOCIETAL VIEWS

Congress did not define the term "crime involving moral turpitude" in the Immigration Act of 1917.[46] The phrase lacked a settled public meaning at that time.[47] Although it was likely that "Congress contemplated that the agency charged with administering the statute would define the term, and specifically would tailor the definition . . . [t]he Board of Immigration Appeals has done neither," at least not to any discernable level.[48] To the extent the Board of Immigration Appeals (BIA) attempted to define a "crime involving moral turpitude," courts have consistently criticized these attempts as a "murky statutory standard"[49] "in all its vagueness, rife with contradiction,"[50] that is "amorphous,"[51] "nebulous,"[52] and "plastic."[53]

The BIA defines a crime involving moral turpitude as a crime that is "inherently base, vile, or depraved, contrary to the accepted rules of morality and the duties owed between man and man, either one's fellow man or society in general."[54] Many courts distill this definition, generally holding that every crime involving moral turpitude requires two elements: (1) a depraved mental state and (2) morally reprehensible conduct. However, in Judge Posner's concurrence in *Arias v. Lynch*, where the Seventh Circuit examined whether the BIA's determination that an immigrant using a false social security number was a crime involving moral turpitude, he noted the words in the definition were "gibberish" and "virtually dropped from the vocabulary of modern Americans."[55] He queried, "What does 'public conscience' mean? What does inherently base, vile, or depraved . . . mean, and how do these terms differ from the 'duties owed between persons or to society in general'? And—urgently—what is depravity?"[56] In his view, the "repetition of clichés attempting to define moral

---

46.  *See Restriction of Immigration: Hearings Before the H. Comm. on Immigration and Naturalization*, 64th Cong. 8 (1916).

47.  "Mr. Sabath[:] 'But you know that a crime involving moral turpitude has not been defined. No one can really say what is meant by saying a crime involving moral turpitude.'" *Restriction of Immigration: Hearings Before the H. Comm. on Immigration and Naturalization*, 64th Cong. 8 (1916) (statement of Rep. Adolph J. Sabath, Member, H. Comm. on Immigration and Naturalization).

48.  Islas-Veloz v. Whitaker, 914 F.3d 1249, 1258 (9th Cir. 2019).

49.  Bobadilla v. Holder, 679 F.3d 1052, 1053 (8th Cir. 2012).

50.  Arias v. Lynch, 834 F.3d 823, 835 (7th Cir. 2016) (Judge Posner, concurring).

51.  Partkya v. Attorney General, 417 F.3d 408, 409 (3d Cir. 2005).

52.  Matter of Flores, 17 I. & N. Dec. 225, 227 (BIA 1980).

53.  Ali v. Mukasey, 521 F.3d 737, 739 (7th Cir. 2008).

54.  Matter of Zaragoza-Vaquero, 26 I. & N. Dec. 814, 815 (BIA 2016).

55.  *Arias*, 834 F.3d at 831 (Judge Posner, concurring).

56.  *Id.*

turpitude" serve to confuse rather than clarify.[57]

The BIA also states that crimes involving moral turpitude are *malum in se* (bad in and of itself), as opposed to *malum prohibitum* (bad simply because it is illegal).[58] This distinction is problematic for at least two reasons. First, as Justice Jackson's dissent in *Jordan v. De George* points out, this distinction originally made at common law "freely blended religious conceptions of sin with legal conceptions of crime."[59] Blackstone defined crimes *malum in se* as "crimes forbidden by the superior laws" because they violate "rights then which God and nature have established . . . natural rights such as are life and liberty, . . . the worship of God, the maintenance of children."[60] Whereas "crimes *malum prohibtum* enjoin only positive duties . . . without mixture of moral guilt"[61] such as "jaywalking and running a stoplight."[62] This distinction fails to guide litigants and the court, because "[i]rrationality is inherent in the task of translating the religious and ethical connotations of the phrase into legal decisions."[63]

Second, the distinction between crimes *malum in se* and *malum prohibitum* is a "paper thin" distinction.[64] The Ninth Edition of Black's Law Dictionary notes "the distinction between offenses *mala in se* and offenses *mala prohibita* . . . has been criticized repeatedly.[65] About a century and a half ago, the distinction was said to be "not founded upon any sound principle" and which had "long since exploded."[66]

Attacking the ambiguity of "crime involving moral turpitude" is not new. In *Jordan v. De George*, the Supreme Court held that an Italian non-citizen's conviction for conspiracy to violate the Internal Revenue Code constituted a crime involving moral turpitude under the Immigration Act of 1917.[67] In dicta, the majority concluded *sua sponte* that the statute was not unconstitutionally vague, although this was unnecessary for the holding and neither party raised the issue or briefed it.[68] Justices Jackson, Black, and Frankfurter dissented from the majority's holding and subsequent conclusion on the vagueness issue. Those three justices found the government's proffered definition of "crime involving moral turpitude" unworkable, concluding it was an "undefined and undefinable standard."[69]

Justice Jackson, writing for the three dissenting justices, reasoned this standard was unworkable because it would require courts to divine "the moral standards that prevail in contemporary society to determine whether violations are generally

---

57. Jordan v. De George, 341 U.S. 223, 239 (1951).
58. Matter of Flores, 17 I. & N. Dec. 225, 227 (BIA 1980).
59. *De George*, 341 U.S. at 237 (1951) (Jackson, J., dissenting).
60. *Id.* at 237 n. 10 (Jackson, J., dissenting) (internal quotation omitted).
61. *Id.*
62. *Malum in se*, BLACK'S LAW DICTIONARY (11th ed. 2009).
63. *De George*, 341 U.S. at 239.
64. Arias v. Lynch, 834 F.3d 823, 832 (7th Cir. 2016) (Judge Posner, concurring).
65. *Malum in se*, *supra* note 63.
66. *De George*, 341 U.S. at 240.
67. *Id.* at 229.
68. *Id.*
69. *Id.* at 232-45 (Jackson, J., dissenting).

considered essentially immoral."[70] Indeed, "moral standards . . . may not be uniform in all parts of the country, nor in all levels of contemporary society."[71] They can also change over time. Justice Jackson also observed that a court's conclusion about which crimes involved moral turpitude depended "upon the moral reactions of particular judges to particular offenses," and "end up by condemning all that we personally disapprove and for no better than that we disapprove of it."[72] This type of analysis, Justice Jackson stated, constituted government by men, not by law.[73]

The actual dispositive factor for whether a non-citizen's conviction for criminal street gang activity constitutes a crime involving moral turpitude is not the legal standard articulated by BIA. It is society's current approval or disapproval towards groups of minorities engaging in criminal activity. The next section will explore how the government's conclusion—that criminal street gang activity is "depraved"— requires accepting the uniform characterization of all members in the group as bestial criminals, as modern rhetoric has indeed attempted to cast them.

## III. EXPOSING THE FLAWS OF THE GOVERNMENT'S ARGUMENT THAT CRIMINAL STREET GANG ACTIVITY IS A CRIME INVOLVING MORAL TURPITUDE

### A. Hernandez-Gonzalez v. Holder *Rejected on Race-Neutral Terms an Issue with Clear Racial Implications*

The government has twice argued that criminal gang participation statutes are categorically crimes involving moral turpitude—once in *Hernandez-Gonzalez* and again in *Cabrera*. The government's argument relies on two premises rooted in white supremacy. First, to accept the government's argument, the court must conclude that every member of a gang is evil and depraved regardless of their level of involvement in the gang, or their motive for joining. Second, the government's argument requires a court to determine immigrant gang criminal activity is morally reprehensible conduct. But this conclusion does not consider or adequately weigh the United States' white-settler, imperial, and capitalist practices that created the conditions for the gang activity to occur.

In *Hernandez-Gonzalez v. Holder*, the Ninth Circuit held that a conviction under California's sentence enhancement statute for gang related crime, California Penal Code § 186.22(b)(1), was not categorically a crime involving moral turpitude. Following the Supreme Court's test articulated in *Taylor v. United States*,[74] the Ninth Circuit applied the categorical approach of determining whether a crime involved moral turpitude. This test compares the BIA's definition of a crime involving moral turpitude to the elements of the state offense, without considering the facts

---

70. *Id.* at 237-38.
71. *Id.* at 238.
72. *Id.* at 235-38.
73. *Id.* at 240.
74. *See* Taylor v. United States, 495 U.S. 575, 600-01 (1990) (instructing courts to use the "categorical approach" to determine whether a specific offense meets the definition of "violent felony" in the Armed Career Criminal Act, which authorizes a sentence enhancement for any defendant convicted of a "violent felony").

of any defendant's particular conviction. The BIA then determines whether the minimum conduct and *mens rea* necessary for a conviction under the state law meets the federal crime involving moral turpitude standard.[75] However, if less exacting criminal activity is punishable under the state law than what the federal standard requires, the state law is not a crime involving moral turpitude.

The California statute before the court in *Hernandez-Gonzalez* added a two-year sentence for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."[76] It also prohibited certain felonies which the BIA previously held were not independently crimes involving moral turpitude (e.g., simple assault and battery).[77] The government nevertheless argued that even an innocuous crime, when done to "promote, further, or assist criminal activity by gang members" is transformed into a crime involving moral turpitude.[78] In other words, the government argued that any crime committed to "promote, further, or assist criminal activity by gang members" necessarily requires a depraved state of mind, and is morally reprehensible conduct.

The Ninth Circuit disagreed with the government's first argument, reasoning it would require a "moral judgment as to the nature and uniformity of [gang members'] intent," despite the "range of reasons motivating young people to associate with gangs," such as protection of a family member or friend.[79] The court also rejected the government's second argument that the conduct of criminal street gang activity was "inherently reprehensible" because "[c]riminal gangs pose a serious danger to public safety and have a taxing burden on society and our moral culture."[80] The Ninth Circuit stated that the government's argument "mistakes mere criminality for moral turpitude."[81] The government failed to explain why the conduct was inherently base, vile, or depraved as opposed to simply criminal conduct that society rejects. In other words, the Ninth Circuit rejected the Government's argument because the government explained why criminal gang activity is *malum prohibitum*, but not why it is *malum in se*.

Ultimately, the Ninth Circuit held that the California statute was not a crime involving moral turpitude. Unfortunately, the court's rationale speaks in completely race-neutral terms and without reference to how the removal of mostly Latinx immigrants under this statute furthers a regime of white-settler colonialism entrenched in

---

75. "[I]n determining whether a state crime of conviction constitutes a crime involving moral turpitude (CIMT) we apply the categorical approach as set forth in *Taylor v. United States,* 495 U.S. 575 (1990). 'Under the categorical approach, we compare the elements of the crime to the generic definition of moral turpitude and decide whether the [minimum] conduct proscribed in the statute is broader than, and so does not categorically fall within the generic definition." Hernandez-Gonzalez v. Holder, 778 F.3d 793, 801 (9th Cir. 2015) (internal citations omitted).

76. CAL. PENAL CODE § 186.22(b)(1) (West 2020).

77. Hernandez-Gonzalez v. Holder, 778 F.3d 793, 808 n.16 (9th Cir. 2015).

78. *Id.* at 802.

79. *Id.* at 806.

80. *Id.* at 808.

81. *Id.*

a white supremacist racial hierarchy. Because the Ninth Circuit failed to grapple with the racist presumptions lurking in the interstices of the government's premises, this section will explore them for the benefit of future courts who may consider the issue. The next subsections will explore two of the government's arguments which rely on racist assumptions. First, Section III.B will counter the government's arguments that all immigrant gang members are "depraved." Next, Section III.C will counter the government's argument that criminal street gang activity is inherently reprehensible conduct.

### B. Condemnation of Latinness: Creating the MS-13 Animal

Though the government argued that all gang members are uniformly depraved, a careful examination reveals that this trope has been tried and debunked. Like the Negro Rascal and the belligerent Irishman, the depraved MS-13 animal is too a fabricated trope of white supremacy. An unsubstantiated stereotype cannot form a legitimate tool in the law. To decide the legal question of whether an individual is depraved based on a race-based stereotype is to fall into the very trap that Justice Jackson warned of in his *De George* dissent.

The trope casting Latinx (specifically Central American) migrants as uniformly depraved began with rhetoric and media reports in the 1980's and 1990's. This stereotype hides beneath the surface of DHS's arguments. American intervention in this time period led war refugees from Central America and Southeast Asia to flee to the United States. Those groups concentrated in large cities like Los Angeles, and there they formed criminal street gangs like MS-13 or "La Mara Salvatrucha" and the 18th Street Gang. The gangs spread to other cities such as New York and Chicago, and a crime wave ensued.[82] The gang violence in those cities was characterized as a "scourge"[83] that "posed a threat to the American people."[84] Elected officials like Chicago Mayor Richard M. Daley framed a rhetorical war of immigrant gangs versus society and promised to "battle to reclaim our streets and our children from the gangs."[85] More importantly, American society imputed the depravity of the criminal activity to the individual gang member. Then-First Lady Hillary Clinton characterized gang members as "superpredators—no conscience, no empathy."[86] The Clinton administration responded to these pressures by deporting thousands of MS-13 members to El Salvador, Guatemala, and Honduras under the 1996 Illegal Immigration Reform and Immigrant Responsibility Act.

---

82. William Triplett, *Gang Crisis*, 14 CQ RESEARCHER 421, 435 (2004).

83. Matt Canham & Tim Sullivan, *Asian American Gangs a Scourge: Violent Rivals in the Vietnamese, Lao, and Cambodia Communities are Settling Scores at Malls, Amusement Parks; Asian Gangs Target Their Own People*, SALT LAKE TRIB., Apr. 14, 2003, at D1.

84. *Gangs: A National Crisis: Hearings Before the Sen. Comm. on the Judiciary*, 105th Cong. 29 (1997) (statement of Sen. Charles Grassley, Member, Sen. Comm. on the Judiciary).

85. Mayor Richard M. Daley, *Inaugural Address*, CHI. PUB. LIBR. (May 6, 1991), https://www.chipublib.org/mayor-richard-m-daley-inaugural-address-1991/ [https://perma.cc/FK84-AFVY].

86. Allison Graves, *Did Hillary Clinton Call African-American Youth Superpredators?*, POLITIFACT (Aug. 28, 2016), https://www.politifact.com/truth-o-meter/statements/2016/aug/28/reince-priebus/did-hillary-clinton-call-african-american-youth-su/ [https://perma.cc/T7CF-KMDG].

The trope persists today. First as a candidate, President Trump renewed a propaganda war against "illegal immigration." Loosely moored in fact, this propaganda paints groups of Latinx immigrants and vicious street gangs all in the same broad stroke. President Trump's statements link gang violence to Latinx immigration and deportation as the remedy to fight against gangs.[87] In his presidential campaign announcement speech, Trump spoke of Mexican immigrants saying, "[t]hey're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people."[88] President Trump reportedly queried to U.S. Senators in an Oval Office meeting why "all these people from shithole countries come here?"[89] The White House issued a press release in 2018 to educate the public on "What You Need to Know About the Violent Animals of MS-13," which stated President Trump would "bring these violent animals"—not criminals or people, but 'animals'—"to justice."[90] The thing is, this trope is unfounded: "Research has shown virtually no support for the enduring assumption that increases in immigration are associated with increases of crime."[91]

This period of American society—that is, from the 1980s to the present—is merely another iteration of the condemnation of a minority group as criminal. It is another cycle of what minorities experienced during the Reconstruction Era towards African Americans, and in the early 1900s towards Eastern and Southern Europeans.[92] As *Atlantic* contributor Ibram Kendi noted, President Trump's statements reveal with "bracing clarity" a re-kindling in the American consciousness of a racial hierarchy and inherent race traits reminiscent of twentieth century progressive social Darwinism.[93]

As Justice Jackson argued in his De George dissent, the "crime involving moral turpitude" statute is fundamentally flawed because it requires judges to use amorphous social opprobrium as an instrument to determine whether crimes, when committed by certain groups of people are immoral. In this case, racist rhetoric towards Latinx gangs since the 1980s has shaped the views of judges or members of society. So, society's view towards Latinx immigrants, rather than an objective legal standard, will determine whether a non-citizen gang member's criminal street gang activity

---

87. "President Trump has linked gang violence to immigration rates and advocated stricter immigration enforcement as a way to fight gangs. He frequently cites murders and other crimes committed by members of the notorious MS-13 gang, including some who entered the country illegally from Central America." Jane Fullerton Lemons, *Gang Violence*, 28 CQ Researcher 465, 465 (2018).

88. Michelle Ye Hee Lee, *Donald Trump's False Comments Connecting Mexican Immigrants and Crime*, Wash. Post (July 8, 2015), https://www.washingtonpost.com/news/fact-checker/wp/2015/07/08/donald-trumps-false-comments-connecting-mexican-immigrants-and-crime/ [https://perma.cc/FQJ2-LMSF].

89. Ibram X. Kendi, *The Day 'Shithole' Entered the Presidential Lexicon*, Atlantic (Jan. 13, 2019), https://www.theatlantic.com/politics/archive/2019/01/shithole-countries/580054/ [https://perma.cc/2GQJ-H8CD].

90. Press Release, *What You Need to Know About the Violent Animals of MS-13*, White House (May 21, 2018), https://www.whitehouse.gov/articles/need-know-violent-animals-ms-13/ [https://perma.cc/FU86-89FL].

91. Fullerton Lemons, *supra* note 88, at 468.

92. *Id.* at 474-75.

93. Kendi, *supra* note 90.

constitutes a crime involving moral turpitude. As Justice Jackson noted, this is problematic because society will inevitably change which group it holds in contempt. In 2019, media ridicule and populist contempt target Latinx immigrants.[94] But changing the year will easily yield a different racial socially vilified group. If the first question in a court's analysis—whether all members of one group are depraved—depends on "the moral standards that prevail in contemporary society,"[95] then the question truly turns on society's opinion of that group and not on an objective legal standard.

### C.  The Latinx Subjugated Knowledge: How U.S. Colonialism Bears Moral Responsibility For Creating Latinx Street Gangs

The government's next argument, that committing a crime in association with a gang is immoral conduct, ignores the complete history of minority street gangs in the U.S. and why they formed in the first instance. The government conveniently ignores how the United States created the conditions for migrant gang culture to thrive.

This section provides an alternative epistemological framework to understand the development of Latinx gangs and understand whether their conduct is indeed immoral. Michael Foucault presents the notion of an epistemological oppression of marginalized groups.[96] In *Society Must Be Defended*, Foucault argues that the official history articulated by the dominant group becomes the hegemonic epistemological framework of understanding past history and present conditions, while the subjugated group's understanding of those same events becomes "subjugated knowledge."[97] He writes, "the history of some is not the history of others. . . . What looks like right, law, or obligation from the point of power looks like the abuse of power, violence, and exaction when it is seen from the viewpoint of new discourse."[98] As Foucauldian scholar José Medina explains, Foucault's subjugated knowledges are the marginalized perspectives deemed unqualified, unworthy, or simply incoherent with the prevailing epistemological paradigm, and so are ignored.[99] These knowledges are often marginalized, because the majority deems them "hierarch[ically] inferior knowledges" that are "below the required level of erudition or scientificity."[100] The discrediting of these perspectives may be a result of the oppression which subjugated these perspectives in the first instance. Understanding the Latinx subjugated knowledge will call into question whether Latinx street gang activity is truly immoral or reprehensible conduct.

---

94.  Fullerton Lemons, *supra* note 88, at 472.

95.  Jordan v. De George, 341 U.S. 223, 237-38 (1951).

96.  MICHAEL FOUCAULT, SOCIETY MUST BE DEFENDED, LECTURES AT THE COLLÈGE DE FRANCE, 1975-1976 BOOK V, 7-9 (Picador 2003).

97.  *Id.*

98.  *Id.* at 66.

99.  Jose Medina, *Toward a Foucaultian Epistemology of Resistance: Counter-Memory, Epistemic Friction, and Guerilla Pluralism*, 12 FOUCAULT STUDIES 9, 11 (2011).

100.  FOUCAULT, *supra* note 97, at 7-10.

Critical Legal Scholars have indeed integrated Foucault's tradition into legal scholarship. For example, Mari Matsuda uses a "bottom-up approach" to support her argument for reparations for Japanese and Hawaiian victims of United States colonization by articulating the subjugated knowledges of those groups.[101] In doing so, she claims to adopt a "new epistemological source" similar to Foucault's subjugated knowledge that looks to "the actual experience, history, culture, and intellectual tradition of people of color," and "those who have suffered through history" particularly fit when deciding legal issues that affect them and their historical oppression.[102]

Like Foucault and Matsuda, this section takes a bottom-up approach to articulate the Latinx Foucaultian counter-history of the United States' imperialist actions to displace, exploit, and oppress peoples of Mexico and Central America. In doing so, it provides an alternative epistemological framework by which scholars, the public, and the courts can understand the criminal activity of Latinx gangs. This counter-history provides a new normative perspective that might guide a judge or society's decision of whether Latinx immigrant criminal gang activity is immoral, demonstrating that much Latinx migrant gang activity results from resisting decades of colonial white settlerism, displacement, exploitation, and ghettoization.

### 1. The United State as a White Settler Imperialist Machine

Under a theory of American exceptionalism, the United States attempts to distinguish itself as an experiment of democracy in contrast to the European absolutist and imperialist monarchies which preceded it. But the United States shares more with its imperialist forebearers than the white Americentric version of history recognizes.[103]

The Latinx counter-history reframes the United States as a global project of white settler colonialism, making it more like its imperial European forebearers. Recent scholars argue the United States developed a distinct form of global colonial rule similar to the European colonial powers: white settler colonialism.[104] Kelly Lytle Hernández explains that a white settler colony is a project of "building a new, permanent, reproductive, and racially exclusive society" through the displacement of an indigenous group and for the benefit of the white settlers.[105] Aziz Rana suggests that white settler colonialism is a "project of settlement" with the aim of creating "emancipatory conditions for self-government" for the in-group, while expropriating and exploiting out-groups like Native Americans, formerly enslaved blacks, as well as

---

101. *See* Mari Matsuda, *Looking to the Bottom: Critical Legal Studies and Reparations*, 22 Harv. C.R.-C.L. L. Rev. 323 (1987).

102. *Id.*

103. *See* Cass Sunstein, *The Real Meaning of American Exceptionalism*, Bloomberg (Sept. 23, 2013), https://www.bloomberg.com/opinion/articles/2013-09-23/the-real-meaning-of-american-exceptionalism [https://perma.cc/VVE8-VXP4].

104. *See, e.g.*, Aziz Rana, *Colonialism and Constitutional Memory*, 5 U.C. Irvine L. Rev. 263, 263-77 (2015).

105. Kelly Lytle Hernández, City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965, 7 (2017).

Latinx and Asian immigrants through land extraction, labor extraction, and economic exploitation.[106]

In *Colonialism and Constitutional Memory*, Rana collects evidence suggesting that the United States' purpose was to further the twin aims of white settler colonialism: white liberty and indigenous exclusion/conquest.[107] Rana notes the language in the nation's founding documents "intertwined arguments for [white] freedom with a clear drive to pacify those external threats posed by both excluded slaves and expropriated Indians."[108] For example, the Declaration of Independence accused the British Crown of "excit[ing] domestic insurrections amongst us, and . . . endeavor[ing] to bring on the inhabitants of our frontiers, the merciless Indian Savages."[109]

Moreover, before the Civil War, Democratic nominee Stephen Douglas stated in the Lincoln-Douglas presidential debates: "[T]his government was made on the white basis, by white men, for the benefit of white men and their posterity forever, and should be administered by white men and none others."[110] President Abraham Lincoln argued the solution to the "Negro Problem" post-Civil War was to remove African Americans through forced emigration, for African Americans were "a troublesome presence" who were incompatible with a democracy intended only for white people.[111] Because the Democratic and Republican nominees for President both articulated a shared vision of white settler colonialism, it is likely that a substantial portion of nineteenth century white Americans also subscribed to such a model laying the foundation to forcibly remove people of color in the twentieth century and beyond.

### 2. White Settler Colonialism Prompted Westward Expansion and Caused the Displacement and Subjugation of Mexican Natives

The United States' westward expansion was an exercise of white-settler colonialism to displace Native Americans and Latinx peoples, and incorporate democratic state governments in those regions for the benefit of white settlers. The United States' involvement in the Mexican-American War is a consequence of westward expansion and resulted in the expropriation of many Mexicans. Mexico lost the war, and by the terms of the 1848 Treaty of Guadalupe Hidalgo, Mexico ceded much of its lands to the United States. Native Mexicans living in northern lands, known now as Arizona, California, Colorado, Nevada, New Mexico, and Utah, became incorporated into the U.S. political regime by conquest.[112] Juan Gonzalez, creator of the *Harvest of Empire* documentary, suggests that the United States did not want to claim

---

106. Rana, *supra* note 112, at 265-66.

107. *Id.*

108. *See id.* at 271.

109. THE DECLARATION OF INDEPENDENCE para. 29 (U.S. 1776).

110. Senator Stephen Douglas, *Speech at the Third Lincoln-Douglas Debate, Jonesboro, Ill.* (Sept. 15, 1858), *reprinted in* ABRAHAM LINCOLN: SPEECHES AND WRITINGS 1832-1858, 598 (Don E. Fehrenbacher ed., 1989).

111. Hannah-Jones, *supra* note 23.

112. *See* Editors of Encyclopedia Britannica, *Mexican American War*, ENCYCLOPEDIA BRITANNICA, https://www.britannica.com/event/Mexican-American-War [https://perma.cc/2NW4-PSHY].

southern parts of the inhabited Mexican territory, which contained a more concentrated population of Mexicans, because it did not want the U.S. democracy contaminated with the Mexican people.[113] Thus, in the Treaty of Guadalupe Hidalgo, the United States sought those northern Mexican territories because it was the most territory with as few Mexicans as possible.

The terms of the Treaty of Guadalupe Hidalgo required Mexicans living in those northern lands to be naturalized into the United States as U.S. citizens,[114] but Gonzalez suggests many felt alienated and were in fact excluded by U.S. society.[115] After naturalization, the white settler population did not get along well (or at all) with the now Mexican Americans, and white settlers still held racist biases towards that population.[116] Mexican Americans were not accepted, but rather treated as second-class citizens and told to go back to their home to Mexico—notwithstanding they were already living in their native land and their "home" now was the United States.[117] Mexicans and Mexican Americans felt, and many still feel, that the United States and the homesteading settlers stole this part of their country from their ancestors.[118]

As a result of this animosity and exclusion, precursors to the modern Latinx criminal street gangs appeared in the region as early as 1890. Small groups of young Mexican men called the *palomilla* (flock of doves) migrated along a path from Mexico to Los Angeles.[119] These groups who moved freely through the newly formed, yet permeable, southwest border may indeed be some of the earliest examples of undocumented or illegal immigration under the modern territorial boundary between the United States and Mexico.[120]

Although these "nascent gangs"[121] traveling back and forth between the border did not have legal authorization to enter the United States, surely their gang activity—though illegal—does not warrant the blanket conclusion that their conduct is immoral. It simply cannot be, as the government suggests, that this and all criminal street gang activity is inherently reprehensible. The criminal conduct in which the migrating *palomilla* engaged seems to be a crime of necessity spurred by external geopolitical pressures. To conclude that even innocuous gang activity is immoral would do as the Ninth Circuit stated: "mistake[] criminality for moral turpitude."[122]

---

113.  *See* Harvest of Empire (Onyx Films 2012) [hereinafter Harvest of Empire documentary].

114.  Andrew Glass, *U.S. and Mexico Sign the Treaty of Guadalupe Hidalgo, Feb. 2, 1848*, Politico (Feb. 2, 2019), https://www.politico.com/story/2019/02/02/us-mexico-treaty-of-guadalupe-hidalgo-1137572 [perma.cc/UC4C-2HMH].

115.  *See* Harvest of Empire documentary, *supra* note 121.

116.  *Id.*

117.  James C. Howell & John P. Moore, *History of Street Gangs in the United States*, Nat'l Gang Ctr. Bull., Off. Juv. Just. & Delinq. Prevention (Bureau Just. Assistance), May 2010, at 7.

118.  *See* Harvest of Empire documentary, *supra* note 121.

119.  Howell & Moore *supra* note 125, at 7.

120.  *Id.* at 10.

121.  *Id.* at 9.

122.  Hernandez-Gonzalez v. Holder, 778 F.3d 793, 805 (9th Cir. 2015).

### 3. The United States' Military and Economic Influence Caused Mass Migration of Latinx Groups to the United States

After the close of the western frontier, the United States pursued a white-settler colonialist project in Latin America. Though many people in the United States envisioned the government as defending democracy in these countries, this is an overly simplistic characterization. The United States pursued a capitalist-driven, neocolonial project through investing in the region and implementing military interventions to ensure such investments returned profits to the United States.[123]

Juan Gonzalez argues that the large Latinx presence in the United States is a direct result of the government's actions in Mexico and Central American countries over many decades through military occupations, invasions, and providing financial support to government and rebel groups, with the objective of protecting the United States' geopolitical and private economic interests.[124] Gonzalez implicitly identifies the dispossession and exploitation that is characteristic of white settler colonialism. The United States' entanglement with Latin American countries which Gonzalez identified cannot thoroughly be discussed at length here, but a few instances highlight the practices of white settler colonialism common in the U.S. exploitation of Latin America.[125]

The United States' foreign intervention in Latin America traces back to the Spanish American War. After losing the Spanish-American War, Spain relinquished sovereignty over Cuba and ceded Puerto Rico, Guam, and the Philippines to the United States as territories. These islands constitute the most explicit forms of U.S. imperialism, as the United States established military outposts and stabilized those areas for American companies to invest and exploit native land and labor. Puerto Rico, Cuba, Guam, and the Philippines contributed significantly to the U.S. economy, as well as U.S. national security. The United States established military outposts in Cuba, Guam, and other territories, using those islands as strategic holdings to protect the democratic government of the United States and its interests abroad. Although these countries contributed land, resources, and security to the United States, the government refused to grant political sovereignty to the islands and initially balked even at incorporating the native inhabitants as citizens. This is consistent with the strategy of white-settler colonialism to expropriate and dispossess without mixing and including. Though the United States eventually granted citizenship to Puerto Ricans in 1917—just in time to draft them for battle in World War I—it was clear that this altruistic action was again motivated by the self-interest of the white settler group.[126]

The United States took a more clandestine approach to colonizing Central American countries like Guatemala, Nicaragua, and El Salvador, yet the ensuing instability and warfare still caused massive waves of migrants and refugees to flee to

---

123. *See* HARVEST OF EMPIRE documentary, *supra* note 121.
124. *Id.*
125. *Id.*
126. *Id.*

the United States. The Roosevelt Corollary to the Monroe Doctrine asserted the U.S. as the police force in the Western hemisphere to protect democracy and liberty. As a result of this policy, the United States both supported and helped overthrow ruthless Latin American dictators and rebel groups to protect U.S. interests abroad, stop the spread of communism, encourage capitalism and free markets, and also to protect U.S. investments.[127]

This period of white-settler colonialism reveals that the United States caused the very "invasion of migrants" which it scorns. The United States reproduced the white-settler colonial project internationally by extracting labor, land, resources, and political security from Latin American countries, while denying Latinx groups the benefits of such activity, and displacing them in the process. In many cases, Latinx peoples from Central America fled their native countries to escape persecution, oppression, genocide, or dire economic consequences caused by U.S. intervention. While some migration may be illegal, and the migrants may engage in criminal activity in groups, that criminal gang activity cannot entirely be categorized as "immoral" as the government would suggest.

#### 4. The Ghetto and the Prison: Incubators for Latinx Migrant Gangs

Those Latinx migrants escaping warfare that America caused fled to cities like Los Angeles, Chicago, and New York.[128] Under the pressures of economic exploitation and social exclusion, two American institutions of social control—the ghetto and the prison—created the modern migrant street gang.

Loic Wacquant draws parallels between the ghetto and prison, describing them as "kindred institutions of forced confinement," each "enclosing a stigmatized population . . . to neutralize the material and/or symbolic threat that it poses for the broader society from which it has been extruded."[129] Wacquant articulates the reflexive

---

127. The U.S.' intervention in Guatemala is demonstrative. The budding multinational conglomerate United Fruit Company, owner of Chiquita Banana, heavily invested in Guatemala. When the United States feared the Guatemalan President Jacobo Árbenz would institute reforms to redistribute land in which United Fruit had an interest, the CIA trained local proxies in guerilla warfare and counterinsurgency tactics, mounted a propaganda campaign labeling President Árbenz as crazy, and engaged in the systematic effort to overthrow of the government in 1954. The United States backed a replacement dictator, Carlos Castillo, but the new government was unstable and the Guatemalan Civil War ensued for thirty years, from 1960 to 1996, during which the CIA-trained government forces retreated to the forest and enacted a mass genocide on the native Mayan people. Though thousands of Guatemalan refugees fled to the United States, during the 1980's, the United States granted asylum to less than two percent of Guatemalans who applied. *Id.*

Similar themes of intervention, unrest, and migration occurred in El Salvador. The U.S.-backed dictator, Humberto Romero, faced an insurgency which the U.S. government feared could result in a communist uprising. The United States provided more than $4 billion in military aid to the Romero government, and the CIA trained a cohort of Salvadoran soldiers. When a civil war ensued, the United Nations Truth Finding Commission concluded that the CIA-trained insurgents committed mass killings that wiped out whole villages in El Salvador throughout the 1980's, and the participated in the assassination of an archbishop of the Catholic Church, Oscar Romero—an outspoken dissident of the Romero regime. The instability caused by the United States led to an increase in 94,000 Salvadoran immigrants in the United States in 1980 to over two million by 2012. *Id.*

128. *See* Howell & Moore *supra* note 125, at 1-13.

129. Loic Wacquant, *The Prison as the Surrogate Ghetto*, 4 THEORETICAL CRIMINOLOGY 377, 378 (2000).

relationship between the ghetto and prison. He writes the ghetto is an "ethnoracial prison" that encages a dishonored category.[130] The ghetto is a device of geospacial restriction that enables the dominant group in an urban setting to control a subordinated group with negative symbolic capital like skin color or perceived criminality through two methods: ostracization and exploitation.[131] Relatedly, a prison is a judicial ghetto, a device of social control where the restrictions are enforced by judicial order.[132] Because persons in a ghetto and prison are both geospatially confined within a limited system of institutions, Wacquant suggests a distinct culture and identity emerges to form a "city within a city."[133]

Wacquant's reflexive relationship between the ghetto and prison explains how Latinx migrants, ostracized and excluded from society, formed criminal street gangs within the ghettos and prisons of Los Angeles. MS-13 specifically was formed by El Salvadoran refugees who migrated to the ghettos or *barrios* of Los Angeles in the 1980s escaping the civil war caused in part by U.S. intervention.[134] Some of the migrants, alienated and ostracized by their new country and relegated to the ghettos, formed the Mara Salvatrucha Stoners, a group of teenagers who smoked marijuana and listened to rock music.[135] Imprisoned members of the gang forged an alliance with Mexican Mafia prison gang, La eMe, which helped create MS-13.[136] The group developed a set of experiences, ostracization, and geospatial confinement characteristic of both the ghetto and prison.[137]

The formation of a migrant criminal street gang, even one as notorious as MS-13, does not warrant an automatic label that each member (or the group) is immoral or depraved as the government suggests. Rather, the ethnoracial group naturally forms because of the coordinate restrictions of a ghetto and prison that are by their purposes meant to stigmatize the members of the group so confined. A court or judge considering this Latinx subjugated knowledge or counter-history must look past the mere existence of the gang and inquire how the gang came to be formed. If courts looked at history, they would see morally mitigating factors that should give a reasonable judge or court pause before concluding that every member of a migrant criminal street gang is immoral or depraved. The Ninth Circuit got it right when it noted, "of course, all gang-related criminal conduct is, at some level, both serious and morally questionable, but not all gang related criminal conduct necessarily involves grave acts of baseness of depravity" to make it immoral.[138]

---

130. *Id.* at 383.
131. *Id.*
132. *Id.*
133. *Id.*
134. Howell & Moore, *supra* note 125, at 21.
135. Geoffrey Ramsey, *Tracing the Roots of El Salvador's Mara Salvatrucha*, InSight Crime (Aug. 31, 2012), https://www.insightcrime.org/news/analysis/history-mara-salvatrucha-el-salvador/ [https://perma.cc/8S9F-XZP4].
136. Howell & Moore, *supra* note 125, at 14.
137. *See id.*; *see also* Wacquant *supra* note 136, at 383.
138. Hernandez-Gonzalez v. Holder, 778 F.3d 793, 802-03 (9th Cir. 2015).

CONCLUSION

The U.S. Courts of Appeals should review with utmost scrutiny the government's prosecution and deportation of overwhelmingly black and brown non-citizen gang members under the "crime involving moral turpitude" statute. The statute relies on a white supremacist fiction, repeated and repurposed by Congress and the Executive since slavery, that nonwhite Anglo Saxon races should be excluded from the United States because they are immoral. Indeed, the government's argument that immigrant gang activity is one such crime involving moral turpitude requires making those assumptions rooted in white supremacy, racist pseudoscience, and populist odium. Specifically, the government's argument that every immigrant gang member acts with the depraved state of mind necessary for a crime involving moral turpitude requires accepting as true the trope that all racial minorities are evil rascals or animals. Additionally, the government's argument that immigrant gang activity is morally reprehensible conduct accepts a global white-settler colonial version of history that improperly places fault on the displaced rather than the displacer.