# EXHIBIT 21



*Law & Society Review* (2024), **58**, 294–328
doi:10.1017/lsr.2024.19

ARTICLE

# Deconstructing racial code words

Deirdre Pfeiffer[1] 🔾 and Xiaoqian Hu[2]

[1]School of Geographical Sciences & Urban Planning, Arizona State University, Tempe, AZ, USA and
[2]University of Arizona James E. Rogers College of Law, Tucson, AZ, USA
**Corresponding author:** Deirdre Pfeiffer; Email: deirdre.pfeiffer@asu.edu

(Received 23 March 2023; revised 14 March 2024; accepted 28 March 2024)

## Abstract
Racism has become more covert in post-civil rights America. Yet, measures to combat it are hindered by inadequate general knowledge on what "colorblind" race talk says and does and what makes it effective. We deepen understanding of covert racism by investigating one type of discourse – racial code words, which are (1) indirect signifiers of racial or ethnic groups that contain (2) at least one positive or negative value judgment and (3) contextually implied or salient meanings. Through a thematic analysis of 734 racial code words from 97 scholarly texts, we develop an interpretive framework that explains their tropes, linguistic mechanisms and unique roles in perpetuating racism, drawing from race, linguistic and cultural studies. Racial code words promote tropes of White people's respectability and privilege and Racial/Ethnic Minorities' pathology and inferiority in efficient, adaptable, plausibly deniable and almost always racially stratifying ways, often through euphemism, metonymy and othering. They construct a "colorblind" discursivity and propel both "epistemic racism" (racism in knowledge) and systemic racism (racism in action). We further strengthen applications of Critical Race Theory in sociolegal studies of race by presenting a "racial meaning decoding tool" to assist legal and societal measures to detect coded racism.

**Keywords:** racial code words; covert racism; critical race theory; epistemic racism

## Introduction

Racism has become more covert in post-civil rights America (Omi and Winant 2014; Bonilla-Silva 2022; Haney López 2014).[1] A few examples illustrate this trend. A city council denies rezoning to accommodate multifamily housing based on fears of *crime*. A nightclub owner instructs his bouncer to turn away anyone in *big chains*. A tech company rejects a minority applicant who *cannot fit our corporate culture*. Nowhere are specific references to race made. Yet, attributes like dress and cultural fitness can be seemingly race-neutral proxies or codes for members of specific racial groups (Carbado and Gulati 2013; Rich 2004). Similarly, concerns about crime may mask residents' racially motivated fears about their future neighbors and convey a subtext that equates Racial/Ethnic Minorities[2] with poverty, pollution and criminality (Beckett 1997; Carlson 2020; Fleury-Steiner and Fleury-Steiner 2009; Gonzalez Van Cleve and

© The Author(s), 2024. Published by Cambridge University Press on behalf of Law and Society Association. This is an Open Access article, distributed under the terms of the Creative Commons Attribution licence (http://creativecommons.org/licenses/by/4.0), which permits unrestricted re-use, distribution and reproduction, provided the original article is properly cited.

Mayes 2015; Longazel 2012). Denying rezoning, employment or club entry based on these concerns may bar Racial/Ethnic Minorities from housing and labor markets and social networking. Practices that transmit racial narratives, like use of stereotypes, work together with practices that exclude racial groups from domains of social life, like markets and networks, to perpetuate racial hierarchy and inequality.

Although the Equal Protection Clause and civil rights laws (broadly termed antidiscrimination law) prohibit racially discriminatory practices, their operating logic is poorly equipped to address the deleterious effects of coded language (Rich 2004; Onwuachi-Willig and Barnes 2005; Haney López 2006; Carbado and Gulati 2013; Murakawa and Beckett; Obasogie 2010; Edelman et al. 2016). Contemporary race scholars have examined practices of covert racism in diverse settings and proposed various theories to better understand it (e.g., Bobo 2017; Bonilla-Silva 2022; Haney López 2003; Kinder and Sears 1981; Levinson and Smith 2012). However, comprehensive knowledge is lacking on what codes "colorblind" race talk deploys, how these codes propel racism in post-civil rights America and ultimately how to confront them in law and social practice. We help to fill this knowledge gap by focusing on one instrument of "colorblind" race talk: racial code words, which we define as (1) indirect signifiers of racial or ethnic groups that contain (2) at least one positive or negative value judgment and (3) contextually implied or salient meanings.

We create a novel corpus of 734 racial code words through a systematic literature review (Xiao and Watson 2019) of 97 scholarly texts that document race talk in post-civil rights America. We then conduct thematic analysis of these code words and develop an interpretive framework that explains their tropes, linguistic mechanisms and unique roles in perpetuating racism, drawing from race, linguistic and cultural studies. We find that racial code words promote tropes of White people's respectability and privilege and Racial/Ethnic Minorities' pathology and inferiority in efficient, adaptable, plausibly deniable and almost always racially stratifying ways, often through euphemism, metonymy and othering. Racial code words construct a "colorblind" discursivity and propel both epistemic racism (racism in knowledge) and systemic racism (racism in action). We narrow a disciplinary divide between sociolegal studies of race and Critical Race Theory (CRT) by integrating CRT insights with our findings into a "racial meaning decoding tool" to assist researchers, legal professionals and social justice advocates in detecting coded race talk. We conclude by highlighting the major contributions and notable limits of our study and reflecting on future research needed to help further deconstruct racial code words and update the right to nondiscrimination for a "colorblind" society.

## Covert racism in law and social theory

The U.S. civil rights movement delegitimized blatant, biologically based, segregationist racism and ushered in new legislation and stronger application of constitutional equal protection to address racism. However, these victories were partial because the legal definition of racism fails to match the social reality of racism. Antidiscrimination law largely treats race as biologically derived, racism as rooted in individual bigotry and racial discrimination as based on immutable traits possessed by all group members (Carbado and Gulati 2013; Freeman 1990; Haney López 2006; Onwuachi-Willig and Barnes 2005; Rich 2004). Yet, race is socially constructed through ever-evolving

meaning systems, and racism results from diffuse, multiscalar and intersecting forces that organize American life in racially stratifying ways (Bonilla-Silva 2022; Haney López 2006; Lawrence 1987; Omi and Winant 2014). As a result, a chasm exists between race and racism operating on the ground and race and racism recognized by antidiscrimination law.

Racial/Ethnic Minorities (particularly Black people) experience the criminal justice system as an expansive, accumulating and mighty apparatus of oppression where law emboldens racism, legal professionals "do racism" as they "do justice," and a "street law" is created for "street people" (Murakawa and Beckett 2010; Gonzalez Van Cleve 2016: 13, 53).[3] Conversely, they experience antidiscrimination law as a narrow, disaggregating and weakened shield of protection that is more promissory than real (Murakawa and Beckett 2010). The "social regime of strict scrutiny" omnipresently surveils, disciplines and traps Black people in a liminal space of life and death and safety and punishment, while the legal regime of strict scrutiny narrowly constricts racially conscious remediation efforts and naturalizes and reinforces their racial subordination (Carbado 2022). Hence, although antidiscrimination law vows to eliminate racism, it takes a formalist and skin-deep approach to race, "aggressively disaggregates" systemic racism and racial causation and is "a jurisprudence of racial *non*recognition" rather than the supposed opposite (Murakawa and Beckett 2010; Obasogie 2010: 612; Edelman et al. 2016).

Law partakes and is a central site of the social construction of race (Haney López 2006). This jurisprudence of racial nonrecognition is in essence a special form of legal construction of race. Similar to how courts in past prerequisite cases constructed racial categories by determining who was and was not White (ibid), courts in racial discrimination cases construct racial boundaries by determining whether a justification is racial or not. In prerequisite cases, courts constructed race by drawing boundaries between races, with classification as White entailing legal protections and advantages. In antidiscrimination cases, courts construct race by drawing boundaries between racial and nonracial explanations, with classification as racial entailing (equal treatment) legal protections and advantages. In both settings, the law demarcates racial boundaries and creates a prized classification (Whiteness and raciality, respectively), courts narrowly guard eligibility for the prize, and plaintiffs are forced to simultaneously abide by and perpetuate the classification to receive legal protection.

Racial codes arise from the chasm between race and racism on the ground and in antidiscrimination law. They give the user "plausible deniability" of race-based decision making (i.e., the ability to deny that actions were racially motivated, Bilotta et al. 2019; Edelman et al. 2016; Liu and Mills 2006). Hence, redress for victims of coded racial discrimination depends on whether they succeed or fail to uncloak plausible deniability. If they succeed, courts recognize the accused act as illegal racial discrimination (e.g., *Dews v. Town of Sunnyvale, Texas*, 2000). If they fail, courts classify the accused act as nonracial and the code provides a legal hack for discrimination with impunity (e.g., *Hallmark Development Inc. v. Fulton County, Georgia*, 2006). Antidiscrimination law's inability to crack racial codes is a major cause of their ascent.

Various theories illuminate how covert racism works. Covert racism spreads a narrative that American society is fair and justifies racial inequality on ostensibly nonracial grounds, such as White cultural/ideological values of individualism, meritocracy and free-market competition (e.g., "symbolic racism" in Kinder and Sears (1981);

"modern racism" in McConahay (1986); "laissez-faire racism" in Bobo (2017); "color-blind racism" in Bonilla-Silva (2022)). These values are so pervasive and hegemonic that they form part of commonsense knowledge about race and racial inequality, to the point of making racist beliefs and actions "automatic," "unconsidered" and even "unconscious" (e.g., "unconscious racism" in Lawrence (1987); "commonsense racism" in Haney López (2003); "implicit bias" in Levinson and Smith (2012)). A smaller, though sizable, literature investigates mechanisms, processes and effects of covert racial discourses. Beckett (1997) exposes how political and media elites socially constructed the *war on crime* and the *war on drugs* in the latter 20th century to stoke racial anxieties and advance a conservative agenda. Mendelberg (2001), Haney López (2014) and Bennett and Walker (2018) show how strategic actors imbue race-neutral words like *fundamental rights, gun ownership, welfare, crime* and *criminal justice*, and *states' rights* with racial meaning to seek political, economic and ideological gains. López-Espino (2023) exposes how legal professionals create covert discourses to racialize and coerce obedience from parents in child welfare cases through techniques of silencing, voicing figures of disbelief and labeling their speech as lies and excuses.

Despite these vibrant and growing studies of covert racism, comprehensive knowledge on tropes, mechanisms, evolving processes, and individual and systemic effects of covert racial discourses is lacking. Our research seeks to narrow this gap. We analyze one type of discourse – racial code words. We ask: What forms do contemporary racial code words take? What tropes do they convey? What functions do they perform and with what mechanisms? What knowledge, if any, can we gain about racial code words that could help researchers, legal professionals and social justice advocates detect coded race talk?

We also seek to narrow a disciplinary gap between sociolegal studies and CRT. On the one hand, we respond to sociolegal race scholars' calls to study race capaciously, operationally and systemically (Gómez 2012; Murakawa and Beckett 2010). We investigate micro-instances of racial code word use and examine their tropes, individual and systemic effects, and linguistic mechanisms. On the other hand, we bring CRT to bear on sociolegal studies of race. The legal realist movement in the early 20th century and the law and society movement in the latter 20th century have made it a common and honored practice to apply social science insights to legal issues (Currie 1951; Macaulay 1963). In recent decades, in the context of race, the neutrality and necessity of applying social science insights to adjudication have been challenged from the left (CRT) and the right (legal formalists), respectively (Moran 2010). We deploy CRT insights to inform, energize and stimulate debate in sociolegal studies of race and racism, a practice explicitly advocated by former Law and Society Association President Laura Gómez (2012).

More concretely, we integrate CRT scholars' insights as we search for ways to deconstruct the hack of racial code words. CRT scholars have long lamented how antidiscrimination law programmatically denies redress to victims of discrimination based on racially salient features such as housing patterns, hairstyles, names or accents and proposed innovative doctrinal solutions (Carbado and Gulati 2013; Lawrence 1987; Onwuachi-Willig and Barnes 2005; Rich 2004). Lawrence (1987) introduces a cultural meaning test for equal protection adjudication. The test asks courts to act "much like a cultural anthropologist" and investigate whether the government defendant's conduct conveys "a symbolic message to which the culture

attaches racial significance" (ibid: 356). If the court determines that more likely than not "a significant portion of the population thinks of the governmental action in racial terms," the court will assume that unconscious racism has influenced the decision-maker and thereby "apply heightened scrutiny" (ibid). Rich (2004) shows how race/ethnicity is embodied in various socially coded racial/ethnic markers and offers a racial/ethnic performativity test to better address modern forms of employment discrimination. Under this test, the plaintiff must establish that the performative act on which discrimination is based carries racial/ethnic significance and that the association between the act and the racial/ethnic identity is too strong to require the individual to change. The defendant then must offer a race-neutral value or justification and specifically explain how the plaintiff's performance thwarts that value. Lastly, Onwuachi-Willig and Barnes (2005) propose a creative transplant of the "regarded as" verbiage in the Americans with Disabilities Act to employment discrimination law to address racial discrimination by proxy. If an employer uses a racial proxy (name, hairstyle, voice, etc.) to determine that a job applicant belongs to a certain race and denies the latter a job based on that determination, the employer has conducted illegal discrimination. Our study integrates these CRT insights into a "racial meaning decoding tool" to support researchers, legal professionals and social justice advocates in detecting racial code words in varied settings.

## Canvassing racial code words from scholarly literature

Studying racial code words in empirical settings, particularly those relevant to antidiscrimination law, is essential to understanding and combating covert racism. Yet, such studies face immediate challenges. Researchers lack a framework informed by knowledge of the common features and functions of racial code words to determine whether words might be racially coded in a particular setting. Incomplete and inconsistent if not arbitrary findings may result in the absence of this foundation. Racial code words' plausible deniability and political sensitivity may expose researchers to accusations of carelessness or subjectivity at best and stoking racial hatred or racism at worst.

A general framework of what racial code words are and how they function is needed to help researchers avoid these pitfalls. Ideally, such a framework would come from repeated empirical investigations into racial code words within and across diverse settings, like local housing or workplace decision making, court cases or police reports. However, this approach would be time- and resource-intensive. Such commitments would be imprudent absent some general knowledge on the forms and functions of racial code words, especially their harmfulness and intractability.

Our research provides this starting foundation by mining a corpus of racial code words from a rich but under-synthesized data source: existing cross-disciplinary scholarly literature on real-life race talk in post-civil rights America. We use a rigorous method of sampling, data extraction and analysis – a systematic literature review (Xiao and Watson 2019). This method draws findings from scholarly texts by identifying relevant texts through keyword searches, applying inclusion criteria to sample texts most able to answer the research questions, recording and validating data extracted from these texts through iterative review processes involving multiple researchers and drawing findings through qualitative methods of analysis, like thematic coding (ibid).

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

*Law & Society Review*    299

We used these methods to synthesize the rich, contemporary empirical scholarly literature on how people talk about race in diverse settings, canvass the code words used and develop an interpretive framework and later a decoding tool broadly applicable across social settings.

A key strength of studying racial code words through this data is that they have been vetted twice: first as race talk by the authors of the texts reviewed and second as racial code words by our research team. This quality helps to weaken their plausible deniability and counteract claims of researchers' subjectivity. The interdisciplinarity of this body of literature also helps to uncover common patterns of racial code words across diverse settings and build global insights on their forms and functions.

Studying racial code words from scholarly literature also has drawbacks. The data are filtered at least once and sometimes twice or more through others' interpretations. This limits the universe of race talk available for analysis within a particular setting. For example, researchers selectively extract instances of race talk from their participant interviews and integrate them into their findings. Instances from news media are filtered first through the perceptions of journalists and then through researchers who analyze the media. Selective filtering also reduces available contextual information on race talk, such as its setting or participant characteristics. This not only creates possibilities for interpretive errors but also limits insight into whether discourse is motivated by racial antipathy. Additionally, the settings studied in this data are shaped by authors' disciplinary orientations (e.g., political speeches for political scientists and schools for education scholars). Settings that are not strongly connected to a specific discipline are underrepresented (e.g., covert race talk at children's summer camps). These qualities of our data increase the risk that our findings fail to capture the broad use of racial code words in post-civil rights America and may misrepresent or misinterpret those that are captured.

Our sample of 734 racial code words comes from 97 texts published between 2000 and 2020 that address race and verbal language in real-life environments in post-civil rights America (see Appendix 1 for their references). These texts were drawn from a larger pool of 1,356 texts identified through a systematic keyword search using Google Scholar and our university library databases, which integrate large repositories, including HeinOnline, JSTOR, Web of Science, EBSCO, ProQuest and others. A text was included in the pool if (1) it had at least one keyword anywhere for each of the four dimensions of our research: race, communication, code and bias (see Appendix 2 for the keyword list) and (2) appeared in the first 200 results of our university library search engines (combining all of the keywords below in a Boolean string) or first 10 results in 190 iterations of searching in Google Scholar (due to limitations in combining keywords in a Boolean string), both sorted by relevance. This approach resulted in an initial sample that was broadly related to these dimensions but also had some blind spots (e.g., Gonzalez Van Cleve 2016; Nguyen et al. 2013; Tighe 2010). It captured texts that addressed race talk, even if their main topic was not explicitly about it.

We next identified texts most able to answer our research questions by retaining those that met the following criteria, which only 97 of the 1,356 texts met:

(1) Published on or after January 1, 2000 in English in an academically recognized press/journal,
(2) Used empirical data to answer questions about race or ethnicity and verbal language in real-world environments that were:

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

- In the United States,
- After 1967 and
- Not from fictional, simulated or other controlled experimental settings and
(3) Contained racial code words identified:
  - By the research team as:
    - Indirect signifiers of racial or ethnic groups that
    - Contain at least one positive or negative value judgment and
    - Contextually implied or salient meanings or
  - By the author(s) of the text.

Words were indirect signifiers of racial groups when they were embedded in discourse that was identified as race talk by the author(s) of the text or our research team but did not explicitly name the referred to racial or ethnic group in the sentence in which they appeared. They contained at least one positive or negative value judgment when the words, sentence or discourse in which they were embedded expressed positive or negative valence or affect (see Mohammad 2018). The meanings were contextually implied or salient when the speaker and the audience within a particular setting shared an understanding of the words during the exchange. An example is a White woman's recounting of conversations with neighbors in a mixed-race Chicago neighborhood who told her to "Be careful when you go down that street' and, where there was, you know, sort of a seemingly *rougher clientele* living on certain streets …' (Burke 2017: 289–290). We identified *rougher clientele* as a racial code word, because it (1) was an indirect signifier of Black people (as suggested by the author and indicated by the lack of explicit reference to Black people in the discourse), (2) contained a negative value judgment (*rougher* has negative valence) and (3) was understood as such by the speaker and the listener in a conversation about safety in a particular Chicago neighborhood.

Evaluating whether texts contained racial code words was challenging. Meanings of words (especially coded words) are context-dependent and fluid (Hall 2013). They are constructed through not only convention but also dynamic, ongoing interactions between people with different identities and societal positionalities. The socially constructed nature of race additionally dictates that racial meanings are contested and even embattled (Omi and Winant 2014). For example, although we interpreted a bouncer's instruction to turn away anyone in *big chains* as coded language for Black people, someone with a different positionality (e.g., a White teenager who wears big chains to "look cool") may reach a different conclusion. These challenges manifested in our research, as our two-person research team carries internal differences in racial, disciplinary and linguistic positioning.

We took several measures to address interpretive challenges. First, we independently extracted code words from a pool of 30 texts selected from our initial sample, discussed and resolved discrepancies and enhanced our inclusion criteria. Then, we sorted the initial sample by author last names, divided it between us alphabetically and independently extracted potential code words fitting the inclusion criteria. We recorded them in a database along with the following contextual elements: the (1) lines of text encompassing the code word, (2) temporal and geographic setting, (3) motivating event and (4) characteristics of the referred-to subject, user and audience, including racial identity if available. We then independently evaluated each other's

data, discussed and resolved discrepancies and iteratively revised our criteria and reevaluated the code words until no further changes were made. This resulted in a final sample of 734 code words from an initially extracted pool of 1,197 code words, testimony once again to difficulties in discerning racial meaning.

We explicitly embrace the malleability and contestability of racial meaning in our decoding tool, which we present in a later section. We follow a practice in CRT of treating words as racially coded when community norms or a plurality of parties – in our case, our research team and often the authors of the examined scholarship – believe that race is being signaled (Lawrence 1987; Rich 2004). Our approach also is informed by the logic of dealing with contested or otherwise uncertain facts in the law, such as hearing from opposing sides and making findings based on a preponderance of evidence.

Henceforth, the code words extracted from scholarly texts are italicized and referred to as the "sample"; their citations are denoted by "S" (i.e., sample) and a number representing the order in which their references appear in Appendix 1 (e.g., S2). Virtually all of the racial code words came from data referenced in the texts; they most often appeared in quotes from the data (e.g., from interview participants or news media, as indicated by the use of singular quotation marks) but in some instances they appeared in an author's synthesis of observations from their data (e.g., a list of racial code words commonly used in a political campaign, as indicated by the use of double quotation marks). We found only a few instances of an author using racially coded language to interpret their data or build an argument, mostly to convey personal experiences or illustrate common examples of coded racism (e.g., S76; S89; S66).

Table 1 shows the sampled code words' temporal, racial and contextual dimensions. Most appeared between the 40-year span of 1968–2008 and the 8-year span of the Obama Presidencies (36% and 35%, respectively). Code words for Black people were most prevalent (45%), followed by White (25%) and Latinx (11%) people. A sizable proportion referred to people from other racial and ethnic groups (henceforth called "Other people"). A small number of these referred to Middle Eastern, Asian, Native American or Jewish people ($n = 34, 18, 3, 3$, respectively); most referred to Mixed Race people or Racial/Ethnic Minorities in general. The user and audience were most often White people when race was known (56% and 31% of code words, respectively), but often the race of the user was unknown (e.g., a police officer) or the race of the audience was irrelevant, because it was the public in general (e.g., American voters). The sampled code words occurred across a range of settings but mostly in the media, politics or research; only a small portion occurred in settings with some potential for antidiscrimination protection (e.g., schools, workplaces, marketplaces and law enforcement).

We used thematic analysis to discover and record the sampled code words' explicit and implicit qualities in a codebook (Gaber 2020). Our approach was abductive, meaning it was informed by categories and theories from existing scholarship and new divergent ones found through systematic and iterative data engagement (Timmermans and Tavory 2012). Tropes from covert racism and sociolegal studies were foundational, including perceptions of Racial/Ethnic Minorities' criminality, deviance from American cultural values like individualism and White possessiveness of American property, economy, governance and citizenship (e.g., Beckett 1997; Bonilla-Silva 2022; Carlson 2020; Moreton-Robinson 2015). We discovered their nuances and

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

302     Deirdre Pfeiffer and Xiaoqian Hu

**Table 1.** Characteristics of sampled code words ($n = 734$)

| Characteristic | % | Characteristic | % |
|---|---|---|---|
| *Period* | | *Subject of code word* | |
| Pre-Obama (<2008) | 36 | Black people | 45 |
| Obama (2008–2015) | 35 | White people | 25 |
| Trump (2016–2020) | 15 | Latinx people | 11 |
| Multiple periods | 8 | Other people | 28 |
| Unknown | 6 | | |
| *User* | | *Audience* | |
| White people | 56 | White people | 31 |
| Black people | 11 | Black people | 9 |
| Latinx people | 2 | Latinx people | 8 |
| Other people | 7 | Other people | 4 |
| Unknown | 28 | General public | 40 |
| | | Unknown | 25 |
| *Settings with little potential for antidiscrimination protection* | 83 | *Settings with some potential for antidiscrimination protection* | 18 |
| Research | 28 | Schools | 5 |
| Politics | 27 | Workplaces | 2 |
| Media | 23 | Marketplaces | 3 |
| Traditional | 17 | Housing | 0 |
| Social | 6 | Law enforcement | 8 |
| Other | 6 | | |

*Source*: Authors' own work.
*Notes*: Code words' subjects, users and audiences may be of multiple racial groups. Other race refers to Asian, Native American, Middle Eastern, Mixed Race, Jewish or Racial/Ethnic Minorities in general. Code words in a few cases have multiple settings.

identified additional categories, like White people's tactics of responding to perceived threats, by iteratively reviewing the data through the lens of theories of covert racism and sociolegal studies (e.g., Beckett 1997; Carlson 2020; Haney López 2014). Finally, we stratified the code words based on their racial subjects and examined trends in their forms and functions, drawing from linguistic, cultural and race theory.

We tell a laboriously researched story about contemporary racial code words. The data are drawn from empirical studies in sociology, communication, education, law and political science and settings as diverse as politics, media, law enforcement, schools and workplaces (see Appendix 1). Our research approach was careful and conservative; the racial code words in our corpus have been twice vetted as race talk, as

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

previously noted. The disciplinary and situational range of our data and the rigor of our methods enables us to identify common ways that racial code words are functioning across settings and offer a new interpretive framework and decoding tool to assist investigations in particular settings.

Nonetheless, the story we tell is imperfect. In addition to the limitations outlined above, we do not bolster the originally sampled texts with texts from their references and citations or conduct parallel data collection by multiple researchers due to the initial sample's large size and our team's limited capacity. Taken together, these issues leave some bias unresolved. The racial code words in our sample do not represent the full range of coded racial speech in post-1968 America. There almost certainly are gaps in the forms, tropes and functions of code words revealed by those sampled. The lack of contextual information for some code words, the fluid and contested nature of racial meaning, and our positionality may have led us to misinterpret racial signaling and meaning in some cases. Deconstructing racial code words will take time. Our research offers starting resources, ones that are rigorously grounded in prior literature, existing norms and careful coding but intended to be discussed, verified and refined.

## Reverse engineering racial code words in contemporary America

This section disassembles the machinery of the sampled racial code words. We reveal how they integrate tropes that create narratives about racial/ethnic groups with linguistic mechanisms that offer efficient, adaptable and plausibly deniable communication, often to racially stratifying ends.

### Forms and tropes

Figure 1 shows the range and relative frequencies of sampled code words for White, Black, Latinx and Other people. The format of the words conveys frequency, with bolded black words appearing ten times or more in our sample, unbolded black words appearing two to nine times and gray words appearing only once. Font size conveys frequency but also code word length, with shorter ones also appearing larger. Parentheticals show the variation of similar code words, including singular and plural versions and qualifications. For example, *America, American, Americans* and *most Americans* are shown as *(most) America(n(s))*. Brackets capture contextually understood but unstated elements, like '*no people walking around with their pants [down]*' (S56: 562).

*America* and *American, suburb* and *suburbanite*, and *law and order*[4] were the most frequent code words for White people; *diversity* was the most common for Black, Latinx and Other people. *Welfare* and *thug* also commonly referred to Black people; *illegal* commonly referred to Latinx people and *fobby* and *terrorist* commonly referred to Asian and Middle Eastern people, respectively. Most code words appeared only once, indicating a rich mosaic of contemporary coded race talk. Notably, none of the code words for White people appeared 10 times or more (bolded black), while multiple code words for Black and Latinx people had this quality. This may indicate that stereotypes for White people are more nuanced and individualized than those for Black or Latinx people.[5] A few of the code words are racial and ethnic slurs ("*towel head,*" '*banana,*' '*twinkie,*' '*Coconut,*' '*Uncle Tom,*' '*nappy-headed hos*' and '*Dindu Nuffins*') (S79: 1818; S81: 118; S40: 234; S25: 8; S16: 160); others have explicitly racist elements ('*camel-riding,*'



**Figure 1.** Forms of code words by the race of their subjects (*n* = 734). *Source*: Authors' own work.
*Notes*: Code words' formatting reveals their frequencies. Those in bolded black appeared at least ten times; those in unbolded black appeared between two and nine times and those in gray appeared once. Font size is mostly a function of frequency, with more common code words appearing larger, but also of length, with shorter code words also appearing larger. People of Other Races & Ethnicities refers to Asian, Native American, Middle Eastern, Mixed Race, Jewish or Racial/Ethnic Minorities in general.

'*jungle,*' '*eat dog,*' '*strapping young buck*' and '*young buck*') (S52: 33; S23: 288; S82: 195; S65: 59; S14: 707) (Wikipedia Contributors n.d; Wiktionary n.d). These have been fully or partly decoded over their lifecycle, a theme we revisit later.

### Code words for White people and Whiteness
Sampled code words for White people were mostly expressed by White people to other White people or the public at large. They convey beliefs about White people's respectability and privilege and their possession of American lifeways see Table 2). The "White Respectability and Privilege" trope conveys that White people are deserving of their high position in the American social structure, because they create community affluence and fulfill their economic and civic duties (Mills 1951; Urciuoli 1994). One example is a White man referring to the segregation of White people and Racial/Ethnic Minorities in local schools as 'they didn't want the sort of *lower areas* to assimilate with the *upper areas*' (S18: 109). Here, '*upper areas*' and '*lower areas*' refer to where White people and Racial/Ethnic Minorities lived, respectively. Code words expressing the affluence of White communities often ground it in suburban single-family homeownership, such as when newspaper managers justified redirecting their investment away from their traditional central city circulation areas as merely trying to serve "*affluent readers [in] the suburbs*" (S97: 27). Those about White people's economic citizenship reference their knack for generating and consuming goods and services, as well as their perceived higher human capital. This is evident in a Chicago computer software employer's view that 'you do not *talk street talk* to the *buying public,*'

**Table 2.** Tropes of sampled code words for White people and Whiteness

| Trope | Main narrative | Sub-narratives | Example code words | Example decoding |
|---|---|---|---|---|
| White Respectability and Privilege | Whites are deserving of their high position in the American social structure, because they create community affluence and fulfill their economic and civic duties. | (1) Community affluence: The affluence of White communities is grounded in suburban single-family homeownership. (2) Economic duties: White people have (a) a knack for generating and consuming goods and services and (b) higher human capital. (3) Civic duties: White people follow laws and pay taxes, which create safer and better resourced communities. | 'they didn't want the sort of *lower areas* to assimilate with the *upper areas*' (S18:109) | *upper areas:* Where White people live *lower areas:* Where Racial/Ethnic Minorities live |
| White Possessiveness | America belongs to White people, as opposed to America belonging also to Racial/Ethnic Minorities or White people belonging to America. Being American requires being from or adopting what is considered White male European Protestant culture – values like individualism; property acquisition, control and extraction; advancement through merit and being hardworking and calm. | (1) Citizenship: White male European Protestant culture is equated with American citizenship. (2) Governance: White male European Protestant culture is the basis for American governance. (3) Nostalgia: Longing for a time when White male European Protestant culture dominated American society, to the detriment of Racial/Ethnic Minorities and other marginalized groups. | *'Make America Great Again'* (S49: 211; S39: 36) | *America:* White people *Make … Great Again:* Revert to time when White male European Protestant culture dominated American society |
| White Defense | Racial/Ethnic Minorities pose threats to White people's respectability, privilege or possession of American lifeways. These conditions are maintained through "colorblind" governance that weakens Racial/Ethnic Minorities' societal power and success. | (1) Resentment: Resentment of policies perceived to benefit Racial/Ethnic Minorities, implying a need for action but not directly calling for it. (2) Response: Calls for a response to modify or eliminate policies perceived to benefit Racial/Ethnic Minorities to benefit White people. | *'competency based education'* (S30: 223–224) | *competency based education:* Advantage White people by ending affirmative action |

(Continued)

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

**Table 2.** (Continued.)

| Trope | Main narrative | Sub-narratives | Example code words | Example decoding |
|---|---|---|---|---|
| Passing | Racial/Ethnic Minorities are succeeding or not to various degrees in adopting White male European Protestant cultural traits. | (1) Acting White: Racial/Ethnic Minorities are succeeding or not in temporarily adopting White male European Protestant cultural traits.<br><br>(2) Becoming White: Racial/Ethnic Minorities are succeeding or not in permanently adopting White male European Protestant cultural traits. | 'While my family eats jollibee for breakfast I'm over here having Starbucks'<br><br>#whitewashed' (575: 515) | eats jollibee: Becoming a Filipino person<br><br>having Starbucks: Becoming a White person<br><br>whitewashed: Becoming assimilated into White culture |

*Sources:* Authors' own work. Tropes adapted from Mills (1951); Urciuoli (1994); Moreton-Robinson (2015); Dudas (2005); Haney López (2014); Anderson (2016) and Drakulich et al. (2021).
*Note:* See Appendix 1 for the example code word sources.

where the employees who'*talk street talk'* are Black and Latinx people and the'*buying public'* is White people (S46: 298–299). Code words about White people's stronger perceived civic citizenship address their tendency to follow laws and pay taxes, which create safer and better resourced communities. This language is present in a Ku Klux Klan recruitment flier distributed to '*[l]aw abiding citizens'* in the Houston area (S88: 53).

Another category is "White Possessiveness," which expresses that America belongs to White people, as opposed to America belonging also to Racial/Ethnic Minorities or White people belonging to America (Moreton-Robinson 2015). Being American requires being from or adopting what is considered White male European Protestant culture – values like individualism; property acquisition, control and extraction; advancement through merit and being hardworking and calm. The subcategory Citizenship equates this culture with American citizenship. Journalist Bill O'Reilly expressed this in comparing the 'non-tradition … constituency' of 'single-women, Hispanic Americans, African Americans, whatever' that reelected Obama in 2012 and the '*[t]raditional American voters'* that didn't (S57: 153–154). The subcategory Governance identifies this culture as the basis for American governance, such as when Senate Majority Leader Trent Lott told the Council of Conservative Citizens (a right-wing, pro-White political group): 'The people in this room stand for the *right principles* and the *right philosophy'* (S21: 54). Nostalgia conveys longing for a time when this culture dominated American society, to the detriment of Racial/Ethnic Minorities and other marginalized groups, a sentiment often expressed by President Trump and his supporters in calls to '*Make America Great Again'* (S49: 211; S39: 36).

Many code words link to Whiteness but do not exclusively refer to White people. Some reflect a trope that we call "White Defense," borrowing from historical and sociolegal studies of White people's responses to civil rights actions (e.g., Anderson 2016; Drakulich et al. 2021; Dudas 2005; Haney López 2014). These mostly convey White people's reaction to supposed threats posed by Racial/Ethnic Minorities to their respectability, privilege or possession of American lifeways. They refer to subjects of all races, though they most commonly refer to White people, followed by Latinx and Black people. Government policies that sought to foster racial equality or that were racialized to defend racial power asymmetries, like busing during the Nixon election and the war on terror during the George W. Bush and Obama administrations, often were subjects. Some convey White people's resentment of policies perceived to benefit Racial/Ethnic Minorities, implying a need for action but not directly calling for it. For example, one author expresses her resentment of law schools' use of affirmative action to admit Black people by arguing that it "flatters their own egos, so that [law schools] can gaze upon their '*diverse'* realm and bask in their noblesse oblige" (S66: 59). Others call for a response to modify or eliminate these policies to benefit White people, such as some politicians' and journalists' advocacy for '*competency based education'* as a strategy to advantage White people by ending affirmative action (S30: 223–224). These code words reflect desires to maintain White respectability, privilege and possession of America through "colorblind" governance that weakens Racial/Ethnic Minorities' societal power and success.

Other code words link to Whiteness but refer to Racial/Ethnic Minorities. These reflect the trope of "Passing," namely perceptions of Black, Latinx, Asian or Middle Eastern people succeeding or not to various degrees in adopting what is recognized as White male European Protestant cultural traits (Urciuoli 1994). They are relatively

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

rare in our sample and were variously spoken by White people and Racial/Ethnic Minorities. One subcategory is "Acting White," such as when an Iranian American man debated whether to '*wear a baseball cap*' representing an American sports team to the airport to emphasize the Whiteness of his racially ambiguous appearance and avoid being perceived as a '*terrorist*' (i.e., a Middle Eastern person) (S67: 120). Another is "Becoming White," such as a Filipino Twitter user's deployment of the hashtag '*white-washed*' to make a self-deprecating joke about being assimilated into White culture, because she is '*having Starbucks*' when her family '*eats jollibee*' (a fast-food restaurant serving Filipino cuisine) (S75: 515).

### Code words for racial/ethnic minorities

Sampled code words referring to Racial/Ethnic Minorities, like those for White people, were often expressed by White people to other White people or to the public at large. They mostly convey that Racial/Ethnic Minorities cause indirect, direct or possible future harm to White people and to society more broadly (see Table 3). This is especially evident in the "Parasite," "Contagion" and "Villain" categories. These well-studied tropes evolved from stereotypes for immigrants (particularly Chinese) in the latter 19th century and Black people in the slavery and post-Reconstruction eras; subsequently, they fueled cultural and economic opposition to civil rights, welfare programs and (particularly Latinx) immigration and justified the expansion of the carceral state and oppression of Racial/Ethnic Minorities and immigrants (e.g., Anderson 2016; Beckett 1997; Beckett and Ming Francis 2020; Carlson 2020; Dvorak 2000; Gold 2012; Haney López 2014; Lens 2009; Russell-Brown 1998; Santa Ana 2002; Santa Ana et al. 1998; Shabazz 2015).

Sampled code words expressing Parasite convey that Racial/Ethnic Minorities exploit communities, institutions, services, amenities or other aspects of the U.S. social system. They close to equally refer to Black, Latinx and Other people. Most present Racial/Ethnic Minorities as "Takers not Makers," as exploitative recipients of and not contributors to social welfare programs who have deep personal and cultural deficiencies within economic spheres. The most pervasive example of Taking is '*welfare queen*,' which Presidential Candidate Ronald Reagan famously used to refer to Black women living extravagantly on public benefits (S65: 58). Another is a news commentator defending the War on Drugs (which disproportionately criminalized Black people) by describing those targeted as '*living on welfare, food stamps, Medicaid, and Section 8*'; the commentator goes on to use Not Making code words by arguing that their communities '*don't promote a strong work ethic* because most … *don't work* themselves' (S84: 258). A small portion presents Racial/Ethnic Minorities as "Cheaters," conveying their perceived exploitation of job markets and higher education through biased hiring, promotion and admissions processes (e.g., calling a Person of Color in the workplace an '*affirmative action hire*' (S76: 113)). Closely related to Parasite is the category "Deficiency," which expresses anxieties that Racial/Ethnic Minorities (particularly low-income and working-class children and their parents) lack personal traits necessary to contribute to the economy, which may eventually threaten White people and society when they become a Parasite (Valles 2021; López-Espino 2023). High school teachers referring to Racial/Ethnic Minority students as '*at-risk kids*' is an example (S80: 124–125). Parasite and Deficiency code words echo Gonzalez Van Cleve (2016)'s observation of "mope" – a lazy, incompetent degenerate who drains

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

**Table 3.** Tropes of sampled code words for racial/ethnic minorities

| Trope | Main narrative | Sub-narratives | Example code words | Example decoding |
|---|---|---|---|---|
| Parasite | Racial/Ethnic Minorities exploit communities, institutions, services, amenities or other aspects of the U.S. social system. | (1) Takers not Makers: Racial/Ethnic Minorities are exploitative recipients of and not contributors to social welfare programs who have deep personal and cultural deficiencies within economic spheres.<br><br>(2) Cheaters: Racial/Ethnic Minorities exploit job markets and higher education through biased hiring, promotion and admissions processes. | 'welfare queen' (S65: 58) | *welfare queen:* Black woman living extravagantly on public benefits |
| Deficiency | Racial/Ethnic Minorities lack personal traits necessary to contribute to the economy, which may eventually threaten White people and society when they become a Parasite (see above). | N/A | 'at-risk kids' (S80: 124–125) | *at-risk:* Racial/Ethnic Minority person |
| Contagion | Racial/Ethnic Minorities spread something harmful within communities, institutions or other societal domains. Agents of harm include attitudes, values, behaviors and conditions. | (1) Invasion: Racial/Ethnic Minorities physically invade White and potentially other communities.<br><br>(2) Corruption: Racial/Ethnic Minorities corrupt White and potentially other communities through conditions associated with Racial/Ethnic Minorities. | "The [Local] High School kids, they're good kids. However, when they come in and out, the *bad element* hides and mixes in between with them.' (S23: 289) | *bad element:* Black and Latinx people |
| Villain | Racial/Ethnic Minorities cause direct harm to White people and potentially others by threatening personal safety or private property. | (1) Suspect: Racial/Ethnic Minorities are suspected of engaging in crime based on their comportment, place of residence or behaviors.<br><br>(2) Offender: Racial/Ethnic Minorities commit violent or property crimes against White people. | 'Shut up, *terrorist*.' (S67: 85) | *terrorist:* A Middle Eastern person |

*Sources:* Authors' own work. Tropes adapted from Bonilla-Silva (2022); Gold (2012); Beckett (1997); Russell-Brown (1998); Dvorak (2000); Lens (2009); Haney López (2014); Shabazz (2015); Beckett and Francis (2020); Anderson (2016); Carlson (2020); Santa Ana (1998; 2002); Valles (2021); Gonzalez Van Cleve (2016); Flores et al. (2019); Fleury-Steiner et al. (2009); Longazel (2012) and Gonzalez Van Cleve and Mayes (2015).

*Note:* See Appendix I for the example code word sources.

societal resources – as a racially coded term that prosecutors, judges and defense attorneys construct to describe poor Black and Latinx defendants charged with nonviolent crimes and frame them as undeserving of legal protection (ibid: 57–61, 69).

Contagion expresses that Racial/Ethnic Minorities spread something harmful within communities, institutions or other societal domains. Agents of harm include attitudes, values, behaviors and conditions. These most refer to Latinx people in our sample – echoing Santa Ana's studies of public discourse about Latinx people in 1990s California (Santa Ana 2002; Santa Ana et al. 1998), followed by Black and Other people. Like Parasite, Contagion code words exist within socioeconomic spheres of life, but the object of harm is geographic: (1) the physical "Invasion" of White and potentially other racial and ethnic communities by Racial/Ethnic Minorities and (2) the "Corruption" of these communities by conditions associated with Racial/Ethnic Minorities. Invasion code words often use deixis like "these" or "those" to differentiate outsiders from insiders, such as White neighbors referring to Black people on their block as '*these people*' in expressing safety concerns (S23: 290). *Illegal* and variants were common Invasion code words for Latinx people. An example is the Tea Party rally sign 'Freeloading *Illegals* are Raping U.S. Taxpayers,' which derives additional potency from its integration of Parasite ('*Freeloading*') and White Respectability and Privilege ('*Taxpayers*') code words (and seeds the trope of Villain (described below) in '*Raping*') (S65: 152). An example of a Corruption code word is referring to Black and Latinx students attending a White neighborhood high school as the '*bad element*' (S23: 289). Contagion code words often reflect users' "legal-spatial consciousness" of how race shapes rights to occupy and behave in space, their attention to transgressions of these norms and their role in reinforcing them (Flores et al. 2019; Shabazz 2015).

Villain expresses that Racial/Ethnic Minorities cause direct harm to White people and potentially others by threatening personal safety or private property. These sampled code words most refer to Black people, followed by Middle Eastern and Latinx people. They commonly convey fear that Racial/Ethnic Minorities will commit crimes against White people. The subcategory "Suspect" expresses concern about Racial/Ethnic Minorities engaging in crime based on their comportment, place of residence or behaviors, such as when a juror in a bank robbery case observed about the Latinx defendant, 'I guess we're profiling but they *cause all the trouble*' (S3: 1135). The subcategory "Offender" addresses perceptions that Racial/Ethnic Minorities commit violent or property crimes against White people. One example is politicians and journalists calling Black people protesting the death of a young Black man in police custody '*thugs*' (S26: 350). Another is a White high school student telling a Middle Eastern peer, 'Shut up, *terrorist*' (S67: 85). Like Contagion, Villain implies a moral-legal cartography that creates "new forms of knowledge of space, self, and other" and calls for White defense and harsher criminalization of minorities, particularly Black and Latinx people (Fleury-Steiner and Fleury-Steiner 2009: 6; Longazel 2012; Gonzalez Van Cleve and Mayes 2015; Shabazz 2015).

## *Functions*

Most of the sampled racial code words have racist effects. Some perpetuate common-sense racism and contribute to a "racial episteme" (a total system of knowledge and knowing about race) that portrays White people and communities as respectable and

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

duly privileged and Racial/Ethnic Minorities and their communities as pathological and duly inferior.[6] Others contribute to systemic racism by supplying the substantive justifications for policies and practices that perpetuate racial inequality. The linguistic mechanisms of euphemism, metonymy and othering enable code words to imbue racial meaning and perpetuate these forms of racism by giving users varying degrees of efficient, adaptable and plausibly deniable race talk (see Table 4). Some evolve, assisted by a technique we call compounding.

### *From covert race talk to racist effects*

Santa Ana observes that discourse "antecedes society" and "speaks society into existence" by creating categories, conceptual mappings, worldviews and institutions (2002: 317). Our findings affirm his insight. Most of the sampled code words intentionally or unintentionally contributed to racist effects. Many perpetuated commonsense racism by promoting White people's respectability or Racial/Ethnic Minorities' pathology (Haney López 2003; Obasogie 2010). Examples include high school teachers and administrators referring to Black students as '*Special Ed kids*,' a journalist referring to a White murder victim as an '*upstanding citizen*,' and Newt Gingrich referring to Black people as those who have '*no habit of showing up on Monday*' (S80: 182–183; S44: 11; S57: 102). These examples, and the eight common tropes that our sample of racial code words conveys, show how racial code words contribute to epistemic racism – routine and automatic discursive practices that link Racial/Ethnic Minorities (and other minoritized groups like women and people from the Global South) with inferior characteristics like unintelligence, animality and irrationality and link White people (mostly "Western" White men) with superior qualities like higher intelligence, civility and rationality (Beagan et al. 2024; Bhimull et al. 2022; Grosfoguel 2010; 2013; Kubota 2020). Although racial code words in our sample rarely rely on metaphors for creation, the narratives they tell about Racial/Ethnic Minorities are mostly metaphors: Parasite, Contagion and Villain.[7] These vivid, rich and familiar metaphors perform powerful "conceptualizing and signaling functions" (Santa Ana 2002: 59), enabling the production of a racial episteme that portrays White people and their spaces as superior and Racial/Ethnic Minorities and their spaces as inferior. These findings indicate that racial code words have become building blocks of a "colorblind" epistemic racism in post-civil rights America.

Other racial code words were used to endorse a policy or practice that perpetuated racial inequality and White privilege. These speakers were frequently a White person advocating for a supposedly pro-White policy or practice or opposing a supposedly pro-Racial/Ethnic Minorities policy or practice. The most common was harsher policing and penalization of Racial/Ethnic Minorities, particularly Black people. Examples include a neighbor advocating for increased policing to stop '*hooligans*' and a gun rights group calling for '*responsible gun ownership*' to intimidate Black people – kinds of discourse that Carlson (2020) labels "gun militarism" and "gun populism," respectively (S23: 289; S14: 701). Use of racial code words to support harsher penalization of Racial/Ethnic Minorities affirms existing studies on how mainstream discourse on crime perpetuates racial power and control by creating state apparatuses that, instead of governing crime, govern through crime (Fleury-Steiner and Fleury-Steiner 2009;

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

312    Deirdre Pfeiffer and Xiaoqian Hu

**Table 4.** Mechanisms of sampled code words

| Mechanism | Qualities | Effects | Subcategories | Example code words | Example decoding |
|---|---|---|---|---|---|
| Euphemism | Use of agreeable, milder or inoffensive language to refer to something disagreeable, harsher or potentially offensive about a racial group or its members. | Makes conversation polite by downplaying racial dimensions and protects speakers from experiencing personal stress and adverse social consequences that might stem from naming race. | (1) Understatement: Use of fuzzy language to lighten a serious topic. (2) Under-specification: Use of general language to refer to something more specific. (3) Overstatement: Use of upbeat exaggerations to highlight something desirable about the referent. | 'Apple products are for the *premium market*' (S85: 28) | *premium market*: people who are not Black people |
| Metonymy | Use of a contextually understood closely associated feature of a racial group to refer to the group or its members. Has two parts: the descriptor (a racially salient feature) and the described (a member; the entirety or another feature of a racial group). The descriptor-described may be part-whole, whole-part or part-part. The relationship linking the descriptor and the described may be physical or conceptual. | Achieves plausible deniability through racial proxies. Reduces the informational, emotional and reputational costs of communication. Relieves speakers from experiencing personal stress and adverse social consequences that might stem from naming race. | (1) Racializing the Location: Use of a closely associated geography to refer to a racial group. (2) Inflating the Social Member or Subgroup: Use of a notable member or closely associated subgroup to refer to a racial group. | 'no *Timberlands* at the door' (S47: 135) | *Timberlands*: a Black man |

(Continued)

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

**Table 4.** (*Continued.*)

| Mechanism | Qualities | Effects | Subcategories | Example code words | Example decoding |
|---|---|---|---|---|---|
| Othering | Use of disagreeable, harsh or potentially offensive language to forge racial difference. | Creates a qualitative difference and ideological distance between two racial groups, placing them on the opposing sides of a contextually salient binary of us vs. them. Reduces the informational, emotional and reputational costs of communication. Weakens plausible deniability. | (1) Total and insurmountable: Involves dehumanization. (2) Moral: Relates to morality. (3) Legal: Relates to legal status. (4) Cultural: Relates to cultural traits. (5) Interpersonal: Involves microaggressions. | '*anchor babies*' (S22: 35) | *anchor babies*; Latinx people |

*Sources:* Authors' own work. Mechanisms adapted from Cameron (2012); Crespo-Fernández (2018); Rich (2004); Onwuachi-Willig and Barnes (2005); Carbado and Gulati (2013); Shabazz (2015); Littlemore (2015); Plumwood (1993); Pandey (2004); Hall (2013) and Lens (2009).

*Note:* See Appendix I for the example code word sources.

Gonzalez Van Cleve and Mayes 2015; Murakawa and Beckett 2010; Simon 2007). Other common policy-positions included:

(1) Delegitimizing or sabotaging policies, initiatives or individuals that sought to empower minorities. For example, conservative critic Craig Smith referred to Barack Obama as a '*hip-hop president*' (S4: 138).
(2) Opposing welfare programs. For example, White politicians referred to welfare recipients as '*welfare queen[s]*,' '*people on food stamps*' and '*people who are on crack*' (S35: 2125; S72: 1164; S57: 60).
(3) Opposing affirmative action programs. For example, White research participants highlighted that affirmative action beneficiaries '*don't keep the averages up*' and are '*destined to fail*' (S13: 19; S52: 30).
(4) Advocating stricter immigration policy. For example, Republican politicians argued that '*bad hombres*' and '*illegal aliens*' stem from "open borders" (S35: 2125; S9: 131).

Most private practices involved race-based exclusion, such as from a bar, shopping mall, neighborhood, newspaper, job, intimate relationship or educational or medical resource, such as school children avoiding a '*terrorist*' peer (S67: 85).

Notably, many code words both perpetuated commonsense racism and supported a racist policy or practice. This shows how covert racism and institutional racism are mutually constituted and reinforced (e.g., Gonzalez Van Cleve and Mayes 2015; Murakawa and Beckett 2010). Code words that perpetuate commonsense racism sustain a racist cultural/epistemic ecology, supplying the substantive justifications for policies and practices that perpetuate racial inequality. In turn, these policies and practices produce appearances of White people's respectability and privilege and Racial/Ethnic Minorities' pathology and inferiority, thus justifying commonsense and epistemic racism (see also Haney López 2006; Lawrence 1987). Like overt race talk, racial code words direct attention away from racist systems and structures and toward the racial difference of the disadvantaged subject (Gonzalez et al. 2022, citing Fields and Fields). However, more convenient than overt race talk, racial code words cloak the co-dependent cultural and systemic racism with plausible deniability and racial innocence and open a new space for cultural/epistemic and systemic racism to co-evolve in a "colorblind" society (Bonilla-Silva 2022; Omi and Winant 2014).

### Euphemism, metonymy and othering: mechanisms for efficient, adaptable and plausibly deniable race talk

Linguistic mechanisms are instrumental to overt and covert racial discourses (e.g., metaphor in Santa Ana 2002; "metapragmatic dismissals" in López-Espino 2023). Santa Ana (2002, 1998) analyzes how use of metaphors such as "immigration as dangerous waters," "immigrant as animal," "affirmative action as disease" and "nonEnglish language as barrier" shaped public discourses on immigration, affirmative action and bilingual education and contributed to the passing of anti-Latinx referenda on these issues in 1990s California. We found that metaphors were used mostly to explicitly

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

racialize a subject in our research and hence were not codes, with a few exceptions, such as referring to Latinx immigrants as '*anchor babies'* (e.g., S22: 35; S57: 42; S14: 712).

Speakers in our sample of racial code words commonly used euphemism, metonymy and othering to covertly racialize a subject and, in turn, perpetuate epistemic and/or systemic racism. Euphemism is the use of agreeable, milder or inoffensive language to refer to something disagreeable, harsher or potentially offensive about a racial group or its members (Cameron 2012). An example is a master's student using '*not diverse'* to refer to the harsher fact that Racial/Ethnic Minorities are absent from her classes (S8: 165). Euphemist code words in our sample exhibit three, often overlapping forms: understatement, under-specification and overstatement (Crespo-Fernández 2018). Understatements use fuzzy language to lighten a serious topic, such as an online news commentator using '*old boys network'* to refer to practices of hiring only White men (S53: 197). Under-specifications use general language to refer to something more specific, like an online news commentator using '*certain group of people'* to refer to Black male athletes perceived to have "foul mouths" at a local mall (S64: 245). Overstatements use upbeat exaggerations to highlight something desirable about the referent, such as an Apple supervisor reminding his employee that 'Apple products are for the *premium market'* (i.e., not Black people) when asked whether "African American English" should be incorporated into Siri speech recognition software (S85: 28).

Euphemism makes conversation polite by downplaying racial dimensions and protects from charges of racism. For example, a Southern politician criticized the growing struggle for racial justice in America with a remark that had the rest of the country voted for Strom Thurmond (a presidential candidate who campaigned on racial segregation) like his state did, 'we wouldn't have had *all these problems* over all these years' (S48: 203). This latter scenario also exhibits "dog whistle racism," where politicians knowingly convey racial meaning while denying race talk (Bennett and Walker 2018; Haney López 2014). Other examples include calls for '*law and order'* and '*states' rights'* and to '*Make America Great Again'* in the Nixon, Reagan and Trump Presidential Campaigns and Presidencies, respectively (S14: 690; S59: 72; S39: 36).

Metonymic racial code words refer to a racial group or its members using a contextually understood closely associated feature (Littlemore 2015; Radden and Kövecses 1999). They have two parts: the descriptor (a racially salient feature) and the described (a member, the entirety or another feature of a racial group). The descriptor-described may be part-whole, whole-part or part-part. Timberland, a shoe brand, is a part that represents the whole of a Black man in a bar's rule of 'no *Timberlands* at the door' (S47: 135). People, a word for society as a whole, represents the part of White people in a White woman's observation that '*people'* get mad at 'people of other races' for competing for jobs (S47: 158). Bussing, a part of school racial desegregation, represents another part – Black students going to White schools – in Nixon's rhetoric against the practice during his presidential campaign (S87: 124). The relationship linking the descriptor and the described may be physical (e.g., police officers referring to a Muslim peer as "*towel head*") or conceptual (e.g., high school teachers referring to White students as '*Gifted and Talented'*) (S79: 1818; S80: 124–125). CRT scholars have analyzed various types of coded racism through metonymy, such as discrimination by proxy (Onwuachi-Willig and Barnes 2005; Rich 2004) and intra-racial discrimination directed against a racial subgroup sharing a common feature, e.g., unassimilated Black people (Carbado and Gulati 2013).

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

316    Deirdre Pfeiffer and Xiaoqian Hu

The variants Racializing the Location and Inflating the Social Member or Subgroup metonymy were common in our sample. Racializing the Location metonymy refers to a racial group through a closely associated geography. Sampled code words for Black people and White people most frequently convey this. Examples include generalized geographies like '*inner city*' and '*urban*' (racialized as Black) and '*suburban*' (racialized as White) and specific geographies like "*Chicago*," "*Compton*," '*Detroit*' and '*the Bronx*' (racialized as Black) and '*the West Coast*' (racialized as White) (e.g., S65: 214; S78: 480; S8: 165; S76: 96; S97: 27; S80: 128; S61: 182). Others include a healthcare case worker's reference to their Black and other Racial/Ethnic Minority clientele as 'the *inner city kids* that we deal with' and a White fraternity mocking Black History Month by hosting a gathering called '*Compton* Cookout' (S37: 477; S90: 63). The utility of Racializing the Location metonymy stems from enduring imagined and real spatial racial segregation in America, through housing types (e.g., the '*projects*' racialized as Black), city sections (e.g., '*South Side*' racialized as Black), entire cities (e.g., '*West Sierra Linda*' racialized as Racial/Ethnic Minorities in general) and regions (e.g., '*rural*' racialized as White) (S38: 115; S41: 97-98; S15: 21; S85: 22; Shabazz 2015).

Inflating the Social Member or Subgroup metonymy refers to a racial group using a notable member or a subgroup. Notable members in our sample include real persons (e.g., '*Osama*' racialized as Middle Eastern and '*Jefferson Davis*' racialized as White), stereotypes of real persons (e.g., '*welfare queen*' racialized as Black), archetypical fictional individuals (e.g., '*Uncle Tom*' as a Black person who betrays other Black people to curry favor with White people) and generic fictional individuals (e.g., '*Alice Tang*' racialized as Asian, '*Tyrone Jackson*' racialized as Black and '*Joe*' racialized as White) (e.g., S67: 81; S57: 41; S35: 2125; S40: 234; S85: 10; S28: 62). Subgroups often convey racial stereotypes. For instance, a White woman moving into a racially "mixed neighborhood" received advice to stick to streets with '*university or professional looking people*,' a code word conveying respectable White people in the neighborhood (S23: 290). Other examples are '*people on food stamps*' (racialized as Black and conveying Parasitism) and "*terrorists*" (racialized as Middle Eastern and conveying Villainy) (S72: 1164; S65: 36).

Metonymies facilitate race talk not only by achieving plausible deniability through racial proxies but also by reducing the informational, emotional and reputational costs of communication. They pare a "large amount of information" down into a simplified "manageable form," enabling speakers to use this skeletal form to access the complex concept (Littlemore 2015: 4–5). For example, wearing '*big chains*' congeals the perceived pathologies of a young Black man: criminality, irresponsibility, poverty and hypersexuality (S47: 135). Like euphemism, they also relieve speakers from experiencing personal stress and adverse social consequences, like cancellation, that might stem from naming race.

Othering, like metonymy, also contributes to efficient race talk (Santa Ana 2002; Santa Ana et al. 1998). It creates a qualitative difference and ideological distance between two racial groups, placing them on the opposing sides of a contextually salient binary of us vs. them (Hall 2013; Lens 2009; Pandey 2004; Plumwood 1993). Othering contrasts sharply with euphemism by explicitly using disagreeable, harsh or potentially offensive language to forge racial difference. Stereotyping is an important tool of othering. It ignores the internal differences among the otherized group, makes them "appear suitably homogeneous" and creates categorical differences that place

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

them in a position of inferiority, which "ground[s] hierarchy" (Plumwood 1993: 53–55). Otherizing differences in our sample include:

(1) Total and insurmountable. Black and Latinx people were dehumanized through words such as '*animal*' and '*demon*' (S89: 237; S40: 56).
(2) Moral. Some politicians portrayed Latinx people as foreigners who took advantage of America's social services through producing '*anchor babies*' (S22: 35).
(3) Legal. Latinx and Asian people's citizenship and belonging were questioned through words such as '*illegals*' and '*fobby*,' respectively (S97: 118; S75: 519).
(4) Cultural. '*eat dog*' was racialized as an Asian practice, and "*towel head*" was a racial proxy for Middle Eastern men (S82: 195; S79: 1818).
(5) Interpersonal. '*rude*,' '*angry*,' '*loud*' and '*opinionated*' were microaggressions against Black people (S47: 81; S76: 205, 109).

These examples reveal that othering is frequently deployed to target Latinx immigrants, a phenomenon also noted by Santa Ana (2002, 1998). While euphemism cloaks race and value judgments in nicer-sounding substitutes, othering amplifies value judgment but avoids direct connections to race. Othering weakens plausible deniability, which makes decoding easier. Yet, it is commonly used despite this risk because, like metaphor and metonymy, it is fundamental to how we think, communicate and form a cultural community. Cultural formation and order depend on sensemaking through differentiation and categorization and marking boundaries against intruding or impure symbolisms (Hall 2013).

Othering often was present among sampled code words that contributed to racist effects, which reveals its potency as a discursive craft of racism (Gonzalez et al. 2022; Hall 2013; Pandey 2004). An example is Tea Party activists' conception of society as made up of '*workers*' and '*nonworkers*,' '*productive citizens*' and 'the *freeloaders*,' which creates a binary of socioeconomic virtue and vice to oppose poverty assistance programs and perpetuate commonsense racism (S1: 14). When stereotype infuses with law, othering is amplified. For example, a Tea Party-backed candidate claimed that 'waves of *illegal aliens* [stream] across our border, joining violent gangs, forcing families to live in fear' (S9: 131). Here, '*illegal aliens*' conveys legal and moral difference; the law's making and marking of human beings as citizens, legal immigrants and illegal aliens and the trope of Villain cross fertilize to produce powerful racist effects (Gonzalez Van Cleve 2016; Longazel 2012).

### Compounding: a catalyst in the lifecycle of racial code words

Racial code words are birthed through the marriage of tropes and linguistic mechanisms like those described above, which enable users to realize complex meaning in an efficient, adaptable and plausibly deniable way. Yet their codedness may wax and wane, with some becoming decoded and transitioning to explicit race talk and others becoming coded and decoded again.

Heavily scrutinized racial code words sit at a crossroads. One path is to become recoded through the discursive practice we call compounding. This technique capitalizes on the syntactic versatility of language by enabling users to stack multiple code words together, graft one code word to a racially neutral expression or remix parts of code words into a new expression to create a new code word. Stacking enables

users to efficiently communicate richer or more precise racial meaning, such as a business leader referring to White areas as '*suburbs in the more affluent communities [that have] college-going culture and much more academically rich environment*' in explaining reasons for enduring social inequality in education (S15: 18–19). Stacking also allows users to recode language decoded in public and academic discourse, like *terrorist* and *street gangs* becoming '*domestic terrorist street gangs*' in a news article commentator advocating for the continuation of the war on drugs (S84: 257). Grafting and remixing enable users to create new code words to racialize new phenomena, like '*political thug*,' '*food stamp president*' and '*gangster government*,' which evolved after the election of President Obama, the first Black President (S26: 351; S14: 707; S57: 48–49). Similarly, a White House staff member's remixing of '*kung flu*' cleverly implicates Chinese people in the spread of the 2020 coronavirus pandemic, which first broke out in China (S50: 654). Compounding responds to the inherently unstable qualities of coded race talk, a dynamic that sociolegal scholars also attribute to "rights talk" (Dudas 2005).

Another path is for the racial code word gradually to become more exposed as explicitly racist. Haney López (2014) traces the political life of code words like *bussing, law and order* and *welfare queen* by showing how their racial meanings become uncloaked by scholars, media and others through their overuse by politicians and pundits during election cycles and political administrations. It is at this stage that the race talk might become fully decoded and enter the lexicon of explicitly racial words (e.g., *towel head*).

The birth and death of individual racial code words do not affect the continuous construction of the racial episteme, because these individual building blocks are perfectly dispensable and replaceable. Like in metaphors, what makes the building block effective is not the particular string of words used, but the conceptual linkages that the words invoke (Santa Ana 2002: 30). Other strings of words can invoke the same linkages. Hence, while individual racial code words are dispensable, racial code words as building material are inherently regenerative and indestructible. They are "[s]mall acts of cunning," endowed with diffused power, subtle arrangements and apparent innocence, and must be subject to profound suspicion (Foucault 1995: 139).

### Detecting the codes: a racial meaning decoding tool

We now present a "racial meaning decoding tool" to assist researchers, legal professionals and social justice advocates in detecting coded race talk. The tool integrates our empirical insights – that racial code words deploy tropes and linguistic mechanisms to convey racially stratifying narratives in efficient, adaptable and plausibly deniable ways, often to racially stratifying effects – with a synthesis of CRT insights discussed earlier from Lawrence (1987), Rich (2004) and Onwuachi-Willig and Barnes (2005). The tool can assist in evaluating whether words suspected to fit our definition of racial code words – indirect signifiers of racial or ethnic groups that contain at least one positive or negative value judgment and contextually implied or salient meanings (see our explanation in "Canvassing Racial Code Words from Scholarly Literature") – are potentially racially coded and used for disequalizing purposes. Application involves conducting three analyses and scoring the words in question based on their outcomes.

*Law & Society Review*     319

**Table 5.** The racial meaning decoding tool

| Step | Purpose | Task | Scoring |
|---|---|---|---|
| Thematic analysis | Evaluates whether the words might have racial meaning. | Determine whether any of the common tropes of racial code words are present (see Tables 2 and 3). | 1: At least one trope is present<br>0: No tropes are present, or the presence of tropes is uncertain or debated |
| Effect analysis | Evaluates whether the words might lead to a disequalizing effect on racial power relations. | Determine whether the words might contribute to:<br>1) Commonsense racism by promoting White people's superiority or Racial/Ethnic Minorities' inferiority.<br>2) A policy or practice that perpetuates racial inequality and White privilege.<br>3) Another racially disequalizing effect. | 1: At least one of these outcomes is possible<br>0: None of these outcomes are possible, or the possibility of these outcomes is uncertain or debated |
| Linguistic analysis | Evaluates whether the words might have qualities that help to obscure or efficiently convey racial meaning. | Determine whether any of the common mechanisms of racial code words are present (see Table 4). | 1: At least one mechanism is present<br>0: No mechanisms are present, or the presence of mechanisms is uncertain or debated |
| Decision | Evaluates the probability of the words exhibiting racial coding and being used for disequalizing purposes. | Tally the scores for the thematic, effect and linguistic analyses. | 0–1: Words are likely not racially coded and used for disequalizing purposes<br>2–3: Words are potentially racially coded and used for disequalizing purposes |

*Sources:* Authors' own work. Steps adapted from Lawrence (1987); Rich (2004) and Onwuachi-Willig and Barnes (2005).
*Note:* The tool should be applied to words suspected to be indirect signifiers of racial or ethnic groups that contain at least one positive or negative value judgment and contextually implied or salient meanings.

Higher scores imply a higher probability of racial coding and use for disequalizing purposes (see Table 5).

The first step is *thematic analysis.* This involves assessing whether the words might have racial meaning by determining whether at least one of the eight common tropes of racial code words shown in Tables 2 and 3 is present. The second step is *effect analysis.* This requires evaluating whether the use of the words could lead to a disequalizing effect on racial power relations. Examples of disequalizing effects include (1) commonsense racism by promoting White people's respectability or Racial/Ethnic Minorities' pathology, (2) a policy or practice that perpetuates racial inequality and White privilege and (3) other disequalizing effects. The third step is *linguistic analysis.*

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

This involves assessing whether the words might have qualities that help to obscure or efficiently convey racial meaning by discerning whether at least one of the three common mechanisms of racial code words shown in Table 4 is present. Words receive a score of 1 for each analysis passed and 0 for each analysis not passed or with unclear outcomes. The final step is to tally the scores of the three analyses. Words scoring between two to three are potentially racially coded and used for disequalizing purposes, while those scoring zero or one are likely not.

Taking two additional steps can help to strengthen the rigor of the tool's application. First, the user should try to apply shared societal understandings of the words in question, particularly those from the speaker's and audience's communities (Rich 2004). Integrating local contextual data can help to clarify shared understandings. For instance, demographic data showing disproportionate tendencies of particular racial and ethnic groups to have particular conditions can help illuminate the use of metonymy (e.g., data on differences in geographic location for Racializing the Location metonymy or housing tenure for Inflating the Social Member or Subgroup metonymy). Second, ideally at least two people should conduct the analyses and cross-validate their outcomes. Scores of 1 should be given only when their outcomes agree; scores of 0 should be given when their outcomes are unclear or disagree.

We illustrate the utility of the tool through two examples of words reflecting grounds for opposition to allowing for denser housing development in Arizona (Eland 2022; Rosequist 2022). In the first example, a resident of a predominately White and single-family home suburb opposes updating a plan to allow for denser mixed-use development, because they '*didn't move here to be in an urban city*.'

*Thematic analysis*: The region's racially segregated housing patterns (higher concentration of Racial/Ethnic Minorities and denser housing in the central city and higher concentration of White people and single-family housing in the suburbs) establish a plausible link between race and geography, with the city imagined as Minority and the suburb imagined as White. In this context, the resident's invocation of *urban city* plausibly reflects a Contagion theme that the planning change would bring Racial/Ethnic Minorities (and presumed negative consequences) to the suburb. Scoring = 1.

*Effect analysis*: The ground for opposition is expected to hinder Racial/Ethnic Minorities from living in the suburb, given that they are disproportionately likely to live in denser, multifamily housing in the region. Scoring = 1.

*Linguistic analysis*: The geographic and racial correlations shown in the thematic analysis reveal that the speaker may be using the linguistic mechanism of metonymy, referring to Racial/Ethnic Minorities by a closely associated geography (*urban city*). Scoring = 1.

*Decision*: Total score = 3. The ground for opposition is potentially racially coded and used for disequalizing purposes.

In the second example, residents of a predominately White small town of large lot homes oppose a denser and mixed-use modular housing project targeted to mining workers because it will increase the '*transient*' population.

*Thematic analysis*: Most workers employed in occupations related to mining in the region identify as White. The ground for opposition reflects none of the common tropes about White people. However, a sizable minority of these workers identify as Racial/Ethnic Minorities. The ground for opposition may reflect the trope of Contagion if it references miners who are Racial/Ethnic Minorities, since the residents perceive

that transient workers may bring harm to the town. Overall, the presence of tropes is uncertain. Scoring = 0.

*Effect analysis*: It is uncertain whether excluding mining workers from a predominately White town would have a racially disequalizing effect, since it is likely that the mining workers who would live in the proposed housing would be mostly White people. Scoring = 0.

*Linguistic analysis*: Transiency is a characteristic of miners; thus, metonymy is present. Scoring = 1.

*Decision*: Total score = 1. The ground for opposition is likely not racially coded and used for disequalizing purposes.

A strength of the tool is that it is designed to deal with the uncertainty and contestability of coded language. It evaluates the possibility of racial coding by investigating multiple dimensions of the words in question and placing them on a spectrum. The deniability of racial meaning is less plausible for words placed higher on the spectrum (i.e., with scores closer to 3) and vice versa for those placed lower (i.e., with scores closer to 0).

The tool has academic as well as practical utility. Researchers can use it to study coded race talk in particular social settings and verify, challenge and refine it for these settings. The tool also encourages legal professionals and social justice advocates to continue inquiry into race-based discrimination claims where antidiscrimination law has so far left off and to update the right to nondiscrimination for a "colorblind" society. In antidiscrimination lawsuits/investigations, legal and other advocates can apply the tool to scrutinize clients' encounters with suspicious words or proffered justifications and analyze whether they encoded plausible racial meaning in their particular context and were used to produce racially disequalizing effects.

Applying the tool will be challenging and risky. Discerning racial coding is a delicate and fraught process. People's positionalities influence how they perceive meaning, as previously noted. Racial coding can take myriad forms and no words are indispensable to conveying a racial message. If one word is decoded, others can take its place. Racial code words can adapt to changed circumstances and be invented spontaneously by drawing on potential cues that appear in a discourse. If evidence to support a particular decoding falls short of being incontrovertible, researchers are vulnerable to accusations of being racist (Haney López 2014). Sharing Lawrence's assessment about his cultural meaning test, the tool "will be beset by the complexities and inadequacies of social interpretation and buffeted by the head winds of political resistance" (1987: 388). While deconstructing the edifice of coded racism one building block at a time is slow and laborious, each of the numerous, diffuse, local and quotidian settings of racial discourse is a potential site of discursive and power remaking. Similar to Santa Ana's call to invent "insurgent metaphors" (2002), to the extent an ever-evolving and regenerative reservoir of racial codes is perpetuating racial domination, society should build a counter-reservoir and systemically, programmatically and ceaselessly uncloak the codes to equalize racial power. Our tool is a first effort in this direction.

## Building knowledge to further deconstruct racial code words

Despite claims by the Supreme Court and others that colorblindness is equal treatment and that race-based remediation efforts are a form of racial discrimination

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

(*Students for Fair Admissions v. Harvard* 2023; Dershowitz 2021), racism and racial stratification continue in post-civil rights America, partly under the disguise of colorblindness (Bonilla-Silva 2022; Powell 2023). Coded language is an instrument of this "colorblind racism." Through a thematic analysis of 734 racial code words from 97 scholarly texts, this research introduced a new interpretive framework and decoding tool to inform and stimulate future investigations of racially coded language.

We identified eight common tropes of racial code words, four for White people and Whiteness and four for Racial/Ethnic Minorities. Tropes for White people and Whiteness (White Respectability and Privilege, White Possessiveness, White Defense and Passing) convey that White people (1) are respectable and duly privileged and have exclusive possession of America and (2) must conduct self-defense against threats from Racial/Ethnic Minorities, who in turn must strive to assimilate to White norms and values. Tropes for Racial/Ethnic Minorities (Parasite, Deficiency, Contagion and Villain) convey that they are socially, economically, morally and developmentally deficient people who cause indirect, direct or possible future harm to White people and communities and society more broadly. Through these tropes, racial code words fuel commonsense racism and a racial episteme that portrays White people and their spaces as superior and Racial/Ethnic Minorities and their spaces as inferior. They also contribute to systemic racism by supplying the substantive justifications for policies and practices that perpetuate racial inequality. These policies and practices, in turn, produce appearances of White people's superiority and Racial/Ethnic Minorities' inferiority, thus justifying commonsense racism (Haney López 2006; Lawrence 1987).

Certain linguistic mechanisms enable racial code words to perpetuate both epistemic and systemic racism. Euphemism and metonymy obscure the racial nature of the discourse, creating a "colorblind discursivity." The ensuing plausible deniability helps to neutralize, normalize and legitimize an otherwise troubled discourse of knowledge production (Foucault 1990). This enables speakers to engage in disavowal, "a strategy by means of which a powerful fascination or desire is both *indulged* and at the same time *denied*" (Hall 2013: 257). Mechanisms like metonymy and othering also decrease the costs of racial communication by reducing complex meanings into a succinct code. Metonymy allows speakers to use a low information-cost concept to access high information-cost concepts. Othering further lowers these costs by reducing the complexity, fluidity and temporality of a person or a group to a few objectified traits (ibid: 247). As a code word gets exposed, or repeated use unravels its congealed meaning, or a new circumstance demands a new code, compounding allows speakers to creatively reconfigure racial code words to convey new and evolving racial meanings. Techniques of syntactic stacking, grafting or remixing re-fix an unraveling meaning (e.g., *inner city crime*) or reinvent meaning for new purposes (e.g., *political thug*), fueling their evolution (Dudas 2005). The creation of racial codes from tropes, the acceptance of codes as commonsense, the unraveling or delegitimization of coded meanings and the eventual destruction and recreation of codes form the life cycles of racial code words.

Our research informs and extends empirical studies of racially coded language. Theoretically, we narrow a disciplinary gap between sociolegal studies of race and CRT. Our interpretive framework reflects sociolegal scholars' calls to study race and racism

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

as processes in social systems (Gómez 2012; Murakawa and Beckett 2010) by showing how use of racial code words in micro-instances constructs race and perpetuates epistemic and systemic racism in society. Our decoding tool integrates insights of CRT scholars (Lawrence 1987; Rich 2004; Onwuachi-Willig and Barnes 2005) with our findings to assist researchers, legal professionals and social justice advocates in examining multiple dimensions of suspected words and placing them on a scored spectrum of possible coding. Practically, our tool can aid legal professionals and social justice advocates in confronting covert racism and uncloaking its various disguises, as recent retrenchments in civil rights by the Supreme Court and some state legislatures and courts exemplify the current battles over meaning and authority of interpretation.

We stress that our framework and tool are only the first steps in a long journey of developing more rigorous methods to detect racial code words, discern their mechanisms and understand how they contribute to epistemic and systemic racism. Discerning meaning from language – particularly indirect, contextually dependent and plausibly deniable language like racial code words – is difficult. This task is made harder in our research by our use of secondary data from scholarly literature, data that has been filtered at least once and sometimes twice or more by others' perceptions. This quality leads to an iterative loss of contextual information valuable in studying race talk and increases the risk of misrepresenting and misinterpreting it. Our data also are biased by practical challenges encountered in comprehensively capturing and conveying racial code words in a large sample of scholarly literature. Our research is a necessary but incomplete attempt at muddling through these challenges to offer preliminary insights on a topic as timely and harmful as racial code words.

Our larger aim is for our framework and decoding tool to spark more research in sociolegal studies on how racial code words facilitate unequal power relations through epistemic and systemic racism. First, research is needed on how racially coded speech in distinct contexts shapes specific policies and practices, and how these in turn entrench racial power hierarchies and complicate remediation efforts. Researchers can use our tool to help discern which words might be racially coded in particular settings, such as legal education, jury deliberations, police officer testimony and local government decision making, and help refine the tool's use for these settings. More case studies of racial code words in particular places, like Gonzalez Van Cleve (2016)'s investigation of Chicago area criminal courts, would help to not only understand their racially stratifying functions but also conceptualize how they vary across different geographic, demographic, situational and discursive contexts. There also is an opportunity to uncover how these contexts relate to one another thematically and temporally within places (e.g., how code words are reinforced, complemented or contradicted among traditional and social media and public meeting contexts). Research on the ecologies and modes of functioning of racial codes in settings regulated by antidiscrimination law especially is warranted, as our sample features only a small number of code words in these settings.

Second, research into racial code words' life cycles and continuums of harm is needed. Why do some retain their coding while others become decoded? Racial code words may have thresholds of efficacy; as they are widely adopted, their effectiveness may first grow but later shrink due to increased exposure and scrutiny. Why are some more effective in achieving racist outcomes than others? Discursive practices

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

like othering may play a role. Code words that exhibit total and insurmountable forms of othering and thematic dimensions of Villain are most harmful, while those that convey thematic dimensions of Passing are less harmful, though there is harm in how they function to codify White normality and erase racial and ethnic differences. Why do some persist after decoding while others perish or evolve? While racial meanings and codes change over time, some may change faster than others, including in particular social contexts and historical periods. There is opportunity to marry historical, sociological and discourse analysis in building continuums of harm and tracing pathways of codedness in various settings, particularly those relevant to antidiscrimination law. Despite its limitations, antidiscrimination law can be a more powerful tool for positive social change if we invest in developing, applying and refining methods to expose racial codes and their functions in the reproduction of racism and racial stratification.

**Supplementary material.**  The supplementary material for this article can be found at https://doi.org/10.1017/lsr.2024.19.

**Acknowledgements.**  We thank Andrew Coan, Robert Glennon, Toni Massaro and Carol Rose for their insights on the viability of racial code words as a research topic and Carolyn Rouse for her engaging and thoughtful comments on an earlier draft of this paper. We also thank participants at our presentations given at the Law and Society Association, Association of American Law Schools, Association of Collegiate Schools of Planning, and Urban Affairs Association conferences and to the Arizona State University Equitable Places Lab and the SouthWest Fair Housing Council. We are grateful to the editorial team and four anonymous reviewers, whose comments pushed us to deepen our research contributions and scholarly engagement. We also recognize the support of Jordyn Hitzeman, an ASU undergraduate student, who assisted in synthesizing scholarship that informed our articulation of the Parasite and Villain tropes present in racial code words for Racial/Ethnic Minorities.

## Notes

**1.** We define post-civil rights America as starting in 1968, the year that the last race-related civil rights law, the Fair Housing Act, was passed.

**2.** We follow Rouse (2021)'s suggestion to articulate how racial descriptors work. We capitalize terms referring to racial groups to emphasize how race is socially constructed through discourse. We use Racial/Ethnic Minorities to refer to both People of Color and Jewish people, given the increasing anti-Semitism in recent years and the ambivalence of some Jewish people regarding their positionality in the White-Color dichotomy. Further, this was a better term than BIPOC to refer to people who identify as Black, Indigenous and People of Color, since our data offers little insight into Indigenous peoples' experiences (see Table 2).

**3.** A similar dynamic exists in child welfare cases. *See* López-Espino 2023.

**4.** The referred-to subject of policy-oriented racial code words is the racial group that the speaker assumes is the beneficiary. For example, *law and order* is a code word for White people even though it mostly targets Black people, because they are the perceived beneficiaries.

**5.** We owe this insight to an anonymous reviewer of the manuscript. Another possibility is that scholars have focused more on studying stereotypes for Black and Latinx people than White people. This latter possibility is not convincing, because the sample features more than twice as many code words for White people (25%) than for Latinx people (11%).

**6.** Although "cultural racism," "commonsense racism" and "epistemic racism" are distinct concepts, we use them interchangeably, since they focus on cultural meanings and epistemic roots of racism.

**7.** Interestingly, tropes about White people in our sample are more literal than metaphoric. We are not sure how to explain this difference. One possibility is that participants in the racial episteme assume that White people are normal, human and moral, and metaphors are an effective tool to conceptualize Racial/Ethnic Minorities as deviant, non- or sub-human and immoral.

## References

Anderson, Carol. 2016. *White Rage: The Unspoken Truth of Our Racial Divide*. New York: Bloomsbury.

Beagan, Brenda L., Stephanie R. Bizzeth, Kaitlin R. Sibbald and Josephine B. Etowa. 2024. "Epistemic Racism in the Health Professions: A Qualitative Study with Black Women in Canada." *Health* 28 (2): 203–15.

Beckett, Katherine. 1997. *Making Crime Pay: Law and Order in Contemporary American Politics*. New York: Oxford University Press.

Beckett, Katherine and Megan Ming Francis. 2020. "The Origins of Mass Incarceration: The Racial Politics of Crime and Punishment in the Post–Civil Rights Era." *Annual Rev. of Law and Social Science* 16: 433–52.

Bennett, Dylan and Hannah Walker. 2018. "Cracking the Racial Code: Black Threat, White Rights and the Lexicon of American Politics." *American J. of Economics and Sociology* 77 (3-4): 689–727.

Bhimull, Chandra, Gabrielle Hecht, Edward Jones-Imhotep, Chakanetsa Mavhunga, Lisa Nakamura and Asif Siddiqi. 2022. "Systemic and Epistemic Racism in the History of Technology." *Technology and Culture* 63 (4): 935–52.

Bilotta, Isabel, Abby Corrington, Saaid A. Mendoza, Ivy Watson and Eden King. 2019. "How Subtle Bias Infects the Law." *Annual Rev. of Law and Social Science* 15: 227–45.

Bobo, Lawrence D. 2017. "Racism in Trump's America: Reflections on Culture, Sociology, and the 2016 US Presidential Election." *The British J. of Sociology* 68 (S1): S85–S104.

Bonilla-Silva, Eduardo. 2022. *Racism without Racists: Color-Blind Racism and the Persistence of Racial Inequality in the United States (6th ed.)*. Lanham, MD: Rowman & Littlefield.

Burke, Meghan A. 2017. "Racing Left and Right: Color-Blind Racism's Dominance across the U.S. Political Spectrum." *The Sociological Quarterly* 58 (2): 277–94.

Cameron, Deborah. 2012. *Verbal Hygiene*. New York: Routledge.

Carbado, Devon W. 2022. "Strict Scrutiny & The Black Body." *UCLA Law Rev.* 69: 2–79.

Carbado, Devon W. and Mitu Gulati. 2013. *Acting White?: Rethinking Race in "Post-Racial" America*. Oxford: Oxford University Press.

Carlson, Jennifer. 2020. *Policing the Second Amendment: Guns, Law Enforcement, and the Politics of Race*. Princeton, NJ: Princeton University Press.

Crespo-Fernández, Eliecer. 2018. "Euphemism as a Discursive Strategy in US Local and State Politics." *J. of Language and Politics* 17 (6): 789–811.

Currie, Brainerd. 1951. "The Materials of Law Study." *J. of Legal Education* 3 (3): 331–83.

Dershowitz, Alan. 2021. *The Case for Color-Blind Equality an Age of Identity Politics*. New York: Hot Books.

Drakulich, Kevin, Kevin H. Wozniak, John Hagan and Devon Johnson. 2021. "Whose Lives Mattered? How White and Black Americans Felt about Black Lives Matters in 2016." *Law & Society Rev.* 55: 227–51.

Dudas, Jeffery R. 2005. "In the Name of Equal Rights: 'Special' Rights and the Politics of Resentment in Post–Civil Rights America." *Law & Society Rev.* 39 (4): 723–58.

Dvorak, Richard. 2000. "Cracking the Code: 'Decoding' Colorblind Slurs during the Congressional Crack Cocaine Debates." *Michigan J. of Race & Law* 5: 611–63.

Edelman, Lauren B., Aaron C. Smyth and Asad Rahim. 2016. "Legal Discrimination: Empirical Sociolegal and Critical Race Perspectives on Antidiscrimination Law." *Annual Rev. of Law and Social Science* 12: 395–415.

Eland, Ron. 2022. "Strong Opposition to Mine's Proposed 'Man Camp'." *The Wickenburg Sun*. August 16.

Fleury-Steiner, Benjamin D. Kerry Dunn and Ruth Fleury-Steiner. 2009. "Governing through Crime as Commonsense Racism: Race, Space, and Death Penalty 'Reform' in Delaware." *Punishment & Society* 11 (1): 5–24.

Flores, Andrea, Kevin Escudero and Edelina Burciaga. 2019. "Legal–Spatial Consciousness: A Legal Geography Framework for Examining Migrant Illegality." *Law & Policy* 41 (1): 12–33.

Foucault, Michel. 1990. *The History of Sexuality: Volume 1: An Introduction*. New York: Vantage Books.

Foucault, Michel. 1995. *Discipline & Punish: The Birth of the Prison*. New York: Vantage Books.

Freeman, Alan. 1990. "Antidiscrimination Law: The View from 1989." *Tulane Law Rev.* 64: 1407–42.

Gaber, John. 2020. *Qualitative Analysis for Planning & Policy: Beyond the Numbers*, 2nd ed. New York: Routledge.

Gold, Martin B. 2012. *Forbidden Citizens; Chinese Exclusion and the U.S. Congress: A Legislative History*. Alexandria, VA: TheCapitol.Net.

Gómez, Laura E. 2012. "Looking for Race in All the Wrong Places." *Law & Society Rev.* 46 (2): 221–45.

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

Gonzalez, Shannon M, Samantha J. Simon and Katie K. Rogers. 2022. "The Diversity Officer: Police Officers' and Black Women Civilians' Epistemologies of Race and Racism in Policing." *Law & Society Rev.* 56: 477–99.

Gonzalez Van Cleve, Nicole. 2016. *Crook County: Racism and Injustice in America's Largest Criminal Court.* Stanford: Stanford Law Books.

Gonzalez Van Cleve, Nicole and Lauren Mayes. 2015. "Criminal Justice through 'Colorblind' Lenses: A Call to Examine the Mutual Constitution of Race and Criminal Justice." *Law & Social Inquiry* 40 (2): 406–32.

Grosfoguel, Ramón. 2010. "Epistemic Islamophobia and Colonial Social Sciences." *Human Architecture: J. of the Sociology of Self-Knowledge* VIII (2): 29–38.

Grosfoguel, Ramón. 2013. "The Structure of Knowledge in Westernized Universities Epistemic Racism/Sexism and the Four Genocides/Epistemicides of the Long 16th Century." *Human Architecture: J. of the Sociology of Self-Knowledge* XI (1): 73–90.

Hall, Stuart. 2013. "The Spectacle of the 'Other'." In *Representation: Cultural Representations and Signifying Practices*, 2nd ed. edited by Stuart Hall, et al., 223–79. Los Angeles: Sage.

Haney López, Ian. 2003. *Racism on Trial: The Chicago Fight for Justice.* Cambridge, MA: Harvard University Press.

Haney López, Ian. 2006. *White by Law: The Legal Construction of Race.* New York: New York University Press.

Haney López, Ian. 2014. *Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism & Wrecked the Middle Class.* New York: Oxford University Press.

Kinder, Donald R. and David O. Sears. 1981. "Prejudice and Politics: Symbolic Racism versus Racial Threats to the Good Life." *J. of Personality and Social Psychology* 40 (3): 414–31.

Kubota, Ryuko. 2020. "Confronting Epistemological Racism, Decolonizing Scholarly Knowledge: Race and Gender in Applied Linguistics." *Applied Linguistics* 41 (5): 712–32.

Lawrence, Charles II. 1987. "The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism." *Stanford Law Rev.* 39 (2): 317–88.

Lens, Vicki. 2009. "Confronting Government after Welfare Reform: Moralists, Reformers, and Narratives of (Ir)responsibility at Administrative Fair Hearings." *Law & Society Rev.* 43 (3): 563–92.

Levinson, Justin D. and Robert J. Smith. 2012. *Implicit Racial Bias across the Law.* Cambridge: Cambridge University Press.

Littlemore, Jeannette. 2015. *Metonymy: Hidden Shortcuts in Language, Thought and Communication.* Cambridge: Cambridge University Press.

Liu, James H. and Duncan Mills. 2006. "Modern Racism and Neo-Liberal Globalization: The Discourses of Plausible Deniability and Their Multiple Functions." *J. of Community & Applied Social Psychology* 16: 83–99.

Longazel, Jamie G. 2012. "Moral Panic as Racial Degradation Ceremony: Racial Stratification and the Local-Level Backlash against Latino/a Immigrants." *Punishment & Society* 15 (1): 96–119.

López-Espino, Jessica. 2023. "Giving and Taking Voice: Metapragmatic Dismissals of Parents in Child Welfare Court Cases." *Law & Social Inquiry*: 1–26. doi:10.1017/lsi.2023.50.

Macaulay, Stewart. 1963. "Non-Contractual Relations in Business: A Preliminary Study." *American Sociological Rev.* 28 (1): 55–67.

McConahay, John B. 1986. "Modern Racism, Ambivalence, and the Modern Racism Scale." In *Prejudice, Discrimination, and Racism*, edited by J. F. Dovidio and S. L. Gaertner, 91–125. New York: Academic Press.

Mendelberg, Tali. 2001. *The Race Card: Campaign Strategy, Implicit Messages, and the Norm of Equality.* Princeton: Princeton University Press.

Mills, C. Wright. 1951. *White Collar: The American Middle Classes.* New York: Oxford University Press.

Mohammad, Saif. 2018. "Obtaining Reliable Human Ratings of Valence, Arousal, and Dominance for 20,000 English Words." In *Proceedings of the 56th Annual Meeting of the Association for Computational Linguistics*, 174–84.

Moran, Rachel F. 2010. "What Counts as Knowledge? A Reflection on Race, Social Science, and the Law." *Law & Society Rev.* 44: 515–52.

Moreton-Robinson, Aileen. 2015. *The White Possessive: Property, Power, and Indigenous Sovereignty.* Minneapolis: University of Minnesota Press.

Murakawa, Naomi and Katherine Beckett. 2010. "The Penology of Racial Innocence: The Erasure of Racism in the Study and Practice of Punishment." *Law & Society Rev.* 44 (3-4): 695–730.

https://doi.org/10.1017/lsr.2024.19 Published online by Cambridge University Press

Nguyen, Mai Thi, Victoria Basolo and Abhishek Tiwari. 2013. "Opposition to Affordable Housing in the USA: Debate Framing and the Responses of Local Actors." *Housing, Theory and Society* 30 (2): 107–30.

Obasogie, Osagie K. 2010. "Do Blind People See Race? Social, Legal, and Theoretical Considerations." *Law & Society Rev.* 44 (3-4): 585–616.

Omi, Michael and Howard Winant. 2014. *Racial Formation in the United States*. 3rd ed. New York: Routledge.

Onwuachi-Willig, Angela and Mario L. Barnes. 2005. "By Any Other Name: On Being Regarded as Black, and Why Title VII Should Apply Even if Lakisha and Jamal are White." *Wisconsin Law Rev.* 2005 (5): 1283–344.

Pandey, Anjali. 2004. "Constructing Otherness: A Linguistic Analysis of the Politics of Representation and Exclusion in Freshmen Writing." *Issues in Applied Linguistics* 14 (2): 153–84.

Plumwood, Val. 1993. *Feminism and the Mastery of Nature*. New York: Routledge.

Powell, Cedric M. 2023. *Post-Racial Constitutionalism and the Roberts Court: Rhetorical Neutrality and the Perpetuation of Inequality*. Cambridge: Cambridge University Press.

Radden, Günter and Zoltán Kövecses. 1999. "Towards a Theory of Metonymy." In *Metonymy in Language and Thought*, edited by Klaus-Uwe Panther, and Günter Radden, 17–59, Amsterdam: John Benjamins Publishing Company.

Rich, Camille G. 2004. "Performing Racial and Ethnic Identity: Discrimination by Proxy and the Future of Title VII." *NYU Law Rev.* 79: 1134–270.

Rosequist, Melissa. 2022. "Little Participation Recorded in Old Town Planning." *Town of Paradise Valley Independent* January 5.

Rouse, Carolyn. 2021. "Capital Crimes: 'Language is a Moving Target'." *Princeton Alumni Weekly*, December: 35–37.

Russell-Brown, Katheryn. 1998. *The Color of Crime Racial Hoaxes, White Fear, Black Protectionism, Police Harassment, and Other Macroaggressions*. New York: New York University Press.

Santa Ana, Otto. 2002. *Brown Tide Rising: Metaphors of Latinos in Contemporary American Public Discourse*. Austin: University of Texas Press.

Santa Ana, Otto, Morán Juan and Cynthia Sanchez. 1998. "Awash under a Brown Tide: Immigration Metaphors in California Public and Print Media Discourse." *Aztán* 23 (2): 137–74.

Shabazz, Rashad. 2015. *Spatializing Blackness: Architectures of Confinement and Black Masculinity in Chicago*. Urbana, IL: University of Illinois Press.

Simon, Jonathan. 2007. *Governing through Crime: How the War on Crime Transformed American Democracy and Created a Culture of Fear*. New York: Oxford University Press.

Tighe, J. Rosie. 2010. "Public Opinion and Affordable Housing: A Review of the Literature." *J. Planning Literature* 25 (1): 3–17.

Timmermans, Stefan and Iddo Tavory. 2012. "Theory Construction in Qualitative Research: From Grounded Theory to Abductive Analysis." *Sociological Theory* 30 (3): 167–86.

Urciuoli, Bonnie. 1994. "Acceptable Difference: The Cultural Evolution of the Model Ethnic American Citizen." *Political and Legal Anthropology Rev.* 17 (2): 19–36.

Valles, Dario. 2021. "Chill Pills Panic: Legal Constructions of Play, Race, and the Policing of Care in California's Administrative Courts." *PoLAR* 44 (1): 156–71.

Wikipedia Contributors. 2023. "List of Ethnic Slurs." *Wikipedia, The Free Encyclopedia*, https://en.wikipedia.org/w/index.php?title=List_of_ethnic_slurs&oldid=1175110837 (accessed September 12, 2023).

Wiktionary. 2023. "Category: English Ethnic Slurs." *Wikipedia, The Free Encyclopedia*, https://en.wiktionary.org/wiki/Category:English_ethnic_slurs (accessed September 12, 2023).

Xiao, Yu and Maria Watson. 2019. "Guidance on Conducting a Systematic Literature Review." *J. of Planning Education and Research* 39 (1): 93–112.

**Cases Cited**

*Dews v. Town of Sunnyvale, Tex.*, 109 F.Supp.2d 526 (N.D. Tex. 2000).

*Hallmark Developers, Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276 (11th Cir. 2006).

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 US _ (2023).

**Dr. Deirdre Pfeiffer's** scholarship, teaching, and community engagement address housing strategies to advance social equity, the relationship between housing and wellbeing, and the socioeconomic impacts of housing market disruptions. She has a PhD in Urban Planning from UCLA and is a member of the American Institute of Certified Planners.

**Dr. Xiaoqian Hu** researches how property law shapes racial and class inequality and what legal changes might be realizable to advance structural equity. She also studies how in China property law shapes and is shapes by the country's socioeconomic transformation and how state actions and discourses affect class dynamics and government legitimacy. She has a SJD from Harvard Law School and a PhD in comparative law and law and economics from the University of Turin.

**Cite this article:** Pfeiffer, Deirdre and Xiaoqian Hu. 2024. "Deconstructing racial code words." *Law & Society Review* 58(2): 294–328. https://doi.org/10.1017/lsr.2024.19