# EXHIBIT 22



EXPLAINER

# Explainer: Asylum Backlogs

January 23, 2024

SHARE

    

RELATED TOPICS

Humanitarian

Refugees/Asylees

**(Versión en español)**

This explainer details how an ever-shifting policy landscape and extensive backlogs impact the **asylum process** in the United States. It describes what asylum is, how people apply, why such cumbersome backlogs exist, and what can be done in terms of solutions.

## What Is Asylum?

**Asylum** is a discretionary form of legal relief for someone who seeks safety in the U.S. based on "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." This definition is identical to the one used for determining who qualifies as a refugee, but unlike refugees who are resettled stateside, asylum seekers arrive to the U.S. *before* seeking protection.

Asylees who win their cases gain access to a pathway to lawful permanent residence — and eventual citizenship — in the U.S.

## Applying for Asylum

People can apply for asylum either through an affirmative or defensive process.

### *Affirmative Asylum*

The affirmative asylum process is handled by **U.S. Citizenship and Immigration Services (USCIS)**. USCIS is part of a trifecta of immigration agencies within the Department of Homeland Security (DHS), and unlike the other two agencies that are primarily focused on enforcement, its role is mostly to adjudicate immigration benefits.

Asylum seekers typically have one year from entering the country to file an **asylum application.** That said, there are some **exceptions** to this one-year deadline, including



Homeland Security (DHS), and unlike the other two agencies that are primarily focused on enforcement, its role is mostly to adjudicate immigration benefits.

Asylum seekers typically have one year from entering the country to file an **asylum application.** That said, there are some **exceptions** to this one-year deadline, including instances that involve changed or extraordinary circumstances.

Applicants for affirmative asylum start by submitting an I-589 form with USCIS. Supporting documentation — including birth certificates, passports, police or court records, witness information, country conditions reports, and other evidence — can strengthen the application.

The **affirmative asylum process** then requires individuals to be interviewed by an asylum officer, when the asylum seeker can bring an attorney and a translator. After that, the asylum officer decides the claim. Affirmative asylum interviews are conducted in a **non-adversarial** manner, which means the asylum officer is supposed to be a neutral decisionmaker and there is no party arguing against the asylum seeker.

If someone files an affirmative asylum application, USCIS decides they do not qualify, and the noncitizen does not otherwise have legal immigration status in the U.S., the agency will refer them to an immigration judge. The asylum seeker then has another opportunity to raise their protection claim, as a defense from removal.

### *Defensive Asylum*

An individual files a **defensive asylum** claim when they are already facing removal from the U.S. Most defensive asylum cases go before an immigration judge who is part of the Executive Office for Immigration Review (EOIR), under the U.S. Department of Justice (DOJ). During these proceedings, an attorney from U.S. Immigration and Customs Enforcement (ICE) argues on behalf of the federal government. The asylum seeker, in turn, can access legal representation at their own expense (at no expense to the government), or they can represent themselves.

After an asylum seeker is apprehended within the U.S., at a port of entry, or while trying to enter the country without proper documentation or status, they can claim asylum as a defense to removal — a process that often happens at the U.S.-Mexico border. Some migrants may be placed **in a fast-tracked deportation mechanism called expedited removal**, where if they express a need for protection, an asylum officer will screen them for a **credible fear of persecution or torture**. If the asylum seeker **passes this preliminary hurdle,** they are generally referred to an immigration judge within EOIR for full removal proceedings, including a merits hearing to decide whether they qualify for asylum. However, under a Biden administration **program**, some asylum seekers may instead have their cases referred to an asylum officer for a non-adversarial interview and adjudication, much like under the affirmative asylum process.

## Asylum by the Numbers



However, under a Biden administration program, some asylum seekers may instead have their cases referred to an asylum officer for a non-adversarial interview and adjudication, much like under the affirmative asylum process.

# Asylum by the Numbers

Amid a global increase in forced migration over the last decade, the U.S. has experienced a significant uptick in the number of people seeking asylum. In fiscal year (FY) **2022** alone, USCIS received around 239,000 affirmative asylum applications, a historic high and a major jump from FY **2021**, when USCIS received approximately 62,800 affirmative applications. This shift was driven by changing migration patterns, as well as the lifting of pandemic-related restrictions that affected migration levels in FY 2020 and 2021. Yet the record levels from FY 2022 were soon eclipsed in FY 2023, when USCIS received roughly **454,000** Form I-589 applications.

At the same time, in FY **2022**, there were approximately 230,389 defensive asylum applications filed with immigration judges. This continued pre-pandemic trends, with defensive asylum applications increasing "**nearly** fivefold between FY 2014 (31,517) and FY 2019 (154,368)." Such dramatic upticks have made it difficult for federal agencies to promptly process claims.

As a result, there are serious backlogs of cases for asylum seekers in both the immigration court system and within USCIS. According to the Transactional Records Access Clearinghouse (**TRAC**) at Syracuse University, by late 2022, there were 1,565,966 people waiting for their asylum cases to be heard. Back then, approximately 778,084 applicants were waiting for a resolution to their asylum claims in front of USCIS. The remaining 787,882 petitioners were in line to go before immigration judges to present defensive asylum claims. By August 20, 2023, the number of pending affirmative asylum cases alone had reached a whopping **974,571.**

With so many asylum seekers stuck in backlogs, delays can be long. If someone is before USCIS, their estimated wait time is **more than 6 years**. For claims in front of EOIR, asylum seekers are looking at an average wait time of approximately **4.3 years.** That said, variations may exist depending on the court where an asylum seeker filed their claim. Recently, the longest delays were at the immigration court in Omaha, Nebraska, where the average wait time was approaching 6 years – 2,168 days.

If justice delayed is justice denied, then the U.S.'s asylum system poses serious concerns. Such extensive delays can manifest as extreme challenges for asylum seekers, making it harder for them to win their cases. Key witnesses may die. Applicants may move. Country conditions may change. And, as asylum seekers struggle with the uncertainty of whether they'll be returned to danger, **research indicates** that longer adjudication timelines can negatively affect their health.

# Why Do Asylum Backlogs Exist?



they'll be returned to danger, research indicates that longer adjudication timelines can negatively affect their health.

# Why Do Asylum Backlogs Exist?

One primary reason for the massive asylum backlogs is the sheer number of people escaping violence and political instability around the globe. Conflicts throughout various regions in the world — many of them within the Western Hemisphere — have contributed. People who come to the U.S. in search of protection may be **fleeing** persecution, gang activity, war, extreme poverty, or natural disasters. In some countries, certain individuals may be targeted because of their race, ethnicity, political beliefs, gender, or other defining characteristics.

According to **TRAC**, "during October and November 2022…, the Immigration Court's asylum case backlog grew by more than the growth during the entire last year of the Obama administration in FY 2016." As more humanitarian migrants arrive, they file more asylum applications. Many of them will be eligible for asylum. Others who do not end up qualifying nevertheless are escaping difficult conditions and/or **believe in good faith** that they have viable claims. For a large portion of these newcomers, asylum is their only potential pathway to permanent status — a limitation of the U.S.'s outdated immigration system that overburdens asylum backlogs.

Then, these backlogs have been further impacted by agency staffing, which has not kept up with the demand for asylum adjudications. An inadequate number of immigration judge teams at EOIR — composed of judges, attorneys, and supporting staff — as well as **funding shortfalls** and **difficulties filling job vacancies** at USCIS have compromised the U.S. government's ability to make timely asylum decisions.

Beyond these overarching challenges, the sheer level of complexity involved in asylum petitions and the ever-changing policy landscape affecting asylum seekers continue to contribute to backlogs as well.

## *Asylum Applications Take Time, Expertise*

Asylum applications are a time-consuming and byzantine process. According to the **American Immigration Lawyers Association** (AILA), for experienced immigration attorneys, an average asylum application takes between 50 to 75 hours to prepare — a major commitment, particularly for lawyers who often have sizable caseloads. Moreover, the time required to complete an asylum application can dramatically increase if the applicant has experienced trauma or is being held in a detention facility.

Asylum seekers with legal representation are much more successful in winning asylum than those forced to represent themselves. In FY 2022, only **18%** of pro se asylum petitioners had their asylum applications granted, compared to 49% of those with representation, according to TRAC. Without counsel, would-be asylum seekers with strong claims struggle to navigate the U.S.'s complex immigration system and may even fail to

Privacy - Terms

Document title: Explainer: Asylum Backlogs - National Immigration Forum
Capture URL: https://immigrationforum.org/article/explainer-asylum-backlogs/
Capture timestamp (UTC): Fri, 14 Feb 2025 21:19:09 GMT
Page 4 of 8

Asylum seekers with legal representation are much more successful in winning asylum than those forced to represent themselves. In FY 2022, only **18%** of pro se asylum petitioners had their asylum applications granted, compared to 49% of those with representation, according to TRAC. Without counsel, would-be asylum seekers with strong claims struggle to navigate the U.S.'s complex immigration system and may even fail to discern how to file the necessary paperwork to ask for protection in the first place.

## *Changes in Federal Immigration Policy Foster Confusion*

While the asylum process is complex in and of itself, the ever-changing policy landscape at the U.S.-Mexico border has further contributed to confusion and has created obstacles to fair, efficient adjudications. A labyrinth of constant policy changes can lead to a lack of credibility surrounding asylum decisions and motivate time-consuming appeals that further backlog the system.

Ultimately, Congress is responsible for making immigration laws. However, since laws are enforced through the executive branch, administrative agencies issue regulations and policy guidance implementing those laws. This means asylum policy may be drastically different from one presidential administration to the next, and over the last decade, such differences have fostered uncertainty that in turn has exacerbated dysfunction. Some policy changes have restricted asylum eligibility, so that people who would have qualified before are suddenly ineligible. Others have forced migrants into situations that limit their access to due process and representation, providing reasonable arguments for the federal government to have to reconsider cases — which in turn deepens backlogs.

Although President Biden has taken a more nuanced approach than his predecessor did to irregular migration at the U.S.-Mexico border, he has still implemented policies that seriously impact and unsettle the asylum process. Many of these practices were designed to expedite fair asylum decisions and deter irregular border crossings, though evidence suggests they have fallen short in achieving either goal.

In May 2022, the Biden administration began implementing an **interim final rule** that permits USCIS asylum officers to hear certain defensive asylum claims. If the USCIS officer does not grant asylum, the case is then referred to an immigration court. The rule, which is slowly being incorporated, represents an attempt to unburden immigration judges and more quickly adjudicate cases. However, some advocates have expressed concerns about its shorter timelines and their impact on due process. Once someone receives a positive credible fear determination, they're given an asylum merits interview between **21 and 45 days** later. In this truncated timeframe, the asylum applicant must travel to their destination city, find an attorney to assist in their case (if they are able to locate and afford one), and prepare for an often life-altering interview, albeit in a non-adversarial setting.

The Biden administration likewise implemented what is known as the **Dedicated Docket**, with the intention of decreasing the amount of time that families spend in immigration proceedings to at most **300 days.** The Dedicated Docket may apply to families who arrive in the U.S. between ports of entry, who are "**placed** in removal proceedings, and enrolled in Alternatives to Detention (ATD)." But in practice, this new docket has had little impact

Privacy - Terms

Document title: Explainer: Asylum Backlogs - National Immigration Forum
Capture URL: https://immigrationforum.org/article/explainer-asylum-backlogs/
Capture timestamp (UTC): Fri, 14 Feb 2025 21:19:09 GMT
Page 5 of 8

The Biden administration likewise implemented what is known as the **Dedicated Docket**, with the intention of decreasing the amount of time that families spend in immigration proceedings to at most **300 days.** The Dedicated Docket may apply to families who arrive in the U.S. between ports of entry, who are "**placed** in removal proceedings, and enrolled in Alternatives to Detention (ATD)." But in practice, this new docket has had little impact on speeding up adjudications, while **critics** have highlighted its due process shortcomings.

In May 2023, **the Biden administration** also invoked a new regulation called the "**Circumvention of Lawful Pathways**" rule, which presumes someone is ineligible for asylum unless they can meet one of several narrow exceptions, such as scheduling an appointment to enter the nation through the government's CBP One phone app or being denied protection in another country of transit. This regulation, which resembles a **Trump-era rule**, has been **challenged in court** but remains in place for now.

These varied asylum-related policy changes in recent years — including some intended to tackle backlogs — have created even more complication and turmoil that have often proved difficult for asylum seekers, attorneys, and U.S. officials to navigate. The confusion that has ensued, in turn, has led to inefficiencies that have further clogged the asylum system.

# Solutions

To improve the asylum process and reduce backlogs, the U.S. government would need to surge resources and personnel to bolster its immigration system, while also taking important steps to ensure fair, efficient adjudications. Many of these reforms would require congressional action, which has proved challenging in recent decades.

To start, Congress could greenlight new funding for additional **immigration judge** teams, asylum officers, and financial support for communities responding to the needs of newcomers. In particular, USCIS is primarily funded through fees for immigration services, even though the agency's caseload is increasingly devoted to humanitarian applications that do not involve fees or may allow for fee waivers. In this context, **in FY 2022**, Congress provided USCIS with a supplementary $275 million to tackle the affirmative asylum backlog. But legislators **could appropriate** far more funding to help the agency access the personnel and resources it needs to process protection claims more quickly.

Another possibility to restore faith in the defensive asylum process could be to **make the immigration courts independent**, instead of under the purview of one of the executive branch's law enforcement components, the Department of Justice. Advocates and **experts** have **called** for the immigration courts to be re-established under Article I of the U.S. Constitution, **much like** tax courts, bankruptcy courts, and veterans' claims courts. While it is **unclear** whether a shift to an independent immigration court system alone would make a significant impact on backlogs, supporters of this reform have argued that by depoliticizing the system and encouraging stability, it could prevent steps by future administrations that would add to existing difficulties, and it could lend credibility to the

Privacy - Terms

Constitution, **much like** tax courts, bankruptcy courts, and veterans' claims courts. While it is **unclear** whether a shift to an independent immigration court system alone would make a significant impact on backlogs, supporters of this reform have argued that by depoliticizing the system and encouraging stability, it could prevent steps by future administrations that would add to existing difficulties, and it could lend credibility to the system that would **preempt appeals** and remands.

More generally, Congress could mitigate asylum backlogs by **opening orderly, humane immigration pathways** that respond to 21st-century challenges. Through a combination of work-based visas to fill chronic labor shortages in the U.S. and various **complementary humanitarian vehicles**, policymakers could preempt the need for many people to take dangerous journeys to the U.S.-Mexico border and request asylum in the first place.

Outside of congressional action, **immigration judges** and U.S. Immigration and Customs Enforcement (ICE) attorneys should use **their discretion** to administratively close or terminate low-priority cases and reduce the defensive asylum backlog that way — particularly when asylum seekers consent and have other legal pathways to remain in the U.S. long-term.

## Conclusion

As people flee violence and instability around the world, the U.S.'s existing asylum process is meant to protect those escaping persecution. However, newcomers applying for asylum today join extensive backlogs, and many will wait years before their adjudications, even as their evidence grows stale.

The sheer number of people asking for protection is one reason for pending backlogs. But the U.S.'s asylum system has simultaneously been hindered by a lack of funding, resources, and personnel, much of which could be shored up through lawmakers' action. It also has been plagued by administrative policy changes that have fostered instability and confusion, at times further lengthening backlogs.

Congress can take steps to better resource USCIS and the immigration court system, so that federal agencies can more effectively tackle their backlogs. Lawmakers should also pass legislation creating an independent immigration court system, and immigration judges and government attorneys should use their discretion to administratively close low-priority cases. At the same time, policymakers should devise new legal immigration pathways for people to reach the U.S. in a safe, orderly manner, outside of the asylum system.

*Thanks to Forum Policy intern Summer Scovil for extensive contributions to this explainer.*

★

## Download Resources



confusion, at times further lengthening backlogs.

Congress can take steps to better resource USCIS and the immigration court system, so that federal agencies can more effectively tackle their backlogs. Lawmakers should also pass legislation creating an independent immigration court system, and immigration judges and government attorneys should use their discretion to administratively close low-priority cases. At the same time, policymakers should devise new legal immigration pathways for people to reach the U.S. in a safe, orderly manner, outside of the asylum system.

*Thanks to Forum Policy intern Summer Scovil for extensive contributions to this explainer.*

★

## Download Resources

**Explainer_ Asylum Backlogs_NOW FINALIZED** (application/pdf)

### Learn More

PRESS RELEASE
**Unique Border Voice, National Security Leader Join Forum as Fellows**

LEGISLATIVE BULLETIN
**Legislative Bulletin — Friday, February 14, 2025**

LEGISLATIVE BULLETIN
**Legislative Bulletin — Friday, February 7, 2025**

Stay Connected
Sign up for email updates
GET UPDATES
Make a Donation
Help us advocate for the value of immigrants and immigration to our country
DONATE NOW
Follow Us
Join our cause
CHARITY NAVIGATOR
Four Star Charity
BBB
amazon
smile

© 2014-2025 National Immigration Forum. All rights reserved.