YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division
SARAH L. VUONG (CA Bar 258528)
Assistant Director
WILLIAM H. WEILAND (Mass. Bar 661433)
Senior Litigation Counsel
ERIC SNYDERMAN (VA Bar 99563)
ANNA DICHTER (NJ Bar 304442019)
LAUREN BRYANT (NY Bar No. 5321880)
CATHERINE ROSS (DC Bar 9007404)
LUZ MARIA RESTREPO (NY Bar 4907077)
Trial Attorneys
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, *et. al*., <br><br> Plaintiff, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et. al*., <br><br> Defendants. | Case No. 3:25-cv-1766-EMC <br><br> **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION** <br><br> Judge: Hon. Edward M. Chen <br> Date:  March 24, 2025 <br> Time:  9:00 a.m. <br> Place:  Courtroom 5, 17th Floor, San Francisco U.S. Courthouse |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

    A.    Statutory Background ...............................................................................3

    B.    Factual Background ..................................................................................5

STANDARDS OF REVIEW ...............................................................................................7

ARGUMENT .......................................................................................................................7

I.    THIS COURT LACKS JURISDICTION TO GRANT PLAINTIFFS THE RELIEF THEY SEEK ............................................................................7

    A.    Section 1252(f) Precludes Plaintiffs' Requested Relief.......................7

    B.    The TPS Statute Bars Plaintiffs' Claims .............................................11

II.    PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS .........................................13

    A.    The Secretary of Homeland Security May Vacate a Prior Extension of a Country's TPS Designation .................................13

    B.    The Secretary's Determinations to Vacate and Terminate the TPS Designation for Venezuela Did Not Violate the Fifth Amendment Because the Determinations were Related to Immigration Policy Objectives and Not Motivated by Racial Animus...........................17

III.    ANY HARM PLAINTIFFS MAY SUFFER IS BASED ON THE INHERENT NATURE OF THE TPS STATUTE.....................................22

IV.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST PRELIMINARY INJUNCTIVE RELIEF ....................24

V.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD........................25

CONCLUSION.................................................................................................................25

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

i

1
2
3

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Albertson v. FCC*,
    182 F.2d 397 (D.C. Cir. 2014) ........................................................................................ 14

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008) ........................................................................................................ 12

*All. For the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ....................................................................................... 24

*Amgen, Inc. v. Smith*,
    357 F.3d 103 (D.C. Cir. 2004) ...................................................................................... 11

*Arizona v. United States*,
    567 U.S. 387 (2012) ........................................................................................................ 25

*Babb v. Wilkie*,
    589 U. S. 399 (2020) ....................................................................................................... 12

*Biden v. Texas*,
    597 U.S. 785 (2022) .......................................................................................................... 8

*Cal. Tow Truck Ass'n v. City & County of San Francisco*,
    807 F.3d 1008 (9th Cir. 2015) ....................................................................................... 12

*California v. Texas*,
    593 U.S. 659 (2021) ........................................................................................................ 25

*California v. Yamasaki*,
    442 U.S. 682 (1979) .......................................................................................................... 3

*Ctr. for Biological Diversity v. Regan*,
    507 F. Supp. 3d 173 (D.D.C. 2022) ............................................................................... 10

*Dan's City Used Cars, Inc. v. Pelkey*,
    569 U.S. 251 (2013) ........................................................................................................ 12

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ............................................................................................................ 19

*DHS v. New York*,
    140 S. Ct. 599 (2020) ..................................................................................................... 25

1

*DHX Inc. v. Allianz AGF MAT, Ltd.*,
   425 F.3d 1169 (9th Cir. 2005) ................................................................................ 12

*Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*,
   774 F.2d 1371 (9th Cir. 1985) ................................................................................ 22

*Durning v. Citibank, N.A.*,
   950 F.2d 1419 (9th Cir. 1991) ................................................................................ 12

*Fiallo v. Bell*,
   430 U.S. 787 (1977) .............................................................................................. 18

*Florida v. Mayorkas*,
   2023 WL 3567851 (N.D. Fla. May 16, 2023) ......................................................... 10

*Galvan v. Press*,
   347 U.S. 522 (1954) .............................................................................................. 18

*Galvez v. Jaddou*,
   52 F.4th 821 (9th Cir. 2022) ................................................................................... 8

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022) ............................................................................................ 8, 9

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) .......................................................................................... 25

*Gun South, Inc. v. Brady*,
   877 F.2d 858 (11th Cir. 1989) ................................................................................ 14

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) .......................................................................................... 15, 18

*Kelch v. Dir., Nev. Dep't of Prisons*,
   10 F.3d 684 (9th Cir. 1993) ................................................................................... 14

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) .............................................................................................. 18

*L.A. Lakers, Inc. v. Fed. Ins. Co.*,
   869 F.3d 795 (9th Cir. 2017) ................................................................................. 13

*Lamar, Archer & Cofrin, Llp v. Appling*,
   584 U.S. 709 (2018) .............................................................................................. 12

*Last Best Beef, LLC v. Dudas,*
   506 F.3d 333 (4th Cir. 2007) ........................................................................... 14

*Lewis v. Casey,*
   518 U.S. 343 (1996) ........................................................................................... 25

*Lopez v. Brewer,*
   680 F.3d 1068 (9th Cir. 2012) ............................................................................. 7

*Macktal v. Chao,*
   286 F.3d 822 (5th Cir. 2002) ............................................................................. 14

*Mathews v. Diaz,*
   426 U.S. 67 (1976) ............................................................................................. 18

*Mazaleski v. Treusdell,*
   562 F.2d 701 (D.C. Cir. 1977) .................................................................... 14, 16

*McNary v. Haitian Refugee Center, Inc.,*
   498 U.S. 479 (1991) ........................................................................................... 12

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell,*
   467 F.3d 999 (6th Cir. 2006) ....................................................................... 10, 11

*Nixon v. Fitzgerald,*
   457 U.S. 731 (1982) ........................................................................................... 22

*Nken v. Holder,*
   556 U.S 418 (2009) ............................................................................................ 24

*Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO,*
   473 U.S. 1301 (1985) ......................................................................................... 11

*Patel v. Garland,*
   596 U.S. 328 (2022) ..................................................................................... 12, 13

*Poursina v. USCIS,*
   936 F.3d 868 (9th Cir. 2019) ............................................................................. 16

*Ramos v. Wolf,*
   975 F.3d 872 (9th Cir. 2020) ................................................................. 12, *passim*

*Ramos v. Wolf,*
   59 F.4th 1010 (9th Cir. 2023) ........................................................................... 12

*Reno v. Catholic Soc. Servs., Inc.,*
   509 U.S. 43 (1993) ............................................................................................. 12

*Richards v. United States,*
  369 U.S. 1 (1962)........................................................................................ 13

*Safety-Kleen Corp. v. EPA,*
  1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996).......................... 10

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,*
  804 F. Supp. 2d 1045 (E.D. Cal. 2011)............................................. 22, 23

*Sampson v. Murray,*
  415 U.S. 61 (1974).................................................................................. 7, 9

*Sanchez v. Mayorkas,*
  593 U.S. 409 (2021)..................................................................................... 4

*Schrill v. Plunkett,*
  760 F. Supp. 1378 (D. Or. 1990) ............................................................. 23

*Scripps-Howard Radio v. FCC,*
  316 U.S. 4 (1942)......................................................................................... 9

*Sorenson v. Sec'y of Treasury,*
  475 U.S. 851 (1986).................................................................................. 10

*Stanley v. Illinois,*
  405 U.S. 645 (1972).................................................................................. 23

*State v. U.S. Bureau of Land Mgmt.,*
  277 F. Supp. 3d 1106 (N.D. Cal. 2017) ................................................... 10

*Taiebat v. Scialabba,*
  2017 WL 747460 (N.D. Cal. Feb. 27, 2017) ........................................... 23

*Trump v. Hawaii,*
  585 U.S. 667 (2018)............................................................................ 3, 16, 17

*United States R.R. Retirement Bd. v. Fritz,*
  449 U.S. 166 (1980).................................................................................. 19

*United States v. Nixon,*
  418 U.S. 683 (1974).................................................................................. 22

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977)................................................................... 3, 17, 19, 21

*Washington v. Trump,*
  847 F.3d 1151 (9th Cir. 2017) ................................................................. 23

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

v

*Webster v. Doe,*
    486 U.S. 592 (1988) .................................................................................................. 17

*Winter v. NRDC,*
    555 U.S. 7 (2008) ...................................................................................................... 7

*Youngstown Sheet and Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) .................................................................................................. 15

## **STATUTES**

5 U.S.C. § 701(a)(1) ......................................................................................................... 11

5 U.S.C. § 705 .................................................................................................... 1, *passim*

6 U.S.C. § 202 .......................................................................................................... 13, 15

6 U.S.C. § 557 .................................................................................................................... 4

8 U.S.C. § 1103 .................................................................................................................. 4

8 U.S.C. § 1103(a) ...................................................................................................... 6, 13

8 U.S.C. § 1103(a)(1) ...................................................................................................... 15

8 U.S.C. § 1103(a)(3) ...................................................................................................... 15

8 U.S.C. § 1252(f) ......................................................................................................... 2, 9

8 U.S.C. § 1252(f)(1) .......................................................................................... 2, *passim*

8 U.S.C. § 1254a ................................................................................... 2, 3, 7, 8, 19

8 U.S.C. § 1254a(a) ........................................................................................................... 4

8 U.S.C. § 1254a(b) ..................................................................................................... 1, 4

8 U.S.C. § 1254a(b)(1)(B)(i) .......................................................................................... 22

8 U.S.C. § 1254a(b)(1)(B)(ii) ......................................................................................... 22

8 U.S.C. § 1254a(b)(1)(C) .............................................................................. 1, 13, 16, 21

8 U.S.C. § 1254a(b)(2) ...................................................................................................... 4

8 U.S.C. § 1254a(b)(2)(B) .............................................................................................. 23

8 U.S.C. § 1254a(b)(3) ................................................................................................ 6

8 U.S.C. § 1254a(b)(3)(A) ............................................................................... 4, 14, 15

8 U.S.C. § 1254a(b)(3)(B) ........................................................................................... 5

8 U.S.C. § 1254a(b)(3)(C) ........................................................................................... 5

8 U.S.C. § 1254a(b)(5)(A) ................................................................................ 1, *passim*

8 U.S.C. § 1254a(g) ................................................................................................... 22

**Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA):**
Pub. L. No. 104-208, 110 Stat. 3009-546

Section § 306 ............................................................................................................. 8

Section § 308 ............................................................................................................. 8

## OTHER AUTHORITIES

### Federal Register Notices

*Designation of Venezuela for Temporary Protected Status and Implementation of Emp. Authorization for Venezuelans Covered by Deferred Enforced Departure*, 86 Fed. Reg. 13,574 (Mar. 9, 2021) ............... 5

*Exec. Order No. 14159, Protecting the American People Against Invasion, § 16(b)*,
90 Fed. Reg. 8443 (Jan. 20, 2025) ............................................................... 17, 24

*Extension and Redesignation of Venezuela for Temporary Protected Status*,
88 Fed. Reg. 68,130 (Oct. 3, 2023)........................................................ 2, 5, 14, 15

*Extension and Redesignation of Venezuela for Temporary Protected Status*,
87 Fed. Reg. 55,024 (Sept. 8, 2022) ............................................................... 5, 14

*Extension of the 2023 Designation of Venezuela for Temporary Protected Status*,
90 Fed. Reg. 5961 (Jan. 17, 2025) ............................................................ 5, 14, 15

*Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador*,
88 Fed. Reg. 40,282 (June 21, 2023) ................................................................. 6

*Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*,
90 Fed. Reg. 9040 (Feb. 5, 2025) ............................................................ 1, *passim*

*Vacatur of 2025 Temporary Protected Status Decision for Venezuela*,
    90 Fed. Reg. 8805 (Feb. 3, 2025) ................................................................ 2, *passim*

**Dictionaries**

Black's Law Dictionary (12th ed. 2024) ....................................................................... 8

Black's Law Dictionary Online (2d ed.)
    https://thelawdictionary.org ....................................................................... 10

Merriam-Webster Dictionary,
    https://www.merriam-webster.com/dictionary .................................................... 10

Oxford English Dictionary (2d ed. 1989) ..................................................................... 8

Webster's Third New Int'l Dictionary ........................................................................ 12

# INTRODUCTION

Defendants Kristi Noem, in her official capacity as Secretary of Homeland Security; the U.S. Department of Homeland Security (DHS); and the United States of America, respectfully submit this response in opposition to Plaintiffs' Motion to Postpone Effective Date of Agency Action.[1] (PI Mot.), ECF 16. In 1990, Congress created the Temporary Protected Status (TPS) program to provide, on a discretionary basis, temporary status to aliens who cannot safely return in the short-term to their home nation because of a natural disaster, armed conflict, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(b). The Secretary of Homeland Security may designate a country for TPS only if the Secretary determines that certain statutory criteria justifying the designation are met. When a country is designated, eligible aliens from that country who are present in the United States on the effective date of the designation and register with the federal government are temporarily protected from removal and receive authorization to work in the United States. Consistent with the temporary nature of TPS, Congress dictated that the Secretary must regularly review a country's TPS designation and must terminate that designation if she determines that the conditions giving rise to the designation are no longer met. Congress further provided that "determinations" concerning TPS "with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection" are not subject to "judicial review." 8 U.S.C. § 1254a(b)(5)(A).

Exercising her clear and unreviewable statutory authority, Secretary Noem terminated the TPS designation for Venezuela. *Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 9040 (Feb. 5, 2025) (hereinafter "2025 Termination"). Venezuela was first designated in 2021 under 8 U.S.C. § 1254a(b)(1)(C) based on former Secretary Mayorkas's determination that there exist in Venezuela "extraordinary and temporary conditions" that prevent Venezuelan nationals from safely returning and that it is not "contrary to the national interest of the United States" to permit the aliens to remain temporarily in the United States. *Id.* at 9041. In 2023, former Secretary Mayorkas newly

---

[1] Plaintiffs style their Motion as one arising under 5 U.S.C. § 705 of the Administrative Procedure Act ("APA"), calling it a Motion to Postpone Effective Date of Agency Action. Yet Plaintiffs cite to the preliminary injunction standard throughout their Motion and effectively ask this Court for prohibited injunctive relief. Defendants will refer to Plaintiffs' Motion as a Preliminary Injunction Motion (PI Mot.).

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1

1    designated Venezuela, creating a parallel designation with the original 2021 designation. *Extension and*
2    *Redesignation of Venezuela for Temporary Protected Status*, 88 Fed. Reg. 68,130 (Oct. 3, 2023)
3    (hereinafter "2023 Designation"). Consistent with her obligation to periodically review whether TPS
4    designations remain appropriate, Secretary Noem, after consulting with other government agencies,
5    determined that the conditions for the 2023 Designation of Venezuela for TPS no longer continue to be
6    met. The Secretary supplied the basis and justification for her determination in the Federal Register notice,
7    where she explained that it is contrary to the U.S. national interest to permit the Venezuelan nationals to
8    remain temporarily in the United States. *See 2025 Termination*, 90 Fed. Reg. at 9042-9044.

9         Notwithstanding the Secretary's clear authority and Congress's decision to commit her
10   determination to her discretion alone, Plaintiffs, the National TPS Alliance, "a member-led organization,"
11   and several TPS beneficiaries, bring this suit challenging the termination and asserting claims under the
12   APA and the Equal Protection Clause. Plaintiffs ask this court to postpone the effective date of Secretary
13   Noem's vacatur of a recently-published decision extending the 2023 designation for Venezuela, *Vacatur*
14   *of 2025 Temporary Protected Status Decision for Venezuela*, 90 Fed. Reg. 21, 8805 (Feb. 3, 2025)
15   (hereinafter "2025 Vacatur"), and the 2025 Termination of TPS for Venezuela. *2025 Termination*, 90 Fed.
16   Reg. at 9040. The Court should reject those extraordinary requests.

17        To start, the Court lacks jurisdiction to issue the requested relief. Although Plaintiffs style their
18   request for relief as a motion to postpone the effective date of the Secretary's determination under 5 U.S.C.
19   § 705, what they actually seek is an injunction enjoining the exercise of her authority. But 8 U.S.C.
20   § 1252(f)—a provision Plaintiffs tellingly ignore—explicitly bars such relief. Section 1252(f)(1) provides:
21   "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action,
22   no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain* the
23   operation of the provisions of part IV of this subchapter … other than with respect to the application of
24   such provisions to an individual alien against whom proceedings … have been initiated." 8 U.S.C.
25   § 1252(f)(1) (emphasis added). Section 1254a is on such a covered provision, and a stay "enjoin[ing] or
26   restrain[ing]" the Secretary's determination from having any legal effect is thus precisely the sort of
27   coercive order § 1252(f) prohibits.

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

                                    2

Additionally, the TPS statute broadly prohibits judicial review of "any determination of the Secretary with respect to" designations, terminations, or extensions. 8 U.S.C. § 1254a(b)(5)(A). Each of the Secretary's decisions is precisely such a "determination" concerning "termination" of a designation under § 1254a. *Id.* Plaintiffs' claims challenging the basis for Secretary Noem's Vacatur and Termination decisions and seeking to set those decisions aside, fit squarely within the statute's bar on judicial review.

Plaintiffs' claims lack merit too. Plaintiffs' APA claims fail because Congress granted the Secretary broad discretion and authority to review TPS decisions pertaining to the continuing mandate that she ensure the continued designation of a country does not adversely affect the national interest. Plaintiffs' equal protection claim is equally unavailing. Plaintiffs fail to identify any evidence indicating that the Secretary was motivated by discriminatory animus. To the contrary, the evidence demonstrates that Secretary Noem's Vacatur and Termination decisions are immigration policies rationally related to government objectives of national security and are not motivated by racially discriminatory intent. And that is true, regardless of whether the Court applies the deferential standard recognized in *Trump v. Hawaii*, 585 U.S. 667 (2018), as applicable to such claims in the immigration context, or the balancing sometimes applied in other contexts set forth in *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

Finally, in seeking a nationwide injunction, the scope of Plaintiffs' requested relief is vastly overbroad. The relief sought goes much further than redressing the injuries to the Plaintiffs and contravenes equitable principles that require relief to be no more burdensome to the defendant than is necessary to provide plaintiff relief. *California v. Yamasaki*, 442 U.S. 682, 702 (1979). Should the Court grant Plaintiffs' requested injunction-like "stay", it should be limited to the individual Plaintiffs.

## **BACKGROUND**

### A. Statutory Background

The Immigration Act of 1990 established a program for providing temporary shelter in the United States on a discretionary basis for aliens from designated countries experiencing ongoing armed conflict, environmental disaster, or "extraordinary and temporary conditions" that temporarily prevent the aliens' safe return or, in the case of environmental disasters, temporarily render the country unable to handle

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

adequately the return of its nationals.  Pub. L. No. 101-649, 104 Stat. 4978. The statute authorizes the Secretary of Homeland Security,[2] "after consultation with appropriate agencies of the Government," to designate countries for "Temporary [P]rotected [S]tatus," if she finds:

> (A) … that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (B) … that—
>
>> (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
>>
>> (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
>>
>> (iii) the foreign state officially has requested designation under this subparagraph; or
>
> (C)  … there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b).

When the Secretary designates a country for TPS, eligible aliens who are granted TPS may not be removed from the United States and are authorized to work for the duration of the country's TPS designation, so long as they remain in valid temporary protected status. 8 U.S.C. § 1254a(a), (c); *see Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021). Initial designations may not exceed eighteen months. 8 U.S.C. § 1254a(b)(2). The Secretary must consult with appropriate agencies and review each designation before it ends to determine whether the conditions for the country's designation continue to be met.  *Id.* § 1254a(b)(3)(A).  If the Secretary finds that the foreign state "no longer continues to meet the conditions for designation," she "shall terminate the designation" by publishing notice in the Federal

---

[2] The statute originally vested the Attorney General with the power to make TPS designation, extension and termination decisions. Congress transferred these powers to the Secretary of Homeland Security. *See* 8 U.S.C. § 1103; 6 U.S.C. § 557.

1    Register of the determination and the basis for the termination. *Id.* § 1254a(b)(3)(B). If the Secretary

2    "does not determine" that the foreign state "no longer meets the conditions for designation," then "the

3    period of designation of the foreign state is extended for an additional period of 6 months (or, in the

4    discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C).

5        Finally, the statute makes the Secretary's TPS determinations unreviewable. Section

6    1254a(b)(5)(A) states: "There is no judicial review of any determination of the [Secretary] with respect

7    to the designation, or termination or extension of a designation, of a foreign state under this subsection."

8    **B.  Factual Background**

9        On March 9, 2021, then-Secretary of Homeland Security Alejandro Mayorkas designated

10   Venezuela for TPS based on extraordinary and temporary conditions that prevented nationals of

11   Venezuela from returning in safety. *See Designation of Venezuela for Temporary Protected Status and*

12   *Implementation of Emp. Authorization for Venezuelans Covered by Deferred Enforced Departure*, 86 Fed.

13   Reg. 13,574 (Mar. 9, 2021) (hereinafter "2021 Designation"). Following the 2021 Designation, former

14   Secretary Mayorkas extended Venezuela's TPS designation twice. *See Extension of the Designation of*

15   *Venezuela for Temp. Protected Status*, 87 Fed. Reg. 55,024 (Sept. 8, 2022); *see also 2023 Designation*,

16   88 Fed. Reg. 68,130.

17       On October 3, 2023, in addition to extending the 2021 Venezuela TPS status through September

18   2025, former Secretary Mayorkas redesignated Venezuela for TPS, effective from October 3, 2023,

19   through April 2, 2025. *2023 Designation*, 88 Fed. Reg. 68,130. This notice not only provided procedures

20   for initial applicants registering for TPS under the 2023 Designation but also allowed Venezuelan

21   nationals who had previously registered for TPS under the 2021 Designation to re-register for TPS and

22   apply to renew their Employment Authorization Document (EAD) with USCIS. *Id*. Finally, on January

23   10, 2025, former Secretary Mayorkas issued a notice extending the 2023 Designation for 18 months,

24   allowing a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether

25   under the 2021 or 2023 designations) could obtain TPS through October 2, 2026, and extend certain EADs.

26   *See Extension of the 2023 Designation of Venezuela for Temp. Protected Status*, 90 Fed. Reg. 5961 (Jan.

27   17, 2025) (hereinafter "2025 Extension").

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

On January 28, 2025, Secretary Noem vacated the 2025 Extension, thereby restoring the status quo that preceded that decision. *See 2025 Vacatur*, 90 Fed. Reg. at 8805. In accordance with the Immigration and Nationality Act (INA) and the APA, Secretary Noem explained her reasoning for the Vacatur in the Federal Register Notice (FRN), stating that the 2025 Extension "did not acknowledge the novelty of its approach" or "explain how it is consistent with the TPS statute." *Id*. at 8807; *see* 8 U.S.C. § 1254a(b)(3). Secretary Noem determined that the "lack of clarity" warranted a vacatur to "untangle the confusion and provide an opportunity for informed determinations regarding the TPS designations and clear guidance." *Id*. In considering putative reliance interests, Secretary Noem provided that "Venezuela 2023 registrants will retain their temporary protected status under the pre-existing designation at least until April 2, 2025," and "[w]ith respect to any Venezuela 2021 registrants who elected, pursuant to the 2025 Extension, to register under the Venezuela 2023 designation, USCIS will restore their Venezuela 2021 registration." *Id*. This Vacatur is consistent with an agency's "statutorily implicit" authority to reconsider TPS-related determinations and upon reconsideration, to vacate or amend the determination. *See* 8 U.S.C. § 1103(a), 1254a(b)(3), (b)(5)(A); *see also Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador*, 88 Fed. Reg. 40,282, 40,285 & n.16 (June 21, 2023) ("An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination." (citing cases)).

A determination whether to extend the 2023 Venezuela designation was due by February 1, 2025. After reviewing country conditions and consulting with the appropriate U.S. Government agencies, Secretary Noem determined that Venezuela no longer continues to meet the conditions for the 2023 Designation. *See 2025 Termination*, 90 Fed. Reg. at 9040. Specifically, Secretary Noem determined that "it is contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States." *Id*. at 9041. Therefore, Secretary Noem terminated the 2023 Designation of Venezuela, effective April 7, 2025. *Id*. In making this determination, she examined DHS' review of country conditions, acknowledging that "there are notable improvements in several areas, such as the economy,

public health, and crime," that allow for Venezuelan nationals to be "safely returned to their home country." *Id*. On that basis, she concluded that termination of the 2023 Designation was "required," and further explained that "national interest is an expansive standard that may encompass an array of broad considerations" which "calls upon the Secretary's expertise and discretionary judgment." *Id*. at 9042. Secretary Noem explained that the significant population of TPS holders has resulted in "associated difficulties in local communities where local resources have been inadequate to meet the demands cause by increased numbers," and further underscored that, across the United States, "city shelters, police stations and aid services are at maximum capacity." *Id*. In considering national and immigration interests, she found that this population includes members of Tren de Aragua, a transnational criminal organization recently determined to "pos[e] threats to the United States." *Id*. at 9042-43. Secretary Noem also observed that "U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration." *Id*. at 9043.

## STANDARDS OF REVIEW

The standards of review for relief under 5 U.S.C. § 705 and for preliminary injunctions are the same. *See Sampson v. Murray*, 415 U.S. 61, 80 (1974). A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). To get relief, a party must show "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## ARGUMENT

## I.    THIS COURT LACKS JURISDICTION TO GRANT PLAINTIFFS THE RELIEF THEY SEEK

### A.    Section 1252(f) Precludes Plaintiffs' Requested Relief

Here, the relief Plaintiffs seek would have the effect of enjoining or restraining DHS's implementation   of the TPS provisions in section 244 of the INA, 8 U.S.C. § 1254a.   But 8 U.S.C. § 1252(f)(1) explicitly bars such relief. It provides: "Regardless of the nature of the action or claim or of

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain* the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings … have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). Section 1254a is one of the statutory provisions § 1252(f)(1) covers.  Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), div. C, Pub. L. No. 104-208, §§ 306, 308, 110 Stat. 3009-546. Although in the U.S. Code, Section 1254a appears in Part V, the U.S. Code is inconsistent with the INA, wherein the TPS provisions in Section 244 appear in Chapter 4. *Id*. When there is a conflict, the INA prevails. *See Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022) ("[T]he text of the United States Code 'cannot prevail over the Statutes at Large when the two are inconsistent.'"); *see also* Section 244 of the INA lies within chapter 4 of title II of the INA, as amended. Section 1252(f)(1) thus eliminates any court's (other than the Supreme Court's) authority to issue coercive orders enjoining or restraining implementation of 8 U.S.C. § 1254a.

By invoking 5 U.S.C. § 705 and asking this Court to "postpone the effective date of the challenged decisions[,]" Plaintiffs seek the type of coercive order prohibited by 8 U.S.C. § 1252(f)(1). Regardless of how Plaintiffs name their motion or frame their claims, their requested relief is barred. An order pursuant to 5 U.S.C. § 705 prevents – i.e. "enjoin[s] or restrain[s]" – DHS from implementing its determinations about the designation of Venezuela for TPS and is thus jurisdictionally barred under § 1252(f)(1). The Supreme Court has held that 8 U.S.C. § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or *to refrain from taking* actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022)) (emphasis added); *see* Black's Law Dictionary (12th ed. 2024) (defining injunction as "[a] court order commanding or preventing an action"). As the Supreme Court held in *Aleman Gonzalez*, to "restrain" means to "check, hold back, or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. 596 U.S. at 549 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989)). An order postponing the effective date of implementation or enforcement of the vacatur and termination determinations would necessarily constitute an order "restraining" federal officials. *Id*. at 550.

Plaintiffs' likely rejoinder is that stays differ from injunctions. But that argument relies on the incorrect assumption that 5 U.S.C. § 705 creates a new form of remedy—a district court stay of agency action that is distinct from an injunction. Section 705 does not, however, create any new remedies beyond the  traditional equitable relief that existed at the time of the APA's passage. *See Scripps-Howard Radio v. FCC*, 316 U.S. 4, 16–17 (1942). When Congress adopted § 705, there is no evidence that it intended to create a wholly new, never-before-seen species of remedy. Instead, Congress simply codified existing equitable remedies. Section 705 allows a court to issue only that "process" that is "necessary and appropriate." And the Supreme Court long ago concluded "[t]he relevant legislative history of that section … indicates that it was primarily intended to reflect existing law" permitting courts of appeals to  stay certain agency actions pending direct review authorized by statute in the same manner that appellate courts can in certain circumstances stay a district court decision pending appeal. *Sampson*, 415 U.S. at 68 n.15; *see Scripps-Howard Radio*, 316 U.S. at 9-10 ("a federal court can stay the *enforcement of a judgment pending the outcome of an appeal*" (emphasis added)). Section 705 was not intended "to fashion new rules of intervention for District Courts." *Id*. Thus, the text, context, legislative history, sources contemporary to the APA's passage, and relevant case law all show 5 U.S.C. § 705 does nothing more than preserve traditional equitable relief—relief that 8 U.S.C. § 1252(f)(1) bars.

Plaintiffs do not seek an order that would operate on the individual removal proceedings  or some other agency adjudication pending judicial review. Plaintiffs instead ask this Court to "prevent" the government from implementing its chosen "course of action" with respect to 8 U.S.C. § 1254a. *See Aleman Gonzalez*, 596 U.S. at 549, 551 (orders requiring government to "refrain from actions that (again in the Government's view) are allowed" by covered provisions are barred by § 1252(f)). Such an order, even if labeled a stay, is injunctive in effect and barred by 8 U.S.C. § 1252(f)(1). Thus, Plaintiffs' stay request is no different from an injunction – an equivalence underscored by the preliminary-injunction standard applying to it.

Even if 8 U.S.C. § 1252(f)(1) did not apply, 5 U.S.C. § 705 by its own terms does not authorize relief here because the challenged actions have already taken effect. Courts construing 5 U.S.C. § 705 have concluded that the phrase "postpone the effective date" of an agency action authorizes the

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

"postpone[ment of] the effective date of *a not yet effective rule*, pending judicial review"—but not suspension of a policy that is *already in effect*. *Ctr. for Biological Diversity v. Regan*, 507 F. Supp. 3d 173, 204 (D.D.C. 2022) (quoting *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2–3 (D.C. Cir. Jan. 19, 1996)) (emphasis added); *see also, e.g.*, *State v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017) (same). While these cases address an agency decision to "postpone the effective date," 5 U.S.C. § 705 uses identical language when referring to "the reviewing court ... postpon[ing] the effective date of an agency action." The use of an identical phrase in the first and second sentences of § 705 must be presumed to be intentional. *See, e.g.*, *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning."). Given its plain meaning, the language in 5 U.S.C. § 705 allowing a court or agency to "postpone the effective date" can only be read to mean that the statute allows the court "to put off until a future time," "defer," or "delay" the "operative" date of the agency action. *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/effective (last visited Mar. 2, 2025); *see also* Black's Law Dictionary Online (2d ed.), https://thelawdictionary.org/?s=postpone (last visited Mar. 3, 2025) (defining "postpone" as "to put off; defer; delay; continue"). One cannot "defer" or "put off" an action that has already occurred; thus, the issuance of a stay after the effective date of the challenged policy has already passed is beyond what § 705 permits. *See Florida v. Mayorkas*, No. 3:23-cv-09962-TKW-ZCB, 2023 WL 3567851, at *4 (N.D. Fla. May 16, 2023) (Section 705 stay unavailable because the policy was in effect when the complaint was filed).

The 2025 Vacatur Plaintiffs seek to stay was published on February 3, 2025. *2025 Vacatur*, 90 Fed. Reg. at 8805. Thus, the publication of that determination means that its effective dates already passed. *See id.* at 8806 ("The vacatur is effective immediately"). That 5 U.S.C. § 705 is disjunctive, permitting reviewing courts to "postpone the effective date of an agency action *or* to *preserve status or rights* pending conclusion of the review proceedings" (emphases added), does not change this result. An order staying a policy after it has already gone into effect thus does not preserve the status quo, but rather, *alters* it. *See, e.g.*, *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467

1    F.3d 999, 1006 (6th Cir. 2006) (explaining an order "preventing the implementation of new regulations"

2    would "disturb[]" rather than preserve "the status quo"); *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps.,*

3    *AFL-CIO*, 473 U.S. 1301, 1305 (1985) (had the district court issued an order stopping rule from taking

4    effect that would alter the "status quo").

5    **B.**    **The TPS Statute Bars Plaintiffs' Claims**

6    Additionally, the TPS statute itself unambiguously provides that "[t]here is no judicial review of

7    any determination of the [Secretary] with respect to the designation, or termination or extension of a

8    designation, of a foreign state" for TPS.  8 U.S.C. § 1254a(b)(5)(A). The statute thus makes clear that TPS

9    designation, extension, and termination determinations are committed to the unreviewable authority of the

10    Secretary. Accordingly, APA challenges to such determinations are prohibited.  *See* 5 U.S.C. § 701(a)(1);

11    *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004) ("If a no-review provision shields particular

12    types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary,

13    capricious, or procedurally defective.").

14    Plaintiffs acknowledge that the statutory language of § 1254a(b)(5)(A) clearly applies to "any

15    determination" made "with respect to the designation, or termination, or extension" of TPS. PI Mot. 17.

16    And despite alleging that Secretary Noem's 2025 Termination of the 2023 Designation for Venezuela

17    violates the APA, Plaintiffs only argue in their PI Motion that they are likely to succeed on their APA

18    claim regarding Secretary Noem's 2025 Vacatur determination. PI Mot. 4-11. To avoid the judicial review

19    limitation in 8 U.S.C. § 1254a(b)(5)(A), Plaintiffs argue that the Secretary's decision to vacate the 2025

20    Extension was something other than a "determination."[3] *Id*. Not so.

21    Plaintiffs would have this Court believe that if the Secretary's decision is not one specifically

22    labeled a designation, termination of a designation, or extension of a designation, then the decision falls

23    outside the scope of the statutory language. PI Mot. 17. However, the Court is prohibited from reviewing

24

25    _____

26    [3] The basis for Plaintiffs' assertion that none of the claims in their Complaint challenge a determination to terminate the 2023 TPS designation by the Secretary is unclear, as Count II of Plaintiffs' Complaint clearly challenges the "order terminating the 2023 TPS designation for Venezuela." Compl. ¶¶ 150-154.

27    Moreover, in Plaintiffs Motion, they explicitly state that "Secretary Noem's decisions to vacate and terminate TPS for Venezuelans" violated the Fifth Amendment. PI Mot. 11.

28    Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

"*any determination … with respect to* the designation, or termination or extension of a designation" of TPS. 8 U.S.C. § 1254a(b)(5)(A). In its now vacated decision, the Ninth Circuit reviewed the exact statute at issue here. *See Ramos v. Wolf*, 975 F.3d 872, 889 (9th Cir. 2020), *vacated by Ramos v. Wolf*, 59 F.4th 1010, 1011 (9th Cir. 2023).[4] Comparing the term "determination" in § 1254a(b)(5)(A) with similar uses of the word in provisions analyzed by the Supreme Court in *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 486 n.6 (1991), and *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 53 (1993), the Ninth Circuit stated that the reference to a determination "generally precludes direct review of the secretary's country-specific TPS determinations." *Ramos*, 975 F.3d at 891. The inquiry does not end here, but rather this Court must look to the surrounding text to understand what types of determinations are restricted from review.

The word "any," modifying "determination" in § 1254a(b)(5)(A), indicates a broad sweep. *See, e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'" (citation omitted)). The phrase "with respect to" in § 1254a(b)(5)(A) is likewise broad in scope, as that phrase "is generally understood to be synonymous with the phrase 'relating to'" or "'related to.'" *Cal. Tow Truck Ass'n v. City & County of San Francisco*, 807 F.3d 1008, 1021 (9th Cir. 2015). And the Supreme Court has underscored that the ordinary meaning of "related to" is "a broad one," meaning "having a connection with or reference to . . ., whether directly or indirectly." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013).

The Supreme Court recently undertook a similar review of the phrase "any judgment regarding the granting of relief" under enumerated provisions. *Patel v. Garland*, 596 U.S. 328 (2022). There, the Supreme Court pointed out that it "has repeatedly explained, the word 'any' has an expansive meaning." *Id*. at 338 (quotations omitted) (citing *Babb v. Wilkie*, 589 U. S. 399, 405, n.2 (2020); Webster's Third New Int'l Dictionary, at 97 (defining "any" as "one or some indiscriminately of whatever kind")). The phrase "with respect to" is the equivalent of "regarding" or "concerning." *Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 717 (2018); *see also Patel*, 596 U.S. at 339. The use of these phrases "in a legal

---

[4] This decision has been vacated and therefore has no precedential effect. *See, e.g., Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) ("[A] decision that has been vacated has no precedential authority whatsoever."). A vacated decision, however, "still carries informational and perhaps even persuasive precedential value." *DHX Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1176 (9th Cir. 2005).

context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Patel*, 596 U.S. at 339.

Within this framework, Secretary Noem's Vacatur of the 2025 Extension falls well within the statute's "any determination" language and is a country-specific TPS determination relating to the prior extension. For this reason, § 1254a(b)(5)(A) eliminates this Court's jurisdiction to review any APA claim regarding the 2025 Vacatur, including those raised by Plaintiffs regarding the substance of the Federal Register Notice and facts that the Secretary considered. *See* PI Mot. at 8-11.

Plaintiffs' interpretation of the statute also flouts the clear intent of Congress to grant the Secretary broad and unreviewable discretion in the exercise of her responsibilities under the TPS statute, section 103(a) of the INA, 8 U.S.C. § 1103(a), and section 402 of the Homeland Security Act of 2002, 6 U.S.C. § 202. *See L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 802 (9th Cir. 2017) ("We must also 'assum[e] that the legislative purpose is expressed by the ordinary meaning of the words used' by the legislature.") (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)). The categorical review preclusion language in 8 U.S.C. § 1254a(b)(5)(A) makes clear that Congress did not intend to permit *anyone*, including an alien or organization of aliens, to obtain review of the Secretary's determinations regarding whether a determination was proper. This includes the way the Secretary weighs how the determination impacts that the administration of the program and the security conditions within the United States. 8 U.S.C. § 1254a(b)(1)(C), *see Ramos*, 975 F.3d at 891 ("[T]he Secretary's discretion to consider and weigh various conditions in a foreign country in reaching her TPS determinations is not only broad, but unreviewable.").

## II.  PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  The Secretary of Homeland Security May Vacate a Prior Extension of a Country's TPS Designation

Even if this Court had jurisdiction to review the 2025 Vacatur and 2025 Termination, Plaintiffs have not shown a likelihood of success on the merits that either determination violates the APA. When Congress authorized the Secretary to designate foreign countries for TPS, it committed several underlying policy questions to her discretion by statute and explicitly barred judicial review of sensitive foreign relations determinations. The Secretary's continuing border and national security responsibilities and

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

broad discretionary authority over TPS require her to evaluate any potential threats to the safety and security of the United States and permit her to change position, including vacating an extension which has yet to go into effect. *See* 8 U.S.C. § 1254a(b)(3)(A) (The Secretary "… shall determine whether the conditions for such designation under this subsection *continue to be met*.") (emphasis added); *see also Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 2014) ("The power to reconsider is inherent in the power to decide.").[5]

Plaintiffs' Motion diverges from the actual claims pleaded within their Complaint and attempts to sever the Secretary's 2025 Vacatur from her 2025 Termination of the 2023 Designation. While the Secretary did issue two determinations, the Vacatur allowed for consideration of whether to terminate or extend the designations for Venezuela. On September 8, 2022, DHS extended the 2021 Designation for 18 months. *See Extension and Redesignation of Venezuela for Temporary Protected Status*, 87 Fed. Reg. 55,024 (Sept. 8, 2022). On October 3, 2023, Secretary Mayorkas extended the 2021 Designation for another 18 months with an expiration date of September 10, 2025. *2023 Designation*, 88 Fed. Reg. at 68,130. In the 2023 notice extending the 2021 Designation, former Secretary Mayorkas also redesignated Venezuela for TPS status. *Id.* This action resulted in there being two separate and concurrent Venezuela TPS designations, the registrations for which Secretary Mayorkas later combined when extending the 2023 Designation for another 18 months. *See 2025 Extension*, 90 Fed. Reg. at 5961 (Jan. 17, 2025). This

---

[5] Circuit courts have long recognized that an administrative agency has inherent or statutorily implicit authority to "reconsider and change a decision if it does so within a reasonable period of time" if Congress has not foreclosed this authority by requiring other procedures. *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977); *see, e.g.*, *Kelch v. Dir., Nev. Dep't of Prisons*, 10 F.3d 684, 687 (9th Cir. 1993) (applying Nevada law holding "administrative agencies have an inherent authority to reconsider their own decision, since the power to decide in the first instance carries with it the power to reconsider"); *Albertson*, 182 F.2d at 399 ("The power to reconsider is inherent in the power to decide."); *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) (holding agency acted lawfully by exercising inherent authority to reconsider decisions) (collecting cases); *see also The Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) ("[F]ederal agencies . . . have broad authority to correct their prior errors. Indeed, when federal agencies take erroneous or unlawful action, courts generally should not stand in the way of the agencies' remediation of their own mistakes." (citations omitted)); *Gun South, Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) ("[T]he Supreme Court and other courts have recognized an implied authority in other agencies to reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration.").

1  novel approach allowed Venezuelan applicants, who had registered under the 2021 Designation, to re-

2  register under the extended 2023 Designation, which provided the benefit of an additional 13 months of

3  status, without the Secretary making an independent determination regarding the 2021 Designation.

4         Employing Plaintiffs' logic that Secretary Mayorkas's complication of the Venezuela designations

5  was irrevocably binding, no Secretary of Homeland Security could ever vacate a designation or extension

6  of a designation, no matter the type of national security threat posed or the seriousness of the error or legal

7  defect in the prior determination. But the TPS statute itself does not mandate such a severe and unworkable

8  limitation of the Secretary's ability to fulfill her border and national security responsibilities and exercise

9  her broad authority to administer and enforce the immigration laws, *see, e.g.*, 6 U.S.C. § 202(1)-(5), 8

10 U.S.C. § 1103(a)(1), (a)(3), and to do so consistent with the President's Executive Orders. The Secretary

11 is authorized by statute to terminate a designation if she "determine[s]" that a foreign state "*no longer*

12 *continues* to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3)(A) (emphasis added). The

13 statute requires the Secretary to review conditions within foreign states designated for TPS, but any

14 subsequent action turns on the Secretary's findings about whether the conditions for such designation

15 continue to exist. 8 U.S.C. § 1254a(b)(3)(A)-(C). Indeed, the statute inevitably requires the Secretary to

16 make determinations affecting the conduct of United States foreign policy. *See Harisiades v. Shaughnessy*,

17 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with

18 contemporaneous policies in regard to the conduct of foreign relations [and] the war power."). When the

19 Executive Branch acts in the field of foreign policy "… pursuant to an express or implied authorization of

20 Congress, [its] authority is at its maximum, for it includes all that [it] possesses in [its] own right plus all

21 that Congress can delegate." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952)

22 (Jackson, J., concurring) (cleaned up).

23        Here, Secretary Noem met all her statutory obligations. The Secretary issued the vacatur notice 17

24 days after the prior extension notice and stated that she would restore the registration of any 2021

25 Venezuela TPS recipients who re-registered in the interim. *See 2025 Vacatur*, 90 Fed. Reg. at 8807; *2025*

26 *Extension*, 90 Fed. Reg. at 5961; *see also 2023 Designation*, 88 Fed. Reg. at 68,132. The 2025 Vacatur

27 notice stated that it was issued to "untangle the confusion" caused by the 2025 Extension, which wove

28 Defendants' Opp. To Plaintiffs' Mot. to Postpone
   3:25-cv-1766-EMC

1  together two prior designations of Venezuela for TPS with different effective dates, "provid[ing] an

2  opportunity for … clear guidance." *2025 Vacatur*, 90 Fed. Reg. at 8807. The Secretary exercised the

3  inherent power of reconsideration she held under the TPS statute within a reasonable time and with the

4  intent to correct significant "deficiencies" in the 2025 Extension. *Id.*; *see Mazaleski*, 562 F.2d at 720.

5        Two days after she issued the 2025 Vacatur, the Secretary issued a notice terminating one of the

6  two Venezuela TPS designations, based on her finding that the presence of the covered persons *is*

7  "contrary to the national interest of the United States." *2025 Termination*, 90 Fed. Reg. at 9042

8  ("[T]ermination of the 2023 Venezuela TPS designation is required because it is contrary to the national

9  interest to permit the Venezuelan nationals … to remain temporarily in the United States.") (cleaned up).

10  In her termination notice, the Secretary noted that "'[n]ational interest' is an expansive standard that may

11  encompass an array of broad considerations, including foreign policy, public safety, national security,

12  migration factors, immigration policy, and economic considerations." *Id.* (cleaned up); *see id.* n.5 (citing

13  cases). The TPS statute explicitly requires the Secretary to determine whether continuing to permit the

14  temporary presence of TPS beneficiaries from a foreign state designated under 8 U.S.C. § 1254a(b)(1)(C)

15  is "contrary to the national interest of the United States," and she has done so. This national interest finding

16  is of a discretionary nature authorized by statute and clearly sounding in foreign policy. *See* 8 U.S.C.

17  § 1254a(b)(1)(C); *cf. Poursina v. USCIS*, 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous

18  INA context, "that the 'national interest' standard invokes broader economic and national-security

19  considerations, and such determinations are firmly committed to the discretion of the Executive Branch—

20  not to federal courts" (citing *Hawaii*, 585 U.S. at 684-86)).

21        Secretary Noem reasonably explained that the 2023 Designation notice was adopted without a

22  reasoned explanation or express consideration of the operational or legal impacts. *2025 Vacatur*, 90 Fed.

23  Reg. at 8807. This "implicitly negat[ed] the 2021 Venezuela TPS designation by effectively subsuming it

24  within the 2023 Venezuela TPS designation." *Id*. By consolidating the registration processes for both the

25  2021 and 2023 TPS designations, the notice had the practical effect of extending the 2021 Designation by

26  up to 13 months and allowing for employment authorization for that period as well. *See id.* Accordingly,

27  she reasonably concluded that "vacatur is warranted to untangle the confusion and provide an opportunity

28  Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1    for informed determinations regarding the TPS designations and clear guidance." *Id.*

2        Plaintiffs' argument that the 2025 Vacatur is impermissible because Secretary Noem "failed to

3    account for alternatives short of termination" also fails. PI Mot. at 10. In issuing the Vacatur, Secretary

4    Noem indicated that the decision to vacate provided "an opportunity for informed determinations

5    regarding the TPS designations and clear guidance." *2025 Vacatur*, 90 Fed. Reg. at 8807 (citing Exec.

6    Order No. 14159, *Protecting the American People Against Invasion*, § 16(b), 90 Fed. Reg. 8443 (Jan. 20,

7    2025)). Thus, the alternative of simply deconsolidating the re-registration periods would not meet the

8    stated reasons for the 2025 Vacatur and is neither arbitrary and capricious nor an impermissible decision.

9    The Secretary's 2025 Vacatur of the 2025 Extension complied with the statute, was in accordance with

10   her authority to reconsider prior actions, and was consistent with her continuing obligation to safeguard

11   the border and national security of the United States and to administer and enforce the immigration laws.

12       **B.    The Secretary's Determinations to Vacate and Terminate the TPS Designation for**
         **Venezuela Did Not Violate the Fifth Amendment Because the Determinations were**
13       **Related to Immigration Policy Objectives and Not Motivated by Racial Animus**

14       Plaintiffs cannot bypass the explicit bar on judicial review by framing their claim as a

15   constitutional challenge.[6] *See* 8 U.S.C. § 1254a(b)(5)(A); *supra* § I.B. Even if this Court determines it has

16   jurisdiction to consider Plaintiffs' constitutional claim here, the Secretary's determinations to (1) vacate

17   the 2025 Extension and (2) terminate the 2023 Designation did not violate the Fifth Amendment. Plaintiffs

18   erroneously contend that racially "discriminatory intent was at least one motivating factor" for Secretary

19   Noem's vacatur and termination determinations and that strict scrutiny under *Vill. of Arlington Heights*,

20   429 U.S. at 265, should apply. PI Mot. 11-12. The appropriate standard for any such review, however, is

21   set forth in *Hawaii*, 585 U.S. at 703-05. There, in determining that a rational basis standard should be

22   applied, the Supreme Court explained that "the upshot of [their] cases in this context is clear: 'Any rule

23   of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world

24   conditions should be adopted only with the greatest caution,' and our inquiry into matters of entry and

25   national security is highly constrained." *Id*. at 704.

26

27   _____
     [6] Section 1254a(b)(5)(A) provides a far clearer bar on review than the statutory provision at issue in
     *Webster v. Doe*, 486 U.S. 592, 603-04 (1988).

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
     3:25-cv-1766-EMC

Here, Secretary Noem's 2025 Vacatur and 2025 Termination determinations are immigration policies related to Government objectives of border and national security and foreign policy. The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Because decisions in these matters implicate "relations with foreign powers" and involve "classifications … defined in the light of changing political and economic circumstances," such judgments "are frequently of a character more appropriate to either the Legislature or the Executive." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government."). The Supreme Court has accordingly made clear that decisions by the political branches about which classes of aliens to exclude or expel will generally be upheld against constitutional challenges so long they satisfy deferential rational-basis review. *Hawaii*, 585 U.S. at 704-05; *see also Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (judicial review of "[p]olicies pertaining to the entry of aliens and their right to remain here" is limited to whether the Executive gave a "facially legitimate and bona fide" reason for its action); *Mathews*, 426 U.S. at 82 (a "narrow standard of review" applies to "decisions made by Congress or the President in the area of immigration and naturalization"); *Shaughnessy*, 342 U.S. at 588–89. Although cases such as *Hawaii*, *Mandel*, and *Fiallo* involved policies directed at aliens seeking to enter the country, those decisions equally support applying rational-basis review in the specific context of these TPS determinations to aliens already present in the United States where the basis for the termination is that "permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." *2025 Termination*, 90 Fed. Reg. at 9040, 9042; *see Hawaii*, 585 U.S. at 706 (If "there is persuasive evidence that the [policy] has a legitimate grounding in national security concerns … we must accept that independent justification").

TPS decisions involve unique country-specific determinations that both "implicate relations with foreign powers" and "involve classifications defined in the light of changing political and economic circumstances," *Hawaii*, 585 U.S. at 702, precisely the situation in which the Supreme Court has repeatedly applied rational-basis review. *See id.*; *Fiallo*, 430 U.S. at 799. Secretary Noem's 2025 Vacatur

and 2025 Termination determinations easily pass rational-basis review. In enacting the TPS statute, Congress provided for the availability of a temporary status to aliens who cannot safely return to their home countries because of, *inter alia*, extraordinary and temporary conditions in those countries. *See* 8 U.S.C. § 1254a. Secretary Noem's termination decision is "plausibly related" to the Government's national security interests as well as the objectives of the TPS program. *Hawaii*, 585 U.S. at 704-05; *see also United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980). After consulting with other appropriate governmental agencies, including the Department of State, Secretary Noem determined that permitting the Venezuelan nationals to remain temporarily in the United States is contrary to the national interest of the United States. *2025 Termination*, 90 Fed. Reg. at 9040, 9042-43 ("Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua." Historically, this gang "has been blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants."). Secretary Noem's determination is fully consistent with Congress's goal of providing TPS to eligible aliens until the Secretary determines that the conditions for the country's TPS designation no longer continue to exist, including in this case that permitting such aliens to remain in the United States is contrary to the U.S. national interest. Thus, under the rational basis test, Plaintiffs' equal protection claim fails.

Even under the heightened standard in *Arlington Heights*, Plaintiffs' Equal Protection Claim is likely to fail because they cannot establish racially discriminatory intent. Under the *Arlington Heights* standard, Plaintiffs must prove that a racially "discriminatory purpose has been a motivating factor in the [government's] decision" to show a violation of the Equal Protection Clause. 429 U.S. at 265-266. In 2020, the Ninth Circuit analyzed an almost identical claim and held that under the *Arlington Heights* standard, plaintiffs failed to present "even serious questions on the merits of their claim that the Secretaries' TPS terminations were improperly influenced by the President's" alleged racial animus. *Ramos*, 975 F.3d at 897 (internal quotations omitted); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34-35 (2020) (rejecting a similar equal protection claim where plaintiffs did not show racial animus or disparate impact). Although the 2020 *Ramos* decision has since been vacated on other grounds, the analysis is instructive.

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

The Ninth Circuit held that the plaintiffs' equal protection claim failed "due to the glaring lack of evidence tying the President's alleged discriminatory intent to the specific TPS terminations—such as evidence that the President personally sought to influence the TPS terminations, or that any administration officials involved in the TPS decision-making process were themselves motivated by" racial animus. *Ramos*, 975 F.3d at 897. The Ninth Circuit reasoned that while there was record evidence that the President "expressed racial animus against 'non-white, non-European immigrants'" and "the White House influenced the TPS termination decisions," there was "no evidence linking the President's animus to the TPS terminations." *Id*. Moreover, the panel explained, "[i]t is expected—perhaps even critical to the functioning of the government—for executive officials to conform their decisions to the administration's policies" and the "mere fact that the White House exerted pressure on the Secretaries' TPS decisions does not itself support the conclusion that the President's alleged racial animus was a motivating factor in the TPS decisions." *Id*. at 898. Finally, the Ninth Circuit addressed the plaintiffs' arguments that the circumstantial evidence and the historical background did not demonstrate that racial animus was a motivating factor for the TPS terminations. *Id*. at 898-99.

Plaintiffs disregard the Ninth Circuit's reasoning in *Ramos*, reiterating similar arguments before this Court. As in *Ramos*, here, Secretary Noem provided reasoned explanations for her decision to terminate Venezuela's 2023 TPS Designation, and Plaintiffs have not demonstrated that she harbored racial animus in making the vacatur or termination determinations at issue. Plaintiffs cite a multitude of exhibits, arguing that Secretary Noem "made numerous contemporaneous statements that prove her decisions sprung at least in part from racial animus." PI Mot. at 12. They also assert that the circumstantial evidence and historical background of the TPS determinations show that "improper purposes are playing a role." *Id*. at 13. But Plaintiffs fail to establish any direct link between the evidence they provide and Secretary Noem's determinations. For example, Plaintiffs cite a February 26, 2024, social media post by Secretary Noem about "[n]ations like Venezuela." ECF 37-1. But this post was made nearly a year before the termination decision was published and focuses on the nation itself, not the race of its people. *See also* ECF 37-2, 37-3, 37-4, 37-5 (social media posts from 2024); ECF 37-6 (unrelated social media post); ECF 37-12, 37-14, 37-15 (transcripts of confirmation hearing and interviews where immigration policy is

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1   generally discussed). National origin is inherently part of TPS. The express statements that Plaintiffs rely

2   on in an attempt to show racial animus were made long before the TPS termination determination or taken

3   out of context—and importantly, none of the statements pertain to race; rather, they concern the country

4   itself. *See Ramos*, 975 F.3d at 898 ("[W]e find it instructive that these statements occurred primarily in

5   contexts removed from and unrelated to TPS policy or decisions."). The Secretary's various statements

6   reflect an emphasis on immigration policy that focuses on America's economic and security interests, not

7   racial or ethnic animus. An immigration policy that seeks to further American strategic and foreign policy

8   interests cannot be the basis of an equal protection claim and is in fact contemplated by the TPS statute.

9   *See* 8 U.S.C. § 1254a(b)(1)(C).

10        Plaintiffs' conjecture is equally unpersuasive and does not show racial animus. PI Mot. 14-15.

11   Plaintiffs speculate that the sequence of Secretary Noem's determinations are "further evidence of

12   Secretary Noem's improper discriminatory purpose," *id*. at 14, and the first Trump administration's

13   attempts to terminate TPS designations "show[] that the second Trump administration's TPS decisions . .

14   . are motivated by 'invidious purposes.'" *Id*. at 14-15 (citing *Arlington Heights*, 429 U.S. at 267). The

15   timing of Secretary Noem's termination of the 2023 Designation, however, and the fact that the first

16   Trump administration sought to terminate TPS designations for other countries, are not—without more—

17   evidence of an "overarching goal [] motivated by racial animus." *Ramos*, 975 F.3d 899. The Secretary's

18   efficiency is hardly a basis for invalidating her action.

19        Finally, Plaintiffs fall back on their previously rejected "cat's paw" theory, PI Mot. 15, theorizing

20   that Secretary Noem's determinations are unconstitutional because the President's animus directly

21   influenced her decisions. *Id*. But the Ninth Circuit doubted that the "cat's paw" theory would apply in this

22   situation. *Ramos*, 975 F.3d at 897 (plaintiffs failed to "provide any case where such a theory of liability

23   has been extended to governmental decisions in the foreign policy and national security realm").

24   Moreover, the "cat's paw" approach would invite judicial second-guessing of an agency official's actions

25   based on mere allegations of discriminatory motive on the part of a different government official who may

26   have played some role in the decision-making process. That would invite impermissible intrusion on

27   privileged Executive Branch deliberations and potential litigant-driven discovery that would disrupt the

28   Defendants' Opp. To Plaintiffs' Mot. to Postpone
    3:25-cv-1766-EMC

President's execution of the laws, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982); *United States v. Nixon*, 418 U.S. 683, 708 (1974) ("A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately."). As such, under any review standard, Plaintiffs are unlikely to succeed on the merits of their equal protection claim.

## III. ANY HARM PLAINTIFFS MAY SUFFER IS BASED ON THE INHERENT NATURE OF THE TPS STATUTE

"An essential element to the granting of a preliminary injunction is a showing of irreparable injury to the moving party in its absence." *Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985). Not just any showing of irreparable harm will suffice. A party "is only entitled to an injunction that prevents [the] irreparable harm" that is "likely to occur." *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 804 F. Supp. 2d 1045, 1054 (E.D. Cal. 2011) (a party's "showing [of irreparable harm] is required in order to justify the specific measures that [the party] request[s]"). Plaintiffs have failed to make the requisite showing here.

First, Plaintiffs contend that their allegations of APA and Fifth Amendment violations *per se* constitute irreparable harm. Pl. Mot. 19-20. However, the alleged harms only occur if it is determined that Defendants have violated Plaintiffs' constitutional or statutory rights. As explained above, Plaintiffs have not established a likelihood of success on the merits of those claims. *See* § II.

Second, Plaintiffs allege numerous injuries resulting from the 2025 Termination that are inherent in the temporary nature of TPS. For example, Plaintiffs allege that, if they lose their TPS, "many of them will be at immediate risk of detention [… and] deportation," "will be in a state of limbo— undocumented and without legal authorization to live and work in the United States," or "will lose other alternative pathways to permanent status...." Pl. Mot. 20-21. Plaintiffs further allege that the loss of TPS could result in their separation from family members in the United States or having to bring their U.S. citizen children to an unknown country. *Id.* at 21. While Plaintiffs heavily focus on the burden that TPS beneficiaries will face should the termination be permitted to go into effect, the underlying cause of this harm flows from the statute ("temporary" protected status) itself. *See*, 8 U.S.C. § 1254a(b)(1)(B)(i) ("substantial, but

temporary"), (b)(1)(B)(ii) ("unable, temporarily"), (b)(1)(C) ("extraordinary and temporary"), (g) ("remain in the United States temporarily"). Undeniably, the alleged harms would exist with or without the termination at issue. As explained, a country's TPS designation must be reviewed at least every 18 months, and there is no guarantee of renewal. 8 U.S.C. § 1254a(b)(2)(B). A TPS beneficiary is therefore always subject to the same uncertainties and concerns that Plaintiffs allege here.

Because the very nature of TPS is temporary, as dictated by law, the potential for familial separation is not an irreparable harm arising from the termination of TPS for Venezuela, but rather the nature of the status. The cases cited by Plaintiffs in support of their argument that the separation of families constitutes irreparable harm as a matter of law are inapposite because the irreparable harms cited in those cases were not assessed against the backdrop of the inevitable termination of a temporary status. Pl. Mot. 22. For example, *Stanley v. Illinois*, 405 U.S. 645, 647 (1972), does not address whether the separation of families is an irreparable harm in the context of a temporary status that must come to an eventual end. *Stanley*, 405 U.S. at 647 ("granting a stay of removal in the context of persecution-based relief, but recognizing that "a noncitizen must show that there is a reason specific to his or her case, as opposed to a reason that would apply equally well to all aliens and all cases, that removal would inflict irreparable harm."); *see also Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (finding that the potential irreparable harm of separating families did not justify a stay).

And even where Plaintiffs' declarations have identified concrete harms, those harms will not be remedied by the requested injunction. The assurances that Plaintiffs seek can only be truly safeguarded through legislative action, not an injunction by this Court. Consequently, Plaintiffs have failed to show a likelihood of irreparable harm that could be remedied by this Court, and their request for a preliminary injunction should be denied. *See Taiebat v. Scialabba*, No. 17-civ-0805-PJH, 2017 WL 747460, at *5 (N.D. Cal. Feb. 27, 2017) (denying preliminary injunction where "plaintiff [could not] establish that the mandatory injunction he seeks would address the alleged harm"); *see also S. Yuba River Citizens League*, 804 F. Supp. 2d at 1057 ("[T]he court declines to order an interim measure that will provide no benefit . . . in the interim period."); *Schrill v. Plunkett*, 760 F. Supp. 1378, 1384 (D. Or. 1990) ("Granting plaintiffs' requested injunctive relief would not prevent the alleged" harm), *aff'd*, 932 F.2d 973 (9th Cir. 1991).

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST PRELIMINARY INJUNCTIVE RELIEF

Notwithstanding Plaintiffs' failure to establish irreparable harm warranting the extraordinary relief that they seek, Plaintiffs have not shown that the remaining equitable factors tip the balance in their favor. As the Supreme Court has explained in the immigration context, the questions of harm to the defendant and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government and the public share an interest in ensuring that the process established by Congress – under which the Secretary of Homeland Security has unreviewable authority to weigh the statutory factors governing TPS designations – is followed as Congress intended. As Secretary Noem observed, vacatur of the 2025 Extension was needed to "untangle the confusion [created by that Notice] and provide an opportunity for informed determinations regarding the TPS designations and clear guidance." *2025 Vacatur*, 90 Fed. Reg. at 8807.

The government has an "obligation to prioritize the safety, security, and financial and economic well-being of Americans." *Protecting the American People Against Invasion*, Exec. Order No. 14159, § 1, 90 Fed. Reg. at 8443. In this vein, "[e]nforcing [the n]ation's immigration laws is critically important to the national security and public safety of the United States." Among the Venezuelan nationals currently residing in the United States are members of the Tren de Aragua, a Venezuelan gang that poses a threat to the public safety. *See 2025 Termination*, 90 Fed. Reg. at 9040, 9042-43. And, as explained in Secretary Noem's 2025 Termination, Congress expressly required that the national interest of the United States be considered in determining whether to extend or terminate Venezuela's TPS designation. Vacating the 2025 Extension allowed the government to take necessary steps to "ensur[e] that designations of [TPS] are consistent with the provisions of […] 8 U.S.C. 1254a[], and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute" –in other words, to make certain the TPS designation is not being abused by individuals who threaten national security and public safety. Exec. Order No. 14159, § 16(b), 90 Fed. Reg. at 8446.

Ultimately, the injunctive relief Plaintiffs seek would frustrate Secretary Noem's substantive judgment as to how to implement the TPS statute in line with the government's established interests. *See All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("We will not grant a preliminary

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

injunction unless those public interests outweigh other public interests that cut in favor of *not* issuing the injunction"). Congress has given the Secretary, in consultation with the appropriate agencies, the broad discretion to assess conditions in foreign countries and reach determinations regarding TPS. Where the Secretary follows the statutory requirements, it is the public interest for the Court deny the extraordinary remedy of preliminary injunctive relief and allow this matter to proceed along the ordinary course.

## V.     PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD

Even if a preliminary injunction (or "stay" accomplishing the same effect) were warranted here, Plaintiffs have no basis to request universal relief benefitting non-parties. Under settled constitutional and equitable principles, the Court may not issue relief that is broader than necessary to remedy actual harm shown by specific Plaintiffs. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *Lewis v. Casey*, 518 U.S. 343, 358 n.5 (1996) ("[S]tanding is not dispensed in gross[.]"). A valid remedy "operate[s] with respect to specific parties," not with respect to a law "in the abstract." *California v. Texas*, 593 U.S. 659, 672 (2021) (quotation marks omitted). In this case, where sensitive foreign policy decisions of the Executive Branch are implicated, an injunction should go no further than redressing any cognizable injuries to individual named plaintiffs. *See Arizona v. United States*, 567 U.S. 387, 409 (2012) (holding the federal government must speak "with one voice" in determining "whether it is appropriate to allow a foreign national to continue living in the United States"). Universal injunctive relief here circumvents the requirement to limit relief to the Parties. Plaintiffs, who do not raise class claims in their Complaint and have not moved to certify a class under Rule 23, have made no effort to explain why they should be entitled to such sweeping relief. Granting universal relief in this situation further encourages forum shopping and effectively nullifies the decisions of other district or circuit courts nationwide. *See DHS v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring); *see also Ramos*, 975 F.3d. at 902–06 (Nelson, J., concurring).

## <u>CONCLUSION</u>

This Court lacks jurisdiction to review both determinations by Secretary Noem relating to the 2023 Designation of Venezuela for TPS and to grant Plaintiffs' requested relief. Even if this Court were to find that neither of the two clear jurisdictional bars applies, Plaintiffs' claims fail on the merits and the remaining factors do no support issuance of equitable relief.

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

Dated: March 3, 2025                                    Respectfully submitted,

                                                        YAAKOV M. ROTH
                                                        Acting Assistant Attorney General
                                                        Civil Division

                                                        WILLIAM H. WEILAND (Mass. Bar 661433)
                                                        Senior Litigation Counsel

                                                        ERIC SNYDERMAN (VA Bar 99563)
                                                        ANNA DICHTER (NJ Bar 304442019)
                                                        LAUREN BRYANT (NY Bar No. 5321880)
                                                        CATHERINE ROSS (DC Bar 9007404)
                                                        LUZ MARIA RESTREPO (NY Bar 4907077)
                                                        Trial Attorneys

                                                        /s/ *Sarah L. Vuong*
                                                        SARAH L. VUONG
                                                        (CA Bar. 258528)
                                                        Assistant Director
                                                        U.S. Department of Justice, Civil Division
                                                        Office of Immigration Litigation
                                                        General Litigation and Appeals Section
                                                        P.O. Box 868, Ben Franklin Station
                                                        Washington, DC 20044
                                                        Tel: (202) 305-1263
                                                        Sarah.L.Vuong@usdoj.gov

                                                        *Attorneys for the Defendants*

Defendants' Opp. To Plaintiffs' Mot. to Postpone
3:25-cv-1766-EMC

1

**CERTIFICATE OF SERVICE**

2    I hereby certify that the foregoing document filed through the ECF system will be sent electronically to

3    the registered participants, as identified on the Notice of Electronic Filing, and that paper copies will be

4    sent to those indicated as non-registered participants.

5                                                                       /s/ *Sarah L. Vuong*
                                                                        SARAH L. VUONG
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    Defendants' Opp. To Plaintiffs' Mot. to Postpone
      3:25-cv-1766-EMC