ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
VILMA PALMA-SOLANA
Supervising Deputy Attorney General
JESSE BASBAUM (SBN 273333)
ALEX FLORES
ANNABELLE WILMOTT
Deputy Attorneys General
  1515 Clay Street, 21st Floor
  Oakland, CA 94612-1499
  Telephone: (510) 879-0280
  Fax: (510) 622-2270
  E-mail: Jesse.Basbaum@doj.ca.gov
*Attorneys for the State of California*

[*Additional Counsel Listed on Signature Page*]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, et al., | Case No. 3:25-cv-1766-EMC |
| Plaintiffs, | |
| v. | **UNOPPOSED MOTION FOR LEAVE TO FILE BRIEF OF AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION** |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al., | |
| Defendants. | |

The States of California and New York, together with the States of Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia ("Amici States"[1]) respectfully move for leave to appear as amici curiae and file the proposed amici curiae brief, attached hereto as Exhibit 1, in support of Plaintiffs' Motion to Postpone Effective Date of Agency Action [Dkt. 16]. Plaintiffs and Defendants have indicated they do not oppose this request.

## I.      STANDARD FOR MOTION FOR LEAVE TO APPEAR AS AMICI CURIAE

District courts may consider amicus briefs from non-parties with unique information or perspectives that are useful or otherwise desirable to the court. *See NGV Gaming, Ltd. V. Upstream Point Molate*, LLC, 355 F. Supp. 2d. 1061, 1067 (N.D. Cal. 2005). While there are no strict prerequisites to qualify for amicus status, "[d]istrict courts frequently welcome amicus briefs from non-parties . . . if the amicus has unique information or perspective that can help the court beyond the help that the lawyers from the parties are able to provide." *Sonoma Falls Developers, L.L.C. v. Nev. Gold & Casinos, Inc.*, 272 F. Supp. 2d 919, 925 (N.D. Cal. 2023) (internal quotation marks and citations omitted). In addition, participation of amicus curiae may be appropriate where the legal issues have potential ramifications beyond the parties directly involved. *Id.*

## II.      INTEREST AND IDENTITY OF AMICI CURIAE

The Amici States are home to at least 99,900 Venezuelan immigrants, most of whom are covered by Temporary Protected Status (TPS).[2] Venezuelans represent the largest share of TPS holders, making up more than half of the one million TPS holders in the United States.[3] The proposed amicus brief provides a unique perspective to the Court about the meaningful

---

[1] The District of Columbia and the Commonwealth of Massachusetts are included as "Amici States" for purposes of this motion.
[2] Ana Alanis Amaya & Jeanne Batalova, *Venezuelan Immigrants in the United States* (Feb. 6, 2025), https://tinyurl.com/Venezuelan-Immigrants-in-US.
[3] Verónica Egui Brito & Syra Ortiz Blanes, *In a Few Weeks, Hundreds of Thousands of Venezuelans Will Lose TPS. What You Need to Know*, Miami Herald (Feb. 13, 2025), https://tinyurl.com/Venezuelans-Will-Lose-TPS (finding that of the about 900,000 Venezuelans in the U.S., according to Census data, as of December 2024 there were around 600,000 approved beneficiaries of TPS).

1

contributions these families have made to our States and the harms that will ensue if their TPS status is suddenly, arbitrarily, and unlawfully terminated. Our States have worked hard to welcome TPS holders and have dedicated resources to provide services to them.[4] The Amici States are proud to invest in Venezuelan and other TPS holders, and have a critical interest in ensuring that their legal status is not unlawfully revoked.

Venezuelan TPS holders contribute meaningfully to our communities, our economies, and our public health and safety in the following ways. *First*, many of them live in mixed-status homes with United States citizens, and losing their legal status would cause profound harms to their families and our communities. As set forth in greater detail in the attached brief, parental deportation (or even the prospect of deportation) has a disruptive and traumatic effect on children that would have ripple effects throughout the Amici States. *Second*, TPS holders' ability to work legally allows them to make significant economic contributions to Amici States. The loss of these workers will deplete Amici States' workforces, negatively impacting many labor-short industries, and the absence of their economic contributions will reduce state and federal tax revenue. *Third*, Venezuelans newly stripped of status would be less likely to seek medical assistance, raising significant public health concerns. The attached brief explains the significant negative effects on the public health of the Amici States', and the strain that State-funded programs will absorb should Venezuelan immigrants currently covered by private-employer health insurance lose that coverage. *Fourth*, as TPS holders lose benefits, including the ability to legally work, these individuals will be forced into the shadows. Fear of removal makes victims and witnesses reluctant to come forward or testify in court. It will also discourage innocent Venezuelan witnesses from coming forward and will hinder law enforcement efforts to combat the newly designated "foreign terrorist organization" Tren de Aragua, as well as other criminal organizations and individuals. This impedes the States' ability to gather evidence and enforce criminal, labor, and civil rights laws.

---

[4] *See, e.g.*, Cal. Legis. Analyst's Off., *The 2024-2025 Budget: Department of Social Services Immigration and Equity Programs* (Mar. 15, 2024), https://tinyurl.com/24-25-Budget; State of New York, *Governor Hochul, Mayor Adams Announce $38 Million for Asylum Seeker Legal Services and Case Management* (Oct. 3, 2023), https://tinyurl.com/38-million-for-asylum.

1    Finally, the Amici States have a strong interest in ensuring that federal agencies refrain

2    from actions that—like those at issue in this matter—are arbitrary and capricious, discriminatory,

3    and unconstitutional.

4                              **CONCLUSION**

5    For the foregoing reasons, the Amici States respectfully request this Court's leave to appear

6    as amici curiae and deem the proposed amicus brief filed.

7

8    Dated:  March 6, 2025                          Respectfully submitted,

9                                                   ROB BONTA
                                                    *Attorney General*
                                                    *State of California*
10                                                  Michael L. Newman
                                                    *Senior Assistant Attorney General*
11                                                  Vilma Palma-Solana
                                                    *Supervising Deputy Attorney General*
12                                                  Alex Flores
                                                    Annabelle Wilmott
13                                                  *Deputy Attorneys General*

14                                                  *s/ Jesse Basbaum*
                                                    Jesse Basbaum
15                                                  *Deputy Attorney General*

16

17                                                  LETITIA JAMES
                                                    *Attorney General*
18                                                  *State of New York*
                                                    Barbara D. Underwood*
19                                                  *Solicitor General*
                                                    Judith N. Vale*
20                                                  *Deputy Solicitor General*
                                                    Zoe Levine*
21                                                  *Special Counsel for Immigrant Justice*

22                                                  *s/ Cleland B. Welton II*
                                                    Cleland B. Welton II (pro hac vice forthcoming)
23                                                  *Assistant Solicitor General*

24                                                  * Not admitted in the Northern District of
                                                    California
25

26

27

28
                                        3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTORNEY ATTESTATION**

I, Jesse Basbaum, am the ECF user whose ID and password are being used to file this Unopposed Motion for Leave to File Brief of Amici Curiae in Support of Plaintiffs' Motion to Postpone Effective Date of Agency Action. In compliance with N.D. Cal. Civil L.R. 5-1(i)(3), I hereby attest that I have the authority to file this document and its related exhibits and attachments on behalf of each of the signatories.

*s/ Jesse Basbaum*
JESSE BASBAUM

4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2025, I caused the above document and its attachments to be electronically filed with the Clerk of Court using CM/ECF, which will send electronic notification of such filing to all registered counsel.

*s/ Jesse Basbaum*
JESSE BASBAUM

5

# EXHIBIT 1

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
VILMA PALMA-SOLANA
Supervising Deputy Attorney General
JESSE BASBAUM  (SBN 273333)
ALEX FLORES
ANNABELLE WILMOTT
Deputy Attorneys General
  1515 Clay Street, 21st Floor
  Oakland, CA 94612-1499
  Telephone:  (510) 879-0280
  Fax: (510) 622-2270
  E-mail:  Jesse.Basbaum@doj.ca.gov
*Attorneys for the State of California*

[*Additional Counsel Listed on Signature Page*]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, et al., | Case No. 3:25-cv-1766-EMC |
| Plaintiffs, | |
| v. | **[PROPOSED] BRIEF OF THE STATES OF CALIFORNIA, NEW YORK, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION** |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.     Introduction ......................................................................................... 1

II.    Background and Interest of Amici States.............................................. 1

III.   The Public Interest Favors Postponement Because DHS's Actions Would Inflict Irreparable Harm on Families and on the Amici States. ............................ 3

     A.     Family Separation Would Devastate Children and Fracture Amici States' Communities and Schools.............................................. 4

     B.     Economies and Workforces Would be Depleted. ....................... 7

     C.     Public Health Would be Compromised and Health Care Costs Would Increase.......................................................................... 9

     D.     Public Safety Would Suffer and Communities Would Hesitate to Report Crime................................................................................ 12

IV.   Conclusion ......................................................................................... 14

# TABLE OF AUTHORITIES

**Page**

**CASES**

*City & Cnty. of S.F. v. Trump*
  897 F.3d 1225 (9th Cir. 2018)...................................................................................... 4

*City & Cnty. of S.F. v. USCIS*
  981 F.3d 742 (9th Cir. 2020)........................................................................................ 4

*Earth Island Inst. v. Elliott*
  290 F. Supp. 3d 1102 (E.D. Cal. 2017)........................................................................ 4

*Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*
  512 F.3d 1112 (9th Cir. 2008)................................................................................... 3, 4

*Hernandez v. Sessions*
  872 F.3d 976 (9th Cir. 2017)........................................................................................ 4

*Immigr. Legal Res. Ctr. v. Wolf*
  491 F. Supp. 3d 520 (N.D. Cal. 2020) ......................................................................... 3

*Nat'l Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.*
  491 F. Supp. 3d 549 (N.D. Cal. 2020) ......................................................................... 4

*New York v. Trump*
  1:17-cv-5228 (E.D.N.Y. Oct. 4, 2017), ECF No. 55-83 ............................................ 10

*Philadelphia v. Sessions*
  280 F. Supp. 3d 579 (E.D. Pa. 2017) ......................................................................... 10

*Regents of Univ. of Cal. v. United States Dep't of Homeland Sec.*
  No. 3:17-cv-05211 (N.D. Cal. Nov. 1, 2017), ECF No. 118-1 .................................. 10

*Stormans, Inc. v. Selecky*
  586 F.3d 1109 (9th Cir. 2009)...................................................................................... 3

*Winter v. Nat. Res. Def. Council*
  555 U.S. 7 (2008) ......................................................................................................... 3

**STATUTES**

5 U.S.C. § 705................................................................................................................... 3

**OTHER AUTHORITIES**

8 C.F.R. 244.14(a)(1) ...................................................................................................... 13

1

### TABLE OF AUTHORITIES
#### (continued)

2

**Page**

3

86 Fed. Reg. 13574 (Mar. 9, 2021) ................................................................ 1

4

88 Fed. Reg. 68130 (Oct. 3, 2023) ................................................................ 2

5

90 Fed. Reg. 5961 (Jan. 17, 2025) ................................................................ 2

6

90 Fed. Reg. 9040 (Feb. 5, 2025) ................................................................. 1

7

90 Fed. Reg. 10030 (Feb. 20, 2025) ........................................................... 13

8

9

ABC Newsline, *Learn About Recent Immigration Actions Under the Trump
    Administration* (Feb. 10, 2025), https://tinyurl.com/Recent-Immigration-
    Actions ....................................................................................................... 7

10

Alejandro Portes, et al., *The U.S. and Immigration: An Institutional Interpretation* ................. 10

11

Am. Coll. of Obstetricians & Gynecologists, Comm. Op. No. 627, *Health Care for
    Unauthorized Immigrants*, 125 ............................................................... 11

12

13

Am. Coll. of Obstetricians & Gynecologists, Comm. Statement No. 4, *Health Care
    for Immigrants*, 141 ................................................................................ 11

14

15

Am. Immigr. Council, *The Contributions of Temporary Protected Status Holders
    to the U.S. Economy* 4 (Sept. 2023), https://tinyurl.com/TPS-Economy ................... 8

16

Am. Immigr. Council, *Map the Impact: Immigrants in California* (updated 2024),
    https://tinyurl.com/5t3by8dw ................................................................... 8

17

18

Am. Immigr. Council, *Map the Impact: Immigrants in New York* (updated 2024),
    https://tinyurl.com/Immigrants-NY ......................................................... 8

19

Am. Immigr. Council, *Map the Impact: Immigrants in the United States* (updated
    2024), https://tinyurl.com/4yn722kh ........................................................ 8

20

21

Am. Immigr. Council, *U.S. Citizen Children Impacted by Immigration
    Enforcement* (June 24, 2021), https://tinyurl.com/Citizen-Children-Impacted ............ 5

22

23

Ana Alanis Amaya & Jeanne Batalova, *Venezuelan Immigrants in the United
    States* (Feb. 6, 2025), https://tinyurl.com/Venezuelan-Immigrants-in-US ............ 2

24

25

Ana Martinez-Donate, et al., *Between the Lines: A Mixed-Methods Study on the
    Impacts of Parental Deportation on the Health and Well-Being of U.S. Citizen
    Children* ..................................................................................................... 6

26

27

28

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

4

Cal. Legis. Analyst's Off., *The 2024-2025 Budget: Department of Social Services Immigration and Equity Programs* (Mar. 15, 2024), https://tinyurl.com/24-25-Budget ............................................................................................................ 3

5

6

Cassandra D. Kelly-Cirino, et al., *Importance of Diagnostics in Epidemic and Pandemic Preparedness* ........................................................................................ 10

7

8

*Colombia, Peru, and Chile*, Migration Policy Inst. & Brookings Inst. (Sept. 2020), https://tinyurl.com/Migration-Crime-Misperceptions ............................................ 13

9

Fox & Friends, *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox News (Jan. 29, 2025) ..................................................... 1

10

11

Huyen Pham, *The Constitutional Right Not to Cooperate? Local Sovereignty and the Federal Immigration Power* ............................................................................ 11

12

13

*Immigration Enforcement*, Dep't of Urb. Plan. & Pol'y, Univ. of Ill. at Chi. (May 2013), https://tinyurl.com/Insecure-Communities ................................................. 12

14

Jacob S. Rugh & Matthew Hall, *Deporting the American Dream: Immigrant Enforcement and Latino Foreclosures* ...................................................................... 9

15

16

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts* ....................................................................... 12

17

18

Karen Hacker, et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA* ................... 11

19

Katherine Yun, et al., *Parental Immigration Status Is Associated with Children's Health Care Utilization* ............................................................................................. 12

20

21

Lila Flavin, et al., *Medical Expenditures on and by Immigrant Populations in the United States: A Systematic Review* ........................................................................ 10

22

23

Marc L. Berk & Claudia L. Schur, *The Effect of Fear on Access to Care Among Undocumented Latino Immigrants* ........................................................................... 11

24

Maria Cramer, et al., *'Migrant Crime Wave' Not Supported by Data, Despite High-Profile Cases*, N.Y. Times (Feb. 15, 2024) ................................................................ 13

25

Mark Perkins, et al., *Diagnostic Preparedness for Infectious Disease Outbreaks* ...................... 10

26

27

Migration Policy Institute, *U.S. Immigrant Population by State and County* (2019-2023), https://tinyurl.com/mrxz97ja ........................................................................ 2

28

iv

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

<u>Page</u>

3

Miguel Pinedo & Christian Escobar, *Childhood Parental Deportations,*
4 *Immigration Enforcement Experiences, and Posttraumatic Stress Disorder*
*Among US-Born Latino Adults, 2021* ....................................................................... 6

5

New York, *Governor Hochul, Mayor Adams Announce $38 Million for Asylum*
6 *Seeker Legal Services and Case Management* (Oct. 3, 2023),
https://tinyurl.com/38-million-for-asylum ............................................................... 3

7

Omar Martinez, et al., *Evaluating the Impact of Immigration Policies on Health*
8 *Status Among Undocumented Immigrants: A Systematic Review* ........................... 10

9

Randy Capps, et al., *Immigration Enforcement and the Mental Health of Latino*
10 *High School Students* ............................................................................................... 5, 6

11

Ronald B. Cox, et al., *Validation of the Family Fear of Deportation Scale for*
*Youth* .......................................................................................................................... 5

12

Scott D. Rhodes, et al., *The Impact of Local Immigration Enforcement Policies on*
13 *the Health of Immigrant Hispanics/Latinos in the United States* ......................... 10

14

Sezer Kisa & Adnan Kisa, *"No Papers, No Treatment": a scoping review of*
15 *challenges faced by undocumented immigrants in accessing emergency*
*healthcare* ............................................................................................................... 10

16

U.S. Dep't of State, *Venezuela Travel Advisory* (Sept. 24, 2024),
17 https://tinyurl.com/VE-Travel-Adv .......................................................................... 5

18

*Trump Says Migrants Are Fueling Violent Crime. Here Is What the Research*
19 *Shows*, Reuters (July 16, 2024) ............................................................................... 13

20

U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets*
*of State and Local Governments* (Dec. 2007) ........................................................ 10

21

*Venezuelans Will Lose TPS. What You Need to Know*, Miami Herald (Feb. 13,
22 2025) .......................................................................................................................... 2

23

Victoria D. Ojeda, et al., *Deported Men's and Father's Perspective: The Impacts*
24 *of Family Separation on Children and Families in the U.S.* ................................... 6

25

26

27

28

v

## I.    INTRODUCTION

Four days after taking office, Secretary of Homeland Security Kristi Noem accused Venezuelan holders of Temporary Protected Status (TPS) of "violat[ing] our laws" and suggested that many were "dirt bags."[1] Shortly thereafter, Secretary Noem vacated and terminated TPS for more than half of these immigrants, claiming, without evidence, that they had cost the country billions in tax dollars and had endangered the economy, safety, and public welfare of our communities.[2] She has also made the inflammatory claim that the Venezuelan TPS community is rife with members of the gang Tren De Aragua. The vacatur and termination at issue in this litigation, which aim to strip legal protection from a community that comprises more than 50 percent of all TPS holders, rest largely on such erroneous and unsubstantiated assertions.

The Amici States[3] are home to countless thriving Venezuelan communities and submit this brief to demonstrate that Secretary Noem's decision was baseless and arbitrary. Far from being a burden or threat to our States, Venezuelan TPS holders are a resounding benefit. They are homeowners and neighbors, co-workers, teachers and students, entrepreneurs and job-creators, caregivers, construction workers and union members, and parents. Stripping these individuals of legal status would harm our residents, our economies, and our public health and safety. The public interest therefore weighs strongly in favor of granting Plaintiffs' requested relief and postponing the vacatur and termination orders pending adjudication of Plaintiffs' claims.

## II.    BACKGROUND AND INTEREST OF AMICI STATES

The collapse of Venezuela's oil-dependent economy over the past ten years has triggered widespread violence and severe shortages of food, medicine, and other necessities.[4] The calamity

---

[1] *See* Fox & Friends, *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox News, at 0:59, 1:22 (Jan. 29, 2025), https://tinyurl.com/Announces-End-TPS-Venezuela.

[2] USCIS, Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9040 (Feb. 5, 2025), https://tinyurl.com/Termination-2023-Designationhttps://tinyurl.com/ythtkffn.

[3] The Amici States include: California and New York, together with Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, Washington, the District Of Columbia, and the Commonwealth of Massachusetts. The District of Columbia and the Commonwealth of Massachusetts are included as "Amici States" for purposes of this brief.

[4] USCIS, 2021 Designation of Venezuela for Temporary Protected Status, 86 Fed. Reg. 13574 (Mar. 9, 2021), https://tinyurl.com/2021-Venezuelan-Designation.

1   has been described as "an unrelenting humanitarian crisis."[5] In response, the Department of

2   Homeland Security (DHS) designated Venezuela for TPS protection in 2021,[6] then issued a re-

3   designation in 2023—available to Venezuelans who arrived after the effective date of the 2021

4   designation—because of the persistence of the humanitarian crisis.[7]

5        In recently extending the duration of protection for Venezuelan TPS holders on January 17,

6   2025, then-Secretary of Homeland Security Alejandro Mayorkas explained in detail how

7   Venezuela's "humanitarian emergency [is] marked by an economic contraction, deepening

8   poverty, reduced access to food and medicine, a collapse in basic services, fuel shortages, human

9   rights abuses and political repression, [and] crime and violence . . ."[8] As a result of this persistent

10  instability, more than one-quarter of Venezuela's population, about 7.7 million people, has fled

11  the country.[9] As of January 2025, more than 600,000 Venezuelans are living in the United States

12  with TPS status.[10]

13       The Amici States are home to at least 99,900 Venezuelan immigrants, the majority of

14  whom are covered by TPS.[11] Venezuelans represent the largest share of TPS holders, making up

15  more than half of the one million TPS holders in the United States.[12] These families have made

16  meaningful contributions to our States, and our States have worked hard to welcome them. For

17  example, California historically allocated $10 million annually to provide legal services to TPS

18  holders, and will continue to dedicate resources to this important community through its funding

19

20       [5] Iván Reyes, *As Election Looms, Venezuelans See-Saw Between Hope and Fear*, The New Humanitarian (July 8, 2024), https://tinyurl.com/Venezuelans-See-Saw.

21       [6] USCIS, *2021 Designation, supra* note 4.
         [7] USCIS, Extension and Redesignation of Venezuela for Temporary Protected Status, 88 Fed. Reg. 68130 (Oct. 3, 2023), https://tinyurl.com/Extension-and-Redesignation.

22       [8] USCIS, Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 5961 (Jan. 17, 2025), https://tinyurl.com/Extension-of-2023-Designation.

23       [9] Karen Aho, *Spotlight on the Economic Contributions of TPS Holders*, Immigration Impact (Oct. 23, 2023), https://tinyurl.com/Economic-Contributions-TPS.

24       [10] Ana Alanis Amaya & Jeanne Batalova, *Venezuelan Immigrants in the United States* (Feb. 6, 2025), https://tinyurl.com/Venezuelan-Immigrants-in-US.

25       [11] *Id.*; *see also* Migration Policy Institute, *U.S. Immigrant Population by State and County*, (2019-2023), https://tinyurl.com/mrxz97ja.

26       [12] Verónica Egui Brito & Syra Ortiz Blanes, *In a Few Weeks, Hundreds of Thousands of Venezuelans Will Lose TPS. What You Need to Know*, Miami Herald (Feb. 13, 2025),

27  https://tinyurl.com/Venezuelans-Will-Lose-TPS (finding that of the about 900,000 Venezuelans in the U.S., according to Census data, as of December 2024 there were around 600,000 approved

28  beneficiaries of TPS).

1  for the immigrant community as a whole—including $45 million annually to support legal

2  services, education, and technical assistance to community organizations.[13] New York has also

3  dedicated substantial resources and support to Venezuelan TPS holders, including by assisting

4  with work authorization applications and connecting these TPS holders to employers.[14]

5        In short, the Amici States are proud to invest in Venezuelan and other TPS holders, and

6  have a critical interest in ensuring that their legal status is not unlawfully revoked. Indeed, the

7  Amici States have a strong interest in ensuring that federal agencies refrain from actions that—

8  like those at issue in this matter—are arbitrary and capricious, discriminatory, and

9  unconstitutional.

10

11  **III.    THE PUBLIC INTEREST FAVORS POSTPONEMENT BECAUSE DHS'S ACTIONS WOULD INFLICT IRREPARABLE HARM ON FAMILIES AND ON THE AMICI STATES.**

12        In evaluating a postponement motion under 5 U.S.C. § 705, courts generally apply the same

13  factors that would apply to a preliminary injunction motion. *See, e.g., Immigr. Legal Res. Ctr. v.*

14  *Wolf*, 491 F. Supp. 3d 520, 529–30 (N.D. Cal. 2020). One of those factors is whether the

15  "injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The

16  public interest is particularly relevant in cases where the impact of an injunction reaches beyond

17  the parties and carries a potential for public consequences. *Stormans, Inc. v. Selecky*, 586 F.3d

18  1109, 1139 (9th Cir. 2009). In cases like this one, which affects many non-parties (including the

19  Amici States), the hardship to third parties is integral to the public interest analysis. *See Golden*

20  *Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1126–27 (9th Cir. 2008). In general,

21  third-party harms that are relevant to the public interest analysis include harms to family

22

23

24

25

26  [13] Cal. Legis. Analyst's Off., *The 2024-2025 Budget: Department of Social Services Immigration and Equity Programs* (Mar. 15, 2024), https://tinyurl.com/24-25-Budget.

27  [14] State of New York, *Governor Hochul, Mayor Adams Announce $38 Million for Asylum Seeker Legal Services and Case Management* (Oct. 3, 2023), https://tinyurl.com/38-million-for-asylum.

28

3

members;[15] economic and employment-based harms;[16] increased public health care expenses;[17] public health harms;[18] public safety harms;[19] and impacts to public services.[20] All these cognizable harms would affect Amici States and their residents if the TPS termination and vacatur are not postponed.

### A.  Family Separation Would Devastate Children and Fracture Amici States' Communities and Schools.

The families of Venezuelan TPS holders, many of whom live in the Amici States, will be profoundly harmed if the vacatur and termination are not postponed. In 2022, approximately 54,000 U.S. citizen children and 80,000 U.S. citizen adults lived with a Venezuelan TPS holder.[21] Thus, over 130,000 U.S. citizens lived in "mixed status" households with individuals whom DHS seeks to unlawfully strip of their legal status—and this figure does not account for the hundreds of thousands of Venezuelans who were newly eligible under the 2023 designation. Terminating TPS would create extreme hardship for these households, withdrawing their members' work authorization and exposing them to the threat of deportation.

Compelling TPS holders to return en masse to Venezuela would pose substantial dangers to many members of the Amici States' communities. As discussed above, just over a month ago, then-Secretary Mayorkas declared that Venezuela remained in a state of "severe humanitarian emergency."[22] He supported his conclusion with 52 sources, whereas Secretary Noem did not cite

---

[15] *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (citing "indirect hardship to [plaintiffs'] friends and family members," including harm to children who "had to receive counseling because of the trauma of their government-compelled separation from their father") (citation omitted).

[16] *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.*, 491 F. Supp. 3d 549, 571 (N.D. Cal. 2020) (enjoining limitation on certain nonimmigrant work visas and noting harms to "hundreds of thousands of American businesses of all sizes and economic sectors").

[17] *Golden Gate Rest. Ass'n*, 512 F.3d at 1126 (citing municipality's "overall health care expenses").

[18] *City & Cnty. of S.F. v. USCIS*, 981 F.3d 742, 762 (9th Cir. 2020) (affirming injunction against DHS's redefinition of "public charge," acknowledging that the rule would have "adverse effects on the health and welfare of the immigrant as well as general population").

[19] *Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1125 (E.D. Cal. 2017) (examining public safety implications of proposed injunction on Forest Service tree removal project).

[20] *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) ("[T]he public interest cannot be disserved by an injunction that brings clarity to all parties and to citizens dependent on public services.").

[21] FWD.us, *Temporary Protected Status Protects Families While Also Boosting the U.S. Economy* (Feb. 2024), https://tinyurl.com/TPS-Protects-Families.

[22] USCIS, *Extension of the 2023 Designation, supra* note 8.

1    a single source for the conclusion that there are "notable improvements in several areas" in

2    Venezuela.[23] Indeed, at the time of Secretary Noem's decision, the U.S. State Department

3    continued to classify Venezuela as a "Level 4: Do Not Travel" country—its highest risk

4    designation—warning of the "high risk of wrongful detentions, terrorism, kidnapping, the

5    arbitrary enforcement of local laws, crime, civil unrest, [and] poor health infrastructure."[24] The

6    United States suspended embassy and consular operations in Venezuela in 2019 and, to date, such

7    services remain unavailable in the country.[25]

8        Against that backdrop, revoking Venezuela's TPS designation would put current TPS

9    holders—particularly those with U.S. citizen children, many of whom live in the Amici States—

10   to an agonizing choice. TPS-holder parents in this situation will be forced to choose between

11   (1) returning to Venezuela alone, leaving their children behind in broken families or in the foster

12   care system;[26] (2) taking their U.S. citizen children with them to a dangerous country that the

13   children do not know; or (3) staying in the United States and retreating into the shadows, knowing

14   that they cannot work legally and could be forcibly removed to Venezuela at any time.

15       This harrowing dynamic would severely harm the mental health and well-being of countless

16   U.S.-citizen children who reside in the Amici States. Children of undocumented parents living in

17   the United States frequently experience persistent anxiety, driven by the constant fear that a

18   family member may be deported.[27] This fear can profoundly shape their daily lives. One study

19   found that 30 percent of Latino student participants—including those born in the United States—

20   altered their routines due to deportation fears.[28] This included refraining from driving, seeking

21   medical care, attending religious services, or participating in afterschool activities; taking a

22

23       [23] Nat'l Found. for Am. Policy, *An Analysis of the DHS Decision to Terminate TPS for Venezuela* 1 (Feb. 2025); *see* USCIS, *Termination of the October 3, 2023 Designation, supra* note 2.

24       [24] U.S. Dep't of State, *Venezuela Travel Advisory* (Sept. 24, 2024), https://tinyurl.com/VE-Travel-Adv.

25       [25] *Id.*

26       [26] Am. Immigr. Council, *U.S. Citizen Children Impacted by Immigration Enforcement* (June 24, 2021), https://tinyurl.com/Citizen-Children-Impacted.

27       [27] Ronald B. Cox, et al., *Validation of the Family Fear of Deportation Scale for Youth*, 72 Family Relations 734, 736 (2023).

28       [28] Randy Capps, et al., *Immigration Enforcement and the Mental Health of Latino High School Students*, Migration Policy Inst. 1, 2–3 (Sept. 2020).

1    different route to school; and staying at home more often.[29] These harms would have ripple

2    effects throughout the Amici States and their schools, with far-reaching and long-term

3    consequences. Indeed, a recent profile of a California school district noted that "fear is

4    everywhere" and "rumors about ICE sweeps abound."[30] As a result, families are "afraid to go to

5    school."[31]

6         When these fears materialize and families are forcibly separated, the consequences are even

7    more severe. Research on U.S.-born Latino children reveals that parental deportation is a deeply

8    traumatic and disruptive event, linked to extreme psychological distress, anxiety, depression,

9    post-traumatic stress disorder (PTSD), externalizing behaviors (such as aggression), and

10   difficulties sleeping.[32] Beyond emotional and psychological harm, these children often face

11   additional hardships, including financial instability, housing and food insecurity, and disruptions

12   in their education, such as increased school absences and lower academic engagement.[33] Bullying

13   related to immigration status is also common.[34] And the long-term effects extend into adulthood.

14   Adults who experienced parental deportation during childhood are more than twice as likely to

15   suffer from PTSD as those who did not endure such separation.[35]

16        The harms associated with the proposed TPS termination are particularly acute given the

17   whiplash nature of the Administration's abrupt policy change. Less than two years ago,

18   approximately 472,000 Venezuelans qualified for protection under the 2023 designation.[36]

19   Secretary Mayorkas's January 17, 2025 extension gave these individuals assurance that they

---

20   [29] *Id.*

21   [30] Carolyn Jones, *'Afraid to Go to School': Immigrant Families in Salinas Are Gripped by Fear*, San Gabriel Valley Tribune (Feb. 20, 2025), https://tinyurl.com/afraid-to-go-to-school.

22   [31] *Id.*

23   [32] Miguel Pinedo & Christian Escobar*, Childhood Parental Deportations, Immigration Enforcement Experiences, and Posttraumatic Stress Disorder Among US-Born Latino Adults, 2021*, 114 Am. J. Pub. Health S495, S496 (2024); *see also* Victoria D. Ojeda, et al., *Deported Men's and Father's Perspective: The Impacts of Family Separation on Children and Families in the U.S.*, 11 Frontiers in Psychiatry 1, 10 (2020).

25   [33] Ojeda, et al., *supra* note 32, at 7, 9, 10; Ana Martinez-Donate, et al., *Between the Lines: A Mixed-Methods Study on the Impacts of Parental Deportation on the Health and Well-Being of U.S. Citizen Children*, 9 J. Migration & Health 1, 5, 7 (2024).

27   [34] Mallika Seshadri, *Research: Immigration Enforcement Hinders Schoolwork; Schools Offer Support*, EdSource (Feb. 16, 2024), https://tinyurl.com/Hinders-Schoolwork.

     [35] Pinedo & Escobar, *supra* note 32, at S501.

28   [36] USCIS, *Extension and Redesignation, supra* note 7.

6

would remain protected through October 2, 2026.[37] As discussed by the Plaintiffs, such extensions have never before been vacated—even after a change in administration. *Plaintiffs' Motion to Postpone Effective Date*, Dkt. 16 at p. 7. Yet just 11 days later, in a "vacatur" without precedent, the new Administration shattered the plans and prospects of countless families when it reversed course while, at the same time, falsely accusing law-abiding TPS holders of being gang members and a threat to national security. *See Plaintiffs' Motion to Postpone Effective Date*, Dkt. 16 at p. 7, 10–11 (discussing relevance of reliance interests).

The fracturing of Venezuelan families would have far-reaching impacts on children, their families, and on the Amici States in which they live. The public interest strongly favors preserving the unity of these families.

## B.    Economies and Workforces Would be Depleted.

The termination of Venezuela's TPS designation would also substantially harm the Amici States' economies by depleting their workforces and depriving them of considerable tax revenue.

The annual economic contribution of TPS-eligible Venezuelans is $11.5 billion.[38] Seventy-five percent of Venezuelan immigrants 16 and older were formally employed in 2023,[39] with high rates of participation in industries such as transportation, material moving, natural resources, construction, and maintenance.[40] Because 48 percent of Venezuelan immigrants have attained at least a bachelor's degree, the community is well-positioned to contribute to a variety of sectors.[41] Moreover, a recent estimate found that 143,000 TPS-eligible Venezuelans work in labor-short

---

[37] USCIS, *Extension of the 2023 Designation, supra* note 8.
[38] FWD.us, *supra* note 21 at 2. "TPS-eligible" includes those who hold TPS as well as those who qualify for TPS but may not have applied. *Id*. at 5.
[39] Amaya & Batalova, *supra* note 10.
[40] *Id.*; *see also* ABC Newsline, *Learn About Recent Immigration Actions Under the Trump Administration,* (Feb. 10, 2025), https://tinyurl.com/Recent-Immigration-Actions (national trade organization representing more than 23,000 members through 67 chapters, calling for "protections for TPS recipients, who have been members of the construction industry workforce for years" and estimating between 70,000-100,000 TPS and DACA recipients work in the construction industry); *see also* Kevin Williams, *What Trump's Mass Deportation Plan Would Mean for Immigrant Workers and the Economy*, CNBC (Nov. 11, 2024), https://tinyurl.com/Mass-Deportation-Plan (reporting estimates from construction, housing, and technology industries that mass deportations including TPS individuals, would shrink U.S. GDP by $1.1 trillion to $1.7 trillion).
[41] *See* Amaya & Batalova, *supra* note 10.

7

1  industries, defined as those with openings for at least 4 percent of their workforce.[42] As a group,

2  TPS holders from all countries have also shown high rates of entrepreneurship—14.5 percent of

3  TPS holders are self-employed, as compared with 9.3 percent of the U.S.-born workforce.[43] The

4  2021 TPS population included more than 38,100 entrepreneurs, or self-employed workers, who

5  generated $1.5 billion in business income.[44] In California alone, 7,800 self-employed TPS holders

6  generated $224.8 million in business income.[45]

7      These workforce contributions generate substantial state and federal tax revenue. In 2023,

8  TPS holders from all countries paid $3.1 billion in federal taxes, contributing to programs like

9  Social Security and Medicare, and paid $2.1 billion in state and local taxes.[46] These contributions

10 were particularly high in several of the Amici States. For example, California TPS households

11 earned $2.1 billion in income, paid $291.2 million in federal taxes, $226.5 million in state and

12 local taxes, and contributed $1.6 billion in spending power.[47] In New York, TPS households

13 earned $2.3 billion in income, paid $348.9 million in federal taxes, $305.5 million in state and

14 local taxes, and also contributed $1.6 billion in spending power.[48] Moreover, at least 41 percent

15 of TPS households are homeowners and pay taxes on property having a total value of

16 approximately $19 billion.[49]

17      Revoking Venezuela's TPS designation would endanger all these economic contributions.

18 Many current TPS holders would have no choice but to return to Venezuela, taking their

19 economic contributions with them. And those who remain in the country would be stripped of

20 their work authorization, causing them to lose their current employment and forcing them to

21 accept lower paying "off the books" jobs. The result would be lower wages and less productivity

22

23 [42] FWD.us, *supra* note 21, at 2.
   [43] Aho, *supra* note 9.

24 [44] Am. Immigr. Council, *The Contributions of Temporary Protected Status Holders to the U.S. Economy* 4 (Sept. 2023), https://tinyurl.com/TPS-Economy.

25 [45] *Id.*
   [46] *See* Am. Immigr. Council, *Map the Impact: Immigrants in the United States* (updated

26 2024), https://tinyurl.com/4yn722kh.
   [47] Am. Immigr. Council, *Map the Impact: Immigrants in California* (updated 2024),

27 https://tinyurl.com/5t3by8dw.
   [48] Am. Immigr. Council, *Map the Impact: Immigrants in New York* (updated 2024),

28 https://tinyurl.com/Immigrants-NY.
   [49] Aho, *supra* note 9.

8

in the Amici States' economies. The average wage gap between undocumented and legal immigrants exceeds 35 percent,[50] with particularly acute impacts for undocumented women. In California, for example, undocumented women make 58 cents for every dollar paid to all men, 44 cents compared to white men, and 67 cents for every dollar paid to all women.[51] Such lower-wage, unauthorized employment would also inevitably lead to a decline in tax revenues for the Amici States. And the Amici States would likely face a wave of mortgage foreclosures if current TPS holders are forced suddenly to leave the country or else to accept lower-paid employment, thus harming property values and reducing property tax receipts.[52]

The TPS-holder community, including Venezuelans, are dynamic contributors to Amici States' economies. Terminating their legal status would cause substantial harms to Amici States' economies, workforces, and tax revenue.

### C. Public Health Would be Compromised and Health Care Costs Would Increase.

Terminating Venezuela's TPS status would also have significant negative effects on public health in the Amici States and around the country. For example, 67 percent of Venezuelan immigrants are covered by private health insurance (often through employer-sponsored insurance programs).[53] Ending work authorization for hundreds of thousands of Venezuelan TPS holders would deprive many of those individuals and their families of their employer-sponsored health insurance. The result would be to increase the Amici States' heath care expenditures—both by increasing the proportion of Venezuelan immigrants who are on public health insurance (currently 18 percent[54]), and by increasing public expenditures on emergency care provided to uninsured patients (e.g., through emergency health insurance, payments to hospitals and community health centers, and funding for public health programs[55]). Avoiding such costs is an

---

[50] *See* George J. Borjas & Hugh Cassidy, *The Wage Penalty to Undocumented Immigration*, 61 Lab. Econ. 1, 2 (2019), https://tinyurl.com/Wage-Penalty.
[51] Alejandra Reyes-Velarde, *'Double Disadvantage': These California Workers' Pay Gap Is Widest by Far*, CalMatters (July 27, 2023), https://tinyurl.com/CA-Workers-Pay-Gap.
[52] *See* Jacob S. Rugh & Matthew Hall, *Deporting the American Dream: Immigrant Enforcement and Latino Foreclosures*, 3 Socio. Science 1053, 1067-68 (2016).
[53] *See* Amaya & Batalova, *supra* note 10.
[54] *See id.*
[55] *See, e.g.*, U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the*

(continued…)

1     important public interest weighing in favor of postponement.

2         Moreover, stripping legal status from hundreds of thousands of Venezuelan immigrants

3     would risk serious negative consequences for public health and the public interest.[56] As courts

4     have noted in other contexts, the "[p]ublic health is served when individuals freely seek

5     preventive care and do not stave off care until they need emergency room treatment in the midst

6     of a health crisis." *E.g.*, *Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 609 (E.D. Pa. 2017)

7     (granting preliminary injunction against enforcement of federal government's attempt to deprive

8     City of Philadelphia of certain federal grants based on certain of that city's policies regarding

9     immigrants), *subsequent judgment aff'd*, 916 F.3d 276 (3d Cir. 2019). For example, the public

10     greatly benefits when residents seek out diagnostic testing for and treatment of (or vaccination

11     against) infectious diseases such as COVID-19, tuberculosis, and HIV.[57] But as studies have

12     consistently found for decades, undocumented immigrants are often reluctant to seek medical

13     treatment due to fear of detention and deportation.[58] This phenomenon is so well documented that

14 *Budgets of State and Local Governments* 8 (Dec. 2007); Am. Compl., Ex. 83, Decl. of Jesse M.
Caplan, *New York v. Trump*, 1:17-cv-5228 (E.D.N.Y. Oct. 4, 2017), ECF No. 55-83 ("Caplan
15 Decl."); Lila Flavin, et al., *Medical Expenditures on and by Immigrant Populations in the United
States: A Systematic Review*, 2018 Int'l J. Health Servs. 601, 617 (2018) (noting that "immigrants
16 often rely on safety-net options" such as public health programs), https:// perma.cc/2XD3-2A3E.

[56] *See, e.g.*, App. in Supp. of Pls.' Mot. for Provisional Relief at 789-90, *Regents of Univ.
17 of Cal. v. United States Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Nov. 1, 2017),
ECF No. 118-1; Caplan Decl., *supra* note 55; Meredith L. King, *Immigrants in the U.S. Health
18 Care System: Five Myths That Misinform the American Public*, Ctr. for Am. Progress 6 (2007),
https://tinyurl.com/Immigrants-Health-Care.

19 [57] *See, e.g.*, Cassandra D. Kelly-Cirino, et al., *Importance of Diagnostics in Epidemic and
Pandemic Preparedness*, 4 BMJ Glob. Health 1, 1 (2018); Mark Perkins, et al., *Diagnostic
20 Preparedness for Infectious Disease Outbreaks*, 390 The Lancet 2211, 2211 (2017); Alejandro
Portes, et al., *The U.S. and Immigration: An Institutional Interpretation*, 24 Socio. Forum 487
21 (2009) (manuscript at 10, 14), https://tinyurl.com/Portes-Manuscript.

[58] *See, e.g.*, Sezer Kisa & Adnan Kisa, *"No Papers, No Treatment": a scoping review
22 of challenges faced by undocumented immigrants in accessing emergency healthcare*, 23 Int'l J.
for Equity in Health 184 (2024) (manuscript at 2, 6, 8), https://tinyurl.com/Kisa-Manuscript;
23 Omar Martinez, et al., *Evaluating the Impact of Immigration Policies on Health Status Among
Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. & Minority. Health 947 (2015)
24 (manuscript at 10), https://tinyurl.com/Martinez-Manuscript (immigrants often "refrain from
seeking vital services, including medical services, from any local government or private agency—
25 even agencies unrelated to law enforcement—for fear of exposing themselves or their family
members to legal sanctions or harassment"); Scott D. Rhodes, et al., *The Impact of Local
26 Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United
States*, 105 Am. J. Pub. Health 329, 332 (2015) (immigrants "reported that they ... did not access
27 or utilize health services for which they were eligible, including preventive services," because
"[t]hey worried that ... their lack of documentation ... would put them at risk for detention and
28                                                           (continued…)

10

1   health-care providers often take significant steps to combat it—as where one clinic "placed itself

2   right next to a Baptist church in order to prevent raids by [ICE] agents that would scare away its

3   mostly undocumented users."[59]

4       Against this well-understood backdrop, stripping Venezuelan immigrants of lawful status

5   (via mass revocation of TPS) would risk significant public health consequences. Many

6   immigrants would not only lose employer-sponsored health care but would also be discouraged

7   from seeking medical treatment of any kind due to fear of deportation. This would increase the

8   broader community risk and would have many adverse results for individual immigrants and their

9   families. For example, undocumented women are less likely to receive needed health care and

10  preventive screenings than the general U.S. population—leading to significantly higher rates of

11  conditions like cervical cancer, birth complications, neonatal morbidity, respiratory distress

12  syndrome, and seizures for newborns.[60]

13      And newly undocumented former TPS holders may also elect not to seek treatment for

14  their children or other family members—who may themselves be natural-born U.S. citizens.[61] For

15  example, studies show that children of undocumented immigrants are often sicker when seeking

16  emergency room care and frequently miss preventive annual exams.[62] And the results can be fatal,

17  _____

18  deportation"); Karen Hacker, et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA*, 73 So. Sci. Med.

19  586 (2011) (manuscript at 7) ("Both documented and undocumented immigrants discussed fears that giving out personal information to acquire health insurance or health care would be reported

20  to ICE," which "[i]n some cases ... led to avoidance of care"), https://tinyurl.com/Hacker-Manuscript; Huyen Pham, *The Constitutional Right Not to Cooperate? Local Sovereignty and the*

21  *Federal Immigration Power*, 74 Univ. Cin. L. Rev. 1373, 1400 (2006) ("Immigrants ... may refuse to seek medical care if they believe that hospital workers will report them or their family

22  members to federal immigration authorities."); Marc L. Berk & Claudia L. Schur, *The Effect of Fear on Access to Care Among Undocumented Latino Immigrants*, 3 J. Immigr. Health 151, 155

23  (2001) ("[L]ack of documentation—and the fear associated with it—is a powerful deterrent to people obtaining care they believe they need[.]").
    [59] Portes, et al., *supra* note 57, at 14.

24  [60]Am. Coll. of Obstetricians & Gynecologists, Comm. Op. No. 627, *Health Care for Unauthorized Immigrants*, 125 Obstetrics & Gynecology 755 (2015); *see also* Am. Coll. of

25  Obstetricians & Gynecologists, Comm. Statement No. 4, *Health Care for Immigrants*, 141 Obstetrics & Gynecology 427, 428–29 & nn.8–11 (2023), https://tinyurl.com/Health-Care-

26  Immigrants.
    [61] *See* Flavin, *supra* note 55, at 18.

27  [62] King, *supra* note 56, at 5; Katherine Yun, et al., *Parental Immigration Status Is Associated with Children's Health Care Utilization*, 17 Maternal & Child Health J. 1913, 1916-19

28  (2013).

1   as where a child in Oklahoma died "when his parents delayed seeking medical treatment because

2   they feared that hospital officials would report them to ICE."[63]

3       Because terminating Venezuela's TPS designation would strip status from a significant

4   population of immigrants in the Amici States, and because such a shift would both raise

5   healthcare costs and pose grave substantive risks to public health, the public interest weighs in

6   favor of postponement.

### D.   Public Safety Would Suffer and Communities Would Hesitate to Report Crime.

8       The Amici States have strong interests in effective law enforcement and protection of

9   public safety, at both the state and local levels. Terminating Venezuela's TPS status would make

10  effective law enforcement and protection of public safety more difficult.

11      Because TPS holders and their families have built lives in the United States, some may try

12  to stay in this country even if their TPS status is terminated. But individuals who lack legal status

13  are less likely to report crime—even crimes in which they themselves are victims—out of "fear

14  that [officials] will ask . . . about [their] immigration status" and increase their perceived risk of

15  being removed.[64] Fear of removal, or of having a family or community member removed, makes

16  victims and witnesses reluctant to come forward, to testify in court, and even to seek safety in a

17  domestic violence shelter.[65] When law enforcement is unable to obtain evidence of crimes and

18  maintain witness cooperation at trial, public safety suffers.[66]

19      This public interest is particularly weighty (and the TPS termination is particularly

20

21      [63] Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and A Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165, 199 (2016).

22      [64] *See, e.g.*, Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Dep't of Urb. Plan. & Pol'y, Univ. of Ill. at Chi. 14 (May 2013), https://tinyurl.com/Insecure-Communities.

23      [65] James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), https://tinyurl.com/Undocumented-Crime-Reporting.

24      [66] *See, e.g.*, Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy, Ctr. for Am. Progress*, Ctr. for Am. Progress (Jan. 26, 2017), https://tinyurl.com/Effects-of-Sanctuary-Policies (sanctuary counties have lower crime rates than comparable nonsanctuary counties); *see also* Queally, *supra* note 65 (quoting former San Francisco District Attorney George Gascón's concern that "severe injury or homicide" can result when domestic violence is unreported).

1    irrational) in view of the Administration's expressed concern regarding the Venezuelan gang Tren

2    de Aragua. Discouraging innocent Venezuelan witnesses from coming forward will hinder law

3    enforcement efforts to combat this gang (which the federal government has newly designated a

4    "foreign terrorist organization") as well as other criminal organizations and individuals.[67] And

5    there is no plausible counterargument that terminating Venezuela's TPS status would somehow

6    reduce crime or facilitate the removal of noncitizens convicted of crimes from the country.

7    Contrary to unsubstantiated contentions, recent arrivals of immigrants, including Venezuelans,

8    have not led to any "crime wave," and research shows that immigrants are *less* likely than the

9    general population to commit crimes.[68] Moreover, TPS applicants must meet specified criteria to

10   be granted that status, including screenings for criminal history and background checks.[69] And

11   conviction for certain criminal offenses can also trigger withdrawal of TPS status. *See* 8 C.F.R.

12   244.14(a)(1).

13          Terminating Venezuela's TPS designation would pose challenges to jurisdictions around

14   the country in enforcing their criminal codes and protecting public safety. Amici's interests in

15   maintaining public order weigh heavily in favor of granting a postponement.

16

17

18

19

20

21

22

---

23   [67] *See* U.S. Dep't of State, Foreign Terrorist Organization Designations of Tren de
     Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles
24   Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 Fed. Reg.
     10030 (Feb. 20, 2025), https://tinyurl.com/Foreign-Terror-Designations.
25   [68] *See, e.g.*, Ted Hesson & Mica Rosenberg, *Trump Says Migrants Are Fueling Violent
     Crime. Here Is What the Research Shows*, Reuters (July 16, 2024), https://tinyurl.com/What-The-
26   Research-Shows; Maria Cramer, et al.,*'Migrant Crime Wave' Not Supported by Data, Despite
     High-Profile Cases*, N.Y. Times (Feb. 15, 2024), https://tinyurl.com/Crime-Wave-Not-Supported;
27   Dany Bahar, et al., *Venezuelan Migration, Crime, and Misperceptions: A Review of Data from
     Colombia, Peru, and Chile*, Migration Policy Inst. & Brookings Inst. (Sept. 2020),
28   https://tinyurl.com/Migration-Crime-Misperceptions.
     [69] *See* Egui Brito & Ortiz Blanes, *supra* note 12.

1  **IV.    CONCLUSION**

2           For the foregoing reasons, Plaintiffs' motion to postpone should be granted.

3

4  Dated:  March 6, 2025                          Respectfully submitted,

5                                                 ROB BONTA
                                                  *Attorney General*
6                                                 *State of California*
                                                  Michael L. Newman
7                                                 *Senior Assistant Attorney General*
                                                  Vilma Palma-Solana
8                                                 *Supervising Deputy Attorney General*
                                                  Alex Flores
9                                                 Annabelle Wilmott
                                                  *Deputy Attorneys General*
10

11                                                *s/ Jesse Basbaum*
                                                  Jesse Basbaum
12                                                *Deputy Attorney General*

13                                                LETITIA JAMES
                                                  *Attorney General*
14                                                *State of New York*
                                                  Barbara D. Underwood*
15                                                *Solicitor General*
                                                  Judith N. Vale*
16                                                *Deputy Solicitor General*
                                                  Zoe Levine*
17                                                *Special Counsel for Immigrant Justice*

18                                                *s/ Cleland B. Welton II*
                                                  Cleland B. Welton II (pro hac vice forthcoming)
19                                                *Assistant Solicitor General*

20                                                * Not admitted in the Northern District of
                                                  California
21

22

23

24

25

26

27

28

| | |
|---|---|
| WILLIAM TONG<br>*Attorney General*<br>*State of Connecticut*<br>165 Capitol Avenue<br>Hartford, CT 06106 | DANA NESSEL<br>*Attorney General*<br>*State of Michigan*<br>P.O. Box 30212<br>Lansing, MI 48909 |
| KATHLEEN JENNINGS<br>*Attorney General*<br>*State of Delaware*<br>Delaware Department of Justice<br>820 N. French Street<br>Wilmington, DE 19801 | KEITH ELLISON<br>*Attorney General*<br>*State of Minnesota*<br>75 Rev. Dr. Martin Luther King Jr. Blvd.<br>St. Paul, MN 55155 |
| BRIAN L. SCHWALB<br>*Attorney General*<br>*District of Columbia*<br>400 6th Street NW<br>Washington, DC 20001 | AARON D. FORD<br>*Attorney General*<br>*State of Nevada*<br>100 North Carson Street<br>Carson City, NV 89701 |
| ANNE E. LOPEZ<br>*Attorney General*<br>*State of Hawai'i*<br>425 Queen Street<br>Honolulu, HI 96813 | MATTHEW J. PLATKIN<br>*Attorney General*<br>*State of New Jersey*<br>25 Market Street<br>Trenton, NJ 08625 |
| KWAME RAOUL<br>*Attorney General*<br>*State of Illinois*<br>115 S. LaSalle St., 35th Floor<br>Chicago, IL 60603 | DAN RAYFIELD<br>*Attorney General*<br>*State of Oregon*<br>1162 Court Street NE<br>Salem, OR 97301 |
| AARON M. FREY<br>*Attorney General*<br>*State of Maine*<br>6 State House Station<br>Augusta, ME 04333-0006 | PETER F. NERONHA<br>*Attorney General*<br>*State of Rhode Island*<br>150 South Main Street<br>Providence, RI 02903 |
| ANTHONY G. BROWN<br>*Attorney General*<br>*State of Maryland*<br>200 Saint Paul Place<br>Baltimore, MD 21202 | CHARITY R. CLARK<br>*Attorney General*<br>*State of Vermont*<br>109 State Street<br>Montpelier, Vermont 05609 |
| ANDREA JOY CAMPBELL<br>*Attorney General*<br>*Commonwealth of Massachusetts*<br>One Ashburton Place<br>Boston, MA 02108 | NICHOLAS W. BROWN<br>*Attorney General*<br>*State of Washington*<br>P.O. Box 40100<br>Olympia, WA 98504 |

15