Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
Stephany Martinez Tiffer (SBN 341254)
martineztiffer@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R., and HENDRINA VIVAS CASTILLO,<br><br>Plaintiffs,<br><br>vs.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA,<br><br>Defendants. | Case No. 3:25-cv-01766-EMC<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION**<br><br>Assigned to: Hon. Edward M. Chen<br><br>Date: March 24, 2025<br>Time: 9:00 a.m.<br>Place: Courtroom 5, 17th Floor<br><br>Complaint filed: February 19, 2025 |

1   Additional Counsel for Plaintiffs

2   Jessica Karp Bansal (SBN 277347)
    jessica@ndlon.org
3   Lauren Michel Wilfong (*pro hac vice*)
    lwilfong@ndlon.org
4   NATIONAL DAY LABORER
    ORGANIZING NETWORK
5   1030 S. Arroyo Parkway, Suite 106
    Pasadena, CA 91105
6   Telephone: (626) 214-5689

7   Eva L. Bitran (SBN 302081)
    ebitran@aclusocal.org
8   ACLU FOUNDATION
    OF SOUTHERN CALIFORNIA
9   1313 West 8th Street
    Los Angeles, CA 90017
10  Telephone: (213) 977-5236

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................1

    I.     This Court Has Jurisdiction and Authority to Grant Relief. ........................ 1

          A.     8 U.S.C. § 1252(f)(1) Does Not Bar Postponement Under 5 U.S.C. § 705...... 1

          B.     Section 705 Authorizes the Relief Plaintiffs Seek. ............................................ 3

          C.     Section 1254a(b)(5)(A) Does Not Bar Plaintiffs' Claims............................... 4

    II.    Plaintiffs Are Likely to Prevail on Their APA Claims. ................................. 6

          A.     DHS Lacks Authority to Vacate TPS Extensions............................................. 6

          B.     The Vacatur Decision Was Arbitrary. ............................................................... 8

    III.   Plaintiffs Are Likely to Prevail on Their Discrimination Claim................................. 9

    IV.   Plaintiffs Have Established Irreparable Harm. ........................................... 11

    V.    The Equities and Public Interest Favor Postponement. ............................. 13

    VI.   The Requested Relief Is Not Overbroad. .................................................... 14

CONCLUSION...................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado, Inc. v. Mayorkas*,
   619 F. Supp. 3d 1029 (S.D. Cal. 2022) ........................................................................2

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
   594 U.S. 758 (2021) ...................................................................................................15

*Alberston v. FCC*,
   182 F.2d 397 (D.C. Cir. 1951) ....................................................................................6

*Am. Trucking Ass'n v. Frisco Transp. Co.*,
   358 U.S. 133 (1958) .....................................................................................................9

*Arizoni Dream Act Coal. v. Brewer*,
   81 F. Supp. 3d 795 (D. Ariz. 2015) ...........................................................................14

*Biden v. Missouri*,
   145 S. Ct. 109 (2024) .................................................................................................15

*Biden v. Texas*,
   597 U.S. 785 (2022) ..................................................................................................2, 3

*California v. U.S. Bureau of Land Mgmt.*,
   277 F. Supp. 3d 1106 (N.D. Cal. 2017) .......................................................................4

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
   98 F.4th 220 (5th Cir. 2024) .....................................................................................14

*Casa de Md., Inc. v. Trump*,
   355 F. Supp. 3d 307 (D. Md. 2018) ...........................................................................10

*CASA, Inc. v. Trump*,
   --- F.4th ---, 2025 WL 654902 (4th Cir. Feb. 28, 2025) ............................................15

*Centro Legal de la Raza v. EOIR*,
   524 F. Supp. 3d 919 (N.D. Cal. 2021) .........................................................................3

*Centro Presente v. DHS*,
   332 F. Supp. 3d 393 (D. Mass. 2018) .........................................................................10

*China Unicom (Ams.) Operations Ltd. v. FCC*,
   124 F. 4th 1128 (9th Cir. 2024) ...............................................................................1, 6

*COR Clearing, LLC v. Ashira Consulting, LLC*,
   2016 WL 7638177 (C.D. Cal. Jan. 13, 2016) ............................................................13

*Ctr. for Biological Diversity v. Regan*,
  597 F. Supp. 3d 173 (D.D.C. 2022) ................................................................4

*Demore v. Kim*,
  538 U.S. 510 (2003) ........................................................................................5

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ............................................................................................7

*Doe v. Becerra*,
  704 F. Supp. 3d 1006 (N.D. Cal. 2023) ........................................................12

*East Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ...............................................................2, 14, 15

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
  92 F.3d 1486 (9th Cir. 1996) ........................................................................14

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ........................................................................................7

*Florida v. Mayorkas*,
  2023 WL 3567851 (N.D. Fla. May 16, 2023) ................................................4

*Florida. v. United States*,
  660 F. Supp. 3d 1239 (N.D. Fla. 2023) ..........................................................2

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022) ........................................................................................1

*Gebhardt v. Nielsen*,
  879 F.3d 980 (9th Cir. 2018) ..........................................................................5

*Gorbach v. Reno*,
  219 F.3d 1087 (9th Cir. 2000) ........................................................................6

*Gun South v. Brady*,
  877 F.2d 858 (11th Cir. 1989) ........................................................................6

*Harmon v. Thornburgh*,
  878 F.2d 484 (D.C. Cir. 1989) ......................................................................14

*Immigrant Defs. L. Ctr. v. Mayorkas*,
  2023 WL 3149243 (C.D. Cal. Mar. 15, 2023) ...............................................2

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ........................................................................................5

*Kelch v. Nevada Dep't of Prisons*,
  10 F.3d. 684 (9th Cir. 1993) ...........................................................................6

*Kidd v. Mayorkas,*
  734 F. Supp. 3d 967 (C.D. Cal. 2024) ......................................................................2

*Last Best Beef, LLC v. Dudas,*
  506 F.3d 333 (4th Cir. 2007) ..................................................................................6

*Macktal v. Chao,*
  286 F.3d 822 (5th Cir. 2002) ..................................................................................6

*Massachusetts v. EPA,*
  549 U.S. 497 (2007)................................................................................................8

*Mazaleski v. Treusdell,*
  562 F.2d 701 (D.C. Cir. 1977)................................................................................6

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010)................................................................................................2

*NAACP v. DHS,*
  364 F. Supp. 3d 568 (D. Md. 2019)......................................................................10

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell,*
  467 F.3d 999 (6th Cir. 2006) ..................................................................................3

*Nken v. Holder,*
  556 U.S. 418 (2009)................................................................................................3

*OPM v. Am. Fed'n of Gov't Emps. AFL-CIO,*
  73 U.S. 1301 (1985)................................................................................................4

*Patel v. Garland,*
  596 U.S. 328 (2022)................................................................................................5

*Perez v. United States,*
  2024 WL 4772734 (U.S. Nov. 12, 2024)..............................................................15

*Ramos v. Nielsen,*
  321 F. Supp. 3d 1083 (N.D. Cal. 2018) ........................................................4, 5, 10

*Ramos v. Wolf,*
  975 F.3d 872 (9th Cir. 2020) ..........................................................................passim

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999)................................................................................................1

*Rodriguez v. Hayes,*
  591 F.3d 1105 (9th Cir. 2010) ................................................................................3

*Saget v. Trump,*
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ..................................................................10

iv

*Sampson v. Murray*,
   415 U.S. 61 (1974) ............................................................................................................3

*Scripps-Howard Radio v. FCC*,
   316 U.S. 4 (1942), ...........................................................................................................3

*Stanley v. Illinois*,
   405 U.S. 645 (1972) ........................................................................................................13

*Texas v. Biden*,
   646 F. Supp. 3d 753 (N.D. Tex. 2022) ........................................................................2, 3

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 2022) ..................................................................................2, 4, 15

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ..........................................................................................................9

*Tuan Thai v. Ashcroft*,
   366 F.3d 790 (9th Cir. 2004) ..........................................................................................10

*United States v. Texas*,
   599 U.S. 670 (2023) ........................................................................................................15

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ...................................................................................................10, 11

*Washington v. Trump*,
   --- F.4th ---, 2025 WL 553485 (9th Cir. Feb. 19, 2025) ...............................................15

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ........................................................................................13

*Youngstown Sheet and Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) (Jackson, J., concurring)................................................................8

**Statutes**

5 U.S.C. § 705 ......................................................................................................... *passim*

5 U.S.C. § 706 .................................................................................................................14

8 U.S.C. § 1252(f) ....................................................................................................1, 2, 3

8 U.S.C. § 1254a .............................................................................................................10

8 U.S.C. § 1254a(b)(3)(B) ...............................................................................................8

8 U.S.C. § 1254a(c)(1)(A)(iv)..........................................................................................8

8 U.S.C. § 1254a(c)(2) .................................................................................................9

8 U.S.C. § 1254a(c)(3)(A) ...........................................................................................9

8 U.S.C. § 1254a(b)(5)(A) ...........................................................................................4

**Other Authorities**

101 Cong. Rec. 25811 (Oct. 25, 1989) ........................................................................7

90 Fed. Reg. 5961-01 ..................................................................................................8

90 Fed. Reg. 8805-01 ..............................................................................................7, 8

90 Fed. Reg. 8807 .......................................................................................................7

90 Fed. Reg. 9040-01 .............................................................................................9, 11

90 Fed. Reg. 9042 ..................................................................................................10, 11

**INTRODUCTION**

The orders Plaintiffs challenge will strip over 350,000 Venezuelan TPS holders of the right to live and work here in *less than a month*, placing them at immediate risk of detention and deportation. Once implemented, no final ruling could unwind their catastrophic social and economic impact. In contrast, Defendants face no concrete harm from relief that preserves the status quo.

Defendants claim "'statutorily implicit' authority to reconsider any TPS-related determination," Opp. 6, but ignore Ninth Circuit precedent that defeats their argument. Mot. 4–8. Agencies do not enjoy unfettered vacatur authority where, as here, Congress establishes a "fixed term" for a benefit. *China Unicom (Ams.) Operations Ltd. v. FCC*, 124 F. 4th 1128, 1148 (9th Cir. 2024). Nor is there a historical basis for such implicit authority. In TPS's thirty-five-year history, no Secretary had ever rescinded an extension before this. Defendants also ignore direct evidence that discrimination animated these decisions: Secretary Noem called Venezuelans "dirt bags" when announcing *this very decision*. Ex. 14 at 3.[1] The direct and circumstantial evidence of the Secretary's animus satisfies any standard for establishing unlawful discrimination.

Defendants insist this Court lacks jurisdiction to review even blatantly illegal agency action, saying this Motion is a disguised request for a preliminary injunction barred by 8 U.S.C. § 1252(f)(1).  But every court to consider that argument has rejected it. Relief under the APA renders agency action ineffective; it does not enjoin persons. Defendants' TPS-specific jurisdictional argument is also meritless. Courts have uniformly recognized that "determination" is a term of art. It does not foreclose claims challenging unlawful processes and discrimination.

**ARGUMENT**

**I.    THIS COURT HAS JURISDICTION AND AUTHORITY TO GRANT RELIEF.**

**A.    8 U.S.C. § 1252(f)(1) Does Not Bar Postponement Under 5 U.S.C. § 705.**

Section 1252(f)(1) "generally prohibits lower courts from entering *injunctions* that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" [certain immigration statutes]. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (emphasis added); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (Section

---

[1] All "Ex." and "Exs." references are to the Exhibits attached to Dkt. 37 (MacLean Decl.).

1   1252(f) "nothing more or less than a limit on injunctive relief").

2          Every court to consider the question—including the Fifth Circuit and at least five district

3   courts—has rejected Defendants' view that APA relief is functionally an injunction barred by

4   Section 1252(f)(1). *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022) (holding Section

5   1252(f)(1) "does not apply to vacatur" and, thus, DHS "unlikely to demonstrate" a lack of

6   "jurisdiction to vacate unlawful agency action"); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D.

7   Cal. 2024) (Section 1252(f) inapplicable because vacating ICE policy neither "compels nor restrains

8   further agency decision-making") (citation omitted); *Florida v. United States*, 660 F. Supp. 3d 1239,

9   1284–85 (N.D. Fla. 2023) (Section "1252(f)(1) does not strip [the Court] of the authority to vacate

10  either of the challenged policies under the APA."); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d

11  1029, 1045–46 (S.D. Cal. 2022) (Section 1252(f)(1) does not prevent "'set[ting] aside' or 'vacating'

12  a policy based upon an APA violation"), *aff'd in part, vacated in part sub nom., Al Otro Lado v.

13  Exec. Off. for Immigr. Rev.*, 120 F.4th 606 (9th Cir. 2024); *Immigrant Defs. L. Ctr. v. Mayorkas*,

14  2023 WL 3149243, at *14 (C.D. Cal. Mar. 15, 2023) (Section 1252(f)(1) "did not bar" vacatur);

15  *Texas v. Biden*, 646 F. Supp. 3d 753, 768 (N.D. Tex. 2022) (same).

16         Defendants cite *Biden v. Texas*, 597 U.S. 785 (2022) for support, Opp. 8, but *Biden* explicitly

17  reserved this question; *id.* at 801 n.4; and the district court on remand rejected Defendants' view.

18  *Texas*, 646 F. Supp. 3d at 768. A vacatur under the APA is a "less drastic remedy" than a

19  preliminary injunction, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), and in this

20  motion Plaintiffs seek only a "Section 705 stay [which] can … be seen as an interim or lesser form

21  of [relief than] vacatur …." *Texas*, 646 F. Supp. 3d at 768. A postponement (or "stay") under Section

22  705 "would not 'order federal officials to take or to refrain from taking actions to enforce,

23  implement, or otherwise carry out the specified statutory provisions' at issue"; it merely postpones

24  agency action from taking effect. *Id.* at 769. That is why "[w]hen a reviewing court determines that

25  agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their

26  application to the individual petitioners is proscribed." *East Bay Sanctuary Covenant v. Biden*, 993

27  F.3d 640, 681 (9th Cir. 2021).

28         Defendants nonetheless argue that APA relief "would have the effect of enjoining or

1   restraining DHS's implementation" of the TPS statute. Opp. 7. But virtually all orders against the

2   government have the "effect" of restraining federal officials in some sense. If Section 1252(f)(1)

3   prohibited them, it would also bar declaratory relief, which it does not. *Biden*, 597 U.S. at 800

4   (Section 1252(f)(1) preserves "jurisdiction to entertain the plaintiffs' request for declaratory relief.")

5   (internal quotations omitted); *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010) (same).[2]

6       Finally, even if vacatur under the APA were analogous to an injunction, the stay relief

7   Plaintiffs seek here still would not violate Section 1252(f)(1), because stays are not injunctions. "A

8   stay … temporarily suspend[s] the source of authority to act," it does not "direct[] the actor's

9   conduct." *Nken v. Holder*, 556 U.S. 418, 428–29 (2009).

10       Therefore, under settled law, Section 1252(f)(1) does not prohibit this Court from vacating

11   agency action, and certainly does not render the Court helpless to maintain the status quo by

12   postponing agency action long enough to fully consider the merits.[3]

13       **B.**    **Section 705 Authorizes the Relief Plaintiffs Seek.**

14       Defendants next attempt to weave together dictionary definitions with inapposite cases to

15   contend that Section 705 "does not authorize relief here because the challenged actions have already

16   taken effect." Opp. 9–10. That is wrong. Under the orders, Plaintiffs' employment authorization

17   documents do not expire until April 3, and they lose legal status on April 8. In any event, "[c]ourts –

18   including the Supreme Court – routinely stay already-effective agency action under Section 705."

19   *Texas*, 646 F. Supp. 3d at 770 (collecting cases); *Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d

20   919, 980 (N.D. Cal. 2021) (ordering "the effectiveness" of rule stayed after effective date passed).

21   Relief "under Section 705 (even after the effective date) restores the [] status quo *ex ante*," *i.e.*, the

22   conditions that existed before the challenged agency action. *Texas*, 646 F. Supp. 3d at 771.

23       Defendants' cases are not to the contrary. *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l*

---

[2] Defendants, on page 9 of their brief, also cite a footnote in *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974), referencing legislative history suggesting Section 705 codified the remedies described in a pre-APA case, *Scripps-Howard Radio v. FCC*, 316 U.S. 4 (1942), but *Scripps-Howard* held there was no "general legislative policy regarding the power to stay administrative orders pending review" discernible from the statutes governing judicial review of agency actions even at that time. *Id.* at 16.

[3] Many Venezuelan TPS holders could seek relief even under Defendants' expansive reading of Section 1252(f) because proceedings have been initiated against them.

1    *Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006), does not address Section 705 at

2    all; it concerned the immediate appealability of a "mandatory injunction" that went "far beyond

3    preserving the status quo." Likewise, *OPM v. Am. Fed'n of Gov't Emps. AFL-CIO*, 73 U.S. 1301,

4    1303–05 (1985) does not address Section 705; it held an *appellate court* lacked authority to stay a

5    regulation following *denial* of a TRO brought "eight months after Congress had finally fixed" the

6    effective date, and where the denial's consequences were not "grave." *Florida v. Mayorkas*, 2023

7    WL 3567851 (N.D. Fla. May 16, 2023) involved a policy actually "in effect," *id.* at *4. Even there,

8    the district court did "not definitively decide" whether Section 705 applied because it granted an

9    injunction. *Id.* at n.7. Finally, *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173 (D.D.C.

10   2022) and *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017)

11   concerned *agencies'* authority to postpone rules after an effective date, not judicial authority. The

12   difference matters because an agency's postponement of an already-effective rule is "tantamount to

13   amending or revoking a rule," which requires APA compliance—unlike court orders under Section

14   705. *Texas*, 646 F. Supp. at 771 (quotations and citations omitted).

15           As a "reviewing court," this Court can exercise "all necessary and appropriate process to

16   postpone the effective date … or to preserve status or rights pending conclusion" of judicial review.

17   5 U.S.C. § 705. Nothing about the timing of this Motion deprives the Court of that authority.

18           **C.    Section 1254a(b)(5)(A) Does Not Bar Plaintiffs' Claims.**

19           Defendants next rely on Section 1254a(b)(5)(A) to dispute jurisdiction, but lack the "clear

20   and convincing evidence" required to prove that Congress intended to bar Plaintiffs' claims. *Ramos*

21   *v. Nielsen*, 321 F. Supp. 3d 1083, 1102 (N.D. Cal. 2018) (citing *Abbott Labs v. Gardner*, 387 U.S.

22   136, 141 (1967)). The statute bars review only of "any determination with respect to the designation,

23   or termination or extension" of TPS. That language does not encompass Plaintiffs' claims for two

24   basic reasons. First, "it is evident from the statutory context that this provision refers to the

25   designation, termination, or extension of a country for TPS," not every other kind of agency decision

26   related to TPS. *Ramos*, 321 F. Supp. at 1102. Second, not every agency conclusion is a

27   "determination … under [subsection(b)]." Mot. 17. "Determination" in jurisdiction-stripping statutes

28   refers narrowly to certain conclusions in support of underlying decisions, such as whether a country

1    is safe for return. *Id.* at 17–18. On that basis, the Supreme Court and Ninth Circuit have found

2    jurisdiction in several cases involving statutes using "determination*." Id.* (collecting cases).

3        These limits make clear that Plaintiffs' claims are cognizable. First, they challenge a vacatur,

4    which is not a "designation, or termination or extension" at all. Second, they challenge the agency's

5    statutory authority to issue a vacatur and its flawed reasoning in support of it (which concerned TPS

6    registration rules). Neither of those challenges attack covered "determination[s]." *Id.*

7        Defendants suggest the appearance of "any" before "determination" and the phrase "with

8    respect to" grant them a get-out-of-court-free card. Not so. "Any" cannot expand the meaning of

9    "determination." "[T]he statute's reference to '*any* determination' does not subsume 'any' general

10   policies or practices. Rather, the word 'any' must be understood in its grammatical context." *Ramos*,

11   321 F. Supp. 3d at 1104 (collecting cases). Indeed, courts have consistently read "any" and other

12   open-ended terms in jurisdiction-stripping statutes narrowly. *See*, *e.g.*, *Demore v. Kim*, 538 U.S. 510,

13   516 (2003) (provision stating "No court may set aside *any* action or decision … regarding the

14   detention … of any alien" not broad enough to cover claim that agency lacked statutory and

15   constitutional authority to detain) (citation omitted). For that reason, "with respect to" also cannot

16   broaden the meaning of "determination"; otherwise, this and other jurisdiction-stripping statutes

17   would be virtually limitless. *Jennings v. Rodriguez*, 583 U.S. 281, 293–94 (2018) (construing

18   reference to claims "arising from" detention narrowly, because "when confronted with capacious

19   phrases like 'arising from' we have eschewed 'uncritical literalism'") (plurality) (citation omitted);

20   *see also id.* (collecting cases involving "affected," "related to," and "in connection with").

21       Defendants cite the Supreme Court's reliance on the "broadening effect" of the words "any"

22   and "regarding" in *Patel v. Garland*, 596 U.S. 328, 339 (2022), but the statute there did not contain

23   the word "determination," and the Court relied on other context clues not present here. *Id.* (citing

24   amendment history of 8 U.S.C. § 1252(a)(2)(D)). Unlike in the TPS statute, when Congress sought

25   to write "categorical review preclusion language" into law, Opp. 13, it did so. *See, e.g., Gebhardt v.*

26   *Nielsen*, 879 F.3d 980, 984–85 (9th Cir. 2018) (statute specifying decisions were in Secretary's "sole

27   and unreviewable discretion" barred review of all but constitutional claims).

28       Finally, Defendants assert that exercising jurisdiction would offend the Secretary's broad

1  grant of discretion over TPS, relying on the now-vacated Ninth Circuit panel's jurisdictional

2  analysis. However, that aspect of the decision was particularly weak, as the dissent explained. *Ramos*

3  *v. Wolf*, 975 F.3d 872, 919–24 (9th Cir. 2020) (Christen, J., dissenting), *opinion vacated upon reh'g*

4  *en banc*, 59 F.4th 1010 (9th Cir. 2023). In fact, the TPS statute provides the Secretary broad

5  discretion to designate a country for TPS once the designation is made, however, the statute requires

6  termination where the country conditions "no longer continue[]," and conversely provides TPS "is

7  extended" if unsafe conditions persist. But even under the *Ramos* majority's reasoning, Plaintiffs'

8  APA claims would be cognizable because the vacatur-authority claim turns on the interpretation of

9  the TPS statute, which is "reviewable under *McNary*." *Id.* at 895. Similarly, the claim that the

10  vacatur decision was arbitrary turns on the Secretary's failure to understand the statute's registration

11  process or consider obvious fixes short of vacatur; not her discretion to "consider and weigh various

12  conditions in a foreign country," which the *Ramos* majority held to be "unreviewable." *Id.* at 891.

## II.  PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR APA CLAIMS.

### A.  DHS Lacks Authority to Vacate TPS Extensions.

15  Defendants claim "[t]he power to reconsider is inherent in the power to decide," Opp. 14 &

16  n.5, but ignore that the en banc Ninth Circuit held the opposite. *Gorbach v. Reno*, 219 F.3d 1087,

17  1095 (9th Cir. 2000) (en banc) ("There is no general principle that what [an agency] can do, [it] can

18  undo"). In particular, the "use of a fixed term" for a benefit (like the fixed length of a TPS extension)

19  "is … inconsistent with … an implied power to revoke … at any time." *China Unicom*, 124 F. 4th at

20  1148. Even Defendants' out-of-circuit authority recognizes that any implied reconsideration

21  authority must yield to statutory limitations. *See Alberston v. FCC*, 182 F.2d 397, 399 (D.C. Cir.

22  1951); *Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002); *Gun South v. Brady*, 877 F.2d 858,

23  862–64 (11th Cir. 1989). Their other cases concern uncontested assertions of reconsideration

24  authority or otherwise involve extraordinary facts not present here, and do not address the statutory

25  schemes at issue. *See Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) (considering

26  whether plaintiff's rejection of agency offer to reconsider precluded claims); *Last Best Beef, LLC v.*

27  *Dudas*, 506 F.3d 333, 336, 340 (4th Cir. 2007) (patent office unknowingly approved trademark on

28  same day legislation prohibiting trademark was signed into law). *Kelch* concerns state law. *Kelch v.*

1   *Nevada Dep't of Prisons*, 10 F.3d. 684, 686 (9th Cir. 1993).

2          Defendants protest that, under "Plaintiffs' logic," the Secretary could never vacate a TPS

3   extension, even if she discovered a genuine error or national security threat. Opp. 15. "Plaintiffs'

4   logic" is the law: "Regardless of how serious the problem an administrative agency seeks to address,

5   … it may not exercise its authority in a manner that is inconsistent with the administrative structure

6   that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125

7   (2000) (quotations omitted). There is nothing remarkable about denying an agency "implicit"

8   authority to revoke the immigration status of potentially millions of people. The Secretary cannot

9   revoke en masse green cards, H-1B visas, or student visas; such authority resides with Congress.

10  Indeed, Congress established fixed time periods for TPS precisely to eliminate confusion under prior

11  humanitarian programs about "how long [beneficiaries] will be able to stay." 101 Cong. Rec. 25811,

12  25837 (Oct. 25, 1989) (Statement of Rep. Richardson) (debate on precursor to TPS statute).

13         Defendants also cannot support the vacatur order based on serious error or national security

14  concerns. Secretary Noem already gave her "[r]easons for the [v]acatur." 90 Fed. Reg. 8805-01 at

15  8807. She identified no error in the prior determination, no urgent national security or foreign policy

16  matter, and no "threats to the safety and security of the United States." Opp. 13–15. Rather, her

17  concerns were ministerial, namely a potential "lack of clarity" due to "multiple notices, overlapping

18  populations, overlapping dates, and sometimes multiple actions happening in a single document." 90

19  Fed. Reg. 8807; Opp. 6 (describing reasons for vacatur). Defendants complain that Plaintiffs "sever"

20  the vacatur from the termination. Opp. 14. But the vacatur cannot be justified by reasons in a later

21  termination notice. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020)

22  ("rescission [may] not [be] upheld on the basis of impermissible '*post hoc* rationalization'") (citation

23  omitted).

24         Finally, while Defendants emphasize the Secretary's "border and national security

25  responsibilities," the breadth of the "national interest" standard, and "foreign policy" implications,

26  they do not (and could not) argue these factors authorize vacatur if the TPS statute does not. Opp.

27  13–17. Defendants concede vacatur authority is "foreclosed" if Congress has "require[ed] other

28  procedures." *Id.* at 14 n.14. Congress has. Mot. 5–8. Terminations take effect either: (a) 60 days after

1    publication or (b) "*if later*," the "expiration of the most recent previous extension"—here, October 2,

2    2026. 8 U.S.C. § 1254a(b)(3)(B) (emphasis added); 90 Fed. Reg. 5961-01 (Jan. 2025 Extension).

3    Secretary Noem's attempt to erase Venezuela's "most recent previous extension" and then terminate

4    TPS eighteen months before the "expiration of" that extension violates the statute.[4]

5            **B.      The Vacatur Decision Was Arbitrary.**

6            Even if DHS had vacatur authority, the reasons given for this vacatur still violate the APA.

7    Defendants ignore Plaintiffs' argument that the vacatur rests on legal errors. Mot. 8–9. They repeat

8    Secretary Noem's concern about "negat[ing] the 2021 Venezuela TPS designation" by "subsuming it

9    within the 2023 Venezuela designation," Opp. 16–17, but ignore that *all* new designations

10   necessarily subsume earlier ones. Defendants also repeat Secretary Noem's objection to

11   consolidating registration processes, *id.*, but the statute's text permits registration "to the extent and

12   in a manner which the [Secretary] establishes." 8 U.S.C. § 1254a(c)(1)(A)(iv).

13          Instead, they defend the vacatur on two grounds. First, they say Secretary Noem "reasonably

14   explained" that the 2025 extension[5] lacked "a reasoned explanation or express consideration of the

15   operational or legal impacts." Opp. 16. The vacatur notice faults the extension for failing to

16   "acknowledge the novelty of its approach or explain how it is consistent with the TPS statute," and

17   providing an "inadequately developed" "explanation for operational impacts" on registration. 90

18   Fed. Reg. 8805-01 at 8807. But those explanations *prove* Secretary Noem's legal errors. Labeling a

19   decision as "novel" and potentially unlawful when it is plainly neither one, and complaining about a

20   failure to explain non-existent flaws, is *not* reasoned decision-making. *Mass. v. EPA*, 549 U.S. 497,

21   534–35 (2007) (decision based on misinterpretation of agency's own authority violated APA).

22          Second, Defendants claim that simple revisions to the registration process would be

23   insufficient because vacatur provided "an opportunity for informed determinations regarding the

24   TPS designations." Opp. 17. This too is not a reasoned explanation. It is a bald assertion that the

25   Secretary should be allowed to vacate a decision whenever she wants. The statute does not permit

---

[4] Because the vacatur is "incompatible with the expressed or implied will of Congress," Defendants' reliance on *Youngstown* is misplaced. Opp. 15 (citing *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)).

[5] Plaintiffs' counsel confirmed with Defendants by email that the Opposition's reference to the "2023 Designation notice," Opp. 16, was instead meant to refer to the 2025 Extension.

1   that result. And even where an agency does have implied reconsideration authority, it may not

2   exercise that authority "as a guise for changing previous decisions because the wisdom of those

3   decisions appears doubtful in the light of changing policies." *Am. Trucking Ass'n v. Frisco Transp.*

4   *Co.*, 358 U.S. 133, 146 (1958). Finally, Defendants suggest the Motion "diverges" from the

5   Complaint, but Plaintiffs pled every APA claim raised here. Compl. ¶¶ 149–149(a)– (f).

6   **III.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR DISCRIMINATION CLAIM.**

7           Defendants never address the most damning direct evidence of race discrimination: Secretary

8   Noem's repeated invocation of false, racist tropes to justify these decisions. When announcing these

9   decisions, she stated "the people of this country … want these dirt bags out." Ex. 14. Similarly,

10  during her confirmation hearing, she called "this extension [of TPS] of over 600,000 Venezuelans …

11  alarming" because of "gangs"—confirming that she equates Venezuelan TPS holders with criminals.

12  Ex. 12. Such fabricated assertions "fit comfortably into [a] historical pattern" of invoking false fears

13  of criminality to stoke racist sentiment against disfavored immigrant populations. Dkt. 22 ¶¶ 20, 27.

14          Even if the deferential standard of review under *Trump v. Hawaii*, 585 U.S. 667 (2018)

15  applied, the Court could consider these contemporaneous statements of animus and related "extrinsic

16  evidence" to prove Defendants' justifications are not "bona fide," *id.* 705–06; *Ramos*, 336 F. Supp.

17  3d at 1108. The evidence of animus connected to these decisions is overwhelming. *See* App'x A

18  hereto (summarizing evidence in the record). Even the Federal Register notice is infused with racial

19  animus. It claims TPS allowed "members of the Venezuelan gang known as Tren de Aragua" to

20  "settle in the interior" of the U.S., and alleges crimes by TdA. 90 Fed. Reg. 9040-01 at 9042. This is

21  false for several reasons: TPS does not allow people to enter the U.S.; TdA "appears to have no

22  substantial U.S. presence and looks unlikely to establish one," Dkt. 26 ¶¶ 16–22; Compl. ¶¶ 95–97;

23  and people who present a national security threat are ineligible for TPS.[6] These blatantly false

24  statements evoking racist tropes cannot be brushed aside as remote in time, "taken out of context," or

25  as about Venezuela "the country itself." *Compare* Opp. 21 *with* Exs. 6, 12, 14, 15, *and* App'x A. Nor

26

27  [6] 8 U.S.C. § 1254a(c)(2); Dkt. 27 ¶ 15. TPS applicants are subject to searching inquiries about
    potential criminal history anywhere in the world. USCIS, Form I-821 "Application for Temporary
28  Protected Status" at 7–10 (Apr. 1, 2024 ed.). Furthermore, the Secretary may withdraw TPS from
    any person if she later determines the person was not eligible. 8 U.S.C. § 1254a(c)(3)(A).

1   does it matter whether the statements reflect animus based on national origin rather than race; both

2   are equally unlawful. Mot. 11 n.3.[7]

3       In any event, this Court and others held that the *Arlington Heights* standard governs TPS

4   decisions.[8] TPS concerns people "already in the United States" with "greater constitutional

5   protections"; *Ramos*, 321 F. Supp. 3d at 1129; and the decisions challenged here were not "intended

6   to induce the cooperation or action of a foreign government," *id.*, and not issued under a statute that

7   "exudes deference to the President in every clause." *Id.* at 1130. And while the Secretary asserted the

8   "national interest" justified the termination (though not the vacatur), her explanations reveal the

9   underlying rationale relates to (unfounded) assumptions about crime and economic harm, not

10   national security as that doctrine is understood. *See Tuan Thai v. Ashcroft*, 366 F.3d 790, 796 (9th

11   Cir. 2004) ("We do not agree that the danger of criminal conduct by an alien is automatically a

12   matter of national security").[9]

13       Defendants suggest the record here is comparable to that in *Ramos*, but, sadly, there is now

14   far more direct proof that "administration officials involved in the TPS decision-making process

15   were themselves motivated by" racial animus. *Ramos*, 975 F.3d at 897. In *Ramos*, the Secretaries

16   made no racist statements, whereas Secretary Noem has used them to explain her decisions, and has

17   also adopted President Trump's racist justifications in the notice itself, 90 Fed. Reg. 9042. For that

18   reason, the Court can rule for Plaintiffs without addressing their "cat's-paw" theory. *Ramos*, 336 F.

19   Supp. 3d at 1098–1101. Defendants also cannot account for Secretary Noem's extraordinary

20   deviations from the normal practice, including the first-ever vacatur of an extension and the

21   dramatically compressed timetable, Mot. 13–14, both of which can be evidence of "improper

22

---

23   [7] The Notice also cites Executive Order 14150, the "America First Policy Directive," claiming the
presence of Venezuelan TPS holders contravenes that order. As was true before, the "America First"

24   slogan itself evokes racial animus. *Ramos*, 336 F. Supp. 3d. at 1104; Compl. ¶ 126 n.82.
     [8] *Ramos*, 975 F.3d at 896 (rejecting government's contention that *Hawaii* standard of review

25   applies); *Ramos*, 336 F. Supp. 3d at 1105–07; *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 411–12
(D. Mass. 2018); *Saget v. Trump*, 345 Supp. 3d 287, 301–02 (E.D.N.Y. 2018); *Saget v. Trump*, 375

26   F. Supp. 3d 280, 367–68 (E.D.N.Y. 2019); *Casa de Md., Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md.
2018); *NAACP v. DHS*, 364 F. Supp. 3d 568, 576 (D. Md. 2019).

27   [9] Defendants claim in passing that this Court lacks jurisdiction to consider the constitutional claim,
but ignore that Section 1254a never mentions constitutional claims.

28

---

10

1     purpose[].” *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).

2          Nor can the termination be substantiated by logic or facts. Aside from the false references to

3     criminality, Secretary Noem asserts that allowing a large number of unauthorized immigrants to

4     settle in the U.S. strains resources of “local communities.” 90 Fed. Reg. 9040-01 at 9042. But, given

5     many Venezuelan TPS holders cannot return to Venezuela or travel to a safe third country,

6     terminating TPS will *increase* the number of unauthorized Venezuelans and prevent them from

7     working lawfully, only worsening any strain on local communities. Dkt. 19 ¶¶ 15–16; Dkt. 27 ¶¶ 18–

8     23, 27. Defendants do not dispute that their actions will cost the U.S. economy at least $3.5 billion,

9     including nearly $500 million in lost Social Security taxes. Dkt. 21 ¶ 9. Finally, Secretary Noem

10     cited “pull factors.” However, her only source of support concerns *redesignating* a country for TPS,

11     which expands the pool of TPS recipients. 90 Fed. Reg. 9040-01 at 9043 n.18. She cites no evidence

12     that TPS *extensions* “pull” immigrants here, and it defies logic because they do not make more

13     people eligible. Dkt. 27 ¶ 26 (“No ‘Magnet Effect.’”).

14          Together, this evidence more than suffices to establish a likelihood of success on the claim

15     that race or national origin discrimination was a motivating factor in these TPS decisions.

16   **IV.     PLAINTIFFS HAVE ESTABLISHED IRREPARABLE HARM.**

17          Plaintiffs’ record on irreparable harm stands unrebutted. Absent postponement, the

18     challenged decisions will devastate the lives and communities of Plaintiffs and thousands of other

19     Venezuelan TPS holders. Dkts. 17–20, 29–36, 64; Mot. 21–23. TPS is supposed to provide

20     humanitarian protection so long as conditions in a designated country have not improved. Here, the

21     Secretary presumes that “conditions in Venezuela remain … ‘extraordinary’” 90 Fed. Reg. 9042, yet

22     her actions will strip hundreds of thousands of people of TPS protection absent judicial intervention.

23          TPS holders are experiencing severe and growing anxiety; many will lose their status,

24     employment authorization, driver’s licenses, and right to legally remain here in a matter of weeks.

25     E.R., for instance, is the sole provider for her twelve-year-old daughter, and faces the loss of her

26     work authorization on April 3; she fears that, absent a legal right to remain, she and her daughter

27     could be detained at her June 2025 ICE check-in and deported shortly after. Dkt. 20 ¶¶ 2, 12–13, 17–

28     18. M.H. also fears she will lose TPS in April, and face the possibility of being separated from her

three-year-old U.S. citizen son as soon as her ICE check-in in May. Dkt. 32 ¶¶ 2, 6, 17. Mr. Arape renewed TPS immediately upon the January 17 decision and received an automatic extension of his work authorization; he now fears the imminent loss of both his work authorization and his ability to apply for an H-1B visa, which is contingent on him remaining in status. Dkt. 18 ¶¶ 2, 14–16. A.V. suffered panic attacks at the thought of losing TPS and overdosed on medication; Ms. Guerrero and her husband cry about the loss of TPS every day. Dkt 31 ¶ 18. Ms. Gonzalez Herrera has cancelled plans to pursue graduate education. Dkt. 29 ¶ 15.

Apart from the human tragedy unfolding here, the challenged decisions will cause billions in unrecoverable economic losses, including lost Social Security contributions and other economic benefits that everyone living here reaps from the contributions of this community. Dkts. 21, 23–24, 27. And deprivations of constitutional and statutory rights alone give rise to irreparable injury. *Compare* Mot. 19–20 *with* Opp. 22 (not disputing violations alone represent irreparable harm).

Lacking an iota of competent evidence of harm, Defendants nonetheless urge the Court to close its eyes to these horrors based on an invented exception to irreparable harm. Defendants argue that the massive loss of safety, family, community, healthcare, work, and education resulting from their decisions are "inherent" byproducts of TPS's "temporary nature." Opp. 22. They made the same argument in *Ramos*, and this Court rejected it, explaining that "the shortening of [] time in the United States and acceleration of [] removal if relief is not granted may constitute irreparable injury." *Ramos*, 336 F. Supp. 3d at 1087. Here the difference is at least 18 months, and could be longer if Venezuela remains unsafe. *Doe v. Becerra*, 704 F. Supp. 3d 1006, 1017 (N.D. Cal. 2023), *abrogated on other grounds by Doe v. Garland*, 109 F.4th 1188 (9th Cir. 2024) (explaining that even limited extensions of time at liberty in the U.S. may affect family ties, employment, and educational opportunities).

Defendants do not deny that their decisions exacerbate what they call "inherent" harm. Nor do they dispute that their decisions upended reasonable reliance expectations—in a prior duly adopted extension, especially where there is no precedent in TPS's 35-year history of an extension being vacated and terminated; and in the continuity of TPS so long as the country conditions justify it. Defendants also provide no legal support for their invented exception to irreparable harm. They

1   cite *Stanley v. Illinois*, 405 U.S. 645, 647 (1972), but this case did not consider the *Winter* factors or

2   endorse such an exception. And they badly misread *Washington v. Trump*, 847 F.3d 1151, 1169 (9th

3   Cir. 2017). It ruled that permitting a decision to take effect even "temporarily" *can* cause

4   "substantial injuries and even irreparable harms" when, as here, it threatens to "separate[] families."

5   *Id.* at 1169. That case also reaffirmed the public "interest … in avoiding separation of families …."

6   *Id.* It concluded that the "powerful interest in national security and in the ability of an elected

7   president to enact policies" did *not* outweigh such harms. *Id.* Ultimately, the Ninth Circuit *denied*

8   two attempts by Defendants to set aside a district court order entered to prevent harms like those

9   here. *Id.* at 1156, 1158. The irreparable harm factor thus supports granting relief here.

10  **V.      THE EQUITIES AND PUBLIC INTEREST FAVOR POSTPONEMENT.**

11              Defendants' equities arguments rest on nothing more than unsubstantiated assertions from

12  the challenged termination itself. Opp. 24. For example, Defendants invoke safety concerns over the

13  Tren de Aragua gang, but offer no evidence that TdA members obtained TPS, and ignore the record

14  evidence thoroughly refuting that possibility. *See supra* p.9. Defendants' other arguments about the

15  public interest in enforcing immigration laws similarly fall short. Opp. 24. As one of Defendants'

16  own authorities illustrates, those interests would be served by postponing an unlawful decision

17  pending judicial review to avoid massive harm. *See Washington*, 847 F.3d at 1169.

18              Defendants' nonexistent evidentiary showing on the equities underscores that the balance of

19  hardships tips sharply in Plaintiffs' favor. The parties will face vastly different consequences from

20  an erroneous decision. *See COR Clearing, LLC v. Ashira Consulting, LLC*, 2016 WL 7638177, at *5

21  (C.D. Cal. Jan. 13, 2016) (weighing the equities "assuming the Court's ruling granting the injunction

22  is erroneous"). At most, an erroneous decision in Plaintiffs' favor would allow Venezuelan TPS

23  holders to temporarily retain TPS—an outcome that, until a short while ago, was what the

24  government itself had ordered. In contrast, an erroneous decision in Defendants' favor will cause

25  immediate and irreversible humanitarian harms, *e.g.*, Dkt. 18 ¶¶ 13, 18, 20, 22; Dkt. 20 ¶¶ 19, 22;

26  Dkt. 25 ¶¶ 19, 21; Dkt. 32 ¶ 22; Dkt. 33 ¶¶ 11, 17, 19; Dkt. 33 ¶¶ 15, 17, broad-based economic

27  disruption, *e.g.*, Dkt. 21 ¶ 9; Dkt. 23 ¶¶ 4–8; Dkt. 24 ¶¶ 6–8; Dkt. 27 ¶¶ 15, 20–22, and compromise

28  public health and safety, *e.g.*, Dkt. 19 ¶ 10; Dkt. 27 ¶¶ 15–16. The harms would impact not only TPS

13

1    holders, but also their American family members, friends, and neighbors.

2    **VI.    THE REQUESTED RELIEF IS NOT OVERBROAD.**

3        The relief Plaintiffs seek is not overbroad. The Ninth Circuit's default rule in APA cases

4    is that orders setting aside administrative agency action apply against the rule itself; only in that sense

5    are they "universal." Opp. 25. "When a reviewing court determines that agency regulations are

6    unlawful, the ordinary result is that the rules are vacated—not that their application to the individual

7    petitioners is proscribed." *East Bay*, 993 F.3d at 681 (cleaned up). Other circuits have long held the

8    same. *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (same); *Career Colls. &*

9    *Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("Nothing in the text of Section

10   705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be

11   limited to [the associational plaintiff] or its members").

12       While there may be exceptions to that default rule, the factors *East Bay* identified for

13   purposes of determining the appropriate scope of relief in APA immigration cases strongly favor

14   postponing the agency action universally in this case. First, it is "necessary to give prevailing parties

15   the relief to which they are entitled." *E. Bay*, 993 F.3d at 680. NTPSA has over 84,000 Venezuelan

16   TPS holder members living in all 50 states and the District of Columbia. Dkt. 34 ¶13. "Requiring …

17   officials … to distinguish between [TPS] recipients who are members of the [Alliance] and those

18   who are not is impractical." *Az. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 810 (D. Ariz.

19   2015), *aff'd*, 855 F.3d 957 (9th Cir. 2017) (relief "should apply to all DACA recipients" where

20   associational plaintiff sought relief for DACA-holder members)*; see also Easyriders Freedom*

21   *F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996). Indeed, even under the most restrictive

22   rule for non-APA cases limiting relief narrowly to the parties before the Court, adequate equitable

23   relief would require a remedy for all Venezuelan NTPSA members who hold TPS, rendering circuit-

24   wide relief inadequate. Dkt. 34 ¶ 33.

25       Second, the Ninth Circuit has generally recognized the "need for uniformity in immigration

26   policy," because the INA itself "was designed to implement a uniform federal policy." *East Bay*, 993

27   F.3d at 681 (quotation omitted). That rationale has particular force here, where the statute

28   contemplates only one TPS status per country at a time. Adopting different rules for TPS holders

from the same country would create confusion and needlessly complicate agency action in response to the "United States's changing immigration requirements." *Id.* at 681. For these reasons, the Ninth Circuit has "consistently recognized the authority of district courts to grant universal relief" in immigration cases. *Id.* at 681;*see also Texas*, 40 F.4th at 219–20 (Fifth Circuit's similar rule).

Defendants' argument against universal relief rests entirely on non-APA cases. Opp. 25. Those cases are about injunctions rather than vacatur or postponement under the APA, and the only immigration case among them states that the federal government must speak with "one voice" in the immigration realm, which supports uniformity here. *Id.* (quoting *Arizona v. United States*, 567 U.S. 387, 409 (2012)). Defendants also cite some concurrences expressing concerns about universal relief, Opp. 25, but other judges (including the Chief Justice) have criticized the suggestion that APA relief would not be universal. *See, e.g.*, *United States v. Texas*, 599 U.S. 670 (2023), Tr. at 35:12–25, https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022/22-58_4fc4.pdf (C.J. Roberts) (characterizing government's view that vacatur does not afford universal relief as "fairly radical" because "that's what you do in an APA case"). Whichever view eventually prevails, the concurrences Defendants cite are not the law now. Even on the shadow docket, when the Supreme Court has had ample opportunity to narrow lower court orders that universally vacate—or even enjoin—agency action in both immigration cases and others, it has consistently refused to do so.[10]

## CONCLUSION

The Court should postpone the effective date of the challenged decisions until it can finally resolve the merits.

---

[10] *See Texas*, 599 U.S. 670, *supra* (denying request for stay of district court order vacating DHS Secretary's enforcement priorities guidance, which applied universally); *Perez v. United States*, 2024 WL 4772734 (U.S. Nov. 12, 2024) (refusing to stay district court order halting the federal government's Keeping Families Together program for certain noncitizens, which applied universally); *Biden v. Missouri*, 145 S. Ct. 109 (2024) (denying request to vacate universal injunction against Biden administration's student loan forgiveness program); *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.,* 594 U.S. 758, 759 (2021) (lifting stay on district court order universally vacating the COVID eviction moratorium); *see also Washington v. Trump*, --- F.4th ---, 2025 WL 553485 (9th Cir. Feb. 19, 2025) (affirming universal injunction against birthright citizenship order, and rejecting request to narrow injunction's scope); *CASA, Inc. v. Trump*, --- F.4th ---, 2025 WL 654902, at *1–3 (4th Cir. Feb. 28, 2025) (same, based on need for equity, uniformity, and complete relief for associational plaintiff).

1    Date:  March 7, 2025                    Respectfully submitted,

2                                           ACLU FOUNDATION
                                            OF NORTHERN CALIFORNIA
3

4                                            /s/ *Emilou MacLean*
                                            Emilou MacLean
                                            Michelle (Minju) Y. Cho
5

6                                           Ahilan T. Arulanantham
                                            Stephany Martinez Tiffer
                                            CENTER FOR IMMIGRATION LAW AND
7                                           POLICY, UCLA SCHOOL OF LAW

8                                           Eva L. Bitran
                                            ACLU FOUNDATION
9                                           OF SOUTHERN CALIFORNIA

10                                          Jessica Karp Bansal
                                            Lauren Michel Wilfong (*pro hac vice*)
11                                          NATIONAL DAY LABORER ORGANIZING
                                            NETWORK
12
                                            Attorneys for Plaintiffs
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

ACLU FOUNDATION
OF NORTHERN CALIFORNIA


 /s/ *Emilou MacLean*
Emilou MacLean