**PAGES 1 - 123**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

NATIONAL TPS ALLIANCE, MARIELA    )
GONZALEZ, FREEDY JOSE ARAPE        )
RIVAS, M.H., CECILIA DANIELA       )
GONZALEZ HERRERA, AHA CECILIA      )
PURICA HERNANDEZ, E.R., and        )
HENDRINA VIVAS CASTILLO,           )
                                   )
          Plaintiffs,              )
                                   )
VS.                                )  **NO. 3:25-CV-01766-EMC**
                                   )
KRISTI NOEM, in her official       )
capacity as Secretary of           )
Homeland Security, UNITED STATES   )
DEPARTMENT OF HOMELAND SECURITY,   )
and UNITED STATES OF AMERICA,      )
                                   )
          Defendants.              )
_____)


                      San Francisco, California
                      Monday, March 24, 2025


                **TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES:**

For Plaintiffs:
                      UCLA School of Law
                      35 Charles E. Young Drive East
                      Box 951476
                      Los Angeles, California 90095
                 **BY:  AHILAN T. ARULANANTHAM, ATTORNEY AT LAW**

             **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  April Wood Brott, CSR No. 13782
              Official United States Reporter

**APPEARANCES:**   (CONTINUED)

For Plaintiffs:

                         ACLU Foundation of Northern California
                         39 Drumm Street
                         San Francisco, California 94111
               BY:  **EMILOU MACLEAN, ATTORNEY AT LAW**
                    **AMANDA YOUNG, ATTORNEY AT LAW**

                         National Day Laborer Organizing Network
                         1030 S. Arroyo Parkway, Suite 106
                         Pasadena, California 91105
               BY:  **JESSICA KARP BANSAL, ATTORNEY AT LAW**
                    **LAUREN M. WILFONG, ATTORNEY AT LAW**

                         Haitian Bridge Alliance
                         4560 Alvarado Canyon Road
                         San Diego, California 92120
               BY:  **ERIK M. CREW, ATTORNEY AT LAW**

For Defendants:

                         DOJ/Civil/Office of Immigration Litigation
                         P.O.  Box 868 Ben Franklin Station
                         Washington, DC 20044
               BY:  **SARAH L. VUONG, ATTORNEY AT LAW**
                    **ANNA DICHTER, ATTORNEY AT LAW**

```
1    Monday - March 24, 2025                              9:02 A.M.

2                         P R O C E E D I N G S

3                              ---o0o---

4         THE COURT:  Good morning, everyone.  Have a seat.

5         THE COURTROOM DEPUTY:  Court is calling the case

6    National TPS Alliance, et al. versus Noem, et al., Case Number

7    25-1766.

8       Counsel, please state your appearance for the record,

9    beginning with the plaintiffs.

10         MR. ARULANANTHAM:  Good morning, Your Honor.  Ahilan

11   Arulanantham from the UCLA Center for Immigration Law and

12   Policy for the plaintiff.

13         THE COURT:  All right.  Good morning, Mr.

14   Arulanatham.

15         MS. BANSAL:  Good morning, Your Honor.  Jessica Bansal

16   from the National Day Laborer Organizing Network for the

17   plaintiffs.

18         THE COURT:  All right.  Good morning.

19         MS. MACLEAN:  Good morning, Your Honor.  Emi MacLean

20   from the ACLU of Northern California, also for the plaintiffs.

21         THE COURT:  All right.  Thank you, Ms. MacLean.

22         MS. YOUNG:  Good morning.  Amanda Young from the ACLU

23   of Northern California for the plaintiffs.

24         THE COURT:  All right.  Good morning, Ms. Young.

25         MS. WILFONG:  Good morning, Your Honor.  Lauren
```

```
1    Wilfong, National Day Laborer Organizing Network, for the

2    plaintiffs.

3              THE COURT:  Thank you.

4              MR. CREW:  Good morning, Your Honor.  Erik Crew from

5    the Haitian Bridge Alliance for the plaintiffs.

6              THE COURT:  All right.  When you speak, it's up to

7    you, but you can remove your masks if you'd like.  Thank you.

8              MS. VUONG:  Good morning, Your Honor.  Sarah Vuong on

9    behalf of the Government.

10             THE COURT:  All right.  Thank you, Ms. Vuong.

11             MS. DICHTER:  Good morning.  Anna Dichter on behalf of

12   the Government.

13             THE COURT:  All right.  Good morning, Ms. Dichter.

14       All right.  So we're on this morning for Plaintiffs' -- a

15   couple of motions, but mainly the motion to postpone the

16   effective date of the agency action in question.  And so let me

17   start by saying first of all, just to reaffirm that this case

18   was assigned to me on a random basis.  It was not related.  It

19   happened to land in my box, and that's why we're here.

20       So in terms of the procedural posture, just to make it

21   clear, this is an action -- at least today's motion is based on

22   the APA Section 705.  It is not based on a -- the plaintiffs

23   are not seeking a temporary restraining order or preliminary

24   injunction under Federal Rules of Civil Procedure 65, correct?

25             MR. ARULANANTHAM:  That's correct, Your Honor.
```

```
 1              THE COURT:  And that means that the normal process

 2     whereby plaintiffs typically seek a temporary restraining

 3     order, which is good for typically 14 days under Rule 65 or for

 4     good cause, extended to 28 days before -- if that motion is

 5     granted, before a preliminary injunction must be held -- does

 6     not apply here?

 7              MR. ARULANANTHAM:  That's correct, Your Honor.  We

 8     contend that the Court has the authority to postpone the

 9     effective date until it resolves the merits.

10              THE COURT:  So in effect, it's similar to what a

11     preliminary injunction would be, not a TRO?

12              MR. ARULANANTHAM:  Yes, Your Honor.

13              THE COURT:  So there wouldn't be a second stage

14     hearing, in other words, if --

15              MR. ARULANANTHAM:  Yes, Your Honor.

16              THE COURT:  -- one were to be granted?  Okay.

17          Does the Government have any disagreement with that

18     procedural framework?

19              MS. VUONG:  No, Your Honor.

20              THE COURT:  Okay.  And just looking for -- I know one

21     of the things we want to address at some point is where do we

22     go from here, and the question about discovery -- is it the

23     plaintiffs' intent to reach an ultimate resolution to this case

24     by way of a bench trial?  Rule 52 findings?  Rule 56 motion for

25     summary judgment?  Do you know at this point what your
```

1    longer-range plan is?

2          MR. ARULANANTHAM:  We anticipate moving for a summary

3    judgment.  We believe we can prevail on the claims without

4    disputed facts once we get there, but we don't know for sure.

5    We also believe that we will need some amount of discovery to

6    prevail on some of the claims.  We're not seeking that today,

7    to be clear.

8          We are going to ask -- Ms. MacLean, actually, I think, is

9    prepared to argue the discovery issues, but the plan was to ask

10    for the administrative record, the complete administrative

11    record as Your Honor understood it in Ramos, but we don't

12    expect to litigate any disputed discovery issues today because

13    we haven't actually propounded discovery.

14          THE COURT:  All right.  Well, we'll cross that bridge,

15    I guess, when we get there.  I just want to try to figure out

16    what is the plan beyond today's hearing and this motion,

17    because I'm hearing a little bit of difference in terms of

18    whether there would be some kind of expedited process.

19          The Government kind of hints that perhaps it can't be too

20    expedited.  Plaintiffs think it can be, and I guess that's

21    something we'll have to address that may inform -- it's

22    relevant insofar as if there's a postponement action, it will

23    be useful to know is this for a period of, you know, 30 days?

24    60 days?  100 days?  180 days?  What are we talking about here?

25          MR. ARULANANTHAM:  Your Honor, as with Ramos, I think

 1    our -- the postponement would not itself preclude the

 2    Government from making new decisions because it is merely a

 3    temporary set-aside under the APA.  So in that sense, I think

 4    the concern that the Court's enforcement authority may be

 5    operating for a long period of time, I don't think is

 6    necessarily -- no reason to be too concerned about the timing.

 7         That being said, you know, I think how fast it goes and

 8    how fast we move for summary judgment is, at least in

 9    substantial part, in the Government's hands.  If we can

10    complete the discovery or the production of the administrative

11    record quickly, then we'll certainly be prepared to move

12    quickly, Your Honor.

13         THE COURT:  All right.  Any comments from the

14    Government?

15         MS. VUONG:  I'm not exactly sure what counsel means

16    about the Government continuing to make decisions, but my

17    colleague will be arguing the motion for discovery.  We too

18    think summary judgment is where this case should be headed on

19    the record.

20         THE COURT:  All right.  There will be time enough to

21    discuss that.

22         So let me ask.  I want to make sure that I have the

23    complete record at this point.  I've received obviously briefs

24    on both sides, very extensive filing of declarations, both

25    individual declarations, organizational declarations, and

```
 1    expert declarations on the plaintiffs' side.

 2         What I have from defense is the brief and then, of course,

 3    the determinations that were made by Secretary Noem that are in

 4    the Federal Register, and I'm assuming you're asking me to take

 5    notice of those?

 6              MS. VUONG:  Yes, Your Honor.

 7              THE COURT:  And but there are no sort of

 8    counter-declarations, at least as we sit here today; is that

 9    correct?

10              MS. VUONG:  That's correct, Your Honor.

11              THE COURT:  And the Government is not seeking to

12    introduce any evidence at today's hearing?

13              MS. VUONG:  Not today, Your Honor.

14              THE COURT:  Well, then let me ask -- there are a lot

15    of issues from dispute, and we're going to talk about

16    everything from jurisdiction and everything else, and statutory

17    interpretation.  But just to get a couple of things out of the

18    way, I'm trying to figure out sort of what's not in dispute so

19    we don't have to spend a lot of time on that.

20         One is the claim of irreparable harm, if postponement is

21    not granted, to the plaintiff and injury to the public

22    interest.  That's what many of the declarations are about.  And

23    so there are a number of declarations about specific harms that

24    would befall folks who are now -- have the protection as

25    beneficiaries under the TPS as it was extended.
```

```
 1          Does the Government take issue with the bona fides or the
 2    veracity of any of those declarations?
 3               MS. VUONG:  No, Your Honor, we do not.
 4               THE COURT:  Okay.  And so for instance, there's -- one
 5    of the declarations is from Plaintiff M.H. and her 7-year-old
 6    daughter, who talks about the need to care for -- she's caring
 7    for children and volunteering in a health clinic, but she needs
 8    a driver's license to drive her severely asthmatic son to the
 9    hospital, and there's a number of consequences that would
10    befall.  That representation is not being contested, at least
11    at this point, something like that?
12               MS. VUONG:  That's correct, Your Honor.  Not for the
13    individual plaintiffs.
14               THE COURT:  Okay.
15               MS. VUONG:  I think that's what you're talking about.
16    But there are expert declarations as well.
17               THE COURT:  All right.  So let's confine ourselves
18    first to the individual ones.  Those are not challenged, at
19    least at this juncture.  Maybe at trial, there could be
20    something else, but at least for today's purposes.
21               MS. VUONG:  Correct, not for the purpose of today's
22    motion.
23               THE COURT:  Okay.  So let's talk -- and then you
24    mentioned about the expert declarations, and there are several.
25    And the data that was presented by the expert declarations
```

1    address, for instance, the high educational attainments of

2    Venezuelan immigrants, including those who are here on TPS

3    status, that appears to actually perhaps exceed that of the

4    native population.  Very high rate of -- for instance, bachelor

5    degrees held by those over 25 is actually higher than that of

6    the population.  Is that contested, that kind of fact or that

7    fact in particular?

8         MS. VUONG:  We don't contest the facts.  We just don't

9    think they are relevant to this motion and shouldn't be

10    considered.

11         THE COURT:  All right.  So you don't contest -- you

12    may contest the relevance but not the fact of, for instance,

13    high employment rates, which also show high employment rates

14    and participation in the workforce that exceed that of the

15    general population?

16         MS. VUONG:  We don't have any counter-facts, so we...

17         THE COURT:  Okay.  And perhaps relevant to one of the

18    issues I do want to talk about is at least some indication that

19    the crime rates among immigrants, including those from

20    Venezuela, are actually on the whole lower than the general

21    population, the incarceration rates, for instance.  Do you have

22    any reason to doubt that?

23         MS. VUONG:  Not today, Your Honor.  However, again, I

24    don't think those are relevant to the motion itself because we

25    don't believe the Court has jurisdiction to delve into the

11

1    decisions.

2         THE COURT:  Okay.  They may be relevant -- maybe not

3    the jurisdiction.  They may be relevant, if we got past

4    jurisdiction, into balance of hardships and irreparable harm

5    under the usual test that applies?

6         MS. VUONG:  Correct.  In the -- I think it can be

7    analyzed for the balance of hardships.

8         THE COURT:  Okay.  Okay.  And then we have general

9    evidence, sort of general economic evidence about the potential

10   loss to the U.S. economy.  One Professor Card estimates a 3.5

11   billion dollar annual loss in economic activity and an annual

12   loss of over 400 million dollars of Social Security taxes that

13   are paid by TPS recipients from Venezuela.  At least at this

14   point, you don't have a counteraffidavit?

15        MS. VUONG:  Correct.  I have no counterevidence to

16   these affidavits at this point.

17        THE COURT:  So and then there is -- I guess we'll get

18   to this at some point.  There's a finding, I think, by

19   Secretary Noem of conditions improving in Venezuela as a

20   country that sort of justify -- at least on the termination

21   side.  I don't think that informed the vacatur.

22        Is there anything in the record other than what's in the

23   Federal Register that I should be aware of, any reports, any

24   big reports from State Department or any agency of the federal

25   government that is more specific that explains what has

1    improved in Venezuela?

2          MS. VUONG:  Not today, Your Honor.  Just the Federal

3    Register notices, and I think Secretary Mayorkas recognized

4    that fact as well in his extension.

5          THE COURT:  Okay.

6          MS. VUONG:  But it would be a part of the

7    administrative record.

8               THE COURT:  Which...

9          MS. VUONG:  Which we don't have today.

10         THE COURT:  Which we don't have.  And I will say in

11   advance, I mean, to kind of skip ahead a little bit, it does

12   seem to me that in terms of discovery, what is now I think more

13   clear than in the Ramos case is that I think the preference is

14   to try to assemble and agree upon an administrative record as

15   the first step, and then determine whether or not the step of

16   going outside the record and supplementation is appropriate,

17   because it may be that the record has much of what the

18   plaintiffs might want or need.

19       I don't know at this point.  I think we're all sort of

20   curious what's in the administrative records since this

21   happened so quickly.  I think the first action, the vacatur,

22   took place within days of Secretary Noem assuming office after

23   her confirmation, and so I don't know what the record looks

24   like, but I think that's something that you all should work out

25   as a first step.

1          So I will indicate that -- that with respect to discovery,

2     I do think it's now more evident and clear from the case law

3     that the first step is to try to identify the administrative

4     record as a basis.

5          And just a last point, you know, a fair amount is made

6     about the Tren de Aragua, the TDA, which is the name given to

7     alleged gang members from Venezuela.  Do we know if there's

8     anything, again, in the record that I should be aware of that

9     shows, that counters -- for instance, there is a declaration

10    from Mr. Dudley, I think, that the plaintiffs have submitted,

11    who looks at the crime reports and concludes that the TDA is

12    not currently a major threat in the U.S. and they have no

13    substantial presence.

14         Is there anything in the record that I should be aware of

15    at this point, beyond what I saw in the Federal Register, that

16    substantiates the extent of TDA's criminality and presence in

17    the United States?

18              MS. VUONG:  Again, just the notice, and then the

19    footnotes that cite to some of the documents that Secretary

20    Noem relied upon.

21              THE COURT:  And in those documents, is there hard

22    data?  Is there actual data about, for instance, how many

23    members there are estimated?  What is their current criminal

24    status?  Now, obviously there's been a recent deportation,

25    which has been the subject of another matter in another court,

1    but is there any data at all in the record?

2            MS. VUONG:  I'm not aware of that right now.  I

3    can't -- I don't have an answer, a specific answer to that.

4            THE COURT:  Okay.  All right.  Well, so it appears, at

5    least for purposes of the motion under 705, which, although it

6    is not a motion for injunction under Rule 65, I think everybody

7    agrees that the same factors, the Winters test and everything

8    else, sort of applies here.  And I am to look whether there's

9    irreparable -- evidence of irreparable injury, balance of

10   hardships, which may inform the degree of the merits showing.

11       And why don't we just address that for a moment.  It does

12   seem to me that given the affidavits that are, at least at this

13   point, uncontested and taking into account their two amicus

14   briefs filed -- amicus briefs filed by a number of states as

15   well as another one filed by cities -- that sort of address the

16   impact on their economy, the impact on public health and public

17   safety, the adverse impact the loss of TPS status and the loss

18   of folks' ability to work and drive etcetera, etcetera, would

19   have.

20       It seems to me that the requisite showing of the

21   likelihood of irreparable injury in the absence of relief is

22   pretty clear, at least based on this record.  It may be that at

23   trial, we may see something else, but so far, that element

24   seems to be not in dispute.  But maybe I'm wrong.  You can

25   correct me.

1          MS. VUONG:  Yes, Your Honor.  We don't concede

2     irreparable harm here.  We note, as we said in the briefs, that

3     temporary protected status is temporary, and the harms herein

4     are inherent to the status itself.  So as a legal matter, while

5     these are difficult choices -- which we recognize they are

6     difficult choices, but as a legal matter, this was always the

7     outcome of temporary status, temporary protected status,

8     ending.

9          THE COURT:  Right.  I understand that legal argument.

10    I think that argument was addressed in the earlier Ramos case,

11    and I think, as I held, that although obviously things like,

12    for instance, family separation in a mixed family situation,

13    having to return back to a country with adverse conditions,

14    etcetera, etcetera perhaps is inherent in the temporary status.

15         But time matters, and the time, for instance, with family

16    seems to me to make a difference if you've got, you know, 30

17    days as opposed to three, four, five, six months, seven months,

18    eight months.  Time matters.  I mean, it's -- I take it that's

19    the plaintiffs' position as well?

20         MR. ARULANANTHAM:  It is, Your Honor.  And our

21    position is that -- the legal position is that they're entitled

22    to the extension from January 17th, which runs through October

23    2026.

24         And as also you may recall from Ramos, our position is

25    that the relevant determination is whether country conditions

1    are such that it is now safe for the return of its nationals.

2    So that's a determination that would have to be made at some

3    point -- I don't know exactly when, but a couple of months, 60

4    days-ish -- before October 2026.  And our view is that the

5    plaintiffs are entitled to rely on that.

6        And then the last thing I would say on the subject is that

7    the bridge in time may allow a number of people in this

8    community to obtain forms of permanent relief.  Freddy Rivas,

9    for example, who is one of the plaintiffs, has an H-1B

10   sponsorship opportunity, but he can't get it if he falls out of

11   status.

12       A number of these individuals have applied for asylum.

13   There's a huge asylum backlog.  Some of them may have their

14   cases get through in that period of time, and there's a number

15   of other ways that things could shift.  So it absolutely

16   matters, even if we're just talking about a few months, and all

17   we're talking about is through October 2026.  That absolutely

18   matters for a 3-year-old or 7-year-old.

19       But also, it's beyond that.  For many of these people, it

20   means that they have an opportunity to avoid going back to a

21   country in massive distress for a much longer period of time.

22           THE COURT:  All right.  So you're saying there are

23   potentially two consequences.  One is the time element that is

24   time with family, time to be able to work, time -- whether

25   it's, you know, separation that's early by months or days, time

1    matters.  And you're saying that for some folks, it's more than

2    just a temporary, additional time with family and in the

3    community.  It may affect their actual more long-term status

4    because they have various applications that are pending that

5    would be jeopardized if the TPS protection were to disappear

6    quickly?

7             MR. ARULANANTHAM:  Exactly, Your Honor.

8             THE COURT:  And then I do have to look at the balance

9    of hardships, as I mentioned, and that's why I'm sort of asking

10   some questions.  I can hear and see what it is on the side of

11   the -- and how many Venezuelan TPS beneficiaries are we talking

12   about being affected at this point?

13            MR. ARULANANTHAM:  350,000 in the April --

14            THE COURTROOM DEPUTY:  Excuse me, Counsel.  Can you

15   speak into the record.  We're having a problem --

16            THE COURT:  Microphone, yeah.

17            THE COURTROOM DEPUTY:  Excuse me.  Microphone.

18            MR. ARULANANTHAM:  There's 350,000 in the April

19   cohorts.  And by the way, that's what the -- Professor Card's

20   analysis is just about those, the 3.5 billion and 400 and

21   something million of Social Security is just about those.

22   There's another something like 240,000 who would lose their

23   right to live and work here in September.

24        So the total number -- I believe the estimate was 607,000

25   overall, which was actually larger than the entire Ramos

 1    population, this population of people.  It's a huge, huge,

 2    population of people.

 3        THE COURT:  All right.  So the hardship to the

 4    Government if postponement were granted -- obviously you've

 5    made the argument that the inability to carry out orders is

 6    sort of inherent in any sort of stay or postponement.

 7        What else -- is there anything else -- there's some

 8    reference made to public costs of -- I don't know if these are

 9    costs that are incurred by local and state governments in terms

10    of support services to this population.  I don't know if I saw

11    any quantification of that, but maybe you can articulate what

12    are the harms to the Government if the postponement were

13    granted?

14        MS. VUONG:  Sure.  If I could go back to the numbers

15    and to your point of time.

16        THE COURT:  Yeah.

17        MS. VUONG:  The September deadline, one, has not been

18    terminated as of yet.  I can't speak to what is happening with

19    that.  I don't want to intimate that I have any knowledge as to

20    what's happening with that.  But I do think that's exactly what

21    Plaintiffs are asking for is more time, right, to prepare to

22    return.  So I don't think that the harm of the 240 should be

23    considered in this postponement.

24        THE COURT:  The 240 -- these are the folks that would

25    be affected...

```
1            MS. VUONG:  With the end date of September 10th, I
2       believe.
3            THE COURT:  What's your response to that?
4            MS. VUONG:  Is that right?
5            MR. ARULANANTHAM:  What's at stake for them is do they
6       lose the right to live and work here on September 10th, 2025,
7       or instead, in October of 2026?  And even then, only if there
8       is a termination that comes at the end of that period, which is
9       what we believe they're, you know, entitled to, that period
10      just from now until September, Your Honor, is about the same
11      time that was the time period from when we started Ramos until
12      the Sudan termination.
13           So that's still a very short period.  It just feels longer
14      because there's 350,000 people whose, you know, deadline is
15      coming up in two weeks -- or less than that now.  So it seems
16      clear to me that that set of people can also have their harms
17      considered.  I mean, they have to make plans now about
18      whether -- you know, without knowing whether their extension
19      will go on beyond September, was what they thought before, was
20      that they were entitled to TPS for more than another year
21      beyond that, 13 months beyond that.
22           THE COURT:  So it's sort of the difference between six
23      more months versus about 18 months?
24           MR. ARULANANTHAM:  Exactly, Your Honor.
25           THE COURT:  Okay.  So it's slightly less of a
```

1    difference but still a significant difference, about a 12-month

2    difference?

3            MR. ARULANANTHAM:  Yes, Your Honor.

4            THE COURT:  12, 13-month difference.

5        All right.  So go ahead and tell me about the harms to the

6    Government.

7            MS. VUONG:  I think as your Honor noted, right, the

8    harms to the Government are that the Secretary has looked at

9    the issue, has made a determination related to the national

10   interest, and the Secretary has an interest in having her

11   orders carried out.

12           THE COURT:  Okay.  So other than the interest in

13   having her orders carried out -- and of course that begs the

14   question of whether her orders are lawful, because if they're

15   not lawful, there's much less of an interest in carrying out an

16   unlawful order.  But if they're lawful, then there's a strong

17   interest in the Government being able to carry out its lawful

18   orders.

19           MS. VUONG:  Correct, Your Honor.

20           THE COURT:  So it sort of begs the question a little.

21       Is there anything else in terms of the economics, safety,

22   etcetera, etcetera, that the Government is asserting as a

23   counterbalance in terms of the balance of hardships?

24           MS. VUONG:  Just the language in the termination

25   notice itself, Your Honor.

1              THE COURT:  And the thing that I remember seeing

2    there, there's a fair amount of emphasis on the TDA as a public

3    safety --

4              MS. VUONG:  There's a focus on the TD -- I'm sorry.  I

5    didn't mean to interrupt you.

6              THE COURT:  Go ahead.

7              MS. VUONG:  There's a focus on the TDA.  There's a

8    focus on the communities.  There was a statistic on the effect

9    of individuals in various cities.  I think New York was used as

10   the example of the effect, if you look on in the February 5th

11   FRN, page 9043, the notice states, "For example, over 180,000

12   illegal aliens have settled in New York city, approximating

13   that this will cost the city 10.6 billion through the summer of

14   2025."

15        So all of that information in the Federal Register notice

16   goes to the balance in favor of the Government.

17             THE COURT:  All right.  What's the plaintiffs'

18   response to something like that?

19             MR. ARULANANTHAM:  Well, Your Honor, that's about what

20   happens when a set of people first come before they have

21   employment authorization.  So I think the question -- this is a

22   mistake that runs throughout the termination decision.  You

23   know, the TPS doesn't let anybody stay -- you know, get here,

24   enter the country.  It just means that if you're here and you

25   qualify, you can get work authorization and be allowed to

1    remain.

2         And so the point that's made -- I believe it's in the

3    Veuger -- yeah, i think it's in the Veuger declaration.  It's

4    certainly in the amicus briefs -- is that what we're talking

5    about now is where they strip all these people of their

6    employment authorization.  So obviously if you take away

7    people's right to work, that worsens the burden on, you know,

8    just sort of every aspect of the public sector.

9         THE COURT:  So it's critical to take this photo at the

10   right -- take this snapshot at the right point in time, and the

11   point in time is now, when we're talking about removing

12   authority and protection for folks who are already working for

13   the most part?

14        MR. ARULANANTHAM:  Exactly, Your Honor.

15        THE COURT:  And I thought I saw a statistic that said

16   that the income of Venezuelan TPS recipients is something like

17   95 percent, 96 percent earned income?

18        MR. ARULANANTHAM:  That's correct, your Honor.  The

19   amount of public assistance now on average per person is less

20   than $200 per year or something like that.  There's different

21   numbers about labor force participation, but they're all

22   extraordinarily high -- 70 percent, 80 percent, depending upon

23   which economist that you talk to.

24        So and obviously that's in a world where they have

25   employment authorization.  You take that away, all of that will

1    become worse.  So the fact that they say that, you know, in

2    2023, there were burdens placed on cities like New York and

3    other cities, when this population came in and didn't yet have

4    employment authorization is just irrelevant to the question of

5    now, if you take it away, will that make things better or

6    worse?

7            THE COURT:  Okay.  What's the Government's response to

8    that, that if you take it from the snapshot in time of where

9    that population that may be affected by this action is, it is

10   largely an employed population and with little dependence on

11   public assistance?

12           MS. VUONG:  The idea behind ending the temporary

13   protected status is that the individuals return to -- that they

14   can return to their country, and so it shouldn't be that these

15   individuals then -- individuals who are working with lawful

16   status and lawful employment authorization documents now seek

17   public assistance from the states where they're living.  So I

18   don't think that is a correct comparator.

19           THE COURT:  Well, what we're trying to measure is what

20   harm would befall the Government if the injunction -- or not

21   injunction, but the postponement were to stay in place if

22   there's ongoing taxing of the welfare system, for instance, and

23   that's something to consider in terms of the fisc, the public

24   fisc.

25           But what I'm -- at least what I'm seeing from the evidence

1    that's in this record so far is that there's not much of a

2    burden on the public fisc at this juncture.  Maybe it was some

3    years ago when folks first got here, but it appears that the

4    employment rate in market -- in labor force participation is

5    very high for Venezuelans.

6         MS. VUONG:  And as I've stated, I don't have any

7    counter-statistics on those numbers.

8         THE COURT:  Okay.  Well, let's -- thank you.  Let's

9    talk about some of the key issues here.  Because it may be that

10   all of this goes nowhere depending on if I have jurisdiction,

11   which is the first question.  And there are two jurisdictional

12   issues.  The first is the limit on injunctive relief under

13   1252(f)(1).

14       And so the question in that context is does it apply here,

15   or does it not?  And there's a couple of issues.

16       MR. ARULANANTHAM:  Your Honor, may I speak from the

17   lectern?

18       THE COURT:  Yeah.  Why don't you come on up to the

19   lectern, and let's talk about 1252, which is -- the subsection

20   (f) is entitled "limit on injunctive relief."  So it expressly

21   uses the term "injunctive relief," and it refers to the lack of

22   jurisdiction, other than the Supreme Court, to enjoin or strain

23   the operation of the provisions of part IV of this subchapter.

24       And part IV of the subchapter, the statute in question,

25   does not fall under part IV right now.  It's codified under

```
 1    part V, as I understand it; is that correct?
 2             MR. ARULANANTHAM:  Your Honor, we have litigated this
 3    under the postponement motion without delving deeply into the
 4    question whether the TPS statute is under 1252(f).  So I guess
 5    I'm -- we're not pressing the argument that it's not within it
 6    because we think that we can get a postponement and
 7    preservation of the rights under the APA, irrespective of
 8    whether the TPS statute is part of part IV of chapter 2 of Ira
 9    Ira or not.
10        Strangely, it seems that there's actually disagreement on
11    exactly what the scope is of those words.  There's Ninth
12    Circuit law which said everybody thought that the TVPRA was
13    within it, and then the Ninth Circuit said it was not.
14        And so, you know, we looked at this and wondered whether
15    or not we should litigate that question in this motion and
16    thought the simplest, narrowest way, particularly given that
17    we've got a deadline in April, was to argue that postponement
18    is not a vacatur and doesn't fall within 1252(f).  That's what
19    the Fifth Circuit held.  It's what every court to consider the
20    question has held.
21        And so we thought that was a way to get the relief that we
22    sought without delving into this strangely ambiguous question
23    of what is within the scope of that code provision or not.
24             THE COURT:  All right.  So you're reserving that
25    point?
```

1          MR. ARULANANTHAM:  Yes, Your Honor.

2          THE COURT:  And at least arguing whether the terms of

3    (f)(1) really apply to this situation?

4          MR. ARULANANTHAM:  That's right, Your Honor.

5          THE COURT:  So what is the difference between an

6    injunction and a vacatur or a postponement?

7          MR. ARULANANTHAM:  I think the core difference is that

8    the postponement -- and also a set-aside or a vacatur under the

9    APA -- operates directly on the agency action, and it does not,

10   by its terms, enjoin persons or federal officials in this case.

11       And so, Your Honor, if you were to rule in our favor and

12   postpone the effective date of the vacatur and the termination,

13   you would be robbing them of legal force, at least, you know,

14   on a temporary basis.  It would be like wiping them from the

15   books for the time period.  That order does not itself direct

16   any federal official to do or not do anything.

17       I acknowledge that that can feel somewhat formal in a way

18   because the bottom line is that everyone -- you know, if you

19   rule in our favor, everybody would have employment

20   authorization and would still have the right to remain in the

21   United States.  But the doctrine on the subject has been

22   extremely focused on the form and not just on the substance.

23       If you look at the Supreme Court's decision in Nken for

24   example, where they said stays of removal are not within

25   1252(f)(2) or, you know, a lot of the law.  Look at the Fifth

1    Circuit's decision in Texas on this exact question that we're

2    talking about today.  They're very focused on the fact that the

3    order runs against the rule and not against the officials, and

4    that seems to really matter when it comes to how the doctrine

5    thinks about remedies in this context.

6            THE COURT:  Why should that make a difference, whether

7    you're restraining the agency in name or a person that directs

8    the agency?

9            MR. ARULANANTHAM:  I think the immediate answer to

10   that question is that if there is a violation of the Court's

11   order to postpone, there's no person who is immediately subject

12   to contempt.  That's the kind of sort of operational difference

13   in the immediate term.  It's similar to declaratory relief.

14       If you violate a declaratory relief order -- if a

15   defendant violates a declaratory relief order, it doesn't

16   immediately subject them to contempt.  Of course, then you

17   could have a motion to enforce, and if that motion to enforce

18   happened and then the Court issued an order, then obviously

19   contempt sanctions could run for a violation of the Court's

20   order --

21           THE COURT:  So how does a person get involved, you

22   say, in the motion to enforce?  At that point, then you name a

23   particular individual that's charged with enforcement?

24           MR. ARULANANTHAM:  That's right, Your Honor, and that

25   would be an individual that hypothetically would be violating

1    the Court's order because they're treating the agency action as

2    still in effect, when this court had ruled that it was no

3    longer in effect.

4        THE COURT:  So that extra layer of having to bring a

5    motion to enforce and then name an individual before contempt

6    can be held makes it sort of one step removed and less

7    intrusive?  Is that the idea?

8        MR. ARULANANTHAM:  Yes, Your Honor.  Exactly.

9    Monsanto, the supreme court case in Monsanto, says that vacatur

10   is a lesser form or less -- yeah, something like that, less

11   intrusive, less coercive in some way.  And if you look at

12   Nken -- again, the N-K-E-N -- v. Holder, which is the case

13   about a very analogous question, it's about whether a stay of

14   removal, like a removal order to deport someone, is injunctive

15   or not.  That's the reasoning that the Court uses there.

16       And this is -- what I'm now explaining is also the

17   reasoning of the Fifth Circuit in the Texas v. U.S. case and

18   several different district courts that we cite -- the Kidd case

19   in the Central District of California.  There's a case in

20   Florida.  A number of district courts have said this.

21       THE COURT:  Is there contrary authority?

22       MR. ARULANANTHAM:  On 1252(f) specifically?

23       THE COURT:  Yeah.

24       MR. ARULANANTHAM:  We are not aware of any contrary

25   authority, and they haven't cited any.

1              And additionally, Your Honor, I would say this idea that

2        APA relief in general operates directly on the rule, that's

3        also the reason why that relief applies as a default rule

4        applies what they say universally, that, you know, if Chevron

5        brings a lawsuit against the Clean Power Program and they win,

6        that the Clean Power Plan is, you know, ultra vires of the

7        statute, Texaco doesn't need to also bring a suit in order to,

8        you know, stop it as applying to them.  It just operates

9        against the rule.

10             That same reasoning, which is the reasoning we're talking

11       about now for 1252(f) -- that applies to the APA writ large.

12       And that idea that an APA vacatur normally operates against the

13       rule is the holding of the Ninth Circuit in East Bay Sanctuary.

14       That case was citing the Regents case from the Ninth Circuit,

15       and there are a mountain of APA cases in every circuit that say

16       this.  It's the D.C. Circuit's practice going back at least to

17       the 1980s, and that's why the default rule in APA cases is that

18       the rule applies, you know, against, the rule itself.

19             And they haven't explained why you could somehow carve out

20       1252(f) and say that that -- you know, that rule doesn't apply

21       here but still preserve it in all of the APA.  And if you look

22       at their briefing on the subject, they're saying essentially --

23       you know, they're pointing to some case from the 1970s.  They

24       cite some case in the 1930s -- about the APA's legislative

25       history.  They're trying to basically undo decades and decades

1    of APA doctrine on the subject.

2        So, you know, they're entitled to make that argument, you

3    know, maybe in the Supreme Court.  I actually think -- you

4    know, the Chief Justice thinks this is wrong.  The D.C. Circuit

5    justices think this is wrong, but whether or not they

6    ultimately get there for today, for purposes of this court,

7    what they're asking for is a revolution in the APA

8    jurisprudence, and that's not appropriate here.

9        The normal rule applies.  This is a postponement -- it's

10   just a temporary form of what would be a set-aside, which is

11   APA relief under Section 706, and that relief is not an

12   injunction.  It's not an injunction.  It operates directly

13   against the rule.  It doesn't apply to persons, and that has

14   been the practice of the federal courts on the subject going

15   back for decades.

16       THE COURT:  What would be an example of where the

17   prohibition or the bar of 1252(f)(1) would apply in the APA

18   context, it would have an effect of restraining a court

19   injunction?

20       MR. ARULANANTHAM:  Well, prior to the Aleman Gonzalez

21   decision, which -- and that decision is 2022, I think.  It's

22   before -- it's after Ramos anyway, right?  Before that, courts

23   issued injunctions, and they weren't, in my view, particularly

24   cognizant of this distinction that we're spending all this time

25   talking about now.

1          So for example, when we were here in the preliminary

2    injunction in Ramos, we sought an injunction, and we didn't

3    sort of think much of it.  Are we seeking a vacatur, a

4    set-aside, or are we seeking an injunction?  We weren't

5    cognizant of that distinction.

6          I think now, after Aleman Gonzalez, if we sought an

7    injunction, then Your Honor would have to address this question

8    that you started with, which, you know, is is the TPS statute

9    within the confines of 1252(f) or not?  Because an

10   injunction -- you know, let's assume that it were -- okay -- if

11   it were, or let's say this case was Aleman v. Gonzalez and we

12   were seeking relief under the detention statutes, well, then

13   the order would violate a 1252(f).

14         So you couldn't -- if you issued an injunction and you

15   actually wrote it that way -- "This is an injunction.  Every

16   officer of the DHS is enjoined from" -- you know, whatever it

17   may be, from deporting anybody who has TPS, from taking away

18   their employment authorization, you know, assuming --

19              THE COURT:  But I wouldn't have to.  I mean, your view

20   is that relief could be sought under the APA 705 and 706.  So

21   what I'm asking is is there a place where 1252(f)(4) would

22   actually -- not because some judge issued it and used the word

23   "injunction," but because actually that -- you couldn't get

24   relief under 705, 706.

25              MR. ARULANANTHAM:  I see.

1          THE COURT:  Or are you saying that it's always proper

2     to seek relief under 705, 706, and therefore you're free --

3          MR. ARULANANTHAM:  I understand.

4          THE COURT:  -- of 1252?

5          MR. ARULANANTHAM:  And now I understand your question,

6     Your Honor.

7          Yes, there are many times in the immigration context where

8     one might bring litigation not to challenge agency action, but

9     instead to challenge other things.  You might challenge the

10    statute itself and not the way it's manifested in agency

11    regulation, and then you couldn't bring a claim under the APA

12    if we argued that a statute was unconstitutional.

13         We might have other arguments, like maybe it doesn't apply

14    to constitutional claims or something like that, but that would

15    be outside the scope of the APA.  Lots of immigration cases

16    that I've litigated, that lots of people have litigated, were

17    not APA claims.  They were claims under whatever statute or

18    claims under the constitution, and for all of those, APA relief

19    is not available, and then, you know, 1252(f) may bar it.

20         So in Aleman Gonzalez, for example, the claim was that the

21    Constitution requires that the set of people subject to

22    prolonged detention are entitled to bond hearings and that the

23    statute authorizes it, not that the APA was violated in any way

24    but that the statute actually requires that the set of people

25    subject to prolonged detention received bond hearings.

1          And we brought that claim -- I was among the counsel in

2     Aleman Gonzalez.  We brought that claim under the immigration

3     laws and under the due process clause.  And the courts said,

4     "You cannot get an injunction" -- they did not address the

5     constitutional question.  They said, "You cannot get an

6     injunction under the immigration statute for this claim."

7          So our claim today is not, you know, brought under the

8     immigration laws as such.  It's bought under the APA.  The

9     constitutional claim is different.  And so that's the reason

10    why 705 relief is available to us.

11         THE COURT:  So when 1252(f)(1) refers to not being

12    able to enjoin the operation and provisions of part IV of the

13    subchapter, there are examples you can give me of part IV

14    matters that might otherwise be subject to an injunction?  I

15    guess there's a lot of stuff here.  It's inspections,

16    apprehension, examination, exclusions, and removal.

17         Are there examples of operations of any of these

18    subsections, which is 1221 through 1232, that would otherwise

19    be enjoinable but not enjoinable because of the bar of

20    1252(f)(1)?

21         MR. ARULANANTHAM:  Yes, Your Honor.  So Aleman

22    Gonzalez itself is a claim about how to interpret section

23    1231(a)(6).  And we said that provision must be read to require

24    bond hearings for people subject to detention.  The Government

25    said no.  They could be locked up even for years without a

1    chance to ask an immigration judge for a release on bond.

2         And the Court said, "You cannot get an injunction

3    requiring them to perform bond hearings under the statute."

4              THE COURT:  Okay.

5              MR. ARULANANTHAM:  And the same could be true for, you

6    know, other provisions involving detention, certainly 1226(c),

7    1225(b).

8         It could also be true -- if you look at the Ninth

9    Circuit's decision in Al Otro Lado, you know, I can't remember

10   if we cited that case in this context or not, but -- I think we

11   did, actually.  But if we did not, we can submit it to this

12   court.

13        I mean, that's a decision where the Court is looking at an

14   injunction concerning certain aspects of the asylum rules, and

15   they say -- parts of that court's order are outside of 1252(f),

16   and so they can be -- they can survive Aleman Gonzalez, but

17   other parts, which I think particularly concerns the ability

18   for people to come back and apply for asylum again -- they say

19   that part is not exempt from 1252(f), and you cannot get an

20   injunction for that part.

21        And there, they were not challenging -- I mean, they had a

22   separate challenge to the agency interpretation of the asylum

23   statute, but the relief that they sought as a remedy was "You

24   have to let these people come back and give them another chance

25   to apply under proper -- under a proper understanding of the

1    asylum rules."

2         And the Court said that form of relief is barred by

3    1252(f), and there's no -- I don't think that there's a way

4    that you could say the APA -- there's no APA error there.  It's

5    just -- you know, it's one form of relief that the plaintiffs

6    asked for, and it was not available because the only way to get

7    it was via injunction.

8              THE COURT:  So in other words, 1252(f)(1) has

9    operative effect, but outside the area of an APA challenge

10   under 705 and 706?

11             MR. ARULANANTHAM:  Yes, Your Honor, it does.

12             THE COURT:  Okay.

13             MR. ARULANANTHAM:  The last thing I would say on this

14   subject, Your Honor, the Supreme Court considered -- they

15   granted cert, actually, on the question of whether APA relief

16   is outside of 1252(f).  It's come up twice in Supreme Court

17   cases, in Texas v. U.S. -- or in the Supreme Court, it might be

18   U.S. v. Texas, which is a case about the enforcement

19   priorities; and just before that, in Biden v. Texas, which is a

20   case about the Remain in Mexico program.

21        And in both of those, the Government was making a version

22   of the argument that you're suggesting now, which is you're

23   blowing a hole through this statute if you can sort of get

24   around it by -- because it doesn't apply to the APA.

25        And in the dissent -- I believe it was Justice Gorsuch's

1    dissent in the U.S. v. Texas case -- he makes a similar kind of

2    point.  But the Supreme Court reserved the question both times.

3    They did not decide the issue, and they acknowledged it was

4    difficult.  And one of the points that other justices of the

5    Supreme Court like the chief justice was making was, "Well, if

6    we accept this idea, then we have to just get rid of what the

7    D.C. Circuit has done in APA cases going back forever."

8         And since that time, the Supreme Court has allowed to

9    stand on its shadow docket vacaturs that were definitely, you

10   know, running -- that clearly were -- the Government was

11   arguing were prohibited by 1252(f), just like they're saying

12   here.  They did it in the MPP case, Biden v. Texas.  There was

13   a stay there.  They did it again in U.S. v. Texas.

14        And so I don't think -- even if it does mean what's left

15   of 1252(f)(1) is very, very little -- which I don't think is

16   true.  I mean, ask the detention -- immigration detainees.

17   They don't think it's very little.  But even if what's left is

18   very little, on the other side is you really have to explain

19   how to square their position with, you know, 50 years or

20   something more of APA doctrine.

21             THE COURT:  All right.  Thank you.

22        Let me hear from the Government.  I mean, it does appear

23   that the U.S. Supreme Court has not addressed this question,

24   has reserved this question, even though it's been tendered that

25   we have Fifth Circuit clearly distinguishing the, quote, less

```
1    drastic remedy of vacatur under 706, and a number of other
2    courts.  So that seems to be the main argument that the
3    plaintiff is making.  What's your response to that?
4         MS. VUONG:  Yes, Your Honor.  That's exactly what I
5    was going to point out.  This is not a settled question.  The
6    Supreme Court has reserved ruling on this issue.  I would point
7    you back to the text of the statute itself -- excuse me -- to
8    1252(f)(1) -- excuse me -- in that the language itself says,
9    "No court shall have the jurisdiction or authority, except the
10   Supreme Court, to enjoin or restrain the operation of the core
11   provisions."
12        We do have a whole analysis of why 1254a is a covered
13   provision.  I believe Plaintiffs have waived the argument on
14   that point, and there's no disagreement that this is a covered
15   provision under 1252(f)(1).  That statute tells us that this
16   court cannot --
17        THE COURT:  Although I will say literally, if you look
18   at the code section --
19        MS. VUONG:  Yes.  Well --
20        THE COURT:  -- it doesn't line up.
21        MS. VUONG:  Correct.  The code cannot overcome the
22   statutes at large, and if you look at the table of contents of
23   Ira Ira from 1996, you'll see 1254, which is 242 listed under
24   chapter 4 of the INA there.  And we argue it's an error when
25   the codifiers moved the statute at large into Title 8.
```

```
 1          THE COURT:  Okay.  So let's address the question about
 2     the -- whether the ban on "injunctions" --
 3          MS. VUONG:  Sure.
 4          THE COURT:  -- quote-unquote, applies here.
 5          MS. VUONG:  Restrain is very clear, and that's what
 6     this postponement would do.  Prior to Aleman Gonzalez,
 7     Plaintiffs in this sphere didn't seek these postponements of
 8     decisions.  But and my friend across the aisle admitted that
 9     in -- I think it is Texas v. United States, Judge Gorsuch did
10     note that this was a clever workaround.  He indicated that
11     Plaintiffs have just pivoted because of the interpretation in
12     Aleman Gonzalez of 1252(f)(1).
13          If you look at that language, Aleman defined "restrain" as
14     to check, hold back, or prevent from some course of action to
15     inhibit, stop, or compel.  And that's exactly what the
16     postponement would do here.  It would stop.  It would inhibit
17     the Government from carrying out its actions, its lawful
18     actions.
19          To the argument of looking to Nken and whether or not a
20     stay qualifies as an injunction, 1252(f)(1) has a carve-out.
21     It says, if you continue on, "Other than with respect to the
22     application of such provision to an individual alien against
23     whom proceedings have been initiated."
24          So that is how a stay of removal is not offensive to
25     1252(f)(1).
```

1           THE COURT:  I'm sorry.  Say that again.

2           MS. VUONG:  Sure.  If you continue on in the language

3     of 1252(f)(1), "No court shall have jurisdiction," and you get

4     to the end of part IV of the subchapter, comma, "Other than

5     with respect to the application of such provision to an

6     individual alien against whom proceedings have been initiated."

7     And the stays that counsel is talking about in Nken is a stay

8     of removal issued by circuit courts.

9           THE COURT:  But that is --

10          MS. VUONG:  Those aren't prohibited.

11          THE COURT:  That's the exception to the bar.

12          MS. VUONG:  Correct.  Those aren't prohibited by

13    1252(f)(1).

14          THE COURT:  And so your argument is by sort of reverse

15    implication, that everything else would be covered, that this

16    narrow exception states that the --

17          MS. VUONG:  Correct, Your Honor.  The statute says

18    when it doesn't apply.  But it very clearly says -- Congress

19    has very clearly said "no authority to enjoin or restrain," and

20    postponement is a restraint on the executive's action.

21          THE COURT:  But no court has held that that should be

22    construed to apply to APA claims under 705 and 706 at this

23    point.

24          MS. VUONG:  Not yet, but it remains an open question.

25    Sorry.  I think the Fifth Circuit has held that.  But as far as

1    within this district and this circuit, no, it remains an open

2    question.

3            THE COURT:  Just as Gorsuch has stated one view --

4            MS. VUONG:  Correct.

5            THE COURT:  -- Justice Sotomayor and Justice Barrett

6    have said this question has not been ruled on yet.  So it's --

7            MS. VUONG:  Yes, Your Honor.

8            THE COURT:  And the Ninth Circuit -- the Fifth

9    Circuit's looked at it, and the Ninth Circuit has not

10    adjudicated this precise question?

11            MS. VUONG:  Not that I'm aware of.  So it's for that

12    reason that we argue that this court doesn't have the authority

13    to issue the remedy that Plaintiffs seek here.

14            THE COURT:  What's your reaction to your opponent's

15    point about there's a difference between vacatur under 706 or

16    postponement and injunction in part because an injunction runs

17    against individuals who are subject to immediate contempt

18    proceedings, whereas a vacatur only operates on the agency

19    action, and any contempt is another step removed and therefore

20    is a less, quote, drastic remedy.

21            MS. VUONG:  I think that falls into this clever

22    workaround language.  Functionally, they're operating the same.

23    So just because you have to take one more step to enforce the

24    postponement, it's still restraining the operation of the

25    statute.

```
 1          THE COURT:  And what about the general presumption of

 2     reviewability given the basic value of separation of powers in

 3     our government, that when you remove effective reviewability,

 4     that perhaps by way of relief -- because you can't get damages

 5     obviously, it essentially nullifies any kind of meaningful

 6     judicial review that the presumption generally obtains against

 7     that and statutes should be construed narrowly to the extent

 8     they purport to remove judicial review.  How does that operate

 9     here?

10          MS. VUONG:  I think here -- right.  There is that

11     presumption, unless Congress is clear, and I think that

12     Congress has been clear in the language of both 1252(f)(1) and,

13     as we'll discuss later, 1254a.

14          THE COURT:  Is there anything in the Congressional

15     Record on this particular section that sheds light on its

16     application to APA actions?

17          MS. VUONG:  Not that I'm aware of, Your Honor.  I have

18     not had time to go back and look at the congressional record of

19     1252(f)(1), of 242(f)(1).

20          THE COURT:  All right.  Well, let me give Mr.

21     Arulanatham the chance to -- if you have one more comment.  And

22     then I'd like to move on to the 1254(b)(5)(a) question.

23          MR. ARULANANTHAM:  Just very quickly, a few things

24     about what Ms. Vuong just said.

25          The point about Nken, Your Honor, is not about 1252(f)(1).
```

1    Nken is not construing 1252(f)(1).  It's construing the next

2    neighboring provision, 1252(f)(2).  But the reason why I

3    mention it is because it explains why a stay of removal is not

4    an injunction.

5        And 1252(f)(2) contains a different kind of bar or just

6    sets a very high standard for certain kinds of injunctions, and

7    its explanation for why a stay of removal is not an injunction

8    is equally applicable to the postponement that we're seeking

9    here.

10        And if you think about what a removal order is, it's an

11    order from the Board of Immigration Appeals or an immigration

12    judge saying this person can be deported, and the Court is

13    saying staying that, which is what happens when you have a

14    deportation order that's being reviewed on a petition for

15    review or a removal order is being reviewed on a petition for

16    review.  I think staying that is not an injunction.

17        That's the holding of the Supreme Court in Nken.  They say

18    it's a stay.  It's not an injunction.  You know, what's the

19    difference?  And they say almost exactly the same argument that

20    I'm making here today, and it's also, as I said, the reasoning

21    of the Fifth Circuit.

22        The second thing -- I just want to be very clear about

23    this.  The Fifth Circuit ruled on our side of this question,

24    and I think five district courts have ruled on our side of this

25    question.  No court in this country has ruled on their side of

1    this question.

2         And the last thing I'll say is if Your Honor were actually

3    going to kind of go down the road of applying the savings

4    clause at the end of 1252(f)(1), which Ms. Vuong referred to,

5    other than with respect to individuals and proceedings, there

6    are lots of Venezuelan TPS holders who are in proceedings.  Or

7    who -- it's actually -- let me modify that.  The phrase is

8    "against whom proceedings have been initiated," other than an

9    individual alien against whom proceedings have been initiated.

10        Our plaintiff M.H. -- I think you were referring to them

11   earlier, if I remember, the 3-year-old son and the 7-year-old.

12   They have a check-in with ICE in May.  Another plaintiff, E.R.

13   --  she has a 7th grade daughter -- has a check-in with ICE in

14   June.  So those are definitely people who fit within the

15   exception.

16        There are -- you know, there's more than 84,000 TPS

17   Alliance Venezuelan members.  There's obviously lots and lots

18   of others.  So it would be a mess to try to limit this court's

19   ruling in some way via that exception and, I think, much more

20   straightforward from an administrative standpoint to postpone

21   the effective date of the rule and preserve the rights, just

22   like every other normal APA case, Your Honor.

23             THE COURT:  Well, I'm not sure which way that cuts

24   because if there are folks who are -- could get relief under

25   the savings clause, I guess the comeback to that is that well,

1    then they should seek individualized release and not a

2    wholesale invalidation of the -- of Secretary Noem's vacatur.

3            MR. ARULANANTHAM:  Well, so to be clear, everybody

4    loses their employment authorization, and there's many reasons

5    why I think this provision doesn't apply that we didn't get

6    into.  You know, one of the many is that once TPS expires, you

7    lose your employment authorization.  That applies to everyone.

8            THE COURT:  That wouldn't be a proceeding brought

9    under this part, such part, to use your --

10           MR. ARULANANTHAM:  I think "other than with respect to

11   an individual against whom proceedings have been initiated"

12   refers to removal proceedings.  That's my understanding of what

13   that term means.

14           And then there's obviously a number of massive -- so I

15   would argue the harm that we're talking about, the 3.5 billion

16   dollars for the April crowd and about 8 billion for everyone --

17   that's triggered totally aside from whether or not people are

18   put into removal proceedings.

19           But the reason I raise this is to say that it doesn't make

20   any sense that a provision like this with an exception clause

21   like that would apply to, you know, this sort of programmatic

22   policy where you're going to strip all these people of their

23   employment authorization well in advance.

24           But even if you reject our view, you know, you would have

25   to split with the Fifth Circuit and all these district courts,

1    and you'd have to explain why this is consistent with APA

2    doctrine, which they still haven't done.  All they've said is

3    they think all the APA doctrine is wrong.

4        But even if you went that road, we wouldn't be done.  We

5    would then -- you know, we'd come back here and say, you know,

6    there's thousands of people who, even under their

7    interpretation, are entitled to relief and could be getting

8    relief in this action, in this case.  It doesn't say that you

9    have to bring it in removal proceedings.  It just says that you

10   can't grant an injunction other than with respect to an

11   individual against whom proceedings have been initiated.

12       So yeah.  It's just all to say, like, they point to this

13   as though it's a solution to the problem, but it just opens its

14   own massive can of worms.

15           THE COURT:  Well, I'm not sure they're saying it's a

16   solution.  They're saying it informs the interpretation of the

17   rest of the statute.  You've got a savings clause and

18   therefore, that would, I guess, argue for a broader

19   interpretation of the front end of the statute.

20           MR. ARULANANTHAM:  I see.  So then my answer to that

21   would be the point I just made a minute ago, which is that

22   there's a huge amount of harm caused by the termination, which

23   cannot be addressed by waiting to raise challenges in removal

24   proceedings.  So it doesn't argue for a narrow interpretation

25   on that basis.

1          And the other thing I would say, Your Honor, is as I

2     understand it, their position is that the illegality of TPS, of

3     the TPS termination and vacatur, cannot be raised in removal

4     proceedings.  That was our position last time anyway in Ramos,

5     that you couldn't -- we couldn't litigate these questions we're

6     litigating now.

7          The individual and removal proceedings couldn't compel the

8     production of the administrative record, what we started the

9     hearing with.  So for both of those reasons, I would argue that

10    the existence of the savings clause cannot be sufficient to

11    resolve the problems that would be created by stripping --

12          THE COURT:  In other words, there's no other form to

13    litigate this.  So it would preclude entirely judicial review,

14    hence the rule of construction about narrowing -- narrow

15    construction of such?

16          MR. ARULANANTHAM:  Yes, Your Honor.

17          THE COURT:  Prohibitions?

18          MR. ARULANANTHAM:  Yes.

19          THE COURT:  All right.  We've got to move on -- thank

20    you -- to the other jurisdictional question and whether that

21    means judicial review, which is barred with respect to, quote,

22    "any determination, with respect to the designation or

23    termination or existence" -- or "extension of a designation of

24    a foreign state."

25          We did look at this question, and so did the Ninth Circuit

1   panel in the now-vacated Ramos decision in the Ninth Circuit.

2   But the vacated decision -- even the majority there reached a

3   conclusion that the sweep of 1254(b)(5) is limited.  That

4   determination, which is a key term here, pertains to review of

5   the underlying considerations and reasoning employed by the

6   Secretary in reaching her country-specific TPS determination,

7   so determining whether or not conditions are so adverse that

8   it's dangerous to send people back.

9        Those are the kinds of things that are generally not

10   reviewable but that sort of procedural or collateral matters

11   can be.  And even under that framework, which is not binding

12   here because that decision was vacated, but it's an indication

13   at least of how three judges look at it.

14        You look at such factors under McNary, as I understand it,

15   as cited by the vacated Ramos decision.  Is the review based on

16   the merits of the individual situation, or is it a broad

17   challenge?  Is the administrative record for a single

18   decision -- does that have any relevance?  Is that needed in

19   the determination?

20        And is examination peculiarly within the agency's special

21   expertise or integral part of its institutional competence?  I

22   mean, those are some factors that you looked at to determine

23   whether it's -- that a determination is really collateral to

24   that.

25        And so here, if we look at the whole question of vacatur

1    -- not necessarily the determination, but just the vacatur of

2    the 2023 extension -- that question seems to be a matter of

3    statutory interpretation by each side and whether or not the

4    statutory framework of the TPS statute allows -- has implicit

5    authority or not.

6        That doesn't sound like the kind of determination of

7    country conditions that the Ramos case was referring to.  And

8    if you look to the reasons justifying the vacatur, again, they

9    were not so much based on analysis of country conditions but

10   really sort of what was done by Secretary Mayorkas before was

11   so novel and perhaps inconsistent with the TPS statute, as was

12   mentioned, and maybe, you know, ultra vires or whatever.

13       But, again, it didn't seem to be based on country

14   conditions or anything akin to that, and so the record that you

15   would look to, the agency expertise about evaluating country

16   conditions and the safety of the return of folks doesn't seem

17   to be at play here.

18       So it seems to me, although this case is a slightly

19   different question that's being raised than Ramos, the

20   framework, if we were to accept Ramos, at least the majority

21   opinion would suggest that 1254(b)(5)(A) would not bar, because

22   this is not a, quote, determination within the meaning of that

23   statute.

24       So I'm going to let the Government respond first.  Then

25   I'll give you a chance to respond, Mr. Arulanantham.

1          MS. VUONG:  Your Honor, I think we need to look -- to

2    go back to the text of the jurisdictional bar at 1254a(b)5(A).

3    And the language is any determination of the attorney general

4    with respect to a designation or termination or extension, and

5    that "any" has a broadening effect of the word "determination."

6          Since the last time we were here arguing this statute, the

7    Supreme Court has weighed in again in the Patel case, Patel v.

8    Garland, and has stated that "any" does have a broadening

9    effect to the next word, to that determination.  And so here,

10   where the statute provides inherent authority to revisit

11   decisions, the decision by Secretary Mayorkas had not even gone

12   into effect.

13         Secretary Noem came and was able to relook at that

14   decision and determine that it didn't -- that it didn't meet

15   the statutory needs.  She noted -- she did note that she was

16   re-looking at it not only to untangle confusion and provide an

17   opportunity for informed determinations -- or sorry.

18         Not only to untangle confusion, but to provide herself.

19   She gave herself the space to make an informed determination

20   regarding the TPS designation and then clear guidance from the

21   President that she was to look -- the guidance being that she

22   was to look at these designations and determine if they met the

23   statutory requirements of the TPS statute.

24         So I'm mixing arguments here, but the inherent authority

25   to issue the vacatur is then swept up -- once she makes that

1    decision to vacate the extension, that decision is then swept

2    up under 1254a(b)(5)(A) as any determination, as one of the

3    determinations --

4         THE COURT:  Well, the one you're reading, if the bar

5    of 1254 is so broad, we wouldn't even reach the question of

6    whether she had authority or not.  We wouldn't even reach the

7    question of whether what she did was reasonable.  There would

8    just be no review, that whatever she did, no review, period.

9         MS. VUONG:  I think the Ninth Circuit in Ramos and

10   yourself indicated you could look at legal questions

11   surrounding the interpretation of the statute.

12        THE COURT:  Okay.  So you could have judicial reviews

13   as to the -- construing the statute, for instance, in

14   determining whether or not there was implicit authority or not?

15        MS. VUONG:  Yes, Your Honor.

16        THE COURT:  Okay.

17        MS. VUONG:  But then once you look to determine that

18   the statute does provide that inherent authority, implicit

19   authority, from there, the decision itself and the evidence and

20   decision-making by the Secretary, then you look at the language

21   of the statute and note that, and it is a determination

22   relating to in this case an extension.

23        THE COURT:  Okay.  So as I understand it, you would

24   concede that looking at the statutory question, the first

25   question of whether there was implicit authority under the

1    statute, which is a matter of statutory interpretation, is

2    within the realm of what this court can do.

3        But if then I were to find that there was authority to do

4    so, the way she exercised it, the reasons why she exercised

5    it -- that's where the bar on judicial review would apply.

6    It's like a determination of a country condition.  It's

7    determining --

8            MS. VUONG:  Correct.  It falls within the same sort of

9    analysis in what the Secretary can look at, and that is open

10   for the Secretary.

11           THE COURT:  Okay.  And --

12           MS. VUONG:  And it's not -- I mean, it's not the first

13   time that a vacatur has occurred.  As we point out, Secretary

14   Mayorkas did the same thing when he reconsidered and vacated

15   the four terminations that were at issue.

16           THE COURT:  But it's the first time in 35 years that a

17   vacatur has been used to terminate an extension or a

18   designation.

19           MS. VUONG:  It's the first time that a vacatur has

20   been used to vacate an extension, correct.  But that's a

21   results-oriented analysis.  If the statute provides authority,

22   the statute provides authority for a secretary --

23           THE COURT:  Well, it might.  And I don't know how

24   relevant it is that it's never been exercised until Secretary

25   Mayorkas did it in the other direction, that is to vacate the

1    termination, which effectively extended it, and now this time

2    to vacate an extension, which effectively terminates it.

3            MS. VUONG:  Correct.

4            THE COURT:  Whether that agency practiced for -- up

5    until that point for 30-something years is informative of an

6    interpretation perhaps, but clearly, until the last couple of

7    years, it's no secretary has ever done that, right?

8            MS. VUONG:  Correct, not until --

9            THE COURT:  In either direction?

10           MS. VUONG:  In either direction, Your Honor.

11           THE COURT:  Well, let's talk about the -- since

12   everybody agrees that we should first determine that it is

13   appropriate for this court to determine whether or not there is

14   this inherent authority to revisit, again, I take it there's no

15   direct cases on point.  We're trying to discern from this

16   statute --

17           MS. VUONG:  No, Your Honor.

18           THE COURT:  -- the rule.

19           MS. VUONG:  Not on this statute.

20           THE COURT:  Yeah.

21           MS. VUONG:  We do point to other cases that note if

22   there's no rubric explaining how a decision can be

23   reconsidered, then that authority is implicit in the statute.

24   And I know that Plaintiffs say, "Look, the statute lays this

25   out.  It's 60 days, and you have to look at" -- you can't

1    revisit a decision if you're not within those 60 days, and this

2    extension has already taken place.  The 60-day language from

3    the statute refers to the termination.  It doesn't refer to

4    anything else.  So this was not a termination.  This was a

5    vacatur that allowed her to then follow the statute for the

6    termination.

7         THE COURT:  Well, let's look at that.

8         MS. VUONG:  Sure.

9         THE COURT:  So the statute does specify that once

10   there's been a designation, it's supposed to be reviewed

11   periodically, no later than 60 days before the end of that

12   designated period, and if the attorney general determines that

13   the foreign state no longer meets the conditions for

14   designation, then the attorney general shall terminate the

15   designation by publishing a notice, and the effective date of

16   the determination is either 60 days after that notice is

17   published or, if later, the expiration of the most recent

18   previous extension under the subparagraph.

19        So in other words, you can't terminate.  Now, I'm not

20   talking about vacate, but you can't terminate midstream.  You

21   have to at least take it to the end of the period, and the

22   periods are either 6 months, 12 months, or up to 18 months.

23   That's within the discretion of the Secretary in the first

24   place for designating.

25        But there is no ability to terminate prior to that.  You

1     can do the notice, give notice of termination even months,

2     several months in advance, but the effective date can't be

3     until -- at the earliest would be the expiration of that

4     period, the original period.

5             MS. VUONG:  That's correct, Your Honor.

6             THE COURT:  So why isn't the Secretary Noem's vacatur

7     of the extension effectively -- how is it any different from a

8     termination?  I mean, what's the difference?

9             MS. VUONG:  The difference is that the vacatur allowed

10    her to then look at the country conditions in Venezuela and

11    determine whether that second piece of the statute comes into

12    play, because you do have to look at the language of what

13    Venezuela was designated under, and it was designated under the

14    extraordinary and temporary conditions subsection.

15        But that subsection continues to say -- if I can find it

16    -- "if it's not contrary to the national interest."  And so

17    that's what Secretary Noem was doing.  So the vacatur allowed

18    her -- the vacatur gave her the space -- I keep saying that,

19    but it gave her the time to fit within the timeframe that the

20    statue permits.

21            THE COURT:  But if you step back, the effect of the

22    extension in 2023 was to give folks, both under the 2021 and

23    2023 designations, until -- what is it?  September or October

24    of '26, correct?

25            MS. VUONG:  Yes.

1          THE COURT:  And so by vacating and then deciding she

2   could terminate, some folks would not have the benefit.  So it

3   does shorten -- it could shorten the period.  So it is in

4   effect an early termination.  At the end of the day, that's

5   what's happening.

6          MS. VUONG:  Secretary Mayorkas made that determination

7   in January, and Secretary Noem came in, I think, maybe ten days

8   later.  So I think most individuals understood that TPS had an

9   end date of April 7th -- or sorry -- of April 2nd if they were

10  under the 2023 re-designation.

11     So the reliance interest there was the ten days between --

12  the ten days to two weeks between Secretary Mayorkas's

13  extension and Secretary Noem coming in and vacating that

14  decision.

15         THE COURT:  Well, we'll talk about the reliance

16  interest in a moment, but I'm just trying to ask as a matter of

17  sort of statutory construction.  If Secretary Noem could not

18  have terminated earlier than the date of the extension date,

19  how could she use the tool of vacatur and then termination to

20  essentially effectuate an earlier termination date?  I mean,

21  that's the upshot of all this.

22         MS. VUONG:  Yes, Your Honor.  Because she used that

23  periodic review language, and it says that the Secretary may

24  periodically look at the conditions, look and determine whether

25  or not that extension or that designation, those conditions

1    still exist.

2         And so in that periodic review, she determined that

3    because the reregistration periods were overlapping, because

4    she wanted to look at the conditions in Venezuela and determine

5    whether or not the Venezuelan TPS designation -- sorry -- the

6    re-designation met the standards of whether or not -- I'm

7    sorry -- whether or not the extraordinary temporary conditions

8    still existed and if it was contrary to the national interest,

9    that periodic review allowed her to go back and look at that

10   extension.  And then she was within --

11             THE COURT:  Well, it --

12             MS. VUONG:  -- the time frame to terminate.

13             THE COURT:  -- just seems to me it's still the same

14   thing in substance.  At the end of the day, it's an earlier

15   termination than had otherwise been granted prior, and whether

16   you call it a straight termination or a vacatur followed by a

17   relook and then a termination, then that effect is the same.

18   And to use Justice Gorsuch's word, this looks like a clever

19   workaround.

20             MS. VUONG:  Well, and I go back to Mayorkas' own

21   language that notes that the TPS statute does not limit the

22   Secretary's inherent authority to reconsider any TPS-related

23   determination and upon reconsideration to change the

24   determination.

25             THE COURT:  Right.  Well, that's one secretary's

1    interpretation of the statute.  It may be right; may be wrong.

2    Let me ask --

3            MS. VUONG:  Well, it's both secretaries'

4    interpretation of the statute.

5            THE COURT:  Well, there's two of them.  On the other

6    hand, we've got the statute.  And doesn't -- even as a matter

7    of statutory interpretation, putting aside whether this is a

8    workaround or not.

9        Where a statute sets forth temporal expectations and time

10   blocks and had specific markers, doesn't that suggest that an

11   agency can't use whatever implicit or -- implicit authority to

12   contravene that, that is to do something -- it is contemplated

13   that there are clear time markers set forth in the TPS statute,

14   and to take actions that effectively shorten the time seems

15   like that's something that's not within the power of the agency

16   to do once Congress had set forth temporal expectations and

17   markers.

18           MS. VUONG:  Well, I will note that the extension

19   hadn't gone into effect.  If you look at the language of the

20   extension itself, it says, "This goes into effect on April

21   3rd."  And so that is the decision that the Secretary is

22   reviewing and reconsidering.  The vacatur had already gone into

23   effect, but the extension had not.

24       And so I go back to the statement that individuals were --

25   under the 2023 designation and extension, these

1    individuals under -- or sorry.  I'm getting all confused.

2        The April 2nd deadline was one that individuals who had

3    registered for TPS under 2023, under the '23 designation --

4    they understood that to be the end of TPS.  So then we have the

5    ten-day period where Mayorkas extends.  But we can't ignore the

6    fact that a new administration is coming shortly thereafter.

7        And so I think those ten days to two weeks end the

8    reliance interest there, and Secretary Noem recognizes that.

9    That's overcome by what she finds to be the national interest

10   concerns that she points out in her termination.

11       THE COURT:  All right.  Let me hear the response to

12   the argument that there is -- there was no violation of the

13   statute, the time frame of the statute, since this was a

14   vacatur, and the Secretary gave herself time before making a

15   termination decision so it's not synonymous, and also the

16   argument that there was -- the extension by Secretary Mayorkas

17   was not effective, and therefore, I guess the argument is there

18   was no real termination.

19       MS. BANSAL:  Thank you.  Good morning, Your Honor.

20   Jessica Bansal.

21       THE COURT:  Yes.

22       MS. BANSAL:  So I'll begin with the argument that

23   because the vacatur was made within the 60-day period, it

24   somehow didn't violate the fixed time terms of the TPS statute.

25   Your Honor, that's incorrect under the statute, subsection

1    (b)(3)(B) that says that a termination cannot take effect

2    earlier than 60 days after publication of the termination

3    notice or, if later, the expiration of the most recent previous

4    extension.

5        And so when Secretary Mayorkas determined on January 17th

6    that the conditions for Venezuela's TPS condition continued to

7    be met, that determination under the statute triggered an

8    extension.  The extension flowed from that determination.  And

9    once that extension was on the books, this fixed time period

10   set forth in the statute controls when a termination can take

11   effect.

12       THE COURT:  So the -- which section do you cite to for

13   the proposition that once the determination by Secretary

14   Mayorkas was made, that triggered the extension at that point?

15       MS. BANSAL:  Your Honor, in subsection (b)(3)(C) of

16   the statute, provides that if the Attorney General does not

17   determine that the foreign state no longer meets the

18   conditions, and so on January 17th, Secretary Mayorkas

19   determined that not only did it not no longer meet the

20   conditions, he made an affirmative determination that

21   conditions continued to be met.

22       Under the statute, the period of designation of the

23   foreign state is extended.  If you look on the January 17th

24   notice also, Your Honor, we disagree that that notice was not

25   effective until April 3rd.

1       The extension of work permits and lawful status began on

2   April 3rd, but that January 17th notice says that TPS holders,

3   for example, can show that notice to their employers with their

4   EAD with that August 2 -- April 2nd expiration date, as of

5   January 17th, and the employer can take that to mean that their

6   employment authorization is extended.

7       It also opened registration to apply to extend your TPS

8   through October 2nd, 2026, on January 17th.  So that notice did

9   take effect immediately, both under the statute and its own

10  terms, Your Honor.

11       THE COURT:  And then I guess that stands in contrast

12  to part B, which determination that has time deadlines.

13  There's a sort of breathing period that is you have to give at

14  least 60 days' notice before it's effective or, if later, the

15  expiration of the previous extension period, whereas subsection

16  (c) regarding the extension of the designation is simply -- is

17  extended.  It doesn't say 60 days later, etcetera.

18       MS. BANSAL:  That's correct, Your Honor.  The

19  extension is effective immediately.

20       Another point I'll make is that the, you know, TPS holders

21  who are covered under the 2023 extension -- you know, my

22  friend, opposing counsel, said that they knew their TPS would

23  end on April 2nd.  That's not correct.  They knew that a new

24  decision was required within 60 days before April 2nd, and they

25  knew what conditions in Venezuela were.

1       And so they knew a new decision would be coming, but they

2       weren't anticipating -- there wasn't a termination of Venezuela

3       that was set to take effect at that time.

4               THE COURT:  All right.  What about -- what about the

5       other argument that, you know, it was not a termination, that

6       this was a vacatur?

7               MS. BANSAL:  First, Your Honor, under Gorbach, Ninth

8       Circuit decision in Gorbach, and China Unicom just a few months

9       ago, as Your Honor stated, where a statute provides a specific

10      process to alter an authorization, here the designation -- that

11      negates an assertion.

12              THE COURT:  I'm sorry.  Say that again.

13              MS. BANSAL:  Where a statute provides a specific

14      process to alter the designation, that negates an assertion of

15      implied agency authority.

16          I'd just also mention that as Your Honor mentioned,

17      neither of those cases discuss the TPS statute, but Gorbach

18      does address one other statutory provision the Government

19      points to, which is 8 USC 1103(a), a sort of broad enabling

20      statute that sets forth the Secretary's powers and

21      responsibilities.

22          And they say that that is not a source of implicit

23      reconsideration authority and that because in Gorbach, the

24      question was whether the Attorney General had authority to

25      denaturalize a person where she had evidence that the

1    naturalization was based on a fraud or material

2    misrepresentation.  And the Court said no because the statute

3    sets forth a process for naturalization, and that exhausts the

4    field.

5        Similarly here, Your Honor, the TPS statute has a process

6    for altering a TPS designation, and that process is

7    inconsistent with an assertion of implicit authority to

8    reconsider, and the fixed time period also is another separate

9    factor.

10        THE COURT:  When you say "the process," that's the

11    process for periodic review?

12        MS. BANSAL:  Yes, Your Honor.  The process in

13    subsection (b)(3) of the statute, the periodic review, it says

14    when the decision has to be made, it requires consultation.  It

15    says how and when the decision has to be published.  It says

16    the bases, the permissible bases for a provision, and it says

17    when the options are.

18        And the options are to extend or to terminate, Your Honor.

19    There is no vacatur.  Under Gorbach and China Unicom, that

20    process exhausts the field, and that process negates an

21    assertion of implied agency reconsideration authority.

22        We also cite, Your Honor, a D.C. Circuit case that

23    involves a similar statutory scheme from 2023.  It's NRDC

24    versus Regan.  That was a case that addressed whether the EPA

25    had authority to reconsider its determination that a certain

1    contaminant in drinking water should be regulated.

2         It's similar because the EPA there had a lot of discretion

3    at the outset to determine whether regulation was appropriate,

4    but once it made that determination, it triggered certain

5    things under the statute.  And so the Court held to allow the

6    EPA to reconsider its determination, just wipe it from the

7    books, contravened the statute, because under the statute, the

8    determination triggered -- certain things flowed from that.

9         The same with the TPS statute, Your Honor.  Secretary

10   Mayorkas' determination that conditions for the designation

11   continued to be met triggered an extension, and under the

12   statute, TPS could not be terminated before the expiration date

13   for that extension.  So to allow the vacatur here would

14   contravene both those protections in the statute.

15        THE COURT:  And what's your response to the

16   argument -- we're going to need to take a break here in a

17   moment because the Court reporter's been going at it.

18        But what's your response to the need -- if an emergency

19   arises, a national emergency arises, that the Government and

20   the Secretary needs flexibility, and that's why one should

21   apply some additional authority beyond that that's prescribed

22   in the TPS statute?  What's your response to that?

23        MS. BANSAL:  A few things, Your Honor.

24        One is that Congress has provided a means in the TPS

25   statute for the Secretary to address national security issues,

```
 1     and it is not to vacate a TPS extension for 600,000 people.
 2     Under subsection (c)(2)(B), if an individual -- if the
 3     Secretary determines there are reasonable grounds to regard an
 4     individual as a danger to the security of the United States,
 5     that individual is not eligible for TPS, and that individual's
 6     TPS may be withdrawn.  That's the mechanism Congress has
 7     provided to the Secretary.
 8          The second point I would say, Your Honor, is that if you
 9     look at the vacatur and the Government's arguments in the
10     brief, the vacatur, as you noted, is based on problems, alleged
11     problems with the filing process.  Vacatur is not based on
12     national security issues.
13          And the last point I'd make, Your Honor, is that China
14     Unicom, which sets forth this rule that where the statute has a
15     specific procedure that exhausts the field, that's a case where
16     the agency was asserting reconsideration authority based on
17     national security grounds, and so there's not a different rule
18     in that context.  Even if the agency is asserting national
19     security or some other important interest, they still have to
20     follow the law.
21          THE COURT:  All right.  Let me give you a brief
22     chance, and then we're going to take a break, and then we're
23     going to continue after we give the Court reporter a chance.
24          MS. VUONG:  Sure, Your Honor.  I do want to go back
25     and note that the extension itself explicitly says that it
```

1    doesn't go into effect until April 3rd, 2025.  So I understand

2    Plaintiffs would like for it to have gone into effect

3    immediately, but the language itself in the RFN explicitly

4    gives the effective date.

5        And just because it allows people to reregister, that

6    makes sense as a practical matter so that there would be no

7    break in their employment authorization documents.

8            THE COURT:  What does effective date mean?  Doesn't

9    that mean that because there was already a designation

10    extension, that this --

11            MS. VUONG:  Correct.

12            THE COURT:  -- becomes -- but that doesn't mean it

13    doesn't have any operative effect?

14            MS. VUONG:  It has operative effect, but it's not

15    going to do anything until April 3rd.  People can reregister,

16    and they can have their employment documents teed up so that

17    they can continue working, but that extension -- it doesn't go

18    into effect until April 3rd.

19            THE COURT:  So you're saying that at the very least,

20    the Secretary has the ability to vacate an action if it's not

21    in effect at the time of the vacatur?

22            MS. VUONG:  Yes, Your Honor.

23            THE COURT:  And is there case law that draws that

24    distinction, that keys it to the effective date?

25            MS. VUONG:  Not that I'm aware of, but that is also

1    what Secretary Mayorkas relied upon when he vacated the

2    termination decisions.

3        I would also point out that it is contrary to the statute

4    to say that a secretary cannot come in and look and determine

5    if there's a national interest concern.

6        THE COURT:  Well, they can, but it does so in the

7    process of designating, you know, whether or not a TPS status

8    is warranted under subsection (c).

9        MS. VUONG:  Well, different administrations are

10   permitted to come in with different goals and different

11   policies as long as they're within the confines of the statute.

12   And here, the statute provides a periodic review.  So the idea

13   that the Secretary would have to wait a year and a half before

14   she could make what she feels is a concerning decision against

15   the national interests of the United States is contrary to what

16   the language of the statute itself says.

17       THE COURT:  Well, I'm not so sure about that.  The

18   language in the statute says even considering where TPS status

19   is granted in part because of concerns about national interest.

20       By the way, it says "national interest."  I'm not sure how

21   that's different from national security, but national --

22       MS. VUONG:  National interest.

23       THE COURT:  -- national interest to the United States.

24       MS. VUONG:  Yes.

25       THE COURT:  It still says that to terminate, you've

1    got to follow (3)(B), and there was no exception to say, well,

2    if it's -- the designation is made under (b)(1)(C) in the

3    national interest, then that can be advanced or something.

4    There's nothing that says that.

5          MS. VUONG:  I'm sorry.  Could you say that again?

6          THE COURT:  Nothing in the statute allows an

7    advancement of the termination right where the designation is

8    based on (b)(1)(C), national interest.  It makes no

9    distinction.  It just says you've got to do it, you know,

10   during these periodic reviews, etcetera, etcetera.

11         MS. VUONG:  Correct, Your Honor.  That's why we argue

12   it's inherent in the statute.  It's not explicit in the

13   statute.

14         THE COURT:  All right.  When we come back, I do want

15   to address the reasons for the vacatur and the question of

16   whether there's a review of that, assuming that there is

17   authority to vacate.  I think the secondary argument is that it

18   was still wrongful to do it.  Obviously if I were to find, as a

19   matter of statutory construction, that there was no power, we

20   don't even reach that question.  And then I do want to address

21   the equal protection matter.

22       So we'll take a 15-minute break for our court reporter,

23   who's been going at it.  Thank you.

24         THE COURTROOM DEPUTY:  Court is in recess.

25                    (A recess was taken.)

```
 1            THE COURTROOM DEPUTY:  Court is back in session.
 2            THE COURT:  All right.  Thank you, everyone.  Please
 3    have a seat.
 4        Okay.  I want to address the question if we assume that
 5    there was the power to reconsider and issue a vacatur, then the
 6    next question is is there a review over that decision, and if
 7    so, was there a problem with that decision such that a stay of
 8    that vacatur -- or not stay, but a postponement of that vacatur
 9    is warranted.
10        So again, we revisited the question of whether the
11    decision to vacate the extension is reviewable, and I guess I
12    start with the same sort of point that if you look at the
13    factors that the Court considers, you look at whether -- you
14    know, how much of this was based on individual analysis,
15    individual records, how much was based on examining things that
16    are within the agency's expertise such as examining country
17    conditions and assessing reports from the State Department from
18    various agencies, or is it more procedural?
19        And it does seem here that the reasons for the vacatur --
20    or vacatur -- I don't know how to pronounce that.  I'll call it
21    vacatur.  It's easier.
22        Whether that is something more collateral than sort of
23    central to what the statute -- to what section 1252 is about --
24    or 1254(b)(5)(A) or (B) is about.  And so, again I'll turn to
25    the Government.  It does seem to me that these were not
```

1    decision based on an assessment of country conditions, based on

2    foreign relations and this sort of thing, but really kind of

3    looking at procedurally whether Secretary Mayorkas essentially

4    screwed up and caused confusion, did something in violation of

5    the TPS statute, created a sort of procedural problem that

6    needed to be fixed.

7        Putting aside the merits of that, isn't that the kind of

8    thing that is not necessarily within the agency's expertise and

9    doesn't depend on the records of individual TPS beneficiaries

10   or specific facts about the country?  It could have been about

11   any country.  I mean, it didn't have to be about -- if he had

12   done the same thing with Haiti or El Salvador, the same

13   arguments would be made.

14       So it doesn't seem to even be related to the country.

15   It's more about the process.  Isn't that the kind of thing that

16   is reviewable?

17            MS. VUONG:  No, Your Honor.

18            THE COURT:  All right.  Tell me why.

19            MS. VUONG:  Looking at the vacated decision from Ramos

20   v. Wolf, the Ninth Circuit talks about the merits of these

21   decisions, and those merits aren't reviewable.  And here,

22   looking at registration, that's a discretionary function of the

23   statute.  The statute gives the Secretary the discretion to

24   determine how registration takes place and when.  And so

25   Plaintiffs are correct that these overlapping registrations can

1    take place, but that's within the discretion of the Secretary

2    on how that registration should take place.

3        So here, the Secretary herself has that knowledge and that

4    ability, that the statute gives her that ability to determine

5    whether or not, in her discretion, she thinks this is the way

6    that the registration should be taking place, and she uses that

7    to decide to vacate the decision extending TPS for Venezuela.

8        And if you're looking for the statutes that I'm

9    discussing, it's 1154(c)(1)(A), sub-Romanette iv, which says,

10    "To the extent and in a manner which the Secretary establishes,

11    the alien registers for temporary protected status under this

12    section during registration period."

13        And I believe there's another.  The period of validity is

14    subsection (d)(2).  The Attorney General may stagger the

15    period's ability of documentation and authorization.  So both

16    of those statutes are discretionary in how the Secretary sets

17    up the registration periods.

18        THE COURT:  So it's funny.  It depends on who's

19    arguing what.  To the extent that there's an argument that any

20    secretary, including Secretary Mayorkas, had the ability to

21    determine the manner of registration and to stagger periods,

22    etcetera, etcetera, there's an argument that that was committed

23    to his discretion in his initial.  But then you're saying that

24    if vacatur revisiting is within the inherent power of the next

25    secretary, she also has the same power to exercise her

1    discretion in changing the manner of registration, etcetera,

2    etcetera?

3              MS. VUONG:  That's correct.  And I go back to the

4    statement I made before that the Supreme Court has recognized a

5    couple times, that it's hardly improper for an agency to come

6    in and change their policy preferences and ideas and work

7    within the confines of the statute to make those changes.  And

8    that's Motor Vehicles Manufacturers Association where Rehnquist

9    was concurring and also Department of Commerce v. New York,

10   where the Supreme Court made that same statement.

11        So here, it's true that she doesn't make an analysis of

12   the country conditions, but she does make an analysis under the

13   statute of how the statute should operate.  And again, that

14   vacatur permitted her to then have space to look at the

15   national interest of the United States and the factors on the

16   ground and determine --

17             THE COURT:  But wouldn't that argue that -- I don't

18   see why you couldn't have judicial review, but that judicial

19   review might be deferential if there's some discretion

20   committed to the agency.  That doesn't mean there's no review.

21   I mean --

22             MS. VUONG:  Well, the statute --

23             THE COURT:  Yeah.

24             MS. VUONG:  The statute does say "any determination

25   relating to."

1          THE COURT:  But it's not a -- if we go back to what

2      determination means and at least has been opined in the

3      now-vacated Ramos decision but which drew, you know, some

4      support from McNary and other cases, there is some framework

5      for determining what is a, quote, determination, and what's

6      collateral, what's procedural.

7          This still sounds very procedural.  I mean, how are you

8      going to do the registration?  Will you stagger them, etcetera,

9      etcetera?  It's not really are conditions really, you know,

10     adverse in a particular country.  So it still sounds like the

11     kind of thing that's not within the determination as used by

12     the TPS statute.

13         MS. VUONG:  And to that, I respond that when looking

14     at McNary, it was a determination, and it was of an

15     application, where this is any determination, which in Patel,

16     the Supreme Court recognized under, true, a different statute,

17     but any judgment regarding a -- there are a couple provisions

18     that the judge was regarding.  And using that any, they found

19     that any broadened what those judgments were.  It wasn't just

20     the final judgment itself.  It was the factual underpinnings.

21         THE COURT:  All right.  Let me hear the response to

22     that, that with respect to whether or not there should be

23     judicial review, that should be informed by the kind of

24     discretion as to the how and the manner and the extent language

25     of (c)(1) Romanette iv and (d)(2).

1          MR. ARULANANTHAM:  Yes, Your Honor.  And just to be

2     clear, I'm discussing jurisdiction.  Ms. Bansal will discuss

3     the merits.

4          THE COURT:  Yeah.

5          MR. ARULANANTHAM:  I realize they're bleeding a little

6     bit, but we'll switch over in a minute.

7          THE COURT:  Okay.

8          MR. ARULANANTHAM:  With the Court's permission, I just

9     want to just mention two things briefly before I answer that

10    question.  One is that on the question of whether the January

11    17th extension went into effect or not, I just want to point

12    out in this record, already there's evidence that two of the

13    plaintiffs, Freddy Rivas, and Mariela Gonzalez both already got

14    an extension for employment authorization of 540 days under the

15    January 17 extension.

16         And I'm sure they're not the only ones, and I think what

17    that shows is that effective date is a reference to when the

18    18-month period starts.  But it obviously doesn't mean that the

19    extension wasn't in operation yet.  And for them, the reliance

20    interest is very real.  Right?  They are holding a document.

21    They're still holding it today which says, "I can work in this

22    country for the next 540 days," and now they're saying, the

23    Government is saying that document facially, on its face, is

24    actually invalid.  So just on that --

25         THE COURT:  All right.  So it was operative?  Whether

1    you call it in effect, it was actually operative?

2          MR. ARULANANTHAM:  Exactly.

3       Now, the second just preliminary point I want to make is

4    we're all talking about these jurisdictional issues as though

5    the Ramos majority decision were correct, which sort of makes

6    sense as to their concession on the vacatur authority points,

7    because the Court held that a claim that agency -- that the

8    agency has adopted an erroneous interpretation of the statute

9    is reviewable under McNary because the analysis goes to the

10   review of the law itself and not the determination.  I

11   understand that's the distinction Your Honor is drawing now.

12      But I just want to put a pin in the fact that if it ever

13   comes to, you know, down the line -- you know, our view is that

14   Your Honor's decision, and also the dissent, is a better

15   reading of the jurisdiction-stripping statute.  I don't think

16   it actually matters for either claim, which I'll get to in a

17   second.  I just want to put in a pin in that.  We're not

18   conceding it.

19      The reason why the second claim is reviewable is actually

20   for a reason that was not discussed at all in Ramos, in any of

21   the opinions in Ramos.  And that's because --

22          THE COURT:  When you say the second claim --

23          MR. ARULANANTHAM:  I mean the challenge -- our

24   challenge to the reasons given for the vacatur.

25          THE COURT:  Okay.  Yeah.

1          MR. ARULANANTHAM:  It's because the statute says

2     there's no judicial review of any determination with respect to

3     designation provision under this subsection.  And under this

4     subsection, that's subsection (b) of the statute, which is what

5     has all the rules for designations, terminations, and

6     extensions.  And that doesn't apply to our second -- our claim

7     on the merits of the vacatur for two reasons.

8          First, vacatur is not one of these things.  You know, it

9     lists the three things -- designation, termination, extension.

10    Doesn't say vacatur.  Obviously that dovetails with our merits

11    claim that there is no vacatur, but as far as construing the

12    jurisdictional statute, does it bar determinations made in

13    vacaturs?  No, because it doesn't say vacatur in it.

14         And the second reason why, Your Honor, is because the

15    defects that the Secretary pointed to have to do with the

16    registration process.  And as Your Honor was just noting, I

17    think the Government said today that Secretary Mayorkas could

18    have had the discretion, did have the discretion, to set up

19    whatever registration period he wanted, and there was some back

20    and forth about that.

21         But either way, what you're talking about is the

22    registration process, and the registration process is discussed

23    not in this subsection, not in subsection (b), but in

24    subsection (c).  And so this stripping provision does not cover

25    determinations that have to do with the registration process.

1    The registration process is in a different subsection of the

2    statute.

3        And so regardless of these other distinctions that were

4    drawn and, you know, what is collateral and what's direct and

5    all that, the subject matter of the stripping provision is

6    focused on country conditions, the things that are at the core

7    of whether you decide, when the Secretary decides, "Am I going

8    to extend, or am I going to terminate?"

9        These registration issues are totally different.  They

10   have to do with how you administer the statute.  Once you've

11   decided you are going to extend, then you have to set rules for

12   how you let people register.  And that part, Congress did not

13   mean to strip.  So our interpretation of the statute is that

14   any APA claim that has to do with registration is cognizable

15   because the statute didn't strip it.

16       And our claim on the merits, Your Honor, is that -- I'm

17   just going to describe it.  I'm not going to defend it.  But

18   the claim on the merits is that the reasons that the Secretary

19   gave for why she had to vacate this are arbitrary, in violation

20   of the APA.  She said that there was something with

21   consolidating the registration period, which I think is the

22   opposite of what Ms. Vuong said today.  She seemed to be saying

23   today there's nothing wrong with it.

24       You know, but either way, our position is that was -- it

25   was wrong.  It was wrong to say that there's something wrong,

1    that there's something illegal or untoward or odd about

2    consolidating registration process.  You know, Ms. Bansal will

3    talk about the merits, but whether we're right or wrong about

4    that, that's what our claim has to do with.  It has to do with

5    the reasons for validity she gave for attacking the -- you

6    know, the extension.

7         And the reason she gave had to do with this dispute about

8    whether you can consolidate them or not.  So that is not within

9    the terms of the stripping statute.

10        THE COURT:  Well, let me ask you.  With respect to the

11   stripping statute, in your point about it pertains -- 5(A) only

12   pertains to designation, termination, or extension of the

13   designation and not vacatur.  So you're not making the argument

14   that the vacatur here was in effect the de facto termination?

15        MR. ARULANANTHAM:  It definitely had the effect of

16   taking away the extension, but it is not a termination.  I

17   mean, it's not styled as a termination.  She said, "Oh, we're

18   going to make that decision later," and then three days later,

19   then they issued the termination.

20        THE COURT:  All right.  So there's not a literal

21   violation of the statute which sets forth this process and

22   effective date of any, quote, termination, but that is -- it's

23   an argument for statutory construction?

24        MR. ARULANANTHAM:  Well, I mean, our merits argument

25   is that any action, however you style it, that shortens the

1     period of an extension after the extension has been made is a

2     violation of the statute.  But the way in which they did it --

3     so our argument is it is definitely functioning to, you know,

4     shorten an extension, which is a violation of the statute.  But

5     the document in which they did it is not an extension.

6          They're saying there's a separate kind of document not

7     mentioned in the statute called a vacatur that we have implicit

8     authority to do, even though it's not mentioned here.  And my

9     point is -- obviously we don't think that's true on the merits,

10    but what my point is -- if you say that there's extra-statutory

11    implicit authority in the common law of agency decision-making

12    to do these vacaturs, well, then where in the stripping statute

13    does it say that a court can't review what's inside those

14    things?  And it doesn't say that.

15         THE COURT:  Well, because if you equate the functional

16    equivalent of termination with vacatur, then, I mean, you sort

17    of have to -- it's a thin line.  For one purpose, you're saying

18    they're kind of the same.  They're functioning the same.  For

19    another purposes, well, the statute doesn't use that

20    terminology, so they're different.

21         MR. ARULANANTHAM:  Yes.  I think what I would -- how I

22    would try and draw the line is I would say a vacatur is -- a

23    vacatur that has the effect of shortening an extension is

24    unlawful.  But the reason it's unlawful is because it violates

25    this provision of the statute, which says that extensions --

1     you know, what Ms. Bansal was talking about -- extensions are

2     -- last until the end of the time, which is what.

3          The Government's argument for why the stripping statute

4     covers this is based on this hyper-literal reading of this

5     statute.  They say it's "any" and not "a."  They say with

6     respect to, not, you know, regarding or something.

7          And I'm saying if you're going to take that seriously and

8     ignore McNary -- you know, ignore the, you know, mountain of

9     Ninth Circuit cases that treat determination as a term of art

10    and just focus on the words, my question is where in the

11    statute does it say that the Court has no authority to review a

12    vacatur, any argument, any determination in a vacatur?  And it

13    doesn't.

14              THE COURT:  All right.

15              MR. ARULANANTHAM:  I should say also, I mean, they --

16    I heard them to concede that statutory claims are reviewable,

17    which is what the two judges in the Ramos majority thought as

18    well.

19         So I'm -- you know, I think it sounds like we're all in

20    agreement about that.  But I'm saying this because it's

21    relevant to our second claim as well.  I think any claim

22    involving a vacatur, even if it would otherwise, you know, not

23    be collateral, should be reviewable because vacaturs are not

24    mentioned in the statute.

25              THE COURT:  All right.  So let's talk about if I were

1    to find to find reviewable -- first of all, that there is

2    authority to do a vacatur, and second of all, that it is

3    reviewable, what about the merits?  Is it arbitrary and

4    capricious here?

5         MR. ARULANANTHAM:  Thank you, Your Honor.

6         THE COURT:  And as I understand it, one of the reasons

7    is that sort of the criticism of, you know, allowing an

8    extension or subsequent designation to sort of subsume earlier

9    ones is somehow inappropriate, but that your view is that

10   that's not all the time.  Every time you redesignate, there is

11   some assumption going on?

12        MS. BANSAL:  That's correct, Your Honor.  So in the

13   35-year history of the program, there have been approximately

14   36 re-designations, and each subsumed an earlier designation.

15   That's the purpose of a re-designation, is to expand the pool

16   of eligible beneficiaries.

17        So under the statute, to be eligible for TPS in subsection

18   (c), you have to show that you've been continuously physically

19   present since the most recent extension of your country.  And

20   so when a country is redesignated, that date gets pushed up.

21   So for Venezuela to qualify under the 2021 designation, an

22   applicant had to show they've been continuously here in this

23   country since March 2021.

24        Then when Venezuela is redesignated in October 2023, that

25   date moves up, so you have to show continuous physical presence

1    since October 2023.  Everyone who qualified under 2021

2    qualifies also under 2023.  So in that sense, a re-designation

3    always subsumes the earlier designation.

4        It's also standard following a re-designation that the

5    filing process to reregister is the same for any applicant who

6    has TPS under that country regardless of when they first

7    registered.  So the example we give in our brief -- and there's

8    many, Your Honor, but, you know, Sudan was first designated for

9    TPS in 1997.  It was redesignated several times, including in

10   2013.  Following the re-designation, there aren't two separate

11   reregistration processes.  Everybody reregisters together.

12           THE COURT:  So there was nothing extraordinary about

13   what happened here?

14           MS. BANSAL:  There's nothing extraordinary about what

15   happened, and I believe, you know, the Government just

16   acknowledged that.  They said the Secretary has discretion to

17   consolidate filing processes.

18       And so Secretary Noem's statement that Secretary Mayorkas

19   says consolidation was somehow novel or inconsistent with the

20   statute demonstrates her own misunderstanding, Your Honor,

21   because all the -- it's not novel because it happens all the

22   time, and all the statute says about registration is that you

23   have to register -- this is at (c)(1)(A) -- to the extent and

24   in a manner which the Secretary establishes.

25       So I don't understand how it could possibly be

1    inconsistent with the statute, Your Honor.  Secretary Noem

2    doesn't explain in the Federal Register notice, and Defendants

3    didn't explain in their opposition, how it could be

4    inconsistent given that all the statute says is register the

5    way the Secretary tells you to.

6              THE COURT:  What about the fact that the January 17th

7    extension -- it extended to the 2023 designation, correct?

8              MS. BANSAL:  That's correct.

9              THE COURT:  But also, it had the effect of extending

10   for the 2021?

11             MS. BANSAL:  That's what Secretary Noem said.  I don't

12   think that's correct, Your Honor.  I think that Secretary Noem

13   was conflating an individual's eligibility for TPS with a

14   country designation.  So Venezuela's 2021 designation still

15   expires.  I mean, the expiration of the current extension is

16   September 10th, 2025, and there will have to be a new decision

17   60 days before that.

18        What Secretary Mayorkas did was say, "Well, if you, an

19   individual, first registered under the 2021 designation, I

20   recognize that you also qualify under the 2023 designation

21   because you meet that" -- you know, "you've been continuously

22   here in this country for longer even than you needed to be.

23   And so you can reregister under this 2023 extension, and you,

24   individual, may extend your TPS status because you qualify.

25   You are eligible under both extensions."

1          THE COURT:  So if you don't register under the 2023

2     extension, you're still subject to the September 2025

3     expiration?

4          MS. BANSAL:  That's correct, Your Honor.

5          THE COURT:  But the effect of the 2023 extension was

6     to allow that registration for the 2021, effectively allowing

7     an extension for them from September 25 through October '26?

8          MS. BANSAL:  It allowed those individuals who had

9     first registered in 2021 to receive an extension through

10    October 2026, that's correct.

11         THE COURT:  And could that have been done as a

12    separate document, other than not just extending the 2023, but

13    expressly extending for those who are coming up in 2025?

14         MS. BANSAL:  So I do think it's a separate question,

15    but if the question is whether Secretary Mayorkas could have

16    extended the 2021 country designation -- is that --

17         THE COURT:  Yeah.

18         MS. BANSAL:  You know, the statute requires that the

19    Secretary make a decision at least -- to be made at least 60

20    days before the expiration.  It doesn't set, you know, a point

21    at which it's too early to make a decision.

22         THE COURT:  As long as it's 60 days or earlier.

23         MS. BANSAL:  Right.

24         THE COURT:  And it's effective upon, like we talked

25    about earlier, once the determination is made, then the country

1    still qualifies?

2        MS. BANSAL:  That's correct, Your Honor.  And we cite

3    in our brief examples where, you know, countries -- decisions

4    have been made as much as 159, 102 days earlier, but that's not

5    -- you know, Secretary Mayorkas did not extend the 2021

6    designation.  He didn't make that decision in January.  What he

7    did was extend the 2023 designation and just acknowledge that

8    the individuals who had first applied in 2021 were also

9    eligible.  They met all the criteria to obtain TPS under the

10   2023 designation too, and so he permitted them to reregister.

11       THE COURT:  So how is that different from an actual,

12   express extension of the 2021 designation?

13       MS. BANSAL:  Because, Your Honor, the individuals who

14   had TPS under 2021 -- if they chose not to reregister under the

15   extension, then their documents expire September 10th, 2025.

16   They would still be on the other track.  So they could choose

17   to switch tracks, but the two tracks still exist.

18       THE COURT:  And had the extension -- an express

19   extension been granted, then there would be no need to

20   reregister under the 2023, that everybody under the 2021 would

21   be -- that's what I'm trying to figure out.  What's the

22   operational difference?

23       MS. BANSAL:  It's just whether or not there's two

24   separate tracks with two separate timelines, Your Honor.  And

25   two separate tracks -- so if 2021 had been extended --

1          THE COURT:  Yes.

2          MS. BANSAL:  -- 2021 folks would still have had to

3     reregister, but their documents would expire on a different

4     date.  So say Secretary Mayorkas had extended the 2021

5     designation 18 months also, that 18 months would run from

6     September 10th rather than --

7          THE COURT:  Or he could have extended it to the same

8     date as the '23 extension.

9          MS. BANSAL:  He could have tried to make them line up.

10         THE COURT:  So had he done that, would there be any

11    operational difference between doing two separate ones as

12    opposed to doing this extension with the clarification that

13    people could reregister, even if they were 2021 designees?

14         MS. BANSAL:  Only, Your Honor, that the extension can

15    only be 6, 12, or 18 months, and so I'm not sure mathematically

16    if he could make them line up exactly.

17         THE COURT:  Oh.  You can't choose anything in between?

18         MS. BANSAL:  Correct.

19         THE COURT:  It has to be --

20         MS. BANSAL:  I mean, that's my understanding.  That's

21    historically the way it's been.

22         THE COURT:  So by using the extension and making it

23    available to those in 2021, that does result in a different

24    timeline than had he actually used an express extension of the

25    2021 because that would have had to have been the six-month --

1    and I don't know how it lines up, but it would have been some

2    other -- six months from September would have been March of '26

3    or September of '26 but not October of '26?

4             MS. BANSAL:  I think that's right, Your Honor.  But

5    again, I think the distinction is between a country designation

6    and individual.  So if you're an individual who came from

7    Venezuela to the United States in March 2021 -- you meet all

8    the eligibility criteria for TPS.  You don't have any criminal

9    history.  You are otherwise eligible -- under the statute, you

10   qualify under either extension.

11       And so there was nothing inconsistent with the statute

12   about Secretary Mayorkas telling those individuals, "If you

13   want to reregister now, you can reregister now because you

14   qualify under the 2023 re-designation."  And he even says in

15   the extension notice that in consolidating, he's not changing

16   any of the substantive eligibility requirements for TPS.  He

17   recognizes that everybody who was eligible under 2021 is also

18   eligible under the 2023 designation.

19             THE COURT:  So this extension gives people a choice --

20             MS. BANSAL:  Yes.

21             THE COURT:  -- the 2021 people a choice to stick with

22   their original designation which would have ran or to register

23   under the '23 extension?

24             MS. BANSAL:  That's correct, Your Honor.  And that's

25   not unprecedented.  That has happened at least two times before

1    with respect to Haiti and Sudan, Your Honor.  And so both those

2    countries were newly designated for TPS in 2022.  And when they

3    were newly designated at that time, individuals -- there were

4    older designations that were terminated, the termination

5    challenged in Ramos.

6         So for example, there were Haitian TPS holders who had

7    first obtained TPS under a 2010 designation.  That designation

8    was terminated, but the termination never takes effect, and so

9    DHS is publishing these automatic extensions of the 2010

10   designation.

11            THE COURT:  I'm sorry.  Say that last part again.

12            MS. BANSAL:  In order to implement this court's

13   injunction, DHS published Federal Register notices that

14   automatically extended Haiti's 2010 designation.

15        At the same time, they then do a new designation, and it

16   creates these two separate tracks for Haiti, sort of similar to

17   what we have for Venezuela.  And the Haitian TPS holders are

18   permitted to get off the 2010 track and sign up on the 2022

19   track because they all qualify.  So it's not -- you know, this

20   is not the first time this has happened, is what --

21            THE COURT:  And does the statue -- or is there any

22   regulation addressing this to track -- that authorizes this?

23            MS. BANSAL:  No, Your Honor.  There's nothing in the

24   statute that explicitly addresses it, and there's nothing in

25   the statute that prohibits it.

1          With respect to the individual registration, subsection

2     (d)(2) of the statute, as Your Honor pointed out recently,

3     explicitly allows the Secretary to stagger the validity periods

4     of individuals' TPS authorization documents.  So that also

5     supports secretary Mayorkas's ability to allow people from --

6     you know, who initially registered under one designation to

7     reregister.

8               THE COURT:  What does that mean, to stagger the --

9     explain what that means.

10              MS. BANSAL:  I believe it means, Your Honor, that --

11    so that everyone's, you know, work permit doesn't expire on

12    exactly the same date, the Secretary could provide that work

13    permits -- you know, some people's work permits expire on this

14    date and some people's work permits expire on that date, as

15    long as they are -- everyone continues to have work

16    authorization while their country designation is in effect, in

17    order to just reduce the burden on the agency so they don't

18    receive everyone's application at once.  That's my

19    understanding.

20              THE COURT:  So the power to sort of consolidate, use

21    an extension, and allow people to go off in that new track when

22    they were on another track -- does the power of that stem from

23    the general power under (c)(1), Romanette iv, prescribing the

24    matter, etcetera, etcetera?  Is that...

25              MS. BANSAL:  I think so, Your Honor.  That's the only

1    place that the statute addresses registration.  There are

2    regulations that we cite in our motion that add a little more

3    content to that.  They require during the period of initial

4    designation and then reregistration pursuant to the Secretary's

5    -- USCIS's instructions.

6          THE COURT:  And so is your response to the concern of

7    Secretary Noem that what Secretary Mayorkas had done was

8    contrary to the TPS statute, a response that he had the

9    authority, the broad authority, under (c)(1) and also, I guess,

10   (d)(2)?

11         MS. BANSAL:  Yes.  Exactly, Your Honor.

12         THE COURT:  What prevents the new secretary though

13   from saying, "Well, okay.  Maybe Secretary Mayorkas had the

14   statutory authority, but the process was confusing, and I also

15   have the power under -- same power under (c)(1) and (d)(2) to

16   clear this up"?

17         MS. BANSAL:  Well, Your Honor, I think there's a

18   difference between fixing a mistake and changing your mind.  I

19   think what Secretary Noem said was that the consolidation was

20   novel and potentially inconsistent with the statute.  Our

21   position is that it was neither, and so those are not reasoned

22   explanations.  Those are actually legal errors on the

23   Secretary's part, and they don't justify vacating the

24   extension.

25         THE COURT:  Well, let's say for a moment she did get

1    it right in suggesting Secretary Mayorkas had actually violated

2    the statute, but nonetheless, it wasn't done in a good way, and

3    she wants to fix it.  What's wrong with that?

4         MS. BANSAL:  Your Honor, I think -- so we're only

5    reaching this claim if the Court were to find that there is

6    some implicit authority in the TPS statute that allows for a

7    reconsideration.

8         THE COURT:  Yeah.  I know that.

9         MS. BANSAL:  And the courts have said that that

10   implicit authority can extend to correcting an inadvertent

11   clerical error.  So this is the Supreme Court in the American

12   Trucking case that we cite in our brief.

13       But it can't be used as a guise to change a decision just

14   because you want to implement a new policy.  So even where an

15   agency has implied reconsideration authority, that authority is

16   not limitless.

17       THE COURT:  So you're saying that that reconsideration

18   is limited to fixing clear clerical errors?

19       MS. BANSAL:  Yes, Your Honor.

20       THE COURT:  And not changing policy?

21       MS. BANSAL:  Correct.  And that's American Trucking,

22   and that's also United States versus Seatrain, Your Honor,

23   which is a Supreme Court case from 1947, I belive, which is one

24   of the first cases where they address this agency

25   reconsideration authority, and they express that

1    reconsideration merely to change your mind is disfavored, and

2    they will not read implicit authority in a statute to authorize

3    that type of reconsideration.

4         THE COURT:  Well, one of the counter-arguments --

5    besides whether that reconsideration, if it is allowed at all,

6    is so limited -- it's not just merely changing mind on policy

7    but clearing up confusion.

8         MS. BANSAL:  Your Honor, if there were confusion,

9    which, again, we disagree because this is not novel.  The

10   instructions were quite clear.  I don't know of any TPS holders

11   who are actually confused, and the agency seems to have

12   understood as well what the process was.  That's an independent

13   reason we've presented why the vacatur violates the APA, is

14   that if the problem was that the consolidation was confusing,

15   the obvious solution is to de-consolidate, not to vacate the

16   entire extension.

17        THE COURT:  So and what would happen with

18   de-consolidation?  Then each would be on their own tracks

19   again?  The 21 people would be back to the September

20   expiration?

21        MS. BANSAL:  That would be one possibility, Your

22   Honor, yes.

23        And the Supreme Court in DHS versus Regents, drawing on

24   Motor Vehicle Manufacturers versus State Farm, says that if an

25   agency is rescinding a prior policy, it has to consider

1    alternatives that are within the ambit of that policy.  And so,

2    for example, in Regents, the Court was evaluating the

3    Secretary's termination of the DACA program.

4        The reason she gave was that the work authorization and

5    other benefits provided by DACA were potentially unlawful, and

6    the Court said, "Okay.  But there's a whole other part of DACA

7    which is protection against deportation, and it's arbitrary and

8    capricious to rescind the whole program without considering

9    whether you could maintain that portion."

10        And so if Your Honor were to find that it -- you know, the

11    Secretary did give a reasoned explanation that the

12    consolidation was somehow confusing, the obvious solution would

13    be to de-consolidate, not to vacate the entire extension.

14        THE COURT:  All right.  Thank you.  Let me hear from

15    the Government.

16        MS. VUONG:  If I could, I do want to go back to just

17    something counsel said regarding the jurisdictional claim in

18    saying that this is a hyper-literal interpretation of the

19    statute.  That's the Supreme Court that has taken that

20    interpretation.  So it's what the Court has told us, that we

21    are supposed to be looking at these words and how we're

22    supposed to be interpreting these words.

23        As to whether or not -- as to the text of the vacatur, the

24    reasons for the vacatur were as Your Honor noted.  It's the

25    novel approach of combining two separate designations into one

```
1    that had previously been on two separate tracks.  Typically

2    when a secretary designates or redesignates, they do it at the

3    same time, and so the tracks flow together, whereas here, by

4    having the October 2023 extension -- sorry -- re-designation,

5    that created a separate track, and we have two sets of

6    individuals who are covered by temporary protected status but

7    with different end dates.

8         So because my --

9         THE COURT:  Well, there were different -- there were

10   two different tracks with different end dates.

11        MS. VUONG:  Yes.

12        THE COURT:  And the fact of this consolidation is to

13   allow people to use the same end date, right?

14        MS. VUONG:  Correct, and thereby over not making a

15   determination on the 2021 designation as an extension.

16        THE COURT:  You mean so what was absent was an express

17   determination on the 2021 country designation?

18        MS. VUONG:  Correct.  Instead, allowing the --

19        THE COURT:  But isn't that sort of obvious -- same

20   findings that apply to the extension in 2023, which made

21   country considerations findings -- I don't know how you could

22   have two different ones.  I mean, how could they diverge?

23        MS. VUONG:  Well, that's true, but the statute does

24   say -- we're here discussing what the statute says, and the

25   decision on each designation shall be made.  Once the initial
```

1    designation is made, the periodic review kicks in.  And so by

2    subsuming that 2021 designation underneath the 2023

3    re-designation, individuals would then obtain, I think, an

4    extra 13 months of TPS status by rolling into the 2023.  So

5    that is the novel interpretation that Secretary Noem is

6    discussing in the vacatur.

7         But she also does state that not only is she looking at

8    this novel approach with the extensions and designations, but

9    she notes that she would like -- that she -- the vacatur

10   provides her an opportunity for informed determinations

11   regarding the TPS designations and clear guidance, which refers

12   to the President's executive order.

13        So it's not just the re-registrations and the conflating

14   the two extensions.  It's also to look at how these

15   designations have been implemented and the underlying legal

16   grounds for those implementations.

17             THE COURT:  Well --

18             MS. VUONG:  Under --

19             THE COURT:  -- you mean to revisit the actual

20   designations that -- not just how they're implemented, but the

21   actual --

22             MS. VUONG:  Correct.

23             THE COURT:  -- designations taking issue --

24             MS. VUONG:  Yes.  Plaintiffs' approach would allow --

25   would never allow a secretary to revisit a designation no

1    matter what changes within the interior or the exterior of the

2    country, and these are foreign policy -- these are national --

3    I mean, here it's a national interest determination, which is a

4    very broad determination.

5        THE COURT:  And that goes back to the question of

6    whether there's authority to revisit on those substantive

7    determinations, so substantive designation determinations?

8        MS. VUONG:  Yes, Your Honor.  Everything is tied up

9    together.

10        To the point of whether or not the Secretary can

11    reconsider the decision, we've already -- this is also

12    something we've already discussed and that Secretary Mayorkas

13    took the same approach and disagreed with how evidence was

14    weighed and vacated the terminations in order to create

15    extensions to extend -- either extend or redesignate, depending

16    on the country.

17        THE COURT:  What about the argument about if there was

18    some confusion, that the obvious answer was to look for

19    alternatives and would have been de-consolidation rather than

20    entire vacation -- or vacatur?

21        MS. VUONG:  I think that goes back to the reasons

22    behind the vacatur, which, again, is because Secretary Noem

23    explicitly says that she wants to relook at these

24    determinations, and so it's not just tied to the approach of

25    subsuming the 2021 extension into the re-designation.  She also

1     would like the opportunity to look at those determinations.

2             THE COURT:  Including the 2023 extension?

3             MS. VUONG:  Yes, the '20 -- yes.

4             THE COURT:  So that was, I guess -- that was a real

5     driving force.  It wasn't just confusion in registration, so

6     let's put it back the way it was.  Allow the 2023 extension in

7     place and take the 2021 people out and put them back to where

8     they were.  It's really to look at the whole designation?

9             MS. VUONG:  The whole scheme and whether or not the

10    designation complies with the statute.

11            THE COURT:  The designation in terms of whether or not

12    it was warranted to redesignate Venezuela as a designee

13    country?

14            MS. VUONG:  Yes, Your Honor.

15            THE COURT:  Okay.  And then the response to that is

16    that well, there's no power to do that, but I guess it puts us

17    back to the old statutory question.

18            MS. VUONG:  Yes, Your Honor.

19            THE COURT:  Okay.  All right.  Time is flying here, so

20    I do want to address briefly the constitutional protection

21    claim here for a moment.

22            MS. VUONG:  Sure.

23            THE COURT:  Again, Ramos -- it's a vacated decision,

24    not binding, but, you know, it has -- it can be looked to at

25    least for some guidance, though it's not binding -- did find

1    that there can be judicial review of constitutional claims

2    asserting racial animus or ethnic animus and that in Trump

3    versus Hawaii, deference doesn't preclude an examination,

4    factual examination for discrimination and that the Arlington

5    Heights test does supply the general framework for discerning

6    whether or not there was an improper racial motive.

7         Has anything, in your view, changed -- now, of course, the

8    decision also said that there was insufficient evidence to show

9    that the statements made by then-President Trump actually were

10   a motivating factor and had substantial influence over the

11   decision-makers, which was the Secretary in that case, and

12   that's why the plaintiff had not -- Plaintiffs had not proven

13   an equal protection claim.

14        But in terms of the overall question about whether there's

15   overall judicial review, whether the Court can consider the

16   question of whether or not the Arlington Heights mode of

17   analysis is still relevant, has anything changed, in your view,

18   from the Ramos, now-vacated, decision?

19             MS. VUONG:  I'd first note that Plaintiffs brought

20   this under the APA, and this is a separate claim, so under the

21   705 stay, 705 postponement, this constitutional claim is not

22   part of their APA claim.  So I don't see how it can be part of

23   their motion.

24             THE COURT:  Part of their motion...

25             MS. VUONG:  Motion to postpone under the APA.

```
 1              THE COURT:  Since it's not an APA claim?

 2              MS. VUONG:  Since it's not an APA claim.  However, if

 3    you disagree getting into the claim itself, we -- the argument

 4    now is that, you know, Trump v. Hawaii is the correct standard,

 5    even looking at the vacated Ramos decision.

 6         You, Your Honor, in your original motion to dismiss the

 7    determination in Ramos, in applying the Trump v. Hawaii

 8    standard, noted that it didn't apply in the Ramos case because

 9    the decisions there did not involve national security as a

10    basis for terminating, and they did not involve foreign policy

11    reasons for the basis of termination as well as -- I'm looking

12    at the -- you broke them out, but the third and fourth piece

13    being the constitutional rights of the individuals.

14         Whereas here, we're dealing with -- at least in the

15    termination sphere, we're dealing with a termination that is

16    explicitly based off of national interest, and the Secretary

17    lays out what she views as the national interest, and that's a

18    standard that is not discernible for the Court --

19              THE COURT:  So let me --

20              MS. VUONG:  -- to analyze.

21              THE COURT:  -- ask maybe, and I should clarify that

22    the equal protection claim challenges both the vacatur as well

23    as the termination decision?

24              MS. VUONG:  Yes.

25              MR. ARULANANTHAM:  That's correct, Your Honor.
```

1          THE COURT:  All right.  So the vacatur decision, to

2     the extent that's being challenged under the protection clause,

3     was not based on national interest.  That was just based on the

4     prior secretary acting outside the bounds, creating a problem,

5     doing something novel.  It's in the decision to terminate that

6     invokes national security, right?

7          MS. VUONG:  Correct.

8          THE COURT:  So you could have a differential Trump

9     versus Hawaii -- there could be a differential analysis between

10    those two decisions?

11         MS. VUONG:  It could.  I think the vacatur, because it

12    does reference looking at the statute, looking at -- and the

13    interpretation of the statute and the executive order of the

14    president, that to -- it's all kind of brought together as a

15    package for foreign policy reasons and the national security of

16    the United States.

17         THE COURT:  And --

18         MS. VUONG:  Sorry.  The national interest of the

19    United States.

20         THE COURT:  National interest.

21         MS. VUONG:  Yes.

22         THE COURT:  And I understand what the national

23    interests are.  That is in part based on alleged gang activity

24    by TDA, correct, that was cited, I believe?

25         MS. VUONG:  Yes, Your Honor.

1          THE COURT:  We've talked about that and whether

2     there's evidence to support that.

3          But what is the foreign policy implication then of the

4     vacatur and the earlier termination of the designation?

5          MS. VUONG:  If you look at the language of the FRN on

6     page 9043, Secretary Noem notes that U.S. foreign policy

7     interests, particularly in the Western Hemisphere, are best

8     served and protected by curtailing policies that facilitate or

9     encourage illegal and destabilizing migration.

10         And so that determination of national interest, which

11    takes into account -- it's an expansive standard.  It takes

12    into account foreign policy, public safety, national security,

13    migration factors, immigration policy, and economic

14    considerations.  So these are all pieces that are going into

15    the national interest determination, and that would --

16         THE COURT:  And the argument is that allowing TPS

17    status attracts illegal entry, or what's the connection between

18    continuing or not continuing TPS status for those who are

19    already here and the national interest in not facilitating

20    illegal entry?

21         MS. VUONG:  Sure.  I mean, Secretary Noem also notes

22    other programs that were undertaken under the prior

23    administration -- and the CHNV program is one of them -- in

24    which individuals were able to come, and then with the

25    re-designation of Venezuela, were then moved into the TPS

1    status, temporary protected status.

2        THE COURT:  But how -- I'm trying to figure out -- the

3    interest is safeguarding the national interest -- national

4    security, however you want to put it -- and we don't want to

5    encourage illegal entry into the United States.  I understand

6    that interest that's being asserted.

7        What I'm having a hard time seeing is how does

8    discontinuing the status of present folks or extending their

9    status or not extending their status -- how does that affect

10    illegal entry?

11        MS. VUONG:  I think this is one of the issues that one

12    goes to the Secretary's determination, and it shouldn't be

13    looked at by the Court.

14        THE COURT:  I'm just trying to understand the logic.

15    I mean --

16        MS. VUONG:  Sure.  But Secretary Noem states that --

17    true, I understand the perspective argument but that it's been

18    used in the past to promote illegal immigration because of the

19    re-designations that then recapture -- or I guess capture

20    individuals who had come unlawfully and trying to get back, I

21    believe she says, to, like, the core meaning of TPS status.

22        THE COURT:  So it is your position that the Court

23    should not test or inquire into whether, in fact, there is any

24    logic or factual basis for either assertion of national

25    interests based on, for instance, TDA gang or foreign policy

1    assertions that -- for which it's hard to see a connection,

2    that the Court can't consider that?

3        MS. VUONG:  Yes.  I think that's straightforward

4    analysis under the 1254a(b)(5)(A) jurisdictional stripping

5    provision.  That goes to the termination grounds that the

6    Secretary relied upon.  That fits in, I think, everybody's

7    definition of determination.

8        In addition to that, national interest is such a broad

9    standard that it's most --

10        THE COURT:  Well, but even the now-vacated Ramos

11    decision said that 1254 does not preclude a

12    constitutional-based challenge notwithstanding the

13    jurisdictional stripping.

14        MS. VUONG:  Well, this is --

15        THE COURT:  It did allow that, and the Court made an

16    inquiry.  It just found as a factual matter there was no racial

17    motivation.

18        MS. VUONG:  Well, I think if you're looking at Trump

19    -- if you're looking at the constitutional grounds, then you

20    look under the rubric of Trump v. Hawaii, which looks for a

21    rational basis, and it must be plausibly related to the

22    government's stated objective.  And here, the stated objective

23    is to protect the national interest.

24        And so we have instruction from the Supreme Court that any

25    rule of constitutional law that would inhibit the flexibility

1    of the political branches of government to respond to changing

2    world conditions should be adopted only with the greatest

3    caution.

4        So yes, my argument is that in the context of national

5    interest, that is such a broad standard that is firmly

6    committed to the executive branch that it would be

7    inappropriate for the Court to go in and weigh the evidence

8    that the Secretary weighed.

9        THE COURT:  All right.  Let me pause right there and

10   get the response that Trump versus Hawaii has greater

11   application here, because unlike Ramos, there is at least an

12   asserted national interest in foreign policy, at least as it

13   affects termination, not vacatur.

14       MR. ARULANANTHAM:  Right.  And I should say that the

15   APA makes reviewable claims that agency action is contrary to

16   constitutional right.  That's in the scope of the provision of

17   the APA.  So we are raising this claim in support of the

18   postponement motion as well.

19       But to answer your question, Your Honor, you alluded to

20   this earlier.  National interest -- that's the word the statute

21   uses.  It's not obvious that that means the same thing as

22   national security.  In the Ashcroft case, which we cite from

23   the Ninth Circuit, the government had tried to claim that a

24   noncitizen who was committing crimes presented a national

25   security concern, and that was in an immigration detention

1    context.

2        And the Court said just the fact that it's a noncitizen

3    committing a crime doesn't somehow transform this into a

4    national security issue.  I think Your Honor certainly can look

5    underneath the reasons that are given and see are the reasons

6    given actually national security concerns, or are they just

7    waving the term around when what they're actually talking about

8    is just crime?

9        And that's certainly relevant here because the record

10   evidence shows that -- I mean, there's not a shred of evidence

11   that a TPS holder is even a member of this gang that they're

12   talking about, and as Your Honor alluded to at the outset,

13   under the Dudley declaration, there's no evidence in this

14   record or anywhere else that I can find that this gang is

15   engaged in anything other than -- or it's not even the gang,

16   individual members of it.  There are some people here in this

17   country who are committing some crimes, and that's it.

18       And everything else they've said about this is just a pack

19   of lies.  I mean, the Colorado apartment complex -- that's been

20   debunked.  It's Exhibit 29 of the MacLean declaration.  There's

21   no substantial organizational presence.  So they can't just

22   make pretend that it's national security and then displace all

23   of the Court's review authority for the constitutional claim,

24   the Fifth Amendment constraint, to have any force.  At some

25   standard of review, the Court gets to look and see whether

1    there's actually any there there.

2         THE COURT:  So your view is that in order to try to

3    invoke the deference under Trump versus Hawaii and the

4    invocation of the claim of national security or national

5    interest, the Court should first understand there's a

6    distinction between the two.

7         National security has certain implications that are

8    different from just national interest generally and that the

9    Court should examine whether there is, in fact, a national

10   security claim here that truly involves national security, so

11   y'alls have to, like, look at the facts in order to determine

12   what review of the facts, what the standard review of the facts

13   are.  You have to look at some predicate questions.

14        MR. ARULANANTHAM:  Yes, Your Honor.  Much in the way

15   that would be true of a jurisdictional question or, you know,

16   other questions.

17        That being said, Trump v. Hawaii is very clear that the

18   deferential standard of review there is a product of several

19   different things.  One of them undoubtedly is the invocation of

20   national security, but also, it's that the claims involve the

21   entry of foreign nationals.  And they say that a few times in

22   the opinion.

23        And then if you look at footnote 5, where they're

24   specifically refuting the dissent's claim that Arlington

25   Heights governs, they say what makes this a case triggering

1    bona fide review, which they construe is a rational basis

2    review, is the fact that it's about the entry of foreign

3    nationals.

4        THE COURT:  Yeah.  I'm aware of that, that you would

5    argue that's the primary point in the fact of national security

6    or not or foreign policy are additional factors, but just --

7    and they would argue well, that's just one of three or four

8    factors, and therefore -- I understand that.

9        MR. ARULANANTHAM:  And the other one, Your Honor, is

10   they say it's a statute giving authority to the President that

11   exudes discretion in every clause to the President.  This is a

12   statute giving authority to the Secretary of Homeland Security,

13   not the President.  And I think that also matters because it's

14   not a separation of powers issue in the same kind of way.

15       Here, Congress set a set of criteria, statutory criteria,

16   and gave the Secretary authority to effectuate what the statute

17   is authorizing.  So there's no Article 2 overlay, nothing about

18   presidential power operating here.  Those are two reasons why,

19   apart from this national interest/national security issue, why

20   Trump v. Hawaii doesn't govern.

21       That being said, I think we would request that the Court,

22   as you did in Ramos, look at whether or not we can make our

23   discrimination claim under Trump v. Hawaii, because this case

24   is much stronger than Ramos.  Even though I thought we had a

25   good claim Ramos, this claim is much, much stronger on the

1    antidiscrimination claim than Ramos.

2        And, Your Honor, if you look at -- we filed it as an

3    appendix, appendix A to the reply brief.  We showed the

4    timeline of the decision-making here.  And, you know, what's

5    happening here is the Secretary is sworn in on January 25th.

6    She makes the vacatur three days later.  So whether it's under

7    Arlington Heights or Trump v. Hawaii, that kind of compressed

8    time for decision-making is truly extraordinary.

9        Then the next day, she goes on national television, on Fox

10   News, to announce the decision, and she makes this slur that

11   says, you know, the people of this country want these dirtbags

12   out.  That is not just campaign trail statements or even just

13   separate statements about Venezuela or Venezuelans.  It's

14   explaining the decision to the public.  It's the reason she

15   gives for why we have done this to the public.  It includes

16   this racial slur.

17       Then three days later, they make the termination decision.

18   And, again, the next day she goes on TV.  Now it's Meet the

19   Press, and she says, "The TPP program has been abused."  Again,

20   she's explaining the decision, and she repeats these lies about

21   them emptying the prisons and mental health institutions, and

22   she says at the end of that, "So we are ending that extension

23   of that program."

24       Again, the reason she is giving to the public for why she

25   is doing this has this lie in it.  You know, and they say, oh,

1    we're pointing to early statements.  But the reason we pointed

2    out in our briefing that she has been making this statement for

3    over a year, Your Honor, is to make the point that she's been

4    lying about it for so long, she has to know it's a lie because

5    it's been debunked again and again.

6        You know, we cite -- I think it's Exhibit 29 to

7    the MacLean -- I can't remember which one it is.  It's Exhibit

8    26 to the MacLean declaration.  We show that this lie about

9    emptying the prisons was debunked long ago, and they keep

10   saying it anyway, and that's a racist trope.

11       You know, the Young declaration shows -- Elliot Young,

12   who's a historian of immigration.  You know, he talks about

13   this lie about they're poisoning the blood by sending bad

14   people -- that goes back 150 years.  Same racist justifications

15   used again and again.

16       And here it's in the decision by the decision-maker.  We

17   didn't have a statement like that Ramos.  You know, we had one

18   reference to America First in notes explaining a decision, you

19   know, by the Secretary.  That's it.  That's all we had, and our

20   argument was primarily based on cat's paw, as you may recall.

21       And here, we don't even need to use the statements of

22   President Trump because -- and we don't need to use any

23   extraneous statements either.  We're just talking about why she

24   says she has done this.  And so I think it's, I think, quite a

25   strong case under Trump v. Hawaii itself, because Trump v.

1    Hawaii, you know, does allow for the consideration of extrinsic

2    evidence.  It cited the President's statements.

3         But ultimately, you know, the Court there found -- you

4    know, whatever you think, you know, the Court found that there

5    was persuasive evidence of legitimate grounds in national

6    security concerns.  That's what they said.  There was

7    persuasive evidence before that.  So they found the decision

8    could be explained by those persuasive grounds.

9         And here, where is the evidence that they considered

10   something other than what she said on TV?  What did she say on

11   TV about why they're doing this?  And there's nothing

12   comparable to that in Trump v. Hawaii.

13        THE COURT:  All right.  Let me turn to the Government

14   and ask why shouldn't statements which seem to attribute group

15   characteristics based on generalizations and -- very negative

16   generalizations about prisons, emptying the prisons, emptying

17   mental health facilities, membership in the Tren de Aragua, it

18   seems to defame an entire group of over 600,000 Venezuelans who

19   are here with this image.

20        Isn't that almost the definition of racism, when you make

21   a generalized stereotype about an entire group and then take

22   action on that, when there's -- really appears to be no basis

23   for that generalization?

24        MS. VUONG:  I don't think that that's what the action

25   was taken on.  I think we have to look at the text of the FRN

1     to see all of the reasons that were taken into account for the

2     termination --

3             THE COURT:  Okay.  Before we get to that question,

4     wouldn't these statements -- whether or not they motivated --

5     that's what you're arguing -- the actual action, aren't they

6     problematic in terms -- aren't they indicia of a view that

7     really engages in racial stereotyping?

8             MS. VUONG:  I think that the plaintiffs are taking

9     them out of context.  I think when she's talking about

10    dirtbags, she's talking about individuals who are Tren de

11    Aragua members, and so you have to look at the statements

12    themselves.

13        But regardless of that, the proper standard is to go back

14    under -- as Plaintiffs are also agreeing to look at Trump v.

15    Hawaii and see "Is there a reasonable justification for this

16    determination?"

17            THE COURT:  Well, and when you do that, I mean, you do

18    have to take into account, as I think even the Ramos decision

19    here looked at, whether there are statements that were made

20    that might inform, you know, what the reason was.  It's true if

21    you apply the Trump versus Hawaii standard, it is more

22    deferential.  It is more akin to rational basis and whether or

23    not you can discern a legitimate basis.  But I don't think that

24    means you totally ignore, you know, the context in here.

25        If you look at at least the factors that seem relevant

1    under Arlington Heights -- the compressed time frame, and I

2    guess we'll see later on, you know, what was exactly before the

3    Secretary and what was it based on.

4        I would have to assume at this point that none of the

5    usual documentation that you see in termination extension

6    designation processes under the TPS were followed here, that

7    is, a country report, a country conditions report, the input

8    from the State Department, etcetera, that the whole process,

9    which usually takes months -- I would assume within this

10   compressed time frame that that didn't happen here.  I don't

11   know if you know the answer to that or not.

12       MS. VUONG:  I don't know the answer to that.  I just

13   have the language from the FRN that says Secretary Noem did

14   consult with the State Department and look at the conditions.

15   So I think making a fast decision is not on its own a reason to

16   overcome the Secretary's determination.

17       THE COURT:  Well, but it may inform whether or not one

18   can, even under the Trump test -- Trump v. Hawaii test, whether

19   one can reasonably discern or whatever that language is,

20   attribute a justifiable explanation, and I would think

21   circumstances might inform that question.  Maybe it's like

22   Arlington Heights with a high degree of deference, but there's

23   still some logic to looking at all the factors, it seems to me.

24       MS. VUONG:  You can look at -- yes, the standard

25   allows extrinsic evidence, but, again, the ultimate

1    determination is whether or not the decision was plausibly

2    related to the Government's stated objective.

3         THE COURT:  Well, all right.  So the question that I'm

4    confronted with is under the postponement statute under 705,

5    which essentially embraces and adopts the traditional standards

6    for relief under Rule 65, right, the balance of hardships, the

7    irreparable harm, the public interest that I have to consider,

8    which way does that go, and the degree of strength on the

9    merits.

10        And I believe the sliding scale test applies under 705 as

11   it does under Rule 65?

12        MR. ARULANANTHAM:  My understanding is that the

13   equitable analysis is the same.  I don't recall if there's a

14   case that specifically draws that distinction, but if it's the

15   same, it's the same.

16        THE COURT:  All right.  Well, I will take the matter

17   under submission, at least this motion.  The argument has been

18   helpful.  I appreciate counsel's input.  But those -- that is

19   the framework, and obviously there are some threshold

20   jurisdictional questions that I have to address before we go

21   anywhere and -- or go any further, that I've got to address

22   that.  So I will do so.

23        Let me ask -- I know that action is going to be taken.

24   The first consequential action occurs on April 4th, is it?

25        MR. ARULANANTHAM:  April 3rd is when the employment

1    authorizations expire, and I would just point Your Honor,

2    there's evidence in the record, the Ferro declaration, Ade

3    Ferro and also from Jose Palma, which show that TPS holders are

4    selling businesses.

5         You know, employers are trying to figure out, you know,

6    what to do.  People are quitting jobs, postponing school, all

7    kinds of things.  I know it's a lot that's come into court,

8    like, a blizzard in a short time frame because of the nature of

9    what's happened.  We would just respectfully request a ruling

10   as soon as possible, Your Honor.

11        THE COURT:  Okay.  And in terms of the motion for

12   discovery, I think I've already indicated my view is that what

13   the parties should do first and foremost is to try to agree on

14   what the administrative record is in this case, and then I

15   think then I can approach -- if there's additional records that

16   are then sought, then I can see in that context, but I think I

17   need to see what the administrative record is first.

18        So the quicker you can put that together, the quicker we

19   can tee up any motion for discovery, if there is one.  So I'm

20   going to direct the parties to meet and confer immediately

21   about that.

22        MS. MACLEAN:  Your Honor, we appreciate that and

23   certainly would seek to meet and confer with Defendants about

24   the administrative record.  We would ask for an expedited

25   production timeline for the administrative record.

1              As a point of reference, in Ramos Your Honor required the

2    production of administrative for two countries ten days after

3    the jurisdictional finding and the other two countries seven

4    days after that, and we would request in these circumstances,

5    given that we're talking about one country and two hastily-made

6    decisions that went into effect very quickly, that nothing

7    greater than that timeline be allowed under these

8    circumstances.

9              Also, Your Honor, in the Ramos context, the guidance that

10   Your Honor provided about what was part of the administrative

11   record, at the end of Your Honor's order on the motion to

12   dismiss was extraordinarily helpful in providing some guidance

13   about what should be part of the administrative record.

14             And we request that guidance again be provided here,

15   perhaps with even greater specificity in light of the fact that

16   we have learned much more from the Ramos experience about some

17   of the limitations that -- the limitations and the extensive

18   motion practice that was required to try to get a more complete

19   record.

20             The guidance that Your Honor provided in the motion to

21   dismiss order recognized binding precedent, that all documents

22   and materials that were directly or indirectly considered by

23   decision-makers and relied on by subordinates should be part of

24   the administrative record.

25             We've also learned in the context of the Ramos litigation

1  about what should be part of the whole administrative record,

2  and we would respectfully request as much guidance as possible

3  from the Court, both about the timeline and about the scope of

4  the administrative record.

5  THE COURT:  All right.  Well, first of all, with

6  respect to scope, I see nothing that would cause me to deviate

7  from my view of what is properly within the administrative

8  record last time.  I have not seen any change in law, and there

9  may be some law with respect to some extra records stuff and

10  what the appropriate timing of that may be, but I don't see any

11  reason to deviate from my view of what should be in the

12  administrative record.

13  I think that was based on clear case law.  If you start to

14  get into a dispute and you have more specific questions, I can

15  address those through my normal process of a joint letter

16  addressed to me for an expedited consideration.  And I agree

17  that, you know, I have to decide the jurisdictional question

18  first, because if I find there's no jurisdiction, there's

19  nothing for me to do.

20  But once I do decide the jurisdiction, I do expect the

21  parties to produce a record within seven days.  So that doesn't

22  preclude you from meeting and conferring now and saying, "Well,

23  here's what it might look like."  There's no reason to start

24  talking now and trying to see, even if it becomes obviated if I

25  find, for instance, no jurisdiction.  It's worth the exercise.

1          So I would urge the parties to get together immediately

2     and start talking about that so that if I do find jurisdiction,

3     that the administrative record can be filed shortly thereafter,

4     and if you have a dispute about what goes into the

5     administrative record based on my criteria, send me a joint

6     letter, and I will resolve that.  So that is my hint in terms

7     of the timeline and scope.

8          MS. MACLEAN:  We appreciate that, Your Honor.  I'd

9     also like to make one additional point, which is that our

10    motion to shorten time was merely a request that this court

11    permit us to propound discovery, not a request that this court

12    make any determination about whether the discovery that we're

13    seeking is proper.

14         That has been prevented because of, you know, what is

15    effectively a unilaterally imposed stay on discovery by the

16    refusal to allow a conference that would have opened up the

17    discovery process.  We're not seeking expedited discovery or a

18    determination about the propriety of any discovery requests,

19    but we do note that in addition to the administrative record

20    that is the basis for any judicial review of an APA claim,

21    there's two parts of our case that require, in fact, some extra

22    record discovery.

23         One is the constitutional claim, which requires a

24    consideration of the motivation of the decision-maker.  My

25    colleague spoke about the statements that were made, for

```
1    instance, after the decisions, the vacatur decisions and the

2    termination decisions on the media.

3        We would like to know and have a right to know, to be able

4    to develop our equal protection claim, what the Secretary

5    relied on, what documents she considered to prepare for those

6    media interviews in which she described TPS holders and

7    Venezuelans more broadly as dirtbags.  That would not be part

8    of the administrative record.  It is a posthoc rationalization,

9    but it is essential for --

10            THE COURT:  Well, we don't know that for sure.  There

11    may be something in the administrative record, because it was

12    only days before that might be relevant.  That's why we need to

13    see what the administrative record is first.

14        But to the extent you are asking in advance for permission

15    to seek extra-record evidence, I think the record is evident

16    that depending on what survives here or what -- if there is

17    jurisdiction, including jurisdiction over constitutional-based

18    claims, I think the Ramos decision and what I've held in the

19    past and in Trump v. Hawaii, I think leaves the door open for

20    extra-record evidence, but that's part of what I'd like you to

21    meet and confer in advance on.

22        Now, whether you can propound a discovery -- let me ask.

23    With respect to a -- obviously you don't need to have a case

24    management conference.  Hard to schedule one until you know

25    what I'm doing here, but I will probably set a case management
```

1    conference either way, whatever I do.  Well, if I find there's

2    no jurisdiction, still going to set a case management

3    conference because then that's going to invite a motion to

4    dismiss, I assume, a formal motion to dismiss.

5        But or if I don't, and, we need a case management

6    conference to figure out where do we go from here, what's the

7    next motion, etcetera, etcetera.  So I will set a case

8    management conference in short order.  Whether you want to

9    propound something in advance of that, I mean, you can, and I

10   can grant that for good cause in advance of the normal process

11   of waiting for the case management conference to propound

12   discovery.

13       However, I would not require the defendants to respond to

14   that until the jurisdictional issue is decided.  But if you

15   want to propound that as a cautionary measure just to get

16   things rolling, I will permit that with the understanding that

17   no response is expected yet until I rule.  And then, you know,

18   once I rule, maybe you can stipulate to a response, and -- if

19   that's appropriate.  So --

20       MS. DICHTER:  Your Honor, may the Government have a

21   chance to respond?

22       THE COURT:  Yeah.

23       MS. DICHTER:  Just I'll do my part to keep it brief.

24       The Government's position is that there should not be any

25   administrative record production prior to this court's

1    adjudication of the motion to dismiss.  And here, Plaintiffs

2    just filed their first amended complaint a few days ago.  So

3    there's now an additional country added that's going to be

4    considered in the Government's anticipated motion to dismiss.

5        There should be adjudication of that first.  I believe

6    that's the whole reasoning in re the United States Supreme

7    Court case, that threshold jurisdictional arguments need to be

8    resolved prior to any administrative record order.  And I'm not

9    clear --

10            THE COURT:  Well, that's why I said I'm not going to

11   require a record be filed until I resolve the jurisdictional

12   question.  But once I do, even if there's a motion to

13   dismiss -- because I'm going to look at the jurisdictional

14   question pretty much on the merits.  It may not be the ultimate

15   decision, but it's enough to get the process going.

16       I don't agree that I have to defer any kind of action in

17   this case until a motion to dismiss has been brought and

18   adjudicated.  It is not uncommon to have a case management

19   conference, to have discovery ongoing.  It's up to the Court

20   whether it should stay discovery pending a motion to dismiss.

21   And sometimes I do.  Sometimes I don't.

22       If you want to make that motion, you can make that motion,

23   but my intent at this point is that since I will have looked at

24   this question quite closely, perhaps not in the context of a

25   12(b)(1) or a 12(b)(6) motion, but this is not, like, just out

1      of the box.  You'll see what my ruling is, and if I find that

2      there's no jurisdiction, you don't have to worry about it.

3          Or if I find that, after looking at everything, there is,

4      there's enough there to start the process of putting together

5      admin, there will be a process of putting together

6      administrative record.  And I would not -- it's highly unlikely

7      I would await a full motion to dismiss to begin that process.

8          You can still move to convince me, but I'm just giving you

9      a preview, since this is unusual.  Since this is a very robust,

10     among other things, merits-based preliminary injunction, I have

11     to look at some of these threshold issues very closely.

12         So that's what we're going to do.  So I will schedule a

13     case management conference either way once I get this ruling

14     out.  But I would like you to meet and confer to start thinking

15     about both discovery, what that is going to look like, what the

16     record's going to look like, the administrative record, and how

17     we might proceed.

18         Is this something that, you know, motion to dismiss then

19     filed by motion for summary judgment, or do you skip motion to

20     dismiss and just do it all in summary judgement?  You move for

21     summary judgement on some claims but not others?  Do we set up

22     a bench trial on issues where there may be some factual

23     questions?  I don't know, but I'd like you to think about that.

24     Okay?

25             MS. VUONG:  Your Honor, may I raise two additional

1    points, just --

2         THE COURT:  Yeah.

3         MS. VUONG:  As far as if the Court determines that it

4    should postpone the vacatur and the termination, I would note

5    that there are three other cases that are looking at this exact

6    issue and so for you to take that into context in the scope of

7    any decision.

8         And then also if there is to be a stay or a postponement,

9    we would request a couple days for the Government to determine

10   whether or not an appeal should be sought.

11        THE COURT:  Sure.

12        All right.  Anything further?

13        MR. ARULANANTHAM:  I don't know if you want to be

14   heard on the question of whether the relief should run, you

15   know --

16        THE COURT:  It's a question of --

17        MR. ARULANANTHAM:  I'm welcome to address it if Your

18   Honor --

19        THE COURT:  Well, if you have anything to add.  I've

20   read the papers, and I understand, you know, we're all dealing

21   partly in a bit of a state of flux here.  Things are moving

22   probably as we speak, probably on this question about scope of

23   any stay, etcetera, etcetera.

24        I understand the arguments, pro and con, and I've read the

25   concurrence in the Ramos case.  So I'm aware of the issues.  I

1    am aware of the at least two other cases that are pending -- is

2    it three or two other --

3         MS. VUONG:  It's the three now.  There's some overlap.

4    So this one is -- there's one in Eastern District of New York

5    that's solely on Haiti.  There's one in Massachusetts.

6         THE COURT:  Massachusetts.

7         MS. VUONG:  Yes, and there's one in Maryland.

8         THE COURT:  And there's one in Maryland.

9         MS. VUONG:  Yes.

10        MR. ARULANANTHAM:  Maryland is only about Venezuela.

11   Massachusetts is about both.  New York is about Haiti.

12        The other thing I would just say is there's a footnote in

13   the reply brief where we collect the cases as well since Ramos,

14   just since -- I can't remember -- 2021 or something like that,

15   where the courts have issued universal, whether it's vacaturs

16   or in some cases injunctions, and those have been upheld

17   recently in the Ninth Circuit.  There was an injunction on the

18   birthright citizenship order.

19        And then -- yeah.  It was in the papers, but, you know, at

20   this point, it's well over 84,000 members.  They're in every

21   state.  You cannot limit to the Ninth Circuit and give relief

22   to the party.  So already you can't do that.  And you so, you

23   know, how exactly you would enforce a postponement limited to

24   TPSA members, the Government hasn't even explained how that

25   would be possible.

1          THE COURT:  No.  I understand the arguments, and you

2     have an organization here as represented, and it's provided by

3     declaration or substantiated by declaration that this is a

4     membership organization that is nationwide with members in all

5     states.  Whether that's relevant or not, I don't know.  We'll

6     figure that out.  All right?  All right.

7          Thank you, everyone.

8          THE COURTROOM DEPUTY:  This hearing is concluded.

9     (The proceedings concluded at 12:18 P.M.)

10                          ---o0o---

11                    CERTIFICATE OF REPORTER

12      I certify that the foregoing is a correct transcript from

13     the record of proceedings in the above-entitled matter.

14

15    DATE:  Friday, March 21, 2025

16

17     _____
                    *April Wood Brott*

18          April Wood Brott, CSR No. 13782

19

20

21

22

23

24

25