Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
Stephany Martinez Tiffer (SBN 341254)
martineztiffer@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R., HENDRINA VIVAS CASTILLO, A.C.A., SHERIKA BLANC, VILES DORSAINVIL, and G.S., <br><br> Plaintiffs, <br><br> vs. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA, <br><br> Defendants. | Case No. 3:25-cv-01766-EMC <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' ADMINISTRATIVE MOTION FOR STAY PENDING APPEAL (ECF NO. 95)** |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*Pro Hac Vice*)
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*Pro Hac Vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.    DEFENDANTS HAVE NOT MADE A "STRONG SHOWING" THAT THEY
ARE LIKELY TO SUCCEED ON THE MERITS. ................................................. 2

A.    The Court Has Jurisdiction to Consider Plaintiffs' Claims. ............................ 2

1.    Section 1254a(b)(5) Does Not Bar Plaintiffs' Claims. ........................ 2

2.    Section 1252(f)(1) Does Not Bar the Relief This Court Ordered. ........ 3

3.    Defendants Have Not Shown a "Strong" Likelihood of Prevailing
on the Merits. ...................................................................................... 4

4.    Defendants Cannot Show a "Strong" Likelihood of Success
on the Discrimination Claim. ................................................................ 6

II.    THE BALANCE OF HARMS STRONGLY FAVORS LEAVING THE COURT'S
ORDER IN PLACE. ............................................................................................... 9

A.    The Equities Weigh Overwhelmingly in Favor of Postponement. .................. 9

B.    The Court Properly Rejected Defendants' Attempt to Recast the Threat of
Irreparable Harm to Plaintiffs as Inherent to the Statutory Scheme. ........................ 12

C.    It Is Not Irreparable Harm to Be Prevented from Performing an Illegal
Action. ............................................................................................................... 13

D.    Narrowing the Scope of the 705 Stay is Unwarranted, Unworkable, and
Inconsistent with Settled APA Practice. ....................................................... 14

E.    Defendants Cannot Justify Withholding the Administrative Record and
Lack a Basis to Preemptively Stay Even the Possibility of Discovery...................... 15

CONCLUSION.................................................................................................................. 16

i

PLAINTIFFS' OPPOSITION TO DEFENDANTS' ADMINISTRATIVE
MOTION FOR STAY PENDING APPEAL (ECF No. 95) - CASE No. 3:25-CV-01766-EMC

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Abrego Garcia v. Noem*,
5      No. 25-cv-951 (D. Md. Mar. 31, 2025) ...............................................................12

6  *California v. DHS*,
    612 F. Supp. 3d 875 (N.D. Cal. 2020) ..............................................................15
7

*CASA de Maryland, Inc. v. Trump*,
8      355 F. Supp. 3d 307 (D. Md. 2018) ....................................................................3

9  *Centro Presente v. DHS*,
    332 F. Supp. 3d 393 (D. Mass. 2018) ................................................................3
10

11  *China Unicom (Ams) Operations Ltd. v. FCC*,
    124 F.4th 1128 (9th Cir. 2024) ..........................................................................5
12

*Doe v. Becerra*,
13      704 F. Supp. 3d 1006 (N.D. Cal. 2023) ............................................................13

14  *East Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ..............................................................................4
15

16  *Easyriders Freedom F.I.G.H.T. v. Hannigan*,
    92 F.3d 1486 (9th Cir. 1996) ............................................................................14
17

*Gorbach v. Reno*,
18      219 F.3d. 1087 (9th Cir. 2000) (en banc) ...........................................................4

19  *Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) ...........................................................................4
20

21  *Ivy Sports Medicine, LLC v. Burwell*,
    767 F.3d 81 (D.C. Cir. 2014) .............................................................................5
22

*U.S. ex rel. Knauff v. Shaughnessy*,
23      338 U.S. 537 (1950) ..........................................................................................13

24  *Korematsu v. United States*,
    323 U.S. 214, 233, 235 (1944) ...........................................................................7
25

26  *Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ..........................................................................15
27

*Latta v. Otter*,
28      771 F.3d 496 (9th Cir. 2014) ............................................................................13

ii

PLAINTIFFS' OPPOSITION TO DEFENDANTS' ADMINISTRATIVE
MOTION FOR STAY PENDING APPEAL (ECF NO. 95) - CASE NO. 3:25-CV-01766-EMC

*McNary v. Haitian Refugee Ctr.*,
   498 U.S. 479 (1991) ................................................................................................3

*Nken v. Holder*,
   556 U.S. 418 (2009) .............................................................................................3, 4

*Patel v. Garland*,
   596 U.S. 328 (2022) ................................................................................................3

*Ramos v. Nielsen*,
   336 F. Supp. 3d 1075 (N.D. Cal. 2018) ................................................................12

*Ramos v. Wolf*,
   975 F.3d 872 (9th Cir. 2020) ...............................................................................3, 9

*Saget v. Trump*,
   345 F. Supp. 3d 287 (E.D.N.Y. 2018) ...................................................................3

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020) ................................................................................13

*SKF USA Inc. v. United States*,
   254 F.3d 1022 (Fed. Cir. 2001)..............................................................................5

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 2022) ...................................................................................4

*Trump v. Hawaii*,
   585 U.S. 667 (2018)................................................................................................7

*United Gas Improvement Co. v. Callery Props., Inc.*,
   382 U.S. 223 (1965)................................................................................................5

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ..............................................................................14

**Statutes**

8 U.S.C. 1254a(c)(2)(B)...............................................................................................10

8 U.S.C. 1254a(c)(3) ....................................................................................................10

**Other Authorities**

90 Fed. Reg. 8805-01....................................................................................................10

90 Fed. Reg. 9040 .........................................................................................................10

Ali Watkins & Alan Feuer, *U.S. Says Deportation of Maryland Man Was an
   'Administrative Error,'* N.Y. TIMES (Apr. 1, 2025)..............................................12

iii

Rule 11(b)(3)...........................................................................................................................7

iv

**INTRODUCTION**

Defendants ask this Court to stay its detailed order postponing their recent Venezuelan TPS decisions. ECF No. 93 (the "Order"); ECF No. 95 (the "Motion" or "Mot."). Their request would upend, rather than preserve, the status quo. The Court should deny it.

Defendants never grapple with the most obvious problem: a stay would strip nearly 350,000 people of their livelihoods and expose them to deportation, shattering families and communities. The resulting humanitarian crisis would be irreversible, no matter how the Court rules on summary adjudication or at trial. In contrast, if Defendants were to win at trial, they would suffer little if any harm from having permitted a few more months of TPS for this community. Defendants never seriously contest these asymmetrical stakes. Nor do they provide an iota of evidence that the government will suffer irreparable injury. Venezuelan TPS holders have registered with the government, passed extensive background checks, and maintained higher levels of labor market participation and lower rates of criminal conduct than the general population. Order 2, 64.

Notably, this Court made these and other irreparable harm findings on an evidentiary record that stands unrebutted. Defendants have proven incapable of marshalling any competent evidence. They also have never disputed the admissibility of Plaintiffs' fact and expert evidence. Instead, Defendants offer a two-page excerpt from the Federal Register containing the Secretary's assertions about "national interest" in light of the alleged actions of individuals Defendants label by fiat as gang members—without offering any evidence that they have TPS status—and alleged burdens on local economies supposedly due to TPS holders. These unsupported assertions cannot establish irreparable harm. Courts evaluate requests for emergency stays based on facts, not rhetorical talking points. Defendants cannot prevail when they have offered *no evidence*.

Defendants also fail to make the required "strong showing" that they will prevail on the legal issues underlying the Order. Their jurisdictional arguments would strip federal courts of the ability to review unlawful and arbitrary conduct, no matter how egregious, and immunize from review blatantly racist state action, even if it clearly violates the Fifth Amendment. That is not our law. As the Court's opinion shows, governing Ninth Circuit and Supreme Court doctrine dictate the result of virtually every important jurisdictional question at issue in this case. Where they do not, this Court's

1

1   conclusions are consistent with the views of the overwhelming majority of courts to consider these

2   issues. In response, Defendants merely regurgitate arguments this Court has already found meritless

3   after detailed analysis.

4        As for the merits, Defendants wholly ignore Plaintiffs' second APA argument—that the

5   Secretary's vacatur decision rested on arbitrary and capricious reasoning—which is sufficient by

6   itself to support this Court's postponement Order. That error makes further consideration of their

7   merits arguments unnecessary. But should the Court address them, it will again find that Defendants

8   have offered nothing to show a likelihood of success, let alone a "strong" one.

9        Finally, Defendants ask this Court to limit the effect of its ruling nationwide. Their argument

10  presumes this Court has issued an injunction, which it has not. It also, again, ignores the record

11  evidence here—that the National TPS Alliance has well over 84,000 Venezuelan TPS holder

12  members in every state (and D.C.). Attempting to limit the Order to those individuals (whether or

13  not they had joined the Alliance at the time the complaint was filed) would be a logistical nightmare,

14  inviting uneven application of unlawful decisions. For all these reasons, this Court should deny

15  Defendants' request for a stay.

16                                  **ARGUMENT**

17  **I.    DEFENDANTS HAVE NOT MADE A "STRONG SHOWING" THAT THEY ARE**

18  **       LIKELY TO SUCCEED ON THE MERITS.**

19       Defendants offer nothing even resembling a "strong showing" of likelihood of success on the

20  merits, as required to obtain a stay pending appeal.

21       **A.    The Court Has Jurisdiction to Consider Plaintiffs' Claims.**

22            1.    Section 1254a(b)(5) Does Not Bar Plaintiffs' Claims.

23       Defendants offer nothing new in defense of their extreme position that Section 1254a(b)(5)

24  bars even claims challenging the Secretary's interpretation of the statute and claims arising under

25  Section 1254a(c)—a subsection that is not covered by the stripping provision. As to the former, the

26  law is so clear that even Defendants conceded reviewability at oral argument. Their attempt to

27  reverse that concession cannot be reconciled with what they actually said in open court. *See* Tr.

28  50:12–15 ("THE COURT: Okay. So you could have judicial reviews as to the -- construing the

                                         2

1    statute, for instance, in determining whether or not there was implicit authority or not? MS.

2    VUONG: Yes, Your Honor."); *see also id.* at 50:4–11, 50:23–51:08, 79:15–20.

3         In any event, Defendants cannot dispute that every judge to have considered the scope of

4    Section 1254a(b)(5) has agreed that "a claim that an agency has adopted an erroneous interpretation

5    of a governing statute would be reviewable under *McNary*, particularly because the court's

6    resolution of these sort of challenges turns on a review of the law itself, rather than a review of the

7    merits of any specific agency determinations." *Ramos v. Wolf*, 975 F.3d 872, 895 (9th Cir. 2020),

8    *vacated upon reh'g en banc*, 59 F.4th 1010 (9th Cir. 2023); *see also Centro Presente v. DHS*, 332 F.

9    Supp. 3d 393, 406–09 (D. Mass. 2018); *Saget v. Trump*, 345 F. Supp. 3d 287, 294–96 (E.D.N.Y.

10   2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 320–21 (D. Md. 2018). A view

11   rejected by every court to consider it does not have a strong likelihood of success.

12        Defendants suggest that the legal landscape has changed because of the Supreme Court's

13   construction of a different statute that also happened to use the word "any" in *Patel v. Garland*, 596

14   U.S. 328 (2022). But *Patel* did not change the meaning of the word "any." Mot. 3. *Patel* never

15   addressed Section 1254a(b)(5), and in this statute "any" modifies "determination." *Patel* did not

16   address the meaning of "determination." That word was construed in *McNary v. Haitian Refugee*

17   *Ctr.*, 498 U.S. 479 (1991). As this Court has already explained, Order 25, *McNary* treated it as a

18   term of art with a narrow focus. *See McNary*, 498 U.S. at 492–94. Its holding binds this Court.

19                    2.    Section 1252(f)(1) Does Not Bar the Relief This Court Ordered.

20        Defendants also rehash their argument that vacatur and postponement relief under the APA

21   are injunctive in nature for purposes of Section 1252(f)(1), but again fail to acknowledge that their

22   view has been rejected by every court to consider it. *See* ECF No. 67 (Pls.' Reply ISO Mot. to

23   Postpone at 2 (citing cases)). They now suggest that any decision that acts to "forestall [Plaintiffs']

24   possible removal" runs afoul of Section 1252(f)(1), Mot. 4, but ignore that the Supreme Court in

25   *Nken* held exactly the opposite *as to stays of removal*. *See Nken v. Holder*, 556 U.S. 418, 428–29

26   (2009). And while *Nken* concerned Section 1252(f)(2), its reasoning that—in contrast to an

27   injunction—"[a] stay … temporarily suspend[s] the source of authority to act" but does not "direct[]

28   an actor's conduct"—obviously applies to stays of other forms of administrative action as well. *See*

3

1    *id.* Similarly, Defendants' argument that any order having "the practical effect of an injunction"

2    must be treated as an injunction ignores both *Nken* and controlling administrative law doctrine in this

3    and virtually every other circuit. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th

4    Cir. 2021) (rejecting that argument as to "set aside" relief under the APA); *Harmon v. Thornburgh*,

5    878 F.2d 484, 495 & n.21 (D.C. Cir. 1989) (same).[1]

6                    3.    Defendants Have Not Shown a "Strong" Likelihood of Prevailing on the

7                          Merits.

8            In their rush to obtain a stay, Defendants entirely fail to address Plaintiffs' second APA

9    argument—that the Secretary's reasons for vacatur were arbitrary and capricious. That independent

10   ground on which this Court ruled supports the entire decision. Order 55. Indeed, at oral argument,

11   Defendants conceded that, contrary to the current Secretary's position, there was nothing wrong with

12   Secretary Mayorkas's decision to consolidate the 2021 and 2023 registration periods. Tr. 69:25–70:2

13   ("Plaintiffs are correct that these overlapping registrations can take place, but that's within the

14   discretion of the Secretary on how that registration should take place."). Defendants' failure to

15   establish that they are likely to prevail on that argument is fatal to their stay motion.

16           Should the Court choose to consider the rest of Defendants' discussion of the merits, it will

17   still find no reason to stay its decision. Even though this Court relied on the Ninth Circuit's en banc

18   decision in *Gorbach v. Reno*, 219 F.3d. 1087, 1095 (9th Cir. 2000) (en banc), *see* Order 47,

19   Defendants again fail to explain how to reconcile their position with that decision. *Gorbach* rejects

20   their view that agencies generally possess implied authority to un-do what they can do. Defendants

21   claim that the Court's analysis of the Secretary's authority to deconsolidate registration periods is

22   "irreconcilable" with its holding that the Secretary lacked vacatur authority, Mot. 5, but fail to

23   recognize that this is an *alternative* holding. As the Court explained, *"[e]ven if"* the Secretary had

24   reconsideration authority, the challenged vacatur would violate the APA because the Secretary failed

---

25   [1] Defendants err in claiming that *Texas v. United States*, 40 F.4th 205 (5th Cir. 2022), is no longer
26   good law. Mot at 5. The Supreme Court never addressed the Fifth Circuit's analysis of Section
     1252(f)(1) in *Texas*. It was the district court's subsequent decision in that case, on remand from the
     Fifth Circuit, that was appealed and reversed on certiorari before judgment. The scope of 1252(f)(1)
27   remains an open question at the Court—albeit one in which the Chief Justice has expressed strong
     disagreement with Defendants' position. *See* ECF No. 67 (citing, *inter alia*, *Biden v. Texas*, 597 U.S.
28   785, 801 n.4 (2022) (explicitly reserving question); *id.* at 15 (quoting C.J. Roberts).

                                                    4

1    to consider deconsolidation as an alternative to vacatur. Order 58–59 (emphasis added). Beyond this

2    obvious mistake, Defendants' argument reflects their ongoing basic misunderstanding of the doctrine

3    in this area. Whether an agency has reconsideration authority turns on the particular statutory

4    provisions governing the decision being reconsidered. The TPS statute forbids reconsideration of

5    decisions extending designations, because the statute provides fixed time periods for extensions and

6    specific procedures for extending and terminating designations. In contrast, the TPS statute provides

7    no specific procedures for altering registration processes. Therefore, reconsideration of registration

8    processes could well be permitted, even if reconsideration of designations is not.

9        Defendants also finally address *China Unicom (Ams) Operations Ltd. v. FCC*, 124 F.4th

10   1128 (9th Cir. 2024)—a decision they entirely ignored in their briefing on the motion. *Compare*

11   Mot. 5 *with* Opp. to Mot. to Postpone (ECF No. 60). Their new arguments are waived, but in any

12   event are meritless. *China Unicom* found agency reconsideration authority only because the statute

13   at issue provided neither fixed time periods nor any process for altering the decision under

14   consideration. *See id.* at 1150 ("CUA neither contends that the Communications Act sets forth any

15   such specific statutory procedures for revoking a certificate, nor has it pointed to any such

16   procedural provision in the Act that the FCC would supposedly evade if it were held to have implied

17   revocation authority here"). Further, *China Unicom* held that a statute's specification of fixed time

18   periods for a benefit is inconsistent with implicit agency authority to reconsider at any time. *Id.* at

19   1148. That recent Ninth Circuit case forecloses Defendants' arguments, as this Court's detailed

20   analysis of the opinion already found. Order 48–49.

21       Defendants also cite *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014)

22   and *SKF USA Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001). Neither supports their position.

23   *Ivy Sports Medicine* confirms that "any inherent reconsideration authority does not apply . . . where

24   Congress has spoken" by providing a specific statutory process to alter an agency decision. 767 F. 3d

25   at 86. And *SKF* says only that *a court* may remand an agency decision under its review if the agency

26   so requests "because [the agency] believes that its original decision is incorrect on the merits and

27   wishes to change the result." 254 F.3d at 1029. *SKF* says nothing about agency authority to

28   reconsider absent a judicial remand. *Id.*; *cf. United Gas Improvement Co. v. Callery Props., Inc.*, 382

5

1   U.S. 223, 229–30 (1965) (agency that normally lacked refund authority could issue refunds where its

2   price orders were challenged in court and court remanded for reconsideration).[2]

3           4.      Defendants Cannot Show a "Strong" Likelihood of Success on the

4                   Discrimination Claim.

5           Defendants have no coherent answer to this Court's detailed, powerful analysis of the race

6   discrimination claim. Order 59–75. As this Court catalogued, Secretary Noem has repeatedly

7   expressed discriminatory animus against Venezuelan immigrants and Venezuelan TPS holders

8   specifically by "equat[ing]" them "with gang members, criminal, mentally unstable persons, and the

9   like," drawing on "'false narrative[s] [and] racist tropes that have long been wielded against

10  immigrants to the United States.'" Order 64 (quoting MacLean Decl., Ex. 20 at 19 & Young Decl.

11  ¶ 3). These statements cannot be dismissed as unconnected to the TPS decisions. For example, *while*

12  *announcing the vacatur* on Fox News, Secretary Noem characterized Venezuelans as "dirt bags."

13  Order 65. In an appearance on Meet The Press only four days later, she doubled down on her

14  aspersions while explaining her termination decision, characterizing "folks from Venezuela that have

15  come into this country" as "members of [TdA]," and insinuating that they migrated to the U.S.

16  because "Venezuela purposely emptied out their prisons, emptied out their mental health facilities

17  and sent them to the United States of America," and claimed TPS is "to [the] benefit of criminals."

18  *See* Order 65–66. Defendants make no attempt to explain away the blatantly racist justifications and

19  slurs that Secretary Noem used specifically when explaining these decisions to the public. *See* Mot.

20  6–7. That omission should suffice to dispose of this issue; a party cannot establish a strong

21  likelihood of success where it ignores the strongest arguments against its position.

22          Against a mountain of evidence to the contrary, and despite no evidence of their own,

23  Defendants make no attempt to explain their view that the Secretary's vilification of Venezuelan

24  TPS holders is *not* driven by animus. *See id*. Defendants characterize Plaintiffs' evidence as a

25  "paucity," but fail to address any of it—they do not even cite to this Court's Order discussing that

26  evidence, or attempt to support their assertion that Plaintiffs' evidence of Secretary Noem's

---

[2] Defendants' argument that it is too late to postpone the decisions under 5 U.S.C. 705, Mot. 6, also
simply repeats their original position while ignoring the Court's reasoning, including the
inconsistency in Defendants' position that the Court highlighted. Order 28–29 & n.9.

6

1   statements were "taken out of context or [lack] any direct link to the Secretary's determination."

2   Mot. 7.[3] And despite having ample opportunity during briefing and at the hearing, Defendants have

3   not tendered even a shred of evidence that Venezuelan TPS holders have ties to any gangs or

4   criminal activity, nor have they attempted to controvert Plaintiffs' evidence demonstrating the

5   opposite. *See* Tr. 13:14–14:03. Thus, the Court was clearly correct to find "the undisputed record

6   establishes that Venezuelan TPS beneficiaries . . . have lower rates of criminality than the general

7   U.S. population," as well as "higher education attainment" and high rates of labor participation and

8   earned income. Order 2. Against the background of these undisputed facts, the Court correctly found

9   that Secretary Noem's invidious characterizations of Venezuelan TPS holders are false, and that her

10  vacatur and termination decisions were driven by animus. Indeed, "[a]cting on the basis of a

11  negative group stereotype and generalizing such stereotype to the entire group," as the Secretary has

12  done, "is the classic example of racism." Order 66 (citing *Hirabayashi v. United States*, 320 U.S. 81,

13  96–99 (1943); *Korematsu v. United States*, 323 U.S. 214, 233, 235 (1944) (Murphy, J. & Roberts. J.,

14  dissenting)).

15          Defendants nonetheless insist that the Secretary's decisions are "plausibly related" to

16  legitimate government objectives, which (they claim) is all they must show under *Trump v. Hawaii*,

17  585 U.S. 667 (2018), asserting that when "the Government's interests in border, national security,

18  and foreign policy" are at stake, "[t]here is no basis to look behind" a challenged policy. Mot. 6

19  (quoting *Hawaii* at 704–05). But Defendants ignore that even *Hawaii*—where the challenged policy

20  barred only the entry of *noncitizens from abroad*, and was promulgated by the *President* under a

21  statute granting vast discretionary authority to act in the name of national security, permitted courts

22  to "look behind the face of" a challenged policy, including by considering "plaintiffs' extrinsic

23  evidence," to "consider[] whether the . . . policy is plausibly related to the Government's stated

24  objective[s]," *see id.* at 670–71, 679–80, 670–71, 704–05 (cleaned up). Defendants do not explain

---

[3] In particular, Defendants have again asserted that Secretary Noem's racist statements lack "any direct link" to the challenged decisions, while ignoring her appearances on Fox News and Meet the Press where she explained these particular decisions using racist slurs and lies. Mot. at 20. Defendants also misstate what the Federal Register notices say about TdA. Mot. 7. In fact, the notices *never* state "[t]he Secretary determined that Tren de Aragua gang members were covered by the 2023 [TPS] designation." *See* discussion *infra* p. 10; *cf.* Rule 11(b)(3) ("factual contentions" must "have evidentiary support").

7

1   why here they are somehow entitled to even *more* deferential review than the Supreme Court applied

2   in *Hawaii*. *See* Order 61 (finding the vacatur decision did not cite either national security or foreign

3   relations as rationales); *id.* at 61–62 (finding no "concrete evidence" nor "any basis" that the

4   termination decision implicated interests in national security or relations with Venezuela).

5   Defendants cannot always obtain extremely deferential review simply by incanting the phrase

6   "national interest," unsupported by any evidence. And, for the reasons explained in this Court's

7   Order, the challenged orders themselves and the Secretary's public statements explaining the

8   decisions leave no doubt that the only "plausible" explanation for these decisions are the racist

9   reasons the Secretary gave when she announced them.

10       In any case, as this Court held, Plaintiffs' claim is governed by *Arlington Heights* rather than

11   *Hawaii*—yet another conclusion Defendants' stay motion declines to contest. Under *Arlington

12   Heights*, this is not a close case. Defendants do not attempt to demonstrate that *any* of Secretary

13   Noem's statements on which this Court relied for its factual findings were *not* motivated by animus.

14   Nor do they defend the highly unusual procedural sequence, history of TPS decision making, and

15   other evidence raising a strong inference of animus. Order 72–75. Defendants are not likely to show

16   that the Court's factual findings as to the Secretary's motivation are clearly erroneous.

17       Contrary to Defendants' characterization, Plaintiffs do not need to rely on a "cat's paw"

18   theory to prove their equal protection claim. *See* Mot. 7. The Court's Order made this abundantly

19   clear, "emphasiz[ing] that, even without consideration of [President Trump's] statements, Plaintiffs

20   have sufficiently established animus based on, *inter alia*, Secretary Noem's discriminatory

21   statements." Order 71. But the Court is also correct that evidence of President Trump's animus

22   merits "consideration" because at least some of his statements related to TPS policy or decision

23   making, and there is evidence that the President directly influenced TPS policy or decision making

24   in this case. *Id.* at 69–70. It is in that context that this Court found that President Trump has, for

25   "years," expressed discriminatory animus "about Venezuelan immigrants and/or TPS holders

26   specifically," and "about non-white immigrants and/or TPS holders generally." *Id.* at 66. For

27   example, while on the campaign trail for the 2024 presidential election, candidate Trump repeated

28   the same lies used by Secretary Noem, claiming that "the slums and prison cells of Caracas

8

1   [Venezuela]" were now empty because the individuals who allegedly used to occupy them—whom

2   he described as "animals"—had been "deposit[ed] into the United States bus after bus after bus." *Id.*

3   at 67–68. After relentlessly characterizing Venezuelan migrants as "criminals" while on the

4   campaign trail, President Trump then claimed, on the first day of his second administration, that

5   Americans needed protection from an immigration "invasion" that had been facilitated, in part, by

6   TPS. *Id.* at 68–69. While this evidence is not necessary for Plaintiffs to prevail, it provides further

7   support for Plaintiffs' equal protection claim. Defendants' motion makes no attempt to suggest—let

8   alone demonstrate—that President Trump lacks animus against Venezuelan TPS holders, that his

9   statements did not relate to TPS, or that his statements did not directly influence Secretary Noem's

10  TPS decision making. Nor do they acknowledge, much less contend with, the Court's careful

11  explanation for why the vacated *Ramos* decision's rejection of a "cat's paw" theory "applies with far

12  less force to the case at bar." *Id.* at 70–71.

## II.  THE BALANCE OF HARMS STRONGLY FAVORS LEAVING THE COURT'S ORDER IN PLACE.

### A.  The Equities Weigh Overwhelmingly in Favor of Postponement.

16      Defendants obscure the vast disparity in potential harm that each side faces at this stage of

17  the litigation. The worst case for Defendants if they lose now but win at trial is that Venezuelan TPS

18  holders would have retained TPS for a few more months while the Court considers the merits on an

19  expedited basis. Meanwhile, Plaintiffs and amici have provided unrebutted evidence that Venezuelan

20  TPS holders would suffer immediate, severe, and irreparable harm if a stay is granted.

21      Defendants have presented no evidence that Venezuelan TPS holders harm the economy or

22  public safety, or otherwise undermine the public interest; on the contrary, a mountain of unrefuted

23  evidence shows the opposite, as this Court found. *See, e.g.*, Order 38–44, 64, 73–74. As one member

24  of the *Ramos* panel majority recognized in the now vacated decision, TPS holders "undoubtedly,

25  contribute[] to the United States in meaningful ways, culturally, economically, and

26  otherwise." *Ramos*, 975 F.3d at 900 (Nelson, J., concurring).

27      In response to the overwhelming evidence that Venezuelan TPS holders make important

28  positive contributions to their communities, Defendants again overstate and in one case actually

9

PLAINTIFFS' OPPOSITION TO DEFENDANTS' ADMINISTRATIVE
MOTION FOR STAY PENDING APPEAL (ECF NO. 95) - CASE NO. 3:25-CV-01766-EMC

1  misrepresent the supposed findings in Secretary Noem's Federal Register notices to support their

2  false claim that Venezuelan TPS holders "pose a public safety threat." Mot. 8. Defendants contend

3  that "[t]he Secretary determined that Tren de Aragua gang members were covered by the 2023 [TPS]

4  designation." *Id.*[4] But the Federal Register notices conspicuously do ***not*** assert that ***any*** TPS holder

5  is a gang member. *See* 90 Fed. Reg. 8805-01 (vacatur notice saying nothing whatsoever about TPS

6  holders posing a threat) *and* 90 Fed. Reg. 9040, 9042 (termination notice stating that "[a]mong these

7  *Venezuelan nationals* who have crossed into the United States are members of the Venezuelan gang

8  known as Tren de Aragua," but saying nothing about whether any *TPS holders* are members)

9  (emphasis added). Defendants also ignore that the statute renders individuals ineligible for TPS

10 based on criminal convictions or security threats. 8 U.S.C. 1254a(c)(2)(B) (rendering ineligible for

11 TPS any noncitizen convicted of more than a single misdemeanor or "described in section

12 1158(b)(2)(A) of this title," which includes when there are "reasonable grounds for regarding [an

13 individual] . . . as a danger to the security of the United States"). And Defendants do not need a stay

14 of this Court's Order to withdraw TPS from any individual who becomes ineligible due to criminal

15 convictions or reasonable grounds for regarding the individual to be a security threat. 8 U.S.C.

16 1254a(c)(3) (authorizing the Secretary to withdraw TPS for an ineligible individual). As this Court

17 found, "[t]he government's attempt to cast Venezuelan TPS holders as criminals . . . is a form of

18 group defamation," Order 42, that lacks foundation in the record. *Id.* at 73–74.

19         Defendants also reiterate Secretary Noem's unsubstantiated assertion in the Federal Register

20 notice that TPS "strains local resources.'" Mot. 9 (cleaned up). But as this Court found, TPS

21 provides employment authorization which has *alleviated* the burden on local communities, allowing

22 individuals who cannot safely return to their home countries to be self-sufficient and not dependent

23 on public assistance. Order 38–40. In fact, it is *stripping* TPS holders of work authorization that

24 would result in grave harm to the economy. *Id.*.

25         Public health and safety would also suffer because fear of removal would deter migrants

26 from seeking preventative healthcare or assisting law enforcement. *Id.* at 40–41, 74. These harms

27 _____

28 [4] Defendants made the same unsupported assertion in opposition to Plaintiffs' postponement motion. *See* ECF No. 60 at 7 ("[Secretary Noem] found that this population [of Venezuelan TPS holders] includes members of Tren de Aragua[.]").

10

PLAINTIFFS' OPPOSITION TO DEFENDANTS' ADMINISTRATIVE
MOTION FOR STAY PENDING APPEAL (ECF NO. 95) - CASE NO. 3:25-cv-01766-EMC

1   would impact not only TPS holders, but also their U.S. citizen neighbors and family members. *Cf.*

2   ECF No. 60 at 24 (government brief purporting to prioritize Americans' wellbeing).

3          The concocted dangers Defendants raise (with no evidence) obviously do not outweigh the

4   risks to Plaintiffs if a stay of this Court's Order is imposed. If the Court allows the TPS vacatur and

5   termination to take effect before adjudication, no final judgment could undo the harm for Plaintiffs

6   and hundreds of thousands of other Venezuelan TPS holders. Defendants never contested the

7   evidence that Plaintiffs face the imminent loss of their legal status, work authorization, and driver's

8   licenses, and risk being deported to a country under dictatorship and a severe humanitarian crisis.

9   Order 36 ("The government conceded at the hearing that it had no counter-evidence and no basis to

10  doubt the bona fides of the factual declarations[.]"). Venezuelan TPS holders face the threat of being

11  separated from their families and children, the loss of vital medical care, the loss of educational

12  opportunities, and the ineligibility for more lasting immigration relief for which they would

13  otherwise be eligible but for the early termination of TPS. *Id.* at 31–36.

14         Defendants now, for the first time, assert that removal of TPS holders cannot constitute

15  irreparable harm on its own. Mot. at 8–10 (citing *Nken*, 556 U.S. at 435). This argument is waived. It

16  is also wrong for several reasons. Plaintiffs challenge not just removal, but also seek relief in light of

17  the massive economic harm from lost employment authorization that the illegal termination of their

18  lawful status would cause. They have also shown more than typical deportation-related harms,

19  because here removal would be to a country the United States has categorized as a "Level 4: Do Not

20  Travel" country due to the extraordinary security risks, humanitarian crisis, and crumbling

21  infrastructure in Venezuela. Order 1. And to the extent Defendants suggest—again for the first

22  time—that many Venezuelan TPS holders could find other avenues to remain in the United States,

23  Mot. at 8, that argument is both waived and contradicted by record evidence establishing that no

24  such avenues exist for many members of this community. *See* ECF No. 25 (Tolchin Dec. ¶¶ 11, 23);

25  ECF No. 19 (Ferro Dec. ¶ 15).

26         Furthermore, if TPS holders are removed during a stay, there may be no remedy even if this

27  Court ultimately finds that the vacatur and termination are contrary to law. Indeed, the government is

28  now taking the position that courts lack jurisdiction to repatriate an erroneously removed noncitizen.

11

PLAINTIFFS' OPPOSITION TO DEFENDANTS' ADMINISTRATIVE
MOTION FOR STAY PENDING APPEAL (ECF NO. 95) - CASE NO. 3:25-CV-01766-EMC

1    In another context, the government recently acknowledged "administrative error" in sending a

2    Salvadoran man—who had no criminal history and was legally protected from removal to El

3    Salvador because of fear of torture—to the Salvadoran prison where it has recently sent at least

4    dozens of Venezuelan migrants with little evidence and no due process.[5] In response to a motion for

5    relief filed on the date of this Court's postponement Order, the government contested the federal

6    district court's jurisdiction to order the individual's return.[6] A stay in the implementation of this

7    Court's Order could thus result in TPS holders—including Plaintiffs—losing their legal status and

8    being removed, with the government arguing that the harm literally cannot be repaired by order of

9    any court.

10        Defendants cannot overcome this lopsided record. The equities overwhelmingly favor

11   keeping the Court's Order in place.

12        **B.    The Court Properly Rejected Defendants' Attempt to Recast the Threat of**

13        **Irreparable Harm to Plaintiffs as Inherent to the Statutory Scheme.**

14        In this case and in *Ramos*, the Court rejected the government's claim—reiterated here—that

15   the harms to Plaintiffs are somehow "inherent" to TPS and thus irrelevant. Order 37. While the

16   statute establishes time-limited periods of protection, and a mechanism to either extend or terminate

17   designations, the unsupported elimination of this humanitarian protection is *not* inherent in the

18   statutory scheme. Congress designed a statutory scheme which compels the extension of TPS

19   protections where country conditions warrant it, not one which can be terminated on the Secretary's

20   whim. "[F]or a fixed period of time, TPS holders have both the right to work and the right to be free

21   from removal, which give not only stability but also security in their lives and time with their

22   families otherwise threatened by Secretary Noem's actions. In short, time matters, even if that time

23   is limited." *Id.* "[T]he shortening of [] time in the United States and acceleration of [] removal . . .

24   may constitute irreparable injury." *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1087 (N.D. Cal. 2018);

25   _____

26   [5] Ali Watkins & Alan Feuer, *U.S. Says Deportation of Maryland Man Was an 'Administrative Error*,' N.Y. TIMES (Apr. 1, 2025), https://www.nytimes.com/2025/04/01/us/politics/maryland-man-deportation-error-el-salvador.html.

27   [6] Defendants' Memorandum of Law in Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order at 5–9, *Abrego Garcia v. Noem*, No. 25-cv-951 (D. Md. Mar. 31, 2025), ECF No. 11.

28

1    *see also Doe v. Becerra*, 704 F. Supp. 3d 1006, 1017 (N.D. Cal. 2023), *abrogated on other grounds*

2    *by Doe v. Garland*, 109 F.4th 1188 (9th Cir. 2024) (explaining that even limited extensions of time

3    at liberty in the U.S. may affect family ties, employment, and educational opportunities). Defendants

4    offer no reason to reject the extensive authority establishing what should be obvious: that the loss of

5    several additional months of time in this country works a severe harm on Plaintiffs and other TPS

6    holders.

7    **C.    It Is Not Irreparable Harm to Be Prevented from Performing an Illegal Action.**

8    The government's central argument that the Court's postponement of agency action causes

9    irreparable harm warranting a stay largely relies on an assertion that the government's statutory

10   interpretation is correct. *See* Mot. 7 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)

11   (Roberts, C.J., in chambers) for the proposition that the government "suffers a form of irreparable

12   injury" "[a]ny time [it] is enjoined by a court from effectuating statutes"). But, as this Court

13   articulated, there is no irreparable harm from being unable to enforce an unlawful action. Where

14   "Plaintiffs have made a showing that the Secretary has acted unlawfully" and indeed contrary to

15   statute, neither the governmental nor the public interest is served by the enforcement of the agency

16   action. Order 38. Moreover, the Ninth Circuit has rejected the notion that there is irreparable harm

17   whenever the government cannot enforce its laws. *Sierra Club v. Trump*, 963 F.3d 874, 897 n.17

18   (9th Cir. 2020) (citation omitted), *vacated and remanded sub nom. Biden v. Sierra Club*, 142 S. Ct.

19   46 (2021) (mem.) (stating that while there may be "some authority" for this idea, it is "not

20   dispositive of the balance of harms analysis"); *Latta v. Otter*, 771 F.3d 496, 500 n.1 (9th Cir. 2014)

21   (citations omitted) ("Individual justices, in orders issued from chambers, have expressed the view

22   that a state suffers irreparable injury when one of its laws is enjoined, [but] [n]o opinion for the

23   Court adopts this view.").

24   Without any evidence of irreparable harm, the government simply argues that it should be

25   given "utmost deference" beyond "the province of any court" based on a bare assertion that it is the

26   Executive's prerogative to "assess[] the national interest." Mot. 7–8 (quoting *U.S. ex rel. Knauff v.*

27   *Shaughnessy*, 338 U.S. 537, 542 (1950)). But executive deference has limits which Defendants have

28   breached here. Defendants rely on *Knauff*, but that case concerns the admissibility of foreign

13

1   nationals at the border, not the rights of individuals who have lived here for years. And even in the

2   context of national security cases concerning the entry of non-citizens from abroad, "the Supreme

3   Court has repeatedly and explicitly rejected the notion that the political branches have unreviewable

4   authority over immigration or are not subject to the Constitution when policymaking in that context.

5   . . . [C]ourts can and do review constitutional challenges to the substance and implementation of

6   immigration policy. . . . This is no less true when the challenged immigration action implicates

7   national security concerns." *Washington v. Trump*, 847 F.3d 1151, 1162–64 (9th Cir. 2017). The law

8   does not give Defendants the impunity they seek.

9         **D.    Narrowing the Scope of the 705 Stay is Unwarranted, Unworkable, and**

10              **Inconsistent with Settled APA Practice.**

11        Finally, Defendants largely repeat their meritless arguments against applying the Court's

12   relief "universally," insofar as it applies against the vacatur and termination orders themselves.

13   Order 75–76. Defendants also advance a wholly new position in passing, asserting without any

14   support that the Court's Order should be limited not only to the named Plaintiffs, but only to those

15   members of Plaintiff NTPSA who held membership "on the date their complaint was filed." Mot. 10

16   (emphasis added). Because Defendants did not raise this argument in their opposition to Plaintiffs'

17   Motion to Postpone, they have waived it. It is also meritless for several reasons. First, attempting to

18   implement such a rule would be a logistical nightmare, as it would require Defendants to somehow

19   apply this Court's Order to only those NTPSA members who joined on some date. Defendants never

20   explain how they would ascertain or apply such a rule to tens of thousands of TPS holders. Second,

21   Defendants cite no case that has ever imposed that limitation, whereas many have not done so. *See,*

22   *e.g.*, *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996) (considering

23   whether relief would benefit associational plaintiff's members, without limitation to when they

24   joined the organization). Third, even if this Court were to impose that arbitrary limitation,

25   Defendants could not bar such individuals from joining this lawsuit as individuals (or filing their

26   own lawsuit in this Court) and obtaining the benefit of this Court's ruling. The Court should find this

27   argument waived, but if it does not it should reject it as meritless.

28

14

PLAINTIFFS' OPPOSITION TO DEFENDANTS' ADMINISTRATIVE
MOTION FOR STAY PENDING APPEAL (ECF NO. 95) - CASE NO. 3:25-cv-01766-EMC

1

2

**E.      Defendants Cannot Justify Withholding the Administrative Record And Lack a**
**Basis to Preemptively Stay Even the Possibility of Discovery.**

3

4

5

Defendants request, without argument, an administrative stay of discovery (including, apparently, on Plaintiffs' Haiti claims, which are not the subject of the Order) and all other deadlines. Mot. 10. Defendants again overreach.

6

7

8

9

10

11

12

This Court has not yet ruled on the propriety of discovery. It has merely set a deadline for the production of the administrative record—the bare minimum in every APA case. Defendants have not objected to producing the administrative record on grounds of burden; nor could irreparable harm arise merely from producing a record. In any event, given that Defendants seek to undo the Order on appeal on an expedited schedule, and given the imminent harm to Haitian TPS holder from Defendants' "partial vacatur" of Haiti's TPS extension, Plaintiffs have a heightened need for prompt record production.

13

14

15

16

17

18

19

20

21

22

In addition, the Court already has recognized that disputes about discovery should be addressed after production of the complete administrative record. It would be particularly unfair to preemptively foreclose discovery on this emergency motion when Plaintiffs have not served any discovery, and when they plainly assert an independent constitutional claim that the Court has already found to be well-grounded. *See, e.g.*, *California v. DHS*, 612 F. Supp. 3d 875, 892 (N.D. Cal. 2020) (extra-record discovery may be warranted where there is an independent constitutional claim). Plaintiffs also expect to be able to establish deviations from past practice, and may need assistance to secure a complete record for that claim as well. *See, e.g.*, *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (extra-record discovery may be proper to "identify and plug holes in the administrative record").

23

24

25

26

The Motion thus falls far short of the showing required for emergency relief both to block the default disclosure practice in cases that include APA claims and to prematurely foreclose the possibility of discovery while Plaintiffs remain in the dark as to the scope of the administrative record.

27

28

1

**CONCLUSION**

2          Therefore, Plaintiffs respectfully request that the Court deny Defendants' Motion in its

3     entirety.

4

 Date:  April 3, 2025                                    Respectfully submitted,

5

6                                                        CENTER FOR IMMIGRATION LAW AND
                                                          POLICY, UCLA SCHOOL OF LAW

7
                                                           /s/ *Ahilan T. Arulanantham*
8                                                        Ahilan T. Arulanantham
                                                          Stephany Martinez Tiffer
9
                                                         Emilou MacLean
10                                                       Michelle (Minju) Y. Cho
                                                          Amanda Young
11                                                       ACLU FOUNDATION
                                                          OF NORTHERN CALIFORNIA
12
                                                         Eva L. Bitran
13                                                       ACLU FOUNDATION
                                                          OF SOUTHERN CALIFORNIA
14
15                                                       Jessica Karp Bansal
                                                          Lauren Michel Wilfong (*Pro Hac Vice*)
16                                                       NATIONAL DAY LABORER ORGANIZING
                                                          NETWORK
17
18                                                       Erik Crew (*Pro Hac Vice*)
                                                          HAITIAN BRIDGE ALLIANCE
19
20                                                       Attorneys for Plaintiffs

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' ADMINISTRATIVE
MOTION FOR STAY PENDING APPEAL (ECF NO. 95) - CASE NO. 3:25-CV-01766-EMC