0805, may be submitted to FDA using Forms FDA 3913 and FDA 3914, respectively.

Patent infringement notifications are also included in the scope of collection activity. Section 351(l) of the PHS Act provides for the exchange of patent information and resolution of patent disputes between a 351(k) biosimilar applicant and the holder of the 351(a) BLA reference product. If a biosimilar applicant is served with a complaint in an action for a patent infringement described in section 351(l)(6) of the PHS Act, the biosimilar applicant is required to provide the Secretary of HHS with notice and a copy of the complaint within 30 days of service. FDA is required to publish notice of a complaint received under section 351(l)(6)(C) of the PHS Act in the **Federal Register**.

Relevant information regarding applicable statutory requirements is discussed in topical guidance documents, issued consistent with our BsUFA Commitment Letter and Agency Good Guidance Practice regulations in 21 CFR 10.115, which provide for public comment at any time. The following draft and final guidance documents include instructional and procedural information on communicating with FDA regarding the BsUFA program:

• ''Assessing User Fees Under the Biosimilar User Fee Amendments of 2022'' (July 2023), available at *https://www.fda.gov/regulatory-information/search-fda-guidance-documents/assessing-user-fees-under-biosimilar-user-fee-amendments-2022*. The guidance document instructs respondents on requesting discontinuation from the BPD program, as well as requesting to move products to the discontinued section of the biosimilar list. The guidance document also provides information on the consequences of failing to pay BsUFA III fees as well as processes for submitting reconsideration and appeal requests.

• ''Formal Meetings Between the FDA and Sponsors or Applicants of BsUFA Products'' (August 2023), available at: *https://www.fda.gov/regulatory-information/search-fda-guidance-documents/formal-meetings-between-fda-and-sponsors-or-applicants-bsufa-products-guidance-industry*. The guidance document explains standardized procedures for requesting, preparing, scheduling, conducting, and documenting formal meetings with FDA, and discusses good meeting management practices.

• As listed on our Center for Drug Evaluation and Research 2023 and 2024 Annual Guidance agenda (available at: *https://www.fda.gov/media/134778/download*), we are planning to issue a draft guidance for industry entitled ''Pediatric Study Plans for Biosimilar Products,'' to help implement provisions of the Pediatric Research Equity Act, codified in section 505B of the FD&C Act (21 U.S.C. 355c). For more information regarding FDA guidance documents, including ways to participate, please visit *https://www.fda.gov/drugs/guidance-compliance-regulatory-information/guidances-drugs*.

*Description of Respondents:* Sponsors and applicants who have or intend to submit an application for a biosimilar product for licensure under section 351(k) of the PHS Act or who intend to submit an initial pediatric study plan (iPSP) as described in section 505B(e) of the FD&C Act for those products intended to be licensed under section 351(k) of the PHS Act and being developed as a proposed biosimilar to a reference product.

In the **Federal Register** of September 23, 2024 (89 FR 77531), we published a 60-day notice requesting public comment on the proposed collection of information. No comments were received.

We estimate the burden of this information collection as follows:

TABLE 1—ESTIMATED ANNUAL REPORTING BURDEN

| FDA form; survey | Number of respondents | Number of responses per respondent | Total annual responses | Average burden per response | Total hours |
|---|---|---|---|---|---|
| Biosimilar User Fee Cover Sheet (Form FDA 3792) | 30 | 2 | 60 | 0.5 (30 minutes). | 30 |
| Request for discontinuation from BPD program or to move products to discontinued section of Biosimilar List. | 6 | 1 | 6 | 1 | 6 |
| Biosimilar product & interchangeable product applications (351(k)); patent infringement notifications (351(l)). | 16 | 1.94 | 31 | 610.90 | 18,938 |
| Formal meeting requests as recommended in FDA guidance | 135 | 2.30 | 311 | 21.42 | 6,661 |
| Submission of Pediatric Assessment; iPSP template information, including deferrals of pediatric assessments for proposed biosimilar products; iPSP amendments as recommended in FDA guidance. | 11 | 1 | 11 | 38.18 | 420 |
| Total | | | 419 | | 26,055 |

Our estimated burden for the information collection reflects an overall increase of 13,069 hours and 105 responses annually. Although part of the increase may be attributed to the inclusion of burden associated with the submission of pediatric study plans, the majority of adjustments correspond with an increase in submissions we are receiving.

Dated: January 28, 2025.

**P. Ritu Nalubola,**

*Associate Commissioner for Policy.*

[FR Doc. 2025–02153 Filed 1–30–25; 11:15 am]

**BILLING CODE 4164–01–P**

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2803–25]**

**Vacatur of 2025 Temporary Protected Status Decision for Venezuela**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) vacatur.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) has decided to vacate the January 10, 2025, decision of former Secretary of Homeland Security Alejandro Mayorkas regarding TPS for Venezuela. Former Secretary Mayorkas extended the 2023 designation of Venezuela for TPS for 18 months, allowed a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) may obtain TPS through the same extension date of October 2, 2026, and extended certain Employment Authorization Documents (EADs). All of this also had the effect of extending the 2021 designation. This notice vacates Mayorkas' notice immediately.

**DATES:** The vacatur is effective immediately.

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Temporary Protected Status (TPS) Generally

The Immigration and Nationality Act (INA) authorizes the Secretary, after consultation with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. INA 244(b)(1), 8 U.S.C. 1254a(b)(1).[1] The determination whether to designate any foreign state (or part thereof) for TPS is discretionary, and there is no judicial review of ''any determination of the

[Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state'' for TPS. INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in the Secretary's discretion, may then grant TPS to eligible nationals of that foreign state (or individual aliens having no nationality who last habitually resided in the designated foreign state). *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## II. Background

On March 9, 2021, Secretary Mayorkas designated Venezuela for TPS on the basis of extraordinary and temporary conditions in Venezuela that prevented nationals of Venezuela from returning in safety (2021 designation). *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure,* 86 FR 13574 (Mar. 9, 2021).

On September 8, 2022, DHS extended the Venezuela 2021 TPS designation for 18 months. *See Extension of the Designation of Venezuela for Temporary Protected Status,* 87 FR 55024 (Sept. 8, 2022). On October 3, 2023, DHS extended the Venezuela 2021 TPS designation for another 18 months with an expiration date of September 10, 2025, and separately newly designated Venezuela, which then Secretary Mayorkas called a ''redesignation,'' for 18 months (the Venezuela 2023 designation) with an expiration of April 2, 2025, resulting in two separate and concurrent Venezuela TPS designations. *See Extension and Redesignation of Venezuela for Temporary Protected Status,* 88 FR 68130 (Oct. 3, 2023).

The Venezuela 2023 TPS designation expires on April 2, 2025, and the Secretary must make a decision by February 1, 2025. The Venezuela 2021 TPS designation expires on September 10, 2025, and the Secretary must make a decision by July 12, 2025. Notwithstanding that these are both decisions that would lie with new Secretary of Homeland Security Kristi Noem, Secretary Mayorkas took action with respect to both designations.

On January 17, 2025, Secretary Mayorkas issued a notice extending the 2023 designation of Venezuela for TPS for 18 months (Mayorkas Notice). The notice was based on Secretary Mayorkas' January 10, 2025, determination that the conditions for the designation continued to be met. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). In the Mayorkas Notice, Secretary Mayorkas did not expressly extend or terminate the 2021 designation. Instead, the notice allowed for a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through the same extension date of October 2, 2026. *See Extension of the 2023 Designation of Venezuela for Temporary Protected Status,* 90 FR 5961 (Jan. 17, 2025). The notice also extended certain EADs. The effect of Secretary Mayorkas' actions, however, resulted in an extension of the 2021 Venezuela TPS designation.

## III. Vacatur of the 2025 Decision

The Secretary of Homeland Security is vacating the January 10, 2025 decision of Secretary Mayorkas which (1) extended the 2023 Venezuela TPS designation and (2) allowed the consolidation of filing processes for both designations, which had the effect of extending the 2021 Venezuela TPS designation, and (3) extended certain EADs. An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination.[2]

---

[1] Although section 244(b)(1) of the INA continues to refer to the Attorney General, this authority now resides with the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, as amended. *See, e.g.,* 6 U.S.C. 557; 8 U.S.C. 1103(a)(1). The Secretary may designate a country (or part of a country) for TPS on the basis of (1) an ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals, (2) an environmental disaster (including an epidemic), or (3) extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must officially request a TPS designation. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1).

[2] *See* INA 103(a), 244(b)(3), (b)(5)(A); 8 U.S.C. 1103(a), 1254a(b)(3), (b)(5)(A); *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador,* 88 FR 40282, 40285 (June 21, 2023) (''An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any

## A. Reason for the Vacatur

The Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation. As described above, Secretary Mayorkas explicitly made a determination to extend the 2023 designation. While he did not make an explicit determination to extend the 2021 designation, he did allow consolidated filing processes for both the 2021 and 2023 designations, which in effect extended the 2021 designation by up to 13 months. Furthermore, he allowed extensions for certain EADs.

The Mayorkas Notice states that *Existing TPS beneficiaries, including those registered under the October 3, 2023 TPS designation or the prior March 9, 2021 TPS designation, who wish to extend their status through October 2, 2026, must re-register during the re-registration period described in* the January 2025 decision. This, and other language in the Mayorkas Notice, indicate that the practical effect of Secretary Mayorkas' decision was to combine both designations and to provide an extension until October 2, 2026, for the population of *both* designations.

The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation ''shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]''). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made

attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.[3]

Given the exceedingly brief period in which the January 17, 2025 extension notice has been in effect and the fact that the effect of this vacatur will restore the status quo preceding that notice, any putative reliance interests on the extension notice are negligible. Venezuela 2023 registrants will retain their temporary protected status under the pre-existing designation at least until April 2, 2025. With respect to any Venezuela 2021 registrants who elected, pursuant to the Mayorkas Notice, to register under the Venezuela 2023 designation, USCIS will restore their Venezuela 2021 registration. And, in any event, any putative reliance interests arguably engendered by the Mayorkas Notice are outweighed by the overriding interests and concerns articulated in this notice.

## B. Effect of the Vacatur

As a result of the vacatur, the 2021 Venezuela TPS designation and the 2023 Venezuela designation remain in effect and their associated statutory deadlines remain in effect. The statutory deadline[4] for each of those designations is as follows: The Secretary (1) must determine, by February 1, 2025, whether to extend or terminate the 2023 Venezuela TPS designation and (2) must determine, by July 12, 2025, whether to extend or terminate the 2021 Venezuela TPS designation.

If the Secretary does not make a timely determination (for example, if the Secretary were *not* to make determination by February 1, 2025 whether to extend or terminate the 2023 Venezuela TPS designation), then the statute provides for an automatic extension of the designation for an

additional period of 6 months. INA 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

Pursuant to this vacatur, USCIS will no longer accept Venezuela TPS re-registration applications (Form I–821) and associated Applications for Employment Authorization (Form I–765) filed under the Mayorkas Notice. For TPS beneficiaries who have already filed applications to re-register for TPS pursuant to the Mayorkas Notice and paid any fees associated with their applications, USCIS will cease processing their applications, and issue refunds of any fees paid by those aliens.[5] Additionally, USCIS will invalidate EADs; Forms I–797, Notice of Action (Approval Notice); and Forms I–94, Arrival/Departure Record (collectively known as TPS-related documentation) that have been issued with October 2, 2026 expiration dates under the Mayorkas Notice. USCIS will provide refunds to any fees paid by these aliens as well.

Additionally, pursuant to this vacatur the automatic EAD extensions provided in the Mayorkas Notice are hereby rescinded. USCIS will provide additional guidance regarding the two Venezuela TPS designations on a future date in accordance with applicable laws.

## IV. Notice of Vacatur of Secretary Mayorkas' 2025 Decision

By the authority vested in me as Secretary under section 244 of the Immigration and Nationality Act, 8 U.S.C. 1254a, I am vacating the decisions announced in the January 17, 2025 notice titled *Extension of the 2023 Designation of Venezuela for TPS*. In doing so, I am vacating the (1) extension of the Venezuela 2023 TPS designation, (2) the consolidation of filing processes for both designations, which, in effect, resulted in the extension of the 2021 TPS designation, and (3) the EADs that were extended. As a result, the Venezuela 2023 TPS designation and the Venezuela 2021 TPS designation remain in effect and their associated statutory deadlines remain in effect.

**Kristi Noem,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2025–02183 Filed 1–30–25; 11:15 am]

**BILLING CODE 9111–97–P**

---

TPS-related determination, and upon reconsideration, to change the determination.''); *see also, e.g., Ivy Sports Medicine, LLC v. Burwell,* 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) (''[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . ''[I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide.'' (quotation marks and citations omitted)); *Macktal v. Chao,* 286 F.3d 822, 825–26 (5th Cir. 2002) (''It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.'') (collecting cases); *Mazaleski v. Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) (''We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.''); *cf. Last Best Beef, LLC v. Dudas,* 506 F.3d 333, 340 (4th Cir. 2007) (agencies possess especially ''broad authority to correct their prior errors'').

[3] *See* Exec. Order, *Protecting the American People Against Invasion,* sec. 16(b) (Jan. 20, 2025), *available at https://www.whitehouse.gov/ presidential-actions/2025/01/protecting-the-american-people-against-invasion/.*

[4] If there is an existing TPS designation for a foreign state, the Secretary must review country conditions in consultation with appropriate U.S. Government agencies and make a determination— at least 60 days before the designation is set to expire—whether to extend or terminate that country's TPS designation (*i.e.,* whether the conditions for the designation continue to be met). INA 244(b)(3), 8 U.S.C. 1254a(b)(3).

[5] As noted above, any Venezuela 2021 registrants who elected, pursuant to the Mayorkas Notice, to register under the Venezuela 2023 designation will have their Venezuela 2021 registration restored.

Decision Document

**USCIS Notice: Determination re Venezuela's 2023 Temporary Protected Status Designation**

(1) Terminate Venezuela's 2023 Temporary Protected Status Designation and (2) Direct an appropriate ESEC office to use the DAC-Federal Register Signature Card to electronically sign the document for publication in the Federal Register

FEB 0 1 2025

Date.

Decision Document

**USCIS Notice: Vacatur of 2025 Temporary Protected Status Decision for Venezuela**

 (1) Vacate the decisions announced in the January 17, 2025 notice titled *Extension of the 2023 Designation of Venezuela for Temporary Protected Status* and (2) Approve publication in the *Federal Register*.

JAN 2 3 2025

Date.

**9111-97**

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2803-25]**

**Vacatur of 2025 Temporary Protected Status Decision for Venezuela**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) vacatur.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) has decided to vacate the January 10, 2025 decision of former Secretary of Homeland Security Alejandro Mayorkas regarding TPS for Venezuela.  Former Secretary Mayorkas (1) extended the 2023 designation of Venezuela for TPS for 18 months, (2) allowed a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) may obtain TPS through the same extension date of October 2, 2026, and (3) extended certain Employment Authorization Documents (EADs).  All of this also had the effect of extending the 2021 designation. This notice vacates Mayorkas' notice immediately.

**DATES:** The vacatur is effective immediately.

**FOR FURTHER INFORMATION CONTACT:**  Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800-375-5283.

**SUPPLEMENTARY INFORMATION:**

1

## I.     Temporary Protected Status (TPS) Generally

The Immigration and Nationality Act (INA) authorizes the Secretary, after consultation with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. INA 244(b)(1), 8 U.S.C. 1254a(b)(1)[1].  The determination whether to designate any foreign state (or part thereof) for TPS is discretionary, and there is no judicial review of "any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS.  INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).  The Secretary, in the Secretary's discretion, may then grant TPS to eligible nationals of that foreign state (or individual aliens having no nationality who last habitually resided in the designated foreign state).  *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation.  *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A).  If the Secretary determines that the conditions in the foreign state continue to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the

---

[1] Although section 244(b)(1) of the INA continues to refer to the Attorney General, this authority now resides with the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, as amended. *See, e.g.*, 6 U.S.C. 557; 8 U.S.C. 1103(a)(1). The Secretary may designate a country (or part of a country) for TPS on the basis of (1) an ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals, (2) an environmental disaster (including an epidemic), or (3) extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must officially request a TPS designation. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1).

2

Secretary's discretion, 12 or 18 months.  *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A),

(C).  If the Secretary determines that the foreign state no longer meets the conditions for TPS

designation, the Secretary must terminate the designation.  *See* INA 244(b)(3)(B), 8 U.S.C.

1254a(b)(3)(B).

## II.    Background

On March 9, 2021, Secretary Mayorkas designated Venezuela for TPS on the basis of

extraordinary and temporary conditions in Venezuela that prevented nationals of Venezuela from

returning in safety (2021 designation).  *See Designation of Venezuela for Temporary Protected*

*Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred*

*Enforced Departure*, 86 FR 13574 (Mar. 9, 2021).

On September 8, 2022, DHS extended the Venezuela 2021 TPS designation for 18

months.  *See Extension of the Designation of Venezuela for Temporary Protected Status*, 87 FR

55024 (Sept. 8, 2022).  On October 3, 2023, DHS extended the Venezuela 2021 TPS designation

for another 18 months with an expiration date of September 10, 2025, and separately newly

designated Venezuela, which then Secretary Mayorkas called a "redesignation," for 18 months

(the Venezuela 2023 designation) with an expiration of April 2, 2025, resulting in two separate

and concurrent Venezuela TPS designations.  *See Extension and Redesignation of Venezuela for*

*Temporary Protected Status*, 88 FR 68130 (Oct. 3, 2023).

The Venezuela 2023 TPS designation expires on April 2, 2025, and the Secretary must

make a decision by February 1, 2025.  The Venezuela 2021 TPS designation expires on

September 10, 2025, and the Secretary must make a decision by July 12, 2025.  Notwithstanding

the fact that these are both decisions that would lie with new Secretary of Homeland Security

Kristi Noem, Secretary Mayorkas took action with respect to both designations.

VZ Vacatur_0008

On January 17, 2025, Secretary Mayorkas issued a notice extending the 2023 designation of Venezuela for TPS for 18 months (Mayorkas Notice).  The notice was based on Secretary Mayorkas' January 10, 2025 determination that the conditions for the designation continued to be met.  *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A).  In the Mayorkas Notice, Secretary Mayorkas did not expressly extend or terminate the 2021 designation.  Instead, the notice allowed for a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through the same extension date of October 2, 2026.  *See Extension of the 2023 Designation of Venezuela for Temporary Protected Status*, 90 FR 5961 (Jan. 17, 2025).  The notice also extended certain EADs.  The effect of Secretary Mayorkas' actions, however, resulted in an extension of the 2021 Venezuela TPS designation.

## III.    Vacatur of the 2025 Decision

The Secretary of Homeland Security is vacating the January 10, 2025 decision of Secretary Mayorkas which (1) extended the 2023 Venezuela TPS designation and (2) allowed the consolidation of filing processes for both designations, which had the effect of extending the 2021 Venezuela TPS designation, and (3) extended certain EADs.  An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination.[2]

---

[2] *See* INA 103(a), 244(b)(3), (b)(5)(A); 8 U.S.C. 1103(a), 1254a(b)(3), (b)(5)(A); *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary*

4

### A.    Reason for the Vacatur

The Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation.  As described above, Secretary Mayorkas explicitly made a determination to extend the 2023 designation.  While he did not make an explicit determination to extend the 2021 designation, he did allow consolidated filing processes for both the 2021 and 2023 designations, which in effect extended the 2021 designation by up to 13 months.  Furthermore, he allowed extensions for certain EADs.

The Mayorkas Notice states that *Existing TPS beneficiaries, including those registered under the October 3, 2023 TPS designation or the prior March 9, 2021 TPS designation, who wish to extend their status through October 2, 2026, must re-register during the re-registration period described in* the January 2025 decision.  This, and other language in the Mayorkas Notice, indicate that the practical effect of Secretary Mayorkas' decision was to combine both designations and to provide an extension until October 2, 2026, for the population of *both* designations.

---

*Protected Status Designation for El Salvador*, 88 FR 40282, 40285 (June 21, 2023) ("An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination."); *see also, e.g.*, *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . "[I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide." (quotation marks and citations omitted)); *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) ("It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time."); *cf. Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) (agencies possess especially "broad authority to correct their prior errors").

VZ Vacatur_0010

The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]"). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.[3]

Given the exceedingly brief period in which the January 17, 2025 extension notice has been in effect and the fact that the effect of this vacatur will restore the status quo preceding that notice, any putative reliance interests on the extension notice are negligible. Venezuela 2023 registrants will retain their temporary protected status under the pre-existing designation at least until April 2, 2025. With respect to any Venezuela 2021 registrants who elected, pursuant to the Mayorkas Notice, to register under the Venezuela 2023 designation, USCIS will restore their Venezuela 2021 registration. And, in any event, any putative reliance interests arguably engendered by the Mayorkas Notice are outweighed by the overriding interests and concerns articulated in this notice.

**B.     Effect of the Vacatur**

---

[3] *See* Exec. Order, *Protecting the American People Against Invasion*, sec. 16(b) (Jan. 20, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/.

6

As a result of the vacatur, the 2021 Venezuela TPS designation and the 2023 Venezuela designation remain in effect and their associated statutory deadlines remain in effect.  The statutory deadline[4] for each of those designations is as follows:  The Secretary (1) must determine, by February 1, 2025, whether to extend or terminate the 2023 Venezuela TPS designation and (2) must determine, by July 12, 2025, whether to extend or terminate the 2021 Venezuela TPS designation.

If the Secretary does not make a timely determination (for example, if the Secretary were *not* to make determination by February 1, 2025 whether to extend or terminate the 2023 Venezuela TPS designation), then the statute provides for an automatic extension of the designation for an additional period of 6 months.  INA 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

Pursuant to this vacatur, USCIS will no longer accept Venezuela TPS re-registration applications (Form I-821) and associated Applications for Employment Authorization (Form I-765) filed under the Mayorkas Notice.  For TPS beneficiaries who have already filed applications to re-register for TPS pursuant to the Mayorkas Notice and paid any fees associated with their applications, USCIS will cease processing their applications, and issue refunds of any fees paid by those aliens.[5]  Additionally, USCIS will invalidate EADs; Forms I-797, Notice of Action (Approval Notice); and Forms I-94, Arrival/Departure Record (collectively known as TPS-related documentation) that have been issued with October 2, 2026 expiration dates under the Mayorkas Notice.  USCIS will provide refunds to any fees paid by these aliens as well.

---

[4] If there is an existing TPS designation for a foreign state, the Secretary must review country conditions in consultation with appropriate U.S. Government agencies and make a determination—at least 60 days before the designation is set to expire—whether to extend or terminate that country's TPS designation (i.e., whether the conditions for the designation continue to be met).  INA 244(b)(3), 8 U.S.C. 1254a(b)(3).

[5] As noted above, any Venezuela 2021 registrants who elected, pursuant to the Mayorkas Notice, to register under the Venezuela 2023 designation will have their Venezuela 2021 registration restored.

VZ Vacatur_0012

Additionally, pursuant to this vacatur the automatic EAD extensions provided in the Mayorkas Notice are hereby rescinded. USCIS will provide additional guidance regarding the two Venezuela TPS designations on a future date in accordance with applicable laws.

**IV.    Notice of Vacatur of Secretary Mayorkas' 2025 Decision**

By the authority vested in me as Secretary under section 244 of the Immigration and Nationality Act, 8 U.S.C. 1254a, I am vacating the decisions announced in the January 17, 2025 notice titled *Extension of the 2023 Designation of Venezuela for TPS*. In doing so, I am vacating the (1) extension of the Venezuela 2023 TPS designation, (2) the consolidation of filing processes for both designations, which, in effect, resulted in the extension of the 2021 TPS designation, and (3) the EADs that were extended. As a result, the Venezuela 2023 TPS designation and the Venezuela 2021 TPS designation remain in effect and their associated statutory deadlines remain in effect.

_____
**Kristi Noem**
Secretary,
U.S. Department of Homeland Security

8

Cite as 26 I&N Dec. 884 (AAO 2016)                     Interim Decision #3882

# Matter of DHANASAR, Petitioner

*Decided December 27, 2016*

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Administrative Appeals Office

USCIS may grant a national interest waiver if the petitioner demonstrates: (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that he or she is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the job offer and labor certification requirements. *Matter of New York State Dep't of Transp.*, 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998), vacated.

ON BEHALF OF PETITIONER:  Gerard M. Chapman, Esquire, Greensboro, North Carolina

In this decision, we have occasion to revisit the analytical framework for assessing eligibility for "national interest waivers" under section 203(b)(2)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(2)(B)(i) (2012).  The self-petitioner, a researcher and educator in the field of aerospace engineering, filed an immigrant visa petition seeking classification under section 203(b)(2) of the Act as a member of the professions holding an advanced degree.  The petitioner also sought a "national interest waiver" of the job offer otherwise required by section 203(b)(2)(A).

The Director of the Texas Service Center denied the petition under the existing analytical framework, concluding that the petitioner qualifies for classification as a member of the professions holding an advanced degree but that a waiver of the job offer requirement would not be in the national interest of the United States.  Upon de novo review, and based on the revised national interest standard adopted herein, we will sustain the appeal and approve the petition.

## I. LEGAL BACKGROUND

Subparagraph (A) of section 203(b)(2) of the Act makes immigrant visas available to "qualified immigrants who are members of the professions holding advanced degrees or their equivalent or who because of their exceptional ability in the sciences, arts, or business, will substantially benefit prospectively the national economy, cultural or educational

interests, or welfare of the United States."  Under subparagraph (A), immigrant visas are available to such individuals only if their "services in the sciences, arts, professions, or business are sought by an employer in the United States."

Before hiring a foreign national under this immigrant classification, an employer must first obtain a permanent labor certification from the United States Department of Labor ("DOL") under section 212(a)(5)(A)(i) of the Act, 8 U.S.C. § 1182(a)(5)(A)(i) (2012).  *See also* 8 C.F.R. § 204.5(k)(4)(i) (2016).  A labor certification demonstrates that DOL has determined that there are not sufficient workers who are able, willing, qualified, and available at the place where the alien is to perform such skilled or unskilled labor, and the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed.  In its labor certification application, the employer must list the position's job requirements consistent with what is normally required for the occupation.  *See* 20 C.F.R. § 656.17(h)(1) (2016).  Moreover, the job requirements described on the labor certification application must represent the actual minimum requirements for the job opportunity.  *See* 20 C.F.R. § 656.17(i)(1).  That is, the employer may not tailor the position requirements to the foreign worker's qualifications; it may only list the position's minimum requirements, regardless of the foreign worker's additional skills that go beyond what is normally required for the occupation.  The employer must then test the labor market to determine if able, willing, or qualified U.S. workers are available with the advertised minimum qualifications.  If such U.S. workers are found, the employer may not hire the foreign worker for the position, even if the foreign worker clearly has more skills (beyond the advertised qualifications).  If the employer does not identify such U.S. workers and DOL determines that those workers are indeed unavailable, DOL will certify the labor certification.  After securing the DOL-approved labor certification, the employer may then file a petition with DHS requesting the immigrant classification.

Under subparagraph (B) of section 203(b)(2), however, the Secretary of Homeland Security may waive the requirement of a "job offer" (namely, that the beneficiary's services are sought by a U.S. employer) and, under the applicable regulations, of "a labor certification."  8 C.F.R. § 204.5(k)(4)(ii).[1]  That subparagraph states, in pertinent part, that the

---

[1]  While appearing to limit national interest waivers to only aliens possessing exceptional ability in the sciences, arts, or business, 8 C.F.R. § 204.5(k)(4)(ii) was superseded in part by section 302(b)(2) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, 105 Stat. 1733, 1743

(continued . . .)

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

Secretary "may, when the [Secretary] deems it to be in the national interest, waive the requirements of subparagraph (A) that an alien's services in the sciences, arts, professions, or business be sought by an employer in the United States."[2]  Section 203(b)(2)(i) of the Act.

USCIS may grant a national interest waiver as a matter of discretion if the petitioner satisfies both subparagraphs (A) and (B).  Thus, a petitioner who seeks a "national interest waiver" must first satisfy subparagraph (A) by demonstrating that the beneficiary qualifies as a member of the professions holding an advanced degree or as an individual of exceptional ability.  *See* 8 C.F.R. § 204.5(k)(1)–(3) (providing definitions and considerations for making such determinations); *see also* section 203(b)(2)(C) of the Act (providing that possession of requisite academic degree or professional license "shall not by itself be considered sufficient evidence of exceptional ability").  The petitioner must then satisfy subparagraph (B) by establishing that it would be in the national interest to waive the "job offer" requirement under subparagraph (A).[3]  *See* 8 C.F.R. § 204.5(k)(4)(ii).  This two-part statutory scheme is relatively straightforward, but the term "national interest" is ambiguous.  Undefined by statute and regulation, "national interest" is a broad concept subject to various interpretations.

In 1998, under the legacy Immigration and Naturalization Service, we issued a precedent decision establishing a framework for evaluating national interest waiver petitions.  *Matter of New York State Dep't of Transp.* ("*NYSDOT*"), 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998).

_____

("MTINA").  Section 302(b)(2) of MTINA amended section 203(b)(2)(B)(i) of the Act by inserting the word "professions" after the word "arts," and thereby made the national interest waiver available to members of the professions holding advanced degrees in addition to individuals of exceptional ability.

[2]  Pursuant to section 1517 of the Homeland Security Act ("HSA") of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2311 (codified at 6 U.S.C. § 557 (2012)), any reference to the Attorney General in a provision of the Act describing functions that were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA "shall be deemed to refer to the Secretary" of Homeland Security.  *See also* 6 U.S.C. § 542 note (2012); 8 U.S.C. § 1551 note (2012).

[3]  To do so, a petitioner must go beyond showing the individual's expertise in a particular field.  The regulation at 8 C.F.R. § 204.5(k)(2) defines "exceptional ability" as "a degree of expertise significantly above that ordinarily encountered" in a given area of endeavor.  By statute, individuals of exceptional ability are generally subject to the job offer/labor certification requirement; they are not exempt by virtue of their exceptional ability.  Therefore, whether a given petitioner seeks classification as an individual of exceptional ability, or as a member of the professions holding an advanced degree, that individual cannot qualify for a waiver just by demonstrating a degree of expertise significantly above that ordinarily encountered in his field of expertise.

886

The *NYSDOT* framework looks first to see if a petitioner has shown that the area of employment is of "substantial intrinsic merit." *Id.* at 217. Next, a petitioner must establish that any proposed benefit from the individual's endeavors will be "national in scope." *Id.* Finally, the petitioner must demonstrate that the national interest would be adversely affected if a labor certification were required for the foreign national. *Id.*

Based on our experience with that decision in the intervening period, we believe it is now time for a reassessment. While the first prong has held up under adjudicative experience, the term "intrinsic" adds little to the analysis yet is susceptible to unnecessary subjective evaluation.[4] Similarly, the second prong has caused relatively few problems in adjudications, but occasionally the term "national in scope" is construed too narrowly by focusing primarily on the geographic impact of the benefit. While *NYSDOT* found a civil engineer's employment to be national in scope even though it was limited to a particular region, that finding hinged on the geographic connections between New York's bridges and roads and the national transportation system. Certain locally or regionally focused endeavors, however, may be of national importance despite being difficult to quantify with respect to geographic scope.

What has generated the greatest confusion for petitioners and adjudicators, however, is *NYSDOT*'s third prong. First, this prong is explained in several different ways within *NYSDOT* itself, leaving the reader uncertain what ultimately is the relevant inquiry. We initially state the third prong as requiring a petitioner to "demonstrate that the national interest would be adversely affected if a labor certification were required." *NYSDOT*, 22 I&N Dec. at 217. We then alternatively describe the third prong as requiring the petitioner to demonstrate that the individual "present[s] a national benefit so great as to outweigh the national interest inherent in the labor certification process." *Id.* at 218. Immediately thereafter, we restate the third prong yet again: the petitioner must establish that the individual will "serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications."[5] *Id.* Finally, in what may be construed as either a fourth restatement of prong three or as an explanation of how to satisfy it, we state that "it clearly must be established that the alien's past record justifies projections of future benefit to the national interest." *Id.* at 219. A footnote

---

[4]  *Cf., e.g.*, *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) ("'Intrinsic value' is an inherently subjective and speculative concept.").
[5]  Other, slight variations of the third prong emerge later in the decision. *See NYSDOT*, 22 I&N at 220 ("to a greater extent than U.S. workers"); *see also id.* at 221 ("considerably outweigh").

to this statement clarifies that USCIS seeks "a past history of demonstrable achievement with some degree of influence on the field as a whole." *Id.* at 219 n.6. Although residing in footnote 6, this "influence" standard has in practice become the primary yardstick against which petitions are measured.[6]

Second, and a more fundamental challenge than parsing its several restatements, *NYSDOT*'s third prong can be misinterpreted to require the petitioner to submit, and the adjudicator to evaluate, evidence relevant to the very labor market test that the waiver is intended to forego. The first iteration of prong three, that the national interest would be adversely affected if a labor certification were required, implies that petitioners should submit evidence of harm to the national interest. The third iteration, that the individual will serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications, suggests that petitioners should submit evidence comparing foreign nationals to unidentified U.S. workers. These concepts have proven to be difficult for many qualified individuals to establish or analyze in the abstract. It has proven particularly ill-suited for USCIS to evaluate petitions from self-employed individuals, such as entrepreneurs. In *NYSDOT*, we even "acknowledge[d] that there are certain occupations wherein individuals are essentially self-employed, and thus would have no U.S. employer to apply for a labor certification." *Id.* at 218 n.5. Nonetheless, we did not modify the test to resolve this scenario, which continues to challenge petitioners and USCIS adjudicators. Lastly, this concept of harm-to-national-interest is not required by, and unnecessarily narrows, the Secretary's broad discretionary authority to grant a waiver when he "deems it to be in the national interest."

## II. NEW ANALYTICAL FRAMEWORK

Accordingly, our decision in *NYSDOT* is ripe for revision. Today, we vacate *NYSDOT* and adopt a new framework for adjudicating national interest waiver petitions, one that will provide greater clarity, apply more flexibly to circumstances of both petitioning employers and self-petitioning

---

[6]   While this "influence" standard rests upon the reasonable notion that past success will often predict future benefit, our adjudication experience in the years since *NYSDOT* has revealed that there are some talented individuals for whom past achievements are not necessarily the best or only predictor of future success.

VZ Vacatur_0018

individuals, and better advance the purpose of the broad discretionary waiver provision to benefit the United States.[7]

Under the new framework, and after eligibility for EB-2 classification has been established, USCIS may grant a national interest waiver if the petitioner demonstrates by a preponderance of the evidence:[8] (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that the foreign national is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. If these three elements are satisfied, USCIS may approve the national interest waiver as a matter of discretion.[9]

The first prong, substantial merit and national importance, focuses on the specific endeavor that the foreign national proposes to undertake. The endeavor's merit may be demonstrated in a range of areas such as business, entrepreneurialism, science, technology, culture, health, or education. Evidence that the endeavor has the potential to create a significant economic impact may be favorable but is not required, as an endeavor's merit may be established without immediate or quantifiable economic impact. For example, endeavors related to research, pure science, and the furtherance of human knowledge may qualify, whether or not the potential accomplishments in those fields are likely to translate into economic benefits for the United States.

In determining whether the proposed endeavor has national importance, we consider its potential prospective impact. An undertaking may have national importance for example, because it has national or even global implications within a particular field, such as those resulting from certain improved manufacturing processes or medical advances. But we do not evaluate prospective impact solely in geographic terms. Instead, we look for broader implications. Even ventures and undertakings that have as their focus one geographic area of the United States may properly be considered to have national importance. In modifying this prong to assess "national

---

[7]   Going forward, we will use "petitioners" to include both employers who have filed petitions on behalf of employees and individuals who have filed petitions on their own behalf (namely, self-petitioners).

[8]   Under the "preponderance of the evidence" standard, a petitioner must establish that he or she more likely than not satisfies the qualifying elements. *Matter of Chawathe*, 25 I&N Dec. 369, 376 (AAO 2010). We will consider not only the quantity, but also the quality (including relevance, probative value, and credibility) of the evidence. *Id.*

[9]   Because the national interest waiver is "purely discretionary," *Schneider v. Chertoff*, 450 F.3d 944, 948 (9th Cir. 2006), the petitioner also must show that the foreign national otherwise merits a favorable exercise of discretion. *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *cf. Matter of Jean*, 23 I&N Dec. 373, 383 (A.G. 2002).

VZ Vacatur_0019

importance" rather than "national in scope," as used in *NYSDOT*, we seek to avoid overemphasis on the geographic breadth of the endeavor. An endeavor that has significant potential to employ U.S. workers or has other substantial positive economic effects, particularly in an economically depressed area, for instance, may well be understood to have national importance.

The second prong shifts the focus from the proposed endeavor to the foreign national. To determine whether he or she is well positioned to advance the proposed endeavor, we consider factors including, but not limited to: the individual's education, skills, knowledge and record of success in related or similar efforts; a model or plan for future activities; any progress towards achieving the proposed endeavor; and the interest of potential customers, users, investors, or other relevant entities or individuals.

We recognize that forecasting feasibility or future success may present challenges to petitioners and USCIS officers, and that many innovations and entrepreneurial endeavors may ultimately fail, in whole or in part, despite an intelligent plan and competent execution. We do not, therefore, require petitioners to demonstrate that their endeavors are more likely than not to ultimately succeed. But notwithstanding this inherent uncertainty, in order to merit a national interest waiver, petitioners must establish, by a preponderance of the evidence, that they are well positioned to advance the proposed endeavor.

The third prong requires the petitioner to demonstrate that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. On the one hand, Congress clearly sought to further the national interest by requiring job offers and labor certifications to protect the domestic labor supply. On the other hand, by creating the national interest waiver, Congress recognized that in certain cases the benefits inherent in the labor certification process can be outweighed by other factors that are also deemed to be in the national interest. Congress entrusted the Secretary to balance these interests within the context of individual national interest waiver adjudications.

In performing this analysis, USCIS may evaluate factors such as: whether, in light of the nature of the foreign national's qualifications or proposed endeavor, it would be impractical either for the foreign national to secure a job offer or for the petitioner to obtain a labor certification;[10]

---

[10] For example, the labor certification process may prevent a petitioning employer from hiring a foreign national with unique knowledge or skills that are not easily articulated in a labor certification. *See generally* 20 C.F.R. § 656.17(i). Likewise, because of the nature of the proposed endeavor, it may be impractical for an entrepreneur or

(continued . . .)

whether, even assuming that other qualified U.S. workers are available, the United States would still benefit from the foreign national's contributions; and whether the national interest in the foreign national's contributions is sufficiently urgent to warrant forgoing the labor certification process. We emphasize that, in each case, the factor(s) considered must, taken together, indicate that on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.

We note that this new prong, unlike the third prong of *NYSDOT*, does not require a showing of harm to the national interest or a comparison against U.S. workers in the petitioner's field. As stated previously, *NYSDOT*'s third prong was especially problematic for certain petitioners, such as entrepreneurs and self-employed individuals. This more flexible test, which can be met in a range of ways as described above, is meant to apply to a greater variety of individuals.

## III. ANALYSIS

The director found the petitioner to be qualified for the classification sought by virtue of his advanced degrees. We agree that he holds advanced degrees and therefore qualifies under section 203(b)(2)(A). The remaining issue before us is whether the petitioner has established, by a preponderance of the evidence, that he is eligible for and merits a national interest waiver.

The petitioner proposes to engage in research and development relating to air and space propulsion systems, as well as to teach aerospace engineering, at North Carolina Agricultural and Technical State University ("North Carolina A&T"). The petitioner holds two master of science degrees, in mechanical engineering and in applied physics, as well as a Ph.D. in engineering, from North Carolina A&T. At the time of filing the instant petition, he also worked as a postdoctoral research associate at the university. The record reflects that the petitioner's graduate and postgraduate research has focused on hypersonic propulsion systems (systems involving propulsion at speeds of Mach 5 and above) and on computational fluid dynamics. He has developed a validated computational model of a high-speed air-breathing propulsion engine, as well as a novel numerical method for accurately calculating hypersonic air flow. The petitioner intends to continue his research at the university.

The extensive record includes: reliable evidence of the petitioner's credentials; copies of his publications and other published materials that

---

self-employed inventor, when advancing an endeavor on his or her own, to secure a job offer from a U.S. employer.

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

cite his work; evidence of his membership in professional associations; and documentation regarding his research and teaching activities. The petitioner also submitted several letters from individuals who establish their own expertise in aerospace, describe the petitioner's research in detail and attest to his expertise in the field of hypersonic propulsion systems.

We determine that the petitioner is eligible for a national interest waiver under the new framework. First, we conclude that the petitioner has established both the substantial merit and national importance of his proposed endeavor. The petitioner demonstrated that he intends to continue research into the design and development of propulsion systems for potential use in military and civilian technologies such as nano-satellites, rocket-propelled ballistic missiles, and single-stage-to-orbit vehicles. In letters supporting the petition, he describes how research in this area enhances our national security and defense by allowing the United States to maintain its advantage over other nations in the field of hypersonic flight. We find that this proposed research has substantial merit because it aims to advance scientific knowledge and further national security interests and U.S. competitiveness in the civil space sector.

The record further demonstrates that the petitioner's proposed endeavor is of national importance. The petitioner submitted probative expert letters from individuals holding senior positions in academia, government, and industry that describe the importance of hypersonic propulsion research as it relates to U.S. strategic interests. He also provided media articles and other evidence documenting the interest of the House Committee on Armed Services in the development of hypersonic technologies and discussing the potential significance of U.S. advances in this area of research and development. The letters and the media articles discuss efforts and advances that other countries are currently making in the area of hypersonic propulsion systems and the strategic importance of U.S. advancement in researching and developing these technologies for use in missiles, satellites, and aircraft.

Second, we find that the record establishes that the petitioner is well positioned to advance the proposed endeavor. Beyond his multiple graduate degrees in relevant fields, the petitioner has experience conducting research and developing computational models that support the mission of the United States Department of Defense ("DOD") to develop air superiority and protection capabilities of U.S. military forces, and that assist in the development of platforms for Earth observation and interplanetary exploration. The petitioner submitted detailed expert letters describing U.S. Government interest and investment in his research, and the record includes documentation that the petitioner played a significant role in projects funded by grants from the National Aeronautics and Space

892

Administration ("NASA") and the Air Force Research Laboratories ("AFRL") within DOD. [11]  Thus, the significance of the petitioner's research in his field is corroborated by evidence of peer and government interest in his research, as well as by consistent government funding of the petitioner's research projects.  The petitioner's education, experience, and expertise in his field, the significance of his role in research projects, as well as the sustained interest of and funding from government entities such as NASA and AFRL, position him well to continue to advance his proposed endeavor of hypersonic technology research.

Third and finally, we conclude that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.  As noted above, the petitioner holds three graduate degrees in fields tied to the proposed endeavor, and the record demonstrates that he possesses considerable experience and expertise in a highly specialized field.  The evidence also shows that research on hypersonic propulsion holds significant implications for U.S. national security and competitiveness.  In addition, the repeated funding of research in which the petitioner played a key role indicates that government agencies, including NASA and the DOD, have found his work on this topic to be promising and useful.  Because of his record of successful research in an area that furthers U.S. interests, we find that this petitioner offers contributions of such value that, on balance, they would benefit the United States even assuming that other qualified U.S. workers are available.

In addition to conducting research, the petitioner proposes to support teaching activities in science, technology, engineering, and math ("STEM") disciplines.  He submits letters favorably attesting to his teaching abilities at the university level and evidence of his participation in mentorship programs for middle school students.  While STEM teaching has substantial merit in relation to U.S. educational interests, the record does not indicate by a preponderance of the evidence that the petitioner would be engaged in activities that would impact the field of STEM education more broadly.  Accordingly, as the petitioner has not established by a preponderance of the evidence that his proposed teaching activities meet the "national importance" element of the first prong of the new framework, we do not address the remaining prongs in relation to the petitioner's teaching activities.

---

[11]  Although the director of North Carolina A&T's Center for Aerospace Research ("CAR") is listed as the lead principal investigator on all grants for CAR research, the record establishes that the petitioner initiated or is the primary award contact on several funded grant proposals and that he is the only listed researcher on many of the grants.

## IV.  CONCLUSION

The record demonstrates by a preponderance of the evidence that: (1) the petitioner's research in aerospace engineering has both substantial merit and national importance; (2) the petitioner is well positioned to advance his research; and (3) on balance, it is beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.  We find that the petitioner has established eligibility for and otherwise merits a national interest waiver as a matter of discretion.

In visa petition proceedings, it is the petitioner's burden to establish eligibility for the immigration benefit sought.  Section 291 of the Act, 8 U.S.C. § 1361 (2012).  The petitioner has met that burden.

**ORDER:**  The appeal is sustained and the petition is approved.

 **EL PAÍS**

SUBSCRIBE 

# International

MEXICO · CHINA · LATEST NEWS

◀        ▶

VENEZUELA >

# Venezuela calls on retired teachers to return to school amid staff shortages

Emigration and low salaries for education workers have resulted in the loss of over 100,000 teaching professionals in recent years

VZ Vacatur_0025

Case 3:25-cv-01766-EMC   Document 103-1   Filed 04/07/25   Page 26 of 99



A school in Caracas, Venezuela.
**RAYNER PENA R (EFE)**

### ALONSO MOLEIRO

Caracas   OCT 10, 2024   13:18 EDT

Venezuela's Education Minister Héctor Rodríguez has signed a resolution inviting retired teachers and professors to return to the classroom, just over a week before the start of the school year. This initiative aims to address a significant number of vacancies, particularly in the public sector, caused by the collapse of the salary structure and the mass emigration of educators.

Rodríguez also announced that teachers currently on "service commissions" — working in administrative roles rather than teaching    must return to their teaching positions. In making this announcement, he acknowledged the challenges in filling subjects such as mathematics, physics, and chemistry within

national public education and emphasized the urgent need to ensure that students have full-time teachers in place.

"The primary task we face is to ensure quality, inclusive education for all. However, the biggest challenge in achieving this goal lies within our own bureaucracy and the functioning of the Ministry," said Rodríguez.

The hyperinflationary crisis and severe economic contraction experienced by the country from 2014 to 2020 triggered a mass exodus of teachers at the end of the previous decade, leading to a significant deterioration of the Venezuelan educational system     once a cornerstone of Chavista propaganda regarding social investment and the achievements of its administration. The Venezuelan Federation of Teachers, an educational union, estimates that approximately 100,000 teachers left the profession between 2015 and 2020.

The Maduro government has spent several years denying this reality, asserting that "not a single school has closed in Venezuela" despite the ongoing crisis. Currently, the government blames the situation on international sanctions, claiming these measures restrict their ability to manage budgets effectively. A public school teacher in Venezuela now earns approximately $25 a month, a stark decline from over $400 in 2010, when they were already underpaid. While teachers receive some additional bonuses deposited into their digital wallets amounting to around $150 — they often seek supplemental income by offering private lessons.

Many teachers have turned to alternative trades, becoming motorcycle taxi drivers or accepting loans from public banks     after nearly seven years of limited access to financing — to start micro-enterprises. While the public education sector serves the majority of Venezuela's lower-income populations, private education caters primarily to the middle and upper classes, representing about 30% of the population. Although private institutions face challenges in retaining teachers who wish to emigrate and have also scaled back their services, they generally offer significantly better working conditions.

As the school year begins, Venezuelan President Nicolás Maduro announced a plan aimed at providing socio-economic aid and improvements for impoverished Venezuelan teachers, who are among the poorest in South

America. This initiative includes a digital credit-based purchasing program for acquiring goods, a new healthcare plan, coverage for urban transportation, and a monthly subsidy that includes food bags. Additionally, the country's network of public schools, which have deteriorated significantly in recent years, will undergo a comprehensive maintenance plan, for which Maduro has requested logistical assistance from the Armed Forces.

The Venezuelan teachers' union, one of the largest in the country, has long expressed frustration over the executive's salary arrears and has become a focal point of social unrest, evidenced by street protests over the past two years. Many of these demonstrations have faced harsh repression from the government, with organizers facing prosecution. Since the era of Hugo Chávez, the Bolivarian Revolution has invested heavily in health and education, yielding some encouraging results in its early years. However, these efforts eventually gave way to catastrophic administrative mismanagement and significant failures.

Chavista educational projects initially enjoyed success, particularly with the establishment of Bolivarian Schools and initiatives aimed at combating poverty, such as the School Feeding Program. Notable progress was made in preschool education, and alternative pathways to higher education were expanded through the Sucre Mission.

However, these achievements began to unravel amidst the national socioeconomic collapse that took hold during the currency crisis of 2013, which led to the disappearance of goods and skyrocketing prices. Structural corruption undermined nearly all social programs, and the rapid devaluation of the currency severely eroded teachers' salaries and the funding available for maintenance.

Following significant advancements in education from the 1940s to the 1980s during which illiteracy was nearly eradicated and access to primary education became widespread     Venezuela's educational system, particularly in the public sector, has entered a decline from which it has yet to recover.

*Sign up for our weekly newsletter to get more English-language news coverage from EL PAÍS USA Edition*

Sign up to EL PAÍS US Edition bulletin

  

---

**MORE INFORMATION**



### It's Christmas in Venezuela as Maduro tries to turn page on political and economic crisis

FLORANTONIA SINGER | CARACAS

---



### Venezuela digs in its heels as US sanctions mount

MIGUEL JIMÉNEZ / JUAN DIEGO QUESADA | WASHINGTON / BOGOTÁ

---

**ARCHIVED IN**

Venezuela · Hugo Chávez · Nicolás Maduro                                    ⌄

---

Adheres to                                                       **The Trust Project**

More information ›

If you are interested in licensing this content, click **here**.

Case 3:25-cv-01766-EMC   Document 103-1   Filed 04/07/25   Page 30 of 99

## ÚLTIMAS NOTICIAS

**19:18**    **Trump claims to have sent a letter to Iran to negotiate a nuclear deal**

**17:15**    **Daylight Saving Time 2025: When to change the clocks and everything you need to know**

**17:03**    **Zelenskiy's adviser Mykhailo Podolyak: 'I think Trump will succeed where previous US administrations failed with Russia'**

**16:21**    **The price of opposing Maduro's power**

## MOST VIEWED

**1.** New inheritance mechanism unrelated to DNA is discovered by chance

**2.** Disappearance of eight young people and the silence of three states highlights opacity of crime in Mexico

**3.** EU explores sending military and civilian missions to Ukraine to guarantee security

**4.** 'El Mencho' and 'Don Rodo,' a life of evading justice: From small time dealers to heads of the most powerful cartel in Mexico

**5.** Judith Butler, philosopher: 'If you sacrifice a minority like trans people, you are operating within a fascist logic'

VZ Vacatur_0030

VZ Vacatur_0031

VZ Vacatur_0032

3/7/25, 12:21 PM
Case 3:25-cv-01766-EMC   Document 103-1   Filed 04/07/25   Page 33 of 99
Venezuela calls on retired teachers to return to school amid staff shortages | International | EL PAÍS English

Case 3:25-cv-01766-EMC    Document 103-1    Filed 04/07/25    Page 34 of 99





 SUBSCRIBE

## International

MEXICO · CHINA · LATEST NEWS

◀        ▶

VENEZUELA >

# Venezuela grapples with economic collapse

The modest recovery of recent years fails to mask Venezuela's crisis: a shattered productive structure, poverty levels nearly three times the regional average, and profound inequality



VZ Vacatur_0034

A fuel processing plant in Falcón (Venezuela).
**MIGUEL GUTIERREZ HENRY CHIRINOS (EFE)**

### ALONSO MOLEIRO

Caracas - JAN 17, 2025 - 23:30 EST

○ ⬡ 𝕏 ◗ in 🔗

The inauguration of Nicolás Maduro last Friday ushers in a new chapter for Venezuela, marked by deep socioeconomic wounds. The ongoing financial crisis — arguably the population's greatest source of discontent — persists despite a modest reactivation of consumption. Crisis and political conflict remain intertwined, and after a decade of catastrophic governance and escalating tensions between the ruling party and the opposition, the Maduro government now faces an especially turbulent period.

The evidence of electoral fraud, which Maduro has been unable to convincingly refute, have heightened international pressure. Both the United States and the European Union have stepped up sanctions, and Maduro is bracing for a new wave of isolation. As in the past, this isolation is likely to exacerbate the nation's economic struggles.

The start of Maduro's new mandate follows three years of moderate economic recovery, a relative improvement considering the depths from which Venezuela has emerged. This recovery was preceded by a historic economic contraction that drastically altered the nation's landscape over the past decade. Amid this unprecedented economic crisis — exacerbated by the political isolation of Chavismo — in 2020, the Maduro government began to distance itself from the statist orthodoxy outlined in the *Plan de la Patria*, its flagship economic program. Instead, it adopted a series of market-oriented reforms in an effort to stabilize the economy.

The partial dollarization of the monetary system, the introduction of new exchange and fiscal policies, a more business-friendly stance, and a shift in the treatment of international capital have led to a reduction in year-on-year inflation, a recovery in purchasing power, and some improvement in trade. However, the damage to Venezuela's productive and social fabric had already been done. The socioeconomic collapse experienced between 2014 and 2020, during Maduro's presidency, delivered a devastating blow to the nation's economic framework. This trauma has left many Venezuelans struggling to fully recover from its far-reaching effects.

During the years of strict economic controls, company takeovers, conflicts with capital, and excessive bureaucratization, Venezuela's economy contracted by more than 80%. The local industrial sector was decimated, and now operates at just 30% of its capacity. Thousands of businesses went bankrupt. A wave of nationalizations severely undermined the country's ability to respond to economic challenges. Hyperinflation, which peaked at an astronomical 9,500% in 2019, wreaked havoc on the economy, devastating the financial stability of millions. Meanwhile, the oil industry, once the backbone of Venezuela's economy, collapsed under the weight of a fixed exchange rate policy and pervasive corruption in the state-owned oil company Petróleos de Venezuela (PDVSA). Income poverty doubled, and now affects an estimated 80% of the population, according to the Venezuelan Academy of Economic Sciences (ANCE).

VZ Vacatur_0035

The crisis of the past decade left profound scars: wages were decimated, prices soared, shortages of essential goods became widespread, and public services deteriorated dramatically. This collapse triggered a mass exodus of millions of Venezuelans, many of whom fled the country on foot, seeking refuge across South America.

In 2015, the Central Bank of Venezuela, under Maduro's control, stopped publishing monthly economic data. Media censorship also worsened. The ruling party's popularity, which began to decline in 2014, has not recovered since. In 2019 and 2020, the national economy displayed metrics comparable to those of a war-torn nation, with GDP contracting by a staggering 30 percentage points, according to estimates from private consulting firms.

The popular social assistance programs created by the Chavista government — such as the Barrio Adentro preventive health initiative, the Mi Casa Bien Equipada goods transfer program, Mercal's cheap food markets, and the Cuban-assisted Comprehensive Diagnostic Centers — collapsed during the crisis, largely due to widespread corruption among government officials.

The minimum monthly wage, traditionally around $400, has dropped to just $3. The government provides periodic bonuses every four weeks, but without retroactive benefits, these only raise the effective minimum wage to $150 per month.

International sanctions, particularly from the United States, were introduced in 2016 in response to the political crisis driven by popular discontent. These sanctions significantly restricted Maduro's ability to explore alternative trade options or revitalize the oil industry. The global search for new markets, spurred by Russia's war in Ukraine, fostered a period of cautious détente between Caracas and Washington, leading to a [modest revival in the oil sector](#). However, with the return of Donald Trump to the White House, it is likely that sanctions on Venezuelan oil will tighten further.

National revenues, heavily reliant on crude oil extraction, hit a critical low point in the last decade, with production dropping from nearly 3 million barrels per day to just 300,000 in 2019. Today, after significant challenges, production is slowly approaching the 1 million mark again.

Since 2016, for the first time in its history, remittances from emigrants have become a significant source of Venezuelan tax revenues. The exodus of between seven and eight million people, according to United Nations estimates, represents an unprecedented event in recent Latin American history, highlighting the severity of Venezuela's economic collapse and the erosion of its citizens' political rights. Despite implementing measures like food rationing based on the last digit of each citizen's identity card, the Maduro government has refused to acknowledge its responsibility for the crisis or the existence of a Venezuelan diaspora.

The disastrous performance of the Chavista administration triggered a political shift. In December 2015, the Venezuelan opposition achieved a decisive victory in the parliamentary elections, sending shockwaves through Chavismo. In response, Chavismo moved quickly to consolidate control over all state institutions. This led to the absolute concentration of power in the hands of Maduro and a select group of loyalists, while the government implemented social programs aimed at maintaining Chavista support and building networks of loyalty.

consistently show a sharp decline in popularity. However, any assistance remains inadequate given the collapse of the country's productive activity. In the meantime, Venezuelans are facing a period marked by political uncertainty and looming economic instability.

*Sign up for [our weekly newsletter](#) to get more English-language news coverage from EL PAÍS USA Edition*



Sign up to EL PAÍS US Edition bulletin

**f**   **X**

**MORE INFORMATION**



**Latin America turns its back on Maduro's 'fraudulent' inauguration as president of Venezuela**

MAR CENTENERA | BUENOS AIRES



**Nicolás Maduro is inaugurated in Venezuela despite failing to present official voting records**

JUAN DIEGO QUESADA / ALONSO MOLEIRO | BOGOTÁ / CARACAS

**ARCHIVED IN**

Venezuela  ·  Nicolás Maduro

Adheres to
More information ›

The Trust Project

If you are interested in licensing this content, click **here**

VZ Vacatur_0037



**ÚLTIMAS NOTICIAS**

19:18  Trump claims to have sent a letter to Iran to negotiate a nuclear deal

17:15  Daylight Saving Time 2025: When to change the clocks and everything you need to know

17:03  Zelenskiy's adviser Mykhailo Podolyak: 'I think Trump will succeed where previous US administrations failed with Russia'

16:21  The price of opposing Maduro's power

**MOST VIEWED**

1. New inheritance mechanism unrelated to DNA is discovered by chance

2. Disappearance of eight young people and the silence of three states highlights opacity of crime in Mexico

3. EU explores sending military and civilian missions to Ukraine to guarantee security

4. 'El Mencho' and 'Don Rodo,' a life of evading justice: From small-time dealers to heads of the most powerful cartel in Mexico

VZ Vacatur_0038



VZ Vacatur_0039



VZ Vacatur_0040



VZ Vacatur_0041



VZ Vacatur_0042

## Presidential Documents

Executive Order 14150 of January 20, 2025

## America First Policy Directive to the Secretary of State

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* From this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.

**Sec. 2**. *Policy.* As soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.

**Sec. 3**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01952
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

VZ Vacatur_0043

# Tren de Aragua gang started in Venezuela's prisons and now spreads fear in the US



FILE - Soldiers raid the Tocorón Penitentiary Center, in Tocorón, Venezuela, Sept. 20, 2023. The Tren de Aragua gang originated at th     Read More



BY [JOSHUA GOODMAN](#)
Updated 8:54 PM EST, September 24, 2024

MIAMI (AP) — Former federal agent Wes Tabor says his phone has been lighting up with calls from police departments around the U.S. for advice on how to combat the growing threat from the Venezuelan gang Tren de Aragua.

Tabor was in charge of the U.S. Drug Enforcement Administration's office in the Venezuelan capital of Caracas in 2012 when the gang was still new and when Tabor had barely heard of it.

ADVERTISEMENT

VZ V_____ 0044

Tren de Aragua gang related in Venezuela's prisons and now spreads fear in the US | AP News

**AP**

AP SETS THE STANDARD FOR POLITICAL REPORTING.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.                    DONATE

western hemisphere tied to a mass exodus of Venezuelan migrants.

"What sets this group apart is the level of violence," said Tabor, now retired from the DEA. "They're aggressive, they're hungry and they don't know any boundaries because they've been allowed to spread their wings without any confrontation from law enforcement until now."

## RELATED STORIES



**US deports immigrants to Venezuela after judge blocked transfer to Guantanamo Bay**



**Venezuela sends 2 planes to US to return migrants, signaling a potential improvement in relations**



**Court grants request to block detained Venezuelan immigrants from being sent to Guantanamo**

That's starting to change.

In July, the Biden administration sanctioned the gang, placing it alongside MS-13 from El Salvador and the Mafia-styled Camorra from Italy on a list of transnational criminal organizations and offering $12 million in rewards for the arrest of three leaders. Then, this month, Texas Gov. Greg Abbott declared Tren de Aragua a Tier 1 threat, directing state police to target the gang and paving the way for stiffer penalties for members. Other states may soon follow suit.

## Gang gains notoriety in the US

Focus on the gang jumped after footage from a security camera surfaced on social media showing a group of heavily armed men brazenly entering an apartment in the Denver suburb of Aurora, Colorado.

That prompted former President Donald Trump to vow to " liberate Aurora " from Venezuelans he falsely said were "taking over the whole town."

Police have called the reports exaggerated but nonetheless acknowledged that it is investigating 10 gang members for involvement in several crimes, including a July homicide.

Among them is a Venezuelan who was arrested in another Denver suburb and accused of helping someone else steal a motorcycle and pointing an AR-15 at a tow truck driver who had asked him to move his car. Another was suspected of stealing designer Gucci sunglasses in Boulder and has a multi-state criminal record, including for carjacking and vehicular assault.

Elsewhere, from the heartland to major cities like New York and Chicago, the gang has been blamed for sex trafficking, drug smuggling and police shootings as well as the exploitation of migrants.

The size of the gang and the extent to which its actions are coordinated across state lines and with leaders believed to be outside the U.S. are unclear.

## The Tren originated in an infamous prison

The Tren, which means "train" in Spanish, traces its origin more than a decade ago to an infamously lawless prison with hardened criminals in the central state of Aragua. It nonetheless has expanded in recent years as more than 8 million desperate Venezuelans fled economic turmoil under President Nicolás Maduro's rule and migrated to other parts of Latin America or the U.S.

One of the founders is Hector Guerrero, who was jailed years ago for killing a police officer, according to InSight Crime, a think tank that monitors organized crime in the Americas. Guerrero, better known by his alias El Nino, Spanish for the "boy," later escaped and then was recaptured in 2013. He fled prison again more recently, as Venezuela's government tried to reassert control over its prison population, and is believed to be residing in Colombia.

Authorities in countries such as Chile, Peru and Colombia — all with large populations of Venezuelan migrants — have accused the group of being behind a spree of violence in a region that has long had some of the highest murder rates in the world. Some of its more sensationalist crimes, including the beheading and burying alive of victims, have spread panic in poor neighborhoods where the gang extorts local businesses and illegally charges residents for "protection."

## Republican lawmakers make an issue of the gang

Now there are concerns about its ruthless tactics reaching U.S. shores as members infiltrate the nearly 1 million Venezuelan migrants who have crossed into the U.S. in recent years.

Eleven Republicans led by Sen. Marco Rubio of Florida, the vice chair of the Senate Select Committee on Intelligence, wrote in a letter to Attorney General Merrick Garland last week calling for a coordinated strategy from the Biden administration to combat the gang.

"The administration's weak enforcement of immigration laws allows gangs, like Tren de Aragua, to control routes and exploit migrants," the letter said.

## Venezuelan officials express bafflement

Meanwhile, back in Venezuela, officials have watched the attention on Tren de Aragua in the U.S. and have expressed their bafflement.

A year ago, President Nicolas Maduro's government claimed it had dismantled the gang after retaking control of the prison where the group was born. In July, Foreign Minister Yván Gil declared that the Tren de Aragua is a "fiction created by the international media."

More recently, Diosdado Cabello, a longtime ruling party-leader, linked the criminal group to an alleged plot backed by the U.S. and the opposition to kill Maduro and some of his allies following the July 28 presidential election.

"The United States knows how to carry out destabilization operations," Cabello said Friday when he announced the arrest of several people, including a U.S. citizen, for their alleged roles in the foiled anti-Maduro plan. "Why don't they stop them?"

——

AP writers Colleen Slevin in Denver, Regina Garcia Cano in Caracas, Venezuela, and Astrid Suarez in Bogota, Colombia, contributed to this report.

——

This version has corrected the retired DEA agent's first name to Wes not Was.



**JOSHUA GOODMAN**
Goodman is a Miami-based investigative reporter who writes about the intersection of crime, corruption, drug trafficking and politics in Latin America. He previously spent two decades reporting from South America.



ADVERTISEMENT

**MOST READ**



1    If you're thinking about selling your stocks, you might want to think twice

2    Trump changes course and delays some tariffs on Mexico and Canada

3    Thrust into unemployment, axed federal workers face relatives who celebrate their firing

4    Pamela Bach, actor and ex-wife of David Hasselhoff, dies at 62

5    Canada's tariffs to remain despite Trump postponing tariffs on many imports from Canada for a month

VZ Vacatur_0051

WORLD NEWS

## US sanctions a Venezuela gang for spreading criminal activity across Latin America




BY **JOSHUA GOODMAN**
Updated 6:07 PM EST, July 11, 2024

MIAMI (AP) — The Biden administration on Thursday sanctioned a Venezuelan gang allegedly behind a spree of kidnappings, extortion and other violent crimes tied to migrants that have spread across Latin America and the United States.

The U.S. also offered a $12 million reward for the arrest of three leaders of Tren de Aragua, which now joins the MS-13 gang from El Salvador and the Mafia-styled Camorra from Italy on a list of transnational criminal organizations banned from doing business in the U.S.

"Tren de Aragua poses a deadly criminal threat across the region," the U.S. Treasury Department said in a statement, adding that it often preys on vulnerable populations such as migrant women and girls for sex trafficking.

"When victims seek to escape this exploitation, Tren de Aragua members often kill them and publicize their deaths as a threat to others," the statement added.

AP SETS THE STANDARD FOR POLITICAL REPORTING.          DONATE
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

The Tren de Aragua traces its origins to more than a decade ago, to an infamously lawless prison in the central state of Aragua where a number of hardened criminals were held. But it has expanded in recent years as millions of desperate Venezuelans fled President Nicolás Maduro's rule and migrated to other parts of Latin America or the U.S.

### RELATED STORIES



**Chile seeks to extradite a suspect from the US over the killing of a Venezuelan dissident**



**Trump administration in talks to send Venezuelan gang members to El Salvador prisons**



**Venezuela frees 6 Americans after meeting between President Maduro and Trump's envoy**

Authorities in countries such as Colombia, Peru and Ecuador — with large populations of Venezuelan migrants — have accused the group of being behind a spree of violent crimes in a region that has long had some of the highest murder rates in the world.

Initially its focus was exploiting Venezuelan migrants through loan sharking, human trafficking and the smuggling of contraband goods to and from Venezuela.

But as the Venezuelan diaspora has settled more permanently abroad, it has joined — and sometimes clashed — with homegrown criminal syndicates engaged in drug trafficking, extortion of local businesses and murders for hire.

Among the groups the Treasury Department said the gang has teamed up with is Primeiro Comando da Capital, a notorious organized crime group out of Brazil that has also been sanctioned by the U.S.

Earlier this year, prosecutors in Chile blamed the gang, whose name means "train" in Spanish, for the killing of a Venezuelan army official who had sought refuge in that country after partaking in a failed plot to overthrow Maduro.

"The Tren de Aragua is not a vertically integrated criminal structure, but rather a federation of different gangs," said Jeremy McDermott, the Colombia-based co-director of InSight Crime, which this month published a report on the gang's expansion.

"It has now become a franchise name for Venezuelan criminal structures operating in the region, with weakening coherence now that its home prison base is no more," McDermott said,

The group is led by Hector Guerrero, who was jailed years ago for killing a police officer, according to InSight Crime. Guerrero, better known by his alias El Nino, or Spanish for the "boy," later escaped and then was recaptured in 2013, returning to the prison in Aragua where the criminal enterprise was then headquartered.

He fled prison again more recently, as Venezuelan authorities tried to reassert control over its prison population.

His current whereabouts are unknown but the U.S. State Department, which has offered up to $12 million for his arrest and that of two other gang leaders, said it believes Guerrero and Giovanny San Vicente, another target of the U.S. bounty, are believed to be living in Colombia.

Sen. Marco Rubio, a Florida Republican who co-chairs the Senate Select Committee on Intelligence, has warned that if left unchecked, the Tren de Aragua could also start terrorizing American cities.

Among the nearly 1 million Venezuelan migrants that have crossed into the U.S. in recent years are suspected gang members tied to police shootings, human trafficking and other crimes although there's no evidence that the gang has set up an organizational structure in the U.S., McDermott said.

"Now we are seeing evidence that they have made it into the United States. Every single day, we're seeing reports from Chicago, South Florida, and New York that these gang members are here," Rubio said at a Senate hearing in April.

VZ Vacatur_0055

The White House, in a statement on Thursday said the Department of Homeland Security has implemented enhanced screening to vet and better identify known or suspected gang members, including Tren de Aragua members.

Maduro's government has accused opponents of exaggerating the reach of Tren de Aragua to tarnish its reputation and said that authorities dismantled the group last year when security forces retook control of the prison that had served as its hub of illicit activity.

Hours after the U.S. sanctioned the gang, the government announced that a brother of the gang's leader, who was arrested in Barcelona earlier this year, arrived home pursuant to a Venezuelan extradition request to Spain.

Attorney General Tarek William Saab said that Gerso Guerrero, who was arrested earlier this year in Barcelona, faces up to 30 years in prison — the maximum in Venezuela — on multiple criminal charges including extortion, money laundering, weapons trafficking and terrorism.

———

Follow AP's coverage of Latin America and the Caribbean at https://apnews.com/hub/latin-america

**JOSHUA GOODMAN**
Goodman is a Miami-based investigative reporter who writes about the intersection of crime, corruption, drug trafficking and politics in Latin America. He previously spent two decades reporting from South America.

 X ✉



ADVERTISEMENT

**MOST READ**



| 1 | **Pamela Bach, actor and ex-wife of David Hasselhoff, dies at 62** |
| 2 | **If you're thinking about selling your stocks, you might want to think twice** |
| 3 | **Canada's tariffs to remain despite Trump postponing tariffs on many imports from Canada for a month** |
| 4 | **Trump changes course and delays some tariffs on Mexico and Canada** |
| 5 | **War heroes and military firsts are among 26,000 images flagged for removal in Pentagon's DEI purge** |

ADVERTISEMENT

VZ Vacatur_0058

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

# In re D-J-, Respondent

*Decided April 17, 2003*

## U.S. Department of Justice
## Office of the Attorney General

(1)  The Attorney General has broad discretion in bond proceedings under section 236(a) of the Immigration and Nationality Act, 8 U.S.C. § 1226(a) (2000), to determine whether to release an alien on bond.

(2)  Neither section 236(a) of the Act nor the applicable regulations confer on an alien the right to release on bond.

(3)  In determining whether to release on bond undocumented migrants who arrive in the United States by sea seeking to evade inspection, it is appropriate to consider national security interests implicated by the encouragement of further unlawful mass migrations and the release of undocumented alien migrants into the United States without adequate screening.

(4)  In bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, Immigration Judges and the Board of Immigration Appeals shall consider such interests.

(5)  Considering national security grounds applicable to a category of aliens in denying an unadmitted alien's request for release on bond does not violate any due process right to an individualized determination in bond proceedings under section 236(a) of the Act.

(6)  The denial of the respondent's release on bond does not violate international law.

(7)  Release of the respondent on bond is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of the respondent and other similarly situated undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002; further, the respondent failed to demonstrate adequately that he does not present a risk of flight if released and should be denied bond on that basis as well.

## IN BOND PROCEEDINGS

The respondent is an undocumented alien from Haiti who was taken into custody and detained by the Immigration and Naturalization Service ("INS") on October 29, 2002, while attempting to evade lawful immigration procedures and enter the United States illegally. He arrived aboard a vessel that sailed into Biscayne Bay, Florida, on that date, carrying 216 undocumented aliens from Haiti and the Dominican Republic. He and other passengers on the vessel were apprehended ashore after the vessel sought to

evade coastal interdiction by the United States Coast Guard and after many of the aliens sought to evade law enforcement authorities ashore. *See* INS Brief in Support of Bond Appeal, Exh. A ("INS Brief"). Respondent was placed in removal proceedings and charged as being an inadmissible alien under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2002) ("INA"). He is now seeking asylum in the United States and has applied for bond, which would allow his release into the community pending disposition on removal or asylum.

On November 6, 2002, an Immigration Judge ("IJ") granted respondent's application for release on bond (set at $2,500) over the objections of the INS. The INS argued, inter alia, that the release of respondent, and of other members of the undocumented migrant group of October 29, would stimulate further surges of such illegal migration by sea and threaten important national security interests. The INS then appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA dismissed the appeal, concluding, inter alia, that the broad national interests invoked by INS were not appropriate considerations for the IJ or the BIA in making the bond determination, "[a]bsent contrary direction from the Attorney General." Decision of the Board of Immigration Appeals, *In re D-J-*, at 2 (March 13, 2003) ("BIA Dec."). Exercising authority transferred to the Department of Homeland Security ("DHS") by the Homeland Security Act of 2002 ("HSA"), and pursuant to the provisions of 8 C.F.R. § 1003.1(h)(1)(iii), the Under Secretary for Border and Transportation Security has now referred the BIA's decision to me for review.[1] This referral automatically stayed the BIA's order pending my decision. *See* 8 C.F.R. § 1003.19(i)(2).

On February 12, 2003, the IJ denied respondent's application for asylum. His appeal of that decision is pending before the BIA.

Although authority to enforce and administer the INA and other laws related to the immigration and naturalization of aliens has recently been transferred to the Secretary of Homeland Security by the HSA, the Attorney General retains his authority to make controlling determinations with respect

---

[1]  On March 1, 2003, the INS was transferred from the Department of Justice to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178. The Executive Office for Immigration Review, however, remains in the Department of Justice. On February 28, 2003, the Attorney General published a technical rule that moved 8 C.F.R. § 3.1(h) (2002) to 8 C.F.R. § 1003.1(h). *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9332 (Feb. 28, 2003) (to be codified at 8 C.F.R. § 1003.1(h)). The authority of the INS Commissioner to refer Board decisions to the Attorney General is now vested in the Secretary of Homeland Security, or in "specific officials of the Department of Homeland Security designated by the Secretary with the concurrence of the Attorney General." 8 C.F.R. § 1003.1(h)(iii).

VZ Vacatur_0060

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

to questions of law arising under those statutes.[2] This statutory framework is consistent with the Attorney General's traditional role as the primary interpreter of the law within the Executive Branch. *See generally* 28 U.S.C. §§ 511-13 (2000).

Pursuant to the authority and discretion vested in me under the provisions of section 236(a) of the INA, 8 U.S.C. § 1226(a) (2000),[3] I have determined that the release of respondent on bond was and is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of respondent and other undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002. I further determine that respondent has failed to demonstrate adequately that he does not present a risk of flight if released on bond and that he should be denied bond on that basis as well. *See* 8 C.F.R. § 236.1(c)(8) (2002). Accordingly, I order that the BIA's decision and order be vacated, and that respondent be denied bond and detained pending appropriate disposition and proceedings respecting his status under the immigration laws.

---

[2] *See* section 103(a)(1) of the INA, 8 U.S.C. § 1103(a)(1), *as amended by* Homeland Security Act of 2002 Amendments, Division L of Pub. L. No. 108-7, § 105(a)(1), 117 Stat. 531 (2003), which provides:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

[3] Section 1102 of the HSA, 116 Stat. at 2274, added a new subsection (g) to section 103 of the INA, providing as follows:

> The Attorney General shall have such authorities and functions under this Act and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

The Attorney General's authority to detain, or authorize bond for aliens under section 236(a) of the INA is one of the authorities he retains pursuant to this provision, although this authority is shared with the Secretary of Homeland Security because officials of that department make the initial determination whether an alien will remain in custody during removal proceedings. *See* sections 103(a), (g) of the INA, *as amended*; 8 C.F.R. §§ 236.1(c), (d), 287.3(d) (2002).

VZ Vacatur_0061

## I.

My review of the BIA's decision in this case is *de novo*; it is not confined to reviewing the decisions of the BIA or the IJ for legal or factual error.  *See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations.").  In making their decisions in this matter, both the IJ and the BIA were exercising limited authority that is dependent upon delegation from the Attorney General.  *See id.* at 4.  When I undertake review of such decisions pursuant to a referral under 8 C.F.R. § 1003.1(h), the delegated authorities of the IJ and BIA are superseded and I am authorized to make the determination based on my own conclusions on the facts and the law.  The recent promulgation of 8 C.F.R. § 1003.l(d)(3), which precludes the BIA from engaging in de novo review of an IJ's findings of fact, does not affect the de novo standard articulated in *Doherty* because that regulation does not govern the authority of the Attorney General to review BIA decisions.

I now turn to the question of whether respondent should have been detained or released on bond under the authority of section 236(a) of the INA.

## II.

### A.

The law governing the detention or release of aliens such as respondent (i.e., aliens arrested and detained pending a decision on removal) is set forth in section 236(a) of the INA.  It provides that the Attorney General may (1) continue to detain the alien; or (2) release the alien on bond or conditional parole.  *See* section 236(a) of the INA.[4]  Conditional parole is not placed in issue here, so the only question is whether the respondent should be detained or released on bond.

As recognized by the Supreme Court, section 236(a) does not give detained aliens any *right* to release on bond.  *See Carlson v. Landon*, 342 U.S. 524, 534 (1952).  Rather, the statute merely gives the Attorney General the authority to grant bond *if* he concludes, in the exercise of broad discretion, that the alien's release on bond is warranted.  The extensive discretion granted the Attorney General under the statute is confirmed by its further provision that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review."  Section 236(c) of the INA.  Even apart from that provision, the courts have consistently recognized that the Attorney General has extremely broad discretion in

---

[4]  *See supra* n.3.

VZ Vacatur_0062

determining whether or not to release an alien on bond under this and like provisions. *E.g.*, *Carlson*, 342 U.S. at 540; *United States ex rel. Barbour v. District Dir. of INS*, 491 F.2d 573, 577-78 (5th Cir.), *cert. denied*, 419 U.S. 873 (1974). Further, the INA does not limit the discretionary factors that may be considered by the Attorney General in determining whether to detain an alien pending a decision on asylum or removal. *See, e.g.*, *Carlson*, 342 U.S. at 534 (Attorney General's denial of bail to alien is within his lawful discretion as long as it has a "reasonable foundation"); *Barbour*, 491 F.2d at 578 (INS finding that alien was a threat to national security warranted denial of bond, applying "reasonable foundation" standard); *see also Sam Andrews' Sons v. Mitchell*, 457 F.2d 745, 748 (9th Cir. 1972) (Attorney General's exercise of discretionary authorities under the INA must be upheld if they are founded "on considerations rationally related to the statute he is administering").

Further discretionary authority for the release on bond of aliens such as respondent is found in subpart A, section 236.1 of the INS regulations governing "Detention of Aliens Prior to Order of Removal." *See* 8 C.F.R. § 236.l(c)(8). This regulation provides:

> Any officer authorized to issue a warrant of arrest *may, in the officer's discretion*, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

*Id.* (emphasis added). This provision gives the DHS discretionary authority to release a covered alien on bond if, and only if, the alien makes a satisfactory demonstration with respect to the stated criteria. Like section 236(a), it does not establish any right to release on bond.

### B.

I will now briefly summarize the pertinent facts and contentions of the parties indicated in the record.

As noted above, respondent arrived off the shores of Florida in an overloaded vessel with 216 undocumented aliens from Haiti and the Dominican Republic on October 29, 2002. After the vessel sought to evade the orders and interdiction efforts of a U.S. Coast Guard ("USCG") vessel, some of the alien passengers jumped from the vessel and swam ashore. After the migrant vessel ran aground, the remaining passengers disembarked and, despite the order of USCG officers to stop, ran ashore and fled from law enforcement officers before they were apprehended. *See* INS Brief, Exh. A (Declaration of Captain Mark J. Kerski, USCG) ("Kerski Declaration"). I find nothing in the record showing that respondent was not among the alien

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

migrants who disobeyed the orders of, and sought to evade, USCG or law enforcement officers ashore in an effort to enter the United States unlawfully.

The respondent offered limited evidence and information in the proceedings below in support of his claims that he did not present a danger to the community, a risk of flight, or a threat to national security. Respondent testified that he has not been arrested or convicted of a crime; and that, if released, he would live with an uncle residing in New York, New York, who would provide him with food, shelter, and transportation while he applied for asylum. Memorandum Decision of the Immigration Judge, *In re D-J-*, at 2 (Dec. 12, 2002) ("IJ Dec.").

Respondent's brief before the BIA asserts that he was "willingly taken into INS custody." Respondent's Brief in Support of the Immigration Judge's Custody Determination at 3 ("Respondent's Brief"). That assertion, however, does not address whether the respondent was among the migrants who sought to evade USCG and other law enforcement officers after coming ashore, as indicated in the USCG's Kerski Declaration. Respondent's brief further asserts that, because he does not speak or understand English, he could not be expected to obey any orders from English-speaking law enforcement officers at the time he came ashore. That assertion, however, does not address the likelihood, indicated by the content of the Kerski Declaration, that the circumstances in which those orders were issued were such that their meaning would have been clear in context, without regard to the particular words uttered by the officers. *See* INS Brief, Exh. A, ¶¶ 4-6.

In opposing respondent's contentions, the INS submitted declarations from officers of the Coast Guard, the Department of State, and the Department of Defense ("DOD") as exhibits before the IJ and the BIA.[5] INS maintains that these declarations show that there are strong concerns of national security requiring the continued detention of the respondent and similarly situated undocumented migrants pending removal proceedings. Two general areas of concern are implicated. First, there is a concern that the release of aliens such as respondent and the other October 29 migrants would tend to encourage further surges of mass migration from Haiti by sea, with attendant strains on national and homeland security resources. Such mass migrations would also place the lives of the aliens at risk. Second, in light of the terrorist attacks of September 11, 2001, there is increased necessity in preventing undocumented aliens from entering the country without the screening of the immigration inspections process.

---

[5] The exhibits submitted with the INS brief included: Declaration of Captain Mark J. Kerski, USCG (Exhibit A); Memorandum from the United States Department of State (Exhibit B); Declaration of Captain Kenneth A. Ward, USCG (Exhibit C); Declaration of Johnny Williams (Exhibit D); Supplemental Declaration of Captain Kenneth A. Ward, USCG (Exhibit E); and Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations (Exhibit F).

VZ Vacatur_0064

The first area of national security concern advanced by INS is the threat of further mass migration. INS asserts that reports and rumors of successful entry into the United States by Haitian migrants have fueled recent migration surges and the perception of further successful entries could encourage further mass migration attempts.[6] In support of this contention, INS has submitted a memorandum issued by the State Department supporting detention of the migrants who landed in Florida on October 29, 2002, in order to prevent further mass migrations. The memorandum states in relevant part:

> The disposition of those detained in the October 29 arrival will spur further migration if they are released into the U.S. Such treatment would create a perception in Haiti of an easing in U.S. policy with respect to admission of migrants. For this reason, the Department of State strongly recommends that the 216 migrants (207 Haitians, 9 Dominicans) from the boat which reached Key Biscayne on October 29 be detained while they undergo processing. The migrants should be detained unless and until they demonstrate a well-founded fear of persecution. Those who cannot do so should continue to be held, absent a compelling humanitarian reason for release, until they can be expeditiously repatriated.

INS Brief, Exh. B (State Department Memorandum). The State Department memorandum sets forth extensive and detailed information documenting the relationship between perceptions in Haiti of successful U.S. entry by seagoing migrants and the likelihood of further mass migrations. *Id.*

The declarations submitted from the Coast Guard (*see supra* n.6) and the Defense Department express corroborating statements regarding this concern. The Coast Guard states that "[a]necdotal reporting and operational experience strongly suggests that detaining and swiftly repatriating those who illegally and unsafely attempt to enter the United States by sea is a significant deterrent to surges in illegal immigration and mass migration." INS Brief, Exh. C, ¶ 9 (Declaration of Captain Kenneth A. Ward, USCG). Similarly, the Department of Defense declaration states that "[a]ctual or even *perceived* changes in U.S. immigration policy can trigger mass migration events by encouraging other potential illegal migrants." *See* INS Brief, Exh. F, ¶ 5 (Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations).

The INS submissions also outline an additional national security implication of encouraging future mass migrations by sea from Haiti. The Coast Guard declaration asserts that continued mass migrations from Haiti have "heavily taxed Coast Guard capacity and capabilities," while "reducing

---

[6] Following the successful landing of more than 200 Haitians on October 29, 2002, on November 7, 2002, and again on November 9, 2002, the USCG successfully interdicted three groups of undocumented Haitian migrants attempting to transit to the United States via the Bahamas. In all, 264 Haitian migrants were interdicted on these dates. Such incidents are "typical of a surge in Haitian migrant departures following similar successful landings and demonstrates the 'pull' factor that successful landing can have." INS Brief, Exh. E, ¶ 3 (Supplemental Declaration of Captain Kenneth A. Ward, USCG).

VZ Vacatur_0065

responsiveness in other mission areas." INS Brief, Exh. C, ¶ 7. The Department of Defense, which is also involved in efforts to contain such overseas migrations, also asserts that the demands of mass migrations from Haiti "would create a drain on scarce assets that are being used in or supporting operations elsewhere." INS Brief, Exh. F, ¶ 8.

The declarations submitted by INS also substantiate a national security concern raised by the prospect of undocumented aliens from Haiti being released within the United States without adequate verification of their background, associations, and objectives. Thus, the State Department declaration asserts that it has "noticed an increase in third country nations (Pakistanis, Palestinians, etc.) using Haiti as a staging point for attempted migration to the United States. This increases the national security interest in curbing use of this migration route." INS Brief, Exh. B, ¶ 11. Relatedly, the Coast Guard's supplemental declaration asserts that the boatloads of interdicted Haitians have included persons previously deported for drug trafficking and subject to outstanding felony warrants. INS Brief, Exh. E, ¶ 4 (Supplemental Declaration of Captain Kenneth A. Ward, USCG). The Coast Guard further asserts that "because maritime migrants are typically undocumented and carry little or no identification, it is often difficult to ascertain the identity and background of interdicted persons, particularly in large groups, which presents potential threats to officer safety, as well as national security." *Id.*

## III.

Having considered the record and the briefs of the parties, and exercising my authority under section 236(a) of the INA, I have determined that the release of respondent on bond is unwarranted.

I conclude that releasing respondent, or similarly situated undocumented seagoing migrants, on bond would give rise to adverse consequences for national security and sound immigration policy. As demonstrated by the declarations of the concerned national security agencies submitted by INS, there is a substantial prospect that the release of such aliens into the United States would come to the attention of others in Haiti and encourage future surges in illegal migration by sea. Encouraging such unlawful mass migrations is inconsistent with sound immigration policy and important national security interests. As substantiated by the government declarations, surges in such illegal migration by sea injure national security by diverting valuable Coast Guard and DOD resources from counterterrorism and homeland security responsibilities. Such national security considerations clearly constitute a "reasonable foundation" for the exercise of my discretion to deny release on bond under section 236(a). *See Carlson*, 342 U.S. at 534; *Barbour*, 491 F.2d at 578.

I have noted the BIA's suggestion that the INS's recent adoption of a policy placing certain aliens (including many undocumented aliens who arrive by sea and are not admitted or paroled) in expedited removal proceedings in which affected aliens, with limited exceptions, would be automatically detained without review by an IJ or the BIA tends to negate the INS's concern regarding the encouragement of migration surges. BIA Dec. at 2 n.3; *see* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924-26 (Nov. 13, 2002). The offsetting effect suggested by the BIA would presumably be due to the prospect that the new expedited removal policy will be so restrictive that potential Haitian migrants would learn of that and be deterred from future migration attempts, regardless of respondent's fate and that of the other October 29 migrants. While the expedited removal policy may reduce the incidence of seagoing Haitian migrants being released on bond pending removal, it hardly provides airtight assurance against future successful entries by such migrants through legal and extra-legal maneuvers, or the encouragement of additional maritime migrations likely to arise from such entries. I note, for example, that the policy's strict detention provision is entirely inapplicable to aliens who are admitted or paroled. In any event, even if the new policy somewhat reduced the expectations of further successful U.S. entries, the release of respondent and hundreds of others from the October 29 migrant group would strongly undercut any resultant deterrent effect arising from the policy. The persistent history of mass migration from Haiti, in the face of concerted statutory and regulatory measures to curtail it, confirms that even sporadic successful entries fuel further attempts. I therefore am not persuaded that the new expedited removal policy negates the migration "surge" consideration.

I further conclude that the release on bond of undocumented seagoing migrant aliens from Haiti without adequate background screening or investigation presents a risk to national security that provides additional grounds for denying respondent's release on bond. This consideration is fortified by the State Department's assertion that it has observed an increase in aliens from countries such as Pakistan using Haiti as a staging point for migration to the United States. Under the current circumstances of a declared National Emergency, the Government's capacity to promptly undertake an exhaustive factual investigation concerning the individual status of hundreds of undocumented aliens is sharply limited and strained to the limit. Under these circumstances, it is reasonable to make a determination that aliens arriving under the circumstances presented by the October 29 influx should be detained rather than released on bond. There is substantial risk that granting release on bond to such large groups of undocumented aliens may include persons who present a threat to the national security, as well as a

VZ Vacatur_0067

Cite as 23 I&N Dec. 572 (A.G. 2003)         Interim Decision #3488

substantial risk of disappearance into the alien community within the United States.

I note that the BIA has acknowledged the seriousness of INS's arguments that the detention or release of these aliens implicates important national security interests. *See* BIA Dec. at 2. The BIA determined, however, that such considerations fall "outside the scope of Immigration Judge bond proceedings as such proceedings are currently constituted," except where individual considerations show that the respondent is not likely to appear or presents a danger to the community. The BIA then stated: "Absent contrary direction from the Attorney General, we therefore agree with the Immigration Judge's focus on the respondent's individual likelihood to appear and individual danger to the community." *Id.* This opinion provides the BIA and Immigration Judges with the "contrary direction" to which the BIA referred. In future proceedings involving similarly situated aliens, this opinion constitutes binding precedent, requiring the BIA and IJs to apply the standards set forth herein, including consideration of national security interests. *See generally Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law"). Further, in all future bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, IJs and the BIA shall consider such interests.

Finally, I conclude that respondent has not individually demonstrated that he satisfies the prerequisites to discretionary release on bond under the provisions of 8 C.F.R. § 236.l(c)(8). INS may (but is not required to) grant release under that provision if the alien demonstrates to its satisfaction that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding. I do not find that respondent has adequately demonstrated that he is likely to appear at future proceedings for purposes of granting release on bond pursuant to section 236(a)(2) of the INA or 8 C.F.R. § 236.l(c)(8). There are strong indications in the record that respondent was among those aliens who sought to evade Coast Guard and law enforcement officers in a determined effort to effect illegal entry into the United States. Because such evasive behavior does not provide reassuring evidence of respondent's likely reliability in appearing for future proceedings, it was incumbent upon respondent to produce substantial countervailing evidence as to that criterion. I conclude that the minimal showing made by respondent on this point was insufficient to demonstrate the likelihood of his appearance for future proceedings.[7]

---

[7] The INS also offered evidence disputing respondent's claim that, individually, he does not

(continued...)

VZ Vacatur_0068

In addition, I note that the respondent was denied asylum by the Immigration Judge on February 12, 2003.  The respondent appealed that decision to the BIA on March 14, 2003, and that appeal remains pending.  The IJ's denial of the respondent's application for asylum increases the risk that the respondent will flee if released from detention.  "A respondent with a greater likelihood of being granted relief from deportation has a greater motivation to appear for a deportation hearing than one who, based on a criminal record or otherwise, has less potential of being granted such relief." *Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987).

## IV

Although neither the IJ nor the BIA chose to address the issue, respondent contends that he is constitutionally entitled on due process grounds to an "individualized determination" of his request for release on bond and that denying bond on broad national security grounds that are generally applicable to the October 29 migrants would somehow violate such a right.  Respondent's Brief at 6-8.  In that regard, I note that several federal appellate courts have recently held that a *lawful permanent resident alien* has a due process right to an individualized hearing and determination on whether he poses a risk of flight or a danger to the community when subjected to the mandatory detention provisions of section 236(c) of the INA.  *See Kim v. Ziglar*, 276 F.3d 523 (9th Cir.), *cert. granted sub nom. Demore v. Hyung Joon Kim*, 536 U.S. 956 (2002); *Patel v. Zemski*, 275 F.3d 299, 314-15 (3d Cir. 2001); *see also Hoang v. Comfort*, 282 F.3d 1247, 1256 (10th Cir. 2002).  Another federal appeals court has reached a contrary conclusion on that issue, *see Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999), and the Supreme Court has granted the Government's petition for a writ of certiorari and heard oral argument in *Kim*.

I first note that the decisions in *Kim* and *Patel* were specifically addressed to the *mandatory* detention provisions of section 236(c) of the INA and are therefore fundamentally distinguishable from the procedures afforded under section 236(a).  Section 236(c) requires nondiscretionary detention as a categorical statutory mandate for those aliens covered by it, whereas section 236(a) affords aliens to whom it applies the opportunity to seek discretionary relief (bond or conditional parole) in a hearing before an Immigration Judge.  *See Kim*, 276 F.3d at 533.

More significantly, however, the holdings in *Kim* and *Patel* were premised upon the petitioner's status as a lawful permanent resident alien.  *See Kim*, 276 F.3d at 528, 534; *Patel*, 275 F.3d at 307.  In contrast, respondent has not

---

[7]  (...continued)
pose a danger to the community and is likely to appear in future proceedings.  *See* INS Brief at 14-15.

even been admitted to the United States, let alone acquired the status of a lawful permanent resident alien.   Respondent's status is that of an undocumented alien, charged as being inadmissible as an alien present in the United States without having first been admitted or paroled.   *See* section 212(a)(6)(A)(i) of the INA.   As an alien who has "not yet gained initial admission to the United States," he does not qualify for the limited due process protection extended to "admitted" aliens under the sharply distinguishable circumstances presented in *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001) ("We deal here with aliens who were admitted to the United States but subsequently ordered removed.  Aliens who have not yet gained initial admission to this country would present a very different question."). As explained by the court in *Gisbert v. United States Attorney General*, 988 F.2d 1437, 1440 (5th Cir.), *amended on other grounds*, 997 F.2d 1122 (5th Cir. 1993):  "Although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country."   *Accord United States v. Lopez-Vasquez*, 227 F.3d 476, 484-85 (5th Cir. 2000); *Zheng v. INS*, 207 F.Supp.2d 550, 552 (E.D. La. 2002) ("The detention of aliens who have been denied initial admission into the United States does not implicate the Fifth Amendment, even if such aliens were subsequently paroled or released within the country.").

Even if the respondent *were* entitled to an individualized hearing, however, such a conclusion would not support a contention that this respondent's request for release on bond must be determined exclusively on the basis of his individual situation, rather than on the basis of general considerations applicable to a category of migrants, as a matter of constitutional due process. The mere fact that general considerations are introduced does not negate the individual nature of the hearing.  The Attorney General is broadly authorized to detain respondent, and deny his request for bond, based on any reasonable consideration, individualized or general, that is consistent with the Attorney General's statutory responsibilities.  *See Reno v. Flores*, 507 U.S. 292, 313-14 & n.9 (1993) (rejecting juvenile aliens' demands for an "individualized custody hearing" and upholding INS use of "reasonable presumptions and generic rules" in such cases).

In any event, I have given full consideration to the individual aspects of respondent's claim for bond based on the record in this proceeding.  I find nothing in respondent's individual case that warrants granting him release on bond when balanced against the above-described compelling factors that militate against such release in the case of undocumented aliens attempting illegal entry into the United States under the circumstances presented by the October 29 influx.

VZ Vacatur_0070

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

Finally, I note that respondent argued to the BIA that an INS policy of detaining Haitian migrants in order to deter other Haitians from migrating to the United States seeking asylum violates international law. *See* Respondent's Brief at 8-9. In support of his argument, he invokes the right to asylum protected by Article 14 of the Universal Declaration of Human Rights ("UDHR") and an advisory opinion of the United Nations High Commission for Refugees stating that "asylum seekers should not be detained for purposes of deterrence." *Id.* at 8. The BIA did not address respondent's arguments on this point in its decision.

This argument is without merit. First, the UDHR is merely a nonbinding expression of aspirations and principles, rather than a legally binding treaty. *See Haitian Refugee Center v. Gracey*, 809 F.2d 794, 816 n.17 (D.C. Cir. 1987) (UDHR "is merely a nonbinding resolution, not a treaty"). In any event, the application of U.S. law to protect the nation's borders against mass migrations by hundreds of undocumented aliens violates no right protected by the UDHR or any other applicable rule of international law. As the Supreme Court has recognized, "'[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments . . . .'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). The authority to expel aliens is meaningless without the authority to detain those who pose a danger or a flight risk during the process of determining whether they should be expelled. The national security interests invoked in this opinion are directed at unlawful and dangerous mass migrations by sea, not the right to seek asylum. Aliens who do arrive in the United States, including the respondent himself, are afforded the right to apply for asylum and have those applications duly considered.[8]

---

[8] I note that a regional official of the United Nations High Commissioner for Refugees ("UNHCR") has sent me a letter volunteering certain comments on this proceeding. Letter for The Honorable John Ashcroft, Attorney General of the United States, from Guenet Guebre-Christos, Regional Representative, United Nations High Commissioner for Refugees, *Re: Matter of D-J-, Advisory Opinion on Detention of Asylum Seekers* (March 28, 2003). In brief, the UNHCR letter makes certain arguments invoking purported obligations arising under the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (Jan. 31, 1967) ("Protocol"), and the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968) ("Convention"). The United States is not a party to the Convention, but it is a party to the Protocol, which incorporates by reference Articles 2 through 34 of the Convention. The Protocol is not self-executing, but Congress has incorporated into the INA, through the Refugee Act of 1980, the appropriate requirements of the Protocol. Consequently, the Protocol does not afford respondent any rights beyond what he is afforded under the federal immigration laws, as applied in this decision. *See Abdelwahed v. INS*, 22 Fed.Appx. 811, 815, 2001 WL 1480651 (9th Cir. 2001) (stating that "the Protocol does not give [the petitioner] any rights beyond what he already enjoys under the immigration statutes"); *Legal Obligations of*

(continued...)

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

## CONCLUSION

I have determined that respondent's release on bond under the provisions of section 236(a) of the INA is unwarranted.  The BIA's Order of March 13, 2003, is hereby vacated and respondent is to be detained pending decision on removal.

---

[8] (...continued)
*the United States under Article 33 of the Refugee Convention*, 15 Op. O.L.C. 86, 87 (1991) ("[T]he Protocol by which the United States adhered to the Convention is not self-executing for domestic law purposes. Accordingly, the Protocol itself does not create rights or duties that can be enforced by a court.").

VZ Vacatur_0072

**Congressional Research Service**
Informing the legislative debate since 1914



Updated January 13, 2025

# Venezuela: Political Crisis and U.S. Policy

Over the past decade, some Members of Congress have expressed concerns about the erosion of democracy in Venezuela under President Nicolás Maduro (2013-present). Maduro took office after garnering a narrow electoral victory following the death of Hugo Chávez (in office 1999-2013), the founder of the United Socialist Party of Venezuela. Maduro has remained in power following elections in 2018 and 2024 that were both deemed fraudulent by international observers, the United States, and most U.S.-aligned democracies. After the July 28, 2024, election, Maduro claimed victory even though precinct-level vote tabulations published by the opposition indicated that opposition candidate Edmundo González Urrutia, a retired diplomat, won with 67% of the vote. Those vote tabulations comprised nearly 84% of all votes cast. Nevertheless, Maduro began a third term on January 10, 2025, with the support of Venezuelan security forces and allies including China, Cuba, Iran, and Russia.

The Trump Administration sought to promote democracy and human rights in Venezuela by using a "maximum pressure" sanctions strategy to try to compel Maduro to cede power. Sanctions proved insufficient to achieve that end and may have exacerbated an ongoing economic crisis that contributed to massive emigration, including to the United States. The Biden Administration offered limited sanctions relief to try to incentivize Maduro to convene freer and fairer elections in 2024 and to allow U.S. companies to operate in Venezuela's energy sector. The Biden Administration recognized Edmundo González as president-elect in November 2024.

The 119th Congress may assess U.S. policies toward the Maduro government, including whether and how to support the democratic opposition and the efficacy of sanctions, while also considering other U.S. interests. Such interests include U.S. energy companies' desire to operate in Venezuela, which has the world's largest proven oil reserves. They also include preventing irregular migration and compelling the Maduro government to agree to receive Venezuelan migrants removed from the United States. Opposition leader Maria Corina Machado (who was barred from running in the 2024 election) has urged President-elect Trump to focus on promoting democracy and human rights in Venezuela. Some analysts have urged the incoming Administration to negotiate with Maduro on discrete issues in the U.S. interest, such as migration or energy.

## Political Situation

Venezuela, which the nongovernmental organization Freedom House ranked "partly free" under President Hugo Chávez (1999-2013), has deteriorated to "not free" under Maduro. Chávez, a charismatic politician, benefited from high oil prices and won most elections by a large majority. In contrast, Maduro has experienced narrow wins and some electoral defeats (including in the 2015 legislative elections

in which his party lost control for the first time since 1999). The opposition, once weak and divided, has remained united since 2022 as the Unitary Platform (PUD).

Maduro has relied on security forces buoyed by corrupt courts to quash dissent. He has allowed security forces to enrich themselves through illicit gold mining, drug trafficking, extortion, and other crimes. The International Criminal Court is investigating whether Venezuelan forces committed crimes against humanity.

Security forces have detained and reportedly abused Maduro's opponents, including dissidents in the military, opposition politicians, and protesters. As of January 9, 2025, the government held 1,700 detainees, including 79 prisoners detained thus far in January 2025, according to Venezuelan human rights group Foro Penal. After the attorney general issued an arrest warrant for González, he fled into exile in September 2024. González visited several countries in January 2025 and met with President Biden in Washington, DC, but reportedly could not return to Venezuela. Machado led protests on January 9, but returned to hiding after Maduro's forces briefly detained her.

## Economic and Humanitarian Crisis

By most accounts, Maduro's government has mismanaged the economy and engaged in massive corruption. Between 2014 and 2021, Venezuela's economy contracted by 80%, according to estimates by the International Monetary Fund (IMF), due to low global oil prices and declines in the country's oil production. According to a February 2021 Government Accountability Office report, sanctions imposed by the United States from 2017 to 2019, particularly those targeting Venezuela's oil industry, contributed to the economic crisis. Hyperinflation declined from 337% in 2023 to 59.6% in 2024, according to the IMF, but income levels remain insufficient for most households to purchase basic necessities. According to one national survey by a Venezuelan university, roughly 82.8% of the population of 26.5 million lived in income poverty in 2023, particularly outside the capital of Caracas.

In 2024, an estimated 7.6 million Venezuelans (28% of the population) required humanitarian assistance, according to the United Nations. Many households lack reliable access to potable water, and interruptions in electrical service and gas supplies persist. With a collapsed health system, overall health indicators, particularly infant and maternal mortality rates, remain poor. Previously eradicated diseases such as measles are a major concern.

As of December 2024, UN agencies estimated there were some 7.9 million Venezuelan refugees and migrants globally. Some 6.6 million of these individuals reside in other Latin American and Caribbean countries. Venezuelan refugees and migrants reportedly face obstacles to keeping jobs and accessing health care; they may be vulnerable to

human trafficking and other abuses. These factors have contributed to secondary migration to the United States.

## U.S. Policy

The U.S. government ceased recognizing Maduro as Venezuela's legitimate president in January 2019. The U.S. government recognizes the democratically elected, opposition-controlled 2015 National Assembly as "the only legitimate branch of the Government of Venezuela," even though most of its members are in exile. From January 2019 through December 2022, the 2015 National Assembly backed an interim government led by its former speaker, Juan Guaidó. The Guaidó government received recognition from the United States and nearly 60 governments but never exerted power in Venezuela. The 2015 National Assembly dissolved the interim government in late 2022.

In November 2022, the Biden Administration sought to support Maduro-PUD talks by offering limited sanctions relief. After the flawed July 2024 elections, the Department of the Treasury's Office of Foreign Assets Control (OFAC) imposed sanctions on 37 Maduro officials for undemocratic actions and repression. President Biden reiterated U.S. support for the opposition at a January 6, 2025, meeting with González. On January 10, 2025, OFAC imposed sanctions on eight Maduro officials (in coordination with the European Union, the United Kingdom, and Canada). The State Department revoked visas of Maduro officials and raised the bounty on Maduro and two other top officials facing U.S. indictments. OFAC thus far has maintained specific licenses issued since 2022 allowing certain companies to conduct business with Petróleos de Venezuela, S.A. (PdVSA), Venezuela's state oil company.

**Sanctions and Indictments.** Sanctions are a key part of U.S. policy toward Venezuela. They are based in various legislated authorities, including the Venezuela Defense of Human Rights and Civil Society Act of 2014, and include the following:

- **Individual sanctions** for terrorism, drug trafficking, antidemocratic actions, human rights violations, or corruption (see Executive Order [E.O.] 13692; P.L. 113-278; P.L. 114-194)

- **Financial sanctions** restricting access to U.S. financial markets by the Maduro government and PdVSA (E.O. 13808); prohibiting transactions using Maduro-issued cryptocurrency (E.O. 13827); and prohibiting the purchase of Venezuelan debt (E.O. 13835)

- **Sectoral sanctions** blocking assets and prohibiting unlicensed transactions with PdVSA, Venezuela's central bank, and the state gold mining company, among other entities (E.O. 13850)

- **Sanctions on the Maduro government** blocking assets in the United States and prohibiting transactions with the Maduro government unless authorized as part of efforts to aid the Venezuelan people (E.O. 13884)

In March 2020, the Department of Justice indicted Maduro and 14 top officials for narco-terrorism, drug trafficking, and other crimes.

**Migration.** On January 10, 2025, the Biden Administration announced an 18-month extension and redesignation of the temporary protected status (TPS) for Venezuelans, initially announced in 2021. As of September 30, 2024, an estimated 505,400 Venezuelans were covered by TPS, which provides work authorization and relief from removal. These protections are set to expire in 2026 unless extended by the Secretary of the Department of Homeland Security (DHS). From January 2023 through September 2024, 117,000 Venezuelans arrived in the United States via a parole program for Cubans, Haitians, Nicaraguans, and Venezuelans (the CHNV program). In October 2024, DHS announced it would not extend the two-year parole status for CHNV beneficiaries. Venezuela is a top country of origin for irregular migrants encountered at the U.S. border. The Maduro government does not cooperate with U.S. removals, a barrier for U.S. immigration enforcement.

**U.S. Assistance.** The United States has supported a regional response to the migration crisis. From FY2017 to FY2024, the United States provided over $3.5 billion in humanitarian aid to Venezuela and countries sheltering Venezuelans. From FY2017 to FY2024, U.S. democracy, development, and health assistance allocated from annual appropriations for Venezuela totaled around $336.2 million. FY2024 estimated aid allocations are not yet available.

## Congressional Action

Congress has supported efforts at restoring democracy in Venezuela through foreign assistance and targeted sanctions, but Members have disagreed on whether broad sanctions should have been imposed and under what circumstances sanctions relief should be granted. The last legislation guiding U.S. policy in Venezuela, the VERDAD Act of 2019 (P.L. 116-64), expired in December 2023. The act aimed to hasten a negotiated solution to the crisis. Bills to reauthorize individual sanctions in the VERDAD Act were ordered to be reported in the House (H.R. 6831) and introduced in the Senate (S. 3363); the 118th Congress did not take further action on them. In the Further Consolidated Appropriations Act, 2024 (P.L. 118-47), Congress appropriated $50 million in democracy assistance for Venezuela subject to election-related restrictions.

The 119th Congress may influence U.S. policy toward Venezuela through the appropriations process. The 118th Congress did not complete action on FY2025 appropriations. U.S. assistance programs are continuing at FY2024 enacted levels under a continuing resolution (P.L. 118-158) scheduled to expire on March 14, 2025. The Biden Administration requested $50 million for democracy programs and $3.8 million for global health programs in Venezuela for FY2025. Both the House-passed (H.R. 8771/H.Rept. 118-554) and Senate-introduced versions of the FY2025 Department of State, Foreign Operations, and Related Programs Appropriations act (S. 4797/S.Rept. 118-204) would have met the $50 million request. H.R. 8771 would have placed conditions on that assistance.

The 119th Congress could consider broad legislation to shape U.S. policy toward Venezuela that could include sanctions guidelines, tools to address Maduro's foreign allies and illicit activities, and authorizations for U.S. assistance. Congress also could consider narrow measures to authorize, maintain, expand, loosen, or otherwise alter sanctions. Oversight could examine the degree to which sanctions have advanced U.S. policy goals, and other U.S. policy options.

**Clare Ribando Seelke**, Specialist in Latin American Affairs

IF10230

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

Act Manager, U.S. Coast Guard, 2703 Martin Luther King Jr. Ave. SE, Stop 7710, Washington, DC 20593–7710.

**FOR FURTHER INFORMATION CONTACT:** A.L. Craig, Office of Privacy Management, telephone 202–475–3528, or fax 202–372–8405, for questions on these documents.

**SUPPLEMENTARY INFORMATION:**

**Public Participation and Request for Comments**

This notice relies on the authority of the Paperwork Reduction Act of 1995; 44 U.S.C. chapter 35, as amended. An ICR is an application to OIRA seeking the approval, extension, or renewal of a Coast Guard collection of information (Collection). The ICR contains information describing the Collection's purpose, the Collection's likely burden on the affected public, an explanation of the necessity of the Collection, and other important information describing the Collection. There is one ICR for each Collection.

The Coast Guard invites comments on whether this ICR should be granted based on the Collection being necessary for the proper performance of Departmental functions. In particular, the Coast Guard would appreciate comments addressing: (1) The practical utility of the Collection; (2) the accuracy of the estimated burden of the Collection; (3) ways to enhance the quality, utility, and clarity of information subject to the Collection; and (4) ways to minimize the burden of the Collection on respondents, including the use of automated collection techniques or other forms of information technology.

In response to your comments, we may revise this ICR or decide not to seek an extension of approval for the Collection. We will consider all comments and material received during the comment period.

We encourage you to respond to this request by submitting comments and related materials. Comments must contain the OMB Control Number of the ICR and the docket number of this request, [USCG–2021–0175], and must be received by May 10, 2021.

**Submitting Comments**

We encourage you to submit comments through the Federal eRulemaking Portal at *https:// www.regulations.gov*. If your material cannot be submitted using *https:// www.regulations.gov*, contact the person in the **FOR FURTHER INFORMATION CONTACT** section of this document for alternate instructions. Documents mentioned in this notice, and all public

comments, are in our online docket at *https://www.regulations.gov* and can be viewed by following that website's instructions. Additionally, if you go to the online docket and sign up for email alerts, you will be notified when comments are posted.

We accept anonymous comments. All comments received will be posted without change to *https:// www.regulations.gov* and will include any personal information you have provided. For more about privacy and submissions in response to this document, see DHS's eRulemaking System of Records notice (85 FR 14226, March 11, 2020).

**Information Collection Request**

*Title:* Outer Continental Shelf Activities—Title 33 CFR Subchapter N.

*OMB Control Number:* 1625–0044.

*Summary:* The Outer Continental Shelf Lands Act, as amended, authorizes the Coast Guard to promulgate and enforce regulations promoting the safety of life and property on Outer Continental Shelf (OCS) facilities. These regulations are located in 33 CFR subchapter N.

*Need:* The information is needed to ensure compliance with the safety regulations related to OCS activities. The regulations contain reporting and recordkeeping requirements for annual inspections of OCS facilities, employee citizenship records, station bills, and emergency evacuation plans.

*Forms:*

• CG–5432, Fixed OCS Facility Inspection Report.

*Respondents:* Operators of facilities and vessels engaged in activities on the OCS.

*Frequency:* On occasion.

*Hour Burden Estimate:* The estimated burden remains 9,582 hours a year.

*Authority:* The Paperwork Reduction Act of 1995; 44 U.S.C. chapter 35, as amended.

Dated: March 3, 2021.

**Kathleen Claffie,**

*Chief, Office of Privacy Management, U.S. Coast Guard.*

[FR Doc. 2021–04845 Filed 3–8–21; 8:45 am]

**BILLING CODE 9110–04–P**

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

[CIS No. 2682–21; DHS Docket No. USCIS–2021–0003]

**RIN 1615–ZB86**

**Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is designating Venezuela for Temporary Protected Status (TPS) for 18 months, effective March 9, 2021, through September 9, 2022. This notice also provides procedures for individuals who believe they are eligible for TPS under the designation of Venezuela to apply. This notice also provides information about Deferred Enforced Departure (DED) for eligible Venezuelan nationals (and persons without nationality who last habitually resided in Venezuela), and provides information on how eligible individuals may apply for DED-related EADs with USCIS, based on the January 19, 2021 memorandum from former President Donald Trump directing the Secretary to take appropriate measures for the implementation of DED for Venezuelan nationals for 18 months, through July 20, 2022 (see 86 FR 6845, dated January 25, 2021).

**Note:** Individuals who apply for and receive TPS and who are also covered by DED do not need to apply for employment authorization under both programs. Individuals who apply for an EAD pursuant to their TPS application will receive an EAD with an expiration date of September 9, 2022, that is eligible for renewal if the Secretary extends TPS for Venezuela after September 9, 2022, after determining that Venezuela continues to meet the conditions supporting its designation for TPS. Individuals who apply for an EAD pursuant to DED will receive an EAD with an expiration date of July 20, 2022. If the President does not direct an extension of the DED authorization, DED, and associated employment authorization, will end on July 20, 2022. USCIS encourages individuals who

believe they are eligible for TPS to file for the benefit during the initial registration period announced in this Notice, even if they are also covered by DED, in case they cannot qualify for TPS late initial filing under 8 CFR 244.2(f)(2) after DED has expired.

**DATES:** The designation of Venezuela for TPS is effective on March 9, 2021, and will remain in effect for 18 months, through September 9, 2022. The 180-day registration period for eligible individuals to submit TPS applications begins March 9, 2021, and will remain in effect through September 5, 2021. DED and employment authorization for noncitizens covered under DED for Venezuela is effective through July 20, 2022.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Maureen Dunn, Division Chief, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *uscis.gov/tps*. You can find specific information about Venezuela's TPS designation by selecting "Venezuela" from the menu on the left side of the TPS web page.

• For further information on DED, including additional information on eligibility, please visit the USCIS DED web page at *uscis.gov/humanitarian/temporary-protected-status/deferred-enforced-departure*. You can find specific information about DED for Venezuela by selecting "DED Granted Country: Venezuela" from the menu on the left of the DED web page.

• If you have additional questions about DED or TPS, please visit *uscis.gov/tools*. Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking registration about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov*, or visit the USCIS Contact Center at *uscis.gov/contactcenter*.

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:** Under section 244(b)(1)(C) of the Immigration

and Nationality Act (INA), 8 U.S.C. 1254a(b)(1)(C), the Secretary is authorized to designate a foreign state (or any part thereof) for TPS upon finding that extraordinary and temporary conditions in the foreign state prevent its nationals from returning safely, unless permitting the foreign state's nationals to remain temporarily in the United States is contrary to the national interest of the United States. Regardless of an individual's country of birth, this designation allows eligible Venezuelan nationals (and noncitizens having no nationality who last habitually resided in Venezuela) who have continuously resided in the United States since March 8, 2021, and have been continuously physically present in the United States since March 9, 2021, to apply for TPS. This notice also describes the other eligibility criteria applicants must meet. Individuals who believe they may qualify for TPS under this designation may apply within the 180-day registration period that begins on March 9, 2021, and ends on September 5, 2021. They may also apply for TPS-related Employment Authorization Documents (EADs) and for travel authorization.

This notice also provides information about Deferred Enforced Departure (DED) for eligible Venezuelan nationals (and persons without nationality who last habitually resided in Venezuela), and provides information on how eligible individuals may apply for DED-related EADs with USCIS, based on the January 19, 2021 memorandum from former President Donald Trump directing the Secretary to take appropriate measures for the implementation of DED for Venezuelan nationals for 18 months, through July 20, 2022 (see 86 FR 6845, dated January 25, 2021).

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DED—Deferred Enforced Departure
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government

IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**Purpose of This Action (TPS)**

Through this notice, DHS sets forth procedures necessary for eligible nationals of Venezuela (or individuals having no nationality who last habitually resided in Venezuela) to submit an initial registration application under the designation of Venezuela for TPS and apply for an EAD. Under the designation, individuals must submit an initial Venezuela TPS application (Form I–821) and they may also submit an application for Employment Authorization (Form I–765), during the 180-day initial registration period that runs from March 9, 2021, through September 5, 2021. In addition to demonstrating continuous residence in the United States since March 8, 2021, and meeting other eligibility criteria, initial applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since March 9, 2021, the effective date of this designation of Venezuela, before USCIS may grant them TPS. USCIS estimates that approximately 323,000 individuals are eligible to file applications for TPS under the designation of Venezuela.

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the INA, or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. Upon return from such authorized travel, TPS beneficiaries retain the same immigration status they had before the travel.

  ○ The granting of TPS does not result in or lead to lawful permanent resident status.

VZ Vacatur_0077

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

## Why was Venezuela designated for TPS?

### Overview

Venezuela is currently facing a severe humanitarian emergency.[1] Under Nicolás Maduro's influence,[2] the country "has been in the midst of a severe political and economic crisis for several years." [3] Venezuela's crisis has been marked by a wide range of factors, including: Economic contraction; inflation and hyperinflation; deepening poverty; high levels of unemployment; reduced access to and shortages of food and medicine; a severely weakened medical system; the reappearance or increased incidence of certain communicable diseases; a collapse in basic services; water, electricity, and fuel shortages; political polarization; institutional and political tensions; human rights abuses and repression; crime and violence; corruption; increased human mobility and displacement (including internal migration, emigration, and return); and the impact of the COVID–19 pandemic, among other factors.[4]

[1] World Report 2021—Venezuela, Human Rights Watch, Jan. 2021.

[2] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), Summary, Aug. 26, 2020.

[3] Venezuelan Humanitarian and Refugee Crisis, Center for Disaster Philanthropy, Jan. 18, 2021.

[4] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), Summary, Aug. 26, 2020; Venezuelan Humanitarian and Refugee Crisis, Center for Disaster Philanthropy, Jan. 18, 2021; Venezuela: Complex Crisis—Overview, ACAPS, Jul. 27, 2020, *https://www.acaps.org/country/venezuela/crisis/complex-crisis* (last visited Feb. 2, 2021); Venezuela: Humanitarian Response Plan with Humanitarian Needs Overview 2020, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.7–9, Jul. 2020; Detailed findings of the independent international factfinding mission on the Bolivarian Republic of Venezuela, United Nations Human Rights Council, p.27, Sep. 15, 2020; Conflictividad Social 2020 [Social Conflict 2020], Observatorio Venezolano de

### Economic Crisis

Venezuela continues to suffer from a severe economic crisis. The Congressional Research Service (CRS) reported in August 2020 that "Venezuela's economy has collapsed." With the largest proven oil reserves in the world, Venezuela had long been "one of the most prosperous countries in South America." However, in 2014, the country entered into an ongoing "economic recession marked by hyperinflation, shortages of basic goods and a collapse in public services such as electricity and water." Sources attribute Venezuela's economic crisis to a variety of factors, including: The crash of global oil prices; economic mismanagement; heavy government regulation of the economy and the private sector; corruption; and the impact of the COVID–19 pandemic.

### Political Crisis

Venezuela continues to be impacted by a prolonged political crisis. Following a May 2018 electoral process that lacked legitimacy, but which Nicolás Maduro claimed to have won, the United States and many other democracies recognized Juan Guaidó as the interim President of Venezuela. Maduro continued to exert control over all Venezuelan institutions after January 2019, aside from the legitimately elected, opposition-controlled 2015 National Assembly. In elections held on December 6, 2020—which were rejected by the Organization of American States, many governments, and other international organizations as fraudulent [5]—supporters of Maduro won a vast majority of seats in the National Assembly under manipulated electoral conditions. Maduro installed a new illegitimate purported National Assembly on January 5, 2021.

### Human Rights

While concerns about "the deterioration of democratic institutions and threats to freedom of speech and press in Venezuela" have been expressed by human rights organizations for over a decade, CRS reported in August 2020 that human rights conditions are even worse under Maduro than under former President

Conflictividad Social (OVCS), Jan. 25, 2021; Asmann, Parker, and Jones, Katie, InSight Crime's 2020 Homicide Round-Up, InSight Crime, Jan. 29, 2021; Venezuela 2020 Crime & Safety Report, Overseas Security Advisory Council (OSAC), U.S. Department of State, Jul. 21, 2020.

[5] See Remarks by Bradley A. Freden, Deputy Permanent Representative of the United States OAS Permanent Council, OAS Resolution Condemns the Fraudulent Elections in Venezuela (Dec 9, 2020).

Chávez.[6] The Independent International Fact-Finding Mission created by the UN Human Rights Council to investigate allegations of atrocities since 2014 concluded that there were reasonable grounds to believe that pro-government groups and high-level authorities, including Maduro, had committed violations amounting to crimes against humanity. The mission found the judiciary contributed to arbitrary arrests, impunity for egregious abuses, and denial of justice to victims.[7]

### Health Crisis

Venezuela was facing a significant health crisis even before the start of the COVID–19 pandemic. According to CRS, "overall health indicators, particularly infant and maternal mortality rates," had deteriorated well before the impact of the COVID–19 pandemic. In April 2019, Human Rights Watch and the Johns Hopkins Bloomberg School of Public Health reported that "Venezuela's health system has been in decline since 2012, with conditions worsening drastically since 2017." Human Rights Watch reported in May 2020 that "Venezuela's health system has collapsed. Shortages of medications and health supplies, interruptions of basic utilities at healthcare facilities, and the emigration of healthcare workers have led to a progressive decline in healthcare operational capacity." Venezuelans also face "severe shortages of medicines and medical supplies" [8] and "a complex situation in which access to basic services, especially health services remain critical." [9]

### Food Insecurity

In an October 2020 report, the Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP) identified Venezuela (and Venezuelan migrants in neighboring countries) as one of 20 "acute food insecurity hotspots" [10] in

[6] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), p.7, Aug. 26, 2020.

[7] OHCHR | Venezuela: UN report urges accountability for crimes against humanity (Sep 16, 2020).

[8] Venezuela: Country Focus, European Asylum Support Office (EASO), p.41, Aug. 2020.

[9] United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Venezuela: Health Emergency 12-month update, *https://reliefweb.int/report/venezuela-bolivarian-republic/venezuela-health-emergency-12-month-update-mdrve004,* May 20, 2020.

[10] FAO–WFP early warning analysis of acute food insecurity hotspots: October 2020, Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP), p.6, Nov. 2020.

the world.[11] In an April 2019 report, Human Rights Watch and the Johns Hopkins Bloomberg School of Public Health reported that "[h]unger, malnutrition, and severe shortages of food are widespread" in Venezuela.[12] Despite a lack of nationwide nutrition data—last published by the government in 2007—the report asserted that "available evidence suggests malnutrition is high." [13] Moreover, Human Rights Watch reported in January 2021 that, "[b]ased on data collected prior to the pandemic, the 2020 National Survey of Life Conditions reported 8 percent of children under five acutely malnourished and 30 percent chronically malnourished, or stunted."

To help address shortages of food, the Venezuelan government established the Local Committees for Supply and Production (Comités Locales de Abastecimiento y Producción—CLAP) in 2016. According to the European Asylum Support Office (EASO), the CLAP "are responsible for the delivery of food and other government aid to the communities." However, CLAP food boxes "do not meet the basic nutritional needs," and their delivery is reportedly "inconsistent and discretionary." Furthermore, EASO noted that the CLAP are reportedly used to monitor the population—including the political activity of beneficiaries—and "as a tool to discriminate and harass those who oppose the government or are involved in human rights advocacy." There have also been allegations that certain Venezuelans have been "excluded from the list of CLAP beneficiaries because they were not government supporters."

*Access to Basic Services (Electricity, Water, Gas, etc.)*

Venezuela has seen a "collapse of basic services." [14] In a July 2020 report, OHCHR stated that "Access and quality of basic services, such as transportation, electricity, water and sanitation, and gas, continued to deteriorate, undermining the right to an adequate

standard of living." [15] Venezuela also faces "severe shortages of water." Further, "an estimated 86% of Venezuelans reported unreliable water service, including 11% who have none at all", according to an April 2020 survey of 4,500 residents by the non-profit Venezuelan Observatory of Public Services.[16]

*Crime and Insecurity*

Sources reported in mid-2020 that Venezuela has "among the highest homicide and crime victimization rates in Latin America and the Caribbean," and "one of the highest number [sic] of violent deaths in the region and in the world." While Venezuela recorded "a substantial decrease in homicides in 2020," InSight Crime noted in January 2021 that "violence is indeed still rampant" in the country. InSight Crime also reported that—per the Venezuelan Violence Observatory (Observatorio Venezolano de Violencia or OVV)—"a violence epidemic continues to plague every single state, as well as the capital district of Caracas." Sources have attributed recent declines in the homicide rate to a variety of factors, including: A decrease in violence among armed structures that engage in territorial control; fewer opportunities to engage in criminal behavior due to rising poverty, emigration, and economic deterioration, among other factors; and the impact of quarantines and restrictions on movement related to the COVID–19 pandemic. In its 2020 report, the U.S. Department of State's Overseas Security Advisory Council (OSAC) stated that "[h]eavily armed criminals have used grenades and assault rifles to commit crimes at banks, shopping malls, public transportation stations, and universities." [17]

**What authority does the Secretary have to designate Venezuela for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government (Government), to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. The decision to designate any foreign state (or part thereof) is a discretionary decision, and

there is no judicial review of any determination with respect to the designation, or termination of or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A). The Secretary, in his/her discretion, may then grant TPS to eligible nationals of that foreign state (or noncitizens having no nationality who last habitually resided in the designated country). See INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in the foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. See INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary does not determine that the foreign state no longer meets the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. See INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. See INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**Notice of the Designation of Venezuela for TPS**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Venezuela's designation for TPS on the basis of extraordinary and temporary conditions are met. See INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am designating Venezuela for TPS for 18 months, from March 9, 2021 through September 9, 2022. See INA section 244(b)(1)(C) and (b)(2); 8 U.S.C. 1254a(b)(1)(C), and (b)(2).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

**Required Application Forms and Application Fees To Register for TPS**

To register for TPS based on the designation of Venezuela, you must submit an Application for Temporary Protected Status (Form I–821) and pay

---

[11] FAO–WFP early warning analysis of acute food insecurity hotspots: October 2020, Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP), p.5–6,12, Nov. 2020.

[12] Venezuela's Humanitarian Emergency: Large-Scale UN Response Needed to Address Health and Food Crises, Human Rights Watch & Johns Hopkins Bloomberg School of Public Health, p.4, Apr. 4, 2019.

[13] Venezuela's Humanitarian Emergency: Large-Scale UN Response Needed to Address Health and Food Crises, Human Rights Watch & Johns Hopkins Bloomberg School of Public Health, p.4, Apr. 4, 2019.

[14] Venezuela: Country Focus, European Asylum Support Office (EASO), p.41, Aug. 2020.

[15] Outcomes of the investigation into allegations of possible human right violations of the human rights to life, liberty and physical and moral integrity in the Bolivarian Republic of Venezuela, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.4, Jul. 2, 2020.

[16] Cost on Water Shortage in Venezuela, Hispanic Oulook Magazine, June 2020.

[17] Venezuela 2020 Crime & Safety Report, Department of State Overseas Security Advisory Council, July 21, 2020.

the filing fee (or submit a Request for a Fee Waiver (Form I–912)). You may be required to pay the biometric services fee. Please see additional information under the ''Biometric Services Fee'' section of this notice.

Although not required to do so, if you want to obtain an EAD valid through September 7, 2021, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or submit a Request for a Fee Waiver (Form I–912)). If you do not want to request an EAD now, you may also file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may complete a Request for Fee Waiver

(Form I–912). For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *dhs.gov/ privacy.*

**Refiling a TPS Registration Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 180-day registration period so USCIS can process your application and issue any EAD promptly. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to refile by the registration deadline, you may still refile your Form I–821 with the biometrics fee. USCIS will review this situation to determine whether you established good cause for late TPS registration. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. See INA section 244(c)(3)(C);

8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late initial registration, visit the USCIS TPS web page at *uscis.gov/tps.* Following denial of your fee waiver request, you may also refile your Form I–765, with fee, either with your Form I–821 or at a later time, if you choose.

*Note:* Although a registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee) when filing a TPS registration application, you may decide to wait to request an EAD. Therefore, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of registration, and could wait to seek an EAD until after USCIS has approved your TPS registration application. If you choose to do this, to register for TPS you would only need to file the Form I–821 with the biometric services fee, if applicable (or request a fee waiver).

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

Table 1-Mailing Addresses:

Mail your completed Application for Employment Authorization (Form I–765) and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You are applying through the U.S. Postal Service and you live in Florida. | USCIS, Attn: TPS Venezuela, P.O. Box 20300, Phoenix, AZ 85036. |
| You are using FedEx, UPS, or DHL and you live in Florida .................. | USCIS, Attn: TPS Venezuela, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034 |
| You are applying through U.S. Postal Service and you live in any other state. | USCIS Attn: TPS Venezuela, P.O. Box 805282, Chicago, IL 60690. |
| You are using FedEx, UPS, or DHL and you live in any other state ...... | USCIS, Attn: TPS Venezuela (805282), 131 South Dearborn—3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. When registering and requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us to verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable

documentation and other requirements for applying or registering for TPS on the USCIS website at *uscis.gov/tps* under ''Venezuela.''

**Purpose of this Action (DED)**

Pursuant to the President's constitutional authority to conduct the foreign relations of the United States, foreign policy considerations warrant implementing DED for Venezuela through July 20, 2022.[18] Through this notice, DHS is establishing procedures for individuals covered by DED for Venezuela to apply for employment authorization through July 20, 2022.

---

[18] *See* Deferred Enforced Departure for Certain Venezuelans, 86 FR 6845, January 25, 2021, available at **Federal Register**: Deferred Enforced Departure for Certain Venezuelans.

**What is Deferred Enforced Departure (DED)?**

• DED is an administrative stay of removal ordered by the President. The authority to grant DED arises from the President's constitutional authority to conduct the foreign relations of the United States. The President can authorize DED for any reason related to this authority. DED has been authorized in situations where foreign nationals may face danger if required to return to countries experiencing political instability, conflict, or other unsafe conditions, or when there are other foreign policy reasons for allowing a designated group of foreign nationals to remain in the United States.

• Although DED is not a specific immigration status, individuals covered

Federal Register / Vol. 86, No. 44 / Tuesday, March 9, 2021 / Notices    13579

by DED are not subject to removal from the United States, usually for a designated period of time. Furthermore, the President may direct that certain benefits, such as employment authorization or travel authorization, be available to foreign nationals covered by the DED directive.

• If the President provides for employment or travel authorization, USCIS administers those benefits. USCIS publishes a **Federal Register** notice to instruct the covered population on how to apply for any benefits provided.

• The President issues directives regarding DED and who is covered via presidential memorandum. The qualification requirements for individuals who are covered under DED are based on the terms of the President's directive regarding DED and any relevant implementing requirements established by DHS. Since DED is a directive not to remove particular individuals, rather than a specific immigration status like TPS, there is no DED application form required to obtain DED coverage.

The Presidential Memorandum ordering DED for Venezuelans can be found at: *https://www.federalregister.gov/documents/2021/01/25/2021-01718/deferred-enforced-departure-for-certain-venezuelans*

### Eligibility and Employment Authorization for DED

#### How will I know if I am eligible for employment authorization under the DED Presidential Memorandum for eligible Venezuelans?

The procedures for employment authorization in this notice apply only to noncitizens who are Venezuelan nationals, and persons without nationality who last habitually resided in Venezuela, who are present in the United States as of January 20, 2021, and except for noncitizens:

• Who have voluntarily returned to Venezuela or their country of last habitual residence outside the United States;

• Who have not continuously resided in the United States since January 20, 2021;

• Who are inadmissible under section 212(a)(3) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(a)(3)) or removable under section 237(a)(4) of the INA (8 U.S.C. 1227(a)(4));

• Who have been convicted of any felony or two or more misdemeanors committed in the United States, or who meet the criteria set forth in section 208(b)(2)(A) of the INA (8 U.S.C. 1158(b)(2)(A));

• Who were deported, excluded, or removed, before January 20, 2021;

• Who are subject to extradition;

• Whose presence in the United States the Secretary of Homeland Security has determined is not in the interest of the United States or presents a danger to public safety; or

• Whose presence in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States.

#### What will I need to file if I am covered by DED and would like to obtain employment authorization?

If you are covered under DED for Venezuela and would like to work, you must apply for an EAD by filing an Application for Employment Authorization (Form I–765). Please carefully follow the Application for Employment Authorization (Form I–765) instructions when completing the application for an EAD. When filing the Application for Employment Authorization (Form I–765), you must:

• Indicate that you are eligible for DED by entering ''(a)(11)'' in response to Question 27 on the Application for Employment Authorization (Form I–765); and

• Submit the fee for the Application for Employment Authorization (Form I–765).

The regulations require individuals covered under DED who request an EAD to pay the fee prescribed in 8 CFR 103.7 for the Application for Employment Authorization (Form I–765). *See also* 8 CFR 274a.12(a)(11) (employment authorization for DED-covered individuals); and 8 CFR 274a.13(a) (requirement to file EAD application if EAD desired). If you are unable to pay the fee, you may apply for an application fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation.

#### How will I know if USCIS will need to obtain biometrics?

If biometrics are required to produce your EAD, you will be notified by USCIS and scheduled for an appointment at a USCIS Application Support Center.

#### Where do I submit my completed DED-based Application for Employment Authorization (Form I–765)?

For DED, mail your completed Application for Employment Authorization (Form I–765) and supporting documentation to the proper address in Table 2.

TABLE 2—MAILING ADDRESSES

| If . . . | Mail to . . . |
| --- | --- |
| You are applying through the U.S. Postal Service | USCIS, Attn: DED Venezuela, PO Box 805283, Chicago, IL 60680–6943] |
| You are using FedEx, UPS, or DHL | USCIS, Attn: DED Venezuela, 131 South Dearborn—3rd Floor, ≤Chicago, IL 60603–5517 |

#### Can I file my DED-based Application for Employment Authorization (Form I–765) electronically?

No. Electronic filing is not available when filing an Application for Employment Authorization (Form I–765) based on DED.

#### What happens after July 20, 2022, for purposes of DED-based employment authorization?

This DED authorization is set to end on July 20, 2022. After that date, employers will no longer accept EADs with a category code of A11 and a July 20, 2022, expiration date, and employees will need to present other evidence of continued work authorization.

**General Employment-Related Information for TPS Applicants and Individuals With DED-Based Employment Authorization and Their Employers**

### How can I obtain information on the status of my EAD request?

To get case status information about your TPS application, as well as the status of your TPS or DED-based EAD request, you can check Case Status Online at *uscis.gov*, or visit the USCIS Contact Center at *uscis.gov/contactcenter*. If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

### When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?

You can find the Lists of Acceptable Documents on the third page of Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *uscis.gov/i-9-central/acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *uscis.gov/I-9Central*. An EAD is an acceptable document under List A.

### If I have an EAD based on another immigration status, can I obtain a new EAD?

Yes, if you are eligible for DED or TPS, you can obtain a new EAD, regardless of whether you have an EAD based on another immigration status. If you want to obtain a new TPS-based EAD valid through September 9, 2022, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee. If you want to obtain a new DED-based EAD valid through July 20, 2022, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee.

### Can my employer require that I provide any other documentation to prove my status, such as proof of my Venezuelan citizenship?

No. When completing Form I–9, employers must accept any documentation that appears on the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Venezuelan citizenship when completing Form I–9 for new hires or reverifying the employment authorization of current employees. Refer to the "Note to Employees" section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

### Note to All Employers

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

### Note to Employees

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. USCIS accepts calls in English, Spanish and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of the TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *justice.gov/ierandtheUSCISandE-Verifywebsitesatuscis.gov/i-9-central* and *e-verify.gov*.

## Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

For Federal purposes, individuals approved for TPS may show their Form I–797, Notice of Action, indicating approval of their Form I–821 application, or their A12 or C19 EAD to prove that they have TPS. Individuals may present their A11 EAD to show they are covered by DED. However, while Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are covered under TPS and/or DED and/or show you are authorized to work based on TPS and/or DED. Examples of such documents are:

• Your new EAD with a category code of A12 or C19 for TPS, or A11 for DED;

• A copy of your Form I–797, the notice of approval, for a current Form I–821, if you received one from USCIS; or

• Any other relevant DHS-issued document that indicates your immigration status or authorization to be in the United States, or that may be used by DHS to determine whether you have such status or authorization to remain in the United States.

Check with the government agency regarding which document(s) the agency will accept.

Some benefit-granting agencies use the SAVE program to confirm the current immigration status of applicants for public benefits. SAVE can verify when an individual has TPS or DED based on the documents above. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *uscis.gov/save/save-casecheck,* then by clicking the "Check Your Case" button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and SAVE verification case number or an immigration identifier number that you provided to the benefit-granting agency. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the response is correct, find detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records on the SAVE website at *www.uscis.gov/save.*

[FR Doc. 2021–04951 Filed 3–8–21; 4:15 pm]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7040–N–05]**

### 60-Day Notice of Proposed Information Collection: Public Housing Assessment System (PHAS) Appeals; PHAS Unaudited Financial Statement Submission Extensions; Assisted and Insured Housing Property Inspection Technical Reviews and Database Adjustments; OMB Control No. 2577–0257

**AGENCY:** Office of the Assistant Secretary for Public and Indian Housing, PIH, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* May 10, 2021.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; telephone 202–402–5564 (this is not a toll-free number) or email at *Colette.Pollard@hud.gov* for a copy of the proposed forms or other available information. Persons with hearing or speech impairments may access this number through TTY by calling the Federal Relay Service at (800) 877–8339 (this is a toll-free number).

**FOR FURTHER INFORMATION CONTACT:** Dacia Rogers, Office of Policy, Programs and Legislative Initiatives, PIH, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; telephone 202–402–3374, (this is not a toll-free number). Persons with hearing or speech impairments may access this number via TTY by calling the Federal Relay Service at (800) 877–8339 (this is a toll-free number). Copies of available documents submitted to OMB may be obtained from Ms. Rogers.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

## A. Overview of Information Collection

*Title of Information Collection:* Public Housing Assessment System (PHAS) Appeals; Public Housing and Multifamily Housing Technical Reviews and Database Adjustments; Assisted and Insured Housing property inspection Technical Reviews and Database Adjustments.

*OMB Approval Number:* 2577–0257.

*Type of Request:* Revision of a currently approved collection.

*Form Number:* HUD–52306.

*Description of the need for the information and proposed use:* The collection of this information supports HUD's ongoing mission to provide safe, decent, and habitable housing to low income households. To ensure HUD's subsidized housing meets this criteria accurate data and information collection is required to provide an assessment reflective of the property's condition. Poorly performing PHAs may be subject to additional reporting requirements, may receive HUD assistance, and are subject to possible penalties. For the Office of Housing, accurate scores are vital to their monitoring and compliance efforts. Unacceptable property scores result in automatic penalties and referral for enforcement actions.

Pursuant to § 6(j)(2)(A)(iii) the United States Housing Act of 1937, as amended, HUD established procedures in the Public Housing Assessment System (PHAS) rule for a public housing agencies (PHAs) to appeal an overall PHAS score or a troubled designation (§ 902.69). The PHAS rule in §§ 902.24 and 902.68 also provides that under certain circumstances PHAs may submit a request for a database adjustment and technical review, respectively, of physical condition inspection results.

Pursuant to the Office of Housing Physical Condition of Multifamily Properties regulation at § 200.857(d) and (e), multifamily property owners also have the right, under certain circumstances, to submit a request for a database adjustment and technical

# Presidential Documents

**Executive Order 14159 of January 20, 2025**

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose*. Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy*. It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws*. In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4**. *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9.** *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10.** *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11.** *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12.** *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13.** *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' accept-
ance of their nationals who are subject to removal from the United States;
and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions
that prevent the prompt repatriation of aliens to any foreign state. Any
failure or delay by a foreign state to verify the identity of a national of
that state shall be considered in carrying out subsection (a) this section,
and shall also be considered regarding the issuance of any other sanctions
that may be available to the United States.

**Sec. 14.** *Visa Bonds.* The Secretary of Treasury shall take all appropriate
action, in coordination with the Secretary of State and the Secretary of
Homeland Security, to establish a system to facilitate the administration
of all bonds that the Secretary of State or the Secretary of Homeland Security
may lawfully require to administer the provisions of the INA.

**Sec. 15.** *Reestablishment of the VOICE Office and Addressing Victims of
Crimes Committed by Removable Aliens.* The Secretary of Homeland Security
shall direct the Director of U.S. Immigration and Customs Enforcement (ICE)
to take all appropriate and lawful action to reestablish within ICE an office
to provide proactive, timely, adequate, and professional services to victims
of crimes committed by removable aliens, and those victims' family members.
The Attorney General shall also ensure that the provisions of 18 U.S.C.
3771 are followed in all Federal prosecutions involving crimes committed
by removable aliens.

**Sec. 16.** *Addressing Actions by the Previous Administration.* The Secretary
of State, the Attorney General, and the Secretary of Homeland Security
shall promptly take all appropriate action, consistent with law, to rescind
the policy decisions of the previous administration that led to the increased
or continued presence of illegal aliens in the United States, and align any
and all departmental activities with the policies set out by this order and
the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA
(8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance
with the plain language of the statute, and in all circumstances only when
an individual alien demonstrates urgent humanitarian reasons or a significant
public benefit derived from their particular continued presence in the United
States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent
with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that
such designations are appropriately limited in scope and made for only
so long as may be necessary to fulfill the textual requirements of that
statute; and

(c) ensuring that employment authorization is provided in a manner con-
sistent with section 274A of the INA (8 U.S.C. 1324a), and that employment
authorization is not provided to any unauthorized alien in the United States.

**Sec. 17.** *Sanctuary Jurisdictions.* The Attorney General and the Secretary
of Homeland Security shall, to the maximum extent possible under law,
evaluate and undertake any lawful actions to ensure that so-called "sanc-
tuary" jurisdictions, which seek to interfere with the lawful exercise of
Federal law enforcement operations, do not receive access to Federal funds.
Further, the Attorney General and the Secretary of Homeland Security shall
evaluate and undertake any other lawful actions, criminal or civil, that
they deem warranted based on any such jurisdiction's practices that interfere
with the enforcement of Federal law.

**Sec. 18.** *Information Sharing.* (a) The Secretary of Homeland Security shall
promptly issue guidance to ensure maximum compliance by Department
of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and
8 U.S.C. 1644 and ensure that State and local governments are provided
with the information necessary to fulfill law enforcement, citizenship, or
immigration status verification requirements authorized by law; and

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

Sec. 19. *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

Sec. 20. *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

Sec. 21. *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

Sec. 22. *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

Sec. 23. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

# Presidential Documents

Executive Order 14157 of January 20, 2025

## Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. 1701 *et seq.* it is hereby ordered:

**Section 1**. *Purpose.* This order creates a process by which certain international cartels (the Cartels) and other organizations will be designated as Foreign Terrorist Organizations, consistent with section 219 of the INA (8 U.S.C. 1189), or Specially Designated Global Terrorists, consistent with IEEPA (50 U.S.C. 1702) and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended.

(a) International cartels constitute a national-security threat beyond that posed by traditional organized crime, with activities encompassing:

(i) convergence between themselves and a range of extra-hemispheric actors, from designated foreign-terror organizations to antagonistic foreign governments;

(ii) complex adaptive systems, characteristic of entities engaged in insurgency and asymmetric warfare; and

(iii) infiltration into foreign governments across the Western Hemisphere. The Cartels have engaged in a campaign of violence and terror throughout the Western Hemisphere that has not only destabilized countries with significant importance for our national interests but also flooded the United States with deadly drugs, violent criminals, and vicious gangs.

The Cartels functionally control, through a campaign of assassination, terror, rape, and brute force nearly all illegal traffic across the southern border of the United States. In certain portions of Mexico, they function as quasi-governmental entities, controlling nearly all aspects of society. The Cartels' activities threaten the safety of the American people, the security of the United States, and the stability of the international order in the Western Hemisphere. Their activities, proximity to, and incursions into the physical territory of the United States pose an unacceptable national security risk to the United States.

(b) Other transnational organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS–13) pose similar threats to the United States. Their campaigns of violence and terror in the United States and internationally are extraordinarily violent, vicious, and similarly threaten the stability of the international order in the Western Hemisphere.

(c) The Cartels and other transnational organizations, such as TdA and MS–13, operate both within and outside the United States. They present an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. I hereby declare a national emergency, under IEEPA, to deal with those threats.

**Sec. 2**. *Policy.* It is the policy of the United States to ensure the total elimination of these organizations' presence in the United States and their ability to threaten the territory, safety, and security of the United States

through their extraterritorial command-and-control structures, thereby protecting the American people and the territorial integrity of the United States.

**Sec. 3**. *Implementation*. (a) Within 14 days of the date of this order, the Secretary of State shall take all appropriate action, in consultation with the Secretary of the Treasury, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to make a recommendation regarding the designation of any cartel or other organization described in section 1 of this order as a Foreign Terrorist Organization consistent with 8 U.S.C. 1189 and/or a Specially Designated Global Terrorist consistent with 50 U.S.C. 1702 and Executive Order 13224.

(b) Within 14 days of the date of this order, the Attorney General and the Secretary of Homeland Security shall take all appropriate action, in consultation with the Secretary of State, to make operational preparations regarding the implementation of any decision I make to invoke the Alien Enemies Act, 50 U.S.C. 21 *et seq.,* in relation to the existence of any qualifying invasion or predatory incursion against the territory of the United States by a qualifying actor, and to prepare such facilities as necessary to expedite the removal of those who may be designated under this order.

**Sec. 4**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02004

Filed 1–28–25; 11:15 am]

Billing code 3395–F4–P

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2761–23; DHS Docket No. USCIS–2021–0003]

RIN 1615–ZB86

## Extension and Redesignation of Venezuela for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) extension and redesignation.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Venezuela for Temporary Protected Status (TPS) for 18 months, beginning on March 11, 2024 and ending on September 10, 2025. This extension allows existing TPS beneficiaries to retain their status through September 10, 2025, if they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through September 10, 2025, must re-register during the re-registration period described in this notice. Separately, the Secretary is also redesignating Venezuela for TPS. The redesignation of Venezuela allows additional Venezuelan nationals (and individuals having no nationality who last habitually resided in Venezuela) who have been continuously residing in the United States since July 31, 2023, to apply for TPS for the first time during the initial registration period described under the redesignation information in this notice. In addition to demonstrating continuous residence in the United States since July 31, 2023, and meeting other eligibility criteria, initial applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since October 3, 2023, the effective date of this redesignation of Venezuela for TPS. The Secretary's actions represent two distinct TPS designations of Venezuela—the first designation of Venezuela that was announced on March 9, 2021 (Venezuela 2021) and is being extended in this FRN, and this second action, redesignating Venezuela on October 3, 2023 (Venezuela 2023).

**DATES:**

*Extension of Designation of Venezuela for TPS:* The 18-month extension of Venezuela 2021 begins on March 11, 2024 and will remain in effect for 18 months, ending on September 10, 2025. The extension affects existing beneficiaries of TPS and those who filed initial applications for TPS under Venezuela 2021 that were pending as of the date of this notice.

*Re-registration:* The 60-day re-registration period for existing beneficiaries under Venezuela 2021 runs from January 10, 2024, through March 10, 2024. (Note: It is important for re-registrants to timely re-register during the registration period and not to wait until their Employment Authorization Document (EAD) expires. Delaying re-registration could result in gaps in their employment authorization documentation.)

*Redesignation of Venezuela for TPS (Venezuela 2023):* The 18-month redesignation of Venezuela for TPS begins on October 3, 2023, and will remain in effect for 18 months, ending on April 2, 2025. The redesignation affects potential first-time applicants and others who do not currently have TPS.

*First-time Registration:* The initial registration period for new applicants under the Venezuela 2023 TPS redesignation begins on October 3, 2023, and will remain in effect through April 2, 2025.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For more information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* You can find specific information about Venezuela's TPS designation by selecting "Venezuela" from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you cannot find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or

visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.*

• You also can find more information at local USCIS offices after this notice is published.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Document
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Purpose of This Action (TPS)

Through this notice, DHS sets forth procedures necessary for nationals of Venezuela (or individuals having no nationality who last habitually resided in Venezuela) to (1) re-register for TPS and apply to renew their EAD with USCIS or (2) submit an initial registration application under the redesignation and apply for an EAD.

Re-registration is limited to individuals who have previously registered for TPS under Venezuela 2021[1] and whose applications have been granted. If you do not re-register properly within the re-registration period, USCIS may withdraw your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under Venezuela 2021, the 60-day re-registration period for existing beneficiaries runs from January 10, 2024, through March 10, 2024. USCIS will issue new EADs with

---

[1] *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure,* 86 FR 13574 (Mar. 9, 2021).

a September 10, 2025, expiration date to eligible Venezuelan TPS beneficiaries who timely re-register and apply for EADs. Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive a new EAD before their current EAD expires. Accordingly, through this **Federal Register** notice, DHS automatically extends through March 10, 2025, the validity of certain EADs previously issued under the TPS designation of Venezuela. As proof of continued employment authorization through March 10, 2025, TPS beneficiaries can show their EAD with the notation A–12 or C–19 under Category and a Card Expires date of March 10, 2024, or September 9, 2022. This notice explains how TPS beneficiaries and their employers may determine if an EAD is automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

Individuals with an initial Venezuela TPS application (Form I–821) or Application for Employment Authorization (Form I–765) pending as of October 3, 2023 under Venezuela 2021, do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through September 10, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date. Individuals who are current beneficiaries under the Venezuela 2021 designation and have a re-registration application (Form I–821) and/or Application for Employment Authorization (Form I–765) pending as of October 3, 2023, do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through September 10, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

Under the redesignation, Venezuela 2023, individuals who currently do not have TPS may submit an initial application during the initial registration period that runs from October 3, 2023, and runs through the full length of the redesignation period ending April 2, 2025. In addition to demonstrating continuous residence in the United States since July 31, 2023, and meeting other eligibility criteria, initial applicants for TPS under this redesignation (Venezuela 2023) must demonstrate that they have been

continuously physically present in the United States since October 3, 2023,[2] the effective date of this redesignation of Venezuela, before USCIS may grant them TPS. DHS estimates that approximately 472,000 individuals may become newly eligible for TPS under the redesignation of Venezuela.

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs if they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, if it is still valid beyond the date their TPS terminates.

**When was Venezuela designated for TPS?**

Venezuela was initially designated on the basis of extraordinary and temporary conditions that prevented nationals of Venezuela from returning in safety. *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure,* 86 FR 13574 (Mar. 9, 2021). The TPS designation was

extended for 18 months on September 8, 2022. *See Extension of the Designation of Venezuela for Temporary Protected Status,* 87 FR 55024 (Sept. 8, 2022).

**What authority does the Secretary have to extend the designation of Venezuela for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[3] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in their discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state continues to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must

---

[2] The "continuous physical presence" date is the effective date of the most recent TPS designation of the country, which is either the publication date of the designation announcement in the **Federal Register** or a later date established by the Secretary. The "continuous residence" date is any date established by the Secretary when a country is designated (or sometimes redesignated) for TPS. *See* INA sec. 244(b)(2)(A) (effective date of designation); 244(c)(1)(A)(i–ii) (continuous residence and continuous physical presence date requirements); 8 U.S.C. 1254a(b)(2)(A); 1254a(c)(1)(A)(i–ii).

[3] INA section 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135 (2002). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1); 8 U.S.C. 1254a(b)(1).

terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## What is the Secretary's authority to redesignate Venezuela for TPS?

In addition to extending an existing TPS designation, the Secretary, after consultation with appropriate Government agencies, may redesignate a country (or part thereof) for TPS. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1); *see also* INA sec. 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that "the alien has been continuously physically present since the effective date of *the most recent designation of the state*") (emphasis added).[4]

When the Secretary designates or redesignates a country for TPS, the Secretary also has the discretion to establish the date from which TPS applicants must demonstrate that they have been "continuously resid[ing]" in the United States. *See* INA sec. 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii). The Secretary has determined that the "continuous residence" date for applicants for TPS under the redesignation of Venezuela will be July 31, 2023. Initial applicants for TPS under this redesignation must also show they have been "continuously physically present" in the United States since October 3, 2023, which is the effective date of the Secretary's redesignation of Venezuela. *See* INA sec. 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i). For each initial TPS application filed under the redesignation, USCIS cannot make the final determination of whether the applicant has met the "continuous physical presence" requirement until October 3, 2023, the effective date of this redesignation for Venezuela. USCIS, however, will issue employment authorization documentation, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

## Why is the Secretary extending the TPS designation for Venezuela 2021 and redesignating Venezuela for TPS?

DHS has reviewed country conditions in Venezuela. Based on the review, including input received from DOS and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because extraordinary and temporary conditions continue to prevent Venezuelan nationals from returning in safety. The Secretary has further determined that redesignating Venezuela for TPS under INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C) is warranted on the same statutory basis of extraordinary and temporary conditions.

### Overview

Venezuela continues to face a severe humanitarian emergency due to a political and economic crisis, as well as human rights violations and abuses and high levels of crime and violence, that impacts access to food, medicine, healthcare, water, electricity, and fuel, and has led to high levels of poverty. Additionally, Venezuela has recently experienced heavy rainfall in the spring and summer of 2023 which triggered flooding and landslides. Given the current conditions in Venezuela, these issues contribute to the country's existing challenges.

Venezuela is experiencing "an unprecedented political, economic, and humanitarian crisis."[5] "Venezuela is suffering one of the worst humanitarian crises in the history of the Western Hemisphere," which has been characterized by "[h]igh levels of poverty, food insecurity, malnutrition, and infant mortality, together with frequent electricity outages and the collapse of health infrastructure."[6] Though there were some positive developments in Venezuela in 2022 "as the economy stabilized and showed signs of economic growth," the effects of these changes were not felt across the Venezuelan population and did not offset the impact of the large-scale economic contraction which resulted in significant humanitarian challenges that continue today and will take time to address.[7]

### Political Repression and Human Rights

The Maduro regime has closed off channels for political dissent, restricting enjoyment of civil liberties and "prosecuting perceived opponents without regard for due process."[8] The UN Human Rights Council's Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela (IIFFM) found in its September 2022 report, "Venezuela's military and civilian intelligence agencies function as well-coordinated and effective structures in the implementation of a plan" to "repress dissent."[9]

### Crime and Insecurity

Venezuela has one of the highest rates of violent deaths in the world.[10] Additionally, "Venezuelans face physical insecurity and violence from several sources, including irregular armed groups, security forces, and organized gangs."[11] Corruption in Venezuela exacerbates insecurity. InSight Crime has reported that "criminal groups and corrupt state actors together form a hybrid state that combines governance with criminality, and where illegal armed groups act at the service of the state, while criminal networks form within it."[12] Human trafficking remains a serious concern. Traffickers exploit and subject Venezuelans, including those fleeing the country, to egregious forms of exploitation, including sex trafficking and forced labor.[13] Members of non-state armed groups that operate in the

[4] The extension and redesignation of TPS for Venezuela is one of several instances in which the Secretary and, before the establishment of DHS, the Attorney General, have simultaneously extended a country's TPS designation and redesignated the country for TPS. *See, e.g.,* "Extension and Redesignation of Haiti for Temporary Protected Status," 76 FR 29000 (May 19, 2011); "Extension and Re-designation of Temporary Protected Status for Sudan," 69 FR 60168 (Oct. 7, 2004); "Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program," 62 FR 16608 (Apr. 7, 1997).

[5] Clare Ribando Seelke, Rebecca M. Nelson, Rhoda Margesson, & Phillip Brown, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), p.1, Dec. 6, 2022, available at *https://crsreports.congress.gov/product/pdf/R/R44841* (last visited Jul. 7, 2023).

[6] Michael Penfold & Cynthia J. Arnson, Overcoming Barriers to Humanitarian Aid in Venezuela, Wilson Center, p.1, Mar. 2023, available at *https://www.wilsoncenter.org/sites/default/files/media/uploads/documents/OVERCOMING%20BARRIERS%20TO%20HUMANITARIAN%20AID%20IN%20VENEZUELA_0.pdf* (last visited Aug. 10, 2023).

[7] United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Venezuela Humanitarian Fund Annual Report 2022, p.6, Jun. 14, 2023, available at *https://www.unocha.org/publications/report/venezuela-bolivarian-republic/venezuela-humanitarian-fund-annual-report-2022* (last visited Aug. 10, 2023).

[8] Freedom House, Freedom in the World 2023—Venezuela, Mar. 10, 2023, available at *https://freedomhouse.org/country/venezuela/freedom-world/2023* (last visited Jul. 18, 2023).

[9] United Nations Human Rights Council, Venezuela: new UN report details responsibilities for crimes against humanity to repress dissent and highlights situation in remotes mining areas, Sept. 20, 2022, available at *https://www.ohchr.org/en/press-releases/2022/09/venezuela-new-un-report-details-responsibilities-crimes-against-humanity* (last visited Sept. 27, 2023).

[10] Overseas Security Advisory Council (OSAC), Venezuela Country Security Report, U.S. Department of State, May 10, 2022, available at *https://www.osac.gov/Content/Report/34f99e62-2161-412d-bfeb-1e752539f6bf* (last visited Jul. 19, 2023).

[11] Freedom House, Freedom in the World 2023—Venezuela, Mar. 10, 2023, available at *https://freedomhouse.org/country/venezuela/freedom-world/2023* (last visited Jul. 18, 2023).

[12] Venezuela Investigative Unit, Rise of the Criminal Hybrid State in Venezuela, InSight Crime, p.5, Jul. 2023, available at *https://insightcrime.org/wp-content/uploads/2023/07/Rise-of-the-Criminal-Hybrid-State-in-Venezuela-InSight-Crime-1.pdf* (last visited Jul. 19, 2023).

[13] U.S. Dep't. of State, 2023 Trafficking in Persons Report: Venezuela, June 15, 2023, available at *https://www.state.gov/reports/2023-trafficking-in-persons-report/venezuela/* (last visited Sept. 25, 2023).

country with impunity, subject Venezuelans to forced labor and forced criminality, and recruit or use child soldiers.[14]

*Economic Collapse*

Since 2014, Venezuela has suffered from an "economic recession marked by hyperinflation, shortages of basic goods and a collapse in public services such as electricity and water." [15] Recently, Venezuela's economy has shown some signs of recovery; however, it is still in a precarious condition.[16] In a report covering the period from May 2022 through April 2023, the Office of the High Commissioner for Human Rights (OHCHR) noted that while economic growth which occurred in 2022 "would bring hope for improved economic prospects, persistent challenges and other factors continued to negatively affect essential public services, transport, education, and health." [17]

In its annual report covering 2022, the Inter-American Commission on Human Rights (IACHR) noted "the high rates of poverty and inequality in the country, in which there are estimates that more than 90% of the population lives in poverty." [18] The same report stated that "as of March 2022, HumVenezuela estimated that 94.5% of the population would not have sufficient income to cover items such as food, housing, health, education, transportation and clothing." [19]

*Health Crisis*

Various sources have referred to severe problems with health systems in Venezuela, including the IACHR, Human Rights Watch, and the Congressional Research Service (CRS).[20] Per *The Associated Press*, Venezuela's "health care system crumbled long before" the start of the COVID–19 pandemic.[21] Likewise, in its 2022 annual report, the IACHR acknowledged that while the COVID–19 pandemic "has had significant impacts on the health sector and the population, the serious affectations of the system preceded the health emergency." [22] Elaborating on this topic, the IACHR identified "shortages of medicines, supplies, materials and medical treatment" as of 2018, and that the "situation has been worsening since 2014, and it is important to highlight that the health system has reportedly collapsed due to its persistent precariousness, which would have been exacerbated by the pandemic." [23]

According to OHCHR, health centers in Venezuela "report structural underfunding and understaffing resulting in for example, regular blackouts and water shortages." [24] In its

report on the humanitarian situation in Venezuela in 2022, the United Nations Office for the Coordination of Humanitarian Affairs (OCHA) noted that "[h]ealth services continue to be affected by insufficient water and sanitation conditions and the lack of electricity supply in facilities." [25] Similarly, Human Rights Watch stated in its annual report covering 2022 that "[p]ower and water outages at healthcare centers—and emigration of healthcare workers—were further weakening operational capacity." [26] Furthermore, the IACHR has reported that "98% of the hospitals in the country lack medicines, electrical plants and water, as well as failures in laboratories, reagents and wards. As a result, it is estimated that only between 3 and 10% of the hospitals have medical and surgical material to solve critical circumstances." [27]

*Food Insecurity*

In a humanitarian response plan published in 2023, the Food and Agriculture Organization of the United Nations (FAO) identified food insecurity as "the most pressing challenge for the population." [28] Human Rights Watch stated in its annual report covering 2022 that HumVenezuela reported in March 2022 that "most Venezuelans face difficulties in accessing food, with 10.9 million undernourished or chronically hungry. Some 4.3 million are deprived of food, sometimes going days without eating." [29] Moreover, the IACHR noted in its 2022 annual report that "32% of children live in a situation of chronic malnutrition." [30]

---

[14] *Id.*

[15] Andrew Cawthorne and Diego Ore, Venezuela confirms recession, highest inflation in Americas, Reuters, Dec. 30, 2014, available at *https://www.reuters.com/article/us-venezuela-economy/venezuela-confirms-recession-highest-inflation-in-americas-idUSKBN0K81KV20141230* (last visited Jul. 7, 2023); Reuters, Venezuela's largest private company calls government supervision 'arbitrary', Apr. 25, 2020, available at *https://www.reuters.com/article/us-venezuela-economy-polar/venezuelas-largest-private-company-calls-government-supervision-arbitrary-idUSKCN2270U8* (last visited Jul. 7, 2023).

[16] The Economist, Nicolás Maduro, Venezuela's autocrat, is winning, Apr. 25, 2023, available at *https://web.archive.org/web/20230531114303/https://www.economist.com/the-americas/2023/04/25/nicolas-maduro-venezuelas-autocrat-is-winning* (last visited Jul. 10, 2023).

[17] Office of the High Commissioner for Human Rights (OHCHR), Situation of human rights in the Bolivarian Republic of Venezuela—Report of the United Nations High Commissioner for Human Rights, p.2, Jul. 4, 2023, available at *https://reliefweb.int/report/venezuela-bolivarian-republic/situation-human-rights-bolivarian-republic-venezuela-report-united-nations-high-commissioner-human-rights-ahrc5354-advance-unedited-version* (last visited Jul. 12, 2023).

[18] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—Venezuela, p.705, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE.pdf* (last visited Jul. 10, 2023).

[19] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—

Venezuela, p.705, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE.pdf* (last visited Jul. 10, 2023).

[20] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—Venezuela, p.674, 706, 708, 709, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE.pdf* (last visited Jul. 12, 2023); Human Rights Watch, World Report 2023: Venezuela, Jan. 13, 2023, available at *https://www.hrw.org/world-report/2023/country-chapters/venezuela* (last visited Jul. 12, 2023); Clare Ribando Seelke, Rebecca M. Nelson, Rhoda Margesson, & Phillip Brown, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), p.11, Dec. 6, 2022, available at *https://crsreports.congress.gov/product/pdf/R/R44841* (last visited Jul. 12, 2023).

[21] Regina Garcia Cano, Governments pledge money, attention to Venezuela's crisis, The Associated Press, Mar. 17, 2023, *https://apnews.com/article/venezuela-migration-crisis-us-united-nations-805873048d2b0532bfbe53428f4ed2aa* (last visited Jul. 12, 2023).

[22] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—Venezuela, p.705, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE.pdf* (last visited Jul. 12, 2023).

[23] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—Venezuela, p.705–706, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE.pdf* (last visited Jul. 12, 2023).

[24] Office of the High Commissioner for Human Rights (OHCHR), Situation of human rights in the Bolivarian Republic of Venezuela—Report of the United Nations High Commissioner for Human Rights, p.3, Jul. 4, 2023, available at *https://reliefweb.int/report/venezuela-bolivarian-republic/situation-human-rights-bolivarian-republic-*

venezuela-report-united-nations-high-commissioner-human-rights-ahrc5354-advance-unedited-version* (last visited Jul. 13, 2023).

[25] United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Venezuela Humanitarian Fund Annual Report 2022, p.6, Jun. 14, 2023, available at *https://www.unocha.org/publications/report/venezuela-bolivarian-republic/venezuela-humanitarian-fund-annual-report-2022* (last visited Aug. 10, 2023).

[26] Human Rights Watch, World Report 2023: Venezuela, Jan. 13, 2023, available at *https://www.hrw.org/world-report/2023/country-chapters/venezuela* (last visited Jul. 13, 2023).

[27] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—Venezuela, p.708, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE.pdf* (last visited Jul. 13, 2023).

[28] Food and Agriculture Organization of the United Nations (FAO), The Bolivarian Republic of Venezuela: Humanitarian Response Plan 2022–2023, p.1, 2023, available at *https://www.fao.org/3/cc6775en/cc6775en.pdf* (last visited Jul. 14, 2023).

[29] Human Rights Watch, World Report 2023: Venezuela, Jan. 13, 2023, available at *https://www.hrw.org/world-report/2023/country-chapters/venezuela* (last visited Jul. 14, 2023).

[30] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—

Continued

*Heavy Rains and Flooding*

Since May 26, 2023, as hurricane season began, Venezuela has experienced heavy rains which resulted in flooding that affected several areas of the country.[31] According to ACAPS, "Between June and July there have been 19 tropical waves, that have brought heavy rains, floods and landslides across the country."[32] As of July 11, 2023, the meteorological situation in Venezuela indicated "that rainfall and resulting damages are expected to be more severe than previous years."[33] Reports of the damage caused by the heavy rains include 5,100 people affected with damage to houses and blockages in the drainage system in the state of Portuguesa.[34] In another area—Delta Amacuro state—around 7,500 people are affected by the 2023 floods.[35]

In summary, extraordinary and temporary conditions continue to prevent Venezuelan nationals from returning in safety due to a severe humanitarian emergency which has resulted in food insecurity and the inability to access adequate medicine, healthcare, water, electricity, and fuel. Additionally, human rights violations and abuses, high levels of poverty, high levels of crime and violence, and heavy rains and flooding prevent Venezuelan nationals from returning in safety and permitting Venezuelan noncitizens to remain in the United States temporarily would not be contrary to the interests of the United States.

Based on this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions supporting Venezuela's designation for TPS continue to be met. *See* INA sec. 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continues to be extraordinary and temporary conditions in Venezuela that prevent Venezuelan nationals (or individuals having no nationality who last habitually resided in Venezuela) from returning to Venezuela in safety, and it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The existing designation of Venezuela for TPS (Venezuela 2021) should be extended for an 18-month period, beginning on March 11, 2024, and ending on September 10, 2025. *See* INA sec. 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• Due to the conditions described above, Venezuela should be redesignated for TPS beginning on October 3, 2023, and ending on April 2, 2025. *See* INA sec. 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

• For the redesignation, the Secretary has determined that TPS applicants must demonstrate that they have continuously resided in the United States since July 31, 2023.

• Initial TPS applicants under the redesignation must demonstrate that they have been continuously physically present in the United States since October 3, 2023, the effective date of the redesignation of Venezuela for TPS.

• There are approximately 243,000 current Venezuela TPS beneficiaries who are eligible to re-register for TPS under the extension.

• It is estimated that approximately 472,000 additional individuals may be eligible for TPS under the redesignation of Venezuela. This population includes Venezuelan nationals in the United States in nonimmigrant status or without immigration status.

**Notice of the Designation of Venezuela for TPS**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Venezuela's designation for TPS on the basis of extraordinary and temporary conditions are met and it is not contrary to the national interest of the United States to allow Venezuelan TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am extending the existing designation of Venezuela for TPS for 18 months, beginning on March 11, 2024, and ending on September 10, 2025.

Additionally, and also on the basis of this determination, I am redesignating Venezuela for TPS for 18 months, beginning on October 3, 2023 and ending on April 2, 2025. *See* INA sec. 244(b)(1) and (b)(2); 8 U.S.C. 1254a(b)(1), and (b)(2). I estimate approximately 472,000 individuals may be newly eligible for TPS under the redesignation of Venezuela.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

*Required Application Forms and Application Fees To Register or Re-Register for TPS*

To register or re-register for TPS based on the designation of Venezuela, you must submit a Form I–821, Application for Temporary Protected Status. Re-registration under this notice applies to TPS beneficiaries whose re-registration application was approved under the TPS extension announced on September 8, 2022, who have been issued Form I–797, Notice of Action, indicating approval of their TPS application and an EAD with a March 10, 2024, expiration date. Individuals with an EAD with a March 10, 2024, expiration date who want to receive an EAD with the September 10, 2025, expiration date must re-register pursuant to the instructions noted in this FRN. If you are submitting an initial TPS application, you must pay the filing fee for Form I–821 (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). If you are filing an application to re-register for TPS, you do not need to pay the fee. *See* 8 CFR 244.17. You may need to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the "Biometric Services Fee" section of this notice.

TPS beneficiaries are eligible for an Employment Authorization Document (EAD), which proves their authorization to work in the United States. You are not required to submit Form I–765, Application for Employment Authorization, or have an EAD to be granted TPS, but see below for more information if you want an EAD to use as proof that you can work in the United States.

Individuals who have an initial Venezuela TPS application (Form I–821) that was still pending as of October 3, 2023, do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through April 2, 2025. Individuals who are current beneficiaries under the Venezuela 2021

Venezuela, p.709, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE_EN.pdf* (last visited Jul. 14, 2023).

[31] ACAPS, ACAPS Anticipatory Note: Venezuela—Anticipation of flooding, 20 July 2023, July 20, 2023, available at *https://reliefweb.int/report/venezuela-bolivarian-republic/acaps-anticipatory-note-venezuela-anticipation-flooding-20-july-2023* (last visited Sept. 19, 2023).

[32] *Id.*

[33] Reliefweb, *Venezuela: Anticipatory Action for Floods—DREF Operation MDRVE008,* July 11, 2023, available at *https://reliefweb.int/report/venezuela-bolivarian-republic/venezuela-anticipatory-actions-floods-dref-operation-mdrve008* (last visited Sep. 19, 2023).

[34] *Id.*

[35] *Id.*

designation and have a re-registration application (Form I–821) and/or Application for Employment Authorization (Form I–765) pending as of October 3, 2023, do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through September 10, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1) (Oct. 1, 2020). The instructions for Form I–821 and Form I–765 also provide more information on requirements and fees for both initial TPS applicants and existing TPS beneficiaries who are re-registering.

## How can TPS beneficiaries obtain an Employment Authorization Document (EAD)?

Everyone must provide their employer with documentation showing that they have the legal right to work in the United States. TPS beneficiaries are eligible to obtain an EAD, which proves their legal right to work. If you want to obtain an EAD, you must file Form I–765 and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). TPS applicants may file this form with their TPS application, or separately later, if their TPS application is still pending or has been approved. Beneficiaries with an initial Venezuela TPS-related Form I–765 that was still pending as of October 3, 2023, do not need to file the application again. If USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through April 2, 2025. Individuals who are current beneficiaries under the Venezuela 2021 designation and have a re-registration application (Form I–821) and/or Application for Employment Authorization (Form I–765) pending as of October 3, 2023, do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through September 10, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

## Refiling an Initial TPS Registration Application After Receiving a Denial of a Fee Waiver Request

If USCIS denies your fee waiver request, you can resubmit your TPS application. The fee waiver denial notice will contain specific instructions about resubmitting your application.

## Filing Information

You may file Form I–821 and related requests for EADs online or by mail. However, if you request a fee waiver, you must submit your application by mail. When filing a TPS application, applicants may request an EAD by submitting a completed Form I–765 with their Form I–821.

*Online filing:* Form I–821 and Form I–765 are available for concurrent filing online.[36] To file these forms online, you must first create a USCIS online account.[37]

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

*Table 1—Mailing Addresses*

Mail your completed Form I–821, Application for Temporary Protected Status; Form I–765, Application for Employment Authorization, if applicable; Form I–912, Request for Fee Waiver (if applicable); and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If you live in: | Then, mail your application to: |
|---|---|
| California, Texas ............................................................... | *U.S. Postal Service (USPS):* USCIS, Attn: TPS Venezuela, P.O. Box 20300, Phoenix, AZ 85036–0300.<br>*FedEx, UPS, and DHL deliveries:* USCIS, Attn: TPS Venezuela (Box 20300), 2108 E Elliot Rd., Tempe, AZ 85284–1806. |
| Florida ............................................................................... | *U.S. Postal Service (USPS):* USCIS, Attn: TPS Venezuela, P.O. Box 660864, Dallas, TX 75266–0864.<br>*FedEx, UPS, and DHL deliveries:* USCIS, Attn: TPS Venezuela (Box 660864), 2501 S State Highway, 121 Business, Suite 400, Lewisville, TX 75067–8003. |
| Illinois, Indiana, Massachusetts, New Jersey, New York, North Carolina, Utah, Virginia. | *U.S. Postal Service (USPS):* USCIS, Attn: Venezuela, P.O. Box 4091, Carol Stream, IL 60197–4091.<br>*FedEx, UPS, and DHL deliveries:* USCIS, Attn: TPS Venezuela (Box 4091), 2500 Westfield Drive, Elgin, IL 60124–7836. |
| All other states, District of Columbia, and U.S. Territories ...................... | *U.S. Postal Service (USPS):* USCIS, Attn: TPS Venezuela, P.O. Box 805282, Chicago, IL 60680–5285.<br>*FedEx, UPS, and DHL deliveries:* USCIS, Attn: TPS Venezuela (Box 805282), 131 South Dearborn Street, 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please file online or mail your Form I–765 application to the appropriate mailing address in Table 1. If you file online, please include the fee. If you file by mail, please include the fee or fee waiver request. When you request an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

---

[36] Find information about online filing at "Forms Available to File Online," *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[37] *https://myaccount.uscis.gov/users/sign_up.*

**Supporting Documents**

The filing instructions on Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (that is, registering) for TPS on the USCIS website at *https:// www.uscis.gov/tps* under "Venezuela."

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *https:// www.uscis.gov/i-131.* You may file Form I–131 together with your Form I–821 or separately. When filing Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
| --- | --- |
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status. | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS): You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL: You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* USCIS may require you to visit an Application Support Center to submit biometrics. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https:// www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms.*

*General Employment-Related Information for TPS Applicants and Their Employers*

**How can I obtain information on the status of my TPS application and EAD request?**

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at uscis.gov, or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.* If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**Am I eligible to receive an automatic extension of my current EAD through March 10, 2025, through this Federal Register notice?**

Yes. Regardless of your country of birth, if you currently have a Venezuela TPS-based EAD with the notation A–12 or C–19 under Category and a Card Expires date of March 10, 2024, or September 9, 2022, this **Federal Register** notice automatically extends your EAD through March 10, 2025. Although this **Federal Register** notice automatically extends your EAD through March 10, 2025, you must re-register timely for TPS in accordance with the procedures described in this **Federal Register** notice to maintain your TPS and employment authorization.

**When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?**

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central.* An EAD is an acceptable document under List A. See the section "How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?" of this **Federal Register** notice for more information. If your EAD states A–12 or C–19 under Category and has a Card Expires date of March 10, 2024, or September 9, 2022, this **Federal Register** notice extends it automatically, and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through March 10, 2025, unless your TPS has been withdrawn or your request for TPS has been denied. Your country of birth noted on the EAD does not have to

reflect the TPS-designated country of Venezuela for you to be eligible for this extension.

**What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?**

Even though we have automatically extended your EAD, your employer is required by law to ask you about your continued employment authorization. Your employer may need to re-examine your automatically extended EAD to check the Card Expires date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the Card Expires date and Category code, they should update the EAD expiration date in Section 2 of Form I–9. See the section ''What updates should my current employer make to Form I–9 if my EAD has been automatically extended?'' of this **Federal Register** notice for more information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through March 10, 2025, but you are not required to do so. The last day of the automatic EAD extension is March 10, 2025. Before you start work on March 11, 2025, your employer is required by law to reverify your employment authorization on Form I–9. By that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

**If I have an EAD based on another immigration status/benefit, can I obtain a new TPS-based EAD?**

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, even if you have an EAD or work authorization based on another immigration status or benefit. If you are a current TPS beneficiary under Venezuela 2021 and want to obtain a new TPS-based EAD valid through September 10, 2025, or if you are applying for TPS for the first time under Venezuela 2023 and want to obtain a TPS-based EAD valid through April 2, 2025, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

**Can my employer require that I provide any other documentation such as evidence of my status, proof of my Venezuelan citizenship, or a Form I–797C showing that I registered for TPS for Form I–9 completion?**

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request other documentation, such as proof of Venezuelan citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document if the EAD reasonably appears to be genuine and to relate to you. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status or your national origin.

**How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?**

When using an automatically extended EAD to complete Form I–9 for a new job before March 10, 2025:

1. For Section 1, you should:
a. Check ''A noncitizen authorized to work until'' and enter March 10, 2025, as the ''expiration date''; and
b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)

2. For Section 2, employers should:
a. Determine whether the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a Card Expires date of March 10, 2024 or September 9, 2022;
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Write March 10, 2025, as the expiration date.

Before the start of work on March 11, 2025, employers must reverify the employee's employment authorization on Form I–9.

**What updates should my current employer make to Form I–9 if my EAD has been automatically extended?**

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has now automatically extended your EAD, your employer may need to re-examine your current EAD if they do not have a copy of the EAD on file. Your employer should determine whether your EAD is automatically extended by ensuring that it contains Category A–12 or C–19 and has a Card Expires date of March 10, 2024 or September 9, 2022. Your employer may not rely on the country of birth listed on the card to determine whether you are eligible for this extension.

If your employer determines that USCIS has automatically extended your EAD, your employer should update Section 2 of your previously completed Form I–9 as follows:
1. Write EAD EXT and March 10, 2025, as the last day of the automatic extension in the Additional Information field; and
2. Initial and date the correction.

**Note:** This is not considered a reverification. Employers do not reverify the employee until either the automatic extension has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By March 11, 2025, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization on Form I–9.

**If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?**

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify. Employers should enter March 10, 2025, as the expiration date for an EAD that has been extended under this **Federal Register** notice.

**If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiring'' alert for an automatically extended EAD?**

E-Verify automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related EAD when they first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire.