Before this employee starts work on March 11, 2025, you must reverify their employment authorization on Form I–9. Employers may not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov* or get more information online at *www.justice.gov/ier*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation other than what is required to complete Form I–9. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (mismatch) must promptly inform employees of the mismatch and give these employees an opportunity to resolve the mismatch. A mismatch means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov*.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, if you present an automatically extended EAD referenced in this **Federal Register** notice, you do not need to show any other document, such as a Form I–797C, Notice of Action, reflecting receipt of a Form I–765 EAD renewal application or this **Federal Register** notice, to prove that you qualify for this extension. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS-designated country of Venezuela;

• Your Form I–94, Arrival/Departure Record;

• Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or

• Form I–797 or Form I–797C, Notice of Action, reflecting approval or receipt of a past or current Form I–821, if you received one from USCIS.

Check with the government agency requesting documentation about which document(s) the agency will accept. Some state and local government agencies use the SAVE program to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94, Arrival/ Departure Record. If an agency accepts the type of TPS-related document you present, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your A-number, USCIS number, or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://save.uscis.gov/casecheck/*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (such as A-number, USCIS number, or Form I–94 number) or Verification Case

Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *https://www.uscis.gov/save,* has detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–21865 Filed 9–29–23; 4:15 pm]

**BILLING CODE P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–7070–N–66]

### 30-Day Notice of Proposed Information Collection: Green and Resilient Retrofit Program (GRRP) Application Forms; OMB Control No.: 2502–0624

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.

**DATES:** *Comments Due Date:* November 2, 2023.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function. Interested persons are also invited to submit comments regarding this proposal and comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Colette Pollard, Clearance Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210, Washington, DC 20410–5000; email

*PaperworkReductionActOffice@hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; email *Colette.Pollard@hud.gov* or telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on August 1, 2023 at 88 FR 50166.

### A. Overview of Information Collection

*Title of Information Collection:* Green and Resilient Retrofit Program (GRRP) Application Forms.

*OMB Approval Number:* 2502–0624.
*OMB Expiration Date:* 8/31/2023.
*Type of Request:* Revision of a currently approved collection.

*Form Numbers:* HUD 5991, HUD 5992, and HUD 5993.

*Description of the need for the information and proposed use:* The Green and Resilient Retrofit Program ("GRRP") is newly funding through Title III of the Inflation Reduction Act of 2022, H.R. 5376 (IRA), in section 30002 titled "Improving Energy Efficiency or Water Efficiency or Climate Resilience of Affordable Housing" (the "IRA"), authorizing HUD to make loans, grants to improve energy or water efficiency; enhance indoor air quality or sustainability; implement the use of zero-emission electricity generation, low-emission building materials or processes, energy storage, or building electrification strategies; or address climate resilience of eligible HUD-assisted multifamily properties. The program leverages significant technological advancements in utility efficiency and adds a focus on preparing for climate hazards—both reducing residents' and properties' exposure to

hazards and protecting life, livability, and property when disaster strikes. With its dual focus, GRRP is the first program to consider, at the national scale, how best to approach both green and energy efficiency upgrades simultaneously with investment in climate resilience strategies in multifamily housing. HUD is taking a multi-faceted approach to deploy these funds multiple funding rounds and for properties at different development stages.

Funding under this program will be made through multiple cohorts under one or multiple Notices of Funding Opportunity (NOFOs) that will detail the application process for eligible applicants. This collection is necessary in order to receive applications requesting funding under this program.

*Respondents:* HUD-assisted multifamily owners.

*Estimated Number of Respondents:* 680.

*Estimated Number of Responses:* 680.

*Frequency of Response:* Once per application.

*Average Hours per Response:* 15 hours.

*Total Estimated Burden:* 10,200.

### B. Solicitation of Public Comment

This notice is soliciting comments from members of the public and affected parties concerning the collection of information described in Section A on the following:

(1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) The accuracy of the agency's estimate of the burden of the proposed collection of information;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) Ways to minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

(5) ways to minimize the burden of the collection of information on those who are to respond, including the use of automated collection techniques or other forms of information technology.

HUD encourages interested parties to submit comment in response to these questions.

VZ Vacatur_0101


mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result occurs if E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Employment-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, if you present an EAD that has been automatically extended by this **Federal Register** notice, you do not need to show any other document, such as a Form I–797C, Notice of Action, reflecting receipt of a Form I–765 EAD renewal application or this **Federal Register** notice, to prove that you qualify for this extension. If you are presenting an EAD extended by an up to 540-day extension, you will need to show your Form I–797C, Notice of Action, reflecting receipt of your Form I–765. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary or applicant, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A12 or C19, even if your country of birth noted on the EAD does not reflect the TPS-designated country of El Salvador;

• Your Form I–94, Arrival/Departure Record;

• Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or

• Form I–797 or Form I–797C, Notice of Action, reflecting approval or receipt of a past or current Form I–821, if you received one from USCIS.

Check with the government agency requesting documentation about which document(s) the agency will accept.

Some state and local government agencies use SAVE, *https://www.uscis.gov/save,* to confirm the current immigration status of applicants for public benefits. While SAVE can verify that an individual has TPS or a pending TPS application, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. If an agency accepts the type of TPS-related document you present, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your A-Number, USCIS number, or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://www.uscis.gov/save-casecheck.* CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (such as your A-Number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must allow you to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct,

the SAVE website, *https://www.uscis.gov/save/for-benefit-applicants,* has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2025–00626 Filed 1–10–25; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

[CIS No. 2790–25; DHS Docket No. USCIS–2021–0003]

RIN 1615–ZB86

**Extension of the 2023 Designation of Venezuela for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) extension.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the 2023 designation of Venezuela for Temporary Protected Status (TPS) for 18 months, beginning on April 3, 2025, and ending on October 2, 2026. Existing TPS beneficiaries who wish to extend their status through October 2, 2026, must re-register during the re-registration period described in this notice.

**DATES:** *Extension of the 2023 Designation of Venezuela for TPS* begins on April 3, 2025, and will remain in effect for 18 months. For registration instructions, see the Registration Information section below.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 240–721–3000.

• For more information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* You can find specific information about Venezuela's TPS designation by selecting "Venezuela" from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *https://uscis.gov/tools*. Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you cannot find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov*, or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter*.

• You can also find more information at local USCIS offices, listed on the USCIS website at *https://www.uscis.gov/about-us/find-a-uscis-office*, after this notice is published.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DoS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Documents, Parole Documents, and Arrival/Departure Records
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–797C—Notice of Action (Receipt Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—**Federal Register**
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
PDF—Portable Document Format
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**Registration Information**

*Extension of the 2023 Designation of Venezuela for TPS:* The 18-month extension of Venezuela's October 3, 2023 TPS designation begins on April 3, 2025, and will remain in effect for 18 months, ending on October 2, 2026. The extension allows existing TPS beneficiaries to retain TPS through October 2, 2026, if they otherwise continue to meet the eligibility

requirements for TPS. Existing TPS beneficiaries, including those registered under the October 3, 2023 TPS designation or the prior March 9, 2021 TPS designation, who wish to extend their status through October 2, 2026, must re-register during the re-registration period described in this notice.

*Re-registration:* The re-registration period for existing beneficiaries runs from January 17, 2025, through September 10, 2025. (Note: It is important for re-registrants to timely re-register during their re-registration period and not to wait until their Employment Authorization Documents (EADs) expire, as delaying re-registration could result in gaps in their employment authorization documentation.)

**Purpose of this Action (TPS)**

Through this notice, DHS sets forth procedures necessary for nationals of Venezuela (or individuals having no nationality who last habitually resided in Venezuela) to re-register for TPS and apply to renew their EAD with USCIS.

Re-registration is limited to individuals who have previously registered for TPS under either of the two prior designations of Venezuela and whose applications have been granted. If you registered for TPS under the October 23, 2023 designation and do not re-register properly within the re-registration period, USCIS may withdraw your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under either of Venezuela's designations, the re-registration period runs from January 17, 2025, through September 10, 2025. USCIS will issue new EADs with an October 2, 2026 expiration date to eligible beneficiaries granted TPS under either of Venezuela's designations who timely re-register and apply for EADs. Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive a new EAD before their current EAD expires. Accordingly, through this **Federal Register** notice, DHS automatically extends through April 2, 2026, the validity of certain EADs previously issued under the TPS designations of Venezuela. As proof of continued employment authorization through April 2, 2026, TPS beneficiaries can show their EAD with the notation A12 or C19 under Category and a "Card Expires" date of September 10, 2025, April 2, 2026, March 10, 2024, or September 9, 2022. This notice explains how TPS beneficiaries and their

employers may determine if an EAD is automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

Individuals who have an Application for Temporary Protected Status (Form I–821) for Venezuela or TPS-related Application for Employment Authorization (Form I–765) that was still pending as of January 17, 2025, do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through October 2, 2026. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

**What Is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, are authorized to work, and may obtain EADs if they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, if it is still valid beyond the date TPS terminates.

**When was Venezuela designated for TPS?**

Venezuela was initially designated on March 9, 2021, on the basis of extraordinary and temporary conditions in Venezuela that prevented nationals of Venezuela from returning in safety. *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred*

VZ Vacatur_0103

*Enforced Departure,* 86 FR 13574 (Mar. 9, 2021). The TPS designation was extended for 18 months on September 8, 2022. *See Extension of the Designation of Venezuela for Temporary Protected Status,* 87 FR 55024 (Sept. 8, 2022). On October 3, 2023, the TPS designation was extended for 18 months and separately redesignated for 18 months based upon the same factual circumstances and legal considerations pursuant to section 244 of the INA, 8 U.S.C. 1254a. *See Extension and Redesignation of Venezuela for Temporary Protected Status,* 88 FR 68130 (Oct. 3, 2023).

**What authority does the Secretary have to extend the designation of Venezuela for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in their discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C.

1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**Will there continue to be two separate filing processes for TPS designations for Venezuela?**

No. USCIS has evaluated the operational feasibility and resulting impact on stakeholders of having two separate filing processes. Operational challenges in the identification and adjudication of Venezuela TPS filings and confusion among stakeholders exist because of the two separate TPS designations. To date, USCIS has created operational measures to process Venezuela TPS cases for both designations; however, it can most efficiently process these cases by consolidating the filing processes for the two Venezuela TPS populations. To decrease confusion among stakeholders, ensure optimal operational processes, and maintain the same eligibility requirements, upon publication of this Notice, individuals registered under either the March 9, 2021 TPS designation or the October 3, 2023 TPS designation will be allowed to re-register under this extension. This would not, however, require that a beneficiary registered under the March 9, 2021 designation to re-register at this time. Rather, it would provide such individuals with the option of doing so. Venezuela TPS beneficiaries who appropriately apply for TPS or re-register under this Notice and are approved by USCIS will obtain TPS through the same extension date of October 2, 2026.

**Why is the Secretary extending the TPS designation for Venezuela through October 2, 2026?**

DHS has reviewed country conditions in Venezuela. Based on the review, including input received from Department of State (DoS) and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because extraordinary and temporary conditions supporting Venezuela's TPS designation remain, and it is not contrary to the national interest of the United States to

permit Venezuelan TPS beneficiaries to remain in the United States temporarily.

**Overview**

Venezuela is experiencing "a complex, serious and multidimensional humanitarian crisis."[2] The crisis has reportedly disrupted every aspect of life in Venezuela. "Basic services like electricity, internet access, and water are patchy; malnutrition is on the rise; the healthcare system has collapsed; and children receive poor or no education. Inflation rates are also among the highest in the world."[3] Venezuela's "complex crisis" has pushed Venezuelans into "poverty, hunger, poor health, crime, desperation and migration."[4] Moreover, Nicolás Maduro's declaration of victory in the July 28, 2024 presidential election— which has been contested as fraudulent by the opposition—"has been followed by yet another sweeping crackdown on dissent."[5]

**Food Insecurity**

Food insecurity is also a significant challenge in Venezuela.[6] "Despite a recent economic recovery [. . .], many families are going hungry and depending on aid to feed themselves."[7] Reports indicate that Venezuela "suffers the second-highest level of hunger in South America," with "[s]ome 5.1 million people [. . .] not getting enough

---

[1] INA section 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. 107–296, 116 Stat. 2135 (2002). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1); 8 U.S.C. 1254a(b)(1).

[2] Annual Report 2023—Chapter IV.B—Venezuela, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 730, available at: *https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Venezuela_ENG.PDF* (last visited Aug. 20, 2024).

[3] Iván Reyes, As election looms, Venezuelans see-saw between hope and fear, The New Humanitarian, Jul. 8, 2024, available at: *https://www.thenewhumanitarian.org/photo-feature/2024/07/08/election-looms-venezuela-see-saw-between-hope-and-fear* (last visited Aug. 20, 2024).

[4] Regina Garcia Cano, As Maduro shifts from migration denier to defender, Venezuelans consider leaving if he is reelected, The Associated Press, updated May 29, 2024, available at: *https://apnews.com/article/venezuela-election-migrants-maduro-9ba01c2cd7246adb9369bf69941d986a* (last visited Aug. 20, 2024).

[5] Sergio Martínez-Beltrán and Marian Carrasquero, Venezuelans in US anxiously watch home crisis, brace for new migration surge, Morning Edition, National Public Radio (NPR), Aug. 12, 2024, available at: *https://www.npr.org/2024/08/11/nx-s1-5066867/venezuela-maduro-election-migration-usborder-immigration* (last visited Aug. 12, 2024).

[6] Clare Ribando Seelke, Venezuela: Political Crisis and U.S. Policy, Congressional Research Service (CRS), updated Sep. 1, 2023, pg. 1, available at: *https://crsreports.congress.gov/product/pdf/IF/IF10230* (last visited Aug. 22, 2024).

[7] Mariela Nava, In Venezuela, hunger stalks presidential election, Reuters, Jul. 9, 2024, available at: *https://www.reuters.com/world/americas/venezuela-hunger-stalks-presidential-election-2024-07-09/* (last visited Aug. 22, 2024).

**5964** Federal Register / Vol. 90, No. 11 / Friday, January 17, 2025 / Notices

to eat.''[8] The U.N. Special Rapporteur on the right to food reported that ''[f]ood insecurity, malnutrition and deterioration in livelihoods is cited as the primary cause for the mass migration out of the country.''[9]

Notably, the problem of food shortages and scarcity has abated;[10] however, ''supply issues have been replaced by affordability ones.''[11] In 2023, ''86% of the population reported not having enough money to buy the food needed in their household,'' while around 22% ''went permanently hungry at times during the year.''[12] Additionally, ''chronic malnutrition is surging among children, leading to stunting, wasting, delayed cognitive development, and higher risks of illness more generally.''[13]

## Access to Basic Services (Including Electricity, Water, and Fuel)

The lack of access to basic services including electricity, water, and fuel represents another component of Venezuela's crisis.[14] Venezuela ''experiences regular power outages,''[15] and ''interruptions in electrical service'' are common and reportedly occur daily.[16] The population suffering intermittent and prolonged power failures increased from 25.9% to 61.9% between 2022 and 2023.''[17] Additionally, Venezuelans face ''growing challenges to access water and sanitation since the water supply is not continuous, and the quality of water has deteriorated.''[18] ''Potable water is frequently not available for long periods,''[19] and many households lack reliable access to potable water.[20]

Venezuela is also impacted by fuel shortages.[21] Venezuela experienced ''years of painful fuel shortages that kept drivers in line for sometimes days to fill up their cars and severely restricted Venezuela's industrial and agricultural activity.''[22] Natural gas—''the fuel essential for cooking, generating power and feeding petrochemical plants and factories—has also been frequently scarce.''[23] In 2023, 69.4% of households were impacted by failures in the availability of domestic gas service.[24] Furthermore, most Venezuelans without direct gas in their homes cook instead ''rely on domestic gas services that households pay for by filling gas cylinders at state plants, one per family per month.''[25] However, ''[t]he capacity of each cylinder averages about 25 days and cannot always be replenished regularly.''[26]

## Health Crisis

The collapse of Venezuela's healthcare system is one of the most severe aspects of its humanitarian crisis.[27] Venezuela's health system is marked by deteriorated infrastructure, lack of medical equipment, poor maintenance, lack of public services,

[8] Mariela Nava, In Venezuela, hunger stalks presidential election, Reuters, Jul. 9, 2024, available at: https://www.reuters.com/world/americas/venezuela-hunger-stalks-presidential-election-2024-07-09/ (last visited Aug. 22, 2024).

[9] End of Mission Statement; U.N. Special Rapporteur on the right to food by Mr. Michael Fakhri; Visit to Venezuela (Bolivarian Republic of), 1–14 February 2024, Office of the High Commissioner for Human Rights (OHCHR), Feb. 14, 2024, pg. 3, available at: https://www.ecoi.net/en/file/local/2104669/20240214-eom-statement-venezuela-sr-food-en.pdf (last visited Aug. 22, 2024).

[10] Regina Garcia Cano, Venezuelans turn to odd jobs and gambling to stretch meager wages they hope will grow after election, The Associated Press, updated July 24, 2024, available at: https://apnews.com/article/venezuela-presidential-election-maduro-crisis-machado-edmundo-4c7f83a5a44a6d80f12d8cad8b67b026 (last visited Aug. 20, 2024); Gabriela Mesones Rojo and Iván Reyes, Hunger, healthcare, and schools: Reasons to leave Venezuela (along with a Maduro poll win), The New Humanitarian, Jun. 25, 2024, available at: https://www.thenewhumanitarian.org/analysis/2024/06/25/hunger-healthcare-schools-reasons-leave-venezuela-maduro-poll-win (last visited Aug. 22, 2024); Follow-Up Report on the Complex Humanitarian Emergency in Venezuela, HumVenezuela, Nov. 2023, pg. 27, available at: https://humvenezuela.com/wp-content/uploads/2024/02/FOLLOW-UP-REPORT-ON-THE-COMPLEX-HUMANITARIAN-EMERGENCY-IN-VENEZUELA-2023-2.pdf (last visited Aug. 22, 2024).

[11] Regina Garcia Cano, UN-backed food expert calls on Venezuela to tackle hunger and urges end to economic sanctions, The Associated Press, Feb. 14, 2024, available at: https://apnews.com/article/venezuela-food-insecurity-hunger-malnutrition-un-maduro-afb4af4978c09cf0f3e54e1cfef981b5 (last visited Aug. 22, 2024).

[12] Gabriela Mesones Rojo and Iván Reyes, Hunger, healthcare, and schools: Reasons to leave Venezuela (along with a Maduro poll win), The New Humanitarian, Jun. 25, 2024, available at: https://www.thenewhumanitarian.org/analysis/2024/06/25/hunger-healthcare-schools-reasons-leave-venezuela-maduro-poll-win (last visited Aug. 22, 2024).

[13] Gabriela Mesones Rojo and Iván Reyes, Hunger, healthcare, and schools: Reasons to leave Venezuela (along with a Maduro poll win), The New Humanitarian, Jun. 25, 2024, available at: https://www.thenewhumanitarian.org/analysis/2024/06/25/hunger-healthcare-schools-reasons-leave-venezuela-maduro-poll-win (last visited Aug. 22, 2024).

[14] Florantonia Singer, Caracas: The ordeal of living in a city with failed public services, El País (Spa.), Sep. 24, 2023, available at: https://english.elpais.com/international/2023-09-24/caracas-the-ordeal-of-living-in-a-city-with-failed-public-services.html (last visited Aug. 23, 2024).

[15] Venezuela Country Security Report, Overseas Security Advisory Council (OSAC), U.S. Dep't of State, last updated Mar. 26, 2024, available at: https://www.osac.gov/Content/Report/34f99e62-2161-412d-bfeb-1e752539f6bf (last visited Aug 23, 2024).

[16] Clare Ribando Seelke, Venezuela: Political Crisis and U.S. Policy, Congressional Research Service (CRS), updated Sep. 1, 2023, pg. 1, available at: https://crsreports.congress.gov/product/pdf/IF/IF10230 (last visited Aug. 23, 2024); Gabriela Mesones Rojo and Iván Reyes, Hunger, healthcare, and schools: Reasons to leave Venezuela (along with a Maduro poll win), The New Humanitarian, Jun. 25, 2024, available at: https://www.thenewhumanitarian.org/analysis/2024/06/25/hunger-healthcare-schools-reasons-leave-venezuela-maduro-poll-win (last visited Aug. 23, 2024).

[17] Follow-Up Report on the Complex Humanitarian Emergency in Venezuela, HumVenezuela, Nov. 2023, pg. 21, available at: https://humvenezuela.com/wp-content/uploads/2024/02/FOLLOW-UP-REPORT-ON-THE-COMPLEX-HUMANITARIAN-EMERGENCY-IN-VENEZUELA-2023-2.pdf (last visited Aug. 23, 2024).

[18] Annual Report 2023—Chapter IV.B—Venezuela, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 732, available at: https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Venezuela_ENG.PDF (last visited Aug. 26, 2024).

[19] Venezuela Country Security Report, Overseas Security Advisory Council (OSAC), U.S. Dep't of State, last updated Mar. 26, 2024, available at: https://www.osac.gov/Content/Report/34f99e62-2161-412d-bfeb-1e752539f6bf (last visited Aug. 26, 2024).

[20] Clare Ribando Seelke, Venezuela: Political Crisis and U.S. Policy, Congressional Research Service (CRS), updated Sep. 1, 2023, pg. 1, available at: https://crsreports.congress.gov/product/pdf/IF/IF10230 (last visited Aug. 26, 2024).

[21] Luke Taylor, 'To be reunited . . . would be a dream': Venezuelan exiles' fate hangs on vote, The Guardian, Jun. 25, 2024, available at: https://www.theguardian.com/global-development/article/2024/jul/25/venezuelan-exiles-election-maduro (last visited Aug. 27, 2024).

[22] Fabiola Zerpa and Lucia Kassai, Oil Majors Fill Venezuela Gas Pumps, Easing Years of Shortages, Bloomberg, Feb. 9, 2024, available at: https://www.rigzone.com/news/wire/oil_majors_fill_venezuela_gas_pumps_easing_years_of_shortages-09-feb-2024-175693-article/ (last visited Sep. 6, 2024).

[23] Marianna Parraga, Deisy Buitrago, and Mircely Guanipa, Whoever wins election, Venezuela faces natural gas problem, Reuters, Jul. 24, 2024, available at: https://www.reuters.com/world/americas/gas-rich-venezuela-next-president-faces-problem-producing-it-2024-07-24/ (last visited Aug. 26, 2024).

[24] Follow-Up Report on the Complex Humanitarian Emergency in Venezuela, HumVenezuela, Nov. 2023, pg. 22, available at: https://humvenezuela.com/wp-content/uploads/2024/02/FOLLOW-UP-REPORT-ON-THE-COMPLEX-HUMANITARIAN-EMERGENCY-IN-VENEZUELA-2023-2.pdf (last visited Aug. 26, 2024).

[25] Follow-Up Report on the Complex Humanitarian Emergency in Venezuela, HumVenezuela, Nov. 2023, pg. 22, available at: https://humvenezuela.com/wp-content/uploads/2024/02/FOLLOW-UP-REPORT-ON-THE-COMPLEX-HUMANITARIAN-EMERGENCY-IN-VENEZUELA-2023-2.pdf (last visited Aug. 26, 2024).

[26] Follow-Up Report on the Complex Humanitarian Emergency in Venezuela, HumVenezuela, Nov. 2023, pg. 22, available at: https://humvenezuela.com/wp-content/uploads/2024/02/FOLLOW-UP-REPORT-ON-THE-COMPLEX-HUMANITARIAN-EMERGENCY-IN-VENEZUELA-2023-2.pdf (last visited Aug. 26, 2024).

[27] Gabriela Mesones Rojo and Iván Reyes, Hunger, healthcare, and schools: Reasons to leave Venezuela (along with a Maduro poll win), The New Humanitarian, Jun. 25, 2024, available at: https://www.thenewhumanitarian.org/analysis/2024/06/25/hunger-healthcare-schools-reasons-leave-venezuela-maduro-poll-win (last visited Aug. 21, 2024).

deficiencies in the provision of medicines and medical supplies, and power and water cuts, in addition to corruption in the health sector, and underfunded and understaffed health centers.[28] Consequently, health indicators in Venezuela have worsened since the collapse of the Venezuelan health system in 2016.[29]

Venezuela's public health system has reportedly lost an estimated "70 percent of its capacity since 2016," and "millions of individuals are unable to access adequate health care" in Venezuela.[30] Additionally, Venezuela faces "persistent shortages and deficiencies in the supply of medicines, supplies, equipment and medical treatments."[31]

### Education

Reports indicate that "dilapidated infrastructure, the lack of teachers and of public transportation—combined with the shortcomings of the school meals programme—are driving many students away. The impoverishment of families due to high inflation is also forcing children to drop out of school to work. In 2023, 40% of students between the ages of three and 17 attended school irregularly."[32]

### Economic Crisis

Venezuela "has faced a long-running economic crisis,"[33] with its economy suffering from "a prolonged meltdown marked by triple-digit inflation and a mass exodus of millions of migrants seeking better prospects elsewhere."[34] Reporting in July 2024 indicated that over the last 10 years, gross domestic product in Venezuela has declined by about 73%.[35] Though Venezuela experienced some economic improvement in 2024,[36] it is "insufficient for an economy like Venezuela's, urgently in need of double-digit growth for several years in order to return to what it once was."[37]

### Political Repression & Human Rights

According to the Inter-American Commission on Human Rights (IACHR), Maduro and his representatives have "systematically violated human rights, including freedom of expression, to facilitate the concentration of power in the executive branch, to discourage political participation and to undermine the independence of institutions."[38] Conditions have grown worse due to harsher crackdowns by Maduro and his representatives on the opposition and their use of thoroughly flawed elections to seize full control of state institutions. Maduro and his representatives have closed off virtually all channels for political dissent, restricting civil liberties and prosecuting perceived opponents without regard for due process.[39] Furthermore, the IACHR has reported allegations that "serious human rights violations" have been committed in Venezuela, which, it asserts, "may amount to crimes against humanity."[40] In late June 2023, International Criminal Court judges "authorized the resumption of an investigation into alleged crimes against humanity in Venezuela."[41] Human Rights Watch reported that, in September 2023, "the United Nations Fact-Finding Mission (FFM) found serious human rights violations that continued the same patterns of conduct that the FFM had previously qualified as crimes against humanity."[42]

Reports indicate that leading up to the recent Venezuelan presidential election, the electoral process was marred by human rights abuses and irregularities that kept the playing field uneven, with reports of Maduro and his representatives repeatedly committing "systematic human rights violations against critics and opposition leaders."[43] According to Amnesty International, the election period was marked with escalating repression with "incessant attacks on civic space, tens of arbitrary detentions, enforced disappearances, torture, reprisals against businesses and contractors providing services to opposition figures, and arbitrary and abusive administrative measures."[44]

On July 31, 2024, the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela reported that, since the National Electoral Council's declaration that Maduro had won the presidential election in the early morning hours of July 29, "thousands of people—including men, women, children, and the elderly—have taken to the streets across the country to protest the

[28] Venezuela—Country Focus, European Union Agency for Asylum (EUAA), Nov. 2023, pg. 33, available at: *https://coi.euaa.europa.eu/administration/easo/PLib/2023_11_EUAA_COI_Report_Venezuela_Country_Focus.pdf* (last visited Aug. 21, 2024).

[29] International Protection Needs of Venezuelan Nationals, Amnesty International, Oct. 2023, pg. 5, available at: *https://www.ecoi.net/en/file/local/2099475/AMR5373312023ENGLISH.pdf* (last visited Aug. 21, 2024).

[30] Annual Report 2023—Chapter IV.B—Venezuela, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 731, available at: *https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Venezuela_ENG.PDF* (last visited Aug. 21, 2024).

[31] Annual Report 2023—Chapter IV.B—Venezuela, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 731, available at: *https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Venezuela_ENG.PDF* (last visited Aug. 21, 2024).

[32] Gabriela Mesones Rojo and Iván Reyes, Hunger, healthcare, and schools: Reasons to leave Venezuela (along with a Maduro poll win), The New Humanitarian, Jun. 25, 2024, available at: *https://www.thenewhumanitarian.org/analysis/2024/06/25/hunger-healthcare-schools-reasons-leave-venezuela-maduro-poll-win* (last visited Sep. 3, 2024).

[33] Mayela Armas, Venezuela's government doubles down on inflation control ahead of election, Reuters, Feb. 28, 2024, available at: *https://www.reuters.com/world/americas/venezuelas-government-doubles-down-inflation-control-ahead-election-2024-02-28/* (last visited Aug. 20, 2024).

[34] Mayela Armas, Venezuela economy grew 5% in 2023, will reach 8% this year-Maduro, Reuters, Jan. 15, 2024, available at: *https://www.reuters.com/world/americas/venezuela-economy-grew-5-2023-will-reach-8-this-year-maduro-2024-01-15/* (last visited Aug. 20, 2024).

[35] Mariela Nava, In Venezuela, hunger stalks presidential election, Reuters, Jul. 9, 2024, available at: *https://www.reuters.com/world/americas/venezuela-hunger-stalks-presidential-election-2024-07-09/* (last visited Aug. 20, 2024).

[36] Alonso Moleiro, Venezuela experiences an economic recovery in times of electoral uncertainty, El País (Spa.), Jul. 22, 2024, available at: *https://english.elpais.com/economy-and-business/2024-07-22/venezuela-experiences-an-economic-recovery-in-times-of-electoral-uncertainty.html* (last visited Aug. 20, 2024).

[37] Alonso Moleiro, Venezuela experiences an economic recovery in times of electoral uncertainty, El País (Spa.), Jul. 22, 2024, available at: *https://english.elpais.com/economy-and-business/2024-07-22/venezuela-experiences-an-economic-recovery-in-times-of-electoral-uncertainty.html* (last visited Aug. 20, 2024).

[38] Annual Report 2023—Chapter IV.B—Venezuela, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 720, available at: *https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Venezuela_ENG.PDF* (last visited Aug. 30, 2024).

[39] Freedom in the World 2024—Venezuela, Freedom House, Feb. 29, 2024, available at: *https://freedomhouse.org/country/venezuela/freedom-world/2024* (last visited Aug. 29, 2024).

[40] Annual Report 2023—Chapter IV.B—Venezuela, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 720, available at: *https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Venezuela_ENG.PDF* (last visited Aug. 30, 2024); International Protection Needs of Venezuelan Nationals, Amnesty International, Oct. 2023, pg. 3, available at: *https://www.ecoi.net/en/file/local/2099475/AMR537331 2023ENGLISH.pdf* (last visited Aug. 30, 2024).

[41] World Report 2024—Venezuela, Human Rights Watch, Jan. 11, 2024, available at: *https://www.hrw.org/world-report/2024/country-chapters/venezuela* (last visited Aug. 30, 2024).

[42] World Report 2024—Venezuela, Human Rights Watch, Jan. 11, 2024, available at: *https://www.hrw.org/world-report/2024/country-chapters/venezuela* (last visited Aug. 30, 2024).

[43] Venezuela: Repression Mars Key Upcoming Election, Human Rights Watch, Jul. 25, 2024, available at: *https://www.hrw.org/news/2024/07/25/venezuela-repression-mars-key-upcoming-election* (last visited Sep. 3, 2024).

[44] Venezuela: After an electoral period marked by repression, a commitment to human rights is imperative, Amnesty International, Jul. 25, 2024, available at: *https://www.amnesty.org/en/latest/news/2024/07/venezuela-after-electoral-period-marked-repression-commitment-human-rights-imperative/* (last visited Sep. 3, 2024).

results.'' [45] In the aftermath of the election, Maduro and his representatives ''mounted a furious campaign against anyone challenging the declared results of the vote, unleashing a wave of repression that human rights groups say is unlike anything the country has seen in recent decades.'' [46]

## Crime & Insecurity

Venezuela was once considered the most dangerous country in Latin America.[47] However, ''a discernible reduction in the overall levels of violence could be observed'' in 2023 and 2024.[48] Various factors behind the apparent decline in crime include the country's ''ongoing economic crisis,'' which has reportedly reduced ''opportunities for extortion and ransom kidnappings,'' and led Venezuelan criminal groups to ''infiltrate Venezuelan diasporas settled in other Latin American countries.'' [49] The ''monopolization of violence in some regions'' by ''non-state armed groups,'' as well as pacts between Maduro representatives and some criminal groups, have also reportedly contributed to improved perceptions of security in certain areas.[50]

Nevertheless, Venezuelans continue to ''face physical insecurity and violence from several sources, including irregular armed groups, security forces,

and organized gangs.'' [51] The European Union Agency for Asylum (EUAA) reported that ''Criminal armed groups often operate with the cooperation, or tolerance of state security forces'' in Venezuela.[52] Moreover, security forces in Venezuela have been ''accused of committing human rights abuses such as torture and cruel, inhuman and degrading treatment, including sexual and gender-based violence, and killings consistent with extrajudicial executions.'' [53]

In summary, extraordinary and temporary conditions, including a severe humanitarian emergency marked by an economic contraction, deepening poverty, reduced access to food and medicine, a collapse in basic services, fuel shortages, human rights abuses and political repression, crime and violence continue to prevent Venezuelan nationals from returning in safety.

Based on this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions supporting Venezuela's designation for TPS continue to be met. *See* INA sec. 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continue to be extraordinary and temporary conditions in Venezuela that prevent Venezuelan nationals (or individuals having no nationality who last habitually resided in Venezuela) from returning to Venezuela in safety, and it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Venezuela for TPS should be extended for an 18-month period, beginning on April 3, 2025, and ending on October 2, 2026. *See* INA sec. 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• There are approximately 607,000 current Venezuelan TPS beneficiaries who are eligible to re-register for TPS under the extension.

## Notice of the Designation of Venezuela for TPS

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Venezuela's designation for TPS on the basis of extraordinary and temporary conditions are met, and it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am extending the existing October 3, 2023 designation of Venezuela for TPS for 18 months, beginning on April 3, 2025, and ending on October 2, 2026. *See* INA sec. 244(b)(1) and (b)(2); 8 U.S.C. 1254a(b)(1), and (b)(2).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

## Eligibility and Employment Authorization for TPS

### Required Application Forms and Application Fees to re-register for TPS:

To re-register for TPS based on the designation of Venezuela, you must submit Form I–821. When filing an application to re-register for TPS, you do not need to pay the application fee; however, you are required to pay the biometric services fee. If you cannot pay the biometric services fee, you may ask USCIS to waive the fee. Please see additional information under the ''Biometric Services Fee'' section of this notice.

TPS beneficiaries are eligible for an EAD, which proves their authorization to work in the United States. You are not required to submit Form I–765 or have an EAD to be granted TPS, but see below for more information if you want an EAD to use as proof that you can work in the United States.

Individuals who have a Venezuela TPS application (Form I–821) that was still pending as of January 17, 2025, do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through October 2, 2026.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 106.2 and the fee waiver-related regulations in 8 CFR 106.3. In addition, USCIS Form G–1055, Fee Schedule,

---

[45] Venezuela: UN Fact-Finding Mission expresses alarm over human rights violations in post-election context, Office of the High Commissioner for Human Rights (OHCHR), Jul. 31, 2024, available at: *https://www.ohchr.org/en/press-releases/2024/07/venezuela-un-fact-finding-mission-expresses-alarm-over-human-rights* (last visited Sep. 3, 2024).

[46] Frances Robles, 'Operation Knock-Knock': Venezuela Sweeps Up Dissenters After Disputed Vote, The New York Times, Aug. 10, 2024, available at: *https://www.nytimes.com/2024/08/10/world/americas/venezuela-election-maduro.html* (last visited Sep. 3, 2024).

[47] Venezuela Investigative Unit, Why Is Venezuela's Crime Rate Falling?, InSight Crime, May 28, 2024, available at: *https://insightcrime.org/news/venezuela-crime-rate-falling/* (last visited Sep. 3, 2024).

[48] Annual Report Violence 2023, Venezuelan Violence Observatory (OVV), Dec. 28, 2023, pg. 30, available at: *https://observatoriodeviolencia.org.ve/wp-content/uploads/2024/01/OVV-Violence-in-Venezuela-Annual-Report-2023-.pdf* (last visited Sep. 3, 2024); Venezuela Investigative Unit, Why Is Venezuela's Crime Rate Falling?, InSight Crime, May 28, 2024, available at: *https://insightcrime.org/news/venezuela-crime-rate-falling/* (last visited Sep. 3, 2024).

[49] Venezuela Investigative Unit, Why Is Venezuela's Crime Rate Falling?, InSight Crime, May 28, 2024, available at: *https://insightcrime.org/news/venezuela-crime-rate-falling/* (last visited Sep. 3, 2024).

[50] Venezuela Investigative Unit, Why Is Venezuela's Crime Rate Falling?, InSight Crime, May 28, 2024, available at: *https://insightcrime.org/news/venezuela-crime-rate-falling/* (last visited Sep. 3, 2024).

[51] Freedom in the World 2024—Venezuela, Freedom House, Feb. 29, 2024, available at: *https://freedomhouse.org/country/venezuela/freedom-world/2024* (last visited Sep. 3, 2024).

[52] Venezuela—Country Focus, European Union Agency for Asylum (EUAA), Nov. 2023, pg. 42, available at: *https://coi.euaa.europa.eu/administration/easo/PLib/2023_11_EUAA_COI_Report_Venezuela_Country_Focus.pdf* (last visited Sep. 3, 2024).

[53] Venezuela—Country Focus, European Union Agency for Asylum (EUAA), Nov. 2023, pg. 26, available at: *https://coi.euaa.europa.eu/administration/easo/PLib/2023_11_EUAA_COI_Report_Venezuela_Country_Focus.pdf* (last visited Sep. 3, 2024).

provides the current fees required for the Form I–821 and Form I–765 for existing TPS beneficiaries who are re-registering.

## How Can TPS Beneficiaries Obtain an EAD?

Everyone must provide their employer with documentation showing that they have the legal right to work in the United States. TPS beneficiaries are eligible to obtain an EAD, which proves their legal right to work. If you want to obtain an EAD, you must file Form I–765 and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912). TPS applicants may file this form with their TPS application, or separately later, if their TPS application is still pending or has been approved.

Beneficiaries with a Venezuela TPS-related Form I–765 that was still pending as of January 17, 2025, do not need to file the application again. If USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through October 2, 2026.

## Can My TPS-Related EAD Be Automatically Extended?

Yes. There are two ways for your TPS-related EAD to be automatically extended. First, if you already have an EAD with a "Card Expires" date of September 10, 2025, April 2, 2025, March 10, 2024, or September 9, 2022, this **Federal Register** notice automatically extends it through April 2, 2026 without any further action on your part. You do not need to present this FRN or any other additional documentation other than your EAD to use this automatic extension.

Second, you may also be eligible for a longer automatic extension of up to 540 days from the "Card Expires" date on the EAD if you file your Form I–765 EAD renewal application during the re-registration period of January 17, 2025, through September 10, 2025 ("Up to 540-Day Automatic EAD Extension").[54] See the section "How can I receive an automatic extension of my current TPS EAD for up to 540 days from the "Card Expires" date on the EAD by filing an EAD renewal application ("Up to 540-Day Automatic EAD Extension")?" of this **Federal Register** notice for more information. Your EAD may be eligible for both types of extensions, but in no case will your EAD automatic extension be valid past October 2, 2026. If you take advantage of both types of EAD extensions, the automatic extension periods run concurrently.

## Filing Information

USCIS offers the option to applicants for TPS under Venezuela's designation to file Form I–821 and related requests for EADs online or by mail. However, if you file Form I–912, Request for Fee Waiver or a written fee waiver request for any applications filed together with your Form I–821, you must submit your applications by mail. When filing a TPS application, you can also request an EAD by submitting a completed Form I–765 with your Form I–821. Under certain circumstances, you may also upload a completed Form I–765 with a fee or fee waiver request, in Portable Document Format (PDF) through your USCIS online account. More information about filing your Form I–765 and fee waiver request through a PDF upload is available at *https://www.uscis.gov/newsroom/stakeholder-messages/uscis-launches-online-pdf-filing-option.*

*Online filing:* Form I–821 and Form I–765 are available for concurrent filing online.[55] To file these forms online, you must first create a USCIS online account.[56]

*PDF upload:* Form I–765, if applicable, and Form I–912, if applicable, are available for PDF upload. To upload these documents, you must first create a USCIS online account.[57]

*Mail filing:* Mail your completed Form I–821; Form I–765, if applicable; Form I–912, if applicable; and supporting documentation to the proper address in Table 1—Mailing Addresses.

### TABLE 1—MAILING ADDRESSES

| If. . . | Mail to. . . |
|---|---|
| You live in California or Texas and are using U.S. Postal Service (USPS). | USCIS, Attn: TPS Venezuela, P.O. Box 20300, Phoenix, AZ 85036–0300. |
| You live in California or Texas and are using FedEX, UPS, or DHL | USCIS, Attn: TPS Venezuela (Box 20300), 2108 E. Elliot Rd., Tempe, AZ 85284–1806. |
| You live in Florida, and you are using the U.S. Postal Service (USPS) | USCIS, Attn: TPS Venezuela, P.O. Box 660864, Dallas, TX 75266–0864. |
| You live in Florida, and you are using FedEx, UPS, or DHL | USCIS, Attn: TPS Venezuela (Box 660864), 2501 S. State Highway, 121 Business, Suite 400, Lewisville, TX 75067–8003. |
| You live in Illinois, Indiana, Massachusetts, New Jersey, New York, North Carolina, Utah, or Virginia, and you are using the U.S. Postal Service (USPS). | USCIS, Attn: TPS Venezuela, P.O. Box 4091, Carol Stream, IL 60197–4091. |
| You live in Illinois, Indiana, Massachusetts, New Jersey, New York, North Carolina, Utah, or Virginia, and you are using FedEx, UPS, or DHL. | USCIS, Attn: TPS Venezuela (Box 4091), 2500 Westfield Drive, Elgin, IL 60124–7836. |
| You live in any other state or territory, and you are using the U.S. Postal Service (USPS). | USCIS, Attn: TPS Venezuela, P.O. Box 805282, Chicago, IL 60680–5285. |
| You live in any other state or territory, and you are using FedEx, UPS, or DHL. | USCIS, Attn: TPS Venezuela (Box 805282), 131 South Dearborn Street, 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you want to request an EAD, you may submit Form I–765 one of three ways: online, mail your Form I–765 to the appropriate address in Table 1, or upload a completed PDF through your USCIS online account. If you file online, you will be prompted to include the fee. If you file by mail, you must include the fee or fee waiver request. If you file by

[54] Under 8 CFR 274a.13(d), EADs with category A12 and C19 are eligible for an automatic extension of up to 540 days from the date on the face of the EAD if the bearer's Form I–765 application is properly filed under either the A12 or C19 category and during the re-registration period described in the applicable **Federal Register** notice.

[55] Find information about online filing at "Forms Available to File Online," *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[56] *https://myaccount.uscis.gov/users/sign_up.*

[57] *https://www.uscis.gov/newsroom/stakeholder-messages/uscis-launches-online-pdf-filing-option.* Sign up to create a new USCIS online account at *https://myaccount.uscis.gov/users/sign_up.*

PDF upload, you must include the fee or a fee waiver request. When you request an EAD based on an IJ or BIA grant of TPS, include with your application a copy of the order from the IJ or BIA granting you TPS. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions for Form I–821 list all the documents you need to re-register for TPS. You may also find information on the acceptable documentation and other requirements for re-registering for TPS on the USCIS website at *https://www.uscis.gov/tps* under ''Venezuela.''

**Travel**

TPS beneficiaries and TPS applicants with pending Form I–821 applications may also apply for travel authorization, which USCIS may grant as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If USCIS grants travel authorization, it gives you permission to leave the United States and to return to a U.S. port of entry to request re-entry during a specific period. To request travel authorization, you must file Form I–131, available at *https://www.uscis.gov/i-131*. You may file Form I–131 together with your Form I–821 or separately. When filing Form I–131, a TPS beneficiary must:

• Select Item Number 4 in Part 1 on the Form I–131; and

• Submit the fee for Form I–131, or request a fee waiver, which you may submit on Form I–912.

When filing Form I–131, a TPS applicant with a pending initial Form I–821 must:

• Select Item Number 5C in Part 1 on the Form I–131; and

• Submit the fee for Form I–131, or request a fee waiver, which you may submit on Form I–912.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797, Notice of Action, or Form I–797C, Notice of Action, indicating either approval or receipt of Form I–821. Form I–131 may not be filed by PDF upload.

TABLE 2—MAILING ADDRESSES

| If you are. . . | Mail to. . . |
|---|---|
| Filing Form I–131 together with Form I–821 .......................................... | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS). You must include a copy of the Notice of Action (Form I–797C or I–797) showing USCIS received or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL. You must include a copy of the Notice of Action (Form I–797C or I–797) showing USCIS received or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S. State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS:**

Biometrics (such as fingerprints) are required for all applicants, in addition to a biometric services fee. As previously stated, if you cannot pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. USCIS may require you to visit an Application Support Center to have your biometrics collected. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https://www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms*.

**General Employment-Related Information for TPS Applicants and Their Employers**

**How can I obtain information on the status of my TPS application and EAD request?**

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at *https://uscis.gov* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter*. If you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**Am I eligible to receive an automatic extension of my current EAD through April 2, 2026, through this Federal Register notice (''FRN-Based Automatic EAD Extension'')?**

Yes. Regardless of your country of birth, if you currently have a Venezuela TPS-based EAD with the notation A12 or C19 under Category and a ''Card Expires'' date of September 10, 2025, April 2, 2025, March 10, 2024, or September 9, 2022, this **Federal Register** notice automatically extends your EAD through April 2, 2026, without any further action on your part. Although this **Federal Register** notice automatically extends your EAD through April 2, 2026, you still must timely re-register for TPS by filing Form I–821 in accordance with the procedures described in this **Federal Register** notice to maintain your TPS.

You also should file your Form I–765 timely to avoid possible gaps in your employment authorization documentation.

**How can I receive an automatic extension of my current TPS EAD for up to 540 days from the ''Card Expires'' date on the EAD by filing an EAD renewal application (''Up to 540-Day Automatic EAD Extension'')?**

You qualify for this other type of automatic EAD extension if:

• You properly file your renewal Form I–765 during the TPS re-registration period which is January 17, 2025, through September 10, 2025; and

• Your Form I–765 EAD renewal application is under category A12 or C19.

As long as the categories listed on your EAD and Form I–797C receipt notice are A12 or C19, they don't need to be the same. (For example, your EAD may still be automatically extended for up to 540 days if your facially expired or expiring EAD says C19 and your renewal application says A12.)

For purposes of your employer verifying your employment eligibility on the Form I–9, if you choose to complete your Form I–9 using the ''Up

to 540-Day Automatic EAD Extension,'' the automatic extension period starts from the ''Card Expires'' date on your EAD. You may use the EAD Automatic Extension Calculator available at *https://www.uscis.gov/eadautoextend* to determine the automatically extended expiration date.

**When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?**

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/ acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three business days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present one selection from List A (which provides evidence of both identity and employment authorization) or one selection from List B (which provides evidence of your identity) together with one selection from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in these lists. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https:// www.uscis.gov/I-9Central.* An EAD is an acceptable document under List A. See the section ''How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?'' of this **Federal Register** notice for more information.

A. FRN-based Automatic EAD Extension. If your EAD states A12 or C19 under Category and has a ''Card Expires'' date of September 10, 2025, April 2, 2025, March 10, 2024, or September 9, 2022, this **Federal Register** notice extends it automatically, and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through April 2, 2026. Your country of birth noted on the EAD does not have to reflect the TPS-designated country of Venezuela for you to be eligible for this extension. You may, but are not required to, show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through April 2, 2026.

B. Up to 540-day Automatic EAD Extension. To show that you qualify for this extension, present:

1. Your EAD with a Category Code of A12 or C19 and

2. Your Form I–797C, Notice of Action, for your Form I–765 renewal EAD application showing a Category Code of A12 or C19. The ''Received Date'' on this notice must fall within the re-registration period described in this FRN, which is from January 17, 2025, through September 10, 2025.

The A12 or C19 categories on your Form I–797C, Notice of Action, and facially expired or expiring A12 or C19 EAD do not need to match, as long as each lists A12 or C19 as the category. (For example, your EAD may still be automatically extended for up to 540 days if your EAD says C19 and your renewal application says A12.)

**What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?**

Your employer is required by law to ask you about your continued employment authorization. Your employer may need to reexamine your automatically extended EAD to check the ''Card Expires'' date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the ''Card Expires'' date and Category code, they should update the EAD expiration date in Section 2 of Form I–9. See the section ''What updates should my current employer make to Form I–9 if my EAD has been automatically extended?'' of this **Federal Register** notice for more information.

A. FRN-based Automatic EAD Extension. If you choose to use the automatic EAD extension based on this **Federal Register** notice, you may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through April 2, 2026; however, you are not required to do so. The last day of this automatic EAD extension is April 2, 2026. Before you start work on April 3, 2026, your employer is required by law to reverify your employment authorization on Form I–9.

B. Up to 540-day Automatic EAD Extension. If you filed your EAD renewal application during the re-registration period indicated in this **Federal Register** notice and choose to have your EAD automatically extended for up to 540 days from the ''Card Expires'' date on your EAD, but no later than October 2, 2026, present:

1. Your facially expired or expiring EAD with a Category Code of A12 or C19, and

2. The Form I–797C, Notice of Action, showing a Category Code of A12 or C19. The ''Received Date'' on this notice must fall within the re-registration period described in this FRN, which is from January 17, 2025, through September 10, 2025.

By the end date of your automatic EAD extension, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in these lists to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

**If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?**

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, even if you already have an EAD or employment authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through October 2, 2026, you must file Form I–765 and pay the associated fee (unless USCIS grants your fee waiver request).

**Can my employer require that I provide any other documentation to complete Form I–9, such as evidence of my status, proof of my Venezuelan citizenship, or a Form I–797 showing that I registered for TPS?**

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request other documentation, such as proof of Venezuelan citizenship or proof of registration for TPS, when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document if the EAD reasonably appears to be genuine and to relate to you. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or

immigration status or your national origin.

**How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?**

A. FRN-based Automatic EAD Extension. When using this type of automatically extended EAD to complete Form I–9 for a new job before April 3, 2026:

1. For Section 1, you should:

a. Check ''A noncitizen authorized to work until'' and enter October 2, 2026, as the ''expiration date''; and

b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)

2. For Section 2, employers should:

a. Determine whether the EAD is auto-extended by ensuring it is in category A12 or C19 and has a ''Card Expires'' date of September 10, 2025, April 2, 2025, March 10, 2024, or September 9, 2022;

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. Write April 2, 2026, as the expiration date.

Before the start of work on April 3, 2026, employers must reverify the employee's employment authorization on Form I–9.

B. Up to 540-day Automatic EAD Extension. If you filed your EAD renewal application during the re-registration period indicated in this **Federal Register** notice and choose to have your EAD automatically extended for up to 540 days from the ''Card Expires'' date on your EAD:

1. For Section 1, you should:

a. Check ''A noncitizen authorized to work until;'' and

b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)

c. Enter October 2, 2026 as the expiration date.

2. In Section 2, in the List A column, the employer must:

a. Determine whether the EAD is automatically extended by ensuring it is in category A12 or C19 and that your Form I–797C indicates that you filed your Form I–765 renewal EAD application under Category A12 or C19 and during the re-registration period indicated in this **Federal Register** notice;

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. In the Expiration Date field, enter the date 540 days from the ''Card Expires'' date on the EAD. This date may not be later than October 2, 2026. Use the Automatic Extension Eligibility Calculator at *https://www.uscis.gov/eadautoextend* to calculate your new EAD expiration date.

f. Employers should also enter ''EAD EXT'' in the Additional Information field.

**What updates should my current employer make to Form I–9 if my EAD has been automatically extended?**

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has now automatically extended your EAD, your employer may need to re-examine your current EAD if they do not have a copy of the EAD on file. Your employer should determine whether your EAD is automatically extended by ensuring that it contains Category A12 or C19.

A. FRN-based automatic EAD Extension. If you are relying on an FRN-based automatic EAD extension, your employer should examine your EAD to see if it has a ''Card Expires'' date of September 10, 2025, April 2, 2025, March 10, 2024, or September 9, 2022. Your employer may not rely on the country of birth listed on the card to determine whether you are eligible for this extension.

If your employer determines that USCIS has automatically extended your EAD through this **Federal Register** notice, they should update Section 2 of your previously completed Form I–9 as follows:

1. Write EAD EXT and April 2, 2026, as the last day of the automatic extension in the Additional Information field; and

2. Initial and date the correction.

*Note:* This is not considered a reverification. Employers do not reverify the employee until either the automatic extension has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By the date that the employee's automatically extended EAD expires, employers are required by law to reverify the employee's employment authorization on Form I–9.

B. Up to 540-day Automatic EAD Extension. If you are relying on an up to 540-day automatic EAD extension, your employer must also examine your Form I–797C indicating receipt of your Form I–765 renewal EAD application to determine if it was filed under Category A12 or C19 and during the re-

registration period indicated in this **Federal Register** notice. Your employer will need to update Form I–9 by entering the appropriate automatic EAD extension expiration date and ''EAD EXT'' in the Section 2 Additional Information field. The new up to 540-day EAD extension expiration date starts from the ''Card Expires'' date on the face of your current EAD, not to exceed the TPS designation end date indicated in this **Federal Register** notice. Use the Automatic Extension Eligibility Calculator at *https://www.uscis.gov/eadautoextend* to calculate your new EAD expiration date.

Note: This information also applies if you initially presented a TPS-related EAD that was automatically extended by the FRN-Based Automatic EAD Extension and later obtained an up to 540-day automatic EAD extension.

**If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?**

Employers may create a case in E-Verify for a new employee by entering the EAD document number and expiration date from Section 2 of Form I–9 into the corresponding fields in E-Verify.

**If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiring'' alert for an automatically extended EAD?**

If you have an employee who provided a TPS-related EAD when they first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. You must reverify your employee's employment authorization on Form I–9 by the date their automatic EAD extension ends. Employers may not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov*. USCIS accepts calls and

emails in English, Spanish, and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in many languages. Employers may also email IER at *IER@usdoj.gov* or get more information online at *https://www.justice.gov/ier.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov*. USCIS accepts calls and emails in English, Spanish and many other languages. Employees or job applicants may also call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in many languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in these lists. Employers may not require extra or additional documentation other than what is required to complete Form I–9. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (mismatch) must promptly inform employees of the mismatch and give these employees an opportunity to resolve the mismatch. A mismatch means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result occurs if E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Employment-

authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, if you present an EAD that has been automatically extended by this **Federal Register** notice, you do not need to show any other document, such as a Form I–797C, Notice of Action, reflecting receipt of a Form I–765 EAD renewal application or this **Federal Register** notice, to prove that you qualify for this extension. If you are presenting an EAD extended by an up to 540-day extension, you will need to show your Form I–797C, Notice of Action, reflecting receipt of your Form I–765. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary or applicant, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A12 or C19, even if your country of birth noted on the EAD does not reflect the TPS-designated country of Venezuela;

• Your Form I–94, Arrival/Departure Record;

• Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or

• Form I–797 or Form I–797C, Notice of Action, reflecting approval or receipt of a past or current Form I–821, if you received one from USCIS.

Check with the government agency requesting documentation about which document(s) the agency will accept.

Some state and local government agencies use SAVE, *https://www.uscis.gov/save,* to confirm the current immigration status of applicants for public benefits. While SAVE can verify that an individual has TPS or a pending TPS application, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. If an agency accepts the type of TPS-related document you present, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your A-Number, USCIS number, or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://www.uscis.gov/save/save-casecheck.* CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (such as your A-Number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must allow you to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *https://www.uscis.gov/save/for-benefit-applicants,* has detailed information on how to correct or update your immigration record, make an

**5972** **Federal Register**/Vol. 90, No. 11/Friday, January 17, 2025/Notices

appointment, or submit a written request to correct records.

[FR Doc. 2025–00769 Filed 1–13–25; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–7092–N–02]

### 30-Day Notice of Proposed Information Collection; Record of Employee Interview; OMB Control No.: 2501–0009

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.

**DATES:** *Comments Due Date: February 18, 2025.*

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open

for Public Comments'' or by using the search function. Interested persons are also invited to submit comments regarding this proposal and comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Anna Guido, Clearance Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210, Washington, DC 20410.

**FOR FURTHER INFORMATION CONTACT:**
Anna Guido, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street, SW, Washington, DC 20410; email *Anna.P.Guido@hud.gov* or telephone (202) 402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Guido.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on September 11, 2024 at 89 FR 73705.

### A. Overview of Information Collection

*Title of Information Collection:* Record of Employee Interview.

*MB Approval Number:* 2501–0009.

*Type of Request:* Reinstatement of a currently approved collection.

*Form Number:* HUD 22019.

*Description of the need for the information and proposed use:*

All federal agencies administering programs subject to Davis-Bacon wage provisions are required to enforce Federal Wage and reporting provisions in accordance with Department of Labor (DOL) regulations (29 CFR part 5, Section 5.6 paragraphs (1)(2) and (a)(3), respectively).

HUD, state, and local agencies administering HUD-assisted programs must enforce Federal Wage and reporting requirements on covered HUD-assisted construction and maintenance work. Enforcement activities include conducting interviews with laborers and mechanics employed on HUD-assisted projected concerning their employment on covered projects. The HUD–11 and HUD–11–SP (Spanish version) are used to assist in the conducting of on-site interviews and to record the information provided by the respondent. The forms may be supplemented with additional pages, as needed. Responses and the provision of supplemental information are voluntary on the part of respondents. (*See* HUD Handbook 1344.1 REV–3 (Federal Labor Standards Requirements in Housing and Urban Development Programs), Sections 5–9, 5–10 (January 2023).

| Information collection | Number of respondents | Frequency of response | Responses per annum | Total burden hours per response | Annual burden hours | Hourly cost per response | Total cost |
|---|---|---|---|---|---|---|---|
| HUD–11/11SP Respondent's Time ......................... | 37,944 | 1 | 37,944.00 | 0.25 | 9,486.00 | $23.69 * | $224,723.34 |

### B. Solicitation of Public Comment

This notice is soliciting comments from members of the public and affected parties concerning the collection of information described in Section A on the following:

(1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) The accuracy of the agency's estimate of the burden of the proposed collection of information;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) Ways to minimize the burden of the collection of information on those who are to respond; including through

the use of appropriate automated collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

(5) Ways to minimize the burden of the collection of information on those who are to respond, including the use of automated collection techniques or other forms of information technology.

HUD encourages interested parties to submit comment in response to these questions.

### C. Authority

Section 3507 of the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35.

**Anna Guido,**

*Department Reports Management Officer, Office of Policy Development and Research, Chief Data Officer.*

[FR Doc. 2025–01139 Filed 1–16–25; 8:45 am]

**BILLING CODE 4210–67–P**

VZ Vacatur_0113

*Can a noncitizen who has been granted TPS apply for reinstatement of F–1 nonimmigrant student status after the noncitizen's F–1 nonimmigrant student status has lapsed?*

Yes. Regulations permit certain students who fall out of F–1 nonimmigrant student status to apply for reinstatement. *See* 8 CFR 214.2(f)(16). This provision might apply to students who worked on a TPS-related EAD or dropped their course load before publication of this notice, and therefore fell out of student status. These students must satisfy the criteria set forth in the F–1 nonimmigrant student status reinstatement regulations.

*How long will this notice remain in effect?*

This notice grants temporary relief through March 10, 2024,[61] to eligible F–1 nonimmigrant students. DHS will continue to monitor the situation in Venezuela. Should the special provisions authorized by this notice need modification or extension, DHS will announce such changes in the **Federal Register**.

**Paperwork Reduction Act (PRA)**

An F–1 nonimmigrant student seeking off-campus employment authorization due to severe economic hardship resulting from the humanitarian crisis in Venezuela must demonstrate to the DSO that this employment is necessary to avoid severe economic hardship. A DSO who agrees that a nonimmigrant student should receive such employment authorization must recommend an application approval to USCIS by entering information in the remarks field of the student's SEVIS record. The authority to collect this information is in the SEVIS collection of information currently approved by the Office of Management and Budget (OMB) under OMB Control Number 1653–0038.

This notice also allows an eligible F–1 nonimmigrant student to request

employment authorization, work an increased number of hours while the academic institution is in session, and reduce their course load while continuing to maintain F–1 nonimmigrant student status.

To apply for employment authorization, certain F–1 nonimmigrant students must complete and submit a currently approved Form I–765 according to the instructions on the form. OMB has previously approved the collection of information contained on the current Form I–765, consistent with the PRA (OMB Control No. 1615–0040). Although there will be a slight increase in the number of Form I–765 filings because of this notice, the number of filings currently contained in the OMB annual inventory for Form I–765 is sufficient to cover the additional filings. Accordingly, there is no further action required under the PRA.

**Alejandro Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2022–19542 Filed 9–7–22; 8:45 am]
**BILLING CODE 9111–28–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

[CIS No. 2682–21; DHS Docket No. USCIS–2021–0003]

RIN 1615–ZB86

**Extension of the Designation of Venezuela for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) extension.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Venezuela for Temporary Protected Status (TPS) for 18 months, effective September 10, 2022 through March 10, 2024. This extension allows currently eligible TPS beneficiaries to retain TPS through March 10, 2024, so long as they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through March 10, 2024 must re-register during the re-registration period. This notice sets forth procedures necessary for

Venezuelan nationals (and individuals having no nationality who last habitually resided in Venezuela) to re-register for TPS and to apply for Employment Authorization Documents (EADs) with U.S Citizenship and Immigration Services (USCIS). USCIS will issue new EADs with a March 10, 2024 expiration date to eligible beneficiaries under Venezuela's TPS designation who timely re-register and apply for EADs under this extension.

**DATES:** *Extension of Designation of Venezuela for TPS:* The 18-month extension of the TPS designation of Venezuela for TPS is effective on September 10, 2022, and will remain in effect for 18 months, through March 10, 2024. The 60-day re-registration period for existing TPS beneficiaries runs from September 8, 2022 through November 7, 2022. (Note: It is important for re-registrants to timely re-register during the 60-day registration period and not to wait until their EADs expire, as delaying reregistration could result in gaps in their employment authorization documentation.)

**FOR FURTHER INFORMATION CONTACT:** You may contact René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

For further information on TPS, including guidance on the re-registration process and additional information on eligibility, please visit the USCIS TPS web page at *uscis.gov/tps.* You can find specific information about this extension of Venezuela's TPS designation by selecting "Venezuela" from the menu on the left side of the TPS web page.

If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.*

Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

---

[61] Because the suspension of requirements under this notice applies throughout an academic term during which the suspension is in effect, DHS considers an F–1 nonimmigrant student who engages in a reduced course load or employment (or both) after this notice is effective to be engaging in a "full course of study," *see* 8 CFR 214.2(f)(6), and eligible for employment authorization, through the end of any academic term for which such student is matriculated as of March 10, 2024, provided the student satisfies the minimum course load requirement in this notice. DHS also considers students who engage in online coursework pursuant to ICE COVID–19 guidance for nonimmigrant students to be in compliance with regulations while such guidance remains in effect. *See* ICE Guidance and Frequently Asked Questions on COVID–19, Nonimmigrant Students & SEVP-Certified Schools: Frequently Asked Questions, *https://www.ice.gov/coronavirus* (last visited July 8, 2022).

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**Purpose of This Action (TPS)**

Through this notice, DHS sets forth procedures necessary for nationals of Venezuela (or individuals having no nationality who last habitually resided in Venezuela) to re-register for TPS and to apply for renewal of their EADs with USCIS. Re-registration is limited to individuals who have previously registered for TPS under the designation of Venezuela and whose applications have been granted. Failure to re-register properly within the 60-day re-registration period may result in the withdrawal of your TPS following appropriate procedures. *See* 8 CFR 244.14. Individuals who have a Venezuelan TPS application (Form I–821) pending as of September 8, 2022 do not need to file to re-register. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through March 10, 2024. Certain nationals of Venezuela (or individuals having no nationality who last habitually resided in Venezuela) who have not previously applied for TPS may be eligible to apply under the late initial registration provisions, if they meet: (1) At least one of the late initial filing criteria; and, (2) all TPS eligibility criteria (including continuous residence in the United States since March 8, 2021, and continuous physical presence in the United States since March 9, 2021). For more information on late initial filing please see 8 CFR 244.2(f)

and (g); and *https://www.uscis.gov/ humanitarian/temporary-protected- status* under Late Filing.

For individuals who have already been granted TPS under Venezuela's designation, the 60-day re-registration period runs from September 8, 2022 through November 7, 2022. USCIS will issue new EADs with a March 10, 2024 expiration date to eligible Venezuelan TPS beneficiaries who timely re-register and apply for EADs. Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive new EADs before their current EADs expire on September 9, 2022. Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of these EADs previously issued under the TPS designation of Venezuela through September 9, 2023.

Therefore, as proof of continued employment authorization through September 9, 2023, TPS beneficiaries can show their EADs that have the notation A–12 or C–19 under Category and a "Card Expires" date of September 9, 2022. This notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

Individuals who have a Venezuelan TPS application (Form I–821) and/or an Application for Employment Authorization (Form I–765) that was still pending as of September 8, 2022 do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through March 10, 2024. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

**What is temporary protected status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work so long as they continue to meet the requirements of TPS. They may apply for and receive EADs as evidence of employment authorization.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

**When was Venezuela designated for TPS?**

Secretary of Homeland Security, Alejandro N. Mayorkas, initially designated Venezuela for TPS on March 9, 2021, on the basis of extraordinary and temporary conditions that prevented nationals of Venezuela from returning in safety. *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure,* 86 FR 13574 (Mar. 9, 2021).

**What authority does the Secretary have to extend the designation of Venezuela for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The decision to designate any foreign state (or part thereof) is a discretionary

---

[1] INA section 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135. The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. *Id.,* at § 244(b)(1).

**55026** **Federal Register** / Vol. 87, No. 173 / Thursday, September 8, 2022 / Notices

decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).[2] The Secretary, in his or her discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state continues to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**Why is the Secretary extending the TPS designation for Venezuela through March 10, 2024?**

The Secretary has determined that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting TPS designation remain based on DHS's review of country conditions in Venezuela, including input received from the Department of State (DOS) and other U.S. Government agencies.

**Overview**

Extraordinary and temporary conditions that prevent Venezuelan nationals from returning in safety include severe economic and political crises ongoing within Venezuela, which have an impact across sectors, including

limited access to food, basic services, and adequate healthcare, and the deterioration of the rule of law and protection of human rights.

Venezuela remains in a humanitarian emergency due to economic and political crises. The Congressional Research Service (CRS) reported in April 2021 that "Venezuela's economy has collapsed"[3] and noted that Venezuela was "in the throes of a multiyear economic crisis, one of the worst economic crises in the world since World War II," with its economy contracting by "more than 75% since 2014 [. . .], estimated as the single largest economic collapse outside of war in at least 45 years and more than twice the magnitude of the Great Depression in the United States."[4] More recently, the CRS reported, "Between 2014 and 2021, Venezuela's economy contracted by 80%."[5] Though the CRS indicates that "hyperinflation has abated and higher oil prices driven by Russia's invasion of Ukraine appear to be driving a nascent economic recovery," the economic situation, which negatively impacts access to food, purchasing power, and social services, has created a humanitarian crisis.[6]

Moreover, Venezuela has experienced more than "two decades of political tumult."[7] The European Asylum Support Office (EASO) also reported that this political polarization contributed to the emergence of institutional duality in Venezuela, in which neither side, those allied with Nicolas Maduro and those allied with Juan Guaidó, recognizes the validity of the other's institutions.[8] Though the Venezuelan constitution provides

citizens the ability to change their government through free and fair elections, the Maduro regime has restricted the exercise of this right and arbitrarily banned key opposition figures from participating, maintained hundreds of political prisoners, used judicial processes to steal the legal personages of political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.[9]

The resulting impact of the economic and political crises spreads across various sectors in Venezuela. Reuters reported on a 2020–2021 National Survey of Living Conditions (ENCOVI) that found that of the country's 28 million residents, 76.6% live in extreme poverty, which was an almost 10% increase from the previous year.[10]

Moreover, Human Rights Watch reports that one out of three Venezuelans is food insecure and in need of assistance.[11] Based on data collected prior to the pandemic, 8 percent of children under age 5 were acutely malnourished and 30 percent chronically malnourished or stunted.[12] The United Nations Children's Fund (UNICEF) estimates that 116,596 Venezuelan children could suffer from global acute malnutrition in 2022.[13] Estimates suggest that Venezuelans would require 136 times the minimum wage of $1.71 per month to access a basic food basket.[14]

---

[2] This issue of judicial review is the subject of litigation. *See, e.g., Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18–16981); *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019).

[3] Clare Ribando Seelke, Rebecca M. Nelson, Rhoda Margesson, Phillip Brown, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), Summary, Apr. 28, 2021, *https://sgp.fas.org/crs/row/R44841.pdf* (last visited: Aug. 18, 2022).

[4] *Id.*

[5] *Id.*

[6] Clare Ribando Seelke, Venezuela: Political Crisis and U.S. Policy, CRS, p. 1, Aug. 1, 2022, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/ *https://sgp.fas.org/crs/row/IF10230.pdf* (last visited Aug. 18, 2022).

[7] Overcoming the Global Rift on Venezuela, International Crisis Group, p. i, Feb. 17, 2022, *https://d2071andvip0wj.cloudfront.net/093-overcoming-the-global-rift-on-venezuela.pdf* (last visited Aug. 18, 2022).

[8] Venezuela: Country Focus, European Asylum Support Office (EASO), p.21, Aug. 2020, *https://coi.easo.europa.eu/administration/easo/PLib/2020_08_EASO_COI_Report_Venezuela.pdf* (last visited Aug. 18, 2022).

[9] 2021 Country Reports of Human Rights Practices: Venezuela, U.S. Department of State, Apr. 12, 2022, available at: *https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/* (last visited: Aug. 18, 2022).

[10] Reuters, Extreme Poverty in Venezuela Rises to 76.6%—study, Sept. 29, 2021, *https://www.reuters.com/world/americas/extreme-poverty-venezuela-rises-766-study-2021-09-29/* (last visited Aug. 18, 2022).

[11] Human Rights Watch, World Report 2021, Venezuela, *https://www.hrw.org/world-report/2021/country-chapters/venezuela* (last visited Aug. 18, 2022).

[12] *Id.*

[13] UNICEF, Humanitarian Action for Children 2022—Venezuela, (Dec. 7, 2021), *https://reliefweb.int/report/venezuela-bolivarian-republic/humanitarian-action-children-2022-venezuela* (last visited Aug. 18, 2022).

[14] *Id.* The UN's Food and Agriculture Organization (FAO) issues a monthly food price index, a measure of change in international prices of a basket of food commodities. See United Nations, "Global Issues: Food" (last visited 7/25/2022), *https://www.un.org/en/global-issues/food.* A national food basket is a group of essential food commodities.

Additionally, sources have described Venezuela's health system as "run-down,"[15] "overloaded and crumbling,"[16] and "collapsed."[17] Human Rights Watch noted that millions of Venezuelans are unable to access basic healthcare.[18] Moreover, Venezuela's "collapsed health system has led to the resurgence of vaccine-preventable and infectious diseases. Shortages of medications and supplies, interruptions of utilities at healthcare centers, and the emigration of healthcare workers have led to a decline in operational capacity."[19] Venezuela is currently experiencing an outbreak of yellow fever, and other vaccine-preventable diseases such as measles and polio are at risk of re-emerging.[20] Three quarters of households experience irregular water service provision, while 8.4% do not have access, factors which exacerbate health and nutrition problems.[21]

Human Rights Watch reports that "As of October 28 [2021], Venezuela has confirmed 403,318 cases of COVID–19 and 4,848 deaths. Given limited availability of reliable testing, lack of government transparency, and persecution of medical professionals and journalists who report on the pandemic, the actual numbers are probably much higher."[22] Reports further indicate that "Venezuela's COVID–19 vaccination has been marred by corruption allegations and opacity regarding the acquisition and distribution of vaccines and other medical supplies."[23] Human Rights Watch reports that ". . . only 21.6 percent of Venezuelans were fully vaccinated as of that date [October 27, 2021], according to the Pan American Health Organization, and 25 to 28 percent of health professionals were still waiting for their second vaccine shot in August."[24]

The political and economic crises also impact respect for human rights in Venezuela. In a February 2022 report, Amnesty International noted that "[c]rimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity."[25] Amnesty International further reported that "trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents" of Nicolás Maduro.[26] While the "people belonging to this group are all different," Amnesty International noted that it is nevertheless "possible to identify particular groups that have been especially targeted by the policy of repression, namely students, political activists, and human rights defenders."[27]

It is estimated that "more than 6 million refugees and migrants have left Venezuela as a result of the political turmoil, socio-economic instability, and the ongoing humanitarian crisis."[28] The New Humanitarian reports that "The vast majority of the 6 million Venezuelans who have escaped poverty, insecurity, and economic collapse . . . have tried to start new lives in South America. But two years after COVID–19 led governments to close borders and enforce quarantines, many are discovering that the region is becoming a less welcoming place."[29]

In summary, Venezuela continues to be in a humanitarian emergency. Venezuela continues to face economic contraction, poverty, high levels of unemployment, reduced access to and shortages of food and medicine, a severely weakened medical system, a collapse in basic services, political polarization, institutional and political tensions, human rights abuses and repression, crime and violence, corruption, and increased human mobility and displacement. The continuing extraordinary and temporary conditions supporting Venezuela's TPS designation remain.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions supporting Venezuela's designation for TPS continue to be met. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• There continue to be extraordinary and temporary conditions in Venezuela that prevent Venezuelan nationals (or individuals having no nationality who last habitually resided in Venezuela) from returning to Venezuela in safety, and it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Venezuela for TPS should be extended for an 18-month period, from September 10, 2022, through March 10, 2024. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

[15] Vivian Sequera, Venezuela COVID patients, exhausted doctors get mental health help from medical charity, Reuters, Feb. 2, 2022, *https://web.archive.org/web/20220217023626/https://www.reuters.com/world/asia-pacific/venezuela-covid-patients-exhausted-doctors-get-mental-health-help-medical-2022-02-02/* (last visited Aug. 18, 2022).

[16] Venezuelans rely on the kindness of strangers to pay for COVID–19 treatment, Reuters, Oct. 4, 2021, *https://web.archive.org/web/20211004193653/https://www.reuters.com/world/americas/venezuelans-rely-kindness-strangers-pay-covid-19-treatment-2021-10-04/* (last visited Aug. 18, 2022).

[17] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, CRS, p.11, Apr. 28, 2021, *https://sgp.fas.org/crs/row/R44841.pdf*; World Report 2022—Venezuela, Human Rights Watch, Jan. 2022, *https://www.hrw.org/world-report/2022/country-chapters/venezuela* (last visited Aug. 18, 2022).

[18] Human Rights Watch, World Report 2021, Venezuela, *https://www.hrw.org/world-report/2021/country-chapters/venezuela* (last visited Aug. 18, 2022).

[19] World Report 2022—Venezuela, Human Rights Watch, Jan. 2022, *https://www.hrw.org/world-report/2022/country-chapters/venezuela* (last visited Aug. 18, 2022).

[20] UNICEF, Humanitarian Action for Children 2022—Venezuela (Dec. 7, 2021), *https://reliefweb.int/report/venezuela-bolivarian-republic/humanitarian-action-children-2022-venezuela* (last visited Aug. 18, 2022).

[21] *Id.*

[22] Human Rights Watch, World Report 2022, Venezuela, *https://www.hrw.org/world-report/2022/country-chapters/venezuela* (last visited Aug. 18, 2022).

[23] *Id.*

[24] *Id.*

[25] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.11, Feb. 10, 2022, *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Aug. 18, 2022).

[26] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.52, Feb. 10, 2022, *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Aug. 18, 2022).

[27] *Id.*

[28] International Organization for Migration, UN Migration, Venezuelan Refugee and Migrant Crisis, *https://www.iom.int/venezuelan-refugee-and-migrant-crisis* (last visited Aug. 15, 2022).

[29] Paula Dupraz-Dobias, The New Humanitarian, Nowhere left to turn, part 2: In a region hit hard by COVID, the welcome for Venezuelan migrants wears thin, July 12, 2022, *https://www.thenewhumanitarian.org/analysis/2022/07/14/South-America-Venezuelan-migrants-COVID* (last visited Aug. 18, 2022).

**Notice of the Extension of the TPS Designation of Venezuela**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, that the statutory conditions supporting Venezuela's designation for TPS on the basis of extraordinary and temporary conditions continue to be met. *See* INA section INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am extending the existing designation of TPS for Venezuela for 18 months, from September 10, 2022, through March 10, 2024. *See* INA section 244(b)(1)(C) and (b)(2); 8 U.S.C. 1254a(b)(1)(C), and (b)(2).

**Alejandro N. Mayorkas**
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

**Required Application Forms and Application Fees To Re-Register for TPS**

To re-register for TPS based on the designation of Venezuela, you must submit an Application for Temporary Protected Status (Form I–821). There is no Form I–821 fee for re-registration. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the "Biometric Services Fee" section of this notice.

Through this **Federal Register** notice, your existing EAD issued under the TPS designation of Venezuela with the expiration date of September 9, 2022, is automatically extended through September 9, 2023. Although not required to do so, if you want to obtain a new EAD valid through March 10, 2024, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver, which you may

submit on Form I–912, Request for Fee Waiver). If you do not want a new EAD, you do not have to file Form I–765 and pay the Form I–765 fee. If you do not want to request a new EAD now, you may file Form I–765 at a later date and pay the fee (or request a fee waiver) at that time, provided that you still have TPS or a pending TPS application.

If you have a Form I–821 and/or Form I–765 that was still pending as of September 8, 2022, then you do not need to file either application again. If USCIS approves your pending TPS application, USCIS will grant you TPS through March 10, 2024. Similarly, if USCIS approves your pending TPS-related Form I–765, it will be valid through the same date.

You may file the application for a new EAD either prior to or after your current EAD has expired. However, you are strongly encouraged to file your application for a new EAD as early as possible to avoid gaps in the validity of your employment authorization documentation.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Refiling a TPS Re-Registration Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue your EAD promptly. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to refile by the re-registration deadline, you may still refile your Form I–821 with the biometrics fee. USCIS will review this situation to determine whether you established good cause for late TPS re-registration. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA section

244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *www.uscis.gov/tps.* Following denial of your fee waiver request, you may also refile your Form I–765 with fee either with your Form I–821 or at a later time, if you choose.

*Note:* A re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee), or request a fee waiver, when filing a TPS re-registration application. However, if you decide to wait to request an EAD, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration. You may wait to seek an EAD until after USCIS has approved your TPS re-registration application or at any later date you decide you want to request an EAD. To re-register for TPS, you only need to file the Form I–821 with the biometrics services fee, if applicable, (or request a fee waiver).

**Filing Information**

USCIS offers the option to re-registrants for TPS under the extension of Venezuela's designation to file Form I–821 and related requests for EADs online or by mail. When filing a TPS application, applicants can also request an EAD by submitting a completed Form I–765, Request for Employment Authorization, with their Form I–821.

*Online filing:* Form I–821 and I–765 are available for concurrent filing online.[30] To file these forms online, you must first create a USCIS online account.[31]

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

**Table 1—Mailing Addresses**

Mail your completed Form I–821, Application for Temporary Protected Status; Form I–765, Application for Employment Authorization; Form I–912, Request for Fee Waiver (if applicable); and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You are a beneficiary re-registering under the TPS designation for Venezuela and you live in Florida. | *U.S. Postal Service (USPS):* USCIS, Attn: TPS Venezuela, P.O. Box 20300, Phoenix, AZ 85036–0300.<br>*FedEx, UPS, and DHL deliveries:* USCIS, Attn: TPS Venezuela (Box 20300), 1820 E Skyharbor Circle S, Suite 100, Phoenix, AZ 85034–4850. |
| You are a beneficiary re-registering under the TPS designation for Venezuela and you live in any other state. | *U.S. Postal Service (USPS):* USCIS, Attn: TPS Venezuela, P.O. Box 805282, Chicago, IL 60680–5285.<br>*FedEx, UPS, and DHL deliveries:* USCIS, Attn: TPS Venezuela (Box 805282), 131 South Dearborn—3rd Floor, Chicago, IL 60603–5517. |

---

[30] Find information about online filing at "Forms Available to File Online," *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[31] *https://myaccount.uscis.gov/users/sign_up.*

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (that is, registering) for TPS on the USCIS website at *uscis.gov/tps* under ''Venezuela.''

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *www.uscis.gov/i-131.* You may file Form I–131 together with your Form I–821 or separately. When filing the Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for the Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

### TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
| --- | --- |
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status. | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS): You must include a copy of the receipt notice (Form I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL: You must include a copy of the receipt notice (Form I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *www.uscis.gov/tps.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometrics screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *www.dhs.gov/privacy.*

**General Employment-Related Information for TPS Applicants and Their Employers**

*How can I obtain information on the status of my TPS application and EAD request?*

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at uscis.gov, or visit the USCIS Contact Center at *uscis.gov/contactcenter.* If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

*Am I eligible to receive an automatic extension of my current EAD through September 9, 2023, using this* **Federal Register** *notice?*

Yes. Regardless of your country of birth, provided that you currently have a Venezuela TPS-based EAD that has the notation A–12 or C–19 under Category and a ''Card Expires'' date of September 9, 2022, this **Federal Register** notice automatically extends your EAD through September 9, 2023. Although this **Federal Register** notice automatically extends your EAD through September 9, 2023, you must re-register timely for TPS in accordance with the procedures described in this **Federal Register** notice to maintain your TPS and employment authorization.

*When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?*

You can find the Lists of Acceptable Documents on the Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *uscis.gov/i-9-central/acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *uscis.gov/I-9Central.* An EAD is an acceptable document under List A. See the section ''How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?'' of this **Federal Register** notice for further information. If your EAD states A–12 or C–19 under Category and has a Card Expires date of September 9, 2022, it has been extended

automatically by virtue of this **Federal Register** notice and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through September 9, 2023, unless your TPS has been withdrawn or your request for TPS has been denied. Your country of birth notated on the EAD does not have to reflect the TPS designated country of Venezuela for you to be eligible for this extension.

*What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?*

Even though we have automatically extended your EAD, your employer is required by law to ask you about your continued employment authorization. Your employer may need to re-inspect your automatically extended EAD to check the "Card Expires" date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the "Card Expires" date and Category code, your employer should update the EAD expiration date in Section 2 of Form I–9. See the section "What updates should my current employer make to Form I–9 if my EAD has been automatically extended?" of this **Federal Register** notice for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through September 9, 2023, but you are not required to do so. The last day of the automatic EAD extension is September 9, 2023. Before you start work on September 10, 2023, your employer is required by law to reverify your employment authorization on Form I–9. By that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

*If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?*

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through March 10, 2024, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

*Can my employer require that I provide any other documentation such as evidence of my status or proof of my Venezuelan citizenship or a Form I–797C showing that I registered or re-registered for TPS for Form I–9 completion?*

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request proof of Venezuelan citizenship or proof of registration or re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document so long as the EAD reasonably appears to be genuine and to relate to you. Refer to the "Note to Employees" section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?*

When using an automatically extended EAD to complete Form I–9 for a new job before September 10, 2023:

1. For Section 1, you should:
a. Check "An alien authorized to work until" and enter September 9, 2023, as the "expiration date"; and
b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)

2. For Section 2, employers should:
a. Determine if the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a "Card Expires" date of September 9, 2022;
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Write September 9, 2023, as the expiration date.

Before the start of work on September 10, 2023, employers must reverify the employee's employment authorization on Form I–9.

*What updates should my current employer make to Form I–9 if my EAD has been automatically extended?*

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has now automatically extended your EAD, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. Your employer should determine if your EAD is automatically extended by ensuring that it contains Category A–12 or C–19 on the front of the card and has a "Card Expires" date of September 9, 2022. The employer may not rely on the country of birth listed on the card to determine whether you are eligible for this extension.

If your employer determines that USCIS has automatically extended your EAD, your employer should update Section 2 of your previously completed Form I–9 as follows:

1. Write EAD EXT and September 9, 2023, as the last day of the automatic extension in the Additional Information field; and

2. Initial and date the correction.

*Note:* This is not considered a reverification. Employers do not reverify the employee until either the one-year automatic extension has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By September 10, 2023, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization on Form I–9.

*If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?*

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify. Employers should enter September 9, 2023, as the expiration date for an EAD that has been extended under this **Federal Register** notice.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiring" alert for an automatically extended EAD?*

E-Verify automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related

EAD when they first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. Before this employee starts work on September 10, 2023, you must reverify their employment authorization on Form I–9. Employers may not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov*. USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation

beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *justice.gov/ierandtheUSCISandE-Verifywebsitesatuscis.gov/i-9-central* and e-verify.gov.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, TPS beneficiaries presenting an automatically extended EAD referenced in this **Federal Register** notice do not need to show any other document, such as an I–797C Notice of Action or this **Federal Register** notice, to prove that they qualify for this extension. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or may be used by DHS to determine if you

have TPS or another immigration status. Examples of such documents are:
• Your current EAD with a TPS category code of A12 or C19, even if your country of birth noted on the EAD does not reflect the TPS designated country of Venezuela;
• Your Form I–94, Arrival/Departure Record;
• Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or
• Form I–797, Notice of Action, reflecting approval or receipt of a past or current Form I–821.

Check with the government agency regarding which document(s) the agency will accept. Some benefit-granting agencies use the SAVE program to confirm the current immigration status of applicants for public benefits.

While SAVE can verify when an individual has TPS, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, or Form I–94, Arrival/Departure Record. If an agency accepts the type of TPS-related document you are presenting, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Present the agency with a copy of the relevant **Federal Register** notice showing the extension of your EAD in addition to your recent TPS-related document with your A-Number, or USCIS number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *save.uscis.gov/casecheck/*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-Number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE

response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save,* has detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2022–19527 Filed 9–7–22; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**[Docket No. FWS–HQ–IA–2022–0120; FXIA16710900000–223–FF09A30000]**

### Foreign Endangered Species; Receipt of Permit Applications

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of receipt of permit applications; request for comments.

**SUMMARY:** We, the U.S. Fish and Wildlife Service, invite the public to comment on applications to conduct certain activities with foreign species that are listed as endangered under the Endangered Species Act (ESA). With some exceptions, the ESA prohibits activities with listed species unless Federal authorization is issued that allows such activities. The ESA also requires that we invite public comment before issuing permits for any activity otherwise prohibited by the ESA with respect to any endangered species.

**DATES:** We must receive comments by October 11, 2022.

**ADDRESSES:**

*Obtaining Documents:* The applications, application supporting materials, and any comments and other materials that we receive will be available for public inspection at *https://www.regulations.gov* in Docket No. FWS–HQ–IA–2022–0120.

*Submitting Comments:* When submitting comments, please specify the name of the applicant and the permit number at the beginning of your comment. You may submit comments by one of the following methods:

• *Internet: https:// www.regulations.gov.* Search for and submit comments on Docket No. FWS–HQ–IA–2022–0120.

• *U.S. mail:* Public Comments Processing, Attn: Docket No. FWS–HQ–IA–2022–0120; U.S. Fish and Wildlife Service Headquarters, MS: PRB/3W;

5275 Leesburg Pike; Falls Church, VA 22041–3803.

For more information, see Public Comment Procedures under **SUPPLEMENTARY INFORMATION.**

**FOR FURTHER INFORMATION CONTACT:** Brenda Tapia, by phone at 703–358–2185 or via email at *DMAFR@fws.gov.* Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

### I. Public Comment Procedures

*A. How do I comment on submitted applications?*

We invite the public and local, State, Tribal, and Federal agencies to comment on these applications. Before issuing any of the requested permits, we will take into consideration any information that we receive during the public comment period.

You may submit your comments and materials by one of the methods in **ADDRESSES.** We will not consider comments sent by email, or to an address not in **ADDRESSES.** We will not consider or include in our administrative record comments we receive after the close of the comment period (see **DATES**).

When submitting comments, please specify the name of the applicant and the permit number at the beginning of your comment. Provide sufficient information to allow us to authenticate any scientific or commercial data you include. The comments and recommendations that will be most useful and likely to influence agency decisions are: (1) Those supported by quantitative information or studies; and (2) those that include citations to, and analyses of, the applicable laws and regulations.

*B. May I review comments submitted by others?*

You may view and comment on others' public comments at *https:// www.regulations.gov,* unless our allowing so would violate the Privacy Act (5 U.S.C. 552a) or Freedom of Information Act (5 U.S.C. 552).

*C. Who will see my comments?*

If you submit a comment at *https:// www.regulations.gov,* your entire comment, including any personal identifying information, will be posted

on the website. If you submit a hardcopy comment that includes personal identifying information, such as your address, phone number, or email address, you may request at the top of your document that we withhold this information from public review. However, we cannot guarantee that we will be able to do so. Moreover, all submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be made available for public disclosure in their entirety.

### II. Background

To help us carry out our conservation responsibilities for affected species, and in consideration of section 10(c) of the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 *et seq.*), we invite public comments on permit applications before final action is taken. With some exceptions, the ESA prohibits certain activities with listed species unless Federal authorization is issued that allows such activities. Permits issued under section 10(a)(1)(A) of the ESA allow otherwise prohibited activities for scientific purposes or to enhance the propagation or survival of the affected species. Service regulations regarding prohibited activities with endangered species, captive-bred wildlife registrations, and permits for any activity otherwise prohibited by the ESA with respect to any endangered species are available in title 50 of the Code of Federal Regulations in part 17.

### III. Permit Applications

We invite comments on the following applications.

*Applicant: Florida State University Robert K. Godfrey Herbarium, Tallahassee, FL; Permit No. PER0050556*

The applicant requests the renewal of their permit to export and re-import herbarium specimens of endangered and threatened species (excluding animals) previously legally accessioned into the permittee's collection for scientific research. This notification covers activities to be conducted by the applicant over a 5-year period.

*Applicant: Duke University, Durham, NC; Permit No. PER0050971*

The applicant requests authorization to export and reimport nonliving museum specimens of endangered animal species previously accessioned into the applicant's collection for scientific research. This notification

**SUPPLEMENTARY INFORMATION:** The United States is signatory to the International Maritime Organization's International Regulations for Preventing Collisions at Sea, 1972 (72 COLREGS), as amended. The special construction or purpose of some vessels makes them unable to comply with the light, shape, or sound signal provisions of the 72 COLREGS. Under statutory law, however, specified 72 COLREGS provisions are not applicable to a vessel of special construction or purpose if the Coast Guard determines that the vessel cannot comply fully with those requirements without interfering with the special function of the vessel.[1]

The owner, builder, operator, or agent of a special construction or purpose vessel may apply to the Coast Guard District Office in which the vessel is being built or operated for a determination that compliance with alternative requirements is justified,[2] and the Chief of the Prevention Division would then issue the applicant a certificate of alternative compliance (COAC) if he or she determines that the vessel cannot comply fully with 72 COLREGS light, shape, and sound signal provisions without interference with the vessel's special function.[3] If the Coast Guard issues a COAC, it must publish notice of this action in the **Federal Register**.[4]

The Chief of Prevention Division, Eighth District, U.S. Coast Guard, certifies that the HAYDEN GRACE, O.N. 1326783 is a vessel of special construction or purpose, and that, with respect to the position of the mast lights, stern light, and sidelights, it is not possible to comply fully with the requirements of the provisions enumerated in the 72 COLREGS, without interfering with the normal operation, construction, or design of the vessel. The Chief of Prevention Division, Eighth District, U.S. Coast Guard, further finds and certifies that the mast lights, stern light, and sidelights are in the closest possible compliance with the applicable provisions of the 72 COLREGS.[5]

This notice is issued under authority of 33 U.S.C. 1605(c) and 33 CFR 81.18.

Dated: October 13, 2022.

**A.H. Moore, Jr.,**

*Captain, U.S. Coast Guard, Chief, Prevention Division, Eighth Coast Guard District.*

[FR Doc. 2022–22712 Filed 10–18–22; 8:45 am]

**BILLING CODE 9110–04–P**

---

[1] 33 U.S.C. 1605.
[2] 33 CFR 81.5.
[3] 33 CFR 81.9.
[4] 33 U.S.C. 1605(c) and 33 CFR 81.18.
[5] 33 U.S.C. 1605(a); 33 CFR 81.9.

---

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Venezuelans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to immediately address the increasing number of encounters of Venezuelan nationals along the southwest border (SWB), as the Administration continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Venezuelans who do not avail themselves of this process, and instead enter the United States without authorization between POEs, will be subject to expulsion or removal. As part of this effort, the Department of Homeland Security (DHS) will implement a process— modeled on the successful *Uniting for Ukraine* (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide housing and other supports as needed; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of entry (POE), rather than entering at a land POE. Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication.

**DATES:** DHS will begin accepting online applications for this process on October 18, 2022.

**FOR FURTHER INFORMATION CONTACT:** Ihsan Gunduz, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445, (202) 282–9708.

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuela Parole Process

This notice describes the implementation of a new parole process for certain Venezuelan nationals announced by the Secretary of Homeland Security on October 12, 2022,[1] including the eligibility criteria

---

[1] DHS Announces New Migration Enforcement Process for Venezuelans, October 12, 2022, available at: *https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.*

---

and filing process. The parole process is intended to enhance border security by reducing the record levels of Venezuelan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The Secretary's announcement followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated October 12, 2022.[2] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

#### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration. The strategy—a shared endeavor with partner countries—focuses on addressing the root causes of migration, which currently are fueling unprecedented levels of irregular migration, and creating safe and orderly processes for migration throughout the region. This strategy will reduce regional irregular migration in the mid- to long-term, but we anticipate continued substantial pressures along the southwest border over the coming months.

In light of this reality, DHS is implementing an immediate effort to address the increasing number of encounters of Venezuelan nationals at the SWB as we continue to implement the broader and long-term strategy. We anticipate that this new effort would reduce the record levels of Venezuelan nationals seeking to irregularly enter the United States between POEs along the SWB, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

With the cooperation of the Government of Mexico (GOM), and potentially other governments, this effort is intended to serve as a deterrent to irregular migration by providing a meaningful alternative to irregular migration and by imposing immediate consequences on Venezuelan nationals who choose to not avail themselves of the new process and instead seek to irregularly enter the United States

---

[2] *See* Memorandum for the Secretary from U.S. Customs and Border Protection Commissioner and U.S. Citizenship and Immigration Services Director, Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022).

**63508** **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices

between POEs. It will also provide an incentive for Venezuelans to avoid the often dangerous journey to the border altogether, by putting in place a safe and orderly process for Venezuelan nationals to travel to the United States to seek a discretionary, case-by-case grant of parole into the United States, based on significant public benefit and urgent humanitarian reasons.[3] Venezuelan nationals who irregularly enter the United States between POEs after October 19, 2022 are subject to expulsion or removal from the United States; those who enter irregularly into the United States, Mexico, or Panama will also be found ineligible for a discretionary grant of parole under this process. Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.

Implementation of the parole process is conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. As such, this new process will couple a meaningful incentive to seek a lawful, safe and orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly.

The new policy is modeled on *Uniting for Ukraine* (U4U), the successful parole process that was put in place in the wake of Russia's unprovoked invasion of Ukraine, when thousands of Ukrainian migrants spontaneously arrived at SWB POEs. Once U4U was implemented, such spontaneous arrivals fell sharply, and travel shifted to a safe and orderly process. This new process is procedurally similar to U4U, in which certain Ukrainians with U.S.-based supporters who meet specified eligibility criteria have been able to travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years. As in U4U, applications using this parole process will be initiated by a supporter in the United States who would apply on behalf of a Venezuelan individual and commit to providing the beneficiary housing and other financial support, as needed, for the duration of their parole.

In addition to the supporter requirement, Venezuelan nationals are required to meet several eligibility criteria, as outlined in more detail later in this notice, to receive advance authorization to travel to the United States and be considered for parole, on

a case-by-case basis. Importantly, individuals are ineligible if they have been ordered removed from the United States within the prior five years; they are also ineligible if they have crossed into the United States between POEs, or entered Mexico or Panama without authorization, after October 19, 2022. Only those who pass national security and public safety vetting and agree to fly to an interior POE, as opposed to entering between POEs, and who meet all specified criteria below will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process.

Any discretionary grants of parole will be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged and long-term strategy and engage with our foreign partners throughout the region. These efforts are intended to support conditions that would decrease irregular migration, work to improve refugee processing and other lawful immigration pathways in the region, and allow for increased removals of those who continue to migrate irregularly and lack a valid claim of asylum or other lawful basis to remain in the United States. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the U.S. economy as they do so. Those who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Venezuelan nationals pursuant to this process will provide a significant public benefit for the United States, while also addressing the urgent humanitarian reasons that Venezuelan nationals are fleeing, to include repression and unsafe conditions in their home country. Most significantly, we anticipate that parole will: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important

foreign policy goals to manage migration collaboratively in the hemisphere. The process is capped at 24,000 beneficiaries. After this cap is reached, DHS will not approve additional beneficiaries, absent a Secretary-level decision, at the Secretary's sole discretion, to continue the process.

### B. Conditions at the Border

#### 1. Trends and Flows: Increase of Venezuelan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year. By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[4] These gains were subsequently reversed, however, as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic— continued to increase at a similar pace in 2021 and 2022.

Shifts in demographics have also had a significant effect on irregular migration. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons. Beginning in the 2010s, a growing share of migrants have been from Northern Central America [5] (NCA) and, since the late 2010s, from countries throughout the Americas. Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence and political oppression and for other non-economic reasons.[6]

The most recent rise in the numbers of encounters at the border has been driven in significant part by a surge in

---

[3] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[4] Office of Immigration Statistics (OIS) analysis of historic CBP data.

[5] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[6] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of Title 42 expulsions in 2020. As the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 62 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

**Federal Register**/Vol. 87, No. 201/Wednesday, October 19, 2022/Notices **63509**

migration of Venezuelan nationals. Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328. More than 25% of Venezuela's population has left the country. The United States is seeing a rising rate of Venezuelans encountered at our border over the past two years, which has surged in the last few months. Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022,[7] rising further to over 25,000 in August and 33,000 in September, compared to a monthly average of 127 unique encounters from FY 2014–2019.[8] Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased by 45 percent. Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating. Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three NCA countries combined.[9]

## 2. Push and Pull Factors

DHS assesses that the high—and rising—number of Venezuelan encounters has three key causes: First, the deteriorating conditions in Venezuela, including repression, instability, and violence, are pushing large numbers to leave their home country. Second, the lack of safe and orderly migration alternatives throughout the entire region, including to the United States, means that those seeking refuge outside of Venezuela have few lawful options. Third, the United States faces significant limits on the ability to return Venezuelan nationals to Venezuela or elsewhere, as

described below; absent such a return ability, more individuals are willing to take a chance that they can come—and stay.

### a. Factors Pushing Migration From Venezuela

A complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country.[10] Maduro has arbitrarily banned key opposition figures from participating in the political process, detained hundreds of political prisoners, employed judicial processes to circumscribe political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.[11] In a February 2022 report, Amnesty International reported that ''[c]rimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity.'' [12] Amnesty International further reported that ''trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents'' of Nicolás Maduro.[13]

According to the United Nations High Commissioner for Refugees, Venezuela has become the second-largest external displacement crisis in the world, following Syria.[14] At least in the short term, the crisis is expected to continue, thus continuing to push Venezuelans to seek alternatives elsewhere. As described above, Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its

territory from Colombia via the Darién jungle each day.

### b. Return Limitations

At this time, there are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs. DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.[15] But Venezuela does not presently allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed. To date, other countries, including Mexico, have generally been reluctant to accept Venezuelans as well. As a result, DHS was only able to repatriate a small number of Venezuelan nationals to Venezuela in FY 2022.

### c. Overall Effect

DHS assesses that the combination of the country conditions in Venezuela, the lack of safe and orderly lawful pathways, and the present inability to expel or remove Venezuelan nationals engaged in irregular migration, has significantly led to the significant increase in irregular migration among Venezuelan nationals. Conversely, DHS assesses that the return of a significant portion of Venezuelans who enter irregularly at the border, coupled with an alternative process pursuant to which Venezuelans could enter the United States lawfully, would meaningfully change the incentives for those intending to migrate—leading to a decline in the numbers of Venezuelans seeking to irregularly cross the SWB.

This prediction is based on prior experience: CBP saw rapidly increasing numbers of encounters of Guatemalan and Honduran nationals from January 2021 until August 2021, when these countries began accepting the direct return of their nationals. In January 2021, CBP encountered an average of 424 Guatemalan nationals and 362 Honduran nationals a day. By August 4, 2021, the 30-day average daily encounter rates had climbed to 1,249 Guatemalan nationals and 1,502 Honduran nationals—an average of 195 percent and 315 percent, respectively. In the 60 days immediately following the resumption of routine flights, average daily encounters fell by 37

---

[7] FY 2022 CBP data cited in this notice is based on internal reporting to date. CBP releases official data in regular intervals; final FY 2022 figures may differ to some degree from the figures cited here.

[8] OIS analysis of OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of U.S. Customs and Border Protection (CBP) data from Unified Immigration Portal (UIP) as of October 6, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this notice unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

[9] OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of CBP UIP data as of October 6, 2022.

[10] UNHCR, Venezuela Situation, available at: *https://www.unhcr.org/en-us/venezuela-emergency.html* (last visited Sept. 24, 2022).

[11] 2021 Country Reports of Human Rights Practices: Venezuela, U.S. Department of State, Apr. 12, 2022, available at: *https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/* (last visited Sept. 24, 2022).

[12] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p. 11, Feb. 10, 2022, available at: *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Sept. 25, 2022).

[13] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.52, Feb. 10, 2022, available at: *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Sept. 25, 2022).

[14] UNHCR, Venezuela Situation, available at: *https://www.unhcr.org/en-us/venezuela-emergency.html* (last visited Sept. 24, 2022).

[15] *Louisiana* v. *CDC*,—F. Supp. 3d—, 2022 WL 1604901 (W.D. La. May 20, 2022).

percent for Guatemala and 42 percent for Honduras, as shown in Figure 1 below.[16]

Figure 1: Daily Encounters of Guatemalan and Honduran Nationals, May 1–November 1, 2021.



**NOTE:** Figure depicts 30-day average of daily encounters.

Source: OIS analysis of OIS Persist Dataset.

Returns alone, however, are not sufficient. While the numbers of encounters of Guatemalan and Honduran nationals have fallen, CBP is currently encountering a total of around 1,000 nationals from these two countries each day. The process thus seeks to *combine* a consequence for Venezuelan nationals who seek to enter the United States irregularly at the land border with an incentive to use the lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.

This effort is informed by the way that similar incentives and disincentives worked in the U4U process. In the two weeks prior to U4U's implementation, DHS encountered a daily average of 940 nationals of Ukraine at the U.S.-Mexico land border seeking to enter the United States. After the new parole process launched and approved Ukrainians could fly directly into the United States—whereas those who sought to enter irregularly were subject to expulsion pursuant to the Title 42 public health Order—daily encounters dropped to fewer than twelve per day.[17]

Mexican officials also reported seeing a similar decline in the number of inbound Ukrainian air passengers.

### 3. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in significant part by the number of Venezuelan nationals encountered—DHS has taken a series of extraordinary steps. Largely since FY 2021, DHS has built and now operates 10 soft-sided processing facilities, which cost $688 million in FY 2022. It has detailed 3,770 officers and agents from CBP and ICE to the SWB. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from elsewhere in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP—H) to assist with the reception and onward travel of irregular migrants arriving at the SWB.

This spending is in addition to $1.4 billion in FY 2022 one-year surge funding for SWB enforcement and processing capacities.[18]

The impact has been particularly acute in certain border sectors. The increased flows of Venezuelan nationals are disproportionately occurring within the remote Del Rio, El Paso, and Yuma sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 93 percent of unique encounters of Venezuelan nationals occurred in these three sectors, with the trend rising to 98 percent in September 2022.[19] In FY 2022, the Del Rio, El Paso, and Yuma sectors encountered almost double the number of migrants as compared to FY 2021 (an 87 percent increase), and a ten-fold increase over the average for FY 2014–FY 2019, primarily as a result of increases in Venezuelans and other non-traditional sending countries.[20]

The focused increase in encounters in those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—until the past two years—they have never been a focal point for large numbers of individuals entering irregularly, they have limited infrastructure and personnel in place to safely process the elevated encounters

---

[16] OIS analysis of OIS Persist Dataset based on data through August 31, 2022.

[17] OIS Persist Dataset based on data through August 31, 2022.

[18] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[19] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data for September 1–30, 2022.

[20] OIS analysis of OIS Persist Dataset through August 31, 2022.

VZ Vacatur_0126

that they are seeing. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border, but is far away from other CBP sectors, which makes it challenging to move individuals elsewhere for processing during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors with capacity to process. In just one week (between September 22–September 28), El Paso and Yuma sectors operated a combined 79 decompression buses staffed by Border Patrol agents to neighboring sectors.[21] In that same week, El Paso and Yuma sectors also operated 29 combined lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[22]

Because these assets are finite, using DHS air resources to operate lateral flights impacts DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. This is concerning given the correlation between DHS's ability to operate return flights to non-contiguous home countries and encounters at the border, as described above. DHS assesses that a reduction in the flow of Venezuelans arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens into the United States temporarily, under such reasonable conditions that the Secretary may prescribe, on a case-by-case basis for "urgent humanitarian reasons or significant public benefit." [23] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[24] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[25] Individuals may be granted advance authorization to travel to the United

States to seek parole.[26] DHS may terminate parole in its discretion at any time.[27] Individuals who are paroled into the United States generally may apply for employment authorization.[28]

This effort will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Venezuelan nationals to remain where they are and use a lawful process to request authorization to travel by air to and ultimately enter the United States for the purpose of seeking a discretionary grant of parole for up to two years.

## III. Justification for the Process

### A. Significant Public Benefit

The case-by-case parole of Venezuelan nationals pursuant to this process—which combines consequences for those who seek to enter the United States irregularly between POEs with an opportunity for eligible Venezuelan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—will serve a significant public benefit for multiple, intersecting reasons. Specifically, as noted above, we assess that the parole of eligible individuals pursuant to this process will result in the following: (i) enhancing the security of our border by reducing irregular migration of Venezuelan nationals; (ii) enhancing border security and national security by vetting individuals before they arrive at our border; (iii) reducing the strain on DHS personnel and resources; (iv) minimizing the domestic impact of Venezuelan irregular migration; (v) disincentivizing a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfilling important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

### 1. Enhancing the Security of Our Border by Reducing Irregular Migration of Venezuelan Nationals

Implementation of the parole process is contingent on the GOM agreeing to accept the return of Venezuelan nationals encountered irregularly entering the United States without authorization between POEs. While DHS remains under the court order to implement the CDC's Title 42 public

health Order, these returns will take the form of expulsions. Once Title 42 is no longer in place, DHS will engage the GOM to effectuate Title 8 removals of individuals subject to expedited removal who cannot be returned to Venezuela or elsewhere. The ability to effectuate returns to Mexico will impose a consequence on irregular entry that currently does not exist.

As described above, Venezuelan nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. We assess that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly parole process, the numbers will continue to grow. By pairing a consequence on those seeking to irregularly cross between the POEs with the incentive provided by the opportunity to apply for advance authorization to travel to the United States to seek a discretionary grant of parole, this process will create a combination of incentives and disincentives that will lead to a substantial decline in irregular migration by Venezuelans to the SWB.

As also described above, this expectation is informed, in part, by past experience with respect to the ways that flows of irregular migration decreased from NCA countries once nationals from those countries were returned to their home countries and shifts that took place once the U4U process was initiated. These experiences provide compelling evidence of the importance of coupling effective disincentives for irregular entry with incentives for lawful entry as a way of addressing migratory surges.

### 2. Enhance Border Security and National Security by Vetting Individuals Before They Arrive at Our Border

The Venezuelan parole process described above will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States. It is important to note that all noncitizens DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing, and that individuals who are determined to pose a national security or public safety threat are detained pending removal. Venezuelan nationals seeking parole via this process will still be subject to this vetting upon their arrival at the POE. That said, there are distinct advantages to being able to conduct some vetting actions *before* an individual arrives at the border to prevent individuals who

---

[21] Data from SBCC, as of September 29, 2022.

[22] Data from SBCC, as of September 29, 2022.

[23] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[24] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[25] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[26] *See* 8 CFR 212.5(f).

[27] *See* 8 CFR 212.5(e).

[28] *See* 8 CFR 274a.12(c)(11).

could pose threats to national security or public safety from even traveling to the United States.

As described above, the vetting will require prospective beneficiaries to upload a live photograph via a mobile application. This will substantially enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them an advance authorization to travel before they arrive at our border.

### 3. Reduce the Burden on DHS Personnel and Resources

As discussed above, the impact of the increased migratory flows has strained the DHS workforce in ways that have been particularly concentrated in certain sectors along the SWB. By reducing encounters of Venezuelan nationals at the SWB, and channeling decreased flows of Venezuelan nationals to interior POEs through this streamlined process, we anticipate the process will relieve some of this burden. This will free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights— enabling the removal of more noncitizens with final orders of removal faster and reducing the number of days in DHS custody. While the process will also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require minimal resources as compared to the status quo.

### 4. Minimize the Domestic Impact

The increase in irregular migration, including the change in demographics, has put a strain on domestic resources, which is felt most acutely by border communities. As the number of arrivals increases, thus necessitating more conditional releases, the strains are shared by others as well. Given the current inability to return or repatriate Venezuelans in substantial numbers, Venezuelan nationals account for a significant percentage of the individuals being conditionally released pending their removal proceedings or the initiation of such proceedings after being encountered and processed along the SWB.

State and local governments, along with NGOs, are providing services and assistance to the Venezuelans and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and

constructing tent shelters to address the increased need.[29] DHS also has worked with Congress to make approximately $290 million available since FY 2019 through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. This funding has allowed DHS to support building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Despite these efforts, local communities have reported strain on their ability to provide needed social services.[30] Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[31] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[32] The parole process will address these concerns by diverting flows of Venezuelan nationals to interior POEs through a safe and orderly process and ensuring that those who do arrive in the United States have support during their period of parole. The effort is intended to yield a decrease in the numbers arriving at the SWB.

Moreover, and critically, beneficiaries will be required to fly to the interior, rather than arriving at the SWB, absent extraordinary circumstances. They will only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also will be eligible to apply for work authorization, thus enabling them to support themselves. We anticipate that this process will help reduce the burden on

communities, state and local governments, and NGOs that currently support the reception and onward travel of migrants arriving at the SWB.

### 5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[33] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[34] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[35] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[36] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[37] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[38] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils of the journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. Migrants are increasingly traveling to the SWB from South America through the Darién Gap, an incredibly dangerous and grueling 100-kilometer stretch of dense jungle between Colombia and Panama. Women and children are particularly vulnerable. Children are particularly at risk for diarrhea, respiratory diseases, dehydration, and other ailments that

---

[29] Aya Elamroussi and Adrienne Winston, Washington, DC, approves creation of new agency to provide services for migrants arriving from other states, CNN, Sept. 21, 2022, available at: *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office (last visited Sept. 29, 2022).*

[30] Lauren Villagran, El Paso struggles to keep up with Venezuelan migrants: 5 key things to know. Sept. 14, 2022, available at: *https://www.elpasotimes.com/story/news/2022/09/14/venezuelan-migrants-el-paso-what-to-know-about-their-arrival/69493289007/* (last visited Sept. 29, 2022); Uriel J. Garcia. El Paso scrambles to move migrants off the streets and gives them free bus rides as shelters reach capacity. Sept. 20, 2022, available at: *https://www.texastribune.org/2022/09/20/migrants-el-paso-texas-shelter/* (last visited Sept. 29, 2022).

[31] Email from City of San Diego Office of Immigration Affairs to DHS, Sept. 23, 2022.

[32] Denelle Confair, Local migrant shelter reaching max capacity as it receives hundreds per day, KGUN9 Tucson, Sept. 23, 2022, available at: *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day* (last visited Sept. 29, 2022).

[33] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html* (last visited Sept. 30, 2022).

[34] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[35] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html* (last visited Sept. 30, 2022).

[36] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[37] Valerie Gonzalez, The Guardian, Migrants risk death crossing treacherous Rio Grande river for 'American dream,' Sept. 5, 2022, available at: *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream* (last visited Oct. 11, 2022).

[38] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

**Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices 63513

require immediate medical attention.[39] According to Panama migration authorities, of the over 31,000 migrants passing through the Darién Gap in August 2022, 23,600 were Venezuelan.[40]

These migration movements are in many cases facilitated by numerous human smuggling organizations that treat the migrants as pawns.[41] These organizations exploit migrants for profit, often bringing them through across inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December, and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[42]

This new process, which will incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights, cuts out the smuggling networks. DHS anticipates it will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit.

**6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere**

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy); the Collaborative Migration Management Strategy (CMMS); and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries. The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration. Countries that have endorsed the L.A. Declaration are committed to implementing programs and processes to stabilize communities that host migrants, or that have high outward migration. They commit to humanely enforcing existing laws regarding movements across international boundaries, especially when minors are involved, taking actions to stop migrant smuggling by targeting the criminals involved in these activities, and providing increased regular pathways and protections for migrants residing in or transiting through the 21 countries. The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[43]

This new process helps achieve these goals by providing an immediate and temporary safe and orderly process for Venezuelan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus enables the United States to lead by example.

The process also responds to an acute foreign policy need. The current surge of Venezuelan nationals transiting the Darién Gap is impacting every country between Colombia and the SWB. Colombia, Peru, and Ecuador are now hosting almost 4 million displaced Venezuelans among them. The Government of Panama has repeatedly signaled that it is overwhelmed with the number of migrants, a significant portion of whom are Venezuelan, emerging from harrowing journeys through the Darién Gap.

Reporting indicates that in the first six months of 2022, 85 percent more migrants, primarily Venezuelans, crossed from Colombia into Panama through the Darién Gap than during the same period in 2021—including approximately 40,000 Venezuelans in September alone.[44] Again, Darién Gap migrant encounters now average more than 3,000 each day, predominantly comprised of Venezuelan nationals.

Figure 2 shows that the number of Venezuelan nationals processed by Panama after entering irregularly from Colombia increased by almost 30-fold from the week of April 1, 2022 to the week of October 1, 2022.

Figure 2: Panamanian Encounters of Venezuelan Nationals in the Darién Gap, February–September 2022

---

[39] UNICEF, 2021 Records Highest Ever Number of Migrant Children Crossing the Darien Towards the U.S., Oct. 11, 2021, available at: *https://www.unicef.org/lac/en/press-releases/2021-records-highest-ever-number-migrant-children-crossing-darien-towards-us* (last visited Sept. 29, 2022).

[40] Panamá Migración, Irregulares en Tránsito Frontera Panamá—Colombia 2022, available at: *https://www.migracion.gob.pa/inicio/estadisticas*

[41] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[42] Jacob Garcia, Reuters, Migrant truck crashes in Mexico killing 54, available at: *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R* (last visited Sept. 29, 2022); Mica Rosenberg, Kristina Cooke, Daniel Trotta, The border's toll: Migrants increasingly die crossing into U.S. from Mexico, July 25, 2022, available at: *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X* (last visited Oct. 2, 2022).

[43] L.A. Declaration.

[44] The Department of State Cable, 22 Panama 624.

**63514**   **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices



**Note:** September figure is a preliminary estimate.

Source: Panama Migration Report, September 24, 2022.

Key allies throughout the region—including the Governments of Mexico, Costa Rica, and Panama, all of which are also affected by the increased movement of Venezuelan nationals—have been seeking greater action to address these challenging flows for some time. Meanwhile, the GOM has consistently expressed concerns with policies, programs, and trends that contribute to large populations of migrants, many of whom are Venezuelan, entering Mexico. These entries strain local governmental and civil society resources in Mexican border communities in both the south and north, and have at times led to violence, crime, and unsafe and unhealthy encampments.

The United States is already taking key steps to address some of these concerns. On June 10, 2022, the Department of State's Bureau of Population, Refugees, and Migration (PRM) and the U.S. Agency for International Development (USAID) announced $314 million in new funding for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere, including support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.[45] And on September 22, 2022,

PRM and USAID announced nearly $376 million in additional humanitarian assistance, which will provide essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed assistance for migrants, refugees, and host communities across the region. This funding will further address humanitarian needs in the region.[46]

This new process adds to these efforts and enables the United States to lead by example. It is a key mechanism to advance the larger domestic and foreign policy goals of this Administration to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It also lays the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, many of which are already taking important steps. Colombia, for example, is hosting more than 2.4 million displaced Venezuelans and has provided temporary protected status for more than 1.5 million of them. Costa Rica is developing plans to renew temporary protection for Venezuelans. And on June 1, 2022, the Government of Ecuador—which is hosting more than 500,000 Venezuelans—authorized a second regularization process that would provide certain Venezuelans a

two-year temporary residency visa.[47] Any effort to meaningfully address the crisis in Venezuela will require continued efforts by these and other regional partners.

Importantly, the United States will not implement the new parole process without the ability to return Venezuelan nationals to Mexico who enter irregularly. The United States' ability to execute this process thus requires the GOM to accept the return of Venezuelan nationals who bypass this new process and enter the United States irregularly between POEs.

For its part, the GOM has made clear that in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe and orderly processes for migrants who seek to enter the United States. As the GOM makes a unilateral decision whether to accept returns of third country nationals at the border and how best to manage migration within Mexico, it is closely watching the United States' approach to migration management and whether the United States is delivering on its plans in this space. Initiating and managing this process—which is dependent on the GOM's actions—will require careful, deliberate, and regular assessment of the GOM's responses to unilateral U.S. actions and ongoing, sensitive diplomatic engagements.

This process is responsive to the GOM's desire to see more lawful pathways to the United States and is aligned with broader Administration

[45] The United States Announces More Than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas, June 10, 2022, available at: *https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-stabilization-efforts-venezuela* (last visited Oct. 11, 2022).

[46] The United States Announces Nearly $376 Million in Additional Humanitarian Assistance for People Affected by the Ongoing Crisis in Venezuela and the Region, Sept. 22, 2022, available at: *https://www.usaid.gov/news-information/press-releases/sep-22-2022-the-us-announces-nearly-376-million-additional-humanitarian-assistance-for-people-affected-by-ongoing-crisis-in-venezuela* (last visited Sept. 30, 2022).

[47] Venezuela Regional Crisis—Complex Emergency, June 14, 2022, available at: *https://www.usaid.gov/sites/default/files/documents/2022-06-14_USG_Venezuela_Regional_Crisis_Response_Fact_Sheet_3.pdf* (last visited Sept. 29, 2022).

domestic and foreign policy priorities in the region. It will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly. The goal of this process is to reduce the irregular migration of Venezuelan nationals throughout the hemisphere while we, together with partners in the region, work to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro. This process provides a safe and orderly mechanism for Venezuelan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

*A. Supporters*

U.S.-based supporters will initiate an application on behalf of a Venezuelan national[48] by submitting a Form I–134, Declaration of Financial Support, to USCIS for each beneficiary. Supporters can be sole individuals, individuals filing on behalf of a group, or individuals representing an entity. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

*B. Beneficiaries*

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United

States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Venezuela or be a non-Venezuelan immediate family member[49] of and traveling with a Venezuelan principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134 on their behalf that USCIS has vetted and confirmed;

• possess a passport valid for international travel;

• provide for their own commercial travel to an air POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Venezuelan national is ineligible to be considered for parole under this process if that person is a permanent resident or dual national of any country other than Venezuela, or currently holds refugee status in any country.[50]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• failed to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar based on a prior removal order;[51]

• has crossed irregularly into the United States, between the POEs, after October 19, 2022;

• has irregularly crossed the Mexican or Panamanian borders after October 19, 2022; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[52]

---

[48] Certain non-Venezuelans may use this process if they are an immediate family member of a Venezuelan beneficiary and traveling with that Venezuelan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[49] See the preceding footnote.

[50] This limitation does not apply to immediate family members traveling with a Venezuelan national.

[51] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[52] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

*Travel requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *https://www.uscis.gov/venezuela.*

*C. Processing Steps*

Step 1: Financial Support

A U.S.-based supporter will submit a Form I–134, Declaration of Financial Support with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134 identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134 for each beneficiary they are seeking to support, including Venezuelans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the individual and any immediate family members whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS on how to create an account with myUSCIS and instructions on next steps for completing the application. The beneficiary will be required to confirm their biographic information in myUSCIS and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive

instructions through myUSCIS on how to access the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice to their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[53] Approval of advance authorization to travel does not guarantee parole into the United States at a U.S. POE. That parole is a discretionary determination made by CBP at the POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Upon their arrival at a POE, each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with the CBP inspectional process. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations. Individuals may request authorization to work from USCIS. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for work authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Sunset, Renewal, and Termination*

The process is capped at 24,000 beneficiaries. After this cap is reached, the program will sunset absent a decision by the Secretary to continue the process, based on the Secretary's sole discretion. The Secretary also retains the sole, unreviewable discretion to terminate the process at any point.

*E. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[54] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[55] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[56] In addition, although under the APA, invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing,[57] and DHS can make one here.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Venezuelan nationals to enter the United States. The United States will not implement the new parole process without the ability to return Venezuelan nationals who enter irregularly to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States irregularly between POEs. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now and result in definitely undesirable international consequences. It also would complicate broader discussions and negotiations about migration management. For now, Mexico has indicated it is prepared to make a unilateral decision to accept a substantial number of Venezuela returns. That willingness to accept the returns could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return nationals of Venezuela to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the request of Mexico and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining a strong bilateral relationship.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, in 2017 DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in

---

[53] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[54] 5 U.S.C. 553(b)(A).

[55] *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[56] 5 U.S.C. 553(a)(1).

[57] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

**Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices **63517**

policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[58]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM described above, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[59] It would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Venezuelan nationals currently being encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths. Undertaking such procedures would also be contrary to the public interest because an advance announcement of this process would seriously undermine a key goal of the policy by incentivizing even more irregular migration of Venezuelan nationals seeking to enter the United States before the process would take effect.

*F. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

First, OMB has approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. USCIS is making some changes to the online form in connection with the implementation of the process described above. These changes include: requiring two new data elements for U.S.-based supporters ("Sex" and "Social Security Number");

adding a third marker ("X") in addition to "M" and "F" in accordance with this Administration's stated gender equity goals; and adding Venezuela as an acceptable option for the beneficiary's country of origin. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

Second, OMB has approved an emergency request under 5 CFR 1320.13 for a new information collection from CBP entitled *Advance Travel Authorization.* OMB has approved the emergency request for a period of 6 months and will assign a control number to the collection. This new information collection will allow certain noncitizens from Venezuela, and their qualifying immediate family members, who lack United States entry documents to submit information through the newly developed CBP ATA capability within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek parole. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA. More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2022–22739 Filed 10–18–22; 8:45 am]
**BILLING CODE 9110–9M–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–7050–N–52]**

**30-Day Notice of Proposed Information Collection: Debt Resolution Program, OMB Control No.: 2502–0483**

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.
**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.

**DATES:** *Comments Due Date:* November 18, 2022.

**ADDRESSES:** Interested persons are invited to submit comments regarding

this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *OIRA_submission@ omb.eop.gov* or *www.reginfo.gov/public/ do/PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; email Colette Pollard at *Colette.Pollard@hud.gov* or telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech and communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https:// www.fcc.gov/consumers/guides/ telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on March 23, 2022 at 87 FR 1479.

**A. Overview of Information Collection**

*Title of Information Collection:* Debt Resolution Program.
*OMB Approval Number:* 2502–0483.
*OMB Expiration Date:* November 30, 2022.
*Type of Request:* Revision of a currently approved collection.
*Form Number:* HUD–56141, HUD–56142, HUD–56146.
*Description of the need for the information and proposed use:* HUD is required to collect debt owed to the agency. As part of the collection process, demand for repayment is made on the debtor(s).
*Respondents:* Individuals or Households, Business or other For-Profit.
*Estimated Number of Respondents:* 648.
*Estimated Number of Responses:* 2,159.
*Frequency of Response:* 1.
*Average Hours per Response:* 1.
*Total Estimated Burden:* 590 hours.

[58] *See* 82 FR 4902 (Jan. 17, 2017).
[59] 5 U.S.C. 553(b)(B).

One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov*.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00252 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

## DEPARTMENT OF HOMELAND SECURITY

## Implementation of Changes to the Parole Process for Venezuelans

**ACTION:** Notice

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to the Parole Process for Venezuelans that was initiated in October 2022. The Venezuela process provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at an interior port of entry, contingent on the Government of Mexico (GOM) making an independent decision to accept the return or removal of Venezuelan nationals who bypass this new process and enter the United States without authorization. Pursuant to this notice, the Secretary has removed the limit of 24,000 total travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). The Secretary also has updated the eligibility criteria for the Venezuela process by including an exception that will enable Venezuelans who cross without authorization into the United States at the Southwest Border (SWB) and are subsequently permitted a one-time option to voluntarily depart or voluntarily withdraw their application for admission to maintain eligibility to participate in this parole process. DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing the number of Venezuelan nationals crossing our border without authorization and the surge in migration throughout the hemisphere and channels migrants into

a safe and orderly process that enables them to enter the United States without making the dangerous journey to the SWB.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023. DHS will apply the changes to the process beginning on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuelan Parole Process

On October 19, 2022, DHS published a **Federal Register** Notice describing a new effort to address the high number of Venezuelans encountered at the SWB.[1] Since the announcement of that process, Venezuelans who have not availed themselves of the process, and instead entered the United States without authorization, have been expelled to Mexico pursuant to the Centers for Disease Control and Prevention (CDC) Title 42 public health Order or, if not expelled, processed for removal or the initiation of removal proceedings.

Once the Title 42 public health Order is lifted, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. The United States' continued operation of this process will continue to be contingent on the GOM's independent decision to accept the return of removal of individuals, including under Title 8 authorities.

### Eligibility To Participate in the Process

As described in the October 19 **Federal Register** Notice, the Department of Homeland Security (DHS) implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of

[1] 87 FR 63507 (Oct. 19, 2022).

entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals also are generally ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela, though per the conforming change described below, they will now remain eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. Only those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

### II. Assessment of Venezuela Parole Process to Date

The success of the Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration[3] throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November.[4] DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] In this notice, irregular migration refers to the movement of people into another country without authorization.

[4] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20PDF_ %20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

VZ Vacatur_0134