flying to interior POEs—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the GOM for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, which imposed a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process. With the vast majority of those encountered returned to Mexico, fewer releases have freed up DHS resources that would otherwise be used to process these individuals; this has also reduced the number of individuals state and local governments, as supported by civil society, have had to receive and assist.

The effects have been felt throughout the Western Hemisphere, not just in the United States. Thousands of Venezuelans who had already crossed the Darién have flown back to Venezuela on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[5] Other migrants who were about to enter the Darién have turned around and headed back south.[6] Still others who were intending to migrate north are staying where they are to apply for this lawful process, rather than make the dangerous journey to the SWB.[7]

DHS has seen strong interest in this parole process. As of December 27, 2022, DHS had authorized travel for more than 15,700 Venezuelan beneficiaries, already more than half of the available number of travel authorizations.[8] Of those authorized to travel to the United States, more than 10,600 have arrived and been paroled into the country.[9] More than 3,600 of those Venezuelans who have flown into the United States and were paroled through this process arrived from Colombia; another 2,300 came from Venezuela, 1,500 from Mexico, and

3,100 from other countries. Those figures show that the process is reaching both people in Venezuela and Colombia *before* they seek to irregularly migrate, and those who are displaced in transit countries, like Mexico.[10]

### III. Changes

Given the early success of the process, the Secretary has authorized two changes to the process to ensure its continued viability, particularly as DHS prepares for an eventual transition from Title 42 processing to full Title 8 processing at the border.[11]

*A. Removal of the 24,000 Limit on Travel Authorizations and Replacement With a 30,000 Monthly Limit Spread Across Separate and Independent Parole Processes*

The process announced in the October 19 **Federal Register** Notice was subject to a numerical limit. Demand for the Venezuela process has far exceeded the 24,000 limit set in the first **Federal Register** Notice. In just two months of operation, DHS received thousands of applications from supporters and has already approved well more than half of the available travel authorizations. Were DHS to reach the numerical limit, prospective migrants would no longer be eligible for this process, which serves as a meaningful alternative to irregular migration. DHS anticipates that we would then see increased irregular migration of Venezuelans.

Accordingly, the Secretary has removed the 24,000 numerical limit on travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations in the aggregate spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). This change gives DHS the flexibility to continue the process for Venezuelans, thereby providing more certainty to the public and supporting partners. It also preserves the flexibility to extend or terminate the process, as the circumstances warrant. DHS will continue to evaluate this monthly limit and make adjustments if needed over time.

*B. Updated Eligibility Criteria*

Following the GOM's independent decision to accept returns of Venezuelans, DHS began expelling Venezuelans who were encountered after entering the United States without authorization, pursuant to the Title 42 public health Order. Currently, a Venezuelan (or qualifying immediate family member) is ineligible to participate in the parole process if, among other things, they crossed irregularly into the United States after October 19, 2022—regardless of whether they were expelled, ordered removed, or departed voluntarily.[12]

After the Title 42 Order ceases to be in effect, DHS will resume Title 8 immigration processing of all individuals, including Venezuelans. Pursuant to Title 8, noncitizens who have entered the United States without authorization may be permitted to voluntarily depart pursuant to Immigration and Nationality Act (INA) 240B, 8 U.S.C. 1229c, may be permitted to voluntarily withdraw their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), or may be ordered removed, regardless of whether Title 42 remains in effect.

Individuals continue to be generally ineligible for consideration for parole pursuant to this process if they have crossed into the United States without authorization between POEs along the SWB since October 20, 2022. There will now be the following exception: individuals who have crossed without authorization into the United States after December 20, 2022, and have been permitted a single instance of voluntary departure pursuant to INA 240B, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), will remain eligible to participate in the parole process. If such an individual crossed without authorization between POEs along the SWB from October 20, 2022 through December 20, 2022, they would remain ineligible and the exception would not apply. Permitting Venezuelan nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

---

[5] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/*, Nov. 9 2022 (last viewed Dec. 8, 2022).

[6] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html*, Oct. 14, 2022 (last viewed Dec. 8, 2022).

[7] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap*, Nov. 7 2022 (last viewed Dec. 8, 2022).

[8] Department of Homeland Security, Daily Venezuela Report, Dec. 27, 2022.

[9] *Id.*

[10] *Id.*

[11] The Secretary authorized the changes following considerations reflected in the Secretary's decision memorandum dated December 22, 2022. *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Updates to the Parole Process for Certain Venezuelan Nationals (Dec. 22, 2022).

[12] 87 FR 63507 (Oct. 19, 2022).

The Secretary has also approved a conforming change to provide that a Venezuelan national who is a permanent resident or dual national of any country or holds refugee status in any country other than Venezuela remains eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. All other eligibility requirements described in the October 19, 2022 Notice remain the same.

These changes are responsive to our multilateral commitments to address irregular migration throughout the Hemisphere. In this case, the United States is making two changes to this process that will support our commitment to creating additional lawful pathways. For its part, the GOM has made an independent decision to accept the return or removal, including under Title 8, of Venezuelan nationals who bypass this new process and enter the United States without authorization. The United States' continued operation of this process is contingent on the GOM's independent decision in this regard.

## C. Scope, Termination, and No Private Rights

The Secretary retains the sole discretion to terminate the Parole Process for Venezuelans at any point.The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**), and shall not exceed 30,000 each month. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## IV. Regulatory Requirements

### A. Administrative Procedure Act

The October 19 **Federal Register** Notice describing this process explained that this process is exempt from notice-and-comment rulemaking requirements because (1) the process is a general statement of policy,[13] (2) the process

pertains to a foreign affairs function of the United States,[14] and (3) even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[15] The changes described in this Notice are amenable to immediate issuance and implementation for the same reasons.

First, these changes relate to a general statement of policy,[16] i.e., a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [17] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

Second, even if these changes were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, these changes—like the implementation of the process itself—pertain to a foreign affairs function of the United States, as described in the October 19 notice, and are directly responsive to ongoing conversations with, and requests from, foreign partners.[18] Specifically, the GOM has urged the United States to consider lifting the 24,000 limit,[19] which would allow more Venezuelans to participate in and engage the process and further disincentivize irregular migration, enhancing the security of both of our borders. Delaying implementation of these changes to conduct notice-and-comment rulemaking would directly implicate the GOM's independent decision to accept returns, including under Title 8 processes, and produce undesirable international consequences. Absent these changes, DHS would soon reach the 24,000 cap and GOM would no longer accept the returns of Venezuelan nationals. Thus, without these changes,

DHS would no longer have the ability to return Venezuelan nationals to Mexico, and the Venezuela process would no longer be viable. That would then, in all likelihood, lead to another surge in migration of Venezuelan nationals throughout the hemisphere and to our border.

Finally, even if notice-and-comment and a delayed effective date were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[20] As noted above, absent immediate action, there is a risk that DHS meets the 24,000 cap, which would in turn cause the GOM to no longer accept the returns of Venezuelan nationals and end the success of the parole process to date at reducing the number of Venezuelan nationals encountered at the border.

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice involves three collections of information, as follows.

In connection with the process for Venezuelans, OMB has previously approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. OMB has recently approved a new collection, Form I–134A, Online Request for Consideration to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will now be used for the Venezuela parole process and is being revised in connection with this notice, including by increasing the burden estimate. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has also previously approved an emergency request under 5 CFR 1320.13 for a revision to an information

---

[13] 5 U.S.C. 553(b)(A); *see also id.* 553(d)(2).

[14] 5 U.S.C. 553(a)(1).

[15] 5 U.S.C. 553(b)(B).

[16] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[17] *Lincoln* v. *Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 302 n.31 (1979)).

[18] 5 U.S.C. 553(a)(1).

[19] *See* Dallas Morning News, *Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock' https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotiations-called-intense-round-the-clock/*, Dec. 13, 2022 (last viewed Dec. 14, 2022).

[20] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the changes described above, CBP is making further changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about these collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00253 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

**[Internal Agency Docket No. FEMA–4678–DR; Docket ID FEMA–2022–0001]**

**West Virginia; Major Disaster and Related Determinations**

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4678–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of July 12 to July 13, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

McDowell County for Public Assistance.
All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00177 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

**[Internal Agency Docket No. FEMA–4677–DR; Docket ID FEMA–2022–0001]**

**South Carolina; Major Disaster and Related Determinations**

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of South Carolina (FEMA–4677–DR), dated November 21, 2022, and related determinations.

**DATES:** The declaration was issued November 21, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 21, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"), as follows:

I have determined that the damage in certain areas of the State of South Carolina resulting from Hurricane Ian during the period of September 25 to October 4, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of South Carolina.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Individual Assistance and Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance, Hazard Mitigation, and Other Needs Assistance under section 408 will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The time period prescribed for the implementation of section 310(a), Priority to Certain Applications for Public Facility and Public Housing Assistance, 42 U.S.C. 5153, shall be for a period not to exceed six months after the date of this declaration.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Kevin A. Wallace, Sr., of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of South Carolina have been designated as adversely affected by this major disaster:



Venezuela      Tren de Aragua

# Tren de Aragua

by *InSight Crime*
12 Jul 2024



Tren de Aragua is Venezuela's **most powerful** homegrown criminal actor and the only Venezuelan gang that has successfully projected its power abroad. It has grown from a prison gang limited to the state of Aragua, to a transnational threat with a wide criminal portfolio.

This **transnational expansion** came on the backs of Venezuelan migrants fleeing the country. From Tocorón prison in Aragua, the gang oversaw and profited from cells established in at least three other South American countries. However, in September 2023, 11,000 Venezuelan police and military personnel, backed by armored vehicles, **stormed** Tocorón to seemingly take control of what had been Tren de Aragua's center of operations. Despite the blow of losing Tocorón, the gang's leadership **escaped**, and its transnational cells continue to operate.

Tren de Aragua's expansion to Colombia, Peru, and Chile has, in certain cases, upended local criminal landscape and significant attention from the authorities within these countries and across the

Manage consent

region. Concern among some lawmakers in the United States about the group's **potential expansion** there led the country's Treasury Department to **sanction** Tren de Aragua as a transnational criminal organization in July 2024. Additionally, the US State Department has offered $12 million in rewards for information leading to the arrests of three of its main leaders.

# History

Tren de Aragua was born in the Tocorón prison in the state of Aragua. The group's name, which roughly translates to the Aragua Train, may have originated from a labor union working on a railway project through the state which was never finished.

Héctor Rustherford Guerrero Flores, alias "**Niño Guerrero**," turned Tren de Aragua into what it is today during his imprisonment in Tocorón.

Under Niño Guerrero's leadership, Tocorón became one of the country's **most notorious** prisons, in large part due to the Venezuelan government's **unofficial policy** of handing control of some prisons, including Tocorón, over to crime bosses known as *pranes*. This freedom and the gang's criminal income allowed for the **construction** of a zoo, swimming pool, playground, restaurant, and nightclub within the prison.

With the gang's control firmly cemented within the prison, Tren de Aragua began expanding its influence. It **started** with the nearby San Vicente neighborhood, where it established strict social control and even **received** resources and support from the government via its charitable wing known as "Fundación Somos El Barrio JK."

Some criminal gangs already operating in Aragua established non-aggression pacts with the gang, among them **Tren del Llano**. However, after Tren del Llano's leader **was killed** in 2016, Tren de Aragua took over its territories in Aragua and part of Guárico state, according to police sources who spoke on condition of anonymity for fear of their safety.

In the years that followed, the gang expanded its network to other states in Venezuela through alliances with smaller gangs, eventually building a presence in at least five other states. During this process, it expanded its criminal portfolio in Venezuela to include extortion, kidnapping, human trafficking for sexual exploitation, migrant smuggling, **contraband**, illegal mining, retail drug trafficking, cybercrime, and theft.

Tren de Aragua's expansion **turned transnational** around 2018, when the gang attempted to **establish itself** on the Venezuela-Colombia border between the Venezuelan state of Táchira and the Colombian department of Norte de Santander. There, it clashed with major Colombian criminal groups, including the National Liberation Army (Ejército de Liberación Nacional – **ELN**) and the Gaitanistas (Autodefensas Gaitanistas de Colombia – **AGC**). The groups fought for control of clandestine border crossings, known as *trochas*, which are home to a variety of criminal economies, including the smuggling of drugs, contraband, and migrants.

Tren de Aragua carved out a niche for itself in the Colombian border town of La Parada, where many Venezuelan migrants fleeing their country first arrive in Colombia. At this point, the Venezuelan exodus was in full swing, and Tren de Aragua **saw an opportunity** in the desperation of its compatriots. While larger Colombian groups focused on drug trafficking, Tren de Aragua began to exploit Venezuelan migrants systematically, charging them extortion fees, smuggling them into and throughout Colombia, and taking control of various nodes of the human trafficking for sexual exploitation market.

Between 2018 and 2023, Tren de Aragua built a transnational criminal network, setting up cells in Colombia, Peru, and Chile, with further reports of a sporadic presence in Ecuador, Bolivia, and **Brazil**.

The group expanded **following** Venezuelan migration flows, initially staying under the radar by only targeting Venezuelan migrants as it increased its presence in border crossings and urban areas where Venezuelan migrants congregate.

As cells became more established, they **moved into** local criminal economies, employing eye-catching, targeted violence to force out local gangs and establish themselves as a serious threat. In addition to extortion and migrant smuggling, Tren de Aragua cells abroad control loan sharking (also referred to as *gota a gota*, or "drop by drop"), retail drug trafficking, kidnapping, **small-scale international drug trafficking**, human trafficking, and robberies. Each cell specializes in different activities, based on local conditions.

However, as the gang's **use of violence** abroad has **rung** regional alarm bells, authorities across South America now have Tren de Aragua firmly in their crosshairs. Venezuela's government finally retook control of Tocorón in September 2023, depriving the gang of its historic stronghold, while security forces in Chile, Peru, and Colombia have **carried out** "mega-operations" targeting the gang since 2022.

# Leadership

The head of the gang is Héctor Rustherford Guerrero Flores, alias "Niño Guerrero," who led the group from Tocorón prison until September 2023. He escaped before the operation, with Venezuelan civil society **reporting** that he was warned ahead of time. His location remains unknown.

Guerrero started his criminal career in 2005, when he murdered a police officer in Aragua, according to records from Venezuela's Supreme Court of Justice. He was first imprisoned in Tocorón in 2010 but **escaped** two years later.

His recapture and return to Tocorón in 2013 led Guerrero to consolidate Tren de Aragua alongside other criminals, who became his most trusted lieutenants. These included Larry Amaury Álvarez, alias "Larry Changa," and Yohan José Guerrero, alias "**Johan Petrica**."

Álvarez escaped Tocorón in 2015 and migrated to Chile in 2018, where he led the expansion of the Tren de Aragua's faction there. In 2022, as the Chilean police began to investigate him, he fled to Colombia, from where he continued leading the faction's operations in Chile and planned the group's expansion in Colombia. Álvarez was **arrested** in July 2024 in the Colombian department of Quindío.

For his part, Johan Petrica has been accused of leading a powerful illegal gold mining gang in Las Claritas, in the south of Bolívar state, known as the **Las Claritas Sindicato**. Some reports suggest that Niño Guerrero may be hiding with Petrica in Las Claritas following the invasion of Tocorón.

Along with offering rewards for information leading to the capture of Niño Guerrero and Johan Petrica, the US State Department **offered** a $3 million reward for information regarding Giovanny San Vicente, alias "Giovanny" or "El Viejo," in July 2024, and named him as one of the group's three leaders. US intelligence officials believe both Niño Guerrero and Giovanny are hiding out in Colombia.

Reports from security forces in Peru, Chile, and Colombia suggest that despite the geographic spread of the gang, it has maintained a hierarchical structure, with Niño Guerrero calling the shots. Judicial documents show how several Tren de Aragua lieutenants have been dispatched to cells across the region, some of whom even appear to rotate between cells in multiple countries.

# Geography

Tren de Aragua's operations center was previously located in Tocorón prison, in the state of Aragua. The gang is also present in at least five other Venezuelan states: Carabobo, Sucre, Bolívar, Guárico, and Lara.

It remains unclear where the group's new nucleus will be following the September 2023 invasion of Tocorón. However, there is no indication that the gang has stopped operating in Venezuela.

Outside of Venezuela, Tren de Aragua has established permanent cells in Colombia, Peru, and Chile, with reports of its activities in Brazil, Ecuador, and Bolivia.

These activities are often concentrated in border areas with clandestine border crossings regularly used by Venezuelan migrants, such as the Venezuela-Colombia border between Táchira and Norte de Santander, the Peru-Chile border, and the Bolivia-Chile border. The gang has also established cells in urban zones with large Venezuelan migrant populations, including **Bogotá**, Colombia; Lima, Peru; and Santiago, Chile.

# Allies and Enemies

Tren de Aragua maintains numerous links with organized crime and prison-based groups, both in Venezuela and in other countries, with which it has established pacts of non-aggression and even alliances to share criminal income. One such prison gang was located in the Trujillo Judicial Confinement Center, dominated by Álvaro Enrique Montilla Briceño, alias "El Loro." This prison was **taken over** by security forces just over a month after officials stormed Tocorón.

In addition, Tren de Aragua allegedly recruited and financed a small criminal gang in Lara state, called the "**El Santanita**" gang, to commit kidnappings and extortion.

A 2021 report from Brazil stated that Tren de Aragua members had been jailed in the northern state of Roraima, near Venezuela, and were working with Brazil's largest criminal group, the First Capital Command (Primeiro Comando da Capital – **PCC**), claims **repeated** by a 2022 academic investigation, although the exact nature of this relationship remains unclear.

Tren de Aragua has clashed with multiple groups, including the ELN, for control of border crossings between Venezuela and Colombia.  Local officials and security forces across the region have highlighted

the gang's willingness to use targeted violence to force out local gangs.

The gang's relationship with Venezuelan security forces and government officials has been complex. On the one hand, multiple sources interviewed by InSight Crime have pointed out that the group has corrupted local and regional officials. Its growth was also driven by the state's unofficial devolution of power to the *pranes* and the impunity it enjoyed within Tocorón. Even following the government invasion of Tocorón, its relationship with officials remains murky. It has lost its stronghold, but appears to have received advanced warning, and no high-ranking gang members were captured.

# Prospects

Tren de Aragua's expansion across South America was the first time a Venezuelan gang managed to project itself internationally. It has become a threat to regional security, and dismantling it will not be easy.

However, its international spread appears to have slowed, and the loss of its operational base in Tocorón prison could disrupt its transnational operations. What's more, security forces across the region are pumping resources into targeting the gang's cells, with over 100 alleged members arrested in 2022 and 2023 by Peruvian, Chilean, and Colombian officials. These arrests, while weakening the gang outside of prison, have the potential to bring the group back to its roots and **spread** through foreign prisons.

The mass migration that allowed for Tren de Aragua's expansion is also slowing and evolving. There was little criminal infrastructure in South America prepared for the number of Venezuelan migrants who traveled across the continent between 2018 and 2022, allowing Tren de Aragua to step in and claim the lion's share of the profits.

Now, however, Venezuelans are increasingly traveling north to the United States, crossing through Colombia and Central America. This is decreasing the migrant-centered income in Tren de Aragua's existing territory. With **human smuggling** and **trafficking** along the northern route already controlled by powerful gangs, Tren de Aragua is not likely to be able to expand north as easily as it did in South America.

Reports of new cells continue to surface in South America, although officials **suggest** that many of these are copycat groups seeking to take advantage of Tren de Aragua's notoriety. It remains to be seen whether Tren de Aragua will maintain its existing network, continue to grow, or if it will fall into decline.

© 2025 InSight Crime
Powered by Newspack



News        Venezuela

# Why Is Venezuela's Crime Rate Falling?

by *Venezuela Investigative Unit*
28 May 2024



A government-reported decline in Venezuela's crime rate may create the illusion of a security breakthrough, but the reduction has more to do with reconfigurations in the country's underworld than an effective state response.

In mid-May, Venezuelan security officials **announced** that crime indicators had fallen by 25.1% compared to 2023.

The Venezuelan government attributes the decrease to **large-scale operations** conducted by security forces against criminal groups.

President Nicolás Maduro also touted a similar theory in December 2023, **saying** "the country is seeing the best results in over 20 years in terms of citizen security, peace, and the protection of the people."

*SEE ALSO:* **In Zulia, Venezuela, Not Even Schools Escape Extortion**

Manage consent

The announcements coincide with figures from the Venezuelan Violence Observatory (Observatorio Venezolano de Violencia    OVV), an organization that studies insecurity and violence at the national level. The OVV also recorded a decrease in violent deaths compared to 2022 and 2023.

But while the government highlights the role of the armed forces, there may be more complex reasons behind the drop-off in crime.

Below, InSight Crime explores key factors driving the apparent drop in crime in Venezuela – a country once considered the most dangerous in Latin America.

# Mass Criminal Migration

Aside from large-scale security operations, the OVV's most recent **violence report** draws a link between the migration of criminal groups and a reduction in crime.

Venezuela's ongoing economic crisis has squeezed both ordinary citizens and the country's criminal groups. Economic decline in the labor and commercial sectors has left businesses and citizens unable to pay criminal groups, reducing opportunities for extortion and ransom kidnappings.

"Crime is falling in Venezuela because of the destruction of the country's economy…because of the loss of opportunities for crime," OVV director, Roberto Briceño-León, told InSight Crime.

Recession in Venezuela has led criminal gangs like the **Tren de Aragua**, **Yeico Masacre**, and **The Meleán** to infiltrate Venezuelan diasporas settled in other Latin American countries.

These gangs    especially the Tren de Aragua    have exploited the vulnerability of migrants and a lack of regional cooperation between authorities to **expand criminal operations** abroad. In Chile, Colombia, and Peru, the expansion of these organizations has led to spikes in violence and crime.

# Monopolizing Violence

The territorial and criminal hegemony enjoyed by some non-state armed groups has created a false sense of security in some regions. The OVV report also points to pacts between the government and some criminal groups, in addition to the monopolization of violence in some regions, as contributing factors to improved security perceptions.

For instance, the **National Liberation Army (Ejército de Liberación Nacional – ELN)** – a Colombian guerrilla group with operations in Venezuela   gained a monopoly on extortion in the Apure state, bordering Colombia, after receiving preferential treatment from the Maduro government.

*SEE ALSO:*   ***Venezuela Security Policy: Armed Groups and Electoral Interference***

The ELN **helped** the Venezuelan army expel a faction of Colombia's ex-FARC mafia – a rival group – from the Apure state in 2022, reducing competition for extortion rackets and social control.

"People may start to feel safer when they can pay one bandit instead of three. They pay one big bandit and the big bandit protects them," Briceño-León said.

But though the ELN's territorial control may appear to improve security, locals are still subjected to **rigorous social rules**, the imposition of illegal taxes, and restrictions on their mobility. Failure to comply with these rules carries severe punishments.

"At times Guasdualito [a settlement in Apure] seems like the safest town in the country because it is controlled by the guerrillas," a cattle rancher who requested anonymity for security reasons told InSight Crime.

# Controlling the Narrative

Despite the Venezuelan government's efforts to promote the drop-off in crime, the absence of official reports makes it impossible to verify the data.

In addition to lacking documentary support, some statements on the reduction in crime have been inconsistent. The most recent figures show a 25% reduction in crime, but, in early May, Ceballos reported a **24%** decrease. In December 2023, a **16%** drop was reported.

In 2015, Venezuelan authorities **stopped** publishing official data on national and regional security, including data on homicides, extortion, and kidnappings.

Instead, the task of collecting statistics and disseminating this information has fallen on the media and NGOs, including the OVV. However, organizations or media outlets failing to tow the government's line

risk facing persecution.

Aside from closures of non-state media and harassment of journalists, the Maduro government is also close to approving a law that would grant it greater control over NGOs.

With **elections looming** in Venezuela, security has become a key instrument for boosting the Maduro government's little remaining popularity.

*Featured image: President Maduro greets Venezuelan police officers during an official event. Credit: Venezuelan government.*

© 2025 InSight Crime

Powered by Newspack



# CHAPTER IV.b

## Venezuela





# CHAPTER IV. B: VENEZUELA

I.      INTRODUCTION ........................................................................... **713**

II.     INSTITUTIONAL CRISIS AND ARBITRARY INTERFERENCE IN
        DEMOCRACY............................................................................... **715**

        A.      Separation of powers and democratic institutional
                framework .........................................................................715

        B.      Arbitrary interference of the citizens' branch in democracy.......715

III.    CLOSURE OF CIVIC SPACE ......................................................... **716**

        A.      Legislative initiatives aimed at closing the civic space..................716

        B.      Court rulings impacting the civic space ...................................717

        C.      Criminalization of political participation and the need to
                implement agreements in good faith ......................................717

        D.      Persecution against human rights defenders and union
                leaders ..............................................................................718

        E.      Corruption and opacity in public governance ...................................719

IV.     HUMAN RIGHTS VIOLATIONS................................................... **720**

        A.      Violations of the right to life, liberty and personal integrity........720

        B.      Situation of freedom of expression .........................................722

        C.      Situation of economic, social, cultural and environmental
                Rights (ESCERs)...............................................................730





**V.    IMPACT ON GROUPS IN VULNERABLE SITUATIONS AND**

**DISCRIMINATION** ........................................................................... **733**

Women............................................................................................734

Refugees, migrants and persons from Venezuela in need of

international protection....................................................................736

Persons deprived of liberty...............................................................737

Lesbian, gay, bisexual, trans and intersex (LGBTI) persons .....................740

Indigenous peoples..........................................................................741

Afro-descendant persons..................................................................742

**VI.    CONCLUSIONS AND RECOMMENDATIONS**.............................................. **742**

 

# CHAPTER IV. B

# VENEZUELA[1]

## I.    INTRODUCTION

1.    In fulfilling its conventional and statutory mandate, the Inter-American Commission on Human Rights ("the Commission", "the Inter-American Commission" or "the IACHR") has followed up on the human rights situation in Venezuela with special attention. The State has been included in Chapter IV.B of the Annual Report since 2005 due to the complete erosion of the democratic system and the serious human rights situation. The progressive concentration of power in the executive branch and the absence of the Rule of Law have been documented throughout these years.

2.    In spite of the different calls and recommendations from the Inter-American Commission and other international bodies, in 2023, the State did not adopt suitable and effective measures to restore the democratic order and the separation and independence of the branches of government. This has allowed the executive branch to maintain control over the judicial branch, the citizens' branch,[2] the electoral branch and the legislative branch, and to impose a systematic policy of repression and intimidation against individuals and organizations that defend rights, express their disagreement with the government, are opponents or perceived as such.

3.    Consequently, after having assessed the human rights situation in Venezuela, the Commission decided to incorporate this country into Chapter IV.B of its Annual Report in accordance with Article 59, subparagraphs 6.a.i, 6.a.ii, 6.d.i and 6.d.iii of its Rules of Procedure, which establishes the following criteria:

a.    a serious breach of the core requirements and institutions of representative democracy mentioned in the Inter-American Democratic Charter, which are essential means of achieving human rights, including:

i. there is discriminatory access to or abusive exercise of power that undermines or denies the rule of law, such as systematic infringement of the independence of the judiciary or lack of subordination of State institutions to the legally constituted civilian authority;

ii. there has been an unconstitutional alteration of the constitutional regime that seriously impairs the democratic order.

d.    The presence of other structural situations that seriously affect the use and enjoyment of fundamental rights recognized in the American Declaration, the American Convention or other applicable instruments. Factors to be considered shall include the following, among others:

---

[1] Chapter not approved by Commissioner Carlos Bernal, with a partial reasoned vote. The partial reasoned vote is found at the end of this chapter.

[2] The Constitution establishes a Citizen Power. Its bodies enjoy functional, financial, and administrative autonomy. Citizen Power is exercised by the Republican Moral Council composed by the Ombudsman, the Prosecutor General and the Comptroller General of the Republic (Constitution of the Bolivarian Republic of Venezuela, promulgated on December 30, 1999. Art. 273).





i. serious institutional crises that infringe the enjoyment of human rights.

iii. serious omissions in the adoption of the necessary measures to make fundamental rights effective, or in complying with the decisions of the Commission and the Inter-American Court [...].

4.        In relation to Article 59, subparagraphs 6.a.i, 6.a.ii and 6.d.i, the Commission considers that, after more than a decade of undue and arbitrary interference, the executive branch has succeeded in controlling the different branches of government. The process of co-opting the institutions has been greatly facilitated by the lack of independence of the Supreme Court of Justice (TSJ). Since 2015, this institution has acted as an extension of the executive branch by systematically adopting decisions which are detrimental to the Rule of Law, the separation of powers and political participation. All this constitutes a clear violation of the requirements set forth in the Inter-American Democratic Charter and other applicable instruments.

5.        The subordination of the institutions to the executive branch had two significant consequences in 2023. First, no decisive measures were adopted to combat impunity for the violations that had occurred in previous years, especially during the protests of 2015 and 2017. It is important to remind that, since these violations were serious and systematic, and considering that they remain unpunished, the Office of the Prosecutor of the International Criminal Court (ICC) opened an investigation due to the alleged commission of crimes against humanity, an unprecedented event in the Western Hemisphere.

6.        The second consequence of the absence of independence of the branches of government was discrimination in the access to public office. During this year, the Office of the Comptroller General of the Republic ratified the disqualification sanctions imposed against opposition leaders with presidential aspirations. In addition, the Office of the Public Prosecutor opened criminal investigations against the individuals who had organized the so-called "primary elections," aimed at asking citizens about who they would choose as the opposition candidate for the 2024 presidential election. These acts show that the national public institutions operate primarily to guarantee the permanence of the ruling party in power, and not to promote and protect human rights.

7.        Regarding Article 59, subparagraph 6.d.iii of the Rules of Procedure, the Commission notes that the structural situations that seriously affect the enjoyment of human rights persist, especially with respect to economic, social, cultural and environmental rights (ESCERs). The limitations on access to these rights caused 500,000 persons to forcibly leave the country in 2023.[3] More than 7 million persons have been forced to migrate, resulting in the largest displacement in the region and one of the largest in the world. This migration flow responds to a survival strategy to protect rights such as life, personal integrity, health and food. All of this is a consequence of the dire human rights situation in Venezuela.

8.        In accordance with Article 59.5 of the Rules of Procedure, the Commission has used various sources of information to prepare this report. These sources include: official acts and any statement or action attributable to state bodies; information available in cases, petitions and precautionary and provisional measures in the inter-American system; information gathered in the course of on-site visits; information obtained during public hearings; conclusions of other international human rights bodies, including UN treaty bodies; human rights reports issued by governments and regional organs; reports by civil society organizations and public information that is widely disseminated in the media.

---

[3] This number was obtained by contrasting the *R4V Latin America and the Caribbean, Venezuelan Refugees and Migrants in the Region* report, published in December 2022, with the *R4V Latin America and the Caribbean, Venezuelan Refugees and Migrants in the Region*, from August 2023.

 

9.      The Commission approved this report on November 29, 2023. On January 12, 2024, the Commission sent the State of Venezuela a copy of the report in accordance with Article 59.10 of its Rules of Procedure. The State did not submit observations.

## II.      INSTITUTIONAL CRISIS AND ARBITRARY INTERFERENCE IN DEMOCRACY

### A.      Separation of powers and democratic institutional framework

10.      At the regulatory level, the Constitution establishes the separation and independence of powers.[4] Nevertheless, due to constant interference from the executive branch, the institutions intended to promote and protect human rights operate primarily to guarantee the permanence of the ruling party in power.

11.      The independence of the judiciary remained compromised in 2023 due to the irregular appointment of Supreme Court justices, the possibility of reelection within that institution, the excessive number of provisional judges, the lack of public competitive examinations for positions within the judiciary and the absence of guarantees for the stability in office.[5]

12.      Likewise, the independence of the legislative branch remained compromised due to the lack of guarantees for opposition political parties, the arbitrary criminal prosecution of opposition leaders and the removal from office and disqualification sanctions imposed by the Office of the Comptroller General of the Republic. The Commission recalls that the National Assembly elected in 2015 was suspended arbitrarily by the Supreme Court of Justice and no measures to repair this severe damage to the institutional framework of the country have been adopted to date.[6]

13.      The independence of the citizens' branch also remained compromised due to the irregular appointment of its authorities. The current Attorney General of the Republic, the highest authority in the Office of the Public Prosecutor, was not appointed in accordance with the Constitution. Instead, the National Constituent Assembly was responsible for the designation.[7]

14.      The independence of the electoral branch remained compromised as a consequence of the atypical appointment of the National Electoral Council (CNE) authorities. The members of the CNE Board of Directors resigned on June 14 this year without providing an adequate justification.[8] This situation empowered the National Assembly to appoint new members. As part of this restructuring process, the National Assembly appointed Elvis Amoroso as president of the CNE. At that time, Mr. Amoroso was the highest authority in the Office of the Comptroller General of the Republic, an entity which has systematically imposed disqualification sanctions against opposition leaders.[9] The Commission recalls that the members of the CNE were not appointed in accordance with constitutional procedures between 1991 and 2021.[10]

### B.      Arbitrary interference of the citizens' branch in democracy

15.      During this year, the Office of the Comptroller General of the Republic continued imposing sanctions such as disqualification for holding public office, which constitute violations of the inter-American standards on political rights). These sanctions have been disproportionately imposed, against individuals who oppose the government, which has in turn caused discrimination in the access to public office.

---

[4] For example, see Articles 256 and 294 of the 1999 Constitution.
[5] IACHR, *2022 Annual Report.* Chapter IV.B. Venezuela, paras. 14–19.
[6] IACHR, *2021 Annual report.* Chapter IV.B. Venezuela, paras. 23–36.
[7] IACHR, *2019 Annual Report.* Chapter IV.B. Venezuela, para. 32.
[8] *El País,* "La renuncia de la directiva del Consejo Nacional Electoral en Venezuela deja en el aire las primarias de la oposición," June 14, 2023.
[9] National Assembly, "Asamblea Nacional designa y juramenta a nuevos rectores del CNE," August 24, 2023.
[10] Acceso a la Justicia, "La historia de un fraude (III): el secuestro del Poder Electoral," September 21, 2019.




Below are some of the disqualification sanctions with the greatest impact on the Venezuelan opposition, based on official documentation and observations from international bodies.

16.    On June 27, through Official Letter No. DGPE-23-08-00-008,[11] the Office of the Comptroller General of the Republic announced that opposition candidate María Corina Machado had been disqualified from holding public office for 15 years, thus preventing her from running in the 2024 presidential elections. This disqualification follows those of other well-known opposition leaders aspiring to run for president, such as Henrique Capriles and Freddy Superlano.[12]

17.    The European Union,[13] the Office of the High Commissioner for Human Rights[14] and the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela established by the Human Rights Council (hereinafter "the Independent International Mission") have condemned these disqualifications.[15]

18.    The Commission recalls that the State of Venezuela was found internationally responsible for these sanctions in *López Mendoza v. Venezuela*. In this context, the Commission reiterates that no administrative body can restrict the political rights to elect and be elected through sanctions of disqualification or dismissal. In accordance with inter-American standards, in order to consolidate and protect a democratic system that is respectful of human rights, this type of sanction can only be imposed through a sentence adopted by a judge within the framework of a criminal proceeding.[16]

### III.    CLOSURE OF CIVIC SPACE

### A.    Legislative initiatives aimed at closing the civic space

19.    During this year, the National Assembly continued discussing legislative proposals aimed at controlling and limiting the work of civil society organizations, as well as restricting fundamental freedoms, such as the freedom of expression, association, and participation in matters of public interest.

20.    On January 24, 2023, the legislative branch successfully held a first debate on a bill to audit and regularize the operations of non-governmental organizations and other similar institutions and to oversee their actions and funding.[17] This bill not only restricts the activities that may be carried out by these organizations, but also enables state authorities to unilaterally dissolve all organizations who, by the State's own criteria, engage in political activities or otherwise undermine national stability or the institutions of Venezuela.[18]

21.    The introduction of the bill included stigmatizing references to 62 civil society organizations, who were described as "enemies," "traitors," and "front operations for political parties."[19] This confirms that

---

[11] Office of the Comptroller General of the Republic, General Directorate for Special Procedures, Official Letter No. DGPE-23-08-00-008, June 27, 2023.

[12] IACHR, Press Release No. 155/23, "Venezuela: IACHR Condemns Politically Motivated Persecution of Individuals in Run-Up to Elections," July 14, 2023.

[13] European Parliament, Resolution on the political disqualifications in Venezuela, 2023/2780 (RSP), July 12, 2023.

[14] Office of the High Commissioner for Human Rights, "Venezuela update by High Commissioner Türk," July 5, 2023.

[15] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, paras. 70–72.

[16] IAHR Court, López Mendoza v. Venezuela. Merits, reparations and costs. Judgment of September 1, 2011. Series C No. 233.

[17] National Assembly, "AN aprueba en primera discusión ley para regular las ONG," January 24, 2023.

[18] Bill titled "Law for the Supervision, Regularization, Performance and Financing of Non-Governmental and Related Organizations."

[19] National Assembly, "AN aprueba en primera discusión ley para regular las ONG," January 24, 2023.

VZ Vacatur_0155



human rights defense organizations still face a hostile environment in Venezuela, where smear campaigns, stigmatization and acts of harassment are rife in retaliation for their advocacy activities.[20]

## B.    Court rulings impacting the civic space

22.    During 2023, the Supreme Court of Justice continued to adopt arbitrary decisions that restrict the civic space, discourage participation in matters of public interest and evidence the absence of independence from the executive branch.

23.    On August 4, the Supreme Court of Justice dissolved the National Committee of the Venezuelan Red Cross through Judgment No. 1,057 and appointed an *ad hoc* restructuring board with the power to reorganize it. This decision contradicts the organization's internal bylaws regarding its governance and grants powers contrary to its articles of incorporation.[21] Likewise, on August 11, 2023, the TSJ issued Judgment No. 1,160, through which it arbitrarily appointed an *ad hoc* board of directors for the Communist Party of Venezuela, a political organization which opposes the government coalition.[22]

## C.    Criminalization of political participation and the need to implement agreements in good faith

24.    The Commission has indicated that the human rights challenges in Venezuela show the need for dialogue processes aimed at re-establishing democratic institutions and the independence of the branches of government.[23] Therefore, the Commission welcomed the dialogue sessions between the government and the Unity Platform (coalition of opposition parties) held from August 13 to 15,[24] which resumed on November 25, 2022.[25]

25.    In 2023, the Commission commended the agreements reached by the parties in Bridgetown, Barbados, on October 17. Among other things, the State committed to establishing a timetable and road map for presidential elections so that the participation of all candidates without arbitrary restrictions, under equal conditions and with security guarantees, would be ensured. In addition, as a result of these agreements, the State released a group of at least five people who had been arbitrarily detained, including journalist Ronald Carreño and opposition legislator Juan Requesens.[26]

26.    In spite of the commitments assumed, during this year, the Office of the Public Prosecutor opened a criminal investigation against the organizers of a public consultation, held on October 22, with the purpose of electing the person who would run represent the opposition in the presidential elections.[27]

---

[20] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, para. 79.

[21] Supreme Court of Justice, Action for the protection of collective or diffuse interests or rights. File No. 23-0802. Judgment No. 1,057, August 4, 2023.

[22] Supreme Court of Justice, Claim for the protection of constitutional rights. File No. 23-0708. Judgment No. 1,160, August 11, 2023.

[23] IACHR, Press Release No. 217/21, "IACHR Calls for Serious, Broad, Inclusive Dialogue for the Urgent Reconstruction of Democratic Institutions in Venezuela," August 23, 2021.

[24] IACHR, Press Release No. 217/21, "IACHR Calls for Serious, Broad, Inclusive Dialogue for the Urgent Reconstruction of Democratic Institutions in Venezuela," August 23, 2021.

[25] *El País*, "El Gobierno venezolano y la oposición acuerdan descongelar entre 3.000 y 5.000 millones de fondos estatales en el extranjero," November 25, 2022.

[26] IACHR, Press Release No. 253/23, "Venezuela: IACHR Urges State to Implement Agreements, Including Guarantees for Political Participation," October 27, 2023.

[27] IACHR, Press Release No. 253/23, "Venezuela: IACHR Urges State to Implement Agreements, Including Guarantees for Political Participation," October 27, 2023.





27.     The Commission considers that the opening of this criminal investigation contravenes the spirit of the agreements and discourages political participation. In the Venezuelan context, political rights are essential for dialogue and to overcome the crisis. Therefore, it is crucial to implement agreements in good faith, avoid the criminalization of this type of citizen initiatives and guarantee the political participation of all sectors in the next presidential elections.[28]

### D.    Persecution against human rights defenders and union leaders

28.     Human rights defenders and union leaders continued to face an adverse environment in 2023. This was marked by public smear campaigns promoted by high-ranking public officials, stigmatization, acts of harassment and criminal proceedings as a means of reprisal for their work.

29.     During the 188th ordinary period of sessions held in November 2023, civil society organizations informed that the State had adjusted its repressive model. In this regard, they reported that repression was no longer generalized and had become more selective, with a special focus on  individuals with leadership roles within workers' movements with the purpose of discouraging social mobilizations.[29]

30.     In this context, according to information received in 2023, 87 union leaders were detained and prosecuted for defending rights between 2013 and 2022, and 344 cases of threats against workers and union leaders were recorded only in 2022. In addition, between July 4 and 7, 2022, six individuals with leadership roles within unions were arbitrarily detained and subsequently sentenced to lengthy terms of imprisonment in August 2023.[30]

31.     In the state of Bolívar, six workers of the Alfredo Maneiro Orinoco Steel Mill (SIDOR) (company) were detained in January 2023 under "incitement to hatred" charges. Three other union leaders of the same company were arrested in July of the same year, two of whom were transferred to Caracas and brought before a court with special competence over terrorism. A leader of the Socialist Workers United Front of the state of Bolívar was detained on July 7, 2023, and his home was raided on September 1, 2023.[31]

32.     Furthermore, the Center for Defenders and Justice (CDJ) informed that 421 attacks against human rights defenders were recorded between January and September 2023, which represents a 6.31 percent increase from 2022.[32] In general, the civil society stated that the executive branch is trying to build an internal enemy narrative by linking the work of human rights defenders to criminal activities, especially by associating them with terrorism, destabilization and threats to the peace of the country.[33]

33.     At the same time, international human rights bodies have also warned about the hardships faced by human rights defenders and union leaders. The Independent International Mission determined that there were reasonable grounds to believe that the regular activities of human rights defenders, union members, journalists and politicians had been systematically repressed, either through direct intervention or through intimidation and surveillance. The acts of repression documented in 2023 included harassment by security forces in uniform and individuals in civilian clothes, unauthorized pictures, threats in the street and in their own homes.[34]

34.     The Independent International Mission also documented a concerted Government campaign to undermine the reputation of real or perceived opponents to the government through defamatory and

---

[28] IACHR, Press Release No. 253/23, "Venezuela: IACHR Urges State to Implement Agreements, Including Guarantees for Political Participation," October 27, 2023.

[29] IACHR, 188th regular period of sessions, public hearing "Venezuela: closure of civic spaces," held on November 9, 2023.

[30] IACHR, 188th regular period of sessions, public hearing "Venezuela: closure of civic spaces," held on November 9, 2023.

[31] IACHR, 188th regular period of sessions, public hearing "Venezuela: closure of civic spaces," held on November 9, 2023.

[32] IACHR, 188th regular period of sessions, public hearing "Venezuela: closure of civic spaces," held on November 9, 2023.

[33] CDJ, *Situation of human rights defenders in Venezuela, First semester of 2023*, June 2023, p. 5.

[34] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, para. 54.

VZ Vacatur_0157





stigmatizing messages issued by high-level state officials, which were taken up and widely diffused by pro-government websites and social media.[35]

35.     In addition, the Office of the High Commissioner for Human Rights (OHCHR) documented, between May 1, 2022, and April 30, 2023; 21 cases of threats and harassment, 46 cases of stigmatization on social media or public broadcasts by state officials; and 17 instances of criminalization, including 10 arbitrary detentions against human rights defenders, journalists and other civil society actors, including eight women.[36]

36.     The Commission considers that human rights defenders and union leaders face an active public policy of persecution, discrediting and criminalization by the State. It is important to recall that human rights defenders and civil society organizations are fundamental pillars in any democratic society. Therefore, it is crucial that Venezuela urgently refrain from taking any actions or measures that may disproportionately restrict the right of association and negatively impact the free exercise of the defense of human rights.

## E.     Corruption and opacity in public governance

37.     The Commission observes that public governance in Venezuela lacks transparency. There is no publicly available information in the country with regard to human development indexes, poverty, schooling, infant mortality, maternal mortality, malnutrition, government contracting, civil service, impunity, criminal complaints, public finances, among others.

38.     According to the most recent report published by Transparency International, Venezuela was ranked 177 among the 180 countries perceived to be the most corrupt.[37] Eighty-seven percent of individuals considered that corruption had increased in the previous 12 months, and 50 percent believed that public service had been used to pay bribes.[38]

39.     The opacity in public governance, the use of the judiciary as a political instrument and the absence of independence of institutions from the ruling party has a twofold effect. On one hand, it enables corruption and creates a climate of tolerance for it. On the other, it casts doubt on the efforts made to fight this phenomenon, especially when political benefits are sought or obtained from the arrest of individuals for non-flagrant criminal offenses.

40.     The Commission notes that more than 40 public officials from Petróleos de Venezuela, S.A. (PDVSA), a state company, were detained in March of this year due to alleged corruption acts.[39] However, due to the opacity of the information, it is not possible to determine whether these charges respond to criminal conduct or political persecution since the executive branch uses the criminal justice system to persecute workers who oppose the government.

41.     The Commission notes that economic, social, cultural and environmental rights may be seriously and negatively impacted by corruption, both directly and indirectly. An act of corruption directly impairs a right when it is used as a means to prevent its effective realization and enjoyment; for instance, when a person has to make unlawful payments to study or gain access to health care, among others. In such instances, corruption is used directly to impair protected rights, be it by obstructing direct access to their full enjoyment or by reducing the resources specifically required to guarantee those rights.[40]

---

[35] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, para. 57.
[36] OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela*. Report of the United Nations High Commissioner for Human Rights, A/HRC/53/54, July 4, 2023, para. 61.
[37] Transparency International, *Corruption perceptions index*, 2022.
[38] Transparency International, *Global corruption barometer*, 2019.
[39] *France 24*, "*Ya son 42 los funcionarios y empresarios detenidos en Venezuela en la 'cruzada' anticorrupción*," April 2, 2023.
[40] IACHR, *Corruption and Human Rights in the Americas: Inter-American Standards*, 2019, para. 163.

VZ Vacatur_0158

 

42.     In other situations, acts of corruption create the conditions contributing indirectly or in a more subtle or covert manner to violations of economic, social, cultural and environmental rights when, for instance, the authorities find themselves forced to prioritize private interests in their fiscal policy, thereby reducing the overall availability of public resources; when they fail to take proactive steps to recover resources diverted by acts of corruption; when they inflate prices in procurement processes or prioritize private interests in public tenders for jobs in the education or health sectors, thereby jeopardizing quality in educational and health care services, among others.[41]

## IV.     HUMAN RIGHTS VIOLATIONS

### A.     Violations of the right to life, liberty and personal integrity[42]

43.     The State has systematically violated human rights, including freedom of expression, to facilitate the concentration of power in the executive branch, to discourage political participation and to undermine the independence of institutions. At the same time, institutional deterioration, and the lack of independence of the judiciary have fostered a climate of impunity in the face of serious human rights violations, which may amount to crimes against humanity due to their systematic nature.

44.     In light of the reluctance to decisively combat impunity, on June 27, 2023, the Pre-Trial Chamber of the International Criminal Court (ICC) ordered the Office of the Prosecutor of that body to resume their investigation on the alleged commission of crimes against humanity. Venezuela is the only country in the Western Hemisphere with an open investigation before the ICC.

45.     Both the Inter-American Commission and the Independent International Mission[43] agree that neither the Office of the Public Prosecutor nor the Office of the Ombudsperson nor the judiciary have acted with due diligence to investigate, prosecute, and punish serious human rights violations. This is a consequence of the lack of independence of these institutions from the government.

46.     The absence of independent democratic institutions has also prevented the State from prioritizing the design of public policies aimed at addressing the needs of the population, especially to counteract the narrowed access to ESCERs.

### Extrajudicial executions and arbitrary deprivation of life

47.     The Independent International Mission investigated nine cases of deaths between 2020 and 2023, out of which five might be attributable to state authorities. Three of these deaths took place in the context of demonstrations over fuel shortages; the remaining two cases involved individuals who were deprived of liberty and reportedly died as a result of the denial of adequate medical attention.[44] In addition, the Committee of Relatives of Victims of the Caracazo (COFAVIC) reported that 414 cases of alleged extrajudicial executions were recorded between January and September 2023.[45]

### Political prisoners and arbitrary detentions

48.     The Commission has used the term "political prisoners" to refer to individuals who, by misusing criminal law, have been detained arbitrarily for disagreeing politically and ideologically with governments in office, for legitimately exercising the fundamental freedoms of expression, assembly and

---

[41] IACHR, *Corruption and Human Rights in the Americas: Inter-American Standards*, 2019, para. 164.

[42] This section was prepared by the Office of the Special Rapporteur for Freedom of Expression.

[43] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, para. 42.

[44] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, paras. 27–30.

[45] COFAVIC, Information on human rights violations between January–September 2023, received by the Commission in November 2023.

VZ Vacatur_0159





association, or for working in the defense of human rights, in States where the justice system is not independent.

49.      In 2023, the Commission continued to observe that the justice system in Venezuela was being used to persecute and detain actual or perceived opponents to the government, due to the absence of the Rule of Law and the co-opting of the judiciary by the executive branch. According to Foro Penal, as of November 2023, there were 272 political prisoners, out of which 18 were women and 146 members of the military.[46] It is particularly concerning that 135 out of the 272 political prisoners have not been convicted, which shows an abuse of pre-trial detention and a lack of compliance with judicial guarantees.[47]

50.      The Independent International Mission documented 58 arbitrary detentions between 2020 and 2023, out of which at least 53 had taken place in the context of selective repression against actual or perceived opponents to the government. This was the case of union leaders, human rights defenders, members of civil society organizations, members of the opposition, teachers and others who had expressed their complaints against the government, including labor demands.[48] Likewise, the COFAVIC recorded 413 alleged arbitrary detentions between January and September 2023,[49] thus reaching a total of 15,700 cases since 2014.[50]

51.      The Commission urges Venezuela to release all the persons who have been deprived of liberty for political reasons and to ensure that all the guarantees of the right to defense and due process enshrined in international human rights instruments are respected.

**Torture and other cruel, inhuman or degrading treatment**

52.      Individuals who are deprived of liberty for political reasons receive differentiated treatment based on the grounds for their arrest, which has an impact on their detention conditions and increases the risk of torture and other cruel, inhuman or degrading treatment.[51] In general, these persons are held in the General Directorate of Military Counterintelligence; El Helicoide, a building that belongs to the Bolivarian National Intelligence Service (SEBIN); and the National Institute for Feminine Orientation (INOF). The information received by the Commission in 2023 included reports of at least 160 complaints of torture of political prisoners under the custody of the State between 2017 and 2020.[52]

53.      The Commission held a hearing in 2023 to follow up on the precautionary measures granted to victims of torture deprived of their liberty in 2017 and 2018. On that occasion, members of the beneficiaries' families informed that the precautionary measures had not been implemented and that their relatives still suffered deplorable and unsanitary detention conditions; overcrowding; suffocation due to lack of ventilation, and lack of access to essential medical treatment.[53] Furthermore, the Independent International Mission documented cases of denial of sexual and reproductive health services, arbitrary restrictions of family and legal visits, and violations of the rights of breastfeeding mothers and detained women with young children outside of prison.[54]

---

[46] Foro Penal database, accessed on November 11, 2023.

[47] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, paras. 36–38.

[48] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, para. 33.

[49] COFAVIC, Information on human rights violations between January–September 2023received by the Commission in November 2023.

[50] Amnesty International, *Life detained: Politically-motivated arbitrary detentions continue in Venezuela*, August 29, 2023.

[51] IACHR, Press Release No. 288/22, "*IACHR Calls for Immediate Release of All Individuals Detained for Political Reasons in the Americas*," December 29, 2022.

[52] Information received by the IACHR.

[53] IACHR, 186th regular period of sessions, public hearing "*Follow-up of precautionary measures of beneficiaries deprived of their liberty in Venezuela*," held on March 6, 2023.

[54] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, para. 44.

 

54.    At this hearing, civil society organizations reported that the beneficiaries of these measures still endured physical torture, prolonged isolation periods, lack of communication, depression, suicide attempts, lack of medical care, denial of transfers to medical centers and acts of coercion to induce confession. One of the beneficiaries participated at the hearing via videoconference and reported that prisoners did not receive medical attention and suffered from mental health disorders and severe dehydration. In addition, this beneficiary requested that a commission from the International Committee of the Red Cross be authorized to enter detention centers and verify their conditions, and that the Office of the Prosecutor of the ICC expedite the ongoing investigation into acts of torture in Venezuela.[55]

55.    The Independent International Mission underscored in its September 2023 report that, during the 2020-2023 period, the mission had investigated 19 cases of gender-based violence, including sexual violence, against persons who were deprived of liberty and were actual or perceived opponents to the government. These cases involved four men and 15 women, including a transgender woman. Among the acts reported were threats of rape, forced nudity, rapes with blunt objects and degrading insults, such as "bad mothers," "bitches" or "prostitutes," among others.[56]

56.    According to the Independent International Mission, "these acts were carried out with particular viciousness against real or perceived political opponents," in particular against women, who were subjected to threats revolving around their children in a disproportionate number of cases compared to men.[57]

57.    In addition, the COFAVIC recorded 74 new cases of alleged torture in the context of repression by state agents during the first nine months of the year.[58]

## B.    Situation of freedom of expression[59]

**Challenges to journalism and the media**

58.    Journalists continue to endure a hostile environment in Venezuela. According to the reports received by the Commission, as in previous years, journalists have suffered threats, intimidation, and legal persecution, as well as seizures of their work equipment and censorship of press material.

59.    Acts of harassment and attacks against media facilities and journalist organizations were recorded in 2023. For instance, on January 23, 2023, masked individuals reportedly used Molotov cocktails and stones to attack the headquarters of *Palpitar Trujillano*, a digital media outlet.[60] Subsequently, on May 11, 2023, SEBIN officials allegedly conducted a search and seized equipment from the headquarters of *Mundo Oriental*, a news website. The search had been reportedly ordered in the context of the administrative proceedings relating to the arrest of former Mayor Ernesto Paraqueima.[61]

60.    These attacks took place in a context of constant stigmatization of the media by public authorities and political leaders. The following instances can be highlighted as paradigmatic examples of this situation: on January 27, the governor of the state of Trujillo labelled *Diario Los Andes* and journalist Alexander

---

[55] IACHR, 186th regular period of sessions, public hearing "*Follow-up of precautionary measures of beneficiaries deprived of their liberty in Venezuela*," held on March 6, 2023.

[56] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, paras. 45–49.

[57] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, paras. 45–49.

[58] COFAVIC, Information on human rights violations between January–September 2023 received by the Commission in November 2023.

[59] This section was prepared by the Office of the Special Rapporteur for Freedom of Expression (SRFOE).

[60] This media outlet reportedly suffered four attacks against its social media accounts in December 2022. *Efecto Cocuyo*, "Atacan con piedras y molotov la sede de un medio digital en Trujillo," January 23, 2023; *IPYS*, "Desconocidos atacaron la sede del medio Palpitar Trujillano," January 25, 2023.

[61] *Punto de Corte*, "SNTP rechaza el allanamiento e incautación de equipos del diario Mundo Oriental en El Tigre," May 9, 2023; Espacio Público, "Funcionarios del SEBIN allanaron la sede del medio Mundo Oriental en Anzoátegui," May 11, 2023.




González as *palangristas* (recipients of *payola*) and accused them of having participated in a *coup d'état*.[62] The governor attacked the same media outlet and journalist on April 14, stating that they had been involved in alleged acts of corruption.[63] In addition, on February 28, the mayor of the Piar municipality, in the state of Bolívar, accused journalists from different media outlets of "having engaged in media terrorism," following the coverage of a protest by relatives of patients who had died during the pandemic.[64] In the same vein, Diosdado Cabello, a member of the National Assembly and anchor of *Con el Mazo Dando*, continued with his stigmatizing statements against the press, which were aired on a public television channel in Venezuela.[65]

61.     Criminal law continues to be used for intimidation. According to public information, on January 25, a prosecutor from the Office of the Public Prosecutor and a group of officials from the Scientific, Criminal and Criminalistics Investigations Body (CICPC) visited the home of the chief editor of *El Nacional*, a newspaper, and took him to the headquarters of the Office of the Public Prosecutor to take a statement. The summons, which allegedly included four other journalists, was reportedly related to his investigative work.

62.     On February 2023, the mayor of the Piar municipality threatened to sue six journalists for their informative work.[66] In May, journalist Sebastiana Barráez reported that she had been threatened with arrest for her coverage of a case of alleged abuse of power committed by a high-ranking government official.[67] Subsequently, in June, the governor of the state of Táchira expressed his intention to sue those who had "unfoundedly" denounced problems in the state for "defamation and libel." According to available information, the same official had allegedly threatened journalist Sebastiana Barráez and political leaders.[68] On May 5, journalist Gustavo Azocar was summoned by the Office of the Public Prosecutor in the state of Táchira for his posts on his social media accounts.[69]

63.     During this year, the Commission followed up on the situation of journalists Roland Carreño, who has been under arrest since October 26, 2020, and Roberto Deniz, who has faced criminal proceedings since October 2021 for the alleged crime of incitement to hatred, linked to his work in the press.[70] Deniz is a beneficiary of precautionary measures.[71]

64.     In addition to the aforementioned information, media outlets continued to be closed based on the alleged non-compliance with administrative requirements for radio broadcasting. According to a report published by IPYS Venezuela, the National Telecommunications Commission of Venezuela (CONATEL), the state administrative agency tasked with issuing permits to operate, is allegedly responsible for this situation. Radio stations are faced with administrative obstacles, as well as a context of "economic strangulation" caused by the lack of economic resources and optimal infrastructure conditions to carry out their transmissions.[72] This

[62] SNTP X account (@sntpvenezuela), January 27, 2023; CEPAZ, "CEPAZ documentó 187 casos de persecución y criminalización en enero de 2023," February 24, 2023.

[63] *Diario Los Andes*, "Piden al Ministerio Público y a la Defensoría del Pueblo cese de ataques del gobernador de Trujillo contra la prensa," April 24, 2023; IPYS, "Gobernador de Trujillo vuelve a atacar discursivamente a Diario Los Andes," April 18, 2023.

[64] *Efecto Cocuyo*, "Por qué la alcaldesa de Upata amenazó a periodistas locales," March 1, 2023; Espacio Público, "Alcaldesa oficialista amenazó a seis periodistas por cubrir denuncias en Upata," March 1, 2023.

[65] *Alberto News* X account (@AlbertoRodNews) February 2, 2023; IPYS, "Diosdado Cabello emitió descalificativos contra Alberto Rodríguez Palencia," February 6, 2023.

[66] *Efecto Cocuyo*, "Por qué la alcaldesa de Upata amenazó a periodistas locales," March 1, 2023; Espacio Público, "Alcaldesa oficialista amenazó a seis periodistas por cubrir denuncias en Upata," March 1, 2023.

[67] Sebastiana Barráez X account (@SebastianaB), May 20, 2023; *Efecto Cocuyo*, "Periodista Sebastiana Barráez denuncia que juez amenazó con detenerla," May 22, 2023.

[68] *Táchira Noticias* Instagram account (@tachiranoticias), June 15, 2023; Espacio Público, "Gobernador de Táchira amenaza con demandar a quienes denuncien problemas en la entidad," June 16, 2023.

[69] *El Carabobeño*, "Periodista Gustavo Azócar fue citado a fiscalía por denuncia formulada a través de redes sociales," May 5, 2023; *Monitoreamos*, "El periodista Gustavo Azócar acudió a la Fiscalía tras una denuncia anónima en su contra," May 5, 2023.

[70] IACHR, *2022 Annual Report. Report of the Office of the Special Rapporteur for Freedom of Expression*, OEA/Ser.L/V/II Doc. 50, March 6, 2023, para. 1379.

[71] IACHR, Press Release No. 031/20, "IACHR Grants Precautionary Measures in Favor of Relatives of Journalist Roberto Deniz of Armando," February 7, 2020.

[72] IPYS, "Un anárquico paisaje sonoro. Condiciones de la radio en Venezuela para las coberturas electorales," February 13, 2023.





is the case of *Radio Caracas Radio*, the oldest radio station in the country, which ceased operations permanently in June.[73]

65.    According to Espacio Público, radio stations continued to be shut down in 2023. Five stations closed in the states of Portuguesa (2), Táchira (1), Anzoátegui (1) and Bolívar (1) pursuant to orders issued by the CONATEL.[74] In addition, the information provided shows that four programs were cancelled in March of this year: three of them  were broadcasted on the radio and the remaining one on social media.[75]

66.    The Atlas de Silencio study shows that at least 21 percent of the population lives in "news deserts," that is, areas in which access to local information is inadequate.[76] This situation is compounded by the deliberate closure of radio stations.[77] Most of the "deserts" are located in small and medium-sized municipalities.[78] The states of Táchira, Zulia and Sucre are reportedly the most affected by the "information drought."[79] Furthermore, the study warns that precarious infrastructure conditions, border areas and socioeconomic conditions also have an impact on the existence of "news deserts."[80]

67.    Along the same lines, Espacio Público published a report which concluded that "there are at least 13 silenced zones," referring to 13 states in the country with little or no access to information sources from diverse and independent publishers.[81]

68.    The Commission underscores that intimidation and threats against journalists strongly restrict freedom of expression and that it is the duty of the State to prevent and investigate said acts.[82] In this regard, the Commission noted that Carlos Germán Debiais, a graphic reporter, was released on June 6, 2023. Debiais had been under arrest since November 12, 2021, for taking drone shots of the Amuay refinery in the state of Falcón.[83]

69.    Finally, the Commission considers that attacks against journalists and media outlets are intended to silence them; therefore, in addition to violating the individual rights of journalists to express and disseminate their ideas, opinion and information, they also affect a society's right to have free access to information.[84] An independent and critical press is fundamental to ensuring respect for other liberties that form part of a democratic system of government and the Rule of Law.[85]

**Transparency and access to public information**

70.    Although the Law of Transparency and Access to Information of Public Interest was enacted in September 2021, the Commission observed a context of state opacity in 2023.[86] Espacio Público reported

---

[73] *Efecto Cocuyo*, "Radio Caracas Radio cesa definitivamente sus transmisiones," June 29, 2023; Espacio Público, "RCR cesa sus transmisiones tras 93 años de labor ininterrumpida," June 29, 2023.

[74] IPYS, "Onda 97.3 FM en Puerto Ordaz confirmó cierre por parte de Conatel," June 14, 2023.

[75] Espacio Público, "Mayo: Crítica bajo acecho," June 6, 2023.

[76] IPYS, "Atlas del silencio," June 8, 2023.

[77] IPYS, "Atlas del silencio," June 8, 2023.

[78] IPYS, "Atlas del silencio," June 08, 2023.

[79] IPYS, "Atlas del silencio," June 08, 2023.

[80] IPYS, "Atlas del silencio," June 08, 2023.

[81] Espacio Público, "Zonas silenciadas: 13 estados de Venezuela," May 3, 2023.

[82] IACHR, Declaration of Principles on Freedom of Expression, 2000.

[83] *Tal Cual*, "Autoridades excarcelan al reportero gráfico Carlos Debiais," June 6, 2023; Espacio Público, "Excarcelan al reportero gráfico Carlos Debiais," June 7, 2023.

[84] IACHR, Background and Interpretation of the Declaration of Principles; IACHR, Office of the Special Rapporteur for Freedom of Expression, *Violence Against Journalists and Media Workers: Inter-American Standards and National Practices on Prevention, Protection and Prosecution of Perpetrators*, 2013, OEA/Ser.L/V/II.

[85] IACHR, Background and Interpretation of the Declaration of Principles; IACHR, *Report on the Situation of Human Rights in Mexico*, OEA/Ser.L/V/II.100 Doc 7 rev.1, September 24, 1998, para. 649.

[86] IACHR, *2022 Annual Report. Report of the Office of the Special Rapporteur for Freedom of Expression*, OEA/Ser.L/V/II Doc. 50, March 6, 2023, para 1386.



that 28 requests for information had been submitted to state bodies, out of which three had been rejected straightforwardly without legal justification and the rest had not been answered.[87]

71.    The Commission reiterates that access to information held by the State is a fundamental right of every individual, and that States have the obligation to guarantee the full exercise of this right. This principle allows only exceptional limitations that must be previously established by law in case of a real and imminent danger that threatens national security in democratic societies.[88] The State's actions should be governed by the principles of disclosure and transparency in public administration that enable all persons subject to its jurisdiction to exercise the democratic control of those actions.[89]

**Restrictions on the freedom of expression and association of human rights defenders and organizations**

72.    In 2023, the Commission received information about alleged monitoring and surveillance actions by state agents against union leaders and members of the National Trade Union Coalition of Workers (CSNT). These actions were reportedly related to the demonstrations than had been called for and held in different parts of the country to protest against an instruction issued by the National Budget Office (ONAPRE) and to demand better working conditions.[90]

73.    The Commission granted precautionary measures in favor of seven CSNT members on April 1, 2023, because it considered that they were at serious and imminent risk of suffering violations of their rights to life and integrity, and requested the State to adopt the necessary protection measures so that the beneficiaries could continue to carry out their union leadership activities without being subject to threats, intimidation, harassment or acts of violence.[91] In addition, in May, Diosdado Cabello, a member of the National Assembly, used TV show *Con El Mazo Dando*, which is broadcasted by the state channel, to attack 10 civil society organizations by questioning their actions and international funding.[92]

74.    In this context, the Commission highlights the arrest of Javier Tarazona, a human rights defender and director of Fundaredes, who, as of July 2023, had been imprisoned for two years while suffering from health conditions.[93] Tarazona has been a beneficiary of precautionary measures granted by the Commission since June 18, 2020. In 2023, the Supreme Court of Justice revoked the jurisdiction of the Third Court of Caracas that hears cases involving terrorism. According to media reports, this was detrimental to the case of Mr. Tarazona.[94]

75.    In view of the above, the Commission reiterates that human rights defenders play a fundamental role in the consolidation of both a democratic society and the Rule of Law, therefore the State has the obligation to guarantee an enabling environment for their work.[95] In addition, the Commission recalls that

---

[87] Espacio Público, "Situación general del derecho al acceso a la información pública: enero-junio 2023," July 10, 2023.

[88] IACHR, Declaration of Principles on Freedom of Expression, 2000.

[89] IAHR Court, Claude Reyes *et al.* v. Chile. Merits, reparations and costs. Judgment of September 19, 2006, Series C No. 151, para. 86.

[90] IACHR, Resolution 15/2023, Precautionary Measure No. 66-23, Carlos Eduardo Salazar Ojeda *et al.* (Trade Union Leaders of the Civil Society Organization National Trade Union Coalition of Workers) regarding Venezuela, April 1, 2023.

[91] IACHR, Resolution 15/2023, Precautionary Measure No. 66-23, Carlos Eduardo Salazar Ojeda *et al.* (Trade Union Leaders of the Civil Society Organization National Trade Union Coalition of Workers) regarding Venezuela, April 1, 2023.

[92] Centro de Justicia y Paz, *Monitoreo de persecución y criminalización en Venezuela*, May 2023; CDJ, *Situation of human rights defenders in Venezuela, First semester of 2023*, July 2023.

[93] UN News, "Venezuela debe garantizar unas elecciones transparentes e inclusivas," July 5, 2023; Acceso a la Justicia, "Cronología del caso de la ONG Fundaredes," July 3, 2023.

[94] *Efecto Cocuyo*, "Juicios de presos políticos como Roland Carreño, Javier Tarazona y Darío Estrada comenzarán de cero," July 15, 2023; Transparencia Venezuela, "TSI despoja a Juzgado Penal de Caracas de Competencias sobre Terrorismo," July 18, 2023.

[95] United Nations, *Report of the Special Rapporteur on the rights to freedom of peaceful assembly and of association* A/74/349, September 11, 2019, para. 25; United Nations Human Rights Council, *Report of the Special Rapporteur on the rights to freedom of peaceful assembly and of association, Maina Kiai* A/HRC/20/27, May 21, 2012, paras. 12 and 13.

VZ Vacatur_0164





the freedom of association is an essential tool for human rights defenders to be able to perform their work fully and comprehensively.[96]

**The "Anti-Hate Law" as a tool to criminalize public interest speech**

76.    During this year, criminal law offenses, such as "incitement to hatred" and "boycott," among others, were defined in broad and ambiguous terms, used as an instrument to intimidate, and punish those who criticize the government. A cardiologist was arrested on June 14 in Valera, a city in the state of Trujillo, under alleged charges of boycott and treason to the homeland, among others, after she had reported irregularities in the fuel supply for a gas station allegedly owned by her family.[97]

77.    The Attorney General informed on June 18 and June 20 that two farmers had been arrested in the state of Mérida under boycott charges.[98] According to the information received, these individuals had been arrested for posting videos on social media in which they could be seen discarding their crops and throwing them into a river as a protest over the shortage of fuel they needed to transport and market their products.[99] Both persons were subsequently released.[100]

78.    In addition, the Anti-Hate Law continues to be used to censor individuals and even public officials. Servando Marín, a columnist of the website *Aporrea*, was arrested on May 1 by state agents in Cumaná, a city in the state of Sucre, under charges of incitement to hatred after he had allegedly expressed critical opinions on environmental and architectural affairs.[101] The co-founder of *Aporrea* reported on May 7 that Mr. Marín had been conditionally released under the obligation to appear periodically before the court.[102] The Attorney General announced on May 4 that an arrest warrant had been issued against Ernesto Paraqueima, the former mayor of the municipality of El Tigre, in the state of Anzoátegui, for incitement to hatred. This action was taken after the official had made several comments against a mural that had been painted in his town to raise awareness about autism spectrum disorder.[103]

79.    Since 2017, the Commission has called for the Anti-Hate Law to be repealed on the grounds that it is contrary to international standards on freedom of expression.[104] Restrictions imposed by this law severely impact the exercise of the right to freedom of expression in Venezuela, which is against the principles of a democratic society. In particular, the Commission notes that this legislation includes vague concepts and exorbitant penalties that are subject to no statute of limitations in order to criminalize statements on matters of public interest; it imposes burdensome obligations on all media outlets, including the suppression and

[96] IACHR, *Second Report on the Situation of Human Rights Defenders in the Americas* OEA/Ser.L/V/II, December 31, 2011, paras. 157 and 163; IAHR Court, Baena Ricardo *et al.* v. Panama. Merits, reparations and costs. Judgment of February 2, 2001, Series C No. 72, para. 158.

[97] *Efecto Cocuyo*, "Trujillanos exigen libertad para médica Mariana Barreto, detenida por denunciar irregularidades en gasolinera," June 18, 2023; Espacio Público, "Detiene a ciudadana que denunció irregularidades con combustible en Trujillo," June 20, 2023.

[98] Attorney General of Venezuela X account (@TarekWilliamSaab), June 19, 2023; *Finanzas Digital*, "Agricultor de Trujillo será imputado por el Ministerio Público tras 'destruir una gran cantidad de alimentos,'" June 20, 2023.

[99] Transparencia Venezuela, "¿Cuál es el delito cometido por los agricultores detenidos?," June 20, 2023; Human Rights Observatory of the University of Los Andes (ULA), "Estado venezolano viola derechos humanos de agricultores, incluido su derecho al trabajo," June 25, 2023.

[100] *Infobae*, "Liberan dos agricultores venezolanos detenidos por protestar por la falta de gasolina," June 21, 2023; Espacio Público X account (@espaciopublico), June 21, 2023.

[101] Espacio Público, "Detienen y excarcelan a arquitecto Servando Marín por opinar y denunciar irregularidades," May 8, 2023; *Aporrea*, "Encarcelan a Servando Marín Lista, Presidente de la Fundación Ramón Badaracco y columnista de Aporrea," June 6, 2023.

[102] Gonzalo Gómez Freire X account (@GonzaloAporrea), May 7, 2023.

[103] Office of the Public Prosecutor of Venezuela X account (@MinpublicoVEN), May 4, 2023, May 4, 2023; *Runrunes*, "Alcalde de El Tigre violó ley para atención de personas dentro del espectro autista al ofender a niños con Asperger," May 3, 2023.

[104] IACHR Office of the Special Rapporteur for Freedom of Expression, Press Release No. R179/17, "Office Of The Special Rapporteur For Freedom Of Expression Expresses Serious Concern Over The Enactment Of The 'Anti-Hate Law' In Venezuela And Its Effects On Freedom Of Expression And Freedom Of The Press," November 10, 2017; IACHR Office of the Special Rapporteur for Freedom of Expression, Press Release No. R169/22, "SRFOE condemns the increase of censorship in Venezuela and reaffirms its support and commitment to the full enjoyment of press freedom in the country.", July 29, 2022.

VZ Vacatur_0165





deletion of information of public interest; and it grants broad power to the State to use media outlets and impose content.[105] The OHCHR has also expressed its concerns over the consequences of this law.[106]

**Social protest**

80.     During 2023, the Commission received reports on the disproportionate use of public force to disperse protests. According to the Venezuelan Observatory of Social Conflict, 3,900 peaceful demonstrations took place in the country during the first five months of 2023, out of which 86 percent had been triggered by demands for economic, social, cultural and environmental rights. The remaining demonstrations had been reportedly organized by unions and their leaders who protested for their labor rights, especially for their right to receive fair wages.[107] The Venezuelan Education Action Program on Human Rights (PROVEA) reported that 18 workers of the Venezuelan Corporation of Guayana had been detained and prosecuted in January for demanding better working conditions.[108]

81.     On June 10, workers Juan Cabrera, Leonardo Azocar and Daniel Romero were reportedly arrested by officials of the Department of Military Counterintelligence (DGCIM), and the latter two were prosecuted by a court in Caracas under charges of boycott, criminal conspiracy and incitement to hatred, after leading a protest in one of the SIDOR plants.[109] On June 14, it was reported that a trial court with competence over labor matters in the state of Bolívar had granted a precautionary measure requested by the Venezuelan Corporation of Guayana, which allegedly restricted the right to strike and to freedom of expression of 22 SIDOR workers.[110]

82.     The Commission reiterates that social protest, which involves the rights to freedom of peaceful and unarmed assembly, freedom of association and freedom of expression, is an essential tool for the defense of democracy and human rights. Therefore, the State has the obligation to respect, protect and guarantee these rights.[111] With regard to the obligation to protect and facilitate said rights, the Commission states that the application of criminal law to conducts related with the exercise of protests constitutes a serious restriction with far-reaching consequences for freedom of expression, as well as the rights of assembly, association and political participation.[112]

**Freedom of online expression**

83.     The reported incidents include the hacking of the Facebook page of *El Tubazo Digital* on January 6. This outlet, which reports news in the state of Guárico and in Venezuela, was forced to create a new

---

[105] IACHR Office of the Special Rapporteur for Freedom of Expression, Press Release No. R179/17, "Office Of The Special Rapporteur For Freedom Of Expression Expresses Serious Concern Over The Enactment Of The 'Anti-Hate Law' In Venezuela And Its Effects On Freedom Of Expression And Freedom Of The Press," November 10, 2017.

[106] OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela*. Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, para. 65.

[107] Venezuelan Observatory of Social Conflict, "Situation of the civic space in Venezuela," side event to the 53rd session of the United Nations Human Rights Council, June 28, 2023.

[108] Venezuelan Education Action Program on Human Rights, "Represión y detenciones arbitrarias: el saldo de seis días de protesta en SIDOR," June 13, 2023.

[109] Venezuelan Education Action Program on Human Rights, "Represión y detenciones arbitrarias: el saldo de seis días de protesta en SIDOR," June 13, 2023; Espacio Público, "Tribunal de Primera Instancia criminaliza la protesta de 22 trabajadores de Sidor," June 14, 2023.

[110] Espacio Público, "Tribunal de Primera Instancia criminaliza la protesta de 22 trabajadores de Sidor," June 14, 2023; Venezuelan Education Action Program on Human Rights, "Represión y detenciones arbitrarias: el saldo de seis días de protesta en SIDOR," June 13, 2023.

[111] IACHR Office of the Special Rapporteur for Freedom of Expression, *Protest and Human Rights*, OEA/Ser.L/V/II CIDH/RELE/INF.22/19, September 2019, foreword and paras. 1-46.

[112] IACHR Office of the Special Rapporteur for Freedom of Expression, *Protest and Human Rights*, OEA/Ser.L/V/II CIDH/RELE/INF.22/19, September 2019, foreword and para. 185.




Facebook profile since it was reportedly impossible to recover its page.[113] In addition, journalist Luis Olavarrieta reported on June 14 that his YouTube channel had been hacked.[114]

84.       In addition, media outlets indicated that they had been impersonated online.[115] This is the case of *Diario Panorama*, which reported that third parties had impersonated them and posted information on their website.[116] Likewise, the visual identity and name of *Alertas 24*, an online media outlet, were used to disseminate false information.[117] On May 15, Joel Dullroy and Laura Clisánchez, journalists from the newspaper *Correo del Caroní*, denounced that their names and images had been used in false emails to ask for money.[118]

85.       Furthermore, the internet infrastructure in Venezuela remains deficient, which is a consequence of the socioeconomic crisis in the country. VE Sin Filtro, an internet observatory, reported several cases of internet connection downtime in several regions of the country, with different durations.[119] In addition, high internet access costs have been a trend across the country.[120] In this context, the country faces a considerable digital divide, considering that, by March 2023, more than half (50.6 percent) of the individuals surveyed by the Venezuelan Observatory of Public Utilities (OVSP) in 12 Venezuelan cities declared that they had no internet service at home.[121]

86.       In addition, the Commission continued to receive reports according to which news websites perceived as opponents of the government, including websites of media outlets and civil society organizations, had been blocked.[122] The VE Sin Filtro Observatory reported that, as of March 12, 2023, 97 blocked domains remained blocked by the Telephones of Venezuela National Public Company (CANTV), as well as by different private service providers, such as Digitel, Inter, NetUno and Movistar, out of which 62 reportedly belonged to media websites.[123] These numbers reportedly amounted to "the near-total blocking of the news outlets reporting critical news in Venezuela."[124]

87.       Four new blocking incidents against websites belonging to news media and organizations, such as media outlets *El Diario*[125] and *Mundo Oriental*,[126] the Finance Observatory[127] and the Living Wage for Venezuela initiative of the Venezuelan Union Network,[128] were reported during 2023. As of June 20, CANTV, a State-owned company, was still the operator with the highest number of restricted domains, using

[113] *IPYS*, "Hackean página de Facebook de El Tubazo Digital," January 19, 2023.

[114] *Nueva Prensa Digital*, "Luis Olavarrieta informó que su canal de Youtube fue hackeado," June 14, 2023; *La Verdad de Monagas*, "Hackean el canal de Youtube del periodista Luis Olavarrieta," June 14, 2023.

[115] *IPYS*, "Desconocidos suplantaron la identidad de El Pitazo para pedir información a lectores," June 7, 2023.

[116] *Diario Panorama* Instagram account (@diariopanorama), May 3, 2023; *IPYS*, "Diario Panorama denunció suplantación de identidad en su dominio web," May 16, 2023.

[117] *IPYS*, "Suplantan identidad de medio digital para difundir información falsa," April 26, 2023.

[118] *IPYS*, "Dos periodistas fueron objeto de suplantación de identidad en plataformas digitales," May 18, 2023; Espacio Público, "Periodista Laura Clisánchez alerta que está siendo acusada de extorsión por una cuenta anónima," June 22, 2023.

[119] Venezuela Sin Filtro X account (@Vesinfiltro), February 8, 2023; February 15, 2023; February 23, 2023; February 28, 2023; March 1, 2023; March 8, 2023; March 17, 2023 March 22, 2023; March 27, 2023; April 13, 2023; April 21, 2023; April 24, 2023; May 8, 2023; May 11, 2023; June 28, 2023.

[120] *Finanzas Digital*, "Consulte las tarifas de los planes de ABA de CANTV para julio de 2023," July 10, 2023; *Bloomberg Línea*, "Empresas de telefonía en Venezuela ajustan tarifas mientras enfrentan debilidad en el servicio," July 11, 2023.

[121] Venezuelan Observatory of Public Utilities, "OVSP: La mitad de los encuestados no cuenta con servicio de internet en el hogar," April 24, 2023.

[122] Espacio Público, *Informe 2022: Situación del derecho a la libertad de expresión e información en Venezuela*, May 3, 2023; *IPYS*, Derechos fuera de línea. Reporte Anual Derechos Digitales 2022, May 24, 2023.

[123] Venezuela Sin Filtro X account (@Vesinfiltro), March 12, 2023.

[124] *NTN24*, "'Lo que más se bloquea en Venezuela son páginas web de medios digitales.' Andrés Azpúrua, director de la 'Ve Sin Filtro,'" March 13, 2023.

[125] Venezuela Sin Filtro X account (@Vesinfiltro), May 3, 2023; *Efecto Cocuyo*, "Ve Sin Filtro: Hay 62 medios de comunicación bloqueados en Venezuela," March 12, 2023.

[126] *IPYS*, "Cuatro medios de comunicación fueron vulnerados en El Tigre tras detención del exalcalde," May 11, 2023; Espacio Público, "Mayo: Crítica bajo acecho," June 6, 2023.

[127] Venezuelan Finance Observatory X account (@observafinanzas), May 8, 2023.

[128] Espacio Público, "Operadoras aplicaron bloqueo DNS a portal web de la Red Sindical Venezolana," May 11, 2023; *Efecto Cocuyo*, "Ve Sin Filtro registra cuatro bloqueos a sitios informativos en lo que va de mayo," May 17, 2023.

VZ Vacatur_0167



HTTP/HTTPS and DNS blocking as the most frequent methods.[129] Some organizations have claimed that the blocking phenomenon was closely related to misinformation in Venezuela because people, instead of accessing the full news article, only reviewed the headline or summary they received via WhatsApp unless they used tools for circumventing blocking, such as virtual private networks (VPNs).[130]

88.    In addition to the blocking incidents, there were complaints about distributed denial-of-service (DDoS) attacks and alleged copyright infringement against news and opinion websites. On May 7, *Aporrea*, a news website, reported that it had suffered a DDoS attack, which allegedly recurred on May 8.[131] It was recorded that media outlets *El Nacional* and *Qué Pasa en Venezuela* had faced obstacles to remain online due to alleged copyright infringement. The websites of these outlets were restricted between May 4 and 6 for more than 13 and 26 hours, respectively, following plagiarism complaints related to a report they had published on the export of Venezuelan gas to Colombia. According to the information available, the requests for removal of the report due to copyright issues were addressed to the companies that hosted the servers of those websites.[132]

89.    There is consensus in international human rights law about the fundamental role that access to the internet plays for the effectiveness of a wide range of human rights, including the freedom of expression, freedom of association and freedom of assembly, the right to participate in social, cultural and political life, the rights to health, education and work, among others.[133] In this regard, the Commission recalls that, as part of the positive obligation to promote and facilitate the enjoyment of human rights, States should take all measures within their power to ensure that all individuals have meaningful access to the Internet. In addition, as part of the obligation to respect, authorities should refrain from interfering with internet access and digital communications platforms unless said interfering is in full compliance with the requirements of the applicable human rights instruments.[134]

**Restrictions on academic freedom**

90.    Finally, according to the information received, university autonomy in Venezuela continued to face significant challenges, including budget restrictions, attacks and interventions in university facilities, limited opportunities for students to participate in the development of public policies impacting them, as well as harassment, arrests and an environment of indirect pressure that stands in the way of full academic freedom in the conduct of research.[135]

91.    For instance, on January 27, María Fernanda Rodríguez, a human rights defender and university professor, was arrested at the Universidad Metropolitana in Caracas a day after having participated as a representative of civil society organizations in a meeting with the United Nations High Commissioner for Human Rights, Volker Türk, during his visit to Venezuela. The professor was subsequently released.[136]

92.    Within this adverse context, information showing a steep decline in both the number of university professors and students was published in 2023. According to estimations, approximately 3,500

---

[129] Venezuela Sin Filtro X account (@Vesinfiltro), June 20, 2023.

[130] *NTN24*, "'Lo que más se bloquea en Venezuela son páginas web de medios digitales.' Andrés Azpúrua, director de la 'Ve Sin Filtro,'" March 13, 2023; Center for International Media Assistance, "Digital rights and democracy: online censorship in Venezuela," March 24, 2022.

[131] *Aporrea* X account (@aporrea). May 7, 2023; Espacio Público, "Portal de Aporrea sufrió un ataque DDoS," May 9, 2023.

[132] *IPYS*, "Portales de El Nacional y Qué Pasa en Venezuela fueron limitados tras falsa denuncia por plagio," May 17, 2023.

[133] United Nations Human Rights Council, Resolution 47/16, The promotion, protection and enjoyment of human rights on the Internet A/HRC/RES/47/16, July 26, 2021; UN, OSCE, OAS and ACHPR, Joint Declaration on Freedom of Expression and the Internet, June 1, 2011.

[134] OHCHR, *Internet shutdowns: trends, causes, legal implications and impacts on a range of human rights*. Report of the Office of the United Nations High Commissioner for Human Rights A/HRC/50/55, May 13, 2022, para. 8.

[135] Human Rights Observatory of the University of Los Andes,  Monthly reports on the situation of universities in Venezuela, 2023.

[136] Human Rights Observatory of the University of Los Andes, *Situación de las Universidades en Venezuela,* January 2023; *El Nacional*, "Liberaron a la defensora de derechos humanos María Fernanda Rodríguez," January 27, 2023.

VZ Vacatur_0168



professors resigned from their positions in 2022, specifically at the Universidad Central de Venezuela.[137] In addition, the enrollment rate at that university decreased by 54.23 percent between 2016 and 2022.[138] This situation also had a significant impact on the country's contribution to the overall academic research activities conducted in Latin America and the Caribbean, which have decreased significantly, from 4.7 percent in 1996 to less than 0.6 percent in 2023.[139]

93.    The Commission highlights the paramount role that universities play as centers that foster critical thinking and the exchange of ideas. At the same time, the Commission underscores the close relationship between academic freedom and the construction and consolidation of a democratic society.[140] The State of Venezuela must respect and guarantee university autonomy. In particular, the Commission stresses that any interference with academic freedom must meet the requirements of legality, legitimate aim, suitability, necessity and proportionality in accordance with the precepts of a democratic society.[141] In addition, the State has the obligation to prevent and investigate all acts of intimidation, assault, harassment or threats against individuals because of their participation in the academic community.[142]

### C.    Situation of economic, social, cultural and environmental Rights (ESCERs)[143]

94.    Within the framework of a complex, serious and multidimensional humanitarian crisis, Venezuela continued to experience high rates of poverty, inequality and food insecurity, in addition to a collapse of the healthcare system and significant limitations to guarantee economic, social, cultural and environmental rights. According to the information available, most of the protests in the country this year were related to demands to guarantee these rights.[144]

**Decrease in poverty and increase in inequality**

95.    With regard to the statistics on poverty in the country, the 2022 National Living Conditions Survey (ENCOVI) found that 50.5 percent of households lived under the poverty line, which constituted a 15-percent decrease against 2021 and the first decline in the poverty rate since 2014. Nevertheless, the data shows that inequality in the country has worsened in parallel to this improvement. In addition, poverty has worsened across the country.[145]

96.    Hum Venezuela informed that poverty continues to be a widespread problem in the country and that the income of most households was insufficient to cover their essential needs In this regard, according to a community survey performed between July and August 2023, low income was the main problem of 86.3 percent of the households surveyed, and 56.5 percent were most concerned about the lack of livelihood, considering that the estimated price of the consumer basket in August was 372 US dollars, while the average monthly household income was only 102.5 US dollars per month in the 20 states of the country where the survey was conducted.[146]

---

[137] *The Conversation*, "Venezuela: sin recursos, sin profesores y sin alumnos, las universidades públicas luchan por sobrevivir," July 6, 2023.

[138] *Últimas Noticias*, "En 54.23% cayó matrícula estudiantil de la UCV," April 26, 2023.

[139] *The Conversation*, "Venezuela: sin recursos, sin profesores y sin alumnos, las universidades públicas luchan por sobrevivir," July 6, 2023.

[140] IACHR, Inter-American Principles on Academic Freedom and University Autonomy, 2021.

[141] IACHR, Inter-American Principles on Academic Freedom and University Autonomy, 2021.

[142] IACHR, Inter-American Principles on Academic Freedom and University Autonomy, 2021.

[143] This section was prepared by the Office of the Special Rapporteur on Economic, Social, Cultural and Environmental Rights.

[144] Venezuelan Observatory of Social Conflict , "Conflictividad social en Venezuela en agosto 2023," September 2023.

[145] Universidad Católica Andrés Bello (UCAB) Economic and Social Research Institute, *Condiciones de vida de los venezolanos. ENCOVI 2022*, November 2022; Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, *El aparato estatal, sus mecanismos de represión y las restricciones al espacio cívico y democrático* A/HRC/54/CRP.8, September 18, 2023.

[146] Hum Venezuela, *Community Diagnostics, July-August 2023*, October 2023, p. 2.



97.     Therefore, although Venezuela left behind the hyperinflation cycle[147] and experienced economic growth in 2022, the economy contracted by 8.5 percent during the first semester of 2023.[148] As a result, no improvement was observed in the quality of life of the population,[149] and households remain largely dependent on state aid, although insufficient.[150]

**Deficiencies of the healthcare system**

98.     In this complex scenario, millions of individuals are unable to access adequate health care and face food insecurity.[151] According to the information available, the country continues to be mired in the collapse of its healthcare system, characterized by persistent shortages and deficiencies in the supply of medicines, supplies, equipment and medical treatments. In addition, it was observed that healthcare workers work under precarious conditions and that numerous medical devices and medical centers were out of service.[152]

99.     In this regard, the public health system responsiveness was found to be dramatically lower, with an estimate loss of 70 percent of its capacity since 2016.[153] In addition, it was reported that 82.2 percent of healthcare centers have structural and operational deficiencies, out of which 50.1 percent are severe.[154] In parallel, according to estimations, 90 percent of public laboratories are inoperative.[155] The shortage of operating room supplies in public hospitals has reached 72 percent.[156] As of August 2023, the shortage of medications stood at 26.3 percent, with diabetes (31.7 percent), seizures (31.9 percent) and acute respiratory infections (32.6 percent) being the three main causes of morbidity with the highest medication shortage rates.[157]

100.     This has resulted in approximately 9.3 million people living with chronic medical conditions and facing the possibility of not being able to receive their treatment due to medication and supply shortages.[158] As of August 2023, 88.9 percent of households reported inoperative services in public health centers due to their inability to provide care, reduced and limited opening hours, or services shutdown. This impacted the services provided by means of assistance program Barrio Adentro (97.8 percent), community clinics (97.3 percent), comprehensive care centers (90.1 percent), outpatient treatment centers (87.8 percent) and hospitals (74.3 percent).[159]

101.     In addition, the current crisis sparked the resurgence of preventable and infectious diseases.[160] This situation was compounded by the opacity of information and the lack of transparency of the

[147] *DW*, "Venezuela: la mayor tasa mundial de inflación en alimentos," September 6, 2023.

[148] Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, *El aparato estatal, sus mecanismos de represión y las restricciones al espacio cívico y democrático* A/HRC/54/CRP.8, September 18, 2023, para. 48.

[149] Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, *El aparato estatal, sus mecanismos de represión y las restricciones al espacio cívico y democrático* A/HRC/54/CRP.8, September 18, 2023; *New York Times*, "Ferrari, Prada y hambre: la visión socialista de Venezuela se tambalea," March 21, 2023.

[150] Hum Venezuela, *Community Diagnostics, July-August 2023*, October 2023, p. 2.

[151] Human Rights Watch (HRW), "Venezuela. Events of 2022," 2023.

[152] IACHR, Resolution 11/2022, Precautionary Measure No. 150-19, Concepción Palacios Maternity Hospital regarding Venezuela (Follow-up), February 27, 2022; REDESCA, *V Annual Report of the Office of the Special Rapporteur on Economic, Social, Cultural and Environmental Rights (REDESCA) of the Inter-American Commission on Human Rights (IACHR)*, 2021, para. 1579.

[153] *El País*, "La salud pública en Venezuela redujo en 70% su capacidad de respuesta desde 2016," May 15, 2023.

[154] Hum Venezuela, *Community Diagnostics, July-August 2023*, October 2023, p. 9.

[155] *El Nacional*, "90% de los laboratorios públicos del país están inoperativos," June 16, 2023.

[156] *Voz de América*, "La odisea de parir en un hospital público en Venezuela," May 22, 2023.

[157] Convite, "Boletín 73: Agosto 2023 cierra con 26,3% de escasez de medicinas para las morbilidades que monitorea Convite," September 28, 2023.

[158] *El País*, "La salud pública en Venezuela redujo en 70% su capacidad de respuesta desde 2016," May 15, 2023.

[159] Hum Venezuela, *Community Diagnostics, July-August 2023*, October 2023, p. 6.

[160] HRW, "Venezuela. Events of 2022," 2023.



State, which has not published the annual epidemiological bulletin for more than seven years.[161] In this context, the Commission notes that the State has not complied with the precautionary measures granted to patients in the Maternity Hospital Concepción Palacios and to children waiting for transplants and services at the J. M. de los Ríos Hospital.[162] The collapse of these hospitals resulted in the death of at least 79 children who were awaiting transplants in the nephrology department over the last six years, while 14 adolescents and 25 children are still awaiting a response from the hematology department.[163]

102.    Deprivation in access to the right to health also arise from the fact that the basic and social determinants of health are not guaranteed. According to estimations, during 2022, at least 6.5 million persons were not able to purchase enough food to cover basic daily food energy needs for at least one year.[164] In addition, 12.3 million Venezuelans faced food insecurity in 2023.[165] This problem was compounded by the fact that, as of July 2023, Venezuela was ranked first within the 10 countries with the highest nominal inflation rate for food in the world, reaching 414 percent.[166]

**Deficiencies in access to basic services**

103.    Similarly, the country faced significant problems to meet the basic needs of a large portion of its population. Power supply deficiencies not only had a negative impact on the quality of life of the population in general, but also caused the death of patients in several medical centers, according to the information available. In particular, Médicos por la Salud reported that, only in 2022, 261 persons had lost their lives due to power outages in hospitals.[167]

104.    In addition, the population faced growing challenges to access water and sanitation since the water supply is not continuous, and the quality of water has deteriorated. According to estimations, between 80 and 90 percent of the population has no access to water due to problems in its distribution and the condition of water basins in the country.[168] According to the information available as of August 2023, approximately 74.3 percent of households had no regular access to water, including 18.1 percent of households with no access to aqueducts, 10.6 percent suffering occasional failures and 45.8 percent experiencing frequent failures.[169]

**Precarious working conditions**

105.    Furthermore, with regard to labor and trade union rights, the Commission noted that most of the persons who are employed are not able to enjoy a decent life due to low wages and precarious working conditions, especially in the public sector. According to the Venezuelan Observatory of Social Conflict (OVCS), as of August 2023, their labor rights were still the main cause for peaceful demonstrations, representing 40 percent of the claims.[170]

[161] *Efecto Cocuyo*, "Enfermedades crónicas se agravaron en Venezuela en dos años de pandemia," March 17, 2022.

[162] Provea, "Los niños del Hospital J. M. de los Ríos 'siguen muriendo' y se mantienen a la espera de que garanticen sus derechos," July 9, 2023; *Efecto Cocuyo*, "Bancos de leche y lactarios disminuyen sus servicios en Caracas," August 15, 2023; *Costa del Sol*, "Parir en Venezuela, "Una vecina me quitó los puntos de la cesárea", 18 de julio de 2023; IACHR, 2022 Annual Report. Chapter IV.B. Venezuela, para. 140. For reference, see: IACHR, Resolution No. 13/19, Precautionary Measure No. 150/19, Maternity Hospital Concepción Palacios regarding Venezuela, Venezuela, March 18, 2019; IACHR, Resolution No. 43/19, Precautionary Measure No. 1039-17, Children and adolescents patients in thirteen services of the José Manuel de los Ríos Hospital regarding Venezuela, August 21, 2019; IACHR, Resolution No. 11/22, Precautionary Measure No. 150-19, Maternity Hospital Concepción Palacios regarding Venezuela, February 27, 2022.

[163] Provea, "Los niños del Hospital J. M. de los Ríos 'siguen muriendo' y se mantienen a la espera de que garanticen sus derechos," July 9, 2023.

[164] Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, *El aparato estatal, sus mecanismos de represión y las restricciones al espacio cívico y democrático* A/HRC/54/CRP.8, September 18, 2023, para. 50.

[165] *Euronews*, "Crisis humanitaria de Venezuela y Haití podrían empeorar, dice Comité Internacional de Rescate," January 24, 2023.

[166] *DW*, "Venezuela: la mayor tasa mundial de inflación en alimentos," September 6, 2023.

[167] *El Nacional*, "Provea advierte que apagones ponen en riesgo a pacientes hospitalarios." September 17, 2023.

[168] Hum Venezuela, *Community Diagnostics, July-August 2023*, October 2023, p. 14.

[169] Hum Venezuela, *Community Diagnostics, July-August 2023*, October 2023, p. 14.

[170] OVCS, "Conflictividad social en Venezuela en agosto 2023," September 2023.

VZ Vacatur_0171




106.    In this regard, the Commission reiterates its deep concern over the complaints involving forced labor in the country, according to which 49 cases of labor exploitation and unsafe conditions were recorded between May and December 2022.[171] Similarly, the Commission has closely monitored the impact of extractive activities in the south part of the country which, in addition to causing deforestation, water contamination and the displacement of indigenous communities, has reportedly resulted in harsh working conditions and in terrible abuses against the population, including amputations, armed attacks and murders, at the hands of groups who control illegal gold mines and who allegedly operate with the acquiescence of the government.[172]

**Sanctions against sectors and unilateral coercive measures**

107.    In this context of democratic backsliding, several countries of the American continent and the European Union have adopted different sanctions in response to the serious and mass human rights violations in Venezuela. On one hand, there are specific sanctions in place aimed at public officials and persons associated with the government and the United Socialist Party of Venezuela (PSUV). On the other, sectoral sanctions have been imposed against industries and sectors.

108.    According to the information available, specific sanctions were imposed before sectoral ones. According to the president of the Venezuelan National Assembly, 962 sanctions of different nature were imposed from 2015 to 2023.[173]

109.    The information available to the IACHR indicates that the serious economic situation preceded the imposition of sanctions and was caused by different factors. Among these are the fall in oil prices,[174] the policy of privatization and expropriations,[175] poor public management characterized by excessive public spending,[176] widespread corruption,[177] among others;[178] however, it takes note of the findings of the UN special rapporteur on unilateral coercive measures and human rights, who, after visiting the country, pointed out that sectoral sanctions have no normative basis in international law and have worsened the situation of people in a vulnerable situation[179]. For this reason, the IACHR reiterates its call for them to be lifted[180] and highlights that the imposition of sanctions does not exempt the Venezuelan State from fulfilling its international obligations regarding human rights.

# V.    IMPACT ON GROUPS IN VULNERABLE SITUATIONS AND DISCRIMINATION

110.    The dire human rights situation in Venezuela has affected the entire population; however, it has differentiated impacts on those persons who have been subjected to structural and historic discrimination, such as women, boys, girls and adolescents, lesbian, gay, bisexual, trans and intersex (LGBTI) persons, Afro-descendants and indigenous peoples, persons with disabilities, refugees, migrants and persons in need of international protection. For this reason, the Inter-American Commission examines the following elements in relation to these specific groups.

---

[171] Movimiento Vinotinto, "Movimiento Vinotinto registra 49 casos de trabajo forzoso entre los estados Táchira, Lara y Zulia," March 15, 2023.
[172] HRW, "Venezuelan Tainted Gold." April 29, 2022; HRW, "Venezuela. Events of 2022," 2023.
[173] National Assembly of Venezuela, "De 962 sanciones contra Venezuela 756 fueron firmadas por Donald Trump," March 9, 2023.
[174] El País, "La caída del precio del petróleo agrava la crisis económica de Venezuela," October 16, 2014.
[175] Acceso a la justicia, "El trágico legado de las expropiaciones y nacionalizaciones," February 14, 2018.
[176] Reuters, "Venezuela says inflation slows, economy grew 1.6 pct in 2013," December 30, 2013.
[177] Transparencia Venezuela, "70 por ciento de los gobiernos no establecen controles anti-corrupción en materia de Defensa," February 9, 2013.
[178] Reuters, "Economía venezolana se desacelera en 3er trimestre 2013 y crece sólo 1.1 pct," November 26, 2013.
[179] UN News, Rapporteur asks the United States and the European Union to lift sanctions on Venezuela due to their devastating effect on the population, February 12, 2021.
[180] IACHR, 2021 Annual Report. Chapter IV.B. Venezuela. OEA/Ser.L/V/II. Doc. 5, May 26, 2022, para. 166; IACHR, 2021 Annual Report, Chapter IV.B. Venezuela. OEA/Ser.L/V/II. Doc. 5, May 26, 2022, para. 166.

VZ Vacatur_0172

 

**Women**

111.     With regard to the human rights situation of women, the Commission notes that the State adopted minor measures to improve the protection of rights and the access to justice in gender-based violence cases. Among these measures, the Commission notes Resolution No. 98 of the Office of the Public Prosecutor, which expanded the competence of the 95th Office of the Public Prosecutor so as to include cases of women trafficking, thus becoming the National Office of the Public Prosecutor Specialized in Women Trafficking;[181] a resolution adopted by the Plenary Chamber of the Supreme Court of Justice which approved the creation of three new courts with competence over crimes involving violence against women in the states of Barinas, La Guaira and Trujillo;[182] and the announcement of the creation of Gran Misión Mujer Venezuela, a governmental body responsible for articulating policies and social programs to promote the development of women in the educational, labor, social and political spheres.[183]

**112.**     In terms of gender equality in public positions, the Commission verified the progress made in achieving equality in the composition of the Supreme Court of Justice, which was presided by a woman in 2023 and whose members were 45 percent female. However, women were still underrepresented in the other branches of the State, such as the National Assembly (31 percent), the national government (27 percent), governorships (8.3 percent) and mayorships (19 percent).[184]

113.     With regard to the prevention, investigation and punishment of gender-based violence, the Commission identified challenges related to the implementation of public policies related to the Organic Law on the Right of Women to a Life Free of Violence (LODMVLV), whose reform, published in 2022, represented a step forward in the protection of women in the country.[185] Among these challenges, the Commission highlights the absence of information on the budget allocation necessary for the implementation of the Law,[186] the failure of the State to appoint members to the National Commission to Guarantee the Right of Women to a Life Free from Violence and to make it operational,[187] as well as the insufficient number of shelters for victims of gender-based violence.[188] These challenges were also compounded by the absence of gender equality legislation, the lack of plans or policies to eradicate gender-based violence, the absence of protocols to investigate these cases with a gender perspective and the limited training programs available for public officials.[189]

114.     Similarly, there were still no official data and statistics records on gender-based violence against women, which could have been used for the development and implementation of prevention policies.[190]

---

[181] Office of the Public Prosecutor of Venezuela, Resolution No. 98, January 27, 2023.

[182] *El Universal*, "TSJ aprueba la creación de tres nuevos tribunales en materia de Delitos de Violencia Contra la Mujer en Barinas, La Guaira y Trujillo," September 27, 2023.

[183] Bolivarian Government of Venezuela, "Gobierno Nacional crea la Gran Misión Mujer Venezuela," March 8, 2023. This measure was also welcomed by the OHCHR. See: OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, para. 30.

[184] Human Rights Committee, Replies of the Bolivarian Republic of Venezuela to the list of issues in relation to its fifth periodic report CCPR/C/VEN/RQ/5, June 7, 2023, para. 33; Committee on the Elimination of Discrimination against Women (CEDAW), Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 29.

[185] IACHR, *2022 Annual Report. Chapter IV.B.* Venezuela, para. 92.

[186] OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, para. 30.

[187] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 17.

[188] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 25; Human Rights Committee, Replies of the Bolivarian Republic of Venezuela to the list of issues in relation to its fifth periodic report, CCPR/C/VEN/RQ/5, June 7, 2023, para. 43.

[189] OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, para, 30; CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, paras. 15 and 25; Amnesty International, *Amnesty International Report 2022/23: The state of the world's human rights.* 2023, pp. 473 and 474.

[190] IACHR, *2021 Annual Report. Chapter IV.B. Venezuela,* para. 179; IACHR, *2022 Annual Report. Chapter IV.B. Venezuela,* para. 92. The Office of the United Nations High Commissioner for Human Rights and the CEDAW have expressed similar concerns. See: OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, para. 31; CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela

VZ Vacatur_0173





According to data published by the Attorney General on social media, since 2018, at least 628 women have been murdered by men with whom they had had a close relationship. One thousand two hundred and eight indictments for these crimes were issued during the same period, and 340 requests for arrest warrants were filed.[191] In addition, according to data gathered by the civil society, it is estimated that 184 femicides and 100 attempted femicides were committed between January 1 and August 31, 2023.[192]

115.     The situation of violence faced by women and girls in rural areas near the borders with Brazil and Colombia, in particular in the states of Zulia, Bolívar and Amazonas, was worsened by the actions of armed and criminal groups present in the region and involved in drug trafficking and illegal extraction activities. Reports showed that these persons, in particular indigenous women and residents of rural areas, were victims of femicides, disappearances, sexual violence and contemporary forms of slavery, such as sexual and labor exploitation by human trafficking networks.[193]

116.     In addition, women who live near mining areas, especially indigenous women, are at risk of contamination by heavy metals used in extractive activities, such as gold and cyanide mining, which jeopardizes their health.[194]

117.     Furthermore, deficiencies in the healthcare system have led to high mortality rates in the country.[195] This is caused by the lack of access to sexual and reproductive health goods and services[196] and by the limitations on the access to contraceptives and essential drugs for pregnant women,[197] as well as by insufficient health services and menstrual hygiene products for women deprived of liberty.[198]

118.     In the same vein, the persistent and almost absolute criminalization of persons who seek to voluntarily terminate a pregnancy, which is only allowed exceptionally in cases where the life of the pregnant woman is at risk,[199] together with the lack of abortion and post-abortion medical protocols,[200] created significant risks to the life and health of persons with gestational capacity. Additionally, the challenges for the implementation of comprehensive sexual education and gender equality programs in schools persisted, which is linked to the high dropout rates of girls and adolescents due to pregnancies.[201]

CEDAW/C/VEN/CO/9, May 31, 2023,para 25.d). See also: Amnesty International, *Amnesty International Report 2022/23: The state of the world's human rights,* 2023, pp. 473 and 474.

[191] Office of the Public Prosecutor of Venezuela X account (@MinpublicoVEN), July 31, 2023.

[192] CEPAZ National Femicide Observatory, *Monitoreo de femicidios enero–julio 2023,* n/d, and Monitoreo de femicidios agosto 2023, retrieved on October 1, 2023. In addition, UTOPIX, a non-governmental organization, recorded 139 femicides during the same period. Utopix, "agosto de 2023: Son 18 femicidios en Venezuela para un total de 139 casos en ocho meses," September 21, 2023.

[193] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, paras. 19 and 27; OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, paras. 23 and 27; Fundaredes, "Mujeres indígenas y de zonas rurales son víctimas de violencia por grupos armados irregulares en territorio venezolano," Bulletin No. 45, July 20, 2023; *Noticia al Día*, "Con mayor incidencia de homicidios en Zulia: Denuncian aumento de acciones delictivas en estados fronterizos," March 16, 2023.

[194] OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, para. 13; CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela, CEDAW/C/VEN/CO/9, May 31, 2023, para. 37.

[195] According to the most recent report published by the United Nations Population Fund (UNFPA), Venezuela was among the eight countries and territories with the largest maternal mortality rate increase in the world between 2000 and 2020. UNFPA, *State of World Population 2023*, n/d, pp. 16 and 39.

[196] IACHR, *2021 Annual Report. Chapter IV.B. Venezuela,* paras. 158 and 184; IACHR, *2022 Annual Report. Chapter IV.B. Venezuela,* para. 94.

[197] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 37; Amnesty International, *Amnesty International Report 2022/23: The state of the world's human rights, 2023,* p. 473.

[198] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 49.

[199] IACHR, *2021 Annual Report. Chapter IV.B Venezuela,* para. 184.

[200] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 37; Amnesty International, Amnesty International Report 2022/23: The state of the world's human rights, 2023, p. 473.

[201] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 33.

 

**Refugees, migrants and persons from Venezuela in need of international protection**

119.    In line with the foregoing, the Commission noted that the main factors that triggered the unprecedented forced displacement of the Venezuelan population within and outside the Americas remain unchanged. According to the most recent figures from the Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela (R4V Platform), as of August 2023, there were 7,710,887 refugees, migrants and asylum seekers from Venezuela, out of which 6,527,064 were in Latin America and the Caribbean.[202]

120.    The main receiving countries for Venezuelan nationals in human mobility were Colombia, which recorded 2.89 million persons in 2023; Peru, with 1.54 million; and Brazil, with 477,500. In addition, according to the most recent figures from the United Nations High Commissioner for Refugees (UNHCR), by the end of 2022, there were 230,393 Venezuelan refugees in the world, as well as 1,137,162 asylum seekers and a total of 5,217,456 persons in need of international protection.[203]

121.    According to the R4V Platform, the impact of the Covid-19 pandemic and the global cost of living are among the factors that have contributed to an environment in which Venezuelan nationals have limited access to livelihoods and to integration opportunities, despite the efforts of the countries of destination to grant international protection to refugees and implement migratory regularization and socio-economic integration processes.[204] This was compounded by a price growth acceleration process in Venezuela: according to the Venezuelan Finance Observatory, the interannual inflation rate was 422 percent as of August 2023.[205]

122.    This mass migration cycle which, in the case of persons with fewer economic resources, took place by land, was combined with challenges during transit. As a result of the barriers imposed by other States to discourage the entry to their territories, Venezuelans increasingly turned to human smuggling networks and irregular routes to avoid stricter border control measures, which exponentially increased risks and promoted potential human rights violations.[206]

123.    Once in the countries of destination, Venezuelan nationals reported food insecurity and lack of access to employment. They also recounted their need for adequate housing, since many of them were reportedly living in overcrowded conditions, with limited access to water, sanitation and hygiene. Children and adolescents also faced difficulties to access education.[207] Furthermore, they reported challenges related to discrimination, xenophobia, violence and the failure to mitigate learning gaps due to low literacy and numeracy levels. In addition, language barriers represent a significant challenge in some countries in the region.[208]

124.    Access to a regular migratory status in the countries of destination constituted an additional challenge for migrants. According to 2023 figures, one out of every three refugees and migrants in the region were living irregularly, which subjected them to exclusion and vulnerability, as well as to situations of precariousness, discrimination and insecurity.[209] In particular, this resulted in an exponential risk of statelessness for children and adolescents who were born in transit or in countries of destination, especially in States whose regulations impose legal and/or practical barriers to naturalization.[210]

125.    In addition to these challenges, Venezuelan nationals faced difficulties in accessing identification and/or travel documents proving their nationality, which created practical obstacles to obtaining a regular migratory status. Changes in bureaucratic procedures, supply shortages, the suspension of consular

---

[202] R4V Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela, *R4V Latin America and the Caribbean, Venezuelan Refugees and Migrants in the Region,* August 31, 2023.

[203] UNHCR, Refugee Data Finder, "Venezuela statistics," December 31, 2022.

[204] R4V, *RMNA 2023 Refugee and migrant needs analysis,* September 2023, p. 14.

[205] Venezuelan Finance Observatory, "August 2023: la inflación fuera de control," September 5, 2023.

[206] R4V, *RMNA 2023 Refugee and migrant needs analysis,* September 2023, p. 17.

[207] R4V, *RMNA 2023 Refugee and migrant needs analysis,* September 2023, p. 26.

[208] R4V, *RMNA 2023 Refugee and migrant needs analysis,* September 2023, p. 36.

[209] R4V, *RMNA 2023 Refugee and migrant needs analysis,* September 2023, p. 26.

[210] UNHCR and Facultad de Derecho Alberto Hurtado, *El riesgo de apatridia en movimientos mixtos sucesivos,* August 2023.

VZ Vacatur_0175




services in some countries and the inability to run errands from abroad, caused by the political crisis, economic instability and the lack of resources, have hindered the possibility to obtain or renew essential documents.[211]

126.    Although various regularization and documentation initiatives had been implemented which have guaranteed access to vital rights and services for these people, the International Organization for Migration (IOM) emphasized that the international community needed to continue protecting them and investing in their host communities.[212] Similarly, the UNHCR and the IOM have called upon ensuring access to regularization mechanisms for Venezuelan refugees and migrants, and they have underscored that said mechanisms were the best way to foster inclusion in host countries, as well as to ensure access to documentation, promote their integration and prevent the increase of movements along dangerous migratory routes in the Americas.[213]

127.    The aforementioned challenges in host countries have led to an increase in the mass and continuous movements of Venezuelan nationals from one country to the other in search of asylum or settlement.[214] Although these movements had been first observed at the end of 2020, they escalated in an unprecedented and multidirectional manner during 2023, and with an increasing tendency towards the north, mainly aimed at Central and North America.[215]

128.    The Inter-American Commission emphasizes that the State needs to address the causes of migration and, in particular, to reestablish democracy and the Rule of Law. Furthermore, the Commission urges other States in the region to coordinate efforts to protect Venezuelan nationals moving through their territories. Finally, the Commission reiterates the need to adopt a complementary approach between the mechanisms for legal status regularization (migratory statutes) and international protection statutes, based on access to rights and comprehensive and durable solutions for Venezuelan nationals in the context of human mobility.[216]

**Persons deprived of liberty**

129.    The situation of persons deprived of liberty in Venezuela stands out as one of the most serious in the region. In particular, this is a result of the persistent lack of updated official statistics, the existence of two prison systems, overcrowding and the excessive use of preventive detention. In addition, deplorable detention conditions have been reported, as well as acts of torture and ill-treatment. This situation has led to an increase in the risks faced by LGBTI persons and those detained for political reasons, as detailed previously, especially considering the complete deterioration of the Rule of Law and the persecution carried out by the State.

**Duality of prison systems**

130.    One of the main challenges faced by persons deprived of liberty in Venezuela is the existence of a dual prison system. The official system, which, by the end of 2022, housed 33,558 people in 45 detention centers run by the Ministry of Popular Power for the Penitentiary Service (MPPSP),[217] and a parallel system,

---

[211] IACHR, *2022 Annual Report*. Chapter IV.B. Venezuela.

[212] International Organization for Migration, "Venezuelan Refugees, Migrants, and Their Hosts Need Help to Chart a Brighter Future." March 14, 2023.

[213] UNHCR and IOM, Joint Press Release, "Regularization and integration are key to addressing human mobility in the Americas." May 31, 2023.

[214] UNHCR and Facultad de Derecho Alberto Hurtado, *El riesgo de apatridia en movimientos mixtos sucesivos.* August 2023.

[215] R4V, *RMNA 2023 Refugee and migrant needs analysis.* September 2023, p. 14.

[216] IACHR, *Guía Práctica Protección internacional y regularización de la condición legal en el contexto de movimientos mixtos a gran escala en las Américas.* April 1, 2023.

[217] Venezuelan Prison Observatory (OVP), *Informe Anual 2022.* 2023, p. 20.




composed of approximately 500 preventive detention spaces or *calabozos*,[218] which allegedly housed 35,000 people as of March 2022.[219]

131.    The Commission emphasizes that it has repeatedly been unable to access official data on the population deprived of liberty in 2023. However, the civil society reported that there had been no significant changes in data compared to 2022 and that the State continued its practice of holding persons in pretrial detention spaces. In some cases, people had been detained for more than 10 years in facilities which are not suitable to house persons for more than 48 hours.[220]

132.    In this regard, the Commission recalls that the State must adopt the necessary legislative measures and structural reforms so that detention at police facilities is used as little as possible, only until a judicial authority determines the legal situation of the person under arrest.[221]

## Overcrowding

133.    Although the number of persons detained decreased by 4.5 percent,[222] according to the most recent information of the Venezuelan Prison Observatory (OVP), there were 33,558 people detained in prisons in 2022, while the capacity of prison facilities is 20,438 people.[223] These figures indicate that the level of overpopulation reaches 64 percent. This situation is more serious in the Penitentiary Center of the state of Aragua, the Anzoátegui Judicial Confinement Center, the Rodeo II Capital Region Judicial Confinement Center and the Rodeo III Capital Region Judicial Confinement Center, where overpopulation levels have reached 281 percent, 230 percent, 220 percent and 202 percent, respectively.[224]

134.    The Commission reiterates that overcrowding of persons deprived of liberty in itself could constitute a form of cruel, inhuman or degrading treatment, and therefore a violation of the right to personal integrity and other internationally recognized human rights.[225] In this regard, the Commission urges the State of Venezuela to adopt urgent measures to reduce overcrowding in detention centers across the country, starting with those whose overpopulation levels are higher than 200 percent.

## The use of pretrial detention

135.    One of the causes of the increased levels of overcrowding is the excessive use of pretrial detention as a precautionary measure in the country. According to information provided by the civil society, out of the 33,558 people in detention centers, 17,825 were in pretrial detention, representing 53 percent of the detained population.[226]

136.    In addition to this, according to the most recent report of the Independent International Mission, there were several instances in which people had been held in pretrial detention in the headquarters of the Bolivarian National Intelligence Service and the General Directorate of Military Counterintelligence, as well as in other places of detention across the country, for longer periods than those permitted by law. Likewise, the information gathered showed that, even after a judge had ordered the immediate release of individuals, prison directors had refused to do so on the grounds that authorizations from the MPPSP were pending. This

---

[218] IACHR, *2021 Annual Report. Chapter IV.B. Venezuela.* para. 202, and IACHR, *2022 Annual Report. Chapter IV.B. Venezuela.* para. 122.

[219] World Prison Brief, World Prison Brief data – Venezuela, 2023.

[220] Venezuelan Prison Observatory, *Informe Anual 2022.* 2023, p. 102.

[221] IACHR, *Report on the Use of Pretrial Detention in the Americas.* para. 257.

[222] Specifically, there were 33,710 people in detention centers in 2021, a figure that decreased to 33,558 persons in 2022. See, in this regard: Venezuelan Prison Observatory, *Informe Anual 2022.* 2023, p. 20.

[223] Venezuelan Prison Observatory (OVP), *Informe Anual 2022.* 2023, p. 35.

[224] See, in this regard: Venezuelan Prison Observatory, *Informe Anual 2022.* 2023, p. 36.

[225] IACHR, *Report on the Use of Pretrial Detention in the Americas.* OEA/Ser.L/V/II, Doc. 46/13, approved on December 30, 2013, para. 290 (hereinafter "the report on the use of pretrial detention in the Americas.")

[226] Venezuelan Prison Observatory, *Informe Anual 2022.* 2023, p. 27.

VZ Vacatur_0177



pattern has disproportionately affected persons deprived of their liberty for having opposed the government.[227]

137.    Accordingly, the Commission recalls that the application of pretrial detention must be based on consideration of the right to presumption of innocence and must take into account the exceptional nature of this measure. Moreover, it should be applied in keeping with the criteria of legality, necessity and proportionality.[228] In addition, a person must not be held in pretrial detention for longer than the State can appropriately justify its need; otherwise, the denial of liberty becomes arbitrary.[229]

**Other problematic issues**

138.    In general, detention conditions faced by persons deprived of liberty in Venezuela have been marked by overcrowding, self-government, corruption, intraprison violence, food shortages, lack of trained staff and lack of access to drinking water and medical care. The lack of updated information (except for the limited information received on the detention of women and LGBTI persons, and on those deprived of liberty for political reasons) makes it impossible for the Commission to determine whether these issues improved or worsened in 2023.

139.    According to a report published by the OVP, prison conditions for women in Venezuela showed significant problems in 2023. Among the 2,560 women who are deprived of liberty in the country, there are 82 foreigners who are detained in spaces described as "improvised" and without an adequate gender approach. Most women's facilities are annexes within prisons for men, which impacts the welfare and specific needs of incarcerated women. Critical overcrowding, which has reached 187.14 percent, is one of the main issues, together with the lack of medical care, especially for women with children, and the absence of adequate maternity spaces inside prisons.[230]

140.    During the 187th regular period of sessions held in July 2023, the Commission held a hearing on the human rights situation of LGBTI persons deprived of liberty. The organizations that requested the hearing reported that these persons were in a situation of extreme vulnerability due to the precariousness of their detention conditions, which are compounded by structural discrimination based on their sexual orientation, identity and/or gender expression.[231]

141.    According to the information provided by the civil society, no detailed statistics on LGBTI persons had been prepared during that year. The absence of information prevents the creation of policies and specific records, resulting in discrimination against LGBTI persons and in their exclusion from official data, and in the persistence of discriminatory practices in the prison system. In addition, as a consequence of the lack of information, no adequate regulations were implemented to protect LGBTI persons. For example, they were not placed in separate areas. As a result, trans women have been placed next to men and gay men in punishment cells, thus aggravating their situation of vulnerability.[232]

142.    In particular, trans, non-binary and gender-diverse individuals face significant challenges in detention centers since prison facilities are not adequately prepared to accommodate people according to their gender identities. Trans persons are frequently assigned to centers based on the sex stated in their identity documents, without considering their gender identity. In addition, the Commission received information about

---

[227] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela* A/HRC/54/57, September 18, 2023, paras. 37 and 38.

[228] IACHR, *Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas* OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, para. 231. Recommendation A "General measures related to matters of state policy," para. 1 (hereinafter "the report on measures aimed at reducing the use of pretrial detention in the Americas.")

[229] IACHR, *Report on the Use of Pretrial Detention in the Americas,* para. 159.

[230] Venezuelan Prison Observatory, "Las mujeres en prisión son discriminadas desde su detención," April 12, 2023.

[231] IACHR, 187th regular period of sessions, public hearing "Human rights situation of LGBTIQ+ persons deprived of liberty in Venezuela," held on July 14, 2023. Information provided by the Venezuelan Prison Observatory.

[232] IACHR, 187th regular period of sessions, public hearing "Human rights situation of LGBTIQ+ persons deprived of liberty in Venezuela," held on July 14, 2023. Information provided by the Venezuelan Prison Observatory.

 

the grim reality faced by these individuals who need to hide their sexual orientation or gender identity to avoid attacks and stigmatization from other inmates and from prison authorities.[233]

143. The challenges that LGBTI persons face in accessing respectful health services are evidenced by the obstacles they encounter to receive hormone therapy and medical care for specific diseases such as the human immunodeficiency virus (HIV). Even those persons who had previously benefited from HIV antiretroviral drugs stopped receiving their treatment during the Covid-19 pandemic and currently have no access to services to assess their health condition. In addition, LGBTI persons faced an increased risk of physical and verbal violence from other inmates. With regard to conjugal visits, although every detained person is entitled to them, the LGBTI population encountered obstacles to the exercise of this right due to the context of discrimination and lack of awareness among prison staff,[234] as well as absence of regulations protecting their relationships.[235]

**Lesbian, gay, bisexual, trans and intersex (LGBTI) persons**

144. LGBTI persons do not only face challenges related to discrimination based on sexual orientation and/or gender identity in the prisons across the country. These persons experienced high levels of violence and discrimination in 2023, which, according to public information, resulted in at least 60 cases of attacks against LGBTI persons during the first three months of the year.[236] At the same time, the preliminary report of País Plural showed that, out of a sample of 555 LGBTI persons, 28.11 percent reported that they had been subjected to violence by state agents, 25.89 percent stated that they had been excluded from employment opportunities, and 20.27 recounted that they had faced discrimination by health professionals.[237]

145. For instance, on July 23, 2023, the Bolivarian National Police (PNB) carried out an operation in a private venue frequented by LGBTI persons in the state of Carabobo and arrested 33 gay and sexually diverse men. During the operation, the detainees were photographed, and pictures of them and their identity cards were published in various media outlets. Thirty of these individuals were released under the condition that they appeared periodically before a court, while three remained in custody for 10 days.[238]

146. Although the operation was allegedly prompted by noise-related complaints from neighbors, human rights defenders claimed that the arrests had been motivated by prejudice and discrimination against these persons based on their sexual orientation. The operation took place in a context of great vulnerability of LGBTI people in Venezuela, who are at the mercy of arbitrary measures or abuses of authority from state security agents based on prejudice against their non-normative sexual orientation or gender identity.[239]

147. The Commission recalls that criminalizing sexual relations between consenting adults of the same sex, whether through laws or the actions of security and justice bodies, runs counter to inter-American and universal human rights standards. Similarly, the principles of due diligence require that information relating to the sexual orientation, gender identity and/or gender expression of people under investigation be handled with strict control of their privacy to ensure respect for the dignity and rights of all people involved.[240]

[233] See, in this regard: IACHR, *2022 Annual Report, Chapter IV.B. Venezuela,* paras. 121, 127-133. In addition, see: IACHR, 187th regular period of sessions, public hearing "Human rights situation of LGBTIQ+ persons deprived of liberty in Venezuela," held on July 14, 2023. Information provided by the Venezuelan Prison Observatory.
[234] IACHR, 187th regular period of sessions, public hearing "Human rights situation of LGBTIQ+ persons deprived of liberty in Venezuela," held on July 14, 2023. Information provided by the Venezuelan Prison Observatory.
[235] IACHR, 187th regular period of sessions, public hearing "Human rights situation of LGBTIQ+ persons deprived of liberty in Venezuela," held on July 14, 2023. Information provided by the Venezuelan Prison Observatory.
[236] *Infobae,* "Denuncian que Venezuela está rezagada en materia de derechos de la comunidad LGBTQ+," June 29, 2023.
[237] Venezuelan Observatory of LGBTIQ+ Violence, "Nuestra Comunidad presentó datos preliminares sobre las condiciones de vida de las personas LGBTIQ+ en Venezuela," September 27, 2023; Tu País Plural, "Nuestra Comunidad comparte datos preliminares de personas LGBTIQ+ en Venezuela," September 22, 2022.
[238] Washington Office for Latin America (WOLA), "Justicia para los 33 en Venezuela: ser LGBTI+ no es delito," August 3, 2023.
[239] Washington Office for Latin America (WOLA), "Justicia para los 33 en Venezuela: ser LGBTI+ no es delito," August 3, 2023.
[240] IACHR, Press Release No. 176/23, "IACHR Urges Venezuela to Refrain from Criminalizing LGBTI People," August 7, 2023.

VZ Vacatur_0179





148.     In this regard, the Inter-American Commission urges Venezuela to respect human rights and cease criminalizing LGBTI people, in strict compliance with the principles of equality and nondiscrimination. The Commission also calls on the State to guarantee the principle of legality and to ensure that people are released if no crime was committed and no charges were brought against them. Finally, the Commission urges the authorities to refrain from publicly humiliating the accused and to ensure strict compliance with due diligence standards.[241]

149.     Moreover, Article 565 of the Organic Code of Military Justice, which criminalized same-sex relations, was repealed this year.[242] This development improves the lives of LGBTI people, since the existence of said laws contributes to preserving a social environment in which discrimination and violence against LGBTI persons are understood to be tacitly permitted or tolerated.

**Indigenous peoples**

150.     The Inter-American Commission remains concerned about the human rights situation of indigenous peoples, in particular with regard to the guarantee of their ESCERs, as well as to the impact of illegal mining on their territories and to the military operations to dismantle this practice. According to estimations, illegal mining practices affected 38 Venezuelan indigenous peoples in 2023.[243]

151.     The situation of the Yanomami people, who live both in the Brazilian and the Venezuelan territories, is of particular concern. According to information provided by the State of Brazil, 570 Yanomamis have died in the last four years and at least 30,400 have suffered from malaria. In addition, the people who are part of this indigenous group and move repeatedly between the borders of Brazil and Venezuela are constantly at risk of suffering from food insecurity and medical conditions.[244]

152.     Various indigenous peoples have historically practiced artisanal mining in states such as Amazonas. However, since the Covid-19 pandemic, there has been an increase in illegal mining both by persons who invade their territories and by foreign gangs from Colombia and Brazil (known as *garimpeiros*) engaged in this practice.[245] As of August 2023, 70 illegal mining hotspots had been identified, and 934 hectares had been deforested in lands belonging to the Yek'wana people.[246]

153.     In September 2023, the State of Venezuela conducted large-scale military operations to dismantle gangs involved in illegal mining. According to information provided by civil society organizations, three indigenous persons died during this operation, reportedly as a result of the action of the armed forces.[247] In addition, according to the information available to the Commission, the State has promoted the militarization of the south part of the country as a measure to strengthen state control over mining activities in the area. As a result of this policy, the levels of violence in the region have increased and clashes, acts of corruption[248] and murders have been recorded, particularly in the municipality of Gran Sabana, Bolívar.[249]

---

[241] IACHR, Press Release No. 176/23, "IACHR Urges Venezuela to Refrain from Criminalizing LGBTI People," August 7, 2023.
[242] OHCHR, "UN High Commissioner for Human Rights Volker Türk concludes official mission to Venezuela," January 28, 2023.
[243] Foro Penal, "Venezuela: en los estados de Amazonas y Bolívar, 38 pueblos indígenas son afectados por la minería ilegal," September 15, 2023.
[244] IACHR, Press Release No. 015/23, "IACHR and Its Special Rapporteurship on Economic, Social, Cultural, and Environmental Rights Stress That Brazil Must Ensure the Survival of the Yanomami People," February 8, 2023.
[245] Mongabay, "Venezuela: monitoreo satelital detecta 70 focos de minería ilegal y 934 hectáreas deforestadas en territorio ye'kwana y sanema," August 1, 2023.
[246] Foro Penal, "Venezuela: en los estados de Amazonas y Bolívar, 38 pueblos indígenas son afectados por la minería ilegal," September 15, 2023.
[247] Foro Penal, "Venezuela: en los estados de Amazonas y Bolívar, 38 pueblos indígenas son afectados por la minería ilegal," September 15, 2023.
[248] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela* A/HRC/51/43, September 20, 2022, para 85.
[249] United Nations Human Rights Council, *Detailed findings of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela: The human rights situation in the Arco Minero del Orinoco region and other areas of the Bolívar state*

 

154.     The Commission reiterates the State's obligation to investigate and punish acts of violence against indigenous peoples with a culturally responsive approach. It also underscores the importance of taking decisive measures to address the risk and threat factors they face, especially in relation to the guarantee and protection of their lands and territories within the context of the activities, plans or projects they carry out therein.

155.     Finally, the Commission reiterates that, in accordance with the international obligations of the State, both in terms of the inter-American[250] human rights system and the universal[251] human rights system, the presence of military forces in indigenous territories must be agreed upon in advance with the indigenous peoples in question through effective consultations and appropriate procedures with their representative institutions.

**Afro-descendant persons**

156.     The State has recognized the contributions of Afro-descendant persons in international entities, such as the United Nations Permanent Forum on People of African Descent.[252] However, the Commission observes that there is no public detailed information about the situation of Afro-descendant persons in Venezuela and the challenges to their rights.

157.     A study prepared by the civil society and published in 2023 revealed a lack of attention to the specific experiences of Venezuelan Afro-descendant migrants from a rights-based and intersectional perspective. Out of a sample of 3,285 migrants in Colombia, six percent identified themselves as Afro-descendant, mainly in the cities of Cúcuta (10.5 percent), Santa Marta (4 percent) and Barranquilla (3.5 percent). This sample included a considerable proportion of women between 27 and 35 years of age.[253] The study found that racism, gender discrimination and xenophobia in the workplace are closely related, and that this has a differentiated impact on migrant Afro-descendant women and has exposed them to gender-based violence in the workplace.[254]

158.     The Commission reaffirms the need for the State of Venezuela to implement public policies with an intersectional perspective, including factors such as ethnic-racial origin, age, gender, migratory status, socioeconomic condition, among others, in order to eradicate structural patterns of racial discrimination.

## VI.     CONCLUSIONS AND RECOMMENDATIONS

159.     The Inter-American Commission has emphasized that, during 2023, Venezuela continued to face significant challenges in respecting and ensuring human rights. The main obstacle to solving the serious crisis in the country is the lack of a democratic institutional framework guided by the separation and balance of the branches of government.

160.     The continued absence of a system of checks and balances, as well as the deterioration of the Rule of Law, has led the Venezuelan government to impose a systematic state policy of repression and intimidation against persons or organizations that express their disagreement with the government or are perceived as opponents.

---

A/HRC/51/CRP.2, September 20, 2022, para. 165; United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela,* A/HRC/51/43, September 20, 2022, paras. 91-102.

[250] IACHR, Right to self-determination of Indigenous and Tribal Peoples, 2021, para. 187; Cf. American Declaration on the Rights of Indigenous Peoples AG/RES.2888 (XLVI-O/16), 2016, art. XXX.4.5.

[251] United Nations Declaration on the Rights of Indigenous Peoples, 2017, art. 30.

[252] *Prensa Latina,* "Venezuela ratifica defensa de pueblos afrodescendientes," May 10, 2023.

[253] Race and Equality, Report: *Situación de la población afrovenezolana en contextos migratorios en Colombia: Análisis y recomendaciones para la aplicación del enfoque étnico-racial,* 2023, p. 29.

[254] Race and Equality, Report: *Situación de la población afrovenezolana en contextos migratorios en Colombia: Análisis y recomendaciones para la aplicación del enfoque étnico-racial,* 2023, p. 83.

VZ Vacatur_0181



161.    With regard to the structured repression policy, the State has failed to adopt effective measures to guarantee that victims of serious human rights violations, such as extrajudicial executions, torture and forced disappearances, have access to justice. The impunity for serious violations committed in previous years, especially since 2017, has persisted and created major accountability gaps.

162.    In addition to the systematic persecution against the opposition, state institutions have implemented discriminatory procedures to access public office. The incumbent authorities have benefited from the absence of a system of checks and balances to implement administrative disqualifications and criminal proceedings to prevent members of the opposition from running for public office. These restrictions against political rights infringe the American Convention on Human Rights and other international treaties and standards.

163.    In addition, the civic space continued to shrink as a result of the restrictions to the freedoms of expression, association and peaceful assembly, which has limited the involvement of human rights defenders, social movements and political parties that are critical of the government in matters of public interest. This policy has been designed to discourage any expression of political opposition, whether real or perceived.

164.    Institutional deterioration has resulted in limited access to economic, social, cultural and environmental rights (ESCERs), causing a mass displacement of people on an unprecedented scale in the region. According to estimations, 7,320,225 persons have abandoned Venezuela since 2015 seeking to protect fundamental rights, such as the rights to food and health.

165.    The Commission has closely monitored the dialogue initiatives between the government and the Unity Platform, a coalition of several opposition parties. Although the Commission welcomes these efforts to reach agreements, it underscores the need for concrete measures to ensure the political participation of all sectors, with gender parity and free from discrimination, as well as accountability for the human rights violations committed.

166.    The Inter-American Commission reiterates its offer to collaborate with the State and the Venezuelan society as a whole in order to ensure effective compliance with the recommendations contained in this report and thus contribute to strengthening the defense and protection of human rights.

167.    Additionally, the Commission reaffirms its interest and willingness to visit Venezuela, and it therefore formally requests the consent of the State.

**Position of the State vis-à-vis the inter-American system**

1.    Fully comply with the decisions and recommendations of the inter-American human rights system, including those set out in the 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021 and 2022 annual reports. In addition, comply with the recommendations put forward in reports such as *Democratic Institutions, the Rule of Law and Human Rights in Venezuela* (2017), *Democracy and Human Rights in Venezuela* (2009) and *Report on the Situation of Human Rights in Venezuela* (2003).

**Democratic institutions**

2.    Restore the constitutional order, guaranteeing:

   i.    the independence of powers and a system of checks and balances for the branches of government

 

    ii.   political participation of the entire population without repression or discrimination and

    iii.   effective citizen control over the actions of the different branches of the State.

3.    Ensure that the provisions relating to the state of emergency are used in situations of extreme seriousness and exceptional nature and are rigorously and reasonably adapted based on the needs of the situation in question.

4.    Promote mechanisms of dialogue between different political stakeholders and the civil society aimed at urgently reconstructing the democratic institutions of the country.

**Administration of justice and judicial independence**

5.    Adopt urgent measures to:

    i.   significantly reduce the number of provisional judges and increase the number of tenured judges

    ii.   ensure that judges can only be removed through a disciplinary process that respects the guarantees of due process of law and that is duly grounded and

    iii.   provide guarantees for the stability of judges in office, especially through public selection processes with transparent appointment procedures.

6.    Take the necessary measures, including legislative measures, so that civilians are not investigated, prosecuted and/or tried by the military criminal jurisdiction, and, if necessary, redirect the ongoing proceedings to the ordinary courts.

**Political rights and participation in public life**

7.    Overturn the administrative measures that restrict political rights, including those imposed by the Office of the Comptroller General of the Republic.

8.    Adapt the domestic regulatory framework to ensure that the Office of the Comptroller General of the Republic cannot institute proceedings or impose removal or disqualification sanctions against persons holding elected office in accordance with governing inter-American standards on the subject.

9.    Refrain from making illegal or arbitrary detentions, and, in the event that a person is deprived of liberty, ensure that all due process of law guarantees are met, including that persons are to be brought promptly before an independent judicial authority, so as to avoid enforced disappearances, torture and other cruel and inhuman treatment.

10.    Remove regulatory obstacles to the legitimate exercise of the right to protest, in particular by eliminating the requirement to obtain prior authorization to hold demonstrations.

11.    Grant journalists the maximum degree of guarantees so that they are not detained, threatened or assaulted, and so that their working materials and tools are not confiscated for practicing their profession.

12.    Promote the amendment of ambiguous or vague criminal laws that limit freedom of expression in a disproportionate manner, such as those designed to protect the honor of ideas or institutions, or those that seek to protect national security or public peace.



13.    Eliminate the use of criminal proceedings to inhibit free democratic debate on matters of public interest and the full exercise of political rights.

14.    Refrain from placing restrictions on the operation of websites, blogs, applications or any other system for the dissemination of information on the Internet, electronic systems or the like, including support systems, such as ISPs, or search engines.

**Violence and citizen security**

15.    Ensure that the use of force is in strict compliance with the principles of exceptionality, legality, necessity, proportionality, nondiscrimination and accountability.

16.    Start, *ex officio* and without delay, a serious, impartial, and effective and open to public scrutiny investigation into facts related to the potentially excessive use of force.

17.    Immediately and decisively adopt measures to exclude the military, armed forces and armed civilian groups from performing citizen security functions.

**Poverty and ESCERs**

18.    Implement economic and fiscal policies with a human rights approach to combat poverty and extreme poverty, and to guarantee the ESCERs of the population, paying special attention to the most vulnerable populations and refraining from discriminatory practices.

19.    Take the necessary measures to ensure that boys, girls and adolescents have access to quality health services, which include the provision of medicines, especially considering the situation of boys, girls and adolescents suffering from chronic diseases.

20.    Refrain from any action or conduct that may limit the autonomy of universities, and study, review and amend any legislation or practice that undermines it.

**Women**

21.    Adopt the necessary measures to comply with the State's obligation of due diligence in the prevention, protection, investigation, punishment, and reparation of all forms of violence against women.

22.    Urgently adopt all necessary measures to ensure that a varied, accessible, and acceptable range of contraceptive and family planning methods are available, both for men and women, across the country.

23.    Review domestic legislation on the voluntary termination of pregnancy, so as to ensure the effective exercise of sexual and reproductive rights of girls, women and pregnant women of all ages.

**Persons deprived of liberty**

24.    Release all political prisoners and individuals who have been arbitrarily detained immediately.

25.    Adopt the penitentiary policies necessary to:

        i.    allow sufficient access to drinking water and food in adequate quantity, quality and conditions of cleanliness, as well as access to light and appropriate ventilation, and

745

 

ii.  Guarantee adequate medical care for women and LGBTI persons, with a gender sensitive approach.

26.  Ensure that detention conditions are compatible with human dignity and respect for human rights to guarantee the dignified treatment of persons in custody.

**Lesbian, gay, transsexual, bisexual, intersex (LGTBI) persons**

27.  Implement measures to prevent violence against LGBTI persons, including effective and independent procedures to report violations.

28.  Investigate and prosecute crimes against LGBTI persons with due diligence, especially when state agents, such as the police, may be responsible for the acts of violence.

**Migrants, asylum seekers, refugees, beneficiaries of complementary protection, internally displaced persons and victims of human trafficking**

29.  Annul all measures that hinder the right of all persons to leave Venezuelan territory.

30.  Guarantee the rights to legal personality and identity through the timely and unhindered issuance of identity documents (including passports, ID cards, civil registration records, as well as criminal background certificates).

**Human rights defenders**

31.  Cease all acts of harassment and criminalization against human rights defenders.

32.  Refrain from approving bills that may disproportionately restrict the right of association of civil society organizations.

**Indigenous peoples**

33.  Produce disaggregated information on the right to health of cross-border indigenous peoples and guarantee equitable and culturally appropriate access to quality health services through health care policies and programs that respect and value the traditional practices and ancestral health care knowledge of these communities.

34.  Implement all necessary measures to launch or strengthen the supervision and oversight mechanisms for relevant extractive, exploration, or development activities.

35.  Ensure that every security operation aimed at dismantling illegal mining practices complies with standards concerning the use of force.

**Afro-descendant persons**

36.  Design and publish statistical records with disaggregated data on the Afro-descendant population.

 

# REASONED VOTE OF COMMISSIONER CARLOS BERNAL PULIDO ON CHAPTER IV.B - VENEZUELA OF THE 2023 ANNUAL REPORT

With all due respect for my colleagues and in accordance with Article 19.1 of the Rules of Procedure of the Inter-American Commission on Human Rights ("the Commission" or "the IACHR"), I hereby submit a partial reasoned vote on certain points raised by the majority of the plenary of the Commission in Chapter IV.B-Venezuela ("the Chapter") of the 2023 Annual Report (the "Report" or "Annual Report"). Although in this document I present my disagreements, I cannot fail to mention that I support the Commission's monitoring of the human rights situation in Venezuela.

Regarding the discrepancies, I will state in particular that Chapter IV-A on Venezuela: (i) contains considerations that pose a risk to pregnant women and ignore the integral needs of women; (ii) raises requirements not derived from the Convention, regarding so-called gender identity; (iii) openly ignores the views that the ACHR incorporated on marriage; (iv) requires more information and academic and scientific rigor regarding gender affirmation therapies and hormone treatments; and (v) has significant gaps regarding the right of parents to choose the education of their children.

## 1. Chapter IV-A contains considerations that pose a risk to pregnant women and ignore women's overall needs (*necesidades integrales de las mujeres*)

Paragraph 118 of the Report mentions that: "Along the same lines, the persistent almost absolute **criminalization** of persons seeking to voluntarily terminate a pregnancy, allowing exceptions only in cases where the life of the pregnant person is at risk, together with the lack of medical protocols for the provision of abortion services and postabortion care, represented greater risks to the life and health of **persons capable of becoming pregnant (with gestational capacity**)." (Bold added)

The recommendations also included "**Reviewing domestic legislation on the voluntary interruption of pregnancy, so as to guarantee the effective exercise of the sexual and reproductive rights** of girls, women, and pregnant women of all ages." (Bold added).

As regard these assertions, I will address the following issues: (i) the non-existence of the right to abortion and the State's leeway with respect to the criminalization of abortion; (ii) the lack of protection for the unborn derived from the considerations of the report; and (iii) the inadequate curtailment of women's rights.

### 1.1. The non-existence of the right to abortion and state leeway with respect to the criminalization of abortion

I reiterate that there are no binding sources in international law -and especially in the American Convention or other treaties that make up the inter-American system- that contemplate (i) the so-called right to abortion or (ii) alleged duties related to the decriminalization of abortion. Under this framework, states have a wide margin of configuration - by virtue of the principles of subsidiarity or complementarity and representative democracy - to take measures to protect prenatal life - which is indeed protected by the American Convention[255]- including, although it is not the only means, the use of criminal law.

Regarding the non-existence of the right to abortion, former I/A Court H.R. Judge Eduardo Vio Grossi (R.I.P.), established in his partially dissenting opinion in the judgment in the case of Manuela et al. v. El Salvador that:

---

[255] ACHR. Article 4

 

"In this regard, it is indisputable that (...) **there is no inter-American or international legal norm** , whether conventional, international custom, or general principle of law, **that recognizes abortion as a right** There are only resolutions of international bodies, most of which are made up of international officials and not representatives of States, decisions which, in addition to not being binding, are not interpretative of current international law but rather reflect aspirations for it to change in the direction they suggest."[256] (Bold added)

I emphasize that this leeway derived from the non-existence of a right to abortion and the convergence of competing rights is increased thanks to the fact that it is incumbent upon States to define punishable conducts and their consequences, and to the automatic referral that, according to the IACHR Court, Article 7.2 of the American Convention makes to domestic law in matters related to deprivation of liberty -legal exception principle (*principio de reserva de ley*).[257]

In addition, I also emphasize that the sections in which such assessments are formulated do not sufficiently support derivation of the indisputable existence, in the Inter-American System, of a clear and binding parameter that could serve as a basis for assessing abortion criminalization as negative. The conventional parameter that does exist and that is mandatory is Article 4 of the ACHR which, as I have said on other occasions, contemplates protection of the right to life from conception and demands the existence of regulatory frameworks that do not leave a fetus totally unprotected.

This is relevant if one bears in mind that, from a systematic reading of Articles 31, 76, and 77 of the American Convention, it is only through consensus -which the States express by signing and ratifying amendments or treaties- that international obligations can arise for all States, different from those already contemplated in the ACHR.

In this sense, I conclude that, in the absence of a right to abortion in the IHRS and the absence of clear rules regarding criminalization models, States have considerable leeway in this regard. I emphasize that the challenges of the States and the concerns of the Commission should reflect a more comprehensive approach that allows for the protection of the unborn child and the pregnant woman. In this sense, these discussions should lead to the revision of policies on sexual and reproductive education; support and protection for pregnant women; security, and health.

### 1.2.    Lack of protection for the unborn derived from the report's considerations

I emphasize that the references to abortion in the Report on Venezuela ignore the other person whose right to life is also conventionally protected: the unborn person and ignore the necessary balancing that must exist between these competing rights (*derechos en tensión*). In this regard, it should be noted that pregnant women are also subjects of law and holders of the right to life.

A pronouncement on abortion always implies a position on a practice that necessarily implies the termination of the life of a dignified human being and that Article 4 of the ACHR protects, so it is necessary to expressly recognize the rights of the unborn person as part of the weighing up of considerations required in any case of abortion.

In this regard, I emphasize that Article 1.2 of the ACHR clearly establishes that, for the purposes of the Convention, a "person" is every human being.[258] Thus, in light of the Convention, human rights are not only recognized for persons who have already been born, but must be protected for all individuals from conception, who are to be considered human beings.  Moreover, the I/A Court H.R. itself, in its advisory opinion 22,

---

[256] Partially Dissenting Opinion of Judge Eduardo Vio Grossi, Inter-American Court of Human Rights, Case of Manuela et al. v. El Salvador, Judgement of November 2, 2021, (Preliminary Objections, Merits, Reparations, and Costs). Paragraph 13

[257] I/A Court H.R. Case of Romero Feris v. Argentina. Merits, Reparations, and Costs. Judgment of October 15, 2019. Series C No. 391. Par. 77.

[258] ACHR. Article 1.2 "For the purposes of this Convention, person means every human being."

VZ Vacatur_0187



indicated that, without being a matter open to interpretation, the term "person" is equivalent to the term "human being."[259]

In view of this, it is clear that the unborn person (*persona en gestación*) is a human being.[260] Furthermore, the Universal Declaration on the Human Genome and Human Rights states that "the human genome underlies the fundamental unity of all members of the human family, as well as the recognition of their inherent dignity and diversity. In a symbolic sense, it is the heritage of humanity."[261]

The consequence of recognizing the unborn as a person as a human being is that he/she becomes a holder of rights. Thus, the ACHR establishes in the articles that develop rights the formula "Everyone (...)"[262]. Likewise, the instruments for the protection of human rights generally recognize the ownership of rights by members of the human species, especially the right to life.[263]

Furthermore, in the Artaviara Murillo judgment, the I/A Court H.R. determined that "the protection of the right to life is not absolute, but gradual and incremental as the development of the fetus progresses" Which implies that without prejudice to the concepts of gradualness and incrementality (with which I take issue), the Court has already established that persons in gestation must be protected by the State in their "right to life." In the same vein, in the Cuscul Pivaral case,[264] the I/ A Court H.R. applied the ACHR to a fetus (persona en gestación) and also applied Article 19 of the ACHR, thus recognizing the legal status of the fetus as a child.

In the same vein, I emphasize that the preamble of the Convention on the Rights of the Child states that the child needs protection and care both before and after birth. This implies that in light of the Convention on the Rights of the Child (CRC), the unborn child is a child in need of special care.  This was reiterated in the preparatory work for the International Covenant on Civil and Political Rights[265]

In conclusion, this Chapter completely ignores the rights of the unborn, especially their right to life, recognized not only in the IHRS but also in multiple instruments of international law.

### 1.3.    Inadequate curtailment of women's rights

I call attention to the importance of not limiting so-called sexual and reproductive rights to access to abortion. This is not only because there is no law that establishes abortion as a guarantee of those rights, but also because this vision simplifies and detracts attention from the problems faced by women in the region and, in so doing, discourages debates that promote the formulation of comprehensive and integral proposals to address the structural problems faced by women in the region.

In addition, I call attention to the fact that the report refers to "persons capable of becoming pregnant" (with

---

259 I/A Court H.R. OC-22/16. Ownership of rights of legal persons in the Inter-American Human Rights System. Advisory Opinion of February 26, 2016. Series A. No. 22, Par. 48.

260 Kaluger, G., and Kaluger, M., Human Development: The Span of Life, The C.V. Mosby Co., St. Louis, 1974, pp. 28-29.

261 Universal Declaration on the Human Genome and Human Rights. Article 1.

262 American Convention on Human Rights, Articles 4, 5, 7, 8, 10, 11, 12, 13, 14, 16, 18, 20, 21, 22, 24, and 25.

263 International Covenant on Civil and Political Rights. Preamble, par. 3; American Convention on Human Rights, par. 3. Preamble; African Charter on Human and Peoples' Rights: Preamble, par. 6; on the Geneva Declaration Rapporteur on the Rights of Children. Preamble, par. 1; American Declaration of the Rights and Duties of Man. Article 1; Universal Declaration of Human Rights. Preamble, par. 1; Declaration of the Rights of the Child. Preamble, par. 2 European Convention on Human Rights. Preamble, par. 2

264 I/A Court H.R. Case of Cuscul Pivaral v. Guatemala. Judgment of August 23, 2018. "That said, the Court has indicated that extreme poverty and the lack of adequate medical care for women during pregnancy and postpartum are causes of high maternal mortality and morbidity. Therefore, States must implement appropriate health policies that allow it to provide assistance with suitably qualified personnel during births; policies to prevent maternal mortality by providing adequate prenatal and postpartum controls, and legal and administrative instruments relating to health policies that record cases of maternal mortality adequately.  Thus, the Court has recognized that, by virtue of article 19, the State must assume its special position of guarantor with greater care and responsibility and take special measures focused on the principle of the best interest of the child."

265 "The main reason for providing in paragraph 4 [now Article 6(5)] of the original text that the death penalty should not be applied to pregnant women was to save the innocent life of the unborn child."  United Nations. General Assembly Report of the Third Committee on the Draft International Covenants on Human Rights. A/3764. P. 40.

VZ Vacatur_0188




gestational capacity), thereby defining a whole category of human beings solely by their reproductive function, generating an even more reductionist vision drawing attention away from women's rights.

On this point, I would like to take advantage of this explanation of my vote to make an appeal not only to my other colleagues on the Commission, but also to different international bodies: we cannot fall into reductionist narratives that, under the protection of women's rights -a completely legitimate and necessary purpose- end up, in fact, affecting those rights.

In this regard, I find it very troubling that the Commission focuses its efforts on scrutinizing the regulation **of States in the area of abortion**, where they have leeway and must necessarily be consistent with the protection of the right to life of the unborn child, and omits, for example, the barriers faced by women in the exercise of their maternity -conditions that in practice may be affecting their ability to make free decisions-.

## 2.    Absence of basic requirements for recognition of the adequacy of gender identity documents.

Paragraph 142 states that "trans persons are often assigned to facilities according to the sex marked on their identity documents, rather than their gender identity."

In this regard, **on the one hand**, the American Convention does not expressly contemplate a right to gender identity, nor is there a binding instrument in the inter-American system that establishes an obligation to adapt identification documents to gender identity.

As I have indicated, recognizing new rights that are not in the Convention through an interpretation that does not follow the procedures established in the Convention itself would undermine Articles 31, 76, and 77, ignoring the original will of the States that ratified the Convention.

Therefore, any pronouncement in which any of the organs of the IHRS applies a right that is not established in the binding instruments of international law that govern its activity will be an act violating the literal meaning of the American Convention and will exceed the scope of the competencies of the IACHR or the I/A Court H.R., as the case may be. Such an irregular constitutive act would also undermine the principles of good faith and *pacta sunt servanda*.[266]

**On the other hand**, although I am not unaware that OC-24/17 asserted the existence of the so-called "right to gender identity" and of the obligation to adapt identification documents to gender identity in the terms indicated in this Chapter, I emphasize that the Advisory Opinions of the I/A Court H.R. are not binding in international law nor do they have the capacity to contemplate rights or obligations other than those expressly contemplated by the American Convention.[267]

I point this out, first, because Article 68 of the Convention is clear in stating that the States are obliged to comply with the decisions rendered by the Court, "in any case in which they are parties." **[TRANSLATOR: correct Spanish "*hayan sean*"]** This provision is of great relevance in that (i) it is the only one that refers to the legal value of the Tribunal's pronouncements and (ii) it limits the binding nature of its decisions expressly for the States party to a case, thus limiting the addressee of the obligations -the State party to a case- and the context in which the pronouncement is issued -that is, the litigation-. This position has also been supported by some doctrinal sectors (*sectores de la doctrina*) also based on the principle of State consent as the basis of conventional law.[268]

---

[266] Vienna Convention on the Law of Treaties. Article 26.

[267] I/A Court H.R. Gender identity, and equality and non-discrimination of same-sex couples. State obligations in relation to name change, gender identity, and rights derived from a same-sex relationship (interpretation and scope of Articles 1(1), 3, 7, 11(2), 13, 17, 18, and 24, in relation to Article 1 of the American Convention on Human Rights). Advisory Opinion OC-24/17, November 24, 2017. Series A, No. 24.

[268] Systematization of the criticisms in: González Domínguez, p. (2017). The doctrine of conventionality control in light of the principle of subsidiarity. Constitutional Studies 15(1), 55-98.



Second, there is no provision establishing an extent to which the Tribunal's interpretations in the framework of the Advisory Opinions are binding. This is reinforced when Article 64 of the ACHR limits the competence of the Court to issue advisory opinions regarding the Convention or treaties of the inter-American system. Thus, if a pronouncement derived from an AO is not binding in itself, much less could it be one that addresses so-called rights or obligations not contemplated in the Convention or interpretations that are also contrary to its text.

Third, to derive obligations or so-called rights not contemplated in the Convention, based exclusively on an advisory opinion, would be, as I have already said, contrary to the principle of *pacta sunt servanda* that governs international treaty law, by virtue of which States are only bound to comply with that to which they have expressed their consent.[269]

Fourth, although the I/A Court H.R. has affirmed that advisory opinions are parameters of conventionality control,[270] I emphasize that an open and transparent inter-American dialogue is still necessary to further discuss this position, which is not expressly derived from the American Convention. I call attention to the fact that there is still no consensus on the matter, neither in the States of the region nor in academic circles; thus, important constitutional courts still refrain from invoking the notion of conventionality control and from incorporating advisory opinions as a parameter.[271]

Likewise, I note that some authors have indicated that the extension of the effects of advisory opinions could contribute to a disruption of the functions of the inter-American system and, thus, weaken it, since (i) it results in equating the decisions issued in the advisory function of the Court with the text of the convention itself,[272] and (ii) it blurs the differences between the jurisdictional and advisory functions of the Court. Some have even indicated that these interpretations by the Court generate legal uncertainty, since there is no certainty as to the impacts associated with the issuance of advisory opinions.[273]

In light of the above, given that there is no conventional right to gender identity that is binding on States, it is possible to affirm that there are no correlative obligations to recognize this right either. Hence, the non-existence of conventional law leads to one conclusion: it is not possible to require States to ensure that identity documents match gender identity.

Furthermore, I reiterate that international human rights law should not erase the biological sexes, and therefore should not erase categories with special inter-American protection, such as women. Therefore, I insist that the criterion of self-perception or self-determination of gender identity requires further debate, and that it is associated with a risk of disproportionate impacts to the detriment of persons with special protection in the inter-American system.

In this sense, it is important that the protection of women (in terms of their biological sex) also be promoted, since, as has been demonstrated in several comparative experiences, women may also run risks to their life and integrity if they do not have separate facilities for them in prisons: a rule reiterated by international human rights law. Thus, Article 5.5 of the American Convention establishes the principle of separation of places of detention for men and women and the Court has considered, based on the Convention and the pronouncements of other human rights bodies, "that all women deprived of their liberty should be housed physically separate

---

[269] Vienna Convention on the Law of Treaties. Article 26.

[270] I/A Court H.R. Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection, Advisory Opinion OC-21/14 of August 19, 2014. Series A No. par. 41. 31.

[271] Ramírez, F. G. (2023). A critical look at the conventionality control Journal of Law and Social Sciences, (28), 101-142; Palacios, D. L. (2017). Inter-American conventionality control at the national level: a notion still under construction. Revista Direito e Práxis, 8, 1389-1418.

[272] Colombo, I. (2022). A critical analysis of the doctrine of conventionality control. Omnia. Law and Society, 5 (1), pp. 83-116.

[273] Colombo, I. (2022). A critical analysis of the doctrine of conventionality control. Omnia. Law and Society, 5 (1), pp. 83-116.

VZ Vacatur_0190



from men and, in addition, in less restrictive and less secure wards or sections that take into account the low level of risk they represent and with sufficient space in which to meet their specific needs."[274]

### 3.    Same-sex couples: disregard for the ACHR's views on marriage

Paragraph 143 of the report states that "with respect to conjugal visits, despite the right of detainees to receive these visits, the LGBTI population encounters obstacles to exercising this right due to the absence of regulations that protect their relationships, **such as the recognition of equal marriage**" (Bold added).

In this regard, I reiterate that there is no conventional provision that obliges States to recognize same-sex marriages. As I have mentioned on several occasions, the treaties that are part of the inter-American human rights system and grant jurisdiction to the Inter-American Commission to address contentious cases do not contemplate any obligation with respect to the recognition of marriage between same-sex couples. This lack of obligation derives from the literal wording of the American Convention, which clearly establishes that marriage is a right reserved for "men and women":

> Section 2) provides, "**The right of men and women of** marriageable age to marry and to raise a family shall be recognized, if they meet the conditions required by domestic laws, insofar as such conditions do not affect the principle of nondiscrimination established in this Convention."[275]  (Bold added).

Therefore, in accordance with the hermeneutic principle that calls for a literal and good faith interpretation,[276] the State is only obliged to recognize the right to marriage for the couples specifically mentioned in Article 17(2) of the American Convention.

It is essential to underline that, according to the jurisprudence of the International Court of Justice, the good faith interpretation of a treaty should not result in changes to the literal wording of the treaties or in inferring what is not expressly contained in the text. This approach implies that the interpreter must assume that the parties intended what is apparent from the ordinary meaning of the terms used in the international agreement.[277] The text-centric approach to treaty interpretation is not only accepted in the field of international law, but is also highly recommended, as it is based on the only empirically verifiable evidence of state intentions: the text of the treaty itself.[278]

Following these rules of interpretation, the European Court of Human Rights has considered the conception of marriage as that concluded between a man and a woman - as established in the European Convention on Human Rights, in a provision similar to that of the ACHR-.[279] In this sense, the European Court supports the idea that there is no binding obligation for States to recognize marriage between same-sex couples, which leaves a wide margin for States to regulate on this matter.[280] Likewise, in the words of the European Court of Human Rights:

> "The Court reiterates that, according to Article 14 in conjunction with Article 8, States are free to restrict marriage only to opposite-sex couples and have some leeway ("a certain margin of

[274]I/A Court H.R. Advisory Opinion OC-29 of 2022; Bangkok Rules, supra, Rules 12 and 41.d., and Report of the United Nations Special Rapporteur on Violence against Women, Rashida Manjoo, Pathways to, conditions and consequences of incarceration for women, A/68/340, supra, par.  85.

[275] American Convention on Human Rights, Article 17.1.

[276] Vienna Convention on the Law of Treaties. Article 31.

[277] International Court of Justice. Case concerning rights of nationals of the United States of America in Morocco. France v. United States of America. ICJ Reports 1952, pp. 196-199. International Court of Justice. Interpretation of peace treaties with Bulgaria, Hungary, and Romania (Second Phase). ICJ Reports 1950, pp.229 -230.

[278] International Court of Justice. Question of the Delimitation of the Continental Shelf between Nicaragua and Colombia beyond 200 Nautical Miles from the Nicaraguan Coast (Nicaragua v. Colombia), Preliminary Objections, Judgment, I.C.J. Reports 2016, pp.116-123, paras. 34-38, 46. Although the International Court of Justice did not rely exclusively on the literal criterion of interpretation, this was one of the first criteria taken into account by the Court to reject the interpretation of the Colombian party.

[279] European Convention on Human Rights. Article 12. "Men and women of marriageable age have the right to marry and to found a family, according to the national laws governing the exercise of this right."

[280]ECHR. Oliari et al. v. Italy. July 21, 2015, Par. 193.



configuration") to decide the exact nature of the legal status granted by other means of legal recognition."[281]

On this point, it is worth noting that this same approach is supported by the European Court in the cases *Orlandi v. Italy*[282] and *Fedotova et al. v. Russia*.[283] Indeed, in both cases, the European Court held that, although States must provide mechanisms for the protection of same-sex unions, this protection does not necessarily derive from the recognition of same-sex marriages.

Within this framework, I fully agree that the leeway available to the States in this regard concerns both the form of recognition and the content of the protection to be granted to same-sex couples, **which cannot be translated into an absolute absence of protection**.

4.   **The need for more information and academic and scientific rigor regarding gender affirming therapies and hormonal treatments**

Paragraph 143 mentioned that "Challenges in accessing respectful health services for LGBTI people **are evidenced in the obstacles to obtaining hormone treatments**" (Bold added).

In this regard, I reiterate that there is a need for the Commission to deepen these discussions with scientific arguments in order to address them comprehensively. In particular, there are studies that indicate the harm that may result from having undergone hormone treatments in adolescence.[284]

In addition, in the case of children and young people, it is essential that their capacity to consent to hormone treatments be taken into account and assessed. Indeed, it is necessary to have an in-depth discussion on the negative effects linked to these treatments and to align this information with the statements made by the Commission.

Indeed, scholars argue that there are long-term studies that show - in individuals who have undergone gender affirming or hormonal treatments - an increase in morbidity and mortality and a risk of suicide after transition.[285]

These elements cannot be ignored by the Commission; especially when this body has the mandate to promote and defend human rights in the region, including the right to health.

5.   **Gaps regarding parents' rights to choose their children's education**

Paragraph 118 mentions "In addition to the above, challenges remained in the implementation of comprehensive sexual education and gender equality programs in schools, which is linked to the high dropout rates of girls and adolescents due to pregnancies."

[281] ECHR. Chapin and Charpentier vs. France. September 9, 2016. Par. 48.

[282] ECHR. Orlandi v Italy. "The Court reiterates that States are still free, under Article 12 of the Convention as well as under Article 14 taken in conjunction with Article 8, to restrict access to marriage to different sex. The same holds for Article 14 taken in conjunction with Article 12 (see *Oliari and Others* cited above, § 193)." (Spanish text: El Tribunal reitera que **los Estados siguen siendo libres**, de acuerdo con el Artículo 12 de la Convención, así como con el Artículo 14 en conjunción con el Artículo 8, **de restringir el acceso al matrimonio a parejas de distinto sexo**. Lo mismo se aplica al Artículo 14 en conjunción con el Artículo 12.) Par. 192.

[283] In this case, the Court analyzed -only- the possible violation of Article 8 of the ECHR, which refers to the right of individuals not to be subjected to arbitrary interference by the State in their private life. In the case of same-sex couples, the Court established that the lack of a legal framework allowing same-sex couples to have their relationship recognized and protected under national law may generate significant obstacles in the daily lives of these couples. Without prejudice to the foregoing, it established that the State may enjoy some leeway to determine the way in which same-sex unions are registered, which implies that this registration need not necessarily involve the notion of marriage.

[284] 'Trust the Experts' Is Not Enough: U.S. Medical Groups Get the Science Wrong on Pediatric 'Gender Affirming' Care. https://media4.manhattan-institute.org/sites/default/files/how-to-respond-to-medical-authorities_claiming_gender_affirming_care_safe.pdf.

[285] Levine, S.B., Abbruzzese, E. Current Concerns About Gender-Affirming Therapy in Adolescents. *Curr Sex Health Rep* **15**, 113-123 (2023). https://doi-org.ez.unisabana.edu.co/10.1007/s11930-023-00358-x.

VZ Vacatur_0192

 

In this regard, I draw attention to the wording of Article 12.4 of the ACHR, which states that "**[p]arents and, where appropriate, guardians, have** the right to ensure that their children or wards **receive a** religious and **moral  education** in accordance with their own convictions." (Bold added)

Within this framework, the content of Article 12.4, which guarantees parents the right to ensure that their children receive a moral education in accordance with their convictions, cannot be overlooked. Thus, parental disagreement with certain content should not be seen as a threat in itself, in as much as it represents a materialization not only of Article 12 of the Convention, but also, for example, of the right to freedom of expression: fundamental element of any democratic system.

According to the ECHR, the right of parents to choose their children's education, including sex education, is an aspect of the right to respect for private and family life protected by the ECHR.[286] Therefore, sex education, like any other type of education, must be framed within the scope of protection of conventional law, recognized by international human rights law, which grants parents the right to choose the religious and moral education of their children, in accordance with Article 12.4 of the Convention.

---

[286] ECHR, Kjeldsen, Busk Madsen and Pedersen, par. 53; Dojan et al, cited above, paras. 78-83.

VZ Vacatur_0193

THE SECRETARY OF STATE
WASHINGTON

September 24, 2024

The Honorable
Alejandro N. Mayorkas
Secretary of the Department of Homeland Security
Washington, DC  20528

Dear Secretary Mayorkas:

The Department of State assesses that extraordinary and temporary conditions currently exist in Venezuela that prevent Venezuelan nationals, or noncitizens having no nationality who last habitually resided in Venezuela, from returning in safety.  Therefore, the Department of State supports the extension and redesignation of Temporary Protected Status (TPS) for 18 months based on extraordinary and temporary conditions.

A complex political, humanitarian, and economic crisis, as well as activities of non-state armed groups, repression, and crumbling infrastructure, mean Venezuelans still cannot return to their country in safety.  Many individuals in Venezuela face the possibility of physical abuse, unlawful killings, disappearances, human trafficking, unjust detentions, and politically motivated reprisals.  High rates of gender-based violence threaten the safe return of women and LGBTQI+ individuals.  The UNHRC's independent fact-finding mission determined the Maduro authorities have dramatically intensified efforts to crush all peaceful opposition, creating one of the most acute human rights crises in recent history.

NGOs report repression by Maduro and his representatives in the pre and post July 28-electoral context, negatively impacting political participation and the freedoms of expression and association.  Venezuela suffers from ongoing endemic violence perpetrated by organized criminal groups throughout the country, including narcotrafficking and terrorist groups that repress, sometimes violently, populations in areas under their control.

Some 7.7 million people, roughly 26 percent of the country's total population, require humanitarian assistance. Persistent operational constraints inside Venezuela imposed by Maduro's representatives include harassment and open hostility toward NGO workers and obstruction of relief efforts, hindering humanitarian actors' ability to provide aid to the most vulnerable populations. In addition, Venezuela's economy remains in shambles following years of mismanagement, corruption, and hyperinflation. Large numbers of Venezuelans lack access to adequate, affordable, and nutritious food and lifesaving health services.

Redesignation would demonstrate solidarity with the Venezuelan people and the many Western Hemisphere countries that generously host Venezuelan refugees and migrants. Given TPS is only available to applicants already present in the United States, State views redesignation as complementary to the expansion of lawful pathways for Venezuelans, including the Venezuelan humanitarian parole program and increased refugee resettlement through the U.S. Refugee Admissions Program.

Such actions send an important signal to other countries the United States has urged to grant temporary protection or other forms of legal status. The United States continues to coordinate with states hosting large Venezuelan displaced populations, including Brazil, Chile, Colombia, Ecuador, and Peru, to support access to international protection and legal status in order to foster the socio-economic integration of Venezuelan migrants and refugees.

Based on the aforementioned factors, I recommend you extend and redesignate TPS for Venezuela for 18 months beyond the current expiration date on the basis of extraordinary and temporary conditions.

Sincerely,

Antony Blinken

Antony J. Blinken

SENSITIVE BUT UNCLASSIFIED

## (U) Department of State Recommendation Regarding
## Temporary Protected Status (TPS) for Venezuela -- (September 2024)

## I. Statutory Basis for Designation

**(U) Have the conditions under which the foreign state was designated for TPS ceased to exist?**

(U) No.  The conditions under which Venezuela was designated for TPS continue to exist.

## A. Armed conflict

**1. (U) Is the foreign state still involved in an ongoing, internal, armed conflict?**

(U) N/A.

**2. (U) If so, would the return of nationals of the foreign state to that state (or to the part of the state) still pose a serious threat to their personal safety?**

(U) N/A.

## B. Environmental Disaster

**1. (U) Does there continue to be a substantial, but temporary, disruption of living conditions in the foreign state affected by an earthquake, flood, drought, epidemic, or other environmental disaster?**

(U) N/A.

**2. (U) Is the foreign state still unable, temporarily, to handle adequately the return to the state of nationals of the state?**

(U) N/A.

**3. (U) Does the foreign state continue to support the TPS designation for its nationals in the United States?**

(U) N/A.

**C. Extraordinary and Temporary Conditions**

**1. (U) Has the foreign state continued to experience extraordinary and temporary conditions that prevent nationals of the state from returning to the state in safety?**

(SBU) Yes.  The complex emergency induced and perpetuated by Nicolás Maduro and his representatives has forced more than seven million Venezuelans to flee their country.  In 2023, more than 300,000 Venezuelans crossed the Darién, double the crossings recorded in 2022.  In 2024, as of mid-August, more than 150,000 have crossed.  The political, humanitarian, and economic crises, complicated by the presence of non-state armed groups, unjustified arrests of members of the opposition, repression by Maduro's security services, food insecurity, and crumbling infrastructure mean Venezuelans still cannot return to their country in safety.  The U.S. Chief of Mission issued a re-declaration of humanitarian need based on the complex emergency in Venezuela for Fiscal Year 2024.  Many individuals in Venezuela, particularly human rights defenders, journalists, students, members of various democratically aligned political parties, internally displaced persons, and members of marginalized ethnic groups are at risk of abuses, such as torture, unlawful killings, disappearances, human trafficking, unjust detentions, and politically motivated reprisals.

(U) On July 28, more than 12 million Venezuelans voted in a historic presidential election.  On July 29, the Maduro-controlled National Electoral Council (CNE) declared Maduro the winner by a narrow margin without publishing precinct-level official tally sheets (*actas*) or presenting other evidence to substantiate its claim.  On August 13, the UN Panel of Experts

published an interim report that reviewed publicly available vote tallies collected and posted online by opposition political parties, found them genuine, and called for the release of tabulated results.  The Department agreed with the findings from independent assessments of the Carter Center and the UN Panel of Experts that this election lacked transparency and integrity and failed to meet basic democratic standards.  The democratic opposition published precinct-level results which verified that opposition unity candidate Edmundo González Urrutia received 67 percent (7.2 million votes) to Maduro's 30 percent (3.2 million votes).  Secretary Blinken publicly affirmed González received the most votes.  On August 22, the Maduro-controlled Supreme Court (TSJ) certified the CNE'S claim Maduro won but failed to cite evidence.  The TSJ's findings lacked all credibility, given the overwhelming evidence that González received the most votes.  As discussed in further detail below, the efforts of Maduro's representatives to undermine the election have involved violence, repression, and human rights abuses throughout the country.

**(U) Violence:**  Citizens of Venezuela continued to experience ongoing violence perpetrated by organized non-state armed groups.  According to InsightCrime, homicides increased by 3.2 percent in 2023 over 2022 figures, accumulating to a total of 6,973 violent deaths. This is the second highest homicide rate in South America.  In 2023, the highest numbers of murders were recorded in the states of Miranda with 279 victims, the Capital District with 223, and Zulia with 205 deaths.

(U) Episodes of localized violence are frequent, unpredictable, and are not adequately prevented or addressed.  Parts of the country experience violence from armed groups because of a deterioration of the rule of law and the participation of non-state armed groups in illicit economic activities.

(U) Terrorist groups largely based in Colombia, including the Revolutionary Armed Forces of Colombia – People's Army (FARC-EP), Segunda Marquetalia, and the National Liberation Army (ELN) operate unimpeded in Venezuela.  The ELN continues to expand its presence beyond its historic base in the border zone with Colombia and consolidate its control over

individuals in the areas it already dominates.  These narcotrafficking and terrorist groups repress, sometimes violently, populations in areas that fall under their control.  These groups engage in sex trafficking and forced labor while operating with impunity.  In other areas, Venezuelan security forces confront narcotrafficking and terrorist groups, creating more violence and instability.

(U) The criminal influence of Venezuelan transnational-gang Tren de Aragua (TdA) continues to threaten the security of Venezuelans.  TdA exploits Venezuela's migrant crisis by targeting Venezuelans in country and Venezuelan migrant communities in the Western Hemisphere for extortion, human trafficking, and migrant smuggling.

**(U) Human Rights Abuses:**  NGOs and international organizations continue to report severe human rights abuses committed by Maduro's representatives, their associates, and Maduro-aligned armed groups. According to credible NGO reports, security forces regularly engage in physical abuse, unlawful killings, disappearances, unjust detentions, and politically motivated reprisals.  The UN Human Rights Council's Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela (FFM) found in its September 2024 report, "During the period covered by the present report and, in particular, after the presidential election of 28 July 2024, the State reactivated and intensified the harshest and most violent mechanisms of its repressive apparatus. As part of that repression, the authorities carried out, in a conscious and deliberate manner, actions aimed at dismantling and demobilizing organized political opposition, inhibiting the dissemination of independent information and opinions critical of the Government and preventing peaceful citizen protests. The brutality of the repression continues to generate a widespread climate of fear among the population."  ""We are witnessing an intensification of the State's repressive machinery in response to what it perceives as critical views, opposition or dissent," said Marta Valiñas, chair of the Fact-Finding Mission. "Additionally, in November 2021, the Prosecutor of the International Criminal Court opened an investigation into the situation in Venezuela after concluding there was a "reasonable basis to believe that

crimes against humanity," particularly in the context of detention were committed.  According to the NGO *Foro Penal*, there were 1,780 political prisoners in custody as of August 26.

(U) Targets of violence include opposition politicians, journalists, students, unionists, civil society activists, and anyone perceived to be at odds with Maduro and his representatives.  It is common for journalists to be beaten or threatened particularly during pre-electoral or political conflict periods.  High rates of gender-based violence threaten women and LGBTQI+ individuals.  NGOs reported repression by Maduro's representatives leading up to and following the July 28 presidential election negatively impacting political participation and freedoms of expression and association.  On July 31, the FFM warned that "We are witnessing the accelerated reactivation of the repressive machinery that was never dismantled and is now being used to undermine the public freedoms of citizens and their right to political participation and free expression of ideas."  In condemning this repression, the FFM said "the vast majority of those detained were simply individuals who voiced their rejection of the presidential election results announced by the authorities."

(U) Human trafficking remains a serious concern.  Traffickers often subject Venezuelans, including those fleeing the country, to forms of exploitation, including sex trafficking and forced labor.  Traffickers allegedly recruit Venezuelan migrants and refugees, particularly women and girls, into trafficking networks using false promises of safe migration.  Venezuelan trafficking victims have been identified in 24 countries over the last five years.  Non-state armed groups that operate in the country with impunity subject Venezuelans to forced labor and forced criminality and forcibly recruit and use child soldiers in combat.  These groups lure vulnerable children in dire economic circumstances with gifts and promises of basic sustenance for themselves and their families to later recruit them into their ranks.  Sex and labor trafficking victims from South America, Caribbean, Asian, and African countries have also been identified in Venezuela.

SENSITIVE BUT UNCLASSIFIED
-6-

**(U) Post-Election Violence:**  Following the July 28 presidential election, the democratic opposition called for nationwide demonstrations in which large numbers of protesters peacefully supported González's victory.  Maduro representatives responded with political repression of opposition members and journalists and violence against demonstrators by Maduro-backed security forces and non-state armed groups.  Maduro called for the arrest of opposition leader María Corina Machado and presidential candidate González, and Maduro's attorney general opened a criminal investigation against both.  Regime-led repression continues with 1,780 total detentions and 24 deaths reported from July 28 to the end of August, according to reputable Venezuelan NGO *Foro Penal*.

**(SBU) Extrajudicial and Unlawful Killings:**  The NGO Monitor of the Use of Lethal Force (MUFLVEN) recorded 361 deaths involving security forces from January 1 to August 22, including 292 killings committed by police.  MUFLVEN reported the Bolivarian National Police (PNB) was involved in the largest percentage of cases, closely followed by the Scientific, Penal, and Criminal Investigative Corps (CICPC), the armed forces, and regional and local police.  *Provea* reported a total of 25 deaths in the days after the July 28 presidential election to mid-September.  *Provea* said they recorded many of the 25 deaths as extrajudicial killings, identifying a lack of pre-existing judicial order and state security forces as perpetrators in these cases.

**(U) Criminal Armed Groups:**  Maduro's representatives condone or support criminal non-state armed groups throughout the country, including in areas in which they do not have territorial control.  Their tolerance of these groups leads to high levels of physical insecurity, human trafficking, and environmental degradation, with outsized impacts on members of vulnerable populations such as women, children, and Indigenous persons.

**(SBU) Underlying Economic Crisis:**  Venezuela's economy remains in shambles following years of mismanagement and corruption, a hollowing out of the private sector, and hyperinflation from 2018 through 2021.  With more than 80 percent of Venezuelans living in poverty according to two 2023 U.S. government surveys (SURVEY-23 and ENCOVI), the poverty rate is

still among the highest in the region.  According to the IMF, Venezuela's GDP declined from $373 billion in 2012 to $102 billion in 2024, a 73 percent decrease from its 2012 peak.  While the regime has had relative success in lowering and stabilizing inflation since January 2024 to the lowest rates in nearly 10 years, economic growth is stifled through Maduro's anti-inflationary policies.  Many families have not seen the benefits of lower inflation as the food basket for a family of four averages $550 per month, while the average minimum salary in the private sector is $250 and only $130 in the public sector.  Meanwhile, about 48 percent of the Venezuelan population is self-employed and works in the informal economy.

(SBU) Oil revenues remain Maduro's largest source of income, and according to estimates revenues have fallen more than 90 percent from their 2012 highs of $94 billion in oil export revenue.  U.S. sanctions relief on Venezuela's oil and gas industry beginning in October 2023 provided some additional revenues but General License 44, which authorized transactions, expired in April and reduced revenue estimates for 2024 to around $9 billion according to analysts.  Since January, Maduro has used about $3 billion in oil revenues to stabilize the bolivar's exchange rate and moderate cost and price increases in local currency.  Declines in oil revenues have also dropped the Venezuelan Central Bank's accessible reserves by 89 percent since 2013 and reserves now hover just below $3 billion with no indication of major increases for 2024.  Venezuela has one of the highest levels of government debt as a percentage of GDP of any country in the world.  The IMF estimated in April the country's external debt is $152 billion, equivalent to 158 percent of GDP.

**(U) Deteriorating Humanitarian Situation:**  Because of the economic collapse and political crisis, in 2019, the UN and humanitarian organizations launched and have been implementing a Venezuela Humanitarian Response Plan and established a humanitarian cluster system in Venezuela.  According to the UN, some 7.7 million people in Venezuela (approximately 26 percent of a total population of 28 million) require humanitarian assistance.

SENSITIVE BUT UNCLASSIFIED
-8-

(U) Persistent operational constraints inside Venezuela imposed by Maduro's representatives, including harassment and open hostility toward NGO workers, obstruct international community relief efforts and the acquisition of up-to-date and accurate data on humanitarian needs, impeding humanitarian actors' ability to reach the most vulnerable populations.  Maduro has created a constrained humanitarian space, leading to the freezing of NGO registration, obstruction of import permits, and refusal to grant visas for humanitarian workers.  State and USAID implementing partners report ad hoc harassment by Maduro and his supporters which hinders humanitarian efforts in Venezuela.  These growing political and economic crises exacerbate the dire conditions faced by the estimated 7.7 million people who require humanitarian assistance.

**(U) Food Insecurity and Malnutrition**:  Access to adequate, affordable, and nutritious food continues to be a challenge for vulnerable Venezuelans due to continued high inflation, low wages, and limited purchasing power.  Venezuela's primarily urban and peri-urban population relies heavily on food imports, making it especially vulnerable to supply and price shocks.  Imported food items remain available in supermarkets but are priced in dollars and unaffordable for most Venezuelans.  World Food Programme's (WFP's) Humanitarian Response Plan (HRP) from mid-2024 seeks to support 5.2 million people of 7.7 million in need of humanitarian assistance, with 2 million of these needing special food security support.  As of July, WFP provides food assistance to nearly 116,000 school children in Venezuela each month.  Remittances have declined as the diaspora's employment levels and purchasing power decreased, further exacerbating humanitarian needs among Venezuelans in country, as well as among Venezuelan refugees and migrants.

(U) Despite a marginal economic recovery, the cost of food continues to rise, with food inflation registering in July at 70 percent year-on-year.  Higher food costs, despite slight income growth in 2023, meant 85 percent of Venezuelans could not afford the basic food basket ($183 per capita).  Women and girls in Venezuela face major protection risks and often resort to negative coping strategies – including reducing meal size and selling

critical assets, exchanging sex for money or food, or engaging in theft to survive.

(U) As Maduro's representatives have imposed restrictive visa measures on humanitarian workers and imposed onerous financial auditing and logistical burdens on aid groups inside Venezuela, these groups have been unable to conduct a comprehensive assessment of the state of hunger in Venezuela. However, humanitarian organizations report families increasingly cannot meet their daily food needs.  Given the macroeconomic context, the population of concern – spread across urban and peri-urban areas – continues to be very poor household that lack income sources in USD and that have limited access to international remittances and/or social programs.

**(U) Lack of Access to Lifesaving Health Services**:  The 2024-2025 extension of the 2023 UN Humanitarian Response Plan indicates that the state of health infrastructure in Venezuela remains poor, and there continues to be a lack of qualified health professionals, medicine, and essential supplies. According to the Venezuelan Medical Federation, as of March 2023, 42,000 Venezuelan healthcare workers left the country.  Health workers who stay in Venezuela earn inadequate wages and frequently protest poor labor conditions.  Many must walk long distances to work, sometimes for more than 10 kilometers, as they cannot afford transport.

(U) Health infrastructure in Venezuela is primarily managed by Maduro's representatives and has therefore been subject to years of neglect and disrepair.  According to the Venezuelan Medical Federation, many hospitals remain unable to offer services because they only have three percent of necessary medicines available.  Outbreaks of communicable diseases, including yellow fever, measles, and diphtheria are persistent threats due to chronic childhood vaccine shortages and poor infrastructure to transport and administer vaccines.  Human Rights Watch reports that 8.4 million gravely ill people were having trouble obtaining medical services, and more than 9 million people could not afford the medications and healthcare they

SENSITIVE BUT UNCLASSIFIED
-10-

needed.  A combined shortage of access to contraception and prenatal care further endangers women and girls.

**2. Would permitting nationals of the foreign state to remain temporarily in the United States be contrary to the national interest of the United States?**

(U) No.  Permitting eligible Venezuelan nationals to remain temporarily in the United States advances the national interest by demonstrating solidarity with the Venezuelan people fleeing Maduro and his representatives in Venezuela, and with the many countries across the Western Hemisphere generously hosting Venezuelan refugees and migrants.  Such actions send an important signal to other countries that the United States has urged to grant temporary protection or other forms of legal status to Venezuelan refugees and migrants.  The United States is the largest single donor to the response to the Venezuela regional crisis, providing more than $3.1 billion in humanitarian assistance since fiscal year 2017.

**II. Discretionary Factors**

**What, if any, additional information relevant to this decision should be brought to the attention of the Department of Homeland Security?**

N/A

**III. Recommendation**

(SBU) For the reasons described herein, the Department (1) recommends that Venezuela's TPS designation be extended for 18 months on the basis of extraordinary and temporary conditions and (2) recommends a redesignation of TPS for Venezuela based on extraordinary and temporary conditions.

 GPB · Georgia Public Broadcasting

'RLY NEWS
EN LIVE | On Air Now

MY PLAYLIST

 

DONATE

 THE INDICATOR FROM PLANET MONEY    LISTEN & FOLLOW    ⌄

## < Why Venezuela is no longer in freefall

MAY 8, 2024 · 8:08 PM ET

**8-Minute Listen**    PLAYLIST    TRANSCRIPT

SYLVIE DOUGLIS, BYLINE: NPR.

(SOUNDBITE OF DROP ELECTRIC SONG, "WAKING UP TO THE FIRE")

DARIAN WOODS, HOST:

This is THE INDICATOR FROM PLANET MONEY. I'm Darian Woods.

WAILIN WONG, HOST:

And I'm Wailin Wong. Venezuela's economy has been in freefall for over a decade. It's an oil rich country that struggles to drill oil. Its currency, the bolivar, has suffered brain bending levels of hyperinflation. We're talking 65,000% in 2018. Bolivares just crumbling in your hands.

WOODS: The seeds of the trouble began under President Hugo Chavez around 25 years ago. He was a leftist populist who made decisions that had some benefits, like boosting education and reducing poverty. But some of his actions slowly chipped away at the country's prosperity. He seized control of farms and oil company's assets. He weakened Congress and suppressed his opponents. Towards

Case 3:25-cv-01766-EMC    Document 103-3    Filed 04/07/25    Page 73 of 148

the end of his rule, the economy faltered, and it then nosedived under his successor Nicolas Maduro, who doubled down as a kind of hapless authoritarian.

WONG: U.S. sanctions haven't helped the economy either. The South American country has had one of the largest outflows of refugees in modern history. More than seven million people left the country in the last decade. That's about one in five Venezuelans.

WOODS: Back in 2019, we at THE INDICATOR started calling in to one Venezuelan economist, Gabriela Saade. She told us stories about what it was like in the capital of Caracas, which were often grim.

GABRIELA SAADE: You go to the streets, and people in Venezuela, they are very skinny. Yeah, it's very, very shocking to see that.

WONG: That was a few years ago when we last spoke with Gabriela. Now, Venezuela and the United States are even more commingled. At the U.S.-Mexican border, about one in seven intercepted migrants are Venezuelan. So today on the show, we check in with Gabriela again and learn about some surprising developments in the Venezuelan economy.

(SOUNDBITE OF MUSIC)

WOODS: Gabriela Saade is a regular guest on THE INDICATOR, updating us on the Venezuelan economy.

SAADE: Well, I don't know if regular 'cause the last time I was here...

WOODS: That's true.

SAADE: ...Was three years ago.

WOODS: Sorry. We haven't been in touch with you for quite a while.

SAADE: It's OK.

WONG: Oh. Call Dad. It's like, who's...

WOODS: Yeah.

WONG: ...Gabriela, my mom?

With impending elections, we check on how Venezuela's economy has changed : The Indicator from Planet Money : NPR

(LAUGHTER)

WOODS: A little. Why didn't you call me? And the last time Gabriela spoke to THE INDICATOR, she was speaking about how hard grocery shopping was in Caracas.

SAADE: Probably 60% of the shelves of the supermarket would be empty. I remember there was this deodorant, this brand called Mum. It was really bad, and it was the only option available.

WONG: There were also more serious problems than deodorant selection blackouts, poverty. Gabriela, as a young professional, was making $300 a month. Not enough, she felt, which is why Gabriela made the hard decision to leave and come to the United States.

SAADE: I have the opportunity to actually save money, and I can also, like, support my family who is living there.

WOODS: Gabriela is an advisor at the Behavioural Insights Team now. That's a behavioral economics consultancy. Now every month she sends back $650 back to Venezuela to her mother. But she hadn't been back to visit the country until December last year.

SAADE: It was a totally different country. It was pretty wild to see it almost as an observer. It was very weird.

WONG: Caracas had been a ghost town when she left. Now, it was full with honking traffic. And because it was Christmas...

SAADE: People just blasting music and, like, making hallacas, which is a traditional dish.

WONG: That's a special type of tamale.

WOODS: Gabriela said she even saw some tourists from Europe. She asked them why they'd come. And they said they'd heard it was nice from TikTok.

SAADE: There was this ongoing joke in 2022. People would say, oh, Venezuela (speaking Spanish), which means Venezuela, like, got fixed, like, it recovered, right? But that's far from the truth.

WONG: One sign of perhaps a superficial fix was in the supermarket.

Vz Vacatur_0208

SAADE: The prices were in dollars. So the prices were not in bolivares. It's like the price tax for those goods, they said R-E-F, REF, which is, like, a reference price, and it would be in dollars.

WOODS: This is called de facto dollarization. What happens is you'd go to the counter, and you could either pay in U.S. dollars or if you only had bolivares...

SAADE: You would just take out your calculator, use the exchange rate and know what it's   yeah, how much it is in bolivares.

WOODS: Yeah. I see that inflation is 200%, which is actually low for recent history in...

SAADE: Yeah.

WOODS: ...Venezuela. But even then, I guess the shops don't want to be changing their prices too much.

SAADE: Yeah, yeah, yeah. So it's just easier just to have the dollar as a reference for prices.

WONG: An estimated 45% of transactions in the main cities are now made in foreign currencies, mostly the U.S. dollar.

WOODS: De facto dollarization is basically just a Band-Aid over the core problem of the declining currency. Jesus Palacios is an economist at the Venezuelan economic firm, Ecoanalitica. He says other reforms have been associated with some growth.

JESUS PALACIOS: In last years, Venezuela has had an average annual growth of 4% in 2021 to 2023.

WONG: Alongside that 4% growth, Jesus says that shortages have eased over the last few years. That's because Maduro's government has loosened the restrictions on imports and price controls he and Chavez had overseen. We know that price controls lead to shortages when more people want something like a deodorant, but the supplier doesn't have the incentive to bring that deodorant into the country. U.S. sanctions relief during this time probably helped, too.

PALACIOS: The economy is growing, but is more and more unequal in the last years. The poorest people earn 30 or 35 times less than those with the highest income. This is facts.

WONG: Jesus says more than 80% of Venezuelans are still in poverty. You can kind of view the economy of Venezuela as falling off a cliff 12 years ago, and now it's made some small crawls upward, but unevenly. Inequality is worsening.

WOODS: I saw that there was a Ferrari dealership that opened in Caracas.

PALACIOS: Yeah, yeah. This is amazing in this context, no?

WOODS: That dealership is for the wealthier Venezuelans who are often plugged into the government apparatus. It's not for ordinary people like Jennifer Ontiveros (ph). Jennifer is a housekeeper in Caracas, and as a mother of two young kids, she needs to multitask, like she was doing on this call.

JENNIFER ONTIVEROS: (Through interpreter) I am ironing right now.

WONG: Jennifer says her income has improved over the last couple of years. She says she's lucky to be on $350 a month, whereas other working Venezuelans get paid as little as $4, but it's still not enough.

ONTIVEROS: (Through interpreter) The country doesn't get better. We don't get any benefits from being Venezuelan. You can't do anything with your money, like, renovate your home, take your kids out to do something    nothing. We can't enjoy anything. Faith is the only thing that keeps us going.

WOODS: A lot of people have left Venezuela over the last decade. Do you want to leave Venezuela?

ONTIVEROS: (Through interpreter) Yes. Yes, I would like to leave. This year, we have a presidential election. I wouldn't leave if Maduro lost and was no longer president. But if he stays and gets elected again, which means five more years of this government, five more years like this, five more years of not having enough, not being able to build your own home, not being able to give a better life to your kids.

WONG: The election is marked for July. But beneath the economic carnage, Jennifer still loves Venezuela.

Case 3:25-cv-01766-EMC   Document 103-3   Filed 04/07/25   Page 77 of 148

ONTIVEROS: (Through interpreter) The music, the culture, the beaches, all of it. All of the country.

WOODS: And that's a sentiment shared by Gabriela.

SAADE: If things actually, like, get better, and there are more opportunities for people like myself, I know for a fact that I won't be alone in returning.

WONG: This episode was produced by Angel Carreras, with engineering by Neal Rauch. It was fact checked by Sierra Juarez. Kate Concannon edits the show, and THE INDICATOR's a production of NPR.

(SOUNDBITE OF MUSIC)

WOODS: Was the deodorant selection better when you went back?

SAADE: Yes, definitely. Yeah.

WOODS: What's your brand?

SAADE: That was - Secret.

WOODS: It's a secret. OK, yeah.

SAADE: No, I mean, it's called Secret. I think it's...

WOODS: Oh, right.

SAADE: ...Like a - yeah (laughter).

WOODS: It's called Secret. I was like, wow...

SAADE: No, but...

WOODS: ...This must be kind of a private question.

*Copyright © 2024 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.*

*NPR transcripts are created on a rush deadline by an NPR contractor. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.*

3/7/25, 12:00 PM    You importantly elections. We credit on Lies Venezuela economy, 7 in 25 Indicator Plate Money: NPR

Case 3:25-cv-01766-EMC    Document 103-3    Filed 04/07/25    Page 78 of 148

**More Stories From NPR**



THE INDICATOR FROM PLANET MONEY
**Can ... we still trust the monthly jobs report?**



THE INDICATOR FROM PLANET MONEY
**What to make of the Ukraine minerals deal**



THE INDICATOR FROM PLANET MONEY
**Is the Panama Canal a rip-off?**

VZ Vacatur_0213



THE INDICATOR FROM PLANET MONEY
**Can the Federal Reserve stay independent?**



THE INDICATOR FROM PLANET MONEY
**How tourist destinations recover after terrorism**

3/7/25, 12:00 PM    You, impending elections, Venezuelan chaos over Venezuela economy : The Indicator from Planet Money : NPR

Case 3:25-cv-01766-EMC    Document 163-3    Filed 04/07/25    Page 81 of 148



THE INDICATOR FROM PLANET MONEY
## Slender Starbucks, Medicaid at risk, and the gold card visa

## Popular on NPR.org



SHOTS - HEALTH NEWS

## She got her dream job at CDC back. But she's already moving on



RACE

## War heroes are among 26,000 images flagged for removal in Pentagon's DEI purge



ASIA

VZ Vacatur_0216

# 5 takeaways: China's foreign minister slams Trump's 'two-faced' policies



HEALTH

## Amid a growing measles outbreak, doctors worry RFK Jr. is sending the wrong message



CODE SWITCH: PERSPECTIVES

**If you see something (woke), say something**



BUSINESS

**Did tariffs contribute to the Great Depression? Here's what to know**


**NPR Editors' Picks**

3/7/25, 12:00 PM
You, important, elections, documentation, businesses, venezuela, coverage, money, the syndication, rage, raise, money, NPR
Case 3:25-cv-01766-EMC   Document 103-3   Filed 04/07/25   Page 85 of 148



CULTURE

## TOKiMONSTA's new album is a 'love letter' to close friend Regina Biondo



MOVIE REVIEWS

## Live, die, repeat: Bong Joon Ho offers a farcical vision of the future in 'Mickey 17'

VZ Vacatur_0219



ECONOMY

**The job market is still pretty solid -- but there are warning signs ahead**



BUSINESS

**A look at some of the creative ways companies try to dodge high tariffs**

VZ Vacatur_0220



UP FIRST NEWSLETTER

**Monthly jobs report to be released. And, the White House to host a crypto event**



NATIONAL

**How a measles outbreak overwhelmed a small West Texas town**

VZ Vacatur_0221

Trump immunity actions could endanger pro-democracy Venezuelans from N.Y. in indication age of money2 : NPR

READ & LISTEN

**Home**

**News**

**Culture**

**Music**

**Podcasts & Shows**

CONNECT

**Newsletters**

**Facebook**

**Instagram**

**Press**

**Public Editor**

**Corrections**

**Contact & Help**

ABOUT NPR

**Overview**

**Diversity**

**NPR Network**

**Accessibility**

**Ethics**

**Finances**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**NPR Shop**

**NPR Events**

**NPR Extra**

terms of use

privacy

your privacy choices

text only

© 2025 npr

Case 3:25-cv-01766-EMC    Document 103-3    Filed 04/07/25    Page 89 of 148

**Venezuela(/country/ven)**

# Situation of human rights in the Bolivarian Republic of Venezuela - Report of the United Nations High Commissioner for Human Rights (A/HRC/56/63) (Advance Unedited Version)

UN Document

**Source:** UN HRC(/organization/un-hrc)

**Posted:** 1 Jul 2024

**Originally published:** 28 Jun 2024

**Origin:** View original



**Download Report**

(PDF | 717.78 KB) (/attachments/7d8295fe-57ca-4b3b-85c7-f03f9a1bc4fd/a-hrc-56-63-auv.pdf)

**Human Rights Council**

**Fifty-sixth session**

18 June–12 July 2024

Agenda items 2 and 4

**Annual report of the United Nations High Commissioner
for Human Rights and reports of the Office of the
High Commissioner and the Secretary-General**

**Human rights situations that require the Council's attention**

*Summary*

Pursuant to Human Rights Council resolution 51/29, in the present report, the United Nations High
Commissioner for Human Rights focuses on the latest developments related to economic, social and cultural
rights and the right to a healthy environment, rule of law and civic space, and the level of implementation of
the corresponding recommendations previously issued by his Office to the Bolivarian Republic of Venezuela.

I. Introduction and methodology

1. The present report is submitted pursuant to Human Rights Council resolution 51/29, in which the Council
requested the United Nations High Commissioner for Human Rights to submit a comprehensive report on the
situation of human rights in the Bolivarian Republic of Venezuela (Venezuela), containing a detailed
assessment of the implementation of the recommendations made in previous reports and to present it to the
Council at its fifty-sixth session.

2. The present report covers the period from 1 May 2023 to 30 April 2024 and focuses on the latest
developments related to economic, social, and cultural rights, the right to a healthy environment, gender, and
LGBTIQ+ rights, civic space, and the rule of law. The report is based on information gathered and analysed by
the Office of the United Nations High Commissioner for Human Rights (OHCHR), including through interviews
with victims and witnesses and meetings with Government officials and civil society organizations. It also
considers official information from State institutions. On 15 February 2024, the Government of Venezuela
announced the suspension of the Letter of Understanding signed with OHCHR, requesting OHCHR personnel
to leave Venezuela within 72 hours. OHCHR regrets this development.

3. The findings in the present report have been documented and corroborated in strict compliance with
OHCHR methodology. OHCHR exercised due diligence to assess the credibility and reliability of sources and
cross-checked the information gathered to verify its validity. It sought informed consent from the interviewees
and took appropriate measures to protect their identities and to ensure confidentiality, as appropriate. OHCHR
assessed the information collected and domestic legislation, in the light of international human rights norms
and standards.

**II. Economic, social, and cultural rights and the right to a healthy environment**

4. Deficiencies in access to and supply of utilities such as water, electricity and fuel, continued to be
exacerbated inter alia by the impact of sectoral sanctions during the reporting period.1 On 18 October 2023,
following the signing of the Barbados Agreements, six licences were issued relaxing these sanctions, including

Case 3:25-cv-01766-EMC    Document 103-2    Filed 04/07/25    Page 91 of 148

in the oil and gas sector.2 On 17 April 2024, the general licence to the oil and gas sector was replaced by a limited licence to reduce operations for 45 days. According to State institutions, as well as humanitarian and human rights organizations, sanctions and overcompliance hindered the receipt of funds and imports of essential goods, including for food and medicine.

5. Despite official figures indicating a five per cent gross domestic product growth in 2023,3 economic challenges such as high inflation4 and devaluation of Venezuelan currency, the bolivar, persisted,5 and continued to restrict purchasing powers, disproportionately affecting groups and communities in vulnerable situations, including the urban poor, those living in rural areas, and particularly women from these populations.

6. Reportedly, structural underfunding and understaffing continued to weaken health and education sectors.6 A report indicated that between July and August 2023, 74.6 per cent of health centres nationwide lacked medical staff, and 73.5 per cent lacked nursing staff,7 thus affecting accessibility, quality and availability of healthcare.8 The national education sector union indicated 80 per cent absenteeism from students at the resumption of the school year in October 2023, due to unaffordability of travel, uniforms, and other needs.9

7. Between 1 and 14 February 2024, the United Nations Special Rapporteur on the right to food carried out his first official visit to Venezuela. This visit highlighted the State's actions to address food insecurity. The Special Rapporteur expressed concern that "[Unilateral] coercive measures significantly limit the Venezuelan government and people's ability to realize the right to food,"10 contributing to the large scale of food insecurity in Venezuela, and disproportionately affecting women and girls. Concluding his visit, the Special Rapporteur also expressed concerns regarding allegations of political instrumentalization of State welfare.11

8. OHCHR reiterates its recommendation to authorities to take all necessary measures, including programmes for improved access to food, to ensure the availability and accessibility of food in sufficient quantity and quality.12

---

**Primary country:**

Venezuela (Bolivarian Republic of)(/country/ven)

**Source:**

UN Human Rights Council(/organization/un-hrc)

**Format:**

UN Document(/updates?list=UN%20Document%20Updates&advanced-search=%28F11%29)

**Themes:**

Climate Change and Environment(/updates?
list=Climate%20Change%20and%20Environment%20Updates&advanced-search=%28T4588%29)  /
Food and Nutrition(/updates?list=Food%20and%20Nutrition%20Updates&advanced-

search=%28T4593%29) / Gender(/updates?list=Gender%20Updates&advanced-

search=%28T4594%29) / Health(/updates?list=Health%20Updates&advanced-

search=%28T4595%29) / Peacekeeping and Peacebuilding(/updates?

list=Peacekeeping%20and%20Peacebuilding%20Updates&advanced-search=%28T4599%29) /

Protection and Human Rights(/updates?

list=Protection%20and%20Human%20Rights%20Updates&advanced-search=%28T4600%29) /

Water Sanitation Hygiene(/updates?list=Water%20Sanitation%20Hygiene%20Updates&advanced-

search=%28T4604%29)

**Language:**

English(/updates?list=English%20Updates&advanced-search=%28L267%29)

# Related Content

Venezuela(/country/ven)   **Situación de los derechos humanos en la República Bolivariana
de Venezuela - Informe del Alto Comisionado de las Naciones Unidas para los Derechos
Humanos (A/HRC/56/63) (Unofficial spanish version)
(https://reliefweb.int/report/venezuela-bolivarian-republic/situacion-de-los-derechos-
humanos-en-la-republica-bolivariana-de-venezuela-informe-del-alto-comisionado-de-
las-naciones-unidas-para-los-derechos-humanos-ahrc5663-unofficial-spanish-version)**

   UN Document

**Source:** UN HRC(/organization/un-hrc)

**Posted:** 1 Jul 2024

**Originally published:** 28 Jun 2024

World(/country/wld)   **Asia and the Pacific SDG Progress Report: Engaging communities to
close the evidence gap 2025(https://reliefweb.int/report/world/asia-and-pacific-sdg-
progress-report-engaging-communities-close-evidence-gap-2025)**

VZ Vacatur_0226

Analysis

**Source:** ESCAP(/organization/escap)

**Posted:** 19 Feb 2025

**Originally published:** 18 Feb 2025

---

Colombia(/country/col)    **Marco de Cooperación para el Desarrollo Sostenible, Colombia 2024 -2027(https://reliefweb.int/report/colombia/marco-de-cooperacion-para-el-desarrollo-sostenible-colombia-2024-2027)**

Analysis

**Sources:** Govt. Colombia(/organization/govt-colombia), UNCT Colombia(/organization/unct-colombia)

**Posted:** 17 Dec 2024

**Originally published:** 19 Jun 2024

---

World(/country/wld)    **Informe Global 2023 - Resumen ejecutivo(https://reliefweb.int/report/world/informe-global-2023-resumen-ejecutivo)**

Other

**Source:** UNHCR(/organization/unhcr)

**Posted:** 11 Dec 2024

**Originally published:** 1 Jul 2024

English | Español





Health in the Americas

# Venezuela - Country Profile

 By PAHO/OPS, 24 September, 2024

Determinants    Digital Coverage    Health Situation    Mortality    Prospects

The Health in the Americas+ country profiles are based on the interagency indicators available as of the dates referenced. In some cases, the values of the indicators may differ from the most recent data available in the country.

## Environmental and social determinants of health

In 2000 the total population of Venezuela (Bolivarian Republic of) was 24 526 708 inhabitants; by 2024 this figure had risen to 28 405 543, representing a 15.8% increase. Regarding the country's demographic profile, in 2024 people over 65 years of age accounted for 9.7% of the total population, an increase of 5.0 percentage points compared to the year 2000. In 2024, there were 102.4 women per 100 men and 37.9 older people (65 years or older) per 100 children under 15 years of age, as can be seen in the country's population pyramids, distributed by age group and sex (Figure 1). Considering the population between 15 and 64 years of age to be potentially active (i.e., potential participants in the labor force), this group represented 64.8% of the total population of the country in 2024 (18 405 026 people). When we add these figures to the potentially passive population (7 251 085 under 15 years of age and 2 749 433 over 65 years of age), the result is a dependency ratio of 54.3 potentially passive people per 100 potentially active people. This ratio was 63.1 in 2000.

Life expectancy at birth in 2024 was 72.7 years, lower than the average for the Region of the Americas and 0.3 years higher that in 2000 (72.4).

Figure 1. Population pyramids of Venezuela, years 2000 and 2024

Microsoft Power BI

Between 2001 and 2016, the average number of years of schooling in Venezuela (Bolivarian Republic of) increased by 27.9%, reaching an average of 10.3 years in the latest year for which information is available. The unemployment rate in 2023 was 5.9%. Disaggregated by sex, the rate was 6.5% for women and 5.5% for men. The literacy rate was 98.7% in 2022. In men, this figure was 99.1%; in women, 98.4%. In addition, 33.1% of the population were below the national poverty line in 2015, a decrease from 41.6% in 2000. In 2006, 7.1% of the population was living in poverty, defined as the percentage of the population with an income of less than US$ 2.15 per day; this is below the regional average of 2.6%.

Between 2000 and 2022, the country's Human Development Index score remained unchanged at 0.699. During the same period, the index increased by 14.6% globally and 11.2% in Latin America (Figure 2).

**Figure 2. Human Development Index in the Region of the Americas, 2022**



In 2021, public expenditure on health accounted for 1.35% of gross domestic product (GDP) (Figure 3) and 5.46% of total public expenditure, while out-of-pocket spending on health accounted for 28.06% of total health expenditure.

**Figure 3. Domestic general government health expenditure as percentage of gross domestic product, 2021**

VZ Vacatur_0229



## Digital coverage

In 2017, 61.6% of the population had an internet connection, representing a considerable increase from 2000, when 3.4% of the population had an internet connection.

## Health situation

### Maternal and child health

Between 2000 and 2018, infant mortality in the Bolivarian Republic of Venezuela decresed from 19.4 to 18.28 deaths per 1000 live births, a decrease of 5.7% (Figure 4). The percentage of low-weight births (less than 2500 g) increased from 8.7% to 9.5% between 2003 and 2017.

Regarding the immunization strategy, measles vaccination coverage was 68% in 2021, a decrease of 16 percentage points from 2000.

**Figure 4. Infant mortality per 1000 live births, 1995–2018**

VZ Vacatur_0230



The maternal mortality ratio in 2020 was estimated at 259.2 deaths per 100 000 live births, representing a 180.5% increase compared to the estimated value in 2000 (Figure 5). In relation to fertility, it is estimated that in 2024 women had an average of 2.1 children throughout their reproductive lives. In the specific case of adolescent fertility, there was a 24.3% decrease, from 96.7 live births per 1000 women aged 15 to 19 years in 2000 to 73.2 in 2024. In 2017, 99.1% of births were attended by skilled birth personnel. Between 2011 and 2018, the percentage of pregnant people who received antenatal care increased from 47.0% to 82.6%.

**Figure 5. Maternal mortality per 100 000 live births, 2000–2020**



## Communicable diseases

In 2022, there were 35 new cases of tuberculosis per 100 000 population in Venezuela (Bolivarian Republic of). In 2019, the overall tuberculosis mortality rate (age-adjusted and per 100 000 population) was 2.7 (1.5 in women and 4.2 in men).

In 2020, the estimated human immunodeficiency virus (HIV) infection incidence rate (new diagnoses) was 17.5 per 100 000 population. The age-adjusted mortality rate for HIV was 26.1 per 100 000 population in 2019. It should be noted that during the 2000-2019 period this indicator decreased by 215.6%. There were no reported cases of human rabies in the country in 2022.

## Noncommunicable diseases and risk factors

In the same age group, the prevalence of overweight and obesity was 53.5% in 2022. Also in 2016, 31.4% of the population reported insufficient physical activity.

In 2015, the reported prevalence of arterial hypertension (high blood pressure) among people aged 18 years or older was 18.6%, a decrease of 6.9 percentage points compared to 2000 (25.5%). The prevalence of diabetes mellitus, which stood at 8.8% in 2000, increased to 9.5% in 2014.

# Mortality

In 2019, the adjusted rate of potentially avoidable premature mortality in Venezuela (Bolivarian Republic of) was 337.9 deaths per 100 000 population, a decrease of 2.3% from a rate of 330.2 in 2000. This meant that, in 2019, the rate in the country was 10.4% lower than the average rate reported for the Region of the Americas as a whole. Among potentially avoidable premature mortality, the rate for preventable causes was 124.3 per 100 000 population in 2019, which is 2.1% lower than the regional average rate.

The overall age-adjusted mortality rate was 6.3 per 1000 population in 2019, a decrease of 2.6% compared to 2000 (5.6 deaths per 1000 population).

When deaths are categorized into three main groups, it is observed that, in 2019, the age-adjusted mortality rate from communicable diseases was 102.3 per 100 000 population (116.4 per 100 000 in men and 29.8 per 100 000 in women), while the age-adjusted mortality rate from noncommunicable diseases was 413.8 per 100 000 population (488.3 per 100 000 in men and 355.3 per 100 000 in women). The rate of age-adjusted mortality from external causes was 119.4 per 100 000 population (214.4 per 100 000 in men and 21.3 per 100 000 in women). In 2000, the percentage distribution of causes was 63.6% for noncommunicable diseases, 16% for communicable diseases, and 20.3% for external causes; in 2019, the percentages were 65.1%, 15.6%, y 19.4%, respectively (Figure 6).

**Figure 6. Proportional mortality in Venezuela, 2000 and 2019**



## Cancer mortality

Regarding cancer mortality from tumors, in 2019, the adjusted mortality rate from prostate cancer was 25.5 per 100 000 men; lung cancer, 16.0 per 100 000; and colorectal cancer, 7.7 per 100 000. In women, these values were 16.8 deaths per 100 000 for breast cancer, 11.4 per 100 000 for lung cancer, and 7.1 per 100 000 for colorectal cancer.

VZ_Vacatur_0232

The sources of the interagency indicators used in this profile can be found [in this table](#).


For the latest data on health indicators for the Region of the Americas, be sure to visit the **PAHO Core Indicators portal**.

## COUNTRY/TERRITORY PROFILES

Anguilla

Antigua and Barbuda

Argentina

Aruba

Bahamas

Barbados

Belize

Bermuda

Bolivia

Bonaire, Sint Eustatius, and Saba

Brazil (English) (Português)

Canada

Cayman Islands

Chile

Colombia

Costa Rica

Cuba

Curaçao

Dominica

Dominican Republic

Ecuador

El Salvador

French Guiana, Guadeloupe and Martinique

Grenada

Guatemala

Guyana

Haiti (English) (Français)

Honduras

Jamaica

Mexico

Montserrat

Nicaragua

Panama

Paraguay

Peru

Puerto Rico

Saint Kitts and Nevis

Saint Lucia

Saint Vincent and the Grenadines

Sint Maarten

Suriname

Trinidad and Tobago

Turks and Caicos Islands

United States of America

Uruguay

Venezuela

Virgin Islands (British)

Virgin Islands (U.S.)

## CURRENT TOPIC

Accelerating Disease Elimination



Health in the Americas was created in 1954, and since its groundbreaking first edition in 1956 has been published fifteen times. Since its inception, it has been recognized as the flagship publication of the Pan American Health Organization (PAHO), being a unique report on the great advances, challenges, and trends in the field of health in the Region of the Americas.

---
**LATEST**
---

**U.S. Virgin Islands - Territory Profile**
Oct 26, 2024

**French Guyana - Profile**
Oct 25, 2024

---
**SEARCH**
---

| Enter the terms you wish to search for | Go |

---
**TAGS**
---

☐ Data sources      ☐ Perfile de país      ☐ Bibliography      ☐ Recommended resources

Health in the Americas+ © 2021 Pan American Health Organization. All rights reserved.









Venezuelan family on the move after being evicted from their house in Soacha, Colombia. © NRC/Nadège Mazars

*"Despite several complexities posed by the uncertainty and deepening of the humanitarian crisis, thanks to the sustained engagement and work of all partners, the RMRP 2021 provides a clear articulation of how to complement host government's efforts."*

Eduardo Stein, UNHCR and IOM Joint Special Representative for Refugees and Migrants from Venezuela

The exodus of Venezuelans is the largest in the recent history of Latin America and the Caribbean. As of November 2020, more than 5.4 million refugees and migrants from Venezuela are outside their country of origin, with 4.6 million in the region alone.

In this context, the **Refugee and Migrant Response Plan 2021** is the result of field-driven planning, bringing together 159 appealing organizations in 17 countries, in consultation with host governments, civil society and faith-based organizations, local communities, donors, as well as the refugees and migrants themselves, with the common objective of addressing the overarching humanitarian, protection and socioeconomic integration needs of refugees and migrants from Venezuela.



Download

# REGIONAL RMRP AT A GLANCE

VZ Vacatur_0236

## POPULATION PROJECTION 2021
**8.13 M**

- 34.2%
- 15.2%
- 34.0%
- 16.6%

| | |
|---|---|
| VENEZUELANS IN DESTINATION | 5.28 M |
| VENEZUELANS PENDULAR | 1.87 M |
| COLOMBIAN RETURNEES | 980 K |
| * IN TRANSIT | 331 K |

## PEOPLE IN NEED
**7.20 M**

- 35.6%
- 14.9%
- 34.4%
- 15.1%

| | |
|---|---|
| VENEZUELANS IN DESTINATION | 3.84 M |
| VENEZUELANS PENDULAR | 992 K |
| COLOMBIAN RETURNEES | 625 K |
| HOST COMMUNITY | 1.75 M |
| * IN TRANSIT | 285 K |

## PEOPLE TARGETED
**3.30 M**

- 37.5%
- 17.9%
- 27.8%
- 16.8%

| | |
|---|---|
| VENEZUELANS IN DESTINATION | 2.27 M |
| VENEZUELANS PENDULAR | 188 K |
| COLOMBIAN RETURNEES | 174 K |
| HOST COMMUNITY | 660 K |
| * IN TRANSIT | 212 K |

**TOTAL REQUIREMENTS**
**$1.44 B**

**RMRP PARTNERS**
**159**

*Figures for refugees and migrants in-transit to other countries are not included in the totals on the left as they can be – by definition – recipients of services in more than one country. However, the total budget and sector specific requirements include activities targeting this population group, including as refugees and migrants in-transit will have specific needs to be addressed

# REQUESTED FUNDING AND BENEFICIARIES TARGETED

UNITED STATES

VZ Vacatur_0237



BY NATIONAL AND SUB–REGIONAL
PLATFORM

**LEGEND**

- POPULATION PROJECTION 2021
- PEOPLE IN NEED
- PEOPLE TARGETED
- TOTAL REQUIREMENTS
- RMRP PARTNERS

**REGION**
- 8.1 M
- 7.2 M
- 3.3 M
- $1.4 B
- 159

**BRAZIL**
- 390 K
- 375 K
- 184 K
- $88.0 M
- 34

**CHILE**
- 478 K
- 370 K
- 143 K
- $42.3 M
- 17

**COLOMBIA**
- 8.1 M
- 4.0 M
- 1.7 M
- $364 M
- 63

**ECUADOR**
- 523 K
- 382 K
- 245 K
- $227 M
- 43

**PERU**
- 1.1 M
- 1.2 M
- 822 K
- $275 M
- 43

**CARIBBEAN**
- 224 K
- 214 K
- 123 K
- $49.7 M
- 26

**CENTRAL AMERICA & MEXICO**
- 262 K
- 125 K
- 42.3 K
- $24.8 M
- 7

**SOUTHERN CONE**
- 234 K
- 278 K
- 180 K
- $44.7 M
- 33

© NRC/Nadège Mazars

VZ Vacatur_0239

# WHERE DO WE STAND

Olivia holds her daughter Eva, who is tired after not sleeping well from months of homelessness, not having enough to eat and lacking healthcare. ©Save the Children/Glenna Gordon

VZ Vacatur_0240

The political, human rights and socio-economic developments in Venezuela have led to the largest movement of refugees and migrants in the recent history of Latin America and the Caribbean. As of November 2020, of the approximately 5.4 million refugees and migrants from Venezuela outside of their country of origin, some 4.6 million are hosted in the region alone, including an estimated 1 million with an irregular status. Despite the devastating and ongoing socioeconomic and human impact of COVID-19, countries in Latin America and the Caribbean have continued to show great solidarity towards Venezuelans and to facilitate access to basic rights and lifesaving services as well as supporting their integration.

The already precarious situation of many refugees and migrants from Venezuela and affected host communities is reaching alarming levels, as national and local capacities have been dangerously strained due to the continued impact of COVID-19, threatening the overall social fabric in the 17 countries covered by the Regional Refugee and Migrant Response Plan. In a region characterized by high levels of informal labour, the implementation of measures aiming to curb the spread of COVID-19 (including border closures, lockdowns, curfews and other quarantine measures) has had a disproportionately grave impact on refugees and migrants. Without savings or alternative social safety nets, the loss of employment has resulted in many being unable to cover basic needs or access vital services.

RMRP 2021 - HUMANITARIAN NEEDS AND THE RESPONSE FOR REFUGEES AND MIGRANTS FROM VENEZUELA

# THE REGIONAL RESPONSE

Humanitarian worker teaches Venezuelan child and his mother how to wash hands to prevent COVID-19 in Bucaramanga, Colombia. ©Oxfam/Mario Niño

As a result of the complex economic and political outlook, increased dependency on emergency humanitarian assistance in the areas of health, shelter, food, Water, Sanitation and Hygiene (WASH), as well as access to education, protection and integration is reflected in the increased needs outlined in the RMRP 2021. The COVID-19 pandemic has also resulted in a dramatic increase of reported cases of gender-based violence (GBV) and mental health needs, while leading to widespread food insecurity, rising levels of malnutrition and growing destitution especially among the most vulnerable, namely unaccompanied and separated children (UASC), single-headed households, women and girls at risk of GBV and trafficking, the elderly, those with chronic diseases, the LGBTQI+ community and those in situations of irregularity.

Xenophobia and stigmatization are on the rise, often based on negative perceptions associated with fear of the spreading virus and rising rates of evictions and homelessness, leading to a vicious cycle of irregularity, vulnerability, and stigmatisation.

VZ Vacatur_0242



# WHAT'S THE RMRP?

Orliannis Sophia and Jesuatny look through the contents of their hygiene kit.
©Plan International/Gina Piñeros

VZ Vacatur_0243

The RMRP was first developed in 2018 (implemented throughout 2019) as a strategic regional response plan and advocacy tool to support country and sub-regional operations and to ensure the most pressing humanitarian, protection and integration needs of refugees and migrants from Venezuela, as well as those of host communities, were met.

The RMRP 2021 intends to build upon the best practices and lessons learned from 2020, presenting a more comprehensive plan, for an even more effective, coordinated and holistic response for refugees and migrants from Venezuela in Latin America and the Caribbean.

As in previous years, the RMRP 2021 provides a comprehensive analysis of the population movement dynamics to be expected for 2021 and the corresponding needs of refugees and migrants from Venezuela as well as of affected host communities. It further describes the response strategies and priority activities and indicates the financial needs of all partners of the Inter-Agency Coordination Platform to be able to continue assisting the population in need in an effective and coordinated manner.



Carmen is one of the many coronavirus heroes. After she left Venezuela, Carmen spent more than two years working as a waitress, a receptionist and a sales attendant until she was able to validate her medical qualifications in Peru. © UNHCR/ Carmen Parra



VZ Vacatur_0244

Reflective of its inter-agency and multisectoral character, the RMRP 2021 is based on joint needs assessments carried out by RMRP partners at national and sub-regional levels on an ongoing basis, and on continuous exchanges with host governments, civil society actors and affected populations. The planning phase started in August 2020 after consultations with key strategic partners of the Platform, host governments, as well as the donor community. The RMRP 2021 is the result of an intra-regional field-driven strategic planning process, bringing together 159 appealing organizations, in consultation with all host governments, local communities and authorities, United Nations agencies, civil society, including international and national non-governmental organizations and faith-based organizations, the Red Cross Movement, the donor community, as well as consultations with refugees and migrants from Venezuela.

The structure of the RMRP 2021 reflects the sectoral set-up of the Regional Inter-Agency Coordination Platform (R4V) and all strategies and activities articulated in this Plan have been reviewed and cleared by the different Platforms and Sectors, both at regional and national/sub-regional levels, and have been elaborated in complementarity with the work of host governments.

VZ Vacatur_0245



# WHAT ARE WE FOCUSING ON IN 2021?

An elder Venezuelan woman digitally signing after receiving information and assistance on COVID-19 prevention. ©MercyCorps/Sol Torres

VZ Vacatur_0246

The RMRP 2021 strives to maintain a balance between responses focusing on immediate humanitarian and protection assistance, and activities that bridge the humanitarian-development-peace nexus by responding to the longer-term resilience and integration needs of affected populations and host communities.

To enhance this complementarity between humanitarian action and development support, the Regional, Sub-regional and National Platforms will to serve as a forum for convening humanitarian and development partners for efficiently coordinated assistance. This approach is in line with the UN Secretary-General's Agenda for Humanity, the UN Development System Reform, the Grand Bargain global commitments and the principles of the New Way of Working, calling for collective and coherent support to reduce people's needs and vulnerabilities, based on comparative advantages of 159 humanitarian and development RMRP actors across the region.

RMRP partners at the regional and national levels have continued to show commitment and dedication throughout the preparation of this Plan. The RMRP 2021 intends to build upon the best practices and lessons learned from 2020, presenting a more comprehensive plan for 2021, for an even more effective, coordinated and holistic response for refugees and migrants from Venezuela in Latin America and the Caribbean.

## Population flows in Latin America & the Caribbean



Source: R4V

✳ A Flourish chart

Bearing in mind the various political and socioeconomic developments unfolding in Venezuela as well as in numerous host states, and the ongoing impact of the COVID-19 pandemic, the outlook for 2021 remains particularly complex and fragile. These dynamics have been reflected throughout the planning exercise and in all chapters of this RMRP.

In this spirit, RMRP partners will continue to regularly and transparently report on implementation of activities under the RMRP dedicated monitoring and reporting framework and will continue to be highly responsive to newly arising challenges or changes impacting on refugees and migrants from Venezuela as well as affected host communities.

In 2021, the RMRP also seeks to complement and further strengthen the national and regional responses of governments, including specifically the Quito Process as the main technical regional intergovernmental coordination forum in which key policies towards refugees and migrants from Venezuela are discussed and adopted.

## BUDGET REQUIREMENT PER SECTOR

Source: RMRP 2021

✳ A Flourish sankey chart

## NATIONAL/SUB-REGIONAL AND SECTORIAL DOWNLOADS

VZ Vacatur_0248

### REGIONAL

RMRP 2021 Regional Summary
[ENG] [ESP]

### BRAZIL

RMRP 2021 Brazil – Two pagers
[ENG] [ESP]

### CHILE

RMRP 2021 Chile – Two pagers
[ENG] [ESP]

### COLOMBIA

RMRP 2021 Colombia – Two pagers
[ENG] [ESP]

### ECUADOR

RMRP 2021 Ecuador – Two pagers
[ENG] [ESP]

### PERU

RMRP 2021 Peru – Two pagers
[ENG] [ESP]

### CARIBBEAN

RMRP 2021 Caribbean – Two pagers
[ENG] [ESP]

### CENTRAL AMERICA & MEXICO

RMRP 2021 Central America & Mexico – Two pagers
[ENG] [ESP]

### SOUTHERN CONE

RMRP 2021 Southern Cone – Two pagers
[ENG] [ESP]

## RMRP 2021 PARTNER ORGANIZATIONS

100% Diversidad y Derechos
ACAPS
Acción contra el Hambre
Adventist Development and Relief Agency (ADRA)
AID FOR AIDS
Alianza por la Solidaridad
Americares Foundation
Asociación Civil Venezolana en Paraguay
Asociación Construyendo Caminos de Esperanza Frente a la Injusticia, el Rechazo y el Olvido (CCEFIRO)
1Asociación de Apoyo al Desarrollo  APOYAR
Asociación de Jubilados y Pensionados Venezolanos en Argentina
Asociación de venezolanos en la República argentina (ASOVEN)
Asociación ILLARI-AMANECER
Asociación Manos Veneguayas
Asociación Mutual Israelita Argentina
Asociación Profamilia
Asociación Venezolana en Chile
Ayuda en Acción
Bethany Christian Services
Blumont
CAM
CARE
Cáritas Alemania
Caritas Brazil
Caritas Ecuador
Caritas Manaus
Caritas Rio de Janeiro
Caritas São Paulo
Caritas Switzerland
Center for Integrated Studies and Programs for Sustainable Development (CIEDS)
Center for Migration and Human Rights of the Diocese of Roraima (CMDH)
Centro de Atencion Psicosocial (CAPS)
Centro de Estudios y Solidaridad con América Latina (CESAL)
Cesvi
ChildFund Internacional
Churún Merú Association
Colonia Foundation of Venezuelans in the Dominican Republic (FUNCOVERD)
Comisión Argentina para Refugiados y Migrantes (CAREF)
Comité Internacional para el Desarrollo de los Pueblos (CISP)
Comité permanente por la defensa de los derechos humanos (CDH)
Compassiva
Consejo Interreligioso del Perú – Religiones por la Paz
COOPI – Cooperación Internacional
Cruz Roja Argentina
Cruz Roja Colombia
Cruz Roja Ecuador
Cuso Internacional
Danish Refugee Council (DRC)
Deutsche Gesellschaft für Internationale Zusammenarbeit (GIZ)
Diakonie Katastrophenhilfe
Diálogo Diverso
Dominican Institute for Integrated Development
Duendes y Ángeles Foundation

Famia Planea
Federación Luterana Mundial
Foro Salud Callao
Foundation of the Americas (FUDELA)
Foundation of Venezuelan Emigrants (FEV)
Fundación Alas de Colibrí
Fundación AVSI
Fundación Comisión Católica Argentina de Migraciones (FCCAM)
Fundación CRISFE
Fundación FIDAL
Fundación Halú Bienestar Humano (HALU)
Fundación Scalabrini Bolivia

VZ Vacatur_0250

Fundación SES

Fundación Tarabita

Globalizate Radio

Guarulhos Human Rights Defense Center (CDDH)

Heartland Alliance International (HAI)

Hebrew Immigrant Aid Society (HIAS)

HELVETAS Swiss Intercooperation

Human Rights Defence Curaçao

Humanity & Inclusion

Humans Analytic

I know my rights

iMMAP

IMPACT Initiatives (REACH)

Inmigrante Feliz Association

Institute for Migration and Human Rights (IMDH)

Instituto Félix Guattari

International Federation of the Red Cross (IFRC)

International Labour Organization (ILO)

International Organization for Migration (IOM)

International Rescue Committee (IRC)

INTERSOS

IPANC

Jesuit Service for Migrants and Refugees (JSMR)

Joint United Nations Programme on HIV/AIDS (UNAIDS)

Kimirina

Latin American Network of Non-Governmental Organizations of Persons with Disabilities and their Families (RIADIS)

LGBT+ Movement Brazil

Malteser International

MedGlobal

Medical Teams International

Médicos del Mundo

Mercy Corps

Mirares

Misión Scalabriniana – Ecuador

Nice Institute

Norwegian Refugee Council (NRC)

Organización de Estados Iberoamericanos para la Educación, la Ciencia y la Cultura (OEI)

Organización de las Naciones Unidas para la Alimentación y la Agricultura (FAO)

Organización Fuerza Internacional de Capellanía DDHH y DIH OFICA ICC

OXFAM

Panamerican Development Foundation (FUPAD)

Panamerican Health Organization/World Health Organization (PAHO/WHO)

Parroquia Ntra Sra Asunción y Madre de los Migrantes

Pastoral de Movilidad Humana – Conferencia Episcopal Peruana

Peace for Development

Plan International

Project HOPE

Red de Investigaciones Orientadas a la Solución de Problemas en Derechos Humanos (RIOSP DDHH)

Red regional LGTBI+

RET International

Salú pa Tur Foundation

Samaritan's Purse

Save the Children International (SCI)

Scalabrini International Migration Network

Sección Peruana de Amnistía Internacional

VZ Vacatur_0251

Servicio Jesuita a Migrantes (SJM)
Servicio Jesuita a Refugiados (SJR)
Solidarites International/Premiere Urgence Internationale (Consorcio de SI y PUI)
SOS Children's Villages
SPM – Serviço Pastoral dos Migrantes Nacional
SPM-NE – Serviço Pastoral dos Migrantes do Nordeste
Stichting Slachtofferhulp Curaçao
Stima Foundation
Swisscontact
Tearfund
Terre des hommes Lausanne
United Nations Children's Fund (UNICEF)
United Nations Development Programme (UNDP)
United Nations Educational, Scientific and Cultural Organization (UNESCO)
United Nations Entity for Gender Equality and the Empowerment of Women (UNWOMEN)
United Nations High Commissioner for Refugees (UNHCR)
United Nations Office for Project Services (UNOPS)
United Nations Office of the High Commissioner for Human Rights (OHCHR)
United Nations Office on Drugs and Crime (UNODC)
United Nations Population Fund (UNFPA)
United Nations Programme for Human Settlements (UN Habitat)
Universidad Católica del Uruguay (UCU)
Vale da Benção Educational and Charitable Association (AEBVB)
VenAruba Solidaria
VenEuropa
Venex Curacao Foundation
Vicaría de Pastoral Social Caritas
War Child
World Council of Credit Unions
World Food Programme (WFP)
World Vision (WV)
ZOA
We World GVC
Sesame Workshop
Servicio Ecuménico para la Dignidad Humana
Fundación de Ayuda Social de Las Iglesias Cristianas
Cruz Roja Uruguay
Cruz Roja Perú
Asociaclón Misioneros de San Carlos Scalabrinianos

## Más información

Visite nuestro sitio web principal

R4V.info

## Síguenos en X

@Plataforma_R4V

Plataforma R4V

## Vea nuestros últimos vídeos

Visite el canal YouTube de R4V

R4V YouTube

## Manténgase informado

Suscríbase al boletín R4V

Regístrese

VZ Vacatur_0252

Esta es una página web de operación interagencial, administrada y sostenida por la Plataforma Regional de Coordinación Interagencial para Refugiados y Migrantes de Venezuela, liderada en conjunto por ACNUR y OIM. Esta página busca ser un sitio de entrada común, que facilite la comunicación, mejore la coordinación de las operaciones en la región y la incidencia basada en hechos, para satisfacer las necesidades de los refugiados y migrantes de Venezuela. Los documentos, cifras y contenidos relacionados publicados en este portal por parte de los participantes de la Plataforma, están acompañados de las fuentes de donde provienen, y las opiniones expresadas en el mismo no reflejan necesariamente el punto de vista o aprobación de ACNUR y OIM.

About    Contact

© R4V 2024

including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

**Overview of This Information Collection**

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of Form/Collection:* Application for Citizenship and Issuance of Certificate Under Section 322.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* N–600K; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Form N–600K is used by children who regularly reside in a foreign country to claim U.S. citizenship based on eligibility criteria met by their U.S. citizen parent(s) or grandparent(s). The form may be used by both biological and adopted children under age 18. USCIS uses information collected on this form to determine that the child has met all of the eligibility requirements for naturalization under section 322 of the Immigration and Nationality Act (INA). If determined eligible, USCIS will naturalize and issue the child a Certificate of Citizenship before the child reaches age 18.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection N–600K (Paper filed) is 2,187 and the estimated hour burden per response is 1.71 hours; the estimated total number of respondents for the information collection N–600K (online filing) is 2,860 and the estimated hour burden per response is 1.14 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 7,003 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $649,801.

Dated: June 14, 2023.

**Samantha L. Deshommes,**

*Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2023–13110 Filed 6–20–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2732–22; DHS Docket No. USCIS–2008–0034]**

**RIN 1615–ZB71**

**Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status (TPS) and Notice of Extension of TPS Designation for El Salvador.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is rescinding the previous termination of the designation of El Salvador for TPS, which was published on January 18, 2018 and extending the designation of El Salvador for Temporary Protected Status (TPS) for 18 months, beginning on September 10, 2023, and ending on March 9, 2025. This extension allows existing TPS beneficiaries to retain TPS through March 9, 2025, so long as they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through March 9, 2025, must re-register during the 60-day re-registration period as described in this notice.

**DATES:** The *Rescission of Termination of the Designation of El Salvador for TPS* took effect June 9, 2023.

*Extension of Designation of El Salvador for TPS:* The 18-month extension of TPS for El Salvador begins on September 10, 2023, and will remain in effect through March 9, 2025. The extension impacts existing beneficiaries of TPS under the designation of El Salvador.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from July 12, 2023 through September 10, 2023.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* You can find specific information about El Salvador's TPS designation by selecting "El Salvador" from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.*

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Document
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security

VZ Vacatur_0254

TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Purpose of This Action (TPS)

Through this notice, DHS announces the reconsideration and rescission of the termination of the designation of El Salvador for TPS and the Secretary's decision to extend the TPS designation for 18 months from September 10, 2023 through March 9, 2025. This notice also sets forth procedures necessary for nationals of El Salvador (or individuals having no nationality who last habitually resided in El Salvador) to re-register for TPS and to apply for renewal of their EADs with USCIS.

Re-registration is limited to individuals who have previously registered or re-registered for TPS under El Salvador's designation, whose applications were granted, and whose TPS has not been withdrawn for individual ineligibility for the benefit. Failure to re-register properly within the 60-day re-registration period may result in the withdrawal of your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under El Salvador's designation, the 60-day re-registration period runs from July 12, 2023 through September 10, 2023. USCIS will issue new EADs with a March 9, 2025 expiration date to eligible Salvadoran TPS beneficiaries who timely re-register and apply for EADs.

Individuals who have an El Salvador TPS application (Form I–821) and Application for Employment Authorization (Form I–765) that were still pending as of June 21, 2023 do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through March 9, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765 filed in connection with a Form I–821, USCIS will issue the individual a new EAD that will be valid through the same date. If you have TPS and only a pending Form I–765, you must file the Form I–821 to re-register for TPS or risk having your TPS withdrawn for failure to timely re-register without good cause. There are currently approximately 239,000 beneficiaries under El Salvador's TPS designation who may be eligible to continue their TPS under the extension announced in this Notice.

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state before arrival in the United States, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

## When was El Salvador designated for TPS?

El Salvador was initially designated for TPS on the basis of environmental disaster, following two separate massive earthquakes in 2001 [1] that resulted in a substantial disruption of living conditions, at the request of the country's government, and because El Salvador temporarily was unable to handle adequately the return of its nationals. *See Designation of El Salvador Under Temporary Protected Status Program,* 66 FR 14214 (Mar. 9, 2001). After its initial designation, El Salvador's TPS designation was extended 11 consecutive times [2] (for periods of 12 or 18 months at a time) under the same statutory basis of environmental disaster. The Secretary last extended TPS for El Salvador from July 8, 2016 through March 9, 2018.[3] Following the statutorily required review of the country conditions, former Secretary Nielsen announced the termination of TPS for El Salvador with an effective date of September 9, 2019.[4] As discussed below, this termination decision has been the subject of litigation and a court order. As a result, the termination has not taken effect.

[2] *Extension of the Designation of El Salvador Under the Temporary Protected Status Program; Automatic Extension of Employment Authorization Documentation for Salvadorans,* 67 FR 46000 (July 11, 2002); *Extension of the Designation of El Salvador Under Temporary Protected Status Program; Automatic Extension of Employment Authorization Documentation for El Salvador,* 68 FR 42071 (July 16, 2003); *Extension of the Designation of Temporary Protected Status for El Salvador; Automatic Extension of Employment Authorization Documentation for El Salvador TPS Beneficiaries,* 70 FR 1450 (Jan. 7, 2005); *Extension of the Designation of Temporary Protected Status for El Salvador; Automatic Extension of Employment Authorization Documentation for El Salvadorian TPS Beneficiaries,* 71 FR 34637 (June 15, 2006); *Extension of the Designation of El Salvador for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries,* 72 FR 46649 (Aug. 21, 2007); *Extension of the Designation of El Salvador for Temporary Protected Status,* 73 FR 57128 (Oct. 1, 2008); *Extension of the Designation of El Salvador for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries,* 75 FR 39556 (July 9, 2010); *Extension of the Designation of El Salvador for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries,* 77 FR 1710 (Jan. 11, 2012); *Extension of the Designation of El Salvador for Temporary Protected Status,* 78 FR 32418, (May 30, 2013); *Extension of the Designation of El Salvador for Temporary Protected Status,* 80 FR 893 (Jan. 7, 2015); *Extension of the Designation of El Salvador for Temporary Protected Status,* 81 FR 44645 (July 8, 2016).

[3] *Extension of the Designation of El Salvador for Temporary Protected Status,* 81 FR 44645 (July 8, 2016).

[4] *Termination of the Designation of El Salvador for Temporary Protected Status,* 83 FR 2654 (Jan. 18, 2018).

[1] *El Salvador—Earthquakes Final Fact Sheet, Fiscal Year (FY) 2001,* US Agency for International Development Situation Report, Sept. 7, 2001, available at *https://reliefweb.int/report/el-salvador/el-salvador-earthquakes-final-fact-sheet-fiscal-year-fy-2001* (last visited March 6, 2023). (The first earthquake on January 13, 2001, registered 7.6 in magnitude on the standard seismic scale; the earthquake on February 13, 2001, one month later, measured 6.6 in magnitude.)

## Litigation Background Regarding Termination of Certain TPS Designations

In addition to El Salvador, in 2017–2018, TPS termination decisions were also announced for five other countries by the Secretary or Acting Secretary: Sudan, Nicaragua, Haiti, Nepal, and Honduras.[5] Lawsuits challenging the terminations were filed in the U.S. District Court for the Northern District of California in *Ramos* v. *Nielsen,* 326 F. Supp. 3d 1075 (N.D. Cal. 2018), and *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019), and in the U.S. District Court for the Eastern District of New York in *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019).[6] In *Ramos,* the district court granted a preliminary injunction enjoining the terminations of TPS for El Salvador, Haiti, Sudan, and Nicaragua and directed DHS to maintain the *status quo* and to continue the TPS and TPS-related documentation of affected TPS beneficiaries under those countries' designations. The U.S. Government appealed, and a three-judge panel vacated the injunction. The appellate court, however, has granted rehearing en banc of the panel decision, vacating the panel's decision.[7] The district court's preliminary injunction thus remains in place. In *Bhattarai,* the district court has stayed proceedings until the *Ramos* appeal is decided and approved the parties' stipulation for the continuation of TPS and TPS-related documentation for eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the *Ramos* appeal. In *Saget,* the district court granted a preliminary injunction enjoining termination of TPS for Haiti, and the Government appealed. However, following the new TPS designation of Haiti in August 2021, the district court dismissed the lawsuit based on the parties' stipulation to dismissal.[8] Beneficiaries under the TPS designations for El Salvador, Nicaragua, Sudan, Haiti, Honduras, and Nepal will retain their TPS while the preliminary injunction in *Ramos* remains in effect, and 120 days thereafter, provided that their TPS is not withdrawn because of individual ineligibility.[9]

DHS has taken actions to ensure its continued compliance with the court orders in *Ramos* and *Bhattarai.* DHS has published periodic notices to continue TPS and extend the validity of TPS-related documentation previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal.[10] The most recent such notice continued TPS and extended the TPS-related documents specified in the notice through June 30, 2024.[11] These extensions apply where the TPS beneficiary properly filed for re-registration during either the most recent DHS-announced registration period for their country, or any applicable previous DHS-announced re-registration periods for the beneficiary's country, or has a re-registration application that remains pending.[12] Although the notice published at 87 FR 68717 remains valid, individuals who wish to remain eligible for TPS under the extension of TPS for El Salvador announced in this notice through March 9, 2025, and any potential future extensions must apply for re-registration in accordance with the procedures announced in this notice.[13] Failure to timely re-register without good cause is a ground for TPS withdrawal. *See* INA section 244(c)(3)(C), 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17.

## What authority does the Secretary have to reconsider and rescind the termination of TPS for El Salvador and extend the prior designation?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[14] The decision to designate any foreign state

---

[5] *Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017); *Termination of the Designation of Nicaragua for Temporary Protected Status,* 82 FR 59636 (Dec. 15, 2017); *Termination of the Designation of Haiti for Temporary Protected Status,* 83 FR 2648 (Jan. 18, 2018); *Termination of the Designation of Nepal for Temporary Protected Status,* 83 FR 23705 (May 22, 2018); *Termination of the Designation of Honduras for Temporary Protected Status,* 83 FR 26074 (June 5, 2018). Haiti and Sudan were later newly designated for TPS on August 3, 2021 and April 19, 2022, respectively, for 18 months. *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021); *Designation of Sudan for Temporary Protected Status,* 87 FR 23202 (Apr. 19, 2022).

[6] *See Ramos* v. *Nielsen,* 336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated,* 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted,* 59 F.4th 1010 (Feb. 10, 2023); *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (staying proceedings until *Ramos* appeal decided and approved parties' stipulation for continued TPS and issuance of TPS-related documentation to eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal). In 2019, the U.S. District Court for the Eastern District of New York also enjoined the termination of the 2011 TPS designation for Haiti in *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019), and DHS cited to that order in previous notices continuing the affected beneficiaries' TPS and documentation. *See, e.g.,* 86 FR 50725, 50726 (Sept. 10, 2021). However, the *Saget* case was dismissed upon the court's approval of the parties' joint Stipulation of Dismissal for mootness following the Secretary's new 18-month designation of Haiti for TPS on August 3, 2021, and DHS' continuation of existing beneficiaries' TPS and related documentation under the Ramos injunction through Dec. 31, 2022. *See id.,* Order approving Stipulation of Dismissal, dated Oct. 15, 2021. Other litigation was filed relating to the terminations of El Salvador, Honduras, and Haiti. A Haiti-related case, *NAACP* v. *U.S. Dept. of Homeland Security,* No. 1:18–cv–00239 (D. Md. Jan. 24, 2018) was dismissed on May 22, 2021, subsequent to the same DHS designation. An El Salvador-related case, *Casa de Maryland,* v. *Biden,* No. GJH–18–00845 (D. Md. Mar. 23, 2018), is currently stayed until April 17, 2023. *Centro Presente* v. *Biden,* No. 1:18–cv–10340 (D. Mass. July 23, 2018), relating to El Salvador, Haiti, and Honduras, is currently stayed until April 14, 2023.

[7] *See Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for reh'g en banc granted,* 59 F.4th 1010 (Feb. 10, 2023) (No. 18–16981).

[8] *See Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019) and Order approving Stipulation of Dismissal, dated Oct. 15, 2021.

[9] As noted, Haiti was newly designated for TPS on August 3, 2021 for 18 months. *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021). On April 19, 2022, the Secretary also newly designated Sudan TPS. *See Designation of Sudan for Temporary Protected Status,* 87 FR 23202 (Apr. 19, 2022). Those designations cover all Haitian and Sudanese nationals who were eligible for TPS under the Haiti and Sudan TPS designations that were terminated in 2018 and 2017, respectively.

[10] 83 FR 54764 (Oct. 31, 2018); 84 FR 7103 (Mar. 1, 2019); 84 FR 20647 (May 10, 2019) (correction notice issued at 84 FR 23578 (May 22, 2019)); 84 FR 59403 (Nov. 4, 2019); 85 FR 79208 (Dec. 9, 2020); 86 FR 50725 (Sept. 10, 2021) (correction notice issued at 86 FR 52694 (Sept. 22, 2021)).

[11] *Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations of El Salvador, Haiti, Nicaragua,* *Sudan, Honduras, and Nepal,* 87 FR 68717 (Nov. 16, 2022).

[12] *Id.,* at 68719, note 5 (listing acceptable re-registration periods for each of the 6 countries).

[13] Through the re-registration process, which is generally conducted every 12 to 18 months while a foreign state is designated for TPS, USCIS determines whether each TPS beneficiary is continuing to maintain individual eligibility for TPS, including but not limited to, the requirements related to disqualifying criminal or security issues. Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 87 FR 68717, 68720 (Nov. 16, 2022) (noting potential future action for El Salvador TPS beneficiaries may include a requirement to re-register).

[14] Although the text of INA section 244(b)(1) continues to ascribe this power to the Attorney General, this authority is now held by the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Pub. L. 107–296, 116 Stat. 2135. *See, e.g.,* 6 U.S.C. 557; *Nielsen* v. *Preap,* 139 S. Ct. 954, 959 n.2 (2019). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA section 244(b)(1).

VZ Vacatur_0256

(or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).

At least 60 days before the expiration of a foreign state's TPS designation, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). If the Secretary does not determine that the foreign state no longer meets the conditions for TPS designation, the designation is extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C); 8 U.S.C. 1254a(b)(3)(A), (C).

On January 18, 2018, the Secretary of Homeland Security issued notice of her decision that El Salvador no longer continued to meet the conditions for TPS designation and announced the termination of TPS for El Salvador. The Secretary also announced an orderly transition period of 18 months, such that the termination was set to go into effect on September 9, 2019. On March 12, 2018, as noted above, plaintiffs in *Ramos* filed suit challenging the termination decision for El Salvador, as well as contemporaneous decisions to terminate TPS for Nicaragua, Sudan, and Haiti. On October 3, 2018, the U.S. District Court for the Northern District of California issued a preliminary injunction order in *Ramos,* preventing the termination decision from going into effect until the court reaches a decision on the merits of the plaintiffs' claims and further directing that DHS maintain the *status quo,* including continuing TPS and TPS-related documentation, such as Employment Authorization Documents (EADs), for affected beneficiaries. After reaching a stipulation with plaintiffs that no termination would go in effect for at least 120 days following the conclusion of any appeal, DHS has issued a series of **Federal Register** notices continuing TPS and TPS-related documentation for affected TPS beneficiaries, with the most recent continuation notice effective through June 30, 2024.[15] As a result, the announced termination of the

[15] *See* note 13 above.

TPS designation for El Salvador has never gone into effect, and TPS beneficiaries under that designation have retained their TPS, unless it has been individually withdrawn pursuant to INA section 244(c)(3), 8 U.S.C. 1254a(c)(3).

An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority.[16] The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination. *See* INA sections 244(b)(3), (b)(5)(A); 8 U.S.C. 1254a(b)(3), (b)(5)(A).

**Why is the Secretary rescinding the previous decision to terminate the TPS designation for El Salvador?**

After conducting an independent assessment of the country conditions in El Salvador as they existed in 2018 and exist today, the Secretary has determined that El Salvador's 2001 TPS designation should not have been terminated. As explained below, the conditions in El Salvador that gave rise to its TPS designation in 2001 persisted in 2018 and persist to this day. Accordingly, the Secretary is, upon reconsideration, vacating the 2018 decision terminating El Salvador's TPS designation and extending that designation for an additional 18 months.

El Salvador was initially designated for TPS in 2001 on environmental disaster grounds[17] following two separate earthquakes that occurred that year. El Salvador suffered catastrophic damage as a result of the 2001 earthquakes. Together, the earthquakes killed over 1,150 people,[18] injured over 8,000, and affected more than 1.5

[16] *Ivy Sports Medicine, LLC* v. *Burwell,* 767 F.3d 81, 86 (D.C. Cir. 2014) (''[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . [I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide.'' (quotation marks and citations omitted)); *Macktal* v. *Chao,* 286 F.3d 822, 825–26 (5th Cir. 2002) (''It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.'') (collecting cases); *Mazaleski* v. *Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) (''We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.'').

[17] *Designation of El Salvador Under Temporary Protected Status Program,* 66 FR 14214 (Mar. 9, 2001).

[18] *Earthquakes Fast Facts,* CNN Editorial Research, June 22, 2022, available at *https:// www.cnn.com/2013/07/05/world/earthquakes-fast-facts/index.html* (last visited March 6, 2023).

million people[19] (approximately 25 percent of the population[20]). The earthquakes damaged or destroyed over 300,000 homes, 2,647 public schools and demolished critical infrastructure throughout the country.[21] The international community responded to the disaster with a significant amount of aid, with the United States initially providing $16 million in relief assistance and announcing another $52 million for reconstruction assistance.[22] Intergovernmental organizations and other governments provided substantial aid, including a $20 million emergency loan from the Inter-American Development Bank (IDB), $4 million for World Food Programme (WFP) emergency operations, and $1.3 billion in pledges from various countries.[23]

While some progress on reconstruction projects had been made by 2018, many of the problems caused by the 2001 earthquakes persisted.[24] Since the disastrous effects of the earthquakes in 2001, El Salvador has

[19] *El Salvador—Earthquakes Final Fact Sheet, Fiscal Year (FY) 2001,* US Agency for International Development Situation Report, Sept. 7, 2001, available at *https://reliefweb.int/report/el-salvador/ el-salvador-earthquakes-final-fact-sheet-fiscal-year-fy-2001* (last visited March 6, 2023).

[20] *El Salvador Earthquakes: Final Fact Sheet (FY 2001); AFSC El Salvador earthquake response: Two years later—An assessment and report,* American Friends Service Committee, May 15, 2003, available at *https://reliefweb.int/report/el-salvador/afsc-el-salvador-earthquake-response-two-years-later-assessment-and-report* (last visited March 6, 2023).

[21] El Salvador Earthquakes: Final Fact Sheet (FY 2001); AFSC El Salvador earthquake response: Two years later—An assessment and report, American Friends Service Committee, May 15, 2003, available at *https://reliefweb.int/report/el-salvador/afsc-el-salvador-earthquake-response-two-years-later-assessment-and-report* (last visited March 6, 2023).

[22] Statement by the President: Relief and Reconstruction Assistance for El Salvador, March 2, 2001, *https://georgewbush-whitehouse.archives.gov/news/releases/2001/03/20010302-9.html* (last visited: March 6, 2023).

[23] El Salvador—Earthquakes Final Fact Sheet, Fiscal Year (FY) 2001, Sept. 7, 2001, *https:// reliefweb.int/report/el-salvador/el-salvador-earthquakes-final-fact-sheet-fiscal-year-fy-2001* (last visited: March 6, 2023).

[24] A January 2016 report by a Salvadoran media outlet found individuals living in homes in San Salvador (El Salvador's capital city) which were declared uninhabitable due to structural damage from the 2001 earthquakes or their locations in areas at high risk from landslides or the potential collapse of walls. While schools have been reconstructed and repaired—including via the U.S. Agency for International Development's (USAID) Earthquake Reconstruction Program—in January 2016 a Salvadoran media outlet reported that certain buildings and schools damaged by the 2001 earthquakes had not yet been repaired or rebuilt. Joma, Susana, Edificios dañados por los terremotos aún son amenaza, El Diario de Hoy (El Sal.), Jan. 11, 2016; Contributions of the PDNA and DRF to Post-Disaster Recovery: El Salvador Case Study 2022, United Nations Development Programme, available at *https://www.undp.org/latin-america/ publications/case-study-contributions-pdna-and-drf-post-disaster* (last visited: March 17, 2023).

been encumbered by several natural disasters, environmental challenges, high levels of violence, and economic instability, all of which significantly slowed its recovery and continued to render El Salvador unable to handle the return of its nationals at the time of the decision to terminate the designation.[25]

At the time of the determination to terminate the designation of TPS, DHS found that the social and economic conditions affected by the earthquakes had stabilized. That conclusion was in error and reflects an inadequate assessment of conditions in El Salvador leading up to the announcement of the decision to terminate. Although some social and economic progress had been made by 2018, frequent and significant environmental disasters occurred after the 2001 earthquakes causing additional challenges.[26] Recovery from the earthquakes continued to be slow and encumbered by hurricanes and tropical storms, heavy rains and flooding, volcanic and seismic activity, a coffee rust epidemic, a prolonged and severe drought, and an increase in various mosquito-borne diseases, among other things.

Numerous natural disasters have negatively affected El Salvador since the 2001 earthquakes and have adversely impacted its ability to adequately handle the return of its nationals granted TPS. In October 2005, for instance, the severe flooding caused by Tropical Storm Stan, coupled with the eruption of the Ilamatepec volcano in early October 2005, affected approximately half of the population of El Salvador.[27] In November 2009,

Tropical Storm Ida caused severe damage and loss of life.[28] In October 2011, Tropical Storm 12–E caused flooding and mudslides across El Salvador.[29] In June 2013, Tropical Storm Barry caused flooding.[30] and the high waves produced by tropical storms in May 2015 forced evacuations and caused damage along the Salvadoran coastal line.[31] In October 2015, heavy rains produced flooding and landslides across El Salvador.[32] In 2016, El Salvador had the third highest percentage of people exposed to disaster risk in the world, with 88.7 percent of the land and 95.4 percent of the population at risk of multiple kinds of disasters.[33] In June 2017, several days of heavy rainfall caused floods and landslides; four people were killed, nearly 300 were displaced, and over 200 homes were damaged.[34] In early

October 2017, Tropical Storm Nate impacted El Salvador, leaving one person dead and one missing.[35] In late October 2017, Tropical Storm Selma brought heavy rain and flooding that caused massive mudslides, overflowed rivers, and left debris on roads.[36]

These environmental disasters have had negative impacts on El Salvador's economic stability that were not considered in the 2018 termination decision.[37] The 2018 termination decision highlighted El Salvador's steady unemployment rate of 7 percent from 2014–2016 but failed to consider that it has the second slowest economic growth rate in Central America, leading to an underemployment rate of 36.8 percent in 2018.[38] According to the 2017 Global Climate Risk Index, El Salvador ranked as the 15th most affected country in the world by extreme weather events from 1996 to 2015, the most recent year for which data was available at the time the termination decision was made.[39] During this time, El Salvador averaged $282 million in damages per year—equivalent to 0.7 percent of its GDP.[40] In 2016, El Salvador was considered the 17th highest country in the world in terms of the impact of disasters on the gross domestic product.[41] An estimated

---

[25] El Salvador-Disaster Response, USAID, Sept. 7, 2022, available at *https://www.usaid.gov/el-salvador/our-work/disaster-response* (last visited March 6, 2023); Miracle or Mirage? Gangs and Plunging Violence in El Salvador, International Crisis Group, p.2, July 8, 2020, available at *https://www.crisisgroup.org/latin-america-caribbean/central-america/el-salvador/81-miracle-or-mirage-gangs-and-plunging-violence-el-salvador* (last visited March 6, 2023); El Salvador: Civil War, Natural Disasters, and Gang Violence Drive Migration, Migration Policy Institute, Aug. 29, 2018, available at: *https://www.migrationpolicy.org/article/el-salvador-civil-war-natural-disasters-and-gang-violence-drive-migration* (last visited: March 6, 2023).

[26] Report: Extending Temporary Protected Status for El Salvador: Country Conditions and U.S. Legal Requirements, American University, Dec. 2017, available at: *https://www.american.edu/centers/latin-american-latino-studies/extending-tps-for-el-salvador.cfm* (last visited: March 6, 2023); Resolving Land Ownership Issues for a Community Water Project: A Post-Earthquake Development Dispute in Rural El Salvador, April 07, 2010, *https://www.tandfonline.com/doi/pdf/10.1080/14649350903538046* (last visited: March 6, 2023).

[27] El Salvador: Hurricane Stan, Floods and Volcanic Activity OCHA Situation Report No. 2, UN Office for the Coordination of Humanitarian Affairs, Oct. 7, 2005, available at *https://reliefweb.int/report/el-salvador/el-salvador-hurricane-stan-*

*floods-and-volcanic-activity-ocha-situation-report-no* (last visited March 6, 2023); Analysis of Tropical Storm Stan in El Salvador, Centro de Intercambio y Solidaridad, Nov. 16, 2005, available at: *https://reliefweb.int/report/el-salvador/analysis-tropical-storm-stan-el-salvador* (last visited Mar. 6, 2023); El Salvador-Disaster Response, USAID, Sept. 7, 2022, available at *https://www.usaid.gov/el-salvador/our-work/disaster-response* (last visited March 6, 2023).

[28] Hurricane Ida and floods in Central America: OCHA Situation Report No. 1, UN Office for the Coordination of Humanitarian Affairs, Nov. 9, 2009 available at: *https://reliefweb.int/report/el-salvador/hurricane-ida-and-floods-central-america-ocha-situation-report-no-1-9-nov-2009* (last visited Mar. 6, 2003); El Salvador-Disaster Response, USAID, Sept. 7, 2022, available at *https://www.usaid.gov/el-salvador/our-work/disaster-response* (last visited March 6, 2023).

[29] Bertelsmann Stiftung, BTI 2014—El Salvador Country Report. Gütersloh: Bertelsmann Stiftung, 2014, available at *https://bti-project.org/fileadmin/api/content/en/downloads/reports/country_report_2014_SLV.pdf* (last visited Mar. 7, 2023); El Salvador-Disaster Response, USAID, Sept. 7, 2022, available at *https://www.usaid.gov/el-salvador/our-work/disaster-response* (last visited March 6, 2023).

[30] Stewart, Stacy R., *Tropical Storm Barry (AL022013), 17–20 June 2013,* National Hurricane Center, Oct. 7, 2013, available at *https://www.nhc.noaa.gov/data/tcr/AL022013_Barry.pdf* (last visited March 6, 2023).

[31] El Salvador: Storm Surge Emergency Plan of Action (EPoA) DREF Operation n° MDRSV008, International Federation of Red Cross And Red Crescent Societies (IFRC) Situation Report, May 15, 2015, available at *https://reliefweb.int/report/el-salvador/el-salvador-storm-surge-emergency-plan-action-epoa-dref-operation-n-mdrsv008* (last visited March 6, 2023).

[32] Guinto, Joel, Typhoon Kills At Least 16 In Philippines, Strands Thousands, Terra Daily, Oct. 19, 2015, available at *http://www.terradaily.com/reports/Typhoon_kills_at_least_16_in_Philippines_strands_thousands_999.html* (last visited: March 6, 2023).

[33] Signing of Japanese ODA Loan with El Salvador: Improving the capacity to mitigate and manage disaster risk, and providing speedy assistance for financing needs in the reconstruction stage, Japan International Cooperation Agency, May 30, 2016, available at *https://reliefweb.int/report/el-salvador/signing-japanese-oda-loan-el-salvador-improving-capacity-mitigate-and-manage* (last visited: March 6, 2023).

[34] El Salvador—Floods (Dirección General de Protección Civil, SNET, Local Media) (ECHO Daily

*Flash of 20 June 2017),* European Commission's Directorate-General for European Civil Protection and Humanitarian Aid Operations, June 20, 2017, available at *https://reliefweb.int/report/el-salvador/el-salvador-floods-direcci-n-general-de-protecci-n-civil-snet-local-media-echo* (last accessed March 6, 2023).

[35] Nate Kills At Least 20 in Central America, Tracks Toward US, VOA News, Oct. 6, 2017, available at *https://www.voanews.com/a/nate-takes-aim-us-still-reeling-from-earlier-storms/4059008.html* (last accessed March 6, 2023).

[36] Report: Extending Temporary Protected Status for El Salvador: Country Conditions and U.S. Legal Requirements, American University, Dec. 2017, available at: *https://www.american.edu/centers/latin-american-latino-studies/extending-tps-for-el-salvador.cfm* (last visited: March 6, 2023).

[37] Contributions of the PDNA and DRF to Post-Disaster Recovery: El Salvador Case Study 2022, United Nations Development Programme, available at *https://www.undp.org/latin-america/publications/case-study-contributions-pdna-and-drf-post-disaster* (last accessed March 6, 2023).

[38] Fact Sheet Employment and Migration El Salvador 2021, International Labour Organization, December 8, 2021, available at *https://www.ilo.org/wcmsp5/groups/public/---americas/---ro-lima/---sro-san_jose/documents/publication/wcms_831274.pdf* (last accessed March 6, 2023).

[39] Kreft, Sönke, Eckstein, David and Melchior, Inga, Global Climate Risk Index 2018, Germanwatch, p. 23, Nov. 2017.

[40] Kreft, Sönke, Eckstein, David and Melchior, Inga, Global Climate Risk Index 2018, Germanwatch, p. 23, Nov. 2017.

[41] Signing of Japanese ODA Loan with El Salvador: Improving the capacity to mitigate and manage disaster risk, and providing speedy assistance for financing needs in the reconstruction stage, Japan International Cooperation Agency, May 30, 2016, available at *https://reliefweb.int/report/el-*

95.4 percent of its GDP is exposed to two or more natural hazards, making it the country with the second highest economic multi-hazard risk worldwide relative to its GDP.[42] In fact, earthquakes have been responsible for the greatest proportion of economic loss, with the 2001 earthquakes causing effects equivalent to 12 percent of El Salvador's GDP.[43] These facts highlight that El Salvador continued to face serious environmental obstacles at the time of the decision to terminate TPS.

In addition to the ongoing environmental and economic impacts from the 2001 earthquakes, high levels of violence have continued to render El Salvador unable to handle the return of those granted TPS. At the time of the decision to terminate TPS, DHS found that the social and economic conditions affected by the earthquakes had stabilized but did not sufficiently consider the combined impacts of the earthquakes and economic instability on rates of violence and general insecurity.[44] El Salvador's recovery had been (and continues to be) encumbered by staggering levels of violence—mainly related to gang activity and the state's response—as well as pervasive and high levels of gender-based violence. In 2018, El Salvador had one of the world's highest homicide rates and its security forces were widely reported as either ineffective or engaged in human rights violations and abuses, including the extrajudicial executions of alleged gang members, sexual assaults, and enforced disappearances.[45] Violent gang activity is particularly serious in El Salvador due to the country's economic and social challenges.[46] Young people are highly vulnerable to gang recruitment, with a quarter of Salvadoran youth not engaged in education, employment, or training.[47] Violent nonstate actors impact the ability of NGOs to operate by imposing restrictions in areas they control.[48] DHS also found that, in 2018, El Salvador was accepting the returns of its nationals who were removed for various reasons; however, it did not adequately consider that some of those who returned became targets for violent nonstate actors, leading to extortion, torture, and murder of deportees.[49]

As explained above, at the time of the decision to terminate TPS, El Salvador continued to experience ongoing environmental disasters, economic instability, and high rates of violence, that were either insufficiently considered or not considered in the termination decision. The termination decision failed to adequately assess conditions in El Salvador in 2018. Those conditions continued to substantially disrupt living conditions and temporarily affected the country's ability to adequately handle the return of its nationals residing in the United States. The Secretary has concluded that reconsideration and rescission of the termination of TPS is appropriate and timely, particularly given that the 2018 termination decision has not yet gone into effect due to the ongoing litigation and associated court orders.

**What authority does the Secretary have to extend the designation of El Salvador for TPS?**

As noted above, section 244(b) of the INA, 8 U.S.C. 1254a(b), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist and instructs the Secretary to periodically review the country conditions underpinning each designation and determine whether they still exist, leading to either termination or extension of the TPS designation. However, if the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). If the Secretary does not make a decision as to either extension or termination, then INA section 244(b)(3)(C) requires the automatic extension of the designation for six months (or 12 or 18 months in the Secretary's discretion).

Prior to the now-rescinded termination of the TPS designation for El Salvador, the most recent extension of the designation was due to end on March 9, 2018.[50] In light of the Secretary's reconsideration and rescission of the January 18, 2018 decision to terminate the TPS designation for El Salvador, there is no longer any standing secretarial determination that El Salvador "no longer meets the conditions for designation" under INA section 244(b)(1). Accordingly, pursuant to INA section 244(b)(3)(C), and in the absence of an affirmative decision by any Secretary to extend the designation for 12 or 18 months rather than the automatic six months triggered by the statue, the TPS designation for El Salvador shall have been extended in consecutive increments of six months between the date when the last designation extension was due to end on March 9, 2018, and the effective date of the TPS extension announced in this notice on September 10, 2023. Coupled with the existing *Ramos* order and corresponding **Federal Register** notices continuing TPS and TPS-related documentation for affected beneficiaries under the designation for El Salvador, this means that all such individuals whose TPS has not been finally withdrawn for individual ineligibility are deemed to have retained TPS since March 9, 2018, and may re-register under procedures announced in this Notice.

**Why is the Secretary extending the TPS designation for El Salvador for TPS for 18 months through March 9, 2025?**

DHS has reviewed country conditions in El Salvador. Based on the review, including input received from DOS and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because the conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster remain.

As previously discussed, El Salvador was originally designated for TPS in 2001[51] following two separate

---

salvador/signing-japanese-oda-loan-el-salvador-improving-capacity-mitigate-and-manage (last visited: March 6, 2023).

[42] Contributions of the PDNA and DRF to Post-Disaster Recovery: El Salvador Case Study 2022, United Nations Development Programme, available at *https://www.undp.org/latin-america/publications/case-study-contributions-pdna-and-drf-post-disaster* (last accessed March 6, 2023).

[43] Contributions of the PDNA and DRF to Post-Disaster Recovery: El Salvador Case Study 2022, United Nations Development Programme, available at *https://www.undp.org/latin-america/publications/case-study-contributions-pdna-and-drf-post-disaster* (last accessed March 6, 2023).

[44] Termination of the Designation of El Salvador for Temporary Protected Status, 83 FR 2654 (Jan. 18, 2018).

[45] El Salvador Events of 2018, Human Rights Watch, available at *https://www.hrw.org/world-report/2019/country-chapters/el-salvador* (last accessed March 6, 2023).

[46] Cheatham, Amelia & Roy, Diana, Central America's Turbulent Northern Triangle, Council on Foreign Relations, available at *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle* (last accessed March 6, 2023).

[47] Brand-Weiner, Ian, Reducing Violence in El Salvador: What it Will Take, Organization for Economic Cooperation and Development, available at *https://oecd-development-matters.org/2018/01/17/reducing-violence-in-el-salvador-what-it-will-take/* (last accessed March 6, 2023).

[48] Disaster Risk Reduction in El Salvador, An Evaluation of Non-Governmental Organizations' Role and Impact, Texas A&M University, May 3, 2022, available at *condevcenter.org/Portals/0/El%20Salvador%20Capstone%202022.pdf* (last accessed March 6, 2023).

[49] El Salvador: Background and U.S. Relations, Congressional Research Service, July 1, 2020, available at *https://sgp.fas.org/crs/row/R43616.pdf* (last accessed March 6, 2023).

[50] *See* 81 FR 44645 (July 8, 2016).

[51] *Designation of El Salvador Under Temporary Protected Status Program*, 66 FR 14214 (Mar. 9, 2001).

**40288**    **Federal Register** / Vol. 88, No. 118 / Wednesday, June 21, 2023 / Notices

earthquakes. Recovery from these earthquakes has been impeded by El Salvador's ongoing environmental challenges, including its high vulnerability to "more frequent occurrences of floods, droughts, and tropical storms, all of which disproportionally affect poor and vulnerable populations." [52] During the rainy season, which generally runs from June to November, El Salvador is impacted by extreme weather, which damages roads, property, and infrastructure; disrupts supplies, services, and utilities; and even causes loss of life. [53] Through the present, El Salvador continues to experience compounding environmental disasters, hindering recovery and rendering it unable to handle adequately the return of its nationals.

As recently as October 2022, Tropical Storm Julia passed over El Salvador, leaving extensive flooding and deadly mudslides due to oversaturated ground from an active rainy season. [54] El Salvador declared a 15-day state of national emergency in response to Tropical Storm Julia. [55] Approximately 120 shelters were activated for 2,837 people, and at least 10 individuals died. [56] Assessments indicated that 180,000 people who were already facing acute food insecurity were affected by heavy rains. [57] A trend analysis of food insecurity and disasters found that environmental degradation and natural

disasters led to increased insecurity, and both of these factors have significantly impacted El Salvador since 2001. [58]

In October 2018, the Government of El Salvador published an updated report regarding the heavy rain situation in the country at that time. Seven rivers flooded and 1,409 homes were affected. [59] In May and June 2020, tropical storms Amanda and Cristóbal causing widespread floods and landslides throughout the country, causing loss of life and significant material damage. [60] Collectively, the storms also disrupted agricultural production, and caused acute food insecurity due to irregular rainfall, which was worsened by the impacts of the COVID–19 pandemic. [61] More than 149,000 people were directly affected the storms, and as a result, the WFP estimated that more than 330,000 people were facing severe food insecurity. [62] In November 2020, the Civil Protection Agency in El Salvador issued a national red alert due to the formation of Hurricane Eta, which sent more than 2,200 people to shelters. [63] As a result of Hurricane Eta, El Salvador experienced major flooding and soon after, experienced heavy rain and flooding from Hurricane Iota. [64] It also

caused two deaths and significant agricultural damage across the country. [65] It is estimated that 17,000 people were internally displaced as a result of Hurricanes Eta and Iota. [66] These countrywide consecutive events led to an overwhelming increase in the number of identified people in need of humanitarian assistance from 643,000 before the start of the COVID–19 pandemic to 1.7 million. [67]

In addition to the numerous environmental disasters following the 2001 earthquakes, El Salvador continues to experience a frail macroeconomic environment, a high rate of unemployment, violence, and a poor security situation that continues to render the country temporarily unable to adequately handle the return of its nationals. El Salvador is plagued by intense violence involving criminal groups and gang warfare, as well as a deteriorating political crisis, due to the government's aggressive security strategies to combat gang violence. As reported in July 2020 by the International Crisis Group (ICG), El Salvador continues to be exposed to violence involving criminal groups, particularly Mara Salvatrucha (MS–13) and the 18th Street gang's two factions, the Revolutionaries and the Southerners. [68] At that time, authorities estimated that 60,000 active gang members operated in 94 percent of the country's municipalities. [69] Gang violence has hampered reconstruction efforts, with NGOs reporting that in gang-controlled territories, they must abide by curfews, stop work when ordered, and often require approval from gangs to work in those areas. [70]

[52] The World Bank in El Salvador, Overview, The World Bank, Apr. 22, 2022, available at *https://www.worldbank.org/en/country/elsalvador/overview* (last visited March 6, 2023).

[53] Foreign Travel Advice El Salvador, *Gov.UK*, Oct. 20, 2022, available at *https://www.gov.uk/foreign-travel-advice/el-salvador/print* (last visited March 6, 2023).

[54] Northern Central America: TS Julia and Rainy Season Flash Update No. 01, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Oct. 14, 2022, available at: *https://reliefweb.int/report/guatemala/northern-central-america-ts-julia-and-rainy-season-flash-update-no-01-14-october-2022* (last visited March 6, 2023).

[55] Northern Central America: TS Julia and Rainy Season Flash Update No. 01, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Oct. 14, 2022, available at: *https://reliefweb.int/report/guatemala/northern-central-america-ts-julia-and-rainy-season-flash-update-no-01-14-october-2022* (last visited March 6, 2023).

[56] El Salvador: Tropical Storm Julia—Emergency Plan of Action (EPoA), DREF Operation No. MDRSV015, International Federation of Red Cross and Red Crescent Societies (IFRC) Situation Report, Oct. 26, 2022, available at *https://reliefweb.int/report/el-salvador/el-salvador-tropical-storm-julia-emergency-plan-action-epoa-dref-operation-no-mdrsv015* (last visited March 6, 2023).

[57] Northern Central America: TS Julia and Rainy Season Flash Update No. 01, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Oct. 14, 2022, available at *https://reliefweb.int/report/guatemala/northern-central-america-ts-julia-and-rainy-season-flash-update-no-01-14-october-2022* (last visited March 6, 2023).

[58] Restoring Food Security and Livelihoods for Vulnerable Groups Affected by Recurrent Shocks in El Salvador, Guatemala, Honduras and Nicaragua, UN World Food Programme, Oct. 7, 2013, *https://one.wfp.org/operations/current_operations/project_docs/200490.pdf* (last visited: March 6, 2023).

[59] Natural Disasters Monitoring, News and Press Release Pan-American Health Organization (PAHO), Oct. 10, 2018, available at *https://reliefweb.int/report/el-salvador/natural-disasters-monitoring-october-10-2018* (last visited March 6, 2023).

[60] Durroux-Malpartida, Veronique, As El Salvador faces the double impact of hurricanes and COVID–19, NGOs step in, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Dec. 30, 2020, available at *https://www.unocha.org/story/el-salvador-faces-double-impact-hurricanes-and-covid-19-ngos-step* (last visited March 6, 2023).

[61] El Salvador-Disaster Response, USAID, Sept. 7, 2022, available at: *https://www.usaid.gov/el-salvador/our-work/disaster-response* (last visited March 6, 2023).

[62] Durroux-Malpartida, Veronique, As El Salvador faces the double impact of hurricanes and COVID–19, NGOs step in, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Dec. 30, 2020, available at *https://www.unocha.org/story/el-salvador-faces-double-impact-hurricanes-and-covid-19-ngos-step* (last visited March 6, 2023).

[63] Durroux-Malpartida, Veronique, As El Salvador faces the double impact of hurricanes and COVID–19, NGOs step in, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Dec. 30, 2020, available at *https://www.unocha.org/story/el-salvador-faces-double-impact-hurricanes-and-covid-19-ngos-step* (last visited March 6, 2023).

[64] National Hurricane Center Tropical Cyclone Report: Hurricane Iota, NHC, Nov. 2020, *https://www.nhc.noaa.gov/data/tcr/AL292020_Eta.pdf* (last visited: Feb. 24, 2023); National Hurricane Center Tropical Cyclone Report: Hurricane Iota, NHC, Nov. 2020, *https://www.nhc.noaa.gov/data/tcr/AL312020_Iota.pdf* (last visited: March 6, 2023).

[65] *Id.*

[66] US Department of State, 2021 Country Report on Human Rights Practices: El Salvador, April 12, 2022, *https://www.ecoi.net/en/document/2071137.html* (accessed on March 6, 2023).

[67] Durroux-Malpartida, Veronique, As El Salvador faces the double impact of hurricanes and COVID–19, NGOs step in, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Dec. 30, 2020, available at *https://www.unocha.org/story/el-salvador-faces-double-impact-hurricanes-and-covid-19-ngos-step* (last visited March 6, 2023).

[68] Miracle or Mirage? Gangs and Plunging Violence in El Salvador, International Crisis Group, p.2, July 8, 2020, available at *https://www.crisisgroup.org/latin-america-caribbean/central-america/el-salvador/81-miracle-or-mirage-gangs-and-plunging-violence-el-salvador* (last visited March 6, 2023).

[69] Miracle or Mirage? Gangs and Plunging Violence in El Salvador, International Crisis Group, p.2, July 8, 2020, available at *https://www.crisisgroup.org/latin-america-caribbean/central-america/el-salvador/81-miracle-or-mirage-gangs-and-plunging-violence-el-salvador* (last visited March 6, 2023).

[70] Disaster Risk Reduction in El Salvador, An Evaluation of Non-Governmental Organizations' Role and Impact, Texas A&M University, May 3, 2022, available at *condevcenter.org/Portals/0/*

Elected in 2019, President Nayib Bukele has attributed a plunge in homicides to a security policy of sending police and troops into gang-controlled neighborhoods.[71] However, El Salvador's overall decline in its homicide rate in 2020 and 2021 [72] has also been attributed to a ''covert pact'' between the government and the largest gangs operating in the country—the collapse of which reportedly led to a spike in murders in late March 2022.[73]

President Bukele has been described as ''increasingly authoritarian, and his critics say the leader's threat to democracy has only grown.'' [74] In a December 2021 report, the Congressional Research Service described a series of actions taken by President Bukele and his government as ''democratic backsliding'' [75] and ''removing checks on presidential power.'' [76] In March 2022, the government of El Salvador declared a 30-day state of emergency, suspending citizen's constitutional rights, in response to a spike in homicides, when El Salvador registered 62 murders in a single day, ''the bloodiest since the end of the country's civil war in 1992.'' [77]

This initial month-long crackdown on gangs has been regularly renewed since then, with the latest renewal announced in March 2023.[78] As of March 2023, more than 65,000 people had been arrested under these orders, and human rights groups claim that many of the of the mass detentions could amount to arbitrary detentions based on ''poorly substantiated investigations or crude profiling of the physical appearance or social background of those detained.'' [79] Human Rights Watch reported that the government's emergency provisions suspended privacy rights, freedom of association and peaceful assembly, and some fair trial guarantees and other applicable legal protections.[80] Amnesty International has documented that authorities in El Salvador have dismantled judicial independence and committed torture and thousands of arbitrary detentions and violations of fair trial guarantees and other applicable legal protections.[81]

Since March 2022, police and soldiers have been conducting raids and arresting thousands at their home and in the street.[82] The number of arrests under the state of emergency increased to 50,000 as of mid-August 2022.[83] Official statistics and other government information has become increasingly difficult to access under the state of emergency, and authorities reportedly have changed ''what counts as a

homicide.'' [84] The discrepancy between reported homicide numbers and the actual numbers of bodies reportedly recovered from mass graves continues to be of concern.[85] Under President Bukele, significant human rights abuses and violations by security forces are widely reported to continue, including unlawful disappearances, torture, and extrajudicial killings of suspected gang members.[86]

The Internal Displacement Monitoring Centre (IDMC) noted in a 2018 report that ''[d]isplacement caused by crime and violence has, by any measure, risen to the level of a humanitarian crisis in El Salvador.'' [87] In July 2018, internal forced displacement was officially recognized by the Supreme Court of El Salvador.[88] In January 2020, the Legislative Assembly approved the ''Special Law for the Comprehensive Care and Protection of People in a situation of Forced Internal Displacement,'' a fundamental instrument to provide care, protection, and lasting solutions to people internally displaced due to violence from organized crime and criminal gangs, as well as those who may be at risk of displacement.[89] In August 2021, the United Nations High Commissioner for Refugees (UNHCR) reported that communities in El Salvador are severely affected by gang violence, extortion, death threats, and sexual violence, as

---

*El%20Salvador%20Capstone%202022.pdf* (last accessed March 6, 2023).

[71] Treasury Targets Corruption Networks Linked to Transnational Organized Crime, Press Release, U.S. Treasury, Dec. 8, 2021, available at *https://home.treasury.gov/news/press-releases/jy0519* (last visited March 6, 2023). After experiencing a spike in homicides in 2015, El Salvador went from Latin America's most violent country to number 11 in 2021. *See* United States Institute of Peace, ''El Salvador Needs Long-Term Solutions to End Cycles of Violence,'' Apr. 6, 2022, available at *https://www.usip.org/publications/2022/04/el-salvador-needs-long-term-solutions-end-cycles-violence#:~:text=From%20Latin%20America's%20most%20violent,Mexico%20(26%20per%20100%2C000* (last visited March 6, 2023).

[72] InSight Crime's 2021 Homicide Round-Up, InSight Crime, Feb. 1, 2022, available at *https://insightcrime.org/news/insight-crimes-2021-homicide-round-up/* (last visited on March 6, 2023).

[73] Martinez, Carlos, Collapsed Government Talks with MS–13 Sparked Record Homicides in El Salvador, Audios Reveal, El Faro [El Sal.], May 17, 2022, available at *https://www.nytimes.com/2022/04/28/world/americas/el-salvador-bukele-gangs.html* (last visited March 6, 2023).

[74] El Salvador's Nayib Bukele: Strong and Getting Stronger, America's Quarterly, Feb. 23, 2021, available at *https://www.americasquarterly.org/article/aq-podcast-el-salvadors-nayib-bukele-strong-and-getting-stronger/* (last visited March 6, 2023).

[75] El Salvador: Authoritarian Actions and U.S. Response, Congressional Research Service, p.1, Dec. 23, 2021, available at *https://crsreports.congress.gov/product/pdf/IN/IN11658* (last visited March 6, 2023).

[76] El Salvador: Authoritarian Actions and U.S. Response, Congressional Research Service, p.2, Dec. 23, 2021, available at *https://crsreports.congress.gov/product/pdf/IN/IN11658* (last visited March 6, 2023).

[77] Renteria, Nelson, In El Salvador's gang crackdown, quotas drive 'arbitrary' arrests of innocents, Reuters, May 16, 2022, available at *https://www.reuters.com/world/americas/el-*

*salvadors-gang-crackdown-quotas-drive-arbitrary-arrests-innocents-2022-05-16/* (last visited March 6, 2023).

[78] El Salvador urged to uphold human rights amid state of emergency, United Nations News, Mar. 28, 2023, available at *https://news.un.org/en/story/2023/03/1135097* (last visited March 30, 2023).

[79] El Salvador urged to uphold human rights amid state of emergency, United Nations News, Mar. 28, 2023, available at *https://news.un.org/en/story/2023/03/1135097* (last visited March 30, 2023); How is a 'state of exception' changing El Salvador?, Al Jazeera, June 7, 2022, available at *https://www.aljazeera.com/program/the-stream/2022/6/7/what-is-the-true-impact-of-el-salvadors-state-of* (last visited March 6, 2023).

[80] El Salvador: Evidence of Serious Abuse in State Of Emergency, Human Rights Watch, May 2, 2022, available at *https://www.hrw.org/news/2022/05/02/el-salvador-evidence-serious-abuse-state-emergency* (last visited March 6, 2023).

[81] Tucker, Duncan, Eviscerating Human Rights Is Not The Answer To El Salvador's Gang Problem, Amnesty International, Aug. 31, 2022, available at *https://www.amnesty.org/en/latest/news/2022/08/eviscerating-human-rights-el-salvador-gang-problem/* (last visited March 6, 2023).

[82] El Salvador: Evidence of Serious Abuse in State Of Emergency, Human Rights Watch, May 2, 2022, available at *https://www.hrw.org/news/2022/05/02/el-salvador-evidence-serious-abuse-state-emergency* (last visited March 6, 2023).

[83] El Salvador extends state of exception as arrests hit 50,000, Al Jazeera, Aug. 17, 2022, available at *https://www.aljazeera.com/news/2022/8/17/el-salvador-extends-state-of-exception-as-arrests-hit-50000* (last visited March 6, 2023).

[84] Renteria, Nelson, In El Salvador, discrepancy over deaths and mass graves alarms critics, Reuters, Aug. 3, 2022, available at *https://www.reuters.com/world/americas/el-salvador-discrepancy-over-deaths-mass-graves-alarms-critics-2022-08-03/* (last visited March 6, 2023).

[85] Renteria, Nelson, In El Salvador, discrepancy over deaths and mass graves alarms critics, Reuters, Aug. 3, 2022, available at *https://www.reuters.com/world/americas/el-salvador-discrepancy-over-deaths-mass-graves-alarms-critics-2022-08-03/* (last visited March 6, 2023).

[86] US Department of State, 2021 Country Report on Human Rights Practices: El Salvador, April 12, 2022, *https://www.ecoi.net/en/document/2071137.html* (last visited March 6, 2023).

[87] Knox, Vickie, An Atomised Crisis: Reframing displacement caused by crime and violence in El Salvador, Internal Displacement Monitoring Centre (IDMC), p.6, Sept. 2018, available at *https://www.internal-displacement.org/sites/default/files/publications/documents/201809-el-salvador-an-atomised-crisis-en.pdf* (last visited March 6, 2023).

[88] Fact Sheet > El Salvador, United Nations High Commissioner for Refugees (UNHCR), p.2, Aug. 2021, available at *https://reporting.unhcr.org/sites/default/files/El%20Salvador%20Factsheet%20August%202021.pdf* (last visited March 6, 2023).

[89] Fact Sheet > El Salvador, United Nations High Commissioner for Refugees (UNHCR), p.2, Aug. 2021, available at *https://reporting.unhcr.org/sites/default/files/El%20Salvador%20Factsheet%20August%202021.pdf* (last visited March 6, 2023).

well as other serious human rights violations.[90]

Gang violence and lack of access to effective protection has forced tens of thousands to flee internally since 2006.[91] Violence and lack of opportunities have forced people to leave their homes in search of protection, access to basic services and livelihood opportunities. COVID–19 has exacerbated the needs of internally displaced persons and those at risk of displacement by impacting their access to protection and livelihoods.[92] While President Bukele's tactics have caused a decrease in the rate of gang violence, severe gang violence persists, and the tactics used by the Bukele administration have failed to address the root causes of gang membership, including poverty and insecurity, which are exacerbated by the lingering effects of major environmental disasters. Impoverished individuals are less likely to move to safer areas due to lack of financial resources and the geographic areas where they can afford to live are more likely to be gang-impacted and environmentally degraded.[93]

In summary, while progress has been made in repairing damage caused by the 2001 earthquakes, El Salvador continues to experience numerous natural disasters that significantly disrupt living conditions and adversely impact its ability to adequately handle the return of those granted TPS. A weak macroeconomic environment, a high rate of unemployment, violence, and a poor security situation adversely impact the country's ability to fully recover and continue to render the country temporarily unable to adequately handle the return of its nationals.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• At the time the Secretary's decision to terminate El Salvador's designation

for TPS was announced on January 18, 2018, conditions in El Salvador continued to support the country's designation for TPS on the ground of environmental disaster; therefore, the termination should be rescinded and such rescission is timely given that the termination has not yet gone into effect. *See* INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B).

• The conditions supporting El Salvador's designation for TPS still continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There has been an earthquake, flood, drought, epidemic, or other environmental disaster in El Salvador resulting in a substantial, but temporary, disruption of living conditions in the area affected; El Salvador is unable, temporarily, to handle adequately the return of its nationals; and El Salvador officially requested designation of TPS. *See* INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B);

• The designation of El Salvador for TPS should be extended for an 18-month period, beginning on September 10, 2023 and ending on March 9, 2025. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

**Notice of the Rescission of TPS Termination and Extension of the TPS Designation of El Salvador**

Pursuant to my lawful authorities, including under sections 103(a) and 244 of the Immigration and Nationality Act, I am hereby rescinding the termination of the TPS designation of El Salvador announced in the **Federal Register** at 83 FR 2654 on January 18, 2018. Due to this rescission and pursuant to INA section 244(b)(3)(C), as well as the ongoing preliminary injunction in *Ramos* v. *Nielsen,* 336 F. Supp. 3d 1075 (N.D. Cal. 2018), the TPS designation of El Salvador has continued to automatically extend under the statute since July 8, 2016, without a standing secretarial determination as to whether TPS should be extended or terminated. TPS beneficiaries under the designation, whose TPS has not been finally withdrawn for individual ineligibility, therefore have continued to maintain their TPS since March 9, 2018.

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting El Salvador's designation for TPS on the basis of environmental disaster continue to be met. *See* INA sections 244(b)(1)(B) and 244(b)(3)(A); 8 U.S.C. 1254a(b)(1)(B) and 1254a(b)(3)(A). On the basis of this

determination, I am extending the existing designation of El Salvador for TPS for 18 months, beginning on September 10, 2023 and ending on March 9, 2025. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). Individuals holding TPS under the designation of El Salvador may file to reregister for TPS under the procedures announced in this notice if they wish to continue their TPS under this 18-month extension.

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

**Required Application Forms and Application Fees To Re-Register for TPS**

To re-register for TPS based on the designation of El Salvador, you must submit a Form I–821, Application for Temporary Protected Status during the 60-day reregistration period that starts on July 12, 2023 and ends on September 10, 2023. There is no Form I–821 fee for re-registration. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the ''Biometric Services Fee'' section of this notice.

Individuals who have an El Salvador TPS application (Form I–821) that was still pending as of June 21, 2023 do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through March 9, 2025.

**Required Application Forms and Application Fees To Obtain an EAD**

Every employee must provide their employer with documentation showing they have a legal right to work in the United States. TPS beneficiaries are authorized to work in the United States and are eligible for an EAD which proves their employment authorization. If you have an existing EAD issued under the TPS designation of El Salvador that has been auto-extended through June 30, 2024 by the notice published at 87 FR 68717, you may continue to use that EAD through that date. If you want to obtain a new EAD valid through March 9, 2025, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver).

You may, but are not required to, submit Form I–765, Application for

---

[90] Fact Sheet > El Salvador, United Nations High Commissioner for Refugees (UNHCR), p.1, Aug. 2021, available at *https://reporting.unhcr.org/sites/default/files/El%20Salvador%20Factsheet%20August%202021.pdf* (last visited March 6, 2023).

[91] Fact Sheet > El Salvador, United Nations High Commissioner for Refugees (UNHCR), p.2, Aug. 2021, available at *https://reporting.unhcr.org/sites/default/files/El%20Salvador%20Factsheet%20August%202021.pdf* (last visited March 6, 2023).

[92] Fact Sheet > El Salvador, United Nations High Commissioner for Refugees (UNHCR), p.1, Aug. 2021, available at *https://reporting.unhcr.org/sites/default/files/El%20Salvador%20Factsheet%20August%202021.pdf* (last visited March 6, 2023).

[93] Disaster risk reduction in El Salvador, Texas A&M University, May 3, 2022, *condevcenter.org/Portals/0/El%20Salvador%20Capstone%202022.pdf* (last visited: March 6, 2023).

Employment Authorization, with your Form I–821 re-registration application. If you do not want a new EAD now, you can request one later by filing your I–765 and paying the fee (or requesting a fee waiver) at that time, provided you have TPS or a pending TPS application. If you have TPS and only a pending Form I–765, you must file the Form I–821 to reregister for TPS or risk having your TPS withdrawn for failure to reregister without good cause.

**Information About Fees and Filing**

USCIS offers the option to applicants for TPS under El Salvador's designation to file Form I–821 and related requests for EADs online or by mail. When filing a TPS application, applicants can also request an EAD by submitting a completed Form I–765, with their Form I–821.

*Online filing:* Form I–821 and I–765 are available for concurrent filing online.[94] To file these forms online, you must first create a USCIS online account.[95] However, if you are requesting a fee waiver, you cannot submit the applications online. You will need to file paper versions of the fee waiver request and the form for which you are requesting the fee waiver.

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

*Table 1—Mailing Addresses:* Mail your completed Form I–821, Application for Temporary Protected Status and Form I–765, Application for Employment Authorization, Form I–912, Request for Fee Waiver, if applicable, and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If you live in: | Then mail your application to: |
|---|---|
| • Texas | USCIS Dallas Lockbox.<br>*U.S. Postal Service (USPS):* USCIS, Attn: TPS El Salvador, P.O. Box 660864, Dallas, TX 75266–0864.<br>*FedEx, UPS, or DHL:* USCIS, Attn: TPS El Salvador (Box 660864), 2501 S State Highway 121 Business, Suite 400, Lewisville, TX 75067–8003. |
| • American Samoa<br>• Arizona.<br>• California.<br>• Connecticut.<br>• Delaware.<br>• District of Columbia.<br>• Georgia.<br>• Guam.<br>• Illinois.<br>• Indiana.<br>• Kentucky.<br>• Maine.<br>• Massachusetts.<br>• Michigan.<br>• Nevada.<br>• New Hampshire.<br>• New Jersey.<br>• North Carolina.<br>• Northern Mariana Islands.<br>• Ohio.<br>• Oregon.<br>• Pennsylvania.<br>• Puerto Rico.<br>• Rhode Island.<br>• South Carolina.<br>• Vermont.<br>• Virgin Islands.<br>• Virginia.<br>• Washington.<br>• West Virginia. | USCIS Chicago Lockbox.<br>*U.S. Postal Service (USCIS):* USPS, Attn: TPS El Salvador, P.O. Box 8635, Chicago, IL 60680–8635.<br>*FedEx, UPS, or DHL:* USCIS, Attn: TPS El Salvador (Box 8635), 131 S. Dearborn St., 3rd Floor, Chicago, IL 60603–5517. |
| • Alabama<br>• Alaska.<br>• Arkansas.<br>• Colorado.<br>• Florida.<br>• Hawaii.<br>• Idaho.<br>• Iowa.<br>• Kansas.<br>• Louisiana.<br>• Maryland.<br>• Minnesota.<br>• Mississippi.<br>• Missouri. | USCIS Elgin Lockbox.<br>*U.S. Postal Service (USPS):* USCIS, Attn: TPS El Salvador, P.O. Box 4091, Carol Stream, IL 60197–4091.<br>*FedEx, UPS, or DHL:* USCIS, Attn: TPS El Salvador (Box 4091), 2500 Westfield Drive, Elgin, IL 60124–7836. |

[94] Find information about online filing at "Forms Available to File Online," *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[95] *https://myaccount.uscis.gov/users/sign_up.*

TABLE 1—MAILING ADDRESSES—Continued

| If you live in: | Then mail your application to: |
|---|---|
| <ul><li>Montana.</li><li>Nebraska.</li><li>New Mexico.</li><li>New York.</li><li>North Dakota.</li><li>Oklahoma.</li><li>South Dakota.</li><li>Tennessee.</li><li>Utah.</li><li>Wisconsin.</li><li>Wyoming.</li></ul> | |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (*i.e.*, registering) for TPS on the USCIS website at *https://www.uscis.gov/tps* under "El Salvador."

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *https://www.uscis.gov/i-131*. You may file Form I–131 together with your Form I–821 or separately. When filing the Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for the Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
|---|---|
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS):<br>You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL:<br>You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S State Hwy. 121, Business Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. Fees for Form I–765 and biometric services are also described in 8 CFR 103.7(b)(1) (Oct. 1, 2020). If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https://www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms*.

**Refiling a TPS Re-Registration Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue your EAD promptly, if one has been requested. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. The fee waiver denial notice will contain specific instructions about resubmitting your application. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. See INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *www.uscis.gov/tps*.

**Note:** A re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee), or request a fee waiver, when filing a TPS re-registration application. As discussed above, if you decide to wait to request an EAD, you do not have to file the Form I–765 or pay the

associated Form I–765 fee (or request a fee waiver) at the time of re-registration. You may wait to seek an EAD until after USCIS has approved your TPS re-registration application or at any later date you decide you want to request an EAD. To re-register for TPS, you only need to file the Form I–821 with the biometrics services fee, if applicable (or request a fee waiver).

## General Employment-Related Information for TPS Applicants and Their Employers

*How can I obtain information on the status of my TPS application and EAD request?*

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at uscis.gov, or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter*. If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

*When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?*

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central*. An EAD is an acceptable document under List A.

*If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?*

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through March 9, 2025, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

*Can my employer require that I provide any other documentation such as evidence of my status or proof of my Salvadoran citizenship or a Form I–797C showing that I registered for TPS for Form I–9 completion?*

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request proof of Salvadoran citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. Refer to the "Note to Employees" section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin. Employers can refer to the compliance notice that DHS published on November 16, 2022, for information on how to complete the Form I–9 with TPS EADs that DHS extended through June 30, 2024.[96]

## Note to All Employers

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility

verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

## Note to Employees

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov*. USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (mismatch) must promptly inform employees of the mismatch and give such employees an opportunity to take action to resolve the mismatch. A mismatch result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call

---

[96] *Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal,* 87 FR 68717 (Nov. 16, 2022).

USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/crt/immigrant-and-employee-rights-section* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

This **Federal Register** Notice does not invalidate the compliance notice DHS issued on November 16, 2022, which extended the validity of certain TPS documentation through June 30, 2024 and does not require individuals to present a Form I–797, Notice of Action. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS designated country of El Salvador; or

• Your Form I–94, Arrival/Departure Record or Form I–797, Notice of Action, as shown in the **Federal Register** notice published at 87 FR 68717.

Check with the government agency requesting documentation regarding which document(s) the agency will accept. Some state and local government agencies use SAVE to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each state and local government agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. It may also assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice listing the TPS-related document, including any applicable auto-extension of the document, in addition to your recent TPS-related document with your A-number, USCIS number or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or any automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://save.uscis.gov/casecheck/.* CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save*, has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–13018 Filed 6–20–23; 8:45 am]

**BILLING CODE 9111–97–P**

# DEPARTMENT OF HOMELAND SECURITY

**U.S. Citizenship and Immigration Services**

[CIS No. 2735–22; DHS Docket No. USCIS–2014–0006]

RIN 1615–ZB69

**Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status (TPS) and Notice of Extension of TPS Designation for Nicaragua.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is rescinding the previous termination of the designation of Nicaragua for TPS, which was published on December 15, 2017 and extending the designation of Nicaragua for Temporary Protected Status (TPS) for 18 months, beginning on January 6, 2024 and ending on July 5, 2025. This extension allows existing TPS beneficiaries to retain TPS through July 5, 2025, so long as they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through July 5, 2025, must re-register during the 60-day re-registration period as described in this notice.

**DATES:** The *Rescission of Termination of the Designation of Nicaragua for TPS* took effect June 9, 2023.

*Extension of Designation of Nicaragua for TPS:* The 18-month extension of TPS for Nicaragua begins on January 6, 2024, and will remain in effect through July 5, 2025. The extension impacts existing beneficiaries of TPS under the designation of Nicaragua.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from November 6, 2023, through January 5, 2024.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital

Case 3:25-cv-01766-EMC    Document 103-3    Filed 04/07/25    Page 133 of 148

 **Reuters**                                                                                         My News  🔍  ☰

# Venezuela inflation has cooled - but voters say they still can't make ends meet

By **Mayela Armas**

July 23, 2024 8:33 AM EDT · Updated 7 months ago

  



[1/3] A woman smiles as she walks with her shopping of food reduced in price and offered to low-income citizens as part of Venezuela's President Nicolas Maduro's presidential campaign, while she seeks... Purchase Licensing Rights ☐ **Read more**                                                                          

CARACAS, July 23 (Reuters) - The government of Venezuelan President Nicolas Maduro, who is seeking reelection on Sunday, has had some success in curbing formerly sky-high inflation, but workers say their salaries have not caught up with high prices for food and other goods.

That, combined with general frustration after years of economic malaise, could chill support for Maduro and help bring out the vote for opposition coalition candidate Edmundo Gonzalez, said voters and analysts.

Venezuela had suffered six-digit hyperinflation for about four years, with the indicator reaching a heady 130,000%, eroding savings and making basic supplies scarce.

But annual inflation fell to around 50% over the last year as the government restricted credit, held the exchange rate steady and curbed public spending.

"We have decelerated (inflation) with the correct policies," Maduro - who has been in power since 2013 - said this month when figures were published showing month-on-month inflation in June was 1%.

VZ Vacatur_0267

The last time an inflation rise was that low was July 2012.

But many in the country are still struggling to make ends meet and some lamented that there had not been the usual boost in public sector pay seen in past election years.

"With the election, buying power isn't changed at all. Prices go up," said Oscar Reyes, a retired public sector worker whose pension is about $100 per month, as he shopped at a Caracas market.

Increases to his income had been minimal, he said. "We buy very little, because we also have to pay utilities."

Gonzalez has promised to broker deals between businesses, workers and the government to improve salaries and continue efforts to curb inflation.

"A few months ago I was spending $75 a week on average on food, now it's double," said Carmen Morales, a 52-year-old administrator in the central city of Valencia, who earns $250 per month and helps support her parents.

Morales said she wants a change in government and will vote for the opposition on Sunday.

Given previous rises, current inflation reductions sometimes are not visible to the average consumer, analysts say.

"Inflation could go down to zero, but if you earn $200 and basic food for a month is $500, there is a gap," said economist Asdrubal Oliveros, director of Caracas-based consulting firm Ecoanalitica. "People don't see (lower) inflation as something positive."

The communications ministry and the central bank did not respond to requests for comment.

**SUSTAINABLE MODEL?**

Analysts say government spending has increased mildly during the election campaign. But salaries for public employees have not risen since 2022, though the government has increased bonuses, which have less fiscal effect.

Private sector salaries tend to be higher than in the public sector and average $231 per month, according to the Venezuela Finance Observatory. For private workers, too, raises have been less frequent than they were during hyperinflation, said consultancy Mercer Venezuela.

The government's inflation effort has required it to artificially hold the exchange rate for the local bolivar currency steady by injecting some $2.24 billion into the economy so far this year, about 30% more than last year, according to calculations by analyst firm Sintesis Financiera.

Analysts say there will eventually have to be a price-stoking correction to the exchange rate, which has been held at 36.5 bolivars to the dollar for seven months.

The government's limiting of bank credit has forced producers of rice and corn, major crops for local consumption, to adopt forward-selling schemes with their buyers.

And business owners have frequently requested during meetings aired on state television that the government revise its fiscal and tax decisions, to help increase production and allow them to pay better salaries, to no avail.

Security guard Lisandro Gomez makes $40 a month plus bonuses and receives a subsidized government food basket.

"They say the economy is better, but I don't see it. What I earn doesn't go very far," he said - adding that he plans to back the opposition.

| The Reuters Daily Briefing newsletter provides all the news you need to start your day. Sign up here.

Reporting by Mayela Armas in Caracas, additional reporting by Johnny Carvajal and Efrain Otero in Caracas and Tibisay Romero in Valencia Writing by Julia Symmes Cobb Editing by Rosalba O'Brien

Our Standards: **The Thomson Reuters Trust Principles.** ↗

Suggested Topics:

( Americas )    ( Worker Rights )

[ Purchase Licensing Rights ]



**Mayela Armas**
Thomson Reuters

Since 2018 Mayela has reported for Reuters on Venezuela's economy and general news from capital Caracas. She is particularly interested in covering the effects of Venezuela's economic crisis and high inflation, especially concerning the

VZ Vacatur_0268

3/7/25, 3:50 PM
Case 3:25-cv-01766-EMC    Document 103-3    Filed 04/07/25    Page 135 of 148
Venezuela inflation has cooled, but voters say they still can't make ends meet | Reuters

effects this has on the day-to-day lives of people and families. She also writes about how the country's finances are managed, as well as Venezuela's main industries. Before she joined Reuters Mayela worked at local media outlets.

 

## Read Next

---

Americas

**Gang infighting leaves 22 dead in Ecuador's Guayaquil**

6:01 PM UTC

---

Americas

**After a murder, cartels loom over Mexico's new system of electing judges**

2:32 PM UTC

---

Technology

**Majority of Brazil Supreme Court chamber upholds Rumble suspension**

7:36 PM UTC

---

Americas

**Mexico aims to boost compliant exports to 90% after U.S. tariff reprieve**

4:28 PM UTC

---

## Sponsored Content

Dianomi ▷



**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**

Sponsored by
WalletJump



**The 5 Dumbest Things We Keep Spending Too Much Money On**

Sponsored by
The Penny Hoarder



**8 Dumbest Things Smart People Waste Money On**

Sponsored by
FinanceBuzz

**Sponsored Content**

Dianomi ▷



**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**
Sponsored by WalletJump



**Top Cards That Charge 0% Interest Until 2026**
Sponsored by Smart Lifestyle Trends



**9 Ways To Get Money Without Getting A Job**
Sponsored by FinanceBuzz



**7 Ways To Help Generate Income Once Your Portfolio Reaches $1,000,000**
Sponsored by Fisher Investments



**50-Year Legend: The Month Stocks Will Likely Crash**
Sponsored by Chaikin Analytics



**Don't Borrow From The Bank If You Own A Home, Borrow From Yourself**
Sponsored by Lendgo

**World** ›

# US cancels $400 million in grants, contracts to Columbia University over antisemitism allegations

United States · March 7, 2025 · 3:37 PM EST · 10 min ago

U.S. President Donald Trump's administration said it had canceled grants and contracts totaling $400 million to Columbia University because of what it described as antisemitic harassment on and near the school's New York City campus.

Europe
**Five residents die in Russian attacks on eastern Donetsk region**

30 min ago

---

United States

**Crypto Summit: Trump hosts digital currency leaders at White House**

16 min ago

---

World

**South Africa rejects 'megaphone diplomacy' as Trump backs funding cut**

36 min ago

---

Middle East

**Scores killed as Syrian forces seek to crush Alawite insurgency**

38 min ago

## Sponsored Content

Dianomi ▷

**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**
Sponsored by WalletJump

 

**8 Dumbest Things Smart People Waste Money On**
Sponsored by FinanceBuzz



**50-year Wall Street Legend: The Month Stocks Will Likely Crash**
Sponsored by Chaikin Analytics



**7 Ways To Help Generate Income Once Your Portfolio Reaches $1,000,000**
Sponsored by Fisher Investments



**Don't Borrow From The Bank If You Own A Home, Borrow From Yourself**
Sponsored by Lendgo



**Virginia Reduce Your Home Insurance Bill If You Live In These Zip C...**
Sponsored by Smart Lifestyle Trends



## Sponsored Content

Dianomi ▷

**Did You Know These Tips? How To Stop Spending On Groceries 2024**
Sponsored by The Penny Hoarder

**9 Ways To Get Money Without Getting A Job**
Sponsored by FinanceBuzz

**13 Things The U.S. Plans To Do For Seniors On SS in 2025**
Sponsored by Smart Lifestyle Trends

**5 Side Hustles That Work Even with a Full-Time Job**
Sponsored by FinanceBuzz

**7 Money Moves To Make Today If You Have $1,000 In Savings**
Sponsored by The Penny Hoarder

**5 Tiny AI Stocks That Could Be "Millionaire Makers"**
Sponsored by Profitable News

Feedback

**Latest**

Home

Authors

Topic Sitemap

Archive

Article Sitemap

**Browse**

World

Business

Markets

Sustainability

Legal

Breakingviews

Media

$\square$ Videos

$\textcircled{\tiny\square}$ Pictures

$\boxtimes$ Graphics

$\bigcap$ Podcasts

Technology

Investigations

Sports

Science

Lifestyle

About Reuters

**About Reuters** ↗

**Advertise with Us** ↗

**Careers** ↗

**Reuters News Agency** ↗

**Brand Attribution Guidelines** ↗

**Reuters and AI** ↗

**Reuters Leadership** ↗

**Reuters Fact Check**

**Reuters Diversity Report** ↗

Stay Informed

**Download the App (iOS)** ↗

**Download the App (Android)** ↗

**Newsletters**

---

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

$\boxed{X}$ $\boxed{f}$ $\boxed{\textcircled{o}}$ $\boxed{\blacktriangleright}$ $\boxed{in}$

---

LSEG Products

**Workspace** ↗

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**DataCatalogue** ↗

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**World-Check** ↗

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

Feedback

---

**Advertise With Us** ↗    **Advertising Guidelines**    **Purchase Licensing Rights** ↗

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

Cookies ↗    Terms of Use    Privacy ↗    Digital Accessibility ↗    Corrections    Site Feedback ↗    Opt Out of Targeted Advertising

VZ Vacatur_0272

© 2025 Reuters. All rights reserved

Feedback

VZ Vacatur_0274

VZ Vacatur_0275

VZ Vacatur_0276

3/7/25, 3:50 PM
Venezuela inflation has cooled, but voters say they still can't make ends meet | Reuters
Case 3:25-cv-01766-EMC   Document 103-3   Filed 04/07/25   Page 143 of 148

VZ Vacatur_0278

VZ Vacatur_0279

agency with a copy of this **Federal Register** Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit granting agencies within seconds but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/ casecheck/,* then by clicking the "Check Your Case" button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found at the SAVE Web site at *http://www.uscis.gov/ save,* then by choosing "For Benefits Applicants" from the menu on the left and selecting "Questions about your Records?".

[FR Doc. 2016–23249 Filed 9–22–16; 4:15 pm]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

[CIS No. 2588–16; DHS Docket No. USCIS– 2014–0011]

**RIN 1615–ZB56**

**Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Liberia's Designation for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of Liberia for Temporary Protected Status (TPS) is set to expire on November 21, 2016. After reviewing relevant country conditions

and consulting with the appropriate U.S. Government (Government) agencies, the Secretary of Homeland Security (Secretary) has determined that conditions in Liberia no longer support its designation for TPS and is therefore extending TPS benefits for 6 months for the purpose of orderly transition before the TPS designation of Liberia terminates. This termination will be effective May 21, 2017, 6 months following the end of the current designation.

To provide for an orderly transition, nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who have been granted TPS under the Liberia designation will automatically retain their TPS and have their current TPS-based Employment Authorization Documents (EAD) extended through May 20, 2017. However, an individual's TPS may still be withdrawn because of ineligibility for TPS. On May 21, 2017, nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who have been granted TPS under the Liberia designation will no longer have TPS.

**DATES:** The designation of Liberia for TPS is terminated effective at 12:01 a.m., local time, on May 21, 2017.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, please visit the U.S. Citizenship and Immigration Services (USCIS) TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about the termination of Liberia's TPS designation by selecting "Liberia" from the menu on the left side of the TPS Web page.

• You can also contact Jerry Rigdon, Chief of the Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529– 2060; or by phone at 202–272–1533 (this is not a toll-free number). Note: The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http:// www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
EVD—Ebola Virus Disease
FNC—Final Nonconfirmation
Government—U.S. Government
INA—Immigration and Nationality Act
OSC—Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
WHO—World Health Organization

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility criteria described in INA section 244(c), 8 U.S.C. 1254a(c) and 8 CFR part 244.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other immigration status they lawfully obtained while registered for TPS.

**When was Liberia designated for TPS?**

On November 21, 2014, the Secretary designated Liberia for TPS for a period of 18 months due to the extraordinary and temporary conditions caused by an epidemic of Ebola Virus Disease (EVD) in West Africa that prevented nationals of Liberia from returning to Liberia in safety. The conditions included high EVD transmission rates in wide-spread geographic areas, overwhelmed health care systems unable to handle the large number of EVD patients or to provide treatment for normally preventable or treatable conditions, and containment

measures that were causing significant disruptions to Liberia's economy and individuals' ability to access food and earn a livelihood. *See Designation of Liberia for Temporary Protected Status,* 79 FR 69502 (Nov. 21, 2014). The Secretary last announced a 6-month extension of TPS for Liberia on March 22, 2016, based on his determination that although there were significant improvements, conditions supporting the designation persisted. *See Extension of the Designation of Liberia for Temporary Protected Status,* 81 FR 15328 (Mar. 22, 2016).

**What authority does the Secretary have to terminate the designation of Liberia for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation may be extended for an additional period of 6, 12, or 18 months. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation, but such termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See* INA section 244(b)(3)(B), 8 U.S.C.

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to the Department of Homeland Security (DHS) "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

1254a(b)(3)(B). The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs, for the purpose of providing an orderly transition. *See id.;* INA section 244(d)(3), 8 U.S.C. 1254a(d)(3).

**Why is the Secretary terminating the designation of Liberia for TPS as of May 21, 2017, after a 6-month extension of TPS benefits for the purpose of orderly transition?**

DHS and the Department of State (DOS) have reviewed conditions in Liberia. Based on the reviews and after consulting with DOS, the Secretary has determined that the termination of the TPS designation of Liberia, after a 6-month extension of TPS benefits for orderly transition, is required because the extraordinary and temporary conditions that prompted Liberia's designation for TPS have substantially resolved and no longer prevent nationals of Liberia from returning in safety.

Guinea, Liberia, and Sierra Leone were designated for TPS in the midst of the largest EVD outbreak in history. From March 2014 through November 2015, these three countries suffered over 11,000 deaths among their more than 28,500 cases of EVD. At the height of the outbreak in late 2014, Ebola was spreading rapidly, with hundreds of new cases being reported each week, the health care systems overwhelmed, and containment measures causing significant disruptions to individuals' ability to access food and earn a livelihood. While the impacts of the epidemic pose a lasting challenge to Liberia's economy and the capacity of its health system to provide treatment for preventable or treatable conditions, at this time, the EVD epidemic has subsided, and conditions have improved since the Secretary initially designated Liberia for TPS.

A robust response by the international community and the governments of Guinea, Liberia, and Sierra Leone has brought the EVD epidemic in West Africa under control and begun the long-term work of rebuilding regional economies and health systems. As of June 2016, Guinea, Liberia, and Sierra Leone are all free of EVD. A country is considered free of EVD transmission after 42 days have passed since the last known person in the country with Ebola receives a second consecutive negative blood test for the virus. While the risk of flare-ups of EVD remains, efforts are underway to promote, over time, robust prevention, surveillance, and response capacity across all three countries.

In Liberia, the government and citizens partnered in a successful effort to control the epidemic and rapidly respond to any new cases. Commerce and imports have begun to rebound, and basic services have returned to pre-EVD outbreak levels. The U.S. Department of Health and Human Services, Centers for Disease Control and Prevention has no Ebola-related Travel Health Notice in place for Liberia as of the date of this Notice.

While health systems and facilities remain fragile, medical centers are no longer overwhelmed by patients with EVD. High rates of child mortality both before and since the EVD epidemic are indicative of the overall fragility of the health system. Although this is comparable to other countries in the region, systems in Liberia must also be able to address ongoing issues of trust between healthcare facilities and communities, as well as continue to care for Ebola survivors who have a series of ongoing and previously unforeseen health conditions, both of which will continue to exacerbate and underscore the fragility of these systems. Normal business activity and national life have largely resumed, although work is ongoing to rebuild Liberia's economy and health care system. On March 29, 2016, the WHO Director-General declared the end of the Public Health Emergency of International Concern regarding the EVD outbreak in West Africa. In conjunction with ending the public health emergency, the WHO emphasized that there should be no restrictions on travel and trade with Guinea, Liberia, and Sierra Leone.

Based upon this review and after consultation with appropriate Government agencies, the Secretary has determined that Liberia no longer continues to meet the statutorily required conditions for a TPS designation on the basis of extraordinary and temporary conditions, because the extraordinary and temporary conditions that prompted Liberia's TPS designation have substantially resolved and no longer prevent nationals of Liberia from returning to Liberia in safety. Therefore, after a 6-month extension of TPS benefits for orderly transition, the Secretary is terminating the TPS designation of Liberia effective at 12:01 a.m., local time, on May 21, 2017, 6 months following the end of the current designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

To provide for an orderly transition, individuals who have been granted TPS under Liberia's designation will automatically retain TPS and have their current EADs extended until the

termination date. *See* INA section 244(d)(3), 8 U.S.C. 1254a(d)(3). DHS may, however, withdraw TPS from any beneficiary who fails to continue meeting the requirements for TPS. *See* INA section 244(c)(3), 8 U.S.C. 1254a(c)(3). There are approximately 2,160 current Liberia TPS beneficiaries. These persons are urged to use the time before termination of their TPS to prepare for and arrange their departure from the United States or, in the alternative, to apply for other immigration benefits for which they are eligible.

**Notice of Six-Month Extension of TPS Benefits for Orderly Transition Before Termination of the TPS Designation of Liberia**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, that Liberia no longer meets the conditions for designation of TPS under INA section 244(b)(1). 8 U.S.C. 1254a(b)(1).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), the designation of Liberia for TPS is terminated effective at 12:01 a.m., local time, on May 21, 2017, 6 months following the end of the current designation.

(2) DHS estimates that there are approximately 2,160 nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who currently receive TPS benefits.

(3) To provide for an orderly transition, nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who have been granted TPS under the Liberia designation will automatically retain TPS until the May 21, 2017, termination date. However, an individual's TPS may be withdrawn before this date under INA section 244(c)(3) and 8 CFR 244.14 because of ineligibility for TPS.

(4) TPS-based EADs that expire on November 21, 2016, are extended automatically through May 20, 2017, for qualified nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia).

(5) Information concerning the termination of TPS for nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) will be available at local USCIS offices upon publication of this notice and through the USCIS National Customer Service Center at 1–800–375–5283. This information will be published on the USCIS Web site at *www.USCIS.gov.*

Jeh Charles Johnson,
*Secretary.*

**If I currently have TPS under Liberia's designation, do I need to re-register to keep my TPS until May 21, 2017, the termination date?**

No. If you already have been granted TPS benefits through the Liberia TPS program, you do not have to re-register to keep your TPS benefits. You will automatically retain TPS until the termination date. However, your TPS may still be withdrawn under INA section 244(c)(3) and 8 CFR part 244 because of ineligibility for TPS. 8 U.S.C. 1254a(c)(3), 8 CFR 244.14. When termination becomes effective on May 21, 2017, you will no longer have TPS.

**Why is the Secretary automatically extending the validity of EADs from November 21, 2016, through May 20, 2017?**

The Secretary has decided to extend automatically the validity of EADs to provide for an orderly transition leading up to the effective date for the termination of the Liberia TPS designation. Therefore, the validity of the applicable EADs is extended for a period of 6 months, through May 20, 2017. 8 U.S.C. 1254a(a)(2) and (d)(3).

**Must qualified individuals apply for the automatic extension of their TPS-related EADs through May 20, 2017?**

No. Qualified individuals do not have to apply for this extension of their TPS-related EADs through May 20, 2017.

**What may I do if I believe that returning to Liberia is not possible or preferable for me?**

This Notice terminates the designation of Liberia for TPS. Nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) in the United States who believe returning to Liberia is not possible or preferable for them may be eligible to apply for another immigration status, such as lawful permanent residence, asylum, or a nonimmigrant status. Eligibility for these and other immigration benefits is determined individually on a case-by-case basis. For information about eligibility and how to apply, visit the USCIS Web site at *www.uscis.gov* or call the USCIS National Customer Service Center at 1–800–375–5283.

**How does the termination of TPS affect my immigration status and what can I do?**

After the termination of the TPS designation of Liberia becomes effective May 21, 2017, former TPS beneficiaries will maintain the same immigration status they held before TPS (unless the status has since expired or been terminated) or any other status they may have acquired while registered for TPS. Liberians who are included in the President's grant of Deferred Enforced Departure for Liberians, if extended past the current expiration date of September 30, 2016, will remain covered by Deferred Enforced Departure. Accordingly, if a TPS beneficiary held no lawful immigration status before being granted TPS and did not obtain any other status during the TPS period, he or she may be subject to removal upon the termination of the TPS designation. TPS-related EADs will expire on May 20, 2017, and will not be renewed.

Termination of the TPS designation for Liberia does not necessarily affect pending applications for other forms of immigration relief or protection. However, former TPS beneficiaries will begin to accrue unlawful presence as of May 21, 2017, if they have not been granted any other immigration status or protection or if they have no pending application to obtain benefits.

**Employment Authorization Document (EAD)**

*How can I obtain information on the status of my EAD request?*

To get case status information about your request for an EAD, you can check Case Status Online at *http:// www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Application for Employment Authorization (Form I–765) has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https:// infopass.uscis.gov.* However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic 6-month extension of my current EAD through May 20, 2017?*

Provided that you currently have TPS under the designation of Liberia, this Notice automatically extends your EAD by 6 months if you: