| Heading/ subheading | Article description | Rates of duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.22 .................. | Articles the product of China and Hong Kong that are informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change". |

4. by inserting the following new heading 9903.01.23 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled ''Heading/ Subheading'', ''Article Description'', ''Rates of Duty 1—General'', ''Rates of Duty 1— Special'' and ''Rates of Duty 2'', respectively:

| Heading/ subheading | Article description | Rates of duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.23 .................. | Except for products described in headings 9903.01.21 and 9903.01.22, and other than products for personal use included in accompanied baggage of persons arriving in the United States, articles the product of China and Hong Kong that: (1) were loaded onto a vessel at the port of loading, or in transit on the final mode of transport prior to entry into the United States, before 12:01 a.m. eastern standard time on February 1, 2025; and (2) are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 4, 2025, and before 12:01 a.m. eastern standard time on March 7, 2025. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change". |

5. by inserting the following new U.S. note 2(s) to subchapter III of chapter 99 of the HTSUS in numerical sequence:

''2. (s) For the purposes of heading 9903.01.20, products of China and Hong Kong, other than products described in heading 9903.01.21, heading 9903.01.22, heading 9903.01.23, and other than products for personal use included in accompanied baggage of persons arriving in the United States, shall be subject to an additional 10% *ad valorem* rate of duty. Notwithstanding U.S. note 1 to this subchapter, all products of China and Hong Kong that are subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.20 shall also be subject to the general rates of duty imposed on products of China and Hong Kong entered under subheadings in chapters 1 to 97 of the tariff schedule. Products of China and Hong Kong that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99 shall be subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.20.

The additional duties imposed by heading 9903.01.20 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection (''CBP''), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in China and Hong Kong), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in China and Hong Kong), less the cost or value of such products of the United States, as described.

Products of China and Hong Kong that are provided for in heading 9903.01.20 shall continue to be subject to antidumping, countervailing, or other duties, taxes, fees, exactions and charges that apply to such products, as well as to the additional *ad valorem* rate of duty imposed by heading 9903.01.20.

Products of China and Hong Kong that are provided for in heading 9903.01.20 shall not be eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—the so-called ''de minimis'' exemption.

(t) Heading 9903.01.21 covers only products of China and Hong Kong, that are donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of title 19 of the U.S. Code, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances.''

[FR Doc. 2025–02293 Filed 2–3–25; 1:15 pm]

**BILLING CODE 9111–14–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[CIS No. 2804–25]**

### Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** On October 3, 2023, Venezuela was newly designated for Temporary Protected Status (TPS) based on the determination that there were extraordinary and temporary conditions in that country that prevented the safe return of Venezuelan nationals, and that permitting such Venezuelan nationals to remain temporarily in the United States is not contrary to the U.S. national interest. The 2023 designation of Venezuela for TPS is set to expire on April 2, 2025. After reviewing country

conditions and considering whether permitting Venezuelan nationals covered by the 2023 designation is contrary to the national interest of the United States, in consultation with the appropriate U.S. Government agencies, the Secretary of Homeland Security has determined that Venezuela no longer continues to meet the conditions for the 2023 designation. In particular, the Secretary has determined it is contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States. The Secretary therefore is terminating the 2023 TPS designation of Venezuela. This termination is effective April 7, 2025. After April 7, 2025, nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) who have been granted TPS under the 2023 Venezuela designation will no longer have TPS. This termination determination does not apply to the 2021 designation of Venezuela for TPS, which remains in effect until September 10, 2025, or to individuals who are registered for TPS under the 2021 designation.

**DATES:** The October 3, 2023 designation of Venezuela for TPS is terminated effective at 11:59 p.m., local time, on April 7, 2025.

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## What is Temporary Protected Status (TPS)?

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. INA 244(b)(1), 8 U.S.C. 1254a(b)(1). The determination whether to designate any foreign state (or part thereof) for TPS is discretionary, and there is no judicial review of ''any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state'' for TPS. INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in the Secretary's discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for TPS designation, TPS will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

TPS is a temporary immigration benefit granted to eligible nationals of a country designated for TPS under the INA, or to eligible aliens without nationality who last habitually resided in the designated country. During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain an Employment Authorization Document (EAD) so long as they continue to meet the requirements of TPS. TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of TPS does not result in or lead to lawful permanent resident status or any other immigration status. To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2). When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated), or any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

## Designation of Venezuela for TPS

On March 9, 2021, then Secretary of Homeland Security Alejandro Mayorkas designated Venezuela for TPS based on his determination that there existed ''extraordinary and temporary conditions'' in Venezuela that prevented nationals of Venezuela from returning in safety and that permitting such aliens to remain temporarily in the United States is not contrary to the U.S. national interest (Venezuela 2021 designation).

*See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure,* 86 FR 13574 (Mar. 9, 2021).

On September 8, 2022, then Secretary Mayorkas extended the Venezuela 2021 TPS designation for 18 months. *See Extension of the Designation of Venezuela for Temporary Protected Status,* 87 FR 55024 (Sept. 8, 2022). On October 3, 2023, Secretary Mayorkas extended the Venezuela 2021 TPS designation for another 18 months with an expiration date of September 10, 2025, and separately newly designated Venezuela for 18 months, a decision the former Secretary called a ''redesignation'' (Venezuela 2023 designation) with an expiration of April 2, 2025, resulting in two separate and concurrent Venezuela TPS designations. *See Extension and Redesignation of Venezuela for Temporary Protected Status,* 88 FR 68130 (Oct. 3, 2023).

On January 17, 2025, Secretary Mayorkas issued a notice extending the 2023 designation of Venezuela for TPS for 18 months. The notice was based on then Secretary Mayorkas's January 10, 2025 determination that the conditions for the designation continued to be met. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). In the January 2025 notice, Secretary Mayorkas did not expressly extend or terminate the 2021 Venezuela designation. Instead, the notice allowed for a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through the same extension date of October 2, 2026. *See Extension of the 2023 Designation of Venezuela for Temporary Protected Status,* 90 FR 5961 (Jan. 17, 2025).

On January 28, 2025, Secretary of Homeland Security Kristi Noem vacated former Secretary Mayorkas's January 10, 2025 decision, restoring the status quo that preceded that decision.[1] Accordingly, a determination whether to extend the 2023 Venezuela designation was due by February 1, 2025. The Department of Homeland Security (DHS or Department) estimates that approximately 348,202 aliens are eligible for TPS under the 2023 Venezuela designation.

## Secretary's Authority To Terminate the 2023 Designation of Venezuela for TPS

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after

---

[1] *See Vacatur of 2025 Temporary Protected Status Decision for Venezuela,* 88 FR 8805 (Feb. 3, 2025).

consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation, but such termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs. *See id.; see also* INA 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary "option" to allow for a certain "orderly transition" period if she determines it to be appropriate).

**Reasons for the Secretary's Termination of the 2023 TPS Designation for Venezuela**

Consistent with section 244(b)(3)(A) of the INA, 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, DHS reviewed conditions in Venezuela and considered whether permitting the Venezuelan nationals to remain temporarily in the United States is contrary to the national interest of the United States.[2]

The Department, in consultation with the Department of State, has reviewed conditions in Venezuela and has considered whether permitting Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest. Overall, certain conditions for the 2023 TPS designation of Venezuela may continue; however, there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country.

Based on the Department's review, the Secretary has determined that, even assuming the relevant conditions in Venezuela remain both "extraordinary" and "temporary," termination of the

2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals (or aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States.[3]

In the TPS statute, Congress expressly prohibits the Secretary from designating a country for TPS or extending a TPS designation if she finds that "permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." INA 244(b)(1), 8 U.S.C. 1254a(b)(1). Accordingly, as the Department and the Attorney General have long recognized, such a "national interest" assessment is an essential element of a determination whether to extend or terminate the 2023 Venezuela designation, which was based on "extraordinary and temporary conditions."[4]

"National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (*e.g.,* potential nexus to criminal gang membership), national security, migration factors (*e.g.,* pull factors), immigration policy (*e.g.,* enforcement prerogatives), and economic considerations (*e.g.,* adverse effects on U.S. workers, impact on U.S. communities).[5] Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment,

informed by her consultations with appropriate U.S. Government agencies.

President Trump in his recent, immigration and border-related executive orders and proclamations clearly articulated an array of policy imperatives bearing upon the national interest. First, the President directed the Secretary to terminate, as contrary to the policy of the United States, the parole program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans" (CHNV). The parole process for Venezuelans had been in effect since October 19, 2022, allowing hundreds of thousands of inadmissible Venezuelans to enter the United States at interior ports of entry and remain in this country, generally for a period of two years, with employment authorization eligibility.[6] DHS estimates that 33,600 CHNV parolees from Venezuela availed themselves of TPS. Venezuelan CHNV parolees, along with Venezuelan nationals who crossed illegally into the United States, who had been continuously residing in the United States since July 31, 2023, and continuously present in the United States since October 3, 2023, were able to secure TPS and TPS-based employment authorization under the 2023 Venezuela designation.

TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States, and the sheer numbers have resulted in associated difficulties in local communities where local resources have been inadequate to meet the demands caused by increased numbers. Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua.[7] Tren de Agua has been blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants. The United States has sanctioned the gang and placed it on a list of transnational criminal organizations.[8] In Executive Order 14157, *Designating Cartels and Other*

---

[2] *See also* E.O. 14159, *Protecting the American People Against Invasion,* sec. 16(b), 90 FR 8443, 8446 (Jan. 20, 2025) (directing that the Secretary should "ensur[e] that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute").

[3] *See INS* v. *Bagamasbad,* 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

[4] *Cf., e.g., Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension,* 63 FR 15437, 15438 (Mar. 31, 1998) (terminating Liberia TPS designation after "consultations with the appropriate agencies of the U.S. Government concerning (a) the conditions in Liberia; and (b) whether permitting nationals of Liberia . . . to remain temporarily in the United States is contrary to the national interest of the United States").

[5] *See, e.g., Poursina* v. *USCIS,* 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are better committed to the discretion of the Executive Branch—not to federal courts" (citing *Trump* v. *Hawaii,* 585 U.S. 667, 684–86 (2018)); *Flores* v. *Garland,* 72 F.4th 85, 89–90 (5th Cir. 2023) (same); *Brasil* v. *Sec'y, Dep't of Homeland Sec.,* 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D–J-,* 23 I&N Dec. 572, 579–81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country is "sound immigration policy" and an "important national security interest"); *Matter of Dhanasar,* 26 I&N Dec. 884, 890–91 (AAO 2016) (taking into account impact on U.S. workers in "national interest" assessments).

[6] *See Implementation of a Parole Process for Venezuelans,* 87 FR 63507 (Oct. 19, 2022); *see also Implementation of Changes to the Parole Process for Venezuelans,* 88 FR 1279 (Jan. 9, 2023).

[7] Joshua Goodman, Tren de Aragua gang started in Venezuela's prisons and spreads fear in the US, Associated Press, Sept. 24, 2024, available at: *https://apnews.com/article/tren-de-aragua-gang-venezuela-us-a12c8fee9dc4a0ca73769ea893e09e53* (last accessed Jan. 28, 2025).

[8] Joshua Goodman, US sanctions a Venezuela gang for spreading criminal activity across Latin America, Associated Press, July 11, 2024, available at: *https://apnews.com/article/washington-venezuela-gang-sanctions-f742f6966d160ee80b703ed419dfdac3* (last accessed Jan. 30, 2025).

*Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists,* the President determined that Tren de Aragua's campaign of violence and terror poses threats to the United States.[9] The Secretary accordingly has considered these important immigration and national interests in terminating the Venezuela parole process.

Second, President Trump observed, referring to CHNV and other policies and processes, that "[o]ver the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States," including millions who crossed U.S. borders or were allowed to fly to a U.S. air port of entry and allowed to settle in American communities.[10] The prolonged presence of these aliens in the United States "has cost taxpayers billions of dollars at the Federal, State, and local levels."[11] For example, over 180,000 illegal aliens have settled in New York City, approximating that this will cost the city $10.6 billion through the summer of 2025.[12] Additionally, although mayors from cities across the United States are attempting to accommodate Venezuelan illegal aliens, city shelters, police stations, and aid services are at a maximum capacity.[13]

The President underscored that enforcing the immigration laws "is critically important to the national security and public safety of the United States."[14] In furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States.[15] Among the directed actions are to ensure that the TPS designations are consistent with the TPS statute and "as

appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute."[16] The Department accordingly has reappraised the national interest factors and given strong consideration to the serious national security, border enforcement, public safety, immigration policy, and economic and public welfare concerns engendered by illegal immigration of Venezuelans, which the President, DHS, and other federal agencies are seeking to stem through other policy actions.

Third, President Trump declared a national emergency at the southern border.[17] As the Attorney General and DHS have long understood, the potential "magnet effect" of a TPS determination is a permissible factor under the TPS statute, especially with respect to a redesignation.[18] The same is true for Venezuela.[19] The anticipated designation or extension for TPS and resulting benefit to access EAD have been pull factors driving Venezuelan nationals to the United States.[20] In October 2023, DHS stated that there were approximately 243,000 Venezuela TPS beneficiaries, while also estimating that approximately *472,000 additional aliens* may be eligible under the October 3, 2023 designation.[21] Currently, DHS estimates that 348,202 aliens are registered under the 2023 designation.

Fourth, as the President directed in Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first."[22] Continuing to permit Venezuelans under the 2023 TPS designation to remain in the United States does not champion core American interests or put American interests first. U.S. foreign policy

interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration.[23]

In making this finding and determination regarding the national interest, the Secretary also has taken into account the national-interest-related factors that were presented to former Secretary Mayorkas for his consideration for purposes of his now-vacated January 10, 2025 decision. However, especially in view of President Trump's Executive Orders relating to immigration and after consulting with the Department of State, the Secretary has reached a different conclusion and has determined that permitting such Venezuelan nationals (and aliens with no nationality who last habitually resided in Venezuela) to remain in the United States is in fact contrary to the national interest, as is the Secretary's authority and prerogative under the statute.[24]

**Effective Date of Termination of 2023 Designation**

The TPS statute provides that the termination of a country's TPS designation may not be effective earlier than 60 days after the **Federal Register** notice is published or, if later, the expiration of the most recent previous extension. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). As noted, the expiration date of the 2023 Venezuela designation is 60 days from the date of publication of this notice.

The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs, for the purpose of providing for an orderly transition. *See id.;* INA 244(d)(3), 8 U.S.C. 1254a(d)(3). Given the Secretary's finding that continuing to permit such Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest, and considering the relative recency of the designation (Oct. 3, 2023), the Secretary has determined that it is not

[9] 90 FR 8439 (Jan. 20, 2025).

[10] E.O. 14159, *Protecting the American People Against Invasion,* sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).

[11] *Id.*

[12] *The Cost of the Border Crisis,* Testimony before the House Budget Committee of Julie Kirchner the Executive Director, Federation for American Immigration Reform (May 8, 2024), available at: *https://www.congress.gov/118/meeting/house/117257/witnesses/HHRG-118-BU00-Wstate-KirchnerJ-20240508.pdf* (last accessed Jan. 30, 2025).

[13] Center for Strategic & International Studies, *The Persistence of the Venezuelan Migrant and Refugee Crisis* (Nov. 27, 2023), available at: *https://www.csis.org/analysis/persistence-venezuelan-migrant-and-refugee-crisis* (last accessed Jan. 30, 2025).

[14] E.O. 14159, *Protecting the American People Against Invasion,* sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).

[15] *Id.,* sec. 16, 90 FR 8446.

[16] *Id.,* sec. 16(b), 90 FR 8446.

[17] Proc. 10886, *Declaring a National Emergency at the Southern Border of the United States,* 90 FR 8327 (Jan. 20, 2025).

[18] *See* Extension and Redesignation and Redesignation of Liberia Under Temporary Protected Status Program, 62 FR 16608, 16609 (Apr. 7, 1997) ("One factor in determining whether redesignation is appropriate is whether it will create a 'magnet effect' for nationals of the country under consideration. In cases where the Attorney General contemplates redesignation, she may consider this possible magnet effect and any other factors weighing against redesignation, together with any discretionary factors in favor of redesignation.").

[19] *See, e.g.,* Center for Strategic & International Studies, *The Persistence of the Venezuelan Migrant and Refugee Crisis* (Nov. 27, 2023), available at: *https://www.csis.org/analysis/persistence-venezuelan-migrant-and-refugee-crisis* (last accessed Jan. 30, 2025).

[20] *See id.*

[21] 88 FR 68134.

[22] *America First Policy Directive to the Secretary of State,* 90 FR 8337 (Jan. 20, 2025).

[23] *See* U.S. Dep't of State, *Priorities and Mission of the Second Trump Administration's Department of State* (Jan. 24, 2025), available at *https://pa.usembassy.gov/priorities-and-mission-of-the-second-trump-administrations-department-of-state/.*

[24] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 59 (Rehnquist, J., concurring in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations. As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration.").

appropriate to allow for a further transition period. Accordingly, the termination of the October 3, 2023 Venezuela TPS designation will be effective 60 days from the date of publication of this notice.[25]

The Secretary has considered putative reliance interests in the 2023 Venezuela TPS designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous TPS terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status, TPS designations are time-limited and must be periodically reviewed, TPS notices clearly notify aliens of the designations' expiration dates, and whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). Any putative reliance interests of registrants under the Venezuela 2023 designation therefore merit only diminished weight. Moreover, any such putative reliance interests are outweighed by the overriding, important national interest considerations described in this notice.[26]

---

[25] *See* 8 CFR 244.19 ("Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.").

[26] DHS recognizes that certain previous TPS terminations allowed for an extended transition, especially in the case of TPS designations that had been extended numerous times over the course of many years. *See, e.g., Termination of the Designation of El Salvador for Temporary Protected Status,* 83 FR 2654 (Jan. 18, 2018) (nearly 17 years, with 18-month transition period); *Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017) (20 years, with 12-month orderly transition period); *Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation,* 68 FR 52407 (Sept. 3, 2003) (nearly 6 years, with 6-month orderly transition period); *Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Liberia's Designation for Temporary Protected Status,* 81 FR 66059 (Sept. 26, 2016) (nearly 2 years, with 6-month orderly transition period). Those countries, however, generally had been designated for TPS for longer periods, and none of those terminations were based on a determination that allowing the aliens to remain temporarily in the United States is contrary to the U.S. national interest. At the same time, certain other TPS designations were terminated without allowing for an extended transition period. *See, e.g., Termination of Designation of Angola Under the Temporary Protected Status Program,* 68 FR 3896 (Jan. 27, 2003) (nearly 3 years, no orderly transition period); *Termination of Designation of Lebanon Under Temporary Protected Status Program,* 58 FR 7582

**Venezuelan Nationals Registered Under the 2021 Venezuela Designation**

Although unorthodox, the prior Administration issued two separate designations of Venezuela. *See* 88 FR 68130 (Oct. 3, 2023); 86 FR 13574 (Mar. 9, 2021). In this notice, DHS is terminating only the October 3, 2023 Venezuela TPS designation. The 2021 Venezuela TPS designation remains in effect until September 10, 2025.

**Notice of Termination of the 2023 TPS Designation of Venezuela**

By the authority vested in the Secretary of Homeland Security under section 244(b)(3) of the INA, 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with appropriate agencies of the U.S. Government, (a) conditions in Venezuela; and (b) whether permitting the nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States is contrary to the national interest of the United States. Based on my review, I have determined that Venezuela no longer continues to meet the conditions for the October 3, 2023 designation for Temporary Protected Status (TPS) under section 244(b)(1)(C) of the Act, 8 U.S.C. 1254a(b)(1)(C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the October 3, 2023 designation of Venezuela for TPS is terminated effective at 11:59 p.m., local time, on April 7, 2025.

(2) This notice supersedes the January 17, 2025 notice at 90 FR 5961, the underlying decision for which was vacated on January 28, 2025.

(3) Information concerning the termination of TPS for nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) under the October 3, 2023 designation will be available at local USCIS offices upon publication of this notice and through the USCIS National Customer Service Center at 1–800–375–5283. This information will be published on the USCIS website at *www.USCIS.gov.*

**Kristi Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–02294 Filed 2–3–25; 12:15 pm]

**BILLING CODE 9111–97–P**

---

(Feb. 8, 1993) (2 years, no extended transition period).

## INTERNATIONAL TRADE COMMISSION

**[Investigation Nos. 701–TA–453 and 731–TA–1136–1137 (Third Review)]**

**Sodium Nitrite From China and Germany**

**Determinations**

On the basis of the record [1] developed in the subject five-year reviews, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that revocation of the antidumping and countervailing duty orders on sodium nitrite from China and the antidumping duty order on sodium nitrite from Germany would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.[2]

**Background**

The Commission instituted these reviews on July 1, 2024 (89 FR 54536) and determined on October 4, 2024 that it would conduct expedited reviews (89 FR 85986, October 29, 2024).

The Commission made these determinations pursuant to section 751(c) of the Act (19 U.S.C. 1675(c)). It completed and filed its determinations in these reviews on January 31, 2025. The views of the Commission are contained in USITC Publication 5582 (January 2025), entitled *Sodium Nitrite from China and Germany: Investigation Nos. 701–TA–453 and 731–TA–1136–1137 (Third Review).*

By order of the Commission.

Issued: January 31, 2025.

**Lisa Barton,**

*Secretary to the Commission.*

[FR Doc. 2025–02260 Filed 2–4–25; 8:45 am]

**BILLING CODE 7020–02–P**

---

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

[2] Commissioner Rhonda K. Schmidtlein not participating.

## DEPARTMENT OF JUSTICE

**Notice of Cancellation of Task Force on Research on Violence Against American Indian and Alaska Native Women Meeting**

**AGENCY:** Office on Violence Against Women, United States Department of Justice.

**ACTION:** Notice; cancellation of meeting.

The Office on Violence Against Women (OVW), U.S. Department of

Decision Document

## USCIS Notice: Determination re Venezuela's 2023 Temporary Protected Status Designation

(1) Terminate Venezuela's 2023 Temporary Protected Status Designation and (2) Direct an appropriate ESEC office to use the DAC-Federal Register Signature Card to electronically sign the document for publication in the Federal Register

FEB 0 1 2025

Date.

**Decision Document**

USCIS Notice: Extension of the 2023 Designation of Venezuela for Temporary Protected Status.



Approve. (1) Extend the 2023 Designation of Venezuela for TPS for 18 months, (2) approve the notice for formal submission to the Office of Information and Regulatory Affairs, (3) direct an appropriate ESEC official to use the Federal Register Signature Card to electronically sign the notice for publication in the *Federal Register*, and (4) approve the consolidation of filing processes such that all eligible Venezuela TPS beneficiaries may obtain TPS through the same extension date of October 2, 2026.



1-10·25

Date.

9111-97

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2803-25]**

**Vacatur of 2025 Temporary Protected Status Decision for Venezuela**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) vacatur.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) has decided to vacate the January 10, 2025 decision of former Secretary of Homeland Security Alejandro Mayorkas regarding TPS for Venezuela. Former Secretary Mayorkas (1) extended the 2023 designation of Venezuela for TPS for 18 months, (2) allowed a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) may obtain TPS through the same extension date of October 2, 2026, and (3) extended certain Employment Authorization Documents (EADs). All of this also had the effect of extending the 2021 designation. This notice vacates Mayorkas' notice immediately.

**DATES:** The vacatur is effective immediately.

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800-375-5283.

**SUPPLEMENTARY INFORMATION:**

1

## I.    Temporary Protected Status (TPS) Generally

The Immigration and Nationality Act (INA) authorizes the Secretary, after consultation with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. INA 244(b)(1), 8 U.S.C. 1254a(b)(1)[1]. The determination whether to designate any foreign state (or part thereof) for TPS is discretionary, and there is no judicial review of "any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in the Secretary's discretion, may then grant TPS to eligible nationals of that foreign state (or individual aliens having no nationality who last habitually resided in the designated foreign state). *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the

---

[1] Although section 244(b)(1) of the INA continues to refer to the Attorney General, this authority now resides with the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, as amended. *See, e.g.*, 6 U.S.C. 557; 8 U.S.C. 1103(a)(1). The Secretary may designate a country (or part of a country) for TPS on the basis of (1) an ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals, (2) an environmental disaster (including an epidemic), or (3) extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must officially request a TPS designation. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1).

2

Secretary's discretion, 12 or 18 months. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A),

(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS

designation, the Secretary must terminate the designation. *See* INA 244(b)(3)(B), 8 U.S.C.

1254a(b)(3)(B).

## II.    Background

On March 9, 2021, Secretary Mayorkas designated Venezuela for TPS on the basis of

extraordinary and temporary conditions in Venezuela that prevented nationals of Venezuela from

returning in safety (2021 designation). *See Designation of Venezuela for Temporary Protected*

*Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred*

*Enforced Departure*, 86 FR 13574 (Mar. 9, 2021).

On September 8, 2022, DHS extended the Venezuela 2021 TPS designation for 18

months. *See Extension of the Designation of Venezuela for Temporary Protected Status*, 87 FR

55024 (Sept. 8, 2022). On October 3, 2023, DHS extended the Venezuela 2021 TPS designation

for another 18 months with an expiration date of September 10, 2025, and separately newly

designated Venezuela, which then Secretary Mayorkas called a "redesignation," for 18 months

(the Venezuela 2023 designation) with an expiration of April 2, 2025, resulting in two separate

and concurrent Venezuela TPS designations. *See Extension and Redesignation of Venezuela for*

*Temporary Protected Status*, 88 FR 68130 (Oct. 3, 2023).

The Venezuela 2023 TPS designation expires on April 2, 2025, and the Secretary must

make a decision by February 1, 2025. The Venezuela 2021 TPS designation expires on

September 10, 2025, and the Secretary must make a decision by July 12, 2025. Notwithstanding

the fact that these are both decisions that would lie with new Secretary of Homeland Security

Kristi Noem, Secretary Mayorkas took action with respect to both designations.

3

On January 17, 2025, Secretary Mayorkas issued a notice extending the 2023 designation of Venezuela for TPS for 18 months (Mayorkas Notice). The notice was based on Secretary Mayorkas' January 10, 2025 determination that the conditions for the designation continued to be met. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). In the Mayorkas Notice, Secretary Mayorkas did not expressly extend or terminate the 2021 designation. Instead, the notice allowed for a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through the same extension date of October 2, 2026. *See Extension of the 2023 Designation of Venezuela for Temporary Protected Status*, 90 FR 5961 (Jan. 17, 2025). The notice also extended certain EADs. The effect of Secretary Mayorkas' actions, however, resulted in an extension of the 2021 Venezuela TPS designation.

## III.    Vacatur of the 2025 Decision

The Secretary of Homeland Security is vacating the January 10, 2025 decision of Secretary Mayorkas which (1) extended the 2023 Venezuela TPS designation and (2) allowed the consolidation of filing processes for both designations, which had the effect of extending the 2021 Venezuela TPS designation, and (3) extended certain EADs. An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination.[2]

---

[2] *See* INA 103(a), 244(b)(3), (b)(5)(A); 8 U.S.C. 1103(a), 1254a(b)(3), (b)(5)(A); *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary*

4

## A.    Reason for the Vacatur

The Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation. As described above, Secretary Mayorkas explicitly made a determination to extend the 2023 designation. While he did not make an explicit determination to extend the 2021 designation, he did allow consolidated filing processes for both the 2021 and 2023 designations, which in effect extended the 2021 designation by up to 13 months. Furthermore, he allowed extensions for certain EADs.

The Mayorkas Notice states that *Existing TPS beneficiaries, including those registered under the October 3, 2023 TPS designation or the prior March 9, 2021 TPS designation, who wish to extend their status through October 2, 2026, must re-register during the re-registration period described in* the January 2025 decision. This, and other language in the Mayorkas Notice, indicate that the practical effect of Secretary Mayorkas' decision was to combine both designations and to provide an extension until October 2, 2026, for the population of *both* designations.

---

*Protected Status Designation for El Salvador*, 88 FR 40282, 40285 (June 21, 2023) ("An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination."); *see also, e.g.*, *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . "[I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide." (quotation marks and citations omitted)); *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) ("It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time."); *cf. Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) (agencies possess especially "broad authority to correct their prior errors").

5

The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]"). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.[3]

Given the exceedingly brief period in which the January 17, 2025 extension notice has been in effect and the fact that the effect of this vacatur will restore the status quo preceding that notice, any putative reliance interests on the extension notice are negligible. Venezuela 2023 registrants will retain their temporary protected status under the pre-existing designation at least until April 2, 2025. With respect to any Venezuela 2021 registrants who elected, pursuant to the Mayorkas Notice, to register under the Venezuela 2023 designation, USCIS will restore their Venezuela 2021 registration. And, in any event, any putative reliance interests arguably engendered by the Mayorkas Notice are outweighed by the overriding interests and concerns articulated in this notice.

### B.     Effect of the Vacatur

---

[3] *See* Exec. Order, *Protecting the American People Against Invasion*, sec. 16(b) (Jan. 20, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/.

As a result of the vacatur, the 2021 Venezuela TPS designation and the 2023 Venezuela designation remain in effect and their associated statutory deadlines remain in effect. The statutory deadline[4] for each of those designations is as follows: The Secretary (1) must determine, by February 1, 2025, whether to extend or terminate the 2023 Venezuela TPS designation and (2) must determine, by July 12, 2025, whether to extend or terminate the 2021 Venezuela TPS designation.

If the Secretary does not make a timely determination (for example, if the Secretary were *not* to make determination by February 1, 2025 whether to extend or terminate the 2023 Venezuela TPS designation), then the statute provides for an automatic extension of the designation for an additional period of 6 months. INA 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

Pursuant to this vacatur, USCIS will no longer accept Venezuela TPS re-registration applications (Form I-821) and associated Applications for Employment Authorization (Form I-765) filed under the Mayorkas Notice. For TPS beneficiaries who have already filed applications to re-register for TPS pursuant to the Mayorkas Notice and paid any fees associated with their applications, USCIS will cease processing their applications, and issue refunds of any fees paid by those aliens.[5] Additionally, USCIS will invalidate EADs; Forms I-797, Notice of Action (Approval Notice); and Forms I-94, Arrival/Departure Record (collectively known as TPS-related documentation) that have been issued with October 2, 2026 expiration dates under the Mayorkas Notice. USCIS will provide refunds to any fees paid by these aliens as well.

---

[4] If there is an existing TPS designation for a foreign state, the Secretary must review country conditions in consultation with appropriate U.S. Government agencies and make a determination—at least 60 days before the designation is set to expire—whether to extend or terminate that country's TPS designation (i.e., whether the conditions for the designation continue to be met). INA 244(b)(3), 8 U.S.C. 1254a(b)(3).

[5] As noted above, any Venezuela 2021 registrants who elected, pursuant to the Mayorkas Notice, to register under the Venezuela 2023 designation will have their Venezuela 2021 registration restored.

7

Additionally, pursuant to this vacatur the automatic EAD extensions provided in the Mayorkas Notice are hereby rescinded. USCIS will provide additional guidance regarding the two Venezuela TPS designations on a future date in accordance with applicable laws.

## IV.    Notice of Vacatur of Secretary Mayorkas' 2025 Decision

By the authority vested in me as Secretary under section 244 of the Immigration and Nationality Act, 8 U.S.C. 1254a, I am vacating the decisions announced in the January 17, 2025 notice titled *Extension of the 2023 Designation of Venezuela for TPS*. In doing so, I am vacating the (1) extension of the Venezuela 2023 TPS designation, (2) the consolidation of filing processes for both designations, which, in effect, resulted in the extension of the 2021 TPS designation, and (3) the EADs that were extended. As a result, the Venezuela 2023 TPS designation and the Venezuela 2021 TPS designation remain in effect and their associated statutory deadlines remain in effect.

**Kristi Noem**
Secretary
U.S. Department of Homeland Security

8

**[9111-97]**

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

## [CIS No. 2804-25]

## Termination of the October 3, 2023 Designation of Venezuela for

## Temporary Protected Status

**AGENCY:**  U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

**ACTION:**  Notice.

**SUMMARY:**  On October 3, 2023, Venezuela was newly designated for Temporary Protected Status (TPS) based on the determination that there were extraordinary and temporary conditions in that country that prevented the safe return of Venezuelan nationals, and that permitting such Venezuelan nationals to remain temporarily in the United States is not contrary to the U.S. national interest.  The 2023 designation of Venezuela for TPS is set to expire on April 2, 2025.  After reviewing country conditions and considering whether permitting Venezuelan nationals covered by the 2023 designation is contrary to the national interest of the United States, in consultation with the appropriate U.S. Government agencies, the Secretary of Homeland Security has determined that Venezuela no longer continues to meet the conditions for the 2023 designation.  In particular, the Secretary has determined it is contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States.  The Secretary therefore is terminating the 2023 TPS designation of Venezuela.

1

This termination is effective **[INSERT DATE 60 DAYS FROM THE DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.

After **[INSERT DATE 60 DAYS FROM THE DATE OF PUBLICATION IN THE FEDERAL REGISTER]**, nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) who have been granted TPS under the 2023 Venezuela designation will no longer have TPS. This termination determination does not apply to the 2021 designation of Venezuela for TPS, which remains in effect until September 10, 2025, or to individuals who are registered for TPS under the 2021 designation.

**EFFECTIVE DATE:** The October 3, 2023 designation of Venezuela for TPS is terminated effective at 11:59 p.m., local time, on **[INSERT DATE 60 DAYS FROM THE DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800-375-5283.

**SUPPLEMENTARY INFORMATION:**

**What Is Temporary Protected Status (TPS)?**

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. INA 244(b)(1), 8 U.S.C. 1254a(b)(1). The determination whether to designate any foreign state (or part thereof) for TPS is discretionary, and there is no judicial review of "any determination of the [Secretary]

2

with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in the Secretary's discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for TPS designation, TPS will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

TPS is a temporary immigration benefit granted to eligible nationals of a country designated for TPS under the INA, or to eligible aliens without nationality who last habitually resided in the designated country. During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain an Employment Authorization Document (EAD) so long as they continue to meet the requirements of TPS. TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of TPS does

not result in or lead to lawful permanent resident status or any other immigration status. To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2). When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated), or any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

**Designation of Venezuela for TPS**

On March 9, 2021, then Secretary of Homeland Security Alejandro Mayorkas designated Venezuela for TPS based on his determination that there existed "extraordinary and temporary conditions" in Venezuela that prevented nationals of Venezuela from returning in safety and that permitting such aliens to remain temporarily in the United States is not contrary to the U.S. national interest (Venezuela 2021 designation). *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure*, 86 FR 13574 (Mar. 9, 2021).

On September 8, 2022, then Secretary Mayorkas extended the Venezuela 2021 TPS designation for 18 months. *See Extension of the Designation of Venezuela for Temporary Protected Status*, 87 FR 55024 (Sept. 8, 2022). On October 3, 2023, Secretary Mayorkas extended the Venezuela 2021 TPS designation for another 18 months with an expiration date of September 10, 2025, and separately newly designated Venezuela for 18 months, a decision the former Secretary called a "redesignation" (Venezuela 2023 designation) with an expiration of April 2, 2025, resulting in two

4

separate and concurrent Venezuela TPS designations.  *See Extension and Redesignation of Venezuela for Temporary Protected Status*, 88 FR 68130 (Oct. 3, 2023).

On January 17, 2025, Secretary Mayorkas issued a notice extending the 2023 designation of Venezuela for TPS for 18 months.  The notice was based on then Secretary Mayorkas's January 10, 2025 determination that the conditions for the designation continued to be met.  *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C).  In the January 2025 notice, Secretary Mayorkas did not expressly extend or terminate the 2021 Venezuela designation.  Instead, the notice allowed for a consolidation of filing processes such that all eligible Venezuela TPS beneficiaries (whether under the 2021 or 2023 designations) could obtain TPS through the same extension date of October 2, 2026.  *See Extension of the 2023 Designation of Venezuela for Temporary Protected Status*, 90 FR 5961 (Jan. 17, 2025).

On January 28, 2025, Secretary of Homeland Security Kristi Noem vacated former Secretary Mayorkas's January 10, 2025 decision, restoring the status quo that preceded that decision.[1]  Accordingly, a determination whether to extend the 2023 Venezuela designation was due by February 1, 2025.  The Department of Homeland Security (DHS or Department) estimates that approximately 348,202 aliens are eligible for TPS under the 2023 Venezuela designation.

**Secretary's Authority to Terminate the 2023 Designation of Venezuela for TPS**

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must

---

[1] *See Vacatur of 2025 Temporary Protected Status Decision for Venezuela*, available at https://www.federalregister.gov/public-inspection/2025-02183/vacatur-of-2025-temporary-protected-status-decision-for-venezuela.

review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation, but such termination may not take effect earlier than 60 days after the date the *Federal Register* notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs. *See id.*; *see also* INA 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary "option" to allow for a certain "orderly transition" period if she determines it to be appropriate).

**Reasons for the Secretary's Termination of the 2023 TPS Designation for Venezuela**

Consistent with section 244(b)(3)(A) of the INA, 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, DHS reviewed conditions in Venezuela and considered whether permitting the Venezuelan nationals to remain temporarily in the United States is contrary to the national interest of the United States.[2]

The Department, in consultation with the Department of State, has reviewed conditions in Venezuela and has considered whether permitting Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest. Overall,

---

[2] *See also* Exec. Order 14159, *Protecting the American People Against Invasion*, sec. 16(b), 90 FR 8443, 8446 (Jan. 20, 2025) (directing that the Secretary should "ensur[e] that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute").

VZ Termination_0021

certain conditions for the 2023 TPS designation of Venezuela may continue; however, there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country.

Based on the Department's review, the Secretary has determined that, even assuming the relevant conditions in Venezuela remain both "extraordinary" and "temporary," termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals (or aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States.[3]

In the TPS statute, Congress expressly prohibits the Secretary from designating a country for TPS or extending a TPS designation if she finds that "permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States."  INA 244(b)(1), 8 U.S.C. 1254a(b)(1).  Accordingly, as the Department and the Attorney General have long recognized, such a "national interest" assessment is an essential element of a determination whether to extend or terminate the 2023 Venezuela designation, which was based on "extraordinary and temporary conditions."[4]

"National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration

---

[3] *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

[4] *Cf., e.g.*, *Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension*, 63 FR 15437, 15438 (Mar. 31, 1998) (terminating Liberia TPS designation after "consultations with the appropriate agencies of the U.S. Government concerning (a) the conditions in Liberia; and (b) whether permitting nationals of Liberia . . . to remain temporarily in the United States is contrary to the national interest of the United States").

VZ Termination_0022

policy (e.g., enforcement prerogatives), and economic considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities).[5]  Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

President Trump in his recent, immigration and border-related executive orders and proclamations clearly articulated an array of policy imperatives bearing upon the national interest.  First, the President directed the Secretary to terminate, as contrary to the policy of the United States, the parole program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans" (CHNV).  The parole process for Venezuelans had been in effect since October 19, 2022, allowing hundreds of thousands of inadmissible Venezuelans to enter the United States at interior ports of entry and remain in this country, generally for a period of two years, with employment authorization eligibility.[6]  DHS estimates that 33,600 CHNV parolees from Venezuela availed themselves of TPS. Venezuelan CHNV parolees, along with Venezuelan nationals who crossed illegally into the United States, who had been continuously residing in the United States since July 31, 2023 and continuously present in the United States since October 3,

---

[5] *See, e.g.*, *Poursina v. USCIS*, 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts" (citing *Trump v. Hawaii*, 585 U.S. 667, 684-86 (2018)); *Flores v. Garland*, 72 F.4th 85, 89-90 (5th Cir. 2023) (same); *Brasil v. Sec'y, Dep't of Homeland Sec.*, 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D-J-*, 23 I&N Dec. 572, 579-81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country is "sound immigration policy" and an "important national security interest"); *Matter of Dhanasar*, 26 I&N Dec. 884, 890-91 (AAO 2016) (taking into account impact on U.S. workers in "national interest" assessments).

[6] *See Implementation of a Parole Process for Venezuelans*, 87 FR 63507 (Oct. 19, 2022); *see also Implementation of Changes to the Parole Process for Venezuelans*, 88 FR 1279 (Jan. 9, 2023).

2023 were able to secure TPS and TPS-based employment authorization under the 2023 Venezuela designation.

TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States, and the sheer numbers have resulted in associated difficulties in local communities where local resources have been inadequate to meet the demands caused by increased numbers. Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua.[7]  Tren de Agua has been blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants.  The United States has sanctioned the gang and placed it on a list of transnational criminal organizations.[8]  In Executive Order 14157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, the President determined that Tren de Aragua's campaign of violence and terror poses threats to the United States.[9]  The Secretary accordingly has considered these important immigration and national interests in terminating the Venezuela parole process.

Second, President Trump observed, referring to CHNV and other policies and processes, that "[o]ver the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States," including

---

[7] Joshua Goodman, Tren de Aragua gang started in Venezuela's prisons and now spreads fear in the US, Associated Press, Sept. 24, 2024, available at: https://apnews.com/article/tren-de-aragua-gang-venezuela-us-a12c8fee9dc4a0ca73769ea893e09e53 (last accessed Jan. 28, 2025).

[8] Joshua Goodman, US sanctions a Venezuela gang for spreading criminal activity across Latin America, Associated Press, July 11, 2024, available at: https://apnews.com/article/washington-venezuela-gang-sanctions-f742f6966d160ee80b703ed419dfdac3 (last accessed Jan. 30, 2025).

[9] 90 FR 8439 (Jan. 20, 2025).

9

millions who crossed U.S. borders or were allowed to fly to a U.S. air port of entry and allowed to settle in American communities.[10]  The prolonged presence of these aliens in the United States "has cost taxpayers billions of dollars at the Federal, State, and local levels."[11]  For example, over 180,000 illegal aliens have settled in New York City, approximating that this will cost the city $10.6 billion through the summer of 2025.[12]  Additionally, although mayors from cities across the United States are attempting to accommodate Venezuelan illegal aliens, city shelters, police stations, and aid services are at a maximum capacity.[13]

The President underscored that enforcing the immigration laws "is critically important to the national security and public safety of the United States."[14]  In furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States.[15]  Among the directed actions are to ensure that the TPS designations are consistent with the TPS statute and "are appropriately limited in scope and made for only

---

[10] Exec. Order 14159, *Protecting the American People Against Invasion*, sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).

[11] *Id.*

[12] *The Cost of the Border Crisis*, Testimony before the House Budget Committee of Julie Kirchner the Executive Director, Federation for American Immigration Reform (May 8, 2024), available at: https://www.congress.gov/118/meeting/house/117257/witnesses/HHRG-118-BU00-Wstate-KirchnerJ-20240508.pdf (last accessed Jan. 30, 2025).

[13] Center for Strategic & International Studies, *The Persistence of the Venezuelan Migrant and Refugee Crisis* (Nov. 27, 2023), available at: https://www.csis.org/analysis/persistence-venezuelan-migrant-and-refugee-crisis (last accessed Jan. 30, 2025).

[14] Exec. Order 14159, *Protecting the American People Against Invasion*, sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).

[15] *Id.*, sec. 16, 90 FR at 8446.

10

so long as may be necessary to fulfill the textual requirements of that statute."[16]  The Department accordingly has reappraised the national interest factors and given strong consideration to the serious national security, border enforcement, public safety, immigration policy, and economic and public welfare concerns engendered by illegal immigration of Venezuelans, which the President, DHS, and other federal agencies are seeking to stem through other policy actions.

Third, President Trump declared a national emergency at the southern border.[17] As the Attorney General and DHS have long understood, the potential "magnet effect" of a TPS determination is a permissible factor under the TPS statute, especially with respect to a redesignation.[18]  The same is true for Venezuela.[19]  The anticipated designation or extension for TPS and resulting benefit to access EAD have been pull factors driving Venezuelan nationals to the United States.[20]  In October 2023, DHS stated that there were approximately 243,000 Venezuela TPS beneficiaries, while also estimating that approximately *472,000 additional aliens* may be eligible under the October 3, 2023 designation.[21]  Currently, DHS estimates that 348,202 aliens are registered under the 2023 designation.

---

[16] *Id.*, sec. 16(b), 90 FR at 8446.

[17] Proc. 10886, *Declaring a National Emergency at the Southern Border of the United States*, 90 FR 8327 (Jan. 20, 2025).

[18] *See Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program*, 62 FR 16608, 16609 (Apr. 7, 1997) ("One factor in determining whether redesignation is appropriate is whether it will create a 'magnet effect' for nationals of the country under consideration. In cases where the Attorney General contemplates redesignation, she may consider this possible magnet effect and any other factors weighing against redesignation, together with any discretionary factors in favor of redesignation.").

[19] *See, e.g.*, Center for Strategic & International Studies, *The Persistence of the Venezuelan Migrant and Refugee Crisis* (Nov. 27, 2023), available at: https://www.csis.org/analysis/persistence-venezuelan-migrant-and-refugee-crisis (last accessed Jan. 30, 2025).

[20] *See id.*

[21] 88 FR at 68134.

VZ Termination_0026

Fourth, as the President directed in Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first."[22]  Continuing to permit Venezuelans under the 2023 TPS designation to remain in the United States does not champion core American interests or put American interests first.  U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration.[23]

In making this finding and determination regarding the national interest, the Secretary also has taken into account the national-interest-related factors that were presented to former Secretary Mayorkas for his consideration for purposes of his now-vacated January 10, 2025 decision.  However, especially in view of President Trump's Executive Orders relating to immigration and after consulting with the Department of State, the Secretary has reached a different conclusion and has determined that permitting such Venezuelan nationals (and aliens with no nationality who last habitually resided in Venezuela) to remain in the United States is in fact contrary to the national interest, as is the Secretary's authority and prerogative under the statute.[24]

---

[22] *America First Policy Directive to the Secretary of State*, 90 FR 8337 (Jan. 20, 2025).

[23] *See* U.S. Dep't of State, *Priorities and Mission of the Second Trump Administration's Department of State* (Jan. 24, 2025), available at https://pa.usembassy.gov/priorities-and-mission-of-the-second-trump-administrations-department-of-state/.

[24] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (Rehnquist, J., concurring in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations. As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration.").

VZ Termination_0027

**Effective Date of Termination of 2023 Designation**

The TPS statute provides that the termination of a country's TPS designation may not be effective earlier than 60 days after the Federal Register notice is published or, if later, the expiration of the most recent previous extension. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). As noted, the expiration date of the 2023 Venezuela designation is 60 days from the date of publication of this notice.

The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs, for the purpose of providing for an orderly transition. *See id.*; INA 244(d)(3), 8 U.S.C. 1254a(d)(3). Given the Secretary's finding that continuing to permit such Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest, and considering the relative recency of the designation (Oct. 3, 2023), the Secretary has determined that it is not appropriate to allow for a further transition period. Accordingly, the termination of the October 3, 2023 Venezuela TPS designation will be effective 60 days from the date of publication of this notice.[25]

The Secretary has considered putative reliance interests in the 2023 Venezuela TPS designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous TPS terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status, TPS designations are time-limited and must be periodically reviewed, TPS notices

---

[25] *See* 8 CFR 244.19 ("Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the Federal Register, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.").

VZ Termination_0028

clearly notify aliens of the designations' expiration dates, and whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). Any putative reliance interests of registrants under the Venezuela 2023 designation therefore merit only diminished weight. Moreover, any such putative reliance interests are outweighed by the overriding, important national interest considerations described in this notice.[26]

**Venezuelan Nationals Registered Under the 2021 Venezuela Designation**

Although unorthodox, the prior Administration issued two separate designations of Venezuela. *See* 88 FR 68130 (Oct. 3, 2023); 86 FR 13574 (Mar. 9, 2021). In this notice, DHS is terminating only the October 3, 2023 Venezuela TPS designation. The 2021 Venezuela TPS designation remains in effect until September 10, 2025.

**Notice of Termination of the 2023 TPS Designation of Venezuela**

By the authority vested in the Secretary of Homeland Security under section 244(b)(3) of the INA, 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with appropriate agencies of the U.S. Government, (a) conditions in Venezuela; and (b)

---

[26] DHS recognizes that certain previous TPS terminations allowed for an extended transition, especially in the case of TPS designations that had been extended numerous times over the course of many years. *See, e.g.*, *Termination of the Designation of El Salvador for Temporary Protected Status*, 83 FR 2654 (Jan. 18, 2018) (nearly 17 years, with 18-month transition period); *Termination of the Designation of Sudan for Temporary Protected Status*, 82 FR 47228 (Oct. 11, 2017) (20 years, with 12-month orderly transition period); *Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation*, 68 FR 52407 (Sept. 3, 2003) (nearly 6 years, with 6-month orderly transition period); *Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Liberia's Designation for Temporary Protected Status*, 81 FR 66059 (Sept. 26, 2016) (nearly 2 years, with 6-month orderly transition period). Those countries, however, generally had been designated for TPS for longer periods, and none of those terminations were based on a determination that allowing the aliens to remain temporarily in the United States is contrary to the U.S. national interest. At the same time, certain other TPS designations were terminated without allowing for an extended transition period. *See. e.g.*, *Termination of Designation of Angola Under the Temporary Protected Status Program*, 68 FR 3896 (Jan. 27, 2003) (nearly 3 years, no orderly transition period); *Termination of Designation of Lebanon Under Temporary Protected Status Program*, 58 FR 7582 (Feb. 8, 1993) (2 years, no extended transition period).

14

whether permitting the nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States is contrary to the national interest of the United States.  Based on my review, I have determined that Venezuela no longer continues to meet the conditions for the October 3, 2023 designation for Temporary Protected Status (TPS) under section 244(b)(1)(C) of the Act, 8 U.S.C. 1254a(b)(1)(C).

Accordingly, I order as follows:

(1)  Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the October 3, 2023 designation of Venezuela for TPS is terminated effective at 11:59 p.m., local time, on **[INSERT DATE 60 DAYS FROM THE DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.

(2)  This notice supersedes the January 17, 2025 notice at 90 FR 5961, the underlying decision for which was vacated on January 28, 2025.

(3)  Information concerning the termination of TPS for nationals of Venezuela (and aliens having no nationality who last habitually resided in Venezuela) under the October 3, 2023 designation will be available at local USCIS offices upon publication of this Notice and through the USCIS National Customer Service Center at 1-800-375-5283.  This information will be published on the USCIS Web site at www.USCIS.gov.

_____
**Kristi Noem,**
Secretary of Homeland Security.

15

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

# Matter of DHANASAR, Petitioner

*Decided December 27, 2016*

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Administrative Appeals Office

USCIS may grant a national interest waiver if the petitioner demonstrates: (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that he or she is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the job offer and labor certification requirements. *Matter of New York State Dep't of Transp.*, 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998), vacated.

ON BEHALF OF PETITIONER:  Gerard M. Chapman, Esquire, Greensboro, North Carolina

In this decision, we have occasion to revisit the analytical framework for assessing eligibility for "national interest waivers" under section 203(b)(2)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(2)(B)(i) (2012). The self-petitioner, a researcher and educator in the field of aerospace engineering, filed an immigrant visa petition seeking classification under section 203(b)(2) of the Act as a member of the professions holding an advanced degree. The petitioner also sought a "national interest waiver" of the job offer otherwise required by section 203(b)(2)(A).

The Director of the Texas Service Center denied the petition under the existing analytical framework, concluding that the petitioner qualifies for classification as a member of the professions holding an advanced degree but that a waiver of the job offer requirement would not be in the national interest of the United States. Upon de novo review, and based on the revised national interest standard adopted herein, we will sustain the appeal and approve the petition.

## I. LEGAL BACKGROUND

Subparagraph (A) of section 203(b)(2) of the Act makes immigrant visas available to "qualified immigrants who are members of the professions holding advanced degrees or their equivalent or who because of their exceptional ability in the sciences, arts, or business, will substantially benefit prospectively the national economy, cultural or educational

884

interests, or welfare of the United States." Under subparagraph (A), immigrant visas are available to such individuals only if their "services in the sciences, arts, professions, or business are sought by an employer in the United States."

Before hiring a foreign national under this immigrant classification, an employer must first obtain a permanent labor certification from the United States Department of Labor ("DOL") under section 212(a)(5)(A)(i) of the Act, 8 U.S.C. § 1182(a)(5)(A)(i) (2012). *See also* 8 C.F.R. § 204.5(k)(4)(i) (2016). A labor certification demonstrates that DOL has determined that there are not sufficient workers who are able, willing, qualified, and available at the place where the alien is to perform such skilled or unskilled labor, and the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed. In its labor certification application, the employer must list the position's job requirements consistent with what is normally required for the occupation. *See* 20 C.F.R. § 656.17(h)(1) (2016). Moreover, the job requirements described on the labor certification application must represent the actual minimum requirements for the job opportunity. *See* 20 C.F.R. § 656.17(i)(1). That is, the employer may not tailor the position requirements to the foreign worker's qualifications; it may only list the position's minimum requirements, regardless of the foreign worker's additional skills that go beyond what is normally required for the occupation. The employer must then test the labor market to determine if able, willing, or qualified U.S. workers are available with the advertised minimum qualifications. If such U.S. workers are found, the employer may not hire the foreign worker for the position, even if the foreign worker clearly has more skills (beyond the advertised qualifications). If the employer does not identify such U.S. workers and DOL determines that those workers are indeed unavailable, DOL will certify the labor certification. After securing the DOL-approved labor certification, the employer may then file a petition with DHS requesting the immigrant classification.

Under subparagraph (B) of section 203(b)(2), however, the Secretary of Homeland Security may waive the requirement of a "job offer" (namely, that the beneficiary's services are sought by a U.S. employer) and, under the applicable regulations, of "a labor certification." 8 C.F.R. § 204.5(k)(4)(ii).[1] That subparagraph states, in pertinent part, that the

---

[1] While appearing to limit national interest waivers to only aliens possessing exceptional ability in the sciences, arts, or business, 8 C.F.R. § 204.5(k)(4)(ii) was superseded in part by section 302(b)(2) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, 105 Stat. 1733, 1743

(continued . . .)

Secretary "may, when the [Secretary] deems it to be in the national interest, waive the requirements of subparagraph (A) that an alien's services in the sciences, arts, professions, or business be sought by an employer in the United States."[2] Section 203(b)(2)(i) of the Act.

USCIS may grant a national interest waiver as a matter of discretion if the petitioner satisfies both subparagraphs (A) and (B). Thus, a petitioner who seeks a "national interest waiver" must first satisfy subparagraph (A) by demonstrating that the beneficiary qualifies as a member of the professions holding an advanced degree or as an individual of exceptional ability. *See* 8 C.F.R. § 204.5(k)(1)–(3) (providing definitions and considerations for making such determinations); *see also* section 203(b)(2)(C) of the Act (providing that possession of requisite academic degree or professional license "shall not by itself be considered sufficient evidence of exceptional ability"). The petitioner must then satisfy subparagraph (B) by establishing that it would be in the national interest to waive the "job offer" requirement under subparagraph (A).[3] *See* 8 C.F.R. § 204.5(k)(4)(ii). This two-part statutory scheme is relatively straightforward, but the term "national interest" is ambiguous. Undefined by statute and regulation, "national interest" is a broad concept subject to various interpretations.

In 1998, under the legacy Immigration and Naturalization Service, we issued a precedent decision establishing a framework for evaluating national interest waiver petitions. *Matter of New York State Dep't of Transp.* ("*NYSDOT*"), 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998).

_____

("MTINA"). Section 302(b)(2) of MTINA amended section 203(b)(2)(B)(i) of the Act by inserting the word "professions" after the word "arts," and thereby made the national interest waiver available to members of the professions holding advanced degrees in addition to individuals of exceptional ability.

[2]   Pursuant to section 1517 of the Homeland Security Act ("HSA") of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2311 (codified at 6 U.S.C. § 557 (2012)), any reference to the Attorney General in a provision of the Act describing functions that were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. *See also* 6 U.S.C. § 542 note (2012); 8 U.S.C. § 1551 note (2012).

[3]   To do so, a petitioner must go beyond showing the individual's expertise in a particular field. The regulation at 8 C.F.R. § 204.5(k)(2) defines "exceptional ability" as "a degree of expertise significantly above that ordinarily encountered" in a given area of endeavor. By statute, individuals of exceptional ability are generally subject to the job offer/labor certification requirement; they are not exempt by virtue of their exceptional ability. Therefore, whether a given petitioner seeks classification as an individual of exceptional ability, or as a member of the professions holding an advanced degree, that individual cannot qualify for a waiver just by demonstrating a degree of expertise significantly above that ordinarily encountered in his field of expertise.

The *NYSDOT* framework looks first to see if a petitioner has shown that the area of employment is of "substantial intrinsic merit." *Id.* at 217. Next, a petitioner must establish that any proposed benefit from the individual's endeavors will be "national in scope." *Id.* Finally, the petitioner must demonstrate that the national interest would be adversely affected if a labor certification were required for the foreign national. *Id.*

Based on our experience with that decision in the intervening period, we believe it is now time for a reassessment. While the first prong has held up under adjudicative experience, the term "intrinsic" adds little to the analysis yet is susceptible to unnecessary subjective evaluation.[4] Similarly, the second prong has caused relatively few problems in adjudications, but occasionally the term "national in scope" is construed too narrowly by focusing primarily on the geographic impact of the benefit. While *NYSDOT* found a civil engineer's employment to be national in scope even though it was limited to a particular region, that finding hinged on the geographic connections between New York's bridges and roads and the national transportation system. Certain locally or regionally focused endeavors, however, may be of national importance despite being difficult to quantify with respect to geographic scope.

What has generated the greatest confusion for petitioners and adjudicators, however, is *NYSDOT*'s third prong. First, this prong is explained in several different ways within *NYSDOT* itself, leaving the reader uncertain what ultimately is the relevant inquiry. We initially state the third prong as requiring a petitioner to "demonstrate that the national interest would be adversely affected if a labor certification were required." *NYSDOT*, 22 I&N Dec. at 217. We then alternatively describe the third prong as requiring the petitioner to demonstrate that the individual "present[s] a national benefit so great as to outweigh the national interest inherent in the labor certification process." *Id.* at 218. Immediately thereafter, we restate the third prong yet again: the petitioner must establish that the individual will "serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications."[5] *Id.* Finally, in what may be construed as either a fourth restatement of prong three or as an explanation of how to satisfy it, we state that "it clearly must be established that the alien's past record justifies projections of future benefit to the national interest." *Id.* at 219. A footnote

---

[4]   *Cf., e.g.*, *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) ("'Intrinsic value' is an inherently subjective and speculative concept.").
[5]   Other, slight variations of the third prong emerge later in the decision. *See NYSDOT*, 22 I&N at 220 ("to a greater extent than U.S. workers"); *see also id.* at 221 ("considerably outweigh").

to this statement clarifies that USCIS seeks "a past history of demonstrable achievement with some degree of influence on the field as a whole." *Id.* at 219 n.6. Although residing in footnote 6, this "influence" standard has in practice become the primary yardstick against which petitions are measured.[6]

Second, and a more fundamental challenge than parsing its several restatements, *NYSDOT*'s third prong can be misinterpreted to require the petitioner to submit, and the adjudicator to evaluate, evidence relevant to the very labor market test that the waiver is intended to forego. The first iteration of prong three, that the national interest would be adversely affected if a labor certification were required, implies that petitioners should submit evidence of harm to the national interest. The third iteration, that the individual will serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications, suggests that petitioners should submit evidence comparing foreign nationals to unidentified U.S. workers. These concepts have proven to be difficult for many qualified individuals to establish or analyze in the abstract. It has proven particularly ill-suited for USCIS to evaluate petitions from self-employed individuals, such as entrepreneurs. In *NYSDOT*, we even "acknowledge[d] that there are certain occupations wherein individuals are essentially self-employed, and thus would have no U.S. employer to apply for a labor certification." *Id.* at 218 n.5. Nonetheless, we did not modify the test to resolve this scenario, which continues to challenge petitioners and USCIS adjudicators. Lastly, this concept of harm-to-national-interest is not required by, and unnecessarily narrows, the Secretary's broad discretionary authority to grant a waiver when he "deems it to be in the national interest."

## II. NEW ANALYTICAL FRAMEWORK

Accordingly, our decision in *NYSDOT* is ripe for revision. Today, we vacate *NYSDOT* and adopt a new framework for adjudicating national interest waiver petitions, one that will provide greater clarity, apply more flexibly to circumstances of both petitioning employers and self-petitioning

---

[6]  While this "influence" standard rests upon the reasonable notion that past success will often predict future benefit, our adjudication experience in the years since *NYSDOT* has revealed that there are some talented individuals for whom past achievements are not necessarily the best or only predictor of future success.

VZ Termination_0035

individuals, and better advance the purpose of the broad discretionary waiver provision to benefit the United States.[7]

Under the new framework, and after eligibility for EB-2 classification has been established, USCIS may grant a national interest waiver if the petitioner demonstrates by a preponderance of the evidence:[8] (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that the foreign national is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. If these three elements are satisfied, USCIS may approve the national interest waiver as a matter of discretion.[9]

The first prong, substantial merit and national importance, focuses on the specific endeavor that the foreign national proposes to undertake. The endeavor's merit may be demonstrated in a range of areas such as business, entrepreneurialism, science, technology, culture, health, or education. Evidence that the endeavor has the potential to create a significant economic impact may be favorable but is not required, as an endeavor's merit may be established without immediate or quantifiable economic impact. For example, endeavors related to research, pure science, and the furtherance of human knowledge may qualify, whether or not the potential accomplishments in those fields are likely to translate into economic benefits for the United States.

In determining whether the proposed endeavor has national importance, we consider its potential prospective impact. An undertaking may have national importance for example, because it has national or even global implications within a particular field, such as those resulting from certain improved manufacturing processes or medical advances. But we do not evaluate prospective impact solely in geographic terms. Instead, we look for broader implications. Even ventures and undertakings that have as their focus one geographic area of the United States may properly be considered to have national importance. In modifying this prong to assess "national

---

[7] Going forward, we will use "petitioners" to include both employers who have filed petitions on behalf of employees and individuals who have filed petitions on their own behalf (namely, self-petitioners).

[8] Under the "preponderance of the evidence" standard, a petitioner must establish that he or she more likely than not satisfies the qualifying elements. *Matter of Chawathe*, 25 I&N Dec. 369, 376 (AAO 2010). We will consider not only the quantity, but also the quality (including relevance, probative value, and credibility) of the evidence. *Id.*

[9] Because the national interest waiver is "purely discretionary," *Schneider v. Chertoff*, 450 F.3d 944, 948 (9th Cir. 2006), the petitioner also must show that the foreign national otherwise merits a favorable exercise of discretion. *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *cf. Matter of Jean*, 23 I&N Dec. 373, 383 (A.G. 2002).

VZ Termination_0036

importance" rather than "national in scope," as used in *NYSDOT*, we seek to avoid overemphasis on the geographic breadth of the endeavor. An endeavor that has significant potential to employ U.S. workers or has other substantial positive economic effects, particularly in an economically depressed area, for instance, may well be understood to have national importance.

The second prong shifts the focus from the proposed endeavor to the foreign national. To determine whether he or she is well positioned to advance the proposed endeavor, we consider factors including, but not limited to: the individual's education, skills, knowledge and record of success in related or similar efforts; a model or plan for future activities; any progress towards achieving the proposed endeavor; and the interest of potential customers, users, investors, or other relevant entities or individuals.

We recognize that forecasting feasibility or future success may present challenges to petitioners and USCIS officers, and that many innovations and entrepreneurial endeavors may ultimately fail, in whole or in part, despite an intelligent plan and competent execution. We do not, therefore, require petitioners to demonstrate that their endeavors are more likely than not to ultimately succeed. But notwithstanding this inherent uncertainty, in order to merit a national interest waiver, petitioners must establish, by a preponderance of the evidence, that they are well positioned to advance the proposed endeavor.

The third prong requires the petitioner to demonstrate that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. On the one hand, Congress clearly sought to further the national interest by requiring job offers and labor certifications to protect the domestic labor supply. On the other hand, by creating the national interest waiver, Congress recognized that in certain cases the benefits inherent in the labor certification process can be outweighed by other factors that are also deemed to be in the national interest. Congress entrusted the Secretary to balance these interests within the context of individual national interest waiver adjudications.

In performing this analysis, USCIS may evaluate factors such as: whether, in light of the nature of the foreign national's qualifications or proposed endeavor, it would be impractical either for the foreign national to secure a job offer or for the petitioner to obtain a labor certification;[10]

---

[10] For example, the labor certification process may prevent a petitioning employer from hiring a foreign national with unique knowledge or skills that are not easily articulated in a labor certification. *See generally* 20 C.F.R. § 656.17(i). Likewise, because of the nature of the proposed endeavor, it may be impractical for an entrepreneur or

(continued . . .)

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

whether, even assuming that other qualified U.S. workers are available, the United States would still benefit from the foreign national's contributions; and whether the national interest in the foreign national's contributions is sufficiently urgent to warrant forgoing the labor certification process. We emphasize that, in each case, the factor(s) considered must, taken together, indicate that on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.

We note that this new prong, unlike the third prong of *NYSDOT*, does not require a showing of harm to the national interest or a comparison against U.S. workers in the petitioner's field. As stated previously, *NYSDOT*'s third prong was especially problematic for certain petitioners, such as entrepreneurs and self-employed individuals. This more flexible test, which can be met in a range of ways as described above, is meant to apply to a greater variety of individuals.

## III. ANALYSIS

The director found the petitioner to be qualified for the classification sought by virtue of his advanced degrees. We agree that he holds advanced degrees and therefore qualifies under section 203(b)(2)(A). The remaining issue before us is whether the petitioner has established, by a preponderance of the evidence, that he is eligible for and merits a national interest waiver.

The petitioner proposes to engage in research and development relating to air and space propulsion systems, as well as to teach aerospace engineering, at North Carolina Agricultural and Technical State University ("North Carolina A&T"). The petitioner holds two master of science degrees, in mechanical engineering and in applied physics, as well as a Ph.D. in engineering, from North Carolina A&T. At the time of filing the instant petition, he also worked as a postdoctoral research associate at the university. The record reflects that the petitioner's graduate and postgraduate research has focused on hypersonic propulsion systems (systems involving propulsion at speeds of Mach 5 and above) and on computational fluid dynamics. He has developed a validated computational model of a high-speed air-breathing propulsion engine, as well as a novel numerical method for accurately calculating hypersonic air flow. The petitioner intends to continue his research at the university.

The extensive record includes: reliable evidence of the petitioner's credentials; copies of his publications and other published materials that

---

self-employed inventor, when advancing an endeavor on his or her own, to secure a job offer from a U.S. employer.

891

cite his work; evidence of his membership in professional associations; and documentation regarding his research and teaching activities. The petitioner also submitted several letters from individuals who establish their own expertise in aerospace, describe the petitioner's research in detail and attest to his expertise in the field of hypersonic propulsion systems.

We determine that the petitioner is eligible for a national interest waiver under the new framework. First, we conclude that the petitioner has established both the substantial merit and national importance of his proposed endeavor. The petitioner demonstrated that he intends to continue research into the design and development of propulsion systems for potential use in military and civilian technologies such as nano-satellites, rocket-propelled ballistic missiles, and single-stage-to-orbit vehicles. In letters supporting the petition, he describes how research in this area enhances our national security and defense by allowing the United States to maintain its advantage over other nations in the field of hypersonic flight. We find that this proposed research has substantial merit because it aims to advance scientific knowledge and further national security interests and U.S. competitiveness in the civil space sector.

The record further demonstrates that the petitioner's proposed endeavor is of national importance. The petitioner submitted probative expert letters from individuals holding senior positions in academia, government, and industry that describe the importance of hypersonic propulsion research as it relates to U.S. strategic interests. He also provided media articles and other evidence documenting the interest of the House Committee on Armed Services in the development of hypersonic technologies and discussing the potential significance of U.S. advances in this area of research and development. The letters and the media articles discuss efforts and advances that other countries are currently making in the area of hypersonic propulsion systems and the strategic importance of U.S. advancement in researching and developing these technologies for use in missiles, satellites, and aircraft.

Second, we find that the record establishes that the petitioner is well positioned to advance the proposed endeavor. Beyond his multiple graduate degrees in relevant fields, the petitioner has experience conducting research and developing computational models that support the mission of the United States Department of Defense ("DOD") to develop air superiority and protection capabilities of U.S. military forces, and that assist in the development of platforms for Earth observation and interplanetary exploration. The petitioner submitted detailed expert letters describing U.S. Government interest and investment in his research, and the record includes documentation that the petitioner played a significant role in projects funded by grants from the National Aeronautics and Space

Administration ("NASA") and the Air Force Research Laboratories ("AFRL") within DOD. [11] Thus, the significance of the petitioner's research in his field is corroborated by evidence of peer and government interest in his research, as well as by consistent government funding of the petitioner's research projects. The petitioner's education, experience, and expertise in his field, the significance of his role in research projects, as well as the sustained interest of and funding from government entities such as NASA and AFRL, position him well to continue to advance his proposed endeavor of hypersonic technology research.

Third and finally, we conclude that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. As noted above, the petitioner holds three graduate degrees in fields tied to the proposed endeavor, and the record demonstrates that he possesses considerable experience and expertise in a highly specialized field. The evidence also shows that research on hypersonic propulsion holds significant implications for U.S. national security and competitiveness. In addition, the repeated funding of research in which the petitioner played a key role indicates that government agencies, including NASA and the DOD, have found his work on this topic to be promising and useful. Because of his record of successful research in an area that furthers U.S. interests, we find that this petitioner offers contributions of such value that, on balance, they would benefit the United States even assuming that other qualified U.S. workers are available.

In addition to conducting research, the petitioner proposes to support teaching activities in science, technology, engineering, and math ("STEM") disciplines. He submits letters favorably attesting to his teaching abilities at the university level and evidence of his participation in mentorship programs for middle school students. While STEM teaching has substantial merit in relation to U.S. educational interests, the record does not indicate by a preponderance of the evidence that the petitioner would be engaged in activities that would impact the field of STEM education more broadly. Accordingly, as the petitioner has not established by a preponderance of the evidence that his proposed teaching activities meet the "national importance" element of the first prong of the new framework, we do not address the remaining prongs in relation to the petitioner's teaching activities.

---

[11] Although the director of North Carolina A&T's Center for Aerospace Research ("CAR") is listed as the lead principal investigator on all grants for CAR research, the record establishes that the petitioner initiated or is the primary award contact on several funded grant proposals and that he is the only listed researcher on many of the grants.

## IV.  CONCLUSION

The record demonstrates by a preponderance of the evidence that: (1) the petitioner's research in aerospace engineering has both substantial merit and national importance; (2) the petitioner is well positioned to advance his research; and (3) on balance, it is beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.  We find that the petitioner has established eligibility for and otherwise merits a national interest waiver as a matter of discretion.

In visa petition proceedings, it is the petitioner's burden to establish eligibility for the immigration benefit sought.  Section 291 of the Act, 8 U.S.C. § 1361 (2012).  The petitioner has met that burden.

**ORDER:**  The appeal is sustained and the petition is approved.





SUBSCRIBE   

## International

MEXICO · CHINA · LATEST NEWS

◀          ▶

VENEZUELA >

# Venezuela grapples with economic collapse

The modest recovery of recent years fails to mask Venezuela's crisis: a shattered productive structure, poverty levels nearly three times the regional average, and profound inequality



A fuel processing plant in Falcón (Venezuela).
**MIGUEL GUTIERREZ HENRY CHIRINOS (EFE)**

**ALONSO MOLEIRO**

Caracas - JAN 17, 2025 - 23:30 EST

The [inauguration of Nicolás Maduro](#) last Friday ushers in a new chapter for Venezuela, marked by deep socioeconomic wounds. The ongoing financial crisis — arguably the population's greatest source of discontent — persists despite a modest reactivation of consumption. Crisis and political conflict remain intertwined, and after a decade of catastrophic governance and escalating tensions between the ruling party and the opposition, the Maduro government now faces an especially turbulent period.

The evidence of electoral fraud, which Maduro has been unable to convincingly refute, have [heightened international pressure](#). Both the United States and the European Union have stepped up sanctions, and Maduro is bracing for a new wave of isolation. As in the past, this isolation is likely to exacerbate the nation's economic struggles.

The start of Maduro's new mandate follows three years of moderate economic recovery, a relative improvement considering the depths from which Venezuela has emerged. This recovery was preceded by a historic economic contraction that drastically altered the nation's landscape over the past decade. Amid this unprecedented economic crisis — exacerbated by the political isolation of Chavismo — in 2020, the Maduro government began to distance itself from the statist orthodoxy outlined in the *Plan de la Patria*, its flagship economic program. Instead, it adopted a series of market-oriented reforms in an effort to [stabilize the economy.](#)

The partial dollarization of the monetary system, the introduction of new exchange and fiscal policies, a more business-friendly stance, and a shift in the treatment of international capital have led to a reduction in year-on-year inflation, a recovery in purchasing power, and some improvement in trade. However, the damage to Venezuela's productive and social fabric had already been done. The socioeconomic collapse experienced between 2014 and 2020, during Maduro's presidency, delivered a devastating blow to the nation's economic framework. This trauma has left many Venezuelans struggling to fully recover from its far-reaching effects.

During the years of strict economic controls, company takeovers, conflicts with capital, and excessive bureaucratization, Venezuela's economy contracted by more than 80%. The local industrial sector was decimated, and now operates at just 30% of its capacity. Thousands of businesses went bankrupt. A wave of nationalizations severely undermined the country's ability to respond to economic challenges. Hyperinflation, which peaked at an [astronomical 9,500% in 2019](#), wreaked havoc on the economy, devastating the financial stability of millions. Meanwhile, the oil industry, once the backbone of Venezuela's economy, collapsed under the weight of a fixed exchange rate policy and [pervasive corruption](#) in the state-owned oil company Petróleos de Venezuela (PDVSA). Income poverty doubled, and now affects an estimated 80% of the population, according to the Venezuelan Academy of Economic Sciences (ANCE).

VZ Termination_0043

Venezuela grapples with economic collapse | International | EL País English

The crisis of the past decade left profound scars: wages were decimated, prices soared, shortages of essential goods became widespread, and public services deteriorated dramatically. This collapse triggered a mass exodus of millions of Venezuelans, many of whom fled the country on foot, seeking refuge across South America.

In 2015, the Central Bank of Venezuela, under Maduro's control, stopped publishing monthly economic data. Media censorship also worsened. The ruling party's popularity, which began to decline in 2014, has not recovered since. In 2019 and 2020, the national economy displayed metrics comparable to those of a war-torn nation, with GDP contracting by a staggering 30 percentage points, according to estimates from private consulting firms.

The popular social assistance programs created by the Chavista government — such as the Barrio Adentro preventive health initiative, the Mi Casa Bien Equipada goods transfer program, Mercal's cheap food markets, and the Cuban-assisted Comprehensive Diagnostic Centers — collapsed during the crisis, largely due to widespread corruption among government officials.

The minimum monthly wage, traditionally around $400, has dropped to just $3. The government provides periodic bonuses every four weeks, but without retroactive benefits, these only raise the effective minimum wage to $150 per month.

International sanctions, particularly from the United States, were introduced in 2016 in response to the political crisis driven by popular discontent. These sanctions significantly restricted Maduro's ability to explore alternative trade options or revitalize the oil industry. The global search for new markets, spurred by Russia's war in Ukraine, fostered a period of cautious détente between Caracas and Washington, leading to a [modest revival in the oil sector](#). However, with the return of Donald Trump to the White House, it is likely that sanctions on Venezuelan oil will tighten further.

National revenues, heavily reliant on crude oil extraction, hit a critical low point in the last decade, with production dropping from nearly 3 million barrels per day to just 300,000 in 2019. Today, after significant challenges, production is slowly approaching the 1 million mark again.

Since 2016, for the first time in its history, remittances from emigrants have become a significant source of Venezuelan tax revenues. The exodus of between seven and eight million people, according to United Nations estimates, represents an unprecedented event in recent Latin American history, highlighting the severity of Venezuela's economic collapse and the erosion of its citizens' political rights. Despite implementing measures like food rationing based on the last digit of each citizen's identity card, the Maduro government has refused to acknowledge its responsibility for the crisis or the existence of a Venezuelan diaspora.

The disastrous performance of the Chavista administration triggered a political shift. In December 2015, the Venezuelan opposition achieved a decisive victory in the parliamentary elections, sending shockwaves through Chavismo. In response, Chavismo moved quickly to consolidate control over all state institutions. This led to the absolute concentration of power in the hands of Maduro and a select group of loyalists, while the government implemented social programs aimed at maintaining Chavista support and building networks of loyalty.

consistently show a sharp decline in popularity. However, any assistance remains inadequate given the collapse of the country's productive activity. In the meantime, Venezuelans are facing a period marked by political uncertainty and looming economic instability.

*Sign up for* <u>*our weekly newsletter*</u> *to get more English-language news coverage from EL PAÍS USA Edition*

Sign up to EL PAÍS US Edition bulletin



**MORE INFORMATION**



**Latin America turns its back on Maduro's 'fraudulent' inauguration as president of Venezuela**
MAR CENTENERA | BUENOS AIRES



**Nicolás Maduro is inaugurated in Venezuela despite failing to present official voting records**
JUAN DIEGO QUESADA / ALONSO MOLEIRO | BOGOTÁ / CARACAS

**ARCHIVED IN**

Venezuela  ·  Nicolás Maduro                                                                            ⌄

Adheres to
More information ›

The Trust Project

If you are interested in licensing this content, click **here**



**ÚLTIMAS NOTICIAS**

19:18    Trump claims to have sent a letter to Iran to negotiate a nuclear deal

17:15    Daylight Saving Time 2025: When to change the clocks and everything you need to know

17:03    Zelenskiy's adviser Mykhailo Podolyak: 'I think Trump will succeed where previous US administrations failed with Russia'

16:21    The price of opposing Maduro's power

**MOST VIEWED**

1. New inheritance mechanism unrelated to DNA is discovered by chance

2. Disappearance of eight young people and the silence of three states highlights opacity of crime in Mexico

3. EU explores sending military and civilian missions to Ukraine to guarantee security

4. 'El Mencho' and 'Don Rodo,' a life of evading justice: From small-time dealers to heads of the most powerful cartel in Mexico

VZ Termination_0046



VZ Termination_0047



VZ Termination_0048



VZ Termination_0049

VZ Termination_0050

 SUBSCRIBE



# Economy And Business

LATEST NEWS



VENEZUELA >

# Venezuela experiences an economic recovery in times of electoral uncertainty

National GDP is expected to grow by 4.2% in 2024 and oil production now exceeds 820,000 barrels per day after years of catastrophic figures

Case 3:25-cv-01766-EMC    Document 104-1    Filed 04/07/25    Page 52 of 95



People at a bar in Caracas (Venezuela).
**GABY ORAA (REUTERS)**

**ALONSO MOLEIRO**

Caracas - JUL 22, 2024 - 06:16 EDT

In an election year of uncertain outcome, Venezuela has experienced some economic improvement after years of financial difficulties. In its latest study, the research firm Ecoanalítico — widely consulted by the specialized media to analyze the behavior of the economy due to the lack of data from the Central Bank of Venezuela — calculated a growth rate of 4.2% for the nation for 2024. The trend is based on improvements in trade and services, driven by the oil and mining sector, in addition to the growth of sectors such as food processing and pharmaceutical production, against an economic backdrop of increasingly normalized relations between the Chavista administration and the private sector.

Case 3:25-cv-01766-EMC    Document 104-1    Filed 04/07/25    Page 53 of 95

The energy sector, the country's economic engine, experienced an improvement compared to previous times. Although it is still far from the 2.5 million barrels it produced at the height of the oil boom, today it produces 820,000 barrels, 70,000 more than a year ago and almost 20% more than two years ago. It is also true that the international sanctions imposed by the White House have prevented this figure from increasing even further. Asdrubal Oliveros, director of Ecoanalítico, asserts that the Nicolás Maduro administration has had some success in its strategy to curb the hyperinflation unleashed in 2018, and that this year it may be averaging 50%, after carrying out an unannounced and severe fiscal and economic adjustment. "The government has more money, it has been increasing its income, but public spending is still much lower than the levels of other years."

Oliveros now wonders about the exchange rate stability of these few months, and fears that the political tensions that may arise will produce some type of adjustment due to the overvaluation of the exchange rate, with its corresponding inflationary impact. Econalítico's calculations tend to resemble those of other economists, who predict growth for the country and rule out the development of a new static agenda. "What is at stake in Venezuela in these elections may be the speed with which the country can emerge from the crisis," says Asdrúbal Oliveros.

The areas of economic growth that were observed are not regular or widespread, but rather focus on very specific areas of the map, with a particular impact on the Caracas-Valencia axis, somewhat less in the Zuliana region, Puerto la Cruz, the island of Margarita and perhaps Barquisimeto. Dense areas of inner Venezuela are still mired in economic depression and a serious crisis of public services. Income poverty in Venezuela currently affects 85% of the population, more than double its average in previous decades.

Other analysts, however, consider that these positive figures might be satisfactory in any other economic context, but that they are insufficient for an economy like Venezuela's, urgently in need of double-digit growth for several years in order to return to what it once was. Venezuela's industries are largely idle, its oil sector is damaged, its market greatly reduced by the diaspora and the destruction of the population's purchasing power. And the traditional engines of an economy like the Venezuelan one, construction and

manufacturing, are practically absent from the growth map, or just have a token presence.



Machinery for oil extraction in operation on the shores of Lake Maracaibo, in November 2023.
**GABY ORAA (BLOOMBERG)**

Despite the unease about the economy, short and medium-term expectations for the Venezuelan economy are positive, and could even become optimal, according to all economic observers, in the event of a transition to democracy that enables the country to reestablish, without sanctions, its relations with the international financial community, accessing credits and loans to undertake reconstruction.

The improvement of the economy could also materialize if Maduro retains power, says Ecoanalítico, although it would be more modest, in his opinion. It is likely that the Chavista administration will do everything possible to raise

capital and obtain exploration licenses, looking for spaces to negotiate and be accepted in the financial community. The impact, however, would be much more limited in terms of inflation and growth.



A man rests in the streets of Caracas, on June 5.
**ARIANA CUBILLOS (AP)**

"The starting point to evaluate the power of the growth of the Venezuelan economy is the quality of the electoral result," says Luis Oliveros, dean of the School of Economics at the Metropolitan University. "Many things depend on that. In the hands of Nicolás Maduro I see the economy growing as well, not as it would grow if the opposition were to take power, but I do believe that oil production can continue to increase in a context in which sanctions remain flexible and individual licenses are granted for the exploitation of the Venezuelan oil fields. The problem is what happens if the electoral results are

not robust, if things do not go well, if sanctions are toughened and the international community closes the door to Venezuela," says the economist.

"Wages for work in 2024 end up representing barely 10% of GDP, when in a year like 2010 it exceeded 40% of the total economy," explains the economist Rodrigo Cabezas, professor at the University of Zulia and former minister of finance, to illustrate the destruction of the value of labor. "GDP growth during 2022-2024 is not only moderate compared to the loss of 75% of the total economy in the Maduro years, but it is also very unequal by sector."

Cabezas is not so optimistic when evaluating the future of Venezuela in the hands of Nicolás Maduro. "It would aggravate the Venezuelan crisis. The slight relief to the economy, as a result of U.S. licenses for oil production and increased imports, would come to a standstill. The truth is that sustainable economic growth is only possible with a political change that recovers the levels of investment necessary to grow."

*Sign up for our weekly newsletter to get more English-language news coverage from EL PAÍS USA Edition*

---

Sign up to EL PAÍS US Edition bulletin

---

 

**MORE INFORMATION**

---


**Chavismo confident of a comeback in the final stretch of the presidential election campaign**
JUAN DIEGO QUESADA | BOGOTÁ

---


**Doubts over whether Chavismo will accept election defeat keep Venezuelan opposition in suspense**
JUAN DIEGO QUESADA | BOGOTÁ

---

**ARCHIVED IN**

Venezuela · Nicolás Maduro · María Corina Machado · Edmundo González Urrutia                          ⌄

VZ Termination_0056

Adheres to

More information ›



If you are interested in licensing this content, click here

## ÚLTIMAS NOTICIAS

**19:18**  **Trump claims to have sent a letter to Iran to negotiate a nuclear deal**

**17:15**  **Daylight Saving Time 2025: When to change the clocks and everything you need to know**

**17:03**  **Zelenskiy's adviser Mykhailo Podolyak: 'I think Trump will succeed where previous US administrations failed with Russia'**

**16:21**  **The price of opposing Maduro's power**

**MOST VIEWED**

---

**1.** New inheritance mechanism unrelated to DNA is discovered by chance

---

**2.** Disappearance of eight young people and the silence of three states highlights opacity of crime in Mexico

---

**3.** EU explores sending military and civilian missions to Ukraine to guarantee security

---

**4.** 'El Mencho' and 'Don Rodo,' a life of evading justice: From small time dealers to heads of the most powerful cartel in Mexico

---

**5.** Judith Butler, philosopher: 'If you sacrifice a minority like trans people, you are operating within a fascist logic'

---

VZ Termination_0058

VZ Termination_0059

VZ Termination_0060

Case 3:25-cv-01766-EMC    Document 104-1    Filed 04/07/25    Page 61 of 95

Case 3:25-cv-01766-EMC   Document 104-1   Filed 04/07/25   Page 62 of 95

## Presidential Documents

**Executive Order 14150 of January 20, 2025**

## America First Policy Directive to the Secretary of State

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* From this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.

**Sec. 2**. *Policy.* As soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.

**Sec. 3**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025*.

[FR Doc. 2025–01952
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

# In re D-J-, Respondent

### *Decided April 17, 2003*

### U.S. Department of Justice
### Office of the Attorney General

(1)  The Attorney General has broad discretion in bond proceedings under section 236(a) of the Immigration and Nationality Act, 8 U.S.C. § 1226(a) (2000), to determine whether to release an alien on bond.

(2)  Neither section 236(a) of the Act nor the applicable regulations confer on an alien the right to release on bond.

(3)  In determining whether to release on bond undocumented migrants who arrive in the United States by sea seeking to evade inspection, it is appropriate to consider national security interests implicated by the encouragement of further unlawful mass migrations and the release of undocumented alien migrants into the United States without adequate screening.

(4)  In bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, Immigration Judges and the Board of Immigration Appeals shall consider such interests.

(5)  Considering national security grounds applicable to a category of aliens in denying an unadmitted alien's request for release on bond does not violate any due process right to an individualized determination in bond proceedings under section 236(a) of the Act.

(6)  The denial of the respondent's release on bond does not violate international law.

(7)  Release of the respondent on bond is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of the respondent and other similarly situated undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002; further, the respondent failed to demonstrate adequately that he does not present a risk of flight if released and should be denied bond on that basis as well.

## IN BOND PROCEEDINGS

The respondent is an undocumented alien from Haiti who was taken into custody and detained by the Immigration and Naturalization Service ("INS") on October 29, 2002, while attempting to evade lawful immigration procedures and enter the United States illegally.  He arrived aboard a vessel that sailed into Biscayne Bay, Florida, on that date, carrying 216 undocumented aliens from Haiti and the Dominican Republic.  He and other passengers on the vessel were apprehended ashore after the vessel sought to

572

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

evade coastal interdiction by the United States Coast Guard and after many of the aliens sought to evade law enforcement authorities ashore. *See* INS Brief in Support of Bond Appeal, Exh. A ("INS Brief"). Respondent was placed in removal proceedings and charged as being an inadmissible alien under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2002) ("INA"). He is now seeking asylum in the United States and has applied for bond, which would allow his release into the community pending disposition on removal or asylum.

On November 6, 2002, an Immigration Judge ("IJ") granted respondent's application for release on bond (set at $2,500) over the objections of the INS. The INS argued, inter alia, that the release of respondent, and of other members of the undocumented migrant group of October 29, would stimulate further surges of such illegal migration by sea and threaten important national security interests. The INS then appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA dismissed the appeal, concluding, inter alia, that the broad national interests invoked by INS were not appropriate considerations for the IJ or the BIA in making the bond determination, "[a]bsent contrary direction from the Attorney General." Decision of the Board of Immigration Appeals, *In re D-J-*, at 2 (March 13, 2003) ("BIA Dec."). Exercising authority transferred to the Department of Homeland Security ("DHS") by the Homeland Security Act of 2002 ("HSA"), and pursuant to the provisions of 8 C.F.R. § 1003.1(h)(1)(iii), the Under Secretary for Border and Transportation Security has now referred the BIA's decision to me for review.[1] This referral automatically stayed the BIA's order pending my decision. *See* 8 C.F.R. § 1003.19(i)(2).

On February 12, 2003, the IJ denied respondent's application for asylum. His appeal of that decision is pending before the BIA.

Although authority to enforce and administer the INA and other laws related to the immigration and naturalization of aliens has recently been transferred to the Secretary of Homeland Security by the HSA, the Attorney General retains his authority to make controlling determinations with respect

---

[1] On March 1, 2003, the INS was transferred from the Department of Justice to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178. The Executive Office for Immigration Review, however, remains in the Department of Justice. On February 28, 2003, the Attorney General published a technical rule that moved 8 C.F.R. § 3.1(h) (2002) to 8 C.F.R. § 1003.1(h). *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9332 (Feb. 28, 2003) (to be codified at 8 C.F.R. § 1003.1(h)). The authority of the INS Commissioner to refer Board decisions to the Attorney General is now vested in the Secretary of Homeland Security, or in "specific officials of the Department of Homeland Security designated by the Secretary with the concurrence of the Attorney General." 8 C.F.R. § 1003.1(h)(iii).

573

to questions of law arising under those statutes.[2] This statutory framework is consistent with the Attorney General's traditional role as the primary interpreter of the law within the Executive Branch. *See generally* 28 U.S.C. §§ 511-13 (2000).

Pursuant to the authority and discretion vested in me under the provisions of section 236(a) of the INA, 8 U.S.C. § 1226(a) (2000),[3] I have determined that the release of respondent on bond was and is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of respondent and other undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002.  I further determine that respondent has failed to demonstrate adequately that he does not present a risk of flight if released on bond and that he should be denied bond on that basis as well.  *See* 8 C.F.R. § 236.1(c)(8) (2002).  Accordingly, I order that the BIA's decision and order be vacated, and that respondent be denied bond and detained pending appropriate disposition and proceedings respecting his status under the immigration laws.

---

[2] *See* section 103(a)(1) of the INA, 8 U.S.C. § 1103(a)(1), *as amended by* Homeland Security Act of 2002 Amendments, Division L of Pub. L. No. 108-7, § 105(a)(1), 117 Stat. 531 (2003), which provides:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

[3] Section 1102 of the HSA, 116 Stat. at 2274, added a new subsection (g) to section 103 of the INA, providing as follows:

> The Attorney General shall have such authorities and functions under this Act and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

The Attorney General's authority to detain, or authorize bond for aliens under section 236(a) of the INA is one of the authorities he retains pursuant to this provision, although this authority is shared with the Secretary of Homeland Security because officials of that department make the initial determination whether an alien will remain in custody during removal proceedings. *See* sections 103(a), (g) of the INA, *as amended*; 8 C.F.R. §§ 236.1(c), (d), 287.3(d) (2002).

VZ Termination_0066

## I.

My review of the BIA's decision in this case is *de novo*; it is not confined to reviewing the decisions of the BIA or the IJ for legal or factual error. *See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations."). In making their decisions in this matter, both the IJ and the BIA were exercising limited authority that is dependent upon delegation from the Attorney General. *See id.* at 4. When I undertake review of such decisions pursuant to a referral under 8 C.F.R. § 1003.1(h), the delegated authorities of the IJ and BIA are superseded and I am authorized to make the determination based on my own conclusions on the facts and the law. The recent promulgation of 8 C.F.R. § 1003.l(d)(3), which precludes the BIA from engaging in de novo review of an IJ's findings of fact, does not affect the de novo standard articulated in *Doherty* because that regulation does not govern the authority of the Attorney General to review BIA decisions.

I now turn to the question of whether respondent should have been detained or released on bond under the authority of section 236(a) of the INA.

## II.

## A.

The law governing the detention or release of aliens such as respondent (i.e., aliens arrested and detained pending a decision on removal) is set forth in section 236(a) of the INA. It provides that the Attorney General may (1) continue to detain the alien; or (2) release the alien on bond or conditional parole. *See* section 236(a) of the INA.[4] Conditional parole is not placed in issue here, so the only question is whether the respondent should be detained or released on bond.

As recognized by the Supreme Court, section 236(a) does not give detained aliens any *right* to release on bond. *See Carlson v. Landon*, 342 U.S. 524, 534 (1952). Rather, the statute merely gives the Attorney General the authority to grant bond *if* he concludes, in the exercise of broad discretion, that the alien's release on bond is warranted. The extensive discretion granted the Attorney General under the statute is confirmed by its further provision that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review." Section 236(c) of the INA. Even apart from that provision, the courts have consistently recognized that the Attorney General has extremely broad discretion in

---

[4] *See supra* n.3.

determining whether or not to release an alien on bond under this and like provisions. *E.g.*, *Carlson*, 342 U.S. at 540; *United States ex rel. Barbour v. District Dir. of INS*, 491 F.2d 573, 577-78 (5th Cir.), *cert. denied*, 419 U.S. 873 (1974). Further, the INA does not limit the discretionary factors that may be considered by the Attorney General in determining whether to detain an alien pending a decision on asylum or removal. *See, e.g.*, *Carlson*, 342 U.S. at 534 (Attorney General's denial of bail to alien is within his lawful discretion as long as it has a "reasonable foundation"); *Barbour*, 491 F.2d at 578 (INS finding that alien was a threat to national security warranted denial of bond, applying "reasonable foundation" standard); *see also Sam Andrews' Sons v. Mitchell*, 457 F.2d 745, 748 (9th Cir. 1972) (Attorney General's exercise of discretionary authorities under the INA must be upheld if they are founded "on considerations rationally related to the statute he is administering").

Further discretionary authority for the release on bond of aliens such as respondent is found in subpart A, section 236.1 of the INS regulations governing "Detention of Aliens Prior to Order of Removal." *See* 8 C.F.R. § 236.l(c)(8). This regulation provides:

> Any officer authorized to issue a warrant of arrest *may, in the officer's discretion*, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

*Id.* (emphasis added). This provision gives the DHS discretionary authority to release a covered alien on bond if, and only if, the alien makes a satisfactory demonstration with respect to the stated criteria. Like section 236(a), it does not establish any right to release on bond.

### B.

I will now briefly summarize the pertinent facts and contentions of the parties indicated in the record.

As noted above, respondent arrived off the shores of Florida in an overloaded vessel with 216 undocumented aliens from Haiti and the Dominican Republic on October 29, 2002. After the vessel sought to evade the orders and interdiction efforts of a U.S. Coast Guard ("USCG") vessel, some of the alien passengers jumped from the vessel and swam ashore. After the migrant vessel ran aground, the remaining passengers disembarked and, despite the order of USCG officers to stop, ran ashore and fled from law enforcement officers before they were apprehended. *See* INS Brief, Exh. A (Declaration of Captain Mark J. Kerski, USCG) ("Kerski Declaration"). I find nothing in the record showing that respondent was not among the alien

migrants who disobeyed the orders of, and sought to evade, USCG or law enforcement officers ashore in an effort to enter the United States unlawfully.

The respondent offered limited evidence and information in the proceedings below in support of his claims that he did not present a danger to the community, a risk of flight, or a threat to national security. Respondent testified that he has not been arrested or convicted of a crime; and that, if released, he would live with an uncle residing in New York, New York, who would provide him with food, shelter, and transportation while he applied for asylum. Memorandum Decision of the Immigration Judge, *In re D-J-*, at 2 (Dec. 12, 2002) ("IJ Dec.").

Respondent's brief before the BIA asserts that he was "willingly taken into INS custody." Respondent's Brief in Support of the Immigration Judge's Custody Determination at 3 ("Respondent's Brief"). That assertion, however, does not address whether the respondent was among the migrants who sought to evade USCG and other law enforcement officers after coming ashore, as indicated in the USCG's Kerski Declaration. Respondent's brief further asserts that, because he does not speak or understand English, he could not be expected to obey any orders from English-speaking law enforcement officers at the time he came ashore. That assertion, however, does not address the likelihood, indicated by the content of the Kerski Declaration, that the circumstances in which those orders were issued were such that their meaning would have been clear in context, without regard to the particular words uttered by the officers. *See* INS Brief, Exh. A, ¶¶ 4-6.

In opposing respondent's contentions, the INS submitted declarations from officers of the Coast Guard, the Department of State, and the Department of Defense ("DOD") as exhibits before the IJ and the BIA.[5] INS maintains that these declarations show that there are strong concerns of national security requiring the continued detention of the respondent and similarly situated undocumented migrants pending removal proceedings. Two general areas of concern are implicated. First, there is a concern that the release of aliens such as respondent and the other October 29 migrants would tend to encourage further surges of mass migration from Haiti by sea, with attendant strains on national and homeland security resources. Such mass migrations would also place the lives of the aliens at risk. Second, in light of the terrorist attacks of September 11, 2001, there is increased necessity in preventing undocumented aliens from entering the country without the screening of the immigration inspections process.

---

[5] The exhibits submitted with the INS brief included: Declaration of Captain Mark J. Kerski, USCG (Exhibit A); Memorandum from the United States Department of State (Exhibit B); Declaration of Captain Kenneth A. Ward, USCG (Exhibit C); Declaration of Johnny Williams (Exhibit D); Supplemental Declaration of Captain Kenneth A. Ward, USCG (Exhibit E); and Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations (Exhibit F).

The first area of national security concern advanced by INS is the threat of further mass migration. INS asserts that reports and rumors of successful entry into the United States by Haitian migrants have fueled recent migration surges and the perception of further successful entries could encourage further mass migration attempts.[6] In support of this contention, INS has submitted a memorandum issued by the State Department supporting detention of the migrants who landed in Florida on October 29, 2002, in order to prevent further mass migrations. The memorandum states in relevant part:

> The disposition of those detained in the October 29 arrival will spur further migration if they are released into the U.S. Such treatment would create a perception in Haiti of an easing in U.S. policy with respect to admission of migrants. For this reason, the Department of State strongly recommends that the 216 migrants (207 Haitians, 9 Dominicans) from the boat which reached Key Biscayne on October 29 be detained while they undergo processing. The migrants should be detained unless and until they demonstrate a well-founded fear of persecution. Those who cannot do so should continue to be held, absent a compelling humanitarian reason for release, until they can be expeditiously repatriated.

INS Brief, Exh. B (State Department Memorandum). The State Department memorandum sets forth extensive and detailed information documenting the relationship between perceptions in Haiti of successful U.S. entry by seagoing migrants and the likelihood of further mass migrations. *Id.*

The declarations submitted from the Coast Guard (*see supra* n.6) and the Defense Department express corroborating statements regarding this concern. The Coast Guard states that "[a]necdotal reporting and operational experience strongly suggests that detaining and swiftly repatriating those who illegally and unsafely attempt to enter the United States by sea is a significant deterrent to surges in illegal immigration and mass migration." INS Brief, Exh. C, ¶ 9 (Declaration of Captain Kenneth A. Ward, USCG). Similarly, the Department of Defense declaration states that "[a]ctual or even *perceived* changes in U.S. immigration policy can trigger mass migration events by encouraging other potential illegal migrants." *See* INS Brief, Exh. F, ¶ 5 (Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations).

The INS submissions also outline an additional national security implication of encouraging future mass migrations by sea from Haiti. The Coast Guard declaration asserts that continued mass migrations from Haiti have "heavily taxed Coast Guard capacity and capabilities," while "reducing

---

[6] Following the successful landing of more than 200 Haitians on October 29, 2002, on November 7, 2002, and again on November 9, 2002, the USCG successfully interdicted three groups of undocumented Haitian migrants attempting to transit to the United States via the Bahamas. In all, 264 Haitian migrants were interdicted on these dates. Such incidents are "typical of a surge in Haitian migrant departures following similar successful landings and demonstrates the 'pull' factor that successful landing can have." INS Brief, Exh. E, ¶ 3 (Supplemental Declaration of Captain Kenneth A. Ward, USCG).

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

responsiveness in other mission areas." INS Brief, Exh. C, ¶ 7. The Department of Defense, which is also involved in efforts to contain such overseas migrations, also asserts that the demands of mass migrations from Haiti "would create a drain on scarce assets that are being used in or supporting operations elsewhere." INS Brief, Exh. F, ¶ 8.

The declarations submitted by INS also substantiate a national security concern raised by the prospect of undocumented aliens from Haiti being released within the United States without adequate verification of their background, associations, and objectives. Thus, the State Department declaration asserts that it has "noticed an increase in third country nations (Pakistanis, Palestinians, etc.) using Haiti as a staging point for attempted migration to the United States. This increases the national security interest in curbing use of this migration route." INS Brief, Exh. B, ¶ 11. Relatedly, the Coast Guard's supplemental declaration asserts that the boatloads of interdicted Haitians have included persons previously deported for drug trafficking and subject to outstanding felony warrants. INS Brief, Exh. E, ¶ 4 (Supplemental Declaration of Captain Kenneth A. Ward, USCG). The Coast Guard further asserts that "because maritime migrants are typically undocumented and carry little or no identification, it is often difficult to ascertain the identity and background of interdicted persons, particularly in large groups, which presents potential threats to officer safety, as well as national security." *Id.*

### III.

Having considered the record and the briefs of the parties, and exercising my authority under section 236(a) of the INA, I have determined that the release of respondent on bond is unwarranted.

I conclude that releasing respondent, or similarly situated undocumented seagoing migrants, on bond would give rise to adverse consequences for national security and sound immigration policy. As demonstrated by the declarations of the concerned national security agencies submitted by INS, there is a substantial prospect that the release of such aliens into the United States would come to the attention of others in Haiti and encourage future surges in illegal migration by sea. Encouraging such unlawful mass migrations is inconsistent with sound immigration policy and important national security interests. As substantiated by the government declarations, surges in such illegal migration by sea injure national security by diverting valuable Coast Guard and DOD resources from counterterrorism and homeland security responsibilities. Such national security considerations clearly constitute a "reasonable foundation" for the exercise of my discretion to deny release on bond under section 236(a). *See Carlson*, 342 U.S. at 534; *Barbour*, 491 F.2d at 578.

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

I have noted the BIA's suggestion that the INS's recent adoption of a policy placing certain aliens (including many undocumented aliens who arrive by sea and are not admitted or paroled) in expedited removal proceedings in which affected aliens, with limited exceptions, would be automatically detained without review by an IJ or the BIA tends to negate the INS's concern regarding the encouragement of migration surges.  BIA Dec. at 2 n.3; *see* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924-26 (Nov. 13, 2002).  The offsetting effect suggested by the BIA would presumably be due to the prospect that the new expedited removal policy will be so restrictive that potential Haitian migrants would learn of that and be deterred from future migration attempts, regardless of respondent's fate and that of the other October 29 migrants.  While the expedited removal policy may reduce the incidence of seagoing Haitian migrants being released on bond pending removal, it hardly provides airtight assurance against future successful entries by such migrants through legal and extra-legal maneuvers, or the encouragement of additional maritime migrations likely to arise from such entries.  I note, for example, that the policy's strict detention provision is entirely inapplicable to aliens who are admitted or paroled.  In any event, even if the new policy somewhat reduced the expectations of further successful U.S. entries, the release of respondent and hundreds of others from the October 29 migrant group would strongly undercut any resultant deterrent effect arising from the policy.  The persistent history of mass migration from Haiti, in the face of concerted statutory and regulatory measures to curtail it, confirms that even sporadic successful entries fuel further attempts. I therefore am not persuaded that the new expedited removal policy negates the migration "surge" consideration.

I further conclude that the release on bond of undocumented seagoing migrant aliens from Haiti without adequate background screening or investigation presents a risk to national security that provides additional grounds for denying respondent's release on bond.  This consideration is fortified by the State Department's assertion that it has observed an increase in aliens from countries such as Pakistan using Haiti as a staging point for migration to the United States.  Under the current circumstances of a declared National Emergency, the Government's capacity to promptly undertake an exhaustive factual investigation concerning the individual status of hundreds of undocumented aliens is sharply limited and strained to the limit.  Under these circumstances, it is reasonable to make a determination that aliens arriving under the circumstances presented by the October 29 influx should be detained rather than released on bond.  There is substantial risk that granting release on bond to such large groups of undocumented aliens may include persons who present a threat to the national security, as well as a

580

substantial risk of disappearance into the alien community within the United States.

I note that the BIA has acknowledged the seriousness of INS's arguments that the detention or release of these aliens implicates important national security interests. *See* BIA Dec. at 2. The BIA determined, however, that such considerations fall "outside the scope of Immigration Judge bond proceedings as such proceedings are currently constituted," except where individual considerations show that the respondent is not likely to appear or presents a danger to the community. The BIA then stated: "Absent contrary direction from the Attorney General, we therefore agree with the Immigration Judge's focus on the respondent's individual likelihood to appear and individual danger to the community." *Id.* This opinion provides the BIA and Immigration Judges with the "contrary direction" to which the BIA referred. In future proceedings involving similarly situated aliens, this opinion constitutes binding precedent, requiring the BIA and IJs to apply the standards set forth herein, including consideration of national security interests. *See generally Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law"). Further, in all future bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, IJs and the BIA shall consider such interests.

Finally, I conclude that respondent has not individually demonstrated that he satisfies the prerequisites to discretionary release on bond under the provisions of 8 C.F.R. § 236.l(c)(8). INS may (but is not required to) grant release under that provision if the alien demonstrates to its satisfaction that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding. I do not find that respondent has adequately demonstrated that he is likely to appear at future proceedings for purposes of granting release on bond pursuant to section 236(a)(2) of the INA or 8 C.F.R. § 236.l(c)(8). There are strong indications in the record that respondent was among those aliens who sought to evade Coast Guard and law enforcement officers in a determined effort to effect illegal entry into the United States. Because such evasive behavior does not provide reassuring evidence of respondent's likely reliability in appearing for future proceedings, it was incumbent upon respondent to produce substantial countervailing evidence as to that criterion. I conclude that the minimal showing made by respondent on this point was insufficient to demonstrate the likelihood of his appearance for future proceedings.[7]

---

[7] The INS also offered evidence disputing respondent's claim that, individually, he does not

(continued...)

In addition, I note that the respondent was denied asylum by the Immigration Judge on February 12, 2003. The respondent appealed that decision to the BIA on March 14, 2003, and that appeal remains pending. The IJ's denial of the respondent's application for asylum increases the risk that the respondent will flee if released from detention. "A respondent with a greater likelihood of being granted relief from deportation has a greater motivation to appear for a deportation hearing than one who, based on a criminal record or otherwise, has less potential of being granted such relief." *Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987).

## IV

Although neither the IJ nor the BIA chose to address the issue, respondent contends that he is constitutionally entitled on due process grounds to an "individualized determination" of his request for release on bond and that denying bond on broad national security grounds that are generally applicable to the October 29 migrants would somehow violate such a right. Respondent's Brief at 6-8. In that regard, I note that several federal appellate courts have recently held that a *lawful permanent resident alien* has a due process right to an individualized hearing and determination on whether he poses a risk of flight or a danger to the community when subjected to the mandatory detention provisions of section 236(c) of the INA. *See Kim v. Ziglar*, 276 F.3d 523 (9th Cir.), *cert. granted sub nom. Demore v. Hyung Joon Kim*, 536 U.S. 956 (2002); *Patel v. Zemski*, 275 F.3d 299, 314-15 (3d Cir. 2001); *see also Hoang v. Comfort*, 282 F.3d 1247, 1256 (10th Cir. 2002). Another federal appeals court has reached a contrary conclusion on that issue, *see Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999), and the Supreme Court has granted the Government's petition for a writ of certiorari and heard oral argument in *Kim.*

I first note that the decisions in *Kim* and *Patel* were specifically addressed to the *mandatory* detention provisions of section 236(c) of the INA and are therefore fundamentally distinguishable from the procedures afforded under section 236(a). Section 236(c) requires nondiscretionary detention as a categorical statutory mandate for those aliens covered by it, whereas section 236(a) affords aliens to whom it applies the opportunity to seek discretionary relief (bond or conditional parole) in a hearing before an Immigration Judge. *See Kim*, 276 F.3d at 533.

More significantly, however, the holdings in *Kim* and *Patel* were premised upon the petitioner's status as a lawful permanent resident alien. *See Kim*, 276 F.3d at 528, 534; *Patel*, 275 F.3d at 307. In contrast, respondent has not

---

[7]  (...continued)
pose a danger to the community and is likely to appear in future proceedings. *See* INS Brief at 14-15.

even been admitted to the United States, let alone acquired the status of a lawful permanent resident alien. Respondent's status is that of an undocumented alien, charged as being inadmissible as an alien present in the United States without having first been admitted or paroled. *See* section 212(a)(6)(A)(i) of the INA. As an alien who has "not yet gained initial admission to the United States," he does not qualify for the limited due process protection extended to "admitted" aliens under the sharply distinguishable circumstances presented in *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001) ("We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question."). As explained by the court in *Gisbert v. United States Attorney General*, 988 F.2d 1437, 1440 (5th Cir.), *amended on other grounds*, 997 F.2d 1122 (5th Cir. 1993): "Although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Accord United States v. Lopez-Vasquez*, 227 F.3d 476, 484-85 (5th Cir. 2000); *Zheng v. INS*, 207 F.Supp.2d 550, 552 (E.D. La. 2002) ("The detention of aliens who have been denied initial admission into the United States does not implicate the Fifth Amendment, even if such aliens were subsequently paroled or released within the country.").

Even if the respondent *were* entitled to an individualized hearing, however, such a conclusion would not support a contention that this respondent's request for release on bond must be determined exclusively on the basis of his individual situation, rather than on the basis of general considerations applicable to a category of migrants, as a matter of constitutional due process. The mere fact that general considerations are introduced does not negate the individual nature of the hearing. The Attorney General is broadly authorized to detain respondent, and deny his request for bond, based on any reasonable consideration, individualized or general, that is consistent with the Attorney General's statutory responsibilities. *See Reno v. Flores*, 507 U.S. 292, 313-14 & n.9 (1993) (rejecting juvenile aliens' demands for an "individualized custody hearing" and upholding INS use of "reasonable presumptions and generic rules" in such cases).

In any event, I have given full consideration to the individual aspects of respondent's claim for bond based on the record in this proceeding. I find nothing in respondent's individual case that warrants granting him release on bond when balanced against the above-described compelling factors that militate against such release in the case of undocumented aliens attempting illegal entry into the United States under the circumstances presented by the October 29 influx.

Finally, I note that respondent argued to the BIA that an INS policy of detaining Haitian migrants in order to deter other Haitians from migrating to the United States seeking asylum violates international law. *See* Respondent's Brief at 8-9. In support of his argument, he invokes the right to asylum protected by Article 14 of the Universal Declaration of Human Rights ("UDHR") and an advisory opinion of the United Nations High Commission for Refugees stating that "asylum seekers should not be detained for purposes of deterrence." *Id.* at 8. The BIA did not address respondent's arguments on this point in its decision.

This argument is without merit. First, the UDHR is merely a nonbinding expression of aspirations and principles, rather than a legally binding treaty. *See Haitian Refugee Center v. Gracey*, 809 F.2d 794, 816 n.17 (D.C. Cir. 1987) (UDHR "is merely a nonbinding resolution, not a treaty"). In any event, the application of U.S. law to protect the nation's borders against mass migrations by hundreds of undocumented aliens violates no right protected by the UDHR or any other applicable rule of international law. As the Supreme Court has recognized, "'[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments . . . .'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). The authority to expel aliens is meaningless without the authority to detain those who pose a danger or a flight risk during the process of determining whether they should be expelled. The national security interests invoked in this opinion are directed at unlawful and dangerous mass migrations by sea, not the right to seek asylum. Aliens who do arrive in the United States, including the respondent himself, are afforded the right to apply for asylum and have those applications duly considered.[8]

---

[8] I note that a regional official of the United Nations High Commissioner for Refugees ("UNHCR") has sent me a letter volunteering certain comments on this proceeding. Letter for The Honorable John Ashcroft, Attorney General of the United States, from Guenet Guebre-Christos, Regional Representative, United Nations High Commissioner for Refugees, *Re: Matter of D-J-, Advisory Opinion on Detention of Asylum Seekers* (March 28, 2003). In brief, the UNHCR letter makes certain arguments invoking purported obligations arising under the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (Jan. 31, 1967) ("Protocol"), and the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968) ("Convention"). The United States is not a party to the Convention, but it is a party to the Protocol, which incorporates by reference Articles 2 through 34 of the Convention. The Protocol is not self-executing, but Congress has incorporated into the INA, through the Refugee Act of 1980, the appropriate requirements of the Protocol. Consequently, the Protocol does not afford respondent any rights beyond what he is afforded under the federal immigration laws, as applied in this decision. *See Abdelwahed v. INS*, 22 Fed.Appx. 811, 815, 2001 WL 1480651 (9th Cir. 2001) (stating that "the Protocol does not give [the petitioner] any rights beyond what he already enjoys under the immigration statutes"); *Legal Obligations of*
(continued...)

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

## CONCLUSION

I have determined that respondent's release on bond under the provisions of section 236(a) of the INA is unwarranted.  The BIA's Order of March 13, 2003, is hereby vacated and respondent is to be detained pending decision on removal.

---

[8]  (...continued)
*the United States under Article 33 of the Refugee Convention*, 15 Op. O.L.C. 86, 87 (1991) ("[T]he Protocol by which the United States adhered to the Convention is not self-executing for domestic law purposes. Accordingly, the Protocol itself does not create rights or duties that can be enforced by a court.").

# The Persistence of the Venezuelan Migrant and Refugee Crisis



Photo: LUIS ACOSTA/AFP via Getty Images

Commentary by **Betilde Muñoz-Pogossian** and **Alexandra Winkler**

Published November 27, 2023

The outflow of refugees and migrants from Venezuela is the largest displacement crisis in the world, with almost 7.7 million migrants and refugees as of August 2023. This is an even greater number than the displacement of Syrians or Ukrainians outside of their countries. Despite these numbers, the Venezuelan migrant and refugee crisis, quite unfortunately, has climbed down the list of political and policy priorities, with fewer headlines in the media and sporadic policy conversations in Washington.

On one hand, there is a sense that this is the new normal for the region and that host countries in Latin America and the Caribbean will have to continue to manage the influx of 6.4 million Venezuelans and counting as best as they can. On the other hand,

it seems that neighboring countries across the region are willing to continue discussions on how best to address migration and forced displacement, but by removing the Venezuelan political focus from the center of the migrant and refugee discussion. The truth is, however, that this is a crisis that persists, and is likely to continue as long as the root causes are not addressed.

The efforts from the region to respond have been commendable thus far. They have varied but have generally followed a spirit of regional solidarity as well as pragmatism in the wake of large-scale Venezuelan inflows. Important regional innovations have also characterized this recent period. Receiving countries in the Americas have extended options to displaced Venezuelans to regularize their status (often with financial support and encouragement from the United States), and other policies have also sought to ensure access to the labor market, health services, and basic education.

Despite these efforts, the reality is that the region is still recovering from Covid-19 setbacks. Venezuelan migrants are now leaving countries like Colombia, Ecuador, Peru, and Chile, where they had originally migrated, due to low salaries, inflation, and lack of jobs, and are making the dangerous trek to reach the U.S. border. To understand the scale of these flows, going by the number of Venezuelans crossing the Darién Gap, the remote stretch of rainforest located between Colombia and Panama, a record 400,000 migrants have crossed during the first nine months of this year, according to Panamanian officials, and Venezuelans account for an estimated 60 percent of those, namely around 240,000, the most of any nationality. In search of the American dream, record numbers of migrants have also reached the U.S.-Mexico border, with 262,633 Venezuelans having crossed just in 2023, up from 189,520 in 2022.

The root causes that generated this unprecedented flow of migrants and refugees, including democratic breakdown, repression, and a lack of basic human rights, remain unchanged in Venezuela. There is also a deep economic crisis driven by devastating policies and a kleptocracy that has characterized the political landscape during the last 20 years. There are also challenges for Venezuelans in receiving countries, such as limited access to legal documentation, basic services, economic opportunities, and rising xenophobia. In addition, with the sometimes tumultuous

changes in governments in Latin America, Venezuelans <u>prefer to leave receiving countries</u> than to go through another national crisis. All these elements will remain throughout 2023, and therefore migration flows should be expected to continue, and even increase in 2024.

The Venezuelan migrant and refugee crisis is still a crisis, and it does not look like it will fix itself anytime soon. Here are some reasons why.

## Venezuelans continue to migrate, even if it means risking their own lives.

The challenges faced by the <u>7,710,887 displaced Venezuelans throughout the world</u>, and the <u>stories of so many of them</u> moving throughout the Americas demonstrates the danger they are in–especially when they attempt to cross the harrowing Darién Gap. This 575,000 hectares of jungle between Panama and Colombia has become one of <u>the Western Hemisphere's most pressing focal points of the crisis</u>. According to the <u>United Nations Office of the High Commissioner for Human Rights</u> (UNHCR), migrants are exposed to "multiple human rights violations, including sexual violence, murders, disappearances, trafficking, robbery and intimidation by organized criminal groups."

Despite this life-threatening journey  which can take almost 10 days  the numbers, as reported by Panamanian authorities, have gone up exponentially, from the almost unthinkable record of nearly 250,000 in 2022 to more than 330,000 in 2023. A gut-wrenching element is that <u>one in five of these migrants were children</u>. Regardless of initiatives such as the <u>Humanitarian Parole for Venezuelans</u> in the United States, and the <u>Safe Mobility</u> initiative (which was announced by the United States government to provide legal pathways to the United States for refugees and migrants in South and Central America) migrants continue to cross the jungle. In August alone, <u>almost 82,000 people made the trek through the Darién</u>, by far the largest single-month total on record. The United States has also tried joint efforts with the Colombian and Panamanian authorities to end the "irregular movement of people" by signing an ambitious <u>agreement</u> in April. But the countries' expectations to end migration through the Darién Gap, reduce poverty, and create jobs and new legal pathways, all in just 60 days, only confirmed they were unrealistic from the start. Unless more comprehensive and impactful action to address this humanitarian crisis is prioritized,

Case 3:25-cv-01766-EMC Document 104-1 Filed 04/07/25 Page 81 of 95

also focusing on addressing the root causes, other political and criminal interests will continue to make a profit from the desperation of these Venezuelans.

## Latin American countries cannot take on the burden of providing humanitarian assistance alone.

According to the International Organization for Migration and UNHCR's Regional Refugee and Migrant Response Plan (RMRP), by the end of 2023, it is projected that there will be 6.83 million Venezuelan refugees and migrants in Latin America, with over 5 million of them in need of humanitarian assistance. This is simply too large a number for a region that has not recovered from preexisting social inequalities that Covid-19 worsened, or structural problems fueled by economic recession and political upheaval.

Although Latin America has been an example of migrant integration with its open-door policy from countries like Colombia, this year, more than 4 million displaced Venezuelans throughout the region cannot fully access food, shelter, healthcare, education and formal employment, according to the Regional Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela (R4V) platform. Under these conditions, Venezuelans in receiving countries with jobs in the informal labor market will have a harder time becoming self-sufficient.

For example, according to the Jesuit Refugee Service in Chile, almost 70,000 Venezuelans have left Chile since 2021. The high cost of living and lack of economic opportunities are among the top reasons for leaving the country. In the case of Colombia, while no official data is available on the number of Venezuelans with temporary protection status (TPS) who have migrated, many of those going to the United States say they decided to leave Colombia because they did not earn enough to support their families. Considering almost all countries in Central America and Mexico require visas for Venezuelans, the only viable option for migrants is to continue heading north.

With the Biden administration's announcement redesignating Venezuela as continuing to be eligible for TPS for all who arrived in the United States before July 31, 2023, and with over 472,000 potentially benefiting from the measure and quickly

Case 3:25-cv-01766-EMC    Document 104-1    Filed 04/07/25    Page 82 of 95

allowing them to work legally, the magnetic pull north continues to be a factor. A recent more restrictive measure, however, to resume removals of Venezuelans at the border who do not have a legal basis to remain in the United States may serve to slow down the growth in numbers. This move also sheds light on what seems to be continued quiet U.S. negotiations with Venezuela, suggesting a sense of normalcy is being sought and that indicate that the country is "safe enough" to deport its citizens back to the undemocratic regime that forced them to leave. After the announcement, between October 18 and 23, the United States has already deported over 220 Venezuelans in two flights, and they were alarmingly received in country by Maduro's security and intelligence forces: SEBIN, PNB and GNB.

The bottom line here is that there is an urgent need for more international support. Only 12 percent of the $1.72 billion the R4V requested for the 2023  2024 Regional Refugee and Migrant Response Plan has been collected. In 2022, that number was 27 percent, confirming that the lack of funds this year is directly proportional to the reduced attention this crisis has across the international community. Without a doubt, humanitarian aid is critical to ease Venezuelan suffering across the region. Although the 2.7 billion dollars that the U.S. government has provided since 2017 has been very generous, it is unfortunately not enough to support the Venezuelans who have had to leave their country nor to address the underlying conditions that caused them to migrate in the first place. The Venezuelan migrant and refugee crisis is probably the most underfunded displacement crisis in the world, even beyond the Rohingya or the South Sudanese.

The repercussions of this migration crisis are also being felt in cities across the United States. The fact that the situation has worsened is evidenced by recent declarations by New York mayor Eric Adams who has said that the ongoing migrant crisis "will destroy New York City." Adams said 110,000 asylum seekers have passed through New York city since April 2022 and the issue is creating a 12 billion-dollar budget deficit. Other cities such as Chicago and Washington, D.C. are also reaching breaking points. Despite efforts from mayors to accommodate Venezuelan migrants, city shelters, police stations, and aid services are at maximum capacity. Hopefully all authorities, especially at the state and local level, can find longer-term solutions, such as requesting an increase in federal funding to attend to this influx, expediting

Case 3:25-cv-01766-EMC     Document 104-1     Filed 04/07/25     Page 83 of 95

mechanisms to grant work authorizations so that migrants can escape informal labor, and advocating for a more permanent extension of temporary protective status for all Venezuelans.

## The longer the Maduro regime stays in power, the more people will flee.

Opposition primaries held on October 22, with the participation of over 2.3 million people, show that Venezuelans have not lost hope in the electoral route to regain democracy in Venezuela, especially when the candidate María Corina Machado won with over 90 percent of the votes. Over 132,000 votes came from the powerful force of the Venezuelan diaspora. If the diaspora is considered as a "state," Venezuelans abroad are in first place in participation in percentage terms (37.35 percent), well above the national average (12.83 percent) placing the diaspora among the five "electoral states" with the highest participation in terms of absolute numbers. This amply demonstrates that allowing migrants and refugees to register to vote will be an important condition to enable free and fair elections in 2024. Even though the U.S. administration agreed to broadly lift sanctions on the oil sector in exchange for democratic conditions for the 2024 electoral process, the regime still needs to keep their part of the deal. Unfortunately, today, that seems far-fetched when Maduro is calling the primaries a fraud and the Supreme Tribunal is opening investigations to persecute the members of the National Primary Committee who organized the event.

If no indication of regime change seems in sight and the 2024 presidential elections are not free or fair, upticks in migration should be expected, as Venezuelans will continue to leave the country in search of better opportunities. Therefore, it is critical not to overlook this migrant crisis nor normalize it, as it is evidence of the persistence of the democratic and economic breakdown in this country, which continues to be a threat to the stability of the region and the world.

*Betilde Muñoz-Pogossian is a senior associate (non-resident) with the Americas Program at the Center for Strategic and International Studies (CSIS) in Washington, D.C. Alexandra Winkler is a senior associate (non-resident) with the CSIS Americas Program.*

*The views expressed are those of the authors and do not represent official positions of the Organization of American States (OAS).*

*Commentary* is produced by the Center for Strategic and International Studies (CSIS), a private, tax-exempt institution focusing on international public policy issues. Its research is nonpartisan and nonproprietary. CSIS does not take specific policy positions. Accordingly, all views, positions, and conclusions expressed in this publication should be understood to be solely those of the author(s). © 2023 by the Center for Strategic and International Studies. All rights reserved.

## Tags

Americas, Human Rights, Humanitarian Assistance, and Conflict and Humanitarian Crises

Center for Strategic and International Studies

1616 Rhode Island Avenue, NW

Washington, DC 20036

Tel: 202.887.0200

Fax: 202.775.3199

MEDIA INQUIRIES

**H. Andrew Schwartz**

Chief Communications Officer

202.775.3242

aschwartz@csis.org

**Samuel Cestari**

Media Relations Coordinator, External Relations

202.775.7317

scestari@csis.org

See Media Page for more interview, contact, and citation details.

©2025 Center for Strategic & International Studies. All Rights Reserved.





Updated January 13, 2025

# Venezuela: Political Crisis and U.S. Policy

Over the past decade, some Members of Congress have expressed concerns about the erosion of democracy in Venezuela under President Nicolás Maduro (2013-present). Maduro took office after garnering a narrow electoral victory following the death of Hugo Chávez (in office 1999-2013), the founder of the United Socialist Party of Venezuela. Maduro has remained in power following elections in 2018 and 2024 that were both deemed fraudulent by international observers, the United States, and most U.S.-aligned democracies. After the July 28, 2024, election, Maduro claimed victory even though precinct-level vote tabulations published by the opposition indicated that opposition candidate Edmundo González Urrutia, a retired diplomat, won with 67% of the vote. Those vote tabulations comprised nearly 84% of all votes cast. Nevertheless, Maduro began a third term on January 10, 2025, with the support of Venezuelan security forces and allies including China, Cuba, Iran, and Russia.

The Trump Administration sought to promote democracy and human rights in Venezuela by using a "maximum pressure" sanctions strategy to try to compel Maduro to cede power. Sanctions proved insufficient to achieve that end and may have exacerbated an ongoing economic crisis that contributed to massive emigration, including to the United States. The Biden Administration offered limited sanctions relief to try to incentivize Maduro to convene freer and fairer elections in 2024 and to allow U.S. companies to operate in Venezuela's energy sector. The Biden Administration recognized Edmundo González as president-elect in November 2024.

The 119th Congress may assess U.S. policies toward the Maduro government, including whether and how to support the democratic opposition and the efficacy of sanctions, while also considering other U.S. interests. Such interests include U.S. energy companies' desire to operate in Venezuela, which has the world's largest proven oil reserves. They also include preventing irregular migration and compelling the Maduro government to agree to receive Venezuelan migrants removed from the United States. Opposition leader María Corina Machado (who was barred from running in the 2024 election) has urged President-elect Trump to focus on promoting democracy and human rights in Venezuela. Some analysts have urged the incoming Administration to negotiate with Maduro on discrete issues in the U.S. interest, such as migration or energy.

## Political Situation

Venezuela, which the nongovernmental organization Freedom House ranked "partly free" under President Hugo Chávez (1999-2013), has deteriorated to "not free" under Maduro. Chávez, a charismatic politician, benefited from high oil prices and won most elections by a large majority. In contrast, Maduro has experienced narrow wins and some electoral defeats (including in the 2015 legislative elections

in which his party lost control for the first time since 1999). The opposition, once weak and divided, has remained united since 2022 as the Unitary Platform (PUD).

Maduro has relied on security forces buoyed by corrupt courts to quash dissent. He has allowed security forces to enrich themselves through illicit gold mining, drug trafficking, extortion, and other crimes. The International Criminal Court is investigating whether Venezuelan forces committed crimes against humanity.

Security forces have detained and reportedly abused Maduro's opponents, including dissidents in the military, opposition politicians, and protesters. As of January 9, 2025, the government held 1,700 detainees, including 79 prisoners detained thus far in January 2025, according to Venezuelan human rights group Foro Penal. After the attorney general issued an arrest warrant for González, he fled into exile in September 2024. González visited several countries in January 2025 and met with President Biden in Washington, DC, but reportedly could not return to Venezuela. Machado led protests on January 9, but returned to hiding after Maduro's forces briefly detained her.

## Economic and Humanitarian Crisis

By most accounts, Maduro's government has mismanaged the economy and engaged in massive corruption. Between 2014 and 2021, Venezuela's economy contracted by 80%, according to estimates by the International Monetary Fund (IMF), due to low global oil prices and declines in the country's oil production. According to a February 2021 Government Accountability Office report, sanctions imposed by the United States from 2017 to 2019, particularly those targeting Venezuela's oil industry, contributed to the economic crisis. Hyperinflation declined from 337% in 2023 to 59.6% in 2024, according to the IMF, but income levels remain insufficient for most households to purchase basic necessities. According to one national survey by a Venezuelan university, roughly 82.8% of the population of 26.5 million lived in income poverty in 2023, particularly outside the capital of Caracas.

In 2024, an estimated 7.6 million Venezuelans (28% of the population) required humanitarian assistance, according to the United Nations. Many households lack reliable access to potable water, and interruptions in electrical service and gas supplies persist. With a collapsed health system, overall health indicators, particularly infant and maternal mortality rates, remain poor. Previously eradicated diseases such as measles are a major concern.

As of December 2024, UN agencies estimated there were some 7.9 million Venezuelan refugees and migrants globally. Some 6.6 million of these individuals reside in other Latin American and Caribbean countries. Venezuelan refugees and migrants reportedly face obstacles to keeping jobs and accessing health care; they may be vulnerable to

human trafficking and other abuses. These factors have contributed to secondary migration to the United States.

## U.S. Policy

The U.S. government ceased recognizing Maduro as Venezuela's legitimate president in January 2019. The U.S. government recognizes the democratically elected, opposition-controlled 2015 National Assembly as "the only legitimate branch of the Government of Venezuela," even though most of its members are in exile. From January 2019 through December 2022, the 2015 National Assembly backed an interim government led by its former speaker, Juan Guaidó. The Guaidó government received recognition from the United States and nearly 60 governments but never exerted power in Venezuela. The 2015 National Assembly dissolved the interim government in late 2022.

In November 2022, the Biden Administration sought to support Maduro-PUD talks by offering limited sanctions relief. After the flawed July 2024 elections, the Department of the Treasury's Office of Foreign Assets Control (OFAC) imposed sanctions on 37 Maduro officials for undemocratic actions and repression. President Biden reiterated U.S. support for the opposition at a January 6, 2025, meeting with González. On January 10, 2025, OFAC imposed sanctions on eight Maduro officials (in coordination with the European Union, the United Kingdom, and Canada). The State Department revoked visas of Maduro and two other top officials and raised the bounty on Maduro and two other top officials facing U.S. indictments. OFAC thus far has maintained specific licenses issued since 2022 allowing certain companies to conduct business with Petróleos de Venezuela, S.A. (PdVSA), Venezuela's state oil company.

**Sanctions and Indictments.** Sanctions are a key part of U.S. policy toward Venezuela. They are based in various legislated authorities, including the Venezuela Defense of Human Rights and Civil Society Act of 2014, and include the following:

- **Individual sanctions** for terrorism, drug trafficking, antidemocratic actions, human rights violations, or corruption (see Executive Order [E.O.] 13692; P.L. 113-278; P.L. 114-194)

- **Financial sanctions** restricting access to U.S. financial markets by the Maduro government and PdVSA (E.O. 13808); prohibiting transactions using Maduro-issued cryptocurrency (E.O. 13827); and prohibiting the purchase of Venezuelan debt (E.O. 13835)

- **Sectoral sanctions** blocking assets and prohibiting unlicensed transactions with PdVSA, Venezuela's central bank, and the state gold mining company, among other entities (E.O. 13850)

- **Sanctions on the Maduro government** blocking assets in the United States and prohibiting transactions with the Maduro government unless authorized as part of efforts to aid the Venezuelan people (E.O. 13884)

In March 2020, the Department of Justice indicted Maduro and 14 top officials for narco-terrorism, drug trafficking, and other crimes.

**Migration.** On January 10, 2025, the Biden Administration announced an 18-month extension and redesignation of the temporary protected status (TPS) for Venezuelans, initially

announced in 2021. As of September 30, 2024, an estimated 505,400 Venezuelans were covered by TPS, which provides work authorization and relief from removal. These protections are set to expire in 2026 unless extended by the Secretary of the Department of Homeland Security (DHS). From January 2023 through September 2024, 117,000 Venezuelans arrived in the United States via a parole program for Cubans, Haitians, Nicaraguans, and Venezuelans (the CHNV program). In October 2024, DHS announced it would not extend the two-year parole status for CHNV beneficiaries. Venezuela is a top country of origin for irregular migrants encountered at the U.S. border. The Maduro government does not cooperate with U.S. removals, a barrier for U.S. immigration enforcement.

**U.S. Assistance.** The United States has supported a regional response to the migration crisis. From FY2017 to FY2024, the United States provided over $3.5 billion in humanitarian aid to Venezuela and countries sheltering Venezuelans. From FY2017 to FY2024, U.S. democracy, development, and health assistance allocated from annual appropriations for Venezuela totaled around $336.2 million. FY2024 estimated aid allocations are not yet available.

## Congressional Action

Congress has supported efforts at restoring democracy in Venezuela through foreign assistance and targeted sanctions, but Members have disagreed on whether broad sanctions should have been imposed and under what circumstances sanctions relief should be granted. The last legislation guiding U.S. policy in Venezuela, the VERDAD Act of 2019 (P.L. 116-64), expired in December 2023. The act aimed to hasten a negotiated solution to the crisis. Bills to reauthorize individual sanctions in the VERDAD Act were ordered to be reported in the House (H.R. 6831) and introduced in the Senate (S. 3363); the 118th Congress did not take further action on them. In the Further Consolidated Appropriations Act, 2024 (P.L. 118-47), Congress appropriated $50 million in democracy assistance for Venezuela subject to election-related restrictions.

The 119th Congress may influence U.S. policy toward Venezuela through the appropriations process. The 118th Congress did not complete action on FY2025 appropriations. U.S. assistance programs are continuing at FY2024 enacted levels under a continuing resolution (P.L. 118-158) scheduled to expire on March 14, 2025. The Biden Administration requested $50 million for democracy programs and $3.8 million for global health programs in Venezuela for FY2025. Both the House-passed (H.R. 8771/H.Rept. 118-554) and Senate-introduced versions of the FY2025 Department of State, Foreign Operations, and Related Programs Appropriations act (S. 4797/S.Rept. 118-204) would have met the $50 million request. H.R. 8771 would have placed conditions on that assistance.

The 119th Congress could consider broad legislation to shape U.S. policy toward Venezuela that could include sanctions guidelines, tools to address Maduro's foreign allies and illicit activities, and authorizations for U.S. assistance. Congress also could consider narrow measures to authorize, maintain, expand, loosen, or otherwise alter sanctions. Oversight could examine the degree to which sanctions have advanced U.S. policy goals, and other U.S. policy options.

VZ-Termination_0087

**Clare Ribando Seelke**, Specialist in Latin American Affairs

IF10230

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

Act Manager, U.S. Coast Guard, 2703
Martin Luther King Jr. Ave. SE, Stop
7710, Washington, DC 20593–7710.

**FOR FURTHER INFORMATION CONTACT:** A.L.
Craig, Office of Privacy Management,
telephone 202–475–3528, or fax 202–
372–8405, for questions on these
documents.

**SUPPLEMENTARY INFORMATION:**

**Public Participation and Request for
Comments**

This notice relies on the authority of
the Paperwork Reduction Act of 1995;
44 U.S.C. chapter 35, as amended. An
ICR is an application to OIRA seeking
the approval, extension, or renewal of a
Coast Guard collection of information
(Collection). The ICR contains
information describing the Collection's
purpose, the Collection's likely burden
on the affected public, an explanation of
the necessity of the Collection, and
other important information describing
the Collection. There is one ICR for each
Collection.

The Coast Guard invites comments on
whether this ICR should be granted
based on the Collection being necessary
for the proper performance of
Departmental functions. In particular,
the Coast Guard would appreciate
comments addressing: (1) The practical
utility of the Collection; (2) the accuracy
of the estimated burden of the
Collection; (3) ways to enhance the
quality, utility, and clarity of
information subject to the Collection;
and (4) ways to minimize the burden of
the Collection on respondents,
including the use of automated
collection techniques or other forms of
information technology.

In response to your comments, we
may revise this ICR or decide not to seek
an extension of approval for the
Collection. We will consider all
comments and material received during
the comment period.

We encourage you to respond to this
request by submitting comments and
related materials. Comments must
contain the OMB Control Number of the
ICR and the docket number of this
request, [USCG–2021–0175], and must
be received by May 10, 2021.

**Submitting Comments**

We encourage you to submit
comments through the Federal
eRulemaking Portal at *https://
www.regulations.gov*. If your material
cannot be submitted using *https://
www.regulations.gov,* contact the person
in the **FOR FURTHER INFORMATION
CONTACT** section of this document for
alternate instructions. Documents
mentioned in this notice, and all public

comments, are in our online docket at
*https://www.regulations.gov* and can be
viewed by following that website's
instructions. Additionally, if you go to
the online docket and sign up for email
alerts, you will be notified when
comments are posted.

We accept anonymous comments. All
comments received will be posted
without change to *https://
www.regulations.gov* and will include
any personal information you have
provided. For more about privacy and
submissions in response to this
document, see DHS's eRulemaking
System of Records notice (85 FR 14226,
March 11, 2020).

**Information Collection Request**

*Title:* Outer Continental Shelf
Activities—Title 33 CFR Subchapter N.

*OMB Control Number:* 1625–0044.

*Summary:* The Outer Continental
Shelf Lands Act, as amended, authorizes
the Coast Guard to promulgate and
enforce regulations promoting the safety
of life and property on Outer
Continental Shelf (OCS) facilities. These
regulations are located in 33 CFR
subchapter N.

*Need:* The information is needed to
ensure compliance with the safety
regulations related to OCS activities.
The regulations contain reporting and
recordkeeping requirements for annual
inspections of OCS facilities, employee
citizenship records, station bills, and
emergency evacuation plans.

*Forms:*

• CG–5432, Fixed OCS Facility
Inspection Report.

*Respondents:* Operators of facilities
and vessels engaged in activities on the
OCS.

*Frequency:* On occasion.

*Hour Burden Estimate:* The estimated
burden remains 9,582 hours a year.

*Authority:* The Paperwork Reduction
Act of 1995; 44 U.S.C. chapter 35, as
amended.

Dated: March 3, 2021.

**Kathleen Claffie,**

*Chief, Office of Privacy Management, U.S.
Coast Guard.*

[FR Doc. 2021–04845 Filed 3–8–21; 8:45 am]

**BILLING CODE 9110–04–P**

**DEPARTMENT OF HOMELAND
SECURITY**

**U.S. Citizenship and Immigration
Services**

**[CIS No. 2682–21; DHS Docket No. USCIS–
2021–0003]**

**RIN 1615–ZB86**

**Designation of Venezuela for
Temporary Protected Status and
Implementation of Employment
Authorization for Venezuelans Covered
by Deferred Enforced Departure**

**AGENCY:** U.S. Citizenship and
Immigration Services (USCIS),
Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this notice, the
Department of Homeland Security
(DHS) announces that the Secretary of
Homeland Security (Secretary) is
designating Venezuela for Temporary
Protected Status (TPS) for 18 months,
effective March 9, 2021, through
September 9, 2022. This notice also
provides procedures for individuals
who believe they are eligible for TPS
under the designation of Venezuela to
apply. This notice also provides
information about Deferred Enforced
Departure (DED) for eligible Venezuelan
nationals (and persons without
nationality who last habitually resided
in Venezuela), and provides information
on how eligible individuals may apply
for DED-related EADs with USCIS,
based on the January 19, 2021
memorandum from former President
Donald Trump directing the Secretary to
take appropriate measures for the
implementation of DED for Venezuelan
nationals for 18 months, through July
20, 2022 (see 86 FR 6845, dated January
25, 2021).

**Note:** Individuals who apply for and
receive TPS and who are also covered
by DED do not need to apply for
employment authorization under both
programs. Individuals who apply for an
EAD pursuant to their TPS application
will receive an EAD with an expiration
date of September 9, 2022, that is
eligible for renewal if the Secretary
extends TPS for Venezuela after
September 9, 2022, after determining
that Venezuela continues to meet the
conditions supporting its designation
for TPS. Individuals who apply for an
EAD pursuant to DED will receive an
EAD with an expiration date of July 20,
2022. If the President does not direct an
extension of the DED authorization,
DED, and associated employment
authorization, will end on July 20, 2022.
USCIS encourages individuals who

believe they are eligible for TPS to file for the benefit during the initial registration period announced in this Notice, even if they are also covered by DED, in case they cannot qualify for TPS late initial filing under 8 CFR 244.2(f)(2) after DED has expired.

**DATES:** The designation of Venezuela for TPS is effective on March 9, 2021, and will remain in effect for 18 months, through September 9, 2022. The 180-day registration period for eligible individuals to submit TPS applications begins March 9, 2021, and will remain in effect through September 5, 2021. DED and employment authorization for noncitizens covered under DED for Venezuela is effective through July 20, 2022.

**FOR FURTHER INFORMATION CONTACT:**
• You may contact Maureen Dunn, Division Chief, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *uscis.gov/tps.* You can find specific information about Venezuela's TPS designation by selecting ''Venezuela'' from the menu on the left side of the TPS web page.

• For further information on DED, including additional information on eligibility, please visit the USCIS DED web page at *uscis.gov/humanitarian/ temporary-protected-status/deferred-enforced-departure.* You can find specific information about DED for Venezuela by selecting ''DED Granted Country: Venezuela'' from the menu on the left of the DED web page.

• If you have additional questions about DED or TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking registration information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.*

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:** Under section 244(b)(1)(C) of the Immigration

and Nationality Act (INA), 8 U.S.C. 1254a(b)(1)(C), the Secretary is authorized to designate a foreign state (or any part thereof) for TPS upon finding that extraordinary and temporary conditions in the foreign state prevent its nationals from returning safely, unless permitting the foreign state's nationals to remain temporarily in the United States is contrary to the national interest of the United States. Regardless of an individual's country of birth, this designation allows eligible Venezuelan nationals (and noncitizens having no nationality who last habitually resided in Venezuela) who have continuously resided in the United States since March 8, 2021, and have been continuously physically present in the United States since March 9, 2021, to apply for TPS. This notice also describes the other eligibility criteria applicants must meet. Individuals who believe they may qualify for TPS under this designation may apply within the 180-day registration period that begins on March 9, 2021, and ends on September 5, 2021. They may also apply for TPS-related Employment Authorization Documents (EADs) and for travel authorization.

This notice also provides information about Deferred Enforced Departure (DED) for eligible Venezuelan nationals (and persons without nationality who last habitually resided in Venezuela), and provides information on how eligible individuals may apply for DED-related EADs with USCIS, based on the January 19, 2021 memorandum from former President Donald Trump directing the Secretary to take appropriate measures for the implementation of DED for Venezuelan nationals for 18 months, through July 20, 2022 (see 86 FR 6845, dated January 25, 2021).

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DED—Deferred Enforced Departure
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government

IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Purpose of This Action (TPS)

Through this notice, DHS sets forth procedures necessary for eligible nationals of Venezuela (or individuals having no nationality who last habitually resided in Venezuela) to submit an initial registration application under the designation of Venezuela for TPS and apply for an EAD. Under the designation, individuals must submit an initial Venezuela TPS application (Form I–821) and they may also submit an application for Employment Authorization (Form I–765), during the 180-day initial registration period that runs from March 9, 2021, through September 5, 2021. In addition to demonstrating continuous residence in the United States since March 8, 2021, and meeting other eligibility criteria, initial applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since March 9, 2021, the effective date of this designation of Venezuela, before USCIS may grant them TPS. USCIS estimates that approximately 323,000 individuals are eligible to file applications for TPS under the designation of Venezuela.

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the INA, or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. Upon return from such authorized travel, TPS beneficiaries retain the same immigration status they had before the travel.

○ The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

## Why was Venezuela designated for TPS?

### Overview

Venezuela is currently facing a severe humanitarian emergency.[1] Under Nicolás Maduro's influence,[2] the country "has been in the midst of a severe political and economic crisis for several years."[3] Venezuela's crisis has been marked by a wide range of factors, including: Economic contraction; inflation and hyperinflation; deepening poverty; high levels of unemployment; reduced access to and shortages of food and medicine; a severely weakened medical system; the reappearance or increased incidence of certain communicable diseases; a collapse in basic services; water, electricity, and fuel shortages; political polarization; institutional and political tensions; human rights abuses and repression; crime and violence; corruption; increased human mobility and displacement (including internal migration, emigration, and return); and the impact of the COVID–19 pandemic, among other factors.[4]

---

[1] World Report 2021—Venezuela, Human Rights Watch, Jan. 2021.

[2] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), Summary, Aug. 26, 2020.

[3] Venezuelan Humanitarian and Refugee Crisis, Center for Disaster Philanthropy, Jan. 18, 2021.

[4] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), Summary, Aug. 26, 2020; Venezuelan Humanitarian and Refugee Crisis, Center for Disaster Philanthropy, Jan. 18, 2021; Venezuela: Complex Crisis—Overview, ACAPS, Jul. 27, 2020, *https://www.acaps.org/country/venezuela/crisis/complex-crisis* (last visited Feb. 2, 2021); Venezuela: Humanitarian Response Plan with Humanitarian Needs Overview 2020, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), p.7–9, Jul. 2020; Detailed findings of the independent international factfinding mission on the Bolivarian Republic of Venezuela, United Nations Human Rights Council, p.27, Sep. 15, 2020; Conflictividad Social 2020 [Social Conflict 2020], Observatorio Venezolano de

### Economic Crisis

Venezuela continues to suffer from a severe economic crisis. The Congressional Research Service (CRS) reported in August 2020 that "Venezuela's economy has collapsed." With the largest proven oil reserves in the world, Venezuela had long been "one of the most prosperous countries in South America." However, in 2014, the country entered into an ongoing "economic recession marked by hyperinflation, shortages of basic goods and a collapse in public services such as electricity and water." Sources attribute Venezuela's economic crisis to a variety of factors, including: The crash of global oil prices; economic mismanagement; heavy government regulation of the economy and the private sector; corruption; and the impact of the COVID–19 pandemic.

### Political Crisis

Venezuela continues to be impacted by a prolonged political crisis. Following a May 2018 electoral process that lacked legitimacy, but which Nicolás Maduro claimed to have won, the United States and many other democracies recognized Juan Guaidó as the interim President of Venezuela. Maduro continued to exert control over all Venezuelan institutions after January 2019, aside from the legitimately elected, opposition-controlled 2015 National Assembly. In elections held on December 6, 2020—which were rejected by the Organization of American States, many governments, and other international organizations as fraudulent[5]—supporters of Maduro won a vast majority of seats in the National Assembly under manipulated electoral conditions. Maduro installed a new illegitimate purported National Assembly on January 5, 2021.

### Human Rights

While concerns about "the deterioration of democratic institutions and threats to freedom of speech and press in Venezuela" have been expressed by human rights organizations for over a decade, CRS reported in August 2020 that human rights conditions are even worse under Maduro than under former President

---

Conflictividad Social (OVCS), Jan. 25, 2021; Asmann, Parker, and Jones, Katie, InSight Crime's 2020 Homicide Round-Up, InSight Crime, Jan. 29, 2021; Venezuela 2020 Crime & Safety Report, Overseas Security Advisory Council (OSAC), U.S. Department of State, Jul. 21, 2020.

[5] See Remarks by Bradley A. Freden, Deputy Permanent Representative of the United States OAS Permanent Council, OAS Resolution Condemns the Fraudulent Elections in Venezuela (Dec 9, 2020).

Chávez.[6] The Independent International Fact-Finding Mission created by the UN Human Rights Council to investigate allegations of atrocities since 2014 concluded that there were reasonable grounds to believe that pro-government groups and high-level authorities, including Maduro, had committed violations amounting to crimes against humanity. The mission found the judiciary contributed to arbitrary arrests, impunity for egregious abuses, and denial of justice to victims.[7]

### Health Crisis

Venezuela was facing a significant health crisis even before the start of the COVID–19 pandemic. According to CRS, "overall health indicators, particularly infant and maternal mortality rates," had deteriorated well before the impact of the COVID–19 pandemic. In April 2019, Human Rights Watch and the Johns Hopkins Bloomberg School of Public Health reported that "Venezuela's health system has been in decline since 2012, with conditions worsening drastically since 2017." Human Rights Watch reported in May 2020 that "Venezuela's health system has collapsed. Shortages of medications and health supplies, interruptions of basic utilities at healthcare facilities, and the emigration of healthcare workers have led to a progressive decline in healthcare operational capacity." Venezuelans also face "severe shortages of medicines and medical supplies"[8] and "a complex situation in which access to basic services, especially health services remain critical."[9]

### Food Insecurity

In an October 2020 report, the Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP) identified Venezuela (and Venezuelan migrants in neighboring countries) as one of 20 "acute food insecurity hotspots"[10] in

---

[6] Ribando Seelke, Clare, Nelson, Rebecca M., Brown, Phillip, Margesson, Rhoda, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), p.7, Aug. 26, 2020.

[7] OHCHR | Venezuela: UN report urges accountability for crimes against humanity (Sep 16, 2020).

[8] Venezuela: Country Focus, European Asylum Support Office (EASO), p.41, Aug. 2020.

[9] United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Venezuela: Health Emergency 12-month update, *https://reliefweb.int/report/venezuela-bolivarian-republic/venezuela-health-emergency-12-month-update-mdrve004,* May 20, 2020.

[10] FAO–WFP early warning analysis of acute food insecurity hotspots: October 2020, Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP), p.6, Nov. 2020.

the world.[11] In an April 2019 report, Human Rights Watch and the Johns Hopkins Bloomberg School of Public Health reported that "[h]unger, malnutrition, and severe shortages of food are widespread" in Venezuela.[12] Despite a lack of nationwide nutrition data—last published by the government in 2007—the report asserted that "available evidence suggests malnutrition is high." [13] Moreover, Human Rights Watch reported in January 2021 that, "[b]ased on data collected prior to the pandemic, the 2020 National Survey of Life Conditions reported 8 percent of children under five acutely malnourished and 30 percent chronically malnourished, or stunted."

To help address shortages of food, the Venezuelan government established the Local Committees for Supply and Production (Comités Locales de Abastecimiento y Producción—CLAP) in 2016. According to the European Asylum Support Office (EASO), the CLAP "are responsible for the delivery of food and other government aid to the communities." However, CLAP food boxes "do not meet the basic nutritional needs," and their delivery is reportedly "inconsistent and discretionary." Furthermore, EASO noted that the CLAP are reportedly used to monitor the population—including the political activity of beneficiaries—and "as a tool to discriminate and harass those who oppose the government or are involved in human rights advocacy." There have also been allegations that certain Venezuelans have been "excluded from the list of CLAP beneficiaries because they were not government supporters."

*Access to Basic Services (Electricity, Water, Gas, etc.)*

Venezuela has seen a "collapse of basic services." [14] In a July 2020 report, OHCHR stated that "Access and quality of basic services, such as transportation, electricity, water and sanitation, and gas, continued to deteriorate, undermining the right to an adequate standard of living." [15] Venezuela also faces "severe shortages of water." Further, "an estimated 86% of Venezuelans reported unreliable water service, including 11% who have none at all", according to an April 2020 survey of 4,500 residents by the non-profit Venezuelan Observatory of Public Services.[16]

*Crime and Insecurity*

Sources reported in mid-2020 that Venezuela has "among the highest homicide and crime victimization rates in Latin America and the Caribbean," and "one of the highest number [sic] of violent deaths in the region and in the world." While Venezuela recorded "a substantial decrease in homicides in 2020," InSight Crime noted in January 2021 that "violence is indeed still rampant" in the country. InSight Crime also reported that—per the Venezuelan Violence Observatory (Observatorio Venezolano de Violencia or OVV)—"a violence epidemic continues to plague every single state, as well as the capital district of Caracas." Sources have attributed recent declines in the homicide rate to a variety of factors, including: A decrease in violence among armed structures that engage in territorial control; fewer opportunities to engage in criminal behavior due to rising poverty, emigration, and economic deterioration, among other factors; and the impact of quarantines and restrictions on movement related to the COVID–19 pandemic. In its 2020 report, the U.S. Department of State's Overseas Security Advisory Council (OSAC) stated that "[h]eavily armed criminals have used grenades and assault rifles to commit crimes at banks, shopping malls, public transportation stations, and universities." [17]

## What authority does the Secretary have to designate Venezuela for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government (Government), to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, or termination of or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A). The Secretary, in his/her discretion, may then grant TPS to eligible nationals of that foreign state (or noncitizens having no nationality who last habitually resided in the designated country). See INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in the foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. See INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary does not determine that the foreign state no longer meets the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. See INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. See INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## Notice of the Designation of Venezuela for TPS

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Venezuela's designation for TPS on the basis of extraordinary and temporary conditions are met. See INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am designating Venezuela for TPS for 18 months, from March 9, 2021 through September 9, 2022. See INA section 244(b)(1)(C) and (b)(2); 8 U.S.C. 1254a(b)(1)(C), and (b)(2).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

## Eligibility and Employment Authorization for TPS

## Required Application Forms and Application Fees To Register for TPS

To register for TPS based on the designation of Venezuela, you must submit an Application for Temporary Protected Status (Form I–821) and pay

---

[11] FAO–WFP early warning analysis of acute food insecurity hotspots: October 2020, Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP), p.5–6,12, Nov. 2020.

[12] Venezuela's Humanitarian Emergency: Large-Scale UN Response Needed to Address Health and Food Crises, Human Rights Watch & Johns Hopkins Bloomberg School of Public Health, p.4, Apr. 4, 2019.

[13] Venezuela's Humanitarian Emergency: Large-Scale UN Response Needed to Address Health and Food Crises, Human Rights Watch & Johns Hopkins Bloomberg School of Public Health, p.4, Apr. 4, 2019.

[14] Venezuela: Country Focus, European Asylum Support Office (EASO), p.41, Aug. 2020.

[15] Outcomes of the investigation into allegations of possible human right violations of the human rights to life, liberty and physical and moral integrity in the Bolivarian Republic of Venezuela, Office of the United Nations High Commissioner for Human Rights (OHCHR), p.4, Jul. 2, 2020.

[16] Latest on Water Shortage in Venezuela, Hispanic Oulook Magazine, June 2020.

[17] Venezuela 2020 Crime & Safety Report, Department of State Overseas Security Advisory Council, July 21, 2020.

the filing fee (or submit a Request for a Fee Waiver (Form I–912)). You may be required to pay the biometric services fee. Please see additional information under the "Biometric Services Fee" section of this notice.

Although not required to do so, if you want to obtain an EAD valid through September 7, 2021, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or submit a Request for a Fee Waiver (Form I–912)). If you do not want to request an EAD now, you may also file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps*. Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

### Biometric Services Fee for TPS

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may complete a Request for Fee Waiver

(Form I–912). For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps*. If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *dhs.gov/privacy*.

### Refiling a TPS Registration Application After Receiving a Denial of a Fee Waiver Request

You should file as soon as possible within the 180-day registration period so USCIS can process your application and issue any EAD promptly. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to refile by the registration deadline, you may still refile your Form I–821 with the biometrics fee. USCIS will review this situation to determine whether you established good cause for late TPS registration. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. See INA section 244(c)(3)(C);

8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late initial registration, visit the USCIS TPS web page at *uscis.gov/tps*. Following denial of your fee waiver request, you may also refile your Form I–765, with fee, either with your Form I–821 or at a later time, if you choose.

*Note:* Although a registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee) when filing a TPS registration application, you may decide to wait to request an EAD. Therefore, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of registration, and could wait to seek an EAD until after USCIS has approved your TPS registration application. If you choose to do this, to register for TPS you would only need to file the Form I–821 with the biometric services fee, if applicable (or request a fee waiver).

### Mailing Information

Mail your application for TPS to the proper address in Table 1.

Table 1-Mailing Addresses:

Mail your completed Application for Employment Authorization (Form I–765) and supporting documentation to the proper address in Table 1.

### TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
| --- | --- |
| You are applying through the U.S. Postal Service and you live in Florida. | USCIS, Attn: TPS Venezuela, P.O. Box 20300, Phoenix, AZ 85036. |
| You are using FedEx, UPS, or DHL and you live in Florida ................... | USCIS, Attn: TPS Venezuela, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034 |
| You are applying through U.S. Postal Service and you live in any other state. | USCIS Attn: TPS Venezuela, P.O. Box 805282, Chicago, IL 60690. |
| You are using FedEx, UPS, or DHL and you live in any other state ...... | USCIS, Attn: TPS Venezuela (805282), 131 South Dearborn—3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. When registering and requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us to verify your grant of TPS and process your application.

### Supporting Documents

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable

documentation and other requirements for applying or registering for TPS on the USCIS website at *uscis.gov/tps* under "Venezuela."

### Purpose of this Action (DED)

Pursuant to the President's constitutional authority to conduct the foreign relations of the United States, foreign policy considerations warrant implementing DED for Venezuela through July 20, 2022.[18] Through this notice, DHS is establishing procedures for individuals covered by DED for Venezuela to apply for employment authorization through July 20, 2022.

---

[18] *See* Deferred Enforced Departure for Certain Venezuelans, 86 FR 6845, January 25, 2021, available at **Federal Register**: Deferred Enforced Departure for Certain Venezuelans.

### What is Deferred Enforced Departure (DED)?

• DED is an administrative stay of removal ordered by the President. The authority to grant DED arises from the President's constitutional authority to conduct the foreign relations of the United States. The President can authorize DED for any reason related to this authority. DED has been authorized in situations where foreign nationals may face danger if required to return to countries experiencing political instability, conflict, or other unsafe conditions, or when there are other foreign policy reasons for allowing a designated group of foreign nationals to remain in the United States.

• Although DED is not a specific immigration status, individuals covered

by DED are not subject to removal from the United States, usually for a designated period of time. Furthermore, the President may direct that certain benefits, such as employment authorization or travel authorization, be available to foreign nationals covered by the DED directive.

• If the President provides for employment or travel authorization, USCIS administers those benefits. USCIS publishes a **Federal Register** notice to instruct the covered population on how to apply for any benefits provided.

• The President issues directives regarding DED and who is covered via presidential memorandum. The qualification requirements for individuals who are covered under DED are based on the terms of the President's directive regarding DED and any relevant implementing requirements established by DHS. Since DED is a directive not to remove particular individuals, rather than a specific immigration status like TPS, there is no DED application form required to obtain DED coverage.

The Presidential Memorandum ordering DED for Venezuelans can be found at: *https://www.federalregister.gov/documents/2021/01/25/2021-01718/deferred-enforced-departure-for-certain-venezuelans*

### Eligibility and Employment Authorization for DED

#### How will I know if I am eligible for employment authorization under the DED Presidential Memorandum for eligible Venezuelans?

The procedures for employment authorization in this notice apply only to noncitizens who are Venezuelan nationals, and persons without nationality who last habitually resided in Venezuela, who are present in the United States as of January 20, 2021, and except for noncitizens:

• Who have voluntarily returned to Venezuela or their country of last habitual residence outside the United States;

• Who have not continuously resided in the United States since January 20, 2021;

• Who are inadmissible under section 212(a)(3) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(a)(3)) or removable under section 237(a)(4) of the INA (8 U.S.C. 1227(a)(4));

• Who have been convicted of any felony or two or more misdemeanors committed in the United States, or who meet the criteria set forth in section 208(b)(2)(A) of the INA (8 U.S.C. 1158(b)(2)(A));

• Who were deported, excluded, or removed, before January 20, 2021;

• Who are subject to extradition;

• Whose presence in the United States the Secretary of Homeland Security has determined is not in the interest of the United States or presents a danger to public safety; or

• Whose presence in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States.

#### What will I need to file if I am covered by DED and would like to obtain employment authorization?

If you are covered under DED for Venezuela and would like to work, you must apply for an EAD by filing an Application for Employment Authorization (Form I–765). Please carefully follow the Application for Employment Authorization (Form I–765) instructions when completing the application for an EAD. When filing the Application for Employment Authorization (Form I–765), you must:

• Indicate that you are eligible for DED by entering ''(a)(11)'' in response to Question 27 on the Application for Employment Authorization (Form I–765); and

• Submit the fee for the Application for Employment Authorization (Form I–765).

The regulations require individuals covered under DED who request an EAD to pay the fee prescribed in 8 CFR 103.7 for the Application for Employment Authorization (Form I–765). *See also* 8 CFR 274a.12(a)(11) (employment authorization for DED-covered individuals); and 8 CFR 274a.13(a) (requirement to file EAD application if EAD desired). If you are unable to pay the fee, you may apply for an application fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation.

#### How will I know if USCIS will need to obtain biometrics?

If biometrics are required to produce your EAD, you will be notified by USCIS and scheduled for an appointment at a USCIS Application Support Center.

#### Where do I submit my completed DED-based Application for Employment Authorization (Form I–765)?

For DED, mail your completed Application for Employment Authorization (Form I–765) and supporting documentation to the proper address in Table 2.

TABLE 2—MAILING ADDRESSES

| If . . . | Mail to . . . |
| --- | --- |
| You are applying through the U.S. Postal Service .................................. | USCIS, Attn: DED Venezuela, PO Box 805283, Chicago, IL 60680–6943] |
| You are using FedEx, UPS, or DHL ....................................................... | USCIS, Attn: DED Venezuela, 131 South Dearborn—3rd Floor, ≤Chicago, IL 60603–5517 |

#### Can I file my DED-based Application for Employment Authorization (Form I–765) electronically?

No. Electronic filing is not available when filing an Application for Employment Authorization (Form I–765) based on DED.

#### What happens after July 20, 2022, for purposes of DED-based employment authorization?

This DED authorization is set to end on July 20, 2022. After that date, employers will no longer accept EADs with a category code of A11 and a July 20, 2022, expiration date, and employees will need to present other evidence of continued work authorization.

**General Employment-Related Information for TPS Applicants and Individuals With DED-Based Employment Authorization and Their Employers**

**How can I obtain information on the status of my EAD request?**

To get case status information about your TPS application, as well as the status of your TPS or DED-based EAD request, you can check Case Status Online at *uscis.gov*, or visit the USCIS Contact Center at *uscis.gov/contactcenter*. If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?**

You can find the Lists of Acceptable Documents on the third page of Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *uscis.gov/i-9-central/acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *uscis.gov/I-9Central*. An EAD is an acceptable document under List A.

**If I have an EAD based on another immigration status, can I obtain a new EAD?**

Yes, if you are eligible for DED or TPS, you can obtain a new EAD, regardless of whether you have an EAD based on another immigration status. If you want to obtain a new TPS-based EAD valid through September 9, 2022, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee. If you want to obtain a new DED-based EAD valid through July 20, 2022, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee.

**Can my employer require that I provide any other documentation to prove my status, such as proof of my Venezuelan citizenship?**

No. When completing Form I–9, employers must accept any documentation that appears on the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the ''Lists of Acceptable Documents.'' Therefore, employers may not request proof of Venezuelan citizenship when completing Form I–9 for new hires or reverifying the employment authorization of current employees. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. USCIS accepts calls in English, Spanish and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of the TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *justice.gov/ierandtheUSCISandE-Verifywebsitesatuscis.gov/i-9-central* and *e-verify.gov*.