## Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

For Federal purposes, individuals approved for TPS may show their Form I–797, Notice of Action, indicating approval of their Form I–821 application, or their A12 or C19 EAD to prove that they have TPS. Individuals may present their A11 EAD to show they are covered by DED. However, while Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are covered under TPS and/or DED and/or show you are authorized to work based on TPS and/or DED. Examples of such documents are:
- Your new EAD with a category code of A12 or C19 for TPS, or A11 for DED;
- A copy of your Form I–797, the notice of approval, for a current Form I–821, if you received one from USCIS; or
- Any other relevant DHS-issued document that indicates your immigration status or authorization to be in the United States, or that may be used by DHS to determine whether you have such status or authorization to remain in the United States.

Check with the government agency regarding which document(s) the agency will accept.

Some benefit-granting agencies use the SAVE program to confirm the current immigration status of applicants for public benefits. SAVE can verify when an individual has TPS or DED based on the documents above. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *uscis.gov/save/save-casecheck,* then by clicking the "Check Your Case" button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and SAVE verification case number or an immigration identifier number that you provided to the benefit-granting agency. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the response is correct, find detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records on the SAVE website at *www.uscis.gov/save.*

[FR Doc. 2021–04951 Filed 3–8–21; 4:15 pm]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7040–N–05]**

## 60-Day Notice of Proposed Information Collection: Public Housing Assessment System (PHAS) Appeals; PHAS Unaudited Financial Statement Submission Extensions; Assisted and Insured Housing Property Inspection Technical Reviews and Database Adjustments; OMB Control No. 2577–0257

**AGENCY:** Office of the Assistant Secretary for Public and Indian Housing, PIH, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* May 10, 2021.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; telephone 202–402–5564 (this is not a toll-free number) or email at *Colette.Pollard@hud.gov* for a copy of the proposed forms or other available information. Persons with hearing or speech impairments may access this number through TTY by calling the Federal Relay Service at (800) 877–8339 (this is a toll-free number).

**FOR FURTHER INFORMATION CONTACT:** Dacia Rogers, Office of Policy, Programs and Legislative Initiatives, PIH, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; telephone 202–402–3374, (this is not a toll-free number). Persons with hearing or speech impairments may access this number via TTY by calling the Federal Relay Service at (800) 877–8339 (this is a toll-free number). Copies of available documents submitted to OMB may be obtained from Ms. Rogers.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

## A. Overview of Information Collection

*Title of Information Collection:* Public Housing Assessment System (PHAS) Appeals; Public Housing and Multifamily Housing Technical Reviews and Database Adjustments; Assisted and Insured Housing property inspection Technical Reviews and Database Adjustments.

*OMB Approval Number:* 2577–0257.

*Type of Request:* Revision of a currently approved collection.

*Form Number:* HUD–52306.

*Description of the need for the information and proposed use:* The collection of this information supports HUD's ongoing mission to provide safe, decent, and habitable housing to low income households. To ensure HUD's subsidized housing meets this criteria accurate data and information collection is required to provide an assessment reflective of the property's condition. Poorly performing PHAs may be subject to additional reporting requirements, may receive HUD assistance, and are subject to possible penalties. For the Office of Housing, accurate scores are vital to their monitoring and compliance efforts. Unacceptable property scores result in automatic penalties and referral for enforcement actions.

Pursuant to § 6(j)(2)(A)(iii) the United States Housing Act of 1937, as amended, HUD established procedures in the Public Housing Assessment System (PHAS) rule for a public housing agencies (PHAs) to appeal an overall PHAS score or a troubled designation (§ 902.69). The PHAS rule in §§ 902.24 and 902.68 also provides that under certain circumstances PHAs may submit a request for a database adjustment and technical review, respectively, of physical condition inspection results.

Pursuant to the Office of Housing Physical Condition of Multifamily Properties regulation at § 200.857(d) and (e), multifamily property owners also have the right, under certain circumstances, to submit a request for a database adjustment and technical


## Presidential Documents

Executive Order 14159 of January 20, 2025

### Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4.** *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5.** *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6.** *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7.** *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8.** *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9.** *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10.** *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11.** *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12.** *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13.** *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' accept-ance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14.** *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15.** *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16.** *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner con-sistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17.** *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanc-tuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18.** *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19**. *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20**. *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21**. *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22**. *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P


## Presidential Documents

Executive Order 14157 of January 20, 2025

### Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. 1701 *et seq.* it is hereby ordered:

**Section 1**. *Purpose.* This order creates a process by which certain international cartels (the Cartels) and other organizations will be designated as Foreign Terrorist Organizations, consistent with section 219 of the INA (8 U.S.C. 1189), or Specially Designated Global Terrorists, consistent with IEEPA (50 U.S.C. 1702) and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended.

(a) International cartels constitute a national-security threat beyond that posed by traditional organized crime, with activities encompassing:

(i) convergence between themselves and a range of extra-hemispheric actors, from designated foreign-terror organizations to antagonistic foreign governments;

(ii) complex adaptive systems, characteristic of entities engaged in insurgency and asymmetric warfare; and

(iii) infiltration into foreign governments across the Western Hemisphere.

The Cartels have engaged in a campaign of violence and terror throughout the Western Hemisphere that has not only destabilized countries with significant importance for our national interests but also flooded the United States with deadly drugs, violent criminals, and vicious gangs.

The Cartels functionally control, through a campaign of assassination, terror, rape, and brute force nearly all illegal traffic across the southern border of the United States. In certain portions of Mexico, they function as quasi-governmental entities, controlling nearly all aspects of society. The Cartels' activities threaten the safety of the American people, the security of the United States, and the stability of the international order in the Western Hemisphere. Their activities, proximity to, and incursions into the physical territory of the United States pose an unacceptable national security risk to the United States.

(b) Other transnational organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS–13) pose similar threats to the United States. Their campaigns of violence and terror in the United States and internationally are extraordinarily violent, vicious, and similarly threaten the stability of the international order in the Western Hemisphere.

(c) The Cartels and other transnational organizations, such as TdA and MS–13, operate both within and outside the United States. They present an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. I hereby declare a national emergency, under IEEPA, to deal with those threats.

**Sec. 2**. *Policy.* It is the policy of the United States to ensure the total elimination of these organizations' presence in the United States and their ability to threaten the territory, safety, and security of the United States

through their extraterritorial command-and-control structures, thereby protecting the American people and the territorial integrity of the United States.

**Sec. 3**. *Implementation.* (a) Within 14 days of the date of this order, the Secretary of State shall take all appropriate action, in consultation with the Secretary of the Treasury, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to make a recommendation regarding the designation of any cartel or other organization described in section 1 of this order as a Foreign Terrorist Organization consistent with 8 U.S.C. 1189 and/or a Specially Designated Global Terrorist consistent with 50 U.S.C. 1702 and Executive Order 13224.

(b) Within 14 days of the date of this order, the Attorney General and the Secretary of Homeland Security shall take all appropriate action, in consultation with the Secretary of State, to make operational preparations regarding the implementation of any decision I make to invoke the Alien Enemies Act, 50 U.S.C. 21 *et seq.,* in relation to the existence of any qualifying invasion or predatory incursion against the territory of the United States by a qualifying actor, and to prepare such facilities as necessary to expedite the removal of those who may be designated under this order.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02004

Filed 1–28–25; 11:15 am]

Billing code 3395–F4–P

**DATES:** This notice is effective May 7, 1997.

**FOR FURTHER INFORMATION CONTACT:**
Ms. Karen FitzGerald, Staff Officer, Immigration and Naturalization Service, Adjudications and Nationality Division, 425 I Street, NW., Room 3214, Washington, DC 20536, telephone (202) 514–5014.

**SUPPLEMENTARY INFORMATION:**

**Background**

Under 8 CFR 103.2(a), applications submitted to the Service must be executed and filed in accordance with the instructions on the application form. By eliminating specific reference to filing location, this regulation provides service center directors with the authority to accept and process applications designated for Direct Mail. It also provides the Service with the flexibility to shift filings to the service centers as the Direct Mail Program continues to expand.

Recent legislation and the publication of an interim rule on March 26, 1996, at 59 FR 13061 have led the Service to conclude that expansion of the use of the direct mail program to include I–360 petitions filed in accordance with the provisions of the Violence Against Women Act (VAWA) is warranted.

It is the intent of the Service to ensure sensitive and expeditious processing of the petitions filed by this class of at-risk applicants. Institution of a centralized direct mail filing process enables the Service to accomplish this and engenders uniformity in the adjudication of all applications of this type. This modification also enhances the Service's ability to be more responsive to inquiries from applicants, their representatives, and benefit-granting agencies.

**Where to File**

Effective May 7, 1997, Form I–360 for self-petitioning battered spouses and children residing within the United States must be mailed, with all supporting documentation, directly to the following address: USINS Vermont Service Center, 75 Lower Weldon Street, St. Albans, VT 05479. Applicants may obtain the Form I–360 by telephoning the toll-free INS Forms Request Line, 1–800–870–3676.

**Special Note**

This notice does not apply to I–360 petitions filed by Amerasians, widow(er)s, or special immigrants.

**Transition**

During the first 30 days following the effective date of this notice, district offices and service centers will forward to the Vermont Service Center, in a timely manner, any Form I–360 filed by a self-petitioning battered spouse or child, which has been inadvertently mailed to an office other than the Vermont Service Center. Petitions filed prior to the effective date of this notice will be adjudicated at the place of initial filing.

Appeals or motions to reopen or reconsider denied I–360 petitions submitted to the Service prior to May 7, 1997 will be processed by the office where the I–360 was originally filed and adjudicated. Appeals and motions filed during the transition period, and after this notice goes into effect, should be filed with the Vermont Service Center and will be processed by that office.

During the transition period, the Service intends to work closely with community organizations and advocacy groups to provide information and assistance to the public regarding this change.

After the 30-day transition period, self-petitioning battered spouses and children will be directed to mail the Form I–360 to the Vermont Service Center for processing.

Dated: March 22, 1997.

**Doris Meissner,**
*Commissioner, Immigration and Naturalization Service.*
[FR Doc. 97–8835 Filed 4–4–97; 8:45 am]
**BILLING CODE 4410–10–M**

---

## DEPARTMENT OF JUSTICE

**Immigration and Naturalization Service**

**[INS No. 1832–97; AG Order No. 2076–97]**

**RIN 1115–AE26**

**Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program**

**AGENCY:** Immigration and Naturalization Service, Justice.
**ACTION:** Notice.

**SUMMARY:** This notice extends the designation of Liberia under the Temporary Protected Status ("TPS") program for an additional 12 months (until March 28, 1998) in accordance with sections 244(b)(3)(A) and (C) of the Immigration and Nationality Act, as amended ("the Act" or "INA"). This notice also describes the procedures with which eligible aliens, who are nationals of Liberia (or who have no nationality and who last habitually resided in Liberia), must comply to re-register for TPS. Re-registration for the TPS extension period is limited to persons who already have registered for the initial period of TPS, which ended on March 27, 1992.

Pursuant to section 244(b)(1) of the Act, this notice concurrently designates Liberia anew ("redesignates") under the TPS program. This redesignation of Liberia makes TPS available to eligible Liberian TPS applicants who have "continuously resided in the United States" since June 1, 1996, and who have been "continuously physically present in the United States" since April 7, 1997.

**EFFECTIVE DATES:**

1. Extension of Designation and Re-registration

The extension of designation is effective on March 29, 1997, and will remain in effect until March 28, 1998. The primary re-registration procedures become effective on April 7, 1997, and will remain in effect until May 6, 1997.

2. Redesignation

The Liberian TPS redesignation is effective concurrently with the extension from March 29, 1997, until March 28, 1998. The registration period for the Liberian TPS redesignation program begins on April 7, 1997 and will remain in effect until October 6, 1997.

**FOR FURTHER INFORMATION CONTACT:**
Ronald Chirlin, Adjudications Officer, Immigration and Naturalization Service, Room 3214, 425 I Street, NW., Washington, DC 20536, telephone (202) 514–5014.

**SUPPLEMENTARY INFORMATION:**

**Background**

*Statutory Provisions for TPS*

1. Designation and Extension Under the TPS Program

Section 308(a)(7) of Public Law 104–132 renumbered section 244A of the Act. Under this section renumbered as INA 244 (8 U.S.C. 1254), the Attorney General is authorized to grant Temporary Protected Status in the United States to eligible aliens who are nationals of a foreign state designated by the Attorney General (or who have no nationality and last habitually resided in that state). The Attorney General may designate a state upon finding that the state is experiencing ongoing armed conflict, environmental disaster, or extraordinary and temporary conditions that prevent nationals or residents of the country from returning in safety.

At least 60 days before the end of a designation or extension of designation, the Attorney General, after consultation with appropriate agencies of the

Government, reviews conditions in the foreign state for which the designation is in effect. The designation is extended if the Attorney General does not determine that termination is appropriate because the foreign state no longer meets the conditions for designation. INA 244(b)(3)(C). Through such an extension of designation, however, TPS continues to be available only to aliens who have been continuously physically present in the United States from the effective date of the designation. TPS is not available to aliens who have been physically present in the United States only from the effective date of the extension but who were not physically present from the date of the designation.

## 2. Redesignation of Liberia Under the TPS Program

Subsection 244(b)(1) of the Act implicitly permits the Attorney General to "redesignate" (that is, to designate under the TPS program a country that has been previously designated), as well as designated for the first time, if she first finds that the required conditions are met. The act of redesignation is referenced in subsection 244(c)(1)(A)(i), which requires that "the alien has been continuously physically present since the effective date of the most recent designation of the state." (Emphasis added.) This provision thus explicitly contemplates more than one designation. This redesignation of Liberia under the TPS program is nonetheless the first time that the Attorney General has found it appropriate to exercise her discretion to redesignate a country.

One factor in determining whether redesignation is appropriate is whether it will create a "magnet effect" for nationals of the country under consideration. In cases where the Attorney General contemplates redesignation, she may consider this possible magnet effect and any other factors weighing against redesignation, together with any discretionary factors in favor of redesignation. A significant discretionary factor in favor of redesignation is the intensification of civil strife and instability in the country under consideration.

The TPS statute imposes a requirement that, in order to be eligible for TPS, an alien must have been continuously physically present in the United States since the effective date of the most recent designation. This means that, regardless of when a designation may have been extended, in order to receive TPS an alien must have been physically present in the United States from the date of initial designation or

from the date of any redesignation. INA 244(c)(1)(A)(i). The statute also authorizes the Attorney General to impose an additional requirement that an alien must have continuously resided in the United States since such date as the Attorney General may designate. INA 244(c)(1)(A)(ii). The authority to designate a separate date from which an alien must have continuously resided in the United States allows the Attorney General to tailor more narrowly the group of aliens to whom she determines it is appropriate to extend the coverage of a designation or redesignation.

The required June 1, 1996, residence date will apply to all applicants. For a small number of applicants with recent foreign travel, certain trips from the United States between June 1, 1996, and April 7, 1997 would be allowed under the definition of "continuously resided." Such trips after April 7, 1997 would be allowed within slightly narrower limits under the definition of "continuously physically present." See definitions at 8 CFR 244.1, formerly 8 CFR 240.1.

The initial registration period for this TPS redesignation continues from April 7, 1997 until October 6, 1997 in accordance with the required 180-day minimum period. INA 244(c)(1)(A)(iv).

### Extension of Designation of Liberia Under the TPS Program

On March 27, 1991, the Attorney General designated Liberia for Temporary Protected Status for a period of 12 months, 56 FR 12746. The Attorney General subsequently extended the designation of Liberia under the TPS program for 5 additional 12-month periods with the last extension valid until March 28, 1997, 61 FR 8076.

The Attorney General has determined that temporary conditions continue to prevent nationals of Liberia from returning to their country in safety. Therefore, by this notice she is extending the designation of Liberia under the Temporary Protected Status program for an additional 12 months (until March 28, 1998) in accordance with sections 244(b)(3) (A) and (C) of the Act.

### Redesignation of Liberia Under the TPS Program

In her discretion, the Attorney General has further determined that, in light of renewed conflict in Liberia during the first half of 1996, the temporary conditions that continue to exist in Liberia warrant redesignation. Therefore, pursuant to section 244(b)(1) of the Act, this notice concurrently grants Liberia a redesignation of TPS.

With the redesignation of Liberia, TPS is now available to otherwise eligible applicants who are ineligible for reregistration under the extension of the initial designation, either because they came to the United States after the initial designation or because they failed to register in a timely manner under the initial designation.

By operation of statute, this redesignation extends the availability of TPS only to Liberians who have been continuously physically present in the United States from the effective date of this redesignation April 7, 1997. In addition, the Attorney General is exercising her discretion under INA section 244(c)(1)(A)(ii) to select a different and earlier date of June 1, 1996, from which Liberians must have continuously resided in the United States in order to receive TPS. Although the Attorney General finds that conditions in Liberia warrant redesignation, she has determined that it is appropriate to establish a separate cut-off date that relates to the renewed conflict in Liberia during the first half of 1996. Therefore, the Attorney General is imposing an additional June 1, 1996, residence date requirement.

### Notice of Extension of Designation of Liberia Under the Temporary Protected Status Program

By the authority vested in me as Attorney General under section 244 of the Immigration and Nationality Act, as amended, (8 U.S.C. 1254), and as required by subsection 244(b)(3) (A) and (C) of the Act, I have consulted with the appropriate agencies of the U.S. Government concerning: (a) the conditions in Liberia and (b) whether permitting nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) to remain temporarily in the United States is contrary to the national interest of the United States. From these consultations, I find that:

(1) After renewed conflict in Liberia during the first half of 1996, and ongoing insecurity, there exist extraordinary and temporary conditions that prevent aliens who are nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) from returning to Liberia in safety; and

(2) Permitting nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) to remain temporarily in the United States is not contrary to the national interest of the United States.

Accordingly, extension of designation is ordered as follows:

(1) The designation of Liberia under section 244(b) of the Act is extended for an

additional 12-month period from March 29, 1997, to March 28, 1998.

(2) I estimate that there are approximately 4,000 nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who have been granted Temporary Protected Status and who are eligible for re-registration.

(3) In order to maintain current registration for Temporary Protected Status, a national of Liberia (or an alien having no nationality who last habitually resided in Liberia) who received a grant of TPS during the initial period of designation from March 27, 1991, to March 27, 1992, must comply with the re-registration requirements contained in 8 CFR 244.17, formerly 8 CFR 240.17, which are described in pertinent part in paragraphs (4) and (5) of this notice.

(4) A national of Liberia (or an alien having no nationality who last habitually resided in Liberia) who previously has been granted TPS must re-register by filing a new Application for Temporary Protection Status, Form I–821, together with an Application for Employment Authorization, Form I–765, within the 30-day period beginning on April 7, 1997 and ending on May 6, 1997 in order to be eligible for Temporary Protected Status during the period from March 29, 1997, to March 28, 1998. Late re-registration applications will be allowed pursuant to 8 CFR 244.17(c), formerly 8 CFR 240.17(c).

(5) There is no fee for Form I–821 filed as part of the re-registration application. The fee prescribed in 8 CFR 103.7(b)(1), currently seventy dollars ($70), will be charged for Form I–765, filed by an alien requesting employment authorization pursuant to the provisions of paragraph (4) of this notice (unless submitted with a fee waiver request properly documented in accordance with 8 CFR 244.20, formerly 8 CFR 240.20). An alien who does not request employment authorization must nonetheless file Form I–821 together with Form I–765, but in such cases both Form I–821 and Form I–765 should be submitted without fee.

(6) Pursuant to section 244(b)(3)(A) of the Act, the Attorney General will review, at least 60 days before March 28, 1998, the designation of Liberia under the TPS program to determine whether the conditions for designation continue to be met. Notice of that determination, including the basis for the determination, will be published in the **Federal Register**. If there is an extension of designation, late initial registration for TSP shall be allowed only pursuant to the requirements of 8 CFR 244.2(f)(2), formerly 8 CFR 240.2(f)(2). Any such future determination will apply to the more recent Liberian TPS registrants under the TPS redesignation as well as the re-registrants for the TPS extension.

*Notice of Redesignation of Liberia Under the Temporary Protected Status Program*

By the authority vested in me as Attorney General under section 244 of the Immigration and Nationality Act, as amended, (8 U.S.C. 1254), and pursuant to the discretion vested in the Attorney General under subsection 244(b)(1) of the Act, I have consulted with the appropriate agencies of the U.S. Government concerning redesignation of Liberia under the Temporary Protected Status program. From these consultations I find that after renewed conflict in Liberia during the first half of 1996, and ongoing insecurity, there exist extraordinary and temporary conditions that prevent aliens who are nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) from returning to Liberia in safety.

In consideration of these consultations and other relevant factors, and in the exercise of my discretion, I order redesignation of Liberia as follows:

(1) Liberia is redesignated under section 244(b)(1)(C) of the Act. Nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who have ''continuously resided in the United States'' since June 1, 1996, and have been ''continuously physically present'' since April 7, 1997 may apply for Temporary Protected Status within the registration period which begins April 7, 1997 and ends on October 6, 1997.

(2) I estimate that there are no more than 5,000 nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who are currently in nonimmigrant or unlawful status (in addition to the earlier Liberian TPS registrants) and are, therefore, eligible for Temporary Protected Status under this redesignation.

(3) Except as specifically provided in this notice, application for TPS by nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) must be filed pursuant to the provisions of 8 CFR part 244, formerly 8 CFR 240. Aliens who wish to apply for TPS must file an Application for Temporary Protected Status, Form I–821, together with an Application for Employment Authorization, Form I–765, during the registration period, which begins on April 7, 1997 and will remain in effect until October 6, 1997.

(4) A fee of fifty dollars ($50) will be charged for each Application for Temporary Protected Status, Form I–821, filed during the registration period.

(5) The fee prescribed in 8 CFR 103.7(b)(1), which is currently seventy dollars ($70), will be charged for each Application for Employment Authorization Form I–765, filed by an alien requesting employment authorization. An alien who does not request employment authorization must nevertheless file Form I–765, together with Form I–821, for informational purposes, but in such cases Form I–765 should be submitted without fee. Both Forms I–821 and I–765 may be submitted without the required fees if a properly documented fee waiver request in accordance with 8 CFR 244.20, formerly 8 CFR 240.20, accompanies the forms.

(6) Information concerning the TPS redesignation program for nationals of Liberia (and aliens having no nationally who last habitually resided in Liberia) will be available at local Immigration and Naturalization Service offices upon publication of this notice.

Dated: April 1, 1997.

**Janet Reno,**
*Attorney General.*

[FR Doc. 97–8925 Filed 4–4–97; 8:45 am]

**BILLING CODE 4410–01–M**

---

# DEPARTMENT OF LABOR

## Office of the Secretary

**Privacy Act of 1974; Publication of Two New Systems of Records; Amendments to an Existing System**

**AGENCY:** Office of the Secretary, Labor.

**ACTION:** Notice of two new systems of records; amendments to an existing system of records.

**SUMMARY:** The Privacy Act of 1974 requires that each agency publish notice of all of the systems of records that it maintains. This document adds two new systems of records to this Department's current systems of records. With the addition of these two new systems of records, the Department will be maintaining 144 systems of records. This document also proposes to amend the Routine Use Category for one of the Department's existing systems of records. The proposed amended system will permit the Department to provide important information to state unemployment insurance agencies in order to facilitate the processing of unemployment insurance claims for Department of Labor (DOL) employees. Finally, various administrative (non-substantive) amendments to this same existing system are being made at this time.

**DATES:** Persons wishing to comment on this new system of records and on the proposed new Routine Use may do so by May 19, 1997. Unless there is a further notice in the **Federal Register**, the two new systems of records, and the proposed amendment to the existing system, will become effective on June 2, 1997. The remaining amendments to DOL/OASAM–1 are administrative (non-substantive), and therefore, will become effective on April 7, 1997.

**ADDRESSES:** Written comments may be mailed or delivered to Robert A. Shapiro, Associate Solicitor, Division of Legislation and Legal Counsel, 200 Constitution Avenue, NW., Room N–2428, Washington, DC 20210.

**FOR FURTHER INFORMATION CONTACT:** Miriam McD. Miller, Co-Counsel for Administrative Law, Office of the Solicitor, Department of Labor, 200 Constitution Avenue, NW., Room N–

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2761–23; DHS Docket No. USCIS–2021–0003]

RIN 1615–ZB86

### Extension and Redesignation of Venezuela for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) extension and redesignation.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Venezuela for Temporary Protected Status (TPS) for 18 months, beginning on March 11, 2024 and ending on September 10, 2025. This extension allows existing TPS beneficiaries to retain TPS through September 10, 2025, if they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through September 10, 2025, must re-register during the re-registration period described in this notice. Separately, the Secretary is also redesignating Venezuela for TPS. The redesignation of Venezuela allows additional Venezuelan nationals (and individuals having no nationality who last habitually resided in Venezuela) who have been continuously residing in the United States since July 31, 2023, to apply for TPS for the first time during the initial registration period described under the redesignation information in this notice. In addition to demonstrating continuous residence in the United States since July 31, 2023, and meeting other eligibility criteria, initial applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since October 3, 2023, the effective date of this redesignation of Venezuela for TPS. The Secretary's actions represent two distinct TPS designations of Venezuela—the first designation of Venezuela that was announced on March 9, 2021 (Venezuela 2021) and is being extended in this FRN, and this second action, redesignating Venezuela on October 3, 2023 (Venezuela 2023).

**DATES:**

*Extension of Designation of Venezuela for TPS:* The 18-month extension of Venezuela 2021 begins on March 11, 2024 and will remain in effect for 18 months, ending on September 10, 2025. The extension affects existing beneficiaries of TPS and those who filed initial applications for TPS under Venezuela 2021 that were pending as of the date of this notice.

*Re-registration:* The 60-day re-registration period for existing beneficiaries under Venezuela 2021 runs from January 10, 2024, through March 10, 2024. (Note: It is important for re-registrants to timely re-register during the registration period and not to wait until their Employment Authorization Document (EAD) expires. Delaying re-registration could result in gaps in their employment authorization documentation.)

*Redesignation of Venezuela for TPS (Venezuela 2023):* The 18-month redesignation of Venezuela for TPS begins on October 3, 2023, and will remain in effect for 18 months, ending on April 2, 2025. The redesignation affects potential first-time applicants and others who do not currently have TPS.

*First-time Registration:* The initial registration period for new applicants under the Venezuela 2023 TPS redesignation begins on October 3, 2023, and will remain in effect through April 2, 2025.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For more information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* You can find specific information about Venezuela's TPS designation by selecting "Venezuela" from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you cannot find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or

visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.*

• You also can find more information at local USCIS offices after this notice is published.

**SUPPLEMENTARY INFORMATION:**

### Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Document
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

### Purpose of This Action (TPS)

Through this notice, DHS sets forth procedures necessary for nationals of Venezuela (or individuals having no nationality who last habitually resided in Venezuela) to (1) re-register for TPS and apply to renew their EAD with USCIS or (2) submit an initial registration application under the redesignation and apply for an EAD.

Re-registration is limited to individuals who have previously registered for TPS under Venezuela 2021[1] and whose applications have been granted. If you do not re-register properly within the re-registration period, USCIS may withdraw your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under Venezuela 2021, the 60-day re-registration period for existing beneficiaries runs from January 10, 2024, through March 10, 2024. USCIS will issue new EADs with

---

[1] *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure,* 86 FR 13574 (Mar. 9, 2021).

VZ Termination_0108

a September 10, 2025, expiration date to eligible Venezuelan TPS beneficiaries who timely re-register and apply for EADs. Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive a new EAD before their current EAD expires. Accordingly, through this **Federal Register** notice, DHS automatically extends through March 10, 2025, the validity of certain EADs previously issued under the TPS designation of Venezuela. As proof of continued employment authorization through March 10, 2025, TPS beneficiaries can show their EAD with the notation A–12 or C–19 under Category and a Card Expires date of March 10, 2024, or September 9, 2022. This notice explains how TPS beneficiaries and their employers may determine if an EAD is automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

Individuals with an initial Venezuela TPS application (Form I–821) or Application for Employment Authorization (Form I–765) pending as of October 3, 2023 under Venezuela 2021, do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through September 10, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date. Individuals who are current beneficiaries under the Venezuela 2021 designation and have a re-registration application (Form I–821) and/or Application for Employment Authorization (Form I–765) pending as of October 3, 2023, do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through September 10, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

Under the redesignation, Venezuela 2023, individuals who currently do not have TPS may submit an initial application during the initial registration period that runs from October 3, 2023, and runs through the full length of the redesignation period ending April 2, 2025. In addition to demonstrating continuous residence in the United States since July 31, 2023, and meeting other eligibility criteria, initial applicants for TPS under this redesignation (Venezuela 2023) must demonstrate that they have been

continuously physically present in the United States since October 3, 2023,[2] the effective date of this redesignation of Venezuela, before USCIS may grant them TPS. DHS estimates that approximately 472,000 individuals may become newly eligible for TPS under the redesignation of Venezuela.

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs if they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

  ○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

  ○ Any other lawfully obtained immigration status or category they received while registered for TPS, if it is still valid beyond the date their TPS terminates.

## When was Venezuela designated for TPS?

Venezuela was initially designated on the basis of extraordinary and temporary conditions that prevented nationals of Venezuela from returning in safety. *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure*, 86 FR 13574 (Mar. 9, 2021). The TPS designation was

extended for 18 months on September 8, 2022. *See Extension of the Designation of Venezuela for Temporary Protected Status*, 87 FR 55024 (Sept. 8, 2022).

## What authority does the Secretary have to extend the designation of Venezuela for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[3] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in their discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state continues to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must

---

[2] The "continuous physical presence" date is the effective date of the most recent TPS designation of the country, which is either the publication date of the designation announcement in the **Federal Register** or a later date established by the Secretary. The "continuous residence" date is any date established by the Secretary when a country is designated (or sometimes redesignated) for TPS. *See* INA sec. 244(b)(2)(A) (effective date of designation); 244(c)(1)(A)(i–ii) (continuous residence and continuous physical presence date requirements); 8 U.S.C. 1254a(b)(2)(A); 1254a(c)(1)(A)(i–ii).

[3] INA section 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135 (2002). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1); 8 U.S.C. 1254a(b)(1).

terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## What is the Secretary's authority to redesignate Venezuela for TPS?

In addition to extending an existing TPS designation, the Secretary, after consultation with appropriate Government agencies, may redesignate a country (or part thereof) for TPS. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1); *see also* INA sec. 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that "the alien has been continuously physically present since the effective date of *the most recent designation of the state*") (emphasis added).[4]

When the Secretary designates or redesignates a country for TPS, the Secretary also has the discretion to establish the date from which TPS applicants must demonstrate that they have been "continuously resid[ing]" in the United States. *See* INA sec. 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii). The Secretary has determined that the "continuous residence" date for applicants for TPS under the redesignation of Venezuela will be July 31, 2023. Initial applicants for TPS under this redesignation must also show they have been "continuously physically present" in the United States since October 3, 2023, which is the effective date of the Secretary's redesignation of Venezuela. *See* INA sec. 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i). For each initial TPS application filed under the redesignation, USCIS cannot make the final determination of whether the applicant has met the "continuous physical presence" requirement until October 3, 2023, the effective date of this redesignation for Venezuela. USCIS, however, will issue employment authorization documentation, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

## Why is the Secretary extending the TPS designation for Venezuela 2021 and redesignating Venezuela for TPS?

DHS has reviewed country conditions in Venezuela. Based on the review, including input received from DOS and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because extraordinary and temporary conditions continue to prevent Venezuelan nationals from returning in safety. The Secretary has further determined that redesignating Venezuela for TPS under INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C) is warranted on the same statutory basis of extraordinary and temporary conditions.

### Overview

Venezuela continues to face a severe humanitarian emergency due to a political and economic crisis, as well as human rights violations and abuses and high levels of crime and violence, that impacts access to food, medicine, healthcare, water, electricity, and fuel, and has led to high levels of poverty. Additionally, Venezuela has recently experienced heavy rainfall in the spring and summer of 2023 which triggered flooding and landslides. Given the current conditions in Venezuela, these issues contribute to the country's existing challenges.

Venezuela is experiencing "an unprecedented political, economic, and humanitarian crisis."[5] "Venezuela is suffering one of the worst humanitarian crises in the history of the Western Hemisphere," which has been characterized by "[h]igh levels of poverty, food insecurity, malnutrition, and infant mortality, together with frequent electricity outages and the collapse of health infrastructure."[6] Though there were some positive developments in Venezuela in 2022 "as the economy stabilized and showed signs of economic growth," the effects of these changes were not felt across the Venezuelan population and did not offset the impact of the large-scale economic contraction which resulted in significant humanitarian challenges that continue today and will take time to address.[7]

### Political Repression and Human Rights

The Maduro regime has closed off channels for political dissent, restricting enjoyment of civil liberties and "prosecuting perceived opponents without regard for due process."[8] The UN Human Rights Council's Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela (IIFFM) found in its September 2022 report, "Venezuela's military and civilian intelligence agencies function as well-coordinated and effective structures in the implementation of a plan" to "repress dissent."[9]

### Crime and Insecurity

Venezuela has one of the highest rates of violent deaths in the world.[10] Additionally, "Venezuelans face physical insecurity and violence from several sources, including irregular armed groups, security forces, and organized gangs."[11] Corruption in Venezuela exacerbates insecurity. InSight Crime has reported that "criminal groups and corrupt state actors together form a hybrid state that combines governance with criminality, and where illegal armed groups act at the service of the state, while criminal networks form within it."[12] Human trafficking remains a serious concern. Traffickers exploit and subject Venezuelans, including those fleeing the country, to egregious forms of exploitation, including sex trafficking and forced labor.[13] Members of non-state armed groups that operate in the

[4] The extension and redesignation of TPS for Venezuela is one of several instances in which the Secretary and, before the establishment of DHS, the Attorney General, have simultaneously extended a country's TPS designation and redesignated the country for TPS. *See, e.g.,* "Extension and Redesignation of Haiti for Temporary Protected Status," 76 FR 29000 (May 19, 2011); "Extension and Re-designation of Temporary Protected Status for Sudan," 69 FR 60168 (Oct. 7, 2004); "Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program," 62 FR 16608 (Apr. 7, 1997).

[5] Clare Ribando Seelke, Rebecca M. Nelson, Rhoda Margesson, & Phillip Brown, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), p.1, Dec. 6, 2022, available at *https://crsreports.congress.gov/product/pdf/R/R44841* (last visited Jul. 7, 2023).

[6] Michael Penfold & Cynthia J. Arnson, Overcoming Barriers to Humanitarian Aid in Venezuela, Wilson Center, p.1, Mar. 2023, available at *https://www.wilsoncenter.org/sites/default/files/media/uploads/documents/OVERCOMING%20BARRIERS%20TO%20HUMANITARIAN%20AID%20IN%20VENEZUELA_0.pdf* (last visited Aug. 10, 2023).

[7] United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Venezuela Humanitarian Fund Annual Report 2022, p.6, Jun. 14, 2023, available at *https://www.unocha.org/publications/report/venezuela-bolivarian-republic/venezuela-humanitarian-fund-annual-report-2022* (last visited Aug. 10, 2023).

[8] Freedom House, Freedom in the World 2023—Venezuela, Mar. 10, 2023, available at *https://freedomhouse.org/country/venezuela/freedom-world/2023* (last visited Jul. 18, 2023).

[9] United Nations Human Rights Council, Venezuela: new UN report details responsibilities for crimes against humanity to repress dissent and highlights situation in remotes mining areas, Sept. 20, 2022, available at *https://www.ohchr.org/en/press-releases/2022/09/venezuela-new-un-report-details-responsibilities-crimes-against-humanity* (last visited Sept. 27, 2023).

[10] Overseas Security Advisory Council (OSAC), Venezuela Country Security Report, U.S. Department of State, May 10, 2022, available at *https://www.osac.gov/Content/Report/34f99e62-2161-412d-bfeb-1e752539f6bf* (last visited Jul. 19, 2023).

[11] Freedom House, Freedom in the World 2023—Venezuela, Mar. 10, 2023, available at *https://freedomhouse.org/country/venezuela/freedom-world/2023* (last visited Jul. 18, 2023).

[12] Venezuela Investigative Unit, Rise of the Criminal Hybrid State in Venezuela, InSight Crime, p.5, Jul. 2023, available at *https://insightcrime.org/wp-content/uploads/2023/07/Rise-of-the-Criminal-Hybrid-State-in-Venezuela-InSight-Crime-1.pdf* (last visited Jul. 19, 2023).

[13] U.S. Dep't. of State, 2023 Trafficking in Persons Report: Venezuela, June 15, 2023, available at *https://www.state.gov/reports/2023-trafficking-in-persons-report/venezuela/* (last visited Sep. 25, 2023).

country with impunity, subject Venezuelans to forced labor and forced criminality, and recruit or use child soldiers.[14]

*Economic Collapse*

Since 2014, Venezuela has suffered from an "economic recession marked by hyperinflation, shortages of basic goods and a collapse in public services such as electricity and water." [15] Recently, Venezuela's economy has shown some signs of recovery; however, it is still in a precarious condition.[16] In a report covering the period from May 2022 through April 2023, the Office of the High Commissioner for Human Rights (OHCHR) noted that while economic growth which occurred in 2022 "would bring hope for improved economic prospects, persistent challenges and other factors continued to negatively affect essential public services, transport, education, and health." [17]

In its annual report covering 2022, the Inter-American Commission on Human Rights (IACHR) noted "the high rates of poverty and inequality in the country, in which there are estimates that more than 90% of the population lives in poverty." [18] The same report stated that "as of March 2022, HumVenezuela estimated that 94.5% of the population would not have sufficient income to cover items such as food, housing, health, education, transportation and clothing." [19]

*Health Crisis*

Various sources have referred to severe problems with health systems in Venezuela, including the IACHR, Human Rights Watch, and the Congressional Research Service (CRS).[20] Per *The Associated Press*, Venezuela's "health care system crumbled long before" the start of the COVID–19 pandemic.[21] Likewise, in its 2022 annual report, the IACHR acknowledged that while the COVID–19 pandemic "has had significant impacts on the health sector and the population, the serious affectations of the system preceded the health emergency." [22] Elaborating on this topic, the IACHR identified "shortages of medicines, supplies, materials and medical treatment" as of 2018, and that the "situation has been worsening since 2014, and it is important to highlight that the health system has reportedly collapsed due to its persistent precariousness, which would have been exacerbated by the pandemic." [23]

According to OHCHR, health centers in Venezuela "report structural underfunding and understaffing resulting in for example, regular blackouts and water shortages." [24] In its

report on the humanitarian situation in Venezuela in 2022, the United Nations Office for the Coordination of Humanitarian Affairs (OCHA) noted that "[h]ealth services continue to be affected by insufficient water and sanitation conditions and the lack of electricity supply in facilities." [25] Similarly, Human Rights Watch stated in its annual report covering 2022 that "[p]ower and water outages at healthcare centers—and emigration of healthcare workers—were further weakening operational capacity." [26] Furthermore, the IACHR has reported that "98% of the hospitals in the country lack medicines, electrical plants and water, as well as failures in laboratories, reagents and wards. As a result, it is estimated that only between 3 and 10% of the hospitals have medical and surgical material to solve medical circumstances." [27]

*Food Insecurity*

In a humanitarian response plan published in 2023, the Food and Agriculture Organization of the United Nations (FAO) identified food insecurity as "the most pressing challenge for the population." [28] Human Rights Watch stated in its annual report covering 2022 that HumVenezuela reported in March 2022 that "most Venezuelans face difficulties in accessing food, with 10.9 million undernourished or chronically hungry. Some 4.3 million are deprived of food, sometimes going days without eating." [29] Moreover, the IACHR noted in its 2022 annual report that "32% of children live in a situation of chronic malnutrition." [30]

---

[14] *Id.*

[15] Andrew Cawthorne and Diego Ore, Venezuela confirms recession, highest inflation in Americas, Reuters, Dec. 30, 2014, available at *https://www.reuters.com/article/us-venezuela-economy/venezuela-confirms-recession-highest-inflation-in-americas-idUSKBN0K81KV20141230* (last visited Jul. 7, 2023); Reuters, Venezuela's largest private company calls government supervision 'arbitrary', Apr. 25, 2020, available at *https://www.reuters.com/article/us-venezuela-economy-polar/venezuelas-largest-private-company-calls-government-supervision-arbitrary-idUSKCN2270U8* (last visited Jul. 7, 2023).

[16] The Economist, Nicolás Maduro, Venezuela's autocrat, is winning, Apr. 25, 2023, available at *https://web.archive.org/web/20230531114303/https://www.economist.com/the-americas/2023/04/25/nicolas-maduro-venezuelas-autocrat-is-winning* (last visited Jul. 10, 2023).

[17] Office of the High Commissioner for Human Rights (OHCHR), Situation of human rights in the Bolivarian Republic of Venezuela—Report of the United Nations High Commissioner for Human Rights, p.2, Jul. 4, 2023, available at *https://reliefweb.int/report/venezuela-bolivarian-republic/situation-human-rights-bolivarian-republic-venezuela-report-united-nations-high-commissioner-human-rights-ahrc5354-advance-unedited-version* (last visited Jul. 12, 2023).

[18] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—Venezuela, p.705, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE.pdf* (last visited Jul. 10, 2023).

[19] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—

Venezuela, p.705, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE.pdf* (last visited Jul. 10, 2023).

[20] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—Venezuela, p.674, 706, 708, 709, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE.pdf* (last visited Jul. 12, 2023); Human Rights Watch, World Report 2023: Venezuela, Jan. 13, 2023, available at *https://www.hrw.org/world-report/2023/country-chapters/venezuela* (last visited Jul. 12, 2023); Clare Ribando Seelke, Rebecca M. Nelson, Rhoda Margesson, & Phillip Brown, Venezuela: Background and U.S. Relations, Congressional Research Service (CRS), p.11, Dec. 6, 2022, available at *https://crsreports.congress.gov/product/pdf/R/R44841* (last visited Jul. 12, 2023).

[21] Regina Garcia Cano, Governments pledge money, attention to Venezuela's crisis, The Associated Press, Mar. 17, 2023, *https://apnews.com/article/venezuela-migration-crisis-us-united-nations-805873048d2b0532bfbe53428f4ed2aa* (last visited Jun. 12, 2023).

[22] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—Venezuela, p.705, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE.pdf* (last visited Jul. 12, 2023).

[23] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—Venezuela, p.705–706, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE.pdf* (last visited Jul. 12, 2023).

[24] Office of the High Commissioner for Human Rights (OHCHR), Situation of human rights in the Bolivarian Republic of Venezuela—Report of the United Nations High Commissioner for Human Rights, p.3, Jul. 4, 2023, available at *https://reliefweb.int/report/venezuela-bolivarian-republic/situation-human-rights-bolivarian-republic-*

*venezuela-report-united-nations-high-commissioner-human-rights-ahrc5354-advance-unedited-version* (last visited Jul. 13, 2023).

[25] United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Venezuela Humanitarian Fund Annual Report 2022, p.6, Jun. 14, 2023, available at *https://www.unocha.org/publications/report/venezuela-bolivarian-republic/venezuela-humanitarian-fund-annual-report-2022* (last visited Aug. 10, 2023).

[26] Human Rights Watch, World Report 2023: Venezuela, Jan. 13, 2023, available at *https://www.hrw.org/world-report/2023/country-chapters/venezuela* (last visited Jul. 13, 2023).

[27] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—Venezuela, p.708, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE.pdf* (last visited Jul. 13, 2023).

[28] Food and Agriculture Organization of the United Nations (FAO), The Bolivarian Republic of Venezuela: Humanitarian Response Plan 2022–2023, p.1, 2023, available at *https://www.fao.org/3/cc6775en/cc6775en.pdf* (last visited Jul. 14, 2023).

[29] Human Rights Watch, World Report 2023: Venezuela, Jan. 13, 2023, available at *https://www.hrw.org/world-report/2023/country-chapters/venezuela* (last visited Jul. 14, 2023).

[30] Inter-American Commission on Human Rights (IACHR), Annual Report 2022—Chapter IV.B—

Continued

*Heavy Rains and Flooding*

Since May 26, 2023, as hurricane season began, Venezuela has experienced heavy rains which resulted in flooding that affected several areas of the country.[31] According to ACAPS, "Between June and July there have been 19 tropical waves, that have brought heavy rains, floods and landslides across the country." [32] As of July 11, 2023, the meteorological situation in Venezuela indicated "that rainfall and resulting damages are expected to be more severe than previous years." [33] Reports of the damage caused by the heavy rains include 5,100 people affected with damage to houses and blockages in the drainage system in the state of Portuguesa.[34] In another area—Delta Amacuro state—around 7,500 people are affected by the 2023 floods.[35]

In summary, extraordinary and temporary conditions continue to prevent Venezuelan nationals from returning in safety due to a severe humanitarian emergency which has resulted in food insecurity and the inability to access adequate medicine, healthcare, water, electricity, and fuel. Additionally, human rights violations and abuses, high levels of poverty, high levels of crime and violence, and heavy rains and flooding prevent Venezuelan nationals from returning in safety and permitting Venezuelan noncitizens to remain in the United States temporarily would not be contrary to the interests of the United States.

Based on this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions supporting Venezuela's designation for TPS continue to be met. *See* INA sec. 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continues to be extraordinary and temporary conditions in Venezuela that prevent Venezuelan nationals (or individuals having no nationality who

last habitually resided in Venezuela) from returning to Venezuela in safety, and it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The existing designation of Venezuela for TPS (Venezuela 2021) should be extended for an 18-month period, beginning on March 11, 2024 and ending on September 10, 2025. *See* INA sec. 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• Due to the conditions described above, Venezuela should be redesignated for TPS beginning on October 3, 2023, and ending on April 2, 2025. *See* INA sec. 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

• For the redesignation, the Secretary has determined that TPS applicants must demonstrate that they have continuously resided in the United States since July 31, 2023.

• Initial TPS applicants under the redesignation must demonstrate that they have been continuously physically present in the United States since October 3, 2023, the effective date of the redesignation of Venezuela for TPS.

• There are approximately 243,000 current Venezuela TPS beneficiaries who are eligible to re-register for TPS under the extension.

• It is estimated that approximately 472,000 additional individuals may be eligible for TPS under the redesignation of Venezuela. This population includes Venezuelan nationals in the United States in nonimmigrant status or without immigration status.

**Notice of the Designation of Venezuela for TPS**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Venezuela's designation for TPS on the basis of extraordinary and temporary conditions are met and it is not contrary to the national interest of the United States to allow Venezuelan TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am extending the existing designation of Venezuela for TPS for 18 months, beginning on March 11, 2024, and ending on September 10, 2025.

Additionally, and also on the basis of this determination, I am redesignating Venezuela for TPS for 18 months, beginning on October 3, 2023 and

ending on April 2, 2025. See INA sec. 244(b)(1) and (b)(2); 8 U.S.C. 1254a(b)(1), and (b)(2). I estimate approximately 472,000 individuals may be newly eligible for TPS under the redesignation of Venezuela.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

*Required Application Forms and Application Fees To Register or Re-Register for TPS*

To register or re-register for TPS based on the designation of Venezuela, you must submit a Form I–821, Application for Temporary Protected Status. Re-registration under this notice applies to TPS beneficiaries whose re-registration application was approved under the TPS extension announced on September 8, 2022, who have been issued Form I–797, Notice of Action, indicating approval of their TPS application and an EAD with a March 10, 2024, expiration date. Individuals with an EAD with a March 10, 2024, expiration date who want to receive an EAD with the September 10, 2025, expiration date must re-register pursuant to the instructions noted in this FRN. If you are submitting an initial TPS application, you must pay the filing fee for Form I–821 (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). If you are filing an application to re-register for TPS, you do not need to pay the fee. *See* 8 CFR 244.17. You may need to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the "Biometric Services Fee" section of this notice.

TPS beneficiaries are eligible for an Employment Authorization Document (EAD), which proves their authorization to work in the United States. You are not required to submit Form I–765, Application for Employment Authorization, or have an EAD to be granted TPS, but see below for more information if you want an EAD to use as proof that you can work in the United States.

Individuals who have an initial Venezuela TPS application (Form I–821) that was still pending as of October 3, 2023, do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through April 2, 2025. Individuals who are current beneficiaries under the Venezuela 2021

---

Venezuela, p.709, Apr. 20, 2023, available at *https://www.oas.org/en/iachr/docs/annual/2022/Chapters/9-IA2022_Cap_4B_VE_EN.pdf* (last visited Jul. 14, 2023).

[31] ACAPS, ACAPS Anticipatory Note: Venezuela—Anticipation of flooding, 20 July 2023, July 20, 2023, available at *https://reliefweb.int/report/venezuela-bolivarian-republic/acaps-anticipatory-note-venezuela-anticipation-flooding-20-july-2023* (last visited Sept. 19, 2023).

[32] *Id.*

[33] Reliefweb, *Venezuela: Anticipatory Action for Floods—DREF Operation MDRVE008,* July 11, 2023, available at *https://reliefweb.int/report/venezuela-bolivarian-republic/venezuela-anticipatory-actions-floods-dref-operation-mdrve008* (last visited Sep. 19, 2023).

[34] *Id.*

[35] *Id.*

designation and have a re-registration application (Form I–821) and/or Application for Employment Authorization (Form I–765) pending as of October 3, 2023, do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through September 10, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1) (Oct. 1, 2020). The instructions for Form I–821 and Form I–765 also provide more information on requirements and fees for both initial TPS applicants and existing TPS beneficiaries who are re-registering.

**How can TPS beneficiaries obtain an Employment Authorization Document (EAD)?**

Everyone must provide their employer with documentation showing that they have the legal right to work in the United States. TPS beneficiaries are eligible to obtain an EAD, which proves their legal right to work. If you want to obtain an EAD, you must file Form I–765 and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). TPS applicants may file this form with their TPS application, or separately later, if their TPS application is still pending or has been approved. Beneficiaries with an initial Venezuela TPS-related Form I–765 that was still pending as of October 3, 2023, do not need to file the application again. If USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through April 2, 2025. Individuals who are current beneficiaries under the Venezuela 2021 designation who have a re-registration application (Form I–821) and/or Application for Employment Authorization (Form I–765) pending as of October 3, 2023, do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through September 10, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

**Refiling an Initial TPS Registration Application After Receiving a Denial of a Fee Waiver Request**

If USCIS denies your fee waiver request, you can resubmit your TPS application. The fee waiver denial notice will contain specific instructions about resubmitting your application.

**Filing Information**

You may file Form I–821 and related requests for EADs online or by mail. However, if you request a fee waiver, you must submit your application by mail. When filing a TPS application, applicants may request an EAD by submitting a completed Form I–765 with their Form I–821.

*Online filing:* Form I–821 and Form I–765 are available for concurrent filing online.[36] To file these forms online, you must first create a USCIS online account.[37]

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

*Table 1—Mailing Addresses*

Mail your completed Form I–821, Application for Temporary Protected Status; Form I–765, Application for Employment Authorization, if applicable; Form I–912, Request for Fee Waiver (if applicable); and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If you live in: | Then, mail your application to: |
|---|---|
| California, Texas | *U.S. Postal Service (USPS):* USCIS, Attn: TPS Venezuela, P.O. Box 20300, Phoenix, AZ 85036–0300.<br>*FedEx, UPS, and DHL deliveries:* USCIS, Attn: TPS Venezuela (Box 20300), 2108 E Elliot Rd., Tempe, AZ 85284–1806. |
| Florida | *U.S. Postal Service (USPS):* USCIS, Attn: TPS Venezuela, P.O. Box 660864, Dallas, TX 75266–0864.<br>*FedEx, UPS, and DHL deliveries:* USCIS, Attn: TPS Venezuela (Box 660864), 2501 S State Highway, 121 Business, Suite 400, Lewisville, TX 75067–8003. |
| Illinois, Indiana, Massachusetts, New Jersey, New York, North Carolina, Utah, Virginia. | *U.S. Postal Service (USPS):* USCIS, Attn: Venezuela, P.O. Box 4091, Carol Stream, IL 60197–4091.<br>*FedEx, UPS, and DHL deliveries:* USCIS, Attn: TPS Venezuela (Box 4091), 2500 Westfield Drive, Elgin, IL 60124–7836. |
| All other states, District of Columbia, and U.S. Territories | *U.S. Postal Service (USPS):* USCIS, Attn: TPS Venezuela, P.O. Box 805282, Chicago, IL 60680–5285.<br>*FedEx, UPS, and DHL deliveries:* USCIS, Attn: TPS Venezuela (Box 805282), 131 South Dearborn Street, 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please file online or mail your Form I–765 application to the appropriate mailing address in Table 1. If you file online, please include the fee. If you file by mail, please include the fee or fee waiver request. When you request an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

[36] Find information about online filing at "Forms Available to File Online," *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[37] *https://myaccount.uscis.gov/users/sign_up.*

**Supporting Documents**

The filing instructions on Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (that is, registering) for TPS on the USCIS website at *https://www.uscis.gov/tps* under "Venezuela."

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *https://www.uscis.gov/i-131*. You may file Form I–131 together with your Form I–821 or separately. When filing Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
|---|---|
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status. | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS): You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL: You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. USCIS may require you to visit an Application Support Center to submit biometrics. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https://www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms*.

*General Employment-Related Information for TPS Applicants and Their Employers*

**How can I obtain information on the status of my TPS application and EAD request?**

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at uscis.gov, or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter*. If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**Am I eligible to receive an automatic extension of my current EAD through March 10, 2025, through this Federal Register notice?**

Yes. Regardless of your country of birth, if you currently have a Venezuela TPS-based EAD with the notation A–12 or C–19 under Category and a Card Expires date of March 10, 2024, or September 9, 2022, this **Federal Register** notice automatically extends your EAD through March 10, 2025. Although this **Federal Register** notice automatically extends your EAD through March 10, 2025, you must re-register timely for TPS in accordance with the procedures described in this **Federal Register** notice to maintain your TPS and employment authorization.

**When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?**

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central*. An EAD is an acceptable document under List A. See the section "How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?" of this **Federal Register** notice for more information. If your EAD states A–12 or C–19 under Category and has a Card Expires date of March 10, 2024, or September 9, 2022, this **Federal Register** notice extends it automatically, and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through March 10, 2025, unless your TPS has been withdrawn or your request for TPS has been denied. Your country of birth noted on the EAD does not have to

reflect the TPS-designated country of Venezuela for you to be eligible for this extension.

**What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?**

Even though we have automatically extended your EAD, your employer is required by law to ask you about your continued employment authorization. Your employer may need to re-examine your automatically extended EAD to check the Card Expires date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the Card Expires date and Category code, they should update the EAD expiration date in Section 2 of Form I–9. See the section ''What updates should my current employer make to Form I–9 if my EAD has been automatically extended?'' of this **Federal Register** notice for more information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through March 10, 2025, but you are not required to do so. The last day of the automatic EAD extension is March 10, 2025. Before you start work on March 11, 2025, your employer is required by law to reverify your employment authorization on Form I–9. By that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

**If I have an EAD based on other immigration status/benefit, can I obtain a new TPS-based EAD?**

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, even if you have an EAD and work authorization based on another immigration status or benefit. If you are a current TPS beneficiary under Venezuela 2021 and want to obtain a new TPS-based EAD valid through September 10, 2025, or if you are applying for TPS for the first time under Venezuela 2023 and want to obtain a TPS-based EAD valid through April 2, 2025, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

**Can my employer require that I provide any other documentation such as evidence of my status, proof of my Venezuelan citizenship, or a Form I–797C showing that I registered for TPS for Form I–9 completion?**

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request other documentation, such as proof of Venezuelan citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document if the EAD reasonably appears to be genuine and to relate to you. Refer to the "Note to Employees" section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status or your national origin.

**How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?**

When using an automatically extended EAD to complete Form I–9 for a new job before March 10, 2025:
1. For Section 1, you should:
a. Check "A noncitizen authorized to work until" and enter March 10, 2025, as the "expiration date"; and
b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)
2. For Section 2, employers should:
a. Determine whether the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a Card Expires date of March 10, 2024 or September 9, 2022;
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Write March 10, 2025, as the expiration date.
Before the start of work on March 11, 2025, employers must reverify the employee's employment authorization on Form I–9.

**What updates should my current employer make to Form I–9 if my EAD has been automatically extended?**

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has now automatically extended your EAD, your employer may need to re-examine your current EAD if they do not have a copy of the EAD on file. Your employer should determine whether your EAD is automatically extended by ensuring that it contains Category A–12 or C–19 and has a Card Expires date of March 10, 2024 or September 9, 2022. Your employer may not rely on the country of birth listed on the card to determine whether you are eligible for this extension.

If your employer determines that USCIS has automatically extended your EAD, your employer should update Section 2 of your previously completed Form I–9 as follows:
1. Write EAD EXT and March 10, 2025, as the last day of the automatic extension in the Additional Information field; and
2. Initial and date the correction.

**Note:** This is not considered a reverification. Employers do not reverify the employee until either the automatic extension has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By March 11, 2025, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization on Form I–9.

**If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?**

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify. Employers should enter March 10, 2025, as the expiration date for an EAD that has been extended under this **Federal Register** notice.

**If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiring'' alert for an automatically extended EAD?**

E-Verify automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related EAD when they first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire.

Before this employee starts work on March 11, 2025, you must reverify their employment authorization on Form I–9. Employers may not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov* or get more information online at *www.justice.gov/ier*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation other

than what is required to complete Form I–9. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (mismatch) must promptly inform employees of the mismatch and give these employees an opportunity to resolve the mismatch. A mismatch means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800– 255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov*.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, if you present an automatically extended EAD referenced in this **Federal Register** notice, you do not need to show any other document, such as a Form I–797C, Notice of Action, reflecting receipt of a Form I–765 EAD renewal application or this **Federal Register** notice, to prove that you qualify for this extension. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine

if you have TPS or another immigration status. Examples of such documents are:
• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS-designated country of Venezuela;
• Your Form I–94, Arrival/Departure Record;
• Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or
• Form I–797 or Form I–797C, Notice of Action, reflecting approval or receipt of a past or current Form I–821, if you received one from USCIS.

Check with the government agency requesting documentation about which document(s) the agency will accept. Some state and local government agencies use the SAVE program to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94, Arrival/ Departure Record. If an agency accepts the type of TPS-related document you present, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your A-number, USCIS number, or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://save.uscis.gov/casecheck/*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (such as A-number, USCIS number, or Form I–94 number) or Verification Case

Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *https://www.uscis.gov/save,* has detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–21865 Filed 9–29–23; 4:15 pm]

**BILLING CODE P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–7070–N–66]

### 30-Day Notice of Proposed Information Collection: Green and Resilient Retrofit Program (GRRP) Application Forms; OMB Control No.: 2502–0624

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.

**DATES:** *Comments Due Date:* November 2, 2023.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function. Interested persons are also invited to submit comments regarding this proposal and comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Colette Pollard, Clearance Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210, Washington, DC 20410–5000; email

*PaperworkReductionActOffice@hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; email *Colette.Pollard@hud.gov* or telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on August 1, 2023 at 88 FR 50166.

### A. Overview of Information Collection

*Title of Information Collection:* Green and Resilient Retrofit Program (GRRP) Application Forms.

*OMB Approval Number:* 2502–0624.

*OMB Expiration Date:* 8/31/2023.

*Type of Request:* Revision of a currently approved collection.

*Form Numbers:* HUD 5991, HUD 5992, and HUD 5993.

*Description of the need for the information and proposed use:* The Green and Resilient Retrofit Program ("GRRP") is newly funding through Title III of the Inflation Reduction Act of 2022, H.R. 5376 (IRA), in section 30002 titled "Improving Energy Efficiency or Water Efficiency or Climate Resilience of Affordable Housing" (the "IRA"), authorizing HUD to make loans, grants to improve energy or water efficiency; enhance indoor air quality or sustainability; implement the use of zero-emission electricity generation, low-emission building materials or processes, energy storage, or building electrification strategies; or address climate resilience of eligible HUD-assisted multifamily properties. The program leverages significant technological advancements in utility efficiency and adds a focus on preparing for climate hazards—both reducing residents' and properties' exposure to

hazards and protecting life, livability, and property when disaster strikes. With its dual focus, GRRP is the first program to consider, at the national scale, how best to approach both green and energy efficiency upgrades simultaneously with investment in climate resilience strategies in multifamily housing. HUD is taking a multi-faceted approach to deploy these funds multiple funding rounds and for properties at different development stages.

Funding under this program will be made through multiple cohorts under one or multiple Notices of Funding Opportunity (NOFOs) that will detail the application process for eligible applicants. This collection is necessary in order to receive applications requesting funding under this program.

*Respondents:* HUD-assisted multifamily owners.

*Estimated Number of Respondents:* 680.

*Estimated Number of Responses:* 680.

*Frequency of Response:* Once per application.

*Average Hours per Response:* 15 hours.

*Total Estimated Burden:* 10,200.

### B. Solicitation of Public Comment

This notice is soliciting comments from members of the public and affected parties concerning the collection of information described in Section A on the following:

(1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) The accuracy of the agency's estimate of the burden of the proposed collection of information;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) Ways to minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

(5) ways to minimize the burden of the collection of information on those who are to respond, including the use of automated collection techniques or other forms of information technology.

HUD encourages interested parties to submit comment in response to these questions.

mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result occurs if E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Employment-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov*.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, if you present an EAD that has been automatically extended by this **Federal Register** notice, you do not need to show any other document, such as a Form I–797C, Notice of Action, reflecting receipt of a Form I–765 EAD renewal application or this **Federal Register** notice, to prove that you qualify for this extension. If you are presenting an EAD extended by an up to 540-day extension, you will need to show your Form I–797C, Notice of Action, reflecting receipt of your Form I–765. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary or applicant, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A12 or C19, even if your country of birth noted on the EAD does not reflect the TPS-designated country of El Salvador;

• Your Form I–94, Arrival/Departure Record;

• Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or

• Form I–797 or Form I–797C, Notice of Action, reflecting approval or receipt of a past or current Form I–821, if you received one from USCIS.

Check with the government agency requesting documentation about which document(s) the agency will accept.

Some state and local government agencies use SAVE, *https://www.uscis.gov/save*, to confirm the current immigration status of applicants for public benefits. While SAVE can verify that an individual has TPS or a pending TPS application, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. If an agency accepts the type of TPS-related document you present, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your A-Number, USCIS number, or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://www.uscis.gov/save/save-casecheck*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (such as your A-Number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must allow you to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct,

the SAVE website, *https://www.uscis.gov/save/for-benefit-applicants*, has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2025–00626 Filed 1–10–25; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

[CIS No. 2790–25; DHS Docket No. USCIS–2021–0003]

RIN 1615–ZB86

**Extension of the 2023 Designation of Venezuela for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) extension.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the 2023 designation of Venezuela for Temporary Protected Status (TPS) for 18 months, beginning on April 3, 2025, and ending on October 2, 2026. Existing TPS beneficiaries who wish to extend their status through October 2, 2026, must re-register during the re-registration period described in this notice.

**DATES:** *Extension of the 2023 Designation of Venezuela for TPS* begins on April 3, 2025, and will remain in effect for 18 months. For registration instructions, see the Registration Information section below.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 240–721–3000.

• For more information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. You can find specific information about Venezuela's TPS designation by selecting "Venezuela" from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *https://uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you cannot find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.*

• You can also find more information at local USCIS offices, listed on the USCIS website at *https://www.uscis.gov/about-us/find-a-uscis-office,* after this notice is published.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DoS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Documents, Parole Documents, and Arrival/Departure Records
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–797C—Notice of Action (Receipt Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—**Federal Register**
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
PDF—Portable Document Format
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**Registration Information**

*Extension of the 2023 Designation of Venezuela for TPS:* The 18-month extension of Venezuela's October 3, 2023 TPS designation begins on April 3, 2025, and will remain in effect for 18 months, ending on October 2, 2026. The extension allows existing TPS beneficiaries to retain TPS through October 2, 2026, if they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries, including those registered under the October 3, 2023 TPS designation or the prior March 9, 2021 TPS designation, who wish to extend their status through October 2, 2026, must re-register during the re-registration period described in this notice.

*Re-registration:* The re-registration period for existing beneficiaries runs from January 17, 2025, through September 10, 2025. (Note: It is important for re-registrants to timely re-register during the re-registration period and not to wait until their Employment Authorization Documents (EADs) expire, as delaying re-registration could result in gaps in their employment authorization documentation.)

**Purpose of this Action (TPS)**

Through this notice, DHS sets forth procedures necessary for nationals of Venezuela (or individuals having no nationality who last habitually resided in Venezuela) to re-register for TPS and apply to renew their EAD with USCIS.

Re-registration is limited to individuals who have previously registered for TPS under either of the two prior designations of Venezuela and whose applications have been granted. If you registered for TPS under the October 23, 2023 designation and do not re-register properly within the re-registration period, USCIS may withdraw your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under either of Venezuela's designations, the re-registration period runs from January 17, 2025, through September 10, 2025. USCIS will issue new EADs with an October 2, 2026 expiration date to eligible beneficiaries granted TPS under either of Venezuela's designations who timely re-register and apply for EADs. Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive a new EAD before their current EAD expires. Accordingly, through this **Federal Register** notice, DHS automatically extends through April 2, 2026, the validity of certain EADs previously issued under the TPS designations of Venezuela. As proof of continued employment authorization through April 2, 2026, TPS beneficiaries can show their EAD with the notation A12 or C19 under Category and a "Card Expires" date of September 10, 2025, April 2, 2026, March 10, 2024, or September 9, 2022. This notice explains how TPS beneficiaries and their employers may determine if an EAD is automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

Individuals who have an Application for Temporary Protected Status (Form I–821) for Venezuela or TPS-related Application for Employment Authorization (Form I–765) that was still pending as of January 17, 2025, do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through October 2, 2026. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

**What Is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, are authorized to work, and may obtain EADs if they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, if it is still valid beyond the date TPS terminates.

**When was Venezuela designated for TPS?**

Venezuela was initially designated on March 9, 2021, on the basis of extraordinary and temporary conditions in Venezuela that prevented nationals of Venezuela from returning in safety. *See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred*

*Enforced Departure,* 86 FR 13574 (Mar. 9, 2021). The TPS designation was extended for 18 months on September 8, 2022. *See Extension of the Designation of Venezuela for Temporary Protected Status,* 87 FR 55024 (Sept. 8, 2022). On October 3, 2023, the TPS designation was extended for 18 months and separately redesignated for 18 months based upon the same factual circumstances and legal considerations pursuant to section 244 of the INA, 8 U.S.C. 1254a. *See Extension and Redesignation of Venezuela for Temporary Protected Status,* 88 FR 68130 (Oct. 3, 2023).

**What authority does the Secretary have to extend the designation of Venezuela for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA sec. 244(b)(5)(A), 8 U.S.C 1254a(b)(5)(A). The Secretary, in their discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C.

1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**Will there continue to be two separate filing processes for TPS designations for Venezuela?**

No. USCIS has evaluated the operational feasibility and resulting impact on stakeholders of having two separate filing processes. Operational challenges in the identification and adjudication of Venezuela TPS filings and confusion among stakeholders exist because of the two separate TPS designations. To date, USCIS has created operational measures to process Venezuela TPS cases for both designations; however, it can most efficiently process these cases by consolidating the filing processes for the two Venezuela TPS populations. To decrease confusion among stakeholders, ensure optimal operational processes, and maintain the same eligibility requirements, upon publication of this Notice, individuals registered under either the March 9, 2021 TPS designation or the October 3, 2023 TPS designation will be allowed to re-register under this extension. This would not, however, require that a beneficiary registered under the March 9, 2021 designation to re-register at this time. Rather, it would provide such individuals with the option of doing so. Venezuela TPS beneficiaries who appropriately apply for TPS or re-register under this Notice and are approved by USCIS will obtain TPS through the same extension date of October 2, 2026.

**Why is the Secretary extending the TPS designation for Venezuela through October 2, 2026?**

DHS has reviewed country conditions in Venezuela. Based on the review, including input received from Department of State (DoS) and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because extraordinary and temporary conditions supporting Venezuela's TPS designation remain, and it is not contrary to the national interest of the United States to

permit Venezuelan TPS beneficiaries to remain in the United States temporarily.

**Overview**

Venezuela is experiencing ''a complex, serious and multidimensional humanitarian crisis.''[2] The crisis has reportedly disrupted every aspect of life in Venezuela. ''Basic services like electricity, internet access, and water are patchy; malnutrition is on the rise; the healthcare system has collapsed; and children receive poor or no education. Inflation rates are also among the highest in the world.''[3] Venezuela's ''complex crisis'' has pushed Venezuelans into ''poverty, hunger, poor health, crime, desperation and migration.''[4] Moreover, Nicolás Maduro's declaration of victory in the July 28, 2024 presidential election— which has been contested as fraudulent by the opposition—''has been followed by yet another sweeping crackdown on dissent.''[5]

**Food Insecurity**

Food insecurity is also a significant challenge in Venezuela.[6] ''Despite a recent economic recovery [. . .], many families are going hungry and depending on aid to feed themselves.''[7] Reports indicate that Venezuela ''suffers the second-highest level of hunger in South America,'' with ''[s]ome 5.1 million people [. . .] not getting enough

---

[1] INA section 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. 107–296, 116 Stat. 2135 (2002). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1); 8 U.S.C. 1254a(b)(1).

[2] Annual Report 2023—Chapter IV.B—Venezuela, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 730, available at: *https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Venezuela_ENG.PDF* (last visited Aug. 20, 2024).

[3] Iván Reyes, As election looms, Venezuelans see-saw between hope and fear, The New Humanitarian, Jul. 8, 2024, available at: *https://www.thenewhumanitarian.org/photo-feature/2024/07/08/election-looms-venezuela-see-saw-between-hope-and-fear* (last visited Aug. 20, 2024).

[4] Regina Garcia Cano, As Maduro shifts from migration denier to defender, Venezuelans consider leaving if he is reelected, The Associated Press, updated May 29, 2024, available at: *https://apnews.com/article/venezuela-election-migrants-maduro-9ba01c2cd7246adb9369bf69941d986a* (last visited Aug. 20, 2024).

[5] Sergio Martínez-Beltrán and Marian Carrasquero, Venezuelans in US anxiously watch home crisis, brace for new migration surge, Morning Edition, National Public Radio (NPR), Aug. 12, 2024, available at: *https://www.npr.org/2024/08/11/nx-s1-5066867/venezuela-maduro-election-migration-usborder-immigration* (last visited Aug. 12, 2024).

[6] Clare Ribando Seelke, Venezuela: Political Crisis and U.S. Policy, Congressional Research Service (CRS), updated Sep. 1, 2023, pg. 1, available at: *https://crsreports.congress.gov/product/pdf/IF/IF10230* (last visited Aug. 22, 2024).

[7] Mariela Nava, In Venezuela, hunger stalks presidential election, Reuters, Jul. 9, 2024, available at: *https://www.reuters.com/world/americas/venezuela-hunger-stalks-presidential-election-2024-07-09/* (last visited Aug. 22, 2024).

to eat.''[8] The U.N. Special Rapporteur on the right to food reported that ''[f]ood insecurity, malnutrition and deterioration in livelihoods is cited as the primary cause for the mass migration out of the country.''[9]

Notably, the problem of food shortages and scarcity has abated;[10] however, ''supply issues have been replaced by affordability ones.''[11] In 2023, ''86% of the population reported not having enough money to buy the food needed in their household,'' while around 22% ''went permanently hungry at times during the year.''[12] Additionally, ''chronic malnutrition is surging among children, leading to stunting, wasting, delayed cognitive development, and higher risks of illness more generally.''[13]

## Access to Basic Services (Including Electricity, Water, and Fuel)

The lack of access to basic services including electricity, water, and fuel represents another component of Venezuela's crisis.[14] Venezuela ''experiences regular power outages,''[15] and ''interruptions in electrical service'' are common and reportedly occur daily.[16] The population suffering intermittent and prolonged power failures increased from 25.9% to 61.9% between 2022 and 2023.''[17] Additionally, Venezuelans face ''growing challenges to access water and sanitation since the water supply is not continuous, and the quality of water has deteriorated.''[18] ''Potable water is frequently not available for long periods,''[19] and many households lack reliable access to potable water.[20]

Venezuela is also impacted by fuel shortages.[21] Venezuela experienced ''years of painful fuel shortages that kept drivers in line for sometimes days to fill up their cars and severely restricted Venezuela's industrial and agricultural activity.''[22] Natural gas—''the fuel essential for cooking, generating power and feeding petrochemical plants and factories—has also been frequently scarce.''[23] In 2023, 69.4% of households were impacted by failures in the availability of domestic gas service.[24] Furthermore, most Venezuelans without direct gas in their homes for cooking instead ''rely on domestic gas services that households pay for by filling gas cylinders at state plants, one per family per month.''[25] However, ''[t]he capacity of each cylinder averages about 25 days and cannot always be replenished regularly.''[26]

## Health Crisis

The collapse of Venezuela's healthcare system is one of the most severe aspects of its humanitarian crisis.[27] Venezuela's health system is marked by deteriorated infrastructure, lack of medical equipment, poor maintenance, lack of public services,

[8] Mariela Nava, In Venezuela, hunger stalks presidential election, Reuters, Jul. 9, 2024, available at: *https://www.reuters.com/world/americas/venezuela-hunger-stalks-presidential-election-2024-07-09/* (last visited Aug. 22, 2024).

[9] End of Mission Statement; U.N. Special Rapporteur on the right to food by Mr. Michael Fakhri; Visit to Venezuela (Bolivarian Republic of), 1–14 February 2024, Office of the High Commissioner for Human Rights (OHCHR), Feb. 14, 2024, pg. 3, available at: *https://www.ecoi.net/en/file/local/2104669/20240214-eom-statement-venezuela-sr-food-en.pdf* (last visited Aug. 22, 2024).

[10] Regina Garcia Cano, Venezuelans turn to odd jobs and gambling to stretch meager wages they hope will grow after election, The Associated Press, updated July 24, 2024, available at: *https://apnews.com/article/venezuela-presidential-election-maduro-crisis-machado-edmundo-4c7f83a5a44a6d80f12d8cad8b67b026* (last visited Aug. 20, 2024); Gabriela Mesones Rojo and Iván Reyes, Hunger, healthcare, and schools: Reasons to leave Venezuela (along with a Maduro poll win), The New Humanitarian, Jun. 25, 2024, available at: *https://www.thenewhumanitarian.org/analysis/2024/06/25/hunger-healthcare-schools-reasons-leave-venezuela-maduro-poll-win* (last visited Aug. 22, 2024); Follow-Up Report on the Complex Humanitarian Emergency in Venezuela, HumVenezuela, Nov. 2023, pg. 27, available at: *https://humvenezuela.com/wp-content/uploads/2024/02/FOLLOW-UP-REPORT-ON-THE-COMPLEX-HUMANITARIAN-EMERGENCY-IN-VENEZUELA-2023-2.pdf* (last visited Aug. 22, 2024).

[11] Regina Garcia Cano, UN-backed food expert calls on Venezuela to tackle hunger and urges end to economic sanctions, The Associated Press, Feb. 14, 2024, available at: *https://apnews.com/article/venezuela-food-insecurity-hunger-malnutrition-un-maduro-afb4af4978c09cf0f3e54e1cfef981b5* (last visited Aug. 22, 2024).

[12] Gabriela Mesones Rojo and Iván Reyes, Hunger, healthcare, and schools: Reasons to leave Venezuela (along with a Maduro poll win), The New Humanitarian, Jun. 25, 2024, available at: *https://www.thenewhumanitarian.org/analysis/2024/06/25/hunger-healthcare-schools-reasons-leave-venezuela-maduro-poll-win* (last visited Aug. 22, 2024).

[13] Gabriela Mesones Rojo and Iván Reyes, Hunger, healthcare, and schools: Reasons to leave Venezuela (along with a Maduro poll win), The New Humanitarian, Jun. 25, 2024, available at: *https://www.thenewhumanitarian.org/analysis/2024/06/25/hunger-healthcare-schools-reasons-leave-venezuela-maduro-poll-win* (last visited Aug. 22, 2024).

[14] Florantonia Singer, Caracas: The ordeal of living in a city with failed public services, El País (Spa.), Sep. 24, 2023, available at: *https://english.elpais.com/international/2023-09-24/caracas-the-ordeal-of-living-in-a-city-with-failed-public-services.html* (last visited Aug. 23, 2024).

[15] Venezuela Country Security Report, Overseas Security Advisory Council (OSAC), U.S. Dep't of State, last updated Mar. 26, 2024, available at: *https://www.osac.gov/Content/Report/34f99e62-2161-412d-bfeb-1e752539f6bf* (last visited Aug. 23, 2024).

[16] Clare Ribando Seelke, Venezuela: Political Crisis and U.S. Policy, Congressional Research Service (CRS), updated Sep. 1, 2023, pg. 1, available at: *https://crsreports.congress.gov/product/pdf/IF/IF10230* (last visited Aug. 23, 2024); Gabriela Mesones Rojo and Iván Reyes, Hunger, healthcare, and schools: Reasons to leave Venezuela (along with a Maduro poll win), The New Humanitarian, Jun. 25, 2024, available at: *https://www.thenewhumanitarian.org/analysis/2024/06/25/hunger-healthcare-schools-reasons-leave-venezuela-maduro-poll-win* (last visited Aug. 23, 2024).

[17] Follow-Up Report on the Complex Humanitarian Emergency in Venezuela, HumVenezuela, Nov. 2023, pg. 21, available at: *https://humvenezuela.com/wp-content/uploads/2024/02/FOLLOW-UP-REPORT-ON-THE-COMPLEX-HUMANITARIAN-EMERGENCY-IN-VENEZUELA-2023-2.pdf* (last visited Aug. 23, 2024).

[18] Annual Report 2023—Chapter IV.B—Venezuela, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 732, available at: *https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Venezuela_ENG.PDF* (last visited Aug. 26, 2024).

[19] Venezuela Country Security Report, Overseas Security Advisory Council (OSAC), U.S. Dep't of State, last updated Mar. 26, 2024, available at: *https://www.osac.gov/Content/Report/34f99e62-2161-412d-bfeb-1e752539f6bf* (last visited Aug. 26, 2024).

[20] Clare Ribando Seelke, Venezuela: Political Crisis and U.S. Policy, Congressional Research Service (CRS), updated Sep. 1, 2023, pg. 1, available at: *https://crsreports.congress.gov/product/pdf/IF/IF10230* (last visited Aug. 26, 2024).

[21] Luke Taylor, 'To be reunited . . . would be a dream': Venezuelan exiles' fate hangs on vote, The Guardian, Jun. 25, 2024, available at: *https://www.theguardian.com/global-development/article/*

[22] Fabiola Zerpa and Lucia Kassai, Oil Majors Fill Venezuela Gas Pumps, Easing Years of Shortages, Bloomberg, Feb. 9, 2024, available at: *https://www.rigzone.com/news/wire/oil_majors_fill_venezuela_gas_pumps_easing_years_of_shortages-09-feb-2024-175693-article/* (last visited Sep. 6, 2024).

[23] Marianna Parraga, Deisy Buitrago, and Mircely Guanipa, Whoever wins election, Venezuela faces natural gas problem, Reuters, Jul. 24, 2024, available at: *https://www.reuters.com/world/americas/gas-rich-venezuela-next-president-faces-problem-producing-it-2024-07-24/* (last visited Aug. 26, 2024).

[24] Follow-Up Report on the Complex Humanitarian Emergency in Venezuela, HumVenezuela, Nov. 2023, pg. 22, available at: *https://humvenezuela.com/wp-content/uploads/2024/02/FOLLOW-UP-REPORT-ON-THE-COMPLEX-HUMANITARIAN-EMERGENCY-IN-VENEZUELA-2023-2.pdf* (last visited Aug. 26, 2024).

[25] Follow-Up Report on the Complex Humanitarian Emergency in Venezuela, HumVenezuela, Nov. 2023, pg. 22, available at: *https://humvenezuela.com/wp-content/uploads/2024/02/FOLLOW-UP-REPORT-ON-THE-COMPLEX-HUMANITARIAN-EMERGENCY-IN-VENEZUELA-2023-2.pdf* (last visited Aug. 26, 2024).

[26] Follow-Up Report on the Complex Humanitarian Emergency in Venezuela, HumVenezuela, Nov. 2023, pg. 22, available at: *https://humvenezuela.com/wp-content/uploads/2024/02/FOLLOW-UP-REPORT-ON-THE-COMPLEX-HUMANITARIAN-EMERGENCY-IN-VENEZUELA-2023-2.pdf* (last visited Aug. 26, 2024).

2024/jul/25/venezuelan-exiles-election-maduro (last visited Aug. 27, 2024).

[27] Gabriela Mesones Rojo and Iván Reyes, Hunger, healthcare, and schools: Reasons to leave Venezuela (along with a Maduro poll win), The New Humanitarian, Jun. 25, 2024, available at: *https://www.thenewhumanitarian.org/analysis/2024/06/25/hunger-healthcare-schools-reasons-leave-venezuela-maduro-poll-win* (last visited Aug. 21, 2024).

Federal Register / Vol. 90, No. 11 / Friday, January 17, 2025 / Notices

**5965**

deficiencies in the provision of medicines and medical supplies, and power and water cuts, in addition to corruption in the health sector, and underfunded and understaffed health centers.[28] Consequently, health indicators in Venezuela have worsened since the collapse of the Venezuelan health system in 2016.[29]

Venezuela's public health system has reportedly lost an estimated "70 percent of its capacity since 2016," and "millions of individuals are unable to access adequate health care" in Venezuela.[30] Additionally, Venezuela faces "persistent shortages and deficiencies in the supply of medicines, supplies, equipment and medical treatments."[31]

### Education

Reports indicate that "dilapidated infrastructure, the lack of teachers and of public transportation—combined with the shortcomings of the school meals programme—are driving many students away. The impoverishment of families due to high inflation is also forcing children to drop out of school to work. In 2023, 40% of students between the ages of three and 17 attended school irregularly."[32]

### Economic Crisis

Venezuela "has faced a long-running economic crisis,"[33] with its economy suffering from "a prolonged meltdown marked by triple-digit inflation and a mass exodus of millions of migrants seeking better prospects elsewhere."[34] Reporting in July 2024 indicated that over the last 10 years, gross domestic product in Venezuela has declined by about 73%.[35] Though Venezuela experienced some economic improvement in 2024,[36] it is "insufficient for an economy like Venezuela's, urgently in need of double-digit growth for several years in order to return to what it once was."[37]

### Political Repression & Human Rights

According to the Inter-American Commission on Human Rights (IACHR), Maduro and his representatives have "systematically violated human rights, including freedom of expression, to facilitate the concentration of power in the executive branch, to discourage political participation and to undermine the independence of institutions."[38] Conditions have grown worse due to harsher crackdowns by Maduro and his representatives on the opposition and their use of thoroughly flawed elections to seize full control of state institutions. Maduro and his representatives have closed off virtually all channels for political dissent, restricting civil liberties and prosecuting perceived opponents without regard for due process.[39] Furthermore, the IACHR has reported allegations that "serious human rights violations" have been committed in Venezuela, which, it asserts, "may amount to crimes against humanity."[40] In late June 2023, International Criminal Court judges "authorized the resumption of an investigation into alleged crimes against humanity in Venezuela."[41] Human Rights Watch reported that, in September 2023, "the United Nations Fact-Finding Mission (FFM) found serious human rights violations that continued the same patterns of conduct that the FFM had previously qualified as crimes against humanity."[42]

Reports indicate that leading up to the recent Venezuelan presidential election, the electoral process was marred by human rights abuses and irregularities that kept the playing field uneven, with reports of Maduro and his representatives repeatedly committing "systematic human rights violations against critics and opposition leaders."[43] According to Amnesty International, the election period was marked with escalating repression with "incessant attacks on civic space, tens of arbitrary detentions, enforced disappearances, torture, reprisals against businesses and contractors providing services to opposition figures, and arbitrary and abusive administrative measures."[44]

On July 31, 2024, the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela reported that, since the National Electoral Council's declaration that Maduro had won the presidential election in the early morning hours of July 29, "thousands of people—including men, women, children, and the elderly—have taken to the streets across the country to protest the

[28] Venezuela—Country Focus, European Union Agency for Asylum (EUAA), Nov. 2023, pg. 33, available at: *https://coi.euaa.europa.eu/administration/easo/PLib/2023_11_EUAA_COI_Report_Venezuela_Country_Focus.pdf* (last visited Aug. 21, 2024).

[29] International Protection Needs of Venezuelan Nationals, Amnesty International, Oct. 2023, pg. 5, available at: *https://www.ecoi.net/en/file/local/2099475/AMR5373312023ENGLISH.pdf* (last visited Aug. 21, 2024).

[30] Annual Report 2023—Chapter IV.B—Venezuela, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 731, available at: *https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Venezuela_ENG.PDF* (last visited Aug. 21, 2024).

[31] Annual Report 2023—Chapter IV.B—Venezuela, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 731, available at: *https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Venezuela_ENG.PDF* (last visited Aug. 21, 2024).

[32] Gabriela Mesones Rojo and Iván Reyes, Hunger, healthcare, and schools: Reasons to leave Venezuela (along with a Maduro poll win), The New Humanitarian, Jun. 25, 2024, available at: *https://www.thenewhumanitarian.org/analysis/2024/06/25/hunger-healthcare-schools-reasons-leave-venezuela-maduro-poll-win* (last visited Sep. 3, 2024).

[33] Mayela Armas, Venezuela's government doubles down on inflation control ahead of election, Reuters, Feb. 28, 2024, available at: *https://www.reuters.com/world/americas/venezuelas-government-doubles-down-inflation-control-ahead-election-2024-02-28/* (last visited Aug. 20, 2024).

[34] Mayela Armas, Venezuela economy grew 5% in 2023, will reach 8% this year-Maduro, Reuters, Jan. 15, 2024, available at: *https://www.reuters.com/world/americas/venezuela-economy-grew-5-2023-will-reach-8-this-year-maduro-2024-01-15/* (last visited Aug. 20, 2024).

[35] Mariela Nava, In Venezuela, hunger stalks presidential election, Reuters, Jul. 9, 2024, available at: *https://www.reuters.com/world/americas/venezuela-hunger-stalks-presidential-election-2024-07-09/* (last visited Aug. 20, 2024).

[36] Alonso Moleiro, Venezuela experiences an economic recovery in times of electoral uncertainty, El País (Spa.), Jul. 22, 2024, available at: *https://english.elpais.com/economy-and-business/2024-07-22/venezuela-experiences-an-economic-recovery-in-times-of-electoral-uncertainty.html* (last visited Aug. 20, 2024).

[37] Alonso Moleiro, Venezuela experiences an economic recovery in times of electoral uncertainty, El País (Spa.), Jul. 22, 2024, available at: *https://english.elpais.com/economy-and-business/2024-07-22/venezuela-experiences-an-economic-recovery-in-times-of-electoral-uncertainty.html* (last visited Aug. 20, 2024).

[38] Annual Report 2023—Chapter IV.B—Venezuela, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 720, available at: *https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Venezuela_ENG.PDF* (last visited Aug. 30, 2024).

[39] Freedom in the World 2024—Venezuela, Freedom House, Feb. 29, 2024, available at: *https://freedomhouse.org/country/venezuela/freedom-world/2024* (last visited Aug. 29, 2024).

[40] Annual Report 2023—Chapter IV.B—Venezuela, Inter-American Commission on Human Rights (IACHR), Apr. 25, 2024, pg. 720, available at: *https://www.oas.org/en/iachr/docs/annual/2023/chapters/IA2023_Cap_4B_Venezuela_ENG.PDF* (last visited Aug. 30, 2024); International Protection Needs of Venezuelan Nationals, Amnesty International, Oct. 2023, pg. 3, available at: *https://www.ecoi.net/en/file/local/2099475/AMR537331 2023ENGLISH.pdf* (last visited Aug. 30, 2024).

[41] World Report 2024—Venezuela, Human Rights Watch, Jan. 11, 2024, available at: *https://www.hrw.org/world-report/2024/country-chapters/venezuela* (last visited Aug. 30, 2024).

[42] World Report 2024—Venezuela, Human Rights Watch, Jan. 11, 2024, available at: *https://www.hrw.org/world-report/2024/country-chapters/venezuela* (last visited Aug. 30, 2024).

[43] Venezuela: Repression Mars Key Upcoming Election, Human Rights Watch, Jul. 25, 2024, available at: *https://www.hrw.org/news/2024/07/25/venezuela-repression-mars-key-upcoming-election* (last visited Sep. 3, 2024).

[44] Venezuela: After an electoral period marked by repression, a commitment to human rights is imperative, Amnesty International, Jul. 25, 2024, available at: *https://www.amnesty.org/en/latest/news/2024/07/venezuela-after-electoral-period-marked-repression-commitment-human-rights-imperative/* (last visited Sep. 3, 2024).

results.'' [45] In the aftermath of the election, Maduro and his representatives ''mounted a furious campaign against anyone challenging the declared results of the vote, unleashing a wave of repression that human rights groups say is unlike anything the country has seen in recent decades.'' [46]

### Crime & Insecurity

Venezuela was once considered the most dangerous country in Latin America.[47] However, ''a discernible reduction in the overall levels of violence could be observed'' in 2023 and 2024.[48] Various factors behind the apparent decline in crime include the country's ''ongoing economic crisis,'' which has reportedly reduced ''opportunities for extortion and ransom kidnappings,'' and led Venezuelan criminal groups to ''infiltrate Venezuelan diasporas settled in other Latin American countries.'' [49] The ''monopolization of violence in some regions'' by ''non-state armed groups,'' as well as pacts between Maduro representatives and some criminal groups, have also reportedly contributed to improved perceptions of security in certain areas.[50]

Nevertheless, Venezuelans continue to ''face physical insecurity and violence from several sources, including irregular armed groups, security forces,

and organized gangs.'' [51] The European Union Agency for Asylum (EUAA) reported that ''Criminal armed groups often operate with the cooperation, or tolerance of state security forces'' in Venezuela.[52] Moreover, security forces in Venezuela have been ''accused of committing human rights abuses such as torture and cruel, inhuman and degrading treatment, including sexual and gender-based violence, and killings consistent with extrajudicial executions.'' [53]

In summary, extraordinary and temporary conditions, including a severe humanitarian emergency marked by an economic contraction, deepening poverty, reduced access to food and medicine, a collapse in basic services, fuel shortages, human rights abuses and political repression, crime and violence continue to prevent Venezuelan nationals from returning in safety.

Based on this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions supporting Venezuela's designation for TPS continue to be met. *See* INA sec. 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continue to be extraordinary and temporary conditions in Venezuela that prevent Venezuelan nationals (or individuals having no nationality who last habitually resided in Venezuela) from returning to Venezuela in safety, and it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Venezuela for TPS should be extended for an 18-month period, beginning on April 3, 2025, and ending on October 2, 2026. *See* INA sec. 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• There are approximately 607,000 current Venezuelan TPS beneficiaries who are eligible to re-register for TPS under the extension.

### Notice of the Designation of Venezuela for TPS

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Venezuela's designation for TPS on the basis of extraordinary and temporary conditions are met, and it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am extending the existing October 3, 2023 designation of Venezuela for TPS for 18 months, beginning on April 3, 2025, and ending on October 2, 2026. *See* INA sec. 244(b)(1) and (b)(2); 8 U.S.C. 1254a(b)(1), and (b)(2).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

### Eligibility and Employment Authorization for TPS

#### Required Application Forms and Application Fees to re-register for TPS:

To re-register for TPS based on the designation of Venezuela, you must submit Form I–821. When filing an application to re-register for TPS, you do not need to pay the application fee; however, you are required to pay the biometric services fee. If you cannot pay the biometric services fee, you may ask USCIS to waive the fee. Please see additional information under the ''Biometric Services Fee'' section of this notice.

TPS beneficiaries are eligible for an EAD, which proves their authorization to work in the United States. You are not required to submit Form I–765 or have an EAD to be granted TPS, but see below for more information if you want an EAD to use as proof that you can work in the United States.

Individuals who have a Venezuela TPS application (Form I–821) that was still pending as of January 17, 2025, do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through October 2, 2026.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 106.2 and the fee waiver-related regulations in 8 CFR 106.3. In addition, USCIS Form G–1055, Fee Schedule,

[45] Venezuela: UN Fact-Finding Mission expresses alarm over human rights violations in post-election context, Office of the High Commissioner for Human Rights (OHCHR), Jul. 31, 2024, available at: *https://www.ohchr.org/en/press-releases/2024/07/venezuela-un-fact-finding-mission-expresses-alarm-over-human-rights* (last visited Sep. 3, 2024).

[46] Frances Robles, 'Operation Knock-Knock': Venezuela Sweeps Up Dissenters After Disputed Vote, The New York Times, Aug. 10, 2024, available at: *https://www.nytimes.com/2024/08/10/world/americas/venezuela-election-maduro.html* (last visited Sep. 3, 2024).

[47] Venezuela Investigative Unit, Why Is Venezuela's Crime Rate Falling?, InSight Crime, May 28, 2024, available at: *https://insightcrime.org/news/venezuela-crime-rate-falling/* (last visited Sep. 3, 2024).

[48] Annual Report Violence 2023, Venezuelan Violence Observatory (OVV), Dec. 28, 2023, pg. 30, available at: *https://observatoriodeviolencia.org.ve/wp-content/uploads/2024/01/OVV-Violence-in-Venezuela-Annual-Report-2023-.pdf* (last visited Sep. 3, 2024); Venezuela Investigative Unit, Why Is Venezuela's Crime Rate Falling?, InSight Crime, May 28, 2024, available at: *https://insightcrime.org/news/venezuela-crime-rate-falling/* (last visited Sep. 3, 2024).

[49] Venezuela Investigative Unit, Why Is Venezuela's Crime Rate Falling?, InSight Crime, May 28, 2024, available at: *https://insightcrime.org/news/venezuela-crime-rate-falling/* (last visited Sep. 3, 2024).

[50] Venezuela Investigative Unit, Why Is Venezuela's Crime Rate Falling?, InSight Crime, May 28, 2024, available at: *https://insightcrime.org/news/venezuela-crime-rate-falling/* (last visited Sep. 3, 2024).

[51] Freedom in the World 2024—Venezuela, Freedom House, Feb. 29, 2024, available at: *https://freedomhouse.org/country/venezuela/freedom-world/2024* (last visited Sep. 3, 2024).

[52] Venezuela—Country Focus, European Union Agency for Asylum (EUAA), Nov. 2023, pg. 42, available at: *https://coi.euaa.europa.eu/administration/easo/PLib/2023_11_EUAA_COI_Report_Venezuela_Country_Focus.pdf* (last visited Sep. 3, 2024).

[53] Venezuela—Country Focus, European Union Agency for Asylum (EUAA), Nov. 2023, pg. 26, available at: *https://coi.euaa.europa.eu/administration/easo/PLib/2023_11_EUAA_COI_Report_Venezuela_Country_Focus.pdf* (last visited Sep. 3, 2024).

provides the current fees required for the Form I–821 and Form I–765 for existing TPS beneficiaries who are re-registering.

### How Can TPS Beneficiaries Obtain an EAD?

Everyone must provide their employer with documentation showing that they have the legal right to work in the United States. TPS beneficiaries are eligible to obtain an EAD, which proves their legal right to work. If you want to obtain an EAD, you must file Form I–765 and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912). TPS applicants may file this form with their TPS application, or separately later, if their TPS application is still pending or has been approved.

Beneficiaries with a Venezuela TPS-related Form I–765 that was still pending as of January 17, 2025, do not need to file the application again. If USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through October 2, 2026.

### Can My TPS-Related EAD Be Automatically Extended?

Yes. There are two ways for your TPS-related EAD to be automatically extended. First, if you already have an EAD with a "Card Expires" date of September 10, 2025, April 2, 2025, March 10, 2024, or September 9, 2022, this **Federal Register** notice automatically extends it through April 2, 2026 without any further action on your part. You do not need to present this FRN or any other additional documentation other than your EAD to use this automatic extension.

Second, you may also be eligible for a longer automatic extension of up to 540 days from the "Card Expires" date on the EAD if you file your Form I–765 EAD renewal application during the re-registration period of January 17, 2025, through September 10, 2025 ("Up to 540-Day Automatic EAD Extension").[54] See the section "How can I receive an automatic extension of my current TPS EAD for up to 540 days from the "Card Expires" date on the EAD by filing an EAD renewal application ("Up to 540-Day Automatic EAD Extension")?" of this **Federal Register** notice for more information. Your EAD may be eligible for both types of extensions, but in no case will your EAD automatic extension be valid past October 2, 2026. If you take advantage of both types of EAD extensions, the automatic extension periods run concurrently.

### Filing Information

USCIS offers the option to applicants for TPS under Venezuela's designation to file Form I–821 and related requests for EADs online or by mail. However, if you file Form I–912, Request for Fee Waiver or a written fee waiver request for any applications filed together with your Form I–821, you must submit your applications by mail. When filing a TPS application, you can also request an EAD by submitting a completed Form I–765 with your Form I–821. Under certain circumstances, you may also upload a completed Form I–765 with a fee or fee waiver request, in Portable Document Format (PDF) through your USCIS online account. More information about filing your Form I–765 and fee waiver request through a PDF upload is available at *https://www.uscis.gov/newsroom/stakeholder-messages/uscis-launches-online-pdf-filing-option.*

*Online filing:* Form I–821 and Form I–765 are available for concurrent filing online.[55] To file these forms online, you must first create a USCIS online account.[56]

*PDF upload:* Form I–765, if applicable, and Form I–912, if applicable, are available for PDF upload. To upload these documents, you must first create a USCIS online account.[57]

*Mail filing:* Mail your completed Form I–821; Form I–765, if applicable; Form I–912, if applicable; and supporting documentation to the proper address in Table 1—Mailing Addresses.

#### TABLE 1—MAILING ADDRESSES

| If. . . | Mail to. . . |
|---|---|
| You live in California or Texas and are using U.S. Postal Service (USPS). | USCIS, Attn: TPS Venezuela, P.O. Box 20300, Phoenix, AZ 85036–0300. |
| You live in California or Texas and are using FedEX, UPS, or DHL ...... | USCIS, Attn: TPS Venezuela (Box 20300), 2108 E. Elliot Rd., Tempe, AZ 85284–1806. |
| You live in Florida, and you are using the U.S. Postal Service (USPS) | USCIS, Attn: TPS Venezuela, P.O. Box 660864, Dallas, TX 75266–0864. |
| You live in Florida, and you are using FedEx, UPS, or DHL .................. | USCIS, Attn: TPS Venezuela (Box 660864), 2501 S. State Highway, 121 Business, Suite 400, Lewisville, TX 75067–8003. |
| You live in Illinois, Indiana, Massachusetts, New Jersey, New York, North Carolina, Utah, or Virginia, and you are using the U.S. Postal Service (USPS). | USCIS, Attn: TPS Venezuela, P.O. Box 4091, Carol Stream, IL 60197–4091. |
| You live in Illinois, Indiana, Massachusetts, New Jersey, New York, North Carolina, Utah, or Virginia, and you are using FedEx, UPS, or DHL. | USCIS, Attn: TPS Venezuela (Box 4091), 2500 Westfield Drive, Elgin, IL 60124–7836. |
| You live in any other state or territory, and you are using the U.S. Postal Service (USPS). | USCIS, Attn: TPS Venezuela, P.O. Box 805282, Chicago, IL 60680–5285. |
| You live in any other state or territory, and you are using FedEx, UPS, or DHL. | USCIS, Attn: TPS Venezuela (Box 805282), 131 South Dearborn Street, 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you want to request an EAD, you may submit Form I–765 one of three ways: online, mail your Form I–765 to the appropriate address in Table 1, or upload a completed PDF through your USCIS online account. If you file online, you will be prompted to include the fee. If you file by mail, you must include the fee or fee waiver request. If you file by

---

[54] Under 8 CFR 274a.13(d), EADs with category A12 and C19 are eligible for an automatic extension of up to 540 days from the date on the face of the EAD if the bearer's Form I–765 application is properly filed under either the A12 or C19 category and during the re-registration period described in the applicable **Federal Register** notice.

[55] Find information about online filing at "Forms Available to File Online," *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[56] *https://myaccount.uscis.gov/users/sign_up.*

[57] *https://www.uscis.gov/newsroom/stakeholder-messages/uscis-launches-online-pdf-filing-option.* Sign up to create a new USCIS online account at *https://myaccount.uscis.gov/users/sign_up.*

PDF upload, you must include the fee or a fee waiver request. When you request an EAD based on an IJ or BIA grant of TPS, include with your application a copy of the order from the IJ or BIA granting you TPS. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions for Form I–821 list all the documents you need to re-register for TPS. You may also find information on the acceptable documentation and other requirements for re-registering for TPS on the USCIS website at *https://www.uscis.gov/tps* under ''Venezuela.''

**Travel**

TPS beneficiaries and TPS applicants with pending Form I–821 applications may also apply for travel authorization, which USCIS may grant as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If USCIS grants travel authorization, it gives you permission to leave the United States and to return to a U.S. port of entry to request re-entry during a specific period. To request travel authorization, you must file Form I–131, available at *https://www.uscis.gov/i-131*. You may file Form I–131 together with your Form I–821 or separately. When filing Form I–131, a TPS beneficiary must:

• Select Item Number 4 in Part 1 on the Form I–131; and

• Submit the fee for Form I–131, or request a fee waiver, which you may submit on Form I–912.

When filing Form I–131, a TPS applicant with a pending initial Form I–821 must:

• Select Item Number 5C in Part 1 on the Form I–131; and

• Submit the fee for Form I–131, or request a fee waiver, which you may submit on Form I–912.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797, Notice of Action, or Form I–797C, Notice of Action, indicating either approval or receipt of Form I–821. Form I–131 may not be filed by PDF upload.

TABLE 2—MAILING ADDRESSES

| If you are. . . | Mail to. . . |
|---|---|
| Filing Form I–131 together with Form I–821 ......................................... | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS).<br>You must include a copy of the Notice of Action (Form I–797C or I–797) showing USCIS received or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL.<br>You must include a copy of the Notice of Action (Form I–797C or I–797) showing USCIS received or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S. State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS:**

Biometrics (such as fingerprints) are required for all applicants, in addition to a biometric services fee. As previously stated, if you cannot pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. USCIS may require you to visit an Application Support Center to have your biometrics collected. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https:// www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms*.

**General Employment-Related Information for TPS Applicants and Their Employers**

**How can I obtain information on the status of my TPS application and EAD request?**

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at *https://uscis.gov* or visit the USCIS Contact Center at *https://www.uscis.gov/ contactcenter*. If you still need assistance, you may ask a question about your case online at *https:// egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**Am I eligible to receive an automatic extension of my current EAD through April 2, 2026, through this Federal Register notice (''FRN-Based Automatic EAD Extension'')?**

Yes. Regardless of your country of birth, if you currently have a Venezuela TPS-based EAD with the notation A12 or C19 under Category and a ''Card Expires'' date of September 10, 2025, April 2, 2025, March 10, 2024, or September 9, 2022, this **Federal Register** notice automatically extends your EAD through April 2, 2026, without any further action on your part. Although this **Federal Register** notice automatically extends your EAD through April 2, 2026, you still must timely re-register for TPS by filing Form I–821 in accordance with the procedures described in this **Federal Register** notice to maintain your TPS.

You also should file your Form I–765 timely to avoid possible gaps in your employment authorization documentation.

**How can I receive an automatic extension of my current TPS EAD for up to 540 days from the ''Card Expires'' date on the EAD by filing an EAD renewal application (''Up to 540-Day Automatic EAD Extension'')?**

You qualify for this other type of automatic EAD extension if:

• You properly file your renewal Form I–765 during the TPS re-registration period which is January 17, 2025, through September 10, 2025; and

• Your Form I–765 EAD renewal application is under category A12 or C19.

As long as the categories listed on your EAD and Form I–797C receipt notice are A12 and C19, they don't need to be the same. (For example, your EAD may still be automatically extended for up to 540 days if your facially expired or expiring EAD says C19 and your renewal application says A12.)

For purposes of your employer verifying your employment eligibility on the Form I–9, if you choose to complete your Form I–9 using the ''Up

to 540-Day Automatic EAD Extension,'' the automatic extension period starts from the ''Card Expires'' date on your EAD. You may use the EAD Automatic Extension Calculator available at *https://www.uscis.gov/eadautoextend* to determine the automatically extended expiration date.

**When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?**

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/ acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three business days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present one selection from List A (which provides evidence of both identity and employment authorization) or one selection from List B (which provides evidence of your identity) together with one selection from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in these lists. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https:// www.uscis.gov/I-9Central.* An EAD is an acceptable document under List A. See the section ''How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?'' of this **Federal Register** notice for more information.

A. FRN-based Automatic EAD Extension. If your EAD states A12 or C19 under Category and has a ''Card Expires'' date of September 10, 2025, April 2, 2025, March 10, 2024, or September 9, 2022, this **Federal Register** notice extends it automatically, and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through April 2, 2026. Your country of birth noted on the EAD does not have to reflect the TPS-designated country of Venezuela for you to be eligible for this extension. You may, but are not required to, show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through April 2, 2026.

B. Up to 540-day Automatic EAD Extension. To show that you qualify for this extension, present:

1. Your EAD with a Category Code of A12 or C19 and

2. Your Form I–797C, Notice of Action, for your Form I–765 renewal EAD application showing a Category Code of A12 or C19. The ''Received Date'' on this notice must fall within the re-registration period described in this FRN, which is from January 17, 2025, through September 10, 2025.

The A12 or C19 categories on your Form I–797C, Notice of Action, and facially expired or expiring A12 or C19 EAD do not need to match, as long as each lists A12 or C19 as the category. (For example, your EAD may still be automatically extended for up to 540 days if your EAD says C19 and your renewal application says A12.)

**What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?**

Your employer is required by law to ask you about your continued employment authorization. Your employer may need to reexamine your automatically extended EAD to check the ''Card Expires'' date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the ''Card Expires'' date and Category code, they should update the EAD expiration date in Section 2 of Form I–9. See the section ''What updates should my current employer make to Form I–9 if my EAD has been automatically extended?'' of this **Federal Register** notice for more information.

A. FRN-based Automatic EAD Extension. If you choose to use the automatic EAD extension based on this **Federal Register** notice, you may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through April 2, 2026; however, you are not required to do so. The last day of this automatic EAD extension is April 2, 2026. Before you start work on April 3, 2026, your employer is required by law to reverify your employment authorization on Form I–9.

B. Up to 540-day Automatic EAD Extension. If you filed your EAD renewal application during the re-registration period indicated in this **Federal Register** notice and choose to have your EAD automatically extended for up to 540 days from the ''Card Expires'' date on your EAD, but no later than October 2, 2026, present:

1. Your facially expired or expiring EAD with a Category Code of A12 or C19, and

2. The Form I–797C, Notice of Action, showing a Category Code of A12 or C19. The ''Received Date'' on this notice must fall within the re-registration period described in this FRN, which is from January 17, 2025, through September 10, 2025.

By the end date of your automatic EAD extension, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in these lists to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

**If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?**

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, even if you already have an EAD or employment authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through October 2, 2026, you must file Form I–765 and pay the associated fee (unless USCIS grants your fee waiver request).

**Can my employer require that I provide any other documentation to complete Form I–9, such as evidence of my status, proof of my Venezuelan citizenship, or a Form I–797 showing that I registered for TPS?**

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request other documentation, such as proof of Venezuelan citizenship or proof of registration for TPS, when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document if the EAD reasonably appears to be genuine and to relate to you. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or

immigration status or your national origin.

**How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?**

A. FRN-based Automatic EAD Extension. When using this type of automatically extended EAD to complete Form I–9 for a new job before April 3, 2026:

1. For Section 1, you should:

a. Check ''A noncitizen authorized to work until'' and enter October 2, 2026, as the ''expiration date''; and

b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)

2. For Section 2, employers should:

a. Determine whether the EAD is auto-extended by ensuring it is in category A12 or C19 and has a ''Card Expires'' date of September 10, 2025, April 2, 2025, March 10, 2024, or September 9, 2022;

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. Write April 2, 2026, as the expiration date.

Before the start of work on April 3, 2026, employers must reverify the employee's employment authorization on Form I–9.

B. Up to 540-day Automatic EAD Extension. If you filed your EAD renewal application during the re-registration period indicated in this **Federal Register** notice and choose to have your EAD automatically extended for up to 540 days from the ''Card Expires'' date on your EAD:

1. For Section 1, you should:

a. Check ''A noncitizen authorized to work until;'' and

b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)

c. Enter October 2, 2026 as the expiration date.

2. In Section 2, in the List A column, the employer must:

a. Determine whether the EAD is automatically extended by ensuring it is in category A12 or C19 and that your Form I–797C indicates that you filed your Form I–765 renewal EAD application under Category A12 or C19 and during the re-registration period indicated in this **Federal Register** notice;

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. In the Expiration Date field, enter the date 540 days from the ''Card Expires'' date on the EAD. This date may not be later than October 2, 2026. Use the Automatic Extension Eligibility Calculator at *https://www.uscis.gov/eadautoextend* to calculate your new EAD expiration date.

f. Employers should also enter ''EAD EXT'' in the Additional Information field.

**What updates should my current employer make to Form I–9 if my EAD has been automatically extended?**

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has now automatically extended your EAD, your employer may need to re-examine your current EAD if they do not have a copy of the EAD on file. Your employer should determine whether your EAD is automatically extended by ensuring that it contains Category A12 or C19.

A. FRN-based automatic EAD Extension. If you are relying on an FRN-based automatic EAD extension, your employer should examine your EAD to see if it has a ''Card Expires'' date of September 10, 2025, April 2, 2025, March 10, 2024, or September 9, 2022. Your employer may not rely on the country of birth listed on the card to determine whether you are eligible for this extension.

If your employer determines that USCIS has automatically extended your EAD through this **Federal Register** notice, they should update Section 2 of your previously completed Form I–9 as follows:

1. Write EAD EXT and April 2, 2026, as the last day of the automatic extension in the Additional Information field; and

2. Initial and date the correction.

*Note:* This is not considered a reverification. Employers do not reverify the employee until either the automatic extension has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By the date that the employee's automatically extended EAD expires, employers are required by law to reverify the employee's employment authorization on Form I–9.

B. Up to 540-day Automatic EAD Extension. If you are relying on an up to 540-day automatic EAD extension, your employer must also examine your Form I–797C indicating receipt of your Form I–765 renewal EAD application to determine if it was filed under Category A12 or C19 and during the re-

registration period indicated in this **Federal Register** notice. Your employer will need to update Form I–9 by entering the appropriate automatic EAD extension expiration date and ''EAD EXT'' in the Section 2 Additional Information field. The new up to 540-day EAD extension expiration date starts from the ''Card Expires'' date on the face of your current EAD, not to exceed the TPS designation end date indicated in this **Federal Register** notice. Use the Automatic Extension Eligibility Calculator at *https://www.uscis.gov/eadautoextend* to calculate your new EAD expiration date.

Note: This information also applies if you initially presented a TPS-related EAD that was automatically extended by the FRN-Based Automatic EAD Extension and later obtained an up to 540-day automatic EAD extension.

**If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?**

Employers may create a case in E-Verify for a new employee by entering the EAD document number and expiration date from Section 2 of Form I–9 into the corresponding fields in E-Verify.

**If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiring'' alert for an automatically extended EAD?**

If you have an employee who provided a TPS-related EAD when they first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. You must reverify your employee's employment authorization on Form I–9 by the date their automatic EAD extension ends. Employers may not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov*. USCIS accepts calls and

emails in English, Spanish, and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in many languages. Employers may also email IER at *IER@usdoj.gov* or get more information online at *https://www.justice.gov/ier.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov.* USCIS accepts calls and emails in English, Spanish and many other languages. Employees or job applicants may also call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in many languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in these lists. Employers may not require extra or additional documentation other than what is required to complete Form I–9. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (mismatch) must promptly inform employees of the mismatch and give these employees an opportunity to resolve the mismatch. A mismatch means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result occurs if E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Employment-

authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, if you present an EAD that has been automatically extended by this **Federal Register** notice, you do not need to show any other document, such as a Form I–797C, Notice of Action, reflecting receipt of a Form I–765 EAD renewal application or this **Federal Register** notice, to prove that you qualify for this extension. If you are presenting an EAD extended by an up to 540-day extension, you will need to show your Form I–797C, Notice of Action, reflecting receipt of your Form I–765. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary or applicant, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A12 or C19, even if your country of birth noted on the EAD does not reflect the TPS-designated country of Venezuela;

• Your Form I–94, Arrival/Departure Record;

• Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or

• Form I–797 or Form I–797C, Notice of Action, reflecting approval or receipt of a past or current Form I–821, if you received one from USCIS.

Check with the government agency requesting documentation about which document(s) the agency will accept.

Some state and local government agencies use SAVE, *https://www.uscis.gov/save,* to confirm the current immigration status of applicants for public benefits. While SAVE can verify that an individual has TPS or a pending TPS application, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. If an agency accepts the type of TPS-related document you present, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your A-Number, USCIS number, or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://www.uscis.gov/save/save-casecheck.* CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (such as your A-Number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must allow you to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *https://www.uscis.gov/save/for-benefit-applicants,* has detailed information on how to correct or update your immigration record, make an

appointment, or submit a written request to correct records.

[FR Doc. 2025–00769 Filed 1–13–25; 8:45 am]

**BILLING CODE 9111–97–P**

---

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–7092–N–02]

## 30-Day Notice of Proposed Information Collection; Record of Employee Interview; OMB Control No.: 2501–0009

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.

**DATES:** *Comments Due Date: February 18, 2025.*

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open

for Public Comments" or by using the search function. Interested persons are also invited to submit comments regarding this proposal and comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Anna Guido, Clearance Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210, Washington, DC 20410.

**FOR FURTHER INFORMATION CONTACT:** Anna Guido, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street, SW, Washington, DC 20410; email *Anna.P.Guido@hud.gov* or telephone (202) 402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Guido.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on September 11, 2024 at 89 FR 73705.

## A. Overview of Information Collection

*Title of Information Collection:* Record of Employee Interview.

*MB Approval Number:* 2501–0009.

*Type of Request:* Reinstatement of a currently approved collection.

*Form Number:* HUD 22019.

*Description of the need for the information and proposed use:*

All federal agencies administering programs subject to Davis-Bacon wage provisions are required to enforce Federal Wage and reporting provisions in accordance with Department of Labor (DOL) regulations (29 CFR part 5, Section 5.6 paragraphs (1)(2) and (a)(3), respectively).

HUD, state, and local agencies administering HUD-assisted programs must enforce Federal Wage and reporting requirements on covered HUD-assisted construction and maintenance work. Enforcement activities include conducting interviews with laborers and mechanics employed on HUD-assisted projected concerning their employment on covered projects. The HUD–11 and HUD–11–SP (Spanish version) are used to assist in the conducting of on-site interviews and to record the information provided by the respondent. The forms may be supplemented with additional pages, as needed. Responses and the provision of supplemental information are voluntary on the part of respondents. (*See* HUD Handbook 1344.1 REV–3 (Federal Labor Standards Requirements in Housing and Urban Development Programs), Sections 5–9, 5–10 (January 2023).

| Information collection | Number of respondents | Frequency of response | Responses per annum | Total burden hours per response | Annual burden hours | Hourly cost per response | Total cost |
|---|---|---|---|---|---|---|---|
| HUD–11/11SP Respondent's Time .......................... | 37,944 | 1 | 37,944.00 | 0.25 | 9,486.00 | $23.69 * | $224,723.34 |

## B. Solicitation of Public Comment

This notice is soliciting comments from members of the public and affected parties concerning the collection of information described in Section A on the following:

(1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) The accuracy of the agency's estimate of the burden of the proposed collection of information;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) Ways to minimize the burden of the collection of information on those who are to respond; including through

the use of appropriate automated collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

(5) Ways to minimize the burden of the collection of information on those who are to respond, including the use of automated collection techniques or other forms of information technology.

HUD encourages interested parties to submit comment in response to these questions.

## C. Authority

Section 3507 of the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35.

**Anna Guido,**

*Department Reports Management Officer, Office of Policy Development and Research, Chief Data Officer.*

[FR Doc. 2025–01139 Filed 1–16–25; 8:45 am]

**BILLING CODE 4210–67–P**

*Can a noncitizen who has been granted TPS apply for reinstatement of F–1 nonimmigrant student status after the noncitizen's F–1 nonimmigrant student status has lapsed?*

Yes. Regulations permit certain students who fall out of F–1 nonimmigrant student status to apply for reinstatement. *See* 8 CFR 214.2(f)(16). This provision might apply to students who worked on a TPS-related EAD or dropped their course load before publication of this notice, and therefore fell out of student status. These students must satisfy the criteria set forth in the F–1 nonimmigrant student status reinstatement regulations.

*How long will this notice remain in effect?*

This notice grants temporary relief through March 10, 2024,[61] to eligible F–1 nonimmigrant students. DHS will continue to monitor the situation in Venezuela. Should the special provisions authorized by this notice need modification or extension, DHS will announce such changes in the **Federal Register**.

**Paperwork Reduction Act (PRA)**

An F–1 nonimmigrant student seeking off-campus employment authorization due to severe economic hardship resulting from the humanitarian crisis in Venezuela must demonstrate to the DSO that this employment is necessary to avoid severe economic hardship. A DSO who agrees that a nonimmigrant student should receive such employment authorization must recommend an application approval to USCIS by entering information in the remarks field of the student's SEVIS record. The authority to collect this information is in the SEVIS collection of information currently approved by the Office of Management and Budget (OMB) under OMB Control Number 1653–0038.

This notice also allows an eligible F–1 nonimmigrant student to request

---

[61] Because the suspension of requirements under this notice applies throughout an academic term during which the suspension is in effect, DHS considers an F–1 nonimmigrant student who engages in a reduced course load or employment (or both) after this notice is effective to be engaging in a "full course of study," *see* 8 CFR 214.2(f)(6), and eligible for employment authorization, through the end of any academic term for which such student is matriculated as of March 10, 2024, provided the student satisfies the minimum course load requirement in this notice. DHS also considers students who engage in online coursework pursuant to ICE COVID–19 guidance for nonimmigrant students to be in compliance with regulations while such guidance remains in effect. *See* ICE Guidance and Frequently Asked Questions on COVID–19, Nonimmigrant Students & SEVP-Certified Schools: Frequently Asked Questions, *https://www.ice.gov/coronavirus* (last visited July 8, 2022).

employment authorization, work an increased number of hours while the academic institution is in session, and reduce their course load while continuing to maintain F–1 nonimmigrant student status.

To apply for employment authorization, certain F–1 nonimmigrant students must complete and submit a currently approved Form I–765 according to the instructions on the form. OMB has previously approved the collection of information contained on the current Form I–765, consistent with the PRA (OMB Control No. 1615–0040). Although there will be a slight increase in the number of Form I–765 filings because of this notice, the number of filings currently contained in the OMB annual inventory for Form I–765 is sufficient to cover the additional filings. Accordingly, there is no further action required under the PRA.

**Alejandro Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2022–19542 Filed 9–7–22; 8:45 am]

**BILLING CODE 9111–28–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2682–21; DHS Docket No. USCIS–2021–0003]

RIN 1615–ZB86

## Extension of the Designation of Venezuela for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) extension.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Venezuela for Temporary Protected Status (TPS) for 18 months, effective September 10, 2022 through March 10, 2024. This extension allows currently eligible TPS beneficiaries to retain TPS through March 10, 2024, so long as they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through March 10, 2024 must re-register during the re-registration period. This notice sets forth procedures necessary for

Venezuelan nationals (and individuals having no nationality who last habitually resided in Venezuela) to re-register for TPS and to apply for Employment Authorization Documents (EADs) with U.S Citizenship and Immigration Services (USCIS). USCIS will issue new EADs with a March 10, 2024 expiration date to eligible beneficiaries under Venezuela's TPS designation who timely re-register and apply for EADs under this extension.

**DATES:** *Extension of Designation of Venezuela for TPS:* The 18-month extension of the TPS designation of Venezuela for TPS is effective on September 10, 2022, and will remain in effect for 18 months, through March 10, 2024. The 60-day re-registration period for existing TPS beneficiaries runs from September 8, 2022 through November 7, 2022. (Note: It is important for re-registrants to timely re-register during the 60-day registration period and not to wait until their EADs expire, as delaying reregistration could result in gaps in their employment authorization documentation.)

**FOR FURTHER INFORMATION CONTACT:** You may contact Renâ Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

For further information on TPS, including guidance on the re-registration process and additional information on eligibility, please visit the USCIS TPS web page at *uscis.gov/tps.* You can find specific information about this extension of Venezuela's TPS designation by selecting "Venezuela" from the menu on the left side of the TPS web page.

If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.*

Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**