instructions through myUSCIS on how to access the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice to their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[53] Approval of advance authorization to travel does not guarantee parole into the United States at a U.S. POE. That parole is a discretionary determination made by CBP at the POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Upon their arrival at a POE, each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with the CBP inspectional process. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations. Individuals may request authorization to work from USCIS. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for work authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Sunset, Renewal, and Termination*

The process is capped at 24,000 beneficiaries. After this cap is reached, the program will sunset absent a decision by the Secretary to continue the process, based on the Secretary's sole discretion. The Secretary also retains the sole, unreviewable discretion to terminate the process at any point.

*E. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[54] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[55] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[56] In addition, although under the APA, invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing,[57] and DHS can make one here.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Venezuelan nationals to enter the United States. The United States will not implement the new parole process without the ability to return Venezuelan nationals who enter irregularly to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States irregularly between POEs. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now and result in definitely undesirable international consequences. It also would complicate broader discussions and negotiations about migration management. For now, Mexico has indicated it is prepared to make a unilateral decision to accept a substantial number of Venezuela returns. That willingness to accept the returns could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return nationals of Venezuela to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the request of Mexico and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining a strong bilateral relationship.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, in 2017 DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in

---

[53] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[54] 5 U.S.C. 553(b)(A).

[55] *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[56] 5 U.S.C. 553(a)(1).

[57] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[58]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM described above, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[59] It would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Venezuelan nationals currently being encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths. Undertaking such procedures would also be contrary to the public interest because an advance announcement of this process would seriously undermine a key goal of the policy by incentivizing even more irregular migration of Venezuelan nationals seeking to enter the United States before the process would take effect.

*F. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

First, OMB has approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. USCIS is making some changes to the online form in connection with the implementation of the process described above. These changes include: requiring two new data elements for U.S.-based supporters ("Sex" and "Social Security Number");

adding a third marker ("X") in addition to "M" and "F" in accordance with this Administration's stated gender equity goals; and adding Venezuela as an acceptable option for the beneficiary's country of origin. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

Second, OMB has approved an emergency request under 5 CFR 1320.13 for a new information collection from CBP entitled *Advance Travel Authorization.* OMB has approved the emergency request for a period of 6 months and will assign a control number to the collection. This new information collection will allow certain noncitizens from Venezuela, and their qualifying immediate family members, who lack United States entry documents to submit information through the newly developed CBP ATA capability within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek parole. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA. More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**

*Secretary of Homeland Security.*

[FR Doc. 2022–22739 Filed 10–18–22; 8:45 am]

**BILLING CODE 9110–9M–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–7050–N–52]**

**30-Day Notice of Proposed Information Collection: Debt Resolution Program, OMB Control No.: 2502–0483**

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.

**DATES:** *Comments Due Date:* November 18, 2022.

**ADDRESSES:** Interested persons are invited to submit comments regarding

this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *OIRA_submission@ omb.eop.gov* or *www.reginfo.gov/public/ do/PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; email Colette Pollard at *Colette.Pollard@hud.gov* or telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech and communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https:// www.fcc.gov/consumers/guides/ telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on March 23, 2022 at 87 FR 1479.

*A. Overview of Information Collection*

*Title of Information Collection:* Debt Resolution Program.

*OMB Approval Number:* 2502–0483.

*OMB Expiration Date:* November 30, 2022.

*Type of Request:* Revision of a currently approved collection.

*Form Number:* HUD–56141, HUD–56142, HUD–56146.

*Description of the need for the information and proposed use:* HUD is required to collect debt owed to the agency. As part of the collection process, demand for repayment is made on the debtor(s).

*Respondents:* Individuals or Households, Business or other For-Profit.

*Estimated Number of Respondents:* 648.

*Estimated Number of Responses:* 2,159.

*Frequency of Response:* 1.

*Average Hours per Response:* 1.

*Total Estimated Burden:* 590 hours.

---

[58] *See* 82 FR 4902 (Jan. 17, 2017).

[59] 5 U.S.C. 553(b)(B).


One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov*.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00252 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of Changes to the Parole Process for Venezuelans

**ACTION:** Notice

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to the Parole Process for Venezuelans that was initiated in October 2022. The Venezuela process provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at an interior port of entry, contingent on the Government of Mexico (GOM) making an independent decision to accept the return or removal of Venezuelan nationals who bypass this new process and enter the United States without authorization. Pursuant to this notice, the Secretary has removed the limit of 24,000 total travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). The Secretary also has updated the eligibility criteria for the Venezuela process by including an exception that will enable Venezuelans who cross without authorization into the United States at the Southwest Border (SWB) and are subsequently permitted a one-time option to voluntarily depart or voluntarily withdraw their application for admission to maintain eligibility to participate in this parole process. DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing the number of Venezuelan nationals crossing our border without authorization and the surge in migration throughout the hemisphere and channels migrants into

a safe and orderly process that enables them to enter the United States without making the dangerous journey to the SWB.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023. DHS will apply the changes to the process beginning on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuelan Parole Process

On October 19, 2022, DHS published a **Federal Register** Notice describing a new effort to address the high number of Venezuelans encountered at the SWB.[1] Since the announcement of that process, Venezuelans who have not availed themselves of the process, and instead entered the United States without authorization, have been expelled to Mexico pursuant to the Centers for Disease Control and Prevention (CDC) Title 42 public health Order or, if not expelled, processed for removal or the initiation of removal proceedings.

Once the Title 42 public health Order is lifted, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. The United States' continued operation of this process will continue to be contingent on the GOM's independent decision to accept the return of removal of individuals, including under Title 8 authorities.

#### Eligibility To Participate in the Process

As described in the October 19 **Federal Register** Notice, the Department of Homeland Security (DHS) implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of

entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals also are generally ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela, though per the conforming change described below, they will now remain eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. Only those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

### II. Assessment of Venezuela Parole Process to Date

The success of the Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration[3] throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November.[4] DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by

---

[1] 87 FR 63507 (Oct. 19, 2022).

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] In this notice, irregular migration refers to the movement of people into another country without authorization.

[4] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

flying to interior POEs—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the GOM for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, which imposed a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process. With the vast majority of those encountered returned to Mexico, fewer releases have freed up DHS resources that would otherwise be used to process these individuals; this has also reduced the number of individuals state and local governments, as supported by civil society, have had to receive and assist.

The effects have been felt throughout the Western Hemisphere, not just in the United States. Thousands of Venezuelans who had already crossed the Darién have flown back to Venezuela on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[5] Other migrants who were about to enter the Darién have turned around and headed back south.[6] Still others who were intending to migrate north are staying where they are to apply for this lawful process, rather than make the dangerous journey to the SWB.[7]

DHS has seen strong interest in this parole process. As of December 27, 2022, DHS had authorized travel for more than 15,700 Venezuelan beneficiaries, already more than half of the available number of travel authorizations.[8] Of those authorized to travel to the United States, more than 10,600 have arrived and been paroled into the country.[9] More than 3,600 of those Venezuelans who have flown into the United States and were paroled through this process arrived from Colombia; another 2,300 came from Venezuela, 1,500 from Mexico, and

3,100 from other countries. Those figures show that the process is reaching both people in Venezuela and Colombia *before* they seek to irregularly migrate, and those who are displaced in transit countries, like Mexico.[10]

## III. Changes

Given the early success of the process, the Secretary has authorized two changes to the process to ensure its continued viability, particularly as DHS prepares for an eventual transition from Title 42 processing to full Title 8 processing at the border.[11]

*A. Removal of the 24,000 Limit on Travel Authorizations and Replacement With a 30,000 Monthly Limit Spread Across Separate and Independent Parole Processes*

The process announced in the October 19 **Federal Register** Notice was subject to a numerical limit. Demand for the Venezuela process has far exceeded the 24,000 limit set in the first **Federal Register** Notice. In just two months of operation, DHS received thousands of applications from supporters and has already approved well more than half of the available travel authorizations. Were DHS to reach the numerical limit, prospective migrants would no longer be eligible for this process, which serves as a meaningful alternative to irregular migration. DHS anticipates that we would then see increased irregular migration of Venezuelans.

Accordingly, the Secretary has removed the 24,000 numerical limit on travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations in the aggregate spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). This change gives DHS the flexibility to continue the process for Venezuelans, thereby providing more certainty to the public and supporting partners. It also preserves the flexibility to extend or terminate the process, as the circumstances warrant. DHS will continue to evaluate this monthly limit and make adjustments if needed over time.

*B. Updated Eligibility Criteria*

Following the GOM's independent decision to accept returns of Venezuelans, DHS began expelling Venezuelans who are encountered after entering the United States without authorization, pursuant to the Title 42 public health Order. Currently, a Venezuelan (or qualifying immediate family member) is ineligible to participate in the parole process if, among other things, they crossed irregularly into the United States after October 19, 2022—regardless of whether they were expelled, ordered removed, or departed voluntarily.[12]

After the Title 42 Order ceases to be in effect, DHS will resume Title 8 immigration processing of all individuals, including Venezuelans. Pursuant to Title 8, noncitizens who have entered the United States without authorization may be permitted to voluntarily depart pursuant to Immigration and Nationality Act (INA) 240B, 8 U.S.C. 1229c, may be permitted to voluntarily withdraw their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), or may be ordered removed, regardless of whether Title 42 remains in effect.[12]

Individuals continue to be generally ineligible for consideration for parole pursuant to this process if they have crossed into the United States without authorization between POEs along the SWB since October 20, 2022. There will now be the following exception: individuals who have crossed without authorization into the United States after December 20, 2022, and have been permitted a single instance of voluntary departure pursuant to INA 240B, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), will remain eligible to participate in the parole process. If such an individual crossed without authorization between POEs along the SWB from October 20, 2022 through December 20, 2022, they would remain ineligible to participate and the exception would not apply. Permitting Venezuelan nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

---

[5] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/*, Nov. 9 2022 (last viewed Dec. 8, 2022).

[6] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html*, Oct. 14, 2022 (last viewed Dec. 8, 2022).

[7] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap*, Nov. 7 2022 (last viewed Dec. 8, 2022).

[8] Department of Homeland Security, Daily Venezuela Report, Dec. 27, 2022.

[9] *Id.*

[10] *Id.*

[11] The Secretary authorized the changes following considerations reflected in the Secretary's decision memorandum dated December 22, 2022. *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Updates to the Parole Process for Certain Venezuelan Nationals (Dec. 22, 2022).

[12] 87 FR 63507 (Oct. 19, 2022).

The Secretary has also approved a conforming change to provide that a Venezuelan national who is a permanent resident or dual national of any country or holds refugee status in any country other than Venezuela remains eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. All other eligibility requirements described in the October 19, 2022 Notice remain the same.

These changes are responsive to our multilateral commitments to address irregular migration throughout the Hemisphere. In this case, the United States is making two changes to this process that will support our commitment to creating additional lawful pathways. For its part, the GOM has made an independent decision to accept the return or removal, including under Title 8, of Venezuelan nationals who bypass this new process and enter the United States without authorization. The United States' continued operation of this process is contingent on the GOM's independent decision in this regard.

## C. Scope, Termination, and No Private Rights

The Secretary retains the sole discretion to terminate the Parole Process for Venezuelans at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**), and shall not exceed 30,000 each month. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## IV. Regulatory Requirements

### A. Administrative Procedure Act

The October 19 **Federal Register** Notice describing this process explained that this process is exempt from notice-and-comment rulemaking requirements because (1) the process is a general statement of policy,[13] (2) the process

pertains to a foreign affairs function of the United States,[14] and (3) even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[15] The changes described in this Notice are amenable to immediate issuance and implementation for the same reasons.

First, these changes relate to a general statement of policy,[16] i.e., a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [17] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

Second, even if these changes were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, these changes—like the implementation of the process itself—pertain to a foreign affairs function of the United States, as described in the October 19 notice, and are directly responsive to ongoing conversations with, and requests from, foreign partners.[18] Specifically, the GOM has urged the United States to consider lifting the 24,000 limit,[19] which would allow more Venezuelans to participate in and engage the process and further disincentivize irregular migration, enhancing the security of both of our borders. Delaying implementation of these changes to conduct notice-and-comment rulemaking would directly implicate the GOM's independent decision to accept returns, including under Title 8 processes, and produce undesirable international consequences. Absent these changes, DHS would soon reach the 24,000 cap and GOM would no longer accept the returns of Venezuelan nationals. Thus, without these changes,

DHS would no longer have the ability to return Venezuelan nationals to Mexico, and the Venezuela process would no longer be viable. That would then, in all likelihood, lead to another surge in migration of Venezuelan nationals throughout the hemisphere and to our border.

Finally, even if notice-and-comment and a delayed effective date were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[20] As noted above, absent immediate action, there is a risk that DHS meets the 24,000 cap, which would in turn cause the GOM to no longer accept the returns of Venezuelan nationals and end the success of the parole process to date at reducing the number of Venezuelan nationals encountered at the border.

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice involves three collections of information, as follows.

In connection with the process for Venezuelans, OMB has previously approved a revision to USCIS Form I–134, Declaration of Financial Support (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. OMB has recently approved a new collection, Form I–134A, Online Request for Consideration to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will now be used for the Venezuela parole process and is being revised in connection with this notice, including by increasing the burden estimate. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has also previously approved an emergency request under 5 CFR 1320.13 for a revision to an information

---

[13] 5 U.S.C. 553(b)(A); see also id. 553(d)(2).

[14] 5 U.S.C. 553(a)(1).

[15] 5 U.S.C. 553(b)(B).

[16] 5 U.S.C. 553(b)(A); id. 553(d)(2).

[17] Lincoln v. Vigil, 508 U.S. 182, 197 (1993) (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302 n.31 (1979)).

[18] 5 U.S.C. 553(a)(1).

[19] See Dallas Morning News, Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock' https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotiations-called-intense-round-the-clock/, Dec. 13, 2022 (last viewed Dec. 14, 2022).

[20] See 5 U.S.C. 553(b)(B); id. 553(d)(3).

collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the changes described above, CBP is making further changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about these collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00253 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

[Internal Agency Docket No. FEMA–4678–DR; Docket ID FEMA–2022–0001]

### West Virginia; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4678–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of July 12 to July 13, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

McDowell County for Public Assistance.
All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00177 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

[Internal Agency Docket No. FEMA–4677–DR; Docket ID FEMA–2022–0001]

### South Carolina; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of South Carolina (FEMA–4677–DR), dated November 21, 2022, and related determinations.

**DATES:** The declaration was issued November 21, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 21, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"), as follows:

I have determined that the damage in certain areas of the State of South Carolina resulting from Hurricane Ian during the period of September 25 to October 4, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of South Carolina.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Individual Assistance and Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance, Hazard Mitigation, and Other Needs Assistance under section 408 will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The time period prescribed for the implementation of section 310(a), Priority to Certain Applications for Public Facility and Public Housing Assistance, 42 U.S.C. 5153, shall be for a period not to exceed six months after the date of this declaration.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Kevin A. Wallace, Sr., of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of South Carolina have been designated as adversely affected by this major disaster:



Venezuela     Tren de Aragua

# Tren de Aragua

by *InSight Crime*
12 Jul 2024



Tren de Aragua is Venezuela's **most powerful** homegrown criminal actor and the only Venezuelan gang that has successfully projected its power abroad. It has grown from a prison gang limited to the state of Aragua, to a transnational threat with a wide criminal portfolio.

This **transnational expansion** came on the backs of Venezuelan migrants fleeing the country. From Tocorón prison in Aragua, the gang oversaw and profited from cells established in at least three other South American countries. However, in September 2023, 11,000 Venezuelan police and military personnel, backed by armored vehicles, **stormed** Tocorón to seemingly take control of what had been Tren de Aragua's center of operations. Despite the blow of losing Tocorón, the gang's leadership **escaped**, and its transnational cells continue to operate.

Tren de Aragua's expansion to Colombia, Peru, and Chile has, in certain cases, upended local criminal lar     l significant attention from the authorities within these countries and across the

Manage consent

region. Concern among some lawmakers in the United States about the group's **potential expansion** there led the country's Treasury Department to **sanction** Tren de Aragua as a transnational criminal organization in July 2024. Additionally, the US State Department has offered $12 million in rewards for information leading to the arrests of three of its main leaders.

# History

Tren de Aragua was born in the Tocorón prison in the state of Aragua. The group's name, which roughly translates to the Aragua Train, may have originated from a labor union working on a railway project through the state which was never finished.

Héctor Rustherford Guerrero Flores, alias "**Niño Guerrero**," turned Tren de Aragua into what it is today during his imprisonment in Tocorón.

Under Niño Guerrero's leadership, Tocorón became one of the country's **most notorious** prisons, in large part due to the Venezuelan government's **unofficial policy** of handing control of some prisons, including Tocorón, over to crime bosses known as *pranes*. This freedom and the gang's criminal income allowed for the **construction** of a zoo, swimming pool, playground, restaurant, and nightclub within the prison.

With the gang's control firmly cemented within the prison, Tren de Aragua began expanding its influence. It **started** with the nearby San Vicente neighborhood, where it established strict social control and even **received** resources and support from the government via its charitable wing known as "Fundación Somos El Barrio JK."

Some criminal gangs already operating in Aragua established non-aggression pacts with the gang, among them **Tren del Llano**. However, after Tren del Llano's leader **was killed** in 2016, Tren de Aragua took over its territories in Aragua and part of Guárico state, according to police sources who spoke on condition of anonymity for fear of their safety.

In the years that followed, the gang expanded its network to other states in Venezuela through alliances with smaller gangs, eventually building a presence in at least five other states. During this process, it expanded its criminal portfolio in Venezuela to include extortion, kidnapping, human trafficking for sexual exploitation, migrant smuggling, **contraband**, illegal mining, retail drug trafficking, cybercrime, and theft.

Tren de Aragua's expansion **turned transnational** around 2018, when the gang attempted to **establish itself** on the Venezuela-Colombia border between the Venezuelan state of Táchira and the Colombian department of Norte de Santander. There, it clashed with major Colombian criminal groups, including the National Liberation Army (Ejército de Liberación Nacional – **ELN**) and the Gaitanistas (Autodefensas Gaitanistas de Colombia – **AGC**). The groups fought for control of clandestine border crossings, known as *trochas*, which are home to a variety of criminal economies, including the smuggling of drugs, contraband, and migrants.

Tren de Aragua carved out a niche for itself in the Colombian border town of La Parada, where many Venezuelan migrants fleeing their country first arrive in Colombia. At this point, the Venezuelan exodus was in full swing, and Tren de Aragua **saw an opportunity** in the desperation of its compatriots. While larger Colombian groups focused on drug trafficking, Tren de Aragua began to exploit Venezuelan migrants systematically, charging them extortion fees, smuggling them into and throughout Colombia, and taking control of various nodes of the human trafficking for sexual exploitation market.

Between 2018 and 2023, Tren de Aragua built a transnational criminal network, setting up cells in Colombia, Peru, and Chile, with further reports of a sporadic presence in Ecuador, Bolivia, and **Brazil**.

The group expanded **following** Venezuelan migration flows, initially staying under the radar by only targeting Venezuelan migrants as it increased its presence in border crossings and urban areas where Venezuelan migrants congregate.

As cells became more established, they **moved into** local criminal economies, employing eye-catching, targeted violence to force out local gangs and establish themselves as a serious threat. In addition to extortion and migrant smuggling, Tren de Aragua cells abroad control loan sharking (also referred to as *gota a gota*, or "drop by drop"), retail drug trafficking, kidnapping, **small-scale international drug trafficking**, human trafficking, and robberies. Each cell specializes in different activities, based on local conditions.

However, as the gang's **use of violence** abroad has **rung** regional alarm bells, authorities across South America now have Tren de Aragua firmly in their crosshairs. Venezuela's government finally retook control of Tocorón in September 2023, depriving the gang of its historic stronghold, while security forces in Chile, Peru, and Colombia have **carried out** "mega-operations" targeting the gang since 2022.

Tren de Aragua

# Leadership

The head of the gang is Héctor Rustherford Guerrero Flores, alias "Niño Guerrero," who led the group from Tocorón prison until September 2023. He escaped before the operation, with Venezuelan civil society **reporting** that he was warned ahead of time. His location remains unknown.

Guerrero started his criminal career in 2005, when he murdered a police officer in Aragua, according to records from Venezuela's Supreme Court of Justice. He was first imprisoned in Tocorón in 2010 but **escaped** two years later.

His recapture and return to Tocorón in 2013 led Guerrero to consolidate Tren de Aragua alongside other criminals, who became his most trusted lieutenants. These included Larry Amaury Álvarez, alias "Larry Changa," and Yohan José Guerrero, alias "**Johan Petrica**."

Álvarez escaped Tocorón in 2015 and migrated to Chile in 2018, where he led the expansion of the Tren de Aragua's faction there. In 2022, as the Chilean police began to investigate him, he fled to Colombia, from where he continued leading the faction's operations in Chile and planned the group's expansion in Colombia. Álvarez was **arrested** in July 2024 in the Colombian department of Quindío.

For his part, Johan Petrica has been accused of leading a powerful illegal gold mining gang in Las Claritas, in the south of Bolívar state, known as the **Las Claritas Sindicato**. Some reports suggest that Niño Guerrero may be hiding with Petrica in Las Claritas following the invasion of Tocorón.

Along with offering rewards for information leading to the capture of Niño Guerrero and Johan Petrica, the US State Department **offered** a $3 million reward for information regarding Giovanny San Vicente, alias "Giovanny" or "El Viejo," in July 2024, and named him as one of the group's three leaders. US intelligence officials believe both Niño Guerrero and Giovanny are hiding out in Colombia.

Reports from security forces in Peru, Chile, and Colombia suggest that despite the geographic spread of the gang, it has maintained a hierarchical structure, with Niño Guerrero calling the shots. Judicial documents show how several Tren de Aragua lieutenants have been dispatched to cells across the region, some of whom even appear to rotate between cells in multiple countries.

VZ Termination_0157

# Geography

Tren de Aragua's operations center was previously located in Tocorón prison, in the state of Aragua. The gang is also present in at least five other Venezuelan states: Carabobo, Sucre, Bolívar, Guárico, and Lara.

It remains unclear where the group's new nucleus will be following the September 2023 invasion of Tocorón. However, there is no indication that the gang has stopped operating in Venezuela.

Outside of Venezuela, Tren de Aragua has established permanent cells in Colombia, Peru, and Chile, with reports of its activities in Brazil, Ecuador, and Bolivia.

These activities are often concentrated in border areas with clandestine border crossings regularly used by Venezuelan migrants, such as the Venezuela-Colombia border between Táchira and Norte de Santander, the Peru-Chile border, and the Bolivia-Chile border. The gang has also established cells in urban zones with large Venezuelan migrant populations, including **Bogotá**, Colombia; Lima, Peru; and Santiago, Chile.

# Allies and Enemies

Tren de Aragua maintains numerous links with organized crime and prison-based groups, both in Venezuela and in other countries, with which it has established pacts of non-aggression and even alliances to share criminal income. One such prison gang was located in the Trujillo Judicial Confinement Center, dominated by Álvaro Enrique Montilla Briceño, alias "El Loro." This prison was **taken over** by security forces just over a month after officials stormed Tocorón.

In addition, Tren de Aragua allegedly recruited and financed a small criminal gang in Lara state, called the "**El Santanita**" gang, to commit kidnappings and extortion.

A 2021 report from Brazil stated that Tren de Aragua members had been jailed in the northern state of Roraima, near Venezuela, and were working with Brazil's largest criminal group, the First Capital Command (Primeiro Comando da Capital – **PCC**), claims **repeated** by a 2022 academic investigation, although the exact nature of this relationship remains unclear.

Tren de Aragua has clashed with multiple groups, including the ELN, for control of border crossings between Venezuela and Colombia.  Local officials and security forces across the region have highlighted

the gang's willingness to use targeted violence to force out local gangs.

The gang's relationship with Venezuelan security forces and government officials has been complex. On the one hand, multiple sources interviewed by InSight Crime have pointed out that the group has corrupted local and regional officials. Its growth was also driven by the state's unofficial devolution of power to the *pranes* and the impunity it enjoyed within Tocorón. Even following the government invasion of Tocorón, its relationship with officials remains murky. It has lost its stronghold, but appears to have received advanced warning, and no high-ranking gang members were captured.

# Prospects

Tren de Aragua's expansion across South America was the first time a Venezuelan gang managed to project itself internationally. It has become a threat to regional security, and dismantling it will not be easy.

However, its international spread appears to have slowed, and the loss of its operational base in Tocorón prison could disrupt its transnational operations. What's more, security forces across the region are pumping resources into targeting the gang's cells, with over 100 alleged members arrested in 2022 and 2023 by Peruvian, Chilean, and Colombian officials. These arrests, while weakening the gang outside of prison, have the potential to bring the group back to its roots and **spread** through foreign prisons.

The mass migration that allowed for Tren de Aragua's expansion is also slowing and evolving. There was little criminal infrastructure in South America prepared for the number of Venezuelan migrants who traveled across the continent between 2018 and 2022, allowing Tren de Aragua to step in and claim the lion's share of the profits.

Now, however, Venezuelans are increasingly traveling north to the United States, crossing through Colombia and Central America. This is decreasing the migrant-centered income in Tren de Aragua's existing territory. With **human smuggling** and **trafficking** along the northern route already controlled by powerful gangs, Tren de Aragua is not likely to be able to expand north as easily as it did in South America.

Reports of new cells continue to surface in South America, although officials **suggest** that many of these are copycat groups seeking to take advantage of Tren de Aragua's notoriety. It remains to be seen whether Tren de Aragua will maintain its existing network, continue to grow, or if it will fall into decline.

© 2025 InSight Crime

Powered by Newspack



News     Venezuela

# Why Is Venezuela's Crime Rate Falling?

by *Venezuela Investigative Unit*
28 May 2024



A government-reported decline in Venezuela's crime rate may create the illusion of a security breakthrough, but the reduction has more to do with reconfigurations in the country's underworld than an effective state response.

In mid-May, Venezuelan security officials **announced** that crime indicators had fallen by 25.1% compared to 2023.

The Venezuelan government attributes the decrease to **large-scale operations** conducted by security forces against criminal groups.

President Nicolás Maduro also touted a similar theory in December 2023, **saying** "the country is seeing the best results in over 20 years in terms of citizen security, peace, and the protection of the people."

*SEE ALSO:*   **In Zulia, Venezuela, Not Even Schools Escape Extortion**

Manage consent

The announcements coincide with figures from the Venezuelan Violence Observatory (Observatorio Venezolano de Violencia    OVV), an organization that studies insecurity and violence at the national level. The OVV also recorded a decrease in violent deaths compared to 2022 and 2023.

But while the government highlights the role of the armed forces, there may be more complex reasons behind the drop-off in crime.

Below, InSight Crime explores key factors driving the apparent drop in crime in Venezuela – a country once considered the most dangerous in Latin America.

# Mass Criminal Migration

Aside from large-scale security operations, the OVV's most recent **violence report** draws a link between the migration of criminal groups and a reduction in crime.

Venezuela's ongoing economic crisis has squeezed both ordinary citizens and the country's criminal groups. Economic decline in the labor and commercial sectors has left businesses and citizens unable to pay criminal groups, reducing opportunities for extortion and ransom kidnappings.

"Crime is falling in Venezuela because of the destruction of the country's economy…because of the loss of opportunities for crime," OVV director, Roberto Briceño-León, told InSight Crime.

Recession in Venezuela has led criminal gangs like the **Tren de Aragua**, **Yeico Masacre**, and **The Meleán** to infiltrate Venezuelan diasporas settled in other Latin American countries.

These gangs    especially the Tren de Aragua    have exploited the vulnerability of migrants and a lack of regional cooperation between authorities to **expand criminal operations** abroad. In Chile, Colombia, and Peru, the expansion of these organizations has led to spikes in violence and crime.

# Monopolizing Violence

The territorial and criminal hegemony enjoyed by some non-state armed groups has created a false sense of security in some regions. The OVV report also points to pacts between the government and some criminal groups, in addition to the monopolization of violence in some regions, as contributing factors to improved security perceptions.

For instance, the **National Liberation Army (Ejército de Liberación Nacional – ELN)** – a Colombian guerrilla group with operations in Venezuela gained a monopoly on extortion in the Apure state, bordering Colombia, after receiving preferential treatment from the Maduro government.

*SEE ALSO:* ***Venezuela Security Policy: Armed Groups and Electoral Interference***

The ELN **helped** the Venezuelan army expel a faction of Colombia's ex-FARC mafia – a rival group – from the Apure state in 2022, reducing competition for extortion rackets and social control.

"People may start to feel safer when they can pay one bandit instead of three. They pay one big bandit and the big bandit protects them," Briceño-León said.

But though the ELN's territorial control may appear to improve security, locals are still subjected to **rigorous social rules**, the imposition of illegal taxes, and restrictions on their mobility. Failure to comply with these rules carries severe punishments.

"At times Guasdualito [a settlement in Apure] seems like the safest town in the country because it is controlled by the guerrillas," a cattle rancher who requested anonymity for security reasons told InSight Crime.

# Controlling the Narrative

Despite the Venezuelan government's efforts to promote the drop-off in crime, the absence of official reports makes it impossible to verify the data.

In addition to lacking documentary support, some statements on the reduction in crime have been inconsistent. The most recent figures show a 25% reduction in crime, but, in early May, Ceballos reported a **24%** decrease. In December 2023, a **16%** drop was reported.

In 2015, Venezuelan authorities **stopped** publishing official data on national and regional security, including data on homicides, extortion, and kidnappings.

Instead, the task of collecting statistics and disseminating this information has fallen on the media and NGOs, including the OVV. However, organizations or media outlets failing to tow the government's line

risk facing persecution.

Aside from closures of non-state media and harassment of journalists, the Maduro government is also close to approving a law that would grant it greater control over NGOs.

With **elections looming** in Venezuela, security has become a key instrument for boosting the Maduro government's little remaining popularity.

*Featured image: President Maduro greets Venezuelan police officers during an official event. Credit: Venezuelan government.*

© 2025 InSight Crime

Powered by Newspack



# CHAPTER IV.b

## Venezuela





# CHAPTER IV. B: VENEZUELA

I.      INTRODUCTION ......................................................................... **713**

II.     INSTITUTIONAL CRISIS AND ARBITRARY INTERFERENCE IN
        DEMOCRACY ........................................................................ **715**

        A.      Separation of powers and democratic institutional
                framework ............................................................................715

        B.      Arbitrary interference of the citizens' branch in democracy .......715

III.    CLOSURE OF CIVIC SPACE ....................................................... **716**

        A.      Legislative initiatives aimed at closing the civic space ..................716

        B.      Court rulings impacting the civic space ..................................717

        C.      Criminalization of political participation and the need to
                implement agreements in good faith .......................................717

        D.      Persecution against human rights defenders and union
                leaders .................................................................................718

        E.      Corruption and opacity in public governance .........................719

IV.     HUMAN RIGHTS VIOLATIONS ............................................... **720**

        A.      Violations of the right to life, liberty and personal integrity ........720

        B.      Situation of freedom of expression .......................................722

        C.      Situation of economic, social, cultural and environmental
                Rights (ESCERs) ..................................................................730

 

**V.    IMPACT ON GROUPS IN VULNERABLE SITUATIONS AND DISCRIMINATION** ........................................................ **733**

Women ........................................................................................ 734

Refugees, migrants and persons from Venezuela in need of
   international protection ............................................................ 736

Persons deprived of liberty ...................................................... 737

Lesbian, gay, bisexual, trans and intersex (LGBTI) persons ........ 740

Indigenous peoples .................................................................. 741

Afro-descendant persons .......................................................... 742

**VI.    CONCLUSIONS AND RECOMMENDATIONS** ........................ **742**

VZ Termination_0167

**ANNUAL REPORT 2023**

**IACHR** Inter-American Commission on Human Rights

# CHAPTER IV. B

# VENEZUELA[1]

## I.     INTRODUCTION

1.     In fulfilling its conventional and statutory mandate, the Inter-American Commission on Human Rights ("the Commission", "the Inter-American Commission" or "the IACHR") has followed up on the human rights situation in Venezuela with special attention. The State has been included in Chapter IV.B of the Annual Report since 2005 due to the complete erosion of the democratic system and the serious human rights situation. The progressive concentration of power in the executive branch and the absence of the Rule of Law have been documented throughout these years.

2.     In spite of the different calls and recommendations from the Inter-American Commission and other international bodies, in 2023, the State did not adopt suitable and effective measures to restore the democratic order and the separation and independence of the branches of government. This has allowed the executive branch to maintain control over the judicial branch, the citizens' branch,[2] the electoral branch and the legislative branch, and to impose a systematic policy of repression and intimidation against individuals and organizations that defend rights, express their disagreement with the government, are opponents or perceived as such.

3.     Consequently, after having assessed the human rights situation in Venezuela, the Commission decided to incorporate this country into Chapter IV.B of its Annual Report in accordance with Article 59, subparagraphs 6.a.i, 6.a.ii, 6.d.i and 6.d.iii of its Rules of Procedure, which establishes the following criteria:

   a.   a serious breach of the core requirements and institutions of representative democracy mentioned in the Inter-American Democratic Charter, which are essential means of achieving human rights, including:

   i. there is discriminatory access to or abusive exercise of power that undermines or denies the rule of law, such as systematic infringement of the independence of the judiciary or lack of subordination of State institutions to the legally constituted civilian authority;

   ii. there has been an unconstitutional alteration of the constitutional regime that seriously impairs the democratic order.

   d.   The presence of other structural situations that seriously affect the use and enjoyment of fundamental rights recognized in the American Declaration, the American Convention or other applicable instruments. Factors to be considered shall include the following, among others:

---

[1] Chapter not approved by Commissioner Carlos Bernal, with a partial reasoned vote. The partial reasoned vote is found at the end of this chapter.

[2] The Constitution establishes a Citizen Power. Its bodies enjoy functional, financial, and administrative autonomy. Citizen Power is exercised by the Republican Moral Council composed by the Ombudsman, the Prosecutor General and the Comptroller General of the Republic (Constitution of the Bolivarian Republic of Venezuela, promulgated on December 30, 1999. Art. 273).





i. serious institutional crises that infringe the enjoyment of human rights.

iii. serious omissions in the adoption of the necessary measures to make fundamental rights effective, or in complying with the decisions of the Commission and the Inter-American Court [...].

4.      In relation to Article 59, subparagraphs 6.a.i, 6.a.ii and 6.d.i, the Commission considers that, after more than a decade of undue and arbitrary interference, the executive branch has succeeded in controlling the different branches of government. The process of co-opting the institutions has been greatly facilitated by the lack of independence of the Supreme Court of Justice (TSJ). Since 2015, this institution has acted as an extension of the executive branch by systematically adopting decisions which are detrimental to the Rule of Law, the separation of powers and political participation. All this constitutes a clear violation of the requirements set forth in the Inter-American Democratic Charter and other applicable instruments.

5.      The subordination of the institutions to the executive branch had two significant consequences in 2023. First, no decisive measures were adopted to combat impunity for the violations that had occurred in previous years, especially during the protests of 2015 and 2017. It is important to remind that, since these violations were serious and systematic, and considering that they remain unpunished, the Office of the Prosecutor of the International Criminal Court (ICC) opened an investigation due to the alleged commission of crimes against humanity, an unprecedented event in the Western Hemisphere.

6.      The second consequence of the absence of independence of the branches of government was discrimination in the access to public office. During this year, the Office of the Comptroller General of the Republic ratified the disqualification sanctions imposed against opposition leaders with presidential aspirations. In addition, the Office of the Public Prosecutor opened criminal investigations against the individuals who had organized the so-called "primary elections," aimed at asking citizens about who they would choose as the opposition candidate for the 2024 presidential election. These acts show that the national public institutions operate primarily to guarantee the permanence of the ruling party in power, and not to promote and protect human rights.

7.      Regarding Article 59, subparagraph 6.d.iii of the Rules of Procedure, the Commission notes that the structural situations that seriously affect the enjoyment of human rights persist, especially with respect to economic, social, cultural and environmental rights (ESCERs). The limitations on access to these rights caused 500,000 persons to forcibly leave the country in 2023.[3] More than 7 million persons have been forced to migrate, resulting in the largest displacement in the region and one of the largest in the world. This migration flow responds to a survival strategy to protect rights such as life, personal integrity, health and food. All of this is a consequence of the dire human rights situation in Venezuela.

8.      In accordance with Article 59.5 of the Rules of Procedure, the Commission has used various sources of information to prepare this report. These sources include: official acts and any statement or action attributable to state bodies; information available in cases, petitions and precautionary and provisional measures in the inter-American system; information gathered in the course of on-site visits; information obtained during public hearings; conclusions of other international human rights bodies, including UN treaty bodies; human rights reports issued by governments and regional organs; reports by civil society organizations and public information that is widely disseminated in the media.

---

[3] This number was obtained by contrasting the *R4V Latin America and the Caribbean, Venezuelan Refugees and Migrants in the Region* report, published in December 2022, with the *R4V Latin America and the Caribbean, Venezuelan Refugees and Migrants in the Region*, from August 2023.

 

9.      The Commission approved this report on November 29, 2023. On January 12, 2024, the Commission sent the State of Venezuela a copy of the report in accordance with Article 59.10 of its Rules of Procedure. The State did not submit observations.

## II.      INSTITUTIONAL CRISIS AND ARBITRARY INTERFERENCE IN DEMOCRACY

### A.      Separation of powers and democratic institutional framework

10.      At the regulatory level, the Constitution establishes the separation and independence of powers.[4] Nevertheless, due to constant interference from the executive branch, the institutions intended to promote and protect human rights operate primarily to guarantee the permanence of the ruling party in power.

11.      The independence of the judiciary remained compromised in 2023 due to the irregular appointment of Supreme Court justices, the possibility of reelection within that institution, the excessive number of provisional judges, the lack of public competitive examinations for positions within the judiciary and the absence of guarantees for the stability in office.[5]

12.      Likewise, the independence of the legislative branch remained compromised due to the lack of guarantees for opposition political parties, the arbitrary criminal prosecution of opposition leaders and the removal from office and disqualification sanctions imposed by the Office of the Comptroller General of the Republic. The Commission recalls that the National Assembly elected in 2015 was suspended arbitrarily by the Supreme Court of Justice and no measures to repair this severe damage to the institutional framework of the country have been adopted to date.[6]

13.      The independence of the citizens' branch also remained compromised due to the irregular appointment of its authorities. The current Attorney General of the Republic, the highest authority in the Office of the Public Prosecutor, was not appointed in accordance with the Constitution. Instead, the National Constituent Assembly was responsible for the designation.[7]

14.      The independence of the electoral branch remained compromised as a consequence of the atypical appointment of the National Electoral Council (CNE) authorities. The members of the CNE Board of Directors resigned on June 14 this year without providing an adequate justification.[8] This situation empowered the National Assembly to appoint new members. As part of this restructuring process, the National Assembly appointed Elvis Amoroso as president of the CNE. At that time, Mr. Amoroso was the highest authority in the Office of the Comptroller General of the Republic, an entity which has systematically imposed disqualification sanctions against opposition leaders.[9] The Commission recalls that the members of the CNE were not appointed in accordance with constitutional procedures between 1991 and 2021.[10]

### B.      Arbitrary interference of the citizens' branch in democracy

15.      During this year, the Office of the Comptroller General of the Republic continued imposing sanctions such as disqualification for holding public office, which constitute violations of the inter-American standards on political rights). These sanctions have been disproportionately imposed, against individuals who oppose the government, which has in turn caused discrimination in the access to public office.

---

[4] For example, see Articles 256 and 294 of the 1999 Constitution.
[5] IACHR, *2022 Annual Report.* Chapter IV.B. Venezuela, paras. 14–19.
[6] IACHR, *2021 Annual report.* Chapter IV.B. Venezuela, paras. 23–36.
[7] IACHR, *2019 Annual Report.* Chapter IV.B. Venezuela, para. 32.
[8] *El País*, "La renuncia de la directiva del Consejo Nacional Electoral en Venezuela deja en el aire las primarias de la oposición," June 14, 2023.
[9] National Assembly, "Asamblea Nacional designa y juramenta a nuevos rectores del CNE," August 24, 2023.
[10] Acceso a la Justicia, "La historia de un fraude (III): el secuestro del Poder Electoral," September 21, 2019.





Below are some of the disqualification sanctions with the greatest impact on the Venezuelan opposition, based on official documentation and observations from international bodies.

16.    On June 27, through Official Letter No. DGPE-23-08-00-008,[11] the Office of the Comptroller General of the Republic announced that opposition candidate María Corina Machado had been disqualified from holding public office for 15 years, thus preventing her from running in the 2024 presidential elections. This disqualification follows those of other well-known opposition leaders aspiring to run for president, such as Henrique Capriles and Freddy Superlano.[12]

17.    The European Union,[13] the Office of the High Commissioner for Human Rights[14] and the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela established by the Human Rights Council (hereinafter "the Independent International Mission") have condemned these disqualifications.[15]

18.    The Commission recalls that the State of Venezuela was found internationally responsible for these sanctions in *López Mendoza v. Venezuela*. In this context, the Commission reiterates that no administrative body can restrict the political rights to elect and be elected through sanctions of disqualification or dismissal. In accordance with inter-American standards, in order to consolidate and protect a democratic system that is respectful of human rights, this type of sanction can only be imposed through a sentence adopted by a judge within the framework of a criminal proceeding.[16]

## III.    CLOSURE OF CIVIC SPACE

### A.    Legislative initiatives aimed at closing the civic space

19.    During this year, the National Assembly continued discussing legislative proposals aimed at controlling and limiting the work of civil society organizations, as well as restricting fundamental freedoms, such as the freedom of expression, association, and participation in matters of public interest.

20.    On January 24, 2023, the legislative branch successfully held a first debate on a bill to audit and regularize the operations of non-governmental organizations and other similar institutions and to oversee their actions and funding.[17] This bill not only restricts the activities that may be carried out by these organizations, but also enables state authorities to unilaterally dissolve all organizations who, by the State's own criteria, engage in political activities or otherwise undermine national stability or the institutions of Venezuela.[18]

21.    The introduction of the bill included stigmatizing references to 62 civil society organizations, who were described as "enemies," "traitors," and "front operations for political parties."[19] This confirms that

---

[11] Office of the Comptroller General of the Republic, General Directorate for Special Procedures, Official Letter No. DGPE-23-08-00-008, June 27, 2023.

[12] IACHR, Press Release No. 155/23, "Venezuela: IACHR Condemns Politically Motivated Persecution of Individuals in Run-Up to Elections," July 14, 2023.

[13] European Parliament, Resolution on the political disqualifications in Venezuela, 2023/2780 (RSP), July 12, 2023.

[14] Office of the High Commissioner for Human Rights, "Venezuela update by High Commissioner Türk," July 5, 2023.

[15] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, paras. 70–72.

[16] IAHR Court, López Mendoza v. Venezuela. Merits, reparations and costs. Judgment of September 1, 2011. Series C No. 233.

[17] National Assembly, "AN aprueba en primera discusión ley para regular las ONG," January 24, 2023.

[18] Bill titled "Law for the Supervision, Regularization, Performance and Financing of Non-Governmental and Related Organizations."

[19] National Assembly, "AN aprueba en primera discusión ley para regular las ONG," January 24, 2023.





human rights defense organizations still face a hostile environment in Venezuela, where smear campaigns, stigmatization and acts of harassment are rife in retaliation for their advocacy activities.[20]

### B.     Court rulings impacting the civic space

22.     During 2023, the Supreme Court of Justice continued to adopt arbitrary decisions that restrict the civic space, discourage participation in matters of public interest and evidence the absence of independence from the executive branch.

23.     On August 4, the Supreme Court of Justice dissolved the National Committee of the Venezuelan Red Cross through Judgment No. 1,057 and appointed an *ad hoc* restructuring board with the power to reorganize it. This decision contradicts the organization's internal bylaws regarding its governance and grants powers contrary to its articles of incorporation.[21] Likewise, on August 11, 2023, the TSJ issued Judgment No. 1,160, through which it arbitrarily appointed an *ad hoc* board of directors for the Communist Party of Venezuela, a political organization which opposes the government coalition.[22]

### C.     Criminalization of political participation and the need to implement agreements in good faith

24.     The Commission has indicated that the human rights challenges in Venezuela show the need for dialogue processes aimed at re-establishing democratic institutions and the independence of the branches of government.[23] Therefore, the Commission welcomed the dialogue sessions between the government and the Unity Platform (coalition of opposition parties) held from August 13 to 15,[24] which resumed on November 25, 2022.[25]

25.     In 2023, the Commission commended the agreements reached by the parties in Bridgetown, Barbados, on October 17. Among other things, the State committed to establishing a timetable and road map for presidential elections so that the participation of all candidates without arbitrary restrictions, under equal conditions and with security guarantees, would be ensured. In addition, as a result of these agreements, the State released a group of at least five people who had been arbitrarily detained, including journalist Ronald Carreño and opposition legislator Juan Requesens.[26]

26.     In spite of the commitments assumed, during this year, the Office of the Public Prosecutor opened a criminal investigation against the organizers of a public consultation, held on October 22, with the purpose of electing the person who would run represent the opposition in the presidential elections.[27]

---

[20] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, para. 79.

[21] Supreme Court of Justice, Action for the protection of collective or diffuse interests or rights. File No. 23-0802. Judgment No. 1,057, August 4, 2023.

[22] Supreme Court of Justice, Claim for the protection of constitutional rights. File No. 23-0708. Judgment No. 1,160, August 11, 2023.

[23] IACHR, Press Release No. 217/21, "IACHR Calls for Serious, Broad, Inclusive Dialogue for the Urgent Reconstruction of Democratic Institutions in Venezuela," August 23, 2021.

[24] IACHR, Press Release No. 217/21, "IACHR Calls for Serious, Broad, Inclusive Dialogue for the Urgent Reconstruction of Democratic Institutions in Venezuela," August 23, 2021.

[25] *El País*, "El Gobierno venezolano y la oposición acuerdan descongelar entre 3.000 y 5.000 millones de fondos estatales en el extranjero," November 25, 2022.

[26] IACHR, Press Release No. 253/23, "Venezuela: IACHR Urges State to Implement Agreements, Including Guarantees for Political Participation," October 27, 2023.

[27] IACHR, Press Release No. 253/23, "Venezuela: IACHR Urges State to Implement Agreements, Including Guarantees for Political Participation," October 27, 2023.

VZ Termination_0172





27.     The Commission considers that the opening of this criminal investigation contravenes the spirit of the agreements and discourages political participation. In the Venezuelan context, political rights are essential for dialogue and to overcome the crisis. Therefore, it is crucial to implement agreements in good faith, avoid the criminalization of this type of citizen initiatives and guarantee the political participation of all sectors in the next presidential elections.[28]

### D.     Persecution against human rights defenders and union leaders

28.     Human rights defenders and union leaders continued to face an adverse environment in 2023. This was marked by public smear campaigns promoted by high-ranking public officials, stigmatization, acts of harassment and criminal proceedings as a means of reprisal for their work.

29.     During the 188th ordinary period of sessions held in November 2023, civil society organizations informed that the State had adjusted its repressive model. In this regard, they reported that repression was no longer generalized and had become more selective, with a special focus on  individuals with leadership roles within workers' movements with the purpose of discouraging social mobilizations.[29]

30.     In this context, according to information received in 2023, 87 union leaders were detained and prosecuted for defending rights between 2013 and 2022, and 344 cases of threats against workers and union leaders were recorded only in 2022. In addition, between July 4 and 7, 2022, six individuals with leadership roles within unions were arbitrarily detained and subsequently sentenced to lengthy terms of imprisonment in August 2023.[30]

31.     In the state of Bolívar, six workers of the Alfredo Maneiro Orinoco Steel Mill (SIDOR) (company) were detained in January 2023 under "incitement to hatred" charges. Three other union leaders of the same company were arrested in July of the same year, two of whom were transferred to Caracas and brought before a court with special competence over terrorism. A leader of the Socialist Workers United Front of the state of Bolívar was detained on July 7, 2023, and his home was raided on September 1, 2023.[31]

32.     Furthermore, the Center for Defenders and Justice (CDJ) informed that 421 attacks against human rights defenders were recorded between January and September 2023, which represents a 6.31 percent increase from 2022.[32] In general, the civil society stated that the executive branch is trying to build an internal enemy narrative by linking the work of human rights defenders to criminal activities, especially by associating them with terrorism, destabilization and threats to the peace of the country.[33]

33.     At the same time, international human rights bodies have also warned about the hardships faced by human rights defenders and union leaders. The Independent International Mission determined that there were reasonable grounds to believe that the regular activities of human rights defenders, union members, journalists and politicians had been systematically repressed, either through direct intervention or through intimidation and surveillance. The acts of repression documented in 2023 included harassment by security forces in uniform and individuals in civilian clothes, unauthorized pictures, threats in the street and in their own homes.[34]

34.     The Independent International Mission also documented a concerted Government campaign to undermine the reputation of real or perceived opponents to the government through defamatory and

---

[28] IACHR, Press Release No. 253/23, "Venezuela: IACHR Urges State to Implement Agreements, Including Guarantees for Political Participation," October 27, 2023.

[29] IACHR, 188th regular period of sessions, public hearing "Venezuela: closure of civic spaces," held on November 9, 2023.

[30] IACHR, 188th regular period of sessions, public hearing "Venezuela: closure of civic spaces," held on November 9, 2023.

[31] IACHR, 188th regular period of sessions, public hearing "Venezuela: closure of civic spaces," held on November 9, 2023.

[32] IACHR, 188th regular period of sessions, public hearing "Venezuela: closure of civic spaces," held on November 9, 2023.

[33] CDJ, *Situation of human rights defenders in Venezuela, First semester of 2023*, June 2023, p. 5.

[34] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, para. 54.



stigmatizing messages issued by high-level state officials, which were taken up and widely diffused by pro-government websites and social media.[35]

35.     In addition, the Office of the High Commissioner for Human Rights (OHCHR) documented, between May 1, 2022, and April 30, 2023; 21 cases of threats and harassment, 46 cases of stigmatization on social media or public broadcasts by state officials; and 17 instances of criminalization, including 10 arbitrary detentions against human rights defenders, journalists and other civil society actors, including eight women.[36]

36.     The Commission considers that human rights defenders and union leaders face an active public policy of persecution, discrediting and criminalization by the State. It is important to recall that human rights defenders and civil society organizations are fundamental pillars in any democratic society. Therefore, it is crucial that Venezuela urgently refrain from taking any actions or measures that may disproportionately restrict the right of association and negatively impact the free exercise of the defense of human rights.

## E.     Corruption and opacity in public governance

37.     The Commission observes that public governance in Venezuela lacks transparency. There is no publicly available information in the country with regard to human development indexes, poverty, schooling, infant mortality, maternal mortality, malnutrition, government contracting, civil service, impunity, criminal complaints, public finances, among others.

38.     According to the most recent report published by Transparency International, Venezuela was ranked 177 among the 180 countries perceived to be the most corrupt.[37] Eighty-seven percent of individuals considered that corruption had increased in the previous 12 months, and 50 percent believed that public service had been used to pay bribes.[38]

39.     The opacity in public governance, the use of the judiciary as a political instrument and the absence of independence of institutions from the ruling party has a twofold effect. On one hand, it enables corruption and creates a climate of tolerance for it. On the other, it casts doubt on the efforts made to fight this phenomenon, especially when political benefits are sought or obtained from the arrest of individuals for non-flagrant criminal offenses.

40.     The Commission notes that more than 40 public officials from Petróleos de Venezuela, S.A. (PDVSA), a state company, were detained in March of this year due to alleged corruption acts.[39] However, due to the opacity of the information, it is not possible to determine whether these charges respond to criminal conduct or political persecution since the executive branch uses the criminal justice system to persecute workers who oppose the government.

41.     The Commission notes that economic, social, cultural and environmental rights may be seriously and negatively impacted by corruption, both directly and indirectly. An act of corruption directly impairs a right when it is used as a means to prevent its effective realization and enjoyment; for instance, when a person has to make unlawful payments to study or gain access to health care, among others. In such instances, corruption is used directly to impair protected rights, be it by obstructing direct access to their full enjoyment or by reducing the resources specifically required to guarantee those rights.[40]

---

[35] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, para. 57.
[36] OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela*. Report of the United Nations High Commissioner for Human Rights, A/HRC/53/54, July 4, 2023, para. 61.
[37] Transparency International, *Corruption perceptions index*, 2022.
[38] Transparency International, *Global corruption barometer*, 2019.
[39] *France 24*, "*Ya son 42 los funcionarios y empresarios detenidos en Venezuela en la 'cruzada' anticorrupción,*" April 2, 2023.
[40] IACHR, *Corruption and Human Rights in the Americas: Inter-American Standards*, 2019, para. 163.





42.    In other situations, acts of corruption create the conditions contributing indirectly or in a more subtle or covert manner to violations of economic, social, cultural and environmental rights when, for instance, the authorities find themselves forced to prioritize private interests in their fiscal policy, thereby reducing the overall availability of public resources; when they fail to take proactive steps to recover resources diverted by acts of corruption; when they inflate prices in procurement processes or prioritize private interests in public tenders for jobs in the education or health sectors, thereby jeopardizing quality in educational and health care services, among others.[41]

## IV.    HUMAN RIGHTS VIOLATIONS

### A.    Violations of the right to life, liberty and personal integrity[42]

43.    The State has systematically violated human rights, including freedom of expression, to facilitate the concentration of power in the executive branch, to discourage political participation and to undermine the independence of institutions. At the same time, institutional deterioration, and the lack of independence of the judiciary have fostered a climate of impunity in the face of serious human rights violations, which may amount to crimes against humanity due to their systematic nature.

44.    In light of the reluctance to decisively combat impunity, on June 27, 2023, the Pre-Trial Chamber of the International Criminal Court (ICC) ordered the Office of the Prosecutor of that body to resume their investigation on the alleged commission of crimes against humanity. Venezuela is the only country in the Western Hemisphere with an open investigation before the ICC.

45.    Both the Inter-American Commission and the Independent International Mission[43] agree that neither the Office of the Public Prosecutor nor the Office of the Ombudsperson nor the judiciary have acted with due diligence to investigate, prosecute, and punish serious human rights violations. This is a consequence of the lack of independence of these institutions from the government.

46.    The absence of independent democratic institutions has also prevented the State from prioritizing the design of public policies aimed at addressing the needs of the population, especially to counteract the narrowed access to ESCERs.

**Extrajudicial executions and arbitrary deprivation of life**

47.    The Independent International Mission investigated nine cases of deaths between 2020 and 2023, out of which five might be attributable to state authorities. Three of these deaths took place in the context of demonstrations over fuel shortages; the remaining two cases involved individuals who were deprived of liberty and reportedly died as a result of the denial of adequate medical attention.[44] In addition, the Committee of Relatives of Victims of the Caracazo (COFAVIC) reported that 414 cases of alleged extrajudicial executions were recorded between January and September 2023.[45]

**Political prisoners and arbitrary detentions**

48.    The Commission has used the term "political prisoners" to refer to individuals who, by misusing criminal law, have been detained arbitrarily for disagreeing politically and ideologically with governments in office, for legitimately exercising the fundamental freedoms of expression, assembly and

---

[41] IACHR, *Corruption and Human Rights in the Americas: Inter-American Standards*, 2019, para. 164.

[42] This section was prepared by the Office of the Special Rapporteur for Freedom of Expression.

[43] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, para. 42.

[44] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, paras. 27–30.

[45] COFAVIC, Information on human rights violations between January–September 2023, received by the Commission in November 2023.

VZ Termination_0175



association, or for working in the defense of human rights, in States where the justice system is not independent.

49.      In 2023, the Commission continued to observe that the justice system in Venezuela was being used to persecute and detain actual or perceived opponents to the government, due to the absence of the Rule of Law and the co-opting of the judiciary by the executive branch. According to Foro Penal, as of November 2023, there were 272 political prisoners, out of which 18 were women and 146 members of the military.[46] It is particularly concerning that 135 out of the 272 political prisoners have not been convicted, which shows an abuse of pre-trial detention and a lack of compliance with judicial guarantees.[47]

50.      The Independent International Mission documented 58 arbitrary detentions between 2020 and 2023, out of which at least 53 had taken place in the context of selective repression against actual or perceived opponents to the government. This was the case of union leaders, human rights defenders, members of civil society organizations, members of the opposition, teachers and others who had expressed their complaints against the government, including labor demands.[48] Likewise, the COFAVIC recorded 413 alleged arbitrary detentions between January and September 2023,[49] thus reaching a total of 15,700 cases since 2014.[50]

51.      The Commission urges Venezuela to release all the persons who have been deprived of liberty for political reasons and to ensure that all the guarantees of the right to defense and due process enshrined in international human rights instruments are respected.

**Torture and other cruel, inhuman or degrading treatment**

52.      Individuals who are deprived of liberty for political reasons receive differentiated treatment based on the grounds for their arrest, which has an impact on their detention conditions and increases the risk of torture and other cruel, inhuman or degrading treatment.[51] In general, these persons are held in the General Directorate of Military Counterintelligence; El Helicoide, a building that belongs to the Bolivarian National Intelligence Service (SEBIN); and the National Institute for Feminine Orientation (INOF). The information received by the Commission in 2023 included reports of at least 160 complaints of torture of political prisoners under the custody of the State between 2017 and 2020.[52]

53.      The Commission held a hearing in 2023 to follow up on the precautionary measures granted to victims of torture deprived of their liberty in 2017 and 2018. On that occasion, members of the beneficiaries' families informed that the precautionary measures had not been implemented and that their relatives still suffered deplorable and unsanitary detention conditions; overcrowding; suffocation due to lack of ventilation, and lack of access to essential medical treatment.[53] Furthermore, the Independent International Mission documented cases of denial of sexual and reproductive health services, arbitrary restrictions of family and legal visits, and violations of the rights of breastfeeding mothers and detained women with young children outside of prison.[54]

---

[46] Foro Penal database, accessed on November 11, 2023.

[47] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, paras. 36–38.

[48] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, para. 33.

[49] COFAVIC, Information on human rights violations between January–September 2023received by the Commission in November 2023.

[50] Amnesty International, *Life detained: Politically-motivated arbitrary detentions continue in Venezuela*, August 29, 2023.

[51] IACHR, Press Release No. 288/22, "*IACHR Calls for Immediate Release of All Individuals Detained for Political Reasons in the Americas*," December 29, 2022.

[52] Information received by the IACHR.

[53] IACHR, 186th regular period of sessions, public hearing "*Follow-up of precautionary measures of beneficiaries deprived of their liberty in Venezuela*," held on March 6, 2023.

[54] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, para. 44.





54.     At this hearing, civil society organizations reported that the beneficiaries of these measures still endured physical torture, prolonged isolation periods, lack of communication, depression, suicide attempts, lack of medical care, denial of transfers to medical centers and acts of coercion to induce confession. One of the beneficiaries participated at the hearing via videoconference and reported that prisoners did not receive medical attention and suffered from mental health disorders and severe dehydration. In addition, this beneficiary requested that a commission from the International Committee of the Red Cross be authorized to enter detention centers and verify their conditions, and that the Office of the Prosecutor of the ICC expedite the ongoing investigation into acts of torture in Venezuela.[55]

55.     The Independent International Mission underscored in its September 2023 report that, during the 2020-2023 period, the mission had investigated 19 cases of gender-based violence, including sexual violence, against persons who were deprived of liberty and were actual or perceived opponents to the government. These cases involved four men and 15 women, including a transgender woman. Among the acts reported were threats of rape, forced nudity, rapes with blunt objects and degrading insults, such as "bad mothers," "bitches" or "prostitutes," among others.[56]

56.     According to the Independent International Mission, "these acts were carried out with particular viciousness against real or perceived political opponents," in particular against women, who were subjected to threats revolving around their children in a disproportionate number of cases compared to men.[57]

57.     In addition, the COFAVIC recorded 74 new cases of alleged torture in the context of repression by state agents during the first nine months of the year.[58]

## B.    Situation of freedom of expression[59]

**Challenges to journalism and the media**

58.     Journalists continue to endure a hostile environment in Venezuela. According to the reports received by the Commission, as in previous years, journalists have suffered threats, intimidation, and legal persecution, as well as seizures of their work equipment and censorship of press material.

59.     Acts of harassment and attacks against media facilities and journalist organizations were recorded in 2023. For instance, on January 23, 2023, masked individuals reportedly used Molotov cocktails and stones to attack the headquarters of *Palpitar Trujillano*, a digital media outlet.[60] Subsequently, on May 11, 2023, SEBIN officials allegedly conducted a search and seized equipment from the headquarters of *Mundo Oriental*, a news website. The search had been reportedly ordered in the context of the administrative proceedings relating to the arrest of former Mayor Ernesto Paraqueima.[61]

60.     These attacks took place in a context of constant stigmatization of the media by public authorities and political leaders. The following instances can be highlighted as paradigmatic examples of this situation: on January 27, the governor of the state of Trujillo labelled *Diario Los Andes* and journalist Alexander

[55] IACHR, 186th regular period of sessions, public hearing "*Follow-up of precautionary measures of beneficiaries deprived of their liberty in Venezuela*," held on March 6, 2023.

[56] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, paras. 45–49.

[57] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/54/57, September 18, 2023, paras. 45–49.

[58] COFAVIC, Information on human rights violations between January–September 2023 received by the Commission in November 2023.

[59] This section was prepared by the Office of the Special Rapporteur for Freedom of Expression (SRFOE).

[60] This media outlet reportedly suffered four attacks against its social media accounts in December 2022. *Efecto Cocuyo*, "Atacan con piedras y molotov la sede de un medio digital en Trujillo," January 23, 2023; *IPYS*, "Desconocidos atacaron la sede del medio Palpitar Trujillano," January 25, 2023.

[61] *Punto de Corte*, "SNTP rechaza el allanamiento e incautación de equipos del diario Mundo Oriental en El Tigre," May 9, 2023; Espacio Público, "Funcionarios del SEBIN allanaron la sede del medio Mundo Oriental en Anzoátegui," May 11, 2023.

González as *palangristas* (recipients of *payola*) and accused them of having participated in a *coup d'état*.[62] The governor attacked the same media outlet and journalist on April 14, stating that they had been involved in alleged acts of corruption.[63] In addition, on February 28, the mayor of the Piar municipality, in the state of Bolívar, accused journalists from different media outlets of "having engaged in media terrorism," following the coverage of a protest by relatives of patients who had died during the pandemic.[64] In the same vein, Diosdado Cabello, a member of the National Assembly and anchor of *Con el Mazo Dando*, continued with his stigmatizing statements against the press, which were aired on a public television channel in Venezuela.[65]

61.     Criminal law continues to be used for intimidation. According to public information, on January 25, a prosecutor from the Office of the Public Prosecutor and a group of officials from the Scientific, Criminal and Criminalistics Investigations Body (CICPC) visited the home of the chief editor of *El Nacional*, a newspaper, and took him to the headquarters of the Office of the Public Prosecutor to take a statement. The summons, which allegedly included four other journalists, was reportedly related to his investigative work.

62.     On February 2023, the mayor of the Piar municipality threatened to sue six journalists for their informative work.[66] In May, journalist Sebastiana Barráez reported that she had been threatened with arrest for her coverage of a case of alleged abuse of power committed by a high-ranking government official.[67] Subsequently, in June, the governor of the state of Táchira expressed his intention to sue those who had "unfoundedly" denounced problems in the state for "defamation and libel." According to available information, the same official had allegedly threatened journalist Sebastiana Barráez and political leaders.[68] On May 5, journalist Gustavo Azocar was summoned by the Office of the Public Prosecutor in the state of Táchira for his posts on his social media accounts.[69]

63.     During this year, the Commission followed up on the situation of journalists Roland Carreño, who has been under arrest since October 26, 2020, and Roberto Deniz, who has faced criminal proceedings since October 2021 for the alleged crime of incitement to hatred, linked to his work in the press.[70] Deniz is a beneficiary of precautionary measures.[71]

64.     In addition to the aforementioned information, media outlets continued to be closed based on the alleged non-compliance with administrative requirements for radio broadcasting. According to a report published by IPYS Venezuela, the National Telecommunications Commission of Venezuela (CONATEL), the state administrative agency tasked with issuing permits to operate, is allegedly responsible for this situation. Radio stations are faced with administrative obstacles, as well as a context of "economic strangulation" caused by the lack of economic resources and optimal infrastructure conditions to carry out their transmissions.[72] This

[62] SNTP X account (@sntpvenezuela), January 27, 2023; CEPAZ, "CEPAZ documentó 187 casos de persecución y criminalización en enero de 2023," February 24, 2023.

[63] *Diario Los Andes*, "Piden al Ministerio Público y a la Defensoría del Pueblo cese de ataques del gobernador de Trujillo contra la prensa," April 24, 2023; IPYS, "Gobernador de Trujillo vuelve a atacar discursivamente a Diario Los Andes," April 18, 2023.

[64] *Efecto Cocuyo*, "Por qué la alcaldesa de Upata amenazó a periodistas locales," March 1, 2023; Espacio Público, "Alcaldesa oficialista amenazó a seis periodistas por cubrir denuncias en Upata," March 1, 2023.

[65] *Alberto News* X account (@AlbertoRodNews) February 2, 2023; IPYS, "Diosdado Cabello emitió descalificativos contra Alberto Rodríguez Palencia," February 6, 2023.

[66] *Efecto Cocuyo*, "Por qué la alcaldesa de Upata amenazó a periodistas locales," March 1, 2023; Espacio Público, "Alcaldesa oficialista amenazó a seis periodistas por cubrir denuncias en Upata," March 1, 2023.

[67] Sebastiana Barráez X account (@SebastianaB), May 20, 2023; *Efecto Cocuyo*, "Periodista Sebastiana Barráez denuncia que juez amenazó con detenerla," May 22, 2023.

[68] *Táchira Noticias* Instagram account (@tachiranoticias), June 15, 2023; Espacio Público, "Gobernador de Táchira amenaza con demandar a quienes denuncien problemas en la entidad," June 16, 2023.

[69] *El Carabobeño*, "Periodista Gustavo Azócar fue citado a fiscalía por denuncia formulada a través de redes sociales," May 5, 2023; *Monitoreamos*, "El periodista Gustavo Azócar acudió a la Fiscalía tras una denuncia anónima en su contra," May 5, 2023.

[70] IACHR, *2022 Annual Report. Report of the Office of the Special Rapporteur for Freedom of Expression*, OEA/Ser.L/V/II Doc. 50, March 6, 2023, para. 1379.

[71] IACHR, Press Release No. 031/20, "IACHR Grants Precautionary Measures in Favor of Relatives of Journalist Roberto Deniz de Armando," February 7, 2020.

[72] IPYS, "Un anárquico paisaje sonoro. Condiciones de la radio en Venezuela para las coberturas electorales," February 13, 2023.





is the case of *Radio Caracas Radio*, the oldest radio station in the country, which ceased operations permanently in June.[73]

65.     According to Espacio Público, radio stations continued to be shut down in 2023. Five stations closed in the states of Portuguesa (2), Táchira (1), Anzoátegui (1) and Bolívar (1) pursuant to orders issued by the CONATEL.[74] In addition, the information provided shows that four programs were cancelled in March of this year: three of them  were broadcasted on the radio and the remaining one on social media.[75]

66.     The Atlas de Silencio study shows that at least 21 percent of the population lives in "news deserts," that is, areas in which access to local information is inadequate.[76] This situation is compounded by the deliberate closure of radio stations.[77] Most of the "deserts" are located in small and medium-sized municipalities.[78] The states of Táchira, Zulia and Sucre are reportedly the most affected by the "information drought."[79] Furthermore, the study warns that precarious infrastructure conditions, border areas and socioeconomic conditions also have an impact on the existence of "news deserts."[80]

67.     Along the same lines, Espacio Público published a report which concluded that "there are at least 13 silenced zones," referring to 13 states in the country with little or no access to information sources from diverse and independent publishers.[81]

68.     The Commission underscores that intimidation and threats against journalists strongly restrict freedom of expression and that it is the duty of the State to prevent and investigate said acts.[82] In this regard, the Commission noted that Carlos Germán Debiais, a graphic reporter, was released on June 6, 2023. Debiais had been under arrest since November 12, 2021, for taking drone shots of the Amuay refinery in the state of Falcón.[83]

69.     Finally, the Commission considers that attacks against journalists and media outlets are intended to silence them; therefore, in addition to violating the individual rights of journalists to express and disseminate their ideas, opinion and information, they also affect a society's right to have free access to information.[84] An independent and critical press is fundamental to ensuring respect for other liberties that form part of a democratic system of government and the Rule of Law.[85]

**Transparency and access to public information**

70.     Although the Law of Transparency and Access to Information of Public Interest was enacted in September 2021, the Commission observed a context of state opacity in 2023.[86] Espacio Público reported

---

[73] *Efecto Cocuyo*, "Radio Caracas Radio cesa definitivamente sus transmisiones," June 29, 2023; Espacio Público, "RCR cesa sus transmisiones tras 93 años de labor ininterrumpida," June 29, 2023.

[74] IPYS, "Onda 97.3 FM en Puerto Ordaz confirmó cierre por parte de Conatel," June 14, 2023.

[75] Espacio Público, "Mayo: Crítica bajo acecho," June 6, 2023.

[76] IPYS, "Atlas del silencio," June 8, 2023.

[77] IPYS, "Atlas del silencio," June 8, 2023.

[78] IPYS, "Atlas del silencio," June 08, 2023.

[79] IPYS, "Atlas del silencio," June 08, 2023.

[80] IPYS, "Atlas del silencio," June 08, 2023.

[81] Espacio Público, "Zonas silenciadas: 13 estados de Venezuela," May 3, 2023.

[82] IACHR, Declaration of Principles on Freedom of Expression, 2000.

[83] *Tal Cual*, "Autoridades excarcelan al reportero gráfico Carlos Debiais," June 6, 2023; Espacio Público, "Excarcelan al reportero gráfico Carlos Debiais," June 7, 2023.

[84] IACHR, Background and Interpretation of the Declaration of Principles; IACHR, Office of the Special Rapporteur for Freedom of Expression, *Violence Against Journalists and Media Workers: Inter-American Standards and National Practices on Prevention, Protection and Prosecution of Perpetrators*, 2013, OEA/Ser.L/V/II.

[85] IACHR, Background and Interpretation of the Declaration of Principles; IACHR, *Report on the Situation of Human Rights in Mexico*, OEA/Ser.L/V/II.100 Doc 7 rev.1, September 24, 1998, para. 649.

[86] IACHR, *2022 Annual Report. Report of the Office of the Special Rapporteur for Freedom of Expression*, OEA/Ser.L/V/II Doc. 50, March 6, 2023, para 1386.



that 28 requests for information had been submitted to state bodies, out of which three had been rejected straightforwardly without legal justification and the rest had not been answered.[87]

71.     The Commission reiterates that access to information held by the State is a fundamental right of every individual, and that States have the obligation to guarantee the full exercise of this right. This principle allows only exceptional limitations that must be previously established by law in case of a real and imminent danger that threatens national security in democratic societies.[88] The State's actions should be governed by the principles of disclosure and transparency in public administration that enable all persons subject to its jurisdiction to exercise the democratic control of those actions.[89]

**Restrictions on the freedom of expression and association of human rights defenders and organizations**

72.     In 2023, the Commission received information about alleged monitoring and surveillance actions by state agents against union leaders and members of the National Trade Union Coalition of Workers (CSNT). These actions were reportedly related to the demonstrations than had been called for and held in different parts of the country to protest against an instruction issued by the National Budget Office (ONAPRE) and to demand better working conditions.[90]

73.     The Commission granted precautionary measures in favor of seven CSNT members on April 1, 2023, because it considered that they were at serious and imminent risk of suffering violations of their rights to life and integrity, and requested the State to adopt the necessary protection measures so that the beneficiaries could continue to carry out their union leadership activities without being subject to threats, intimidation, harassment or acts of violence.[91] In addition, in May, Diosdado Cabello, a member of the National Assembly, used TV show *Con El Mazo Dando*, which is broadcasted by the state channel, to attack 10 civil society organizations by questioning their actions and international funding.[92]

74.     In this context, the Commission highlights the arrest of Javier Tarazona, a human rights defender and director of Fundaredes, who, as of July 2023, had been imprisoned for two years while suffering from health conditions.[93] Tarazona has been a beneficiary of precautionary measures granted by the Commission since June 18, 2020. In 2023, the Supreme Court of Justice revoked the jurisdiction of the Third Court of Caracas that hears cases involving terrorism. According to media reports, this was detrimental to the case of Mr. Tarazona.[94]

75.     In view of the above, the Commission reiterates that human rights defenders play a fundamental role in the consolidation of both a democratic society and the Rule of Law, therefore the State has the obligation to guarantee an enabling environment for their work.[95] In addition, the Commission recalls that

---

[87] Espacio Público, "Situación general del derecho al acceso a la información pública: enero-junio 2023," July 10, 2023.

[88] IACHR, Declaration of Principles on Freedom of Expression, 2000.

[89] IAHR Court, Claude Reyes *et al.* v. Chile. Merits, reparations and costs. Judgment of September 19, 2006, Series C No. 151, para. 86.

[90] IACHR, Resolution 15/2023, Precautionary Measure No. 66-23, Carlos Eduardo Salazar Ojeda *et al.* (Trade Union Leaders of the Civil Society Organization National Trade Union Coalition of Workers) regarding Venezuela, April 1, 2023.

[91] IACHR, Resolution 15/2023, Precautionary Measure No. 66-23, Carlos Eduardo Salazar Ojeda *et al.* (Trade Union Leaders of the Civil Society Organization National Trade Union Coalition of Workers) regarding Venezuela, April 1, 2023.

[92] Centro de Justicia y Paz, *Monitoreo de persecución y criminalización en Venezuela*, May 2023; CDJ, *Situation of human rights defenders in Venezuela, First semester of 2023*, July 2023.

[93] UN News, "Venezuela debe garantizar unas elecciones transparentes e inclusivas," July 5, 2023; Acceso a la Justicia, "Cronología del caso de la ONG Fundaredes," July 3, 2023.

[94] *Efecto Cocuyo, "Juicios de presos políticos como Roland Carreño, Javier Tarazona y Darío Estrada comenzarán de cero,"* July 15, 2023; Transparencia Venezuela, "TSI despoja a Juzgado Penal de Caracas de Competencias sobre Terrorismo," July 18, 2023.

[95] United Nations, *Report of the Special Rapporteur on the rights to freedom of peaceful assembly and of association* A/74/349, September 11, 2019, para. 25; United Nations Human Rights Council, *Report of the Special Rapporteur on the rights to freedom of peaceful assembly and of association, Maina Kiai* A/HRC/20/27, May 21, 2012, paras. 12 and 13.



the freedom of association is an essential tool for human rights defenders to be able to perform their work fully and comprehensively.[96]

**The "Anti-Hate Law" as a tool to criminalize public interest speech**

76.     During this year, criminal law offenses, such as "incitement to hatred" and "boycott," among others, were defined in broad and ambiguous terms, used as an instrument to intimidate, and punish those who criticize the government. A cardiologist was arrested on June 14 in Valera, a city in the state of Trujillo, under alleged charges of boycott and treason to the homeland, among others, after she had reported irregularities in the fuel supply for a gas station allegedly owned by her family.[97]

77.     The Attorney General informed on June 18 and June 20 that two farmers had been arrested in the state of Mérida under boycott charges.[98] According to the information received, these individuals had been arrested for posting videos on social media in which they could be seen discarding their crops and throwing them into a river as a protest over the shortage of fuel they needed to transport and market their products.[99] Both persons were subsequently released.[100]

78.     In addition, the Anti-Hate Law continues to be used to censor individuals and even public officials. Servando Marín, a columnist of the website *Aporrea*, was arrested on May 1 by state agents in Cumaná, a city in the state of Sucre, under charges of incitement to hatred after he had allegedly expressed critical opinions on environmental and architectural affairs.[101] The co-founder of *Aporrea* reported on May 7 that Mr. Marín had been conditionally released under the obligation to appear periodically before the court.[102] The Attorney General announced on May 4 that an arrest warrant had been issued against Ernesto Paraqueima, the former mayor of the municipality of El Tigre, in the state of Anzoátegui, for incitement to hatred. This action was taken after the official had made several comments against a mural that had been painted in his town to raise awareness about autism spectrum disorder.[103]

79.     Since 2017, the Commission has called for the Anti-Hate Law to be repealed on the grounds that it is contrary to international standards on freedom of expression.[104] Restrictions imposed by this law severely impact the exercise of the right to freedom of expression in Venezuela, which is against the principles of a democratic society. In particular, the Commission notes that this legislation includes vague concepts and exorbitant penalties that are subject to no statute of limitations in order to criminalize statements on matters of public interest; it imposes burdensome obligations on all media outlets, including the suppression and

[96] IACHR, *Second Report on the Situation of Human Rights Defenders in the Americas* OEA/Ser.L/V/II, December 31, 2011, paras. 157 and 163; IAHR Court, Baena Ricardo *et al.* v. Panama. Merits, reparations and costs. Judgment of February 2, 2001, Series C No. 72, para. 158.

[97] *Efecto Cocuyo*, "Trujillanos exigen libertad para médica Mariana Barreto, detenida por denunciar irregularidades en gasolinera," June 18, 2023; Espacio Público, "Detienen a ciudadana que denunció irregularidades con combustible en Trujillo," June 20, 2023.

[98] Attorney General of Venezuela X account (@TarekWilliamSaab), June 19, 2023; *Finanzas Digital*, "Agricultor de Trujillo será imputado por el Ministerio Público tras 'destruir una gran cantidad de alimentos,'" June 20, 2023.

[99] Transparencia Venezuela, "¡Cuál es el delito cometido por los agricultores detenidos?," June 20, 2023; Human Rights Observatory of the University of Los Andes (ULA), "Estado venezolano viola derechos humanos de agricultores, incluido su derecho al trabajo," June 25, 2023.

[100] *Infobae*, "Liberan dos agricultores venezolanos detenidos por protestar por la falta de gasolina," June 21, 2023; Espacio Público X account (@espaciopublico), June 21, 2023.

[101] Espacio Público, "Detienen y excarcelan a arquitecto Servando Marín por opinar y denunciar irregularidades," May 8, 2023; *Aporrea*, "Encarcelan a Servando Marín Lista, Presidente de la Fundación Ramón Badaracco y columnista de Aporrea," June 6, 2023.

[102] Gonzalo Gómez Freire X account (@GonzaloAporrea), May 7, 2023.

[103] Office of the Public Prosecutor of Venezuela X account (@MinpublicoVEN), May 4, 2023, May 4, 2023; *Runrunes*, "Alcalde de El Tigre violó ley para atención de personas dentro del espectro autista al ofender a niños con Asperger," May 3, 2023.

[104] IACHR Office of the Special Rapporteur for Freedom of Expression, Press Release No. R179/17, "Office Of The Special Rapporteur For Freedom Of Expression Expresses Serious Concern Over The Enactment Of The 'Anti-Hate Law' In Venezuela And Its Effects On Freedom Of Expression And Freedom Of The Press," November 10, 2017; IACHR Office of the Special Rapporteur for Freedom of Expression, Press Release No. R169/22, "SRFOE condemns the increase of censorship in Venezuela and reaffirms its support and commitment to the full enjoyment of press freedom in the country," July 29, 2022.

VZ Termination_0181



deletion of information of public interest; and it grants broad power to the State to use media outlets and impose content.[105] The OHCHR has also expressed its concerns over the consequences of this law.[106]

**Social protest**

80.    During 2023, the Commission received reports on the disproportionate use of public force to disperse protests. According to the Venezuelan Observatory of Social Conflict, 3,900 peaceful demonstrations took place in the country during the first five months of 2023, out of which 86 percent had been triggered by demands for economic, social, cultural and environmental rights. The remaining demonstrations had been reportedly organized by unions and their leaders who protested for their labor rights, especially for their right to receive fair wages.[107] The Venezuelan Education Action Program on Human Rights (PROVEA) reported that 18 workers of the Venezuelan Corporation of Guayana had been detained and prosecuted in January for demanding better working conditions.[108]

81.    On June 10, workers Juan Cabrera, Leonardo Azocar and Daniel Romero were reportedly arrested by officials of the Department of Military Counterintelligence (DGCIM), and the latter two were prosecuted by a court in Caracas under charges of boycott, criminal conspiracy and incitement to hatred, after leading a protest in one of the SIDOR plants.[109] On June 14, it was reported that a trial court with competence over labor matters in the state of Bolívar had granted a precautionary measure requested by the Venezuelan Corporation of Guayana, which allegedly restricted the right to strike and to freedom of expression of 22 SIDOR workers.[110]

82.    The Commission reiterates that social protest, which involves the rights to freedom of peaceful and unarmed assembly, freedom of association and freedom of expression, is an essential tool for the defense of democracy and human rights. Therefore, the State has the obligation to respect, protect and guarantee these rights.[111] With regard to the obligation to protect and facilitate said rights, the Commission states that the application of criminal law to conducts related with the exercise of protests constitutes a serious restriction with far-reaching consequences for freedom of expression, as well as the rights of assembly, association and political participation.[112]

**Freedom of online expression**

83.    The reported incidents include the hacking of the Facebook page of *El Tubazo Digital* on January 6. This outlet, which reports news in the state of Guárico and in Venezuela, was forced to create a new

---

[105] IACHR Office of the Special Rapporteur for Freedom of Expression, Press Release No. R179/17, "Office Of The Special Rapporteur For Freedom Of Expression Expresses Serious Concern Over The Enactment Of The 'Anti-Hate Law' In Venezuela And Its Effects On Freedom Of Expression And Freedom Of The Press," November 10, 2017.

[106] OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, para. 65.

[107] Venezuelan Observatory of Social Conflict, "Situation of the civic space in Venezuela." side event to the 53rd session of the United Nations Human Rights Council, June 28, 2023.

[108] Venezuelan Education Action Program on Human Rights, "Represión y detenciones arbitrarias: el saldo de seis días de protesta en SIDOR," June 13, 2023.

[109] Venezuelan Education Action Program on Human Rights, "Represión y detenciones arbitrarias: el saldo de seis días de protesta en SIDOR," June 13, 2023; Espacio Público, "Tribunal de Primera Instancia criminaliza la protesta de 22 trabajadores de Sidor," June 14, 2023.

[110] Espacio Público, "Tribunal de Primera Instancia criminaliza la protesta de 22 trabajadores de Sidor," June 14, 2023; Venezuelan Education Action Program on Human Rights, "Represión y detenciones arbitrarias: el saldo de seis días de protesta en SIDOR," June 13, 2023.

[111] IACHR Office of the Special Rapporteur for Freedom of Expression, *Protest and Human Rights,* OEA/Ser.L/V/II CIDH/RELE/INF.22/19, September 2019, foreword and paras. 1-46.

[112] IACHR Office of the Special Rapporteur for Freedom of Expression, *Protest and Human Rights,* OEA/Ser.L/V/II CIDH/RELE/INF.22/19, September 2019, foreword and para. 185.

VZ Termination_0182





Facebook profile since it was reportedly impossible to recover its page.[113] In addition, journalist Luis Olavarrieta reported on June 14 that his YouTube channel had been hacked.[114]

84.     In addition, media outlets indicated that they had been impersonated online.[115] This is the case of *Diario Panorama*, which reported that third parties had impersonated them and posted information on their website.[116] Likewise, the visual identity and name of *Alertas 24*, an online media outlet, were used to disseminate false information.[117] On May 15, Joel Dullroy and Laura Clisánchez, journalists from the newspaper *Correo del Caroní*, denounced that their names and images had been used in false emails to ask for money.[118]

85.     Furthermore, the internet infrastructure in Venezuela remains deficient, which is a consequence of the socioeconomic crisis in the country. VE Sin Filtro, an internet observatory, reported several cases of internet connection downtime in several regions of the country, with different durations.[119] In addition, high internet access costs have been a trend across the country.[120] In this context, the country faces a considerable digital divide, considering that, by March 2023, more than half (50.6 percent) of the individuals surveyed by the Venezuelan Observatory of Public Utilities (OVSP) in 12 Venezuelan cities declared that they had no internet service at home.[121]

86.     In addition, the Commission continued to receive reports according to which news websites perceived as opponents of the government, including websites of media outlets and civil society organizations, had been blocked.[122] The VE Sin Filtro Observatory reported that, as of March 12, 2023, 97 blocked domains remained blocked by the Telephones of Venezuela National Public Company (CANTV), as well as by different private service providers, such as Digitel, Inter, NetUno and Movistar, out of which 62 reportedly belonged to media websites.[123] These numbers reportedly amounted to "the near-total blocking of the news outlets reporting critical news in Venezuela."[124]

87.     Four new blocking incidents against websites belonging to news media and organizations, such as media outlets *El Diario*[125] and *Mundo Oriental*,[126] the Finance Observatory[127] and the Living Wage for Venezuela initiative of the Venezuelan Union Network,[128] were reported during 2023. As of June 20, CANTV, a State-owned company, was still the operator with the highest number of restricted domains, using

[113] *IPYS*, "Hackean página de Facebook de El Tubazo Digital," January 19, 2023.

[114] *Nueva Prensa Digital*, "Luis Olavarrieta informó que su canal de Youtube fue hackeado," June 14, 2023; *La Verdad de Monagas*, "Hackean el canal de Youtube del periodista Luis Olavarrieta," June 14, 2023.

[115] *IPYS*, "Desconocidos suplantaron la identidad de El Pitazo para pedir información a lectores," June 7, 2023.

[116] *Diario Panorama* Instagram account (@diariopanorama), May 3, 2023; *IPYS*, "Diario Panorama denunció suplantación de identidad en su dominio web," May 16, 2023.

[117] *IPYS*, "Suplantan identidad de medio digital para difundir información falsa," April 26, 2023.

[118] *IPYS*, "Dos periodistas fueron objeto de suplantación de identidad en plataformas digitales," May 18, 2023; Espacio Público, "Periodista Laura Clisánchez alerta que está siendo acusada de extorsión por una cuenta anónima," June 22, 2023.

[119] Venezuela Sin Filtro X account (@Vesinfiltro), February 8, 2023; February 15, 2023; February 23, 2023; February 28, 2023; March 1, 2023; March 8, 2023; March 17, 2023 March 22, 2023; March 27, 2023; April 13, 2023; April 21, 2023; April 24, 2023; May 8, 2023; May 11, 2023; June 28, 2023.

[120] *Finanzas Digital*, "Consulte las tarifas de los planes de ABA de CANTV para julio de 2023," July 10, 2023; *Bloomberg Línea*, "Empresas de telefonía en Venezuela ajustan tarifas mientras enfrentan debilidad en el servicio," July 11, 2023.

[121] Venezuelan Observatory of Public Utilities, "OVSP: La mitad de los encuestados no cuenta con servicio de internet en el hogar," April 24, 2023.

[122] Espacio Público, *Informe 2022: Situación del derecho a la libertad de expresión e información en Venezuela,* May 3, 2023; *IPYS*, Derechos fuera de línea. Reporte Anual Derechos Digitales 2022, May 24, 2023.

[123] Venezuela Sin Filtro X account (@Vesinfiltro), March 12, 2023.

[124] *NTN24*, "'Lo que más se bloquea en Venezuela son páginas web de medios digitales.' Andrés Azpúrua, director de la 'Ve Sin Filtro,'" March 13, 2023.

[125] Venezuela Sin Filtro X account (@Vesinfiltro), May 3, 2023; *Efecto Cocuyo*, "Ve Sin Filtro: Hay 62 medios de comunicación bloqueados en Venezuela," March 12, 2023.

[126] *IPYS*, "Cuatro medios de comunicación fueron vulnerados en El Tigre tras detención del exalcalde," May 11, 2023; Espacio Público, "Mayo: Crítica bajo acecho," June 6, 2023.

[127] Venezuelan Finance Observatory X account (@observafinanzas), May 8, 2023.

[128] Espacio Público, "Operadoras aplicaron bloqueo DNS a portal web de la Red Sindical Venezolana," May 11, 2023; *Efecto Cocuyo*, "Ve Sin Filtro registra cuatro bloqueos a sitios informativos en lo que va de mayo," May 17, 2023.



HTTP/HTTPS and DNS blocking as the most frequent methods.[129] Some organizations have claimed that the blocking phenomenon was closely related to misinformation in Venezuela because people, instead of accessing the full news article, only reviewed the headline or summary they received via WhatsApp unless they used tools for circumventing blocking, such as virtual private networks (VPNs).[130]

88.    In addition to the blocking incidents, there were complaints about distributed denial-of-service (DDoS) attacks and alleged copyright infringement against news and opinion websites. On May 7, *Aporrea*, a news website, reported that it had suffered a DDoS attack, which allegedly recurred on May 8.[131] It was recorded that media outlets *El Nacional* and *Qué Pasa en Venezuela* had faced obstacles to remain online due to alleged copyright infringement. The websites of these outlets were restricted between May 4 and 6 for more than 13 and 26 hours, respectively, following plagiarism complaints related to a report they had published on the export of Venezuelan gas to Colombia. According to the information available, the requests for removal of the report due to copyright issues were addressed to the companies that hosted the servers of those websites.[132]

89.    There is consensus in international human rights law about the fundamental role that access to the internet plays for the effectiveness of a wide range of human rights, including the freedom of expression, freedom of association and freedom of assembly, the right to participate in social, cultural and political life, the rights to health, education and work, among others.[133] In this regard, the Commission recalls that, as part of the positive obligation to promote and facilitate the enjoyment of human rights, States should take all measures within their power to ensure that all individuals have meaningful access to the Internet. In addition, as part of the obligation to respect, authorities should refrain from interfering with internet access and digital communications platforms unless said interfering is in full compliance with the requirements of the applicable human rights instruments.[134]

**Restrictions on academic freedom**

90.    Finally, according to the information received, university autonomy in Venezuela continued to face significant challenges, including budget restrictions, attacks and interventions in university facilities, limited opportunities for students to participate in the development of public policies impacting them, as well as harassment, arrests and an environment of indirect pressure that stands in the way of full academic freedom in the conduct of research.[135]

91.    For instance, on January 27, María Fernanda Rodríguez, a human rights defender and university professor, was arrested at the Universidad Metropolitana in Caracas a day after having participated as a representative of civil society organizations in a meeting with the United Nations High Commissioner for Human Rights, Volker Türk, during his visit to Venezuela. The professor was subsequently released.[136]

92.    Within this adverse context, information showing a steep decline in both the number of university professors and students was published in 2023. According to estimations, approximately 3,500

---

[129] Venezuela Sin Filtro X account (@Vesinfiltro), June 20, 2023.

[130] *NTN24*, "'Lo que más se bloquea en Venezuela son páginas web de medios digitales.' Andrés Azpúrua, director de la 'Ve Sin Filtro,'" March 13, 2023; Center for International Media Assistance, "Digital rights and democracy: online censorship in Venezuela," March 24, 2022.

[131] *Aporrea* X account (@aporrea). May 7, 2023; Espacio Público, "Portal de Aporrea sufrió un ataque DDoS," May 9, 2023.

[132] *IPYS*, "Portales de El Nacional y Qué Pasa en Venezuela fueron limitados tras falsa denuncia por plagio," May 17, 2023.

[133] United Nations Human Rights Council, Resolution 47/16, The promotion, protection and enjoyment of human rights on the Internet A/HRC/RES/47/16, July 26, 2021; UN, OSCE, OAS and ACHPR, Joint Declaration on Freedom of Expression and the Internet, June 1, 2011.

[134] OHCHR, *Internet shutdowns: trends, causes, legal implications and impacts on a range of human rights*. Report of the Office of the United Nations High Commissioner for Human Rights A/HRC/50/55, May 13, 2022, para. 8.

[135] Human Rights Observatory of the University of Los Andes, Monthly reports on the situation of universities in Venezuela, 2023.

[136] Human Rights Observatory of the University of Los Andes, *Situación de las Universidades en Venezuela*. January 2023; *El Nacional*, "Liberaron a la defensora de derechos humanos María Fernanda Rodríguez," January 27, 2023.

VZ Termination_0184





professors resigned from their positions in 2022, specifically at the Universidad Central de Venezuela.[137] In addition, the enrollment rate at that university decreased by 54.23 percent between 2016 and 2022.[138] This situation also had a significant impact on the country's contribution to the overall academic research activities conducted in Latin America and the Caribbean, which have decreased significantly, from 4.7 percent in 1996 to less than 0.6 percent in 2023.[139]

93.      The Commission highlights the paramount role that universities play as centers that foster critical thinking and the exchange of ideas. At the same time, the Commission underscores the close relationship between academic freedom and the construction and consolidation of a democratic society.[140] The State of Venezuela must respect and guarantee university autonomy. In particular, the Commission stresses that any interference with academic freedom must meet the requirements of legality, legitimate aim, suitability, necessity and proportionality in accordance with the precepts of a democratic society.[141] In addition, the State has the obligation to prevent and investigate all acts of intimidation, assault, harassment or threats against individuals because of their participation in the academic community.[142]

### C.      Situation of economic, social, cultural and environmental Rights (ESCERs)[143]

94.      Within the framework of a complex, serious and multidimensional humanitarian crisis, Venezuela continued to experience high rates of poverty, inequality and food insecurity, in addition to a collapse of the healthcare system and significant limitations to guarantee economic, social, cultural and environmental rights. According to the information available, most of the protests in the country this year were related to demands to guarantee these rights.[144]

**Decrease in poverty and increase in inequality**

95.      With regard to the statistics on poverty in the country, the 2022 National Living Conditions Survey (ENCOVI) found that 50.5 percent of households lived under the poverty line, which constituted a 15-percent decrease against 2021 and the first decline in the poverty rate since 2014. Nevertheless, the data shows that inequality in the country has worsened in parallel to this improvement. In addition, poverty has worsened across the country.[145]

96.      Hum Venezuela informed that poverty continues to be a widespread problem in the country and that the income of most households was insufficient to cover their essential needs In this regard, according to a community survey performed between July and August 2023, low income was the main problem of 86.3 percent of the households surveyed, and 56.5 percent were most concerned about the lack of livelihood, considering that the estimated price of the consumer basket in August was 372 US dollars, while the average monthly household income was only 102.5 US dollars per month in the 20 states of the country where the survey was conducted.[146]

---

[137] *The Conversation*, "Venezuela: sin recursos, sin profesores y sin alumnos, las universidades públicas luchan por sobrevivir," July 6, 2023.

[138] *Últimas Noticias*, "En 54.23% cayó matrícula estudiantil de la UCV," April 26, 2023.

[139] *The Conversation*, "Venezuela: sin recursos, sin profesores y sin alumnos, las universidades públicas luchan por sobrevivir," July 6, 2023.

[140] IACHR, Inter-American Principles on Academic Freedom and University Autonomy, 2021.

[141] IACHR, Inter-American Principles on Academic Freedom and University Autonomy, 2021.

[142] IACHR, Inter-American Principles on Academic Freedom and University Autonomy, 2021.

[143] This section was prepared by the Office of the Special Rapporteur on Economic, Social, Cultural and Environmental Rights.

[144] Venezuelan Observatory of Social Conflict , "Conflictividad social en Venezuela en agosto 2023," September 2023.

[145] Universidad Católica Andrés Bello (UCAB) Economic and Social Research Institute, *Condiciones de vida de los venezolanos. ENCOVI 2022*, November 2022; Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, *El aparato estatal, sus mecanismos de represión y las restricciones al espacio cívico y democrático* A/HRC/54/CRP.8, September 18, 2023.

[146] Hum Venezuela, *Community Diagnostics, July-August 2023*, October 2023, p. 2.

VZ Termination_0185





97.     Therefore, although Venezuela left behind the hyperinflation cycle[147] and experienced economic growth in 2022, the economy contracted by 8.5 percent during the first semester of 2023.[148] As a result, no improvement was observed in the quality of life of the population,[149] and households remain largely dependent on state aid, although insufficient.[150]

**Deficiencies of the healthcare system**

98.     In this complex scenario, millions of individuals are unable to access adequate health care and face food insecurity.[151] According to the information available, the country continues to be mired in the collapse of its healthcare system, characterized by persistent shortages and deficiencies in the supply of medicines, supplies, equipment and medical treatments. In addition, it was observed that healthcare workers work under precarious conditions and that numerous medical devices and medical centers were out of service.[152]

99.     In this regard, the public health system responsiveness was found to be dramatically lower, with an estimate loss of 70 percent of its capacity since 2016.[153] In addition, it was reported that 82.2 percent of healthcare centers had structural and operational deficiencies, out of which 50.1 percent are severe.[154] In parallel, according to estimations, 90 percent of public laboratories are inoperative.[155] The shortage of operating room supplies in public hospitals has reached 72 percent.[156] As of August 2023, the shortage of medications stood at 26.3 percent, with diabetes (31.7 percent), seizures (31.9 percent) and acute respiratory infections (32.6 percent) being the three main causes of morbidity with the highest medication shortage rates.[157]

100.    This has resulted in approximately 9.3 million people living with chronic medical conditions and facing the possibility of not being able to receive their treatment due to medication and supply shortages.[158] As of August 2023, 88.9 percent of households reported inoperative services in public health centers due to their inability to provide care, reduced and limited opening hours, or services shutdown. This impacted the services provided by means of assistance program Barrio Adentro (97.8 percent), community clinics (97.3 percent), comprehensive care centers (90.1 percent), outpatient treatment centers (87.8 percent) and hospitals (74.3 percent).[159]

101.    In addition, the current crisis sparked the resurgence of preventable and infectious diseases.[160] This situation was compounded by the opacity of information and the lack of transparency of the

---

[147] *DW*, "Venezuela: la mayor tasa mundial de inflación en alimentos," September 6, 2023.

[148] Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, *El aparato estatal, sus mecanismos de represión y las restricciones al espacio cívico y democrático* A/HRC/54/CRP.8, September 18, 2023, para. 48.

[149] Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, *El aparato estatal, sus mecanismos de represión y las restricciones al espacio cívico y democrático* A/HRC/54/CRP.8, September 18, 2023; *New York Times*, "Ferrari, Prada y hambre: la visión socialista de Venezuela se tambalea," March 21, 2023.

[150] Hum Venezuela, *Community Diagnostics, July-August 2023*, October 2023, p. 2.

[151] Human Rights Watch (HRW), "Venezuela. Events of 2022," 2023.

[152] IACHR, Resolution 11/2022, Precautionary Measure No. 150-19, Concepción Palacios Maternity Hospital regarding Venezuela (Follow-up), February 27, 2022; REDESCA, *V Annual Report of the Office of the Special Rapporteur on Economic, Social, Cultural and Environmental Rights (REDESCA) of the Inter-American Commission on Human Rights (IACHR)*, 2021, para. 1579.

[153] *El País*, "La salud pública en Venezuela redujo en 70% su capacidad de respuesta desde 2016," May 15, 2023.

[154] Hum Venezuela, *Community Diagnostics, July-August 2023*, October 2023, p. 9.

[155] *El Nacional*, "90% de los laboratorios públicos del país están inoperativos," June 16, 2023.

[156] *Voz de América*, "La odisea de parir en un hospital público en Venezuela," May 22, 2023.

[157] Convite, "Boletín 73: Agosto 2023 cierra con 26,3% de escasez de medicinas para las morbilidades que monitorea Convite," September 28, 2023.

[158] *El País*, "La salud pública en Venezuela redujo en 70% su capacidad de respuesta desde 2016," May 15, 2023.

[159] Hum Venezuela, *Community Diagnostics, July-August 2023*, October 2023, p. 6.

[160] HRW, "Venezuela. Events of 2022," 2023.

VZ Termination_0186



State, which has not published the annual epidemiological bulletin for more than seven years.[161] In this context, the Commission notes that the State has not complied with the precautionary measures granted to patients in the Maternity Hospital Concepción Palacios and to children waiting for transplants and services at the J. M. de los Ríos Hospital.[162] The collapse of these hospitals resulted in the death of at least 79 children who were awaiting transplants in the nephrology department over the last six years, while 14 adolescents and 25 children are still awaiting a response from the hematology department.[163]

102.    Deprivation in access to the right to health also arise from the fact that the basic and social determinants of health are not guaranteed. According to estimations, during 2022, at least 6.5 million persons were not able to purchase enough food to cover basic daily food energy needs for at least one year.[164] In addition, 12.3 million Venezuelans faced food insecurity in 2023.[165] This problem was compounded by the fact that, as of July 2023, Venezuela was ranked first within the 10 countries with the highest nominal inflation rate for food in the world, reaching 414 percent.[166]

**Deficiencies in access to basic services**

103.    Similarly, the country faced significant problems to meet the basic needs of a large portion of its population. Power supply deficiencies not only had a negative impact on the quality of life of the population in general, but also caused the death of patients in several medical centers, according to the information available. In particular, Médicos por la Salud reported that, only in 2022, 261 persons had lost their lives due to power outages in hospitals.[167]

104.    In addition, the population faced growing challenges to access water and sanitation since the water supply is not continuous, and the quality of water has deteriorated. According to estimations, between 80 and 90 percent of the population has no access to water due to problems in its distribution and the condition of water basins in the country.[168] According to the information available as of August 2023, approximately 74.3 percent of households had no regular access to water, including 18.1 percent of households with no access to aqueducts, 10.6 percent suffering occasional failures and 45.8 percent experiencing frequent failures.[169]

**Precarious working conditions**

105.    Furthermore, with regard to labor and trade union rights, the Commission noted that most of the persons who are employed are not able to enjoy a decent life due to low wages and precarious working conditions, especially in the public sector. According to the Venezuelan Observatory of Social Conflict (OVCS), as of August 2023, their labor rights were still the main cause for peaceful demonstrations, representing 40 percent of the claims.[170]

[161] *Efecto Cocuyo*, "Enfermedades crónicas se agravaron en Venezuela en dos años de pandemia," March 17, 2022.

[162] Provea, "Los niños del Hospital J. M. de los Ríos 'siguen muriendo' y se mantienen a la espera de que garanticen sus derechos," July 9, 2023; *Efecto Cocuyo*, "Bancos de leche y lactarios disminuyen sus servicios en Caracas," August 15, 2023; *Costa del Sol*, "Parir en Venezuela, "Una vecina me quitó los puntos de la cesárea", 18 de julio de 2023," July 18, 2023; IACHR, 2022 Annual Report. Chapter IV.B. Venezuela, para. 140. For reference, see: IACHR, Resolution No. 13/19, Precautionary Measure No. 150/19, Maternity Hospital Concepción Palacios regarding Venezuela, Venezuela, March 18, 2019; IACHR, Resolution No. 43/19, Precautionary Measure No. 1039-17, Children and adolescents patients in thirteen services of the José Manuel de los Ríos Hospital regarding Venezuela, August 21, 2019; IACHR, Resolution No. 11/22, Precautionary Measure No. 150-19, Maternity Hospital Concepción Palacios regarding Venezuela, February 27, 2022.

[163] Provea, "Los niños del Hospital J. M. de los Ríos 'siguen muriendo' y se mantienen a la espera de que garanticen sus derechos," July 9, 2023.

[164] Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, *El aparato estatal, sus mecanismos de represión y las restricciones al espacio cívico y democrático* A/HRC/54/CRP.8, September 18, 2023, para. 50.

[165] Euronews, "Crisis humanitaria de Venezuela y Haití podrían empeorar, dice Comité Internacional de Rescate," January 24, 2023.

[166] *DW*, "Venezuela: la mayor tasa mundial de inflación en alimentos," September 6, 2023.

[167] *El Nacional*, "Provea advierte que apagones ponen en riesgo a pacientes hospitalarios," September 17, 2023.

[168] Hum Venezuela, *Community Diagnostics, July-August 2023*, October 2023, p. 14.

[169] Hum Venezuela, *Community Diagnostics, July-August 2023*, October 2023, p. 14.

[170] OVCS, "Conflictividad social en Venezuela en agosto 2023," September 2023.

VZ Termination_0187



106.    In this regard, the Commission reiterates its deep concern over the complaints involving forced labor in the country, according to which 49 cases of labor exploitation and unsafe conditions were recorded between May and December 2022.[171] Similarly, the Commission has closely monitored the impact of extractive activities in the south part of the country which, in addition to causing deforestation, water contamination and the displacement of indigenous communities, has reportedly resulted in harsh working conditions and in terrible abuses against the population, including amputations, armed attacks and murders, at the hands of groups who control illegal gold mines and who allegedly operate with the acquiescence of the government.[172]

**Sanctions against sectors and unilateral coercive measures**

107.    In this context of democratic backsliding, several countries of the American continent and the European Union have adopted different sanctions in response to the serious and mass human rights violations in Venezuela. On one hand, there are specific sanctions in place aimed at public officials and persons associated with the government and the United Socialist Party of Venezuela (PSUV). On the other, sectoral sanctions have been imposed against industries and sectors.

108.    According to the information available, specific sanctions were imposed before sectoral ones. According to the president of the Venezuelan National Assembly, 962 sanctions of different nature were imposed from 2015 to 2023.[173]

109.    The information available to the IACHR indicates that the serious economic situation preceded the imposition of sanctions and was caused by different factors. Among these are the fall in oil prices,[174] the policy of privatization and expropriations,[175] poor public management characterized by excessive public spending,[176] widespread corruption,[177] among others;[178] however, it takes note of the findings of the UN special rapporteur on unilateral coercive measures and human rights, who, after visiting the country, pointed out that sectoral sanctions have no normative basis in international law and have worsened the situation of people in a vulnerable situation[179]. For this reason, the IACHR reiterates its call for them to be lifted[180] and highlights that the imposition of sanctions does not exempt the Venezuelan State from fulfilling its international obligations regarding human rights.

## V.    IMPACT ON GROUPS IN VULNERABLE SITUATIONS AND DISCRIMINATION

110.    The dire human rights situation in Venezuela has affected the entire population; however, it has differentiated impacts on those persons who have been subjected to structural and historic discrimination, such as women, boys, girls and adolescents, lesbian, gay, bisexual, trans and intersex (LGBTI) persons, Afro-descendants and indigenous peoples, persons with disabilities, refugees, migrants and persons in need of international protection. For this reason, the Inter-American Commission examines the following elements in relation to these specific groups.

---

[171] Movimiento Vinotinto, "Movimiento Vinotinto registra 49 casos de trabajo forzoso entre los estados Táchira, Lara y Zulia," March 15, 2023.

[172] HRW, "Venezuelan Tainted Gold," April 29, 2022; HRW, "Venezuela. Events of 2022," 2023.

[173] National Assembly of Venezuela, "De 962 sanciones contra Venezuela 756 fueron firmadas por Donald Trump," March 9, 2023.

[174] El País, "La caída del precio del petróleo agrava la crisis económica de Venezuela," October 16, 2014.

[175] Acceso a la justicia, "El trágico legado de las expropiaciones y nacionalizaciones," February 14, 2018.

[176] Reuters, "Venezuela says inflation slows, economy grew 1.6 pct in 2013," December 30, 2013.

[177] Transparencia Venezuela, "70 por ciento de los gobiernos no establecen controles anti-corrupción en materia de Defensa," February 9, 2013.

[178] Reuters, "Economía venezolana se desacelera en 3er trimestre 2013 y crece sólo 1,1 pct," November 26, 2013.

[179] UN News, Rapporteur asks the United States and the European Union to lift sanctions on Venezuela due to their devastating effect on the population, February 12, 2021.

[180] IACHR, 2021 Annual Report. Chapter IV.B. Venezuela. OEA/Ser.L/V/II. Doc. 5, May 26, 2022, para. 166; IACHR, 2021 Annual Report, Chapter IV.B. Venezuela. OEA/Ser.L/V/II. Doc. 5, May 26, 2022, para. 166.

VZ Termination_0188





## Women

111.    With regard to the human rights situation of women, the Commission notes that the State adopted minor measures to improve the protection of rights and the access to justice in gender-based violence cases. Among these measures, the Commission notes Resolution No. 98 of the Office of the Public Prosecutor, which expanded the competence of the 95th Office of the Public Prosecutor so as to include cases of women trafficking, thus becoming the National Office of the Public Prosecutor Specialized in Women Trafficking;[181] a resolution adopted by the Plenary Chamber of the Supreme Court of Justice which approved the creation of three new courts with competence over crimes involving violence against women in the states of Barinas, La Guaira and Trujillo;[182] and the announcement of the creation of Gran Misión Mujer Venezuela, a governmental body responsible for articulating policies and social programs to promote the development of women in the educational, labor, social and political spheres.[183]

**112.**    In terms of gender equality in public positions, the Commission verified the progress made in achieving equality in the composition of the Supreme Court of Justice, which was presided by a woman in 2023 and whose members were 45 percent female. However, women were still underrepresented in the other branches of the State, such as the National Assembly (31 percent), the national government (27 percent), governorships (8.3 percent) and mayorships (19 percent).[184]

113.    With regard to the prevention, investigation and punishment of gender-based violence, the Commission identified challenges related to the implementation of public policies related to the Organic Law on the Right of Women to a Life Free of Violence (LODMVLV), whose reform, published in 2022, represented a step forward in the protection of women in the country.[185] Among these challenges, the Commission highlights the absence of information on the budget allocation necessary for the implementation of the Law,[186] the failure of the State to appoint members to the National Commission to Guarantee the Right of Women to a Life Free from Violence and to make it operational,[187] as well as the insufficient number of shelters for victims of gender-based violence.[188] These challenges were also compounded by the absence of gender equality legislation, the lack of plans or policies to eradicate gender-based violence, the absence of protocols to investigate these cases with a gender perspective and the limited training programs available for public officials.[189]

114.    Similarly, there were still no official data and statistics records on gender-based violence against women, which could have been used for the development and implementation of prevention policies.[190]

[181] Office of the Public Prosecutor of Venezuela, Resolution No. 98, January 27, 2023.

[182] *El Universal*, "TSJ aprueba la creación de tres nuevos tribunales en materia de Delitos de Violencia Contra la Mujer en Barinas, La Guaira y Trujillo," September 27, 2023.

[183] Bolivarian Government of Venezuela, "Gobierno Nacional crea la Gran Misión Mujer Venezuela," March 8, 2023. This measure was also welcomed by the OHCHR. See: OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, para. 30.

[184] Human Rights Committee, Replies of the Bolivarian Republic of Venezuela to the list of issues in relation to its fifth periodic report CCPR/C/VEN/RQ/5, June 7, 2023, para. 33; Committee on the Elimination of Discrimination against Women (CEDAW), Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 29.

[185] IACHR, *2022 Annual Report. Chapter IV.B.* Venezuela, para. 92.

[186] OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, para. 30.

[187] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 17.

[188] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 25; Human Rights Committee, Replies of the Bolivarian Republic of Venezuela to the list of issues in relation to its fifth periodic report, CCPR/C/VEN/RQ/5, June 7, 2023, para. 43.

[189] OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, para, 30; CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, paras. 15 and 25; Amnesty International, *Amnesty International Report 2022/23: The state of the world's human rights,* 2023, pp. 473 and 474.

[190] IACHR, *2021 Annual Report. Chapter IV.B. Venezuela,* para. 179; IACHR, *2022 Annual Report. Chapter IV.B. Venezuela,* para. 92. The Office of the United Nations High Commissioner for Human Rights and the CEDAW have expressed similar concerns. See: OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, para. 31; CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela



According to data published by the Attorney General on social media, since 2018, at least 628 women have been murdered by men with whom they had a close relationship. One thousand two hundred and eight indictments for these crimes were issued during the same period, and 340 requests for arrest warrants were filed.[191] In addition, according to data gathered by the civil society, it is estimated that 184 femicides and 100 attempted femicides were committed between January 1 and August 31, 2023.[192]

115.    The situation of violence faced by women and girls in rural areas near the borders with Brazil and Colombia, in particular in the states of Zulia, Bolívar and Amazonas, was worsened by the actions of armed and criminal groups present in the region and involved in drug trafficking and illegal extraction activities. Reports showed that these persons, in particular indigenous women and residents of rural areas, were victims of femicides, disappearances, sexual violence and contemporary forms of slavery, such as sexual and labor exploitation by human trafficking networks.[193]

116.    In addition, women who live near mining areas, especially indigenous women, are at risk of contamination by heavy metals used in extractive activities, such as gold and cyanide mining, which jeopardizes their health.[194]

117.    Furthermore, deficiencies in the healthcare system have led to high mortality rates in the country.[195] This is caused by the lack of access to sexual and reproductive health goods and services[196] and by the limitations on the access to contraceptives and essential drugs for pregnant women,[197] as well as by insufficient health services and menstrual hygiene products for women deprived of liberty.[198]

118.    In the same vein, the persistent and almost absolute criminalization of persons who seek to voluntarily terminate a pregnancy, which is only allowed exceptionally in cases where the life of the pregnant woman is at risk,[199] together with the lack of abortion and post-abortion medical protocols,[200] created significant risks to the life and health of persons with gestational capacity. Additionally, the challenges for the implementation of comprehensive sexual education and gender equality programs in schools persisted, which is linked to the high dropout rates of girls and adolescents due to pregnancies.[201]

---

CEDAW/C/VEN/CO/9, May 31, 2023,para 25.d). See also: Amnesty International, *Amnesty International Report 2022/23: The state of the world's human rights,* 2023, pp. 473 and 474.

[191] Office of the Public Prosecutor of Venezuela X account (@MinpublicoVEN), July 31, 2023.

[192] CEPAZ National Femicide Observatory, *Monitoreo de femicidios enero–julio 2023,* n/d, and Monitoreo de femicidios agosto 2023, retrieved on October 1, 2023. In addition, UTOPIX, a non-governmental organization, recorded 139 femicides during the same period. Utopix, "agosto de 2023: Son 18 femicidios en Venezuela para un total de 139 casos en ocho meses," September 21, 2023.

[193] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, paras. 19 and 27; OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, paras. 23 and 27; Fundaredes, "Mujeres indígenas y de zonas rurales son víctimas de violencia por grupos armados irregulares en territorio venezolano," Bulletin No. 45, July 20, 2023; *Noticia al Día*, "Con mayor incidencia de homicidios en Zulia: Denuncian aumento de acciones delictivas en estados fronterizos," March 16, 2023.

[194] OHCHR, *Situation of human rights in the Bolivarian Republic of Venezuela.* Report of the United Nations High Commissioner for Human Rights A/HRC/53/54, July 4, 2023, para. 13; CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela, CEDAW/C/VEN/CO/9, May 31, 2023, para. 37.

[195] According to the most recent report published by the United Nations Population Fund (UNFPA), Venezuela was among the eight countries and territories with the largest maternal mortality rate increase in the world between 2000 and 2020. UNFPA, *State of World Population 2023*, n/d, pp. 16 and 39.

[196] IACHR, *2021 Annual Report. Chapter IV.B. Venezuela,* paras. 158 and 184; IACHR, 2022 Annual Report. Chapter IV.B. Venezuela, para. 94.

[197] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 37; Amnesty International, *Amnesty International Report 2022/23: The state of the world's human rights, 2023,* p. 473.

[198] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 49.

[199] IACHR, *2021 Annual Report. Chapter IV.B. Venezuela,* para. 184.

[200] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 37; Amnesty International, Amnesty International Report 2022/23: The state of the world's human rights, 2023, p. 473.

[201] CEDAW, Concluding observations on the ninth periodic report of the Bolivarian Republic of Venezuela CEDAW/C/VEN/CO/9, May 31, 2023, para. 33.

VZ Termination_0190





**Refugees, migrants and persons from Venezuela in need of international protection**

119.    In line with the foregoing, the Commission noted that the main factors that triggered the unprecedented forced displacement of the Venezuelan population within and outside the Americas remain unchanged. According to the most recent figures from the Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela (R4V Platform), as of August 2023, there were 7,710,887 refugees, migrants and asylum seekers from Venezuela, out of which 6,527,064 were in Latin America and the Caribbean.[202]

120.    The main receiving countries for Venezuelan nationals in human mobility were Colombia, which recorded 2.89 million persons in 2023; Peru, with 1.54 million; and Brazil, with 477,500. In addition, according to the most recent figures from the United Nations High Commissioner for Refugees (UNHCR), by the end of 2022, there were 230,393 Venezuelan refugees in the world, as well as 1,137,162 asylum seekers and a total of 5,217,456 persons in need of international protection.[203]

121.    According to the R4V Platform, the impact of the Covid-19 pandemic and the global cost of living are among the factors that have contributed to an environment in which Venezuelan nationals have limited access to livelihoods and to integration opportunities, despite the efforts of the countries of destination to grant international protection to refugees and implement migratory regularization and socio-economic integration processes.[204] This was compounded by a price growth acceleration process in Venezuela: according to the Venezuelan Finance Observatory, the interannual inflation rate was 422 percent as of August 2023.[205]

122.    This mass migration cycle which, in the case of persons with fewer economic resources, took place by land, was combined with challenges during transit. As a result of the barriers imposed by other States to discourage the entry to their territories, Venezuelans increasingly turned to human smuggling networks and irregular routes to avoid stricter border control measures, which exponentially increased risks and promoted potential human rights violations.[206]

123.    Once in the countries of destination, Venezuelan nationals reported food insecurity and lack of access to employment. They also recounted their need for adequate housing, since many of them were reportedly living in overcrowded conditions, with limited access to water, sanitation and hygiene. Children and adolescents also faced difficulties to access education.[207] Furthermore, they reported challenges related to discrimination, xenophobia, violence and the failure to mitigate learning gaps due to low literacy and numeracy levels. In addition, language barriers represent a significant challenge in some countries in the region.[208]

124.    Access to a regular migratory status in the countries of destination constituted an additional challenge for migrants. According to 2023 figures, one out of every three refugees and migrants in the region were living irregularly, which subjected them to exclusion and vulnerability, as well as to situations of precariousness, discrimination and insecurity.[209] In particular, this resulted in an exponential risk of statelessness for children and adolescents who were born in transit or in countries of destination, especially in States whose regulations impose legal and/or practical barriers to naturalization.[210]

125.    In addition to these challenges, Venezuelan nationals faced difficulties in accessing identification and/or travel documents proving their nationality, which created practical obstacles to obtaining a regular migratory status. Changes in bureaucratic procedures, supply shortages, the suspension of consular

---

[202] R4V Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela, *R4V Latin America and the Caribbean, Venezuelan Refugees and Migrants in the Region,* August 31, 2023.
[203] UNHCR, Refugee Data Finder, "Venezuela statistics," December 31, 2022.
[204] R4V, *RMNA 2023 Refugee and migrant needs analysis,* September 2023, p. 14.
[205] Venezuelan Finance Observatory, "August 2023: la inflación fuera de control," September 5, 2023.
[206] R4V, *RMNA 2023 Refugee and migrant needs analysis,* September 2023, p. 17.
[207] R4V, *RMNA 2023 Refugee and migrant needs analysis,* September 2023, p. 26.
[208] R4V, *RMNA 2023 Refugee and migrant needs analysis,* September 2023, p. 36.
[209] R4V, *RMNA 2023 Refugee and migrant needs analysis,* September 2023, p. 26.
[210] UNHCR and Facultad de Derecho Alberto Hurtado, *El riesgo de apatridia en movimientos mixtos sucesivos,* August 2023.



services in some countries and the inability to run errands from abroad, caused by the political crisis, economic instability and the lack of resources, have hindered the possibility to obtain or renew essential documents.[211]

126.    Although various regularization and documentation initiatives had been implemented which have guaranteed access to vital rights and services for these people, the International Organization for Migration (IOM) emphasized that the international community needed to continue protecting them and investing in their host communities.[212] Similarly, the UNHCR and the IOM have called upon ensuring access to regularization mechanisms for Venezuelan refugees and migrants, and they have underscored that said mechanisms were the best way to foster inclusion in host countries, as well as to ensure access to documentation, promote their integration and prevent the increase of movements along dangerous migratory routes in the Americas.[213]

127.    The aforementioned challenges in host countries have led to an increase in the mass and continuous movements of Venezuelan nationals from one country to the other in search of asylum or settlement.[214] Although these movements had been first observed at the end of 2020, they escalated in an unprecedented and multidirectional manner during 2023, and with an increasing tendency towards the north, mainly aimed at Central and North America.[215]

128.    The Inter-American Commission emphasizes that the State needs to address the causes of migration and, in particular, to reestablish democracy and the Rule of Law. Furthermore, the Commission urges other States in the region to coordinate efforts to protect Venezuelan nationals moving through their territories. Finally, the Commission reiterates the need to adopt a complementary approach between the mechanisms for legal status regularization (migratory statutes) and international protection statutes, based on access to rights and comprehensive and durable solutions for Venezuelan nationals in the context of human mobility.[216]

**Persons deprived of liberty**

129.    The situation of persons deprived of liberty in Venezuela stands out as one of the most serious in the region. In particular, this is a result of the persistent lack of updated official statistics, the existence of two prison systems, overcrowding and the excessive use of preventive detention. In addition, deplorable detention conditions have been reported, as well as acts of torture and ill-treatment. This situation has led to an increase in the risks faced by LGBTI persons and those detained for political reasons, as detailed previously, especially considering the complete deterioration of the Rule of Law and the persecution carried out by the State.

**Duality of prison systems**

130.    One of the main challenges faced by persons deprived of liberty in Venezuela is the existence of a dual prison system. The official system, which, by the end of 2022, housed 33,558 people in 45 detention centers run by the Ministry of Popular Power for the Penitentiary Service (MPPSP),[217] and a parallel system,

[211] IACHR, *2022 Annual Report*. Chapter IV.B. Venezuela.

[212] International Organization for Migration, "Venezuelan Refugees, Migrants, and Their Hosts Need Help to Chart a Brighter Future," March 14, 2023.

[213] UNHCR and IOM, Joint Press Release, "Regularization and integration are key to addressing human mobility in the Americas," May 31, 2023.

[214] UNHCR and Facultad de Derecho Alberto Hurtado, *El riesgo de apatridia en movimientos mixtos sucesivos,* August 2023.

[215] R4V, *RMNA 2023 Refugee and migrant needs analysis,* September 2023, p. 14.

[216] IACHR, Guía Práctica Protección internacional y regularización de la condición legal en el contexto de movimientos mixtos a gran escala en las Américas, April 1, 2023.

[217] Venezuelan Prison Observatory (OVP), *Informe Anual 2022,* 2023, p. 20.



composed of approximately 500 preventive detention spaces or *calabozos*,[218] which allegedly housed 35,000 people as of March 2022.[219]

131.    The Commission emphasizes that it has repeatedly been unable to access official data on the population deprived of liberty in 2023. However, the civil society reported that there had been no significant changes in data compared to 2022 and that the State continued its practice of holding persons in pretrial detention spaces. In some cases, people had been detained for more than 10 years in facilities which are not suitable to house persons for more than 48 hours.[220]

132.    In this regard, the Commission recalls that the State must adopt the necessary legislative measures and structural reforms so that detention at police facilities is used as little as possible, only until a judicial authority determines the legal situation of the person under arrest.[221]

**Overcrowding**

133.    Although the number of persons detained decreased by 4.5 percent,[222] according to the most recent information of the Venezuelan Prison Observatory (OVP), there were 33,558 people detained in prisons in 2022, while the capacity of prison facilities is 20,438 people.[223] These figures indicate that the level of overpopulation reaches 64 percent. This situation is more serious in the Penitentiary Center of the state of Aragua, the Anzoátegui Judicial Confinement Center, the Rodeo II Capital Region Judicial Confinement Center and the Rodeo III Capital Region Judicial Confinement Center, where overpopulation levels have reached 281 percent, 230 percent, 220 percent and 202 percent, respectively.[224]

134.    The Commission reiterates that overcrowding of persons deprived of liberty in itself could constitute a form of cruel, inhuman or degrading treatment, and therefore a violation of the right to personal integrity and other internationally recognized human rights.[225] In this regard, the Commission urges the State of Venezuela to adopt urgent measures to reduce overcrowding in detention centers across the country, starting with those whose overpopulation levels are higher than 200 percent.

**The use of pretrial detention**

135.    One of the causes of the increased levels of overcrowding is the excessive use of pretrial detention as a precautionary measure in the country. According to information provided by the civil society, out of the 33,558 people in detention centers, 17,825 were in pretrial detention, representing 53 percent of the detained population.[226]

136.    In addition to this, according to the most recent report of the Independent International Mission, there were several instances in which people had been held in pretrial detention in the headquarters of the Bolivarian National Intelligence Service and the General Directorate of Military Counterintelligence, as well as in other places of detention across the country, for longer periods than those permitted by law. Likewise, the information gathered showed that, even after a judge had ordered the immediate release of individuals, prison directors had refused to do so on the grounds that authorizations from the MPPSP were pending. This

---

[218] IACHR, *2021 Annual Report. Chapter IV.B. Venezuela.* para. 202, and IACHR, *2022 Annual Report. Chapter IV.B. Venezuela.* para. 122.

[219] World Prison Brief, World Prison Brief data – Venezuela, 2023.

[220] Venezuelan Prison Observatory, *Informe Anual 2022,* 2023, p. 102.

[221] IACHR, *Report on the Use of Pretrial Detention in the Americas,* para. 257.

[222] Specifically, there were 33,710 people in detention centers in 2021, a figure that decreased to 33,558 persons in 2022. See, in this regard: Venezuelan Prison Observatory, *Informe Anual 2022,* 2023, p. 20.

[223] Venezuelan Prison Observatory (OVP), *Informe Anual 2022,* 2023, p. 35.

[224] See, in this regard: Venezuelan Prison Observatory, *Informe Anual 2022,* 2023, p. 36.

[225] IACHR, *Report on the Use of Pretrial Detention in the Americas,* OEA/Ser.L/V/II, Doc. 46/13, approved on December 30, 2013, para. 290 (hereinafter "the report on the use of pretrial detention in the Americas.")

[226] Venezuelan Prison Observatory, *Informe Anual 2022,* 2023, p. 27.



pattern has disproportionately affected persons deprived of their liberty for having opposed the government.[227]

137.    Accordingly, the Commission recalls that the application of pretrial detention must be based on consideration of the right to presumption of innocence and must take into account the exceptional nature of this measure. Moreover, it should be applied in keeping with the criteria of legality, necessity and proportionality.[228] In addition, a person must not be held in pretrial detention for longer than the State can appropriately justify its need; otherwise, the denial of liberty becomes arbitrary.[229]

**Other problematic issues**

138.    In general, detention conditions faced by persons deprived of liberty in Venezuela have been marked by overcrowding, self-government, corruption, intraprison violence, food shortages, lack of trained staff and lack of access to drinking water and medical care. The lack of updated information (except for the limited information received on the detention of women and LGBTI persons, and on those deprived of liberty for political reasons) makes it impossible for the Commission to determine whether these issues improved or worsened in 2023.

139.    According to a report published by the OVP, prison conditions for women in Venezuela showed significant problems in 2023. Among the 2,560 women who are deprived of liberty in the country, there are 82 foreigners who are detained in spaces described as "improvised" and without an adequate gender approach. Most women's facilities are annexes within prisons for men, which impacts the welfare and specific needs of incarcerated women. Critical overcrowding, which has reached 187.14 percent, is one of the main issues, together with the lack of medical care, especially for women with children, and the absence of adequate maternity spaces inside prisons.[230]

140.    During the 187th regular period of sessions held in July 2023, the Commission held a hearing on the human rights situation of LGBTI persons deprived of liberty. The organizations that requested the hearing reported that these persons were in a situation of extreme vulnerability due to the precariousness of their detention conditions, which are compounded by structural discrimination based on their sexual orientation, identity and/or gender expression.[231]

141.    According to the information provided by the civil society, no detailed statistics on LGBTI persons had been prepared during that year. The absence of information prevents the creation of policies and specific records, resulting in discrimination against LGBTI persons and in their exclusion from official data, and in the persistence of discriminatory practices in the prison system. In addition, as a consequence of the lack of information, no adequate regulations were implemented to protect LGBTI persons. For example, they were not placed in separate areas. As a result, trans women have been placed next to men and gay men in punishment cells, thus aggravating their situation of vulnerability.[232]

142.    In particular, trans, non-binary and gender-diverse individuals face significant challenges in detention centers since prison facilities are not adequately prepared to accommodate people according to their gender identities. Trans persons are frequently assigned to centers based on the sex stated in their identity documents, without considering their gender identity. In addition, the Commission received information about

---

[227] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela* A/HRC/54/57, September 18, 2023, paras. 37 and 38.

[228] IACHR, *Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas* OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, para. 231. Recommendation A "General measures related to matters of state policy," para. 1 (hereinafter "the report on measures aimed at reducing the use of pretrial detention in the Americas.")

[229] IACHR, *Report on the Use of Pretrial Detention in the Americas,* para. 159.

[230] Venezuelan Prison Observatory, "Las mujeres en prisión son discriminadas desde su detención," April 12, 2023.

[231] IACHR, 187th regular period of sessions, public hearing "Human rights situation of LGBTIQ+ persons deprived of liberty in Venezuela," held on July 14, 2023. Information provided by the Venezuelan Prison Observatory.

[232] IACHR, 187th regular period of sessions, public hearing "Human rights situation of LGBTIQ+ persons deprived of liberty in Venezuela," held on July 14, 2023. Information provided by the Venezuelan Prison Observatory.

VZ Termination_0194





the grim reality faced by these individuals who need to hide their sexual orientation or gender identity to avoid attacks and stigmatization from other inmates and from prison authorities.[233]

143.    The challenges that LGBTI persons face in accessing respectful health services are evidenced by the obstacles they encounter to receive hormone therapy and medical care for specific diseases such as the human immunodeficiency virus (HIV). Even those persons who had previously benefited from HIV antiretroviral drugs stopped receiving their treatment during the Covid-19 pandemic and currently have no access to services to assess their health condition. In addition, LGBTI persons faced an increased risk of physical and verbal violence from other inmates. With regard to conjugal visits, although every detained person is entitled to them, the LGBTI population encountered obstacles to the exercise of this right due to the context of discrimination and lack of awareness among prison staff,[234] as well as absence of regulations protecting their relationships.[235]

**Lesbian, gay, bisexual, trans and intersex (LGBTI) persons**

144.    LGBTI persons do not only face challenges related to discrimination based on sexual orientation and/or gender identity in the prisons across the country. These persons experienced high levels of violence and discrimination in 2023, which, according to public information, resulted in at least 60 cases of attacks against LGBTI persons during the first three months of the year.[236] At the same time, the preliminary report of País Plural  showed that, out of a sample of 555 LGBTI persons, 28.11 percent reported that they had been subjected to violence by state agents, 25.89 percent stated that they had been excluded from employment opportunities, and 20.27 recounted that they had faced discrimination by health professionals.[237]

145.    For instance, on July 23, 2023, the Bolivarian National Police (PNB) carried out an operation in a private venue frequented by LGBTI persons in the state of Carabobo and arrested 33 gay and sexually diverse men. During the operation, the detainees were photographed, and pictures of them and their identity cards were published in various media outlets. Thirty of these individuals were released under the condition that they appeared periodically before a court, while three remained in custody for 10 days.[238]

146.    Although the operation was allegedly prompted by noise-related complaints from neighbors, human rights defenders claimed that the arrests had been motivated by prejudice and discrimination against these persons based on their sexual orientation. The operation took place in a context of great vulnerability of LGBTI people in Venezuela, who are at the mercy of arbitrary measures or abuses of authority from state security agents based on prejudice against their non-normative sexual orientation or gender identity.[239]

147.    The Commission recalls that criminalizing sexual relations between consenting adults of the same sex, whether through laws or the actions of security and justice bodies, runs counter to inter-American and universal human rights standards. Similarly, the principles of due diligence require that information relating to the sexual orientation, gender identity and/or gender expression of people under investigation be handled with strict control of their privacy to ensure respect for the dignity and rights of all people involved.[240]

233 See, in this regard: IACHR, _2022 Annual Report, Chapter IV.B. Venezuela,_ paras. 121, 127-133. In addition, see: IACHR, 187th regular period of sessions, public hearing "Human rights situation of LGBTIQ+ persons deprived of liberty in Venezuela," held on July 14, 2023. Information provided by the Venezuelan Prison Observatory.
234 IACHR, 187th regular period of sessions, public hearing "Human rights situation of LGBTIQ+ persons deprived of liberty in Venezuela," held on July 14, 2023. Information provided by the Venezuelan Prison Observatory.
235 IACHR, 187th regular period of sessions, public hearing "Human rights situation of LGBTIQ+ persons deprived of liberty in Venezuela," held on July 14, 2023. Information provided by the Venezuelan Prison Observatory.
236 _Infobae_, "Denuncian que Venezuela está rezagada en materia de derechos de la comunidad LGBTQ+," June 29, 2023.
237 Venezuelan Observatory of LGBTIQ+ Violence, "Nuestra Comunidad presentó datos preliminares sobre las condiciones de vida de las personas LGBTIQ+ en Venezuela," September 27, 2023; Tu País Plural, "Nuestra Comunidad comparte datos preliminares de personas LGBTIQ+ en Venezuela," September 22, 2022.
238 Washington Office for Latin America (WOLA), "Justicia para los 33 en Venezuela: ser LGBTI+ no es delito," August 3, 2023.
239 Washington Office for Latin America (WOLA), "Justicia para los 33 en Venezuela: ser LGBTI+ no es delito," August 3, 2023.
240 IACHR, Press Release No. 176/23, "IACHR Urges Venezuela to Refrain from Criminalizing LGBTI People," August 7, 2023.



148.    In this regard, the Inter-American Commission urges Venezuela to respect human rights and cease criminalizing LGBTI people, in strict compliance with the principles of equality and nondiscrimination. The Commission also calls on the State to guarantee the principle of legality and to ensure that people are released if no crime was committed and no charges were brought against them. Finally, the Commission urges the authorities to refrain from publicly humiliating the accused and to ensure strict compliance with due diligence standards.[241]

149.    Moreover, Article 565 of the Organic Code of Military Justice, which criminalized same-sex relations, was repealed this year.[242] This development improves the lives of LGBTI people, since the existence of said laws contributes to preserving a social environment in which discrimination and violence against LGBTI persons are understood to be tacitly permitted or tolerated.

**Indigenous peoples**

150.    The Inter-American Commission remains concerned about the human rights situation of indigenous peoples, in particular with regard to the guarantee of their ESCERs, as well as to the impact of illegal mining on their territories and to the military operations to dismantle this practice. According to estimations, illegal mining practices affected 38 Venezuelan indigenous peoples in 2023.[243]

151.    The situation of the Yanomami people, who live both in the Brazilian and the Venezuelan territories, is of particular concern. According to information provided by the State of Brazil, 570 Yanomamis have died in the last four years and at least 30,400 have suffered from malaria. In addition, the people who are part of this indigenous group and move repeatedly between the borders of Brazil and Venezuela are constantly at risk of suffering from food insecurity and medical conditions.[244]

152.    Various indigenous peoples have historically practiced artisanal mining in states such as Amazonas. However, since the Covid-19 pandemic, there has been an increase in illegal mining both by persons who invade their territories and by foreign gangs from Colombia and Brazil (known as *garimpeiros*) engaged in this practice.[245] As of August 2023, 70 illegal mining hotspots had been identified, and 934 hectares had been deforested in lands belonging to the Yek'wana people.[246]

153.    In September 2023, the State of Venezuela conducted large-scale military operations to dismantle gangs involved in illegal mining. According to information provided by civil society organizations, three indigenous persons died during this operation, reportedly as a result of the action of the armed forces.[247] In addition, according to the information available to the Commission, the State has promoted the militarization of the south part of the country as a measure to strengthen state control over mining activities in the area. As a result of this policy, the levels of violence in the region have increased and clashes, acts of corruption[248] and murders have been recorded, particularly in the municipality of Gran Sabana, Bolívar.[249]

[241] IACHR, Press Release No. 176/23, "IACHR Urges Venezuela to Refrain from Criminalizing LGBTI People," August 7, 2023.
[242] OHCHR, UN High Commissioner for Human Rights Volker Türk concludes official mission to Venezuela, January 28, 2023.
[243] Foro Penal, "Venezuela: en los estados de Amazonas y Bolívar, 38 pueblos indígenas son afectados por la minería ilegal," September 15, 2023.
[244] IACHR, Press Release No. 015/23, "IACHR and Its Special Rapporteurship on Economic, Social, Cultural, and Environmental Rights Stress That Brazil Must Ensure the Survival of the Yanomami People," February 8, 2023.
[245] Mongabay, "Venezuela: monitoreo satelital detecta 70 focos de minería ilegal y 934 hectáreas deforestadas en territorio ye'kwana y sanema," August 1, 2023.
[246] Foro Penal, "Venezuela: en los estados de Amazonas y Bolívar, 38 pueblos indígenas son afectados por la minería ilegal," September 15, 2023.
[247] Foro Penal, "Venezuela: en los estados de Amazonas y Bolívar, 38 pueblos indígenas son afectados por la minería ilegal," September 15, 2023.
[248] United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela* A/HRC/51/43, September 20, 2022, para 85.
[249] United Nations Human Rights Council, *Detailed findings of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela: The human rights situation in the Arco Minero del Orinoco region and other areas of the Bolívar state*




154.     The Commission reiterates the State's obligation to investigate and punish acts of violence against indigenous peoples with a culturally responsive approach. It also underscores the importance of taking decisive measures to address the risk and threat factors they face, especially in relation to the guarantee and protection of their lands and territories within the context of the activities, plans or projects they carry out therein.

155.     Finally, the Commission reiterates that, in accordance with the international obligations of the State, both in terms of the inter-American[250] human rights system and the universal[251] human rights system, the presence of military forces in indigenous territories must be agreed upon in advance with the indigenous peoples in question through effective consultations and appropriate procedures with their representative institutions.

**Afro-descendant persons**

156.     The State has recognized the contributions of Afro-descendant persons in international entities, such as the United Nations Permanent Forum on People of African Descent.[252] However, the Commission observes that there is no public detailed information about the situation of Afro-descendant persons in Venezuela and the challenges to their rights.

157.     A study prepared by the civil society and published in 2023 revealed a lack of attention to the specific experiences of Venezuelan Afro-descendant migrants from a rights-based and intersectional perspective. Out of a sample of 3,285 migrants in Colombia, six percent identified themselves as Afro-descendant, mainly in the cities of Cúcuta (10.5 percent), Santa Marta (4 percent) and Barranquilla (3.5 percent). This sample included a considerable proportion of women between 27 and 35 years of age.[253] The study found that racism, gender discrimination and xenophobia in the workplace are closely related, and that this has a differentiated impact on migrant Afro-descendant women and has exposed them to gender-based violence in the workplace.[254]

158.     The Commission reaffirms the need for the State of Venezuela to implement public policies with an intersectional perspective, including factors such as ethnic-racial origin, age, gender, migratory status, socioeconomic condition, among others, in order to eradicate structural patterns of racial discrimination.

## VI.    CONCLUSIONS AND RECOMMENDATIONS

159.     The Inter-American Commission has emphasized that, during 2023, Venezuela continued to face significant challenges in respecting and ensuring human rights. The main obstacle to solving the serious crisis in the country is the lack of a democratic institutional framework guided by the separation and balance of the branches of government.

160.     The continued absence of a system of checks and balances, as well as the deterioration of the Rule of Law, has led the Venezuelan government to impose a systematic state policy of repression and intimidation against persons or organizations that express their disagreement with the government or are perceived as opponents.

---

A/HRC/51/CRP.2, September 20, 2022, para. 165; United Nations Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, A/HRC/51/43, September 20, 2022, paras. 91-102.

[250] IACHR, Right to self-determination of Indigenous and Tribal Peoples, 2021, para. 187; Cf. American Declaration on the Rights of Indigenous Peoples AG/RES.2888 (XLVI-O/16), 2016, art. XXX.4.5.

[251] United Nations Declaration on the Rights of Indigenous Peoples, 2017, art. 30.

[252] *Prensa Latina*, "Venezuela ratifica defensa de pueblos afrodescendientes," May 10, 2023.

[253] Race and Equality, Report: *Situación de la población afrovenezolana en contextos migratorios en Colombia: Análisis y recomendaciones para la aplicación del enfoque étnico-racial*, 2023, p. 29.

[254] Race and Equality, Report: *Situación de la población afrovenezolana en contextos migratorios en Colombia: Análisis y recomendaciones para la aplicación del enfoque étnico-racial*, 2023, p. 83.





161.    With regard to the structured repression policy, the State has failed to adopt effective measures to guarantee that victims of serious human rights violations, such as extrajudicial executions, torture and forced disappearances, have access to justice. The impunity for serious violations committed in previous years, especially since 2017, has persisted and created major accountability gaps.

162.    In addition to the systematic persecution against the opposition, state institutions have implemented discriminatory procedures to access public office. The incumbent authorities have benefited from the absence of a system of checks and balances to implement administrative disqualifications and criminal proceedings to prevent members of the opposition from running for public office. These restrictions against political rights infringe the American Convention on Human Rights and other international treaties and standards.

163.    In addition, the civic space continued to shrink as a result of the restrictions to the freedoms of expression, association and peaceful assembly, which has limited the involvement of human rights defenders, social movements and political parties that are critical of the government in matters of public interest. This policy has been designed to discourage any expression of political opposition, whether real or perceived.

164.    Institutional deterioration has resulted in limited access to economic, social, cultural and environmental rights (ESCERs), causing a mass displacement of people on an unprecedented scale in the region. According to estimations, 7,320,225 persons have abandoned Venezuela since 2015 seeking to protect fundamental rights, such as the rights to food and health.

165.    The Commission has closely monitored the dialogue initiatives between the government and the Unity Platform, a coalition of several opposition parties. Although the Commission welcomes these efforts to reach agreements, it underscores the need for concrete measures to ensure the political participation of all sectors, with gender parity and free from discrimination, as well as accountability for the human rights violations committed.

166.    The Inter-American Commission reiterates its offer to collaborate with the State and the Venezuelan society as a whole in order to ensure effective compliance with the recommendations contained in this report and thus contribute to strengthening the defense and protection of human rights.

167.     Additionally, the Commission reaffirms its interest and willingness to visit Venezuela, and it therefore formally requests the consent of the State.

**Position of the State vis-à-vis the inter-American system**

1.    Fully comply with the decisions and recommendations of the inter-American human rights system, including those set out in the 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021 and 2022 annual reports. In addition, comply with the recommendations put forward in reports such as *Democratic Institutions, the Rule of Law and Human Rights in Venezuela* (2017), *Democracy and Human Rights in Venezuela* (2009) and *Report on the Situation of Human Rights in Venezuela* (2003).

**Democratic institutions**

2.    Restore the constitutional order, guaranteeing:

    i.    the independence of powers and a system of checks and balances for the branches of government



ii. political participation of the entire population without repression or discrimination and

iii. effective citizen control over the actions of the different branches of the State.

3. Ensure that the provisions relating to the state of emergency are used in situations of extreme seriousness and exceptional nature and are rigorously and reasonably adapted based on the needs of the situation in question.

4. Promote mechanisms of dialogue between different political stakeholders and the civil society aimed at urgently reconstructing the democratic institutions of the country.

**Administration of justice and judicial independence**

5. Adopt urgent measures to:

i. significantly reduce the number of provisional judges and increase the number of tenured judges

ii. ensure that judges can only be removed through a disciplinary process that respects the guarantees of due process of law and that is duly grounded and

iii. provide guarantees for the stability of judges in office, especially through public selection processes with transparent appointment procedures.

6. Take the necessary measures, including legislative measures, so that civilians are not investigated, prosecuted and/or tried by the military criminal jurisdiction, and, if necessary, redirect the ongoing proceedings to the ordinary courts.

**Political rights and participation in public life**

7. Overturn the administrative measures that restrict political rights, including those imposed by the Office of the Comptroller General of the Republic.

8. Adapt the domestic regulatory framework to ensure that the Office of the Comptroller General of the Republic cannot institute proceedings or impose removal or disqualification sanctions against persons holding elected office in accordance with governing inter-American standards on the subject.

9. Refrain from making illegal or arbitrary detentions, and, in the event that a person is deprived of liberty, ensure that all due process of law guarantees are met, including that persons are to be brought promptly before an independent judicial authority, so as to avoid enforced disappearances, torture and other cruel and inhuman treatment.

10. Remove regulatory obstacles to the legitimate exercise of the right to protest, in particular by eliminating the requirement to obtain prior authorization to hold demonstrations.

11. Grant journalists the maximum degree of guarantees so that they are not detained, threatened or assaulted, and so that their working materials and tools are not confiscated for practicing their profession.

12. Promote the amendment of ambiguous or vague criminal laws that limit freedom of expression in a disproportionate manner, such as those designed to protect the honor of ideas or institutions, or those that seek to protect national security or public peace.

 

13.     Eliminate the use of criminal proceedings to inhibit free democratic debate on matters of public interest and the full exercise of political rights.

14.     Refrain from placing restrictions on the operation of websites, blogs, applications or any other system for the dissemination of information on the Internet, electronic systems or the like, including support systems, such as ISPs, or search engines.

**Violence and citizen security**

15.     Ensure that the use of force is in strict compliance with the principles of exceptionality, legality, necessity, proportionality, nondiscrimination and accountability.

16.     Start, *ex officio* and without delay, a serious, impartial, and effective and open to public scrutiny investigation into facts related to the potentially excessive use of force.

17.     Immediately and decisively adopt measures to exclude the military, armed forces and armed civilian groups from performing citizen security functions.

**Poverty and ESCERs**

18.     Implement economic and fiscal policies with a human rights approach to combat poverty and extreme poverty, and to guarantee the ESCERs of the population, paying special attention to the most vulnerable populations and refraining from discriminatory practices.

19.     Take the necessary measures to ensure that boys, girls and adolescents have access to quality health services, which include the provision of medicines, especially considering the situation of boys, girls and adolescents suffering from chronic diseases.

20.     Refrain from any action or conduct that may limit the autonomy of universities, and study, review and amend any legislation or practice that undermines it.

**Women**

21.     Adopt the necessary measures to comply with the State's obligation of due diligence in the prevention, protection, investigation, punishment, and reparation of all forms of violence against women.

22.     Urgently adopt all necessary measures to ensure that a varied, accessible, and acceptable range of contraceptive and family planning methods are available, both for men and women, across the country.

23.     Review domestic legislation on the voluntary termination of pregnancy, so as to ensure the effective exercise of sexual and reproductive rights of girls, women and pregnant women of all ages.

**Persons deprived of liberty**

24.     Release all political prisoners and individuals who have been arbitrarily detained immediately.

25.     Adopt the penitentiary policies necessary to:

        i.     allow sufficient access to drinking water and food in adequate quantity, quality and conditions of cleanliness, as well as access to light and appropriate ventilation, and

VZ Termination_0200

 

ii.   Guarantee adequate medical care for women and LGBTI persons, with a gender sensitive approach.

26.   Ensure that detention conditions are compatible with human dignity and respect for human rights to guarantee the dignified treatment of persons in custody.

**Lesbian, gay, transsexual, bisexual, intersex (LGTBI) persons**

27.   Implement measures to prevent violence against LGBTI persons, including effective and independent procedures to report violations.

28.   Investigate and prosecute crimes against LGBTI persons with due diligence, especially when state agents, such as the police, may be responsible for the acts of violence.

**Migrants, asylum seekers, refugees, beneficiaries of complementary protection, internally displaced persons and victims of human trafficking**

29.   Annul all measures that hinder the right of all persons to leave Venezuelan territory.

30.   Guarantee the rights to legal personality and identity through the timely and unhindered issuance of identity documents (including passports, ID cards, civil registration records, as well as criminal background certificates).

**Human rights defenders**

31.   Cease all acts of harassment and criminalization against human rights defenders.

32.   Refrain from approving bills that may disproportionately restrict the right of association of civil society organizations.

**Indigenous peoples**

33.   Produce disaggregated information on the right to health of cross-border indigenous peoples and guarantee equitable and culturally appropriate access to quality health services through health care policies and programs that respect and value the traditional practices and ancestral health care knowledge of these communities.

34.   Implement all necessary measures to launch or strengthen the supervision and oversight mechanisms for relevant extractive, exploration, or development activities.

35.   Ensure that every security operation aimed at dismantling illegal mining practices complies with standards concerning the use of force.

**Afro-descendant persons**

36.   Design and publish statistical records with disaggregated data on the Afro-descendant population.

VZ Termination_0201





# REASONED VOTE OF COMMISSIONER CARLOS BERNAL PULIDO ON CHAPTER IV.B - VENEZUELA OF THE 2023 ANNUAL REPORT

With all due respect for my colleagues and in accordance with Article 19.1 of the Rules of Procedure of the Inter-American Commission on Human Rights ("the Commission" or "the IACHR"), I hereby submit a partial reasoned vote on certain points raised by the majority of the plenary of the Commission in Chapter IV.B-Venezuela ("the Chapter") of the 2023 Annual Report (the "Report" or the "Annual Report").   Although in this document I present my disagreements, I cannot fail to mention that I support the Commission's monitoring of the human rights situation in Venezuela.

Regarding the discrepancies, I will state in particular that Chapter IV-A on Venezuela: (i) contains considerations that pose a risk to pregnant women and ignore the integral needs of women; (ii) raises requirements not derived from the Convention, regarding so-called gender identity; (iii) openly ignores the views that the ACHR incorporated on marriage; (iv) requires more information and academic and scientific rigor regarding  gender affirmation therapies and hormone treatments; and (v) has significant gaps regarding the right of parents to choose the education of their children.

1. **Chapter IV-A contains considerations that pose a risk to pregnant women and ignore women's overall needs (*necesidades integrales de las mujeres*)**

Paragraph 118 of the Report mentions that: "Along the same lines, the persistent almost absolute **criminalization** of persons seeking to voluntarily terminate a pregnancy, allowing exceptions only in cases where the life of the pregnant person is at risk, together with the lack of medical protocols for the provision of abortion services and postabortion care, represented greater risks to the life and health of **persons capable of becoming pregnant (with gestational capacity)**." (Bold added)

The recommendations also included "**Reviewing domestic legislation on the voluntary interruption of pregnancy, so as to guarantee the effective exercise of the sexual and reproductive rights** of girls, women, and pregnant women of all ages." (Bold added).

As regard these assertions, I will address the following issues: (i) the non-existence of the right to abortion and the State's leeway with respect to the criminalization of abortion; (ii) the lack of protection for the unborn derived from the considerations of the report; and (iii) the inadequate curtailment of women's rights.

1.1. **The non-existence of the right to abortion and state leeway with respect to the criminalization of abortion**

I reiterate that there are no binding sources in international law -and especially in the American Convention or other treaties that make up the inter-American system- that contemplate (i) the so-called right to abortion or (ii) alleged duties related to the decriminalization of abortion. Under this framework, states have a wide margin of configuration - by virtue of the principles of subsidiarity or complementarity and representative democracy - to take measures to protect prenatal life - which is indeed protected by the American Convention[255]- including, although it is not the only means, the use of criminal law.

Regarding the non-existence of the right to abortion, former I/A Court H.R. Judge Eduardo Vio Grossi (R.I.P.), established in his partially dissenting opinion in the judgment in the case of Manuela et al. v.  El Salvador that:

---

[255] ACHR. Article 4




"In this regard, it is indisputable that (...) **there is no inter-American or international legal norm** , whether conventional, international custom, or general principle of law, **that recognizes abortion as a right** There are only resolutions of international bodies, most of which are made up of international officials and not representatives of States, decisions which, in addition to not being binding, are not interpretative of current international law but rather reflect aspirations for it to change in the direction they suggest."[256] (Bold added)

I emphasize that this leeway derived from the non-existence of a right to abortion and the convergence of competing rights is increased thanks to the fact that it is incumbent upon States to define punishable conducts and their consequences, and to the automatic referral that, according to the IACHR Court, Article 7.2 of the American Convention makes to domestic law in matters related to deprivation of liberty -legal exception principle (*principio de reserva de ley*).[257]

In addition, I also emphasize that the sections in which such assessments are formulated do not sufficiently support derivation of the indisputable existence, in the Inter-American System, of a clear and binding parameter that could serve as a basis for assessing abortion criminalization as negative. The conventional parameter that does exist and that is mandatory is Article 4 of the ACHR which, as I have said on other occasions, contemplates protection of the right to life from conception and demands the existence of regulatory frameworks that do not leave a fetus totally unprotected.

This is relevant if one bears in mind that, from a systematic reading of Articles 31, 76, and 77 of the American Convention, it is only through consensus -which the States express by signing and ratifying amendments or treaties- that international obligations can arise for all States, different from those already contemplated in the ACHR.

In this sense, I conclude that, in the absence of a right to abortion in the IHRS and the absence of clear rules regarding criminalization models, States have considerable leeway in this regard. I emphasize that the challenges of the States and the concerns of the Commission should reflect a more comprehensive approach that allows for the protection of the unborn child and the pregnant woman. In this sense, these discussions should lead to the revision of policies on sexual and reproductive education; support and protection for pregnant women; security, and health.

### 1.2.    Lack of protection for the unborn derived from the report's considerations

I emphasize that the references to abortion in the Report on Venezuela ignore the other person whose right to life is also conventionally protected: the unborn person and ignore the necessary balancing that must exist between these competing rights (*derechos en tensión*). In this regard, it should be noted that pregnant women are also subjects of law and holders of the right to life.

A pronouncement on abortion always implies a position on a practice that necessarily implies the termination of the life of a dignified human being and that Article 4 of the ACHR protects, so it is necessary to expressly recognize the rights of the unborn person as part of the weighing up of considerations required in any case of abortion.

In this regard, I emphasize that Article 1.2 of the ACHR clearly establishes that, for the purposes of the Convention, a "person" is every human being.[258] Thus, in light of the Convention, human rights are not only recognized for persons who have already been born, but must be protected for all individuals from conception, who are to be considered human beings.  Moreover, the I/A Court H.R. itself, in its advisory opinion 22,

---

[256] Partially Dissenting Opinion of Judge Eduardo Vio Grossi, Inter-American Court of Human Rights, Case of Manuela et al. v. El Salvador, Judgement of November 2, 2021, (Preliminary Objections, Merits, Reparations, and Costs). Paragraph 13

[257] I/A Court H.R. Case of Romero Feris v. Argentina. Merits, Reparations, and Costs. Judgment of October 15, 2019. Series C No. 391. Par. 77.

[258] ACHR. Article 1.2 "For the purposes of this Convention, person means every human being."





indicated that, without being a matter open to interpretation, the term "person" is equivalent to the term "human being."[259]

In view of this, it is clear that the unborn person (*persona en gestación*) is a human being.[260] Furthermore, the Universal Declaration on the Human Genome and Human Rights states that "the human genome underlies the fundamental unity of all members of the human family, as well as the recognition of their inherent dignity and diversity. In a symbolic sense, it is the heritage of humanity."[261]

The consequence of recognizing the unborn as a person as a human being is that he/she becomes a holder of rights. Thus, the ACHR establishes in the articles that develop rights the formula "Everyone (...)"[262]. Likewise, the instruments for the protection of human rights generally recognize the ownership of rights by members of the human species, especially the right to life.[263]

Furthermore, in the Artaviara Murillo judgment, the I/A Court H.R. determined that "the protection of the right to life is not absolute, but gradual and incremental as the development of the fetus progresses" Which implies that without prejudice to the concepts of gradualness and incrementality (with which I take issue), the Court has already established that persons in gestation must be protected by the State in their "right to life." In the same vein, in the Cuscul Pivaral case,[264] the I/A Court H.R. applied the ACHR to a fetus (persona en gestación) and also applied Article 19 of the ACHR, thus recognizing the legal status of the fetus as a child.

In the same vein, I emphasize that the preamble of the Convention on the Rights of the Child states that the child needs protection and care both before and after birth. This implies that in light of the Convention on the Rights of the Child (CRC), the unborn child is a child in need of special care. This was reiterated in the preparatory work for the International Covenant on Civil and Political Rights[265]

In conclusion, this Chapter completely ignores the rights of the unborn, especially their right to life, recognized not only in the IHRS but also in multiple instruments of international law.

### 1.3.    Inadequate curtailment of women's rights

I call attention to the importance of not limiting so-called sexual and reproductive rights to access to abortion. This is not only because there is no law that establishes abortion as a guarantee of those rights, but also because this vision simplifies and detracts attention from the problems faced by women in the region and, in so doing, discourages debates that promote the formulation of comprehensive and integral proposals to address the structural problems faced by women in the region.

In addition, I call attention to the fact that the report refers to "persons capable of becoming pregnant" (with

---

[259] I/A Court H.R. OC-22/16. Ownership of rights of legal persons in the Inter-American Human Rights System. Advisory Opinion of February 26, 2016. Series A. No. 22, Par. 48.
[260] Kaluger, G., and Kaluger, M., Human Development: The Span of Life, The C.V. Mosby Co., St. Louis, 1974, pp. 28-29.
[261] Universal Declaration on the Human Genome and Human Rights. Article 1.
[262] American Convention on Human Rights, Articles 4, 5, 7, 8, 10, 11, 12, 13, 14, 16, 18, 20, 21, 22, 24, and 25.
[263] International Covenant on Civil and Political Rights. Preamble, par. 3; American Convention on Human Rights, par. 3. Preamble; African Charter on Human and Peoples' Rights: Preamble, par. 6; on the Geneva Declaration Rapporteur on the Rights of Children. Preamble, par. 1; American Declaration of the Rights and Duties of Man. Article 1; Universal Declaration of Human Rights. Preamble, par. 1; Declaration of the Rights of the Child. Preamble, par. 2 European Convention on Human Rights. Preamble, par. 2
[264] I/A Court H.R. Case of Cuscul Pivaral v. Guatemala. Judgment of August 23, 2018. "That said, the Court has indicated that extreme poverty and the lack of adequate medical care for women during pregnancy and postpartum are causes of high maternal mortality and morbidity. Therefore, States must implement appropriate health policies that allow it to provide assistance with suitably qualified personnel during births; policies to prevent maternal mortality by providing adequate prenatal and postpartum controls, and legal and administrative instruments relating to health policies that record cases of maternal mortality adequately. Thus, the Court has recognized that, by virtue of article 19, the State must assume its special position of guarantor with greater care and responsibility and take special measures focused on the principle of the best interest of the child."
[265] "The main reason for providing in paragraph 4 [now Article 6(5)] of the original text that the death penalty should not be applied to pregnant women was to save the innocent life of the unborn child." United Nations. General Assembly Report of the Third Committee on the Draft International Covenants on Human Rights. A/3764. P. 40.

VZ Termination_0204

 

gestational capacity), thereby defining a whole category of human beings solely by their reproductive function, generating an even more reductionist vision drawing attention away from women's rights.

On this point, I would like to take advantage of this explanation of my vote to make an appeal not only to my other colleagues on the Commission, but also to different international bodies: we cannot fall into reductionist narratives that, under the protection of women's rights -a completely legitimate and necessary purpose- end up, in fact, affecting those rights.

In this regard, I find it very troubling that the Commission focuses its efforts on scrutinizing the regulation **of States in the area of abortion**, where they have leeway and must necessarily be consistent with the protection of the right to life of the unborn child, and omits, for example, the barriers faced by women in the exercise of their maternity -conditions that in practice may be affecting their ability to make free decisions-.

### 2.    Absence of basic requirements for recognition of the adequacy of gender identity documents.

Paragraph 142 states that "trans persons are often assigned to facilities according to the sex marked on their identity documents, rather than their gender identity."

In this regard, **on the one hand**, the American Convention does not expressly contemplate a right to gender identity, nor is there a binding instrument in the inter-American system that establishes an obligation to adapt identification documents to gender identity.

As I have indicated, recognizing new rights that are not in the Convention through an interpretation that does not follow the procedures established in the Convention itself would undermine Articles 31, 76, and 77, ignoring the original will of the States that ratified the Convention.

Therefore, any pronouncement in which any of the organs of the IHRS applies a right that is not established in the binding instruments of international law that govern its activity will be an act violating the literal meaning of the American Convention and will exceed the scope of the competencies of the IACHR or the I/A Court H.R., as the case may be. Such an irregular constitutive act would also undermine the principles of good faith and *pacta sunt servanda*.[266]

**On the other hand**, although I am not unaware that OC-24/17 asserted the existence of the so-called "right to gender identity" and of the obligation to adapt identification documents to gender identity in the terms indicated in this Chapter, I emphasize that the Advisory Opinions of the I/A Court H.R. are not binding in international law nor do they have the capacity to contemplate rights or obligations other than those expressly contemplated by the American Convention.[267]

I point this out, first, because Article 68 of the Convention is clear in stating that the States are obliged to comply with the decisions rendered by the Court, "in any case in which they are parties." **[TRANSLATOR: correct Spanish "*hayan sean*"]** This provision is of great relevance in that (i) it is the only one that refers to the legal value of the Tribunal's pronouncements and (ii) it limits the binding nature of its decisions expressly for the States party to a case, thus limiting the addressee of the obligations -the State party to a case- and the context in which the pronouncement is issued -that is, the litigation-. This position has also been supported by some doctrinal sectors (*sectores de la doctrina*) also based on the principle of State consent as the basis of conventional law.[268]

---

[266] Vienna Convention on the Law of Treaties. Article 26.

[267] I/A Court H.R. Gender identity, and equality and non-discrimination of same-sex couples. State obligations in relation to name change, gender identity, and rights derived from a same-sex relationship (interpretation and scope of Articles 1(1), 3, 7, 11(2), 13, 17, 18, and 24, in relation to Article 1 of the American Convention on Human Rights). Advisory Opinion OC-24/17, November 24, 2017. Series A, No. 24.

[268] Systematization of the criticisms in: González Domínguez, p. (2017). The doctrine of conventionality control in light of the principle of subsidiarity. Constitutional Studies 15(1), 55-98.



Second, there is no provision establishing an extent to which the Tribunal's interpretations in the framework of the Advisory Opinions are binding. This is reinforced when Article 64 of the ACHR limits the competence of the Court to issue advisory opinions regarding the Convention or treaties of the inter-American system. Thus, if a pronouncement derived from an AO is not binding in itself, much less could it be one that addresses so-called rights or obligations not contemplated in the Convention or interpretations that are also contrary to its text.

Third, to derive obligations or so-called rights not contemplated in the Convention, based exclusively on an advisory opinion, would be, as I have already said, contrary to the principle of *pacta sunt servanda* that governs international treaty law, by virtue of which States are only bound to comply with that to which they have expressed their consent.[269]

Fourth, although the I/A Court H.R. has affirmed that advisory opinions are parameters of conventionality control,[270] I emphasize that an open and transparent inter-American dialogue is still necessary to further discuss this position, which is not expressly derived from the American Convention. I call attention to the fact that there is still no consensus on the matter, neither in the States of the region nor in academic circles; thus, important constitutional courts still refrain from invoking the notion of conventionality control and from incorporating advisory opinions as a parameter.[271]

Likewise, I note that some authors have indicated that the extension of the effects of advisory opinions could contribute to a disruption of the functions of the inter-American system and, thus, weaken it, since (i) it results in equating the decisions issued in the advisory function of the Court with the text of the convention itself,[272] and (ii) it blurs the differences between the jurisdictional and advisory functions of the Court. Some have even indicated that these interpretations by the Court generate legal uncertainty, since there is no certainty as to the impacts associated with the issuance of advisory opinions.[273]

In light of the above, given that there is no conventional right to gender identity that is binding on States, it is possible to affirm that there are no correlative obligations to recognize this right either. Hence, the non-existence of conventional law leads to one conclusion: it is not possible to require States to ensure that identity documents match gender identity.

Furthermore, I reiterate that international human rights law should not erase the biological sexes, and therefore should not erase categories with special inter-American protection, such as women. Therefore, I insist that the criterion of self-perception or self-determination of gender identity requires further debate, and that it is associated with a risk of disproportionate impacts to the detriment of persons with special protection in the inter-American system.

In this sense, it is important that the protection of women (in terms of their biological sex) also be promoted, since, as has been demonstrated in several comparative experiences, women may also run risks to their life and integrity if they do not have separate facilities for them in prisons: a rule reiterated by international human rights law. Thus, Article 5.5 of the American Convention establishes the principle of separation of places of detention for men and women and the Court has considered, based on the Convention and the pronouncements of other human rights bodies, "that all women deprived of their liberty should be housed physically separate

---

[269] Vienna Convention on the Law of Treaties. Article 26.

[270] I/A Court H.R. Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection, Advisory Opinion OC-21/14 of August 19, 2014. Series A No. par. 41. 31.

[271] Ramírez, F. G. (2023). A critical look at the conventionality control Journal of Law and Social Sciences, (28), 101-142; Palacios, D. L. (2017). Inter-American conventionality control at the national level: a notion still under construction. Revista Direito e Práxis, 8, 1389-1418.

[272] Colombo, I. (2022). A critical analysis of the doctrine of conventionality control. Omnia. Law and Society, 5 (1), pp. 83-116.

[273] Colombo, I. (2022). A critical analysis of the doctrine of conventionality control. Omnia. Law and Society, 5 (1), pp. 83-116.

VZ Termination_0206



from men and, in addition, in less restrictive and less secure wards or sections that take into account the low level of risk they represent and with sufficient space in which to meet their specific needs."[274]

### 3. Same-sex couples: disregard for the ACHR's views on marriage

Paragraph 143 of the report states that "with respect to conjugal visits, despite the right of detainees to receive these visits, the LGBTI population encounters obstacles to exercising this right due to the absence of regulations that protect their relationships, **such as the recognition of equal marriage**" (Bold added).

In this regard, I reiterate that there is no conventional provision that obliges States to recognize same-sex marriages. As I have mentioned on several occasions, the treaties that are part of the inter-American human rights system and grant jurisdiction to the Inter-American Commission to address contentious cases do not contemplate any obligation with respect to the recognition of marriage between same-sex couples. This lack of obligation derives from the literal wording of the American Convention, which clearly establishes that marriage is a right reserved for "men and women":

> Section 2) provides, "**The right of men and women of** marriageable age to marry and to raise a family shall be recognized, if they meet the conditions required by domestic laws, insofar as such conditions do not affect the principle of nondiscrimination established in this Convention."[275]  (Bold added).

Therefore, in accordance with the hermeneutic principle that calls for a literal and good faith interpretation,[276] the State is only obliged to recognize the right to marriage for the couples specifically mentioned in Article 17(2) of the American Convention.

It is essential to underline that, according to the jurisprudence of the International Court of Justice, the good faith interpretation of a treaty should not result in changes to the literal wording of the treaties or in inferring what is not expressly contained in the text. This approach implies that the interpreter must assume that the parties intended what is apparent from the ordinary meaning of the terms used in the international agreement.[277] The text-centric approach to treaty interpretation is not only accepted in the field of international law, but is also highly recommended, as it is based on the only empirically verifiable evidence of state intentions: the text of the treaty itself.[278]

Following these rules of interpretation, the European Court of Human Rights has considered the conception of marriage as that concluded between a man and a woman - as established in the European Convention on Human Rights, in a provision similar to that of the ACHR-.[279] In this sense, the European Court supports the idea that there is no binding obligation for States to recognize marriage between same-sex couples, which leaves a wide margin for States to regulate on this matter.[280] Likewise, in the words of the European Court of Human Rights:

> "The Court reiterates that, according to Article 14 in conjunction with Article 8, States are free to restrict marriage only to opposite-sex couples and have some leeway ("a certain margin of

[274]I/A Court H.R. Advisory Opinion OC-29 of 2022; Bangkok Rules, supra, Rules 12 and 41.d., and Report of the United Nations Special Rapporteur on Violence against Women, Rashida Manjoo, Pathways to, conditions and consequences of incarceration for women, A/68/340, supra, par.  85.

[275] American Convention on Human Rights, Article 17.1.

[276] Vienna Convention on the Law of Treaties. Article 31.

[277] International Court of Justice. Case concerning rights of nationals of the United States of America in Morocco. France v. United States of America. ICJ Reports 1952, pp. 196-199. International Court of Justice. Interpretation of peace treaties with Bulgaria, Hungary, and Romania (Second Phase). ICJ Reports 1950, pp.229 -230.

[278] International Court of Justice. Question of the Delimitation of the Continental Shelf between Nicaragua and Colombia beyond 200 Nautical Miles from the Nicaraguan Coast (Nicaragua v. Colombia), Preliminary Objections, Judgment, I.C.J. Reports 2016, pp.116-123, paras. 34-38, 46. Although the International Court of Justice did not rely exclusively on the literal criterion of interpretation, this was one of the first criteria taken into account by the Court to reject the interpretation of the Colombian party.

[279] European Convention on Human Rights. Article 12. "Men and women of marriageable age have the right to marry and to found a family, according to the national laws governing the exercise of this right."

[280]ECHR. Oliari et al. v. Italy. July 21, 2015, Par. 193.

VZ Termination_0207





configuration") to decide the exact nature of the legal status granted by other means of legal recognition."[281]

On this point, it is worth noting that this same approach is supported by the European Court in the cases Orlandi v. *Italy*[282] and *Fedotova et al. v.* Russia.[283] Indeed, in both cases, the European Court held that, although States must provide mechanisms for the protection of same-sex unions, this protection does not necessarily derive from the recognition of same-sex marriages.

Within this framework, I fully agree that the leeway available to the States in this regard concerns both the form of recognition and the content of the protection to be granted to same-sex couples, **which cannot be translated into an absolute absence of protection**.

### 4.  The need for more information and academic and scientific rigor regarding gender affirming therapies and hormonal treatments

Paragraph 143 mentioned that "Challenges in accessing respectful health services for LGBTI people **are evidenced in the obstacles to obtaining hormone treatments**" (Bold added).

In this regard, I reiterate that there is a need for the Commission to deepen these discussions with scientific arguments in order to address them comprehensively. In particular, there are studies that indicate the harm that may result from having undergone hormone treatments in adolescence.[284]

In addition, in the case of children and young people, it is essential that their capacity to consent to hormone treatments be taken into account and assessed. Indeed, it is necessary to have an in-depth discussion on the negative effects linked to these treatments and to align this information with the statements made by the Commission.

Indeed, scholars argue that there are long-term studies that show - in individuals who have undergone gender affirming or hormonal treatments - an increase in morbidity and mortality and a risk of suicide after transition.[285]

These elements cannot be ignored by the Commission; especially when this body has the mandate to promote and defend human rights in the region, including the right to health.

### 5.  Gaps regarding parents' rights to choose their children's education

Paragraph 118 mentions "In addition to the above, challenges remained in the implementation of comprehensive sexual education and gender equality programs in schools, which is linked to the high dropout rates of girls and adolescents due to pregnancies."

---

[281] ECHR. Chapin and Charpentier vs. France. September 9, 2016. Par. 48.

[282] ECHR. Orlandi v Italy. "The Court reiterates that States are still free, under Article 12 of the Convention as well as under Article 14 taken in conjunction with Article 8, to restrict access to marriage to different sex. The same holds for Article 14 taken in conjunction with Article 12 (see *Oliari and Others* cited above, § 193)." (Spanish text: El Tribunal reitera que **los Estados siguen siendo libres**, de acuerdo con el Artículo 12 de la Convención, así como con el Artículo 14 en conjunción con el Artículo 8, **de restringir el acceso al matrimonio a parejas de distinto sexo**. Lo mismo se aplica al Artículo 14 en conjunción con el Artículo 12.) Par. 192.

[283] In this case, the Court analyzed -only- the possible violation of Article 8 of the ECHR, which refers to the right of individuals not to be subjected to arbitrary interference by the State in their private life. In the case of same-sex couples, the Court established that the lack of a legal framework allowing same-sex couples to have their relationship recognized and protected under national law may generate significant obstacles in the daily lives of these couples. Without prejudice to the foregoing, it established that the State may enjoy some leeway to determine the way in which same-sex unions are registered, which implies that this registration need not necessarily involve the notion of marriage.

[284] 'Trust the Experts' Is Not Enough: U.S. Medical Groups Get the Science Wrong on Pediatric 'Gender Affirming' Care. https://media4.manhattan-institute.org/sites/default/files/how-to-respond-to-medical-authorities_claiming_gender_affirming_care_safe.pdf.

[285] Levine, S.B., Abbruzzese, E. Current Concerns About Gender-Affirming Therapy in Adolescents. *Curr Sex Health Rep* **15**, 113-123 (2023). https://doi-org.ez.unisabana.edu.co/10.1007/s11930-023-00358-x.

VZ Termination_0208





In this regard, I draw attention to the wording of Article 12.4 of the ACHR, which states that "**[p]arents and, where appropriate, guardians, have** the right to ensure that their children or wards **receive a** religious and **moral  education** in accordance with their own convictions." (Bold added)

Within this framework, the content of Article 12.4, which guarantees parents the right to ensure that their children receive a moral education in accordance with their convictions, cannot be overlooked. Thus, parental disagreement with certain content should not be seen as a threat in itself, in as much as it represents a materialization not only of Article 12 of the Convention, but also, for example, of the right to freedom of expression: fundamental element of any democratic system.

According to the ECHR, the right of parents to choose their children's education, including sex education, is an aspect of the right to respect for private and family life protected by the ECHR.[286] Therefore, sex education, like any other type of education, must be framed within the scope of protection of conventional law, recognized by international human rights law, which grants parents the right to choose the religious and moral education of their children, in accordance with Article 12.4 of the Convention.

---

[286] ECHR, Kjeldsen, Busk Madsen and Pedersen, par. 53; Dojan et al, cited above, paras. 78-83.

VZ Termination_0209

THE SECRETARY OF STATE
WASHINGTON

September 24, 2024

The Honorable
Alejandro N. Mayorkas
Secretary of the Department of Homeland Security
Washington, DC  20528

Dear Secretary Mayorkas:

The Department of State assesses that extraordinary and temporary conditions currently exist in Venezuela that prevent Venezuelan nationals, or noncitizens having no nationality who last habitually resided in Venezuela, from returning in safety.  Therefore, the Department of State supports the extension and redesignation of Temporary Protected Status (TPS) for 18 months based on extraordinary and temporary conditions.

A complex political, humanitarian, and economic crisis, as well as activities of non-state armed groups, repression, and crumbling infrastructure, mean Venezuelans still cannot return to their country in safety.  Many individuals in Venezuela face the possibility of physical abuse, unlawful killings, disappearances, human trafficking, unjust detentions, and politically motivated reprisals.  High rates of gender-based violence threaten the safe return of women and LGBTQI+ individuals.  The UNHRC's independent fact-finding mission determined the Maduro authorities have dramatically intensified efforts to crush all peaceful opposition, creating one of the most acute human rights crises in recent history.

NGOs report repression by Maduro and his representatives in the pre and post July 28-electoral context, negatively impacting political participation and the freedoms of expression and association.  Venezuela suffers from ongoing endemic violence perpetrated by organized criminal groups throughout the country, including narcotrafficking and terrorist groups that repress, sometimes violently, populations in areas under their control.

Some 7.7 million people, roughly 26 percent of the country's total population, require humanitarian assistance. Persistent operational constraints inside Venezuela imposed by Maduro's representatives include harassment and open hostility toward NGO workers and obstruction of relief efforts, hindering humanitarian actors' ability to provide aid to the most vulnerable populations. In addition, Venezuela's economy remains in shambles following years of mismanagement, corruption, and hyperinflation. Large numbers of Venezuelans lack access to adequate, affordable, and nutritious food and lifesaving health services.

Redesignation would demonstrate solidarity with the Venezuelan people and the many Western Hemisphere countries that generously host Venezuelan refugees and migrants. Given TPS is only available to applicants already present in the United States, State views redesignation as complementary to the expansion of lawful pathways for Venezuelans, including the Venezuelan humanitarian parole program and increased refugee resettlement through the U.S. Refugee Admissions Program.

Such actions send an important signal to other countries the United States has urged to grant temporary protection or other forms of legal status. The United States continues to coordinate with states hosting large Venezuelan displaced populations, including Brazil, Chile, Colombia, Ecuador, and Peru, to support access to international protection and legal status in order to foster the socio-economic integration of Venezuelan migrants and refugees.

Based on the aforementioned factors, I recommend you extend and redesignate TPS for Venezuela for 18 months beyond the current expiration date on the basis of extraordinary and temporary conditions.

Sincerely,

Antony Blinken

Antony J. Blinken

SENSITIVE BUT UNCLASSIFIED

## (U) Department of State Recommendation Regarding
## Temporary Protected Status (TPS) for Venezuela -- (September 2024)

**I. Statutory Basis for Designation**

**(U) Have the conditions under which the foreign state was designated for TPS ceased to exist?**

(U) No.  The conditions under which Venezuela was designated for TPS continue to exist.

**A. Armed conflict**

**1. (U) Is the foreign state still involved in an ongoing, internal, armed conflict?**

(U) N/A.

**2. (U) If so, would the return of nationals of the foreign state to that state (or to the part of the state) still pose a serious threat to their personal safety?**

(U) N/A.

**B. Environmental Disaster**

**1. (U) Does there continue to be a substantial, but temporary, disruption of living conditions in the foreign state affected by an earthquake, flood, drought, epidemic, or other environmental disaster?**

(U) N/A.

**2. (U) Is the foreign state still unable, temporarily, to handle adequately the return to the state of nationals of the state?**

(U) N/A.

**3. (U) Does the foreign state continue to support the TPS designation for its nationals in the United States?**

(U) N/A.

**C. Extraordinary and Temporary Conditions**

**1. (U) Has the foreign state continued to experience extraordinary and temporary conditions that prevent nationals of the state from returning to the state in safety?**

(SBU) Yes.  The complex emergency induced and perpetuated by Nicolás Maduro and his representatives has forced more than seven million Venezuelans to flee their country.  In 2023, more than 300,000 Venezuelans crossed the Darién, double the crossings recorded in 2022.  In 2024, as of mid-August, more than 150,000 have crossed.  The political, humanitarian, and economic crises, complicated by the presence of non-state armed groups, unjustified arrests of members of the opposition, repression by Maduro's security services, food insecurity, and crumbling infrastructure mean Venezuelans still cannot return to their country in safety.  The U.S. Chief of Mission issued a re-declaration of humanitarian need based on the complex emergency in Venezuela for Fiscal Year 2024.  Many individuals in Venezuela, particularly human rights defenders, journalists, students, members of various democratically aligned political parties, internally displaced persons, and members of marginalized ethnic groups are at risk of abuses, such as torture, unlawful killings, disappearances, human trafficking, unjust detentions, and politically motivated reprisals.

(U) On July 28, more than 12 million Venezuelans voted in a historic presidential election.  On July 29, the Maduro-controlled National Electoral Council (CNE) declared Maduro the winner by a narrow margin without publishing precinct-level official tally sheets (*actas*) or presenting other evidence to substantiate its claim.  On August 13, the UN Panel of Experts

published an interim report that reviewed publicly available vote tallies collected and posted online by opposition political parties, found them genuine, and called for the release of tabulated results.  The Department agreed with the findings from independent assessments of the Carter Center and the UN Panel of Experts that this election lacked transparency and integrity and failed to meet basic democratic standards.  The democratic opposition published precinct-level results which verified that opposition unity candidate Edmundo González Urrutia received 67 percent (7.2 million votes) to Maduro's 30 percent (3.2 million votes).  Secretary Blinken publicly affirmed González received the most votes.  On August 22, the Maduro-controlled Supreme Court (TSJ) certified the CNE'S claim Maduro won but failed to cite evidence.  The TSJ's findings lacked all credibility, given the overwhelming evidence that González received the most votes.  As discussed in further detail below, the efforts of Maduro's representatives to undermine the election have involved violence, repression, and human rights abuses throughout the country.

**(U) Violence:**  Citizens of Venezuela continued to experience ongoing violence perpetrated by organized non-state armed groups.  According to InsightCrime, homicides increased by 3.2 percent in 2023 over 2022 figures, accumulating to a total of 6,973 violent deaths. This is the second highest homicide rate in South America.  In 2023, the highest numbers of murders were recorded in the states of Miranda with 279 victims, the Capital District with 223, and Zulia with 205 deaths.

(U) Episodes of localized violence are frequent, unpredictable, and are not adequately prevented or addressed.  Parts of the country experience violence from armed groups because of a deterioration of the rule of law and the participation of non-state armed groups in illicit economic activities.

(U) Terrorist groups largely based in Colombia, including the Revolutionary Armed Forces of Colombia – People's Army (FARC-EP), Segunda Marquetalia, and the National Liberation Army (ELN) operate unimpeded in Venezuela.  The ELN continues to expand its presence beyond its historic base in the border zone with Colombia and consolidate its control over

individuals in the areas it already dominates.  These narcotrafficking and terrorist groups repress, sometimes violently, populations in areas that fall under their control.  These groups engage in sex trafficking and forced labor while operating with impunity.  In other areas, Venezuelan security forces confront narcotrafficking and terrorist groups, creating more violence and instability.

(U) The criminal influence of Venezuelan transnational-gang Tren de Aragua (TdA) continues to threaten the security of Venezuelans.  TdA exploits Venezuela's migrant crisis by targeting Venezuelans in country and Venezuelan migrant communities in the Western Hemisphere for extortion, human trafficking, and migrant smuggling.

**(U) Human Rights Abuses:**  NGOs and international organizations continue to report severe human rights abuses committed by Maduro's representatives, their associates, and Maduro-aligned armed groups. According to credible NGO reports, security forces regularly engage in physical abuse, unlawful killings, disappearances, unjust detentions, and politically motivated reprisals.  The UN Human Rights Council's Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela (FFM) found in its September 2024 report, "During the period covered by the present report and, in particular, after the presidential election of 28 July 2024, the State reactivated and intensified the harshest and most violent mechanisms of its repressive apparatus. As part of that repression, the authorities carried out, in a conscious and deliberate manner, actions aimed at dismantling and demobilizing organized political opposition, inhibiting the dissemination of independent information and opinions critical of the Government and preventing peaceful citizen protests. The brutality of the repression continues to generate a widespread climate of fear among the population."  ""We are witnessing an intensification of the State's repressive machinery in response to what it perceives as critical views, opposition or dissent," said Marta Valiñas, chair of the Fact-Finding Mission. "Additionally, in November 2021, the Prosecutor of the International Criminal Court opened an investigation into the situation in Venezuela after concluding there was a "reasonable basis to believe that

crimes against humanity," particularly in the context of detention were committed.  According to the NGO *Foro Penal*, there were 1,780 political prisoners in custody as of August 26.

(U) Targets of violence include opposition politicians, journalists, students, unionists, civil society activists, and anyone perceived to be at odds with Maduro and his representatives.  It is common for journalists to be beaten or threatened particularly during pre-electoral or political conflict periods.  High rates of gender-based violence threaten women and LGBTQI+ individuals.  NGOs reported repression by Maduro's representatives leading up to and following the July 28 presidential election negatively impacting political participation and freedoms of expression and association.  On July 31, the FFM warned that "We are witnessing the accelerated reactivation of the repressive machinery that was never dismantled and is now being used to undermine the public freedoms of citizens and their right to political participation and free expression of ideas."  In condemning this repression, the FFM said "the vast majority of those detained were simply individuals who voiced their rejection of the presidential election results announced by the authorities."

(U) Human trafficking remains a serious concern.  Traffickers often subject Venezuelans, including those fleeing the country, to forms of exploitation, including sex trafficking and forced labor.  Traffickers allegedly recruit Venezuelan migrants and refugees, particularly women and girls, into trafficking networks using false promises of safe migration.  Venezuelan trafficking victims have been identified in 24 countries over the last five years.  Non-state armed groups that operate in the country with impunity subject Venezuelans to forced labor and forced criminality and forcibly recruit and use child soldiers in combat.  These groups lure vulnerable children in dire economic circumstances with gifts and promises of basic sustenance for themselves and their families to later recruit them into their ranks.  Sex and labor trafficking victims from South America, Caribbean, Asian, and African countries have also been identified in Venezuela.

SENSITIVE BUT UNCLASSIFIED
-6-

**(U) Post-Election Violence:**  Following the July 28 presidential election, the democratic opposition called for nationwide demonstrations in which large numbers of protesters peacefully supported González's victory.  Maduro representatives responded with political repression of opposition members and journalists and violence against demonstrators by Maduro-backed security forces and non-state armed groups.  Maduro called for the arrest of opposition leader María Corina Machado and presidential candidate González, and Maduro's attorney general opened a criminal investigation against both.  Regime-led repression continues with 1,780 total detentions and 24 deaths reported from July 28 to the end of August, according to reputable Venezuelan NGO *Foro Penal*.

**(SBU) Extrajudicial and Unlawful Killings:**  The NGO Monitor of the Use of Lethal Force (MUFLVEN) recorded 361 deaths involving security forces from January 1 to August 22, including 292 killings committed by police.  MUFLVEN reported the Bolivarian National Police (PNB) was involved in the largest percentage of cases, closely followed by the Scientific, Penal, and Criminal Investigative Corps (CICPC), the armed forces, and regional and local police.  *Provea* reported a total of 25 deaths in the days after the July 28 presidential election to mid-September.  *Provea* said they recorded many of the 25 deaths as extrajudicial killings, identifying a lack of pre-existing judicial order and state security forces as perpetrators in these cases.

**(U) Criminal Armed Groups:**  Maduro's representatives condone or support criminal non-state armed groups throughout the country, including in areas in which they do not have territorial control.  Their tolerance of these groups leads to high levels of physical insecurity, human trafficking, and environmental degradation, with outsized impacts on members of vulnerable populations such as women, children, and Indigenous persons.

**(SBU) Underlying Economic Crisis:**  Venezuela's economy remains in shambles following years of mismanagement and corruption, a hollowing out of the private sector, and hyperinflation from 2018 through 2021.  With more than 80 percent of Venezuelans living in poverty according to two 2023 U.S. government surveys (SURVEY-23 and ENCOVI), the poverty rate is

still among the highest in the region.  According to the IMF, Venezuela's GDP declined from $373 billion in 2012 to $102 billion in 2024, a 73 percent decrease from its 2012 peak.  While the regime has had relative success in lowering and stabilizing inflation since January 2024 to the lowest rates in nearly 10 years, economic growth is stifled through Maduro's anti-inflationary policies.  Many families have not seen the benefits of lower inflation as the food basket for a family of four averages $550 per month, while the average minimum salary in the private sector is $250 and only $130 in the public sector.  Meanwhile, about 48 percent of the Venezuelan population is self-employed and works in the informal economy.

(SBU) Oil revenues remain Maduro's largest source of income, and according to estimates revenues have fallen more than 90 percent from their 2012 highs of $94 billion in oil export revenue.  U.S. sanctions relief on Venezuela's oil and gas industry beginning in October 2023 provided some additional revenues but General License 44, which authorized transactions, expired in April and reduced revenue estimates for 2024 to around $9 billion according to analysts.  Since January, Maduro has used about $3 billion in oil revenues to stabilize the bolivar's exchange rate and moderate cost and price increases in local currency.  Declines in oil revenues have also dropped the Venezuelan Central Bank's accessible reserves by 89 percent since 2013 and reserves now hover just below $3 billion with no indication of major increases for 2024.  Venezuela has one of the highest levels of government debt as a percentage of GDP of any country in the world.  The IMF estimated in April the country's external debt is $152 billion, equivalent to 158 percent of GDP.

**(U) Deteriorating Humanitarian Situation:**  Because of the economic collapse and political crisis, in 2019, the UN and humanitarian organizations launched and have been implementing a Venezuela Humanitarian Response Plan and established a humanitarian cluster system in Venezuela.  According to the UN, some 7.7 million people in Venezuela (approximately 26 percent of a total population of 28 million) require humanitarian assistance.

(U) Persistent operational constraints inside Venezuela imposed by Maduro's representatives, including harassment and open hostility toward NGO workers, obstruct international community relief efforts and the acquisition of up-to-date and accurate data on humanitarian needs, impeding humanitarian actors' ability to reach the most vulnerable populations.  Maduro has created a constrained humanitarian space, leading to the freezing of NGO registration, obstruction of import permits, and refusal to grant visas for humanitarian workers.  State and USAID implementing partners report ad hoc harassment by Maduro and his supporters which hinders humanitarian efforts in Venezuela.  These growing political and economic crises exacerbate the dire conditions faced by the estimated 7.7 million people who require humanitarian assistance.

**(U) Food Insecurity and Malnutrition**:  Access to adequate, affordable, and nutritious food continues to be a challenge for vulnerable Venezuelans due to continued high inflation, low wages, and limited purchasing power. Venezuela's primarily urban and peri-urban population relies heavily on food imports, making it especially vulnerable to supply and price shocks. Imported food items remain available in supermarkets but are priced in dollars and unaffordable for most Venezuelans.  World Food Programme's (WFP's) Humanitarian Response Plan (HRP) from mid-2024 seeks to support 5.2 million people of 7.7 million in need of humanitarian assistance, with 2 million of these needing special food security support.  As of July, WFP provides food assistance to nearly 116,000 school children in Venezuela each month.  Remittances have declined as the diaspora's employment levels and purchasing power decreased, further exacerbating humanitarian needs among Venezuelans in country, as well as among Venezuelan refugees and migrants.

(U) Despite a marginal economic recovery, the cost of food continues to rise, with food inflation registering in July at 70 percent year-on-year.  Higher food costs, despite slight income growth in 2023, meant 85 percent of Venezuelans could not afford the basic food basket ($183 per capita). Women and girls in Venezuela face major protection risks and often resort to negative coping strategies – including reducing meal size and selling

critical assets, exchanging sex for money or food, or engaging in theft to survive.

(U) As Maduro's representatives have imposed restrictive visa measures on humanitarian workers and imposed onerous financial auditing and logistical burdens on aid groups inside Venezuela, these groups have been unable to conduct a comprehensive assessment of the state of hunger in Venezuela. However, humanitarian organizations report families increasingly cannot meet their daily food needs.  Given the macroeconomic context, the population of concern – spread across urban and peri-urban areas – continues to be very poor household that lack income sources in USD and that have limited access to international remittances and/or social programs.

**(U) Lack of Access to Lifesaving Health Services**:  The 2024-2025 extension of the 2023 UN Humanitarian Response Plan indicates that the state of health infrastructure in Venezuela remains poor, and there continues to be a lack of qualified health professionals, medicine, and essential supplies. According to the Venezuelan Medical Federation, as of March 2023, 42,000 Venezuelan healthcare workers left the country.  Health workers who stay in Venezuela earn inadequate wages and frequently protest poor labor conditions.  Many must walk long distances to work, sometimes for more than 10 kilometers, as they cannot afford transport.

(U) Health infrastructure in Venezuela is primarily managed by Maduro's representatives and has therefore been subject to years of neglect and disrepair.  According to the Venezuelan Medical Federation, many hospitals remain unable to offer services because they only have three percent of necessary medicines available.  Outbreaks of communicable diseases, including yellow fever, measles, and diphtheria are persistent threats due to chronic childhood vaccine shortages and poor infrastructure to transport and administer vaccines.  Human Rights Watch reports that 8.4 million gravely ill people were having trouble obtaining medical services, and more than 9 million people could not afford the medications and healthcare they

needed.  A combined shortage of access to contraception and prenatal care further endangers women and girls.

**2. Would permitting nationals of the foreign state to remain temporarily in the United States be contrary to the national interest of the United States?**

(U) No.  Permitting eligible Venezuelan nationals to remain temporarily in the United States advances the national interest by demonstrating solidarity with the Venezuelan people fleeing Maduro and his representatives in Venezuela, and with the many countries across the Western Hemisphere generously hosting Venezuelan refugees and migrants.  Such actions send an important signal to other countries that the United States has urged to grant temporary protection or other forms of legal status to Venezuelan refugees and migrants.  The United States is the largest single donor to the response to the Venezuela regional crisis, providing more than $3.1 billion in humanitarian assistance since fiscal year 2017.

**II. Discretionary Factors**

**What, if any, additional information relevant to this decision should be brought to the attention of the Department of Homeland Security?**

N/A

**III. Recommendation**

(SBU) For the reasons described herein, the Department (1) recommends that Venezuela's TPS designation be extended for 18 months on the basis of extraordinary and temporary conditions and (2) recommends a redesignation of TPS for Venezuela based on extraordinary and temporary conditions.



**THE SECRETARY OF STATE**

**WASHINGTON**

January 31, 2025

The Honorable
Kristi Noem
Secretary of the Department of Homeland Security
Washington, DC  20528

Dear Secretary Noem:

The U.S. Department of State has assessed that permitting nationals of Venezuela to remain temporarily in the United States under 8 U.S.C. 1254a is contrary to the national interest of the United States.  Accordingly, I recommend that you terminate the designation of Venezuela pursuant to 8 U.S.C. 1254a(b)(3)(A)-(B).

Under Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first."  Designating Venezuela under 8 U.S.C. 1254a(b)(1) does not champion core American interests or put America and American citizens first, therefore it is contrary to the foreign policy and the national interest of the United States.

In particular, I have determined that the first priority of the foreign policy of the United States is that "we must curb mass migration and secure our borders.  The State Department will no longer undertake any activities that facilitate or encourage mass migration.  Our diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants."

The designation of Venezuela under 8 U.S.C. 1254a(b)(1) facilitates and encourages mass migration because it causes more than 600,000 Venezuelan beneficiaries to remain in the United States.

-2-

Moreover, organizations like the Venezuelan transnational criminal organization Tren De Aragua commit "campaigns of violence and terror in the United States and internationally" that "are extraordinarily violent, vicious," and "threaten the stability of the international order in the Western Hemisphere." Under Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, "it is the policy of the United States to ensure the total elimination of these organizations' presence in the United States and their ability to threaten the territory, safety, and security of the United States."

For these reasons, I support your decision to vacate the decisions announced in the January 17, 2025 notice that extended a designation for Venezuela under 8 U.S.C. 1254a(b)(1), and, in consultation with you under 8 U.S.C. 1254a(b)(3)(A), I am recommending that you terminate this designation pursuant to 8 U.S.C. 1254a(b)(3)(B).

Sincerely,

Marco Rubio



'RLY NEWS
GPB · Georgia Public Broadcasting
On Air Now
LISTEN LIVE



MY PLAYLIST

 DONATE

 THE INDICATOR FROM PLANET MONEY    LISTEN & FOLLOW ⌄

# < Why Venezuela is no longer in freefall

MAY 8, 2024 · 8:08 PM ET

**8-Minute Listen**    PLAYLIST    TRANSCRIPT

SYLVIE DOUGLIS, BYLINE: NPR.

(SOUNDBITE OF DROP ELECTRIC SONG, "WAKING UP TO THE FIRE")

DARIAN WOODS, HOST:

This is THE INDICATOR FROM PLANET MONEY. I'm Darian Woods.

WAILIN WONG, HOST:

And I'm Wailin Wong. Venezuela's economy has been in freefall for over a decade. It's an oil rich country that struggles to drill oil. Its currency, the bolivar, has suffered brain bending levels of hyperinflation. We're talking 65,000% in 2018. Bolivares just crumbling in your hands.

WOODS: The seeds of the trouble began under President Hugo Chavez around 25 years ago. He was a leftist populist who made decisions that had some benefits, like boosting education and reducing poverty. But some of his actions slowly chipped away at the country's prosperity. He seized control of farms and oil company's assets. He weakened Congress and suppressed his opponents. Towards

the end of his rule, the economy faltered, and it then nosedived under his successor Nicolas Maduro, who doubled down as a kind of hapless authoritarian.

WONG: U.S. sanctions haven't helped the economy either. The South American country has had one of the largest outflows of refugees in modern history. More than seven million people left the country in the last decade. That's about one in five Venezuelans.

WOODS: Back in 2019, we at THE INDICATOR started calling in to one Venezuelan economist, Gabriela Saade. She told us stories about what it was like in the capital of Caracas, which were often grim.

GABRIELA SAADE: You go to the streets, and people in Venezuela, they are very skinny. Yeah, it's very, very shocking to see that.

WONG: That was a few years ago when we last spoke with Gabriela. Now, Venezuela and the United States are even more commingled. At the U.S.-Mexican border, about one in seven intercepted migrants are Venezuelan. So today on the show, we check in with Gabriela again and learn about some surprising developments in the Venezuelan economy.

(SOUNDBITE OF MUSIC)

WOODS: Gabriela Saade is a regular guest on THE INDICATOR, updating us on the Venezuelan economy.

SAADE: Well, I don't know if regular 'cause the last time I was here...

WOODS: That's true.

SAADE: ...Was three years ago.

WOODS: Sorry. We haven't been in touch with you for quite a while.

SAADE: It's OK.

WONG: Oh. Call Dad. It's like, who's...

WOODS: Yeah.

WONG: ...Gabriela, my mom?

(LAUGHTER)

WOODS: A little. Why didn't you call me? And the last time Gabriela spoke to THE INDICATOR, she was speaking about how hard grocery shopping was in Caracas.

SAADE: Probably 60% of the shelves of the supermarket would be empty. I remember there was this deodorant, this brand called Mum. It was really bad, and it was the only option available.

WONG: There were also more serious problems than deodorant selection blackouts, poverty. Gabriela, as a young professional, was making $300 a month. Not enough, she felt, which is why Gabriela made the hard decision to leave and come to the United States.

SAADE: I have the opportunity to actually save money, and I can also, like, support my family who is living there.

WOODS: Gabriela is an advisor at the Behavioural Insights Team now. That's a behavioral economics consultancy. Now every month she sends back $650 back to Venezuela to her mother. But she hadn't been back to visit the country until December last year.

SAADE: It was a totally different country. It was pretty wild to see it almost as an observer. It was very weird.

WONG: Caracas had been a ghost town when she left. Now, it was full with honking traffic. And because it was Christmas...

SAADE: People just blasting music and, like, making hallacas, which is a traditional dish.

WONG: That's a special type of tamale.

WOODS: Gabriela said she even saw some tourists from Europe. She asked them why they'd come. And they said they'd heard it was nice from TikTok.

SAADE: There was this ongoing joke in 2022. People would say, oh, Venezuela (speaking Spanish), which means Venezuela, like, got fixed, like, it recovered, right? But that's far from the truth.

WONG: One sign of perhaps a superficial fix was in the supermarket.

Why impending election could determine the future of Venezuela's economy : The Indicator from Planet Money : NPR

SAADE: The prices were in dollars. So the prices were not in bolivares. It's like the price tax for those goods, they said R-E-F, REF, which is, like, a reference price, and it would be in dollars.

WOODS: This is called de facto dollarization. What happens is you'd go to the counter, and you could either pay in U.S. dollars or if you only had bolivares...

SAADE: You would just take out your calculator, use the exchange rate and know what it's   yeah, how much it is in bolivares.

WOODS: Yeah. I see that inflation is 200%, which is actually low for recent history in...

SAADE: Yeah.

WOODS: ...Venezuela. But even then, I guess the shops don't want to be changing their prices too much.

SAADE: Yeah, yeah, yeah. So it's just easier just to have the dollar as a reference for prices.

WONG: An estimated 45% of transactions in the main cities are now made in foreign currencies, mostly the U.S. dollar.

WOODS: De facto dollarization is basically just a Band-Aid over the core problem of the declining currency. Jesus Palacios is an economist at the Venezuelan economic firm, Ecoanalitica. He says other reforms have been associated with some growth.

JESUS PALACIOS: In last years, Venezuela has had an average annual growth of 4% in 2021 to 2023.

WONG: Alongside that 4% growth, Jesus says that shortages have eased over the last few years. That's because Maduro's government has loosened the restrictions on imports and price controls he and Chavez had overseen. We know that price controls lead to shortages when more people want something like a deodorant, but the supplier doesn't have the incentive to bring that deodorant into the country. U.S. sanctions relief during this time probably helped, too.

Case 3:25-cv-01766-EMC   Document 164-4   Filed 04/07/25   Page 81 of 145

PALACIOS: The economy is growing, but is more and more unequal in the last years. The poorest people earn 30 or 35 times less than those with the highest income. This is facts.

WONG: Jesus says more than 80% of Venezuelans are still in poverty. You can kind of view the economy of Venezuela as falling off a cliff 12 years ago, and now it's made some small crawls upward, but unevenly. Inequality is worsening.

WOODS: I saw that there was a Ferrari dealership that opened in Caracas.

PALACIOS: Yeah, yeah. This is amazing in this context, no?

WOODS: That dealership is for the wealthier Venezuelans who are often plugged into the government apparatus. It's not for ordinary people like Jennifer Ontiveros (ph). Jennifer is a housekeeper in Caracas, and as a mother of two young kids, she needs to multitask, like she was doing on this call.

JENNIFER ONTIVEROS: (Through interpreter) I am ironing right now.

WONG: Jennifer says her income has improved over the last couple of years. She says she's lucky to be on $350 a month, whereas other working Venezuelans get paid as little as $4, but it's still not enough.

ONTIVEROS: (Through interpreter) The country doesn't get better. We don't get any benefits from being Venezuelan. You can't do anything with your money, like, renovate your home, take your kids out to do something   nothing. We can't enjoy anything. Faith is the only thing that keeps us going.

WOODS: A lot of people have left Venezuela over the last decade. Do you want to leave Venezuela?

ONTIVEROS: (Through interpreter) Yes. Yes, I would like to leave. This year, we have a presidential election. I wouldn't leave if Maduro lost and was no longer president. But if he stays and gets elected again, which means five more years of this government, five more years like this, five more years of not having enough, not being able to build your own home, not being able to give a better life to your kids.

WONG: The election is marked for July. But beneath the economic carnage, Jennifer still loves Venezuela.

ONTIVEROS: (Through interpreter) The music, the culture, the beaches, all of it. All of the country.

WOODS: And that's a sentiment shared by Gabriela.

SAADE: If things actually, like, get better, and there are more opportunities for people like myself, I know for a fact that I won't be alone in returning.

WONG: This episode was produced by Angel Carreras, with engineering by Neal Rauch. It was fact checked by Sierra Juarez. Kate Concannon edits the show, and THE INDICATOR's a production of NPR.

(SOUNDBITE OF MUSIC)

WOODS: Was the deodorant selection better when you went back?

SAADE: Yes, definitely. Yeah.

WOODS: What's your brand?

SAADE: That was - Secret.

WOODS: It's a secret. OK, yeah.

SAADE: No, I mean, it's called Secret. I think it's...

WOODS: Oh, right.

SAADE: ...Like a - yeah (laughter).

WOODS: It's called Secret. I was like, wow...

SAADE: No, but...

WOODS: ...This must be kind of a private question.

*Copyright © 2024 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.*

*NPR transcripts are created on a rush deadline by an NPR contractor. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.*

3/7/25, 12:00 PM
Case 3:25-cv-01766-EMC Document 164-4 Filed 04/07/25 Page 83 of 145
You, imperiling elections. We, children of love. Venezuela Economy. The Indicator from Planet Money : NPR

**More Stories From NPR**



THE INDICATOR FROM PLANET MONEY

**Can ... we still trust the monthly jobs report?**



THE INDICATOR FROM PLANET MONEY
**What to make of the Ukraine minerals deal**



THE INDICATOR FROM PLANET MONEY
**Is the Panama Canal a rip-off?**



THE INDICATOR FROM PLANET MONEY
**Can the Federal Reserve stay independent?**



THE INDICATOR FROM PLANET MONEY
**How tourist destinations recover after terrorism**



THE INDICATOR FROM PLANET MONEY

## Slender Starbucks, Medicaid at risk, and the gold card visa

## Popular on NPR.org



VZ Termination_0233

SHOTS - HEALTH NEWS

## She got her dream job at CDC back. But she's already moving on



RACE

## War heroes are among 26,000 images flagged for removal in Pentagon's DEI purge



ASIA

VZ Termination_0234



HEALTH

## Amid a growing measles outbreak, doctors worry RFK Jr. is sending the wrong message



CODE SWITCH: PERSPECTIVES

You impending elections. We can blow Venezuela money. This indicator...Rate Of Money. NPR

## If you see something (woke), say something



BUSINESS

## Did tariffs contribute to the Great Depression? Here's what to know

## NPR Editors' Picks

You, importantly, Auctions, Lou, Gabrielon on 1,047, Venezuelan economy, 07, 25, Indicator, from Planet Money, NPR



**CULTURE**

**TOKiMONSTA's new album is a 'love letter' to close friend Regina Biondo**



**MOVIE REVIEWS**

**Live, die, repeat: Bong Joon Ho offers a farcical vision of the future in 'Mickey 17'**

Case 3:25-cv-01766-EMG    Document 164-4    Filed 04/07/25    Page 91 of 145



ECONOMY

**The job market is still pretty solid -- but there are warning signs ahead**



BUSINESS

**A look at some of the creative ways companies try to dodge high tariffs**

VZ Termination_0238

Case 3:25-cv-01766-EMG   Document 104-4   Filed 04/07/25   Page 93 of 145



**UP FIRST NEWSLETTER**

# Monthly jobs report to be released. And, the White House to host a crypto event



**NATIONAL**

# How a measles outbreak overwhelmed a small West Texas town

Case 3:25-cv-01766-EMC    Document 104-4    Filed 04/07/25    Page 93 of 145

**READ & LISTEN**

Home

News

Culture

Music

Podcasts & Shows

**CONNECT**

Newsletters

Facebook

Instagram

Press

Public Editor

Corrections

Contact & Help

ABOUT NPR

Overview

Diversity

NPR Network

Accessibility

Ethics

Finances

GET INVOLVED

Support Public Radio

Sponsor NPR

NPR Careers

NPR Shop

NPR Events

NPR Extra

---

terms of use

privacy

your privacy choices

text only

© 2025 npr

Case 3:25-cv-01766-EMC    Document 104-4    Filed 04/07/25    Page 94 of 145

**Venezuela(/country/ven)**

# Situation of human rights in the Bolivarian Republic of Venezuela - Report of the United Nations High Commissioner for Human Rights (A/HRC/56/63) (Advance Unedited Version)

UN Document

**Source:** UN HRC(/organization/un-hrc)

**Posted:** 1 Jul 2024

**Originally published:** 28 Jun 2024

**Origin:** View original



### Download Report

(PDF | 717.78 KB)
(/attachments/7d8295fe-57ca-4b3b-85c7-f03f9a1bc4fd/a-hrc-56-63-auv.pdf)

**Human Rights Council**

**Fifty-sixth session**

18 June−12 July 2024

VZ Termination_0241

Case 3:25-cv-01766-EMC   Document 104-4   Filed 04/07/25   Page 95 of 145

Agenda items 2 and 4

**Annual report of the United Nations High Commissioner
for Human Rights and reports of the Office of the
High Commissioner and the Secretary-General**

**Human rights situations that require the Council's attention**

*Summary*

Pursuant to Human Rights Council resolution 51/29, in the present report, the United Nations High Commissioner for Human Rights focuses on the latest developments related to economic, social and cultural rights and the right to a healthy environment, rule of law and civic space, and the level of implementation of the corresponding recommendations previously issued by his Office to the Bolivarian Republic of Venezuela.

I. Introduction and methodology

1. The present report is submitted pursuant to Human Rights Council resolution 51/29, in which the Council requested the United Nations High Commissioner for Human Rights to submit a comprehensive report on the situation of human rights in the Bolivarian Republic of Venezuela (Venezuela), containing a detailed assessment of the implementation of the recommendations made in previous reports and to present it to the Council at its fifty-sixth session.

2. The present report covers the period from 1 May 2023 to 30 April 2024 and focuses on the latest developments related to economic, social, and cultural rights, the right to a healthy environment, gender, and LGBTIQ+ rights, civic space, and the rule of law. The report is based on information gathered and analysed by the Office of the United Nations High Commissioner for Human Rights (OHCHR), including through interviews with victims and witnesses and meetings with Government officials and civil society organizations. It also considers official information from State institutions. On 15 February 2024, the Government of Venezuela announced the suspension of the Letter of Understanding signed with OHCHR, requesting OHCHR personnel to leave Venezuela within 72 hours. OHCHR regrets this development.

3. The findings in the present report have been documented and corroborated in strict compliance with OHCHR methodology. OHCHR exercised due diligence to assess the credibility and reliability of sources and cross-checked the information gathered to verify its validity. It sought informed consent from the interviewees and took appropriate measures to protect their identities and to ensure confidentiality, as appropriate. OHCHR assessed the information collected and domestic legislation, in the light of international human rights norms and standards.

**II. Economic, social, and cultural rights and the right to a healthy environment**

4. Deficiencies in access to and supply of utilities such as water, electricity and fuel, continued to be exacerbated inter alia by the impact of sectoral sanctions during the reporting period.1 On 18 October 2023, following the signing of the Barbados Agreements, six licences were issued relaxing these sanctions, including

3/7/25, 12:08 PM     Situation of human rights in the Bolivarian Republic of Venezuela - Report of the United Nations High Commissioner for Human Rig…

Case 3:25-cv-01766-EMC   Document 104-4   Filed 04/07/25   Page 96 of 145

in the oil and gas sector.2 On 17 April 2024, the general licence to the oil and gas sector was replaced by a limited licence to reduce operations for 45 days. According to State institutions, as well as humanitarian and human rights organizations, sanctions and overcompliance hindered the receipt of funds and imports of essential goods, including for food and medicine.

5. Despite official figures indicating a five per cent gross domestic product growth in 2023,3 economic challenges such as high inflation4 and devaluation of Venezuelan currency, the bolivar, persisted,5 and continued to restrict purchasing powers, disproportionately affecting groups and communities in vulnerable situations, including the urban poor, those living in rural areas, and particularly women from these populations.

6. Reportedly, structural underfunding and understaffing continued to weaken health and education sectors.6 A report indicated that between July and August 2023, 74.6 per cent of health centres nationwide lacked medical staff, and 73.5 per cent lacked nursing staff,7 thus affecting accessibility, quality and availability of healthcare.8 The national education sector union indicated 80 per cent absenteeism from students at the resumption of the school year in October 2023, due to unaffordability of travel, uniforms, and other needs.9

7. Between 1 and 14 February 2024, the United Nations Special Rapporteur on the right to food carried out his first official visit to Venezuela. This visit highlighted the State's actions to address food insecurity. The Special Rapporteur expressed concern that "[Unilateral] coercive measures significantly limit the Venezuelan government and people's ability to realize the right to food,"10 contributing to the large scale of food insecurity in Venezuela, and disproportionately affecting women and girls. Concluding his visit, the Special Rapporteur also expressed concerns regarding allegations of political instrumentalization of State welfare.11

8. OHCHR reiterates its recommendation to authorities to take all necessary measures, including programmes for improved access to food, to ensure the availability and accessibility of food in sufficient quantity and quality.12

---

**Primary country:**

Venezuela (Bolivarian Republic of)(/country/ven)

**Source:**

UN Human Rights Council(/organization/un-hrc)

**Format:**

UN Document(/updates?list=UN%20Document%20Updates&advanced-search=%28F11%29)

**Themes:**

Climate Change and Environment(/updates?
list=Climate%20Change%20and%20Environment%20Updates&advanced-search=%28T4588%29) /
Food and Nutrition(/updates?list=Food%20and%20Nutrition%20Updates&advanced-

Case 3:25-cv-01766-EMC    Document 104-4    Filed 04/07/25    Page 97 of 145

search=%28T4593%29) / Gender(/updates?list=Gender%20Updates&advanced-

search=%28T4594%29) / Health(/updates?list=Health%20Updates&advanced-

search=%28T4595%29) / Peacekeeping and Peacebuilding(/updates?

list=Peacekeeping%20and%20Peacebuilding%20Updates&advanced-search=%28T4599%29) /

Protection and Human Rights(/updates?

list=Protection%20and%20Human%20Rights%20Updates&advanced-search=%28T4600%29) /

Water Sanitation Hygiene(/updates?list=Water%20Sanitation%20Hygiene%20Updates&advanced-

search=%28T4604%29)

**Language:**

English(/updates?list=English%20Updates&advanced-search=%28L267%29)

# Related Content

**Venezuela(/country/ven)**    **Situación de los derechos humanos en la República Bolivariana
de Venezuela - Informe del Alto Comisionado de las Naciones Unidas para los Derechos
Humanos (A/HRC/56/63) (Unofficial spanish version)
(https://reliefweb.int/report/venezuela-bolivarian-republic/situacion-de-los-derechos-
humanos-en-la-republica-bolivariana-de-venezuela-informe-del-alto-comisionado-de-
las-naciones-unidas-para-los-derechos-humanos-ahrc5663-unofficial-spanish-version)**

UN Document

**Source:** UN HRC(/organization/un-hrc)

**Posted:** 1 Jul 2024

**Originally published:** 28 Jun 2024

**World(/country/wld)**    **Asia and the Pacific SDG Progress Report: Engaging communities to
close the evidence gap 2025(https://reliefweb.int/report/world/asia-and-pacific-sdg-
progress-report-engaging-communities-close-evidence-gap-2025)**

Case 3:25-cv-01766-EMC   Document 104-4   Filed 04/07/25   Page 98 of 145

Analysis

**Source:** ESCAP(/organization/escap)

**Posted:** 19 Feb 2025

**Originally published:** 18 Feb 2025

---

Colombia(/country/col)    **Marco de Cooperación para el Desarrollo Sostenible, Colombia 2024 -2027(https://reliefweb.int/report/colombia/marco-de-cooperacion-para-el-desarrollo-sostenible-colombia-2024-2027)**

Analysis

**Sources:** Govt. Colombia(/organization/govt-colombia), UNCT Colombia(/organization/unct-colombia)

**Posted:** 17 Dec 2024

**Originally published:** 19 Jun 2024

---

World(/country/wld)    **Informe Global 2023 - Resumen ejecutivo(https://reliefweb.int/report/world/informe-global-2023-resumen-ejecutivo)**

Other

**Source:** UNHCR(/organization/unhcr)

**Posted:** 11 Dec 2024

**Originally published:** 1 Jul 2024



English | Español



# Health in the Americas+

Health in the Americas

# Venezuela - Country Profile



By PAHO/OPS, 24 September, 2024

| Determinants | Digital Coverage | Health Situation | Mortality | Prospects |

The Health in the Americas+ country profiles are based on the interagency indicators available as of the dates referenced. In some cases, the values of the indicators may differ from the most recent data available in the country.

## Environmental and social determinants of health

In 2000 the total population of Venezuela (Bolivarian Republic of) was 24 526 708 inhabitants; by 2024 this figure had risen to 28 405 543, representing a 15.8% increase. Regarding the country's demographic profile, in 2024 people over 65 years of age accounted for 9.7% of the total population, an increase of 5.0 percentage points compared to the year 2000. In 2024, there were 102.4 women per 100 men and 37.9 older people (65 years or older) per 100 children under 15 years of age, as can be seen in the country's population pyramids, distributed by age group and sex (Figure 1). Considering the population between 15 and 64 years of age to be potentially active (i.e., potential participants in the labor force), this group represented 64.8% of the total population of the country in 2024 (18 405 026 people). When we add these figures to the potentially passive population (7 251 085 under 15 years of age and 2 749 433 over 65 years of age), the result is a dependency ratio of 54.3 potentially passive people per 100 potentially active people. This ratio was 63.1 in 2000.

Life expectancy at birth in 2024 was 72.7 years, lower than the average for the Region of the Americas and 0.3 years higher that in 2000 (72.4).

Figure 1. Population pyramids of Venezuela, years 2000 and 2024



Microsoft Power BI

VZ Termination_0246

Between 2001 and 2016, the average number of years of schooling in Venezuela (Bolivarian Republic of) increased by 27.9%, reaching an average of 10.3 years in the latest year for which information is available. The unemployment rate in 2023 was 5.9%. Disaggregated by sex, the rate was 6.5% for women and 5.5% for men. The literacy rate was 98.7% in 2022. In men, this figure was 99.1%; in women, 98.4%. In addition, 33.1% of the population were below the national poverty line in 2015, a decrease from 41.6% in 2000. In 2006, 7.1% of the population was living in poverty, defined as the percentage of the population with an income of less than US$ 2.15 per day; this is below the regional average of 2.6%.

Between 2000 and 2022, the country's Human Development Index score remained unchanged at 0.699. During the same period, the index increased by 14.6% globally and 11.2% in Latin America (Figure 2).

**Figure 2. Human Development Index in the Region of the Americas, 2022**



In 2021, public expenditure on health accounted for 1.35% of gross domestic product (GDP) (Figure 3) and 5.46% of total public expenditure, while out-of-pocket spending on health accounted for 28.06% of total health expenditure.

**Figure 3. Domestic general government health expenditure as percentage of gross domestic product, 2021**



## Digital coverage

In 2017, 61.6% of the population had an internet connection, representing a considerable increase from 2000, when 3.4% of the population had an internet connection.

## Health situation

### Maternal and child health

Between 2000 and 2018, infant mortality in the Bolivarian Republic of Venezuela decresed from 19.4 to 18.28 deaths per 1000 live births, a decrease of 5.7% (Figure 4). The percentage of low-weight births (less than 2500 g) increased from 8.7% to 9.5% between 2003 and 2017.

Regarding the immunization strategy, measles vaccination coverage was 68% in 2021, a decrease of 16 percentage points from 2000.

**Figure 4. Infant mortality per 1000 live births, 1995–2018**



The maternal mortality ratio in 2020 was estimated at 259.2 deaths per 100 000 live births, representing a 180.5% increase compared to the estimated value in 2000 (Figure 5). In relation to fertility, it is estimated that in 2024 women had an average of 2.1 children throughout their reproductive lives. In the specific case of adolescent fertility, there was a 24.3% decrease, from 96.7 live births per 1000 women aged 15 to 19 years in 2000 to 73.2 in 2024. In 2017, 99.1% of births were attended by skilled birth personnel. Between 2011 and 2018, the percentage of pregnant people who received antenatal care increased from 47.0% to 82.6%.

**Figure 5. Maternal mortality per 100 000 live births, 2000–2020**

## Communicable diseases

In 2022, there were 35 new cases of tuberculosis per 100 000 population in Venezuela (Bolivarian Republic of). In 2019, the overall tuberculosis mortality rate (age-adjusted and per 100 000 population) was 2.7 (1.5 in women and 4.2 in men).

VZ Termination_0249

In 2020, the estimated human immunodeficiency virus (HIV) infection incidence rate (new diagnoses) was 17.5 per 100 000 population. The age-adjusted mortality rate for HIV was 26.1 per 100 000 population in 2019. It should be noted that during the 2000-2019 period this indicator decreased by 215.6%. There were no reported cases of human rabies in the country in 2022.

## Noncommunicable diseases and risk factors

In the same age group, the prevalence of overweight and obesity was 53.5% in 2022. Also in 2016, 31.4% of the population reported insufficient physical activity.

In 2015, the reported prevalence of arterial hypertension (high blood pressure) among people aged 18 years or older was 18.6%, a decrease of 6.9 percentage points compared to 2000 (25.5%). The prevalence of diabetes mellitus, which stood at 8.8% in 2000, increased to 9.5% in 2014.

# Mortality

In 2019, the adjusted rate of potentially avoidable premature mortality in Venezuela (Bolivarian Republic of) was 337.9 deaths per 100 000 population, a decrease of 2.3% from a rate of 330.2 in 2000. This meant that, in 2019, the rate in the country was 10.4% lower than the average rate reported for the Region of the Americas as a whole. Among potentially avoidable premature mortality, the rate for preventable causes was 124.3 per 100 000 population in 2019, which is 2.1% lower than the regional average rate.

The overall age-adjusted mortality rate was 6.3 per 1000 population in 2019, a decrease of 2.6% compared to 2000 (5.6 deaths per 1000 population).

When deaths are categorized into three main groups, it is observed that, in 2019, the age-adjusted mortality rate from communicable diseases was 102.3 per 100 000 population (116.4 per 100 000 in men and 29.8 per 100 000 in women), while the age-adjusted mortality rate from noncommunicable diseases was 413.8 per 100 000 population (488.3 per 100 000 in men and 355.3 per 100 000 in women). The rate of age-adjusted mortality from external causes was 119.4 per 100 000 population (214.4 per 100 000 in men and 21.3 per 100 000 in women). In 2000, the percentage distribution of causes was 63.6% for noncommunicable diseases, 16% for communicable diseases, and 20.3% for external causes; in 2019, the percentages were 65.1%, 15.6%, y 19.4%, respectively (Figure 6).

Figure 6. Proportional mortality in Venezuela, 2000 and 2019



## Cancer mortality

Regarding cancer mortality from tumors, in 2019, the adjusted mortality rate from prostate cancer was 25.5 per 100 000 men; lung cancer, 16.0 per 100 000; and colorectal cancer, 7.7 per 100 000. In women, these values were 16.8 deaths per 100 000 for breast cancer, 11.4 per 100 000 for lung cancer, and 7.1 per 100 000 for colorectal cancer.

VZ Termination_0250

The sources of the interagency indicators used in this profile can be found in this table.

 For the latest data on health indicators for the Region of the Americas, be sure to visit the **PAHO Core Indicators portal**.

## COUNTRY/TERRITORY PROFILES

Anguilla
Antigua and Barbuda
Argentina
Aruba
Bahamas
Barbados
Belize
Bermuda
Bolivia
Bonaire, Sint Eustatius, and Saba
Brazil (English) (Português)
Canada
Cayman Islands
Chile
Colombia
Costa Rica
Cuba
Curaçao
Dominica
Dominican Republic
Ecuador
El Salvador
French Guiana, Guadeloupe and Martinique
Grenada
Guatemala
Guyana
Haiti (English) (Français)
Honduras
Jamaica
Mexico
Montserrat
Nicaragua
Panama
Paraguay
Peru
Puerto Rico
Saint Kitts and Nevis
Saint Lucia
Saint Vincent and the Grenadines
Sint Maarten
Suriname
Trinidad and Tobago
Turks and Caicos Islands
United States of America
Uruguay
Venezuela
Virgin Islands (British)
Virgin Islands (U.S.)

## CURRENT TOPIC

Accelerating Disease Elimination

VZ Termination_0251



Health in the Americas was created in 1954, and since its groundbreaking first edition in 1956 has been published fifteen times. Since its inception, it has been recognized as the flagship publication of the Pan American Health Organization (PAHO), being a unique report on the great advances, challenges, and trends in the field of health in the Region of the Americas.

---

## LATEST

**U.S. Virgin Islands - Territory Profile**
Oct 26, 2024

**French Guyana - Profile**
Oct 25, 2024

---

## SEARCH

| Enter the terms you wish to search for | Go |
|---|---|

---

## TAGS

⛁ Data sources     ⛁ Perfile de país     ⛁ Bibliography     ⛁ Recommended resources

---

Health in the Americas+ © 2021 Pan American Health Organization. All rights reserved.







Venezuelan family on the move after being evicted from their house in Soacha, Colombia. © NRC/Nadège Mazars

*"Despite several complexities posed by the uncertainty and deepening of the humanitarian crisis, thanks to the sustained engagement and work of all partners, the RMRP 2021 provides a clear articulation of how to complement host government's efforts."*
*Eduardo Stein, UNHCR and IOM Joint Special Representative for Refugees and Migrants from Venezuela*

VZ Termination_0253

The exodus of Venezuelans is the largest in the recent history of Latin America and the Caribbean. As of November 2020, more than 5.4 million refugees and migrants from Venezuela are outside their country of origin, with 4.6 million in the region alone.

In this context, the **Refugee and Migrant Response Plan 2021** is the result of field-driven planning, bringing together 159 appealing organizations in 17 countries, in consultation with host governments, civil society and faith-based organizations, local communities, donors, as well as the refugees and migrants themselves, with the common objective of addressing the overarching humanitarian, protection and socioeconomic integration needs of refugees and migrants from Venezuela.



Download

# REGIONAL RMRP AT A GLANCE

VZ Termination_0254

| | | | |
|---|---|---|---|
| POPULATION PROJECTION 2021 **8.13 M** | ↑ 34.2% | VENEZUELANS IN DESTINATION | 5.28 M |
| | ↑ 15.2% | VENEZUELANS PENDULAR | 1.87 M |
| | ↑ 34.0% | COLOMBIAN RETURNEES | 980 K |
| | ↑ 16.6% | * IN TRANSIT | 331 K |
| PEOPLE IN NEED **7.20 M** | ↑ 35.6% | VENEZUELANS IN DESTINATION | 3.84 M |
| | ↑ 14.9% | VENEZUELANS PENDULAR | 992 K |
| | ↑ 34.4% | COLOMBIAN RETURNEES | 625 K |
| | ↑ 15.1% | HOST COMMUNITY | 1.75 M |
| | | * IN TRANSIT | 285 K |
| PEOPLE TARGETED **3.30 M** | ↑ 37.5% | VENEZUELANS IN DESTINATION | 2.27 M |
| | ↑ 17.9% | VENEZUELANS PENDULAR | 188 K |
| | ↑ 27.8% | COLOMBIAN RETURNEES | 174 K |
| | ↑ 16.8% | HOST COMMUNITY | 660 K |
| | | * IN TRANSIT | 212 K |

| | | | |
|---|---|---|---|
| TOTAL REQUIREMENTS **$1.44 B** | | RMRP PARTNERS **159** | |

*Figures for refugees and migrants in-transit to other countries are not included in the totals on the left as they can be – by definition – recipients of services in more than one country. However, the total budget and sector specific requirements includ activities targeting this population group, including as refugees and migrants in-transit will have specific needs to be addresse

# REQUESTED FUNDING AND BENEFICIARIES TARGETED





# BY NATIONAL AND SUB-REGIONAL PLATFORM

Case 3:25-cv-01766-EMC    Document 104-4    Filed 04/07/25    Page 110 of 145

LEGEND

CHILE

COLOMBIA

ECUADOR

PERU

MEXICO

SOUTHERN

© NRC/Nadège Mazars

f

t

# WHERE DO WE STAND

Olivia holds her daughter Eva, who is tired after not sleeping well from months of homelessness, not having enough to eat and lacking healthcare. ©Save the Children/Glenna Gordon

VZ Termination_0258

Case 3:25-cv-01766-EMC   Document 104-4   Filed 04/07/25   Page 112 of 145

The political, human rights and socio-economic developments in Venezuela have led to the largest movement of refugees and migrants in the recent history of Latin America and the Caribbean. As of November 2020, of the approximately 5.4 million refugees and migrants from Venezuela outside of their country of origin, some 4.6 million are hosted in the region alone, including an estimated 1 million with an irregular status. Despite the devastating and ongoing socioeconomic and human impact of COVID-19, countries in Latin America and the Caribbean have continued to show great solidarity towards Venezuelans and to facilitate access to basic rights and lifesaving services as well as supporting their integration.

The already precarious situation of many refugees and migrants from Venezuela and affected host communities is reaching alarming levels, as national and local capacities have been dangerously strained due to the continued impact of COVID-19, threatening the overall social fabric in the 17 countries covered by the Regional Refugee and Migrant Response Plan. In a region characterized by high levels of informal labour, the implementation of measures aiming to curb the spread of COVID-19 (including border closures, lockdowns, curfews and other quarantine measures) has had a disproportionately grave impact on refugees and migrants. Without savings or alternative social safety nets, the loss of employment has resulted in many being unable to cover basic needs or access vital services.

# THE REGIONAL RESPONSE

Humanitarian worker teaches Venezuelan child and his mother how to wash hands to prevent COVID-19 in Bucaramanga, Colombia. ©Oxfam/Mario Niño

As a result of the complex economic and political outlook, increased dependency on emergency humanitarian assistance in the areas of health, shelter, food, Water, Sanitation and Hygiene (WASH), as well as access to education, protection and integration is reflected in the increased needs outlined in the RMRP 2021. The COVID-19 pandemic has also resulted in a dramatic increase of reported cases of gender-based violence (GBV) and mental health needs, while leading to widespread food insecurity, rising levels of malnutrition and growing destitution especially among the most vulnerable, namely unaccompanied and separated children (UASC), single-headed households, women and girls at risk of GBV and trafficking, the elderly, those with chronic diseases, the LGBTQI+ community and those in situations of irregularity.

Xenophobia and stigmatization are on the rise, often based on negative perceptions associated with fear of the spreading virus and rising rates of evictions and homelessness, leading to a vicious cycle of irregularity, vulnerability, and stigmatisation.

VZ Termination_0260



# WHAT'S THE RMRP?

Orliannis Sophia and Jesuatny look through the contents of their hygiene kit.
©Plan International/Gina Piñeros

VZ Termination_0261

The RMRP was first developed in 2018 (implemented throughout 2019) as a strategic regional response plan and advocacy tool to support country and sub-regional operations and to ensure the most pressing humanitarian, protection and integration needs of refugees and migrants from Venezuela, as well as those of host communities, were met.

The RMRP 2021 intends to build upon the best practices and lessons learned from 2020, presenting a more comprehensive plan, for an even more effective, coordinated and holistic response for refugees and migrants from Venezuela in Latin America and the Caribbean.

As in previous years, the RMRP 2021 provides a comprehensive analysis of the population movement dynamics to be expected for 2021 and the corresponding needs of refugees and migrants from Venezuela as well as of affected host communities. It further describes the response strategies and priority activities and indicates the financial needs of all partners of the Inter-Agency Coordination Platform to be able to continue assisting the population in need in an effective and coordinated manner.



Carmen is one of the many coronavirus heroes. After she left Venezuela, Carmen spent more than two years working as a waitress, a receptionist and a sales attendant until she was able to validate her medical qualifications in Peru. © UNHCR/ Carmen Parra



VZ Termination_0262

Reflective of its inter-agency and multisectoral character, the RMRP 2021 is based on joint needs assessments carried out by RMRP partners at national and sub-regional levels on an ongoing basis, and on continuous exchanges with host governments, civil society actors and affected populations. The planning phase started in August 2020 after consultations with key strategic partners of the Platform, host governments, as well as the donor community. The RMRP 2021 is the result of an intra-regional field-driven strategic planning process, bringing together 159 appealing organizations, in consultation with all host governments, local communities and authorities, United Nations agencies, civil society, including international and national non-governmental organizations and faith-based organizations, the Red Cross Movement, the donor community, as well as consultations with refugees and migrants from Venezuela.

The structure of the RMRP 2021 reflects the sectoral set-up of the Regional Inter-Agency Coordination Platform (R4V) and all strategies and activities articulated in this Plan have been reviewed and cleared by the different Platforms and Sectors, both at regional and national/sub-regional levels, and have been elaborated in complementarity with the work of host governments.

VZ Termination_0263



# WHAT ARE WE FOCUSING ON IN 2021?

An elder Venezuelan woman digitally signing after receiving information and assistance on COVID-19 prevention. ©MercyCorps/Sol Torres

The RMRP 2021 strives to maintain a balance between responses focusing on immediate humanitarian and protection assistance, and activities that bridge the humanitarian-development-peace nexus by responding to the longer-term resilience and integration needs of affected populations and host communities.

To enhance this complementarity between humanitarian action and development support, the Regional, Sub-regional and National Platforms will to serve as a forum for convening humanitarian and development partners for efficiently coordinated assistance. This approach is in line with the UN Secretary-General's Agenda for Humanity, the UN Development System Reform, the Grand Bargain global commitments and the principles of the New Way of Working, calling for collective and coherent support to reduce people's needs and vulnerabilities, based on comparative advantages of 159 humanitarian and development RMRP actors across the region.

RMRP partners at the regional and national levels have continued to show commitment and dedication throughout the preparation of this Plan. The RMRP 2021 intends to build upon the best practices and lessons learned from 2020, presenting a more comprehensive plan for 2021, for an even more effective, coordinated and holistic response for refugees and migrants from Venezuela in Latin America and the Caribbean.

# Population flows in Latin America & the Caribbean



Source: R4V

A Flourish chart

VZ Termination_0265

Case 3:25-cv-01766-EMC    Document 104-4    Filed 04/07/25    Page 119 of 145

Bearing in mind the various political and socioeconomic developments unfolding in Venezuela as well as in numerous host states, and the ongoing impact of the COVID-19 pandemic, the outlook for 2021 remains particularly complex and fragile. These dynamics have been reflected throughout the planning exercise and in all chapters of this RMRP.

In this spirit, RMRP partners will continue to regularly and transparently report on implementation of activities under the RMRP dedicated monitoring and reporting framework and will continue to be highly responsive to newly arising challenges or changes impacting on refugees and migrants from Venezuela as well as affected host communities.

In 2021, the RMRP also seeks to complement and further strengthen the national and regional responses of governments, including specifically the Quito Process as the main technical regional intergovernmental coordination forum in which key policies towards refugees and migrants from Venezuela are discussed and adopted.

## BUDGET REQUIREMENT PER SECTOR

Source: RMRP 2021

✳ A Flourish sankey chart

## NATIONAL/SUB-REGIONAL AND SECTORIAL DOWNLOADS

VZ Termination_0266

## REGIONAL

RMRP 2021 Regional Summary
[ENG] [ESP]

## BRAZIL

RMRP 2021 Brazil – Two pagers
[ENG] [ESP]

## CHILE

RMRP 2021 Chile – Two pagers
[ENG] [ESP]

## COLOMBIA

RMRP 2021 Colombia – Two pagers
[ENG] [ESP]

## ECUADOR

RMRP 2021 Ecuador – Two pagers
[ENG] [ESP]

## PERU

RMRP 2021 Peru – Two pagers
[ENG] [ESP]

## CARIBBEAN

RMRP 2021 Caribbean – Two pagers
[ENG] [ESP]

## CENTRAL AMERICA & MEXICO

RMRP 2021 Central America & Mexico – Two pagers
[ENG] [ESP]

## SOUTHERN CONE

RMRP 2021 Southern Cone – Two pagers
[ENG] [ESP]

# RMRP 2021 PARTNER ORGANIZATIONS

100% Diversidad y Derechos
ACAPS
Acción contra el Hambre
Adventist Development and Relief Agency (ADRA)
AID FOR AIDS
Alianza por la Solidaridad
Americares Foundation
Asociación Civil Venezolana en Paraguay
Asociación Construyendo Caminos de Esperanza Frente a la Injusticia, el Rechazo y el Olvido (CCEFIRO)
1Asociación de Apoyo al Desarrollo  APOYAR
Asociación de Jubilados y Pensionados Venezolanos en Argentina
Asociación de venezolanos en la República argentina (ASOVEN)
Asociación ILLARI-AMANECER
Asociación Manos Veneguayas
Asociación Mutual Israelita Argentina
Asociación Profamilia
Asociación Venezolana en Chile
Ayuda en Acción
Bethany Christian Services
Blumont
CAM
CARE
Cáritas Alemania
Caritas Brazil
Caritas Ecuador
Caritas Manaus
Caritas Rio de Janeiro
Caritas São Paulo
Caritas Switzerland
Center for Integrated Studies and Programs for Sustainable Development (CIEDS)
Center for Migration and Human Rights of the Diocese of Roraima (CMDH)
Centro de Atencion Psicosocial (CAPS)
Centro de Estudios y Solidaridad con América Latina (CESAL)
Cesvi
ChildFund Internacional
Churún Merú Association
Colonia Foundation of Venezuelans in the Dominican Republic (FUNCOVERD)
Comisión Argentina para Refugiados y Migrantes (CAREF)
Comité Internacional para el Desarrollo de los Pueblos (CISP)
Comité permanente por la defensa de los derechos humanos (CDH)
Compassiva
Consejo Interreligioso del Perú – Religiones por la Paz
COOPI – Cooperación Internacional
Cruz Roja Argentina
Cruz Roja Colombia
Cruz Roja Ecuador
Cuso Internacional
Danish Refugee Council (DRC)
Deutsche Gesellschaft für Internationale Zusammenarbeit (GIZ)
Diakonie Katastrophenhilfe
Diálogo Diverso
Dominican Institute for Integrated Development
Duendes y Ángeles Foundation

Famia Planea
Federación Luterana Mundial
Foro Salud Callao
Foundation of the Americas (FUDELA)
Foundation of Venezuelan Emigrants (FEV)
Fundación Alas de Colibrí
Fundación AVSI
Fundación Comisión Católica Argentina de Migraciones (FCCAM)
Fundación CRISFE
Fundación FIDAL
Fundación Halü Bienestar Humano (HALU)
Fundación Scalabrini Bolivia

VZ Termination_0268

Fundación SES

Fundación Tarabita

Globalizate Radio

Guarulhos Human Rights Defense Center (CDDH)

Heartland Alliance International (HAI)

Hebrew Immigrant Aid Society (HIAS)

HELVETAS Swiss Intercooperation

Human Rights Defence Curaçao

Humanity & Inclusion

Humans Analytic

I know my rights

iMMAP

IMPACT Initiatives (REACH)

Inmigrante Feliz Association

Institute for Migration and Human Rights (IMDH)

Instituto Félix Guattari

International Federation of the Red Cross (IFRC)

International Labour Organization (ILO)

International Organization for Migration (IOM)

International Rescue Committee (IRC)

INTERSOS

IPANC

Jesuit Service for Migrants and Refugees (JSMR)

Joint United Nations Programme on HIV/AIDS (UNAIDS)

Kimirina

Latin American Network of Non-Governmental Organizations of Persons with Disabilities and their Families (RIADIS)

LGBT+ Movement Brazil

Malteser International

MedGlobal

Medical Teams International

Médicos del Mundo

Mercy Corps

Mirares

Misión Scalabriniana – Ecuador

Nice Institute

Norwegian Refugee Council (NRC)

Organización de Estados Iberoamericanos para la Educación, la Ciencia y la Cultura (OEI)

Organización de las Naciones Unidas para la Alimentación y la Agricultura (FAO)

Organización Fuerza Internacional de Capellanía DDHH y DIH OFICA ICC

OXFAM

Panamerican Development Foundation (FUPAD)

Panamerican Health Organization/World Health Organization (PAHO/WHO)

Parroquia Ntra Sra Asunción y Madre de los Migrantes

Pastoral de Movilidad Humana – Conferencia Episcopal Peruana

Peace for Development

Plan International

Project HOPE

Red de Investigaciones Orientadas a la Solución de Problemas en Derechos Humanos (RIOSP DDHH)

Red regional LGTBI+

RET International

Salú pa Tur Foundation

Samaritan's Purse

Save the Children International (SCI)

Scalabrini International Migration Network

Sección Peruana de Amnistía Internacional

Servicio Jesuita a Migrantes (SJM)
Servicio Jesuita a Refugiados (SJR)
Solidarites International/Premiere Urgence Internationale (Consorcio de SI y PUI)
SOS Children's Villages
SPM – Serviço Pastoral dos Migrantes Nacional
SPM-NE – Serviço Pastoral dos Migrantes do Nordeste
Stichting Slachtofferhulp Curaçao
Stima Foundation
Swisscontact
Tearfund
Terre des hommes Lausanne
United Nations Children's Fund (UNICEF)
United Nations Development Programme (UNDP)
United Nations Educational, Scientific and Cultural Organization (UNESCO)
United Nations Entity for Gender Equality and the Empowerment of Women (UNWOMEN)
United Nations High Commissioner for Refugees (UNHCR)
United Nations Office for Project Services (UNOPS)
United Nations Office of the High Commissioner for Human Rights (OHCHR)
United Nations Office on Drugs and Crime (UNODC)
United Nations Population Fund (UNFPA)
United Nations Programme for Human Settlements (UN Habitat)
Universidad Católica del Uruguay (UCU)
Vale da Benção Educational and Charitable Association (AEBVB)
VenAruba Solidaria
VenEuropa
Venex Curacao Foundation
Vicaría de Pastoral Social Caritas
War Child
World Council of Credit Unions
World Food Programme (WFP)
World Vision (WV)
ZOA
We World GVC
Sesame Workshop
Servicio Ecuménico para la Dignidad Humana
Fundación de Ayuda Social de Las Iglesias Cristianas
Cruz Roja Uruguay
Cruz Roja Perú
Asociaclón Misioneros de San Carlos Scalabrinianos

## Más información

Visite nuestro sitio web principal

R4V.info

## Síguenos en X

@Plataforma_R4V

X Plataforma R4V

## Vea nuestros últimos vídeos

Visite el canal YouTube de R4V

▶ R4V YouTube

## Manténgase informado

Suscríbase al boletín R4V

Regístrese

Esta es una página web de operación interagencial, administrada y sostenida por la Plataforma Regional de Coordinación Interagencial para Refugiados y Migrantes de Venezuela, liderada en conjunto por ACNUR y OIM. Esta página busca ser un sitio de entrada común, que facilite la comunicación, mejore la coordinación de las operaciones en la región y la incidencia basada en hechos, para satisfacer las necesidades de los refugiados y migrantes de Venezuela. Los documentos, cifras y contenidos relacionados publicados en este portal por parte de los participantes de la Plataforma, están acompañados de las fuentes de donde provienen, y las opiniones expresadas en el mismo no reflejan necesariamente el punto de vista o aprobación de ACNUR y OIM.

About    Contact

© R4V 2024

Learn more about 



My News  

# Venezuela inflation has cooled - but voters say they still can't make ends meet

By **Mayela Armas**

July 23, 2024 8:33 AM EDT · Updated 7 months ago

  



[1/3] A woman smiles as she walks with her shopping of food reduced in price and offered to low-income citizens as part of Venezuela's President Nicolas Maduro's presidential campaign, while he seeks... Purchase Licensing Rights ⧉ **Read more**

 

CARACAS, July 23 (Reuters) - The government of Venezuelan President Nicolas Maduro, who is seeking reelection on Sunday, has had some success in curbing formerly sky-high inflation, but workers say their salaries have not caught up with high prices for food and other goods.

That, combined with general frustration after years of economic malaise, could chill support for Maduro and help bring out the vote for opposition coalition candidate Edmundo Gonzalez, said voters and analysts.

Venezuela had suffered six-digit hyperinflation for about four years, with the indicator reaching a heady 130,000%, eroding savings and making basic supplies scarce.

But annual inflation fell to around 50% over the last year as the government restricted credit, held the exchange rate steady and curbed public spending.

"We have decelerated (inflation) with the correct policies," Maduro - who has been in power since 2013 - said this month when figures were published showing month-on-month inflation in June was 1%.

VZ Termination_0272

3/7/25, 3:50 PM    Venezuela inflation has cooled. But voters say they still can't make ends meet | Reuters

Case 3:25-cv-01766-EMC    Document 104-4    Filed 04/07/25    Page 126 of 145

The last time an inflation rise was that low was July 2012.

But many in the country are still struggling to make ends meet and some lamented that there had not been the usual boost in public sector pay seen in past election years.

"With the election, buying power isn't changed at all. Prices go up," said Oscar Reyes, a retired public sector worker whose pension is about $100 per month, as he shopped at a Caracas market.

Increases to his income had been minimal, he said. "We buy very little, because we also have to pay utilities."

Gonzalez has promised to broker deals between businesses, workers and the government to improve salaries and continue efforts to curb inflation.

"A few months ago I was spending $75 a week on average on food, now it's double," said Carmen Morales, a 52-year-old administrator in the central city of Valencia, who earns $250 per month and helps support her parents.

Morales said she wants a change in government and will vote for the opposition on Sunday.

Given previous rises, current inflation reductions sometimes are not visible to the average consumer, analysts say.

"Inflation could go down to zero, but if you earn $200 and basic food for a month is $500, there is a gap," said economist Asdrubal Oliveros, director of Caracas-based consulting firm Ecoanalitica. "People don't see (lower) inflation as something positive."

The communications ministry and the central bank did not respond to requests for comment.

**SUSTAINABLE MODEL?**

Analysts say government spending has increased mildly during the election campaign. But salaries for public employees have not risen since 2022, though the government has increased bonuses, which have less fiscal effect.

Private sector salaries tend to be higher than in the public sector and average $231 per month, according to the Venezuela Finance Observatory. For private workers, too, raises have been less frequent than they were during hyperinflation, said consultancy Mercer Venezuela.

The government's inflation effort has required it to artificially hold the exchange rate for the local bolivar currency steady by injecting some $2.24 billion into the economy so far this year, about 30% more than last year, according to calculations by analyst firm Sintesis Financiera.

Analysts say there will eventually have to be a price-stoking correction to the exchange rate, which has been held at 36.5 bolivars to the dollar for seven months.

The government's limiting of bank credit has forced producers of rice and corn, major crops for local consumption, to adopt forward-selling schemes with their buyers.

And business owners have frequently requested during meetings aired on state television that the government revise its fiscal and tax decisions, to help increase production and allow them to pay better salaries, to no avail.

Security guard Lisandro Gomez makes $40 a month plus bonuses and receives a subsidized government food basket.

"They say the economy is better, but I don't see it. What I earn doesn't go very far," he said - adding that he plans to back the opposition.

The Reuters Daily Briefing newsletter provides all the news you need to start your day. Sign up here.

Reporting by Mayela Armas in Caracas, additional reporting by Johnny Carvajal and Efrain Otero in Caracas and Tibisay Romero in Valencia Writing by Julia Symmes Cobb Editing by Rosalba O'Brien

Our Standards: **The Thomson Reuters Trust Principles.** ↗

Suggested Topics:

Americas    Worker Rights

Purchase Licensing Rights



**Mayela Armas**
Thomson Reuters

Since 2018 Mayela has reported for Reuters on Venezuela's economy and general news from capital Caracas. She is particularly interested in covering the effects of Venezuela's economic crisis and high inflation, especially concerning the

effects this has on the day-to-day lives of people and families. She also writes about how the country's finances are managed, as well as Venezuela's main industries. Before she joined Reuters Mayela worked at local media outlets.

 

## Read Next

Americas

**Gang infighting leaves 22 dead in Ecuador's Guayaquil**

6:01 PM UTC

---

Americas

**After a murder, cartels loom over Mexico's new system of electing judges**

2:32 PM UTC

---

Technology

**Majority of Brazil Supreme Court chamber upholds Rumble suspension**

7:36 PM UTC

---

Americas

**Mexico aims to boost compliant exports to 90% after U.S. tariff reprieve**

4:28 PM UTC

---

## Sponsored Content

Dianomi ▷



**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**

Sponsored by
WalletJump



**The 5 Dumbest Things We Keep Spending Too Much Money On**

Sponsored by
The Penny Hoarder



**8 Dumbest Things Smart People Waste Money On**

Sponsored by
FinanceBuzz

**Sponsored Content**

Dianomi ▷

**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**
Sponsored by WalletJump


**Top Cards That Charge 0% Interest Until 2026**
Sponsored by Smart Lifestyle Trends


**9 Ways To Get Money Without Getting A Job**
Sponsored by FinanceBuzz


**7 Ways To Help Generate Income Once Your Portfolio Reaches $1,000,000**
Sponsored by Fisher Investments


**50-Year Legend: The Month Stocks Will Likely Crash**
Sponsored by Chaikin Analytics


**Don't Borrow From The Bank If You Own A Home, Borrow From Yourself**
Sponsored by Lendgo


World ›

## US cancels $400 million in grants, contracts to Columbia University over antisemitism allegations

United States · March 7, 2025 · 3:37 PM EST · 10 min ago

U.S. President Donald Trump's administration said it had canceled grants and contracts totaling $400 million to Columbia University because of what it described as antisemitic harassment on and near the school's New York City campus.

Europe
**Five residents die in Russian attacks on eastern Donetsk region**

30 min ago

---

United States

**Crypto Summit: Trump hosts digital currency leaders at White House**

16 min ago

---

World

**South Africa rejects 'megaphone diplomacy' as Trump backs funding cut**

36 min ago

---

Middle East

**Scores killed as Syrian forces seek to crush Alawite insurgency**

38 min ago

## Sponsored Content

Dianomi ▷

**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**
Sponsored by WalletJump


**8 Dumbest Things Smart People Waste Money On**
Sponsored by FinanceBuzz


**50-year Wall Street Legend: The Month Stocks Will Likely Crash**
Sponsored by Chaikin Analytics


**7 Ways To Help Generate Income Once Your Portfolio Reaches $1,000,000**
Sponsored by Fisher Investments


**Don't Borrow From The Bank If You Own A Home, Borrow From Yourself**
Sponsored by Lendgo


**Virginia Reduce Your Home Insurance Bill If You Live In These Zip C...**
Sponsored by Smart Lifestyle Trends


## Sponsored Content

Dianomi ▷

**Did You Know These Tips? How To Stop Spending On Groceries 2024**
Sponsored by The Penny Hoarder

**9 Ways To Get Money Without Getting A Job**
Sponsored by FinanceBuzz

**13 Things The U.S. Plans To Do For Seniors On SS in 2025**
Sponsored by Smart Lifestyle Trends

**5 Side Hustles That Work Even with a Full-Time Job**
Sponsored by FinanceBuzz

**7 Money Moves To Make Today If You Have $1,000 In Savings**
Sponsored by The Penny Hoarder

**5 Tiny AI Stocks That Could Be "Millionaire Makers"**
Sponsored by Profitable News

Feedback

Latest

Home

Authors

Topic Sitemap

Archive

Article Sitemap

Browse

World

Business

Markets

Sustainability

Legal

Breakingviews

VZ Termination_0276

3/7/25, 3:50 PM
Case 3:25-cv-01766-EMC    Document 104-4    Filed 04/07/25    Page 130 of 145
Venezuela inflation has cooled - but voters say they still can't make ends meet | Reuters

Media

Technology

 Videos
 Pictures
 Graphics
 Podcasts

Investigations

Sports

Science

Lifestyle

About Reuters

About Reuters ⧉

Advertise with Us ⧉

Careers ⧉

Reuters News Agency ⧉

Brand Attribution Guidelines ⧉

Reuters and AI ⧉

Reuters Leadership ⧉

Reuters Fact Check

Reuters Diversity Report ⧉

Stay Informed

Download the App (iOS) ⧉

Download the App (Android) ⧉

Newsletters

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

 X   Facebook   Instagram   YouTube   LinkedIn

LSEG Products

Workspace ⧉

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

DataCatalogue ⧉

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

World-Check ⧉

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

Advertise With Us ⧉    Advertising Guidelines    Purchase Licensing Rights ⧉

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

Cookies ⧉    Terms of Use    Privacy ⧉    Digital Accessibility ⧉    Corrections    Site Feedback ⧉    Opt Out of Targeted Advertising

VZ Termination_0277

Feedback

Case 3:25-cv-01766-EMC    Document 104-4    Filed 04/07/25    Page 131 of 145

© 2025 Reuters. All rights reserved

Feedback

VZ Termination_0278

Case 3:25-cv-01766-EMC    Document 104-4    Filed 04/07/25    Page 132 of 145

3/7/25, 3:50 PM
Venezuela inflation has cooled, but voters say they still can't make ends meet | Reuters
Case 3:25-cv-01766-EMC   Document 104-4   Filed 04/07/25   Page 133 of 145

Case 3:25-cv-01766-EMC    Document 104-4    Filed 04/07/25    Page 184 of 145

VZ Termination_0282

VZ Termination_0284

agency with a copy of this **Federal Register** Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit granting agencies within seconds but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/ casecheck/*, then by clicking the ''Check Your Case'' button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found at the SAVE Web site at *http://www.uscis.gov/ save*, then by choosing ''For Benefits Applicants'' from the menu on the left and selecting ''Questions about your Records?''.

[FR Doc. 2016–23249 Filed 9–22–16; 4:15 pm]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2588–16; DHS Docket No. USCIS– 2014–0011]**

**RIN 1615–ZB56**

**Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Liberia's Designation for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of Liberia for Temporary Protected Status (TPS) is set to expire on November 21, 2016. After reviewing relevant country conditions

and consulting with the appropriate U.S. Government (Government) agencies, the Secretary of Homeland Security (Secretary) has determined that conditions in Liberia no longer support its designation for TPS and is therefore extending TPS benefits for 6 months for the purpose of orderly transition before the TPS designation of Liberia terminates. This termination will be effective May 21, 2017, 6 months following the end of the current designation.

To provide for an orderly transition, nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who have been granted TPS under the Liberia designation will automatically retain their TPS and have their current TPS-based Employment Authorization Documents (EAD) extended through May 20, 2017. However, an individual's TPS may still be withdrawn because of ineligibility for TPS. On May 21, 2017, nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who have been granted TPS under the Liberia designation will no longer have TPS.

**DATES:** The designation of Liberia for TPS is terminated effective at 12:01 a.m., local time, on May 21, 2017.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, please visit the U.S. Citizenship and Immigration Services (USCIS) TPS Web page at *http://www.uscis.gov/tps*. You can find specific information about the termination of Liberia's TPS designation by selecting ''Liberia'' from the menu on the left side of the TPS Web page.

• You can also contact Jerry Rigdon, Chief of the Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529– 2060; or by phone at 202–272–1533 (this is not a toll-free number). Note: The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http:// www.uscis.gov*, or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
EVD—Ebola Virus Disease
FNC—Final Nonconfirmation
Government—U.S. Government
INA—Immigration and Nationality Act
OSC—Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
WHO—World Health Organization

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility criteria described in INA section 244(c), 8 U.S.C. 1254a(c) and 8 CFR part 244.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other immigration status they lawfully obtained while registered for TPS.

**When was Liberia designated for TPS?**

On November 21, 2014, the Secretary designated Liberia for TPS for a period of 18 months due to the extraordinary and temporary conditions caused by an epidemic of Ebola Virus Disease (EVD) in West Africa that prevented nationals of Liberia from returning to Liberia in safety. The conditions included high EVD transmission rates in wide-spread geographic areas, overwhelmed health care systems unable to handle the large number of EVD patients or to provide treatment for normally preventable or treatable conditions, and containment

measures that were causing significant disruptions to Liberia's economy and individuals' ability to access food and earn a livelihood. *See Designation of Liberia for Temporary Protected Status,* 79 FR 69502 (Nov. 21, 2014). The Secretary last announced a 6-month extension of TPS for Liberia on March 22, 2016, based on his determination that although there were significant improvements, conditions supporting the designation persisted. *See Extension of the Designation of Liberia for Temporary Protected Status,* 81 FR 15328 (Mar. 22, 2016).

**What authority does the Secretary have to terminate the designation of Liberia for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation may be extended for an additional period of 6, 12, or 18 months. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation, but such termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See* INA section 244(b)(3)(B), 8 U.S.C.

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to the Department of Homeland Security (DHS) "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

1254a(b)(3)(B). The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs, for the purpose of providing an orderly transition. *See id.;* INA section 244(d)(3), 8 U.S.C. 1254a(d)(3).

**Why is the Secretary terminating the designation of Liberia for TPS as of May 21, 2017, after a 6-month extension of TPS benefits for the purpose of orderly transition?**

DHS and the Department of State (DOS) have reviewed conditions in Liberia. Based on the reviews and after consulting with DOS, the Secretary has determined that the termination of the TPS designation of Liberia, after a 6-month extension of TPS benefits for orderly transition, is required because the extraordinary and temporary conditions that prompted Liberia's designation for TPS have substantially resolved and no longer prevent nationals of Liberia from returning in safety.

Guinea, Liberia, and Sierra Leone were designated for TPS in the midst of the largest EVD outbreak in history. From March 2014 through November 2015, these three countries suffered over 11,000 deaths among their more than 28,500 cases of EVD. At the height of the outbreak in late 2014, Ebola was spreading rapidly, with hundreds of new cases being reported each week, the health care systems overwhelmed, and containment measures causing significant disruptions to individuals' ability to access food and earn a livelihood. While the impacts of the epidemic pose a lasting challenge to Liberia's economy and the capacity of its health system to provide treatment for preventable or treatable conditions, at this time, the EVD epidemic has subsided, and conditions have improved since the Secretary initially designated Liberia for TPS.

A robust response by the international community and the governments of Guinea, Liberia, and Sierra Leone has brought the EVD epidemic in West Africa under control and begun the long-term work of rebuilding regional economies and health systems. As of June 2016, Guinea, Liberia, and Sierra Leone are all free of EVD. A country is considered free of EVD transmission after 42 days have passed since the last known person in the country with Ebola receives a second consecutive negative blood test for the virus. While the risk of flare-ups of EVD remains, efforts are underway to promote, over time, robust prevention, surveillance, and response capacity across all three countries.

In Liberia, the government and citizens partnered in a successful effort to control the epidemic and rapidly respond to any new cases. Commerce and imports have begun to rebound, and basic services have returned to pre-EVD outbreak levels. The U.S. Department of Health and Human Services, Centers for Disease Control and Prevention has no Ebola-related Travel Health Notice in place for Liberia as of the date of this Notice.

While health systems and facilities remain fragile, medical centers are no longer overwhelmed by patients with EVD. High rates of child mortality both before and since the EVD epidemic are indicative of the overall fragility of the health system. Although this is comparable to other countries in the region, systems in Liberia must also be able to address ongoing issues of trust between healthcare facilities and communities, as well as continue to care for Ebola survivors who have a series of ongoing and previously unforeseen health conditions, both of which will continue to exacerbate and underscore the fragility of these systems. Normal business activity and national life have largely resumed, although work is ongoing to rebuild Liberia's economy and health care system. On March 29, 2016, the WHO Director-General declared the end of the Public Health Emergency of International Concern regarding the EVD outbreak in West Africa. In conjunction with ending the public health emergency, the WHO emphasized that there should be no restrictions on travel and trade with Guinea, Liberia, and Sierra Leone.

Based upon this review and after consultation with appropriate Government agencies, the Secretary has determined that Liberia no longer continues to meet the statutorily required conditions for a TPS designation on the basis of extraordinary and temporary conditions, because the extraordinary and temporary conditions that prompted Liberia's TPS designation have substantially resolved and no longer prevent nationals of Liberia from returning to Liberia in safety. Therefore, after a 6-month extension of TPS benefits for orderly transition, the Secretary is terminating the TPS designation of Liberia effective at 12:01 a.m., local time, on May 21, 2017, 6 months following the end of the current designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

To provide for an orderly transition, individuals who have been granted TPS under Liberia's designation will automatically retain TPS and have their current EADs extended until the

termination date. *See* INA section 244(d)(3), 8 U.S.C. 1254a(d)(3). DHS may, however, withdraw TPS from any beneficiary who fails to continue meeting the requirements for TPS. *See* INA section 244(c)(3), 8 U.S.C. 1254a(c)(3). There are approximately 2,160 current Liberia TPS beneficiaries. These persons are urged to use the time before termination of their TPS to prepare for and arrange their departure from the United States or, in the alternative, to apply for other immigration benefits for which they are eligible.

**Notice of Six-Month Extension of TPS Benefits for Orderly Transition Before Termination of the TPS Designation of Liberia**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, that Liberia no longer meets the conditions for designation of TPS under INA section 244(b)(1). 8 U.S.C. 1254a(b)(1).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), the designation of Liberia for TPS is terminated effective at 12:01 a.m., local time, on May 21, 2017, 6 months following the end of the current designation.

(2) DHS estimates that there are approximately 2,160 nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who currently receive TPS benefits.

(3) To provide for an orderly transition, nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who have been granted TPS under the Liberia designation will automatically retain TPS until the May 21, 2017, termination date. However, an individual's TPS may be withdrawn before this date under INA section 244(c)(3) and 8 CFR 244.14 because of ineligibility for TPS.

(4) TPS-based EADs that expire on November 21, 2016, are extended automatically through May 20, 2017, for qualified nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia).

(5) Information concerning the termination of TPS for nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) will be available at local USCIS offices upon publication of this notice and through the USCIS National Customer Service Center at 1–800–375–5283. This information will be published on the USCIS Web site at *www.USCIS.gov.*

Jeh Charles Johnson,
*Secretary.*

**If I currently have TPS under Liberia's designation, do I need to re-register to keep my TPS until May 21, 2017, the termination date?**

No. If you already have been granted TPS benefits through the Liberia TPS program, you do not have to re-register to keep your TPS benefits. You will automatically retain TPS until the termination date. However, your TPS may still be withdrawn under INA section 244(c)(3) and 8 CFR part 244 because of ineligibility for TPS. 8 U.S.C. 1254a(c)(3), 8 CFR 244.14. When termination becomes effective on May 21, 2017, you will no longer have TPS.

**Why is the Secretary automatically extending the validity of EADs from November 21, 2016, through May 20, 2017?**

The Secretary has decided to extend automatically the validity of EADs to provide for an orderly transition leading up to the effective date for the termination of the Liberia TPS designation. Therefore, the validity of the applicable EADs is extended for a period of 6 months, through May 20, 2017. 8 U.S.C. 1254a(a)(2) and (d)(3).

**Must qualified individuals apply for the automatic extension of their TPS-related EADs through May 20, 2017?**

No. Qualified individuals do not have to apply for this extension of their TPS-related EADs through May 20, 2017.

**What may I do if I believe that returning to Liberia is not possible or preferable for me?**

This Notice terminates the designation of Liberia for TPS. Nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) in the United States who believe returning to Liberia is not possible or preferable for them may be eligible to apply for another immigration status, such as lawful permanent residence, asylum, or a nonimmigrant status. Eligibility for these and other immigration benefits is determined individually on a case-by-case basis. For information about eligibility and how to apply, visit the USCIS Web site at *www.uscis.gov* or call the USCIS National Customer Service Center at 1–800–375–5283.

**How does the termination of TPS affect my immigration status and what can I do?**

After the termination of the TPS designation of Liberia becomes effective May 21, 2017, former TPS beneficiaries will maintain the same immigration status they held before TPS (unless the status has since expired or been terminated) or any other status they may have acquired while registered for TPS. Liberians who are included in the President's grant of Deferred Enforced Departure for Liberians, if extended past the current expiration date of September 30, 2016, will remain covered by Deferred Enforced Departure. Accordingly, if a TPS beneficiary held no lawful immigration status before being granted TPS and did not obtain any other status during the TPS period, he or she may be subject to removal upon the termination of the TPS designation. TPS-related EADs will expire on May 20, 2017, and will not be renewed.

Termination of the TPS designation for Liberia does not necessarily affect pending applications for other forms of immigration relief or protection. However, former TPS beneficiaries will begin to accrue unlawful presence as of May 21, 2017, if they have not been granted any other immigration status or protection or if they have no pending application to obtain benefits.

**Employment Authorization Document (EAD)**

*How can I obtain information on the status of my EAD request?*

To get case status information about your request for an EAD, you can check Case Status Online at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Application for Employment Authorization (Form I–765) has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov.* However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic 6-month extension of my current EAD through May 20, 2017?*

Provided that you currently have TPS under the designation of Liberia, this Notice automatically extends your EAD by 6 months if you:

• Are a national of Liberia (or an alien having no nationality who last habitually resided in Liberia);

• Received an EAD under the last designation of TPS for Liberia; and

• Have an EAD with a marked expiration date of November 21, 2016, bearing the notation "A–12" or "C–19" on the face of the card under "Category."

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Form I–9. You can find additional detailed information on the USCIS I–9 Central Web page at *http://www.uscis.gov/I-9Central.* Employers are required to verify the identity and employment authorization of all new employees by using *Employment Eligibility Verification* (Form I–9). Within 3 days of being hired, you must present proof of identity and employment authorization to your employer.

You may present any document from List A (reflecting both your identity and employment authorization) or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization). An EAD is an acceptable document under "List A." Or you may present an acceptable receipt for a List A, List B, or List C document as described in the Form I–9 Instructions. An acceptable receipt includes a document that shows an employee has applied to replace a required document that was lost, stolen, or damaged. If you present an acceptable receipt for the application of a replacement document, you must present your employer with the actual document within 90 days. Employers may not reject a document based on a future expiration date.

If your EAD has an expiration date of November 21, 2016, and states "A–12" or "C–19" under "Category," it has been extended automatically for 6 months by virtue of this **Federal Register** Notice and you may choose to present your EAD to your employer as proof of identity and employment authorization for Form I–9 through May 20, 2017 (see the subsection titled "*How do my employer and I complete the Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*" for further information). To minimize confusion over this extension at the time of hire, you should explain to your employer that USCIS has automatically

extended your EAD through May 20, 2017. You may also show your employer a copy of this **Federal Register** Notice confirming the automatic extension of employment authorization through May 20, 2017. As an alternative to presenting your automatically extended EAD, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

*What documentation may I show my employer if I am already employed but my current TPS-related EAD is set to expire?*

Even though EADs with an expiration date of November 21, 2016, that state "A–12" or "C–19" under "Category" have been automatically extended for 6 months by this **Federal Register** Notice, your employer will need to ask you about your continued employment authorization once November 21, 2016, is reached to meet its responsibilities for *Employment Eligibility Verification* (Form I–9). Your employer may need to re-inspect your automatically extended EAD to check the expiration date and code to record the updated expiration date on your *Employment Eligibility Verification* (Form I–9) if he or she did not keep a copy of this EAD at the time you initially presented it. You and your employer must make corrections to the employment authorization dates in Section 1 and Section 2 of *Employment Eligibility Verification* (Form I–9) (see the subsection titled "*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*" for further information). You are also strongly encouraged, although not required, to show this **Federal Register** Notice to your employer to explain what to do for *Employment Eligibility Verification* (Form I–9).

By May 20, 2017, the expiration date of the automatic extension, your employer must reverify your employment authorization. If you are employment authorized beyond the expiration date of the automatic extension, you must present any unexpired document from List A or any unexpired document from List C on *Employment Eligibility Verification* (Form I–9) to reverify employment authorization, or an acceptable List A or List C receipt described in the *Employment Eligibility Verification* (Form I–9) instructions. Your employer is required to reverify on *Employment Eligibility Verification* (Form I–9) the employment authorization of current employees no later than the

automatically extended expiration date of a TPS-related EAD, which is May 20, 2017, in this case. Your employer should use either Section 3 of the *Employment Eligibility Verification* (Form I–9) originally completed for you or, if this section has already been completed or if the version of *Employment Eligibility Verification* (Form I–9) is no longer valid (check the date in the upper right-hand corner of the form), complete Section 3 of a new *Employment Eligibility Verification* (Form I–9) using the most current version. Note that your employer may not specify which List A or List C document employees must present, and cannot reject an acceptable receipt. An acceptable receipt is described in the *Employment Eligibility Verification* (Form I–9) Instructions and includes one that shows an employee has applied to replace a required document that was lost, stolen or damaged.

*Can my employer require that I produce any other documentation to prove my current TPS status, such as proof of my Liberian citizenship?*

No. When completing *Employment Eligibility Verification* (Form I–9), including reverifying employment authorization, employers must accept any documentation that appears on the "Lists of Acceptable Documents" for *Employment Eligibility Verification* (Form I–9) that reasonably appears to be genuine and that relates to you or an acceptable List A, List B, or List C receipt. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Liberian citizenship or proof of re-registration for TPS when completing *Employment Eligibility Verification* (Form I–9) for new hires or reverifying the employment authorization of current employees. Refer to the *Note to Employees* section of this Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*What happens after May 20, 2017, for purposes of employment authorization?*

After May 20, 2017, employers may no longer accept the EADs that this **Federal Register** Notice automatically extended.

*How do my employer and I complete Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*

When using an automatically extended EAD to complete Employment Eligibility Verification (Form I–9) for a new job before May 20, 2017, you and your employer should do the following:

1. For Section 1, you should:
   a. Check "An alien authorized to work;"
   b. Write the automatically extended EAD expiration date (May 20, 2017) in the first space; and
   c. Write your alien number (USCIS number or A-number) in the second space (your EAD or other document from DHS will have your USCIS number or A-number printed on it; the USCIS number is the same as your A-number without the A prefix).

2. For Section 2, employers should record the:
   a. Document title;
   b. Issuing authority;
   c. Document number; and
   d. Automatically extended EAD expiration date (May 20, 2017).

No later than May 20, 2017, employers must reverify your employment authorization in Section 3 of Form I–9.

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job, but that EAD has now been automatically extended, your employer may need to reinspect your automatically extended EAD if your employer does not have a photocopy of the EAD on file, and you and your employer should correct your previously completed Form I–9 as follows:

1. For Section 1, you should:
   a. Draw a line through the expiration date in the first space;
   b. Write "May 20, 2017," above the previous date;
   c. Write "TPS Ext." in the margin of Section 1; and
   d. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:
   a. Draw a line through the expiration date written in Section 2;
   b. Write "May 20, 2017" above the previous date;
   c. Write "EAD Ext." in the margin of Section 2; and
   d. Initial and date the correction in the margin of Section 2.

No later than May 20, 2017, when the automatic extension of EADs expires, employers must reverify your employment authorization in Section 3.

*As an employer, what are my Employment Eligibility Verification (Form I–9) obligations after May 20, 2017?*

Employers are required to reverify an employee's employment authorization in Section 3 of Employment Eligibility Verification (Form I–9) by the expiration date of an automatically extended EAD. Your employee must present unexpired documentation from either List A or List C (or an acceptable Form I–9 receipt) showing he or she is still authorized to work. Employers may not ask for specific documents; employees choose which List A or List C documents to present from the Lists of Acceptable Documents.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

If you have an employee who is a TPS beneficiary who provided a TPS-related EAD when he or she first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. E-Verify will not send an alert for the original November 21, 2016 expiration date. By May 20, 2017, employment authorization must be reverified in Section 3. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email *I-9Central@dhs.gov*. Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process, employers may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Employer Hotline, at 800–255–8155

(TTY 800–237–2515), which offers language interpretation in numerous languages, or email OSC at *osccrt@ usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, you may call USCIS at 888–897–7781 (TTY 877–875–6028) or email *I-9Central@dhs.gov*. Calls are accepted in English and many other languages. You may also call the OSC Worker Information Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship status, immigration status, or national origin, including discrimination related to *Employment Eligibility Verification* (Form I–9) and E-Verify. The OSC Worker Information Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable receipt described in the *Employment Eligibility Verification* (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for *Employment Eligibility Verification* (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from *Employment Eligibility Verification* (Form I–9) differs from Federal or State government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against you based on your decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify your employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). If you believe you were discriminated against by an employer in the E-Verify process based on citizenship, immigration status, or national origin, you may contact OSC's Worker Information Hotline at 800–255–7688 (TTY 800–237–2515). Additional

information about proper nondiscriminatory *Employment Eligibility Verification* (Form I–9) and E-Verify procedures is available on the OSC Web site at *http://www.justice.gov/crt/about/osc/* and the USCIS Web site at *http://www.dhs.gov/E-verify.*

### Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each State may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples are:

(1) Your unexpired EAD;

(2) A copy of this **Federal Register** Notice if your EAD is automatically extended under this Notice;

(3) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797);

(4) A copy of your past or current Application for Temporary Protected Status Approval Notice (Form I–797), if you received one from USCIS; and/or

(5) If there is an automatic extension of work authorization, a copy of the fact sheet from the USCIS TPS Web site that provides information on the automatic extension.

Check with the government agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this **Federal Register** Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit granting agencies within seconds but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/casecheck/,* then by clicking the "Check Your Case" button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If such an agency has denied your application based solely or in part on a SAVE response, the agency

must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found at the SAVE Web site at *http://www.uscis.gov/save,* then by choosing "For Benefit Applicants" from the menu on the left and selecting "Questions about your Records?".

[FR Doc. 2016–23250 Filed 9–22–16; 4:15 pm]

**BILLING CODE 9111–97–P**

---

### DEPARTMENT OF HOMELAND SECURITY

#### U.S. Citizenship and Immigration Services

**[CIS No. 2587–16; DHS Docket No. USCIS–2014–0010]**

**RIN 1615–ZB55**

#### Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Guinea's Designation for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of Guinea for Temporary Protected Status (TPS) is set to expire on November 21, 2016. After reviewing country conditions and consulting with the appropriate U.S. Government (Government) agencies, the Secretary of the Department of Homeland Security (Secretary) has determined that conditions in Guinea no longer support its designation for TPS and is therefore extending TPS benefits for 6 months for the purpose of orderly transition before the TPS designation of Guinea terminates. This termination will be effective May 21, 2017, 6 months following the end of the current designation.

To provide for an orderly transition, nationals of Guinea (and aliens having no nationality who last habitually resided in Guinea) who have been granted TPS under the Guinea designation will automatically retain their TPS and have their current tps-based Employment Authorization Documents (EAD) extended through

May 20, 2017. However, an individual's TPS may still be withdrawn because of ineligibility for TPS. On May 21, 2017, nationals of Guinea (and aliens having no nationality who last habitually resided in Guinea) who have been granted TPS under the Guinea designation will no longer have TPS.

**DATES:** The designation of Guinea for TPS is terminated effective at 12:01 a.m., local time, on May 21, 2017.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, please visit the U.S. Citizenship and Immigration Services (USCIS) TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about the termination of Guinea's TPS designation by selecting "Guinea" from the menu on the left side of the TPS Web page.

• You can also contact Jerry Rigdon, Chief of the Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at 202–272–1533 (this is not a toll-free number). Note: The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

### Table of Abbreviations

DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
EVD—Ebola Virus Disease
FNC—Final Nonconfirmation
Government—U.S. Government
INA—Immigration and Nationality Act
OSC—Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
WHO—World Health Organization

### What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a

(4) Be both admissible as an immigrant, except as provided under section 244(c)(2)(A) of the Act, and not ineligible under section 244(c)(2)(B) of the Act.

Additionally, the applicant must be able to demonstrate that during the registration period for the initial designation (from November 4, 1997 to November 3, 1998), or during the registration period for the redesignation (from November 9, 1999 to November 2, 2000), he or she:

(1) Was a nonimmigrant or had been granted voluntary departure status or any relief from removal;

(2) Had an application for change of status, adjustment of status, asylum, voluntary departure, or any relief from removal or change of status pending or subject to further review or appeal;

(3) Was a parolee or had a pending request for reparole; or

(4) Was the spouse or child of an alien currently eligible to be a TPS registrant.

An applicant for late initial registration must file an application for late registration no later than 60 days after the expiration or termination of the conditions described above. 8 CFR 244.2(g).

## What Happens When This Extension of TPS Expires on November 2, 2004?

At least 60 days before this extension of TPS expires on November 2, 2004, the Secretary of DHS will review conditions in Burundi and determine whether the conditions for designation under the TPS program continue to be met at that time, or whether the TPS designation should be terminated. Notice of that determination, including the basis for the determination, will be published in the **Federal Register**.

If the TPS designation is extended at that time, an alien who has received TPS benefits must re-register under the extension in order to maintain TPS benefits. If, however, the Secretary of DHS terminates the TPS designation, TPS beneficiaries will maintain the immigration status they had before TPS (unless that status had since expired or been terminated) or any other status they may have acquired while registered for TPS. Accordingly, if an alien had no lawful immigration status prior to receiving TPS and did not obtain any status during the TPS period, he or she will revert to that unlawful status upon termination of the TPS designation.

## Notice of Extension of Designation of Burundi Under the TPS Program

By the authority vested in me as Secretary of DHS under sections 244(b)(1)(A), (b)(3)(A), and (b)(3)(C) of the Act, I have consulted with the appropriate government agencies and determine that the conditions that prompted designation of Burundi for TPS continue to be met. 8 U.S.C. 1254a(b)(3)(A). Accordingly, I order as follows:

(1) The designation of Burundi under section 244(b)(1)(A) of the Act is extended for an additional 12-month period from November 2, 2003, to November 2, 2004. 8 U.S.C. 1254a(b)(3)(C).

(2) There are approximately 30 nationals of Burundi (or aliens having no nationality who last habitually resided in Burundi) who have been granted TPS and who are eligible for re-registration.

(3) To maintain TPS, a national of Burundi (or an alien having no nationality who last habitually resided in Burundi) who was granted TPS during the initial designation period or redesignation period must re-register for TPS during the 60-day re-registration period from September 3, 2003 until November 3, 2003.

(4) To re-register, the applicant must file the following: (1) Form I–821, Application for Temporary Protected Status; (2) Form I–765, Application for Employment Authorization; and (3) two identification photographs (1½ inches by 1½ inches). Applications submitted without the required fee and/or photos will be returned to the applicant. There is no fee for filing a Form I–821 for re-registration application. If the applicant requests employment authorization, he or she must submit one hundred and twenty dollars ($120) or a properly documented fee waiver request, pursuant to 8 CFR 244.20, with the Form I–765. An applicant who does not request employment authorization must nonetheless file Form I–765 along with Form I–821, but is not required to submit the fee. The fifty-dollar ($50) fingerprint fee is required only for children beneficiaries of TPS who have reached the age of 14 but were not previously fingerprinted. Failure to re-register without good cause will result in the withdrawal of TPS. 8 CFR 244.17(c). Some persons who had not previously applied for TPS may be eligible for late initial registration under 8 CFR 244.2.

(5) At least 60 days before this extension terminates on November 2, 2004, the Secretary will review the designation of Burundi under the TPS program and determine whether the conditions for designation continue to be met. 8 U.S.C. 1254a(b)(3)(A). Notice of that determination, including the basis for the determination, will be published in the **Federal Register**. 8 U.S.C. 1254a(b)(3)(A).

(6) Information concerning the extension of designation of Burundi under the TPS program will be available at local BCIS offices upon publication of this notice and on the BCIS Web site at *http://www.bcis.gov*.

Dated: August 28, 2003.

**Tom Ridge,**
*Secretary of Homeland Security.*
[FR Doc. 03–22508 Filed 8–29–03; 12:00 pm]
**BILLING CODE 4410–10–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Bureau of Citizenship and Immigration Services

**[CIS No. 2294–03]**

**RIN 1650–AB06**

### Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation

**AGENCY:** Bureau of Citizenship and Immigration Services, Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of Sierra Leone under the Temporary Protected Status (TPS) Program will expire on November 2, 2003. After reviewing country conditions and consulting with the appropriate Government agencies, the Secretary of Homeland Security has determined that conditions in Sierra Leone no longer support TPS designation and is therefore terminating the TPS designation of Sierra Leone. This termination is effective May 3, 2004, six months from the end of the current extension. To provide for an orderly transition, nationals of Sierra Leone (and aliens having no nationality who last habitually resided in Sierra Leone) who have been granted TPS under the Sierra Leone designation or redesignation will automatically retain their temporary protected status and have their current Employment Authorization Documents (EADs) extended until the termination date. However, an individual's TPS may still be withdrawn because of ineligibility for TPS, prior failure to timely re-register if there was not good cause for such failure, or failure to maintain continuous physical presence in the United States. On May 3, 2004, nationals of Sierra Leone (and aliens having no nationality who last habitually resided in Sierra Leone) who have been granted TPS under the Sierra

**52408** **Federal Register** / Vol. 68, No. 170 / Wednesday, September 3, 2003 / Notices

Leone designation or redesignation will no longer have TPS status.

**EFFECTIVE DATE:** The TPS designation of Sierra Leone is terminated effective May 3, 2004.

**FOR FURTHER INFORMATION CONTACT:** Jonathan Mills, Residence and Status Services, Office of Programs and Regulations, Bureau of Citizenship and Immigration Services, Department of Homeland Security, 425 "I" Street, NW., Room 3040, Washington, DC 20536, telephone (202) 514–4754.

**SUPPLEMENTARY INFORMATION:**

## What Authority Does the Secretary of the Department of Homeland Security Have To Terminate the Designation of Sierra Leone Under the TPS Program?

On March 1, 2003, the functions of the Immigration and Naturalization Service (Service) transferred from the Department of Justice to the Department of Homeland Security (DHS) pursuant to the Homeland Security Act of 2002, Public Law 107–296. The responsibilities for administering the TPS program held by the Service were transferred to the Bureau of Citizenship and Immigration Services (BCIS).

Under section 244 of the Immigration and Nationality Act (Act), 8 U.S.C. 1254a, the Secretary of DHS, after consultation with appropriate agencies of the Government, is authorized to designate a foreign state or (part thereof) for TPS. The Secretary of DHS may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state).

Section 244(b)(3)(A) of the Act requires the Secretary of DHS to review, at least 60 days before the end of the TPS designation or any extension thereof, the conditions in a foreign state designated under the TPS program to determine whether the conditions for a TPS designation continue to be met and, if so, the length of an extension of TPS. 8 U.S.C. 1254a(b)(3)(A). If the Secretary of DHS determines that the foreign state no longer meets the conditions for TPS designation, he shall terminate the designation, but such termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published. 8 U.S.C. 1254a(b)(3)(B). The Secretary of DHS may determine the appropriate effective date of the termination in order to provide an orderly transition. 8 U.S.C. 1254a(d)(3).

## Why Did the Secretary of DHS Decide To Terminate the TPS Designation for Sierra Leone as of May 3, 2004?

On November 4, 1997, the Attorney General published a notice in the **Federal Register** designating Sierra Leone under the TPS program based upon ongoing armed conflict occurring within the country. 62 FR 59736. The Attorney General extended this TPS designation annually and re-designated Sierra Leone by publishing a notice on November 9, 1999, determining in each instance that the conditions warranting such designation continued to be met. 64 FR 61125.

Since the date of the last extension, the Departments of Homeland Security and State have continued to review conditions in Sierra Leone. It is determined that termination of the TPS designation of Sierra Leone is warranted because there is no longer an ongoing armed conflict within Sierra Leone that would pose a serious threat to the personal safety of returning nationals of Sierra Leone (or aliens having no nationality who last habitually resided in Sierra Leone). 8 U.S.C. 1254a(b)(1)(A) and (B).

The Department of State (DOS) notes that the armed conflict that provided the basis for the Sierra Leone TPS designation is over. DOS Recommendation (June 19, 2003). Most of Sierra Leone has been at peace for nearly three years. *Id*. More than 66,000 ex-combatants have entered into a program of disarmament, demobilization, and reintegration into society. *Id*. Disarmament was largely complete by January 2002, and there has been no fighting since that time. *Id*. Peaceful multiparty presidential and parliamentary elections took place in May 2002. *Id*.

A year ago, the overall political situation was fragile. *Id*. Since then, however, human rights abuses have decreased dramatically nationwide. *Id*. The United Nations High Commissioner for Refugees (UNHCR) considers no area of the country unsafe to return. *Id*. More than 400,000 refugees have returned home to participate in the reconstruction of their country. *Id*. Of the approximately 45,000 refugees remaining in neighboring countries, two-thirds are expected to return home by December 2003. *Id*. In addition, reintegration of the 300,000 internally displaced persons (IDPs) is nearly complete. *Id*.

While there are approximately 60,000 Liberian refugees in Sierra Leone, they are concentrated along the eastern border with Liberia and have not caused any instability in Sierra Leone. *Id*.

Furthermore, there have been no recent cross-border attacks from Liberia into Sierra Leone. *Id*.

The BCIS Resource Information Center (RIC) notes additional indications of stability. RIC Report (July 10, 2003). A special court has been created to bring to justice those most responsible for war crimes and other major human rights violations. *Id*. A Truth and Reconciliation Commission has been established to establish a record of the conflict and promote reconciliation. *Id*. Humanitarian and economic conditions have improved markedly. *Id*.

The newly elected government enjoys significant international support and has extended police control across the country. DOS Recommendation. A British-trained police force is in place. RIC Report. The British government continues to assist and train Sierra Leone's 10,000-member armed forces and has committed to providing significant support for at least six years. DOS Recommendation. The United Nations (U.N.) Security Council has determined that security conditions have improved so much that the international U.N. peacekeeping force, which once numbered 17,500 troops, can be phased out. *Id*. The peacekeeping force currently numbers 14,000, and will further decrease to about 9,000 by year's end. *Id*.

Based upon this review, the Secretary of DHS, after consultation with appropriate government agencies, finds that the conditions that prompted designation of Sierra Leone under the TPS program no longer exist. 8 U.S.C. 1254a(b)(3). There is not an ongoing armed conflict within Sierra Leone that would pose a serious threat to the personal safety of returning aliens who are nationals of Sierra Leone (or aliens having no nationality who last habitually resided in Sierra Leone). 8 U.S.C. 1254a(b)(1)(A). Based upon these findings, the Secretary of DHS is terminating the TPS designation for Sierra Leone as of May 3, 2004. 8 U.S.C. 1254a(b)(3)(B).

To provide for an orderly transition, nationals of Sierra Leone (and aliens having no nationality who last habitually resided in Sierra Leone) who have been granted TPS under the Sierra Leone designation or redesignation will automatically retain TPS status and have their current employment authorization documents (EADs) extended until the termination date. 8 U.S.C. 1254a(a)(2) and (d)(3). These persons are urged to use the time before termination of their TPS to apply for any other immigration benefits they are eligible for or, in the alternative, prepare