

**Federal Register** / Vol. 90, No. 35 / Monday, February 24, 2025 / Notices **10511**

| Community | Community map repository address |
|---|---|
| City of Buchanan | Buchanan City Hall, 302 North Redbud Trail, Buchanan, MI 49107. |
| City of Coloma | Coloma City Hall, 119 North Paw Paw Street, Coloma, MI 49038. |
| City of Niles | Niles City Hall, 333 North Second Street, Suite 301, Niles, MI 49120. |
| City of St. Joseph | St. Joseph City Hall, 700 Broad Street, St. Joseph, MI 49085. |
| City of Watervliet | Watervliet City Hall, 158 West Pleasant Street, Watervliet, MI 49098. |
| Township of Berrien | Berrien Township Office, 8916 M–140, Berrien Center, MI 49102. |
| Township of Bertrand | Bertrand Community Hall, 3835 Buffalo Road, Buchanan, MI 49107. |
| Township of Buchanan | Buchanan Township Hall, 15235 Main Street, Buchanan, MI 49107. |
| Township of Hagar | Hagar Township Hall, 3900 Riverside Road, Riverside, MI 49084. |
| Township of Royalton | Royalton Township Hall, 980 Miners Road, St. Joseph, MI 49085. |
| Township of Sodus | Sodus Township Office, 4056 King Drive, Sodus, MI 49126. |
| Village of Shoreham | Village of Shoreham Village Hall, 2120 Brown School Road, St. Joseph, MI 49085. |

| Cass County, Michigan (All Jurisdictions) Project: 23–05–0013S  Preliminary Date: March 27, 2024 | |
|---|---|
| City of Dowagiac | City Hall, 241 South Front Street, Dowagiac, MI 49047. |
| Township of Calvin | Calvin Township Hall, 18693 Mount Zion Street, Cassopolis, MI 49031. |
| Township of Jefferson | Jefferson Township Hall, 24725 Jefferson Center Street, Cassopolis, MI 49031. |
| Township of Lagrange | Lagrange Township Hall, 58253 M–62, Cassopolis, MI 49031. |
| Township of Marcellus | Township Hall, 463 W Main Street, Marcellus, MI 49067. |
| Township of Mason | Mason Township Hall, 17049 US Highway 12, Edwardsburg, MI 49112. |
| Township of Newberg | Newberg Township Hall, 13020 Born Street, Jones, MI 49061. |
| Township of Ontwa | Ontwa Township Hall, 26225 US Highway 12, Edwardsburg, MI 49112. |
| Township of Penn | Penn Township Hall, 60717 South Main Street, Vandalia, MI 49095. |
| Township of Pokagon | Pokagon Township Hall, 30683 Peavine Street, Dowagiac, MI 49047. |
| Township of Porter | Porter Township Hall, 69373 Baldwin Prairie Road, Union, MI 49130. |
| Township of Silver Creek | Silver Creek Township Hall, 32764 Dixon Street, Dowagiac, MI 49047. |
| Township of Volinia | Volinia City Hall, 53254 Goodenough Road, Marcellus, MI 49067. |
| Township of Wayne | Wayne Township Hall, 53950 Glenwood Road, Dowagiac, MI 49047. |
| Village of Cassopolis | Village Hall, 121 North Disbrow Street, Cassopolis, MI 49031. |
| Village of Edwardsburg | Village Hall, 26296 US Highway 12, Edwardsburg, MI 49112. |
| Village of Vandalia | Village Hall, 18035 State Street, Vandalia, MI 49095. |

[FR Doc. 2025–02982 Filed 2–21–25; 8:45 am]

BILLING CODE 9110–12–P

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2809–25; DHS Docket No. USCIS–2014–0001]

RIN 1615–ZB70

## Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) partial vacatur.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) has decided to partially vacate the June 4, 2024, decision of former Secretary Alejandro Mayorkas regarding the extension of the designation of Haiti for Temporary Protected Status (TPS) and the new designation of Haiti for TPS. In

the 2024 action, former Secretary Mayorkas again extended the designation of Haiti for TPS for the statutory maximum of 18 months (until February 3, 2026), which covered approximately 199,445 Haitian nationals; and again newly designated Haiti for TPS, which had the effect of allowing approximately 321,349 additional Haitian nationals to qualify for the same 18-month period. For the reasons described in this notice, the Secretary has determined to partially vacate the June 4, 2024, decision by reducing the designation period from 18 months to 12 months. The Secretary is also making a corresponding change to the registration deadline for new applicants under the new designation. Accordingly, by operation of this notice, the Haiti TPS extension and new designation will expire on August 3, 2025, instead of February 3, 2026, and the first-time registration will remain in effect until August 3, 2025, instead of February 3, 2026.

**DATES:** The partial vacatur of the June 4, 2024, decision is effective immediately. Notice of the June 4, 2024, decision was published at 89 FR 54484 (July 1, 2024).

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Chief,

Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Temporary Protected Status (TPS) Generally

The Immigration and Nationality Act (INA) authorizes the Secretary, after consultation with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] In the case of Haiti, the designation was based on former Secretary Mayorkas' determination that "there exist extraordinary and temporary conditions in [Haiti] that prevent aliens who are nationals of [Haiti] from returning to [Haiti] in safety." Former Secretary Mayorkas, however, failed to evaluate whether "permitting the aliens to remain temporarily in the United

---

[1] INA 244(b)(1), 8 U.S.C. 1254a(b)(1). Although section 244(b)(1) of the INA continues to refer to the Attorney General, this authority now resides with the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, as amended. *See, e.g.,* 6 U.S.C. 557; 8 U.S.C. 1103(a)(1).

HT Vacatur AR_0001

States'' is not "contrary to the national interest of the United States."[2]

The determination whether to designate any foreign state (or part thereof) for TPS is discretionary, and with respect to an exercise of this discretion, Congress expressly withheld jurisdiction from Federal courts such that there is no judicial review of "any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS.[3] If a country is designated, the Secretary, in the Secretary's discretion, may then grant TPS to eligible nationals of that foreign state (or individual aliens having no nationality who last habitually resided in the designated foreign state). *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A). The INA provides that such aliens shall be granted employment authorization, and that such work authorization must be effective throughout the TPS designation period.[4]

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines conditions in the foreign state continue to meet the conditions for TPS designation, the designation will be extended for 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## II. Background

Designations of Haiti for TPS based on "extraordinary and temporary conditions" in that country extend back *15 years*. Haiti was initially designated

in January 2010 on the basis of extraordinary and temporary conditions stemming from an earthquake.[5] DHS estimated at the time that there were 100,000 to 200,000 Haitians in the United States who would be eligible.[6] Following the initial designation, DHS extended the TPS designation for Haiti and newly designated Haiti based on "extraordinary and temporary conditions" numerous times between 2011 and 2018.[7]

In January 2018, DHS announced the termination of the TPS designation of Haiti effective July 22, 2019.[8] The termination of Haiti's TPS designation was challenged in several lawsuits, and preliminary injunctions prevented DHS from implementing the termination of TPS for Haiti pending a final court order.[9]

Meanwhile, in August 2021, former Secretary Mayorkas announced that he was newly designating Haiti for 18

months on the basis of "extraordinary and temporary conditions."[10] Another 18-month extension and new designation was published in February 2023.[11] DHS then extended the re-registration period from 60 days to 18 months.[12]

Most recently, in July 2024, DHS issued a notice stating that Secretary Mayorkas once again had determined to extend and newly designate Haiti for TPS for an 18-month period, set to expire on February 3, 2026.[13] DHS concluded, in summary, that "Haiti is experiencing extraordinary and temporary conditions resulting from grave insecurity and gang crime, as well as socio-economic and humanitarian conditions, including those resulting from environmental disasters aggravating food insecurity."[14] However, DHS concluded, without any support in the record, that allowing Haitian nationals who would qualify for TPS to remain in the country was not contrary to the national interest, as required by the statute.

Each new designation allowed additional Haitian nationals who entered the United States, including illegally, to qualify even though these populations were not impacted by the preceding findings of "extraordinary and temporary conditions." In May 2011, DHS estimated that 57,000 Haitians were eligible to register for TPS.[15] In August 2021, DHS estimated that 155,000 Haitians were eligible under that new designation.[16] And by July 2024, the estimate had ballooned to 520,694 (199,445 under the extension, and 321,249 additional aliens under the new designation).[17]

Further, former Secretary Mayorkas in 2023 reconsidered and rescinded the first Trump Administration's decisions to terminate TPS designations for Honduras, El Salvador, Nicaragua, and Nepal.[18] In the case of El Salvador,

---

[2] INA 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C); *see Extension and Redesignation of Haiti for Temporary Protected Status,* 89 FR 54484 (July 1, 2024). The Secretary also may designate a country (or part of a country) for TPS on the basis of (1) an ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals, or (2) an environmental disaster (including an epidemic) that results in a substantial, but temporary, disruption of living conditions in the affected area and certain other conditions are met. *See* INA 244(b)(1)(A)–(B), 8 U.S.C. 1254a(b)(1)(A)–(B).

[3] INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).

[4] *See* INA 244(a)(1)(B), (a)(2), 8 U.S.C. 1254a(a)(1)(B), (a)(2).

[5] *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010).

[6] 75 FR 3477.

[7] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011); *Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (Oct. 1, 2012); *Extension of the Designation of Haiti for Temporary Protected Status,* 79 FR 11808 (Mar. 3, 2014); *Extension of the Designation of Haiti for Temporary Protected Status,* 80 FR 51582 (Aug. 25, 2015); *Extension of the Designation of Haiti for Temporary Protected Status,* 82 FR 23830 (May 24, 2017).

[8] *See Termination of the Designation of Haiti for Temporary Protected Status,* 83 FR 2648 (Jan. 18, 2018).

[9] *See, e.g.,* Order Granting Motion for Preliminary Injunction dated Oct. 3, 2018, ECF 128, in *Ramos* v. *Nielsen,* No. 18–cv–01554 (N.D. Cal.); Decision and Order dated Apr. 11, 2019, ECF 155 in *Saget* v. *Trump,* No. 1:18–cv–1599 (E.D.N.Y.). Both preliminary injunctions were appealed, *see Ramos* v. *Nielsen,* No. 18–16981 (9th Cir.) and *Saget* v. *Trump,* No. 19–1685 (2d Cir.), but the appellate proceedings were dismissed after Haiti was newly designated for TPS. *See* Order dated June 29, 2023, ECF 191, *Ramos* v. *Nielsen,* No. 18–16981 (9th Cir.); Order on parties' stipulated dismissal of appeal, dated Oct. 5, 2021, ECF 281, *Saget* v. *Trump,* No. 19–1685 (2d Cir.). On Dec. 28, 2023, the U.S. District Court for the Northern District of California dismissed *Ramos* v. *Nielsen,* No. 18–cv–01554 (N.D. Cal. Dec. 28, 2023), holding that the subsequent TPS designations rendered the litigation moot. *See* Order Granting Defendants' Motion to Dismiss dated Dec. 28, 2023, ECF 222, *Ramos* v. *Nielsen,* No. 18–cv–01554, (N.D. Cal.). On October 15, 2021, the U.S. District Court for the Eastern District of New York similarly dismissed the *Saget* case. *See* Stipulation of Dismissal and Order Dismissing Case dated Oct. 15, 2021, ECF 166, *Saget* v. *Trump,* No. 1:18–cv–1599 (E.D.N.Y.). The termination of TPS for Haiti was also challenged in *Centro Presente, et al.,* v. *Biden,* No. 1:18–cv–1–340 (D. Mass.) and *Nat'l Ass'n for the Advancement of Colored People* v. *Dep't of Homeland Security,* No.1:18–cv–239 (D. Md.). Claims in those cases were also dismissed following the new designation of TPS for Haiti. *See* Stipulation of Dismissal dated June 29, 2023, ECF 178, *Centro Presente, et al.* v. *Biden,* No. 1:18–cv–1–340 (D. Mass.); Order Approving Stipulation of Dismissal dated Nov. 4, 2021, ECF 116, *NAACP* v. *DHS,* No.1:18–cv–239 (D. Md.).

[10] *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021).

[11] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 88 FR 5022 (Jan. 26, 2023).

[12] *See Extension of Re-Registration Periods for Extensions of the Temporary Protected Status Designations of El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan,* 88 FR 86665 (Dec. 14, 2023).

[13] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 89 FR 54484 (July 1, 2024).

[14] 89 FR 54491.

[15] 76 FR 29002.

[16] 86 FR 41868.

[17] 89 FR 54492.

[18] *See Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador,* 88 FR 40282 (June 21, 2023);

Secretary Mayorkas determined—five years after the 2018 termination decision was announced—that "at the time of the decision to terminate TPS, El Salvador continued to experience" certain conditions "that were either insufficiently considered or not considered in the termination decision" and therefore that "[t]he termination decision failed to adequately assess conditions in El Salvador in 2018." [19] That notice stated that "[a]n agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority" and that "[t]he TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination." [20] DHS did not similarly reconsider and rescind the 2018 decision to terminate the Haiti TPS designation because, as noted, Secretary Mayorkas instead decided to newly designate Haiti.[21]

### III. Reconsideration and Partial Vacatur of the 2024 Decision

President Trump underscored in Executive Order 14159, *Protecting the American People Against Invasion,* that enforcing the immigration laws "is critically important to the national security and public safety of the United States." [22] In furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States.[23] Among the directed actions are to ensure that the TPS designations are consistent with the TPS statute and "are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." [24]

The Secretary of Homeland Security accordingly is reconsidering and partially vacating the June 4, 2024, decision of Secretary Mayorkas to extend the Haiti TPS designation and newly designate Haiti for TPS for an additional 18 months (from Aug. 4, 2024, to Feb. 3, 2026). Specifically, the Secretary has determined that the extension and designation period for Haiti should be reduced from the statutory maximum of 18 months to 12 months. Accordingly, by operation of this notice, the Haiti TPS extension and new designation will expire on August 3, 2025, instead of February 3, 2026.

The Secretary is taking this action for several reasons. First, there is no discussion in the July 1, 2024, **Federal Register** notice of why the 18-month period was selected in lieu of a 6- or 12-month period. Nor does the administrative record underlying the June 3, 2024, decision and July 1, 2024, notice bear any discussion of why the 18-month period was chosen. Allowing aliens from a given country, including aliens who entered the United States illegally or overstayed their authorized period of admission, to remain in the United States temporarily with employment authorization is an extraordinary act. Congress recognized the gravity of such action under the TPS statute by setting the default extension period at 6 months,[25] underscoring the uniqueness of this authority,[26] and limiting its own authority to enact legislation allowing TPS recipients to adjust to lawful permanent resident status.[27] Accordingly, determinations of how long a new designation should remain in effect and whether to depart from the default six-month period for an extension of an existing designation should take into account important considerations relating to the purpose of the statute and specific country and country conditions at issue and should not rest alone on administrative convenience. Here, there was no explanation whatsoever of why the 18-month period was selected.

Second, and similarly, the July 1, 2024, notice is bereft of any justification of why permitting the ever-increasing population of Haitian TPS recipients, particularly those who entered the country unlawfully, to remain

temporarily in the United States is not contrary to the U.S. national interest. The notice simply states that "it is not contrary to the national interest of the United States." The administrative record underlying Secretary Mayorkas' June 4, 2024, decision likewise lacks any discussion of the critical national interest criterion. Such conclusory determinations do not accord with the gravity of TPS decisions under the INA. "National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (*e.g.,* potential nexus to criminal gang membership), national security, migration factors (*e.g.,* pull factors), immigration policy (*e.g.,* enforcement prerogatives), and economic considerations (*e.g.,* adverse effects on U.S. workers, impact on U.S. communities).[28] Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

Third, although the July 1, 2024, notice cites some country conditions reports that are relatively proximate to the June 4, 2024, decision, several others date back to early 2023, 2022, or even earlier.[29] And certain sources upon which DHS relied indicated that significant developments were taking place in 2024 that might result in an improvement in conditions. For example, as stated in the July 1, 2024, **Federal Register** notice, the United Nations had recently authorized a Multinational Security Support (MSS) mission to deploy in Haiti in 2024 and support the Haitian National Police in capacity building, combatting gang violence, and provide security for

---

*Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras,* 88 FR 40304 (June 21, 2023); *Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua,* 88 FR 40294 (June 21, 2023); *Reconsideration and Rescission of Termination of The Designation of Nepal for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nepal,* 88 FR 40317 (June 21, 2023).

[19] 88 FR 40287.

[20] 88 FR 40285.

[21] *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021).

[22] 90 FR 8443, 8443 (Jan. 20, 2025).

[23] 90 FR 8446.

[24] *Id.*

[25] *See* INA 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

[26] *See* INA 244(g), 8 U.S.C. 1254a(g) ("Except as otherwise specifically provided, this section shall constitute the exclusive authority of the [Secretary of Homeland Security] under law to permit aliens who are or may become otherwise deportable or have been paroled into the United States to remain in the United States temporarily because of their particular nationality or region of foreign state of nationality.").

[27] *See* INA 244(h), 8 U.S.C. 1254a(h).

[28] *See, e.g., Poursina* v. *USCIS,* 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic an national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts" (citing *Trump* v. *Hawaii,* 585 U.S. 667, 684–86 (2018)); *Flores* v. *Garland,* 72 F.4th 85, 89–90 (5th Cir. 2023) (same); *Brasil* v. *Sec'y, Dep't of Homeland Sec.,* 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D–J–,* 23 I&N Dec. 572, 579–81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country—in that case, Haiti—is "sound immigration policy" and an "important national security interest"); *Matter of Dhanasar,* 26 I&N Dec. 884, 890–91 (AAO 2016) (taking into account impact on U.S. workers in "national interest" assessments).

[29] *See, e.g.,* 89 FR 54888, 54490 (relying on Apr. 2021 report by Harvard Law School, July 2022 report by the International Crisis Group, and Sept. 2021 report by the Council on Foreign Relations).

critical infrastructure.[30] The Department of State likewise underscored that significant development. Thus, both DHS and the Department of State contemplated the real possibility of an improvement in conditions with the deployment of the United Nations MSS mission, yet that important development was not expressly factored into the determination of the length of the extension and designation period.

Eighteen months is the maximum period of designation or extension authorized under the TPS statute. Neither the 2021 new designation, the 2023 extension and new designation, nor the 2024 extension and new designation contained any discussion of national interest considerations or why the 18-month (vs. 6 or 12-month) periods were granted. Given the protracted duration of the "extraordinary and temporary conditions"-based designation for Haiti, the absence of any meaningful appraisal of national interest factors or justification for the 18-month extension, and the fact that eligible Haitians were able to register for TPS under the July 1, 2024, notice for over seven months, the Secretary has determined that a 12-month period is warranted. Abbreviating the period from 18 to 12 months will allow for a fresh review of country conditions in Haiti and of whether such conditions remain both "extraordinary" and "temporary," whether Haitian may return in safety, and whether it is contrary to the U.S. national interest to continue to permit the Haitian nationals to remain temporarily in the United States.

Although the statute allows the Secretary to reassess country conditions—including whether allowing the aliens to remain temporarily in the United States is contrary to the U.S. national interest—at any time at least 60 days before the end of the extension or designation period, the statute does not preclude this more modest action in the interim.[31] The Secretary intends to conduct a review of current conditions in Haiti and make a new determination in due course.

As the prior Administration concluded, the TPS statute does not limit the Secretary's inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the

determination.[32] The Secretary is taking the modest action here of partially vacating the June 4, 2024, decision to reduce the designation and extension period from 18 months to 12 months and to make a corresponding change to the initial registration period for new applicants under the 2024 new designation.

In taking this action, the Secretary has considered putative reliance interests in Secretary Mayorkas' unreasoned granting of the statutory maximum 18-month period.[33] In particular, as noted, in determining that a 12-month period (vs. 6 months) is warranted, the Secretary considered that Haitians have already been able to register under the July 1, 2024, notice for over seven months. The Secretary also considered potential reliance interests in deciding only to partially vacate the 2024 decision instead of—as Secretary Mayorkas did in 2023—entirely rescinding or vacating the prior Administration's decision. This action does not alter the 60-day re-registration period permitted for existing beneficiaries under the 2024 extension, which expired on August 30, 2024. And eligible new applicants will still be able to register under the 2024 new designation, but they must now do so by August 3, 2025, instead of February 3, 2026. Moreover, any putative reliance

interests arguably engendered by the 18-month, vs. 12-month, designation and extension period are outweighed by the overriding interests and concerns articulated in this notice.

*B. Effect of the Vacatur*

As a result of the partial vacatur, the 2024 Haiti TPS extension and new designation remains in effect until August 3, 2025, and the initial registration period for new applicants under the 2024 Haiti TPS designation will remain in effect until August 3, 2025. The Secretary, consistent with the statute, intends to review the Haiti TPS designation by June 4, 2025. If she fails to do so, the statute triggers an automatic six-month extension of the current TPS designation.

Pursuant to this partial vacatur, TPS re-registration applications, initial applications, and associated applications for employment authorization filed pursuant to the July 1, 2024, notice that remain pending with USCIS will, if approved, receive an expiration date of August 3, 2025. TPS beneficiaries under the Haiti TPS designation who have already received Employment Authorization Documents (EADs); Forms 1–797, Notice of Action (Approval Notice); and Forms 1–94, Arrival/Departure Record (collectively known as TPS-related documentation) with a February 3, 2026, expiration date do not need to refile applications with USCIS for new TPS-related documentation showing an August 3, 2025, expiration date. USCIS will not recall TPS-related documentation previously issued with February 3, 2026, expiration dates and those documents remain valid through the new TPS Haiti designation period expiring on August 3, 2025. Additionally, USCIS will not issue new TPS-related documentation with the August 3, 2025, expiration date to aliens who have previously received documentation with the February 3, 2026, expiration date.

Employers and Federal, State, and local government agencies (such as Departments of Motor Vehicles) that previously accepted or are presented with an EAD with the TPS category code of A–12 or C–19 that expires on February 3, 2026, must update their records to note that the validity date of the document is through August 3, 2025.

Aliens who have filed TPS applications pursuant to the July 1, 2024, notice that remain pending with USCIS may also choose to withdraw their TPS applications and request a refund of any filing fees by submitting

---

[30] 89 FR 54490 & nn. 77–79 (citing United Nations Security Council, Resolution 2699 (Oct. 2, 2023)).

[31] *See* INA 244(b)(3)(A)–(B), 1254a(b)(3)(A)–(B) (providing that the Secretary shall review conditions at least 60 days before the end of the initial period of designation and any extended period of designation).

[32] *See* INA 103(a), 244(b)(3), (b)(5)(A); 8 U.S.C. 1103(a), 1254a(b)(3), (b)(5)(A); *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador,* 88 FR 40282, 40285 (June 21, 2023) ("An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination."); *see also, e.g., Ivy Sports Medicine, LLC v. Burwell,* 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . "[I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide." (quotation marks and citations omitted)); *Macktal v. Chao,* 286 F.3d 822, 825–26 (5th Cir. 2002) ("It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); *Mazaleski v. Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time."); *cf. Last Best Beef, LLC v. Dudas,* 506 F.3d 333, 340 (4th Cir. 2007) (agencies possess especially "broad authority to correct their prior errors").

[33] Because temporary protected status, as the name itself makes clear, is an inherently temporary status and TPS designations are time-limited and subject to agency review, any putative reliance interests of registrants in the Haiti under the Haiti designation merit only diminished weight.

a signed written withdrawal request to USCIS.

## IV. Notice of Partial Vacatur of Secretary Mayorkas' 2024 Decision Regarding the Haiti TPS Extension and New Designation

By the authority vested in me as Secretary under sections 103(a) and 244 of the Immigration and Nationality Act, 8 U.S.C. 1103(a), 1254a, I am vacating in part the decision announced in the July 1, 2024, notice titled *Extension and Redesignation of Haiti for Temporary Protected Status,* 89 FR 54484. In doing so, I am (1) amending the period of the extension and designation of Haiti for TPS from 18 months to 12 months, with a new end date of August 3, 2025; and (2) making a corresponding change to the initial registration period for new applicants under the new designation, which now will remain in effect through August 3, 2025. This notice supersedes the July 1, 2024, notice at 89 FR 54484 to the extent modified by this partial vacatur.

Information concerning the TPS designation for Haiti will be available at local USCIS offices upon publication of this notice and through the USCIS National Customer Service Center at 1–800–375–5283. This information will be published on the USCIS website at *www.USCIS.gov.*

**Kristi Noem,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2025–02970 Filed 2–20–25; 4:15 pm]
**BILLING CODE 9111–97–P**

---

## INTERNATIONAL TRADE COMMISSION

**[Investigation Nos. 731–TA–1662–1663 (Final)]**

## Glass Wine Bottles From China and Mexico

### Determinations

On the basis of the record [1] developed in the subject investigations, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that an industry in the United States is not materially injured or threatened with material injury by reason of imports of glass wine bottles from China and Mexico, provided for in subheading 7010.90.50 of the Harmonized Tariff Schedule of the United States, that have been found by the U.S. Department of

Commerce ("Commerce") to be sold in the United States at less than fair value ("LTFV").[2]

### Background

The Commission instituted these investigations effective December 29, 2023, following receipt of petitions filed with the Commission and Commerce by the U.S. Glass Producers Coalition, which is comprised of Ardagh Glass Inc. (Indianapolis, Indiana) and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (Pittsburgh, Pennsylvania). The Commission scheduled the final phase of the investigations following notification of a preliminary determination by Commerce that imports of glass wine bottles from China were being subsidized by the government of China (89 FR 47533, June 3, 2024). Notice of the scheduling of the final phase of the Commission's investigations and of a public hearing to be held in connection therewith was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the **Federal Register** (89 FR 49901, June 12, 2024, and as revised in 89 FR 63445, August 5, 2024). The Commission conducted its hearing on August 14, 2024. All persons who requested the opportunity were permitted to participate.

Although antidumping duty petitions for Chile, China, and Mexico and a countervailing duty petition for China were filed on the same day, December 29, 2023, the investigation schedules became staggered when Commerce did not align its countervailing duty investigation concerning China with its antidumping duty investigations concerning Chile, China, and Mexico and reached an earlier final countervailing duty determination. On October 9, 2024, the Commission issued a final negative determination in its countervailing duty investigation of glass wine bottles from China (89 FR 83515, October 16, 2024).

On December 10, 2024, counsel for the petitioner filed with Commerce a request to withdraw its petition regarding imports of glass wine bottles from Chile. On December 30, 2024, Commerce published notice in the **Federal Register** of the termination of its subject investigation concerning glass wine bottles from Chile (89 FR 106425) and the Commission subsequently terminated its antidumping duty investigation

concerning glass wine bottles from Chile (90 FR 1543, January 8, 2025).

Following notification of final determinations by Commerce that imports of glass wine bottles from China and Mexico were being sold at LTFV within the meaning of section 735(a) of the Act (19 U.S.C. 1673d(a)), notice of the supplemental scheduling of the final phase of the Commission's antidumping duty investigations concerning China and Mexico was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the **Federal Register** (90 FR 3251, January 14, 2025).

The Commission made these determinations pursuant to § 735(b) of the Act (19 U.S.C. 1673d(b)). It completed and filed its determinations in these investigations on February 18, 2025. The views of the Commission are contained in USITC Publication 5588 (February 2025), entitled *Glass Wine Bottles from China and Mexico: Investigation Nos. 731–TA–1662–1663 (Final).*

By order of the Commission.
Issued: February 18, 2025.

**Lisa Barton,**
*Secretary to the Commission.*
[FR Doc. 2025–02959 Filed 2–21–25; 8:45 am]
**BILLING CODE 7020–02–P**

---

## INTERNATIONAL TRADE COMMISSION

## Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

---

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has received a complaint entitled *Certain Foreign-Fabricated Semiconductor Devices, Products Containing the Same, and Components Thereof, DN3809;* the Commission is soliciting comments on any public interest issues raised by the complaint or complainant's filing pursuant to the Commission's Rules of Practice and Procedure.

**FOR FURTHER INFORMATION CONTACT:** Lisa R. Barton, Secretary to the Commission, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436, telephone (202) 205–2000. The public version of the complaint can be accessed on the Commission's Electronic Document Information System (EDIS) at *https://edis.usitc.gov.*

---

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

[2] 90 FR 76 and 79 (January 2, 2025).

Decision Document

**USCIS Notice: Partial Vacatur of June 4, 2024 Decision to Extend and Newly Designate Haiti for Temporary Protected Status**

(1) Partially vacate the Secretary Mayorkas' June 4, 2024 decisions for TPS, such that the extension and designation period is 12 months instead of 18 months, and (2) Approve publication in the *Federal Register.*

_____          ████████████████████████████

_____          ████████████████

_____          ████████████

_____          Date.

COUNCIL *on*
FOREIGN
RELATIONS

*Backgrounder*

# Haiti's Troubled Path to Development

Hobbled by foreign interventions, political instability, and natural disasters, the former French colony is paralyzed by multiple crises.

**WRITTEN BY**
Diana Roy *and* Rocio Cara Labrador

**UPDATED**
*Last updated June 25, 2024 11:40 am (EST)*

---

## Summary

Once the wealthiest colony in the Americas, Haiti is now the Western Hemisphere's poorest country, with more than half of its population living below the World Bank's poverty line.

Foreign intervention and debt, political instability, and natural disasters have long stymied development efforts in Haiti, but there are hopes a new prime minister could help stabilize governance.

While the Joe Biden administration has ruled out sending U.S. troops to the island, it has pledged to provide financial support for a UN-authorized, Kenya-led multinational force to fight Haiti's powerful gangs.

## Introduction

Few countries have struggled with development like Haiti. Since breaking free from French colonial rule over two centuries ago, the Caribbean state has weathered multiple foreign interventions, chronic political instability, social unrest, and devastating natural disasters. The

confluence of these forces has transformed what was once the wealthiest colony in the Americ
into the poorest country in the Western Hemisphere.

The United States has had a long and troubled history with Haiti, including a nearly twenty-yea
sometimes bloody, occupation in the early twentieth century. Despite an often rocky relationsh
the two countries maintain close economic and social ties, although bilateral relations have co
under increased strain in recent years. During his tenure, President Donald Trump sought to
restrict immigration from Haiti, sending thousands of Haitians back on deportation flights.
Though President Joe Biden promised a new approach toward the country, he has continued to
deport Haitian asylum seekers en masse even as the situation on the island grows increasingly
dangerous, challenging U.S. policy on multiple fronts.

## What are Haiti's origins?

Spanish settlers arrived on the island of Hispaniola, which comprises modern-day Haiti and th
Dominican Republic, in 1492. Within a quarter-century, diseases brought by Europeans, such a
smallpox and measles, decimated the Indigenous Taíno population. Over the next three centu
European colonizers imported hundreds of thousands of enslaved people from western and
central Africa to harvest sugar, coffee, and timber—all lucrative exports.

In the early 1600s, French traders established an outpost on the western third of the island, wh
Paris annexed as the colony of Saint-Domingue several decades later. In the late 1700s, Toussa
L'Ouverture and Jean-Jacques Dessalines, both formerly enslaved, led a rebellion against Fren
rule that culminated with the creation of Haiti in 1804. The first postcolonial Black republic, H
became a beacon of abolition, self-determination, and racial equality.





**HAITI AT A GLANCE**

**Area**
27,750 sq km (slightly smaller than
Maryland)

**Life expectancy**
63 years (2021)

**Form of government**
Semi-presidential republic

**Primary religions**
Catholicism 55%, Protestantism
29%, none 10% (2018)

**GDP**
$20.3 billion (2022)

**GDP per capita**
$1,748 (2022)

**Population**
11.6 million (2022)

**Primary languages**
French, Creole

*Sources:* CIA World Factbook; World Bank.

# What is Haiti's economic situation?

Haiti is the poorest country in the Western Hemisphere. More than half the population lives be
the poverty line, with limited access to basic services, and many people rely on subsistence
farming to feed their families. The country is also heavily dependent on external revenue:
between 2010 and 2020, the United Nations allocated more than $13 billion in international aic
for Haiti, most of which has funded disaster-relief missions and development programs.
Meanwhile, Haitian remittances have steadily risen over the past two decades, totaling $4.3
billion in 2023 as the island remains paralyzed by multiple crises.

Since 2010, trade has composed 41 percent of Haiti's GDP on average. The country's major
industries include sugar refining, flour milling, and cement and textile manufacturing; textiles
accounted for $1.15 billion, making up 85 percent of all exports in 2021. The United States is
Haiti's largest trade partner, followed by Canada and Mexico.

In recent years, natural disasters, disease, political instability, mismanagement of humanitaria
relief, and a depreciation of the gourde—Haiti's currency—have strained the economy. Tourisn
once a vibrant sector, has declined. Compared to a record 1.3 million tourists in 2018, which dr
in $620 million, Haiti welcomed only 148,000 travelers in 2021, generating around $80 millior
profits. That same year, the neighboring Dominican Republic welcomed five million tourists.

Haiti remains heavily in debt. For example, while international lenders canceled Haiti's debt
following a massive earthquake in 2010, since then its total public debt has since risen mostly c
to disbursements related to PetroCaribe—the Venezuela-led regional alliance that offers its
members subsidized oil. At the end of fiscal year 2021 (FY 2021), Haiti's public debt totaled $5
billion, or nearly 30 percent of its GDP. Further upheaval, including an escalating protest
movement, the 2021 assassination of President Jovenel Moïse, back-to-back natural disasters ir
July and August 2021, and rampant gang violence have placed further stress on the country's
economic situation.

Case 3:25-cv-01766-EMC    Document 16-2    Filed 04/15/25    Page 11 of 137

Growing Instability in Haiti

---

# Why has Haiti had such difficulty developing?

Since its independence from France, Haiti's development has been menaced by forces that run
gamut, including interference of foreign powers, domestic political malfeasance, natural
disasters, social instability, and epidemics.

*Foreign intervention and debt.* Freedom from France in 1804 did not mean an end to foreign pov
intervening in Haiti. France only recognized an independent Haiti in 1825 after its former color
agreed to pay reparations that are estimated to be worth $21 billion in today's dollars. Over the
next 122 years, as much as 80 percent of Haiti's revenues went to paying off this debt.

The United States recognized Haiti only in 1862, when President Abraham Lincoln was
championing emancipation at home and abroad. Subsequent U.S. administrations viewed Hait
through a mostly strategic lens. Wary of encroaching German influence in the Caribbean at the
outset of World War I, President Woodrow Wilson ordered Marines to Haiti in 1915, purportedl
restore political stability. In the five years prior, seven Haitian presidents were ousted from off
or assassinated. During the nearly two-decade occupation, the United States controlled Haiti's

https://www.cfr.org/backgrounder/haitis-troubled-path-development

security and finances; it also imposed racial segregation, forced labor, and press censorship, an
deposed presidents and legislatures that opposed the U.S. presence. Some fifteen thousand
Haitians were killed in rebellions against the U.S. administration, the bloodiest of which occur
in 1919 and 1929. President Franklin D. Roosevelt withdrew U.S. troops in 1934 as part of his G
Neighbor Policy.

*Political instability*. The U.S. withdrawal was followed by a series of unstable governments, whi
culminated in 1957 with the establishment of a dictatorship under François Duvalier and his so
Jean-Claude. Their twenty-nine-year rule was characterized by corruption that drained the
nation's coffers and human rights violations that left an estimated thirty thousand people dead
missing. In 1986, massive protests and international pressure forced the younger Duvalier to fl
the country, giving way to a new constitution and democratic institutions [PDF].

However, political instability persisted. Jean-Bertrand Aristide, the country's first democratica
elected president, was twice deposed in coups, in 1991 and 2004. Both prompted U.S. military
interventions supported by the United Nations. In 2004, the United Nations launched a thirtee
year peacekeeping mission, the Brazil-led UN Stabilization Mission in Haiti (MINUSTAH) [PD
which sought to restore order after the fall of the Aristide government. In 2011, the election of
Michel Martelly as president was clouded by allegations of U.S. meddling on his behalf. He late
stepped down after postponing presidential elections twice and ruling by decree for more than
year. Haiti was cast into a political vacuum in 2016, when fraud allegations against Martelly's
successor, Jovenel Moïse, postponed Moïse's official election until early 2017.

Moïse's presidency saw mass protests and calls for his resignation in response to increased fue
prices and the removal of government subsidies, accusations of corruption, a worsening econo
crisis, and dispute over his administration's legitimacy. The widespread social unrest culminat
in Moïse's July 2021 assassination. U.S. authorities initially arrested several mercenaries, many
whom had received U.S. military training, on suspicion of involvement in the killing. Eleven
people now face charges in a U.S. court in connection to the murder, even as Haiti's own
investigation has proceeded slowly; in February 2024, a Haitian judge charged Moïse's widow v
complicity in his killing.

HT Vacatur AR_0012

Case 3:25-cv-01766-EMC    Document 16-2    Filed 04/15/25    Page 13 of 137

Ariel Henry, named prime minister only days before the murder, took over as acting president
came under suspicion after Haiti's chief prosecutor alleged that Henry was in communication
a key suspect. In January 2022, Henry survived an assassination attempt himself. After postpon
it several times, the government has committed to holding a general election by August 2025. V
gang violence on the island worsening, Haiti and Kenya reached a deal in March 2024 authoriz
the deployment of one thousand Kenyan police officers to Haiti as part of a UN-backed
multinational stabilization mission, beginning with a contingent of a few hundred officers. In
May, a transitional council, created to help form a new government in the wake of Henry's
resignation, chose Garry Conille as Haiti's new prime minister. Conille briefly served in the rol
between 2011 and 2012.

*Natural disasters*. Located on a geological fault line in a region prone to severe storms, Haiti
suffers more natural disasters [PDF] than most Caribbean nations. Widespread deforestation I
left the country especially prone to flooding and mudslides, and the island is also prone to
cyclones, hurricanes, tropical storms, and earthquakes.

A massive earthquake near the capital in 2010, for example, killed about 220,000 Haitians and
displaced 1.5 million more. At $8 billion, basic reconstruction costs surpassed the country's an
GDP. Between 2015 and 2017, drought led to crop losses of 70 percent, and in 2016, Hurricane
Matthew decimated the country's housing, livestock, and infrastructure. Haiti was then struck
back-to-back disasters in August 2021, when a magnitude 7.2 earthquake rocked the southern
peninsula, destroying 30 percent of local homes, killing over 2,000 people, and displacing tens
thousands more. Days later, Tropical Storm Grace exacerbated the destruction, dumping heavy
rains and triggering flash flooding and landslides. Inclement and dangerous weather has
continued to strike the island as the threat of climate change intensifies.

A number of factors magnify the impact of such disasters, including poor urban planning;
substandard infrastructure and housing; large coastal populations; and widespread dependenc
on subsistence farming, which can degrade the environment if overexploited.

Epidemics and aid mismanagement have further complicated matters. Dengue and malaria ru
rampant, and cholera, introduced by UN peacekeepers from Nepal after the 2010 earthquake,
killed almost ten thousand people and infected nearly one million more. Despite declaring itse

HT Vacatur AR_0013

cholera-free in 2022, a lack of access to healthcare and other essential services is fueling a resurgence of the disease across the island. At the same time, billions of dollars in aid pledges from governments and organizations following the 2010 crisis are still unaccounted for.

## How have recent U.S. administrations approached Haiti?

Washington's stated aims have been to bring political and economic stability to its southern neighbor while easing Haiti's humanitarian distress. The Barack Obama administration focuse on strengthening Haiti's national police force, boosting economic security, improving health a education services, and buttressing infrastructure. Under Obama, the United States led the international responses to Haiti's crises, calling the country a "key foreign assistance priority" [PDF] in the Caribbean, and continued to support the United Nations' MINUSTAH mission. Si the 2010 earthquake, the U.S. Agency for International Development (USAID) has been Haiti's donor, contributing more than $5 billion, including millions in support of disaster-risk reductic programs.

On trade, a series of accords struck by President George W. Bush and extended under Obama provide Haitian textiles with duty-free access to the United States. As of 2020, more than 83 percent of all Haitian exports were going to the United States.

Immigration has been a central issue in the U.S.-Haiti relationship. Between 1990 and 2015, th Haitian immigrant population in the United States tripled as Haitians fled political instability a natural disasters, though some previous U.S. administrations responded with harsh detention a repatriation policies. After the 2010 earthquake, Obama granted Haitians temporary protected status (TPS), which affords undocumented migrants from troubled countries the right to live a work in the United States for renewable periods of up to eighteen months. According to the late American Community Survey, more than one million people of full or partial Haitian descent resided in the United States in 2021, making the country home to the largest Haitian populatio outside of Haiti.

## What did Trump do?

The Trump administration cut USAID's humanitarian and development assistance to Haiti by nearly 18 percent in 2017 as part of broader reductions to U.S. foreign aid, but preserved fundin for initiatives to reduce poverty, improve infrastructure and services, and promote democratic institutions. Several trade agreements from the Obama era have likewise endured, including Haiti's duty-free access to U.S. markets, which was among the deals renewed by the Trump administration. When protests erupted across Haiti in 2019, Trump supported President Moïse who faced accusations of political illegitimacy and growing authoritarianism.

At the same time, Trump diverged from his recent predecessors on immigration, particularly w regard to TPS, which he sought to end for many countries. In late 2017, he denied some 59,000 Haitians an extension of their protected status, leading to the deportation of more than 2,500 [PDF] of them between 2018 and 2020. However, Haiti's TPS designation was subsequently extended several times due to legal rulings against the Trump administration's policies, as wel Haiti's ongoing instability.

## What is Biden's approach?

Before taking office, President Biden promised a new era of U.S. engagement with Latin Ameri and the Caribbean. However, his response to Haiti's ongoing crises has drawn ire from locals w say the United States has done little to help and spurred calls for stronger action.

In January 2021, the administration announced that it was sending $75.5 million in developmen aid and health assistance to Haiti. Following the August earthquake, the administration approv an additional $32 million in disaster-relief funds and authorized USAID rescue teams to be dispatched to the island. In response to the country's deteriorating political and security situat the Biden administration revived TPS for an estimated 155,000 Haitians, announcing a new, eighteen-month designation [PDF] in May 2021. (Haiti was again redesignated for TPS beginni in February 2023.)

The administration also contributed another $50 million to Haiti's recovery fund alongside oth UN members during an international aid conference led by the United Nations in February 202 The United States later designated Haiti a priority country under the 2022 Global Fragility Act,

HT Vacatur AR_0015

which aims to provide funding to prevent and reduce violent conflict and promote stability in f
at-risk countries and regions. In March 2023, as part of the Act's implementation process, the
White House announced a ten-year strategic plan aimed at fostering stability in Haiti.

Though he lifted Title 42, Biden has maintained some aspects of Trump's border policy. Fearin
migration surge after Title 42 expired in May 2023, the Biden administration unveiled a restrict
new policy that allows the government to deny asylum to migrants who did not previously appl
for it in a third country and to those who cross the border illegally. Among those affected by the
policy are thousands of Haitian asylum seekers; since Biden took office, more than twenty-sev
thousand [PDF] asylum seekers have been deported back to Haiti. To incentivize legal migratic
meanwhile, the administration created new humanitarian parole programs for nationals of fou
Latin American countries, including Haiti.

Some policy analysts have argued that the Biden administration's response in the aftermath of
President Moïse's murder was lackluster. Several members of Congress urged Biden to withdra
his support for Prime Minister Henry, arguing that he lacked the political sway needed to organ
elections to determine Haiti's next president. Others in Congress pressed the administration to
halt mass deportations of Haitians under Title 42—a practice that drove the U.S. special envoy
Haiti to resign in October 2021.

Meanwhile, the White House continues to rule out sending U.S. troops or additional military
assistance to Haiti. However, the United States remains the largest humanitarian donor to Hait
and USAID has provided the island with more than $146 million in emergency assistance since
2023. Washington has also pledged to financially back the deployment of the Kenya-led
multinational force to help local police fight Haiti's gangs. As the security situation in Haiti rap
deteriorates, the Biden administration has urged all U.S. citizens on the island to leave, even as
deportation flights continue.

## Recommended Resources

For the Center for Preventive Action, the University of Michigan's Susan D. Page argues that the
United States needs a smarter assistance strategy in Haiti.

Edwidge Danticat looks at the legacy of Haiti's occupation in the *New Yorker*.

HT Vacatur AR_0016

The *New York Times*' Matt Apuzzo, Selam Gebrekidan, Constant Méheut, and Catherine Porter analyze how Haiti's current troubles stem from its colonial past.

The Center for Preventive Action tracks instability in Haiti.

Nathalie Baptiste explores the legacy of the Duvalier dictatorships on Haiti and its diaspora for Foreign Policy In Focus and the *Nation*.

The U.S. Institute of Peace's Keith Mines explains the need for an internationally facilitated political process in Haiti.

 Creative Commons: Some rights reserved.

Michael Bricknell and Will Merrow created the map for this Backgrounder.

**For media inquiries on this topic, please reach out to communications@cfr.org.**

HT Vacatur AR_0017

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ APR 1 1 2019 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

PATRICK SAGET, SABINA BADIO FLORIAL,
NAÏSCHA VILME, GERALD MICHAUD,
BEATRICE BELIARD, RACHELLE GUIRAND,
JEAN CLAUDE MOMPOINT, YOLNICK JEUNE,
GUERLINE FRANCOIS, LEOMA PIERRE, HAÏTI
LIBERTÉ, and FAMILY ACTION NETWORK
MOVEMENT, INC.,

                              Plaintiffs,

                    v.

DONALD TRUMP, President of the United
States of America, UNITED STATES OF
AMERICA, DEPARTMENT OF HOMELAND
SECURITY, KIRSTJEN NIELSEN, Secretary of
Homeland Security, and ELAINE C. DUKE,
Deputy Secretary of Homeland Security,

                              Defendants.

------------------------------------------------------------ X

**DECISION & ORDER**
18-CV-1599 (WFK) (ST)

**WILLIAM F. KUNTZ, II, United States District Judge:**

Plaintiffs bring this action challenging then-Acting Secretary of Homeland Security Elaine C. Duke's November 20, 2017 determination to terminate Haiti's Temporary Protected Status designation based on her assessment that Haiti had sufficiently recovered from a 2010 earthquake and there were no longer "extraordinary and temporary conditions" preventing Haitian nationals residing in the United States from safely returning to Haiti. For the foregoing reasons, the Court hereby ORDERS a preliminary injunction enjoining the termination of Temporary Protected Status for those Haitian nationals lawfully residing in the United States of America under the Temporary Protected Status the United States of America awarded them.

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 5

A.    History and Purpose of TPS ........................................................................... 5

B.    The TPS Decisionmaking Process ................................................................ 7

    i.    Department of State ............................................................................. 7

    ii.    Department of Homeland Security ...................................................... 9

        a.    General Practices DHS Employs in Making TPS Determinations ............................. 9

        b.    Factors DHS Considers in Making TPS Determinations ........................................ 10

HAITI'S TPS DESIGNATIONS ...................................................................................... 12

A.    History of Haiti's TPS Designation ............................................................ 12

B.    Events Leading Up to May 2017 Extension ............................................... 14

    i.    The 2016 Periodic Review Process ................................................... 14

    ii.    March 2017 Official Drafts Recommend 18-Month Extension ................................... 18

    iii.    In March and April 2017, USCIS Revises Draft Director Memorandum to Recommend Termination ................................................................................. 19

    iv.    USCIS and DHS Officials Began Collecting Criminality, Welfare, and Immigration Status Data ........................................................................... 23

    v.    Career Staffers React to USCIS's Recommendation ........................................ 26

    vi.    April 2017 Press Leaks ..................................................................... 28

    vii.    In May 2017, Secretary Kelly Announces 6-Month Extension ................................... 28

C.    Events Leading Up to November 2017 Termination ................................... 32

    i.    DHS Looks to Statute for TPS Process with "Fresh Eyes" ............................ 33

    ii.    DHS and Department of State Officials Seek to Coordinate TPS Review ................ 36

        a.    U.S. Embassy in Haiti Recommends Extension .......................................... 39

        b.    WHA Recommends Termination and Sends a Split Memo to Secretary Tillerson .. 40

   c.    Secretary Tillerson Recommends Termination for Haiti, Honduras, El Salvador, and Nicaragua ............................................................................................................ 40

  iii.   USCIS Recommends Termination........................................................................... 42

  iv.   Acting Secretary Duke Decides to Terminate TPS................................................ 48

    a.    Input Within DHS ............................................................................................ 48

    b.    Input from the White House and SOUTHCOM ............................................. 51

    c.    The Government of Haiti Continues to Ask for Extension................................ 54

    d.    Acting Secretary Duke Announces Termination of TPS for Haiti .................... 56

PROCEDURAL HISTORY............................................................................................. 58

JURISDICTION ............................................................................................................. 60

A.    Subject Matter Jurisdiction Over Plaintiffs' Claims............................................... 60

  i.   General Legal Standards ........................................................................................ 61

  ii.   Discussion ............................................................................................................ 61

B.    Plaintiff's Claims Against the President ................................................................. 67

STANDING .................................................................................................................... 70

PRELIMINARY INJUNCTION ..................................................................................... 76

A.    General Legal Standards ........................................................................................ 76

B.    Likelihood of Success on the Merits/Serious Questions......................................... 77

  i.   APA and Ultra Vires Claims.................................................................................. 77

    a.    Scope of Review .............................................................................................. 77

    b.    Discussion ....................................................................................................... 87

      1.    Not in Accordance with Law ..................................................................... 88

      2.    Arbitrary and Capricious ........................................................................ 101

        i.    Departure from Agency Practices.................................................... 103

        ii.    Improper Political Influence............................................................ 111

iii.   Pretext ................................................................................. 113

3.   Notice-and-Comment ........................................................ 116

4.   Ultra Vires ........................................................................ 121

ii.  Equal Protection Claim ........................................................... 122

a.  General Legal Standards ................................................... 123

b.  Scope of Review ................................................................ 126

c.  Discussion .......................................................................... 126

1.   Direct Evidence ................................................................ 127

2.   Circumstantial Evidence ................................................... 132

C.   Irreparable Harm ............................................................................. 136

D.   Public Interest and Balance of the Equities ..................................... 141

SCOPE OF RELIEF ................................................................................... 143

CONCLUSION ........................................................................................... 145

HT Vacatur AR_0021

# BACKGROUND

## A. History and Purpose of TPS

Congress enacted the Immigration Act of 1990 to amend the Immigration and Nationality Act ("INA") and to provide additional avenues for immigrants to enter lawfully and remain in the United States. *See* Pub. L. 101-649, 104 Stat. 4978 (1990). Upon signing the Act into law, President George H.W. Bush announced the Act "recognizes the fundamental importance and historic contributions of immigrants to our country." Presidential Statement on Signing the Immigration Act of 1990 (Nov. 29, 1990). The law established, among other things, a diversity visa program, a family-based immigration visa, and additional employment-based visas. *See* 104 Stat. at 4986-5001.

Congress also created Temporary Protected Status ("TPS") for nationals of designated countries experiencing an ongoing armed conflict, environmental disaster, or extraordinary and temporary conditions. 8 U.S.C. § 1254a(b). Section 1254a(b) governs TPS designations, providing in relevant part:

> (1) the Attorney General, after consultation with appropriate agencies of the Government, may designate any foreign state (or any part of such foreign state) under this subsection only if –
>
> (A) the Attorney General finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (B) the Attorney General finds that –
>
> > (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial but temporary, disruption of living conditions in the area affected,
> >
> > (ii) the foreign state is unable temporarily to handle adequately the return to the state of aliens who are nationals of the state, and

(iii) the foreign state officially has requested designation under this subparagraph; or

(C) the Attorney General finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

*Id.* Congress subsequently transferred authority to make TPS designations from the Attorney General to the Secretary of the Department of Homeland Security ("DHS"). *See id.* § 1103; 6 U.S.C. § 557.

TPS provides eligible foreign nationals with employment authorization and deportation stays. 8 U.S.C. § 1254a(a)(2); *id.* § 1254a(g). To be eligible, the foreign national must: (1) be a national of a TPS-designated country; (2) have been present in the United States on the date of the initial designation, re-designation, or extension; (3) be otherwise admissible into the United States; and (4) register within a specified time frame. 8 U.S.C. § 1254a(c)(1)(A); 8 C.F.R. § 244.2. Nationals who are otherwise eligible but who have been convicted of either a felony or two or more misdemeanors in the United States are categorically barred from TPS eligibility. 8 U.S.C. § 1254a(c)(2)(B). Moreover, if the Secretary determines allowing a foreign state's nationals to remain temporarily in the United States is against the U.S. national interest, the Secretary may elect not to designate that foreign state for TPS. *Id.* § 1254a(b)(1)(C).

When DHS first designates a foreign country for TPS, "the initial period of designation . . . [is] not less than 6 months and not more than 18 months." 8 U.S.C. § 1254a(b)(2). The Secretary then undertakes a periodic review to determine whether to re-designate, extend, or terminate TPS for that country. *See id.* § 1254a(b)(3). Per the statute, "[a]t least 60 days before [the] end of the initial period designation, and any extended period of designation, … the [Secretary of Homeland Security], after consultation with appropriate

agencies of the Government, shall review the conditions in the foreign state . . . and shall determine whether the conditions of such designation under this subsection continue to be met." *Id.* § 1254a(b)(3)(A). If the Secretary determines the foreign state no longer meets the conditions for TPS designation, the Secretary "shall terminate the designation." *Id.* § 1254a(b)(3)(B). If the Secretary "does not determine" the foreign state "no longer meets the conditions for designation . . . , the period of designation is extended for an additional period of" six, twelve, or eighteen months. *Id.* There is no limit to the number of extensions a designated foreign state may receive. The Secretary may also redesignate the foreign state for TPS, which may expand the population of eligible foreign nationals who were present in the United States after the prior designation. *See* 8 U.S.C. § 1254a(b); *see also, e.g.*, *Extension of Designation and Redesignation of Haiti for Temporary Protected Status*, 76 Fed. Reg. 3476 (Jan. 21, 2010). The Secretary must timely publish the decision to extend or terminate TPS, including the basis for that determination, in the Federal Register. 8 U.S.C. § 1254a(b)(1)(C); *id.* §§ 1254a(b)(3)(A)–(B).

## B. The TPS Decisionmaking Process

As noted, the TPS statute endows the DHS Secretary with the authority to determine whether to designate, redesignate, extend, or terminate a foreign nation's TPS. 8 U.S.C. §§ 1254a(b)(2)–(3). But the statute stipulates the Secretary is to consult the appropriate federal agencies when conducting the required periodic review for TPS designation. *Id.* § 1254a(b)(3)(A). During this periodic review, the Secretary is to consider the current conditions in the foreign state and whether the conditions supporting the original designation are still met. *Id.*

### i.    Department of State

HT Vacatur AR_0024

The Department of State is one of the "appropriate agencies" with whom the Secretary consults when making a TPS determination. 8 U.S.C. §§ 1254a(b)(1), 1254a(b)(3)(A). Because of its vast network of foreign service officers, the Department is in a position to report effectively on local country conditions. *See* Pl. Ex. 331 at 2. Thus, DHS will contact the Department of State "to initiate their own process of putting together a country conditions assessment and generally a recommendation . . . ." Prelogar Dep. Tr. at 31:11-14.

The local U.S. Embassy, under the direction of the local ambassador, provides the Department of State with an analysis of country conditions for the Secretary's consideration. Pl. Ex. 331 at 2; Trial Tr. at 114:11–115:7 (Posner). As former Ambassador James Nealon testified, "[A]n ambassador's input carries a tremendous amount of weight in the Department of State." Nealon Dep. Tr. at 109:8-10. Thus, the Department of State normally gives great deference to the factual reports prepared by the local Embassy. Pl. Ex. 331 at 2-3; Trial Tr. at 115:20–116:4 (Posner).

Once the local Ambassador and foreign service officers complete the report, they send it to the applicable regional bureau and policy bureaus to prepare a document—the Secretary of State Memorandum—for the Secretary's review. *See* Trial Tr. at 114:18–115:18 (Posner). The Bureau for Western Hemisphere Affairs ("WHA"), is the regional bureau for Haiti. *Id.* at 115:19-21 (Posner). Once the regional and policy bureaus complete the Secretary of State Memorandum, the Embassy and applicable bureaus review it and must approve it before submitting it to the Secretary of State. *Id.* at 126:24–131:17 (Posner); *see also, e.g.*, Pl. Ex. 145 at 6. The Department of State considers the Embassy's clearance and approval particularly important because the Embassy plays a primary role in gathering information on country conditions. Trial Tr. at 126:24–131:17 (Posner). If an embassy, regional bureau, or policy

bureau disagree on a recommendation to the Secretary, the parties typically produce a "split memo" to present their competing positions to the Secretary.  Pl. Ex. 331 at 4; *see also* Trial Tr. at 144:15-24 (Posner).

    ii.    <u>Department of Homeland Security</u>

        DHS engages in well-established practices and considers a number of factors to aid the DHS Secretary in making a well-informed, evidence-based decision.

    **a.**  **General Practices DHS Employs in Making TPS Determinations**

        Within DHS, the "process for gathering information to inform decision makers relating to the periodic review for TPS" begins with reaching out to the Refugee Asylum and International Operations ("RAIO") directorate, a subdivision of U.S. Citizenship and Immigration Services ("USCIS").  Prelogar Dep. Tr. at 31:1-8.  RAIO contains a country conditions unit staffed by career civil servants specializing in country conditions research.  *See id.* at 232:6–233:23; Trial Tr. at 233:15-23 (Rodriguez).  RAIO creates a "country conditions assessment for the relevant country," which informs the Secretary's TPS determination.  Prelogar Dep. Tr. at 31:9-10.  This Report, also known as the "RAIO Report," is a fact-based assessment used to determine whether TPS should be extended, redesignated, or terminated.  Trial Tr. at 233:15-23, 233:9-14 (Rodriguez).  The Report "provide[s] an assessment about the country conditions and whether the statutory conditions continue to be met with respect to a TPS designation."  Prelogar Dep. Tr. at 34:7-10.  Because it contains the "factual predicate" for USCIS's recommendation to the DHS Secretary, the Report plays a crucial role in the Secretary's decision to extend or terminate TPS.  Trial Tr. at 233:7-14 (Rodriguez).

        In addition, the Office of Policy and Strategy ("OP&S"), another subdivision within USCIS, drafts a Decision Memorandum, also called a "Director Memo," containing USCIS's

HT Vacatur AR_0026

recommendation regarding a foreign nation's TPS designation and provides the final report to the Secretary.  Kovarik Dep. Tr. at 28:12-16; *see also* Prelogar Dep. Tr. at 31:16-22 (describing how the RAIO Report is used to create the Director Memo); Trial Tr. at 235:15-21 (Rodriguez) (same).  The Director Memo is a "distill[ed]" version of the more comprehensive RAIO Report.  Trial Tr. at 235:20-21 (Rodriguez).  The Office of the Executive Secretary, another office within USCIS, "would distribute a document for review by various entities within USCIS. . . . They would provide the administrative function of circulating it to the right people who needed to review it."  Anderson Dep. Tr. at 133:11-21.  Once drafted, OP&S sends the Director Memorandum to the Direction of USCIS to send to the DHS Secretary.  Kovarik Dep. Tr. at 28:12-16.

The purpose of the Director Memorandum is to "give[] the secretary everything that they need" to make an informed decision on whether to designate, extend or terminate TPS.  Trial Tr. at 235:20-21 (Rodriguez).  Because the DHS Secretary holds a "tremendous number of responsibilities," she looks "to the USCIS, to the director, to [its] staff, as the experts on Temporary Protected Status."  *Id.* at 235:6-14 (Rodriguez).  Accordingly, the DHS Secretary gives a "high level of deference" to the USCIS Director's TPS recommendation.  *Id.* at 246:5-7 (Rodriguez).

### b.  Factors DHS Considers in Making TPS Determinations

Former Director Rodriguez testified extensively to the factors DHS and USCIS have traditionally considered as part of TPS decisionmaking.  According to Rodriguez, USCIS historically interpreted the term "extraordinary and temporary conditions," *see* 8 U.S.C. § 1254a(b)(1)(C), to require an analysis of conditions at the "particular point in time when the adjudication is occurring" that "prevent nationals of that country from returning to the country in

safety, which means significant threat to life or health." Trial Tr. at 248:30–249:12, 250:11-12 (Rodriguez). This includes, conditions "not necessarily caused by," and conditions "untethered" to, the initial event that led to an initial TPS designation. *Id.* at 251:13-14, 252:6-14 (Rodriguez).

Under established practice, the USCIS Director and DHS Secretary generally consider many factors to determine whether it is safe for nationals to return to a country and whether the receiving country can absorb the return of TPS recipients, including but not limited to the number of TPS recipients, and issues of "public safety, national security, healthcare, housing, [and] education" in the receiving county. *Id.* at 214:20-25 (Rodriguez). It was established practice that USCIS recommendations on TPS considered "a broad range of issues, including food security, gender violence, stability of the Government, education, [and] healthcare." *Id.* at 255:5-9 (Rodriguez). Consequently, the USCIS Director and DHS Secretary have historically considered "intervening factors" arising after a country's original TPS designation, such as subsequent natural disasters, issues of governance, housing, health care, poverty, crime, general security, and other humanitarian considerations, even if those factors lacked any connection to the event that formed the basis for the original designation. Pl. Ex. 330 ¶ 21.

Rodriguez testified he did not consider crime rates among TPS recipients during his tenure as USCIS Director. As Director Rodriguez explained, crime rates were not a factor because "by definition, you do not qualify to receive TPS in the first place if you are a convicted criminal. . . . And if you are convicted while you were on TPS, your TPS would ordinarily be . . . terminated . . . based on that conviction. Trial Tr. at 255:25–256:6 (Rodriguez); *see also* 8 U.S.C. § 1254a(c)(2)(B). "[I]f somebody is convicted of a crime while they are on TPS, ordinarily Immigrations and Customs Enforcement, which is the enforcement agency within the Department of Homeland Security, . . . would initiate proceedings . . . to terminate their TPS[]

and then to potentially place that person in deportation proceedings." Trial Tr. at 257:24–258:5
(Rodriguez).

## HAITI'S TPS DESIGNATIONS

### A. History of Haiti's TPS Designation

After a 7.0-magnitude earthquake struck Haiti on January 12, 2010, DHS Secretary Janet
Napolitano designated Haiti for TPS because she found "extraordinary and temporary
conditions" prevented Haitian nationals from returning to Haiti in safety. *Designation for Haiti
for Temporary Protected Status*, 75 Fed. Reg. 3476, 3476-77 (Jan. 21, 2010). Secretary
Napolitano made her determination "after consulting with the Department of State . . . and other
government agencies" and after DHS and the Department of State "conducted an initial review
of the conditions in Haiti following the earthquake." *Id.* at 3477. The Federal Register Notice
that provided the Secretary's stated basis for designation cited reports describing collapsed
homes, overflowing hospitals, and severe damage to critical infrastructure, which hindered
access to Haiti's capital city, Port-au-Prince. *Id.* Initial reports estimated the death toll was
substantial. *Id.* "Given the size of the destruction and humanitarian challenges," the Secretary
found "there clearly exist extraordinary and temporary conditions preventing Haitian nationals
from returning to Haiti in safety," warranting designation under 8 U.S.C. § 1254a(b)(1)(C). *Id.*

Immigration and Customs Enforcement ("ICE") temporarily ceased removing Haitian
nationals to Haiti. Def. Ex. K. On April 1, 2011, just over one year after the earthquake, ICE
announced it would resume removals of Haitians who had final orders of removal and were
convicted of a serious crime or who posed a national security threat. *Id.*

In May 2011, Secretary Napolitano decided to extend and to redesignate Haiti for TPS
for 18 months from July 23, 2011 through January 22, 2013. *See Extension and Redesignation*

*of Haiti for Temporary Protected Status*, 76 Fed. Reg. 29,000, 29,001 (May 19, 2011). "Based on [a] review" of the conditions conducted by DHS and the Department of State, Secretary Napolitano determined the "conditions prompting the original designation continue[d] to be met" and "further determined that these same conditions in Haiti support redesignating Haiti for TPS." *Id.* Because Secretary Napolitano redesignated Haiti for TPS, she determined protections should be extended for "eligible Haitians who arrived between January 12, 2010 and January 12, 2011." *Id.*

Secretary Napolitano and her successor, Secretary Jeh Johnson announced 18-month extensions in October 2012, March 2014, and August 2015. *See* 77 Fed. Reg. 59,943 (Oct. 1, 2012); 79 Fed. Reg. 11,808 (Mar. 3, 2014); 80 Fed. Reg. 51,582 (Aug. 25, 2015). With each of these decisions, DHS outlined conditions arising from the 2010 earthquake in Haiti and its attendant damage to infrastructure, public health, agriculture, transportation, and educational facilities. In addition, each extension cited the cholera epidemic and the exacerbation of pre-existing vulnerabilities caused by the earthquake, including food insecurity and a housing crisis. *See* 77 Fed. Reg. at 59,944-45; 79 Fed. Reg. at 11,809-10; 80 Fed. Reg. at 51,583-84. In his extension of TPS designation on August 25, 2015, then-Secretary Johnson concluded:

> Many of the conditions prompting the original January 2010 TPS designation and the May 2011 redesignation persist, including a housing shortage, a cholera epidemic, limited access to medical care, damage to the economy, political instability, security risks, limited access to food and water, a heightened vulnerability of women and children, and environmental risks. . . . Although the Government of Haiti has taken significant steps to improve stability and the quality of life for Haitian citizens, Haiti continues to lack the adequate infrastructure, health and sanitation services, and emergency response capacity necessary to ensure the personal safety of Haitian nationals.

80 Fed. Reg. at 51,583-84.

On September 22, 2016, Secretary Jeh Johnson announced DHS would resume more regular removals of Haitian nationals to Haiti, consistent with standard practice. Secretary

Johnson's policy "prioritize[d] the removal of convicted felons, individuals convicted of significant or multiple misdemeanors, and individuals apprehended at or between ports of entry while attempting to unlawfully enter the United States." *Id*. Secretary Johnson stressed, however, that "Haitian nationals . . . covered by Temporary Protected Status [were] unaffected by this change in policy . . . and [were] not subject to removal." *Id*.

ICE briefly suspended removal flights after Hurricane Matthew struck on October 4, 2016. Def. Ex. L. On November 22, 2016, Secretary Johnson announced ICE had resumed removal flights to Haiti. *Id*. Again, Secretary Johnson stressed "Haitian nationals . . . covered by Temporary Protected Status (TPS) [were] unaffected by the resumption of flights to Haiti . . . and [were] not subject to removal." *Id*.

On May 24, 2017, Secretary John Kelly once again extended TPS designation through January 22, 2018. *See Extension of Designation of Haiti for Temporary Protected Status*, 82 Fed. Reg. 23,830, 23,830-01 (May 24, 2017).

**B. Events Leading Up to May 2017 Extension**

i.    The 2016 Periodic Review Process

With the deadline for a TPS decision approaching, on December 12, 2016, Secretary of State John Kerry recommended Secretary Johnson extend TPS for Haiti upon its expiration on July 22, 2017, citing "lingering effects of the 2010 earthquake [that] remain in infrastructure, health, sanitation services, and emergency response capacity." Def. Ex. M. Specifically, Secretary Kerry wrote:

> [O]f the original two million people made homeless by the 2010 earthquake, approximately 55,000 remain in camps for internally displaced persons. Gender-based violence in these settlements continue to be a serious concern, and personal security continues to be a serious and pervasive issue. Some of those displaced have moved back to unsafe homes, begun reconstruction of damaged homes without assistance or guidance, or relocated to informal settlements located in

hazardous areas. Despite efforts by Haitian authorities and the international
community to address these concerns, infrastructure damage to housing in Haiti
remain[s]."

*Id.* Secretary Kerry concluded "[f]or these reasons, Haiti lacks the capacity to ensure the safe

return of the 59,000 TPS beneficiaries residing in the United States" and recommended

extension. *Id.* Secretary Kerry did not recommend redesignation of TPS for Haiti based on

Hurricane Matthew, noting "conditions in Haiti have improved since the earthquake, and Haiti

has taken significant steps to improve the stability and the quality of life for its citizens." *Id.*

By December 2016, DHS began the TPS review process for Haiti. USCIS researchers

and career analysts published the RAIO report in December 2016. Based on the conditions

described in the report, USCIS officials considered formally recommending extension of TPS for

Haiti until January 22, 2019. Although it found Haiti "continues to make progress in a variety of

fields," it concluded:

> [T]he pace and scope of recovery has been uneven, and the country remains
> vulnerable to external shocks and internal fragility. Many of the conditions
> prompting the original January 2010 TPS designation persist, including a housing
> shortage, a cholera epidemic and limited access to medical care, damage to the
> economy (including extensive damage to Haiti's physical infrastructure), political
> instability, security risks, food insecurity, and environmental risks (as exemplified
> by the impact of Hurricane Matthew in October 2016).

Pl. Ex. 326 at 1.

With respect to Haiti's housing shortage, the December 2016 RAIO Report determined

"significant challenges remain." *Id.* According to the Report, individuals residing in internally

displaced person ("IDP") camps had declined since the 2010 earthquake but "moved back to

unsafe houses or started building or reconstructing their houses, in most cases with no assistance

or guidance, and often in informal settlements located in hazardous areas." *Id.* at 2 (internal

quotation marks omitted). For those who remained in IDP camps, "living

conditions . . . have progressively worsened as many humanitarian programmes have ended due to lack of funding and in line with the overall strategy of closing camps." *Id.*

The Report also made findings with respect to the public health system and the cholera epidemic, which began after the 2010 earthquake. *Id.* at 3. Although the Report noted Haiti made "some progress" in recent years, Haiti continued to face significant public health challenges: "Approximately 40 percent of the population still lacks access to fundamental health and nutrition services. Public spending in the health sector is low, and the country has a limited number of health professionals and a deficit of health infrastructure." *Id.* The Report noted UN peacekeepers had introduced a cholera epidemic—"the largest such epidemic ever registered." *Id.*[1] The Report further noted "lack of access to safe drinking water and Haiti's weak sanitation infrastructure remain significant concerns." *Id.*

The Report also highlighted Haiti's economic and political instability. It explained the 2010 earthquake "caused $7.8 billion in damages and losses to the country's economy," which is "equivalent to more than 120 percent of Haiti's 2009 gross domestic product." *Id.* at 4. Despite some economic strides, the Report, citing a 2014 World Bank report, noted "the wealth generated in the country is largely inadequate to meet the needs of the people." *Id.* Moreover, it found nearly 60 percent of the population is living in poverty and unable to meet basic needs, while almost 25 percent of the population is living in extreme poverty and unable to cover their basic food needs. *Id.* It found "[a]n additional one million people are at risk of falling into poverty following an external shock," 40 percent unemployment, "a dependence on subsistence agriculture, recurring natural disasters, and a largely informal economy," present further challenges to economic growth. *Id.* It also reported "[t]he January 2010 earthquake had an

---

[1] According to the December 2016 RAIO Report, "[s]ince October 2010, close to 800,000 Haitians have reportedly contracted cholera and nearly 10,000 people have been killed by the disease." *Id.*

immediate impact on governance and the rule of law in Haiti, killing an estimated 18 percent of the country's civil service and destroying key government infrastructure." *Id*. In 2016, Haiti continued to "lack[] fully-functioning governance institutions, enforceable legal norms, and qualified and trained government staff." *Id*. at 5.

With respect to security, the Report noted "Haitians lack basic policing services, and criminals are able to operate without fear of the police." *Id*. at 6. Based on reports from the Department of State, "homicide, armed robberies, and crimes against persons (including gender-based violence) remain major concerns in Haiti." *Id*. And as of September 2016, "an estimated 3.2 million people were food insecure." *Id*.

Finally, the Report addressed the environmental risks faced by Haiti as well as the damage caused by Hurricane Matthew, which it noted made landfall in Haiti in October 2016. *Id*. at 6-7. According to the Report, Hurricane Matthew was "the strongest storm to hit Haiti" in more than half a century and caused extensive damage "at a time when the country is already facing an increase in the number of cholera cases and severe food insecurity and malnutrition." *Id*. at 7. Following Hurricane Matthew, some towns in Haiti were "in a state of near total destruction . . . almost wiped off the map" and "[b]y mid-December 2016 as many as 1.4 million people were in need of humanitarian assistance, while 806,000 people were severely food insecure." *Id*. at 7-8 (internal quotation marks omitted). In sum, the Report concluded:

> Haiti continues to rebuild following the 2010 earthquake. However, Haiti's progress remains fragile and vulnerable, and the country faces serious challenges, including a housing shortage, a cholera epidemic and limited access to medical care, damage to the economy, political instability, security risks, food insecurity, and considerable environmental risk. The deleterious impact of Hurricane Matthew in October 2016 has further hindered Haiti's ability to recover from the 2010 earthquake.

*Id*. at 8.

In February 2017, USCIS researchers and career analysts produced and published an addendum to the December 2016 RAIO Report dedicated entirely to the effects of Hurricane Matthew on Haiti.  The addendum concluded Hurricane Matthew "exacerbated" the existing conditions, noting it "will likely take Haiti years to recover from the damages of Hurricane Matthew." Pl. Ex. 9 at 1.  "Of the 2.1 million people who were impacted by Hurricane Matthew in Haiti," it found, "close to 1.4 million remain in need of some form of humanitarian assistance." *Id*.  For example, Hurricane Matthew "caused an increase in the number of suspected [cholera] cases" and "[a]n additional 175,000 people impacted by Hurricane Matthew have been left without housing." *Id*. at 1-2.

ii.   March 2017 Official Drafts Recommend 18-Month Extension

On March 2, 2017, the Office of the USCIS Executive Secretary received a draft Director Memorandum and draft Federal Register Notice regarding TPS for Haiti, recommending extension.  Pl. Ex. 11 at 4.  The cover email explained the draft "discuss[ed] relevant country conditions in Haiti and explain[ed] USCIS's recommendation that the Secretary extend the TPS designation of Haiti.  Following a decision by the Secretary, the [Federal Register Notice] would alert the public that the designation for TPS of Haiti is being extended." *Id*.

Specifically, the March 2, 2017 Draft Memorandum recommended that Secretary Kelly "extend Haiti's designation for TPS for 18 months . . . through January 22, 2019." Pl. Ex. 144 at 1.  The March 2nd Draft Memorandum largely tracked the December 2016 RAIO Report, noting:

> [A]lthough Haiti continues to make progress in recovering from the 2010 earthquake, many of the conditions prompting Haiti's designation for TPS persist. Hurricane Matthew, which struck Haiti on October 4, 2016, has also significantly contributed to continued extraordinary and temporary conditions in Haiti that prevent Haitian nationals from safely returning to Haiti.

*Id.* at 2.  The Director Memorandum also described housing and infrastructure shortages, and "damage to the economy, health, sanitation services, security risks, and emergency response capacity, which it described as the "[l]ingering effects of the 2010 earthquake." *Id.*  In addition, the Memorandum described the damage from Hurricane Matthew and a cholera epidemic, noting that since October 2010, "close to 800,000 Haitians have contracted cholera." *Id.* at 3.  USCIS officials delivered the draft Memorandum and Federal Register Notice to the Director's office for approval on March 6, 2017.  Pl. Ex. 11 at 3.

iii.   In March and April 2017, USCIS Revises Draft Director Memorandum to Recommend Termination

Beginning in March 2017, new USCIS appointees began to cultivate a record they believed would weigh in favor of termination.  DHS officials suggested the USCIS memorandum could disregard factors not directly traceable to the 2010 earthquake.  In a mid-March email exchange among Carl Risch, Gene Hamilton, Kathy Kovarik, and others, officials characterized Haiti's "challenges—from political instability to food insecurity" as "long-standing, intractable problems," and distinguished those "[i]ssues related specifically to the 2010 earthquake" as "hav[ing] been largely addressed." Pl. Ex. 309; Priv. Prod. 3468-70.  The email also described Hurricane Matthew as a "recent hurricane [that] has caused new problems in Haiti." *Id.*  Risch did not find this view of the statute "an unreasonable read at all." *Id.*  He previously noted, "all of the problems caused by the earthquake are not necessarily solved (nor need they be to have TPS terminated)." *Id.*  Risch finally suggested, "[a]fter our meeting, USCIS could decide to change this decision to recommend termination." *Id.*  "If USCIS leadership wants to send up its package recommending an 18-month extension, then your memo might be needed to counter the recommendation by USCIS leadership." *Id.*

Meanwhile, USCIS political appointees directed staffers to "refashion" the draft Director Memorandum to now include an option for terminating TPS for Haiti. Gene Hamilton, an appointee of President Trump and Senior Counselor to Secretary Kelly "prognosticat[ed]" Secretary Kelly "may wish to terminate" TPS for Haiti. Pl. Ex. 12 at 1; *see also* Hamilton Dep. Tr. at 26:11-19. On March 24, 2017, Mark Boivin, a USCIS project manager, emailed USCIS officials Brandon Prelogar and Kathryn Anderson, writing: "I understand that [the Director Memorandum] will now be an action/decision memo and one of the options will be to terminate." Pl. Ex. 12 at 2. Prelogar responded: "The word you got regarding refashioning the memo to provide options is right." *Id.* at 1. Prelogar stated USCIS would continue to assess conditions were met and extension is warranted but noted it would be a good idea "to at least begin to draft up a termination memo so that, in the event [Secretary Kelly] does decide to end Haiti TPS, we're ready to provide the [Federal Register Notice] to do it." *Id.* On March 28, 2017, Prelogar sent a draft of the revised Director Memorandum for interoffice review. *Id.*

On April 3, 2017, the Office of the Executive Secretary received this new draft, which "now include[d] options for the Acting Director's approval," including termination of TPS for Haiti, and ultimately recommended extension. Pl. Ex. 11 at 1. Although the March 2, 2017 draft memorandum provided only one option for the Secretary—extension—the April 3, 2017 draft memorandum presented three options: (1) extension; (2) termination; or (3) redesignation, coupled with an extension of the current designation. Pl. Ex. 143 at 3-4. Nevertheless, the Director Memorandum recommended Secretary Kelly extend TPS for Haiti for 18 months because "extraordinary and temporary conditions" continued to prevent the safe return of Haitian nationals. *See id.* at 1-5 (highlighting the lingering effects of the earthquake in housing, infrastructure, damage to the economy, health, security risks, emergency response capacity, as

well as gender-based violence in IDP camps, the development of informal, hazardous

settlements, the impact of Hurricane Matthew, food insecurity, and the ongoing cholera

epidemic).  Indeed, the Memorandum concludes:

> [A]lthough Haiti continues to make progress in recovering from the 2010 earthquake, many of the conditions prompting Haiti's designation for TPS persist. Hurricane Matthew, which struck Haiti on October 4, 2016, has also significantly contributed to continued extraordinary and temporary conditions in Haiti that prevent Haitian nationals from safely returning to Haiti.

Pl. Ex. 143 at 2.

Just a few days later, on April 10, 2017, USCIS circulated another draft, this time

recommending termination of Haiti's designation with an effective date of January 22, 2018.  Pl.

Ex. 122.  The April 10th Draft Memorandum differed from the March 2nd and April 3rd Draft

Memoranda in a number of ways.  For example, the March 2nd and April 3rd Draft Memoranda

both concluded: "[A]lthough Haiti continues to make progress recovering from the 2010

earthquake, many of the conditions prompting Haiti's designation for TPS persist."  *See* Pl. Exs.

143 at 2, 144 at 2.  In contrast, the April 10th Draft Memorandum concluded "Haiti has made

significant progress in recovering from the 2010 earthquake and no longer continues to meet the

conditions for designation."  Pl. Ex. 122.

The revisions focused on those conditions resulting directly from the 2010 earthquake.

For example, the March 2nd and April 3rd memoranda each stated: "Lingering effects of the

2010 earthquake remain in housing, infrastructure, damage to the economy, health, sanitation

services, security risks and emergency response capacity."  Pl Exs. 143, 144.  By contrast, the

April 10th Draft Memorandum stated: "While lingering effects of the 2010 earthquake remain in

housing, infrastructure damage to the economy, health, sanitation services, security risks, and

emergency response capacity, Haiti has made significant progress in addressing issues specific to

the earthquake." Pl. Ex. 122 at 3. The April 10th Draft Memorandum characterized the "specific extraordinary and temporary conditions" as having "been largely ameliorated" and cast the "myriad problems remaining in Haiti [as] longstanding problems which have existed for many years before the 2010 disaster." *Id.* at 4.

The April 10th Draft Memorandum, which the Acting USCIS Director ultimately signed, minimized many of the conditions that predated the 2010 earthquake. *Id.* For example, with respect to housing, current housing deficits were deemed irrelevant because they existed before the earthquake: "96 percent of people displaced by the earthquake and living in internally displaced person . . . camps have left those camps. Over 98 percent of the IDP camps have closed. While those persons who have left the camps have not necessarily moved into ideal housing, Haiti had a substantial housing deficit long before the 2010 earthquake." *Id.* at 3. Missing from this draft were critical facts noted in the prior iterations, both of which emphasized over 55,000 Haitians "are still living in 31 camps for internally displaced persons without viable options to leave." Pl. Exs. 143 at 2, 144 at 2. With respect to Haiti's economic and political conditions, the April 10th memorandum characterized Haiti as "the poorest country in the western hemisphere" with "enormous problems long before the 2010 earthquake. Even before the earthquake, the Haitian government could not or would not deliver core functions to the majority of its people." Pl. Ex. 122 at 3. Similarly, it characterized gender-based violence in IDP camps as "security problems [that] are not a post-earthquake phenomenon," and it related food insecurity to historical food challenges, tropical storm, and drought. *Id.* Previous draft memoranda never included such language classifying conditions as pre- versus post-earthquake phenomena. *See* Pl. Exs. 143, 144.

HT Vacatur AR_0039

On May 10, 2017, RAIO researchers published another addendum to the RAIO Report regarding TPS for Haiti. Pl. Ex. 141. It concluded "Haiti has yet to fully recover from the impact of the 2010 earthquake." *Id.* at 1. Like the February addendum to the RAIO Report, the May addendum again emphasized the widespread destruction of Hurricane Matthew, and it further highlighted damage from recent spring flooding. *Id.* at 1-2. The Report also stressed the extent to which aid for Haiti failed to materialize, both with respect to the earthquake and with respect to Hurricane Matthew. *Id.*

### iv. USCIS and DHS Officials Began Collecting Criminality, Welfare, and Immigration Status Data

As officials circulated the USCIS Director Memorandum drafts in April 2017, numerous DHS and USCIS appointees instructed career staffers to compile criminality and welfare data on Haitian TPS recipients. According to internal DHS communications, officials sought this data to bolster the decision to terminate TPS for Haiti. *See* Pl. Ex. 119.[2]

On April 7, 2017, Secretary Kelly emailed Kristjen Nielsen—copying Elizabeth Neumann, Gene Hamilton, Elaine Duke, Jonathan Hoffman, and Ben Cassidy—directing her to "arrange a conversation with the right people about TPS . . .. No email—just a conversation(s)." Priv. Prod. at 4757.[3] He also directed Nielsen to collect, "[s]pecific to Haiti, details on how many are on public and private relief, how many school aged kids [are] in school, how many [are] convicted of crimes of any kind, how often they travel back and forth to the island, remittances, etc.," to which Nielsen responded, "Roger." *Id.* Hamilton subsequently sent an

---

[2] On April 28, 2017, the Office of the USCIS Executive Secretary sent an email to "Policy Clearance" requesting a "memo in regards to the Notice for the termination of TPS for Haiti." Pl. Ex. 119 at 1. The email further directed recipients to include responses to Secretary Kelly's criminality and welfare questions. *Id.*

[3] Documents cited as "Priv. Prod." refer to documents in the privilege log submitted by Defendants to the Court and according to the Bates stamp on each document.

email to several individuals, including Kathy Kovarik, who had recently assumed the role of Chief of the USCIS Office of Policy and Strategy, relaying Secretary Kelly's directive to gather this data on Haitian TPS recipients.[4] Pl. Ex. 103. Kovarik then emailed USCIS career officials Brandon Prelogar and Kathryn Anderson and instructed them to gather crime and welfare data about TPS recipients. Pl. Ex. 15. The instructions Kovarik sent mirrored those in Kelly's directive. *Compare id.*, *with* Pl Ex. 103; *see also* Kovarik Dep. Tr. at 74:15 (testifying her email to Prelogar and Anderson was "nearly identical" to the one she received from Hamilton on April 7, 2017).

According to Prelogar and Anderson, prior to Kovarik's request, no senior USCIS officials had ever asked them to gather criminality or welfare data on a TPS population during their combined nine years as USCIS researchers. Anderson Dep. Tr. at 17:8-14, 307:16–308:11; Prelogar Dep. Tr. at 116:10–118:20; *accord* Trial Tr. at 255:25–256:6 (Rodriguez) (testifying he never gathered or used criminality or welfare data for TPS determinations during his tenure as USCIS Director). On April 7, 2017, Prelogar replied to Kovarik's instructions, noting data regarding "public and private relief" were "[n]ot available specific to TPS holders." Pl. Ex. 15 at 10. Anderson similarly explained welfare data "specific to TPS holders is not available, but in general, TPS holders don't qualify for federal benefits." *Id.* at 8. On April 10, 2017, another DHS staffer, Alexander King, wrote to Kovarik and others he had "been unable to verify whether we can systematically pull electronic criminality data" for TPS recipients. *Id.* at 4.

Nevertheless, DHS staffers continued to demand criminality and welfare data on Haitian TPS recipients through the end of April. On April 25, 2017, Nielsen, Secretary Kelly's Chief of

---

[4] According to Hamilton, Kelly sought information regarding how many Haitian TPS beneficiaries were "on public and private relief"—and "how many have been convicted of crimes of any kind." *Id.* Hamilton testified Secretary Kelly wanted "welfare" data, and he could not remember whether Secretary Kelly sought crime and welfare for any TPS population other than Haitians. Hamilton Dep. Tr. at 253:3-5, 256:20–257:2.

Staff at the time, emailed Hamilton, Acting USCIS Director James McCament, and USCIS

staffer Carl Risch, asking for the following information by the end of the day:

    (1) How many current Haitian TPS folks were illegal pre-TPS designation?
    (2) Since designation, how many have committed crimes?
    (3) Since designation, how many are on public assistance? Out of work?
    (4) Can we describe what has changed in Haiti warranting the recommended
        change (this may be in the memo but I have not seen it yet—would include if
        verified items such as rebuild of palace, build of army, change in UN list, 4-5%
        growth in GDP.

Pl. Ex. 342 at 1. Acknowledging such data would be "difficult to obtain," Kovarik again emailed

her subordinates requesting this data and instructed them on how it could be obtained.[5] Pl. Ex.

15 at 3-4. In response, Anderson explained the "TPS statute does not require individuals to have

lawful status in order to qualify for TPS." *Id.* at 3. As she had previously informed Kovarik,

Anderson further noted: "TPS beneficiaries are not eligible for the majority of public benefits.

We know of no way internal to USCIS or DHS to determine whether TPS beneficiaries are on

public assistance or out of work." *Id.* at 2. On April 27, 2017, Kovarik emailed USCIS staffers

once more and cautioned: "[T]he Secretary is going to be sending a request to us to be more

responsive. I know that some of [the data] is not captured, but we'll have to figure out a way to

squeeze more data out of our systems. So, we may as well get started." *Id.* at 1.

    In response to another "TPS data request" from Kovarik for "any data whatsoever"

regarding "criminal activity," stories that positively depict "how things are in Haiti," and

"random sampling[s] of files that [USCIS] could then use to generalize the entire population,"

Leroy Potts quoted several reports and replied "[u]nfortunately conditions in Haiti remain

difficult." Pl. Ex. 212 at 1-3. The reports referenced by Potts largely concluded "Haiti has not

---

[5] Kovarik's requests were identical to Nielsen's first three requests. *Compare* Pl. Ex. 15 at 3-4, *with* Pl. Ex. 342 at 1. Kovarik also testified she did not know "if the TPS statute precludes" USCIS researchers from inquiring into a TPS recipient's immigration status. Kovarik Dep. Tr. at 103:12-22.

fully recovered from the 2010 earthquake" and highlighted Hurricane Matthew, food security, housing, and heavy flooding. *Id.* at 1-2.

Finally, on May 15, 2017, USCIS Director James McCament circulated a memorandum addressing the repeated demands for criminality and welfare data on Haitian TPS recipients. Pl Ex. 139. The memorandum stated: "Information regarding whether TPS beneficiaries have committed crimes is not currently available through USCIS systems." *Id.* at 4. It further explained: "Regarding immigration status at the time of application, the TPS statute does not require individuals to have lawful status in order to qualify for TPS." *Id.*

v.   Career Staffers React to USCIS's Recommendation

Numerous emails among USCIS staffers appear to indicate confusion and concern regarding the shift in USCIS's recommendation from extension to termination. On April 13, 2017, RAIO researcher LeRoy Potts separately emailed Anderson and Prelogar, asking "to get together next week and chat? For now, I'm hoping you can give me your take on the Haiti TPS decision? I'd like to know a little bit more about how it was decided current conditions 'don't merit ongoing TPS designation' . . . ." Pl. Ex. 16. In response, Anderson noted:

> [T]he short answer is that the decision was a political one by the [USCIS Front Office] and [Secretary Kelly's] advisors. Their position was that Haiti was designated on account of the 2010 earthquake, and those conditions have significantly improved. The extraordinary conditions Haiti currently faces are longstanding, intractable problems, not "temporary" as the statute requires.

*Id. see also* Anderson Dep. Tr. at 199:21–200:1 ("TPS decisions are not always as impacted by political priorities as this one was."). Prelogar responded in kind: "I don't think it was RU's fine work on the country conditions, *nor our original presentation* of them in the Decision Memo we drafted, that didn't make the cut and led to the conclusion USCIS should recommend termination." Priv. Prod. at 20338 (emphasis added); *see also* Prelogar Dep. Tr. at 149:3-20

(testifying the process surrounding the TPS decision for Haiti was "handled differently" than previous TPS decisions for Haiti).

Anderson and Prelogar also emailed one another to discuss an April 30, 2017 *New York Times* editorial reporting on Haiti TPS determinations. Pl. Ex. 18. According to Prelogar, the editorial, which recommended extending TPS for Haiti, was "[w]ell said." *Id.* at 1. Anderson wrote she "especially appreciated that [the *Times*] noted the memo did cite a bunch of horrible conditions but then somehow reached the wrong conclusion." *Id.* Prelogar responded: "Right? Give me a break." *Id.* By "[g]ive me a break," Prelogar intended to express his "contention that the country conditions and the statutory requirements suggested a different decision" from termination. Prelogar Dep. Tr. at 127:10-12. Prelogar testified he believed the April 10th Director Memorandum recommending termination reached the wrong conclusion. *Id.* at 126:13. He also sought to express "agreement with Kathryn [Anderson]'s observation" and "some degree of incredulity." *Id.* at 123:11-14.[6]

In another email, Anderson confided to Prelogar she was "fuming" after a phone call following a May 19, 2017 meeting with Hamilton and then-DHS Deputy Secretary Duke. Pl. Ex. 25 at 1; Anderson Dep. Tr. at 243:7-9. Prelogar was "deeply distraught to hear this pillar of normality, [Secretary Duke], (our trusty second in charge) was anything but." Pl. Ex. 25 at 2; Prelogar Dep. Tr. at 146:2. "These people need a helping hand out," he wrote. Pl. Ex. 25 at 2. "Looks like there are whack jobs everywhere. Even the civil service." *Id.* Prelogar testified these statements referred to his "impression . . . that the deputy secretary . . . seemed to be in

---

[6] After reviewing a set of briefing materials for an upcoming meeting between Secretary Kelly and Haitian Foreign Minister Antonio Rodrigue, Anderson wrote to Prelogar: "The explanation of the current situation/conditions in Haiti in the [briefing memo] is amazing. I love it." Pl. Ex. 22 at 1; *see also* Anderson Dep. Tr. at 221:4–225:19. Anderson later testified she "found the explanation of conditions in the briefing memo to be surprising" and was accordingly "speaking sarcastically" in her correspondence with Prelogar. Anderson Dep. Tr. at 224:13–225:19.

alignment with some of the perspectives on temporary protected status that were being advanced

by parties with whom [he and Anderson] disagreed." Prelogar Dep. Tr at. 146:19–147:2.

      vi.    April 2017 Press Leaks

      At the end of April, a number of items related to Secretary Kelly's upcoming decision on

TPS for Haiti were leaked to the press. Several outlets reported Secretary Kelly sought

criminality and welfare data in connection with his decision on TPS for Haiti. A May 9, 2017

Associated Press article quoted directly Kovarik's April 27 and April 28, 2017 directives to

"squeeze [out] more data" on and "find any reports of criminal activity" by Haitian TPS

beneficiaries. Pl. Ex. 124. Acting USCIS Director McCament forwarded to Kovarik an email

chain with two articles reporting on her instructions. *Id.* By April 29, 2017, the April 10th

Director Memorandum leaked to the press. Pl. Ex. 18. That day, the *New York Times* published

an editorial quoting the April 10th Director Memorandum and urging Secretary Kelly to extend

TPS for Haiti. *Id.*

      On May 20, 2017, DHS's Office of Public Affairs circulated an email with draft talking

points for a press conference scheduled for the following Monday, at which time Secretary Kelly

would announce his decision on TPS for Haiti. Pl. Ex. 126. Among these talking points were

denials that DHS or USCIS ever looked into criminal history or welfare data in connection with

the TPS decision. *See id.* at 6-7 ("[C]riminal history and public benefit usage was not used as

criteria for the TPS determination."). The talking points stressed criminal activity data did not at

all factor into the TPS decision; rather, "Secretary Kelly, separate and distinct from the decision

on TPS for Haiti, asked DHS staff for information to increase his understanding of how the TPS

program operates and the elements of information we have on program recipients." *Id.*

      vii.    In May 2017, Secretary Kelly Announces 6-Month Extension

By mid-May, DHS officials had been instructed to revise again the recommendation on Haiti's TPS, this time recommending an extension. In a May 18, 2017 email to DHS official Brian Kelliher, DHS official Megan Westmoreland wrote: "USCIS [was] told to redraft the Haiti TPS notice once again, this time to announce a 6-month extension. . . . [and was] instruct[ed] [] not to announce a termination at this point, but to suggest in the notice somehow that it is likely to be terminated in 6 months and that the Haiti beneficiaries should get their affairs in order." Priv. Prod. at 5206. According to Westmoreland, USCIS officials were "concerned how [the Secretary] could find Haiti to meet TPS conditions now but find in just a few months from now that it no longer does. Do the clients really believe conditions will improve over the current baseline over the next 4-6 months? Could extending now box [the Secretary] in for the next determination?" Priv. Prod. at 1186.

In a meeting held just three days before the announcement, several DHS staffers discussed their views with respect to TPS for Haiti and the TPS program as a whole. *See* Pl. Ex. 53; Anderson Dep. Tr. at 106:4-8.[7] Then-Deputy Secretary Duke reported there was "[e]very expectation Haiti may not be renewed again," and that in Secretary Kelly's view, "Haiti is still a horrible place to live, but good . . . . If we recommend terminating [Secretary Kelly] will be inclined to follow us, but be clear." Pl. Ex. 53; Anderson Dep. Tr. at 274-8-17. Gene Hamilton noted, in his view, TPS was "to be used" as an "extreme measure" and not "out of whole air like [the] Obama administration." Pl. Ex. 53; Anderson Dep. Tr. at 269:14–270:2. He further stressed Secretary Kelly was "not hesitant to make TPS designations when warranted." Anderson Dep. Tr. at 288:6-9; Pl. Ex. 53.

---

[7] USCIS staffer Kathryn Anderson took extensive notes at this meeting, which are in evidence as Plaintiff's Exhibit 53.

On May 22, 2017, DHS issued a press release announcing Secretary Kelly would extend

TPS for Haiti for six months.  Suppl. Admin. R. at 193-94.  The same day, Anderson attended a

press conference call on Secretary Kelly's decision on TPS for Haiti.  Anderson Dep. Tr. at

252:12-21, 298:8-12.  She recalled Gene Hamilton and a number of DHS communications

staffers attended the call.  *Id.* at 298:15-19.  DHS characterized Secretary Kelly's request for

criminality data pertaining to Haitian TPS recipients as a "common sense" question to ensure the

"programmatic integrity" of the TPS program at large.  *Id.* at 301:10-14.

The same press release announcing extension stressed TPS beneficiaries should use the

time before the end of the extension period "to prepare for and arrange their departure from the

United States—including proactively seeking travel documentation—or to apply for other

immigration benefits for which they may be eligible."  Suppl. Admin. R. at 194.  DHS officials

also informed the press that Secretary Kelly "highly encourages" TPS recipients "to pack up."

Pl. Ex. 51.  The Haitian Foreign Minister Antonio Rodrigue and Haitian President Jovenel Moïse

were advised "the Government of Haiti [should] take steps to prepare for the eventual end of its

TPS designation."  Suppl. Admin. R. at 12.[8]

In announcing the six-month extension, Secretary Kelly "was . . . encouraged by

representations made to him directly by the Haitian government regarding their desire to

---

[8] Secretary Kelly travelled to Haiti to meet with Haitian President Moïse on May 31, 2017, accompanied by Gene
Hamilton.  Pl. Ex. 310; Hamilton Dep. Tr. at 152:2-6.  DHS briefing materials explained:

> [TPS] is an emotionally-charged issue in Haiti, and while the recent six-month extension allayed
> some immediate fears, concerns remain about its potential expiration. . . . Once TPS expires, [TPS
> recipients] will be expected to depart the United States and return to Haiti.  However, given the
> current lack of economic opportunity in Haiti, Haitian government officials privately speculate that
> even if TPS were to expire, many Haitians would be unlikely to return to Haiti voluntarily.

Pl. Ex. 310.  During his visit, Secretary Kelly told President Moïse "DHS has the responsibility for deciding whether
or not a country qualifies for TPS, no one else."  Id.  He stressed "TPS is meant to be a temporary measure, not a
permanent parole policy."  Id.  He also "strongly encouraged Haitian officials to begin planning now for the return
of Haitians who currently reside in the U.S. with temporary protected status."  *Id.*

HT Vacatur AR_0047

welcome the safe repatriation of Haitian TPS recipients in the near future." *Id.* at 193. A few weeks earlier, Ambassador Altidor wrote in his letter requesting an extension of Haiti's TPS that "[w]e look to the day Haiti can welcome our countrymen back home; however, now is not the time." Pl. Ex. 172 at 2.

The USCIS announcement on May 24, 2017, and the Federal Register Notice published the same day, also signaled TPS for Haiti would come to an impending end. The Federal Register Notice stated: "It is in the best interest of TPS beneficiaries to prepare for their return to Haiti in the event that Haiti's TPS designation is not extended again." Suppl. Admin. R. at 189. The same day he published his decision in the Federal Register, Secretary Kelly opined in a meeting that Congress had "no moral courage" because it failed to include a "sunset clause" for TPS. Pl. Ex. 52; Anderson Dep. Tr. at 317:1-5.[9] He also said Haitians are "[n]ot a bad people, but they are welfare recipients." Pl. Ex. 52; Anderson Dep. Tr. at 321:14–322:4.[10]

Despite Secretary Kelly's signal TPS for Haiti would soon come to an end, the Federal Register Notice found: "although Haiti has made significant progress in recovering from the January 2010 earthquake that prompted its initial designation conditions in Haiti supporting its designation for TPS persist." Suppl. Admin. R. at 187. The Notice characterized many of Haiti's difficulties as "longstanding," and highlighted whether they were recent developments:

> Haiti faces longstanding public health challenges, where 40% of the population lacked access to basic health services before the 2010 earthquake. As of 2016, this figure remains the same—40% of the population lacks access to fundamental health and nutrition services. While the lack of access to safe drinking water and Haiti's weak sanitation infrastructure remain significant concerns, these are not new problems. Extreme poverty, corruption, and low levels of education in Haiti challenge its resilience and have contributed to the government's longstanding inability to adequately provide for the security, health, and safety of its citizenry.

---

[9] USCIS staffer Kathryn Anderson took extensive notes at this meeting, which are in evidence as Plaintiff's Exhibit 52.
[10] Anderson testified she wrote these words down specifically "to remember what Secretary Kelly said." Anderson Dep. Tr. at 321:1-2.

*Id.* Nevertheless, the Federal Register Notice cited Haiti's housing crisis, noting though 98 percent of IDP camps closed:

> over 55,000 Haitians who lost their homes in the earthquake are still living in 31 camps . . . without viable options to leave. Gender-based violence in these camps continues to be a serious concern, and personal security is a serious and pervasive issue. Some people who were displaced by the earthquake, although no longer in camps have moved back to unsafe homes or relocated to informal settlements located in hazardous areas.

*Id.* Importantly, the Federal Register Notice also cited the effects of more recent natural disasters, such as Hurricane Matthew and extensive flooding in the spring of 2017. It explained "Hurricane Matthew made landfall in Haiti on October 4, 2016, causing extensive damage to crops, housing, livestock, and infrastructure across Haiti's southwest peninsula." *Id.* The Notice also explained:

> Heavy rains in late 2017 caused flooding and landslides in South, South East, Grand'Anse, and Nippes departments, with South department most impacted. At least four people were killed, nearly 10,000 homes may have been damaged, and at least 350,000 people may have been affected. According to a Haitian government official, an estimated 80% of the spring harvest in South department may have been destroyed.

*Id.*

In sum, the Notice provided, "the damage from Hurricane Matthew and the recent rains are compounding the existing food insecurity experienced by an estimated 3.2 million people (approximately 30 percent of the population) in September 2016." *Id.* The Federal Register Notice also cited Haiti's strained public health system, Haiti's weak sanitation infrastructure, and the cholera epidemic. *See id.*

## C. Events Leading Up to November 2017 Termination

The day the extension was announced, officials at DHS began exploring rationales for terminating TPS for Haiti, recognizing Secretary Kelly—or whoever would be Secretary at the

time—would seek termination.  Indeed, when he arrived at DHS in July 2017, James Nealon, the Assistant Secretary of Homeland Security for International Affairs and Acting Undersecretary for Policy testified "there was a general feeling that TPS . . . for Haiti was going to be terminated."  Nealon Dep. Tr. at 27:5-18, 128:9-17.  Nealon also recalled expecting termination based on a conversation he had with Secretary Kelly during that time.  *Id.* at 129:5–130:10.  In conversations with a career officer, Nealon discussed the implications of a decision to terminate and "what sort of things we could do to help mitigate the consequences of that decision."  *Id.* at 128:7-17.  Other officials at DHS, including Nielsen, inquired about conditions in Haiti that might weigh toward termination.  On July 28, 2017, Nielsen sent an email to Nealon asking him whether USCIS had "any information on the TPS registrants in terms of current jobs or education" because she presumed "if the majority of folks are highly educated and have jobs in the US (many years living here), the [Haitian Government's] concerns about return, joblessness[,] and potentially turning to crime may be overstated."  Pl. Ex. 355.

i.  DHS Looks to Statute for TPS Process with "Fresh Eyes"

Secretary Kelly and other members of the Administration had "concerns about the TPS program as a whole" and planned to look at TPS with "fresh eyes."  Pl. Ex. 51.  Secretary Kelly and other DHS officials emphasized he could premise an extension only on conditions related to the circumstances that prompted the original designation—in Haiti's case, the 2010 earthquake.  For example, Kathryn Anderson testified that during the May 22, 2017 press call on Haiti's TPS, a DHS official said "[c]onditions have substantially improved since 2010.  Congress asked us to look at conditions that led to initial designations and not at other conditions.  Understand some fine lines to draw there."  Pl. Ex. 51; Anderson Dep. Tr. at 297:10-14.

On June 6, 2017, Secretary Kelly testified before the Senate Homeland Security and Governmental Affairs Committee. During questioning, officials asked about his approach to TPS designations and extensions. Pl. Ex. 213 at 69-71. Secretary Kelly responded that in his view, TPS "is for a specific event. . . . [I]n Haiti, it was the earthquake. Yes, Haiti had horrible conditions before the earthquake, and those conditions aren't much better after the earthquake. But the earthquake was why TPS—was granted and—and's that's how I have to look at it." *Id.* at 70. Kelly added, "the word [in the statute] is 'temporary,' and I—I think those that have been . . . in my position over the years have simply automatically extended it." *Id.* at 71. Indeed, after she took over as DHS Secretary, Kirstjen Nielsen stated the TPS statute forbade her from considering country conditions other than those connected to the original designating event—in Haiti's case, the 2010 earthquake. In testimony to Congress, Nielsen explained that, in her view, "the law really restricts [a DHS Secretary's] ability to extend TPS. The law says that if the effects *of the originating event* . . . do not continue to exist, then the Secretary of Homeland Security *must* terminate." Pl. Ex. 345 at 3 (emphasis added).

The day after Secretary Kelly testified, USCIS Writer-Editor Tina Wimbush sent a high-priority email to, among others, the USCIS Executive Secretary. Pl. Ex. 29 at 3. The email contained instructions and notes "from the Secretary's Office" for drafting responses to letters to Secretary Kelly from the public about Haiti's TPS. *Id.* According to the email, Secretary Kelly instructed those drafting the letter to "[h]ighlight [the] temporary nature" of TPS and state the "2010 Earthquake is the only reason for TPS being granted—not [the] hurricane or current economic conditions—[n]ot [the] cholera epidemic." *Id.* In accordance with this instruction, the email suggested the draft include: "As you know, granting TPS was based solely on [the] 2010 earthquake that ravaged Port au Prince." *Id.*

Similarly, on June 8, 2017, Gene Hamilton exchanged emails with DHS Spokesman and Trump Administration official David Lapan to respond to an inquiry from a reporter regarding TPS for Haiti. Hamilton noted Lapan should include in his response:

> Secretary Kelly does have the authority under US law to designate a foreign country for Temporary Protected Status (TPS) in very limited circumstances outlined in section 244 of the Immigration and Nationality Act. As the Secretary has said, the operative word is "temporary." TPS is a temporary benefit that does not lead to lawful permanent resident status or give any other immigration status.

Priv. Prod. at 4148.

Tina Wimbush's high-priority email regarding letter responses to TPS inquiries also stated Secretary Kelly "want[ed] a stronger response beginning to build a case for not extending" TPS for Haiti. Pl. Ex. 29 at 3. According to the email, Secretary Kelly requested inclusion of the following suggested language in letter responses: "Primarily localized damage in [the] capital region of Port au Prince. Recovery [is] slow but steady, [the] UN has determined their stabilization force is no longer needed. Decision to rebuild palace shows [the] economic [situation] is recovering." *Id.*

Career USCIS researchers believed many of these talking points to be untrue. Kathryn Anderson, for example, thought Secretary Kelly's proposed language was "ridiculous" and "amazing (and mostly incorrect)." *Id.* at 2. In particular, she believed "this idea of localized damage from the earthquake is insane." *Id.* Prelogar agreed with Anderson's sentiment and described Secretary Kelly's suggestions to be "[u]nreal." *Id.* Prelogar expressed difficulty drafting the letter responses in accordance with Secretary Kelly's directives regarding their content, writing to Anderson: "I'm torn between taking a first run at saying not untrue things and just quoting Secretary Kelly saying untrue things from the get go." *Id.* He ultimately decided to "just pull some stuff from [Secretary Kelly's May 22, 2017] statement" announcing the TPS

extension. *Id.* Anderson agreed with Prelogar's approach, noting "[a]t least the untrue things said by Sec[retary] K[elly] can be attributed to him." *Id.* Exercising this approach, Prelogar completed a draft that quoted extensively Secretary Kelly's May 22, 2017 statement. *Id.* After reviewing his draft, Anderson lauded Prelogar: "That's the best possible combo of true things from you and quotes of not true things from [Secretary Kelly]. Nicely done." *Id.*

In a separate chain of emails, DHS officials concurrently inquired about the status of "more aggressive" response letters. Priv. Prod. at 3785. One DHS official, Elizabeth Neumann, directed another, Michael Plostock, to look for "stronger language indicating Haiti is recovering from the earthquake." *Id.* On June 13, 2017, Neumann emailed Hamilton a draft letter, noting it would "help with one of the tasks [Hamilton] received from [Secretary Kelly] . . .." She added, "I'd like for [Secretary Kelly] to see soon as he personally asked me for this about a week ago." *Id.*

ii.    <u>DHS and Department of State Officials Seek to Coordinate TPS Review</u>

As DHS prepared for the TPS review process, the Department of State also began to work through its own internal process regarding TPS. And although Secretary Tillerson recommended extending TPS in June and the U.S. Embassy in Haiti advocated for an extension to the Department of State in August in advance of Secretary Duke's decision, Secretary Tillerson ultimately recommended termination of TPS not only for Haiti but also for Honduras, El Salvador, and Nicaragua—all within the same timeframe.

According to Anderson's handwritten notes from a meeting involving herself, Duke, Hamilton, and other DHS officials, they asked, "[C]an we support keeping State in their lane?" which Anderson understood to mean: "[C]an we look into how we can have [S]tate focus on

providing country conditions as opposed to using TPS as a foreign policy tool[?]" Pl. Ex. 53 at 4; Anderson Dep. Tr. at 287:11-16.

On June 2, 2017, Scott Krause emailed Nielsen, and others, noting he "received a couriered letter from Secretary of State Tillerson recommending a 12 month TPS extension for Haiti." Priv. Prod. at 3710. He attached a copy of the letter for review. *Id.* Nielsen responded, noting briefly "[t]his is a mistake. State will be pulling this back shortly." *Id.* The Department of State ultimately did retract its recommendation and, despite the Embassy's findings over the summer, worked diligently throughout the Fall to reach the opposite conclusion for the next series of TPS determinations.

Secretary Tillerson's May 31, 2017 letter recommended Secretary Kelly "extend for twelve months the designation of Temporary Protected Status (TPS) for Haiti upon expiration on July 22, because certain extraordinary and temporary conditions related to the 2010 earthquake continue to exist." Pl. Ex. 256. The letter noted:

> As described in the Department of State's Haiti country conditions report, significant lingering effects from the 2010 earthquake remain in Haiti in the areas of infrastructure, health, sanitation services, and emergency response capacity. For example, of the original two million people made homeless by the 2010 earthquake, approximately 55,000 remain in evacuation shelters or other temporary facilities. Some of those who were displaced have moved back to unsafe homes, begun ad-hoc reconstruction of damaged homes, or relocated to informal settlements located in hazardous areas. Despite efforts by Haitian authorities and the international community to address these concerns, Haiti still lacks the capacity to fully ensure a safe return of the 59,000 TPS beneficiaries residing in the United States.

*Id.* Secretary Tillerson also described the progress Haiti has made since the earthquake:

> For example, all of the 10 million cubic meters of 2010 earthquake-related rubble has been cleared, and there have been improvements to road conditions and infrastructure. Most government offices and ministries destroyed in the earthquake are now housed in temporary facilities. Tourism increased by 10 percent annually from 2012 to 2015. . . . These conditions allow Haiti to safely receive traditional levels of returned Haitian nationals, which it is doing . . . .

*Id.* Secretary Tillerson did not recommend re-designating Haiti for TPS based on Hurricane Matthew's impact, noting its impact "was limited to three of Haiti's 10 departments and conditions in Port-au-Prince have returned to normal." *Id.*

The report appended to Secretary Tillerson's letter regarding extension of TPS for Haiti noted "Haiti lacks the capacity to absorb the approximately 59,000 Haitians residing in the United States under TPS." Pl. Ex. 257. In support of this finding, the report cited:

- poor quality of education for children;

- the Haitian government's weak institutional capacity to respond to the lingering effects of the earthquake;

- the 55,000 people residing in IDP camps;

- gender-based violence in IDP camps;

- the creation of informal settlements located in hazardous areas;

- Haitian citizens moving back to unsafe homes;

- the Haitian National Police's susceptibility to severe budgetary pressure and its heavy concentration in the capital, as opposed to other parts of the country;

- Haiti's poor infrastructure, health and sanitation services, and emergency response capacity; and

- concerns the "Haitian government would have serious problems shouldering the responsibility for facilitating the reintegration of approximately 59,000 Haitian nationals when the Haiti TPS program would otherwise expire.

*Id.*

Just over one month after Secretary Tillerson's "mistake" recommendation, DHS and the Department of State began to make affirmative efforts to coordinate on upcoming TPS decisions. On July 8, Kathy Kovarik sent an email to Gene Hamilton, Theresa Hunter, and Susanne Cassil—copying James McCament, among others—"to share a draft letter . . . we propose Secretary Kelly send to Secretary Tillerson to formally request his recommendation and State

Department input on upcoming Temporary Protected Status designations." Priv. Prod. at 7244; 13837. Kovarik noted this approach would be "a departure from past practice," but she stressed "[t]here may be an advantage in ensuring Secretary Tillerson's visibility into and commitment to the TPS consultative process." *Id.* Both Kovarik and her colleagues at the Department of State agreed "to facilitate State's, and, specifically, Secretary Tillerson's input into DHS' TPS review process, it's best if Secretary Tillerson directly receives a written request from DHS." *Id.* On July 17, Kovarik wrote in the same email exchange "we did a call with State about Haiti TPS and they welcome this letter as soon as we can send it." *Id.*

**a. U.S. Embassy in Haiti Recommends Extension**

On August 3, 2017, the U.S. Embassy in Haiti sent a cable again recommending extension of TPS for Haiti. Pl. Ex. 370. The Embassy analyzed the facts on the ground, acknowledging there had been some progress but ultimately noted country conditions remain poor. *Id.* at 2. On the whole, the Embassy's cable was largely consistent with the Department's previous findings, though it added of Haiti's socio-political conditions: "Hurricane Matthew demonstrated Haiti's weakened ability to cope, recover, and adapt to shock from natural disasters. Meanwhile, as a result of electoral-related tensions, politically motivated demonstrations and insecurity have affected the humanitarian operating environment. . . ." *Id.* As a result, the cable concluded:

> Extending TPS for Haiti is in the U.S. national interest. At this time the [Government of Haiti] is not capable of facilitating the reabsorption of 59,000 Haitians currently holding TPS in the United States in a time frame of less than several years. Lingering issues from the 2010 earthquake, additional effects of the cholera epidemic, and the aftermath of Hurricane Matthew exacerbate this concern, and a termination of TPS for Haiti would threaten the country's ability to make needed progress across numerous sectors.

*Id.*

**b. WHA Recommends Termination and Sends a Split Memo to Secretary Tillerson**

The Embassy was not the only entity within the Department of State that recommended extension of TPS for Haiti; however, the Bureau of Population and Refugee Management ("PRM") also recommended a six-month extension. *See* Pl. Ex. 246. On the other hand, the WHA—the Department of State's regional bureau for Haiti—and the Department's Policy Planning Staff ("S/P") recommended termination. *Id.* at 1-3. Because these three recommendations conflicted, the bureaus presented a split memo to Secretary Tillerson. *See id.* at 1-5. The split memo did not present the U.S. Embassy's position recommending an extension of TPS for Haiti, but it included the two memoranda recommending termination—from the WHA and S/P—and the PRM memorandum recommending extension. *See id.* at 4 (listing attachments). It omitted the U.S. Embassy's principal findings regarding conditions in Haiti as well as the views of the Haitian Government. *See id.* at 1-5; Trial Tr. at 157:23–158:3, 159:4-8 (Posner). The split memo included a clearance page indicating certain Department of State bureaus and divisions had cleared the document, but it was unclear whether the U.S. Embassy in Haiti had. Pl. Ex. 246 at 5; Trial Tr. at 126:10–131:17, 158:24–159:8 (Posner).

**c. Secretary Tillerson Recommends Termination for Haiti, Honduras, El Salvador, and Nicaragua**

The Department of State ultimately developed a memorandum recommending extension. *See* Suppl. Admin. R. at 45. The memorandum acknowledged many of the concerns identified by the Embassy,[11] but it concluded "[t]he extraordinary and temporary conditions that served as

---

[11] For example, the memorandum recognized "[s]pecific lingering effects of the earthquake remain in the areas of infrastructure, health, sanitation services, and emergency response capacity." Suppl. Admin. R. at 45. It also noted "Haiti continues to be affected by lingering earthquake damage." *Id.* The memorandum also noted "gender-based violence in the IDP areas remains a serious concern, and personal security is a serious and pervasive problem. An estimated 41,000 Haitians who have become homeless as a result of various natural disasters since 2010, including Hurricane Matthew in 2016, affecting Haiti remain in IDP areas." *Id.* at 46. With respect to the more recent natural disasters in Haiti, the memorandum noted "the aftermath of Hurricane Matthew in 2016, the heavy rains and

the basis for Haiti's most recent designation have sufficiently improved such that they no longer prevent nationals of Haiti from returning in safety." *Id.* It noted:

> Country conditions have improved since the January 2010 earthquake. The IDP population has decreased 97 percent from its peak in 2010. A legitimized government is in place after two years of electoral impasse. As of October 15, 2017, all UN military personnel have been withdrawn from Haiti; to be replaced by a police only successor mission focused on strengthening rule of law and promoting human rights.

*Id.* The memorandum also flagged several measures the Government of Haiti had undertaken to prepare for repatriating and reintegrating its citizens, including: (1) establishing a working group to mitigate illegal migration; (2) raising awareness among diaspora leaders to inform the Haitian community in the U.S. on how a policy change will affect them; and (3) and establishing a hotline to provide legal assistance to migrants. *Id.* at 48. And when describing Secretary Kelly's recent extension of TPS for Haiti, the memorandum carefully distinguished conditions it considered related to the earthquake from those it classified as "subsequent conditions." *Id.* at 45.[12] Notably, the State memorandum omitted the necessary clearance page that would have indicated the U.S. Embassy in Haiti cleared the document. *See* Trial Tr. at 158:9-10 (Posner

---

landslides in 2017, Hurricane Irma in September 2017, and the additional effects of the cholera epidemic continue to effect Haiti. *Id.* at 48-49. And Hurricane Matthew, largely due to Haiti's extreme poverty, "demonstrated Haiti's weakened ability to cope, recover, and adapt to shocks from natural disasters," in part *Id.* at 46. "This fragility was exposed again most recently by Hurricane Irma, which temporarily displaced over 10,000 people into shelters and exacerbated an existing food security crisis on the northern coast." *Id.* With respect to security, the memorandum noted, "[T]he HNP remains highly concentrated in Port-au-Prince and has limited resources, challenging its ability to guarantee security throughout the country." *Id.* at 47.

[12] According to the Department of State memorandum:

> The most recent extension, effective from July 23, 2017 – January 22, 2018, cited not only temporary and extraordinary conditions in the wake of the 2010 earthquake, but subsequent conditions, including: 2016's Hurricane Matthew, April 2017 heavy rains and landslides, security vulnerabilities that some Haitians who reside in Internally Displaced Persons (IDP) areas experience, and health vulnerabilities due to a weak public health system, which has been strained by a cholera epidemic. The extension also noted Haiti's serious economic and security challenges."

Suppl. Admin. R. at 45.

HT Vacatur AR_0058

This process culminated in Secretary Tillerson's October 31, 2017 letter to Acting Secretary Duke recommending her to terminate TPS not only for Haiti but also for El Salvador, Honduras, and Nicaragua. Suppl. Admin. R. at 36-37. Secretary Tillerson wrote, "[t]he extraordinary and temporary conditions that served as the basis for Haiti's most recent designation have sufficiently improved such that they no longer prevent nationals of Haiti from returning in safety." *Id.* at 36. He emphasized, "these countries do not—in the State Department's judgment—meet the legal requirements necessary for extension." *Id.* at 37. Secretary Tillerson's letter attached the Department of State's country conditions report. *Id.* at 36. It did not otherwise describe the conditions in Haiti warranting termination. *Compare id.* at 36-37, *with* Pl. Ex. 256 (describing some of the conditions in Haiti warranting a twelve-month extension of TPS).

iii.    UUSCIS Recommends Termination

As the Department of State prepared to recommend termination of TPS for Haiti, so too did officials at DHS. In October 2017, RAIO published a country conditions report detailing the conditions in Haiti. Through the remainder of the month, officials at DHS and USCIS grappled with the Report's findings and ultimately recommended terminating TPS for Haiti.

The October RAIO Report found "[m]any of the conditions prompting the original January 2010 TPS designation persist, and the country remains vulnerable to external shocks and internal fragility." Suppl. Admin. R. at 51. The Report concluded Haiti continued to struggle from the effects of the earthquake, which caused the destruction of approximately 105,000 houses, considerable damage to 188,383 houses, and the displacement of 1.5 million persons. *Id.* at 52. Despite some progress, "Haiti was also still facing "considerable obstacles" in housing, including relocation to unsafe homes or to informal settlements in hazardous areas, and the

eviction of 60,000 IDPs. *Id.* According to the Report, lack of access to fundamental health services and public health challenges continued to plague Haiti, including the ongoing cholera epidemic. *Id.* at 53-55. The Report acknowledged U.N. troops are "widely blamed" for introducing cholera—"reportedly the largest such outbreak of cholera in recent history" and that, despite a decline in suspected outbreaks in 2016, it "continues to place additional strains on Haiti's beleaguered public health system." *Id.* at 54-55.

The RAIO Report also addressed the status of Haiti's governance and political stability. While the earthquake "destroyed 28 of 29 government ministry buildings, the Haitian National Police's headquarters, and various judicial facilities," President Moïse announced plans to rebuild the National Palace in April 2017 and pledged to rebuild the Parliament and the Palace of Justice. *Id.* at 56-57. In another sign of progress, the Report acknowledged Haiti "successfully completed its electoral process in February 2017," but despite "'the formal structures of a democracy, many of these have yet to become fully functional.'" *Id.* Citing the United Nations Economic and Social Council, the Report noted "the Government has limited capacity to ensure a public administration system that can effectively guarantee the rule of law and a functioning justice system, promote the fight against corruption and effectively protect human rights." *Id.* at 57-58.

Concerns for the economy, public security, and food security continued to persist, according to the RAIO Report. As to the Haitian economy, the Report concluded the earthquake "caused $7.8 billion in damages and economic losses—equivalent to more than 120 percent of Haiti's 2009 gross domestic product" and over 25% of Haiti's gross domestic product comes from remittances sent back to Haiti from diaspora members living in the United States. *Id.* at 55-56. The Report emphasized high unemployment figures and widespread poverty. *Id.*

The Report noted the earthquake "had a deleterious impact on public security in Haiti" by "creating new security vulnerabilities and stimulating an increase in crime. . . . The escape of thousands of prisoners and the diffusion of gangs throughout Port-au-Prince in the aftermath overwhelmed Haiti's historically weak justice system and police." *Id.* at 58. The Report acknowledged the U.N. would withdraw the military component of its peacekeeping mission, MINUSTAH, and replace it with a mission that would help the Government strengthen rule-of-law institutions and develop and train local police. *Id.* at 59-60. But overall the Report characterized the security situation in Haiti as "unpredictable." *Id.* at 59. It expressed concern about gender-based violence, theft, domestic violence, homicide, robberies, and other crimes against persons. *Id.* at 58-59.

The RAIO Report also noted "[d]amage from the 2010 earthquake exacerbated Haiti's historic food security challenges," contributing to "a sharp decline in income and food availability" and an "increase in the price of food." *Id.* at 61. It stressed Haiti continues to rely on imports to meet more than half of its food needs and over half the population suffers from chronic malnutrition. *Id.* It concluded as of May 2017, "approximately 5.82 million people were facing food insecurity in Haiti, including 2.35 million people who were severely food-insecure and in need of immediate assistance." *Id.* at 62.

The RAIO report also addressed a series of natural disasters that have affected Haiti after the earthquake. It reported Hurricane Matthew was the "strongest Hurricane to strike the country in more than 50 years and the third strongest ever recorded in Haiti." *Id.* at 64. The "impact of the hurricane occurred at a time when Haiti was already facing an increase in the number of cholera cases and severe food insecurity and malnutrition." *Id.* The Report found Hurricane Matthew "affected 2.1 million people in Haiti; of this amount, 1.4 million were estimated to be

in need of humanitarian assistance in the aftermath of the storm. An estimated 175,000 people were displaced, and 546 people were killed." *Id.* at 64-65. At the time, the damage from Hurricane Matthew was "estimated at nearly $2.8 billion—equivalent to 1/3 of Haiti's gross domestic product." *Id.* at 65. It also "exacerbated food insecurity in Haiti." *Id.* at 61.

Similarly, in September 2017, Hurricane Irma displaced more than 12,500 people and impacted about 8,000 homes and caused extensive damage to livestock and crops. *Id.* at 63-64. And in April 2017, the Report noted, a heavy rainy season caused significant damage including floods and landslides. *Id.* at 63. According to the Report, prior to the flooding, Haiti experienced several years of drought, which had been exacerbated by the effects of *El Nino*. *Id.* at 64.

Last, the Report references a recent "crackdown on undocumented migrants in the Dominican Republic [that] has contributed to an influx of returnees to Haiti in recent years." *Id.* at 66. Citing a UN Secretary General Report, RAIO found "returnees . . . continue to find themselves in a situation of vulnerability owing to the insufficient reception capacity of the Haitian authorities and a lack of reintegration opportunities." *Id.* at 67. Ultimately, the October 2017 RAIO Report concluded:

> Haiti's recovery [from the 2010 earthquake] has been hindered by subsequent natural disasters and various political, social, health, security, and economic conditions which have negatively impacted the country in recent years. Haiti remains vulnerable to external shocks, and its internal fragility has left it unable to adequately respond to a wide range of persistent humanitarian needs."

*Id.* at 68. Indeed, RAIO wrote: "Haiti's recovery from the 2010 earthquake could be characterized as . . . one step forward, two steps back." *Id.* at 68.

After receiving the RAIO Report, USCIS officials began working on a draft Director Memorandum for USCIS Director Cissna. Cissna set a meeting with Acting Secretary Duke regarding TPS for about the middle of October. *See* Pl. Ex. 36 at 1. Kovarik wanted a draft from

USCIS career official Prelogar recommending termination of TPS for Haiti by that time, noting, "We don't need them finalized, but in good shape for Dir[ector] Cissna before he meets with Sec[retary] Duke at 4:30." *Id.* She critiqued the Director Memorandum in its current form, adding: "The problem is that [the Director Memo] reads as though we'd recommend an extension [because] we talk so much about how bad it is [in Haiti], but there's not enough in there about positive steps that have been taken since its designation." *Id.* Within minutes, Prelogar responded:

> We can comb through the country conditions to try to see what else there might be, but the basic problem is that it IS bad there [with regard to] all of the standard metrics. Our strongest argument for termination, we thought, is just that it is not bad in a way clearly linked to the initial disasters prompting the designations. We can work . . . to try to get more, and/or comb through the country conditions we have again looking for positive gems, but the conditions are what they are.

Pl. Ex. 37 at 1.

On October 20, 2017, DHS Spokesman and Trump Administration official David Lapan forwarded an email containing a transcript of a "gaggle" from the previous day to request comments on what his office should clarify to the press. Pl. Ex. 40A at 4-7. During the press gaggle, a reported asked: "[In] the case of Haiti . . . are [DHS officials] reviewing the effects of the cholera epidemic or just sticking to the earthquake?" *Id.* at 4. Lapan responded, "No, it's the earthquake. That was, again, by statute, it's the condition that created the TPS designation in the first place, the conditions in the country at that time that are considered." *Id.* He added with respect to the cholera epidemic, "let me not rule that out completely, because again, if there is a tie to the event, rather than being something that is completely separate." *Id.* In response to several questions, Lapan went on:

> We're looking at the fact that temporary protected status means temporary and it has not been temporary for many years and that we have created, the U.S. Government, the situation where people have lived in this country a long time. But

it always should have been the understanding that it was temporary. But every time
it's well, then we're going to give an extension and then we're going to give an
extension, and soon you have people who have been living here 20 plus years under
what was supposed to be a temporary program. . . .

Again, if you take a look at Haiti, for example, when we talked about the conditions
in Haiti having to do with the earthquake, which is where the TPS designation came
from in the first place, nobody would argue that a week before, a month before, a
year before that earthquake, things in Haiti weren't pretty bad. But we can't judge
for temporary protected status what the conditions were that have nothing to do
with the event that created TPS to start with. So nobody is going to argue that there
is still a lot of poverty in Haiti. That's been the way for a long time, that there is
still a lot of other things that affect those countries. But the statute provides that
TPS is designated and decisions about extending should be based on those
conditions that predicated the designation, not everything else that may point to the
fact that those countries have problems. . . .

*Id*. at 5-6. Referencing the recent extension of Haiti's TPS, Lapan stressed Secretary Kelly's

instructions to Haitian TPS recipients to prepare to return to Haiti, forecasting an end to the TPS

program. *Id*. at 6. On Lapan's request for comment, Kovarik noted she had some concerns but

stressed, "I think he did okay in really trying to stick to the letter of the law." *Id*. at 3.

By October 22, 2017, Kovarik was still dissatisfied with the draft Director Memorandum.

She sent the draft to Robert Law, another USCIS official, because she "want[ed] another set of

eyes on it." Pl. Ex. 127 at 1. In response to Kovarik's request to review the draft Director

Memorandum, Law noted:

The draft is overwhelming[ly] weighted for extension[,] which I do not think is the
conclusion we are looking for. The memo seems to dismiss or downplay the
positive developments that should suggest reauthorization is inappropriate. The
memo also makes no mention of the substantial amount of foreign aid the U.S. and
charities have invested in Haiti since the earthquake—another relevant factor to
indicate that Haiti no longer meets the definition of TPS.

*Id*. Kovarik then instructed Law to "[e]dit away!" *Id*.

In less than thirty minutes, Law changed the conclusion of the Director Memorandum.

USCIS career official Prelogar had initially written the draft to "support either extension or

termination" and "left the recommendation blank pending further discussion." *Id.* at 1-2. But Law noted he "made the document fully support termination" and "provided comment boxes where additional data should be provided to back up this decision." *Id.* at 1. [13] A little over one week later, Law emailed DHS employee Jacob Stubbs with an "important research project" seeking "positive data on the current status of Haiti to bolster the recommendation to terminate TPS." Pl. Ex. 86 at 1. Law referred Stubbs to the recent TPS extension "for language citing 'improvements' or the like that I can plug in . . . unemployment/workforce, wages, etc. Be creative." *Id.*

    iv.   <u>Acting Secretary Duke Decides to Terminate TPS</u>

**a. Input Within DHS**

On November 3, 2017, USCIS issued a Director Memorandum, signed by Director Cissna and addressed to Secretary Duke. Suppl. Admin. R. at 38-44. Director Cissna formally recommended Acting Secretary Duke to terminate TPS for Haiti, noting Haiti has "made significant progress in recovering from the 2010 earthquake" and "no longer continues to experience the extraordinary and temporary conditions that formed the basis of [its] designation and Redesignation of TPS." *Id.* at 38.

The Memorandum first describes the bases for Haiti's original TPS designation—the "7.0 magnitude earthquake"—and subsequent redesignation. *Id.* at 39. According to the Memorandum, the original designation described a substantial death toll and overflowing hospitals, the destruction of homes and government buildings, and extensive damage to infrastructure and food security. *Id.* at 38-39.

---

[13] In the past, Prelogar noted edits on decisional memoranda regarding TPS for Sudan "could be read as taking another step toward providing an incomplete and lopsided country conditions presentation to support termination. . . ." Priv. Prod. at 4583.

The Director Memorandum noted DHS re-designated TPS for Haiti in 2011 because, at the time, more than one million Haitians were either homeless or living in one of 1,300 IDP camps. *Id.* at 39. According to the Memorandum, DHS also premised Haiti's TPS redesignation on crowd conditions, flood susceptibility, "crime (including gender-based violence), and disease" in the camps. *Id.*

The Director Memorandum then described country conditions in Haiti, stressing their relationship to the earthquake. For example, it noted "Haiti is the poorest country in the western hemisphere, but it had enormous problems long before, and unrelated to, the 2010 earthquake." *Id.* at 40. Similarly, although the Memorandum alludes to gender-based violence and security concerns, it stresses "neither is a post-earthquake phenomenon." *Id.* The Memorandum reaches the same conclusion with respect to food insecurity, contending: "Haiti's food insecurity problems seem related to tropical storms and a drought rather than from lingering effects of the 2010 earthquake." *Id.* at 41.

To support the recommendation for termination, the Director Memorandum cites the declining number of IDP camps and IDPs, the withdrawal of the U.N. peacekeeping mission, the completion of the presidential election, and the Haitian President's commitment to reconstruct government buildings including the National Palace. *Id.* at 40. The Memorandum also points to GDP growth through 2016 and the regular removals of Haitian migrants since September 2016 as a sign of progress, although this evidence was not included in the RAIO Report. *Id.*

With respect to the cholera epidemic, the Memorandum notes only that "cholera is currently at its lowest level since the outbreak started." *Id.* at 41. It does not include any information as to what USCIS estimates that level to be. *See id.* The Memorandum then

describes Acting Secretary Duke's various options. With respect to her option to extend, it notes:

> USCIS has concluded that the specific extraordinary and temporary conditions stemming from the 2010 earthquake which caused Haiti to be initially designated for TPS and to be redesignated in 2011 have been largely ameliorated. Haitian nationals may safely return to Haiti as evidenced by DHS's decision to resume removals to Haiti in 2016. Additionally, it is not in the national interest to extend a TPS designation when the specific extraordinary and temporary conditions giving rise to a TPS designation no longer exist. . . . The review of conditions in Haiti indicates that significant progress has been made in reconstruction and recovery efforts and Haiti's current challenges cannot be directly tied to the 2010 earthquake.

*Id.* With respect to Acting Secretary Duke's option to redesignate Haiti, the Memorandum noted Hurricane Matthew was "[t]he most significant recent event that could be considered." *Id.* at 42. It then stresses USCIS does not seek redesignation on that basis. *Id.*

After receiving the Director Memorandum from USCIS, Acting Secretary Duke began preparing to terminate TPS for Haiti. Acting Secretary Duke's own handwritten notes—many of which appear in the designated administrative record—reveal her approach to the impending decision. For example, Acting Secretary Duke's notes reference the "America first" strategy. Reciting President Trump's slogan, Acting Secretary Duke wrote, "I believe America First," but she opined she was "not sure ending TPS is America first strategy." Suppl. Admin. R. at 318. In other notes concerning TPS for El Salvador, Honduras, and Nicaragua, which she reviewed concurrently with TPS for Haiti, Acting Secretary Duke wrote: "The TPS program must end for these countries soon . . . . This conclusion is the result of an America first view of the TPS decision." Pl. Ex. 179 at 1.

Acting Secretary Duke's notes also demonstrate she could not yet rationalize terminating Haiti's TPS by early November. In one set of notes, she wrote: "Haiti TPS is dramatically different from the other three countries due to the limited duration of TPS. Haiti—7 years;

Honduras and Nicaragua—19 years. . . . Separate out Haiti. They have been given a preview of what is likely to happen. Eight years is not the same as 20 years." Suppl. Admin. R. at 317-18. Regarding her "[r]ationale" for terminating TPS, she wrote: "don't know, need to rationalize conflicting info" but that "all agree [TPS] must end." *Id.* at 318. To that end, Acting Secretary Duke wrote of the "need" for a "plan for a decision" and to "foreshadow [TPS] will end." *Id.* She queried, "do we need a better strategy to lay a groundwork before terminating (diplomacy) to ensure neg[ative] consequences don't occur[?]" *Id.* Regarding termination, Acting Secretary Duke added laying such groundwork was "better than term[inating] in 18 mo[nths] [and] dealing w[ith] fallout . . . . [TPS] still could end in 18 mo[nths,] just w[ith]out the 'punch.'" *Id.* These notes revealed an initial desire to defer terminating TPS for Haiti to "give full discretion" to incoming DHS Secretary Nielsen. *Id.* Duke also considered going "one step stronger than Kelly" by indicating the "hurricane condition does not exist." *Id.*

### b. Input from the White House and SOUTHCOM

As her decision deadline approached, Acting Secretary Duke met with political officials and solicited information from additional sources. On November 3, 2017, the White House sponsored a Principals Small Group Meeting to "coordinate the conditions and process for terminating temporary protected status (TPS) for aliens from El Salvador, Honduras, Nicaragua, and Haiti." *Id.* at 127. Present at the meeting were Acting Secretary Duke, White House advisor Stephen Miller, former White House Advisor Tom Bossert, former Attorney General Jeff Sessions, and Gene Hamilton. Hamilton Dep. Tr. at 184:16–185:22. The committee briefing materials expressly recommended Acting Secretary Duke to "[t]erminate with an effective date of January 5, 2019 and engage Congress to pass a comprehensive immigration reform to include a merit based entry system." Suppl. Admin. R. at 129. The materials further noted:

Extending TPS for any or all of the four countries would prolong the distortion between the temporary protections that TPS was designed to provide and current circumstances. It would also lengthen the period during which beneficiaries would deepen their connections to the United States, making any future resolution of their status in the United States more complicated. Redesignation is not a viable option because the challenges all four countries face are long-term political, security, and economic deficiencies and are unrelated to ongoing armed conflict or natural disasters.

*Id.* Moreover, they suggested the approaching deadline on TPS for Haiti "support[ed] a case for setting a unified course of action for all four countries simultaneously," referring to Nicaragua, El Salvador, Honduras, and Haiti. *Id.* at 127.

According to Secretary Duke's handwritten notes from the meeting, Sessions told Duke she "can't keep certifying," "no one has the guts to pull the trigger, and she should just "just bite the bullet" and decertify. *Id.* at 113-15. He noted it would be "problematic to recertify" and added it would be "dangerous to separate out Haitians" because it would show "prejudice against Haitians." *Id.* He concluded that she "cannot certify." *Id.* at 115. The officials also discussed the political ramifications of a decision to terminate TPS for Haiti, cautioning the decision should not "get too close to end of 2019 political and midterms." *Id.* at 113.

Acting Secretary Duke spoke over the phone with Tom Bossert and Zack Fuentes, both White House Officials, on November 5, 2017. *See* Suppl. Admin. R. at 283. According to Acting Secretary Duke's handwritten notes, Bossert and Fuentes told her "conditions in [the four] countries no longer exist," "gutless fed[eral officials] have extended" TPS, and the White House would be "extremely disappointed if [she] kick[ed the termination decision] into [the] lap of [the] next secretary." *Id.*

On November 6, 2017, Acting Secretary Duke emailed White House Chief of Staff Kelly regarding her decision to terminate TPS for Nicaragua, with an effective date of 18 months later, and to extend a "no decision" for Honduras. In her email, Acting Secretary Duke wrote:

> These decisions along with the public statements will send a clear signal that TPS in general is coming to a close. I believe it is consistent with the President's position on immigration. . . . While some are portraying this differently, this decision is really just a difference in strategy to get to the President's objectives.

Pl. Ex. 169 at 1. Several hours after her initial email, Acting Secretary Duke wrote to Kelly once more: "I had a discussion with [Tom Bossert] this evening and he informed me of a strategy I was not previously aware of. I incorporated this new information into my final decision and the published timeframe for the Nicaragua termination is 12 months, not 18." Pl. Ex. 96 at 1. At Acting Secretary Duke's request, Chad Wolf forwarded her initial email to Bossert, who responded, "Thank you for all the time and effort today, and for the 12 month outcome." Pl. Ex. 165 at 1. He later added the TPS decisions would signal a "clear need for statutory reform of our immigration system." *Id.*

On November 10, 2017, Chief of Staff Kelly wrote to Acting Secretary Duke, Stephen Miller, Hope Hicks, Sarah Huckabee Sanders, Tom Bossert, and others, noting:

> The conversation revolved around 'make a decision.' That the decision on TPS was entirely [Duke's]. That whatever she decided she'd be criticized but that comes with the job. My view was to grant limited (no more than 12 months or so [versus] the maximum 18 months allowed by the TPS program) to the Central American TPS recipients who have been here for 20 years. This approach then gives us time to work out a permanent solution with the hill. Similar thinking on Haiti."

Pl. Ex. 184. He later added, "[C]alls to leaders and staff within an organization to help in the decision making process particularly when they call looking for guidance, which includes ensuring agenda adherence, is EXACTLY what a chief-of-staff does." *Id.*

On November 15, 2017 Secretary Duke requested "any input SOUTHCOM has on the potential impact/points of consideration" regarding her decision on TPS for Haiti. Suppl. Admin. R. at 2. In response to Secretary Duke's request, Major General Jon Norman noted:

> The impact of removing Haiti from TPS . . . may have near and long term repercussions for Haitian stability. In the near term, the removal of an estimated

59,000 Haitians from the US may place considerable additional stress on the Government of Haiti (GOH) and the social services of the country. Current conditions and GOH capacity have improved sufficiently to absorb the return of a moderate flow of Haitian nationals, but a large return would likely overwhelm a fragile government system and infrastructure.  The GOH continues to receive weekly flights of between 50 and 100 noncriminal deportees, and even this moderate number is a level that stretches its resources to maintain a secure and orderly reception program.  The return of a large number of citizens may place additional security stress upon the Haitian government, which is contending with rising crime and violence exacerbated by the security vacuum created by the withdrawal of MINUSTAH. . . .

*Id.* at 1.

### c. The Government of Haiti Continues to Ask for Extension

The Haitian Government made clear its position on TPS for Haiti even prior to Secretary Kelly's May 2017 decision.  On May 4, 2017, the Haitian Ambassador to the United States, Paul Altidor, sent a letter to Secretary Kelly "asking for an extension of TPS, a stay of deportations to Haiti and the much-needed time to adequately prepare to welcome our citizens home." Pl. Ex. 172 at 2.  Ambassador Altidor wrote Haiti had "encountered a number of roadblocks in the rebuilding process" since the 2010 earthquake, including Hurricane Matthew, which "caused, by some estimates, more than two (2) billion USD worth of damage and resulted in complete destruction of some parts of the country." *Id.* at 1.  He also reported "pledges of donations did not equate to monies received" and noted the cholera epidemic "continu[ed] to devastate [Haiti's] citizens given [its] vulnerable conditions." *Id.*  As a result, "recovery is not yet at a stage where [it] can receive and provide the necessary support for more than 50,000 arrivals back to the country." *Id.* at 2.  Four days later, Ambassador Altidor sent another letter to Secretary Kelly requesting an in-person meeting to discuss Haiti's TPS designation.  Pl. Ex. 171.  Ambassador Altdor wrote the Government of Haiti "strongly believes that a renewal of TPS for

Haitians, for at least another eighteen (18) months, is in the national interest of both Haiti and the United States." *Id.* at 1.

Secretary Kelly met with Haitian Foreign Minister Antonio Rodrigue approximately one week later. Pl. Ex. 22. According to a memo from a November 13, 2017 Haiti TPS Strategy Meeting, "At former Secretary Kelly's request, Haiti has taken some steps to prepare for the eventual end of its TPS designation" even though the "Government of Haiti . . . stresse[d] it does not yet have the ability to accept back all of its TPS beneficiaries." Suppl. Admin. R. at 28.

James Nealon, the Assistant Secretary of Homeland Security for International Affairs and Acting Undersecretary for Policy, spoke by phone with Ambassador Altidor to also discuss Haiti's TPS in July 2017. *See* Pl. Ex. 355; Nealon Dep. Tr. at 27:12-22. Nealon called "the Haitian Ambassador to urge progress on preparing Haitian citizens to return home with the impending end of TPS." Pl. Ex. 355 at 1. During the call, Ambassador Altidor told Nealon the Haitian Government understands TPS is temporary. *Id.* But he stressed "Haiti is not yet ready to absorb a large number of returnees." *Id.* He stressed though "the Government is focused on creating an environment in which returnees . . . could expect to find adequate housing, . . . those conditions don't yet exist." *Id.* Ambassador Altidor also noted the Haitian Government does not want to "welcome [its] citizens back only to see them attempt to return to the United States for lack of opportunity, or worse, be attracted to criminal activity because of lack of legitimate work opportunities." *Id.* Nealon reported "the Ambassador asked directly if TPS will end in 2018. His message was clear – we understand it's a temporary program, but we're not ready, please extend it." *Id.*

Through the fall of 2017, the Haitian government continued to warn DHS officials it was not prepared to repatriate Haitian TPS recipients. The Embassy of the Republic of Haiti wrote

DHS to further highlight the conditions warranting extension, including the housing shortage, destruction from Hurricane Matthew, the cholera epidemic, food insecurity, and damage from other environmental disasters. Suppl. Admin. R. at 7-9. And on October 4, 2017, Ambassador Altidor sent a letter to Acting Secretary Duke requesting an eighteen-month extension of Haiti's TPS designation or re-designation. Suppl. Admin. R. at 4-6. In the letter, Ambassador Altidor stressed the destruction of Hurricane Matthew, the ongoing cholera epidemic, and newly-inflicted damage from Hurricanes Maria and Irma warranted extension or re-designation. *Id.* As such, while Ambassador Altidor reported Haiti "is diligently working to put the country back on a trajectory towards a swift recovery," he expressed "fear that a non-renewal may cause TPS beneficiaries to find alternative, and ill-advised, ways to remain in the United States, and would also embolden trans-national human traffickers and cartels to prey upon this group of vulnerable individuals." *Id.* at 6.

In his October 4 letter, Ambassador Altidor invited Acting Secretary Duke to Haiti to discuss TPS and see the conditions in Haiti on the ground. *Id.* at 6. Instead, Acting Secretary Duke met with Foreign Minister Rodrigue in the United States on November 13, 2017. *Id.* at 11-13. Prior to that meeting, Acting Secretary Duke's briefing notes demonstrate she recognized the steps Haiti had taken "to prepare for the eventual end of its TPS designation" may be insufficient to adequately prepare "for the potential return of tens of thousands of Haitian TPS beneficiaries in the United States." *Id.* at 11. USCIS Director Francis Cissna, who attended the meeting, testified Foreign Minister Rodrigue "expressed his desire that the Secretary would extend TPS, and just he and his staff made that desire very clear." Cissna Dep. Tr. at 134:16-20.

**d. Acting Secretary Duke Announces Termination of TPS for Haiti**

On November 20, 2017, Acting Secretary Duke announced she had decided to terminate TPS for Haiti.  DHS issued a press release announcing her decision:

> The decision to terminate TPS for Haiti was made after a review of the conditions upon which the country's original designation were based and whether those extraordinary but temporary conditions prevented Haiti from adequately handling the return of their nationals, as required by statute.  Based on all available information, including recommendations received as part of an inter-agency consultation process, Acting Secretary Duke determined that those extraordinary but temporary conditions caused by the 2010 earthquake no longer exist.

Pl. Ex. 114 at 1.  The press release also noted "Acting Secretary Duke met with Haitian Foreign Minister Rodrigue" to discuss TPS.  *Id.*  It did not, however, reflect Foreign Minister Rodrigue's desire to extend.  Cissna Dep. Tr. at 134:16-20.  After the announcement, Prelogar emailed Anderson: "Unbelievable."  Pl. Ex. 42.  Prelogar later testified he found "unbelievable" that "an announcement by the secretary that [in his] view was riddled with errors of various sorts would be released."  Prelogar Dep. Tr. at 230:19–231:11.

DHS published its official notice in the Federal Register in January 2018, providing exclusively the following for its reasons:

> [T]he conditions for Haiti's designation for TPS—on the basis of "extraordinary and temporary conditions" relating to the 2010 earthquake that prevented Haitian nationals from returning in safety—are no longer met.
>
> Haiti has made progress recovering from the 2010 earthquake and subsequent effects that formed the basis for its designation.  For example, the number of internally displaced persons (IDP) from the earthquake has continued to decline—98 [percent] of IDP sites have closed, and only approximately 38,000 of the estimated 2 million Haitians who lost their homes in the earthquake were still living in camps as of June 2017.  In October 2017, the United Nations withdrew its peacekeeping mission, noting the mission had achieved its goals.  The peacekeeping mission has been replaced by a successor operation that is a police-only force focused on strengthening rule of law, promoting human rights and supporting the Haitian National Police.
>
> Haiti successfully completed its presidential election in February 2017.  The 2010 earthquake destroyed key government infrastructure, including dozens of primary federal buildings, which the Haitian government is working to rebuild.  The

Supreme Court is already reconstructed and operational, and, in April 2017,
President Moïse announced a project to rebuild Haiti's National Palace. A Palace
spokesperson announced on January 8 that a project to reconstruct the Palace would
commence on January 12, 2018.

Haiti's economy continues to recover from the 2010 earthquake. Annual
GDP growth has been generally positive since 2010, averaging 1.7 percent over the
period (2010-2016). Although Haiti has grappled with a cholera epidemic that
began in 2010 in the aftermath of the earthquake, cholera is currently at its lowest
level since the outbreak began.

Pl. Ex. 341 at 3. The language in the notice largely tracks the language in the November 2017

Director Memorandum. *Compare id.*, *with* Suppl. Admin. R. at 40.

## PROCEDURAL HISTORY

On March 15, 2018, Patrick Saget, Yolnick Jeune, Sabina Badio Florial, Jean Claude

Mompoint, Gerald Michaud, Leoma Pierre, Naïscha Vilme, Guerline Francoise, Beatrice

Beliard, Rachelle Guiriand, Family Action Network Movement, Inc. ("FANM") and Haiti

Liberté (collectively, "Plaintiffs") filed this action against President Donald J. Trump, the United

States of America, the Department of Homeland Security ("DHS"), Kirstjen Nielsen in her

capacity as the DHS Secretary, and Elaine C. Duke as DHS Deputy Secretary (who was later

replaced by Claire M. Grady) (collectively, "Defendants") seeking declaratory and injunctive

relief. Compl., ECF No. 1.

On May 31, 2018, Plaintiffs filed an Amended Complaint challenging then-Acting

Secretary of Homeland Security Elaine C. Duke's termination of Temporary Protected Status

("TPS") for Haiti, effective July 22, 2019. Am. Compl., ECF No. 21. Plaintiffs claim the

decision to terminate TPS for Haiti: (1) was arbitrary and capricious, an abuse of discretion, and

otherwise not in accordance with law in violation of the Administrative Procedure Act ("APA");

(2) was based on a new and changed standard for conducting TPS review, violating both the

APA and the Regulatory Flexibility Act ("RFA"); (3) violated the Due Process and Equal

Protection clauses of the Fifth Amendment of the Constitution; and (4) was ultra vires of the Immigration and Nationality Act ("INA").

On October 9, 2018, Defendants moved to dismiss the action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Def. Mot., ECF No. 58; *see also* Def. Mem. ECF No. 59; Pl. Opp'n, ECF No. 62; Def. Reply, ECF No. 63. On October 30, 2018, Defendants filed a motion to stay this action pending final appellate review of the preliminary injunction issued in *Ramos v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018). Mot. to Stay, ECF No. 65. After the motions were fully briefed, the Court held oral argument on the motions on November 13, 2018. At the hearing, this Court made an oral ruling denying both Defendants' motion to dismiss and motion to stay, *see* Nov. 13, 2018 Tr., ECF No. 72, and issued a written decision and order on December 14, 2018, ECF No. 96.

From January 7, 2019 through January 10, 2019, this Court held a bench trial in this action to determine the propriety of a preliminary injunction. During the trial, the Court heard testimony from eight witnesses called by Plaintiffs. The witnesses included: two individual plaintiffs, Rachelle Guirand and Naischa Vilme; representatives of the two organizational plaintiffs, Haiti Liberté and the Family Action Network Movement, Inc. ("FANM"); and four expert witnesses. The expert witnesses included Ellie Happel and Brian Concannon, experts on country conditions in Haiti; Michael Posner, a former Assistant Secretary of State and an expert on Department of State practice and procedure; and Leon Rodriguez, the former Director of the United States Citizenship and Immigration Services ("USCIS") and an expert on USCIS practice and procedure. Defendants called no witnesses at trial. The parties entered into evidence deposition designations from eight witnesses, including witnesses called in *Ramos*. On January 10, 2019, this Court admitted these deposition transcripts in their entirety. *See* Order, ECF No.

133; Trial Tr. at 610–11. At the conclusion of trial, the Court reserved judgment and directed the

parties to file proposed findings of fact and conclusions of law. Trial Tr. at 728:10-14; *see* Pls.

Proposed Findings of Fact and Concls. of Law ("Pl. Br."), ECF No. 146-1; Defs. Proposed

Findings of Fact and Concls. of Law ("Def. Br."), ECF No. 136; Pl. Resp. to Defs. Proposed

Findings of Fact and Concls. of Law ("Pl. Reply"), ECF No. 154; Defs. Resp. to Pls. Proposed

Findings of Fact and Concls. of Law ("Def. Reply"), ECF No. 153.

## JURISDICTION

This Court previously held the judicial review provision of the TPS statute, 8 U.S.C. §

1254a(b)(5)(A), does not bar review of Secretary Duke's decisionmaking process for terminating

Haiti's TPS. *See Saget v. Trump*, 345 F. Supp. 3d 287 (E.D.N.Y. 2018) (Kuntz, J.).

Nevertheless, Defendants continue to assert this Court lacks subject matter jurisdiction. First,

Defendants argue Section 1254a(b)(5)(A) bars judicial review of claims relating to the

Secretary's determination, be they statutory or constitutional. Def. Br. at 47-50. The TPS statute

strips courts of jurisdiction to review "any determination of the Attorney General with respect to

the designation, or termination or extension of a designation, of a foreign state under this

subsection." 8 U.S.C. § 1254a(b)(5)(A). Second, Defendants contend the Court also lacks

subject matter jurisdiction over all claims against the President.

### A. Subject Matter Jurisdiction Over Plaintiffs' Claims

Because, as Defendants argue, Plaintiffs challenge "the content and factual accuracy" of

Secretary Duke's decision, the TPS statute bars this Court from reviewing Plaintiffs' claims.

Def. Br. at 48. Defendants also argue the statute bars judicial review even when the Secretary

violates the TPS statute. *Id.* at 49. The Court addresses these arguments in turn and concludes it

has subject matter jurisdiction over all of Plaintiffs' claims.

HT Vacatur AR_0077

i.    General Legal Standards

With respect to Plaintiffs' APA claims, there is a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). As a result, "statutory limitations on judicial review of agency action should be interpreted narrowly in light of the APA's strong presumption in favor of judicial review." *Sharkey v. Quarantillo*, 541 F.3d 75, 84 (2d Cir. 2008) (citing *I.N.S. v. St. Syr*, 533 U.S. 289, 298 (2001); *Bowen*, 476 U.S. at 670). Given this strong presumption, courts must "restrict access to judicial review" of administrative action "only upon a showing of 'clear and convincing evidence' of contrary legislative intent." *Bowen*, 476 U.S. at 671-73 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)). Similarly, with respect to Plaintiffs' constitutional claims, "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (citation omitted).

ii.    Discussion

Defendants face "'the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of [its] decision.'" *Salazar v. King*, 822 F.3d 61, 75 (2d Cir. 2016) (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975)). Defendants contend they meet this burden because the plain text of the TPS statute precludes judicial review. Def. Br. at 48-49. The defendants in *Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018), and *Centro Presente v. Department of Homeland Security*, 332 F. Supp. 3d 393 (D. Mass. 2018), advanced similar jurisdictional arguments, which both courts rejected. *See Ramos*, 321 F. Supp. 3d at 1104 (concluding the Government could not show "clear and convincing evidence of Congressional intent to strip jurisdiction of the courts to review generally applicable policies and practices which transcend individual TPS determination for a particular country"); *Centro*

*Presente*, 332 F. Supp. 3d at 409 (holding the plaintiffs' challenge was "sufficiently collateral that the Court has jurisdiction over both the constitutional and statutory claims").

In denying Defendants' motion to dismiss, the Court compared the instant action to *McNary v. Haitian Refugee Center*, 498 U.S. 479 (1991). In *McNary*, the Supreme Court held the Immigration Reform and Control Act ("Reform Act") did not bar constitutional and statutory challenges to INS's decision making process regarding special agricultural worker status "given the absence of clear congressional language mandating preclusion of federal jurisdiction and the nature of respondents' requested relief." *Id.* at 483-84. Critically, the plaintiffs in *McNary* did not seek a substantive declaration. *Id.* at 495; *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 55-56 (1993) (applying *McNary* to conclude the Reform Act did not preclude "jurisdiction over an action challenging the legality of a regulation without referring to or relying on the denial of any individual application"). The Reform Act's jurisdiction-stripping provision is very similar to that of the TPS statute. Whereas the TPS statute provides "[t]here no judicial review of *any determination* of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state," 8 U.S.C. § 1254a(b)(5)(A) (emphasis added), the Reform Act provides "[t]here shall be no . . . judicial review of *a determination* respecting an application for adjustment of status," 8 U.S.C. § 1160(e)(1) (emphasis added). *See also McNary*, 498 U.S. at 492.

The construction of the TPS statute does not evince an intent to bar all judicial review. If Congress intended to bar collateral challenges to the processes underlying TPS determinations, it very well could have by using "broader statutory language," such as language proscribing "all causes . . . arising under" the statute or "referring to review 'on all questions of law and fact,'" as Congress has done elsewhere in the INA. *McNary*, 498 U.S. at 494; *compare* 8 U.S.C. §

HT Vacatur AR_0079

1252(b)(9) ("Judicial review of all questions of law and fact, *including interpretation and application of constitutional and statutory provisions*, arising from any action taken or proceeding brought to remove an alien . . . shall be available only in judicial review of a final order under this section." (emphasis added)), *with id.* § 1254a(b)(5)(A) ("There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."). Thus, as the Court concluded previously, the text of the TPS statute demonstrates the jurisdiction-stripping provision proscribes only direct review of individual TPS determinations.

Despite the Court's prior decision, Defendants argue the evidence presented at trial "demonstrates that Plaintiffs' real objective is not to establish a process-based deficiency, but instead to challenge both the content of [Secretary] Duke['s] decision and the factual accuracy of Acting Secretary Duke's findings." Def. Br. at 47-48. Defendants point to Plaintiffs' expert testimony regarding country conditions in Haiti to suggest Plaintiffs' motive is to challenge the substance of the decision itself. *Id.* at 48. In response, Plaintiffs argue they did not call country conditions experts to contradict factual findings but rather to demonstrate Defendants "intentionally disregarded and/or misconstrued relevant, available evidence and therefore violated the *procedural* requirements of the TPS statute." Pl. Reply at 23. Ultimately, Plaintiffs do not ask the Court to make findings of fact concerning current conditions in Haiti or to evaluate the factual accuracy of Acting Secretary Duke's findings. *Id.* at 22. Rather, "Plaintiffs have requested that the Court make findings of fact relating to *deficiencies in the process* employed by Defendants to terminate TPS for Haiti." *Id.* At trial, Plaintiffs brought experts who spoke directly to the typical processes employed at DHS and the Department of State leading up to TPS determinations and the alleged procedural deficiencies in the decision to terminate Haiti's

TPS.  As Plaintiffs point out, "most of the evidence that Plaintiffs presented at trial speaks directly to process-based deficiencies in the Trump Administration's policies and practices for reviewing TPS." *Id.* at 23.

Defendants also argue Plaintiffs' legal assertions evince a "quintessential arbitrary-and-capricious challenge to the agency decision itself." Def. Reply at 3.  But again, Plaintiffs' claims rely on *process-based* deficiencies.  Plaintiffs do not challenge the content of the decision.  They do not seek a substantive declaration from the Court they are entitled to a TPS determination in their favor. Pl. Br. at 90.  Plaintiffs' success in this case would not compel Defendants to extend Haiti's TPS designation.  Rather, it would require Defendants to make a new, good faith, fact- and evidence-based determination regarding Haiti's status by applying lawful criteria.  *See McNary*, 498 U.S. at 495 (noting respondents would be entitled only "to have their case files reopened and their applications reconsidered"); *Centro Presente*, 332 F. Supp. 3d at 408.  If the Court were to grant Plaintiffs the relief they seek, Acting Secretary Duke's TPS determination would be set aside, and the DHS Secretary would need to make a new determination, applying lawful criteria—that is, criteria other than those Plaintiffs allege to be procedurally deficient.  *See id.* at 408.  This very well could result in the same TPS determination.

Defendants cite several cases to support their argument the TPS statute bars this Court from reviewing Acting Secretary Duke's decision.  *See, e.g.*, *Gebhardt v. Nielsen*, 879 F.3d 980 (9th Cir. 2018); *Skagit Cty. Public Hosp. District No. 2 v. Shalala*, 80 F.3d 379 (9th Cir. 1996); *Palisades Gen. Hosp. v. Leavitt*, 426 F.3d 400 (D.C. Cir. 2005); *see also City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865 (9th Cir. 2009).  But Defendants' reliance on these cases is misplaced.

The issue in the present case is different from that in *Gebhardt*. In *Gebhardt*, the Ninth Circuit determined the Adam Walsh Act precluded judicial review of statutory claims because the explicit and clear language of the statute provides the Secretary with "sole and unreviewable discretion" over a determination bearing on the risk a citizen poses to a non-citizen being claimed as an immediate relative. 879 F.3d at 984; *see also* 8 U.S.C. § 1154(a)(1)(A)(i). The TPS statute does not endow the Secretary with such unfettered discretion. It does not provide the Secretary with "sole and unreviewable discretion." *Compare* 8 U.S.C. § 1154(a)(1)(A)(i), *with* 8 U.S.C. § 1254a(b)(5)(A). In fact, the TPS statute limits the Secretary's discretion by *requiring* the Secretary to, among other things: (1) consult with appropriate government agencies; (2) publish the basis for a determination in the federal register; and (3) terminate a foreign state's TPS if that state no longer meets the conditions for designation. *See* 8 U.S.C. §§ 1254a(b)(3)(A)–(B) (providing the Secretary "*shall*" fulfill these responsibilities (emphasis added)). Thus, the requirements of the APA and the TPS statute itself constrain the Secretary. Put another way, the Secretary may not violate the law. If she does, a federal court may hold her accountable.

The issues in this case also differ from those in *Skagit County*, *Palisades General Hospital*, and *City of Rialto*. In both *Skagit County* and *Palisades General Hospital*, the plaintiffs requested relief in the form of a substantive declaration from the court. *See Skagit Cty.*, 80 F.3d at 386 (asking the court "to order . . . [the Health Care Finance Administration to] award [the plaintiff] its appropriate share of Medicare reimbursement"); *Palisades Gen. Hosp.*, 426 F.3d at 403-05 (citing the same "unique" statutory scheme as *Skagit County*, 42 U.S.C. § 1395(d)(10)(C)(iii)(II), as the basis of finding the court lacked jurisdiction). Similarly, in *City of Rialto*, the Ninth Circuit determined a "pattern and practice" claim under the Comprehensive

Environmental Response, Compensation, and Liability Act of 1980 was "decidedly substantive," distinguishing it from *McNary* in which the plaintiffs sought a "fair hearing" regarding the "deprivation of a substantial liberty interest." 581 F.3d at 876, 878. As the Court has already stressed, Plaintiffs seek neither a substantive declaration nor individualized relief. Rather, they seek to prevent the Secretary and DHS from making TPS determinations based on a subjective goal engineered toward termination rather than on the objective assessment required by law.

Moreover, the case at hand, unlike *Skagit County*, *Palisades General Hospital*, and *City of Rialto*, involves a substantial liberty interest—immigration status. Protecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law: "Given th[ose] substantial liberty interest[s] and the 'well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action,'" Congress did not isolate the immigrants in this case from seeking judicial review of their valid claims. *See id.* at 878 (quoting *McNary*, 498 U.S. at 496).

If the Court did not have jurisdiction to hear Plaintiffs' claims, there would be no judicial avenue by which Plaintiffs could meaningfully object to DHS procedure regarding TPS determinations at large. *See McNary*, 498 U.S. at 496. Defendants argued at the Preliminary Injunction Hearing Plaintiffs' only recourse is to lobby Congress to enact legislation to designate a given country for TPS. *See* Trial Tr. at 720:16–721:9. Defendants note they would maintain this position even if the DHS Secretary deliberately and blatantly violated the dictates of the APA or the TPS statute. *Id.*; *see also* Def. Br. at 49 (stating "judicial review is . . . not permitted even in a scenario where a Secretary of Homeland Security *violates* the TPS statute" (emphasis added)). The language of the TPS statute does not provide such an unrestrained destruction of the rule of law. Given "our well-settled presumption favoring interpretations of statutes that

allow judicial of review of administrative action" and the limited review provisions of the TPS statute, the Court finds Defendants fail to meet their burden of demonstrating Congress intended "to foreclose all forms of meaningful judicial review" under the TPS statute. *See McNary*, 498 U.S. at 496 (citation omitted). Accordingly, the Court has subject-matter jurisdiction over Plaintiffs' claims.

### B. Plaintiff's Claims Against the President

Defendants also contend this Court does not have subject matter jurisdiction over Plaintiffs' claims against the President, who Plaintiffs sue in his official capacity. Def. Br. at 50; Def. Reply at 7. This Court previously held it was premature to dismiss the President as a party to this action when it denied Defendants' Motion to Dismiss. *See Saget*, 345 F. Supp. 3d at 297. Courts possess the power to grant injunctive relief against subordinate executive officials, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584, 588 (1952), as well as the President, *Clinton v. New York*, 524 U.S. 417, 433 (1998); *Nixon v. Fitzgerald*, 457 U.S. 731, 753-54 (1982). That no individual is above the law is a well-settled principle in this nation. *See Nixon*, 457 U.S. at 754 (citing *Youngstown Sheet & Tube Co.*, 343 U.S. at 579; *United States v. Burr*, 25 F. Cas. 30, 34 (C.C. Va. 1807) (Marshall, C.J.) (contrasting the "principle of the English constitution that the king can do no wrong," with the U.S. constitution, which explicitly includes provisions for impeachment and removal)).

Enjoining the President from certain action is "extraordinary" relief, but it may nonetheless be available in certain circumstances. *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992). Courts "must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." *Nixon*, 457 U.S. at 754.

HT Vacatur AR_0084

Defendants previously invoked and incorporate by reference *Franklin* and *Mississippi v. Johnson*, 71 U.S. (Wall.) 475 (1866), to argue this Court cannot enjoin the President in this action. *See* Def. Br. at 50. In *Mississippi*, a group of Southern states sought to enjoin President Johnson and his subordinate officials from enforcing the post-Civil War Reconstruction Acts passed by Congress, which the Supreme Court deemed unconstitutional. 71 U.S. (Wall.) at 498. Although it dismissed the suit as to all defendants, the *Mississippi* Court—as the Court in *Franklin* acknowledged—did not bar injunctive relief against the President in all cases; instead, it left the door open for "a judicial injunction requiring the performance of a purely 'ministerial' duty." *Franklin*, 505 U.S. at 802-03 (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall) at 498-99). And as the D.C. Circuit has advised, courts "should be extremely reluctant in light of the fundamental constitutional reasons for subjecting Executive actions to the purview of judicial scrutiny to hold that the federal judiciary lacks power to compel the President to perform a ministerial duty in accordance with the law." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 612 (D.C. Cir. 1974) (issuing a declaratory judgment against the President). The correction of an unlawful act "far more closely resembles the performance of 'a mere ministerial duty,' where 'nothing [is] left to discretion,' than the performance of a 'purely executive and political' duty requiring the exercise of discretion vested in the President." *Knight First Amendment Inst. v. Trump*, 302 F. Supp. 3d 541, 578 (S.D.N.Y. 2018) (Buchwald, J.) (quoting *Mississippi*, 71 U.S. (4 Wall.) at 499).

Plaintiffs argue injunctive relief against the President is proper in this case. Pl. Br. at 92-93. They contend "[a]n injunction against the President is . . . appropriate to ensure that the Secretary's new decision on whether to extend or terminate TPS for Haiti is based on a review of the proper statutory criteria and not prejudicial influence motivated by racial animus." *Id.*

In balancing the weight of the interests to be served by injunctive relief against the intrusion into Executive affairs, the Court concludes, at this time, enjoining the President to ensure executive officials operate in accordance with the law is appropriate in this case and well within the Court's power.  The Government's comparison to *Mississippi*—where states that disagreed with the constitutionality of a law sought to enjoin the President from enforcing it—is inapposite. Here, unlike in *Mississippi*, injunctive relief against the President corrects unlawful conduct (rather than promotes it) and ensures the decision to extend or terminate TPS for Haiti is in accordance with the law.  Plaintiffs cite numerous statements made by the President himself to support their respective claims in this action, and evidence within the administrative record reflects the influence of several senior White House officials.  *See, e.g.*, Suppl. Admin. R. at 127-29 (White House-sponsored small group meeting coordinating TPS process); *id.* at 283 (Duke's handwritten notes describing phone call with White House officials).  Such involvement suggests enjoining the Secretary alone would not afford complete relief sought by Plaintiffs.  Moreover, any intrusion into executive function would be minimal; the Court is not directing the President or any executive official to reach a certain policy conclusion but rather to abide by the mandates of the APA, the TPS statute, and the Constitution.  The United States is a government of laws, not of men.  Executive officials, be they senior or subordinate, must follow the law.

The Government also cites as support *Doe 2 v. Trump*, 319 F. Supp. 3d 539 (D.D.C. 2018).  There, plaintiffs filed suit seeking injunctive relief against the President after he issued a statement via Twitter announcing "the United states Government will not accept or allow transgender individuals to serve in any capacity in the U.S. Military."  *Id.* at 540.  The court dismissed the President as a party in the action, based "on the particular facts of this case— where no relief is available from the President himself, the Court can review the policy at issue

without the President as a party, and Plaintiffs can obtain all of the relief that they seek from other Defendants." *Id.* at 542-43.

But *Doe 2* is markedly different from the instant action. First, the plaintiffs sought to declare a presidential policy itself was unconstitutional, not that the means by which the policy was enacted was unlawful. Second, the policy at issue in *Doe 2* was without question "an official, non-ministerial act of the President[.]" *Id.* at 541. Here, injunctive relief against the President does not invade the province of executive discretion as it would in *Doe 2*; rather, enjoining the President and other executive officials from violating the TPS statute is akin to performing a ministerial duty and ensuring executive officials follow the laws enacted by the Congress. *See Knight First Amendment Inst.*, 302 F. Supp. 3d at 578-79. Third, the plaintiffs in *Doe 2* explicitly stated in their Second Amended Complaint "they are no longer seeking preliminary (or permanent) injunctive relief from the President at all." *Doe 2*, 319 F. Supp. 3d at 541. Here, Plaintiffs continue to seek relief against the President.

Accordingly, the Court concludes at this stage of the litigation the President is an appropriate party to the action.

## STANDING

The Court next addresses "the threshold question in every federal case": whether Plaintiffs have standing. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006). Because federal courts may hear only actual cases or controversies, litigants must "satisfy th[is] 'irreducible constitutional minimum' of Article III standing" before their claims may be properly heard in federal court. *Strubel v. Comenity Bank*, 842 F.3d 181, 187 (2d Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To establish standing, a plaintiff must have first suffered an "injury in fact, . . . an invasion of a legally protected interest which is (a)

concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-48 (2016).  Congress may construct a statutory right that, if violated, would lead to an injury in fact that would not otherwise be cognizable.  *See, e.g.*, *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 19-21 (1998) (holding advocacy organizations' "inability to obtain information" that Congress determined to make public by statute is a concrete injury satisfying the standing requirement of Article III); *Spokeo, Inc.*, 136 S. Ct. at 1549-50 (listing cases); *id.* at 1554-55 (Ginsburg, J., dissenting) (listing cases).  Second, a plaintiff must show the injury is "fairly traceable" to the defendant's challenged action.  *Lujan*, 504 U.S. at 560 (alterations omitted).  Third, a plaintiff must show "the injury will be redressed by a favorable decision."  *Id.* at 561 (internal quotation marks omitted).

The requirements for "organizational" standing, when an organization sues on its own behalf to vindicate a right, are the same.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).  If an organization is suing on behalf of its members, or asserting "associational" standing, it must also show: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  An interest is "germane" to an organization's purpose if the litigation would "reasonably tend to further the general interests that individual members sought to vindicate in joining the association and . . . bears a reasonable connection to the association's knowledge and experience."  *Bldg. & Constr. at Trades Council & Vicinity v. Downtown Dev., Inc.*, 448 F.3d

138, 149 (2d Cir. 2006); *see also Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir.

1988) (noting germaneness requires only "mere pertinence between litigation subject and

organizational purpose"). The third requirement is "only a prudential one" and "not an element

of Article III's jurisdictional limitations on the power of the federal courts." *New York v. U.S.

Dep't of Commerce*, 351 F. Supp. 3d 502, 605 (S.D.N.Y. 2019) (Furman, J.) (citing *Food &

Commercial Workers v. Brown Grp.*, 517 U.S. 544, 544 (1996)).

    Defendants argue Haiti Liberté lacks organizational standing because it has not suffered

an injury-in-fact that is concrete and particularized and because "Plaintiffs cannot prove the

causation prong to show Haiti Liberté's organizational standing." Def. Reply at 11.  The

Government also argues Haiti Liberté lacks standing under the RFA because it should not be

considered a "small entity." *See* Def. Br. at 66-67; Def. Reply at 8-10.[14]  In response, Plaintiffs

contend Haiti Liberté has organizational and associational standing to sue Defendants because its

readership in the United States will be reduced by approximately ten percent if Haiti's TPS is

terminated and because one of its employees, Mr. Rateau, is a Haitian TPS beneficiary.  Pl. Br. at

84, 86-87.  They argue as a concrete injury "the loss of one of its most important writers" and a

"decrease in readership and revenue." Pl. Reply at 40.  Additionally, Haiti Liberté asserts it has

standing under the RFA as a "small business" or "small entity" because it does not dominate the

field of newspaper publishing and has approximately twelve employees. *Id.* at 86; Pl. Reply at

39-40.

    The Court agrees with Defendants that Haiti Liberté's interest in reducing its readership

and advertising revenues in the United States is not a concrete future injury actually or

imminently threatened by the challenged action of Defendants.  Thus, Haiti Liberté fails to

---

[14] The Government does not dispute any other Plaintiff has standing to maintain their claims.

establish an injury-in-fact and lacks organizational standing.[15]  If Haiti's TPS expires, and TPS beneficiaries return to Haiti, these beneficiaries would still be able to access and read Haiti Liberté's weekly newspaper.  Indeed, Mr. Kim Ives, a journalist for Haiti Liberté, testified readers situated in Haiti can access the weekly paper online or in print because the organization maintains an office in Port-au-Prince.  Trial Tr. at 359:21-22, 372:17-22 (Ives).   Moreover, neither Mr. Ives nor Plaintiffs suggest Haiti Liberte would fire its key employee, Mr. Rateau, in the event his TPS status expires.  Haiti Liberté would not suffer "the loss of one its most important writers" because of the Secretary's decision to terminate TPS for Haiti because he could work out of the Port-au-Prince office should he return to Haiti.  Plaintiffs also have not proffered evidence the readership of Haiti Liberté overall would be reduced or harmed by some of its readership relocating from the United States to Haiti.  Haiti Liberté also fails to show any loss in advertising based on terminating Haiti's TPS is a "concrete" future injury "certainly impending."  *See Lujan*, 504 U.S. at 564 n.2; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  The Court cannot rely on the mere conjecture of Mr. Ives without more evidence of a concrete injury.  *See Clapper*, 568 U.S. at 409 ("Allegations of possible future injury are not sufficient." (internal quotation marks omitted)).

Haiti Liberté's contention it maintains associational standing is also without merit.  Even if the Court were to accept the tenuous argument the removal of Mr. Rateau would "make it exceedingly difficult for Haiti Liberté to cover news and current events in Haiti," Haiti Liberté still fails to meet the second criteria for associational standing.  Pl. Br. at 84.[16]  Rather than

---

[15] Because the Court concludes Haiti Liberté failed to establish injury-in-fact, it does not address the Government's additional standing arguments. *See* Def. Reply at 11-12.

[16] The Court cautions here that "proof of a mere 'statistical probability that some of [an organization's] members are threatened with concrete injury' is not enough to satisfy the first prong of associational standing." *New York*, 351 F. Supp. 3d at 605 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 497-98 (2009)).

explain its interests or its broader purpose, Plaintiffs assert only "[t]he interests that Haiti Liberté seeks to protect through this lawsuit are germane to its purpose." *Id.* at 86. If the Court were to accept such a conclusory recitation without more, associational standing requirements would become toothless. Furthermore, this hollow argument fails for the same reason Haiti Liberté failed to establish organizational standing. As a Haitian weekly newspaper distributed in the United States and in Haiti, Haiti Liberté does not proffer evidence to show its interests as an organization, such as maintaining its readership, would be harmed based on the residency of some of its readers, when the paper is accessible in Haiti. Haiti Liberté's "general interests" appear to be informing its readership and broader public about Haiti-centric issues, and it is not clear to this Court how its involvement in the action regarding the immigration status of some of its readers "bears a reasonable connection to the association's knowledge and experience." *Bldg. & Constr. at Trades Council*, 448 F.3d at 149.

Because Haiti Liberté lacks organizational or associational standing, standing under the RFA is the only means by which it can remain in this action as a federal litigant. "The RFA requires administrative agencies to consider the effect of their actions on small entities, including small businesses, small non-profit enterprises, and small local governments." *Nw. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 14 (D.D.C. 1998). The RFA provides "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review." 5 U.S.C. § 611(a)(1); *see also Nw. Mining Ass'n*, 5 F. Supp. 2d at 13. A "small entity" is "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field." 5 U.S.C. § 601(4). The D.C. Circuit "has consistently rejected the contention that the RFA applies to small businesses indirectly affected by the regulation of other entities." *Cement Kiln Recycling Coal. v. E.P.A.*, 255 F.3d 855, 869 (D.C. Cir. 2001); *see also Mid-Tex Elec. Coop. v. F.E.R.C.*,

773 F.2d 327, 342 (D.C. Cir. 1985) ("The problem Congress . . . discerned was the high cost to small entities of compliance with uniform regulations, and the remedy Congress fashioned—careful consideration of those costs in regulatory flexibility analyses—is accordingly limited to small entities *subject to the proposed regulation*." (emphasis added)).

Here, Defendants do not contest Haiti Liberté is independently owned and operated, but they argue Haiti Liberté dominates its field because it is the largest Haitian weekly newspaper in New York City. Def. Br. at 66-67 (citations omitted). Moreover, in Defendants' view, while Plaintiffs submit Haiti Liberté makes no profit as a business, "such losses do not legally qualify Haiti Liberté as a 'not-for-profit enterprise' under the RFA." Def. Reply at 12-13. In response, Plaintiffs contend, at a minimum, Haiti Liberté is a "small business" not dominant in the field of newspaper publishing because it has approximately twelve employees. Pl. Br. at 86-87 (citations omitted). According to Plaintiffs, "Defendants' attempt to narrow Haiti Liberté's 'field' to 'Haitian weekly newspaper[s] in New York' lacks any basis in law. The Small Business Association. . . does not list this category, nor does common sense dictate this conclusion. Pl. Reply at 40 (citations omitted). Even if Haiti Liberté is considered a small entity, Defendants still assert "Plaintiffs fail to prove that Haiti Liberté is 'adversely affected or aggrieved,' either through its workforce or readership." Def. Br. at 67 (quoting 5 U.S.C. § 611(a)(1)).

The Court need not decide whether Haiti Liberté is a "small entity" under the RFA because it concludes it is not a *regulated* small entity "adversely affected or aggrieved by final agency action" and therefore lacks prudential standing to bring its RFA claim. *See Mid-Tex Elec. Coop., Inc.*, 773 F.2d at 342; *see also Permapost Prods., Inc. v. McHugh*, 55 F. Supp. 3d 14, 30 (D.D.C. 2014) (applying the reasoning of *Mid-Tex Electric Co-op., Inc.* and holding company-plaintiffs lacked prudential standing to bring RFA claims because they were not

subject to the proposed regulation). Plaintiffs do not argue Haiti Liberté is a small entity subject to the decision to terminate Haiti's TPS; rather, they argue it would suffer economic harm through reduced readership and the relocation of one employee as an indirect result of the agency action. But as the Court has already concluded, Plaintiffs have failed to establish this hypothetical injury is concrete, particularized, and actual or imminent. Moreover, a decision to terminate TPS would "doubtless have economic impacts in many sectors of the economy. But to require an agency to assess the impact on all of the nation's small businesses possibly affected by a rule would be to convert every rulemaking process into a massive exercise in economic modeling, an approach" this Court, in accord with the D.C. Circuit, rejects. *Cement Kiln Recycling Coal.*, 255 F.3d at 869 (citing *Mid-Tex Elec. Coop.*, 773 F.2d at 343).

In sum, Haiti Liberté has failed to adduce cognizable evidence of an injury to confer standing. Accordingly, its claim against Defendants is dismissed.

## PRELIMINARY INJUNCTION

Plaintiffs seek to enjoin Defendants' November 20, 2017 decision to terminate TPS status for Haitian beneficiaries. Compl. at 1. As a result, Plaintiffs' TPS status is set to expire on July 22, 2019. Pl. Ex. 341 at 3. For the reasons set forth below, Plaintiffs have demonstrated they are entitled to a preliminary injunction against termination of TPS status for Haitian beneficiaries.

### A. General Legal Standards

A preliminary injunction is an equitable remedy a court may issue in its discretion. *Silber v. Barbara's Bakery, Inc.*, 950. F. Supp. 2d 432, 438-39 (E.D.N.Y. 2013) (Kuntz, J.) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). A preliminary injunction preserves the status quo and the rights of the parties until a final adjudication on the merits. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018); *see also Boardman v.*

*Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) ("The purpose of a preliminary injunction is to preserve the status quo ante litem . . . [which] refers to the last uncontested status which preceded the pending controversy.") (internal quotation marks and citations omitted). Courts may enjoin future action by government officials where the traditional principles of equity support such relief. *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 260-61 (2006) (affirming an injunction against the Attorney General in an APA action); *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) ("[I]njunctive relief against executive officials like the Secretary of Commerce is within the courts' power.").

In the Second Circuit, a party seeking a preliminary injunction must demonstrate: (1) irreparable harm; (2) either (a) a likelihood of success on the merits or (b) both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest. *N. Am. Soccer League, LLC*, 883 F.3d at 37; *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A showing that irreparable harm is probable in the absence of a preliminary injunction is "the single most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983) (internal quotation marks omitted). Regarding the last two factors, because the Government is a party, and "the Government's interest *is* the public interest," the balance of hardships and public interest merge as one factor. *New York v. U. S. Dep't. of Commerce*, 351 F. Supp. 3d 502, 673 (S.D.N.Y. 2019) (Furman, J.) (internal quotation marks omitted).

**B.  Likelihood of Success on the Merits/Serious Questions**

i.    <u>APA and Ultra Vires Claims</u>

**a.  Scope of Review**

As a threshold matter, Defendants raise several evidentiary objections relevant to the Court's decision. First, Defendants argue the Court should decide this case based solely on the administrative record. Second, even if the Court reviews materials beyond the designated administrative record, Defendants argue this Court should not admit a number of documents on the bases of deliberative-process privilege and attorney-client privilege.

For the reasons discussed below, the Court holds it may consider evidence outside of the designated administrative record. Regardless of that finding, the evidence on the record is alone sufficient to establish Plaintiffs' likelihood of success on the merits. With respect to Defendants' privilege assertions, the Court has carefully reviewed Defendants' substantial privilege log *in camera*.[17] The Court admits only the privilege-log documents cited in this opinion.

Defendants argue the Court should decide this case based solely on the designated administrative record they have prepared for the Court's consideration. Def. Br. at 52 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985)). Plaintiffs, on the other hand, argue the Court can and should consider evidence outside the designated administrative record because they introduce "a wealth of specific evidence showing bad faith and improper behavior by Defendants." Pl. Reply at 26.

Courts reviewing agency action under the APA must base their review on the "whole record." 5 U.S.C. § 706(2). Ordinarily, courts confine their review of administrative action under the APA to the full administrative record, which should include all materials the agency "compiled" that were before the agency when it made its decision. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971); *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996). When courts evaluate an agency's compliance with the APA, "the focal

---

[17] Defendants produced many thousands of pages of documents to the Court shortly before the Court's Preliminary Injunction Hearing. The Judge reviewed them all.

point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). Ultimately, "[i]t is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made." *Envtl. Def. Fund, Inc.*, 657 F.2d at 284.

The agency under review is ordinarily tasked with compiling the "whole" administrative record for the court. The "whole administrative record, however, is not necessarily those documents that the *agency* has compiled and submitted as 'the' administrative record." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (internal quotation marks and citation omitted). Rather, "[t]he 'whole' administrative record . . . consists of all documents and materials directly or *indirectly* considered by agency decision-makers, including evidence contrary to the agency's position." *Id.* (internal quotation marks and citation omitted) (emphasis in original); *see also Schicke v. Romney*, 474 F.2d 309, 315 (2d Cir. 1973) ("[T]he court must have before it the full administrative record which was before the agency and on which the agency determination was based.").

An agency's designation of the administrative record is entitled to a rebuttable "'presumption of administrative regularity.'" *New York*, 351 F. Supp. 3d at 632 (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)). A court is to assume "the agency properly designated the Administrative Record absent clear evidence to the contrary." *Bar MK Ranches*, 994 F.2d at 740. If a party shows the record may be incomplete, additional discovery is appropriate. *Id.* Ultimately, it is the responsibility of the reviewing court to determine the administrative record is complete. *See New York*, 351 F. Supp. 3d at 631-32 (noting the question of what constitutes the Administrative Record is "one for the Court" (citing *Overton Park*, 401

U.S. at 420; *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 340 (D.C. Cir. 1989); *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982); *Suffolk Cty. v. Sec'y of Interior*, 562 F.2d 1368, 1384 n.9 (2d Cir. 1975)).

Courts have delineated several circumstances in which a party may nevertheless include evidence beyond the scope of the designated administrative record. A court may consider extra-record or supplemental evidence when: (1) the agency's designated administrative record is incomplete, and the district court cannot conduct its review in accordance with the APA's "whole record" requirement; (2) when supplemental materials would illuminate a complex record; (3) when the court must look to supplemental materials to evaluate whether the agency failed to consider all relevant factors, ignored an important aspect of the problem, or deviated from established agency practices; and (4) when a plaintiff makes a "strong showing" the Government's decision was in bad faith. The Court discusses the grounds for considering supplemental or extra-record evidence in turn.

*First*, a court may look to evidence outside the agency's designated Administrative Record when it finds the Administrative Record so designated is incomplete. *See, e.g., Nat. Res. Def. Council v. Train*, 519 F.2d 287, 291 (D.C. Cir. 1975) (finding the plaintiffs "made a substantial showing in the District Court that the Administrator had not filed the entire administrative record with the court"). "The failure to include the information relied upon by the agency in the administrative record, even if later disclosed to the court is . . . inconsistent with the Administrative Procedure Act's requirement that review take place on 'the whole record.'" *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 534 n.43 (D.C. Cir. 1978). Thus, "where it appears that the administrative record designated by the agency is *not* the 'whole record' that was before the agency decisionmakers at the time of decision, a court may order that the record

be *completed*." *New York*, 351 F. Supp. 3d at 632 (citing *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 54 (D.C. Cir. 1977)). A court may accordingly order completion of the record when "a challenger shows that 'materials exist that were actually considered by the agency decision-makers but are not in the record as filed.'" *Id.* (quoting *Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 309 (S.D.N.Y. 2012) (Engelmayer, J.)). It may also do so when a challenger has "made a prima facie showing that the agency excluded from the record evidence adverse to its position." *Id.* (internal quotation marks and citation omitted). Importantly, a court may also "consider evidence that was considered by the agency but omitted from the [designated] administrative record." *New York v. Shalala*, 93-CV-1330 (JFK), 1996 WL 87240, at *5 (S.D.N.Y. Feb. 29, 1996) (Keenan, J.); *see also Thompson*, 885 F.2d at 555-56 (holding that letters outside the designated agency record "should have been included as part of the record" and that the "court can consider [them] in determining whether the Secretary's decision was 'arbitrary and capricious'").

*Second*, a court may supplement the record with additional material, including, "for example, background information." *See, e.g.*, *AT&T Info. Sys., Inc. v. Gen. Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987). It is "proper" for courts to consider supplemental materials to clarify or explain "the original information before the [a]gency" when such material would be "helpful in understanding the problem faced by the [a]gency and the methodology it used to resolve it." *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811 (9th Cir. 1980) (Kennedy, J.). A party may not use supplemental materials admitted for this purpose "as a new rationalization either for sustaining or attacking the [a]gency's decision." *Id.* at 811-12. Rather, "a court may consider such materials only to illuminate a complex record and to help the court better understand the issues involved." *New York*, 351 F. Supp. 3d at 633.

*Third*, a court may consider supplemental materials to evaluate "whether all relevant factors were examined by an agency," whether the agency ignored an important aspect of the problem, or whether the agency departed from established agency practices. *See AT&T Info. Sys., Inc.*, 810 F.2d at 1236; *see also I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996); *Motor Vehicle Mfrs. of U.S., Inc. v. State Farm. Mut. Auto. Ins. Co.*, 463 U.S. 29, 44 (1983); *Overton Park*, 401 U.S. at 416. To assess whether an agency meets these criteria in the first instance, a court must adequately understand the relevant factors, important aspects of the problem, and the agency's established practices. Indeed, issues pertaining to the "relevant factors," the "important aspects of the problem" at hand, and "established agency practices" go to the very heart of this case. *See New York*, 351 F. Supp. 3d at 633-34. "[W]ithout looking to evidence beyond the administrative record to determine [these criteria], a court may be unable to identify, let alone redress, the most egregious APA violations: those in which the administrative record is carefully cultivated to exclude contrary evidence." *Id.* at 634 (citing *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997)).

*Finally*, a Court may consider extra-record evidence when a party makes a "strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers." *Nat'l Audubon Soc'y*, 132 F.3d at 14 (citing *Overton Park*, 401 U.S. at 420). The *Overton Park* bad faith standard "is no small hurdle" to overcome. *Ali v. Pompeo*, 16-CV-3691, 2018 WL 2058152, at *5 (E.D.N.Y. May 2, 2018) (Bulsara, M.J.). "Allegations of bad faith must be based on hard facts. . . . Evidence, and not merely counsel's argument, must support the showing." *Id.* at *6 (internal quotation marks, citations, and alterations omitted). A finding of bad faith "would be material to determining whether the Government acted

arbitrarily" in making its decision, and therefore violated the APA. *James Madison Ltd.*, 82 F.3d at 1096.

Defendants argue "Plaintiffs have not established . . . that the Administrative Record was formulated through 'bad faith or improper behavior' under the *Overton Park* standard." Def. Br. at 53 (quoting *Overton Park*, 401 U.S. at 416). But Plaintiffs need not establish Defendants formulated the record itself in bad faith or as the result of improper behavior. Rather, Plaintiffs must make a strong showing that bad faith or improper behavior infected the agency's decision-making process. *See Tummino v. Torti*, 603 F. Supp. 2d 519, 544 (E.D.N.Y. 2009) (Korman, J.) (permitting review of extra-record evidence and finding bad faith because of "unreasonable delays, pressure emanating from the White House" and "significant departures" from past agency practices); *see also Nat'l Audubon Soc.*, 132 F.3d at 14, 16 (holding plaintiffs failed to make the required "strong showing" that the Forest Service acted pretextually in issuing a "finding of no significant impact"); *James Madison Ltd.*, 82 F.3d at 1096-97 (holding plaintiffs failed to make the required "strong showing" that the Office of the Comptroller of the Currency acted arbitrarily in establishing the loan loss allowance at issue); *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1357 (11th Cir. 1994) (holding a plaintiff made a strong showing of bad faith in part because the plaintiff presented significant evidence the Navy's decision to award a contract to the plaintiff's competitor resulted from prejudicial violations of procurement regulations).

Here, Plaintiffs have not made mere "[n]aked assertions of bad faith." *See Hadwan v. U.S. Dep't of State*, 340 F. Supp. 3d 351, 356 (S.D.N.Y. 2018) (Pauley, J.) (internal quotation marks, alterations and citations omitted). Rather, Plaintiffs have proffered significant evidence based on hard facts the Government's decision was pretextual, tending to show DHS, USCIS,

and the Department of State reverse engineered the TPS process with the principal aim of "getting to no." For example, the evidence shows DHS officials pushed back on drafts "weighted for extension" because extension "was not the conclusion [they were] looking for." Pl. Ex. 127. DHS officials directed USCIS officials to "[b]e creative" in finding "positive data on the current status of Haiti to bolster the recommendation to terminate TPS." Pl. Ex. 86. Plaintiffs offer evidence that DHS and USCIS officials departed from prior practice by changing their interpretation of the TPS statute because the new interpretation would better support termination. *See, e.g.*, Pl. Ex. 309 (describing "all of Haiti's challenges" as "long-standing, intractable problems" as opposed to "[i]ssues related specifically to the 2010 earthquake); Pl. Ex. 37 (noting "the conditions are what they are" but "[o]ur strongest argument for termination . . . is just that it is not bad in a way clearly linked to the initial disasters prompting the designations"). There are numerous emails from high-ranking DHS officials directing USCIS career staffers to look for criminality data and welfare data regarding Haitian TPS recipients and to research conditions "warranting the recommended change" to provide further ammunition for terminating TPS for Haiti, contrary to prior practices of not considering such data. *See, e.g.*, Pl. Ex. 342. Plaintiffs offer evidence Acting Secretary Duke decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute, and that the White House extensively pressured her terminate TPS for Haiti. *See, e.g.*, Pl. Ex. 179; Pl. Ex. 184; Suppl. Admin. R. at 113-15, 123-31, 283, 317-18. Plaintiffs show Acting Secretary Duke sought out a "rationale" to "[s]eparate out Haiti." Suppl. Admin. R. at 317-18. These documents are only a snapshot of what the parties have submitted to the Court suggesting the agencies undertook the TPS process in bad faith.

According to former USCIS Director Leon Rodriguez, this evidence demonstrates the Agency engaged in an outcome-determinative process in the decision to terminate Haiti's TPS. Former Director Rodriguez testified the proffered evidence "suggests a predetermination as to the outcome of the adjudication and the interest in essentially card-stacking to drive a particular outcome, in this case, termination of TPS." Trial Tr. at 298:21-24 (Rodriguez). He further opined the exchanges between officials do "not suggest an impartial adjudication of the issue, but rather a certain predetermined outcome." *Id*. at 299:18-20.

The evidence before this Court with respect to the record rule issue is substantively similar to that before Judge Korman in *Tummino v. Torti*, which involved a challenge to the FDA's denial of a citizen petition that sought nonprescription availability of a contraceptive for women of all ages. 603 F. Supp. 2d at 522-23. In *Tummino*, Judge Korman considered extra-record evidence because the plaintiffs "presented unrebutted evidence of the [agency's] lack of good faith regarding its decisions." *Id*. at 544. In particular, the plaintiffs, among other things, presented evidence of "pressure emanating from the White House" and "significant departures from the [agency's] normal procedures and policies." *Id*. Consistent with the evidence highlighted above, Plaintiffs here proffer many documents demonstrating a departure from past practices, pretext, and pressure from high-ranking White House officials.

Consequently, Plaintiffs' preliminary showing is sufficient to allow this Court to review extra-record evidence in reaching its decision. *See New York*, 351 F. Supp. 3d at 634 ("Where a plaintiff asserts a genuine dispute as to an agency's bad faith, that dispute is only 'material,' and thus appropriate for trial, if the plaintiff's proffered evidence amounts to the 'strong showing' necessary for including that evidence in the summary-judgment record . . . .").

In reaching this conclusion, the Court pauses to take note of the extent to which it can and does consider supplemental and extra-record evidence with respect to Plaintiffs' APA claims. Specifically, in assessing whether the agency acted arbitrarily and capriciously by departing from established agency practices and by acting in bad faith, the Court may consider evidence outside the designated administrative record. *See New York*, 351 F. Supp. 3d at 635 (noting the court may consider material outside the administrative record "to the limited extent that [the Secretary] is alleged to have entirely failed to consider an important aspect of the problem" (internal quotation marks omitted)). Similarly, the Court may consider material outside the administrative record in evaluating whether Secretary Duke's decision was made in bad faith or was pretextual. *Id.* at 636. The Court also may consider such evidence in assessing whether Defendants' actions were "not in accordance with law."[18]

Though the Court stresses it may consider evidence from outside the administrative record, it further notes that it can—and does—resolve Plaintiffs' likelihood of success on evidence contained within the administrative record. In so doing, this Court takes a route consistent with that wisely taken by Judge Furman in *New York v. United States Dep't of Commerce*, 351 F. Supp. 3d at 630-35 (S.D.N.Y. 2019). The plaintiffs in *New York* claimed the Secretary of Commerce's decision to reinstate the citizenship question on the census, and the process leading to his decision, violated the APA. *New York*, 351 F. Supp. 3d at 515-16. As an evidentiary matter, the defendants sought to limit the court's review to the administrative record

---

[18] In *New York*, Judge Furman held "the Court may not . . . consider any extra-record evidence . . . in evaluating [whether] Secretary Ross's decision was 'not in accordance with law" but noted it "*may* consider material outside the administrative record in evaluating whether [the] decision was made in bad faith or was pretextual." 351 F. Supp. 3d at 636. Plaintiffs argue Acting Secretary Duke's decision was made in bad faith, violating the TPS statute's requirement that the Secretary conduct a good faith, objective review of a designated country's conditions. In other words, Plaintiffs argue the decision was "not in accordance with law" *because* it was made in bad faith. To that end, the Court may consider extra-record evidence in evaluating whether the decision was not in accordance with law here.

before the Secretary of Commerce at the time he made his decision, also citing the record rule. *Id.* at 630-35. Judge Furman's comprehensive decision included both record and extra-record evidence, but Judge Furman stressed he could "resolve Plaintiffs' claims without relying on extra-record evidence."[19]

Having resolved these evidentiary matters, the Court now turns to the substance of Plaintiffs' claims.

**b. Discussion**

Plaintiffs argue the process by which Defendants arrived at a TPS decision for Haiti—including its adoption of a new standard for assessing whether to extend or terminate a country's TPS—violated the APA in several ways. Pl. Br. at 93.

Under the APA "[t]he reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without proper observance of procedure required by law." 5 U.S.C. §§ 706(2)(A)–(D).

For the reasons discussed in detail below, Plaintiffs have demonstrated a likelihood of success on the merits of their APA claims for three independent reasons. First, the evidence shows Acting Secretary Duke's decision was not in accordance with law because she did not base her decision on an objective, inter-agency assessment the TPS statute requires. Second, the evidence shows Acting Secretary Duke's decision was arbitrary and capricious because she departed from past agency practices without explanation and was improperly influenced by the

---

[19] Notably, the applicability of the record rule in the case became less central than expected both because the Court could resolve the issues at hand without extra-record evidence and because the defendants "stipulated that a wide swath of previously contested documentary material [was] properly part of the Administrative Record for purposes of [the] litigation." *New York*, 351 F. Supp. 3d at 630.

White House.  Third, the evidence shows Acting Secretary Duke's decision was pretextual and, accordingly, made in bad faith—the rationale she provided for her decision was not her real rationale.  The Court concludes, however, Plaintiffs failed to meet their burden of showing Acting Secretary Duke articulated a new substantive rule for evaluating TPS subject to notice-and-comment rulemaking.

### 1. Not in Accordance with Law

Plaintiffs are likely to succeed in their claim Acting Secretary Duke's decision was "not in accordance with law," 5 U.S.C. § 706(2)(A), because the evidence shows she violated the TPS statute.  The evidence shows Plaintiffs can demonstrate success on the merits Acting Secretary Duke violated the TPS statute because she did not conduct the periodic review in accordance with the dictates of the statute—her decision was preordained and pretextual, and it was made in part due to political influence.  Acting Secretary Duke's decision was not purely evidence-based, as the statute requires.  In fact, it ignored much of the evidence in the record.

Under the APA, courts may set aside agency action that violates the law.  *See* 5 U.S.C. § 706(2)(A); *F.C.C. v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003) ("The Administrative Procedure Act requires federal courts to set aside federal agency action that is 'not in accordance with law' which means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." (citation omitted)).  Setting aside agency action that is "not in accordance with law" is "[s]eparate and apart from . . . set[ting] aside agency action that is arbitrary and capricious."  *New York*, 351 F. Supp. 3d at 629.

The TPS statute imposes several requirements on the DHS Secretary regarding periodic review and termination of TPS designations.  First, under the TPS statute, the Secretary "*shall review the conditions in the foreign state*" designated for TPS at least 60 days prior to extending

or terminating TPS. 8 U.S.C. § 1254a(b)(3)(A) (emphasis added). Second, in reviewing these conditions, the Secretary must "consult[] with appropriate agencies of the Government." *Id.* Third, the Secretary "*shall* determine whether the conditions for such designation" continue to be met. *Id.* (emphasis added). Where the DHS Secretary initially designates a foreign state for TPS under 8 U.S.C. § 1254a(b)(1)(C), as in this case, he or she must assess in determining whether the conditions continue to be met whether "there exist extraordinary and temporary conditions . . . that prevent . . . nationals of the state from returning to the state in safety." Finally, if the Secretary determines a foreign state no longer meets the conditions for designation, the Secretary must terminate the designation by publishing notice in the Federal Register, including the basis for the determination. *Id.* § 1254a(b)(3)(B). Conversely, if the Secretary "does not determine" the foreign state "no longer meets the conditions for designation . . . , the period of designation . . . is extended." *Id.* § 1254a(b)(3)(C).

The statute plainly outlines the procedures the Secretary must undertake in deciding whether to terminate TPS for a recipient country. Congress's use of the word "shall" in the periodic review and termination provisions of the statute evinces its intent to *require* the Secretary to follow the enumerated procedure. *Id.* §§ 1254a(b)(3)(A)–(B); *accord New York,* 351 F. Supp. 3d at 637-38 (finding Section 6(c) of the Census Act "mandatory where it applies" based on the language of the statute, including the word "shall"). Moreover, Congress's use of "shall," specifically in requiring the Secretary to "review the conditions in the foreign state," evinces its intent that the Secretary undertake a periodic review grounded in fact—*i.e.,* based on objective conditions in the foreign country and regardless of any government official's political motives—and in good faith. *See* 8 U.S.C. § 1254a(b)(3)(A). The statute's requirement that the Secretary publish notice of a termination determination in the Federal Register, "including the

basis for the determination," further evinces Congress's intent in this regard. *See id.* § 1254a(b)(3)(B). The Secretary must articulate and publish the true and factual basis for termination. *See id.* To be sure, the DHS Secretary exercises discretion to make the determination she deems fit, but the Secretary must base that discretion on the "conditions in the foreign state" and on consultations with appropriate Government officials. *Id.* § 1254a(b)(3)(A). Indeed, the TPS statute shields the Secretary's substantive determination from district court review. *Id.* § 1254a(b)(5). But procedurally, the Secretary may not provide sham or pretextual justifications as the basis for the decision under the statute, and the Secretary must review the conditions of the foreign state.

With these principles in mind, the Court turns to the parties' arguments. Plaintiffs claim the Secretary violated the statutorily-mandated procedure for termination of a TPS designation on several grounds. Pl. Br. at 88. First, they argue "the Secretary did not make the 'determination' required by the statute *at all*, but instead carried out a preordained decision to terminate Haiti's TPS designation for reasons unrelated to the statutory criteria and then manufactured support for that outcome." *Id.* In other words, Plaintiffs argue Acting Secretary Duke violated the TPS statute because "the review process was a sham designed to create a pretext for terminating TPS for Haiti." *Id.*; *see also id.* at 100. Second, Plaintiffs contend the Secretary violated the TPS statute's "directive concerning the procedures for termination" because she failed "to consider *all* current conditions to determine whether grounds for designation continued to exist and whether nationals could safely return to Haiti." *Id.* at 99-100. Rather, she considered only conditions related to the 2010 earthquake. Such an interpretation, Plaintiffs argue, is "legally erroneous." *Id.* at 97.

Defendants, on the other hand, argue Acting Secretary Duke's decision "was made in good faith, was evidence-based, and reasonably applied the criteria set forth in the TPS statute." Def. Br. at 55. They further argue Acting Secretary Duke did not apply a new standard but rather "considered Haiti's conditions stemming from the originating conditions that triggered Haiti's TPS designation *and* Haiti's overall current country conditions." Def. Reply at 15.

Plaintiffs are likely to succeed in their claim Acting Secretary Duke violated the TPS statute by failing to make a "real merits determination" and by instead issuing "a pretextual edict," contravening the evidence-based review the TPS statute requires. *See* Pl. Br. at 89. Simply put, the justifications articulated in the January 2018 Federal Register Notice were not the agency's actual reasons for terminating Haiti's TPS. Plaintiffs have proffered significant evidence showing Acting Secretary Duke, DHS, USCIS, and the Department of State reverse engineered the TPS review process to achieve a desired political outcome: the termination of Haiti's TPS. Such an outcome-determinative process violates the mandatory periodic review process of the TPS statute.

As described below, the evidence shows Acting Secretary Duke, the White House, and other Government agencies and officials undertook the TPS review process with the explicit goal of terminating TPS for Haiti. This includes direct evidence that Acting Secretary Duke sought to terminate TPS for Haiti, evidence of White House involvement, and evidence that Secretary Kelly foreshadowed an end to TPS for Haiti while simultaneously announcing an extension in 2017, laying the foundation for Acting Secretary Duke to terminate.

*First*, there is significant evidence from the record linking Acting Secretary Duke directly to a desire to terminate TPS for Haiti. Acting Secretary Duke's handwritten notes—many of which are part of the designated administrative record—indicate she sought to terminate TPS for

Haiti regardless of her statutory obligation to conduct an interagency, fact-based review of the
conditions in Haiti.  Secretary Duke wrote she did not have a "[r]ationale" for terminating TPS
for Haiti but instead "need[ed] to rationalize conflicting info" because "all agree[d] [TPS] must
end."  Suppl. Admin. R. at 318.  She stressed, "Haiti TPS is dramatically different from the other
three countries due to the limited duration of TPS.  Haiti—7 years; Honduras and Nicaragua—19
years. . . . Separate out Haiti.  They have been given a preview of what is likely to happen.  Eight
years is not the same as 20 years."  *Id.* at 317-18.  Acting Secretary Duke wrote she needed a
"plan for a decision" and to "foreshadow [TPS] will end."  *See id.*  Secretary Duke sought to
terminate TPS for Haiti in part due to President Trump's "America First" strategy.  *See id.* at
318; Pl. Ex. 179 at 1 ("The TPS program must end for these countries soon . . . . This conclusion
is the result of an America first view of the TPS decision.").

Moreover, extensive pressure from the White House to terminate TPS impeded Acting
Secretary Duke's statutory obligations to conduct an interagency, fact-based review process.
Acting Secretary Duke met with Chief of Staff Kelly regarding her decision on TPS "with
specific reference to Haiti" as early as October 19, 2017.  *See* Priv. Prod. at 1033.  White House
officials formally recommended terminating TPS for Haiti, Honduras, Nicaragua, and El
Salvador at the November 3, 2017 Principals Small Group Meeting called to "coordinate the
conditions and process for terminating temporary protected status," regardless of country
conditions.  Suppl. Admin. R. at 127.  The officials pressured Acting Secretary Duke to
terminate TPS, not because of Haiti's country conditions, but because of their belief that
"[e]xtending TPS for any or all of the four countries would prolong the distortion between the
temporary protections that TPS was designed to provide and current circumstances."  *Id.* at 129.
Acting Secretary Duke's notes reveal at that meeting, Attorney General Sessions strongly

advocated termination and pushed her to "ha[ve] the guts to pull the trigger." *Id.* at 113-15. Pressure from the White House continued on through November 5, 2017, when White House officials Tom Bossert and Zack Fuentes suggested in the event Acting Secretary Duke cast the decision "into the lap of [the] next secretary," she would be another "gutless fed[eral] bureaucrat." *Id.* at 283. They would have been "extremely disappointed" with such an outcome and did not want the decision to "get to close to end of 2019 political and midterms." *Id.*

Emails from Acting Secretary Duke to Chief of Staff Kelly further reveal the White House in fact influenced Acting Secretary Duke's decision making with respect to TPS at large. Acting Secretary Duke viewed her TPS decision as "send[ing] a clear signal that TPS in general is coming to a close," and noted her "decision is really just a difference in strategy to get to the President's objectives." Pl. Ex. 169. After a discussion with Bossert, Acting Secretary Duke wrote she changed the timeframe for termination of TPS for Nicaragua from 18 months to 12 months purely because "of a strategy [she] was not previously aware of," and not because of the country conditions. Pl. Ex. 96. A White House official thanked her for that outcome. Pl. Ex. 165. Significantly, though some contact with executive officials is to be expected, White House influence is probative in claims of bad faith, particularly when such influence is a break from past practices. *See Tummino*, 603 F. Supp. 2d at 544 (finding a "lack of good faith [was] evidenced by, among other things . . . pressure emanating from the White House").

*Second*, the evidence shows Secretary Kelly foreshadowed the end of TPS for Haiti even when he made his decision to extend Haiti's TPS in May 2017, indicating a predetermined outcome for the next decision on TPS for Haiti. In late April 2017, leaked documents revealed to the press and public that Secretary Kelly intended to terminate TPS for Haiti and had been inquiring into criminality and welfare data, resulting in public backlash. In early May 2017,

"USCIS [was] told to redraft the Haiti TPS notice once again, *this time* to announce a 6-month extension [and] instruct[ed] [] not to announce a termination *at this point*, but to suggest in the notice somehow that it is likely to be terminated in 6 months and that the Haiti beneficiaries should get their affairs in order." Priv. Prod at 5206.  Some officials expressed skepticism at this approach, noting: "We are concerned how [the Secretary] could find Haiti to meet TPS conditions now but find in just a few months from now that it no longer does.  Do the clients really believe conditions will improve over the current baseline over the next 4-6 months?  Could extending now box [the Secretary] in for the next determination?" *Id.* at 4623.  These internal communications demonstrate the extent to which Defendants refashioned evidence- and fact-based memoranda to arrive at predetermined outcomes.

In accordance with this approach, when Secretary Kelly extended TPS for six months in November 2017, he, DHS, and USCIS warned TPS recipients "to prepare for and arrange their departure from the United States" prior to the end of the next extension period.  Suppl. Admin R. at 194; *see also id.* (describing the Haitian Government's ability to "welcome the safe repatriation of Haitian TPS recipients *in the near future*" (emphasis added)); *id.* at 12 (requesting Haitian Government officials to "take steps to prepare for the eventual end of its TPS designation"); *id.* at 179-80 ("During this 6-month extension, beneficiaries are encouraged to prepare for their return to Haiti in the event Haiti's designation is not extended again, including requesting updated travel documents from the government of Haiti."); Pl. Ex. 51 (encouraging TPS recipients "to pack up").  Officials, including then-Deputy Secretary Duke, privately recognized the agency likely would not extend TPS again after these warnings.  *See* Pl. Ex. 53 (highlighting Duke's statement there was "[e]very expectation that Haiti may not be renewed again"); Nealon Dep. Tr. at 27:12-22, 128:9-17, 129:5–130:10 (noting there was a "general

feeling that TPS . . . for Haiti was going to be terminated" by July 2017 based on discussions with Secretary Kelly).

The manner in which Acting Secretary Duke, DHS, and the Department of State undertook the review process also strongly suggests the decision was pretextual. This includes evidence that: (1) Defendants manipulated the facts in the record to gradually minimize, omit, or deem unrelated to the hurricane "negative" information about Haiti; (2) Defendants changed their interpretation of the TPS statute; (3) Defendants intentionally edited the 2017 director memorandum to support the case for termination; (4) high-ranking officials directed staffers to uncover data they believed would weigh toward termination; and (5) the Department of State conducted a "highly unusual" process that departed from past practices.

*First*, Defendants' manipulation of the facts in the record are highly suggestive of a pretextual decision. Comparisons between the October 2017 RAIO Report, November 2017 Director Memorandum, and January 2018 Federal Register Notice show the agencies gradually minimized, omitted, or deemed unrelated to the 2010 earthquake negative information about Haiti. Positive information, however tangential or isolated, became the sole focus and the stated basis for decision. *See* Suppl. Admin. R. at 38-44, 51-68; Pl. Ex. 341. Indeed, whereas the October RAIO Report concluded Hurricane Matthew had done over $2.8 billion in damage in Haiti, the January 2018 Federal Register Notice did not mention Hurricane Matthew at all. *Compare* Suppl. Admin. R. at 61, *with* Pl. Ex. 341. Similarly, whereas the RAIO Report concluded Haiti's cholera epidemic "remains ongoing and continues to place strain on Haiti's beleaguered public health system" and that nearly 10,000 people had died from the disease, the Federal Register Notice noted only that the disease "is currently at its lowest level since the outbreak began." *Compare* Suppl. Admin. R. at 54-55, *with* Pl. Ex. 341. Acting Secretary Duke

HT Vacatur AR_0112

adopted wholesale much of the language in the November 2017 Director Memorandum as the basis for her decision in the January 2018 Federal Register Notice. *Compare* Suppl. Admin. R. at 40, *with* Pl. Ex. 341. The Court does not question the substantive verity of the Secretary's conclusions—but it considers the glaring editorial decisions, including the omission of obviously "negative" information, as further evidence Acting Secretary Duke sidestepped the review process required by the TPS statute.

    *Second*, Defendants departed from their past practice of considering all country conditions at the time of the adjudication, further suggesting the decision was pretextual. *See Tummino*, 603 F. Supp. 2d at 544 (holding "lack of good faith is evidenced by, among other things . . . significant departures from the [Agency's] normal procedures and policies."). Prior to Acting Secretary Duke's decision, the DHS Secretary, DHS, and USCIS had a longstanding practice of considering all country conditions when undertaking the mandatory periodic review under the statute, regardless of their relation to the originating condition. *See, e.g.*, Trial Tr. at 248:30–249:12, 250:11-12, 251:13-14, 252:6-14 (Rodriguez) (describing the longstanding practice of evaluating conditions at the "particular point in time when the adjudication is occurring"); *see also infra* (detailing the agency's change in practices in full). This was standard practice even in May of the same year, when Secretary Kelly extended Haiti's TPS for six months. *See* Suppl. Admin. R. 187-89 (including as conditions forming the basis for a May 2017 TPS extension intervening conditions such as Hurricane Matthew and flooding).

    Despite that longstanding practice, Acting Secretary Duke and her staff considered only those factors related to the originating event, *i.e.*, extraordinary and temporary conditions in the aftermath of the earthquake. *See, e.g.*, Pl. Ex. 341 at 3 ("[T]he conditions for Haiti's designation for TPS—on the basis of 'extraordinary and temporary conditions' *relating to the 2010*

*earthquake* that prevented Haitian nationals from returning in safety—are no longer met." (emphasis added)); Pl. Ex. 345 at 3 ("[T]he law really restricts [a DHS Secretary's] ability to extend TPS. The law says that if the effects *of the originating event* . . . do not continue to exist, then the Secretary of Homeland Security *must* terminate."); *see also infra* (detailing the agency's change in practices in full). Importantly, agency staffers characterized linking conditions to the initial designation rather than looking to all conditions as "[o]ur strongest argument for termination" because they recognized "the basic problem . . . that it IS bad there [with regard to] all of the standard metrics." Pl. Ex. 37. This evidence strongly suggests DHS and USCIS changed their past practice of looking to all conditions specifically to create a pretext for termination.

*Third*, evidence shows DHS and USCIS officials intentionally edited the November 2017 Director Memorandum, which also provided much of the language in Secretary Duke's Federal Register Notice, to support the case for termination and to undermine the case for extension. In an email exchange between DHS officials Robert Law and Kathy Kovarik, Law noted "[t]he draft is overwhelmingly weighted for extension *which I do not think is the conclusion we are looking for*." Pl. Ex. 127 (emphasis added). In fewer than thirty minutes—and thus within no time to conduct factual investigation or analysis—Law returned another draft Director Memorandum that "made the document fully support termination." *Id.* In the draft, Law "provided comment boxes where additional data should be provided to back up this decision." *Id.* Former Director Rodriguez testified this exchange does "not suggest an impartial adjudication of the issue, but rather a certain predetermined outcome." Trial Tr. at 299:18-20 (Rodriguez).

*Fourth*, DHS and USCIS officials directed staff to research information they believed would weigh in favor of termination, both immediately prior to Secretary Duke's termination and prior to Secretary Kelly's extension.[20]  For example, Secretary Kelly emailed Nielsen, Hamilton, and others on April 7, 2017 requesting criminality data, welfare data, and more.  *See* Priv. Prod. at 4757.  Nielsen then directed staff to describe "what has changed in Haiti warranting the recommended change" (*i.e.*, termination) and to research criminality and welfare data on Haitian TPS recipients.  Pl. Ex. 342 at 1.  At that time, Nielsen hoped researchers could uncover information positively highlighting Haiti's redevelopment, such as "rebuild of palace, build of army, change in UN list, [or] 4-5% growth in GDP."  *Id.*  Similarly, Kathy Kovarik directed staffers to search for criminality and welfare data, "to conduct a random sampling of files that we could then use to generalize the entire population," and to "dig for any stories (successful or otherwise)" that could provide a positive spin on the facts in Haiti.  Pl. Ex. 212 at 3.

DHS and USCIS officials continued to issue these directives leading up to the November 2017 termination.  In June 2017, after issuing a six-month extension, Secretary Kelly "want[ed] a stronger response beginning to build a case for not extending" TPS for Haiti.  Pl. Ex. 29.  In July 2017, Nielsen sought "any information on the TPS registrants in terms of current jobs or education" to push back on some of the Haitian Government's concerns about ending TPS.  Pl. Ex. 355.  After RAIO circulated its October 2017 country conditions report, officials, including Kathy Kovarik, directed staffers to further research and highlight "positive steps that have been taken since [Haiti's] designation" for TPS because, at the time, the draft Director Memorandum

---

[20] Defendants characterize the "myriad" of facts arising out of this time period as a "red herring" that has "no bearing on anything related to Acting Secretary Duke's decision on whether to extend, re-designate, or terminate Haiti's designation." Def. Reply at 23.  They suggest findings related to this period "should be rejected wholesale." *Id.*  But the Court finds these facts probative of the general and widespread desire of officials within DHS to terminate Haiti's TPS.

"read[] as though we'd recommend an extension." Pl. Ex. 36. Former Director Rodriguez testified this communication "suggests a predetermination as to the outcome of the adjudication and the interest in essentially card-stacking to drive a particular outcome, in this case, termination of TPS." Trial Tr. at 298:21-24, 299:3-5 (Rodriguez). Robert Law's October 31, 2017 email requesting "positive data on the current status of Haiti to bolster the recommendation to terminate TPS" and instructing the staffer tasked to "[b]e creative" yields the same inference. Pl. Ex. 86.

Secretary Kelly's directives to staff to search for criminality and welfare data provide further evidence the agency was fishing for reasons to terminate TPS for Haiti. Indeed, Secretary Kelly sought data showing extending Haiti's TPS would be contrary to the national interest. These factors are largely irrelevant to the Secretary's review under the statute because individuals with a felony conviction or two misdemeanor convictions are ineligible for TPS, and TPS beneficiaries may be ineligible for public benefits. *See* 8 U.S.C. §§ 1254a(c)(2)(B), 1254a(f)(2).[21] Still, the TPS statute requires the Secretary to consider whether "permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(C). And, as the Government points out, an inquiry into the "national interest" could by some measure include an inquiry into criminality. *See* Rodriguez Dep. Tr. at 257:8-9; 339:20; Def. Br. at 40. It therefore follows that Secretary Kelly and others at DHS and USCIS sought this information in the hopes of finding that extending TPS would not be in the "national interest"—indeed, DHS officials said as much. *See* Priv. Prod. at 7260 (Kovarik wrote "the law provides the Secretary should consider whether 'permitting aliens to remain temporarily

---

[21] Moreover, the agencies never had a practice of seeking this data in making TPS determinations prior to Kelly's request. *See* Trial Tr. at 256:25, 306:7-9 (Rodriguez).

in the U.S. is contrary to the national interest of the U.S.' . . . [I]n my view, the data requested is pertinent to whether an extension of Haiti's designation should be granted or not.").

*Fifth*, the "highly unusual" process undertaken by the Department of State, which typically provides a TPS recommendation to DHS, also suggests a predetermined outcome. Trial Tr. at 125:2-3 (Posner). The process internal to the Department of State begins with an Embassy recommendation, which receives great deference. Pl. Ex. 331 at 2-3; Trial Tr. at 115:19–116:4 (Posner). When another bureau within the Department of State disagrees with the Embassy, the bureaus present a split memorandum addressing the positions of all parties to the Secretary of State. Pl. Ex. 331 at 4. Here, although the U.S. Embassy in Haiti recommended extension and the regional bureau WHA recommended termination, the WHA failed to present the Embassy's perspective in its split memo to Secretary Tillerson, casting aside the views of the Embassy and thereby contravening longstanding State Department practices. See Trial Tr. at 125:22–126:23, 157:8–160:10 (Posner); Pl. Ex. 246. Inconsistent with past practices, DHS and the Department of State moved in lockstep to coordinate its review of Haiti's TPS in advance of Acting Secretary Duke's decision and after Secretary Tillerson's "mistake[n]" extension recommendation. Priv. Prod. at 3710; *see also* Pl. Ex. 53 (noting Acting Secretary Duke's comment, "can we support keeping State in their lane?"); Priv. Prod. at 7244; 13837 (discussing TPS coordination, noting it would be a "departure from past practice" but stressing "[t]here may be an advantage in ensuring Secretary Tillerson's visibility into and commitment to the TPS consultative process."). Before Secretary Tillerson made his recommendation, he had discussions with Chief of Staff Kelly where Kelly articulated the prior TPS decision-making process was a "problem of our own making by not following [the] intent of Congress." Suppl. Admin. R. at 133. Ultimately,

Former Assistant Secretary Posner testified the State Department recommendation was "outcome determinative." Trial Tr. at 132:1-4 (Posner).

Defendants argue Acting Secretary Duke must have considered current conditions because USCIS Director Cissna attached the 2017 Haiti country conditions report to the November 2017 Director Memorandum he had sent to her. *See* Def. Reply at 17. But as our learned sister court in *Ramos* noted, "the fact that Acting Secretary Duke *received* information regarding current conditions, does not prove she ultimately considered and relied on those conditions in deciding to terminate TPS status." 336 F. Supp. 3d at 1097. Here, as in *Ramos*, "the substantial record recited above strongly suggests she did not." *Id.*

In sum, the evidence demonstrates Plaintiffs are likely to succeed in their claim that Acting Secretary Duke, DHS, and the Department of State reverse engineered the TPS process to support their desired conclusion to terminate TPS for Haiti, thereby violating the requirements of the TPS statute.

### 2. Arbitrary and Capricious

Plaintiffs also establish a likelihood of success on their claim Secretary Duke's decision was arbitrary and capricious.

Plaintiffs argue Acting Secretary Duke's decision was arbitrary and capricious because it: (1) departed from both the statute and well-established agency practice; (2) was the product of improper political influence that dictated the Government's strategy to terminate TPS; and (3) reflected a pre-ordained outcome accomplished by sweeping negative evidence under the rug and disregarding contrary or inconvenient factual determinations made by prior decisionmakers. Pl. Br. at 96; Pl. Reply at 27-28.

Defendants argue Acting Secretary Duke conducted a thorough and rigorous review

consistent with the demands of the APA and the TPS statute and did not adopt a new standard.

Def. Br. at 55-63; Def. Reply at 15-17. Even if Acting Secretary Duke did adopt a new standard,

Defendants argue, she merely "emphasized different factors or weighed the statutory criteria

differently than past Secretaries, [and] such an assessment is not equivalent to a substantive

regulatory change." Def. Br. at 62.

"The scope of review under the 'arbitrary and capricious' standard is narrow." *Motor

Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). A

court may not—and this Court does not—"substitute its judgment for that of the agency." *Id*. A

court must nevertheless set aside agency action as arbitrary and capricious if the agency:

> has relied on factors which Congress has not intended it to consider, entirely failed
> to consider an important aspect of the problem, offered an explanation for its
> decision that runs counter to the evidence before the agency, or is so implausible
> that it could not be ascribed to a difference in view or the product of agency
> expertise.

*Id*. Ultimately, "the agency must examine the relevant data and articulate a satisfactory

explanation for its action including a 'rational connection between the facts found and the choice

made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). "An

agency cannot simply disregard contrary or inconvenient factual determinations that it made in

the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *F.C.C.

v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) (Kennedy, J., concurring).

Agency action is arbitrary and capricious when the agency departs from prior policy

without explanation. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)

(noting an "unexplained inconsistency in agency policy is a reason for holding an interpretation

to be an arbitrary and capricious change from agency practice" (internal quotation marks,

citation, and modifications omitted)); *Fox*, 556 U.S. at 515 (2009); *I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996). Agency action may also be arbitrary and capricious when the action is the product of bad faith and improper political influence. *See Tummino*, 603 F. Supp. 2d at 544-45 (holding the agency's "bad faith render[ed] its decision arbitrary and capricious," as demonstrated by, among other things "pressure emanating from the White House").

The Court addresses each of Plaintiffs' contentions in turn and considers evidence the agency disregarded contrary or inconvenient factual determinations made by prior decisionmakers as relevant to these contentions.

i.   *Departure from Agency Practices*

To establish a likelihood of success on the merits Plaintiffs must show DHS changed its practices with respect to TPS designations and failed to provide a sufficient explanation for that change. *Ramos*, 336 F. Supp. 3d at 1091. Plaintiffs argue Acting Secretary Duke departed from agency practices by adopting a new standard without justification or explanation. Pl. Br. at 108. Specifically, Plaintiffs aver Defendants adopted a new standard when it interpreted the TPS statute to require DHS to consider only those conditions related to the originating event—*i.e.*, the 2010 earthquake—and that Defendants considered only conditions tethered to that event. Defendants argue Acting Secretary Duke did not adopt such a standard for TPS determinations. Def. Br. 58-63; Def. Reply at 15-17. And even if Acting Secretary Duke did adopt a new standard, she merely weighed statutory criteria differently than past secretaries as within her discretion to make a TPS determination. Def. Br. at 62.

As explained above, "[t]he APA constrains an agency's ability to change its practices or policies without acknowledging the change or providing an explanation." *Ramos*, 336 F. Supp. 3d at 1089; *see also Encino Motorcars, LLC*, 136 S. Ct. at 2126. When an agency changes

course, it must "provide a reasoned explanation for its action [that] would ordinarily demand that it display awareness that it *is* changing position." *Fox*, 556 U.S. at 515. Indeed, "[a]n agency may not . . . depart from a prior policy *sub silentio*." *Id.* It must further "show that there are good reasons for the new policy." *Id.* An agency may fail to justify a departure from past practice by "failing to persuasively distinguish contrary precedent." *New York*, 351 F. Supp. 3d at 629. Though an agency need not demonstrate "the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicated." *Fox*, 556 U.S. at 515 (emphasis in original).

This requirement is not limited to formal rules or official policies and applies equally to practices implied from agency conduct. The *Ramos* court applied this principle, relying on a Ninth Circuit decision, *California Trout v. F.E.R.C.*, 572 F.3d 1003 (9th Cir. 2009):

> In *California Trout* . . . , the plaintiffs challenged the Federal Energy Regulatory Commission's (FERC) denial of their untimely attempt to intervene in a proceeding concerning the renewal of an operating license for a dam and power plant. In essence, the plaintiffs argued that FERC's decision to grant late intervention requests in three prior adjudications had given rise to an implicit rule that FERC would always grant late requests in certain circumstances, and that FERC was required to offer a reasoned explanation before abandoning that practice. Although it ultimately held against the plaintiffs, the Ninth Circuit agreed that the alleged change in adjudicative practice was subject to the APA's requirements for reasoned decision-making. It explained that "while an agency may announce new principles in an adjudicatory proceeding, it may not depart, sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case." [*Cal. Trout*, 572 F.3d] at 10 (quotation and citation omitted). Rather, "if [an agency] announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative Procedure Act.'" The court proceeded to consider the claim on the merits . . . . [*Cal. Trout*, 572 F.3d] at 1024.

336 F. Supp. 3d at 1090 (citations omitted).

Similarly, in *American Wild Horse Preservation Campaign v. Perdue*, the D.C. Circuit held the Forest Service's unexplained change in its "longstanding practice" of treating certain land as if it were part of the Wild Horse Territory was arbitrary and capricious, in large part because it "fail[ed] even to acknowledge its past practice . . . let alone to explain its reversal of course." 873 F.3d 914, 927 (D.C. Cir. 2017). As Justice Souter, sitting for the First Circuit, has explained, although "an agency is not forever bound by an earlier resolution of an interpretive issue, . . . a change must be addressed expressly, at least by the agency's articulate recognition that it is departing from its precedent." *N.L.R.B. v. Lily Transp. Corp.*, 853 F.3d 31, 36 (1st Cir. 2017). Notably, the court in *Centro Presente* relied on *Lily Transportation* to conclude "even if the alleged new policy is interpretive, Defendants would be required to provide some rationale acknowledging the change in position . . . even though Defendants would not be required to go through a full notice-and-comment process." 332 F. Supp. 3d 393, 417 (D. Mass. 2018) (citing *Lily Transp. Corp.*, 853 F.3d at 36).

The evidence shows for the 2017 decision to terminate Haiti's TPS, Defendants interpreted the statute to require DHS to consider only the conditions resulting from the originating event marking a departure from past practice. In the past, when evaluating whether a foreign state designated for extraordinary and temporary conditions "continues to meet the conditions for designation," *see* 8 U.S.C. § 1254a(b)(3)(B) the Secretary, USCIS, and the State Department have in the past considered *all* "extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety," *see id.* § 1254a(b)(1)(C).[22] This includes conditions untethered to the originating event resulting in the initial TPS designation. For example, extension notices sent prior to Secretary

---

[22] Notably, Haiti was not designated under 8 U.S.C. § 1254a(b)(1)(B)(i), which specifically references natural disasters such as earthquakes.

Duke's decision indicate former secretaries consistently considered, at the very least, whether intervening events had frustrated or impeded recovery efforts from the originating conditions in Haiti.

The two TPS extensions preceding Duke's decision both underscore this practice. The May 2017 Federal Register Notice, which explained Secretary Kelly's rationale for a six-month extension, cited not only extraordinary and temporary conditions related to the originating event but also highlighted subsequent conditions preventing TPS recipients from returning to Haiti at the time of the announcement. *See* Suppl. Admin. R. at 187-89. Though the Notice noted "Haiti has made significant progress in addressing issues specific to the earthquake," it detailed the conditions resulting from Hurricane Matthew and April 2017 rains as they had been reported by RAIO. *Id.*; Pl. Exs. 9, 326. Secretary Johnson's 2015 extension also considered intervening conditions in his Federal Register Notice. For example, he noted "[s]ome Haitians have returned to unsafe homes or built houses in informal settlements located in hazardous areas without access to basic services." Pl. Ex. 339. It also referenced food security concerns both prior to and after the earthquake, as well as Haiti's longstanding public health challenges. *Id.* In addition, previous extensions cited the cholera epidemic and the exacerbation of pre-existing vulnerabilities caused by the earthquake, including food insecurity and a housing crisis. *See* 77 Fed. Reg. at 59,944-45; 79 Fed. Reg. at 11,809-10; 80 Fed. Reg. at 51,583-84.

By contrast, the January 2018 Federal Register Notice explaining Acting Secretary Duke's rationale emphasized "Haiti has made progress recovering from the 2010 earthquake and subsequent effects that formed the basis for its designation." Pl. Ex. 341. It listed as the basis of her determination only considerations relating to the 2010 earthquake, *see id.*, even though the RAIO report extensively detailed the destruction wrought by intervening events such as

Hurricanes Matthew and Irma and the 2017 heavy rains—events the previous extension had considered, *see* Suppl. Admin. R. at 187-89; 225-59. In the Notice, Acting Secretary Duke ultimately concluded "the conditions for Haiti's designation for TPS—on the basis of 'extraordinary and temporary conditions' *relating to the 2010 earthquake* that prevented Haitian nationals from returning in safety—are no longer met." *Id.* (emphasis added). Pl. Ex. 341. In contrast to prior Notices, Acting Secretary Duke's Notice omitted references to unsafe homes, food security concerns, and longstanding public health challenges. Consequently, the most recent January 2018 notice terminating TPS for Haiti fails to address any conditions untethered to the originating event, including a number of existing conditions that previously justified an extension of TPS.

Plaintiffs presented a wealth of evidence of past practices at DHS to support their claim DHS departed from those practices. In his expert report, former USCIS Director Rodriguez noted the DHS Secretary and USCIS Director historically considered, among other things:

> intervening factors arising after a country's original TPS designation, such as subsequent natural disasters, issues of governance, housing, health care, poverty, crime, general security, and other humanitarian considerations . . . [,] regardless of whether those intervening factors had any connection to the event that formed the basis for the original designation or to the country's recovery from that originating event.

Pl. Ex. 330 ¶ 21. Director Rodriguez—who himself participated in a dozen or more TPS decisions—testified this process was firmly established for before he became USCIS Director. Trial Tr. at 213:20-25; 216:8-24; 244:21–245:22 (Rodriguez); *see also* Pl. Ex. 330 at 2. At the injunction hearing, he testified USCIS historically interpreted "extraordinary and temporary conditions" to mean the country conditions in existence at the "particular point in time when the adjudication is occurring" because those contemporaneous conditions "prevent nationals of that country from returning to the country in safety, which means significant threat to life or health."

Trial Tr. at 248:30–249:12, 250:11-12 (Rodriguez).  This includes, conditions "not necessarily caused by," and conditions "untethered" to, the initial event that led to an initial TPS designation. *Id.* at 251:13-14, 252:6-14 (Rodriguez).  In his expert view and from his experience, Secretary Duke's decision did not espouse this previous interpretation of the TPS statute.  *Id.*

USCIS and Department of State documents further reflect the change in approach. Significantly, these documents show the decision to terminate was based solely on Haiti's recovery since the originating condition without consideration of current country conditions that may have been unrelated to the originating event—conditions that DHS and prior Secretaries consistently considered in rendering prior TPS decisions.  The November 2017 Director Memorandum recommended termination because "[a]ny *current issues* in Haiti are unrelated to the 2010 earthquake."  Suppl. Admin. R. at 18.  Director Cissna took care to distinguish "issues specific to the earthquake" from those "unrelated to the . . . earthquake" and "post-earthquake phenomen[a]."  *See id.* at 14-22.  With this distinction in mind, the Director Memorandum emphasizes "Haiti's food insecurity problems seem related to tropical storms and a drought rather than from lingering effects of the 2010 earthquake" and "Haiti's current challenges cannot be directly tied to the 2010 earthquake."  *Id.* at 22.  And Acting Secretary Duke summarily adopted USCIS Director Cissna's rationale in the Federal Register Notice concerning her TPS decision.  *Compare id.* at 16, *with* Pl. Ex. 341.  Similarly, Secretary Tillerson's letter to Acting Secretary Duke recommending termination omitted subsequent events, such as Hurricane Matthew.  *Id.*  In addition, the Department of State carefully differentiated considerations it considered related to the earthquake from those it classified as "subsequent conditions."  *Id.* at 45.  The Department of State's Memorandum also relied on "[t]he extraordinary and temporary conditions that served as the basis for Haiti's most recent designation."  *Id.*

The designated administrative record also suggests White House officials wanted Acting Secretary Duke to consider only those conditions related to the 2010 earthquake. At the November 3, 2017 "principals small group" meeting, White House officials impressed upon Acting Secretary Duke the decision "to extend or terminate the status [would be] based on an evaluation of the conditions *that initially warranted* granting TPS." *Id.* at 127. For all four countries undergoing TPS review, the officials concluded, "the temporary conditions that arose out of natural disasters and supported TPS designations have long ceased to exist." *Id.*

The following evidence further demonstrates Defendants departed from past practice by restricting the Secretary's considerations to conditions related to the originating event:

- The March 19, 2017 email exchange between Kathy Kovarik and others suggested Director Memoranda could ignore problems not directly traceable to the 2010 earthquake: "[V]irtually all of [Haiti's] challenges . . . are long-standing, intractable problems. Issues related specifically to the 2010 earthquake, however, have been largely addressed." Pl. Ex. 309.

- Whereas the April 3, 2017 draft Director Memorandum referenced conditions as they existed at the time of the adjudication, the April 10, 2017 Director Memorandum insisted Haiti's severe continuing problems were not attributable to the earthquake. *Compare* Pl. Ex. 11, *with* Pl. Ex. 122.

- USCIS staff member Kathryn Anderson's April 14, 2017 email to RAIO researcher Leroy Potts characterized the decision regarding Haiti as a "political one": "Their position was that Haiti was designated on account of the 2010 earthquake, and those conditions have significantly improved. The extraordinary conditions Haiti currently faces are longstanding, intractable problems, not 'temporary' as the statute requires." Pl. Ex. 16.

- At the May 22, 2017 press conference call regarding Secretary Kelly's decision on TPS for Haiti, a DHS official explained: "Congress asked us to look at conditions that led to initial designations and not at other conditions. Understand some fine lines to draw there." Anderson Dep. Tr. at 297:11-14; Pl. Ex. 51.

- On June 6, 2017, Secretary Kelly testified before Congress: TPS "is for a specific event. . . . [I]n Haiti, it was the earthquake. Yes, Haiti had horrible conditions before the earthquake, and those conditions aren't much better after the earthquake. But the earthquake was why TPS—was granted and—and's that's how I have to look at it." Pl. Ex. 213. Kelly added, "the word [in the statute] is 'temporary,' and

I—I think those that have been . . . in my position over the years have simply automatically extended it. *Id.*

- By June 7, 2017, Secretary Kelly instructed response letters regarding TPS for Haiti to "[h]ighlight [the] temporary nature" of TPS and state the "2010 Earthquake is the only reason for TPS being granted—not [the] hurricane or current economic conditions—[n]ot [the] cholera epidemic." Pl. Ex. 29.

- In October 2017, USCIS staffer Brandon Prelogar wrote to Kathy Kovarik: "We can comb through the country conditions to try to see what else there might be, but the basic problem is that it IS bad there [with regard to] all of the standard metrics. Our strongest argument for termination, we thought, is just that it is not bad in a way clearly linked to the initial disasters prompting the designations. We can work . . . to try to get more, and/or comb through the country conditions we have again looking for positive gems, but the conditions are what they are." Pl. Ex. 37.

- David Lapan's October 20, 2017 press gaggle extensively references DHS's interpretation of the statute. Pl. Ex. 40. A reporter asked: "In the case of Haiti . . . are they [within DHS] reviewing the effects of the cholera epidemic or just sticking to the earthquake?" Lapan responded, "No, it's the earthquake. That was, again, by statute, it's the condition that created the TPS designation in the first place, the conditions in the country at that time that are considered." *Id.*

- The November 20, 2017 press release announcing Acting Secretary Duke's decision noted her decision "was made after a review of the conditions upon which the country's *original* designations were based. . . . Acting Secretary Duke determined that those extraordinary but temporary conditions caused by the 2010 earthquake no longer exist." Pl. Ex. 114.

- In April 2018, Secretary Nielsen testified to Congress that the TPS statute forbade her from considering country conditions other than those connected to the original designating event: "[T]he law really restricts [a DHS Secretary's] ability to extend TPS. The law says that if the effects *of the originating event* . . . do not continue to exist, then the Secretary of Homeland Security *must* terminate." Pl. Ex. 345 (emphasis added).

In her testimony to Congress, Secretary Nielsen argued the DHS Secretary does not have the discretion to consider conditions unrelated to the originating event. *Id.* Such an absurd interpretation of the TPS statute violated past practice and undermines Defendants' position that attenuation to the originating event is merely one factor for the Secretary to consider as part of the discretionary TPS review process. *See* Def. Br. at 64.

By changing their interpretation of the TPS statute to consider only those conditions tethered to the 2010 earthquake, the agency departed from past practice. It did so without acknowledgment and without explaining its rationale. As such, the agency's process in arriving at its 2017 decision to terminate Haiti's designation embodies the type of *sub silentio* change in agency action the Supreme Court held impermissible in *Fox*. *See* 556 U.S. at 515. Accordingly, Plaintiffs are likely to succeed in showing Secretary Duke's decision was arbitrary and capricious due to a departure in agency practice.

ii.    *Improper Political Influence*

The Court next addresses Plaintiffs' argument that Secretary Duke's decision was arbitrary and capricious because it was the product of improper political influence. "To support a claim of improper political influence on a federal administrative agency, there must be some showing that the political pressure was intended to and did cause the agency's action to be influenced by factors not relevant under the controlling statute." *Town of Orangetown v. Ruckelshaus*, 740 F.2d 185, 188 (2d Cir. 1984). "An agency's consideration of some relevant factors does not 'immunize' the decision; it would still 'be invalid if based in whole or in part on the pressures emanating from [political actors]." *Tummino*, 603 F. Supp. 2d at 544 (alterations in original) (quoting *D.C. Fed'n of Civic Assocs. v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971)). "Even if the Secretary had taken every formal step required by every applicable statutory provision, reversal would be required . . . [where] extraneous pressure intruded into the calculus of considerations on which the Secretary's decision was based." *D.C. Fed'n*, 459 F.2d at 1245-46 (holding an influential Congressman's public statements to block appropriations for the D.C. subway system until a bridge project was approved constituted improper political influence).

*Tummino v. Torti* is particularly instructive here. 603 F. Supp. 2d at 544-47. As noted,

*Tummino* involved a challenge to the FDA's denial of a citizen petition that sought

nonprescription availability of a contraceptive—"Plan B"—for women of all ages. *Id.* at 522-23.

In holding "pressure emanating from the White House" constituted improper political influence

and bad faith, Judge Korman pointed to evidence showing the White House and constituents,

"who would be very unhappy with . . . an over the counter Plan B," had pressured the

Commissioner of the FDA not to approve over-the-counter use of Plan B without age

restrictions. *Id.* at 546 (internal quotation marks omitted). Moreover, Judge Korman found the

Commissioner who ultimately made the decision had been influenced by the confirmation of a

future FDA Commissioner. *Id.*

Likewise, the evidence shows the White House exerted significant influence over Acting

Secretary Duke when she made her TPS decision. Evidence of their political motivations is

replete throughout the administrative record. As highlighted above, Secretary Duke considered

how the Haiti TPS decision fit into the White House's grander "America First" strategy. Suppl.

Admin. R. at 318; Pl. Ex. 179. Moreover, White House officials at a meeting with Secretary

Duke, sought to "coordinate the conditions and process for terminating temporary protected

status" because they believed "[e]xtending TPS for any or all of the four countries would prolong

the distortion between the temporary protections that TPS was designed to provide and current

circumstances." Suppl. Admin. R. at 127, 129. Other members of the Executive Branch, such as

Attorney General Sessions, impressed upon Secretary Duke she could not kick the decision down

the road to the next Secretary. *See id.* at 113-15 (insisting Secretary Duke should "ha[ve] the

guts to pull the trigger"); *id.* at 283 (noting officials would be "extremely disappointed if [the

decision was] kick[ed] into [the] lap of [the] next Sec[retary]" and officials did not want the

decision to "get too close to end of 2019 political and midterms"). Moreover, Chief of Staff Kelly suggested to Acting Secretary Duke "work[ing] out a permanent solution with the hill" factored into his "thinking on Haiti." Pl. Ex. 184. He viewed his role as making "calls to leaders and staff to help in the decision making process . . . and ensuring agenda adherence." *Id.*

Clearly, political motivations influenced Secretary Duke's decision to terminate TPS for Haiti. Even if these factors, which are not relevant under the statute, were not dispositive, they nevertheless factored into the Acting Secretary's TPS calculus. Although the TPS statute requires the Secretary consult with appropriate federal agencies, any discussions should center on the factors on the ground, as well as the "national interest" of the United States. A TPS determination should not be a political decision made to carry out political motives. Ultimately, the potential political ramifications should not have factored into the decision to terminate Haiti's TPS. Nor should the likelihood of working out a permanent legislative solution or the desire for "agenda adherence." Accordingly, Plaintiffs are likely to succeed in showing Secretary Duke's decision was arbitrary and capricious due to improper political influence.

### iii. *Pretext*

Plaintiffs are also likely to succeed in their arbitrary and capricious claim because Acting Secretary Duke's decision reflected a pre-ordained outcome. The reasons motivating her decision were not those articulated in the Federal Register Notice. As discussed above, Plaintiffs argue "the review process was a sham designed to create a pretext for terminating TPS for Haiti." Pl. Br. at 88; *see also id.* at 100. Defendants, on the other hand, argue Acting Secretary Duke's decision "was made in good faith, was evidence-based, and reasonably applied the criteria set forth in the TPS statute." Def. Br. at 55.

Agency action "requires that the grounds upon which the . . . agency acted be clearly disclosed"—a foundational principle older than the APA itself. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). Put simply, an agency must "disclose the basis of its" action. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (internal quotation marks omitted). Otherwise, "a court cannot sustain agency action founded on a pretextual or sham justification that conceals the true 'basis' for the decision." *New York*, 351 F. Supp. 3d at 660. Consequently, when a court finds the agency has relied on a pretextual justification, the court must set aside the agency's action for violating the APA. *See id.* at 660-64 (setting aside agency action where the Secretary of Commerce made the decision before a decision was requested); *see also, e.g.*, *Woods Petroleum Corp. v. U.S. Dep't of Int.*, 18 F.3d 854, 859 (10th Cir. 1994) (setting aside agency action where the "sole reason" for the action was "to provide a pretext for [the agency's] ulterior motive").

An agency's actions are arbitrary and capricious under the APA if they are pretextual. *See Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150, 176-79 (4th Cir. 2018). In *Cowpasture River Preservation Association*, for example, the Fourth Circuit concluded "the Forest Service's approval of [a] project" was arbitrary and capricious in part because it "'was a preordained decision' and the Forest Service 'reverse engineered the [process] to justify this outcome, despite that the Forest Service lacked necessary information about the environmental impacts of the project." *Id.* at 179 (quoting *Nat'l Audubon Soc. v. Dep't of Navy*, 422 F.3d 174, 183 (4th Cir. 2005)).

The Court previously articulated its basis for concluding Acting Secretary Duke's decision was pretextual and therefore violated the TPS statute. *See supra.* The evidence summarized above amply supports the conclusion Acting Secretary Duke made her decision with

a closed mind and for reasons other than those articulated in the Federal Register. Acting Secretary Duke terminated TPS for Haiti for reasons unrelated to the conditions in Haiti. Acting Secretary Duke met with White House officials, who exerted significant pressure on her to terminate. These officials sought to "coordinate the conditions and process for terminating temporary protected status (TPS) for aliens from El Salvador, Honduras, Nicaragua, and Haiti." Suppl. Admin. R. at 127. They also believed "[e]xtending TPS for any or all of the four countries would prolong the distortion between the temporary protections that TPS was designed to provide and current circumstances." *Id.* at 129. The record of that meeting suggests high-level cabinet officials, including the Attorney General, and other White House advisors, insisted Acting Secretary Duke terminate TPS. *See id.* at 113-15. The pressure continued through November. *See id.* at 283 (noting, for example, the White House would be "extremely disappointed if [she] kick[ed] [the termination decision] into [the] lap of [the] next secretary"). Moreover, Acting Secretary Duke's handwritten notes strongly indicate she had trouble figuring out a "plan" or "rationale" to terminate TPS. *See id.* at 317-18.

The parties involved in the periodic review process decided to terminate well before the start of the TPS review process—*i.e.*, before USCIS officials issued the RAIO Report. Secretary Kelly foreshadowed the end of TPS for Haiti with his final six-month extension. Indeed, even before the extension, Secretary Kelly's Senior Advisor, Gene Hamilton, wrote in an April 20, 2017 email to David Lapan: "African countries are toast . . . Haiti is up next." Priv. Prod. at 4670. Officials within the agency understood DHS would terminate Haiti's TPS in the next decision. As James Nealon testified, based on his discussions with former Secretary Kelly, there was a "general feeling that TPS . . . for Haiti was going to be terminated" by July 2017. Nealon Dep. Tr. at 27:12-22; 128:9-17, 129:4–130:10.

As in *Cowpasture River*, the agency reverse-engineered facts and objective assessments to justify termination. DHS manipulated, minimized, and omitted many of the facts included in the October 2017 RAIO Report. Notably, it suddenly departed from its longstanding practice of considering all country conditions and instead only considered conditions directly related to the originating condition (*i.e.*, the 2010 earthquake). Indeed, officials were "looking for" an outcome of termination rather than coming to the outcome after a fact-based review of country conditions. Pl. Ex. 127. Similarly, the Department of State violated its own internal and longstanding practice of awarding great deference to the recommendations by the U.S. Embassy in Haiti by failing to include the Embassy's viewpoint in the split memorandum presented to Secretary Tillerson. These factors are all highly suggestive of a pretextual decision. Therefore, Plaintiffs are likely to succeed in their claim the decision to terminate was arbitrary and capricious because it was pretextual.

### 3. Notice-and-Comment

Plaintiffs are not, however, likely to succeed on their claim Defendants violated the APA's notice-and-comment requirement. Nor can they demonstrate serious questions going to the merits of that claim.

The APA requires agencies to publish proposed "rules" in the Federal Register and seek public comment before settling on a final version. 5 U.S.C. §§ 553(b)–(c). Specifically, before promulgating a "rule," an agency must publish a "[g]eneral notice of proposed . . . rule making . . . in the Federal Register" and provide the public with "an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id*. The APA defines "rule" as "the whole or part of an agency statement of general or particular applicability and future

effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

Notice-and-comment procedures for rulemaking serve critical functions. Congress designed the notice requirements: "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *United States v. Lott*, 750 F.3d 214, 219 (2d Cir. 2014) (internal quotation marks and citation omitted).

The APA's notice-and-comment requirement applies to so-called "substantive rules," not "to interpretative rules, general statements of policy, or rules of agency organization procedure, or practice." 5 U.S.C. § 553(b)(A); *see also Lincoln v. Vigil*, 508 U.S. 182, 196 (1993). Whether an agency must comply with the APA's notice-and-comment requirement accordingly turns on whether the "rule" or standard in question is either a substantive rule or an interpretive rule.

"The central question is essentially whether an agency is exercising its rule-making power to clarify an existing statute or regulation, or to create new law, rights, or duties in what amounts to a legislative act." *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993). When evaluating whether the notice-and-comment requirement applies, courts look "not to labels given by the agency, but rather to the nature of the impact of the agency action." *L.M. v. Johnson*, 150 F. Supp. 3d 202, 215 (E.D.N.Y. 2015) (Garaufis, J.) (citing *Lewis Mota v. Sec'y of Labor*, 469 F.2d 478, 481-82 (2d Cir. 1972)).

Substantive, or legislative, rules "'create new law, rights, or duties, in what amounts to a legislative act.'" *Time Warner Cable v. F.C.C.*, 729 F.3d 137, 168 (2d Cir. 2013) (quoting *Sweet v. Sheahan*, 235 F.3d 80, 91 (2d Cir. 2000)). Put another way, a substantive rule "'grants rights,

imposes obligations, or produces other significant effects on private interests.'" *White*, 7 F.3d at 303 (quoting *Perales v. Sullivan*, 948, F.2d 1348, 1354 (2d Cir. 1991)); *see also Batterton v. Marshall*, 648 F.2d 694, 701-02 (D.C. Cir. 1980) ("Legislative rules . . . implement congressional intent [and] effectuate statutory purposes. In so doing, they grant rights, impose obligations, or produce other significant effects on private interests." (footnote omitted)). "Legislative rules have the force of law." *N.Y.C. Emps.' Ret. Sys. v. SEC*, 45 F.3d 7, 12 (2d Cir. 1995). "Generally, notice and comment is required if the rule makes a substantive impact on the rights and duties of the person subject to regulation." *L.M.*, 150 F. Supp. 3d at 215 (internal quotation marks and citation omitted).

Interpretive rules, by contrast, are "an agency's 'intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities.'" *White*, 7 F.3d at 303 (quoting *Perales*, 948 F.2d at 1354). They "do not create rights, but merely 'clarify an existing statute or regulation.'" *N.Y.C. Emps.' Ret. Sys.*, 45 F.3d at 12 (quoting *White*, 7 F.3d at 303). Interpretive rules, moreover, "do not have force of law, though they are entitled to deference from the courts." *Id.* (citing *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977)).

Plaintiffs argue Acting Secretary Duke's decision articulated a new standard that amounts to a substantive rule. Pl. Br. at 111-12. Under the old standard, Plaintiffs argue, "the Secretary considered all country conditions relevant to whether extraordinary and temporary conditions prevented TPS holders from returning safely to their country." *Id.* at 111. But "[u]nder the new standard, [the Secretary considers] only conditions DHS political appointees deem directly linked to the originating event." *Id.* In effect, Plaintiffs argue the shift in procedure produced substantive consequences in this case because the decision to use one standard could very well

mean the difference between allowing TPS beneficiaries to stay in or forcing them out. Under the old standard, they argue, consideration of all country conditions supported TPS extension for Haiti. But under the new standard, consideration of only those conditions tied to the originating event supported removal. The "new standard thus 'makes a substantive impact on the rights and duties of the person subject to regulation.'" *Id.* (quoting *L.M.*, 150 F. Supp. 3d at 215).

Defendants raise two contentions in response. First, Defendants argue "[d]ifferences in how DHS Secretaries render their fact-intensive TPS determinations do not trigger any APA procedural requirements." Def. Br. at 63. Defendants aver the APA's notice-and-comment requirement attaches to the promulgation of rules under 8 U.S.C. § 1254a(b)(5)(B), not the process by which the DHS Secretary makes a TPS determination. *Id.* at 63-64 (citing 8 U.S.C. § 1254a(b)(5)(B)). In Defendants' view, whereas Congress expressly mandated the Secretary "shall establish an administrative procedure for the review of the denial of benefits" to nationals of TPS-designated countries, it did not require the Secretary to promulgate procedures for the TPS determination process. The decision not to require the Secretary to promulgate such procedural rules, Defendants argue, demonstrates Congress "did not intend or contemplate that any 'new rule' would be promulgated and thereafter judicially enforced." Def. Br. at 64.

Second, the Government argues "[e]ven if such procedural requirements could apply, a difference in emphasis does not constitute a new rule requiring notice-and-comment under the APA." *Id.* Defendants aver even if there was a change, it was "*at most*[] a shift in interpretation made in particular determinations, not a 'substantive rule.'" *Id.* (emphasis in original). This "shift in interpretation," according to Defendants, is merely a "different way[] of approaching the decision-making process," which culminates in the Secretary's discretionary exercise of informed judgment. *Id.* In support of this argument, Defendants cite Former Director

Rodriguez's testimony that DHS has never codified the factors the Secretary must or will consider, or the weight the Secretary must assign to each factor, in any regulation. *Id.*; *see also* Trial Tr. at 320:25–324:11 (Rodriguez). Ultimately, "[a] government official's reading of a statute that vests a decision in the official's judgment is not tantamount to a substantive rule." *Id.*

The Court agrees with Defendants' contentions that the exercise of such official discretion does not amount to a substantive or legislative rule. The Court cannot find, as Plaintiffs argue, that the Acting Secretary would have extended TPS had she applied the old standard. Nor, given this discretion, can the Court find the Secretary's decision resulted purely from the change in interpretation. Neither the new nor the past interpretation of the TPS statute employed by DHS demand extension or termination as a matter of right; rather, they merely serve to clarify the Secretary's role and authority under the statute. *See N.Y.C. Emps.' Ret. Sys.*, 45 F.3d at 12.

Moreover, through embracing a new interpretation of the TPS statute, Secretaries Kelly, Duke, and Nielsen did not bind themselves, future DHS Secretaries, or other DHS officials to adhere to their interpretation of the TPS statute. Thus, the change in interpretation does not "create new law, rights, or duties, in what amounts to a legislative act." *See Time Warner Cable*, 729 F.3d at 168. Nor does the change in interpretation, viewed in this light, carry the force of law. *See N.Y.C. Emps.' Ret. Sys*, 45 F.3d at 12. At most, the interpretation served as a "tentative view of the meaning of a particular statutory term." *See White*, 7 F.3d at 303.

The Court acknowledges the Secretary's TPS decision generally has a significant impact on the substantive rights of TPS holders. The agency's change in interpretation naturally affects whether the Secretary will or will not extend a TPS designation, which in turn affects whether