TPS holders will continue to be eligible for TPS benefits. But the change in interpretation does not make extension or termination a foregone conclusion here, and the Court declines to find as such. Ultimately, as with procedural rules, most interpretive rules affect substantive rights to some extent. *Cf. Time Warner*, 729 F.3d at 168.

As stressed above, the Court's conclusion that Plaintiffs fail to satisfy its burden of establishing it is likely to succeed on its notice-and-comment claim in no way forecloses Plaintiffs' claim that the APA required Defendants to provide a reasoned explanation for their change in position. The APA's requirement that an agency articulate some rationale acknowledging and explaining a change in position is separate and apart from the APA's notice-and-comment requirement and applies to legislative and interpretive rules alike. *See Centro Presente*, 332 F. Supp. 3d at 418.

### 4. Ultra Vires

Plaintiffs also argue, should the TPS statute preclude review, the Court should review their claims under the Court's common law authority to review ultra vires agency action. Pl. Reply at 25, 28 n.4.

Courts have inherent authority to review government action that is ultra vires or in excess of statutory authority. *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017). But that relief is available only "when 'the plaintiff ha[s] *no* other means of obtaining review of the agency action.'" *Id.* (alterations in original) (quoting *Ukiah Adventist Hosp. v. F.T.C.*, 981 F.2d 543, 550 (D.C. Cir. 1992)).

Plaintiffs assert their claims both as a violation of the TPS statute and as a substantive violation of the APA, and the Court has meaningfully reviewed those claims, having held it has subject matter jurisdiction to do so. Because the Court has considered Plaintiffs' claims under

the APA, it need not—and does not—review Plaintiffs' claims pursuant to its inherent authority to review ultra vires agency action. *See Jafarzadeh*, 270 F. Supp. 3d at 311-12 (dismissing ultra vires claim since the plaintiffs could assert the same claim under the APA).

ii.   Equal Protection Claim

In addition to Plaintiff's APA claims , the Court also concluded Plaintiffs' claim that Defendants' decision-making process violated the Equal Protection Clause of the Fifth Amendment survived dismissal. *See Saget*, 345 F. Supp. 3d at 302-03.

The equal protection component of the Fifth Amendment's Due Process Clause generally prohibits discrimination by official conduct on the basis of race. *Bolling v. Sharpe*, 347 U.S. 497, 498-500 (1954). Plaintiffs argue the decision to terminate Haiti's TPS violated their rights to equal protection under the laws because the decision was motivated by discriminatory animus and resulted in disparate impact against non-white immigrants. Pl. Br. at 115-18. Defendants contend Plaintiffs fail to proffer evidence of discriminatory animus, and any alleged animus of the President cannot be imputed to the Secretary. Def. Br. at 32-38.[23]

The Court recognizes at the outset the well-founded principle of judicial restraint should "'caution us to avoid reaching constitutional questions when they are unnecessary to the disposition of a case.'" *New York*, 351 F. Supp. 3d at 665 (quoting *Anobile v. Pelligrino*, 303 F.3d 107, 123 (2d Cir. 2002)). However, the Court agrees with the approach taken in *New York* that "the unusual circumstances here and the need to make a comprehensive record for appeal

---

[23] As an initial matter, Defendants aver Congress precluded judicial review of TPS determinations, regardless of the nature of the challenge. Def. Br. at 48-49. As discussed *supra*, this Court flatly rejects the Government's contention federal district courts do not have jurisdiction over allegedly unconstitutional conduct by executive officials. *See Henderson v. I.N.S.*, 157 F.3d 106, 118 (2d Cir. 1998) ("[A]lthough Congress exercises broad power over immigration matters, that power is limited by the Constitution." (internal quotation marks and citation omitted)); *Battaglia v. Gen. Motors Corp.*, 169 F.2d 254, 257 (2d Cir. 1948) ("[T]he exercise of Congress of its control over jurisdiction is subject to compliance with at least the requirements of the Fifth Amendment.").

HT Vacatur AR_0139

call for a different approach, so the Court will proceed." *Id.* For the reasons discussed below, the Court finds, at the very least, there are serious questions going to the merits of Plaintiffs' equal protection claim, thus justifying the issuance of a preliminary injunction on this independent ground.[24]

### a. General Legal Standards

This Court previously determined in its decision denying Defendants' Motion to Dismiss that *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), provides the governing legal standard to address Plaintiffs' constitutional claims. *See Saget*, 345 F. Supp. 3d at 301-02.

"[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 264-65 (citation omitted). But a plaintiff need not prove "the challenged action rested solely on racially discriminatory purposes." *Id.* at 265; *see also Hunter v. Underwood*, 471 U.S. 222, 232 (1985) ("[A]n additional purpose to discriminate against poor whites would not render nugatory the purpose to discriminate against all blacks[.]"). Instead, plaintiffs must establish a discriminatory

---

[24] The Court declines, however, to decide whether Plaintiffs have raised serious questions on the merits of their procedural due process claim. Plaintiffs allege they have protectable property and liberty interests in ensuring lawful compliance with the TPS statute, and contend such constitutional rights are coextensive with the established APA and equal protection violations. *See* Pl. Br. at 118-19; Pl. Reply at 42. Because Plaintiffs' claim is "unnecessary to the disposition of [the] case," and would not further illuminate an already comprehensive record, the Court need not reach Plaintiffs' procedural due process claim. *See Anobile*, 303 F.3d at 123.

While not explicitly addressed in its opinion, the *Ramos* Court similarly declined to address the plaintiffs' procedural due process claim in granting injunctive relief, even though the court raised concerns at the motion-to-dismiss stage. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018) (declining to mention or address procedural due process claim in granting injunctive relief); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1121-22 (N.D. Cal. 2018) ("[T]o the extent Plaintiffs' challenge is based on a property-entitlement theory, they have at least a plausible claim co-extensive with their ability to prove that Defendants violated the APA or equal protection guarantee."); *id.* at 1122-23 ("While the Court is dubious about whether Plaintiffs' asserted due process liberty interest can overcome the government's interest in enforcing an otherwise valid immigration law, the Court need not resolve the question at this time because Plaintiffs have stated a plausible due process claim. . . .").

purpose or intent was one motivating factor of the decision. 429 U.S. at 265-66.[25] Because

"[p]roving the motivation behind official action is often a problematic undertaking," *Hunter*, 471

U.S. at 228, the Court must conduct a "sensitive inquiry into such circumstantial and direct

evidence of intent as may be available," *Arlington Heights*, 429 U.S. at 266; *see also Ramos*, 336

F. Supp. 3d at 1098-1101 (evaluating direct and circumstantial evidence of animus under

*Arlington Heights*). *Arlington Heights* sets forth a non-exhaustive list of factors to consider in

determining whether a challenged decision was based on an impermissible purpose. 429 U.S. at

266. "[W]hether the impact of the action 'bears more heavily on one race than another' may

provide an important starting point.'" *New York*, 351 F. Supp. 3d at 665 (quoting *Arlington

Heights*, 429 U.S. at 266)). Here, it is axiomatic the decision to terminate TPS for Haitians

impacts one race, namely non-white Haitians, more than another. But "impact alone is not

determinative," and the Court should consider additional factors, including: "[t]he historical

background of the decision . . . , particularly if it reveals a series of official actions taken for

invidious purposes," "[s]ubstantive departures . . . , particularly if the factors usually considered

important by the decisionmaker strongly favor a decision contrary to the one reached," and the

"administrative history . . . , especially where there are contemporary statements by members of

the decisionmaking body, minutes of its meetings, or reports." 429 U.S. at 266-68.[26]

Although Defendants apply the *Arlington Heights* standard in its submissions to the

Court, the Government again contends the standard set forth in *Trump v. Hawaii*, 138 S. Ct. 2392

(2018) applies to this action, not *Arlington Heights*. Def. Reply at 33 n.15. In *Hawaii*, two

---

[25] Plaintiffs "need not plead or show the disparate treatment of other similarly situated individuals" under *Arlington Heights*. *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001); *see also Saget*, 345 F. Supp. 3d at 301.

[26] The *Arlington Heights* Court also noted in certain limited instances, "members might be called to the stand at trial to testify concerning the purpose of the official action." *Id.* at 268. In this case, Defendants elected not to provide any live testimony.

pivotal factors informed the Supreme Court's standard of review: (1) "plaintiffs [sought] to invalidate a national security directive regulating the entry of aliens abroad"; and (2) the executive order was "facially neutral toward religion," which required "prob[ing] the sincerity of the stated justifications for the policy by reference to extrinsic statements—many of which were made before the president took the oath of office." 138 S. Ct. at 2418. Neither factor is present here. In *Hawaii*, the foreign nationals at issue were not present in the United States. *Id.* at 2419. Here, the foreign nationals—Haitian TPS beneficiaries—are lawfully present in the United States along with their U.S.-born dependents. Foreign nationals lawfully present in the United States are accorded greater constitutional protection than those outside of the United States. *See Zadvydas v. Davis*, 533 U.S. 678, 693-94 (2001) (collecting cases). Thus, this Court again concludes, in accord with the courts in *Ramos* and *Centro Presente*, the deferential standard employed in *Trump v. Hawaii* does not apply to Plaintiffs' constitutional challenges to Haiti's TPS termination. *See Ramos*, 321 F. Supp. 3d at 1130 ("*Hawaii* did not address the standard of review to be applied under the equal protection doctrine when steps are taken to *withdraw* an immigration status or benefit from aliens lawfully present and admitted into the United States for reasons unrelated to national security or foreign affairs." (emphasis in original)); *Centro Presente*, 332 F. Supp. 3d at 410-11; *accord New York*, 351 F. Supp. 3d at 666 ("Nothing in the [*Trump v. Hawaii*] opinion indicates that this 'circumscribed inquiry' applies outside of the 'national security and foreign affairs context.'" (quoting *Hawaii*, 138 S. Ct. at 2420 n.5)).[27]

---

[27] The Government also submits *Reno v. Am. Arab Anti-Discrimination*, 525 U.S. 471 (1999) ("*AADC*") is applicable despite this Court's prior decision rejecting the Government's argument, and it stresses Plaintiffs must adduce "clear evidence" the TPS termination was based on "outrageous" discrimination. Def. Reply at 33 n.15. In *AADC*, the plaintiffs alleged the Attorney General had unconstitutionally selected them for deportation due to "their affiliation with a politically unpopular group." *AADC*, 525 U.S. at 472. The *AADC* Court applied a "particularly demanding" standard because the plaintiffs' claims "invade[d] a special province of the Executive—its prosecutorial discretion" to choose to deport certain people but not others. *Id.* at 489.

HT Vacatur AR_0142

### b. Scope of Review

Before the Court applies the *Arlington Heights* standard, another word is warranted on the proper scope of review. In its submissions to the Court, the Government repeatedly stresses the Court should limit its review of all Plaintiffs' claims, including its constitutional claims, to the administrative record. *See* Def. at 68-69; Def. Reply at 32. Intentional discrimination by government officials contravenes the Constitution, and "the very doctrine contemplates a wide-ranging and penetrating inquiry capable of uncovering hidden forms of discrimination." *New York*, 351 F. Supp. at 668. If this case were limited to the administrative record, as the Government suggests, it would be impossible to conduct the full and thorough analysis of direct and circumstantial evidence *Arlington Heights* demands. *See id.* To constrain judicial review in such a way and to adopt the Government's view is inapposite to the Court's responsibility to "smoke out" unconstitutional government conduct under the doctrine. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989); *accord Battaglia v. Gen. Motors Corp.*, 169 F.2d 254, 257 (2d Cir. 1948) ("[W]hile Congress has the undoubted power to give, withhold, and restrict the jurisdiction of the courts . . . , it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law."). Accordingly, the Court will determine whether Plaintiffs have at the very least raised serious questions on the merits of their equal protection and procedural due process claims based on the full record.

### c. Discussion

---

Here, the concern is the termination of Haiti's TPS status and not an individual removal decision. Thus, prosecutorial discretion is not implicated and accordingly, the heightened standard set forth in *AADC* does not apply. *See Ramos*, 321 F. Supp. 3d at 1125-26; *see also NAACP v. U.S. Dep't of Homeland Sec.*, No. 18-0239, 2019 WL 1126386, at *6 n.5 (D. Md. Mar. 12, 2019) (listing cases).

The Court previously determined Plaintiffs plausibly alleged Secretary Duke's decision to terminate TPS for Haiti was motivated by discriminatory animus. *See Saget*, 345 F. Supp. 3d at 302-03.

The Government argues there is no evidence officials involved in the decision to terminate Haiti "were motivated by anything other than a legitimate belief that the countries in question no longer met the statutory criteria for TPS." Def. Br. at 35. But the evidence tells a different story. Here, consideration of the *Arlington Heights* factors raises, at the very least, serious questions as to whether a discriminatory purpose was a motivating factor in Secretary Duke's decision to terminate Haiti TPS. Specifically, the evidence suggests the Secretary was influenced by the White House and White House policy to ignore statutory guidelines, contort data, and disregard objective reason to reach a predetermined decision to terminate TPS and abate the presence of non-white immigrants in the country.

### 1. Direct Evidence

The Government argues Plaintiffs offer "no legal basis for *imputing* the President's alleged animus to Acting Secretary Duke." Def. Br. at 69. As the Court previously determined, Plaintiffs need not establish the Secretary herself harbored animus under *Arlington Heights* even though she alone possessed the statutory authority to make the decision to terminate TPS. *See Saget*, 345 F. Supp. 3d at 303; *accord Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018) (Garaufis, J.) (imputing the President's racially charged statements to Acting Secretary Duke in denying defendant's motion to dismiss and reasoning "liability for discrimination will lie when a biased individual manipulates a non-biased decision-maker into taking discriminatory action"). Indeed, the Secretary is an official subordinate to the President, appointed and removable by the President at will. *See Batalla Vidal*, 291 F. Supp. 3d at 279

(citing U.S. Const., art. II, § 1, cl. 1). Administrative action may violate equal protection if the alleged animus of other senior executive officials, including the President, "influenced or manipulated their decisionmaking process." *Ramos*, 336 F. Supp. 3d at 1098 (internal quotation marks omitted). The Court must address whether, on the full record, the evidence reveals the White House influenced the decisionmaking process to terminate TPS.

Defendants argue Plaintiffs have failed to proffer any evidence Secretary Duke acted with discriminatory purpose and have failed to establish the alleged animus of the President "was a significant, intended, and proximate cause of the Duke decision." Def. Br. at 69. Plaintiffs argue the evidence of President Trump's animus toward Haitian immigrants and the Administration's "targeting [of] Haitian TPS holders for termination" establishes a nexus sufficient to impute a discriminatory purpose to Acting Secretary Duke's decision. Pl. Br. at 116. To underscore the discriminatory purpose behind the termination, Plaintiffs highlight evidence indicating Secretary Duke's decision was the product of "agenda adherence." Pl. Reply at 43-44.

Defendants rely on the recent decision in *New York* to argue Plaintiffs fail to meet their evidentiary burden of showing Secretary Duke's decision was a pretext for discrimination. Def. Br. at 69-70; Def. Reply at 35. In *New York*, Judge Furman concluded Secretary Ross's decision to add a citizenship question to the 2020 Census was pretextual based on the evidence but held Plaintiffs failed to carry their burden of establishing that decision was a pretext for discrimination. 351 F. Supp. 3d at 670. Specifically, Judge Furman concluded the evidence did not reveal any discriminatory purpose was communicated to the decisionmakers, "as would be necessary to impute their discriminatory purpose to [the Secretary]." *Id.*

Here, unlike in *New York*, the record reveals direct evidence of direct communications and involvement between the White House and DHS in formulating the decision to terminate

Haiti's TPS.  Important to this Court's calculus, these communications also reveal the intent to formulate a general policy of terminating TPS for predominantly non-white foreign countries in order to decrease the presence of non-white immigrants in the United States.  Unlike prior decisions on TPS, the White House was not only involved in but was influential in producing the decision to terminate TPS for Haiti.  For example, DHS official Christina McDonald wrote in an email to other DHS officials on November 21, 2017:  "The interagency process for TPS – Haiti *was led by the White House*.  For ex[ample], there was a Principals Committee meeting about TPS Haiti. . . . The outcome of those discussions *factored in to [sic] our Acting Secretary's decision re Haiti*."  Priv. Prod. 2280 (emphasis added).  The Principals meeting, held on November 3, 2017, was sponsored by the White House to "coordinate the conditions and process for terminating Temporary Protected Status (TPS) for aliens from El Salvador, Honduras, Nicaragua, and Haiti."  *See* Hamilton Dep. Tr. at 184:16–185:22, 195:1-2; *see also* Suppl. Admin. R. at 127, 129 ("Extending TPS for any or all of the four countries would prolong the distortion between the temporary protections that TPS was designed to provide. . . .").

Secretary Duke's own writings suggest she was well aware the White House wanted to terminate TPS for Haiti and other predominantly non-white foreign nations, and her decisionmaking process was engineered at least in part to reflect that goal.  For instance:

- Duke's handwritten notes from the November 3, 2017 Principals Meeting suggest Attorney General Sessions told her she "can't keep certifying," that she should "just bite the bullet," and that it would be "problematic to recertify."  Suppl. Admin. R. at 113-15.

- According to her notes, Duke also had a phone call with White House officials Tom Bossert and Zach Fuentes, who told her "gutless fed[eral officials] have extended" TPS for the four majority non-white nations, Haiti, El Salvador, Honduras, and Nicaragua.  Suppl. Admin. R. at 283.  Her notes reveal in the same phone call they stated the White House would be "extremely disappointed if [she] kick[ed] the decision] into [the] lap of [the] next secretary."  *Id.*

- Duke wrote in an email to White House Chief of Staff Kelly on November 6, 2017 regarding TPS decisions generally: "These decisions along with the public statements will send a clear signal that TPS in general is coming to a close. I believe it is consistent with the President's position on immigration . . . . While some are portraying this differently, this decision is really just a difference in strategy to get to the President's objectives." Pl. Ex. 169 at 1.

- Hours after her November 6 email to Kelly, Duke informed him that Bossert had "informed me of a strategy I was not previously aware of. . . . [I] incorporated this new information into my final decision" regarding Nicaragua's TPS determination. Pl. Ex. 96 at 1. Bossert replied thanking Duke "for all the time and effort today, and for the 12 month outcome." *Id.*

- In her notes, Duke flatly stated: "The TPS program must end for these countries soon. . . . This conclusion is the result of an America first view of the TPS decision." Pl. Ex. 179 at 1.

In addition to Duke's own statements, evidence of interoffice meetings and writings of DHS officials highlight the White House's direct involvement in Duke's decisionmaking process. For example, Ambassador James Nealon testified in his deposition that Stephen Miller, a senior advisor in the White House, is a "name that always came up" as a White House official involved in conversations surrounding TPS termination. Nealon Dep. 224:9-19.

The Government does not dispute White House involvement, and instead argues it is unsurprising—and certainly not improper—the White House provided input to DHS. Def. Br. at 69. But the White House did not simply provide input. That the White House "led" the decision to terminate is contrary to the statute and indicates the White House heavily influenced DHS in the decision to terminate TPS. *Compare Ramos*, 336 F. Supp. 3d at 1098-1100 (cataloguing evidence of White House influence on TPS decisions), *and Centro Presente*, 332 F. Supp. 3d at 414-15 (same), *with New York*, 351 F. Supp. 3d at 670 ("Plaintiffs failed to prove a sufficient nexus between President Trump and Secretary Ross's decision to make the President's

statements or policies relevant to the equal protection analysis.").[28] Here, there is sufficient evidence of interactions and communications between White House officials and DHS regarding Secretary Duke's decision to raise serious questions on the merits of Plaintiffs' equal protection claim.

Because the evidence reflects the White House (and the President's agenda more broadly) influenced Duke's decisionmaking process, the Court next considers whether there is evidence the President and other White House officials harbored animus against Haitian foreign nationals and whether such animus influenced the Secretary's decision to end TPS designation for Haiti. Other district courts have catalogued evidence of such animus against non-white immigrants. *See Ramos*, 336 F. Supp. 3d at 1100-01; *Centro Presente*, 332 F. Supp. 3d at 399-402. Indeed, numerous public statements made by the President both when he was a presidential candidate and during his time in office reflect animus against non-white immigrants. For example, then-candidate Trump released a public, written statement in which he asserted: "The United States has become a dumping ground for Mexico and, in fact, for many other parts of the world." Pl. Ex. 266 at 2. While President, Trump stated in a June 2017 meeting with then-DHS Secretary Kelly and others that Haitians "all have AIDS" upon learning 15,000 Haitian people received visas to enter the U.S. that year. Pl. Ex. 369 at 1. And after Acting Secretary Duke decided to terminate TPS, the President allegedly reacted to a draft immigration plan protecting people from

---

[28] The Government's suggestion the decision not to "terminate TPS for Honduras and El Salvador, notwithstanding a recommendation to terminate both TPS designations from the White House" reflects Secretary Duke's independent consideration ignores the broader context. Def. Br. at 70. For example, in November 2017, when Haiti's TPS designation was formally terminated but the designations of Honduras and El Salvador were not, memos were already written about "Implications for TPS Expiring for Beneficiaries from *El Salvador, Honduras*, Haiti, and Nicaragua." Priv. Prod. at 936 (emphasis added). And in January 2018, a USCIS official reported being "shocked" when the Federal Register Notice for El Salvador's TPS designation was delivered before Haiti, even though El Salvador's designation was set to expire afterward. Priv. Prod. at 19894-96. While perhaps the decisions to terminate El Salvador and Honduras TPS designations were delayed, the decisions themselves were (like that of Haiti's TPS) predetermined and in line with Secretary Duke's admission that terminating TPS designations "is the result of an America first review of the TPS decision." Pl. Ex. 179 at 1.

Haiti, El Salvador, and some African countries by asking "[w]hy are we having all these people
from shithole countries come here?" Pl. Ex. 351 at 18.

In addition to statements by the President, other White House officials have made
disparaging comments regarding Haitians and other non-white immigrants. For example, in an
April 20, 2017 email to David Lapan, Gene Hamilton wrote "African countries are toast," and
"Haiti is up next." Priv. Prod. at 4670. Chief of Staff John Kelly stated Haitians were "welfare
recipients." Anderson Dep. Tr. at 321:14–322:4. Weeks earlier, Kelly had been soliciting data
regarding Haitian TPS beneficiaries and public and private assistance, although public talking
points stressed such data "was not used as criteria for the TPS determination." Pl. Ex. 126; *see
also* Hamilton Dep. Tr. at 253:3-5, 256:20–257:15; Priv. Prod. at 4757.

"Although the use of racial slurs, epithets, or other racially charged language does not
violate equal protection *per se*, it can be evidence that official action was motivated by unlawful
discriminatory purposes." *Batalla Vidal*, 291 F. Supp. 3d at 277. Here, the evidence of White
House influence on Secretary Duke's decision and evidence of animus toward non-white
immigrants, including Haitians specifically, raises at the very least serious questions going to the
merits of Plaintiffs' equal protection claim.

## 2. Circumstantial Evidence

Defendants also contend there is no circumstantial evidence Secretary Duke's decision as
motivated in part by a discriminatory purpose to lessen the number of non-white immigrants
present in the country. Defendants argue DHS officials were motivated solely by "a legitimate
belief that the countries in question no longer met the statutory criteria for TPS," and there is no
evidence the Secretary's decision was a pretext for discrimination. Def. Br. at 69-70; Def. Reply
at 35. In the Government's view, hearsay evidence from news articles, media reports, and video

excerpts of Senators are inadmissible and should not be considered by this Court. Def. Br. at 70-73.

The court may look to "[t]he specific sequence of events leading up to the challenged decision" and "[d]epartures from the normal procedural sequence" when determining whether discrimination was a motivating factor. *Arlington Heights*, 429 U.S. at 266-67. Here, the sequence of events leading up to the decision to terminate Haiti's TPS was a stark departure from ordinary procedure, suggestive of a pre-determined outcome not anchored in an objective assessment, but instead a politically motivated agenda. *Cf. supra* Section VI.B.i; *see also Ramos*, 336 F. Supp. 3d at 1101. For example, RAIO researcher LeRoy Potts emailed Kathryn Anderson on April 13, 2017, asking for her "take on the Haiti TPS decision" and "to know a little bit more about how it was decided current conditions 'don't merit ongoing TPS designation . . . ?'" Pl. Ex. 16 at 1. Anderson replies the next day stating "the decision was a political one." *Id.* In a similar email exchange USCIS official Brandon Prelogar wrote to Potts: "Needless to say, I don't think it was RU's fine work on the country conditions, nor our original presentation of them in the Decision Memo we drafted . . . ." Priv. Prod. at 20338. Following the brief extension of TPS in May 2017, DHS officials were proactively mad-libbing official documents to reach termination. For example, in an October 31, 2017 email, Senior Advisor Robert Law wrote to Jacob Stubbs "I need positive data on the current status of Haiti to bolster the recommendation to terminate TPS. Look back to Sec. Kelly's [six-month] extension for language citing 'improvement' or the like that I can plug in. . . . *Be creative*." Pl. Ex. 86 at 1 (emphasis added). In another email, Law wrote in reply to receiving a Decision Memo on Haiti TPS: "The draft is overwhelming[ly] weighted for extension which I do not think is the conclusion we are looking for." Pl. Ex. 127 at 1.

Further evidence of USCIS officials repackaging the Director Memo highlights both the explicitly procedural and substantive departures from the established decisionmaking process. After leaked documents revealed an intent to terminate TPS for Haiti in April 2017, resulting in public backlash, "USCIS [was] told to redraft the Haiti TPS notice once again, this time to announce a 6-month extension. . . . [and was] instruct[ed] [] not to announce a termination at this point, but to suggest in the notice somehow that it is likely to be terminated in 6 months and that the Haiti beneficiaries should get their affairs in order." Priv. Prod, at 5206. Conceding how bizarre it may appear to draft a notice this way, Westmoreland wrote: "We are concerned how [the Secretary] could find Haiti to meet TPS conditions now but find in just a few months from now that it no longer does. Do the clients really believe conditions will improve over the current baseline over the next 4-6 months? Could extending now box [the Secretary] in for the next determination?" Priv. Prod. at 1186. These internal communications show Defendants refashioned evidence-based memos to arrive at the desired outcome of terminating TPS. *See also Ramos*, 336 F. Supp. 3d at 1101-03 (cataloguing evidence of a similar process of "repackaging" memos to reach a "desired result of terminating TPS" with respect to Sudan, Honduras, Nicaragua, and El Salvador).

The Administration also solicited data regarding criminal activity and public assistance, a departure from "factors usually considered important by the decisionmaker." *Arlington Heights*, 429 U.S. at 268. In early April, senior DHS officials, including then-Secretary Kelly, began requesting criminal data on Haitian TPS recipients and how many were on public or private welfare. Pl. Ex. 103 at 1. Defendants did not put forward any evidence to suggest the administration typically assesses these factors as part of the TPS decision-making process. Instead, the Government merely argues this evidence is "beyond the scope of this action, as

Plaintiffs here only challenge Acting Secretary Duke's decision." Def. Reply at 35.[29]  In

contrast, Plaintiffs proffer testimony from former USCIS Director Leon Rodriguez, who

affirmed TPS decisionmakers typically would not have considered crime rates because "by

definition, you do not qualify to receive TPS in the first place if you are a convicted

criminal . . . ." Trial Tr. at 255:25–256:6; *see also* Anderson Dep. Tr. at 307:16–308:11

(testifying she was never asked to gather criminality or welfare data about a TPS population

when working as a USCIS researcher); Prelogar Dep. Tr. at 110:22–118:20 (same).  Indeed, the

TPS statute says as such.  8 U.S.C. § 1254a(c)(2)(B).  Plaintiffs also produced testimony noting

TPS holders generally do not qualify for federal benefits, either.  Pl. Ex. 15 at 8 (email by

Kathryn Anderson).  Further evidence indicates government officials were fully aware the data

request was atypical.  *See, e.g.*, Pl. Ex. 103 at 1 ("If you need a specific data set and need to ask

someone to pull it, please do not indicate what it is for.  I don't want this to turn into a big thing

where people start prodding and things start leaking out.").  When then-Chief of Staff to the DHS

Secretary Kirstjen Nielsen requested the same data later that month, Kovarik relayed the request

to her employees, acknowledging it was "difficult to obtain" but to "figure out a way to squeeze

more data out of our systems."  Pl. Ex. 342 at 1; Pl. Ex. 15 at 1, 3.  The Office of the USCIS

Executive Secretary asked for the same data, along with data on how many TPS recipients "were

illegal pre-TPS designation" and a request for "what has changed in Haiti warranting the

recommended change" on April 28, 2017, in an email titled "memo in regards to the *Notice for

the termination of TPS for Haiti*."  Pl. Ex. 119 at 1.  Soliciting new information to comport

with a predetermined termination decision, when such information was never previously

---

[29] Defendants also argue even if the evidence was within the scope of the action, criminal information and public assistance date are relevant factors "to the extent they impact the 'national interest' of the United States." Def. Reply at 35.  This Court does not challenge this argument; rather, based on the record, it considers the newfound interest in such data as evidence of a departure from past practice, a relevant inquiry under *Arlington Heights*.

requested for TPS decisions, certainly raises eyebrows on the motivation behind the decision in question in this action. *See Arlington Heights*, 429 U.S. at 268.

\* \* \*

As President John Adams once observed, "Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passion, they cannot alter the state of facts and evidence." Based on the facts on this record, and under the factors prescribed by *Arlington Heights*, there is both direct and circumstantial evidence a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti. Accordingly, Plaintiffs have, at the very least, raised serious questions going to the merits of their Equal Protection Claim.

## C. Irreparable Harm

In determining whether to issue a preliminary injunction, Plaintiffs must also demonstrate they are likely to suffer irreparable harm absent injunctive relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008) (noting this "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." (emphasis in the original)). Irreparable harm must be an actual and imminent injury—one that cannot be remedied if a court waits until a final adjudication on the merits. *See Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). Irreparable harm cannot be resolved by an award of monetary damages. *Id.*

This factor weighs heavily in favor of Individual Plaintiffs and FANM.[30]  *Ramos v. Nielsen*, a parallel case to this action involving a challenge to the decision of DHS to terminate TPS designations for Haiti, Sudan, Nicaragua, and El Salvador, is instructive here. *See* 336 F.

---

[30] Because the Court has held Haiti Liberté does not have standing in this case, the Court need not analyze irreparable harm as to this Plaintiff.

Supp. 3d 1075 (N.D. Cal. 2018).  In finding TPS beneficiaries and their children stood to suffer

irreparable harm and great hardship, the court noted the "TPS beneficiaries who have lived,

worked, and raised families in the United States . . . will be subject to removal" to countries that

may not be safe.  *Id.* at 1085.  The court also noted "those [with U.S.-born children] may be

faced with the Hobson's choice of bringing their children with them (and tearing them away

from the only country and community they have known)."  *Id.*[31]  The evidence before the Court

in this action yields similar conclusions.  Absent injunctive relief, Plaintiffs, as well as 50,000 to

60,000 Haitian TPS beneficiaries and their 30,000 U.S-citizen children, stand to suffer serious

harm.  *See* Pl. Br. at 68-69.  Haitian TPS holders are lawful U.S. residents that have become

deeply rooted in their state and local communities.  The decision to terminate Haiti's TPS

designation subjects them to removal from their homes, jobs, and communities in the United

States.  Many of them have little to no ties left in Haiti.  TPS holders will lose their work

authorization and will no longer be legally employable in the United States, causing financial

distress.  *See Batalla Vidal*, 279 F. Supp. 3d at 434 (finding irreparable harm in part where

DACA recipients stood to lose their work authorization and employer-sponsored healthcare

coverage).

---

[31] The Government's decision to terminate TPS may also harm Plaintiffs with U.S.-citizen children by depriving them of their liberty interest in family integrity.  The right not to be separated from one's immediate family is well-established.  *See Landon v. Plancencia*, 459 U.S. 21, 34 (1982) (holding plaintiff's "right to rejoin her immediate family [is] a right that ranks high among the interests of the individual); *Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." (quoting *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-640 (1974)).  To be sure, courts have held family separation resulting from legitimate immigration enforcement does not inherently violate a U.S. citizen's constitutional rights. *See, e.g., Gebhardt v. Nielsen*, 879 F.3d 980, 988 (9th Cir. 2018) (holding "a fundamental right to reside in the United States with [one's] non-citizen relatives" would "run [] headlong into Congress' plenary power over immigration.").  But here, if the decision to terminate TPS for Haiti is illegitimate and unlawful, depriving families with U.S. citizen children of their protected interest in family integrity, even if this interest alone is insufficient to overcome a legitimate government interest, may also cause irreparable harm.

Here, as in *Ramos*, those with U.S.-citizen children will confront the impossible choice of either leaving their children behind or taking their children with them to a country to which they may not be safe. *See* 336 F.3d at 1075. Confronted with these prospects, Haitian TPS holders are understandably suffering from severe emotional distress and anxiety. At trial, Plaintiffs' proffered testimony illustrating the profound hardships impacting Haitian TPS holders and organizations working on behalf of this population. For example, Rachelle Guirand, a 40-year-old TPS beneficiary, has lived in the United States since 2009 and works full time as a home health aide and certified nursing assistant and attends school part-time in pursuit of a career as a dental hygienist. Trial Tr. at 182:8-25, 183:10-22 (Guirand). She has a nine-year old son born in the United States. *Id*. at 184:1-10 (Guirand). Ms. Guirard testified she "would never imagine going to Haiti and leaving him" in the United States but does not know where she will live or how she will provide for her son in Haiti, where the need for health aides is scarce or non-existent. *Id*. at 185:15-20, 187:6-11, 189:21-25, and 190:1-2 (Guirand). Other than her father who is "an old man and struggling himself," she has no ties to family or friends in Haiti. *Id*. at 187:6-11 (Guirand). Her son requires a nebulizer and a mobile pump for his asthma, and she fears her son will suffer the same fate as her relative, who died from an "asthmatic crisis" because the hospitals in Haiti lacked the necessary materials to treat him. *Id*. at 189:13-16 (Guirand).

Plaintiffs offered similar testimony from Naischa Vilme, a 22-year-old TPS holder from Haiti. *Id*. at 167:9-12 (Vilme). Ms. Vilme entered the United States with her family in January 2010 after the earthquake. *Id*. at 168:8-17 (Vilme). She is a recent college graduate in math and psychology with hopes of obtaining a doctorate in clinical psychology but has held off applying to Ph.D programs in the United States due to the uncertainty regarding Haiti's TPS. *Id*. at 170:9-

15 (Vilme). Ms. Vilme testified she and her family intended to remain the United States until it was safe to return to Haiti. *Id.* at 169:1-2 (Vilme). The termination of Haiti's TPS has made her family "very anxious" because they "don't know how to plan their lives." *Id.* at 176:18-23 (Vilme).

The concerns shared by Ms. Guirand and Ms. Vilme are reflective of the broad anxiety in the Haitian community. According to Madeleine Bastien, the Executive Director of FANM, Haitian TPS holders in Florida, where the largest population of Haitian TPS holders reside, are experiencing "high levels of stress," increasing the need for "mental health counseling, crisis intervention, and psychosocial intervention." *Id.* at 409:22–410:1 (Bastien). With the expiration date of Haiti's TPS looming, Plaintiffs face imminent and irreparable harm.

The decision to terminate Haiti's TPS will also exacerbate social, emotional, and financial harms to FANM, a nonprofit which serves low-income families, including Haitian TPS holders, in the South Florida community. *Id.* at 382:6-10, 426:13-15 (Bastien). Since January 2017, FANM has supplemented its traditional array of wrap-around services with TPS-specific services, such as providing up-to-date information on TPS, holding bi-weekly community meetings regarding TPS, and providing psycho-social counseling for TPS holders and their children. *Id.* at 383:8-21 (Bastien). FANM does not have a dedicated source of funding for its TPS-related activities. To support the increased need to provide TPS-services, FANM draws financial resources from its "general support" fund, which is used to pay for its "[i]nfrastructure, to organize training, [and] to support staff." *Id.* 385:24–386:7 (Bastien). Terminating Haiti's TPS will put significant pressure on FANM's resources. *See generally* Pl. Br. at 266-70 (noting FANM will need to expend more time and personnel to fundraise the amount it needs to serve Haitian TPS holders, will lose essential employees, and stands to lose more than half of its

membership dues). For example, Ms. Bastien testified since January 2017, the amount of fiscal resources FANM expended on TPS-related activities have tripled. *See* Trial Tr. at 384:4-20 (Bastien).

Although Defendants do not dispute termination of TPS for Haiti may inflict deep psychological pain and impose financial hardships upon the community of Haitian TPS holders, they nevertheless argue any injuries Plaintiffs may suffer in the form of uncertainties, concerns, and stress are based inherently on the temporary nature of the TPS program. Def. Br. at 44-45. These harms, however, are not necessarily a direct result of the temporary nature of the TPS program. Rather, they stem from the government's actions in evaluating TPS status for Haiti. In *Ramos*, the court noted if "the government were to follow the APA's procedural requirements" as mandated by law, TPS beneficiaries would have additional time to work, wrap up their affairs in the United States, and prepare for their return to their countries of origin. 336 F. Supp. 3d at 1087. Even if their status is temporary, as the court reasoned, "the shortening of their time in the United States and acceleration of their removal if relief is not granted may constitute irreparable harm." *Id.*

The harms Plaintiffs identified are sufficient to demonstrate irreparable harm. Moreover, the Court cannot issue a final adjudication on the merits before Haiti's TPS designation expires, at which point the harms will materialize. On March 1, 2019, DHS announced beneficiaries under the TPS designation for Haiti will retain their TPS while the preliminary injunction order issued in *Ramos* remains in effect. Their TPS-related Employment Authorization Documents and other TPS-related documents will automatically extend through January 2, 2020, provided the affected TPS beneficiaries otherwise remain eligible individually for TPS. *See* 84 Fed. Reg. 7103, 7104 (Mar. 1, 2019). In the event the *Ramos* injunction is reversed, and that reversal

becomes final, DHS plans to allow for a transition period the "later of (a) 120 days from the effective date of such a superseding final order," or (b) July 22, 2019, the date of the termination of Haiti's TPS designation. *Id.* at 7105. Such a reversal could occur at any point after the date of this Court's decision, and Haitian TPS beneficiaries would have three months left to wrap up their affairs in the United States. Once TPS beneficiaries are removed, the Government's actions cannot be undone. Accordingly, the Court concludes in its discretion Plaintiffs will suffer imminent and actual harm absent injunctive relief.

### D. Public Interest and Balance of the Equities

Because Plaintiffs have shown both a likelihood of success on the merits and irreparable harm, it is also likely the public interest supports preliminary relief. *See Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017) ("If a plaintiff proves both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest favors preliminary relief." (internal quotation marks omitted)). Indeed, the perpetuation of unlawful agency action is not in the public interest. *See New York*, 351 F. Supp. 3d at 673 ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (internal quotation marks omitted) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also New York v. U.S. Dep't of Justice*, 343 F. Supp. 3d 213, 244 (S.D.N.Y. 2019) (Ramos, J.) (holding "[a permanent] injunction will serve the public interest in the lawful administration of government consistent with the separation of powers"). Moreover, injunctive relief would maintain the status quo pending the outcome of this litigation.

The balance of the equities also tips in Plaintiffs' favor. Of course, balanced against Plaintiffs' injuries if this Court does not issue a preliminary injunction are the Government's

injuries if this Court does. Nothing in the record suggests the continued presence of Haitian TPS beneficiaries in the United States pending review of Haiti's TPS designation would cause any concrete harm to the United States. Indeed, in its recommendation to DHS, the Department of State found permitting Haitian TPS beneficiaries to remain temporarily in the United States would not be contrary to the "national interest." *See, e.g.*, Suppl. Admin. R. at 183; *see also Ramos*, 336 F. Supp. 3d at 1087-88. Current TPS beneficiaries have lawfully lived and lawfully worked in the United States for over eight years. The Government does not dispute these individuals make valuable contributions to their state and local communities.

Nevertheless, Defendants argue "the government and public share an interest in ensuring that the process established by Congress—under which the Secretary of Homeland Security is vested with unreviewable discretion to carefully weigh the statutory factors governing TPS designations—is followed as Congress intended." Def. Br. at 45. Furthermore, in denying the Government's motion to dismiss, this Court ruled it has jurisdiction over Plaintiffs' claims. Plaintiffs challenge the process of the adjudication of Haiti's TPS—not the substance of the adjudication itself. To the extent the constitutional claims affect the ultimate determination for Haiti, they would do so based on unconstitutional considerations.

Defendants' logic is problematic because it would apply to any public injunction enjoining the execution of any agency or government policy. *See Ramos*, 336 F. Supp. 3d at 1088. "The risk of interference with government action inheres in any public injunction but does not categorically bar such injunctions." *Id.* Indeed, "the political branches' plenary power over immigration" is not immune from judicial review. *Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 175 (3d Cir. 2018). The manner of executive enforcement must adhere to the laws created by Congress and the fundamental rights protected by the Constitution. *Cf. Zadvydas v. Davis*, 533

U.S. 678, 695 (2001) ("[T]he Judicial Branch must defer to Executive and Legislative Branch decisionmaking in [immigration law]. . . . But that power is subject to important constitutional limitations." (citations omitted)).

Absent a preliminary injunction, there is a strong likelihood that Plaintiffs would suffer irreparable injury. Any harm to Defendants is strongly outweighed by the harm to Plaintiffs and their communities absent injunctive relief. The balance of hardships tips decidedly in Plaintiffs' favor. Accordingly, Plaintiffs have met their burden, and in the exercise of its discretion, this Court grants a preliminary injunction.

## SCOPE OF RELIEF

Before concluding, the Court makes one final note on the scope of the preliminary injunction. The Court enjoins the termination of Haiti's TPS on a nationwide basis.

Defendants argue any relief the Court orders should be limited to the parties before the Court. Def. Br. at 76. Defendants attempt to position this case in recent debate over granting so-called "nationwide" injunctions. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) ("[N]ationwide injunctions are beginning to take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."). *See generally* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 418 (2017); Zayn Saddique, *Nationwide Injunctions*, 117 Colum. L. Rev. 2095 (2017).

Nevertheless, the Court finds the specific facts of this case warrant a nationwide injunction. As an initial matter, district courts sitting in equity have the authority to issue nationwide injunctions. *See Lemon v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932)

(holding district court's injunction "binding . . . not simply within the District of Massachusetts, but throughout the United States"). The United States Constitution vests district courts with "the judicial Power of the United States," which "extends across the country." *See Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (quoting U.S. Const. art. III, § 1). Accordingly, district courts have the authority to issue universal relief keeping in mind the principle that such relief must be no more burdensome to defendants than necessary to provide complete relief to plaintiffs. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Here, a national injunction is warranted in this case. Plaintiffs not only include residents of New York but also individuals and a nonprofit entity based in Florida. Limiting a preliminary injunction to the parties would not adequately protect the interests of all stakeholders. Moreover, this action does not involve case-by-case enforcement of a particular policy or statute. Instead, it concerns a single decision on a nationwide policy by Acting Secretary Duke. Defendants do not suggest termination of Haiti's TPS would apply to some beneficiaries and not to others. Because the Secretary's decision had a nationwide effect—so too should any relief directed at that decision. *See, e.g.*, *New York*, 351 F. Supp. 3d at 677 (issuing a nationwide injunction to prevent the government from including a citizenship question on the 2020 census questionnaire because the "single decision about a single questionnaire" was "to be used on a single census throughout the nation"); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d, 401, 438 (E.D.N.Y. 2018) (Garaufis, J.) (enjoining rescission of the DACA program on a "nationwide" basis "[b]ecause the decision to rescind the DACA program had a systemwide impact warranting a systemwide remedy" (internal quotation marks omitted)); *see also Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 831 (E.D. Pa. 2019) ("[T]he national character of an APA violation ordinarily demands a national remedy." (internal quotations and citation omitted)). Moreover, a nationwide injunction does not intrude

on the discretion delegated to the DHS Secretary in deciding a country's TPS designation. Thus, a preliminary injunction with nationwide effect is necessary in this case.

## CONCLUSION

Accordingly, the Court concludes Plaintiffs are likely to succeed on and have raised serious questions going to the merits of their substantive APA claims and equal protection claim. Because Plaintiffs also satisfy the requirements for the Court to issue a preliminary injunction, the court **ENJOINS** Defendants from terminating TPS status for Haiti, pending a final decision on the merits of this case. The preliminary injunction shall take effect immediately and shall remain in effect pending resolution of this case on the merits or further order of this Court.

**SO ORDERED.**

s/WFK

HON. WILLIAM F. KUNTZ, II
United States District Judge

Dated: Brooklyn, New York
April 11, 2019

**Decision Document**

USCIS Notice: Extension and Redesignation of Haiti for Temporary Protected Status.

███████████████████████████████
███████████████████████████████████
██████████████████████████████████
███████████████████████████████

███████████████████████████████
████████████████████████████████
██████████████████████████
███████████████████

Modify per further instructions.    JUNE 3, 2024
CONTINUOUS RESIDENCE DATE

████████████

6-4-24    Date.



*SIGNATURE NEEDED BY DAYS/ASAP*

*SUMMARY: TPS HAITI PARTIAL VACATUR*

*TYPE OF ACTION: S1 SIGNATURE*

**ES 25-07536**

| DEPARTMENT OF HOMELAND SECURITY | STORM # | SENIOR LIAISON OFFICER: |
|---|---|---|
| **RECORD OF CLEARANCE AND APPROVAL** | **25-07536** | LAWRENCE INDYK |

| LEAD COMPONENT: OGC | DATE SUBMITTED TO FO: 02/14/25 | DRAFT RECEIVED DATE: 02/14/25 |
|---|---|---|

SUMMARY OF DOCUMENT: TPS HAITI PARTIAL VACATUR
ATTACHMENT A: DECISION DOCUMENT
ATTACHMENT B: DRAFT FEDERAL REGISTER NOTICE
ATTACHMENT C: JULY 2024 PACKAGE - TPS LEGAL AUTHORITY
ATTACHMENT D: JULY 2024 PACKAGE - USCIS COUNTRY CONDITIONS
ATTACHMENT E: JULY 2024 PACKAGE - DEPARTMENT OF STATE RECOMMENDATION & COUNTRY CONDITIONS
ATTACHMENT F: JULY 2024 PACKAGE - SIGNED DECISION DOCUMENT
ATTACHMENT G: JULY 2024 PACKAGE- PUBLISHED FEDERAL REGISTER NOTICE

| OFFICE | SIGNATURE | DATE | COMMENTS |
|---|---|---|---|
| SENIOR COUNSELOR (ROB LAW) | RL | 2/14 | CLEAR |
| SENIOR ADVISOR (JIMMY PERCIVAL) | JP | 2/14 | CLEAR |
| SENIOR ADVISOR (JOSEPH N. MAZZARA) | JM | 2/15 | CLEAR |
| JOSEPH GUY SENIOR ADVISOR | JG | 2/15 | CLEAR |
| SENIOR ADVISOR (TROUP HEMENWAY) | TH | 2/15 | CLEAR |
| SENIOR ADVISOR (TROY EDGAR) | TE | 2/15 | CLEAR |
| CHIEF ADVISOR COREY LEWANDOWSKI | *(signature)* | 2.7 | (ALSO PROVIDED VIA EMAIL) |
| S1 | *(signature)* | 2/18/25 | — |

| AFTER REVIEW RETURN TO: | TELEPHONE |
|---|---|
| ▮▮▮▮, EXECUTIVE SECRETARIAT | ▮▮▮▮ |

APPROVED FOR AUTOPEN: _____ YES _____ NO   DATE AND INITIALS FOR AUTOPEN APPROVAL: _____  ☐ ☐

9111-97

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2809-25; DHS Docket No. USCIS-2014-0001]**

**RIN 1615-ZB70**

**Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) partial vacatur.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) has decided to partially vacate the June 4, 2024 decision of former Secretary Alejandro Mayorkas regarding the extension of the designation of Haiti for Temporary Protected Status (TPS) and the new designation of Haiti for TPS.  In the 2024 action, former Secretary Mayorkas (1) again extended the designation of Haiti for TPS for the statutory maximum of 18 months (until February 3, 2026), which covered approximately 199,445 Haitian nationals; and (2) again newly designated Haiti for TPS, which had the effect of allowing approximately 321,349 additional Haitian nationals to qualify for the same 18-month period.  For the reasons described in this notice, the Secretary has determined to partially vacate the June 4, 2024 decision by reducing the designation period from 18 months to 12 months.  The Secretary is also making a corresponding change to the registration deadline for new applicants under the new designation.  Accordingly, by operation of this notice, the Haiti TPS extension and

1

new designation will expire on August 3, 2025 instead of February 3, 2026, and the first-time

registration will remain in effect until August 3, 2025 instead of February 3, 2026.

**DATES:** The partial vacatur is effective immediately.

**FOR FURTHER INFORMATION CONTACT:**  Samantha Deshommes, Chief, Regulatory

Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration

Services, Department of Homeland Security, 800-375-5283.

**SUPPLEMENTARY INFORMATION:**

## I.    Temporary Protected Status (TPS) Generally

The Immigration and Nationality Act (INA) authorizes the Secretary, after consultation

with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS

if the Secretary determines that certain country conditions exist.[1]  In the case of Haiti, the

designation was based on former Secretary Mayorkas' determination that "there exist

extraordinary and temporary conditions in [Haiti] that prevent aliens who are nationals of [Haiti]

from returning to [Haiti] in safety." Former Secretary Mayorkas, however, failed to evaluate

whether "permitting the aliens to remain temporarily in the United States" is not "contrary to the

national interest of the United States."[2]

---

[1] INA 244(b)(1), 8 U.S.C. 1254a(b)(1).  Although section 244(b)(1) of the INA continues to refer to the Attorney General, this authority now resides with the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, as amended. *See, e.g.*, 6 U.S.C. 557; 8 U.S.C. 1103(a)(1).

[2] INA 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C); *see Extension and Redesignation of Haiti for Temporary Protected Status*, 89 FR 54484 (July 1, 2024).  The Secretary also may designate a country (or part of a country) for TPS on the basis of (1) an ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals, or (2) an environmental disaster (including an epidemic) that results in a substantial, but temporary, disruption of living conditions in the affected area and certain other conditions are met. *See* INA 244(b)(1)(A)-(B), 8 U.S.C. 1254a(b)(1)(A)-(B).

2

The determination whether to designate any foreign state (or part thereof) for TPS is discretionary, and with respect to an exercise of this discretion, Congress expressly withheld jurisdiction from federal courts such that there is no judicial review of "any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS.[3]  If a country is designated, the Secretary, in the Secretary's discretion, may then grant TPS to eligible nationals of that foreign state (or individual aliens having no nationality who last habitually resided in the designated foreign state).  *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).  The INA provides that such aliens shall be granted employment authorization, and that such work authorization must be effective throughout the TPS designation period.[4]

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation.  *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A).  If the Secretary determines conditions in the foreign state continue to meet the conditions for TPS designation, the designation will be extended for 6 months or, in the Secretary's discretion, 12 or 18 months.  *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C).  If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation.  *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

---

[3] INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).

[4] *See* INA 244(a)(1)(B), (a)(2), 8 U.S.C. 1254a(a)(1)(B), (a)(2).

3

## II.    Background

Designations of Haiti for TPS based on "extraordinary and temporary conditions" in that country extend back *15 years*.  Haiti was initially designated in January 2010 on the basis of extraordinary and temporary conditions stemming from an earthquake.[5]  DHS estimated at the time that there were 100,000 to 200,000 Haitians in the United States who would be eligible.[6] Following the initial designation, DHS extended the TPS designation for Haiti and newly designated Haiti based on "extraordinary and temporary conditions" numerous times between 2011 and 2018.[7]

In January 2018, DHS announced the termination of the TPS designation of Haiti effective July 22, 2019.[8]  The termination of Haiti's TPS designation was challenged in several lawsuits, and preliminary injunctions prevented DHS from implementing the termination of TPS for Haiti pending a final court order.[9]

---

[5] *See Designation of Haiti for Temporary Protected Status*, 75 FR 3476 (Jan. 21, 2010).

[6] 75 FR at 3477.

[7] *See Extension and Redesignation of Haiti for Temporary Protected Status*, 76 FR 29000 (May 19, 2011); *Extension of the Designation of Haiti for Temporary Protected Status*, 77 FR 59943 (Oct. 1, 2012); *Extension of the Designation of Haiti for Temporary Protected Status*, 79 FR 11808 (Mar. 3, 2014); *Extension of the Designation of Haiti for Temporary Protected Status*, 80 FR 51582 (Aug. 25, 2015); *Extension of the Designation of Haiti for Temporary Protected Status*, 82 FR 23830 (May 24, 2017).

[8] *See Termination of the Designation of Haiti for Temporary Protected Status*, 83 FR 2648 (Jan. 18, 2018).

[9] *See, e.g.*, Order Granting Motion for Preliminary Injunction dated Oct. 3, 2018, ECF 128, in *Ramos v. Nielsen*, No. 18-cv-01554 (N.D. Cal.); Decision and Order dated Apr. 11, 2019, ECF 155 in *Saget v. Trump*, No. 1:18-cv-1599 (E.D.N.Y.). Both preliminary injunctions were appealed, *see Ramos v. Nielsen*, No. 18-16981 (9th Cir.) and *Saget v. Trump*, No. 19-1685 (2d Cir,), but the appellate proceedings were dismissed after Haiti was newly designated for TPS. *See* Order dated June 29, 2023, ECF 191, *Ramos v. Nielsen*, No. 18-16981 (9th Cir,); Order on parties' stipulated dismissal of appeal, dated Oct. 5, 2021, ECF 281, *Saget v. Trump*, No. 19-1685 (2d Cir.). On Dec. 28, 2023, the U.S. District Court for the Northern District of California dismissed *Ramos v. Nielsen*, No. 18-cv-01554 (N.D. Cal. Dec. 28, 2023), holding that the subsequent TPS designations rendered the litigation moot. *See* Order Granting Defendants' Motion to Dismiss dated Dec. 28, 2023, ECF 222, *Ramos v. Nielsen*, No. 18-cv-01554, (N.D. Cal.). On October 15, 2021, the U.S. District Court for the Eastern District of New York similarly dismissed the *Saget* case.  *See* Stipulation of Dismissal and Order Dismissing Case dated Oct. 15, 2021, ECF 166, *Saget v. Trump*,

4

Meanwhile, in August 2021, former Secretary Mayorkas announced that he was newly designating Haiti for 18 months on the basis of "extraordinary and temporary conditions."[10] Another 18-month extension and new designation was published in February 2023.[11]  DHS then extended the re-registration period from 60 days to 18 months.[12]

Most recently, in July 2024, DHS issued a notice stating that Secretary Mayorkas once again had determined to extend and newly designate Haiti for TPS for an 18-month period, set to expire on February 3, 2026.[13]  DHS concluded, in summary, that "Haiti is experiencing extraordinary and temporary conditions resulting from grave insecurity and gang crime, as well as socio-economic and humanitarian conditions, including those resulting from environmental disasters aggravating food insecurity."[14]  However, DHS concluded, without any support in the record, that allowing Haitian nationals who would qualify for TPS to remain in the country was not contrary to the national interest, as required by the statute.

Each new designation allowed additional Haitian nationals who entered the United States, including illegally, to qualify even though these populations were not impacted by the preceding findings of "extraordinary and temporary conditions."  In May 2011, DHS estimated that 57,000

---

No. 1:18-cv-1599 (E.D.N.Y.). The termination of TPS for Haiti was also challenged in *Centro Presente, et al., v. Biden*, No. 1:18-cv-1-340 (D. Mass.) and *Nat'l Ass'n for the Advancement of Colored People v. Dep't of Homeland Security*, No.1:18-cv-239 (D. Md.). Claims in those cases were also dismissed following the new designation of TPS for Haiti. *See* Stipulation of Dismissal dated June 29, 20203, ECF 178, *Centro Presente, et al. v. Biden*, No. 1:18-cv-1-340 (D. Mass.); Order Approving Stipulation of Dismissal dated Nov. 4, 2021, ECF 116, *NAACP v. DHS*, No.1:18-cv-239 (D. Md.).

[10] *See Designation of Haiti for Temporary Protected Status*, 86 FR 41863 (Aug. 3, 2021).

[11] *See Extension and Redesignation of Haiti for Temporary Protected Status*, 88 FR 5022 (Jan. 26, 2023).

[12] *See Extension of Re-Registration Periods for Extensions of the Temporary Protected Status Designations of El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan*, 88 FR 86665 (Dec. 14, 2023).

[13] *See Extension and Redesignation of Haiti for Temporary Protected Status*, 89 FR 54484 (July 1, 2024).

[14] 89 FR at 54491.

HT Vacatur AR_0169

Haitians were eligible to register for TPS.[15]  In August 2021, DHS estimated that 155,000 Haitians were eligible under that new designation.[16]  And by July 2024, the estimate had ballooned to 520,694 (199,445 under the extension, and 321,249 additional aliens under the new designation).[17]

Further, former Secretary Mayorkas in 2023 reconsidered and rescinded the first Trump Administration's decisions to terminate TPS designations for Honduras, El Salvador, Nicaragua, and Nepal.[18]  In the case of El Salvador, Secretary Mayorkas determined – five years after the 2018 termination decision was announced – that "at the time of the decision to terminate TPS, El Salvador continued to experience" certain conditions "that were either insufficiently considered or not considered in the termination decision" and therefore that "[t]he termination decision failed to adequately assess conditions in El Salvador in 2018."[19]  That notice stated that "[a]n agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority" and that "[t]he TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination."[20]  DHS did not similarly reconsider and rescind

---

[15] 76 FR at 29002.

[16] 86 FR at 41868.

[17] 89 FR at 54492.

[18] *See Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador*, 88 FR 40282 (June 21, 2023); *Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras*, 88 FR 40304 (June 21, 2023); *Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua*, 88 FR 40294 (June 21, 2023); *Reconsideration and Rescission of Termination of the Designation of Nepal for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nepal*, 88 FR 40317 (June 21, 2023).

[19] 88 FR at 40287.

[20] 88 FR at 40285.

6

the 2018 decision to terminate the Haiti TPS designation because, as noted, Secretary Mayorkas instead decided to newly designate Haiti.[21]

### III.    Reconsideration and Partial Vacatur of the 2024 Decision

President Trump underscored in Executive Order 14159, *Protecting the American People Against Invasion*, that enforcing the immigration laws "is critically important to the national security and public safety of the United States."[22]  In furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States.[23]  Among the directed actions are to ensure that the TPS designations are consistent with the TPS statute and "are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute."[24]

The Secretary of Homeland Security accordingly is reconsidering and partially vacating the June 4, 2024 decision of Secretary Mayorkas to extend the Haiti TPS designation and newly designate Haiti for TPS for an additional 18 months (from Aug. 4, 2024 to Feb. 3, 2026). Specifically, the Secretary has determined that the extension and designation period for Haiti should be reduced from the statutory maximum of 18 months to 12 months.  Accordingly, by operation of this notice, the Haiti TPS extension and new designation will expire on August 3, 2025 instead of February 3, 2026.

---

[21] *See Designation of Haiti for Temporary Protected Status*, 86 FR 41863 (Aug. 3, 2021).

[22] 90 FR 8443, 8443 (Jan. 20, 2025).

[23] 90 FR at 8446.

[24] *Id.*

7

The Secretary is taking this action for several reasons.  First, there is no discussion in the July 1, 2024 Federal Register notice of why the 18-month period was selected in lieu of a 6- or 12-month period.  Nor does the administrative record underlying the June 3, 2024 decision and July 1, 2024 notice bear any discussion of why the 18-month period was chosen.  Allowing aliens from a given country, including aliens who entered the United States illegally or overstayed their authorized period of admission, to remain in the United States temporarily with employment authorization is an extraordinary act.  Congress recognized the gravity of such action under the TPS statute by setting the default extension period at 6 months,[25] underscoring the uniqueness of this authority,[26] and limiting its own authority to enact legislation allowing TPS recipients to adjust to lawful permanent resident status[27]  Accordingly, determinations of how long a new designation should remain in effect and whether to depart from the default six-month period for an extension of an existing designation should take into account important considerations relating to the purpose of the statute and specific country and country conditions at issue and should not rest alone on administrative convenience.  Here, there was no explanation whatsoever of why the 18-month period was selected.

Second, and similarly, the July 1, 2024 notice is bereft of any justification of why permitting the ever-increasing population of Haitian TPS recipients, particularly those who entered the country unlawfully, to remain temporarily in the United States is not contrary to the

---

[25] *See* INA 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

[26] *See* INA 244(g), 8 U.S.C. 1254a(g) ("Except as otherwise specifically provided, this section shall constitute the exclusive authority of the [Secretary of Homeland Security] under law to permit aliens who are or may become otherwise deportable or have been paroled into the United States to remain in the United States temporarily because of their particular nationality or region of foreign state of nationality.").

[27] *See* INA 244(h), 8 U.S.C. 1254a(h).

U.S. national interest.  The notice simply states that "it is not contrary to the national interest of

the United States."  The administrative record underlying Secretary Mayorkas' June 4, 2024

decision likewise lacks any discussion of the critical national interest criterion.  Such conclusory

determinations do not accord with the gravity of TPS decisions under the INA.  "National

interest" is an expansive standard that may encompass an array of broad considerations,

including foreign policy, public safety (e.g., potential nexus to criminal gang membership),

national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement

prerogatives), and economic considerations (e.g., adverse effects on U.S. workers, impact on

U.S. communities).[28]  Determining whether permitting a class of aliens to remain temporarily in

the United States is contrary to the U.S. national interest therefore calls upon the Secretary's

expertise and discretionary judgment, informed by her consultations with appropriate U.S.

Government agencies.

Third, although the July 1, 2024 notice cites some country conditions reports that are

relatively proximate to the June 4, 2024 decision, several others date back to early 2023, 2022, or

even earlier.[29]  And certain sources upon which DHS relied indicated that significant

developments were taking place in 2024 that might result in an improvement in conditions.  For

example, as stated in the July 1, 2024 *Federal Register* notice, the United Nations had recently

---

[28] *See, e.g., Poursina v. USCIS*, 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic an national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts" (citing *Trump v. Hawaii*, 585 U.S. 667, 684-86 (2018)); *Flores v. Garland*, 72 F.4th 85, 89-90 (5th Cir. 2023) (same); *Brasil v. Sec'y, Dep't of Homeland Sec.*, 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D-J-*, 23 I&N Dec. 572, 579-81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country – in that case, Haiti – is "sound immigration policy" and an "important national security interest"); *Matter of Dhanasar*, 26 I&N Dec. 884, 890-91 (AAO 2016) (taking into account impact on U.S. workers in "national interest" assessments).

[29] *See, e.g.*, 89 FR at 54888, 54490 (relying on Apr. 2021 report by Harvard Law School, July 2022 report by the International Crisis Group, and Sept. 2021 report by the Council on Foreign Relations).

authorized a Multinational Security Support (MSS) mission to deploy in Haiti in 2024 and support the Haitian National Police in capacity building, combatting gang violence, and provide security for critical infrastructure.[30]  The Department of State likewise underscored that significant development.  Thus, both DHS and the Department of State contemplated the real possibility of an improvement in conditions with the deployment of the United Nations MSS mission, yet that important development was not expressly factored into the determination of the length of the extension and designation period.

Eighteen months is the maximum period of designation or extension authorized under the TPS statute.  Neither the 2021 new designation, the 2023 extension and new designation, nor the 2024 extension and new designation contained any discussion of national interest considerations or why the 18-month (vs. 6 or 12-month) periods were granted.  Given the protracted duration of the "extraordinary and temporary conditions"-based designation for Haiti, the absence of any meaningful appraisal of national interest factors or justification for the 18-month extension, and the fact that eligible Haitians were able to register for TPS under the July 1, 2024 notice for over seven months, the Secretary has determined that a 12-month period is warranted.  Abbreviating the period from 18 to 12 months will allow for a fresh review of country conditions in Haiti and of whether such conditions remain both "extraordinary" and "temporary," whether Haitian may return in safety, and whether it is contrary to the U.S. national interest to continue to permit the Haitian nationals to remain temporarily in the United States.

Although the statute allows the Secretary to reassess country conditions – including whether allowing the aliens to remain temporarily in the United States is contrary to the U.S.

---

[30] 89 FR at 54490 & nn. 77-79 (citing United Nations Security Council, Resolution 2699 (Oct. 2, 2023)).

national interest – at any time at least 60 days before the end of the extension or designation period, the statute does not preclude this more modest action in the interim.[31]  The Secretary intends to conduct a review of current conditions in Haiti and make a new determination in due course.

As the prior Administration concluded, the TPS statute does not limit the Secretary's inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination.[32]  The Secretary is taking the modest action here of partially vacating the June 4, 2024 decision to reduce the designation and extension period from 18 months to 12 months and to make a corresponding change to the initial registration period for new applicants under the 2024 new designation.

In taking this action, the Secretary has considered putative reliance interests in Secretary Mayorkas' unreasoned granting of the statutory maximum 18-month period.[33]  In particular, as noted, in determining that a 12-month period (vs. 6 months) is warranted, the Secretary

---

[31] *See* INA 244(b)(3)(A)-(B), 1254a(b)(3)(A)-(B) (providing that the Secretary shall review conditions at least 60 days before the end of the initial period of designation and any extended period of designation).

[32] *See* INA 103(a), 244(b)(3), (b)(5)(A); 8 U.S.C. 1103(a), 1254a(b)(3), (b)(5)(A); *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador*, 88 FR 40282, 40285 (June 21, 2023) ("An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination."); *see also, e.g., Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . "[I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide." (quotation marks and citations omitted)); *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) ("It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time."); *cf. Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) (agencies possess especially "broad authority to correct their prior errors").

[33] Because temporary protected status, as the name itself makes clear, is an inherently temporary status and TPS designations are time-limited and subject to agency review, any putative reliance interests of registrants in the Haiti under the Haiti designation merit only diminished weight.

considered that Haitians have already been able to register under the July 1, 2024 notice for over seven months.  The Secretary also considered potential reliance interests in deciding only to partially vacate the 2024 decision instead of – as Secretary Mayorkas did in 2023 – entirely rescinding or vacating the prior Administration's decision.  This action does not alter the 60-day re-registration period permitted for existing beneficiaries under the 2024 extension, which expired on August 30, 2024.  And eligible new applicants will still be able to register under the 2024 new designation, but they must now do so by August 3, 2025 instead of February 3, 2026. Moreover, any putative reliance interests arguably engendered by the 18-month, vs. 12-month, designation and extension period are outweighed by the overriding interests and concerns articulated in this notice.

### B.    Effect of the Vacatur

 As a result of the partial vacatur, the 2024 Haiti TPS extension and new designation remains in effect until August 3, 2025, and the initial registration period for new applicants under the 2024 Haiti TPS designation will remain in effect until August 3, 2025.  The Secretary, consistent with the statute, intends to review the Haiti TPS designation by June 4, 2025.  If she fails to do so, the statute triggers an automatic six-month extension of the current TPS designation.

Pursuant to this partial vacatur, TPS re-registration applications, initial applications, and associated applications for employment authorization filed pursuant to the July 1, 2024 notice that remain pending with USCIS will, if approved, receive an expiration date of August 3, 2025. TPS beneficiaries under the Haiti TPS designation who have already received EADs; Forms 1-797, Notice of Action (Approval Notice); and Forms 1-94, Arrival/Departure Record (collectively known as TPS-related documentation) with a February 3, 2026 expiration date do

12

not need to refile applications with USCIS for new TPS-related documentation showing an August 3, 2025 expiration date. USCIS will not recall TPS-related documentation previously issued with February 3, 2026 expiration dates and those documents remain valid through the new TPS Haiti designation period expiring on August 3, 2025. Additionally, USCIS will not issue new TPS-related documentation with the August 3, 2025 expiration date to aliens who have previously received documentation with the February 3, 2026 expiration date.

Employers and Federal, State, and Local Government Agencies (such as Departments of Motor Vehicles) that previously accepted or are presented with an EAD with the TPS category code of A-12 or C-19 that expires on February 3, 2026 must update their records to note that the validity date of the document is through August 3, 2025.

Aliens who have filed TPS applications pursuant to the July 1, 2024 notice that remain pending with USCIS may also choose to withdraw their TPS applications and request a refund of any filing fees by submitting a signed written withdrawal request to USCIS.

## IV.    Notice of Partial Vacatur of Secretary Mayorkas' 2024 Decision Regarding the Haiti TPS Extension and New Designation

By the authority vested in me as Secretary under sections 103(a) and 244 of the Immigration and Nationality Act, 8 U.S.C. 1103(a), 1254a, I am vacating in part the decision announced in the July 1, 2024 notice titled *Extension and Redesignation of Haiti for Temporary Protected Status*, 89 FR 54484. In doing so, I am (1) amending the period of the extension and designation of Haiti for TPS from 18 months to 12 months, with a new end date of August 3, 2025; and (2) making a corresponding change to the initial registration period for new applicants under the new designation, which now will remain in effect through August 3, 2025. This notice supersedes the July 1, 2024 notice at 89 FR 54484 to the extent modified by this partial vacatur.

13

Information concerning the TPS designation for Haiti will be available at local USCIS

offices upon publication of this notice and through the USCIS National Customer Service Center

at 1-800-375-5283.  This information will be published on the USCIS website at

www.USCIS.gov.


_____

**Kristi Noem**
Secretary,
U.S. Department of Homeland Security

14

**3476** Federal Register / Vol. 75, No. 13 / Thursday, January 21, 2010 / Notices

*Agenda:* To review and evaluate grant applications.

*Place:* Embassy Suites Hotel, 1250 22nd Street, Washington, DC 20037.

*Contact Person:* Joann Mcconnell, PhD, Scientific Review Administrator, Scientific Review Branch, NIH/NINDS/Neuroscience Center, 6001 Executive Blvd., Suite 3208, Msc 9529, Bethesda, MD 20892–9529, (301) 496–5324, *mcconnej@ninds.nih.gov.*

(Catalogue of Federal Domestic Assistance Program Nos. 93.853, Clinical Research Related to Neurological Disorders; 93.854, Biological Basis Research in the Neurosciences, National Institutes of Health, HHS)

Dated: January 14, 2010.

**Jennifer Spaeth,**
*Director, Office of Federal Advisory Committee Policy.*

[FR Doc. 2010–1053 Filed 1–20–10; 8:45 am]

**BILLING CODE 4140–01–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### National Institute on Aging; Notice of Closed Meeting

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended (5 U.S.C. App.), notice is hereby given of the following meeting.

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The contract proposals and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the contract proposals, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* National Institute on Aging Special Emphasis Panel; Clinical Services.

*Date:* January 29, 2010.

*Time:* 2 p.m. to 3 p.m.

*Agenda:* To review and evaluate contract proposals.

*Place:* National Institute on Aging, Gateway Building, 7201 Wisconsin Avenue, Suite 2C212, Bethesda, MD 20892. (Telephone Conference Call)

*Contact Person:* Ramesh Vemuri, PhD, Chief, Scientific Review Branch, National Institute on Aging, National Institutes of Health, 7201 Wisconsin Avenue, Suite 2C–212, Bethesda, MD 20892, 301–402–7700, *rv23r@nih.gov.*

This notice is being published less than 15 days prior to the meeting due to the timing limitations imposed by the review and funding cycle.

(Catalogue of Federal Domestic Assistance Program Nos. 93.866, Aging Research, National Institutes of Health, HHS)

Dated: January 14, 2010.

**Jennifer Spaeth,**
*Director, Office of Federal Advisory Committee Policy.*

[FR Doc. 2010–1051 Filed 1–20–10; 8:45 am]

**BILLING CODE 4140–01–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2491–10; DHS Docket No. USCIS]

RIN 1615–ZA96

### Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

---

**SUMMARY:** The Department of Homeland Security announces that the Secretary of Homeland Security (Secretary) has designated Haiti for temporary protected status (TPS) for a period of 18 months. Under section 244(b)(1) of the Immigration and Nationality Act, the Secretary is authorized to designate a foreign state for TPS or parts of such state upon finding that such state is experiencing ongoing armed conflict, an environmental disaster, or "extraordinary and temporary conditions." The Secretary may grant TPS to individual nationals of the designated foreign state (or to eligible aliens having no nationality who last habitually resided in such state) who have been both continuously physically present in the United States since the effective date of the designation and continually residing in the United States since a date determined by the Secretary, and who meet other eligibility criteria. TPS is available only to persons who were continuously physically present in the United States as of the effective date of the designation.

Under this designation, Haitian nationals (and aliens having no nationality who last habitually resided in Haiti) who have continuously resided in the United States since January 12, 2010, and who remain in continual physical presence in the United States from the effective date of the notice, may apply for TPS within the 180-day registration period that begins on the date of publication of the notice. These nationals may also apply for employment authorization documents and for permission to depart from and return to the United States.

This notice also sets forth procedures necessary for nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) to register and to apply for TPS and employment authorization documents with U.S. Citizenship and Immigration Services.

**DATES:** This designation of Haiti for TPS is effective on January 21, 2010, and will remain in effect through July 22, 2011. The 180-day registration period for eligible individuals to submit their TPS applications begins January 21, 2010, and will remain in effect until July 20, 2010.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS Web site at *http://www.uscis.gov.* Select "Temporary Protected Status" from the homepage under "Humanitarian." You can find detailed information about this Haitian designation on our Web site at the Haitian Questions & Answers Section.

• Applicants seeking information about the status of their individual cases can check Case Status Online available at the USCIS Web site (*http://www.uscis.gov*), or call the USCIS National Customer Service Center at 1–800–375–5283 (TTY 1–800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

### Abbreviations and Terms Used in This Document

ASC—USCIS Application Support Center
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
Government—United States Government
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration Related Unfair Employment Practices
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
USCIS—U.S. Citizenship and Immigration Services

### What Is Temporary Protected Status?

TPS is a temporary immigration status granted to eligible nationals of a country (or to persons without nationality who last habitually resided in the designated country) that the Secretary has designated for TPS because the country is experiencing an ongoing armed conflict, an environmental disaster, or extraordinary and temporary conditions. During the period for which the Secretary has designated a country for TPS, TPS beneficiaries are eligible to remain in the United States and may

HT Vacatur AR_0179

obtain work authorization, so long as they continue to meet the terms and conditions of their TPS status. The granting of TPS is available only to persons who were continuously physically present in the United States as of the effective date of this designation and does not lead to permanent resident status.

When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS (unless that status has since expired or been terminated) or to any other status they may have obtained while registered for TPS.

## What Authority Does the Secretary of Homeland Security Have To Designate Haiti for TPS?

The Immigration and Nationality Act (INA), authorizes the Secretary, after consultation with appropriate agencies of the government, to designate a foreign State (or part thereof) for TPS.[1] One of the bases for TPS designation is "there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, *unless* [she] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." INA section 244(b)(1)(C) (emphasis added); 8 U.S.C. 1254a(b)(1)(C). The Secretary has determined, after consulting with the Department of State (DOS) and other government agencies, that there exists in Haiti "extraordinary and temporary conditions," preventing Haitian nationals from returning to Haiti in safety and that permitting eligible Haitian nationals to remain temporarily in the United States would not be contrary to the national interest.

Following the designation of a country for TPS, the Secretary may grant TPS to eligible nationals of that foreign State (or aliens having no nationality who last habitually resided in that State) who have been both continuously physically present in the United States since the effective date of the notice and continually residing in the United States since a date determined by the Secretary, and who meet all other eligibility criteria. INA section 244(a)(1)(A) and (c); 8 U.S.C.

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the Immigration and Nationality Act describing functions transferred under the HSA from the Department of Justice to the Department of Homeland Security "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (2003) (codifying HSA, tit. XV, sec. 1517).

1254a(a)(1)(A) and (c). Persons convicted of any felony, or two or more misdemeanors, committed in the United States are ineligible for TPS. Applicants may also be ineligible if one of the bars to asylum eligibility applies. *Id.* at section 244(c)(2)(B)(i–ii).

## Why Is the Secretary Designating Haiti for TPS?

On January 12, 2010, Haiti was struck by a 7.0-magnitude earthquake. DHS and DOS have conducted an initial review of the conditions in Haiti following the earthquake. Based on this review, the Secretary has determined to designate Haiti for TPS for 18-months pursuant to section 244(b)(1)(C) of the INA for reasons discussed below. The Department of State concurs in the designation of Haiti for a period of 18 months.

The epicenter of the earthquake was off the coast of Haiti, and only 17 km from the capital, Port-au-Prince, an area where some three million of the nation's nine million residents reside. Aftershocks have been measured at 5.9 and 5.5 respectively, and more aftershocks are expected.

Reports indicate that the earthquake destroyed most of the capital city. Initial estimates indicate that the death toll is substantial. The International Red Cross indicates that almost three million people—one-third of Haiti's population—have been affected by the earthquake.

Reports also indicate that concrete homes have collapsed and hospitals are overflowing with victims. The Presidential Palace, the Ministry of Justice, Parliament, the tax office and other government buildings, as well as the United Nations headquarters, and the World Bank offices are among the buildings reported to be destroyed or damaged. Hospitals and schools have been destroyed. The Ministry of Public Works and the Ministry of Communication and Culture have also been damaged.

The country's critical infrastructure, including its capacity for the provision of electricity, water, and telephone services, has been severely affected. Food and water are increasingly scarce. Fuel shortages are emerging as an immediate concern.

There is limited access to the capital city. Roads are blocked by debris and other obstacles, and the collapse of the Croix de Mission Bridge has cut off a major artery between Port-au-Prince and the northern part of the country, making it more difficult to transport food, fresh water, and medical supplies. Haiti's main airport in Port-au-Prince, Toussaint L'Ouverture International

Airport, also has suffered significant damage that is hindering access to the country.

Haiti has limited resources to cope with a natural disaster, and now has been struck by its strongest earthquake in 200 years. Although a number of organizations and countries have pledged humanitarian aid, the magnitude of the disaster is substantial.

Given the size of the destruction and humanitarian challenges, there clearly exist extraordinary and temporary conditions preventing Haitian nationals from returning to Haiti in safety. Moreover, allowing eligible Haitian nationals to remain temporarily in the United States, as an important complement to the U.S. government's wider disaster relief and humanitarian aide response underway on the ground in Haiti, would not be contrary to the public interest.

DHS estimates that there are 100,000 to 200,000 nationals of Haiti (or otherwise eligible aliens having no nationality who last habitually resided in Haiti) who are eligible for TPS under this designation.

## Designation of Haiti for TPS

Based upon these unique, specific, and extreme factors, the Secretary has determined, after consultation with the appropriate Government agencies, that there exist extraordinary and temporary conditions in Haiti preventing aliens who are nationals of Haiti from returning to Haiti in safety. The Secretary further finds that it is not contrary to the national interest of the United States to permit Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) who meet the eligibility requirements of TPS to remain in the United States temporarily. *See* INA section 244(b)(1)(C); 8 U.S.C. 1254a(b)(1)(C). On the basis of these findings and determinations, the Secretary concludes that Haiti should be designated for TPS for an 18-month period. *See* INA section 244(b)(2)(B); 8 U.S.C. 1254a(b)(2)(B).

Nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who have been "continuously physically present" in the United States since January 21, 2010 and have "continuously resided" in the United States since January 12, 2010, may apply for TPS within the registration period that begins on January 21, 2010 and ends on July 20, 2010. Except as specifically provided in this notice, applications for TPS by nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) must be filed pursuant to the

provisions of 8 CFR part 244. Aliens who wish to apply for TPS must file an Application for Temporary Protected Status, Form I–821, together with an Application for Employment Authorization, Form I–765, in accordance with the form's instructions and applicable regulations during the registration period.

**Janet Napolitano,**
*Secretary.*

## Required Application Forms and Application Fees To Register for TPS

To register for TPS, an applicant must submit two applications:

1. Form I–821, Application for Temporary Protected Status, and pay the Form I–821 application fee, which is $50. If you are unable to pay the fee, you may submit a fee waiver request with appropriate documentation.

2. Form I–765, Application for Employment Authorization.

• If you want an employment authorization document (EAD), you must pay the Form I–765 application fee, which is $340, or submit a fee waiver request.

• However, if you are filing an initial TPS registration and you are under the age of 14 or above the age of 65, you do not pay the Form I–765 fee to obtain an EAD.

• If you are not requesting an EAD, you do not pay the Form I–765 fee.

3. Individuals who may apply for TPS pursuant to this notice and who are in removal proceedings will be provided an opportunity to apply in accordance with 8 CFR 244.7(d).

You must submit both applications together. For more information on the application forms and application fees for TPS, please visit the USCIS Web site at *http://www.uscis.gov*.

## Biometric Services Fee

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee of $80. If you are unable to pay the fee, you may submit a fee waiver request with appropriate documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov*.

## Mailing Information

Mail your application for TPS to the proper address in Table 3:

### TABLE 3—MAILING ADDRESSES

| Residence | Filing location |
|---|---|
| If you live in the state of Florida ............................................................ | US Postal Service: USCIS, PO Box 4464, Chicago, IL 60680–4464. For Express mail and courier deliveries: USCIS, Attn: Haiti TPS, 131 South Dearborn, 3rd Floor, Chicago, IL 60603–5520. |
| If you live in the state of New York ....................................................... | US Postal Service: USCIS, PO Box 660167, Dallas, TX 75266–0167. For Express mail and courier deliveries: USCIS, Attn: Haiti TPS, 2501 S. State Hwy. 121 Business, Suite 400, Lewisville, TX 75067. |
| All other .................................................................................................. | US Postal Service: USCIS, PO Box 24047, Phoenix, AZ 85074–4047. For Express mail and courier deliveries: USCIS, Attn: Haiti TPS, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034. |

## E-Filing

You cannot E-file your application when applying for initial registration for TPS. Please mail your application to the mailing address listed in Table 3 above.

## Supporting Documents

*What type of basic supporting documentation must I submit?*

To meet the basic eligibility requirements for TPS, you must submit evidence that you:

• Are a national of Haiti or an alien of no nationality who last habitually resided in Haiti (such as a copy of your passport, birth certificate with English translation, etc.);

• Continually resided in the United States since January 12, 2010 (see 8 CFR 244.9(a)(2));

• Have been continually physically present in the United States since January 21, 2010; and

• Two color passport-style photographs of yourself.

The filing instructions on Form I–821, Application for Temporary Protected Status, list all the documents needed to establish basic eligibility for TPS.

*Do I need to submit additional supporting documentation?*

If one or more of the questions listed in Part 4, Question 2 of the Form I–821 applies to you, then you must submit an explanation on a separate sheet(s) of paper, and/or additional documentation. Depending on the nature of the question(s) you are addressing, additional documentation alone may suffice, but usually a written explanation will also be needed.

## Employment Authorization Document (EAD)

*May I request an interim EAD at my local USCIS office?*

No. USCIS will not issue interim EADs to TPS applicants at USCIS local offices.

*What documents may a qualified individual show to his or her employer as proof of employment authorization and identity when completing Form I–9, Employment Eligibility Verification?*

TPS beneficiaries under the designation of Haiti who have timely registered with USCIS as directed under this Notice and obtained an EAD, may present their valid EAD to their employers as proof of employment authorization and identity. Employers may not accept EADs that are no longer valid.

Individuals may also present any other legally acceptable document or combination of documents listed on the Form I–9 as proof of identity and employment eligibility.

## Note to Employers

Employers are reminded that the laws requiring employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth re-verification requirements. For questions, employers may call the USCIS Customer Assistance Office at 1–800–357–2099. Employers may also call the U.S. Department of Justice Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) Employer Hotline at 1–800–255–8155.

## Note to Employees

Employees or applicants may call the OSC Employee Hotline at 1–800–255–7688 for information. Additional information is available on the OSC

Web site at *http://www.justice.gov/crt/osc/index.php.*

[FR Doc. 2010–1169 Filed 1–20–10; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–5364–N–01]**

### Mortgagee Review Board: Administrative Actions

**AGENCY:** Office of the Assistant Secretary for Housing-Federal Housing Commissioner, Department of Housing and Urban Development (HUD).

**ACTION:** Notice.

**SUMMARY:** In compliance with Section 202(c) of the National Housing Act, this notice advises of the cause and description of administrative actions taken by HUD's Mortgagee Review Board against HUD-approved mortgagees.

**FOR FURTHER INFORMATION CONTACT:** Julie Shaffer, Acting Secretary to the Mortgagee Review Board, 451 Seventh Street, SW., Room 3150, Washington, DC 20410–8000; telephone: (215) 861–7216. A Telecommunications Device for Hearing- and Speech-Impaired Individuals (TTY) is available at (800) 877–8339 (Federal Information Relay Service).

**SUPPLEMENTARY INFORMATION:** Section 202(c)(5) of the National Housing Act (added by Section 142 of the Department of Housing and Urban Development Reform Act of 1989, Pub. L. 101–235, approved December 15, 1989), requires that HUD "publish a description of and the cause for administrative action against a HUD-approved mortgagee" by the Department's Mortgagee Review Board (Board). In compliance with the requirements of Section 202(c)(5), this notice advises of actions that have been taken by the Board from July 10, 2008 to August 4, 2009.

### I. Settlement Agreements, Civil Money Penalties, Withdrawal of FHA Approval, Suspensions, Probations, Reinstatement and Reprimand

*1. Ascella Mortgage, LLC, Manchester, CT [Docket No. 09–9610–MR]*

*Action:* On August 4, 2009, the Board voted to immediately withdraw Ascella Mortgage LLC's (Ascella) FHA approval for a period of one year.

*Cause:* The Board took this action based on the following violation of HUD/FHA requirements alleged by HUD: Ascella failed to notify HUD that

it voluntarily surrendered its license to originate mortgages.

*2. Americare Investment Group, Inc. d/b/a/Premiere Capital Lending, Arlington, TX [Docket No. 08–8082–MR]*

*Action:* On October 8, 2009, the Board entered into a settlement with Americare Investment Group, Inc's., d/b/a Premiere Capital Lending (Americare) requiring, without the admission of fault or liability, the payment of a civil money penalty of $124,000 and placing Americare on probation for a period of six months. During the period of probation, Americare will be required to obtain and provide to HUD post-closing reviews on all construction-to-permanent loans closed during the period.

*Cause:* The Board took this action based on the following violations of HUD/FHA requirements alleged by HUD: (1) Failing to include required loan documents and information and (2) failing to ensure that the maximum mortgage amount was properly calculated, resulting in over-insured mortgages.

*3. Beneficial Mortgage Corp., San Juan, PR [Docket No. 09–9626–MR]*

*Action:* On June 3, 2009, the Board immediately suspended Beneficial Mortgage's (Beneficial) FHA approval pending the outcome of a HUD review and any ensuing legal proceedings.

*Cause:* The Board took this action based on the following violation of HUD/FHA requirements alleged by HUD: Beneficial failed to notify HUD of a business change affecting the information upon which Beneficial was originally approved. Specifically, Beneficial failed to notify HUD that it was the subject of an investigation by the Puerto Rico Financial Institutions Commissioner's Office.

*4. Community Home Lending, Inc., Birmingham, AL [Docket No. 09–8041–MR]*

*Action:* On July 1, 2009, the Board entered into a settlement agreement with Community Home Lending, Inc.'s (Community) requiring Community to pay a civil money penalty in the amount of $11,500 without admitting fault or liability.

*Cause:* The Board took this action based on the following violations of HUD/FHA requirements alleged by HUD: Community violated third party origination restrictions by allowing non-employees to originate FHA-insured mortgages; allowed an employee to originate FHA-insured mortgages and simultaneously work in the fields of

property management and real estate; failed to maintain a quality control (QC) plan conforming to all HUD/FHA requirements, including allowing its reviews to be conducted by a loan officer; and failing to conduct QC reviews in 15 early default cases.

*5. Eagle Nationwide Mortgage Company, Chadds Ford, PA [Docket No. 09–9003–MR]*

*Action:* On July 29, 2009, the Board entered into a settlement agreement with Eagle Nationwide Mortgage Company's (Eagle) requiring Eagle to pay a $3,500 civil money penalty without admitting fault or liability.

*Cause:* The Board took this action based on the following violations of HUD/FHA requirements alleged by HUD: Eagle distributed a direct mail solicitation which improperly used the name of the Federal Housing Administration, thereby implying FHA endorsement of Eagle's programs. Additionally, the text of the advertisement implied that Eagle employed FHA personnel.

*6. Golden First Mortgage Corp., Great Neck, New York [Docket No. 09–9625–MR]*

*Action:* On June 3, 2009, the Board immediately suspended Golden First Mortgage's (Golden First) FHA approval pending the outcome of the Office of Inspector General's investigation and any ensuing legal proceedings.

*Cause:* The Board took this action based on the following violations of HUD/FHA requirements alleged by HUD: Golden First failed to notify HUD of a business change affecting the information upon which Golden First was originally approved. Specifically, Golden First Mortgage failed to notify HUD that its president was under investigation by the Office of Thrift Supervision, U.S. Department of Treasury, and was a party to a civil money penalty proceeding.

*7. Great Country Mortgage Bankers, Corp., Coral Gables, FL [Docket No. 09–9618–MR]*

*Action:* On June 3, 2009, the Board immediately suspended Great Country Mortgage Bankers Corporation's (Great Country) FHA approval pending the outcome of a HUD review and any ensuing legal proceedings.

*Cause:* The Board took this action based on the following violations of HUD/FHA requirements alleged by HUD: Great Country failed to implement a QC plan in compliance with HUD/FHA requirements by failing to conduct QC reviews on loans defaulting within six months of origination; failed to

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2693–21; DHS Docket No. USCIS–2014–0001]

RIN 1615–ZB70

## Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) designation.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is designating Haiti for Temporary Protected Status (TPS) for 18 months, effective August 3, 2021, through February 3, 2023. This designation allows eligible Haitian nationals (and individuals having no nationality who last habitually resided in Haiti) who have continuously resided in the United States since July 29, 2021, and who have been continuously physically present in the United States since August 3, 2021 to apply for TPS. TPS beneficiaries whose TPS has been continued pursuant to court orders, as described in 85 FR 79208 (Dec. 9, 2020) should newly apply for TPS following the instructions in this Notice.

**DATES:** *Designation of Haiti for TPS:* The 18-month designation of Haiti for TPS is effective on August 3, 2021 and will remain in effect for 18 months, through February 3, 2023. The registration period for eligible individuals to submit TPS applications begins August 3, 2021, and will remain in effect through February 3, 2023.

**FOR FURTHER INFORMATION CONTACT:** You may contact Andria Strano, Acting Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**ADDRESSES:** For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *uscis.gov/tps.* You can find specific information about Haiti's TPS designation by selecting ''Haiti'' from the menu on the left side of the TPS web page.

If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *uscis.gov/contactcenter.*

Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice Civil, Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Purpose of This Action (TPS)

Through this Notice, DHS sets forth procedures for beneficiaries whose TPS has been continued pursuant to court orders, as described in 85 FR 79208 (Dec. 9, 2020), to newly apply for TPS.[1] This Notice also sets

forth procedures for other eligible nationals of Haiti (or individuals having no nationality who last habitually resided in Haiti) to submit an initial registration application under the designation of Haiti for TPS and apply for an EAD. Under the designation, individuals may submit an initial Application for Temporary Protected Status (Form I–821), and they may also submit an Application for Employment Authorization (Form I–765) during the registration period that runs from August 3, 2021 through February 3, 2023. Under section 244(b)(1)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. 1254a(b)(1)(C), the Secretary is authorized to designate a foreign state (or any part thereof) for TPS upon finding that extraordinary and temporary conditions in the foreign state prevent its nationals from returning safely, unless permitting the foreign state's nationals to remain temporarily in the United States is contrary to the national interest of the United States.

In addition to demonstrating continuous residence in the United States since July 29, 2021, and meeting other eligibility criteria, applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since August 3, 2021, the effective date of this designation of Haiti, for USCIS to grant them TPS. USCIS estimates that approximately 155,000 individuals are eligible to apply for TPS under the designation of Haiti.[2]

---

[1] Since its first litigation compliance **Federal Register** notice, DHS has repeatedly emphasized and reserved its statutory authority to conduct re-registration of beneficiaries, including those under the Haiti TPS designation, whose TPS is presently continued under the preliminary injunctions issued in *Ramos, et al.* v. *Nielsen, et. al.,* No. 18–cv–01554 (N.D. Cal. Oct. 3, 2018) (''*Ramos*''), *on appeal* 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18–16981); *Saget, et. al.,* v. *Trump, et. al.,* No. 18–cv–1599 (E.D.N.Y.

Apr. 11, 2019) (''*Saget*'') *appeal filed,* No. 19–1685 (2d Cir.); and *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (''*Bhattarai*''). *See* 85 FR at 79209–10; 84 FR 59403, 59406(Nov. 4, 2019); 84 FR 7103, 7105 (March 1, 2019); 84 FR 45764, 45765–66 (Oct. 31, 2018). See also *infra* for discussion of these lawsuits.

[2] In general, individuals must be given an initial registration period of no less than 180 days to register for TPS, but the Secretary has discretion to provide for a longer registration period. *See* 8 U.S.C. 1254a(c)(1)(A)(iv). Historically, the length of the initial registration period has varied. *Compare* 66 FR 14214 (March 9, 2001) (18 month initial registration period during extension and redesignation of South Sudan for TPS); 78 FR 1866 (Jan. 9, 2013) (setting 180-day initial registration period during extension and redesignation of Sudan for TPS); 75 FR 39957 (July 13, 2010) (extension of previously announced initial 180-day registration period for Haiti TPS applicants to allow more time for individuals to apply). After evaluating whether to limit the initial registration period for TPS under this new designation of Haiti to the statutory

Continued

**41864**    **Federal Register** / Vol. 86, No. 146 / Tuesday, August 3, 2021 / Notices

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

## Is Haiti's previous designation for TPS still in effect?

On January 21, 2010, former Secretary of Homeland Security Janet Napolitano designated Haiti for TPS under INA section 244(b)(1)(C) based on extraordinary and temporary conditions within the country, specifically the effects of the 7.0-magnitude earthquake that occurred on January 12, 2010.[3] In 2011, Haiti's designation was extended, and Haiti was also redesignated for TPS at the same time, expanding the number of Haitians in the United States eligible for TPS.[4] Haiti's designation was subsequently extended[5] several additional times before the termination was announced on January 18, 2018.[6]

The termination of Haiti's TPS designation is being challenged in several separate lawsuits, and court injunctions currently require DHS to continue TPS temporarily for Haiti pending further court order.[7] There are approximately 55,000 beneficiaries under the TPS designation for Haiti that the courts have continued and whose TPS-related documentation is automatically extended at least through October 4, 2021, in compliance with the court orders, unless a beneficiary's TPS is withdrawn for individual ineligibility.[8] Beneficiaries under the TPS designation for Haiti that continues under the *Ramos* and *Saget* preliminary injunctions who maintain individual eligibility for TPS will maintain their status as long as the injunctions remain in effect and in accordance with the compliance notice that DHS published on December 9, 2020, unless superseded by future court orders or compliance notices.[9] The continuation of the 2011 designation of

Haiti required by the preliminary injunctions is not a statutory "extension" of the designation determined by the Secretary as described in section 244(b)(3)(C) of the INA. Individuals with existing TPS who are covered by those injunctions should newly apply for TPS under this designation. This will help ensure that eligible individuals maintain TPS under this new designation of Haiti even if the injunctions cease to be in effect. An estimated additional 100,000 nationals of Haiti (and individuals having no nationality who last habitually resided in Haiti), regardless of their country of birth, will become eligible for TPS under this new designation, for an estimated total of 155,000 individuals who could potentially apply or re-apply for TPS under the new TPS designation.

## Why was Haiti newly designated for TPS?

DHS and the Department of State (DOS) have reviewed conditions in Haiti. Based on this review and after consulting with DOS, the Secretary has determined that an 18-month designation is warranted because of extraordinary and temporary conditions described below.

### Overview

Haiti is grappling with a deteriorating political crisis, violence, and a staggering increase in human rights abuses.[10] Within this context, as noted by the United Nations Children's Fund (UNICEF), Haiti faces the challenges of "rising food insecurity and malnutrition, [. . .] waterborne disease epidemics, and high vulnerability to natural hazards, all of which have been further exacerbated by the coronavirus disease 2019 (COVID–19) pandemic." [11]

### Context

Haiti is a constitutional republic with a multiparty political system. The most recent national legislative elections were held in November 2016. Jovenel Moïse was elected as president for a 5-year term and took office in February 2017. Due to political gridlock and the failure of parliament to approve an elections law and a national budget,

---

minimum of 180 days, DHS has determined that it will provide the full 18 months of this designation for applicants to file their initial registration Form I–821 and, if desired, Form I–765 to obtain employment authorization documentation. Limiting the initial registration period to 180 days may place a burden on applicants who are unable to timely file but would otherwise be eligible for a grant of TPS. In addition, permitting registration throughout the entirety of the designation period could reduce the operational burden on USCIS, as incoming applications may be spread out over a longer period of time. This extended registration period is both in keeping with the humanitarian purpose of TPS and will better advance the goal of ensuring "the Federal Government eliminates . . . barriers that prevent immigrants from accessing government services available to them." *See Executive Order 14012, Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans,* 86 FR 8277 (Feb. 5, 2021).

[3] See Designation of Haiti for Temporary Protected Status, 75 FR 3476 (Jan. 21, 2010).

[4] See Extension and Redesignation of Haiti for Temporary Protected Status, 76 FR 29000 (May 19, 2011).

[5] See Extension of the Designation of Haiti for Temporary Protected Status, 77 FR 59943 (Oct. 1, 2012), Extension of the Designation of Haiti for Temporary Protected Status, 79 FR 11808 (March 3, 2014); Extension of the Designation of Haiti for Temporary Protected Status, 80 FR 51582 (Aug 25, 2015); Extension of the Designation of Haiti for Temporary Protected Status, 82 FR 23830 (May 24, 2017).

[6] See Termination of the Designation of Haiti for Temporary Protected Status, 83 FR 2648 (January 18, 2018).

[7] See *Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18–16981)(district court's preliminary injunction against termination of four countries' TPS, including TPS for Haiti remains in effect pending 9th Circuit consideration of plaintiffs' request for en banc rehearing of appellate panel decision to vacate the district court injunction); *Saget* v. *Trump,* No. 1:18–cv–1599 (E.D.N.Y.) (preliminary injunction against termination of Haiti's TPS), *appeal filed,* No. 19–1685 (2d Cir.); *NAACP* v. *DHS,* No. 18–cv–00239 (D. Md.); and *Centro Presente* v. *Trump,* No. 18–cv–10340 (D. Mass).

[8] TPS-related documentation includes certain Employment Authorization Documents (EADs); Notices of Action (Forms I–797); and Arrival/Departure Records (Forms I–94) as described in Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 85 FR 79208, (Dec. 9, 2020). If necessary, DHS will publish subsequent notices to ensure its continued compliance with court orders that may remain in effect beyond October 4, 2021.

[9] Id.

[10] See *e.g.,* Charles, Jacqueline, "Haitian Journalists Injured as Nation Plunges Deeper into Turmoil Amid Constitutional Crisis," Miami Herald, Feb. 10, 2021, *https://www.miamiherald.com/news/nation-world/world/americas/haiti/article249163765.html* and "A Cycle of Instability': Haiti's Constitutional Crisis," CSIS, Feb. 8, 2021, *https://www.csis.org/analysis/cycle-instability-haitis-constitutional-crisis.*

[11] "Humanitarian Action for Children: Haiti," United Nations Children's Fund (UNICEF), 2021, *https://www.unicef.org/media/87006/file/2021-HAC-Haiti.pdf.*

parliamentary elections scheduled for October 2019 did not take place. In January 2020, parliament lapsed, leaving only 10 senators and no deputies remaining in office, and on February 7, 2020, President Moïse began to rule by decree, without a legislative body.[12]

In March 2020, President Moïse appointed Joseph Jouthe as prime minister to head a new government. The president subsequently reappointed or replaced all elected mayors throughout the country when their terms ended in July 2020. As of November 2020, the president was the sole nationally elected leader empowered to act, as the 10 senators remaining in office were unable to conduct legislative activities due to a lack of quorum.[13]

President Moïse used executive decrees to schedule a vote on a new constitution June 27, 2021, and then elections for a new president and legislature on September 19, 2021. However, these moves were met with criticism from opposition parties who feared that these actions may allow President Moïse's party to retain power indefinitely.[14] Further, the international community has expressed the need to address election-related security, transparency and logistical issues so voting can take place. For example, on March 24, 2021, the U.N. Security Council underscored the need for Haiti to address "essential security, transparency and logistical considerations and also reiterated the urgent need to hold free, fair, transparent and credible legislative elections, overdue since October 2019." [15] On May 24, 2021, U.S. Ambassador to the United Nations Linda Thomas-Greenfield met with President Moïse and conveyed deep concern regarding Haiti's ongoing political impasse, a lack of accountability for human rights violations, and deteriorating security conditions. Ambassador Thomas-Greenfield noted that to date, preparations for the constitutional referendum scheduled for June 27, 2021,

had not been sufficiently transparent or inclusive, and reiterated that Haiti must hold free, fair, and transparent legislative and presidential elections in 2021.[16]

*Human Rights Violations and Abuses*

President Moïse became increasingly authoritarian through reliance on executive decrees to accomplish his agenda, including the creation of an intelligence agency accountable only to the president.[17] The Human Rights Component of the United Nations Integrated Office in Haiti and the Office of the High Commissioner for Human Rights reported a staggering 333% increase in the number of human rights violations and abuses by law enforcement officials and non-state actors, respectively, against the rights to life and security of person in the period between July 2018 and December 2019.[18] The *Miami Herald* has reported "an atmosphere of heightened tension between the government and the press," citing as an example a February 2021 attack against journalists who were covering protests.[19] Also, on February 8, 2021 Moïse dismissed three Supreme Court judges who had been approached by the opposition as possible interim leaders to replace Moïse and head a transitional government.[20] In response to these events, the U.S. Embassy in Haiti issued a statement expressing concerns about "any actions that risk damaging Haiti's democratic institutions." [21] On March 24, 2021, the United Nations Security Council noted "with concern reported violations and

abuses of international human rights, including some involving the alleged use of deadly force against protesters and reported arbitrary arrests and detentions" and called on the Government to respect the freedoms of expression and association. It also called on the Inspector General of the Haitian National Police to conduct a thorough investigation of the reported incidents.[22]

*Serious Security Concerns*

Violent criminal gangs pose a growing challenge to state authority, including de facto control of territory. From 2019–2021 a new federation emerged, uniting urban criminal gangs that control entire neighborhoods in the capital city of Port-au-Prince.[23] DOS's Overseas Security Advisory Council (OSAC) reported in 2020 that gang activity was also on the rise outside of Port-au-Prince, and noting that the last weeks in November 2020 were particularly dangerous, with 14 kidnappings reported at that time.[24] In January 2021, a leading Haitian human rights organization, the Center for the Analysis and Research of Human Rights (CARDH), stated in its 2020 annual report that over a third of Haiti's voters now live in areas controlled by criminal gangs.[25] In January of 2021 the U.S. Agency for International Development (USAID) said, "Security conditions have deteriorated in Port-au-Prince since late November [2020] due to an increase in kidnappings and political protests." [26]

In March 2021, the UN Security Council expressed its deep concern regarding the protracted political, constitutional, humanitarian, and security crises in Haiti.[27]

On April 21, 2021, DOS issued a Level 4 Travel Advisory for Haiti, advising travelers not to visit Haiti because of kidnapping, crime, and civil

---

[12] "2020 Country Reports on Human Rights Practices: Haiti," United States Department of State, March 30, 2021, *https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/haiti/*.

[13] Id.

[14] See e.g., Andre Paultre and Sarah Marsh "The battle for democracy goes on in Haiti as Moïse gains power," The Christian Science Monitor, March 30, 2021, *https://www.csmonitor.com/World/Americas/2021/0330/The-battle-for-democracy-goes-on-in-Haiti-as-Moise-gains-power*.

[15] Security Council Presidential Statement Expresses Deep Concern over Multiple Crises in Haiti, Stressing Government's Primary Duty to Tackle Instability, United Nations Security Council Press Release, March 24, 2021

[16] "Readout of a Meeting Between Ambassador Linda Thomas-Greenfield and Haiti's President Jovenel Moïse," United States Mission to the United Nations, May 24, 2021.

[17] Andre Paultre and Sarah Marsh "The battle for democracy goes on in Haiti as Moïse gains power," The Christian Science Monitor, March 30, 2021, *https://www.csmonitor.com/World/Americas/2021/0330/The-battle-for-democracy-goes-on-in-Haiti-as-Moise-gains-power*.

[18] Unrest in Haiti: Their Impact on Human Rights and the State's Obligation to Protect all Citizens, United Nations Office of the High Commissioner for Human Rights/United National Integrated Office in Haiti, Jan. 18, 2021, *https://binuh.unmissions.org/en/unrest-haiti-their-impact-human-rights-and-state%E2%80%99s-obligation-protect-all-citizens-0*.

[19] Charles, Jacqueline, "Haitian Journalists Injured as Nation Plunges Deeper into Turmoil Amid Constitutional Crisis," Miami Herald, Feb. 10, 2021, *https://www.miamiherald.com/news/nation-world/world/americas/haiti/article249163765.html*.

[20] Paultre, Andre, "Haitian Protesters, Police Clash After President Moves Against Top Judges," Reuters, Feb. 10, 2021, *https://www.reuters.com/article/us-haiti-politics/haitian-protesters-police-clash-after-president-moves-against-top-judges-idUSKBN2AA2X6*.

[21] U.S. Embassy Statement on February 9, 2021, U.S. Embassy in Haiti, Feb. 9, 2021, *https://ht.usembassy.gov/u-s-embassy-statement-on-february-9-2021/*.

[22] Statement by the President of the Security Council, United Nations Security Council, March 24, 2021.

[23] See e.g., "4 Police Die in Raid on Haiti Gang Stronghold", Voice of America, March 13, 2021 ("Criminal networks exercise total control over several poor, densely populated neighborhoods of the capital, creating no-go zones where they hold kidnap victims.")

[24] Haiti 2020 Crime and Safety Report, Overseas Security Advisory Council (OSAC), U.S. Department of State, Apr. 29, 2020, and December 17, 2020, *https://www.osac.gov/Content/Report/09752c66-7cac-47f7-a92e-188fe7af0f75*.

[25] See *https://cardh.org/archives/1519*.

[26] Haiti—Complex Emergency Fact Sheet #1, Fiscal Year 2021, U.S. Agency for International Development (USAID), Jan. 19, 2021, *https://reliefweb.int/report/haiti/haiti-complex-emergency-fact-sheet-1-fiscal-year-fy-2021*.

[27] Statement by the President of the Security Council on Haiti, March 24, 2021.

unrest.[28] Media outlets characterized Haiti as suffering from "escalating violence," including kidnappings and homicides,[29] and a "public security free fall." [30] In early April 2021, *Agence France-Presse* reported that "Kidnappings for ransom have surged in recent months in Port-au-Prince and other provinces, reflecting the growing influence of armed gangs." [31] The *Miami Herald* reported that "Reports of kidnappings in Haiti continue to make headlines on a near daily basis, drawing alarm from international allies and humanitarian groups," [32] while the *Associated Press* noted that kidnapping "has become so common that radio stations often broadcast pleas for help." [33] On April 11, 2021, 10 individuals were kidnapped in the town of Croix-des-Bouquets—including seven members of the Catholic clergy.[34] In response, the Archdiocese of Port-au-Prince issued a statement warning that the country "is facing a 'descent into hell'" and criticizing the Haitian government for its inaction.[35] In mid-April 2021, rising levels of violence led schools, businesses, and banks across Haiti to close in protest.[36]

In an April 2021 report by Harvard Law School's International Human Rights Clinic and a consortium of Haitian civil society organizations, the authors describe complicity of state officials and police in gang attacks that left hundreds of people dead. [37] The report's authors asserted that the government has helped to unleash criminal violence on poor neighborhoods, including by providing gangs with money, weapons, police uniforms, and government vehicles and that such support has encouraged the gangs to grow to the point where they can no longer be reined in, allowing criminality to explode. According to the report, the United Nations warned that a lack of accountability contributed to an increase in gang attacks throughout 2020, including attacks on Cité Soleil, where police resources were reportedly used on multiple occasions.

In early April 2021, the *Miami Herald* reported on increasing violence on public transportation in Haiti, noting, "Already driven to despair in Haiti by brutal poverty and a paralyzing political crisis, bus drivers and commuters are now having to grapple with surging violence on the country's public transportation. Robberies and kidnappings have become a daily reality as buses get intercepted by armed gangs controlling access to large swaths of the country." [38]

On June 10, 2021, the United Nations Office for the Coordination of Humanitarian Affairs (OCHA) reported an upsurge in deadly clashes between gangs in Port-au-Prince displaced more than 5,000 people since the beginning of June.[39] According to OCHA, the displacement brings the overall number to some 10,000 residents who have been displaced in the past 12 months due to similar incidents.[40] Starting June 24, 2021, multiple news organizations reported one of Haiti's most powerful gang leaders warned that he was launching a "revolution" against the country's business and political elites, signaling a likely further escalation of

violence in Haiti.[41] On July 7, 2021 a group of assailants attacked President Möise's residence and killed him. No one has claimed responsibility for the assassination.

*Economic Situation*

According to the World Bank, Haiti's economic and social development continue to be hindered by political instability, governance issues, and fragility. With a Gross Domestic Product (GDP) per capita of US$1,149.50 and a Human Development Index ranking of 170 out of 189 countries in 2020, Haiti remains the poorest country in the Latin America and Caribbean region and among the poorest countries in the world.[42] The World Bank further reports that even before the COVID–19 pandemic, the economy was contracting and facing significant fiscal imbalances. Following a contraction of 1.7% percent in 2019 in the context of the political turmoil and social discontent, GDP contracted by an estimated 3.8% in 2020, as the COVID–19 pandemic exacerbated the already weak economy and political instability.[43] It further reports that past marginal gains in poverty reduction have been undone by these recent shocks, with current estimates pointing to a poverty rate of nearly 60% in 2020 compared to the last official national estimate of 58.5% in 2012. About two thirds of the poor live in rural areas. The welfare gap between urban and rural areas is largely due to adverse conditions for agricultural production.[44] The Congressional Research Service (CRS) reported in March 2020 that "Public frustration with economic woes has contributed greatly to ongoing demonstrations, some of which have become violent." [45] Protests have been spurred in part by the elimination of fuel subsidies in 2018 and subsequent increases in fuel prices.[46] In late 2019, protests in response to rising fuel costs precipitated

---

[28] Haiti Travel Advisory, U.S. Department of State, Apr. 21, 2021, *https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html*.

[29] Sanon, Evens, and Coto, Dánica, "Surge in violence rattles Haiti as poverty, fear deepens," The Associated Press, Apr. 16, 2021, *https://apnews.com/article/port-au-prince-kidnapping-violence-poverty-haiti-06ba2725c9639a532a69ac3c6645d916*.

[30] Tim Padgett, "Haitian Prime Minister Resigns As Economic And Public Security Collapse Deepens," Miami NPR affiliate WLRN, April 14, 2021, *https://www.wlrn.org/news/2021-04-14/haitian-prime-minister-resigns-as-economic-and-public-security-collapse-deepens*.

[31] "Catholic church says Haiti faces 'descent into hell' after clergy kidnappings," Agence France-Presse, Apr. 12, 2021, *https://www.theguardian.com/world/2021/apr/12/catholic-clergy-abducted-ransom-haiti-france*.

[32] Charles, Jacqueline, "Haiti orphanage attacked by armed bandits, children sexually assaulted," manager says, Miami Herald, Apr. 13, 2021, *https://www.miamiherald.com/news/nation-world/world/americas/haiti/article250622224.html*.

[33] Sanon, Evens, and Coto, Dánica, "Surge in violence rattles Haiti as poverty, fear deepens," The Associated Press, Apr. 16, 2021, *https://apnews.com/article/port-au-prince-kidnapping-violence-poverty-haiti-06ba2725c9639a532a69ac3c6645d916*.

[34] Sanon, Evens, "Catholic officials halt activity in Haiti for 9 kidnapped," The Associated Press, Apr. 21, 2021, *https://apnews.com/article/latin-america-haiti-kidnapping-port-au-prince-europe-9cd7e6f7077009e30830f277ece721db*.

[35] "Catholic church says Haiti faces 'descent into hell' after clergy kidnappings," Agence France-Presse, Apr. 12, 2021, *https://www.theguardian.com/world/2021/apr/12/catholic-clergy-abducted-ransom-haiti-france*.

[36] Sanon, Evens, and Coto, Dánica, "Surge in violence rattles Haiti as poverty, fear deepens," The Associated Press, Apr. 16, 2021, *https://apnews.com/article/port-au-prince-kidnapping-*

violence-poverty-haiti-06ba2725c9639a532a69ac3c6645d916*.

[37] Harvard Law School International Human Rights Clinic and Observatoire Haitien des crimes contre l'humanité, Killing With Impunity, State-Sanctioned Massacres in Haiti, *http://hrp.law.harvard.edu/wp-content/uploads/2021/04/Killing_With_Impunity-1.pdf*, April 2021.

[38] Charles, Jacqueline, "When we aren't killed, they kidnap us.' Riding a bus in Haiti now a dangerous quest," Miami Herald, Apr. 8, 2021, *https://www.miamiherald.com/news/nation-world/world/americas/haiti/article248908489.html*.

[39] Daily Noon Briefing Highlights, United Nations Office for the Coordination of Humanitarian Affairs, 10 June 2021, *https://www.unocha.org/story/daily-noon-briefing-highlights-ethiopia-haiti*.

[40] Id.

---

[41] See *e.g.*, "Haiti Gang Leader Launches 'Revolution' as Violence Escalates", U.S. News and World Report, June 24, 2021, *https://www.usnews.com/news/world/articles/2021-06-24/haiti-gang-leader-launches-revolution-as-violence-escalates*, and "Haiti gang leader threatens 'revolution'", The New York Carib News, June 26, 2021, *https://www.nycaribnews.com/articles/haiti-gang-leader-threatens-revolution/*.

[42] "The World Bank in Haiti", World Bank, April 26, 2021.

[43] Id.

[44] Id.

[45] Taft-Morales, Maureen, "Haiti's Political and Economic Conditions," Congressional Research Service (CRS), p.5, Mar. 5, 2020, *https://fas.org/sgp/crs/row/R45034.pdf*.

[46] "World Report 2021—Haiti," Human Rights Watch, Jan. 13, 2021, *https://www.hrw.org/world-report/2021/country-chapters/haiti*.

a halt in nearly all economic activity for a period of about eight weeks.

The United Nations Integrated Office in Haiti reports that, as a result of multiple crises including political instability and COVID–19, Haiti's economy contracted by 1.2% in 2019. Factories are operating at reduced capacity, unemployment is rising, the Haitian gourde continues to lose value against the United States dollar, inflation consistently exceeds 20%.[47]

On June 8, OCHA reported that the unprecedented level of violence and subsequent displacements as a result of gang violence is creating a host of secondary issues, such as the disruption of community-level social functioning, family separation, increased financial burdens on host families, forced school closures, loss of livelihoods and a general fear among the affected populations.[48]

*Healthcare Situation*

USAID reported in January 2020 that insufficient funding, a weak health service delivery system, a lack of qualified health professionals, and the lingering impact of the 2010 earthquake and Hurricane Matthew in 2016 pose key challenges to the delivery of healthcare services to Haiti's population.[49] In March 2020, the independent humanitarian analysis organization ACAPS reported on a severe lack of healthcare services and infrastructure across the country, noting that only 31% of Haitians have access to healthcare services.[50] Several vector-borne diseases are prevalent in Haiti, including malaria, chikungunya, dengue, and Zika.[51] Diphtheria is endemic, and cases have increased in recent years.[52] Treatment of these types of diseases is hampered by a lack of healthcare infrastructure and medication, and a low vaccination rate.[53] The current epidemiological situation of cholera in Haiti has improved overall, but the medical community appears divided on cholera's current prevalence in Haiti.[54] Special Representative of the Secretary General La Lime said the COVID–19 pandemic is stretching the country's fragile health system: In a country of more than 11 million inhabitants, La Lime explained that Haiti only has the capacity to treat a few hundred patients at a time, due to suboptimal coordination within the state apparatus, inadequate funding of the national response plan, and staunch opposition by local communities to the opening of these centers, a manifestation of the lingering climate of denial, stigma and discrimination.[55]

*COVID–19's Exacerbation of Food Insecurity and Lack of Access to Basic Services*

High rates of poverty and natural disasters, including earthquakes and hurricanes, have contributed to elevated levels of food insecurity in Haiti.[56] According to the World Food Programme (WFP), Haiti has one of the highest levels of food insecurity in the world.[57] More than half of the population is chronically food insecure.[58] According to UNICEF, 4.1 million Haitians (nearly 40 per cent of the Haitian population) are estimated to be food insecure, and the estimated number of children suffering from acute malnutrition has risen to 167,000 as of May 2020.[59]

In an October 2020 report, the Food and Agriculture Organization of the United Nations (FAO) and the WFP identified Haiti as one of 20 "acute food insecurity hotspots"[60] in the world.[61] The report also noted that "COVID–19-related restrictions have exacerbated an already high acute food insecurity situation, reducing availability of and access to food."[62]

In mid-March 2021, FAO stated that the effects of the COVID–19 pandemic—combined with economic instability, civil unrest, and recurring shocks linked to natural disasters including droughts, earthquakes, floods and hurricanes, have led to increased food insecurity and other humanitarian needs throughout the country.[63]

In early May 2021, USAID reported that the socioeconomic impacts of coronavirus disease (COVID–19) mitigation measures—along with ongoing violence and instability and persistent economic challenges—continue to affect access to services for vulnerable people in Haiti, where approximately 4.4 million people are in need of humanitarian assistance, according to the UN.[64]

On June 10, 2021, OCHA reported that as a result of deadly gang clashes, the displaced are in need of urgent humanitarian assistance and protection. Priority needs include sanitation, shelter, access to clean water and food.[65]

## What authority does the Secretary have to designate Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary,[66] after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. The

[47] "United Nations Integrated Office in Haiti: Report of the Secretary-General," United Nations Security Council, pg 9, Feb. 11, 2021, *https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s2021133*.

[48] "HAITI: Displacement in Port-au-Prince Situation Report No. 1", OCHA, June 1–8, 2021.

[49] "Haiti Health Fact Sheet," U.S. Agency for International Development (USAID), Jan. 2020, *https://www.usaid.gov/sites/default/files/documents/1862/USAID_Haiti_Health_Fact_Sheet_-_January_2020.pdf*.

[50] "Briefing Note: Haiti," ACAPS, p.4, Mar. 23, 2020, *https://www.acaps.org/sites/acaps/files/products/files/20200323_acaps_briefing_note_complex_crisis_in_haiti.pdf*.

[51] Brown, Clive M.; Ejike-King, Lacreisha; Gracia, J. Nadine; and Sampson, Dana M.; Chapter 10: Haiti, Yellow Book, Centers for Disease Control and Prevention, last reviewed Jun. 24, 2019, accessed Feb. 12, 2021, *https://wwwnc.cdc.gov/travel/yellowbook/2020/popular-itineraries/haiti*.

[52] Brown, Clive M.; Ejike-King, Lacreisha; Gracia, J. Nadine; and Sampson, Dana M.; Chapter 10: Haiti, Yellow Book, Centers for Disease Control and Prevention, last reviewed Jun. 24, 2019, accessed Feb. 12, 2021, *https://wwwnc.cdc.gov/travel/yellowbook/2020/popular-itineraries/haiti*.

[53] "Briefing Note: Haiti," ACAPS, p.4, Mar. 23, 2020, *https://www.acaps.org/sites/acaps/files/products/files/20200323_acaps_briefing_note_complex_crisis_in_haiti.pdf*.

[54] *See e.g.*, Henrys, Jean et all, "Cholera in Haiti," The Lancet, Dec. 2020, *https://www.thelancet.com/journals/langlo/article/PIIS2214-109X(20)30450-2/fulltext?rss=yes*.

[55] "Haiti's Stability in Peril without Strong Response to COVID-19, Legal Expert Tells Security Council," June 19, 2020, *https://www.un.org/press/en/2020/sc14218.doc.htm*.

[56] "Country Brief—Haiti," World Food Programme (WFP), p. 1, Oct. 2020, *https://reliefweb.int/report/haiti/wfp-haiti-country-brief-october-2020*.

[57] "Haiti," World Food Programme (WFP), accessed Feb. 5, 2021, *https://www.wfp.org/countries/haiti*.

[58] "Country Brief—Haiti," World Food Programme (WFP), p. 1, Oct. 2020, *https://reliefweb.int/report/haiti/wfp-haiti-country-brief-october-2020*.

[59] "Haiti Humanitarian Situation Report", UNICEF, January–December 2020, *https://www.unicef.org/media/94046/file/Haiti-SitRep-December-2020.pdf*.

[60] "FAO–WFP Early Warning Analysis of Acute Food Insecurity Hotspots: October 2020," Food and Agriculture Organization of the United Nations (FAO) and the World Food Programme (WFP), p.6, Nov. 2020, *http://www.fao.org/3/cb1907en/CB1907EN.pdf*.

[61] Id. at p.5–6,12.

[62] Id. at p.12.

[63] "Haiti | Humanitarian Response Plan 2021," Food and Agriculture Organization of the United Nations (FAO), p.1, Mar. 11, 2021, *https://reliefweb.int/report/haiti/haiti-humanitarian-response-plan-2021*.

[64] "Haiti—Complex Emergency Fact Sheet #2, Fiscal Year (FY) 2021," U.S. Agency for International Development (USAID), p.2, May 4, 2021, *https://reliefweb.int/report/haiti/haiti-complex-emergency-fact-sheet-2-fiscal-year-fy-2021*.

[65] Daily Noon Briefing Highlights, United Nations Office for the Coordination of Humanitarian Affairs, 10 June 2021, *https://www.unocha.org/story/daily-noon-briefing-highlights-ethiopia-haiti*.

[66] INA § 244(b)(1) prescribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. 107–296, 116 Stat. 2135.

decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, or termination of or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).[67] The Secretary, in his or her discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state meets the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**Notice of the Designation of Haiti for TPS**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Haiti's designation for TPS on the basis of extraordinary and temporary conditions are met. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). I estimate approximately 155,000 individuals are eligible to apply for TPS under the designation of Haiti. On the basis of this determination, I am designating Haiti for TPS for 18 months, from August 3, 2021 through February 3, 2023. See INA

section 244(b)(1)(C) and (b)(2); 8 U.S.C. 1254a(b)(1)(C), and (b)(2).

**Alejandro N. Mayorkas**
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

*Required Application Forms and Application Fees To Register for TPS*

*ALL APPLICANTS, including individuals whose TPS under the previous designation of Haiti has been continued under preliminary injunctions issued by certain courts and 85 FR 79208 (Dec. 9, 2020), should follow these instructions:* You must submit an Application for Temporary Protected Status (Form I–821) as a *new applicant* by selecting ''1.a This is my initial (first time) application for Temporary Protected Status (TPS). I do not currently have TPS,'' along with the required $50 fee for Form I–821 or request for fee waiver. If your TPS is currently continuing under the court orders in *Ramos* and *Saget,* checking this 1.a. box as an initial applicant under this new designation of Haiti does not affect the continuation of your TPS while those orders remain. However, if those orders are no longer in effect applying for TPS under this **Federal Register** Notice will help ensure that you have TPS until the end of the designation as long as you remain eligible. USCIS understands that you *do* currently have TPS if you are covered by the court orders, and checking Box 1.a. will not be deemed a misrepresentation on your part.

You may request a fee waiver by submitting a Request for a Fee Waiver (Form I–912). You must also pay the biometrics services fee if you are age 14 or older, unless USCIS grants a fee waiver. Please see additional information under the ''Biometric Services Fee'' section of this Notice. You are not required to submit an I–765 or have an EAD, but see below for more information if you want to work in the United States.

*How TPS Beneficiaries Can Obtain an Employment Authorization Document (EAD)*

Everyone must provide their employer with documentation showing that they have the legal right to work in the United States. TPS beneficiaries are eligible to apply for and obtain an EAD, which proves their legal right to work.

TPS applicants who want to obtain an EAD valid through February 3, 2023 must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver by submitting a Request for a Fee Waiver (Form I–912)). TPS applicants may file this form along with their TPS application, or at a later date, provided their TPS application is still pending or has been approved.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

*Refiling a TPS Registration Application After Receiving a Denial of a Fee Waiver Request*

If you receive a denial of a fee waiver request, you must refile your Form I–821 for TPS along with the required fees during the registration period, which extends until February 3, 2023, in order to continue seeking initial TPS or to newly register to avoid losing protection in the event that the court injunctions are lifted. You may also file for your Employment Authorization Document on Form I–765 with payment of the fee along with your TPS application or at any later date you decide you want to request an EAD during the registration period.

*Filing Information*

USCIS offers the option to applicants for TPS under Haiti's designation to file Form I–821 and related requests for EADs online or by mail. When filing an initial TPS application, applicants can also request an EAD by submitting a completed Form I–765, Request for Employment Authorization, with their Form I–821.

*Online filing:* Form I–821 and I–765 are available for concurrent filing online.[68] To file these forms online, you must first create a USCIS online account.[69]

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

Table 1—Mailing Addresses

Mail your completed Application for Temporary Protected Status (Form I–821) and Application for Employment Authorization (Form I–765), Form I–912 for a fee waiver (if applicable) and supporting documentation to the proper address in Table 1.

---

[67] This availability of judicial review is under consideration by the courts in the TPS litigation referenced supra.

[68] Find information about online filing at Forms Available to File Online, *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[69] *https://myaccount.uscis.gov/users/sign_up.*

TABLE 1—MAILING ADDRESSES

| If you . . . | Mail to . . . |
| --- | --- |
| Are a beneficiary under the TPS designation for Haiti and you live in the following states: Florida, New York. | U.S. Postal Service (USPS), U.S. Citizenship and Immigration Services, Attn: TPS Haiti, P.O. Box 660167, Dallas, TX 75266–0167.<br>FedEx, UPS, or DHL: U.S. Citizenship and Immigration Services, Attn: TPS Haiti (Box 660167), 2501 S. State Highway, 121 Business Suite 400, Lewisville, TX 75067–8003. |
| Are a beneficiary under the TPS designation for Haiti and you live in any other state. | U.S. Postal Service (USPS), U.S. Citizenship and Immigration Services, Attn: TPS Haiti, P.O. Box 24047, Phoenix, AZ 85074–4047.<br>FedEx, UPS, or DHL: U.S. Citizenship and Immigration Services, Attn: TPS Haiti (Box 24047), 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

*Supporting Documents*

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying or registering for TPS on the USCIS website at *uscis.gov/tps* under "Haiti."

*Biometric Services Fee for TPS*

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must generally submit a biometric services fee. As previously stated, if you demonstrate an inability to pay the biometric services fee you may be able to have the fee waived. A fee waiver may be requested by submitting a Request for Fee Waiver (Form I–912). For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *uscis.gov/tps*. If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *dhs.gov/privacy.*

**General Employment-Related Information for TPS Applicants and Their Employers**

*How can I obtain information on the status of my TPS application and EAD request?*

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at *uscis.gov*, or visit the USCIS Contact Center at *uscis.gov/contactcenter*. If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

*When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?*

You can find the Lists of Acceptable Documents on the third page of Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *uscis.gov/i-9-central/acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. The TPS EADs that DHS automatically extended in the December 9, 2020 compliance notice will remain valid until at least October 4, 2021.[70] Employers may not reject a document based on the fact that it has been automatically extended, or due to a future expiration date. An EAD is an acceptable document under List A. Individuals whose existing TPS-related documentation continues through October 4, 2021, in accordance with the court orders in *Ramos* and *Saget* and the DHS **Federal Register** notice at 85 FR 79208 (Dec. 9, 2020), may present documentation as described in that notice to their employers for purposes of demonstrating employment eligibility through October 4, 2021. Additional information about Form I–9 is available on the I–9 Central web page at *uscis.gov/I–9Central.*

*If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?*

Yes, if you are eligible for TPS, you can obtain a new EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through February 3, 2023, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

*Can my employer require that I provide any other documentation such as evidence of my status or proof of my Haitian citizenship or a Form I–797C showing that I registered for TPS for Form I–9 completion?*

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C

---

[70] See Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 85 FR 79208, (Dec. 9, 2020).

receipt. Employers need not reverify List B identity documents. Employers may not request proof of Haitian citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin. Employers can refer to the compliance notice that DHS published on December 9, 2020 for information on how to complete the Form I–9 with TPS EADs that DHS extended through October 4, 2021.[71]

*Note to All Employers*

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

*Note to Employees*

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@uscis.dhs.gov*. USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment

discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a TNC while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *justice.gov/ier* and the USCIS and E-Verify websites at *uscis.gov/i-9-central* and *e-verify.gov*.

*Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)*

This **Federal Register** Notice does not invalidate the compliance notice DHS issued on December 9, 2020, which extended the validity of certain TPS documentation through October 4, 2021, and does not require individuals to present an I–797, Notice of Action. For Federal purposes, individuals approved for TPS may show their Form I–797, Notice of Action, indicating approval of their Form I–821 application, or their

A12 EAD (including those that have been extended) to prove that they have TPS. USCIS can also confirm whether an individual has TPS if they show a C19 EAD, which indicates prima facie eligibility for TPS. While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents they require you to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are covered under TPS or show you are authorized to work based on TPS. Examples of such documents are:

• Your new EAD with a category code of A12 or C19 for TPS;

• Your Form I–94, Arrival/Departure Record; or

• Your Form I–797, the notice of approval, for a current Form I–821, if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept.

Some benefit-granting agencies use the Systematic Alien Verification for Entitlements (SAVE) program to confirm the current immigration status of applicants for public benefits. SAVE can verify when an individual has TPS based on the documents above. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *uscis.gov/save/save-casecheck*, then by clicking the "Check Your Case" button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and SAVE verification case number or an immigration identifier number that you provided to the benefit-granting agency. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the response is correct, find detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request for information about

---

[71] See Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 85 FR 79208, (Dec. 9, 2020).

**Federal Register** / Vol. 86, No. 146 / Tuesday, August 3, 2021 / Notices **41871**

correcting records on the SAVE website at *www.uscis.gov/save.*

[FR Doc. 2021–16481 Filed 7–30–21; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**[FWS–R1–ES–2021–N005; FXES11130100000–212–FF01E00000]**

### Endangered and Threatened Wildlife and Plants; Draft Recovery Plan for White Bluffs Bladderpod

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of availability; request for review and public comment.

---

**SUMMARY:** We, the U.S. Fish and Wildlife Service, announce the availability of the Draft Recovery Plan for White Bluffs Bladderpod (*Physaria douglasii* subsp. *tuplashensis*), listed as threatened under the Endangered Species Act, and endemic to Franklin County, Washington. We request review and comment on this draft recovery plan from Federal, State, and local agencies; Native American Tribes; and the public.

**DATES:** To ensure consideration, comments on the draft recovery plan must be received on or before October 4, 2021. However, we will accept information about any species at any time.

**ADDRESSES:**
*Document availability:* Obtain the recovery plan by the following method.
• *Internet: http://www.fws.gov/ endangered/species/recovery-plans.html* or *http://www.fws.gov/pacific/ ecoservices/endangered/recovery/ plans.html.*

*Comment submission:* You may submit written comments and materials by one of the following methods:
• *U.S. mail:* Jeff Krupka, Central Washington Field Office, at the above U.S. mail address.
• *Fax:* 360–753–9405.
• *Email:* WFWO_LR@fws.gov.

**FOR FURTHER INFORMATION CONTACT:** Brad Thompson, State Supervisor, U.S. Fish and Wildlife Service, Washington Fish and Wildlife Office, at the above U.S. mail address; telephone 360–753–4652. If you use a telecommunications device for the deaf, call the Federal Relay Service at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** We, the U.S. Fish and Wildlife Service (Service), announce the availability of the Draft Recovery Plan for White Bluffs Bladderpod (*Physaria douglasii* subsp.

*tuplashensis*). The subspecies, listed as threatened under the Endangered Species Act of 1973, as amended (Act; 16 U.S.C. 1531 *et seq.*), is a plant endemic to the White Bluffs of Franklin County, Washington. The draft recovery plan includes specific goals, objectives, and criteria that should be met prior to our consideration of removing the species from the Federal List of Endangered and Threatened Plants. We request review and comment on this draft recovery plan from Federal, State, and local agencies; Native American Tribes; and the public.

### Background

The White Bluffs bladderpod is a short-lived, herbaceous perennial that occurs intermittently in a narrow, linear strip about 15 kilometers (9.3 miles) long, along sparsely vegetated upper and top exposures of the White Bluffs in eastern Washington State. This plant is closely associated with highly alkaline, cemented calcium carbonate soil along the Columbia River in the State of Washington. In April 2013, and as reaffirmed in December 2013, the White Bluffs bladderpod was listed as a threatened species pursuant to the Act (78 FR 23983; April 23, 2013; 78 FR 76995; December 20, 2013).

### Recovery Planning Process

Recovery of endangered and threatened animals and plants is a primary goal of our endangered species program. To help guide the recovery effort, we prepare recovery plans for most listed species. Recovery plans describe actions considered necessary for conservation of the species, establish criteria for downlisting or delisting, and estimate time and cost for implementing recovery measures.

### Recovery Planning and Implementation

The Service recently revised its approach to recovery planning, and is now using a process termed recovery planning and implementation (RPI) (see *https://www.fws.gov/endangered/esa-library/pdf/RPI.pdf*). The RPI approach is intended to reduce the time needed to develop and implement recovery plans, increase recovery plan relevancy over a longer timeframe, and add flexibility to recovery plans so they can be adjusted to new information or circumstances. Under RPI, a recovery plan includes the statutorily required elements under section 4(f) of the Act (objective and measurable recovery criteria, site-specific management actions, and estimates of time and costs), a concise introduction, and our strategy for how we plan to achieve species recovery. The RPI recovery plan

is supported by two supplementary documents: A species status assessment or biological report, which describes the best available scientific information related to the biological needs of the species and assessment of threats; and the recovery implementation strategy, which details the particular near-term activities needed to implement the recovery actions identified in the recovery plan. Under this approach, we can more nimbly incorporate new information on species biology or details of recovery implementation by updating these supplementary documents without concurrent revision of the entire recovery plan, unless changes to statutorily required elements are necessary.

### Recovery Plan Components

The primary recovery strategy for the White Bluffs bladderpod is to increase the capability of populations to withstand stochastic events; to establish new populations as possible and appropriate; to provide a safety margin against catastrophic events; and to increase the ecological and/or genetic diversity of the subspecies. Recovery will hinge on two types of strategies, direct and indirect, to improve habitat, reduce threats, and preserve or enhance the ability of individuals to survive and reproduce in the range of conditions they are likely to experience.

We may initiate an assessment of whether recovery has been achieved and delisting is warranted when the recovery criteria have been met, including once a second population has been discovered or established on conserved lands and is managed in a way that is compatible with White Bluffs bladderpod conservation. All populations must be self-sustaining.

### Request for Public Comments

Section 4(f) of the Act requires us to provide public notice and an opportunity for public review and comment during recovery plan development. It is also our policy to request peer review of recovery plans (59 FR 34270; July 1, 1994). In an appendix to the approved final recovery plan, we will summarize and respond to the issues raised during public comment and peer review. Substantive comments may or may not result in changes to the recovery plan. Comments regarding recovery plan implementation will be forwarded as appropriate to Federal and other entities so that they can be taken into account during the course of implementing recovery actions.

We will consider all comments we receive by the date specified in **DATES** prior to final approval of the plan.



**Q&A** / LATIN AMERICA & CARIBBEAN    27 JULY 2022    ⏱ 13 MINUTES

# New Gang Battle Lines Scar Haiti as Political Deadlock Persists

*Increasingly deadly turf wars between rival gang coalitions have revealed the depth of Haiti's political morass. In this Q&A, Crisis Group shows how the former and the latter are deeply intertwined.*



### Diego Da Rin
Consultant, Latin America and Caribbean

**What is behind the rising violence in Haiti, and how have security conditions changed since the president was assassinated in 2021?**

Security in Haiti has deteriorated sharply since President Jovenel Moïse was shot to death inside his private residence in the early hours of 7 July 2021, with clashes between well-armed criminal gangs causing hundreds of violent deaths in recent months. It is still unclear who was behind the president's assassination. In the meantime, Haiti's gangs have exploited the instability created by his death to expand their territorial footprint beyond what they have held for decades. The turf wars have been brutal. Human rights organisations have said there were more than 1,200 kidnappings in 2021, almost twice the number reported in 2020 and five times more than in 2019. Homicides have increased by at least 17 per cent, but because of under-reporting the real number might be considerably higher.

Case 3:25-cv-01766-EMC    Document 110-3    Filed 04/15/25    Page 56 of 165

Recent episodes of gang violence illustrate the severity of the security crisis. Clashes between 24 April and 6 May left at least 188 dead and displaced over 16,000 in the capital Port-au-Prince, which is home to nearly 3 million people. Gunfights that started on 7 July and raged for ten days in the nearby slums of Cité Soleil have killed at least 300 people and left some 160 wounded. The battles have intensified of late in the northern and north-eastern districts of Port-au-Prince, threatening to cut off the capital from the rest of the country. A tense calm has allowed the mayor of Cité Soleil to open a humanitarian corridor and UN agencies have started delivering aid to the most vulnerable residents there, but sources worry that the violence could restart at any moment. Clashes are hindering traffic on two of the roads that connect Port-au-Prince with the northern states, while fighting has already blocked a third one leading to the south. On 10 June, members of the gang Village de Dieu seized the Court of First Instance of Port-au-Prince, the largest court in the country. The Haitian National Police have not yet tried to regain control of the courthouse, fuelling rumours that the gangs may seek to take over other public buildings, including the Haitian parliament.

---

*Many in Haiti see [Prime Minister Henry] as the face of continuity for an entrenched system of political corruption.*

---

There are few brakes on the gangs' growth and no impediments in sight given politicians' failure to create a legitimate government since Moïse's assassination. With international backing, Ariel Henry has acted as interim prime minister since July 2021, but many in Haiti see him as the face of continuity for an entrenched system of political corruption. Haitian law enforcement officers have leaked reports accusing Henry of obstructing the investigation into Moïse's death, going so far as to suggest that the acting premier has direct links to the murder's masterminds, which he denies. The so-called Montana Accord, a coalition of over 180 political parties and civil society organisations, is challenging Henry's mandate, instead proposing a "Haitian-led solution" involving a two-year transitional government formed by representatives of different social sectors. Discussions between Henry and Accord members have yielded no agreement.

Amid the power vacuum, the gangs have been able to kill, kidnap and extort with little resistance from the state. Sources told Crisis Group that gang leaders aim to consolidate control of populous neighbourhoods before new elections are scheduled so they can coerce residents to vote for certain candidates, assuring them a valuable negotiating tool with politicians.

**Which are the main gangs in Haiti, and why are they fighting?**

There are around 200 gangs across Haiti, 95 of which operate in metropolitan Port-au-Prince. The gangs have historically established strongholds in the capital's overcrowded slums. These neighbourhoods are of great political value because of their large populations and remain easy to

HT Vacatur AR_0193

defend from state security forces due to their lack of urban planning: their narrow, unpaved roads are difficult for vehicles to navigate. The gangs often use civilians as human shields when the security forces do attempt to enter. Beyond the capital and its vicinity, gangs have also established footholds in cities such as Cap Haïtien, Gonaïves, Les Cayes, Jérémie and Jacmel – all densely populated ports connected to main roads.

Many of Haiti's gangs have coalesced around two main alliances: the G9 an Fanmi e Alye, also known as the G9, headed by former police officer Jimmy "Barbecue" Chérizier, and the GPèp la, also known as the Gpèp, led by Gabriel Jean Pierre, alias "Ti Gabriel". The G9 was officially created in June 2020, when the heads of nine major Port-au-Prince gangs formed a coalition, with the aim of establishing armed supremacy. After extending an invitation to all of Cité Soleil's gangs to join, they launched a coordinated attack on those who said no. The next month, Ti Gabriel, leader of the gang Nan Brooklyn, gathered all the refusers under the Gpèp banner.

---

*Gangs have decapitated opponents in public, burnt corpses on the street, set fire to houses and used sexual violence to intimidate residents out of collaborating with their rivals.*

---

A two-party gang war on numerous fronts has thus superseded the old local rivalries, as the G9 and Gpèp vie for overall ascendancy. The Gpèp has gradually expanded into a broader alliance beyond Cité Soleil to resist the G9's rise. Fighting has spread, with civilians stuck at home to stay out of the crossfire. Gangs have decapitated opponents in public, burnt corpses on the street, set fire to houses and used sexual violence to intimidate residents out of collaborating with their rivals. The effects of this violence are increasingly pernicious. The blockage of Route 2, the road connecting Port-au-Prince to the south, has also hampered humanitarian groups trying to reach victims of the earthquake that destroyed southern cities in August 2021.

Until April, the most powerful gang in Port-au-Prince, 400 Mawozo, stayed on the sidelines, but it has now joined the battle. Having built its power around the commune of Croix-de-Bouquets, on the capital's north-eastern outskirts, this gang attained international notoriety when it kidnapped seventeen Christian missionaries from the U.S. and Canada in 2021. Coordinated attacks involving the Gpèp's Cité Soleil gangs and 400 Mawozo in April indicate that they have sealed an alliance of convenience. Sources tell Crisis Group that 400 Mawozo's assistance has been vital to preventing the G9 from scoring a quick victory over Gpèp, which it would otherwise overpower.

**What is the relationship among criminal gangs, political power and wealth?**

HT Vacatur AR_0194

Case 3:25-cv-01766-EMC    Document 110-3    Filed 04/15/25    Page 58 of 165

Politicians and the business elite in Haiti have historically relied on gangs to obtain and exert power, but the criminals have grown more autonomous in recent years. While powerful paramilitary organisations controlled by the executive branch date back to the Duvalier dictatorship (1957-1986), the organisations that engendered today's gangs were born during the second presidency of Jean Bertrand Aristide between 2001 and 2004. During those years, young people, primarily from the poor neighbourhoods of northern Port-au-Prince, formed extralegal armed groups known as *chimères* to help consolidate the power of Aristide's Fanmi Lavalas party, as well as to deter his adversaries from ousting him. Aristide was unpopular with Haitian elites and former members of the armed forces, which he had disbanded in 1995 (during his first presidency) out of concern that they might impede the consolidation of democracy by attempting a coup d'état.

Moïse did not hesitate in using the gangs to his political advantage. To cope with massive demonstrations, which broke out in July 2018 after the government announced a sharp hike in fuel prices, and which continued for two years in response to corruption scandals, high-ranking officials – including at the Interior Ministry – reportedly helped plan three massacres of dissenters. Gang members, allegedly protected by Haitian National Police officers, killed at least 240 people in La Saline, Bel-Air and Cité Soleil, three poor neighbourhoods of Port-au-Prince seen as hotbeds of anti-Moïse unrest. U.S. authorities and human rights organisations have accused G9 leader Chérizier, who was until 2018 part of a special police unit, of being behind these attacks. Moïse and his allies denied accusations of links to the G9 or involvement in the massacres. The spokesperson for the state's National Disarmament, Demobilisation and Reintegration Commission, which the late president reactivated in 2019 to promote gangs' disarmament, did say that the reorganisation of the gangs, which has empowered the criminal groups, took place after the Commission had encouraged gang leaders to form a coalition to facilitate negotiations with the government.

---

*[Gangs] have continued to rely on businessmen for subventions and on politicians for shelter from police and justice investigations.*

---

Notwithstanding their links to Haiti's elites, criminal groups have not tended to be motivated by political considerations. Most of these alliances have been rooted in an exchange of benefits: elites use gang violence to suppress political opposition, influence electoral outcomes and secure economic monopolies; the gangs use their elite connections to secure funding, weapons and ammunition, as well as impunity for their crimes. Although the gangs have diversified their sources of financing, which today include ransom from kidnappings, extortion of businesses, such as public transport companies, and profits from arms and drug trafficking, they have continued to rely on businessmen for subventions and on politicians for shelter from police and justice investigations.

These relations, however, have been subtly shifting in recent months. The military might behind the G9 coalition appears to have fed Chérizier's desire for political power. In a video that went viral on

HT Vacatur AR 0195

social media, he stated that the G9 was a revolutionary force opposed to the whole political establishment (excluding, apparently, Moïse, whom he deemed a protector of the poor). A few days after Moïse's murder, heavily armed men belonging to the G9, followed by hundreds of people, paraded through the streets of Port-au-Prince to pay tribute to the president, while Chérizier affirmed that his death would be avenged. On 17 October 2021, his men forced Henry and his security detail to flee an official commemoration, and later that day, blocked access to the country's largest oil terminal. The blockage would last almost a month, creating severe fuel shortages in Port-au-Prince and other cities. Chérizier demanded that the prime minister resign, and while Henry did not step down, the government entered negotiations with the G9 about resuming fuel deliveries. The terms of their eventual agreement were never made public.

### Why have the Haitian police been unable to curb the gangs' growth? What needs to be done to make the security responses more effective?

The Haitian National Police, the sole state security force mandated to tackle criminal violence, has fallen woefully short in that task. It was created in 1995, the same year that Aristide disbanded the armed forces. The National Police has more than ten specialised units to combat organised crime, but they face various obstacles in their anti-gang efforts. Alongside MINUSTAH, the UN peacekeeping force that operated from 2004 to 2017, the police units did indeed reduce violent crime in hotspots around Port-au-Prince. But they did not succeed in dismantling the gangs, partly because there was no successful social reintegration campaign for gang members, most of whom hung onto their guns.

Now, despite tens of millions of dollars of assistance over the past 25 years, the Haitian police find themselves under-equipped, outgunned and underpaid. Since the UN mission ended, the police have failed to expand their ranks: with under 16,000 officers on the job, the police-to-population ratio is lower than what UN missions recommend. Washington has lifted the arms embargo it established in the mid-1990s, but the executive branch still has to notify Congress of any sales and there are no plans afoot to sell weapons to the Haitian police. Gang members, by contrast, have no problem acquiring sophisticated high-calibre weapons on the black market.

---

*An expert … believes that about 40 per cent of officers are directly or indirectly connected to gangs.*

---

As Crisis Group has noted, collusion between state security forces and illegal armed groups has flourished in the absence of political will to hold corrupt officers accountable and because of the efforts of those in power to deploy the police (as well as gangs) to serve their personal interests. An expert with close knowledge of the way the Haitian police operate believes that about 40 per cent of officers are directly or indirectly connected to gangs. A case in point is G9 leader Chérizier, who frequently points out that he served for fourteen years as a police officer. In fact, Chérizier headed a notorious gang, the Delmas 6, for several months, while still serving as an agent of a special police unit devoted

HT Vacatur AR_0196

to fighting criminal groups. Collusion is not just financially motivated. For many police officers, working with gangs is a matter of survival: many of them live in poor neighbourhoods controlled by armed groups, and though they might not have chosen to collaborate with gangs, confronting them would lead to certain death.

Although the police force has been largely incapable of responding to the security threats facing Haiti, there are a few exceptions worth noting. In the immediate aftermath of Moïse's assassination, the police were quick to arrest over 40 suspects. While none of them have been brought to trial, it demonstrated that, when they want to, the police can move fast. The police have also systematically targeted the 400 Mawozo gang, reducing its capacity to carry out kidnappings for ransom, its main source of financing.

### What kind of assistance could Haiti's international partners provide to mitigate and prevent further violence?

Haiti's partners should step up their financial and technical support aimed at bolstering the security forces, which have grown noticeably weaker over the past year: in May, the National Police's director acknowledged that more than 1,000 officers have recently abandoned their posts because of their precarious working and living conditions. A comprehensive revamp of the police will require strengthening their intelligence gathering, creating a specialised anti-gang task force, which is already in the works, and reinforcing oversight structures to address gang infiltration. International partners should also ramp up efforts to stop arms smuggling into Haiti. Over the last month, authorities have intercepted four shipments of arms in Port-au-Prince and Port-de-Paix, all coming from the U.S. These operations come in the wake of the dismissal of the Haitian customs agency director, who is being investigated on charges of arms trafficking and money laundering. Ports have until recently faced little scrutiny from state authorities, but international cooperation agreements on this front could help the Haitian state expand its oversight over shipments.

A strategy focused solely on security, however, is insufficient. Crisis Group has recommended that donors consider supporting a specialised office, buttressed by international partners, to help stymie corruption in the police force and overcome the impunity enjoyed by political and business elites. Over the long term, a demobilisation process that offers an off-ramp to gang members and real livelihood alternatives will also be an indispensable step toward reducing violence. These policies, however, are expensive to implement and Haiti – the Western Hemisphere's poorest country – is facing a harrowing economic crisis, with donor funding in short supply. A UN Development Programme initiative creating a multi-donor fund to bolster the security force's operational and intelligence-gathering capacity has raised less than one third of its $28 million funding target, though the U.S. government recently announced an additional $48 million in security assistance.

*Haitians resent what they perceive as a long history of foreign intervention.*

Beyond the financial costs, the appropriate dimension of foreign support remains a matter of great controversy in Haiti. Haitians resent what they perceive as a long history of foreign intervention that, at best, has little to show for it – and, at worst, has hurt their country. Animosity is particularly fierce toward the UN, after departing MINUSTAH soldiers abandoned hundreds of girls and women whom they had impregnated. The UN has also refused to pay compensation after its peacekeepers inadvertently started a bout of cholera that killed over 10,000. There is no love lost either between many Haitians and the current UN political mission BINUH, which critics say has "miserably failed" as the political, economic and security situation has only got worse on its watch. Haitian civil society organisations have also accused the country's Core Group (of which the UN is a member, alongside the ambassadors from Germany, Brazil, Canada, Spain, the U.S., France, the EU and a representative from the Organisation of American States) of perpetuating a corrupt regime by supporting Henry's government.

Despite calls from civil society organisations to end its mandate, the UN Security Council renewed BINUH for another year in a 15 July resolution, directing it to focus on helping Haitian authorities to address the country's political and security crises. In addition to requesting that member states prohibit arms trafficking to Haiti, the resolution threatened sanctions against those who engage or support gang activity. In the days preceding the vote, a number of countries expressed support in private for an international police mission in Haiti, though the details of what that would look like remain fuzzy. External actors interested in this option will need to step cautiously – taking into account local animosity toward foreign intervention and the UN's compromised reputation in Haiti – and should focus first on how to strengthen the force's independence and integrity.

The Security Council also reiterated the need for urgent agreement on a political process that leads to free and fair elections, acknowledging that "breaking links between political and economic actors and gangs" must be a priority. But it did not ask BINUH to work on this latter issue, and questions linger as to which international body, if any, could lead this effort, meaning that the main source of international pressure and support is likely to be bilateral partners. As Crisis Group's Deputy Program Director for Latin America, Renata Segura, has argued in *Foreign Affairs*, Haiti cannot become a significantly safer place unless and until it addresses its political turmoil. Much of the state is in shambles: because of postponed elections, only one third of Senate seats are filled, the lower house is entirely empty and the Supreme Court is not functioning. Operating outside the constitutional framework, these weak institutions cannot even aspire to a monopoly on violence. It is urgent that Henry and the Montana Accord members negotiate a consensus that allows a stable transitional government to come into being with a realistic timetable for elections, and Haiti's foreign partners should press upon them the urgency of doing so. Until that happens, the gangs will only continue to get stronger and Haitians will face a grim future.

HT Vacatur AR_0198

Related Tags

# Presidential Documents

Executive Order 14159 of January 20, 2025

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4**. *Civil Enforcement Priorities*. The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities*. The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces*. (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens*. The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties*. (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9**. *Efficient Removals of Recent Entrants and Other Aliens*. The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10**. *Detention Facilities*. The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11**. *Federal-State Agreements*. To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12**. *Encouraging Voluntary Compliance with the Law*. The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13**. *Recalcitrant Countries*. The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14.** *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15.** *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16.** *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17.** *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18.** *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19.** *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20.** *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21.** *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22.** *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

Case 3:25-cv-01766-EMC Document 110-3 Filed 04/15/25 Page 69 of 165



# ecoi.net

Document #2103219

## HRW – Human Rights Watch (Author)

## World Report 2024 - Haiti

In 2023, Haiti's security, justice, political, and humanitarian crises worsened. Killings, kidnappings, and sexual violence by criminal groups increased dramatically. The state response was weak to nonexistent, and the justice system was barely functioning.

More than 40 percent of Haiti's population experienced acute food insecurity. Access to electricity, safe drinking water, sanitation, health care, and education was severely limited.

In October, the United Nations Security Council authorized a Multinational Security Support Mission, led by Kenya, to improve security.

Prime Minister Ariel Henry did not reach a consensus with Haitian politicians and civil society to enable a democratic transition.

Despite the dire conditions in the country, foreign governments returned more than 100,000 people to Haiti from January through August; the Dominican Republic was responsible for 94 percent of the returns.

## Political Crisis

Since the assassination of President Jovenel Moïse in July 2021, Prime Minister Henry, who never received parliamentary approval and thus does not have a constitutional mandate, has been ruling by decree. Parliament has been dysfunctional since 2019, when President Moïse refused to organize legislative elections. Since January 2023, the country has had no national elected officials.

HT Vacatur AR_0206

In June 2023, Henry and Haitian political and civic leaders met in Jamaica, led by the Caribbean Community (CARICOM) Eminent Persons Group, consisting of three former prime ministers from the region, to seek a political solution to the crisis. They could not reach a consensus. Some political parties and civil society groups signed the Kingston Joint Declaration, calling for a national unity government. Nine major Haitian human rights organizations and a US diaspora group called on the international community to stop propping up those who created Haiti's crisis and instead support the establishment of a transitional government "led by technocrats who would commit to not participating in future elections and who would work … for the organization of free, fair, and credible elections."

## Dysfunctional Criminal Justice System

Haiti's justice system is plagued by insecurity, corruption, strikes, and political interference. Criminal groups have taken over some court buildings, including the Tribunal de Paix in Cité Soleil in July 2020 and the Port-au-Prince Palace of Justice, the main justice complex in the country, in July 2022. They appear to have stolen or destroyed evidence and records that may be impossible to recover, as Haitian courts do not have digital copies of files. The courts have not been relocated.

No progress was made, as of October, in investigations into the massacres in La Saline in 2018, Bel Air in 2019, Plaine du Cul-de-Sac and Cité Soleil in 2022, and Carrefour-Feuilles in 2023.

The Conseil Supérieur du Pouvoir Judiciaire (CSPJ), the judiciary's oversight body, refused to certify 28 judges and prosecutors in January and 12 in June, citing abuse of authority, invalid credentials, and unlawful release of detainees, among other reasons. There is no mechanism to appeal the CSPJ's decisions.

In February 2023, Prime Minister Henry appointed eight judges to the Cour de Cassation, Haiti's Supreme Court, to allow it to function after more than one year during which it did not have enough judges to make up a quorum. Civil society groups argued that Henry did not respect the constitutional procedure for these appointments.

As of September, Haiti's prisons held more than three times their capacity for inmates. Most of the 11,784 detainees—84 percent of whom were awaiting trial—were living in inhumane conditions, without access to adequate food, water, or health care. From January through September, 128 detainees died, most from malnutrition-related diseases.

HT Vacatur AR_0207

New penal and criminal procedure codes providing alternatives to pretrial detention are scheduled to come into effect in June 2024.

## Investigation of President Moïse's Assassination

President Moïse was assassinated on July 7, 2021. As of May 2023, 45 people were in pretrial detention in Haiti in connection with the case, including 18 former Colombian military officers, whose families complained that they lacked legal assistance and were being mistreated and held in inhumane conditions. In October, police arrested a key suspect.

United States prosecutors allege that conspirators had initially planned to kidnap Moïse but later decided to kill him, hoping to win government contracts under a successor. US judges sentenced a Haitian-Chilean businessman and a former Colombian army colonel to life in prison for their roles in the killing. A former Haitian senator pled guilty; his sentencing was set for December 19. Nine other defendants are awaiting trial in the US.

## Violence by Criminal Groups

UN agencies estimate that more than 300 criminal groups controlled 80 percent of Haiti's capital, Port-au-Prince, as of September. Many are alleged to have ties to political and economic elites as well as police officers.

The UN Office of the High Commissioner for Human Rights (OHCHR) recorded the killing of 3,156 people—including 36 police officers—and 1,284 kidnappings by those groups from January through September 2023.

Criminal groups continued to use sexual violence to terrorize the population and demonstrate control. Médecins Sans Frontières (Doctors Without Borders, MSF) reported assisting 1,005 sexual violence survivors at its hospitals in Port-au-Prince between January and May 2023, almost double the number for the same period in 2022.

Human Rights Watch documented abuses committed by criminal groups in four communes in the metropolitan area of Port-au-Prince, including the killing of 67 people—including 11 children and 12 women—and rape of 23 girls and women. Survivors told Human Rights Watch about being dragged off the street, gang raped, and made to watch people getting killed by machete and gunshot.

HT Vacatur AR_0208

OHCHR documented dozens of sexual attacks on lesbian, gay, bisexual, and transgender (LGBT) people by gang members between January and June 2022. Female victims said that criminal groups had subjected them to "corrective rapes" to "cure" them.

The Haitian government has failed to protect people from criminal violence, which has been exacerbated by a continued flow of weapons and ammunition to Haiti, largely from the US state of Florida.

Often in collusion with police, the vigilante justice Bwa Kale movement had reportedly killed more than 420 people suspected of being members of criminal groups from January through September, OHCHR reported. Human Rights Watch verified material posted to social media and news sites confirming four attacks in March and April, three of which took place in the immediate vicinity of police stations.

Criminal groups have formed their own movement in retaliation, Zam Pale. The UN secretary-general warned in July that the Bwa Kale and Zam Kale movements have "sparked a new and alarming cycle of violence" that could lead to further recruitment of children.

## Attacks on Journalists

At least three journalists were killed from January through May 2023, the Inter-American Commission on Human Rights said. At least six media workers had been kidnapped in 2023 and others had fled their homes to escape escalating violence, the Committee to Protect Journalists said in September.

## Police Conduct

Police killed 407 people from January through September, the UN Integrated Office in Haiti (BINUH) said. According to that office, the prosecutors of Les Cayes and Miragoâne reportedly participated in 7 extrajudicial executions, and individuals wearing police uniforms executed at least 18 people in Tabarre.

The police internal affairs office opened cases of alleged human rights violations against 103 officers from January through September.

## Sexual Abuse in Sports

HT Vacatur AR_0209

Case 3:25-cv-01766-EMC   Document 110-3   Filed 04/15/25   Page 73 of 165

In 2020, the International Federation of Football Association (FIFA) Ethics Committee banned Haitian Football Federation president, Yves Jean-Bart, for life after finding evidence of his systematic sexual abuse of female players. In February 2023, the Court of Arbitration for Sport wrongly annulled FIFA's ban. A criminal case against Jean-Bart is pending in Haiti. More than a dozen male and female survivors and witnesses told Human Rights Watch that he coerced female players into having sex with him.

In July 2022, Evans Lescouflair, a former sports minister, was arrested in Puerto Rico and sent to Haiti in connection with complaints filed by child sexual abuse survivors. He was released, pending trial, in June 2023.

## Access to Abortion

Haiti has a total ban on abortion. A criminal code scheduled to take effect in 2024 will legalize it in all circumstances until the 12th week of pregnancy and at any time in cases of rape, of incest, or when the mental or physical health of the pregnant person is in danger.

## Disability Rights

Although Haiti ratified the UN Convention on the Rights of Persons with Disabilities, its laws still include offensive terminology, and people with disabilities experience discrimination in access to health, education, and justice. Moreover, stigma places them at a heightened risk of violence.

Local advocates say that people with disabilities face significant obstacles to civic participation, including difficulty obtaining the national identification cards required for voting because the National Identification Office was inaccessible to them.

## Economic and Social Rights

The security and political crises compounded a dire humanitarian situation. Heavy flooding in June and July across the country also highlighted Haiti's vulnerability to natural disasters.

According to the World Bank, about 59 percent of Haiti's population of 11.5 million lived on less than US$3.65 per day in 2023. About 5.2 million needed food and shelter assistance, a 20 percent increase from 2022; of these, 4.9 million were acutely food insecure.

As of early 2023, only one-third of Haitians had access to electricity, but only intermittently and at high prices. Only 55 percent of Haitian

HT Vacatur AR_0210

households had access to safe drinking water and two-thirds of the population had limited or no sanitation services, aggravating the spread of cholera. As of August, the Pan American Health Organization had reported 58,230 suspected cases of cholera, 3,696 confirmed cases, and 823 deaths since the beginning of the ongoing outbreak in October 2022.

International organizations estimate that 75 percent of the country's health facilities have inadequate medical supplies and insufficient trained personnel. Insecurity has triggered an exodus of health workers from Haiti in recent years.

Nearly half of Haitians aged 15 and older are illiterate; in 2020, only 46 percent of children completed primary school. The quality and availability of public education is generally poor, and 85 percent of primary schools and even more secondary schools were private in 2020. High costs, attacks on schools and on children en route, and lack of infrastructure and staff have deprived 4.2 million children of their right to education, UNICEF reported.

## Internal Displacement and Migration

Almost 195,000 Haitians were internally displaced by violence from January 2022 through July 2023, the International Organization for Migration (IOM) said. Many others left the country, often on dangerous journeys.

The IOM reported that from January through August 2023, foreign governments returned 103,706 people despite the risk to their lives and physical integrity in Haiti and the UN's calls to stop forced returns there. The Dominican Republic was responsible for 94 percent of returns; the US, the Bahamas, Turks and Caicos, and Cuba were responsible for most of the rest. In April, the UN Committee on the Elimination of Racial Discrimination expressed grave concern about increases in hate speech and racist or xenophobic violence against Haitians abroad and the use of racial profiling by law enforcement in some countries in the Americas.

Humanitarian workers told Human Rights Watch that Dominican authorities routinely rounded up people they suspected were Haitian nationals solely on the basis of skin color. Authorities took them to the border and placed them in cages on flatbed trucks to await processing, in sweltering heat and with little or no access to food or water, before returning them to Haiti.

In September, the Dominican Republic closed its land border with Haiti, as well as all connections by sea and air, in a dispute over a waterway. The

HT Vacatur AR_0211

UN designated expert on human rights in Haiti warned that this would intensify an already grave crisis, as the country imported at least 25 percent of its food, as well as medical supplies, from its neighbor.

## Key International Actors

In late 2022, Prime Minister Henry asked the international community to deploy a specialized armed force, a call echoed by the UN secretary-general. In July, Kenya offered 1,000 police officers to train and assist Haitian police. Human rights groups expressed concern about the Kenyan police's record of human rights abuses.

In October, the UN Security Council authorized the deployment of a Multinational Security Support Mission for an initial period of 12 months to help improve security and build conditions conducive to free and fair elections. The US pledged US$100 million for such a mission in September.

Haitian civil society called for strong accountability measures to avoid repetition of past harms from foreign interventions and urged foreign governments to stop supporting Prime Minister Henry, whom many Haitians see as heading an illegitimate government with links to criminal groups.

In October 2022, the UN Security Council approved sanctions—including asset freezes, travel bans, and arms embargos—against leaders of criminal groups and others involved in violence. As of March 2023, foreign governments had sanctioned 25 individuals. In July, the EU set up its own sanctions regime on Haiti. In October, the council renewed the sanctions measures for one year and broadened the arms embargo, prohibiting all arms sales or transfers by foreign countries to Haiti as a whole, except for the UN-authorized mission and law enforcement.

In April 2023, at Haiti's own initiative, the UN Human Rights Council adopted a resolution by consensus, establishing a UN designated expert on human Rights in Haiti. He completed his second official visit to the country in October.

The UN appealed for US$720 million in aid for Haiti for 2023, almost double the 2022 amount. As of September, it had only raised 26 percent of that amount.

HT Vacatur AR_0212

**Austrian Red Cross**        Wiedner Hauptstraße          Contact
Austrian Centre for          32, 1041 Wien                Imprint & Disclaimer
Country of Origin and        T +43 1 589 00 583           F.A.Q.
Asylum Research and          F +43 1 589 00 589           Data Protection Notice
Documentation                info@ecoi.net
(ACCORD)

ecoi.net is run by the Austrian Red Cross (department ACCORD) in cooperation with Informationsverbund Asyl &
Migration. ecoi.net is funded by the Asylum, Migration and Integration Fund, the Austrian Ministry of the Interior
and Caritas Austria. ecoi.net is supported by ECRE & UNHCR.

    



HT Vacatur AR_0213

May 13, 2011.

**W. Craig Fugate,**

*Administrator, Federal Emergency Management Agency.*

[FR Doc. 2011–12353 Filed 5–18–11; 8:45 am]

**BILLING CODE 9111–23–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2500–10; DHS Docket No. USCIS 2010–0016]**

**RIN 1615–ZB01**

**Extension and Redesignation of Haiti for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

---

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) is both extending the existing designation of Haiti for temporary protected status (TPS) for 18 months from July 23, 2011 through January 22, 2013, and redesignating Haiti for TPS for 18 months, effective July 23, 2011 through January 22, 2013. The extension allows current eligible TPS beneficiaries to retain their TPS through January 22, 2013. The redesignation of Haiti allows additional individuals who have been continuously residing in the United States since January 12, 2011, to obtain TPS, if eligible, including certain Haitians who arrived in the United States following the January 12, 2010 earthquake in Haiti.

Under the redesignation, individuals who currently do not have TPS, or a TPS application pending, may apply for TPS from May 19, 2011 through November 15, 2011. In addition to demonstrating continuous residence in the United States since January 12, 2011, initial applicants for TPS under this redesignation must demonstrate that they have been continuously physically present in the United States since July 23, 2011, the effective date of the redesignation of Haiti.

For individuals who have already been granted Haiti TPS, the 90-day re-registration period will run from May 23, 2011 through August 22, 2011. The Department will publish a **Federal Register** notice in May with complete information on the re-registration procedures, including the automatic 6-month extension of currently valid employment authorization documents (EADs) that expire July 22, 2011.

However, current Haiti TPS beneficiaries may not apply for re-registration until May 23, 2011. Applications and fees submitted before that date will be rejected and will have to be resubmitted once the re-registration period starts.

TPS applications that were filed during the first Haiti designation that opened on January 21, 2010, and remain pending on May 19, 2011 will be treated as initial applications under the redesignation. Therefore, individuals who have a pending TPS application will not need to file a new Application for Temporary Protected Status, Form I–821. Additional instructions for individuals whose TPS applications remain pending and who would like to obtain an EAD valid through January 22, 2013.

**DATES:** *Extension of TPS:* The 18-month extension of the existing designation for Haiti is effective July 23, 2011, and will remain in effect through January 22, 2013. The 90-day re-registration period for current Haiti TPS beneficiaries will run from May 23, 2011 through August 22, 2011. Re-registration procedures will be announced prior to the start of the re-registration period.

*Redesignation of TPS:* The redesignation of Haiti for TPS is effective July 23, 2011, and will remain in effect through January 22, 2013, a period of 18 months. The initial registration period for new applicants under the Haiti TPS re-designation will run from May 19, 2011 through November 15, 2011.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about this TPS extension and re-designation of TPS for Haiti by selecting "TPS Designated Country—Haiti" from the menu on the left of the TPS Web page. From the Haiti page, you can select the Haiti TPS Questions & Answers Section from the menu on the right for further information.

• You can also contact the TPS Operations Program Manager at Status and Family Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Washington, DC 20529–2060 or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS notice. It is not for individual case status inquiries. Applicants seeking

information about the status of their individual cases can check Case Status Online available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 1–800–375–5283 (TTY 1–800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**Abbreviations and Terms Used in This Document**

DHS—Department of Homeland Security
DOJ—Department of Justice
DOS—Department of State
EAD—Employment Authorization Document
GoH—Government of Haiti
IDP—Internally Displaced Person
INA—Immigration and Nationality Act
NGO—Nongovernmental Organizations
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration Related Unfair Employment Practices
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
UN—United Nations
UNICEF—United Nations Children's Fund
USAID—U.S. Agency for International Development
USCIS—U.S. Citizenship and Immigration Services

**What is TPS?**

• Temporary Protected Status (TPS) is an immigration status granted under the Immigration and Nationality Act (INA) to eligible nationals of a country designated for TPS (or to persons without nationality who last habitually resided in the designated country).

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States and to obtain work authorization documentation, so long as they continue to meet the terms and conditions of their TPS status.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• A grant of TPS does not lead to permanent resident status.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before obtaining TPS (unless that status has since expired or been terminated) or to any other status they may have obtained while registered for TPS.

**When was Haiti first designated for TPS?**

On January 21, 2010, the Secretary designated Haiti for TPS based on extraordinary and temporary conditions within Haiti which prevented aliens who are nationals of Haiti (or persons without nationality who last habitually resided in Haiti) from returning to Haiti

**Federal Register** / Vol. 76, No. 97 / Thursday, May 19, 2011 / Notices

safely, specifically the effects of the 7.0-magnitude earthquake that occurred January 12, 2010. *See* 75 FR 3476; *see also* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).[1]

## What authority does the Secretary have to extend the designation of Haiti for TPS?

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate agencies of the government, must review the conditions in a foreign State designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation is extended for an additional 6 months (or in the Secretary's discretion for 12 or 18 months). *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## What is the Secretary's authority to redesignate Haiti for TPS?

In addition to extending an existing TPS designation so that current beneficiaries may renew their TPS, the Secretary, after consultation with appropriate agencies of the government, may redesignate a country (or part thereof) for TPS. *See* INA section 244(b)(1), 8 U.S.C. 1254a(b)(1); *see also* INA section 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that "the alien has been continuously physically present since the effective date of *the most recent designation of the state*") (emphasis added). This is one of several instances in which the Secretary and, prior to the establishment of DHS, the Attorney General have simultaneously extended a country's TPS designation and redesignated the country for TPS. *See, e.g.,* 69 FR 60168 (Oct. 7, 2004) (extension and redesignation for Sudan); 62 FR 16608 (Apr. 7, 1997) (extension and redesignation for Liberia).

When the Secretary designates or redesignates a country for TPS, she also has the discretion to establish the date

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred under the HSA from the DOJ to the DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (2003) (codifying HSA, tit. XV, sec. 1517).

from which TPS applicants must demonstrate that they have been "continuously resid[ing]" in the United States. *See* INA section 244(c)(1)(A)(ii). This discretion permits her to tailor the "continuous residence" date to offer TPS protection to the group of individuals that she deems most appropriate.

The Secretary has determined that the "continuous residence" date for applicants for Haiti TPS shall be changed from its original date of January 12, 2010, to January 12, 2011. *See* 75 FR 3476. Initial applicants for TPS under this redesignation must also show they have been "continuously physically present" in the United States since July 23, 2011, which is the effective date of the Secretary's most recent designation, or redesignation, of Haiti. *See* INA section 244(c)(1)(A)(i). For each initial TPS application filed under the redesignation, the final determination whether the applicant has met the "continuous physical presence" requirement cannot be made until July 23, 2011. USCIS, however, will issue employment authorization documentation, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

## Why is the Secretary extending the TPS designation for Haiti and simultaneously re-designating Haiti for TPS?

Over the past year, DHS and the Department of State (DOS) have continued to review conditions in Haiti. Based on this review, and after consulting with DOS, the Secretary has determined that an 18-month extension of Haiti's TPS designation from July 23, 2011 through January 22, 2013, is warranted because the conditions prompting the original designation continue to be met. The Secretary has further determined that these same conditions in Haiti support redesignating Haiti for TPS under INA section 244(b)(1)(C) and changing the "continuous residence" and "continuous physical presence" dates so as to continue affording TPS protection to eligible Haitians who arrived in the United States before January 12, 2010 and to extend TPS protection to eligible Haitians who arrived between January 12, 2010 and January 12, 2011.

The January 12, 2010 earthquake has exacerbated Haiti's position as the least-developed country in the Western Hemisphere and one of the poorest in the world. According to the Central Intelligence Agency World Factbook (last updated on September 22, 2010), 80 percent of Haiti's population is living below the poverty line. Per capita gross domestic product is now under $2 per

day, and comparative social and economic indicators continue to decline. Low revenue collection rates by the Government of Haiti (GoH)—barely over 10 percent of gross domestic product—remain insufficient for Haiti to provide adequate social services and to invest in physical and human capital.

According to the GoH, an estimated 230,000 people died and approximately three million were affected by the earthquake. In total, more than one million Haitians have been left homeless and are currently living in temporary camps. As of October 14, 2010, teams from international nongovernmental organizations (NGOs) and the GoH had conducted assessments of structures to determine habitability on 297,569 buildings out of an estimated 350,000 to 400,000 buildings destroyed by the earthquake. Roughly half of those buildings assessed were deemed safe for habitation with another 26 percent deemed possibly safe with repairs conducted. Approximately 21 percent of assessed homes thus far have been deemed unsafe, requiring major repairs or demolition.

Despite these assessments, DOS estimates that there are approximately 1,300 internally displaced persons (IDPs) camps in Haiti. Although statistical reports vary, the United Nations Children's Fund (UNICEF) reports that there are approximately 1.6 million IDPs, of which approximately 800,000 are children. The IDP camps are extremely crowded and are vulnerable to flooding, crime (including gender-based violence), and disease.

International NGOs report that primary healthcare services are available at 160 fixed and mobile sites. Thirty-one percent of these sites are supported by USAID and the Office of U.S. Foreign Disaster Assistance. The current cholera outbreak in Haiti is evidence of the vulnerability of the public health sector of Haiti. Although statistical reports have varied, the GoH Ministry of Public Health and Population reported 199,497 cholera cases, including 112,656 hospitalizations and 3,927 deaths. Health officials and aid organizations believe the outbreak may spread nationwide. In efforts to contain the outbreak, a network of cholera treatment centers has been created.

Based on this review and after consultation with the appropriate Government agencies, the Secretary has determined that:

• The conditions that prompted the January 21, 2010 designation of Haiti for TPS continue to be met. *See* INA sections 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• Nationals of Haiti (and persons without nationality who last habitually resided in Haiti) still cannot safely return to Haiti due to continued extraordinary and temporary conditions. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• It is not contrary to the national interest of the United States to permit aliens who meet the eligibility requirements for TPS to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The TPS designation of Haiti should be extended for an additional 18-month period from July 23, 2011 through January 22, 2013. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• Haiti should be simultaneously redesignated for TPS effective July 23, 2011 through January 22, 2013. *See* INA sections 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2),

• It is appropriate to change the date by which TPS applicants must demonstrate that they have continuously resided in the United States from January 12, 2010 to January 12, 2011.

• The date by which TPS applicants must demonstrate that they have been continuously physically present in the United States is July 23, 2011, the effective date of the redesignation of Haiti for TPS.

• There are approximately 47,000 current Haiti TPS beneficiaries who are expected to be eligible to re-register for TPS under the extension.

• It is estimated that approximately 10,000 additional individuals may be eligible for TPS under the redesignation of Haiti.

### Why is the Secretary changing the "continuous residence" date from January 12, 2010 to January 12, 2011?

In the aftermath of the earthquake in Haiti, additional Haitian nationals were lawfully admitted to the United States as nonimmigrants or were granted humanitarian parole for emergency reasons. As described in this notice, the devastating impact of the January 12, 2010 earthquake continues to create extraordinary and temporary conditions that prevent aliens who are nationals of Haiti from safely returning to Haiti. Therefore, the Secretary has determined, in her discretion, that it is appropriate for DHS to extend TPS to eligible Haitians who arrived in the United States between January 12, 2010, and January 12, 2011, so that they will not be subject to removal while in TPS and can obtain work authorization to support themselves until they are able to return safely to Haiti.

### Notice of Extension of TPS for Haiti and Re-designation of Haiti for TPS through January 22, 2013

By the authority vested in me as Secretary of Homeland Security under section 244 of the INA, 8 U.S.C. 1254a,

I have determined, after consultation with the appropriate government agencies, that the conditions that prompted the original designation of Haiti for temporary protected status on January 21, 2010, continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am simultaneously extending the existing TPS designation of Haiti for 18 months from July 23, 2011 through January 22, 2013, and redesignating Haiti for TPS for 18 months effective July 23, 2011 through January 22, 2013. *See* INA sections 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2). I am also changing the "continuous residence" date from January 12, 2010 to January 12, 2011. *See* INA section 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii).

**Janet Napolitano,**
*Secretary.*

### How do I know whether I should wait until May 23, 2011, to apply for re-registration under the extension of TPS or whether I should file an initial TPS application now under the re-designation of Haiti?

Table 1 below will help you decide if you should file for re-registration under the extension of TPS for Haiti or if you should file an initial application under the re-designation of Haiti for TPS.

TABLE 1—RE-REGISTRATION FILING VERSUS INITIAL FILING

| If . . . | And . . . | Then . . . |
|---|---|---|
| You filed a TPS application under the initial designation of Haiti during the registration period January 21, 2010 through January 18, 2011, or filed after January 18 under the fee waiver cure.. | Your application was approved by May 19, 2011. | You need to re-register under the extension by filing a Form I–821 application and Form I–765 during the re-registration period May 23, 2011 through August 22, 2011. |
| You filed a TPS application under the initial designation of Haiti during the registration period January 21, 2010 through January 18, 2011, or filed after January 18 under the fee waiver cure.. | Your application is still pending as of May 19, 2011. | You do not yet have TPS and your pending Form I–821 will be treated as an initial application under the re-designation. You do not need to file a new Form I–821. Please see Table 2 to determine if you need to file a new Form I–765. |
| You filed a TPS application under the initial designation of Haiti during the registration period January 21, 2010 through January 18, 2011, or filed after January 18 under the fee waiver cure.. | Your application was denied before May 19, 2011, and you believe you may be eligible for TPS under the redesignation. | You may be covered under the re-designation and you need to file an initial application during the registration period May 19, 2011 through November 15, 2011. |
| You never filed a TPS application under the initial designation of Haiti. | You believe you may be eligible for TPS under the redesignation. | You may be covered under the re-designation and you need to file an initial application during the registration period May 19, 2011 through November 15, 2011. |

**I have been granted TPS. If the re-registration period does not begin until May 2011, does my current TPS continue through January 22, 2013?**

Although an individual's TPS continues until it is withdrawn or terminated, your TPS will be withdrawn if you fail to re-register during the May 23, 2011 through August 22, 2011 period, or if USCIS does not approve your re-registration application. The forthcoming **Federal Register** notice, to be published in May 2011, regarding re-registration will explain the requirements, fees, and fee waiver procedures. Please do not submit your re-registration application before May 23rd or it will be rejected, and you will need to re-file when the re-registration period opens. Given the timeframes involved with processing TPS re-registration applications, and because the re-registration period will not open

until May 23, 2011, DHS recognizes the possibility that re-registrants may not receive new EADs until after their current EADs expire on July 22, 2011. Accordingly, the May 2011 **Federal Register** notice explaining the re-registration procedures will also extend the validity of EADs issued under the original TPS designation of Haiti for an additional 6 months, through January 22, 2012. That notice will provide further details for re-registration and explanations of the 6-month automatic extension of EADs that expire on July 22, 2011.

**I have a pending TPS application filed during the original Haiti TPS registration period that ran from January 21, 2010 through January 18, 2011. What should I do?**

If your TPS application is still pending on May 19, 2011, then you will

not need to file a new Application for Temporary Protected Status, Form I–821. Pending TPS applications will be treated as initial applications under the re-designation. Therefore, if your TPS application is approved, you will be granted TPS from January 22, 2013. If you have a pending TPS application *and* you wish to have an EAD valid through January 22, 2013, please look at Table 2 below to determine whether you should file a new Application for Employment Authorization, Form I–765. If you do need to file a new Form I–765, wait until the re-registration period opens May 23, 2011, before filing your application.

TABLE 2—EAD INFORMATION FOR STILL PENDING TPS APPLICATIONS

| If . . . | And . . . | Then . . . | But if . . . |
|---|---|---|---|
| You requested an EAD during the original registration period for Haiti TPS. | You received an EAD with Category C19 or A12. | You must file a new Form I–765 with fee (or fee waiver request) during the re-registration period that opens May 23, 2011 if you wish to have a new EAD valid through January 22, 2013. | Your Form I–821 is denied before the re-registration period opens May 23, 2011, then DO NOT file a new Form I–765. If you file a new Form I–765, it will be denied due to the denial of your Form I–821. |
| You requested an EAD during the original registration period for Haiti TPS. | You did not receive an EAD with Category C19 or A12. | You do not need to file a new Form I–765. If your TPS application is approved, your Form I–765 will be approved through January 22, 2013. | |
| You did not request an EAD during the original registration period for Haiti TPS. | You wish to have an EAD valid through January 22, 2013. | You must file a new Form I–765 with fee (or fee waiver request) during the re-registration period that opens May 23, 2011. | Your Form I–821 is denied before the re-registration period opens on May 23, 2011, then DO NOT file a new Form I–765. If you file a new Form I–765, it will be denied due to the denial of your Form I–821. |
| You did not request an EAD during the original registration period. | You do not wish to have an EAD valid through January 22, 2013. | You do not need to file a new Form I–765. | |

**I am not a TPS beneficiary and I do not have a TPS application pending. What are the procedures for Initial Registration for TPS under the Redesignation?**

Individuals who do not yet have Haiti TPS or a pending application for TPS may submit their TPS applications during the 180-day initial registration period that will run from May 19, 2011 through November 15, 2011.

The remainder of this **Federal Register** notice provides the procedures for initial registration under the redesignation. The following procedures *do not* apply to individuals who have already been granted TPS under the original designation of Haiti. Re-registration procedures for current TPS

beneficiaries will be announced in a subsequent **Federal Register** notice that will be published in May.

**Required Application Forms and Application Fees To Register Initially for TPS**

To register for TPS for the first time, an applicant must submit:

1. Application for Temporary Protected Status, Form I–821 and pay the Form I–821 application fee, which is $50, and

2. Application for Employment Authorization, Form I–765.

• If you want an EAD, you must pay the Form I–765 fee only if you are age 14 through 65. No EAD fee is required if you are under the age of 14 or over

the age of 65 and filing for initial TPS registration.

• You do not pay the Form I–765 fee if you are not requesting an EAD. Individuals who are in removal proceedings will be provided an opportunity to apply for TPS in accordance with 8 CFR 244.7(d) and 1244.7(d).

You must submit both completed application forms together. If you are unable to pay, you may apply for application and/or biometrics fee waivers by completing Request for Fee Waiver, Form I–912, or submitting your own request for a fee waiver, and providing satisfactory supporting documentation. For more information on the application forms and

application fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps* and click on Temporary Protected Status for Haiti. Fees for the Form I–821, Form I–765, and biometrics fee are also described in 8 CFR 103.7(b).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay, you may apply for a biometrics fee waiver by completing Form I–912 or your own request for a fee waiver, and

providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov.*

**Mailing Information**

Mail your application for TPS to the proper address in Table 3:

### TABLE 3—MAILING ADDRESSES

| If you live in . . . | For regular mail, send to . . . | For express mail and courier deliveries, send to . . . |
|---|---|---|
| The state of Florida .............. | USCIS, P.O. Box 4464, Chicago, IL 60680–4464 .......... | USCIS, *Attn:* Haiti TPS, 131 South Dearborn, 3rd Floor, Chicago, IL 60603–5520. |
| The state of New York ......... | USCIS, P.O. Box 660167, Dallas, TX 75266–0167 ....... | USCIS, *Attn:* Haiti TPS, 2501 S. State Hwy. 121, Business, Suite 400, Lewisville, TX 75067. |
| All other states ..................... | USCIS, P.O. Box 24047, Phoenix, AZ 85074–4047 ...... | USCIS, *Attn:* Haiti TPS, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034. |

**E-Filing**

You cannot e-file your application when applying for initial registration for TPS. Please mail your application to the mailing address listed in Table 2 above.

**Employment Authorization Document (EAD)**

*May I request an interim EAD at my local USCIS office?*

No. USCIS will not issue interim EADs to TPS applicants at local offices.

*What documents may I show to my employer as proof of employment authorization and identity for Form I–9 (Employment Eligibility Verification form)?*

To complete Form I–9 for new hires, an employee must present his or her employer with proof of identity and employment authorization. For reverification, an employee needs to provide proof of continued employment authorization. Document choices are listed on the Lists of Acceptable Documents on page 5 of Form I–9. An EAD is listed as an acceptable document under "List A." Therefore, TPS beneficiaries under this redesignation of Haiti who have timely registered with USCIS as directed under this notice and obtained an EAD may present their valid EAD to their employers as proof of employment authorization and identity. In the alternative, employees may present any other legally acceptable document or combination of documents listed on the Form I–9 as proof of identity and employment authorization.

Employers may not request proof of Haitian citizenship when completing Form I–9. Employers should accept a valid EAD so long as the EAD reasonably appears on its face to be genuine and to relate to the employee.

**Note to Employers:** Employers are reminded that the laws requiring employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For questions, employers may call the USCIS Customer Assistance Office at 1–800–357–2099. Employers may also call DOJ's Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) Employer Hotline at 1–800–255–8155.

**Note to Employees:** Employees or applicants may call the OSC Employee Hotline at 1–800–255–7688 for information regarding employment problems. Additional information is available on the OSC Web site at *http://www.justice.gov/crt/osc/.*

**Note Regarding State and Local Government Agencies (Such as Departments of Motor Vehicles):** State and Local government agencies are permitted to create their own guidelines when granting certain benefits, such as a driver's license or an identification card. Each state may have different laws and requirements pertaining to the documents that may be used to prove eligibility for certain benefits. If you are applying for a state or local government benefit, you should take all documents that show that you are a TPS beneficiary to the state or local government agency. Examples are:

(1) A copy of your Form I–821 Approval Notice (I–797), and

(2) Your EAD that has a valid expiration date (if you have a TPS-based EAD).

[FR Doc. 2011–12440 Filed 5–18–11; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–5487–N–16]

**Notice of Submission of Proposed Information Collection to OMB; Emergency Comment Request Choice Neighborhoods**

**AGENCY:** Office of the Assistant Secretary for Public and Indian Housing, HUD.

**ACTION:** Notice of proposed information collection.

**SUMMARY:** The proposed information collection requirement described below has been submitted to the Office of Management and Budget (OMB) for review and approval, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35, as amended). The Department is soliciting public comments on the subject proposal, to assure better understanding of the reporting requirements and consistency in the submission of data.

**DATES:** *Comments Due Date:* May 26, 2011.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments must be received within seven (14) days from the date of this Notice. Comments should refer to the proposal by name/or OMB approval number) and should be sent to: HUD Desk Officer, Office of Management and Budget, New Executive Office Building, Washington, DC 20503; *e-mail: Ross_A._Rutledge@omb.eop.gov;* fax: 202–395–3086.

**FOR FURTHER INFORMATION CONTACT:** Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street, SW.,

nonimmigrant will be able to maintain compliance requirements for F–1 nonimmigrant student status while having TPS.

**When a student applies simultaneously for TPS and benefits under this notice, what is the minimum course load requirement while an application for employment authorization is pending?**

The F–1 nonimmigrant student must maintain normal course load requirements for a "full course of study" [43] unless or until the nonimmigrant student receives employment authorization under this notice. TPS-related employment authorization, by itself, does not authorize a nonimmigrant student to drop below twelve credit hours, or otherwise applicable minimum requirements (*e.g.*, clock hours for non-traditional academic programs). Once approved for Special Student Relief employment authorization, the F–1 nonimmigrant student may drop below twelve credit hours, or otherwise applicable minimum requirements (with a minimum of six semester or quarter hours of instruction per academic term if at the undergraduate level, or for a minimum of three semester or quarter hours of instruction per academic term if at the graduate level). *See* 8 CFR 214.2(f)(5)(v), (f)(6), and (f)(9)(i) and (ii).

**How does a student who has received a TPS-related EAD then apply for authorization to take a reduced course load under this notice?**

There is no further application process with USCIS if a student has been approved for a TPS-related EAD. The F–1 nonimmigrant student must demonstrate and provide documentation to the DSO of the direct economic hardship resulting from the current crisis in Haiti. The DSO will then verify and update the student's record in SEVIS to enable the F–1 nonimmigrant student with TPS to reduce the course load without any further action or application. No other EAD needs to be issued for the F–1 nonimmigrant student to have employment authorization.

**Can a noncitizen who has been granted TPS apply for reinstatement of F–1 nonimmigrant student status after the noncitizen's F–1 nonimmigrant student status has lapsed?**

Yes. Regulations permit certain students who fall out of F–1 nonimmigrant status to apply for reinstatement. *See* 8 CFR 214.2(f)(16). This provision might apply

to students who worked on a TPS-related EAD or dropped their course load before the date of publication of this notice, and therefore fell out of student status. These students must satisfy the criteria set forth in the F–1 nonimmigrant student status reinstatement regulations.

**How long will this notice remain in effect?**

This notice grants temporary relief until August 3, 2024,[44] to eligible F–1 nonimmigrant students. DHS will continue to monitor the situation in Haiti. Should the special provisions authorized by this notice need modification or extension, DHS will announce such changes in the **Federal Register**.

**Paperwork Reduction Act (PRA)**

An F–1 nonimmigrant student seeking off-campus employment authorization due to severe economic hardship resulting from the current crisis in Haiti must demonstrate to the DSO that this employment is necessary to avoid severe economic hardship. A DSO who agrees that a nonimmigrant student should receive such employment authorization must recommend an application approval to USCIS by entering information in the remarks field of the student's SEVIS record. The authority to collect this information is in the SEVIS collection of information currently approved by the Office of Management and Budget (OMB) under OMB Control Number 1653–0038.

This notice also allows an eligible F–1 nonimmigrant student to request employment authorization, work an increased number of hours while the academic institution is in session, and reduce their course load while continuing to maintain F–1 nonimmigrant student status.

To apply for employment authorization, certain F–1 nonimmigrant students must complete

and submit a currently approved Form I–765 according to the instructions on the form. OMB has previously approved the collection of information contained on the current Form I–765, consistent with the PRA (OMB Control No. 1615–0040). Although there will be a slight increase in the number of Form I–765 filings because of this notice, the number of filings currently contained in the OMB annual inventory for Form I–765 is sufficient to cover the additional filings. Accordingly, there is no further action required under the PRA.

**Alejandro Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–01593 Filed 1–25–23; 8:45 am]

**BILLING CODE 9111–28–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2737–22; DHS Docket No. USCIS–2014–0001]**

**RIN 1615–ZB70**

**Extension and Redesignation of Haiti for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) extension and redesignation.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) for 18 months, beginning on February 4, 2023, and ending on August 3, 2024. This extension allows existing TPS beneficiaries to retain TPS through August 3, 2024, so long as they continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through August 3, 2024, must re-register during the 60-day re-registration period described in this notice. The Secretary is also redesignating Haiti for TPS. The redesignation of Haiti allows additional Haitian nationals (and individuals having no nationality who last habitually resided in Haiti) who have been continuously residing in the United States since November 6, 2022, to apply for TPS for the first time during the initial registration period described under the redesignation information in

---

[43] *See* 8 CFR 214.2(f)(6).

[44] Because the suspension of requirements under this notice applies throughout an academic term during which the suspension is in effect, DHS considers an F–1 nonimmigrant student who engages in a reduced course load or employment (or both) after this notice is effective to be engaging in a "full course of study," *see* 8 CFR 214.2(f)(6), and eligible for employment authorization, through the end of any academic term for which such student is matriculated as of August 3, 2024, provided the student satisfies the requirement in this notice. DHS also considers students who engage in online coursework pursuant to ICE coronavirus disease 2019 (COVID–19) guidance for nonimmigrant students to be in compliance with regulations while such guidance remains in effect. *See* ICE Guidance and Frequently Asked Questions on COVID–19, Nonimmigrant Students & SEVP-Certified Schools: Frequently Asked Questions, *https://www.ice.gov/coronavirus* (last visited Nov. 30, 2022).

this notice. In addition to demonstrating continuous residence in the United States since November 6, 2022, and meeting other eligibility criteria, applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since February 4, 2023, the effective date of this redesignation of Haiti for TPS.

**DATES:**

*Extension of Designation of Haiti for TPS:* The 18-month extension of Haiti's designation for TPS begins on February 4, 2023, and will remain in effect for 18 months, ending on August 3, 2024. The extension impacts existing beneficiaries of TPS.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from January 26, 2023 through March 27, 2023. (*Note:* It is important for re-registrants to timely re-register during the registration period and not to wait until their Employment Authorization Documents (EADs) expire, as delaying re-registration could result in gaps in their employment authorization documentation.) [1]

*Redesignation of Haiti for TPS:* The 18-month redesignation for TPS begins on February 4, 2023, and will remain in effect for 18 months, ending on August 3, 2024. The redesignation impacts potential first-time applicants and others who do not currently have TPS.

*First-time Registration:* The initial registration period for new applicants under the Haiti TPS redesignation begins on January 26, 2023 and will remain in effect through August 3, 2024.

**FOR FURTHER INFORMATION CONTACT:** You may contact Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

---

[1] Individuals with TPS who were granted under the 2011 designation of Haiti and who are covered under the preliminary injunction that requires DHS to continue their TPS and TPS-related documents, unless their TPS has been withdrawn for individual ineligibility, retain their TPS and their documents remain valid through June 30, 2024 in accordance with the **Federal Register** notice published at 87 FR 68717 (Nov. 16, 2022) or any superseding such litigation-related notice that DHS may issue. *See Ramos, et al. v. Nielsen, et al.,* 321 F.Supp.3d 1083 (N.D. Cal. Oct. 3, 2018) ("*Ramos*"), *vacated Ramos v. Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18–16981). However, such individuals may re-register under this notice, which will help ensure that their TPS continues (if they remain eligible) as long as Haiti's designation exists even if the *Ramos* injunction ceases.

For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* You can find specific information about Haiti's TPS designation by selecting "Haiti" from the menu on the left side of the TPS web page.

If you have additional questions about TPS, please visit *https://www.uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *https://www.uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.*

Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Purpose of This Action (TPS)

Through this notice, DHS sets forth procedures necessary for nationals of Haiti (or individuals having no nationality who last habitually resided in Haiti) to (1) re-register for TPS and apply for renewal of their EADs with USCIS or (2) submit an initial registration application under the redesignation and apply for an EAD.

Individuals who previously registered for TPS under the August 3, 2021 prior designation of Haiti and whose applications have been granted must re-register properly within the 60-day re-registration period in order to maintain TPS and avoid withdrawal of their TPS following appropriate procedures. *See* 8 CFR 244.14. If your TPS is currently continuing under the court order in *Ramos,* re-registering for TPS under this Notice does not affect the continuation of your TPS while the order remains in effect. However, if the court order is no longer in effect, re-registering for TPS under this **Federal Register** Notice will help ensure that you have TPS until the end of the designation as long as you remain eligible.

For individuals who have already been granted TPS under Haiti's August 3, 2021 designation or the July 23, 2011 designation and who continue to have TPS, the 60-day re-registration period runs from January 26, 2023 through March 27, 2023.

USCIS will issue new EADs with an August 3, 2024 expiration date to eligible Haitian TPS beneficiaries who timely re-register and apply for EADs.

Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive new EADs before their current EADs expire. Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of EADs previously issued under the August 3, 2021 TPS designation of Haiti through February 3, 2024. Therefore, as proof of continued employment authorization through February 3, 2024, TPS beneficiaries can show their EADs that have the notation A–12 or C–19 under Category and a "Card Expires" date of February 3, 2023. This notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes. [2]

Individuals who have a Haiti TPS application (Form I–821) and/or Application for Employment Authorization (Form I–765) that was still pending as of January 26, 2023 do

---

[2] Certain EADs and other TPS documents issued to individuals covered by the *Ramos* injunction remain valid in accordance with that court order. For details, please *see* 86 FR 50725 (Sept. 10, 2021). If a superseding litigation-related notice is published that affects individuals under *Ramos,* DHS will also notify the public on the USCIS website.

not need to file either application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through August 3, 2024. Similarly, if USCIS approves a pending TPS-related Form I–765 filed in connection with a Form I–821, USCIS will issue the individual a new EAD that will be valid through the same date.

Under the redesignation, individuals who currently do not have TPS may submit an initial application during the initial registration period that runs from January 26, 2023 through the full length of the redesignation period ending August 3, 2024.[3] In addition to demonstrating continuous residence in the United States since November 6, 2022, and meeting other eligibility criteria, applicants for TPS under this redesignation must demonstrate that they have been continuously physically present in the United States since February 4, 2023,[4] the effective date of this redesignation of Haiti, before USCIS may grant them TPS. DHS estimates that approximately 105,000 individuals may become newly eligible for TPS under the redesignation of Haiti.

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the Immigration and Nationality Act (INA), or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work so long as they continue to meet the requirements of TPS. They may apply

for and receive EADs as evidence of employment authorization.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

**When was Haiti designated for TPS?**

Haiti was initially designated on the basis of extraordinary and temporary conditions that prevented nationals of Haiti from returning in safety. *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010). Following the initial designation, TPS for Haiti was extended and redesignated once from July 23, 2011, through January 22, 2013, based on extraordinary and temporary conditions.[5] Thereafter, TPS for Haiti was extended four times based on extraordinary and temporary conditions: (1) from January 23, 2013, through July 22, 2014;[6] (2) from July 23, 2014, through January 22, 2016;[7] (3) from January 23, 2016, through July 22, 2017;[8] and (4) from July 23, 2017, through January 22, 2018.[9] Subsequently, the Secretary announced the termination of the TPS designation of Haiti effective July 22, 2019.[10]

The termination of Haiti's 2011 TPS designation is being challenged in several lawsuits, and court injunctions require DHS to continue TPS for Haiti temporarily pending further court

order.[11] Secretary Mayorkas newly designated Haiti on the basis of extraordinary and temporary conditions effective August 3, 2021, through February 3, 2023.[12]

**What authority does the Secretary have to extend the designation of Haiti for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[13] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).[14] The Secretary, in his or her discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the

---

[3] In general, individuals must be given an initial registration period of no less than 180 days to register for TPS, but the Secretary has discretion to provide for a longer registration period. *See* 8 U.S.C. 1254a(c)(1)(A)(iv). In keeping with the humanitarian purpose of TPS and advancing the goal of ensuring "the Federal Government eliminates . . . barriers that prevent immigrants from accessing government services available to them" under Executive Order 14012, *Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans,* 86 FR 8277 (Feb. 5, 2021), the Secretary has exercised his discretion to provide for a TPS initial registration period that coincides with the full period of a Haiti's redesignation.

[4] The "continuous physical presence date" (CPP) is the effective date of the most recent TPS designation of the country, which is either the publication date of the designation announcement in the **Federal Register** or such later date as the Secretary may establish. The "continuous residence date" (CR) is any date established by the Secretary when a country is designated (or sometimes redesignated) for TPS. Note that both the CR (effective date of designation); 244(c)(1)(A)(i–ii) (discussing CR and CPP date requirements).

[5] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011).

[6] *See Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (Oct. 1, 2012).

[7] *See Extension of the Designation of Haiti for Temporary Protected Status,* 79 FR 11808 (Mar. 3, 2014).

[8] *See Extension of the Designation of Haiti for Temporary Protected Status,* 80 FR 51582 (Aug. 25, 2015).

[9] *See Extension of the Designation of Haiti for Temporary Protected Status,* 82 FR 23830 (May 24, 2017).

[10] *See Termination of the Designation of Haiti for Temporary Protected Status,* 83 FR 2648 (Jan. 18, 2018).

[11] *See Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18–16981) (district court's preliminary injunction against termination of six countries' TPS, including TPS for Haiti, remains in effect pending 9th Circuit consideration of plaintiffs' request for *en banc* rehearing of appellate panel decision to vacate the district court injunction); *Saget* v. *Trump,* No. 1:18–cv–1599 (E.D.N.Y. 2019) (injunction issued, but dismissed as moot, Oct. 15, 2021)); *NAACP* v. *DHS,* No. 18–cv–00239 (D. Md.); and *Centro Presente* v. *Trump,* No. 18–cv–10340 (D. Mass).

[12] *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021).

[13] INA section 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135. The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. *Id.,* at section 244(b)(1).

[14] This issue of judicial review is the subject of litigation. *See, e.g., Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18–16981); *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019).

**Federal Register** / Vol. 88, No. 17 / Thursday, January 26, 2023 / Notices

conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state continues to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**What is the Secretary's authority to redesignate Haiti for TPS?**

In addition to extending an existing TPS designation, the Secretary, after consultation with appropriate Government agencies, may redesignate a country (or part thereof) for TPS. *See* INA section 244(b)(1), 8 U.S.C. 1254a(b)(1); *see also* INA section 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that "the alien has been continuously physically present since the effective date of *the most recent designation of the state*") (emphasis added).[15]

When the Secretary designates or redesignates a country for TPS, the Secretary also has the discretion to establish the date from which TPS applicants must demonstrate that they have been "continuously resid[ing]" in the United States. *See* INA section 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii). The Secretary has determined that the "continuous residence" date for applicants for TPS under the redesignation of Haiti will be November 6, 2022. Initial applicants for TPS under this redesignation must also show they have been "continuously physically present" in the United States since February 4, 2023, which is the effective date of the Secretary's redesignation of Haiti. *See* INA section 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i). For each initial TPS application filed under the redesignation, the final determination of whether the applicant has met the

"continuous physical presence" requirement cannot be made until February 4, 2023, the effective date of this redesignation for Haiti. USCIS, however, will issue employment authorization documentation, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

**Why is the Secretary extending the TPS designation for Haiti and simultaneously redesignating Haiti for TPS through August 3, 2024?**

DHS has reviewed country conditions in Haiti. Based on the review, including consultation with DOS and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting Haiti's TPS designation remain and that such extension is not contrary to the national interest of the United States. The Secretary has further determined that redesignating Haiti for TPS based on extraordinary and temporary conditions under INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(1)(C) is warranted, including a determination that redesignation is not contrary to the national interest of the United States, and is changing the "continuous residence" and "continuous physical presence" dates that applicants must meet to be eligible for TPS.

*Overview*

DHS has conducted a thorough review of country conditions in Haiti. Haiti is experiencing economic, security, political, and health crises simultaneously. Haitian gangs are the primary source of violence and instability in Haiti and pose an increasing threat as they expand their influence and geographic presence over portions of metropolitan Port-au-Prince.[16] Haitian political and business elites have long cultivated relationships with gang leaders to further their agendas and destabilize Haiti.[17] While elites often operationalize gangs, the gangs typically function as mercenaries responsive to the highest bidder.[18] Moreover, some gangs earn sufficient funds from kidnapping for ransom operations to function as independent

criminal organizations.[19] At the same time, Haiti is confronting a humanitarian crisis, with many citizens having limited access to safety, healthcare, food, water, and economic opportunity. These circumstances continue to make return to Haiti dangerous for Haitian nationals living in the United States.

*Political Situation*

The Haitian parliament was dissolved in January 2020 as the mandates of two thirds of Senate members and all Chamber of Deputies members expired, and no new elections were held.[20] On July 7, 2021, President Jovenel Moïse was assassinated in his private residence in Port-au-Prince. Subsequently, Ariel Henry, whom Moïse had appointed prime minister days before the assassination, was installed as head of a new government.[21]

Since then, PM Henry and opposition groups have engaged in intermittent negotiations about a political path towards elections. On December 21, 2022, representatives of civil society, the private sector, and political groups began signing a revised political agreement known as the "December Accord," which was supported by PM Henry.[22] Some opposition members, including many members of the Citizen Conference for a Haitian Solution to the Crisis, also known as Montana Group members, had not yet agreed to the accord as of January 4, 2023.[23]

The Haitian government has long been accused of corruption and ineptitude. Politicians and the business elite in Haiti have historically relied on gangs to obtain and exert power, but the gangs have grown more autonomous in recent years.[24] An April 2021 report by

---

[15] The extension and redesignation of TPS for Haiti is one of several instances in which the Secretary and, prior to the establishment of DHS, the Attorney General, have simultaneously extended a country's TPS designation and redesignated the country for TPS. *See, e.g.,* 76 FR 29000 (May 19, 2011) (extension and redesignation for Haiti); 69 FR 60168 (Oct. 7, 2004) (extension and redesignation for Sudan); 62 FR 16608 (Apr. 7, 1997) (extension and redesignation for Liberia).

[16] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists*, International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists.*

[17] *Id.*

[18] D.C. Beer, *Chapter 3 Haiti: The Gangs of Cité Soleil*, PRISM: National Defense University, May 24, 2016, *https://cco.ndu.edu/News/Article/780129/chapter-3-haiti-the-gangs-of-cit-soleil/.*

[19] Jennifer Jelly and Tatiana Vasquez, *The Rise of Kidnappings for Ransom in Haiti*, The Counterterrorism Group, Dec. 13, 2021, *https://www.counterterrorismgroup.com/post/the-rise-of-kidnappings-for-ransom-in-haiti.*

[20] Freedom House, *Freedom in the World 2022—Haiti* (Feb. 28, 2022), *https://freedomhouse.org/country/haiti/freedom-world/2022.*

[21] Human Rights Watch, *World Report 2022—Haiti* (Jan. 13, 2022), *https://www.hrw.org/world-report/2022/country-chapters/haiti.*

[22] Haiti Libre, *Haiti—FLASH: The PM signed a historic consensus for an inclusive transition*, Dec. 22, 2022, *https://www.haitilibre.com/en/news-38427-haiti-flash-the-pm-signed-a-historic-consensus-for-an-inclusive-transition.html.*

[23] Juno7, *Accord du 21 décembre 2022: les violons ne s'accordant pas au sein de l'accord de Montana*, Dec. 29, 2022, *https://www.juno7.ht/accord-du-21-decembre-2022-violons-laccord-de-montana/.*

[24] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists*, International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists.*

Harvard Law School's International Human Rights Clinic alleged that the Moïse government funneled money, weapons, uniforms, and vehicles to gangs like the G9, in exchange for them repressing political opponents, often brutally, and maintaining the peace in poorer neighborhoods.[25] A July 2022 International Crisis Group report stated "collusion between state security forces and illegal armed groups has flourished in the absence of political will to hold corrupt officers accountable and because of efforts of those in power to deploy the police (as well as gangs) to serve their personal interests." [26]

*Security Situation*

Since President Moïse's assassination, Haiti has experienced a sharp deterioration in an already fragile security situation. Gang violence and kidnappings have spiked throughout the country, particularly in the capital, Port-au-Prince. The United Nations documented 934 killings, 684 injuries, and 680 kidnappings in Port-au-Prince from January to June 2022.[27] In one 10-day period in July 2022, more than 200 people were killed in gang violence in Port-au-Prince; nearly half of the decedents had no gang ties.[28] Human rights organizations have said there were more than 1,200 kidnappings in 2021, almost twice the number reported in 2020 and five times more than in 2019.[29]

There are around 200 gangs across Haiti, 95 of which operate in metropolitan Port-au-Prince. Many of Haiti's gangs have coalesced around two main alliances: the G9 and the GPèp. A struggle for dominance by various gangs has superseded the old local rivalries. Gangs have decapitated opponents in public, burnt corpses in the street, set fire to houses, and used sexual violence to intimidate residents out of

collaborating with their rivals.[30] Clashes between rival gangs led to particularly high levels of gang violence in April and May 2022, leading to the temporary closure of dozens of schools, medical centers, businesses, and markets, making it difficult for people to find basic products including food, water, and medicines.[31] In May 2022, UN High Commissioner for Human Rights Michelle Bachelet described armed violence in Haiti as "unimaginable and intolerable" and stated that "violence has had a severe impact on the most basic human rights of people." [32] Also in May, Doctors Without Borders warned that kidnappings for ransom that target many residents of Port-au-Prince, including medical personnel, were making it increasingly difficult for the population to access healthcare.[33] Gangs in Port-au-Prince targeted homeless and at-risk teens as participants in gang violence.[34] In July 2022, the UN Office for the Coordination of Humanitarian Affairs (UNOCHA) estimated that more than a third of Port-au-Prince was under the control of gangs.[35]

Haitian gangs have also attacked religious and government infrastructure. On June 10, 2022, a gang known as 5 Seconds took temporary control of the Court of First Instance, the main courthouse in Port au Prince. While the courthouse had not been used for criminal trials for several years due to persistent insecurity, the gang nevertheless forced judicial officials out and stole computers, desks, and other assets. The gang appears to have stolen or destroyed case files and evidence that the president of the Association of Haitian Magistrates said would be impossible to recover as Haitian courts

do not have digital copies of files.[36] On July 27, 2022, gang members set Port-au-Prince's transitional cathedral on fire and deployed tear gas during a clash in Bel Air neighborhood, in which several people were killed and others injured by stray bullets. Local sources denounced the use of state-owned machinery by the G9 as well as a lack of action by state forces. In Ouest department, the region in which Port-au-Prince is located, members of the 400 Mawozo gang set a public prosecutor's office on fire in Croix-de-Bouquets district near the capital on the night of July 25, 2022.[37]

In mid-September, gangs blocked access to the Varreux Terminal in Port-au-Prince, the main entry point for fuel in Haiti, cutting off millions of gallons of diesel and gasoline and causing a severe fuel shortage.[38] The fuel blockage paralyzed Haiti's economy.[39] Health centers and hospitals had to close, and the distribution of water was interrupted.[40] The lack of access to clean water contributed to the outbreak of cholera in early October, and complicated efforts to respond to and contain the outbreak.[41] On October 7, the government of Haiti requested assistance from the international community to confront gangs and address the humanitarian crisis.[42] In an October 12, 2022 Press Statement, U.S. Secretary of State Antony Blinken emphasized the critical nature of the humanitarian situation in Haiti, noting that the United States is committed to continuing to help Haiti address the crisis through multiple avenues.[43] On

[25] Harvard Law School International Human Rights Clinic, *Killing with Impunity: State-Sanctioned Massacres in Haiti* (April 2021), *http://hrp.law.harvard.edu/wp-content/uploads/2021/04/Killing_With_Impunity-1.pdf.*

[26] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists,* International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists.*

[27] Haiti: UN sounds alarm over worsening gang violence across Port-au-Prince, UN News, July 16, 2022, *https://news.un.org/en/story/2022/07/1122662#:~:text=%E2%80%9CWe%20have%20so%20far%20documented,Soleil%20area%20of%20the%20city.%E2%80%9D.*

[28] BBC News, *Haiti Gang Violence: 209 killed in Cité Soleil in 10 days,* July 26, 2022, *https://www.bbc.com/news/world-latin-america-62292007.*

[29] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists,* International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists.*

[30] *Id.*

[31] Office of the High Commissioner for Human Rights, *Press Release: Haiti: Bachelet deeply disturbed by human rights impact of deteriorating security situation in Port-au-Prince* (May 17, 2022), *https://www.ohchr.org/en/press-releases/2022/05/haiti-bachelet-deeply-disturbed-human-rights-impact-deteriorating-security.*

[32] *Id.*

[33] Doctors Without Borders, *Haiti: Attacks on medical staff leave many people without health care* (May 22, 2022), *https://www.doctorswithoutborders.org/latest/haiti-attacks-medical-staff-leave-many-people-without-health-care.*

[34] InSight Crime, *Haiti Gangs Recruiting, Arming More Children* (June 3, 2022), *https://insightcrime.org/news/haiti-gangs-recruiting-arming-more-children/.*

[35] UNOCHA, *Haiti: Impact of the deteriorating security situation on humanitarian access: Background note—8 July 2022* (July 9, 2022), *https://reliefweb.int/report/haiti/haiti-impact-deteriorating-security-situation-humanitarian-access-background-note-8-july-2022.*

[36] HRW, *Haiti: Wave of Violence Deepens Crisis* (July 22, 2022), *https://reliefweb.int/report/haiti/haiti-wave-violence-deepens-crisis.*

[37] ACLED, *ACLED Regional Overview—Mexico, Central America, and the Caribbean (23–29 July 2022)* (July 29, 2022), *https://reliefweb.int/report/haiti/acled-regional-overview-mexico-central-america-and-caribbean-23-29-july-2022.*

[38] PBS NewsHour, *Haiti reaches a breaking point as the economy tanks and violence soars* (Oct. 4, 2022), *https://www.pbs.org/newshour/world/haiti-reaches-a-breaking-point-as-the-economy-tanks-and-violence-soars.*

[39] Brian Ellsworth and Harold Isaac, *UN calls for 'humanitarian corridor' in Haiti as gang blockade drags on,* Reuters, Oct. 6, 2022, *https://www.reuters.com/world/americas/un-calls-humanitarian-corridor-haiti-gang-blockade-drags-2022-10-06/.*

[40] UN News, *Haiti: Fuel crisis prompts appeal for humanitarian corridor amid cholera outbreak,* Oct. 6, 2022, *https://news.un.org/en/story/2022/10/1129317.*

[41] *Id.*

[42] Reuters, *Haiti's situation is dire and cannot persist,* State Department says, Oct. 11, 2022, *https://www.reuters.com/world/americas/haitis-situation-is-dire-cannot-persist-state-department-says-2022-10-11/.*

[43] U.S. Department of State, Press Statement, Steps to Address the Humanitarian and Security Situation in Haiti, Oct. 12, 2022, *https://www.state.gov/steps-to-address-the-humanitarian-and-security-situation-in-haiti/.*

*Federal Register*/Vol. 88, No. 17/Thursday, January 26, 2023/Notices    **5027**

October 15, the U.S. and Canada delivered Haitian National Police-purchased armored vehicles and other law enforcement equipment to assist in re-taking the terminal.[44] A Haitian National Police operation in early November successfully re-gained control of the fuel terminal.[45] The relatively small size of the Haitian National Police remains concerning. Out of 14,161 officers, approximately 13,000 officers are assigned to law enforcement activities.[46] Haiti has just over one police officer assigned to law enforcement activities per 1,000 inhabitants, well below the 2.2 officers per 1,000 recommended by the United Nations.[47]

### Environmental Situation

Several recent environmental disasters have contributed to the extraordinary and temporary conditions in Haiti. On August 14, 2021, a 7.2 magnitude earthquake hit the southern region of Haiti, killing more than 2,200 people, injuring 12,700, destroying 130,000 homes, and leaving thousands of people in urgent need of assistance.[48] Two days later, Tropical Storm Grace's torrential rains caused floods and landslides in the same departments affected by the earthquake, as well as in Sud-Est.[49] According to the 2021 Global Climate Risk Index, Haiti was third among the countries most affected by extreme weather events between 2000 and 2019 and continues to remain vulnerable.[50] Widespread deforestation has left the country especially prone to flooding and mudslides, which strike Haiti at twice the rate as the Dominican Republic.[51]

### Humanitarian Situation

Haiti has one of the highest levels of chronic food insecurity in the world with more than half of its total population chronically food insecure and 22% of children chronically malnourished, according to a September 2022 report.[52] As of October 2022, the total number of people in acute food insecurity stood at 4.7 million people, including 1.8 million people in the "emergency" phase on the World Food Program's (WFP) Integrated Food Security Classification Index.[53] For the first time ever, 19,000 Haitians are considered to be in the "catastrophe" phase (the most severe classification).[54]

Armed clashes between gangs destroyed water networks and disrupted water truck deliveries in several Port-au-Prince neighborhoods during 2022. A Doctors Without Borders project coordinator noted that in addition to an epidemic of scabies directly connected to the lack of water since the beginning of 2022, people could only "afford small quantities of drinking water, but they [couldn't] access clean water in quantities needed for hygiene."[55] Adding to the struggle Haitians face to meet their basic needs, two WFP warehouses were looted and pillaged in September 2022, resulting in the loss of approximately $6 million of relief assistance, including 2,000 tons of food.[56]

Haiti continues to face many health challenges. USAID's most recent Strategic Framework report stated: "health challenges for preventable diseases worsened after the 2010 cholera epidemic and there has been limited progress in improving health outcomes."[57] As of August 1, 2022, 1.4% of the country's population was fully vaccinated against COVID–19.[58] Haiti ranks among the world's bottom 10 countries in terms of COVID–19 vaccination coverage.[59]

The United Nations and the Haitian government have reported a new cholera outbreak, with the first cases detected between October 1–2, 2022.[60] As of November 15, 2022, there were 8,146 hospitalized suspected cases and 821 confirmed cases of cholera, resulting in 188 deaths.[61] The end of the two-month fuel terminal seizure allowed hospitals, water treatment plants, commercial water suppliers, and transportation networks to resume functioning, allowing for better access to cholera prevention and treatment. However, paradoxically, the availability of fuel also allowed for resumed mobility among the general population, potentially leading to increased cholera transmission.[62] In November 2022, the UN launched a "Flash Appeal" requesting $145.6 million to contain the outbreak and respond to other humanitarian needs throughout Haiti.[63]

### Economic Situation

Amidst the political, security, and environmental crises, Haiti's economy has floundered. Haiti is among the countries with the greatest inequality in the region. The richest 20% of its population holds more than 64% of its total wealth, while the poorest 20% has less than 1%.[64] Latest estimates put the

[44] Reuters, *U.S., Canada deliver armored vehicles to Haitian police to fight gangs*, Oct. 15, 2022, *https://www.reuters.com/world/americas/us-canada-deliver-armored-vehicles-haitian-police-2022-10-15/*.

[45] Reuters, *Haitians hope for fuel supplies after police break up gang blockade at terminal*, Nov. 5, 2022, *https://www.reuters.com/world/americas/haitians-hope-fuel-supplies-after-police-break-up-gang-blockade-terminal-2022-11-05/*.

[46] United National Security Council, Letter dated 8 October 2022 from the Secretary-General addresses to the President of the Security Council, Oct. 10, 2022, *https://digitallibrary.un.org/record/3990649?ln=en*.

[47] *Id.*

[48] UNICEF, *Massive earthquake leaves devastation in Haiti* (last updated Oct. 4, 2021), *https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti*.

[49] FAO, *Haiti: Urgent call for funding (September 2021–May 2022)—Emergency response to households affected by the earthquake and Tropical Storm Grace* (Sept. 10, 2021), *https://reliefweb.int/report/haiti/haiti-urgent-call-funding-september-2021-may-2022-emergency-response-households*.

[50] Germanwatch, *Global Climate Risk Index 2021* (Jan. 25, 2021), *https://reliefweb.int/report/world/global-climate-risk-index-2021*.

[51] Council on Foreign Relations, *Haiti's Troubled Path to Development* (Sept. 17, 2021), *https://www.cfr.org/backgrounder/haitis-troubled-path-development*.

[52] WFP, *WFP Haiti Country Brief, September 2022* (Sept. 30, 2022), *https://reliefweb.int/report/haiti/wfp-haiti-country-brief-september-2022*.

[53] UN News, *'Catastrophic' hunger recorded in Haiti for first time, UN warns*, Oct. 14, 2022, *https://news.un.org/en/story/2022/10/1129537#:~:text=According%20to%20the%20latest%20IPC,in%20Catastrophe%20phase%2C%20phase%205*.

[54] *Id.*

[55] Doctors Without Borders, *Returning to Haiti means death* (Aug. 12, 2022), *https://www.doctorswithoutborders.org/latest/returning-haiti-means-death*.

[56] Reuters, *Haiti looting caused loss of some $6 million in relief supplies, WFP says*, Sept. 26, 2022, *https://www.reuters.com/world/haiti-looting-caused-loss-some-6-mln-relief-supplies-wfp-says-2022-09-26/*.

[57] USAID, *Haiti Strategic Framework December 23, 2020–December 23, 2022* (July 29, 2021), *https://www.usaid.gov/sites/default/files/documents/Strategic_Framework_-_Haiti_-_December_2020-2022.pdf*.

[58] Congressional Research Service, *Haiti: Political Conflict and U.S. Policy Overview* (Aug. 2, 2022), *https://crsreports.congress.gov/product/pdf/IF/IF12182*.

[59] World Bank, *The World Bank approved $35 million to improve Haiti's COVID–19 response* (June 11, 2022), *https://reliefweb.int/report/haiti/world-bank-approved-35-million-improve-haitis-covid-19-response*.

[60] Widlore Mérancourt, Kelly Kasulis Cho, and Amanda Coletta, The Washington Post, Cholera Resurfaces in Haiti as gangs hinder access to water, hospitals, Oct. 3, 2022, *https://www.washingtonpost.com/world/2022/10/03/haiti-cholera-gang-violence-water/*.

[61] Pan American Health Organization, *Cholera Outbreak in Hispaniola, Situation Report #6*, Nov. 17, 2022, *https://www.paho.org/en/documents/cholera-outbreak-hispaniola-2022-situation-report-6*.

[62] PBS NewsHour, *Cholera overwhelms Haiti, experts warn outbreak could worsen as fuel blockade lifts*, Nov. 16, 2022, *https://www.pbs.org/newshour/world/cholera-overwhelms-haiti-experts-warn-outbreak-could-worsen-as-fuel-blockade-lifts*.

[63] UN Office for the Coordination of Humanitarian Affairs, *Haiti 2022 Cholera Flash Appeal (Mid Oct 2022–Mid Apr 2023)*, Nov. 15, 2022, *https://reliefweb.int/report/haiti/haiti-2022-cholera-flash-appeal-mid-oct-2022-mid-apr-2023*.

[64] World Bank, *The World Bank in Haiti Overview* (last updated June 14, 2022), *https://www.worldbank.org/en/country/haiti/overview*.

2021 poverty rate at 52.3%, up from 51% in 2020.[65] In 2021, Haiti had a GDP per capita of $1,815, the lowest in the Latin America and the Caribbean (LAC) region and less than a fifth of the LAC average of $15,092.[66] On the UN's Human Development Index,[67] Haiti ranked 170 out of 189 in 2020.[68]

In summary, Haiti is experiencing extraordinary and temporary conditions resulting from grave insecurity and gang crime, as well as socio-economic and humanitarian conditions, including those resulting from environmental disasters aggravating food insecurity.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions supporting Haiti's designation to TPS continue to be met. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(1)(C).

• There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or individuals having no nationality who last habitually resided in Haiti) from returning to Haiti in safety, and it is not contrary to the national interest of the United States to permit Haitian TPS beneficiaries to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Haiti for TPS should be extended for an 18-month period, from February 4, 2023, through August 3, 2024. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• Due to the conditions described above, Haiti should be simultaneously redesignated for TPS effective February 4, 2023, through August 3, 2024. *See* INA section 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

• The Secretary has determined that TPS applicants under the redesignation must demonstrate that they have continuously resided in the United States since November 6, 2022.

• TPS applicants under the redesignation must demonstrate that they have been continuously physically present in the United States since February 4, 2023, the effective date of the redesignation of Haiti for TPS.

---

[65] *Id.*

[66] *Id.*

[67] The Human Development Index (HDI) is a summary measure of average achievement in key dimensions of human development: a long and healthy life, being knowledgeable and have a decent standard of living. *See* UNDP, *Human Development Index (HDI)* (last visited Aug. 15, 2022), *https:// hdr.undp.org/data-center/human-development-index#/indicies/HDI.*

[68] World Bank, *The World Bank in Haiti Overview* (last updated June 14, 2022), *https:// www.worldbank.org/en/country/haiti/overview.*

• It is estimated that approximately 105,000 additional individuals may be eligible for TPS under the redesignation of Haiti. This population includes Haitian nationals in the United States in nonimmigrant status or without immigration status.

**Notice of the Designation of Haiti for TPS**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Haiti's designation for TPS on the basis of extraordinary and temporary conditions are met. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am simultaneously extending the existing designation of TPS for Haiti for 18 months, from February 4, 2023, through August 3, 2024, and redesignating Haiti for TPS for the same 18-month period. *See* INA section 244(b)(1)(C) and (b)(2); 8 U.S.C. 1254a(b)(1)(C), and (b)(2).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

*Required Application Forms and Application Fees To Register or Re-Register for TPS*

To register initially for TPS based on the designation of Haiti, you must submit a Form I–821, Application for Temporary Protected Status, and pay the filing fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). You may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the "Biometric Services Fee" section of this notice.

Individuals with existing TPS granted under the 2021 designation of Haiti must file Form-821 for re-registration as discussed above. Individuals who currently retain their TPS under the *Ramos* injunction noted in footnote 1 above, may file Form I–821 for re-registration if they wish to help ensure that their TPS continues should the *Ramos* court order end and they remain eligible. Re-registrants do not pay the $50 filing fee for the Form I–821 but must pay the biometric services fee if age 14 or older (or request a fee waiver).

TPS beneficiaries are authorized to work in the United States. You are not required to submit Form I–765 or have

an EAD, but see below for more information if you want to work in the United States.

Individuals who have a Haiti TPS application (Form I–821) that was still pending as of January 26, 2023 do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through August 3, 2024.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1) (Oct. 1, 2020). In addition, the form instructions for the Form I–821 and Form I–765 provide further information on requirements and fees for both initial TPS applicants and existing TPS beneficiaries who are re-registering.

How can TPS beneficiaries obtain an Employment Authorization Document (EAD)?

Every employee must provide their employer with documentation showing that they have the legal right to work in the United States. TPS beneficiaries are eligible for an EAD, which proves their legal right to work. Those who want to obtain an EAD must file a Form I–765, Application for Employment Authorization, and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). TPS applicants may file this form along with their TPS application, or at a later date, provided their TPS application is still pending or has been approved. Beneficiaries with a Haiti TPS-related Form I–765 application in connection with a Form I–821 that was still pending as of January 26, 2023 do not need to file the application again. If USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through August 3, 2024.

**Refiling an Initial TPS Registration Application After Denial of a Fee Waiver Request**

If your fee waiver request is denied, you must refile your Form I–821 for TPS along with the required fees during the registration period, which extends until August 3, 2024. You may also file your Form I–765 with payment of the fee along with your TPS application or at any later date you decide you want to request an EAD during the registration period.

**Federal Register** / Vol. 88, No. 17 / Thursday, January 26, 2023 / Notices **5029**

## Refiling a TPS Re-Registration Application After Denial of a Fee Waiver Request

You should refile your Form I–821 for TPS and Form I–765 as soon as possible so USCIS can process your application and issue any EAD promptly, if you requested one. Properly filing early will also give you time to refile your application before the deadline, if USCIS does not grant your fee waiver request. If you receive a notice that USCIS did not grant your fee waiver request, and you are unable to refile by the re-registration deadline, you may still refile your Form I–821 with the biometric services fee. USCIS will review this situation to determine whether you established good cause for late TPS re-registration. However, if possible, we urge you to refile within 45 days of the date on any USCIS notice that we did not grant a fee waiver. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *https://www.uscis.gov/tps.* If USCIS does not grant your fee waiver request, you may also refile your Form I–765 with the fee either with your Form I–821 or at a later time, if you choose.

**Note:** A re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 filing fee), or request a fee waiver, when filing a TPS re-registration application. However, if you decide to wait to request an EAD, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration. You may wait to seek an EAD until after USCIS has approved your TPS re-registration application or at any later date you decide you want to request an EAD. To re-register for TPS, you only need to file the Form I–821 with the biometric services fee, if applicable (or request a fee waiver).

### Filing Information

USCIS offers the option to applicants for TPS under Haiti's designation to file Form I–821 and related requests for EADs online or by mail. When filing a TPS application, applicants can also request an EAD by submitting a completed Form I–765, Request for Employment Authorization, with their Form I–821.

*Online filing:* Forms I–821 and I–765 are available for concurrent filing online.[69] To file these forms online, you must first create a USCIS online account.[70]

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

*Table 1—Mailing Addresses*

Mail your completed Form I–821, Application for Temporary Protected Status; Form I–765, Application for Employment Authorization, if applicable; Form I–912, Request for Fee Waiver (if applicable); and supporting documentation to the proper address in Table 1.

### TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You live in the following states: Florida or New York, and you are using the U.S. Postal Service (USPS). | USCIS, Attn: TPS Haiti, P.O. Box 660167, Dallas, TX 75266–0167. |
| You live in the following states: Florida or New York, and you are using FedEx, UPS, or DHL. | USCIS, Attn: TPS Haiti (Box 660167), 2501 S State Highway, 121 Business, Suite 400, Lewisville, TX 75067–8003. |
| You live in any other state, and you are using the U.S. Postal Service (USPS). | USCIS, Attn: TPS Haiti, P.O. Box 24047, Phoenix, AZ 85074–4047. |
| You live in any other state, and you are using FedEx, UPS, or DHL ..... | USCIS Attn: TPS Haiti (Box 24047), 1820 E Skyharbor Circle S, Suite 100, Phoenix, AZ 85034–4850. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

### Supporting Documents

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (that is, registering) for TPS on the USCIS website at *https://www.uscis.gov/tps* under "Haiti."

### Travel

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *https://www.uscis.gov/i-131.* You may file Form I–131 together with your Form I–821 or separately. When filing the Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for the Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

### TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
|---|---|
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status. | The address listed for on the TPS page for your country. |

[69] Find information about online filing at "Forms Available to File Online," *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[70] *https://myaccount.uscis.gov/users/sign_up.*

**5030**  **Federal Register** / Vol. 88, No. 17 / Thursday, January 26, 2023 / Notices

TABLE 2—MAILING ADDRESSES—Continued

| If you are . . . | Mail to . . . |
|---|---|
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS): You must include a copy of the receipt notice (Form I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL: You must include a copy of the receipt notice (Form I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S State Hwy., 121 Business, Ste. 400, Lewisville, TX 75067. |

*Biometric Services Fee for TPS*

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https://www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms*.

*General Employment-Related Information for TPS Applicants and Their Employers*

How can I obtain information on the status of my TPS application and EAD request?

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at *https://www.uscis.gov*, or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter*. If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

Am I eligible to receive an automatic extension of my current EAD through February 3, 2024, using this **Federal Register** notice?

Yes. Regardless of your country of birth, provided that you currently have a Haiti TPS-based EAD that has the notation A–12 or C–19 under Category and a "Card Expires" date of February 3, 2023, this **Federal Register** notice automatically extends your EAD

through February 3, 2024. Although this **Federal Register** notice automatically extends your EAD through February 3, 2024, you must re-register timely for TPS in accordance with the procedures described in this **Federal Register** notice to maintain your TPS and employment authorization.

**Note:** The validity dates of certain EADs with facial expiration dates before February 3, 2023 for TPS beneficiaries who are covered by the *Ramos* injunction continue in accordance with 86 FR 50725 (Sept. 10, 2021) and may be continued by a superseding litigation-related notice.

When I am hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central*. An EAD is an acceptable document under List A. See the section "How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?" of this **Federal Register** notice for further information. If your EAD states A–12 or C–19 under

Category and has a "Card Expires" date of February 3, 2023, it has been extended automatically by virtue of this **Federal Register** notice and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through February 3, 2024, unless your TPS has been withdrawn or your request for TPS has been denied. Your country of birth notated on the EAD does not have to reflect the TPS designated country of Haiti for you to be eligible for this extension.

What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?

Even though we have automatically extended your EAD, your employer is required by law to ask you about your continued employment authorization. Your employer may need to re-inspect your automatically extended EAD to check the "Card Expires" date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the "Card Expires" date and Category code, your employer should update the EAD expiration date in Section 2 of Form I–9. See the section "What updates should my current employer make to Form I–9 if my EAD has been automatically extended?" of this **Federal Register** notice for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through February 3, 2024, but you are not required to do so. The last day of the automatic EAD extension is February 3, 2024. Before you start work on February 4, 2024, your employer is required by law to reverify your employment authorization on Form I–9. By that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

**If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?**

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through August 3, 2024, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

**Can my employer require that I provide any other documentation such as evidence of my status or proof of my Haitian citizenship or a Form I–797C showing that I registered for TPS for Form I–9 completion?**

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request proof of Haitian citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document so long as the EAD reasonably appears to be genuine and to relate to you. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

**How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?**

When using an automatically extended EAD to complete Form I–9 for a new job before February 3, 2024:

1. For Section 1, you should:
   a. Check ''An alien authorized to work until'' and enter February 3, 2024, as the ''expiration date''; and
   b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the

same as your A-Number without the A prefix.)

2. For Section 2, employers should:
   a. Determine if the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a ''Card Expires'' date of February 3, 2023;
   b. Write in the document title;
   c. Enter the issuing authority;
   d. Provide the document number; and
   e. Write February 3, 2024, as the expiration date.

Before the start of work on February 4, 2024, employers must reverify the employee's employment authorization on Form I–9.

**What updates should my current employer make to Form I–9 if my EAD has been automatically extended?**

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has now automatically extended your EAD, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. Your employer should determine if your EAD is automatically extended by ensuring that it contains Category A–12 or C–19 on the front of the card and has a ''Card Expires'' date of February 3, 2023. Your employer may not rely on the country of birth listed on the card to determine whether you are eligible for this extension.

If your employer determines that USCIS has automatically extended your EAD, your employer should update Section 2 of your previously completed Form I–9 as follows:

1. Write EAD EXT and February 3, 2024, as the last day of the automatic extension in the Additional Information field; and

2. Initial and date the correction.

**Note:** This is not considered a reverification. Employers do not reverify the employee until either the one-year automatic extension has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By February 4, 2024, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization on Form I–9.

**If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?**

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify. Employers should enter February 3, 2024, as the expiration date for an EAD that has been extended under this **Federal Register** notice.

**If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiring'' alert for an automatically extended EAD?**

E-Verify automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related EAD when they first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. Before this employee starts work on February 4, 2024, you must reverify their employment authorization on Form I–9. Employers may not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (mismatch) must promptly inform employees of the mismatch and give such employees an opportunity to contest the mismatch. A mismatch means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

### Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

For Federal purposes, if you present an automatically extended EAD referenced in this **Federal Register** notice, you do not need to show any other document, such as a Form I–797C, Notice of Action, or this **Federal Register** notice, to prove that you qualify for this extension. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS designated country of Haiti;

• Your Form I–94, Arrival/Departure Record;

• Your Form I–797C, Notice of Action, reflecting approval of your Form I–765; or

• Form I–797 or Form I–797C, Notice of Action, reflecting approval or receipt of a past or current Form I–821.

Check with the government agency requesting documentation regarding which document(s) the agency will accept. Some state and local government agencies use the SAVE program to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each state and local government agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94, Arrival/Departure Record. If an agency accepts the type of TPS-related document you present, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice listing the TPS-related document, including any applicable auto-extension of the document, in addition to presenting your recent TPS-related document with your A-Number, or USCIS number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *https://save.uscis.gov/casecheck.* CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-Number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save,* has detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–01586 Filed 1–25–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–6374–N–01]**

### Appointments to the Housing Counseling Federal Advisory Committee; Solicitation of Nominations

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, Department of Housing and Urban Development (HUD).

**ACTION:** Notice.

---

**SUMMARY:** The Department of Housing and Urban Development (HUD) established the HCFAC on April 14, 2015. The HCFAC will consist of 12 members, equally representing the mortgage industry and real estate industry, including consumers, and HUD-approved housing counseling agencies. This notice invites nominations for an appointment to fill one vacancy on the HCFAC to represent the mortgage industry.

**DATES:** All nominations must be received no later than February 27, 2023.

**ADDRESSES:** Nominations must be in writing using a completed HUD–90005 (Application for Membership on the HCFAC, OMB Approval Number: 2502–0606) and submitted via email to *HCFAC.application@hud.gov.* Individuals who do not have internet access may submit nominations to the Office of the Deputy Assistant Secretary for Housing Counseling, U.S. Department of Housing and Urban

study'' [60] unless or until the nonimmigrant student receives employment authorization under this notice. TPS-related employment authorization, by itself, does not authorize a nonimmigrant student to drop below twelve credit hours, or otherwise applicable minimum requirements (*e.g.,* clock hours for non-traditional academic programs). Once approved for a TPS-related EAD and Special Student Relief employment authorization, as indicated by the DSO's required entry in SEVIS and issuance of an updated Form I–20, the F–1 nonimmigrant student may drop below twelve credit hours or otherwise applicable minimum requirements (with a minimum of six semester or quarter hours of instruction per academic term if at the undergraduate level, or for a minimum of three semester or quarter hours of instruction per academic term if at the graduate level). *See* 8 CFR 214.2(f)(5)(v), (f)(6), and (f)(9)(i) and (ii).

**How does a student who has received a TPS-related EAD then apply for authorization to take a reduced course load under this notice?**

There is no further application process with USCIS if a student has been approved for a TPS-related EAD. The F–1 nonimmigrant student must demonstrate and provide documentation to the DSO of the direct economic hardship resulting from the current crisis in Haiti. The DSO will then verify and update the student's record in SEVIS to enable the F–1 nonimmigrant student with TPS to reduce the course load without any further action or application. No other EAD needs to be issued for the F–1 nonimmigrant student to have employment authorization.

**Can a noncitizen who has been granted TPS apply for reinstatement of F–1 nonimmigrant student status after the noncitizen's F–1 nonimmigrant student status has lapsed?**

Yes. Regulations permit certain students who fall out of F–1 nonimmigrant student status to apply for reinstatement. *See* 8 CFR 214.2(f)(16). This provision may apply to students who worked on a TPS-related EAD or dropped their course load before publication of this notice, and therefore fell out of student status. These students must satisfy the criteria set forth in the F–1 nonimmigrant student status reinstatement regulations.

[60] *See* 8 CFR 214.2(f)(6).

**How long will this notice remain in effect?**

This notice grants temporary relief until February 3, 2026,[61] to eligible F–1 nonimmigrant students. DHS will continue to monitor the situation in Haiti. Should the special provisions authorized by this notice need modification or extension, DHS will announce such changes in the **Federal Register**.

**Paperwork Reduction Act (PRA)**

An F–1 nonimmigrant student seeking off-campus employment authorization due to severe economic hardship resulting from the current crisis in Haiti must demonstrate to the DSO that this employment is necessary to avoid severe economic hardship. A DSO who agrees that a nonimmigrant student should receive such employment authorization must recommend an application approval to USCIS by entering information in the remarks field of the student's SEVIS record. The authority to collect this information is in the SEVIS collection of information currently approved by the Office of Management and Budget (OMB) under OMB Control Number 1653–0038.

This notice also allows an eligible F–1 nonimmigrant student to request employment authorization, work an increased number of hours while the academic institution is in session, and reduce their course load while continuing to maintain F–1 nonimmigrant student status.

To apply for employment authorization, certain F–1 nonimmigrant students must complete and submit a currently approved Form I–765 according to the instructions on the form. OMB has previously approved the collection of information contained on the current Form I–765, consistent with the PRA (OMB Control Number 1615–0040). Although there will be a slight increase in the number of Form I–765 filings because of this notice, the number of filings currently contained in the OMB annual inventory for Form I–765 is sufficient to cover the additional

[61] Because the suspension of requirements under this notice applies throughout an academic term during which the suspension is in effect, DHS considers an F–1 nonimmigrant student who engages in a reduced course load or employment (or both) after this notice is effective to be engaging in a "full course of study," *see* 8 CFR 214.2(f)(6), and eligible for employment authorization, through the end of any academic term for which such student is matriculated as of February 3, 2026, provided the student satisfies the minimum course load requirements in this notice.

filings. Accordingly, there is no further action required under the PRA.

**Alejandro Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2024–14232 Filed 6–28–24; 8:45 am]

**BILLING CODE 9111–CB–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

[CIS No. 2772–24; DHS Docket No. USCIS–2014–0001]

**RIN 1615–ZB70**

**Extension and Redesignation of Haiti for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) extension and redesignation.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) and redesignating Haiti for TPS for 18 months, beginning on August 4, 2024, and ending on February 3, 2026. This extension and redesignation allows Haitian nationals (and individuals having no nationality who last habitually resided in Haiti) who have been continuously residing in the United States since June 3, 2024, and who have been continuously physically present in the United States since August 4, 2024, to apply or re-register for TPS.

**DATES:** *Extension and Redesignation of Designation of Haiti for TPS* begins on August 4, 2024, and will remain in effect for 18 months. For registration instructions, see the Registration Information section below.

**FOR FURTHER INFORMATION CONTACT:**
• You may contact Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 240–721–3000.
• For more information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*.

**Federal Register** / Vol. 89, No. 126 / Monday, July 1, 2024 / Notices **54485**

You can find specific information about Haiti's TPS designation by selecting "Haiti" from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *https://uscis.gov/ tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you cannot find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *Agenda:* or visit the USCIS Contact Center at *https:// www.uscis.gov/contactcenter.*

• You can also find more information at local USCIS offices after this notice is published.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DoS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Document
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—**Federal Register**
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
PM—Prime Minister
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Registration Information

*Extension of Designation of Haiti for TPS:* The 18-month designation of Haiti for TPS begins on August 4, 2024, and will remain in effect for 18 months, ending on February 3, 2026. The extension allows existing TPS beneficiaries to retain TPS through February 3, 2026, if they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through February 3, 2026, must re-register during the 60-day re-registration period described in this notice.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from July 1, 2024, through August 30, 2024. (*Note:* It is important for re-registrants to timely re-register during the re-registration period and not to wait until their Employment Authorization Documents (EADs) expire, as delaying re-registration could result in gaps in their employment authorization documentation.)

*Redesignation of Haiti for TPS:* The 18-month redesignation of Haiti for TPS begins on August 4, 2024, and will remain in effect for 18 months, ending on February 3, 2026. The redesignation allows individuals who do not currently have TPS to apply for TPS during the initial registration period described under the first-time registration information in this notice. In addition to demonstrating continuous residence in the United States since June 3, 2024, and meeting other eligibility criteria, initial applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since August 4, 2024, the effective date of this redesignation of Haiti for TPS.

*First-time Registration:* The initial registration period for new applicants under the Haiti TPS redesignation begins on July 1, 2024 and will remain in effect through February 3, 2026.

## Purpose of This Action (TPS)

Through this notice, DHS sets forth procedures necessary for nationals of Haiti (or individuals having no nationality who last habitually resided in Haiti) to (1) re-register for TPS and apply to renew their EAD with USCIS or (2) submit an initial registration application under the redesignation and apply for an EAD.

Re-registration is limited to individuals who have previously registered for TPS under the prior designation of Haiti and whose applications have been granted. If you do not re-register properly within the 60-day re-registration period, USCIS may withdraw your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under Haiti's designation, the 60-day re-registration period runs from July 1, 2024, through August 30, 2024. USCIS will issue new EADs with a February 3, 2026 expiration date to eligible beneficiaries granted TPS under Haiti's designation who timely re-register and apply for EADs. Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive a new EAD before their current EAD expires. Accordingly, through this **Federal Register** notice, DHS automatically extends through August 3, 2025, the validity of certain EADs previously issued under the TPS designation of Haiti. As proof of continued employment authorization through August 3, 2025, TPS beneficiaries can show their EAD with the notation A–12 or C–19 under Category and a "Card Expires" date of August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017. This notice explains how TPS beneficiaries and their employers may determine if an EAD is automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

Individuals who have an Application for Temporary Protected Status (Form I–821) for Haiti or Application for Employment Authorization (Form I–765) that was still pending as of July 1, 2024, do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through February 3, 2026. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

Under the redesignation, individuals who currently do not have TPS may submit an initial application during the initial registration period that runs from July 1, 2024, through the full length of the redesignation period ending February 3, 2026. In addition to demonstrating continuous residence in the United States since June 3, 2024, and meeting other eligibility criteria, initial applicants for TPS under this redesignation must demonstrate that they have been continuously physically present in the United States since August 4, 2024,[1] the effective date of

---

[1] The "continuous physical presence" date is the effective date of the most recent TPS designation of the country, which is either the publication date of the designation announcement in the **Federal Register** or a later date established by the Secretary. The "continuous residence" date is any date established by the Secretary when a country is designated (or sometimes redesignated) for TPS. *See* INA sec. 244(b)(2)(A) (effective date of designation); 244(c)(1)(A)(i–ii) (continuous residence and continuous physical presence date requirements); 8 U.S.C. 1254a(b)(2)(A); 1254a(c)(1)(A)(i–ii).

this redesignation of Haiti, before USCIS may grant them TPS. DHS estimates that approximately 309,000 individuals may become newly eligible for TPS under the redesignation of Haiti.

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs if they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, if it is still valid beyond the date TPS terminates.

## When was Haiti designated for TPS?

Haiti was initially designated on the basis of extraordinary and temporary conditions in Haiti that prevented nationals of Haiti from returning in safety.[2] Following the initial designation, TPS for Haiti was extended and redesignated once from July 23, 2011, through January 22, 2013, based on extraordinary and temporary conditions.[3] Thereafter, TPS for Haiti was extended four times based on extraordinary and temporary conditions: (1) from January 23, 2013, through July 22, 2014;[4] (2) from July 23, 2014, through January 22, 2016;[5] (3) from

[2] *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010).

[3] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011).

[4] *See Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (Oct. 1, 2012).

[5] *See Extension of the Designation of Haiti for Temporary Protected Status,* 79 FR 11808 (Mar. 3, 2014).

January 23, 2016, through July 22, 2017;[6] and (4) from July 23, 2017, through January 22, 2018.[7] Subsequently, the Secretary announced the termination of the TPS designation of Haiti effective July 22, 2019.[8]

The termination of Haiti's 2011 TPS designation was challenged in several lawsuits, and court injunctions required DHS to temporarily continue TPS for Haiti pending a final court order.[9] Secretary Mayorkas newly designated Haiti on the basis of extraordinary and temporary conditions effective August 3, 2021, through February 3, 2023.[10] Thereafter, TPS for Haiti was extended and redesignated effective February 4, 2023, and ending on August 3, 2024.[11]

## What authority does the Secretary have to extend the designation of Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[12] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the

[6] *See Extension of the Designation of Haiti for Temporary Protected Status,* 80 FR 51582 (Aug. 25, 2015).

[7] *See Extension of the Designation of Haiti for Temporary Protected Status,* 82 FR 23830 (May 24, 2017).

[8] *See Termination of the Designation of Haiti for Temporary Protected Status,* 83 FR 2648 (Jan. 18, 2018).

[9] On Dec. 28, 2023, the U.S. District Court for the Northern District of California dismissed Ramos v. Nielsen, 18–cv–01554 (N.D. Cal. Dec. 28, 2023). *Bhattarai v. Nielsen,* 19–cv–731 (N.D. Cal. Mar. 12, 2019) was consolidated with Ramos in August 2023. The court agreed with the government position that subsequent TPS designations rendered the pending litigation moot.

[10] *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021).

[11] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 88 FR 5022 (Jan. 26, 2023).

[12] INA section 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135 (2002). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1); 8 U.S.C. 1254a(b)(1).

designation, termination, or extension of a designation. *See* INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in their discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state continues to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## What is the Secretary's authority to redesignate Haiti for TPS?

In addition to extending an existing TPS designation, the Secretary, after consultation with appropriate Government agencies, may redesignate a country (or part thereof) for TPS. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1); *see also* INA sec. 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that "the alien has been continuously physically present since the effective date of *the most recent designation of the state*") (emphasis added).[13]

When the Secretary designates or redesignates a country for TPS, the Secretary also has the discretion to establish the date from which TPS applicants must demonstrate that they have been "continuously resid[ing]" in the United States. *See* INA sec. 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii). The Secretary has

[13] The extension and redesignation of TPS for Haiti is one of several instances in which the Secretary and, before the establishment of DHS, the Attorney General, have simultaneously extended a country's TPS designation and redesignated the country for TPS. *See, e.g., Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011); *Extension and Re-designation of Temporary Protected Status for Sudan,* 69 FR 60168 (Oct. 7, 2004); *Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program,* 62 FR 16608 (Apr. 7, 1997).

determined that the "continuous residence" date for applicants for TPS under the redesignation of Haiti will be June 3, 2024. Initial applicants for TPS under this redesignation must also show they have been "continuously physically present" in the United States since August 4, 2024, which is the effective date of the Secretary's redesignation of Haiti. *See* INA sec. 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i). For each initial TPS application filed under the redesignation, USCIS cannot make the final determination of whether the applicant has met the "continuous physical presence" requirement until August 4, 2024, the effective date of this redesignation for Haiti.

USCIS, however, will issue employment authorization documentation, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

### Why is the Secretary extending the TPS designation for Haiti and simultaneously redesignating Haiti for TPS through February 3, 2026?

DHS has reviewed country conditions in Haiti. Based on the review, including input received from Department of State (DoS) and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting Haiti's TPS designation remain. The Secretary has further determined that redesignating Haiti for TPS under INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C) is warranted and is changing the continuous residence and continuous physical presence dates that applicants must meet to be eligible for TPS.

### Overview

DHS has conducted a thorough review of country conditions in Haiti. Haiti continues to experience simultaneous economic, security, political, and health crises. Haitian gangs are the primary source of violence and instability in Haiti and pose an increasing threat as they continue to escalate and expand their influence and geographic presence over large portions of metropolitan Port-au-Prince, Haiti's capital, as well as to several of Haiti's ten departments (regional administrative divisions).[14]

Since early March 2024, the gangs have also attacked the capital's primary airport and major port terminals, and blocked roads to access the city.[15] An ongoing political impasse has left Haiti without a functioning democratically elected national government and hindered Haiti's ability to respond to the gang-driven violence. The political situation has continued to worsen since the July 2021 assassination of President Jovenel Moïse.[16] At the same time, Haiti struggles through a humanitarian crisis, with many citizens having limited access to safety, healthcare, food, water, and economic opportunity. These circumstances continue to make return to Haiti dangerous for Haitian nationals living in the United States.

### Political Situation

On July 7, 2021, President Jovenel Moïse was assassinated in his private residence in Port-au-Prince. Subsequently, Ariel Henry, whom Moïse had appointed prime minister (PM) days before the assassination, assumed power as head of a new government.[17] In the wake of the assassination, there were ongoing efforts to create a transitional government and eventually hold free and fair elections, but talks repeatedly failed, with some opposition groups demanding the resignation of PM Henry as a precondition for dialogue.[18] On December 21, 2022, representatives of civil society organizations, the private sector, and political groups created a political accord called the "National consensus for an inclusive transition and transparent elections," which was supported by PM Henry.[19] While dialogue to define a strategic direction

for holding elections continued, frustration has grown at the failure to hold elections over the last three years.[20] The last national elections in Haiti were held in November 2016. Since then, the terms of 30 senators and 119 members of Haiti's lower legislative chamber have expired, leaving Haiti without an active national legislative body since January 2023.[21]

Beginning in mid-January 2024, significant protests erupted throughout Haiti, paralyzing numerous cities.[22] The protests were driven by supporters of Guy Philippe, the leader of a 2004 rebellion against former President Jean-Bertrand Aristide in which he masterminded multiple attacks on police stations.[23] Since returning to Haiti from the United States, Philippe has spent his time "shoring up support for his so-called revolution."[24] Philippe is believed by some to be a destabilizing force in Haiti and the protests have led to the closing of schools, government agencies, and private businesses in cities throughout Haiti.[25]

PM Henry traveled abroad at the beginning of 2024 for international engagements. During his travel, a series of coordinated gang attacks began against targets in Haiti's capital and beyond, freeing thousands of inmates and closing the main international airport.[26] PM Henry has been unable to

---

[14] Edith M. Lederer, Gang violence in Haiti is escalating and spreading with a significant increase in killings, UN says, The Associated Press, Sept. 27, 2023, available at: *https://apnews.com/article/haiti-gang-violence-un-report-killings-5d3f7ff272b7303852869dfc67692a23* (last visited Apr. 29, 2024); Haiti: Humanitarian impact of gang violence, ACAPS, June 2, 2023, available at: *https://*

[15] Widlore Mérancourt and Samantha Schmidt, As gangs attack a critical port, 'Haiti will go hungry soon', The Washington Post, Mar. 7, 2024, available at: *https://www.washingtonpost.com/world/2024/03/07/haiti-gangs-port/* (last visited Apr. 29, 2024).

[16] Clare Ribando Seelke and Karla I. Rios, Haiti: Recent Developments and U.S. Policy, Congressional Research Service (CRS), Sept. 18, 2023, available at: *https://sgp.fas.org/crs/row/R47394.pdf* (last visited Apr. 29, 2024).

[17] Human Rights Watch, *World Report 2022—Haiti* (Jan. 13, 2022), *https://www.hrw.org/world-report/2022/country-chapters/haiti* (last visited Apr. 29, 2024).

[18] United Nations Integrated Office in Haiti (BINUH)—Report of the Secretary-General, UN Security Council, p. 2, Jan. 15, 2024, available at: *https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-generals202462-enarruzh* (last visited Feb. 26, 2024).

[19] Haiti Libre, *Haiti—FLASH: The PM signed a historic consensus for an inclusive transition*, Dec. 22, 2022, *https://www.haitilibre.com/en/news-38427-haiti-flash-the-pm-signed-a-historic-consensus-for-an-inclusive-transition.html* (last visited Apr. 29, 2024).

[20] Final report of the Panel of Experts on Haiti, UN Security Council, p. 8, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[21] Becky Sullivan, As its only remaining elected officials depart, Haiti reaches a breaking point, National Public Radio (NPR), Jan. 18, 2023, available at: *https://www.npr.org/2023/01/18/1149556481/haiti-last-elected-official-political-crisis* (last visited Apr. 29, 2024); *see also* Camila Domonoske, 14 Months After Elections Began, Haiti Finally Has a President-Elect, National Public Radio (NPR), Jan. 4, 2017, available at: *https://www.npr.org/sections/thetwo-way/2017/01/04/508171191/14-months-after-elections-began-haiti-finally-has-a-president-elect* (last visited Apr. 29, 2024).

[22] Supporters of former Haitian rebel leader Guy Philippe launch widespread protests, The Associated Press, Jan. 16, 2024, available at: *https://apnews.com/article/haiti-protests-guy-philippe-supporters-d0e749d75b96aee0f01395a580a6dec0* (last visited Apr. 29, 2024).

[23] *Id.*

[24] Frances Robles, An Unlikely New Threat to Haiti's Stability: An Armed Environmental Group, The New York Times, Jan. 25, 2024, available at: *https://web.archive.org/web/20240126040146/https://www.nytimes.com/2024/01/25/world/americas/haiti-political-instability-bsap.html* (last visited Apr. 29, 2024).

[25] Supporters of former Haitian rebel leader Guy Philippe launch widespread protests, The Associated Press, Jan. 16, 2024, available at: *https://apnews.com/article/haiti-protests-guy-philippe-supporters-d0e749d75b96aee0f01395a580a6dec0* (last visited Apr. 29, 2024).

[26] Dánica Coto, Haiti's prime minister is locked out of his country and faces pressure to resign, The

Continued

**54488** **Federal Register** / Vol. 89, No. 126 / Monday, July 1, 2024 / Notices

return to Haiti. On March 6, 2024, Jimmy ''Barbecue'' Cherizier, the leader of one of Haiti's most powerful gang alliances, the G9, warned that unless PM Henry stepped down, there would be civil war in Haiti.[27] In March 2024, Caribbean Community (CARICOM) leaders, with agreement from key Haitian stakeholders, announced that PM Henry would resign once a transitional presidential council was established and an interim leader was selected.[28] PM Henry resigned in late April 2024, the day before the swearing in of a 9-member transitional presidential council.[29] The council is tasked with, among other duties, selecting an interim prime minister, setting the agenda of a new Cabinet, appointing a provisional electoral commission, and establishing a national security council.[30]

The Haitian government has long been accused of corruption and ineptitude. ''Politicians and the business elite in Haiti have historically relied on gangs to obtain and exert power, but the [gangs] have grown more autonomous in recent years.'' [31] An April 2021 report by Harvard Law School's International Human Rights

Clinic alleged that the Moïse government funneled money, weapons, uniforms, and vehicles to gangs like the G9 in exchange for them repressing political opponents, often brutally, and maintaining the peace in poorer neighborhoods.[32] A July 2022 International Crisis Group report stated, ''[C]ollusion between state security forces and illegal armed groups has flourished in the absence of political will to hold corrupt officers accountable and because of the efforts of those in power to deploy the police (as well as gangs) to serve their personal interests.'' [33]

Allegations of corruption against members of Haiti's government are prevalent and its ''justice system is plagued by insecurity, corruption, strikes, and political interference.'' [34] A judge has accused more than 30 high-ranking officials, including former presidents and prime ministers, of government corruption and warrants have been issued for their arrest.[35] As of January 2024, none of the accused had been arrested.[36] Haitian government officials accused of criminal misconduct commonly ignore arrest warrants and requests for questioning.[37]

## Security Situation

Since President Moïse's assassination, Haiti has experienced a sharp deterioration in an already fragile security situation. Gang violence and kidnappings have spiked throughout the country, particularly in Port-au-Prince. In the first three months of 2024, gang violence killed or injured more than 2,500 people.[38] The violence heavily

affects three of Haiti's ten departments, with gangs having an established presence in at least six departments.[39] Gang violence continues to escalate and expand outside the capital and other major cities including Gonaïves and Cap-Haïtien. The Ouest Department, where Port-au-Prince is located, suffers from extreme insecurity from armed gang violence against civilians, police, and infrastructure alike.[40] Neighborhoods in Port-au-Prince that were previously relatively safe from the gangs have recently seen an alarming expansion of gang influence, including in Carrefour-Feuilles, Solino, Bon Repos, Mariani, and Léogâne.[41] A September 2023 final report from a panel of experts from the United Nations found that gangs controlled or influenced over 80 percent of the Port-au-Prince metropolitan area, while they committed incursions in the remaining 20 percent in which they carried out murders, kidnappings, robberies, and various other crimes.[42] In early March 2024, gangs attacked police stations and stormed two prisons in and around Port-au-Prince, allowing more than 4,700 inmates to escape.[43] Haiti's government declared a 72-hour state of emergency.[44] Following the initial attacks, the gangs blocked the roads leading to Port-au-Prince and attacked the city's main airport.[45] On March 6, the gangs attacked the primary port terminal, forcing the terminal to close indefinitely, threatening Haiti's food supply and cutting off deliveries of

Associated Press, Mar. 8, 2024, available at: *https://apnews.com/article/haiti-prime-minister-gangs-resign-e583a191a2f800bc63752220a47dec0d* (last visited Apr. 29, 2024).

[27] Haiti's top gang leader warns of ''civil war that will lead to genocide'' unless prime minister steps down, CBS News, Mar. 6, 2024, available at: *https://www.cbsnews.com/news/haiti-gang-leader-jimmy-cherizier-warns-civil-war-genocide/* (last visited Apr. 29, 2024).

[28] Widlore Mérancourt, Samantha Schmidt, and Amanda Coletta, Haitian prime minister says he'll resign, clearing way for new government, The Washington Post, Mar. 12, 2024, available at: *https://www.washingtonpost.com/world/2024/03/12/haitian-prime-minister-resign-clearing-way-new-government/* (last visited Apr. 29, 2024).

[29] Dánica Coto, Ariel Henry resigns as prime minister of Haiti, wracked by gang violence, paving the way for new government to take power, PBS News Hour, Apr. 25, 2024, available at: *https://www.pbs.org/newshour/world/ariel-henry-resigns-as-prime-minister-of-haiti-wracked-by-gang-violence-paving-the-way-for-new-government-to-take-power* (last visited May 13, 2024); Dánica Coto, Haiti's new transitional council faces urgent demands for solutions amid gang violence, PBS News Hour, Apr. 26, 2024, available at: *https://www.pbs.org/newshour/world/haitis-new-transitional-council-faces-urgent-demands-for-solutions-amid-gang-violence* (last visited May 13, 2024).

[30] Dánica Coto, Haiti's new transitional council faces urgent demands for solutions amid gang violence, PBS News Hour, Apr. 26, 2024, available at: *https://www.pbs.org/newshour/world/haitis-new-transitional-council-faces-urgent-demands-for-solutions-amid-gang-violence* (last visited May 13, 2024).

[31] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists*, International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists* (last visited Apr. 29, 2024).

[32] Harvard Law School International Human Rights Clinic, *Killing with Impunity: State-Sanctioned Massacres in Haiti* (April 2021), *http://hrp.law.harvard.edu/wp-content/uploads/2021/04/Killing_With_Impunity-1.pdf* (last visited Apr. 29, 2024).

[33] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists*, International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists* (last visited Apr. 29, 2024).

[34] World Report 2024—Haiti, Human Rights Watch, Jan. 11, 2024, available at: *https://www.ecoi.net/en/document/2103219.html* (last visited Apr. 29, 2024).

[35] Judge in Haiti issues arrest warrants accusing former presidents and prime ministers of corruption, The Associated Press, Jan. 8, 2024, available at: *https://apnews.com/article/haiti-corruption-arrest-warrant-presidents-prime-ministers-1e2c1d0530cbca235e33ada3009acabf* (last visited Apr. 29, 2024).

[36] *Id.*

[37] *Id.*

[38] Sarah Morland, Haiti's death toll rises as international support lags, UN report says, Reuters, Apr. 19, 2024, available at: *https://www.reuters.com/world/americas/haitis-death-toll-rises-international-support-lags-un-report-says-2024-04-19/* (last visited May 13, 2024).

[39] Haiti: Humanitarian impact of gang violence, ACAPS, June 2, 2023, available at: *https://reliefweb.int/report/haiti/acaps-briefing-note-haiti-humanitarian-impact-gang-violence-02-june-2023* (last visited Apr. 29, 2024).

[40] United Nations Integrated Office in Haiti (BINUH)—Report of the Secretary-General, UN Security Council, p.3, Jan. 15, 2024, available at: *https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh* (last visited Apr. 29, 2024).

[41] *Id.*

[42] Final report of the Panel of Experts on Haiti, UN Security Council, p.14, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[43] Gangs in Haiti try to seize control of main airport as thousands escape prisons: ''Massacring people indiscriminately,'' CBS News, Mar. 5, 2024, available at: *https://www.cbsnews.com/news/haiti-gangs-try-to-seize-airport-thousands-inmates-escape-prisons-state-of-emergency/* (last visited Apr. 29, 2024).

[44] Henri Astier and Gianluca Avagnina, Haiti violence: Haiti gangs demand PM resign after mass jailbreak, BBC, March 4, 2024, available at: *bbc.com/news/world-latin-america-68462851* (last visited Apr. 29, 2024).

[45] Widlore Mérancourt and Samantha Schmidt, As gangs attack a critical port, 'Haiti will go hungry soon', The Washington Post, Mar. 7, 2024, available at: *https://www.washingtonpost.com/world/2024/03/07/haiti-gangs-port/* (last visited Apr. 29, 2024).

medical supplies.[46] In response, the Haitian government extended the state of emergency until April 3 in Port-au-Prince and Haiti's Ouest Department.[47] Due to the escalating violence in neighborhoods surrounding the U.S. Embassy in Haiti and the attack on the airport, the U.S. military evacuated all non-essential Embassy personnel by airlift on Saturday, March 9, and Sunday, March 10.[48] The coordinated gang attacks that began on February 29 have displaced over 15,000 people from their homes in Port-au-Prince.[49]

There are approximately 200 groups associated with seven major gang coalitions across Haiti, and the majority of armed groups operate in metropolitan Port-au-Prince.[50] "Many of Haiti's gangs have coalesced around two main alliances:" the G9 and the GPèp.[51] "Gangs have decapitated opponents in public, burnt corpses on the street, set fire to houses and used sexual violence to intimidate residents out of collaborating with their rivals." [52] Many of these groups employ heavy armaments in their activities, and they frequently use handguns and assault weapons.[53]

Reported homicides increased significantly in 2023, by 119.4 percent from 2022, while reported kidnappings also increased significantly in 2023, by 83 percent from 2022.[54] Since the start of 2024, gangs have launched assaults against entire neighborhoods in Port-au-Prince. Automatic gunfire and burning barricades trapped residents of the Solino neighborhood in their homes in mid-January 2024.[55] The Solino neighborhood, home to many police officers, is regarded as a gateway to access other neighborhoods such as Canapé Vert that have remained relatively safe to this point.[56] Similar attacks began in the Gabelliste neighborhood in early January 2024.[57] Armed attacks in the neighborhoods of Carrefour, Cité Soleil, and Tabarre that began on February 5 have displaced almost 10,000 people from those areas.[58]

In response to the gang violence and escalating insecurity plaguing much of Haiti, as well as the lack of prosecutions and convictions relating to the violence leading to a sense of impunity, a movement known as *Bwa Kale* began in April 2023.[59] This movement is driven by anti-gang vigilantes who have armed themselves with improvised weapons and hunted down and killed suspected gang members, often burning their bodies in the aftermath.[60]

Vigilante groups had been active in Haiti prior to April 2023, but a rumored large-scale attack to be carried out by gang members in Port-au-Prince led to a major incident involving vigilantes. Police intercepted a mini-bus of suspected gang members carrying weapons in the Canapé Vert neighborhood of Port-au-Prince.[61] A large crowd surrounded the mini-bus, pelting the suspected gang members with stones and setting several of them on fire while they were still alive.[62] Thirteen people were killed.[63] Footage of the attack spread widely on social media and inspired additional attacks.[64] Lynchings were reported in Port-au-Prince in the following days.[65] Increasing numbers of people joined vigilante groups to defend themselves and their neighborhoods from gang attacks.[66] In April 2023 alone, 164 cases of mob killings and lynchings of suspected gang members were reported.[67]

Reports suggest collaboration between some vigilante groups and Haitian security forces, and that current or former Haitian police officers have participated in the vigilante violence.[68] At times, they may have also shared their weapons with the vigilante groups.[69] In response, the gangs have mounted their own movement to retaliate against the vigilante groups, called *Zam Pale*.[70] The offensive by the various vigilante groups lasted only a few months before gangs resumed their push into new territory. However, some vigilante groups remain active.[71]

Haitian law enforcement has been unable to cope with the level of gang violence due to a failure to expand the size of the Haitian National Police or sufficiently improve its operational capabilities.[72] The gangs, meanwhile, have expanded their arsenals and upgraded their firepower, hindering the

[46] *Id.*

[47] Harold Isaac and Sarah Morland, Haiti healthcare near collapse, says UN, as state of emergency extended, Reuters, Mar. 8, 2024, available at: *https://www.reuters.com/world/americas/haiti-extends-state-emergency-pm-absent-2024-03-07/* (last visited Apr. 29, 2024).

[48] Emily Mae Czachor, U.S. military airlifts embassy staff from Port-au-Prince amid Haiti's escalating gang violence, CBS News, Mar. 11, 2024, available at: *https://www.cbsnews.com/news/us-military-airlifts-evacuation-staff-embassy-port-au-prince-haiti-gang-violence/* (last visited Apr. 29, 2024).

[49] Evans Sanon and Dánica Coto, Violence is battering Haiti's fragile economy and causing food and water shortages, The Associated Press, Mar. 9, 2024, available at: *https://apnews.com/article/haiti-violence-gangs-food-economy-092a20f037b48a8e1837a4e6424cf571* (last visited Apr. 29, 2024).

[50] United Nations Integrated Office in Haiti (BINUH)—Report of the Secretary-General, UN Security Council, p.6, Apr. 14, 2023, available at: *https://binuh.unmissions.org/sites/default/files/sg_report_on_binuh_14_april_2023.pdf* (last visited Apr. 29, 2024).

[51] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists*, International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists* (last visited Apr. 29, 2024).

[52] *Id.*

[53] United Nations Integrated Office in Haiti (BINUH)—Report of the Secretary-General, UN Security Council, p.6, Apr. 14, 2023, available at: *https://binuh.unmissions.org/sites/default/files/sg_report_on_binuh_14_april_2023.pdf* (last visited Apr. 29, 2024).

[54] *Id.* at p.3.

[55] Haiti: residents trapped as armed gangs target key pocket of Port-au-Prince, The Guardian, Jan. 18, 2024, available at: *https://www.theguardian.com/world/2024/jan/18/haiti-residents-trapped-port-au-prince-gangs* (last visited Apr. 29, 2024).

[56] 'It's very scary now:' Fear grips Haiti's Port-au-Prince amid gang violence, Al Jazeera, Jan. 19, 2024, available at: *https://www.aljazeera.com/gallery/2024/1/19/fear-grips-haitis-port-au-prince-amid-gang-violence* (last visited Apr. 29, 2024).

[57] United Nations—International Organization for Migration, Haiti—Emergency Tracking Tool—Dashboard #34, Displacement following attacks in Solino and Gabelliste—Municipality of Port-au-Prince, (Jan. 18, 2024), *https://dtm.iom.int/reports/haiti-emergency-tracking-tool-34-displacement-following-attacks-solino-and-gabelliste* (last visited Apr. 29, 2024).

[58] United Nations—International Organization for Migration, Haiti—Emergency Tracking Tool—Dashboard #37.1, Updates on displacement following attacks in Carrefour, Cité Soleil and Tabarre (Feb. 13, 2024), *https://dtm.iom.int/reports/haiti-emergency-tracking-tool-371-updates-displacement-following-attacks-carrefour-cite?close=true* (last visited Apr. 29, 2024).

[59] Final report of the Panel of Experts on Haiti, UN Security Council, p. 3, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[60] *Id.*; Henry Shuldiner, Haiti's Anti-Gang Vigilantes May Pose Future Criminal Threat, InSight Crime, May 9, 2023, available at: *https://insightcrime.org/news/bwa-kale-vigilante-movement-challenging-haitis-gangs/* (last visited Apr. 29, 2024).

[61] Diego Da Rin, Haitians Turn to Mob Justice as the Gang Threat Festers, International Crisis Group, Jul. 3, 2023, available at: *https://www.crisisgroup.org/latin-america-caribbean/haiti/haitians-turn-mob-justice-gang-festers* (last visited Apr. 29, 2024).

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] Final report of the Panel of Experts on Haiti, UN Security Council, p. 17, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[71] Haiti's Gangs: Can a Foreign Mission Break Their Stranglehold?, International Crisis Group, Jan. 5, 2024, available at: *https://www.crisisgroup.org/latin-america-caribbean/haiti/b49-haitis-gangs-can-foreign-mission-break-their-stranglehold* (last visited Apr. 29, 2024).

[72] Diego Da Rin, Haitians Turn to Mob Justice as the Gang Threat Festers, International Crisis Group, Jul. 3, 2023, available at: *https://www.crisisgroup.org/latin-america-caribbean/haiti/haitians-turn-mob-justice-gang-threat-festers* (last visited Apr. 29, 2024).

Haitian National Police's ability to effectively fight them.[73] According to remarks delivered in April 2023 by the UN Special Representative of the Secretary-General for Haiti, María Isabel Salvador, the Haitian National Police are down from 14,772 personnel to about 13,200 personnel of whom only approximately 9,000 are police officers. However, only 3,500 police officers are on active duty throughout the entire country at any one time.[74] In just the first half of 2023, gang members attacked multiple police stations, murdered 29 police officers, and posted grisly pictures of the deceased on social media.[75]

Haiti's government requested international help in late 2022 to aid the Haitian National Police in combatting gang violence.[76] A Multinational Security Support (MSS) mission was authorized by the United Nations Security Council in United Nations Security Council Resolution 2699.[77] The mandate for the MSS mission is to provide operational support to the Haitian National Police, including through capacity building, and to support the Haitian National Police in providing security for critical infrastructure.[78] However, to date, the multinational armed force has not deployed to Haiti.[79]

## Environmental Situation

Several recent environmental disasters have contributed to the extraordinary and temporary conditions in Haiti. On August 14, 2021, a 7.2 magnitude earthquake hit the southern region of Haiti, killing more than 2,200 people, injuring 12,700 people, destroying 130,000 homes, and leaving thousands of people in immediate need of aid.[80] Only a few days later, Tropical Storm Grace resulted in floods and landslides in the same departments affected by the earthquake, in addition to Sud-Est.[81] Some healthcare facilities have still not been rebuilt since the August 2021 earthquake.[82] Worldwide, "Haiti remains one of the most vulnerable countries" to natural disasters, predominately including hurricanes, floods, and earthquakes.[83] Over 96 percent of Haitians are vulnerable to these disasters.[84] Widespread deforestation has left the country especially prone to flooding and mudslides, and Haiti being situated on a geographical fault line makes it more susceptible to natural disasters in general as compared to the majority of other Caribbean countries.[85] In 2023, smaller but still significant storms and flooding destroyed over 13,000 homes and cut off roads between communities.[86] In June 2023, a 4.4 magnitude earthquake and 5.5

magnitude earthquake hit Haiti's west coast only two days apart causing the deaths of at least four people while destroying homes, blocking roads, and overwhelming healthcare facilities.[87]

## Humanitarian Situation

Haiti has one of the highest levels of chronic food insecurity in the world with more than half of its total population chronically food insecure and 22 percent of children chronically malnourished, according to the World Food Programme.[88] As of September 2023, the total number of people in acute food insecurity stood at 4.35 million people, including 1.4 million people in the "emergency" phase on the World Food Program's (WFP) Integrated Food Security Classification Index.[89]

A 2024 BINUH report found that the security crisis has led to disruptions in the market supply chain, contributing to the high level of food insecurity.[90] Gangs that control the main roads between cities and departments charge increasingly high fees to allow vehicles transporting food, as well as other goods, to pass unharmed.[91] The global rise in food prices, depreciation of the Haitian currency, and other restrictions on internal movement of goods in Haiti have, along with the security crisis, contributed to the high food prices and general shortage of food.[92]

The Pan-American Health Organization and the Haitian government reported a new cholera

[73] Final report of the Panel of Experts on Haiti, UN Security Council, p. 3, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[74] María Isabel Salvador (BINUH) on the question concerning Haiti—Security Council, 9311th meeting (Apr. 26, 2023), available at: *https://webtv.un.org/en/asset/k1d/k1dtg6n2jc* (last visited Apr. 29, 2024).

[75] Diego Da Rin, Haitians Turn to Mob Justice as the Gang Threat Festers, International Crisis Group, Jul. 3, 2023, available at: *https://www.crisisgroup.org/latin-america-caribbean/haiti/haitians-turn-mob-justice-gang-threat-festers* (last visited Apr. 29, 2024).

[76] Reuters, Explainer: Why did the UN vote to send an international force to Haiti? (Oct. 2, 2023), available at: *https://www.reuters.com/world/americas/why-did-un-vote-send-an-international-force-haiti-2023-10-02/* (last visited Apr. 29, 2024).

[77] United Nations Security Council, Resolution 2699, Oct. 2, 2023, available at: *https://digitallibrary.un.org/record/4022890?ln=en&v=pdf* (last visited Apr. 29, 2024).

[78] Ambassador Robert Wood, Remarks at a UN Security Council Briefing on Haiti, United States Mission to the United Nations, Apr. 22, 2024, available at: *https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-on-haiti-11/#:~:text=This%20mission%20seeks%20to%20build,and%20communities%20to%20build%20trust.* (last visited Apr. 29, 2024).

[79] What's going on with the planned international mission to Haiti?, Reuters, Apr. 26, 2024, available at: *https://www.reuters.com/world/americas/haitis-prime-minister-called-international-security-support-who-answered-2024-03-05/* (last visited Apr. 29, 2024).

[80] UNICEF, *Massive earthquake leaves devastation in Haiti* (last updated Oct. 4, 2021), *https://www.unicef.org/emergencies/massivEdite-earthquake-devastation-haiti* (last visited Apr. 29, 2024).

[81] FAO, *Haiti: Urgent call for funding (September 2021–May 2022)—Emergency response to households affected by the earthquake and Tropical Storm Grace* (Sept. 10, 2021), *https://reliefweb.int/report/haiti/haiti-urgent-call-funding-september-2021-may-2022-emergency-response-households* (last visited Apr. 29, 2024).

[82] Luke Taylor, 'We have no time to heal': floods followed by earthquake heap more trauma on Haiti, The Guardian, available at: *https://www.theguardian.com/global-development/2023/jul/11/we-have-no-time-to-heal-floods-followed-by-earthquake-heap-more-trauma-on-haiti* (last visited Apr. 29, 2024).

[83] The World Bank in Haiti, The World Bank, Oct. 26, 2023, available at: *https://www.worldbank.org/en/country/haiti/overview* (last visited Apr. 29, 2024).

[84] The World Bank in Haiti, The World Bank, Oct. 26, 2023, available at: *https://www.worldbank.org/en/country/haiti/overview* (last visited Apr. 29, 2024).

[85] Council on Foreign Relations, *Haiti's Troubled Path to Development* (Sept. 17, 2021), *https://www.cfr.org/backgrounder/haitis-troubled-path-development* (last visited Apr. 29, 2024).

[86] Haiti—Severe weather, floods and landslides, European Commission's Directorate-General for European Civil Protection and Humanitarian Aid Operations, Jun. 6, 2023, available at: *https://reliefweb.int/report/haiti/haiti-severe-weather-floods-and-landslides-haiti-civil-protection-noaa-cpc-echo-daily-flash-06-june-2023* (last visited Apr. 29, 2024).

[87] Luke Taylor, 'We have no time to heal': floods followed by earthquake heap more trauma on Haiti, The Guardian, available at: *https://www.theguardian.com/global-development/2023/jul/11/we-have-no-time-to-heal-floods-followed-by-earthquake-heap-more-trauma-on-haiti* (last visited Apr. 29, 2024). UN, Haiti: UN deeply saddened as latest earthquake kills three, in wake of floods, available at *https://news.un.org/en/story/2023/06/1137407* (last visited Apr. 29, 2024).

[88] Haiti Country Brief, World Food Programme (WFP), Nov. 2023, available at: *https://docs.wfp.org/api/documents/WFP-0000155417/download/?_ga=2.249432451.544473126.1706236500-581114880.1706236500* (last visited Apr. 29, 2024).

[89] Haiti Country Brief, World Food Programme (WFP), Nov. 2023, available at: *https://docs.wfp.org/api/documents/WFP-0000155417/download/?_ga=2.249432451.544473126.1706236500-581114880.1706236500* (last visited Apr. 29, 2024).

[90] United Nations Integrated Office in Haiti—Report of the Secretary-General, UN Security Council, p.12, Jan. 15, 2024, available at: *https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh* (last visited Apr. 29, 2024).

[91] *Id.*

[92] Tanvi Nagpal, No Easy Solutions: Understanding the Scale of the Humanitarian Crisis in Haiti, Center for Strategic & International Studies (CSIS), Dec. 12, 2023, *https://www.csis.org/analysis/no-easy-solutions-understanding-scale-humanitarian-crisis-haiti* (last visited Apr. 29, 2024).

outbreak in October 2022.[93] As of November 15, 2022 there had been 8,146 hospitalized suspected cases and 821 confirmed cases of cholera, resulting in 188 deaths.[94] As of September 2023, the World Health Organization found that a continued lack of access to clean water sources contributed to the spread of the disease.[95] As of January 2024, an estimated 73,000 Haitians were confirmed or suspected to have cholera across all 10 departments of Haiti.[96] Human Rights Watch also estimated that as of January 2024, only 55 percent of Haitian households could access safe drinking water while two-thirds of Haitians had limited or no access to sanitation services.[97] The recent closure of some hospitals and reduced availability of ambulance services, in addition to the generally poor health condition of the entire population (due, at least in part, to significant malnutrition), has led to more significant likelihood of severe disease and death for those Haitians who contract cholera.[98]

Haiti lacks the healthcare resources to effectively respond to the cholera outbreak. Gangs control or have influence over almost half of all hospitals in the Port-au-Prince metropolitan area, with attacks on patients, staff, and facilities forcing some to close.[99] Shootings, robberies,

and kidnappings of doctors and nurses have been reported.[100] For example, in a June 2023 attack on a hospital in Ouest department, six hospital security personnel were kidnapped and ''vehicles, a generator, solar panels, and various medical supplies and equipment'' were stolen.[101] After an attack on a convoy of ambulances for Medecins Sans Frontiers (MSF) in December 2023 that killed a patient, MSF suspended their work at the Turgeau emergency center.[102] Human Rights Watch stated that it is estimated that three-quarters of Haiti's healthcare facilities lack adequate medical supplies and sufficient trained personnel as the security crisis has led to a mass exodus of health workers in recent years.[103]

## Economic Situation

Amidst the political, security, and environmental crises, Haiti's economy has been decimated and threatens the future of the country. Many children are not able to attend school.[104] Haiti is one of the poorest countries in the world, and it remains the poorest in Latin America and the Caribbean.[105] The economy has contracted for five straight years, from 2019 through 2023.[106] With prices increasing 53 percent year-on-year as of early 2023, inflation in Haiti is among the ten highest in the world.[107] Previous gains in the reduction of poverty have been undone with two-thirds of households reporting a reduction in their income in March

2023.[108] On the UN's Human Development Index,[109] Haiti ranked 158 out of 191 countries in 2022.[110]

In summary, Haiti is experiencing extraordinary and temporary conditions resulting from grave insecurity and gang crime, as well as socio-economic and humanitarian conditions, including those resulting from environmental disasters aggravating food insecurity.

Based on this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions supporting Haiti's designation for TPS continue to be met. *See* INA sec. 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or individuals having no nationality who last habitually resided in Haiti) from returning to Haiti in safety, and it is not contrary to the national interest of the United States to permit Haitian TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Haiti for TPS should be extended for an 18-month period, beginning on August 4, 2024, and ending on February 3, 2026. *See* INA sec. 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• Due to the conditions described above, Haiti should be simultaneously extended and redesignated for TPS beginning on August 4, 2024, and ending on February 3, 2026. *See* INA sec. 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

• For the redesignation, the Secretary has determined that TPS applicants must demonstrate that they have continuously resided in the United States since June 3, 2024.

• Initial TPS applicants under the redesignation must demonstrate that they have been continuously physically present in the United States since

---

[93] Widlore Mérancourt, Kelly Kasulis Cho, and Amanda Coletta, The Washington Post, Cholera Resurfaces in Haiti as gangs hinder access to water, hospitals, Oct. 3, 2022, *https://www.washingtonpost.com/world/2022/10/03/haiti-cholera-gang-violence-water/* (last visited Apr. 29, 2024).

[94] Pan American Health Organization, *Cholera Outbreak in Hispaniola, Situation Report #6*, Nov. 17, 2022, *https://www.paho.org/en/documents/cholera-outbreak-hispaniola-2022-situation-report-6* (last visited Apr. 29, 2024).

[95] Haiti Health Cluster: Navigating a Multifaceted Humanitarian Crisis, World Health Organization (WHO), Sept. 5, 2023, available at: *https://healthcluster.who.int/newsroom/news/item/05-09-2023-haiti-health-cluster-navigating-a-multifaceted-humanitarian-crisis* (last visited Apr. 29, 2024).

[96] United Nations Integrated Office in Haiti—Report of the Secretary-General, UN Security Council, p.13, Jan. 15, 2024, available at: *https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh* (last visited Apr. 29, 2024).

[97] World Report 2024—Haiti, Human Rights Watch, Jan. 11, 2024, available at: *https://www.ecoi.net/en/document/2103219.html* (last visited Apr. 29, 2024).

[98] Haiti | Earthquake and Cholera Outbreak—Emergency Appeal No. MDRHT018—Operation update #6, International Federation of Red Cross and Red Crescent Societies (IFRC), Nov. 3, 2023, available at: *https://reliefweb.int/report/haiti/haiti-earthquake-and-cholera-outbreak-emergency-appeal-no-mdrht018-operation-update-6* (last visited Apr. 29, 2024).

[99] Final report of the Panel of Experts on Haiti, UN Security Council, p. 145, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/*

*un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[100] *Id.*

[101] *Id.*

[102] MSF suspends work in Haiti emergency centre after armed group kills patient, Al Jazeera, Dec. 15, 2023, available at: *https://www.aljazeera.com/news/2023/12/15/msf-suspends-work-at-hatian-hospital-after-armed-group-kill-patient* (last visited Apr. 29, 2024).

[103] World Report 2024—Haiti, Human Rights Watch, Jan. 11, 2024, available at: *https://www.ecoi.net/en/document/2103219.html* (last visited Apr. 29, 2024).

[104] Final report of the Panel of Experts on Haiti, UN Security Council, pp. 2–3, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[105] World Bank, *The World Bank in Haiti Overview* (last updated Oct. 26, 2023), *https://www.worldbank.org/en/country/haiti/overview* (last visited Apr. 29, 2024).

[106] Haiti—Recession: Haiti's economy in free fall, −10.5% of GDP in total over 5 years, Haiti Libre, Jan. 3, 2024, available at: *https://www.haitilibre.com/en/news-41354-haiti-recession-haiti-s-economy-in-free-fall105-of-gdp-in-total-over-5-years.html* (last visited Apr. 29, 2024).

[107] Johnny Wood, These countries have been the hardest hit by food price inflation, World Economic Forum, Feb. 21, 2023, available at: *https://www.weforum.org/agenda/2023/02/countries-hit-by-food-prices-inflation-cost-of-living-crisis/* (last visited Apr. 29, 2024).

[108] World Bank, The World Bank in Haiti Overview (last updated Oct. 26, 2023), *https://www.worldbank.org/en/country/haiti/overview* (last visited Apr. 29, 2024).

[109] The Human Development Index (HDI) is a summary measure of average achievement in key dimensions of human development: a long and healthy life, being knowledgeable and have a standard of living. The latest 2024 HDI report contains data for 2022. See UN Development Programme (UNDP), Human Development Index (HDI) (last visited Apr. 29, 2024), *https://hdr.undp.org/data-center/human-development-index#/indicies/HDI*.

[110] World Bank, The World Bank in Haiti Overview (last updated Oct. 26, 2023), *https://www.worldbank.org/en/country/haiti/overview* (last visited Apr. 29, 2024); UNDP, Human Development Index (HDI) (last visited Apr. 29, 2024), *https://hdr.undp.org/data-center/human-development-index#/indicies/HDI*.

**54492** **Federal Register**/Vol. 89, No. 126/Monday, July 1, 2024/Notices

August 4, 2024, the effective date of the redesignation of Haiti for TPS.

• There are approximately 214,000 current Haiti TPS beneficiaries who are eligible to re-register for TPS under the extension.

It is estimated that approximately 309,000 additional individuals may be eligible for TPS under the redesignation of Haiti. This population includes Haitian nationals in the United States in nonimmigrant status or without immigration status.

## Notice of the Designation of Haiti for TPS

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Haiti's designation for TPS on the basis of extraordinary and temporary conditions are met, and it is not contrary to the national interest of the United States to allow Haitian TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2). On the basis of this determination, I am simultaneously extending the existing designation of Haiti for TPS for 18 months, beginning on August 4, 2024, and ending on February 3, 2026, and redesignating Haiti for TPS for the same 18-month period. *See* INA sec. 244(b)(1) and (b)(2); 8 U.S.C. 1254a(b)(1), and (b)(2).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

## Eligibility and Employment Authorization for TPS

### Required Application Forms and Application Fees To Register or Re-Register for TPS

To register or re-register for TPS based on the designation of Haiti, you must submit a Form I–821. If you are submitting an initial TPS application, you must pay the application fee for Form I–821 (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). If you are filing an application to re-register for TPS, you do not need to pay the application fee. Whether you are registering as an initial applicant or re-registering, you are required to pay the biometric services fee. If you cannot pay the biometric services fee, you may ask USCIS to waive the fee. Please see additional information under the ''Biometric Services Fee'' section of this notice.

TPS beneficiaries are eligible for an Employment Authorization Document (EAD), which proves their authorization to work in the United States. You are not required to submit Form I–765 or have an EAD to be granted TPS, but see below for more information if you want an EAD to use as proof that you can work in the United States.

Individuals who have a Haiti TPS application (Form I–821) that was still pending as of July 1, 2024 do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through February 3, 2026.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 106.2 and the fee waiver-related regulations in 8 CFR 106.3. In addition, USCIS Form G–1055, Fee Schedule, provides the current fees required for the Form I–821 and Form I–765 for both initial TPS applicants and existing TPS beneficiaries who are re-registering.

### How can TPS beneficiaries obtain an Employment Authorization Document (EAD)?

Everyone must provide their employer with documentation showing that they have the legal right to work in the United States. TPS beneficiaries are eligible to obtain an EAD, which proves their legal right to work. If you want to obtain an EAD, you must file Form I–765 and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912). TPS applicants may file this form with their TPS application, or separately later, if their TPS application is still pending or has been approved.

Beneficiaries with a Haiti TPS-related Form I–765 that was still pending as of July 1, 2024 do not need to file the application again. If USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through February 3, 2026.

### Refiling an Initial TPS Registration Application After Receiving a Denial of a Fee Waiver Request

If USCIS denies your fee waiver request, you can resubmit your TPS application. The fee waiver denial notice will contain specific instructions about resubmitting your application.

### Filing Information

USCIS offers the option to applicants for TPS to file Form I–821 and related requests for EADs online or by mail. However, if you request a fee waiver, you must submit your application by mail. When filing a TPS application, you can also request an EAD by submitting a completed Form I–765 with your Form I–821.

*Online filing:* Form I–821 and Form I–765 are available for concurrent filing online.[111] To file these forms online, you must first create a USCIS online account.[112]

*Mail filing:* Mail your completed Form I–821; Form I–765, if applicable; Form I–912, if applicable; and supporting documentation to the proper address in Table 1—Mailing Addresses.

### TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You live in Florida, and you are using the U.S. Postal Service (USPS) | USCIS Attn: TPS Haiti, P.O. Box 660167, Dallas, TX 75266–0167. |
| You live in Florida, and you are using FedEx, UPS, or DHL .................. | USCIS Attn: TPS Haiti (Box 660167),2501 S State Highway, 121, Business Suite 400, Lewisville, TX 75067–8003. |
| You live in Massachusetts or New York, and you are using the U.S. Postal Service (USPS). | USCIS Attn: TPS Haiti, P.O. Box 4091, Carol Stream, IL 60197–4091. |
| You live in Massachusetts or New York, and you are using FedEx, UPS, or DHL. | USCIS Attn: TPS Haiti (Box 4091), 2500 Westfield Drive, Elgin, IL 60124–7836. |
| You live in any other state or territory, and you are using the U.S. Postal Service (USPS). | USCIS Attn: TPS Haiti, P.O. Box 24047, Phoenix, AZ 85074–4047. |

---

[111] Find information about online filing at ''Forms Available to File Online,'' *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[112] *https://myaccount.uscis.gov/users/sign_up.*

**Federal Register** / Vol. 89, No. 126 / Monday, July 1, 2024 / Notices

**54493**

## TABLE 1—MAILING ADDRESSES—Continued

| If . . . | Mail to . . . |
|---|---|
| You live in any other state or territory, and you are using FedEx, UPS, or DHL. | USCIS Attn: TPS Haiti (Box 24047), 2108 East Elliot Road, Tempe, AZ 85284–1806. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please file online or mail your Form I–765 to the appropriate address in Table 1. If you file online, please include the fee. If you file by mail, please include the fee or fee waiver request. When you request an EAD based on an IJ or BIA grant of TPS, please include with your application a copy of the order from the IJ or BIA granting you TPS. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions for Form I–821 list all the documents you need to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (also called registering) for TPS on the USCIS website at *https://www.uscis.gov/tps* under "Haiti."

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If USCIS grants travel authorization, it gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, available at *https://www.uscis.gov/i-131*. You may file Form

I–131 together with your Form I–821 or separately. When you file Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for Form I–131, or request a fee waiver, which you may submit on Form I–912.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for your approved or pending Form I–821.

## TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
|---|---|
| Filing Form I–131 together with Form I–821 .................................................. | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS):<br>You must include a copy of the Notice of Action (Form I–797C or I–797) showing USCIS accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL:<br>You must include a copy of the Notice of Action (Form I–797C or I–797) showing USCIS accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S. State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants, in addition to a biometric services fee. As previously stated, if you cannot pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. USCIS may require you to visit an Application Support Center to have your biometrics collected. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https://www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms*.

**General Employment-Related Information for TPS Applicants and Their Employers**

**How can I obtain information on the status of my TPS application and EAD request?**

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at *https://uscis.gov* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter*. If you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**Am I eligible to receive an automatic extension of my current EAD through August 3, 2025, through this Federal Register notice?**

Yes. Regardless of your country of birth, if you currently have a Haiti TPS-based EAD with the notation A–12 or C–

19 under Category and a "Card Expires" date of August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017, this **Federal Register** notice automatically extends your EAD through August 3, 2025. Although this **Federal Register** notice automatically extends your EAD through August 3, 2025, you must timely re-register for TPS in accordance with the procedures described in this **Federal Register** notice to maintain your TPS and avoid possible gaps in your employment authorization documentation.

**When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?**

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/*

*acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three business days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in these lists. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central.* An EAD is an acceptable document under List A. See the section "How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?" of this **Federal Register** notice for more information. If your EAD states A–12 or C–19 under Category and has a "Card Expires" date of August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017, this **Federal Register** notice extends it automatically, and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through August 3, 2025, unless your TPS has been withdrawn or your request for TPS has been denied. Your country of birth noted on the EAD does not have to reflect the TPS-designated country of Haiti for you to be eligible for this extension.

**What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?**

Even though we have automatically extended your EAD, your employer is required by law to ask you about your continued employment authorization. Your employer may need to reexamine your automatically extended EAD to check the "Card Expires" date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the "Card Expires" date and Category code, they should update the EAD expiration date in Section 2 of Form I–9. See the section "What updates should my current employer make to Form I–9 if my EAD

has been automatically extended?" of this **Federal Register** notice for more information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through August 3, 2025, but you are not required to do so. The last day of the automatic EAD extension is August 3, 2025. Before you start work on August 4, 2025, your employer is required by law to reverify your employment authorization on Form I–9. By that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in these lists to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

**If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?**

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, even if you already have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through February 3, 2026, you must file Form I–765 and pay the associated fee (unless USCIS grants your fee waiver request).

**Can my employer require that I provide any other documentation to complete Form I–9, such as evidence of my status, proof of my Haitian citizenship, or a Form I–797C showing that I registered for TPS?**

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request other documentation, such as proof of Haitian citizenship or proof of registration for TPS, when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document if the EAD reasonably appears to be genuine and to relate to you. Refer to the "Note to Employees" section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or

otherwise discriminates against you based on your citizenship or immigration status or your national origin.

**How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?**

When using an automatically extended EAD to complete Form I–9 for a new job before August 4, 2025:
1. For Section 1, you should:
a. Check "A noncitizen authorized to work until" and enter August 3, 2025, as the "expiration date"; and
b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)
2. For Section 2, employers should:
a. Determine whether the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a "Card Expires" date of August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017;
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Write August 3, 2025, as the expiration date.
Before the start of work on August 4, 2025, employers must reverify the employee's employment authorization on Form I–9.

**What updates should my current employer make to Form I–9 if my EAD has been automatically extended?**

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has now automatically extended your EAD, your employer may need to re-examine your current EAD if they do not have a copy of the EAD on file. Your employer should determine whether your EAD is automatically extended by ensuring that it contains Category A–12 or C–19 and has a "Card Expires" date of August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017. Your employer may not rely on the country of birth listed on the card to determine whether you are eligible for this extension.

If your employer determines that USCIS has automatically extended your EAD, they should update Section 2 of your previously completed Form I–9 as follows:
1. Write EAD EXT and August 3, 2025, as the last day of the automatic

extension in the Additional Information field; and

2. Initial and date the correction.

**Note:** This is not considered a reverification. Employers do not reverify the employee until either the automatic extension has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By August 4, 2025, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization on Form I–9.

**If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?**

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify. Employers should enter August 3, 2025, as the expiration date for an EAD that has been extended under this **Federal Register** notice.

**If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiring" alert for an automatically extended EAD?**

E-Verify automated the verification process for TPS-related EADs that are automatically extended. If you have an employee who provided a TPS-related EAD when they first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. Before this employee starts work on August 4, 2025, you must reverify their employment authorization on Form I–9. Employers may not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls and emails in English, Spanish, and many other languages. For questions about avoiding discrimination during the

employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in many languages. Employers may also email IER at *IER@usdoj.gov* or get more information online at *https:// www.justice.gov/ier.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls and emails in English, Spanish and many other languages. Employees or job applicants may also call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in many languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in these lists. Employers may not require extra or additional documentation other than what is required to complete Form I–9. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (mismatch) must promptly inform employees of the mismatch and give these employees an opportunity to resolve the mismatch. A mismatch means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result occurs if E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more

information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

For Federal purposes, if you present an automatically extended EAD referenced in this **Federal Register** notice, you do not need to show any other document, such as a Form I–797C, Notice of Action, reflecting receipt of a Form I–765 EAD renewal application or this **Federal Register** notice, to prove that you qualify for this extension. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary or applicant, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS-designated country of Haiti;

• Your Form I–94, Arrival/Departure Record;

• Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or

• Form I–797 or Form I–797C, Notice of Action, reflecting approval or receipt of a past or current Form I–821, if you received one from USCIS.

Check with the government agency requesting documentation about which document(s) the agency will accept.

Some state and local government agencies use SAVE to confirm the current immigration status of applicants for public benefits. While SAVE can verify that an individual has TPS or a

pending TPS application, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. If an agency accepts the type of TPS-related document you present, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your A-Number, USCIS number, or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://www.uscis.gov/save/save-casecheck*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (such as your A-Number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must allow you to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *https://www.uscis.gov/save,* has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2024–14247 Filed 6–28–24; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

**[245A2100DD/AAKC001030/A0A501010.999900]**

### Indian Gaming; Extension of Tribal-State Class III Gaming Compact in California

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice.

**SUMMARY:** This notice announces the extension of the Class III gaming compact between the Table Mountain Rancheria and the State of California.

**DATES:** The extension takes effect on July 1, 2024.

**FOR FURTHER INFORMATION CONTACT:** Ms. Paula L. Hart, Director, Office of Indian Gaming, Office of the Assistant Secretary—Indian Affairs, Washington, DC 20240, *IndianGaming@bia.gov;* (202) 219–4066.

**SUPPLEMENTARY INFORMATION:** An extension to an existing Tribal-State Class III gaming compact does not require approval by the Secretary if the extension does not modify any other terms of the compact. 25 CFR 293.5. The Table Mountain Rancheria and the State of California have reached an agreement to extend the expiration date of their existing Tribal-State Class III gaming compact to December 31, 2024. This publication provides notice of the new expiration date of the compact.

**Bryan Newland,**

*Assistant Secretary—Indian Affairs.*

[FR Doc. 2024–14350 Filed 6–28–24; 8:45 am]

**BILLING CODE 4337–15–P**

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

**[BLM_ID_FRN_MO4500171580]**

### Notice of Realty Action: Direct Sale of Public Lands in Custer County, ID

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of realty action.

**SUMMARY:** The Bureau of Land Management (BLM) proposes a non-competitive (direct) sale of a parcel of BLM-managed public lands in Idaho to permanently resolve the inadvertent and unauthorized use of the land. The parcel, located in Custer County, contains 2.07 acres and, if approved, would be sold to Mr. Raymond M. Simon. The sale would be subject to the applicable provisions of the Federal

Land Policy and Management Act of 1976 (FLPMA), as amended, and BLM land sale regulations. The surface and mineral estate would be sold for no less than the appraised fair market value of $30,000.

**DATES:** Interested parties must submit written comments, postmarked, or delivered no later than August 15, 2024.

The land would not be offered for sale until after August 30, 2024.

**ADDRESSES:** Mail written comments to Martha Price, Acting Field Manager, BLM Challis Field Office, P.O. Box 817, Challis, ID 83226. Comments may also be emailed to *mprice@blm.gov*.

**FOR FURTHER INFORMATION CONTACT:** David Hilliard, Assistant Field Manager, BLM Challis Field Office, phone: 208–879–6217, or email: *dhilliard@blm.gov*. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** The BLM will consider a direct sale in accordance with applicable provisions of Sections 203 and 209 of FLPMA and BLM land sale regulations. The parcel would be sold for no less than the appraised fair market value of $30,000.

**Boise Meridian, Idaho**

T. 13 N., R. 19 E.
    Sec. 9, lot 4.
    The area described contains 2.07 acres.

There is no known mineral value in the parcel; therefore, the mineral estate would also be conveyed in accordance with Section 209 of FLPMA. Mr. Raymond M. Simon would be required to pay a $50 non-refundable filing fee for conveyance of the available mineral interests and any associated administrative costs with the sale. The proposed sale is in conformance with the BLM Challis Resource Management Plan approved in July 1999, and the plan maintenance action approved on May 10, 2022. The BLM prepared a parcel-specific Environmental Assessment (EA), document number DOI–BLM–ID–I030–2023–0012–EA, in connection with this realty action. It can be viewed online at *https://eplanning.blm.gov/eplanning-ui/project/2024447/510*.

Regulations at 43 CFR 2710.0–3(a) and 2711.3–3(a) authorize the BLM to utilize a direct sale of public land when a competitive sale is not appropriate and the public interest would best be

today, the TSS is an impediment to safe navigation in the area. The TSS identifies separate northbound and southbound travel lanes which accommodated both lanes of vessel traffic in 1969, given the size of vessels operating in the area then. Today, however, vessels with deeper drafts, which are limited to operating in the waters the TSS covers, travel in the area, and they must travel in opposing lanes to avoid the risk of grounding.

The comment, and supporting documents, are available in the public docket and can be viewed at *https://www.regulation.gov.* To view documents, in the "Search" box insert "USCG–2023–0330" and click "Search." Then select "Supporting & Related Material" in the Document Type column.

The Smith Point TSS no longer serves a useful purpose, and the notice of inquiry USCG published in August confirms that there are no concerns from the public about removing it and therefore the USCG has decided to move forward with the removal of the vessel traffic routing measure.

## III. Authority and Action To Be Taken

Under 46 U.S.C. 70001(a)(4), as delegated, USCG may control vessel traffic in areas subject to the jurisdiction of the United States that it determines to be hazardous by, among other means, establishing vessel traffic routing schemes. Based on the analysis of historical vessel traffic patterns and the comment received, the Coast Guard will:

1. Request NOAA remove the Smith Point TSS chart feature from all applicable charts and update the U.S. Coast Pilot to remove the TSS and reflect changes to the on-scene navigational buoy the USCG will deploy.

2. Change the Smith Point Fairway Lighted Buoy SP (LLNR 7490) to Smith Point Lighted Buoy SP, a white and red striped Safe Water Buoy and the light will be changed from a yellow to white with a Morse Code "A" flash characteristic.

Dated: December 8, 2023.

**Shannon N. Gilreath,**

*Rear Admiral, U.S. Coast Guard, Commander, Fifth Coast Guard District.*

[FR Doc. 2023–27440 Filed 12–13–23; 8:45 am]

**BILLING CODE 9110–04–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2760–23; DHS Docket No. USCIS–2023–0013]**

**RIN 1615–ZC06**

### Extension of Re-Registration Periods for Extensions of the Temporary Protected Status Designations of El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of extension of re-registration periods for extensions of the Temporary Protected Status designations of El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the re-registration periods for the extensions of the Temporary Protected Status (TPS) designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan from 60 days to the full 18-month designation extension period of each country. Beneficiaries must re-register to receive TPS benefits under the most recent designation extensions for these countries.

**DATES:** The re-registration period for individuals to submit TPS applications under the designation of:

• El Salvador is July 12, 2023, through March 9, 2025;

• Haiti is January 26, 2023, through August 3, 2024;

• Honduras is November 6, 2023, through July 5, 2025;

• Nepal is October 24, 2023, through June 24, 2025;

• Nicaragua is November 6, 2023, through July 5, 2025; and

• Sudan is August 21, 2023, through April 19, 2025.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Renà Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS

web page at *https://uscis.gov/tps.* You can find specific information about each country's TPS designation by selecting the name of the country from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *https://uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *https://uscis.gov/contactcenter.*

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

### Table of Abbreviations

DHS   U.S. Department of Homeland Security
EAD   Employment Authorization Document
Form I–765   Application for Employment Authorization
Form I–821   Application for Temporary Protected Status
FR   Federal Register
INA   Immigration and Nationality Act
Secretary   Secretary of Homeland Security
TPS   Temporary Protected Status
TTY   Text Telephone
USCIS   U.S. Citizenship and Immigration Services

### Purpose of This Action (TPS)

The re-registration period extensions apply to the following **Federal Register** notices:

*Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador,* 88 FR 40282 (June 21, 2023). The 18-month re-registration period now runs from July 12, 2023, through March 9, 2025.

*Extension and Redesignation of Haiti for Temporary Protected Status,* 88 FR 5022 (January 26, 2023). The re-registration period now runs from January 26, 2023, through August 3, 2024.

*Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras,* 88 FR 40304 (June 21, 2023). The 18-month re-registration period now runs from November 6, 2023, through July 5, 2025.

*Reconsideration and Rescission of Termination of the Designation of Nepal for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nepal,* 88 FR 40317 (June 21, 2023). The 18-month re-registration period now runs from October 24, 2023, through June 24, 2025.

*Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua,* 88 FR 40294 (June 21, 2023). The 18-month re-registration period now runs from November 6, 2023, through July 5, 2025.

*Extension and Redesignation of Sudan for Temporary Protected Status,* 88 FR 56864 (August 21, 2023). The re-registration period now runs from August 21, 2023, through April 19, 2025.

Through this notice, DHS sets forth updated re-registration periods from 60 days to 18 months for the extensions of the TPS designations for El Salvador,[1] Haiti,[2] Honduras,[3] Nepal,[4] Nicaragua,[5] and Sudan[6] as specified in this notice. *See* section 244 of the Immigration and Nationality Act (INA), 8 U.S.C. 1254a; 8 CFR 244.17. This will allow individuals to submit a re-registration application for TPS and an application for employment authorization documentation (if desired), during the full length of the relevant country's TPS designation extension.

DHS is extending the re-registration periods for a number of reasons, including that certain beneficiaries have not been required to re-register for TPS for several years due to pending litigation and related continuation of their documentation, confusion within

the beneficiary population, and operational considerations for USCIS. Historically, the length of the re-registration period has typically been 60 days.[7] Beneficiaries of TPS have typically re-registered for TPS within a 60-day period on a recurring basis at the end of their country's designation approximately every 12 to 18 months as announced by **Federal Register** notices that extended the designation. However, certain beneficiaries under these TPS designations have not been required to re-register for TPS for several years due to a series of DHS-issued **Federal Register** notices that continued the documentation for beneficiaries of TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal pursuant to ongoing litigation.[8] Those beneficiaries must re-register to receive TPS benefits under the most recent extensions.

After reevaluating the initial 60-day re-registration periods announced for TPS under the designation extensions for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, DHS has determined that it will provide the full designation extension periods for applicants to file their re-registration

Form I–821 and Form I–765 to obtain an EAD, if desired. Limiting the re-registration period to 60 days for these particular beneficiaries may place a burden on applicants who are unable to timely file but would otherwise be eligible to re-register for TPS, particularly in light of the ongoing litigation and the resulting overlapping periods of TPS validity announced in several **Federal Register** notices, which may be confusing to some current beneficiaries. This notice allows beneficiaries of these countries who have not been required to re-register for TPS since their last extension to re-register over the full TPS designation period.[9] Prior to the currently required re-registration, beneficiaries under these designations[10] were last required to re-register from July 8, 2016, through September 6, 2016, under El Salvador's designation,[11] from May 16, 2016, through July 15, 2016, under Nicaragua's and Honduras's designations,[12] and from October 26, 2016, through December 27, 2016, under Nepal's designation.[13]

As discussed previously, due to unique circumstances, including protracted litigation, these TPS

---

[1] *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador,* 88 FR 40282 (June 21, 2023).

[2] *Extension and Redesignation of Haiti for Temporary Protected Status,* 88 FR 5022 (Jan. 26, 2023).

[3] *Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras,* 88 FR 40304 (June 21, 2023).

[4] *Reconsideration and Rescission of Termination of the Designation of Nepal for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nepal,* 88 FR 40317 (June 21, 2023).

[5] *Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua,* 88 FR 40294 (June 21, 2023).

[6] *Extension and Redesignation of Sudan for Temporary Protected Status,* 88 FR 56864 (Aug. 21, 2023).

[7] DHS has previously provided a re-registration period for longer than 60 days. *See, e.g., Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011) (providing a 90-day re-registration period for Haiti TPS). Additionally, DHS has previously extended a re-registration period. *See, e.g., Extension of the Re-Registration Period for Haiti Temporary Protected Status,* 79 FR 25141 (May 2, 2014) (providing an extension of the re-registration period for Haiti TPS in order to maximize re-registration opportunities for eligible beneficiaries. At the time, USCIS had received a low proportion of the expected number of re-registration applications, and stakeholders reported that the low number of re-registration applications may have been due to confusion about the re-registration deadline). Similarly, DHS is providing applicants under these designations extended re-registration periods to address the several year gap in the typical re-registration requirements.

[8] TPS termination decisions were announced for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal in 2017–2018. Lawsuits challenging the terminations were filed in the U.S. District Court for the Northern District of California in *Ramos* v. *Nielsen,* 326 F. Supp. 3d 1075 (N.D. Cal. 2018), and *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019), and in the U.S. U.S. District Court for the Eastern District of New York in *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019). DHS has taken actions to ensure its continued compliance with the court orders in *Ramos* and *Bhattarai.* DHS has published periodic notices to continue TPS and extend the validity of TPS-related documentation previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal. *See* 83 FR 54764 (Oct. 31, 2018); 84 FR 7103 (Mar. 1, 2019); 84 FR 20647 (May 10, 2019) (correction notice issued at 84 FR 23578 (May 22, 2019)); 84 FR 59403 (Nov. 4, 2019); 85 FR 79208 (Dec. 9, 2020); 86 FR 50725 (Sept. 10, 2021) (correction notice issued at 86 FR 52694 (Sept. 22, 2021)); 87 FR 68717 (Nov. 16, 2022).

[9] Re-registrants under TPS Haiti and Sudan, including beneficiaries who initially obtained TPS under the 2021 and 2022 designations of TPS for Haiti and Sudan, may file during the entire designation re-registration period as noted in this notice.

[10] Haiti and Sudan were newly designated for TPS in 2021 and 2022, respectively. Prior to the new designation of TPS for Haiti on August 3, 2021, beneficiaries under the Haiti designation were last required to re-register from May 24, 2017, through July 24, 2017. *See Extension and Redesignation of Haiti for Temporary Protected Status,* 82 FR 23830 (July 23, 2017). Prior to the new designation of TPS for Sudan on April 19, 2022, beneficiaries under the Sudan designation were last required to re-register from January 25, 2016, through March 25, 2016. *See Extension and Redesignation of Sudan for Temporary Protected Status,* 81 FR 4045 (January 25, 2016).

[11] *Extension of the Designation of El Salvador for Temporary Protected Status,* 81 FR 44645 (July 8, 2016).

[12] *Extension of the Designation of Nicaragua for Temporary Protected Status,* 81 FR 30325 (May 16, 2016). *Extension of the Designation of Honduras for Temporary Protected Status,* 81 FR 30331 (May 16, 2016). Following the last extension of TPS for Honduras, former Acting Secretary Elaine Duke did not make a decision on extending or terminating Honduras's TPS designation by the statutory deadline, resulting in an automatic 6-month extension of the designation, through July 5, 2018. *See Extension of the Designation of Honduras for Temporary Protected Status,* 82 FR 59630 (Dec. 15, 2017). If the Secretary makes no decision on extension or termination of a country's TPS designation by at least 60 days before the expiration of the existing TPS designation, then INA sec. 244(b)(3)(C) requires that the designation be extended an additional six months (or 12 or 18 months in the Secretary's discretion).

[13] *Extension of the Designation of Nepal for Temporary Protected Status,* 81 FR 74470 (October 26, 2016).

**Federal Register** / Vol. 88, No. 239 / Thursday, December 14, 2023 / Notices

beneficiaries have been subject to multiple, overlapping periods of potential TPS validity due to the ongoing litigation. They also have not been required to re-register for several years. Therefore, this extended re-registration period allows this population of beneficiaries to more easily comply with the re-registration requirement, which could avoid placing additional burdens on these re-registrants. In addition, permitting re-registration throughout the entirety of the designation extension period could reduce the operational burden on USCIS; reviewing and adjudicating late-filed re-registration applications that may occur as a result of the 60-day period due to lack of awareness of the re-registration requirement that these particular beneficiaries are more likely to experience because of the protracted litigation and subsequent TPS actions to continue documentation, would require additional resources.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–27342 Filed 12–13–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7076–N–19]**

**60-Day Notice of Proposed Information Collection: Public Housing Agency (PHA) 5-Year and Annual Plan; OMB Control No.: 2577–0226**

**AGENCY:** Office of the Assistant Secretary for Public and Indian Housing (PIH), HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* February 12, 2024.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Written comments and recommendations for the proposed information collection can be submitted within 60 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting

''Currently under 60-day Review—Open for Public Comments'' or by using the search function. Interested persons are also invited to submit comments regarding this proposal by name and/or OMB Control Number and can be sent to: Colette Pollard, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210, Washington, DC 20410–5000 or email at *PaperworkReductionActOffice@hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Management Analyst, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street, SW, Washington, DC 20410; email *Colette.Pollard@hud.gov,* telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.* Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

## A. Overview of Information Collection

*Title of Information Collection:* Public Housing Agency (PHA) 5-Year and Annual Plan.

*OMB Approval Number:* 2577–0226.
*Type of Request:* Revision of currently approved collection.

*Form Number(s):* HUD–50075–5Y, HUD–50075–HCV, HUD–50075–HP, HUD–50075–MTW, HUD–50075–SM, HUD–50075–ST, HUD–50077–CR, HUD–50077–CRT–SM HUD–50077–ST–HCV–HP and HUD–50077–SL.

*Description of the need for the information and proposed use:* The Public Housing Agency (PHA) Plan was created by section 5A of the United States Housing Act of 1937 (42 U.S.C. 1437c–1). There are two different PHA Plans: The Five-Year Plan and the Annual Plan. The Five-Year Plan describes the agency's mission, long-range goals, and objectives for achieving its mission over a five-year period. The Annual PHA Plan is a comprehensive guide to PHA policies, programs, operations, and strategies for meeting local housing needs and goals. This revision addresses updates to the HUD–

50075–HCV form and the automation of all the PHA Plan forms including the Moving to Work (MTW) Supplement for PHAs that joined the MTW Demonstration under the 2016 Appropriations Act (*i.e.,* MTW Expansion).

PHA Plans are needed to inform the Department of Housing and Urban Development (HUD), residents, and the public of the PHA's mission and strategy for serving the needs of low income, very low-income, and extremely low- income families in the PHA's jurisdiction. This information helps provide accountability to the local community for how PHAs spend their funding and implement their policies. The PHA Plan submission also includes various certifications to confirm that PHAs will abide by all Federal civil rights laws and that the PHA Plan is consistent with the applicable Consolidated Plan.

PHA plans also allow HUD to monitor the performance of programs and the performance of the public housing agencies that administer them. Since 2000, HUD has taken several steps to reduce the administrative burden of the PHA Plan submission including the use of streamlined plan submissions for certain PHA based on size and performance. Most recently, the Housing and Economic Reform Act (HERA) removed the requirement for qualified PHAs to submit an annual PHA Plan and to only submit the 5-year Plan. A ''qualified PHA'' is one that manages 550 or fewer public housing units and vouchers and is not labeled as a troubled public housing agency. Currently, qualified PHA must only submit an annual certification to confirm that they will abide by all Federal civil rights laws.

In January 2021 HUD requested from OMB that the PHA Plan collection be reinstated with change. These changes included a new section to accommodate the new requirements of the Affirmatively Furthering Fair Housing (AFFH) Rule and the introduction of the MTW Supplement. OMB approved the changes, reinstated the collections and HUD made the new templates available to PHAs on the HUD website as individual word processing files. After publication, HUD made subsequent minor changes to the forms and certifications to remove unnecessary sections, make minor edits and to account for updated or removed regulatory citations. Additionally, HUD took steps to automate the MTW supplement in the Housing Information Portal (HIP).

With this current proposed information collection, HUD intends to

money from relatives in Haiti who are themselves continuing to recover from the earthquake.

The United States is committed to continuing to assist the people of Haiti. DHS is therefore extending this employment authorization for F–1 nonimmigrant students whose country of citizenship is Haiti and who are continuing to experience severe economic hardship as a result of the earthquake.

## How do I apply for an employment authorization under the circumstances of this notice?

F–1 nonimmigrant students whose country of citizenship is Haiti who were lawfully present in the United States on January 12, 2010 and are experiencing severe economic hardship as a result of the earthquake may apply for employment authorization under the guidelines described in 75 FR 56120. This notice extends the time period during which such F–1 students may seek employment authorization due to the earthquake. It does not impose any new or additional policies or procedures beyond those listed in the original notice. All interested F–1 students should follow the instructions listed in the original notice.

**Janet Napolitano,**
*Secretary.*

[FR Doc. 2012–23825 Filed 9–28–12; 8:45 am]

**BILLING CODE 9111–28–P**

---

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2524–12; DHS Docket No. USCIS–2012–0009]**

**RIN 1615–ZB14**

## Extension of the Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) for 18 months from January 23, 2013 through July 22, 2014. The extension allows currently eligible TPS beneficiaries to retain TPS through July 22, 2014. The Secretary has determined that an extension is warranted because the conditions in Haiti that prompted the initial 2010 TPS designation and the 2011 redesignation continue to be met. There continue to be extraordinary and temporary conditions in Haiti resulting from the devastating effects of the

January 2010 earthquake that prevent Haitians from returning to their country in safety. Permitting eligible Haitians to remain temporarily in the United States is not contrary to the national interest of the United States.

This notice also sets forth procedures necessary for nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EADs) with U.S. Citizenship and Immigration Services (USCIS). Re-registration is limited to persons who have previously registered for TPS under the designation of Haiti and whose applications have been granted. Certain nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) who have not previously applied for TPS may be eligible to apply under the late initial registration provisions, if they meet: (1) At least one of the late initial filing criteria and (2) all TPS eligibility criteria (including continuous residence in the United States since January 12, 2011, and continuous physical presence in the United States since July 23, 2011).

USCIS will issue new EADs with a July 22, 2014 expiration date to eligible Haitian TPS beneficiaries who timely re-register and apply for EADs under this extension. Given the timeframes involved with processing TPS re-registration applications, the Department of Homeland Security (DHS) recognizes that all re-registrants may not receive new EADs until after their current EADs expire on January 22, 2013. Accordingly, this Notice automatically extends the validity of EADs issued under the TPS designation of Haiti for 6 months, from January 22, 2013 through July 22, 2013, and explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and their impact on the Employment Eligibility Verification (Form I–9) and E-Verify processes.

**DATES:** The 18-month extension of the TPS designation of Haiti is effective January 23, 2013, and will remain in effect through July 22, 2014. The 60-day re-registration period begins October 1, 2012 and will remain in effect until November 30, 2012.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility (including eligibility for late initial registration), please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* The general TPS Web page has detailed information on

filing and eligibility requirements. You can find specific information about this extension of Haiti for TPS by selecting "TPS Designated Country: Haiti" from the menu on the left of the TPS Web page. You can obtain information in French or Creole by selecting the language from the menu on the right from the TPS Haiti-specific Web page.

• You can also contact the TPS Operations Program Manager at the Status and Family Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS notice. It is not for individual case status inquiries.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 1–800–375–5283 (TTY 1–800–767–1833). Service is available in English and Spanish only.

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

## Abbreviations and Terms Used in This Document

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
Government—U.S. Government
HNP—Haitian National Police
IDP—Internally Displaced Persons
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
PAHO—Pan American Health Organization
Secretary—Secretary of Homeland Security
SAVE—USCIS Systematic Alien Verification for Entitlements Program
TPS—Temporary Protected Status
UN—United Nations
USCIS—U.S. Citizenship and Immigration Services

## What is Temporary Protected Status (TPS)?

• TPS is an immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States and may obtain

work authorization, so long as they continue to meet the requirements of TPS status.
• TPS beneficiaries may also be granted travel authorization as a matter of discretion.
• The granting of TPS does not lead to permanent resident status.
• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS (unless that status has since expired or been terminated) or to any other lawfully obtained immigration status they received while registered for TPS.

## When was Haiti designated for TPS?

On January 22, 2010, the Secretary designated Haiti for TPS based on extraordinary and temporary conditions within the country, specifically the effects of the 7.0-magnitude earthquake that occurred January 12, 2010. *See* 75 FR 3476. In 2011, the Secretary extended Haiti's designation and redesignated Haiti for TPS for 18 months through January 22, 2013. *See* 76 FR 29000 (May 19, 2011). This announcement is the second extension of TPS for Haiti since the original designation in January 2010.

## What authority does the Secretary have to extend the designation of Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate Government agencies, to designate a foreign state (or part thereof) for TPS.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state). *See* section 244(a)(1)(A) of the INA, 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* section 244(b)(3)(A) of the INA, 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation is extended

for an additional 6 months (or in the Secretary's discretion for 12 or 18 months). *See* section 244(b)(3)(C) of the INA, 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* section 244(b)(3)(B) of the INA, 8 U.S.C. 1254a(b)(3)(B).

## Why is the Secretary extending the TPS designation for Haiti for TPS through July 22, 2014?

Over the past year, the Department of Homeland Security (DHS) and the Department of State (DOS) have continued to review conditions in Haiti. Based on this review and after consulting with DOS, the Secretary has determined that an 18-month extension is warranted because the extraordinary and temporary conditions that prompted the original January 2010 TPS designation and the July 2011 extension and redesignation persist.

The January 12, 2010 earthquake that struck Haiti caused extensive damage to infrastructure, public health, agriculture, transportation, and educational facilities. A coordinated international effort and strong partnership with the Haitian people resulted in emergency response activities that saved lives and laid a foundation for Haiti to rebuild. However, many of the conditions prompting the original January 2010 TPS designation and the July 2011 extension and redesignation persist.

Haitian government estimates of the death toll caused by the earthquake have ranged from 230,000 to over 300,000 people. The Government of Haiti further estimated that more than 1,000,000 people were displaced within the Port-au-Prince metropolitan area. Destruction from the earthquake rose to catastrophic levels due to Haiti's already weak infrastructure, as the government struggled to provide minimum basic services even prior to the earthquake.

Security in Haiti remains a concern as progress toward a return to country conditions before the January 2010 earthquake has been slow. The earthquake killed 77 officers of the Haitian National Police (HNP), injured 253 officers, and destroyed or severely damaged 45 HNP stations and substations. The earthquake destroyed 13 of the 15 ministry buildings and 180 other government buildings, including the National Palace. In addition to devastating the center of government, damage from the earthquake paralyzed the economic center as well. Some 30,000 commercial buildings suffered severe damage, collapsed, or were

expected to be demolished. Political instability, including the resignation of Prime Minister Conille, had also hampered the reconstruction process. Without the Government of Haiti's authority to fully engage in development decisions, the reconstruction process was at a standstill. However, a new Prime Minister and cabinet are now in place.

Following the January 2010 earthquake, more than 1,000,000 Haitians were left homeless and living in temporary camps. In early 2012, approximately 500,000 people continued to live in internally displaced persons (IDP) camps, which are vulnerable to flooding, disease, crime, and gender-based violence. Alternative housing options are lacking. Severely damaged infrastructure remains unrepaired, disrupting the informal businesses on which the economy is based. Rubble continues to impede recovery efforts. By some estimates, the amount of debris in Port-au-Prince alone after the earthquake was about 33,000,000 cubic yards. The scale of the damage, level of displacement, low funding, and the lack of a government housing reconstruction policy have all impeded reconstruction efforts.

Poor camp conditions were exacerbated by steady rains in October 2010, which led to flooding and contributed to a deadly cholera outbreak. According to the Haitian Ministry of Health, as of May 1, 2012, there have been an estimated 532,192 cholera cases and 7,060 associated deaths since October 2010. The Pan American Health Organization (PAHO) warns that 200,000 to 250,000 people could contract the disease during the April to November 2012 rainy season.

Food security continues to be a problem 2 years after the earthquake, although much progress has been made. The quality of drinking water in the camps has remained stable since January 2012 according to the National Directorate for Potable Water and Sanitation of the Republic of Haiti. A survey conducted at 433 sites showed that roughly 63 percent of the camp population is drinking chlorinated water. Despite this promising number, camp sanitation remains a concern.

Children are a particularly vulnerable population in Haiti. Of the 661,000 displaced persons outside of Port-au-Prince six months after the quake, roughly half were estimated to be children. The Ministry of Education in Haiti estimated that 80 percent of the schools west of the capital were destroyed or severely damaged in the earthquake. The Ministry further estimated that some 35 to 40 percent of

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to the Department of Homeland Security "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying HSA, tit. XV, sec. 1517).

schools in the southeast were destroyed, rendering the total number of schools destroyed or severely damaged as high as 5,000.

The 2010 earthquake exacerbated Haiti's position as the poorest nation in the Western Hemisphere and one of the poorest nations in the world. Given the risk of contracting cholera, unsafe living conditions in IDP camps, damaged infrastructure, and a shortage of permanent shelter, it is unsafe for Haitians currently in the United States with TPS to return home. While the situation has improved, the effects of the earthquake continue to reverberate in Haiti.

Based upon this review and after consultation with appropriate Government agencies, the Secretary finds that:

• The conditions that prompted the July 23, 2011 extension and redesignation of Haiti for TPS continue to be met. *See* section 244(b)(3)(A) and (C) of the INA, 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals from returning to Haiti in safety. *See* section 244(b)(1)(C) of the INA, 8 U.S.C. 1254a(b)(1)(C).

• It is not contrary to the national interest of the United States to permit Haitians (and persons who have no nationality who last habitually resided in Haiti) who meet the eligibility requirements of TPS to remain in the United States temporarily. *See* section 244(b)(1)(C) of the INA, 8 U.S.C. 1254a(b)(1)(C).

• The designation of Haiti for TPS should be extended for an additional 18-month period from January 23, 2013 through July 22, 2014. *See* section 244(b)(3)(C) of the INA, 8 U.S.C. 1254a(b)(3)(C).

• There are approximately 60,000 current Haiti TPS beneficiaries who are expected to be eligible to re-register for TPS under the extension.

**Notice of Extension of the TPS Designation of Haiti**

By the authority vested in me as Secretary under section 244 of the INA, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, that the conditions that prompted the redesignation of Haiti for TPS on July 23, 2011 continue to be met. *See* section 244(b)(3)(A) of the INA, 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am extending the existing TPS designation of Haiti for 18

months from January 23, 2013 through July 22, 2014.

**Janet Napolitano,**
*Secretary.*

**Required Application Forms and Application Fees To Register or Re-register for TPS**

To register or re-register for TPS for Haiti, an applicant must submit each of the following two applications:

1. Application for Temporary Protected Status (Form I–821).

• You only need to pay the Application for Temporary Protected Status (Form I–821) application fee if you are filing an application for late initial registration. *See* 8 CFR 244.2(f)(2) and information on late initial filing on the USCIS TPS Web page at *www.uscis.gov/tps.*

• You do not need to pay the Application for Temporary Protected Status (Form I–821) fee for a re-registration;
and

2. Application for Employment Authorization (Form I–765).

• If you are applying for re-registration, you must pay the Application for Employment Authorization (Form I–765) fee only if you want an EAD.

• If you are applying for late initial registration and want an EAD, you must pay the Application for Employment Authorization (Form I–765) fee only if you are age 14 through 65. No Application for Employment Authorization (Form I–765) fee is required if you are under the age of 14 or over the age of 65 and applying for late initial registration.

• You do not pay the Application for Employment Authorization (Form I–765) fee if you are not requesting an EAD, regardless of whether you are applying for re-registration or are filing a late initial registration.

You must submit both completed application forms together. If you are unable to pay for the application and/or biometrics fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Fees for Application for Temporary Protected Status (Form I–821), Application for Employment Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured.

**Re-Filing a Re-Registration TPS Application After Receiving a Denial of a Fee Waiver Request**

USCIS urges all re-registering applicants to file as soon as possible within the 60-day re-registration period so that USCIS can promptly process the applications and issue EADs. Filing early will also allow those applicants who may receive denials of their fee waiver requests to have time to re-file their applications before the re-registration deadline. If, however, an applicant receives a denial of his or her fee waiver request and is unable to re-file by the re-registration deadline, the applicant may still re-file his or her application. This situation will be reviewed under good cause for late re-registration. However, applicants are urged to re-file within 45 days of the date on their USCIS fee waiver denial notice, if at all possible. *See* section 244(c)(3)(C) of the INA; 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(c). For more information on good cause for late re-registration, visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Note: As previously stated, although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the initial TPS application fee) when filing a TPS re-registration application, the applicant may decide to wait to request an EAD and pay the Application for Employment Authorization (Form I–765) fee after USCIS has approved the individual's TPS re-registration, if he or she is eligible.

**Mailing Information**

Mail your application for TPS to the proper address in Table 1:

TABLE 1—MAILING ADDRESS

| If you live in . . . | For regular mail using the U.S. Postal Service, send to . . . | For delivery services other than the U.S. Postal Service, send to . . . |
|---|---|---|
| The State of Florida ................... | USCIS, P.O. Box 4464, Chicago, IL 60680–4464 ...... | USCIS, Attn: TPS Haiti, 131 S. Dearborn 3rd Floor, Chicago, IL 60603–5517. |
| The State of New York .............. | USCIS, P.O. Box 660167, Dallas, TX 75266–0167 ... | USCIS, Attn: TPS Haiti, 2501 S. State Hwy. 121, Business, Suite 400, Lewisville, TX 75067. |
| Any other state .......................... | USCIS, P.O. Box 24047, Phoenix, AZ 85074–4047 ... | USCIS, Attn: TPS Haiti, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA), and you wish to request an EAD or are re-registering for the first time following a grant of TPS by the IJ or BIA, please mail your application to the appropriate address in Table 1 above. Upon receiving a Receipt Notice from USCIS, please send an email to the appropriate USCIS Service Center handling your application providing the receipt number and stating that you submitted a re-registration and/or request for an EAD based on an IJ/BIA grant of TPS. If your USCIS receipt number begins with the letters "LIN", please email the Nebraska Service Center at *TPSijgrant.nsc@uscis.dhs.gov*. If your USCIS receipt number begins with the letters "WAC", please email the California Service Center at *TPSijgrant.csc@uscis.dhs.gov*. You can find detailed information on what further information you need to email and the email addresses on the USCIS TPS Web page at *http://www.uscis.gov/tps*.

**E-Filing**

You cannot electronically file your application when registering or re-registering for Haiti TPS. Please mail your application to the mailing address listed in Table 1 above.

**Employment Authorization Document (EAD)**

*May I request an interim EAD at my local USCIS office?*

No. USCIS will not issue interim EADs to TPS applicants and re-registrants at local offices.

*Am I eligible to receive an automatic 6-month extension of my current EAD from January 22, 2013 through July 22, 2013?*

Provided that you currently have TPS under the Haiti designation, this notice automatically extends your EAD by 6 months if you:

• Are a national of Haiti (or an alien having no nationality who last habitually resided in Haiti);

• Received an EAD under the last extension or re-designation of TPS for Haiti; and

• Have an EAD with a marked expiration date of January 22, 2013, bearing the notation "A–12" or "C–19" on the face of the card under "Category."

Although your EAD is automatically extended through July 22, 2013 by this notice, you must re-register timely for TPS in accordance with the procedures described in this notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Employment Eligibility Verification (Form I–9). You can find additional detailed information on the USCIS I–9 Central Web page at *http://www.uscis.gov/I–9Central*. Employers are required to verify the identity and employment authorization of all new employees by using Employment Eligibility Verification (Form I–9). Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (reflecting both your identity and employment authorization), or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization) on the Employment Eligibility Verification (Form I–9). An EAD is an acceptable document under "List A." Employers may not reject a document based upon a future expiration date.

If your EAD has an expiration date of January 22, 2013, and states "A–12" or "C–19" under "Category", it has been extended automatically for 6 months by virtue of this **Federal Register** notice, and you may choose to present your EAD to your employer as proof of identity and employment authorization

for Employment Eligibility Verification (Form I–9) through July 22, 2013 (see the subsection below titled "*How do I and my employer complete the Employment Eligibility Verification (Form I–9) (i.e., verification) with an automatically extended EAD for a new job?*" for further information). To minimize confusion over this extension at the time of hire, you may also show your employer a copy of this **Federal Register** notice confirming the automatic extension of employment authorization through July 22, 2013. As an alternative to presenting your automatically extended EAD, you may choose to present any other acceptable document from List A, or List B plus List C.

*What documentation may I show my employer if I am already employed but my current TPS-related EAD is set to expire?*

Even though EADs with an expiration date of January 22, 2013, that state "A–12" or "C–19" under "Category" have been automatically extended for 6 months by virtue of this **Federal Register** notice, your employer will need to ask you about your continued employment authorization once January 22, 2013 is reached in order to meet its responsibilities for Employment Eligibility Verification (Form I–9). However, your employer does not need a new document in order to reverify your employment authorization until after July 22, 2013. Instead, you and your employer must make corrections to the employment authorization expiration dates in section 1 and section 2 of the Employment Eligibility Verification (Form I–9) (see the subsection below titled "*What corrections should I and my employer at my current job make to the Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*" for further information). In addition, you may also show this **Federal Register** notice to your employer to avoid confusion about what to do for the Form I–9.

After July 22, 2013, when the automatic extension expires, your

employer must reverify your employment authorization. You may show any document from List A or List C on the Employment Eligibility Verification (Form I–9) to satisfy this reverification requirement. Your employer is required to reverify on the Employment Eligibility Verification (Form I–9) your continued employment authorization upon the July 22, 2013 expiration of your TPS-related EAD but may not specify which List A or List C document you must present. Employers reverify either in Section 3 of the Form I–9 originally completed or, if this section is already been completed or if the version of Form I–9 is no longer valid, in Section 3 of a new Form I–9 using the most current version.

*What happens after July 22, 2013 for purposes of employment authorization?*

After July 22, 2013, employers may no longer accept the EADs that this **Federal Register** notice automatically extended. However, before that time, USCIS will issue new EADs to TPS re-registrants. These new EADs will have an expiration date of July 22, 2014 and can be presented to your employer for completion of Employment Eligibility Verification (Form I–9). Alternatively, you may choose to present any other legally acceptable document or combination of documents listed on the Employment Eligibility Verification (Form I–9).

*How do I and my employer complete the Employment Eligibility Verification (Form I–9) (i.e., verification) using an automatically extended EAD for a new job?*

When using an automatically extended EAD to fill out the Employment Eligibility Verification (Form I–9) for a new job prior to July 22, 2013, you and your employer should do the following:

(1) For Section 1, you should:
a. Check "An alien authorized to work";

b. Write your alien number (USCIS number or A-number) in the first space (your EAD or other document from DHS will have your USCIS number or A-number printed on it; the USCIS Number is the same as your A-number without the A prefix); and

c. Write the automatic extension date (July 22, 2013) in the second space.

(2) For Section 2, employers should record the:
a. Document title;
b. Document number; and
c. Automatically extended EAD expiration date (July 22, 2013).

After July 22, 2013, employers must reverify the employee's employment authorization in Section 3 of the Employment Eligibility Verification (Form I–9).

*What corrections should my current employer and I make to the Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job, but that EAD has now been automatically extended, you and your employer should correct your previously completed Employment Eligibility Verification (Form I–9) as follows:

(1) For Section 1, you should:
a. Draw a line through the expiration date in the second space;

b. Write "July 22, 2013" above the previous date;

c. Write "TPS Ext." in the margin of Section 1; and

d. Initial and date the correction in the margin of Section 1.

(2) For Section 2, employers should:
a. Draw a line through the expiration date written in Section 2;

b. Write "July 22, 2013" above the previous date;

c. Write "TPS Ext." in the margin of Section 2; and

d. Initial and date the correction in the margin of Section 2.

After July 22, 2013, when the automatic extension of EADs expires, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

If you are an employer who participates in E-Verify, you will receive a "Work Authorization Documents Expiring" case alert when a TPS beneficiary's EAD is about to expire. Usually, this message is an alert to complete Section 3 of the Employment Eligibility Verification (Form I–9) to reverify an employee's employment authorization. For existing employees with TPS-related EADs that have been automatically extended, employers should dismiss this alert by clicking the red "X" in the "dismiss alert" column and follow the instructions above explaining how to correct the Employment Eligibility Verification (Form I–9). After July 22, 2013, employment authorization must be reverified in Section 3. Employers should never use E-Verify for reverification.

*Can my employer require that I produce any other documentation to prove my status, such as proof of my Haitian citizenship?*

No. When completing the Employment Eligibility Verification (Form I–9), including reverifying employment authorization, employers must accept any documentation that appears on the Employment Eligibility Verification (Form I–9) lists of acceptable documentation, and that reasonably appears to be genuine and that relates to you. Employers may not request documentation that does not appear on the Lists of the Acceptable Document for Form I–9. Therefore, employers may not request proof of Haitian citizenship when completing the Employment Eligibility Verification (Form I–9) for new hires or reverifying the employment authorization of current employees. If presented with EADs that have been automatically extended pursuant to this **Federal Register** notice or EADs that are unexpired on their face, employers should accept such EADs as valid "List A" documents so long as the EADs reasonably appear to be genuine and to relate to the employee. See below for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call the USCIS Form I–9 Customer Support at 1–888–464–4218 (TDD 877–875–6028 for hearing impaired). For questions about avoiding discrimination during the employment eligibility verification process, employers may also call the Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Employer Hotline at 1–800–255–8155 (TDD for the hearing impaired is at 1–800–237–2515), which offers language interpretation in numerous languages.

## Note to Employees

For general questions about the employment eligibility verification process, employees may call the USCIS National Customer Service Center at 1–800–375–5283; calls are accepted in English and Spanish. Employees or applicants may also call the OSC Worker Information Hotline at 1–800–255–7688 (TDD for the hearing impaired is at 1–800–237–2515) for information regarding employment discrimination based upon citizenship or immigration status, or based on national origin, or for information regarding discrimination related to the Employment Eligibility Verification (Form I–9) and E-Verify. The OSC Worker Information Hotline provides language interpretation in numerous languages. In order to comply with the law, employers must accept any document or combination of documents acceptable for Employment Eligibility Verification (Form I–9) completion if the documentation reasonably appears to be genuine and to relate to the employee. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-verify who receive an E-verify initial mismatch (''tentative nonconfirmation'' or ''TNC'') on employees must inform employees of the mismatch and give such employees an opportunity to challenge the mismatch. Employers are prohibited from taking adverse action against such employees based on the initial mismatch unless and until E-Verify returns a final nonconfirmation. For example, employers must allow employees challenging their mismatches to continue to work without any delay in start date or training, and without any change in hours or pay, while the final E-Verify determination remains pending. Additional information is available on the OSC Web site at *http://www.justice.gov/crt/about/osc* and the USCIS Web site at *http://www.dhs.gov/E-verify.*

## Note Regarding Federal, State and Local Government Agencies (Such as Departments of Motor Vehicles)

While federal government agencies must follow the guidelines laid out by the federal government, state and local government agencies are permitted to create their own guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples are:

(1) Your expired EAD that has been automatically extended, or your EAD that has a valid expiration date;

(2) A copy of this **Federal Register** notice if your EAD is automatically extended under this notice;

(3) A copy of your Application for Temporary Protected Status Receipt Notice (Form I–797) for this re-registration;

(4) A copy of your past or current Application for Temporary Protected Status Approval Notice (Form I–797), if you receive one from USCIS; and/or

(5) If there is an automatic extension of work authorization, a copy of the fact sheet from the USCIS TPS Web site that provides information on the automatic extension.

Check with the government agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to verify the current immigration status of applicants for public benefits. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request can be found at the SAVE Web site at *www.uscis.gov/save,* then by choosing ''How to Correct Your Records'' from the menu on the right.

[FR Doc. 2012–23826 Filed 9–28–12; 8:45 am]

**BILLING CODE 9111–97–P**

# DEPARTMENT OF HOMELAND SECURITY

## Federal Emergency Management Agency

[Docket ID FEMA–2012–0024; OMB No. 1660–0108]

## Agency Information Collection Activities: Submission for OMB Review; Comment Request

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** The Federal Emergency Management Agency (FEMA) will submit the information collection abstracted below to the Office of Management and Budget for review and clearance in accordance with the requirements of the Paperwork Reduction Act of 1995. The submission will describe the nature of the information collection, the categories of respondents, the estimated burden (i.e., the time, effort and resources used by respondents to respond) and cost, and the actual data collection instruments FEMA will use.

**DATES:** Comments must be submitted on or before October 31, 2012.

**ADDRESSES:** Submit written comments on the proposed information collection to the Office of Information and Regulatory Affairs, Office of Management and Budget. Comments should be addressed to the Desk Officer for the Department of Homeland Security, Federal Emergency Management Agency, and sent via electronic mail to *oira.submission@omb.eop.gov* or faxed to (202) 395–5806.

**FOR FURTHER INFORMATION CONTACT:** Requests for additional information or copies of the information collection should be made to Director, Records Management Division, 1800 South Bell Street, Arlington, VA 20598–3005, facsimile number (202) 646–3347, or email address *FEMA-Information-Collections-Management@dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## Collection of Information

*Title:* National Emergency Family Registry and Locator System.

*Type of information collection:* Revision of a currently approved information collection.

*Form Titles and Numbers:* None.

*Abstract:* NEFRLS is a Web-based database enabling FEMA to provide a nationally available and recognized database allowing adults (including medical patients) that have been

recommendations presented in the subcommittees' reports, and formulate recommendations for the Department's consideration.

The Committee is scheduled to receive the following briefs:

(1) National Plan for Safety and Security of Especially Hazardous Cargo.

(2) U.S. Army Corps of Engineers Galveston District Set-back Design Operating Procedures.

(3) Carriage of Shale Gas Extraction Wastewater in Bulk.

A copy of each draft report, presentation and the final agenda will be available at *https:// homeport.uscg.mil/tsac.*

An opportunity for oral comments by the public will be provided during the meeting on March 20, 2014. Speakers are requested to limit their comments to 3 minutes. Please note that the public oral comment period may end before the end of the stated meeting times if the Committee has finished its business. Please contact Lieutenant Commander William A. Nabach, listed in the **FOR FURTHER INFORMATION CONTACT** section to register as a speaker.

**Minutes**

Minutes from the meeting will be available for public review and copying within 90 days following the close of the meeting and can be accessed from the Coast Guard Homeport Web site *http://homeport.uscg.mil/tsac.*

**Notice of Future 2014 TSAC Meetings**

To receive automatic email notices of future TSAC meetings in 2014, go to the online docket, USCG–2013–1065 (*http://www.regulations.gov/ #!docketDetail;D=USCG-2013-1065*), and select the sign-up-for-email-alerts option. We plan to use the same docket number for all TSAC meeting notices in 2014, so when the next meeting notice is published you will receive an email alert from www.regulations.gov when the notice appears in this docket.

Dated: February 25, 2014.

**J.G. Lantz,**
*Director of Commercial Regulations and Standards.*

[FR Doc. 2014–04561 Filed 2–28–14; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2539–13; DHS Docket No. USCIS–2014–0001]**

**RIN 1615–ZB25**

### Extension of the Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) for 18 months from July 23, 2014 through January 22, 2016.

The extension allows currently eligible TPS beneficiaries to retain TPS through January 22, 2016, so long as they otherwise continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because the conditions in Haiti that prompted the TPS designation continue to be met. There continues to be a substantial, but temporary, disruption of living conditions in Haiti based upon extraordinary and temporary conditions in that country that prevent Haitians who have TPS from safely returning.

Through this Notice, DHS also sets forth procedures necessary for nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EADs) with U.S. Citizenship and Immigration Services (USCIS). Re-registration is limited to persons who have previously registered for TPS under the designation of Haiti and whose applications have been granted. Certain nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) who have not previously applied for TPS may be eligible to apply under the late initial registration provisions, if they meet: (1) At least one of the late initial filing criteria; and, (2) all TPS eligibility criteria (including continuous residence in the United States since January 12, 2011, and continuous physical presence in the United States since July 23, 2011).

For individuals who have already been granted TPS under the Haiti designation, the 60-day re-registration period runs from March 3, 2014 through May 2, 2014. USCIS will issue new EADs with a January 22, 2016 expiration date to eligible Haiti TPS beneficiaries who timely re-register and apply for EADs under this extension. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on July 22, 2014. Accordingly, through this Notice, DHS automatically extends the validity of EADs issued under the TPS designation of Haiti for 6 months, from July 22, 2014 through January 22, 2015, and explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and their impact on Employment Eligibility Verification (Form I–9), and the E-Verify processes.

**DATES:** The 18-month extension of the TPS designation of Haiti is effective July 23, 2014, and will remain in effect through January 22, 2016. The 60-day re-registration period runs from March 3, 2014 through May 2, 2014.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.*

You can find specific information about this extension of Haiti for TPS by selecting "TPS Designated Country: Haiti" from the menu on the left of the TPS Web page.

• You can also contact the TPS Operations Program Manager at the Family and Status Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Washington, DC 20529–2060; or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http:// www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals

DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
UN—United Nations
USCIS—U.S. Citizenship and Immigration Services

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and may obtain work authorization, so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to permanent resident status.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other lawfully obtained immigration status they received while registered for TPS.

## When was Haiti designated for TPS?

On January 21, 2010, the Secretary designated Haiti for TPS based on extraordinary and temporary conditions within the country, specifically the effects of the 7.0-magnitude earthquake that occurred on January 12, 2010. *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010). In 2011, the Secretary both extended Haiti's designation and redesignated Haiti for TPS for 18 months through January 22, 2013. *See Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011). The Secretary last extended Haiti's TPS designation in 2012. Through a notice published in the **Federal Register** on October 1, 2012, the Secretary extended Haiti's designation for TPS for 18 months, through July 22, 2014, because the conditions warranting

the 2011 redesignation continued to be met. *See Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (Oct. 1, 2012). This announcement is the third extension of TPS for Haiti since the original designation in January 2010 and the second extension of TPS for Haiti since the 2011 redesignation.

## What authority does the Secretary of Homeland Security have to extend the designation of Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate Government agencies, to designate a foreign state (or part thereof) for TPS.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation is extended for an additional 6 months (or in the Secretary's discretion for 12 or 18 months). *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## Why is the Secretary extending the TPS designation for Haiti through January 22, 2016?

Over the past year, DHS and the Department of State (DOS) have continued to review conditions in Haiti. Based on this review and after consulting with DOS, the Secretary has determined that an 18-month extension is warranted because the extraordinary and temporary conditions that prompted the July 2011 extension and redesignation continue to exist.

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

While the Government of Haiti has made considerable progress in improving security and quality of life of its citizens following the January 2010 earthquake, Haiti continues to lack the adequate infrastructure, employment and educational opportunities, and basic services to absorb the approximately 58,000 Haitian nationals living in the United States under TPS. The January 12, 2010 earthquake that struck Haiti caused extensive damage to infrastructure, public health, agriculture, transportation, and educational facilities. A coordinated international effort and strong partnership with the Haitian people resulted in emergency response activities that saved lives and laid a foundation for Haiti to rebuild. However, many of the conditions prompting the 2011 extension and redesignation, continue to persist.

Haitian government estimates of the death toll caused by the earthquake have ranged from 230,000 to 316,000 people, though the accuracy of differing estimates is in dispute. The U.S. Agency for International Development reported that approximately 1.5 million people were initially displaced to temporary camps. Destruction from the earthquake rose to catastrophic levels due to Haiti's already weak infrastructure, as the government struggled to provide minimum basic services prior to the earthquake. Rubble severely impeded recovery efforts, yet most of the 11 million cubic meters of debris has been removed, making Port-au-Prince's roads passable.

The January 2010 earthquake had an immediate impact on governance and the rule of law, killing more than 16,000 of Haiti's civil service members and destroying key infrastructure, including the National Palace, the Parliament, 28 of 29 government ministry buildings, the headquarters of the Haitian National Police, many courts, and several correctional facilities. The most serious impediments to human rights in Haiti are weak governance; inadequate respect for the rule of law, a deficient judicial system; and a high prevalence of corruption in various branches of government. Establishing a timetable for long-delayed partial senatorial, municipal, and local elections has generated considerable ongoing political friction since 2011. While finally resolved, Haiti faces another round of elections in 2014.

Since the January 2010 earthquake, Haiti's population has faced increased risks to its security and fundamental human rights. Those displaced to camps, as well as those living in marginalized communities, have been

subjected to a high risk of crime, gender-based violence, and exploitation. The earthquake also exacerbated pre-existing vulnerabilities, including gender-based violence, trafficking, sexual exploitation, child labor, domestic violence, and recruitment into crime or violence. The Pan American Health Organization indicated that kidnappings, death threats, murders, armed robberies, home break-ins, and carjacking continue to occur in large urban centers of Haiti, though it notes that statistics are not readily available. The humanitarian community estimates that over 16,000 households have been affected by forced evictions, including violent evictions by police officers. On October 10, 2013, the UN Security Council voted unanimously to extend the UN peacekeeping mission in Haiti until mid-October 2014 so that it can further contribute to the country's stability and development.

The earthquake devastated much of Haiti's health infrastructure and exacerbated the already poor state of health care in the country where 40 percent of the Haitian population had no access to basic health services. Steady rains in October 2010 led to flooding, which contributed to poor camp conditions and a deadly cholera outbreak. According to the Haitian Ministry of Health and Population, there have been 693,875 cumulative cholera cases and 8,482 deaths as of November 30, 2013. Since the onset of the 2013 rainy season in April, Haiti experienced a rise in new cholera infections. Available resources for the cholera response, including funding and staff, have been in steady decline since 2012.

The January 2010 earthquake was a major setback to the economy and aggravated an already precarious social situation. The earthquake inflicted $7.8 billion in damage and caused the country's GDP to contract 5.4 percent in 2010. In 2011, the Haitian economy began to slowly recover from the effects of the earthquake, however, Tropical Storm Isaac and Hurricane Sandy adversely affected the economic recovery in 2012. Haiti's ability to attract investment is impeded, partly because of weak infrastructure such as access to electricity. Estimates indicate that unemployment in Haiti was as high as 80 percent before the earthquake, and though it has decreased, it remained at approximately 40 percent as of July 2013. More than 78 percent live on less than $2 per day and over 50 percent live on less than $1 per day. In rural areas, 88 percent of individuals live below the poverty line and basic services are practically nonexistent.

Following the January 2010 earthquake, approximately 1.5 million Haitians were left homeless and living in temporary camps. According to the International Organization for Migration as of September 2013, approximately 172,000 individuals still remained in temporary camps. It is estimated that there will be approximately 100,000 persons in these camps by the end of 2013/early 2014.

According to the World Bank, 964 schools were greatly damaged by the earthquake, affecting more than 200,000 children. Since then, many schools have been reconstructed, with the government and donors agreeing to pay school fees for a total of 1,130,000 children for the 2012/2013 school year.

Based upon this review and after consultation with appropriate Government agencies, the Secretary finds that:

• The conditions that prompted the 2011 redesignation of Haiti for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals from returning to Haiti in safety. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• It is not contrary to the national interest of the United States to permit Haitians (and persons who have no nationality who last habitually resided in Haiti) who meet the eligibility requirements of TPS to remain in the United States temporarily. See INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Haiti for TPS should be extended for an additional 18-month period from July 23, 2014 through January 22, 2016. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• There are approximately 51,000 current Haiti TPS beneficiaries who are expected to file for re-registration and may be eligible to retain their TPS under the extension.

## Notice of Extension of the TPS Designation of Haiti

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, that the conditions that prompted the redesignation of Haiti for TPS in 2011 continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am extending the existing TPS designation of Haiti for 18 months from July 23, 2014 through January 22, 2016. *See* INA

section 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

**Jeh Charles Johnson,**
*Secretary.*

## Required Application Forms and Application Fees to Register or Re-register for TPS

To register or re-register for TPS for Haiti, an applicant must submit each of the following two applications:

1. Application for Temporary Protected Status (Form I–821).

• If you are filing an application for late initial registration, you must pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.2(f)(2) and 244.6 and information on late initial filing on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

• If you are filing an application for re-registration, you do not need to pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.17. and

2. Application for Employment Authorization (Form I–765).

• If you are applying for late initial registration and want an EAD, you must pay the fee for the Application for Employment Authorization (Form I–765) only if you are age 14 through 65. No fee for the Application for Employment Authorization (Form I–765) is required if you are under the age of 14 or are 66 and older and applying for late initial registration.

• If you are applying for re-registration, you must pay the fee for the Application for Employment Authorization (Form I–765) only if you want an EAD, regardless of age.

• You do not pay the fee for the Application for Employment Authorization (Form I–765) if you are not requesting an EAD, regardless of whether you are applying for late initial registration or re-registration.

You must submit both completed application forms together. If you are unable to pay for the Application for Employment Authorization (Form I–765) and/or biometrics fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Fees for the Application for Temporary Protected Status (Form I–821), the Application for Employment

Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured.

**Re-filing a Re-registration TPS Application After Receiving a Denial of a Fee Waiver Request**

USCIS urges all re-registering applicants to file as soon as possible within the 60-day re-registration period so that USCIS can process the applications and issue EADs promptly. Filing early will also allow those applicants who may receive denials of their fee waiver requests to have time to re-file their applications *before* the re-registration deadline. If, however, an applicant receives a denial of his or her fee waiver request and is unable to re-file by the re-registration deadline, the applicant may still re-file his or her application. This situation will be reviewed to determine whether the applicant has established good cause for late re-registration. However, applicants are urged to re-file within 45 days of the date on their USCIS fee waiver denial notice, if at all possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(c). For more information on good cause for late re-registration, visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Note: As previously stated, although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the initial TPS application fee) when filing a TPS re-registration application, the applicant may decide to wait to request an EAD, and therefore not pay the Application for Employment Authorization (Form I–765) fee, until after USCIS has approved the individual's TPS re-registration, if he or she is eligible.

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You live in the State of Florida | *U.S. Postal Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, P.O. Box 4464, Chicago, IL 60680–4464. *Non-US Postal Delivery Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 131 S. Dearborn—3rd Floor, Chicago, IL 60603–5517 |
| You live in the State of New York | *U.S. Postal Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, P.O. Box 660167, Dallas, TX 75266–0167. *Non-U.S. Postal Delivery Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 2501 S. State Highway, 121 Business Suite 400, Lewisville, TX 75067 |
| You live in any other state | *U.S. Postal Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, P.O. Box 24047, Phoenix, AZ 85074–4047. *Non-U.S. Postal Delivery Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034 |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA), and you wish to request an EAD, or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate address in Table 1. Upon receiving a Notice of Action (Form I–797) from USCIS, please send an email to the appropriate USCIS Service Center handling your application providing the receipt number and stating that you submitted a re-registration and/or request for an EAD based on an IJ/BIA grant of TPS. If your USCIS receipt number begins with the letters "LIN," please email the Nebraska Service Center at TPSijgrant.nsc@uscis.dhs.gov. If your USCIS receipt number begins with the letters "WAC," please email the California Service Center at TPSijgrant.csc@uscis.dhs.gov. You can find detailed information on what further information you need to email and the email addresses on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

**E-Filing**

You cannot electronically file your application when re-registering or submitting a late initial registration for Haiti TPS. Please mail your application to the mailing address listed in Table 1.

**Employment Authorization Document (EAD)**

*May I request an interim EAD at my local USCIS office?*

No. USCIS will not issue interim EADs to TPS applicants and re-registrants at local offices.

*Am I eligible to receive an automatic 6-month extension of my current EAD from July 22, 2014 through January 22, 2015?*

Provided that you currently have TPS under the Haiti designation, this notice automatically extends your EAD by 6 months if you:

- Are a national of Haiti (or an alien having no nationality who last habitually resided in Haiti);
- Received an EAD under the last extension or redesignation of TPS for Haiti; and
- Have an EAD with a marked expiration date of July 22, 2014, bearing the notation "A–12" or "C–19" on the face of the card under "Category."

Although this Notice automatically extends your EAD through January 22, 2015, you must re-register timely for TPS in accordance with the procedures described in this Notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Employment Eligibility Verification (Form I–9). You can find additional detailed information on the USCIS I–9 Central Web page at *http://www.uscis.gov/I–9Central*. Employers are required to verify the identity and employment authorization of all new employees by using Employment Eligibility Verification (Form I–9). Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (reflecting both your identity and employment authorization), or one document from List B (reflecting identity) together with one document from List C (reflecting employment

authorization). You may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. An EAD is an acceptable document under "List A." Employers may not reject a document based on a future expiration date.

If your EAD has an expiration date of July 22, 2014, and states "A–12" or "C–19" under "Category", it has been extended automatically for 6 months by virtue of this **Federal Register** Notice, and you may choose to present your EAD to your employer as proof of identity and employment authorization for Employment Eligibility Verification (Form I–9) through January 22, 2015 (see the subsection titled "*How do I and my employer complete the Employment Eligibility Verification (Form I–9) (i.e., verification) using an automatically extended EAD for a new job?*" for further information). To minimize confusion over this extension at the time of hire, you may also show your employer a copy of this **Federal Register** Notice confirming the automatic extension of employment authorization through January 22, 2015. As an alternative to presenting your automatically extended EAD, you may choose to present any other acceptable document from List A, or a combination of one selection from List B and one selection from List C.

*What documentation may I show my employer if I am already employed but my current TPS-related EAD is set to expire?*

Even though EADs with an expiration date of July 22, 2014, that state "A–12" or "C–19" under "Category" have been automatically extended for 6 months by this **Federal Register** Notice, your employer will need to ask you about your continued employment authorization once July 22, 2014 is reached to meet its responsibilities for Employment Eligibility Verification (Form I–9). However, your employer does not need a new document to reverify your employment authorization until January 22, 2015, the expiration date of the automatic extension. Instead, you and your employer must make corrections to the employment authorization expiration dates in Section 1 and Section 2 of Employment Eligibility Verification (Form I–9) (see the subsection titled "*What corrections should I and my current employer make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*" for further information). In addition, you may also show this **Federal Register** Notice to your employer to explain what to do for

*Employment Eligibility Verification* (Form I–9).

By January 22, 2015, the expiration date of the automatic extension, your employer must reverify your employment authorization. At that time, you must present any document from List A or any document from List C on Employment Eligibility Verification (Form I–9) to reverify employment authorization, or an acceptable List A or List C receipt described in the Form I–9 Instructions. Your employer should complete either Section 3 of the Employment Eligibility Verification (Form I–9) originally completed for the employee or, if this Section has already been completed or if the version of Employment Eligibility Verification (Form I–9) is no longer valid, complete Section 3 of a new Employment Eligibility Verification (Form I–9) using the most current version. Your employer should use either Section 3 of the Employment Eligibility Verification (Form I–9) originally completed for the employee or, if this Section has already been completed or if the version of Employment Eligibility Verification (Form I–9) is no longer valid, complete Section 3 of a new Employment Eligibility Verification (Form I–9) using the most current version. Note that your employer may not specify which List A or List C document employees must present, and cannot reject an acceptable receipt.

*Can my employer require that I produce any other documentation to prove my status, such as proof of my Haitian citizenship?*

No. When completing Employment Eligibility Verification (Form I–9), including re-verifying employment authorization, employers must accept any documentation that appears on the "Lists of Acceptable Documents" for Employment Eligibility Verification (Form I–9) and that reasonably appears to be genuine and that relates to you or an acceptable List A, List B, or List C receipt. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Haitian citizenship when completing Employment Eligibility Verification (Form I–9) for new hires or reverifying the employment authorization of current employees. If presented with EADs that have been automatically extended, employers should accept such EADs as valid List A documents so long as the EADs reasonably appear to be genuine and to relate to the employee. Refer to the Note to Employees section of this Notice for important information about your rights

if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*What happens after January 22, 2015 for purposes of employment authorization?*

After January 22, 2015, employers may no longer accept the EADs that this **Federal Register** Notice automatically extended. Before that time, however, USCIS will issue new EADs to eligible TPS re-registrants who request them. These new EADs will have an expiration date of January 22, 2016 and can be presented to your employer for completion of Employment Eligibility Verification (Form I–9). Alternatively, you may choose to present any other legally acceptable document or combination of documents listed on the Employment Eligibility Verification (Form I–9).

*How do my employer and I complete Employment Eligibility Verification (Form I–9) (i.e., verification) using an automatically extended EAD for a new job?*

When using an automatically extended EAD to complete Employment Eligibility Verification (Form I–9) for a new job prior to January 22, 2015, you and your employer should do the following:

1. For Section 1, you should:
   a. Check "An alien authorized to work";
   b. Write your alien number (USCIS number or A-number) in the first space (your EAD or other document from DHS will have your USCIS number or A-number printed on it; the USCIS number is the same as your A-number without the A prefix); and
   c. Write the automatically extended EAD expiration date (January 22, 2015) in the second space.
2. For Section 2, employers should record the:
   a. Document title;
   b. Document number; and
   c. Automatically extended EAD expiration date (January 22, 2015).

No later than January 22, 2015, employers must reverify the employee's employment authorization in Section 3 of the Employment Eligibility Verification (Form I–9).

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job, but that EAD has now been automatically extended, you and your employer should correct your previously completed Employment Eligibility Verification (Form I–9) as follows:

1. For Section 1, you should:
   a. Draw a line through the expiration date in the second space;
   b. Write "January 22, 2015" above the previous date;
   c. Write "TPS Ext." in the margin of Section 1; and
   d. Initial and date the correction in the margin of Section 1.
2. For Section 2, employers should:
   a. Draw a line through the expiration date written in Section 2;
   b. Write "January 22, 2015" above the previous date;
   c. Write "TPS Ext." in the margin of Section 2; and
   d. Initial and date the correction in the margin of Section 2.

By January 22, 2015, when the automatic extension of EADs expires, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

If you are an employer who participates in E-Verify, you will receive a "Work Authorization Documents Expiring" case alert when a TPS beneficiary's EAD is about to expire. Usually, this message is an alert to complete Section 3 of the Employment Eligibility Verification (Form I–9) to reverify an employee's employment authorization. For existing employees with TPS-related EADs that have been automatically extended, employers should dismiss this alert by clicking the red "X" in the "dismiss alert" column and follow the instructions above explaining how to correct the Employment Eligibility Verification (Form I–9). By January 22, 2015, employment authorization must be reverified in Section 3. Employers should never use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth re-verification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at I-9Central@dhs.gov. Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process, employers may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Employer Hotline at 800–255–8155 (TTY for the hearing impaired is at 800–237–2515), which offers language interpretation in numerous languages, or email OSC at osccrt@usdoj.gov.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email at *I-9Central@dhs.gov*. Calls are accepted in English, Spanish and many other languages. Employees or applicants may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Worker Information Hotline at 800–255–7688 (TTY for the hearing impaired is at 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, or for information regarding discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The OSC Worker Information Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the List of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt described in the *Employment Eligibility Verification* (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Employment Eligibility Verification (Form I–9) differs from the Social Security Administration, DHS, or DOS records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). An employer that discriminates against an employee in the E-Verify process based on citizenship or immigration status, or based on national origin, may contact OSC's Worker Information Hotline at 800–255–7688 (TTY for the hearing impaired is at 800–237–2515). Additional information about proper nondiscriminatory Employment Eligibility Verification (Form I–9) and E-Verify procedures is available on the OSC Web site at *http://www.justice.gov/crt/about/osc/* and the USCIS Web site at *http://www.dhs.gov/E-verify.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal government agencies must follow the guidelines laid out by the Federal government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples are:

(1) Your unexpired EAD that has been automatically extended, or your EAD that has not expired;

(2) A copy of this **Federal Register** Notice if your EAD is automatically extended under this Notice;

(3) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration;

(4) A copy of your past or current Application for Temporary Protected Status Notice of Action (Form I–797), if you received one from USCIS; and/or

(5) If there is an automatic extension of work authorization, a copy of the fact sheet from the USCIS TPS Web site that provides information on the automatic extension.

Check with the government agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this **Federal Register** Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to verify the current immigration status of applicants for public benefits. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request can be found at the SAVE Web site at *http://www.uscis.gov/save,* then by choosing "How to Correct Your Records" from the menu on the right.

[FR Doc. 2014–04593 Filed 2–28–14; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Customs and Border Protection**

**Agency Information Collection Activities: Haitian Hemispheric Opportunity Through Partnership Encouragement Act of 2006**

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

**ACTION:** 30-Day Notice and request for comments; Extension of an existing collection of information: 1651–0129.

**SUMMARY:** U.S. Customs and Border Protection (CBP) of the Department of Homeland Security will be submitting the following information collection request to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act: Haitian Hemispheric Opportunity through Partnership Encouragement Act of 2006 ("Haiti HOPE Act"). This is a proposed extension of an information collection that was previously approved. CBP is proposing that this information collection be extended with no change to the burden hours. This document is published to obtain comments from the public and affected agencies. This proposed information collection was previously published in the **Federal Register** (78 FR 76851) on December 19, 2013, allowing for a 60-day comment period. This notice allows for an additional 30 days for public comments. This process is conducted in accordance with 5 CFR 1320.10.

**DATES:** Written comments should be received on or before April 2, 2014 to be assured of consideration.

**ADDRESSES:** Interested persons are invited to submit written comments on this proposed information collection to the Office of Information and Regulatory Affairs, Office of Management and Budget. Comments should be addressed to the OMB Desk Officer for Customs and Border Protection, Department of Homeland Security, and sent via electronic mail to *oira_submission@omb.eop.gov* or faxed to (202) 395–5806.

**FOR FURTHER INFORMATION CONTACT:** Requests for additional information should be directed to Tracey Denning, U.S. Customs and Border Protection, Regulations and Rulings, Office of International Trade, 90 K Street NE., 10th Floor, Washington, DC 20229–1177, at 202–325–0265.

**SUPPLEMENTARY INFORMATION:** CBP invites the general public and other Federal agencies to comment on proposed and/or continuing information collections pursuant to the Paperwork Reduction Act of 1995 (Pub. L. 104–13; 44 U.S.C. 3507). The comments should address: (a) Whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimates of the burden of the collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; (d) ways to minimize the burden including the use of automated collection techniques or the use of other forms of information technology; and (e) the annual costs burden to respondents or record keepers from the collection of information (a total capital/startup costs and operations and maintenance costs). The comments that are submitted will be summarized and included in the CBP request for Office of Management and Budget (OMB) approval. All comments will become a matter of public record. In this document CBP is soliciting comments concerning the following information collection:

*Title:* Haitian Hemispheric Opportunity through Partnership Encouragement Act of 2006 ("Haiti Hope Act").

*OMB Number:* 1651–0129.

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2567–15; DHS Docket No. USCIS–2014–0001]

RIN 1615–ZB40

## Extension of the Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) for 18 months, from January 23, 2016 through July 22, 2017.

The extension allows currently eligible TPS beneficiaries to retain TPS through July 22, 2017, so long as they otherwise continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because the conditions in Haiti that prompted the TPS designation continue to be met. There continue to be extraordinary and temporary conditions in that country that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety.

Through this Notice, DHS also sets forth procedures necessary for nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EAD) with U.S. Citizenship and Immigration Services (USCIS). Re-registration is limited to persons who have previously registered for TPS under the designation of Haiti and whose applications have been granted. Certain nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) who have not previously applied for TPS may be eligible to apply under the late initial registration provisions if they meet (1) at least one of the late initial filing criteria, and (2) all TPS eligibility criteria (including continuous residence in the United States since January 12, 2011, and continuous physical presence in the United States since July 23, 2011).

For individuals who have already been granted TPS under Haiti's designation, the 60-day re-registration period runs from August 25, 2015 through October 26, 2015. USCIS will issue new EADs with a July 22, 2017 expiration date to eligible Haiti TPS beneficiaries who timely re-register and apply for EADs under this extension. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on January 22, 2016. Accordingly, through this Notice, DHS automatically extends the validity of EADs issued under the TPS designation of Haiti for 6 months, through July 22, 2016, and explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and their impact on Employment Eligibility Verification (Form I–9) and the E-Verify processes.

**DATES:** The 18-month extension of the TPS designation of Haiti is effective January 23, 2016, and will remain in effect through July 22, 2017. The 60-day re-registration period runs from August 25, 2015 through October 26, 2015. (**Note:** It is important for re-registrants to timely re-register during this 60-day re-registration period and not to wait until their EADs expire.)

## Further Information

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps*. You can find specific information about Haiti's TPS extension by selecting ''TPS Designated Country: Haiti'' from the menu on the left side of the TPS Web page.

• You can also contact the TPS Operations Program Manager at the Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov*, or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IDP—Internally Displaced Person
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2) and 8 CFR 244.2–.4.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other lawfully obtained immigration status they received while registered for TPS.

## When was Haiti designated for TPS?

On January 21, 2010, the Secretary designated Haiti for TPS based on extraordinary and temporary conditions within the country, specifically the effects of the 7.0-magnitude earthquake that occurred on January 12, 2010. *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010). In 2011, the Secretary both extended Haiti's designation and redesignated Haiti for TPS for 18 months through January 22, 2013. *See Extension and Redesignation of Haiti for*

*Temporary Protected Status,* 76 FR 29000 (May 19, 2011). Haiti's designation was then extended for an additional 18 months on October 1, 2012. *See Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (October 1, 2012). The Secretary last extended Haiti's TPS designation in 2014. Through a notice published in the **Federal Register** on March 3, 2014, the Secretary extended Haiti's designation for TPS for 18 months, through January 22, 2016, because the conditions warranting the 2011 redesignation continued to be met. *See Extension of the Designation of Haiti for Temporary Protected Status,* 79 FR 11808 (March 3, 2014). This announcement is the third extension of TPS for Haiti since the 2011 redesignation.

### What authority does the Secretary of Homeland Security have to extend the designation of Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government (Government), to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation may be extended for an additional period of 6, 12, or 18 months. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA

section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

### Why is the Secretary extending the TPS designation for Haiti through July 22, 2017?

Over the past year, DHS and the Department of State (DOS) have continued to review conditions in Haiti. Based on this review and after consulting with DOS, the Secretary has determined that an 18-month extension is warranted because the extraordinary and temporary conditions that led to Haiti's designation continue to exist and prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety.

Many of the conditions prompting the original January 2010 TPS designation and the May 2011 redesignation persist, including a housing shortage, a cholera epidemic, limited access to medical care, damage to the economy, political instability, security risks, limited access to food and water, a heightened vulnerability of women and children, and environmental risks. More than 5 years after the earthquake, Haiti continues to recover.

The January 12, 2010 earthquake caused extensive damage to the country's physical infrastructure and public health, agricultural, housing, transportation, and educational facilities. The Haitian government estimates that 105,000 houses were destroyed and 188,383 houses collapsed or suffered considerable damage. At the peak of the displacement, estimates of people internally displaced range from approximately 1.5 million to 2.3 million. While most of the earthquake related rubble has been cleared, and there have been improvements to road conditions, the effort to rebuild damaged buildings has been slow. Virtually all government offices and ministries were destroyed in downtown Port-au-Prince and, 5 years later, remain housed in temporary facilities.

While the country continues to make progress in relocating people made homeless by the 2010 earthquake, estimates by the International Organization for Migration in December 2014 put the number of Haitians still living in internally displaced person (IDP) camps at approximately 80,000 scattered across 105 sites. Basic services available to camp residents have deteriorated as IDP camps close and funding dries up, with most camps lacking waste management services and adequate sanitation facilities—leading to a high risk of cholera transmission— and possessing malnutrition rates higher than emergency thresholds. Gender-

based violence that exists within these informal settlement areas continues to be a serious concern and personal security is a serious and pervasive issue. While IDP camps are closing, Haiti's housing shortage remains far from resolved. Haiti lacks sufficient housing units to address its pre-earthquake shortage, replace damaged or destroyed units, and satisfy projected urban growth. Some Haitians have returned to unsafe homes or built houses in informal settlements located in hazardous areas without access to basic services.

Lingering infrastructure damage since the earthquake has also impacted food security. Even prior to the 2010 earthquake, Haiti had one of the highest rates of hunger and malnutrition in the Western Hemisphere, with 45 percent of the population undernourished and 30 percent of children under 5 suffering from chronic malnutrition. Damage from the 2010 earthquake exacerbated Haiti's historic food security challenges. An estimated 2.5 million people are unable to cover their basic food needs and a January 2015 United Nations report estimated that over 600,000 people were facing severe food insecurity.

Haiti's longstanding public health challenges were exacerbated by the January 2010 earthquake and an ongoing cholera epidemic that started in October 2010. The introduction of cholera in Haiti shortly after the earthquake, and its persistence since then, is mainly due to the lack of access to clean water and appropriate sanitation facilities. Concerted efforts by Haiti and its partners have reduced the number of reported cholera cases in the country, but Haiti continues to host the largest cholera epidemic in the Western Hemisphere. As of December 2014, the cholera epidemic has affected approximately 725,000 people and claimed over 8,800 lives in Haiti since October 2010. In January 2015, the U.S. Centers for Disease Control and Prevention stated that outbreaks of epidemic diseases still occur and that progress has been slow and limited in restoring Haiti's physical health infrastructure.

Haiti's ability to recover has been further constrained by political instability. The January 2010 earthquake had an immediate impact on governance and the rule of law in Haiti, killing an estimated 18 percent of the country's civil service and destroying key government infrastructure, including the National Palace, 28 of 29 government ministry buildings, the National Police headquarters, and various judicial facilities. Following the expiration of local and parliamentary

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS ''shall be deemed to refer to the Secretary'' of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

mandates on January 12, 2015, Haiti was left without a functioning legislative branch or duly elected local authorities. Increasingly, politically and economically motivated protests and demonstrations have turned violent.

Although the Government of Haiti has taken significant steps to improve stability and the quality of life for Haitian citizens, Haiti continues to lack the adequate infrastructure, health and sanitation services, and emergency response capacity necessary to ensure the personal safety of Haitian nationals.

Based upon this review and after consultation with appropriate Government agencies, the Secretary has determined that:

• The conditions that prompted the July 23, 2011 redesignation of Haiti for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• It is not contrary to the national interest of the United States to permit Haitians (or aliens having no nationality who last habitually resided in Haiti) who meet the eligibility requirements of TPS to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Haiti for TPS should be extended for an 18-month period from January 23, 2016 through July 22, 2017. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• There are approximately 50,000 current Haiti TPS beneficiaries who are expected to file for re-registration under the extension.

**Notice of Extension of the TPS Designation of Haiti**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with appropriate Government agencies, that the conditions that prompted the redesignation of Haiti for TPS on July 23, 2011, continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am extending the existing designation of Haiti for TPS for 18 months, from January 23, 2016 through July 22, 2017. *See* INA section

244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

**Jeh Charles Johnson,**
*Secretary.*

**Required Application Forms and Application Fees To Register or Re-Register for TPS**

To register or re-register for TPS based on the designation of Haiti, an applicant must submit each of the following two applications:

*1. Application for Temporary Protected Status (Form I–821)*

• If you are filing an application for late initial registration, you must pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.2(f)(2) and 244.6 and information on late initial filing on the USCIS TPS Web page at *http://www.uscis.gov/tps*.

• If you are filing an application for re-registration, you do not need to pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.17.

*2. Application for Employment Authorization (Form I–765)*

• If you are applying for late initial registration and want an EAD, you must pay the fee for the Application for Employment Authorization (Form I–765) only if you are age 14 through 65. No fee for the Application for Employment Authorization (Form I–765) is required if you are requesting an initial EAD and are under the age of 14 or over the age of 65 and applying for late initial registration.

• If you are applying for re-registration, you must pay the fee for the Application for Employment Authorization (Form I–765) only if you want an EAD, regardless of age.

• You do not pay the fee for the Application for Employment Authorization (Form I–765) if you are not requesting an EAD, regardless of whether you are applying for late initial registration or re-registration. You must submit both completed application forms together. If you are unable to pay for the Application for Employment Authorization (Form I–765) and/or biometrics fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps*. Fees for the Application for Temporary Protected Status (Form I–821), the

Application for Employment Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov*. If necessary, you may be required to visit an Application Support Center to have your biometrics captured.

**Re-Filing a Re-Registration TPS Application After Receiving a Denial of a Fee Waiver Request**

USCIS urges all re-registering applicants to file as soon as possible within the 60-day re-registration period so that USCIS can process the applications and issue EADs promptly. Filing early will also allow those applicants who may receive denials of their fee waiver requests to have time to re-file their applications before the re-registration deadline. If, however, an applicant receives a denial of his or her fee waiver request and is unable to re-file by the re-registration deadline, the applicant may still re-file his or her application. This situation will be reviewed to determine whether the applicant has established good cause for late re-registration. However, applicants are urged to re-file within 45 days of the date on their USCIS fee waiver denial notice, if at all possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(c). For more information on good cause for late re-registration, visit the USCIS TPS Web page at *http://www.uscis.gov/tps*. **Note:** As previously stated, although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the initial TPS application fee) when filing a TPS re-registration application, the applicant may decide to wait to request an EAD, and therefore not pay the Application for Employment Authorization (Form I–765) fee until after USCIS has approved the individual's TPS re-registration, if he or she is eligible. If you choose to do this, you would file the Application for Temporary Protected Status (Form I–821) with the fee and the Application

for Employment Authorization (Form I–765) without the fee and without requesting an EAD.

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You live in Florida ............................................................ | *U.S. Postal Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, P.O. Box 4464, Chicago, IL 60680. *Non-U.S. Postal Delivery Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 131 S. Dearborn—3rd Floor, Chicago, IL 60603. |
| You live in the State of New York .......................................... | *U.S. Postal Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, P.O. Box 660167, Dallas, TX 75266. *Non-U.S. Postal Delivery Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 2501 S. State Highway, 121 Business Suite 400, Lewisville, TX 75067. |
| You live in any other state .................................................. | *U.S. Postal Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, P.O. Box 24047, Phoenix, AZ 85074. *Non-U.S. Postal Delivery Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. Upon receiving a Notice of Action (Form I–797) from USCIS, please send an email to the appropriate USCIS Service Center handling your application providing the receipt number and stating that you submitted a re-registration and/or request for an EAD based on an IJ/BIA grant of TPS. If your USCIS receipt number begins with the letters "LIN," please email the Nebraska Service Center at *TPSijgrant.nsc@uscis.dhs.gov*. If your USCIS receipt number begins with the letters "WAC," please email the California Service Center at *TPSijgrant.csc@uscis.dhs.gov*. You can find detailed information on what further information you need to email and the email addresses on the USCIS TPS Web page at *http://www.uscis.gov/tps*.

**E-Filing**

You cannot electronically file your application when re-registering or submitting an initial registration for Haiti TPS. Please mail your application to the mailing address listed in Table 1.

**Employment Authorization Document (EAD)**

*How can I obtain information on the status of my EAD request?*

To obtain case status information about your TPS application, including the status of a request for an EAD, you can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov*, or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Form I–765 Application for Employment Authorization has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov*. However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for

assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic 6-month extension of my current EAD through July 22, 2016?*

Provided that you currently have TPS under the designation of Haiti, this Notice automatically extends your EAD by 6 months if you:

• Are a national of Haiti (or an alien having no nationality who last habitually resided in Haiti);

• Received an EAD under the last extension of TPS for Haiti; and

• Have an EAD with a marked expiration date of January 22, 2016, bearing the notation "A–12" or "C–19" on the face of the card under "Category."

Although this Notice automatically extends your EAD through July 22, 2016, you must re-register timely for TPS in accordance with the procedures described in this Notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Employment Eligibility Verification (Form I–9). You can find additional detailed information on the USCIS I–9 Central Web page at *http://www.uscis.gov/I-9Central.* Employers are required to verify the identity and employment authorization of all new employees by using Employment Eligibility Verification (Form I–9). Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (reflecting both your identity and employment authorization) or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization). You may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. An acceptable receipt is one that shows an employee has applied to replace a document that was lost, stolen or damaged. If you present this receipt, you must present your employer with the actual document within 90 days. An EAD is an acceptable document under "List A." Employers may not reject a document based on a future expiration date.

If your EAD has an expiration date of January 22, 2016, and states "A–12" or "C–19" under "Category," it has been extended automatically for 6 months by virtue of this **Federal Register** Notice, and you may choose to present your EAD to your employer as proof of identity and employment authorization for Employment Eligibility Verification (Form I–9) through July 22, 2016 (see the subsection titled "*How do my employer and I complete the Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*" for further information). To minimize confusion over this extension at the time of hire, you should explain to your employer that USCIS has automatically extended your EAD through July 22, 2016, based on your Temporary Protected Status. You are also strongly encouraged, although not required, to show your employer a copy of this **Federal Register** Notice confirming the automatic extension of employment authorization through July 22, 2016. As an alternative to presenting your automatically extended EAD, you may choose to present any other acceptable document from List A, or a combination of one selection from List B and one selection from List C.

*What documentation may I show my employer if I am already employed but my current TPS-related EAD is set to expire?*

Even though EADs with an expiration date of January 22, 2016, that state "A–12" or "C–19" under "Category" have been automatically extended for 6 months by this **Federal Register** Notice, your employer will need to ask you about your continued employment authorization once January 22, 2016, is reached to meet its responsibilities for Employment Eligibility Verification (Form I–9). Your employer does not need a new Form I–9 to reverify your employment authorization until July 22, 2016, the expiration date of the automatic extension, but may need to reinspect your automatically extended EAD to check the expiration date and code in order to record the updated expiration date on your Form I–9 if your employer did not keep a copy of this EAD at the time you initially presented it. You and your employer must make corrections to the employment authorization expiration dates in Section 1 and Section 2 of Employment Eligibility Verification (Form I–9) (see the subsection titled "*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*" for further information). You are also strongly encouraged, although not required, to show this **Federal Register** Notice to your employer to explain what to do for Employment Eligibility Verification (Form I–9).

By July 22, 2016, the expiration date of the automatic extension, your employer must reverify your employment authorization. At that time, you must present any unexpired document from List A or any unexpired document from List C on Employment Eligibility Verification (Form I–9) to reverify employment authorization, or an acceptable List A or List C receipt described in the Form I–9 instructions. Your employer is required to reverify on Employment Eligibility Verification (Form I–9) the employment authorization of current employees upon the automatically extended expiration date of a TPS-related EAD, which is July 22, 2016, in this case. Your employer should use either Section 3 of the Employment Eligibility Verification (Form I–9) originally completed for the employee or, if this section has already been completed or if the version of Employment Eligibility Verification (Form I–9) is no longer valid, complete Section 3 of a new Employment Eligibility Verification (Form I–9) using the most current version. Note that your employer may not specify which List A or List C document employees must present, and cannot reject an acceptable receipt. An acceptable receipt is one that shows an employee has applied to replace a document that was lost, stolen or damaged.

*Can my employer require that I produce any other documentation to prove my current TPS status, such as proof of my Haitian citizenship or proof that I have re-registered for TPS?*

No. When completing Employment Eligibility Verification (Form I–9), including reverifying employment authorization, employers must accept any documentation that appears on the "Lists of Acceptable Documents" for Employment Eligibility Verification (Form I–9) that reasonably appears to be genuine and that relates to you or an acceptable List A, List B, or List C receipt. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Haitian citizenship or proof of re-registration for TPS when completing Employment Eligibility Verification (Form I–9) for new hires or reverifying the employment authorization of current employees. Refer to the Note to Employees section of this Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin. Note that although you are not required to provide your employer with a copy of this **Federal Register** notice, you are strongly encouraged to do so to help avoid confusion.

*What happens after July 22, 2016, for purposes of employment authorization?*

After July 22, 2016, employers may no longer accept the EADs that this **Federal Register** Notice automatically extended. Before that time, however, USCIS will endeavor to issue new EADs to eligible TPS re-registrants who request them. These new EADs will have an expiration date of July 22, 2017, and can be presented to your employer for completion of Employment Eligibility Verification (Form I–9). Alternatively, you may choose to present any other legally acceptable document or

combination of documents listed on the Employment Eligibility Verification (Form I–9).

*How do my employer and I complete Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*

When using an automatically extended EAD to complete Employment Eligibility Verification (Form I–9) for a new job prior to July 22, 2016, you and your employer should do the following:

1. For Section 1, you should:
   a. Check "An alien authorized to work;"
   b. Write the automatically extended EAD expiration date (July 22, 2016) in the first space; and
   c. Write your alien number (USCIS number or A-number) in the second space (your EAD or other document from DHS will have your USCIS number or A-number printed on it; the USCIS number is the same as your A-number without the A prefix).

2. For Section 2, employers should record the:
   a. Document title;
   b. Issuing authority;
   c. Document number; and
   d. Automatically extended EAD expiration date (July 22, 2016).

By July 22, 2016, employers must reverify the employee's employment authorization in Section 3 of the Employment Eligibility Verification (Form I–9).

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job but that EAD has now been automatically extended, your employer may reinspect your automatically extended EAD if the employer does not have a photocopy of the EAD on file, and you and your employer should correct your previously completed Employment Eligibility Verification (Form I–9) as follows:

1. For Section 1, you should:
   a. Draw a line through the expiration date in the first space;
   b. Write "July 22, 2016" above the previous date;
   c. Write "TPS Ext." in the margin of Section 1; and
   d. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:
   a. Draw a line through the expiration date written in Section 2;
   b. Write "July 22, 2016" above the previous date;

c. Write "EAD Ext." in the margin of Section 2; and
   d. Initial and date the correction in the margin of Section 2.

By July 22, 2016, when the automatic extension of EADs expires, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

If you are an employer who participates in E-Verify and you have an employee who is a TPS beneficiary who provided a TPS-related EAD when he or she first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when this EAD is about to expire. Usually, this message is an alert to complete Section 3 of the Employment Eligibility Verification (Form I–9) to reverify an employee's employment authorization. For existing employees with TPS-related EADs that have been automatically extended, employers should dismiss this alert by clicking the red "X" in the "dismiss alert" column and follow the instructions above explaining how to correct the Employment Eligibility Verification (Form I–9). By July 22, 2016, employment authorization must be reverified in Section 3. Employers should never use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov.* Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process, employers may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Employer Hotline, at 800–255–8155 (TTY 800–237–2515), which offers language interpretation in numerous languages, or email OSC at *osccrt@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email at *I-9Central@dhs.gov.* Calls are accepted in English and many other languages. Employees or applicants may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Worker Information Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship status, immigration status, or national origin, or for information regarding discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The OSC Worker Information Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt described in the Employment Eligibility Verification (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Employment Eligibility Verification (Form I–9) differs from records available to DHS or the Social Security Administration.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). An employee that believes he or she was discriminated against by an employer in the E-Verify process based on citizenship or immigration status or based on national origin, may contact OSC's Worker

HT Vacatur AR_0264

Information Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Employment Eligibility Verification (Form I–9) and E-Verify procedures is available on the OSC Web site at *http://www.justice.gov/ crt/about/osc/* and the USCIS Web site at *http://www.dhs.gov/E-verify*.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each State may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples are:

(1) Your unexpired EAD;

(2) A copy of this **Federal Register** Notice if your EAD is automatically extended under this Notice;

(3) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration;

(4) A copy of your past or current Application for Temporary Protected Status Approval Notice (Form I–797), if you received one from USCIS; and/or

(5) If there is an automatic extension of work authorization, a copy of the fact sheet from the USCIS TPS Web site that provides information on the automatic extension.

Check with the government agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this **Federal Register** Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to verify the current immigration status of applicants for public benefits. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found at the SAVE Web site at *http://www.uscis.gov/ save,* then by choosing ''How to Correct Your Records'' from the menu on the right.

[FR Doc. 2015–21006 Filed 8–24–15; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–5835–N–10]**

**Notice of Proposed Information Collection: Comment Request; FHA Insured Title I Property Improvement and Manufactured Home Loan Programs**

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

**DATES:** *Comments Due Date: October 26, 2015.*

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Reports Liaison Officer, Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410, Room 9120 or the number for the Federal Information Relay Service (1–800–877–8339).

**FOR FURTHER INFORMATION CONTACT:** Kevin Stevens, Director, Home Mortgage Insurance Division, Office of Single Family Program Development, Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410, telephone (202) 708–2121 (this is not a toll free number) for copies of the proposed forms and other available information.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

**A. Overview of Information Collection**

*Title of Information Collection:* Title I Property Improvement and Manufactured Home Loan Programs.

*OMB Control Number, if applicable:* 2502–0328.

*Type of Request:* Extension of currently approved collection.

*Description of the need for the information and proposed use:* Title I loans are made by private sector lenders and insured by HUD against loss from defaults. HUD uses this information to evaluate individual lenders on their overall program performance. The information collection is used to determine insurance eligibility and claim eligibility.

*Agency form numbers, if applicable:* HUD–637, 646, 27030, 55013, 55014, 56001, 56001–MH, 56002, 56002–MH, & SF 3881.

*Respondents:*

• Lenders approved to make insured Title I loans

• Dealers/Contractors

• Manufacturers of manufactured homes

• Applicants for property improvement loans

• Applicants for manufactured home loans

*Estimation of the total numbers of hours needed to prepare the information collection:*

*Estimated Number of Respondents:* 10,733.

*Estimated Number of Responses:* 59,790.

*Frequency of Response:* 1.

*Average Hours per Response:* 17.03.

*Total Estimated Burdens:* 43,049.

**B. Solicitation of Public Comment**

This notice is soliciting comments from members of the public and affected parties concerning the collection of information described in Section A on the following:

(1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) The accuracy of the agency's estimate of the burden of the proposed collection of information; (3) Ways to enhance the quality, utility, and clarity of the information to be collected; and (4) Ways to minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

HUD encourages interested parties to submit comment in response to these questions.

**C. Authority**

Section 3507 of the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or Households. Form I–854 A—Law enforcement agencies (LEAs) use Form I–854A to request an alien witness and/ or informant receive classification as an S nonimmigrant. Form I–854B—LEAs use Form I–854B to request an alien in S nonimmigrant status be permitted to apply for adjustment of status to adjust to lawful permanent resident (LPR) status under section 245(j) of the Immigration and Nationality Act (INA).

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* Form I–854A—150 responses at 3 hours per response, and Form I–854B—150 responses at 1 hour per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 600 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $0.

Dated: May 19, 2017.

**Jerry Rigdon,**

*Deputy Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2017–10649 Filed 5–23–17; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2596–16; DHS Docket No. USCIS–2014–0001]**

**RIN 1615–ZB63**

### Extension of the Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) for 6 months, from July 23, 2017, through January 22, 2018. The Secretary has determined that a limited, 6-month extension is warranted because,

although Haiti has made significant progress in recovering from the January 2010 earthquake that prompted its initial designation, conditions in Haiti supporting its designation for TPS continue to be met at this time. The Secretary is committed to making TPS determinations that fully comply with the Immigration and Nationality Act and the intent of the program to provide a temporary form of immigration relief and protection to eligible individuals who cannot return to their home country due to ongoing armed conflict, environmental disasters, or other extraordinary and temporary conditions. This Notice also sets forth procedures necessary for nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EAD) with U.S. Citizenship and Immigration Services (USCIS). USCIS will issue EADs with a January 22, 2018 expiration date to eligible Haiti TPS beneficiaries who timely re-register and apply for EADs under this extension. Provided a Haiti TPS beneficiary timely re-registers and properly files an application for an EAD during the 60-day re-registration period, his or her employment authorization will be automatically extended for an additional period not to exceed 180 days from the date the current EAD expires, *i.e.,* January 18, 2018. *See* 8 CFR 274a.13(d)(1). TPS beneficiaries are reminded that, prior to January 22, 2018, the Secretary will re-evaluate the designation for Haiti and decide anew whether extension, redesignation, or termination is warranted. During this period, beneficiaries are encouraged to prepare for their return to Haiti in the event Haiti's designation is not extended again, including requesting updated travel documents from the Government of Haiti.

**DATES:** *Extension of Designation of Haiti for TPS:* The 6-month extension of the TPS designation of Haiti is effective July 23, 2017, and will remain in effect through January 22, 2018. The 60-day re-registration period runs from May 24, 2017 through July 24, 2017.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about Haiti's TPS extension by selecting ''Haiti'' from the menu on the left side of the TPS Web page.

• You can also contact Guillermo Roman-Riefkohl, TPS Operations

Program Manager, at the Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at 202–272–1533 (this is not a toll-free number).

**Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http:// www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

### Table of Abbreviations

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
IJ—Immigration Judge
INA—Immigration and Nationality Act
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

The extension allows TPS beneficiaries to maintain TPS through January 22, 2018, so long as they continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because the conditions in Haiti that prompted the TPS designation, while significantly improved, continue to be met. There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety. The Secretary also has determined that permitting such Haitian nationals to continue to remain in the United States, at this time, is not contrary to the national interest of the United States.

TPS beneficiaries are reminded that, prior to the conclusion of this six-month

extension period, the Secretary will re-evaluate Haiti's TPS designation and decide anew whether extension, redesignation, or termination is warranted. Because the designation of TPS was intended by Congress to be temporary in nature, and because the Government of Haiti has expressed a desire for its nationals to return to Haiti, the Secretary will fully re-evaluate the country conditions and any other factors he deems necessary to determine whether Haiti's TPS designation should continue. Among those factors, the Secretary will consider whether permitting Haitian nationals to remain in the United States is contrary to the national interest of the United States.

Thus, during this limited six-month period, beneficiaries are encouraged to prepare for their return to Haiti, including requesting updated travel documents from the Government of Haiti. The Secretary is committed to working with the Government of Haiti to ensure an orderly transition should Haiti's TPS designation be terminated at the conclusion of this limited six-month extension.

Re-registration is limited to persons who have previously registered for TPS under the designation of Haiti and whose applications have been granted. Certain nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) who have not previously applied for TPS may be eligible to apply under the late initial registration provisions if they meet (1) at least one of the late initial filing criteria in 8 CFR 244.2(f)(2), which are also described on the TPS Web page at *https://www.uscis.gov/humanitarian/ temporary-protected-status,* and (2) all TPS eligibility criteria (including continuous residence in the United States since January 12, 2011, and continuous physical presence in the United States since July 23, 2011).

For individuals who have already been granted TPS under Haiti's designation, the 60-day re-registration period runs from May 24, 2017 through July 24, 2017. USCIS will issue EADs with a January 22, 2018 expiration date to eligible Haiti TPS beneficiaries who timely re-register and apply for EADs under this extension. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on July 22, 2017. But provided a Haiti TPS beneficiary timely re-registers and properly files an application for an EAD during the 60-day re-registration period, his or her employment authorization will be automatically extended for an

additional period not to exceed 180 days from the date the current EAD expires, *i.e.,* January 18, 2018. This notice explains how TPS beneficiaries and their employers may determine whether a beneficiary's employment authorization has been automatically extended and the impact on the Employment Eligibility Verification (Form I–9) and E-Verify processes. There are approximately 46,000 current Haiti TPS beneficiaries who are expected to file for re-registration under the extension.

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other lawfully obtained immigration status they received while registered for TPS.

**When was Haiti designated for TPS?**

On January 21, 2010, the Secretary designated Haiti for TPS based on extraordinary and temporary conditions within the country, specifically the effects of the 7.0-magnitude earthquake that occurred on January 12, 2010. *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010). In 2011, the Secretary both extended Haiti's designation and redesignated Haiti for TPS for 18 months through January 22, 2013. *See Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011). This announcement was the fourth extension of TPS for Haiti since the 2011 redesignation. The Secretary last extended Haiti's designation on August 25, 2015. *See Extension of the Designation of Haiti for Temporary*

*Protected Status,* 80 FR 51582 (Aug. 25, 2015).

**What authority does the Secretary of Homeland Security have to extend the designation of Haiti for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary finds that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If following this review the Secretary determines that a foreign state continues to meet the conditions for TPS designation (or makes no determination at all), the designation must be extended for an additional period of 6 months or, in the Secretary's discretion, for an additional 12 or 18 months. *See* INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**Why is the Secretary extending the TPS designation for Haiti through January 22, 2018?**

Since the last extension was announced, DHS has reviewed conditions in Haiti. Based on this review and after consulting with DOS, the Secretary has determined that a limited, 6-month extension is warranted because, although Haiti has made significant progress in recovering from the January 2010 earthquake that prompted its initial designation, conditions in Haiti supporting its designation for TPS persist.

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, title XV, section 1517).

Although lingering effects of the 2010 earthquake remain, Haiti has made significant progress in addressing issues specific to the earthquake, as its economy continues to recover and grow. For example, 96% of people displaced by the earthquake and living in internally displaced person (IDP) camps have left those camps. Over 98% of the IDP camps have closed. However, over 55,000 Haitians who lost their homes in the earthquake are still living in 31 camps for internally displaced persons without viable options to leave. Gender-based violence in these camps continues to be a serious concern, and personal security is a serious and pervasive issue. Some people who were displaced by the earthquake, although no longer in camps, have moved back to unsafe homes or relocated to informal settlements located in hazardous areas. However, demonstrating improvement in Haiti's security situation, in March 2017, the United Nations announced that the mandate of the United Nations peacekeeping mission in Haiti will end in October 2017, to be replaced by a new police-only mission focused on rule of law.

Hurricane Matthew made landfall in Haiti on October 4, 2016, causing extensive damage to crops, housing, livestock, and infrastructure across Haiti's southwest peninsula. The Government of Haiti confirmed 546 fatalities from the storm, and over 175,000 people were left without housing. The most significant impact from the storm was concentrated in 3 of Haiti's 10 departments—Nippes, Grand'Anse, and Sud. Minimal damage was inflicted on the rest of the country, including the capital, Port-au-Prince, and the second largest city, Cap-Haïtien. Still, significant losses of crops and livestock in the regions damaged by Hurricane Matthew impacted the entire country.

Heavy rains in late April 2017 caused flooding and landslides in South, South East, Grand'Anse, and Nippes departments, with South department most impacted. At least four people were killed, nearly 10,000 homes may have been damaged, and at least 350,000 people may have been affected. According to a Haitian government official, an estimated 80% of the spring harvest in South department may have been destroyed. The damage from Hurricane Matthew and the recent heavy rains are compounding the existing food insecurity experienced by an estimated 3.2 million people (approximately 30 percent of the population) in September 2016.

Haiti's weak public health system is further strained due to an ongoing cholera epidemic, whose inception was traced to U.N. peacekeepers assisting with earthquake recovery. Since October 2010, close to 800,000 Haitians have contracted cholera, and nearly 10,000 people have died from the disease. However, progress has been made in combatting cholera, and Haiti has made some progress in the health sector in recent years. Nevertheless, Haiti faces longstanding public health challenges, where 40% of the population lacked access to basic health services before the 2010 earthquake. As of 2016, this figure remains the same—40% of the population lacks access to fundamental health and nutrition services. While the lack of access to safe drinking water and Haiti's weak sanitation infrastructure remain significant concerns, these are not new problems. Extreme poverty, corruption, and low levels of education in Haiti challenge its resilience and have contributed to the government's longstanding inability to adequately provide for the security, health, and safety of its citizenry.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions that prompted the July 23, 2011 redesignation of Haiti for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• It is not contrary to the national interest of the United States to permit Haitians (or aliens having no nationality who last habitually resided in Haiti) who meet the eligibility requirements of TPS to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Haiti for TPS should be extended for a 6-month period from July 23, 2017, through January 22, 2018. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• It is in the best interest of TPS beneficiaries to prepare for their return to Haiti in the event that Haiti's TPS designation is not extended again, including requesting updated travel documents from the Government of Haiti.

**Notice of Extension of the TPS Designation of Haiti**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, that the conditions that prompted the redesignation of Haiti for TPS on July 23, 2011, continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am extending the existing designation of Haiti for TPS for 6 months, from July 23, 2017, through January 22, 2018. *See* INA section 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

John F. Kelly,
*Secretary.*

**Required Application Forms and Application Fees To Register or Re-Register for TPS**

To register or re-register for TPS based on the designation of Haiti, an applicant must submit each of the following two applications:

1. Application for Temporary Protected Status (Form I–821).

• If you are filing an application for late initial registration, you must pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.2(f)(2) and 244.6 and information on late initial filing on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

• If you are filing an application for re-registration, you do not need to pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.17.

2. Application for Employment Authorization (Form I–765).

• If you are applying for late initial registration and want an EAD, you must pay the fee (or request a fee waiver) for the Application for Employment Authorization (Form I–765) only if you are age 14 through 65. No fee for the Application for Employment Authorization (Form I–765) is required if you are under the age of 14 or are age 66 or older and applying for late initial registration.

• If you are applying for re-registration, you must pay the fee (or request a fee waiver) for the Application for Employment Authorization (Form I–765) only if you want an EAD, regardless of age.

• You do not pay the fee for the Application for Employment Authorization (Form I–765) if you are not requesting an EAD, regardless of whether you are applying for late initial registration or re-registration.

• If you do not want to request an EAD now, you may also file Form I–765 later to request an EAD, and pay the fee (or request a fee waiver), provided that

you still have TPS or a pending TPS application. Your EAD application will be considered timely filed even if the date on your current TPS-related EAD has expired. But until you timely re-register and properly file an EAD application, your current employment authorization will end on July 22, 2017. Accordingly, you must also properly file your EAD application during the 60-day re-registration period in order for your current employment authorization to be automatically extended for 180 days (i.e., Janaury 18, 2018). You are strongly encouraged to file your EAD application as early as possible during the 60-day re-registration period to avoid lapses in your employment authorization.

You must submit both completed application forms together, even if you are not currently requesting an EAD. If you are unable to file the Application for Employment Authorization (Form I–765) and/or biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps*. Fees for the Application for Temporary Protected Status (Form I–821), the Application for Employment Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or by submitting a personal letter requesting a fee waiver, and providing satisfactory documentation. For more information on the biometric services fee, please see the Instructions to Form I–821 or visit the USCIS Web site at *http://www.uscis.gov*. If necessary, you may be required to visit an Application Support Center (ASC) to have your biometrics captured. In such case, USCIS will send you an ASC scheduling notice.

**Re-Filing a Re-Registration TPS Application After Receiving a Denial of a Fee Waiver Request**

USCIS urges all re-registering applicants to file as soon as possible within the 60-day re-registration period so that USCIS can process the applications and reissue EADs promptly. Filing early will also allow those applicants who may receive denials of their fee waiver requests to have time to re-file their applications before the re-registration deadline. If, however, an applicant receives a denial of his or her fee waiver request and is unable to re-file by the re-registration deadline, the applicant may still re-file his or her application. This situation will be reviewed to determine whether the applicant has established good cause for late re-registration. However, applicants are urged to re-file within 45 days of the date on their USCIS fee waiver denial notice, if at all possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(c). For more information on good cause for late re-registration, visit the USCIS TPS Web page at *http://www.uscis.gov/tps*.

**Note:** As previously stated, although a re-registering TPS beneficiary age 14 or older must pay the biometric services fee (but not the initial TPS application fee) when filing a TPS re-registration application, the applicant may decide to wait to request an EAD, and therefore not pay the Application for Employment Authorization (Form I–765) fee until after USCIS has approved the individual's TPS re-registration, if he or she is eligible. If you choose to do this, you would file the Application for Temporary Protected Status (Form I–821) with the fee and the Application for Employment Authorization (Form I–765) without the fee and without requesting an EAD.

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You live in Florida ........................... | *For U.S. Postal Service:* U.S. Citizenship and Immigration Services, P.O. Box 4464, Chicago, IL 60680. *For FedEx, UPS, and DHL deliveries:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 131 S. Dearborn—3rd Floor, Chicago, IL 60603. |
| You live in the State of New York .. | *For U.S. Postal Service:* U.S. Citizenship and Immigration Services, P.O. Box 660167, Dallas, TX 75266. *For FedEx, UPS, and DHL deliveries:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 2501 S. State Highway, 121 Business Suite 400, Lewisville, TX 75067. |
| You live in any other state .............. | *For U.S. Postal Service:* U.S. Citizenship and Immigration Services, P.O. Box 24047, Phoenix, AZ 85074. *For FedEx, UPS, and DHL deliveries:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate address in Table 1. When submitting a re-registration application and/or requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will aid in the verification of your grant of TPS and processing of your application, as USCIS may not have received records of your grant of TPS by either the IJ or the BIA.

**Supporting Documents**

*What type of basic supporting documentation must I submit?*

To meet the basic eligibility requirements for TPS, you must submit evidence that you:

• Are a national of Haiti or an alien having no nationality who last habitually resided in Haiti. Such documents may include a copy of your

passport if available, other documentation issued by the Government of Haiti showing your nationality (*e.g.*, national identity card, official travel documentation issued by the Government of Haiti), and/or your birth certificate with English translation accompanied by photo identification. USCIS will also consider certain forms of secondary evidence supporting your Haitian nationality. If the evidence presented is insufficient for USCIS to make a determination as to your nationality, USCIS may request additional evidence. If you cannot provide a passport, birth certificate with photo identification, or a national identity document with your photo or fingerprint, you must submit an affidavit showing proof of your unsuccessful efforts to obtain such documents and affirming that you are a national of Haiti. However, please be aware that an interview with an immigration officer will be required if you do not present any documentary proof of identity or nationality or if USCIS otherwise requests a personal appearance. *See* 8 CFR 103.2(b)(9), 244.9(a)(1);

• Have continuously resided in the United States since January 12, 2011. *See* INA section 244(c)(1)(A)(ii); 8 U.S.C. 1254a(c)(1)(A)(ii); 8 CFR 244.9(a)(2); and

• Have been continuously physically present in the United States since June 23, 2011. *See* INA sections 244(b)(2)(A), (c)(1)(A)(i); 8 U.S.C. 1254a(b)(2)(A), (c)(1)(A)(i).

The filing instructions on the Application for Temporary Protected Status (Form I–821) list all the documents needed to establish basic eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying for TPS on the USCIS Web site at *www.uscis.gov/tps* under "Haiti."

*Do I need to submit additional supporting documentation?*

If one or more of the questions listed in Part 4, Question 2 of the Application for Temporary Protected Status (Form I–821) applies to you, then you must submit an explanation on a separate sheet(s) of paper and/or additional documentation. Depending on the nature of the question(s) you are addressing, additional documentation alone may suffice, but usually a written explanation will also be needed.

**EAD**

*How can I obtain information on the status of my EAD request?*

To get case status information about your TPS application, including the status of a request for an EAD, you can check Case Status Online at *http://www.uscis.gov*, or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Application for Employment Authorization (Form I–765) has been pending for more than 90 days and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov*. However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic extension of my current EAD through January 18, 2018?*

Provided that you currently have a Haiti TPS-based EAD, you may be eligible to have your employment authorization automatically extended to January 18, 2018 if you:

• Are a national of Haiti (or an alien having no nationality who last habitually resided in Haiti);

• Received an EAD under the designation of Haiti for TPS;

• Have an EAD with a marked expiration date of July 22, 2017, bearing the notation "A–12" or "C–19" on the face of the card under "Category";

• Timely re-registered for TPS during the 60-day re-registration period; and

• Properly filed an application for an EAD during the 60-day re-registration period.

Although you may be eligible to automatically extend your employment authorization through January 18, 2018, you must timely re-register for TPS in accordance with the procedures described in this Notice if you would like to maintain your TPS. You are strongly encouraged to file your EAD renewal application as early as possible during the 60-day re-registration period to avoid lapses in your employment authorization.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Form I–9. You can find additional detailed information about Form I–9 on the

USCIS I–9 Central Web page at *http://www.uscis.gov/I–9Central*. Employers are required to verify the identity and employment authorization of all new employees by using Form I–9. Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (which reflect both identity and employment authorization), or one document from List B (which reflects your identity) together with one document from List C (which reflects employment authorization), or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. An EAD is an acceptable document under List A. Employers may not reject a document based on a future expiration date.

If your EAD has an expiration date of July 22, 2017, and states "A–12" or "C–19" under "Category," and you timely filed an EAD renewal application during the 60-day re-registration period, you may choose to present your EAD to your employer together with the Form I–797C Notice of Action (showing the qualifying eligibility category of either A12 or C19) as proof of identity and employment authorization for Form I–9 through January 18, 2018 (see the subsection titled "*How do my employer and I complete the Employment Eligibility Verification (Form I–9) on the basis of automatically extended employment authorization for a new job?*" for further information). To minimize confusion over this extension at the time of hire, you should explain to your employer that your employment authorization has been automatically extended through January 18, 2018. As an alternative to presenting evidence of your automatically extended employment authorization, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

*What documentation may I show my employer to complete Employment Verification (Form I–9) if I am already employed but my current TPS-related EAD is set to expire?*

Even though you may be eligible to have your employment authorization automatically extended, your employer will need to ask you about your continued employment authorization once July 22, 2017, is reached to meet its responsibilities for Form I–9. Your employer will need a new document to re-verify your employment authorization. Once presented, you and your employer must make corrections to the employment authorization

expiration dates in Section 1 and Section 2 of Form I–9 (see the subsection titled ''What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?'' for further information). In addition, you may also show this **Federal Register** Notice to your employer to explain what to do for Form I–9.

If you file your Form I–765 to renew your current EAD, *and* you receive a USCIS receipt notice (Form I–797C) stating that your current ''A–12'' or ''C–19'' coded EAD is automatically extended for 180 days, you may show that receipt notice to your employer along with your EAD to confirm automatic extension of employment authorization through January 18, 2018, unless your TPS has been finally withdrawn or your request for TPS has been finally denied. To avoid delays in receiving the Form I–797C and a lapse in your employment authorization, you should file your EAD renewal application as early as possible during the re-registration period.

By January 18, 2018, the expiration date of the automatic extension, your employer must re-verify your employment authorization. At that time, you must present any document from List A or any document from List C on Form I–9 to re-verify employment authorization, or an acceptable List A or List C receipt described in the Form I–9 Instructions. Your employer should complete either Section 3 of the Form I–9 originally completed for you or, if this section has already been completed or if the version of Form I–9 has expired (check the date in the bottom left-hand corner of the form), complete Section 3 of a new Form I–9 using the most current version. Note that your employer may not specify which List A or List C document employees must present and cannot reject an acceptable receipt.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my Haitian citizenship?*

No. When completing Form I–9, including re-verifying employment authorization, employers must accept any documentation that appears on the ''Lists of Acceptable Documents'' for Form I–9 that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request documentation that does not appear on the ''Lists of Acceptable Documents.'' Therefore, employers may not request

proof of Haitian citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or re-verifying the employment authorization of current employees. If the expired EAD with category A12 or C19 is presented with the Form I–797C Notice of Action as described herein, an employer should accept this document combination as a valid List A document so long as the EAD reasonably appears to be genuine and to relate to the employee. Refer to the Note to Employees section of this Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Employment Eligibility Verification (Form I–9) on the basis of automatically extended employment authorization for a new job?*

To evidence the automatic extension of your employment authorization, you may present your expired EAD with category A12 or C19 in combination with the Form I–797C Notice of Action showing that the EAD renewal application was timely filed and that the qualifying eligibility category is either A12 or C19. This document combination is considered an unexpired Employment Authorization Document (Form I–766) under List A. When completing Form I–9 for a new job before January 18, 2018, you and your employer should do the following:

1. For Section 1, you should:

a. Check ''An alien authorized to work until'' and enter the date that is 180 days from the date your current EAD expires (January 18, 2018) as the ''employment authorized until mm/dd/yyyy'' date; and

b. Enter your Alien Number/USCIS number or A-Number where indicated (your EAD or other document from DHS will have your USCIS Number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2. When completing Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:
• It is in category A12 or C19;
• the ''received date'' on Form I–797 is on or before the end of the 60-day re-registration period stated in this Notice; and
• the category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A12 and C19 to be the same category code;

b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Insert the date that is 180 days from the date the current EAD expires (January 18, 2018).

By January 18, 2018, employers must re-verify the employee's employment authorization in Section 3 of the Form I–9.

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job and your employment authorization has now been automatically extended when you timely filed a new application for employment authorization during the 60-day re-registration period, you may present your expired EAD with category A12 or C19 in combination with the Form I–797C Notice of Action. The Form I–797C should show that the EAD renewal application was timely filed and that the qualifying eligibility category is either A12 or C19. Your employer may need to re-inspect your current EAD if your employer does not have a copy of the EAD on file. You and your employer should correct your previously completed Form I–9 as follows:

1. For Section 1, you should:

a. Draw a line through the expiration date in Section 1;

b. Write the date that is 180 days from the date your current EAD expires (January 18, 2018) above the previous date (July 22, 2017); and

c. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:
• It is in category A12 or C19;
• the ''received date'' on Form I–797 is on or before the end of the 60-day re-registration period stated in this Notice; and
• the category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A12 and C19 to be the same category code;

b. Draw a line through the expiration date written in Section 2;

c. Write the date that is 180 days from the date the employee's current EAD expires (January 18, 2018) above the previous date (July 22, 2017); and

d. Initial and date the correction in the margin of Section 2.

**Note:** This is not considered a reverification; do not complete Section 3

until either the 180-day extension has ended or the employee presents a new document to show continued employment authorization, whichever is sooner. By January 18, 2018, when the employee's automatically extended employment authorization ends, employers must re-verify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

E-Verify automated the verification process for employees whose TPS-related EAD was automatically extended in a **Federal Register** Notice. If you have an employee who is a TPS beneficiary who provided a TPS-related EAD when he or she first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. After completing the Form I–9 in accordance with the instructions above, the employer may create a case in E-Verify for a new employee using the information provided on Form I–9 and Form I–797C. The receipt number entered as the document number on Form I–9 should be entered into the document number field in E-Verify. By January 18, 2018, employment authorization must be re-verified in Section 3. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may also call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER), formerly the Office of Special Counsel for Immigration-Related Unfair Employment Practices, Employer Hotline at 800–255–8155 (TTY 800–237–2515), which offers language interpretation in numerous

languages, or email IER at *IER@usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email at *I-9Central@dhs.gov*. Calls are accepted in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Employment Eligibility Verification (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Employment Eligibility Verification (Form I–9) differs from Federal or state government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship or immigration status, or based on national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515).

Additional information about proper nondiscriminatory Employment Eligibility Verification (Form I–9) and E-Verify procedures is available on the IER Web site at *https://www.justice.gov/ier* and the USCIS Web site at *http://www.dhs.gov/E-verify*.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples of such documents are:

(1) Your current EAD;

(2) A copy of this **Federal Register** Notice;

(3) A copy of your receipt notice (Form I–797C) for your application to renew your current EAD providing an automatic extension of your current expired or expiring EAD;

(4) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration; and

(5) A copy of your past or current Application for Temporary Protected Status Notice of Action (Form I–797), if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements (SAVE) program to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/casecheck/*, then by clicking the "Check Your Case" button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in

accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found on the SAVE Web site at *http://www.uscis.gov/save*, then by choosing "For Benefits Applicants" from the menu on the left, selecting "Save Resources," followed by "SAVE Fact Sheet for Benefit Applicants."

[FR Doc. 2017–10749 Filed 5–23–17; 8:45 am]

**BILLING CODE 9111–97–P**

---

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–6011–N–01]**

## Annual Indexing of Basic Statutory Mortgage; Limits for Multifamily Housing Programs

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

**SUMMARY:** In accordance with Section 206A of the National Housing Act, HUD has adjusted the Basic Statutory Mortgage Limits for Multifamily Housing Programs for Calendar Year 2016.

**DATES:** Effective January 1, 2016.

**FOR FURTHER INFORMATION CONTACT:** Daniel J. Sullivan, Acting Director, Office of Multifamily Development, Department of Housing and Urban Development, 451 Seventh Street SW., Washington, DC 20410–8000, telephone (202) 402–6130 (this is not a toll-free number). Hearing or speech-impaired individuals may access this number through TTY by calling the toll-free Federal Information Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:** The FHA Down Payment Simplification Act of 2002 (Pub. L. 107–326, approved December 4, 2002) amended the National Housing Act by adding a new Section 206A (12 U.S.C. 1712a). Under Section 206A, the following are affected:

I. Section 207(c)(3)(A) (12 U.S.C. 1713(c)(3)(A));
II. Section 213(b)(2)(A) (12 U.S.C. 1715e (b)(2)(A));
III. Section 220(d)(3)(B)(iii)(I) (12 U.S.C. 1715k (d)(3)(B)(iii)(I));
IV. Section 221(d)(4)(ii)(I) (12 U.S.C.

17151(d)(4)(ii)(I));
V. Section 231(c)(2)(A) (12 U.S.C. 1715v(c)(2)(A)); and
VI. Section 234(e)(3)(A) (12 U.S.C. 1715y(e)(3)(A)).

The Dollar Amounts in these sections are the base per unit statutory limits for FHA's multifamily mortgage programs collectively referred to as the 'Dollar Amounts,' they are adjusted annually (commencing in 2004) on the effective date of the Consumer Financial Protection Bureau's adjustment of the $400 figure in the Home Ownership and Equity Protection Act of 1994 (HOEPA) (Pub. L. 103–325, approved September 23, 1994). The adjustment of the Dollar Amounts shall be calculated using the percentage change in the Consumer Price Index for All Urban Consumers (CPI–U) as applied by the Bureau of Consumer Financial Protection for purposes of the above-described HOEPA adjustment.

HUD has been notified of the percentage change in the CPI–U used for the HOEPA adjustment and the effective date of the HOEPA adjustment. The percentage change in the CPI–U is 0.7% and the effective date of the HOEPA adjustment is January 1, 2016. The Dollar Amounts have been adjusted correspondingly and have an effective date of January 1, 2016.

The adjusted Dollar Amounts for Calendar Year 2016 are shown below:

### Basic Statutory Mortgage Limits for Calendar Year 2016

*Multifamily Loan Programs*

Section 207—Multifamily Housing

Section 207 Pursuant to Section 223(f)— Purchase or Refinance Housing

Section 220—Housing in Urban Renewal Areas

| Bedrooms | Non-elevator | Elevator |
| --- | --- | --- |
| 0 ................ | $50,515 | $58,921 |
| 1 ................ | 55,958 | 65,286 |
| 2 ................ | 66,841 | 80,053 |
| 3 ................ | 82,386 | 100,263 |
| 4+ .............. | 93,270 | 113,369 |

Section 213—Cooperatives

| Bedrooms | Non-elevator | Elevator |
| --- | --- | --- |
| 0 ................ | $54,745 | $58,291 |
| 1 ................ | 63,122 | 66,042 |
| 2 ................ | 76,127 | 80,307 |
| 3 ................ | 97,443 | 103,892 |
| 4+ .............. | 108,558 | 114,044 |

Section 234—Condominium Housing

| Bedrooms | Non-elevator | Elevator |
| --- | --- | --- |
| 0 ................ | $55,862 | $58,787 |

| Bedrooms | Non-elevator | Elevator |
| --- | --- | --- |
| 1 ................ | 64,410 | 67,391 |
| 2 ................ | 77,680 | 81,947 |
| 3 ................ | 99,433 | 106,013 |
| 4+ .............. | 110,772 | 116,369 |

Section 221(d)(4)—Moderate Income Housing

| Bedrooms | Non-elevator | Elevator |
| --- | --- | --- |
| 0 ................ | $50,273 | $54,305 |
| 1 ................ | 57,068 | 62,255 |
| 2 ................ | 68,981 | 75,702 |
| 3 ................ | 86,582 | 97,932 |
| 4+ .............. | 97,836 | 107,501 |

Section 231—Housing for the Elderly

| Bedrooms | Non-elevator | Elevator |
| --- | --- | --- |
| 0 ................ | $47,797 | $54,305 |
| 1 ................ | 53,433 | 62,255 |
| 2 ................ | 63,808 | 75,702 |
| 3 ................ | 76,789 | 97,932 |
| 4+ .............. | 90,278 | 107,501 |

Section 207—Manufactured Home Parks Per Space—$23,191

Dated: May 17, 2017.

**Genger Charles,**
*General Deputy, Assistant Secretary for Housing.*

[FR Doc. 2017–10558 Filed 5–23–17; 8:45 am]

**BILLING CODE 4210–67–P**

---

# DEPARTMENT OF JUSTICE

## Bureau of Alcohol, Tobacco, Firearms and Explosives

**[OMB Number 1140–0013]**

## Agency Information Collection Activities; Proposed eCollection eComments Requested; Application for Tax-Exempt Transfer of Firearm and Registration to Special Occupational Taxpayer, ATF Form 3 (5320.3)

**AGENCY:** Bureau of Alcohol, Tobacco, Firearms and Explosives, Department of Justice.

**ACTION:** 30-Day notice.

**SUMMARY:** The Department of Justice (DOJ), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), will submit the following information collection request to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995. The proposed information collection was previously published in the **Federal Register** on March 14, 2017, allowing for a 60-day comment period.



# Killing with Impunity:

## State-Sanctioned Massacres in Haiti

Harvard Law School International Human Rights Clinic
Observatoire Haïtien des crimes contre l'humanité

HT Vacatur AR_0274

 

Cover Illustration
© David Duverseau, Nègès Mawon

Design
Tutaev Design

Copyright © 2021 President and Fellows of Harvard College. All rights reserved.

**Killing with Impunity:**
State-Sanctioned Massacres in Haiti

Harvard Law School International Human Rights Clinic
Observatoire Haïtien des crimes contre l'humanité

April 2021

HT Vacatur AR_0276

# Table of Contents

**Acknowledgments**                                                                          **2**

**Executive Summary**                                                                        **3**
A Pattern of Sustained Attacks                                                                 3
Legal Framework                                                                                4
Findings                                                                                       5

**I. Political Context of the Attacks**                                                      **6**
President Moïse's Consolidation of Power                                                        6
Anti-Government Protests                                                                        7
Repression of Government Opposition and Violence Against Civil Society                          7
The Expanding Role of Gangs and Their Relationship to State Actors                             8

**II. Emblematic Attacks Against Civilians**                                                 **9**
The Attack on La Saline, November 13-14, 2018                                                   9
   • Leadup to the Attack                                                        9
   • The Attack                                                                 10
   • State Response                                                             11
Attack on Bel-Air, November 4-6, 2019                                                          11
   • Leadup to the Attack                                                       11
   • The Attack                                                                 12
   • State Response                                                             13
Attack on Cité Soleil, May-July 2020                                                           13
   • Leadup to the Attack                                                       13
   • The Attack                                                                 14
   • State Response                                                             15

**III. Legal Analysis: There Is a Reasonable Basis to Conclude That the Attacks**            **16**
**Amount to Crimes Against Humanity**
Crimes Against Humanity Under International Law                                                16
The Attacks Involved Qualifying Acts of Violence                                              16
   • Murder                                                                     17
   • Rape                                                                       17
   • Torture                                                                    17
   • Persecution Against an Identifiable Group or Collectivity on Political Grounds  18
   • The Underlying Crimes Are a Part of the Attacks                             19
The Attacks Were Directed Against a Civilian Population                                        19
   • The Assaults on La Saline, Bel-Air and Cité Soleil Constitute Attacks       19
   • The Attacks Were Directed Agains,t a Civilian Population                    20
The Attacks Were Widespread and Systematic in Nature                                          20
   • The Attacks Were Widespread                                                20
   • The Attacks Were Systematic                                                20
The Attacks Furthered a State or Organizational Policy                                         21
   • The Attacks Furthered a State Policy                                        22
   • The Attacks Furthered a Separate Gang Policy to Attack                      23

**IV. The Available Evidence Points to Several State Actors Who May Be Liable**    **24**
**for Crimes Against Humanity**
Direct Commission    25
Aiding and Abetting    25
   &bull; Haitian National Police    26
   &bull; Moïse Administration Officials    27
Ordering, Soliciting, or Inducing the Crimes    27
Common Enterprise    28
   &bull; Moïse Administration Officials    28
   &bull; Haitian National Police    28
President Moïse May Be Responsible for Crimes Against Humanity Under    28
the Doctrine of Command Responsibility

**V. Ensuring Accountability for Perpetrators of Crimes Against Humanity**    **30**
The Crimes Have Been Carried Out with Impunity    30
Implications for Accountability    30

**Recommendations**    **32**

**Conclusion**    **34**

**Annex I**    **35**

**Endnotes**    **37**

# Acknowledgements

This is a report of the International Human Rights Clinic (IHRC) at Harvard Law School and the *Observatoire Haïtien des crimes contre l'humanité* (OHCCH).

**The International Human Rights Clinic (IHRC) at Harvard Law School** seeks to protect and promote human rights and international humanitarian law through documentation; legal, factual, and strategic analysis; litigation before national, regional, and international bodies; treaty negotiations; and policy and advocacy initiatives. IHRC also engages in innovative clinical education to develop advanced practice techniques and approaches to human rights advocacy. IHRC has significant experience documenting and seeking accountability for international crimes around the world, including in Bolivia, Myanmar, and South Africa. IHRC Clinical Instructor Beatrice Lindstrom has worked on human rights issues in Haiti since 2010. For more information, please visit IHRC's website: https://hrp.law.harvard.edu/clinic/.

**The *Observatoire Haïtien des crimes contre l'humanité*** is a consortium of Haitian civil society organizations and prominent leaders that came together in October 2020 with a mission of monitoring human rights violations in Haiti that may amount to crimes against humanity. Members include the Bureau des Avocats Internationaux (BAI), the Réseau National de Défense des Droits Humains (RNDDH), and individual civil society leaders and prominent lawyers. OHCCH's members have a long history of documenting human rights violations in Haiti, accompanying victims in legal proceedings to seek accountability, and advocating for justice and respect for human rights on the national and international stage.

This report was written by Harvard Law School students Joey Bui, JD '21, and Nathalie Gunasekera, JD '21, together with Clinical Instructor and Lecturer on Law Beatrice Lindstrom. Ellie Abramov, an LLM student in the Fall of 2020, contributed legal research. Members of OHCCH conducted critical investigations into the attacks in La Saline, Bel-Air, and Cité Soleil that form the basis for the report. The primary investigations relied on in this report are contained in Annex I. OHCCH also provided vital analysis and review of this report.

The authors are grateful for additional input and feedback on drafts from Nixon Boumba, Brian Concannon, Sasha Filippova, and Susan Farbstein. The authors further wish to thank the survivors of the attacks and Haitian civil society who have provided crucial testimony and information about the attacks, and who continue to courageously call for justice.

# Executive Summary

## A Pattern of Sustained Attacks

Over the course of President Jovenel Moïse's presidency, Haitian civil society has raised alarm that armed gangs are carrying out heinous, state-sanctioned attacks against civilians in impoverished neighborhoods in Port-au-Prince. The scale, pattern, and context of the attacks indicate that they may amount to crimes against humanity.

The attacks have taken place in the context of an escalating political crisis. President Moïse's rule has become increasingly authoritarian and has turned to repression to quell dissent. Since 2018, massive public protests calling for government accountability and Moïse's resignation have periodically shut down the country.[1] The government has responded to the protests with aggressive measures, including criminalizing common non-violent protest tactics and increasing illegal surveillance of opponents.[2] Targeted assassinations and threats against government critics have been carried out with impunity.[3]

During the four years of Moïse's presidency, human rights observers have documented at least ten brutal attacks in impoverished parts of the capital where opposition against his administration runs strong.[4] Three attacks—in La Saline, Bel-Air, and Cité Soleil—are particularly well-documented and severe.[5] These three attacks offer insights into the means and methods used to carry out the assaults, and the ways in which state actors have supported the orchestration and execution of the attacks. When viewed together, they reveal a pattern of state-sanctioned violence, human rights abuses, and refusal to hold perpetrators accountable that likely amounts to crimes against humanity.

**La Saline:** In November 2018, the worst massacre in decades was carried out in La Saline, a neighborhood that was playing a leading role in organizing protests against the President.[6] In the weeks before the attack, two senior officials from Moïse's administration, Pierre Richard Duplan and Fednel Monchéry, met with then-police officer and gang leader Jimmy Chérizier *alias* Barbecue to plan and provide resources for the attack.[7] On November 13-14, 2018, armed gangs led by Chérizier carried out a vicious attack on the community. Over the course of fourteen hours, the assailants systematically extracted victims, including children, from their homes and executed them at gunpoint and with machetes.[8] Bodies were burned, dismembered, and disposed of in trash piles.[9] At least 71 people were killed, 11 women were raped, and 150 homes were looted and destroyed.[10] Despite widespread outrage in Haiti and internationally, President Moïse has failed to condemn his subordinates' role in the massacre or support their prosecutions.[11]

**Bel-Air:** In September 2019, as popular protests escalated into a nationwide shutdown, demonstrators placed flaming barricades on the main roads of Bel-Air, another opposition stronghold.[12] After several failed attempts to remove the barriers, an official from the Moïse administration reportedly hired Chérizier to secure the removal of the barriers and prevent further protests in Bel-Air.[13] Over the course of three days from November 4-6, 2019, Chérizier and allied gang leaders carried out an armed attack on Bel-Air. The assailants shot civilians and set fire to homes, killing at least 24 people.[14] Eyewitnesses identified three police officers in civilian clothes among the attackers.[15] Although the attack took place in an area surrounded by police stations, the police failed to intervene to protect residents despite repeated pleas for help broadcasted over the radio and social media.[16]

**Cité Soleil:** Between May and July 2020, Chérizier and allied gang leaders—now operating under the newly formed G9 alliance[17]—coordinated simultaneous attacks across several neighborhoods in Cité Soleil. They killed at least 145 civilians, raped multiple women, and burnt homes in efforts to claim areas held by rivals with ties to Moïse's political opponents.[18] Police resources were reportedly utilized at numerous points in the attacks.[19] Like La Saline and Bel-Air, Cité Soleil is known as an opposition stronghold.[20] The area is also strategically important for electoral purposes, with many polling stations located there.[21] Residents believe they were targeted for their political affiliations, in an effort to secure electoral support for the president and his party.[22]

To date, the Haitian government has failed to hold perpetrators accountable, allowing them to act with near complete impunity. Known perpetrators such as Chérizier, who is implicated as a principal actor in repeated attacks, remain free.[23] Moreover, the government has failed to reckon with the criminal responsibility of officials and police officers within its ranks.[24] Duplan and Monchéry remained in office for almost a year after the 2018 La Saline attack,[25] and prosecutions have failed to progress.[26] Police officers implicated in the attacks have not been brought to justice.[27] Despite indications that Moïse himself has sanctioned the attacks,[28] his role remains unscrutinized by any official investigation. This lack of justice has allowed a culture of impunity to grow, emboldening criminals and leaving civilians vulnerable to politically-motivated violence.[29]

In the absence of an official response, Haitian human rights organizations have been at the forefront of responding to the attacks, including being the first to investigate the attacks in their aftermath and publishing detailed reports of their findings.[30] Significant facts surrounding the attacks are now well-documented. This report builds on that critical work to analyze the attacks under international criminal law.

## Legal Framework

Relying on publicly available information, this report synthesizes what is currently known about the attacks in La Saline, Bel-Air, and Cité Soleil and applies international criminal law to analyze whether they amount to crimes against humanity. The three attacks were selected for analysis because of a combination of their severity and the existence of detailed documentation of facts surrounding the attacks.

The report uses the definition of crimes against humanity as contained in the Rome Statute, the international treaty that established the International Criminal Court (ICC), as well as related international jurisprudence from the ICC and other international criminal tribunals. The Rome Statute contains the most recent and widely accepted definition of the crime under international law.[31]

Under Article 7 of the Rome Statute, certain crimes may constitute crimes against humanity when they are committed as part of a widespread or systematic attack against a civilian population and are carried out pursuant to a state or organizational policy.[32] Using this framework, the report assesses whether there is a reasonable basis to conclude that the attacks amount to crimes against humanity.

Determining whether an attack constitutes crimes against humanity entails analyzing the violent acts to assess the scale, pattern, and context in which they took place. It also allows for a broader examination of individual criminal responsibility. Under international criminal law, liability for crimes against humanity is not limited to the persons who carried out the criminal acts, but also includes those who solicited, oversaw, and aided and abetted the crimes, as well as those who failed in their duties to punish the crimes after the fact. Given the compelling evidence that state actors—including

President Moïse himself and others in his administration—are implicated in the attacks, such an inquiry provides a fuller picture of the actors who may be held responsible for the attacks and who have allowed the attacks to be carried out with impunity.

## Findings

This report finds that there is a reasonable basis to conclude that both state and non-state actors may have committed crimes against humanity in Haiti. The attacks analyzed here involve murder, rape, torture, and persecution of a group based on their political identity—the types of underlying crimes that form a foundation for crimes against humanity.[33] The scale, pattern, and intensity of violence indicate that the acts were neither isolated nor random, but rather constitute both widespread and systematic attacks targeted at civilians. Furthermore, evidence suggests that the attacks were pre-planned and furthered both an organizational policy of the gangs and an implicit state policy to repress political opposition. This state policy can be gleaned from the consistent targeting of opposition neighborhoods and the repeated involvement of government officials, police officers, and police resources in the attacks. Moreover, state actors allowed the attacks to be carried out without police intervention and have since failed to punish those responsible.

> Under Article 7 of the Rome Statute, qualifying underlying crimes may constitute crimes against humanity when they are committed as part of a widespread or systematic attack against a civilian population that is carried out pursuant to a state or organizational policy.

Based on what is currently known about the attacks, it is likely that further investigations could establish individual criminal responsibility for gang members and leaders, as well as government officials, including police officers and high-level Moïse administration officials who were involved in the attacks. As much of the international attention on the attacks has focused on the role of gangs,[34] this report instead focuses on the lesser-examined role of state actors who either actively provided material support to perpetrators or supported the perpetrators passively by failing in duties to prevent or punish them. The report identifies key legal theories under which state actors may be responsible for crimes against humanity: direct commission; aiding and abetting; ordering, soliciting, or inducing the crimes; and common enterprise. Under the doctrine of command responsibility, President Moïse himself may also be liable for the crimes committed by his subordinates, particularly with respect to the attack in La Saline.

The findings that crimes against humanity have likely taken place in Haiti, and that state actors may be liable for the crimes, have important ramifications for accountability. Haiti is a party to the American Convention on Human Rights, which under Haiti's Constitution becomes part of domestic law.[35] Haiti has also accepted the binding jurisdiction of the Inter-American Court of Human Rights, tasked with interpreting the American Convention. The Court has not only endorsed universal application of crimes against humanity,[36] but has also held that no statute of limitations applies to such crimes.[37] The Haitian government therefore has a duty to investigate and punish those who are responsible for crimes against humanity.[38] A finding of crimes against humanity also opens the door for other countries to prosecute perpetrators found outside of Haiti on the basis of universal jurisdiction.[39] Finally, although Haiti is not a party to the ICC, the situation could be referred to the ICC by the UN Security Council.[40]

It is crucial that the Haitian government and others fulfill their duty to hold perpetrators responsible for these crimes, in line with the recommendations set forth at the end of this report. Accountability is critical to supporting rule of law, but also to ensuring an end to the grave human rights abuses that have placed Haitian communities in a state of terror.

# I. Political Context of the Attacks

## President Moïse's Consolidation of Power

President Moïse was elected in 2016, after an extended process marked by fraud and low voter turnout.[41] Throughout his term, Moïse has systematically consolidated power by weakening branches of government and agencies meant to serve as a check on the presidency.

At the time of this report, Moïse is one of only 11 elected officials in the entire country.[42] In January 2020, the terms of most members of Parliament expired without elections being held for their replacements.[43] Defying calls to limit the use of executive decrees to the scheduling of legislative elections,[44] Moïse has instead used them to undertake significant legislative action, including creating a domestic intelligence agency with extensive policing and surveillance powers that is only subjected to limited judicial review,[45] and ordering an unlawful constitutional referendum.[46] When the mandates of mayors in all 141 of Haiti's municipalities expired in July 2020, Moïse used a decree to give himself the power to appoint municipal commissions.[47] In March 2021, Moïse used a decree to expand the law on states of emergency, granting him the power to suspend fundamental rights and enabling security forces, including the remobilized army, to take "necessary measures" to respond to threats to public security as defined by the executive.[48]

President Moïse has also undermined autonomous government oversight bodies that have implicated him, along with a large swath of government officials across administrations, in the disappearance of $3.8 billion in public funds made available through the PetroCaribe loan program.[49] Moïse has denied the allegations, and there has been no meaningful judicial accountability for the misspending, aside from the prosecution of a political rival of Moïse's administration.[50] The scandal has sparked widespread and persistent protests across Haiti.

Moïse's approach to overdue elections raises further concerns about his consolidation of power. Moïse's term as president was widely interpreted to end on February 7, 2021, but he has refused to step down, citing an alternative interpretation of the Constitution that he contends allows him to stay in office until at least February 2022.[51] Haitian civil society and opposition parties have called for a transition government to be put in place to credibly and independently organize elections.[52] In September 2020, Moïse instead appointed a controversial provisional electoral council, mandating it to organize elections and hold a constitutional referendum.[53] Constitutional amendments by referendum are prohibited under the constitution, after it was used by Haiti's former dictator Jean-Claude Duvalier to make him "president-for-life."[54] Moïse's proposed amendments would fundamentally restructure government and concentrate power with the presidency at the expense of other branches,[55] and grant him indefinite immunity for acts related to his official functions as President.[56]

On February 7, 2021, the day many argued Moïse's term was set to end, the police arrested 18 individuals, including Supreme Court Justice Yvickel Dabrésil, for allegedly planning a coup.[57] The next day, Moïse issued a decree illegally "retiring" three Supreme Court justices appointed by the opposition,[58] and replaced them with new judges appointed by decree.[59] The police also seized control of the Supreme Court.[60] These actions have sparked widespread condemnation as attacks on judicial independence.[61]

## Anti-Government Protests

Civil society has strongly objected to President Moïse's seizure of power and the lack of accountability for corruption and other human rights violations. Protests calling for his resignation have repeatedly gripped the nation. These protests form an important backdrop to the brutal attacks carried out against civilians in neighborhoods that have been particularly active in opposing the government during Moïse's term.

In August 2018, a robust national movement erupted in response to the PetroCaribe corruption scandal, sparking a series of mass protests that have continued into 2021.[62] On October 17, 2018, an estimated 10,000 to 15,000 Haitians marched across the country, constituting one of the largest public demonstrations in Haiti's recent history.[63] The protests culminated in multiple operations '*peyi lok*,' during which businesses, schools, and public transportation were shut down across Haiti as a result of widespread demonstrations.[64] During a three-month *peyi lok* beginning in September 2019, large demonstrations took place almost every day.[65]

As living conditions deteriorated and impunity reigned, Haiti saw a sharp rise in violence and kidnappings in 2020.[66] These worsening conditions also underlie the continued protests and calls for Moïse's resignation.[67] In February 2021, protests again erupted over Moïse's refusal to step down.[68] Demonstrators accused Moïse of reinstating a dictatorship and called for his ouster.[69]

## Repression of Government Opposition and Violence Against Civil Society

The government has responded to demonstrations and growing opposition with increasingly aggressive tactics. As analyzed below, government officials have sought to suppress anti-government organizing through bribery, and when that has failed, have enlisted gangs to carry out targeted attacks against anti-government strongholds active in the protests.[70] The events in La Saline, Bel-Air, and Cité Soleil provide vivid examples of such attacks, but are far from the only instances.[71]

The Haitian National Police (PNH) has repeatedly used excessive force—including shooting live rounds and teargas—to shut down peaceful sit-ins and other demonstrations.[72] In November 2020, as violence and kidnappings were surging with impunity, Moïse targeted those protesting impunity by issuing a decree that criminalizes popular forms of non-violent protest as 'terrorist acts.'[73] The decree also subjects PNH officers to harsh prison sentences for failing to quell demonstrations, which observers fear will encourage even more aggressive use of force.[74]

Targeting and surveillance of government critics has also increased during Moïse's presidency. In August 2020, for example, Monferrier Dorval, the head of the Port-au-Prince Bar Association, was assassinated outside his home.[75] Hours before his death, Dorval gave a radio interview in which he criticized the government for dysfunction and called for "another kind of country."[76] Dorval had previously also joined a statement denouncing more than two dozen presidential decrees signed by Moïse.[77] Although Dorval's case was transferred to an investigative judge, crime-scene evidence disappeared from the court the following month, and the investigation has stalled.[78] One of the four individuals who were eventually arrested in connection with the killing allegedly has ties to the Moïse administration.[79]

The Moïse administration has also threatened human rights organizations and activists that have documented abuses and called for accountability. In 2019, human rights groups raised alarm about an alleged plan between the Minister of the Interior and gang leader Jimmy 'Barbecue' Chérizier to assassinate Pierre Esperance, the head of RNDDH.[80] Following a hearing before the Inter-American

Commission on Human Rights (IACHR) in December 2020, where lawyers from the *Bureau des Avocats Internationaux* (BAI) and the Institute for Justice & Democracy in Haiti (IJDH) testified about the rise in impunity for human rights violations, the Minister of Justice publicly denounced the BAI, IJDH, and RNDDH as "tools of instability" and accused them of enabling violence and insecurity in the country.[81] Around the same time, the government announced that the newly-instituted national intelligence agency has begun to monitor opposition activity,[82] leading to further concern that a crackdown on political dissent and civil liberties will follow.[83]

Moïse also reinstated the military (FAdH) in 2018, sparking concern that he will deploy the army to further curb dissent and opposition.[84] FAdH was notorious for mounting coups and perpetrating human rights abuses before its disbandment in 1995.[85] Moïse appointed former high-ranking army officers to the new FAdH, including Jean-Robert Gabriel, who was convicted *in absentia* for his role as a military commander in the 1994 Raboteau Massacre.[86]

## The Expanding Role of Gangs and Their Relationship to State Actors

In recent years, armed gangs have amassed significant power and control over impoverished neighborhoods.[87] Warring gangs with competing political affiliations rule neighborhoods like fiefdoms, using violence and terror to secure cooperation and extract bribes from the population.[88] They also wield significant socioeconomic power by taking on quasi-governmental functions and serving as conduits for government and financial assistance in the areas they control.[89]

Credible investigations have documented that many gangs receive financing, weapons, and ammunition from government sources in exchange for their political support.[90] This relationship serves an important political function; by controlling key segments of the population, gangs are able to deliver electoral support for politicians.[91] The UN has observed that gang violence has especially surged in impoverished neighborhoods with large polling stations, where gangs can use terror to influence electoral outcomes.[92]

In June 2020, a new gang alliance formed under the name 'G9 Family and Allies,' marking an alarming consolidation of power and raising concerns that state institutions will be further undermined.[93] The alliance is led by Chérizier, a former PNH officer and notorious gang leader implicated as the principal perpetrator in numerous brutal attacks against civilians, including the ones discussed here.[94] As of September 2020, the alliance included fifteen gangs and controlled vast swaths of territory in the Port-au-Prince metropolitan area.[95] G9 reportedly enjoys ties to both the Moïse administration and PNH.[96] The National Commission for Disarmament, Demobilization and Reintegration (CNDDR)—which was reinstituted by President Moïse in 2019 with a stated goal of dismantling gangs—initially indicated that it encouraged G9's formation to help facilitate negotiations, and stressed that it had a "good relationship with the G9 gang."[97] The CNDDR later denied that it participated in the G9's formation.[98]

The gangs also have a complicated relationship with PNH. Numerous police officers have personal ties to gangs.[99] Witnesses to violent gang attacks against civilians have reported seeing PNH officers participate directly in the attacks, and official PNH vehicles and uniforms have regularly been used in such attacks.[100] PNH has also systematically failed to provide protection to targeted neighborhoods, to intervene during the perpetration of crimes, or to arrest perpetrators with warrants issued against them.[101] PNH faces significant budgetary and other resource constraints that limits its ability to effectively tackle gang violence,[102] but the police's failure to take any action during the course of vicious, lengthy attacks against civilians raises the specter of intentional complicity, especially when viewed in contrast to the strong showings of force against demonstrators.

# II. Emblematic Attacks Against Civilians

During Jovenel Moïse's presidency, gangs acting with the support of state actors have perpetrated numerous brutal attacks against communities in impoverished neighborhoods around the capital. This report focuses on three such attacks: the 2018 attack in La Saline, the 2019 attack in Bel-Air, and the 2020 attack in Cité Soleil. These attacks were selected for analysis based on their severity and on the availability of existing documentation collected through credible investigations by a diversity of actors.

Common elements present in each of the three attacks raise particular concern that they amount to crimes against humanity under international law. The attacks have had grave impacts on the affected communities; together, at least 240 people were killed,[103] at least 45 injured,[104] at least 25 were raped,[105] and hundreds of homes were destroyed leading to widespread displacement.[106] The attacks targeted civilians who reside in impoverished neighborhoods where opposition to the government runs strong and anti-government protests are common.[107] The attacks were carried out by prominent gang leaders, including Jimmy Chérizier, Serge Alectis *alias* Ti Junior, Iscar Andrice *alias* Isca, and Micanor Altès *alias* Roi Mikano, who in June 2020 formed the G9 gang alliance. The attacks each involve some degree of state involvement—ranging from high-level officials in Moïse's administration to individual PNH officers and resources—indicating that gang attacks are being systematically deployed as a tool of political repression.

A number of independent state, non-governmental, and international actors have investigated the attacks, including the Haitian judicial police (DCPJ), prominent Haitian human rights organizations RNDDH and *Fondasyon Jè Klere* (FJKL), the United Nations through the UN Mission for Justice Support in Haiti (MINUJUSTH) and the UN Integrated Office in Haiti (BINUH), and the media.[108] These investigations have involved interviews with victims, witnesses, community leaders, suspected perpetrators, and state authorities.[109] The following section draws on the findings of these investigations to summarize the key facts of the attacks. Where material discrepancies exist between accounts, it is noted accordingly.

## The Attack on La Saline, November 13-14, 2018

### Lead-up to the Attack

On November 13-14, 2018, armed gangs operating with government support carried out a brutal massacre of residents in La Saline, a neighborhood of Port-au-Prince that has long been the center of anti-government organizing and resistance.[110]

La Saline is a long-standing stronghold of *Fanmi Lavalas*, the political party of former President Jean-Bertrand Aristide and one of the key opposition parties to Moïse's PHTK.[111] The neighborhood is known to have "an exceptional ability to either mobilize or thwart street demonstrations," as protests frequently begin in La Saline and then proceed around the capital.[112] La Saline's political significance has made it a highly contested area for gangs of different political affiliations.[113] Gangs also vie for control of La Saline's *Croix-des-Bossales* market, where they can extort businesses and charge fees for allocating space.[114]

The La Saline community has played an active role in organizing protests against the Moïse administration,[115] and government officials have repeatedly tried to suppress anti-government activity there. In 2017, First Lady Martine Moïse, two government ministers, and other state officials reportedly

met with gang leaders and community leaders in La Saline and offered to invest in community projects in exchange for a reduction in anti-government activities in the area.[116] The proposal was rejected as "bold and inappropriate."[117] As the PetroCaribe movement intensified in 2018, organizers planned large protests for October 17, 2018, the national commemoration day for Haiti's revolutionary leader Jean-Jacques Dessalines.[118] On October 15, 2018, political opposition leaders held a joint press conference in La Saline, rallying support for the movement and demanding Moïse's resignation.[119] Two days later, one of the largest protest in Haiti's recent history took place, with particularly large crowds gathering in and around Port-au-Prince, including in La Saline.[120] Protestors blocked President Moïse from entering La Saline to lay a ceremonial wreath at Dessalines' monument in Pont Rouge, leading to clashes with the police and the police firing guns into the crowd.[121]

With the protest movement in full swing, activists planned another round of nationwide demonstrations for November 18, 2018. On November 6, two weeks before the scheduled protests, Joseph Pierre Richard Duplan, then President Moïse's Delegate for the West Department,[122] and Fednel Monchéry, then Director General of the Ministry of the Interior, reportedly met with Jimmy Chérizier in Delmas 6 to plan an attack against the residents of La Saline.[123] At the time, Chérizier was still a PNH officer and the head of the Delmas 6 gang.[124] He had a reputation for violence and was widely known as a key perpetrator of an earlier massacre in the 2017 Grand Ravine neighborhood, in which nine civilians were killed.[125] According to witnesses, Duplan and Monchéry supplied Chérizier and his gang with weapons, police uniforms, and government vehicles to use in the attack.[126]

| Events leading up to the La Saline attack | |
|---|---|
| Oct. 2017 | First Lady Martine Moïse visits La Saline to ask gang leaders to reduce antigovernment activity in return for investments. |
| Aug.-Oct. 2018 | PetroCaribe protest movement intensifies. |
| Oct. 15, 2018 | Political opposition leaders hold joint press conference in La Saline to support antigovernment protests. |
| Oct. 17, 2018 | Largest protest in Haiti's recent history. Protesters block President Moïse from entering La Saline to lay a ceremonial wreath. |
| Nov. 6, 2018 | Duplan and Monchéry meet gang leaders to plan an attack in La Saline and provide supplies. |
| Nov. 13, 2018 | Gangs attack La Saline residents and kill at least 71. |

## The Attack

The details of the massacre that took place seven days later are well-documented.[127] On November 13, heavily armed gangs led by Alectis, Chérizier and other allied gang leaders arrived in La Saline in several vehicles, including an armored vehicle from the Departmental Intervention Unit (BOID), a unit of PNH.[128] The perpetrators began firing automatic weapons around 4pm, and over the course of fourteen hours, killed at least 71 residents, including children and a ten-month-old infant.[129] Some of the perpetrators wore BOID uniforms and lured residents out of their homes under the guise of a PNH operation, then executed them in the streets.[130] Many of the residents were shot and some were beheaded with machetes.[131] At least eleven women were raped, including two gang rapes carried out

inside the victims' homes.[132] The assailants looted at least 150 homes, destroying many of them.[133] An estimated 300 people were forced to flee their homes and sought shelter in the nearby neighborhood of Wharf Jérémie.[134]

The perpetrators removed some corpses to unknown locations and threw others in garbage piles where pigs fed on them.[135] In the morning of November 14, photos and videos of bodies began circulating on social media, allowing online commentators to identify some victims.[136] That evening, the perpetrators dismembered and burned remaining bodies, and transported some of the remains by tractor to another destination.[137] Other remains that could no longer be identified were only retrieved days later when a pastor was able to negotiate safe passage with gang leaders.[138]

The attacks were spearheaded by Chérizier, Alectis, Chrisla, and Andrice, leaders of allied gangs who went on to form the G9 alliance.[139] Eyewitnesses also reported that Duplan, President Moïse's Delegate, was personally present during the attack, talking to Chérizier and other gang leaders.[140] The UN has documented that in addition to Chérizier, at least two other PNH officers participated in the attack.[141]

## State Response

During the course of the 14-hour attack, PNH never intervened to protect the community.[142] PNH has several outposts within a kilometer of the site of the attack, and several police patrol cars were seen near La Saline during the attack.[143] The La Saline police station reportedly informed the Departmental West Directorate of the attack as soon as it began,[144] and by 5pm, at least five PNH units were on notice that the attack was taking place.[145] Citing inadequate resources, no part of PNH made an attempt to intervene.[146]

Even as photos and videos of the gruesome massacre spread across social media, President Moïse did not publicly condemn the violence or pay respects to the community.[147] The government has not offered any assistance or reparations to the survivors or those who are still displaced as a result of the massacre.[148]

Following public outcry, DCPJ conducted an investigation into the attack and reportedly identified 70 individuals responsible for carrying out the massacre, including Duplan, Monchéry, and Chérizier.[149] Prosecutions have been slow to progress, however, and none of the orchestrators of the attack have been arrested.[150] Both Duplan and Monchéry remained in their government roles until September 2019—nearly a full year after the perpetration of the attack— when they were replaced amidst intensifying protests.[151] While PNH fired Chérizier in December 2018, he remains at large despite an outstanding arrest warrant for his role in a massacre in Grand Ravine the year prior.[152] He has gone on to carry out several other massacres since, including the attacks in Bel-Air and Cité Soleil, described below.

# Attack on Bel-Air, November 4-6, 2019

## Leadup to the Attack

Like La Saline, Bel-Air is a key stronghold for government opposition.[153] The neighborhood has traditionally supported *Fanmi Lavalas*, dating back to Jean-Bertrand Aristide's ascent to the presidency.[154] Since Bel-Air is generally a locus for popular protest, gangs in control of the area are well-positioned to prevent demonstrations and hold off political opposition in exchange for payment.[155] The area is also a key access point to several large markets.[156]

In September 2019, anti-corruption protests escalated into a three-month *peyi lok*, in which businesses, schools, and public transportation were closed, and demonstrations against the government took place almost daily.[157] Protestors placed flaming barricades on Bel-Air's main roads, shutting down traffic and blocking government entry to the neighborhood.[158] According to testimony from community leaders, government officials made several attempts to persuade residents to remove the barriers.[159] When these efforts were repeatedly rejected, the Secretary of State for Public Security, Léon Ronsard Saint-Cyr, reportedly approached Chérizier on October 31, 2019 and asked him to secure the removal of barriers and prevent further anti-government protests in Bel-Air.[160] In exchange, Saint-Cyr allegedly provided Chérizier with a large sum of money and several new motorcycles.[161] At the time of this exchange, Chérizier was widely known for his role in both the Grand Ravine and La Saline massacres.[162] Saint-Cyr denies these allegations.[163]

| Events leading to the Bel-Air attack | |
|---|---|
| **Sep.-Nov. 2019** | *Peyi lok* - nation-wide shutdown with regular antigovernment protests known. |
| **Sep.-Oct. 2019** | Government officials fail to persuade residents to remove *peyi lok* road barriers in Bel-Air. |
| **Oct. 31, 2019** | Government official Saint-Cyr reportedly asks Chérizier to remove barriers and to prevent further protests. |
| **Nov. 3, 2019** | Chérizier, 40 armed men, and other gang leaders ask Bel-Air residents to remove barriers. Residents refuse. |
| **Nov. 4-7, 2019** | Chérizier and armed gang members attack residents and burn down houses, killing at least 24. |

## The Attack

On November 3, 2019, 40 armed men led by Chérizier and two allied gang leaders, Wilson Pierre *alias* Ti Sonson and Alex *alias* Malkomprann, went to Bel-Air and offered residents money to remove the barriers.[164] The residents rejected the proposition, noting that the barricades were erected as a part of popular movement that they did not control.[165]

Over the course of the next four days, the gangs carried out attacks that killed at least 24 people, injured five, and burned 28 residences and 11 vehicles.[166] The attacks began on November 4, when Chérizier and his co-perpetrators returned to Bel-Air with 50 heavily armed men carrying automatic assault rifles.[167] Multiple eyewitnesses confirmed the presence of three plain-clothed PNH officers with ties to Chérizier's Delmas 6 gang among the attackers.[168] The assailants fired at residents and homes and set fire to numerous vehicles and residences, injuring at least two residents.[169] The attack was reported on numerous radio stations as it was taking place, but the police did not deploy to intervene.[170] Later in the day, a BOID patrol vehicle happened to pass through Bel-Air and exchanged fire with the attackers, causing the assailants to temporarily retreat.[171] The BOID officers notified central command of the situation, but did not call for reinforcements, physically pursue the attackers, return to provide protection, nor take measures to investigate the attack or identify victims and damage.[172]

In the middle of the night on November 5, Chérizier and his co-perpetrators returned to Bel-Air, again firing at civilian homes while residents slept inside, injuring at least one woman.[173] A group of off-duty police officers residing in an adjacent neighborhood opened fire in response, killing Alex in the shoot-out.[174] On November 6, Chérizier, Pierre and their men returned to avenge Alex death.[175] Armed with military rifles and assault rifles, they killed two men and a 16-year-old girl and set 26 homes ablaze.[176] Deadly attacks on Bel-Air continued for several days throughout November.[177]

### State Response

Bel-Air is surrounded by police outposts, including four local police stations, the main Port-au-Prince station, and three police department headquarters.[178] Over the course of the multiple-day attacks, residents repeatedly called on the authorities for help.[179] These requests were widely circulated over the radio and social media, but PNH did not intervene or provide protection.[180] Investigations and prosecution of these crimes have largely stalled, and the UN has expressed concern that this lack of accountability contributed to an increase in gang attacks throughout 2020, including the attack on Cité Soleil.[181]

## Attack on Cité Soleil, May-July 2020

### Leadup to the Attack

Cité Soleil is a deeply impoverished and densely populated commune with approximately 250,000 residents.[182] It borders La Saline to the north. Like La Saline and Bel-Air, it is a historical stronghold for *Fanmi Lavalas*.[183] For decades, warring gangs have controlled different neighborhoods in Cité Soleil, but gang fighting has intensified in recent years.[184] Control over Cité Soleil has political implications because it is an area with many large polling stations; the gangs that hold territorial control are in a position to influence electoral outcomes and political activities.[185]

Violent gang fighting surged in 2020 during the solidification of the G9 alliance and in anticipation of elections, in what appears to be a concerted effort to turn Cité Soleil into an area controlled by pro-government gangs.[186] In May 2020, Altès, the leader of one of the anti-government gangs in Cité Soleil, was allegedly paid by an unidentified state actor to switch political alliances and eliminate Ernso Nicolas, another anti-government gang leader in the area.[187] He allegedly received 40,000 US dollars, five new firearms, the return of three other weapons previously seized by the police, and the withdrawal of official 'wanted person' notifications as a part of the deal.[188] After Nicolas was murdered, several gangs with ties to the government joined forces to take control of additional anti-government strongholds.[189]

To this end, on May 23, 2020, Chérizier convened a meeting of 13 gang leaders—who would go on to form the G9 alliance—to plan simultaneous attacks in various parts of Cité Soleil and the adjacent neighborhood of Nan Tokyo.[190] The attacks targeted Pont Rouge, where residents had blocked Moïse from laying a wreath the year prior; Nan Brooklyn, a neighborhood in Cité Soleil controlled by Gabriel Jean-Pierre *alias* Ti Gabriel, who reportedly supported government opposition during *peyi lok*; and Nan Tokyo, which had previously been brutally attacked by Chérizier and Alectis.[191]



| Timeline of the Cité Soleil Attack | |
|---|---|
| **May 2020** | Government official reportedly pays gang leader Micanor Altès to switch alliance from antigovernment gang to Chérizier-allied gangs, kill another antigovernment gang leader. |
| **May 23, 2020** | Chérizier convened meeting of 13 gang leaders, including Altès, to plan simultaneous attacks against parts of Cité Soleil and Nan Tokyo. |
| **May 24-27, 2020** | Chérizier and allied gangs attack Cité Soleil and Nan Tokyo, killing at least 34 people. As a result, Chérizier and allies take control of nine more areas. |
| **Jun. 2020** | Chérizier and allies form the G9 gang alliance. |
| **Jun.-Jul. 2020** | G9 focuses attacks on Nan Brooklyn neighborhood of Cité Soleil, controlled by their rival Gabriel Jean-Pierre. During this period, at least 111 were killed. |

## The Attack

Between May 24 and July 31, 2020, communities in Cité Soleil faced an onslaught of gang-led assaults during which at least 145 people were killed and 98 homes were destroyed.[192]

On May 24, Chérizier and his men arrived in Nan Tokyo, while gangs led by Altès and Alectis besieged Pont Rouge.[193] Throughout the afternoon and evening and carrying into the following day, the gangs fired automatic weapons at civilians, reportedly killing numerous people.[194] When rival gangs hid in a post-earthquake resettlement camp for disabled people, attackers followed them there on May 25 and set 24 residences on fire, killing two residents.[195]

On May 26, at around 3pm, five armored PNH vehicles parked outside a key entrance to Nan Brooklyn.[196] According to survivors' accounts, tear gas tubes and cylinders were indiscriminately fired, forcing residents to flee and leading to an eruption of gunfire from all directions.[197] Residents were shot and attacked with knives and stones as they tried to escape.[198] Some were beheaded.[199] Many bodies were burned and thrown into the water.[200] On May 26 and 27, gangs attacked Nan Brooklyn killing at least four people, injuring 20 others, and setting fire to multiple houses.[201] G9 gangs also attacked displaced persons from La Saline who had taken refuge at the Wharf Jérémie after the November 2018 massacre, killing them and throwing their remains into the sea.[202] As a result of these attacks, the G9 took control of nine more areas, including Chancerelles, Nan Tokyo, and Fort Dimanche.[203]

After the May 2020 attacks, the entire commune of Cité Soleil was subject to greater gang-related violence. Between June and July 2020, G9 gangs murdered at least 111 people, a number of whom were first captured and then shot in the head.[204] The gangs also committed rapes and burned houses.[205] The G9 particularly focused attacks in Nan Brooklyn, the neighborhood still controlled by their rival and anti-government leader Gabriel Jean-Pierre.[206] They carried out five separate attacks on the Nan Brooklyn Market during this period and monitored all roads into Nan Brooklyn.[207]

## State Response

There is no indication that police intervened in order to protect civilians during the course of the sustained attack. RNDHH notes that police presence in the area was markedly lower throughout this time,[208] and that PNH officers twice abandoned the Cite Soleil police station during the height of the attack, citing a lack of resources and reinforcements.[209] Given the scale of the insecurity, police interviewed as a part of RNDDH's investigation noted that units needed reinforcements and a comprehensive plan for intervention from senior officials, including the Directorate General of PNH, but no such plan was issued.[210] Meanwhile, some PNH officers and resources were periodically used to perpetrate the attacks. In addition to PNH's involvement in the May attack, on July 2, 2020, two armored PNH vehicles passed through an area under G9 attack and shot at passersby in the direction of homes, killing at least five civilians and injuring ten others.[211] Four armored PNH carriers also assisted G9 gangs on July 19, 2020 to take back a building seized by Jean-Pierre.[212] While the Prime Minister and the Minister of Justice and Public Safety have allegedly issued orders to pursue accountability for perpetrators, no arrests appear to have been made in connection with the attack.[213]

RNDDH interviewed residents of Cité Soleil who believe that the attacks were politically motivated, carried out as a part of a concerted effort between gangs and the government to control the neighborhoods for electoral purposes.[214] Former Deputy for Cité Soleil, Pierre Lemaire, told FKJL that President Moïse set out to remove Jean-Pierre from control of the neighborhood after learning of his role in organizing anti-government activity during *peyi lok* in 2019.[215] Residents of Pont Rouge believe they were targeted in retaliation for denying Moïse entry to the area for the October 17, 2018 wreath-laying ceremony.[216] While additional evidence is needed to confirm these theories, they are consistent with a broader pattern of state-sponsored gang attacks being used for political aims.

| Gangs implicated in each attack | |
|---|---|
| **La Saline attack 2018** | • Chabon led by Alectis • Delmas 6 led by Chérizier • Nan Bwadom led by Jimmy Joseph • Belekou led by Iscar Andrice • Twi Bwa led by Chrisla • Base Pilate led by Wilson Pierre • St Martin Street gang led by Alex |
| **Bel-Air attack 2019** | • Delmas 6 led by Chérizier • Chabon led by Alectis • Krache Dife led by Pierre • St Martin Street gang led by Malkonprann |
| **Cité Soleil attack 2020** | • Wharf Jérémie gang led by Altès • Chabon led by Alectis • Delmas 6 led by Chérizier • Simon Pélé gang led by Zouma • Belekou led by Iscar Andrice • Nan Boston gang led by Matias Saintil |

# III. Legal Analysis: There Is a Reasonable Basis to Conclude That the Attacks Amount to Crimes Against Humanity

## Crimes Against Humanity Under International Law

Crimes against humanity are among the gravest crimes under international law. They are considered crimes not just against the individual victims, but humanity as a whole.[217] Crimes against humanity are prohibited under customary international law and are considered *jus cogens*, a peremptory norm from which no derogation is permitted.[218] They are therefore prohibited internationally regardless of whether a state has affirmatively joined a treaty that outlaws such crimes.

This section assesses whether the attacks in La Saline, Bel-Air, and Cité Soleil meet the legal definition of crimes against humanity under international criminal law. The report uses the definition of crimes against humanity articulated in the Rome Statute, the international treaty that created the International Criminal Court (ICC), because the Rome Statute and related jurisprudence is regarded as the most widely accepted and recent articulation of the crime under international law.[219] Where instructive, the analysis in this section also draws on case law from other international criminal tribunals.

To find that crimes against humanity are taking place under the Rome Statute's definition, several elements must be present. First, the attack must involve at least one of the underlying crimes listed in Article 7(1) of the Rome Statute, such as murder or rape.[220] Second, several contextual elements must be met: the underlying crimes must be (1) committed as part of an attack directed against any civilian population; (2) that is widespread or systematic; and (3) that is pursuant to or in furtherance of a state or organizational policy.[221]

Based on the publicly available evidence, there is a reasonable basis to conclude that all these elements are met, and that the attacks in La Saline, Bel-Air, and Cité Soleil amount to crimes against humanity. The report uses the "reasonable basis" standard because it is the one used by the ICC prosecutor to determine whether to open an investigation into a given situation, with a view to prosecuting the individuals who are personally responsible for committing the crimes.[222] While Haiti has signed, but not ratified the Rome Statute, and therefore is not subject to the prosecutor directly opening an investigation, the framework is useful for evaluating Haiti's international duty to fully investigate and prosecute the crimes. Moreover, the UN Security Council may refer crimes against humanity in Haiti to the ICC, regardless of whether Haiti is a party to the Rome Statute.[223] Potential venues for trying crimes against humanity are discussed in Section V, below.

## The Attacks Involved Qualifying Acts of Violence

To find that a crime against humanity has taken place, at least one of the underlying crimes listed in Article 7(1) of the Rome Statute must be present. There is evidence that at least four such crimes were perpetrated in the attacks in La Saline, Bel-Air, and Cité Soleil: murder, rape, torture, and the persecution of groups based on their political identity. Each are analyzed in turn.

## Murder

The Rome Statute and Elements of Crime define murder as the killing of one or more persons.[224] Investigations into the attacks have documented at least 240 civilians who were killed in the three attacks. In the La Saline attack of November 2018, RNDDH documented that at least 71 people were killed as assailants systematically shot and beheaded civilians.[225] This number is likely an undercount; since many bodies were burned, chopped into pieces, and disposed of by the gangs, human rights investigators have noted that the true number of deaths may never be known.[226] In the Bel-Air attack of November 2019, Chérizier and his associates killed at least 24 people.[227] Between May 23 and July 28, 2020, armed gangs led by G9 members killed at least 145 people in numerous attacks on and around Cite Soleil.[228]

## Rape

Rape is another prohibited act under the Rome Statute. Rape requires the invasion, committed by force, threat of force, or coercion,[229] of a person's body "by conduct resulting in penetration, however slight, of any part of the body of the victim or of the perpetrator with a sexual organ."[230]

Human rights groups have documented the use of rape as a tool to terrorize civilians in the La Saline and Cité Soleil attacks. Haitian human rights organizations have reported 11 cases of rapes, including gang rapes, that took place during the 2018 attack on La Saline.[231] RNDDH interviewed a 19-year old woman who recalled that at least five men broke into her house and gang raped her.[232] J.J.L., a 26-year-old survivor, described how armed men entered her house, raped her, and then set her house on fire.[233] Similarly, J.J., a 27-year-old woman, reported that she was in her home when two armed individuals broke into her house and then took turns raping her.[234] Another 23-year-old woman was beaten with rifles before the assailants raped her.[235] A 14-year old girl also reported on the radio that she was raped by Alectis, leader of the Chabon gang.[236]

During the course of the attack on Cité Soleil from May 24 to July 28, 2020, RNDDH documented that at least 18 women were raped by gang members.[237] Many survivors named the armed gangs led by Iscard Andrice as key perpetrators.[238] A.C., a 38-year-old woman, reported being raped by three members of Andrice's gang in her home on June 3.[239] On the same day, 25-year-old F.P. was beaten and raped by at least five of Andrice's men.[240] Other survivors described how they were accosted by gang members as they were walking to work or on their way to buy groceries. L.T. was on her way to buy food for her three children when two armed men beat her, dragged her into an alley, and then took turns raping her.[241] On July 7, two young women were captured by three armed men and held for several hours during which they repeatedly raped. S.R., a 59-year-old woman, was walking in Cité Soleil when armed gang members stopped her and began to beat her. One of the perpetrators dragged her into a street corner and raped her.[242]

These testimonies likely do not capture the full scale of rapes committed during the attacks, as social stigma often stifles the reporting of the crime.[243]

## Torture

Torture is another crime that underlies crimes against humanity.[244] The Rome Statute defines torture as the intentional infliction of severe pain or suffering, whether physical or mental, and which does not arise from lawful sanctions.[245] Courts have further elaborated that, to rise to torture, the infliction

of severe pain or suffering must be aimed at "obtaining information or a confession, or at punishing, intimidating or coercing the victim or a third person, or at discriminating, on any ground, against the victim or third person."[246]

Courts have consistently found that rape is a form of torture.[247] As discussed above, rape—and therefore torture—was used as a tool to terrorize civilians in at least 11 instances in the La Saline attacks and in at least 18 instances in the Cité Soleil attacks. Perpetrators in the La Saline attacks also tortured victims by raping them while relatives were watching, and by causing victims to watch the rape of their relatives. Such acts inflict severe mental suffering that amounts to torture.[248] The UN verified that in the La Saline attacks, gang rapes took place in the homes of the victims, in front of their parents or children.[249] In one such case, the perpetrators also mutilated the rape victim's parents.[250] Such mutilation inflicts severe pain in itself, and especially rises to torture in the context of mental suffering from watching the rape of a child.[251]

Other acts in the attacks also likely inflicted severe pain that amount to torture. In the aftermath of the La Saline attacks, for example, human bodies were found charred, mutilated, dismembered, and left for pigs to feed on.[252]

These acts amount to torture as they appear aimed to punish or intimidate the victims. Each of the attacks were perpetrated against residents in neighborhoods known as antigovernment strongholds and sites of recent antigovernment activity. As further discussed below, the perpetrators likely attacked these victims to punish them for perceived antigovernment activity and to intimidate them from further antigovernment activity. Moreover, in the Bel-Air attack, RNDDH reports that a man named Etienne Monbrun was captured and taken to Delmas 4, where he was brutally beaten and eventually killed for failing to provide the information that gang members requested.[253] This particular act also amounts to torture as the pain was inflicted in order to obtain information.

## Persecution against an identifiable group or collectivity on political grounds

Persecution of identifiable groups on political grounds is another prohibited act. The Rome Statute defines persecution as the intentional and severe violation of fundamental rights contrary to international law by reason of the identity of the group or collectivity.[254] The severe deprivation of fundamental rights can include murder, sexual assault, and property damage such as the burning and pillaging of homes.[255]

The neighborhoods of La Saline, Bel-Air, and Cité Soleil are all known strongholds of the political opposition. The communities were particularly active in organizing and carrying out protests against Moïse that included publicly calling for his resignation. They are also historical strongholds of the *Fanmi Lavalas* party, a key opposition party to Moïse's PHTK, and have become rallying sites for broader alliances opposed to PHTK.[256] As set out in Section II, the massacre in La Saline followed several failed attempts by senior government officials to bribe the community into discontinuing anti-government demonstrations.[257] The attacks in Bel-Air similarly took place after failed government attempts to persuade residents to remove blockades during the *peyi lok* anti-government protests.[258] Finally, residents of Cité Soleil believe that they were targeted because of their political affiliations with *Fanmi Lavalas*, in an effort to ensure pro-government election outcomes.[259] The community in Pont Rouge further believes that they were targeted in retaliation for having blocked President Moïse from laying a wreath there during the October 2018 protests.[260] These common characteristics and the context in which the attacks were perpetrated suggest that the residents of La Saline, Bel-Air, and Cité Soleil were targeted because of their identity as supporters of the political opposition.

### The underlying crimes are a part of the attacks

In order to meet the requirements for crimes against humanity, the underlying crimes must be a part of the attack.[261] The crime cannot be an isolated act so far removed from an attack that, considering the context and circumstances, it cannot reasonably be said to have been part of the attack.[262] In order to determine whether a specific act of violence has an adequate nexus to the attack, an individualized inquiry is needed. For the purpose of meeting the definition of crimes against humanity, however, it is sufficient to view the acts as whole to assess whether their "characteristics, aims, nature, or consequence" demonstrate that they are objectively connected to the attack. [263]

The acts enumerated above—murder, rape, torture, and destruction of property—make up the heart of the attacks on La Saline, Bel-Air, and Cité Soleil. These acts are not isolated or disconnected from the attacks, but rather appear to be carried out pursuant to a pre-established plan.[264] This conclusion is reinforced by the fact that in each of the attacks, the perpetrators came to the sites of the attack together, they were sufficiently armed to cause widespread harm, and they worked together to inflict violence in a coordinated manner.[265]

Further fact-finding may also reveal additional acts that formed parts of these attacks.

## The Attacks Were Directed Against a Civilian Population

### The assaults on La Saline, Bel-Air, and Cité Soleil constitute attacks

The Rome Statute requires that the prohibited acts must be part of "an attack directed against any civilian population."[266] An "attack" refers to multiple commissions of prohibited acts that form a course of conduct or pattern of behavior.[267] It describes a series or overall flow of events as opposed to a mere aggregate of random acts.[268]

The evidence indicates that the events in La Saline, Bel-Air, and Cité Soleil each meet the definition of an attack. The killings, rapes, and property destruction in La Saline were carried out pursuant to a preconceived plan and followed a systematic pattern that formed an attack on the neighborhood.[269] In Bel-Air, the killings and property destruction were also carried out pursuant to a plan. They took place over the course of three days, and were carried out by the same perpetrators who repeatedly returned to continue the attack.[270] Finally, the crimes committed by G9 in Cité Soleil also follow a pattern that indicates that they were not merely an aggregate of random acts. The assaults on May 24-27 were carried out pursuant to a plan to simultaneously target Nan Brooklyn, Nan Tokyo, and Pont Rouge.[271] As a result, G9 gained control of nine new neighborhoods in Cité Soleil.[272] Nan Brooklyn, however, remained under the control of rival Jean-Pierre.[273] G9 then continued to carry out killings, rapes, and property damage in June and July that focused on Nan Brooklyn, using a similar pattern of violence targeted at civilians.[274] The evidence indicates that these were not random acts of gang violence, but a part of an ongoing attack over an extended period of time.[275]

The assaults on La Saline, Bel-Air, and Cité Soleil could also potentially be viewed as components of a sustained, multi-year attack against civilians pursuant to an effort to exert control over communities opposed to the government.[276] The repeated involvement of Chérizier, the common characteristics of the targeted neighborhoods, and similarities in how the attacks were carried out, may establish a broader pattern indicative of such a sustained attack. Since the available evidence supports a finding that each of the assaults in and of themselves amount to crimes against humanity, however, this report primarily analyses each event as a separate attack.

### The attacks were directed against a civilian population

The attacks must be directed at a civilian population. This distinguishes crimes against humanity from attacks directed against "armed forces and other legitimate combatants."[277] To meet this element, civilians must be the "primary object of the attack," and not just incidental victims of the attack. [278] Moreover, the attack must target a broader group and not merely a "limited and randomly selected number of individuals."[279] The targeted civilian population can include a group defined by its perceived political affiliation.[280]

The primary objects of the three attacks are civilian residents of the targeted opposition neighborhoods. The manner in which the residents were targeted—including being extracted from or sought out in their homes to be murdered or raped—demonstrates that they were primary targets of the attacks, and not merely collateral damage in the context of gang fighting.

## The Attacks Were Widespread and Systematic in Nature

In order for specific crimes to amount to crimes against humanity, they must also be a part of an attack that is either widespread or systematic in nature.[281] While only one of the two is required to establish this element,[282] the existing evidence supports a finding that the attacks in La Saline, Bel-Air, and Cité Soleil were both widespread and systematic.

### The attacks were widespread

An attack is widespread when it is a large-scale attack with numerous victims.[283] While no numerical threshold of victims must be met and no large geographic area is required,[284] courts have taken into account the consequences of the attack on the targeted population, the number of victims, and the nature of the acts.[285]

Each of the three attacks meet this requirement. In La Saline, the attackers killed at least 71 people, raped seven people, and vandalized 150 homes.[286] In Bel-Air, the gangs killed at least 24 people and set 28 houses on fire.[287] In the attack on Cité Soleil, the perpetrators killed at least 145 people and burned or vandalized more than 90 houses.[288] The cumulative number of deaths as a result of these attacks is at least 240. Beyond the number of causalities and physical injuries, the attacks have had dire economic and social consequences on the civilian population in these neighborhoods. According to human rights groups, hundreds of civilians were displaced as a result of the La Saline massacre.[289] Many have not been able to return to their homes and became homeless, and some who sought shelter in Wharf Jérémie were executed during the attack on Cité Soleil two years later.[290] The UN reports that the attacks in Cité Soleil rendered at least 298 households displaced,[291] and Haiti's Office for Civil Protection estimates the number of displaced persons to be over 1000.[292] As insecurity persists, terror and trauma continues to prevail in the targeted communities.

### The attacks were systematic

While it is only necessary to demonstrate that an attack is widespread, there is also evidence that the attacks were systematic. Systematic refers to the "the organized nature of the acts of violence and the improbability of their random occurrence."[293] A systematic attack may be demonstrated through "patterns of crimes—that is the non-accidental repetition of similar criminal conduct on a regular basis."[294] Other factors that are indicative of a systematic and organized attack include the identification of a target population prior to the commencement of the attack, the ferrying of attackers

from other locations specifically for the purpose of the attack, and the provision of uniforms and weapons to the attackers.[295]

The attacks in La Saline, Bel-Air, and Cité Soleil were far from spontaneous or random; rather, each attack was organized and entails a pattern of similar criminal conduct.

The 2018 La Saline attack was well-organized and carried out pursuant to an established plan. Two weeks before the attack, Richard Duplan, then President Moïse's Delegate for the West Department; Fednel Monchéry, then Director General of the Ministry of the Interior; and gang leaders including Chérizier met to plan the attack.[296] During the planning meeting, Duplan and Monchéry reportedly furnished the gangs with weapons, police uniforms, and government vehicles that were used in the attack, and provided payment for the execution of the attack.[297] On November 13, 2018, about 50 heavily-armed assailants arrived in La Saline together in order to carry out the attack.[298] The acts of violence carried out during the attack follow a pattern of similar criminal conduct: over the course of fourteen hours, the assailants divided into four groups and systematically went from house to house, pulling residents out their homes and killing them with single shots or machete blows.[299] Numerous bodies were hacked to pieces and several women were raped.[300] An estimated 150 homes were looted and burned.[301] Gangs also appear to have coordinated in the disposal of bodies; gangs burned the corpses in the evening, and a tractor picked up the burnt bodies and moved them to another location on the night of November 15-16.[302]

The 2019 Bel-Air attack was similarly planned and organized, and showed a pattern of terrorizing civilians. After failed attempts to remove flaming barriers placed on Bel-Air's roads as part of the *peyi lok* protests, then Secretary of State for Public Security Léon Saint-Cyr reportedly met with Chérizier and paid him a significant sum of money to secure the removal of the barriers and prevent further anti-government protests in Bel-Air.[303] Chérizier initially approached organizers with 40 armed men and sought to bribe them into removing the barricades.[304] After he was rebuffed, Chérizier brought 50 heavily-armed men carrying automatic assault rifles to Bel-Air on November 4, 2019, to carry out the attack.[305] They terrorized the neighborhood, shooting civilians and setting fire to homes.[306] Gangs returned for two consecutive nights, wearing coordinated military uniforms and again firing at civilians and setting fire to their homes while they slept inside.[307]

The May-July 2020 attack on Cité Soleil also reveals organization and a pattern of terrorizing civilians through similar criminal conduct. Thirteen gang leaders from the G9 alliance met on May 23, 2020 to plan simultaneous assaults on Pont Rouge, Chancerelles, and Nan Tokyo.[308] In these attacks, gangs again fired at civilians, burned their bodies, and set houses on fire.[309] Those who tried to flee were specifically targeted and shot, attacked with knives or stones.[310] Some were beheaded. Throughout June and July, the G9 continued its assault on the residents of Cité Soleil to capture parts of the area not yet under their control.[311] G9 particularly focused on Nan Brooklyn, a neighborhood controlled by their rival Jean-Pierre.[312] Within these attacks, gang members followed a similar pattern of terrorizing civilians by capturing them and then shooting or raping them and burning numerous houses.[313] The violence does not appear to be random, accidental, or isolated.

## The Attacks Furthered a State or Organizational Policy

The Rome Statute also requires that the attacks were committed pursuant to, or in furtherance of, a state or organizational policy to commit the attack.[314] The policy element does not refer to a formally defined policy in the commonly used sense; rather, any attack "which is planned, directed or organized—as opposed to spontaneous or isolated acts of violence"[315] will qualify as a policy.

To establish a policy, it is relevant that the state or organization actively promoted or encouraged an attack against a civilian population;[316] however, attacks do not have to be predetermined in order to be part of a policy. A policy may "only crystallize and develop as actions are set in train and undertaken by perpetrators," such that it is only possible to define the overall policy in retrospect.[317] Motive or purpose is not required to prove a policy to attack a civilian population.[318]

The policy element shares many similarities with the systematic element, such that evidence relevant to demonstrating the systematic nature of an attack is also relevant to whether the attack was carried out pursuant to a policy.[319] However, the two elements are not simply synonymous.[320] The systematic nature of an attack concerns the pattern of repeated, non-random acts of crime, but "to establish a 'policy' it need be demonstrated only that the State or organization meant to commit an attack against a civilian population."[321]

### The attacks furthered a state policy

There are substantial grounds to find that the attacks in La Saline, Bel-Air, and Cité Soleil furthered a state policy to attack civilians in order to discourage or repress political opposition. A state policy does not have to be explicit or formal; indeed, it is relatively rare that a "State or organization seeking to encourage an attack against a civilian population might adopt and disseminate a pre-established design or plan to that effect."[322] Instead, a state policy to attack can be inferred from such evidence as preparations or collective mobilization coordinated by the state,[323] including "the enlistment of gangs to unleash violence on perceived rival communities."[324] The police's deliberate failure to take action, with the aim of encouraging the attack,[325] and the political background against which the attack took place,[326] are also relevant.

The involvement of various Moïse administration officials and police officers in planning and executing the attacks point to a state policy to attack civilians. As set out in the preceding section, each attack was carried out pursuant to a plan, and evidence suggests that government officials were active in the preparations of at least the La Saline and Bel-Air attacks and that they enlisted gangs to carry out the attacks. The attack in Cité Soleil was triggered by an unidentified government official paying Altès to switch political alliances and kill another anti-government gang leader in the area.[327] Even if the government official did not commission the attack on civilians *per se*, this reinforces a pattern of gangs being used to effectuate a state policy.

Persistent use of police resources in the execution of the attacks also support an inference of a policy.[328] Gang members arrived in a BOID vehicle in the La Saline attack,[329] undercover police officers attacked civilians alongside gang members in the Bel-Air attacks,[330] and Chérizier arrived in Cité Soleil in a PNH vehicle in the May 2020 attacks.[331] Moreover, the police failed to intervene to protect civilians in each of the attacks. The La Saline attack lasted for 14 hours without any intervention from PNH, even though two police sub-stations were less than a kilometer away and five different police units were on notice of the attacks.[332] The Bel-Air attack took place over a three-day period without PNH intervention, even though police stations surround the area and a BOID control alerted the police force of the attacks.[333] The police also did not intervene in the May attack on Cité Soleil, and RNDDH reports that PNH's presence generally declined in the area despite continued violence against civilians over the subsequent months.[334] The extended time periods of the attacks provided ample opportunity to at least attempt to intervene, call in reinforcements, and/or gather additional resources. Especially when viewed in contrast to the strong show of force by police against protesters, these facts may suggest a conscious aim to encourage the attacks.

Finally, the political background of the attacks suggest that they furthered a broader state policy to repress. As set out in Section I, President Moïse has engaged in a persistent pattern of repression against the political opposition. Moreover, as detailed above, each of the attacked neighborhoods are opposition strongholds and each attack took place in the context of growing protests against Moïse's administration. This political background, and state actors' involvement in the planning and execution of the attacks, indicate that the attacks furthered a state policy.

### The attacks furthered a separate gang policy to attack

The attacks also appear to have furthered the gangs' own organizational policy to attack civilians in order to gain territorial control. First, the gangs that carried out the attacks are organizations within the meaning of the Rome Statute. "Organizations" include non-state-actors and do not need to be organized similarly to a state.[335] Rather, instructive factors include: (1) whether the group is under a responsible command or has an established hierarchy;[336] (2) whether it has the necessary capacities to "allow an attack to be executed", including having the membership and resources to undertake the "action, mutual agreement and coordination;"[337] (3) whether it exercises control over part of the territory of a state; and (4) whether it has criminal activities against civilians as a primary purpose. Applying such factors, organized gangs in other contexts have been found to meet the definition of an organization under the Rome Statute.[338]

As noted in Section I of this report, the gangs involved in these attacks are structured entities organized under a leader who exerts command over the membership.[339] The gangs exercise authority over distinct territories, command significant resources, and often carry out state-like functions with regards to the populations they control. These structures and resources allow gang leaders to efficiently coordinate attacks against a civilian population.

Ample evidence indicates that the gangs were acting pursuant to a policy to gain territorial control by attacking the civilian population. While analyzing each specific gang implicated in each attack is beyond the scope of this report, these gangs generally follow an economic model that relies on exerting authority over territory through the use of violence.[340] As discussed above, the attacks were directed by established gang leaders, planned in advance, and well-organized in their execution. Chérizier, who orchestrated each of the attacks, has himself articulated a policy of sorts, calling his gang activities an "armed revolution," while noting that he would "put guns in the hands of every child if we have to."[341] These aspects all point to the attacks having been carried out in furtherance of an organizational policy.

Thus, there is a reasonable basis to conclude that the elements of crimes against humanity are met in the attacks on La Saline, Bel-Air, and Cité Soleil.

# IV. The Available Evidence Points to Several State Actors Who May Be Liable for Crimes Against Humanity

Under international criminal law, criminal liability for crimes against humanity extends both to the individuals who carry out the underlying violent acts, and to the individuals who have planned, instigated, ordered, or otherwise aided and abetted in the planning, preparation, or execution of the attacks.

To date, much of the international reporting on these attacks has focused on gangs as the chief perpetrators.[342] Indeed, the attacks were led by gang leaders, most prominent among them Jimmy Chérizier, who appears to have played a central role in orchestrating and executing each of the three emblematic attacks. Investigators have also identified the gangs that directly participated in carrying out these attacks, and in some cases, the individuals who committed the specific crimes.[343] It is critical for these individuals to be fully investigated, tried, and punished for crimes against humanity. As the UN has stressed, the ongoing failure to hold perpetrators accountable for these attacks is "creating an enabling environment for further violence."[344]

Yet the available evidence also suggests repeated involvement of state actors in both the commission of the crimes, and in ordering, instigating, and enabling the attacks. These state actors include officers within PNH who participated in carrying out the attacks or otherwise supported their execution; senior officials in the Moïse administration who appear to have commissioned the attacks; and President Moïse himself, whose position of control and failure to act in response may trigger liability under the doctrine of command responsibility. Individuals in a position of superiority who fail in their duty to prevent or punish crimes against humanity may be considered more culpable than the direct perpetrators, in light of their leadership position and their failure to uphold duties to prevent or punish the crimes.[345]

Despite the potential liability of state actors for these attacks, their role in perpetrating crimes against humanity in Haiti has received relatively less attention at the international level.[346] In order to provide a fuller picture of the actors who could be responsible for crimes against humanity in Haiti, this section identifies the principal legal theories under which state actors may be held criminally responsible for the attacks.

Assigning criminal responsibility to specific individuals requires an extensive, individualized inquiry into the actions and state of mind of specific perpetrators, and will necessitate additional fact-finding and investigation. While such an analysis is thus beyond the scope of this report, this section sets out the most relevant analytical frameworks for understanding potential liability of the state actors implicated in the attacks to date. Further investigations are needed to establish the extent of state involvement, the specific acts in which various individuals were involved, and the state of mind of the accused.

## Direct Commission

In addition to gang members, the available evidence implicates state actors in the direct commission of certain crimes. These individuals can be held criminally responsible if their acts were a part of the widespread or systematic attack and they acted with knowledge that their conduct was part of such an attack.[347]

Investigations have found that multiple PNH officers participated in the attacks alongside gang members. Chérizier was still a police officer at the time of the La Saline attack and has been consistently singled out for responsibility in the attacks.[348] Then-police officer Gregory Antoine, *alias* Ti Greg, and Gustave *alias* Chupit are also accused of participating in the La Saline attack.[349] In the Bel-Air attack, eyewitnesses report that three police officers in civilian clothes who had ties to Chérizier's gang shot residents and burned vehicles alongside gang members.[350] The UN's investigation identified two of the police officers by precinct and noted that the third was believed to be a member of the National Palace security.[351] In Cité Soleil, police officers in armored vehicles who drove through the neighborhood during the course of an attack reportedly shot and killed five civilians.[352]

These officers may be responsible for directly committing crimes against humanity if they knew or intended for these acts to be a part of the attacks.[353] Given that the PNH officers were seen working closely with gang members during the attacks, it is likely that such knowledge existed. Further fact-finding and an individualized inquiry into the actions and states of mind of specific officers are required to establish their responsibility.

## Aiding and Abetting

Even if there is not adequate evidence to establish that state actors personally carried out the underlying criminal acts, they may still be responsible for aiding and abetting crimes against humanity.[354] Aiding and abetting refers to acts or omissions that assist, encourage, or lend moral support to crimes.[355] The assistance may either be practical, material, moral, or psychological,[356] provided that it had an effect on the crime.[357] Moreover, under the Rome Statute, the aider and abettor must also have acted with the purpose of facilitating the commission of the crime.[358]

### Haitian National Police

The existing evidence indicates that PNH officers may have aided and abetted the crimes through: (1) their presence and actions during the course of the attacks;[359] (2) the provision of PNH resources for use in the attacks;[360] and (3) their failure to intervene and protect civilians under attack.[361]

First, as noted above, a number of police officers actively supported gang perpetrators in each of the three attacks. In La Saline and Bel-Air, the officers were identified as participating in the attack alongside gang members.[362] Even if evidence is inadequate to hold them responsible for directly committing the underlying crimes, their presence likely served as encouragement to the principal perpetrators, especially in light of their positions of authority.[363] The circumstances of the attacks, including the pre-planning, scale, concentration, extended period of the attacks, and the fact that the PNH officers worked alongside gang members during the attacks, suggest that they intended to facilitate the crimes through their presence. In Cité Soleil, the police arrived separately from the gangs, but did not intervene to stop the attacks and instead may have assisted through their own use of force against civilians. On May 26, 2020, five armored PNH vehicles parked at the entrance to Nan Brooklyn and fired gas tubes and cylinders that forced residents to flee and set the stage for gangs to systematically chase down and attack civilians.[364] In July, two armored PNH vehicles passed through an area under G9 attack and shot at passersby, killing at least five civilians.[365] Additional investigations may further support the conclusion that the police acted with the purpose of facilitating the attacks.

Moreover, RNDDH has documented that Chérizier generally operates with the assistance of PNH officers, who facilitate his travel and ensure his safety, including during the course of criminal activities.[366] RNDDH has identified officers Garry Sanon, Alain Boyard, Mackendy Cantave, David