Diverant, and Luckson Dessources as acting in collusion with Chérizier.[367] If further investigations show that their services were used in the attacks discussed here, and that the services were provided with the purpose of facilitating the attacks, these officers could also be liable for aiding and abetting crimes against humanity.

Second, official PNH resources including weapons, vehicles, and uniforms were used in the attacks on La Saline and Cité Soleil. In La Saline, some of the assailants were transported to the scene in an armored BOID vehicle, wearing BOID uniforms that induced residents to believe they were a part of an official PNH operation rather than an operation aimed at the residents themselves.[368] RNDDH's investigation indicates that these resources may have been furnished by Duplan and Monchéry, but further investigation may show that police officers were also complicit in making the resources available for the purpose of facilitating the crimes.[369] In Cité Soleil, Chérizier again arrived at the scene of the May attack in a PNH vehicle.[370] In July 2020, four armored PNH personnel carriers assisted armed gangs led by Andrice and Saintil in taking over a building where multiple people were killed.[371] While investigations to date do not establish how these vehicles were obtained, further investigations may find that they were provided by PNH officials to facilitate the crime.[372]

Finally, the police may have facilitated the crimes by failing in their legal duty to intervene to protect civilians during the attacks. During the multiple-day attacks in Bel-Air, residents made repeated pleas for help, the attacks took place in a neighborhood surrounded by police outposts, and a police patrol notified central command of the attack, yet PNH did not respond. As the UN has found, the police's failure to respond to La Saline, moreover, may not only have signaled official approval for the attacks, but also facilitated the ongoing perpetration of the crimes and the high death toll.[373] RNDDH has similarly found that the decreased PNH presence in Cité Soleil "facilitates the intensification of armed attacks against the city by G-9 members."[374] To find that this inaction violated a legal duty to act, however, the police must have had the means to act,[375] which PNH has contested.[376]

### Moïse Administration Officials

Government officials may also be liable for aiding and abetting crimes against humanity under the legal framework set out above. There is significant evidence that officials in the Moïse administration provided practical, material, and moral assistance to the gangs in the commission of the attacks in La Saline and Bel-Air. Duplan and Monchéry allegedly furnished weapons and vehicles for use in the La Saline attack.[377] Duplan was also physically present with Chérizier, Gregory Antoine, and other assailants at the scene of the La Saline attack, which may have had the effect of providing encouragement and moral support.[378] The fact that Duplan and Monchéry provided resources in the context of a planning meeting suggests intent to assist in the attack.

Moreover, Léon Saint-Cyr's alleged payment to Chérizier to put an end to growing anti-government protests in advance of the Bel-Air attack[379] likely served as essential encouragement for the attack. Saint-Cyr's decision to hire Chérizier for the task, when Chérizier was well-known for his use of violence against civilians in both Grand Ravine and La Saline, may indicate an intent to facilitate a violent attack. However, a more extensive inquiry into the effect of the support and Saint-Cyr's state of mind would be required, especially in light of Saint-Cyr's denials.[380]

## Ordering, Soliciting, or Inducing the Crimes

Under international criminal law, individuals are liable for crimes against humanity if they are found to have ordered, solicited, or induced the crimes carried out by others.[381] Individuals in a position of

authority can be liable for ordering a crime if they used their authority to instruct another person to commit an offence.[382] A formal superior-subordinate relationship is not necessary.[383] Orders must entail a positive act, rather than an omission, but do not need to be issued directly, in writing, or given in any particular form.[384] The individuals must also have intended to order a crime or must be aware of the substantial likelihood that the crime would be committed due to their order.[385] Individuals can be equally liable for soliciting, inducing, or instigating the perpetrators to commit the underlying crimes by prompting or urging them to do so.[386] There must be a causal link, or nexus, between the instigation and the final offence; the instigation must substantially contribute to the final offense.[387] Moreover, they must have acted with either the intent to instigate another person to commit a crime, or alternatively, with awareness of the "substantial likelihood that a crime will be committed in the execution of the act or omission instigated."[388]

Senior government officials in the Moïse administration may be liable for ordering, inducing, soliciting, or instigating gangs to perpetrate the crimes in La Saline and Bel-Air. Evidence strongly suggests that government officials Duplan and Monchéry ordered, induced, or solicited gangs to attack civilians in La Saline. The DCPJ has identified them as the "presumed authors" of the La Saline attack.[389] They commissioned Chérizier and others to commit the crime in exchange for payment.[390] They also actively participated in the planning of the attack and reportedly provided key resources, including weapons, government vehicles, and police uniforms that made a substantial contribution to the resulting offenses.[391] Eyewitnesses report that Duplan was personally present during the attack in La Saline, and that he told Chérizier "you killed too many people," suggesting that he knew that a crime was likely to be committed in the execution of the act.[392] The senior government officials' advanced planning is evidence of their intent to engage in the criminal act, and demonstrates their awareness that their conduct would influence gang members' perpetration of the crimes.

Similarly, government official Leon Saint-Cyr may have ordered, induced, or solicited Chérizier and his gang to attack civilians in Bel-Air. Saint-Cyr allegedly asked Chérizier to remove the road barriers and prevent further antigovernment protests, in exchange for a substantial sum of money and several motorcycles.[393] This conduct prompted Chérizier to remove the barriers by force, attacking civilians in November 2019. The paid exchange indicates that Saint-Cyr's request made a substantial contribution to the Bel-Air attacks against civilians, and was perhaps the catalyst. In light of Chérizier's well known record of using violence against civilians, Saint-Cyr would have been aware that Chérizier's involvement in this type of operation was likely to lead to criminal acts.[394]

## Common Enterprise

Government officials and PNH officers may also potentially be liable for taking part in a joint criminal enterprise with those who carried out the attacks. A joint criminal enterprise does not have to be formally organized in a military, political, or administrative structure;[395] rather, the existence of a common plan, design, or purpose that involves the commission of a crime is relevant.[396] There is no need for the purpose to have been previously arranged or formulated; it may materialize extemporaneously and be inferred from the facts.[397] To be liable under this theory, a person must have substantially assisted or significantly affected the furtherance of the goals of the enterprise, such as by procuring weapons for the plan.[398] Moreover, all co-perpetrators, including the accused, must have had the shared intent to perpetrate the crime.[399]

### Moïse Administration Officials

Though the requirement of a significant contribution to the planned crime creates a high bar to hold

individuals liable in a joint criminal enterprise, Duplan and Monchéry may meet this bar for their role in the La Saline attack. The common plan is evident in their meeting with gang members two weeks prior to the attack to plan it.[400] This planning meeting also demonstrates a shared intent among the co-perpetrators—Duplan, Monchéry, and the gang leaders—to commit the attack. Duplan and Monchéry significantly contributed to the crime by planning the attack and furnishing resources for the attack, including weapons, vehicles, and police uniforms.[401] Furthermore, Duplan was present at the attack along with gang members.[402] This significant contribution indicates that they intended to perpetrate the attack against civilians.

### Haitian National Police

Further investigations may also reveal that police officers were engaged in a common enterprise with gang leaders. The evidence to date does not indicate how all the police resources used in the attacks were obtained, but if it is shown that police officers made them available for the purpose of facilitating the attacks, a common enterprise may be found.

## President Moïse May Be Responsible for Crimes Against Humanity Under the Doctrine of Command Responsibility

President Moïse may personally be criminally responsible for crimes against humanity committed during his term as president. In particular, the prominent role of Moïse's senior officials in planning and executing the La Saline attack may trigger liability under the doctrine of command responsibility. It is a well-established norm of international law that "military commanders and other persons occupying positions of superior authority may be held criminally responsible for the unlawful conduct of their subordinates."[403] This criminal responsibility "may arise either out of the positive acts of the superior or from his culpable omissions," such as "failing to take measures to prevent or repress the unlawful conduct of his subordinates."[404]

For President Moïse to be criminally responsible under the doctrine of command responsibility, three elements must be met: (1) there is a superior-subordinate relationship between the commander and the perpetrator of the crime;[405] (2) the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit criminal acts;[406] and (3) the commander failed to prevent the commission for the crime, or failed to punish the subordinates after the commission of the crime.[407]

With respect to the first element of command responsibility, the superior-subordinate relationship centers on whether the superior had "effective control" over the subordinate.[408] Effective control can be indicated by the power to prevent or punish the subordinate.[409] It extends to situations where the superior has less than absolute power, such as a degree of "influence" that does not amount to "formal powers of command."[410] Persons in senior government offices, including presidents, have been subject to liability under the command responsibility doctrine.[411] Moreover, command responsibility is not limited to liability within military structures, but applies to civilian structures as well, so long as the superior had the power to prevent or punish the subordinate.[412]

First, there is a reasonable basis to conclude that President Moïse occupied a superior position over both Duplan and Monchéry, the two officials in his administration that DCPJ identified as the "presumed authors" of the La Saline attack.[413] At the time of the attack, Duplan held a senior government position as the Delegate to the West Department, Moïse's official representative for one

of Haiti's ten geographical territories. Delegates report directly to the president.[414] Moreover, Moïse personally appointed Duplan to the position in 2017, and was empowered to unilaterally remove him from the position.[415] Monchéry was serving as Director General of the Ministry of the Interior, a position that oversees the principal execution of the Ministry's work.[416] Moïse also personally appointed Monchéry to the position in 2017.[417] Moïse's position of superiority and oversight gave him effective control over Duplan and Monchéry; that is, he had the power to prevent their acts or punish them for acts that rise to the level of crimes against humanity.

Second, Moïse is likely to have known, and certainly should have known, that his subordinates had committed, were committing, or planned to commit the acts rising to crimes against humanity. Duplan and Monchéry's proximity to the President creates an inference of knowledge. This is reinforced by the fact that the attack was planned specifically to suppress protests against Moïse. Moreover, President Moïse and his wife were personally involved in efforts to control anti-government activity in La Saline prior to the planning of the attacks. On October 13, 2017, about a year before the attack, First Lady Martine Moïse and then-Minister of Interior Max Rudolph Saint-Albin personally led a delegation to La Saline to offer state resources in exchange for the discontinuation of protests.[418] In the days before anti-government protests were scheduled to take place in October 2018, residents report that the First Lady returned to La Saline to bribe the community into compliance (an allegation she has denied).[419] Around the same time, President Moïse also personally visited police stations across the capital and reportedly distributed cash to officers to encourage them to quell the protests.[420] Haiti's former police chief denounced the action, interpreting it as a sign of the President's state of panic in the context of growing opposition.[421] The protests proceeded anyway and demonstrators blocked President Moïse and the First Lady from entering La Saline for the official commemoration ceremony, injuring one of their security guards in the process.[422] The plan to attack residents of La Saline was put into motion by Moïse's senior officials two weeks later.

Furthermore, President Moïse certainly should have known that crimes had been committed by his subordinates in La Saline after the fact. The massacre was a major event. In the immediate aftermath, photos and videos of corpses circulated widely on social media and the attacks were reported across Haitian news.[423] An estimated 300 people fled La Saline and took up shelter in a makeshift camp across the street from the Haitian Parliament.[424] RNDDH identified Duplan and Monchéry as key suspects in a report published just two weeks after the attack.[425] This information was reinforced by DCPJ's official investigation, which was made public in May 2019, and named Duplan and Monchéry as the "presumed authors" of the attack.[426] Under the doctrine of command responsibility, Moïse cannot escape liability by claiming ignorance that his subordinates had planned and committed these crimes.

Finally, President Moïse failed to properly investigate and punish his subordinates after the commission of the crime. Despite many credible sources, including the UN and the DCPJ, implicating Duplan and Monchéry in the attack, Moïse did not immediately remove them from their posts. Instead, they remained in their official government roles for almost a year after the La Saline attack.[427] Prosecutions of both Duplan and Monchéry have stalled, and neither has been arrested for their roles in the massacre. They initially sought to avoid responsibility by asserting that, as high-level officials, they could not be prosecuted without the President's consent.[428] President Moïse has not taken action to issue such consent or otherwise ensure that the prosecution moves forward.

Based on the currently available evidence, there is a reasonable basis to conclude that President Moïse may be liable for crimes against humanity committed in La Saline under the doctrine of command responsibility. Further investigations may reveal culpability in other attacks as well.

# V. Ensuring Accountability for Perpetrators of Crimes Against Humanity

## The Crimes Have Been Carried Out with Impunity

To date, the attacks on civilians have largely been carried out with impunity. In 2020, the UN expressed concern that the ongoing "lack of accountability for human rights violations committed by State agents," and the "chronic absence of progress on judicial proceedings against alleged perpetrators."[429] Indeed, criminal investigations and prosecutions for the attacks have been slow to non-existent. Out of nearly one hundred suspects identified, only 11 people have been arrested for the La Saline massacre,[430] and the prosecution has stalled since July 2019.[431] None of the chief perpetrators or implicated police officers are among those arrested.[432] Chérizier remains at large despite a warrant for his arrest for involvement in the Grand Ravine massacre, and has continued to gain power over the course of Moïse's presidency. While the government maintains that he has eluded capture, he has been seen in the company of police officers who have declined to arrest him[433] and has repeatedly been interviewed by media.[434] Duplan and Monchéry also remain free. Monchéry was briefly arrested for driving with a government license plate in February 2021, and then promptly released.[435] Similarly, no one has been held criminally responsible for the attacks in Bel-Air or Cité Soleil.[436] It is unclear whether Saint Cyr's alleged involvement in Bel-Air is subject to any formal investigation.

The Moïse administration has also persistently rejected international calls for accountability. In 2018, when the UN Special Representative to the Secretary-General in Haiti urged an investigation into the 2017 Grand Ravine and Lilavois massacres, Moïse responded by recalling Haiti's ambassador to the UN and summoning the Special Representative to explain her comments.[437] She was recalled and replaced shortly thereafter.[438] A year later, when members of the U.S. Congress publicly urged an independent investigation of the La Saline massacre, the Haitian Embassy condemned the statement and categorically denied the existence of human rights violations in Haiti.[439] In December 2020, the United States government issued civil sanctions against Duplan, Monchéry, and Chérizier for their involvement in the attack,[440] but Haitian authorities have not taken any subsequent meaningful steps towards holding them accountable.

## Implications for Accountability

The finding that crimes against humanity have likely taken place in Haiti has important implications for accountability, as it heightens the duty to investigate and prosecute perpetrators and opens additional avenues for doing so. Specifically, it (1) triggers an international obligation on the Haitian government to investigate and prosecute individuals responsible for these crimes;[441] (2) allows other states and international bodies to investigate and prosecute the crimes under certain circumstances;[442] and (3) limits the application of domestic statutes of limitations and immunity provisions so even high-ranking government officials can be tried for crimes indefinitely into the future.[443]

Haiti has a duty to investigate and prosecute crimes against humanity.[444]  Haiti is a party to the American Convention on Human Rights, which recognizes the universal application of the crime.[445] Under Haiti's Constitution, international agreements ratified by Haiti, such as the American Convention, become part of the country's domestic laws. Indeed, in 2014, because of the country's ratification of the American Convention, the Port-au-Prince Court of Appeals decided to reopen a domestic investigation against former dictator Jean-Claude Duvalier for alleged crimes against humanity.[446]

Duvalier had just returned to Haiti after 25 years in exile, and stood accused of overseeing brutal crimes against civilians carried out by *tonton macoutes*—state-sponsored gangs operating within an apparatus that shares some similar characteristics to the patterns of terrorizing civilians seen today.[447] The prosecution has stalled since his death in 2014, but the case serves as a relevant example.[448] The Haitian government must promptly investigate and prosecute the crimes against humanity that are taking place in present day.

The finding that crimes against humanity have likely been committed also opens the door for other countries and international bodies to ensure that justice is served. Crimes against humanity are crimes so serious and heinous that they are an "attack on the very quality of being human."[449] They not only represent a crime against the individual victims, but are an affront against humanity as a whole. Humankind, therefore, has an interest in ensuring that crimes against humanity do not go unpunished.[450] Haiti is not a party to the Rome Statute, so the ICC prosecutor cannot directly open an investigation into the situation, but the UN Security Council has the power to refer the situation to the Court.[451] The Security Council could also decide to establish an ad hoc tribunal or mechanism for Haiti, as it has in prior circumstances where the host state was unable or unwilling to prosecute international crimes.[452] Finally, domestic courts of other countries could prosecute crimes against humanity under the principle of universal jurisdiction, should the Haitian state continue to prove unwilling or unable to do so.[453] The principle of universal jurisdiction allows states to prosecute certain crimes—including crimes against humanity—regardless of the location of the crime or the nationality of the perpetrators or victims.[454] Initially codified in the 1949 Geneva Conventions on the laws of war, governments have increased the application of universal jurisdiction in the past 15 years.[455] This is a significant step in offering redress to victims who have no legal recourse in the states where the crimes were committed, and combating a culture of impunity for perpetrators of grave human rights violations.

Importantly, Haitian and international courts have held that there is no statute of limitations for crimes against humanity, meaning that alleged perpetrators can be tried even after time limits under domestic law have lapsed.[456] Thus, there can and should be accountability for these abuses into the future. There are also limitations to the application of immunity for crimes against humanity. As noted above, the draft constitution proposed by Moïse's administration in January 2021 introduces immunity for acts taken by the head of state in an official capacity, and applies it retroactively even beyond the end of mandate. If the new constitution passes by referendum, questions will remain as to its enforceability, however, given that the current constitution bans amendments through referendum. Moreover, the immunity clause should not serve as a bar to prosecution for crimes against humanity, as acts that are incompatible with the president's mandate and that do not fall within the exercise of presidential functions are not covered by immunity.[457] Since crimes against humanity are prohibited in Haiti as *jus cogens* and through Haiti's incorporation of the American Convention on Human Rights into domestic law,[458] there is a strong argument that such conduct is incompatible with the president's mandate and exercise of functions. Moreover, both international and national courts have found that *jus cogens* violations such as crimes against humanity cannot be a state actor's "official acts" for the purpose of immunity, and therefore allowed prosecution of heads of state in domestic courts.[459] As for international courts, head of state immunity does not apply to international crimes under customary international law.[460] Therefore, an international court may issue a warrant for the arrest of a head of state, and also request another states to arrest and surrender a head of state.[461]

It is imperative that actors within and outside of Haiti fulfil their duties to ensure accountability for these heinous crimes.

# Recommendations

Based on the finding that there is compelling evidence that crimes against humanity have been committed in Haiti, we recommend the following actions:

## Haiti

We urge Haiti to urgently and rigorously investigate and prosecute the crimes discussed in this report. As Haiti has a duty to investigate crimes against humanity as a result of its international obligations and as statute of limitations do not apply, perpetrators of crimes against humanity can, and should, be tried directly in Haiti's domestic courts. The justice system must ensure that criminal accountability extends to government officials and other state agents who share culpability for the attacks. Moreover, individuals identified by DCPJ as implicated in the La Saline massacre should immediately be placed under arrest.

## The Inter-American Commission on Human Rights

The Inter-American Commission on Human Rights (IACHR) has historically played an important role in supporting an end to impunity for gross human rights violations in Haiti. We ask the Commission to address crimes against humanity in Haiti as a situation that requires special attention in its annual report, by conducting a country visit on the concerns raised herein, and requesting that the Haitian government submit a written report outlining a concrete plan of action for addressing crimes against humanity.[462] We also encourage the IACHR to offer the Haitian government technical assistance to prosecute the crimes against humanity identified in this report.

In January 2020, the IACHR granted precautionary measures in favor of La Saline Victims' Committee, a group comprised of victims of the La Saline attack, their families, and human rights defenders.[463] The IACHR found that members of the La Saline Victims' Committee face serious, urgent risk of suffering irreparable damages and requested that the Haitian government protect the rights to life and integrity of the affected individuals. The IACHR further demanded that the government ensure that members of the La Saline Victims' Committee can do their work as human rights defenders without being subject to threats, harassment, or other acts of violence, and that Haiti report on any actions taken to investigate the La Saline attack.[464]

To date, the Haitian government has markedly failed to comply with the measures recommended by the IACHR. We urge the Commission to ensure that Haiti complies with the precautionary measures by convening working meetings or hearings, initiating an exchange of communications, and holding a follow-up visit to Haiti.[465] In addition, should Haiti continue its history of noncompliance, we encourage IACHR to file a provisional measure request with the Inter-American Court of Human Rights.[466]

## The United Nations

The UN should strongly condemn the crimes against humanity identified in this report and support investigations and prosecutions of the perpetrators.

Specifically, we urge BINUH and the Office of the High Commissioner for Human Rights (OHCHR) to pursue further investigations into the attacks on civilians in Haiti, including the attack in Cité

Soleil that has not been subject of a UN investigation. While UN actors have undertaken important documentation of gang violence, similar investigations into the role of state actors are merited. We also encourage the offices to provide technical support for the prosecution of perpetrators, as was done for the prosecution of Jean-Claude Duvalier for crimes against humanity.

We also encourage the UN Security Council to continue to monitor the human right situation in Haiti, with a renewed focus on the role of state actors in the commission of gross human rights violations, and to consider referring the situation in Haiti to the ICC. The Haitian government has proven unable or unwilling to try these crimes, and since Haiti is not a party to the Rome Statute, Security Council referral is the only avenue to bring the crimes before the ICC.

## The United States

The United States has responded to the Moïse administration's consolidation of power and record of human rights abuses with mixed messages.[467]

In December 2020, the U.S. Treasury Department sanctioned Chérizier, Duplan, and Monchéry for their roles in the La Saline attack, and has repeatedly called for the prosecution of perpetrators of human rights violations. At the same time, the State Department has taken several concerning positions that run contrary to supporting civil society's calls to hold the Haitian government accountability for human rights abuse. On September 16, 2020, a senior State Department official encouraged President Moïse to unilaterally appoint a provisional electoral council (CEP) to organize elections and warned Haitian civil society and opposition groups to comply with the process, threatening that further resistance is "going to start to have consequences for those who stand in the way of it."[468] In the context of the brutal attacks already carried out against the political opposition, observers have expressed concern that this statement condones the actions of the Moïse administration.[469] Further, in February 2021, the State Department explicitly endorsed President Moïse's position that he is entitled to remain in office until February 2022,[470] contrary to the interpretation of Haitian legal experts, opposition groups, and members of U.S. Congress.[471] After Haitians who protested faced violent repression, the State Department commented that the "remarkable lack of popular response to calls for mass protests" indicates that the Haitian people are tired of "squabbles over power."[472] Members of the U.S. Congress have strongly condemned these positions and repeatedly called on the State Department to promote democracy and human rights in Haiti.[473]

We urge the United States government to support accountability for human rights in Haiti by continuing to call for investigations and prosecutions of the perpetrators in all instances of crimes against humanity, and by extending sanctions to other perpetrators as merited by the evidence. We also encourage the United States to consider the Haitian government's role in these crimes as it formulates foreign policy vis-à-vis Haiti and to respect Haitian sovereignty by refraining from supporting political moves that are inconsistent with the Haitian constitution and rule of law.

## Governments with Universal Jurisdiction Statutes

To the extent that the Haitian government fails to prosecute the crimes against humanity discussed in this report, we appeal to governments with universal jurisdiction statutes, such as Canada, France, Senegal, Switzerland, and the United States, to prosecute any perpetrators found within their jurisdictions.

# Conclusion

There is a reasonable basis to conclude that state and non-state actors have committed crimes against humanity in Haiti during Jovenel Moïse's presidency. The brutal killings, rapes, and torture of civilians in La Saline, Bel-Air, and Cité Soleil appear to follow a widespread and systematic pattern that further state and organizational policies to control and repress communities at the forefront of government opposition. This finding must serve as an urgent call to action to ensure that accountability follows.

The attacks show an alarming pattern of state involvement. Evidence suggests that senior government officials in Moïse's administration have planned, provided resources for, and solicited attacks against civilians. Police resources were used in all three attacks, and police officers directly participated in the attacks alongside gang members. The police also failed to intervene to protect civilians during the course of the attacks, despite their close proximity to the sites and repeated pleas for help. Each attack targeted neighborhoods known as opposition strongholds and where recent protests against Moïse's administration had taken place. In short, there is strong indication that these massacres were politically motivated.

The human cost is intolerable. At least 240 civilians were killed in these three attacks. Hundreds of homes have been vandalized or burned. Human rights groups documented at least 25 rapes in the attacks. The full toll is likely far greater, as incomplete access to evidence, disposal of bodies, fear of retribution, and social stigma often stifles the reporting of these crimes. Beyond the number of casualties and physical injuries, the attacks have had dire economic, social, and psychological consequences for the victims and their communities, including widespread displacement, homelessness, and survival in a state of terror.

The Haitian government has so far appeared unwilling or unable to hold perpetrators accountable and has instead fostered a culture of impunity that the UN has cautioned may encourage further attacks. Indeed, after the government failed to take action to hold perpetrators accountable for the attack in La Saline, the BAI noted that this "begs the question, when will the next carnage happen?" The answer came a year later in Bel-Air, and recurred the following year in Cité Soleil. Since that time, Chérizier and other perpetrators have gone on to carry out similar attacks.

The Haitian government must heed mounting calls from Haitian civil society to urgently investigate and prosecute the crimes discussed in this report. The finding that crimes against humanity are likely taking place should also trigger action by the international community, as these crimes are not only an affront to the victims in Haiti, but against humanity as a whole. The UN, the Inter-American Commission on Human Rights, and other governments must do more to unequivocally condemn the crimes taking place under Moïse's rule and facilitate the investigation and prosecution of perpetrators – whether in Haiti or abroad.

Putting an end to impunity for gross human rights violations is critical for Haiti's future. As Moïse takes steps to remove limits on his power, Haitian civil society is increasingly raising concerns of a slide back to Haiti's dictatorial past. That past was characterized by brutal repression and extensive rights violations. Accountability and rule of law are critical pre-requisites for human rights and democracy to thrive in Haiti and beyond.

# Annex I

This report draws on the extensive fact-finding conducted by Haitian human rights organizations, the UN, and other international actors. The report primarily relies on findings from the following investigations:

**National Network for the Defense of Human Rights (RNDDH),** *The events in La Saline: from power struggle between armed gangs to State-sanctioned massacre* **(Dec. 1, 2018)** documenting the events of and leading up to the La Saline attack. RNDHH interviewed 439 residents of La Saline, including victims and their families; government officials, including Richard Duplan and then-police officer Gregory Antoine, members of the judiciary, police authorities; and members of grassroots organizations. Available at https://web.rnddh.org/wp-content/uploads/2018/12/10-Rap-La-Saline-1Dec2018-Ang1.pdf.

**Mission des Nations Unies Pour L'Appui A La Justice en Haiti (MINUJUSTH),** *La Saline: Justice pour les victims. L'Etat a l'obligation de protéger tous les citoyens* **(June 2019)** presenting the findings of the Human Rights Service (SDH) division of MINUJUSTH on the attacks of November 13 and 14, 2018, in La Saline. The report is based on 55 interviews with survivors, eyewitnesses and family members of those killed, as well as 10 meeting with civil society and 25 meetings with state actors. Available at https://reliefweb.int/sites/reliefweb.int/files/resources/minujusth_hcdh_rapport_la_saline_1.pdf.

**Judith Mirkinson and Seth Donnelly,** *The Lasalin Massacre and the Human Rights Crisis in Haiti, National Lawyers Guild and Haiti Action Committee* **(Jul. 8, 2019)** report documenting the events of the La Saline attack based on interviews with victims and their families. Available at https://www.nlg.org/wp-content/uploads/2019/07/The-Lasalin-Massacre-ONLINE-7-11-19-Nat-NLG.pdf.

**National Network for the Defense of Human Rights (RNDDH),** *Massacre au Bel-Air: Banalisation du droit a la vie par les autorités étatiques* **(Dec. 17, 2019)** report documenting the Bel-Air attack from Nov. 4-8, 2019. RNDDH interviewed victims and their families, government officials, including Ronsard Saint-Cyr, Secretary of State for Public Security, and a Judge at the Tribunal of Peace in Delmas. Available at https://www.haitilibre.com/docs/6-Rap-Massacre-Bel-Air-17Dec2019.pdf.

**Fondasyon Je Klere (FJKL),** *Conflit au Bel-Air et à la ruelle Mayard : la Fondasyon Je Klere (FJKL) s'inquiète de l'instrumentalisation politique des groupes armés* **(Nov. 29, 2019)** documenting attacks in Bel-Air and its contiguous neighborhoods from November 4-6, 2019. Available at https://www.fjkl.org.ht/images/doc/FJKL_conflit_au_Bel_Air.pdf.

**BINUH,** *Rapport sur les allegations d eviolations et abus des droits de l'homme lors des attques dans le quartier de Bel-Air, a Port-au-Prince, du 4 au 6 novembre 2019* **(Feb. 2020)** report documenting the human rights abuses that occurred between Nov. 4 and 6, 2019, in Bel-Air. BINUH's human rights section conducted 34 interviews with victims, witnesses, hospital staff, government officials such as members of the Port-au-Prince Public Prosecutor's Office, the General Inspectorate of the Haitian National Police, the Investigative Service of the Port-au-Prince Police Station, and the Departmental Judicial Police Section (SDPJ) of the West Department. Available at https://reliefweb.int/sites/reliefweb.int/files/resources/20200217_haiti_-_rapport_bel-air_-_final_master_version.pdf.

**RNDDH,** *Attacks on deprived neighborhoods: The RNDDH demands the end of the protection of armed gangs by the authorities in power,* **(Jun. 23, 2020)** documenting attacks from May 23-27, 2020, in several impoverished areas of Port-au-Prince, including Pont Rouge, Fort Dimanche, La Saline, and Nan Tokyo. RNDDH conducted interviews with 27 victims, police authorities, judicial authorities, the Director General of the Social Assistance Fund, Frantz Indrice, and Pierre Lemaire, former member of parliament for Cité Soleil. Available at https://web.rnddh.org/wp-content/uploads/2020/06/7-Rap-Attaque-Quartiers-Defavorise-Version-Anglaise-23Jun2020-2.pdf.

**RNDDH,** *Assassinations, Ambushes, Hostage-taking, Rape, Fires, Raids: The authorities in power have installed terror in Cité Soleil* **(Aug. 13, 2020)** reporting on armed attacks in Cité Soleil from June 30 to August 8, 2020 by interviewing several government officials, including officials from Central Directorate of Administrative Police, PNH, Public Prosecutor's Office at the Court of First Instance in Port-au-Prince, and 108 victims and their families. Available at https://web.rnddh.org/wp-content/uploads/2020/08/Version-Anglaise-Rap-Cité-Soleil-082020.pdf.


# Endnotes

1    Bureau intégré des Nations Unies en Haïti (BINUH), *Rapport sur les allegations de violations et abus des droits de l'homme lors des attaques dans le quartier de Bel-Air, a Port-au-Prince, du 4 au 6 novembre 2019*, ¶5 (2020) (noting that multiple waves of protests began in 2018, and that the 2019 demonstrations, which demanded the departure of the President, paralyzed the country for many weeks) [hereinafter BINUH]; U.N. Secretary-General, United Nations Integrated Office in Haiti, ¶3, U.N. Doc. S/2020/123 (Feb. 13, 2020) ("the wave of civil unrest that gripped the country between September and November 2019 [was] the longest period of continued protests since the President, Jovenel Moïse, assumed office,")[hereinafter Secretary-General Feb. 2020 Report]; *see also* Inst. Just. & Democracy in Haiti (IJDH), *Haiti at a Crossroads: An Analysis of the Drivers Behind Haiti's Political Crisis* (2019) (describing the immediate, medium and long-term drivers of the protests) [hereinafter IJDH, *Haiti at a Crossroads*].

2    Jake Johnston & Kira Paulemon, *What's in Haiti's New National Security Decrees: An Intelligence Agency and an Expanded Definition of Terrorism*, Ctr. Econ. & Pol'y Research (Dec. 14, 2020) (discussing Moïse's creation of a domestic intelligence agency with sweeping surveillance powers that is not subject to judicial review and criminalizing popular forms of non-violent protests as "terrorist acts."). In January 2021, Moïse announced that the agency had begun surveilling opponents. *See* Robenson Geffrard, *L'Agence nationale d'intelligence opérationnelle, les adversaires de Jovenel Moïse sous surveillance*, Le Nouvelliste (Jan. 19, 2021).

3    *See e.g.* Jacqueline Charles, *Haitian lawyer, constitutional expert gunned down hours after controversial radio interview*, Miami Herald (Aug. 29, 2020) (reporting the assassination of prominent lawyer Monferrier Dorval, hours after he had criticized the government on a radio interview.); Campaign Letter by Amnesty International, *Haiti: Human Rights Defender Fears for Safety* (May 16, 2019), https://www.amnesty.org/download/Documents/AMR3603432019ENGLISH.pdf (addressing the death threats made to Pierre Espérance, a prominent Haitian human rights defender).

4    In addition to the attacks on La Saline, Bel-Air, and Cité Soleil that are the focus of this report, attacks also took place in the neighborhoods of Lilavois (October 2017), Grand Ravine (November 2017), Nan Tokyo (four separate occasions between March 2019 and December 2019), and Bel-Air (August 2020). *See* U.N. Secretary-General, *United Nations Integrated Office in Haiti*, U.N. Doc. S/2020/537, ¶24 (June 15, 2020)[hereinafter Secretary-General June 2020 Report] (noting no new concrete judicial action in response to Lilavois, Grand Ravine, La Saline or Bel-Air); Réseau National de défense des droits de l'homme (RNDDH), *Attacks on Deprived Neighborhoods: The RNDDH Demands the End of the Protection of Armed Gangs by the Authorities in Power*, ¶¶24-29 (2020) (documenting four separate attacks in Nan Tokyo between March 2019 and December 2019)[hereinafter RNDDH, *Attacks on Deprived Neighborhoods*]; Onz Chery, *HaitiPM: Helping During Bel-Air Massacre Could Have Hurt More People*, Haitian Times (Sept. 14, 2020) (noting that at least 12 people died during the Bel-Air attack carried out by the G9 alliance on Aug. 31, 2020); *see also* Danio Darius, *Cinquante personnes tuées a Cité Soleil en juillet, selon Pierre Espérance*, Le Nouvelliste (Aug. 10, 2020) (quoting RNDDH Director Pierre Espérance counting nine massacres between November 2017 and July 2020).

5    *See generally* RNDDH, *The Events in La Saline: from Power Struggle Between Armed Gangs to State-Sanctioned Massacre* (2018) [hereinafter RNDDH, The Events in La Saline]; Mission des Nations Unies Pour L'Appui a la Justice en Haïti (MINUJUSTH), *La Saline: Justice pour les Victims. L'Etat a L'Obligation de Protéger tous les Citoyens* (2019) [hereinafter MINUJUSTH]; BINUH, *supra* note 1; RNDDH, *Attacks on Deprived Neighborhoods: The RNDDH Demands the End of the Protection of Armed Gangs by the Authorities in Power* (2020); RNDDH, *Assassinations, Ambushes, Hostage-taking, Rape, Fires, Raids: The Authorities in Power Have Installed Terror in Cité Soleil* (2020) [hereinafter RNDDH, *Terror in Cité Soleil*].

6    RNDDH, *The Events in La Saline*, *supra* note 5, ¶10 ("La Saline has an exceptional ability to either mobilize or thwart street demonstrations…" and noting that political opposition rallied protesters on Oct. 15, 2018 and the antigovernment demonstration in La Saline on October 17, 2018.); *see also* Fondasyon Je Klere (FJKL), *Situation de Terreur a la Saline: La Fondasyon Je Klere (FJKL) Deplore L'incapacite de L'etat a Garantir la Securite des Citoyens et des Citoyennes* 3 (2018) (noting that Moïse's procession was attacked by demonstrators at the Pont Rouge as one of the causes of the La Saline attack); Sojourner Truth with Margaret Prescod, *Sojourner Truth Radio: La Saline, Haiti Speaks Out Against Poverty and State Violence*, KPFK Radio, at 11:58 (Apr. 5, 2019), https://soundcloud.com/sojournertruthradio/sojourner-truth-radio-april-5 (a victim of the attack saying that La Saline "has a reputation of revolution" and that is a reason why the "government does not like the community.").

7    RNDDH, *The Events in La Saline*, *supra* note 5, ¶58.

8    *Id.*, ¶¶38-40.

9    MINUJUSTH, *supra* note 5, ¶5 (confirming that the bodies of victims were mutilated, burned and left in a dump at the mercy of animals.)

10   Press Release, RNDDH, *Communique de presse: Massacre d'Etat à La Saline : Révision à la hausse du bilan des personnes tuées et violées le 13 novembre 2018*, at 3 (Dec. 20, 2018) [hereinafter RNDDH, *Revised Toll*]; *see also* Jacqueline Charles, *Dozens Brutally Killed, Raped in Haiti Massacre, Police Say. 'Even Young Children Were not Spared'*, Miami Herald (May 15, 2019) (reporting that human rights groups put the death toll between 15 and 71) [hereinafter "Charles, *Dozens Brutally Killed*"]; *cf.* MINUJUSTH, *supra* note 5, ¶5 (separately able to confirm 26 deaths,12 missing, three injured, and two gang rapes).

11   Instead, Duplan and Monchéry stayed in their government roles until September 2019. *See Fednel Monchéry et Joseph Pierre Richard Duplan révoqués*, Le Nouvelliste (Sep. 9, 2019).

12   BINUH, *supra* note 1, ¶6 (noting that Bel-Air is also considered to be one of the traditional bases of anti-government mobilization and that demonstrators placed barricades on the main axes of the district in support of *peyi lok*).

13   RNDDH, *Massacre au Bel-Air : Banalisation du droit a la vie par les autorités* étatique ¶20 (Dec. 17, 2019), [hereinafter RNDDH, *Massacre au Bel-Air*]; *see also* BINUH, *supra* note 1, ¶17 (finding a link between the state representative and Cherizier's acts).

14   RNDDH, *Massacre au Bel-Air*, *supra* note 13, ¶31; *cf.* BINUH, *supra* note 1, ¶2 (confirming that the attacks left at least 3 dead).

15   BINUH, *supra* note 1, ¶19.

16   BINUH, *supra* note 1, ¶¶20-21.

17   U.N. Secretary-General, *United Nations Integrated Office in Haiti*, ¶16, U.N. Doc. S/2020/944 (Sept. 25, 2020), [hereinafter Secretary-General Sept. 2020 Report].

18   RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶55 (documenting 34 killings between May 24-27, 2020); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶3 (documenting 111 killings between June and July 2020).

19   RNNDH, *Terror in Cité Soleil, supra* note 5, ¶58.

20   *Id.,* ¶¶17-21.

21   *Id.,* ¶87.

22   RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶¶61-68.

23   U.N. Secretary-General, *United Nations Integrated Office in Haiti,* ¶33, U.N. Doc. S/2021/133 (Feb. 11, 2021), [hereinafter Secretary-General Feb. 2021 Report].

24   MINUJUSTH, *supra* note 5, ¶17 (noting that Duplan and Monchéry are still at large).

25   *Fednel Monchéry et Joseph Pierre Richard Duplan révoqués,* Le Nouvelliste, *supra* note 11; *see also* Edwidge Danticat, *Demonstrators in Haiti are Fighting for an Uncertain Future,* New Yorker (Oct. 19, 2019) (noting that protests against the government intensified and stating that "Moïse has not directly denounced the La Saline massacre, nor has his government sought to prosecute any of the perpetrators.")

26   IJDH, Request for a thematic hearing on impunity for serious human rights violations and the lack of judicial independence in Haiti, at 7 (Sept. 23, 2020) (noting that senior state actors implicated in the La Saline attack have not been arrested and that judicial processes appear blocked).

27   *See* Secretary-General Sept. 2020 Report, *supra* note 17, ¶34 ("The lack of accountability for human rights violations committed by State agents… remains concerning, because of the chronic absence of progress on judicial proceedings against alleged perpetrators, including those within the national police.").

28   Moïse was likely to have known, or should have known, that senior government officials Duplan and Monchéry orchestrated the La Saline attack and failed to prevent their acts and punish them. *See* Section IV of this report.

29   Secretary-General Sept. 2020 Report, *supra* note 17, ¶32 (noting that known perpetrators of past attacks, such as Cherizier, have committed more recent attacks, which "underscores how impunity and a manifest lack of accountability fuel recurrent cycles of violence.").

30   See Annex 1 for a list of principal investigations relied on in this report.

31   *See* U.N. Office on Genocide Protection and the Responsibility to Protect, Definitions: Crimes Against Humanity, https://www.un.org/en/genocideprevention/crimes-against-humanity.shtml (last visited Feb. 25, 2021) (the Rome Statute "reflects the latest consensus among the international community…[and] offers the most extensive list of specific acts that may constitute the crime."); Sean Murphy (Special Rapporteur), *First Report on Crimes Against Humanity,* U.N. Doc A/CN.4/680, ¶8 (Feb. 17, 2015) ("Article 7 of the Rome Statute marks the culmination of almost a century of development of the concept of crimes against humanity and expresses the core elements of the crime.").

32   Rome Statute of the International Criminal Court, art. 7, Jul. 17, 1998, 2187 U.N.T.S. 38544.

33   *Id.,* art. 7(1).

34   *See, e.g.,* Secretary-General Feb. 2021 Report, *supra* note 23, ¶33 (discussing attacks in the context of gang violence and mentioning the state's failure to protect but omitting any reference to state actors in the commission of the crimes); Secretary-General Sept. 2020 Report, *supra* note 17 (discussing the rise in G-9 and Cherizier's role in massacres without acknowledging documentation of state actor involvement); *see also* IJDH, *Human Rights and Rule of Law in Haiti: Key Recent Developments* fn. 95 (Feb. 2020) ("Though BINUH reports and Security Council comments extensively discuss gang violence, Jimmy Chérizier, and the G-9, the UN and Security Council Members systematically ignore well-documented evidence from civil society regarding state actor complicity in that violence and requests for investigation and accountability.") [hereinafter IJDH, *Human Rights and the Rule of Law in Haiti*].

35   Constitution de la République d'Haïti, art. 276(2) (1987) (English translation), *available at* https://www.constituteproject.org/constitution/Haiti_2012.pdf?lang=en [hereinafter Haiti Const.].

36   Arellano v. Chile, Preliminary Objections, Merits, Reparations and Costs, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 154, ¶¶152, 110 (Sep. 26, 2006) (crimes against humanity are "intolerable in the eyes of the international community and offend humanity as a whole. The damage caused by these crimes … demand that those responsible be investigated and punished"); ("The obligation that arises pursuant to international law to try, and if, if found guilty, to punish the perpetrators of certain international crimes, among which are crimes against humanity, is derived from the duty of protection embodied in Article 1(1) of the American Convention.").

37   *Id.,* ¶152.

38   *Id.,* ¶110.

39   *See* U.N.G.A. 6th Comm., 73rd Sess., The scope and application of the principle of universal jurisdiction: Summary of work (2018), https://www.un.org/en/ga/sixth/73/universal_jurisdiction.shtml ("Delegations generally stated that universal jurisdiction was an important, well-established principle of international law aimed at combating impunity… which should be exercised in accordance with the principle of subsidiarity."); Basic Facts on Universal Jurisdiction, Human Rights Watch (Oct. 19, 2009), https://www.hrw.org/news/2009/10/19/basic-facts-universal-jurisdiction ("Universal jurisdiction is the ability of the domestic judicial systems of a state to investigate and prosecute certain crimes, even if they were not committed on its territory, by one of its nationals, or against one of its nationals.").

40   Rome Statute, *supra* note 32, art. 13(b) (granting the Security Council the power, acting under Chapter VII of the UN Charter, to refer to the ICC situations in which crimes under the jurisdiction of the court have taken place).

41   After the initial 2015 election was nullified due to extensive fraud, the 2016 re-run election saw the lowest turnout since the end of the Duvalier dictatorship in 1987. In 2016, Moïse received a mere 600,000 votes in a country of 10 million people, representing the support of less than 10% of registered voters. IJDH, *Haiti at a Crossroads, supra* note 1; *see also* Freedom House, *Freedom in the World 2018 Haiti* (2019); Int'l Ass'n Democratic Law. & Nat'l Law. Guild, *Haiti's Unrepresentative Democracy: Exclusion and Discouragement in the November 20, 2016, Elections* 9-13 (2017).

42   Jacqueline Charles, *Trump Administration Wants Haiti to Hold Overdue Legislative Elections by January,* Miami Herald (Oct. 27, 2020).

43   Parliamentary elections scheduled for October 2019 were postponed due to failures to achieve a ratified government and budget since March 2019. On January 13, 2020, one-third of the seats in the Senate, all seats in the lower chamber of Deputies, and all locally elected posts had expired. IJDH, *Human Rights and Rule of Law in Haiti, supra* note 34, at 1; Kim Ives, *Haitian Opposition Condemns Moïse's Appointment of New De Facto Prime Minister,* Haïti Liberté (Mar. 4, 2020) (noting that Moïse dissolved the Haitian Parliament on Jan. 13, 2020).



44 *See e.g.,* Secretary-General Feb. 2021 Report, *supra* note 23, ¶13 ("several actors, both domestic and foreign, reiterated strong calls to the President to limit his use of executive decrees to govern"); U.S. Dept of State, Department Press Briefing – February 5, 2021: Ned Price (Department Spokesperson) (Feb. 5, 2021) ("The United States continues to maintain that the Haitian Government should exercise restraint in issuing decrees, only using that power to schedule legislative elections…").

45 Robenson Geffrard, *Jovenel Moïse apporte quelques modifications au décret portant création de l'Agence nationale d'intelligence,* Le Nouvelliste (Feb. 4, 2021) (noting that while citizens may file a complaint with the General Inspectorate of Intelligence Services should they have been harmed by the agency's activities, the government is under no obligation to disclose the details of its operations).

46 Johnston & Paulemon, *supra* note 2; *see also* Jacqueline Charles, *Slew of Presidential Decrees Have Some Wondering If Haiti Is On the Road to Dictatorship,* Miami Herald (Dec. 21, 2020); Moïse has issued at least 44 unilateral decrees since the Parliament termed out. Kim Ives, *The Year the Regime and Empire Struck Back, Assisted by Covid-19,* Haïti Liberté (Dec. 30, 2020).

47 Robenson Geffrard, *La présidence prend le contrôle des mairies,* Le Nouvelliste (Jul. 8, 2020).

48 Décret du 15 mars 2021 révisant la Loi du 15 avril 2010 portant amendement de celle du 9 septembre 2008 sur l'État d'Urgence, 176 Le Moniteur 17 (Mar. 15, 2021)(on file); Arrêté instaurant l'État d'Urgence dans les zones de Village de Dieu; de Grand-Ravine; de Delmas 2; de Savien, dans la Petite Rivière de l'Artibonite; et dans toutes autres zones rouges identifiées par le Conseil supérieur de la Police nationale, pour une période d'un (1) mois, 176 Le Moniteur 18 (Mar. 16, 2021)(on file); *see also* Robenson Geffrard, *Jovenel Moïse modifie la loi sur l'état d'urgence et se donne de nouveaux pouvoirs,* Le Nouvelliste (Mar. 17, 2021).

49 The PetroCaribe loan program provided access to low-interest fuel from Venezuela, with revenue intended to finance socioeconomic development. IJDH, *Haiti at a Crossroads, supra* note 1, at 3. In July 2017, Moïse replaced the Director General of the Central Financial Intelligence Unit (UCREF), an anti-corruption unit that found that Moïse had laundered approximately $6 million through his company. Kim Ives, *Illegally Ousted Anti-Corruption Chief: "We Have a Dictatorship taking Place,* Haïti Liberté (Jul 12, 2017). Moïse also constrained the powers of the Superior Court of Auditors and Administrative Disputes (CSCCA), which has implicated him and a large swath of government officials in the PetroCaribe scandal. Jake Johnston & Kira Paulemon, *At Odds with Presidency, a Government Watchdog is Weakened by Executive Decree,* Ctr. Econ. & Pol'y Research (Nov. 12, 2020).

50 IJDH, *Human Rights and Rule of Law in Haiti, supra* note 34, 4 (Nov. 2020); Secretary-General Feb. 2020 Report, *supra* note 1, ¶10 (noting that the only ongoing prosecution related to PetroCaribe accountability initiated by the Moïse administration has been characterized by human rights groups as an "instrumentalization of the judiciary for political purposes," selectively prosecuting only one political rival in order to achieve the administrations political goals related to electricity).

51 Haiti presidents are elected to a five-year term. Moïse was elected in 2016, in a re-run of the 2015 election. Moïse argues that because he did not take office until 2017, his five-year term runs until February 2022, but this is inconsistent with the Haitian Constitution and the 2015 Electoral Law. The Constitution specifies that the presidential term starts on February 7 after elections are held. Haiti Const., *supra* note 35, art. 134-1. Article 134-2 further specifies that when elections are delayed, "the president elected enters into his functions immediately after the validation of the ballot and his mandate is considered to have commenced on 7 February of the year of the election." *Id.* art. 134-2. The 2016 elections were organized pursuant to the 2015 Electoral Law, which specified that the president's term would end five years from the mandated start date, regardless of when the president actually took office. Electoral Law of 2015, art. 239(a), Le Moniteur, https://www.haitilibre.com/docs/decretelectoral2015.pdf  ("The term of office of the President of the Republic shall end on the seventh (7th) of February in the fifth year of his term of office, regardless of the date of his entry into office."). The Superior Council of Judicial Power, the Haitian Bar Federation, and many other legal experts and civil society endorse this interpretation. *See e.g.,* Conseil Superieur du Pouvoir Judiciaire, *Resolution of the Superior Council of the Judicial Power (CSPJ) on the issue of the expiry of the constitutional mandate of the President of the Republica His Excellency Mr. Jovenel Moïse,* adopted Feb. 6, 2021, *available at* https://www.haitiwatch.org/home/cspj6feb2021en; Haitian Bar Federation, Institutional Crisis and the End of the Presidential Term, Resolution 2021-01, *adopted* Jan. 30, 2021, *available at* https://bdhhaiti.org/archives/754. The U.S. State Department and Secretary-General of the Organizations of American States have sided with Moïse's interpretation. U.S. Dept. of State, *supra* note 44 ("In accordance with the OAS position on the need to proceed with the democratic transfer of executive power, a new elected president should succeed President Moise when his term ends on February 2nd, 2022.").

52 IJDH, *Human Rights and Rule of Law in Haiti, supra* note 34, at 1; *see also* Caleb Lefevre, *L'opposition crée une direction politique pour préparer l'après Jovenel Moïse,* Le Nouvelliste (Oct. 15, 2020) (reporting that opposition organizations and political parties are working together to put and prepare for a transitional government).

53 The Haitian Bar Federation has objected to the CEP's constitutionality, and Haiti's Supreme Court refused to swear in the CEP. Jacqueline Charles, *Haiti's supreme court declines to swear in election council. Moïse installed them anyway,* Miami Herald (Sep. 22, 2020).

54 Haiti Const., *supra* note 35, art. 284-3 ("General elections to amend the Constitution by referendum are strictly forbidden.").

55 The proposed changes would completely eliminate the Senate, replace the semi-independent Prime Minister with a Vice-President, and allow Moïse to hand-pick an electoral council that would run the next two Presidential elections. *See* Winnie Hugot Gabriel Duvil, *L'avant-projet de nouvelle constitution consacre un président avec des pouvoirs exorbitants,* Le Nouvelliste (Feb. 5, 2021)(constitutional amendments would profoundly change the organization of the three branches of government); U.S. Rep. Maxine Waters, *Haiti's President Jovenel Moïse's shameful assault on democracy,* Miami Herald (Feb. 27, 2021)(calling the referendum Moïse's "most audacious and dangerous power grab yet,"); Farah Stockman, *Did a Coup Really Happen Two Weeks Ago in Haiti?,* N.Y. Times (Feb. 23, 2021) (noting that the "nakedly unconstitutional referendum…would strengthen his grip on power).

56 Comité Consultatif Independant, Avant-Project Constitution art. 139 (Jan. 2021), https://www.haitilibre.com/docs/CCI-CONSTITUTION_Projet-de-Constitution-2-fevrier-2021-20h00.pdf.

57 Jacqueline Charles, *Amid calls for Moïse's ouster, Haiti announces arrest of 23 people in alleged coup* attempt, Miami Herald (Feb. 7, 2021). Human rights organizations view the arrests as a crackdown against Moïse's political opponents. *Id.; see also* Stockman, *supra* note 55 (questioning the evidence of a coup).

58 Robenson Geffrard, *Jovenel Moïse met à la retraite les trois juges de la Cour de cassation pressentis pour le remplacer,* Le Nouvelliste (Feb. 9, 2021). Article 177 of the Constitution provides that Supreme Court judges are "irremovable" unless they have been legally determined to have abused their authority. Haiti Const., *supra* note 35, art 177.

59  Winnie Hugot Gabriel Duvil, *Le Président Moïse Nomme Trois Nouveaux Juges à la Cour de Cassation*, Le Nouvelliste (Feb. 12, 2021). The Constitution requires that the president nominate judges chosen from a list provided by the Senate. Haiti Const., *supra* note 35, art. 175. Although Moïse claimed in a Tweet to have followed this procedure, the Senate has not been in session for many months, since the terms of most members of parliament have expired. Ives, *supra* note 43 (noting that Moïse dissolved the Haitian Parliament on Jan. 13, 2020).

60  *Après la Cour de cassation, l'École de la magistrature est placée sous contrôle de la police*, Haiti Standard (Feb. 8, 2021).

61  *See e.g.*, UN Human Rights Office Alarmed by 'Attacks' on Judicial Independence in Haiti, U.N. News (Feb. 19, 2021); *Haiti: Attacks on Judicial Independence*, Human Rights Watch (Feb. 22, 2021).

62  *See* U.N. Secretary-General, *United Nations Mission for Justice Support in Haiti*, ¶2, U.N. Doc. S/2018/1059 (Nov. 28, 2018) [hereinafter Secretary-General Nov. 2018 Report] (noting that the PetroCaribe scandal gave rise to widespread yet predominantly peaceful civil society demonstrations nationwide in 2018; Jacqueline Charles, *'Where did the money go?" Haitians denounce corruption in social media campaign*, Miami Herald (Aug. 25, 2020) (reporting on the continued protests related to PetroCaribe in 2020); *'Down with the Dictatorship': Protests continue in Haiti*, Al Jazeera (Feb. 15, 2021) (reporting that mass protests in 2021 were in part due to the PetroCaribe corruption scandal).

63  Secretary-General Nov. 2018 Report, *supra* note 62, ¶3.

64  BINUH, *supra* note 1, ¶6.

65  *Id.* (noting that *peyi lok* began in September 2019 and continued up to the Bel-Air attack in November 2019); Danticat, *supra* note 25 (noting that since the *peyi lok* began in September 2019, large demonstrations have taken place almost every day).

66  According to the UN, kidnappings increased by 200% from Feb. 2020 to Feb. 2021 compared to the previous year and voluntary homicide increased by 20% in 2020. Secretary-General Feb. 2021 Report, *supra* note 23, ¶19.

67  *Id.* at ¶17 ("The mounting insecurity, driven by a growing wave of kidnappings combined with several ruthless killings, increased public outraged, as evidenced by a monthly average of 84 demonstrations in the second half of 2020,"); Sandra Lemaire & Renan Toussaint, *Thousands of Haitians Protest Violence, Impunity on Human Rights Day,* VOA News (Dec. 20, 2020).

68  Ralph Tomassaint Joseph, *What is Happening in Haiti, Where Political Crisis Persists?,* Al Jazeera, Feb. 28, 2021.

69  Jacqueline Charles, *Thousands march in Haiti to say 'No to dictatorship' as peaceful protest turned violent,* Miami Herald (Feb. 14, 2021).

70  RNDDH, *The Events in La Saline, supra* note 5, ¶¶25-29, 54, 58 (reporting that in 2017 First Lady Martine Moïse and other government officials offered to invest in community projects in La Saline in exchange for a reduction in anti-government protests in the area, and that just prior to the La Saline attack in 2018 two high-level government officials, Fednel Monchéry and Richard Duplan, held a planning meeting with Chérizier, providing resources for the attack); BINUH, *supra* note 1, ¶¶17-18 (noting that Chérizier's attack on Bel-Air followed shortly after government officials unsuccessfully tried to bribe local organizations to remove the barricades from the neighborhood); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶¶35, 54, 64 (reporting that a government actor allegedly paid off an anti-government gang leader, Altès, to take control of anti-government strongholds in Cité Soleil).

71  *See* fn. 4, *supra.*

72  The UN has documented 60 violations of the right to life and 171 violations of the right to personal security committed by state actors against protesters between July 6, 2018 and December 10, 2019. BINUH & le Haut-Commissariat des Nations Unies aux droits de l'homme (HCDH), *Manifestations en Haïti : Leurs impacts sur les droits humains et l'obligation de l'État de protéger tous les citoyens* 12 (2021). Between June–July 2020, for example, the PNH repeatedly shot live rounds and teargas to break up peaceful sit-ins and other demonstrations. IJDH, *Human Rights and Rule of Law in Haiti, supra* note 34.

73  Johnston & Paulemon, *supra* note 2; Jacqueline Charles, *Is democracy in Haiti eroding? The president's new intelligence agency has many uneasy,* Miami Herald (Dec. 12, 2020).

74  *Id.*

75  Charles, *Haitian Lawyer, Constitutional Expert Gunned Down, supra* note 3.

76  *Id.*

77  *Id.*

78  Secretary-General Feb. 2021 Report, *supra* note 23, ¶¶35, 61.

79  After significant civil society and international pressure, investigations into the killing have resulted in four arrests, including of a businessman who allegedly worked at the National Palace and has close ties to Moïse's *Parti Haitien Tet Kale* (PHTK). Pierre Emmanuella Tanis, *Enquête sur l'assassinat de Me Monferrer Dorval: Arrestation de l'homme d'affaires Vilpique Dunès,* Juno7 (Sep. 12, 2020); *see also* Le Nouvelliste, *Le téléphone de Me Monferrier Dorval mène aux présumés exécutants et complices, un juge d'instruction saisi* (Sept. 25, 2020).

80  Fédération internationale pour les droits humains (FIDH), *Haïti : Planification d'assassinat à l'encontre de M. Pierre Espérance* (May 9, 2019), https://www.fidh.org/fr/themes/defenseurs-des-droits-humains/haiti-planification-d-assassinat-a-l-encontre-de-m-pierre-esperance.

81  Le Nouvelliste, *Le ministre de la Justice accuse des organisations de défense des droits humains d'être « des outils de déstabilisation »* (Dec. 14, 2020).

82  Le Nouvelliste, *L'Agence nationale d'intelligence opérationnelle, les adversaires de Jovenel Moïse sous surveillance* (Jan. 19, 2021).

83  Johnston, *supra* note 2; Charles, *Thousands march in Haiti to say 'No to dictatorship,' supra* note 69.

84  Jake Johnston, *Meet the New Haitian Military? It's Starting to Look a Lot Like the Old One*, Ctr. Econ. & Pol'y Research (Mar. 16, 2018); Freedom House, *Freedom in the World 2018 – Haiti* (Aug. 1, 2018); *see also* Jacqueline Charles, *Haiti has a new army with much of the old leadership. Some in the U.S. aren't happy*, Miami Herald (Mar. 26, 2018).

85  Andres Martinez Casares & Joseph Guyler Delva, *Haitian army set to make controversial after two decades*, Reuters (Nov. 18, 2017).

86  Press Release, IJDH & BAI, *The BAI Denounces the Appointment of an Ex-Torturer of the Bloody Coup d'Etat of 30 September 1991 to the So-Called High Command of the Haitian Armed Forces* (Mar. 14, 2018).

87  In 2019, the National Commission for Disarmament, Demobilization and Reintegration (CNDDR) documented the existence of at least 76 armed gangs in Haiti, Danio Darius, *76 gangs armés répertoriés en Haïti par la Commission de désarmement,* Le Nouvelliste (May 6, 2019).

88  *Id.* For example, control over areas such as the *Croix-des-Bossales* market in La Saline is highly contested, as it allows for the extortion of businesses and collection of fees for space allocation. RNDDH, *The events in La Saline: supra* note 5, ¶¶16-19.

89  *See* RNDDH, *Terror in Cité Soleil, supra* note 5, ¶¶38-49; FKJL, *Terreur dans les quariers populaires/Pont Rouge au Coeur d'une stratégie electoral macabre* ¶42 (June 22, 2020).

90  *See e.g.,* RNDDH, *The Events in La Saline, supra* note 5, ¶¶14, 17; RNDDH, *Massacre au Bel-Air, supra* note 13, ¶20; FJKL, *Conflit au Bel-Air et à la ruelle Mayard : la Fondasyon Je Klere (FJKL) s'inquiète de l'instrumentalisation politique des groupes armés*, at 11-12 (Nov. 29, 2019) [hereinafter FJKL, *Conflit au Bel-Air*]; RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶¶35, 62; Hamed Aleaziz, *DHS Officials Are Deporting Haitian Immigrants Despite Knowing They May Face Danger,* BuzzFeed News (Mar. 2, 2021)(citing U.S. Department of Homeland Security document acknowledging that the Haitian government was using gangs to "repress the opposition."); *cf.* Darius, *supra* note 87 (quoting Jean Rebel Dorcénat, member of the CNDDR, as stating that gang members have confirmed to him that they lack the means to purchase arms but are rather armed by politicians close to the government, as well as the opposition and the private sector).

91  FKJL, *Terreur dans les quariers populaires, supra* note 89, ¶36 (noting that it is well-known that electoral outcomes in impoverished neighborhoods reflect the will of the gangs in control, not the will of the people); Secretary-General Sept. 2020 Report, *supra* note 17, ¶15 (noting "linkages between gang violence and political developments…which suggest that competition among gangs is growing in anticipation of elections.").

92  Secretary-General Sept. 2020 Report, *supra* note 17, ¶15.

93  *Id.*, at ¶16 (noting that G9's creation has "raised concerns among political and civil society actors about the detrimental impact partisan gangs can have on State institutions."); Ingrid Arnesen & Anthony Faiola, *In Haiti, coronavirus and a man named Barbecue test the rule of law,* Wash. Post (Aug. 14, 2020).

94  *Id.*

95  *Id.*

96  *See e.g.,* RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶98 ("armed gangs protected by the power of Jovenel Moïse become more powerful day by day. They organize themselves with the blessing of the authorities who provide them with weapons and ammunition. They benefit, for the protection of the police institution. This is the case for example of Jimmy Chérizier alias Barbecue, which is allowed to use the rolling stock of the PNH for as long as it says it wants attack underprivileged neighborhoods housing close relatives of the political opposition."); ¶¶84-87 (noting that members of G9 participate in high-level government meetings and are able to influence government appointments, including the appointment of Frantz Iderice as head of the Caisse d'Assistance Social). Chérizier has denied such ties. *Jimmy CHERIZIER Alyas BARBECUE ap esplike kisa ki G9 an Fanmi e Alye a*, June 10, 2020, YouTube.com, https://www.youtube.com/watch?v=Fc3Rq_3PZ5g (presenting a G-9's formation and insisting on its independence from the government and other political forces).

97  Haitian Popular News Agency, *Social movements in Haiti denounce president's links to criminal gangs*, Peoples Dispatch (Sept. 9, 2020); *see also* Danio Darius, *Les gangs se sont fédérés sur proposition de la Commission nationale de désarmement, démantèlement et reinsertion,* Le Nouvelliste (Sept. 2, 2020).

98  *Haiti – G9: Formal denial of the National Disarmament Commission,* Haiti Libre (Sept. 20, 2020), https://www.haitilibre.com/en/news-31847-haiti-g9-formal-denial-of-the-national-disarmament-commission.html.

99  *See e.g.,* RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶¶88-93 (documenting that Chérizier generally operates with the assistance of PNH officers, who facilitate his travel and ensure his safety); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶¶31, 101 (in Cité Soleil, residents believe calling on police for protection is futile because local police officers regularly participate in recreational activities with armed gangs, including celebrating gang members' birthdays, watching soccer matches and consuming alcohol with them).

100 See *Emblematic Attacks Against Civilians, infra.*

101 *Id.;* MINUJUSTH noted that the La Saline attack lasted at least fourteen hours, yet the PNH did not intervene to protect civilians. This is particularly striking as two police stations were located less than one kilometre from the site of the attack. MINUJUSTH, *supra* note 5, ¶¶23-26. It was only following public outcry that the DCJP conducted an investigation into the La Saline attack. The investigation implicated 70 individuals responsible for carrying out their the attack, including Duplan, Monchéry and Chérizier. Jacqueline Charles, *U.N. investigators say Haitian government condoned massacre that left dozens dead,* Miami Herald (June 21, 2019); Press Release, IJDH & BAI, *Human Rights Groups Petition Inter-American Commission to Protect Survivors of Haiti's La Saline Massacre* (Aug. 13, 2019), http://www.ijdh.org/wp-content/uploads/2019/08/Press-Release-La-Saline-PMs-8-31-FINAL.pdf. Nevertheless, none of them have been arrested. *See also* Press Release, Security Council, Haiti's Stability in Peril without Strong Response to COVID-19, Legal Experts Tell Security Council, U.N. Press Release SC/14218 (June 19, 2020 (noting that "[A]ccountability is a challenge, seen in the lack of progress in investigating and prosecuting the Lilavois, Grand Ravine, La Saline and Bel-Air cases, involving abuses by gang members, law enforcement agents and political officials."); Secretary-General Sept. 2020 Report, *supra* note 17, ¶31 (highlighting the "lack of accountability for past abuses, including emblematic cases like Grand Ravine (2017), La Saline (2018) and Bel-Air (2019).").

102 PNH has cited these constraints as a reason for their failure to intervene in the attacks. *See, e.g.,* BINUH, *supra* note 1, ¶21. Strengthening the police force through capacity building and training has also been a key objective of the UN deployed peacekeeping missions to Haiti from 2004-2019. MINUJUSTH, *MINUJUSTH Completes its Mandate, Putting an End to 15 Consecutive Years of Peacekeeping in Haiti* (Oct. 16, 2019), https://minujusth.unmissions.org/en/minujusth-completes-its-mandate-putting-end-15-consecutive-years-peacekeeping-haiti-0. Yet PNH has continued to suffer from some systemic constraints, including poor pay and difficult working conditions. Jacqueline Charles, *While Haiti police take frustration out on streets, U.N. sounds alarm on gangs, bad cops,* Miami Herald (Feb. 18, 2020). In September 2020, the Moïse administration increased funding for PNH for the first time in 13 years. Secretary-General Feb. 2021 Report, *supra* note 23, ¶17.

103 At least 71 people were killed in the 2018 La Saline attack. RNDDH, Revised Toll, *supra* note 10; Seth Donnelly & Judith Mirkinson, *The Lasalin massacre and the human rights crisis in Haiti* 6 (Aug. 23, 2019) (noting that "residents and local human rights defenders maintain that this number is deplorably low, based only on the number of bodies actually left on the ground and not taking into account those buried or taken away."); *cf.* MINUJUSTH, *supra* note 5, ¶5 (separately able to confirm 26 deaths) The death toll of the Bel-Air attack is at least 24 people. RNDDH, *Massacre au Bel-Air, supra* note 13, ¶31; *cf.* BINUH, *supra* note 1, ¶¶2, 4 (separately able to confirm that the attacks left at least 3 dead but noting that this is likely an undercount). Between May and July 2020, at least 145 people were killed in Cité Soleil. RNDDH, *Attacks on Deprived Neighborhoods, supra* note 5, ¶55 (documenting the death of 34 people in Pont Rouge, Nan Brooklyn, Chancerelles, Fort Dimanche, and Nan Tokyo between May 24-27, 2020); RNNDH, *Terror in Cité Soleil, supra* note 5, ¶3 (documenting 111 killings between June and July 2020).

104 RNDDH reported that 5 were injured in the Bel-Air attack. RNDDH, *Massacre au Bel-Air, supra* note 13, ¶34. At least 40 people were shot and injured in Cité Soleil between May 24–July 28, 2020. RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶51 (reporting that at least 20 people were injured on May 26 and 27); RNNDH, *Terror in Cité Soleil, supra* note 5, ¶65 (documenting that at least 20 people were injured between June 1 and July 28, 2020).

105 At least 7 women were raped in La Saline. RNDDH, *The Events in La Saline, supra* note 5, ¶43. Between June 1 and July 28, 2020, 18 women and girls were reported raped in Cité-Soleil. RNNDH, *Terror in Cité Soleil, supra* note 5, ¶65.

106 RNDDH documented that 150 houses were vandalized by the attackers La Saline. RNDDH, *The Events of La Saline, supra* note 5, ¶46. Moreover, at least 300 people are estimated to have fled La Saline after the attack. Press Release, RNDHH, *supra* note 11. 28 houses were set on fire during the Bel-Air attack. RNDDH, *Massacre au Bel-Air, supra* note 13, ¶35. 98 houses were set on fire in Cité-Soleil May 23 to 27, 2020. RNDDH, *Attacks on Deprived Neighborhoods, supra* note 5, ¶59. As a consequence of the various attacks, the UN estimates that at least 298 households have been displaced in Bel-Air and Cité-Soleil. Secretary-General Sept. 2020 Report, *supra* note 17, ¶15. *See also* Office for Civil Protection Haiti, *Profile – Site de Déplacés Poste Marchand* (Sept. 17, 2020), https://www.humanitarianresponse.info/sites/www. humanitarianresponse.info/files/documents/files/dpc_om_bel_air_3_sites_de_deplaces.pdf.

107 RNDDH, *The Events of La Saline, supra* note 5, ¶¶10, 30-31 (noting that "La Saline has an exceptional ability to either mobilize or thwart street demonstrations, which is why this community is often courted by opposition political clans" and highlighting the anti-government demonstrations on October 15 and 17, 2018); BINUH, *supra* note 1, ¶¶6, 16 (emphasizing Bel-Air's central role in the 2019 *peyi lok* protests where almost daily demonstrations against the government took place); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶¶17-18 (highlighting Cité-Soleil's historical support for *Fanmi Lavalas*, the government opposition).

108 See Annex I for a list of the principal investigations relied on in this report.

109 *Id.*

110 RNDDH, *The Events in La Saline, supra* note 5; MINUJUSTH, *supra* note 5; Donnelly & Mirkinson, *supra* note 103.

111 *See* Donnelly & Mirkinson, *supra* note 103, at 4 ("La Saline has been known as a stronghold of Lavalas"); Press Release, Human Rights Delegation Condemns Political Massacres Tied to Haiti's Government (May 8, 2019), http://www.ijdh.org/wp-content/uploads/2019/05/DelegationPressReleaseFinal5-08-2.pdf (human rights delegation finding that "the months-long series of attacks in poor neighborhoods of Port-au-Prince …were done to punish neighborhood residents–many of whom identify as supporters of the Fanmi Lavalas party–for playing a leading role in a series of demonstrations opposing government corruption, mismanagement and brutality."); Bureau des Avocats Internationaux (BAI) & IJDH, Precautionary Measures Request for Anonymous Petitioners of La Saline, Inter-Am. Comm'n H.R., ¶¶11-13, http://www.ijdh.org/wp-content/uploads/2019/08/IACHR-Precautionary-Measures-Request_Haiti_La-Saline_August-9-2019.pdf [hereinafter BAI & IJDH, Petition for Precautionary Measures] (setting out the political background of La Saline); Prescod, *supra* note 6.

112 RNDDH, *The Events in La Saline, supra* note 5, ¶10; *see also* Randall White, *Haiti Government Complicit in La Saline Massacre,* haitiaction.net (Dec. 4, 2018), http://www.haitiaction.net/News/RAW/12_4_18/12_4_18.html (describing La Saline as a frequent starting point for demonstrations).

113 RNDDH, *The Events in La Saline, supra* note 5, ¶17.

114 *Id.* ¶16; MINUJUSTH, *supra* note 5, ¶10.

115 Press Release, Human Rights Delegation, *supra* note 111; RNDDH, *The Events in La Saline, supra* note 5, at 6; Prescod, *supra* note 6.

116 RNDDH, *The Events in La Saline, supra* note 5, ¶¶25-28; Donnelly & Mirkinson, *supra* note 103, at 4.

117 RNDDH, *The Events in La Saline, supra* note 5, ¶29.

118 Secretary-General Nov. 2018 Report, *supra* note 60, ¶3.

119 RNDDH, *The Events in La Saline, supra* note 5,¶30; Donnelly & Mirkinson, *supra* note 103, at 4.

120 Secretary-General Nov. 2018 Report, *supra* note 60, ¶3; RNDDH, *The Events in La Saline, supra* note 5, ¶31.

121 Donnelly & Mirkinson, *supra* note 103, at 4-5; FKJL, *Situation de Terreur a La Saline* 3 (Nov. 2018).

122 The President's delegates serve as their official representative in each of Haiti's ten geographic departments, and are responsible for the coordination and control of public services there. Haiti Const. *supra* note 35, art. 85.

123 RNDDH, *The Events in La Saline, supra* note 5, ¶58.

124 MINUJUSTH, *supra* note 5, ¶21.

125 Jake Johnston, *A UN-Backed Police Force Carried out a Massacre in Haiti. The Killings Have Been Almost Entirely Ignore,* The Intercept (Jan. 10, 2018).

126 RNDDH, *The Events in La Saline, supra* note 5, ¶¶54-58; *see also* Press Release, Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day, U.S. Treasury Dept. (Dec. 10, 2020), https://home.treasury.gov/news/press-releases/sm1208 ("Monchéry supplied weapons and state vehicles to members of armed gangs who perpetrated the attack.…Duplan provided firearms and HNP uniforms to armed gang members who participated in the killings.").

127 *See e.g.,* RNDDH, *The Events in La Saline, supra* note 5; MINUJUSTH, *supra* note 5; Donnelly & Mirkinson, *supra* note 103.

128 MINUJUSTH, *supra* note 5, ¶¶12-15; RNDDH, *The Events in La Saline, supra* note 5, ¶¶38-40.

129 RNDDH Revised Toll, *supra* note 103; *see also* Donnelly & Mirkinson, *supra* note 103 (noting that "residents and local human rights defenders maintain that this number is deplorably low, based only on the number of bodies actually left on the ground and not taking into account either those buried or taken away."). MINUJUSTH was separately able to confirm 26 deaths,12 missing, three injured, and two gang rapes. MINUJUSTH, *supra* note 5, ¶4.

130 MINUJUSTH, *supra* note 5, ¶¶13-15.

131 RNDDH, *The Events in La Saline, supra* note 5, ¶39; MINJUSTH, *supra* note 5, ¶5.

132 RNDDH, *The Events in La Saline, supra* note 5, ¶48 (documenting 7 rapes); MINJUSTH, *supra* note 5, ¶7 (noting that Haitian human rights organizations documented 11 cases of rape, including two gang rapes).

133 RNDDH, *The Events in La Saline, supra* note 5, ¶46.

134 BAI & IJDH, Petition for Precautionary Measures, *supra* note 111, at 2.

135 MINUJUSTH, *supra* note 5, ¶19; RNDDH, *The Events in La Saline, supra* note 5, ¶4, 6; Donnelly & Mirkinson, *supra* note 103, at 2.

136 MINUJUSTH, *supra* note 5, ¶18; Haiti Breaking News – Massacre a La Saline, bidonville de Port-au-Prince, TVImage, Nov. 14, 2018, https://www.youtube.com/watch?v=U1X6IpEhTvc (showing bodies disposed of in trash piles).

137 MINUJUSTH, *supra* note 5, ¶19.

138  *Id.*¶20; Jacqueline Charles, *Dozens Brutally Killed, Raped in Haiti Massacre, Police Say. 'Even Young Children Were Not Spared'*, Miami Herald (May 15, 2019).

139  RNDDH, *The events in La Saline, supra* note 5, ¶39; MINUJUSTH, *supra* note 5, ¶¶12–14.

140  MINUJUSTH, *supra* note 5, ¶¶21-22.

141  The UN documented that then-police officers Gregory Antoine and Gustave alias Chupit also participated in the attacks. *Id.*, ¶21.

142  *Id.*, ¶¶23-26 (documenting the proximity of various police outposts to the site of the attack and that police was put on notice of the attack as it was ongoing).

143  *Id.*

144  *Id.*, ¶24.

145  *Id.*, ¶26.

146  *Id.*

147  BAI & IJDH, Petition for Precautionary Measures, *supra* note 111, at 11-12 ("Despite the scale and horror of the atrocities, President Moïse has not spoken out about the massacre, condemned the massacre, or paid visitis to the survivors."); RNDDH, *The Events in La Saline, supra* note 5, ¶75 (noting that in the two weeks that followed the massacre, the only official comment on the attack was made by Prime Minister Céant); Michael Weissenstein, *Witnesses: Men in police garb massacred civlians in Haiti*, Associated Press (Jan. 14, 2019) ("The authorities have said nothing…they haven't even condemned this massacre)(quoting FJKL director Marie-Ylene Gilles).

148  BAI & IJDH, Petition for Precautionary Measures, *supra* note 111, at 12; *see also* Hearing on Access to Justice and Judicial Independence in Haiti, Inter-Am. Comm'n H.R., PS 178 18, at 51:04, (Dec. 10, 2020), https://www.youtube.com/watch?v=FUgzRzOI-BU (Commission President Joel Hernández García calling on Haitian government to take concrete steps to advance reparations for victims of the La Saline massacre).

149  Charles, *supra* note 138 (reporting on the findings). The results of the investigation have been referred to the prosecutor, but remain confidential in accordance with Haitian criminal procedure. MINUJUSTH, *supra* note 5, ¶¶31-34.

150  *See e.g.,* BAI & IJDH, Written Submission for the Dec. 10, 2020 Thematic Hearing, *supra* note 26 (noting lack of accountability for La Saline attack, including that the legal process has stalled since 2019); Secretary-General Feb. 2021 Report, *supra* note 23, ¶33 (Cherizier remains at large despite continuing domestic and international appeals for justice); Worlgenson Noël, *Deux ans après le massacre à la Saline, toujours pas de justice pour les victimes...*, Le Nouvelliste (Nov. 12, 2020) (quoting RNDDH lamenting that government officials implicated in the massacre still hold political power). Monchéry was briefly arrested in 2021 for driving with illegal plates, but quickly released. Robenson Geffrard, *Indexé dans le cadre du massacre de La Saline, Fednel Monchéry arrêté puis libéré par la police,* Le Nouvelliste (Feb. 18, 2021).

151  Haïti - Politique : Fednel Monchéry, DG du Ministère de l'intérieur démissionne, Haiti Libre (Sept. 26, 2019) (citing letter of resignation from Monchéry); Fednel Monchéry et Joseph Pierre Richard Duplan révoqués, Le Nouvelliste (Sept. 26, 2019) (reporting on Duplan and Monchéry's revocations and replacements) ; *see also* Danticat, *supra* note 11 (noting that they were fired as protests intensified).

152  BINUH, *supra* note 1, at 4 (citing warrant issued by an investigating judge on February 6, 2019); Sandra Lemaire, *UN Security Council Expresses Serious Concern About Haiti, Calls for Elections,* VOA News (Feb. 23, 2021) (France's Deputy Permanent Representative to the UN asking Moïse "how is it possible today that Jimmy Chérizier is still walking free?").

153  BINUH, *supra* note 1, ¶6.

154  Chelsey Kivland, *Street Sovereigns: Young Men and the Makeshift State in Urban Haiti* 87 (2000).

155  FJKL, *Conflit au Bel-Air,  supra* note 90, at 11-12.

156  BINUH, *supra* note 1, ¶8.

157  *See e.g.,* Secretary-General Feb. 2020 Report, *supra* note 1, ¶3; Danticat, *supra* note 11; BINUH, *supra* note 1, ¶5.

158  BINUH, *supra* note 1, ¶6.

159  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶19; BINUH, *supra* note 1, ¶17.

160  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶20.

161  *Id.*, ¶¶20, 41.

162  *See e.g.,* BINUH, *supra* note 1, ¶7 (noting Cherizier's documented involvement in Grand Ravine and La Saline).

163  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶42.

164  RNDDH, *supra* note 1, ¶9.

165  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶19.

166  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶31. BINUH reported that multiple sources confirmed at least three deaths and six injured, while also noting that this may be a severe undercount in view of the office's inability to access certain sites and reluctance by victims and witnesses to come forward. BINUH, *supra* note 1, ¶4.

167  BINUH, *supra* note 1, ¶10.

168  *Id.*, ¶19.

169  *Id.*, ¶10.

170  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶2; BINUH, *supra* note 1, ¶20.

171  BINUH, *supra* note 1, ¶11.

172  *Id.*

173  *Id.*, ¶12.

174  *Id.*

175  *Id.*, ¶13.

176  *Id.*; RNDDH, *Massacre au Bel-Air, supra* note 13, ¶27.

177  BINUH, *supra* note 1, ¶15.

178  *Id.*, ¶20.

179  *Id.*, ¶22.

180  *Id.*

181  BINUH, *supra* note 1, ¶28 (as of February 2020, no warrants for arrests were issued in connection with the attack); Press Release, Security Council, Haiti's Stability in Peril without Strong Response to COVID-19, Legal Experts Tell Security Council, U.N. Press Release SC/14218,  (Jun. 19, 2020), https://www.un.org/press/en/2020/sc14218.doc.htm ("Accountability is a challenge, seen in the lack of progress in investigating and prosecuting the Lilavois, Grand Ravine, La Saline and Bel-Air cases, involving abuses by gang members, law enforcement agents and political officials."); *see also*

Secretary-General Sept. 2020 Report, *supra* note 17, ¶31 (discussing an increase in attacks by gangs targeting the population, a development that can be explained by the establishment of the G9 and "lack of accountability for past abuses, including in emblematic cases like Grand Ravine (2017), La Saline (2018) and Bel-Air (2019).").

182 RNDDH, *Terror in Cité Soleil*, *supra* note 5, ¶¶6-13 (describing the neighborhood); Cité Soleil, Wikipedia, https://en.wikipedia.org/wiki/Cité_Soleil.

183 RNDDH, *Terror in Cité Soleil*, *supra* note 5, ¶17.

184 *Id.,* ¶¶18-43 (setting out the background of gangs in Cite Soleil); RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶¶12-15 (noting that a situation of relative peace among gangs changed in 2018).

185 *See* Secretary-General Sept. 2020 Report, *supra* note 17, ¶15 (observing a rise in gang violence linked to competition in anticipation of elections); *Id.,* ¶87; RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶¶61-63 (testimony of former Cité Soleil parliamentary representative Pierre Lemaire, attributing the attacks to the "will of the authorities [and] the power to politically control the territories…for electoral purposes."), ¶65 (noting that residents interviewed as a part of the investigation agree with the assessment of motive); *cf. id.* ¶68 (reporting that other residents believe they are being targeted as retribution for their anti-government positions and activities, rather than specifically for electoral control).

186 Secretary-General Sept. 2020 Report, *supra* note 17, ¶15; RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶70 (reporting that police officers interviewed as a part of the investigation believe the May 23-27 attack was planned in part because of the new G9 alliance); RNDDH, *Terror in Cité Soleil*, *supra* note 5, ¶¶1, 6 (observing that the rise in G-9 has contributed to inter-gang violence as they vie for control); *see also* text accompanying fns. 96-98 (discussing ties between the government and G-9).

187 RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 5, ¶¶32-37 (discussing the circumstances of Ernso Nicolas' murder).

188 RNDDH, *Attaques contre des quartiers défavorisés: Le RNDDH exige la fin de la protection des gangs armés par les autorités au pouvoir*, ¶¶34-35, 62-64 (June 23, 2020) (French original including references to state involvement in payments, based on testimony of Pierre Lemaire).

189 RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶40.

190 *Id.,* ¶¶41-42.

191 *See e.g.,* text accompanying fn. 121 (describing the blockage of the wreath-laying ceremony); RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶14 ("for some, Pont Rouge, in the same way as La Saline, is hated by the authorities in power because of its anti-government resistance."); *id.,* ¶¶25-31 (describing prior attacks in Nan Tokyo in 2019); FKJL, *Terreur dans les quartiers populaires, supra* note 89, ¶52 (President Moise reportedly became aware of Jean-Pierre's role in *peyi lok*).

192 RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶55 (documenting toll of gang assaults in Cité Soleil between May 23-27, 2020); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶59 (documenting toll of gang assaults in Cité Soleil between June and July 2020).

193 RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶43.

194 *Id.,* ¶¶43-44.

195 *Id.,* ¶45.

196 *Id.,* ¶46.

197 *Id.*

198 *Id.*

199 *Id.,* ¶48.

200 *Id.,* ¶46.

201 *Id.,* ¶51.

202 *Id.,* ¶53.

203 In the aftermath of the attacks, G9 leaders appointed new gang leaders in the areas they had conquered. *Id.,* ¶77.

204 RNDDH, *Terror in Cité Soleil, supra* note 5, ¶59.

205 *Id.,* ¶¶63-64, 69, 71.

206 *Id.,* ¶52-57.

207 *Id.,* ¶¶55-56.

208 *Id.,* ¶58.

209 *Id.,* ¶¶73, 79.

210 *Id.,* ¶¶72-76, 79-81.

211 *Id.,* ¶58.

212 *Id.*

213 Id., ¶84; *see also* Secretary-General Feb. 2021 Report, *supra* note 23, at ¶¶33-34 (noting the continued lack of accountability for human rights abuses committed by law enforcement and by prominent gang members such as Cherizier, who still remains at large.)

214 RNDDH, *Attacks on deprived neighborhoods, supra* note 4, ¶61.

215 FKJL, *Terreur dans les quartiers populaires, supra* note 89, ¶¶52-54.

216 RNDDH, *Attacks on deprived neighborhoods, supra* note 4, ¶68.

217 Murphy, *supra* note 31, ¶27.

218 *Id.,* ¶39; *see also* Arellano, *supra* note 36, ¶99 (discussing the jus cogens status of crimes against humanity).

219 Murphy, *supra* note 31, ¶¶8, 122; Int'l Hum. Rts. Clinic Harv. L. Sch., *Crimes in Burma* fn.4 (2009) (the Rome Statute reflects customary international law on key elements of crimes against humanity).

220 Rome Statute, *supra* note 32, art. 7.

221 *Id.*

222 *Id.,* art. 53.

223 Article 13(b) of the Rome Statute grants the Security Council the power, acting under Chapter VII of the UN Charter, to refer to the ICC situations in which crimes under the jurisdiction of the court have taken place. Rome Statute, *supra* note 32, art. 13(b).

224 International Criminal Court, *Elements of Crime,* ICC-ASP/1/3 (part II-B), at 5 (Sep. 9, 2002).

225 RNDDH, *Revised Toll, supra* note 10.

226 Donnelly & Mirkinson, *supra* note 103, at 7.

227  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶31; *cf.* BINUH *Rapport sur Bel Air, supra* note 1, ¶¶4, 13, 15, 27 (separately confirming 3 murders, and 5 complaints for murder filed with the police, while noting that the toll could be much higher since they were unable to verify several allegations due to challenges including accessing certain sites and the reluctance of victims and witnesses to give information for fear of reprisals).

228  34 people were killed in Pont Rouge, Nan Brooklyn, Chancerelles, Fort Dimanche, and Nan Tokyo between May 23-27, 2020. RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶55. 111 people were killed in Cité-Soleil between June 1 and July 28 2020. RNDDH, *Terror in Cité Soleil, supra* note 5, ¶59.

229  Prosecutor v. Furundžija, Case No. IT-97-17/1-T, Judgment, ¶185 (Int'l Crim. Trib. For the Former Yugoslavia Dec. 10, 1998).

230  Prosecutor v. Jean-Pierre Bemba Gombo, ICC-01/05-01/08, Trial Judgement of Judge Steiner, ¶99-101 (Mar. 21, 2016).

231  MINUJUSTH, *supra* note 5, ¶7 (noting that 11 cases of rape were reported by Haitian human rights organizations, of which they could verify 2); *see also* RNDDH, *Revised Toll, supra* note 10.

232  RNDDH, *The Events in la Saline, supra* note 5, ¶48.

233  *Id.*

234  *Id.*

235  MINUJUSTH, *supra* note 5, ¶7.

236  Donnelly & Mirkinson, *supra* note 103, at 7.

237  RNDDH, *Terror in Cité Soleil, supra* note 5, ¶3.

238  *Id.,* at ¶69.

239  *Id.*

240  *Id.*

241  *Id.*

242  *Id.*

243  Donnelly & Mirkinson, *supra* note 103, at 7.

244  Rome Statute, *supra* note 32, art. 7(1)(f).

245  *Id.* art. 7(2)(e).

246  Prosecutor v. Karadžić, Case No. IT-95-5/18-T, Judgment, ¶506 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 24, 2016).

247  Prosecutor v. Kunarac, Case No. IT-96-23-T and IT-96-23/1-A, Judgment ¶¶150-151 (Int'l Crim. Trib. for the Former Yugoslavia Jun. 12, 2002)("rape is viewed as an 'obvious' per se act of torture. Severe pain or suffering, as required by the definition of the crime of torture, can thus be said to be established once rape has been proved, since the act of rape necessarily implies such pain or suffering."); *see also* Prosecutor v. *Delalić et al.*, Case No. IT-96-21-T, Judgment ¶480 (Int'l Crim. Trib. for the Former Yugoslavia Nov. 16, 1998).

248  Prosecutor v. Kvočka, Case No. IT-98-30/1-T, Judgement ¶149 (Int'l Crim. Trib. for the Former Yugoslavia  Nov. 2, 2001) ("The mental suffering caused to an individual who is forced to watch severe mistreatment inflicted on a relative would rise to the level of gravity required under the crime of torture. Similarly, the Furundžija Trial Chamber found that being forced to watch serious sexual attacks inflicted on a female acquaintance was torture for the forced observer. The presence of onlookers, particularly family members, also inflicts severe mental harm amounting to torture on the person being raped.").

249  MINUJUSTH, *supra* note 5, ¶7.

250  *Id.*

251  Courts have not delineated the degree of pain required to constitute torture, but take the general circumstances into consideration. *See Kvočka, supra* note 248, ¶161 ("[T]he degree of physical or mental suffering required to prove cruel treatment is lower than the one required for torture, though it must be at the same level as 'willfully causing great suffering or serious injury to body or health'."); *see also* Prosecutor v. Krnojelac, Case No. IT-97-25-T, Judgment ¶¶182-183, (Int'l Crim. Trib. for the Former Yugoslavia Mar. 15, 2002) ("[T]he Trial Chamber must take into account all the circumstances of the case, including the nature and context of the infliction of pain, the premeditation and institutionalisation of the ill-treatment, the physical condition of the victim, the manner and method used, and the position of inferiority of the victim.").

252  MINUJUSTH, *supra* note 5, ¶5.

253  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶33.

254  Rome Statute, *supra* note 32, art. 7(1)(h).

255  *See e.g.* Prosecutor v. Kupreškić et al., Case No. IT-95-16-T, Judgment, ¶¶593-631 (Int'l Crim. Trib. for the Former Yugoslavia Jan. 14, 2000) (finding that murder, imprisonment, and deportation can constitute persecution); Prosecutor v. Blaškić, Case No. IT-95-14-T, Judgment, ¶233 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 3, 2000)(finding that persecution includes harm to property, so long as the "victimised persons were specially selected on grounds linked to their belonging to a particular community.") [hereinafter Blaškić Trial Chamber Judgment]; Prosecutor v. Kordić, Case No. IT-95-14-/2, Judgment, ¶205 (Feb. 26, 2001); Prosecutor v. Milutinović, Case No. IT-05-87, Trial Judgment, ¶¶193-4 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 26 2009) (establishing that sexual assault may be a form of persecution,).

256  The Democratic and Popular Sector is a coalition of several opposition leaders and social sectors that have organized protests against Moïse in La Saline. *Port-au-Prince slum exemplifies dire problems of crisis-racked Haiti*, Agencia EFE (Feb. 22, 2019).

257  RNDDH, *The Events in La Saline, supra* note 5, ¶¶25-28; Donnelly & Mirkinson, *supra* note 103, at 4.

258  RNDDH, *Massacre au Bel-Air, supra* note 13, ¶19; BINUH, *supra* note 1, ¶17.

259  RNDDH, *Attacks on deprived neighborhoods, supra* note 4, ¶61.

260  *Id.,* ¶68

261  *Kunarac, supra* note 247, ¶417.

262  *Id.,* ¶100; *see also* Prosecutor v. Kayishema, Case No. ICTR-95-1-T, Judgment, ¶122 (May 21, 1999).

263  *Situation in Kenya*, ICC-01/09 Decision Pursuant to Article 15 of the Rome Statute on the Authorization of an Investigation into the Situation in the Republic of Kenya, ¶135 (Mar. 31, 2010) [hereinafter *Situation in Kenya*] ("the issue of whether an act was committed as part of a widespread or systematic attack needs to be analyzed on a case-by-case basis with regard to each particular act. At the current stage of the proceedings, the Chamber merely considers the situation as a whole without focusing beyond what is necessary for the purpose of the present decision on specific criminal acts. In this regard, the Chamber observes that the nature, aims and consequences of many of the individual acts recall either the characteristics of the initial attacks, the retaliatory attacks or the attacks emanating from the police.").

264  See Section III of this report.

265  See Section II of this report.

266 Rome Statute, *supra* note 32, art. 7(1).

267 *Id.,* art. 7(2)(a).

268 Prosecutor v. Gbagbo, ICC-02/11-01/11-656-Red, Pre-Trial Chamber I Decision on the confirmation of charges, ¶209 (Jun. 12, 2014).

269 See Section II of this report.

270 BINUH, *supra* note 1, ¶¶8-12.

271 RNDDH, *Attacks on deprived neighborhoods, supra* note 5, ¶¶41-42.

272 *Id.,* ¶77.

273 RNDDH, *Terror in Cité Soleil, supra* note 5, ¶52.

274 *Id.,* ¶¶54-58 (G9 gangs monitored all roads in and out of Nan Brooklyn, and carried out seven attacks against Nan Brooklyn in June and July.)

275 It is common for courts to find that one attack can take place over an extended period of time. *See e.g., Kunarac, supra* note 247, ¶3 (charging three individuals with an attack that took place over the course of three days).

276 *See* BINUH, *supra* note 1, at 4 (observing that the attack on Bel Air is "far from an isolated incident," with similarities to other attacks including La Saline that illustrate a broader reality in Haiti.)

277 Prosecutor v. Bemba, ICC-01/05-01/08-424, Decision Pursuant to Article 61(7)(a) and (b) of the Rome Statute on the Charges of the Prosecutor Against Jean-Pierre Bemba Gombo, ¶78 (Jun. 15, 2009) [hereinafter *Bemba* Confirmation of Charges Decision].

278 *Id.,* ¶¶76-77.

279 Prosecutor v. Ntaganda, ICC-01/04-02/06-2359, Judgment, ¶667 (Jul. 9, 2019).

280 Prosecutor v. Muthaura, ICC-01/09-02/11-382-Red, Decision on the Confirmation of Charges Pursuant to Article 61(7)(a) and (b) of the Rome Statute ¶110 (Jan. 23, 2012).

281 Rome Statute, *supra* note 32, art. 7.

282 *See, e.g.,* Prosecutor v. Kayishema, Case No. ICTR-95-1-T, Judgment, ¶123 (May 21, 1999) ("The attack must contain one of the alternative conditions of being widespread or systematic.").

283 Prosecutor v. Prlić, Case No. IT-04-74-T, Judgment, ¶49 (Int'l Crim. Trib. for the Former Yugoslavia May 29, 2013).

284 Blaškić, Trial Chamber Judgment, *supra* note 255, ¶207 ("The quantitative criterion is not objectively definable as witnessed by the fact that neither international texts nor international and national case-law set any threshold starting with which a crime against humanity is constituted."); *Kordić,* supra note 255, ¶179 ("a crime may be widespread or committed on a large scale by the 'cumulative effect of a series of inhumane acts or the singular effect of an inhumane act of extraordinary magnitude.'").

285 *Kunarac, supra* note 247, ¶95.

286 RNDDH, *Revised Toll, supra* note 10.

287 RNDDH, *Massacre au Bel-Air, supra* note 13, ¶31.

288 RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶55 (documenting 34 deaths between May 23-27, 2020); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶59 (documenting 111 deaths between June 1-July 28, 2020).

289 BAI & IJDH, *Precautionary Measures Request, supra* note 111, ¶4 (noting that at least 300 people fled La Saline after the massacre and seeking precautionary measures on behalf of those still displaced).

290 Donnelly & Mirkinson, *supra* note 103, RNDDH, *Attacks on deprived neighborhoods, supra* note 4, ¶53.

291 Secretary-General Sept. 2020 Report, *supra* note 17, ¶15.

292 *See* IJDH, *Human Rights and Rule of Law in Haiti, supra* note 34 (citing Office de la Protection du Citoyen, *Profile – Site de Déplacés Poste Marchand* (Sept. 17, 2020)).

293 *Blaškić,* Case No. IT-95-14-A, Judgment, ¶101 (Int'l Crim. Trib. for the Former Yugoslavia, Jul. 29, 2004)[hereinafter *Blaškić,* Appeals Chamber Judgment]; Prosecutor v. Ndindiliyimana, Case No. ICTR-00-56-A, Judgement, ¶260 (Feb. 11, 2014).

294 *Kunarac, supra* note 247, ¶94.

295 Prosecutor v. Muthaura, ICC-01/09-02/11, Decision on the Confirmation of Charges, ¶158 (Jan. 23, 2012).

296 RNDDH, *The Events in La Saline, supra* note 5, ¶54.

297 RNDDH, *The Events in La Saline, supra* note 5, ¶¶54-58. The ICC Pre-Trial Chamber has found that the provision of uniforms and weapons to the attackers supported a conclusion that an attack was systematic and organized. *Muthaura, supra* note 295, ¶158.

298 Charles, *Dozens Brutally Killed, Raped in Haiti Massacre, supra* note 138.

299 RNDDH, *The Events in La Saline, supra* note 5, ¶39; *see also* Weissenstein, *supra* note 147.

300 RNDDH, *The Events in La Saline, supra* note 5, ¶¶39, 43.

301 *Id.,* ¶46.

302 MINUJUSTH, *supra* note 5, ¶19.

303 RNDDH, *Massacre au Bel-Air, supra* note 13, ¶20.

304 BINUH, *supra* note 1, ¶9.

305 *Id.,* ¶10.

306 *Id.,* ¶¶9-11.

307 *Id.,* ¶¶12-14.

308 RNDDH, *Attacks on Deprived Neighborhoods, supra* note 5, ¶¶41-42.

309 *Id.,* ¶¶43-44.

310 *Id.,* ¶46.

311 RNDDH, *Terror in Cité Soleil, supra* note 5, ¶59.

312 *Id.,* ¶52.

313 *Id.,* ¶¶54-57, 64.

314 Rome Statute, *supra* note 32, art. 7(2). The ICTY has held that there is no separate policy requirement under customary international law, but that it is a relevant factor to assessing the systematic nature of an attack. *Kunarac, supra* note 247, ¶20; *see also* Marjolein Cupido, *The Policy Underlying Crimes Against Humanity,* 22 Crim. L. Forum 275, 283 (2011). While the analysis in this report applies the higher threshold of the Rome Statute, this element would not need to be established if the customary international law definition of crimes against humanity were applied. *See, e.g, Kunarac, supra* note 247, ¶98.

315 *Situation in Kenya*, *supra* note 263, ¶84; *see also* Prosecutor v. Katanga, ICC-01/04-01/07-3436-tENG, Judgment, ¶1108 (Mar. 7, 2014); Open Society Justice Initiatives (OSJI), *Undeniable Atrocities: Confronting Crimes Against Humanity in Mexico* 50 (2016) [hereinafter OSJI].

316 ICC, *Elements of Crimes*, *supra* note 224, at 5; *see also Gbagbo*, *supra* note 268, ¶214.

317 *Katanga*, *supra* note 315, ¶1110.

318 Prosecutor v. Ruto, ICC-01/09-01/11-373, Decision on the Confirmation of Charges, ¶213 (Jan. 23, 2012).

319 *See Cupido*, *supra* note 314, at 287 (analyzing ICC treatment of the policy element and finding that similar evidence is used under the policy and systematic elements).

320 *Katanga*, *supra* note 315, ¶1112 ("Indeed it should be recalled that it is not so much the policy as it is the widespread or systematic nature of the attack – *viz.*, a consideration of the scale and regular nature of the pattern followed — which first and foremost distinguishes a crime against humanity and constitutes its 'hallmark'… if an attack is 'systematic' because the existence of a policy had been demonstrated, that would be in "contradiction with the Statute's disjunctive wording.").

321 *Id.*, ¶1113.

322 *Id.*, ¶1109.

323 *Situation in Kenya*, *supra* note 263, ¶119 (citing preparatory meetings during which perpetrators were "given instructions, supplied with weapons and distributed money" as relevant to finding a policy).

324 *Cupido*, *supra* note 314, at 295 (citing *Situation in Kenya*, *supra* note 263, ¶127); *see also Gbagbo*, *supra* note 268, ¶¶219-20 (holding that the actions of "pro-Gbagbo forces," which included "youth militia and mercenaries" acting under the leadership of Gbagbo, could be attributed to either a "State" or an "organizational" policy for purposes of Article 7(2) of the Statute); *see also* Aleaziz, *supra* note 89 (U.S. Department of Homeland Security acknowledging that the Haitian government is using gangs to "repress the opposition."); *OSJI*, *supra* note 315, at 50.

325 Prosecutor v. Ruto, *supra* note 318, ¶210.

326 *Katanga*, *supra* note 315, ¶1109; *see also Situation in Kenya*, *supra* note 263, ¶79.

327 RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶64.

328 *See Situation in Kenya*, *supra* note 263, ¶117 (noting participation of members of the police as indicative that violence was "not a mere accumulation of spontaneous or isolated acts").

329 Donnelly & Mirkinson, *supra* note 103, at 5; RNDDH, *The Events in La Saline, supra* note 5, ¶40.

330 BINUH, *supra* note 1, ¶19.

331 RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶52.

332 MINUJUSTH, *supra* note 5, ¶¶23, 48 [Translated from French] ("The lack of intervention by the PNH during the attack, which lasted for several hours, may have allowed the attackers to act with impunity and contributed to the very high number of victims.").

333 BINUH, *supra* note 1, ¶20.

334 RNDDH, Terror in Cité Soleil, *supra* note 5, ¶58.

335 *Situation in Kenya*, *supra* note 263, ¶90.

336 *Id.*, ¶93 (stressing that these factors do not constitute a strict legal definition, and do not need to be exhaustively fulfilled).

337 *Katanga*, *supra* note 315, ¶1120.

338 *See e.g., Muthaura*, *supra* note 295, ¶¶186, 190-223 (finding that the Mungiki gang constitutes an organization under the Rome Statute, pointing to factors such as the existence of leadership and the gang's role as quasi-public authority in certain slums. The Pre-trial Chamber expressly rejected an argument that shifting political affiliations of the gang suggests that it was not an 'organization'); *see also* OSJI, *supra* note 315, at 87-92 (finding that the Mexican Zetas cartel meets the definition of an organization.)

339 Gangs also form structured and hierarchical alliance. In the Bel-Air attack, for example, the UN observed that different gang leaders pledged allegiance to Cherizier and operated under his authority. BINUH, *supra* note 1, ¶8.

340 See Section I, infra, at 9-10; *see also* OSJI, *supra* note 315, at 92 (pointing to this as indicative of a policy to attack civilians).

341 Arnesen & Faiola, *supra* note 93.

342 *See* IJDH, *Human Rights & Rule of Law in Haiti, supra* note 34, fn.95 (noting a disproportionate UN focus on gang violence while ignoring the role of state actor complicity in violence).

343 See text box in Section II.

344 Secretary-General June 2020 Report, *supra* note 4, ¶56.

345 *See e.g.,* Prosecutor v. Blaškic, Case No. IT-95-14-T, Judgment, ¶789, (Int'l Crim. Trib. For the Former Yugoslavia Mar. 3, 2000)("… [w]hen a commander fails in his duty to prevent the crime or to punish the perpetrator thereof he should receive a heavier sentence than the subordinates who committed the crime insofar as the failing conveys some intolerance or even approval on the part of the commander towards the commission of crimes by his subordinates and thus contributes to encouraging the commission of new crimes. It would not be in fact consistent to punish a simple perpetrator with a sentence equal or greater to that of the commander.")

346 *See, e.g.,* Secretary-General Feb. 2021 Report, *supra* note 23, ¶33 (discussing attacks in the context of gang violence and mentioning the state's failure to protect but omitting any reference to state actors in the commission of the crimes); Secretary-General Sept. 2020 Report, *supra* note 17 (discussing the rise in G-9 and Cherizier's role in massacres without acknowledging documentation of state actor involvement); *see also* IJDH, *Human Rights and Rule of Law in Haiti, supra* note 34, fn. 95 ("Though BINUH reports and Security Council comments extensively discuss gang violence, Jimmy Chérizier, and the G-9, the UN and Security Council Members systematically ignore well-documented evidence from civil society regarding state actor complicity in that violence and requests for investigation and accountability.").

347 Rome Statute, *supra* note 32, art. 7(1).

348 BINUH, *supra* note 1, ¶7 (noting that Chérizier was a police officer until Dec. 14, 2018, and was found to be implicated as a perpetrator of the La Saline massacre by police and judicial investigations); *see also* Dánica Coto, *Leader or Killer? A day with 'Barbecue in Haiti's capital,* Associated Press, June 7, 2019, https://apnews.com/article/ ebc2cee089f149309bd73afa07816a63 (Chérizier has been personally implicated in carrying out at least two of the murders in La Saline); BINUH, *supra* note 1, ¶¶9-15 (identifying Chérizier as a lead perpetrator in the Bel-Air attack); RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶43 (Chérizier personally lead the May 24 attack on Nan Tokyo and May 26-27 attack on Nan Brooklyn); RNDDH, *Terror in Cité Soleil, supra* note 5, ¶67 (documenting that Chérizier personally captured 17-year old Waldo Jean in Cité Soleil on June 3, 2020, who has since been missing).

349 MINUJUSTH, *supra* note 5, ¶21 (Witnesses identified Gregory Antoine, an administrative police agent, dressed in civilian clothes at the center of the attack, and Gustave alias Chupit, a PNH agent with the CIMO agency, among members of the Chabon gang); RNDDH, *The Events in La Saline*, *supra* note 5, ¶56 ("Gregory Antoine alias Ti Greg presented by all interviewees as the Chief of *Base Pilate* is accused of having actively participated with his troop, alongside the *Base Nan Chabon* in the killings of November 13, 2018."). Note that some sources maintain that Gregory Antoine has since died. Weissenstein *supra* note 147 (noting that family reports he was killed in a gang fight in January 2019; MINUJUSTH, *supra* note 5, ¶37 (noting that he is "allegedly dead.").

350 BINUH, *supra* note 1, ¶19 (multiple eyewitnesses identified three police officers with ties to Cherizier's Delmas 6 gang as armed and active participants throughout the three-day attack); RNDDH, *Massacre au Bel-Air, supra* note 13, ¶28 (police officers took part in the attack on Nov. 6, including setting a house where civilians were hiding on fire, killing 13 people).

351 BINUH, *supra* note 1, ¶19 (the officers belonged to the Petite-Rivière precinct in the Artibonite Department, the Pignon precinct in the North Department, and the 'Unité de sécurité générale du Palais National (USGPN)).

352 RNDDH, *Terror in Cite Soleil, supra* note 5, ¶58.

353 Rome Statute, *supra* note 32, art. 7(1).

354 *Id.*, art. 25(3)(c); *see generally* Oona Hathaway et al., *Aiding and Abetting in International Criminal Law*, 104:6 Cornell L. Rev. 1593 (2019) (analyzing the state of international criminal law on aiding and abetting).

355 Bemba, Case No. ICC-0105-01/13, Trial Judgment Pursuant to Article 74 of the Statute, ¶¶88-89 (Oct. 19, 2016). Blaškić, Appeals Chamber Judgment, *supra* note 293, ¶46.

356 *Bemba*, *supra* note 355, ¶¶88-89.

357 *Id.*, ¶¶90-93 (holding that the Rome Statute does not require the meeting of any specific or minimum threshold); *but see* Hathaway et al., *supra* note 354, at 1611(noting that the ad hoc tribunals and hybrid tribunals apply a "substantial effect" standard). Even under this standard, acquittals on the basis that the "substantial effect" requirement was not met are rare, however. *Id.* at 1611 (finding only two instances of such a basis for acquittal).

358 Rome Statute, *supra* note 32, art.25(3)(c); Bemba, *supra* note 355, ¶97; Prosecutor v. Mbarushimana, Case No. ICC-01/04-01/10, Decision on the Confirmation of the Charges, ¶274 (2011); *but see* Hathaway et al., *supra* note 354, at 1607 (finding that the ad hoc and hybrid tribunals only require knowledge that their act will assist the commission of the underlying crime).

359 *See* Bemba, *supra* note 355, ¶89 ("Under certain circumstances, even the act of being present at the crime scene (or in its vicinity) as a 'silent spectator' can be construed as tacit approval or encouragement of the crime,"); *see also* Prosecutor v. Aleksovski, Case No. IT-95-14/1-T, Judgment, ¶87 (Int'l Crim. Trib. For the Former Yugoslavia June 25, 1999)(finding a prison warden liable for aiding and abetting abuse due to his presence during the mistreatment of detainees, failure to object to it, and his necessary awareness that this would act as tacit approval, support and encouragement).

360 *See e.g.,* Prosecutor v. Semanza, Case No. ICTR-97-20-T, Judgment, ¶432 (Mar. 3, 2003)(finding an individual liable for aiding and abetting genocide by bringing equipment to the site where a large-scale massacre of Tutsi refugees was occurring, thus providing substantial assistance to the genocidal enterprise).

361 *See* Prosecutor v. Mrkšić, Case No. IT-95-13/1-A, Judgment, ¶49 (Int'l Crim. Trib. For Former Yugoslavia May 5, 2009) ("The *actus reus* of aiding and abetting by omission will thus be fulfilled when it is established that the failure to discharge a legal duty assisted, encouraged or lent moral support to the perpetration of the crime and had a substantial effect on the realisation of that crime.").

362 MINUJUSTH, *supra* note 5, ¶21 (discussing police involvement in La Saline); RNDDH, *The Events in La Saline*, *supra* note 5, ¶56; BINUH, *supra* note 1, ¶19 (discussing police participation throughout the three-day attack on Bel-Air); RNDDH, *Massacre au Bel-Air, supra* note 13, ¶28 (police officers took part in the attack on Nov. 6).

363 *See e.g., Semanza*, *supra* note 360, ¶386 ("The authority of an individual is frequently a strong indication that the principal perpetrators will perceive his presence as an act of encouragement."); *Aleksovski, supra* note 359, ¶¶62-64 (while the mere presence of an individual in authority is not in itself enough to establish encouragement, "it can hardly be doubted that the presence of an individual with authority will frequently be perceived by the perpetrators of the criminal act as a sign of encouragement likely to have a significant or even decisive effect on promoting its commission."). Previous active role in similar acts by the same group also strengthens the liability for aiding and abetting by presence. Prosecutor v. Tadić, Case No. IT-94-1-T, Opinion and Judgment, ¶690 (Int'l Crim. Trib. For Former Yugoslavia May 7, 1997) (when an accused is present and participates in the beating of one person and remains with the group when it moves on to beat another person, his presence would have an encouraging effect).

364 RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶46.

365 RNDDH, *Terror in Cite Soleil, supra* note 5, ¶58.

366 RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶¶88-93.

367 *Id.*

368 MINUJUSTH, *supra* note 5, ¶¶12-15; RNDDH, *The Events in La Saline, supra* note 5, ¶¶38-40; *Weissenstein, supra* note 147.

369 RNDDH, *The Events in La Saline, supra* note 5, ¶¶54-55 (residents interviewed report that Monchéry and Duplan provided weapons, government vehicles and uniforms); Press Release, Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day, *supra* note 126 ("Monchéry supplied weapons and state vehicles to members of armed gangs who perpetrated the attack….;Duplan provided firearms and HNP uniforms to armed gang members who participated in the killings."); *but see Weissenstein, supra* note 147 ("Armed gangs have bought or stolen untold amounts of Haitian police gear in recent years, so the degree of official involvement in the La Saline massacre remains unclear."), so the degree of official involvement in the La Saline massacre remains unclear."

370 RNDDH, *Attacks on Deprived Neighborhoods*, *supra* note 4, ¶52 (eyewitnesses report that Chérizier was transported to Cite Soleil in an armored PNH vehicle and that he requested photos and videos to be taken of his arrival).

371 RNDDH, *Terror in Cité Soleil, supra* note 5, ¶58.

372 Police officers interviewed as a part of RNDDH's investigation into the May attack on Cité Soleil believe they are being intentionally furnished to support gang violence. RNDDH, *Attacks on Deprived Neighborhoods, supra* note 4, ¶71 (noting with concern that "authorities in power" are providing "the continued supply of weapons and ammunition to armed gangs" at the expense of resourcing official PNH operations).

373 MINUJUSTH, *supra* note 5, at 17 ("The lack of intervention by the PNH during the attack, which lasted for several hours, may have allowed the attackers to act with impunity and contributed to the very high number of victims.")(Translated from French).

374 RNDDH, *Terror in Cité Soleil, supra* note 5, ¶58.

375  Mrkšić, *supra* note 361, ¶49 (aiding and abetting by omission implicitly requires that the accused had the ability to act, such that there were means available to the accused to fulfil his duty).

376  *See* MINUJUSTH, *supra* note 5, ¶26 (PNH confirmed having aware of the attack on La Saline but maintained that it could nto intervene due to limited available resources); BINUH, *supra* note 1, ¶21 (in response to questioning about inaction in Bel-Air, PNH cited the presence of barricades, and the lack of vehicles, communication equipment, and personal protective equipment); RNDDH, *Terror in Cité Soleil*, *supra* note 5, ¶¶72-81 (reporting on interviews with various police units citing the need for reinforcements and a response as a part of a comprehensive plan developed by senior leadership of PNH).

377  RNDDH, *The events in La Saline*, *supra* note 5, ¶¶54-55; Press Release, Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day, *supra* note 126 ("Monchéry supplied weapons and state vehicles to members of armed gangs who perpetrated the attack….Duplan provided firearms and HNP uniforms to armed gang members who participated in the killings.").

378  MINUJUSTH, *supra* note 5, ¶21. Presence itself can amount to abetting under certain circumstances, especially where the individual is in a position of authority. *See* Bemba, *supra* note 355, ¶89 ("Under certain circumstances, even the act of being present at the crime scene (or in its vicinity) as a 'silent spectator' can be construed as tacit approval or encouragement of the crime."); *Semanza*, *supra* note 360, ¶386 (the presence of an individual in position of authority is a strong indication that it will serve as an act of encouragement.)

379  RNDDH, *Massacre au Bel-Air*, *supra* note 13, ¶¶20, 41-43.

380  *Id.*, ¶42 (noting that Saint-Cyr categorically denied the allegations to RNDDH, insisting that he learned of the attack on the radio).

381  Rome Statute art. 25(3)(b).

382  *Prlić*, *supra* note 283, ¶231.

383  *Id.*; *Ndindiliyimana*, *supra* note 293, ¶1911.

384  *Prlić*, *supra* note 283, ¶231; *Karadžić*, *supra* note 246, ¶573.

385  *Karadžić*, *supra* note 246, ¶573.

386  Prosecutor v. Šešelj, Case No. IT-03-67-T, Judgment, ¶295 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 31, 2016) ("The physical element of instigation involves prompting another person to commit an offense."); *see also Prlić*, *supra* note 284, ¶229("… the very notion of instigation requires a positive act on the part of the instigator. The verb "to instigate" – to urge on or to incite a person to do something – implicitly suggests a positive action.").

387  Prosecutor v. Nahimana, Case No. ICTR-99-52-A, Judgment, ¶480 (Nov. 28, 2007).

388  *Karadžić*, *supra* note 246, ¶572; *Ndindiliyimana*, *supra* note 293, ¶1913.

389  Charles, *Dozens Brutally Killed, Raped in Haiti Massacre*, *supra* note 10.

390  RNDDH, *The Events in La Saline*, *supra* note 5; MINUJUSTH, *supra* note 5.

391  RNDDH, *The Events in La Saline*, *supra* note 5, ¶¶53-55; *see also* Press Release, Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day, *supra* note 126 ("Monchéry supplied weapons and state vehicles to members of armed gangs who perpetrated the attack….Duplan provided firearms and HNP uniforms to armed gang members who participated in the killings.").

392  MINUJUSTH, *supra* note 5, ¶22 (reporting that Duplan was overheard stating « *Nou touye twop moun, se pa misyon sa yo te bay nou* » (Vous avez tué trop de personnes, ce n'était pas ça votre mission)).

393  BINUH, *supra* note 1, ¶17; RNDDH, *Massacre au Bel-Air*, *supra* note 13, ¶41.

394  Leon Saint-Cyr denies that he requested Chérizier's help in removing the protesters' barricades. *See* RNDDH, *Massacre au Bel-Air*, *supra* note 14, ¶42.

395  Prosecutor v. Tadić, Case No. IT-94-1-A, Judgment, ¶227 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999) [hereinafter *Tadić*, Appeals Judgment].

396  *Id.*, ¶227; Prosecutor v. Brđanin, Case No. IT-99-36-T, Judgment, ¶260 (Int'l Crim. Trib. for the Former Yugoslavia Sept. 1, 2004).

397  *Tadić*, Appeals Judgment, *supra* note 395, ¶227; Prosecutor v. Stakić, Case No. IT-97-24-A, Judgment, ¶64 (Int'l Crim. Trib. for the Former Yugoslavia Mar. 22, 2006).

398  Prosecutor v. Brđanin, Case No. IT-99-36-A, Judgment, ¶439 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007).

399  *Tadić*, Appeals Judgment, *supra* note 395, ¶228.

400  RNDDH, *The Events in La Saline*, *supra* note 5, ¶58.

401  *Id.*, ¶¶54-55.

402  MINUJUSTH, *supra* note 5, ¶22; *see also* Press Release, Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day, *supra* note 126 ("Monchéry supplied weapons and state vehicles to members of armed gangs who perpetrated the attack….Duplan provided firearms and HNP uniforms to armed gang members who participated in the killings.").

403  Prosecutor v Delalic, Case No. IT-96-21-T, Judgment, ¶333 (Int'l Crim. Trib. for the Former Yugoslavia Nov. 16, 1998).

404  *Id.*

405  A superior-subordinate relationship exists (i) when the subordinate who committed the crime is subject to the effective control of the accused, that is to say, (ii) when the accused has the material ability to prevent the crime or punish the criminally responsible subordinate." *Prlić*, *supra* note 283, ¶238.

406  *Id.*, ¶246 ("For this purpose, the Prosecution must prove: (1) that the superior actually knew, taking into consideration the direct or circumstantial evidence at his disposal, that his subordinates (i) were committing, preparing to commit, or had committed the crimes referred to in Articles 2 through 5 of the Statute; or (2) that the superior possessed information of a sort that would at least alert him to such risks insofar as they might indicate additional inquiries were needed (ii) to ascertain whether such crimes had been committed or were about to be. The assessment of the mental element required under Article 7(3) of the Statute must be conducted according to the circumstances of the case by taking into account the specific situation of the superior concerned at the time in question.").

407  *Karadžić*, *supra* note 246, ¶587 ("For the accused to be held responsible under Article 7(3), it must be established that he failed to take the necessary and reasonable measures to prevent or punish the commission of the crimes charged."); *see also* U.N. Secretary-General, Report of the Secretary-General pursuant to paragraph 5 of Security Council resolution 955 (1994), U.N. Doc. S/1995/134, ¶56 (Feb. 13, 1995) ("a person in a position of superior authority should, therefore, be held individually responsible for giving the unlawful order to commit a crime under the present statute. But he should also be held responsible for failure to prevent a crime or to deter the unlawful behaviour of his subordinates. This imputed responsibility or criminal negligence is engaged if the person in superior authority knew, or had reason to know, that his subordinates

were about to commit or had committed crimes and yet failed to take the necessary and reasonable steps to prevent or repress the commission of such crimes or to punish those who had committed them.")

408  Prosecutor v. Momčilo Perišić, Case No. IT-04-81-A, Judgement, ¶87 (Int'l. Crim. Trib. for the Former Yugoslavia Feb. 28, 2013).

409  Id.

410  Delalic, supra note 403, ¶375.

411  See Mamani v. Sánchez de Lozada, No. 18-12728, at 49-50 (11ᵗʰ Cir. Aug. 3, 2020)(confirming the viability of a jury verdict finding former Bolivian president and minister of defense liable under the command responsibility doctrine); Yousuf v. Samantar, 2012 WL 3730617, at *11–12 (E.D. Va. Aug. 28, 2012) (First Vice President and Minister of Defense liable as persons "with higher authority"); Ford ex rel. Est. of Ford v. Garcia, 289 F.3d 1283, 1288-94 (11th Cir. 2002) (accepting that defendants, former Salvadoran Ministers of Defense, could have been held liable under the doctrine of command responsibility); see also OSJI, The Trial of Charles Taylor before the Special Court for Sierra Leone: the Appeal Judgment (Sept. 2013) (noting that former President Taylor was indicted on five counts of crimes against humanity based in part on liability under command responsibility, though the court ultimately disagreed that sufficient evidence existed to convict him on this theory of liability).

412  Karadžić, supra note 246, ¶580 ("In assessing whether there is a superior-subordinate relationship it does not matter whether the accused was a civilian or military superior. An evaluation of effective control is more a question of fact than of law and requires consideration of factors that show "that the accused had the power to prevent, punish, or initiate measures leading to proceedings against the alleged perpetrators where appropriate."); see also Prlić, supra note 284, ¶240 ("The superior-subordinate relationship manifests itself in the exercise of effective control over subordinates. That control has been defined as "the material ability to prevent or punish criminal conduct" and pertains to every superior, whether a military chief or any civilian person vested with authority within a hierarchy, even a leader of a paramilitary group.").

413  Charles, Dozens Brutally Killed, Raped in Haiti Massacre, supra note 11.

414  Haiti Const., supra note 35, art. 85-86.

415  See id. art. 85; New Wave of Appointments, Haiti Libre (Mar. 31, 2017), https://www.haitilibre.com/en/news-20517-haiti-flash-new-wave-of-appointments.html; BAI & IJDH, Petition for Precautionary Measures, supra note 111, ¶28.

416  See Ministère de l'Intérieur et des Collectivités Territoriales, Direction Générale, http://www.mict.gouv.ht/direction-generale/ (describing the role of the directorate general).

417  See Robenson Geffrard, Jovenel Moïse commence à prendre le contrôle de l'administration publique, Le Nouvelliste (Mar. 27, 2017) (reporting on the appointment of Fednel Monchéry by presidential decree).

418  Donnelly & Mirkinson, supra note 103, at 4; RNDDH, The Events of La Saline, supra note 5, ¶¶25-29.

419  Donnelly & Mirkinson, supra note 103, at 5; see also Le Point (Tele Metropole broadcast Dec. 4, 2018), https://www.youtube.com/watch?v=xY7J0kFggXs (Interview with Martine Moïse denying reports that she was in La Saline in the days preceding the massacre).

420  IJDH, Haiti at a Crossroads, supra note 1, at 8; Andrésol dénonce les visites de Jovenel Moïse dans les commissariats et les distributions d'argent, Rezo Nodwes (Oct. 14, 2018), https://rezonodwes.com/2018/10/14/andresol-denonce-les-visites-de-jovenel-moise-dans-les-commissariats-et-les-distributions-dargent/.

421  Rezo Nodwes, supra note 420.

422  Charles, Thousands Protest Corruption in Haiti as President Calls for Unity and Patience, supra note 69.

423  MINUJUSTH, supra note 5, ¶18.

424  BAI & IJDH, Precautionary Measures Request, supra note 111, ¶18.

425  RNDDH, The Events in La Saline, supra note 5, ¶24.

426  Charles, Dozens Brutally Killed, Raped in Haiti Massacre, supra note 10.

427  Fednel Monchéry et Joseph Pierre Richard Duplan révoqués, Le Nouvelliste (Sep. 9, 2019); see also Danticat, supra note 25.

428  Legal experts have contested the viability of such a defense, noting that Duplan and Monchery's positions did not fall within the definition of the article, and that since leaving their positions, the provision no longer applies. See e.g., BAI & IJDH, Petition for Precautionary Measures, supra note 111, ¶29; Caleb Lefèvre, Fednel Monchery and Joseph Pierre Richard Duplan sont susceptibles d'être arrêtés, Le Nouvelliste (Oct. 1, 2019).

429  Press Release, Security Council, Haiti's Stability in Peril without Strong Response to COVID-19, Legal Experts Tell Security Council, U.N. Press Release SC/14218 (June 19, 2020 (noting that "accountability is a challenge, seen in the lack of progress in investigating and prosecuting the Lilavois, Grand Ravine, La Saline and Bel-Air cases, involving abuses by gang members, law enforcement agents and political officials."); Secretary-General Sept. 2020 Report, supra note 17, ¶31 (highlighting the "lack of accountability for past abuses, including emblematic cases like Grand Ravine (2017), La Saline (2018) and Bel-Air (2019).").

430  MINUJUSTH, supra note 5, ¶33.

431  BAI & IJDH, Written Submission for the Dec. 10, 2020 Thematic Hearing, supra note 26.

432  MINUJUSTH, supra note 5, ¶33 (those arrested so far are all presumed gang members).

433  RNDDH, Attacks on Deprived Neighborhoods, supra note 4, ¶¶99, 100.

434  Coto, supra note 348; Arnesen, supra note 93.

435  Fednel Monchery Libéré, Gazette Haiti (Feb. 13, 2021), https://www.gazettehaiti.com/node/2622.

436  Secretary-General Sept. 2020 Report, supra note 17, ¶56

437  Jake Johnston, Haitian Government on the Defensive Following UN Welcoming of Corruption Investigation, Ctr. Econ. & Pol. Research (Mar. 7, 2018), https://cepr.net/haitian-government-on-the-defensive-following-un-welcoming-of-corruption-investigation/.

438  Id.

439  Press Release, Embassy of the Republic of Haiti, Allegations of Human Rights Violations by Congress of the United States (Mar. 28, 2019), https://www.haiti.org/allegations-of-human-rights-violations-by-congress-of-the-united-states/ (responding to a letter from a bipartisan group of 104 U.S. House of Representatives members calling on U.S. Secretary of State Mike Pompeo to support thorough and independent investigations into the extrajudicial killings that have taken place during the current crisis in Haiti, including the massacre at La Saline. See Letter from Members of Congress to Mike Pompeo, Sec'y of State, U.S. Dept. of State (Mar. 20, 2019), http://www.ijdh.org/wp-content/uploads/2019/03/LevinLee-Haiti-ltr-03-2019-1.pdf; Jacqueline Charles & Harold Isaac, U.S. Congresswoman Maxine Waters, Actor Danny Glover Make Impromptu Visit to Haiti, Miami Herald (Apr. 24, 2019).

440  Press Release, Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day, *supra* note 126.

441  *Arellano*, *supra* note 36, ¶110.

442  U.N.G.A. 6th Comm., *supra* note 39; Human Rights Watch, *supra* note 39.

443  *Id.*, ¶152.

444  IACHR, Statement on the Duty of the Haitian State to Investigate the Gross Violations of Human Rights Committed during the Regime of Jean-Claude Duvalier (May 17, 2011), http://www.oas.org/en/iachr/docs/other/Haiti2011.asp; MINUJUSTH, *supra* note 5, ¶42.

445  *Arellano*, *supra* note 36, ¶¶152, 110 (stating that crimes against humanity are "intolerable in the eyes of the international community and offend humanity as a whole. The damage caused by these crimes … demand that those responsible be investigated and punished"); ("The obligation that arises pursuant to international law to try, and if, if found guilty, to punish the perpetrators of certain international crimes, among which are crimes against humanity, is derived from the duty of protection embodied in Article 1(1) of the American Convention.").

446  Amélie Baron, *Haiti court says human rights charges can be brought against Duvalier*, Reuters (Feb. 20, 2014), https://www.reuters.com/article/us-haiti-duvalier/haiti-court-says-human-rights-charges-can-be-brought-against-duvalier-idUSBREA1J2D220140220; Int'l Just. Resource Ctr., *In Landmarking Ruling, Haitian Court opens investigation into Jean-Claude Duvalier for crimes against humanity* (Feb. 25, 2014), https://ijrcenter.org/2014/02/25/in-landmark-ruling-haitian-court-opens-investigation-into-jean-claude-duvalier-for-crimes-against-humanity/.

447  Trenton Daniel, *Haiti court urges further probes on Duvalier trial*, Associated Press (Feb. 20, 2014), https://apnews.com/article/045e363f6bdc485e8e18abdc056ed2b2.

448  Justice Denied by Duvalier's Death, Human Rights Watch (Oct. 4, 2014), https://www.hrw.org/news/2014/10/04/haiti-justice-denied-duvaliers-death; Human Rights Watch, *World Report 2020* 255 (2020).

449  Murphy, *supra* note 31, ¶27.

450  *Id.*

451  Article 13(b) of the Rome Statute grants the Security Council the power, acting under Chapter VII of the UN Charter, to refer to the ICC situations in which crimes under the jurisdiction of the court have taken place. Rome Statute, *supra* note 32, art. 13(b); *see also* Security Council Rpt., *In Hindsight: The Security Council and the International Criminal Court* (Jul. 31, 2008), https://www.securitycouncilreport.org/monthly-forecast/2018-08/in_hindsight_the_security_council_and_the_international_criminal_court.php.

452  For example, the Security Council established ad hoc tribunals for Yugoslavia and Rwanda. *See* United Nations Security Council, International Tribunals, https://www.un.org/securitycouncil/content/repertoire/international-tribunals. More recently, the General Assembly established an International, Impartial, Independent Mechanism to assist in the investigation and prosecution of international crimes committed in Syria. G.A. Res. 71/248 (Jan. 11, 2017).

453  *See* fn. 441, *supra*.

454  Xavier Philippe, *The principles of universal jurisdiction and complementarity: how do the two principles intermesh?*, 88 Int'l Rev. of the Red Cross 375, 377 (2006).

455  Human Rights Watch, *supra* note 39; *see also* Trial Int'l, *Make Way for Justice #3*, Universal Jurisdiction Annual Rev. 2017, 67-70 (2017); Trial Int'l, *Make Way for Justice #6*, Universal Jurisdiction Annual Rev. (2020).

456  Int'l Just. Resource Ctr., *supra* note 446; *Arellano*, *supra* note 37, ¶152.

457  Comité Consultatif Independant, Avant-Project Constitution art. 139 (Jan. 2021), https://www.haitilibre.com/docs/CCI-CONSTITUTION_Projet-de-Constitution-2-fevrier-2021-20h00.pdf.

458  Haiti Const., *supra* note 35, art. 276(2); *see also Arellano*, *supra* note 36, ¶110, 152 (stating that crimes against humanity are "intolerable in the eyes of the international community and offend humanity as a whole. The damage caused by these crimes still prevails in the national society and the international community, both of which demand that those responsible be investigated and punished" and holding that "to punish the perpetrators of certain international crimes, among which are crimes against humanity, is derived from the duty of protection embodied in Article 1(1) of the American Convention.").

459  *See, e.g.* Regina v. Bartle and the Commissioner of Police for the Metropolis and others *ex parte* Pinochet, [1999] 38 I.L.M. at 581 (H.L.) ¶581 (appeal taken from Eng.); Bouterse Case, Petition Nos. R 97/163/12 Sv & R 97/176/12 Sv, P 5.1 (Amsterdam Ct. App. Nov. 20, 2000) (Neth.) [Unofficial International Commission of Jurists Translation] ("the commission of very serious offences as are concerned here--cannot be considered to be one of the official duties of a head of state."); Ould Dah v. France, 2009-I Eur. Ct. H.R., *48 I.L.M. 884, 891 (2009)* (determining that *ratione materiae* immunity was inapplicable to acts of torture, which are prohibited under international law as a matter of *jus cogens.*); A v. Office of the Attorney General of Switzerland, No. BB.2011.140, A, Bundesstrafgericht [BStR] [Federal Criminal Court] July 25, 2012 (Switz.) [unofficial translation by TRIAL] ("[I]t is generally reocgnized that the prohibition of serious crimes against humanity… is mandatory in nature (*jus cogens*)… [I]t would be difficult to admit that conduct contrary to fundamental values of the international legal order can be protected by rules of the very same legal order. Such situation would be paradoxical… It follows that, in the present case, the suspect cannot claim any immunity *ratione materiae.*"); Questions Relating to Obligation to Prosecute or Extradite (Belg. v. Sen.), 2012 I.C.J. 1, P 22 (July 20) (Ordering Senegal to submit the case to prosecution or extradite Hissène Habré for alleged acts of torture "committed in the exercise of his functions" as the President of Chad.); Thomas Weatherall, *Jus Cogens and Sovereign Immunity: Reconciling Divergence in Contemporary Jurisprudence*, 46 Geo. J. Int'L. 1151 at 1188 ("One might infer from this omission [by the ICJ on Habré's claim of immunity] that the precedent had been sufficiently established by 2012 that immunity *ratione materiae* does not apply to the criminal prosecution of *jus cogens* violations before domestic courts.").

460  Prosecutor v. Omar Hassan Ahmad Al-Bashir, Judgment in the Jordan Referral re Al-Bashir Appeal, Case No. ICC-02/05-01/09 OA2, ¶1 (May 6, 2019)( "[t]here is neither State practice nor *opinio juris* that would support the existence of Head of State immunity under customary international law *vis-à-vis* an international court."); *see also Prosecutor v. Taylor*, Decision on Immunity from Jurisdictional Immunity, Case No. SCSL-03-01-I, ¶53 (May 31, 2004) ("the principle seems now established that the sovereign equality of states does not prevent a Head of State from being prosecuted before an international criminal tribunal or court.").

461  Prosecutor v Omar Hassan Ahmad Al-Bashir, *supra* note 460 at ¶2.

462  We endorse the specific recommendations made by the BAI and IJDH in their recent submission to the IACHR calling for (1) including Haiti in Chapter IV.B of its Annual Report, (2) including the crimes against humanity, the pervasive impunity, and lack of accountability in Haiti among the working topics for the expected new Special Rapporteurship on judicial independence, (3) conducting a country visit on the concerns raised herein, and issuing a focused report with recommendations, (4) requesting that the government of Haiti submit a written report outlining a concrete plan of action for addressing the concerns raised herein; and (5) providing to the government of Haiti with technical and material support for strengthening the independence and capacity of Haiti's judicial system, in particular to prosecute the crimes against humanity identified in this report. BAI & IJDH, Written Submission for the Dec. 10, 2020 Thematic Hearing, *supra* note 26.

463  Press Release, IACHR Grants Precautionary Measures in Favor of Victims of La Saline in Haiti, Inter-Am. Comm'n for Hum. Rts. (Jan. 29, 2020), https://www.oas.org/en/iachr/media_center/PReleases/2020/017.asp.

464  The IACHR also asked Haiti to come to an agreement with beneficiaries and their representatives regarding any measures that need to be taken. Press Release, IACHR Grants Precautionary Measures in Favor of Victims of La Saline in Haiti, Inter-Am. Comm'n for Hum. Rts. (Jan. 29, 2020), https://www.oas.org/en/iachr/media_center/PReleases/2020/017.asp.

465  *See* Inter-American Commission on Human Rights, About Precautionary Measures, available at https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/decisions/about-precautionary.asp.

466  Article 63(2)of the American Convention and Article 27 of the Court's Rules of Procedure (2009).

467  *See* Joint Statement from U.S. Human Rights Clinics on the Constitutional and Human Rights Crisis in Haiti (Feb. 13, 2021), https://law.yale.edu/sites/default/files/area/clinic/document/210213-final_human_rights_clinics_statement_re_haiti_-_nyu_hls_yls8.pdf.

468  Jacqueline Charles, *U.S. tells Haiti leaders on delayed elections: 'Do your respective jobs'*, Miami Herald (Sept. 16, 2020), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article245788370.html.

469  Joint Statement from U.S. Human Rights Clinics, *supra* note 466.

470  Amy MacKinnon & Robbie Gramer, *Political Crisis in Haiti poses Challenges for Biden's Democracy Push*, Foreign Policy (Feb. 10, 2021), https://foreignpolicy.com/2021/02/10/haiti-political-crisis-biden-state-department-challenge/.

471  *See e.g.,* Conseil Superieur du Pouvoir Judiciaire, *supra* note 51; Haitian Bar Federation, *supra* note 51; Letter from Rep. Yvette D. Clark et al. to Sec'y of State Antony Blinken (Feb. 6, 2021), *available at* https://clarke.house.gov/clarke-and-meeks-co-lead-letter-to-secretary-blinken-urging-the-u-s-to-condemn-the-undemocratic-actions-of-president-moise-and-support-the-establishment-of-a-transitional-government-in-haiti/ (urging the Sec'y of State to "unambiguously reject any attempt by President Moïse to retain power in contravention" of the rule of law and democracy); Patrick Leahy (Sen. Patrick Leahy), Twitter (Feb. 6, 2021, 1:10 PM), https://twitter.com/SenatorLeahy/status/1358115921114578945 (stating that "US should join in calling for an inclusive transition that represents the Haitian people.").

472  Statement by Ned Price, Department Spokesperson, Press Briefing (Feb. 12, 2021), https://www.state.gov/briefings/department-press-briefing-february-12-2021/#post-218259-HAITI

473  Letter from Rep. Frederica Wilson et al. to Sec'y of State Mike Pompeo (Oct. 15, 2020), available at https://www.dropbox.com/s/tw0vquftj3sdtx4/Markey%20Wilson%20Letter%20Haiti%2010.15.20%5B3%5D.pdf?dl=0.

**THE SECRETARY OF STATE**
**WASHINGTON**

February 2, 2024

The Honorable
Alejandro N. Mayorkas
Secretary of Homeland Security
Washington, DC  20528

Dear Secretary Mayorkas:

The Department of State assesses extraordinary and temporary conditions currently exist in Haiti that prevent nationals (or noncitizens having no nationality who last habitually resided in Haiti) in the United States from returning to Haiti in safety.  The Department therefore supports Haiti's extension for Temporary Protected Status (TPS) and redesignation for TPS for 18 months based on extraordinary and temporary conditions.

Widespread gang violence in Haiti, both in Port-au-Prince and other parts of the country, resulted in thousands of deaths, injuries, and kidnappings in 2023, exacerbated by a rise in civilian vigilante movements.  Gang violence is characterized by brutal attacks, including beheadings; gender-based violence, including sexual violence; and the burning of homes, vehicles, and people.  The UNSC passed a resolution in October 2023 approving a Multinational Security Support (MSS) mission to deploy in Haiti and support Haitian police.  Though the MSS mission is expected to arrive in 2024, establishing and maintaining security in Port-au-Prince and the surrounding areas will take time.

The violence has forced more than 200,000 people to leave their homes, according to the International Organization for Migration (IOM), fleeing to inadequate and unsanitary shelters where they risk further violence and disease.  IOM estimates at least 31,000 people are sleeping outside.

The country's inability to respond to the increase in violence is complicated by political instability, which has increased sharply since the assassination of President Jovenel Moise in July 2021. Elections have not been held in several years and the volatile security situation precludes the facilitation of safe elections. As a result of a weak economy and past natural disasters, including heavy rains, flooding and earthquakes, Haiti suffers from food insecurity and the spread of infectious diseases. Higher levels of violence, displacement, and poverty increase the risk of human trafficking for vulnerable Haitians, including children.

Therefore, I recommend you extend TPS for Haiti for 18 months beyond the current expiration date and redesignate Haiti for TPS based on extraordinary and temporary conditions. To help inform your decision, the Department prepared the attached country conditions assessment.

Sincerely,

Antony J. Blinken

Enclosures:
    As stated.

SENSITIVE BUT UNCLASSIFIED

## (U) Department of State Recommendation Regarding Temporary Protected Status (TPS) For (Haiti) – (December 2023)

**I.    (U) Statutory Basis for Designation**

**(U) Have the conditions under which the foreign state was designated for Temporary Protected Status ceased to exist?**

(SBU) No.

**A. Armed conflict**

(U) N/A

**1.  (U) Is the foreign state still involved in an ongoing, internal, armed conflict?**

(U) N/A

**2.  (U) If so, would the return of nationals of the foreign state to that state (or to the part of the state) still pose a serious threat to their personal safety?**

(U) N/A

**B. (U) Environmental Disaster**

**1.  (U) Does there continue to be a substantial, but temporary, disruption of living conditions in the foreign state affected by an earthquake, flood, drought, epidemic, or other environmental disaster?**

(U) N/A

**2. (U) Is the foreign state still unable, temporarily, to handle adequately the return to the state of nationals of the state?**

(U) N/A

**3. (U) Does the foreign state continue to support the TPS designation for its nationals in the United States?**

(U) N/A

**C. (U) Extraordinary and Temporary Conditions**

**(U) Has the foreign state continued to experience extraordinary and temporary conditions that prevent nationals of the state from returning to the state in safety?**

(SBU) Yes.

**(U) Violence/Gang Activity**

(SBU) The geographical reach of and level of violent crime committed by Haiti's criminal gangs continued to rise through 2023. The United Nations Integrated Office in Haiti (BINUH) reported at the end of November 2023 that at least 3,960 people were killed, 1,432 injured, and 2,951 kidnapped in gang-related violence in 2023.[1] This escalation was driven by the expansion of gang violence into previously unaffected areas, and the rise of civilian vigilante movements. Violent criminal gangs pose a growing challenge to state authority, and in places hold *de facto* control of territory. The National Network for the Defense of Human Rights (RNDDH) reported that all 10 geographic departments have at least one gang, although the majority of gangs operate in the Port-au-Prince metropolitan area.[2] Clashes between gangs competing for territory and revenue have become more frequent and

---

[1] https://binuh.unmissions.org/en/haiti-un-report-says-gang-violence-spreading-urgesspeedy-deployment-multinational-security-mission

[2] https://web.rnddh.org/crise-securitaire-et-situation-des-personnes-deplacees-internes-en-haiti/?lang=en

SENSITIVE BUT UNCLASSIFIED
- 3 -

increasingly deadly, both in the capital metropolitan area and previously unaffected areas, including the Artibonite and Centre departments.  Two major gangs in the Artibonite region, Gran Grif ("Big Claw") and Kokorat Sans Ras ("Vagabonds Without Family"), intensified their violent activity in 2023, burning telecommunications infrastructure and targeting farmers. Inter-gang violence was characterized by aggressive, macabre attacks, including beheadings; gender-based violence, including weaponized sexual violence; and the burning of homes, vehicles, and people.  Victims of such attacks included gang members and Haitian National Police (HNP), as well as individuals with no affiliation with gangs.[3]

(U) These attacks had profound humanitarian impacts, including widespread displacement.  IOM estimates more than 200,000 people were displaced due to gang violence in Haiti.[4]  BINUH assesses gangs' ever-expanding areas of control impede the possibility of return for most displaced persons.[5] Sudden spikes in violence also rapidly displaced significant numbers of residents.  The Grand Ravine gang's attack on the strategic Carrefour-Feuilles neighborhood in Port-au-Prince, for example, displaced more than 5,000 residents in three days in August 2023.[6]

(SBU) Within the Government of Haiti, the General Directorate for Civil Protection (GDCP) is responsible for assisting displaced persons, but its resources, along with those of international organizations, are insufficient to provide services to the large number of IDPs.  IOM estimates at least 31,000 people are sleeping outside.[7]  When available, shelters are inadequate and prone to the spread of disease.  Inadequate shelter and crowded living conditions further exacerbate tensions, contributing to violence and increasing the risk of sexual assault.  Many shelters are in schools, which prevented thousands of students across Port-au-Prince from resuming

---

[3] 23 PORT AU PRINCE 1504
[4] https://haiti.iom.int/news/displacement-soars-haiti-requires-usd-21-million-emergency-shelter-protection-services
[5] https://binuh.unmissions.org/sites/default/files/2023_q3_rapport_trimestriel_droits_humains_en.pdf
[6] https://binuh.unmissions.org/sites/default/files/2023_q3_rapport_trimestriel_droits_humains_en.pdf
[7] https://haiti.iom.int/news/displacement-soars-haiti-requires-usd-21-million-emergency-shelter-protection-services

SENSITIVE BUT UNCLASSIFIED
-4-

classes in September 2023. Displaced households largely lack access to essential services and income-generating activities to meet their basic needs.

(SBU) The HNP, suffering from a lack of equipment and personnel, has made limited progress in combatting the rising violence. UNSCR 2699 authorizes a Multinational Security Support (MSS) mission to deploy in Haiti and support Haitian police. Although the MSS is expected to arrive later in 2024, establishing and maintaining security in Port-au-Prince and the surrounding areas will take time.

(SBU) Gangs are increasingly cooperating amongst themselves to coordinate attacks against the HNP and in the lucrative kidnapping for ransom business. In addition to expanding and consolidating their control over territory, gangs continue to target affluent residents, including Haitians, in previously secure areas of Port-au-Prince. Targets for kidnapping are thought to be identified by their perceived ability to pay ransom demands, and doctors, lawyers, human rights defenders, journalists, and professors are some of the most frequently kidnapped groups. The flow of weapons and munitions into Haiti and into the hands of the gangs remains difficult to control.

(SBU) Several UN and human rights organizations have stated that gangs in the metropolitan Port-au-Prince area and the Artibonite department regularly employed gender-based violence, including sexual violence, as a tool of degradation and community control against neighborhood residents regardless of age or gender. These numbers increased dramatically during periods of inter-gang violence, when gangs targeted women, girls, and LGBTQI+ persons for collective and public rape.[8]

---

[8] 23 PORT AU PRINCE 1504

SENSITIVE BUT UNCLASSIFIED
-5-

## (U) Political Instability

(SBU) Political instability in Haiti has increased sharply since the assassination of President Jovenel Moïse in July 2021. Legislative elections scheduled for October 2019 did not take place, and the terms of two-thirds of senators and all members of the chamber of deputies subsequently expired with no one elected to fill the vacant seats. Despite the urging of the international community and several facilitated mediation processes, conflicting groups in Haiti have made little progress in negotiations. Even if consensus were achieved, the current volatile security situation in Haiti would prevent the Haitian government from facilitating safe elections. In addition to the political impasse, ongoing violence, instability, and increased kidnappings prevent many institutions, including Haiti's judiciary, from resuming normal functions. Many courts in Port-au-Prince cannot conduct judicial business in their assigned facilities due to gang activity and insecurity. As a result of this judicial dysfunction, BINUH's October 2023 human rights update reported that 83 percent of cases nationwide remained in the pre-trial detention phase, and that conditions in the resulting overcrowded prisons were abysmal.[9]

(U) Widespread public protests occurred throughout 2023 in response to instability, violence, and kidnapping. In April 2023, this spread to a vigilante movement known as "Bwa Kale," which comprised civilians targeting and killing alleged gang members across Haiti. Vigilante groups used tactics similar to those used by gangs, such as lynching and burning of victims, to target suspected gang members, and sometimes innocent individuals who were mistakenly suspected to be affiliated with gangs.[10] Occurrences of vigilante extrajudicial killings in Port-au-Prince continued as recently as November 2023.[11] The UN Secretary General's October 2023 report on Haiti concluded that Haiti continues to face significant governance and institutional crises amidst a deteriorating security situation.[12]

---

[9] https://binuh.unmissions.org/sites/default/files/2023_q3_rapport_trimestriel_droits_humains_en.pdf
[10] 23 PORT AU PRINCE 574
[11] 23 PORT AU PRINCE 1532
[12] https://digitallibrary.un.org/record/4024597/files/S_2023_768-EN.pdf

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED
-6-

## (U) Economic Conditions

(U) Economic difficulties continued through 2023, with annual inflation of 46.4 percent and volatility in the country's currency.  After a brief and sharp appreciation of nearly 28 percent at the end of calendar year 2020, the Haitian gourde depreciated nearly 140 percent against the U.S. dollar during the following two years.  However, in April 2023, the gourde began to appreciate against the dollar and the rate strengthened to 132 gourdes to 1 USD in December 2023.

(SBU) Businesses in Haiti continue to face major challenges in 2023 due to energy supply issues, political instability, persistent gang violence, and road blockages that interrupt most commercial activity.  While there are business opportunities in the country, Haiti's investment and trade climate is challenging.  Impediments to investment include poor infrastructure, weak investor protection, uneven contract enforcement, high energy costs, and corruption.[13]

(U) Haitian GDP contracted by 1.7 percent in 2022, and by an estimated 2.5 percent in 2023, according to the Haitian Institute of Information and Statistics.[14]  Progress in poverty reduction has been hampered by a succession of crises including the assassination of Moïse and the August 2021 earthquake.  Haiti's economy was impacted by setbacks in the agriculture sector, which suffered from loss of crops due to natural disasters, and the service sector, which was affected by violence, gang activities, and political unrest.  Past marginal gains in poverty reduction have been undone by the recent shocks, with current World Bank estimates indicating that 63 percent of the population is living on an income of $3.65 or less per day.  About two-thirds of the poor live in rural areas.  According to the World Bank, Haitian GDP is estimated at 1,745 USD per capita.[15]

---

[13] https://www.trade.gov/country-commercial-guides/haiti-market-overview
[14] https://ihsi.gouv.ht/#
[15] https://www.worldbank.org/en/country/haiti/overview

SENSITIVE BUT UNCLASSIFIED

(U) Disruptions in the supply of local products, together with high commodity prices and below-average incomes, negatively affect poor households' purchasing power and access to food. The poorest households are forced to resort to crisis strategies, including increased sales of charcoal, consumption of low-quality or early-harvested food, and other stress behaviors such as reductions in the quantity and quality of food consumed, and purchases on credit.

## (U) Environmental Factors

(U) In June 2023, heavy rains and flooding displaced 19,000 people across the country, leading to the activation of the National Emergency Operations Center. The GDCP reported June 5 that 42 people killed, 85 injured, and 11 missing due to flooding.[16] Flooding damaged or destroyed approximately 13,600 houses, inundated roads, and resulted in the loss of an estimated 2,500 livestock. The IOM reported that flooding displaced an estimated 500 individuals and damaged temporary shelter sites in Cité Soleil in Port-au-Prince's Cité Soleil commune. The GDCP reported flood-affected households required access to safe drinking water, food assistance, and shelter support.

## (U) Food insecurity

(U) Haiti has one of the highest levels of food insecurity in the world. The Famine Early Warning System Network reported that up to 2.5 million people in Haiti, more than 20 percent of the population, were facing acute food insecurity – Integrated Food Security Classification 3 (IPC Phase 3) – at the beginning of 2024. In the Cité Soleil area of Port-au-Prince, the deteriorating security situation could push the neighborhood to IPC Phase 4 (Emergency).[17]

---

[16] 23 PORT AU PRINCE 680
[17] https://fews.net/latin-america-and-caribbean/haiti/key-message-update/november-2023

SENSITIVE BUT UNCLASSIFIED
-8-

(U) The UN's 2023 Humanitarian Needs Overview for Haiti, updated in May 2023, estimated that 5.2 million people (almost half the population) would require at least one form of humanitarian assistance during the year, an approximately 6 percent increase compared to the previous year.[18]

## (U) Human Trafficking

(U) As noted in the 2023 TIP Report, human traffickers exploit domestic and foreign victims in Haiti.  In 2023, the National Committee for the Fight Against Human Trafficking estimated three million Haitians were at risk of trafficking.  Most of Haiti's trafficking cases involve children in forced labor and sex trafficking in domestic servitude situations, in which children are often physically abused, receive no payment for services, and have significantly lower school enrollment rates.

(U) According to NGOs, international child sex tourism also occurs in Haiti. Practices include "bride-buying," in which men pay between $100 to $200 to the families of girls as young as 14.  Traffickers also target:  children in private and NGO-sponsored residential care centers; Haitian children working in construction, agriculture, fisheries, domestic work, begging, and street vending; internally displaced persons, including those displaced by natural disasters; those who are stateless or at risk of becoming stateless; LGBTQI+ youth often left homeless and stigmatized by their families and society; and those affected by gang violence.  The government lacks control of areas where gangs are in charge, reducing law enforcement action and increasing risks for potential victims.

## (U) Health Sector Fragility

(SBU) Infant and maternal mortality remain high; routine vaccination and vitamin A supplementation efforts are stagnating or declining; and childhood malnutrition is increasing, especially among the poorest

---

[18] https://www.unicef.org/media/142336/file/2023-HAC-Haiti-revised-May.pdf

SENSITIVE BUT UNCLASSIFIED

households.[19][20]According to the Human Capital Index, a child born today in Haiti will grow up to be only 45 percent as productive as they could have been if they had enjoyed full access to education and health services.[21]  Haiti also continues to struggle to respond to outbreaks, including cholera and COVID-19, and remains vulnerable to devastating natural disasters and the ongoing droughts that affect food production.  The health sector continues to face significant challenges and its weak public health and social services systems are extremely strained.  Neonatal, infant and child mortality are among the highest rates in the Western Hemisphere, despite improvements over time.[22]  Haiti has the highest HIV burden in the Caribbean, and the highest perinatal infection rates in the hemisphere.[23]

(U) Haiti also has the highest tuberculosis (TB) incidence in the Western Hemisphere at 154 cases per 100,000 people.[24].The number of people with TB in Haiti is likely to rise, and there is limited capacity for managing such cases in-country due to the high cost of the drugs required for treatment. Haiti also has the highest rate of multi-drug resistant TB in the hemisphere, comprising 3.5 percent of new cases and 18 percent of recurrent cases.  The overall TB case fatality rate is 12 percent.[25]

(SBU) Haiti is only one of four countries in the Western Hemisphere with lymphatic filariasis (LF), an endemic mosquito-borne tropical disease also known as elephantiasis and has the highest infection rate in the region.[26]  LF has a significant economic impact, as with malaria, because people cannot work when infected.[27]

---

[19] https://www.unicef.org/media/142366/file/Haiti-Humanitarian-SitRep-No.3-May-2023.pdf
[20] https://hia.paho.org/en/countries-22/haiti-country-profile#:~:text=The%20maternal%20mortality%20ratio%20for,for%202000%20(Figure%205).
[21] https://databank.worldbank.org/reports.aspx?dsid=63&series=HD.HCI.OVRL
[22] https://hia.paho.org/en/countries-22/haiti-country-profile
[23] https://www.state.gov/wp-content/uploads/2022/09/Haiti-COP22-SDS.pdf
[24] https://worldhealthorg.shinyapps.io/tb_profiles/?_inputs_&entity_type=%22country%22&iso2=%22H T%22&lan=%22EN%22
[25] https://worldhealthorg.shinyapps.io/tb_profiles/?_inputs_&entity_type=%22country%22&iso2=%22H T%22&lan=%22EN%22
[26] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4102456/
[27] https://www.paho.org/en/topics/lymphatic-filariasis#info

**(U) Department Assessment**

(SBU) The Department assesses that these challenges amount to "extraordinary and temporary" conditions that affect the lives and safety of all persons in Haiti, including potential returnees.

**1. (U) Would permitting nationals of the foreign state to remain temporarily in the United States be contrary to the national interest of the United States?**

(SBU) No. It is not contrary to the national interest of the United States to permit those who meet the eligibility requirements of TPS to remain in the United States temporarily.

**II.    (U) Discretionary Factors**

**(U) What, if any, additional information relevant to this decision should be brought to the attention of the Department of Homeland Security?**

(SBU) The Department assesses that Haiti can handle with constraints the return of some of its nationals but could not manage the return of all Haitians currently in the United States on TPS. The Government of Haiti continues to support the current TPS designation.

**III.    (U) Recommendation**

(SBU) For the reasons described herein, the Department (1) recommends Haiti TPS designation be extended for 18 months on the basis of these extraordinary and temporary conditions, and (2) recommends a redesignation of TPS resulting from unprecedented levels of violence, insecurity, gang crime, food insecurity, and severe public health concerns, among others.

UNCLASSIFIED

## Temporary Protected Status (TPS)

**What is TPS?** TPS provides relief from removal to individuals present in the United States who are temporarily unable to return to their country of origin due to ongoing armed conflict, environmental disaster, or other extraordinary and temporary conditions.

**How does it work?** TPS is available only to individuals who were present in the United States *before* the date of their country's designation for TPS. Throughout the period of designation, TPS beneficiaries can neither be detained by DHS on the basis of their immigration status nor removed from the United States. They can obtain from DHS an employment authorization document to work and may be granted travel authorization to depart from, and return to, the United States. TPS does not lead to LPR or other immigration status. However, TPS beneficiaries can petition for a change to nonimmigrant status, file for adjustment of their status based on an immigrant petition, and apply for any other immigration benefit or protection for which they may be eligible.

**Who makes the decision?** Section 244 of the Immigration and Nationality Act gives the Secretary of DHS the authority to designate a foreign state or part thereof for TPS after consultation with other appropriate government agencies. The statute does not specify that the Secretary of State provide a recommendation, although the Secretary has traditionally done so. The DHS Secretary may grant TPS for a period of 6 to 18 months.

**What are the options for extending or ending TPS?** At least 60 days before the end of a country's TPS designation period, the DHS Secretary, in consultation with appropriate government agencies, reviews conditions in the designated country. Based on the conditions, the DHS Secretary may (a) extend the period of designation for TPS; (b) terminate TPS; or (c) newly designate the country for TPS. An extension prolongs TPS for existing beneficiaries but does not allow for new beneficiaries. A new designation allows the DHS Secretary to expand the number of individuals eligible for TPS by establishing new dates from which TPS applicants must have been

UNCLASSIFIED
-2-

continuously residing and physically present in the United States. Termination ends a country's TPS designation and establishes a date by which beneficiaries who do not enjoy another lawful immigration status must depart the United States.

**How does the Secretary provide input to DHS?**  PRM serves as the Department lead for TPS.  USCIS contacts PRM to request the Department provide a country conditions report and the Secretary's recommendation for a new designation, extension, or termination of TPS.  PRM coordinates with other Department bureaus, including the relevant regional bureau, to draft the Department's recommendation package and present it to the Secretary for review.



# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 5th day of October, two thousand twenty-one.

Before:      Denny Chin,
                *Circuit Judge.*

_____

PATRICK SAGET, SABINA BADIO FLORIAL, NAÏSCHA VILME, GERALD MICHAUD, BEATRICE BELIARD, RACHELLE GUIRAND, JEAN CLAUDE MOMPOINT, YOLNICK JEUNE, GUERLINE FRANCOIS, LEOMA PIERRE, HAÏTI LIBERTÉ, and FAMILY ACTION NETWORK MOVEMENT, INC.,

          Plaintiffs - Appellees,

v.

JOSEPH R. BIDEN, President of the United States of America, UNITED STATES OF AMERICA, DEPARTMENT OF HOMELAND SECURITY, ALEJANDRO MAYORKAS, Secretary of Homeland Security, and JOHN TIEN, Deputy Secretary of Homeland Security,

          Defendants - Appellants.

**ORDER**
Docket No. 19-1685

_____

The parties stipulate that the above-captioned appeal is withdrawn with prejudice without costs and without attorneys' fees pursuant to FRAP 42(b).

The stipulation is SO ORDERED.[1]

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

*Catherine O'Hagan Wolfe*

*Catherine O'Hagan Wolfe*

---

[1]       Judge Menashi, a member of the panel, dissents from this order in the attached memorandum.

HT Vacatur AR_0345

MENASHI, *Circuit Judge*, dissenting:

In August, the Department of Homeland Security published in the Federal Register its designation of Haiti for Temporary Protected Status. 86 Fed. Reg. 41,863 (Aug. 3, 2021). Because this case challenges the termination of TPS for Haiti, even the appellants acknowledge that the new designation "likely moots this appeal." Appellants' Status Report at 2. The appellants said that, in light of this development, the parties "will file a motion to govern further proceedings in the near future." *Id.* Yet the parties did not file such a motion and have instead stipulated to a dismissal under Federal Rule of Appellate Procedure 42.

That is not how we resolve cases that become moot pending our review. When "mootness occurs," as it apparently did in this case in August, "the court loses jurisdiction over the suit, which therefore must be dismissed." *Hassoun v. Searls*, 976 F.3d 121, 127 (2d Cir. 2020) (alteration omitted) (quoting *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of Watervliet*, 260 F.3d 114, 118-19 (2d Cir. 2001)). Importantly, however, the "established practice" when a case becomes moot "pending our decision on the merits" is "to reverse or vacate the judgment below and remand with a direction to dismiss." *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950). We have explained that "our rule" in these circumstances is "that it is the duty of an appellate court to vacate a district court judgment when the matter becomes moot on appeal," subject to narrow exceptions. *Associated Gen. Contractors of Conn., Inc. v. City of New Haven*, 41 F.3d 62, 67 (2d Cir. 1994).

Today the court departs from that established practice. Instead, it orders the parties' stipulation to dismiss with prejudice an appeal that has already been moot for months. That is not the usual disposition for a moot case. *See Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 123 (2d Cir. 1999) ("Article III deprives federal courts of the power to dismiss a case with prejudice where federal subject matter jurisdiction does not exist.").

We have "an independent obligation to examine [our] own jurisdiction" and therefore must address a question of mootness that arises "at any stage in the litigation." *In re TPG Troy, LLC*, 793 F.3d 228, 232 (2d Cir. 2015). For that reason, I would determine whether the case is moot and whether vacatur is required before remanding the case to the district court. "Every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) (alteration and internal quotation marks omitted). Because the court ignores that obligation, I respectfully dissent.

A True Copy
Catherine O'Hagan Wolfe
United States Court of Appeals, Second Circuit

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CRISTA RAMOS, et al.,

         Plaintiffs,

     v.

KIRSTJEN NIELSEN, et al.,

         Defendants.

Case No.  18-cv-01554-EMC

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS**

Docket No. 206

     Plaintiffs are individuals, some noncitizen adults and some citizen children with noncitizen parents, who live in the United States legally.  The noncitizen individuals have permission to be in the country pursuant to the Temporary Protected Status ("TPS") designations for six countries, specifically: (1) Sudan; (2) Haiti; (3) Nicaragua; (4) El Salvador; (5) Honduras; and (6) Nepal.  Plaintiffs filed suit in 2018 and 2019, challenging the Trump administration's termination of the TPS designations for those six countries.  In October 2018, this Court granted Plaintiffs a preliminary injunction.  The government appealed and prevailed, but, subsequently, in February 2023, the Ninth Circuit granted Plaintiffs' petition for an en banc hearing.  Shortly before the en banc hearing, the government announced that it would be rescinding the 2017 and 2018 terminations of the TPS designations for El Salvador, Honduras, Nepal, and Nicaragua.  By that time the government had already newly designated Haiti and Sudan for TPS.  The government thereafter voluntarily moved to dismiss its appeal with the Ninth Circuit , and the Ninth Circuit granted that relief.

     Following the appellate proceedings, Plaintiffs took the position before this Court that the case was still not moot.  The Court allowed Plaintiffs to file a consolidated amended complaint.

The government then filed the pending motion to dismiss for lack of subject matter jurisdiction. The government primarily argues that the case should be dismissed based on mootness, whether Plaintiffs are arguing (1) that the Trump administration's TPS terminations were improper or (2) that the government has improperly charged TPS holders from Haiti or Sudan a $50 registration fee.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** the motion to dismiss.

## I.    FACTUAL & PROCEDURAL BACKGROUND

In the operative class action amended complaint ("CAC"), Plaintiffs allege as follows.

Congress established the TPS program through the Immigration Act of 1990. *See* CAC ¶ 46. The TPS statute is codified at 8 U.S.C. § 1254a. *See id.* Under the program, foreign nationals of designated countries are given lawful immigrant status because they cannot safely return home. Specifically, the Attorney General has the authority to issue a TPS designation based on certain criteria – *e.g.*, an ongoing armed conflict or an environmental disaster such as an earthquake or flood. *See id.* ¶ 47; *see also* 8 U.S.C. § 1254a(b)(1). An initial designation lasts between 6 to 18 months. *See* CAC ¶ 48; *see also* 8 U.S.C. § 1254a(b)(2). "Before the designation can become effective, the Secretary [of Homeland Security] must publish a notice in the Federal Register that includes, among other things, a statement of findings, the effective date of the designation, and a tally of eligible foreign nationals." CAC ¶ 48; *see also* 8 U.S.C. § 1254a(b) ("A designation of a foreign state . . . under this paragraph shall not become effective unless notice of the designation (including a statement of the findings under this paragraph and the effective date of the designation) is published in the Federal Register. In such notice, the Attorney General shall also state an estimate of the number of nationals of the foreign state designated who are (or within the effective period of the designation are likely to become) eligible for temporary protected status under this section and their immigration status in the United States.").

Thereafter, the Secretary engages in a periodic review of TPS designations. *See id.* ¶ 51; *see also* 8 U.S.C. § 1254a(b)(3). The statute provides in relevant part as follows:

(A)    Periodic review. At least 60 days before end of the initial

United States District Court
Northern District of California

period of designation, and any extended period of
designation, of a foreign state (or part thereof) under this
section the Attorney General, after consultation with
appropriate agencies of the Government, shall review the
conditions in the foreign state (or part of such foreign state)
for which a designation is in effect under this subsection and
shall determine whether the conditions for such designation
under this subsection continue to be met. The Attorney
General shall provide on a timely basis for the publication of
notice of each such determination (including the basis for the
determination, and, in the case of an affirmative
determination, the period of extension of designation under
subparagraph (C)) in the Federal Register.

(B)    Termination of designation. If the Attorney General
determines under subparagraph (A) that a foreign state (or
part of such foreign state) no longer continues to meet the
conditions for designation under paragraph (1), the Attorney
General shall terminate the designation by publishing notice
in the Federal Register of the determination under this
subparagraph (including the basis for the determination).
Such termination is effective in accordance with subsection
(d)(3), but shall not be effective earlier than 60 days after the
date the notice is published or, if later, the expiration of the
most recent previous extension under subparagraph (C).

(C)    Extension of designation. If the Attorney General does not
determine under subparagraph (A) that a foreign state (or
part of such foreign state) no longer meets the conditions for
designation under paragraph (1), the period of designation of
the foreign state is extended for an additional period of 6
months (or, in the discretion of the Attorney General, a
period of 12 or 18 months).

*Id.*

In 2017 and 2018, the Trump administration terminated the TPS designations of four

countries: (1) Sudan; (2) Haiti; (3) Nicaragua; and (4) El Salvador. *See id.* ¶¶ 2, 8. The

termination was based on a new interpretation of the TPS statute. According to Plaintiffs,

DHS abandoned a long-established practice under which it
considered all current conditions – including *intervening* events – in
deciding whether to extend or terminate a country's TPS
designation. In its place, DHS adopted a new, narrow practice in
which DHS considers only whether the *original* conditions that
initially gave rise to the TPS designation persist, and only those
ongoing harms directly tied to those original conditions.

*Id.* ¶ 62 (emphasis added). The new interpretation was "motivated by intentional race- and

national-origin-based animus against individuals from what former President Trump referred to as

'shithole countries.' *i.e.*, non-white, non-European immigrants." *Id.* ¶ 10.

United States District Court
Northern District of California

In October 2018, this Court granted Plaintiffs' motion for a preliminary injunction, barring enforcement of the decisions to terminate TPS for Sudan, Haiti, El Salvador, and Nicaragua. *See id.* ¶ 153; *see also* Docket No. 128 (order). The government appealed to the Ninth Circuit. However, pending appeal, it agreed "to issue periodic Federal Register notices automatically extending TPS status and employment authorization for TPS holders from El Salvador, Haiti, Nicaragua, and Sudan . . . for at least nine months at a time." CAC ¶ 156. The government later agreed to the same procedure for Nepal and Honduras, after it was announced their TPS designations would also be terminated.[1] *See id.* ¶ 158-59; *see also id.* ¶ 161 (alleging that "Defendants have issued five Federal Register notices automatically extending TPS status and employment authorization for TPS holders protected by this Court's orders").

In September 2020, a Ninth Circuit panel reversed this Court's decision granting a preliminary injunction. Plaintiffs sought rehearing en banc. *See id.* ¶ 160.

In January 2021, President Biden took office. Shortly thereafter, Plaintiffs asked the Ninth Circuit to stay proceedings on their petition, "citing President Biden's stated intention to take swift action on TPS." *Id.* ¶ 164.

In June 2021, the parties jointly moved the case to be referred to the Ninth Circuit's mediation program. *See id.* ¶ 166.

In August 2021,

> DHS published a Federal Register notice designating Haiti for TPS for 18 months . . . . The Federal Register notice cites human rights violations and abuses by law enforcement officials and non-state actors; serious security concerns, including violent criminal gangs; a dire economic situation, including a poverty rate of nearly 60%; a weak healthcare system suffering from 'the lingering impact of the 2010 earthquake and Hurricane Matthew in 2016'; and the impact of the COVID-19 pandemic.

*Id.* ¶ 170 (citing 86 Fed. Reg. 41,863 (Aug. 3, 2021)). *Compare id.* ¶ 88 (alleging that Haiti was first designated for TPS in January 2010 after a major earthquake). Haiti was subsequently

---

[1] The challenge to the TPS terminations for Nepal and Honduras were initially brought in a different case, *Bhattarai v. Nielsen*, No. C-19-0731 EMC (N.D. Cal.). *Bhattarai* was subsequently consolidated with this case.

4

1  redesignated for TPS.  *See id.* ¶ 180 (citing 88 Fed. Reg. 5022 (Jan. 26, 2023)).

2       In April 2022,

3       > DHS published a Federal Register notice designating Sudan for TPS
         > for 18 months . . . . The Secretary explained that he had "determined
4        > that an eighteen-month designation is warranted because of the
         > extraordinary and temporary conditions," including ongoing armed
5        > conflict and civil unrest, political instability, flooding, droughts,
         > widespread poverty, and "deteriorating economic conditions."
6

7  *Id.* ¶ 171 (citing 87 Fed. Reg. 23,202 (Apr. 19, 2022)).  *Compare id.* ¶ 79 (alleging that Sudan was

8  first designated for TPS in November 1997 during a civil war).  Sudan was later redesignated for

9  TPS.  *See id.* ¶ 180 (citing 88 Fed. Reg. 56,857 (Aug. 21, 2023)).

10       In October 2022, after settlement negotiations between the parties were not successful, the

11  Ninth Circuit released the appeal from the mediation program.  *See id.* ¶ 167.

12       In February 2023, the Ninth Circuit granted a rehearing en banc.  *See id.* ¶ 168.

13       On June 13, 2023, "one week before [the] en banc oral argument in the *Ramos* appeal,"

14  DHS announced in a press release that it was rescinding the Trump administration's terminations

15  of TPS for the remaining four countries at issue – *i.e.*, El Salvador, Honduras, Nepal, and

16  Nicaragua.  *Id.* ¶ 174.  DHS also stated that it would be extending the TPS designations for those

17  countries.  *See id.*

18       The next day, Defendants moved to voluntarily dismiss the *Ramos* appeal.  *See id.* ¶ 175.

19       On June 21, 2023, "one day before the en banc oral argument," DHS published Federal

20  Register notices announcing the rescission of the TPS terminations and the extension of the TPS

21  designations."  *Id.* ¶ 176 (citing 88 Fed. Reg. 40,282 (June 21, 2023) (El Salvador); 88 Fed. Reg.

22  40,304 (June 21, 2023) (Honduras); 88 Fed. Reg. 40,317 (June 21, 2023) (Nepal); and 88 Fed.

23  Reg. 40,294 (June 21, 2023) (Nicaragua)).[2]

24  _____

25  [2] The Federal Register notice for El Salvador is representative:

26  • "After conducting an independent assessment of the country conditions in El Salvador as
      they existed in 2018 and exist today, the Secretary has determined that El Salvador's 2001
27    TPS designation should not have been terminated."  88 Fed. Reg. 40,282, at 40,285.
    • "El Salvador was initially designated for TPS in 2001 on environmental disaster grounds
28    following two separate earthquakes that occurred that year."  *Id.*  "While some progress on
      reconstruction projects had been made by 2018, many of the problems caused by the 2001

1    On June 29, 2023, the Ninth Circuit granted Defendants' motion to voluntarily dismiss the

2  appeal.  The court did not address whether Defendants' actions related to the countries at issue had

3  mooted the case.  *See id.* ¶ 177.

4    In addition to the above, Plaintiffs allege that, for Haiti and Sudan, there is another

5  problem related to TPS designations.  Specifically, "[i]n redesignating Haiti and Sudan for TPS,

6  DHS required Haitian and Sudanese TPS holders to file a request for TPS as *new* applicants,

7  which requires the payment of a $50 fee which does not apply to TPS holders *renewing* their

8  registrations."  *Id.* ¶ 172 (emphasis added).

9    Based on, *inter alia*, the above allegations, Plaintiffs assert the following claims for relief:

10   (1) **Violation of equal protection.**  "Defendants' decisions to terminate the TPS

11   designations for [the six countries] are unconstitutional because they were

12   motivated, at least in part, by intentional discrimination based on race, ethnicity, or

13   national origin."  *Id.* ¶ 226.

14   (2) **Violation of due process.**  "The government has not articulated, and cannot

15   establish, any rational basis for reversing course on decades of established TPS

16   policy and ignoring the current capability of TPS counties to safely receive

17   longtime TPS holders, their families, and their U.S. citizen children."  *Id.* ¶ 232.

18   (3) **Violation of the Administrative Procedure Act ("APA").**  Defendants violated

19

20   ───────────────
   earthquakes persisted.  Since the disastrous effects of the earthquakes in 2001, El Salvador
21   has been encumbered by several natural disasters, environmental challenges, high levels of
   violence, and economic instability, all of which significantly slowed its recovery and
22   continued to render El Salvador unable to handle the return of its nationals at the time of
   the decision to terminate the designation."  *Id.* at 40,285-86.
23   • "At the time of the determination to terminate the designation of TPS, DHS found that the
   social and economic conditions affected by the earthquakes had stabilized.  That
24   conclusion was in error and reflects an inadequate assessment of conditions in El Salvador
   leading up to the announcement of the decision to terminate.  Although some social and
25   economic progress had been made by 2018, frequent and significant environmental
   disasters occurred after the 2001 earthquakes causing additional challenges.  Recovery
26   from the earthquakes continued to be slow and encumbered by hurricanes and tropical
   storms, heavy rains and flooding, volcanic and seismic activity, a coffee rust epidemic, a
27   prolonged and severe drought, and an increase in various mosquito-borne diseases, among
   other things."  *Id.* at 40,286.  "Numerous natural disasters have negatively affected El
28   Salvador since the 2001 earthquakes and have adversely impacted its ability to adequately
   handle the return of its nationals granted TPS."  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

the APA by making a "sudden and unexplained departure from decades of decision-making practices and ordinary procedures.  By shifting the decision-governing standard for country designations without explanation, Defendants have ignored a clear statutory command and engaged in procedurally flawed decision-making.  Further, Defendants changed their policy without taking into account the serious reliance interests that their prior policy had engendered." *Id.* ¶ 239.

(4) **Violation of the APA.**  Defendants did not interpret the TPS statute in accordance with the law because the statute "does not prohibit the Secretary from considering intervening events when determining whether to extend TPS." *Id.* ¶ 242.

(5) **Violation of the APA.**  *The parties agree that this claim is now moot.  See* Mot. at 15; Opp'n at 18 n.6.  Plaintiffs had alleged that Defendants violated the APA by "impos[ing] re-registration deadlines that expire long before the current TPS extensions expire." *Id.* ¶ 245.

(6) **Violation of due process.**  *The parties agree that this claim is now moot.  See* Mot. 15; Opp'n at 18 n.6.  Plaintiffs had alleged that "Defendants' adoption of re-registration deadlines that expire long before the current TPS extensions expire is so lacking in justification and contrary to past practice that it fails to satisfy the rationality constraints imposed by the Fifth Amendment on governmental decisionmaking in this context." *Id.* ¶ 248.

(7) **Violation of due process.**  The due process rights of U.S. citizen children have been violated.  They have an absolute right to live in the United States and they have a fundamental right to live with and be raised by their parents. *See id.* ¶¶ 252-53.  "[T]he government's decision to end the lawful immigration status of their parents" forces the children "to choose between two alternatives when each alternative will deprive them of a substantial, constitutionally-protected aspect of liberty." *Id.* ¶ 254.

## II.    DISCUSSION

A.    Legal Standard

In the pending motion, the government argues that Plaintiffs' case is now moot. Because mootness "pertain[s] to a federal court's subject-matter jurisdiction under Article III, [it is] properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

> A Rule 12(b)(1) jurisdictional attack may be facial or factual. In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction. . . .

> In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. The court need not presume the truthfulness of the plaintiff's allegations. "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."

*Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); *see also NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 614 (9th Cir. 2016).

In the instant case, the government makes both a facial attack and a factual one. The government makes a facial attack to the extent Plaintiffs are challenging the Trump administration's TPS terminations.[3] The government makes a facial and a factual attack to the extent Plaintiffs are asserting that the government has failed to refund the $50 registration fee to TPS holders from Haiti and Sudan.

B.    Mootness

"A case becomes moot – and therefore no longer a 'Case' or 'Controversy' for purposes of Article III – 'when the issues presented are no longer "live" or the parties lack a legally cognizable

---

[3] Although the government made a facial attack, Plaintiffs have somewhat tried to convert the attack into a factual one by submitting a notice about recent statements made by Candidate Trump's team – *i.e.*, regarding an intend to rescind TPS if Trump is elected President in 2024. *See* Docket No. 219 (notice).

8

1    interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013). According to the

2    government, to the extent Plaintiffs challenge the Trump administration's TPS terminations, that

3    challenge is now moot because there are no live issues to resolve: (1) the government has given

4    new TPS designations to Haiti and Sudan and (2) the government has rescinded the TPS

5    terminations and granted TPS extensions for the remaining four countries at issue.

6    In response, Plaintiffs argue that their claims are not moot because of the voluntary

7    cessation exception to mootness. *See Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964 (9th

8    Cir. 2007) (taking note of "several major exceptions to mootness, including for (1) 'collateral legal

9    consequences,' (2) 'wrongs capable of repetition yet evading review,' and (3) 'voluntary

10   cessation'"). Under the voluntary cessation exception, "'a defendant cannot automatically moot a

11   case simply by ending its unlawful conduct once sued.'" *Brach v. Newsom*, 38 F.4th 6, 12 (9th

12   Cir. 2022). The exception is based on "'the principle that a party should not be able to evade

13   judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'" *Id.*; *see*

14   *also Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (stating that the "'[t]he voluntary

15   cessation of challenged conduct does not ordinarily render a case moot because a dismissal for

16   mootness would permit a *resumption* of the challenged conduct as soon as the case is dismissed'")

17   (emphasis added).

18   "[V]oluntary cessation can yield mootness if a 'stringent' standard is met: 'A case might

19   become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior

20   could not reasonably be expected to recur.'" *Id.* "Reasonable expectation means something more

21   than 'a mere physical or theoretical possibility.'" *Brach*, 38 F.4th at 14 (where plaintiffs alleged

22   state officials violated federal law by suspending in-person instruction in schools during COVID-

23   19 pandemic but restrictions had since been lifted and schools reopened, stating that the

24   "speculative contingency [that pandemic conditions might change] and the fact 'the Governor has

25   the power to issue executive orders cannot itself be enough to skirt mootness, because then no suit

26   against the government would ever be moot'").

27   "The party asserting mootness bears a 'heavy burden' in meeting [the] standard [of no

28   reasonable expectation of recurrence]." *Rosebrock*, 745 F.3d at 971. This is true even where it is

United States District Court
Northern District of California

United States District Court
Northern District of California

the government that claims mootness.  But a court

> nonetheless "treat[s] the voluntary cessation of challenged conduct by government officials with more solicitude . . . than similar action by private parties."  This is no bare deference: we probe the record to determine whether the government has met its burden, even as we grant it a presumption of good faith.

*Brach*, 38 F.4th at 12-13; *see also Rosebrock*, 745 F.3d at 971 ("We presume that a government entity is acting in good faith when it changes its policy, but when the Government asserts mootness based on such change it still must bear the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again.").

According to the government, a government entity generally meets the heavy burden of establishing no reasonable expectation of recurrence when a plaintiff is challenging a regulation and the government then "changes or repeals the regulation at issue."  *M.W.*, 2017 WL 10456732, at *5; *cf. Rosebrock*, 745 F.3d at 971 ("'A statutory change . . . is usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.'").  The government adds that, with this kind of voluntary cessation, the burden shifts to the plaintiff to show that the government entity will likely reenact the regulation.  The government's position is supported by Ninth Circuit precedent.  In *Board of Trustees of the Glazing Health & Welfare Trust v. Chambers*, 941 F.3d 1195 (9th Cir. 2019), the Ninth Circuit stated:

> [W]e join the majority of our sister circuits in concluding that legislative actions should not be treated the same as voluntary cessation of challenged acts by a private party, and that we should assume that a legislative body is acting in good faith in repealing or amending a challenged legislative provision, or in allowing it to expire.  Therefore, in determining whether a case is moot, we should *presume* that the repeal, amendment, or expiration of legislation will render an action challenging the legislation moot, *unless* there is a reasonable expectation that the legislative body will reenact the challenged provision or one similar to it.
>
> The *party challenging the presumption of mootness* need not show that the enactment of the same or similar legislation is a "virtual certainty," only that there is a *reasonable expectation of reenactment*.  But a determination that such a reasonable expectation exists must be founded in the record, as it was in *City of Mesquite*,[4]

---

[4] *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.11 (1982) (stating that "the

United States District Court
Northern District of California

rather than on speculation alone.

*Id.* at 1199 (emphasis added); *see also Rentberry, Inc. v. City of Seattle*, 814 Fed. Appx. 309, 309 (9th Cir. 2020) (stating that "[a]ppellants have not met their burden of showing a 'reasonable expectation' that Seattle will enact a same or similar ordinance in the future"); *Cocina Cultura LLC v. Oregon Dep't of Admin. Servs.*, No. 3:20-cv-01866-IM, 2021 U.S. Dist. LEXIS 162629, at *16 (D. Or. Aug. 27, 2021) (stating that, "[n]otably, *Glazing Health* placed the burden on the plaintiff to show the case is not moot"); *Cal. Rental Hous. Ass'n v. Newsom*, No. 2:21-cv-01394-JAM-JDP, 2022 U.S. Dist. LEXIS 186483, at *9 (E.D. Cal. Oct. 11, 2022) (stating that, "[a]s the party seeking to rebut the presumption of mootness, Plaintiffs must show there is a reasonable expectation that the State will reoffend").[5]

However, in the case at bar, the government has not repealed or amended any statute or regulation. The government's TPS determinations did not undergo the same rigorous process that statutes and regulations generally do (whether for repeal or amendment). On the other hand, there is also no dispute that the government's TPS designations/extensions have the force of law, and its actions have been formalized through publication in the Federal Register. Thus, it may be argued that the government's TPS designations/extensions are akin to regulations – in which case, arguably, mootness should be presumed and the burden shifted to Plaintiffs, *i.e.*, to show that there is a reasonable expectation that the government will terminate the TPS designations in the future.

For purposes of this order, the Court need not decide whether it would be appropriate to presume mootness based on the government's TPS determinations and shift the burden to

---

city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated"; "[i]ndeed, the city has announced just such an intention").

[5] In addition to the Ninth Circuit, the Eleventh Circuit has adopted the same approach. *See Walker v. City of Calhoun*, 901 F.3d 1245, 1270 (11th Cir. 2018) ("When a government voluntarily ceases the challenged action, however, there is a presumption that the government will not later resume the action, so the plaintiff bears the burden of showing that there is 'a reasonable expectation' that the government 'will reverse course and reenact the allegedly offensive' policy.") (emphasis omitted).

United States District Court
Northern District of California

1    Plaintiffs.  This is because, even under the typical standard – which imposes a heavy burden on the

2    government to prove mootness – the government has sufficiently established there is no

3    reasonable expectation that the government will reverse course on the TPS designations.  In this

4    regard, the Ninth Circuit's decision in *Rosebrock* is instructive.  There, the Ninth Circuit noted

5    that

6            a policy change not reflected in statutory changes or even changes in
             ordinances or regulations will not necessarily render a case moot,

7            but it may do so in certain circumstances.

8            We have not set forth a definitive test for determining whether a
             voluntary cessation of this last type – one not reflected in statutory

9            changes or even in changes in ordinances or regulations – has
             rendered a case moot.  But we have indicated that mootness is more

10           likely if (1) the policy change is evidenced by language that is
             "broad in scope and unequivocal in tone"; (2) the policy change

11           fully "addresses all of the objectionable measures that [the
             Government] officials took against the plaintiffs in th[e] case"; (3)

12           "th[e] case [in question] was the catalyst for the agency's adoption
             of the new policy"; (4) the policy has been in place for a long time

13           when we consider mootness; and (5) "since [the policy's]
             implementation the agency's officials have not engaged in conduct

14           similar to that challenged by the plaintiff[ ]."  On the other hand, we
             are less inclined to find mootness where the "new policy . . . could

15           be easily abandoned or altered in the future."

16   *Rosebrock*, 745 F.3d at 971-72.

17         At the hearing, Plaintiffs argued that the government's actions in the case at bar did not

18   amount to a change in policy.  The Court rejects that position.  The government clearly made a

19   policy change: it considered intervening conditions for each of the six countries in making its TPS

20   determinations (contrary to the Trump administration considering only originating conditions).[6]

21   Furthermore, the government's consideration of intervening conditions was memorialized in

22   written form – indeed, documented publicly in the Federal Register.  It is also worth noting that

23   each designation granted TPS status for the statutory maximum of eighteen months.  *Cf. White*,

24   227 F.3d at 1223 (stating that "it is clear that the Achtenberg memorandum [a document issued by

25   the Assistant Secretary for Fair Housing and Equal Opportunity] represents a permanent change in

26   the way HUD conducts HFA investigations, not a temporary policy that the agency will refute

27   

28   _____
     [6] And for Haiti and Sudan, there were two designations each; the first TPS designation took place
     in 2022 and the second in 2023.

once this litigation has concluded").

At the hearing, Plaintiffs suggested that the government's TPS determinations did not amount to a policy change because the government simply considered intervening factors as a factual matter and never stated outright that it was legally required to do so. Plaintiffs' position is strained. Because the government considered intervening conditions in making its TPS determinations, it implicitly endorsed consideration of intervening conditions as a legal matter, even if it never expressly stated so.[7] Even in the absence of a statement that it was legally required to consider intervening circumstances, the government's clearly articulated decision to do so negates a reasonable expectation that it will revert to the previous administration's contrary policy.

Because the government's TPS determinations did amount to a policy change, the Court turns to the *Rosebrock* factors. Those factors point to mootness.

(1) The government's policy change is unequivocal for the reasons stated above – *e.g.*, it consistently considered intervening conditions in multiple TPS determinations as publicly documented in the Federal Register.

(2) The policy change fully addressed Plaintiffs' objections by granting TPS status and/or rescinding TPS terminations at issue.

(3) Although it is not definitively evident whether the instant case was the catalyst for the government to make the policy change, the case was referred to in the Federal Register notices, thus indicating that the case was in fact a consideration for the government.

(4) Of the six countries at issue, Haiti was the first to be given a TPS designation after the Trump administration ended. Since Haiti's TPS designation issued in 2021, the policy change has been in effect for at least two years. This is not an insignificant period of time, especially as eighteen months is the statutory maximum for a TPS designation. Furthermore, it is notable that, by Plaintiffs' own account, the government's policy change was a return to a "'long-established practice' . . . used

---

[7] To the extent Plaintiffs are asserting that mootness cannot be established absent an express renunciation of a prior policy or practice by the government, that issue is addressed *infra*.

United States District Court
Northern District of California

1    'by Republican and Democratic Administrations alike.'"  Mot. at 11 (quoting

2    CAC); *see also* CAC ¶ 11 (alleging that the Trump administration "abandoned a

3    long-established practice under which [DHS] considered all current conditions –

4    including intervening events – in deciding whether to extend or terminate a

5    country's TPS designation").  The current policy is a long standing one.

6       (5) Since the policy change, agency officials have not engaged in conduct similar to

7           that challenged by Plaintiffs.  In fact, Haiti and Sudan have each been designated

8           twice, which reflects a commitment to the policy change.

9    In short, there is no indication that the government's policy change here is a "temporary [one] that

10   [it] will refute once this litigation has concluded."[8]  *White*, 227 F.3d at 1223.

11        In their papers, Plaintiffs protest it is not absolutely clear that the challenged conduct could

12   not reasonably be expected to recur because the government has failed to acknowledge that the

13   Trump administration's interpretation of the TPS statute "ever existed" and has refused to

14   explicitly acknowledge the unlawfulness of that interpretation.  Opp'n at 1; *see also* Opp'n at 5

15   ("Defendants appears to have departed from a past practice . . . for the time being, but have never

16   acknowledged using it, let alone disavowed it.").  But Plaintiffs' position cannot be squared with

17   the Ninth Circuit's decision in *Brach*.  There, the court stated: "'[T]he mere power to reenact a

18   challenged [policy] is not a sufficient basis on which a court can conclude that a reasonable

19   expectation of recurrence exists.'"  *Brach*, 38 F.4th at 14.  Moreover, as noted above, even if the

20   current administration does not concede the prior policy was unlawful, it has squarely rejected that

21   policy.

22        Plaintiffs contend still that case authority supports their position that there is no mootness

23   where the government changes its conduct but fails to clearly renounce its prior conduct (*i.e.*, it

24   does not clearly repudiate that prior conduct).  *See* Opp'n at 6-7.  The cases that Plaintiffs cite,

25

26   _____

27   [8] To be sure, the Court is recognizes Plaintiffs' concern that there is the possibility of another
     policy change in the future, in particular, if Candidate Trump is reelected.  But at this point in the
     proceedings, that possibility is too speculative.  Furthermore, nothing precludes Plaintiffs from
28   reinitiating a challenge if Candidate Trump were to be reelected and reinstates the challenged
     policy.

51

United States District Court
Northern District of California

however, are distinguishable.  For example, in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), the EPA promulgated what was known as the Clean Power Plan rule (pursuant to the Clean Air Act). The Clean Power Plan never went into effect because the same day that the EPA promulgated the rule, a number of parties petitioned for review in federal court.  The Supreme Court granted a stay which prevented the rule from taking effect.  Before the lower appellate court could issue a decision on the merits, there was a change in Presidential administrations, and "[t]he new administration requested that the litigation be held in abeyance so that EPA could reconsider the Clean Power Plan." *Id.* at 2604.

Subsequently, the EPA repealed the rule, concluding that the Plan had been in excess of its statutory authority.  The agency also replaced the Clean Power Plan by promulgating a new regulation known as the Affordable Clean Energy rule.  This agency action precipitated a new round of petitions for review.  The D.C. Circuit thereafter held that the EPA's repeal of the Clean Power Plan rested on a mistaken reading of the Clean Air Act and thus vacated the agency's repeal of the Clean Power Plan and further vacated the replacement rule.  This court decision was followed by another change in Presidential administrations.  The EPA then asked the D.C. Circuit to partially stay issuance of its mandate so that the Clean Power Plan "would not immediately go back into effect.  EPA believed that such a result would not make sense while it was in the process of considering whether to promulgate a new [replacement] rule." *Id.* at 2606.

One of the issues before the Supreme Court was whether any petitioners had standing to seek relief from the federal court.  The Supreme Court held that at least one group of petitioners did, specifically because they had suffered injury as a result of the D.C. Circuit decision vacating the repeal of the Clean Power Plan.  That decision "purports to bring the Clean Power Plan back into legal effect." *Id.* at 2606.  The government argued that the petitioners' challenge should be deemed moot because the EPA had made a representation that it had "no intention of enforcing the Clean Power Plan prior to promulgating a new . . . rule." *Id.* at 2607.  The Supreme Court rejected the government's position, stating as follows: "[T]he Government 'nowhere suggests that if this litigation is resolved in its favor it will not' reimpose emissions limits predicated on generation shifting; indeed, it 'vigorously defends' the legality of such an approach.  We do not dismiss a

15

1    case as moot in such circumstances." *Id.*

2         As the government points out in its papers, *West Virginia* is of limited support to Plaintiffs.

3    The facts in *West Virginia* are markedly different from those in instant case as (1) *West Virginia*

4    involved a mere promise, not a policy change as in the case at bar, and (2) the promise in *West*

5    *Virginia* was that the government would *not* enforce an existing policy whereas, here, the

6    government has acted to enforce its policy and demonstrated a commitment to the same.

7         This, of course, is not to say that it is entirely irrelevant whether the government expressly

8    repudiates its prior conduct.  *See, e.g.*, *Brach*, 38 F.4th at 13 ("California has presented a strong

9    case that the current order opening schools is not a temporary move to sidestep the litigation.

10   Most importantly, the State has 'unequivocally renounce[d]' the use of school closure orders in the

11   future.  The State has consistently worked to reopen schools and Governor Newsom has publicly

12   'reaffirm[ed]' his 'commitment to keeping California's schools open for safe, in-person learning.'

13   That reaffirmance is no mere statement of aspiration.'").  But as one district court has noted,

14   *Brach*'s reference to the government's unequivocal renouncing of prior conduct should not be

15   overstated:

16            Although the Ninth Circuit found it compelling that the State
              "renounce[d] its use of school closure orders in the future," the court
17            did not *require* an explicit renouncement for its analysis.  The
              renouncement was significant only because it demonstrated the
18            State's "commitment" to keeping schools open.  As such, where the
              State shows through other means that it is committed to quitting the
19            challenged conduct, the State does need an explicit announcement
              denouncing its previous conduct.
20

21   *Cal. Rental Hous. Ass'n*, 2022 U.S. Dist. LEXIS 186483, at *9-10 (emphasis added); *see also Am.*

22   *Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1152 (9th Cir. 2019) (stating

23   that government "still must bear the heavy burden of showing that the challenged conduct cannot

24   reasonably be expected to start up again" and "[i]t *may* do so by persuading the court that the

25   change in its behavior is entrenched or permanent") (emphasis added; internal quotation marks

26   omitted).  While an express repudiation of prior policy may make for an exceptionally clear case

27   for mootness, unequivocal action which implicitly repudiates prior policy may also establish

28   mootness, particularly when all or nearly all the *Rosebrock* factors are satisfied.

United States District Court
Northern District of California

60

United States District Court
Northern District of California

1    Accordingly, the Court concludes that the government has met its burden of showing that

2    the challenged conduct cannot reasonably be expected to recur.  Plaintiffs' challenge to the TPS

3    terminations is moot.

4    C.    Registration Fee of $50

5    Plaintiffs argue that, even if the Court finds their challenge to the TPS terminations moot,

6    the case still has another live component.  Plaintiffs have alleged that, when DHS issued new TPS

7    designations for Haiti and Sudan (in August 2021 and April 2022), it required TPS holders from

8    those countries to pay a $50 registration fee – "which does not apply to TPS holders *renewing*

9    their registrations."  CAC ¶ 172 (emphasis added).  "These individuals would not have had to pay

10   any fee if TPS for Haiti and Sudan had not been terminated during the Trump Administration,

11   because they would have been able to apply for TPS as re-registrants, rather than initial

12   applicants."  *Id.* ¶ 173.

13   In response to this claim of injury, the government has provided a declaration from a

14   USCIS employee, Sharon Orise.  In her declaration, Ms. Orise testifies to the following:

15   • "On August 3, 2021, an FRN was published newly designating Haiti for TPS.

16   Everyone who applied for Haiti TPS under this designation had to file as an initial

17   registrant and pay the $50 registration fee, regardless of whether an individual had

18   TPS prior to the January 18, 2018 termination [by the Trump administration]."

19   Orise Decl. ¶ 15.

20   • "On April 19, 2022, an FRN was published designating Sudan for TPS. Everyone

21   who applied for Sudan TPS under this designation had to file as an initial registrant

22   and pay the $50 registration fee, regardless of whether an individual had TPS prior

23   to the October 2017 termination [by the Trump administration]."  Orise Decl. ¶ 18.

24   • But "[i]n August 2021, USCIS began refunding the $50 registration fee to

25   Sudanese and Haitian TPS beneficiaries who paid this fee a second time due to the

26   2021 and 2022 FRNs.  This would include applicants who paid the $50 fee under

27   the Haiti 2021 designation, provided they had Haiti TPS prior to January 2018, and

28   applicants who paid the $50 fee under the Sudan 2022 designation, provided they

had Sudan TPS prior to October 2017.  The first certified refund request was received on August 3, 2022.  Thereafter, USCIS has been refunding on a quarterly basis.  USCIS efforts to identify and refund applicable payments continue.  There are currently no refunds pending."  Orise Decl. ¶ 20.

- "As of August 29, 2023, USCIS has processed 24,227 refunds for TPS Haiti applicants and 43 refunds for TPS Sudan applicants."  Orise Decl. ¶ 21.

The Orise declaration's statements regarding refunds are consistent with statements regarding registration fees made in the TPS extension given to Haiti in January 2023.  *See* 88 Fed. Reg. 5,022, at 5,028 (Jan. 26, 2023) ("Individuals with existing TPS granted under the 2021 designation of Haiti must file Form-821 for re-registration as discussed above.  Individuals who currently retain their TPS under the *Ramos* injunction noted in footnote 1 above, may file Form I-821 for re-registration if they wish to help ensure that their TPS continues should the *Ramos* court order end and they remain eligible.  Re-registrants do not pay the $50 filing fee for the Form I-821 but must pay the biometric services fee if age 14 or older (or request a fee waiver).").

The government argues that any injury claimed by Plaintiffs with respect to the $50 registration fee is at most a collateral consequence (the primary injury being the TPS terminations by the Trump administration).[9]  Plaintiffs somewhat disagree, asserting that the injury here could be construed as an ongoing injury, and not just a collateral consequence.  How exactly the injury is characterized is not material.  The government's position is that:

(1) Plaintiffs themselves have not suffered that injury – *i.e.*, those Plaintiffs who are from

---

[9] There is an exception to mootness for collateral legal consequences.  This exception applies where a party would suffer collateral legal consequences "although the primary injury may have passed."  *EEOC v. Fed. Express Corp.*, 558 F.3d 842, 847 (9th Cir. 2009) (stating that "[t]he collateral legal consequences exception applies [where], although the primary injury may have passed . . . , there remains 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment'"); *see also Ctr. for Biological Diversity*, 511 F.3d at 964-65 (the exception "applies where an appellant 'would suffer collateral legal consequences if the actions being appealed were allowed to stand'").  "It is commonly applied in habeas corpus proceedings where mootness would generally bar relief if the petitioner completes his sentence before the court has addressed the merits of his petition, but not if the plaintiff demonstrates he will suffer collateral legal consequences if the challenged conviction is allowed to stand."  *San Luis & Delta-Mendota Water Auth. v. United States DOI*, 870 F. Supp. 2d 943, 959 (E.D. Cal. 2012).

United States District Court
Northern District of California

1  Haiti or Sudan did not themselves pay a $50 registration fee even if other Haitian or

2  Sudanese TPS holders did. *See* Mot. at 11 ("No Plaintiff alleges that they have actually

3  had to pay a $50 registration fee."); Reply at 9 ("Whether cast as a continuing harm or

4  collateral legal consequence, Plaintiffs do not allege that they are affected by the now-

5  rescinded and already refunded $50 re-registration fee and thus have no standing to

6  challenge it.").

7  (2) Even if Plaintiffs could amend to correct this deficiency (either amending to allege that

8  they suffered this injury or amending to add a new plaintiff who did, *see* Opp'n at 14

9  n.3), "the latest amended complaint seeks only declaratory and injunctive relief," and

10  "a moot case seeking [such] relief cannot be revived by a damages claim raised for the

11  first time in briefing challenging mootness." Reply at 9; *see also Seven Words LLC v.*

12  *Network Solns.*, 260 F.3d 1089, 1097 (9th Cir. 2001) ("The Supreme Court has

13  admonished us to be wary of late-in-the-day damages claims . . . , cautioning that 'a

14  claim for . . . damages, extracted late in the day from [plaintiff's] general prayer for

15  relief and asserted solely to avoid otherwise certain mootness, [bears] close

16  inspection.'").

17  (3) Even if the Court were inclined to allow a damages claim, there is sovereign immunity.

18  *See* Reply at 9.

19  For purposes of this order, the Court need only address the first argument. Plaintiffs agree

20  that no named Plaintiff has paid a $50 registration fee following the new designations of Haiti and

21  Sudan. That being the case, there is no Plaintiff in this case who has standing to proceed with this

22  claim.

23  ### III.    CONCLUSION

24  For the foregoing reasons, the Court grants the government's motion to dismiss. Plaintiffs'

25  claims challenging the TPS terminations are moot. Those claims are therefore dismissed. The

26  dismissal is with prejudice as Plaintiffs have not indicated that they could plead additional facts to

27  overcome this deficiency.

28  As for Plaintiffs' claim challenging the $50 registration fee, it is also dismissed but based

19

on lack of standing. The Court shall give Plaintiffs sixty (60) days to file an amended complaint

to the extent they wish to pursue any claim based on the $50 registration fee.[10]

This order disposes of Docket No. 206.

**IT IS SO ORDERED**.

Dated: December 28, 2023

_____
EDWARD M. CHEN
United States District Judge

---

[10] At the hearing, Plaintiffs indicated that, if the Court were to dismiss their primary claims challenging the TPS terminations, they would need some time to decide whether they still wanted to pursue their claim based on the $50 registration fee.

1
2
3
4
UNITED STATES DISTRICT COURT
5
NORTHERN DISTRICT OF CALIFORNIA
6
7   CRISTA RAMOS, et al.,                    Case No. 18-cv-01554-EMC
8                     Plaintiffs,
                                             **ORDER GRANTING PLAINTIFFS'**
9        v.                                  **MOTION FOR PRELIMINARY**
                                             **INJUNCTION**
10  KIRSTJEN NIELSEN, et al.,
                                             Docket No. 120
11                    Defendants.

12
13       The federal government seeks to terminate the Temporary Protected Status ("TPS")

14  designations for four countries: Haiti, Sudan, Nicaragua, and El Salvador.  Under three prior

15  administrations, the TPS designations of these countries have been repeatedly extended based on

16  adverse and dangerous conditions in these countries.  Under the designations, approximately

17  300,000 TPS beneficiaries have been allowed to stay and work in the United States because of

18  dangerous or unsafe conditions in their home countries.[1]  Without TPS designations, these

19  beneficiaries will be subject to removal from the United States.

20       Plaintiffs in this case are TPS beneficiaries (who have resided in the United States for

21  years) along with their U.S.-citizen children.  In this suit, Plaintiffs challenge the Trump

22  administration's decision to terminate TPS status for the affected countries.  Currently pending

23  before the Court is Plaintiffs' motion for a preliminary injunction.  Plaintiffs seek to enjoin the

24  government from implementing or enforcing the decisions of the Secretary of the Department of

25  Homeland Security to terminate TPS designations of these countries pending a final resolution of

26

27  [1] *See* Degen Decl., Ex. 14 (NSC Memo) (indicating that there are 5,349 TPS beneficiaries from
    Nicaragua; 263,282 TPS beneficiaries from El Salvador; and 58,706 TPS beneficiaries from
28  Haiti); Degen Decl., Ex. 87 (Decision Memo at 2) (indicating that there are 1,039 TPS
    beneficiaries from Sudan).

United States District Court
Northern District of California

1    the case on the merits.

2           As described below, absent injunctive relief, TPS beneficiaries and their children

3    indisputably will suffer irreparable harm and great hardship.  TPS beneficiaries who have lived,

4    worked, and raised families in the United States (many for more than a decade), will be subject to

5    removal.  Many have U.S.-born children; those may be faced with the Hobson's choice of

6    bringing their children with them (and tearing them away from the only country and community

7    they have known) or splitting their families apart.  In contrast, the government has failed to

8    establish any real harm were the status quo (which has been in existence for as long as two

9    decades) is maintained during the pendency of this litigation.  Indeed, if anything, Plaintiffs and

10   amici have established without dispute that local and national economies will be hurt if hundreds

11   of thousands of TPS beneficiaries are uprooted and removed.

12          The balance of hardships thus tips sharply in favor of TPS beneficiaries and their families.

13   And Plaintiffs have made substantial showing on the merits of their claims, both on the facts and

14   the law.  They have presented a substantial record supporting their claim that the Acting Secretary

15   or Secretary of DHS, in deciding to terminate the TPS status of Haiti, El Salvador, Nicaragua and

16   Sudan, changed the criteria applied by the prior administrations, and did so without any

17   explanation or justification in violation of the Administrative Procedure Act.  There is also

18   evidence that this may have been done in order to implement and justify a pre-ordained result

19   desired by the White House.  Plaintiffs have also raised serious questions whether the actions

20   taken by the Acting Secretary or Secretary was influenced by the White House and based on

21   animus against non-white, non-European immigrants in violation of Equal Protection guaranteed

22   by the Constitution.  The issues are at least serious enough to preserve the status quo.

23          Having considered the parties' briefs and accompanying submissions, as well as the oral

24   argument of counsel, the Court hereby **GRANTS** Plaintiffs' motion.  It also sets a Case

25   Management Conference for October 26, 2018 at 10:30 a.m. to discuss with the parties the

26   possibility of an expeditious adjudication of the merits.

27

28

United States District Court
Northern District of California

## I.    FACTUAL & PROCEDURAL BACKGROUND

A.    Statutory Background

The TPS statute is 8 U.S.C. § 1254a.  Section 1254a(b) covers TPS designations.  It provides in relevant part as follows.

> (1)    In general.  The Attorney General, after consultation with appropriate agencies of the Government, may designate any foreign state (or any part of such foreign state) under this subsection only if –

> (A)    the Attorney General finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

> (B)    the Attorney General finds that –

>> (i)    there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
>> (ii)    the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
>> (iii)    the foreign state officially has requested designation under this subparagraph; or

> (C)    the Attorney General finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b).

Per the statute, "the initial period of designation of a foreign state . . . is the period, specified by the Attorney General, of not less than 6 months and not more than 18 months."  *Id.* § 1254a(b)(2).  Thereafter, there is periodic review to see whether the TPS designation should be terminated or extended.  *See id.*  Under § 1254a(b)(3)(A), "[a]t least 60 days before end of the initial period designation, and any extended period of designation, . . . the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the

3

1   foreign state (or part of such foreign state) . . . and shall determine whether the conditions for such

2   designation under this subsection continue to be met."

3   • "If the Attorney General determines . . . that a foreign state (or part of such foreign

4   state) no longer continues to meet the conditions for designation under paragraph

5   (1), the Attorney General shall *terminate* the designation . . . ." *Id.* §

6   1254a(b)(3)(B) (emphasis added).

7   • "If the Attorney General does not determine . . . that a foreign state (or part of such

8   foreign state) no longer meets the conditions for designation under paragraph (1),

9   the period of designation of the foreign state is *extended* for an additional period of

10   6 months (or, in the discretion of the Attorney General, a period of 12 or 18

11   months)." *Id.* § 1254a(b)(3)(C) (emphasis added).

12   Section 1254a(b)(5)(A) provides that "[t]here is no judicial review of any determination of

13   the Attorney General with respect to the designation, or termination or extension of a designation,

14   of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A). However, the Court previously

15   held that this provision does not bar the Court from considering Plaintiffs' particular claims

16   brought in the instant case, including their Administrative Procedure Act ("APA") and Equal

17   Protection claims. *See* Docket No. 55 (Order at 15, 20-21) (holding that this provision does not

18   preclude a challenge to general collateral practices or certain colorable constitutional claims).

19   B.   General Process for TPS Designation Decision (on Periodic Review)

20   For the most part, the parties agree that the general process for a TPS designation decision

21   (on periodic review) is as follows. The decisions are formally made by the Secretary for the

22   Department of Homeland Security ("DHS"). For her review, RAIO[2] (a division within USCIS)

23   provides a Country Conditions Memo. In addition, OP&S[3] (another division within USCIS) drafts

24   a Decision Memo that contains USCIS's recommendation on what to do about the TPS

25   designation. Once the Decision Memo is finalized, the USCIS Director passes it on to the DHS

26

27   [2] RAIO stands for Refugee, Asylum and International Operations Directorate.

28   [3] OP&S stands for Office of Policy and Strategy.

4

United States District Court
Northern District of California

1    Secretary.  The State Department provides further input (*e.g.*, country conditions,

2    recommendations).  At times, input can also come from other government sources, but the above

3    is the information consistently provided to the DHS Secretary.  *See generally* Rodriguez Decl.

4    (former USCIS director during part of the Obama administration).

5    C.    General Timeline for Countries at Issue

6          Below is a general timeline of events for each of the countries at issue.

7          1.    Haiti

8          "Haiti was originally designed for TPS on January 21, 2010 based on the 7.0-magnitude

9    earthquake on January 12, 2010 that prevented Haitians from returning safely."  Docket No. 55

10   (Order at 6); *see also* 75 Fed. Reg. 3476, 3477 (Jan. 21, 2010).  "Haiti's designation was

11   subsequently extended and re-designated four times by the Obama administration and once by the

12   Trump administration."  Docket No. 55 (Order at 6).

13         Although the Trump administration extended Haiti's TPS designation one time (in or about

14   May 2017), the extension was for six months only, and the Federal Register Notice announcing

15   the extension emphasized that "the designation of TPS was intended by Congress to be temporary

16   in nature"; that "the Government of Haiti has expressed a desire for its nationals to return"; that

17   the DHS Secretary would – after the six months – "consider whether permitting Haitian nationals

18   to remain in the United States is contrary to the national interest of the United States"; and that

19   beneficiaries are therefore "encouraged to prepare for their return to Haiti."  82 Fed. Reg. 23830,

20   23831 (May 24, 2017); *see also* Degen Decl., Ex. 45 (Decision Memo at 2) (noting that former

21   DHS Secretary Kelly "extended Haiti's TPS designation for a limited period of 6 months, with

22   strong public messaging to the Haitian community to prepare for their return to their homeland").

23   In short, the Notice portended the end of Haiti's TPS designation.

24         Subsequently, on November 20, 2017, Acting Secretary Duke made the decision to

25   terminate Haiti's TPS designation.  *See* 83 Fed. Reg. 2648, 2650 (Jan. 18, 2018).  The termination

26   was formally announced on January 18, 2018.  *See* Docket No. 55 (Order at 6).  The Federal

27   Register Notice stated that the Acting Secretary was terminating the TPS designation for Haiti as

28   of July 22, 2019, because "the conditions for Haiti's designation for TPS – on the basis of

5

1    'extraordinary and temporary conditions' relating to the 2010 earthquake that prevented Haitian

2    nationals from returning in safety – are no longer met."  83 Fed. Reg. 2648, 2650 (Jan. 18, 2018).

3         2.    Sudan

4         "Sudan was designated for TPS in November 1997 due to an ongoing armed conflict and

5    extraordinary conditions preventing nationals from returning safely."  Docket No. 55 (Order at

6    10); *see also* 62 Fed. Reg. 59737 (Nov. 4, 1997).  The TPS designation "was periodically extended

7    and/or re-designated . . . 15 times by the Clinton, Bush, and Obama administrations."  Docket No.

8    55 (Order at 10).

9         It appears that, in early September 2017, Acting Secretary Duke made the decision to

10   terminate Sudan's TPS designation.  *See, e.g.*, Degen Decl., Ex. 5 (email) (discussing "edits to the

11   FRN [Federal Register Notice] announcing the termination of TPS for Sudan").

12        "On October 11, 2017, Acting Secretary . . . Duke announced the termination of Sudan's

13   TPS [designation] . . . ."  Docket No. 55 (Order at 11).  The Federal Register Notice stated that the

14   TPS designation was being terminated as of November 2, 2018, because "[t]he ongoing armed

15   conflict no longer prevents the return of nationals to Sudan to all regions of Sudan without posing

16   a serious threat to their personal safety.  Further, extraordinary and temporary conditions within

17   Sudan no longer prevent nationals from returning in safety to all regions of Sudan."  82 Fed. Reg.

18   47228, 47230 (Oct. 11, 2017).

19        3.    Nicaragua

20        "Nicaragua was originally designated for TPS on January 5, 1999 on the basis of Hurricane

21   Mitch."  Docket No. 55 (Order at 8).  Its "designation was extended 13 times by the Clinton, Bush,

22   and Obama administrations."  Docket No. 55 (Order at 9).

23        On or about November 5, 2017, Acting Secretary Duke made the decision to terminate

24   Nicaragua's TPS designation.  *See* Degen Decl., Ex. 30 (email).

25        "On December 15, 2017, Acting Secretary Duke announced that Nicaragua's designation

26   would terminate . . . ."  Docket No. 55 (Order at 9).  The Federal Register Notice stated that the

27   TPS designation was being terminated as of January 9, 2019, because "conditions for Nicaragua's

28   1999 designation for TPS on the basis of environmental disaster due to the damage caused by

1    Hurricane Mitch are no longer met."  82 Fed. Reg. 59636, 59637 (Dec. 15, 2017).

2             4.    El Salvador

3             "El Salvador was designated for TPS on March 9, 2001 based on a series of earthquakes."

4    Docket No. 55 (Order at 7).  Its designation was "extended 11 times by the Bush and Obama

5    administrations."  Docket No. 55 (Order at 7).

6             It is not clear from the record when Secretary Nielsen made the actual decision to

7    terminate but it appears to have taken place some time in early to mid-January 2018.  *See* El

8    Salvador AR at 1 (email, dated January 4, 2018, from Maj. Gen. Norman (U.S. Southern

9    Command)) (providing comments on what might happen if the TPS designation were terminated);

10   El Salvador AR at 5-01 (memo on January 5, 2018, phone call to President of El Salvador)

11   (referring to "your upcoming decision regarding the future of El Salvador's Temporary Protected

12   Status (TPS) designation").

13            The termination of El Salvador's TPS designation was formally announced on January 18,

14   2018.  *See* Docket No. 55 (Order at 8).  The Federal Register Notice stated that the TPS

15   designation was being terminated as of September 9, 2019, because "the conditions supporting El

16   Salvador's 2011 designation for TPS on the basis of environmental disaster due to the damage

17   caused by the 2001 earthquakes are no longer met."  83 Fed. Reg. 2654, 2655-56 (Jan. 18, 2018).

18                         **II.    DISCUSSION**

19   A.    Legal Standard

20            "[The] purpose of a preliminary injunction . . . is to preserve the status quo and the rights

21   of the parties until a final judgment issues in the cause."  *U.S. Philips Corp. v. KBC Bank N.V.*,

22   590 F.3d 1091, 1094 (9th Cir. 2010); *see also Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011,

23   1024 (9th Cir. 2016) (stating that "[t]he 'purpose of a preliminary injunction is to preserve the

24   status quo ante litem pending a determination of the action on the merits'; '[s]tatus quo ante litem'

25   refers to 'the last uncontested status which preceded the pending controversy'").  "A preliminary

26   injunction . . . is not a preliminary adjudication on the merits but rather a device for preserving the

27   status quo and preventing the irreparable loss of rights before judgment."  *Sierra On-Line, Inc. v.*

28   *Phx. Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

United States District Court
Northern District of California

A party seeking a preliminary injunction must meet one of two variants of the same standard.  Under the original *Winter* standard, a party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Under the "sliding scale" variant of the *Winter* standard, "if a plaintiff can only show that there are 'serious questions going to the merits' – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied."

*All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).

B.     Likelihood of Irreparable Injury/Balance of Hardships/Public Interest

        The Court addresses first the likelihood of irreparable injury, the balance of hardships, and the public interest.

        The record evidence establishes a compelling case as to these factors in favor of Plaintiffs. Plaintiffs have submitted a number of declarations which establish that, without a preliminary injunction, TPS beneficiaries are likely to suffer irreparable injury.  *See, e.g.*, Docket No. 91 (Abdalla Decl.); Docket No. 92 (De Ayala Decl.); Docket No. 93 (Elarabi Decl.); Docket No. 94 (Ampie Decl).  The declarants are TPS beneficiaries who have lived in the United States for a significant number of years, some as many as twenty.  Without a preliminary injunction, the declarants risk being removed.  At the hearing, the government conceded that there are approximately 300,000 TPS beneficiaries registered as such and that they are likely to be subject to removal.[4]  TPS beneficiaries thus risk being uprooted from their homes, jobs, careers, and communities.  They face removal to countries to which their children and family members may have little or no ties and which may not be safe.  Those with U.S.-citizen children will be confronted with the dilemma of either bringing their children with them, giving up their children's lives in the United States (for many, the only lives they know), or being separated from their children.  *See* County/Citi Amici at 4 (noting that "[t]he beneficiaries . . . have hundreds of

_____

[4] Removal of TPS status returns beneficiaries to their former status.  Those who have an independent status entitling them to stay in the U.S. are not likely to be registered under TPS status.  Hence, those who are so registered likely do not enjoy any other status entitling them to stay.  The government essentially conceded such at the hearing.

Case 3:25-cv-01766-EMC   Document 110-24   Filed 04/15/25   Page 73 of 142

United States District Court
Northern District of California

1    thousands of U.S.-citizen children, 192,000 born to Salvadoran beneficiaries alone").

2    Understandably, this prospect is a source of great emotional distress, fear, and anxiety.

3          For example, Ebtihal Abdalla and her husband are TPS beneficiaries from Sudan.  They

4    have been beneficiaries since the late 1990s.  They have three children.  One is a TPS beneficiary

5    and has lived in the United States since she was a baby.  The other two are U.S. citizens.  Once

6    Sudan's designation is terminated, her husband will be unable to work and, as he is the primary

7    breadwinner, this will have significant impact on the family's livelihood.  Furthermore, since the

8    announcement of Sudan's termination, Ms. Abdalla has suffered bouts of uncontrollable crying

9    and serious migraines.  She has also found it difficult to eat and to leave the house.  She was

10   recently diagnosed with severe depression and prescribed medications.  Ms. Abdalla's children

11   have also been impacted by the announcement of Sudan's termination.  For example, Ms.

12   Abdalla's oldest daughter is currently at a community college.  Once Sudan's termination is

13   terminated, she will not be able to work, and she needs the work in order to help pay for tuition.

14   She is fearful that she will not be able to attend a four-year college or university, as planned, if

15   Sudan's TPS is terminated before she completes her coursework at the community college.  As for

16   Ms. Abdalla's youngest daughter, she is only twelve and, after learning that her family's

17   immigration status is in jeopardy, she has struggled at school, with a teacher even expressly

18   voicing concern.

19          Similar testimony is provided in the declarations of Elsy Yolanda Flores De Ayala, *see* De

20   Ayala Decl. (testifying about the impact of the announcement of El Salvador's termination on her,

21   her husband, her U.S.-citizen sister who has cancer, and her three children, one who is a TPS

22   beneficiary and the other two who are U.S. citizens); Hiwaida Elarabi, *see* Elarabi Decl. (testifying

23   about the impact of the announcement of Sudan's termination on him, her extended family with

24   whom she lives in the United States and whom she helps support, and her parents in Sudan whom

25   she helps support); Imara Ampie, *see* Ampie Decl. (testifying about the impact of the

26   announcement of Nicaragua's termination on her, her husband, and her two U.S.-citizen children,

27   both of whom have special needs); and Wilna Destin.  *See* Destin Decl. (testifying about the

28   impact of the announcement of Haiti's termination on her and her two U.S.-citizen children).  *See*

HT Vacatur AR_0375

*also* Docket No. 55 (Order at 3-6) (discussing Plaintiffs' backgrounds as alleged in the complaint).

The amicus briefs underscore that the harms to TPS beneficiaries will also harm the public interest. For example, many TPS beneficiaries are part of the workforce and have a significant presence in the construction, hospitality, food service, landscaping, home health care, child care, and retail industries. *See, e.g.*, Docket No. 103-1 (State Amici at 9) (noting that "an estimated 37,000-70,000 construction workers are TPS holders"). Without a preliminary injunction, these TPS beneficiaries will no longer be able to work, thus adversely impacting state and local economies. The State Amici estimates that "loss of legal status for these TPS holders is projected to cost $132.6 billion in GDP (due to lost earnings as well as decreased industry outputs), $5.2 billion in Social Security and Medicare contributions, and $733 million in employers' turnover costs." Docket No. 103-1 (State Amici at 9). Also, if TPS beneficiaries cannot work, then they will lose their employer-sponsored health care which will put a strain on public resources. Furthermore, many TPS beneficiaries are homeowners; if these TPS beneficiaries are no longer able to work, they may not be able to pay their property taxes, and their homes may become subject to foreclosure. *See, e.g.*, Docket No. 103-1 (State Amici at 10) (stating that "[t]hirty-two percent of TPS holders from El Salvador and Haiti have mortgages, and almost 42 percent of Nicaraguan immigrants are homeowners"; adding that "Salvadoran TPS homeowners pay an estimated $100 million in property taxes annually, including up to $32 million in the Los Angeles area alone"). Finally, TPS beneficiaries also contribute to their communities in other less tangible, but equally important, ways. *See, e.g.*, County/Citi Amici at 5 (noting that "a survey of TPS recipients from El Salvador, Honduras, and Nicaragua found that 30 percent are civically active, and about 20 percent engage in community service such as volunteering with nonprofit organizations or at children's hospitals").

The government does not dispute the practical and human hardships upon TPS beneficiaries and their children that will be caused if TPS status were terminated. Nor has the government taken issue with the estimates of adverse impact upon the economy resulting from the termination and resulting *en masse* removal of TPS beneficiaries.

Indeed, the government's own documents reflect that public interest considerations weighs

10

in favor of a preliminary injunction. Apart from adversely impacting the domestic economy, terminating TPS status may have adverse ramifications internationally. For example, in a memo dated October 2017, James Nealon, then-Assistant Secretary for International Affairs in OP&S (and a former ambassador to Honduras), gave examples as to why terminating the TPS designations for, *inter alia*, Nicaragua and El Salvador would be against the United States' own interest – *e.g.*, returning aliens to these countries would put a strain on the countries' systems and "possibly spur further irregular migration to the United States." Degen Decl., Ex. 161 (Memo at 2); El Salvador AR at 1 (U.S. Southern Command, making a similar point regarding El Salvador); *see also* Degen Decl., Ex. 70 (U.S. embassy in El Salvador, recommending extension of TPS designation because it was in the United States' own interest). In an email dated September 2017, the Department of Defense raised concerns that termination of Sudan's TPS designation could negatively impact the United States from a foreign policy perspective. *See* Degen Decl., Ex. 9 (email from Department of Defense, expressing concern about draft language in Federal Register Notice regarding Sudan's TPS designation; adding that "[w]e are entering a delicate phase in our relationship with the Government of Sudan that may set the future trajectory of the relationship for years to come, and maintaining domestic and international partner support through consistent and credible messaging will be critical to achieving defense interests in Sudan").

As noted, the government does not challenge the record evidence compiled by Plaintiffs and amici. That is, as a *factual* matter, the government does not contest any of the injuries or hardships catalogued above. Instead, the government offers only two *legal* arguments as to why there is no likelihood of irreparable injury, the balance of hardships does not tip sharply in Plaintiffs' favor, and/or the public interest weighs against a preliminary injunction. Those legal arguments are: (1) Plaintiffs will suffer an irreparable injury only if they prevail on the merits and Plaintiffs are likely to lose on the merits and (2) Plaintiffs' injuries "are inherent in the temporary nature of TPS status" – *i.e.*, "[a] TPS beneficiary is . . . always subject to the same uncertainties and concerns that Plaintiffs allege here" because the TPS program is inherently temporary in nature. Opp'n at 26. Neither of these arguments is persuasive.

The government's first argument is problematic because it effectively makes the factor of

United States District Court
Northern District of California

likelihood of success on the merits dispositive. But likelihood of success on the merits is not the

sole consideration at the preliminary injunction phase; rather, irreparable injury and the balance of

hardships must also be taken into account. The government's position cannot be squared with the

sliding scale test expressly endorsed by the Ninth Circuit – *i.e.*, that the balance of hardships

defines the showing on the merits the plaintiff must make at the preliminary injunction stage.

Instead, the government's argument assumes there is no merit to Plaintiffs' claims and thus no

irreparable injury. But at this stage, the merits cannot be definitively resolved, as evident in this

Court's order denying the motion to dismiss, its assessment of the merits below, and the District

Court's decision in *Centro Presente v. United States Dep't of Homeland Sec.*, No. 18-10340, 2018

U.S. Dist. LEXIS 122509 (D. Mass. July 23, 2018) (in similar TPS case, largely denying

government's motion to dismiss). At bottom, the government's argument ignores the fact that "[a]

preliminary injunction . . . is not a preliminary adjudication on the merits but rather a device for

preserving the status quo and preventing the irreparable loss of rights before judgment." *Sierra

On-Line*, 739 F.2d at 1422.

The government's second argument fares no better. Although the TPS program is

temporary in nature, that does not mean that Plaintiffs' injuries claimed herein are the purely result

of the temporary nature of the program as opposed to the government's actions. For example, if

(as Plaintiffs argue) the government were to follow the APA's procedural requirements as

Plaintiffs contend is mandated by law, then, at the very least, TPS beneficiaries would have

additional time in the United States to, *e.g.*, work, wrap up their affairs in the United States, and

prepare for a return to their countries of origin. Although their stay is temporary in nature, the

shortening of their time in the United States and acceleration of their removal if relief is not

granted may constitute irreparable injury. There is also the possibility that were DHS to apply

properly the requisites of the APA in assessing the TPS designation at issue, and to do so free of

any Equal Protection taint, the Secretary might determine the extension(s) of TPS status for one or

more of the affected countries is justified.

Balanced against Plaintiffs' injuries if a preliminary injunction were not to issue are the

government's injuries if a preliminary injunction were to issue. As an initial matter, the Court

United States District Court
Northern District of California

1    notes that the government cannot argue in good faith that the continued presence of TPS

2    beneficiaries in the country pending a final adjudication of the merits causes any concrete harm to

3    the United States.  By and large, TPS beneficiaries have been in the United States for a significant

4    number of years, and there is nothing in the record suggesting their continued presence until the

5    merits of this case can be adjudicated threatens the national interest or, *e.g.*, national security.

6    Rather, as amici have underscored and the government has not disputed, TPS beneficiaries are

7    contributors to state and local communities.[5]  Moreover, the Court intends to expedite trial and

8    final adjudication on the merits without delay, thereby minimizing any prejudice to the

9    government.

10            The government nevertheless protests that it and the public "share an interest in ensuring

11   that the process established by Congress – under which the Secretary of Homeland Security is

12   vested with unreviewable discretion to carefully weigh the statutory factors governing TPS

13   designations – is followed as Congress intended."  Opp'n at 27.  The government also states that

14   "the injunctive relief sought by Plaintiffs would frustrate and displace the DHS Secretary's

15   substantive judgment as to how to implement the TPS statute."  Opp'n at 27.  But these arguments

16   are lacking because they relate to jurisdictional issues upon which this Court has already ruled in

17   denying the government's motion to dismiss – *e.g.*, the APA claim herein focuses on process only

18   (not the actual substantive determination as to TPS status of each country), and thus judicial

19   review is not barred.  While the equal protection claim could impact the ultimate determination as

20   to each country, it would do so not on the Secretary's factual findings about country condition

21   which would be insulated from judicial review, but because of the influence of an overarching

22   unconstitutional consideration that transcends each individual determination.

23            Furthermore, the government's argument would apply to any public injunction enjoining

24   the implementation or execution of any legislation or agency/executive policy.  The risk of

25   interference with governmental actions inheres in any public injunction, but that does not

26   _____

27   [5] At the hearing, the government mentioned for the first time that there would be operational costs
     involved if the Court were to issue a preliminary injunction in favor of Plaintiffs.  However, this
28   argument is waived as it was never presented in the government's papers.  Moreover, there is no
     record evidence to substantiate any "operational harm."

United States District Court
Northern District of California

categorically bar such injunctions.  While courts must exercise particular caution in issuing

injunctions on matters that concern immigration given Congress and the President's extensive

authority in this arena, it is beyond peradventure that governmental decision, even those that

concern on immigration, are not immune from judicial review.  *See, e.g., Zadvydas v. Davis*, 533

U.S. 678, 682 (2001) (with respect to "aliens who were admitted to the United States but

subsequently ordered removed," considering "whether the post-removal-period statute authorizes

the Attorney General to detain a removable alien indefinitely beyond the removal period or only

for a period reasonably necessary to secure the alien's removal") (emphasis added); *Osorio-

Martinez v. AG United States*, 893 F.3d 153, 175 (3d Cir. 2018) ("recogniz[ing] that, while the

political branches' plenary power over immigration is 'by no means . . . subject to judicial review

in all contexts,' it is 'certain[ly]' subject to judicial review in some contexts because that power 'is

[not] limitless in all respects'"; thus, distinguishing between aliens seeking initial admission to the

country and those who had developed substantial connections with the country).

The bottom line is there is nothing in the record establishing the continued presence of TPS

beneficiaries in the United States causes harm to the country; in contrast, if the Court were to deny

an injunction, Plaintiffs stand to suffer substantial irreparable injury.  Any ultimate adjudication on

the merits in their favor may come too late if they have been removed prior to final adjudication.

Once the TPS beneficiaries are removed, the government's actions – if deemed unlawful in this

lawsuit – could not practically be undone.

Accordingly, the Court finds that, without a preliminary injunction, there is a strong

likelihood that Plaintiffs would suffer irreparable injury, with concomitant harm to state and local

communities as well.  In addition, any harm to the government or the public if a preliminary

injunction were issued is strongly outweighed by the harm to Plaintiffs and their communities

should a preliminary injunction not issue.[6]  The balance of hardships tips decidedly in Plaintiffs'

---

[6] To the extent the government argues laches (*i.e.*, Plaintiffs should have brought their case and/or moved for a preliminary injunction earlier), that contention is without merit because Plaintiffs have been diligent.  Plaintiffs filed their case in March 2018, which was only a few months after decisions were made on Haiti and El Salvador.  While the decisions on Sudan and Nicaragua were made a little earlier, Plaintiffs' lawsuit was still filed well in advance of the actual termination dates.  As for the motion for preliminary injunction, although it was not filed until August 2018,

United States District Court
Northern District of California

1    favor.

2    C.       Likelihood of Success on the Merits/Serious Questions Going to the Merits

3            The Court now turns to the issue of likelihood of success on the merits.  Because Plaintiffs

4    have established that the balance of hardships tips sharply in their favor, they need only show

5    serious questions on the merits have been raised in order to obtain preliminary injunctive relief.

6    Plaintiffs argue that they are likely to succeed, but, at the very least, there are serious questions

7    going to the merits, on both their APA and Equal Protection claims.  Each claim is addressed

8    below.

9            1.       APA Claim

10           The Court previously laid out the legal standard for Plaintiffs' APA claim in its order

11   denying the government's motion to dismiss:

12               Under the APA, agency action may be set aside if it is arbitrary or
                 capricious. See 5 U.S.C. § 706(2)(A). Under this standard, an
13               agency must "examine the relevant data and articulate a satisfactory
                 explanation for its action."  *Motor Vehicle Mfrs. Assn. of United*
14               *States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43
                 (1983).  But "a court is not to substitute its judgment for that of the
15               agency" and "should uphold a decision of less than ideal clarity if
                 the agency's path may reasonably be discerned."  *F.C.C. v. Fox*
16               *Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation and
                 quotation omitted).
17
                 The APA constrains an agency's ability to change its practices or
18               policies without acknowledging the change or providing an
                 explanation.  "[T]he requirement that an agency provide reasoned
19               explanation for its action would ordinarily demand that [an agency]
                 display awareness that it *is* changing position."  *Id.* at 515 (emphasis
20               in original). Thus, agencies "may not . . . depart from a prior policy
                 *sub silentio* or simply disregard rules that are still on the books," and
21               "must show that there are good reasons for the new policy."  *Id.*
                 (emphasis in original).  An agency need not demonstrate that "the
22               reasons for the new policy are better than the reasons for the old
                 one; it suffices that the new policy is permissible under the statute,
23               that there are good reasons for it, and that the agency *believes* it to
                 be better, which the conscious change of course adequately
24               indicates."  *Id.* (emphasis in original).

25               This constraint on changes to agency policy is not limited to formal
                 rules or official policies.  It applies to practices implied from the
26               agency conduct.  For example, in *California Trout v. F.E.R.C.*, 572

27   _____

28   that is because the parties first decided to litigate the 12(b)(6) issues, which included a
     jurisdictional issue.

HT Vacatur AR_0381

United States District Court
Northern District of California

F.3d 1003 (9th Cir. 2009), the plaintiffs challenged the Federal Energy Regulatory Commission's (FERC) denial of their untimely attempt to intervene in a proceeding concerning the renewal of an operating license for a dam and power plant. In essence, the plaintiffs argued that FERC's decision to grant late intervention requests in three prior adjudications had given rise to an implicit rule that FERC would always grant late requests in certain circumstances, and that FERC was required to offer a reasoned explanation before abandoning that practice. Although it ultimately held against the plaintiffs, the Ninth Circuit agreed that the alleged change in adjudicative practice was subject to the APA's requirements for reasoned decision-making. It explained that "while an agency may announce new principles in an adjudicatory proceeding, it may not depart, sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case." *Id.* at 1022 (quotation and citation omitted)). Rather, "if [an agency] announces and follows – *by rule or by settled course of adjudication* – a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative Procedure Act.'" *Id.* at 1023 (quoting *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996)) (emphasis added, alteration in original). The court proceeded to consider the claim on the merits and held that the agency's prior decisions had *not* "establish[ed] a broad principle that the Commission will allow untimely intervention." *Id.* at 1024.

Thus, *California Trout* establishes that a shift in agency practice (as opposed to a formal rule or policy) is also reviewable under the APA. Courts have also looked, in part, to whether an agency's past practice evinces the existence of an implicit rule or policy. *See, e.g.*, *Northwest Env. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668 (9th Cir. 2007) (holding that BPA's decision to stop funding Fish Passage Center and to divert its responsibilities to two other entities after nearly two decades was arbitrary and capricious where no reasoned explanation was provided); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017) (after "longstanding practice" of treating certain land as if it were part of the Wild Horse Territory, agency's unexplained change in practice was arbitrary-and-capricious, particularly where it "fail[ed] even to acknowledge its past practice . . . let alone to explain its reversal of course in the 2013 decision").

Docket No. 55 (Order at 24-26). The alleged changes in policy – eliminating consideration of intervening conditions not directly related to the originating condition – is substantive and highly consequential; it is at least as significant and impactful as the changes in *California Trout*, *Bonneville Power Admin.*, and *Am Wild Horse Pres. Campaign*. Indeed, the significance of the change was recognized by Acting Secretary Duke as "a strong break with past practice." Degen Decl., Ex. 30. *See Centro Presente*, 2018 U.S. Dist. LEXIS 122509, at *62 (in a similar TPS case,

16

United States District Court
Northern District of California

1  noting that "even if the alleged new policy is interpretive [rather than legislative, with only the

2  latter requiring the notice-and-comment process], Defendants would be required to provide some

3  rationale acknowledging the change in position to provide the 'observance of procedure required

4  by law'"). *Cf. Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) (noting that,

5  in explaining its changed position, an agency must also be cognizant that longstanding policies

6  may have "engendered serious reliance interests that must be taken into account").

7          Based on the above legal standard, all that Plaintiffs must show to establish a likelihood of

8  success on the merits – or least serious questions going to the merits – is a change in DHS

9  practices with respect to TPS designations.  There is no dispute that DHS never acknowledged any

10  change in practice and thus has not provided any explanation for any such change.

11          Recognizing the impact of the Court's order on the motion to dismiss, the government

12  implicitly suggests that the Court should reconsider its ruling that the APA's restrictions apply to

13  agency practices, and not just formal rules or official policies.  This is evidenced by the

14  government's attempt to distinguish the cases cited by the Court in its order on the motion to

15  dismiss.  *See* Opp'n at 12-13 & n.11 (addressing, *inter alia*, three cases discussed in the Court's

16  order – namely, *California Trout*, *Bonneville Power*, and *Wild Horse*).  The Court rejects the

17  government's implicit suggestion because (1) the government has not formally moved for

18  reconsideration of the Court's order on the motion to dismiss and (2) even if it had, it has made no

19  showing that, *e.g.*, the Court manifestly failed "to consider material facts or dispositive legal

20  arguments which were presented to the Court before" it ruled on the motion to dismiss.  Civ. L.R.

21  7-9(b)(3).

22          Left with this, the government has come up with a slightly different legal argument:

23      (1) that the purpose behind the APA's procedural requirements is "to ensure that regulated

24          entities have fair notice of permissible and impermissible regulated conduct and their

25          obligations under the law, as well as the sanctions they may incur if they breach those

26          obligations";

27      (2) that the APA's procedural requirements therefore kick in only when an agency

28          "change[s] the rules of the game in a way that bears directly on the rights or interests of

United States District Court
Northern District of California

1    regulated entities and other stakeholders"; and

2    (3)  that, here, "[u]nlike regulatory administrative actions, the designation of a country for

3    [TPS] and the subsequent termination of that temporary status does not impose

4    regulatory obligations or restrictions on regulated entities, or impose penalties for the

5    violation of those obligations or restrictions."  Opp'n at 11, 13.

6    This argument is not convincing for two reasons.  First, although there are cases in which

7    regulated entities have challenged regulating agency policy or practices, there are also cases in

8    which the challenging party is not a regulated entity – including *California Trout*, *Bonneville*

9    *Power*, and *Wild Horse*.  For example, the plaintiffs in *California Trout* were organizations

10    designed to preserve California's wild trout populations and to preserve California's rivers; they

11    argued that an agency's denial of their ability to intervene in a license renewal proceeding for a

12    dam operator was arbitrary and capricious.  *See Cal. Trout*, 572 F.3d at 1011; *see also Bonneville*

13    *Power*, 477 F.3d at 672 (plaintiff-environmental groups challenging an action of the federal

14    agency that operates dams on the Columbia River – *i.e.*, transferring the functions of the Fish

15    Passage Center to other entities); *Wild Horse*, 873 F.3d at 922 (plaintiff-advocates for the

16    protection of wild horses asserting that the Forest Service's revision of the Devil's Garden Wild

17    Horse Territory violated various federal statutes).  Second, TPS beneficiaries clearly have a stake

18    in whether their countries of origin maintain their TPS designations.  A person cannot become a

19    TPS beneficiary unless he or she is, in the first place, "a national . . . of a foreign state" with a TPS

20    designation.  8 C.F.R. § 244.2(a).  Therefore, TPS beneficiaries have a sufficient interest – as

21    much interest as any regulated entity – to challenge the agency actions: here DHS's decisions to

22    terminate TPS designations.

23    In its opposition, the government contends that, to the extent TPS beneficiaries are

24    regulated, the only rules to which APA procedural requirements attach are the regulations found in

25    8 C.F.R. Part 244, which expressly apply to TPS beneficiaries.  *See, e.g.*, 8 C.F.R. § 244.2

26    (providing that "an alien may in the discretion of the director be granted [TPS] if the alien

27    establishes" certain facts); *id.* § 244.10 (providing, *inter alia*, that "USCIS will grant temporary

28    treatment benefits to the applicant if the applicant establishes prima facie eligibility for [TPS]" and

United States District Court
Northern District of California

1    that, if TPS is denied, the alien may appeal).  But the government offers no principled reason why

2    the APA's procedural requirements attach to these regulations only.  Even though these

3    regulations deal with TPS beneficiaries specifically, that does not mean that TPS beneficiaries are

4    not impacted by rules that relate to TPS designations more broadly, including the practices and

5    policies at issue here.  As noted above, broader rules on TPS designations *do* impact TPS

6    beneficiaries since a TPS beneficiary's status is dependent on a TPS designation.

7          The government protests that, even if Plaintiffs are allowed to challenge the process related

8    to a TPS designation, they have still failed to show that there is any new policy or practice that

9    would trigger the APA's procedural requirements (*i.e.*, an acknowledgment of the change in policy

10   or practice and an explanation thereof).  According to the government, there have simply been

11   "variations in how different Secretaries render their fact-intensive TPS determinations" – "at most

12   a difference in emphasis rather than what could plausibly be considered a 'new rule.'"  Opp'n at

13   11.  The Court disagrees.  There is a wealth of record evidence to support Plaintiffs' position that

14   the DHS changed its practices with regard to TPS designations – notably, evidence *beyond* a

15   comparison of the Federal Register Notices on TPS designations before and after the Trump

16   administration took over which this Court previously undertook.  *See* Docket No. 55 (Order at 27-

17   33) (noting, *inter alia*, that "[p]rior to October 2017, extension and/or re-designation notices

18   indicate that DHS consistently considered, at the very least, whether intervening events had

19   frustrated or impeded recovery efforts from the originating conditions in Sudan, Haiti, Nicaragua,

20   and El Salvador"; in contrast, "the termination notices for Sudan, Haiti, Nicaragua, and El

21   Salvador [under the Trump administration] are curt and fail to address numerous conditions that

22   justified extensions of TPS status in the most recent notices issued by prior administrations").  The

23   comparative table set forth in this Court's prior order is relevant here.  *See* Docket No. 55 (Order

24   at 30-32).

25          Since that order, Plaintiffs have developed additional evidence of a change in DHS process

26   and policy.  For example, Leon Rodriguez, a former USCIS director, testified that, both before and

27   during his tenure at USCIS, there was no agency policy or practice that precluded "consideration

28   of the *full range* of current country conditions" in assessing whether a TPS designation should be

United States District Court
Northern District of California

1  terminated or extended.  Rodriguez Decl. ¶ 17 (emphasis added).

2              Rather, USCIS had broad discretion to consider current conditions
3          in the subject country.  Intervening factors arising after a country's
           original TPS designation, such as subsequent natural disasters,
4          issues of governance, housing, health care, poverty, crime, general
           security, and other humanitarian considerations were considered
5          relevant to determining whether a country continued to meet the
           conditions for continuing TPS designation.  *This was true regardless*
6          *of whether those intervening factors had any connection to the event*
           *that formed the basis for the original designation or to the country's*
7          *recovery from that originating event.*

8  Rodriguez Decl. ¶ 17 (emphasis added).  *See, e.g.*, Degen Decl., Exs. 125-26 (Decision Memos,

9  signed by Mr. Rodriguez while USCIS director) (recommending extensions for Nicaragua and El

10  Salvador because of "subsequent environmental disasters").

11        Evidence that DHS/USCIS under the Trump administration changed the above practice –

12  now disregarding current conditions if they are not the originating condition or directly related to

13  the originating condition – is substantiated by the following:

14        •  On April 14, 2017, a career USCIS staff member sent an email to a senior RAIO

15           official regarding Haiti's TPS designation.  The staff member indicated that the

16           decision regarding Haiti "was a political one . . . . *Their position was that Haiti was*

17           *designated on account of the 2010 earthquake, and those conditions have*

18           *significantly improved.  The extraordinary conditions Haiti currently faces are*

19           *longstanding, intractable problems, not 'temporary' as the statute requires.*"

20           Degen Reply Decl., Ex. 124 (email) (emphasis added).

21        •  On May 22, 2017, there was a press call on Haiti's TPS designation.  During the

22           call, there were reporter questions about, *e.g.*, what "evidence and information that

23           the [DHS] Secretary looked at to make the decision and what went into his

24           determination that conditions were improving."  Degen Decl., Ex. 17 (email, with

25           attachment).  "The most common response [from DHS] was that the Secretary was

26           doing exactly what Congress asked us to do via the INA and that is to determine

27           whether conditions *that led to Haiti's initial designation in 2010* remain."  Degen

28           Decl., Ex. 17 (email, with attachment) (emphasis added).

United States District Court
Northern District of California

- On May 23, 2017, an email was sent from USCIS to OP&S which provided guidance from the DHS Secretary with respect to "drafting response letters regarding TPS for Haiti." Degen Reply Decl., Ex. 127 (email). "'From S1 [the Secretary], make case as such: Highlight temporary nature; *2010 Earthquake is the only reason for TPS being granted – Not based on hurricane, or current economic conditions – Not based on cholera epidemic*.' Suggested language, 'As you know, granting TPS was based solely on 2010 earthquake that ravaged Port au Prince. Primarily localized damage in capital region of Port au Prince. Recovery slow but steady, UN has determined their stabilization force is no longer needed. Decision to rebuild palace shows economic [sic] is recovering.'" Degen Reply Decl., Ex. 127 (email) (emphasis added).

- On June 6, 2017, then-DHS Secretary Kelly testified before the Senate Homeland Security and Governmental Affairs Committee and was asked whether DHS was "going to look at the situation that started temporary protected status, and ask if that situation has changed." Degen Decl., Ex. 35 (Tr. at 69). Secretary Kelly responded: "[O]nce someone goes on this status, they – traditionally or historically, they just renew it"; "some of the Central Americans have been on status over 20 years, and they were put on status because of a hurricane that happened over 20 years ago. [¶] I can tell you that things are going better in Central America, much, much better over the last 20 years, in many ways better. But no one's every looked at it. And I think that's something – we have to do that." Degen Decl., Ex. 35 (Tr. at 70). Secretary Kelly continued: "[A]nd the program is for a specific event. In – in Haiti, it was the earthquake. Yes, Haiti had horrible conditions before the earthquake, and those conditions aren't much better after the earthquake. *But the earthquake was why TPS was – was granted and – and that's how I have to look at it.*" Degen Decl., Ex. 35 (Tr. at 70) (emphasis added).

- On November 6, 2017, Acting Secretary Duke wrote an email to White House Chief of Staff Kelly, informing him of her decisions on TPS for Nicaragua and

Honduras (terminate and extend for six months, respectively).  She noted that her decisions "will send a clear signal that TPS in general is coming to a close" – "a strong break with past practice."  Degen Decl., Ex. 30 (email).

- On November 6, 2017, there was a moderated press call regarding Acting Secretary Duke's decisions on Nicaragua and Honduras's TPS designations.  *See* Degen Decl., Ex. 31 (transcript).  During the call, Mr. Hoffman (the Assistant Secretary of Public Affairs at DHS) was asked the following question: "If you talk to immigrant advocates in the Central American community, they'll raise the issue of creasing violence in Central America in the northern triangle and while that was not the cause for the initial TPS, they say that that warrants continuing the program.  Is that a factor that you are considering?"  Degen Decl., Ex. 31 (Tr. at 8).  Mr. Hoffman responded: "So, under the Statute, the INA restricts considerations for continuing designation of TPS to the conditions on the ground *as impacted by the initial event*, whether it's a civil war or a natural disaster.  So, the conditions on the ground and how they were impacted by that event is what we have to consider under the State.  I will say that if individuals believe that there are other reasons that they cannot return, there are other avenues available and they can apply for other immigration benefits outside of TPS."  Degen Decl., Ex. 31 (Tr. at 8) (emphasis added).

- In January 2018, DHS Secretary Nielsen testified before the Senate Judicial Committee, noting that "[w]e did not talk generally about the country conditions, and I want to be very clear on this.  The law does not allow me to look at the country conditions of a country, writ large"; rather, "[i]t requires me to look very specifically as to whether the country conditions originating from the original designation continue to exist" so, for El Salvador, "we didn't dispute the country conditions are difficult . . . , but unfortunately, the law requires me, *if I cannot say that the conditions emanating from the earthquakes still exist, regardless of other systemic conditions, I must terminate TPS*."  Degen Decl., Ex. 36 (Tr. at 26) (emphasis added).

United States District Court
Northern District of California

United States District Court
Northern District of California

- In April 2018, DHS Secretary Nielsen testified before the House Appropriations Subcommittee on Homeland Security.  She was asked about the termination of Haiti's TPS designation – more specifically, "[H]ow can we possibly rationalize sending 59,000 people back to those kinds of conditions?" which included "political violence" and "civil unrest" such that the DOS has a "level three travel advisory for Haiti, meaning that people should reconsider any plans to travel there because of the conditions on the ground."  Degen Decl., Ex. 34 (Tr. at 47).  Secretary Nielsen responded in part as follows: "[T]he law really restricts my ability to extend TPS.  The law says that *if the effects of the originating event, so that's a causation issue, do not continue to exist* then the secretary of Homeland Security must terminate."  Degen Decl., Ex. 34 (Tr. at 47) (emphasis added).

- The Decision Memos for the countries at issue reference recovery from the originating condition as the basis for termination and, in three out of four instances, explicitly reject consideration of current country conditions not directly related thereto.[7]  *See, e.g.,*

  ❖ Degen Decl., Ex. 45 (Haiti Decision Memo at 1, 5) (noting that Haiti was

---

[7] The Country Conditions Memos, which the government does not dispute were prepared by career DHS/RAIO employees rather than political appointees, did not limit discussion of country conditions to those only directly related to the originating conditions for the TPS designations. *See, e.g.,* Haiti AR at 46-47 (noting that "Haiti has also experienced various setbacks that have impeded its recovery, including a cholera epidemic and the impact of Hurricane Matthew"; that "Haiti 'continues to be affected by a convergence of humanitarian needs,' including food insecurity, internal displacement, an influx of refugees from the Dominican Republic, the persistence of cholera, and the lingering impact of various natural disasters"; and that "Haiti's recovery has also been impacted by a series of other challenges related to housing, healthcare, economic growth, political instability, security, and environmental concerns"); Sudan AR at 29, 37-38 (noting that, "while armed conflict has been the primary driving force behind the humanitarian needs in Sudan, poverty, floods, drought, and environmental degradation have also significantly affected the livelihoods of vulnerable people, particularly children"; also taking note of "an inadequate transportation infrastructure prevents efficient access to markets," "significant economic instability after the secession of South Sudan in 2011," and a "cholera outbreak" that began in 2016); Nicaragua AR at 17, 22 (taking note of environmental disasters occurring after Hurricane Mitch, as well as violence and conflict in the country); El Salvador AR at 52 (taking note of "subsequent natural disasters and environmental concerns, including: hurricanes and tropical storms; heavy rains and flooding; volcanic and seismic activity; a coffee rust epidemic; and prolonged and severe drought; and an increase in various mosquito-borne diseases"; also taking note of "widespread gang activity and one of the highest homicide rates on earth").

United States District Court
Northern District of California

designated for TPS in 2010 "due to extraordinary and temporary conditions resulting from the earthquake" that struck the country on January 12, 2010, and ultimately recommending termination of TPS designation because "Haiti has made significant progress in recovering from the 2010 earthquake and no longer continues to experience the extraordinary and temporary conditions that formed the basis of Haiti's designation and redesignation of TPS"; "[a]ny current issues in Haiti are unrelated to the 2010 earthquake")[8];

❖ Degen Decl., Ex. 87 (Sudan Decision Memo at 2, 6) (noting that Sudan was designated for TPS in 1997 "due to ongoing armed conflict and extraordinary and temporary conditions in Sudan" and ultimately recommending termination of TPS designation because, *inter alia*, "[t]here were unilateral ceasefires in October 2016 which led to a reduction in violence and rhetoric from the conflict parties" and, although "[t]here is ongoing conflict in some regions, [it is] not the entire country");

❖ Degen Decl., Ex. 44 (Nicaragua Decision Memo at 1, 4) (noting that Nicaragua was designated for TPS in 1999 "because of the devastation caused by Hurricane Mitch in October of 1998" and ultimately recommending termination of TPS designation because "the country suffers few remaining residual effects of Hurricane Mitch, which formed the basis of Nicaragua's designation for TPS in 1999"; "current challenges cannot be directly tied to damage from the storm");

❖ Degen Decl., Ex. 110 (El Salvador Decision Memo at 1, 5) (noting that El Salvador was designated for TPS in 2001 "because of the devastation

---

[8] *See also* Degen Decl., Ex. 52 (Haiti Decision Memo at 4) (in memo dated April 10, 2017, stating that "it is not in the national interest to extend a TPS designation when the specific extraordinary and temporary conditions giving rise to a TPS designation no longer exist[;] in addition, the law only permits an extension of Haiti's TPS designation if the extraordinary and temporary conditions that prompted designation continue to exist").

caused by major earthquakes in January and February of that year" and
ultimately recommending termination of TPS designation because "El
Salvador suffers few remaining residual effects related to the major
earthquakes that led to its designation for TPS in 2001"; "current
challenges cannot be directly tied to damage from the earthquakes").

A particularly telling communication is an internal email exchange within DHS/OP&S,
dated October 13, 2017.  Ms. Kovarik (Chief of OP&S) stated that, with respect to the draft
Decision Memos for what appear to be Honduras, Nicaragua, and El Salvador, there was a
"problem" in that the memos "read[] as though we'd recommend an extension b/c we talk so much
about how bad it is, but there's not enough in there about positive steps that have been taken since
it's designation."  Degen Decl., Ex. 2 (email).  A responsive email from a career employee stated:
"We can comb through the country conditions to try to see what else there might be, but the basic
problem is that it IS bad there [with respect to] all of the standard metrics.  *Our strongest
argument for termination, we thought, is just that it is not bad in a way clearly linked to the initial
disasters prompting the designations.*  We can work with RU to try to get more, and/or comb
through the country conditions we have again looking for positive gems, but the conditions are
what they are."  Degen Decl., Ex. 2 (email) (emphasis added).

The government makes much of the fact that Acting Secretary Duke – who made the TPS
decisions on Haiti, Sudan, and Nicaragua – was given information about current conditions (and
from many different sources), *see* Opp'n at 4-5; that Acting Secretary Duke was required to
consider current conditions per the TPS statute (*e.g.*, in the case of an environmental disaster, to
assess whether the country of origin could adequately handle the return of its nationals); and that
Acting Secretary Duke did give current conditions weight as reflected by her November 2017
decision not to terminate Honduras's TPS designation and extend it for six months.

However, the fact that Acting Secretary Duke *received* information regarding current
conditions, does not prove she ultimately considered and relied on those conditions in deciding to
terminate TPS status.  The substantial record recited above strongly suggests she did not.  As to
the government's new claim that the Acting Secretary (or Secretary) was now *required* under TPS

United States District Court
Northern District of California

United States District Court
Northern District of California

1   statute to consider country conditions other than the triggering condition, that assertion is belied

2   by the record evidence above.  It is also not supported by any reference by the Acting Secretary or

3   Secretary to any document acknowledging any such requirement.

4          As to Honduras, the Court notes that (1) Honduras was given only a brief extension of six

5   months; (2) Honduras's TPS designation was eventually terminated; (3) whether a foreign country

6   can adequately handle the return of its nationals is – at least arguably – a secondary issue, separate

7   and distinct from whether the originating condition or conditions directly related thereto persist;

8   (4) Acting Secretary Duke's November 2017 decision did not disavow the general approach that a

9   TPS designation must ultimately be terminated if the existence of the originating condition or

10  conditions directly related do not exist; and (5) Acting Secretary Duke seemed to endorse that

11  approach, stating, in an email dated November 6, 2017, that her actions on Honduras were "a

12  strong break with past practice . . . . By not affirmatively extending, I'm stating that I'm not

13  satisfied that the country conditions remain – but not yet sure how to best end TPS for this

14  country."  Degen Decl., Ex. 30 (email).  Finally, regardless of what Acting Secretary Duke did

15  with respect to Honduras, the fact remains that she did not grant any extension for Haiti, Sudan,

16  and Nicaragua and that, as reflected in the Federal Register Notices related to the termination of

17  those countries' TPS designations, termination largely turned on whether the originating condition

18  or conditions directly related thereto persisted.

19         Accordingly, the Court concludes that not only have Plaintiffs have shown serious

20  questions going to the merits, they have demonstrated a likelihood of success on the merits for

21  their APA claim.  DHS made a deliberate choice to base the TPS decision solely on whether the

22  originating conditions or conditions directly related thereto persisted, regardless of other current

23  conditions no matter how bad, and that this was a clear departure from prior administration

24  practice.[9]  This departure was a substantial and consequential change in practice – indeed, as the

25

26  ─────────────────────
[9] In their briefs, Plaintiffs also describe other changes in the TPS decision-making process.  These

27  changes are more relevant to the Equal Protection claim and therefore are addressed there.
    However, the Court acknowledges that the changes in the TPS decision-making process do have

28  some probative value for the APA claim as well – *i.e.*, the changes underscore that there was a
    conscious choice by DHS under the Trump administration to take a different approach.

United States District Court
Northern District of California

1    government now argues, it could violate the TPS statute itself.  The government has offered no

2    explanation or justification for this change.  The evidence submitted by Plaintiffs (discussed above

3    and below) suggests this change may have been made in order to implement and justify a pre-

4    ordained result.

5            In light of the balance of hardships, which, as discussed above, tips sharply in Plaintiffs'

6    favor, Plaintiffs are entitled to a preliminary injunction based on their showing on the merits of the

7    APA claim.

8            2.        Equal Protection Claim

9            Regarding the Equal Protection claim, the Court finds that there are, at the very least,

10   serious questions going to the merits, thus justifying the issuance of a preliminary injunction on an

11   independent ground.

12           a.        *Arlington Heights*

13           In its order denying the government's motion to dismiss, the Court held that *Village of*

14   *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) – and not

15   *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) – provides the governing legal standard.  *See* Docket No.

16   55 (Order at 44-45).  Under *Arlington Heights*, "[p]roof of a racially discriminatory intent or

17   purpose of required to show a violation of the Equal Protection Clause," and, "[w]hen there is

18   proof that a discriminatory purpose has been a motivating factor in the [government's] decision, . .

19   . judicial deference [to that decision] is no longer justified." *Arlington Heights*, 429 U.S. at 265-

20   66. *Arlington Heights* sets forth various factors to consider in discerning whether the decision at

21   issue was based on an impermissible purpose.

22           Here, Plaintiffs have provided sufficient evidence to raise serious questions as to whether a

23   discriminatory purpose was a motivating factor in the decisions to terminate the TPS designations.

24   In particular, Plaintiffs have provided evidence indicating that (1) the DHS Acting Secretary or

25   Secretary was influenced by President Trump and/or the White House in her TPS decision-making

26   and (2) President Trump has expressed animus against non-white, non-European immigrants.  As

27   this Court noted, even if the DHS Secretary or Acting Secretary did not "personally harbor animus

28   . . . , their actions may violate the equal protection guarantee if President Trump's alleged animus

United States District Court
Northern District of California

1    influenced or manipulated their decisionmaking process."  Docket No. 55 (Order at 43).

2           As to the first issue, Plaintiffs have pointed to several pieces of evidence suggesting that

3    the White House was putting pressure on DHS to end TPS.  For example, there is evidence that

4    "the White House was keenly interested in the [DHS] Secretary's decisions related to TPS,"

5    Degen Decl., Ex. 12 (Nealon Depo. at 89-90), and that Stephen Miller, "an important [senior]

6    adviser to the President and the White House," "frequently" reached out to Chad Wolf, the DHS

7    Chief of Staff, about TPS, Degen Decl., Ex. 85 (Nealon Depo. at 288, 297, 300), as well as Gene

8    Hamilton, the Senior Counselor to the DHS Secretary.  On more than one occasion, Mr. Hamilton

9    stated that "Mr. Miller favored the termination of TPS."  Degen Decl., Ex. 85 (Nealon Depo. at

10   292).

11          As another example, shortly before Acting Secretary Duke was to make a decision on the

12   TPS designations for Nicaragua, Honduras, and El Salvador, a White House Principals Meeting

13   was held to discuss the TPS designations.[10]  It appears that attendees included high-level White

14   House officials such as Chief of Staff Kelly, then-Principal Deputy Chief of Staff Nielsen, and

15   Press Secretary Sanders.  A memo distributed by the White House National Security Council in

16   advance of the meeting recommended that the TPS designations be terminated and that Congress

17   be engaged "to pass a comprehensive immigration reform to include a merit based entry system."

18   Degen Decl., Ex. 14 (NSC Memo at 2).  The National Security Council recommendation to

19   terminate TPS status was given to Acting Secretary Duke.  *See* Degen Decl., Ex. 29 (Memo at 2).

20   In addition, White House Chief of Staff Kelly subsequently had a conversation with Acting

21   Secretary Duke about the TPS designations for the Central American countries.[11]  *See* Degen

22   _____

23   [10] A Principals Meeting is "a meeting of people at the cabinet level to coordinate policy."  Docket
     No. 117-4 (Martin Decl., Ex. 4) (Nealon Depo. at 340).

24   [11] The Washington Post reported that White House Chief of Staff Kelly had put pressure on
25   Acting Secretary Duke to terminate Honduras's TPS designation.  *See* Degen Decl., Ex. 28
     (Washington Post article, dated November 9, 2017).  The Court acknowledges, however, that, in
26   an email that was eventually passed on to Acting Secretary Duke, White House Chief of Staff
     Kelly maintained that he merely told Acting Secretary Duke that the decision was hers and that he
27   would recommend a limited extension no longer than twelve months for the Central American
     countries.  *See* Martin Decl., Ex. 3 (email) (White House Chief of Staff maintaining that he simply
28   conveyed that his "view was to grant limited (no more than 12 months or so [versus] the
     maximum 18 months allowed by the TPS program) to the Central American TPS recipients who

     28

1  Decl., Ex. 30 (email).

2       That the White House did, in fact, have influence on the TPS decisions is supported by the

3  fact that, soon after the above, Acting Secretary Duke terminated the TPS designation for

4  Nicaragua.  Also, Acting Secretary Duke essentially indicated to White House Chief of Staff Kelly

5  that Honduras's TPS designation would eventually be terminated as well, although she was not, at

6  that point, formally terminating that country's status.  *See* Degen Decl., Ex. 30 (email) (stating

7  that, "[b]y not affirmatively extending [Honduras's TPS designation], I'm stating that I'm not

8  satisfied that the country conditions remain – but not yet sure how to best end TPS for this

9  country"; also stating that "[t]hese decisions along with the public statements will send a clear

10  signal that *TPS in general is coming to a close*") (emphasis added).

11       Notably, Acting Secretary Duke's writings suggest that she, in her role at DHS, was

12  largely carrying out or conforming with a predetermined presidential agenda to end TPS.  For

13  example, in a November 2017 email to White House Chief of Staff Kelly, in which she reported

14  on her decision to terminate for Nicaragua and temporarily extend for Honduras, Acting Secretary

15  Duke stated that "[t]hese decisions along with the public statements will send a clear signal that

16  TPS in general is coming to a close.  *I believe it is consistent with the President's position on*

17  *immigration* . . . ."  Degen Decl., Ex. 30 (email) (emphasis added).  She added: "[T]his decision is

18  really just a difference in strategy *to get to the President's objectives*."  Degen Decl., Ex. 30

19  (email) (emphasis added).  In a subsequent email to White House Chief of Staff Kelly, Acting

20  Secretary Duke noted that Tom Bossert of the White House National Security Council had

21  "informed me of a strategy I was not previously aware of" and she had now "incorporated this

22  new information into my final decision."[12]  Degen Decl., Ex. 30 (email).  In a draft memo

23  regarding her TPS decisions, Acting Secretary Duke was equally direct:  "The TPS program must

24  end for these countries soon . . . . [¶] *This conclusion is the result of an America first view of the*

25  _____

26  have been here for 20 years," and that he simply told Acting Secretary Duke to make a decision –
    and "[t]hat the decision on TPS was entirely hers").

27  [12] *Cf.* Degen Reply Decl., Ex. 135 (email) (Acting Secretary Duke stating that there was an
28  "internal controversy . . . at least in part because there was a WH strategy that DHS, and me as the
    decision maker, wasn't informed of").

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    *TPS decision.*"  Degen Decl., Ex. 29 Memo at 1 (emphasis added).

2          Because there is evidence that President Trump and/or the White House influenced the

3    DHS on the TPS decisions to at least raise serious question on the merits, the remaining issue is

4    whether there is evidence that President Trump harbors an animus against non-white, non-

5    European aliens which influenced his (and thereby the Secretary's) decision to end the TPS

6    designation.  As Plaintiffs have catalogued, there is evidence of such as reflected by statements

7    made by President Trump before, during, and after the TPS decision-making process[13]:

8          • In June 2015, Mr. Trump announced that he was running for President and

9            delivered remarks characterizing Mexican immigrants as drug dealers or users,

10           criminals, and rapists.  *See* Degen Decl., Ex. 92 (Washington Post article).

11         • "In December 2015, [Mr.] Trump called for 'a total and complete shutdown of

12           Muslims entering the United States.'"  Degen Decl., Ex. 95 (New York Times

13           article).

14         • In June 2017, President Trump stated that "15,000 recent immigrants from Haiti

15           'all have AIDS' and that 40,000 Nigerians, once seeing the United States, would

16           never 'go back to their huts' in Africa."  Degen Decl., Ex. 95 (New York Times

17           article).

18         • On January 11, 2018, during a meeting with lawmakers where immigrants from

19           Haiti, El Salvador, and African countries were discussed, including with respect to

20           TPS designations that had been terminated, President Trump asked: "'Why are we

21           having all these people from shithole countries come here?'  [He] then suggested

22

23    _____

      [13] The government has objected to "hearsay excerpts from newspaper articles and similar sources."
      Opp'n at 10.  However, the objection lacks merit for several reasons.

24

25          First, Plaintiffs cited the statements in their complaint, but the government did not clearly
      deny them in the answer.  *See, e.g.*, Ans. ¶ 66 ("Defendants aver that any such statements speak
      for themselves.").  Second, it is not apparent that President Trump's statements are even hearsay in

26    the first place.  See Fed. R. Evid. 801(d)(2) (providing that an opposing party's statement, when
      offered against the opposing party, is not hearsay).  Finally, as Plaintiffs point out, the Ninth

27    Circuit has held that "[a] district court may . . . consider hearsay in deciding whether to issue a
      preliminary injunction" – in fact, "'may give even inadmissible evidence some weight, when to do
      so serves the purpose of preventing irreparable harm before trial.'"  *Johnson v. Couturier*, 572

28    F.3d 1067, 1083 (9th Cir. 2009).

                                    30

Case 3:25-cv-01766-EMC Document 112-4 Filed 04/15/25 Page 95 of 142

United States District Court
Northern District of California

that the United States should instead bring more people from countries such as Norway," which has a predominantly white population.  Degen Decl., Ex. 96 (Washington Post article).  He also told lawmakers that immigrants from Haiti "must be left out of any deal."  Degen Decl., Ex. 96 (Washington Post article).

- In February 2018, President Trump gave a speech at the annual Conservative Political Action Conference where he used MS-13 – a gang with many members having ties to Mexico and Central America – to disparage immigrants, indicating that that they are criminals and comparing them to snakes.  *See* Degen Decl., Ex. 93 (article from www.vox.com); *see also* Degen Decl., Ex. 98 (New York Times article) (stating that President Trump characterized undocumented immigrants as "'animals'").

- In July 2018, President Trump told European leaders that "they 'better watch themselves' because a wave of immigration of 'changing the culture' of their countries,'" which he characterized as being "'a very negative thing for Europe.'" Degen Decl., Ex. 99 (Washington Post article).

*See also Centro Presente*, 2018 U.S. Dist. LEXIS 122509, at *15-19 (cataloguing evidence of possible animus, including but not limited to those identified above).

The Court also notes that not only is there direct evidence of animus, but there is also circumstantial evidence of race being a motivating factor.  Under *Arlington Heights*, circumstantial evidence of a discriminatory intent can be inferred from, *e.g.*, "[t]he impact of the official action – whether it bears more heavily on one race than another"; "[t]he historical background of the decision" and "[t]he specific sequence of events leading up to the challenged decision"; and "[d]epartures from the normal procedural sequence."  *Arlington Heights*, 429 U.S. at 266-67 (internal quotation marks omitted).  In the instant case, consideration of these factors weighs in favor of Plaintiffs.

First, the impact of the TPS terminations clearly bears more heavily on non-white, non-European individuals; indeed, it affects those populations exclusively.

Also, the sequence of events leading up to the challenged decisions are irregular and

suggestive of a pre-determined outcome not based on an objective assessment.  The record

evidence indicates that, after receiving Decision Memos from career DHS employees, higher-level

DHS employees – *i.e.*, the political appointees – were "repackaging" the memos in order to get to

the President/White House's desired result of terminating TPS.  This was especially apparent with

respect to the process on Sudan.

- On August 17, 2017, USCIS submitted a Decision Memo on Sudan to the Acting

  DHS Secretary.  (The memo was signed by James McCament, the USCIS Deputy

  Director and then-Acting USCIS Director.)  In the memo, USCIS noted that the

  State Department had submitted a draft package to the Secretary of State and that

  the draft package "assesses that the statutory conditions supporting Sudan's TPS

  designation continue to be met and recommends an 18-month extension of Sudan's

  designation for TPS."  Degen Decl., Ex. 40 (Decision Memo at 1).  USCIS further

  indicated that, per its own country conditions report, "the ongoing armed conflict

  and temporary conditions that supported Sudan's designation for TPS persist."

  Degen Decl., Ex. 40 (Decision Memo at 1).  USCIS concluded the memo by listing

  the Acting Secretary's options – *i.e.*, extend, redesignate, or terminate.  Although

  USCIS did not formally make a recommendation at that time, it did note, under the

  extend option, that "[t]he review of conditions in Sudan indicates that *it remains*

  *unsafe for individuals to return to Sudan and that the statutory requirements to*

  *designate a country for TPS under Immigration and Nationalit Act § 244(b)(1)(A)*

  *(ongoing armed conflict) and under § 244(b)(1)(C) (extraordinary and temporary*

  *conditions) continue to be met.*"  Degen Decl., Ex. 40 (Decision Memo at 4)

  (emphasis added).  Similarly, under the terminate option, USCIS stated: "Because

  the conditions supporting Sudan's TPS designation persist, *termination does not*

  *appear to be warranted.*"  Degen Decl., Ex. 40 (Decision Memo at 5) (emphasis

  added).

- A week and a half later, on August 28, 2017, USCIS submitted a second Decision

  Memo on Sudan to the Acting DHS Secretary.  In the memo, USCIS reiterated

largely reiterated *all* of the above – but in spite of such, USCIS now made a formal recommendation that Sudan's TPS designation be terminated.  Degen Decl., Ex. 41 (Decision Memo at 5).

- The very next day, August 29, 2018, Frank Cissna, who would later become the USCIS Director, sent an email noting that the Decision Memo "seems a bit confused" – *i.e.*, the extend and terminate options indicated that TPS should be extended but the recommendation came to the opposite conclusion.  Degen Decl., Ex. 1 (email).  Mr. Cissna added: "*The memo reads like one person who strongly supports extending TPS for Sudan wrote everything up to the recommendation section, and then someone who opposes extension snuck up behind the first guy, clubbed him over the head, pushed his senseless body out of the way, and finished the memo.  Am I missing something?*"  Degen Decl., Ex. 1 (email) (emphasis added).

- The same day, Kathy Kovarik, the Chief of OP&S (a political appointee), informed Mr. Hamilton, the Senior Counselor to the DHS Secretary (and another political appointee), that she was to blame: "The options memo went up, and because of our rush to add recommendations, I didn't catch the contradiction. How would like you us to proceed?"  Degen Decl., Ex. 48 (email).  Mr. Hamilton's response was: "We need to repackage."  Degen Decl., Ex. 48 (email).

- On September 1, 2017, the Decision Memo was "repackaged" and included a recommendation to extend Sudan's TPS designation for six months.  *See* Degen Decl., Ex. 27 (email and attachment).  In the memo, USCIS noted that the Deputy Secretary of State recommended a six-month extension because "the statutory conditions supporting Sudan's TPS designation continue to be met."  Degen Decl., Ex. 27 (Decision Memo at 1).  USCIS further noted that, per its own country conditions report, "the ongoing armed conflict and extraordinary and temporary conditions that supported Sudan's designation for TPS persist."  Degen Decl., Ex. 27 (Decision Memo at 2).  Finally, USCIS made its own recommendation that a

United States District Court
Northern District of California

six-month extension be given because, *inter alia*, the Deputy Secretary of State

had recommended such and because USCIS had "assesse[d] the conditions related

to the most recent designation continue to be met," that is, "there is an ongoing

armed conflict limited to certain parts of Sudan and extraordinary and temporary

conditions continue to exist preventing nationals from returning in safety."  Degen

Decl., Ex. 27 (Decision Memo at 5).  That recommendation, however, was

apparently not satisfactory to Mr. Hamilton, the Senior Counselor to the DHS

Acting Secretary.  Thus, following a discussion with Mr. Hamilton, Mr.

McCament, the Acting USCIS Director, prepared a new Decision Memo "to

clearly support the AS1 decision to terminate with a delayed effective date of 12

months."  Degen Decl., Ex. 27 (email).

- In the new Decision Memo, USCIS acknowledged the recommendation of the
  Deputy Secretary of State (a six-month extension) but now stated that its review of
  country conditions indicated that there was "emerging progress and improvement
  in certain areas while noted challenges remain."  Degen Decl., Ex. 87 (Decision
  Memo at 2).  Ultimately, USCIS recommended that Sudan's TPS designation be
  terminated with a delayed effective date by twelve months.  Included as support
  for the recommendation was the statement that "[t]here is ongoing conflict in some
  regions, but not the entire country."  Degen Decl., Ex. 87 (Decision Memo at 6).
  USCIS did not explain, however, whether it made an assessment of any kind as to
  whether some TPS beneficiaries would likely be returned to those unsafe areas
  where conflict persisted.

- Subsequently, DHS took steps to prepare the Federal Register Notice for the
  termination.  Following an edit of the notice by Mr. Hamilton (the Senior
  Counselor to the Acting DHS Secretary), a DHS career employee noted that,
  "based on what we've seen to date, [the] State [Department] would likely object to
  the removal of human rights violations – pared down as the language already was
  – that was in there.  For our part, we'd just say that this could be read as taking

34

1   another step toward providing an incomplete and lopsided country conditions

2   presentation to support termination, which may increase the likelihood of criticism

3   from external stakeholders to that effect." Degen Decl., Ex. 5 (email).

4   • The DHS career employee rightly noted that the State Department would have

5   concerns about the Federal Register Notice. The State Department stated that it

6   believed there were "some significant mischaracterizations that are at odds with

7   the Department's understanding of circumstances on the ground." Degen Decl.,

8   Ex. 7 (email); *see also* Degen Decl., Ex. 8 (email) (State Department again

9   expressing concern about mischaracterizations and downplaying of the actual

10   situation). Mr. Hamilton responded that, while DHS would work to accommodate

11   some of the State Department's concerns, it would not do all, deeming many of the

12   concerns as overblown and irrelevant to the legal determination for TPS

13   designation. *See* Degen Decl., Ex. 9 (email).

14   The TPS decision-making for the other countries underwent a similar process. For

15   example, for the decisions on Honduras, Nicaragua, and El Salvador, Ms. Kovarik, the Chief of

16   OP&S, complained that the Decision Memos "read[] as though we'd recommend an extension b/c

17   we talk so much about how bad it is, but there's not enough in there about positive steps that have

18   been taken since its designation." Degen Decl., Ex. 2 (email). A career DHS employee

19   responded:

20   We can comb through the country conditions to try to see what else
there might be, but the basis problem is that it IS bad wrt [with

21   respect to] all of the standard metrics. Our strongest argument for
termination, we thought, is just that it is not bad in a way clearly

22   linked to the initial disasters prompting the designations. We can
work with RU to try to get more, and/or comb through the country

23   conditions we have again looking for positive gems, but the
conditions are what they are

24

25   Degen Decl., Ex. 2 (email). After the career employee "cleaned up [the Central American] TPS

26   decisions memos," Degen Decl., Ex. 4 (email), Ms. Kovarik was still not satisfied with the

27   repackaging, noting, *e.g.*, that "disasters" should be changed to "challenges." Degen Decl., Ex. 4

28   (email).

For Haiti, the same career employee submitted a Decision Memo "written so that it could support either extension or termination, but left the recommendation blank, pending further discussion."  Degen Decl., Ex. 3 (email).  Robert Law, a Senior Adviser to Ms. Kovarik, still responded:

> The draft is overwhelming[ly] weighted for extension which I do not think is the conclusion we are looking for.  The memo seems to dismiss or downlay the positive developments that should suggest reauthorization is inappropriate.  The memo also makes no mention of the substantial amount of foreign aid the U.S. and charities have invested in Haiti since the earthquake[,] another relevant factor to indicate that Haiti no longer meets the definition of TPS.

Degen Decl., Ex. 3 (email).  Mr. Law then made edits to the Decision Memo: "I made the document fully support termination and provided comment boxes where additional data should be provided to back up this decision."  Degen Decl., Ex. 3.

And in addition to the above "repackaging," Acting Secretary Duke expressly acknowledged that the terminations of TPS designations were "a strong break with past practice," Degen Decl., Ex. 30 (email) – designed to fit the President's objectives on immigration which would put "America first."  *See* Degen Decl., Ex. 30 (email) ("These decisions along with the public statements will send a clear signal that TPS in general is coming to a close.  *I believe it is consistent with the President's position on immigration . . . .*") (emphasis added); Degen Decl., Ex. 29 (memo) ("The TPS program must end for these countries soon . . . . [¶] *This conclusion is the result of an America first view of the TPS decision.*") (emphasis added).  This begs the question what "America first" means.  Plaintiffs suggest this is a code word for removal of immigrants who are non-white and/or non-European.  When the Court asked the government's counsel at the hearing what "an America first view of the TPS decision" meant, counsel was unable to provide a clear and direct response.  *See* Docket No. 127 (Tr. at 69-70) (defense counsel arguing that Acting Secretary Duke was referring to "migration and . . . drug enforcement issues and a general kind of perspective" and that she was "grappling with the decision" on what to do about TPS).

Finally, as discussed above in the context of the APA claim, there were departures from the normal procedural sequence during the TPS decision-making process; that is, instead of

considering all current country conditions as had been done in previous administrations, the DHS political appointees in the current administration made TPS decisions turn on whether the originating condition or conditions directly related thereto continued to exist, disregarding all other current conditions no matter how bad. Moreover, at the apparent behest of then-DHS Secretary Kelly, there was an effort to gather negative information about Haitian TPS beneficiaries prior to the decision on Haiti's TP designation – in particular, whether Haitian TPS beneficiaries had been convicted of crimes or were on public or private relief. *See* Degen Decl., Ex. 84 (email). There is no indication that these factors had previously been considered by DHS in making TPS decisions[14]; indeed, the email indicated that the request for the information should be kept quiet. *See* Degen Decl., Ex. 84 (email) ("Please keep the prep for this briefing limited to those on this email. If you need a specific data set and need to ask someone to pull it, please do not indicate what it is for. I don't want this to turn into a big thing were people start prodding and things start leaking out."). The information sought by the Secretary coincides with racial stereotypes – *i.e.*, that non-whites commit crimes and are on the public dole.

Accordingly, the Court holds that, at the very least, the evidence submitted by Plaintiffs supports serious questions on the merits on the Equal Protection Claim. Combined with a balance of hardships that tips sharply in Plaintiffs' favor, a preliminary injunction based on the Equal Protection claim (and not just the APA claim) is also warranted.

### b. *Trump v. Hawaii*

The government protests that the above analysis is incorrect because *Arlington Heights* does not provide the proper legal standard and that the Equal Protection claim should be evaluated based on the deferential standard articulated in *Trump v. Hawaii*, 138 S. Ct. at 2392. But this is essentially a request for reconsideration of the Court's prior order denying the government's

---

[14] Although the government argues that such information is relevant to the "national interest of the United States," 8 U.S.C. § 1254a(b), this appears to be a post-hoc justification. *Cf.* Degen Reply Decl., Ex. 129 (email exchange, dated May 20, 2017) (in response to email recommending that, as a talking point, the agency deny having used crime and public benefits data to make the TPS decision on Haiti, acknowledging that "[w]e did try to dig up some data on crime and public benefits" but proposing that "there is a fair argument that that sort of data could be considered under the [TPS] statute . . . given the national interest component"). No document presented to this Court substantiates this was the purpose of the request.

37

United States District Court
Northern District of California

1   motion to dismiss.  The Court shall not reconsider its earlier ruling because (1) the government has

2   not formally moved to reconsider and (2) even if it had, it has not shown that the Court manifestly

3   failed "to consider material facts or dispositive legal arguments which were presented to the Court

4   before" it ruled on the motion to dismiss.  Civ. L.R. 7-9(b)(3).

5          However, even if the Court were to reconsider and take into account the government's new

6   argument, the government would still fare no better.  The Court previously held that a deferential

7   standard was applied in *Trump v. Hawaii* because the case involved "the entry of aliens from

8   outside the United States, express national security concerns[,] and active involvement of foreign

9   policy."  Docket No. 55 (Order at 50).  The instant case was distinguishable from *Trump v. Hawaii*

10  because (1) there was no indication that national security or foreign policy was a reason to

11  terminate TPS designations[15]; (2) unlike the aliens in *Trump v. Hawaii*, the aliens here (*i.e.*, the

12  TPS beneficiaries) are already in the United States and "aliens within the United States have

13  greater constitutional protections than those outside who are seeking admission for the first time";

14  and (3) "the executive order in *Trump [v. Hawaii]* was issued pursuant to a very broad grant of

15  statutory discretion" whereas "Congress has not given the Secretary *carte blanche* to terminate

16  TPS for any reason whatsoever."  Docket No. 55 (Order at 52-53); *see also* Docket No. 55 (Order

17  at 53) (stating that *Trump v. Hawaii* "did not address the standard of review to be applied under

18  the equal protection doctrine when steps are taken to *withdraw* an immigration status or benefit

19  from aliens lawfully present and admitted into the United States for reasons unrelated to national

20  security or foreign affairs") (emphasis in original).  In another TPS case pending in the District of

21  Massachusetts, the district court made a similar analysis of *Trump v. Hawaii*.  *See Centro*

22

23  [15] The Court notes that the record evidence presented in conjunction with the preliminary
    injunction motion continues to reflect that national security was not tendered as a reason to
24  terminate TPS designation.  As for foreign policy, although the State Department provided DHS
    with its evaluation of country of conditions and recommendations, and although Acting DHS
25  Secretary did appear to consider foreign policy for at least the Central American TPS designations,
    ultimately, the decisions to terminate (or, for Honduras, temporarily extend but with the indication
26  that termination would be forthcoming) were ultimately driven by the question of whether the
    originating condition or conditions directly related thereto continued to exist.  Notably, the foreign
27  policy considerations appeared to warrant extension, *not termination*, of TPS status of the affected
    countries.  In short, the termination decisions were *not justified* by foreign policy considerations.
28  In contrast to the travel ban at issue in *Trump v. Hawaii*, the TPS statute was enacted primarily for
    humanitarian reasons, not as a tool for foreign policy.

38

United States District Court
Northern District of California

1  *Presente*, 2018 U.S. Dist. LEXIS 122509, at *44 (stating that the Supreme Court's "decision to

2  apply rational basis review [in *Trump v. Hawaii*] was based on two considerations not at issue

3  here: first, the limited due process rights afforded to foreign nationals seeking entry into the

4  United States and the particular deference accorded to the executive in making national security

5  determinations").  Applying *Arlington Heights*, the Massachusetts court found that there were

6  sufficient allegations in the complaint to withstand the government's motion to dismiss.  *See id.* at

7  *56 ("find[ing] that the combination of a disparate impact on particular racial groups, statements

8  of animus by people plausibly alleged to be involved in the decision-making process, and an

9  allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose

10  was a motivating factor in a decision").

11      The government argues that the Court's analysis above is inconsistent with cases cited in

12  *Trump v. Hawaii*, *see* Opp'n at 19-20 (arguing that *Trump v. Hawaii* "is not limited to executive

13  actions rooted in national security concerns or to actions restricting entry of foreign nationals").

14  The Court does not agree.

15      *Kleindienst v. Mandel*, 408 U.S. 753 (1972), is a case that involved *admission* of an alien

16  into the United States, and thus is distinguishable from the instant case where the TPS

17  beneficiaries are already lawfully present and admitted into the country.  In fact, the alien in

18  *Mandel* was actually ineligible for a visa under the Immigration and Nationality Act (because of

19  his advocacy of Communist doctrines) and could only enter the United States if he first obtained a

20  waiver from the Attorney General.  *See id.* at 756-59.

21      Similarly, *Fiallo v. Bell*, 430 U.S. 787 (1977), is an admission case and is therefore

22  distinguishable.  *See id.* at 790 n.3 (noting that appellants all sought immigrant visas on the basis

23  of a parent-child relationship where the parent was the natural father and the child the illegitimate

24  offspring).  The Court acknowledges that, in *Fiallo*, the appellants "characterize[d] [the Supreme

25  Court's] prior immigration cases as involving foreign policy matters and congressional choices to

26  exclude or expel groups of aliens that were specifically and clearly perceived to pose a grave

27  threat to the national security . . . or to the general welfare of this country" and that the Supreme

28  Court noted there was

no indication in our prior cases that the scope of judicial review is a function of the nature of the policy choice at issue. To the contrary, [s]ince decisions in these matters may implicate our foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary, and [t]he reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

*Id.* at 796 (internal quotation marks omitted). *Fiallo* also contains other broad language that could be read unfavorably to Plaintiffs (*i.e.*, suggesting limited judicial review). *See Fiallo*, 430 U.S. at 792 ("Our cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"). However, this language of "expel" and "exclude" appears to be a dated or historical phrase, *see Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893) (indicating that "'[t]he control of the people within its limits, and the right to expel from its territory persons who and dangerous to the peace of the State, are too clearly within the essential attributes of sovereignty to be seriously contested'"), and does not detract from evolved and well-established authority that aliens lawfully within the United States have rights from those seeking admission in the first instance into the United States. *See Zadvydas*, 533 U.S. at 693 (noting that "certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders"); *cf. Yamataya v. Fisher*, 189 U.S. 86, 101 (1903) (stating that "it is not competent for the Secretary of the Treasury or any executive officer, at any time within the year limited by the statute, arbitrarily to cause an alien, who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States").

In any event, this Court does not hold that *Trump v. Hawaii* inapplicable to the instant case solely because the decisions to terminate did not rest on national security – or foreign policy – concerns. Rather, the Court's holding is predicated on an amalgam of factors: the fact that the TPS beneficiaries are living and have lived in the United States for lengthy periods with

United States District Court
Northern District of California

1   established ties to the community, no foreign policy or national security interest has been relied

2   upon the DHS to support its decision to terminate TPS status for the affected countries, and the

3   TPS statute does not conferred unfettered authority upon the Secretary.  The justification for a

4   kind of super deference advocated by the government in this case is not warranted.

5          Finally, *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), is distinguishable from the instant

6   case as well.  Although *Rajah*, like the instant case, is *not* an admission case, it is still

7   distinguishable because the aliens in *Rajah* were, undisputedly, deportable from the country, and

8   the only issue was whether the aliens might be able to get a reprieve from deportation because the

9   "deportation proceedings were so tainted by the [post-9/11] Program [that required nonimmigrant

10  alien males over the age of 16 from designated countries to appear for registration and

11  fingerprinting] and associated events."  *Id.* at 434.  *See, e.g.*, *id.* at 434-38 (addressing petitioners'

12  arguments that, *inter alia*, "the Attorney General had no statutory authority to enact the Program,"

13  that "the Program was invalidly promulgated because the relevant regulations were not subject to

14  the required public notice and comment," and that the petitioners' "deportation orders violate their

15  rights under . . . Equal Protection . . . because the immigration laws were selectively enforced

16  against them based on their religion, ethnicity, gender, and race").  Moreover, *Rajah* is

17  distinguishable because, while the case (like the instant case) involved an Equal Protection claim,

18  the claim was really one for selective prosecution/enforcement, an area in which the courts have

19  applied substantial deference to the exercise of prosecutorial discretion.  *See, e.g.*, *Reno v. Am.-*

20  *Arab Anti-Discrim. Comm.*, 525 U.S. 471, 489-90 (1999) (noting that, "[e]ven in the criminal-law

21  field, a selective prosecution claim is a *rara avis*" because "such claims invade a special province

22  of the Executive" and therefore a "criminal defendant [must] introduce 'clear evidence] displacing

23  the presumption that a prosecutor has acted lawfully"; adding that "[t]hese concerns are greatly

24  magnified in the deportation context" but also stating that "we need not rule out the possibility of a

25  rare case in which the alleged basis of discrimination is so outrageous that the foregoing

26  considerations can be overcome").

27         At the very least, the above analysis indicates that there are serious questions going to the

28  merits as to whether *Trump v. Hawaii* governs in the instant case.  Even if *Trump v. Hawaii* did

provide the governing legal standard for the Equal Protection claim here, the Court nevertheless finds that there are serious questions going to the merits that warrant a preliminary injunction.  In *Trump v. Hawaii*, the Supreme Court stated that the "standard of review considers whether the [challenged decision] is plausibly related to the Government's stated objective."  *Trump v. Hawaii*, 138 S. Ct. at 2420.  The Supreme Court also indicated that, in spite of this deferential standard of review, it assumed a court could "look behind the face of the [challenged decision] to the extent of applying rational basis review."  *Id.*  In other words, a court could "consider [a plaintiff's] extrinsic evidence," including statements by the President, and should "uphold [the challenged decision] so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds."  *Id.*  Judicial review, though more deferential than traditional strict scrutiny, remains fact based.  Here, considering the substantial extrinsic evidence submitted by Plaintiffs, there are serious questions as to whether the terminations of TPS designations could "reasonably be understood to result from a justification independent of unconstitutional grounds."  *Id.*; *see also Centro Presente*, 2018 U.S. Dist. LEXIS 122509, at *58-59 (in similar TPS case, stating that, "even if rational basis review were to apply, Plaintiffs' claims, at this early stage of litigation, would still survive"; noting that "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees").

### III.     CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for a preliminary injunction.

1.     It is hereby ORDERED THAT Defendants, their officers, agents, employees, representatives, and all persons acting in concert or participating with them, are ENJOINED AND RESTRAINED from engaging in, committing, or performing, directly or indirectly, by any means whatsoever, implementation and/or enforcement of the decisions to terminate TPS for Sudan, Haiti, El Salvador, and Nicaragua pending resolution of this case on the merits.

2.     It is further ORDERED that Defendants shall take all administrative actions needed to preserve the status quo pending completion of discovery and a ruling on the merits of the

United States District Court
Northern District of California

action, including all steps needed to ensure the continued validity of documents that prove lawful status and employment authorization for TPS holders. Defendants shall report to the Court within fifteen (15) days of this Order on the administrative steps taken to comply with this paragraph and otherwise preserve the status quo.

The preliminary injunction shall take effect immediately and shall remain in effect pending resolution of this case on the merits or further order of this Court. The Court shall hold a Case Management Conference on October 26, 2018 at 10:30 a.m. The parties shall file a joint case management conference statement by October 19, 2018 and shall address, *inter alia*, the expedited setting of trial or other means of adjudication of the merits.

This order disposes of Docket No. 120.

**IT IS SO ORDERED**.

Dated: October 3, 2018

EDWARD M. CHEN
United States District Judge

HT Vacatur AR_0409

CMⓂ️ECF   **Query    Reports ▾    Utilities ▾    Help    Log Out**

| 02/03/2021 | 100 | Consent MOTION to Stay re 99 Order on Motion to Stay by Elaine Costanzo Duke, Kirstjen Nielsen, United States Department of Homeland Security (Attachments: # 1 Text of Proposed Order)(Kirschner, Adam) (Entered: 02/03/2021) |
| 02/03/2021 | 101 | PAPERLESS ORDER GRANTING 100 consent motion to continue the stay to April 2, 2021. Signed by Judge Deborah K. Chasanow on 2/3/2021. (Chasanow, Deborah) (Entered: 02/03/2021) |
| 03/31/2021 | 102 | Consent MOTION to Stay re 101 Order on Motion to Stay by Elaine Costanzo Duke, Kirstjen Nielsen, United States Department of Homeland Security (Attachments: # 1 Text of Proposed Order)(Kirschner, Adam) (Entered: 03/31/2021) |
| 03/31/2021 | 103 | PAPERLESS ORDER GRANTING 102 consent motion to continue the stay to June 4, 2021. Signed by Judge Deborah K. Chasanow on 3/31/2021. (Chasanow, Deborah) (Entered: 03/31/2021) |
| 05/14/2021 | 104 | NOTICE by County of Los Angeles *(Notice of Withdrawal of Counsel - Margaret L. Carter)* (Suvor, Daniel) (Entered: 05/14/2021) |
| 06/04/2021 | 105 | Consent MOTION to Stay re 103 Order on Motion to Stay by Elaine Costanzo Duke, Kirstjen Nielsen, United States Department of Homeland Security (Attachments: # 1 Text of Proposed Order)(Kirschner, Adam) (Entered: 06/04/2021) |
| 06/04/2021 | 106 | PAPERLESS ORDER GRANTING 105 consent motion to continue the stay to September 2, 2021. Signed by Judge Deborah K. Chasanow on 6/4/2021. (Chasanow, Deborah) (Entered: 06/04/2021) |
| 09/02/2021 | 107 | Consent MOTION to Stay re 106 Order on Motion to Stay by Elaine Costanzo Duke, Kirstjen Nielsen, United States Department of Homeland Security (Attachments: # 1 Text of Proposed Order)(Kirschner, Adam) (Entered: 09/02/2021) |
| 09/02/2021 | 108 | PAPERLESS ORDER GRANTING 107 consent motion to continue the stay to September 20, 2021. Signed by Judge Deborah K. Chasanow on 9/2/2021. (Chasanow, Deborah) (Entered: 09/02/2021) |
| 09/20/2021 | 110 | Consent MOTION to Stay re 108 Order on Motion to Stay *until October 4, 2021* by Elaine Costanzo Duke, Kirstjen Nielsen, United States Department of Homeland Security (Attachments: # 1 Text of Proposed Order)(Kirschner, Adam) (Entered: 09/20/2021) |
| 09/21/2021 | 111 | PAPERLESS ORDER GRANTING 110 consent motion to continue the stay to October 4, 2021. Signed by Judge Deborah K. Chasanow on 9/21/2021. (Chasanow, Deborah) (Entered: 09/21/2021) |
| 10/04/2021 | 112 | NOTICE by Elaine Costanzo Duke, Kirstjen Nielsen, United States Department of Homeland Security re 111 Order on Motion to Stay (Kirschner, Adam) (Entered: 10/04/2021) |
| 11/03/2021 | 114 | STIPULATION of Dismissal by Haitian Lawyers Association, Inc., Haitian Women for Haitian Refugees, National Association for the Advancement of Colored People(Audain, Raymond) (Entered: 11/03/2021) |
| 11/03/2021 | 115 | STIPULATION of Dismissal by Haitian Lawyers Association, Inc., Haitian Women for Haitian Refugees, National Association for the Advancement of Colored People(Audain, Raymond) (Entered: 11/03/2021) |
| 11/04/2021 | 116 | PAPERLESS ORDER APPROVING 115 Stipulation of Dismissal. Signed by Judge Deborah K. Chasanow on 11/4/2021. (Chasanow, Deborah) (Entered: 11/04/2021) |

including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Overview of This Information Collection**

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Citizenship and Issuance of Certificate Under Section 322.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* N–600K; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Form N–600K is used by children who regularly reside in a foreign country to claim U.S. citizenship based on eligibility criteria met by their U.S. citizen parent(s) or grandparent(s). The form may be used by both biological and adopted children under age 18. USCIS uses information collected on this form to determine that the child has met all of the eligibility requirements for naturalization under section 322 of the Immigration and Nationality Act (INA). If determined eligible, USCIS will naturalize and issue the child a Certificate of Citizenship before the child reaches age 18.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection N–600K (Paper filed) is 2,187 and the estimated hour burden per response is 1.71 hours; the estimated total number of respondents for the information collection N–600K (online filing) is 2,860 and the estimated hour burden per response is 1.14 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 7,003 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $649,801.

Dated: June 14, 2023.

**Samantha L. Deshommes,**
*Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2023–13110 Filed 6–20–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2732–22; DHS Docket No. USCIS–2008–0034]**

**RIN 1615–ZB71**

**Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status (TPS) and Notice of Extension of TPS Designation for El Salvador.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is rescinding the previous termination of the designation of El Salvador for TPS, which was published on January 18, 2018 and extending the designation of El Salvador for Temporary Protected Status (TPS) for 18 months, beginning on September 10, 2023, and ending on March 9, 2025. This extension allows existing TPS beneficiaries to retain TPS through March 9, 2025, so long as they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through March 9, 2025, must re-register during the 60-day re-registration period as described in this notice.

**DATES:** The *Rescission of Termination of the Designation of El Salvador for TPS* took effect June 9, 2023.

*Extension of Designation of El Salvador for TPS:* The 18-month extension of TPS for El Salvador begins on September 10, 2023, and will remain in effect through March 9, 2025. The extension impacts existing beneficiaries of TPS under the designation of El Salvador.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from July 12, 2023 through September 10, 2023.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* You can find specific information about El Salvador's TPS designation by selecting "El Salvador" from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.*

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Document
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security

TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Purpose of This Action (TPS)

Through this notice, DHS announces the reconsideration and rescission of the termination of the designation of El Salvador for TPS and the Secretary's decision to extend the TPS designation for 18 months from September 10, 2023 through March 9, 2025. This notice also sets forth procedures necessary for nationals of El Salvador (or individuals having no nationality who last habitually resided in El Salvador) to re-register for TPS and to apply for renewal of their EADs with USCIS.

Re-registration is limited to individuals who have previously registered or re-registered for TPS under El Salvador's designation, whose applications were granted, and whose TPS has not been withdrawn for individual ineligibility for the benefit. Failure to re-register properly within the 60-day re-registration period may result in the withdrawal of your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under El Salvador's designation, the 60-day re-registration period runs from July 12, 2023 through September 10, 2023. USCIS will issue new EADs with a March 9, 2025 expiration date to eligible Salvadoran TPS beneficiaries who timely re-register and apply for EADs.

Individuals who have an El Salvador TPS application (Form I–821) and Application for Employment Authorization (Form I–765) that were still pending as of June 21, 2023 do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through March 9, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765 filed in connection with a Form I–821, USCIS will issue the individual a new EAD that will be valid through the same date. If you have TPS and only a pending Form I–765, you must file the Form I–821 to re-register for TPS or risk having your TPS withdrawn for failure to timely re-register without good cause. There are currently approximately

239,000 beneficiaries under El Salvador's TPS designation who may be eligible to continue their TPS under the extension announced in this Notice.

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state before arrival in the United States, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

## When was El Salvador designated for TPS?

El Salvador was initially designated for TPS on the basis of environmental disaster, following two separate massive earthquakes in 2001[1] that resulted in a substantial disruption of living conditions, at the request of the country's government, and because El

Salvador temporarily was unable to handle adequately the return of its nationals. *See Designation of El Salvador Under Temporary Protected Status Program,* 66 FR 14214 (Mar. 9, 2001). After its initial designation, El Salvador's TPS designation was extended 11 consecutive times[2] (for periods of 12 or 18 months at a time) under the same statutory basis of environmental disaster. The Secretary last extended TPS for El Salvador from July 8, 2016 through March 9, 2018.[3] Following the statutorily required review of the country conditions, former Secretary Nielsen announced the termination of TPS for El Salvador with an effective date of September 9, 2019.[4] As discussed below, this termination decision has been the subject of litigation and a court order. As a result, the termination has not taken effect.

---

[1] *El Salvador—Earthquakes Final Fact Sheet, Fiscal Year (FY) 2001,* US Agency for International Development Situation Report, Sept. 7, 2001, available at *https://reliefweb.int/report/el-salvador/el-salvador-earthquakes-final-fact-sheet-fiscal-year-fy-2001* (last visited March 6, 2023). (The first earthquake on January 13, 2001, registered 7.6 in magnitude on the standard seismic scale; the earthquake on February 13, 2001, one month later, measured 6.6 in magnitude.)

[2] *Extension of the Designation of El Salvador Under the Temporary Protected Status Program; Automatic Extension of Employment Authorization Documentation for Salvadorans,* 67 FR 46000 (July 11, 2002); *Extension of the Designation of El Salvador Under Temporary Protected Status Program; Automatic Extension of Employment Authorization Documentation for El Salvador,* 68 FR 42071 (July 16, 2003); *Extension of the Designation of Temporary Protected Status for El Salvador; Automatic Extension of Employment Authorization Documentation for El Salvador TPS Beneficiaries,* 70 FR 1450 (Jan. 7, 2005); *Extension of the Designation of Temporary Protected Status for El Salvador; Automatic Extension of Employment Authorization Documentation for El Salvadorian TPS Beneficiaries,* 71 FR 34637 (June 15, 2006); *Extension of the Designation of El Salvador for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries,* 72 FR 46649 (Aug. 21, 2007); *Extension of the Designation of El Salvador for Temporary Protected Status,* 73 FR 57128 (Oct. 1, 2008); *Extension of the Designation of El Salvador for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries,* 75 FR 39556 (July 9, 2010); *Extension of the Designation of El Salvador for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries,* 77 FR 1710 (Jan. 11, 2012); *Extension of the Designation of El Salvador for Temporary Protected Status,* 78 FR 32418, (May 30, 2013); *Extension of the Designation of El Salvador for Temporary Protected Status,* 80 FR 893 (Jan. 7, 2015); *Extension of the Designation of El Salvador for Temporary Protected Status,* 81 FR 44645 (July 8, 2016).

[3] *Extension of the Designation of El Salvador for Temporary Protected Status,* 81 FR 44645 (July 8, 2016).

[4] *Termination of the Designation of El Salvador for Temporary Protected Status,* 83 FR 2654 (Jan. 18, 2018).

**40284** Federal Register / Vol. 88, No. 118 / Wednesday, June 21, 2023 / Notices

## Litigation Background Regarding Termination of Certain TPS Designations

In addition to El Salvador, in 2017–2018, TPS termination decisions were also announced for five other countries by the Secretary or Acting Secretary: Sudan, Nicaragua, Haiti, Nepal, and Honduras.[5] Lawsuits challenging the terminations were filed in the U.S. District Court for the Northern District of California in *Ramos* v. *Nielsen,* 326 F. Supp. 3d 1075 (N.D. Cal. 2018), and *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019), and in the U.S. District Court for the Eastern District of New York in *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019).[6] In *Ramos,* the district court granted a preliminary injunction enjoining the terminations of TPS for El Salvador, Haiti, Sudan, and Nicaragua and directed DHS to maintain the *status quo* and to continue the TPS and TPS-related documentation of affected TPS beneficiaries under those countries' designations. The U.S. Government appealed, and a three-judge panel vacated the injunction. The appellate court, however, has granted rehearing en banc of the panel decision, vacating the panel's decision.[7] The district court's preliminary injunction thus remains in place. In *Bhattarai,* the district court has stayed proceedings until the *Ramos* appeal is decided and approved the parties' stipulation for the continuation of TPS and TPS-related documentation for eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the *Ramos* appeal. In *Saget,* the district court granted a preliminary injunction enjoining termination of TPS for Haiti, and the Government appealed. However, following the new TPS designation of Haiti in August 2021, the district court dismissed the lawsuit based on the parties' stipulation to dismissal.[8] Beneficiaries under the TPS designations for El Salvador, Nicaragua, Sudan, Haiti, Honduras, and Nepal will retain their TPS while the preliminary injunction in *Ramos* remains in effect, and 120 days thereafter, provided that their TPS is not withdrawn because of individual ineligibility.[9]

DHS has taken actions to ensure its continued compliance with the court orders in *Ramos* and *Bhattarai.* DHS has published periodic notices to continue TPS and extend the validity of TPS-related documentation previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal.[10] The most recent such notice continued TPS and extended the TPS-related documents specified in the notice through June 30, 2024.[11] These extensions apply where the TPS beneficiary properly filed for re-registration during either the most recent DHS-announced registration period for their country, or any applicable previous DHS-announced re-registration periods for the beneficiary's country, or has a re-registration application that remains pending.[12] Although the notice published at 87 FR 68717 remains valid, individuals who wish to remain eligible for TPS under the extension of TPS for El Salvador announced in this notice through March 9, 2025, and any potential future extensions must apply for re-registration in accordance with the procedures announced in this notice.[13] Failure to timely re-register without good cause is a ground for TPS withdrawal. *See* INA section 244(c)(3)(C), 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17.

## What authority does the Secretary have to reconsider and rescind the termination of TPS for El Salvador and extend the prior designation?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[14] The decision to designate any foreign state

---

[5] *Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017); *Termination of the Designation of Nicaragua for Temporary Protected Status,* 82 FR 59636 (Dec. 15, 2017); *Termination of the Designation of Haiti for Temporary Protected Status,* 83 FR 2648 (Jan. 18, 2018); *Termination of the Designation of Nepal for Temporary Protected Status,* 83 FR 23705 (May 22, 2018); *Termination of the Designation of Honduras for Temporary Protected Status,* 83 FR 26074 (June 5, 2018). Haiti and Sudan were later newly designated for TPS on August 3, 2021 and April 19, 2022, respectively, for 18 months. *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021); *Designation of Sudan for Temporary Protected Status,* 87 FR 23202 (Apr. 19, 2022).

[6] *See Ramos* v. *Nielsen,* 336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated,* 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted,* 59 F.4th 1010 (Feb. 10, 2023); *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (staying proceedings until *Ramos* appeal decided and approved parties' stipulation for continued TPS and issuance of TPS-related documentation to eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal). In 2019, the U.S. District Court for the Eastern District of New York also enjoined the termination of the 2011 TPS designation for Haiti in *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019), and DHS cited to that order in previous notices continuing the affected beneficiaries' TPS and documentation. *See, e.g.,* 86 FR 50725, 50726 (Sept. 10, 2021). However, the *Saget* case was dismissed upon the court's approval of the parties' joint Stipulation of Dismissal for mootness following the Secretary's new 18-month designation of Haiti on August 3, 2021, and DHS' continuation of existing beneficiaries' TPS and related documentation under the *Ramos* injunction through Dec. 31, 2022. *See id.,* Order approving Stipulation of Dismissal, dated Oct. 15, 2021. Other litigation was filed relating to the terminations of El Salvador, Honduras, and Haiti. A Haiti-related case, *NAACP* v. *U.S. Dept. of Homeland Security,* No. 1:18–cv–00239 (D. Md. Jan. 24, 2018) was dismissed on May 22, 2021, subsequent to the same DHS designation. An El Salvador-related case, *Casa de Maryland,* v. *Biden,* No. GJH–18–00845 (D. Md. Mar. 23, 2018), is currently stayed until April 17, 2023. *Centro Presente* v. *Biden,* No. 1:18–cv–10340 (D. Mass. July 23, 2018), relating to El Salvador, Haiti, and Honduras, is currently stayed until April 14, 2023.

[7] *See Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for reh'g en banc granted,* 59 F.4th 1010 (Feb. 10, 2023) (No. 18–16981).

[8] *See Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019) and Order approving Stipulation of Dismissal, dated Oct. 15, 2021.

[9] As noted, Haiti was newly designated for TPS on August 3, 2021 for 18 months. *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021). On April 19, 2022, the Secretary also newly designated Sudan TPS. *See Designation of Sudan for Temporary Protected Status,* 87 FR 23202 (Apr. 19, 2022). Those designations cover all Haitian and Sudanese nationals who were eligible for TPS under the Haiti and Sudan TPS designations that were terminated in 2018 and 2017, respectively.

[10] 83 FR 54764 (Oct. 31, 2018); 84 FR 7103 (Mar. 1, 2019); 84 FR 20647 (May 10, 2019) (correction notice issued at 84 FR 23578 (May 22, 2019)); 84 FR 59403 (Nov. 4, 2019); 85 FR 79208 (Dec. 9, 2020); 86 FR 50725 (Sept. 10, 2021) (correction notice issued at 86 FR 52694 (Sept. 22, 2021)).

[11] *Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations of El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal,* 87 FR 68717 (Nov. 16, 2022).

[12] *Id.,* at 68719, note 5 (listing acceptable re-registration periods for each of the 6 countries).

[13] Through the re-registration process, which is generally conducted every 12 to 18 months while a foreign state is designated for TPS, USCIS determines whether each TPS beneficiary is continuing to maintain individual eligibility for TPS, including but not limited to, the requirements related to disqualifying criminal or security issues. Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 87 FR 68717, 68720 (Nov. 16, 2022) (noting potential future action for El Salvador TPS beneficiaries may include a requirement to re-register).

[14] Although the text of INA section 244(b)(1) continues to ascribe this power to the Attorney General, this authority is now held by the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Pub. L. 107–296, 116 Stat. 2135. *See, e.g.,* 6 U.S.C. 557; *Nielsen* v. *Preap,* 139 S. Ct. 954, 959 n.2 (2019). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA section 244(b)(1).

**Federal Register**/Vol. 88, No. 118/Wednesday, June 21, 2023/Notices

**40285**

(or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).

At least 60 days before the expiration of a foreign state's TPS designation, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). If the Secretary does not determine that the foreign state no longer meets the conditions for TPS designation, the designation is extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C); 8 U.S.C. 1254a(b)(3)(A), (C).

On January 18, 2018, the Secretary of Homeland Security issued notice of her decision that El Salvador no longer continued to meet the conditions for TPS designation and announced the termination of TPS for El Salvador. The Secretary also announced an orderly transition period of 18 months, such that the termination was set to go into effect on September 9, 2019. On March 12, 2018, as noted above, plaintiffs in *Ramos* filed suit challenging the termination decision for El Salvador, as well as contemporaneous decisions to terminate TPS for Nicaragua, Sudan, and Haiti. On October 3, 2018, the U.S. District Court for the Northern District of California issued a preliminary injunction order in *Ramos*, preventing the termination decision from going into effect until the court reaches a decision on the merits of the plaintiffs' claims and further directing that DHS maintain the *status quo*, including continuing TPS and TPS-related documentation, such as Employment Authorization Documents (EADs), for affected beneficiaries. After reaching a stipulation with plaintiffs that no termination would go in effect for at least 120 days following the conclusion of any appeal, DHS has issued a series of **Federal Register** notices continuing TPS and TPS-related documentation for affected TPS beneficiaries, with the most recent continuation notice effective through June 30, 2024.[15] As a result, the announced termination of the

TPS designation for El Salvador has never gone into effect, and TPS beneficiaries under that designation have retained their TPS, unless it has been individually withdrawn pursuant to INA section 244(c)(3), 8 U.S.C. 1254a(c)(3).

An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority.[16] The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination. *See* INA sections 244(b)(3), (b)(5)(A); 8 U.S.C. 1254a(b)(3), (b)(5)(A).

**Why is the Secretary rescinding the previous decision to terminate the TPS designation for El Salvador?**

After conducting an independent assessment of the country conditions in El Salvador as they existed in 2018 and exist today, the Secretary has determined that El Salvador's 2001 TPS designation should not have been terminated. As explained below, the conditions in El Salvador that gave rise to its TPS designation in 2001 persisted in 2018 and persist to this day. Accordingly, the Secretary is, upon reconsideration, vacating the 2018 decision terminating El Salvador's TPS designation and extending that designation for an additional 18 months.

El Salvador was initially designated for TPS in 2001 on environmental disaster grounds[17] following two separate earthquakes that occurred that year. El Salvador suffered catastrophic damage as a result of the 2001 earthquakes. Together, the earthquakes killed over 1,150 people,[18] injured over 8,000, and affected more than 1.5

million people[19] (approximately 25 percent of the population[20]). The earthquakes damaged or destroyed over 300,000 homes, 2,647 public schools and demolished critical infrastructure throughout the country.[21] The international community responded to the disaster with a significant amount of aid, with the United States initially providing $16 million in relief assistance and announcing another $52 million for reconstruction assistance.[22] Intergovernmental organizations and other governments provided substantial aid, including a $20 million emergency loan from the Inter-American Development Bank (IDB), $4 million for World Food Programme (WFP) emergency operations, and $1.3 billion in pledges from various countries.[23]

While some progress on reconstruction projects had been made by 2018, many of the problems caused by the 2001 earthquakes persisted.[24] Since the disastrous effects of the earthquakes in 2001, El Salvador has

---

[15] *See* note 13 above.

[16] *See Ivy Sports Medicine, LLC* v. *Burwell,* 767 F.3d 81, 86 (D.C. Cir. 2014) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . [I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide." (quotation marks and citations omitted)); *Macktal* v. *Chao,* 286 F.3d 822, 825–26 (5th Cir. 2002) ("It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); *Mazaleski* v. *Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.").

[17] *Designation of El Salvador Under Temporary Protected Status Program,* 66 FR 14214 (Mar. 9, 2001).

[18] *Earthquakes Fast Facts,* CNN Editorial Research, June 22, 2022, available at *https://www.cnn.com/2013/07/05/world/earthquakes-fast-facts/index.html* (last visited March 6, 2023).

[19] *El Salvador—Earthquakes Final Fact Sheet, Fiscal Year (FY) 2001,* US Agency for International Development Situation Report, Sept. 7, 2001, available at *https://reliefweb.int/report/el-salvador/el-salvador-earthquakes-final-fact-sheet-fiscal-year-fy-2001* (last visited March 6, 2023).

[20] *El Salvador Earthquakes: Final Fact Sheet (FY 2001); AFSC El Salvador earthquake response: Two years later—An assessment and report,* American Friends Service Committee, May 15, 2003, available at *https://reliefweb.int/report/el-salvador/afsc-el-salvador-earthquake-response-two-years-later-assessment-and-report* (last visited March 6, 2023).

[21] El Salvador Earthquakes: Final Fact Sheet (FY 2001); AFSC El Salvador earthquake response: Two years later—An assessment and report, American Friends Service Committee, May 15, 2003, available at *https://reliefweb.int/report/el-salvador/afsc-el-salvador-earthquake-response-two-years-later-assessment-and-report* (last visited March 6, 2023).

[22] Statement by the President: Relief and Reconstruction Assistance for El Salvador, March 2, 2001, *https://georgewbush-whitehouse.archives.gov/news/releases/2001/03/20010302-9.html* (last visited: March 6, 2023).

[23] El Salvador—Earthquakes Final Fact Sheet, Fiscal Year (FY) 2001, Sept. 7, 2001, *https://reliefweb.int/report/el-salvador/el-salvador-earthquakes-final-fact-sheet-fiscal-year-fy-2001* (last visited: March 6, 2023).

[24] A January 2016 report by a Salvadoran media outlet found individuals living in homes in San Salvador (El Salvador's capital city) which were declared uninhabitable due to structural damage from the 2001 earthquakes or their locations in areas at high risk from landslides or the potential collapse of walls. While schools have been reconstructed and repaired—including via the U.S. Agency for International Development's (USAID) Earthquake Reconstruction Program—in January 2016 a Salvadoran media outlet reported that certain buildings and schools damaged by the 2001 earthquakes had not yet been repaired or rebuilt. Joma, Susana, Edificios dañados por los terremotos aún son amenaza, El Diario de Hoy (El Sal.), Jan. 11, 2016; Contributions of the PDNA and DRF to Post-Disaster Recovery: El Salvador Case Study 2022, United Nations Development Programme, Available at *https://www.undp.org/latin-america/publications/case-study-contributions-pdna-and-drf-post-disaster* (last visited: March 17, 2023).

been encumbered by several natural disasters, environmental challenges, high levels of violence, and economic instability, all of which significantly slowed its recovery and continued to render El Salvador unable to handle the return of its nationals at the time of the decision to terminate the designation.[25]

At the time of the determination to terminate the designation of TPS, DHS found that the social and economic conditions affected by the earthquakes had stabilized. That conclusion was in error and reflects an inadequate assessment of conditions in El Salvador leading up to the announcement of the decision to terminate. Although some social and economic progress had been made by 2018, frequent and significant environmental disasters occurred after the 2001 earthquakes causing additional challenges.[26] Recovery from the earthquakes continued to be slow and encumbered by hurricanes and tropical storms, heavy rains and flooding, volcanic and seismic activity, a coffee rust epidemic, a prolonged and severe drought, and an increase in various mosquito-borne diseases, among other things.

Numerous natural disasters have negatively affected El Salvador since the 2001 earthquakes and have adversely impacted its ability to adequately handle the return of its nationals granted TPS. In October 2005, for instance, the severe flooding caused by Tropical Storm Stan, coupled with the eruption of the Ilamatepec volcano in early October 2005, affected approximately half of the population of El Salvador.[27] In November 2009,

Tropical Storm Ida caused severe damage and loss of life.[28] In October 2011, Tropical Storm 12–E caused flooding and mudslides across El Salvador.[29] In June 2013, Tropical Storm Barry caused flooding.[30] and the high waves produced by tropical storms in May 2015 forced evacuations and caused damage along the Salvadoran coastal line.[31] In October 2015, heavy rains produced flooding and landslides across El Salvador.[32] In 2016, El Salvador had the third highest percentage of people exposed to disaster risk in the world, with 88.7 percent of the land and 95.4 percent of the population at risk of multiple kinds of disasters.[33] In June 2017, several days of heavy rainfall caused floods and landslides; four people were killed, nearly 300 were displaced, and over 200 homes were damaged.[34] In early

October 2017, Tropical Storm Nate impacted El Salvador, leaving one person dead and one missing.[35] In late October 2017, Tropical Storm Selma brought heavy rain and flooding that caused massive mudslides, overflowed rivers, and left debris on roads.[36]

These environmental disasters have had negative impacts on El Salvador's economic stability that were not considered in the 2018 termination decision.[37] The 2018 termination decision highlighted El Salvador's steady unemployment rate of 7 percent from 2014–2016 but failed to consider that it has the second slowest economic growth rate in Central America, leading to an underemployment rate of 36.8 percent in 2018.[38] According to the 2017 Global Climate Risk Index, El Salvador ranked as the 15th most affected country in the world by extreme weather events from 1996 to 2015, the most recent year for which data was available at the time the termination decision was made.[39] During this time, El Salvador averaged $282 million in damages per year—equivalent to 0.7 percent of its GDP.[40] In 2016, El Salvador was considered the 17th highest country in the world in terms of the impact of disasters on the gross domestic product.[41] An estimated

[25] El Salvador-Disaster Response, USAID, Sept. 7, 2022, available at *https://www.usaid.gov/el-salvador/our-work/disaster-response* (last visited March 6, 2023); Miracle or Mirage? Gangs and Plunging Violence in El Salvador, International Crisis Group, p.2, July 8, 2020, available at *https://www.crisisgroup.org/latin-america-caribbean/central-america/el-salvador/81-miracle-or-mirage-gangs-and-plunging-violence-el-salvador* (last visited March 6, 2023); El Salvador: Civil War, Natural Disasters, and Gang Violence Drive Migration, Migration Policy Institute, Aug. 29, 2018, available at: *https://www.migrationpolicy.org/article/el-salvador-civil-war-natural-disasters-and-gang-violence-drive-migration* (last visited: March 6, 2023).

[26] Report: Extending Temporary Protected Status for El Salvador: Country Conditions and U.S. Legal Requirements, American University, Dec. 2017, available at: *https://www.american.edu/centers/latin-american-latino-studies/extending-tps-for-el-salvador.cfm* (last visited: March 6, 2023); Resolving Land Ownership Issues for a Community Water Project: A Post-Earthquake Development Dispute in Rural El Salvador, April 07, 2010, *https://www.tandfonline.com/doi/pdf/10.1080/14649350903538046* (last visited: March 6, 2023).

[27] El Salvador: Hurricane Stan, Floods and Volcanic Activity OCHA Situation Report No. 2, UN Office for the Coordination of Humanitarian Affairs, Oct. 7, 2005, available at *https://reliefweb.int/report/el-salvador/el-salvador-hurricane-stan-*

*floods-and-volcanic-activity-ocha-situation-report-no* (last visited March 6, 2023); Analysis of Tropical Storm Stan in El Salvador, Centro de Intercambio y Solidaridad, Nov. 16, 2005, available at *https://reliefweb.int/report/el-salvador/analysis-tropical-storm-stan-el-salvador* (last visited Mar. 6, 2023); El Salvador-Disaster Response, USAID, Sept. 7, 2022, available at *https://www.usaid.gov/el-salvador/our-work/disaster-response* (last visited March 6, 2023).

[28] Hurricane Ida and floods in Central America: OCHA Situation Report No. 1, UN Office for the Coordination of Humanitarian Affairs, Nov. 9, 2009 available at: *https://reliefweb.int/report/el-salvador/hurricane-ida-and-floods-central-america-ocha-situation-report-no-1-9-nov-2009* (last visited Mar. 6, 2003); El Salvador-Disaster Response, USAID, Sept. 7, 2022, available at *https://www.usaid.gov/el-salvador/our-work/disaster-response* (last visited March 6, 2023).

[29] Bertelsmann Stiftung, BTI 2014—El Salvador Country Report. Gütersloh: Bertelsmann Stiftung, 2014, available at *https://bti-project.org/fileadmin/api/content/en/downloads/reports/country_report_2014_SLV.pdf* (last visited Mar. 7, 2023); El Salvador-Disaster Response, USAID, Sept. 7, 2022, available at *https://www.usaid.gov/el-salvador/our-work/disaster-response* (last visited March 6, 2023).

[30] Stewart, Stacy R., *Tropical Storm Barry (AL022013), 17–20 June 2013*, National Hurricane Center, Oct. 7, 2013, available at *https://www.nhc.noaa.gov/data/tcr/AL022013_Barry.pdf* (last visited March 6, 2023).

[31] El Salvador: Storm Surge Emergency Plan of Action (EPoA) DREF Operation n° MDRSV008, International Federation of Red Cross And Red Crescent Societies (IFRC) Situation Report, May 15, 2015, available at *https://reliefweb.int/report/el-salvador/el-salvador-storm-surge-emergency-plan-action-epoa-dref-operation-n-mdrsv008* (last visited March 6, 2023).

[32] Guinto, Joel, Typhoon Kills At Least 16 In Philippines, Strands Thousands, Terra Daily, Oct. 19, 2015, available at *http://www.terradaily.com/reports/Typhoon_kills_at_least_16_in_Philippines_strands_thousands_999.html* (last visited: March 6, 2023).

[33] Signing of Japanese ODA Loan with El Salvador: Improving the capacity to mitigate and manage disaster risk, and providing speedy assistance for financing needs in the reconstruction stage, Japan International Cooperation Agency, May 30, 2016, available at *https://reliefweb.int/report/el-salvador/signing-japanese-oda-loan-el-salvador-improving-capacity-mitigate-and-manage* (last visited: March 6, 2023).

[34] El Salvador—Floods (Dirección General de Protección Civil, SNET, Local Media) (ECHO Daily

*Flash of 20 June 2017)*, European Commission's Directorate-General for European Civil Protection and Humanitarian Aid Operations, June 20, 2017, available at *https://reliefweb.int/report/el-salvador/el-salvador-floods-direcci-n-general-de-protecci-n-civil-snet-local-media-echo* (last accessed March 6, 2023).

[35] Nate Kills At Least 20 in Central America, Tracks Toward US, VOA News, Oct. 6, 2017, available at *https://www.voanews.com/a/nate-takes-aim-us-still-reeling-from-earlier-storms/4059008.html* (last accessed March 6, 2023).

[36] Report: Extending Temporary Protected Status for El Salvador: Country Conditions and U.S. Legal Requirements, American University, Dec. 2017, available at: *https://www.american.edu/centers/latin-american-latino-studies/extending-tps-for-el-salvador.cfm* (last visited: March 6, 2023).

[37] Contributions of the PDNA and DRF to Post-Disaster Recovery: El Salvador Case Study 2022, United Nations Development Programme, available at *https://www.undp.org/latin-america/publications/case-study-contributions-pdna-and-drf-post-disaster* (last accessed March 6, 2023).

[38] Fact Sheet Employment and Migration El Salvador 2021, International Labour Organization, December 8, 2021, available at *https://www.ilo.org/wcmsp5/groups/public/---americas/---ro-lima/---sro-san_jose/documents/publication/wcms_831274.pdf* (last accessed March 6, 2023).

[39] Kreft, Sönke, Eckstein, David and Melchior, Inga, Global Climate Risk Index 2018, Germanwatch, p. 23, Nov. 2017.

[40] Kreft, Sönke, Eckstein, David and Melchior, Inga, *Global Climate Risk Index 2018*, Germanwatch, p. 23, Nov. 2017.

[41] Signing of Japanese ODA Loan with El Salvador: Improving the capacity to mitigate and manage disaster risk, and providing speedy assistance for financing needs in the reconstruction stage, Japan International Cooperation Agency, May 30, 2016, available at *https://reliefweb.int/report/el-*

95.4 percent of its GDP is exposed to two or more natural hazards, making it the country with the second highest economic multi-hazard risk worldwide relative to its GDP.[42] In fact, earthquakes have been responsible for the greatest proportion of economic loss, with the 2001 earthquakes causing effects equivalent to 12 percent of El Salvador's GDP.[43] These facts highlight that El Salvador continued to face serious environmental obstacles at the time of the decision to terminate TPS.

In addition to the ongoing environmental and economic impacts from the 2001 earthquakes, high levels of violence have continued to render El Salvador unable to handle the return of those granted TPS. At the time of the decision to terminate TPS, DHS found that the social and economic conditions affected by the earthquakes had stabilized but did not sufficiently consider the combined impacts of the earthquakes and economic instability on rates of violence and general insecurity.[44] El Salvador's recovery had been (and continues to be) encumbered by staggering levels of violence—mainly related to gang activity and the state's response—as well as pervasive and high levels of gender-based violence. In 2018, El Salvador had one of the world's highest homicide rates and its security forces were widely reported as either ineffective or engaged in human rights violations and abuses, including the extrajudicial executions of alleged gang members, sexual assaults, and enforced disappearances.[45] Violent gang activity is particularly serious in El Salvador due to the country's economic and social challenges.[46] Young people are highly vulnerable to gang recruitment, with a quarter of Salvadoran youth not engaged in education, employment, or training.[47] Violent nonstate actors impact the ability of NGOs to operate by imposing restrictions in areas they control.[48] DHS also found that, in 2018, El Salvador was accepting the returns of its nationals who were removed for various reasons; however, it did not adequately consider that some of those who returned became targets for violent nonstate actors, leading to extortion, torture, and murder of deportees.[49]

As explained above, at the time of the decision to terminate TPS, El Salvador continued to experience ongoing environmental disasters, economic instability, and high rates of violence, that were either insufficiently considered or not considered in the termination decision. The termination decision failed to adequately assess conditions in El Salvador in 2018. Those conditions continued to substantially disrupt living conditions and temporarily affected the country's ability to adequately handle the return of its nationals residing in the United States. The Secretary has concluded that reconsideration and rescission of the termination of TPS is appropriate and timely, particularly given that the 2018 termination decision has not yet gone into effect due to the ongoing litigation and associated court orders.

**What authority does the Secretary have to extend the designation of El Salvador for TPS?**

As noted above, section 244(b) of the INA, 8 U.S.C. 1254a(b), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist and instructs the Secretary to periodically review the country conditions underpinning each designation and determine whether they still exist, leading to either termination or extension of the TPS designation. However, if the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). If the Secretary does not make a decision as to either extension or termination, then INA section 244(b)(3)(C) requires the automatic extension of the designation for six months (or 12 or 18 months in the Secretary's discretion).

Prior to the now-rescinded termination of the TPS designation for El Salvador, the most recent extension of the designation was due to end on March 9, 2018.[50] In light of the Secretary's reconsideration and rescission of the January 18, 2018 decision to terminate the TPS designation for El Salvador, there is no longer any standing secretarial determination that El Salvador ''no longer meets the conditions for designation'' under INA section 244(b)(1). Accordingly, pursuant to INA section 244(b)(3)(C), and in the absence of an affirmative decision by any Secretary to extend the designation for 12 or 18 months rather than the automatic six months triggered by the statue, the TPS designation for El Salvador shall have been extended in consecutive increments of six months between the date when the last designation extension was due to end on March 9, 2018, and the effective date of the TPS extension announced in this notice on September 10, 2023. Coupled with the existing *Ramos* order and corresponding **Federal Register** notices continuing TPS and TPS-related documentation for affected beneficiaries under the designation for El Salvador, this means that all such individuals whose TPS has not been finally withdrawn for individual ineligibility are deemed to have retained TPS since March 9, 2018, and may re-register under procedures announced in this Notice.

**Why is the Secretary extending the TPS designation for El Salvador for TPS for 18 months through March 9, 2025?**

DHS has reviewed country conditions in El Salvador. Based on the review, including input received from DOS and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because the conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster remain.

As previously discussed, El Salvador was originally designated for TPS in 2001[51] following two separate

salvador/signing-japanese-oda-loan-el-salvador-improving-capacity-mitigate-and-manage* (last visited: March 6, 2023).

[42] Contributions of the PDNA and DRF to Post-Disaster Recovery: El Salvador Case Study 2022, United Nations Development Programme, available at *https://www.undp.org/latin-america/publications/case-study-contributions-pdna-and-drf-post-disaster* (last accessed March 6, 2023).

[43] Contributions of the PDNA and DRF to Post-Disaster Recovery: El Salvador Case Study 2022, United Nations Development Programme, available at *https://www.undp.org/latin-america/publications/case-study-contributions-pdna-and-drf-post-disaster* (last accessed March 6, 2023).

[44] Termination of the Designation of El Salvador for Temporary Protected Status, 83 FR 2654 (Jan. 18, 2018).

[45] El Salvador Events of 2018, Human Rights Watch, available at *https://www.hrw.org/world-report/2019/country-chapters/el-salvador* (last accessed March 6, 2023).

[46] Cheatham, Amelia & Roy, Diana, Central America's Turbulent Northern Triangle, Council on Foreign Relations, available at *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle* (last accessed March 6, 2023).

[47] Brand-Weiner, Ian, Reducing Violence in El Salvador: What it Will Take, Organization for Economic Cooperation and Development, available at *https://oecd-development-matters.org/2018/01/17/reducing-violence-in-el-salvador-what-it-will-take/* (last accessed March 6, 2023).

[48] Disaster Risk Reduction in El Salvador, An Evaluation of Non-Governmental Organizations' Role and Impact, Texas A&M University, May 3, 2022, available at *condevcenter.org/Portals/0/El%20Salvador%20Capstone%202022.pdf* (last accessed March 6, 2023).

[49] El Salvador: Background and U.S. Relations, Congressional Research Service, July 1, 2020, available at *https://sgp.fas.org/crs/row/R43616.pdf* (last accessed March 6, 2023).

[50] *See* 81 FR 44645 (July 8, 2016).

[51] *Designation of El Salvador Under Temporary Protected Status Program,* 66 FR 14214 (Mar. 9, 2001).

**40288** Federal Register / Vol. 88, No. 118 / Wednesday, June 21, 2023 / Notices

earthquakes. Recovery from these earthquakes has been impeded by El Salvador's ongoing environmental challenges, including its high vulnerability to "more frequent occurrences of floods, droughts, and tropical storms, all of which disproportionally affect poor and vulnerable populations." [52] During the rainy season, which generally runs from June to November, El Salvador is impacted by extreme weather, which damages roads, property, and infrastructure; disrupts supplies, services, and utilities; and even causes loss of life. [53] Through the present, El Salvador continues to experience compounding environmental disasters, hindering recovery and rendering it unable to handle adequately the return of its nationals.

As recently as October 2022, Tropical Storm Julia passed over El Salvador, leaving extensive flooding and deadly mudslides due to oversaturated ground from an active rainy season. [54] El Salvador declared a 15-day state of national emergency in response to Tropical Storm Julia. [55] Approximately 120 shelters were activated for 2,837 people, and at least 10 individuals died. [56] Assessments indicated that 180,000 people who were already facing acute food insecurity were affected by heavy rains. [57] A trend analysis of food insecurity and disasters found that environmental degradation and natural disasters led to increased insecurity, and both of these factors have significantly impacted El Salvador since 2001. [58]

In October 2018, the Government of El Salvador published an updated report regarding the heavy rain situation in the country at that time. Seven rivers flooded and 1,409 homes were affected. [59] In May and June 2020, tropical storms Amanda and Cristóbal causing widespread floods and landslides throughout the country, causing loss of life and significant material damage. [60] Collectively, the storms also disrupted agricultural production, and caused acute food insecurity due to irregular rainfall, which was worsened by the impacts of the COVID–19 pandemic. [61] More than 149,000 people were directly affected the storms, and as a result, the WFP estimated that more than 330,000 people were facing severe food insecurity. [62] In November 2020, the Civil Protection Agency in El Salvador issued a national red alert due to the formation of Hurricane Eta, which sent more than 2,200 people to shelters. [63] As a result of Hurricane Eta, El Salvador experienced major flooding and soon after, experienced heavy rain and flooding from Hurricane Iota. [64] It also caused two deaths and significant agricultural damage across the country. [65] It is estimated that 17,000 people were internally displaced as a result of Hurricanes Eta and Iota. [66] These countrywide consecutive events led to an overwhelming increase in the number of identified people in need of humanitarian assistance from 643,000 before the start of the COVID–19 pandemic to 1.7 million. [67]

In addition to the numerous environmental disasters following the 2001 earthquakes, El Salvador continues to experience a frail macroeconomic environment, a high rate of unemployment, violence, and a poor security situation that continues to render the country temporarily unable to adequately handle the return of its nationals. El Salvador is plagued by intense violence involving criminal groups and gang warfare, as well as a deteriorating political crisis, due to the government's aggressive security strategies to combat gang violence. As reported in July 2020 by the International Crisis Group (ICG), El Salvador continues to be exposed to violence involving criminal groups, particularly Mara Salvatrucha (MS–13) and the 18th Street gang's two factions, the Revolutionaries and the Southerners. [68] At that time, authorities estimated that 60,000 active gang members operated in 94 percent of the country's municipalities. [69] Gang violence has hampered reconstruction efforts, with NGOs reporting that in gang-controlled territories, they must abide by curfews, stop work when ordered, and often require approval from gangs to work in those areas. [70]

[52] The World Bank in El Salvador, Overview, The World Bank, Apr. 22, 2022, available at *https://www.worldbank.org/en/country/elsalvador/overview* (last visited March 6, 2023).

[53] Foreign Travel Advice El Salvador, *Gov.UK*, Oct. 20, 2022, available at *https://www.gov.uk/foreign-travel-advice/el-salvador/print* (last visited March 6, 2023).

[54] Northern Central America: TS Julia and Rainy Season Flash Update No. 01, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Oct. 14, 2022, available at: *https://reliefweb.int/report/guatemala/northern-central-america-ts-julia-and-rainy-season-flash-update-no-01-14-october-2022* (last visited March 6, 2023).

[55] Northern Central America: TS Julia and Rainy Season Flash Update No. 01, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Oct. 14, 2022, available at: *https://reliefweb.int/report/guatemala/northern-central-america-ts-julia-and-rainy-season-flash-update-no-01-14-october-2022* (last visited March 6, 2023).

[56] El Salvador: Tropical Storm Julia—Emergency Plan of Action (EPoA), DREF Operation No. MDRSV015, International Federation of Red Cross and Red Crescent Societies (IFRC) Situation Report, Oct. 26, 2022, available at *https://reliefweb.int/report/el-salvador/el-salvador-tropical-storm-julia-emergency-plan-action-epoa-dref-operation-no-mdrsv015* (last visited March 6, 2023).

[57] Northern Central America: TS Julia and Rainy Season Flash Update No. 01, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Oct. 14, 2022, available at: *https://reliefweb.int/report/guatemala/northern-central-america-ts-julia-and-rainy-season-flash-update-no-01-14-october-2022* (last visited March 6, 2023).

[58] Restoring Food Security and Livelihoods for Vulnerable Groups Affected by Recurrent Shocks in El Salvador, Guatemala, Honduras and Nicaragua, UN World Food Programme, Oct. 7, 2013, *https://one.wfp.org/operations/current_operations/project_docs/200490.pdf* (last visited: March 6, 2023).

[59] Natural Disasters Monitoring, News and Press Release Pan-American Health Organization (PAHO), Oct. 10, 2018, available at *https://reliefweb.int/report/el-salvador/natural-disasters-monitoring-october-10-2018* (last visited March 6, 2023).

[60] Durroux-Malpartida, Veronique, As El Salvador faces the double impact of hurricanes and COVID–19, NGOs step in, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Dec. 30, 2020, available at *https://www.unocha.org/story/el-salvador-faces-double-impact-hurricanes-and-covid-19-ngos-step* (last visited March 6, 2023).

[61] El Salvador-Disaster Response, USAID, Sept. 7, 2022, available at: *https://www.usaid.gov/el-salvador/our-work/disaster-response* (last visited March 6, 2023).

[62] Durroux-Malpartida, Veronique, As El Salvador faces the double impact of hurricanes and COVID–19, NGOs step in, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Dec. 30, 2020, available at *https://www.unocha.org/story/el-salvador-faces-double-impact-hurricanes-and-covid-19-ngos-step* (last visited March 6, 2023).

[63] Durroux-Malpartida, Veronique, As El Salvador faces the double impact of hurricanes and COVID–19, NGOs step in, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Dec. 30, 2020, available at *https://www.unocha.org/story/el-salvador-faces-double-impact-hurricanes-and-covid-19-ngos-step* (last visited March 6, 2023).

[64] National Hurricane Center Tropical Cyclone Report: Hurricane Eta, NHC, Nov. 2020, *https://www.nhc.noaa.gov/data/tcr/AL292020_Eta.pdf* (last visited: Feb. 24, 2023); National Hurricane Center Tropical Cyclone Report: Hurricane Iota, NHC, Nov. 2020, *https://www.nhc.noaa.gov/data/tcr/AL312020_Iota.pdf* (last visited: March 6, 2023).

[65] *Id.*

[66] US Department of State, 2021 Country Report on Human Rights Practices: El Salvador, April 12, 2022, *https://www.ecoi.net/en/document/2071137.html* (accessed on March 6, 2023).

[67] Durroux-Malpartida, Veronique, As El Salvador faces the double impact of hurricanes and COVID–19, NGOs step in, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Dec. 30, 2020, available at *https://www.unocha.org/story/el-salvador-faces-double-impact-hurricanes-and-covid-19-ngos-step* (last visited March 6, 2023).

[68] Miracle or Mirage? Gangs and Plunging Violence in El Salvador, International Crisis Group, p.2, July 8, 2020, available at *https://www.crisisgroup.org/latin-america-caribbean/central-america/el-salvador/81-miracle-or-mirage-gangs-and-plunging-violence-el-salvador* (last visited March 6, 2023).

[69] Miracle or Mirage? Gangs and Plunging Violence in El Salvador, International Crisis Group, p.2, July 8, 2020, available at *https://www.crisisgroup.org/latin-america-caribbean/central-america/el-salvador/81-miracle-or-mirage-gangs-and-plunging-violence-el-salvador* (last visited March 6, 2023).

[70] Disaster Risk Reduction in El Salvador, An Evaluation of Non-Governmental Organizations' Role and Impact, Texas A&M University, May 3, 2022, available at *condevcenter.org/Portals/0/*

Elected in 2019, President Nayib Bukele has attributed a plunge in homicides to a security policy of sending police and troops into gang-controlled neighborhoods.[71] However, El Salvador's overall decline in its homicide rate in 2020 and 2021 [72] has also been attributed to a ''covert pact'' between the government and the largest gangs operating in the country—the collapse of which reportedly led to a spike in murders in late March 2022.[73]

President Bukele has been described as ''increasingly authoritarian, and his critics say the leader's threat to democracy has only grown.'' [74] In a December 2021 report, the Congressional Research Service described a series of actions taken by President Bukele and his government as ''democratic backsliding'' [75] and ''removing checks on presidential power.'' [76] In March 2022, the government of El Salvador declared a 30-day state of emergency, suspending citizen's constitutional rights, in response to a spike in homicides, when El Salvador registered 62 murders in a single day, ''the bloodiest since the end of the country's civil war in 1992.'' [77]

This initial month-long crackdown on gangs has been regularly renewed since then, with the latest renewal announced in March 2023.[78] As of March 2023, more than 65,000 people had been arrested under these orders, and human rights groups claim that many of the of the mass detentions could amount to arbitrary detentions based on ''poorly substantiated investigations or crude profiling of the physical appearance or social background of those detained.'' [79] Human Rights Watch reported that the government's emergency provisions suspended privacy rights, freedom of association and peaceful assembly, and some fair trial guarantees and other applicable legal protections.[80] Amnesty International has documented that authorities in El Salvador have dismantled judicial independence and committed torture and thousands of arbitrary detentions and violations of fair trial guarantees and other applicable legal protections.[81]

Since March 2022, police and soldiers have been conducting raids and arresting thousands at their home and in the street.[82] The number of arrests under the state of emergency increased to 50,000 as of mid-August 2022.[83] Official statistics and other government information has become increasingly difficult to access under the state of emergency, and authorities reportedly have changed ''what counts as a

homicide.'' [84] The discrepancy between reported homicide numbers and the actual numbers of bodies reportedly recovered from mass graves continues to be of concern.[85] Under President Bukele, significant human rights abuses and violations by security forces are widely reported to continue, including unlawful disappearances, torture, and extrajudicial killings of suspected gang members.[86]

The Internal Displacement Monitoring Centre (IDMC) noted in a 2018 report that ''[d]isplacement caused by crime and violence has, by any measure, risen to the level of a humanitarian crisis in El Salvador.'' [87] In July 2018, internal forced displacement was officially recognized by the Supreme Court of El Salvador.[88] In January 2020, the Legislative Assembly approved the ''Special Law for the Comprehensive Care and Protection of People in a situation of Forced Internal Displacement,'' a fundamental instrument to provide care, protection, and lasting solutions to people internally displaced due to violence from organized crime and criminal gangs, as well as those who may be at risk of displacement.[89] In August 2021, the United Nations High Commissioner for Refugees (UNHCR) reported that communities in El Salvador are severely affected by gang violence, extortion, death threats, and sexual violence, as

El%20Salvador%20Capstone%202022.pdf (last accessed March 6, 2023).

[71] Treasury Targets Corruption Networks Linked to Transnational Organized Crime, Press Release, U.S. Treasury, Dec. 8, 2021, available at *https:// home.treasury.gov/news/press-releases/jy0519* (last visited March 6, 2023). After experiencing a spike in homicides in 2015, El Salvador went from Latin America's most violent country to number 11 in 2021. *See* United States Institute of Peace, ''El Salvador Needs Long-Term Solutions to End Cycles of Violence,'' Apr. 6, 2022, available at *https:// www.usip.org/publications/2022/04/el-salvador-needs-long-term-solutions-end-cycles-violence#:~: text=From%20Latin%20America's%20most%20 violent,Mexico%20(26%20per%20100%2C000* (last visited March 6, 2023).

[72] InSight Crime's 2021 Homicide Round-Up, InSight Crime, Feb. 1, 2022, available at *https:// insightcrime.org/news/insight-crimes-2021-homicide-round-up/* (last visited on March 6, 2023).

[73] Martinez, Carlos, Collapsed Government Talks with MS–13 Sparked Record Homicides in El Salvador, Audios Reveal, El Faro (El Sal.), May 17, 2022, available at *https://www.nytimes.com/2022/04/28/world/americas/el-salvador-bukele-gangs.html* (last visited March 6, 2023).

[74] El Salvador's Nayib Bukele: Strong and Getting Stronger, America's Quarterly, Feb. 23, 2021, available at *https://www.americasquarterly.org/article/aq-podcast-el-salvadors-nayib-bukele-strong-and-getting-stronger/* (last visited March 6, 2023).

[75] El Salvador: Authoritarian Actions and U.S. Response, Congressional Research Service, p.1, Dec. 23, 2021, available at *https://crsreports. congress.gov/product/pdf/IN/IN11658* (last visited March 6, 2023).

[76] El Salvador: Authoritarian Actions and U.S. Response, Congressional Research Service, p.2, Dec. 23, 2021, available at *https://crsreports. congress.gov/product/pdf/IN/IN11658* (last visited March 6, 2023).

[77] Renteria, Nelson, In El Salvador's gang crackdown, quotas drive 'arbitrary' arrests of innocents, Reuters, May 16, 2022, available at *https://www.reuters.com/world/americas/el-

salvadors-gang-crackdown-quotas-drive-arbitrary-arrests-innocents-2022-05-16/* (last visited March 6, 2023).

[78] El Salvador urged to uphold human rights amid state of emergency, United Nations News, Mar. 28, 2023, available at *https://news.un.org/en/story/2023/03/1135097* (last visited March 30, 2023).

[79] El Salvador urged to uphold human rights amid state of emergency, United Nations News, Mar. 28, 2023, available at *https://news.un.org/en/story/2023/03/1135097* (last visited March 30, 2023); How is a 'state of exception' changing El Salvador?, Al Jazeera, June 7, 2022, available at *https:// www.aljazeera.com/program/the-stream/2022/6/7/what-is-the-true-impact-of-el-salvadors-state-of* (last visited March 6, 2023).

[80] El Salvador: Evidence of Serious Abuse in State of Emergency, Human Rights Watch, May 2, 2022, available at *https://www.hrw.org/news/2022/05/02/el-salvador-evidence-serious-abuse-state-emergency* (last visited March 6, 2023).

[81] Tucker, Duncan, Eviscerating Human Rights Is Not The Answer To El Salvador's Gang Problem, Amnesty International, Jul. 31, 2022, available at *https://www.amnesty.org/en/latest/news/2022/08/eviscerating-human-rights-el-salvador-gang-problem/* (last visited March 6, 2023).

[82] El Salvador: Evidence of Serious Abuse in State of Emergency, Human Rights Watch, May 2, 2022, available at *https://www.hrw.org/news/2022/05/02/el-salvador-evidence-serious-abuse-state-emergency* (last visited March 6, 2023).

[83] El Salvador extends state of exception as arrests hit 50,000, Al Jazeera, Aug. 17, 2022, available at *https://www.aljazeera.com/news/2022/8/17/el-salvador-extends-state-of-exception-as-arrests-hit-50000* (last visited March 6, 2023).

[84] Renteria, Nelson, In El Salvador, discrepancy over deaths and mass graves alarms critics, Reuters, Aug. 3, 2022, available at *https://www.reuters.com/world/americas/el-salvador-discrepancy-over-deaths-mass-graves-alarms-critics-2022-08-03/* (last visited March 6, 2023).

[85] Renteria, Nelson, In El Salvador, discrepancy over deaths and mass graves alarms critics, Reuters, Aug. 3, 2022, available at *https://www.reuters.com/world/americas/el-salvador-discrepancy-over-deaths-mass-graves-alarms-critics-2022-08-03/* (last visited March 6, 2023).

[86] US Department of State, 2021 Country Report on Human Rights Practices: El Salvador, April 12, 2022, *https://www.ecoi.net/en/document/2071137.html* (last visited March 6, 2023).

[87] Knox, Vickie, An Atomised Crisis: Reframing displacement caused by crime and violence in El Salvador, Internal Displacement Monitoring Centre (IDMC), p.6, Sept. 2018, available at *https:// www.internal-displacement.org/sites/default/files/publications/documents/201809-el-salvador-an-atomised-crisis-en.pdf* (last visited March 6, 2023).

[88] Fact Sheet > El Salvador, United Nations High Commissioner for Refugees (UNHCR), p.2, Aug. 2021, available at *https://reporting.unhcr.org/sites/default/files/El%20Salvador %20Factsheet%20August%202021.pdf* (last visited March 6, 2023).

[89] Fact Sheet > El Salvador, United Nations High Commissioner for Refugees (UNHCR), p.2, Aug. 2021, available at *https://reporting.unhcr.org/sites/default/files/El%20Salvador%20Factsheet %20August%202021.pdf* (last visited March 6, 2023).

well as other serious human rights violations.[90]

Gang violence and lack of access to effective protection has forced tens of thousands to flee internally since 2006.[91] Violence and lack of opportunities have forced people to leave their homes in search of protection, access to basic services and livelihood opportunities. COVID–19 has exacerbated the needs of internally displaced persons and those at risk of displacement by impacting their access to protection and livelihoods.[92] While President Bukele's tactics have caused a decrease in the rate of gang violence, severe gang violence persists, and the tactics used by the Bukele administration have failed to address the root causes of gang membership, including poverty and insecurity, which are exacerbated by the lingering effects of major environmental disasters. Impoverished individuals are less likely to move to safer areas due to lack of financial resources and the geographic areas where they can afford to live are more likely to be gang-impacted and environmentally degraded.[93]

In summary, while progress has been made in repairing damage caused by the 2001 earthquakes, El Salvador continues to experience numerous natural disasters that significantly disrupt living conditions and adversely impact its ability to adequately handle the return of those granted TPS. A weak macroeconomic environment, a high rate of unemployment, violence, and a poor security situation adversely impact the country's ability to fully recover and continue to render them temporarily unable to adequately handle the return of its nationals.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined:

• At the time the Secretary's decision to terminate El Salvador's designation

for TPS was announced on January 18, 2018, conditions in El Salvador continued to support the country's designation for TPS on the ground of environmental disaster; therefore, the termination should be rescinded and such rescission is timely given that the termination has not yet gone into effect. *See* INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B).

• The conditions supporting El Salvador's designation for TPS still continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There has been an earthquake, flood, drought, epidemic, or other environmental disaster in El Salvador resulting in a substantial, but temporary, disruption of living conditions in the area affected; El Salvador is unable, temporarily, to handle adequately the return of its nationals; and El Salvador officially requested designation of TPS. *See* INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B);

• The designation of El Salvador for TPS should be extended for an 18-month period, beginning on September 10, 2023 and ending on March 9, 2025. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

**Notice of the Rescission of TPS Termination and Extension of the TPS Designation of El Salvador**

Pursuant to my lawful authorities, including under sections 103(a) and 244 of the Immigration and Nationality Act, I am hereby rescinding the termination of the TPS designation of El Salvador announced in the **Federal Register** at 83 FR 2654 on January 18, 2018. Due to this rescission and pursuant to INA section 244(b)(3)(C), as well as the ongoing preliminary injunction in *Ramos* v. *Nielsen,* 336 F. Supp. 3d 1075 (N.D. Cal. 2018), the TPS designation of El Salvador has continued to automatically extend under the statute since July 8, 2016, without a standing secretarial determination as to whether TPS should be extended or terminated. TPS beneficiaries under the designation, whose TPS has not been finally withdrawn for individual ineligibility, therefore have continued to maintain their TPS since March 9, 2018.

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting El Salvador's designation for TPS on the basis of environmental disaster continue to be met. *See* INA sections 244(b)(1)(B) and 244(b)(3)(A); 8 U.S.C. 1254a(b)(1)(B) and 1254a(b)(3)(A). On the basis of this

determination, I am extending the existing designation of El Salvador for TPS for 18 months, beginning on September 10, 2023 and ending on March 9, 2025. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). Individuals holding TPS under the designation of El Salvador may file to reregister for TPS under the procedures announced in this notice if they wish to continue their TPS under this 18-month extension.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

**Required Application Forms and Application Fees To Re-Register for TPS**

To re-register for TPS based on the designation of El Salvador, you must submit a Form I–821, Application for Temporary Protected Status during the 60-day reregistration period that starts on July 12, 2023 and ends on September 10, 2023. There is no Form I–821 fee for re-registration. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the "Biometric Services Fee" section of this notice.

Individuals who have an El Salvador TPS application (Form I–821) that was still pending as of June 21, 2023 do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through March 9, 2025.

**Required Application Forms and Application Fees To Obtain an EAD**

Every employee must provide their employer with documentation showing they have a legal right to work in the United States. TPS beneficiaries are authorized to work in the United States and are eligible for an EAD which proves their employment authorization. If you have an existing EAD issued under the TPS designation of El Salvador that has been auto-extended through June 30, 2024 by the notice published at 87 FR 68717, you may continue to use that EAD through that date. If you want to obtain a new EAD valid through March 9, 2025, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver).

You may, but are not required to, submit Form I–765, Application for

---

[90] Fact Sheet > El Salvador, United Nations High Commissioner for Refugees (UNHCR), p.1, Aug. 2021, available at *https://reporting.unhcr.org/sites/default/files/El%20Salvador%20Factsheet%20August%202021.pdf* (last visited March 6, 2023).

[91] Fact Sheet > El Salvador, United Nations High Commissioner for Refugees (UNHCR), p.2, Aug. 2021, available at *https://reporting.unhcr.org/sites/default/files/El%20Salvador%20Factsheet%20August%202021.pdf* (last visited March 6, 2023).

[92] Fact Sheet > El Salvador, United Nations High Commissioner for Refugees (UNHCR), p.1, Aug. 2021, available at *https://reporting.unhcr.org/sites/default/files/El%20Salvador%20Factsheet%20August%202021.pdf* (last visited March 6, 2023).

[93] Disaster risk reduction in El Salvador, Texas A&M University, May 3, 2022, *condevcenter.org/Portals/0/El%20Salvador%20Capstone%202022.pdf* (last visited: March 6, 2023).

Employment Authorization, with your Form I–821 re-registration application. If you do not want a new EAD now, you can request one later by filing your I–765 and paying the fee (or requesting a fee waiver) at that time, provided you have TPS or a pending TPS application. If you have TPS and only a pending Form I–765, you must file the Form I–821 to reregister for TPS or risk having your TPS withdrawn for failure to reregister without good cause.

**Information About Fees and Filing**

USCIS offers the option to applicants for TPS under El Salvador's designation to file Form I–821 and related requests for EADs online or by mail. When filing a TPS application, applicants can also request an EAD by submitting a completed Form I–765, with their Form I–821.

*Online filing:* Form I–821 and I–765 are available for concurrent filing online.[94] To file these forms online, you must first create a USCIS online account.[95] However, if you are requesting a fee waiver, you cannot submit the applications online. You will need to file paper versions of the fee waiver request and the form for which you are requesting the fee waiver.

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

*Table 1—Mailing Addresses:* Mail your completed Form I–821, Application for Temporary Protected Status and Form I–765, Application for Employment Authorization, Form I–912, Request for Fee Waiver, if applicable, and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If you live in: | Then mail your application to: |
|---|---|
| • Texas ........................................ | USCIS Dallas Lockbox.<br>*U.S. Postal Service (USPS):* USCIS, Attn: TPS El Salvador, P.O. Box 660864, Dallas, TX 75266–0864.<br>*FedEx, UPS, or DHL:* USCIS, Attn: TPS El Salvador (Box 660864), 2501 S State Highway 121 Business, Suite 400, Lewisville, TX 75067–8003. |
| • American Samoa ...................<br>• Arizona.<br>• California.<br>• Connecticut.<br>• Delaware.<br>• District of Columbia.<br>• Georgia.<br>• Guam.<br>• Illinois.<br>• Indiana.<br>• Kentucky.<br>• Maine.<br>• Massachusetts.<br>• Michigan.<br>• Nevada.<br>• New Hampshire.<br>• New Jersey.<br>• North Carolina.<br>• Northern Mariana Islands.<br>• Ohio.<br>• Oregon.<br>• Pennsylvania.<br>• Puerto Rico.<br>• Rhode Island.<br>• South Carolina.<br>• Vermont.<br>• Virgin Islands.<br>• Virginia.<br>• Washington.<br>• West Virginia. | USCIS Chicago Lockbox.<br>*U.S. Postal Service (USCIS):* USPS, Attn: TPS El Salvador, P.O. Box 8635, Chicago, IL 60680–8635.<br>*FedEx, UPS, or DHL:* USCIS, Attn: TPS El Salvador (Box 8635), 131 S. Dearborn St., 3rd Floor, Chicago, IL 60603–5517. |
| • Alabama ...................................<br>• Alaska.<br>• Arkansas.<br>• Colorado.<br>• Florida.<br>• Hawaii.<br>• Idaho.<br>• Iowa.<br>• Kansas.<br>• Louisiana.<br>• Maryland.<br>• Minnesota.<br>• Mississippi.<br>• Missouri. | USCIS Elgin Lockbox.<br>*U.S. Postal Service (USPS):* USCIS, Attn: TPS El Salvador, P.O. Box 4091, Carol Stream, IL 60197–4091.<br>*FedEx, UPS, or DHL:* USCIS, Attn: TPS El Salvador (Box 4091), 2500 Westfield Drive, Elgin, IL 60124–7836. |

[94] Find information about online filing at "Forms Available to File Online," *https://www.uscis.gov/ file-online/forms-available-to-file-online.*

[95] *https://myaccount.uscis.gov/users/sign_up.*

### TABLE 1—MAILING ADDRESSES—Continued

| If you live in: | Then mail your application to: |
|---|---|
| • Montana.<br>• Nebraska.<br>• New Mexico.<br>• New York.<br>• North Dakota.<br>• Oklahoma.<br>• South Dakota.<br>• Tennessee.<br>• Utah.<br>• Wisconsin.<br>• Wyoming. | |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable

documentation and other requirements for applying (*i.e.*, registering) for TPS on the USCIS website at *https://www.uscis.gov/tps* under "El Salvador."

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *https://www.uscis.gov/i-131*. You may file Form

I–131 together with your Form I–821 or separately. When filing the Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for the Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

### TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
|---|---|
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS):<br>    You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL:<br>    You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S State Hwy. 121, Business Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. Fees for Form I–765 and biometric services are also described in 8 CFR 103.7(b)(1) (Oct. 1, 2020). If necessary, you may be required to visit an Application Support Center to have your biometrics

captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https://www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms*.

**Refiling a TPS Re-Registration Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue your EAD promptly, if one has been requested. Properly filing early will also allow you to have time to refile your application before the deadline,

should USCIS deny your fee waiver request. The fee waiver denial notice will contain specific instructions about resubmitting your application. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. See INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *www.uscis.gov/tps*.

**Note:** A re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee), or request a fee waiver, when filing a TPS re-registration application. As discussed above, if you decide to wait to request an EAD, you do not have to file the Form I–765 or pay the

associated Form I–765 fee (or request a fee waiver) at the time of re-registration. You may wait to seek an EAD until after USCIS has approved your TPS re-registration application or at any later date you decide you want to request an EAD. To re-register for TPS, you only need to file the Form I–821 with the biometrics services fee, if applicable (or request a fee waiver).

## General Employment-Related Information for TPS Applicants and Their Employers

*How can I obtain information on the status of my TPS application and EAD request?*

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at uscis.gov, or visit the USCIS Contact Center at *https://www.uscis.gov/ contactcenter*. If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800– 375–5283 (TTY 800–767–1833).

*When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?*

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/ acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central*. An EAD is an acceptable document under List A.

*If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?*

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through March 9, 2025, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

*Can my employer require that I provide any other documentation such as evidence of my status or proof of my Salvadoran citizenship or a Form I– 797C showing that I registered for TPS for Form I–9 completion?*

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request proof of Salvadoran citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin. Employers can refer to the compliance notice that DHS published on November 16, 2022, for information on how to complete the Form I–9 with TPS EADs that DHS extended through June 30, 2024.[96]

## Note to All Employers

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility

verification process, employers may call USCIS at 888–464–4218 (TTY 877–875– 6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I– 9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

## Note to Employees

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (mismatch) must promptly inform employees of the mismatch and give such employees an opportunity to take action to resolve the mismatch. A mismatch result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E- Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call

---

[96] *Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal,* 87 FR 68717 (Nov. 16, 2022).

USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ crt/immigrant-and-employee-rights-section* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

This **Federal Register** Notice does not invalidate the compliance notice DHS issued on November 16, 2022, which extended the validity of certain TPS documentation through June 30, 2024 and does not require individuals to present a Form I–797, Notice of Action. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS designated country of El Salvador; or

• Your Form I–94, Arrival/Departure Record or Form I–797, Notice of Action, as shown in the **Federal Register** notice published at 87 FR 68717.

Check with the government agency requesting documentation regarding which document(s) the agency will accept. Some state and local government agencies use SAVE to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each state and local government agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. It may also assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice listing the TPS-related document, including any applicable auto-extension of the document, in addition to your recent TPS-related document with your A-number, USCIS number or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or any automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://save.uscis.gov/casecheck/.* CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save,* has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–13018 Filed 6–20–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

[CIS No. 2735–22; DHS Docket No. USCIS–2014–0006]

RIN 1615–ZB69

**Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status (TPS) and Notice of Extension of TPS Designation for Nicaragua.

---

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is rescinding the previous termination of the designation of Nicaragua for TPS, which was published on December 15, 2017 and extending the designation of Nicaragua for Temporary Protected Status (TPS) for 18 months, beginning on January 6, 2024 and ending on July 5, 2025. This extension allows existing TPS beneficiaries to retain TPS through July 5, 2025, so long as they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through July 5, 2025, must re-register during the 60-day re-registration period as described in this notice.

**DATES:** The *Rescission of Termination of the Designation of Nicaragua for TPS* took effect June 9, 2023.

*Extension of Designation of Nicaragua for TPS:* The 18-month extension of TPS for Nicaragua begins on January 6, 2024, and will remain in effect through July 5, 2025. The extension impacts existing beneficiaries of TPS under the designation of Nicaragua.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from November 6, 2023, through January 5, 2024.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital

## Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

This **Federal Register** Notice does not invalidate the compliance notice DHS issued on November 16, 2022, which extended the validity of certain TPS documentation through June 30, 2024, and does not require individuals to present a Form I–797, Notice of Action. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS designated country of Nicaragua; or

• Your Form I–94, Arrival/Departure Record or Form I–797, Notice of Action, as shown in the **Federal Register** notice published at 87 FR 68717.

Check with the government agency requesting documentation regarding which document(s) the agency will accept. Some state and local government agencies use SAVE to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each state and local government agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. It may also assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice listing the TPS-related document, including any applicable auto-extension of the document, in addition to your recent TPS-related document with your A-number, USCIS number or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or any automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at https:// CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save*, has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–13246 Filed 6–20–23; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2733–22; DHS Docket No. USCIS–2014–0007]**

**RIN 1615–ZB75**

### Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status (TPS) and Notice of Extension of TPS Designation for Honduras.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is rescinding the previous termination of the designation of Honduras for TPS which was published on June 5, 2018 and extending the designation of Honduras for Temporary Protected Status (TPS) for 18 months, beginning on January 6, 2024, and ending on July 5, 2025. This extension allows existing TPS beneficiaries to retain TPS through July 5, 2025, so long as they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through July 5, 2025, must re-register during the 60-day re-registration period as described in this notice.

**DATES:** The *Rescission of Termination of the Designation of Honduras for TPS* took effect June 9, 2023.

*Extension of Designation of Honduras for TPS:* The 18-month extension of TPS for Honduras begins on January 6, 2024, and will remain in effect through July 5, 2025. The extension impacts existing beneficiaries of the TPS under the designation of Honduras.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from November 6, 2023 through January 5, 2024.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. You can find specific information about Honduras's TPS designation by selecting "Honduras" from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *uscis.gov/tools*. Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov*, or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter*.

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Document
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Purpose of This Action (TPS)

Through this notice, DHS announces the reconsideration and rescission of the termination of the designation of Honduras for TPS and the Secretary's decision to extend the TPS designation for 18 months from January 6, 2024, through July 5, 2025. This notice also sets forth procedures necessary for nationals of Honduras (or individuals having no nationality who last habitually resided in Honduras) to re-register for TPS and to apply for renewal of their EADs with USCIS.

Re-registration is limited to individuals who have previously registered or re-registered for TPS under Honduras' designation, whose applications were granted, and whose TPS has not been withdrawn for individual ineligibility for the benefit. Failure to re-register properly within the 60-day re-registration period may result in the withdrawal of your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under Honduras's designation, the 60-day re-registration period runs November 6, 2023 through January 5, 2024. USCIS will issue new EADs with a July 5, 2025, expiration date to eligible Honduran TPS beneficiaries who timely re-register and apply for EADs.

Individuals who have a Honduras TPS application (Form I–821) and

Application for Employment Authorization (Form I–765) that were still pending as of June 21, 2023 do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through July 5, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765 filed in connection with a Form I–821, USCIS will issue the individual a new EAD that will be valid through the same date. If you have TPS and only a pending Form I–765, you must file the Form I–821 to re-register for TPS or risk having your TPS withdrawn for failure to timely reregister without good cause. There are currently approximately 76,000 beneficiaries under Honduras's TPS designation who may be eligible to continue their TPS under the extension announced in this Notice.

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state before arrival in the United States, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

  ○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

  ○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

## When was Honduras designated for TPS?

Honduras was initially designated for TPS based on an environmental disaster that resulted in a substantial disruption of living conditions, in response to a request by the country's government, and because Honduras temporarily was

unable to handle adequately the return of its nationals. *See Designation of Honduras Under Temporary Protected Status,* 64 FR 524 (Jan. 5, 1999). Since its initial designation in 1999, TPS for Honduras was extended thirteen consecutive times [1] by subsequent Attorneys General and Secretaries of Homeland Security until 2017. That year, former Acting Secretary Elaine Duke did not make a decision on extending or terminating Honduras's TPS designation by the statutory deadline, resulting in an automatic 6-month extension of the designation, through July 5, 2018.[2]

Following the statutorily required review of the country conditions, former Secretary Kirstjen M. Nielsen announced the termination of TPS for Honduras, with an effective date of January 5, 2020; *see* Termination of the Designation of Honduras for Temporary Protected Status;[3] *see also* INA secs. 244(b)(3)(A) and (B), 8 U.S.C. 1254a(b)(3)(A) and (B). As discussed below, this termination has been the

---

[1] *Extension of Designation of Honduras Under Temporary Protected Status Program,* 65 FR 30438 (May 11, 2000); *Extension of the Designation of Honduras Under the Temporary Protected Status Program,* 66 FR 23269 (May 8, 2001); *Extension of the Designation of Honduras Under the Temporary Protected Status Program,* 67 FR 22451 (May 3, 2002); *Extension of the Designation of Honduras Under Temporary Protected Status Program; Automatic Extension of Employment Authorization Documentation for Hondurans,* 68 FR 23744 (May 5, 2003); *Extension of the Designation of Temporary Protected Status for Honduras; Automatic Extension of Employment Authorization Documentation for Honduras TPS Beneficiaries,* 69 FR 64084 (November 3, 2004); *Extension of the Designation of Temporary Protected Status for Honduras; Automatic Extension of Employment Authorization Documentation for Honduras TPS Beneficiaries,* 71 FR 16328 (March 31, 2006); *Extension of the Designation of Honduras for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Honduran TPS Beneficiaries,* 72 FR 29529 (May 29, 2007); *Extension of the Designation of Honduras for Temporary Protected Status,* 73 FR 57133 (Oct. 1, 2008); *Extension of the Designation of Honduras for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Honduran TPS Beneficiaries,* 75 FR 24734 (May 5, 2010); *Extension of the Designation of Honduras for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Honduran TPS Beneficiaries,* 76 FR 68488 (Nov. 4, 2011); *Extension of the Designation of Honduras for Temporary Protected Status,* 78 FR 20123 (Apr. 3, 2013); *Extension of the Designation of Honduras for Temporary Protected Status,* 79 FR 62170 (Oct. 16, 2014); *Extension of the Designation of Honduras for Temporary Protected Status,* 81 FR 30331 (May 16, 2016).

[2] *See* 82 FR 59630 (Dec. 15, 2017). If the Secretary makes no decision on extension or termination of a country's TPS designation by at least 60 days before the expiration of the existing TPS designation, then INA, section 244(b)(3)(C) requires that the designation be extended an additional six months (or 12 or 18 months in the Secretary's discretion).

[3] 83 FR 26074 (June 5, 2018).

subject of litigation and a court order that has prevented the termination from taking effect.

## Litigation Background Regarding Termination of Certain TPS Designations

In addition to Honduras, in 2017–2018, TPS was also terminated for five additional countries by the Secretary or Acting Secretary: Sudan, Nicaragua, El Salvador, Haiti, and Nepal.[4] Lawsuits challenging the terminations were filed in the U.S. District Court for the Northern District of California in *Ramos* v. *Nielsen,* 326 F. Supp. 3d 1075 (N.D. Cal. 2018), and *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019), and in the U.S. District Court for the Eastern District of New York in *Saget,* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019).[5] In *Ramos* the district court granted a preliminary injunction enjoining the terminations of TPS for El

Salvador, Haiti, Sudan, and Nicaragua and directed DHS to maintain the *status quo* and to continue the TPS and TPS-related documentation of affected TPS beneficiaries under those countries' designations. The U.S. Government appealed, and a three-judge panel vacated the injunction. The appellate court, however, has granted rehearing en banc of the panel decision, vacating the panel's decision.[6] The court's preliminary injunction thus remains in place. In *Bhattarai*—which challenged the determination to terminate TPS for Honduras—the district court has stayed proceedings until the *Ramos* appeal is decided and approved the parties' stipulation for the continuation of TPS and TPS-related documentation for eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal. In *Saget,* the district court granted a preliminary injunction enjoining termination of TPS for Haiti, and the Government appealed.[7] Beneficiaries under the TPS designations for El Salvador, Nicaragua, Sudan, Haiti, Honduras, and Nepal will retain their TPS while the preliminary injunction in *Ramos* remains in effect, and 120 days thereafter, provided that their TPS is not withdrawn because of individual ineligibility.[8]

DHS has taken actions to ensure its continued compliance with the court orders in *Ramos* and *Bhattarai*. DHS has published periodic notices to continue TPS and extend the validity of TPS-related documentation previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal.[9] The most recent such notice continued TPS and extended the TPS-related documents specified in the notice through June 30, 2024.[10] These

extensions of documentation apply where the TPS beneficiary properly filed for re-registration during either the most recent DHS-announced registration period for their country, or any applicable previous DHS-announced re-registration periods for the beneficiary's country, or has a re-registration application that remains pending.[11] Although the notice published at 87 FR 68717 remains valid, individuals who wish to remain eligible for TPS under the extension of TPS for Honduras announced in this notice through July 5, 2025, and any potential future extensions must apply for re-registration in accordance with the procedures announced in this notice.[12] Failure to timely re-register without good cause is a ground for TPS withdrawal. *See INA* section 244(c)(3)(C); 8 U.S.C. 12(c)(3)(C); 8 CFR 244.17.

## What authority does the Secretary have to reconsider and rescind the termination of TPS for Honduras?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[13] The

---

[4] *Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017); *Termination of the Designation of Nicaragua for Temporary Protected Status,* 82 FR 59636 (Dec. 15, 2017); *Termination of the Designation of El Salvador for Temporary Protected Status,* 83 FR 2654 (Jan. 18, 2018); *Termination of the Designation of Haiti for Temporary Protected Status,* 83 FR 2648 (Jan. 18, 2018); *Termination of the Designation of Nepal for Temporary Protected Status,* 83 FR 23705 (May 22, 2018). Haiti and Sudan were newly designated for TPS on August 3, 2021, and April 19, 2022, respectively, for 18 months. *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021) and *Designation of Sudan for Temporary Protected Status,* 87 FR 23202 (Apr. 19, 2022).

[5] *See Ramos* v. *Nielsen,* 336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated,* 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted,* 59 F.4th 1010 (Feb. 10, 2023); *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (staying proceedings until *Ramos* appeal decided and approved parties' stipulation for continued TPS and issuance of TPS-related documentation to eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal). In 2019, the U.S. District Court for the Eastern District of New York also enjoined the termination of the 2011 TPS designation for Haiti in *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019), and DHS cited to that order in previous notices continuing the affected beneficiaries' TPS and documentation. *See, e.g.,* 86 FR 50725, 50726 (Sept. 10, 2021). However, the *Saget* case was dismissed upon the court's approval of the parties' joint Stipulation of Dismissal for mootness following the Secretary's new 18-month designation of Haiti for TPS on August 3, 2021, and DHS' continuation of existing beneficiaries' TPS and related documentation under the Ramos injunction through Dec. 31, 2022. *See id.,* Order approving Stipulation of Dismissal, dated Oct. 15, 2021. Other litigation was filed relating to the terminations of El Salvador, Honduras, and Haiti. A Haiti-related case, *NAACP v. U.S. Dept. of Homeland Security,* No. 1:18–cv–00239 (D. Md., Jan. 24, 2018) was dismissed on May 22, 2021, subsequent to the same DHS decision. An El Salvador-related case, *Casa de Maryland v. Biden,* No. GJH–18–00845 (D. Md. Mar. 23, 2018) is currently stayed until April 17, 2023. *Centro Presente v. Biden,* No. 1:18–cv–10340 (D. Mass. July 23, 2018), relating to El Salvador, Haiti, and Honduras, is currently stayed until April 14, 2023.

[6] *See Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for reh'g en banc granted,* 2023 WL 1880467 (Feb. 10, 2023) (No. 18–16981).

[7] *See Saget, et. al.,* v. *Trump, et. al.,* 375 F.Supp 280 (E.D.N.Y. April 11, 2019) and Order approving Stipulation of Dismissal, dated Oct. 15, 2021.

[8] As noted, Haiti was newly designated for TPS on August 3, 2021, for 18 months. *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021). On April 19, 2022, the Secretary also newly designated Sudan TPS. *See Designation of Sudan for Temporary Protected Status,* 87 FR 23202 (Apr. 19, 2022). Plaintiffs in *Ramos* and *Bhattarai* remain eligible for TPS status based on DHS new and continued designations.

[9] 83 FR 54764 (Oct. 31, 2018); 84 FR 7103 (March 1, 2019); 84 FR 20647 (May 10, 2019) (correction notice issued at 84 FR 23578 (May 22, 2019)); 84 FR 59403 (Nov. 4, 2019); 85 FR 79208 (Dec. 9, 2020); and 86 FR 50725 (Sept. 10, 2021) (correction notice issued at 86 FR 52694 (Sept. 22, 2021). Those designations cover all Haitian and Sudanese nationals who were eligible for TPS under the Haiti and Sudan TPS designations that were terminated in 2018 and 2017, respectively.

[10] *Continuation of Documentation for Beneficiaries of Temporary Protected Status*

*Designations of El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal,* 87 FR 68717 (Nov. 16, 2022).

[11] *Id. See* fn. 1 for acceptable re-registration periods for TPS Honduras beneficiaries).

[12] Through the re-registration process, which is generally conducted every 12 to 18 months while a foreign state is designated for TPS, USCIS determines whether each TPS beneficiary is continuing to maintain individual eligibility for TPS, including but not limited to, the requirements related to disqualifying criminal or security issues. Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 87 FR 68717, 68720 (Nov. 16, 2022) (noting potential future action for Honduras TPS beneficiaries may include a requirement to re-register).

[13] Although the text of INA section 244(b)(1) continues to ascribe this power to the Attorney General, this authority is now held by the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Public Law 107296, 116 Stat. 2135. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See Homeland Security Act of 2002,* Public Law 107–296, 116 Stat. 2135. *See, e.g.,* 6 U.S.C. 557; *Nielsen v. Preap,* 139 S. Ct. 954, 959 n.2 (2019). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the

---

decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).

At least 60 days before the expiration of a foreign state's TPS designation, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for TPS designation. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). If the Secretary does not determine that the foreign state no longer meets the conditions for TPS designation, the designation is extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C); 8 U.S.C. 1254a(b)(3)(A), (C).

On June 5, 2018, the Secretary of Homeland Security issued notice of her decision that Honduras no longer continued to meet the conditions for TPS designation and terminated TPS for Honduras stating that the conditions supporting Honduras's 1999 designation for TPS on the basis of environmental disaster due to the damage caused by Hurricane Mitch in October 1998 were no longer met. The Secretary also announced an orderly transition period of 18 months, such that the termination was set to go into effect on January 5, 2020. However, as noted above, plaintiffs in *Bhattarai* challenged the termination decisions for Honduras and Nepal. On March 12, 2019, the proceedings were stayed, and the parties stipulated that the termination decision would not go into effect during the pendency of the *Ramos* appeal and for at least 120 days thereafter. The district court also approved the parties' stipulation that TPS and TPS-related documentation of affected beneficiaries of the Honduras and Nepal TPS designations would continue under terms similar to those applied to the *Ramos*-covered beneficiaries. The order to stay proceedings and approval of the stipulation remain in effect.[14] DHS has since issued a series of **Federal Register**

notices continuing TPS and TPS-related documentation for affected TPS beneficiaries, with the most recent notice effective through June 30, 2024.[15] As a result, the termination of the TPS designation for Honduras has never gone into effect, and TPS beneficiaries under that designation have retained their TPS, unless it has been individually withdrawn pursuant to INA section 244(c)(3), 8 U.S.C. 1254a(c)(3).

An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions within a reasonable period unless Congress has expressly limited that authority.[16] The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination. *See* INA sections 244(b)(3), (b)(5)(A); 8 U.S.C. 1254a(b)(3), (b)(5)(A).

## Why is the Secretary rescinding the previous termination of the TPS designation for Honduras?

After conducting an independent assessment of the country conditions in Honduras as they existed in 2018 and exist today, the Secretary has determined that Honduras's 1999 designation should not have been terminated. As explained below, the conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day. Accordingly, the Secretary is, upon reconsideration, rescinding the 2018 decision terminating Honduras's TPS

designation and extending that designation for an additional 18 months.

Honduras was initially designated for TPS in 1999[17] following the destruction wrought by Hurricane Mitch, which struck Honduras in October 1998, causing a substantial disruption of living conditions in Honduras.[18] In the Secretary's view, the determination to terminate Honduras's TPS designation erroneously concluded that the conditions giving rise to that designation had been ameliorated by 2018, such that Honduras was able to adequately handle the return of its nationals. Numerous environmental, political, and social crises since Hurricane Mitch, however, have prevented the country from recovering from the hurricane and continue to impair Honduras from ensuring the safe return of its nationals.

Although recovery efforts were implemented in the years after Hurricane Mitch, the effects of Hurricane Mitch set back Honduras economically and socially by as much as 20 years.[19] Since Hurricane Mitch, various hurricanes, tropical storms, and tropical depressions have made landfall in Honduras. These subsequent natural disasters, to which the termination decision gave inadequate attention, significantly impeded Hurricane Mitch-related reconstruction projects.

Hurricane Mitch caused a substantial disruption of living conditions in Honduras, resulting in, among other things, substantial housing, and food shortages. *See* 65 FR 30438 (May 11, 2000). The determination to terminate TPS for Honduras failed to recognize that many of these conditions persisted in 2018, exacerbated by subsequent environmental disasters and other problems. The termination determination did not consider that in the years prior to the determination, approximately 1.3 million people remained in need of humanitarian assistance[20] due in part to Hurricane

---

country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA section 244(b)(1).

[14] *Bhattarai* v. *Nielsen*, No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019).

[15] *See* 84 FR 20647(May 10, 2019) (correction notice issued at 84 FR 23578 (May 22, 2019)); 84 FR 59403 (Nov. 4, 2019); 85 FR 79206 (Dec. 9, 2020); and 86 FR 50725 (Sept. 10, 2021) (correction notice issued at 86 FR 52694 (Sept. 22, 2021); and 87 FR 68717 (Nov. 16, 2022). DHS had published previous notices to comply with the earlier preliminary injunction order issued by the Ramos court. *See* 83 FR 54764 (Oct. 31, 2018); 84 FR 7103 (March 1, 2019).

[16] *See Ivy Sports Medicine, LLC* v. *Burwell,* 767 F.3d 81, 86 (D.C. Cir. 2014) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . [I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide." (quotation marks and citations omitted)); *NRDC* v. *Regan,* 67 F.4th 397, 401 (D.C. Cir. 2023) ("[A]lthough the power to decide is normally accompanied by the power to reconsider, Congress undoubtedly can limit an agency's discretion to reverse itself." (quotation marks omitted); *Macktal* v. *Chao,* 286 F.3d 822, 825–26 (5th Cir. 2002) ("It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); *Mazaleski* v. *Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.").

[17] *Designation of Honduras Under Temporary Protected Status,* 64 FR 526 (Jan. 5, 1999).

[18] OCHA, Analysis of the medium-term effects of Hurricane Mitch on food security in Central America, Nov. 30, 2001, available at *https:// reliefweb.int/report/belize/analysis-medium-term-effects-hurricane-mitch-food-security-central-america.*

[19] Suárez, Ginés, & Sánchez, Walter J., Desastres, riesgo y desarrollo en Honduras: Delineando los vínculos entre el desarrollo humano y la construcción de riesgo en Honduras, Programa de las Naciones Unidas para el Desarrollo (PNUD), p.22, Jan. 2012, available at: *https://criterio.hn/wp-content/uploads/2020/11/INFORME-PNUD-desastres-ambientales-honduras.pdf.*

[20] Central America Sub-Regional Analysis—El Salvador, Guatemala, Honduras: Humanitarian Needs Overview 2016 (Dec 2015), United Nations

Continued

Mitch and subsequent environmental impacts. For example, over 2 million Hondurans—approximately 25% of the population—had been severely affected by drought, and over 460,000 were in need of food assistance.[21] By March 2017, consecutive years of drought had left many subsistence farmers in the Dry Corridor struggling to produce food.[22] In addition to impacting food security, UNOCHA reported that the drought had also "contributed to the spread of mosquito-borne diseases, such as Zika, malaria, dengue and chikungunya." [23] Also contributing to illness was destruction from forest fires which increased by 40% in the first three months of 2017 compared to the same time period the previous year.[24] The termination decision failed to assess adequately or give sufficient weight to these health and safety issues that have persisted since Hurricane Mitch and impeded recovery from the hurricane.

The decision to terminate also did not appropriately consider that despite efforts and foreign assistance after Hurricane Mitch, Honduras was still experiencing a housing deficit. According to a 2016 study by Habitat for Humanity Honduras, Honduras had a housing deficit exceeding 1.3 million units.[25]

Aside from environmental impacts on the recovery from Hurricane Mitch, at the time of the decision to terminate TPS, Honduras continued to face challenges of violent crime, which have likewise made recovery from the hurricane more difficult.[26] In 2016, there were an estimated 174,000 internally displaced people in Honduras.[27] "Internal displacement was generally caused by violence, national and transnational gang activity, human trafficking, and migrant smuggling." [28] Additionally, although Honduras's murder rate had been falling in recent years, Honduras remained "one of the world's deadliest peacetime nations" in 2017 with a murder rate of 59.1 killings per 100,000 people.[29] Extortion remained a critical problem and a major source of violence that impacted almost all segments of society, including bus and taxi companies, small businesses, and ordinary citizens.[30] Together, these factors negatively impacted Honduras's ability to adequately handle the return of its nationals granted TPS.

At the time of the TPS termination decision, the country continued to suffer from impacts of Hurricane Mitch and subsequent environmental events, including humanitarian needs, hunger, disease, housing deficits, and underdeveloped infrastructure, in addition to widespread violence. The enduring impact of Hurricane Mitch in Honduras at the time of the decision to terminate TPS continued to substantially disrupt living conditions. Those enduring conditions impacting Honduras's ability to recover from Hurricane Mitch along with Honduras's challenges with violent crime affected the country's ability to adequately handle the return of its nationals granted TPS residing in the United States. The Secretary has concluded that reconsideration and rescission of the termination of TPS is timely, particularly given that the 2018 termination decision has not yet gone into effect.

**What authority does the Secretary have to extend the designation of Honduras for TPS?**

As noted above, INA section 244(b), 8 U.S.C. 1254a(b), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist and instructs the Secretary to periodically review the country conditions underpinning each designation and determine whether they still exist, leading to either termination or extension of the TPS designation. However, if the Secretary does not make a decision as to either extension or termination, then INA section 244(b)(3)(C) requires the automatic extension of the designation for six months (or 12 or 18 months in the Secretary's discretion).

Prior to the now-rescinded termination of the TPS designation for Honduras, the most recent extension of the designation was due to end on July 5, 2018.[31] In light of the Secretary's reconsideration and rescission of the June 5, 2018 notice of termination of the TPS designation for Honduras, there is no longer any standing secretarial determination that Honduras "no longer meets the conditions for designation" under INA section 244(b)(1). Accordingly, with this rescission of the prior termination, pursuant to INA section 244(b)(3)(C), and in the absence of an affirmative decision by any Secretary to extend the designation for 12 or 18 months rather than the

---

Office for the Coordination of Humanitarian Affairs (UNOCHA), p. 6, Jan. 14, 2016, available at: *https://reliefweb.int/report/guatemala/central-america-sub-regional-analysis-el-salvador-guatemala-honduras-humanitarian*.

[21] El Niño: Overview of Impact, Projected Humanitarian Needs, and Reponses, p.18; WFP Honduras—Country Brief, p.1, Jun. 2016, available at: *http://reliefweb.int/sites/reliefweb.int/files/resources/Honduras_CB_June2016OIM.pdf*; UN Envoy: Drought-hit Honduras Needs New Approach to Tackle Extreme Weather, Reuters, Aug. 1, 2016, available at: *http://www.voanews.com/a/un-envoy-drought-hit-honduras-needs-new-approach-to-tackle-extreme-weather/3444720.html*.

[22] Hares, Sophie, Honduran farmers prize rainwater as most precious harvest, Thomson Reuters Foundation, Mar. 22, 2017, available at: *http://reliefweb.int/report/honduras/honduran-farmers-prize-rainwater-most-precious-harvest*.

[23] El Niño: Overview of Impact, Projected Humanitarian Needs, and Reponses, UN Office for the Coordination of Humanitarian Affairs (UNOCHA), p. 23, June 3, 2016, available at: *https://reliefweb.int/report/world/el-ni-o-overview-impact-projected-humanitarian-needs-and-response-02-june-2016*.

[24] En un 40% aumentan incendios en el país, La Tribuna (Hon.), Apr. 2, 2017, available at: *http://reliefweb.int/report/honduras/en-un-40-aumentan-incendios-en-el-pa-s*.

[25] Habitat for Humanity Honduras, Habitat for Humanity, available at: *http://www.habitat.org/*

*where-we-build/honduras* (last visited Apr. 6, 2023).

[26] World Report 2018—Honduras Events of 2017, Human Rights Watch, Jan. 18, 2018, available at: *https://www.hrw.org/world-report/2018/country-chapters/honduras* (last visited: Apr. 6, 2023); Freedom in the World 2018, Honduras, Freedom House, Jan. 2018, available at: *https://freedomhouse.org/country/honduras/freedom-world/2018* (last visited: Apr. 6, 2023).

[27] U.S. Department of State, 2017 Country Reports on Human Rights Practices: Honduras, Apr. 20, 2018, available at: *https://www.state.gov/reports/2017-country-reports-on-human-rights-practices/honduras/* (last visited: Apr. 6, 2023).

[28] *Id.*

[29] Reuters, Honduras murder rate fell by more than 25 percent in 2017: government, Jan. 18, 2018, available at: *https://www.reuters.com/article/us-honduras-violence/honduras-murder-rate-fell-by-more-than-25-percent-in-2017-government-idUSKBN1ER1K9* (last visited: Mar. 17, 2023).

[30] Gurney, Krya, What an Extortion Call in Honduras Sounds Like, InSight Crime, Mar. 4, 2015, available at: *http://www.insightcrime.org/news-analysis/what-an-extortion-call-in-honduras-sounds-like*; Refworld, UNHCR Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Honduras, July 27, 2016, available at: *https://www.refworld.org/docid/579767434.html* (last visited: March 17, 2023).

[31] 82 FR 59631 (Dec. 15, 2017).

automatic six months triggered by the statute, the TPS designation for Honduras shall have been extended in consecutive increments of 6 months between the date when the last designation extension was due to end on July 5, 2018, and the effective date of the TPS extension announced in this Notice, January 6, 2024. Coupled with the existing *Bhattarai* order and corresponding **Federal Register** notices continuing the TPS and TPS-related documentation for affected beneficiaries under the designation for Honduras, this means that all such individuals whose TPS has not been finally withdrawn for individual ineligibility are deemed to have retained TPS since July 5, 2018, and may re-register under procedures announced in this notice.

**Why is the Secretary extending the TPS designation for Honduras for TPS for 18 months through July 5, 2025?**

DHS has reviewed country conditions in Honduras. Based on the review, including input received from DOS and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because the environmental disaster conditions and substantial disruption of living conditions supporting Honduras's TPS designation remain.

Since Honduras was designated for TPS in January 1999, various natural disasters, and related environmental concerns—including hurricanes, tropical storms, flooding and heavy rain, severe drought, and mosquito-borne illnesses—have contributed to loss of life and damages to property and infrastructure in Honduras and prevented the country from fully recovering from Hurricane Mitch. Additionally, since the extension of TPS for Honduras in 2018,[32] violence and social and political concerns have adversely impacted living conditions and hindered recovery from environmental disasters in Honduras.[33] These subsequent natural disasters, violence, and social and political concerns continue to inflict damage on a population that has not fully recovered from Hurricane Mitch and

impact Honduras's ability to adequately handle the return of its nationals granted TPS. Accordingly, the Secretary has concluded that the conditions that gave rise to Honduras's 1999 TPS designation persist, and an extension is therefore warranted. Since Hurricane Mitch, Honduras has been impacted by a "repetitive cycle" of storm-related damage to infrastructure and 16 of the 18 departments in the country recently reported damaged roads, collapsed bridges, devastated crops, flooded houses, and landslides.[34]

In 2019, Honduras experienced a severe drought that "decimated staple-crop harvests of beans and maize by up to 80% in some areas," and led the government to declare a state of emergency.[35] In November 2020, within weeks of each other,[36] hurricanes Eta and Iota, both Category 4 storms,[37] struck Honduras. UNHCR noted that "more than 4 million people were affected by Hurricanes Eta and Iota in Honduras alone,"[38] about "half the country's population."[39] "In 2020, hurricanes Eta and Iota forced more than 55,000 to move into temporary shelters, according to the Red Cross."[40] In rural areas, the storms destroyed fields and slow receding water hindered sowing, impacting the livelihood of

those who depend on seasonal crops. In urban areas, the storms greatly impacted populations already suffering socioeconomic effects of the COVID–19 pandemic, job losses, and increased violence.[41]

Among the storms affecting Honduras recently was Tropical Storm Julia, which "wreaked havoc in 15 of the country's 18 departments."[42]Flooding related to Julia is estimated to have affected over 200,000 Hondurans.[43] Even a "relatively weak" hurricane like Julia reportedly can cause significant destruction in Honduras due to unaddressed damage to infrastructure from previous storms.[44]

Recent tropical storms, flooding, and subsequent landslides across the country in 2022 "affected 188,000 people" and sparked another government declared country-wide state of emergency, after 23,000 people were evacuated from homes and more than 12,300 people moved into housing shelters across eight departments.[45] As of August 2022, "more than 16,000 public educational centers in Honduras lack adequate infrastructure. Some 5,700 centers lack drinking water, and 44% of schools do not have electricity."[46] "Between 1 September and 10 October, 162 municipalities in 15 of the 18 departments in Honduras reported damage to basic and critical infrastructure, including over 3,500 damaged or destroyed houses (COPECO/Gov't of Honduras 11/10/2022)."[47]

---

[32] The TPS designation of Honduras was statutorily automatically extended for 6 months (from January 6, 2018, through July 5, 2018) after the Secretary of Homeland Security did not make a determination on Honduras's designation 60 days prior to the previous expiration (January 5, 2018). Subsequently, on June 5, 2018, the Secretary published a determination to terminate TPS for Honduras, effective January 5, 2020.

[33] United Nations Office for the Coordination of Humanitarian Affairs, Honduras Humanitarian Needs Overview 2023 (September 2022) (Feb. 8, 2023), *https://reliefweb.int/report/honduras/honduras-humanitarian-needs-overview-2023-september-2022* (last visited Mar. 13, 2023).

[34] Starting from Scratch Over and Over Again: Heavy Rains and Floods Displace Thousands of Hondurans, International Organization for Migration (IOM), Oct. 28, 2022, available at: *https://reliefweb.int/report/honduras/starting-scratch-over-and-over-again-heavy-rains-and-floods-displace-thousands-hondurans* (last visited Apr. 6, 2023).

[35] Moloney, Anastasia, In Honduras, years of drought pressure farmers to leave land, Reuters, Sept. 27, 2019, available at: *https://reliefweb.int/report/honduras/honduras-years-drought-pressure-farmers-leave-land.*

[36] In Honduras, climate change is one more factor sparking displacement, United Nations High Commissioner for Refugees (UNHCR), Nov. 9, 2021, available at: *https://reliefweb.int/report/honduras/honduras-climate-change-one-more-factor-sparking-displacement.*

[37] The National Oceanic and Atmospheric Administration (NOAA) defines category 4 hurricanes as major storms with winds between 130–156 miles per hour which cause catastrophic damage. *See:* Saffir-Simpson Hurricane Wind Scale, National Oceanic and Atmospheric Administration, *https://www.nhc.noaa.gov/aboutsshws.php.* (last visited Jun. 17, 2022).

[38] In Honduras, climate change is one more factor sparking displacement, United Nations High Commissioner for Refugees (UNHCR), Nov. 9, 2021, available at: *https://reliefweb.int/report/honduras/honduras-climate-change-one-more-factor-sparking-displacement.*

[39] Lakhani, Nina, 'We can't live like this': climate shocks rain down on Honduras's poorest, The Guardian, Oct. 28, 2021, available at: *https://www.theguardian.com/environment/2021/oct/28/honduras-climate-crisis-floods-hurricanes-poor-community.*

[40] World Report 2022—Honduras, Human Rights Watch, Jan. 13, 2022, available at: *https://www.hrw.org/world-report/2022/country-chapters/honduras#dbcb23.*

[41] Honduras: Hurricane Eta and Iota—Emergency appeal n° MDR43007 Operation Update no. 2, International Federation of Red Cross and Red Crescent Societies (IFRC), Jan. 21, 2021, available at: *https://reliefweb.int/report/honduras/honduras-hurricane-eta-and-iota-emergency-appeal-n-mdr43007-operation-update-no-2.*

[42] United Nations Office for the Coordination of Humanitarian Affairs, Honduras Humanitarian Needs Overview 2023 (September 2022) (Feb. 8, 2023), *https://reliefweb.int/report/honduras/honduras-humanitarian-needs-overview-2023-september-2022* (last visited Feb. 9, 2023).

[43] *Id.*

[44] Brigida, Anna-Cat, Hurricane Julia pushes displaced Hondurans to consider migration, Al Jazeera, Oct. 18, 2022, available at: *https://www.aljazeera.com/news/2022/10/18/hurricane-julia-pushes-displaced-hondurans-to-consider-migration.*

[45] ACAPS Briefing Note: Honduras—Impact of Floods, ACAPS, p.1, Oct. 27, 2022, available at: *https://reliefweb.int/report/honduras/acaps-briefing-note-honduras-impact-floods-27-october-2022.*

[46] Quartucci, Soledad, Educational Reform in Honduras-The Roots of Challenges and the Way Forward, Latina Republic, Aug. 29, 2022, available at: *https://latinarepublic.com/2022/08/29/educational-reform-in-honduras-the-roots-of-challenges-and-the-way-forward/.*

[47] ACAPS Briefing Note: Honduras—Impact of Floods, ACAPS, p.1, Oct. 27, 2022, available at: *https://reliefweb.int/report/honduras/acaps-briefing-note-honduras-impact-floods-27-october-2022.*

**40310** Federal Register / Vol. 88, No. 118 / Wednesday, June 21, 2023 / Notices

The Food and Agriculture Organization of the United Nations (FAO) noted in April 2022 that "[t]he number of acutely food-insecure people in Honduras has doubled in just over a year, due to the combined impact of COVID–19, poverty and climate-related disasters." [48] The United Nations estimated a similar impact, reporting that in early 2022, 2.8 million people in Honduras were in need of humanitarian assistance.[49] Recent reports indicate that food insecurity is worsening, with at least 2.6 million people in Crisis (IPC Phase 3) [50] or worse levels of food insecurity, which is more than a quarter of the population.[51] Environmental events have been a driving factor for food insecurity by "affecting food production and availability and increasing staple food prices in markets," such that Honduras faced a "Crisis (IPC Phase 3) food insecurity." [52]

In June 2022, *The Guardian* reported that pneumonia was "one of the leading causes of child death in Honduras," and deaths of children "caused by the disease are strongly linked to malnutrition, lack of safe water and sanitation, and inadequate access to healthcare." [53] Honduras reported the highest number of severe dengue fever cases in the Americas in both 2020 [54]

and 2021.[55] In 2020, the risks of major infectious diseases including typhoid fever, dengue fever and malaria were also rated as high.[56] According to the U.S. Embassy in Honduras, "medical care in Honduras varies greatly in quality and availability." [57] Outside of Honduras's two major cities, it is "inadequate to address complex situations," "facilities for advanced surgical procedures are not available," and "ambulance services are limited in major cities and almost non-existent elsewhere." [58]

"Honduras is one of the most unequal, corrupt and violent countries in Latin America, where a handful of politically powerful clans control the economy while more than two-thirds of the population live in poverty." [59] In 2021, Honduras "saw some of its worst political violence in the run-up to November's presidential elections . . . [in which] 68 candidates in various local and national races were killed." [60] The United States indicted the out-going president of Honduras, Juan Orlando Hernandez, (president of Honduras from 2014 through January 2022),[61] on federal drug and arms trafficking charges shortly after he left office,[62] and Honduras extradited him to the United States in April 2022 to face the charges.[63] The current president who

took office on January 27, 2022, inherited the remnants of what U.S. prosecutors have called a "narco state." [64]

In recent years, Honduras has been plagued by staggering levels of crime and violence—ranking as the murder capital of the world in 2012 and 2013.[65] Gangs that originated in the United States are engaged in violent fighting in Honduras. They "have laid siege to communities" and "have plunged the country into a state of crisis"— "govern[ing] much of daily life for residents living in their areas of control, [as] stand-ins for a corrupt and ineffectual government." [66] A UNHCR representative stated in November 2021 that gangs in Honduras "took advantage of the extreme vulnerability of victims of the hurricanes to tighten their control, imposing restrictions on movements [. . .] For many who were displaced by the storms, going back could be dangerous." [67] Honduras was Central America's most deadly country in 2021, with homicides slightly outpacing 2020, and falling below rates in 2019.[68]

In 2020, internally displaced Hondurans "represented almost 80 percent of the internally displaced population in Central America and Mexico." [69] The United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA) reported that

[48] Honduras: Humanitarian Response Plan 2022, Food and Agriculture Organization of the United Nations (FAO), p.1, Apr. 6, 2022, available at: *https://reliefweb.int/report/honduras/honduras-humanitarian-response-plan-2022.*

[49] Global Humanitarian Overview 2022, United Nations Office for the Coordination of Humanitarian Affairs, *https://www.unocha.org/sites/unocha/files/Global%20Humanitarian%20Overview%202022.pdf.*

[50] IPC Acute Food Insecurity is categorized in five distinct phases: (1) Minimal/None, (2) Stressed, (3) Crisis, (4) Emergency, (5) Catastrophe/Famine. For additional information on these classifications, please see the IPC Technical Manual, available at: *https://www.ipcinfo.org/fileadmin/user_upload/ipcinfo/docs/IPC-Manual-2-Interactive.pdf.*

[51] United Nations Office for the Coordination of Humanitarian Affairs, Honduras Humanitarian Needs Overview 2023 (September 2022) (Feb. 8, 2023), *https://reliefweb.int/report/honduras/honduras-humanitarian-needs-overview-2023-september-2022.* (last visited Mar. 13, 2023).

[52] ACAPS Briefing Note: Honduras—Impact of Floods, ACAPS, p.2, Oct. 27, 2022, available at: *https://www.acaps.org/sites/acaps/files/products/files/20221027_acaps_rapid_analysis_team_briefing_note_honduras_flooding.pdf.*

[53] Johnson, Sarah, Fears for Honduran children as poverty worsens pneumonia's toll, The Guardian, June 9, 2022, available at: *https://www.theguardian.com/global-development/2022/jun/09/poverty-drought-impending-famine-now-pneumonia-takes-its-cruel-toll-on-honduran-children-acc.*

[54] Epidemiological Update for Dengue, Chikungunya and Zika in 2020, Pan American Health Organization, updated June 16, 2022, available at: *https://www3.paho.org/data/index.php/en/mnu-topics/indicadores-dengue-en/annual-arbovirus-bulletin-2020.html.*

[55] Epidemiological Update for Dengue, Chikungunya and Zika in 2021, Pan American Health Organization, updated June 16, 2022, available at: *https://www3.paho.org/data/index.php/en/mnu-topics/indicadores-dengue-en/annual-arbovirus-bulletin-2021.html.*

[56] World Fact Book, U.S. Central Intelligence Agency, available at: *https://www.cia.gov/the-world-factbook/countries/honduras/* (last visited June 23, 2022).

[57] Medical Assistance, U.S. Embassy in Honduras, *https://hn.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens-2/doctors/* (last visited Jun. 16, 2022).

[58] Medical Assistance, U.S. Embassy in Honduras, *https://hn.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens-2/doctors/* (last visited Jun. 16, 2022).

[59] Lakhani, Nina, 'We can't live like this': climate shocks rain down on Honduras's poorest, The Guardian, Oct. 28, 2021, available at: *https://www.theguardian.com/environment/2021/oct/28/honduras-climate-crisis-floods-hurricanes-poor-community.*

[60] InSight Crime's 2021 Homicide Round-Up, Insight Crime, Feb. 1, 2022, available at: *https://insightcrime.org/news/insight-crimes-2021-homicide-round-up/.*

[61] Honduras ex-President Hernandez pleads not guilty in U.S. court, Al Jazeera, May 10, 2022, available at: *https://www.aljazeera.com/news/2022/5/10/honduras-ex-president-hernandez-pleads-not-guilty-in-us-court.*

[62] Fernández Simon, Maite, Who is Juan Orlando Hernández and why was he extradited to the U.S.?, The Washington Post, Apr. 21, 2022, available at: *https://www.washingtonpost.com/world/2022/04/21/honduras-juan-orlando-hernandez-extradition/.*

[63] Martin, Maria and Griffiths, Robbie, Ex-Honduran President Hernández is extradited to the U.S. on drug charges, National Public Radio (NPR),

Apr. 21, 2022, available at: *https://www.npr.org/2022/04/21/1093975738/ex-honduran-president-hernandez-will-be-extradited-to-the-u-s-on-drugs-charges.*

[64] Grant, Will, Has Honduras become a 'narco-state'?, BBC News, Apr. 22, 2022, available at: *https://www.bbc.com/news/world-latin-america-56947595.*

[65] Kahn, Carrie, Honduras Claims Unwanted Title Of World's Murder Capital, NPR, July 2, 2013, available at: *http://www.npr.org/sections/parallels/2013/06/13/190683502/honduras-claims-unwanted-title-of-worlds-murder-capital;* Rhodan, Maya, Honduras Is Still the Murder Capital of The World, Time, Feb. 17, 2014, available at: *http://world.time.com/2014/02/17/honduras-is-still-the-murder-capital-of-the-world/;* UNHCR Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Honduras, UNHCR, p.10, July 27, 2016, available at: *http://www.refworld.org/docid/579767434.html.*

[66] Azam, Ahmed, Three Weeks Embedded in Honduran Gang Territory, The New York Times, May 7, 2019.

[67] Rubi, María and Gaynor, Tim, In Honduras, climate change is one more factor sparking displacement, United Nations High Commissioner for Refugees (UNHCR), Nov. 9, 2021, available at: *https://reliefweb.int/report/honduras/honduras-climate-change-one-more-factor-sparking-displacement.*

[68] InSight Crime's 2021 Homicide Round-Up, Insight Crime, Feb. 1, 2022, available at: *https://insightcrime.org/news/insight-crimes-2021-homicide-round-up/.*

[69] World Report 2022—Honduras, Human Rights Watch, Jan. 13, 2022, available at: *https://www.hrw.org/world-report/2022/country-chapters/honduras#dbcb23.*

"Honduras registered 937,000 new displacements, ranking it among the top four countries in Latin America and the Caribbean for new disaster-triggered displacements . . . surpass[ing] countries such as South Sudan in the number of new displacements due to disasters and conflicts in 2020." [70] The United Nations High Commissioner for Refugees (UNHCR) reported in July 2022 that "58,000 families abandon their homes in Honduras annually, being internally displaced due to the violence crisis in the country." [71]

In summary, Honduras's slow recovery after Hurricane Mitch and more recent environmental disasters, including hurricanes, tropical storms, flooding and heavy rain, severe drought, and mosquito-borne illness, continue to disrupt living conditions and render Honduras temporarily unable to handle the return of those granted TPS under the 1999 designation and are currently residing in the United States. Additionally, since the 2018 extension of TPS for Honduras,[72] violence, social and political concerns have adversely impacted living conditions and hindered recovery from environmental disasters in Honduras.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• At the time the Secretary's determination to terminate Honduras's designation for TPS was announced on June 5, 2018, conditions in Honduras continued to support the country's designation for TPS based on environmental disaster grounds; therefore, the termination should be rescinded, and such rescission is timely given that the termination has not yet gone into effect. *See* INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B).

• The conditions supporting Honduras's designation for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There has been an earthquake, flood, drought, epidemic, or other environmental disaster in Honduras resulting in a substantial, but temporary, disruption of living conditions in the area affected; Honduras is unable, temporarily, to handle adequately the return of its nationals; and Honduras officially requested designation of TPS. *See* INA section 244(b)(1)(B)(i), 8 U.S.C. 1254a(b)(1)(B)(i);

• The designation of Honduras for TPS should be extended for an 18-month period, beginning on January 6, 2024, and ending on July 5, 2025. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

**Notice of the Rescission of TPS Termination and Extension of the TPS Designation of Honduras**

Pursuant to my lawful authorities, including under sections 103(a) and 244 of the INA, I am hereby rescinding the termination of the TPS designation of Honduras announced in the **Federal Register** at 83 FR 26074 (June 5, 2018). Due to this rescission and pursuant to section 244(b)(3)(C) of the INA as well as the court order in *Bhattarai* v. *Nielsen*, No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019), the TPS designation of Honduras has continued to exist since July 5, 2018, without a standing secretarial determination as to whether TPS should be extended or terminated. TPS beneficiaries under the designation, whose TPS has not been finally withdrawn for individual ineligibility, therefore have continued to maintain their TPS since July 5, 2018.

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Honduras's designation for TPS on the basis of an environmental disaster continue to be met. *See* INA sections 244(b)(1)(B), 244(b)(3)(A); 8 U.S.C. 1254a(b)(1)(B), 1254a(b)(3)(A). On the basis of this determination, I am extending the existing designation of Honduras for TPS for 18 months, beginning on January 6, 2024, and ending on July 5, 2025. *See* INA section 244(b)(1)(B), (b)(3)(C); 8 U.S.C. 1254a(b)(1)(B), (b)(3)(C). Individuals holding TPS under the designation of Honduras may file to reregister for TPS under the procedures announced in this Notice if they wish to

continue their TPS under this 18-month extension.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

**Required Application Forms and Application Fees to Re-Register for TPS:**

To re-register for TPS based on the designation of Honduras, you must submit a Form I–821, Application for Temporary Protected Status during the 60-day re-registration period that runs November 6, 2023 through January 5, 2024. There is no Form I–821 fee for re-registration. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the "Biometric Services Fee" section of this notice.

Individuals who have a Honduras TPS application (Form I–821) that was still pending as of June 21, 2023 do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through July 5, 2025.

**Required Application Forms and Application Fees To Obtain an EAD**

Every employee must provide their employer with documentation showing they have a legal right to work in the United States. TPS beneficiaries are authorized to work in the United States and are eligible for an EAD which proves their employment authorization. If you have an existing EAD issued under the TPS designation of Honduras that has been auto-extended through June 30, 2024 by the notice published at 87 FR 68717, you may continue to use that EAD through that date. If you want to obtain a new EAD valid through July 5, 2025, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver).

You may, but are not required to, submit Form I–765, Application for Employment Authorization, with your Form I–821 re-registration application. If you do not want a new EAD now, you can request one later by filing your I–765 and paying the fee (or requesting a fee waiver) at that time, provided you have TPS or a pending TPS application. If you have TPS and only a pending Form I–765, you must file the Form I–821 to re-register for TPS or risk having

---

[70] *Honduras: Humanitarian Response Plan (August 2021–December 2022),* United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Nov. 19, 2021, available at: *https://reliefweb.int/report/honduras/honduras-humanitarian-response-plan-august-2021-december-2022.*

[71] Honduras External Update—June to July 2022, United Nations High Commissioner for Refugees (UNHCR), Jul. 31, 2022, available at: *https://reliefweb.int/report/honduras/honduras-external-update-june-july-2022.*

[72] The TPS designation of Honduras was statutorily automatically extended for 6 months (from January 6, 2018, through July 5, 2018) after the Secretary of Homeland Security did not make a determination on Honduras's designation 60 days prior to the previous expiration (January 5, 2018). Subsequently, on June 5, 2018, the Secretary published a determination to terminate TPS for Honduras, effective January 5, 2020.

your TPS withdrawn for failure to reregister without good cause.

**Information About Fees and Filing**

USCIS offers the option to applicants for TPS under Honduras's designation to file Form I–821 and related requests for EADs online or by mail. When filing a TPS application, applicants can also request an EAD by submitting a completed Form I–765, with their Form I–821.

*Online filing:* Form I–821 and I–765 are available for concurrent filing online.[73] To file these forms online, you must first create a USCIS online account.[74] However, if you are requesting a fee waiver, you cannot submit the applications online. You will need to file paper versions of the fee waiver request and the form for which you are requesting the fee waiver.

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

**Table 1—Mailing Addresses**

Mail your completed Form I–821, Application for Temporary Protected Status and Form I–765, Application for Employment Authorization, Form I–912, Request for Fee Waiver, if applicable, and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If you live in: | Then mail your application to: |
|---|---|
| • Alabama .....................................<br>• Alaska<br>• American Samoa<br>• Arizona<br>• Arkansas<br>• California<br>• Colorado<br>• Guam<br>• Hawaii<br>• Idaho<br>• Kentucky<br>• Louisiana<br>• Mississippi<br>• Montana<br>• Nevada<br>• New Mexico<br>• North Carolina<br>• Northern Mariana Islands<br>• Oklahoma<br>• Oregon<br>• Puerto Rico<br>• Tennessee<br>• Texas<br>• Utah<br>• Virgin Islands<br>• Virginia<br>• Washington<br>• West Virginia<br>• Wyoming. | USCIS Phoenix Lockbox.<br>*U.S. Postal Service (USPS):* USCIS, Attn: TPS Honduras, P.O. Box 21800, Phoenix, AZ 85036–1800.<br>*FedEx, UPS, or DHL:* USCIS, Attn: TPS Honduras (Box 21800), 2108 E. Elliot Rd., Tempe, AZ 85284–1806. |
| • Connecticut ...............................<br>• Delaware<br>• District of Columbia<br>• Florida<br>• Georgia<br>• Illinois<br>• Indiana<br>• Iowa<br>• Kansas<br>• Maine<br>• Maryland<br>• Massachusetts<br>• Michigan<br>• Minnesota<br>• Missouri<br>• Nebraska<br>• New Hampshire<br>• New Jersey<br>• New York<br>• North Dakota<br>• Ohio<br>• Pennsylvania<br>• Rhode Island<br>• South Carolina | USCIS Elgin Lockbox.<br>*U.S. Postal Service (USPS):* USCIS, Attn: TPS Honduras, P.O. Box 4091, Carol Stream, IL 60197–4091.<br>*FedEx, UPS, or DHL:* USCIS, Attn: TPS Honduras (Box 4091), 2500 Westfield Drive, Elgin, IL 60124–7836. |

[73] Find information about online filing at "Forms Available to File Online," *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[74] *https://myaccount.uscis.gov/users/sign_up.*

### TABLE 1—MAILING ADDRESSES—Continued

| If you live in: | Then mail your application to: |
|---|---|
| • South Dakota<br>• Vermont<br>• Wisconsin | |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (*i.e.*, registering) for TPS on the USCIS website at *https://www.uscis.gov/tps* under ''Honduras.''

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *https://www.uscis.gov/i-131.* You may file Form I–131 together with your Form I–821 or separately. When filing the Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for the Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

### TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
|---|---|
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS):<br>    You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL:<br>    You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* Fees for Form I–765 and biometric services are also described in 8 CFR 103.7(b)(1) (Oct. 1, 2020). If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https://www.dhs.gov/publication/dhsuscispia-*060-customer-profile-management-service-cpms.*

**Refiling a TPS Re-Registration Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue your EAD promptly, if one has been requested. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. The fee waiver denial notice will contain specific instructions about resubmitting your application. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *www.uscis.gov/tps.*

**Note:** A re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the I–821 fee), or request a fee waiver, when filing a TPS re-registration application. As discussed above, if you decide to wait to request an EAD, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration. You may wait to seek an EAD until after USCIS has approved your TPS re-registration application or at any later date you decide you want to request an EAD. To re-register for TPS, you only need to file the Form I–821 with the biometrics services fee, if applicable, (or request a fee waiver).

**General Employment-Related Information for TPS Applicants and Their Employers**

*How can I obtain information on the status of my TPS application and EAD request?*

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at

*uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/ contactcenter.* If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800– 375–5283 (TTY 800–767–1833).

*When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?*

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/ acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central.* An EAD is an acceptable document under List A.

*If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?*

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through July 5, 2025, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

*Can my employer require that I provide any other documentation such as evidence of my status or proof of my Honduran citizenship or a Form I–797C showing that I registered for TPS for Form I–9 completion?*

No. When completing Form I–9, employers must accept any

documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request proof of Honduran citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. Refer to the "Note to Employees" section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin. Employers can refer to the compliance notice that DHS published on November 16, 2022, for information on how to complete the Form I–9 with TPS EADs that DHS extended through June 30, 2024.[75]

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875– 6028) or email USCIS at *I-9Central@ uscis.dhs.gov.* USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I– 9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov.* USCIS accepts calls in

English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (mismatch) must promptly inform employees of the mismatch and give such employees an opportunity to take action to resolve the mismatch. A mismatch result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800– 255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ crt/immigrant-and-employee-rights-section* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

This **Federal Register** Notice does not invalidate the compliance notice DHS issued on November 16, 2022, which

---

[75] Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 87 FR 68717 (Nov. 16, 2022).

extended the validity of certain TPS documentation through June 30, 2024, and does not require individuals to present a Form I–797, Notice of Action. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS designated country of Honduras; or

• Your Form I–94, Arrival/Departure Record or Form I–797, Notice of Action, as shown in the **Federal Register** notice published at 87 FR 68717.

Check with the government agency requesting documentation regarding which document(s) the agency will accept. Some state and local government agencies use the SAVE program to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each state and local government agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. It may also assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice listing the TPS-related document, including any applicable auto-extension of the document, in addition to your recent TPS-related document with your A-number, USCIS number or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or any automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic

response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://save.uscis.gov/casecheck/*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save*, has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–13017 Filed 6–20–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[OMB Control Number 1615–0003]**

**Agency Information Collection Activities; Revision of a Currently Approved Collection: Application To Extend/Change Nonimmigrant Status**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** 30-Day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) will be submitting the following information collection request to the Office of Management and Budget (OMB) for review and clearance in accordance with the Paperwork Reduction Act of 1995. The purpose of this notice is to allow an additional 30 days for public comments.

**DATES:** Comments are encouraged and will be accepted until July 21, 2023.

**ADDRESSES:** Written comments and/or suggestions regarding the item(s) contained in this notice, especially regarding the estimated public burden and associated response time, must be submitted via the Federal eRulemaking Portal website at *http:// www.regulations.gov* under e-Docket ID

number USCIS–2007–0038. All submissions received must include the OMB Control Number 1615–0003 in the body of the letter, the agency name and Docket ID USCIS–2007–0038.

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Samantha Deshommes, Chief, Telephone number (240) 721–3000 (This is not a toll-free number; comments are not accepted via telephone message.). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries. Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS website at *http:// www.uscis.gov*, or call the USCIS Contact Center at (800) 375–5283; TTY (800) 767–1833.

**SUPPLEMENTARY INFORMATION:**

**Comments**

The information collection notice was previously published in the **Federal Register** on January 30, 2023, at 88 FR 5903, allowing for a 60-day public comment period. USCIS did receive 5 comments in connection with the 60-day notice.

You may access the information collection instrument with instructions, or additional information by visiting the Federal eRulemaking Portal site at: *http://www.regulations.gov* and enter USCIS–2007–0038 in the search box. The comments submitted to USCIS via this method are visible to the Office of Management and Budget and comply with the requirements of 5 CFR 1320.12(c). All submissions will be posted, without change, to the Federal eRulemaking Portal at *http:// www.regulations.gov*, and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov*.

Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the

Naturalization Proceedings under Section 336.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* N–336; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Form N–336 is used by an individual whose Form N–400, Application for Naturalization was denied, to request a hearing before an immigration officer on the denial of the N–400. USCIS uses the information submitted on Form N–336 to locate the requestor's file and schedule a hearing in the correct jurisdiction. It allows USCIS to determine if there is an underlying Form N–400, Application for Naturalization that was denied, to warrant the filing of Form N–336. The information collected also allows USCIS to determine if a member of the U.S. armed forces has filed the appeal.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection N–336 (paper filed) is 3,788 and the estimated hour burden per response is 2.75 hours; the estimated total number of respondents for the information collection N–336 (filed online) is 1,263 and the estimated hour burden per response is 2.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 13,575 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $2,601,265.

Dated: June 14, 2023.

**Samantha L. Deshommes,**

*Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2023–13125 Filed 6–20–23; 8:45 am]

**BILLING CODE 9111–97–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2734–22; DHS Docket No. USCIS–2015–0003]

RIN 1615–ZB74

## Reconsideration and Rescission of Termination of the Designation of Nepal for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nepal

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Reconsideration and Rescission of Termination of the Designation of Nepal for Temporary Protected Status (TPS) and Notice of Extension of TPS Designation for Nepal.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is rescinding the previous termination of the designation of Nepal for TPS, which was published on May 22, 2018 and extending the designation of Nepal for Temporary Protected Status (TPS) for 18 months, beginning on December 25, 2023, and ending on June 24, 2025. This extension allows existing TPS beneficiaries to retain TPS through June 24, 2025, so long as they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through June 24, 2025, must re-register during the 60-day re-registration period as described in this notice.

**DATES:** The *Rescission of Termination of the Designation of Nepal for TPS* is effective took effect June 9, 2023.

*Extension of Designation of Nepal for TPS:* The 18-month extension of TPS for Nepal begins on December 25, 2023 and will remain in effect through June 24, 2025. The extension impacts existing beneficiaries of TPS under the designation of Nepal.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from October 24, 2023 through December 23, 2023.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Renά Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* You can find specific information about Nepal's TPS designation by selecting Nepal from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.*

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Document
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**Purpose of This Action (TPS)**

Through this notice, DHS announces the reconsideration and rescission of the termination of the designation of Nepal for TPS, and the Secretary's decision to extend Nepal's designation for TPS for 18 months from December 25, 2023 through June 24, 2025. This notice also

sets forth procedures necessary for nationals of Nepal (or individuals having no nationality who last habitually resided in Nepal) to re-register for TPS and to apply for renewal of their EADs with USCIS.

Re-registration is limited to individuals who have previously registered or reregistered for TPS under Nepal's designation, whose applications were granted, and whose TPS has not been withdrawn for individual ineligibility for the benefit. Failure to re-register properly within the 60-day re-registration period may result in the withdrawal of your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under Nepal's designation, the 60-day re-registration period runs from October 24, 2023 through December 23, 2023. USCIS will issue new EADs with a June 24, 2025 expiration date to eligible Nepalese TPS beneficiaries who timely re-register and apply for EADs.

Individuals who have a Nepal TPS application (Form I–821) and Application for Employment Authorization (Form I–765) that were still pending as of June 21, 2023 do not need to file another application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through June 24, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765 filed in connection with a Form I–821, USCIS will issue the individual a new EAD that will be valid through the same date. If you have TPS and only a pending Form I–765, you must file the Form I–821 to reregister for TPS or risk having your TPS withdrawn for failure to timely reregister without good cause. There are currently approximately 14,500 beneficiaries under Nepal's TPS designation who may be eligible to continue their TPS under the extension announced in this Notice.

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state before arrival in the United States, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

**When was Nepal designated for TPS?**

On June 24, 2015, former Secretary of Homeland Security Jeh Johnson designated Nepal for TPS on environmental disaster grounds as a result of the magnitude 7.8 earthquake that occurred on April 25, 2015 that resulted in a substantial disruption of living conditions, at the request of the country's government, and because Nepal was temporarily unable to adequately handle the return of its nationals. *See Designation of Nepal for Temporary Protected Status,* 80 FR 36346 (June 24, 2015). On October 26, 2016, former Secretary Johnson announced an 18-month extension of Nepal's TPS designation, effective December 25, 2016 through June 24, 2018.[1]

Following the statutorily required review of the country conditions, former Secretary Kirstjen M. Nielsen announced the termination of TPS for Nepal, with an effective date of June 24, 2019. *See* Termination of the Designation of Nepal for Temporary Protected Status, 83 FR 23705 (May 22, 2018); *see also* INA secs. 244(b)(3)(A) and (B), 8 U.S.C. 1254a(b)(3)(A) and (B). As discussed below, this termination has been the subject of litigation and a court order that has prevented the termination from taking effect.

**Litigation Background Regarding Termination of Certain TPS Designations**

In addition to Nepal, in 2017–2018, TPS was also terminated for five other countries by the Secretary or Acting Secretary: Sudan, El Salvador, Haiti,

Nicaragua, and Honduras.[2] Lawsuits challenging the terminations were filed in the U.S. District Court for the Northern District of California in *Ramos* v. *Nielsen,* 326 F. Supp. 3d 1075 (N.D. Cal. 2018), and *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019), and in the U.S. District Court for the Eastern District of New York in *Saget* v. *Trump,* 375 F. Supp 3d 280 (E.D.N.Y. 2019).[3] In *Ramos,* the district court granted a preliminary injunction enjoining the terminations of TPS for El Salvador, Haiti, Sudan, and Nicaragua and directed DHS to maintain the *status quo* and to continue the TPS and TPS-related documentation of affected TPS beneficiaries under those countries' designations. The U.S. Government appealed, and a three-judge panel vacated the injunction. The appellate court, however, has granted rehearing *en banc* of the panel decision, vacating the panel's decision.[4] The district court's preliminary injunction thus remains in place. In *Bhattarai*—which challenged the determination to terminate TPS for Nepal—the district court has stayed proceedings until the *Ramos* appeal is decided and approved the parties' stipulation for

[2] Sudan (82 FR 47228) (Oct. 11, 2017), El Salvador (83 FR 2654) (Jan. 18, 2018), Haiti (83 FR 2648) (Jan. 18, 2018), Nicaragua (82 FR 59636) (Dec. 15, 2017), and Honduras (83 FR 26074) (June 05, 2018).

[3] See *Ramos* v. *Nielsen,* 336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated,* 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted,* 59 F.4th 1010 (Feb. 10, 2023) (No. 18–16981) ("*Ramos*"); *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (staying proceedings until *Ramos* appeal decided and approved parties' stipulation for continued TPS and issuance of TPS-related documentation to eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal). In 2019, the U.S. District Court for the Eastern District of New York also enjoined the termination of the 2011 TPS designation for Haiti in *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019), and DHS cited to that order in previous notices continuing the affected beneficiaries' TPS and documentation. See, *e.g.,* 86 FR 50725, 50726 (Sept. 10, 2021). However, the *Saget* case was dismissed upon the court's approval of the parties' joint Stipulation of Dismissal for mootness following the Secretary's new 18-month designation of Haiti for TPS on August 3, 2021, and DHS' continuation of existing beneficiaries' TPS and related documentation under the *Ramos* injunction through Dec. 31, 2022. See id., Order approving Stipulation of Dismissal, dated Oct. 15, 2021. Other litigation was filed relating to the terminations of El Salvador, Honduras, and Haiti. A Haiti-related case, *NAACP* v. *U.S. Dept. of Homeland Security,* No. 1:18–cv–00239 (D. Md., Jan. 24, 2018) was dismissed on May 22, 2021, subsequent to the same DHS designation. An El Salvador related case, *Casa de Maryland.,* v. *Biden,* No. GJH–18–00845 (D. Md., Mar. 23, 2018), is currently stayed until April 17, 2023. *Centro Presente* v. *Biden,* No. 1:18–cv–10340 (D. Mass, July 23, 2018), relating to El Salvador, Haiti, and Honduras, is currently stayed until April 14, 2023.

[4] See *Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for reh'g en banc granted,* 59 F.4th 1010 (Feb. 10, 2023) (No. 18–16981) ("*Ramos*").

continuation of TPS and TPS-related documentation for eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the *Ramos* appeal. In *Saget*, the district court granted a preliminary injunction enjoining termination of TPS for Haiti, and the Government appealed. However, following the new TPS designation of Haiti in August 2021, the district court dismissed the lawsuit based on the parties' stipulation to dismissal.[5] Beneficiaries under the TPS designations for El Salvador, Nepal, Sudan, Haiti, Honduras, and Nepal will retain their TPS while the preliminary injunction in *Ramos* remains in effect, and for at least 120 days thereafter, provided that their TPS is not withdrawn because of individual ineligibility.[6]

DHS has taken actions to ensure its continued compliance with the court orders in *Ramos* and *Bhattarai*. DHS has published periodic notices to continue TPS and extend the validity of TPS-related documentation previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nepal, Sudan, Honduras, and Nepal.[7] The most recent such notice continued TPS and extended the TPS-related documents specified in the notice through June 30, 2024.[8] These extensions apply where the TPS beneficiary properly filed for re-registration during either the most recent DHS-announced registration period for their country, or any applicable previous DHS-announced re-registration periods for the beneficiary's country, or has a re-registration application that remains pending.[9] Although the notice published at 87 FR 68717 remains valid, individuals who wish to remain eligible for TPS under

the extension of TPS for Nepal announced in this notice through June 24, 2025 and any potential future extensions must apply for re-registration in accordance with the procedures announced in this notice.[10] Failure to timely re-reregister without good cause is a ground for TPS withdrawal. *See* INA section 244(c)(3)(C), 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17.

## What authority does the Secretary have to reconsider and rescind the termination of TPS for Nepal?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[11] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).

At least 60 days before the expiration of a foreign state's TPS designation, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If

the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). If the Secretary does not determine that the foreign state no longer meets the conditions for TPS designation, the designation is extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C); 8 U.S.C. 1254a(b)(3)(A), (C).

On May 22, 2018, the Secretary of Homeland Security issued notice of her decision that Nepal no longer continued to meet the conditions for TPS designation and terminated TPS for Nepal, indicating that the conditions for Nepal's 2015 designation for TPS on the basis of environmental disaster due to the damage caused by the 2015 earthquake were no longer met.[12] The Secretary also announced an orderly transition period of 12 months, such that the termination was set to go into effect on June 24, 2019. However, as noted above plaintiffs in *Bhattarai* filed suit challenging the termination decisions for Nepal and Honduras. On March 12, 2019, the proceedings were stayed and the parties stipulated that the termination decisions would not go into effect during the pendency of the *Ramos* appeal of similar issues and for at least 120 days thereafter. The district court also approved the parties' stipulation that TPS and TPS-related documentation of affected beneficiaries of the Nepal and Honduras TPS designations would continue under terms similar to those applied to the *Ramos*-covered beneficiaries. The order to stay proceedings and approval of the stipulation remain in effect.[13]

DHS has since issued a series of **Federal Register** notices continuing TPS and TPS-related documentation for affected TPS beneficiaries, with the most recent continuation notice effective through until June 30, 2024.[14] As a result, the termination of the TPS designation for Nepal has never gone into effect, and TPS beneficiaries under that designation have retained their TPS, unless it has been individually

---

[5] *See Saget* v. *Trump*, 375 F. Supp 3d 280 (E.D.N.Y. 2019) and Order approving Stipulation of Dismissal, dated Oct. 15, 2021.

[6] As noted, Haiti was newly designated for TPS on August 3, 2021 for 18 months. *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021). On April 19, 2022, the Secretary also newly designated Sudan TPS. *See Designation of Sudan for Temporary Protected Status,* 87 FR 23202 (Apr. 19, 2022). Those designations cover all Haitian and Sudanese nationals who were eligible for TPS under the Haiti and Sudan TPS designations that were terminated in 2018 and 2017, respectively.

[7] 83 FR 54764 (Oct. 31, 2018); 84 FR 7103 (Mar. 1, 2019); 84 FR 20647(May 10, 2019) (correction notice issued at 84 FR 23578 (May 22, 2019)); 84 FR 59403 (Nov. 4, 2019); 85 FR 79208 (Dec. 9, 2020); and 86 FR 50725 (Sept. 10, 2021) (correction notice issued at 86 FR 52694 (Sept. 22, 2021).

[8] *Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations of El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal,* 87 FR 68717 (Nov. 16, 2022).

[9] *Id.,* at 68719 note 5 (listing acceptable re-registration periods for each of the 6 countries).

[10] Through the re-registration process, which is generally conducted every 12 to 18 months while a foreign state is designated for TPS, USCIS determines whether each TPS beneficiary is continuing to maintain individual eligibility for TPS, including but not limited to the requirements related to disqualifying criminal or security issues. Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 87 FR 68717, 68720 (Nov. 16, 2022) (noting potential future action for Nepal TPS beneficiaries may include a requirement to re-register).

[11] Although the text of INA section 244(b)(1) continues to ascribe this power to the Attorney General, this authority is now held by the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135. See, *e.g.,* 6 U.S.C. 557; *Nielsen* v. *Preap,* 139 S. Ct. 954, 959 n.2 (2019). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA section 244(b)(1).

[12] *Termination of the Designation of Nepal for Temporary Protected Status,* 83 FR 23705 (May 22, 2018).

[13] *Bhattarai* v. *Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019).

[14] *See* 84 FR 20647 (May 10, 2019) (correction notice issued at 84 FR 23578 (May 22, 2019)); (Nov. 4, 2019); (Dec. 9, 2020); and 86 FR 50725 (Sept. 10, 2021) (correction notice issued at 86 FR 52694 (Sept. 22, 2021)); and 87 FR 68717 (Nov. 16, 2022). DHS had published previous notices to comply with the earlier preliminary injunction order issued by the *Ramos* court. *See* 83 FR 54764 (Oct. 31, 2018); 84 FR 7103 (March 1, 2019).

withdrawn pursuant to INA § 244(c)(3), 8 U.S.C. 1254a(c)(3).

An agency has inherent (*i.e.* statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority.[15] The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination. *See* INA sections 244(b)(3), (b)(5)(A); 8 U.S.C. 1254a(b)(3), (b)(5)(A).

## Why is the Secretary rescinding the previous termination of the TPS designation for Nepal?

After conducting an independent assessment of the country conditions in Nepal as they existed in 2018 and exist today, the Secretary has determined that Nepal's 2015 TPS designation should not have been terminated. As explained below, the conditions in Nepal that gave rise to its TPS designation in 2015 persisted in 2018 and persist to this day. Accordingly, the Secretary is, upon reconsideration, rescinding the 2018 decision terminating Nepal's TPS designation and extending that designation for an additional 18 months.

On April 25, 2015, an earthquake of magnitude 7.8 struck Nepal, with the epicenter approximately 77 to 81 kilometers (km) northwest of Kathmandu, Nepal's capital.[16] Dozens

of aftershocks followed, including one of magnitude 7.3 on May 12, 2015.[17] Over 8 million people—roughly 25% to 33% of Nepal's population—were affected in 39 of Nepal's 75 districts.[18] Over 2 million people lived in the 11 most critically hit districts.[19] In these districts, half of the population was estimated to be affected.[20] In response, Nepal was designated for TPS for 18 months effective June 24, 2015.[21]

At the time of the determination to terminate the designation of TPS, DHS found that Nepal had made progress in reconstruction and that the disruption in living conditions had decreased. While some progress had been made in these areas, Nepal continued to experience significant challenges due to the destruction caused by the earthquake and subsequent landslides that hampered reconstruction that were not sufficiently considered in the termination decision. These challenges include continued internal displacement and problems in allocation of reconstruction funds and assistance. Ongoing environmental disasters, like landslides, that Nepal continued to experience, were also not considered at the time of the termination decision. In 2017, Amnesty International found that delays in allocation of earthquake relief funds led to more than 70% of those living in the most seriously damaged districts continuing to live in temporary shelters.[22] This lack of adequate

protection from environmental changes negatively impacted the health of earthquake survivors.[23] In both 2017 and 2018, the Department of State reported that the most vulnerable populations, such as internally displaced people, stateless individuals, indigenous people, and a large number of children remained in camps or informal settlements and/or faced discrimination in receiving reconstruction assistance while also acknowledging the government promoted their safe, voluntary return and had policies in place to help them.[24] A comprehensive report from Human Rights Watch corroborated "the country is still far from recovery" and that "an already poor nation leaves its most impoverished citizens without the support that could, and should, be provided because of available resources."[25] The Kathmandu Post reported that "a debilitating shortfall of necessary funds, an initial shortage of reconstruction materials as a result of the unofficial border blockade, the absence of a central coordinating body, frequent changes in leadership, and the politicization of reconstruction have resulted in snail paced-recovery efforts."[26] A 2017 assessment on vulnerabilities found that Nepal lacks comprehensive social vulnerability analyses and mapping which would directly influence disaster preparedness.[27] The assessment also found that "Nepal's preparedness and policy interventions are not compatible with the existing hazard, exposure, and risk perception level" and this "leads to losses every year".[28] In the weeks following the earthquake, more than 4,300 landslides were mapped using spaceborne and ground observations

---

[15] *Ivy Sports Medicine, LLC* v. *Burwell,* 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.); *see, e.g., id.* ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . "[I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide." (quotation marks and citations omitted)); *NRDC* v. *Regan,* 67 F.4th 397, 401 (D.C. Cir. 2023) ("[A]lthough the power to decide is normally accompanied by the power to reconsider, Congress undoubtedly can limit an agency's discretion to reverse itself." (quotation marks omitted)); *Macktal* v. *Chao,* 286 F.3d 822, 825–26 (5th Cir. 2002) ("It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); *Mazaleski* v. *Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time."); *see also Last Best Beef, LLC* v. *Dudas,* 506 F.3d 333, 340 (4th Cir. 2007) (agencies possess especially "broad authority to correct their prior errors").

[16] More than 1900 killed by 7.8 magnitude quake in Nepal, Washington Post, Apr. 26, 2015, available at: *https://www.washingtonpost.com/world/magnitude-79-earthquake-hits-densely-populated-area-of-nepal/2015/04/25/1c1b3f46-eb21-11e4-9a6a-c1ab95a0600b_story.html* (last visited Mar. 10, 2023); UN Nepal Earthquake Flash Appeal, U.N. Development Program, Jul. 28, 2017, available at *https://www.undp.org/publications/un-nepal-earthquake-flash-appeal;* Nepal Earthquake Fact Sheet #8—May 4, 2015, U.S. Agency for International Development, May 4, 2015, available

at: *chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://2012-2017.usaid.gov/sites/default/files/documents/1866/nepal_eq_fs08_05-04-2015.pdf* (last visited Mar. 10, 2023).

[17] Deadly aftershock rocks Nepal, CBS News, May 14, 2015, available at *https://www.cbsnews.com/pictures/earthquake-rocks-nepal/* (last visited Mar. 10, 2023).

[18] UN Nepal Earthquake Flash Appeal, U.N. Development Program, Jul. 28, 2017, available at: *https://www.undp.org/publications/un-nepal-earthquake-flash-appeal* (last accessed Mar. 10, 2023).

[19] UN Nepal Earthquake Flash Appeal, U.N. Development Program, Jul. 28, 2017, available at: *https://www.undp.org/publications/un-nepal-earthquake-flash-appeal* (last accessed Mar. 10, 2023).

[20] UN Nepal Earthquake Flash Appeal, U.N. Development Program, Jul. 28, 2017, available at: *https://www.undp.org/publications/un-nepal-earthquake-flash-appeal* (last accessed Mar. 10, 2023).

[21] Designation of Temporary Protected Status for Nepal, **Federal Register,** Jun. 24, 2015, available at: *https://www.federalregister.gov/documents/2015/06/24/2015-15576/designation-of-nepal-for-temporary-protected-status* (last visited Mar. 10, 2023).

[22] Amnesty International, "Building Inequality"—The failure of the Nepali government to protect the marginalised in post-earthquake reconstruction efforts, April 25, 2017, *https://www.ecoi.net/en/file/local/1398796/1226_1493194920_asa3160712017english.pdf* (accessed on April 6, 2023).

[23] Id.

[24] Country Report on Human Rights Practices 2017—Nepal, U.S. Department of State, 20 April 2018, available at: *https://www.ecoi.net/en/document/1430386.html* (last visited April 6, 2023); Country Report on Human Rights Practices 2018—Nepal, U.S. Department of State, 13 March 2019, available at: *https://www.ecoi.net/en/document/2004213.html* (last visited Mar. 10, 2023).

[25] Tejshree Thapa, Lessons for Nepal, Three Years After Deadly Earthquake: Government Should Ensure Support for Survivors, Human Rights Watch, April 25, 2018, available at: *https://www.hrw.org/news/2018/04/25/lessons-nepal-three-years-after-deadly-earthquake* (last visited Mar. 10, 2023).

[26] Costs of Reconstruction, April 25, 2018, available at: *https://kathmandupost.com/editorial/2018/04/25/costs-of-reconstruction,* (last visited: Mar. 10, 2023).

[27] Gautam, Dipendra, Assessment of social vulnerability to natural hazards in Nepal, Natural Hazards and Earth System Sciences, Dec. 15, 2017, available at: *https://nhess.copernicus.org/articles/17/2313/2017/nhess-17-2313-2017.pdf* (last visited: April 10, 2023).

[28] Id.

and the likelihood of landslides remained due to the cyclical monsoon season and unstable ground from the earthquake.[29] In fact, a 2017 study found that landslides triggered by large earthquakes contribute not only to earthquake losses but "pose a major secondary hazard that can persist for months or years." [30] Even while Nepal worked to reconstruct damaged infrastructure and homes, it continued to experience earthquake aftershocks until August 24, 2017.[31] These assessments and reports highlight that while Nepal made some progress in reconstruction, it continued to face environmental obstacles at the time of the determination to terminate TPS that hindered meaningful progress.

The conditions in Nepal at the time of the TPS termination determination continued to substantially disrupt living conditions and negatively affected the country's ability to adequately handle the return of its nationals residing in the United States. At the time of the determination to terminate TPS, Nepal continued to experience challenges, including internal displacement, problems with reconstruction fund distribution, and ongoing environmental disasters, that were either insufficiently considered or not considered. The Secretary has concluded that reconsideration and rescission of the termination of TPS is timely, particularly given that the 2018 termination decision has not yet gone into effect.

**What authority does the Secretary have to extend the designation of Nepal for TPS?**

As noted above, section 244(b) of the INA, 8 U.S.C. 1254a(b), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist and instructs the Secretary to periodically review the country conditions underpinning each designation and determined whether they still exist, leading to either termination or extension of the TPS

designation. However, if the Secretary does not make a decision as to either extension or termination, then INA section 244(b)(3)(C) requires the automatic extension of the designation for six months (or 12 or 18 months in the Secretary's discretion).

Prior to the now-rescinded termination of the TPS designation for Nepal, the most recent extension of the designation was due to end on June 24, 2018.[32] In light of the Secretary's reconsideration and rescission of the May 22, 2018 decision to terminate the TPS designation for Nepal, there is no longer any standing secretarial determination that Nepal "no longer meets the conditions for designation" under INA section 244(b)(1). Accordingly, with this rescission of the prior termination, pursuant to INA section 244(b)(3)(C), and in the absence of an affirmative decision by any Secretary to extend the designation for 12 or 18 months rather than the automatic six months triggered by the statute, the TPS designation for Nepal shall have been extended in consecutive increments of 6 months between the date when the last designation extension was due to end on June 24, 2018, and the effective date of the TPS extension announced in this notice, December 25, 2023. Coupled with the existing *Bhattarai* order and corresponding **Federal Register** notices continuing TPS and TPS-related documentation for affected beneficiaries under the designation for Nepal, this means that all such individuals whose TPS has not been finally withdrawn for individual ineligibility are deemed to have retained TPS since June 24, 2018 and may re-register under procedures announced in this notice.

**Why is the Secretary extending the TPS designation for 18 months through June 24, 2025?**

While Nepal had been making progress on its recovery in the years immediately following the 2015 earthquake, subsequent environmental disasters, and the associated macroeconomic shocks, have impeded the recovery process.

There continues to be a substantial disruption of living conditions, including earthquakes and other environmental events that continue to inflict damage on a population that has still not fully recovered from the earthquake in 2015, and this has impacted Nepal's ability to adequately handle the return of its nationals. Recent earthquakes have caused considerable damage throughout Nepal

and impeded or reversed the progress the country had made since the 2015 earthquake. On November 9, 2022, a 5.6 magnitude earthquake in Western Nepal killed six people living in mud and brick houses in Doti District, 430 kilometers (270 miles) west of Kathmandu and affected 200 families.[33] Shortly thereafter, on November 12, 2022, a second strong earthquake followed in the Bajhang district.[34] The International Federation of Red Cross/ Red Crescent Societies reported that as of November 14, 2022, affected people were living in the open and were in need of emergency shelter, as well as improved access to water, sanitation and hygiene, psychosocial support and protection services.[35] As recently as January 24, 2023, another 5.9 magnitude earthquake struck Bajura district in the Sudurpaschim province.[36] Reports indicate that this earthquake resulted in damage to approximately 400 houses and the displacement of over 40 families.[37] A 2018 World Bank study based on interviews with displaced persons from three villages indicated continuing vulnerabilities due to environmental degradation.[38] That study, conducted during the monsoon season in 2018 (June to October), found that there were "[i]ncreased landslide risks due to road/tunnel constructions for hydropower projects" and that [p]eople in hazard-prone areas need[ed] safe/adequate land through monsoon seasons." [39] It also found that "[a]nalysis

[29] When the Earth Shook, NASA, Nov. 28, 2017, available at: *https://appliedsciences.nasa.gov/our-impact/story/when-earth-shook* (last visited: April 10, 2023).

[30] Jack Williams, et al., Satellite-based emergency mapping: Landslides triggered by the 2015 Nepal earthquake, Natural Hazards and Earth System Sciences, Jan. 16, 2018, available at: *https://nhess.copernicus.org/preprints/nhess-2017-273/nhess-2017-273.pdf* (last visited: April 10, 2023).

[31] Nepal Disaster Report 2017, Government of Nepal-Ministry of Home Affairs, Dec. 2017, available at: *http://drrportal.gov.np/uploads/document/1321.pdf* (last visited: April 10, 2023).

[32] See 81 FR 74470 (Oct. 26, 2016).

[33] Doti Earthquake Response, NRCS, Nov. 18, 2022, available at: *https://reliefweb.int/report/nepal/doti-earthquake-response* (last visited: Mar. 10, 2023).

[34] Far Western Earthquake Response in Nepal DREF Application, International Foundation of Red Cross/Red Crescent Societies, Nov. 18, 2022, available at: *https://reliefweb.int/report/nepal/nepal-far-western-earthquake-response-nepal-dref-application-mdrnp013* (last visited Mar. 10, 2023).

[35] Far Western Earthquake Response in Nepal DREF Application, International Foundation of Red Cross/Red Crescent Societies, Nov. 18, 2022, available at: *https://reliefweb.int/report/nepal/nepal-far-western-earthquake-response-nepal-dref-application-mdrnp013* (last visited Mar. 10, 2023).

[36] 5.9 M earthquake with epicentre in Bajura recorded, Kathmandu Post, Jan. 24, 2023, available at: *https://kathmandupost.com/national/2023/01/24/5-9-m-earthquake-with-epicentre-in-bajura-recorded* (last visited Mar. 10, 2023).

[37] HRRP Bulletin, Housing Recovery and Reconstruction Platform—Nepal, Feb. 1, 2023, available at: *https://reliefweb.int/report/nepal/nepal-hrrp-bulletin-31-january-2023* (last visited Mar. 10, 2023).

[38] Kerstin Rieger, Multi-hazards, displaced people's vulnerability and resettlement: Post-earthquake experiences of from Rasuwa district in Nepal and their connections to policy loopholes and reconstruction practices, Progress in Disaster Science, Oct. 2021, available at: *https://www.sciencedirect.com/science/article/pii/S2590061721000478* (last visited Mar. 10, 2023).

[39] Kerstin Rieger, Multi-hazards, displaced people's vulnerability and resettlement: Post-

Continued

**40322** **Federal Register** / Vol. 88, No. 118 / Wednesday, June 21, 2023 / Notices

demonstrate[ed] that no clear relocation plan for displaced people exist[ed], and that livelihood opportunities in new re-settlement areas receiv[ed] no attention.''[40] Further, according to a 2021 study in open access journal *Progress in Disaster Science,* mapping showed that the landslide hazard in the fourteen worst-affected districts remained significantly higher than on the day of the earthquake in 2015.[41] While some areas experienced a degree of stabilization, new areas experienced landslides and others continued to develop risk of landslides.[42] The study emphasized that it should be expected that the levels of landslide risk in these areas will remain elevated for at least ''several more years.''[43]

Both droughts and heavy monsoon floods, made more frequent by climate change, have drastically increased food insecurity in areas of the country that were most heavily affected by the 2015 earthquake while also significantly slowing Nepal's reconstruction efforts by causing increasingly severe damage to existing infrastructure.[44] In December 2022, UNICEF published a report indicating that the prolonged monsoon season triggered disasters, including floods and landslides, claiming more than 1,200 lives and affecting over 2,321 households across the country in the previous year.[45]

Furthermore, Nepal continues to experience housing insecurity after the 2015 earthquake that is evidence of the continued disruption in living conditions that temporarily impacts the country's ability to handle the return of its nationals granted TPS. Nepal's National Reconstruction Authority (NRA) was disbanded on December 26, 2021, despite the fact that it had not fully completed reconstruction of damage caused by the 2015 earthquake.[46] Local news reports indicate that a delay in the release of NRA funding led to incomplete settlements being built, leaving people without homes or with partly completed dwellings that lacked roofs and other necessities.[47] Incomplete rebuilding is more prevalent in areas where poor and vulnerable populations live.[48] This has led to many internally displaced persons (IDP) remaining in camps or informal settlements because their homes were not rebuilt or remain vulnerable to environmental disasters, or because they did not hold title to the homes they were living in at the time of the 2015 earthquake.[49]

In addition to the subsequent environmental events following the 2015 earthquake, Nepal continues to experience serious food insecurity, health-infrastructure concerns, and agricultural instability that render Nepal temporarily unable to handle the return of its nationals granted TPS. An August 2020 NIH article noted that Nepal's ''already strained health system was worsened'' by the 2015 earthquakes and highlighted the continuing impact of the earthquakes on vulnerable populations, which were further impacted by COVID.[50] Additionally, a 2021 Penn State Department of Agricultural Sciences study found that heavy monsoon rains compounded food insecurity in areas most affected by the 2015 earthquake, likely due to increased landslides, which damaged roads, disrupted distribution of food aid, and destroyed agricultural land and assets.[51]

In October 2022, Nepal experienced widespread damage in many regions as a result of flooding and landslides that occurred after heavy rainfall.[52] In Lumbini Province alone, more than 8,000 households were impacted by flooding with over 1,000 displaced.[53] As a result of floods, at least 33 people died, while at least 22 people remain missing.[54] The flooding and numerous landslides resulting from the storm destroyed critical infrastructure,

earthquake experiences from Rasuwa district in Nepal and their connections to policy loopholes and reconstruction practices, Progress in Disaster Science, Oct. 2021, available at: *https:// www.sciencedirect.com/science/article/pii/ S2590061721000478* (last visited Mar. 10, 2023).

[40] Kerstin Rieger, Multi-hazards, displaced people's vulnerability and resettlement: Post-earthquake experiences from Rasuwa district in Nepal and their connections to policy loopholes and reconstruction practices, Progress in Disaster Science, Oct. 2021, available at: *https:// www.sciencedirect.com/science/article/pii/ S2590061721000478* (last visited Mar. 10, 2023).

[41] Nick Rosser, *et al.*, Changing significance of landslide hazard and risk after the 2015 Mw 7.8 Gorkha, Nepal Earthquake, Progress in Disaster Science, April 2021, available at: *https:// www.sciencedirect.com/science/article/pii/ S2590061721000193* (last visited: Mar. 10, 2023).

[42] Nick Rosser, *et al.*, Changing significance of landslide hazard and risk after the 2015 Mw 7.8 Gorkha, Nepal Earthquake, Progress in Disaster Science, April 2021, available at: *https:// www.sciencedirect.com/science/article/pii/ S2590061721000193* (last visited: Mar. 10, 2023).

[43] Nick Rosser, *et al.*, Changing significance of landslide hazard and risk after the 2015 Mw 7.8 Gorkha, Nepal Earthquake, Progress in Disaster Science, April 2021, available at: *https:// www.sciencedirect.com/science/article/pii/ S2590061721000193* (last visited: Mar. 10, 2023).

[44] Sangam Prasain and Mohan Budhaair, Fertiliser shortage, drought, heat wave threaten Nepal's farming future, Asia News Network, Aug. 31, 2022, available at: *https://asianews.network/ fertilisser-shortage-drought-heat-wave-threaten-nepals-farming-future/* (last visited: Mar. 10, 2023); Nepal Development Update, World Bank Group, Oct. 6, 2022, available at: *https:// thedocs.worldbank.org/en/doc/a27ca3a0 8e77befb785fc6742708a56c-0310012022/original/ Nepal-Development-Update-October-2022.pdf* (last visited: Mar. 10, 2023); Poudel S, Funakawa S, Shinjo H., Household Perceptions about the Impacts of Climate Change on Food Security in the Mountainous Region of Nepal, Sustainability, 2017, *https://doi.org/10.3390/su9040641* (last visited Mar. 31, 2023); 2015 Nepal Earthquake: Facts, FAQS, and

how to help, World Vision, April 3, 2018, *https:// www.worldvision.org/disaster-relief-news-stories/ 2015-nepal-earthquake-facts #:~:text=by%20Crislyn%20FelisildaWhere%20did %20the%202015%20Nepal %20earthquake%20strike%3F,%2C %20Bangladesh%2C%20and%20southern %20Tibet* (last visited: Mar. 31, 2023).

[45] Nepal Humanitarian Situation Report No. 3, 1 January—30 December 2022, UNICEF, Dec. 30, 2022, available at: *https://reliefweb.int/report/ nepal/unicef-nepal-humanitarian-situation-report-no-3-1-january-30-december-2022* (last visited Feb. 10, 2023).

[46] See e.g., Tika Prasad Bhatta, Integrated settlements meant for earthquake victims left incomplete in Ramechhap, The Kathmandu Post, Feb. 15, 2021, available at: *https:// kathmandupost.com/province-no-3/2021/02/15/ integrated-settlements-meant-for-earthquake-victims-left-incomplete-in-ramechhap* (last visited: Mar. 10, 2023); Rastriya Samachar Samiti, NRA's term comes to an end, The Himalayan Times, available at: *https://thehimalayantimes.com/nepal/ nras-term-comes-to-an-end* (last visited: Mar. 10, 2023).

[47] Tika Prasad Bhatta, Integrated settlements meant for earthquake victims left incomplete in Ramechhap, The Kathmandu Post, Feb. 15, 2021, available at: *https://kathmandupost.com/province-no-3/2021/02/15/integrated-settlements-meant-for-earthquake-victims-left-incomplete-in-ramechhap* (last visited: Mar. 10, 2023)

[48] See e.g., Tika Prasad Bhatta, Integrated settlements meant for earthquake victims left incomplete in Ramechhap, The Kathmandu Post, Feb. 15, 2021, available at: *https://kathmandupost. com/province-no-3/2021/02/15/integrated-settlements-meant-for-earthquake-victims-left-incomplete-in-ramechhap* (last visited: Mar. 10, 2023); The poorest are the hardest hit in rural Nepal, World Bank Blogs, May 05, 2015, *https:// blogs.worldbank.org/endpovertyinsouthasia/ poorest-are-hardest-hit-rural-nepal* (last visited Mar. 31, 2023).

[49] 2022 Country Report on Human Rights Practices: Nepal, US Department of State, March 20, 2023, *https://www.ecoi.net/en/document/ 2089245.html* (last visited: April 6, 2023).

[50] Bipin Adhikari, *et al.*, Earthquake rebuilding and response to COVID–19 in Nepal, a country nestled in multiple crises, Journal of Global Health, Aug. 23, 2020, available at: *https://www.ncbi.nlm. nih.gov/pmc/articles/PMC7567410* (last visited: Mar. 10, 2023).

[51] Heather Randell, *et al.*, Food insecurity and compound environmental shocks in Nepal: Implications for a changing climate, World Development, September 2021, available at: *https:// www.sciencedirect.com/science/article/abs/pii/ S0305750X21001236* (last visited: Mar. 10, 2023).

[52] Nepal: Disruptions due to flooding and landslides ongoing in multiple regions as of Oct. 11, Crisis24, Oct. 11, 2022, available at: *https:// crisis24.garda.com/alerts/2022/10/nepal-disruptions-due-to-flooding-and-landslides-ongoing-in-multiple-regions-as-of-oct-11* (last visited: Mar. 10, 2023).

[53] Nepal: Disruptions due to flooding and landslides ongoing in multiple regions as of Oct. 11, Crisis24, Oct. 11, 2022, available at: *https:// crisis24.garda.com/alerts/2022/10/nepal-disruptions-due-to-flooding-and-landslides-ongoing-in-multiple-regions-as-of-oct-11* (last visited: Mar. 10, 2023).

[54] At least 33 killed in Nepal flooding and landslides, BBC, Oct. 12, 2022, available at: *https:// www.bbc.com/news/world-asia-63224454* (last visited: Mar. 10, 2023).

including sections of major highways and market access roads, all of which continue to further affect food security and impede post-earthquake recovery in these especially vulnerable areas.[55]

The destruction of agricultural lands and disruption of supply chains due to these road blockages have resulted in shortages and price increases of key staples. This has exacerbated recent dramatic rises in the price of key staples resulting from Russia's war on Ukraine,[56] which has resulted in global food, fuel, and fertilizer shortages and rising food prices around the world, which have impacted Nepal with particular severity.[57] The war has posed new threats to Nepal's food security and economy, both of which have struggled to stabilize under the impacts of the COVID–19 pandemic, environmental shocks, and above-average global food prices.[58] While food security conditions in Nepal have improved in recent years, "nearly 3.9 million people— approximately 13 percent of the country's population—were experiencing food insecurity as of June 2022. . . Additionally, an estimated 33 percent of Nepali children ages 6–23 months did not meet the recommended minimum standards for dietary diversity and nutrient intake." [59]

The global fertilizer shortage resulting from the Ukraine conflict has left Nepal, a country heavily reliant on imports, unable to supply the necessary fertilizers for its farmers.[60] A significant

portion of this year's agricultural productivity was lost before the planting season even began, with many farmers opting not to plant, given the challenges with obtaining sufficient fertilizer to make commercial farming feasible.[61]

Rising inflation, currently at a new, six-year high of 8.64 percent in September, and fuel prices that have remained about 50% higher this year have already contributed to growing food prices and heightened risk of food insecurity.[62] Prices have risen across nearly all commodities, and the cost of the household food basket is around 10% higher nationally than a year ago, and as much as 27% higher in some of the most isolated and disaster-affected regions, raising concerns about the immediate and longer-term impacts on Nepal's economic growth, stability, and food security.[63] High inflation rates and recent interest rate hikes by Nepal's central bank compound the effects of an ongoing liquidity crunch, constraining access to finance and hampering economic growth and completion of water projects that would address Nepal's environmental vulnerabilities.[64]

Given the high level of household-level poverty and the high share of food spending—representing as much as two-thirds of the total income for poor families—the ongoing war and food inflation will continue to stress an already volatile food security and nutrition situation.[65] A 2021 UNICEF report indicated that 17.4 percent of Nepalese are poor on a multidimensional poverty index, so over one in six Nepalese—five million people—are under serious threat due to ongoing food inflation on top of previous economic and environmental stressors.[66]

Due to the triple threat of global economic effects, dire environmental shocks, and the lingering impacts of the COVID–19 pandemic, more poor households are expected to slip into poverty across the country, erasing years of hard-won development gains.[67] According to the International Food Policy Research Institute (IFPRI), Nepal's poverty rate is expected to rise by 4.5 percent, pushing more than 1.27 million people into poverty this year.[68] Labor migration emerges as a primary coping strategy for Nepalese during times of hardship, with households and the economy relying heavily on remittances.[69]

In summary, Nepal's slow recovery after the 2015 earthquake and more recent environmental disasters, including devastating floods, further earthquakes, and landslides, continue to

[55] Sunir Pandey, Flooding affects millions in Bangladesh, India and Nepal, UNICEF, Aug. 21, 2017, available at: *https://www.unicef.org/stories/ flooding-affects-millions-bangladesh-india-and-nepal* (last visited Mar. 10, 2023).

[56] See *e.g.,* Lekhanath Pandey Kathmandu, Ukraine conflict intensifies Nepal's economic woes, DW, April 15, 2022, available at: *https:// www.dw.com/en/ukraine-conflict-intensifies-nepals-economic-woes/a-61488700* (last visited Mar. 10, 2023).

[57] See *e.g.,* Lekhanath Pandey Kathmandu, Ukraine conflict intensifies Nepal's economic woes, DW, April 15, 2022, available at: *https:// www.dw.com/en/ukraine-conflict-intensifies-nepals-economic-woes/a-61488700* (last visited Mar. 10, 2023).

[58] See *e.g.,* Lekhanath Pandey Kathmandu, Ukraine conflict intensifies Nepal's economic woes, DW, April 15, 2022, available at: *https:// www.dw.com/en/ukraine-conflict-intensifies-nepals-economic-woes/a-61488700* (last visited Mar. 10, 2023); Kristine Eck, Nepal in 2021: From Bad to Worse, University of California Press, Feb. 09, 2022, *https://doi.org/10.1525/as.2022.62.1.19* (last visited Mar. 31, 2023).

[59] Nepal Assistance Overview, USAID Bureau for Humanitarian Assistance, November 2022, available at: *https://www.usaid.gov/humanitarian-assistance/ nepal* (last visited Mar. 17, 2023).

[60] Sangam Prasain, *et al.,* Farmers reduce acreage for lack of adequate fertilizer, The Kathmandu Post, July 29, 2022, available at: *https://kathmandupost. com/money/2022/07/29/farmers-reduce-acreage-for-lack-of-adequate-fertiliser* (last visited Mar. 10, 2023); Sangam Prasain, Crippling fertiliser shortage

clouds Paddy Day celebrations for thousands of farmers, The Kathmandu Post, June 29, 2022, available at: *https://kathmandupost.com/money/ 2022/06/29/crippling-fertiliser-shortage-clouds-paddy-day-celebrations-for-thousands-of-farmers* (last visited Mar. 10, 2023); Sangam Prasain and Mohan Budhaair, Fertiliser shortage, drought, heat wave threaten Nepal's farming future, The Kathmandu Post, Aug. 31, 2022, available at: https://asianews.network/fertiliser-shortage-drought-heat-wave-threaten-nepals-farming-future/ (last visited Mar. 10, 2023).

[61] Sangam Prasain, *et al.,* Farmers reduce acreage for lack of adequate fertilizer, The Kathmandu Post, July 29, 2022, available at: *https://kathmandupost. com/money/2022/07/29/farmers-reduce-acreage-for-lack-of-adequate-fertiliser* (last visited Mar. 10, 2023); Sangam Prasain, Crippling fertiliser shortage clouds Paddy Day celebrations for thousands of farmers, The Kathmandu Post, June 29, 2022, available at: *https://kathmandupost.com/money/ 2022/06/29/crippling-fertiliser-shortage-clouds-paddy-day-celebrations-for-thousands-of-farmers* (last visited Mar. 10, 2023); Sangam Prasain and Mohan Budhaair, Fertiliser shortage, drought, heat wave threaten Nepal's farming future, The Kathmandu Post, Aug. 31, 2022, available at: https://asianews.network/fertiliser-shortage-drought-heat-wave-threaten-nepals-farming-future/ (last visited Mar. 10, 2023).

[62] Nepal Multidimensional Poverty Index 2021: Report, UNICEF, Sept. 2021, available at: *https:// www.unicef.org/nepal/reports/nepal-multidimensional-poverty-index-2021-report* (last visited Mar. 10, 2023).

[63] Nepal Multidimensional Poverty Index 2021: Report, UNICEF, Sept. 2021, available at: *https:// www.unicef.org/nepal/reports/nepal-multidimensional-poverty-index-2021-report* (last visited Mar. 10, 2023).

[64] Nepal Multidimensional Poverty Index 2021: Report, UNICEF, Sept. 2021, available at: *https:// www.unicef.org/nepal/reports/nepal-multidimensional-poverty-index-2021-report* (last visited Mar. 10, 2023); Development projects suffer from funds crunch as government revenue takes hit, The Kathmandu Post, *https://kathmandupost.com/ national/2023/01/05/development-projects-suffer-*

*from-funds-crunch-as-government-revenue-takes-hit* (last visited Mar. 31, 2023).

[65] Nepal Multidimensional Poverty Index 2021: Report, UNICEF, Sept. 2021, available at: *https:// www.unicef.org/nepal/reports/nepal-multidimensional-poverty-index-2021-report* (last visited Mar. 10, 2023).

[66] Nepal Multidimensional Poverty Index 2021: Report, UNICEF, Sept. 2021, available at: *https:// www.unicef.org/nepal/reports/nepal-multidimensional-poverty-index-2021-report* (last visited: Nov. 22, 2023).

[67] Xinshen Diao, *et al.,* Nepal: Impacts of the Ukraine and Global Crises on Poverty and Food Security, International Food Policy Research, July 7, 2022, available at: *https://ebrary.ifpri.org/utils/ getfile/collection/p15738coll2/id/135953/filename/ 136162.pdf* (last visited Mar. 10, 2023).

[68] Xinshen Diao, *et al.,* Nepal: Impacts of the Ukraine and Global Crises on Poverty and Food Security, International Food Policy Research, July 7, 2022, available at: *https://ebrary.ifpri.org/utils/ getfile/collection/p15738coll2/id/135953/filename/ 136162.pdf* (last visited: Dec. 8, 2022).

[69] Sangam Prasain, Remittance hits Rs961 billion, an all-time high in the time of Covid-19, The Kathmandu Post, Aug. 22, 2021, available at: *https://kathmandupost.com/money/2021/08/22/ remittance-hits-rs961-billion-an-all-time-high-in-the-time-of-covid-19* (last visited: Mar. 10, 2023); Rohan Byanjankar and Mira Sakha, Impact of Remittances on Rural Poverty in Nepal: Evidence from Cross-Section Data, NRB, Aug. 2021, available at: *https://www.nrb.org.np/contents/uploads/2021/ 08/NRB-WP-53-Impact-of-Remittances-Rohan-and-Mira-1.pdf* (last visited: Nov. 22, 2022).

disrupt living conditions and render Nepal temporarily unable to handle the return of those granted TPS. Since the disastrous earthquake in 2015, Nepal has continued to be encumbered by significant environmental events that have hindered Nepal's recovery. The subsequent environmental disasters and the associated macroeconomic shocks have impeded the recovery process, and as a result, there continues to be a substantial disruption of living conditions. Soaring food and fuel prices further exacerbate the situation. Nepal continues to lack the infrastructure and capacity to adequately handle the return of Nepalese nationals (as well as others with no nationality who last habitually resided there) who were granted TPS under the 2015 designation and are currently residing in the United States.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions supporting Nepal's designation for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There has been an earthquake, flood, drought, epidemic, or other environmental disaster in Nepal resulting in a substantial, but temporary, disruption of living conditions in the area affected; Nepal is unable, temporarily, to handle adequately the return of its nationals; and Nepal has officially requested designation of TPS. *See* INA section 244(b)(1)(B)(i), 8 U.S.C. 1254a(b)(1)(B)(i);

• The designation of Nepal for TPS should be extended for an 18-month period, beginning on December 25, 2023, and ending on June 24, 2025. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• There are approximately 14,500 current Nepal TPS beneficiaries who are expected to be eligible to re-register for TPS under the extension.

## Notice of the Rescission of TPS Termination and Extension and Redesignation of Nepal for TPS

Pursuant to my lawful authorities, including under sections 103(a) and 244 of the Immigration and Nationality Act, I am hereby rescinding the termination of the TPS designation of Nepal announced in the **Federal Register** at 83 FR 23705 (May 2018). Due to this rescission and pursuant to section 244(b)(3)(C) as well as the ongoing stay of proceedings order and approval of the

parties' stipulation in *Bhattarai,* the TPS designation of Nepal has continued to exist since June 24, 2018, without a standing secretarial determination as to whether TPS should be extended or terminated. TPS beneficiaries under the designation, whose TPS has not been finally withdrawn for individual ineligibility, therefore have continued to maintain their TPS since June 24, 2018.

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Nepal's designation for TPS on the basis of environmental disaster are met. *See* INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B) and section 244(b)(3)(A); 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am extending the existing designation of Nepal for TPS for 18 months, beginning on December 25, 2023, and ending on June 24, 2025. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). Individuals holding TPS under the designation of Nepal may file to reregister for TPS under the procedures announced in this notice if they wish to continue their TPS under this 18-month extension.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

## Eligibility and Employment Authorization for TPS

### Required Application Forms and Application Fees to Re-Register for TPS

To re-register for TPS based on the designation of Nepal, you must submit a Form I–821, Application for Temporary Protected Status during the 60-day reregistration period that begins on October 24, 2023 and ends on December 23, 2023. There is no Form I–821 fee for re-registration. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the "Biometric Services Fee" section of this notice.

Individuals who have a Nepal TPS application (Form I–821) that was still pending as of June 21, 2023 do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through June 24, 2025.

## Required Application Forms and Application Fees to Obtain an EAD

Every employee must provide their employer with documentation showing they have a legal right to work in the United States. TPS beneficiaries are authorized to work in the United States and are eligible for an EAD which proves their employment authorization. If you have an existing EAD issued under the TPS designation of Nepal that has been auto-extended through June 30, 2024, by the notice published at 87 FR 68717, you may continue to use that EAD through that date. If you want to obtain a new EAD valid through June 24, 2025, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver).

You may, but are not required to, submit Form I–765, Application for Employment Authorization, with your Form I–821 re-registration application. If you do not want a new EAD now, you can request one later by filing your I–765 and paying the Form I–765 fee (or requesting a fee waiver) at that time, provided you have TPS or a pending TPS application. If you have TPS and only a pending Form I–765, you must file the Form I–821 to reregister for TPS or risk having your TPS withdrawn for failure to reregister without good cause.

## Information About Fees and Filing

USCIS offers the option to applicants for TPS under Nepal's designation to file Form I–821 and related requests for EADs online or by mail. When filing a TPS application, applicants can also request an EAD by submitting a completed Form I–765, with their Form I–821.

*Online filing:* Form I–821 and I–765 are available for concurrent filing online.[70] To file these forms online, you must first create a USCIS online account.[71]

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

## Table 1—Mailing Addresses

Mail your completed Form I–821, Application for Temporary Protected Status and Form I–765, Application for Employment Authorization, Form I–912, Request for Fee Waiver, if applicable, and supporting documentation to the proper address in Table 1.

---

[70] Find information about online filing at "Forms Available to File Online," *https://www.uscis.gov/ file-online/forms-available-to-file-online.*

[71] *https://myaccount.uscis.gov/users/sign_up.*

Federal Register / Vol. 88, No. 118 / Wednesday, June 21, 2023 / Notices **40325**

TABLE 1—MAILING ADDRESSES

| If you live in: | Then mail your application to: |
|---|---|
| • Connecticut<br>• Delaware<br>• District of Columbia<br>• Maine<br>• Maryland<br>• Massachusetts<br>• New Hampshire<br>• New York<br>• North Carolina<br>• Pennsylvania<br>• Rhode Island<br>• Texas<br>• Vermont<br>• Virginia<br>• West Virginia | USCIS Elgin Lockbox.<br>U.S. Postal Service (USPS): USCIS, Attn: TPS Nepal, P.O. Box 4091, Carol Stream, IL 60197–4091.<br>FedEx, UPS, or DHL: USCIS, Attn: TPS Nepal (Box 4091), 2500 Westfield Drive, Elgin, IL 60124–7836. |
| • Alabama<br>• Alaska<br>• American Samoa<br>• Arizona<br>• Arkansas<br>• California<br>• Colorado<br>• Florida<br>• Georgia<br>• Guam<br>• Hawaii<br>• Idaho<br>• Louisiana<br>• Mississippi<br>• Montana<br>• Nevada<br>• New Mexico<br>• Northern Mariana Islands<br>• Oklahoma<br>• Oregon<br>• Puerto Rico<br>• South Carolina<br>• Utah<br>• Virgin Islands<br>• Washington<br>• Wyoming | USCIS Phoenix Lockbox.<br>U.S. Postal Service (USPS): USCIS, Attn: TPS Nepal, P.O. Box 21800, Phoenix, AZ 85036–1800.<br>FedEx, UPS, or DHL: USCIS, Attn: TPS Nepal (Box 21800), 2108 E. Elliot Rd., Tempe, AZ 85284–1806. |
| • Illinois<br>• Indiana<br>• Iowa<br>• Kansas<br>• Kentucky<br>• Michigan<br>• Minnesota<br>• Missouri<br>• Nebraska<br>• North Dakota<br>• Ohio<br>• South Dakota<br>• Tennessee<br>• Wisconsin | USCIS Chicago Lockbox.<br>U.S. Postal Service (USPS): USCIS, Attn: TPS Nepal, P.O. Box 6943, Chicago, IL 60680–6943.<br>FedEx, UPS, or DHL: USCIS, Attn: TPS Nepal (Box 6943), 131 S. Dearborn St., 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application.

This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (*i.e.,* registering) for TPS on

the USCIS website at *https:// www.uscis.gov/tps* under ''Nepal.''

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States