**40326**    **Federal Register** / Vol. 88, No. 118 / Wednesday, June 21, 2023 / Notices

and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *https://www.uscis.gov/i-131*. You may file Form I–131 together with your Form I–821 or separately. When filing Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and
• Submit the fee for the Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

### TABLE 2—MAILING ADDRESSES

| If you are | Mail to |
|---|---|
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status. | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS):<br>You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL:<br>You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S. State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS:**

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https://www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms*.

**Refiling a TPS Re-Registration Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue your EAD promptly, if one has been requested. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. The fee waiver denial notice will contain specific instructions about resubmitting your application. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. See INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late

re-registration, visit the USCIS TPS web page at *www.uscis.gov/tps*.

**Note:** A re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee), or request a fee waiver, when filing a TPS re-registration application. As discussed above, if you decide to wait to request an EAD, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration. You may wait to seek an EAD until after USCIS has approved your TPS re-registration application or at any later date you decide you want to request an EAD. To re-register for TPS, you only need to file the Form I–821 with the biometrics services fee, if applicable, (or request a fee waiver).

**General Employment-Related Information for TPS Applicants and Their Employers**

*How can I obtain information on the status of my TPS application and EAD request?*

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at uscis.gov, or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter*. If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

*When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?*

You can find the Lists of Acceptable Documents on Form I–9, Employment

Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/acceptable-documents*. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central*. An EAD is an acceptable document under List A.

*If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?*

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through June 24, 2025, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

*Can my employer require that I provide any other documentation such as evidence of my status or proof of my Nepalese citizenship or a Form I–797C showing that I registered for TPS for Form I–9 completion?*

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request proof of Nepalese citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. Refer to the "Note to Employees" section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin. Employers can refer to the compliance notice that DHS published on November 16, 2022, for information on how to complete the Form I–9 with TPS EADs that DHS extended through June 30, 2024.[72]

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in

[72] *Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal,* 87 FR 68717 (Nov. 16, 2022).

numerous languages. Employers may also email IER at *IER@usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov*. USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (mismatch) must promptly inform employees of the mismatch and give such employees an opportunity to take action to resolve the mismatch. A mismatch result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ crt/immigrant-and-employee-rights-*

*section* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov*.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

This **Federal Register** Notice does not invalidate the compliance notice DHS issued on November 16, 2022, which extended the validity of certain TPS documentation through June 30, 2024 and does not require individuals to present a Form I–797, Notice of Action. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS designated country of Nepal; or

• Your Form I–94, Arrival/Departure Record or Form I–797, Notice of Action, as shown in the **Federal Register** notice published at 87 FR 68717.

Check with the government agency requesting documentation regarding which document(s) the agency will accept. Some state and local government agencies use the SAVE program to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each state and local government agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. It may also assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice listing the TPS-related document, including any applicable auto-extension of the document, in addition to your recent TPS-related document with your A-number, USCIS number or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow

**40328** Federal Register / Vol. 88, No. 118 / Wednesday, June 21, 2023 / Notices

through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or any automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://save.uscis.gov/casecheck/*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save*, has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–13019 Filed 6–20–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

[Docket No. FR–7071–N–07]

**60-Day Notice of Proposed Information Collection: Manufactured Home Construction and Safety Standards Act Park Model RV Exemption, OMB Control No. 2502–0616**

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* August 21, 2023.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal.

Written comments and recommendations for the proposed information collection can be submitted within 60 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain*. Find this particular information collection by selecting ''Currently under 60-day Review—Open for Public Comments'' or by using the search function. Interested persons are also invited to submit comments regarding this proposal by name and/or OMB Control Number and can be sent to: Colette Pollard, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210, Washington, DC 20410–5000 or email at *PaperworkReductionActOffice@hud.gov*.

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; email Colette Pollard at *Colette.Pollard@hud.gov* or telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs*.

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

**A. Overview of Information Collection**

*Title of Information Collection:* Manufactured Home Construction and Safety Standards Act Park Model RV Exemption Notice.

*OMB Approval Number:* 2502–0616.

*OMB Expiration Date:* January 31, 2024.

*Type of Request:* Revision of a currently approved collection.

*Form Number:* None.

*Description of the need for the information and proposed use:* For recreational vehicles that are exempt from HUD regulation as manufactured homes, HUD requires certification with either the American National Standards Institute's (ANSI) standard for Park Model Recreational Vehicles (PMRV),

A119.5–15 or the National Fire Protection Association's NFPA 1192, Standard on Recreational Vehicles, 2015 Edition. PMRVs built to ANSI A119.5–15 may exceed the RV exemption's 400 square foot threshold; a manufacturer must post notice in the home that the structure is only designed for recreational purposes and is not designed as a primary residence or for permanent occupancy. The Recreation Vehicle Industry Association's (RVIA) current seal does not satisfy HUD's standard for the manufacturer's notice. HUD requirements provide specifics regarding the content and prominence of the notice and which requires the notice to be prominently displayed in the unit and delivered to the consumer before the sale transaction is complete, regardless of whether the transaction occurs online or in-person. PMRV manufacturers will satisfy this requirement with two printed sheets of paper per PMRV: One in the kitchen, and one delivered to the consumer before the transaction.

*Respondents:* Business or other for-profit.

*Estimated Number of Respondents:* 25.

*Estimated Number of Responses:* 4,480 per annum.

*Frequency of Response:* Approximately 179.

*Average Hours per Response:* 20 seconds.

*Total Estimated Burden:* 25 hours.

**B. Solicitation of Public Comment**

This notice is soliciting comments from members of the public and affected parties concerning the collection of information described in Section A on the following:

(1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) The accuracy of the agency's estimate of the burden of the proposed collection of information;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) Ways to minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

HUD encourages interested parties to submit comment in response to these questions.

USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/crt/immigrant-and-employee-rights-section* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov*.

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

This **Federal Register** Notice does not invalidate the compliance notice DHS issued on November 16, 2022, which extended the validity of certain TPS documentation through June 30, 2024 and does not require individuals to present a Form I–797, Notice of Action. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS designated country of El Salvador; or

• Your Form I–94, Arrival/Departure Record or Form I–797, Notice of Action, as shown in the **Federal Register** notice published at 87 FR 68717.

Check with the government agency requesting documentation regarding which document(s) the agency will accept. Some state and local government agencies use SAVE to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each state and local government agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. It may also assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice listing the TPS-related document, including any applicable auto-extension of the document, in addition to your recent TPS-related document with your A-number, USCIS number or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or any automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://save.uscis.gov/casecheck/*. CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save*, has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–13018 Filed 6–20–23; 8:45 am]

**BILLING CODE 9111–97–P**

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

[CIS No. 2735–22; DHS Docket No. USCIS–2014–0006]

RIN 1615–ZB69

**Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status (TPS) and Notice of Extension of TPS Designation for Nicaragua.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is rescinding the previous termination of the designation of Nicaragua for TPS, which was published on December 15, 2017 and extending the designation of Nicaragua for Temporary Protected Status (TPS) for 18 months, beginning on January 6, 2024 and ending on July 5, 2025. This extension allows existing TPS beneficiaries to retain TPS through July 5, 2025, so long as they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through July 5, 2025, must re-register during the 60-day re-registration period as described in this notice.

**DATES:** The *Rescission of Termination of the Designation of Nicaragua for TPS* took effect June 9, 2023.

*Extension of Designation of Nicaragua for TPS:* The 18-month extension of TPS for Nicaragua begins on January 6, 2024, and will remain in effect through July 5, 2025. The extension impacts existing beneficiaries of TPS under the designation of Nicaragua.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from November 6, 2023, through January 5, 2024.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital

Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. You can find specific information about Nicaragua's TPS designation by selecting ''Nicaragua'' from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *uscis.gov/tools*. Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at uscis.gov, or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter*.

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Document
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—**Federal Register**
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

**Purpose of This Action (TPS)**

Through this notice, DHS announces the reconsideration and rescission of the termination of the designation of Nicaragua for TPS and the Secretary's decision to extend the TPS designation for 18 months from January 6, 2024, through July 5, 2025. This notice also sets forth procedures necessary for nationals of Nicaragua (or individuals having no nationality who last habitually resided in Nicaragua) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EADs) with USCIS.

Re-registration is limited to individuals who have previously registered or re-registered for TPS under Nicaragua's designation, whose applications were granted, and whose TPS has not been withdrawn for individual ineligibility for the benefit. Failure to re-register properly within the 60-day re-registration period may result in the withdrawal of your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under Nicaragua's designation, the 60-day re-registration period runs from November 6, 2023, through January 5, 2024. USCIS will issue new EADs with a July 5, 2025, expiration date to eligible Nicaraguan TPS beneficiaries who timely re-register and apply for EADs.

Individuals who have a Nicaragua TPS application (Form I–821) and Application for Employment Authorization (Form I–765) that were still pending as of June 21, 2023 do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through July 5, 2025. Similarly, if USCIS approves a pending TPS-related Form I–765 filed in connection with a Form I–821, USCIS will issue the individual a new EAD that will be valid through the same date. If you have TPS and only a pending Form I–765, you must file the Form I–821 to re-register for TPS or risk having your TPS withdrawn for failure to timely re-register without good cause. There are currently approximately 4,000 beneficiaries under Nicaragua's TPS designation who may be eligible to continue their TPS under the extension announced in this Notice.

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state before arrival in the United States, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

**When was Nicaragua designated for TPS?**

Nicaragua was initially designated on the basis of environmental disaster that prevented nationals of Nicaragua from returning in safety following this environmental disaster, at the request of the country's government, and because Nicaragua was unable, temporarily, to handle adequately the return of its nationals. *See Designation of Nicaragua Under Temporary Protected Status*, 64 FR 526 (Jan. 5, 1999). Since its initial designation in 1999, TPS for Nicaragua was extended 13 consecutive times (for periods of 12 or 18 months at a time) under the same statutory basis of environmental disaster. The last such extension was due to expire on January 5, 2018.[1]

Following the statutorily required review of the country conditions, former Acting Secretary Elaine C. Duke announced the termination of TPS for Nicaragua, with an effective date of January 5, 2019. *See Termination of the Designation of Nicaragua for Temporary Protected Status*, 82 FR 59636 (Dec. 15, 2017); *see also* INA secs. 244(b)(3)(A) and (B); 8 U.S.C. 1254a(b)(3)(A) and (B). As discussed below, this termination decision has been the subject of litigation and a court order. As a result, the termination has not taken effect.

**Litigation Background Regarding Termination of Certain TPS Designations**

In addition to Nicaragua, in 2017–2018, TPS termination decisions were also announced for five other countries

---

[1] *Extension of the Designation of Nicaragua for Temporary Protected Status*, 81 FR 30325 (July 6, 2016).

by the Secretary or Acting Secretary: Sudan, El Salvador, Haiti, Nepal, and Honduras.[2] Lawsuits challenging the terminations were filed in the U.S. District Court for the Northern District of California in *Ramos* v. *Nielsen*, 326 F. Supp. 3d 1075 (N.D. Cal. 2018), and *Bhattarai* v. *Nielsen*, No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019), and in the U.S. District Court for the Eastern District of New York in *Saget* v. *Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019).[3] In *Ramos*, the district court granted a preliminary injunction enjoining the terminations of TPS for El Salvador, Haiti, Sudan, and Nicaragua and directed DHS to maintain the *status quo* and to continue the TPS and TPS-related documentation of affected TPS beneficiaries under those countries' designations. The U.S. Government appealed, and a three-judge panel vacated the injunction. The appellate court, however, has granted rehearing en banc of the panel decision, vacating the panel's decision.[4] The district court's preliminary injunction thus remains in place. In *Bhattarai* the district court has stayed proceedings until the *Ramos* appeal is decided and approved the parties' stipulation for the continuation of TPS and TPS-related documentation for eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the *Ramos* appeal. In *Saget*, the district court granted a preliminary injunction enjoining termination of TPS for Haiti, and the Government appealed. However, following the new TPS designation of Haiti in August 2021, the district court dismissed the lawsuit based on the parties' stipulation to dismissal.[5] Beneficiaries under the TPS designations for El Salvador, Nicaragua, Sudan, Haiti, Honduras, and Nepal will retain their TPS while the preliminary injunction in *Ramos* remains in effect, and 120 days thereafter, provided that their TPS is not withdrawn because of individual ineligibility.[6]

DHS has taken actions to ensure its continued compliance with the court orders in *Ramos* and *Bhattarai*. DHS has published periodic notices to continue TPS and extend the validity of TPS-related documentation previously issued to beneficiaries under the TPS designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal.[7] The most recent such notice continued TPS and extended the TPS-related documents specified in the notice through June 30, 2024.[8] These extensions apply where the TPS beneficiary properly filed for re-registration during either the most recent DHS-announced registration period for their country, or any applicable previous DHS-announced re-registration periods for the beneficiary's country, or has a re-registration application that remains pending.[9] Although the notice published at 87 FR 68717 remains valid, individuals who wish to remain eligible for TPS under the extension of TPS for Nicaragua announced in this notice through July 5, 2025, and any potential future extensions must apply for re-registration in accordance with the procedures announced in this notice.[10] Failure to timely re-register without good cause is a ground for TPS withdrawal. *See* INA sec. 244(c)(3)(C), 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17.

**What authority does the Secretary have to reconsider and rescind the termination of TPS for Nicaragua and extend the prior designation?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[11] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of

---

[2] *Termination of the Designation of Sudan for Temporary Protected Status*, 82 FR 47228 (Oct. 11, 2017); *Termination of the Designation of El Salvador for Temporary Protected Status*, 83 FR 2654 (Jan. 18, 2018); *Termination of the Designation of Haiti for Temporary Protected Status*, 83 FR 2648 (Jan. 18, 2018); *Termination of the Designation of Nepal for Temporary Protected Status*, 83 FR 23705 (May 22, 2018); *Termination of the Designation of Honduras for Temporary Protected Status*, 83 FR 26074 (June 5, 2018). Haiti and Sudan were later newly designated for TPS on August 3, 2021 and April 19, 2022, respectively, for 18 months. *See Designation of Haiti for Temporary Protected Status*, 86 FR 41863 (Aug. 3, 2021); *Designation of Sudan for Temporary Protected Status*, 87 FR 23202 (Apr. 19, 2022).

[3] *See Ramos* v. *Nielsen*, 336 F.Supp.3d 1075 (N.D. Cal. Oct. 3, 2018) ("*Ramos*") (district court granted preliminary injunction against terminations of TPS for El Salvador, Haiti, Sudan, and Nicaragua). On appeal, a three-judge panel of the U.S. Court of Appeals for the Ninth Circuit vacated the district court's injunction and remanded the case to the district court, but the plaintiffs filed a motion for rehearing en banc. *Ramos* v. *Wolf*, 975 F.3d 872 (9th Cir. 2020). The appellate court did not issue its directive to the district court to make its vacatur of the injunction effective, thus the injunction remained in place. On February 10, 2023, the Ninth Circuit issued an order granting rehearing en banc and vacated the previous ruling from its three-judge panel. 59 F.4th 1010 (9th Cir. 2023). En banc arguments are scheduled to be heard during the week of June 20, 2023. In the meantime, the injunction remains in place. *See also Bhattarai* v. *Nielsen*, No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) (district court stayed proceedings until *Ramos* appeal decided and approved parties' stipulation for continued TPS and issuance of TPS-related documentation to eligible, affected beneficiaries of TPS for Honduras and Nepal during the stay and pendency of the appeal, treatment similar to that provided *Ramos*-covered individuals). Other litigation was filed relating to the terminations of El Salvador, Honduras, and Haiti. The Haiti-related case, NAACP v. *U.S. Dep't of Homeland Sec.*, No. 1:18–cv–00239 (D. Md. Jan. 24, 2018) was dismissed on May 22, 2021, subsequent to the same DHS designation. Meanwhile, *Centro Presente* v. *Biden*, No. 1:18–cv–10340 (D. Mass. July 23, 2018), relating to El Salvador, Honduras, and Haiti, and *Casa de Maryland* v. *Biden*, No. 18–00845 (D. Md. Mar. 23, 2018), relating to El Salvador, are currently either stayed or subject to a pending stay motion.

[4] *Ramos* v. *Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated*, 975 F.3d 872 (9th Cir. 2020), *pet. for reh'g en banc granted*, 59 F.4th 1010 (Feb. 10, 2023) (No. 18–16981). ("*Ramos*").

[5] *See Saget* v. *Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) and Order approving Stipulation of Dismissal, dated Oct. 15, 2021.

[6] As noted, Haiti was newly designated for TPS on August 3, 2021 for 18 months. *See Designation of Haiti for Temporary Protected Status*, 86 FR 41863 (Aug. 3, 2021). On April 19, 2022, the Secretary also newly designated Sudan TPS. *See Designation of Sudan for Temporary Protected Status*, 87 FR 23202 (Apr. 19, 2022). Those designations cover all Haitian and Sudanese nationals who were eligible for TPS under the Haiti and Sudan TPS designations that were terminated in 2018 and 2017, respectively.

[7] 83 FR 54764 (Oct. 31, 2018); 84 FR 7103 (Mar. 1, 2019); 84 FR 20647 (May 10, 2019) (correction notice issued at 84 FR 23578 (May 22, 2019)); 84 FR 59403 (Nov. 4, 2019); 85 FR 79208 (Dec. 9, 2020); 86 FR 50725 (Sept. 10, 2021) (correction notice issued at 86 FR 52694 (Sept. 22, 2021)).

[8] *Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations of El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal*, 87 FR 68717 (Nov. 16, 2022).

[9] *Id.*, at 68719.

[10] Through the re-registration process, which is generally conducted every 12 to 18 months while a foreign state is designated for TPS, USCIS determines whether each TPS beneficiary is continuing to maintain individual eligibility for TPS, including but not limited to, the requirements related to disqualifying criminal or security issues. *See Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal*, 87 FR 68717, 68720 (Nov. 16, 2022) (noting potential future action for TPS beneficiaries may include a requirement to re-register).

[11] Although the text of INA section 244(b)(1) continues to ascribe this power to the Attorney General, this authority is now held by the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135. *See, e.g.*, 6 U.S.C. 557; *Nielsen* v. *Preap*, 139 S. Ct. 954, 959 n.2 (2019). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1).

a designation. *See* INA sec. 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).

At least 60 days before the expiration of a foreign state's TPS designation, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). If the Secretary does not determine that the foreign state no longer meets the conditions for TPS designation, the designation is extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C); 8 U.S.C. 1254a(b)(3)(A), (C).

On December 15, 2017, the Acting Secretary of Homeland Security issued notice of her decision that Nicaragua no longer continued to meet the conditions for TPS designation and announced the termination of TPS for Nicaragua. The Secretary also announced an orderly transition period of 12 months, such that the termination was set to go into effect on January 5, 2019. On March 12, 2018, as noted above, plaintiffs in *Ramos* filed suit challenging the termination decision for Nicaragua, as well as contemporaneous decisions to terminate TPS for El Salvador, Sudan, and Haiti. On October 3, 2018, the U.S. District Court for the Northern District of California issued a preliminary injunction order in *Ramos,* preventing the termination decision from going into effect until the court reaches a decision on the merits of the plaintiffs' claims and further directing that DHS maintain the *status quo,* including continuing TPS and TPS-related documentation such as EADs for affected beneficiaries. After reaching a stipulation with plaintiffs that no termination would go in effect for at least 120 days following the conclusion of any appeal, DHS has issued a series of **Federal Register** notices continuing TPS and TPS-related documentation for affected TPS beneficiaries, with the most recent continuation notice effective through June 30, 2024.[12] As a result, the announced termination of the TPS designation for Nicaragua has never gone into effect, and TPS beneficiaries

under that designation have retained their TPS, unless it has been individually withdrawn pursuant to INA section 244(c)(3), 8 U.S.C. 1254a(c)(3).

An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority.[13] The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination. *See* INA secs. 244(b)(3), (b)(5)(A); 8 U.S.C. 1254a(b)(3), (b)(5)(A).

## Why is the Secretary rescinding the previous decision to terminate the TPS designation for Nicaragua?

After conducting an independent assessment of the country conditions in Nicaragua as they existed in 2017 and exist today, the Secretary has determined that Nicaragua's 1999 TPS designation should not have been terminated. As explained below, the conditions in Nicaragua that gave rise to its TPS designation in 1999 persisted in 2017 and persist to this day. Accordingly, the Secretary is, upon reconsideration, vacating the 2017 decision terminating Nicaragua's TPS designation and extending that designation for an additional 18 months.

Nicaragua was initially designated for TPS in 1999 on environmental disaster grounds following Hurricane Mitch, at the request of the country's government, and because Nicaragua was unable, temporarily to handle adequately the return of its nationals.[14] The hurricane, which struck in 1998, killed approximately 2,500 people and 885

were reported missing.[15] The devastation of Hurricane Mitch affected nearly 868,000 people.[16] Landslides and floods destroyed entire villages and caused extensive damages to the transportation network, housing, medical and educational facilities, water supply and sanitation facilities, and the agricultural sector.[17] Overall damage estimates ranged between $1.3–1.5 billion.[18]

At the time of the decision to terminate the designation of TPS, Nicaragua continued to experience significant challenges due to the destruction of the hurricane. While the international community and the Government of Nicaragua helped to repair the damage and destruction left behind by Hurricane Mitch and there were notable improvements in some sectors, several sectors including housing and infrastructure remained severely impacted. In 2017, Habitat for Humanity reported that Nicaragua had one of the highest housing deficits in Central America stating, "The total deficit generates a need for 957,000 new houses and home improvements, and only 50 percent of the total need is covered between the private and public sectors." [19] Moreover, though a significant amount of aid was dedicated to repairing and improving road infrastructure following Hurricane Mitch, transportation infrastructure in Nicaragua remained poor and suffered from damage from tropical storms and hurricanes.[20]

Additionally, according to the 2017 Global Climate Risk Index, Nicaragua

---

[12] *Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations of El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal,* 87 FR 68717 (Nov. 16, 2022).

[13] *Ivy Sports Medicine, LLC v. Burwell,* 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.); *see, e.g., id.* ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . "[I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide." (quotation marks and citations omitted)); *NRDC v. Reagan,* 67 F.4th 397, 401 (D.C. Cir. 2023) ("[A]lthough the power to decide is normally accompanied by the power to reconsider, Congress undoubtedly can limit an agency's discretion to reverse itself." (quotation marks omitted); *Macktal v. Chao,* 286 F.3d 822, 825–26 (5th Cir. 2002) ("It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); *Mazaleski v. Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time."); *see also Last Best Beef, LLC v. Dudas,* 506 F.3d 333, 340 (4th Cir. 2007) (agencies possess especially "broad authority to correct their prior errors").

[14] *See Designation of Nicaragua Under Temporary Protected Status,* 64 FR 526 (Jan. 5, 1999).

[15] OCHA, Central America—Hurricane Tropical Storm Mitch OCHA Situation Report No. 14, Nov. 16, 1998, available at *https://reliefweb.int/report/belize/central-america-hurricanetropical-storm-mitch-ocha-situation-report-no-14* (last visited Nov. 7, 2022).

[16] *Id.*

[17] Nicaragua: Huracán Mitch Daños, Costos, Acciones de Rehabilitación del Gobierno y la Cooperación Internacional, Government of Nicaragua, May 28, 1999, available at *https://reliefweb.int/report/nicaragua/nicaragua-hurac\%C3\%A1n-mitch-da\%C3\%B1os-costos-acciones-de-rehabilitaci\%C3\%B3n-del-gobierno-y-la* (last visited Nov. 18, 2022).

[18] *Nicaragua Overview,* U.S. Agency for International Development (USAID), *http://web.archive.org/web/20110606154439/http://www.usaid.gov/pubs/bj2001/lac/ni/* (last visited Nov. 16, 2022). According to a USAID source, overall damages were US$1.5 billion. The Government of Nicaragua assessed damages at US$1.3 billion. *See Nicaragua:* Huracán Mitch Daños, Costos, Acciones de Rehabilitación del Gobierno y la Cooperación Internacional.

[19] *Habitat for Humanity in Nicaragua, Habitat for Humanity, https://web.archive.org/web/20171121013537/https://www.habitat.org/where-we-build/nicaragua,* (last visited June 6, 2017).

[20] Nicaragua > Infrastructure, Jane's Sentinel Security Assessment—Central America And The Caribbean, Feb. 3, 2017, *http://janes.ihs.com/Janes/Display/1302302* (last visited Nov. 16, 2022).

ranked as the 4th most affected country in the world by extreme weather events from 1996 to 2015; during this time, Nicaragua averaged $234.7 million in damages per year, and witnessed over 3,200 total fatalities from extreme weather events.[21] Per the World Food Program, Nicaragua's vulnerability to natural disasters hinders its progress in addressing both poverty and food security.[22]

Since Hurricane Mitch, various hurricanes, tropical depressions, and tropical storms have made landfall in Nicaragua.[23] The conditions leading up to the decision to terminate show recurrent hydrometeorological and environmental events that delayed and prolonged Nicaragua's ability to recover. In 2016, heavy rains and wind once again caused damage and flooding in Nicaragua.[24] In July 2016, more than 8,900 people were affected, 3,900 people were evacuated, and nearly 1,700 homes were flooded due to heavy rains and flooding.[25] In November 2016, Hurricane Otto—a category 2 storm—damaged 817 and destroyed 120 homes and necessitated the evacuation of over 11,600 people.[26] Also, consecutive years of drought (from November 2013 to April 2016)[27] negatively impacted agriculture, fishing, and hydroelectric energy production in Nicaragua.[28]

The conditions in Nicaragua at the time of the TPS termination decision prevented Nicaraguan nationals from returning to Nicaragua in safety and negatively affected the country's ability to adequately handle the return of its nationals residing in the United States. As explained above, at the time of the decision to terminate TPS, Nicaragua continued to experience ongoing environmental disasters that were either insufficiently considered or not considered in the termination decision. The termination decision failed to adequately assess conditions in Nicaragua in 2017. Those conditions continued to substantially disrupt living conditions and temporarily affected the country's ability to adequately handle the return of its nationals residing in the United States. The Secretary has concluded that reconsideration is appropriate and timely, particularly given that the 2017 termination decision has not yet gone into effect due to the ongoing litigation and associated court orders.

**What authority does the Secretary have to extend the designation of Nicaragua for TPS?**

As noted above, section 244(b) of the INA, 8 U.S.C. 1254a(b), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist and instructs the Secretary to periodically review the country conditions underpinning each designation and determine whether they still exist, leading to either termination or extension of the TPS designation. However, if the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). If the Secretary does not make a decision as to either extension or termination, then INA section 244(b)(3)(C) requires the automatic extension of the designation for six months (or 12 or 18 months in the Secretary's discretion).

Prior to the now-rescinded termination of the TPS designation for Nicaragua, the most recent extension of the designation was due to end on January 5, 2018.[29] In light of the Secretary's reconsideration and rescission of the December 15, 2017 decision to terminate the TPS designation for Nicaragua, there is no longer any standing secretarial determination that Nicaragua "no longer meets the conditions for designation" under INA section 244(b)(1). Accordingly, pursuant to INA section 244(b)(3)(C), and in the absence of an affirmative decision by any Secretary to extend the designation for 12 or 18 months rather than the automatic six months triggered by the statue, the TPS designation for Nicaragua shall have been extended in consecutive increments of six months between the date when the last designation extension was due to end on January 5, 2018, and the effective date of the TPS extension announced in this notice on January 6, 2024. Coupled with the existing *Ramos* order and corresponding **Federal Register** notices continuing TPS

---

[21] Kreft, Sönke, Eckstein, David and Melchior, Inga, *Global Climate Risk Index 2017*, Germanwatch, p. 5–6, Nov. 2016, available at *https://reliefweb.int/report/world/global-climate-risk-index-2017-who-suffers-most-extreme-weather-events-weather-related* (last visited Nov. 17, 2022).

[22] *WFP Nicaragua Country Brief*, World Food Programme, p. 2, Feb. 2017, available at *https://reliefweb.int/report/nicaragua/wfp-nicaragua-country-brief-february-2017* (last visited Nov. 17, 2022).

[23] *Central America—Drought in El Salvador, Guatemala, Honduras and Nicaragua*, ACAPS, p. 5, Sept. 29, 2015, available at *https://reliefweb.int/report/el-salvador/acaps-briefing-note-central-america-drought-el-salvador-guatemala-honduras* (last visited Nov. 17, 2022).

[24] *Gobierno atiende a familias afectadas por fuertes vientos en Malpaisillo*, Government of Nicaragua, Apr. 27, 2016, available at *https://reliefweb.int/report/nicaragua/gobierno-atiende-familias-afectadas-por-fuertes-vientos-en-malpaisillo* (last visited May 22, 2023); REDLAC *Weekly Note on Emergencies Latin America & The Caribbean—Year 9—Volume 451*, UNOCHA, May 10, 2016, available at *https://reliefweb.int/report/ecuador/redlac-weekly-note-emergencies-latin-america-caribbean-year-9-volume-451* (last visited Nov. 17, 2022); *Monitoring Emergencies: Nicaragua—06/01/2016: 509 people affected by rain*, Pan American Health Organization, June 1, 2016, available at *https://reliefweb.int/report/nicaragua/monitoring-emergencies-nicaragua-06012016-509-people-affected-rain* (last visited Nov. 17, 2022); *Ríos crecidos y zonas incomunicadas por las lluvias*, El Nuevo Diario (Nica.), Jun. 6, 2016, available at *https://reliefweb.int/report/nicaragua/r-os-crecidos-y-zonas-incomunicadas-por-las-lluvias* (last visited Nov. 17, 2022); *Monitoring Emergencies: Nicaragua—07/12/2016: 1,781 families have been affected in 9 municipalities due to flooding—Update*, Pan American Health Organization, July 12, 2016, available at *https://reliefweb.int/report/nicaragua/monitoring-emergencies-nicaragua-07122016-1781-families-have-been-affected-9* (last visited Nov. 17, 2022); *Monitoring Emergencies: Nicaragua—12/13/2016: Strong rains affect the Southern Caribbean region*, Pan American Health Organization, Dec. 13, 2016, available at *https://reliefweb.int/report/nicaragua/monitoring-emergencies-nicaragua-12132016-strong-rains-affect-southern-caribbean* (last visited Nov. 17, 2022); *Más de 900 familias afectadas por lluvias*, Redhum, Oct. 22, 2016, available at *https://reliefweb.int/report/nicaragua/m-s-de-900-familias-afectadas-por-lluvias* (last visited Nov. 17, 2022).

[25] *Monitoring Emergencies: Nicaragua—07/12/2016: 1,781 families have been affected in 9 municipalities due to flooding—Update*, Pan American Health Organization, July 12, 2016, available at *https://reliefweb.int/report/nicaragua/monitoring-emergencies-nicaragua-07122016-1781-families-have-been-affected-9* (last visited Nov. 17, 2022); *World events—ECHO Daily Map| 12/07/2016*, European Commission Humanitarian Aid Office, July 12, 2016, available at *https://reliefweb.int/map/world/world-events-echo-daily-map-12072016* (last visited Nov. 17, 2022).

[26] *Humanitarian Bulletin—Latin America and the Caribbean*, UNOCHA, p. 2, Nov–Dec. 2016, available at *https://reliefweb.int/report/world/humanitarian-bulletin-latin-america-and-caribbean-volume-30-november-december-2016* (last visited Nov. 17, 2022); *Huracán Otto provoca daños en 817 viviendas*, Redhum, Nov. 29, 2016, available at *https://reliefweb.int/report/nicaragua/hurac-n-otto-provoca-da-os-en-817-viviendas* (last visited Nov. 17, 2022); *Rosario presenta informe sobre respuesta a familias afectadas por el huracán Otto*, Redhum, Nov. 28, 2016, available at *https://reliefweb.int/report/nicaragua/rosario-presenta-informe-sobre-respuesta-familias-afectadas-por-el-hurac-n-otto* (last visited Nov. 17, 2022).

[27] *Situación "muy grave" con 40 pozos comunitarios secos en Occidente*, La Prensa (Nic.), Feb. 16, 2017, available at *https://reliefweb.int/report/nicaragua/situaci-n-muy-grave-con-40-pozos-comunitarios-secos-en-occidente* (last visited Nov. 17, 2022).

[28] Ríos, Julia, *In drought-hit central Nicaragua, water 'is like looking for gold'*, Agence France-Presse, Apr. 7, 2016, available at *https://www.yahoo.com/news/drought-hit-central-nicaragua-water-looking-gold-101011971.html?guccounter=1* (last visited Nov. 17, 2022); Silva, José Adán, *Cambio climático seca a Nicaragua, Inter Press Service*, Mar. 30, 2016, available at *https://ipsnoticias.net/2016/03/cambio-climatico-seca-a-nicaragua/* (last visited Nov. 17, 2022).

[29] *See Extension of the Designation of Nicaragua for Temporary Protected Status*, 81 FR 30325 (July 6, 2016).

and TPS-related documentation for affected beneficiaries under the designation for Nicaragua, this means that all such individuals whose TPS has not been finally withdrawn for individual ineligibility are deemed to have retained TPS since January 5, 2018, and may re-register under procedures announced in this Notice.

## Why is the Secretary extending the TPS designation for Nicaragua for TPS for 18 months through July 5, 2025?

DHS has reviewed country conditions in Nicaragua. Based on the review, including input received from the United States Department of State (DOS) and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because the conditions supporting Nicaragua's 1999 designation for TPS on the basis of environmental disaster remain.

As previously discussed, Nicaragua was originally designated for TPS in 1999 [30] following Hurricane Mitch. Since the disastrous hurricane in 1998, Nicaragua has been encumbered by several significant natural disasters and environmental challenges.

Nicaragua continues to suffer from the residual effects of Hurricane Mitch, and subsequent disasters have caused additional damage and added to the country's fragility. "In the last 20 years, Nicaragua has been hit by major, extreme weather events such as Hurricanes Mitch in 1998, Beta in 2005, Felix in 2007, and most recently by hurricanes Eta and Iota in November 2020 . . . The economic, social, housing, and infrastructure losses have been devastating for the region." [31] According to the International Federation of Red Cross and Red Crescent Societies (IFRC), Hurricane Eta and Hurricane Iota left severe damage in the region, including loss of lives. [32] The "back-to-back major hurricanes affected 60 per cent of the national territory," [33]

while "[c]oastal areas such as the North Caribbean Coast Autonomous Region (RACCN), a rural area mostly inhabited by indigenous and Afro-descendant peoples, bore the brunt of the destruction." [34] More than 3 million people were exposed to these hurricanes, with an estimated 1.8 million people affected. [35] Damages from the hurricanes were estimated at $738 million [36] and limited access to safe drinking water and sanitation facilities, damaged staple crops, and worsened food insecurity for vulnerable individuals. [37]

On July 1, 2022, Tropical Storm Bonnie hit the Caribbean coast of Nicaragua. [38] The storm "caused flash flooding, overflow in rivers and landslides in the North and South Caribbean Coast," [39] and "affected 21 municipalities, flooding 300 homes, ripping off the roofs of 123 homes, and destroying 3 homes." [40] At least 3,000 people were evacuated, [41] and "[t]ens of thousands of people across Nicaragua were left without power and more than 10,000 homes had no water." [42] In

addition, 12 people were injured, [43] and four people were killed when they were "swept away by rivers which had been turned into raging torrents by the heavy rains." [44]

On October 9, 2022, Hurricane Julia hit Nicaragua's central Caribbean coast. [45] Reports indicate that Hurricane Julia damaged hundreds of homes but left no reported casualties. [46] The director of Nicaragua's disaster system reported that more than 13,000 families had been evacuated, more than 800 houses had been flooded, and many roofs had been damaged. [47]

In addition to hurricanes, Nicaragua has also been impacted by other hydrometeorological events [48] and is also one of the countries in the Dry Corridor of Central America. [49] These environmental shocks have affected conditions throughout Nicaragua resulting in deaths, damage to homes and infrastructure, and loss of crops throughout the years. [50]

[30] Designation of Nicaragua Under Temporary Protected Status, 64 FR 526 (Jan. 5, 1999).

[31] Nicaragua: Preparatory Action for Disaster/Crisis—DREF Plan of Action, Operation No. MDRNI011, International Federation of Red Cross and Red Crescent Societies (IFRC), p.2, Sept. 3, 2021, available at https://reliefweb.int/report/nicaragua/nicaragua-preparatory-action-disastercrisis-dref-plan-action-operation-ndeg-mdrni011 (last visited Feb. 7, 2023).

[32] OCHA, Nicaragua: Hurricanes Eta & Iota—Emergency Appeal No. MDR43007, Operation Update No. 2, International Federation of Red Cross and Red Crescent Societies (IFRC), p. 2, Jan. 20, 2021, available at https://reliefweb.int/report/nicaragua/nicaragua-hurricanes-eta-iota-emergency-appeal-n-mdr43007-operation-update-no-2 (last visited Feb. 7, 2023).

[33] OCHA, Nicaragua: Plan of Action √ Hurricanes Eta and Iota, January 2021, Feb. 22, 2021, available

at https://reliefweb.int/report/nicaragua/nicaragua-plan-action-hurricanes-eta-and-iota-january-2021-one-pager (last visited Feb. 7, 2023).

[34] OCHA, Nicaragua Action Plan to focus on recovery efforts after hurricanes Eta and Iota, United Nations Office for the Coordination of Humanitarian Affairs (UNOCHA), Mar. 17, 2021, available at https://www.unocha.org/story/nicaragua-action-plan-focus-recovery-efforts-after-hurricanes-eta-and-iota (last visited Feb. 7, 2023).

[35] OCHA, Nicaragua: Plan of Action | Hurricanes Eta and Iota, January 2021, Feb. 22, 2021, available at https://reliefweb.int/report/nicaragua/nicaragua-plan-action-hurricanes-eta-and-iota-january-2021-one-pager (last visited Feb. 7, 2023).

[36] Id.

[37] USAID, Nicaragua Assistance Overview, Aug. 2022, available at https://www.usaid.gov/humanitarian-assistance/nicaragua#:~:text=With%20approximately%20%2412.6%20million%20in,affected%20by%20Eta%20and%20Iota. (last visited Feb. 7, 2023).

[38] Tropical Storm Bonnie hits Nicaragua's Caribbean Coast, AP, July 1, 2022, available at https://apnews.com/article/storms-central-america-tropical-cyclones-nicaragua-51688c5a8896b3679b0358004e20d076 (last visited Feb. 7, 2023).

[39] OCHA, WFP Nicaragua Country Brief, July 2022, Aug. 26, 2022, available at https://reliefweb.int/report/nicaragua/wfp-nicaragua-country-brief-july-2022 (last visited Feb. 7, 2023).

[40] PAHO, Natural Hazards Monitoring—5 August 2022, Aug. 5, 2022, available at https://www.paho.org/en/natural-hazards-monitoring/natural-hazards-monitoring-5-august-2022 (last visited Feb. 7, 2023).

[41] Nicaragua—Floods (PAHO, SINAPRED, INETER) (ECHO Daily Flash of 06 July 2022), European Commission's Directorate-General for European Civil Protection and Humanitarian Aid Operations (ECHO), Jul. 6, 2022, available at https://reliefweb.int/report/nicaragua/nicaragua-floods-paho-sinapred-ineter-echo-daily-flash-06-july-2022 (last visited Feb. 7, 2023).

[42] Buschschlüter, Vanessa, Storm Bonnie leaves deadly trail in Central America, BBC, July 4, 2022, available at https://www.bbc.com/news/world-latin-america-62037088 (last visited Feb. 7, 2023).

[43] Nicaragua—Floods (PAHO, SINAPRED, INETER) (ECHO Daily Flash of 06 July 2022), European Commission's Directorate-General for European Civil Protection and Humanitarian Aid Operations (ECHO), Jul. 6, 2022, available at https://reliefweb.int/report/nicaragua/nicaragua-floods-paho-sinapred-ineter-echo-daily-flash-06-july-2022 (last visited Feb. 7, 2023).

[44] Buschschlüter, Vanessa, Storm Bonnie leaves deadly trail in Central America, BBC, July 4, 2022, available at https://www.bbc.com/news/world-latin-america-62037088 (last visited Feb. 7, 2023).

[45] Hurricane Julia hits Nicaragua with torrential rainfall, AP, Oct. 9, 2022, available at https://apnews.com/article/hurricanes-caribbean-storms-nicaragua-tropical-2a6032a0432971cb2c88a9643b5e8f75 (last visited Feb. 7, 2023).

[46] Tropical Storm Julia emerges over Pacific after crossing Nicaragua, Reuters, Oct. 10, 2022, available at https://www.reuters.com/business/environment/hurricane-julia-hits-nicaragua-with-high-winds-2022-10-09/ (last visited Feb. 7, 2023).

[47] Id.

[48] OCHA, Hydrometeorological and Climate Services Modernisation Plan For Nicaragua—January 2019, World Bank Group, p.2, Jan. 31, 2019, available at https://reliefweb.int/report/nicaragua/hydrometeorological-and-climate-services-modernisation-plan-nicaragua-january-2019 (last visited Feb. 7, 2023).

[49] OCHA, Central America's Dry Corridor: Turning emergency into opportunities, Oct. 19, 2022, available at https://reliefweb.int/report/honduras/central-americas-dry-corridor-turning-emergency-opportunities (last visited Feb. 7, 2023).

[50] Velásquez, Uriel, Lluvias dejan 14 muertos en Nicaragua [Rains leave 14 dead in Nicaragua], El Nuevo Diario (Ni.), Oct. 19, 2018, available at https://web.archive.org/web/20181019114015/https://www.elnuevodiario.com.ni/nacionales/477437-lluvias-dejan-14-muertos-nicaragua/; Nicaragua floods: DREF final report (8 July 2018), International Federation of Red Cross and Red Crescent Societies (IFRC), p.1, July 8, 2018, available at https://reliefweb.int/report/nicaragua/nicaragua-floods-dref-final-report-8-july-2018; A comprehensive action plan for the Dry Corridor in Nicaragua, Food and Agriculture Organization of the United Nations (FAO), Nov. 27, 2017, available at https://web.archive.org/web/20200731011949/

Continued

In addition to the numerous environmental disasters following the 1998 hurricane, Nicaragua is experiencing political instability and a humanitarian crisis that continue to render the country temporarily unable to adequately handle the return of its nationals.

The Nicaraguan government's harsh response to domestic dissent and political opponents began in 2018 when President Ortega proposed to reduce social security benefits in Nicaragua which triggered protests.[51] The government's response was repressive[52] and included an "estimated 325–600 extrajudicial killings, as well as torture, political imprisonment, and suppression of the press, and led to thousands of citizens going into exile" according to a 2019 Report of the High-Level Commission on Nicaragua of the Organization of the American States.[53] The Ortega government launched a new period of increased oppression beginning in May 2021, arresting dozens of government critics, including several

revolutionary leaders who once fought alongside Ortega.[54]

In a September 2022 report, the Office of the United Nations High Commissioner for Human Rights (OHCHR) reported that the "human rights situation in Nicaragua has progressively deteriorated since 2018." [55] The Associated Press noted in August 2022 that political stability in Nicaragua "has never fully returned" since the outbreak of protests in 2018 and the subsequent "crackdown by security forces and allied civilian militias." [56] Moreover, OHCHR reported that it had noted "a deterioration of the human rights situation" in 2022, "particularly regarding civil and political rights, in a context characterized by the absence of dialogue, the deepening of the political crisis, and the isolation of Nicaragua from the international ommunity." [57] As part of the government's authoritarian crackdown, it has shut down nearly 3,000 NGOs in 2022, reducing the number of organizations that would have assisted with disaster response and recovery efforts.[58] These actions along with insufficient investment in public works and other programs necessary for long-term socioeconomic development have impacted Nicaragua's ability to recover from Hurricane Mitch.

The resulting instability has caused a humanitarian crisis. Between 2018 and 2020, more than 108,000 Nicaraguans fled their country, according to UNHCR.[59] Further, UNHCR has

reported that in 2021, new asylum applications worldwide by nationals of Nicaragua were among the most commonly registered and experienced a five-fold increase from 2020.[60] The UN High Commissioner for Human Rights stated that the "sociopolitical, economic and human rights crises we are witnessing in Nicaragua are driving thousands of people from the safety of their homes. The number of Nicaraguans leaving the country is growing in unprecedented numbers, even higher than in the 1980s." [61] UNHCR discussed "Conflict-Induced Displacement" in Nicaragua stating that, "[d]ue to the continuously deteriorating political and security situation coupled with ongoing state repression, thousands of people have been forced to flee their homes, hide in safe houses or leave the country altogether." [62]

As of June 2022, more than 260,000 Nicaraguans had been forced to flee their country, including 191,875 to Costa Rica, 30,937 to Mexico, 21,556 to the United States,[63] 8,124 to Guatemala, 6,774 to Spain, and 5,170 to Panama." [64] In early September 2022, reports indicated that Nicaraguans seeking asylum in Costa Rica were at its highest level since Nicaragua's political crisis exploded in April 2018.[65] Additionally, more than "200,000 pending applications and another 50,000 people waiting for their appointment to make a

*https://www.fao.org/in-action/agronoticias/detail/ en/c/1062713/;* Moloney, Anastasia, In Honduras, years of drought pressure farmers to leave land, Reuters, Sept. 27, 2019, available at *https:// news.trust.org/item/20190927063451-szxlj/;* Tórrez García, Cinthya, Trescientos mil nicaragüenses viven en riesgo ante sequía [Three hundred thousand Nicaraguans live at risk of drought], La Prensa (Ni.), Feb. 27, 2018, available at *https:// web.archive.org/web/20220613192407/https://www. laprensani.com/2018/02/27/nacionales/2383214- trescientos-mil-nicaraguenses-viven-en-riesgo-ante- sequia;* Josefsen Hermann, Lise, Caught between floods and drought: Farmers in Nicaragua living in uncertainty, DW, June 12, 2019, available at *https:// www.dw.com/en/caught-between-floods-and- drought-farmers-in-nicaragua-living-in-uncertainty/ a-49021423;* NICARAGUA: Dry spell in northern Nicaragua, ACAPS, p.1, July 24, 2019, available at *https://www.acaps.org/sites/acaps/files/products/ files/20190724_acaps_start_briefing_note_ nicaragua_drought.pdf.* (All sources listed in this footnote last visited Feb. 7, 2023).

[51] Nicaragua: Announcement of Ortega's re- election augurs a terrible new cycle for human rights, Amnesty International, Nov. 8, 2021, available at *https://www.amnesty.org/en/latest/ news/2021/11/nicaragua-announcement-of-ortegas- re-election-augurs-a-terrible-new-cycle-for-human- rights/* (last visited Feb. 7, 2023).

[52] United Nations Human Rights Office of the Commissioner, Human Rights Committee Considers Report of Nicaragua in the Absence of a Delegation, Experts Ask about the Treatment of Protesters and Reported Fraudulent Practices in Past Elections, Oct. 19, 2022, available at *https://www.ohchr.org/ en/press-releases/2022/10/human-rights- committee-considers-report-nicaragua-absence- delegation-experts* (last visited Feb. 7, 2023); Amnesty International, Shoot to Kill: Nicaragua's Strategy to Repress Protest, May 29, 2018, available at *https://www.amnesty.org/en/documents/amr43/ 8470/2018/en/* (last visited Feb. 7, 2023).

[53] Congressional Research Service, Nicaragua in Brief: Political Developments in 2021, U.S. Policy, and Issues for Congress, November 4, 2021, available at *https://crsreports.congress.gov* (last visited Feb. 7, 2023).

[54] Congressional Research Service, Nicaragua in Brief: Political Developments and U.S. Policy, June 3, 2022, available at *https://crsreports.congress.gov* (last visited Feb. 7, 2023).

[55] Human Rights Situation in Nicaragua, OHCHR, p. 2, Sept. 2, 2022, available at *https://reliefweb.int/ report/nicaragua/human-rights-situation- nicaragua-report-united-nations-high- commissioner-human-rights-ahrc5142-unofficial- english-translation* (last visited Feb. 7, 2023).

[56] Selser, Gabriela, and Hernández, Maria Teresa, EXPLAINER: Tension between Nicaragua and the Catholic Church, The Associated Press, Aug. 14, 2022, available at *https://apnews.com/article/ religion-caribbean-nicaragua-daniel-ortega- a445a59fd605f8089c5e661cb66c2773* (last visited Feb. 7, 2023).

[57] Human rights situation in Nicaragua, OHCHR, p.2, Sept. 2, 2022, available at *https://reliefweb.int/ report/nicaragua/human-rights-situation- nicaragua-report-united-nations-high- commissioner-human-rights-ahrc5142-unofficial- english-translation* (last visited Feb. 7, 2023).

[58] Associated Press, Nicaragua orders Red Cross to close, in Ortega government's latest crackdown on civic groups, May 10, 2023, available at *https:// apnews.com/article/nicaragua-ortega-red-cross- crackdown-b34298af8fb89f89f0b8ab28b5b21e95* (last visited May 23, 2023).

[59] As reported in Noticias Financieras, "Diaspora and Exiles Call for March Against 'Electoral Fraud' in Nicaragua," Oct. 19, 2021, referenced from Congressional Research Service, Nicaragua in Brief: Political Developments and U.S. Policy, June 3, 2022, available at *https://crsreports.congress.gov* (last visited Feb. 7, 2023).

[60] UNHCR, 2021 Global Trends Report, June 16, 2022, available at *https://www.unhcr.org/ 62a9d1494/global-trends-report-2021* (last visited Feb. 7, 2023).

[61] UN rights chief warns of 'unprecedented' exodus from Nicaragua, Al Jazeera, June 16, 2022, available at *https://www.aljazeera.com/news/2022/ 6/16/un-rights-chief-warns-of-unprecedented- exodus-from-nicaragua* (last visited Feb. 7, 2023).

[62] International Protection Considerations with Regard to People Fleeing Nicaragua, UNHCR, Jan. 2023, available at *https://www.refworld.org/country, ,UNHCR,,NIC,,63bc17264,0.html* (last visited May 5, 2023).

[63] In January 2023, the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV) allowed for certain Nicaraguan nationals to request to come to the United States. The U.S. government will provide travel authorization for up to 30,000 individuals to come to the United States each month across the Cuban, Haitian, Nicaraguan, and Venezuelan parole processes. The United States has consistently met the cap since the implementation of the process. The 21,566 individuals noted above does not include Nicaraguan nationals who have come to the United States with travel authorization under CHNV.

[64] International Protection Considerations with Regard to People Fleeing Nicaragua, UNHCR, Jan. 2023, available at *https://www.refworld.org/ country,,UNHCR,,NIC,,63bc17264,0.html* (last visited May 5, 2023).

[65] Castillo, Moises, and Sherman, Christopher, Fleeing Nicaraguans strain Costa Rica's asylum system, The Associated Press, Sept. 2, 2022, available at *https://apnews.com/article/covid- health-elections-presidential-caribbean- 52044748d15dbbb6ca706c66cc7459a5* (last visited Feb. 7, 2023).

formal application'' to seek asylum in Costa Rica, ''Nicaraguans account for nearly nine out of 10 applicants.'' [66]

In summary, while progress has been made in repairing damage caused by the 1998 hurricane, Nicaragua continues to experience numerous natural disasters that significantly disrupt living conditions and adversely impact its ability to adequately handle the return of those granted TPS. Nicaragua is encumbered by the effects of several significant natural disasters, environmental challenges, political instability, and a resulting humanitarian crisis that adversely impact the country's ability to fully recover and continue to render the country temporarily unable to adequately handle the return of its nationals.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• At the time the Secretary's decision to terminate Nicaragua's designation for TPS was announced on December 15, 2017, conditions in Nicaragua continued to support the country's designation for TPS on the ground of environmental disaster; therefore, the termination should be rescinded and such rescission is timely given that the termination has not yet gone into effect. *See* INA sec. 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B).

• The conditions supporting Nicaragua's designation for TPS still continue to be met. *See* INA sec. 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There has been an earthquake, flood, drought, epidemic, or other environmental disaster in Nicaragua resulting in a substantial, but temporary, disruption of living conditions in the area affected; Nicaragua is unable, temporarily, to handle adequately the return of its nationals; and Nicaragua officially requested designation of TPS. *See* INA sec. 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B);

• The designation of Nicaragua for TPS should be extended for an 18-month period, beginning on January 6, 2024, and ending on July 5, 2025. *See* INA sec. 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

**Notice of the Rescission of TPS Termination and Extension of the TPS Designation of Nicaragua**

Pursuant to my lawful authorities, including under sections 103(a) and 244 of the Immigration and Nationality Act, I am hereby rescinding the termination of the TPS designation of Nicaragua

announced in the **Federal Register** at 82 FR 59636 on December 15, 2017. Due to this rescission and pursuant to INA section 244(b)(3)(C), as well as the ongoing preliminary injunction in *Ramos* v. *Nielsen,* 336 F. Supp. 3d 1075 (N.D. Cal. 2018), the TPS designation of Nicaragua has continued to automatically extend under the statute since May 16, 2016, without a standing secretarial determination as to whether TPS should be extended or terminated. TPS beneficiaries under the designation, whose TPS has not been finally withdrawn for individual ineligibility, therefore have continued to maintain their TPS since January 5, 2018.

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, that the statutory conditions supporting Nicaragua's designation for TPS on the basis of environmental disaster continue to be met. *See* INA secs. 244(b)(1)(B) and 244(b)(3)(A); 8 U.S.C. 1254a(b)(1)(B) and 1254a(b)(3)(A). On the basis of this determination, I am extending the existing designation of Nicaragua for TPS for 18 months, beginning on January 6, 2024, and ending on July 5, 2025. *See* INA sec. 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). Individuals holding TPS under the designation of Nicaragua may file to re-register for TPS under the procedures announced in this notice if they wish to continue their TPS under this 18-month extension.

**Alejandro N. Mayorkas**
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

*Required Application Forms and Application Fees To Re-Register for TPS*

To re-register for TPS based on the designation of Nicaragua, you must submit a Form I–821, Application for Temporary Protected Status during the 60-day reregistration period that starts on November 6, 2023, through January 5, 2024. There is no Form I–821 fee for re-registration. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the ''Biometric Services Fee'' section of this notice.

Individuals who have a Nicaragua TPS application (Form I–821) that was still pending as of June 21, 2023 do not need to file the application again. If USCIS approves an individual's Form I–

821, USCIS will grant the individual TPS through July 5, 2025.

*Required Application Forms and Application Fees To Obtain an EAD*

Every employee must provide their employer with documentation showing they have a legal right to work in the United States. TPS beneficiaries are authorized to work in the United States and are eligible for an EAD which proves their employment authorization. If you have an existing EAD issued under the TPS designation of Nicaragua that has been auto-extended through June 30, 2024, by the notice published at 87 FR 68717, you may continue to use that EAD through that date. If you want to obtain a new EAD valid through July 5, 2025, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver).

You may, but are not required to, submit Form I–765, Application for Employment Authorization, with your Form I–821 re-registration application. If you do not want a new EAD now, you can request one later by filing your I–765 and paying the fee (or requesting a fee waiver) at that time, provided you have TPS or a pending TPS application. If you have TPS and only a pending Form I–765, you must file the Form I–821 to re-register for TPS or risk having your TPS withdrawn for failure to re-register without good cause.

*Information About Fees and Filing*

USCIS offers the option to applicants for TPS under Nicaragua's designation to file Form I–821 and related requests for EADs online or by mail. When filing a TPS application, applicants can also request an EAD by submitting a completed Form I–765, with this Form I–821.

*Online filing:* Forms I–821 and I–765 are available for concurrent filing online.[67] To file these forms online, you must first create a USCIS online account.[68] However, if you are requesting a fee waiver, you cannot submit the applications online. You will need to file paper versions of the fee waiver request and the form for which you are requesting the fee waiver.

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

**Table 1-Mailing Addresses**

Mail your completed Form I–821, Application for Temporary Protected

---

[66] *Id.*

[67] Find information about online filing at ''Forms Available to file Online,'' *https://www.uscis.gov/ file-online/forms-available-to-be-file-online.*
[68] ''*https://myaccount.uscis.gov/users/sign_up.*''

**40302**   **Federal Register** / Vol. 88, No. 118 / Wednesday, June 21, 2023 / Notices

Status and Form I–765, Application for Employment Authorization, Form I–912, Request for Fee Waiver, if applicable, and supporting documentation to the proper address in Table 1.

### TABLE 1—MAILING ADDRESSES

| If you send your paper applications via: | Then mail your application to: |
|---|---|
| U.S. Postal Service (USPS): .................................................................. | USCIS, Attn: TPS Nicaragua, P.O. Box 4413, Chicago, IL 60680–4388. |
| FedEx, UPS, or DHL deliveries: ............................................................ | USCIS, Attn: TPS Nicaragua (Box 4413), 131 S. Dearborn St., 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (*i.e.*, registering) for TPS on the USCIS website at *https://www.uscis.gov/tps* under "Nicaragua."

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *https://www.uscis.gov/i-131*. You may file Form I–131 together with your Form I–821 or separately. When filing the Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for the Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

### TABLE 2—MAILING ADDRESSES

| If you are | Mail to |
|---|---|
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status. | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS): You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL: You must include a copy of the receipt notice (Form I–797 or I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S. State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

*Biometric Services Fee for TPS*

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps*. Fees for Form I–765 and biometric services are also described in 8 CFR 103.7(b)(1) (Oct. 1, 2020). If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https://*

*www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms*.

**Refiling a TPS Re-Registration Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue your EAD promptly, if one has been requested. Properly filing early will also allow you to have time to refile your application before the deadline, should USCIS deny your fee waiver request. The fee waiver denial notice will contain specific instructions about resubmitting your application. However, you are urged to refile within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA sec. 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on

good cause for late re-registration, visit the USCIS TPS web page at *www.uscis.gov/tps*.

**Note:** A re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee), or request a fee waiver, when filing a TPS re-registration application. As discussed above, if you decide to wait to request an EAD, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration. You may wait to seek an EAD until after USCIS has approved your TPS re-registration application or at any later date you decide you want to request an EAD. To re-register for TPS, you only need to file the Form I–821 with the biometrics services fee, if applicable (or request a fee waiver).

HT Vacatur AR_0456

## General employment-related information for TPS applicants and their employers

How can I obtain information on the status of my TPS application and EAD request?

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at uscis.gov, or visit the USCIS Contact Center at *https://www.uscis.gov/ contactcenter.* If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

## When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/ acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central.* An EAD is an acceptable document under List A.

## If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through July 5, 2025, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

## Can my employer require that I provide any other documentation such as evidence of my status or proof of my Nicaraguan citizenship or a Form I–797C showing that I registered for TPS for Form I–9 completion?

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request proof of Nicaraguan citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. Refer to the "Note to Employees" section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin. Employers can refer to the compliance notice that DHS published on November 16, 2022, for information on how to complete the Form I–9 with TPS EADs that DHS extended through June 30, 2024.[69]

### Note to All Employers

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov.* USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

### Note to Employees

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov.* USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (mismatch) must promptly inform employees of the mismatch and give such employees an opportunity to take action to resolve the mismatch. A mismatch result means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

This **Federal Register** Notice does not invalidate the compliance notice DHS issued on November 16, 2022, which extended the validity of certain TPS documentation through June 30, 2024, and does not require individuals to present a Form I–797, Notice of Action. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS designated country of Nicaragua; or

• Your Form I–94, Arrival/Departure Record or Form I–797, Notice of Action, as shown in the **Federal Register** notice published at 87 FR 68717.

Check with the government agency requesting documentation regarding which document(s) the agency will accept. Some state and local government agencies use SAVE to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each state and local government agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. It may also assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice listing the TPS-related document, including any applicable auto-extension of the document, in addition to your recent TPS-related document with your A–number, USCIS number or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or any automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at https:// CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save,* has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–13246 Filed 6–20–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2733–22; DHS Docket No. USCIS–2014–0007]**

**RIN 1615–ZB75**

**Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status (TPS) and Notice of Extension of TPS Designation for Honduras.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is

rescinding the previous termination of the designation of Honduras for TPS which was published on June 5, 2018 and extending the designation of Honduras for Temporary Protected Status (TPS) for 18 months, beginning on January 6, 2024, and ending on July 5, 2025. This extension allows existing TPS beneficiaries to retain TPS through July 5, 2025, so long as they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through July 5, 2025, must re-register during the 60-day re-registration period as described in this notice.

**DATES:** The *Rescission of Termination of the Designation of Honduras for TPS* took effect June 9, 2023.

*Extension of Designation of Honduras for TPS:* The 18-month extension of TPS for Honduras begins on January 6, 2024, and will remain in effect through July 5, 2025. The extension impacts existing beneficiaries of TPS under the designation of Honduras.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from November 6, 2023 through January 5, 2024.

**FOR FURTHER INFORMATION CONTACT:**

• You may contact René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

• For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* You can find specific information about Honduras's TPS designation by selecting ''Honduras'' from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.*

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

|                                                                                    |   |                          |
|------------------------------------------------------------------------------------|---|--------------------------|
| CENTRO PRESENTE, a membership organization, *et al.*,                              | ) |                          |
|                                                                                    | ) |                          |
| Plaintiffs,                                                                        | ) |                          |
|                                                                                    | ) | No. 1:18-cv-10340 (DJC)  |
| v.                                                                                 | ) |                          |
|                                                                                    | ) |                          |
| JOSEPH R. BIDEN, JR., President of the United States, in his official capacity, *et al.*, | ) |                          |
|                                                                                    | ) |                          |
| Defendants.                                                                        | ) |                          |

---

## STIPULATION OF DISMISSAL WITHOUT PREJUDICE

Plaintiffs, Haitian-Americans United, Inc., Anne Christine Nicolas, Chris Jean Baptiste, Josue Dorfeuille, and Natacha Dorfeuille (collectively, the "Haiti Plaintiffs") and Defendants, Joseph R. Biden, Jr., United States Department of Homeland Security, Kirstjen Nielsen, and Elaine Costanzo Duke (collectively, "Defendants"), by and through their respective counsel, hereby stipulate, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), to the dismissal of the Haiti Plaintiffs from this action. All claims brought by the Haiti Plaintiffs are dismissed in their entirety against all Defendants, without prejudice. Each party will bear its own costs, expenses, and attorneys' fees. The claims of the remaining plaintiffs (i.e., all plaintiffs other than the Haiti Plaintiffs) are not affected by this stipulation.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

Dated: June 29, 2023

/s/ Justin Wolosz
Eric J. Marandett (BBO# 561730)
Justin J. Wolosz (BBO# 643543)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000

Oren Sellstrom (BBO# 569045)
Iván Espinoza-Madrigal (Admitted *Pro Hac Vice*)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, 5th Floor
Boston, Massachusetts 02110
(617) 988-0624

*Counsel for Plaintiffs*

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

BRIGHAM J. BOWEN
Assistant Branch Director

/s/ Zachary A. Avallone
ZACHARY A. AVALLONE
(D.C. Bar No. 1023361)
CHRISTOPHER M. LYNCH
(D.C. Bar No. 1049152)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. St., N.W.
Washington, D.C. 20005
Telephone: (202) 514-2705
Facsimile: (202) 616-8470
Email: Zachary.A.Avallone@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants.

Dated: June 29, 2023

/s/ Justin J. Wolosz
Justin J. Wolosz

2

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-00239-DKC |
| | ) | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

———————————————————————————

### STIPULATION OF DISMISSAL

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), Plaintiffs National Association

for the Advancement of Colored People, Haitian Women for Haitian Refugees, and the Haitian

Lawyers Association, Inc., and Defendants Department of Homeland Security and Secretary

Alejandro N. Mayorkas, hereby stipulate to the dismissal of the above-captioned case.

Dated:  November 3, 2021                Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Acting Assistant Attorney General

                                        BRIGHAM J. BOWEN
                                        Assistant Branch Director

                                        */s/Adam D. Kirschner*
                                        ADAM D. KIRSCHNER
                                        (signed by Raymond Audain with permission of
                                        Adam D. Kirschner)

                                        IL Bar No. 6286601
                                        Senior Trial Counsel
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street NW, Room 11020
                                        Washington, DC 20530

1

Tel.:     (202) 353-9265
Fax:     (202) 616-8460
E-mail:   adam.kirschner@usdoj.gov

<u>Mailing Address:</u>
Post Office Box 883
Washington, D.C. 20044

<u>Courier Address:</u>
1100 L Street NW, Room 11020
Washington, D.C. 20005

*Counsel for Defendants*

<u>*/s/ Raymond Audain*</u>
Raymond Audain*
*Counsel of Record*
NAACP LEGAL DEFENSE &
  EDUCATIONAL FUND, INC.
40 Rector Street, 5th floor
New York, NY 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
raudain@naacpldf.org

James I. McClammy*
Antonio M. Haynes*
Erika A. James*
DAVIS POLK &
  WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Fax: (212) 701-5800
james.mcclammy@davispolk.com

*\* Admitted pro hac vice*

*Counsel for Plaintiffs*

2

**CERTIFICATE OF SERVICE**

I certify that on November 3, 2021, I filed the foregoing Stipulation of Dismissal

electronically via the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/*Raymond Audain*
Raymond Audain*
*Counsel of Record*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
Tel.: (212) 965-2200
Fax.: (212) 226-7592
raudain@naacpldf.org

*\*Appearing pro hac vice*

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – X

PATRICK SAGET, SABINA BADIO FLORIAL,
NAÏSCHA VILME, GERALD MICHAUD,           
BEATRICE BELIARD, RACHELLE GUIRAND,      Docket No. CV-18-1599
JEAN CLAUDE MOMPOINT, YOLNICK JEUNE,
GUERLINE FRANCOIS, LEOMA PIERRE,         (Kuntz, J.)
HAÏTI LIBERTÉ, and FAMILY ACTION         (Tiscione, M.J.)
NETWORK MOVEMENT, INC.,

                     Plaintiffs,

        v.

JOSEPH R. BIDEN, President of the United States
of America, UNITED STATES OF AMERICA,
DEPARTMENT OF HOMELAND SECURITY,
ALEJANDRO   MAYORKAS,   Secretary   of
Homeland Security, and JOHN TIEN, Deputy
Secretary of Homeland Security,
                  Defendants.
– – – – – – – – – – – – – – – – – – – – – – – – X

## STIPULATION OF DISMISSAL

      On May 22, 2021, the Secretary of the Department of Homeland Security announced a new

18-month designation of Haiti for Temporary Protected Status ("TPS"), and on August 3, 2021, United

States Citizenship and Immigration Services ("USCIS") published a Federal Register notice establishing

that the new designation is effective through February 3, 2023. *See* 86 Fed. Reg. 41863. On September

10, 2021, USCIS published a Federal Register Notice automatically extending documentation for current

TPS beneficiaries for Haiti through December 31, 2022. *See* 86 Fed. Reg. 50725. The above-captioned

action is therefore moot.

      IT IS HEREBY STIPULATED AND AGREED, by and between all parties in the above-

captioned action that this action shall be dismissed with prejudice pursuant to Federal Rule of Civil

Procedure 41(a)(1)(A)(ii).

Dated: Chicago, Illinois

    October 15, 2021

ATTORNEYS FOR PLAINTIFFS

By:    /s/ Geoffrey M. Pipoly
MAYER BROWN LLP
Evan M. Tager
Geoffrey M. Pipoly
Christopher J. Ferro
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
gpipoly@mayerbrown.com

KURZBAN, KURZBAN,
TETZELI & PRATT, P.A.
Ira J. Kurzban
2650 S.W. 27th Avenue, 2nd Floor
Miami, FL 33133
Phone: (312) 660-1364
ira@kkwtlaw.com

JUSTICE FUTURES LAW
Sejal Zota
sejal@justfutureslaw.org

Dated: Brooklyn, New York
    October 15, 2021

ATTORNEYS FOR DEFENDANTS
BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820

By:    /s/ Joseph A. Marutollo
Joseph A. Marutollo
Assistant U.S. Attorney
718-254-6288
Joseph.marutollo@usdoj.gov

The application is ✓ granted.
SO ORDERED ___ denied.
      WFK
William F. Kuntz, II, U.S.D.J.
Dated: Oct. 15, 2021
    Brooklyn, New York

HT Vacatur AR_0465

57. Peru
58. The Philippines
59. Poland
60. Portugal
61. Romania
62. San Marino
63. Serbia
64. Singapore
65. Slovakia
66. Slovenia
67. Solomon Islands
68. South Africa
69. South Korea
70. Spain
71. St. Vincent and the Grenadines
72. Sweden
73. Switzerland
74. Taiwan
75. Thailand
76. Timor-Leste
77. Tonga
78. Turkey
79. Tuvalu
80. Ukraine
81. United Kingdom
82. Uruguay
83. Vanuatu

Pursuant to the authority provided to the Secretary of Homeland Security under sections 214(a)(1), 215(a)(1), and 241 of the Immigration and Nationality Act (8 U.S.C. 1184(a)(1), 1185(a)(1), and 1231), I am designating, with the concurrence of the Secretary of State, nationals from the following countries to be eligible to participate in the H–2B nonimmigrant worker program:

1. Andorra
2. Argentina
3. Australia
4. Austria
5. Barbados
6. Belgium
7. Brazil
8. Brunei
9. Bulgaria
10. Canada
11. Chile
12. Colombia
13. Costa Rica
14. Croatia
15. Czech Republic
16. Denmark
17. Dominican Republic
18. Ecuador
19. El Salvador
20. Estonia
21. Ethiopia
22. Fiji
23. Finland
24. France
25. Germany
26. Greece
27. Grenada
28. Guatemala
29. Honduras
30. Hungary
31. Iceland
32. Ireland
33. Israel
34. Italy
35. Jamaica
36. Japan
37. Kiribati

38. Latvia
39. Lichtenstein
40. Lithuania
41. Luxembourg
42. Macedonia
43. Madagascar
44. Malta
45. Mexico
46. Monaco
47. Mongolia
48. Montenegro
49. Nauru
50. The Netherlands
51. Nicaragua
52. New Zealand
53. Norway
54. Panama
55. Papua New Guinea
56. Peru
57. The Philippines
58. Poland
59. Portugal
60. Romania
61. San Marino
62. Serbia
63. Singapore
64. Slovakia
65. Slovenia
66. Solomon Islands
67. South Africa
68. South Korea
69. Spain
70. St. Vincent and the Grenadines
71. Sweden
72. Switzerland
73. Taiwan
74. Thailand
75. Timor-Leste
76. Tonga
77. Turkey
78. Tuvalu
79. Ukraine
80. United Kingdom
81. Uruguay
82. Vanuatu

This notice does not affect the status of aliens who currently hold valid H–2A or H–2B nonimmigrant status. Persons currently holding such status, however, will be affected by this notice should they seek an extension of stay in H–2 classification, or a change of status from one H–2 status to another. Similarly, persons holding nonimmigrant status other than H–2 status are not affected by this notice unless they seek a change of status to H–2 status.

Nothing in this notice limits the authority of the Secretary of Homeland Security or her designee or any other federal agency to invoke against any foreign country or its nationals any other remedy, penalty, or enforcement action available by law.

**Elaine C. Duke,**
*Deputy Secretary.*
[FR Doc. 2018–00812 Filed 1–17–18; 8:45 am]
**BILLING CODE 9110–9M–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2615–17; DHS Docket No. USCIS–2014–0001]

RIN 1615–ZB70

### Termination of the Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of Haiti for Temporary Protected Status (TPS) is set to expire on January 22, 2018. After reviewing country conditions and consulting with the appropriate U.S. Government agencies, the Acting Secretary of Homeland Security determined on November 20, 2017 that conditions in Haiti no longer support its designation for TPS and is therefore terminating the TPS designation of Haiti. To provide time for an orderly transition, this termination is effective on July 22, 2019, 18 months following the end of the current designation.

Nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who have been granted TPS and wish to maintain their TPS and receive TPS-based Employment Authorization Documents (EAD) valid through July 22, 2019, must re-register for TPS in accordance with the procedures set forth in this Notice. After July 22, 2019, nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who have been granted TPS under the Haiti designation will no longer have TPS.

**DATES:** The designation of Haiti for TPS is terminated effective at 11:59 p.m., local time, on July 22, 2019.

The 60-day re-registration period runs from January 18, 2018 through March 19, 2018.

(**Note:** It is important for re-registrants to timely re-register during this 60-day period.)

**FOR FURTHER INFORMATION CONTACT:**
• You may contact Alex King, Branch Chief, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529–2060; or by phone at (202) 272–8377 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

• For further information on TPS, including guidance on the re-registration process and additional information on eligibility, please visit the USCIS TPS web page at *http://www.uscis.gov/tps.* You can find specific information about this termination of Haiti's TPS by selecting ''Haiti'' from the menu on the left side of the TPS web page.

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
FR—Federal Register
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

Through this Notice, DHS sets forth procedures necessary for eligible nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) to re-register for TPS and to apply for renewal of their EADs with USCIS. Re-registration is limited to persons who have previously registered for TPS under the designation of Haiti and whose applications have been granted.

For individuals who have already been granted TPS under Haiti's designation, the 60-day re-registration period runs from January 18, 2018 through March 19, 2018. USCIS will issue new EADs with a July 22, 2019 expiration date to eligible Haitian TPS beneficiaries who timely re-register and apply for EADs. Given the timeframes involved with processing TPS re-registration applications, DHS

recognizes that not all re-registrants will receive new EADs before their current EADs expire on January 22, 2018. Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of EADs issued under the TPS designation of Haiti for 180 days, through July 21, 2018. This Notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, and E-Verify processes.

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the INA, or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2).

• When the Secretary terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

**When was Haiti designated for TPS?**

On January 21, 2010, the Secretary of Homeland Security (Secretary) designated Haiti for TPS under INA section 244(b)(1)(C) based on ''extraordinary and temporary conditions'' within the country, specifically the effects of the 7.0-magnitude earthquake that occurred on January 12, 2010, that prevented Haitians from returning in safety. *See* Designation of Haiti for Temporary Protected Status, 75 FR 3476 (Jan. 21, 2010). In 2011, the Secretary both extended Haiti's designation and

redesignated Haiti for TPS for 18 months through January 22, 2013. *See* Extension and Redesignation of Haiti for Temporary Protected Status, 76 FR 29000 (May 19, 2011). The last extension of Haiti's TPS designation, for 6 months, was announced on May 24, 2017. *See* Extension of the Designation of Haiti for Temporary Protected Status, 82 FR 23830 (May 24, 2017). DHS estimates that there are approximately 58,550 nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who currently hold TPS under Haiti's designation.

**What authority does the Secretary have to terminate the designation of Haiti for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation must be extended for an additional period of 6 months and, in the Secretary's discretion, may be extended for 12 or 18 months. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation, but such termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to the U.S. Department of Homeland Security (DHS) ''shall be deemed to refer to the Secretary'' of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

the country designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs, for the purpose of providing for an orderly transition. *See id.;* INA section 244(d)(3), 8 U.S.C. 1254a(d)(3).

**Why is the Secretary terminating the TPS designation for Haiti as of July 22, 2019?**

DHS has reviewed conditions in Haiti. Based on the review, including input received from other appropriate U.S. Government agencies, the Acting Secretary of Homeland Security determined on November 20, 2017 that the conditions for Haiti's designation for TPS—on the basis of "extraordinary and temporary conditions" relating to the 2010 earthquake that prevented Haitian nationals from returning in safety—are no longer met.

Haiti has made progress recovering from the 2010 earthquake and subsequent effects that formed the basis for its designation. For example, the number of internally displaced persons (IDP) from the earthquake has continued to decline—98 percent of IDP sites have closed, and only approximately 38,000 of the estimated 2 million Haitians who lost their homes in the earthquake were still living in camps as of June 2017. In October 2017, the United Nations withdrew its peacekeeping mission, noting the mission had achieved its goals. The peacekeeping mission has been replaced by a successor operation that is a police-only force focused on strengthening rule of law, promoting human rights and supporting the Haitian National Police.

Haiti successfully completed its presidential election in February 2017. The 2010 earthquake destroyed key government infrastructure, including dozens of primary federal buildings, which the Haitian government is working to rebuild. The Supreme Court is already reconstructed and operational, and, in April 2017, President Moïse announced a project to rebuild Haiti's National Palace. A Palace spokesperson announced on January 8 that a project to reconstruct the Palace would commence on January 12, 2018.

Haiti's economy continues to recover from the 2010 earthquake. Annual GDP growth has been generally positive since 2010, averaging 1.7 percent over the period (2010–2016). Although Haiti has grappled with a cholera epidemic that began in 2010 in the aftermath of the earthquake, cholera is currently at its lowest level since the outbreak began.

**Notice of Termination of the TPS Designation of Haiti**

By the authority vested in the Secretary of Homeland Security under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), the Acting Secretary of Homeland Security determined on November 20, 2017, after consultation with appropriate U.S. Government agencies, that the conditions for the designation of Haiti for TPS under 244(b)(1)(C) of the INA. 8 U.S.C. 1254a(b)(1)(C), are no longer met. Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B) and in accordance with INA section 244(d)(3), in order to provide for an orderly transition, the designation of Haiti for TPS is terminated effective at 11:59 p.m., local time, on July 22, 2019, 18 months following the end of the current designation.

(2) Information concerning the termination of TPS for nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) will be available at local USCIS offices upon publication of this Notice and through the USCIS National Customer Service Center at 1–800–375–5283. This information will be published on the USCIS website at *www.USCIS.gov.*

**Elaine C. Duke,**
*Deputy Secretary.*

**Required Application Forms and Application Fees To Re-Register for TPS**

To re-register for TPS based on the designation of Haiti, you *must* submit an Application for Temporary Protected Status (Form I–821). You do not need to pay the filing fee for the Form I–821. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. Please see additional information under the "Biometric Services Fee" section of this Notice.

Through operation of this **Federal Register** notice, your existing EAD issued under the TPS designation of Haiti with the expiration date of January 22, 2018, is automatically extended for 180 days, through July 21, 2018. You do not need to apply for a new EAD in order to benefit from this 180-day automatic extension. However, if you want to obtain a new EAD valid through July 22, 2019, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee. Note, if you do not want a new EAD, you do not have to file Form I–765 or pay the Form I–765 fee. If you do not want to request a new EAD now, you may also file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have

TPS or a pending TPS application. But unless you timely re-register and properly file an EAD application in accordance with this Notice, the validity of your current EAD will end on July 21, 2018. You may file the application for a new EAD either prior to or after your current EAD has expired. However, you are strongly encouraged to file your application for a new EAD as early as possible to avoid gaps in the validity of your employment authorization documentation and to ensure that you receive your new EAD by July 22, 2018.

If you are seeking an EAD with your re-registration for TPS, please submit both the Form I–821 and Form I–765 together. If you are unable to pay the application fee and/or biometric services fee, you may complete a Request for Fee Waiver (Form I–912) or submit a personal letter requesting a fee waiver with satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *http://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Note:** If you have a Form I–821 and/or Form I–765 that was still pending as of January 18, 2018, then you do *not* need to file a new application or applications. If your TPS application is approved, you will be granted TPS through July 22, 2019. Similarly, if you have a pending TPS-related application for an EAD that is approved, it will be valid through the same date.

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may complete a Form I–912 or submit a personal letter requesting a fee waiver with satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS website at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometrics screening process please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *www.dhs.gov/privacy.*

**Re-Filing a Re-Registration TPS Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application

and issue an EAD promptly. Properly filing early will also allow you to have time to re-file your application before the deadline, should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to re-file by the re-registration deadline, you may still re-file your Form I–821 with the biometrics fee. This situation will be reviewed to determine whether you established good cause for late TPS re-registration. However, you are urged to re-file within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *http://www.uscis.gov/tps.* Following denial of your fee waiver request, you may also re-file your Form I–765 with fee either with your Form I–821 or at a later time, if you choose.

**Note:** Although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–765 fee) when filing a TPS re-registration

application, you may decide to wait to request an EAD. Therefore, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration, and could wait to seek an EAD until after USCIS has approved your TPS re-registration. If you choose to do this, to re-register for TPS you would only need to file the Form I–821 with the biometrics services fee, if applicable, (or request a fee waiver).

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

### TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You live in the State of Florida ........................... | *For U.S. Postal Service:* U.S. Citizenship and Immigration Services, P.O. Box 4464, Chicago, IL 60680. |
| | *For FedEx, UPS and DHL deliveries:* U.S. Citizenship and Immigration Services, Attn: TPS Haiti, 131 S. Dearborn—3rd Floor, Chicago, IL 60603–5517. |
| You live in the State of New York ....................... | *For U.S. Postal Service:* U.S. Citizenship and Immigration Services, P.O. Box 660167, Dallas, TX 75266. |
| | *For FedEx, UPS and DHL deliveries:* U.S. Citizenship and Immigration Services, Attn: TPS Haiti, 2501 S. State Highway, 121 Business Suite 400, Lewisville, TX 75067. |
| You live in any other state ................................. | *For U.S. Postal Service:* U.S. Citizenship and Immigration Services, P.O. Box 24047, Phoenix, AZ 85074. |
| | *For FedEx, UPS and DHL deliveries:* U.S. Citizenship and Immigration Services, Attn: TPS Haiti, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. When re-registering and requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us to verify your grant of TPS and process your application, as USCIS may not have received records of your grant of TPS by either the IJ or the BIA.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying or registering for TPS on the USCIS website at *www.uscis.gov/tps* under "Haiti."

**Employment Authorization Document (EAD)**

*How can I obtain information on the status of my EAD request?*

To get case status information about your TPS application, including the status of an EAD request, you can check Case Status Online at *http://*

*www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov.* However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic 180-day extension of my current EAD through July 21, 2018, using this* **Federal Register** *notice?*

Yes. Provided that you currently have a Haiti TPS-based EAD, this **Federal Register** notice automatically extends your EAD by 180 days (through July 21, 2018) if you:

• Are a national of Haiti (or an alien having no nationality who last habitually resided in Haiti);

• Have an EAD with a marked expiration date of January 22, 2018, bearing the notation A–12 or C–19 on the face of the card under Category.

Although this **Federal Register** notice automatically extends your EAD through July 22, 2018, you must re-register timely for TPS in accordance with the procedures described in this

**Federal Register** notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Form I–9. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization), or one document from List B (which provides evidence of your identity) together with one document from List C (which is evidence of employment authorization), or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional detailed information about Form I–9 on USCIS' I–9 Central web page at *http://www.uscis.gov/I-9Central.*

An EAD is an acceptable document under List A. If your EAD has an

expiration date of January 22, 2018, and states A–12 or C–19 under Category, it has been extended automatically for 180 days by virtue of this **Federal Register** notice and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through July 21, 2018, unless your TPS has been withdrawn or your request for TPS has been denied. If you properly filed for a new EAD in accordance with this notice, you will receive Form I–797C, Notice of Action that will state your current A–12 or C–19 coded EAD is automatically extended for 180 days. You may choose to present your EAD to your employer together with this Form I–797C as a List A document that provides evidence of your identity and employment authorization for Form I–9 through July 21, 2018, unless your TPS has been finally withdrawn or your request for TPS has been finally denied. See the subsection titled, "*How do my employer and I complete the Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*" for further information.

To reduce confusion over this extension at the time of hire, you should explain to your employer that your EAD has been automatically extended through July 21, 2018. You may also provide your employer with a copy of this **Federal Register** notice, which explains that your EAD has been automatically extended. As an alternative to presenting evidence of your automatically extended EAD, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

*What documentation may I present to my employer for Employment Eligibility Verification (Form I–9) if I am already employed but my current TPS-related EAD is set to expire?*

Even though your EAD has been automatically extended, your employer will need to ask you about your continued employment authorization no later than before you start work on January 23, 2018. You will need to present your employer with evidence that you are still authorized to work. Once presented, you may correct your employment authorization expiration date in Section 1 and your employer should correct the EAD expiration date in Section 2 of Form I–9. See the subsection titled, "*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically*

*extended?*" for further information. You may also show this **Federal Register** notice to your employer to explain what to do for Form I–9.Your employer may need to reinspect your automatically extended EAD to check the expiration date and Category code to record the updated expiration date on your Form I–9 if your employer did not keep a copy of this EAD when you initially presented it. In addition, if you properly filed your Form I–765 to obtain a new EAD, you will receive a Form I–797C, Notice of Action. Form I–797C will state that your current A–12 or C–19 coded EAD is automatically extended for 180 days. You may present Form I–797C to your employer along with your EAD to confirm that the validity of your EAD has been automatically extended through July 21, 2018, unless your TPS has been finally withdrawn or your request for TPS has been finally denied. You may also present this **Federal Register** notice to your employer to show that your EAD has been automatically extended through July 21, 2018. To reduce the possibility of gaps in your employment authorization documentation, you should file your Form I–765 to request a new EAD as early as possible during the re-registration period.

The last day of the automatic EAD extension is July 21, 2018. Before you start work on July 22, 2018, your employer must reverify your employment authorization. At that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 Instructions to reverify employment authorization.

By July 22, 2018, your employer must complete Section 3 of the current version of the form, Form I–9 07/17/17 N, and attach it to the previously completed Form I–9, if your original Form I–9 was a previous version. Your employer can check the USCIS' I–9 Central web page at *http:// www.uscis.gov/I-9Central* for the most current version of Form I–9.

Note that your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my Haitian citizenship?*

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the Form I–9 "Lists of Acceptable

Documents" that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Haitian citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If presented with EADs that have been automatically extended, employers should accept such documents as a valid List A document so long as the EAD reasonably appears to be genuine and relates to the employee. Refer to the Note to Employees section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Employment Eligibility Verification (Form I–9) using my automatically extended employment authorization for a new job?*

When using an automatically extended EAD to complete Form I–9 for a new job before July 22, 2018, you and your employer should do the following:

1. For Section 1, you should:
a. Check "An alien authorized to work until" and enter July 21, 2018, the automatically extended EAD expiration date as the "expiration date, if applicable, mm/dd/yyyy"; and
b. Enter your Alien Number/USCIS number or A-Number where indicated (your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).
2. For Section 2, employers should:
a. Determine if the EAD is auto-extended for 180 days by ensuring it is in category A–12 or C–19 and has a January 22, 2018 expiration date;
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Insert July 21, 2018, the date that is 180 days from the date the current EAD expires.

If you also filed for a new EAD, as proof of the automatic extension of your employment authorization, you may present your expired or expiring EAD with category A–12 or C–19 in combination with the Form I–797C

Notice of Action showing that the EAD renewal application was filed and that the qualifying eligibility category is either A–12 or C–19. Unless your TPS has been finally withdrawn or your request for TPS has been finally denied, this document combination is considered an unexpired EAD (Form I–766) under List A. In these situations, to complete Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:

• It is in category A–12 or C–19; and
• The category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A–12 and C–19 to be the same category code.

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. Insert July 21, 2018, the date that is 180 days from the date the current EAD expires. From the start of work on July 22, 2018, employers must reverify the employee's employment authorization in Section 3 of Form I–9.

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?*

If you presented a TPS-related EAD that was valid when you first started your job and your EAD has now been automatically extended, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. You and your employer should correct your previously completed Form I–9 as follows:

1. For Section 1, you may:

a. Draw a line through the expiration date in Section 1;

b. Write July 21, 2018, the date that is 180 days from the date your current EAD expires above the previous date (January 22, 2018); and

c. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:

• It is in category A–12 or C–19; and
• Has an expiration date of January 22, 2018.

b. Draw a line through the expiration date written in Section 2;

c. Write July 21, 2018, the date that is 180 days from the date the employee's current EAD expires above the previous date (January 22, 2018); and

d. Initial and date the correction in the margin of Section 2.

In the alternative, if you properly applied for a new EAD, you may present your expired EAD with category A–12 or C–19 in combination with the Form

I–797C Notice of Action. The Form I–797C should show that the EAD renewal application was filed and that the qualifying eligibility category is either A–12 or C–19. To avoid confusion, you may also provide your employer a copy of this Notice. Your employer should correct your previously completed Form I–9 as follows:

For Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:

• It is in category A–12 or C–19; and
• The category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A–12 and C–19 to be the same category code.

b. Draw a line through the expiration date written in Section 2;

c. Write July 21, 2018, the date that is 180 days from the date the employee's current EAD expires above the previous date (January 22, 2018); and

d. Initial and date the correction in the Additional Information field in Section 2.

**Note:** This is not considered a reverification. Employers do not need to complete Section 3 until either the 180-day extension has ended or the employee presents a new document to show continued employment authorization, whichever is sooner. By July 22, 2018, when the employee's automatically extended EAD has expired, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?*

Employers may create a case in E-Verify for a new employee using the EAD with expiration date January 22, 2018, or the Form I–797C receipt information provided on Form I–9. In either case, the receipt number entered as the document number on Form I–9 should be entered into the document number field in E-Verify.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

E-Verify automated the verification process for employees whose TPS-related EAD was automatically extended. If you have employees who are TPS beneficiaries who provided a TPS-related EAD when they first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. This indicates that you should update Form I–9 in accordance with the

instructions above. Before such an employee starts to work on July 22, 2018, employment authorization must be reverified in Section 3. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I9Central@ dhs.gov*. Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) (formerly the Office of Special Counsel for Immigration-Related Unfair Employment Practices) Employer Hotline at 800–255–8155 (TTY 800–237–2515). The IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. Calls are accepted in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Employment Eligibility Verification (Form I–9) Instructions. Employers may

not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from an employee's Form I–9 differs from Federal or state government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS website at *http://www.dhs.gov/E-verify*.

### Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples of such documents are:

(1) Your current EAD;

(2) A copy of your Notice of Action (Form I–797C) for your application to renew your current EAD providing an automatic extension of your currently expired or expiring EAD;

(3) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration; and

(4) A copy of your past or current Application for Temporary Protected Status Notice of Action (Form I–797), if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept. Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements (SAVE) program to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/casecheck/*, then by clicking the ''Check Your Case'' button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found on the SAVE website at *http://www.uscis.gov/save*.

[FR Doc. 2018–00886 Filed 1–17–18; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2616–18; DHS Docket No. USCIS–2008–0034]

RIN 1615–ZB71

### Termination of the Designation of El Salvador for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of El Salvador for Temporary Protected Status (TPS) is set to expire on March 9, 2018. After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary of Homeland Security has determined that conditions in El Salvador no longer support its designation for TPS and that termination of the TPS designation of El Salvador is required pursuant to statute. To provide time for an orderly transition, the Secretary is terminating the designation effective on September 9, 2019, which is 18 months following the end of the current designation.

Nationals of El Salvador (and aliens having no nationality who last habitually resided in El Salvador) who have been granted TPS and wish to maintain their TPS and receive TPS-based Employment Authorization Documents (EAD) valid through September 9, 2019, must re-register for TPS in accordance with the procedures set forth in this Notice. After September 9, 2019, nationals of El Salvador (and aliens having no nationality who last habitually resided in El Salvador) who have been granted TPS under the El Salvador designation will no longer have TPS.

**DATES:** The designation of El Salvador for TPS is terminated effective at 11:59 p.m., local time, on September 9, 2019.

The 60-day re-registration period runs from January 18, 2018 through March 19, 2018. (**Note:** It is important for re-registrants to timely re-register during this 60-day period.)

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Alex King, Branch Chief, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529–2060; or by phone at (202) 272–8377 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

• For further information on TPS, including guidance on the re-registration process and additional information on eligibility, please visit the USCIS TPS web page at *http://www.uscis.gov/tps*. You can find specific information about this termination of El Salvador's TPS by selecting ''El Salvador'' from the menu on the left side of the TPS web page.

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *http://*



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

**Temporary Protected Status (TPS) Considerations**
**Haiti**
**January 2024**

### Overview

Haiti "remains mired in interrelated political, security, and humanitarian crises."[1] The political situation "has hindered Haiti's ability to respond to worsening security and humanitarian crises caused by rampant gang violence, food and fuel shortages, and a resurgence of cholera."[2] In September 2023, the Congressional Research Service (CRS) noted that "Haiti lacks an elected president, legislature, and mayors following the July 2021 assassination of President Jovenel Moise" due to an "ongoing political impasse."[3] Haiti currently has no democratically elected officials at the national level.[4]

The security situation in Haiti has "deteriorated drastically as violent criminal groups have expanded their areas of control, committing serious human rights abuses and disrupting the social and economic lives of Haitians."[5]

### Gangs & the Security Crisis

Haiti is divided into ten departments, and gang violence heavily affects at least three, with gang presence established in at least six.[6] Gang violence continues to escalate and expand, "spreading from the capital Port-au-Prince through the center of the country to its two other major cities, Gonaives [Artibonite department] and Cap-Haïtien [Nord department], with a significant increase in killings, kidnappings and rapes in the past few months."[7] In January 2024, the United Nations Integrated Office in Haiti (BINUH) reported that the Ouest department, where Port-au-Prince is located, also continued "to be affected by extreme insecurity marked by indiscriminate

---

[1] Clare Ribando Seelke and Karla I. Rios, Haiti: Recent Developments and U.S. Policy, Congressional Research Service (CRS), September 18, 2023, available at: https://sgp.fas.org/crs/row/R47394.pdf (last visited Jan. 19, 2024).

[2] Clare Ribando Seelke and Karla I. Rios, Haiti: Recent Developments and U.S. Policy, Congressional Research Service (CRS), September 18, 2023, available at: https://sgp.fas.org/crs/row/R47394.pdf (last visited Jan. 19, 2024).

[3] Clare Ribando Seelke and Karla I. Rios, Haiti: Recent Developments and U.S. Policy, Congressional Research Service (CRS), September 18, 2023, available at: https://sgp.fas.org/crs/row/R47394.pdf (last visited Jan. 19, 2024).

[4] Becky Sullivan, As its only remaining elected officials depart, Haiti reaches a breaking point, National Public Radio (NPR), Jan. 18, 2023, available at: https://www.npr.org/2023/01/18/1149556481/haiti-last-elected-official-political-crisis (last visited Jan. 25, 2024).

[5] "Living a Nightmare": Haiti Needs an Urgent Rights-Based Response to Escalating Crisis, Human Rights Watch, Aug. 14, 2023, available at: https://www.hrw.org/report/2023/08/14/living-nightmare/haiti-needs-urgent-rights-based-response-escalating-crisis (last visited Jan. 22, 2024).

[6] Haiti: Humanitarian impact of gang violence, ACAPS, Jun. 2, 2023, available at: https://reliefweb.int/report/haiti/acaps-briefing-note-haiti-humanitarian-impact-gang-violence-02-june-2023 (last visited Jan. 24, 2024.

[7] Edith M. Lederer, Gang violence in Haiti is escalating and spreading with a significant increase in killings, UN says, The Associated Press, Sep. 27, 2023, available at: https://apnews.com/article/haiti-gang-violence-un-report-killings-5d3f7ff272b7303852869dfc67692a23 (last visited Jan. 19, 2024).

HT Vacatur AR_0473



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

armed gang violence against civilians and attacks against police units and infrastructure."[8] In addition, "gang influence expanded at an alarming rate" to sections of Port-au-Prince that were "previously less affected" by gangs, including Carrefour-Feuilles, Solino, Bon Repos, Mariani and Léogâne.[9] ACAPS registered gang activity in the departments of Sud, Sud-Est, and Grand'Anse as of June 2023.[10]

As of September 2023, gangs reportedly controlled or influenced "about 80 per cent of the Port-au-Prince metropolitan area," while "the remaining 20 per cent" suffered "from the incursions by gangs looking to conduct kidnappings, robberies, murders, and other crimes."[11]

The Haitian National Police (HNP) estimated that, as of April 2023, there were "seven major gang coalitions and approximately 200 affiliated groups" in Haiti.[12] The majority of armed groups reportedly "operate in and around the metropolitan area of Port-au-Prince and in the Artibonite Department, using a variety of heavy armaments, including handguns and assault weapons."[13] The United Nations Panel of Experts cautioned in its 2023 report "that not every grouping of individuals in Haiti is necessarily a gang," and that there is a difference between gangs and *baz*, which are smaller, community-based groups "involved in self-defence or petty criminal activities."[14] In contrast, the panel defined gangs in Haiti as:

> a group of individuals with an organized structure (e.g., chain of command and strategic functions […]) that uses armed violence with more sophisticated firearms to control and influence neighbourhoods and engage in illegal activities, such as illicit trafficking of firearms or drugs, extortion, kidnappings, murders, sexual violence and hijacking of trucks.[15]

---

[8] United Nations Integrated Office in Haiti - Report of the Secretary-General, UN Security Council, p.3, Jan. 15, 2024, available at: https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh (last visited Jan. 23, 2024).

[9] United Nations Integrated Office in Haiti (BINUH) - Report of the Secretary-General, UN Security Council, p.3, Jan. 15, 2024, available at: https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh (last visited Jan. 23, 2024).

[10] Haiti: Humanitarian impact of gang violence, ACAPS, Jun. 2, 2023, available at: https://reliefweb.int/report/haiti/acaps-briefing-note-haiti-humanitarian-impact-gang-violence-02-june-2023 (last visited Jan. 24, 2024).

[11] Final report of the Panel of Experts on Haiti, UN Security Council, p.14, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).

[12] United Nations Integrated Office in Haiti (BINUH) – Report of the Secretary-General, UN Security Council, p.6, Apr. 14, 2023, available at: https://binuh.unmissions.org/sites/default/files/sg_report_on_binuh_14_april_2023.pdf (last visited Jan. 24, 2024).

[13] United Nations Integrated Office in Haiti (BINUH) – Report of the Secretary-General, UN Security Council, p.6, Apr. 14, 2023, available at: https://binuh.unmissions.org/sites/default/files/sg_report_on_binuh_14_april_2023.pdf (last visited Jan. 24, 2024).

[14] Final report of the Panel of Experts on Haiti, UN Security Council, p.13, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).

[15] Final report of the Panel of Experts on Haiti, UN Security Council, pp.13-14, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

The same report noted that "levels of violence and the depths of cruelty that gangs will go to in violating human rights are unprecedented, with regular indiscriminate attacks against the population and the obstruction of humanitarian assistance."[16]

Reports of homicides and kidnappings increased significantly in 2023, as the BINUH noted that "the number of reported homicides for 2023 increased by 119.4 per cent compared with 2022," and "the number of victims of kidnapping rose from 1,359 reported in 2022 to 2,490 in 2023, representing an 83 per cent increase."[17]

Gangs have also launched assaults against entire neighborhoods.[18] In mid-January 2024, gangs attacked the Solino neighborhood in Port-au-Prince, which "left residents trapped in their homes by flaming barricades and automatic gunfire."[19] The Solino neighborhood – "home to thousands of people," including "numerous police officers" – is regarded as a "key community" that could give gangs "easy access to neighbourhoods such as Canapé Vert, which have so far remained peaceful and largely safe."[20] As of January 19, 2024, the attacks had lasted for four days and were still ongoing.[21] Similar attacks began in the Gabelliste neighborhood on January 2.[22]

*Bwa Kale/Vigilante Justice*

The United Nations Panel of Experts reported that the *Bwa Kale* movement began in April 2023 in response to "the near absence of convictions over the past three years and the resulting sense of insecurity and perceptions of impunity."[23] *Bwa Kale*[24] is a movement of "anti-gang

---

[16] Final report of the Panel of Experts on Haiti, UN Security Council, p.2, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).

[17] United Nations Integrated Office in Haiti - Report of the Secretary-General, UN Security Council, p.3, Jan. 15, 2024, available at: https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh (last visited Jan. 23, 2024).

[18] Haiti: residents trapped as armed gangs target key pocket of Port-au-Prince, The Guardian, Jan. 18, 2024, available at: https://www.theguardian.com/world/2024/jan/18/haiti-residents-trapped-port-au-prince-gangs (last visited Jan. 22, 2024).

[19] Haiti: residents trapped as armed gangs target key pocket of Port-au-Prince, The Guardian, Jan. 18, 2024, available at: https://www.theguardian.com/world/2024/jan/18/haiti-residents-trapped-port-au-prince-gangs (last visited Jan. 22, 2024).

[20] 'It's very scary now': Fear grips Haiti's Port-au-Prince amid gang violence, Al Jazeera, Jan. 19, 2024, available at: https://www.aljazeera.com/gallery/2024/1/19/fear-grips-haitis-port-au-prince-amid-gang-violence (last visited Jan. 23, 2024).

[21] 'It's very scary now': Fear grips Haiti's Port-au-Prince amid gang violence, Al Jazeera, Jan. 19, 2024, available at: https://www.aljazeera.com/gallery/2024/1/19/fear-grips-haitis-port-au-prince-amid-gang-violence (last visited Jan. 23, 2024).

[22] Haiti — Emergency Tracking Tool 34 — Displacement following attacks in Solino and Gabelliste — Municipality of Port-au-Prince (15 — 18 January 2024), International Organization for Migration (IOM), Jan. 18, 2024, available at: https://dtm.iom.int/reports/haiti-emergency-tracking-tool-34-displacement-following-attacks-solino-and-gabelliste (last visited Jan. 23, 2024).

[23] Final report of the Panel of Experts on Haiti, UN Security Council, p. 3, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).

[24] The term "*bwa kale*" means "peeled wood" in Haitian Creole.

HT Vacatur AR_0475



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

vigilantes" which has spread and gained public support "amid escalating insecurity in Haiti."[25] According to a May 2023 article by InSight Crime, the movement consists "of large groups of civilians armed with improvised weapons, hunting down and killing alleged gang members and burning their bodies."[26] While vigilante groups were active in Haiti before April 2023, the *Bwa Kale* movement took off on April 24:

> when rumour spread of an imminent large-scale attack by gang members in Port-au-Prince. As panic grew, the police intercepted a mini-bus in Canapé-Vert, a neighbourhood in the capital's southern outskirts, where a number of individuals were carrying weapons, supposedly for use by gangs. The news spread fast, and a crowd gathered around the suspected gang members, throwing stones at them and setting them on fire while several were still alive, killing thirteen of them.

> Footage of the attack went viral on social media and appears to have inspired copycat violence: numerous lynchings were reported in different parts of the capital over the following days. Emboldened by these events, as well as by news of the death of powerful gang leader Ti Makak on the same day, increasing numbers of people set up and joined vigilante groups to defend themselves from gang attacks in their neighbourhoods. In April alone, international organisations recorded 164 cases of mob killings and lynchings of alleged gang members.[27]

The International Crisis Group has reported that "there has been some informal collaboration between vigilantes and state security forces," and "serving or former police officers who live in the neighbourhoods defended by the self-defence brigades have informally joined the vigilance rounds and, on occasion, have permitted the groups to make use of their weapons."[28]

This vigilante justice movement "has resulted in several hundred atrocious executions of alleged gang members, as well as the reinforcement of existing self-defence groups and the spawning of new ones."[29] The United Nations Panel of Experts reported that gangs responded to the *Bwa Kale* movement with their own movement called *Zam Pale,* or "speaking weapons," described as

---

[25] Henry Shuldiner, Haiti's Anti-Gang Vigilantes May Pose Future Criminal Threat, InSight Crime, May 9, 2023, available at: https://insightcrime.org/news/bwa-kale-vigilante-movement-challenging-haitis-gangs/ (last visited on Jan. 24, 2024).

[26] Henry Shuldiner, Haiti's Anti-Gang Vigilantes May Pose Future Criminal Threat, InSight Crime, May 9, 2023, available at: https://insightcrime.org/news/bwa-kale-vigilante-movement-challenging-haitis-gangs/ (last visited on Jan. 24, 2024).

[27] Diego Da Rin, Haitians Turn to Mob Justice as the Gang Threat Festers, International Crisis Group, Jul. 3, 2023, available at: https://www.crisisgroup.org/latin-america-caribbean/haiti/haitians-turn-mob-justice-gang-threat-festers (last visited Jan. 24, 2024).

[28] Diego Da Rin, Haitians Turn to Mob Justice as the Gang Threat Festers, International Crisis Group, Jul. 3, 2023, available at: https://www.crisisgroup.org/latin-america-caribbean/haiti/haitians-turn-mob-justice-gang-threat-festers (last visited Jan. 24, 2024).

[29] Final report of the Panel of Experts on Haiti, UN Security Council, p. 3, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

"a retaliatory movement against the popular mob."[30] The International Crisis Group noted in January 2024 that "Bwa Kale's offensive lasted only a few months and gangs have resumed encroaching upon new territory," although some vigilante brigades affiliated with *Bwa Kale* "remain active."[31]

*Police Response to Gang Violence*

Attempts "to expand the size and improve the operational capabilities of the Haitian National Police have failed to match the scale of criminality that the country is facing," resulting in "a complete failure of Haitian law enforcement to address gang violence."[32] The September 2023 report by the United Nations Panel of Experts noted that "gangs are developing more sophisticated arsenals, and their firepower exceeds that of the Haitian national police, […] which does not have enough capacity to fight the gangs."[33] Furthermore, the panel's report described Haiti's national police force as "the only law enforcement agency in Haiti and one of the last institutions to remain operational in the country."[34] In the first half of 2023, three police stations were attacked and 29 police officers were murdered.[35] The International Crisis Group stated in a July 2023 report that "a large number of police officers have abandoned their posts, while some have also tried to leave the country."[36]

*Foreign Intervention*

An international force backed by the United Nations Security Council and led by Kenya is scheduled to arrive in Haiti in 2024 to help Haitian police combat gangs.[37] The multinational force has been tasked with "training Haitian police to quell widespread gang violence, reassert

---

[30] Final report of the Panel of Experts on Haiti, UN Security Council, p. 17, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).
[31] Haiti's Gangs: Can a Foreign Mission Break Their Stranglehold?, International Crisis Group, Jan. 5, 2024, available at: https://www.crisisgroup.org/latin-america-caribbean/haiti/b49-haitis-gangs-can-foreign-mission-break-their-stranglehold (last visited on Jan. 24, 2024).
[32] Diego Da Rin, Haitians Turn to Mob Justice as the Gang Threat Festers, International Crisis Group, Jul. 3, 2023, available at: https://www.crisisgroup.org/latin-america-caribbean/haiti/haitians-turn-mob-justice-gang-threat-festers (last visited Jan. 24, 2024).
[33] Final report of the Panel of Experts on Haiti, UN Security Council, p. 3, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).
[34] Final report of the Panel of Experts on Haiti, UN Security Council, p. 9, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).
[35] Diego Da Rin, Haitians Turn to Mob Justice as the Gang Threat Festers, International Crisis Group, Jul. 3, 2023, available at: https://www.crisisgroup.org/latin-america-caribbean/haiti/haitians-turn-mob-justice-gang-threat-festers (last visited Jan. 24, 2024).
[36] Diego Da Rin, Haitians Turn to Mob Justice as the Gang Threat Festers, International Crisis Group, Jul. 3, 2023, available at: https://www.crisisgroup.org/latin-america-caribbean/haiti/haitians-turn-mob-justice-gang-threat-festers (last visited Jan. 24, 2024).
[37] Dánica Coto, Experts warn that foreign armed forces headed to Haiti will face major obstacles, The Associated Press, Jan. 5, 2024, available at: https://apnews.com/article/haiti-gangs-kenya-force-international-crisis-group-25c739193ba533b3e3d3707db7abf17c (last visited Jan. 25, 2024).



**Refugee, Asylum and
Int'l Operations
Research Division**

civil order, and restore overall security."[38] The Kenyan contingent of the force has been blocked from traveling to Haiti by Kenya's High Court, which issued a final ruling in the case on January 26, 2024, saying "that the deployment would be illegal as [Kenya's] National Security Council lacks the legal authority to send police outside Kenya."[39] The court previously issued an initial order blocking the deployment in October 2023, and renewed that order in December 2023.[40] On January 30, 2024, *Reuters* reported that Kenya's president was working with Haiti on a bilateral agreement that would include a formal, written request from Haiti for Kenya's assistance, which would "satisfy the demands of the court" and allow the international mission to move forward.[41]

### Political Crisis

Haiti currently has no democratically elected officials at the national level.[42] Acting Prime Minister Ariel Henry has been ruling by decree since the assassination of Jovenel Moïse in 2021.[43] According to *National Public Radio* (NPR), because Henry "was never technically sworn in," many in Haiti viewed his mandate "as questionable from the start."[44] Human Rights Watch concluded that Henry "does not have a constitutional mandate" because "he never received parliamentary approval."[45] The last national elections were held in November 2016, and since then, the terms of Haiti's 30 senators and 119 members of its lower legislative chamber have all expired, leaving the country without an active national legislative body since January 2023.[46]

Efforts aimed at the creation of a transitional government and eventual elections were ongoing, but have been hindered by the "continued demands by some sections of the opposition group for

---

[38] Tanvi Nagpal, No Easy Solutions: Understanding the Scale of the Humanitarian Crisis in Haiti, Center for Strategic & International Studies (CSIS), Dec. 12, 2023, https://www.csis.org/analysis/no-easy-solutions-understanding-scale-humanitarian-crisis-haiti (last visited Jan. 25, 2024).

[39] Ian Wafula, Kenya court blocks police deployment to Haiti, BBC News, Jan. 26, 2024, available at: https://www.bbc.com/news/world-africa-68090488 (last visited Jan. 26, 2024).

[40] Emmanuel Igunza, Kenya's high court extends a block on sending police to Haiti even as parliament approves deployment, The Associated Press, Nov.16, 2023, available at: https://apnews.com/article/kenya-police-haiti-violence-8a0f81f2784574574f9139cdf00d47ac (last visited Jan. 25, 2024).

[41] Crispian Balmer, Kenyan president says Haiti mission to go ahead despite court ruling, Reuters, Jan. 30, 2024, available at: https://www.reuters.com/world/africa/kenyan-president-says-haiti-mission-go-ahead-despite-court-ruling-2024-01-30/ (last visited Jan. 30, 2024).

[42] Becky Sullivan, As its only remaining elected officials depart, Haiti reaches a breaking point, National Public Radio (NPR), Jan. 18, 2023, available at: https://www.npr.org/2023/01/18/1149556481/haiti-last-elected-official-political-crisis (last visited Jan. 25, 2024).

[43] World Report 2024 – Haiti, Human Rights Watch, Jan. 11, 2024, available at: https://www.ecoi.net/en/document/2103219.html (last visited Jan. 25, 2024).

[44] Becky Sullivan, As its only remaining elected officials depart, Haiti reaches a breaking point, National Public Radio (NPR), Jan. 18, 2023, available at: https://www.npr.org/2023/01/18/1149556481/haiti-last-elected-official-political-crisis (last visited Jan. 25, 2024).

[45] World Report 2024 – Haiti, Human Rights Watch, Jan. 11, 2024, available at: https://www.ecoi.net/en/document/2103219.html (last visited Jan. 25, 2024).

[46] Becky Sullivan, As its only remaining elected officials depart, Haiti reaches a breaking point, National Public Radio (NPR), Jan. 18, 2023, available at: https://www.npr.org/2023/01/18/1149556481/haiti-last-elected-official-political-crisis (last visited Jan. 25, 2024).

HT Vacatur AR_0478



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

the resignation of the Prime Minister as a precondition for dialogue."[47] In December 2022, a body referred to as the High Transitional Council was created by an agreement "among various parties."[48] The council is reportedly "responsible for defining a strategic direction for the transition and for coordinating political dialogue."[49] Henry has previously "committed to step down in February" 2024, but as no elections have been held, it is unclear if he will actually leave office.[50]

In September 2023, the United Nations Panel of Experts noted the frustration of "observers" at the lack of progress toward elections nearly three years after the assassination of Jovenel Moïse:

> While dialogue efforts are crucial to restoring security and democratic institutions in the country, many Haitian and international observers deplore the lack of willingness to compromise of the key political players in the country. Furthermore, despite efforts to define the structure of the Provisional Electoral Council, several sectors of civil society have refused to engage in the process, arguing that running elections is not realistic given the current insecurity.[51]

*Justice Sector & Corruption*

In its 2024 annual report on Haiti (covering the events of 2023), Human Rights Watch stated that "Haiti's justice system is plagued by insecurity, corruption, strikes, and political interference."[52] The same report further noted that gangs had "stolen or destroyed evidence and records that may be impossible to recover" after they took over Haiti's "main justice complex" in July 2022.[53]

According to a January 2024 report by *The Associated Press*, arrest warrants had been issued "for more than 30 high-ranking officials accused of government corruption," including "former presidents Michel Martelly and Jocelerme Privert, as well as former prime ministers Laurent

---

[47] United Nations Integrated Office in Haiti - Report of the Secretary-General, UN Security Council, p.2, Jan. 15, 2024, available at: https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh (last visited Jan. 23, 2024).

[48] Haiti's Gangs: Can a Foreign Mission Break Their Stranglehold?, International Crisis Group, Jan. 5, 2024, available at: https://www.crisisgroup.org/latin-america-caribbean/haiti/b49-haitis-gangs-can-foreign-mission-break-their-stranglehold (last visited Jan. 24, 2024).

[49] Final report of the Panel of Experts on Haiti, UN Security Council, p. 8, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).

[50] Haiti's Gangs: Can a Foreign Mission Break Their Stranglehold?, International Crisis Group, Jan. 5, 2024, available at: https://www.crisisgroup.org/latin-america-caribbean/haiti/b49-haitis-gangs-can-foreign-mission-break-their-stranglehold (last visited Jan. 24, 2024).

[51] Final report of the Panel of Experts on Haiti, UN Security Council, p. 8, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).

[52] World Report 2024 – Haiti, Human Rights Watch, Jan. 11, 2024, available at: https://www.ecoi.net/en/document/2103219.html (last visited Jan. 25, 2024).

[53] World Report 2024 – Haiti, Human Rights Watch, Jan. 11, 2024, available at: https://www.ecoi.net/en/document/2103219.html (last visited Jan. 25, 2024).



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

Lamothe, Jean-Michel Lapin, Evans Paul and Jean-Henry Céant."[54] As of January 8, none of the accused government officials had been arrested, but the judge who issued the warrants had asked them to "meet with him for questioning."[55] *The Associated Press* stated that "it is common for Haitian government officials accused in a criminal or civil case to ignore arrest warrants or requests for questioning and face no punishment as they accuse judges of political persecution."[56]

*Guy Philippe & January 2024 Protests*

Guy Philippe, "one of Haiti's most controversial figures," returned to Haiti in November 2023 after being deported from the United States, where he had been convicted for money laundering for allegedly taking "more than $1 million from Colombian cocaine traffickers."[57] Guy Philippe "is best known for leading a 2004 rebellion against former President Jean-Bertrand Aristide and masterminding attacks on police stations."[58] On January 25, 2024, *The New York Times* reported that Guy Philippe has spent his time since returning to Haiti "traveling the country, shoring up support for his so-called revolution."[59] Critics view Guy Philippe as a destabilizing force in Haiti.[60]

On January 16, 2024, *The Associated Press* reported that Philippe's supporters "have launched protests that have paralyzed some cities across Haiti as they demand the resignation of Prime Minister Ariel Henry."[61] The same article described disruptions caused by the protests which have:

---

[54] Haitian judge issues arrest warrants accusing former presidents and prime ministers of corruption, The Associated Press, Jan. 8, 2024, available at: https://apnews.com/article/haiti-corruption-arrest-warrant-presidents-prime-ministers-1e2c1d0530cbca235e33ada3009acabf (last visited Jan. 25, 2024).

[55] Haitian judge issues arrest warrants accusing former presidents and prime ministers of corruption, The Associated Press, Jan. 8, 2024. https://apnews.com/article/haiti-corruption-arrest-warrant-presidents-prime-ministers-1e2c1d0530cbca235e33ada3009acabf

[56] Haitian judge issues arrest warrants accusing former presidents and prime ministers of corruption, The Associated Press, Jan. 8, 2024. https://apnews.com/article/haiti-corruption-arrest-warrant-presidents-prime-ministers-1e2c1d0530cbca235e33ada3009acabf

[57] Jacqueline Charles, U.S. deports former coup leader, convicted drug trafficker Guy Philippe back to Haiti, Miami Herald, Nov. 30, 2023, available at: https://www.miamiherald.com/news/nation-world/world/americas/haiti/article282500613.html (last visited Jan. 26, 2024).

[58] Supporters of former Haitian rebel leader Guy Philippe launch widespread protests, The Associated Press, Jan. 16, 2024, available at: https://apnews.com/article/haiti-protests-guy-philippe-supporters-d0e749d75b96aee0f01395a580a6dec0 (last visited Jan. 26, 2024).

[59] Frances Robles, An Unlikely New Threat to Haiti's Stability: An Armed Environmental Group, The New York Times, Jan. 25, 2024, available at: https://web.archive.org/web/20240126040146/https://www.nytimes.com/2024/01/25/world/americas/haiti-political-instability-bsap.html (last visited Jan. 26, 2024).

[60] Jacqueline Charles, U.S. deports former coup leader, convicted drug trafficker Guy Philippe back to Haiti, Miami Herald, Nov. 30, 2023, available at: https://www.miamiherald.com/news/nation-world/world/americas/haiti/article282500613.html (last visited Jan. 26, 2024).

[61] Supporters of former Haitian rebel leader Guy Philippe launch widespread protests, The Associated Press, Jan. 16, 2024, available at: https://apnews.com/article/haiti-protests-guy-philippe-supporters-d0e749d75b96aee0f01395a580a6dec0 (last visited Jan. 26, 2024).

HT Vacatur AR_0480



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

forced the closures of schools, government agencies and private businesses on Monday [January 15] in places including the southern cities of Jeremie and Miragoane, as well as the northern city of Ouanaminthe, which borders the Dominican Republic, according to local media reports. Hundreds of protesters also were reported Tuesday in the southern city of Les Cayes, with additional demonstrations expected in coming days.

Some leaders of Haiti's Brigade for the Security of Protected Areas, or BSAP, which consists of "armed officers ostensibly responsible for protecting environmentally sensitive areas," have declared their allegiance to Philippe.[62] The *Miami Herald* provided additional details about the BSAP's activities and its connection to Guy Philippe:

> The head of Philippe's National Consortium of Haitian Political Parties runs a service brigade, known by its French acronym BSAP, that is supposed to be in charge of Haiti's environmentally fragile areas. Critics, however, say that the organization, which is part of the country's security apparatus, has become more of a paramilitary group whose armed agents get into scuffles with the police and the public. Last year Haiti's environment ministry announced that it had canceled Consortium agents' badges due to reports about inappropriate behavior. The group, however, remains active.[63]

In late January 2024, "armed uniformed members of the [BSAP] clashed with government forces in northern Haiti" after attempting "to invade the local customs office, and Haitian National Police units repelled them using tear gas."[64]

### Economic Conditions

According to The World Bank, "Haiti remains the poorest country in the Latin America and the Caribbean (LAC) region and among the poorest countries in the world."[65] Haiti's economy has contracted for five straight years, from 2019 through 2023.[66] The World Economic Forum

---

[62] Frances Robles, An Unlikely New Threat to Haiti's Stability: An Armed Environmental Group, The New York Times, Jan. 25, 2024, available at: https://web.archive.org/web/20240126040146/https://www.nytimes.com/2024/01/25/world/americas/haiti-political-instability-bsap.html (last visited Jan. 26, 2024).

[63] Jacqueline Charles, U.S. deports former coup leader, convicted drug trafficker Guy Philippe back to Haiti, Miami Herald, Nov. 30, 2023, available at: https://www.miamiherald.com/news/nation-world/world/americas/haiti/article282500613.html (last visited Jan. 26, 2024).

[64] Frances Robles, An Unlikely New Threat to Haiti's Stability: An Armed Environmental Group, The New York Times, Jan. 25, 2024, available at: https://web.archive.org/web/20240126040146/https://www.nytimes.com/2024/01/25/world/americas/haiti-political-instability-bsap.html (last visited Jan. 26, 2024).

[65] The World Bank in Haiti: Overview, The World Bank, Oct. 26, 2023, available at: https://www.worldbank.org/en/country/haiti/overview (last visited Jan. 25, 2024).

[66] Haiti – Recession: Haiti's economy in free fall, -10.5% of GDP in total over 5 years, Haiti Libre, Jan. 3, 2024, available at: https://www.haitilibre.com/en/news-41354-haiti-recession-haiti-s-economy-in-free-fall105-of-gdp-in-total-over-5-years.html (last visited Jan. 30, 2024).



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

reported in February 2023 that Haiti had the tenth highest inflation in the world, "with year-on-year price increases of 53%."[67] Additionally, a survey conducted in March 2023 indicated that "two-thirds of households experienced a reduction in their income, which is partly explained by a deterioration in labor market conditions and a drop in remittances from abroad."[68]

The September 2023 report by the United Nations Panel of Experts noted that "violence and insecurity [in Haiti] not only undermine the political transition, but also decimate the national economy and threaten the future of the country, with many children not going to school and skilled people leaving the country."[69]

### Humanitarian Concerns

In its 2024 annual report, Human Rights Watch stated that "access to electricity, safe drinking water, sanitation, health care, and education was severely limited" in Haiti throughout 2023.[70] The World Food Programme (WFP) reported in September 2023 that Haiti, "one of 9 countries facing starvation risks," experienced ongoing high levels of food insecurity.[71] Furthermore, Haiti faced an increasing number of cholera cases following the resurgence of cholera that began in October 2022, according to a November 2023 report by the International Federation of Red Cross and Red Crescent Societies (IFRC).[72]

The International Organization for Migration (IOM) reported that, as of October 2023, "nearly 200,000 people are now internally displaced in Haiti, of which roughly 70,000 find themselves in inadequate and precarious spontaneous settlements and collective centres, 31,000 are sleeping in the open air and 34,000 are crammed into classrooms."[73] In addition, IOM stated that "many families cannot meet their basic needs." The lack of adequate housing for internally displaced

---

[67] Johnny Wood, These countries have been the hardest hit by food price inflation, World Economic Forum, Feb. 21, 2023, available at: https://www.weforum.org/agenda/2023/02/countries-hit-by-food-prices-inflation-cost-of-living-crisis/ (last visited Jan. 30, 2024).
[68] The World Bank in Haiti: Overview, The World Bank, Oct. 26, 2023, available at: https://www.worldbank.org/en/country/haiti/overview (last visited Jan. 25, 2024).
[69] Final report of the Panel of Experts on Haiti, UN Security Council, pp. 2-3, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).
[70] World Report 2024 – Haiti, Human Rights Watch, Jan. 11, 2024, available at: https://www.ecoi.net/en/document/2103219.html (last visited Jan. 25, 2024).
[71] Severe hunger persists in Haiti as violence intensifies in the capital, World Food Programme (WFP), Sep. 19, 2023, available at: https://reliefweb.int/report/haiti/severe-hunger-persists-haiti-violence-intensifies-capital (last visited Jan. 30, 2024).
[72] Haiti | Earthquake and Cholera Outbreak - Emergency Appeal No. MDRHT018 - Operation update #6, International Federation of Red Cross and Red Crescent Societies (IFRC), Nov. 3, 2023, available at: https://reliefweb.int/report/haiti/haiti-earthquake-and-cholera-outbreak-emergency-appeal-no-mdrht018-operation-update-6 (last visited Jan. 25, 2024).
[73] As Displacement Soars, Haiti Requires USD 21 Million for Emergency Shelter, Protection Services, International Organization for Migration (IOM), Oct. 10, 2023, available at: https://reliefweb.int/report/haiti/displacement-soars-haiti-requires-usd-21-million-emergency-shelter-protection-services (last visited Jan. 25, 2024).

HT Vacatur AR_0482



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

persons (IDPs) "and crowded living conditions further exacerbate tensions, contributing to violence and increasing the risk of sexual assault."[74]

*Food Insecurity*

The World Food Programme (WFP) notes that Haiti "has one of the world's highest levels of chronic food insecurity in the world."[75] In July 2023, the International Crisis Group reported that "around half of all Haitians are now considered food insecure."[76] According to a 2024 BINUH report, this food insecurity is attributable in part to the security crisis, which has led to "dysfunction in the market supply chain."[77] Gangs charge "increasingly heavy illegal passage fees" to allow vehicles, including trucks transporting food, to transit the main roads in Haiti.[78]

In addition to the problems caused by the security crisis, the food shortages are also partly to blame on "the confluence of a global rise in food prices, depreciation of the local currency, and restrictions on internal transport," which "have made food both scarce and unaffordable."[79]

*Cholera*

As of January 2024, there were an estimated 73,000 "confirmed and suspected cases" of cholera in Haiti, "across all 10 departments."[80] The resurgence of cholera began in October 2022, "after more than three years with no reported cases."[81] The World Health Organization (WHO) stated in September 2023 that "access to clean water remains limited, contributing to the spread of

---

[74] As Displacement Soars, Haiti Requires USD 21 Million for Emergency Shelter, Protection Services, International Organization for Migration (IOM), Oct. 10, 2023, available at: https://reliefweb.int/report/haiti/displacement-soars-haiti-requires-usd-21-million-emergency-shelter-protection-services (last visited Jan. 25, 2024).

[75] Haiti Country Brief, World Food Programme (WFP), Nov. 2023, available at: https://docs.wfp.org/api/documents/WFP-0000155417/download/?_ga=2.249432451.544473126.1706236500-581114880.1706236500 (last visited Jan. 25, 2024).

[76] Diego Da Rin, Haitians Turn to Mob Justice as the Gang Threat Festers, International Crisis Group, Jul. 3, 2023, available at: https://www.crisisgroup.org/latin-america-caribbean/haiti/haitians-turn-mob-justice-gang-threat-festers (last visited Jan. 24, 2024).

[77] United Nations Integrated Office in Haiti - Report of the Secretary-General, UN Security Council, p.12, Jan. 15, 2024, available at: https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh (last visited Jan. 23, 2024).

[78] United Nations Integrated Office in Haiti - Report of the Secretary-General, UN Security Council, p.12, Jan. 15, 2024, available at: https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh (last visited Jan. 23, 2024).

[79] Tanvi Nagpal, No Easy Solutions: Understanding the Scale of the Humanitarian Crisis in Haiti, Center for Strategic & International Studies (CSIS), Dec. 12, 2023, https://www.csis.org/analysis/no-easy-solutions-understanding-scale-humanitarian-crisis-haiti (last visited Jan. 25, 2024).

[80] United Nations Integrated Office in Haiti - Report of the Secretary-General, UN Security Council, p.13, Jan. 15, 2024, available at: https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh (last visited Jan. 23, 2024).

[81] Cholera – Haiti, World Health Organization (WHO), Dec. 13, 2022, available at: https://www.who.int/emergencies/disease-outbreak-news/item/2022-DON427 (last visited Jan. 24, 2024).

HT Vacatur AR_0483



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

cholera."[82] Human Rights Watch reported in January 2024 that "only 55 percent of Haitian households had access to safe drinking water and two-thirds of the population had limited or no sanitation services, aggravating the spread of cholera" in 2023.[83]

The IFRC reported in November 2023 that people in Haiti who contract cholera "face a greater likelihood of severe disease and death" because of "the current socioeconomic situation and complex humanitarian crisis, which includes recent closure of hospitals and reduced ambulance services, as well as overall poor health condition of the population, including acute malnutrition."[84]

*Access to Medical Care*

The United Nations Panel of Experts noted that "Haiti is suffering one of its worst health care crises in its history."[85] The same source reported that "about 48% of hospitals in the Port-au-Prince metropolitan area are under gang influence or control, leading to forced closures due to attacks on patients, staff, or facilities."[86] Doctors and nurses have reportedly been "shot, robbed, and kidnapped while on their way to work" in Fonds Parisien, a communal section of the arrondissement of Croix-des-Bouquets, in the Ouest department.[87] In a June 2023 attack on a hospital in Ouest department, six hospital security personnel were kidnapped and "vehicles, a generator, solar panels, and various medical supplies and equipment" were stolen.[88] Medecins Sans Frontiers (MSF), "one of the few remaining international organisations delivering medical care in the capital," suspended their work at the Turgeau emergency center in December 2023 after alleged gang members attacked a "MSF ambulance convoy," killing one patient.[89]

Human Rights Watch stated in its 2024 annual report on Haiti (covering the events of 2023) that "international organizations estimate that 75 percent of the country's health facilities have

---

[82] Haïti Health Cluster: Navigating a Multifaceted Humanitarian Crisis, World Health Organization (WHO), Sep. 5, 2023, available at: https://healthcluster.who.int/newsroom/news/item/05-09-2023-haiti-health-cluster-navigating-a-multifaceted-humanitarian-crisis (last visited on Jan. 24, 2024).

[83] World Report 2024 – Haiti, Human Rights Watch, Jan. 11, 2024, available at: https://www.ecoi.net/en/document/2103219.html (last visited Jan. 25, 2024).

[84] Haiti | Earthquake and Cholera Outbreak - Emergency Appeal No. MDRHT018 - Operation update #6, International Federation of Red Cross and Red Crescent Societies (IFRC), Nov. 3, 2023, available at: https://reliefweb.int/report/haiti/haiti-earthquake-and-cholera-outbreak-emergency-appeal-no-mdrht018-operation-update-6 (last visited Jan. 25, 2024).

[85] Final report of the Panel of Experts on Haiti, UN Security Council, p. 145, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).

[86] Final report of the Panel of Experts on Haiti, UN Security Council, p. 145, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).

[87] Final report of the Panel of Experts on Haiti, UN Security Council, p. 145, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).

[88] Final report of the Panel of Experts on Haiti, UN Security Council, p. 145, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).

[89] MSF suspends work in Haiti emergency centre after armed group kills patient, Al Jazeera, Dec. 15, 2023, available at: https://www.aljazeera.com/news/2023/12/15/msf-suspends-work-at-hatian-hospital-after-armed-group-kill-patient (last visited Jan. 19, 2024).



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

inadequate medical supplies and insufficient trained personnel," and that "insecurity has triggered an exodus of health workers from Haiti in recent years."[90]

*Electricity*

According to Human Rights Watch, "as of early 2023, only one-third of Haitians had access to electricity, but only intermittently and at high prices."[91] The United Nations Office for Project Services (UNOPS) reported in November 2023 that "areas with access to the centralized electricity grid face regular power outages."[92] Furthermore, "the high cost of fuel limits the use of generators," which health and water facilities rely on to operate.[93]

*Access to Schools*

The United Nations Children's Fund (UNICEF) reported in February 2023 that "acts of armed violence against schools in Haiti, including shooting, ransacking, looting and kidnappings have increased nine-fold in one year."[94] The same article goes on to note that "in the first six days of February alone, 30 schools were shuttered as a result of escalating violence in urban areas, while over 1 in 4 schools has remained closed since October last year."[95] Gangs reportedly steal school equipment and ingredients destined for school meals,[96] in a country where children may not be able to access food outside of school, given the context of food insecurity in Haiti.[97]

In September 2023, the United Nations Panel of Experts reported that many schools in Ouest Department have closed because they have "been vandalised, destroyed, or occupied by gangs or they have been used as shelters by IDPs, thus impeding the right to education of children and adolescents."[98] The closure of schools due to gang violence also reportedly puts children "at

---

[90] World Report 2024 – Haiti, Human Rights Watch, Jan. 11, 2024, available at: https://www.ecoi.net/en/document/2103219.html (last visited Jan. 25, 2024).

[91] World Report 2024 – Haiti, Human Rights Watch, Jan. 11, 2024, available at: https://www.ecoi.net/en/document/2103219.html (last visited Jan. 25, 2024).

[92] Powering hospitals in Haiti, United Nations Office for Project Services (UNOPS), Nov. 16, 2023, available at: https://reliefweb.int/report/haiti/powering-hospitals-haiti (last visited Jan. 25, 2024).

[93] Powering hospitals in Haiti, United Nations Office for Project Services (UNOPS), Nov. 16, 2023, available at: https://reliefweb.int/report/haiti/powering-hospitals-haiti (last visited Jan. 25, 2024).

[94] Haiti: Armed violence against schools increases nine-fold in one year – UNICEF, United Nations Children's Fund (UNICEF), Feb. 9, 2023, available at: https://www.unicef.org/press-releases/haiti-armed-violence-against-schools-increases-nine-fold-one-year-unicef (last visited Jan. 25, 2024).

[95] Haiti: Armed violence against schools increases nine-fold in one year – UNICEF, United Nations Children's Fund (UNICEF), Feb. 9, 2023, available at: https://www.unicef.org/press-releases/haiti-armed-violence-against-schools-increases-nine-fold-one-year-unicef (last visited Jan. 25, 2024).

[96] Haiti: Armed violence against schools increases nine-fold in one year – UNICEF, United Nations Children's Fund (UNICEF), Feb. 9, 2023, available at: https://www.unicef.org/press-releases/haiti-armed-violence-against-schools-increases-nine-fold-one-year-unicef (last visited Jan. 25, 2024).

[97] Marie Tamagnan and Zoé Routhier-Drab, The Power of School Feeding in Haiti: How to Build a Healthy Community, Inter-American Development Bank (IDB), Sep. 20, 2022, available at: https://blogs.iadb.org/educacion/en/school-feeding-haiti/ (last visited Jan. 25, 2024).

[98] Final report of the Panel of Experts on Haiti, UN Security Council, p.137, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).

HT Vacatur AR_0485



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

greater risk of recruitment by gangs and makes them highly vulnerable to sexual and physical abuse."[99]

<h2 style="text-align:center">Natural Disasters</h2>

In its overview on Haiti published in October 2023, The World Bank reports that "Haiti remains one of the most vulnerable countries worldwide to natural hazards, mainly hurricanes, floods, and earthquakes," as "more than 96 percent of the population is exposed to these types of shocks."[100] The World Bank also stated that "climate change is expected to increase the frequency, intensity, and impacts of extreme weather events, and Haiti, while making some progress, still lacks adequate preparedness and resilience-building mechanisms."[101]

Haiti experienced its most recent major earthquake in August 2021.[102] A July 2023 article in *The Guardian* stated that "the collapse of the Haitian state in recent years means there is little help for people to rebuild their houses and lives" after the earthquake.[103] Some healthcare facilities have not been rebuilt since that earthquake, and other healthcare facilities that are functioning feature beds "on cinder blocks."[104]

In June 2023, "heavy rain, strong winds, floods and landslides [...] affected most of Haiti," with an estimated 42 dead and 85 injured.[105] In addition, over 13,000 homes flooded and "several roads were destroyed."[106] Also in June 2023, a 5.5 magnitude earthquake "hit Haiti's west

---

[99] Final report of the Panel of Experts on Haiti, UN Security Council, p.137, Sep. 15, 2023, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N23/246/28/PDF/N2324628.pdf (last visited Jan. 24, 2024).

[100] The World Bank in Haiti, The World Bank, Oct. 26, 2023, available at: https://www.worldbank.org/en/country/haiti/overview (last visited Jan. 25, 2024).

[101] The World Bank in Haiti, The World Bank, Oct. 26, 2023, available at: https://www.worldbank.org/en/country/haiti/overview (last visited Jan. 25, 2024).

[102] Luke Taylor, 'We have no time to heal': floods followed by earthquake heap more trauma on Haiti, The Guardian, available at: https://www.theguardian.com/global-development/2023/jul/11/we-have-no-time-to-heal-floods-followed-by-earthquake-heap-more-trauma-on-haiti (last visited Jan. 25, 2024).

[103] Luke Taylor, 'We have no time to heal': floods followed by earthquake heap more trauma on Haiti, The Guardian, available at: https://www.theguardian.com/global-development/2023/jul/11/we-have-no-time-to-heal-floods-followed-by-earthquake-heap-more-trauma-on-haiti (last visited Jan. 25, 2024).

[104] Luke Taylor, 'We have no time to heal': floods followed by earthquake heap more trauma on Haiti, The Guardian, available at: https://www.theguardian.com/global-development/2023/jul/11/we-have-no-time-to-heal-floods-followed-by-earthquake-heap-more-trauma-on-haiti (last visited Jan. 25, 2024).

[105] Haiti - Severe weather, floods and landslides, European Commission's Directorate-General for European Civil Protection and Humanitarian Aid Operations, Jun. 6, 2023, available at: https://reliefweb.int/report/haiti/haiti-severe-weather-floods-and-landslides-haiti-civil-protection-noaa-cpc-echo-daily-flash-06-june-2023 (last visited Jan. 25, 2024).

[106] Haiti - Severe weather, floods and landslides, European Commission's Directorate-General for European Civil Protection and Humanitarian Aid Operations, Jun. 6, 2023, available at: https://reliefweb.int/report/haiti/haiti-severe-weather-floods-and-landslides-haiti-civil-protection-noaa-cpc-echo-daily-flash-06-june-2023 (last visited Jan. 25, 2024).

HT Vacatur AR_0486



**U.S. Citizenship and Immigration Services**

**Refugee, Asylum and Int'l Operations Research Division**

coast."[107] The earthquake caused the deaths of four people and "flattened houses, blocked main roads and inundated healthcare facilities with patients."[108]

---

[107] Luke Taylor, 'We have no time to heal': floods followed by earthquake heap more trauma on Haiti, The Guardian, available at: https://www.theguardian.com/global-development/2023/jul/11/we-have-no-time-to-heal-floods-followed-by-earthquake-heap-more-trauma-on-haiti (last visited Jan. 25, 2024).

[108] Luke Taylor, 'We have no time to heal': floods followed by earthquake heap more trauma on Haiti, The Guardian, available at: https://www.theguardian.com/global-development/2023/jul/11/we-have-no-time-to-heal-floods-followed-by-earthquake-heap-more-trauma-on-haiti (last visited Jan. 25, 2024).

United Nations

**S**/RES/2699 (2023)



# Security Council

Distr.: General
2 October 2023

## Resolution 2699 (2023)

### Adopted by the Security Council at its 9430th meeting, on 2 October 2023

*The Security Council*,

*Recalling* all its previous resolutions and press statements, and *reaffirming* resolution 2692 (2023), on the situation in Haiti,

*Reaffirming* its strong commitment to the sovereignty, independence, territorial integrity and unity of Haiti,

*Emphasizing* that the Government of Haiti has the primary responsibility for the provision of security, ensuring stability and respect for the rule of law and human rights, and for the protection of civilians across the territory of Haiti, and *expressing great concern* at the increasingly violent actions taken by armed groups and criminal networks,

*Reaffirming* the importance of a professional, self-sustaining, fully functioning Haitian National Police of adequate size, structure and equipment, able to conduct the full spectrum of police functions, for the maintenance of public safety, respect for human rights, consolidation of democracy and the revitalization of Haiti's system of justice and *encouraging* Haiti to pursue actively its plans in these respects,

*Condemning* in the strongest terms the increasing violence, criminal activities, and human rights abuses and violations which undermine the peace, stability, and security of Haiti and the region, including kidnappings, sexual and gender-based violence, trafficking in persons and the smuggling of migrants, homicides, extrajudicial killings, as well as arms smuggling,

*Strongly condemning and expressing deep concern* over the gravity and numbers of violations and abuses committed against children in Haiti; and *urging all* actors, especially gangs and criminal networks, to immediately end and prevent all violations and abuses against children, including those involving killing and maiming, recruitment and use, rape and other forms of sexual and gender-based violence, particularly against girls, attacks on schools and hospitals, abduction, and denial of humanitarian access,

*Urging all* actors, including Haitian gangs and their supporters, to cease their destabilizing and criminal activities, and further urging those with the ability to influence the gangs to act to stop the blocking of roads required for the supplying of and access to local markets and the damaging of sources of food, including crops and



HT Vacatur AR_0488

Please recycle 

livestock, as well as medical, and humanitarian supplies, and highlighting the link between violence and food insecurity, that has reached unprecedented levels,

*Stressing* the need to create a safe and secure environment in Haiti and the region that enables respect for human rights, in particular women's rights, and the protection of children, is conducive to the rule of law, functional state institutions and an effective judicial system, and facilitates the humanitarian delivery of life-sustaining water, fuel, food, and medical supplies,

*Recalling* its resolution 2653 (2022), which established sanctions measures in response to the threat to international peace and security in the region posed by the high levels of gang violence and other criminal activities, as well as of illicit arms and financial flows, and *further recalling* resolution 2664 (2022) which supersedes the asset freeze exception set forth in paragraph 10 of resolution 2653,

*Reaffirming* the commitment of the international community to address the security and humanitarian needs in Haiti, including through offering continued support to the United Nations Integrated Office in Haiti (BINUH),

*Stressing* that addressing the root causes of instability in Haiti requires political solutions, and in this regard *further emphasizing* the urgent need to encourage wider participation and forge the broadest possible consensus in the political process, with, as soon as necessary security conditions are met, a view to holding transparent, inclusive, and credible electoral processes and free and fair elections, and restoring democratic institutions,

*Reiterating* the need for all Haitian stakeholders, including with BINUH's support, to continue to facilitate a Haitian-led, Haitian-owned political process to permit the organization of free and fair legislative and presidential elections, with the full, equal, meaningful, and safe participation of women and the engagement of youth, civil society, and other relevant stakeholders through an inclusive inter-Haitian national dialogue, and further requests all Haitian stakeholders to urgently reach an agreement on a sustainable, time-bound and commonly accepted roadmap for elections,

*Taking note* of the recent visits by the Eminent Persons Group of Caribbean Community (CARICOM) to Haiti and welcoming its continued commitment to supporting the political dialogue,

*Recognizing* the key role of countries in the region, as well as regional and subregional organizations such as the Caribbean Community (CARICOM), and other international partners, in particular the key role of CARICOM and its Eminent Persons Group in facilitating the political dialogue, and *calling on* the international community to remain committed to Haiti's efforts in overcoming the ongoing political stalemate and security and humanitarian situation,

*Taking note of* the direct appeal of 6 October 2022 of Haiti's Council of Ministers for the deployment of a specialized international force and technical assistance to support the Haitian National Police's efforts to address high levels of gang violence and re-establish security, further taking note of the letter dated 8 October 2022 of the Secretary-General (S/2022/747), the report of the Secretary-General (document S/2023/274) dated 14 April 2023, and Jamaican statement on behalf of CARICOM before the Security Council on 6 July 2023 to authorize multinational security efforts with the appropriate mandate to support the Haitian National Police,

*Gravely concerned* by the continued and significant deterioration of the humanitarian situation in Haiti, including the forced displacement of persons, and urging all parties to immediately cease violations and abuses,

HT Vacatur AR_0489

*Taking note* of the need to coordinate, as appropriate, with BINUH and UNODC to reduce gang and community violence, as well as to ensure respect for human rights and build child protection capacity, and the need to further strengthen training efforts by BINUH and international partners to expand the overall capacities of the national police beyond security operations, including expanding the number of national police officers, continued vetting, enhancing community-oriented policing skills, strengthening capacity to prevent and respond to sexual and gender-based violence, ensuring the full, equal, and meaningful involvement and representation of women at all levels, ensuring respect for the rule of law, and restoring police stations that have been destroyed in gang-controlled areas,

*Underscoring* the need for broader efforts beyond the work of the Multinational Security Support (MSS) mission to sustainably address the root causes of gang violence, which emanate from political, institutional, and socio-economic instability and, in this regard, reiterating its call to the international community, including international financial institutions, to enhance support for long-term economic, social and institutional development in Haiti even after its stability is restored,

*Underscoring* the need for the international community to work with the people of Haiti in a long-term effort to promote the rebuilding of democratic institutions, including the organization of free and fair elections,

*Welcoming* the announcement of 29 July by the Government of Kenya to positively consider leading a multinational mission at the invitation of Haiti and in response to the appeal by the UN Secretary-General, following consultations with Haiti and the unanimous encouragement of security support to Haiti by the Security Council in resolution 2692 (2023), and further welcoming the positive responses to participate made by several Member States,

*Taking note* of the letter dated 26 September 2023 from the Secretary-General addressed to the President of the Security Council (S/2023/726), strongly expressing the desire to obtain authorization from the Security Council under Chapter VII, and which expresses hope, following an assessment visit by a Kenyan delegation, that the Multinational Security Support mission would help ensure the security of the country's critical infrastructure and would be able to carry out targeted operations, in close collaboration with the Haitian National Police,

*Recognizing* the importance and urgency of curbing the illicit trafficking of arms and ammunition to Haiti to the creation of a safe operating environment for international security support, including the deployment of a multinational security support mission,

*Taking note* of the call made by the Government of Kenya on 21 September 2023 urging the United Nations to urgently deliver an appropriate framework to facilitate the deployment of Multinational Security Support as part of a holistic response to Haiti's challenges, calling on the Security Council to approve a resolution under Chapter VII that tailors the security support mission to the specific needs of Haiti and its people,

*Determining* that the situation in Haiti continues to constitute a threat to international peace and security and to stability in the region,

*Acting* under Chapter VII of the Charter of the United Nations,

1.  *Authorizes* Member States that have notified the Secretary-General of their participation to form and deploy a Multinational Security Support (MSS) mission with a lead country, in close cooperation and coordination with the Government of Haiti, for an initial period of twelve months following the adoption of this resolution, to be reviewed nine months after the adoption of this resolution, on the understanding

HT Vacatur AR_0490

that the cost of implementing this temporary operation will be borne by voluntary contributions and support from individual Member States and regional organizations, and in strict compliance with international law, including, international human rights law, as applicable, to support the efforts of the Haitian National Police to re-establish security in Haiti and build security conditions conducive to holding free and fair elections, by:

(a)    providing operational support to the Haitian National Police, including building its capacity through the planning and conduct of joint security support operations, as it works to counter gangs and improve security conditions in Haiti, characterized by kidnappings, sexual and gender-based violence, trafficking in persons and the smuggling of migrants and arms, homicides, extrajudicial killings, and recruitment of children by armed groups and criminal networks; and

(b)    providing support, to the Haitian National Police, for the provision of security for critical infrastructure sites and transit locations such as the airport, ports, schools, hospitals and key intersections;

2.    *Calls on* the MSS, through its support to the Haitian National Police outlined in paragraph 1, to help ensure unhindered and safe access to humanitarian aid for the population receiving assistance;

3.    *Decides* that the Multinational Security Support mission, as requested by Haiti in its letter dated 22 September 2023, in coordination with the Haitian National Police, may, to prevent the loss of life and within the limits of its capacities and areas of deployment, adopt urgent temporary measures on an exceptional basis, which are limited in scope, time bound, proportionate and consistent with the objectives set forth in paragraph 1 above, to help the Haitian National Police maintain basic law and order and public safety, including through arrest and detention, as necessary and in full compliance with international law, including international human rights law, as applicable; and requests the leadership of the Multinational Security Support mission to update the Security Council any measures that may be adopted on this basis;

4.    *Calls on* Member States and regional organizations to contribute personnel, equipment, and necessary financial and logistic resources based upon the urgent needs of the Multinational Security Support mission and *invites* contributing Member States to inform in writing the leadership of the Multinational Security Support mission, the Security Council and the Secretary-General of their intent to participate in the mission, and further requests Haiti and the leadership of the Multinational Security Support mission to update regularly the Security Council and the Secretary-General of the progress of deployment of relevant personnel and equipment;

5.    *Authorizes* the Member States participating in the Multinational Security Support mission in Haiti to take all necessary measures to fulfil its mandate, strictly adhering to all international law, including international human rights law, as applicable;

6.    *Requests* the Multinational Security Support mission to take fully into account child protection and the protection of other vulnerable groups as a cross-cutting issue throughout its mandate in all the planning and conduct of its operations;

7.    *Requests* Member States participating in the Multinational Security Support mission in Haiti to include dedicated expertise in anti-gang operations, community-oriented policing, children and women's protection, and preventing and responding to sexual and gender-based violence in a victim-centred manner, and to take necessary action to ensure appropriate conduct and discipline and to prevent sexual exploitation and abuse, including vetting of all personnel and other safe hiring practices, encouraging women's representation at all levels of the MSS, and

HT Vacatur AR_0491

predeployment and in-mission awareness training on human rights, child protection, and sexual and gender based violence, and to detect incidents when they occur and ensure a safe survivor- and victim-centred response in cases of such conduct involving their personnel, including through providing safe and accessible complaint mechanisms and timely investigations of all allegations of misconduct, to hold perpetrators accountable, and to repatriate units when there is credible evidence of misconduct, including widespread or systemic sexual exploitation and abuse, by those units;

8.    *Requests* the leadership of the Multinational Security Support mission, in coordination with the government of Haiti and Member States participating in the MSS, to inform the Council, prior to the mission's full deployment, on information including but not limited to the concept of operations developed in consultations and cooperation with the government of Haiti and Member States participating in the MSS, sequencing of deployment, mission goals and end state, rules of engagement, as well as indicative financial needs to be funded by voluntary contributions, and number of personnel to be deployed;

9.    *Reaffirms* that the rules of engagement and any directives on the use of force are to be developed by the leadership of the Multinational Security Support mission in consultation with Haiti and other Member States participating in the MSS and should be in full respect of Haiti's sovereignty and in strict compliance with international law, including, international human rights law, as applicable;

10.    *Requests* the Member States participating in the Multinational Security Support mission in Haiti to ensure the highest standards of transparency, conduct and discipline for their contingents operating in the framework of the Multinational Security Support mission in Haiti, to establish a robust compliance mechanism to prevent, investigate, address and publicly report violations or abuses of human rights related to the Multinational Security Support mission in Haiti;

11.    *Calls on* the Multinational Security Support mission to establish an oversight mechanism to prevent human rights violations or abuses, in particular sexual exploitation and abuse as well as to ensure that the planning and conduct of operations during deployment will be in accordance with applicable international law;

12.    *Requests* Member States participating in the Multinational Security Support mission in Haiti to adopt appropriate wastewater management and other environmental controls to guard against the introduction and spread of water-borne diseases, in accordance with The World Health Organization Water Quality: Guidelines, Standards, and Health publication on Assessment of Risk and Risk Management for Water-related infectious diseases from 2001, and in cooperation with Haitian authorities, which bear shared responsibility for guarding against water-borne disease;

13.    *Requests* the Multinational Security Support mission to cooperate with BINUH and relevant UN agencies, including but not limited to UNODC and the Office of the High Commissioner for Human Rights, to support the efforts of the Haitian National Police to re-establish security in Haiti, including efforts by the Haitian National police to combat illicit trafficking and diversion of arms and related materiel and to enhance management and control of borders and ports;

14.    *Decides* that paragraph 11 of resolution 2653 (2022) shall be replaced by the following:

"*Decides* that, for an initial period of one year from the date of adoption of this resolution, all Member States shall take the necessary measures to prevent the direct or indirect supply, sale, or transfer to Haiti, from or through their territories or by their nationals, or using their flag vessels or aircraft of

HT Vacatur AR_0492

small arms, light weapons, and ammunition, and *further decides* that this measure shall not apply to:

    a.    The supply, sale, or transfer of small arms, light weapons, or ammunition to the UN or a UN-authorized mission or to a security unit that operates under the command of the Government of Haiti, intended to be used by or in coordination with those entities and intended solely to further the objectives of peace and stability in Haiti;

    b.    Other supplies, sales, or transfers of small arms, light weapons, and ammunition to Haiti as approved in advance by the Committee established pursuant to resolution 2653 (2022) to further the objectives of peace and stability in Haiti;"

15.    *Calls on* all parties in Haiti to cooperate fully with the Multinational Security Support mission in the execution of its mandate and to respect the security and freedom of movement of the Multinational Security Support mission;

16.    *Requests* the Secretary-General to establish a trust fund as a mechanism that can facilitate voluntary contributions to the Multinational Security Support mission to enable and operationalize the mandate;

17.    *Affirms* the Secretary-General may provide logistical support packages to the MSS, when requested by the MSS and MSS donors, subject to the full financial reimbursement to the United Nations through available voluntary contributions, and in full respect of the United Nations Human Rights Due Diligence Policy (HRDDP);

18.    *Requests* the leadership of the Multinational Security Support mission to ensure the highest standards of transparency and conduct, and to report every three months once the MSS is operational on the ground, as a part of regular reporting to the Security Council, through the Secretary-General, on the implementation of the resolution, including but not limited to composition of the mission, measures to ensure appropriate conduct and discipline, and to prevent sexual exploitation and abuse; and on investigations of allegations of misconduct and excessive use of force;

19.    *Requests* the Secretary-General to provide as part of the Secretary-General's regular reporting to the Security Council, no later than nine months following adoption of this resolution, recommendations on possible adaptation of the mandate of the Multinational Security Support mission or its transformation as needed;

20.    *Requests* the leadership of the Multinational Security Support mission to develop a strategy for mission conclusion and withdrawal and include information on that matter in regular reporting to the Security Council;

21.    *Emphasizes* the need for Member States, United Nations organs, bodies and agencies, and other international organizations, including international financial institutions, to redouble their efforts to promote the institutional, social, and economic development of Haiti, in particular for the long-term, in order to achieve and sustain stability and combat poverty;

22.    *Strongly urges* the Haitian authorities and other stakeholders to cooperate fully with the good offices of CARICOM and BINUH to reach compromise for the broadest possible consensus as soon as possible;

23.    *Decides* to remain actively seized of the matter.

———————————

HT Vacatur AR_0493