Pages 1 - 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

NATIONAL TPS ALLIANCE, et al., )
)
)
            Plaintiffs, )
)
    VS. )         NO. 25-cv-01766-EMC
)
KRISTI NOEM, et al., )
)
            Defendants. )
_____ )

                    San Francisco, California
                    Monday, April 21, 2025

**TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
            ACLU OF NORTHERN CALIFORNIA
            39 Drumm Street
            San Francisco, CA 94111
        BY: **EMILOU H. MACLEAN, ATTORNEY AT LAW**

            NATIONAL DAY LABORER ORGANIZING NETWORK
            1030 S Arroyo Parkway, Suite 106
            Pasadena, CA 91105
        BY: **JESSICA K. BANSAL, ATTORNEY AT LAW**

            UCLA SCHOOL OF LAW
            385 Charles E Young Drive East
            Los Angeles, CA 90095
        BY: **AHILAN T. ARULANANTHAM, ATTORNEY AT LAW**


        **(APPEARANCES CONTINUED ON THE NEXT PAGE.)**


REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                    Official United States Reporter

**APPEARANCES:** (Continued)

For Defendants:

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
P.O. Box 868
Ben Franklin Station
Washington, DC 20044-0868
BY:  **SARAH L. VUONG, ASSISTANT DIRECTOR**
**WILLIAM WEILAND, SENIOR LITIGATION COUNSEL**

Monday - April 21, 2025                                    1:33 p.m.

P R O C E E D I N G S

---o0o---

THE COURTROOM DEPUTY:  These proceedings are being recorded by this court.  Any other recording of this proceeding, either by audio, video, including screenshots or any other copying of the hearing, is strictly prohibited.

This Court is now in session, the Honorable Edward M. Chen presiding.

The court is calling the case National TPS Alliance, et al. v. Noem, et al., Case Number 25-1766.

Counsel, please state your appearance for the record, beginning with the plaintiffs.

MS. MACLEAN:  Good afternoon, Your Honor.  Emi MacLean of the ACLU of Northern California representing plaintiffs.

THE COURT:  All right.  Good afternoon, Ms. MacLean.

MS. BANSAL:  Good afternoon, Your Honor.  Jessica Bansal from the National Day Laborer Organizing Network, for the plaintiffs.

THE COURT:  Morning.  Thank you, Ms. Bansal.

MR. ARULANANTHAM:  Good morning, Your Honor.  Ahilan Arulanantham for the National TPS Alliance, for the plaintiffs.

One thing, Your Honor.  I have an auto transcript thing. And I'm going to shut it off now so that it doesn't record this

proceeding.

THE COURT: Okay.

MR. ARULANANTHAM: And if it doesn't work, then I'm going to sign out and sign back in.

THE COURT: All right.

MR. ARULANANTHAM: I didn't think about it until she just said that, but I'll do that right now, Your Honor.

THE COURT: All right. Thank you, Mr. Arulanantham. And for the defendants.

MR. WEILAND: Good afternoon, Your Honor. Will Weiland for the United States, joined by Sarah Vuong.

THE COURT: All right. Thank you, Mr. Weiland, Ms. Vuong.

MR. ARULANANTHAM: And, Your Honor, I just -- it worked, so I'm not recording.

THE COURT: Good. All right. So we can proceed.

MR. ARULANANTHAM: Or that's what I think, anyway.

THE COURT: All right.

MR. ARULANANTHAM: I hit "stop" and it stopped, so hopefully --

THE COURT: Okay. Good.

Okay. So I think there are sort of two tracks that we need to discuss today. One is pertaining to Venezuelan beneficiaries; the other with respect to the Haitian beneficiaries. So let's talk about the Venezuelan case first.

So I see that the Ninth Circuit's proceeding with briefing, which will be completed, I guess, when, toward the end of May?  And it looks like it may be on the court calendar in July for a hearing on the postponement.

So let me first survey the parties and ask your views, currently, now, as to what you think should happen in the next couple of months in this case -- let's say between now and when a decision is rendered by the Ninth Circuit upon the postponement action -- starting with the plaintiffs.

**MS. MACLEAN:**  Thank you, Your Honor.  And it may actually make sense for us to speak about Venezuela and Haiti together, if that's acceptable.

**THE COURT:**  That's fine.

**MS. MACLEAN:**  And that's because we seek to modify the proposal with regard to how to proceed on our claims related to Haiti.  And we think it might be best to join them at this stage, in light of our review of the administrative record and the timeline for both the judicial proceedings and what is supposed to happen with regard to agency action concerning Haiti.

Plaintiffs had initially proposed to file a motion pursuant to Section 705 to protect the rights of Haitian TPS holders by April 29th.  And in last week's case management statement, we indicated that depending on our review of the administrative record, we might, instead, move for summary

judgment.

And now, after that review, we do propose, instead, to move for summary judgment on or around May 15th, in connection with all three challenged agency actions, the Venezuelan vacatur and termination decisions, and the Haitian partial vacatur decision. And we hope that this timeline will best preserve the court and party resources and expedite the process while ensuring the best protection for the plaintiffs, as well.

If Your Honor's amenable, I'd also like to address a couple of other issues that are related to the timeline, specifically --

**THE COURT:** Well, let me ask you about the timeline first. You say file on May 15th. Have you discussed with defendants a possible stipulation to a timeline? And what's your anticipation about the briefing schedule?

**MS. MACLEAN:** We haven't discussed with defendants a proposal around the timeline. We had presumed a 35-day briefing schedule, which we believe would result in a hearing date -- I don't have that at my fingerprints -- but we had understood that that would be a 35-day briefing schedule. We believe that that would allow for Your Honor to make a decision before the end date of the designation as it's currently set.

**THE COURT:** All right. Well, just looking at the calendar, if it's a 35-day, that would be around June 19th or so would be the earliest date for a hearing. So that's a

possible hearing date on the MSJs?

**MS. MACLEAN:**  Yes.  Thank you, Your Honor.  And the -- I would just note that the Haiti designation is due to end now on August 3rd --

**THE COURT:**  Right.

**MS. MACLEAN:**  -- unless there's agency action that would extend it.

**THE COURT:**  August 6th or August 3rd?

**MS. MACLEAN:**  August 3rd is what I have, unless my --

**THE COURT:**  Oh.  Somewhere I read in the -- in your CMC papers, I thought it had August 6th, but in either event -- okay.

**MS. MACLEAN:**  And we would just note that the agency's required to make a decision no later than June 4th, 60 days before the end of the designation.  And obviously if there's a decision to extend or an earlier decision to terminate, that might affect the timeline.

**THE COURT:**  Okay.  All right.  And then you had some other comments you wanted to make?

**MS. MACLEAN:**  Yes.  So defendants have now produced the administrative record for all three agency actions.  And plaintiffs have identified to the defendants what we consider to be deficiency in the -- deficiencies -- in these records, some of which we've elaborated in the case management statement.

In plaintiffs' view, the administrative records lack substantiation of the agency's purported justifications for the actions and lack records that are typically part of TPS periodic review processes; however, plaintiffs are prepared to accept the administrative record in light of defendants' reaffirmations that these constitute the complete administrative record, despite the identification of these deficiencies.

But we'd like the defendants to make a confirmation on the record not only via email just to avoid a situation where defendants would attempt to rely on additional materials to oppose a summary adjudication.  And a representation by counsel today on the record, in our view, would be sufficient.

But we -- we also believe that extra-record discovery is warranted and appropriate here.  And we intend to seek leave for extra-record discovery and would propose to do so a week from today, through a joint letter brief, pursuant to this Court's standing discovery order after meeting and conferring with defendants this week.

THE COURT:  All right.  Has that meeting-and-conferring commenced or have you been engaged in some meet-and-confer with respect to additional discovery?

MS. MACLEAN:  There has been minimal meet-and-confer related to -- related -- various issues that are related to the discovery.  We have not had a complete meet-and-confer related

to the discovery at this point.

And I would just add, the last -- the last point here is that there has been substantial meet-and-confer related to a document preservation and ESI protocol, as Your Honor had identified in the order.  And we hope to be able to reach resolution; however, if we can't reach a resolution on the document preservation and ESI protocol, we would propose to submit competing versions to the Court by the end of this week to avoid the delay or the potential loss of materials or metadata.

**THE COURT:**  Okay.

All right.  Let me hear from defendants what your views are, particularly in response to the proposal that's been offered.

**MR. WEILAND:**  Yes, Your Honor.  Will Weiland, again, here for the Government.

As I understood Counsel for the plaintiffs, they're envisioning filing summary judgment on May 15th and having briefing complete in 35 days.  We would actually ask for 30 days to respond to that briefing.

We haven't conferred with them at all on this, and this is a new proposal, but we would -- we would imagine, given the size of this complaint and allegations, that the briefing will be substantial.  And keeping it on a tight timeline of 35 days completed, if I understood Counsel to be saying that

correctly -- yeah -- we don't believe that's workable on our end.

THE COURT: All right. So that would push the hearing back, depending on how much time the plaintiffs wanted on -- if you were to get, let's say, 30 days, or 28 days, or something like that -- if the plaintiff still would respond under the normal time frame pursuant to our local rules, the reply brief I think is due 7 days after the opposition. And that would push the hearing back to early July. Or if you want an extra week or -- you know -- that would basically mean that the hearing would be held sometime in early July, which would be about three weeks in advance of any -- the first termination date; is that right? If it's August -- yeah.

MR. WEILAND: Yes, sir. That's -- based on the dates we discussed earlier in this conference, I do believe that to be true.

THE COURT: Okay. So I'll put a question mark there -- July hearing. Other comments that you might have in response?

MR. WEILAND: I guess I would address extra-record discovery first.

THE COURT: Okay.

MR. WEILAND: Because it seems like the summary judgment motion should be based on the record. So it's not really quite clear to me what additional discovery is

necessary.

THE COURT:  Well, maybe we should do the first question.  That is, the composition of the administrative records.  As I understand it, there's been a representation that, as far as the Government's concerned, it is complete. Everything that should be in the record is in there, even including the -- in the face of the plaintiffs' assertion -- that there's not much in there in terms of substantiation of justification and other things that one would typically find in a record for this kind of decision.

The Government's -- maybe we should confirm that it is -- notwithstanding those concerns -- that everything that should be there -- everything that was considered, I guess, or relied upon -- I think the term is "directly" or "indirectly" -- is in the record that's been put together; is that accurate?

MR. WEILAND:  I would say -- yes, Your Honor -- I would say there's a file certification with each of those, where the individual compiled the record and stated as much. And our client has confirmed -- and we told counsel this, this afternoon -- our client, the agency, has said that's the complete administrative record.

THE COURT:  All right.  So let me just stop right there.

Ms. MacLean, are you satisfied that we have clarity now that that is the administrative record?

**MS. MACLEAN:**  That is satisfactory to us, Your Honor. We were seeking a confirmation of this on the record after the identification of the deficiencies.  And that has been provided by Mr. Weiland, and we appreciate it.

**THE COURT:**  All right.  Good.  Thank you.

So then the question is the plaintiffs' request for evidence beyond the administrative record.  I understand that there's been some meet-and-confer, but not really.  I don't know if you've presented a specific list of items or how far those discussions have gone at this point.

**MS. MACLEAN:**  We have not had those discussions yet, at this point, Your Honor.

**THE COURT:**  All right.

Mr. Weiland, any comments?  I know you haven't seen their full request yet, so it's maybe hard for you to respond.  But it sounds like they're asking for a meet-and-confer over the next week or so and then tee the issue up.  Do you have any thoughts, procedurally, how we might proceed on that?

**MR. WEILAND:**  Yes, Your Honor.  I believe we said this in the case management statement, as a record review case, it should stand or fall on the record that's been presented to the Court.  We don't see any basis for extra-record discovery here. We don't think they've made any showing of bad faith in any way.

And so if we're proceeding to the summary judgment motion

on May 15th, and a briefing schedule to be set by that Court -- or by this Court -- it's unclear why there's any need for any extra-record discovery, let alone the fact that they haven't made any showing.

THE COURT:  All right.  Well, it sounds like that's going to be a matter that the parties may not agree on, ultimately, and I'll have to adjudicate that.  But I -- in order to adjudicate that, obviously it's helpful, number one, to know what the administrative record is.  And now we do know that.  I think that was the first step that I had indicated.

Second, I need to know specifically what it is that the plaintiffs are asking for and why you think that such discovery is warranted under the circumstances.  But I'm sure you'll have that discussion, and then we'll tee that up by a joint letter brief to me.

MS. MACLEAN:  That's our intent, Your Honor.

THE COURT:  All right.  I anticipate there's not going to be a stipulation here.

MS. MACLEAN:  We would anticipate that there's not going to be a stipulation here.  We do think that there are exceptions to the standard rule for where extra-record discovery beyond the administrative record is warranted. for multiple reasons.  As Your Honor notes, we don't expect that we will have agreement, but we do intend to meet and confer.

We would note that Your Honor had already made a pretext

finding that -- in the order.  On page 59, Your Honor identified that confusion was not the Secretary's concern, so much as the desire to totally undo Secretary Mayorkas' decision.  That was before the administrative record.  The administrative record seems to even further substantiate that.

And the Supreme Court recognized, in *Department of Commerce*, that a pretextual rationale is sufficient for an *Overton Park* finding.  So that's just one of what we think are three reasons why extra-record discovery is warranted here.  And the full review of the administrative record makes that even more apparent.

**THE COURT:**  Well, okay.  I guess I will see all that when you file your letter brief, which sounds like may be fairly substantive on this question.

Let me ask, is what you are seeking documentary evidence?  You're not seeking depositions or anything like that?

**MS. MACLEAN:**  At this point, we're only seeking documentary evidence.

**THE COURT:**  Okay.  And this would be in service of the equal protection claim as opposed to the APA claim, or does it go to both?

**MS. MACLEAN:**  It goes to both the APA claim and the equal protection claim.  The -- the pretextual decision-making requires also -- and the -- on the -- it is part of the APA claim.  That was an APA claim that was at issue in *Department*

*of Commerce*, as well.

Also, there's an unexplained departure from agency practice, as we've identified here, where we've asserted that the agency is making a determination that TPS holders and TPS designations are, themselves, illegal can also be a justification for extra-record discovery. But we intend to elaborate this more fully in a joint letter brief after meet-and-confer.

THE COURT: All right. And are we anticipating cross-motions for summary judgment to motion for summary judgment?

MR. WEILAND: Yeah. Your Honor, since this proposal is relatively new to us, we hadn't fleshed out our position on that entirely. I suppose we should put a marker on the table then to say we'll move for cross-motion -- or cross-move for summary judgment. But --

THE COURT: All right. So then --

MR. WEILAND: -- we'd ask some grace from the Court if we later determine not to do so.

THE COURT: Well, the reason why I asked is because that could affect the briefing schedule. I mean, you could do simultaneous briefing or you could do the four-brief gang scheduling, where one party moves for a summary judgment, the other party files its opposition and then moves for cross-summary judgment. Then the original party files its

opposition to the cross-motion and its reply to its motion. And then -- you know -- that will extend the briefing time to a certain extent, although that may suggest, you know, the parties need something less than a full 30 days to respond since they have two opportunities to respond.

I think the main thing is, we need to have this heard within that time frame that I had calculated, which would be the -- for the mid-July -- and I will say, one logical date would be -- July 10th could be a hearing date. I believe we are available, Vicky.

**THE COURTROOM DEPUTY:** We are, Your Honor.

**THE COURT:** Yeah. I could also specially set this for, like, the 11th or something. But I would need to hear this, you know, somewhere around that time frame -- around the July time frame -- in view of the timing of things -- the August date. So if you could -- I'd like you to meet and confer, and that will give the Government a chance to figure out whether it really needs to file a cross-motion. If so, how that briefing can go.

If you -- I mean, I think I would prefer the four-brief schedule. It makes more sense, rather than simultaneous exchange. And then you end up replicating and duplicating and all sorts of stuff. I think everybody gets more out of it if you can do it. But that means it has to be slightly compressed, because now you've got four briefs to file.

The only thing I'm going to ask is I do need a minimum of the usual rule of two weeks between the hearing and whoever files the last brief.

MR. WEILAND:  Yes, Your Honor.  We'll get with the plaintiffs and discuss that.

THE COURT:  Okay.

MS. MACLEAN:  Your Honor, if I might, I -- plaintiffs -- I just wanted to say, on the record, that plaintiffs would oppose anything greater than the default briefing schedule, given the urgency of this issue, the harm due to the plaintiffs, and the fact that the record, as presented, is very small.

There's really only a couple dozen pages of records from this administration's decision-making process and then a number of newspaper articles, executive orders, and various reports. And the summary judgment briefing will likely rely largely on legal issues that have been litigated as part of the 705 briefing motion and potentially also as part of a motion to dismiss briefing, if defendants still intend to proceed in that way.

So we would strongly prefer the default briefing schedule and don't understand any justification for a greater briefing schedule.

THE COURT:  Well, again, I'd like you to meet and confer to see if you can work something out.  If there is a

four-brief schedule, like I said, that gives each side a chance to file two briefs. So that might obviate the need to pack everything in.

But, in any event, as long as I get the brief -- if we can figure out a schedule -- and maybe I should let you know now -- let's see -- what else is available here. We could hear it possibly the following -- that's getting kind of close, to tell you the truth. I mean, I'd like to hear it on the 10th or the 11th or thereabouts. So if you could work out a briefing schedule -- again, if you can't work it out, submit to me two competing schedules, and I will have to choose between those.

THE COURTROOM DEPUTY: Your Honor, the Court is not available on the 11th.

THE COURT: I am now.

THE COURTROOM DEPUTY: Okay.

THE COURT: There's been a change. So I meant to tell you, I -- we need to change the calendar on that.

THE COURTROOM DEPUTY: Okay. Thank you.

THE COURT: Okay. So -- and I take it the motion is going to involve both the APA claim and the equal protection claim?

MS. MACLEAN: Yes.

THE COURT: All right. And your view, at least as the plaintiffs, is that there are not disputed issues of fact? Because typically a question of unconstitutional intent and all

that is one that normally is amenable only to a fact-finding process.

MS. MACLEAN: We'll need to consult further. I think I misspoke. We intend to move on the APA claim with summary judgment. And we may need additional discovery on the equal protection claim.

THE COURT: All right. Okay. Well, let me indicate this: Depending what you move on, obviously this -- the summary judgment claim, at least with respect to the APA claim, I think is -- the timing of that is driven, in part, on the timing of the Haitian TPS decision.

The -- obviously, you know, we all like the benefit of the Ninth Circuit's -- if they -- on the -- their ruling on the current postponement motion. But it may be that we may not know that in advance. So that's less than ideal.

Of course -- I take it, the Secretary has not made a decision yet -- the trigger -- the 60-day period -- hasn't started yet -- so the Secretary hasn't made a decision on what to do with the Haitian TPS status situation, which would appear to expire on August -- and I don't know if it's August 3rd or 6th -- but somewhere in early August. Is that a fair assumption at this point, that no decisions have been made?

MR. WEILAND: Your Honor, I don't have any information on that. But certainly no decision has been published. I do believe that to be --

**THE COURT:** Okay.

**MR. WEILAND:** -- true. But I -- I don't have anything to offer on --

**THE COURT:** Okay.

**MR. WEILAND:** -- the decision-making process for that later date.

**THE COURT:** Okay.

**MR. ARULANANTHAM:** Your Honor, this is Ahilan Arulanantham.

**THE COURT:** Yeah.

**MR. ARULANANTHAM:** Oh, I'm sorry, Your Honor.

**THE COURT:** Go ahead.

**MR. ARULANANTHAM:** Just to note, I mean, if we're lucky enough that there's a decision and an extension, and it comes 60 days before August 3rd, then obviously we can adjust the schedule if -- you know -- if it turns out that it doesn't have that tight of a deadline after all.

But, yeah, I think we should take the schedule into account like we've been talking about, on the assumption it will fit. You know, if that happens, that's great. And then we can adjust the schedule accordingly.

**THE COURT:** Is there any urgency to hear -- if it weren't for the Haitian deadline, is there any urgency to hear the Venezuelan deadline or the Venezuelan beneficiaries' case at least while this -- while the postponement is still in

effect?  Is there any -- is that driven by anything?  Are there some dates that I should be aware of?

MR. WEILAND:  Your Honor, as things stand right now, it's -- that decision is postponed, per this Court's order.  We don't -- I mean, just to be clear, the Government maintains their jurisdictional arguments here, that the -- there is no jurisdiction.  That's one of the significant issues that is going to be reviewed, we believe, by the Ninth Circuit.  And we think that's -- waiting for that ruling is important.

So certainly don't see any reason to press the Venezuela prompt forward.  We would assert, overall, the whole case should be stayed pending that decision.  And we had -- are in discussions with the plaintiffs about the possibility of that.  But if we can't come to an agreement, we had intended to move the Court to that effect.

THE COURT:  Well, let me ask -- I know that we started off with the plaintiffs indicating they want to join the Haitian arguments and the claims with the Venezuelan claims.  But I'm wondering -- there's some time urgency, potentially, if the Secretary does not extend status with respect to the Haitian claim doesn't apply so long as the postponement order is still in effect.  Is there a reason to join the two for purposes of this summary judgment motion?

MS. MACLEAN:  I would just note, Your Honor identified that so long as the postponement motion is still in effect, the

defendants are, you know, acting through both stay applications and appellate processes to ensure that the postponement motion is not in effect.  So that is the greatest urgency and, you know, of significant import for Venezuelan TPS holders, as well.

We also believe that there is and will be sufficient evidence in the record, both from the administrative record that has been produced -- the administrative records that have been produced -- as well as extra-record discovery to be able to move forward expeditiously.  And we're responding to Your Honor's recommendation.  And the plaintiffs need to have a final adjudication on the merits as quickly as possible.

**THE COURT:**  Well, I understand your point.  There's also the countervailing point that since the case -- we know it's going to be heard by the Ninth Circuit in July -- I don't know how long they'll take to issue a decision, but often it's useful to get guidance from the appellate court on how it sees the jurisdictional issue, the review question, the -- all the issues that we're looking at.

You know, since it is only an appeal of a postponement action and not final adjudication, I don't know how -- you know -- hard to know how much guidance we'd get.  But often that guidance is useful.  So that's sort of the tension of sort of going into this while we're waiting for word, and, yet, we're just wondering.  I understand the need to address,

potentially, the Haitian situation.

Now, of course, we also have the case before Judge Cogan in the Eastern District of New York.  And I know there's a briefing schedule there, which is another question I have for you.  Taking that into account -- should the Court take that into account, or should the Court just proceed apace sort of acting in parallel?  What are your thoughts about -- I know that is -- scheduled briefing is to be completed in early May, I believe, from Judge Cogan's order.  What are your thoughts on that?

MR. ARULANANTHAM:  I'm happy to jump in here, Your Honor.  I mean, I think our view is that we want to take the steps needed to protect the members of the National TPS Alliance.  So, you know, while we're -- you know -- obviously, we're happy that there's other litigation happening elsewhere. We don't know what the ultimate effect of that litigation is going to be.  And we sort of feel an obligation to --

(Court reporter clarified.)

MR. ARULANANTHAM:  I'm so sorry.

We feel an obligation to protect our clients.  I think if there's a decision from that court that eliminates the urgency as to, you know, the NTPSA Haitian members before the issue is teed up for Your Honor, wherever it falls in the middle of this briefing schedule, then, you know, definitely we would be very happy to, you know, take another look at the briefing schedule

and, you know, adjust accordingly.

But we're just -- we're hesitant to take our foot off the pedal when we don't actually know, you know, what's going to happen in that case and, you know, what the effect of any ruling might be.

I'm sure Your Honor also knows there's the argument in the birthright case right now, which I don't know how that's going to be -- you know -- what that's going to say about the scope of injunctions and whether that would be relevant to APA relief and just like a lot of moving parts in that respect, Your Honor.

So I think our view is we would prefer to just keep on going forward as reasonably fast as possible in order to make sure that we can protect, you know, the Haitian -- our Haitian clients. And then, yes, if something else happens down the road later that justifies changing things, then we can cross that bridge.

THE COURT: Well, I'm wondering whether the best thing to do is similar to what Judge Cogan has ordered, which is sort of joint motions, one, for a Rule 705 postponement motion with respect to the Haitians, because that's the one that has the most potentially urgent deadline, and still brief the summary judgment, but that would give the Court some ability, if not necessary to rule on the merits, to see what the appellate court might have to say while preserving potentially -- if --

if a 705 motion is granted -- the interests of the Haitian beneficiaries.

Do you see any downside of why not join a 705 motion so that the Court has a full range of procedural options here?

MR. ARULANANTHAM: Emi, do you have anything to say on this? I mean, I think from -- yeah -- go ahead. Go ahead.

MS. MACLEAN: No. I mean, I just would concur with the points that Mr. Arulanantham and I have been making before, that, you know, at this stage, if there's anything that upsets Your Honor's 705 ruling with regard to Venezuela, there's hundreds of thousands of Venezuelan TPS holders who will be out of status, at risk of deportation, and at risk of losing their employment authorization.

And we believe that the best way to protect them is to ensure that there's a summary adjudication. And so we would like to move forward as quickly as possible and as quickly as the processes allow to be able to have a final judgment on the APA claim with regard to Venezuela.

THE COURT: I didn't say "in lieu of." I said "in addition to," as happening in the Eastern District of New York. He's got summary judgment, a postponement action, and I think ultimate merits briefing going on there.

So why not join a 705 motion for the Haitian beneficiaries along with your summary judgments motions? And that way, you know, I can look at the whole thing and see what's appropriate

in the circumstance.  Because there is the -- you know -- the interest in getting guidance from the Ninth Circuit, which should be pending soon, I mean, given that they've expedited the hearing and are going to hear the case it looks like on their July calendar.

**MS. MACLEAN:**  Your Honor, I think -- you know -- we're open to considering all options.  And Your Honor had recommended that we meet and confer around scheduling, and that might be the best next step on this so that we can come up with a schedule that responds to the concerns and recommendations that Your Honor has identified.

We would just note that the urgency with regard to Haiti, while significant, is not the same as the urgency with regard to Venezuela at the time that we filed, because the Venezuela termination was to enter into effect within a matter of weeks.  And Your Honor responded in kind.

With regard to the Haiti partial vacatur, there was a larger window of time before the final decision has been made -- before the final decision was to be made -- which allows us to be able to have the administrative record -- to review the administrative record.  And we hope to be able to get what we consider to be necessary extra-record discovery to allow for the final adjudication, which may not require a 705 motion.

But we are eager to take this back and meet and confer,

consult internally, and also meet and confer about what schedule might make the most sense.

THE COURT: All right. Why don't you meet and confer about that. It just seems to me that it makes sense, number one, at cross-motions, perhaps, if the Government wants. But it also makes sense to join a 705 motion along with that on behalf -- you know -- with respect to addressing any urgency that may arise with respect to the Haitian beneficiaries.

But why don't I give you a chance to meet and confer and maybe, in a week or so, to file a hopefully joint letter with a stipulation.

MS. MACLEAN: Certainly, Your Honor. We can absolutely file a joint letter -- and hopefully with a stipulation.

THE COURT: And then I'm also going to -- you're proposing to meet and confer -- also file a joint letter regarding the extra-record discovery request. My only request there is that you be specific in terms of what it is you're seeking and what your justification is with respect to the rule that might permit an exception to administrative record evidence.

MS. MACLEAN: Thank you, Your Honor.

THE COURT: And so I'm going to assume that we will have some kind of a hearing, whether it's on one or all motions, in July. And maybe we should set this for --

preliminarily set it for July 11th, since -- rather than trying to squeeze it into the law and motion calendar. This may be substantial. So why don't we just go ahead and set that now -- reserve that date -- let's say for 10 o'clock -- or 9:30 -- on the 11th of July. And you can then space out your briefing accordingly. That means I will need briefing two weeks before that to be completed.

MS. MACLEAN: Your Honor, we think that that may overlap with the oral argument schedule on the 9th. And so we would ask --

THE COURT: Oh.

MS. MACLEAN: -- instead, if possible, to hold a date in late June.

THE COURT: Late June? Well --

MS. MACLEAN: Is that possible?

THE COURT: Do you know what the -- which week is their calendar week for the Ninth Circuit?

MR. ARULANANTHAM: We know it's -- we know it's that week that they're -- that they gave us, but they didn't give us a day, at least last time I checked. I haven't checked in like 24 hours, but...

THE COURT: So it's the week of the 7th?

MR. ARULANANTHAM: Yeah. I mean, I also think we can do -- well, I guess, the risk is, if the argument's on the 11th, then we're going to be in trouble. If it's --

THE COURT:  You know what?  We can -- they also hear arguments usually in the morning; right?  We could set it for the afternoon.  That would minimize the chances.  And, if necessary -- you know -- if we have to hear it, I'm now available Monday after -- if worse comes to worst.  But I'd like to just get a date down for us.  And I would suggest the afternoon of the 11th, let's say at 1:30.  So in case you have a Ninth Circuit argument, I think there's a minimum chance they're going to hear it on a Friday afternoon.  I may be wrong, but that would be the best date to minimize any conflict.  All right?

MR. ARULANANTHAM:  Yes, Your Honor.

THE COURT:  And I don't know, is their calendar -- is that the Pasadena calendar or San Francisco calendar?  Did they tell you where they're going to -- did they just give you a date or week -- they didn't say where?

MR. ARULANANTHAM:  They did, but I don't remember which it was.  Do you know?

I think we'll -- it looks like Jess is looking it up right now and will tell you that in a moment.

THE COURT:  Okay.

Because, obviously, if it's in San Francisco, that will give you time to get over from one court -- if it's Los Angeles or Pasadena, that's a little more difficult.

MS. MACLEAN:  I think what we --

**MS. BANSAL:** I apologize, Your Honor. I'm trying to find it. But, yeah, do you have it, Emi?

**MS. MACLEAN:** So the motion -- sorry. The motion calendar set a July setting in San Francisco or Seattle for the week of the 7th through the 11th and Pasadena the week of the 14th through the 18th.

**THE COURT:** All right.

**MR. ARULANANTHAM:** They then -- didn't we then figure out that they gave us the first --

**MS. MACLEAN:** The 7th through the 11th, I believe.

**THE COURT:** All right. So it's San Francisco versus Seattle. Hard to believe they would bring you all the way up to Seattle, but you never know.

Okay. Well, let's just set it for now for 1:30, 7/11. And if you could hopefully stipulate to a briefing schedule leading up to that, I appreciate it. And then I also look forward to your discovery dispute letter. And so we'll go from there.

All right. Anything --

**MR. ARULANANTHAM:** Your Honor --

**THE COURT:** -- else we need to discuss?

**MR. ARULANANTHAM:** I think there are actually two more issues, Your Honor, if that's okay.

**THE COURT:** All right.

**MR. ARULANANTHAM:** So for -- I have one, and I think

Ms. Bansal has the other one.

**MS. BANSAL:** Do you want me -- mine's quicker.

**MR. ARULANANTHAM:** Yeah, yours is scheduling related. You should go first.

**MS. BANSAL:** Your Honor, we just wanted to alert the Court that there's three TPS decisions that are past due right now. Like, three countries that have designations that expire in less than 60 days. It's for South Sudan, Afghanistan, and Cameroon.

At this point, we have not seen the decisions, Your Honor. We don't know what, if anything, we may need to do, because we haven't seen anything. There was reporting on April 11th. And The New York Times reported that the Department of Homeland Security had made a decision to terminate for Afghanistan and Cameroon, but that hasn't been published.

There's been no news on South Sudan, which expires, actually, in 12 days. We had asked the Government last week if and when they intend or expect that these decisions are going to be published. And we haven't received an answer. So, at this point, we just wanted to make the Court aware and renew our request, you know, that defendants please advise when they expect those decisions will be published. Because we haven't seen them.

**THE COURT:** Okay. Well, that's not within the scope of this present suit. But I don't know if Mr. Weiland has any

comments or information.

MR. WEILAND: No, Your Honor, I don't have any comments or information on that.

I do think it raises an issue that we're looking -- and this is tangentially related to our scheduling. But we do intend to file a motion to dismiss. And one of the issues we're looking at is whether or not these cases are actually properly joined together.

We're talking about different decisions, different interests. We understand the association is pressing for associational standing. But there's really no overlap in the interest of the members on these. And it's becoming unwieldy with -- with regards to briefing.

This Court has been trying hard to make sure -- make it -- you know -- how do we do summary judgment and 705 stay for Haiti versus Venezuela. And if -- it seems -- it sounds, from that last question, that plaintiffs are anticipating potentially seeking leave to amend their complaint to add that. And we will probably oppose. And we're still digging into it, but that's -- that's really the crux of our concern, is that --

THE COURT: Okay.

MR. WEILAND: -- unlike the case you had before in *Ramos*, there's not a single legal theory here. These are completely different fact patterns in different countries -- different individuals affected -- who have no real overlap.

And so I wanted to alert the Court that that is a matter that we do still intend to file on the 29th.  And that is an issue we are strongly considering raising for this Court's consideration.  And it may impact any future motions for leave to amend should -- should some decision be published.

THE COURT:  All right.

MS. BANSAL:  Your Honor, if I might respond?

THE COURT:  Go ahead.

MS. BANSAL:  I mean, we've alleged, in the first amended complaint, Your Honor -- it's several pages -- paragraph 105 to, I think, 120 -- that the public statements of Secretary Noem and President Trump and Vice President Vance have -- you know -- they've clearly stated that they're -- they believe that this program is somehow unlawful, and that there's an intention to dismantle the TPS program.  And that's evinced, also, in the decisions that were published for Haiti and Venezuela.

There's a change in prior practice where now people with TPS are seen as somehow unlawfully present and the program itself constitutes unlawful immigration.  And so that is a unifying theme as to all the decisions that we're challenging.

And just to be clear, we're not -- we just would like to see the decisions, Your Honor.  We don't know what they have said or what reasons they've given.  But we're concerned with the delay in publishing even a decision for those countries.

THE COURT: All right. Well, I don't have jurisdiction over those questions. That's not before me. And if there is a motion to amend, you are hearing a preview of what the response is going to be. So that's all I can say at this point. I can only adjudicate what's before me.

MR. ARULANANTHAM: Thank you, Your Honor.

The other issue we raised with the defendants on April 4th, and we haven't heard back, and it's continuing to be a problem, which is that their client is detaining TPS holders, not, you know, by the thousands or something, but there have been -- I think it's something like ten maybe that we've known of over time. There were two today that came into my email. I think there's something like seven others that we were tracking at different points.

And in many of these cases, people are showing their I-94 or, you know, other proof of the -- of TPS status. Sometimes they're showing the employment authorization document with the subsection to show it's TPS. And, anyway, they're being told, you know, any number of things -- it's cancelled, it doesn't matter -- something like this -- and they're being detained anyway. This isn't only Venezuelans. There's one, for sure, for a Haitian that it happened where we, you know, wrote an email about it to the local field office.

And so what we were hoping was to get a process with the defendants whereby, you know, the lawyers can get involved to

share the information, you know, about the Court's order directly with the client.  The TPS statute, by the way -- it's actually -- I don't think it's ever come up in all the years we've been doing this litigation in front of Your Honor -- but the TPS statute unambiguously says they're -- the Attorney General shall not detain a TPS holder on the basis of their immigration status.

It's a super clear provision in the statute that we've never had to deal with, because this has never happened before. You know, in all the years we were litigating *Ramos*, this didn't come up.

So, you know, again, like the issue with other countries, it's not before Your Honor right now.  But we wanted to tell you that we've discussed it with them.  Thus far, it's sort of gone nowhere.  And we may seek the Court's help -- intervention -- whether to stop it on the front end or other steps to take as maybe necessary if we can't get the practice to stop.  And we've been trying, but it doesn't seem to be stopping, at least so far.

**THE COURT:**  Where -- where -- based on your information, where are folks being detained?  Is it across country or --

**MR. ARULANANTHAM:**  Yeah, several -- New York, Virginia, New Mexico, Texas -- yeah, multiple different places.

**THE COURT:**  All right.

Mr. Weiland, do you have any knowledge or comments you'd like to make?

**MR. WEILAND:**  No, Your Honor, other than to point out this isn't a class action, and they haven't shown that any of these individuals are members of their association, let alone a named plaintiff.

So we believe -- you know -- to the extent they think there are other claims to bring, those are probably other lawsuits that the individuals can raise.  And, certainly, if they're being detained with a view towards removal, then they can bring that up in their removal proceeding.  So we believe that to be wholly beyond the scope of the issues before this Court and have nothing, other than that, to say about it.

**THE COURT:**  Well, again, it's not before me.  You have a preview, Mr. Arulanantham, what the Government's going to argue.  So, again, I can't comment unless something's before me and I'll have to make a decision.  But, you know, obviously it sounds like the Government's going to raise jurisdictional issues, venue issues, et cetera, et cetera.  And, you know, I -- I'll address something that comes before me, but it's not before me at this point.  But I think you've got a short preview of what the Government's response may be.

**MR. ARULANANTHAM:**  Okay, Your Honor.  I mean, detention is no different than removal.  Employment authorization is one of the things that's guaranteed in the

statute.  But, anyway, that's -- if it's not before you, and we can't reach agreement, then we'll just take it to the court.  That's fine.

THE COURT:  Okay.  All right.  And if this issue does come before me, one of the questions is whether this constitutes a violation of the Court's order or are you alleging something done -- different source.  Anyway, I don't want to get into it, because I haven't thought about it much.  But there may be a number of issues here that we'll have to cross if that comes up.  But --

MR. ARULANANTHAM:  Very well, Your Honor.

THE COURT:  -- if brought before me, I will address it.

All right.  Anything else?

MR. ARULANANTHAM:  Not --

THE COURT:  All right.

MR. ARULANANTHAM:  -- from the plaintiffs, Your Honor.

Not from the plaintiffs, Your Honor.  Thank you.

THE COURT:  Okay.

From defense?

MR. WEILAND:  No, sir.  Thank you.

THE COURT:  Great.

So sounds like we will see you on July 11th.  And -- but I'm going to get two communications from you about the record and the briefing schedule.

All right.  So we'll see you in a couple of months.

MS. MACLEAN:  Thank you, Your Honor.

MR. ARULANANTHAM:  Thank you, Your Honor.

MS. BANSAL:  Thank you, Your Honor.

MR. WEILAND:  Yes, Your Honor.

THE COURT:  Great.  Thank you.  Thank you.

(Proceedings adjourned at 2:23 p.m.)

---oOo---


**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Wednesday, April 30, 2025


_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court