# Exhibit B

No. 24A

# In the Supreme Court of the United States

————————

KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, ET AL., APPLICANTS

*v.*

NATIONAL TPS ALLIANCE, ET AL.

————————

APPLICATION TO STAY THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

————————

D. JOHN SAUER
  *Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

TABLE OF CONTENTS

Statement ..................................................................................................... 4

    A.    Legal Background ................................................................. 4

    B.    Factual Background ............................................................ 6

    C.    Procedural Background ...................................................... 10

Argument ................................................................................................. 14

    A.    The Government Is Likely To Succeed On The Merits ........................ 15

        1.    The statute precludes judicial review of the Secretary's determination with respect to vacating the extension ........... 16

        2.    The Secretary had authority to vacate the outgoing administration's extension of Venezuela's TPS designation .. 20

        3.    The district court's equal protection analysis is flawed ........ 23

    B.    At Minimum, The District Court Erred In Granting Universal Relief 31

    C.    The Other Factors Support Relief From The District Court's Order ... 34

        1.    The issues raised by this case warrant this Court's review ... 35

        2.    The equities favor a stay ...................................................... 36

Conclusion ............................................................................................... 38

ii

## PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) are Kristi Noem, in her official capacity as Secretary of Homeland Security, United States Department of Homeland Security, and the United States of America.

Respondents (plaintiffs-appellees below) are National TPS Alliance, Mariela Gonzalez, Freddy Arape Rivas, M.H., Cecilia Gonzalez Herrera, Alba Purica Hernandez, E.R., Hendrina Vivas Castillo, Viles Dorsainvil, A.C.A., and Sherika Blanc.

## RELATED PROCEEDINGS

United States District Court (N.D. Cal.):

> *National TPS Alliance* v. *Noem*, No. 25-cv-1766 (Mar. 31, 2025) (order postponing agency actions)

> *National TPS Alliance* v. *Noem*, No. 25-cv-1766 (April 4, 2025) (order denying motion for stay pending appeal)

United States Court of Appeals (9th Cir.):

> *National TPS Alliance* v. *Noem*, No. 25-2120 (April 18, 2025) (order denying motion for stay pending appeal)

# In the Supreme Court of the United States

———————

No. 24A

KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, ET AL., APPLICANTS

*v.*

NATIONAL TPS ALLIANCE, ET AL.

———————

APPLICATION TO STAY THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

———————

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General—on behalf of applicants Kristi Noem, et al.—respectfully files this application to stay the order granting a motion to postpone agency actions that was issued by the United States District Court for the Northern District of California (App., *infra*, 1a-77a), pending the consideration and disposition of the government's appeal to the United States Court of Appeals for the Ninth Circuit and, if the court of appeals affirms the order, pending the timely filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court.

The Temporary Protected Status (TPS) program implicates particularly discretionary, sensitive, and foreign-policy-laden judgments of the Executive Branch regarding immigration policy. Congress has expressly authorized the Secretary to provide temporary relief to aliens who cannot safely return to their home nation due to a natural disaster, armed conflict, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. 1254a(b)(1)(C). The statute commits to the Secretary's sole discretion such judgments as whether the conditions in a particular country are "ex-

(1)

2

traordinary," and whether allowing foreign nationals to temporarily remain in the United States would be "contrary to the national interest." 8 U.S.C. 1254a(b)(1)(C). When the Secretary determines that a country no longer meets the conditions for designation, the statute requires her to terminate the TPS designation, 8 U.S.C. 1254a(b)(3)(B)—as Secretaries have periodically done across administrations. To protect the Secretary's wide discretion in this fast-moving area of foreign affairs, Congress shielded those determinations from judicial review: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state." 8 U.S.C. 1254a(b)(5)(A).

On February 1, 2025, Secretary Noem terminated one portion of the TPS designations relating to Venezuelan nationals. The prior administration had twice designated Venezuela for TPS—once in 2021 and again in 2023. The first designation extended to September 10, 2025; the latter, to April 2, 2025. In the final days of the last administration, however, Secretary Alejandro N. Mayorkas effectively extended both TPS designations until October 2026. But Secretary Mayorkas's notice was to become legally effective only on April 3, 2025. Shortly after Secretary Noem's confirmation on January 28, 2025, she vacated the noticed extension. Thereafter, and in consultation with appropriate U.S. government agencies, she reviewed relevant country conditions, evaluated public safety and other legitimate policy concerns, and terminated Venezuela's 2023 TPS designation as contrary to the "national interest." 8 U.S.C. 1254a(b)(1)(C). That termination was set to take effect on April 7, 2025. The 2021 designation remains in effect until September 10, 2025.

The Secretary's determination to vacate an extension that had not yet taken legal effect, and then to terminate one of the two TPS designations for Venezuela, are quintessentially unreviewable decisions under the statutory framework that Con-

3

gress enacted. Yet the district court issued sweeping preliminary relief that overrides the Secretary's determinations and stays her vacatur and termination decisions indefinitely as to hundreds of thousands of program beneficiaries nationwide. The court reasoned that respondents, a nonprofit organization and seven TPS beneficiaries from Venezuela, mounted supposedly reviewable collateral challenges under the Administrative Procedure Act (APA)—reasoning that would eviscerate the statute's bar on judicial review. See App., *infra*, 23a-27a, 55a-59a. The court also faulted the Secretary for vacating Secretary Mayorkas's not-yet-effective TPS extension determination—even though agencies have inherent authority to reconsider prior actions before they take effect. See *id*. at 44a-55a. The court further held that the Secretary's determinations to vacate the extension and terminate the 2023 TPS Designation likely rested on impermissible racial animus in violation of equal protection principles, citing a pastiche of out-of-context "evidence" that raises no plausible inference of racial animus. See *id*. at 59a-75a. That spurious theory, if upheld, could be applied to invalidate virtually any immigration-related initiative of the Trump administration, and it ignores the Secretary's reasoned policy determination justifying the decisions at issue here.

On top of all that, the district court entered nationwide relief supplanting Secretary Noem's assessment of the national interest—an area into which a district court is uniquely unqualified to intrude. See App., *infra*, 75a-77a. The court thus wrested control of the nation's immigration policy away from the Executive Branch and imposed the court's own perception as to whether the government's actions might "contradict U.S. foreign policies," "have adverse national security ramifications," or "weaken the standing of the United States in the international community." *Id*. at 41a-44a. The court's order contravenes fundamental Executive Branch prerogatives

4

and indefinitely delays sensitive policy decisions in an area of immigration policy that Congress recognized must be flexible, fast-paced, and discretionary.

A panel of the Ninth Circuit issued a one-page order summarily denying the government's request for a stay pending appeal. Indeed, the panel issued two other unreasoned denials of stays that same afternoon.[1] The panel's only explanation was that the government purportedly had "not demonstrated that they will suffer irreparable harm." App., *infra*, 85a. That explanation cannot withstand scrutiny. So long as the order is in effect, the Secretary must permit hundreds of thousands of Venezuelan nationals to remain in the country, notwithstanding her reasoned determination that doing so is "contrary to the national interest." 8 U.S.C. 1254a(b)(1). That finding alone suffices to establish the threat of irreparable harm. Moreover, the district court's decision undermines the Executive Branch's inherent powers as to immigration and foreign affairs. It also frustrates the statutory scheme, which specifies that TPS designations must be "temporary," 8 U.S.C. 1254a(a), and, when circumstances change, *requires* the Secretary to terminate TPS designations so that the ordinary Title 8 processes can resume, see 8 U.S.C. 1254a(b)(1)(B). The decision to delay the Secretary's actions effectively nullifies them, tying them up in the very judicial second-guessing that Congress prohibited. The district court's ill-considered preliminary injunction should be stayed.

**STATEMENT**

**A.    Legal Background**

In 1990, Congress established a discretionary program for providing temporary shelter in the United States for aliens from countries experiencing armed conflict,

---

[1] See *Shilling* v. *Trump*, 24A1030, (filed Apr. 19, 2025); Order, *Shilling* v. *Trump*, No. 25-2039 (Apr. 18, 2025); Order, *Community Legal Services of East Palo Alto* v. *Department of Health and Human Services*, No. 25-2038 (Apr. 18, 2025).

natural disaster, or other "extraordinary and temporary conditions" that prevent the aliens' safe return. 8 U.S.C. 1254a(b)(1)(C); see Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. The program authorizes the Secretary of Homeland Security, "after consultation with appropriate agencies of the Government," to designate countries for "Temporary [P]rotected [S]tatus," if she finds:

> (A)   *  *  *   that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

> (B)   *  *  *   that— (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected, (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and (iii) the foreign state officially has requested designation under this subparagraph; or

> (C)   *  *  *   that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States

8 U.S.C. 1254a(b)(1).[2]

When the Secretary designates a country for TPS, eligible individuals from that country who are physically present in the United States on the effective date of the designation (and continuously thereafter) may not be removed from the United States and are authorized to work here for the duration of the country's TPS designation. 8 U.S.C. 1254a(a) and (c).

As the program's name suggests, the statute instructs that designations will be "temporary." 8 U.S.C. 1254a(a). Initial designations and extensions thereof may

---

[2] While the provisions at issue refer to the Attorney General, Congress has transferred the authority to the Secretary of Homeland Security. See 6 U.S.C. 552(d), 557.

6

not exceed eighteen months. 8 U.S.C. 1254a(b)(2) and (3)(C). The Secretary, in consultation with appropriate agencies, must review each designation at least 60 days before the designation period ends to determine whether the conditions for the country's designation continue to be met. 8 U.S.C. 1254a(b)(3)(A). If the Secretary finds that the foreign state "no longer continues to meet the conditions for designation," she "shall terminate the designation" by publishing notice in the Federal Register of the determination and the basis for the termination. 8 U.S.C. 1254a(b)(3)(B). If the Secretary "does not determine" that the foreign state "no longer meets the conditions for designation," then "the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." 8 U.S.C. 1254a(b)(3)(C).

The TPS statute leaves to the Secretary the sensitive judgment calls about the government's national interest. The statute categorically bars judicial review of her TPS determinations: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. 1254a(b)(5)(A).

### B.    Factual Background

Since the statute was enacted, every administration has designated countries for TPS or extended those designations in extraordinary circumstances.[3] But Secretaries across administrations—including that of President Bill Clinton,[4] President

---

[3] See Gov't Accountability Office, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* 11 fig. 2 (Apr. 2020), http://gao.gov/assets/gao-20-134.pdf (charting TPS designations).

[4] See, *e.g.*, *Termination of Designation of Lebanon Under Temporary Protected Status Program*, 58 Fed. Reg. 7582 (Feb. 8, 1993); *Termination of Designation of Rwanda Under Temporary Protected Status Program After Final 6-Month Extension*, 62 Fed. Reg. 33,442 (June 19, 1997).

7

George W. Bush,[5] and President Barack Obama[6]—have also terminated designations when the conditions were no longer met. This case involves Secretary Noem's determination to terminate the TPS designation of a particular country (Venezuela) for a particular subset of its nationals (those who became beneficiaries in October 2023).

1.      On January 19, 2021, President Trump announced that he would defer for 18 months the removal of certain Venezuelan nationals who were present in the United States. See *Deferred Enforced Departure for Certain Venezuelans*, 86 Fed. Reg. 6845 (Jan. 25, 2021). The President announced the program in connection with sanctions that the administration had imposed against the Venezuelan regime, led by Nicolás Maduro. See *ibid.* Following a change in administration, Secretary Mayorkas then designated Venezuela for TPS, citing extraordinary and temporary conditions that he determined prevented Venezuelans from safely returning. *Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure,* 86 Fed. Reg. 13,574 (Mar. 9, 2021) (2021 Designation).

On October 3, 2023, Secretary Mayorkas extended the 2021 Designation through September 10, 2025, while simultaneously redesignating Venezuela for TPS until April 2, 2025. *Extension and Redesignation of Venezuela for Temporary Protected Status*, 88 Fed. Reg. 68,130 (2023 Designation). This redesignation allowed Venezuelan nationals who were initially ineligible for TPS—primarily because they

---

[5] See, *e.g., Termination of the Designation of Montserrat Under the Temporary Protected Status Program*, 69 Fed. Reg. 40,642 (July 6, 2004); *Termination of the Designation of Burundi for Temporary Protected Status*, 72 Fed. Reg. 61,172 (Oct. 29, 2007).

[6] See, *e.g., Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Guinea's Designation for Temporary Protected Status*, 81 Fed. Reg. 66,064 (Sept. 26, 2016); *Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Sierra Leone's Designation for Temporary Protected Status*, 81 Fed. Reg. 66,054 (Sept. 26, 2016).

had arrived to the United States after the 2021 Designation—to apply for TPS for the first time. See *id.* at 68,130, 68,132.

On January 17, 2025, the last Friday of the prior administration, Secretary Mayorkas published a notification that the Department would extend the 2023 Designation for 18 months. *Extension of the 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 5961, 5961 (Jan. 17, 2025). Critically, the extension would become effective only on April 3, 2025. See *ibid.* Secretary Mayorkas also announced a consolidated process for individuals who had been granted TPS under either the 2021 or 2023 Designations to register under that extension. *Id.* at 5962-5963.

That approach was "novel." See *Vacatur of 2025 Temporary Protected Status Decision for Venezuela*, 90 Fed. Reg. 8805, 8806-8807 (Feb. 3, 2025). The 2021 and 2023 Designations had previously been subject to different registration processes. Further, before the January 2025 notification, these designations would have expired on different dates: The 2023 Designation on April 2, 2025, and the 2021 Designation on September 10, 2025. See *ibid.* The Secretary was accordingly under no obligation to act on the 2021 Designation until July 12, 2025, the date by which the statute requires the Secretary to assess whether the "conditions for such designations * * * continue to be met." 8 U.S.C. 1254a(b)(1)(B). Yet Secretary Mayorkas preempted that determination: His actions had the effect of extending the 2021 Designation by allowing *all* eligible Venezuela TPS beneficiaries to re-register under the 2023 Designation and thus obtain TPS through the same extension date of October 2, 2026. See 90 Fed. Reg. 5961, 5963.

2.   On January 28, 2025, following the change in administration, Secretary Noem vacated the extension, two months before it was set to take legal effect. The

extension, she explained, attempted to extend two different designations, which expired on different dates, at a time when both were still in effect, and long before the 2021 Designation was set to expire. 90 Fed. Reg. at 8807. The Secretary determined that the basis for such an extension was "thin and inadequately developed," and that vacatur was warranted so that the new administration could have its own "opportunity for informed determinations regarding the TPS designations." *Id.* at 8807. The Secretary reasoned that because an "exceedingly brief period" had elapsed since Secretary Mayorkas first noticed his extension, it was appropriate to restore the status quo, and that the concerns justifying vacatur outweighed any highly attenuated reliance interests.[7] *Ibid.* The Secretary therefore announced that the 2023 and 2021 Designations would remain in effect until their end dates of April 2, 2025, and September 10, 2025, respectively, and promised separate determinations as to whether to terminate each designation in accordance with statutory deadlines. *Ibid.*

3.    On February 1, 2025, after consultation with relevant agencies, Secretary Noem terminated the 2023 Designation. *Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 9040, 9041 (Feb. 5, 2025). She determined that "permitting the aliens to remain temporarily in the United States [would be] contrary to the national interest of the United States," 8 U.S.C. 1254a(b)(1)(C), such that the statutory conditions for designation were no longer met, 90 Fed. Reg. at 9042. The Secretary cited several factors that informed her "discretionary judgment." *Ibid.* The TPS program, she explained, had allowed "a

---

[7] DHS immediately stopped accepting Venezuela TPS re-registration applications filed under the Mayorkas Notice, and the agency will refund any fees paid by TPS beneficiaries who had already filed applications pursuant to that Notice. 90 Fed. Reg. at 8807. The Secretary also recognized that some beneficiaries of the 2021 Designation might have re-registered for the 2023 Designation after the Mayorkas Notice issued. *Ibid.* The Secretary restored status under the 2021 Designation for any such individuals, such that they will retain TPS benefits until at least September 10, 2025. *Ibid.*

significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States." *Ibid.* The sheer number of individuals had stretched local resources, including "city shelters, police stations, and aid services," to their "maximum capacity." *Id.* at 9043. The Secretary also found that the TPS program had a potential "magnet effect," attracting additional Venezuelan nationals even beyond the current TPS beneficiaries. See *id.* at 9043 & n.18 (quoting *Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program,* 62 Fed. Reg. 16,608, 16,609 (Apr. 7, 1997)). "Among the[] Venezuelan nationals who have crossed into the United States are members of the Venezuela gang known as Tren de Aragua," and the Secretary therefore considered the "potential nexus to criminal gang membership" and "public safety" concerns as part of her determination. *Id.* at 9042.

The Secretary set the termination of the 2023 Designation to take effect on April 7, 2025—60 days after publication in the Federal Register. 90 Fed. Reg. at 9043 (citing 8 U.S.C. 1254a(b)(3)(B)). The Secretary did not terminate the 2021 Designation, which will remain effective until at least September 10, 2025. See *id.* at 9044.

### C.    Procedural Background

1.    On February 18, 2025, respondents brought APA challenges to the Secretary's determinations to vacate Secretary Mayorkas's extension of the 2023 Designation and to terminate that designation, seeking to postpone the effective date of both determinations. Respondents include individuals who hold beneficiary status under the 2021 and 2023 Designations, plus an organizational plaintiff—the National TPS Alliance (NTPSA)—whose members include beneficiaries under both designa-

11

tions.  See Am. Compl. ¶¶ 15-24; see also D. Ct. Dkt. 34 ¶¶ 35-39 (Feb. 20, 2025).[8]

2.    On March 31, 2025, the district court granted respondents' motion and postponed the Secretary's vacatur and termination determinations from taking effect nationwide.  In other words, the district court indefinitely prevented the rescission of a TPS designation covering more than 300,000 Venezuelan nationals.

a.    The district court held that Section 1254a(b)(5)(A) did not bar judicial review of respondents' claims, including their APA challenges to the Secretary's vacatur determination.[9]  App., *infra*, 25a-27a.  The court explained that it had previously addressed the scope of Section 1254(a)(b)(5)(A) in *Ramos* v. *Nielson*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018)—"another case that involved TPS terminations but during the first Trump administration."  App., *infra*, 23a.  The court recognized that, on appeal, the Ninth Circuit had reversed its holding.  See *Ramos* v. *Wolf*, 975 F.3d 872 (9th Cir. 2020).  That panel decision, however, was later vacated so that the case could be heard en banc, see 59 F.4th 1010 (9th Cir. 2023), and became moot when "the government, [now under] the Biden administration, made new decisions regarding the TPS and terminations at issue," App., *infra*, 24a.  The district court therefore decided to "adhere[] to its prior views on the scope of § 1254a(b)(5)(A)," *i.e.*, that respondents' arbitrary-and-capricious claims could be treated as "collateral challenges" on the Secretary's actions and were therefore outside the scope of the judicial review bar.  *Id*. at 24a & n.7 (citation omitted).

---

[8]  On February 20, 2025, respondents amended their complaint to include three Haitian nationals as additional plaintiffs.  Am. Compl. ¶¶ 25-27.  Those plaintiffs have challenged a separate TPS action that is not at issue in this application.

[9]  Respondents also challenged the Secretary's termination determination as arbitrary and capricious.  See App., *infra*, 13a.  The district court did not suggest that judicial review of that argument would be proper.  Cf. App., *infra*, 27a (holding only that Section 1254a(b)(5)(A) "does not bar judicial review of Plaintiffs' challenge to the Secretary's decision to *vacate*") (emphasis added).

12

b.    On the merits, the district court held that respondents were likely to succeed on their challenge to the vacatur for two independent reasons. First, the court held that the Secretary lacked authority to vacate the recently noticed extension. Though Secretary Mayorkas's extension had not yet taken effect—and had been noticed only for days—the court held that the statute forbade Secretary Noem from reconsidering or revoking the extension, such that it would remain in effect until October 2, 2026. App., *infra*, 50a-51a. Second, the court held that, even if the Secretary could vacate the extension, her rationale was arbitrary and capricious in violation of the APA. *Id.* at 55a. The court disagreed with the Secretary's determination that the consolidated process was "'novel'" or would create "confusion," instead deciding that a streamlined process "would tend to eliminate, not create, confusion," and it faulted the Secretary for failing to consider alternatives short of vacatur. *Id.* at 57a-59a.

The district court separately held that both the Secretary's vacatur and termination decisions were likely motivated by racial animus in violation of the equal protection component of the Due Process Clause. See App., *infra*, 59a-75a. The court relied on its own seven-year-old decision in *Ramos* holding that the last Trump administration had violated equal protection principles when it terminated TPS for different countries, even though a panel of the Ninth Circuit had overturned that decision. See *id.* at 70a-72a. The district court cited a handful of statements from Secretary Noem over the course of a year that, in the court's view, supposedly evinced racial animus, alongside statements from President Trump dating back to 2018. See *id.* at 64a-68a. The court also faulted the Secretary for purportedly acting too hastily in terminating the 2023 Designation; giving a rationale lacking reasoned support; and taking part in a historical pattern of discrimination, namely, the President's previous issuance of "adverse TPS decision[s] directed at non-whites." *Id.* at 75a; see *id.* at

72a-75a.

c.    The district court found that the remaining equitable factors weighed in respondents' favor. *See* App., *infra*, 30a-44a. The court recognized that Congress intended for respondents' protected status to be temporary, but then determined that termination of TPS would impose irreparable harm on otherwise eligible aliens. *Id.* at 31a-38a. The court discounted the government's interests in advancing its foreign and immigration policy. *See id.* at 38a-44a. Though Secretary Noem had determined that immediate termination was necessary to relieve strained local communities, 90 Fed. Reg. at 9042, the court disagreed based on respondents' own declarations and two amicus briefs, *see* App., *infra*, 38a-40a. The court likewise rejected the Secretary's findings as to public safety and national security, stating that terminating TPS protection would "threaten public safety" and "could actually have adverse ramifications to national security." *Id.* at 43a. The court speculated that any cooperation with the Maduro regime to effectuate removals might "contradict U.S. foreign policies" and "weaken the standing of the United States in the international community." *Id.* at 43a-44a.

d.    Finally, the district court determined that universal relief was appropriate and postponed the Secretary's actions pursuant to Section 705 of the APA. App., *infra*, 75a-77a. The court reasoned that universal relief was justified because "the agency actions have had a uniform and nationwide impact on all Venezuelan TPS holders located across the United States," and because NTPSA had "more than 84,000 members who are Venezuelan TPS holders in all fifty states plus the District of Columbia." *Id.* at 76a (emphasis omitted). The court also perceived "an interest in uniformity in the immigration system." *Ibid*. The court "acknowledge[d] that there are at least three other recent TPS cases that have been filed against the Trump admin-

14

istration, with at least two related to Venezuela specifically." *Ibid*; see *Casa, Inc.* v. *Noem*, No. 25-cv-525 (D. Md.) (filed Feb. 20, 2025); *Haitian Ams. United Inc.* v. *Trump*, No. 25-cv-10498 (D. Mass.) (filed Mar. 3, 2025); *Haitian Evangelical Clergy Assn.* v. *Trump*, No. 25-cv-1464 BMC (E.D.N.Y.) (filed Mar. 14, 2025).[10]

3.     On April 1, 2025, the government appealed the district court's decision and sought a stay pending appeal in both the district court and the court of appeals. See D. Ct. Doc. 95.  On April 4, 2025, the district court denied the government's request for a stay.  App., *infra*, 79a-83a.

4. On April 18, the Ninth Circuit issued a one-page denial of the government's request for a stay pending appeal, summarily stating that the government had not shown that it "will suffer irreparable harm absent a stay."  App., *infra*, at 85a.

## ARGUMENT

Under Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Court may stay preliminary relief entered by a federal district court.  See, *e.g.*, *Trump* v. *International Refugee Assistance Project*, 582 U.S. 571 (2017) (per curiam); *Brewer* v. *Landrigan*, 562 U.S. 996 (2010); *Brunner* v. *Ohio Republican Party*, 555 U.S. 5 (2008) (per curiam).[11]  To obtain such relief, an applicant must show a likelihood of success on the merits, a reasonable probability of obtaining certiorari, and a

---

[10]  The court rejected the government's argument that 8 U.S.C. 1252(f)(1) prohibited the requested relief by precluding courts (except this Court) from "enjoin[ing] or restrain[ing] the operation of" provisions including Section 1254a.  App., *infra*, 15a-22a (citation omitted). The court viewed that language as referring only to preliminary injunctions and temporary restraining orders, not the vacatur or postponement respondents sought.  *Ibid.*  The government is not pressing its Section 1252(f)(1) argument for purposes of this application, but the provision is an independent bar to the relief the district court granted, and the government intends to continue to assert it in the lower courts.

[11]  The cited cases arise in the context of preliminary injunctions.  The district court's order is styled as an order postponing the effective date of agency actions under 5 U.S.C. 705, but the practical effect of preventing the agency from taking certain actions is the same.  The same standard should therefore apply.

likelihood of irreparable harm. See *Hollingsworth* v. *Perry*, 558 U.S. 183, 190 (2010) (per curiam). In "close cases," "the Court will balance the equities and weigh the relative harms." *Ibid.* Those factors overwhelmingly support a stay here.

A.     **The Government Is Likely To Succeed On The Merits**

The Secretary's decision whether to designate, extend, or terminate TPS implicates sensitive judgments as to foreign policy and, in this case, the "national interest"—a discretionary determination that Congress expressly committed to her judgment. 8 U.S.C. 1254a(b)(1)(C), (b)(3), and (b)(5)(A). On his last Friday in office, the outgoing Secretary purported to extend Venezuela's 2023 TPS Designation until October 2026. Days later, Secretary Noem vacated that extension, and then she terminated the 2023 Designation after conducting her own assessment of the "national interest," 8 U.S.C. 1254a(b)(1)(C), in keeping with a "change in administration brought about by the people casting their votes," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part). The district court has now postponed the effective date of those agency actions.

The district court's reasoning is untenable. The court contravened an express bar on judicial review, sidestepped black-letter law authorizing agencies to reverse as-yet-inoperative actions, and embraced a baseless equal-protection theory on the road to issuing impermissible universal relief that intrudes on central Executive Branch operations. Its order upsets the judgments of the political branches, prohibiting the Executive Branch from enforcing a time-sensitive immigration policy and indefinitely extending an immigration status that Congress intended to be "temporary," 8 U.S.C. 1254a(a).

16

### 1.    The statute precludes judicial review of the Secretary's determination with respect to vacating the extension

The TPS statute is unambiguous: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS.  8 U.S.C. 1254a(b)(5)(A).  The statute commits to the Secretary's unreviewable authority any and all determinations concerning TPS designation, extension, and termination.  *Ibid.*  The Secretary's vacatur of the extension represents such a determination.  The district court exceeded its authority by ignoring Congress's commands and engaging in APA review of the Secretary's unreviewable decision.  See App., *infra*, 23a-27a, 55a-59a.

a.    The district court held that the Secretary's determination to vacate an extension was, "literally and textually," App., *infra*, 25a, not a determination "with respect to the designation, or termination, or extension of a designation, of a foreign state," 8 U.S.C. 1254a(b)(5)(A).  That is wrong.  The Secretary's action was plainly a determination "*with respect to*" an extension—*i.e.,* a determination that Secretary Mayorkas's extension was improper and should be vacated.  8 U.S.C. 1254a(b)(5)(A) (emphasis added).  Put simply, the Secretary determined that no extension should exist and vacated it months before it was set to take effect.

The text of Section 1254a(b)(5)(A) is broad.  First, Congress prefaced "determination" with the term "any."  8 U.S.C. 1254a(b)(5)(A).  "As this Court has repeatedly explained, the word 'any' has an expansive meaning."  *Patel* v. *Garland*, 596 U.S. 328, 338 (2022) (internal quotation marks omitted).  The provision thus captures determinations "of whatever kind."  *Ibid.* (quoting Webster's Third New International Dictionary 97 (1993)).  Likewise, the use of the phrase "with respect to," has "a broadening effect," as it "ensur[es] that the scope of [the] provision covers not only its subject

17

but also matters relating to that subject." *Id.* at 339 (quoting *Lamar, Archer & Cofrin, LLP* v. *Appling*, 584 U.S. 709, 717 (2018)).  When Congress has stripped a court of jurisdiction "in respect to" particular claims, this Court has accordingly construed it as a "broad prohibition."  *United States* v. *Tohono O'odham Nation*, 563 U.S. 307, 312 (2011); see *Patel*, 596 U.S. at 338.

Reinforcing this interpretation, "the Government's political departments [are] largely immune from judicial control" in the immigration context, *Fiallo* v. *Bell*, 430 U.S. 787, 792 (1977) (citation omitted), particularly when making the sensitive foreign-policy judgments at issue here.  The Executive Branch had long exercised inherent authority to afford temporary immigration status based on its assessment of conditions in foreign states, even before there was any "specific statutory authority" for such relief.  See *Hotel & Rest. Emps. Union, Loc. 25* v. *Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (per curiam).  That authority included the discretion "*not* to extend [protected] status" to a particular class of aliens, and the D.C. Circuit had recognized that such decisions were "unreviewable" by courts.  *Ibid.*  Congress legislated against that backdrop when it enacted the TPS program and codified in Section 1254a(b)(5)(A) the understanding that "[t]here is no judicial review" of such determinations.  8 U.S.C. 1254a(b)(5)(A).

The Secretary's determination to vacate an extension—*i.e.*, a determination that an extension was improper and should have no legal effect—is a determination "with respect to" an extension.  8 U.S.C. 1254a(b)(5)(A).  No other reading of the text is plausible.  Moreover, to hold otherwise would create an unusual disparity:  "[D]esignations" are unreviewable, as are "terminations" of those designations.  *Ibid.*  But under the district court's reading, "extensions" are unreviewable, while rescissions of extensions would not be.  See *ibid.*  That loophole is even less plausible given that the

18

point of the statute was to "limit[] unwarranted * * * extensions of TPS." *Ramos* v.
*Wolf*, 975 F.3d 872, 891 (9th Cir. 2020), reh'g en banc granted, opinion vacated, 59
F.4th 1010 (9th Cir. 2023); see pp. 21-22, *infra*.[12]

b.    The district court alternatively held that that respondents could evade
the statutory bar by characterizing their APA claims as "collateral" challenges to the
"process" by which Secretary Noem reached her termination decision. See App., *infra*,
26a. That reasoning is meritless and would create an end-run around the judicial-review
bar.

"If a no-review provision shields particular types of administrative action, a
court may not inquire whether a challenged agency decision is arbitrary, capricious,
or procedurally defective." *Amgen Inc.* v. *Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004);
see *Delgado* v. *Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (per curiam) (preclusion
provision barred review of APA claim "indirectly challenging" underlying order);
*Skagit County Pub. Hosp. Dist. No. 2* v. *Shalala*, 80 F.3d 379, 386 (9th Cir. 1996)
(preclusion provision applies when "procedure is challenged only in order to reverse
the individual [unreviewable] decision"). To hold otherwise "would eviscerate the
statutory bar, for almost any challenge to [a determination] could be recast as a chal-
lenge to its underlying methodology." *DCH Reg'l Med. Ctr.* v. *Azar*, 925 F.3d 503,

---

[12] Plaintiffs also brought an arbitrary-and-capricious challenge to the Secretary's ter-
mination of the 2023 Designation. See p. 11 & n.9, *supra*. The district court did not suggest
that it could review that challenge, see App., *infra*, 27a, and Section 1254a(b)(5)(A) would
plainly preclude review of a "determination * * * with respect to a termination," 8 U.S.C.
1254b(5)(A). The court's review of the vacatur decision, however, would effectively open the
Secretary's "termination" determination to judicial review, too. The Secretary's vacatur was
an essential prerequisite of her determination to terminate, rather than extend, the 2023
Designation. See 90 Fed. Reg. at 9044 (explaining that her "notice supersede[d] the January
17, 2025" notice). The Secretary's decision to "supersede[]" prior agency action in her termi-
nation determination was unreviewable under Section 1254a(b)(5)(A), and the fact that the
Secretary announced the rationale for that determination in a separate notice does not re-
move it from Section 1254a(b)(5)(A)'s scope.

505-507 (D.C. Cir. 2019).

Indeed, the Ninth Circuit had previously rejected the district court's theory of judicial review. The "TPS statute," it held, "precludes review of non-constitutional claims that fundamentally attack the Secretary's specific TPS determinations, as well as the substance of her discretionary analysis in reaching those determinations." *Ramos*, 975 F.3d at 891. It was not enough, the Ninth Circuit explained, for respondents to "insist that their APA claim does not challenge the specific TPS determination" or to "simply couch[] their claim as a collateral 'pattern or practice' challenge." *Id*. at 893. An APA challenge claiming that a Secretary failed to "adequately explain" her decision or had "depart[ed] from past practice" is "essentially an attack on the substantive considerations underlying the Secretary's specific TPS determinations, over which the statute prohibits review." *Ibid.*

Respondents pressed that type of APA challenge below. Secretary Noem vacated the extension because it employed a "novel" approach by consolidating registrations for two different designations—a maneuver she determined would create confusion and deny the new administration its own "opportunity for informed determinations regarding the TPS designations." 90 Fed. Reg. at 8807. But respondents argued—and the district court accepted—that the Secretary's decision contained *substantive* flaws: that she was wrong to view Secretary Mayorkas's approach as novel; that she erred in finding his two-track system confusing; and that she failed to consider alternatives short of vacatur of the extension. See App., *infra*, 54a-59a. In short, the district court found that the Secretary had not provided a "reasoned explanation for the change." *Id*. at 58a (quoting *Encino Motorcars, LLC* v. *Navarro*, 579 U.S, 211, 221 (2016)).

The district court's reasoning involves exactly the second-guessing that Section

20

1254a(b)(5)(A) forbids.  The district court thought it enough that its decision did not "dictate how the Secretary should *ultimately* rule on a TPS designation, termination, or extension."  App., *infra*, 26a (emphasis added).  That misses the point:  Because Section 1254a(b)(5)(A) "precludes [courts] from reviewing the Secretary's TPS determinations and her underlying considerations," *Ramos*, 975 F.3d at 894, the court had no authority to set aside the Secretary's determinations.  Yet the Ninth Circuit panel did not even engage with that basic legal problem, let alone weigh in on any other aspect of the merits.

### 2.  The Secretary had authority to vacate the outgoing administration's extension of Venezuela's TPS designation

The district court's alternative basis for postponing the Secretary's vacatur was equally flawed.  The Secretary has inherent authority to vacate an extension that her predecessor had issued days previously, and the district court erred in holding that Section 1254a(b)(1) precludes that action.  See App., *infra*, 44a-55a.

"[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion."  *Ivy Sports Med., LLC* v. *Burwell,* 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.).  That is because the "power to reconsider is inherent in the power to decide."  *Ibid.* (quoting *Albertson* v. *FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950)); *Macktal* v. *Chao,* 286 F.3d 822, 825-826 (5th Cir. 2002) ("[I]t is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); *Mazaleski* v. *Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.").

Here, Secretary Noem acted within days to reconsider and vacate Secretary

Mayorkas's eleventh-hour decision to extend TPS, and she did so months before the extension's effective date of April 3, 2025. This was a classic exercise of an agency's inherent power to reconsider past decisions. Underscoring the point, the Executive Branch—including Secretary Mayorkas—has long understood the Secretary's power to implement the TPS program to include the power to reconsider decisions. See *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador*, 88 Fed. Reg. 40,282, 40,285 & n.16 (June 21, 2023). In revisiting the Trump administration's previous termination decisions, Secretary Mayorkas likewise invoked the agency's "inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority," and explained that "[t]he TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination." *Id.* at 40,285 (footnote omitted); see *id.* at 40,285 n.16.

Far from curbing the Secretary's inherent power to reconsider past decisions, Section 1254a(b)(1) codifies the Executive Branch's "undoubtedly broad and unique" discretion to administer TPS. *Ramos*, 975 F.3d 890; see p. 17, *supra*. Section 1254a(b)(1) vests in the Secretary the sole authority to designate a foreign country, and it provides that she "may" do so when certain "extraordinary and temporary conditions" exist in the foreign state. 8 U.S.C. 1254a(b)(1)(C). "The word 'may' indicates that, even if the Secretary finds one of [the] requisite criteria is met, she retains the discretion *not* to designate a country for TPS." *Ramos*, 975 F.3d at 890. By contrast, the statute specifies that the "Secretary 'shall' periodically review the country conditions and 'shall' terminate TPS if she finds the requisite criteria are no longer met." *Id.* at 890-891. Taken together, those provisions afford the Secretary broad discretion

22

and, "to the extent the TPS statute places constraints on [that] discretion, it does so in favor of limiting unwarranted designations or extensions of TPS." *Id.* at 891.

The district court instead read Section 1254a(b) to curb the Secretary's discretion such that once one Secretary approves a TPS extension, no one else—not that Secretary or a successor—can vacate it, apparently no matter the foreign policy, national security, or national interests at stake or the seriousness of the error in the prior decision. App., *infra*, 51a (citing 8 U.S.C. 1254a(b)(3)(B)). That reasoning is unsupportable—especially because Secretary Mayorkas's extension here was not yet effective when Secretary Noem terminated it. The statute provides a mechanism for "terminat[ing] [a] designation" once in effect, 8 U.S.C. 1254a(b)(3)(B), but it provides no "mechanism capable of rectifying [a] mistaken" announcement that the Secretary *will* extend the designation on a future date. *Ivy Sports Med.*, 767 F.3d at 86 (citation omitted). The Secretary therefore acted well within her inherent authority in vacating an unwarranted extension before it took effect. Cf. *Kennecott Utah Copper Corp.* v. *U.S. Dep't of Interior*, 88 F.3d 1191, 1206 (D.C. Cir. 1996) (recognizing the benefits of allowing agencies to "correct mistakes and even  *  *  *  withdraw regulations until virtually the last minute before public release"); *Chen* v. *INS*, 95 F.3d 801, 805 (9th Cir. 1996) (holding that rule that was withdrawn before it became effective was not enforceable and "ha[d] no legal effect").

The alternative construction is implausible. It would entail that, in a statute meant to "limit[] unwarranted designations or extensions of TPS," *Ramos*, 975 F.3d at 891, Congress stripped the Secretary of her inherent authority to vacate an extension issued days previously, even though that extension had not taken yet effect (either on its own terms or by operation of the statutory deadline in Section 1254a(b)(3)(C)). The district court's reasoning would allow an outgoing administra-

tion to bind its successors on sensitive questions of foreign and immigration policy for more than 20 months—nearly half a Presidential term. Indeed, Secretary Mayorkas extended the 2023 Designation before the statute required action and for a term of 18 months—the outer bound of the statutory limit. See 8 U.S.C. 1254a(b)(3)(C). Further, he effectively extended the 2021 Designation nearly *six months* before the statute required him to act, purportedly preempting Secretary Noem's discretion and leaving her no authority to consider for herself whether the country conditions and "national interest" would favor the extension. 8 U.S.C. 1254a(b)(1)(C).

Section 1254a does not mandate such an unworkable limitation of the Secretary's ability to fulfill her responsibility to administer and enforce the immigration laws. See, *e.g.*, 6 U.S.C. 202(1)-(5), 8 U.S.C. 103(a)(1) and (a)(3). Indeed, the district court's construction would pose serious concerns under Article II, as it would represent a significant incursion on the Executive Branch's authority to oversee foreign affairs and immigration policy, and it should be rejected on that basis alone. See *United States* v. *Hansen*, 599 U.S. 762, 781 (2023) ("When legislation and the Constitution brush up against each other, our task is to seek harmony, not to manufacture conflict."); *Jones* v. *Hendrix*, 599 U.S. 465, 492 (2023) (explaining that "clear-statement rules [are] appropriate when a statute implicates historically or constitutionally grounded norms that we would not expect Congress to unsettle lightly").

### 3.    The district court's equal protection analysis is flawed

The district court likewise erred in holding that the decisions to vacate the extension and terminate the 2023 TPS Designation likely rested on impermissible racial animus on the part of the Secretary and President Trump. That holding applies the wrong legal standard, egregiously misconstrues the factual basis for the Secretary's actions as well as the Secretary's and President Trump's statements, and

24

would effectively brand any immigration policy of this administration as unconstitutional.

a. The district court's application of heightened scrutiny contravenes *Trump* v. *Hawaii*, 585 U.S. 667 (2018), which prescribes that rational-basis review governs constitutional challenges to Executive Branch immigration policies and that such policies pass constitutional muster so long as they are "plausibly related" to the government's policy objective. *Id.* at 704. That deferential review reflects that "decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications . . . defined in the light of changing political and economic circumstances,'" which are judgments "'frequently of a character more appropriate to either the Legislature or the Executive.'" *Id.* at 702 (citation omitted); see *Galvan* v. *Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government."). That reasoning certainly holds for TPS-related actions, which involve unique country-specific determinations that both "implicate 'relations with foreign powers'" and "involve 'classifications defined in the light of changing political and economic circumstances.'" 585 U.S. at 702 (citation and ellipsis omitted).

Yet the district court refused to follow *Hawaii* and apply rational-basis review to Secretary Noem's decision on the theory that TPS concerns aliens who are already in the United States. App., *infra*, 60a. That conclusion defies this Court's reasoning in *Hawaii* that rational-basis review applies "across different contexts and constitutional claims." 585 U.S. at 703. Underscoring the point, *Hawaii* approvingly cited *Rajah* v. *Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008), a case which, like this one, involved an equal protection challenge to an Executive Branch action brought by aliens within the United States, see *Hawaii*, 585 U.S. at 704.

25

The district court also dismissed foreign-policy concerns because the Secretary did not expressly "cite an interest in effecting foreign relations" in the vacatur action and supposedly did not sufficiently invoke national security and foreign relations in the termination action. App., *infra*, 61a. But foreign-policy concerns do not disappear from a program inherently laden with foreign-policy considerations simply because the Secretary did not state the obvious in the particular action. The government is engaged in complex negotiations with Venezuela that involve the use of multiple policy tools at multiple levels. See *id*. at 43a (noting that the government "has made an agreement with the Maduro government to resume deportations to Venezuela"); see also D. Ct. Doc. 104-9, at 57-58 (Apr. 7, 2025) (Secretary of State Rubio explaining that "[o]ur diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants"). TPS actions inherently involve determinations regarding the current state of emergencies within particular foreign countries, their nationals, and the effect of the TPS program on this country's national interests—all sensitive foreign policy judgments that the Constitution entrusts to the Executive, not courts.

b.     Even if heightened scrutiny were appropriate, respondents' equal protection claim fails. The district court applied *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), which requires respondents to establish that "a discriminatory purpose has been a motivating factor in the [government's] decision." *Id*. at 265-266.

The decision here, however, lacks any plausible discriminatory purpose, not least because Secretary Noem took the measured step of terminating TPS for 2023 beneficiaries while leaving it in place for those Venezuelans who are covered under

26

the 2021 Designation. On top of that, the Secretary provided reasoned explanations for her decision to vacate the extension and terminate Venezuela's designation. She consulted with the appropriate governmental agencies, including the Department of State, and determined that prolonging Venezuela's TPS designation was contrary to the national interest. A fair reading of her explanation for that determination indicates that it was based, among other factors, on the Secretary's concerns with the "sheer numbers" of "inadmissible or illegal aliens" that had entered the United States due to the prior administration's border policies, 90 Fed. Reg. at 9042; the "magnet effect" of a TPS extension, which had been a "pull factor[] driving Venezuelan nationals to the United States" at a time when the Secretary was concerned about members of Tren de Aragua who were "[a]mong the[] Venezuelan nationals who have crossed into the United States," *id.* at 9042-9043; the burdening of "city shelters, police stations, and aid services" that had reached "maximum capacity" due to the influx of immigration, *id.* at 9043; and the President's policy of promoting the national interest, including U.S. foreign policy interests, by discouraging "illegal and destabilizing migration," *ibid.* The Secretary's reasoning does not permit any inference of impermissible discriminatory intent.

Instead of focusing on the Secretary's stated justifications, the district court cherry-picked statements the Secretary made in social media posts and public appearances, where she advocated for and promoted policies that curb immigration and decrease crime, and wrongly portrayed those comments as racially tinged. App., *infra*, 64a-66a. But forceful condemnations of gang violence and broad questioning of the integrity of the prior administration's immigration practices, including potential abuses of the TPS program, do not evince discriminatory intent. See *ibid.*; see also D. Ct. Doc. 37-15, at 7 (Feb. 21, 2025) (Secretary Noem discussing "abuse[]" and lack

of "integrity" in TPS program).  Worse, the district court mischaracterized those state-
ments as supposedly portraying all Venezuelan TPS beneficiaries as engaging in
criminal activity or belonging to gangs, when the Secretary never said any such thing.
The court drew that inference because the Secretary "decided to take *en masse* actions
against all Venezuelan TPS beneficiaries, who number in the hundreds of thousands."
App., *infra*, 66a.  But the Secretary did not terminate TPS for all Venezuelan benefi-
ciaries—in fact, she expressly left in place the 2021 Venezuela TPS designation.  See
90 Fed. Reg. at 9044.

Moreover, although the Secretary linked her concerns with Tren de Aragua
and criminal activity with the TPS program, the Secretary's statements and her pub-
lished explanation for the termination do not indicate that she viewed TPS benefi-
ciaries in general as criminals and gang members.  For example, the district court
highlighted the Secretary's statement that the Department planned to "evaluate all
of these individuals that are in our country, including the Venezuelans that are here
and members of [Tred de Aragua]," after which the Secretary explained that she had
been in "New York City yesterday and the people of this country want these dirt bags
out." App., *infra*, 65a.  The district court misinterpreted the Secretary's statement as
calling all Venezuelans "dirt bags," *ibid.*, when her statement plainly refers to mem-
bers of Tren de Aragua—a group that the President designated a foreign terrorist
organization.  See *Designating Cartels and Other Foreign Organizations as Foreign
Terrorist Organizations and Specially Designated Global Terrorists*, Exec. Order No.
14157, 90 Fed. Reg. 8439 (Jan. 29, 2025); see also 90 Fed. Reg. 10,030 (Feb. 20, 2025)
(State Department designation).  That context was all the clearer because the Secre-
tary had just discussed her visit to New York City to help arrest a ringleader of Tren
de Aragua.  See D. Ct. Doc. 37-14, at 3 (Feb. 21, 2025).

28

The court refused to accept that common-sense understanding absent a "declaration under oath" from the Secretary, and it likewise refused to accept an objective understanding of the remaining statements. App., *infra*, 65a n.26; see *id*. at 66a. The court's insistence on implausibly reading the Secretary's statements out of context and construing them in the worst possible light is inconsistent with the presumption of regularity afforded to the Executive Branch. *United States* v. *Chemical Found., Inc.*, 272 U.S. 1, 14 (1926). Likewise, the court's suggestion that the government could defend its actions only through the Secretary's personal testimony defies this Court's admonitions that compelling the testimony of a high-ranking government official—especially a Cabinet Secretary—is rarely if ever justified. See *United States* v. *Morgan*, 313 U.S. 409, 422 (1941) (holding district court erred in ordering deposition of Secretary of Agriculture); *In re Department of Commerce*, 586 U.S. 956, 956 (2018) (granting emergency relief when district court compelled deposition of Secretary of Commerce).

Compounding its errors, the district court found animus by imputing statements of President Trump to the Secretary on a so-called "cat's paw" theory. App., *infra*, 66a-71a. That theory is untenable. Even if it were appropriate to consider President Trump's statements, they do not show racial animus. President Trump's statements observe that lax border policies of the previous administration led to the unlawful entry of millions of aliens, including disproportionate numbers of aliens with criminal records. *Id*. at 67a-69a. His statements call for the government to immediately secure the border, vigorously enforce our immigration laws, and promptly remove criminal aliens from our country—policy views shared by many millions of Americans. See *ibid*. These statements do not raise any plausible inference of racial animus.

29

Moreover, most of the statements cited by the district court did not relate to Venezuela at all, and many were "remote in time and made in unrelated contexts" and therefore "do not qualify as 'contemporary statements' probative of the decision at issue." *DHS* v. *Regents of the Univ. of Cal.*, 591 U.S. 1, 35 (2020) (opinion of Roberts, C.J.) (quoting *Arlington Heights*, 429 U.S. at 268); see *Ramos*, 975 F.3d at 898 (noting that President Trump's statements "occurred primarily in contexts removed from and unrelated to TPS policy or decisions").

The district court nevertheless faulted the administration writ large—and the Secretary's decisions here—as supposedly "continu[ing] a pattern of the Trump administration's targeting of non-white, non-European TPS holders." App., *infra*, 72a.[13] This charge is baseless. The court treated the President's statements as "discriminatory"—then attributed that supposed animus to Secretary Noem's ensuing actions on TPS—by pointing to 2018 statements about immigrants from other countries, campaign comments about Haitian immigrants in Springfield, Ohio and about the Biden administration's policies that allowed in "drug dealers" and other dangerous criminals that other countries, including Venezuela, refuse to allow back. *Id.* at 66a-69a. The district court even stretched to asserting that the President's statement that "[t]he American people deserve a Federal Government that puts their interests first" supposedly reflected covert racism. *Id.* at 68a.

---

[13] The district court correctly discounted the relevance of disparate impact. App., *infra*, 74a-75a. "[V]irtually every country that has been designated for TPS since its inception has been 'non-European' (with the exception of Bosnia and the Province of Kosovo) and most have majority 'non-white' populations." *Ramos*, 975 F.3d at 898. Accepting a disparate-impact claim here would mean that "almost any TPS termination in the history of the program" would "give rise to a potential equal protection claim." *Ibid.*; see *Regents of the Univ. of Cal.*, 591 U.S. at 34 (opinion of Roberts, C.J.) (noting that "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program," thereby refuting an equal protection claim).

30

But the President's well-founded view that the prior administration's border policies encouraged a mass illegal influx of aliens, and particularly attracted criminals, gang members, and drug dealers, underscores the President's national-security concerns. As the President, the Secretary, and others have repeatedly explained, the administration has been confronting a crisis at the border; the illegal influx of millions of aliens has created an unsustainable situation; the dangers of that influx have been heightened by the infiltration of groups like Tren de Aragua that seek to destabilize the country; and reforming programs that have been previously abused is a critical need. Yet, under the district court's reasoning, those concerns are irrelevant, and its indefensible misinterpretation of the President's statements going back to 2018 would vitiate every ensuing immigration policy on equal-protection grounds.

The Trump administration's handling of other TPS-related decisions further belies the district court's reasoning. During the first administration, for example, the administration extended TPS designations for four other "non-white, non-European" countries. *Ramos*, 975 F.3d at 898; see *id.* at 880 (describing the extension of TPS designations of Somalia, South Sudan, Syria, and Yemen). Also during the first administration, the President deferred removal of certain Venezuelans—an action that is inexplicable under the district court's assumption that the President has consistently harbored discriminatory animus. See 86 Fed. Reg. at 6845.

On the law, the district court's recitation of President Trump's prior statements could not show animus by *the Secretary* regardless. See, e.g., *Staub* v. *Proctor Hospital*, 562 U.S. 411, 418 (2011); *Ramos*, 975 F.3d at 897 ("We doubt that the 'cat's paw' doctrine of employer liability in discrimination cases can be transposed to th[e] particular context" of TPS terminations). Such an approach would invite judicial second-guessing of an agency official's actions based on mere allegations that a different gov-

ernment official harbored some discriminatory motive. Such second-guessing would in turn open the door to impermissible intrusion on privileged Executive Branch deliberations, see *United States* v. *Nixon*, 418 U.S. 683, 708 (1974), and potential litigant-driven discovery that would disrupt the President's execution of the laws, see *Nixon* v. *Fitzgerald*, 457 U.S. 731, 749-750 (1982).

Finally, the district court viewed the reasoning within the termination decision as "further indicat[ion] that the termination was motivated at least in part by animus." App., *infra*, 73a. The court faulted a "lack of evidentiary support" for the Secretary's rationale. *Ibid*. But, for this conclusion, the court relied on amicus briefs in support of respondents, not on the administrative record, which had not yet been produced. *Id*. at 73a-74a. The court erred in substituting its own judgment regarding the benefits of permitting Venezuelan TPS holders to maintain their status for the Secretary's view of the costs of the TPS program and her "predictive judgment (which merits deference)," *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009), regarding the benefits of terminating the designation. Because the Secretary's actions were plainly based on her view of the national interest, and not on any discriminatory animus, respondents' equal protection challenge fails.

**B.    At Minimum, The District Court Erred In Granting Universal Relief**

The district court compounded its errors by "postpon[ing] the effective date[s]" of the termination and vacatur nationwide, 5 U.S.C. 705, thereby granting universal relief that prohibits the Secretary from terminating TPS for 2023 beneficaries whether or not they are parties to the case. Such relief violates longstanding equitable principles that are incorporated into the APA and that require limiting any available relief to that which is necessary to address the harm to the plaintiff.

As Members of this Court have recognized, universal remedies are "incon-

sistent with longstanding limits on equitable relief and the power of Article III courts" and impose a severe "toll on the federal court system." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring); see *DHS* v. *New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay).  The government has explained those problems at length in recent emergency applications, on which this Court is scheduled to hear oral argument on May 15.  See Appl. at 15-28, *Trump* v. *CASA, Inc.*, No. 24A884 (Mar. 13, 2025); Appl. at 15-28, *Trump* v. *Washington*, No. 24A885 (Mar. 13, 2025); Appl. at 15-28, *Trump* v. *New Jersey*, No. 24A886 (Mar. 13, 2025).

Here, the district court sought to justify its universal remedy by pointing to the APA—specifically, to 5 U.S.C. 705.  That provision states that, "to the extent necessary to prevent irreparable injury," a reviewing court may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. 705.  The statutory reference to "necessary and appropriate process" incorporates traditional equitable principles.  Cf. *Starbucks Corp.* v. *McKinney*, 602 U.S. 339, 347 (2024) (holding that statutory phrase "just and proper" invokes traditional equitable standards).  In addition, the final clause of Section 705 provides that a reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action *or* to preserve status or rights pending conclusion of the review proceedings." *Ibid*. (emphasis added).  The statute's use of the disjunctive "or" provides courts with two options that may be appropriate during judicial review.  But including postponement as one possible form of relief does not mean that it will be "necessary to prevent irreparable injury" or "necessary and appropriate" in every case.  *Ibid*.

In the suit here, brought by only a subset of the individuals to which the actions apply, postponing the effective date of the actions on a universal basis was neither

consistent with traditional equitable principles nor "necessary and appropriate."  5 U.S.C. 705.  Universal relief running to all TPS beneficiaries is contrary to Section 705's focus on "prevent[ing] irreparable injury" to the challenging party and to general principles of equity, and is therefore improper.  5 U.S.C. 705.  A preliminary injunction for the benefit of the named plaintiffs, if otherwise warranted and available, would be sufficient to "prevent irreparable injury" to those plaintiffs and to preserve any "status or right" they may have.  *Ibid*.  That is the type of tailored relief Congress intended under Section 705.  As the House Report explained, the authority granted by what is now Section 705 "is equitable" and "would normally, if not always, be limited to the parties complainant."  H.R. Rep. No. 1980, 79th Cong., 2d Sess. 43 (1946).

In nonetheless holding that universal relief was warranted, the district court focused on NTPSA, the organizational plaintiff purportedly representing some 84,000 Venezuelan TPS holders living in all 50 States and the District of Columbia.  App., *infra*, 76a.  As an initial matter, the court should have focused on the members named in the complaint and should not have granted relief to absent members.[14]  Article III confines courts to adjudicating the rights of "the litigants brought before the Court."  *Broadrick* v. *Oklahoma*, 413 U.S. 601, 611 (1973).  Courts may not grant relief to members who were not identified in the complaint and who did not agree to be bound by the judgment.  See *FDA* v. *Alliance for Hippocratic Med.*, 602 U.S. 367, 399 (2024)

---

[14]  The amended complaint lists only five members who are beneficiaries under the 2023 Designation.  See Am. Compl. ¶¶ 19-20, 22-24.  NTPSA also filed a declaration listing two additional members who are beneficiaries under the 2023 Designation, and one additional member who has a pending application for TPS under the 2023 Designation.  See D. Ct. Doc. 34, at 6-8 (Feb. 20, 2025).  The other listed Venezuelan members in the amended complaint and declaration are beneficiaries under the 2021 designation, which is not affected by the termination action at issue here.  See 90 Fed. Reg. at 9044 ("The 2021 Venezuela TPS designation remains in effect until September 10, 2025.").

34

(Thomas, J., concurring).  Extending relief to NTPSA's absent members "subverts the class-action mechanism" by allowing the organization "to effectively bring a class action without satisfying any of the ordinary requirements" for class certification.  *Id*. at 402.  It also "creates the possibility of asymmetrical preclusion," enabling NTPSA's members to enjoy the benefits of a favorable judgment while escaping the burdens of an adverse one.  *Ibid*.  And even if the court could properly enjoin the enforcement of the actions against NTPSA's unnamed members, the court had no basis for granting relief to thousands more aliens who do not belong to that group.

The district court also deemed universal relief appropriate because the agency actions "have had a uniform and nationwide impact on all Venezuelan TPS holders located across the United States."  App., *infra*, 76a.  But Article III and principles of equity require courts to tailor relief to the scope of the plaintiff's injury, not to the scope of the defendant's policy.  The court's contrary view "lacks a limiting principle and would make nationwide injunctions the rule rather than the exception with respect to all actions of federal agencies."  *Arizona* v. *Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (Sutton, C.J., concurring).

Nor can the district court's order of universal postponement be justified by its reference to the "interest in uniformity in the immigration system."  App., *infra*, 76a. The way to achieve uniformity is for this Court to resolve circuit conflicts, not for district courts to issue universal relief.

### C.    The Other Factors Support Relief From The District Court's Order

In deciding whether to grant emergency relief, this Court also considers whether the underlying issues warrant its review, whether the applicant likely faces irreparable harm, and, in close cases, the balance of equities.  See *Hollingsworth*, 558 U.S. at 190.  Those factors overwhelmingly support relief here.

35

### 1.    The issues raised by this case warrant this Court's review

The district court's order impermissibly intrudes on an area of Executive Branch operations that Congress left to the Executive Branch's discretion, in a manner that stymies the operation of a time-sensitive program.  This Court has repeatedly intervened in similar circumstances.  See, *e.g.*, *Heckler* v. *Lopez*, 463 U.S. 1328, 1329 (1983) (Rehnquist, J., in chambers) (granting stay of district court order requiring Secretary of Health and Human Services "immediately to reinstate benefits to the applicants" and mandating that the Secretary then make certain showings "before terminating benefits"); cf. *Trump* v. *Sierra Club*, 140 S. Ct. 1 (2019) (granting stay of district court order enjoining the Department of Defense from undertaking any border-wall construction using funding the Acting Secretary transferred pursuant to statutory authority); *INS* v. *Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers) (granting stay of district court order requiring INS to engage in certain immigration procedures, as "an improper intrusion by a federal court into the workings of a coordinate branch of the Government").

This Court's immediate attention is especially warranted because protracted litigation will effectively preclude the President from enforcing a critical component of the administration's immigration policy.  For decades, Secretaries across administrations have terminated TPS designations without judicial intervention.  See pp. 6-7 & n.4-6, *supra*.  That changed in 2018, when the same district court invalidated several "TPS terminations * * * during the first Trump administration."  App., *infra*, 23a (quoting *Ramos* v. *Nielson*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018)).  The Ninth Circuit reversed the district court, only to grant review en banc—review that remained pending until a change in administration mooted the appeal years later.  *Ibid*. The pattern repeated in other district courts.  See, *e.g.*, *Saget* v. *Trump*, 375 F. Supp.

3d 280, 379 (E.D.N.Y. 2019) (preliminarily enjoining on a nationwide basis TPS termination as to Haiti); *Saget* v. *Biden*, No. 19-1685, 2021 WL 12137584 (2d Cir. Oct. 5, 2021) (stipulated withdrawal of appeal).

President Trump has determined that these efforts are "critically important to the national security and public safety of the United States," and he has directed the Secretary to ensure that TPS designations "are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of the statute." *Protecting the American People Against Invasion* § 16(b), Exec. Order No. 14,159, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). The district court, however, has blocked those actions once more, and it has done so on a theory that could threaten the administration's ability to enforce *any* immigration laws. See p. 29-30, *supra*.

2.    **The equities favor a stay**

Courts irreparably injure our democratic system when they forbid the government from effectuating those policies against anyone anywhere in the Nation. See *Doe #1* v. *Trump*, 957 F.3d 1050, 1084 (9th Cir. 2020) (Bress, J., dissenting). The district court's universal relief is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Legalization Assistance Project*, 510 U.S. at 1305-1306 (O'Connor, J., in chambers); see *Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (brackets and citation omitted). And the harm here arises in an area that implicates "a fundamental sovereign attribute exercised by the Government's political departments[,] largely immune from judicial control." *Fiallo*, 430 U.S. at 792 (citation omitted).

The harm here is particularly pronounced because the Secretary determined

37

that an 18-month extension would harm the United States' "national security" and "public safety," while also straining police stations, city shelters, and aid services in local communities that had reached a breaking point. 90 Fed. Reg. at 9044. Delay of the Secretary's decisions threatens to undermine the United States' foreign policy just as the government is engaged in complex and ongoing negotiations with Venezuela, including with respect to "an agreement * * * to resume deportations" to that country, App., *infra*, 43a; see p. 25, *supra*. The district court discounted the Secretary's assessment of the national interest by substituting its own policy views for her expertise and deciding for itself whether "economic considerations," "public safety," and "national security" favored extending the 2023 TPS designation for Venezuela. App., *infra*, 38a-44a. The court formed its own views of "U.S. foreign policies," based on its own assessment as to what might "weaken the standing of the United States in the international community." *Id.* at 43a-44a. That is a classic case of judicial arrogation of core Executive Branch prerogatives and alone warrants correction.

On the other side of the ledger, respondents have not established irreparable harm that warrants extraordinary relief. Congress designed the TPS statute to provide "temporary" status, see 8 U.S.C. 1254a(b)(1)(B)(i), (ii), (C), and (g), and the Secretary's termination decision provided the requisite 60-day notice that the 2023 Designation would terminate. Thus, respondents' alleged harms are inherent in the scheme *Congress* designed. See 8 U.S.C. 1254a(b)(3)(B). Respondents maintain that preliminary relief is warranted primarily based on the possibility that they might be removed if Venezuela loses its TPS designation. As an initial matter, the Secretary has not yet terminated the 2021 Designation, which covers many Venezuelan TPS beneficiaries—including several of the individual respondents and identified members of the NTPSA. See Am. Compl. ¶¶ 18, 21; D. Ct. Doc. 34, at 6-7. In any event,

the Secretary's decision to terminate TPS is not equivalent to a final removal order. See 8 U.S.C. 1101(a)(47). When a TPS designation terminates, beneficiaries return to the immigration status they held before Venezuela's designation. TPS beneficiaries may have other immigrant or nonimmigrant status, 8 U.S.C. 1254a(a)(5), and those who have a credible fear of persecution in their home country may apply for asylum, as many of the respondents represent that they are now pursuing, see, *e.g.*, D. Ct. Doc. 18, at 6 (Feb. 20, 2025); D. Ct. Doc. 29, at 2 (Feb. 20, 2025); D. Ct. Doc. 32, at 5 (Feb. 20, 2025); D. Ct. Doc. 34, at 6-7; D. Ct. Doc. 36, at 5 (Feb. 21, 2025). Respondents' concerns at this stage are therefore insufficient to outweigh the concrete harms to the government.

This Court's immediate intervention is warranted.

## CONCLUSION

This Court should stay the district court's order postponing the agency actions. Respectfully submitted.

D. JOHN SAUER
*Solicitor General*

MAY 2025

APPENDIX

District court order granting motion to postpone agency actions

    (N.D. Cal. Mar. 31, 2025) ........................................................... 1a

District court order denying stay pending appeal

    (N.D. Cal. Apr. 4, 2025) ........................................................... 79a

Court of appeals order denying stay pending appeal

    (9th Cir. Apr. 18, 2025) ........................................................... 84a

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL TPS ALLIANCE, et al., | Case No. 25-cv-01766-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION TO POSTPONE** |
| KRISTI NOEM, et al., | |
| Defendants. | Docket No. 16 |

## I.     INTRODUCTION

At issue is whether this Court should temporarily postpone actions by Kristi Noem, Secretary of the Department of Homeland Security, taken against over 600,000 Venezuelan nationals who have legal status to reside and work temporarily in the United States.  The Secretary's actions will shortly strip nearly 350,000 of these residents of their protection under the Temporary Protected Status ("TPS") program, subjecting them to possible imminent deportation back to Venezuela, a country so rife with economic and political upheaval and danger that the State Department has categorized Venezuela as a "Level 4: Do Not Travel" country "due to the high risk of wrongful detentions, terrorism, kidnapping, the arbitrary enforcement of local laws, crime, civil unrest, poor health infrastructure." https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-advisory.html (last visited 3/30/2025).  The unprecedented action of vacating existing TPS (a step never taken by any previous administration in the 35 years of the TPS program), initiated just three days after Secretary Noem took office, reverses actions taken by the Biden administration to extend temporary protection of Venezuelan nationals that have been in place since 2021.

1  Although the Secretary's actions appear predicated on negative stereotypes casting class-wide

2  aspersions on their character (insinuating they were released from Venezuelan prisons and mental

3  health facilities and imposed huge financial burdens on local communities), the undisputed record

4  establishes that Venezuelan TPS beneficiaries, in fact, have higher education attainment than most

5  U.S. citizens (40-54% have bachelor degrees), have high labor participation rates (80-96%), earn

6  nearly all their personal income (96%), and annually contribute billions of dollars to the U.S.

7  economy and pay hundreds of millions, if not billions, in social security taxes. They also have

8  lower rates of criminality than the general U.S. population.

9        Following Secretary Noem's actions, Plaintiffs filed the instant action. Plaintiffs are seven

10  individuals from Venezuela who are TPS holders, plus the National TPS Alliance ("NTPSA").

11  The NTPSA is "a member-led organization representing Temporary Protected Status ('TPS')

12  holders across the country." Compl. ¶ 2. NTPSA's members include over 84,000 Venezuelan

13  TPS holders living in all fifty states and the District of Columbia. *See* Jimenez Decl. ¶ 13.

14  Among other things, NTPSA "engages in advocacy to defend TPS and win a path to permanent

15  status for TPS holders."[1] Jimenez Decl. ¶ 21.

16        Having considered the parties' briefs and accompanying submissions, the oral argument of

17  counsel, and the views of Amici (a collection of various states, cities, and counties throughout the

18  United States),[2] the Court hereby **GRANTS** Plaintiffs' motion. For the reasons stated below, the

---

[1] NTPSA has submitted a declaration from Jose A. Palma Jimenez, the Co-Coordinator of the organization. In his declaration, Mr. Jimenez explains that NTPSA also

> organizes actions to raise public awareness about TPS and the contributions TPS holders make to this country; facilitates community and civic engagement by TPS holders; and provides access to timely and accurate TPS-related information and services to its members.

Jimenez Decl. ¶ 21. The government has not contested NTPSA's standing to bring suit. *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 199 (2023) (noting that, "where the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways[:] [e]ither the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members'").

[2] There are two sets of Amici: (1) the Amici States and (2) the Amici Cities and Counties. The Amici States are California, New York, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island,

3a

Court finds that the Secretary's action threatens to: inflict irreparable harm on hundreds of thousands of persons whose lives, families, and livelihoods will be severely disrupted, cost the United States billions in economic activity, and injure public health and safety in communities throughout the United States.  At the same time, the government has failed to identify any real countervailing harm in continuing TPS for Venezuelan beneficiaries.  Plaintiffs have also shown they will likely succeed in demonstrating that the actions taken by the Secretary are unauthorized by law, arbitrary and capricious, and motivated by unconstitutional animus.  For these reasons, the Court grants Plaintiffs' request to postpone the challenged actions pending final adjudication of the merits of this case.

## II.       FACTUAL & PROCEDURAL BACKGROUND

A.       Background on TPS

As part of the Immigration Act of 1990, Congress created the TPS program.  The TPS program is a humanitarian program; the governing statute is codified at 8 U.S.C. § 1254a.

Under § 1254a, the Secretary of DHS may **designate** a foreign country for TPS when individuals from that country cannot safely return due to armed conflict, natural disaster, or other extraordinary and temporary circumstances.  *See* 8 U.S.C. § 1254a(b).  The initial designation lasts for 6, 12, or 18 months, at the Secretary's discretion.  *See id.* § 1254a(b)(2).

Once a foreign country is given a TPS designation, individuals from that country may apply for immigration status.  If granted, they may not be removed from the United States; furthermore, they are given authorization to work in the United States.  *See id.* § 1254a(a)(1).

For individuals to become TPS holders, there are specific requirements that must be met.  For example, an individual must have "been continuously physically present in the United States since the effective date of the most recent designation of that [foreign] state."  *Id.* § 1254a(c)(1)(A)(i).  In addition, an individual must be "admissible as an immigrant."  *Id.* § 1254a(c)(1)(A)(iii).  An individual is inadmissible if, *e.g.*, they have been convicted of certain

Vermont, Washington, and the District of Columbia.  The Amici Cities and Counties are Denver, San Francisco, Hartford, Cambridge, San Diego, Chicago, Iowa City, Minneapolis, Saint Paul, Boston, and Santa Clara.  Both Amici have submitted briefs in support of Plaintiffs' motion.

United States District Court
Northern District of California

4a

crimes (such as a crime involving moral turpitude or drugs) or are a member of a terrorist organization.[3] *See id.* § 1182(a)(2)-(3). Moreover, an individual is expressly deemed ineligible for TPS if they have "been convicted of any felony or 2 or more misdemeanors committed in the United States." *Id.* § 1254a(c)(2)(B). The Secretary "shall withdraw [TPS] granted to an alien . . . if [the Secretary] finds that the alien was not in fact eligible for such status." *Id.* § 1254a(c)(3)(A).

After a foreign country has been given a TPS designation, that designation is subject to periodic review to determine if the TPS designation should be **terminated** or **extended**.

> At least 60 days before end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the [Secretary of DHS[4]], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met.

*Id.* § 1254a(b)(3)(A).

- "If the [Secretary] determines . . . that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the [Secretary] shall terminate the designation . . . ." *Id.* § 1254a(b)(3)(B).

- "If the [Secretary] does not determine . . . that a foreign state (or part of such foreign state) no longer meets the conditions for designation under paragraph (1), the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C).

/ / /

---

[3] The TPS statute bars the Secretary from waiving certain inadmissibility grounds. *See* 8 U.S.C. § 1254a(c)(2)(A)(iii).

[4] The TPS statute "originally provided the Attorney General with this authority" but, "[w]ith the Homeland Security Act of 2002 (Pub. L. No. 107-296, 116 Stat. 2135), the former Immigration and Naturalization Service was transferred to the Department of Homeland Security, and the responsibility for administering the TPS was transferred from the Attorney General to the Secretary of DHS." *Ramos v. Wolf*, 975 F.3d 872, 879 n.1 (9th Cir. 2020), *vacated for rehearing en banc*, 59 F.4th 1010 (9th Cir. 2023).

United States District Court
Northern District of California

5a

1    In addition, it is possible for a country to be given more than one TPS designation.  As

2    explained by Plaintiffs (with no dispute by the government),

3    [a] TPS designation for a country that is already designated for TPS
     is called a "**redesignation**."  When DHS redesignates a country for
4    TPS, it generally has the effect of expanding the pool of potential
     beneficiaries to include individuals who came to the United States
5    after the country was first designated for TPS.

6    Compl. ¶ 26 n.4 (emphasis added).

7    B.    TPS Designation for Venezuela

8          1.    2021 TPS Designation

9    In March 2021, Secretary Mayorkas (the Secretary of DHS under the Biden

10   administration) first designated Venezuela for TPS – specifically, for 18 months, from March 9,

11   2021, through September 9, 2022.  *See* 86 Fed. Reg. 13574, 13577 (Mar. 9, 2021).  The

12   designation allowed those "who have continuously resided in the United States since March 8,

13   2021, and have been continuously physically present in the United States since March 9, 2021, to

14   apply for TPS."  *Id.* at 13575.  U.S. Citizenship and Immigration Services ("USCIS") estimated

15   that "approximately 323,000 individuals are eligible to file applications for TPS under the

16   designation of Venezuela."  *Id.*

17   The basis for the designation was stated as follows:

18   Venezuela is currently facing a severe humanitarian emergency.
     Under Nicolás Maduro's influence, the country "has been in the
19   midst of a severe political and economic crisis for several years."
     Venezuela's crisis has been marked by a wide range of factors,
20   including: Economic contraction; inflation and hyperinflation;
     deepening poverty; high levels of unemployment; reduced access to
21   and shortages of food and medicine; a severely weakened medical
     system; the reappearance or increased incidence of certain
22   communicable diseases; a collapse in basic services; water,
     electricity, and fuel shortages; political polarization; institutional
23   and political tensions; human rights abuses and repression; crime
     and violence; corruption; increased human mobility and
24   displacement (including internal migration, emigration, and return);
     and the impact of the COVID-19 pandemic, among other factors.
25

26   *Id.* at 13576.

27   The parties refer to this designation as the "2021 Designation."

28

United States District Court
Northern District of California

6a

United States District Court
Northern District of California

2.     First and Second Extensions of the 2021 Designation

The 2021 Designation was set to expire, as noted above, in September 2022. However, on September 8, 2022, before expiration, DHS **extended** the 2021 Designation for 18 months – *i.e.*, from September 10, 2022, through March 10, 2024. *See* 87 Fed. Reg. 55024, 55027 (Sept. 8, 2022). The basis for the extension was as follows: "Extraordinary and temporary conditions that prevent Venezuelan nationals from returning in safety include severe economic and political crises ongoing within Venezuela, which have an impact across sectors, including limited access to food, basic services, and adequate healthcare, and the deterioration of the rule of law and protection of human rights." *Id.* at 55026. As Plaintiffs point out, "because the decision [here] was only an extension, and not also a re-designation, it did not provide protection to Venezuelans who had arrived in the U.S. *after* March 9, 2021 [*i.e.*, the date of the 2021 Designation]." Compl. ¶ 42 (emphasis added).

DHS **extended** the 2021 Designation a second time on October 3, 2023, for another 18 months. The extension ran from March 11, 2024 (when the first extension above would end) to September 10, 2025. *See* 88 Fed. Reg. 68130, 68131 (Oct. 3, 2023).

3.     2023 TPS Designation

At the same time as the second extension of the 2021 Designation, DHS also **redesignated** Venezuela for TPS. *See id.* The redesignation covered an 18-month period, from October 3, 2023, through April 2, 2025. *See id.* While the 2021 Designation allowed individuals who had been in the United States since March 2021 to apply, this designation – which the parties refer to as the "2023 Designation" – allowed individuals to apply if they had continuously resided in the United States since July 31, 2023, and had continuously been physically present since October 3, 2023. *See id.* DHS estimated that "approximately 472,000 additional individuals may be eligible for TPS under the redesignation of Venezuela." *Id.* at 68134.

For both (1) the second extension of the 2021 Designation and (2) the 2023 Designation, the basis was the same:

> Venezuela continues to face a severe humanitarian emergency due
> to a political and economic crisis, as well as human rights violations
> and abuses and high levels of crime and violence, that impacts

6

7a

> access to food, medicine, healthcare, water, electricity, and fuel, and has led to high levels of poverty.  Additionally, Venezuela has recently experienced heavy rainfall in the spring and summer of 2023 which triggered flooding and landslides.  Given the current conditions in Venezuela, these issues contribute to the country's existing challenges.
>
> Venezuela is experiencing "an unprecedented political, economic, and humanitarian crisis."  "Venezuela is suffering one of the worst humanitarian crises in the history of the Western Hemisphere," which has been characterized by "[h]igh levels of poverty, food insecurity, malnutrition, and infant mortality, together with frequent electricity outages and the collapse of health infrastructure."  Though there were some positive developments in Venezuela in 2022 "as the economy stabilized and showed signs of economic growth," the effects of these changes were not felt across the Venezuelan population and did not offset the impact of the large-scale economic contraction which resulted in significant humanitarian challenges that continue today and will take time to address.

*Id.* at 68132.

### 4.   Extension of the 2023 Designation

On January 17, 2025, shortly before the second Trump administration was to begin,

Secretary Mayorkas **extended** the 2023 Designation by 18 months, through October 2, 2026.  *See*

90 Fed. Reg. 5961 (Jan. 17, 2025).  As indicated above, without an extension, the 2023

Designation would end on April 2, 2025.  The basis for the extension was as follows:

> Venezuela is experiencing "a complex, serious and multidimensional humanitarian crisis."  The crisis has reportedly disrupted every aspect of life in Venezuela.  "Basic services like electricity, internet access, and water are patchy; malnutrition is on the rise; the healthcare system has collapsed; and children receive poor or no education.  Inflation rates are also among the highest in the world."  Venezuela's "complex crisis" has pushed Venezuelans into "poverty, hunger, poor health, crime, desperation and migration."  Moreover, Nicolás Maduro's declaration of victory in the July 28, 2024 presidential election – which has been contested as fraudulent by the opposition – "has been followed by yet another sweeping crackdown on dissent."

*Id.* at 5963.

In the extension, DHS also clarified the relationship between the two designations for

Venezuela – (1) the 2021 Designation and (2) the 2023 Designation – both of which had been

subject to extensions.  DHS addressed the following question:

/ / /

7

**Will there continue to be two separate filing processes for TPS designations for Venezuela?**

No. USCIS has evaluated the operational feasibility and resulting impact on stakeholders of having two separate filing processes. Operational challenges in the identification and adjudication of Venezuela TPS filings and confusion among stakeholders exist because of the two separate TPS designations. To date, USCIS has created operational measures to process Venezuela TPS cases for both designations; however, it can most efficiently process these cases by consolidating the filing processes for the two Venezuela TPS populations. To decrease confusion among stakeholders, ensure optimal operational processes, and maintain the same eligibility requirements, upon publication of this Notice, **individuals registered under either the March 9, 2021 TPS designation or the October 3, 2023 TPS designation will be allowed to re-register under this extension**. This would not, however, require that a beneficiary registered under the March 9, 2021 designation to re-register at this time. Rather, it would provide such individuals with the option of doing so. **Venezuela TPS beneficiaries who appropriately apply for TPS or re-register under this Notice and are approved by USCIS will obtain TPS through the same extension date of October 2, 2026.**

*Id.* at 5964 (some emphasis added).

5.      Vacatur of the Extension of the 2023 Designation

On January 20, 2025, President Trump began his second administration. That same day, President Trump issued an Executive Order titled "Protecting the American People Against Invasion." *See* https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/ (last visited 3/30/2025). Section 16 of the Executive Order states as follows:

Addressing Actions by the Previous Administration. The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

. . . .

(b)      ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute . . . .

9a

1  *Id.*

2         Secretary Noem was sworn in as Secretary of DHS on January 25, 2025.  Three days later,

3  on January 28, 2025, the Secretary vacated the extension of the 2023 Designation.  DHS formally

4  published notice of the vacatur on February 3, 2025.  *See* 90 Fed. Reg. 8805 (Feb. 3, 2025).  This

5  is the first time – in TPS's thirty-five-year history – that an extension of a TPS designation has

6  ever been vacated.

7         The notice began by stating that:

8         The Venezuela 2023 TPS designation expires on April 2, 2025, and
          the Secretary must make a decision by February 1, 2025 [*i.e.*, 60
9         days in advance].  The Venezuela 2021 TPS designation expires on
          September 10, 2025, and the Secretary must make a decision by July
10        12, 2025.  Notwithstanding the fact that these are both decisions that
          would lie with new Secretary of Homeland Security Kristi Noem,
11        Secretary Mayorkas [the DHS Secretary under the Biden
          administration] took action with respect to both designations.
12
          On January 17, 2025, Secretary Mayorkas issued a notice extending
13        the 2023 designation of Venezuela for TPS for 18 months
          (Mayorkas Notice).  The notice was based on Secretary Mayorkas'
14        January 10, 2025, determination that the conditions for the
          designation continued to be met.  *See* INA 244(b)(3)(A), 8 U.S.C.
15        1254a(b)(3)(A).  In the Mayorkas Notice, Secretary Mayorkas did
          not expressly extend or terminate the 2021 designation.  Instead, the
16        notice allowed for a consolidation of filing processes such that all
          eligible Venezuela TPS beneficiaries (whether under the 2021 or
17        2023 designations) could obtain TPS through the same extension
          date of October 2, 2026.  *See* Extension of the 2023 Designation of
18        Venezuela for Temporary Protected Status, 90 FR 5961 (Jan. 17,
          2025). The notice also extended certain EADs [employment
19        authorization documents].  The effect of Secretary Mayorkas'
          actions, however, resulted in an extension of the 2021 Venezuela
20        TPS designation.

21  *Id.* at 8806.

22         The notice then stated that the extension given by Secretary Mayorkas was vacated:

23        The Secretary of Homeland Security is vacating the January 10,
          2025 decision of Secretary Mayorkas which (1) extended the 2023
24        Venezuela TPS designation and (2) allowed the consolidation of
          filing processes for both designations, which had the effect of
25        extending the 2021 Venezuela TPS designation, and (3) extended
          certain EADs.  An agency has inherent (that is, statutorily implicit)
26        authority to revisit its prior decisions unless Congress has expressly
          limited that authority.  The TPS statute does not limit the Secretary's
27        inherent authority under the INA to reconsider any TPS-related
          determination, and upon reconsideration, to vacate or amend the
28        determination.

9

*Id.*

The reason for the vacatur was stated as follows: "The Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation." *Id.* at 8807.

> The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]"). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.

*Id.*

The effect of the vacatur was stated as follows:

> As a result of the vacatur, the 2021 Venezuela TPS designation and the 2023 Venezuela designation remain in effect and their associated statutory deadlines remain in effect. The statutory deadline for each of those designations is as follows: The Secretary (1) must determine, by February 1, 2025, whether to extend or terminate the 2023 Venezuela TPS designation and (2) must determine, by July 12, 2025, whether to extend or terminate the 2021 Venezuela TPS designation.

*Id.* In its papers, the government characterizes the vacatur as a "restor[ation] [of] the status quo." Opp'n at 6.

6. Termination of the 2023 Designation

On February 1, 2025 (*i.e.*, just three days after the vacatur was first announced), Secretary Noem decided to terminate the 2023 Designation, effective in April 2025 (*i.e.*, 60 days after publication of the termination notice). DHS formally published noticed on February 5, 2025. *See* 90 Fed. Reg. 9040 (Feb. 5, 2025).

In explaining the basis for the termination, DHS began by stating as follows:

> Consistent with section 244(b)(3)(A) of the INA, 8 U.S.C.

11a

1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, DHS reviewed conditions in Venezuela and considered whether permitting the Venezuelan nationals to remain temporarily in the United States is contrary to the national interest of the United States.

The Department, in consultation with the Department of State, has reviewed conditions in Venezuela and has considered whether permitting Venezuelan nationals to remain temporarily in the United States is contrary to the U.S. national interest. Overall, certain conditions for the 2023 TPS designation of Venezuela may continue; however, there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country.

*Id.* at 9042. Although DHS referred to a consultation with other agencies and suggested there was review of a country conditions report, the government failed to provide any evidence in conjunction with the pending motion to support such claims. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) (noting that the general process for a TPS designation (on periodic review) includes the following: RAIO (a division within USCIS) provides a Country Conditions Memo, OPS (another division within USCIS) drafts a Decision Memo, and the State Department provides further input). It is difficult to imagine how such a considered process could have been accomplished in such a short period.

DHS continued its explanation for the termination as follows:

Based on the Department's review, the Secretary has determined that, even assuming the relevant conditions in Venezuela remain both "extraordinary" and "temporary," termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals (or aliens having no nationality who last habitually resided in Venezuela) to remain temporarily in the United States.

In the TPS statute, Congress expressly prohibits the Secretary from designating a country for TPS or extending a TPS designation if she finds that "permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." INA 244(b)(1), 8 U.S.C. 1254a(b)(1). . . .

*Id.* at 9042.

The notice continued in relevant part:

"National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations (e.g.,

11

United States District Court
Northern District of California

adverse effects on U.S. workers, impact on U.S. communities). Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

. . . .

[First,] TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States, and the sheer numbers have resulted in associated difficulties in local communities where local resources have been inadequate to meet the demands caused by increased numbers. Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua. Tren de Aragua has been blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants. The United States has sanctioned the gang and placed it on a list of transnational criminal organizations. In Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, the President determined that Tren de Aragua's campaign of violence and terror poses threats to the United States. The Secretary accordingly has considered these important immigration and national interests in terminating the Venezuela parole process.

Second, President Trump observed, referring to CHNV [the parole program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans"] and other policies and processes, that "[o]ver the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States," including millions who crossed U.S. borders or were allowed to fly to a U.S. airport of entry and allowed to settle in American communities. The prolonged presence of these aliens in the United States "has cost taxpayers billions of dollars at the Federal, State, and local levels." For example, over 180,000 illegal aliens have settled in New York City, approximating that this will cost the city $10.6 billion through the summer of 2025. Additionally, although mayors from cities across the United States are attempting to accommodate Venezuelan illegal aliens, city shelters, police stations, and aid services are at a maximum capacity.

. . . .

Third, President Trump declared a national emergency at the southern border. As the Attorney General and DHS have long understood, the potential "magnet effect" of a TPS determination is a permissible factor under the TPS statute, especially with respect to a redesignation. The same is true for Venezuela. . . .

Fourth, as the President directed in Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first." Continuing to permit Venezuelans under the 2023 TPS designation

13a

to remain in the United States does not champion core American interests or put American interests first.  U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration.

*Id.* at 9042-43.

The notice concluded with the statement that "DHS is terminating only the October 3, 2023 Venezuela TPS designation.  The 2021 Venezuela TPS designation remains in effect until September 10, 2025."  *Id.* at 9044.  Because of the decision to terminate (which was possible only because of the decision to vacate Secretary Mayorkas's extension in the first place), the 2023 Designation will end on April 7, 2025.  *See id.*

C.    Causes of Action

Following the vacatur and termination decisions made by Secretary Noem, Plaintiffs filed suit.  In their complaint, Plaintiffs assert three claims for relief:

(1) The government violated the APA because the Secretary's decision to vacate the extension of the 2023 Designation was arbitrary and capricious.  Most fundamentally, the Secretary did not have inherent authority to reconsider the prior Secretary's extension.  "The TPS statute carefully regulates the length of TPS extensions, the conditions under which they may be terminated, and the timetable for doing so.  Defendants had no authority to annul a TPS extension under the timetable and procedures they utilized here."  Compl. ¶ 149(a).  In addition, the Secretary "objected to the . . . extension for allowing 2021 TPS holders to re-register under the 2023 extension, but failed to consider that 2021 TPS holders were necessarily eligible for TPS under the 2023 designation as well."  Compl. ¶ 149(b).

(2) The government further violated the APA because the Secretary's decision to terminate the 2023 Designation was arbitrary and capricious.  For example, the decision assumed that TPS designations are illegal, and "[t]he research, consultation, and review process leading up to the decision deviated dramatically from past practice without explanation."  Compl. ¶ 153(a), (c).

(3) The government violated the Equal Protection Clause because the "decisions to vacate the . . . TPS extension for Venezuela, and to terminate the 2023 Venezuela Designation . . . were motivated, at least in part, by intentional discrimination based on race, ethnicity, or national origin." Compl. ¶ 157.

In the pending motion, Plaintiffs largely focus on the first and third claims above. To be clear, however, the relief Plaintiffs seek would result in postponement of both (1) Secretary Noem's decision to vacate the extension of the 2023 Designation and (2) the decision to terminate the 2023 Designation.

## III.    DISCUSSION

As indicated by the above, Plaintiffs' case is founded in large part on the APA. The APA provides in relevant part that a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (B) contrary to constitutional right, power, privilege or immunity . . . . 5 U.S.C. § 706(2)." 5 U.S.C. § 706(2). Plaintiffs' present motion seeks temporary relief pursuant to § 705 of the APA. Section 705 provides as follows:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705.

A.    Jurisdiction

Although § 705 expressly authorizes a court to postpone the effective date of any agency action, or to preserve status or rights pending judicial review, the government contends that the Court lacks jurisdiction to grant the relief sought by Plaintiffs. The government raises two jurisdictional arguments, one based on 8 U.S.C. § 1252(f)(1) and the other based on § 1254a(b)(5)(A).

United States District Court
Northern District of California

15a

1.    Section 1252(f)(1)

According to the government, Plaintiffs are effectively seeking "classwide" injunctive relief in their motion, and thus their motion must be denied pursuant to § 1252(f)(1) which prohibits such relief.  Section 1252(f)(1) provides as follows:

> (f)     Limit on injunctive relief.
>
> > (1)     In general.  Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ["IIRIRA"], other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.

8 U.S.C. § 1252(f)(1).  As the Supreme Court has explained, § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions."  *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

The government maintains that the TPS statute (§ 1254a) is one of the specified provisions to which § 1252(f)(1) applies – *i.e.*, that the TPS statute falls within "part IV of this subchapter." 8 U.S.C. § 1252(f)(1).  The government acknowledges that the U.S. Code places the TPS statute within part V, not part IV, which is consistent with the statements by a number of courts that part IV covers only §§ 1221-32.[5]  No court has yet to hold that §1252(f)(1) applies to §1254a, which, as a facial matter, is reasonable given that § 1252 is titled "Judicial review of orders of removal" and TPS does not directly involve orders of removal.  *Cf. Bhd. of R.R. Trainmen v. Balt. & Ohio*

---

[5] *See, e.g.*, *Gonzalez v. U.S. Immigration & Customs Enf't*, 975 F.3d 788, 812 (9th Cir. 2020) (stating that "'Part IV' [as used in § 1252(f)(1)] is a reference to the provisions titled 'Inspection, Apprehension, Examination, Exclusion, and Removal,' which currently include 8 U.S.C. §§ 1221-1232 of the INA"); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (stating that § 1252(f)(1) "prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221-1231"); *Biden v. Texas*, 597 U.S. 785, 798 (2022) (discussing § 1252(f)(1) and its impact on a court's power to hear claims "brought under sections 1221 through 1232").

United States District Court
Northern District of California

15

16a

*R.R.*, 331 U.S. 519, 529 (1947) (noting that "the title of a statute and the heading of a section cannot limit the plain meaning of the text" but they can be of use "when they shed light on some ambiguous word or phrase").

Nevertheless, the government argues that the U.S. Code contains an error; that the IIRIRA, when it amended the INA in 1996, designated the TPS statute, among other sections, under part IV, *see* 110 Stat. 3009, at 3009-548, 614-15 (Sept. 30, 1996) (in § 308 of the IIRIRA, amending the table of contents); and that "the text of the United States Code 'cannot prevail over the Statutes at Large [*i.e.*, the IIRIRA/INA] when the two are inconsistent.'" *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022). Yet, it appears that the codification of §1254a into part V may well have been consistent with IIRIRA and the INA. Part IV is titled "Inspection, Apprehension, Examination, Exclusion, and Removal" whereas Part V is titled "Adjustment and Change of Status." TPS is more akin to an adjustment of status (albeit temporary) than a deportation proceeding.

In any event, because Plaintiffs opted at this juncture not to focus on this aspect of the government's argument, the Court shall turn to and analyze in greater depth Plaintiffs' assertion that § 1252(f)(1) has no application where a court is simply called upon to vacate an agency action as opposed to issue an "injunction" that would, *inter alia,* govern the conduct of a government official. *See Aleman Gonzalez*, 596 U.S. at 548 (noting that "[t]he term 'to enjoin' ordinarily means to 'require,' 'command,' or 'positively direct' an action or to 'require a person to perform, . . . or to abstain or desist from, some act'[;] [w]hen a court 'enjoins' conduct, it issues an 'injunction,' which is a judicial order that 'tells someone what to do or not to do'"). In other words, according to Plaintiffs, there is a material distinction between vacatur of a specific agency action under §706 (and likewise postponement of such action under §705) and an injunction under Federal Rule of Civil Procedure 65. Plaintiffs emphasize that "[e]very court to consider the question – including the Fifth Circuit and at least five district courts – has rejected [the government's] view that APA relief is functionally an injunction barred by Section 1252(f)(1)." Reply at 2.

/ / /

17a

1    In assessing Plaintiffs' position, the Court must begin with the "strong presumption . . .

2    that the actions of federal agencies are reviewable in federal court." *KOLA, Inc. v. United States*,

3    882 F.2d 361, 363 (9th Cir. 1980); *see also Sackett v. E.P.A.*, 566 U.S. 120, 128 (2012) (stating

4    that "[t]he APA . . . creates a presumption favoring judicial review of administrative action").

5    "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should

6    the courts restrict access to judicial review." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967).

7    Moreover, where there is no other forum for a litigant to raise their claim, that should also factor

8    into a court's determination as to whether judicial review is available. *Cf. Veterans for Common*

9    *Sense v. Shinseki*, 678 F.3d 1013, 1034-35 (9th Cir. 2012) (noting that, "because [a veterans

10   organization] cannot bring its suit in the Veterans Court, that court cannot claim exclusive

11   jurisdiction over the suit," and, "[b]ecause [the organization] would be unable to assert its claim in

12   the review scheme established by the [Veterans' Judicial Review Act], that scheme does not

13   operate to divest us of jurisdiction").

14   The Court also bears in mind that the Supreme Court has, to date, declined to address the

15   issue of whether § 1252(f)(1) is a bar to a court issuing relief pursuant to the APA.  For example,

16   in *Aleman Gonzalez*, the Supreme Court held that § 1252(f)(1) barred a lower court from entering

17   an injunction requiring the government to provide bond hearings for not only plaintiffs but also all

18   other class members (all of whom had been detained under 8 U.S.C. § 1231(a)(6)).  But, as Justice

19   Sotomayor pointed out in her concurrence/dissent, the majority decision did

20           not purport to hold that §1252(f)(1) affects courts' ability to "hold
             unlawful and set aside agency action, findings, and conclusions"
21           under the Administrative Procedure Act. 5 U. S. C. §706(2). . . . In
             addition, the Court rightly does not embrace the Government's
22           eleventh-hour suggestion at oral argument to hold that §1252(f )(1)
             bars even classwide declaratory relief, a suggestion that would (if
23           accepted) leave many noncitizens with no practical remedy
             whatsoever against clear violations by the Executive Branch.
24

25   *Aleman Gonzalez*, 596 U.S. at 571-72 (Sotomayor, J., concurring in part and dissenting in part).

26   Justice Barrett made the same point as part of her dissent in *Biden v. Texas*, 597 U.S. at 785

27   (where the Supreme Court held that § 1252(f)(1) did not deprive lower courts of all subject matter

28   jurisdiction but rather simply withdrew the authority to grant a particular form of relief).

United States District Court
Northern District of California

1    Specifically, she noted that the majority "reserves the question whether §1252(f)(1) bars

2    declaratory relief, an issue on which there are conflicting views" and further "avoids a position on

3    whether §1252(f)(1) prevents a lower court from vacating or setting aside an agency action under

4    the Administrative Procedure Act." *Id.* 839 (Barrett, J., dissenting). The Supreme Court,

5    therefore, has not adopted any view of § 1252(f)(1) that would preclude Plaintiffs from obtaining

6    relief. *See also Biden v. Texas*, 597 U.S. at 801 n.4 ("At our request, the parties briefed several

7    additional questions regarding the operation of section 1252(f)(1), namely, whether its limitation

8    on 'jurisdiction or authority' is subject to forfeiture and whether that limitation extends to other

9    specific remedies, such as declaratory relief and relief under section 706 of the APA. We express

10   no view on those questions.").

11          No court has adopted the construction of § 1252(f)(1) advanced by the government.

12   Rather, all courts that have addressed the issue have rejected the government's construction of the

13   statute. For example, in a decision issued after *Aleman Gonzalez* and *Biden v. Texas*, the Fifth

14   Circuit rejected DHS's contention that vacatur of an agency action is a de facto enjoining or

15   restraining of an agency enforcement decision. The Fifth Circuit explained:

16                  There are meaningful differences between an injunction, which is a
                    "drastic and extraordinary remedy," and vacatur, which is "a less
17                  drastic remedy." The Supreme Court has indicated that § 1252(f) is
                    to be interpreted relatively narrowly. Indeed, the Court described §
18                  1252(f) as "nothing more or less than a limit on injunctive relief."

19   *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (addressing DHS's memoranda regarding

20   immigration guidance for the apprehension and removal of noncitizens). The Fifth Circuit added:

21                  [A] vacatur does nothing but re-establish the status quo absent the
                    unlawful agency action. Apart from the constitutional or statutory
22                  basis on which the court invalidated an agency action, vacatur
                    neither compels nor restrains further agency decision-making. We
23                  decline to extend *Aleman Gonzalez* to such judicial orders,
                    especially when doing so would be contrary to the "strong
24                  presumption favoring judicial review of administrative action."

25   *Id.* at 220; *see also Texas v. United States*, 126 F.4th 392, 419 n.40 (5th Cir. 2025) (reaffirming the

26   same); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284-85 (N.D. Fla. 2023) (stating that

27   "[v]acatur is 'a less drastic remedy' than an injunction, and the Fifth Circuit concluded in the

28   opinion currently on review at the Supreme Court that §1252(f)(1) does not preclude vacatur

United States District Court
Northern District of California

1    under the APA because vacatur 'does nothing but re-establish the status quo absent the unlawful

2    agency action' and 'neither compels nor restrains further agency decision-making'").

3          Notably, the Fifth Circuit's holding is directly supported by the Supreme Court's decision

4    in *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).  There, the Supreme Court noted

5    that

6          [a]n injunction is a drastic and extraordinary remedy, which should
             not be granted as a matter of course.  If a less drastic remedy (**such**
7          **as partial or complete vacatur of APHIS's deregulation**
             **decision**) was sufficient to redress respondents' injury, no recourse
8          to the additional and extraordinary relief of an injunction was
             warranted.

9

10   *Id.* at 165-66 (emphasis added).

11         Furthermore, while *Monsanto* itself did not explain why a vacatur is a less drastic remedy,

12   it is clear that there are material differences between a vacatur and an injunction.  While a court

13   may only enter a vacatur to re-establish the status quo absent the unlawful agency action, *see*

14   *Texas v. United States*, 40 F.4th at 220, it has "broad latitude in fashioning equitable relief

15   [through an injunction] when necessary to remedy an established wrong."  *Boardman v. Pac.*

16   *Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (collecting cases).  Injunctions may apply to

17   parties and nonparties who act "in concert with" named parties.  *See, e.g.*, *SEC v. Wencke*, 622

18   F.2d 1363, 1368 (9th Cir. 1980) ("[Federal Rule of Civil Procedure 65 is] binding only upon the

19   parties to the action, their officers, agents, servants, employees, and attorneys, and upon those

20   persons in active concert or participation with them who receive actual notice of the order by

21   personal service or otherwise."); *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) ("[A]n

22   injunction is not necessarily made over-broad by extending benefit or protection to persons other

23   than prevailing parties in the lawsuit – even if it is not a class action – *if such breadth is necessary*

24   *to give prevailing parties the relief to which they are entitled*.") (emphasis in original).  Courts

25   may hold both parties and nonparties in contempt for violating an injunction.  *See Portland*

26   *Feminist Women's Health Ctr. v. Advocs. for Life, Inc.*, 877 F.2d 787, 788-89 (9th Cir. 1989)

27   (affirming a lower court's imposition of sanctions on a nonparty held "in civil contempt for

28   disobeying the injunction by acting in concert with the named defendants"); *Inst. of Cetacean*

United States District Court
Northern District of California

20a

*Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949-50 (9th Cir. 2014) (affirming courts may hold nonparties in contempt for "aiding and abetting violations" of the injunction, and courts may also hold parties in contempt for "giving a non-party the means to violate an injunction"). Injunctions may be mandatory, compelling a wide range of affirmative conduct. *See Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (affirming lower court's injunction that required affirmative conduct by drug manufacturer to continue providing drug to participants after clinical trial). Injunctions may compel or restrain further agency decision-making. *See Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D. Cal. 2024) (noting that although a vacatur or injunction would strike down ICE's "knock and talk" policy, "only an injunction would restrain Defendants from, in the future, attempting to institute a modified or amended version of the "knock and talk" policy that complies with constitutional limitations."). Injunctions may prohibit "otherwise lawful conduct" as well as unlawful conduct. *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010) ("The district court may even enjoin certain otherwise lawful conduct when the defendant's conduct has demonstrated that prohibiting only unlawful conduct would not effectively protect the plaintiff's rights against future encroachment."). And injunctions may evolve and morph over time. *See Brown v. Plata*, 563 U.S. 493, 542-43 (2011) ("The three-judge court . . . retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion. . . . A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order."). Conversely, none of the above is true of a court's vacatur of unlawful agency action under § 706(2) involved here. *See, e.g., Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 954-55 (N.D. Cal. 2010) (finding that a vacatur was more appropriate as to an injunction, but noting that the court's "[o]rder is without prejudice to Plaintiffs seeking further redress if, after the deregulation decision is vacated, Plaintiffs can demonstrate that Defendant-Intervenors or other third parties have in fact violated the vacatur").

In addition, as Plaintiffs argued at the hearing, the Supreme Court's decision in *Nken v. Holder*, 556 U.S. 418 (2009), lends further support. In *Nken*, the plaintiff asked the Supreme

20

21a

Court to stay his removal pending an adjudication of his petition for a review of a BIA order. The

government argued that the plaintiff could not obtain a stay of removal because of 8 U.S.C. §

1252(f)(2), which provides that "no court shall *enjoin* the removal of any alien pursuant to a final

order under this section unless the alien shows by clear and convincing evidence that the entry or

execution of such order is prohibited as a matter of law." 8 U.S.C. § 1252(f)(2) (emphasis added).

The Supreme Court did not agree with the government, explaining that a stay and an injunction

cannot be equated with one another.

> An injunction and a stay have typically been understood to serve different purposes. The former is a means by which a court tells someone what to do or not to do. When a court employs "the extraordinary remedy of injunction," it directs the conduct of a party, and does so with the backing of its full coercive powers.
>
> It is true that "'[i]n a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam*.'" This is so whether the injunction is preliminary or final; in both contexts, the order is directed at someone, and governs that party's conduct.
>
> By contrast, instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself. It does so either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability.
>
> A stay pending appeal certainly has some functional overlap with an injunction, particularly a preliminary one. Both can have the practical effect of preventing some action before the legality of that action has been conclusively determined. But a stay achieves this result by temporarily suspending the source of authority to act – the order or judgment in question – not by directing an actor's conduct. A stay "simply suspend[s] judicial alteration of the status quo," while injunctive relief "grants judicial intervention that has been withheld by lower courts."

*Nken*, 556 U.S. at 428-49. Although the instant case concerns § 1252(f)(1), while *Nken*

considered § 1252(f)(2), the point that the *Nken* Court made has force in the case at bar: to wit, an

injunction has a specific legal meaning, and the fact that a different procedural mechanism can

achieve the same result as an injunction does not mean that the two should be deemed the same. A

material distinction still obtains. The fact that the title of Section 1252(f)(1) is a "limit on

*injunctive* relief" (emphasis added) specifically suggests the distinction between an injunction and

a vacatur is material. *Cf. Bhd. of R.R. Trainmen*, 331 U.S. at 529 (noting that "the title of a statute

United States District Court
Northern District of California

22a

1    and the heading of a section cannot limit the plain meaning of the text" but they can be of use

2    "when they shed light on some ambiguous word or phrase").  Moreover, the operative language of

3    § 1252(f)(1) limiting a court's authority "to enjoin or restrain" operations tracks Federal Rule of

4    Civil Procedure 65 which governs preliminary *injunctions* and temporary *restraining* orders.  It

5    does not track §§ 705 and 706(2) of the APA which only grant courts the authority to "set aside"

6    (*i.e.*, vacate) and "postpone" agency action.

7           Finally, the Court takes note that, under binding Ninth Circuit law, § 1252(f)(1)'s bar on

8    classwide injunctive relief does not preclude a court from issuing declaratory relief.  *See Al Otro*

9    *Lado v. Exec. Off. for Immigr. Review*, 120 F.4th 606, 625 (9th Cir. 2024) (stating that "§

10   1252(f)(1) does not 'bar classwide declaratory relief'"); *see also Kidd v. Mayorkas*, 734 F. Supp.

11   3d 967, 986 (C.D. Cal. 2024) (stating that "the Court can issue declaratory relief – which is not

12   precluded by § 1252(f)"); *Immigrant Defenders Law Ctr. v. Mayorkas*, No. CV 20-9893 JGB

13   (SHKx), 2023 U.S. Dist. LEXIS 75206, at *40 (C.D. Cal. Mar. 15, 2023) (stating that "[t]he best

14   reading of *Biden v. Texas* and *Aleman Gonzalez* is that district courts like this one retain

15   jurisdiction to award declaratory relief in immigration class actions").[6]  Here, Plaintiffs do seek

16   declaratory relief.  *See* Compl., Prayer ¶¶ 1-3; FAC, Prayer ¶¶ 1-3.  Thus, if the Court were to

17   deny Plaintiffs' motion to postpone based on § 1252(f)(1) – as the government requests – that

18   would effectively render any declaratory relief moot.  The TPS of the 2023 Designation

19   beneficiaries, if the Secretary's vacatur is not postponed, will expire in early April 2025, long

20   before any final judgment ordering declaratory relief could be obtained herein.

21          Accordingly, the Court rejects the government's contention that § 1252(f)(1) is a bar to

22   Plaintiffs' request for relief.

23

24   _____

     [6] The Supreme Court has not yet addressed this issue.  *See Aleman Gonzalez*, 596 U.S. at 551 n.2
25   ("At oral argument, the Government suggested that §1252(f)(1) not only bars class-wide
     injunctive relief but also prohibits any other form of relief that is 'practically similar to an
26   injunction,' including class-wide declaratory relief. . . . Because only injunctive relief was entered
     here, we have no occasion to address this argument."); *Biden v. Texas*, 597 U.S. at 801 n.4 ("At
27   our request, the parties briefed several additional questions regarding the operation of section
     1252(f)(1), namely, whether its limitation on 'jurisdiction or authority' is subject to forfeiture and
28   whether that limitation extends to other specific remedies, such as declaratory relief and relief
     under section 706 of the APA.  We express no view on those questions.").

23a

United States District Court
Northern District of California

2. <u>Section 1254a(b)(5)(A)</u>

The government argues that, even if § 1252(f)(1) is not a bar to Plaintiffs' case, there is another jurisdictional hurdle – specifically, § 1254a(b)(5)(A). Section 1254a(b)(5)(A) is part of the TPS statute. It provides that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A).

In assessing the government's argument based on § 1254a(b)(5)(A), the Court must first separate out the challenges being made by Plaintiffs in the case at bar. Plaintiffs are contesting (1) Secretary Noem's decision to vacate the extension of the 2023 Designation and (2) her decision to terminate the 2023 Designation. With respect to (1), Plaintiffs have multiple arguments: (a) the Secretary lacked the inherent authority to vacate the extension; (b) even if she had the authority, the rationale to vacate the extension was arbitrary and capricious; and (c) even if she had the authority, the decision to vacate was motivated at least in part by unconstitutional animus based on race, ethnicity, and/or national origin. With respect to (2), Plaintiffs assert, *inter alia*, that the decision to terminate (like the decision to vacate) was infected by unconstitutional animus.

At the hearing, the government explicitly conceded that § 1254a(b)(5)(A) does *not* bar the Court from entertaining Plaintiffs' contention that the Secretary lacked the inherent authority to vacate the extension of the 2023 Designation. The government acknowledged that whether the Secretary had such authority is purely a matter of statutory construction (*i.e.*, of the TPS statute) and is not a "determination" with respect to a TPS designation, termination, or extension.

The government, however, contends that § 1254a(b)(5)(A) bars the other claims asserted by Plaintiffs (*i.e.*, whether the vacatur was arbitrary and capricious and/or whether the vacatur or termination was unconstitutionally motivated). The Court does not agree. The Court previously addressed the scope of § 1254a(b)(5)(A) in *Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018), another case that involved TPS terminations but during the first Trump administration. When *Ramos* was appealed, the Ninth Circuit panel also addressed the scope of § 1254a(b)(5)(A), *see Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020). However, the panel decision was later vacated so that the matter could be reheard en banc. *See Ramos v. Wolf*, 59 F.4th 1010 (9th Cir. 2023).

24a

United States District Court
Northern District of California

1    Ultimately, the en banc hearing did not take place because the government, having transitioned to

2    the Biden administration, made new decisions regarding the TPS designations and terminations at

3    issue. *See Ramos v. Nielsen*, 709 F. Supp. 3d 871, 876 (N.D. Cal. 2023) (reviewing history of

4    proceedings).

5          Because the *Ramos* panel decision was vacated and no en banc ruling ever issued, this

6    Court's decision in *Ramos* has not been overturned. Moreover, although the Ninth Circuit panel in

7    *Ramos* ultimately held that § 1254a(b)(5)(A) did bar Plaintiffs from proceeding based on the

8    particular nature of the claims asserted, the panel basically agreed with this Court that the scope of

9    § 1254a(b)(5)(A)'s bar on judicial review was limited to "inquiring into the underlying

10   considerations and reasoning employed by the Secretary in reach her country-specific TPS

11   determinations." *Ramos*, 975 F.3d at 891. It does not apply to, *e.g.*, a pattern or practice that is

12   "collateral to and distinct from the specific [country] TPS decisions and their underlying

13   rationale."[7] *Id.* at 891-92.

14         Given these circumstances, the Court adheres to its prior views on the scope of §

15   1254a(b)(5)(A). Nothing in the government's papers or oral arguments presented in the case at

16   bar persuade the Court that § 1252a(b)(5)(A) should be construed differently.[8] Thus, here, the

17   government's argument that § 1254a(b)(5)(A) is a jurisdictional bar lacks merit for several

18   reasons.

19              a.    Presumption of Judicial Review

20         First, as noted above, there is a "strong presumption . . . that the actions of federal agencies

21   are reviewable in federal court," *KOLA*, 882 F.2d at 363, and "only upon a showing of 'clear and

22   convincing evidence' of a contrary legislative intent should the courts restrict access to judicial

23   _____

24   [7] In her dissent in *Ramos*, Judge Christen agreed that § 1254a(b)(5)(A) "bars review of TPS
     determinations only, not collateral challenges," *Ramos*, 975 F.3d at 911, but she disagreed with the
25   majority that the plaintiffs' claims constituted direct challenges instead of collateral ones.

26   [8] For example, the government argues that, because § 1254a(b)(5)(A) refers to "any
     determination" and "any" is a word with an expansive meaning, *see* Opp'n at 12 (citing *Patel v.*
27   *Garland*, 596 U.S. 328, 338 (2022)), § 1254a(b)(5)(A) must be construed broadly. But the word
     "any" cannot overcome the fact that, as discussed below, § 1254a(b)(5)(A) refers to "any
28   determination . . . with respect to the designation, or termination or extension of a designation." 8
     U.S.C. § 1254a(b)(5)(A). The key is what constitutes "determination."

1    review." *Abbott Labs.*, 387 U.S. at 141.

2            b.      Applicability to Plaintiffs' APA Claim

3            Second, Plaintiffs' claim that the Secretary's decision to vacate was arbitrary and

4    capricious does not fall within the scope of § 1254a(b)(5)(A) because the statute bars judicial

5    review of determinations made with respect to TPS designations, terminations, or extensions only.

6    A decision to vacate (a matter not expressly authorized by the TPS statute) is, literally and

7    textually, not a "designation, or termination or extension of a designation, of a foreign state under

8    this subsection." 5 U.S.C. § 1254a(b)(5)(A).

9            Furthermore, as the Court held in *Ramos*, § 1254a(b)(5)(A) was designed to bar judicial

10   review of substantive country-specific conditions in service of TPS designations, terminations, or

11   extensions of a foreign state – not judicial review of general procedures or collateral practices

12   related to such.  *See Ramos*, 321 F. Supp. 3d at 1102 (taking note of Supreme Court cases holding

13   that "similar statutes which preclude review of a 'determination' of immigration status did not

14   preclude review of collateral practices and policies"; citing, *e.g.*, *McNary v. Haitian Refugee Ctr.,

15   Inc.*, 498 U.S. 479 (1991) (individual denials on the merits were not challenged but rather the

16   process under which denials were determined)).  This holding is consistent with the panel decision

17   in *Ramos*.  *See Ramos*, 975 F.3d at 891-92 ("[A court] may still have jurisdiction over a broad

18   challenge to the agency's procedures or practices.  To the extent a claim purports to challenge an

19   agency pattern or practice rather than a specific TPS determination, we may review it only if the

20   challenged pattern or practice is indeed collateral to, and distinct from, the specific TPS decisions

21   and their underlying rationale, which the statute shields from judicial scrutiny.") (internal

22   quotation marks omitted).  It is also consistent with the understanding of multiple district courts

23   who have addressed TPS cases.  *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 330-32 (E.D.N.Y.

24   2019) (stating that "the jurisdiction-stripping provision proscribes only direct review of individual

25   TPS determinations" but does not block challenges based on deficiencies in the process employed

26   to terminate TPS); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 317-21 (D. Md. 2018)

27   (concluding that the TPS jurisdiction-stripping provision "is best read as barring judicial review of

28   the merits of the determination itself, but not whether the determination was made through

United States District Court
Northern District of California

1 'unconstitutional practices and policies'"; adding that "Plaintiffs' constitutional and APA claims

2 do not threaten the 'agency's primacy over its core statutory function'"); *Centro Presente v.*

3 *United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 404-09 (D. Mass. 2018) (noting that

4 plaintiffs' "constitutional and statutory claims [are] frame[d] as challenges to Defendants' process

5 of adjudication rather than the content of any particular adjudication").

6          In the case at bar, Plaintiffs' contention that the decision to vacate was arbitrary or

7 capricious – and thus should be set aside – does not dictate how the Secretary should ultimately

8 rule on a TPS designation, termination, or extension.  Indeed, Secretary Noem's vacatur decision

9 was based purely on procedural concerns (*e.g.*, whether Secretary Mayorkas had taken a "novel

10 approach" or caused confusion) and did not turn, *e.g.*, on country conditions in Venezuela or a

11 concern about U.S. interests.  Therefore, Plaintiffs are simply making a collateral challenge, not a

12 direct one, and § 1254a(b)(5)(A) is not implicated.

13          That Plaintiffs' challenge to the vacatur decision is collateral in nature is underscored by

14 *Mace v. Skinner*, 34 F.3d 854 (9th Cir. 1994), where the Ninth Circuit considered the following

15 factors in determining whether a challenge is direct or collateral: (1) whether the plaintiff's claims

16 are based on the "merits of his individual situation" or, instead, a "broad challenge to allegedly

17 [improper agency] practices"; (2) whether the administrative record "for a single [decision] would

18 have . . . relevance" to the plaintiff's claims; and (3) whether the claims raised matters "peculiarly

19 within the agency's 'special expertise'" or "an integral part of its 'institutional competence.'"  *Id.*

20 at 859; *see also Ramos*, 975 F.3d at 892 (panel decision) (considering the above factors); *id.* at

21 912-13 (Christen, J., dissenting) (same).  *City of Rialto v. West Coast Loading Corp.*, 581 F.3d

22 865 (9th Cir. 2009), added a fourth consideration: whether there is another forum where a

23 plaintiff's claim may be heard.  *See id.* at 874 (taking note that, in a prior decision, "we rejected

24 jurisdiction over the plaintiffs' claim in part because we held that the claim 'can be effectively

25 advanced in the context of an appeal from an individual order of deportation'"); *see also Ramos*,

26 975 F.3d at 913 (stating that "*City of Rialto* teaches that we must consider whether another forum

27 exists where plaintiffs' claim may be heard").

28 / / /

27a

1      In the case at bar, the first factor points to a collateral challenge for the reasons stated

2  above.  The second factor also weighs in favor of a collateral challenge; for instance, whether

3  Secretary Mayorkas had taken a "novel approach," as claimed by Secretary Noem when she

4  vacated the extension, will likely require consideration of matters outside the administrative

5  record.  The same is true for the third factor – *e.g.*, whether Secretary Mayorkas's decision

6  engendered confusion was not something particularly within DHS's expertise.  Finally, there does

7  not appear to be any other forum where Secretary Noem's decision to vacate could be challenged.

8  *Cf. Ramos*, 975 F.3d at 894 (panel decision) ("recogniz[ing] that Plaintiffs cannot raise their APA

9  challenge in another forum or at a different stage in the proceedings"); *id.* at 913 (Christen, J.,

10  dissenting) (noting that "[t]he TPS statute includes an administrative review process for

11  challenging denials of individual noncitizen TPS applications, but it does not include a path for

12  challenging the termination of a foreign state's TPS designation").

13      The Court, therefore, holds that § 1254a(b)(5)(A) does not bar judicial review of Plaintiffs'

14  challenge to the Secretary's decision to vacate.

15          c.      Applicability to Plaintiffs' Equal Protection Claim

16      Finally, § 1254a(b)(5)(A) does not preclude judicial review of Plaintiffs' separate claim for

17  violation of equal protection, whether based on the decision to vacate or the decision to terminate.

18  "The presumption in favor of judicial review [of agency action] is particularly important in regards

19  to constitutional claims."  *CASA de Md.*, 355 F. Supp. 3d at 317.  Here, "there is no 'clear and

20  convincing' evidence that Congress intended to preclude the Court from reviewing constitutional

21  challenges of the nature alleged.  Indeed, as Plaintiffs point out, where Congress otherwise

22  intended to preclude review of all constitutional claims in the INA, it said so explicitly."  *Ramos*,

23  321 F. Supp. 3d at 1105.  As above, the panel decision in *Ramos* is in accord.  *See Ramos*, 975

24  F.3d at 895 (entertaining the equal protection claim on the merits – *i.e.*, not applying a

25  jurisdictional bar under § 1254a(b)(5)(A)).  It is also notable that the APA expressly provides that

26  agency action shall be set aside if unconstitutional.  *See* 5 U.S.C. § 706(2)(B) (providing that a

27  court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to

28  constitutional right, power, privilege, or immunity").

United States District Court
Northern District of California

28a

1    The Court, therefore, rejects the government's contention that jurisdiction is lacking based

2 on § 1254a(b)(5)(A) for both Plaintiffs' APA claim and their equal protection claim.

3 B.    <u>Section 705 of the APA</u>

4    According to the government, even if there is no jurisdictional bar to Plaintiffs' suit, § 705

5 of the APA still cannot provide them with any relief because the statute "by its own terms does not

6 authorize relief [where] the challenged actions *have already taken effect*."  Opp'n at 9 (emphasis

7 added).  The government's position here seems to be that, because the Secretary's vacatur decision

8 took effect *immediately* (as reflected in the Federal Register notice), *see* 90 Fed. Reg. at 8807

9 (stating that "[t]he vacatur is effective immediately"), it is impossible to postpone the effective

10 date of the vacatur pursuant to § 705.  *See* 5 U.S.C. § 705 (providing that "the reviewing court . . .

11 may issue all necessary and appropriate process to postpone the effective date of an agency action

12 or to preserve status or rights pending conclusion of the review proceedings").

13    There are several problems with the government's position.

14    First, although Plaintiffs may technically be asking for postponement of the effective date

15 of the vacatur decision (which enabled the termination decision), what they are ultimately seeking

16 is postponement of the *impact* of the vacatur decision – *i.e.*, the actual termination of the 2023

17 TPS Designation.  As the actual termination of the 2023 Designation has not yet gone into effect,

18 since the challenged actions have yet not changed the status of TPS beneficiaries, Plaintiffs should

19 be able to seek postponement.[9]

20    Second, the government's reliance on *Center for Biological Diversity v. Regan*, 597 F.

21 Supp. 3d 173 (D.D.C. 2022), in support of its position is flawed because that case focused on

22 when an *agency* – and not a *court* – can postpone agency action (*i.e.*, pending judicial review).

23 *See id.* at 204 ("The D.C. Circuit has declared – albeit in a non-precedential order – that Section

24 705 'permits an *agency* to postpone the effective date of a not yet effective rule, pending judicial

25 review,' but 'it does not permit the agency to suspend without notice and comment a promulgated

26 _____

27 [9] Ironically, at the hearing, the government argued that Secretary Noem had the authority to reconsider the extension of the 2023 Designation because that extension had not yet gone into
28 effect.

Case: 25-5366, 04/07/2025, DktEntry: 14.1, Page 72 of 127
Case 3:25-cv-01766-EMC   Document 14432   Filed 03/21/25   Page 29 of 78

29a

rule.'") (emphasis added).  To be sure, § 705 of the APA does address both postponement by an

agency and postponement by a court.[10]  However, that does not mean that postponement by an

agency and postponement by a court are treated the same under §705.

The district court in *Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022), made this very

point.[11]  In *Texas v. Biden*, as here, the government argued that "Section 705 may only remedy an

agency action that has *yet* to take effect."  *Id.* at 769 (emphasis added).  The court disagreed,

stating that "[w]hether the effective date of the [DHS's] October 29 Memoranda [which

terminated an immigration program] has passed is irrelevant to this *Court's* ability to issue a

Section 705 stay.  Courts – including the Supreme Court – routinely stay *already-effective* agency

action under Section 705."  *Id.* at 770 (emphasis added).

The *Texas v. Biden* court pointed out that

> [t]he cases Defendants cite [including *Center for Biological Diversity*] preclude *agencies* – not *courts* – from staying the effective date of agency actions after the effective date.  [This was reasonable because] [a]uthorizing an agency to stay an already-taken action would allow the agency to evade notice-and-comment requirements.  An agency's "order delaying [a] rule's effective date . . . [is] tantamount to amending or revoking a rule."  The APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."  This includes the general requirement that rules be subject to notice-and-comment procedures.
>
> The limitation on agencies contrasts with courts' inherent authority to stay agency action to facilitate judicial review.

---

[10] As stated above, the full text of § 705 is as follows:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review.  On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705.

[11] The case was ultimately appealed the Supreme Court, *see Biden v. Texas*, 597 U.S. at 785, but the matter at issue here was not presented as part of the appeal.

30a

1   *Id.* at 770-71 (emphasis added).  *See, e.g.*, *GB Int'l, Inc. v. Crandall*, No. 19-35866, 2020 U.S.

2   App. LEXIS 20008, at *1 (9th Cir. June 25, 2020) ("The renewed motion to postpone the effective

3   date of agency action is granted.  *See* 5 U.S.C. § 705.  The effective date of the USCIS' denial of

4   appellants' adjustment of status applications is postponed pending resolution of this appeal.").

5       Finally, the government gives short shrift to the fact,

6       [w]hereas an agency may only "postpone the effective date of action
        taken by it, pending judicial review," a federal court has broader
7       power to "issue all necessary and appropriate process to postpone
        the effective date of an agency action *or to preserve status or rights*
8       *pending conclusion of the review proceedings*."  5 U.S.C. § 705
        (emphasis added).  The greater limitation on agencies exists because
9       "agencies are creatures of statute" and, thus, "possess only the
        authority that Congress has provided."

10

11  *Id.* at 770 (emphasis in original).  In its opposition, the government contends that the latter

12  provision still cannot save Plaintiffs' case because "[a]n order staying a policy after it has already

13  gone into effect . . . does not preserve the status quo, but rather, *alters* it."  Opp'n at 10 (emphasis

14  in original).  This argument, however, is without merit because, traditionally, "[t]he 'status quo' to

15  be restored is 'the last peaceable uncontested status existing between the parties *before* the dispute

16  developed.'"  *Texas v. Biden*, 646 F. Supp. 3d at 771 (emphasis added); *cf. Boardman v. Pac.

17  Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2061) (stating that "[t]he 'purpose of a preliminary

18  injunction is to preserve the status quo ante litem pending a determination of the action on the

19  merits,'" and "'[s]tatus quo ante litem' refers to 'the last uncontested status which *preceded* the

20  pending controversy'") (emphasis added).  Here, the last uncontested status that preceded the

21  pending controversy was the state of the TPS designations at the time Secretary Mayorkas

22  extended the 2023 Designation in January 2025 – *i.e.*, *before* Secretary Noem took the contested

23  action of vacating the extension and then terminated the 2023 Designation.

24  C.    Section 705 Factors in Determining Postponement

25      Having addressed the government's procedural challenges to Plaintiffs' motion to

26  postpone, the Court may now turn to the merits of the motion.  The factors considered in

27  determining whether to postpone pursuant to § 705 "'substantially overlap with the . . . factors for

28  a preliminary injunction.'"  *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529 (N.D.

United States District Court
Northern District of California

31a

1   Cal. 2020); *see also Colorado v. United States EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (stating

2   that the preliminary injunction "factors also determine when a court should grant a stay of agency

3   action under section 705 of the APA"); *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020)

4   (stating that the standard for a stay under § 705 is "the same" as the standard for a preliminary

5   injunction).

6          The Ninth Circuit has explained the standard for a preliminary injunction as follows:

7                  A party seeking a preliminary injunction must meet one of two
                   variants of the same standard.  Under the original *Winter* standard, a
8                  party must show "that he is likely to succeed on the merits, that he is
                   likely to suffer irreparable harm in the absence of preliminary relief,
9                  that the balance of equities tips in his favor, and that an injunction is
                   in the public interest."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S.
10                 Ct. 365, 172 L. Ed. 2d 249 (2008).  Under the "sliding scale" variant
                   of the *Winter* standard, "if a plaintiff can only show that there are
11                 'serious questions going to the merits' – a lesser showing than
                   likelihood of success on the merits – then a preliminary injunction
12                 may still issue if the 'balance of hardships tips sharply in the
                   plaintiff's favor,' and the other two *Winter* factors are satisfied."
13

14  *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).  Neither party disputed that

15  this framework would also apply to a motion brought pursuant to § 705 of the APA.

16         1.    Irreparable Injury

17         The Court considers first the factor of irreparable injury.  Irreparable injury is particularly

18  important as § 705 explicitly invokes it as a basis to issue relief.  Plaintiffs have submitted a

19  number of declarations establishing that, without postponement of the agency actions, TPS

20  beneficiaries will suffer irreparable injury.  The declarations have been submitted by, *e.g.*, TPS

21  holders (including the named Plaintiffs), experts, and leaders of community organizations.

22         The declarations reflect that TPS beneficiaries feel stuck between a rock and a hard place

23  because of DHS's actions.  Absent relief from the Court, TPS beneficiaries will no longer have

24  authorization to work in the United States and thus will lose their jobs – which in turn imperils

25  their livelihoods, housing, and health care.  Absent relief from the Court, they will no longer have

26  legal status, which means not only loss of, *e.g.*, driver's licenses and educational opportunities, but

27  also – and most significantly – the prospect of removal from the United States.

28  / / /

United States District Court
Northern District of California

32a

Removal is a concrete reality because, for many TPS holders, TPS is their only avenue for legal status in the United States.  For example, those with asylum cases have been waiting for years for their adjudications.  *See* Watson & Veuger Decl. ¶ 11 (Senior Fellow at the Brookings Institution in Economic Studies and Senior Fellow in economic policy studies at American Enterprise Institute) (testifying that, "[a]s of 2024[,] it was estimated that 132,272 Venezuelans had filed asylum cases which had not yet been adjudicated, consistent with the well-documented backlogs in the immigration system").  Even if an individual could obtain asylum – or even parole – these legal mechanisms do not provide the same protections as TPS.  *See* Tolchin Decl. ¶ 11 (immigration attorney) (testifying that, "[a]lthough many Venezuelan TPS holders may . . . be eligible for protection from removal and work authorization through other avenues [*e.g.*, asylum and parole], only a small minority will actually receive relief, and it is very likely that many Venezuelans TPS holders would *not* be protected to the same degree by any other statute") (emphasis in original).

Removal presents significant hardship for several reasons.  First, removal would mean separation from family, friends, and communities.  *See Washington v. Trump*, 847 F.3d 1151, 1168-69 (9th Cir. 2017) (recognizing the separation of families as "substantial injuries and even irreparable harms").[12]  Some TPS holders have been in the United States for years; some TPS holders who are children have known or remembered only the United States as their home.  *See, e.g.*, M.R. Decl. ¶¶ 3, 7, 18 (arrived in 2015 with her then two-year-old daughter, both of whom

---

[12] In *Washington v. Trump*, the district court temporarily enjoined an executive order that banned entry into the United States of individuals from seven countries.  The government moved for an emergency stay of the district court decision pending appeal.  In evaluating, *inter alia*, the balance of hardships and the public interest, the Ninth Circuit noted:

> the States have offered ample evidence that if the Executive Order were reinstated even temporarily, it would substantially injure the States and multiple "other parties interested in the proceeding." When the Executive Order was in effect, the States contend that the travel prohibitions harmed the States' university employees and students, separated families, and stranded the States' residents abroad.  These are substantial injuries and even irreparable harms.

*Washington v. Trump*, 847 F.3d at 1168-69.

33a

1   have TPS).  Furthermore, separation is particularly complicated because many TPS holders live in

2   mixed-status families – *i.e.*, some family members, including partners and/or some children, are

3   U.S. citizens.  *See* Docket No. 62 (Amicus Br. at 4) (noting that, "[i]n 2022, approximately 54,000

4   U.S. citizen children and 80,000 U.S. citizen adults lived with a Venezuelan TPS holder").

5   Decisions, therefore, would have to be made about whether families should stay together or split

6   apart.  Decisions would also have to be made how to provide for families in either scenario, both

7   in terms of economic and emotional support.  *Cf.* Docket No. 62 (Amicus Br. at 6) (noting that

8   "parental deportation is a deeply traumatic and disruptive event, linked to extreme psychological

9   distress, anxiety, depression, post-traumatic stress disorder (PTSD), externalizing behaviors (such

10  as aggression), and difficulties sleeping").

11          Second, removal presents a great deal of uncertainty because it is not clear where TPS

12  holders stripped of their legal status in the United States can go.  Removal could mean a return to

13  Venezuela which has been in the throes of a political and economic crisis for years, *see, e.g.*,

14  Young Decl. ¶¶ 3, 13-18 (opining that "the political and economic crisis that Venezuela has been

15  experiencing for the last decade continues to this day"; discussing, *inter alia*, political repression

16  in Venezuela throughout the Hugo Chávez and Nicolás Maduro regimes, fraudulent election in

17  July 2024, and mismanaged economy and U.S. economic sanctions that have left over 80% of

18  Venezuelans in poverty and over 50% in extreme poverty); Watson & Veuger Decl. ¶¶ 8-9

19  (describing economic crisis that began under Hugo Chávez  and worsened under Nicolás Maduro,

20  Nicolás Maduro's use of anti-democratic means to maintain power, and fraudulent election in

21  2024) – **and** which is still classified by the U.S. State Department as a "Level 4: Do Not Travel"

22  country.[13]  *See*

23  https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-

24  advisory.html (Venezuela travel advisory reissued in September 2024) (designating Venezuela a

25  Level 4 country and stating: "Do not travel to Venezuela due to the high risk of wrongful

26  _____

27  [13] The Watson & Veuger Declaration fairly points out that it is not clear how TPS holders could
    return to Venezuela given that this would "require cooperation with the Maduro regime," which
28  the United States does not recognize and on which the United States has imposed sanctions.
    Watson & Veuger Decl. ¶ 24.

United States District Court
Northern District of California

1  detentions, terrorism, kidnapping, the arbitrary enforcement of local laws, crime, civil unrest, poor

2  health infrastructure").  Removal to a different country is not a readily available option because

3  there is no Venezuelan consulate in the United States where to update or get passports.  *See* Ferro

4  Decl. ¶ 16 (Executive Director of Venezuelan American Caucus).  And even if there were such an

5  option, the prospect of rebuilding in a new place – finding a job, health care, basic necessities – is

6  no easy task.

7            The declarations detailing hardships are compelling.  For example, Plaintiff M.H. and her

8  seven-year-old daughter are TPS beneficiaries from Venezuela.  *See* M.H. Decl. ¶ 2.  TPS is their

9  only form of legal status because of long waits and delays in the asylum and green card processes.

10  *See id.* ¶¶ 11-16.  M.H.'s Venezuelan passport is expired, and she has no way to renew it because

11  the U.S. severed diplomatic relations with Venezuela, so she cannot travel to another country.  *See*

12  *id.* ¶ 24.  Her husband and two-year-old son are U.S. citizens.  *See id.* ¶ 2.  M.H. left Venezuela

13  because of political repression for working with an opposition party, including facing a warrant for

14  her arrest.  *See id.* ¶¶ 5, 6.  Currently, the family lives in Tennessee, where M.H. cares for the

15  children full-time and volunteers at a local health clinic, while her husband works a full-time job

16  to provide for the family and is gone all day at work.  *See id.* ¶ 7.  Both roles require M.H. to have

17  a driver's license (which is dependent on her having legal status) to drive her severely asthmatic

18  son to the hospital, her daughter to school, and herself to the clinic to volunteer.  *See id.* ¶¶ 7, 8.

19  The son requires M.H.'s daily care because of the risk of asthma attacks.  *See id.* ¶ 18.  Her family

20  in Venezuela tells her about the ongoing political and economic crisis in the country, including

21  facing shortages of basic necessities and water and power shut offs.  *See id.* ¶ 10.  These family

22  members rely on remittances from M.H. to survive.  *See id.*  Without postponement, the DHS

23  actions would result in her TPS expiring on April 7, 2025.  *See id.* ¶ 2.  This prospect has brought

24  M.H. fear and sadness of being separated from her family and traumatizing her children.  *See id.*

25  ¶¶ 19-23.  M.H. would lose her driver's license, crucial to her caring for her son's asthma attacks.

26  *See id.* ¶ 18.  If removed to Venezuela with her daughter, she fears political persecution, hunger,

27  and facing a lack of housing, healthcare, and basic goods.  *See id.* ¶¶ 19-23.  The family would be

28  forced to make the difficult decision of separating or all moving to Venezuela, a country that lacks

United States District Court
Northern District of California

35a

the medical infrastructure to meet the son's needs. *See id.* If the husband remains in the United States, he will have to leave his job to care for the son, leaving both sides of the family without income and health insurance. *See id.*

Plaintiff Freddy Jose Arape Rivas has lived in the U.S. since January 2023 and registered for TPS pursuant to the 2023 Designation. *See* Rivas Decl. ¶ 2. TPS is his sole legal authorization to remain and work in the U.S. *See id.* ¶ 14. In Venezuela, he studied computer science in college but was forced to flee Venezuela due to repression for supporting the opposition party and inability to obtain necessities. *See id.* ¶¶ 5-7. In the United States, he has worked an IT job for an energy and technology company in Texas, and the company is so pleased with his performance that that they sponsored him for an H1B visa application, which is still pending. *See id.* ¶ 8. He has filed a tax return for each year he has lived in the U.S. *See id.* ¶ 9. He is the sole source of economic support for his parents, who have chronic health conditions, and other family members still in Venezuela. *See id.* ¶ 10. Based on the extension of the 2023 Designation (in January 2025), he renewed his lease for his house and extended his employment. *See id.* ¶ 11. Without TPS, Mr. Rivas would lose his job, home, and driver's license; live under constant fear of deportation, particularly to Venezuela where he could be tortured for his prior political opposition; and would no longer be able to provide for his parents and family in Venezuela, including paying for life-saving medications. *Id.* ¶¶ 15-17, 19. Mr. Rivas also has many family members in Texas who are TPS holders themselves, including a cousin who works at a hospital and has a seven-year-old child protected by TPS and two young U.S.-born children. For the child who has TPS, the United States is the only country she remembers. *See id.* ¶ 13.

Plaintiff Cecilia Daniela González Herrera has lived her entire adult life in the U.S. and relies on TPS for legal status because her family's asylum application has been pending for eight years. *See* Gonzalez Herrera Decl. ¶ 2. She and her parents fled political persecution in Venezuela in 2017. *See id.* ¶¶ 4-6. She attends university and works as a voting rights advocacy coordinator. *See id.* ¶ 9. TPS allows her to pay in-state tuition and be eligible for scholarships; without TPS, she would likely be forced to abandon her studies. *See id.* ¶ 10. Ms. Herrera feels scared to go outside for fear of being racially profiled and detained by ICE, and a decline in

36a

1   mental health has caused an inability to focus on schoolwork.  *See id.* ¶¶ 14-16.  She has no family

2   or home in Venezuela and fears returning to Venezuela and facing violence or harm from the

3   government.  *See id.* ¶ 17.

4       The Executive Director of the Venezuelan American Caucus takes note of even more

5   hardships faced by numerous Venezuelan TPS holders to whom she has spoken:

6           small business owners unsure whether to sell their businesses or
            close their doors; employees who will lose their employment
7           authorization, and their livelihood, in a matter of weeks; students
            fearful of the loss of financial aid which guarantees their ability to
8           pursue their education; individuals terrified that they will be
            deported without this essential legal status, and trying to determine
9           whether to stay or flee to avoid this outcome; business owners with
            employees unsure whether to lay them off in preparation for closure;
10          Venezuelans who have taken out significant loans from banks to
            start businesses or buy homes and properties, now unable to sleep at
11          night, wondering what to do and how to resolve these matters; and
            Venezuelans who honestly know they have no grounds to apply for
12          political asylum, and who, wanting to do things the right way, have
            turned to TPS while they wait for a real solution to the political and
13          humanitarian crisis caused by the dictatorship of Nicolás Maduro,
            especially after the largest electoral fraud ever perpetrated in the
14          region in July 2024.

15  Ferro Decl. ¶ 13.

16      Notably, the government offers no evidence to counter Plaintiffs' showing of irreparable

17  injury.  The government conceded at the hearing that it had no counter-evidence and no basis to

18  doubt the bona fides of the factual declarations filed herein.  Its main assertion at the hearing was

19  that most of these facts are not relevant, an assertion the Court rejects.  They are indeed relevant to

20  the issue of irreparable injury, the public interest, and the balance of hardships.

21      At best, the government makes a passing claim that conditions have improved in

22  Venezuela, *see* 90 Fed. Reg. at 9042 (in decision to terminate the 2023 Designation, stating that

23  there was "consultation with the Department of the State," that conditions in Venezuela were

24  reviewed, and that "[o]verall, certain conditions for the 2023 TPS designation of Venezuela may

25  continue; however, there are notable improvements in several areas such as the economy, public

26  health, and crime that allow for these nationals to be safely returned to their home country"), but

27

28

*United States District Court*
*Northern District of California*

there is no evidence – not even a country conditions report – to support that claim.[14]  The claim is also squarely contradicted by the expert declarations submitted by Plaintiffs, *see, e.g.*, Young Decl. ¶ 3 (opining that "the political and economic crisis that Venezuela has been experiencing for the last decade continues to this day"), and the U.S. State Department's classification of Venezuela as a "Level 4: Do Not Travel" country because of its dangerous conditions.

The government also tenders a legal argument – to wit, that the harms identified by Plaintiffs are not cognizable because they are inherent to the temporary nature of TPS.  *See* Opp'n at 22-23 (arguing that, "[w]hile Plaintiffs heavily focus on the burden that TPS beneficiaries will face should the termination be permitted to go into effect, the underlying cause of this harm flows from the statute ('temporary' protected status) itself" – *i.e.*, "the alleged harms would exist with or without the termination at issue" because "a country's TPS designation must be reviewed at least every 18 months, and there is no guarantee of renewal").  The Court previously rejected this argument in *Ramos*, *see Ramos*, 336 F. Supp. 3d at 1087 (noting that, "[a]lthough the TPS program is temporary in nature, that does not mean that Plaintiffs' injuries claimed herein are the purely result of the temporary nature of the program as opposed to the government's actions"), and it fares no better here.  Although the TPS designations for Venezuela are only temporary, they still afford TPS holders with concrete, meaningful relief: for a fixed period of time, TPS holders have both the right to work and the right to be free from removal, which give not only stability but also security in their lives and time with their families otherwise threatened by Secretary Noem's actions.  In short, time matters, even if that time is limited.  Certainly, anyone who, for instance, has experienced the loss of a loved one to a terminal illness understands the preciousness of time, even if short.[15]

---

[14] To be clear, the government represents that Secretary Noem found there to be improvements after examining DHS's "review of country conditions," Opp'n at 6, but no country conditions report has been provided to the Court in conjunction with the pending motion.  To the extent the government suggested at the hearing that Secretary Mayorkas found improved conditions when she extended the 2023 Designation, that is not accurate.  The Federal Register notice for the extension stated: "Recently, Venezuela's economy has shown some signs of recovery; however, it is still in a precarious condition."  88 Fed. Reg. at 68133.

[15] At the hearing, Plaintiffs also pointed out that time matters in practical terms because some TPS holders have, *e.g.*, asylum applications pending which would provide for longer-term relief.  It is

United States District Court
Northern District of California

38a

1    Faced with the above, the government's remaining argument is that the interests of TPS

2  holders are outweighed by other interests – in particular, the public interest in national security.

3  The public interest factor is addressed below.  To the extent the government argues the Secretary

4  has an interest in having her actions enforced, that would only be if her actions were lawful.  As

5  discussed below, the Plaintiffs have made a showing that the Secretary has acted unlawfully.

6    2.    Public Interest

7    Contrary to what the government argues, the public interest weighs in favor of, not against,

8  postponement of the agency actions.

9    a.    Economic Impacts

10    As reflected in the declarations submitted by Plaintiffs and the two Amici briefs

11  (representing the views of a number of states, cities, and counties), Venezuelan TPS holders are

12  integrated into the U.S. communities in which they live.  Many are married to, or are parents of,

13  U.S. citizens.  A great number work – and in diverse settings.  *See also* Morten Decl. ¶ 4

14  (Professor of Economics at Stanford University) (noting that employment rates associated with

15  TPS holders generally is estimated to be between 81 and 96%); Ferro Decl. ¶ 11 (noting that, "[i]n

16  the United States, TPS holders work in frontline jobs, hospitality, delivery, customer service,

17  retail, restaurants, transportation, construction, factories, and manufacturing, among many other

18  professional fields").

19    By virtue of their work alone, Venezuelan TPS holders make significant economic

20  contributions to their communities.  For example, if one were to consider only the 360,000

21  Venezuelans who arrived in the United States between 2021 and 2023 (the two TPS designations

22  for Venezuela), "there were approximately 195,000 people age 16 and over who had earnings in

23  the United States in the year before they were interviewed in the [2023 American Community

24  Survey]," and "[t]heir average earnings were $17,981 per person.  Termination of their TPS status

25

26  _____

27  possible that adjudications on such applications could be made during the time TPS holders are
   still present in the United States, *i.e.*, if the Court postpones the agency actions pending judicial
   review.  Removal before the application is acted upon could impact the application, if only as a
28  practical matter.

United States District Court
Northern District of California

1 would result in an estimated 3.5 billion dollar annual loss to the U.S. economy, and an annual loss

2 of 434.8 million dollars in Social Security taxes."  Card Decl. ¶ 9(i) (emphasis omitted); *cf.*

3 Watson & Veuger Decl. ¶ 20 ("Economists largely agree that immigration is good for the U.S.

4 economy overall, promoting GDP growth and if anything raising wages for the average U.S. born

5 worker.").  If one were to consider the additional 320,000 Venezuelans who were present in the

6 United States in 2023 and who arrived in the country between 2013 (when Nicolás Maduro

7 assumed power) and 2020, there were approximately 230,000 people age 16 and over who had

8 earnings in the United States, and

> [t]heir average earnings were \$37,161 per person.  Assuming a
> fraction **x** of this group would lose TPS status as a result of the
> proposed termination, there would be an estimated 8.55**x** billion
> dollar[] annual loss to the U.S. economy, and an annual loss of
> 1.06**x** billion dollars in Social Security taxes.

12 Card Decl. ¶ 9(ii).[16]

13      The two Amici briefs underscore the economic contributions made by TPS holders

14 generally, and Venezuelan TPS holders specifically, because they work, spend, and pay taxes.

15 *See, e.g.*, Docket No. 62 (Amici Br. at 8) ("California TPS households earned \$2.1 billion in

16 income, paid \$291.2 million in federal taxes, \$226.5 million in state and local taxes, and

17 contributed \$1.6 billion in spending power.  In New York, TPS households earned \$2.3 billion in

18 income, paid \$348.9 million in federal taxes, \$305.5 million in state and local taxes, and also

19 contributed \$1.6 billion in spending power.  Moreover, at least 41 percent of TPS households are

20 homeowners and pay taxes on property having a total value of approximately \$19 billion.");

21 Docket No. 71 (Amici Br. at 6) ("It is . . . reasonable to estimate that the 344,335 Venezuelans

22 with approved TPS in 2024 had spending power of approximately \$8 billion, if not more given

23 their higher participation in the work force and higher percentage of educational attainment

24 relative to other populations.").

25 / / /

26

27 [16] In his declaration, Professor Card also explains that Venezuelan TPS holders who work do not
pose a "significant threat to the labor market opportunities of native workers" (*i.e.*, because they
28 "have about the same education as natives" do).  Card Decl. ¶ 9(iv).

United States District Court
Northern District of California

40a

The evidence above on the economic contributions of Venezuelan TPS holders is consistent with evidence that Venezuelan TPS holders have a relatively high level of educational attainment and receive only modest public assistance benefits. *See* Card Decl. ¶ 9(iv) (noting that, with respect to 366,000 Venezuelans who arrived in the United States between 2021 and 2023, 40% have bachelor's degrees and that, with respect to 320,000 additional Venezuelans who arrived between 2013 and 2020, 54% have bachelor's degrees); Card Decl. ¶ 9(vi) (testifying that Venezuelans who arrived in the United States between 2021 and 2023 "received an average of $56.9 in public assistance payments over the previous 12 months" and, "[o]n average, over 96% of their personal income was attributable to their own earnings").

If TPS holders from Venezuela lose their work authorization under the TPS program, there would be additional economic impacts on the United States and the communities where the TPS holders currently live. The cost to companies to replace laid-off TPS employees could be as high as $1.3 billion, *see* Morten Decl. ¶ 7(a) (citing in support a 2017 report from the Immigration Legal Resource Center), and "[e]nding TPS would also impose costs on the government due to deportation expenses. . . . Deporting approximately 350,000 Venezuelan TPS holders could . . . cost taxpayers an estimated $4.8 billion." Morten Decl. ¶ 7(b). Moreover, if TPS holders no longer have jobs, they or their families may need to seek public assistance. *See* Watson & Veuger Decl. ¶ 27 ("Terminating TPS will increase, not decrease, the burden on localities by preventing TPS holders from working in the formal sector, thus increasing the number of people needing assistance (*e.g.*, the U.S.-citizen children of deported TPS holders and TPS holders who lose their work permit but are not yet removed)."). Without jobs, TPS holders and their families would also lose employer-sponsored health insurance, which would likely increase health care expenditures for local governments. *See* Docket No. 62 (Amici Br. at 9) (explaining that health care expenditures for Amici States would increase "both by increasing the proportion of Venezuelan immigrants who are on public health insurance . . . and by increasing public expenditures on emergency care provided to uninsured patients").

/ / /

/ / /

United States District Court
Northern District of California

### b. Public Safety

Termination of the Venezuelan TPS designations would also have more than just an economic impact on the United States and the local communities where TPS holders live. Public safety would also be implicated. Fears of detention and deportation cause undocumented immigrants to forego medical care, such as diagnostic testing and vaccinations, which increases health risks to the broader community. *See, e.g.*, Watson & Veuger Decl. ¶ 16 (stating that public health would suffer from terminating TPS for Venezuelans because immigrants without legal status forego healthcare for fear of being apprehended at medical facilities); Docket No. 62 (Amici Br. at 10-11). In addition, immigrants without legal status are less likely to report crimes or testify in court, reducing public safety and making effective law enforcement more difficult. *See* Docket No. 62 (Amici Br. at 12); Docket No. 71 (Amici Br. at 7-8).

### c. National Security

Similar to above, the government has offered no evidence to counter that provided by Plaintiffs and Amici. The government conceded, at the hearing, that they had no counter-evidence.[17] Instead, the government simply contends that the public interest weighs against postponement of the agency actions because of national security interests. But the government's assertion that Venezuelan TPS holders pose some kind of danger to the country or the communities where they live is entirely unsubstantiated. In fact, an individual must be "admissible as an immigrant," 8 U.S.C. § 1254a(c)(1)(A)(iii), in order to be eligible for TPS, which means, *inter alia*, they cannot have been convicted of certain crimes (*e.g.*, a crime involving moral turpitude or drugs) or a member of a terrorist organization. *See id.* § 1182(a)(2)-(3). In addition, an individual is expressly deemed ineligible for TPS if they have "been convicted of any felony or 2 or more misdemeanors committed in the United States." *Id.* § 1254a(c)(2)(B). It is not surprising, therefore, that Amici state and local jurisdictions from across the United States expressly state they have not faced any "crime wave" because of Venezuelan TPS holders. *See*

---

[17] At the hearing, the government appeared to refer to the Federal Register notice for the termination of the 2023 Designation, which stated that "over 180,000 illegal aliens have settled in New York City, [which will] cost the city [approximately] $10.6 billion through the summer of 2025." 90 Fed. Reg. at 9043. But TPS holders are not in the United States illegally.

United States District Court
Northern District of California

1    Docket No. 62 (Amici Br. at 13); *see also* Perez Decl. ¶ 7 (noting that "immigrants have had lower

2    incarceration rates than the U.S.-born throughout American history (including lower incarceration

3    rates than U.S. born whites)" and that "immigrants' relative incarceration rates have actually

4    declined since the 1960s in the U.S.") (emphasis omitted).  The government's attempt to cast

5    Venezuelan TPS holders as criminals is also in tension with record evidence reflecting that

6    Venezuelan TPS holders are largely employed and have relatively high education levels.  It is a

7    form of group defamation.

8              To the extent the government contends that there is a threat from the Venezuelan gang

9    Tren de Aragua ("TdA"), it has made no showing that any Venezuelan TPS holders are members

10   of the gang or otherwise have ties to the gang.  In fact, Plaintiffs have submitted evidence that,

11   although the TdA gang is "a powerful criminal organization in Venezuela and some other parts of

12   South America, there is no evidence of a structured or operational presence in the United States."

13   Dudley Decl. ¶ 16 (Co-Director of InSight Crime).  According to the Co-Director of InSight

14   Crime, a think tank that specializes in investigating and analyzing organized crime in the

15   Americas and assessing state efforts to combat these organizations, *see* Dudley Decl. ¶ 4, "local

16   police we have spoken to in the United States have not asserted that [TdA] has any significant

17   criminal operations in the country," and "[t]he few crimes attributed to alleged [TdA] members in

18   the United States appear to have no connection with the larger group or its leadership in

19   Venezuela."  Dudley Decl. ¶ 16; *see also id.* ¶ 20 (stating that "[i]t is rare – indeed, practically

20   unheard of – for foreign street and prison gangs from Latin America to gain a significant foothold

21   in the United States in light of a complex array of factors").  InSight Crime also reports that, "[i]n

22   March 2024, a review of all federal and state court databases found only two criminal cases which

23   even mentioned [TdA]," and,

24              [b]y February 18, 2025, we had identified only five federal cases of
               an alleged [TdA] connection.  However, none of these cases
25             appeared to be connected to each other or the international structure
               of the gang outside of the U.S.  What's more, the details of the cases
26             do not suggest any sophisticated criminal operations or modus
               operandi, and there was no discernable pattern of criminal behavior
27             or indications these individuals were seeking to regroup with [TdA]
               members or other gangs.

28

United States District Court
Northern District of California

43a

*Id.* ¶ 19.

Finally, even assuming a legitimate concern about the presence of TdA gang members in the United States, the government has failed to show that it cannot deal with that specific problem through other means. As noted above, anyone who is convicted of a felony or two misdemeanors or an act of terrorism will be ineligible for TPS status. The government has made no showing the traditional law enforcement and immigration measures cannot handle criminal problems that might be caused by the TdA and that *en masse* action stripping all Venezuelan nationals of TPS status is necessary. In addition, the government has shown no basis for attributing criminality to the entire population of Venezuelans or Venezuelan TPS holders in the United States and seeking their exclusion wholesale instead of focusing on specific TdA gang members. *Cf. Korematsu v. United States*, 323 U.S. 214, 218-19 (1944) (stating that "exclusion of those of Japanese origin [from the West Coast war area] was deemed necessary because of the presence of an unascertained number of disloyal members of the group, most of whom we have no doubt were loyal to this country"), *abrogated by Trump v. Hawaii*, 585 U.S. 667, 710 (2018) (stating that "*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and – to be clear – 'has no place in law under the Constitution'").

Indeed, there is uncontradicted evidence in the record that stripping Venezuelan beneficiaries of TPS protection would impede law enforcement and threaten public safety. As noted above, immigrants without legal status are less likely to report crimes or testify in court, reducing public safety and making effective law enforcement more difficult. *See* Docket No. 62 (Amici Br. at 12); Docket No. 71 (Amici Br. at 7-8).

Finally, the government's interest in national security is unclear. Terminating TPS could actually have adverse ramifications to national security (in addition to impeding domestic prosecutions) because "deporting Venezuelan TPS holders will require cooperation with the Maduro regime." Watson & Veuger Decl. ¶ 24. Since taking office in January 2025, the Trump administration has made an agreement with the Maduro government to resume deportations to Venezuela. *See id.* And yet, this action would seem to contradict U.S. foreign policies that have refused to recognize Nicolás Maduro as the legitimate president of Venezuela since 2019. *See id.*

1   ¶¶ 8, 24.  Indeed, the U.S. is still offering a $25 million reward for information leading to Nicolás

2   Maduro's arrest and/or conviction.  *See id.* ¶ 8.  Therefore, it would seem that normalizing

3   relations with Nicolás Maduro to deport immigrants "to a place known for human rights abuses

4   may also weaken the standing of the United States in the international community and adversely

5   affect national security."  *See id.* ¶ 24.  It is hard to discern precisely what the U.S. interest is in

6   this instance.

7          3.  <u>Balance of Hardships</u>

8         As discussed above, Plaintiffs have provided significant evidence that TPS holders and

9   their families would suffer irreparable harm if they are not afforded temporary relief, and the

10  public interest also weighs in favor of Plaintiffs because of the substantial economic, public safety,

11  and humanitarian ramifications.  In contrast, the government's contention that the public interest

12  weighs in its favor is not convincing because the government lacks any evidence of national

13  security harms.  Accordingly, the balance of hardships (including consideration of the public

14  interest) tips sharply in Plaintiffs' favor.

15         4.  <u>Likelihood of Success on the Merits</u>

16        Because the balance of hardships tips sharply in their favor, Plaintiffs need only show

17  serious questions going to the merits of their claims.  *See All. for the Wild Rockies*, 865 F.3d at

18  1217.  But as discussed below, Plaintiffs have not only shown that there are such serious

19  questions; they have also established a likelihood of success on the merits, thus entitling them to

20  postponement of the Secretary's vacatur and termination even without the benefit of the sliding

21  scale test.

22        a.  <u>Authority to Vacate Extension of 2023 Designation</u>

23        The threshold question is whether Secretary Noem lacked the authority to vacate the

24  extension of the 2023 Designation.[18]  Plaintiffs are likely to succeed on the merits of this issue.

25  As noted above, this is the first time that an extension of a TPS designation has ever been vacated

26

27  _____

28  [18] As noted above, the government has conceded that § 1254a(b)(5)(A) does not preclude judicial
    review of Plaintiffs' claim that the Secretary lacked the inherent authority to vacate the extension
    of the 2023 Designation.

United States District Court
Northern District of California

45a

1   in the statute's history.  While the Secretary has the ultimate authority to terminate a TPS

2   designation and can "change her mind," she may do so only under the terms and timeframe set

3   forth in the TPS statute.

i.  Notice of Vacatur

5       In the notice of vacatur, the Secretary stated: "An agency has inherent (that is, statutorily

6   implicit) authority to revisit its prior decisions unless Congress has expressly limited that

7   authority.  The TPS statute does not limit the Secretary's inherent authority under the INA to

8   reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the

9   determination."  90 Fed. Reg. at 8806.  In a footnote, she cited the following:

> *See* INA 103(a), 244(b)(3), (b)(5)(A); 8 U.S.C. 1103(a),
> 1254a(b)(3), (b)(5)(A); Reconsideration and Rescission of
> Termination of the Designation of El Salvador for Temporary
> Protected Status; Extension of the Temporary Protected Status
> Designation for El Salvador, 88 FR 40282, 40285 (June 21, 2023)
> ("An agency has inherent (that is, statutorily implicit) authority to
> revisit its prior decisions unless Congress has expressly limited that
> authority.  The TPS statute does not limit the Secretary's inherent
> authority to reconsider any TPS-related determination, and upon
> reconsideration, to change the determination."); *see also, e.g.*, *Ivy
> Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014)
> (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess
> at least some inherent authority to revisit their prior decisions, at
> least if done in a timely fashion. . . . "[I]nherent authority for timely
> administrative reconsideration is premised on the notion that the
> power to reconsider is inherent in the power to decide." (quotation
> marks and citations omitted)); *Macktal v. Chao*, 286 F.3d 822, 825-
> 26 (5th Cir. 2002) ("It is generally accepted that in the absence of a
> specific statutory limitation, an administrative agency has the
> inherent authority to reconsider its decisions.") (collecting cases);
> *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) ("We
> have many times held that an agency has the inherent power to
> reconsider and change a decision if it does so within a reasonable
> period of time."); *cf. Last Best Beef, LLC v. Dudas*, 506 F.3d 333,
> 340 (4th Cir. 2007) (agencies possess especially "broad authority to
> correct their prior errors").

24  *Id.* at 8806 n.2.

ii.  Authorities Cited by the Secretary

26      As an initial matter, the Court takes note that the statutes cited by the Secretary do not give

27  her the authority to vacate.

28  / / /

United States District Court
Northern District of California

46a

- 8 U.S.C. § 1103(a)(1) is simply a general provision stating that "[t]he Secretary of Homeland Security shall be charged with the administration and enforcement of this Act and all other laws relating to the immigration and naturalization of aliens . . . ."

- 8 U.S.C. § 1254a(b)(3) is about periodic review, terminations, and extensions of TPS.

- 8 U.S.C. § 1254a(b)(5) is the jurisdictional provision – stating that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."

Thus, ultimately, the Secretary's claim for authority to vacate rests on the concept of inherent authority to reconsider.

As a general matter, the government is correct that "administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion." *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014). But

> the term "inherent" is misleading because "it is 'axiomatic' that 'administrative agencies may act only pursuant to authority delegated to them by Congress.'" Thus, "the more accurate label" for the power EPA describes "is **'statutorily implicit.'**" And although the power to decide is **normally** accompanied by the power to reconsider, **"Congress . . . undoubtedly can limit an agency's discretion to reverse itself."**

*NRDC v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023) (emphasis added); *see also Ivy Sports*, 767 F.3d at 86 (stating that "any inherent reconsideration authority does not apply in cases where Congress has spoken"). Thus, the power to reconsider and revoke prior agency decision is not universally inherent, but is "statutorily inherent" – it turns on construction of the governing statute. For instance, "an agency may not rely on inherent reconsideration authority 'when Congress has provided a mechanism capable of rectifying mistaken actions.'" *Id.*; *see also id.* at 87 (stating that "it would be unreasonable under [the] statutory scheme to infer that FDA retains inherent authority to short-circuit or end-run **the carefully prescribed statutory reclassification process** [for a medical device] in order to correct the same mistake") (emphasis added).

United States District Court
Northern District of California

1    Ninth Circuit authority is consistent with that of the D.C. Circuit. To determine whether

2  an agency has the statutorily implicit authority to reconsider an earlier agency decision depends on

3  the statute and whether such legislative intent to confer such authority can be inferred. For

4  example, in *Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc), the Ninth Circuit

5  considered whether the Attorney General's "power to confer citizenship through the process of

6  naturalization necessarily includes the power to revoke that citizenship." *Id.* at 1089. The Ninth

7  Circuit noted that, "[b]ecause 'an agency may not confer power upon itself,' the Attorney General

8  needs some statutory authority to have the power to take away an individual's American

9  citizenship." *Id.* at 1092-93. The court reviewed the "established and carefully constructed

10 statutory scheme" which provided, *inter alia*, that U.S. attorneys could institute actions to revoke

11 naturalization in federal court and that the Attorney General could cancel "certificates of

12 citizenship"[19] but such cancellations affected only the document and not the citizenship status

13 itself. The Ninth Circuit held that "implying authority for the Attorney General to take away

14 people's citizenship administratively would gravely upset this carefully constructed legislative

15 arrangement." *Id.* at 1094.

16    Notably, the court recognized the "heart" of the government's argument was that "the

17 power to denaturalize is 'inherent' in the power to naturalize" but it explicitly rejected that

18 contention. *Id.* at 1095.

19        The formula the government urges, that what one can do, one can
20        undo, is sometimes true, sometimes not. A person can give a gift,
         but cannot take it back. A minister, priest, or rabbi can marry
21        people, but cannot grant divorces and annulments for civil purposes.
         A jury can acquit, but cannot revoke its acquittal and convict.
22        Whether the Attorney General can undo what she has the power to
         do, naturalize citizens, depends on whether Congress said she could.

23 *Id.* at 1095. The agency power to revoke prior action was sufficiently circumscribed to preclude

24 an inference of statutorily implicit power to reconsider the grant of citizenship.

25 ///

26 _____

27 [19] "The certificate of naturalization is issued by the Commissioner of Immigration and
   Naturalization. It says, 'the Attorney General having found that' the person is entitled to
28 citizenship and has met the requirements and taken the oath of allegiance, 'such person is admitted
   as a citizen of the United States of America.'" *Gorbach*, 219 F.3d at 1090.

48a

1    In *China Unicom (Ams.) Ops. Ltd. v. FCC*, 124 F.4th 1128 (9th Cir. 2024) [hereinafter

2    *CUA*], the Ninth Circuit held that the agency *did* have the implicit authority to reconsider the

3    decision at issue but, again, only after reviewing the statutory scheme to determine what was

4    Congress's intent.  *See, e.g.*, *id.* at 1149 (noting that, "[w]here Congress has provided a particular

5    mechanism, with specified procedures, for an agency to make such alterations, 'it is not reasonable

6    to infer' an implied authority that would allow an agency to circumvent those statutory procedural

7    protections").  CUA, the plaintiff in the case, was a California company but ultimately owned by

8    the Chinese government.  It "was authorized to provide domestic and international

9    telecommunications services pursuant to certificates granted to it many years ago" by the FCC

10   under § 214 of the Communications Act of 1934.  *Id.* at 1132.  In 2020, the FCC "issued an order

11   directing CUA to show cause why the FCC should not revoke its § 214 certificates" based on

12   "national security concerns," as articulated during proceedings in which the agency had denied an

13   application for a § 214 authorization submitted by a *different* Chinese government-owned carrier.

14   *Id.*; *see also id.* at 1136 (noting that the other proceedings raised concerns about "the susceptibility

15   of Chinese state-owned enterprises, including subsidiaries, to Chinese government influence,

16   control, and exploitation").  Ultimately, in 2022, the FCC revoked CUA's certificates "on the

17   grounds that CUA's retention of them presented an unreasonable national security risk and,

18   separately, that CUA had exhibited a lack of candor and trustworthiness over the course of the

19   proceedings."  *Id.* at 1132; *see also id.* at 1141.

20   Before the Ninth Circuit, CUA argued that, "as a matter of law, the FCC lacks any

21   statutory authority [including implicit] to revoke a § 214 certificate, except as a penalty imposed in

22   connection with adjudicated violations of applicable law."  *Id.* at 1142.  The court disagreed after

23   reviewing the statutory text and structure.  The Ninth Circuit acknowledged that, in a different title

24   in the Communications Act that dealt with radio licensing, there was an express provision that

25   empowered the FCC to revoke any station license for a variety of reasons.  But,

26          [i]n our view, no negative inference can be drawn from the fact that
          the "radio" licensing provisions in Title III of the Communications
27          Act contain an express revocation provision, while the common-
          carrier certificate provisions in Title II do not.  As the Supreme
28          Court has noted, the two distinct regulatory systems established

under Title II and Title III are very different, because, in "contradistinction" to wire-telecommunications carriers, the Act recognizes that "broadcasters are not common carriers and are not to be dealt with as such." *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 474 (1940) (footnote omitted). . . . **Indeed, given that broadcast licenses are generally issued for fixed, renewable terms of up to eight years,** *see* **47 U.S.C. § 307(c)(1), the statute reflects a clear temporal expectation that, absent contrary indication in the statutory text, such a license will endure for the length of that term. The use of a fixed term is thus affirmatively inconsistent with positing an implied power to revoke a license at any time, and it is therefore unsurprising that Title III contains a provision expressly recognizing an agency power of revocation.** By contrast, as noted earlier, Title II's silence on the temporal duration of common-carrier certificates, which have traditionally been open-ended in length, is a factor that weighs in favor of an implied power of revocation.

*Id.* at 1147-48 (emphasis added). The court thus held that

the FCC possesses statutory authority to revoke a § 214(a) certificate by invoking grounds that it may properly consider in denying issuance of such a certificate as an original matter. Of course, any actual exercise of such authority must consider the relevant constraints that may be placed upon that action by the Constitution, other statutes, or applicable principles of administrative law. In some cases, such as ones involving substantial reliance interests, those constraints may be significant and may preclude a particular exercise of such authority.

*Id.* at 1150-51; *see also id.* at 1160-61 (Bea, J., dissenting) (noting that carriers may develop reliance interests in their § 214 certificates).[20]

---

[20] As indicated above, Judge Bea issued a dissent in *CUA*. Judge Bea stated that "the specificity of § 214's provision of authority to the FCC to grant a certificate to start, to modify, to change, or to end services only upon a telecommunications carrier's application would normally imply Congress intended not to grant the FCC the authority to take a different course of action with respect to such certificates." *CUA*, 124 F.4th at 1158. He also rejected

the premise that the power to refuse certification is the functional equivalent of the power to revoke certification . . . because it ignores the reliance interests carriers may develop in their § 214 certificates.

A business that is refused a certificate can decide to expend no further capital – money – for its proposed enterprise. But a business that has been granted a certificate is likely to have invested further capital, time, and resources into existing infrastructure in reasonable reliance on the vested right to build a telecommunications line pursuant to its duly granted § 214 certificate. Simply put, there is a material difference between the power to refuse and the power to revoke. It is not reasonable to assume that the power to grant, to refuse, or to condition a grant also encapsulates the power to revoke.

Hence, the critical question in the instant case is whether there is anything in the statutory scheme of the INA suggesting that the Secretary does or does not have the inherent authority to vacate a TPS designation or extension.

### iii.   Statutory Analysis

Plaintiffs argue that the Secretary does not have the implicit authority because the TPS statute lays out specific timelines and processes for TPS designations, extensions, and terminations.

> The fixed terms of TPS designations, extensions, and terminations, and the statutorily prescribed processes governing how the Secretary must proceed after an initial TPS designation, are inconsistent with implicit vacatur authority. Unless otherwise specified in the original notice, an initial designation "take[s] effect upon the date of publication of the designation" and "shall remain in effect until the effective date of the termination of the designation." 8 U.S.C. § 1254a(b)(2). The same is true of extensions. 8 U.S.C. § 1254a(b)(3)(C). "At least 60 days before the end of the initial period of designation, and any extended period of designation," the Secretary "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The Secretary must "provide on a timely basis for the publication of notice of such determination . . . in the Federal Register." *Id.* If the Secretary determines "that a foreign state . . . no longer continues to meet the conditions for designation" the Secretary "shall terminate the designation by publishing a notice in the Federal Register." 8 U.S.C. § 1254a(b)(3)(B). Without such a determination, the designation "is extended." 8 U.S.C. § 1254a(b)(3)(A) & (C). Extensions take effect immediately, and last for the length of time specified in the notice, up to 18 months. *Id.* In contrast, a termination "shall not be effective earlier than 60 days after the date the notice is published *or, if later, the expiration of the most recent previous extension*." 8 U.S.C. § 1254a(b)(3)(B) (emphasis added).

Mot. at 6 (italics in original).

Plaintiffs' analysis is compelling. Secretary Noem's claim that she had the inherent right to vacate the extension of the 2023 Designation effectively gave her the power to countermand Secretary Mayorkas's decision and in practical terms terminate the TPS designation given to Venezuela is at odds with the structure of the TPS statute. The TPS statute is specifically

---

*Id.* at 1161 (citing *Gorbach*).

51a

prescriptive as to the time frame within which a TPS designation may be terminated.  *See* 8 U.S.C.

§ 1254a(b)(3)(B) (providing that a termination "shall not be effective earlier than 60 days after the

date the notice is published or, if later, the expiration of the most recent previous extension").  It

expressly provides that termination of TPS designation can be *no earlier* than the *expiration* of the

most recent extension.  It does not permit the Secretary to terminate a TPS designation

"midstream" during the term of the prior designation.  Yet, the upshot of the Secretary's action

herein does just that.  And while the statute carefully and expressly sets forth in detail the process

of "designation," "extension," and "termination," it says *nothing* about vacatur.

   The Ninth Circuit's *CUA* decision is particularly instructive here.  As noted above, in

*CUA*, the Ninth Circuit reasoned that,

> **given that broadcast licenses are generally issued for fixed,
> renewable terms of up to eight years,** *see* **47 U.S.C. § 307(c)(1),
> the statute reflects a clear temporal expectation that, absent
> contrary indication in the statutory text, such a license will
> endure for the length of that term.  The use of a fixed term is
> thus affirmatively inconsistent with positing an implied power to
> revoke a license at any time, and it is therefore unsurprising that
> Title III [addressing radio licensing] contains a provision
> expressly recognizing an agency power of revocation.**  By
> contrast, as noted earlier, Title II's silence on the temporal duration
> of common-carrier certificates, which have traditionally been open-
> ended in length, is a factor that weighs in favor of an implied power
> of revocation.

*CUA*, 124 F.4th at 1148 (emphasis added).  Here, "clear temporal expectations" are reflected in

the TPS statute, and the clear stated terms for extensions and terminations of TPS designations are

likewise "affirmatively inconsistent with the positing an implied power to revoke" or vacate a

prior designation (or extension).  *Id.*

   It is also worth noting that, in the vacated *Ramos* decision, the panel noted that "Congress

enacted the TPS statute to curb and control the executive's **previously unconstrained discretion**

under the [extended voluntary departure] process . . . ."  *Ramos*, 975 F.3d at 890 (emphasis

added); *cf. NRDC v. Regan*, 67 F.4th at 401-02 (noting that, "[i]n 2011, EPA determined that

perchlorate satisfied the statutory criteria for regulating," and, therefore, "[u]nder the statute, . . .

EPA has one authorized course of action: it 'shall' propose and promulgate the MCLG and

regulations, and it 'shall' do so by the statutory deadlines"; "[t]o read into the statute another

United States District Court
Northern District of California

52a

course of action – one that allows EPA to withdraw its regulatory determination entirely and decide that it 'shall not' regulate – would be to contravene the statute's clear language and structure and 'nullif[y] textually applicable provisions **meant to limit [EPA's] discretion**'") (emphasis added).  To permit the Secretary unconstrained discretion to revoke, at any time, a prior TPS designation would not be consistent with Congress's general intent to cabin such discretion.[21]

To the extent the government relies on a prior claim by the Biden administration of the implicit authority to reconsider – specifically, when dealing with the TPS designation for El Salvador, *see* 88 Fed. Reg. 40282, 40285 (June 21, 2023) – that reliance is misplaced for several reasons.  First, prior agency practice is not dispositive.  *See New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008) ("[P]revious statutory violations cannot excuse the one now before the court. '[W]e do not see how merely applying an unreasonable statutory interpretation for several years can transform it into a reasonable interpretation.'").  Simply put, the legality of the action by the Biden administration was not tested in court.

Second, assuming the action of the Biden administration was legally authorized, the Biden administration reconsidered a decision to *terminate* a TPS designation, not a decision to *extend* a TPS designation.  This difference is significant.  Where a TPS extension is given, it creates important reliance interests.[22]  *See, e.g.*, Rivas Decl. ¶ 12 (testifying that, the day the extension of the 2023 Designation was given, he submitted his renewal application, he thereafter received a receipt that confirmed his work authorization was extended for 540 days, he provided that information to his employer so he could continue to work, and, "[w]ith that assurance, [he] renewed [his] lease on [his] home").[23]  Indeed, the TPS statute itself implicitly recognizes the

---

[21] To be sure, the *Ramos* panel also stated that, "to the extent the TPS statute places constraints on the Secretary's discretion, it does so in favor of limiting unwarranted designations or extensions of TPS." *Ramos*, 975 F.3d at 891.  Nevertheless, the limitations that Congress established by setting forth the specific circumstances under which designations, extensions, *or* terminations evidence a more general intent to constrain discretion.

[22] *Cf. CUA*, 124 F.4th at 1150-51 (recognizing that, "[i]n some cases, such as ones involving substantial reliance interests, . . . constraints [on an agency's authority to revoke] may be significant and may preclude a particular exercise of such authority [to revoke]"); *id.* at 1160-61 (Bea, J., dissenting) (noting that carriers may develop reliance interests in their § 214 certificates).

[23] The government has suggested that there cannot be any real reliance interests in the instant case

53a

importance of such reliance interests because it provides that, during periodic review of a TPS designation, if the Secretary does not make an express decision that the foreign country "no longer meets the conditions for designation . . . , the period of designation of the foreign [country] is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 to 18 months)." 8 U.S.C. § 1254a(b)(3)(C). It essentially provides extension as a default and its effect can be immediate. In contrast, the TPS statute partially builds in some delay before termination of TPS becomes effective: termination does not take effect until the later of 60 days from the date of notice or the expiration of the most recent previous extension. *See* 8 U.S.C. § 1254a(b)(3)(B). Thus, given the difference in reliance interests (between extensions and terminations) and the structure of the statute, even if there is room to argue that the Secretary has the implicit authority to vacate a decision to terminate, the same cannot necessarily be said for a decision to extend.

Third, as Plaintiffs point out, it is notable that the Biden administration reconsidered terminations only after they had already been

> *enjoined for five years*; [the terminations] never took effect.
> Agencies have flexibility to undo decisions already found unlawful
> by courts. *United Gas Improvement Co. v. Callery Props., Inc.*, 382
> U.S. 223, 229-30 (1965) (agency had power to "undo what is
> wrongly done" when original decision never became final and
> was overturned on judicial review).

Mot. at 7 (emphasis in original).

Ultimately, the government's main response to Plaintiffs' position is that it is extreme – *i.e.*, under Plaintiffs' position, "no Secretary of Homeland Security could ever vacate a designation or extension of a designation, no matter the type of national security threat posed or the seriousness of the error or legal defect in the prior determination" (unless the specific timeline under the TPS statute allowed for a new determination to be made). Opp'n at 15. The government's argument may have some surface appeal, but it is ultimately unpersuasive.

_____

because Secretary Noem vacated Secretary Mayorkas's extension shortly after it was given. The Rivas Declaration is but one example of why that argument lacks merit.

53

54a

First, Secretary Noem's decision to vacate the extension of the 2023 Designation was not based on any claimed national security interest. While this rationale may have been one basis of her subsequent decision to terminate (a basis which, as discussed below, is unsupported by any evidence), her decision to vacate the extension was based on her purported belief that Secretary Mayorkas's decision was novel, possibly in violation of the TPS statute, and engendered confusion regarding registration process. It was not based on any claim of national security.

Second, "[r]egardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (internal quotation marks omitted). Thus, as Plaintiffs point out, in spite of possible national security interests, the Secretary does not have the ability, *e.g.*, to "revoke en masse green cards, H-1B visas, or student visas; such authority resides with Congress." Reply at 7. Congress did not create a national security exception to the framework it prescribed for the termination of TPS status. Instead, under the TPS statute, national security is an explicit consideration in one circumstance: when granting TPS to a foreign country on the basis of extraordinary and temporary conditions. *See* 8 U.S.C. § 1254a(b)(1)(C) (providing for TPS designation if the Secretary "finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States").

Third, to the extent concern for national security comes into play, the TPS statute accounts for that in several ways: (a) TPS is temporary, not permanent, in nature; (b) the Secretary is to consult with other government agencies before making a decision on TPS designations, terminations, or extensions, and, presumably, the agencies would alert her to any potential for concern; and (c) if there are any concerns, the Secretary can issue a TPS designation of short duration (*e.g.*, 6 months instead of 18).

Perhaps more to the point, the Secretary maintains the authority to *withdraw* a TPS holder's status if a beneficiary presents a danger to national security: the Secretary "shall withdraw

54

55a

[TPS] granted to an alien . . . if [the Secretary] finds that the alien was not in fact eligible for such status," 8 U.S.C. § 1254a(c)(3)(A), and ineligibility includes, *e.g.*, committing a crime involving moral turpitude, committing a felony, or being a member of a terrorist organization.  Moreover, the government, of course, has law enforcement resources to address any such threat posed by an individual or group of individuals.  Indeed, the government has already attempted to employ extraordinary means against putative TdA gang members.  *See generally J.G.G. v. Trump*, No. 25-766 (JEB) (D.D.C.) (addressing claim brought by Venezuelan noncitizens fearing removal pursuant to the Alien Enemies Act of 1798 instead of the INA).  Revocation/vacatur of TPS status en masse because of the suspect acts of a few would be statutory overkill.  Nothing in the TPS statute indicates there is an exception to its statutorily imposed temporal limitations and expectations that would implicitly permit the Secretary to vacate at will, in midstream, a TPS designation still in effect.

Accordingly, the Court concludes that Plaintiffs have established a likelihood of success on the merits for their claim that Secretary Noem lacked the inherent authority to vacate the extension of the 2023 Designation.  And if Secretary Noem lacked the authority to vacate the extension, she necessarily did not have the authority to terminate the 2023 Designation thereafter, which Secretary Mayorkas had extended to October 2026.

### b.     Arbitrary and Capricious – Legal Error

Given the Secretary did not have the legal right to vacate the 2023 extension, the Plaintiffs have established a likelihood of if success on the merits.  But even if, contrary to the above analysis, the Secretary had the implicit authority to reconsider and vacate the extension of the 2023 Designation (*i.e.*, could supplant Secretary Mayorkas's decision on whether to terminate or extend with her own), Plaintiffs would still be entitled to relief.  This is because, as Plaintiffs argue, even if the Secretary had the authority to vacate the extension, her vacatur was founded on legal error and thus was arbitrary and capricious.  *See* 5 U.S.C. § 706(2).

In vacating the extension of the 2023 Designation, the Secretary claimed that the extension did not simply extend the 2023 Designation to October 2026 but also, in effect, extended the 2021 Designation to the same 2026 date.  *See* Opp'n at 16 ("By consolidating the registration processes

1  for both the 2021 and 2023 TPS designations, the notice had the practical effect of extending the

2  2021 Designation by up to 13 months and allowing for employment authorization for that period

3  as well.").  She characterized this as a "novel approach."  90 Fed. Reg. at 8807 ("The Mayorkas

4  Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by

5  effectively subsuming it within the 2023 Venezuela TPS designation.").

> The Mayorkas Notice did not acknowledge the novelty of its
> approach or explain how it is consistent with the TPS statute.  *See*
> INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS
> country designation "shall remain in effect until the effective date of
> the termination of the designation under [INA 244(b)(3)(B), 8
> U.S.C. 1254a(b)(3)(B)]").  This novel approach has included
> multiple notices, overlapping populations, overlapping dates, and
> sometimes multiple actions happening in a single document.  While
> the Mayorkas Notice may have made attempts to address these
> overlapping populations, the explanations in the Mayorkas Notice,
> particularly the explanation for operational impacts, are thin and
> inadequately developed.  Given these deficiencies and lack of
> clarity, vacatur is warranted to untangle the confusion, and provide
> an opportunity for informed determinations regarding the TPS
> designations and clear guidance.

*Id.*

15  But Secretary Noem's stated rationale was legally erroneous.  As Plaintiffs argued in their

16  papers and at the hearing, the Secretary failed to recognize that a TPS beneficiary under the 2021

17  Designation was necessarily a TPS beneficiary under the 2023 Designation.

> [E]very earlier designation is "subsum[ed]" by a later one because
> redesignation expands the pool of potential beneficiaries **to include
> not only those who qualified under an earlier designation, but
> also those who arrived after their country was first designated**.
> *See* 8 U.S.C. § 1254a(c)(1)(A)(i) (TPS applicants must have been
> "continuously physically present in the United States since the
> effective date of the most recent designation of [their country]").
> Thus, TPS holders who initially registered for TPS under
> Venezuela's 2021 designation had to prove they remained
> continuously present since March 9, 2021. 86 Fed. Reg. 13575.
> Accordingly, they **necessarily** also satisfied the later continuous
> presence requirement in Venezuela's 2023 re-designation."

25  Mot. at 9 (emphasis added).  When Secretary Mayorkas extended the 2023 Designation, he simply

26  recognized that a TPS holder under the 2021 Designation could choose to register as a TPS holder

27  under the 2023 Designation:

28  / / /

57a

**Will there continue to be two separate filing processes for TPS designations for Venezuela?**

No.  USCIS has evaluated the operational feasibility and resulting impact on stakeholders of having two separate filing processes. Operational challenges in the identification and adjudication of Venezuela TPS filings and confusion among stakeholders exist because of the two separate TPS designations.  To date, USCIS has created operational measures to process Venezuela TPS cases for both designations; however, it can most efficiently process these cases by consolidating the filing processes for the two Venezuela TPS populations.  To decrease confusion among stakeholders, ensure optimal operational processes, and maintain the same eligibility requirements, upon publication of this Notice, **individuals registered under either the March 9, 2021 TPS designation or the October 3, 2023 TPS designation will be allowed to re-register under this extension**.  This would not, however, require that a beneficiary registered under the March 9, 2021 designation to re-register at this time.  Rather, it would provide such individuals with the option of doing so. **Venezuela TPS beneficiaries who appropriately apply for TPS or re-register under this Notice and are approved by USCIS will obtain TPS through the same extension date of October 2, 2026.**

*Id.* at 5964 (some emphasis added).

Contrary to what Secretary Noem suggested, streamlining the two tracks for the two designations into one (so long as a TPS holder under the 2021 Designation was willing to register under the 2023 Designation) would tend to eliminate, not create, confusion – *i.e.*, confusion that could arise based on the fact that there are two tracks.  Moreover, contrary to what Secretary Noem suggested, as a factual matter, it was not "novel" for different tracks to be streamlined as part of a TPS process.  Plaintiffs have pointed out that there has been similar streamlining for both the Sudan and Haiti TPS designations.  *See, e.g.*, 79 Fed. Reg. 52027, at 52028-29 (Sept. 2, 2014) (extending Sudan's TPS designation and establishing one process for re-registration, regardless of which designation individual initially registered under); 88 Fed. Reg. 5022, at 5028 (Jan. 26, 2023) (permitting "[i]ndividuals who [initially registered for TPS under Haiti's 2010 or 2011 designation and] currently retain their TPS [through June 30, 2024] under the *Ramos* injunction" to "re-register" under a later redesignation to receive TPS through August 3, 2024).

Furthermore, nothing in the TPS statute prevents the Secretary from extending TPS designation of a country well in advance of the natural expiration date of the prior designation. The statute only requires that the Secretary review the designation at least 60 days in advance of

57

the expiration. *See* 5 U.S.C. § 1254a(b)(3)(A) ("*At least* 60 days before end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met.") (emphasis added). It does not place a limit on how far in advance the extension may be considered and granted. Thus, to the extent the extension of the 2023 Designation had the independent effect of extending the status of the 2021 Designation 8 months in advance of the September 2025 expiration date, it was entirely consistent with the TPS statute.

Thus, the practical operation of the extension of the 2023 Designation was not "novel," did not engender undue confusion as to registration, and was entirely consistent and compliant with the TPS statute. The Court therefore concludes that Plaintiffs are likely to succeed on their claim that the decision to vacate (assuming the Secretary had implicit authority to vacate) was arbitrary and capricious because it was based on legal (as well as factual) error.

        c.    <u>Arbitrary and Capricious – Failure to Consider Alternatives Short of Termination</u>

Even if vacatur were permitted and not founded on any legal error, the vacatur was still arbitrary and capricious because, in revoking prior action, the Secretary failed to consider alternatives short of termination.

As a general matter, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). But "when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

Here, there were alternatives within the ambit of the existing policy that the Secretary failed to consider. Most notably, if Secretary Noem was truly concerned about confusion arising from Secretary Mayorkas's decision to allow 2021 TPS holders to register as 2023 TPS holders,

59a

she easily could have chosen to "deconsolidate" the registration process and keep the 2021 and 2023 Designations on two different tracks – with the 2021 Designation ending in September 2025 and with the 2023 Designation still ending in October 2026. But Secretary Noem did not so act – effectively demonstrating that confusion was not her concern so much as the desire to totally undo Secretary Mayorkas's decision.

The government admitted as much at the hearing. The government conceded the Secretary's ultimate goal extended beyond minimizing registration confusion; it was to revisit and undo Secretary's Mayorkas's decision to extend the TPS designation for Venezuela to October 2026. The government also effectively conceded as much in its papers. In the opposition brief, the government asserted:

> In issuing the Vacatur, Secretary Noem indicated that the decision to vacate provided "an opportunity for informed determinations regarding the TPS designations and clear guidance." 2025 Vacatur, 90 Fed. Reg. at 8807 (citing Exec. Order No. 14159, Protecting the American People Against Invasion, § 16(b), 90 Fed. Reg. 8443 (Jan. 20, 2025)). Thus, the alternative of simply deconsolidating the re-registration periods would not meet the stated reasons for the 2025 Vacatur and is neither arbitrary and capricious nor an impermissible decision.

Opp'n at 17. The failure to consider the alternative action to address the stated reasons for the vacatur further renders the vacatur arbitrary and capricious.

d. <u>Equal Protection – APA and Constitutional Claims</u>

Finally, Plaintiffs contend that they are likely to succeed on their equal protection claim[24] – *i.e.*, that the Secretary's decisions to vacate and terminate TPS for Venezuelans are unconstitutional because they were motivated at least in part by animus based on race, ethnicity, or national origin. Based on the extensive record provided by Plaintiffs, the Court finds that Plaintiffs have raised a substantial claim of unconstitutional animus.

"As a general matter, where an equal protection claim is based on membership in a suspect

---

[24] Plaintiffs' complaint could suggest that the equal protection claim is a constitutional claim alone but, as Plaintiffs noted at the hearing, an APA claim can also be based on a constitutional violation. *See* 5 U.S.C. § 706(2) (providing that a court may hold unlawful and set aside agency action "contrary to constitutional right, power, privilege, or immunity").

60a

class such as race [or ethnicity or national origin] or the burdening of a fundamental right, then strict scrutiny is applied; otherwise there is only rational review." *Litmon v. Brown*, No. C-10-3894 EMC, 2012 U.S. Dist. LEXIS 8381, at *4-5 (N.D. Cal. Jan. 25, 2012); *see also Kahawaiolaa v. Norton*, 386 F.3d 1271, 1277-78 (9th Cir. 2005) (stating that, "[w]hen no suspect class is involved and no fundamental right is burdened, we apply a rational basis test to determine the legitimacy of the classifications").

In spite of this general principle, the government argues that a deferential review should still apply in the instant case because the DHS's actions were based on national security interests. In support, it cites *Trump v. Hawaii*, 585 U.S. 667 (2018). This Court, however, rejected application of *Trump v. Hawaii* in the *Ramos* case, and so did the Ninth Circuit (vacated) panel decision. Central to the Court's reasoning was that

> the TPS-beneficiaries here, unlike those affected by the Proclamation in *Trump [v. Hawaii]*, are already in the United States. They are not aliens abroad seeking entry or admission who "have no constitutional right of entry"; TPS-beneficiaries have been admitted to the United States. As Plaintiffs currently reside lawfully in the United States, this case is unlike *Trump [v. Hawaii]*; it does not implicate "the admission and exclusion of foreign nationals," who have "no constitutional rights regarding [their] application" in light of the "sovereign prerogative" "to admit or exclude aliens." Hence, the basis for invoking broad judicial deference to executive action in excluding aliens does not apply.

*Ramos*, 321 F. Supp. 3d at 1129; *see also id.* (adding that "aliens *within* the United States have greater constitutional protections than those *outside* who are seeking admission for the first time") (emphasis added). The Court also noted that

> the executive order at issue in *Trump [v. Hawaii]* was issued pursuant to a very broad grant of statutory discretion: Section 1182(f) "exudes deference to the President in every clause" by "entrust[ing] to the President the decisions whether and when to suspend entry . . . ; whose entry to suspend . . . ; for how long . . . ; and on what conditions." In contrast, Congress has not given the Secretary *carte blanche* to terminate TPS for any reason whatsoever. Rather, the TPS statute empowers the Secretary of Homeland Security discretion to initiate, extend, and terminate TPS in specific enumerated circumstances. Even though the statute circumscribes judicial review, Congress prescribed the discretion of the Secretary in administering TPS.

*Id.* at 1130. The Ninth Circuit panel in *Ramos* invoked similar reasoning, stating that "the level of

60

deference that courts owe to the President in his executive decision to exclude foreign nationals who have not yet entered the United States may be greater than the deference to an agency in its administration of a humanitarian relief program established by Congress for foreign nationals who have lawfully resided in the United States for some time." *Ramos*, 975 F.3d at 896.

To be sure, in *Ramos*, there was a further confluence of the fact that the government had asserted "to a lesser extent" national security and foreign policy reasons as a basis to terminate TPS. *Ramos*, 975 F.3d at 896; *cf. Ramos*, 321 F. Supp. at 1129. Here, the government does assert, perhaps more strenuously than in *Ramos*, that the Secretary's decisions in vacating the extension of the 2023 Designation and in terminating the designation were informed by these additional concerns.

However, as noted above, the decision to vacate the extension did not cite national security as a rationale therefor. Nor did it cite an interest in effecting foreign relations in connection with the vacatur decision. Thus, the deferential standard of *Trump v. Hawaii* does not apply to Secretary Noem's vacatur decision.

As to Secretary's Noem's second decision – to terminate the 2023 Designation – the invocation of national security and foreign relations is insufficient to implicate *Trump v. Hawaii*'s deferential standard.[25] The government does not get a free pass to deferential review under *Trump v. Hawaii* simply because it makes an *ipse dixit* assertion that there is a national security interest. There must be some basis for such a claim, but, as the Court has discussed above, the government's claim of a national security interest is not supported by any concrete evidence. The government has referred to the TdA gang, but (1) "the danger of criminal conduct by an alien is [not] automatically a matter of national security," *Thai v. Ashcroft*, 366 F.3d 790, 796 (9th Cir. 2004), and (2) even if the TdA is a foreign terrorist organization that poses a national security threat (as claimed by President Trump in Executive Order 14157 (*see* 90 Fed. Reg. at 9042-93)),

---

[25] As discussed above, § 1254a(b)(5)(A) does not bar judicial review of Plaintiffs' equal protection claim because "there is no 'clear and convincing' evidence that Congress intended to preclude the Court from reviewing constitutional challenges of the nature alleged." *Ramos*, 321 F. Supp. 3d at 1105; *see also Ramos*, 975 F.3d at 895 (panel decision entertaining the equal protection claim on the merits); *accord* 5 U.S.C. § 706(2)(B) (providing that a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity").

62a

1    there is no evidence to tie TPS holders to TdA or even to establish that TdA has a substantial

2    presence in the United States.  *See generally* Dudley Decl. ¶ 16.  Nor has the government

3    demonstrated that its employment of law enforcement resources cannot handle the criminal threat

4    posed by members of the TdA.  *See* page 54, *supra*.

5         Nor is there any basis to the government's claim that the vacatur and termination of

6    Venezuelan TPS status effected relations with Venezuela.  The government suggests that there is a

7    "magnet effect" associated with a TPS designation, but that assertion does not address how there

8    is a magnet effect for an *extension* of TPS (not a designation or redesignation) which does not

9    make more people eligible for TPS.  *See* Watson & Veuger Decl. ¶ 26 ("We do not see any reason

10   that the extension of an existing TPS designation would act as an immigration magnet.  TPS status

11   is not available to those arriving after the 2023 designation.").

12        The government also seems to suggest that there can be no equal protection violation

13   because Secretary Noem's actions were focused on the nation of Venezuela, and not the race of its

14   people, and "[n]ational origin is inherently part of TPS."  Opp'n at 21.  This argument misses the

15   point.  The point is not that a person has been treated on the basis of national origin, which as the

16   government asserts, is inherent in the TPS decisions which are made on a country-by-country

17   basis.  Rather, the claim here is that the decisions made against Venezuelan TPS beneficiaries are

18   driven by animus and generalized stereotypes directed against them.  Plaintiffs also claim that the

19   decisions made by Secretary Noem are infected by racial animus.  Moreover, courts must be

20   mindful of the fact that there can be overlap between national origin and race.  *See, e.g.*, *St.*

21   *Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (noting that

22   "the line between discrimination based on 'ancestry or ethnic characteristics,' and discrimination

23   based on 'place or nation of . . . origin,' is not a bright one"); *Deravin v. Kerik*, 335 F.3d 195, 201

24   (2d Cir. 2003) (stating that "race and national origin discrimination claims may substantially

25   overlap or even be indistinguishable depending on the specific facts of a case" – *e.g.*, "[r]ace and

26   national origin discrimination may present identical factual issues when a victim is "born in a

27   nation whose primary stock is one's own ethnic group""); *Krowel v. Palm Beach Cnty.*, No. 22-

28   cv-81958, 2023 U.S. Dist. LEXIS 76203, at *7-8 (S.D. Fla. Apr. 27, 2023) (stating that, as

United States District Court
Northern District of California

63a

1  recognized by other courts, "discrimination based on national origin often overlaps with other

2  forms of racial discrimination").

3        Animus and stereotypes based on national origin and/or race trigger strict scrutiny.  *See*

4  *Valeria v. Davis*, 320 F.3d 1014, 1020 (9th Cir. 2003) ("[D]iscriminatory intent, by itself, triggers

5  strict scrutiny . . . .").  Strict scrutiny applies if such discriminatory purpose is a motivating factor.

6  *Cf. Cal. v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994, 1023 (N.D. Cal. 2020).  The

7  framework for discerning whether a discriminatory purpose was a motivating factor is set forth in

8  *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265

9  (1977) (stating that "[p]roof of racially discriminatory intent or purpose is required to show a

10  violation of the Equal Protection Clause."); *id.* at 265-66 (noting that a plaintiff does not have to

11  "prove that the challenged action rested solely on racially discriminatory purposes" or that such

12  was a dominant or primary purpose).  That is, *Arlington Heights* provides a methodology for

13  determining whether a discriminatory purpose was a motivating factor.

14        In *Arlington Heights*, the Supreme Court indicated that there could be either direct or

15  circumstantial evidence of a discriminatory purpose and further provided examples of what

16  evidence would support a discriminatory purpose – *e.g.*:

17       •  "The impact of the official action – whether it 'bears more heavily on one race than

18          another.'" *Id.* at 266.

19       •  "The historical background of the decision . . . , particularly if it reveals a series of

20          official actions taken for invidious purposes." *Id.* at 267.

21       •  "The specific sequence of events leading up to the challenged decision," including

22          "[d]epartures from the normal procedural sequence" and "[s]ubstantive departures .

23          . . , particularly if the factors usually considered important by the decisionmaker

24          strongly favor a decision contrary to the one reached." *Id.*

25       •  "The legislative or administrative history . . . , especially where there are

26          contemporary statements by members of the decisionmaking body, minutes of its

27          meetings, or reports." *Id.* at 268.

28        In the instant case, there is evidence of discriminatory animus by the decisionmaker at

United States District Court
Northern District of California

63

64a

United States District Court
Northern District of California

1    issue, Secretary Noem.  There is also evidence of discriminatory animus by President Trump and

2    that his intent and actions bore a direct nexus to the actions taken by Secretary Noem in the instant

3    case.

4                          i.        Discriminatory Statements by Secretary Noem

5            Plaintiffs have catalogued a number of discriminatory statements made by Secretary

6    Noem, beginning as early as February 2024 as part of the 2024 presidential race and continuing

7    through early 2025, when she issued her decisions to vacate the extension of the 2023 Designation

8    and then terminate the designation.  *See, e.g.*, MacLean Decl. ¶¶ 2-7, 12, 14-15.  In many of these

9    comments, the Secretary equated Venezuelan immigrants and/or TPS holders with gang members,

10   criminals, mentally unstable persons, and the like.  Such statements play on "longstanding tropes

11   or stereotypes that certain races have inherently immoral traits."  MacLean Decl., Ex. 20, at 19

12   (2020 article titled "The Racialization of Crimes Involving Moral Turpitude); *see also* Young

13   Decl. ¶ 3 (noting that "characterizing Venezuelan TPS holders as dangerous criminals who harm

14   the U.S. economy is a false narrative, and one reflecting racist tropes that have long been wielded

15   against immigrants to the United States"); *cf. United States v. Taveras*, 585 F. Supp. 2d 327, 338

16   (E.D.N.Y. 2008) (stating that, "'[w]hen government officials are permitted to use race [or ethnicity

17   and national origin] as a proxy for gang membership and violence . . . society as a whole

18   suffers'").  Furthermore, as discussed above, there is no evidence that Venezuelan TPS holders are

19   tied to gangs or are criminals.  Indeed, "[i]t is well documented that immigrants are much less

20   likely to commit crimes than U.S.-born Americans, and TPS recipients in particular have passed a

21   criminal background check and have a clear incentive to stay out of legal trouble to maintain their

22   status."  Watson & Veuger Decl. ¶ 15.

23          Examples of discriminatory statements by Secretary Noem include the following.

24          •    MacLean Decl. ¶ 3 & Ex. 2.  A social media post from February 28, 2024, that

25               stated: "Venezuela didn't send us their best.  They emptied their prisons and sent

26               criminals to America.  [¶] Deportations need to start on DAY ONE of [President

27               Trump's] term' in office."

28          •    MacLean Decl. ¶ 13 & Ex. 12 (Tr. at 104-05).  Testimony during her January 15,

64

65a

United States District Court
Northern District of California

2025, confirmation hearing such as: "[The TPS] program has been abused and manipulated by the Biden administration and that will no longer be allowed to allow that and these extensions going forward the way that they are, the program was intended to be temporary and this extension of over 600,000 Venezuelans as well is alarming when you look at what we've seen in different states, including Colorado with gangs doing damage and harming the individuals and the people that live there."

- MacLean Decl. ¶ 15 & Ex. 14 (Tr. at 3).  A statement during a January 29, 2025, interview on Fox that: "Today we signed an executive order within the Department of Homeland Security in a direction that we were not going to follow through on what he did to tie our hands, that we are going to follow the process, evaluate all of these individuals that are in our country, including the Venezuelans that are here and members of [TdA].  Listen, I was in New York City yesterday and the people of this country want these dirt bags out."  This statement is particularly notable because, as Plaintiffs point out, "Secretary Noem called Venezuelans 'dirt bags' when announcing [her] very decision [to vacate the extension of the 2023 Designation]."  Reply at 1.[26]

- MacLean Decl. ¶ 16 & Ex. 15 (Tr. at 18-19).  A statement during a February 2, 2025, interview on Meet the Press that: "[T]he TPP program has been abused, and it doesn't have integrity right now.  And folks from Venezuela that have come into this country are members of [TdA].  And remember, Venezuela purposely emptied out their prisons, emptied out their mental health facilities and sent them to the United States of America.  So we are ending that extension of that program, adding some integrity back to it.  And this administration's evaluating all of our programs to make sure they truly are something that's to the benefit of the United States, so

---

[26] Though the government claims this statement was taken out of context and that Secretary Noem was referring to the TdA, not to Venezuelan TPS beneficiaries generally, there is a reasonable inference that her reference was not so narrowly confined.  The Secretary has not submitted any declaration under oath elucidating her intended message.

United States District Court
Northern District of California

1    that they're not to benefit of criminals."  Similar to above, this statement is notable

2    because it was effectively made contemporaneously with the decision to terminate

3    the 2023 Designation.

4        It is evident that the Secretary made sweeping negative generalizations about Venezuelan

5    TPS beneficiaries *in toto*.  This is evident not only in what she said, but also in the fact that she

6    decided to take *en masse* actions against all Venezuelan TPS beneficiaries, who number in the

7    hundreds of thousands.  Acting on the basis of a negative group stereotype and generalizing such

8    stereotype to the entire group is the classic example of racism.  *Cf. Hirabayashi v. United States*,

9    320 U.S. 81, 96-99 (1943) (describing why Japanese Americans as a group, despite the fact that

10   most were American citizens, were susceptible to disloyalty and thus constitute a security threat,

11   relying on assumed stereotypes); *Korematsu*, 323 U.S. at 233, 235 (Murphy, J., dissenting)

12   (characterizing the majority decision upholding the mass internment of Japanese Americans as

13   falling into the "ugly abyss of racism"; noting that the "forced exclusion [of Japanese Americans]

14   was the result in good measure of the erroneous assumption of racial guilt . . .").

15                    ii.    Discriminatory Statements by President Trump

16       Like Secretary Noem, President Trump also made a number of discriminatory statements –

17   and not only about Venezuelan immigrants and/or TPS holders specifically, but also about non-

18   white immigrants and/or TPS holders generally.  President Trump's statements span years, starting

19   with his first administration when he terminated the TPS designations of Sudan, Haiti, Nicaragua,

20   El Salvador, Honduras, and Nepal, and continuing through the start of his second administration

21   where one of the first actions he endorsed was ending TPS designations to put "America first."

22       Examples of discriminatory statements by President Trump targeting non-white

23   immigrants generally include the following.

24           • MacLean Decl. ¶ 17 & Ex. 16.  A Washington Post article from January 12, 2018,

25               indicating that, during a discussion about "protecting immigrants from Haiti, El

26               Salvador and African countries," President Trump stated: "'Why are we having all

27               these people from shithole countries come here?'"  He "then suggested that the

28               United States should instead bring more people from countries such as Norway . . .

."

- MacLean Decl. ¶ 19 & Ex. 18.  A New York Times article from May 16, 2018, indicating that President Trump claimed "dangerous people were clamoring to breach the country's borders and brand[ed] such people 'animals.'"

- MacLean Decl. ¶ 25 & Ex. 24.  A New York Times article from April 7, 2024, reflecting that President Trump stated that "people were not immigrating to the United States from 'nice' countries like 'Denmark'" as well as Switzerland and Norway.  President Trump also stated with respect to immigrants from the Southern border that "'[t]hese are people coming in from prisons and jails.  They're coming in from just unbelievable places and countries, countries that are a disaster.'"

- MacLean Decl. ¶ 9 & Ex. 8 (Tr. at 29, 34-35).  Statements during the presidential debate on September 10, 2024, that Haitian immigrants – TPS holders – living in Springfield, Ohio, are "eating the dogs," "eating the cats," and "eating the pets of the people that live' in Springfield, Ohio."  President Trump also stated: "They allowed people to come in, drug dealers, to come into our country, and they're now in the United States.  And told by their countries like Venezuela don't ever come back or we're going to kill you.  Do you know that crime in Venezuela and crime in countries all over the world is way down?  You know why?  Because they've taken their criminals off the street, and they've given them to her to put into our country. . . . [T]hey're destroying the fabric of our country by what they've done.  There's never been anything done like this at all.  They've destroyed the fabric of our country.  Millions of people let in."

Examples of discriminatory statements by President Trump targeting Venezuelan noncitizens specifically include the following.

- MacLean Decl. ¶ 10 & Ex. 9 (Tr. at 32-33).  Statements during a campaign speech held on October 11, 2024, that: "[E]very day, Americans . . . are living in fear all because Kamala Harris decided to empty the slums and prison cells of Caracas [Venezuela] and many other places happening all over the world. . . . [¶] You

68a

United States District Court
Northern District of California

1    know, prison populations all over the world are down. Crime all over the world is

2    down because they take the world's criminals, gang members, drug dealers, and

3    they deposit them into the United States bus after bus after bus. In Venezuela, their

4    crime rate went down 72 percent. You know why? Because they took the

5    criminals out of Caracas and they put them along your border and they said, 'If you

6    ever come back, we're going to kill you.' [¶] Think of that. And we have to live

7    with these animals, but we're not going to live with them for long, you watch."

8    • MacLean Decl. ¶ 11 & Ex. 10 (Tr. at 6, 12-13). Statements during a campaign

9    speech held on October 27, 2024, that the Venezuelan gang TdA is "savage."

10   President Trump also stated: "The United States is now an occupied country, but it

11   will soon be an occupied country no longer. Not going to be happening. Not going

12   to be happening. November 5th, 2024, nine days from now will be Liberation Day

13   in America. It's going to be Liberation Day. [¶] On day one, I will launch the

14   largest deportation program in American history to get these criminals out. I will

15   rescue every city and town that has been invaded and conquered, and we will put

16   these vicious and bloodthirsty criminals in jail. We're going to kick them the hell

17   out of our country as fast as possible."

18    • President Trump's Executive Order, issued on the first day of his second

19   administration, which claimed that Americans needed protection from an

20   immigrant "invasion," stated that "[t]he American people deserve a Federal

21   Government that puts their interests first," and specifically identified the TPS

22   program as a problem. https://www.whitehouse.gov/presidential-

23   actions/2025/01/protecting-the-american-people-against-invasion/; *cf. Ramos*, 336

24   F. Supp. 3d at 1104 (where plaintiffs argued that "America first" was "a code word

25   for removal of immigrants who are non-white and/or non-European, and counsel

26   for the government could not articulate a "clear and direct response" to what "'an

27   America first view of the TPS decision'" meant).

28   The Court also takes note of an article from Axios, dated October 2024, that analyzed 109

1   of President Trump's speeches, interviews, debates, and rallies from September 1, 2023, to

2   October 2, 2024, and found that he called Venezuelan migrants "criminals" at least 70 times.  *See*

3   MacLean Decl. ¶ 33 & Ex. 32.

4          Significantly, the vacated panel decision in *Ramos* declined to find that President Trump's

5   statements made in 2018 were not evidence of racial discrimination.  Instead, the panel found

6   there was an insufficient showing of a nexus between President Trump's statements and intent and

7   the specific TPS decisions made by the Secretary of DHS.  *See Ramos*, 975 F.3d at 897 (stating

8   that "Plaintiffs' EPC claim fails predominantly due to the glaring lack of evidence tying the

9   President's alleged discriminatory intent to the specific TPS terminations – such as evidence that

10  the President personally sought to influence the TPS terminations, or that any administration

11  officials involved in the TPS decision-making process were themselves motivated by animus

12  against 'non-white, non-European' countries").

13         Relying on the vacated panel decision in *Ramos*, the government suggests that President

14  Trump's statements cited here should likewise not be given any consideration because (1) the

15  statements were not sufficiently tied or linked to TPS policy or decision-making specifically; (2)

16  there is insufficient evidence that "the President personally sought to influence the TPS

17  terminations"; and (3) even if so, "[t]he mere fact that the White House exerted pressure on the

18  Secretaries' TPS decisions does not in itself support the conclusion that the President's alleged

19  racial animus was a motivating factor in the TPS decisions" because "[i]t is expected – perhaps

20  even critical to the functioning of government – for executive officials to conform their decisions

21  to the administration's policies."  *Id.* at 897-98.

22         None of these arguments is convincing.  First, contrary to what the government suggests,

23  some of President Trump's statements *did* relate to TPS policy or decision-making (*e.g.*,

24  statements about Haitian immigrants present in Springfield because of the TPS program,

25  statements in the Executive Order about an "invasion" and targeting, *inter alia*, the TPS program).

26  Furthermore, even if other statements did not directly relate to TPS policy or decision-making,

27  there is no principled reason to hold that these statements should thereby be ignored, especially

28  when the discriminatory statements still addressed the issue of immigration and, further, were not

United States District Court
Northern District of California

70a

1  isolated occurrences but rather comments made repeatedly over time – including in the several

2  months immediately preceding Secretary Noem's decisions to vacate and then terminate.[27]  The

3  length of time over which discriminatory statements were made, including those in close temporal

4  proximity to Secretary Noem's actions, differentiate this case from *Ramos*.

5       More than that, there is evidence *in this case* that President Trump directly influenced TPS

6  policy and/or decision-making at issue.  This is apparent from both his Executive Order addressed

7  above *and* Secretary Noem's decision to terminate, which expressly took note of President

8  Trump's

> recent, immigration and border-related executive orders and
> proclamations [which] clearly articulated an array of policy
> imperatives bearing upon the national interest. . . .
>
> [A]s the President directed in Executive Order 14150, "the foreign
> policy of the United States shall champion core American interests
> and always put America and American citizens first."  Continuing to
> permit Venezuelans under the 2023 TPS designation to remain in
> the United States does not champion core American interests or put
> American interests first.  U.S. foreign policy interests, particularly in
> the Western Hemisphere, are best served and protected by curtailing
> policies that facilitate or encourage illegal and destabilizing
> migration.

16  90 Fed. Reg. at 9042 (also stating that "President Trump in his recent, immigration and border-

17  related executive orders and proclamations clearly articulated an array of policy imperatives

18  bearing upon the national interest").  The challenged actions by Secretary Noem were instituted

19  shortly after issuance of the Executive Order and almost immediately upon her taking office.  The

20  inference of a nexus here between President Trump and the TPS vacatur and termination, is, more

21  so than in *Ramos*, compelling.  Thus, the *Ramos* panel's rejection of the "cat's paw" theory, *see*

22

23  _____

[27] The Ninth Circuit panel in *Ramos* suggested that there must be a close nexus between a
24  discriminatory statement and the challenged action, citing in support *Mendiola-Martinez v.*
*Arpaio*, 836 F.3d 1239, 1261 (9th Cir. 2016) (stating that, even if "offensive quotes about Mexican
25  nationals attributed to Sheriff Arpaio and published in newspapers" were admissible, "they do not
mention the Restraint Policy and do not otherwise lead to any inference that Sheriff Arpaio's 2006
26  Restraint Policy was promulgated to discriminate against Mexican nationals").  But *Mendiola-*
*Martinez* is distinguishable because, there, the Restraint Policy at issue was facially neutral,
27  "mandat[ing] that . . . officers restrain all inmates during transport, including those who are 'sick
or injured.'"  *Id.* at 1245; *see also id.* at 1261 (acknowledging that the Restraint Policy was "a
28  facially neutral policy").  Here, the TPS-related decisions were not facially neutral as they
specifically targeted Venezuelan TPS holders.

70

United States District Court
Northern District of California

71a

*Ramos*, 975 F.3d at 897-98, applies with far less force to the case at bar. And notably, numerous district courts that considered TPS designations and terminations during the first Trump administration still applied the cat's paw theory and found the plaintiffs' equal protection claims viable. *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 368-69 (E.D.N.Y. 2019) (in TPS case, noting that "the evidence suggests the Secretary was influenced by the White House and White House policy to ignore statutory guidelines, contort data, and disregard objective reason to reach a predetermined decision to terminate TPS and abate the presence of non-white immigrants in the country"); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 326 (D. Md. 2018) (in TPS case, noting that President Trump made racially discriminatory statements about Latino immigrants and he was allegedly "involved in the decision to terminate TPS for El Salvador"; adding that, "if, as alleged, the President influenced the decision to terminate El Salvador's TPS, the discriminatory motivation cannot be laundered through the Secretary"); *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 414, 416 (D. Mass. 2018) (in TPS case, stating that "'liability for discrimination will lie when a biased individual manipulates a non-biased decision-maker into taking discriminatory action'"; "find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision").

Accordingly, the Court rejects the government's attempt to avoid consideration of President Trump's statements. That being said, the Court emphasizes that, even without consideration of these statements, Plaintiffs have sufficiently established animus based on, *inter alia*, Secretary Noem's discriminatory statements. That Secretary Noem – the clear decision-maker on the vacatur and termination – made discriminatory comments herself (some contemporaneously with her decisions to vacate and terminate) further distinguishes the instant case from *Ramos*. *See Ramos*, 975 F.3d at 897 (stating there was no evidence that "any administration officials involved in the TPS decision-making process were themselves motivated by animus against 'non-white, non-European' countries").

/ / /

71

72a

United States District Court
Northern District of California

### iii.    Historical Background

Consistent with the above, the Court also considers the historical background of the first Trump administration and its termination of TPS for non-white, non-European TPS holders from Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. As the Court held in *Ramos*, there was "sufficient evidence to raise serious questions as to whether a discriminatory purpose was a motivating factor in the decisions to terminate [these] TPS designations" based on, *e.g.*, President Trump's discriminatory statements, irregular decision making, and departures from prior practice. *See Ramos*, 336 F. Supp. 3d at 1098-105. *But see Ramos*, 975 F.3d at 896-99 (vacated panel decision disagreeing with this Court's equal protection analysis). Secretary Noem's decision here to vacate the extension of the 2023 Designation and then terminate the designation continues a pattern of the Trump administration's targeting of non-white, non-European TPS holders.

### iv.    Sequence of Events

Even putting aside the general historical background, the sequence of events related to Secretary Noem's decision-making on the TPS designations here is clearly anomalous. As Plaintiffs note, the decision-making process for the vacatur and termination "took place over a week, at most" and at the very outset of the second Trump administration. Opp'n at 14. The Secretary vacated the extension of the 2023 Designation only three days after she was confirmed. Then just a few days later, she terminated the TPS designation for Venezuela (even though, under the TPS statute, she was required to, *e.g.*, consult with other government agencies before making a decision). This was a clear departure from longstanding prior practice which included obtaining the considered analysis from constituent agencies and the State Department before reaching a decision on TPS status of a particular country. *See, e.g.*, *Ramos*, 336 F. Supp. 3d at 1082 (taking note that the parties agreed on the general process for a TPS designation (on periodic review): "RAIO (a division within USCIS) provides a Country Conditions Memo [for the Secretary]" while "OP&S (another division within USCIS) drafts a Decision Memo that contains USCIS's recommendation on what to do about the TPS designation"; "[t]he State Department provides further input (e.g., country conditions, recommendations" and, "[a]t times input can also come from other government sources"). Moreover, as noted above, Secretary Noem's vacatur was the

72

73a

first-ever vacatur of an extension of TPS over the TPS program's thirty-five-year history.

    v.    Lack of Support for Both the Vacatur of the Extension and for the
          Termination of the 2023 Designation

The lack of support for the vacatur – both legal and evidentiary – has already been discussed above.  In addition, the lack of evidentiary support for the termination of the 2023 Designation further indicates that the termination was motivated at least in part by animus.  In the Federal Register, Secretary Noem justified the termination of the 2023 Designation on the following grounds: (1) members of the Venezuelan TdA gang have crossed into the United States; (2) the resources of local communities have not been adequate to "meet the demands" of the Venezuelan TPS holders, and their presence has cost local communities billions of dollars; (3) a TPS designation has a potential "magnet effect" – *i.e.*, it is a "pull factor[] driving Venezuelan nationals to the United States"; and (4) an extension of the TPS designation is contrary to the Trump administration's policy of "America first" as it "facilitate[s] or encourage[s] illegal and destabilizing migration."  90 Fed. Reg. at 9042-43.

As discussed in other parts of this order, the Secretary's rationale is entirely lacking in evidentiary support.  For example, there is no evidence that Venezuelan TPS holders are members of the TdA gang, have connections to the gang, and/or commit crimes.  Venezuelan TPS holders have lower rates of criminality than the general population.  Generalization of criminality to the Venezuelan TPS population as a whole is baseless and smacks of racism predicated on generalized false stereotypes.  Moreover, Venezuelan TPS holders are critical contributors to both the national and local economies: they work, spend money, and pay taxes.  Barring these TPS beneficiaries from the labor market in which they enjoy higher rates of participation than the general population, *see* Docket No. 71 (Amici Br. at 5), will cost the United States billions in taxes.  *See,* Card Decl. ¶ 9(i) (stating that termination of TPS for just those Venezuelans who arrived in the U.S. between 2021 and 2023 would result in an estimated $3.5 billion annual loss to the U.S. economy and a $434.8 million annual loss in social security taxes); *see also* Docket No. 62 (Amici Br. at 7) (noting that, "[i]n 2023, TPS holders from all countries paid $3.1 billion in federal taxes, contributing to programs like Social Security and Medicare, and paid $2.1 billion in state and local

73

74a

taxes"); Docket No. 71 (Amici Br. at 6) (noting that, "[i]n 2021, the approximately 354,000 TPS holders in the United States from all countries paid an estimated $966.5 million in state and local taxes"). Far from being a burden, a number of jurisdictions – states, cities, and counties – have emphasized the value that Venezuelan TPS holders bring to their communities. They have documented the adverse impact on the economy, public health, and public safety of terminating TPS status of these beneficiaries. *See generally* Docket No. 62 (Amici Br.); Docket No. 71 (Amici Br.). And as noted above, the purported "magnet effect" of TPS designation makes no sense because a mere *extension* of TPS (not a designation or redesignation) does not make more people eligible for TPS. *See* Watson & Veuger Decl. ¶ 26 ("We do not see any reason that the extension of an existing TPS designation would act as an immigration magnet. TPS status is not available to those arriving after the 2023 designation. The current administration's termination of the parole program makes it clear it is not interested in facilitating additional migration from Venezuela, and a reasonable migrant would not believe that a TPS designation for new Venezuelan immigrants is likely to be issued by this administration. TPS status does not allow individuals to sponsor relatives for migration."). Finally, the Trump administration's invocation of "America first" raises a further inference of animus given the historical connotation of that phrase. *See Ramos*, 336 F. Supp. 3d at 1104 (noting that the government could not articulate a "clear and direct response" to what "'an America first view of the TPS decision'" meant). The lack of bona fides of purported justifications gives rise to an inference of pretext. *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007) (in Title VII case, noting that "'the fact of pretext alone may allow the inference of discrimination'").

### vi.   Disparate Impact of Agency's Action

Finally, it is clear that the agency's action has a disparate impact, bearing more heavily on one race/ethnicity/national origin than others. *See, e.g., Saget*, 375 F. Supp. 3d at 367 (stating that "it is axiomatic the decision to terminate TPS for Haitians impacts one race, namely non-white Haitians, more than another"). To be sure, this factor is less probative where, by definition, a TPS decision by country will have an inherent disparate impact based on national origin. Any relevance of disparate impact in this context is instead rooted in the racially charged historical

74

context discussed above – the invocation of a pattern of adverse TPS decision directed at non-whites – those from so-called "shithole countries."

### vii.   Summary

Taking into account the *Arlington Height* factors, including but not limited to the direct animus of Secretary Noem, the animus of President Trump that appears to have directly influenced the Secretary's decision making, the anomalous procedures followed (the highly compressed time in which the decisions to vacate and then terminate were made and the precedential and unique nature of the decisions made), and the lack of bona fides for the decisions to vacate and then terminate, the Court concludes that Plaintiffs have established a likelihood of success on their equal protection claim directed against both the decision to vacate and the decision to terminate.

D.   Nationwide Relief

Because the § 705 factors weigh strongly in Plaintiffs' favor, the Court holds that Plaintiffs are entitled to relief.  Although § 705 expressly states that relief that may be afforded is postponement of the effective date of agency action, without limitation, the government asserts that the Court should nevertheless restrict the relief given –  specifically, to only the named individual Plaintiffs.  The government takes the position that "universal relief benefitting non-parties" is "broader than necessary to remedy actual harm shown by specific Plaintiffs."  Opp'n at 25.

The government's position lacks merit.  As a preliminary matter, its position is predicated on criticisms made of nationwide injunctions but, as discussed above, Plaintiffs are seeking to postpone or set aside agency actions, and vacatur of agency action is not the same thing as an injunction.  More importantly, where agency action is challenged as a violation of the APA, nationwide relief is commonplace.  *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680-81 (9th Cir. 2021) (in APA case, noting that there is "'no general requirement that an injunction affect only the parties in suit'" and, "'[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated –  not that their application to the individual petitioners is proscribed'"); *see also Cook Cnty. v. Wolf*, 498 F. Supp. 3d 999, 1006-07 (N.D. Ill. 2020) (noting that "vacatur will prevent DHS from enforcing the Rule against

76a

nonparties," but "that is a consequence not of the court's choice to grant relief that is broader than necessary, but of the APA's mandate that flawed agency action must be 'h[e]ld unlawful and set aside'").

Nationwide relief is also warranted because the agency actions here have had a uniform and nationwide impact on all Venezuelan TPS holders located across the United States.  And here, NTPSA – the named organizational plaintiff – advocates for Venezuelan TPS holders nationwide and has more than 84,000 members who are Venezuelan TPS holders *in all fifty states, plus the District of Columbia*.  *See* Jimenez Decl. ¶ 13; *cf. City & Cnty. Of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (indicating that, to support a nationwide injunction, record must be sufficiently developed on nationwide impact of challenged actions); *E. Bay Sanctuary*, 993 F.3d at 680 (noting that organizational plaintiffs did "'not operate in a fashion that permits neat geographic boundaries'").   Full relief for the NTPSA and its members cannot be obtained absent application to all fifty states and the District of Columbia.  Nor has the government explained how, as a practical matter, relief could be afforded to some subset of all Venezuelan TPS holders, particularly given that NTPSA has tens of thousands of members located across the country.  *See id.* at 680-81 (criticizing the government for failing to propose a workable alternative form of injunction).

Finally, there is an interest in uniformity in the immigration system.  *See id.* at 681 (noting that, "in immigration cases, we 'consistently recognize[] the authority of the district courts to enjoin unlawful policies on a universal basis'"); *Texas v. United States*, 40 F.4th at 229 n.18 ("reject[ing] DHS's contention that the nationwide vacatur is overbroad[;] [i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistent in enforcement").

Accordingly, consistent with the text of section 705, the Court grants Plaintiffs' motion to postpone the agency actions at issue, and the relief afforded here is nationwide in scope.  The Court acknowledges that there are at least three other recent TPS cases that have been filed against the Trump administration, with at least two related to Venezuela specifically.  *See Casa, Inc. v. Noem*, No. C-25-0525 GLR (D. Md.); *Haitian Ams. United Inc. v. Trump*, No. C-25-10498 RGS (D. Mass.).  How the courts in those cases should proceed in light of the relief that the Court

orders here will be up to those courts to decide; the Court is confident these sister courts are aware of the various proceedings and will be mindful of the issues.

E.   Motion to Shorten Time to Confer

Finally, the Court addresses a motion that Plaintiffs filed shortly before the hearing on their motion to postpone. In the new motion, Plaintiffs ask that the Court shorten the deadline for the parties to begin their Rule 26(f) conference and/or open discovery now. The Court holds as follows. (Some of the rulings were made during the hearing on the motion to postpone.)

- Given the Court's ruling on the jurisdictional arguments raised by the government, there is no reason to delay production of the administrative record, even if the government intends to file a motion to dismiss. The parties shall meet and confer regarding production of the administrative record (to the extent they have not already) and the record shall be produced by the government within one week of the date of this order. There is an interest in moving this case forward promptly.

- At this time, the Court does not opine on what discovery, if any, Plaintiffs may be entitled to beyond the administrative record. The administrative record should be produced in the first instance. What the administrative record does or does not reveal will likely inform whether additional discovery is warranted. The Court does not bar Plaintiffs from serving discovery requests on the government now, but the government is not required at this point to respond to those requests.

- Although the Court is not requiring the government to respond to any discovery requests at this juncture, the parties shall meet and confer (if they have not already) and reach agreement on a stipulated document preservation order.

## IV.   CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion to postpone the actions taken by Secretary Noem, specifically, her decisions to vacate the extension of the 2023 Designation and to terminate the 2023 Designation.

Within one week of the date of this order, the parties shall file a joint status report (after meeting and conferring), addressing (1) whether the government intends to appeal this Court's

order; (2) whether Plaintiffs will be filing a motion to postpone with respect to agency action related to Haiti's TPS designation (which is within the scope of the newly filed amended complaint); and (3) a proposed date for the initial case management conference in which the Court and the parties will discuss ways in which adjudication of the merits of this case can be expedited.

This order disposes of Docket Nos. 16 and 79.

**IT IS SO ORDERED**.

Dated: March 31, 2025

EDWARD M. CHEN
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL TPS ALLIANCE, et al., | Case No.  25-cv-01766-EMC |
| Plaintiffs, | |
| v. | **ORDER DENYING DEFENDANTS' MOTION TO STAY** |
| KRISTI NOEM, et al., | |
| Defendants. | Docket No. 95 |

The government has appealed the Court's order granting Plaintiffs' motion to postpone the Secretary's actions.  The government has moved to stay the postponement order pending appeal.  The instant motion is being heard on shortened time as requested by the government.

Absent the postponement, the Secretary's termination of the 2023 TPS Designation would take effect on April 7, 2025.  In considering the stay motion, the Court considers the following factors:

> "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

*Nken v. Holder*, 556 U.S. 418, 434 (2009).

The Court's analysis in its postponement order effectively addresses the factors above.  That analysis weighs against the government and in favor of Plaintiffs – even more so here for two reasons.  First, for a stay pending appeal, the government is required to make a *strong showing* of likelihood of success on the merits.  *See id.*  Second, if the Court were to order a stay of the postponement order pending appeal, that would mean hundreds of thousands of Venezuelan TPS

holders would lose legal status in just a few days and thus be subject to removal – removal would effectively *moot out* the postponement order and the appeal thereof (at least with respect to the 2023 Designation).  Any removal likely could not be "undone" should Plaintiffs ultimately prevail.  In fact, just recently, the government mistakenly deported an individual, who has legal status to be in the United States, to El Salvador but has essentially taken the position that it cannot do anything to address that mistake.

To the extent the government suggests the loss of legal status does not automatically mean removal, *see* Mot. at 8 (arguing that "neither the 2025 Vacatur nor 2025 Termination is equivalent to requiring Plaintiffs to depart the United States"), that is a disingenuous argument.  The entire point of Secretary Noem's vacatur and termination decisions was to enable the removal of Venezuelan TPS holders on a schedule well in advance of the schedule set by Secretary Mayorkas. *See, e.g.*, Docket No. 37 (McLean Decl. ¶ 15 & Ex. 14) (Secretary Noem stating, during an interview where she announced the decision to vacate the extension of the 2023 Designation, that "people of this country want these dirt bags out").  Nor has the government stated that, if the Court were to stay its postponement order, it will not immediately move forward with removal of any Venezuelan TPS holder.  In seeking to stay the postponement, even in light of the expedited briefing schedule set by the Ninth Circuit, the government impliedly intends to do so.

Furthermore, in addition to the risk of removal, there is another significant harm that will befall TPS beneficiaries if the stay were granted: the loss of work authorization that follows the loss of legal status.  This would jeopardize beneficiaries' ability to sustain themselves and/or their families.  It will also cause dislocation and harm to the economy as described in the Court's postponement order.

Although, the Court's postponement order addresses the arguments raised in the pending motion to stay (indeed, the motion to stay reads to a large extent like a motion to reconsider), the Court notes the following.

- With respect to the issue of whether 8 U.S.C. § 1252(f)(1) is a jurisdictional bar, the government asserts that the Court mistakenly relied on *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022), because "the Supreme Court reversed that

81a

1    decision on expedited review and Justice Gorsuch criticized the district court's

2    evasion of § 1252(f)(1) . . . ."  Mot. at 5.  But the Fifth Circuit reaffirmed its view

3    that a vacatur and an injunction are distinct in *Texas v. United States*, 126 F.4th

4    392, 419 n.40 (5th Cir. 2025) ("Section 1252(f)(1) is inapplicable to vacatur

5    because it is a 'limit on injunctive relief,' and vacatur is different from injunctive

6    relief.").  As for Justice Gorsuch's criticism, that was part of a concurrence and his

7    criticism was rooted in an analysis of standing: the "clever work around" did not

8    "succeed" because "a vacatur order still does nothing to *redress* the States'

9    injuries" and, therefore, standing was still a problem.  *United States v. Texas*, 599

10   U.S. 670, 691 (2023) (Gorsuch, J., concurring) (emphasis added).

11   •  With respect to the issue of whether 8 U.S.C. § 1254a(b)(5)(A) is a jurisdictional

12      bar, the government contends that it did not make any concession – specifically,

13      with respect to Plaintiffs' claim that Secretary Noem lacked the implicit authority

14      to vacate the decision to extend the 2023 Designation.  *See* Mot. at 3 n.3.  But the

15      record of the hearing is clear.  In any event, even if the government could withdraw

16      its concession, the government's asserted argument fails.  As the Court stated in its

17      postponement order, "§ 1254a(b)(A)(A) was designed to bar judicial review of

18      substantive country-specific conditions in service of TPS designations,

19      terminations, or extensions of a foreign state – not judicial review of general

20      procedures or collateral practices related to such."  Docket No. 93 (Order at 25).

21   •  With respect to the issue of whether Secretary Noem had the implicit authority to

22      vacate the extension of the 2023 Designation, the government cites, *inter alia*, *SKF*

23      *USA, Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001).  *See* Mot. at 5.  But

24      *SKF* is not on point (which the government implicitly acknowledges given its use

25      of the "cf." cite), because the issue there was whether an "agency may request [*a*

26      *court* for] a remand because it believes that its original decision was incorrect on

27      the merits and it wishes to change the result."  *Id.* at 1028.  That is not the situation

28      here.  Secretary Noem did not ask a court for relief before vacating and then

3

1    terminating the 2023 Designation.

2    •   According to the government, the Court's postponement order is flawed because

3        the Court made "irreconcilable" holdings: to wit, that "the Secretary *could*

4        'deconsolidate' Secretary Mayorkas's TPS designations for Venezuela and that the

5        TPS statute forbids reconsideration." Mot. at 5 (emphasis in original).  This

6        argument ignores the express language in the order that, "*even if vacatur were*

7        *permitted* and not founded on any legal error, the vacatur was still arbitrary and

8        capricious because, in revoking the prior action, the Secretary failed to consider

9        alternatives short of termination." Docket No. 93 (Order at 58) (emphasis added).

10   •   On the equal protection claim, *even if* the deferential review of *Trump v. Hawaii*,

11       585 U.S. 667 (2018), were to apply (the Court held it did not), Secretary Noem's

12       decisions would still be subject to rational basis review – *i.e.*, the Court would have

13       to consider whether the Secretary's decisions are "plausibly related to the

14       Government's stated objective[s]." *Id.* at 704-05.  Based on the record evidence on

15       the motion to postpone, Plaintiffs have raised at least a serious question whether, in

16       fact, the Secretary's actions are plausibly related to her stated objective. *See, e.g.*,

17       Docket No. 93 (Order at 73-74) (addressing lack of support for the decisions to

18       vacate and terminate).

19   •   Regarding the nationwide scope of relief, Plaintiffs correctly note that the

20       government argued in its opposition to the motion to postpone that relief should be

21       afforded to only the named individual plaintiffs. *See* Docket No. 60 (Opp'n at 25).

22       Thus, the government has waived the argument that it now makes in its motion to

23       stay – *i.e.*, that, at most, relief should be limited to the named individual plaintiffs

24       *and* the "associated members" of NTPSA (the organizational plaintiff).  In any

25       event, the government still has not "explained how, as a practical matter, relief

26       could be afforded to some subset of all Venezuelan TPS holders," Docket No. 93

27       (Order at 76), particularly in light of the number of NTPSA members located in

28       states throughout the country.

4

83a

- The government's request to stay discovery pending appeal (so that the government may pursue a stay pending appeal with the Ninth Circuit) is premature. The Court has already held that the first step is for the parties to compile the administrative record. There is no motion before the Court in regard to that compilation. Nor is there any pending motion for discovery beyond the record.

For the foregoing reasons, the government's motion to stay the postponement order pending appeal is denied.

**IT IS SO ORDERED**.

Dated: April 4, 2025

_____
EDWARD M. CHEN
United States District Judge

84a

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

APR 18 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

|  |  |
|---|---|
| NATIONAL TPS ALLIANCE; et al., <br><br> Plaintiffs - Appellees, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security; et al., <br><br> Defendants - Appellants. | No. 25-2120 <br><br> D.C. No. 3:25-cv-01766-EMC <br> Northern District of California, San Francisco <br><br> ORDER |

Before: TASHIMA, OWENS, and DESAI, Circuit Judges.

The emergency motion (Docket Entry No. 3) to stay the district court's March 31, 2025 order is denied. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (defining standard for stay pending appeal). Appellants have not demonstrated that they will suffer irreparable harm absent a stay. *See Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020) ("[I]f we were to adopt the government's assertion that the irreparable harm standard is satisfied by the fact of executive action alone, no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction. That cannot be so."); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018).

The existing briefing schedule remains in effect. The clerk will place this case on the calendar for July 2025. *See* 9th Cir. Gen Ord. 3.3(g).