# Exhibit C

No. 24A1059

# 𝕴𝖓 𝖙𝖍𝖊 𝕾𝖚𝖕𝖗𝖊𝖒𝖊 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘

―――――――

KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, ET AL., APPLICANTS

*v.*

NATIONAL TPS ALLIANCE, ET AL.

―――――――

**REPLY IN SUPPORT OF APPLICATION
TO STAY THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

―――――――

D. JOHN SAUER
  *Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## TABLE OF CONTENTS

A.    The Government Is Likely To Succeed On The Merits..........................3

    1.    The INA bars judicial review of the Secretary's vacatur decision.................................................................................3

    2.    The Secretary lawfully vacated a not-yet-effective extension ...............................................................................6

    3.    The district court's equal-protection analysis is flawed..........8

B.    At Minimum, Universal Relief Was Inappropriate ............................ 12

C.    The Other Factors Support Relief .......................................................... 15

    1.    The issues raised by this case warrant this Court's review......................................................................................15

    2.    The equities favor a stay ......................................................15

# In the Supreme Court of the United States

———————

No. 24A1059

Kristi Noem, Secretary of Homeland Security, et al., applicants

*v.*

National TPS Alliance, et al.

———————

**REPLY IN SUPPORT OF APPLICATION
TO STAY THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

———————

As its name suggests, the Temporary Protected Status (TPS) program allows the Secretary of Homeland Security to provide "temporary"—not permanent—relief to aliens who cannot safely return to their homes. 8 U.S.C. 1254a(a)(1)(A). Congress committed to the Secretary's discretion the determination whether to extend or terminate a TPS designation, 8 U.S.C. 1254a(b)(3) and (5)(A), including based on her own assessment of whether such relief remains in the "national interest," 8 U.S.C. 1254a(b)(1)(C). For decades, Secretaries across administrations have accordingly terminated TPS designations when, in their judgment, the statutory conditions no longer warrant them. That is exactly what Secretary Noem did here: She terminated the 2023 TPS designation of Venezuela because it was "contrary to the national interest"— as the statute requires. 8 U.S.C. 1254a(b)(1)(C) and (3)(B).

Respondents, however, seek to tie up the Secretary's determination in protracted litigation that will effectively nullify it. Litigants have run this play before. In 2018, a district court invalidated various "TPS terminations * * * during the first

(1)

2

Trump administration."   Appl. App. 23a (quoting *Ramos* v. *Nielson*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018)).   The Ninth Circuit reversed, only to grant review en banc— which remained pending until a change in administration mooted the appeal years later.  *Ibid.*  The pattern repeated in other district courts.  Appl. 35.  Relief that Congress meant to be "temporary" instead extended indefinitely.  And courts prevented the then-Secretary from exercising her statutory right to terminate TPS designations for an entire Presidential administration—all without any appellate ruling that she had acted unlawfully.

Respondents again ask this Court to hold off, await further proceedings, and thus indefinitely extend the 2023 TPS designation relating to Venezuelan nationals. The same district court again blocked the Secretary's action and issued sweeping preliminary relief that postpones the effective date of the Secretary's determinations as to hundreds of thousands of program beneficiaries nationwide.  The Ninth Circuit then cursorily denied relief in a one-page order, reasoning that the government had purportedly "not demonstrated that [it] will suffer irreparable harm."  Appl. App. 85a.

Respondents are unlikely to succeed on the merits of their challenges to the Secretary's vacatur and termination of TPS.  To start, courts cannot leverage Administrative Procedure Act (APA) claims to second-guess sensitive foreign-policy judgments about whether particular TPS programs should start or end, or supplant the political branches' control of immigration policy by peering behind policy-laden, discretionary decisions as to whether a particular extension was warranted.  Nor should this Court allow lower courts to indefinitely suspend critical immigration initiatives by resting on spurious equal-protection claims that contravene this Court's precedent and treat the administration's considered immigration policies as irrational actions moored in racial animus.

Respondents downplay the consequences of the district court's universal relief, asking the court to leave it in place because there will be "expedited" appellate review in the courts below. But the Secretary has determined that an extension of temporary protected status—even an extension of six months—would be "contrary to the national interest," an obvious form of irreparable harm. *Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 9040, 9041 (Feb. 5, 2025) (quoting 8 U.S.C. 1254a(b)(1)(C)). And expedited review is no panacea when it will be months before the Ninth Circuit hears oral argument in the government's appeal, let alone issues a decision. In the meantime, a single district court has barred the government from implementing efforts that the President has deemed "critically important to the national security and public safety of the United States." *Protecting the American People Against Invasion,* Exec. Order No. 14,159, § 16(b) (Jan. 20, 2025), 90 Fed. Reg. 8443, 8446 (Jan. 29, 2025).

### A. The Government Is Likely To Succeed On The Merits

#### 1. The INA bars judicial review of the Secretary's vacatur decision

Among other things, the Immigration and Nationality Act (INA) unambiguously bars judicial review of APA claims that attempt to challenge the substantive considerations underlying the Secretary's decision to vacate the previous administration's TPS extension. Section 1254a(b)(5)(A) provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the * * * extension of a [TPS] designation." 8 U.S.C. 1254a(b)(5)(A). That bar clearly foreclosed the district court from reviewing whether the Secretary acted arbitrarily and capriciously when she vacated an extension that her predecessor had issued days previously. See Appl. App. 55a-59a; Appl. 16-20.

That vacatur qualifies as a "determination * * * with respect to" a TPS exten-

4

sion: The Secretary determined that her predecessor's extension was improper and vacated it. 8 U.S.C. 1254a(b)(5)(A). Respondents have no answer to the bizarre loophole that their reading would create: A Secretary's rationale for an "extension" is unreviewable. *Ibid.* But the Secretary's rationale for vacating that same extension would be subject to full arbitrary-and-capricious review. Nothing in the statutory text supports such a disparity. The Court therefore should not reach respondents' arguments on the merits that the Secretary's "vacatur was arbitrary." Opp. 33-34. Because the challenge is unreviewable, it cannot provide a "separate basis for the district court's conclusion that the Secretary's vacatur order was unlawful." Opp. 4.

The district court sidestepped the judicial-review bar by framing respondents' APA claim as a "collateral" challenge to the "process" by which Secretary Noem reached her vacatur decision. Appl. App. 25a-26a. But "a court may not inquire whether a challenged agency decision is arbitrary, capricious, or procedurally defective" when "a no-review provision shields particular types of administrative action." Appl. 18 (quoting *Amgen Inc.* v. *Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004)).

Respondents tellingly do not defend the district court's rationale, instead offering (Opp. 21) a new theory of judicial review: "Section 1254a(b)(5)(A) does not bar [their] claim," they say, "because the Secretary's registration authority is addressed in subsection 1254a(c) of the statute," while "Section 1254a(b)(5)(A) withdraws jurisdiction only over determinations" made in "subsection 1254a(b)," *i.e.*, determinations with respect to "the designation, or termination or extension of a designation" of a foreign state, 8 U.S.C. 1254a(b)(5)(A). Respondents thus depict the Secretary's action as a determination with respect to "*registration*" under Section 1254a(c), not a determination with respect to an "*extension*" under Section 1254a(b)(3)(C), on the theory that the Secretary rested her vacatur decision in part on the ground that Secretary

5

Mayorkas adopted improper procedures for TPS registration in his extension.

That is wrong. Just because one aspect of the Secretary's reasoning touched upon registration does not transform her ultimate decision to vacate a TPS *extension* into a determination regarding registration alone. Her operative legal act was to "vacate the January [17], 2025 decision of [the] former Secretary," in which he announced that he would "*extend*[] the 2023 designation of Venezuela for TPS for 18 months." *Vacatur of 2025 Temporary Protected Status Decision for Venezuela*, 90 Fed. Reg. 8805, 8806 (Feb. 3, 2025) (emphasis added); see *id.* at 8807. Indeed, that was how respondents understood the Secretary's action below: They attacked her decision to "vacate the *extension*" as "arbitrary and capricious." Appl. App. 55a (emphasis added). Respondents thus successfully sought postponement of that vacatur so that Secretary Mayorkas's extension could take effect. Respondents cannot now claim that the agency action relates only to registration, and somehow is no longer a "determination with respect to [an] extension."

For similar reasons, respondents miss the mark when they maintain (Opp. 19-21) that the "Secretary's conclusions about alleged registration defects" were not a "determination[]" under Section 1254a(b)(5)(A). No one contends otherwise. The rationale respondents cite is simply one "basis for the determination"—not the "determination" itself. See 8 U.S.C. 1254a(b)(3)(B). The relevant "determination" is the Secretary's vacatur of her predecessor's extension—a determination that necessarily involves whether "the conditions for the designation continued to be met." 90 Fed. Reg. at 8806. After all, the Secretary rescinded Secretary Mayorkas's determination in that respect when she rescinded the extension. See *ibid.* And just as Secretary Mayorkas's January 17, 2025 action was an unreviewable "determination with respect to an  * * *  extension," Secretary Noem's vacatur of that action was unreview-

able, too.  8 U.S.C. 1254a(b)(5)(A); Appl. 17-18.

That leaves respondents to attack a strawman:  They contend that the government's position would bar judicial review of decisions to "grant TPS to Mexico to 50 years."  Opp. 2, 26-27.  But regardless of whether the statute authorizes judicial review in that circumstance, respondents here raise a very different challenge:  Their claim mounts "an attack on the substantive considerations underlying the Secretary's specific TPS determinations."  *Ramos* v. *Wolf*, 975 F.3d 872, 893 (9th Cir. 2023), reh'g en banc granted, opinion vacated, 59 F.4th 1010 (9th Cir. 2023).  Such a challenge falls squarely within the judicial-review bar.

### 2.    The Secretary lawfully vacated a not-yet-effective extension

The district court also wrongly postponed the Secretary's vacatur on the ground that she lacked authority to rescind an extension that had not yet taken effect. Appl. App. 44a-55a.  Respondents argue (Opp. 18-20, 21-27) that this particular type of APA claim is reviewable, but this Court need not reach the question.  Even if the judicial-review bar did not cover this claim, it fails on the merits.  Secretary Mayorkas issued a determination that lacked legal effect until April 5, 2025.  Secretary Noem had inherent authority to reconsider that action before it took effect, and nothing in the statute limits that authority.  Appl. 20-23.

Here again, respondents attack a strawman, contending (Opp. 28-30) that the government seeks to nullify TPS extensions by circumventing statutory procedures and time limits for when terminations can happen.  But this case does not present the question whether or how the Secretary can terminate extensions *that have already gone into effect*.  Here, Secretary Mayorkas took the unusual step of extending TPS early—on the last Friday of the prior administration.  But, because of that timing, his extension by its terms could only take effect "beginning on April 3, 2025" and

last for "18 months," *i.e.,* to "October 2, 2026." *Extension of the 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 5961, 5961 (Jan. 17, 2025). It should be especially clear that when the relevant agency action is legally inoperative because it has not yet taken effect, agencies have inherent authority to revisit the prior decision before it takes effect. Appl. 20-23. Respondents' contrary view would instead reward gamesmanship with a one-way ratchet: Earlier administrations could preemptively extend or terminate TPS and tie the hands of any incoming administration, which (under respondents' view) would be unable to undo those actions for more than a year even if the actions did not take legal effect until months into the new administration.

Respondents' theory is unavailing. They do not dispute that agencies "possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion." *Ivy Sports Med., LLC* v. *Burwell,* 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.); see Appl. 20. Instead, respondents contend that the TPS statute "foreclose[s] any implied reconsideration authority." Opp. 29 (internal quotation marks omitted). They maintain that once one Secretary approves a TPS extension, Section 1254a(b)(3)(B) precludes another Secretary from terminating it until the extension "expir[es]," Opp. 32 (quoting 8 U.S.C. 1254a(b)(3)(B))—even if the extension will not go into effect for months.

But again, Section 1254a(b)(3)(B) speaks only to "termination of [a] designation" that is in effect. 8 U.S.C. 1254a(b)(3)(B). When a Secretary terminates an existing designation, the statute specifies that her action "*shall not be effective* earlier than 60 days after the date the notice is published, or, if later, the expiration of the most recent previous extension." *Ibid.* (emphasis added). The statute says nothing about whether or how a Secretary can vacate an extension (or designation) that has

8

not yet taken effect.  The Secretary therefore appropriately relied on her inherent, undisturbed authority to vacate Secretary Mayorkas's extension before its effective date of April 3, 2025.  See 90 Fed. Reg. at 8806.

Respondents contend (Opp. 31) that Secretary Mayorkas's decision *was* in effect from the moment it issued.  But, by its terms, Secretary Mayorkas's extension only took effect "beginning on April 3, 2025" and would then last for a period of "18 months," *i.e.*, to "October 2, 2026."  90 Fed. Reg. at 5961.  Indeed, the Secretary's actions could not have taken effect sooner, as the original 2023 Designation "remain[ed] in effect" until "April 2, 2025," and was therefore the operative designation at the time that Secretary Noem acted.  *Extension and Redesignation of Venezuela for Temporary Protected Status*, 88 Fed. Reg. 68,130, 68,130 (Oct. 3, 2023) (explaining that the designation was to "remain in effect for 18 months, ending on April 2, 2025"); see 8 U.S.C. 1254a(b)(3)(C) (authorizing extensions for an "additional" (rather than superseding) period of 18 months after designation ends).  Thus, while Secretary Mayorkas had *announced* an extension months in advance—and had begun accepting registrations for it—the extension itself would not have been effective until April 3, 2025.  Indeed, by respondents' logic, the Secretary's extension would have violated the statute by extending the designation from January 17, 2025, to October 2, 2026— well beyond the maximum term of 18 months.  See 8 U.S.C. 1254a(b)(3)(C).  Nothing in the statute precluded Secretary Noem from vacating that not-yet-effective agency action.

### 3.    The district court's equal-protection analysis is flawed

Finally, respondents treat the district court's equal-protection holding—the bulk of the court's rationale for postponing the Secretary Noem's actions indefinitely—as an afterthought.  That holding is unsupportable even if it were reviewable.

The court branded Secretary Noem and President Trump as racists for opposing TPS extension for Venezuelans, no matter that the Secretary retained part of the program for Venezuelans and President Trump in his first administration announced Deferred Enforced Departure for Venezuelans. The court's skewed portrayal of a mismmash of comments as evincing racial animus contravenes the way this Court assesses executive-branch actions. Respondents do not even defend the court's reasoning as to the President's comments, and their rejoinders as to Secretary Noem are meritless.

a.    Respondents offer no meaningful argument as to why the rational-basis standard in *Trump* v. *Hawaii,* 585 U.S. 667 (2018), would not govern their challenge, even if it were subject to judicial review. This Court held that rational-basis review governed an equal-protection challenge to a facially neutral executive-branch action involving immigration and national security (there, the entry restrictions on nationals from particular foreign countries) based on extrinsic comments. *Id*. at 704-705. The same rational-basis standard should apply to a facially neutral executive-branch action involving immigration and national security based on extrinsic comments by Secretary Noem and the President.

Respondents maintain (Opp. 37-38) that the Secretary's actions cannot survive even under rational-basis review. That is plainly incorrect. "[T]he Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 585 U.S. at 705. Only policies that "lack any purpose other than a 'bare . . . desire to harm a politically unpopular group'" flunk that standard. *Ibid*. (citation omitted). Secretary Noem's actions abundantly clear that bar: They are facially neutral and rationally related to legitimate goals of addressing the significant burdens imposed by the prior administration's immigration policies. In terminating the 2023 Designation for Venezuela, the Secretary expressed concerns about the vast number of inadmissible or

10

illegal aliens that have entered the United States, the resulting strain on local re-
sources, the magnet effect of TPS in drawing other Venezuelan nationals to the
United States at a time when Tren de Aragua has infiltrated the country, and the
need to discourage illegal and destabilizing migration.  90 Fed. Reg. at 9042-9043.
The Secretary's decision was thus "expressly premised on legitimate purposes." *Ha-
waii*, 585 U.S. at 706.  The Secretary's actions are "plausibly related to the Govern-
ment's stated objective[s]," and respondents and the district court could "only attempt
to argue otherwise by refusing to apply anything resembling rational basis review."
*Id.* at 704-706.

b.    Respondents cannot rely (Opp. 34-35) on the clear-error standard of re-
view for factual findings to insulate the district court's decision here.  While a "finding
of fact on the question of discriminatory intent is reviewed for clear error," when such
a finding is "based on the application of an incorrect" legal principle, "the finding
cannot stand." *Abbott* v. *Perez*, 585 U.S. 579, 607 (2018).  And here, the district court's
factual findings regarding the Secretary and the President's supposed discriminatory
intent were clearly erroneous because the court disregarded the presumption of reg-
ularity, and instead construed each statement in the worst possible light.  See Appl.
28; see *Abbott*, 585 U.S. at 607 (holding that the district court's factual findings were
clearly erroneous where the court "disregarded the presumption of legislative good
faith and improperly reversed the burden of proof").  Respondents do not even address
the presumption of regularity.  And, especially viewed through that lens, the evidence
of discriminatory intent on which the district court relied is "plainly insufficient to
prove" that Secretary Noem "acted in bad faith and engaged in intentional discrimi-
nation" in making her vacatur and termination decisions.  *Abbott*, 585 U.S. at 607.

Like the district court, respondents cite (Opp. 36) out-of-context excerpts of

statements the Secretary made in various public appearances in which she discussed the TPS program as well as immigration policy more generally, although they abandon any reliance on President Trump's statements. Respondents contend (*ibid.*) that the Secretary "conflated Venezuelan TPS holders with gang members to justify" her termination decision. That is inaccurate. The Secretary discussed the TPS program alongside broader concerns about the effects of the prior administration's immigration policy, including concerns with criminal and gang activity and Tren de Aragua—a designated foreign terrorist organization. The Secretary's discussion of those issues together simply indicates that she viewed the problems as interrelated. As she explained in the termination action itself, a TPS extension can create a "magnet effect" such that Venezuelan nationals who are not eligible for TPS may cross into the United States. 90 Fed. Reg. at 9043. And she expressed understandable concern that the TPS program had been subject to abuse in the prior administration, when levels of illegal immigration were at an all-time high. Appl. App. 65a.

But the Secretary never suggested that she viewed all Venezuelan TPS beneficiaries as gang members or criminals. And respondents never explain why, if she harbored such views, the Secretary would have left in place the 2021 Venezuela TPS designation. See 90 Fed. Reg. at 9044; see also Appl. 25-27. Their charges of animus against the Secretary are factually baseless.

It is inappropriate for courts to dissect the Secretary's extemporaneous statements to infer hidden discriminatory meanings that may then provide the basis for intrusive discovery. See Appl. 28.[1] Her statements should be read for what they are: statements of a public official in media appearances to promote the immigration pol-

---

[1] The district court has already authorized extra-record discovery on respondents' equal-protection claim. See D. Ct. Doc. 123 (May 2, 2025).

icies of this administration.  Read in that light, and with due regard for the presumption of regularity, the Secretary's statements in no way "raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *DHS* v. *Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020) (citation omitted).

**B.    At Minimum, Universal Relief Was Inappropriate**

Even setting aside the merits, the district court's order impermissibly grants universal relief that contravenes Article III and longstanding equitable principles. Respondents do not dispute that Article III and principles of equity permit a court to award relief only to the extent necessary to remedy the injury to the plaintiff before the court.  See, *e.g.*, *Hawaii*, 585 U.S. at 716-719 (Thomas, J., concurring); *Warth* v. *Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise protect against injury to the complaining party.").  Nor do respondents dispute that the relief here extends far beyond what is necessary to address their alleged harms.  Instead, they contend (Opp. 38-39) that principles requiring tailored relief apply only to injunctions, not relief under the APA.  But Congress did not abandon equitable principles in enacting the APA.  Section 705 "was primarily intended to reflect existing law  * * *  and not to fashion new rules of intervention for District Courts." *Sampson* v. *Murray*, 415 U.S. 61, 69 n.15 (1974).  And "existing law" at the time of Section 705's enactment did not abandon equitable principles or authorize relief extending beyond the parties.

Quite the contrary, Section 705 expressly incorporates equitable principles and focuses on the parties challenging the agency action by authorizing interim relief only "to the extent necessary to prevent irreparable injury," and "necessary and appropriate to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceeding."  5 U.S.C. 705; cf. *Starbucks Corp.* v.

13

*McKinney*, 602 U.S. 339, 347 (2024) (statutory reference to "proper" relief requires courts to apply "normal equitable rules"). As the House Report explained, the authority granted by Section 705 "is equitable" and Congress intended that it "would normally, if not always, be limited to the parties complainant." H.R. Rep. No. 1980, 79th Cong., 2d Sess. 43 (1946).

Respondents fare no better in asserting (Opp. 38-39) that relief under Section 705 is a "preliminary form of 'set aside' relief under Section 706," which courts have not limited to the parties. Regardless of the extent of any remedies authorized by Section 706—a question that is not presented here—Section 705 does not authorize universal relief. Sections 705 and 706 are distinct provisions with distinct texts: One provides that a court "may" grant "necessary and appropriate" relief "to the extent necessary to prevent irreparable injury," 5 U.S.C. 705, while the other provides that a court "shall" "set aside" unlawful agency action, 5 U.S.C. 706(2). In allowing for discretionary preliminary relief, Section 705 should be construed to require courts to exercise their discretion in accordance with established equitable principles. See, *e.g.*, *Martin* v. *Franklin Capital Corp.*, 546 U.S. 132, 139-140 (2005). The availability of a remedy after final judgment, moreover, does not prove that a "preliminary form" of that remedy must be available at an earlier stage in the litigation. Cf. *Doran* v. *Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("[P]rior to final judgment there is no established declaratory remedy comparable to a preliminary injunction."). The relief authorized under Section 705 is the functional equivalent of a preliminary injunction pending judicial review, not a preliminary vacatur. The district court recognized as much in applying the preliminary injunction factors in determining whether to grant postponement under Section 705. See Appl. App. 30a-31a. Equitable principles must apply to that preliminary relief, even if broader relief is ultimately available.

14

Respondents also contend (Opp. 40) that universal relief is particularly appropriate here because of the need for uniformity and the practical difficulties that would arise if the government had to distinguish individuals covered by the court's order. Those supposedly case-specific justifications would invite universal relief in almost every case, and in any event, they are mistaken. Article III promotes uniformity by establishing "one Supreme Court" to resolve conflicts among the lower courts, U.S. Const. Art. III, § 1—not by authorizing a single district court judge to decide immigration policy for the country. Courts lack the power to require more relief than necessary to remedy the plaintiff's injury simply because they think that would be more efficient for the defendant. See *Arizona* v. *Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring) ("[T]he district court worried that the Guidance could not 'be applied on a state-by-state basis.' But that is initially the National Government's problem, not ours.").

Nor are respondents correct in asserting (Opp. 39-40) that the National TPS Alliance (NTPSA) is entitled to relief for all its members nationwide. Article III confines courts to adjudicating the rights of the "litigants brought before the Court." *Broadrick* v. *Oklahoma*, 413 U.S. 601, 611 (1973). Courts may not grant relief to members who were not identified in the complaint and who did not agree to be bound by the judgment. See *FDA* v. *Alliance for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring); see also *Summers* v. *Earth Island Inst.*, 555 U.S. 488, 497-499 (2009). And respondents fail to rebut the government's arguments that awarding relief to absent and unidentified members of NTPSA would violate Article III, circumvent rules limiting class actions, and lead to asymmetrical results. See Appl. 33-34. Organizations cannot end-run limitations on courts' equitable powers and the existing mechanism of Rule 23 class actions just by cursorily identifying thousands

of putative but unidentified organization members—without even saying whether those particular members are affected by the particular TPS actions at issue.

Finally, respondents suggest (Opp. 39-40) that this Court should not tailor relief here because it has not ruled on the scope of available relief under Section 705 after full briefing and argument. But this Court previously granted a partial stay to tailor a universal injunction without having finally resolved the availability of such nationwide relief in a case on the merits. See *Labrador* v. *Poe*, 144 S. Ct. 921 (2024). Here, there is no question that Section 705 allows courts to issue party-specific relief that is limited to those challenging the agency action. Such relief will "prevent irreparable injury" to respondents, and that is all that is "necessary and appropriate" to "preserve [respondents'] status or rights pending conclusion of the review proceedings." 5 U.S.C. 705.

### C.    The Other Factors Support Relief

#### 1.    The issues raised by this case warrant this Court's review

Respondents do not dispute that if the Ninth Circuit were to uphold the district court's injunction, certiorari would be warranted. The injunction nullifies the Secretary's time-sensitive judgments in an area that the President has deemed "critically important to the national security and public safety of the United States." Exec. Order No. 14,159, § 16(b), 90 Fed. Reg. at 8446. And the district court's reasoning could threaten the administration's ability to promulgate *any* new immigration policies. See Appl. 30.

#### 2.    The equities favor a stay

The government suffers irreparable injury "[a]ny time" it is "enjoined by a court from effectuating statutes by enacted by representatives of [the] people." *Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Here, the harm to the

16

government is especially acute:  The Secretary determined that an extension of the 2023 TPS designation would harm "national security" and "public safety," imperil the United States' foreign policy interests, and strain police stations, city shelters, and aid services in local communities that had reached a breaking point.  90 Fed. Reg. at 9044.

Respondents see no harm in "retain[ing] TPS for a few more months during expedited litigation."  Opp. 15.  But that ignores that the Secretary terminated the 2023 Designation because she determined that an extension—even for six months— would harm the United States' "national interest."  90 Fed. Reg. 9040, 9041 (Feb. 5, 2025) (quoting 8 U.S.C. 1254a(b)(1)(C)).  The district court could conclude otherwise only by second-guessing the Secretary's determinations as to whether "economic considerations," "public safety," "national security," and "foreign policy" favored extending the 2023 Designation for Venezuela.  Appl. App. 38a-44a.  The court recognized that the government was engaged with ongoing negotiations with the Maduro regime, including with respect to "any agreement  * * * to resume deportations" to that country.  *Id.* at 43a.  But it discounted that interest, forming its own view of what might "weaken the standing of the United States in the international community."  *Id.* at 43a-44a.  Respondents barely attempt to defend that judicial overreach.

Respondents, meanwhile, cite potential harms to beneficiaries that are inherent to any termination of temporary protected status.  Whenever a Secretary terminates TPS, beneficiaries will lose work authorization and protected status under the program.  See 8 U.S.C. 1254a(a)(2).  Congress, however, has already balanced the equities:  When the Secretary concludes that a TPS designation under 8 U.S.C. 1254a(b)(1)(C) is "contrary to the national interest," she *must* terminate it, 8 U.S.C. 1254a(b)(3)(B), and a court has no basis for second-guessing that determination, see

17

pp. 3-6, *supra*.

In all events, none of the individual respondents allege that they are currently subject to a final order of removal; many allege that they have alternative grounds for immigration status. See Appl. 38. Thus, each respondent will have the ability to challenge on an individual basis whether removal is proper—or seek to stay, withhold, or otherwise obtain relief from any order of removal—through ordinary Title 8 proceedings. This Court should stay the district court's decision to extend an additional, and nationwide, layer of protection, contrary to the Secretary's determination that doing so was "contrary to the national interest." 8 U.S.C. 1254a(b)(1)(C).

\* \* \* \* \*

For the foregoing reasons and those stated in the government's application, this Court should stay the district court's order postponing the agency actions in its entirety. At minimum, this Court should stay the order except as to the individual respondents identified in this case.

Respectfully submitted.

D. JOHN SAUER
*Solicitor General*

MAY 2025