Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R., HENDRINA VIVAS CASTILLO, A.C.A., SHERIKA BLANC, VILES DORSAINVIL, and G.S., <br><br> Plaintiffs, <br><br> vs. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA, <br><br> Defendants. | Case No. 3:25-cv-01766-EMC <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:   July 11, 2025 <br> Time:  9:00 am <br> Place:  Courtroom 5, 17th Floor |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*Pro Hac Vice*)
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
Diana Sanchez (SBN 338871)
dianasanchez@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*Pro Hac Vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

# NOTICE OF MOTION

PLEASE TAKE NOTICE THAT, on July 11, 2025 at 9:00 am PT, or as soon thereafter as this matter may be heard, before the Honorable Edward M. Chen of the United States District Court for the Northern District of California, Plaintiffs move for partial summary judgment to set aside three challenged agency actions under 5 U.S.C. § 706.

This Motion is based upon this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting declarations and evidence filed concurrently herewith; pleadings and filings in this case; any additional matter of which the Court may take judicial notice; and such further evidence or argument as may be presented before, at, or after the hearing. Unless otherwise specified, all citations in the Memorandum of Points and Authorities to an "Exhibit," "Exhibits," "Ex." or "Exs." refer to exhibits attached to the Declaration of Emilou MacLean.

Date:  June 3, 2025

Respectfully submitted,

ACLU FOUNDATION
OF NORTHERN CALIFORNIA

 /s/ *Emilou MacLean*
Emilou MacLean

Emilou MacLean
Michelle (Minju) Y. Cho
Amanda Young
ACLU FOUNDATION
OF NORTHERN CALIFORNIA

Ahilan T. Arulanantham
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW

Eva L. Bitran
Diana Sanchez
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA

Jessica Karp Bansal
Lauren Michel Wilfong (*Pro Hac Vice*)
NATIONAL DAY LABORER ORGANIZING
NETWORK

Erik Crew (*Pro Hac Vice*)
HAITIAN BRIDGE ALLIANCE

Attorneys for Plaintiffs

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:25-CV-01766-EMC

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD ................................................................................................... 2

BACKGROUND ........................................................................................................... 2

         A.    The Vacatur and Termination of Venezuela's TPS Designation ................... 13

         B.    The "Partial Vacatur" of Haiti's TPS Designation ........................................ 8

         C.    The Impact of the Venezuela and Haiti Decisions ........................................ 10

ARGUMENT ................................................................................................................. 13

    I.    The Venezuela Vacatur Violated the APA ...................................................... 13

         A.    The Secretary Lacked Authority to Vacate
               Venezuela's Extension .................................................................................... 13

         B.    The Venezuela Vacatur was Arbitrary and
               Capricious and Without Observance of Procedure
               Required by Law ............................................................................................. 15

    II.    The Termination of TPS for Venezuela Violated the APA ........................... 17

         A.    The Venezuela Termination is Contrary to Law ............................................ 17

         B.    The Termination Was Without Observance of
               Procedure Required by Law ............................................................................ 19

    III.    The Partial Vacatur of the TPS extension for Haiti Violated the APA ..................... 20

         A.    The Secretary Lacked Authority to Partially
               Vacate Haiti's Extension and Redesignation .................................................. 20

         B.    The Partial Vacatur of Haiti's Extension and
               Redesignation Failed to Follow Statutorily
               Required Procedures and Was Pretextual and Contrary to Law .................... 21

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Methyl Corp. v. EPA*,
    749 F.2d. 826 (D.C. Cir. 1984) ................................................................. 21

*Am. Trucking Ass'ns v. Frisco Transp. Co.*,
    358 U.S. 133 (1958) ................................................................. 14, 21

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) ................................................................. 20

*Campanale & Sons, Inc. v. Evans*,
    311 F.3d 1090 (1st Cir. 2002) ................................................................. 20

*China Unicom (Ams.) Ops. Ltd. v. FCC*,
    124 F.4th 1128 (9th Cir. 2024) ................................................................. 13, 14

*Corus Staal BV v. U.S. Dep't of Com.*,
    27 C.I.T. 388 (2003) ................................................................. 14

*Dep't of Commerce v. New York*,
    588 U.S. 752 (2019) ................................................................. 16, 22, 24

*Gorbach v. Reno*,
    219 F.3d 1087 (9th Cir. 2000) ................................................................. 13

*Hernandez v. USCIS*,
    No. C22-904 MJP, 2023 WL 7386573 (W.D. Wash. Nov. 7, 2023) ................................................................. 22

*Hotel & Rest. Emps. Union, Local 25 v. Smith*,
    846 F.2d 1499 (D.C. Cir. 1988) ................................................................. 15

*Ingle v. Cir. City*,
    408 F.3d 592 (9th Cir. 2005) ................................................................. 2

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ................................................................. 16, 24

*Lone Star Sec. & Video, Inc. v. City of L.A.*,
    989 F. Supp. 2d 981 (C.D. Cal. 2013) ................................................................. 2

*Mazaleski v. Treusdell*,
    562 F.2d 701 (D.C. Cir. 1977) ................................................................. 21

*Nat'l Res. Def. Council v. Regan*,
    67 F.4th 397 (D.C. Cir. 2023) ................................................................. 13

*Ramos v. Neilsen*,
    709 F. Supp. 3d 871 (N.D. Cal. 2023) ........................................................................ 8

*Ramos v. Nielsen*,
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) .................................................................... 19

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) .................................................................................................. 20

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................................................ 8

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) .................................................................................... 2

**Statutes**

5 U.S.C. § 706 .............................................................................................................. *passim*

8 U.S.C. § 1254a .......................................................................................................... *passim*

**Other Authorities**

101 Cong. Rec. H25811 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) ................... 15

Pub. L. 101-649, Title III, § 303 (1990) ............................................................................ 15

Lynda J. Oswald, Note, *Voluntary Departure: Limiting the
    Attorney General's Discretion in Immigration Matters*,
    85 Mich. L. Rev. 152 (1986) ...................................................................................... 14

**Federal Regulations**

63 Fed. Reg. 15437 (Mar. 31, 1998) ................................................................................ 19

75 Fed. Reg. 347602 (Jan. 21, 2010) ................................................................................ 8

83 Fed. Reg. 2648 (Jan. 18, 2018) .................................................................................... 8

86 Fed. Reg. 41863 (Aug. 3, 2021) .................................................................................. 8

88 Fed. Reg. 5022 (Jan. 26, 2023) .................................................................................... 8

89 Fed. Reg. 54484 (Jul. 1, 2024) ............................................................................. 3, 8, 21

90 Fed. Reg. 5936 (Jan. 17, 2025) .................................................................................. 23

90 Fed. Reg. 5961 (Jan. 17, 2025) ............................................................................. 3, 14

90 Fed. Reg. 8805 (Feb. 3, 2025) .......................................................................... 4, 5, 13, 21

iii

90 Fed. Reg. 9040 (Feb. 5, 2025) ................................................................... 7, 17, 18

90 Fed. Reg. 10511 (Feb. 24, 2025) ................................................................ 9, 22, 25

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The decisions challenged in this action stripped or dramatically shortened the period of lawful immigration status and work authorization for over one million people. Even with extremely limited discovery, it is now clear that the vacatur, partial vacatur, and termination of humanitarian Temporary Protected Status protections for over 600,000 Venezuelans and 500,000 Haitians were preordained decisions driven by the changing policies of a new administration. Their asserted justifications were contrived, and not the product of the reasoned review required by the TPS statute. In their haste to undo protections granted by the previous administration, Defendants exceeded their statutory authority, sidestepped statutory review requirements, and failed to conduct mandatory inter-agency consultations and country conditions reviews. Instead, they concocted pretextual explanations that ran counter even to the limited evidence they had before them.

This Court has already held in its March 31 and May 30 orders granting Plaintiffs' motions to postpone and preserve status and rights that Plaintiffs are likely to succeed on the merits of their claim that the Secretary lacks vacatur authority; that even if she had vacatur authority, she cannot use it to retroactively invalidate already issued TPS-related documentation; and that her decision to vacate Venezuela's TPS extension was arbitrary and capricious because it was based on legal error, failed to consider obvious alternatives, failed to consider reliance interests, and was pretextual. Dkts. 93; 162. The Supreme Court's May 19 stay of this Court's March 31 order provides no reasoning and has no precedential effect, so this Court's March 31 order remains the law of the case, as does its May 30 order.

Plaintiffs now move for summary judgment on the claims raised in their motions to postpone and preserve status and rights under the Administrative Procedure Act (APA) as well as additional claims, including their claim that the partial vacatur of Haiti's July 1, 2024 TPS extension and redesignation violated the APA. This Court should grant their motion and set aside the challenged decisions because there is no genuine dispute of material fact that: (1) the Secretary has no authority (implied or inherent) to vacate a prior extension and, (2) even if she had such authority, the Venezuela vacatur and Haiti partial vacatur exceeded its limits because they were based on nothing

1

1   more than a policy disagreement with the previous administration. Further, (3) the timing of the

2   Haiti partial vacatur—*seven months* after Haiti's redesignation and extension—contravenes

3   Subsections (b)(3)(A) and (C) of the TPS statute; (4) the Secretary lacks authority to retroactively

4   invalidate already issued TPS-related documents and her failure to consider the reliance interests of

5   individuals who received those documents was arbitrary and capricious; (5) the reasons provided to

6   justify the Venezuela vacatur and Haiti partial vacatur are founded on legal errors and are pretextual

7   and contrary to the evidence before the agency; (6) the termination of Venezuela's TPS designation

8   and the partial vacatur of the Haiti designation were contrary to law because the TPS statute does not

9   permit termination based solely on national interest grounds, or indeed any consideration of national

10  interest during periodic review; and (7) all three decisions were made without observance of

11  procedure required by law because they were made without the inter-agency consultation and

12  country conditions review required by the TPS statute.

13                                  **LEGAL STANDARD**

14          Summary judgment is appropriate when there is no genuine issue of material fact and the

15  moving party is entitled to judgment as a matter of law. *Sierra Club v. Bosworth*, 510 F.3d 1016,

16  1022 (9th Cir. 2007). Pursuant to Section 706 of the Administrative Procedure Act (APA), a court

17  "shall" "hold unlawful and set aside agency action, findings, and conclusions" found to be, among

18  other things, "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

19  law;" "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or

20  "(D) without observance of procedure required by law." 5 U.S.C. § 706. The "law of the case"

21  doctrine generally precludes a court from reconsidering an issue it has already decided, including

22  decisions on pure issues of law made in the interim relief context. *Ingle v. Cir. City*, 408 F.3d 592,

23  594 (9th Cir. 2005). *See Lone Star Sec. & Video, Inc. v. City of L.A.*, 989 F. Supp. 2d 981, 989 (C.D.

24  Cal. 2013), *aff'd*, 827 F.3d 1192 (9th Cir. 2016).

25                                    **BACKGROUND**

26          This Court provided background on TPS and Venezuela's designation in its order granting

27  Plaintiffs' motion to postpone. Dkt. 93 at 3–13. When President Trump took office on January 20,

28  2025, both Venezuela and Haiti were designated for TPS based on extraordinary and temporary

conditions preventing nationals from each country from returning in safety. Venezuela's designation had been extended on January 17, 2025 and was set to expire on October 2, 2026. 90 Fed. Reg. 5961 (Jan. 17, 2025) (extending based on "extraordinary and temporary conditions" that prevent nationals "from returning in safety"). Approximately 607,000 Venezuelans qualified for protection. *Id.* at 5966. Haiti's designation had most recently been extended on July 1, 2024 and was set to expire on February 3, 2026. 89 Fed. Reg. 54484 (Jul. 1, 2024) (extending and re-designating based on "extraordinary and temporary conditions" that prevent nationals "from returning in safety"). Approximately 523,000 Haitians qualified for protection. *Id.* at 54492.

### A.    The Vacatur and Termination of Venezuela's TPS Designation

At her confirmation hearing on January 17, 2025, DHS Secretary Kristi Noem testified that the "extension [of TPS] of over 600,000 Venezuelans" was "alarming" due to reports of alleged gang activity by individuals in Colorado, Ex. 17, even though these reports had been debunked by local law enforcement officials. Ex. 22. She further stated that "[TPS] has been abused and manipulated by the Biden Administration and that will no longer be allowed … and these extensions going forward the way that they are, the program was intended to be temporary." Ex. 17 at 104.

Secretary Noem was confirmed on January 25. Even before her confirmation, DHS began to draft a "vacatur" of the January 17 extension—the first such vacatur in the 35-year history of the TPS program. Late on Friday, January 24, officials circulated a "first (rough) draft of the TPS Venezuela Vacatur notice … prepared this evening." Ex. 1 (January 24 8:39 PM email from DHS senior official to senior DHS and USCIS personnel, with subject, "For review by 5 pm Sat: TPS Vacatur for Venezuela"). The notice was deemed "final" by Monday, January 27. Ex. 2 (January 27 8:42 PM email from DHS senior advisor to DHS senior official with subject and attachment, "Memo – TPS VZ Vacatur Final.pdf"). Secretary Noem signed off on Tuesday, January 28. Ex. 3 (January 28 6:12 PM email from DHS Office of the Executive Secretary to senior DHS personnel with subject, "Venezuela Vacatur Notice," and attaching "Venezuela – Vacatur – FR – SIGNED.pdf" and "Memo – TPS VZ Vacatur Final.pdf"); Dkt. 103-1 at VZ Vacatur_5 (Decision Document dated January 28); Ex. 4 (DHS Clearance Record). On Wednesday, January 29, she appeared on national television and announced the vacatur by explaining "[w]e were not going to follow through on what

1  [Secretary Mayorkas] did to tie our hands …. [W]e are going to … evaluate all of these individuals

2  that are in our country, including the Venezuelans that are here and members of [Tren de Aragua]

3  …. [T]he people of this country want these dirt bags out." Ex. 21.

4        The vacatur decision was filed on January 30 and formally published in the Federal Register

5  on February 3. 90 Fed. Reg. 8805−07 (Feb. 3, 2025) (noting below signature that document was

6  filed on January 30 at 11:15 AM), Dkt. 103-1. In the Federal Register notice, the agency provided

7  three "[r]easons for the [v]acatur," all of which focused on alleged defects in the registration process

8  established by the January 17 extension. *Id.* at 8807 (complaining that process "has included

9  multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions

10  happening in a single document"). The vacatur notice asserted that the extension's registration

11  process was "novel," "confus[ing]" and potentially not "consistent with the TPS statute." *Id.* It did

12  not mention national interest and said nothing about conditions in Venezuela.

13        The Certified Administrative Record (CAR) for the vacatur decision contains *nothing* about

14  the extension's registration process. Dkts. 103 (Index of Vacatur CAR) & 103-1–103-5 (Vacatur

15  CAR). No analysis of prior TPS registration processes examines whether the extension's registration

16  process was, in fact, novel. Defendants have now conceded, and this Court has found, that it was not.

17  Dkt. 93 at 56; Ex. 12. No reports or statistics indicate that TPS recipients were confused about how

18  to register. This is unsurprising, given the extension's "streamlining … would tend to eliminate, not

19  create, confusion." Dkt. 93 at 57. No legal memorandum identifies how the registration process

20  could be inconsistent with the TPS statute. It is not. *Id.* at 58.

21        Rather, the CAR consists of: (1) the vacatur Federal Register notice and two one-sentence

22  "Decision Document[s]" approving publication of the vacatur and termination notices, Dkt. 103 at

23  ¶¶ 1–4; (2) Immigration-related Executive Orders issued by President Trump and a Press Statement

24  from Secretary of State Marco Rubio regarding Trump Administration immigration priorities, *id.*

25  ¶¶ 8, 14–15, 40, 47; (3) seven Federal Register notices announcing terminations of TPS designations

26  for other countries and the rescission of the El Salvador TPS termination from the first Trump

27  administration, *id.* ¶¶ 29, 31–37; (4) two Federal Register notices regarding the "Parole Process for

28  Venezuelans," *id.* ¶¶ 19–20; (5) decisions from the Attorney General and USCIS Administrative

Appeals Office addressing standards for considering national interest and national security outside the TPS context, *id.* ¶¶ 5, 11; (6) an assortment of articles and reports, including 16 about conditions in Venezuela, three about Tren de Aragua, and two about costs of irregular migration,[1] *id.* ¶¶ 6–7, 9–10, 12, 21–23, 25–28, 30, 38–39, 41–45, 49; (7) Biden-era Federal Register notices regarding Venezuela's TPS designation, *id.* ¶¶ 13, 16–18; and (8) Biden-era country conditions reports[2] prepared by USCIS and the State Department in advance of, and fully supporting, the January 17 extension, and a one-sentence "Decision Document" approving publication of the extension notice, *id.* ¶¶ 24, 48. The CAR includes no evidence of any consultation with other government agencies or country conditions assessments post-dating the January 17 extension decision. *Id.*

The vacatur notice explained that, as a result of the vacatur, the Secretary "must determine, by February 1, 2025, whether to extend or terminate the 2023 Venezuela TPS designation." 90 Fed. Reg. at 8807. But record evidence now makes clear that Defendants were preparing to terminate TPS for Venezuela even *before* Secretary Noem signed off on the vacatur. The personnel involved in both decisions overlapped. *Compare* Ex. 1 (January 24 email concerning drafting of TPS vacatur notice, including Christina McDonald, Rene Browne, Laura Smith, Brian Keliher, John Havranek, and Nader Baroukh) *with* Ex. 5 (excerpt of privilege log showing, *inter alia*, January 27 & 28 emails with subject "RE: TPS VZ Termination: Data & Policy Matters," between Christina McDonald, Rene Browne, Laura Smith, Brian Keliher, John Havranek, Nader Baroukh, and others (at NTPSA-DHSHQ_00000172, NTPSA-DHSHQ_00000374, NTPSA-DHSHQ_00000623, NTPSA-DHSHQ_00000632, NTPSA-DHSHQ_00000667, NTPSA-DHSHQ_00000670, NTPSA_USCIS_00001617, NTPSA_USCIS_00001618, NTPSA_USCIS_00001619, NTPSA_USCIS_00001620)). At the same time as DHS personnel were drafting the vacatur notice, they were also communicating about termination as though it were a fait accompli. *See* Ex. 5

---

[1] Sixteen of these articles and reports appear to have been downloaded from the internet on March 7, 2025, after this litigation was filed. *See* Dkts. 103-1–103-5 at VZ Vacatur_25–33, 34–42, 44–51, 52–58, 138–44, 145–48, 206–22, 223–27, 228–34, 235–53, 267–79, 406–08, 409–11, 443–54, 455–59, 503–17 (with "3/7/2025" printed on top left).
[2] The CAR Index lists "USCIS RAIO TPS Considerations: Bolivarian Republic of Venezuela" with a "2025" date, Dkt. 103 ¶ 48, but the document itself is dated August 2024. Dkt. 103-5 at VZ Vacatur_472.

1  (excerpt of privilege log showing January 26 email between senior DHS personnel with subject,

2  "FW: TPS VZ Termination. Draft Notice"; and January 27 & 28 emails preceding the vacatur notice,

3  with subject, "RE: TPS VZ Termination: Data & Policy Matters"). The same *minute* that DHS

4  Senior Advisor Joseph Mazzara sent a message about the "TPS VZ Vacatur Notice," he also sent a

5  message regarding "TPS VZ Termination: Data & Policy Matters." Ex. 5 (excerpt of privilege log

6  showing two January 28 12:05 PM emails from Joseph Mazzara to James Percival, Rob Law, and

7  others (at NTPSA-DHSHQ_00000074 & NTPSA_USCIS_00001618)). Simultaneously, senior

8  agency personnel were actively seeking to identify "positive improvements" in Venezuela country

9  conditions, apparently to support the forthcoming termination. Ex. 6 (excerpt of privilege log

10  showing January 28 12:41 PM email from Associate Director of USCIS Refugee, Asylum and

11  International Operations Directorate (RAIO) Ted Kim to USCIS Senior Advisor Joseph Edlow, with

12  subject, "Venezuela country conditions," and attachment, "Relevant quotes from updated Venezuela

13  COI sources (012825) positive improvements highlighted.docx" (at NTPSA_USCIS_00001623 &

14  NTPSA_USCIS_00001371)), Ex. 7 (January 28 1:35 PM email from USCIS Senior Advisor Joe

15  Edlow to USCIS Chief of Office and Policy and Strategy Samantha Deshommes and Ihsan Gunduz

16  with subject "FW: Venezuela country conditions," identifying "information pulled together from

17  RAIO" for "Team working on TPS"), Ex. 8 (four bullet points of articles regarding country

18  conditions in Venezuela, showing limited signs of progress, with metadata identifying its creation on

19  January 27).

20        Shortly after Secretary Noem signed off on the vacatur decision, agency personnel noted an

21  "URGENT" timeline to finalize the termination notice. Ex. 9 (January 30 12:10 PM email from

22  USCIS Chief of Office and Policy and Strategy Samantha Deshommes to various USCIS personnel

23  with subject "URGENT: VZ Draft FRN – Due by 3 pm TODAY"). In a letter dated January 31,

24  Secretary of State Rubio wrote to Secretary Noem recommending termination in a one-and-a-half-

25  page letter. Dkt. 104-4 at VZ Termination_0222-23. Secretary Rubio did not provide any State

26  Department country conditions report, although such reports are typically part of the TPS review

27  process. *Compare, e.g.*, *id. with id.* at VZ Termination_0210-21 (Secretary Blinken's extension

28  recommendation, including detailed 10-page memorandum on Venezuela country conditions). *See*

*also* Dkt. 110-4 at HT Vacatur AR_0344 (explaining that the State Department generally coordinates with relevant regional bureau to prepare a country conditions report and TPS recommendation).[3] Nor did he say anything about conditions in Venezuela. Rather, he recommended termination based solely on the State Department's "assess[ment] that permitting nationals of Venezuela to remain temporarily in the United States pursuant to 8 U.S.C. section 1254a is contrary to the national interest of the United States." Dkt. 104-4 at VZ Termination_0222.

Secretary Noem signed the termination decision on February 1, just three days after approving the vacatur. Dkt. 104-1 at VZ Termination_0006. The one-page "Record of Clearance and Approval" for her decision is atypical in that it does not identify *any* documents Secretary Noem reviewed in connection with the decision and fails to name or include signatures for two of the three "Senior Advisors" who signed off on the decision.[4] *Compare* Ex. 13 (DHS Clearance Record for Venezuela termination decision) *with* Ex. 4 (DHS Clearance Record for Venezuela vacatur decision) & Dkt. 110-3 at HT_Vacatur AR_0164 (DHS Clearance Record for Haiti partial vacatur decision).

In the Federal Register termination notice, Secretary Noem stated that "even assuming" conditions in Venezuela warranted extension, she would terminate because "it is contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States." 90 Fed. Reg. 9040, 9042 (Feb. 5, 2025), Dkt. 104-1. The termination CAR consists largely of the documents from the vacatur CAR in a different order. *Compare* Dkt. 104 (Index of Termination CAR) *with* Dkt. 103 (Index of Vacatur CAR). The only new documents in it are the termination Federal Register notice, a 1997 Federal Register notice regarding the extension and redesignation of Liberia for TPS, and the January 31 letter from Secretary Rubio recommending termination. The CAR includes no evidence of any other inter-agency consultation and no country conditions assessments post-dating the January 17 extension. Dkt. 104.

---

[3] *See also* Ex. 16 (Government Accountability Office, Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions (Apr. 2020) ("GAO Report)) at 20–21 (noting that, typically, the "Secretary of State provides [a] country conditions report and recommendation to the Secretary of Homeland Security").

[4] The Record of Clearance and Review reflects the culmination of the "standard departmental clearance project" during which officials from various DHS components "provide relevant technical comments and ensure that complete information has been gathered for the Secretary's review." Ex. 16 at 26.

The day after signing the decision to terminate TPS for Venezuela, Secretary Noem appeared on Meet the Press and explained her decision by denigrating TPS holders with long-debunked myths about the Venezuelans who had come to the United States seeking safety: "[R]emember, Venezuela purposely emptied out their prisons, emptied out their mental health facilities and sent them to the United States of America. So we are ending that extension of [the TPS] program." Ex. 12. *See* Ex. 23 (debunking the myth that Venezuela is emptying prisons and mental institutions). *See also* Exs. 21, 24–28 (showing Secretary Noem has long repeated these falsehoods).

**B.      The "Partial Vacatur" of Haiti's TPS Designation**

Haiti was first designated for TPS on January 21, 2010 based on "extraordinary and temporary conditions" following a 7.0 magnitude earthquake that affected three million people— about one-third of the population. 75 Fed. Reg. 3476–02 (Jan. 21, 2010). After a 2011 redesignation and several extensions, Haiti's designation was terminated during the first Trump Administration. 83 Fed. Reg. 2648 (Jan. 18, 2018). Two federal district courts held the termination likely violated the APA and found substantial evidence that it was unconstitutionally based on animus toward Haitian immigrants. The courts issued preliminary injunctions, and the termination never entered into effect. *Ramos v. Neilsen*, 709 F. Supp. 3d 871, 877–79 (N.D. Cal. 2023); *Saget v. Trump*, 375 F. Supp. 3d 280, 372, 374 (E.D.N.Y. 2019).

On August 3, 2021, in the wake of the assassination of Haitian President Jovenel Moïse, DHS newly designated Haiti for TPS on the basis of extraordinary and temporary conditions. 86 Fed. Reg. 41863 (Aug. 3, 2021). On January 26, 2023, and again on July 1, 2024, DHS extended and redesignated TPS for Haiti. 88 Fed. Reg. 5022 (Jan. 26, 2023); 89 Fed. Reg. 54484 (Jul. 1, 2024). The July 2024 extension and redesignation was due to "remain in effect for 18 months, ending on February 3, 2026." 89 Fed. Reg. at 54485.

On February 6, 2025, the day after publishing the Venezuela termination notice, Defendants turned their attention to Haiti.[5] Ex. 10 (excerpt of privilege log showing that Defendants' custodians

---

[5] This Court has ordered Defendants to produce additional documents responsive to Plaintiffs' discovery request by June 6. Dkt. 161. Plaintiffs will update this timeline and provide any additional relevant evidence on reply if warranted and permitted by the Court.

first communicated about Haiti on February 6). As with Venezuela, it appears the review process began not by assessing country conditions or consulting with other agencies, but by drafting the partial vacatur notice. *Id.* (excerpt of privilege log showing that, on February 7, Defendants prepared a draft partial vacatur Federal Register notice, "FRN – Haiti TPS Partial Vacatur (DRAFT ONLY 2.7.25).docx); Ex. 11 (February 12 email with a revised version of the February 7 draft partial vacatur Federal Register notice). By February 14, high-level advisors had signed off on the decision. 110-3 at HT Vacatur AR_0164. Secretary Noem approved it on February 18. Dkt. 110-2 at HT_Vacatur AR_0006.

Two days later, on February 20, DHS issued a press release titled "Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status." Ex. 15. The release announced that Secretary Noem "vacated a decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law." *Id.* It stated that "[f]or decades the TPS system has been exploited and abused" and that "Biden and Mayorkas attempted to tie the hands of the Trump administration by extending Haiti's Temporary Protected Status by 18 months." *Id.*

Later on February 20, the partial vacatur notice was filed and "pre-published" in the Federal Register, with final publication on February 24. 90 Fed. Reg. 10511, 10515 (Feb. 24, 2025) (stating "Filed 2-20-25; 4:15pm" under signature line), Dkt. 110-1. In the notice, the agency offered three reasons for the partial vacatur: (1) the July 1, 2024 extension and redesignation notice failed to explain "why the 18-month period was selected in lieu of a 6- or 12-month period" and why it "depart[ed] from" a supposed "default six-month period for an extension of an existing designation;" (2) the notice did not explain its conclusion that extending and redesignating Haiti for TPS was not contrary to the U.S. national interest; and (3) the notice relied on "several" sources of country conditions information which were from 2023 or before. 90 Fed. Reg. at 10513–14. Based on these reasons, the partial vacatur notice purported to retroactively shorten the expiration dates of all documents issued under the prior extension from February 3, 2026 to August 3, 2025.

The CAR for the Haiti partial vacatur shows DHS did not consult with the State Department or prepare any country conditions report as part of its decisionmaking process. Dkt. 110-1 (Index of

9

Haiti Partial Vacatur CAR). Rather, the CAR consists entirely of: (1) the partial vacatur Federal Register notice, one-sentence "Decision Document" approving its publication, and one-page "Record of Clearance and Approval," identifying who signed off on it and when, *id.* ¶¶ 1–2; 6–7; (2) President Trump's Executive Order 14159, Protecting the American People Against Invasion, *id.* ¶ 11; (3) old Federal Register notices regarding previous Haiti TPS decisions, *id.* ¶¶ 8–9, 13–20; (4) Federal Register notices announcing the reconsideration and rescission of TPS terminations decisions made during the first Trump Administration, *id.* ¶¶ 27–30; (5) court filings from litigation challenging the termination of Haiti's TPS designation during the first Trump Administration, *id.* ¶¶ 4, 23-26, 31–33; (6) the State Department recommendation and country conditions reports supporting the July 1, 2024 extension and redesignation and the one-sentence "Decision Document" approving that decision, *id.* ¶¶ 5, 22, 35; (7) three reports regarding conditions in Haiti, each of which was cited in the July 2024 extension and redesignation notice, *id.* ¶¶ 3, 10, 21; and (8) a UN resolution authorizing a mission to support the National Police in Haiti, which had been cited in the partial vacatur notice, *id.* ¶ 36.

### C.    The Impact of the Venezuela and Haiti Decisions

This Court described the harm the vacatur and termination of Venezuela's TPS designation caused to individual Venezuelan TPS holder plaintiffs and other Venezuelan TPS holder members of associational plaintiff National TPS Alliance in its postponement order. Dkt. 93 at 31–44. The partial vacatur of Haiti's TPS designation has wreaked similar havoc on the lives of individual Haitian TPS holder plaintiffs and other Haitian TPS holder members of NTPSA.

Plaintiff Sherika Blanc has lived in the United States since she was a young child, and has had TPS since 2010. Declaration of Sherika Blanc, ¶ 3. She is married to a U.S. citizen and the mother of four U.S. citizen children aged one to 13. *Id.* ¶¶ 5–6. Sherika is a homeowner and works in healthcare administration coordinating care and supportive services for disabled patients while also running a small business. *Id.* ¶¶ 4–5, 7-8. Since the announcement of the partial vacatur, she has "been living in a state of fear and limbo," afraid that she will lose her job and not be able to pay for her family's basic needs. *Id.* ¶ 8. After she re-registered pursuant to the July 2024 extension, Sherika received a notice which automatically extended her employment authorization for 540 days. Based

1  on this assurance, Sherika signed a lease for her small business. *Id.* ¶ 9. Now, she faces the prospect

2  of having to break her lease early if TPS is terminated in August. *Id.* She cannot safely return to

3  Haiti, which is in crisis. *Id.* ¶ 10. She also could not bring her children there, and so would face

4  separation from her family if she lost her status and was forced to return; her family left behind

5  would also likely be required to rely on public assistance without her work to pay the bills. *Id.* ¶¶

6  11–12.

7          Plaintiff Viles Dorsainvil, 39 years old, is a pastor and the founding director of the Haitian

8  Community Help and Support Center in Springfield, Ohio. Declaration of Viles Dorsainvil ¶¶ 2–3,

9  5. He also previously worked as a case manager at the Ohio Department of Job and Family Services

10  and served for seven years as the Executive Director of the Haitian Association of the United

11  Nations. *Id.* ¶¶ 3–4. Viles registered for TPS in 2021, soon after his arrival in the U.S. *Id.* ¶ 4. TPS

12  allowed him to earn a living and support his daughter in Haiti. *Id.* After being granted TPS, Viles

13  began work for the state of Ohio, and resumed studies in pursuit of a master's degree in political

14  science. *Id.* ¶ 4. He renewed his TPS pursuant to the July 2024 extension and received an approval

15  notice and I-94 extending his TPS status through February 3, 2026 and a work permit valid through

16  that date. *Id.* ¶ 7. When his TPS was renewed, Viles advanced his plans to grow the Haitian Support

17  Center, including by buying a defunct fire station to renovate for use as a community center. *Id.* ¶ 11.

18  The announcement of the partial vacatur left Viles anxious for himself and his community. *Id.* ¶ 12.

19  Without TPS, he will lose his ability to work, have to give up his studies, and lose his home. *Id.* ¶ 13

20  ("Everything that I have worked for will be destroyed."). His brother also has TPS; he recently

21  graduated from nursing school and works at a local hospital. *Id.* ¶ 13. Without TPS, Viles' brother

22  also will not be able to work and will lose the home he and Viles share, which he bought earlier this

23  year. *Id.* ¶ 13. Viles cannot safely return to Haiti. *Id.* ¶ 16.

24          Plaintiff G.S. is a 30-year-old Haitian physician who fled Haiti in 2024 because the country

25  was in crisis and doctors were being targeted for kidnappings and killings because they were

26  perceived to have more money than most people. Declaration of G.S. ¶¶ 2–3. G.S. works as a case

27  manager for Massachusetts's emergency shelter program, assisting low-income residents find

28  housing and jobs. *Id.* ¶ 4. He has relied on TPS since soon after he arrived in the U.S. *Id.* ¶ 2. G.S.

11

signed an apartment lease in February 2025, after he was granted TPS with an expiration date of February 3, 2026, as he was confident that he would have legal status and work authorization through the end of the lease. *Id.* ¶ 5. He also began studying to become a licensed physician in the U.S. to continue the work that he did in Haiti. *Id.* ¶ 5. The partial vacatur was announced just days after G.S. moved into his new apartment," and left him feeling "trapped and hopeless." *Id.* ¶¶ 5–6, 8 ("It's like a slow death, each day bringing me closer to losing the only form of protection that I have left."). Without TPS, G.S. fears he will be unable to work, and at risk of detention and deportation. *Id.* ¶ 7. To G.S., "[r]eturning to Haiti … would be a death sentence." *Id.* ¶ 8.

Plaintiff A.C.A., a Haitian TPS holder, is a 30-year-old administrator for a healthcare company that provides hospice services; and is also pursuing his bachelor's degree in accounting, due to be finished next year. Declaration of A.C.A. ¶¶ 2, 7, 9. A.C.A. has lived in the United States since 2010, arriving when he was a child. *Id.* ¶¶ 2–4. His mother and brothers are U.S. citizens or green card holders. *Id.* ¶ 10. A.C.A. has had TPS since 2022, as a result of Haiti's 2021 designation. *Id.* ¶ 7. TPS allowed A.C.A. to support himself and get a driver's license. *Id.* ¶ 8. He has no other form of legal status besides TPS, for which he re-registered in July and received an auto-extension notice. *Id.* ¶ 10. While A.C.A. has a pending family-based adjustment petition filed in 2011, that will not provide a chance for permanent protection for the foreseeable future. *Id*. After the announcement of the partial vacatur, A.C.A. "felt like [his] TPS had already been cancelled," and was devastated. A.C.A. ¶ 11. Without TPS, he will lose his job, and his ability to complete his degree. *Id.* ¶ 13. Returning to Haiti is "the worst thing [he] can imagine" and he does not know how he would survive or be safe there. *Id.* ¶ 14.

In addition to the individual Plaintiffs, all of whom are members of the National TPS Alliance ("NTPSA"), many other NTPSA members are also suffering as a result of the challenged decisions. NTPSA has over 550 Haitian TPS holder members living in 36 states. Declaration of José Palma Jimenez ¶ 5. These include Stanley Louis, who lives in Washington, and who re-registered for TPS pursuant to the July 1, 2024 extension of Haiti's designation. *Id.* ¶ 9. Stanley received an approval notice and employment authorization document extending his TPS and employment authorization through February 3, 2026. *Id.* In March 2025, shortly after the partial vacatur, he

1    interviewed for a job at the Seattle airport. He learned that he was not eligible for the position
2    because airport security requires employment authorization to be valid for at least six months and, as
3    a result of the partial vacatur, his employment authorization was not valid for that period. *Id.*

4         NTPSA's Venezuelan TPS holder membership has also grown since this litigation was filed.
5    NTPSA currently has over 161,000 Venezuelan TPS holder members, living in all 50 states and the
6    District of Columbia. *Id.* ¶ 15. In light of the May 19 Supreme Court decision staying this Court's
7    postponement order, many of NTPSA's Venezuelan members have lost their work authorization and
8    are facing the prospect of deportation. Throughout this difficult period, NTPSA has continued its
9    work to inform TPS holders about their rights; to provide accurate, updated information about the
10   status of TPS designations; and to organize to defend the TPS program and protect TPS holders. *Id.*
11   ¶¶ 6, 13–14.

12                                          **ARGUMENT**

13   **I.    THE VENEZUELA VACATUR VIOLATED THE APA**

14         **A.    The Secretary Lacked Authority to Vacate Venezuela's Extension.**

15         As this Court has held, Secretary Noem's assertion of "inherent" or "statutorily implicit"
16   authority to reconsider prior TPS decisions, 90 Fed. Reg. 8805, 8806 (Feb. 3, 2025), "is at odds with
17   the structure of the TPS statute." Dkt. 93 at 44–55. The TPS statute forecloses vacatur authority for
18   two reasons. *Id.* at 44–55. First, implied reconsideration authority is "foreclosed … when there is a
19   specific statutory *process* for altering an agency's grant of … authorization." *China Unicom (Ams.)*
20   *Ops. Ltd. v. FCC*, 124 F.4th 1128, 1149 (9th Cir. 2024) ("*CUA*"); *see also Gorbach v. Reno*, 219
21   F.3d 1087, 1098 (9th Cir. 2000) (en banc) (holding that "statutory denaturalization procedure
22   exhausts the field"). Here, "the TPS statute lays out specific … processes for TPS designations,
23   extensions, and terminations." Dkt. 93 at 50. That process does not include the option to vacate an
24   extension. Indeed, "Congress did not create a process for [DHS] to withdraw [an extension] because
25   it seemingly did not want [DHS] to have the power to do so." *Nat'l Res. Def. Council v. Regan*, 67
26   F.4th 397, 404 (D.C. Cir. 2023).
27         Second, a statute's "use of a fixed term" is "affirmatively inconsistent with positing an
28   implied power to revoke a license at any time." *CUA*, 124 F.4th at 1148 (finding implied

1    reconsideration authority where statute provided no process to alter certificate and no fixed term for

2    certificate's duration). "The TPS statute is specifically prescriptive as to the time frame within which

3    a TPS designation may be terminated." Dkt. 93 at 50–51. Under 8 U.S.C. § 1254a(b)(3)(B),

4    terminations take effect either: (a) 60 days after publication or (b) "if later, the expiration of the most

5    recent previous extension"—here, October 2, 2026. 90 Fed. Reg. 5961 (Jan. 17, 2025 Extension).

6    Secretary Noem's attempt to erase Venezuela's "most recent previous extension" and then terminate

7    TPS eighteen months before the "expiration of" that extension violates the statute.

8         In addition, as this Court recently held, the vacatur exceeded the Secretary's authority under

9    the TPS statute by purporting to invalidate TPS-related documentation already issued. Dkt. 162 at 6.

10        Finally, even assuming the TPS statute does provide the Secretary with *some* implicit

11   authority to reconsider a TPS designation, any implicit reconsideration authority would nonetheless

12   have limits, including that implicit reconsideration authority may not be used "as a guise for

13   changing previous decisions because the wisdom of those decisions appears doubtful in the light of

14   changing policies." *Am. Trucking Ass'ns v. Frisco Transp. Co*., 358 U.S. 133, 146 (1958); *see also*

15   *Corus Staal BV v. U.S. Dep't of Com.*, 27 C.I.T. 388, 391 (2003) (describing "the line of cases

16   indicating that mere policy changes should not be allowed to alter final agency determinations").

17   Because the evidence here shows the Secretary's true purpose in vacating the extension was to

18   "undo," Dkt. 93 at 59, the previous administration's decision in light of the new administration's

19   "changing policies," *Am. Trucking Ass'ns,* 358 U.S. at 146, the vacatur exceeds the Secretary's

20   authority. *See supra* Background A.

21        The Secretary's assertion of implicit, unconstrained authority to vacate a TPS extension is

22   especially unwarranted given that Congress created TPS specifically to *constrain* executive

23   discretion in humanitarian relief programs. Dkt. 93 at 3–13. TPS replaced "extended voluntary

24   departure" (EVD) which lacked "any specific . . . criteria" and was "neither statutorily condoned or

25   mandated." *See* Lynda J. Oswald, Note, *Voluntary Departure: Limiting the Attorney General's*

26   *Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157–60, 164, 178 n.153 (1986) (internal

27   quotation omitted). Unconstrained executive discretion resulted in arbitrary, overtly political results,

28   creating congressional pressure to reform the system, particularly in the wake of the Attorney

General's refusal to grant EVD for Salvadoran refugees. *See Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1510–11 (D.C. Cir. 1988) (Mikva, J.) (per curiam) (separate opinion). By creating TPS, Congress sought to ensure future decisions would be based on "identifiable conditions" rather than "the vagaries of our domestic politics," 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating Central American Studies and Temporary Relief Act of 1989, immediate precursor to the TPS statute); replace the "ad hoc, haphazard ... procedures" that existed before, *id.* at 25837 (statement of Rep. Richardson); and provide beneficiaries with certainty about "what [their] rights are, how the Justice Department determines what countries merit EVD status [and] how long they will be able to stay."[6] *Id.*

### B. The Venezuela Vacatur Was Arbitrary and Capricious and Without Observance of Procedure Required by Law.

Whether or not the Secretary has vacatur authority, the Venezuela vacatur violated the APA for five independent reasons. First, it was founded on legal error. Dkt. 93 at 55–58. Contrary to Secretary Noem's assertion, "the practical operation of the extension of the 2023 Designation was not 'novel,' did not engender undue confusion as to registration, and was entirely consistent and compliant with the TPS statute." *Id.* at 58. Second, it arbitrarily failed to consider obvious alternatives to vacatur. *Id.* at 58–59. Third, it failed to consider the unique reliance interests of individuals who had received documents under the January 17 extension. Dkt. 162 at 6. Fourth, it was pretextual, Dkt. 93 at 59, and ran afoul of the general requirements of reasoned agency decisionmaking. Fifth, the Secretary failed to observe procedures required by law because the purported vacatur took place without the interagency consultation and review of country conditions required for termination.

There is no genuine issue of material fact on any of these claims. The Secretary's legal error and failure to consider alternatives and reliance interests are clear from the face of the vacatur decision and confirmed by the vacatur CAR, which shows no consideration of alternatives or

---

[6] Congress also statutorily designated El Salvador for TPS, Pub. L. 101-649, Title III, § 303 (1990) effectively overruling *Smith* and establishing blanket humanitarian protection where the executive had refused.

1    reliance interests. *See supra* Background A (describing contents of CAR). As to pretext, Defendants

2    have *conceded* that the Secretary's "ultimate goal … was to revisit and undo Secretary Mayorkas's

3    decision to extend the TPS designation for Venezuela" and this Court has found that "confusion was

4    not [the Secretary's] concern so much as the desire to totally undo Secretary Mayorkas's decision."

5    Dkt. 93 at 59; *see also* Dkt. 129 at 5–6 ("The record provided by Plaintiffs, while obviously not

6    identical, presents an equally troubling set of circumstances" as those in *Department of Commerce v.*

7    *New York*, 588 U.S. 752 (2019)). The CAR and discovery produced to date confirm the Court's

8    finding. *See supra* Background A.

9        The vacatur CAR shows that the consolidated registration process was not the reason for the

10   vacatur decision—nothing in the record suggests the Secretary had any interest in registration issues

11   at all. Rather, the CAR contains immigration-related Executive Orders and prior TPS termination

12   notices, indicating the agency was motivated to make a termination decision in light of shifting

13   immigration policy and saw vacatur as the means to clear the way to implement that policy. *See*

14   *supra* Background A; Dkt. 103 ¶¶ 8, 14, 32–37. Communications among DHS officials show they

15   rushed to begin drafting the vacatur notice before the Secretary was confirmed and began drafting

16   the termination before the vacatur was finalized. *See supra* Background A. This timeline left no

17   room for any real evaluation of the consolidated registration process. It confirms Defendants' true

18   purpose was to use vacatur as a path to termination. Thus, just as in *Department of Commerce*, "the

19   sole stated reason … seems to have been contrived" and "[t]he explanation provided here was more

20   of a distraction." *Dep't of Com.*, 588 U.S. at 756. Further, the disconnect between the explanation

21   provided in the vacatur decision (alleged problems with the consolidated registration process) and

22   the CAR (which did not contain any consideration of registration issues) renders the vacatur

23   arbitrary and capricious, because the agency's "explanation for the decision … is contrary to the

24   evidence" before it. *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

25       Finally, the Secretary failed to observe procedures required by law because she failed to

26   engage in interagency consultation and country conditions review required by statute before any

27   TPS-related decision can be made. 5 U.S.C. § 706(2)(D). The TPS statute requires that the Secretary

28   conduct regular periodic reviews, including "consultation with appropriate agencies of the

16

Government" and a "review [of] the conditions in the foreign state," to assess whether a country's TPS designation should be extended or, instead, terminated. 8 U.S.C. § 1254a(b)(3)(A). As explained further in Argument II.B. below, these requirements are express constraints on the Secretary's power to terminate a TPS designation. If vacatur authority exists, they surely must apply with at least the same force. There is no reason Congress would expressly require interagency consultation and a review of country conditions for extension and termination but allow the Secretary ignore those requirements when issuing a vacatur. Because the vacatur CAR establishes that the Secretary did not engage in interagency consultation or a review of country conditions, the vacatur notices violate 5 U.S.C.§ 706(2)(D).

## II.    THE TERMINATION OF TPS FOR VENEZUELA VIOLATED THE APA

### A.    The Venezuela Termination is Contrary to Law.

Secretary Noem's decision to terminate Venezuela's TPS designation was "not in accordance with law," 5 U.S.C. § 706(2)(A), for two independent reasons: (1) it was predicated on the unlawful vacatur, and (2) it was based on "national interest," which is not a permissible ground for terminating a country's TPS designation.

First, the termination was unlawful because it was predicated on the unlawful vacatur. The premise of the termination was that "[t]he 2023 designation of Venezuela for TPS is set to expire on April 2, 2025," and so "a determination whether to extend the 2023 Venezuela designation was due by February 1, 2025." 90 Fed. Reg. at 9040–41. However, if this Court grants Plaintiffs' request to set aside the vacatur, then that premise no longer applies. Instead, the January 17 extension remains in effect, the 2023 TPS designation of Venezuela does not expire until October 2, 2026, a determination whether to extend the 2023 designation is not due until August 3, 2026, and any termination "shall not be effective earlier" than October 2, 2026. 8 U.S.C. § 1254a(b)(3)(B)). The Secretary's termination decision was based on the contrary (and legally erroneous) belief that the TPS periodic review process required a decision by February 1, 2025. *See* Dkt. 104-1 at 4–5. Relatedly, because the termination decision was based on conditions that may change materially before the next periodic review is required, it must be set aside along with the vacatur.

Second, the only rationale Secretary Noem proffered for the termination was that "it is

1   contrary to the national interest to permit the Venezuelan nationals … to remain temporarily in the

2   United States." 90 Fed. Reg. at 9042 (finding termination required on national interest grounds

3   "even assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary'").

4   But that is not a permissible justification for termination under the TPS statute. Section 1254a(b)(1)

5   governs *initial* TPS designations. It requires that the Secretary consider "national interest" when

6   designating a country for TPS based on extraordinary and temporary conditions. 8 U.S.C.

7   § 1254a(b)(1)(C). But it does not otherwise require (or permit) the Secretary to consider national

8   interest in making other TPS-related decisions. For example, national interest is not identified as a

9   factor to consider when designating a country for TPS based on armed conflict or environmental

10  disasters. *Id*. § 1254a(b)(1)(A)–(B). Nor, as relevant here, is national interest identified as a

11  permissible consideration during the periodic review process. *Id.* § 1254a(b)(3). Rather, during

12  periodic review, the Secretary must review "the *conditions in the foreign state*" and determine

13  whether the "*foreign state* … continues to meet the conditions for designation under paragraph (1)."

14  *Id.* § 1254a(b)(3)(A), (B) (emphasis added). In other words, the statute directs the Secretary to focus

15  on conditions in the country designated for TPS, not conditions in the United States. Defendants'

16  contrary interpretation—that the periodic review provision requires the Secretary to consider

17  whether the "foreign state continues to meet the condition" that "permitting the aliens to remain

18  temporarily in the United States is [not] contrary to the national interest of the United States," *see*,

19  Dkt. 122 at 27—makes no sense, particularly given the statute's overarching purpose to bring

20  objectivity to decisionmaking about humanitarian protection. *See supra* Argument I.A.

21      Further, in the 35-year history of the program, no Secretary has ever terminated a TPS

22  designation on the basis that it was "no longer in the national interest." *See* MacLean Decl. ¶ 30. The

23  termination notice cites to a 1998 decision terminating Liberia's TPS designation to assert that the

24  agency "ha[s] long recognized … a 'national interest' assessment is an essential element of a

25  determination whether to extend or terminate" a country's TPS designation. 90 Fed. Reg. at 9042

26  (citing 63 Fed. Reg. 15437, 15438 (Mar. 31, 1998)). But the Liberia notice says only that the

27  Attorney General consulted with other agencies concerning both country conditions and national

28  interest and decided to terminate because "overall security conditions in Liberia have improved

during the past year." 63 Fed. Reg. at 15438. It does not suggest a termination could be based on an assessment of national interest alone. In any event, even a past practice of terminating TPS based on national interest would not render it lawful because the statute's plain text does not permit termination on that ground.

**B.    The Termination Was Without Observance of Procedure Required by Law.**

As described above, a decision to terminate a country's TPS designation can only be made "after consultation with appropriate agencies of the Government" and a "review [of country] conditions." 8 U.S.C. § 1254a(b)(3)(A). A typical periodic review of a TPS designation takes months. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) (describing process); GAO Report 15–33 (same); HT_Vacatur AR_164 (DHS Clearance Record for Haiti partial vacatur decision showing the "Package" provided to the Secretary for the July 2024 extension). USCIS Refugee, Asylum and International Operations Directorate (RAIO) first prepares a country conditions report. Then, the USCIS Office of Policy & Strategy (OP&S) prepares a Decision Memo—a detailed and substantiated recommendation from USCIS to DHS—based on the RAIO country conditions report and other governmental and nongovernmental sources, including a recommendation and country conditions report provided by the State Department (relying on input from the relevant regional bureaus), and information from other DHS and USCIS components. The OP&S Chief then reviews and approves the Decision Memo before presenting it to the USCIS Director who sends a final, signed Decision Memo as part of a "package" to the DHS Secretary. The "package" may include, *e.g.,* a draft Federal Register Notice, a document called "TPS Legal Authority" describing the TPS statute, the USCIS RAIO Country Conditions Report, and the Department of State Recommendation and Country Conditions Report. The Secretary makes a final decision informed by the recommendation in the USCIS Decision Memo and other sources, and consultation within DHS and with other agencies. She then provides a written memorandum or notice documenting the decision. Finally, DHS publishes the decision in the Federal Register.

The Venezuela termination CAR deviates sharply from this standard process. The sum total of statutorily required consultation with "appropriate agencies" consisted of a one-and-a-half-page letter from Secretary Rubio recommending termination based on a conclusory assessment of the

1  national interest, without addressing country conditions. *See supra* Background A. Neither the State

2  Department nor USCIS prepared country conditions memoranda. *Id.* Indeed, to the extent

3  decisionmakers conducted further analysis of country conditions at all, the focus was on seeking out

4  "positive" conditions that could justify termination. *Id.*

5      This meager "consultation" and "review" does not satisfy the statute. 8 U.S.C.

6  § 1254a(b)(3)(A). *See Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1088 (9th Cir.

7  2011) (discussing cases defining agency consultation requirements and noting the consultation is an

8  "affirmative duty," that must be "meaningful" and occur before making a decision); *Campanale &*

9  *Sons, Inc. v. Evans*, 311 F.3d 109, 119−20 (1st Cir. 2002) (holding letters were insufficient to

10 establish that agency complied with statutory consultation requirement). In particular, it is clear from

11 the text and context of the periodic review provision that it mandates consultation with "appropriate

12 agencies" regarding *country conditions.* 8 U.S.C. § 1254a(b)(3)(A) ("the [Secretary], after

13 consultation with appropriate agencies of the Government, shall review the conditions in the foreign

14 state"). *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (noting that plain meaning of

15 statutory language is determined by reference to the specific context in which the language is used

16 and the broader context of the statute as a whole). Because the Venezuela termination skipped this

17 statutorily required step, it must be set aside.

18 **III.    THE PARTIAL VACATUR OF THE TPS EXTENSION FOR HAITI VIOLATED**
19 **        THE APA**

20      **A.    The Secretary Lacked Authority to Partially Vacate Haiti's Extension and**
        **        Redesignation.**

21      As discussed above, the Secretary has no authority to vacate a TPS extension. The partial

22 vacatur of Haiti's extension and redesignation is unlawful for all the same reasons this Court found

23 her vacatur of Venezuela's extension to be unlawful, including because it purports to shorten

24 retroactively the validity period of already issued TPS-related documents. *See supra* Argument I.A.

25 Further, even if the Secretary had some implicit vacatur authority, the Haiti partial vacatur exceeded

26 its limits because the CAR and other evidence show its purpose was to clear the way for

27 implementation of the new administration's "changing policies." *Am. Trucking Ass'ns,* 358 U.S. at

28 146.

20

The Haiti partial vacatur also contravenes the TPS statute for an additional reason. Before this Court, Defendants have repeatedly stressed that the Venezuela vacatur was announced shortly after Venezuela's extension, and thus that it was not unlawful because the extension (in their view) had not yet entered into effect, and the Secretary then acted to issue a new decision before the 60-day window required by statute.[7] *See* Dkt. 60 at 15; Dkt. 122 at 17. But the Haiti partial vacatur was published *seven months* after Haiti's extension and redesignation. The reliance interests for this extension are therefore undisputable, and were not considered at all by the Secretary. 89 Fed. Reg. 54484. And the Secretary's timing for the partial vacatur contravenes the statutory mandate that the Secretary "shall" decide whether to extend or terminate a TPS designation "[a]t least 60 days before" the end of the previous period of designation or else the designation and, relatedly, that the designation is extended by default if no decision is made. 8 U.S.C. § 1254a(b)(3)(A), (C). Accepting Defendants' asserted authority "would in effect empower the [Secretary] to [make a decision] after the [60]-day period had elapsed, thereby writing the [60]-day time limit" and the default extension "out of the statute."[8] *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 836–37 (D.C. Cir. 1984) (holding EPA lacked authority to revoke waiver where statute provided waiver applications were granted by default if EPA failed to act on them within a specific timeframe).

**B.    The Partial Vacatur of Haiti's Extension and Redesignation Failed to Follow Statutorily Required Procedures and Was Pretextual and Contrary to Law.**

Even if the Secretary had authority to partially vacate Haiti's extension and redesignation, the partial vacatur violated the APA because Secretary Noem failed to follow statutorily required procedures and because the reasons she gave for her decision were pretextual and contrary to law.

First, the Secretary failed to follow statutorily required procedures. As discussed above, the TPS statute requires interagency consultation and country conditions review before any decision to

---

[7] As Plaintiffs have previously elaborated, the January 17 extension entered into effect immediately. Defendants' vacatur notice confirms as much. 90 Fed. Reg. at 8807 ("Given the exceedingly brief period in which the January 17, 2025 extension notice has been in effect…."). And Defendants have acknowledged that approximately 5,000 TPS holders had already received TPS approvals pursuant to the extension. Dkt. 162 at 7–8.

[8] Further, even where implied reconsideration authority exists, it must be exercised within a "reasonable time," generally measured in weeks. *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977). The Haiti partial vacatur clearly violates that limitation.

21

alter a country's TPS designation. *See supra* Argument I.B. But neither the partial vacatur CAR nor extra-record discovery includes any recommendation from the State Department or assessment of country conditions. *See supra* Background B; Dkt. 110 (Haiti Partial Vacatur Index). Rather, the Secretary stated only that she "intends to conduct a review of current conditions in Haiti and make a new determination *in due course*." 90 Fed. Reg. at 10514 (emphasis added).

Second, the Secretary's explanation for the partial vacatur was pretextual and violates the general requirements of reasoned agency decisionmaking. The evidence leaves no doubt that the partial vacatur of Haiti's TPS extension and redesignation was a preordained decision based not on the reasons given in the partial vacatur notice, but rather, like the Venezuela vacatur, on "the desire to totally undo Secretary Mayorkas's decision." Dkt. 93 at 59. Just as with the Venezuela vacatur, Defendants have *conceded* that the ultimate purpose of the Haiti partial vacatur was to "afford[] [Secretary Noem] the opportunity" to make a new decision. Defs' Mot. to Dismiss, Dkt. 122 at 23–24.

The partial vacatur "cannot be adequately explained in terms of" the reasons provided by Secretary Noem in the Federal Register. *Dep't of Com.*, 588 U.S. at 783. Those reasons—that Secretary Mayorkas did not explain why he chose an 18-month period or why he concluded that extension and redesignation were not contrary to the national interest, and that he cited both contemporaneous and slightly older country conditions reports—could be invoked to vacate *all* previous TPS extensions, because they are not flaws but rather standard features of TPS decisions. No Secretary has ever explained in the Federal Register why they chose a particular duration rather than an alternative. MacLean Decl. ¶ 30. Nor have Secretaries typically explained their conclusion that "permitting [TPS beneficiaries] to remain temporarily in the United States" is *not* "contrary to the national interest," which would require proving a negative. *Id.*; *cf. Hernandez v. USCIS*, No. C22-904 MJP, 2023 WL 7386573, at *9 (W.D. Wash. Nov. 7, 2023) ("[A]n agency may act arbitrarily and capriciously where it requires [an applicant] to prove a negative."). And it is not uncommon for Secretaries to consider facts both close in time and further from the determination when conducting periodic reviews. MacLean Decl. ¶ 30. The CAR for the Venezuela termination itself indicates that Secretary Noem considered country conditions sources from 2021 and 2023 in

making her decision. Dkt. 104 (CAR Index, citing Venezuela Termination_78–85, 165–209, 246–52, 253–71, 461–91).

Because Secretary Noem's stated justifications for reconsideration would apply equally to *all* previous TPS extensions and redesignations, they fail to explain why Haiti's extension and redesignation specifically were selected for reconsideration, instead of other TPS extensions. *See, e.g.*, 90 Fed. Reg. 5936 (Jan. 17, 2025) (extending Ukraine's TPS designation for 18 months without explaining why the Secretary chose an 18-month period or concluding that extension was not contrary to the national interest, and citing both contemporaneous and slightly older country reports).

The focus on Haiti *is* explained, however, by public statements from Secretary Noem, President Trump, Vice President Vance, and DHS itself, which demonstrate a predetermined conclusion to terminate TPS for Haiti. In a press release issued to announce the partial vacatur, DHS cited as proof for its belief "the TPS system has been exploited and abused" that "Haiti has been designated for TPS since 2010, with each extension … allow[ing] more Haitian nationals, even those who entered the U.S. illegally, to qualify for legal protected status." Ex. 15. Secretary Noem has expressed her intent to limit TPS extensions: "[TPS] has been abused and manipulated by the Biden Administration and that will no longer be allowed … and these extensions going forward the way that they are, the program was intended to be temporary"). Ex. 17. And President Trump expressly asserted that he would "[a]bsolutely" "revoke [TPS]" for Haitians. Ex. 19 (President Trump: "You have to remove [Haitians]; you cannot destroy our country … In my opinion, it's not legal …. Absolutely I would revoke [TPS]."). When asked about TPS for Haiti, Vice President Vance rejected the idea that TPS conferred any legal status, describing TPS as illegally waving a magic wand. Ex. 20 (Vice President Vance: "The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way … they are here legally. And what they mean is that Kamala Harris used two separate programs, mass parole and temporary protective status …. Well, if Kamala Harris waves the wand illegally and says these people are now here legally, I'm still going to call them an illegal alien"). *See* Dkt. 129 at 4–6 (noting that the showing of bad faith for the Venezuela decisions would apply to Haiti, including "disparaging statements discussed in the postponement order … by President Trump that Haitian immigrants in Springfield, Ohio, were eating people's pets").

The CAR for the Haiti partial vacatur and discovery produced by Defendants confirms there is no genuine issue of material fact as to Plaintiffs' pretext claim. Nothing in the CAR substantiates the reasons the Secretary gave to explain the partial vacatur in the Federal Register. *See supra* Background B. The *only* document in the CAR that post-dates Secretary Mayorkas's July 1, 2024 extension and redesignation decision—other than the partial vacatur Federal Register notice itself, a one-sentence "Decision Document" approving its publication, and a one-page "Record of Clearance and Approval," identifying who signed off on it and when—is President Trump's Executive Order "Protecting the American People Against Invasion." *See* CAR Index, Dkt. 110-1. DHS communications confirm the decisionmaking process, to the extent there was one, began and ended with drafting the Federal Register notice announcing the preordained partial vacatur decision. *See supra* Background B. There was no consultation, no periodic review, and no consideration of the factors asserted in the Federal Register notice. Where, as here, the reasons provided to justify the decision are "contrived," *Dep't of Com.*, 588 U.S. at 756, and "contrary to the evidence," Defendants do not satisfy their obligation to provide a reasoned explanation, particularly for such a consequential decision. *Lands Council*, 395 F.3d at 1026.

Finally, the partial vacatur was contrary to law for two reasons. First, the Secretary justified the partial vacatur on the ground that Secretary Mayorkas had failed to adequately consider the national interest. But, as explained above, the statute does not permit the Secretary to consider national interest when reviewing an existing TPS designation. *See supra* Argument II.A. By basing vacatur of the extension on a supposed failure to evaluate whether allowing Haitian nationals to remain would be "contrary to the national interest," Secretary Noem misinterpreted the TPS statute and inserted a legal requirement for TPS extension that does not exist.[9]

Second, the partial vacatur was based on the Secretary's legally erroneous conclusion that the TPS statute has a default six-month extension period. Contrary to Secretary Noem's statement, there is no "default" period for TPS extensions. Rather, the TPS statute allows a period of 6, 12, or 18

---

[9] Plaintiffs raise this argument only as to the partial vacatur of the *extension*, and not the partial vacatur of the redesignation. National interest is a permissible consideration at the redesignation stage.

1    months "in [the Secretary's] discretion." 8 U.S.C. § 1254a(b)(3)(C). The six-month default applies

2    only if the Secretary fails to make any determination. *Id.* Indeed, of more than 200 TPS extensions

3    since 1990, six-month extensions were granted on only a handful of occasions with unique

4    circumstances. Ex. 14. The overwhelming majority of TPS extensions in the past twenty years have

5    been for 18 months. *Id.* (88% of TPS extensions over past two decades have been for an 18-month

6    period). Even assuming there is a "default" six-month period, there is no requirement for a separate

7    justification for extensions beyond the six-month period; no such explanation was provided in prior

8    extension decisions. 8 U.S.C. § 1254a(b)(3)(C); MacLean Decl. ¶ 30. The government does not

9    claim otherwise. In fact, over the 35-year history of the statute, in virtually all cases in which

10   Secretaries designated or extended TPS for a country, they announced the length of the designation

11   without elaborating their reasons for choosing that duration and not another. MacLean Decl. ¶ 30.

12   Secretary Noem's partial vacatur for Haiti TPS is itself consistent with that practice—it does not

13   explain why she chose a twelve-month period. 90 Fed. Reg. 10511.

## CONCLUSION

15       Because there is no genuine issue of material fact regarding Plaintiffs' claims that the

16   challenged decisions violated the APA, this Court should grant Plaintiffs' motion to "set aside" the

17   vacatur and termination of Venezuela's TPS designation and the partial vacatur of Haiti's TPS

18   designation.

19

20

21   Date:  June 3, 2025                              Respectfully submitted,

22                                                   ACLU FOUNDATION
                                                     OF NORTHERN CALIFORNIA

23                                                    /s/ *Emilou MacLean*
                                                     Emilou MacLean

24

25                                                   Emilou MacLean
                                                     Michelle (Minju) Y. Cho

26                                                   Amanda Young
                                                     ACLU FOUNDATION
                                                     OF NORTHERN CALIFORNIA

27

                                                     Ahilan T. Arulanantham
28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:25-CV-01766-EMC

CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW

Eva L. Bitran
Diana Sanchez
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA

Jessica Karp Bansal
Lauren Michel Wilfong (*Pro Hac Vice*)
NATIONAL DAY LABORER ORGANIZING
NETWORK

Erik Crew (*Pro Hac Vice*)
HAITIAN BRIDGE ALLIANCE

Attorneys for Plaintiffs

1

**<u>CERTIFICATE OF SERVICE</u>**

2

     I hereby certify that on June 3, 2025, I caused the foregoing to be electronically filed with the

3

Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to

4

all counsel of record.

5

6

                           ACLU FOUNDATION
                           OF NORTHERN CALIFORNIA

7

8

                           <u>/s/ *Emilou MacLean*</u>
                           Emilou MacLean

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28