**Pages 1 - 65**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

NATIONAL TPS ALLIANCE,           )
et al.,                          )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )      **NO. 25-CV-01766-EMC**
                                 )
KRISTI NOEM, et al.,             )
                                 )
          Defendants.            )
_____)

                        San Francisco, California
                        Thursday, May 29, 2025

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                    ACLU OF NORTHERN CALIFORNIA
                    39 Drumm Street
                    San Francisco, California 94111
              BY:   **EMILOU H. MacLEAN, ATTORNEY AT LAW**
                    **AMANDA YOUNG, ATTORNEY AT LAW**

                    NATIONAL DAY LABORER ORGANIZING NETWORK
                    1030 South Arroyo Parkway, Suite 106
                    Pasadena, California 91105
              BY:   **JESSICA K. BANSAL, ATTORNEY AT LAW**


        **(APPEARANCES CONTINUED ON THE NEXT PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES:**  (CONTINUED)

For Defendants:

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868
Ben Franklin Station
Washington, DC 20044
BY:  **ANNA DICHTER, TRIAL ATTORNEY**
     **SARAH L. VUONG, TRIAL ATTORNEY**

**Thursday - May 29, 2025**                              **3:21 p.m.**

P R O C E E D I N G S

---o0o---

THE COURTROOM DEPUTY:  Calling Civil Case Number 25-1766, National TPS Alliance, et al. versus Noem, et al.

Will counsel please step forward and state your appearances for the record.

MS. BANSAL:  Good morning, Your Honor.  Jessica Bansal for the plaintiffs.

THE COURT:  All right.  Thank you, Ms. Bansal.

MS. MacLEAN:  Good afternoon, Your Honor.  Emi MacLean for the plaintiffs, and I'm joined by my co-counsel Amanda Young as well.

THE COURT:  All right.  Good afternoon.

MS. DICHTER:  Good afternoon.  Anna Dichter for the defendants.

THE COURT:  All right.  Thank you, Ms. Dichter.

MS. VOUONG:  Sarah Vouong for the defendants.

THE COURT:  All right.  Thank you, Ms. Vouong.

All right.  We have four matters here.  As well as the status conference, there's a motion to stay all proceedings; motion to reconsider this Court's discovery order, which is somewhat related, although a bit narrower; there's a motion regarding non-compliance with discovery orders; and then the

preservation of status rights that stem from the Supreme Court's order, the second paragraph.  And I'd like to take that one first.

So I think we've all read the order numerous times from the Supreme Court in trying to see what we can understand.  And it does seem to me that the Court could have easily not said anything, but it did, and I have to assume that it did with a purpose.  And it clearly is intended to preserve a certain kind of claim, and it appears to me that it is about preserving, potentially at least, allowing a challenge or further challenge for those who received various forms that have the later expiration date pursuant to the prior administration, Secretary Mayorkas's earlier action, the extension.

There may be -- I do have some questions as to what -- is there an end date?  Is there some dispute as to what window of time we're talking about with respect to receipt of these?  I don't know if anybody has a sense of how many folks fit into this category.  And does it make any difference if we use, as the cutoff date, the 60 days from the -- I think the termination notice, which is the April date, or what the plaintiffs suggests, which is using this Court's order until the issuance of the Supreme Court's order?  Is that a May -- which is the later date that the plaintiffs were asking for as a cutoff date?

**MS. BANSAL:**  May 19th, Your Honor.

**THE COURT:** May 19th. The date that the order from this Court kind of preserved the ability to get these notices was effectively terminated by the Supreme Court's stay. I don't know if it makes any difference.

Were there -- after Secretary Noem's vacatur and the termination notice, do we know whether any more EADs, 797 notices of actions, I94s were issued?

**MS. BANSAL:** Your Honor, we don't know exact numbers, but we know that one of the named plaintiffs received a receipt notice after April 7th.

**THE COURT:** After April 7th?

**MS. BANSAL:** (Nods head.)

**THE COURT:** And how did that occur?

**MS. BANSAL:** Our understanding, Your Honor, is that the vacatur didn't go into effect because the Court's order postponed the effective date, and so USCIS continued to process reregistration applications pursuant to the January 17th extension.

**THE COURT:** Okay. And we have no idea, including surveying the membership of the plaintiff organization, whether there are others, whether this is a rare thing, or whether there are tens of people, hundreds of people, thousands of people?

**MS. BANSAL:** We don't know numbers, Your Honor. I would assume that the Government would have that information,

but we don't know the number.

**THE COURT:**  Okay.  So let me ask the Government.

Do you have any sense?  What are we talking about here?

**MS. VOUONG:**  We don't have -- can you hear me?

We don't have a breakdown.  We just know there is about 5,000.  But I can't tell you, like, was it 5,000 before February 3rd, April 7th, May 19th.

**THE COURT:**  But about 5,000 people got something with the October 2nd, 2026, expiration date?

**MS. VOUONG:**  That's what we think from looking at numbers.  And I'm saying "about" because it could be fewer; it could be a little more.

**THE COURT:**  Yes.  All right.  So it's a relatively small group relative to the larger pool that we were originally dealing with -- right? -- which were the hundreds of thousands.

**MS. VOUONG:**  Proportionally, yes, correct.

**THE COURT:**  Okay.  Well, I understand when we get to the merits, that there's at least an asserted distinction between termination, invalidation, vacatur, et cetera, et cetera.

But the common sense is that for this second paragraph to mean anything, it meant any challenge to the invalidity, the invalidation, whether it's by way of vacatur, termination, et cetera.  It does seem to me and the citation to 1254a(d)(3) does suggest that it was intended to reach people who got

notices that were issued pursuant to the prior administration's extension. And they are distinct from those who, in the future, would hope to get notices or might be eligible for action but never got those, because (d)(3) is a distinct provision of 1254 and it does seem to single out those who actually have some kind of documents in hand. And it seems to me that's the obvious gist of this.

And so I'm not sure what else to say other than I've seen the arguments by the Government and I'm not convinced that it doesn't apply.

I think the Supreme Court meant to say something with this, and it does seem to me that it leaves the door of potential protection -- notwithstanding the stay, this is kind of an exception. It sounds like a small exception. We're talking about maybe, at most, roughly 5,000 people instead of 350- or 6- or 700,000 people.

**MS. BANSAL:** On that point, Your Honor, I do want to clarify that we think there are two groups of people who are covered by paragraph 2 of that Supreme Court order, and we address this in Footnote 2 of our motion.

This is -- there are people who received Form I94 with an expiration date of October 2nd, 2026. There are also people who received Forms I-797, notices of action.

I apologize. Should I --

**THE COURT:** Yes, why don't you come on up.

**MS. BANSAL:**  There are also people, Your Honor, who received Forms I-797, notices of action, that automatically extended their employment authorization for 540 days.  That's approximately 18 months, Your Honor.  It's 30 times 18.  It works out to September 24th, 2025 [sic].

And we think that group of people is also covered by paragraph 2 of the Supreme Court opinion.

**THE COURT:**  So are you referring to Footnote 2 of your opening brief, or which?

**MS. BANSAL:**  Yes, Your Honor, Footnote 2 of the motion.

**THE COURT:**  So the second group includes I-797.  And that's a notice of action, essentially?

**MS. BANSAL:**  Yes, Your Honor.  There's various different types of notices of action.  The Supreme Court uses the plural.  One of those types of notices of action that was issued pursuant to the January 17th extension was a notice of action automatically extending, by 540 days, employment authorization.

**THE COURT:**  Well, and you're saying those are folks that had what had been received?  Received a notice?

**MS. BANSAL:**  A notice of action, Your Honor.

**THE COURT:**  And what is a notice of action exactly?

**MS. BANSAL:**  There's various notices of action.  One is a receipt notice, so a notice that USCIS has received the

application.  And the specific receipt notice for an employment authorization application under the January 17th extension also stated in the notice that, upon receipt, the work authorization was automatically extended for 540 days.

This is the type of notice that plaintiff Freddy Arape Rivas received that we mentioned in the motion.

**THE COURT:**  So they got the extension on work authorization, but then it says "who applied for reregister under the extension but had not yet received final approval."

So final approval in terms of TPS status, or final approval of what?

**MS. BANSAL:**  Had not yet received a final decision on the TPS status or the employment authorization, Your Honor. What they received was a 540-day automatic extension, which is provided upon receipt of the application.

**THE COURT:**  And that 540 days would have expired generally when?

**MS. BANSAL:**  September 24th, Your Honor.  It's meant to be approximately 18 months.  It's 30 times --

**THE COURT:**  September?

**MS. BANSAL:**  September 24th of 2026.  So it's a week before October 2nd.

**THE COURT:**  Well, how do I square that with the language of the text of the Supreme Court order that makes reference "issued with the October 2nd, 2026, expiration"?

Literally -- I mean, maybe would you argue that it falls within the spirit, but it doesn't meet the letter.

**MS. BANSAL:**  I mean, two things, Your Honor.  One, yes, it falls within the spirit.  It's approximately October 2nd.

But two, Your Honor, we read that October 2nd to qualify the Forms I94.  Not all these documents are issued with a specific date.  And we find meaningful the Supreme Court's use of the plural, notices of action and Forms I797.

This wasn't the subject of the briefing before the Supreme Court, but the example of a person who receives such a notice is, again, plaintiff Freddy Arape Rivas, who received a 540-day extension.

We also think, Your Honor, under subsection (d)(3), that section pertains to documentation and authorization.  It doesn't distinguish between different types of documentation and different types of authorization.  And it's focused on when the document was issued.

Employers and TPS holders -- employers are required to accept, Your Honor, that notice of action automatically providing a 540-day extension as proof of extended work authorization, and it implicates the same type of reliance interest as Form I94 with the October 2nd date on it.

**THE COURT:**  And what is an I94?

**MS. BANSAL:**  An I94 is approval of the TPS status.

THE COURT:  Actual approval.  Not just a notice of action?

MS. BANSAL:  That's my understanding, Your Honor.

THE COURT:  And that would have the date of termination or expiration of that status?

MS. BANSAL:  I believe that, typically, it does.

THE COURT:  Whereas, you're saying that it is not unusual for an EAD or I-797 notice of action to have any particular termination date.

MS. BANSAL:  It doesn't have a date.  It has approximately 18 months' extension.

THE COURT:  All right.  So there's an interpretation question as to how -- do you have any idea what -- if this paragraph were to be construed to include the notices of action that were received in that so-called reliance window period, how many more would -- how common is that?  If it's 5,000 in the other group, what would your guess be?

MS. BANSAL:  I don't know, Your Honor.  I would assume also that USCIS has that information.  I don't know.

THE COURT:  All right.  Let me see if USCIS has any information in that regard.

MS. VOUONG:  We do not.

THE COURT:  Okay.  Well, if my interpretation is correct, subject to the question about this extra sort of tail on that and subject to figuring out whether the window period

ends April 7 or May 19 -- but there's some group.  It may be -- I don't know -- thousands.  I don't know how many.

Why shouldn't the Court issue -- I guess you're asking for another -- a Section 705-type order; is that right?  To the extent this group, in particular, based on this theory, it's a subgroup based on an additional legal theory.

**MS. BANSAL:**  Yes, Your Honor.  And we think the legal theory is quite straightforward.  As Your Honor said, the statute explicitly prohibits retroactively invalidating documentation.  We think these individuals have a unique reliance interest, and we know that reliance interests are something that the Supreme Court has valued, placed a lot of value on.

For example, in the *Regents* case five years ago, one of the primary reasons for rescinding -- for invalidating a rescission of the DACA program was failure to consider reliance interests.

And here, there's nothing in the vacatur order that indicates that the reliance interests of this specific subset of people was considered or the reliance interests of the many third parties who rely on these documents, Your Honor.

And so we think the legal claim is straightforward. The Government's interpretation of (d)(3) renders the Supreme Court statement meaningless and also renders the provision meaningless.  So we don't find that convincing.

And on the equities, Your Honor, again, this is a subgroup that has unique harm, and this is a situation where the public interest weighs even more heavily in favor of postponement because of all the third parties who are relying on this documentation.

THE COURT:  All right.  Well, let me hear from the Government.  I understand sort of the technical argument that the statute talks about termination, not necessarily invalidation or vacatur, et cetera, et cetera.  But, I mean, I just don't find that very persuasive in view of the gist of this.  But I'll let you make your case.

MS. DICHTER:  Thank you, Your Honor.

Beyond what we've briefed, which it sounds like you understand, I just want to point out what I think is the bigger question here, that this is about the Secretary not being locked into a last-minute extension made by a previous administration.

And it seems that plaintiffs would have there be no ability for the Secretary to ever end an extension, even if the extension never went into effect, even if she finds that the extension is contrary to the national interest.

THE COURT:  Well, there's a possible outcome here, and that is the termination of the extension if the Ninth Circuit, Supreme Court disagrees with my analysis and says she can.

But that still leaves a little island, that is, documents

that were actually put in the hands of people.  If you don't get that document, you don't get the protection; that even though it was extended, that extension can be revoked, depending on what the higher courts say.

But that could still leave an island, which it seems like the Supreme Court was carving out here, for those who actually have documents in hand because of the reliance interest and because of this express language of (d)(3).

So I don't know if it has that huge -- it's a small exception.  It's talking about those with documents in hand.

**MS. DICHTER:**  Yes.  The Government's position here is that this issue was not raised before the Supreme Court, and the Supreme Court has left the question open.

The only other thing I'll note is that (d)(2) is the controlling part of the statute here, which makes clear that TPS documentation is only valid during the initial period of designation and extension.  And because here, there is no extension that ever went into effect, these documents --

**THE COURT:**  Except it does start off "Subject to paragraph 3."  So paragraph 3 is incorporated by reference.  It starts off.

**MS. DICHTER:**  Correct.

**THE COURT:**  So I understand what you're saying, but then you can't ignore (d)(3).

**MS. DICHTER:**  Yeah.  And as I said, we rest on our

briefing that a termination is distinct from the vacatur at issue here.

**THE COURT:**  Let me ask just procedurally.  It's a very unusual situation.  But we've got a pending case on the original order of this Court under the 705 order.  This seems collateral to that.  I mean, it's overlapping to a certain extent in the sense that some of the people that might be affected by this are also within the larger group, and yet one could say it's kind of collateral because it's a different theory.  It's no longer hinged on all the other things that the Court has opined.  It's really based on discrete language coming from the Supreme Court and the examination of (d)(3).

Is there any doubt that this Court could act one way or the other, either deny or grant this motion?

**MS. DICHTER:**  The Government's position is that the Court lacks jurisdiction.

**THE COURT:**  Because of the pendency -- I know, generally, there's no condition review.

**MS. DICHTER:**  Including over this vacatur notice that has a conclusion about the validity of these documents.

**THE COURT:**  I'm sorry.  Say it again.

**MS. DICHTER:**  The Government's position is that the vacatur is a determination with respect to an extension, and that "with respect to" language sweeps in any conclusion about the validity of these documents with an October 2nd date.

**THE COURT:**  Okay.  But in terms of my question about the pendency of an appeal -- sometimes an appeal divests the district court of jurisdiction over certain things, over things that are being appealed.  It doesn't divest the Court of jurisdiction over other matters.

Is there an argument -- is there a potential issue here about jurisdiction being divested because of the appeal, that kind of lack of jurisdiction?  I mean, I didn't see anybody argue that, but I always have to be cautious to make sure I know what I'm doing here.

**MS. DICHTER:**  Not that we have argued, but I'd like to reserve the right to talk about it with --

**THE COURT:**  You're not going to waive that argument, I take it.

**MS. DICHTER:**  No.

**THE COURT:**  Do the plaintiffs have any view?  Is this collateral?  Is that --

**MS. BANSAL:**  Yeah.  I would just say, I understand, Your Honor, that the Court is divested of jurisdiction to modify the prior postponement order or do something that would affect the issues that are pending on appeal.

But as you say, I think this is collateral.  I don't think it affects any of the issues that are pending on appeal; so I don't see why the Court would be divested of jurisdiction.

**THE COURT:**  Well, as a practical matter, it seems to

me that if I were to issue some kind of order, it would be in the interests of everyone, including the circuit court, to be able to -- if there's going to be an appeal, to hear this timely with the other. And right now, we've got some time. I could envision if I did issue some kind of 705 order limited to these folks, that there'd be an appeals process. And it seems like the Ninth Circuit would have time to accelerate briefing and have it heard concurrent.

I mean, I guess I'm guessing at this point. I don't know. But it does -- I do know that there's -- right now there's still a fair amount of time left.

**MS. BANSAL:** That's right. It's scheduled for July 16th.

**THE COURT:** July 16th is the argument date.

Okay. Let me just go back. In terms of the scope as well, if there is a window here, (d)(3) does say [as read]:

". . . such termination shall apply only to documentation and authorization issued or renewed after the effective date of the publication of notice . . . ."

It seems like the plaintiff wants to read this as the effective date of the termination, not of the notice. Normally, they would be aligned. There's not a question. But here, there was a notice. And normally, the effective date is what? 60 days or something after?

But there's an argument that there was no legal effect of that notice because of my 705 order.  But if you read it literally, it seems to be the effective date of the publication of notice, not the effective date of the termination.  Is that a fair distinction?

**MS. BANSAL:**  Except that I don't think that the statute or the termination notice itself contemplate two different effective dates.  The only effective date is when the termination takes effect.  There isn't an effective date of publication and then an effective date of --

**THE COURT:**  Where did I see the 60 days --

**MS. BANSAL:**  The 60 days is in subsection (b) -- (c)(V) I believe, Your Honor.

**THE COURT:**  C- --

**MS. DICHTER:**  If I may, the notice says the effective date is April 7th.  That's where --

**THE COURT:**  Oh.

**MS. DICHTER:**  -- the Government's --

**THE COURT:**  The notice says that.

**MS. DICHTER:**  -- taking that date from, yes.

**THE COURT:**  Oh, so it's in the notice?

**MS. DICHTER:**  Yes.

**MS. BANSAL:**  That's the effective date of the termination, Your Honor.

**THE COURT:**  Right.  And the vacatur notice, there's no

distinction between its effective date?  Just, it was effective immediately?

**MS. DICHTER:**  I believe it was effective immediately.

**THE COURT:**  Well, if we stick to the language of the statute, it does say "termination."  So it does seem like the termination notice would be the operative document.

The question is whether the Court could interpret that as being not just the effective date of the notice, as stated, but the effective date of the actual termination itself.

**MS. BANSAL:**  Yeah.  And if I may, Your Honor, that's the interpretation that preserves the reliance interest in this document.  And so if the document was issued after April 7th and it says that "Pursuant to the January 17th extension, your work authorization is extended 540 days" or "This is your new I94" and people are relying on that document, I think the reliance interests are the same.

It's obviously a unique situation where the termination did not go into effect on its effective date.

**THE COURT:**  Well, one could also parse this to the letters here.  And it says "See 8 U.S.C."  It doesn't just cite it.  It says "see."

**MS. DICHTER:**  That's the Government's position, Your Honor.

**THE COURT:**  Well, that could be interpreted several different ways.

Okay. Well, as often is the case, we are -- we're -- we have to deal with the dealt that -- the deck that is dealt to us, and I've got to make the best interpretations I can.

I do think that at least the singular message is fairly clear, that there's a certain group of folks who received documents with -- you know, that were authorized under the prior extension; and it's natural to think, too, that that lines up with a greater reliance interest when you have documents in hand.

What that window is and whether that extends to notices of action that don't have that expiration date, again, you could look -- if you try to read this textually like a statute, there's a question of whether the modifier of "October 2nd" modifies only the I94 or whether it modifies everything else.

And I've heard the argument that, well, obviously, it only applies to I94 because that's a document that typically has an expiration date. You typically don't have expiration dates for EADs and notices of action. But the gist of it was meant to -- of course, this could have been phrased a little differently so we didn't have this ambiguity, but it is what it is.

But I do think that there's a group, and it sounds like it's a fairly small, but not insubstantial, group that falls into this. So I'm going to look at this very shortly because I know I have to act very shortly, and we'll get out an order.

But in all likelihood, I think it's clear that there's

some group protected.  What I have to struggle with is who's in that zone and when the cutoff date is and whether folks who got an EAD or notice of action that doesn't expressly contain this date are included.  I'm inclined to think, for the reason I just stated, that it is.  And then the question is whether their reliance interest is kind of the crucible here versus a close reading of the statute, and that's where I have to take into account that the Court says "See (d)(3)."

All right.  So that while that is proceeding, I think then the question is:  What are we doing with sort of main case at this juncture?  And I do want to address the Government's request that we stay all proceedings and also reconsider the discovery orders.

So my view with that is that, notwithstanding everything that's happening and the fact that there's a pending appeal and a stay in place of my 705 order, nothing prevents, as I read it, this Court from moving forward to a resolution on the merits, whether that's by way of summary judgment, Rule 52 motion, trial, whatever, motion to dismiss, because, after all, it is only a 705 order.

Now, it may be that we learn something from the appellate proceedings that may affect the course of those proceedings. So, for instance, if the Court were to find ultimately that there's no judicial review or that the scope of review under the ADA -- APA is either narrow or broad, or however you want

to read it, obviously, that may affect what we do.

The question is whether we should sort of stop and do nothing and wait or whether we need to move ahead and then adjust as we go along.

And my inclination is that because of the time frames involved, there are dates that are coming up in the fall where, if this Court's order is reversed and Secretary Noem's vacaturs are given effect, that another group will be affected, I think, come -- October?  September?

**MS. BANSAL:**  On October 3rd, Your Honor --

**THE COURT:**  October 3rd.

**MS. BANSAL:**  -- there's 500,000 Haitian TPS holders who are scheduled to lose their status.

**THE COURT:**  All right.  And yet -- so now we're looking at a July 16th Ninth Circuit argument.

How long it takes for the Ninth Circuit to then rule, that window between that ruling and whatever happens and what might happen in October, et cetera, et cetera, gets shorter and shorter.

And if the Ninth Circuit rules on a procedural basis that, for instance, says the 705 order is not appropriate, maybe balance of hardships, or whatever, on some procedural ground that doesn't dispose of the merits, then we're in a situation where we probably should be deciding the merits fairly quickly.

So that's why I'm inclined to move forward, to kind of cut

to the chase.  Here's what I'm thinking.  I think there's some merit to the Government's alternative suggestion.  I know it was done in a status conference statement.  But we brief sort of the pure legal issues, partly because the ones that are fact-intensive, we've got discovery disputes; we've got things going on; we've got privilege claims; and that's going to be harder to resolve, I think, on a straight summary judgment.  I don't know.  Maybe they can.  I don't know yet.

But maybe it makes sense to have a briefing schedule that moves forward on the pure -- what we call the sort of pure legal questions, which are quite important to this case, obviously, knowing that that may be adjusted, that we may end up having briefing and then the Ninth Circuit decides, based on the appeal, and that may require some supplemental briefing.  But at least we've got a running start and I'll be able to respond to those fairly quickly.

And so I'm inclined to continue a briefing schedule, at least on legal questions that are quite important and may be dispositive, certainly will frame the issues to a large extent; to continue the discovery.

But because, if we brief the legal issues, we need not sequence the discovery quite as critical.  In other words, it doesn't have to be completed tomorrow in order to brief.  It will have to be completed soon because we may go on to the next stage fairly quickly and I want to resolve those discovery

disputes, but -- and I will want to get an update as to where we are on discovery.  But I'm not inclined to stop discovery altogether.  I think that should proceed, but it could proceed in an orderly way but still with deadlines in a fairly expeditious way.

And I will deal with the alleged non-compliance, which I want to get an update on.  And I may call upon a magistrate judge.  We did this last time in the *Ramos* case.  I think Judge Kim, who's familiar with these issues, I may call upon her to assist with some of the more granular issues that come up.

But that's my general thinking.  So it's half dealing with these motions, half kind of status conference.  But I think that's the map that I see, but I'd like to get your reaction to that.

And maybe I'll start, since it's the plaintiffs' case, with your views of what I just said.

**MS. BANSAL:**  Thank you, Your Honor.

Our plan is to move for summary judgment.  Our motion is due on Tuesday.  And we think it's very important that we be able to move not only on the purely legal claims, but also on -- we have an APA claim that the decisions violated the Administrative Procedure Act because they were pretextual. That claim we raised on the postponement motion.  There is now a different and fuller record supporting that claim.

**THE COURT:** Can you bring that -- I don't know exactly, as we sit here today, because things were moving the last time you filed. Are you in a position to file that motion, even though there's still matters you want to see?

**MS. BANSAL:** We are, Your Honor. We intended to ask the Court today. Our position is that we're prepared to file the motion. The record that we have is -- we think substantially strengthens some of the APA claims.

There's obviously still records that haven't been produced, and so we think that we should be able to address any new material on reply. The reply is currently scheduled for June 20th, I believe, Your Honor. But we believe that we can move forward on the existing summary judgment.

**THE COURT:** What is the current -- I know there was a -- I thought there was a stipulation on the briefing. What is the current briefing schedule?

**MS. BANSAL:** I know that our motion is due on Tuesday.

**THE COURT:** And Tuesday is the --

**MS. BANSAL:** June 3rd.

**THE COURT:** -- 3rd.

Opposition?

**MS. BANSAL:** Our reply is due the 27th.

**THE COURT:** 27th?

**MS. BANSAL:** The 27th of June, Your Honor, which is, I think -- I believe two weeks before the July 11th hearing.

**THE COURT:** And the opposition?

**MS. BANSAL:** I believe the 20th?

**MS. MacLEAN:** 17th.

**THE COURT:** 20th?

**MS. BANSAL:** 17th. Pardon me. 17th, June 17th.

**THE COURT:** And you are intending to file on both the legal issues and then the arbitrary and capricious pretext question of the APA?

**MS. BANSAL:** Yes, Your Honor. And there's also an APA claim that the Government here failed to follow -- failed to observe procedure required by law; specifically, that there was not the required consultation and country conditions review preceding both decisions.

And in light of the fact that we -- you know, the TPS holders are no longer protected by your stay order, it's extremely urgent that we be able to bring those claims on an expedited schedule, the current schedule.

**THE COURT:** And were you planning to also move on the equal protection claim or leave that for --

**MS. BANSAL:** No, Your Honor.

**THE COURT:** Okay. So this is all APA?

**MS. BANSAL:** Yes.

**THE COURT:** And we'd set the 7/11 hearing, but there's a 7/16 Ninth Circuit hearing.

**MS. BANSAL:** Yes. And my co-counsel said I perhaps

misstated.  The Haitian TPS holders' documents expire August 3rd.  It's not October.  It's August 3rd, is the current expiration date.

THE COURT:  And there's been no final action yet on that --

MS. BANSAL:  No.

THE COURT:  -- from the Secretary?

And there's also a pending parallel case in EDNY, and that briefing, as I recall, schedule had been also set up there.

MS. BANSAL:  There was argument there yesterday, Your Honor.

THE COURT:  Oh, there was an argument?

MS. BANSAL:  Yes.

THE COURT:  So it's fully been briefed and now argued?

MS. BANSAL:  Yes, Your Honor.

MS. VOUONG:  And I argued yesterday; so I can speak to that if you need me to.

THE COURT:  Oh, okay.  Is there anything I should know?

MS. VOUONG:  Judge Cogan is planning to wait, I believe, until at least next week, based off the fact that the vacatur determination for Haiti notes a June 4th date of the 60 days out --

THE COURT:  Yeah.

MS. VOUONG:  -- for a decision.

And pending before Judge Cogan are three motions.  There's our -- the plaintiffs' 705, defendants' motion to dismiss, and plaintiffs' partial motion for summary judgment, which aligns with what we have asked for in our joint status report.

And the summary judgment motion is on the *ultra vires* claim of the vacatur and whether or not the jurisdictional bars apply.

THE COURT:  Ah.  But not on arbitrary and capricious?

MS. VOUONG:  Not on -- not on the merits.  Not on the underlying merits of arbitrary and capricious or the equal protection claim.

THE COURT:  And that's left for -- what's the case management plan that Judge Cogan has for those?

MS. VOUONG:  We don't -- we haven't gotten any farther.

And that's the same in our other cases as well.  We also have one case in Maryland, *CASA*, which involves Venezuela, and then one case in Massachusetts, which is called *Haitian Americans United*, which involves Venezuela and Haiti.

THE COURT:  And those --

MS. VOUONG:  And all three of those have MSJ -- have the three motions kind of working in tandem:  our motions to dismiss, plaintiffs' motions for summary judgment.

The judges in Maryland and Massachusetts stayed their 705 briefing decisions pending your decision and the Ninth Circuit

appeal, but the MTDs and the MSJs are still going forward.

THE COURT:  And when are those going to be heard in those courts?

MS. VOUONG:  I don't think we have hearing deadlines yet.  We're finishing up the briefing next week, I believe, in *CASA* and shortly in the Massachusetts case, *HAU*.

THE COURT:  So that's being briefed, but no hearing date yet --

MS. VOUONG:  Not that I'm aware of.

THE COURT:  -- in those two courts?

MS. VOUONG:  Unless something has come in --

THE COURT:  Right.

MS. VOUONG:  -- during this week.

I've been trying to keep up with email, but I don't think that any hearing dates have been scheduled as of yet.

THE COURT:  And does that briefing on the MSJ include more than *ultra vires* and --

MS. VOUONG:  All three of them raise the same claim of *ultra vires* and the jurisdictional bars, plaintiffs' argument that the jurisdictional bars don't apply --

THE COURT:  Right.

MS. VOUONG:  -- meaning 1254a and also 1252(f)(1).

THE COURT:  Okay.  But not the question of, if you get past those jurisdictional bars, arbitrary and capricious, pretext?

**MS. VOUONG:**  Correct.  Those have not been --

**THE COURT:**  Just the legal --

**MS. VOUONG:**  Not on the MSJs, no.

**THE COURT:**  So what you kind of classified as purely legal questions.

**MS. VOUONG:**  Correct.

**MS. DICHTER:**  And just for clarity, that is what we were seeking here as the alternative, is more of like a bifurcated approach where we're not doing the equal protection claim at this time.

**THE COURT:**  Well, it sounds like there's no equal protection claim that's going to be moved on.  It's really the APA, arbitrary and capricious, pretext claims.

**MS. DICHTER:**  And also those.

**THE COURT:**  Yes.  So that's the addition.  That's the difference, it sounds like.  That's the one that you believe is sort of fact intensive that would be excluded under your alternative approach of just the legal cases.  It would be --

**MS. DICHTER:**  Right.

**THE COURT:**  -- more parallel with the other courts.

**MS. DICHTER:**  Right, because we don't think any discovery is needed beyond what's already been produced in the administrative record.

**MS. BANSAL:**  Your Honor, our position is, obviously, that every day that there's not a final decision in this case,

our plaintiffs are now subject to deportation, are now losing their jobs, and we need to move urgently towards a final resolution in this case.

THE COURT:  I wonder whether it makes sense, putting aside the scope of the motions for a moment, to defer our hearing until after we at least hear what the Ninth Circuit has heard.  I mean, we may have a more intelligent -- maybe not.  You never know but...

MS. BANSAL:  I think that the challenge there is the timing for Haiti in particular, Your Honor.  It's literally three weeks after the hearing.

THE COURT:  Well, do you know if relief is being sought with respect to the Haitian TPS beneficiary before Judge Cogan?

MS. BANSAL:  Yes, it is, I believe.

MS. VOUONG:  Yes.  The 705 has been filed and briefed and argued before Judge Cogan, yes.

THE COURT:  Okay.  And that's for the Haitians and for --

MS. VOUONG:  Just for Haitians.

MS. BANSAL:  Just for Haitians and just, if my understanding is right, Your Honor, on the *ultra vires* claim.

THE COURT:  Okay.  I'm just looking at the schedule here.

Well, putting aside the scope for a moment, we could

proceed with the schedule, and we could hear it.  But I may end up asking for supplemental briefing or a second round of hearings.

There's something to be said to try to lay the groundwork as much as possible to get the parties' positions out and be familiar and then see what needs to be adjusted based on what we get.

There's something also to be said for preserving resources here.  But on the other hand, it's not like this is brand-new briefing.  I don't know how much is going to be new.  But it's not like you're going to start from scratch.

**MS. DICHTER:**  May I respond to an earlier point?

**THE COURT:**  Yes.

**MS. DICHTER:**  Just to point out that there is no 705 motion here for Haiti.

**THE COURT:**  Yeah.

**MS. DICHTER:**  So any of these points about Haiti's immediate harm, for lack of a better way to phrase it, just hasn't been brought by plaintiffs at this point through a 705 motion.

**THE COURT:**  Right.  And I take it the gist of your point is that with all the briefing, any 705 motion is not hard -- I mean, it won't be hard to figure out after we go through this round of briefing because there's not going to be anything particularly new on the merits.

**MS. BANSAL:** Your Honor, our intention for Haiti was, on the current schedule, to be able to seek a 706 set-aside with the record that we have developed and based on the certified administrative record. That, we feel, is the best way to protect the interests of the Haitian TPS holder plaintiffs, and so that's how we intended to proceed with the case, rather than --

**THE COURT:** You are in a position to file your motion with what you have now, and you feel you've got some information that's useful that's different from with the original 705 motion?

**MS. BANSAL:** Yes, Your Honor. The certified administrative record shows that there was no actual deliberation or information that supports any of the bases for the vacatur for either country, which is very helpful on the pretext claim, and there's also strong evidence that there was no required consultation or country conditions review.

**THE COURT:** Okay. Let me ask. Why don't we jump to the discovery question in terms of where are things at right now. I know there was a reply and a letter and things were sort of moving. What are the main areas of dispute now at this point?

**MS. MacLEAN:** Good afternoon, Your Honor.

**THE COURT:** Good afternoon.

**MS. MacLEAN:** What we are seeking with our discovery

filings, which I'm not sure if Your Honor has seen the joint letter brief that was submitted yesterday afternoon --

**THE COURT:**  With your reply brief --

**MS. MacLEAN:**  My apologies for the late timing.

**THE COURT:**  -- or is that different?

**MS. MacLEAN:**  There was a reply brief, and there was also a joint letter brief related to deliberative process privilege and a dispute there.  That is Docket Entry 159.

**THE COURT:**  Yes.  Okay.  I have that.

**MS. MacLEAN:**  So essentially, with regard to our discovery-related filings, 154 and 159, what plaintiffs are seeking is essentially compliance with this Court's May 2nd and May 9th orders.

We have received very few records in response to Your Honor's order that records be produced related to communications with key decision-makers.  There were 20 decision-makers, 20 custodians that were identified, a limited time period of one month for three monumental decisions, and defendants have produced approximately 100 records.

These include, basically, no actual communications.  Most of the records that have been produced are duplicates of documents that are either publicly available, like Federal Register notices, or documents that had already been produced in the Federal Register notice.

For example, approximately one-third are copies of just two documents, the Secretary of State recommendations with regard to TPS for Venezuela from Secretary of State Blinken and then Secretary of State Rubio.  Very few actual substantive communications were produced.

Defendants have provided a privilege log, but there's very few records that are included on the privilege log as well, about 450, including supplemental entries that were produced this week.  And it is possible --

**THE COURT:**  When you say "450 entries," on the log or 450 --

**MS. MacLEAN:**  On the log.

**THE COURT:**  So there are a total of how many entries on that privilege log?

**MS. MacLEAN:**  There's 450 entries on the privilege log and 100 documents that have been produced.

Again, most of the documents that have actually been produced are not actual communications.  So it's a quite small universe of documents that have even been logged, let alone documents that have actually been produced; and, of course, it's very possible that there was very little deliberation for these three momental decisions or, you know, basically no process at all.  But the privilege log does make clear that there should be other documents that have been produced -- that should have been produced that have not been produced.

Just a few examples.  There are numerous days -- again, this is a one-month period, a very limited period of time. There are numerous days with no documents logged at all, including the first four days after the inauguration, January 20th through 23rd, which is the last four weekdays before the Secretary signed the vacatur decision, and February 20th to 24th, which are the five days before the publication of the Federal Register notice.

Also, the very first privilege log entry is from January 24th at 11:00 p.m. at night.  That's a Friday before the Monday signature on the decision notice from Secretary Noem.  And what that privilege log entry says, again, on Friday night at 11:00 p.m. is that there's a request for a weekend review of the draft vacatur notice that would be signed by Secretary Noem on the Monday.

What led to the request that there be reviews and revisions to the vacatur notice for Venezuela?  Were there communications amongst the key custodians that led to that?  It is inconceivable for such a monumental decision that affects 600,000 people, that the only communications related to that decision that led to the drafting and review and finalization of the vacatur notice were in-person communications of which there is no record.

**THE COURT:**  And you're saying that the privilege log doesn't show any communications during those periods?

**MS. MacLEAN:**  During -- from January 20th to 11:00 p.m. on the night of the 24th, there are zero entries in the privilege log, despite that period being part of the period that Your Honor had identified and, actually, the parties had stipulated to as part of the time period of the search and production of records.

**THE COURT:**  So has there been an updated production with respect to, there's a problem with the search, some systematic problems with the Purview standard, and there was going to be a further data pull, Benjamine Huffman's data, the OR, capital O-R, et cetera?  Has that part now been resolved?

**MS. MacLEAN:**  Partially.  And I wouldn't say "resolved."

But there were -- there was production on the 27th of additional documents.  Again, that was 20 documents that were actually produced that carry the same problems with the first production:  basically, no communications; basically, documents that were already publicly available or part of the certified administrative record; and an additional, I think, 77 documents that were logged in the privilege log that have the same deficiencies as the previous logs.

The custodian, Benjamine Huffman, we believe that there has not yet been a search and production of Mr. Huffman's records.

So other custodians that had been identified as not having

been searched or not having been reviewed and the documents not having been produced or logged.  All that is communicated on the declaration at, I think it's 153-1, is that -- and the related filing from Tuesday from the defendants, is that those would be produced as soon as possible.  We're now three days in, and we've asked repeatedly for more information about how many documents are at issue and when those will be produced, and we've not been able to get any answer.

We don't believe, especially given the universe of documents that we're talking about, such a limited window of time, the number of documents that have actually been produced and logged thus far, that the review and production or logging of those documents should take this long.

THE COURT:  So if you were to request right now a further search, what specifically would you ask for that would be concrete?  Which custodians?  How would you phrase the additional search effort that should be made?

MS. MacLEAN:  The one major problem that we believe is apparent from the search is that it seems that there -- and including in the declaration that was provided from DHS on Tuesday morning, is that there's a very limited search of the communication tools that custodians almost certainly relied on.

There's a search of government emails, the One Drive, et cetera.  We have numerous custodians, including Secretary Noem and her chief advisor, Corey Lewandowski, who

have signed onto clearance records approving of these decisions.  Mr. Lewandowski's signature says he has also approved this by email, but there are zero emails and zero documents that are attached to him.  So our view is that defendants have not searched the communication tools that the custodians are relying on in all instances.

So what we would request is that there be a requirement from this Court, which we think is already implicit in Your Honor's prior orders, that the defendants search all forms of communication used by the custodians for government business, including non-government email, text, and messaging applications, to the extent that they were relied on for the Government business related to the challenged actions, and including paper documents and documents that may be on the hard drives of the custodians.

From the declaration -- the Marbray declaration on 153-1, it does not appear that those have been searched.  And the fact that we're getting so few documents that are even logged and that certain key custodians are identifying zero --

**THE COURT:**  So which custodians -- if you could narrow to get to the core issues here and not just anybody possible, who would you identify as the custodians for which this expanded, more expansive, complete search of the communication tools, against whom, which custodians?

**MS. MacLEAN:**  Your Honor, we don't think this is

expanded.  We think that this is actually what Your Honor had ordered.

THE COURT:  Okay.  But who would you identify as --

MS. MacLEAN:  So we're talking about a very limited window of time.  And defendants have already identified about 20 custodians.

What we think and what we've asked of defendants over the course of the last week is that they inquire of the custodians if they used any other means of communication aside from those that are identified in the Marbray declaration which had been searched and, if they have, to search those means of communication.

So, for instance --

THE COURT:  So the query would go to these 20 identified custodians?

MS. MacLEAN:  Yes, Your Honor.

THE COURT:  And that would include the Secretary as well as Mr. Lewandowski?

MS. MacLEAN:  Yes, and Mr. Law.  There's a list of, you know, 20 custodians that they've already identified.  My presumption is that, you know, there would be some subset of those custodians who have not used messaging applications or personal emails for government business.  But clearly, some of these custodians, for whom there are zero or only a handful of documents, despite their very high-level involvement in these

decisions, suggests that there are other means of communications that have not been searched that should be searched for those custodians.

THE COURT:  So that's the main problem?

MS. MacLEAN:  That is one of the main problems, yes. I would say that's the main problem with regard to the adequacy of the search.

THE COURT:  And then there's the issue of what to do with the privilege log?

MS. MacLEAN:  Yes.  And just to follow up on something that my co-counsel shared, we do believe that we should be able to use the documents that have been -- that hopefully will be late produced in our reply briefing, and so we'd like an accommodation to be able to do that.

Your Honor had identified that we may need to deal with some of these fact-specific or fact-intensive issues at a later date.  We would just note this is an accommodation that Your Honor permitted during the *Ramos* litigation as well, where there was fast-paced production of records and, in our preliminary injunction reply, we were able to use records that were produced later in the litigation.

In that case, the number of documents that the Government was required to produce and did produce numbered in the thousands.  Here, we're talking about documents that are produced that are in the hundreds, and it's taking longer to

actually produce some of those documents than was true in the *Ramos* litigation.

**THE COURT:** All right. Let me get a response.

I'm trying to get practical here. And it sounds like what the plaintiffs are asking for, it's a query to the custodians that have been identified, whether they use other means other than government email and One Drive, such as messaging, texting, non-government emails, paper docs, to see whether and who might have used other means to talk about this subject and then to make that inquiry.

What's your response?

**MS. DICHTER:** Okay. Well, I have several responses, but I understand this is what you want to focus on.

I just want to point out that a lot of things that plaintiffs' counsel is asking for is already happening, and defendants' position is that there doesn't need to be court intervention at this point. Yes, it hasn't been perfect, but we are clearly trying to comply and moving as quickly as we can to continue searching through the data and, as you can see from the May 29th production, make these productions as quickly as possible.

So in response to some of the points about potential data, documents missing, there may be more productions coming, assuming there are things that are responsive and non-privileged, and we are truly working around the clock to

make that happen as quickly as possible.

Regarding the ask for private personal conversations, DHS has a policy prohibiting the use of personal phones for official business.

And these private individuals have a clear privacy interest in avoiding disclosure of their personal text messages without some compelling reason, especially where there's already a policy prohibiting it.  It seems astonishing that we would be -- I don't even know how we would go about doing it.

**THE COURT:**  Well, but what do you mean by -- if somebody uses their personal phone but is conducting business on it, saying, "Here's a draft --

**MS. DICHTER:**  Well --

**THE COURT:**  -- "of blah-blah-blah," is that what you're including?

I don't think they're asking for private communications. Just if it happened to be sent -- we all have multiple emails. If you happen to send it by private email and not the dot-gov email but it's all about business, are you suggesting that that's not within the realm of coverage?

**MS. DICHTER:**  Correct, because these employees have work phones.  They're using the work messaging system, which is Teams, which is being searched.  This all comes up on the One Drive, which is the equivalent of a hard drive for this particular system.

This would be --

**THE COURT:** What if an employee just happens to use their Gmail account for convenience, or whatever, and there's a critical country conditions draft report or some comment on that or something about that? Not what I had for breakfast or where I'm going on vacation, but I mean something that's clearly business but happened to be on one of their channels, which --

**MS. DICHTER:** That would be --

**THE COURT:** -- happens quite often, is my guess.

**MS. DICHTER:** That would be prohibited conduct under the policy.

**THE COURT:** Well, it may be prohibited, but that doesn't mean it doesn't exist and it's not relevant.

**MS. DICHTER:** I guess I'm struggling to understand what that would mean, like taking everybody's personal cell phones? And how would those be searched?

**THE COURT:** Well, I think the first question -- I thought the first step is to make the query to people: Have you sent emails about the vacatur and the Venezuelan TPS thing, within this window, on private email, for instance? And the answer may be "no," and then that's it.

**MS. DICHTER:** I believe --

**THE COURT:** If the answer is "yes," then we have to reach a question: Well, how do you -- do we have them self --

how do you protect their privacy and yet still vet relevant information?

**MS. DICHTER:** I believe that query has been asked, but I don't think that there is a -- I think if that query -- you want that query to be done again, I think defendants are not opposed to that.

**THE COURT:** Well, wouldn't that be the first step?

**MS. MacLEAN:** That would, of course, be the first step, Your Honor. We've asked that over the course of the last week. We've been told that counsel has asked DHS to make that inquiry. We've gotten no confirmation that that inquiry has been made. And we note that that does not -- is not included at all in the Marbray declaration, that that inquiry has been made.

And so to the extent that's been made, we would want to ensure that there is a declaration from someone with personal knowledge of the inquiry and the response to be able to confirm that that has been made and what the response is.

**THE COURT:** And if it ends up that some folks discovered that they did use their personal email or phone to convey business matters, do you have a procedure that you would suggest as to how one -- how that inquiry should be made and how that search should be made?

**MS. MacLEAN:** I don't have particular insight at this stage into how that search should be made.

I don't think that this is a novel issue that has come up. We've cited some cases where, you know, chats, for instance, have been recognized as forms of communication that should have been preserved and should have been searched by the party.

And I imagine that Your Honor may have dealt with this before; but to the extent it's useful to provide some supplemental brief with a recommendation on that, we'd be glad to do that. I don't have something at this point about how to do that, but I think Your Honor is correct that there's various different ways that you could implement that in the cases of custodians who have used other communication, not with other communication tools, notwithstanding that that is contrary to government policy.

THE COURT: And let me ask this. It's almost -- the interests are somewhat perhaps inverted; and that is, if the Government produces -- unable to produce anything more, maybe because it's in private hands or whatever it is, because you're trying to -- your theory is based on a dearth of evidence and a dearth of discussion and a lack of substantiation, isn't there sort of self-interest on their part to try to find stuff? This is not looking for the smoking gun that's going to -- unless somebody admits "I hate this group." It's interesting, because it may be that the Government may be at its own disadvantage in not recovering things.

MS. MacLEAN: Certainly true, Your Honor.

The record, as it currently is, based just on the privilege log, shows that the vacatur was the beginning and end point of the deliberations that the Government has made, both with regard to the Haiti decisions and with regard to the Venezuela decisions.

We believe we are, nonetheless, entitled to the record evidence that may also show the animus and other deviations from the normal process that would help substantiate our claim. But certainly, the dearth of evidence is also very compelling for other aspects of our claim.

**THE COURT:** Well, let's do this. I think -- you say that the inquiry was made. Let's confirm that the inquiry was made. And you should report the results back in terms of are there or are there not custodians. And if there aren't any, you can state that in response or some form, certify that in a letter.

If there are responses, then we should -- I'd like you to meet and confer to see if there's a way, whether through self-search or some -- you know, it may depend on how many, how big and how many people, mindful of the privacy interests of private tools. But to the extent people have not followed the rules -- and I dare say that I bet you that happens in commerce, probably happens around here quite a bit, people just use whatever is at their disposal. Sometimes they're at home, whatever. Let's find out if there are any and get a sense of

the volume and then think about a way to filter those, while keeping mindful of the privacy interests.

Seems to me there's a way to do it.  May not be perfect, but there should be a way to do it.

**MS. MacLEAN:**  Your Honor, I would just --

**THE COURT:**  So the first step is the query.

**MS. MacLEAN:**  Thank you, Your Honor.

We would note that we are seeking also a declaration from someone with personal knowledge, not just the assertions of counsel.  It seems that in some cases, counsel does not have full information, is not conducting the search directly, and so a declaration from someone with personal knowledge about the inquiry and the responses seems critical here.

The one other issue that we had identified is that in the Marbray declaration from Tuesday, there's identification of other searches, unrelated to this issue, that defendants have done where documents have not been reviewed and produced or logged, and there's no date certain by which defendants will produce those documents, and there's no identification of how many documents are at issue.

We have asked this of defendants over the course of the week and have not gotten an answer.  We believe that defendants should be able to provide an answer and to produce the documents that have been identified and not produced no later than Friday, given that these were identified on Tuesday.

**THE COURT:** All right. Response?

**MS. DICHTER:** Well, Your Honor, this is the exact reason we really could use more time. We are trying to provide all the answers to all the questions as quickly as we can. We did note that we are doing more searches because we recognize that there were some blind spots that we were trying to produce. A month would be ideal. Then we could resolve all these disputes. But the fast pace that we're going at, it's impossible to do it and make it perfect.

**THE COURT:** Do you know what the rough volume of these documents are?

**MS. VOUONG:** I think it's like two mega- -- I don't know.

**MS. DICHTER:** I think -- it's about double, I think, what our original production was, but please don't hold me to that. We should be able to let you know soon. And there again, just to be clear, they're going through the review process and they're not all going to be responsive and some of them will be privileged.

**MS. MacLEAN:** Just to be clear, the original production and logging was about 550 documents, and the idea that the U.S. Government would need a month to review and produce 500 documents or to log them seems --

**THE COURT:** Yeah. Well, and we don't have a month, is the problem. So if I need to set a date, I'll set a date. It

seems to me, looking at the briefing schedule -- you want this stuff in time for your reply.

**MS. MacLEAN:** We want that -- I mean, what we need -- the resolution that we need for the reply specifically is related to the assertions of privilege, which we can talk about subsequently, because right now what we're expecting from the documents that have been identified, but not reviewed and logged, is something that we've received so far, which is, you know, a couple of handfuls, probably, of documents that we've already received and then a privilege log identifying documents that they've identified that show something based on, you know, who they're sent from and to and the dates.

But we presume, based on what we've seen thus far, that virtually all of the documents that are going to result from this review process are going to be asserted to be privileged.

**THE COURT:** All right. So what's your proposed timeline?

**MS. MacLEAN:** So what we would like is for that initial step to be made because we believe that that is essential for Your Honor to make the determinations that we believe are also going to be necessary to resolve the privilege disputes, one of which we've identified in our filing yesterday, but we believe there may be others that cannot be resolved between the parties.

So with regard to these specific documents that are

identified in the Marbray declaration, we believed -- we believe that those should be reviewed and either produced or logged promptly.  They were identified on Tuesday.  We think it's probably several hundred documents that need to be produced and logged.  That process is already ongoing.  We don't understand why it should take more than a week to do that.

**THE COURT:**  All right.  I'm going to require that to be produced by Friday of next week, the 6th.  That gives more than a week.  It's almost ten days from when they were produced.  And that means the production of the documents or privilege log -- is that what you're seeking?

**MS. MacLEAN:**  Yes.

**THE COURT:**  And then we're going to have a larger and larger privilege log.  Right?

**MS. MacLEAN:**  Yes.

**THE COURT:**  And are you then going to identify which of those entries you think are critical to your case or worthy of -- because there's already, you said, 400 -- or several hundred entries.

**MS. MacLEAN:**  Yes.  It is impossible for us to identify which of those are most compelling based on the really sparse entries in the privilege log.  But we believe Your Honor and Magistrate Judge Kim have dealt with this before, at least with regard to the deliberative process privilege, in the *Ramos*

case.

In that context, again, where we were dealing with thousands, not hundreds, of documents that the Government had identified as subject to the deliberative process privilege, Magistrate Judge Kim and Your Honor reviewed documents that were selected by both plaintiffs and defendants *in camera* and determined that deliberative process privilege, to the extent that it applied, should be overcome as a qualified privilege.

**THE COURT:** Well, so that's my question. Before -- I'm not going to give a 1000-item privilege log to Judge Kim to resolve. There's got to be some identification, whether it's by meet and confer or selection. And I know some of it's the cart before the horse, but we have to have some -- we're dealing with time deadlines here, and there's got to be some accommodation.

So do you have a suggestion as to how that would go forward?

**MS. MacLEAN:** Yes. Based on past practice in the *Ramos* litigation and what we've seen thus far and Your Honor's analysis of some of these issues in your May 2nd and May 9th orders, we believe that there should be presumptive disclosure of documents that are asserted to be subject to the deliberative process privilege.

The way that Your Honor dealt with this in *Ramos* is that you identified that there may be the possibility that

defendants could identify some subset of documents for which the deliberative process privilege should not apply.

I will note that in that case, in that context, the Government then identified 15 documents that they produced to Magistrate Judge Kim to ascertain whether there was -- based on an argument that there -- that the deliberative process privilege should not apply to those documents.

THE COURT: Wait. The defendants identified 15 documents that they thought the privilege should not apply?

MS. MacLEAN: Sorry. That the privilege should apply.

THE COURT: Okay.

MS. MacLEAN: After both Magistrate Judge Kim and then Your Honor rejected the deliberative process privilege as applied to, essentially, all of the documents for which the deliberative process privilege had been asserted, after a review of a sample of documents --

THE COURT: Yes.

MS. MacLEAN: -- that was presented both by plaintiffs and defendants.

But Your Honor, in an abundance of caution, had said that there may be some subset of documents for which there is a heightened need for non-disclosure.

In that context, after defendants presented 15 documents for which they said there was a heightened need for the continuation of the deliberative process privilege protections,

Magistrate Judge Kim rejected that.  So all of the items that had been asserted as subject to the deliberative process privilege in *Ramos* were ultimately ordered to be disclosed.

We think that that is strong evidence, in addition to Your Honor's analysis of the legal issues at play in your May 2nd and May 9th orders, for presumptive disclosure -- presumptive overruling of the deliberative process privilege.

**THE COURT:**  All right.  So I'm trying to discern from you exactly what the procedure is.

Am I hearing you to say what we should do is a repeat? That the defendants -- once we have the privilege log by the 6th, that the defendants would identify a certain number of those, like 15 where they feel the privilege is most compelling and then there'd be, like, a bellwether ruling on those?  Or what are you suggesting?

**MS. MacLEAN:**  We believe that Your Honor can make a determination now that the deliberative process privilege is not properly asserted here for the documents for which there is a deliberative process privilege.

**THE COURT:**  Okay.  Let's say that's not going to happen here and now.  What's your process?

**MS. MacLEAN:**  Well, we would welcome -- and we don't believe that this needs to wait until after the 6th because we currently have a privilege log that we could do this from.

We would welcome a process that was similar, as an

alternative, to what Your Honor had created and Magistrate Judge Kim had done previously, which is that plaintiffs and defendants identify a subset, a sampling of documents for review.  I think in that case it was something like 15 or 20 documents that had been identified by both sides for review.  And after reviewing those documents, Magistrate Judge Kim recognized the deliberative process privilege, to the extent it applied, should be overruled.

We think that that process should move forward quickly. We are, you know, open, if Your Honor believes it necessary, for, you know, an option that defendants could present a small subset of documents, as Your Honor identified in that *Ramos* ruling, for which, despite that assertion of the -- that finding that the deliberative process privilege was not applicable here, that --

**THE COURT:**  So what do you suggest as -- this is going to go to Judge Kim.  And you want both sides to meet and confer and identify a sampling of documents; correct?

**MS. MacLEAN:**  Yes.  We believe we could do that very quickly.

**THE COURT:**  When?

**MS. MacLEAN:**  We believe we could do that by Tuesday or Wednesday.  Let's say Wednesday because our summary judgment motion is due on Tuesday.

**THE COURT:**  So by 6/4, if you were to meet and confer

and identify from the current privilege log, whatever is added to that -- I don't know -- 20 documents that you think are exemplary and representative?

**MS. MacLEAN:** Yes.

**THE COURT:** And get a ruling from Judge Kim, and then further meet and confer, report back to this Court?

**MS. MacLEAN:** I mean, we would hope for an order from Judge Kim at that point about how -- whether the deliberative process privilege is properly asserted and can be --

**THE COURT:** Well, she could rule on the ones that you've identified. And you want her to rule more broadly at that point?

**MS. MacLEAN:** Yes. That is what happened previously, and we believe that that was appropriate. What Magistrate Judge Kim identified after that sampling was that those documents, to the extent that the sampling is representative, demonstrate that the deliberative process privilege was --

**THE COURT:** All right. What I'm going to do is order the parties to meet and confer and identify, let's say, up to 20 documents that you want rulings on by Judge Kim. You're to do that by --

**MS. VOUONG:** And can I respond to that?

**THE COURT:** Well, let me finish. Then you can respond.

**MS. VOUONG:** Sure.

**THE COURT:**  -- by 6/4.

And I will leave it to her whether, based on that sampling, she can make a more generalized ruling or whether she's going to direct the parties to meet and confer or what the process should be, knowing the short timelines we're dealing with, to see if those can be resolved one way or the other.

So, go ahead.

**MS. VOUONG:**  Sure.  I just wanted to go back a little bit.

Is the decision, then, that the MSJ motion will -- the partial MSJ, I guess, will cover the APA merits claim?

**THE COURT:**  At this point, I'm going to include those as we originally --

**MS. VOUONG:**  And then --

**THE COURT:**  -- spoke.

**MS. VOUONG:**  -- I know that plaintiffs want this case to follow the exact same pattern as *Ramos*, but I don't think that that should be the template here.

We can identify, I think -- is it 20 documents per side that are sent to Judge Kim?

**THE COURT:**  Well, I said 20.  I didn't know about per side.  But I was hoping -- I want to keep it manageable for Judge Kim.  If you want to go 25, or something, to give you a better sampling.  But I don't want to -- I've got to be

respectful of -- I haven't even asked her yet.  But I have to be respectful of her schedule.  And if I start telling her "You're going to have to look at 50 documents," that may run into some resistance.  So some number in that neighborhood.

MS. VOUONG:  Okay.  And then we are -- I actually -- I wasn't involved in the *Ramos* process, so I don't know how it works, if we send them via email.  Will there be more information about how we should do that?

THE COURT:  I'll have -- I can have her set up the process.  You might file something under seal.  I don't know. Processing by email.  I'll let her dictate what it is she needs from you, if there's anything more than identifying those documents and seeing those documents.

MS. VOUONG:  Okay.  And then we would also like the opportunity, then, to brief whether or not it's proper to completely remove the entire deliberative process privilege --

THE COURT:  Yeah.  I --

MS. VOUONG:  -- which we see as an extreme -- an extreme remedy.

THE COURT:  And it may be.  But I think that's something that -- if what we're asking her to do is more than kind of a bellwether ruling and you want something broader, then, obviously, that should be briefed to her.

But that may -- I think, again, I'm going to defer to her in the first instance whether she wants to take that on or feel

like she's only going to do a bellwether and then ask you-all to meet and confer.  And then we can decide at that point: Where do we go from here?  Time is short, but we do have to resolve it one way or another.

MS. VOUONG:  And then I will, once again --

THE COURT:  I think it's a good first step.

MS. VOUONG:  -- relay our request for more time because of this process.

It just necessarily will take time.

THE COURT:  Well, for just identifying documents?

MS. VOUONG:  No, I understand that.  But as far as, like, the briefing and --

THE COURT:  Oh.

MS. VOUONG:  Plaintiffs are trying to push us into this schedule for, I guess at this point, January -- "January" -- June --

When is your reply due or -- when is your reply due?

MS. MacLEAN:  Our reply is due June 27th.

MS. VOUONG:  June 27th.

So they're seeking to have everything accomplished by June 20th.  And I would note that that's three weeks from now.

THE COURT:  Well, yeah, but, I mean, that's kind of the nature of things.  This is all moving fairly quickly for all of us.

So I'm going to put that schedule in place.

I first have to communicate with Judge Kim and let her kind of run with the privilege question.

Meanwhile, I am going to order the production of the supplemental documents that have been discovered by the 6th.

**MS. VOUONG:** If there is a stay entered by Judge Cogan in EDNY for Haiti, would we be -- we, the Government, be permitted to seek a greater schedule then of the entire MSJ briefing?

**THE COURT:** So if he issues a 705 stay, you mean?

**MS. VOUONG:** Or kind of any order that stays the deadline on Haiti or a decision by the -- you know, or a decision that comes out by the Secretary regarding what happens with Haiti, if that pushes out a deadline.

**MS. MacLEAN:** Your Honor, we'd just note that it's not just Haiti that's at issue. Because of the stay that the Government sought at the Supreme Court, 350,000 Venezuelan TPS holders are currently without status.

**THE COURT:** Well, I think the schedule that we set is appropriate, given the circumstances. Obviously, if something extenuating happens, maybe there's a little bit of breathing space because I am keeping an eye on the Ninth Circuit as well. But I do want to keep this train moving because I think the merits adjudication is, at least for now, separate from the 705 question.

So I'm going to keep the schedule as is, and my intent is

to adhere to that schedule.  If there's any adjustment -- request for adjustment, I'll hear it, but don't assume and don't count on that.

MS. MacLEAN:  Thank you, Your Honor.

I would just note that to the extent that there is a sequencing where the identification of the documents to be reviewed by Judge Kim is the first step and briefing is the second step, we would propose that the identification of the documents and briefing happen simultaneously.  We believe that we could do that by the same date that Your Honor identified, June 4th.

We've -- both parties have included a framing of these issues already in the deliberative process privilege joint letter brief that was submitted yesterday.  Unfortunately, too late for Your Honor to review.  But we would just request that it be possible just to keep the train moving, as Your Honor identified, to hold --

THE COURT:  So this would be briefing on the privilege question?

MS. MacLEAN:  On the privilege question as -- for Judge Kim to have the benefit of the parties' positions on privilege at the same time as Judge Kim has the documents in hand --

THE COURT:  And you've already essentially sketched that briefing --

**MS. MacLEAN:**  Yes.

**THE COURT:**  -- from both sides?

**MS. MacLEAN:**  Including -- I mean, obviously, it could be further elaborated; but Docket Entry 159 includes the frame; and obviously, *Ramos* is not --

**THE COURT:**  Well, I think that should accompany the privilege log because, otherwise, she's working on sort of thin air.  She needs to know your respective positions, obviously.  So I think that's appropriate.

I thought I -- I sort of assumed that you wouldn't just say, "Here's Documents 1 through 25," that there'd be some explanation.  I don't know how extensive it needs to be, but something for her to be able to make that judgment on.

So, yes, I assumed that there would be some -- whether it's a joint letter or however or you build it into the table.  I've seen that with evidentiary objections, with kind of explanation of each side's position, whatever way is convenient.

**MS. MacLEAN:**  Thank you, Your Honor.

**THE COURT:**  Okay?

**MS. MacLEAN:**  Can I just --

**THE COURT:**  So --

**MS. MacLEAN:**  -- make one --

**THE COURT:**  Yes.

**MS. MacLEAN:**  -- additional point, if I may?

**THE COURT:** Okay.

**MS. MacLEAN:** The deliberative process privilege is one of the privileges that plaintiffs believe has been overasserted by defendants.

In this case -- and it seems this is where -- one area where *Ramos* and this case diverge -- we believe that the attorney-client privilege has also been overasserted.

For all communication -- for 80 percent of the communications that have been logged, defendants have asserted the attorney-client privilege along with the deliberative process privilege, and the deliberative process privilege has only been asserted on its own for about 20 percent of the documents.

So what we would just request is, to the extent that we're not able to reach a resolution on that, to be able to brief that as well. I don't know if that's too much to give to Magistrate Judge --

**THE COURT:** That's okay, but that should be included in the 20 or 25, whatever. If you want to devote a certain subset of that to the attorney-client because that seems to be an issue, then you should do that. But I don't want to give her double -- I don't want to give her 50, 25 of one and 50 --

**MS. MacLEAN:** Your Honor, they're overlapping, in our view, based on what we've seen in the privilege log. It's just we would want to make sure, to keep things moving, that we're

allowing an opportunity to brief and have a resolution on both the deliberative process privilege --

**THE COURT:**  Yeah, that should be briefed to her as well if you want her to resolve that question.

**MS. MacLEAN:**  Thank you, Your Honor.

**THE COURT:**  So essentially, I have, in effect, denied the motion to stay all proceedings.  We're going to move forward.

I'm denying the motion to reconsider, obviously, my application the Court's prior discovery orders.

I am -- and with respect to the motion for non-compliance, we're going to do what I just ordered with respect to the process of identification of -- and the query about use of other communication means and what we have already ordered at this point on the 4th and on the 6th.

So that's how we're going to proceed in that matter.  And then I will issue an order on the -- I want to think a little bit about the preservation motion of the status and rights. But that is the upshot of what we've done today.

We should reconvene probably pretty shortly, just see how things are going.  So we should choose another date.

Now, the briefing is going to be -- you're going to be well underway by late June.  I'm wondering if we should have a status conference maybe on the 24th of June.

**MS. VOUONG:**  Could that be via Zoom, Your Honor?

**THE COURT:**  We can do that by Zoom.

**MS. VOUONG:**  Thank you.

**THE COURT:**  Yeah, since it's a status.

Why don't we set that at 3 o'clock.

Oh, that's late for you.

**MS. VOUONG:**  That's 6 o'clock.

**THE COURT:**  That is late.  Okay.  Why don't we set it -- why don't we set it at 1 o'clock our time.

**MS. VOUONG:**  Thank you.

**THE COURT:**  Okay.  And that's on the 24th, Zoom, status.

And I will alert Judge Kim that things are coming her way.

**MS. MacLEAN:**  Thank you, Your Honor.

**THE COURT:**  All right?

All right.  Thank you, Counsel.  Appreciate it.

**MS. VOUONG:**  Thank you.

**THE COURTROOM DEPUTY:**  Court is in recess.

(Proceedings adjourned at 4:49 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Wednesday, June 4, 2025

_Ana Dub_

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter