Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
[Additional Counsel Listed on Next Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R., HENDRINA VIVAS CASTILLO, A.C.A., SHERIKA BLANC, VILES DORSAINVIL, and G.S., <br><br> Plaintiffs, <br><br> vs. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA, <br><br> Defendants. | Case No. 3:25-cv-01766-EMC <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date:   August 1, 2025 <br> Time:  10:00 am <br> Place:  Courtroom 5, 17th Floor |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*Pro Hac Vice*)
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
Diana Sanchez (SBN 338871)
dianasanchez@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*Pro Hac Vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

BACKGROUND .................................................................................................................... 2

    A.    Venezuela Vacatur ................................................................................ 2

    B.    Venezuela Termination ........................................................................ 4

    C.    Haiti Partial Vacatur ........................................................................... 8

STANDARD OF REVIEW .................................................................................................... 9

ARGUMENT ........................................................................................................................ 10

    I.    THIS COURT HAS SUBJECT MATTER JURISDICTION .................................. 10

    II.    THE CHALLENGED DECISIONS VIOLATED THE APA ................................ 12

        A.    Secretary Noem Lacked Authority to Vacate
            Venezuela's Extension ................................................................. 12

        B.    The Vacatur was Arbitrary and Capricious and Without
            Observance of Procedure Required by Law .................................. 15

        C.    The Venezuela TPS Termination Violated the APA ...................... 17

        D.    The Partial Vacatur of Haiti's TPS Extension and
            Redesignation Violated
            the APA ....................................................................................... 18

    III.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE
          SUMMARY JUDGMENT FOR DEFENDANTS ON
          THE DISCRIMINATION CLAIM ........................................................... 20

CONCLUSION ..................................................................................................................... 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Methyl Corp. v. EPA,*
    749 F.2d 826 (D.C. Cir. 1984) ...........................................................................................13

*Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ..............................................................................................................20

*ATF v. Fed. Labor Relations Auth.,*
    464 U.S. 89 (1983) ................................................................................................................15

*Biden v. Texas,*
    597 U.S. 785 (2022) ..............................................................................................................11

*CASA de Maryland, Inc. v. Trump,*
    971 F.3d 220 (4th Cir. 2020) ...............................................................................................10

*CASA de Maryland v. Trump,*
    981 F.3d 311 (4th Cir. 2020) ...............................................................................................10

*China Unicom (Ams.) Ops. Ltd. v. FCC,*
    124 F.4th 1128 (9th Cir. 2024) ...............................................................................12, 13, 14

*Chuang v. Univ. of Cal. Davis, Bd. of Trs.,*
    225 F.3d 1115 (9th Cir. 2000) .............................................................................................20

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1977) ..............................................................................................................10

*Civil Aeronautics Bd. v. Delta Air Lines, Inc.,*
    367 U.S. 316 (1961) ..............................................................................................................14

*Dep't of Commerce v. New York,*
    588 U.S. 752 (2019) .........................................................................................................11, 15

*DHS v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ..................................................................................................................11

*Dubbs v. CIA,*
    866 F.2d 1114 (9th Cir. 1989) ...............................................................................................9

*Gorbach v. Reno,*
    219 F.3d 1087 (9th Cir. 2000) (en banc) .............................................................................12

*Haitian Evangelical Clergy Ass'n v. Trump*,
    No. 25-CV-1464 (BMC), --- F. Supp. 3d ---, 2025 WL 1808743 (E.D.N.Y. July 1,
    2025) ....................................................................................................................................12

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ...........................................................................................10

*Latecoere Int'l, Inc. v. U.S. Dep't of Navy*,
    19 F.3d 1342 (11th Cir. 1994), *as amended* (May 27, 1994) ............................................9

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ...........................................................10

*Nat. Res. Def. Council v. Regan*,
    67 F.4th 397 (D.C. Cir. 2023)........................................................................................12, 13

*Oberdorfer v. Jewkes*,
    583 F. App'x 770 (9th Cir. 2014) .........................................................................................9

*Occidental Eng'g Co. v. INS*,
    753 F.2d 766 (9th Cir. 1985) ..............................................................................................10

*Oceana, Inc. v. Bryson*,
    940 F. Supp. 2d 1029 (N.D. Cal. 2013) (Chen, J.) ............................................................21

*Organized Village of Kake v. U.S. Dept. of Agriculture*,
    795 F.3d 956 (en banc) ................................................................................................18, 20

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019). Dkt. 199 ...............................................................16

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) ..............................................................................................9

*Washington v. DHS*,
    No. 4:19-CV-5210-RMP, 2020 WL 4667543 (E.D. Wash. Apr. 17, 2020)..........................9

*Wilkinson v. Garland*,
    601 U.S. 209 (2024).............................................................................................................11

**Statutes**

8 U.S.C. 1254a(b)(3)...................................................................................................... *passim*

8 U.S.C. 1254a(c)...............................................................................................................7

**Other Authorities**

63 Fed. Reg. 15437 (Mar. 31, 1998).................................................................................17

77 Fed. Reg. 59943 (Oct. 1, 2012) .................................................................................................17

90 Fed. Reg. 5961 (Jan. 17, 2025) ........................................................................................6, 16, 18

90 Fed. Reg. 8805 (Feb. 3, 2025) ........................................................................................ *passim*

90 Fed. Reg. 9040 (Feb. 5, 2025) ........................................................................................ *passim*

90 Fed. Reg. 10511 (Feb. 24, 2025) .................................................................................9, 11, 22

1

**<u>INTRODUCTION</u>**

2      Defendants fail to rebut Plaintiffs' compelling case for summary judgment on their APA

3   claims—as to both the claims they pled in their motion to postpone and new theories based on the

4   evidence obtained in discovery. As to the latter, documents produced in discovery have

5   overwhelmingly confirmed that there is no genuine issue of material fact as to whether Defendants'

6   decisions to vacate, partially vacate, and terminate TPS for Venezuela and Haiti were the product of

7   reasoned agency decisionmaking. They were not.

8      The evidence shows Defendants knew that the official justification provided for the

9   Venezuela vacatur—alleged confusion caused by the extension's consolidated registration process—

10  was false. Defendants searched for evidence of confusion, but found instead that consolidation had

11  simplified the registration process. They vacated anyway, in order to clear the way for termination.

12  In fact, the vacatur and termination were so interchangeable in the minds of agency officials that,

13  while working on the vacatur, they referred to it as a termination. The evidence further shows that

14  Defendants began preparing the Venezuela termination notice before the vacatur decision was

15  finalized—and before any country conditions review or interagency consultation was conducted.

16  What little country conditions review ultimately occurred was slanted and ends-oriented. USCIS

17  staff were instructed to "input the data and rationale supporting the termination" into the *already*

18  *drafted* "termination package." In order to do so, they focused their review on identifying "positive

19  improvements." When none could be identified on a particular topic, such as political repression and

20  human rights, they simply deleted the topic entirely from their country conditions analysis. The

21  evidence shows the Haiti partial vacatur decision was similarly preordained, and the rationale

22  contrived. Finally, far from considering the reliance interests of Venezuelan and Haitian TPS holders

23  who had applied for and received protections under the vacated extensions of TPS for their country,

24  the evidence shows Defendants affirmatively *removed* information about the large number of re-

25  registrants from the Decision Memo provided to the Secretary, because USCIS found it

26  "concern[ing]."

27      In addition, this Court previously found Plaintiffs likely to prevail on their claims that the

28  Venezuela vacatur exceeded the Secretary's authority and was arbitrary and capricious, even *without*

1

this extensive evidence of impropriety. The vacatur issue is primarily legal; unsurprisingly, Defendants have failed to show a genuine dispute of material fact that would disturb this Court's prior, well-reasoned conclusion that the agency lacks free-standing vacatur authority to circumvent the TPS statute's detailed timing and procedural requirements. As to the arbitrary and capricious claim challenging the propriety of the Secretary's reasons for the vacatur, the evidence obtained in discovery again leaves no room for doubt. Not a shred of evidence shows there was any actual confusion caused by the consolidation of registration processes. If anything, the opposite was true.

For these reasons, this Court should grant summary judgment and reinstate the protections it established earlier through its order on Plaintiffs' motion to postpone. Venezuelan TPS holders are currently being fired from their jobs, detained in immigration jails, separated from their U.S. citizen children, and deported to a country where they fear for their safety. These catastrophic harms are happening pursuant to Defendants' unlawful vacatur and termination decisions. *See* Declaration of Emilia Garcia. Haitian TPS holders will face the same fate as early as soon as September 2, 2025. This Court should grant Plaintiffs' Motion and set aside the vacatur and termination of Venezuela's TPS designation, and the partial vacatur of Haiti's TPS designation, because they exceed the Secretary's authority, and are arbitrary and capricious, contrary to law, and without observance of the procedures required by the TPS statute.

## **BACKGROUND**

There is no genuine dispute of fact that the challenged TPS decisions were not the product of reasoned review, as the statute requires. The reasons the government provided in the Federal Register notices for each decision were a pretext to reach the politically-required result.

### A.      Venezuela Vacatur

The Venezuela vacatur decisionmaking process was brief and ends-oriented; the agency did not evaluate country conditions or consult with the State Department. DHS senior staff began to "draft[] the TPS vacatur notice" for Venezuela on January 24, the day *before* Secretary Noem's confirmation. Declaration of Jessica Karp Bansal, Ex. 1[1] (Jan. 24 6:43 pm). On January 25, the

---

[1] Unless otherwise specified, all references to "Exhibit," "Exhibits," "Ex." or "Exs." refer to exhibits attached to the Declaration of Jessica Karp Bansal.

1    Office of General Counsel directed staff to find the rationale and finalize the vacatur notice without

2    questioning the end result: they were "not at all interested in revisiting the substance of whether [the

3    vacatur] should go forward." Ex. 2 at 2 (Jan. 25 4:57 pm).

4         The agency's official "Reasons for the Vacatur" were that the extension's consolidated

5    registration process was allegedly novel and confusing. 90 Fed. Reg. at 8807. The evidence shows

6    that, while agency officials *searched* for evidence that the consolidated registration process resulted

7    in confusion, they found the opposite. On January 25, USCIS Director-Nominee Joe Edlow

8    requested evidence that the registration process "presented operational challenges" so he could

9    describe those challenges in "the draft [vacatur] federal register notice." Ex. 3 (Jan. 25 9:23 am); *see*

10   Ex. 4 at 1 (Jan. 25 12:25 pm: Edlow adds "operational concerns with the [extension] notice" to the

11   draft vacatur notice and offers to have subject matter experts "flesh out more if needed"). But USCIS

12   operational personnel reported instead that the *lack* of consolidation *prior* to the extension had

13   resulted in "confusion." Ex. 5 (Jan. 25 10:32 am: describing operational difficulties arising from the

14   existence of two separate cohorts with "two different sets of validity dates").[2] Personnel drafting the

15   vacatur also circulated a 2023 analysis which described the challenges associated with "[t]wo

16   different designation dates for Venezuela TPS" – challenges that would have been ameliorated by

17   the consolidated registration process. Ex. 7 at 1-2 (Jan. 25 4:51 pm: recognizing that the different

18   dates "may lead to confusion" and that concurrent dates for the two designations would be "[l]ess

19   confusing" and "[c]onsistent with the general practice").

20        Accordingly, by January 28, when Secretary Noem made the vacatur decision, Dkt. 103-1 at

21   VZ Vacatur_0005, the agency was well-aware that—as this Court also previously observed—the

22   extension's "streamlining … would tend to eliminate, not create, confusion." Dkt. 93 at 57. Yet

23   Secretary Noem asserted the opposite in the Federal Register notice. 90 Fed. Reg. at 8807. *See also*

24   Ex. 20 (USCIS "can most efficiently process [Venezuela TPS applications] by consolidating the re-

25   registration filing processes for the two Venezuela TPS populations").

---

[2] USCIS, which is typically responsible for leading the periodic review process, was otherwise
almost entirely uninvolved in the vacatur decision. Ex. 6 (Jan. 25 1:12 pm: email to USCIS OP&S
director on Saturday afternoon, while the Venezuela vacatur notice is being drafted, asking for
relevant dates for Venezuelan TPS "if they look to vacate TPS").

1      The evidence further shows the true purpose of the vacatur was to clear the way for a

2    termination decision that was underway before the vacatur was finalized. *See* Ex. 10 at 1 (Jan. 27

3    12:51 pm: requesting data to support "a project involving termination of TPS status"); Ex. 11 (Jan.

4    27 10:59 am: Office of General Counsel simultaneously "work[ing] on the memo for the vacatur

5    notice" and circulating a "shell for a termination notice"); Ex. 12 at 1 (Jan. 27 8:11 am: Chief of

6    Provisional Protections Branch at OP&S Humanitarian Affairs Division, which is typically

7    responsible for TPS recommendations, recognizing that DHS is "going to try to terminate the

8    previous S1 decision"). The projects were interchangeable in the minds of agency officials: on

9    January 26, senior DHS officials circulating the draft vacatur notice actually referred to it as a

10   "termination notice." Ex. 13 at 4 (Jan. 26 1:42 pm). When DHS Acting General Counsel Joe

11   Mazzara received confirmation that the vacatur notice had been published on January 30, he

12   responded: "Great. Where are we with Vz termination?" Ex. 14 at 1 (Jan. 30 10:28 am).

13      **B.      Venezuela Termination**

14      On February 1, 2025, just three days after Secretary Noem signed off on the vacatur decision,

15   she signed off on the decision to terminate TPS for Venezuela. Dkt. 104-1 at VZ Termination_0006.

16   Rather than reviewing country conditions and then assessing whether conditions for designation

17   continued to be met, the Secretary and her subordinates searched for evidence to support their

18   preordained decision to terminate.

19      Typically, USCIS's Refugee, Asylum, and International Operations (RAIO) Directorate and

20   the State Department provide objective country conditions reports to inform a TPS decision. Dkt.

21   166, Ex. 16 at 21-23 & n. 38. Here, agency officials "created a shell for a termination notice" before

22   any country conditions analysis was conducted. Ex. 11 (Jan. 27 10:59 am: circulating shell

23   termination notice); Ex. 15 at 1 (Jan. 29 1:17 pm: circulating country conditions report and USCIS

24   Decision Memo two days later).[3] USCIS staff were directed to "input the data and rationale

25

26   _____
     [3] The DHS Office of General Counsel led the drafting of the Termination Federal Register notice, a
27   function traditionally performed by USCIS. Dkt. 166, Ex. 16 at 30 ("USCIS generally takes about 2
     weeks to draft the [Federal Register] notice"); *id.* at 83 (typically, "the purpose of [the General
28   Counsel's] review is generally to provide relevant technical comments and ensure that complete
     information has been gathered for the Secretary's review").

supporting the termination" into the already drafted "termination package." Ex. 16 at 1 (Jan. 30 12:16 pm: "OGC EO Tracking & Coordination"). RAIO was given one day to conduct research focusing on "any improvements" in country conditions in Venezuela. Ex. 17 (Jan. 28 12:42 pm); Ex. 18 (Jan. 27 6:40 pm: producing a "list of sources which discuss the topics covered in the August 2024 Venezuela COI report for TPS," with "updated information" on a deadline of end of January 27); Ex. 19 (circulating the "updated … sources" with "positive improvements highlighted"). DHS instructed RAIO to produce the country conditions update even before the vacatur was signed. When researchers could not identify improvements in a particular area—such as political repression and human rights, or food insecurity—USCIS excised that topic from the Secretary's consideration. *Compare* Ex. 20 (Jan. 9, 2025 Biden-era Decision Memo addressing political repression and human rights, and food insecurity), *with* Dkt. 166, Ex. 13 (Jan. 31, 2025 Trump-era Decision Memo with no section on political repression and human rights, or food insecurity); *see also* Ex. 19 at 2, 4 (USCIS unable to identify "positive improvements" in political repression and human rights or food insecurity).

The State Department did not provide *any* updated country conditions report at all. The sum total of "consultation" with the State Department consisted of a recommendation letter from Secretary Rubio introduced into the file on January 31, at the eleventh hour. Ex. 15 (Jan. 29 1:22 pm: circulating USCIS Decision Memo and noting the lack of recommendation or country conditions from the State Department); Ex. 22 (Jan. 31 10:34 am: "waiting on DOS anyway"); Ex. 23 at 1 (Jan. 31 4:29 pm: "letter from the Secretary of State … regarding TPS Designation for Venezuela"); Ex. 24 (Feb. 3 2:03 pm: USCIS OP&S Chief circulating State Dept recommendation, which they had not seen: "this was apparently rec'd late Friday/early Sat and provided to S1 before the decision deadline").

The resulting country conditions information was incomplete and lopsided. A side-by-side comparison between the Decision Memo provided to Secretary Noem on January 31, Dkt. 166, Ex. 13,  and the one provided to Secretary Mayorkas just weeks earlier, on January 9, Ex. 20, reveals jarring omissions and wholly unexplained inconsistencies:

| Topic | January 9 Memo (Ex. 20) | January 31 Memo (Dkt. 166, Ex. 13) |
|-------|------------------------|-----------------------------------|
| Food Insecurity | "Venezuela 'suffers the second-highest level of hunger in South America,' with '[s]ome 5.1 million people […] not getting enough to eat.' The U.N. Special Rapporteur on the right to food reported that '[f]ood insecurity, malnutrition and deterioration in livelihoods is cited as the primary cause for the mass migration out of the country." (p. 4) | Not addressed. |
| Political Repression & Human Rights | "Conditions have grown worse due to harsher crackdowns by Maduro and his representatives on the opposition and their use of thoroughly flawed elections to seize full control of state institutions." (p. 8) | Not addressed. |
| Access to Basic Services (Including Electricity, Water, & Fuel) | Describes ongoing shortages of fuel and natural gas; "growing challenges to access water and sanitation since the …. quality of water has deteriorated;" and daily power outages. (pp. 5-6) | No mention of fuel, natural gas, or sanitation.<br><br>States that power outages have "diminished" in the last six months. (p. 3) |
| Health Crisis | "The collapse of Venezuela's healthcare system is one of the most severe aspects of its humanitarian crisis."<br><br>Describes deteriorated healthcare infrastructure, persistent shortages of medicine, **worsening health indicators**, and "**re-emergence**" of vaccine-preventable and previously eradicated diseases, like diphtheria and **measles**. (pp. 6-7) | Heading changed from "Health Crisis" to "Public Health."<br><br>Notes "incremental **improvement in** … **life expectancy** … from 2000 to 2024."<br><br>States that U.N. vaccination program "contributed to declaring Venezuela **free of measles** in November 2023." (p. 3) |

The incomplete, skewed country conditions information in the January 31 Decision Memo formed the basis for Secretary Noem's conclusion that "notable improvements" "allow for [Venezuelan] nationals to be safely returned to their home country," 90 Fed. Reg. 9040, 9042 (Feb. 5, 2025), directly contradicting Secretary Mayorkas's conclusion just three weeks earlier that "extraordinary and temporary conditions, including a severe humanitarian emergency marked by an economic contraction, deepening poverty, reduced access to food and medicine, a collapse in basic services, fuel shortages, human rights abuses and political repression, crime and violence continue to prevent Venezuelan nationals from returning in safety." 90 Fed. Reg. 5961, 5966 (Jan. 17, 2025).

1    In addition to searching for "improvements" in conditions in Venezuela, DHS also sought

2  evidence that could justify termination on national interest grounds.[4] Ex. 10 at 1 (Jan. 27 12:51 pm:

3  "This is a project involving termination of TPS status and we need to tell the data story if can be.").

4  Again providing researchers a one-day deadline, the agency sought data showing that "TPS … is a

5  pull factor" for migration. *Id.* at 2; *see* Ex. 28 (Jan. 27 10:55 am: DHS asking USCIS OP&S for

6  information "by the end of the day tomorrow to make a decision on Venezuela TPS by Friday"); Ex.

7  29 (Jan. 27 11:05 am: "It is a very short turnaround (end of day tomorrow)."). In response, USCIS

8  staff explained that "factors within Venezuela fueled the emigration crisis" and that "[i]nformation

9  on migration patterns as they may relate to a TPS designation are not available." Ex. 30 at 1; *see also*

10  Ex. 31 at 1 (Jan. 27 11:01 am: explaining that "there were studies conducted a few years ago [on

11  whether TPS is a pull factor], but they weren't very conclusive"). Nonetheless, the Termination

12  Federal Register notice asserts that "[t]he anticipated designation or extension for TPS and resulting

13  benefit to access EAD have been pull factors driving Venezuelan nationals to the United States." 90

14  Fed. Reg. at 9043.

15    DHS also sought data about "gang violence" in Venezuela which would support its

16  preordained termination decision. Ex. 10 at 2. None was forthcoming. The Termination Federal

17  Register Notice asserts that "[a]mong these Venezuelan nationals who have crossed into the United

18  States are members of the Venezuelan gang known as Tren de Aragua." 90 Fed. Reg. at 9042. But

19  the Termination Notice does not assert, nor did USCIS ever find, that the population *of TPS holders*

20  "includes members of Tren de Aragua." *Contra* Dkt. 199 at 5. Indeed, an individual who has been

21  convicted of more than one misdemeanor or who can be regarded as "a danger to the security of the

22  United States" is statutorily ineligible for TPS. 8 U.S.C. 1254a(c)(1); 8 U.S.C. 1254a(c)(2)(B)(ii)

23

---

24  [4] The initial USCIS draft Decision Memo recommended termination based only on "notable
improvements" in country conditions, rather than national interest. Ex. 25 at 4 (Jan. 29 AM draft
25  termination Decision Memo). Later that afternoon, a new draft recommended termination based on
the *Secretary's* national interest determination. Ex. 26 at 5 (Jan. 29 PM draft termination DM: "[T]he
26  Secretary has determined that it is contrary to the national interest of the United States to permit
Venezuelan TPS beneficiaries to remain in the United States). In the final draft, on January 30,
USCIS tentatively adopted the Secretary's conclusion as its own. Ex. 27 at 5 (Jan. 30 PM draft
27  termination Decision Memo: "*USCIS* believes that it *may* be contrary to the national interest of the
United States to permit Venezuelan TPS beneficiaries to remain in the United States." (emphasis
28  added); *see* Dkt. 166, Ex. 13 at 5 (final signed Decision Memo with the same language).

1   (citing 8 U.S.C. 1158). Similarly, the *only* basis for USCIS's ultimate conclusion that the continued

2   presence of Venezuelan TPS holders in the United States "may be" contrary to the national interest

3   did not reference TPS holders at all: "Given the noted criminal activity of some Venezuelan

4   nationals, we recommend the Secretary terminate the TPS designation of Venezuela." Dkt. 166, Ex.

5   13 at 5. In suggesting a mass revocation of status for 600,000 Venezuelans based on alleged

6   "criminal activity" of some individuals generalized to the entire group, the reasoning in this

7   statement is "the classic example of racism." Dkt. 93 at 66. *See infra* Section III.

8       Finally, DHS was aware that Venezuelan TPS holders had already re-registered pursuant to

9   the January 2025 extension but sought to downplay this fact in the Decision Memo and, ultimately,

10  the Federal Register notice. In revising the Decision Memo in support of termination, USCIS

11  removed references to people who had re-registered "since [Acting Director Jennifer Higgins] is

12  concerned with that." Ex. 33 at 2 (Jan. 30 8:26 pm); Ex. 34 at 2 (Jan. 31: draft Decision Memo

13  removing paragraph on existing EADs with Oct. 2, 2026 expiry dates). The final Federal Register

14  notice emphasized that "any putative reliance interests on the extension notice are negligible." 90

15  Fed. Reg. at 8807.

16      **C.    Haiti Partial Vacatur**

17      Defendants made the decision to partially vacate TPS for Haiti over a ten-day period. Ex. 35

18  (Feb. 4 10:54 am: DHS Office of General Counsel circulated "TPS Haiti Docs" for February 5 TPS

19  meeting); Ex. 36 at 1 (Feb. 14 2:29 pm: OGC submitted the "Notice re Partial Vacatur for TPS

20  Haiti" to the DHS office). As with Venezuela, the partial vacatur was predetermined, with vacatur

21  the only outcome DHS leadership deemed permissible from the start. No country conditions review

22  or State Department consultation took place. During the very first agency conversation about "TPS

23  Haiti," DHS senior leadership discussed "[r]educ[ing] … length [of Haiti's designation] to 12

24  months" to "[a]llow[] more review" and "review of national interest in real time." Ex. 37 (Feb. 5:

25  apparent notes of TPS Haiti meeting taken by senior DHS official). In searching for a rationale (and

26  apparently not realizing that an 18-month extension period is typical, and that Secretaries have not

27  historically elaborated on their reasons for choosing a particular time period, Dkt. 166 ¶ 30) officials

28  raised the question, "Why was the full 18 month given? Was not given any review." Ex. 13.

1    The DHS's Chief Advisor's only question in his final review and "clearance" of the

2    Secretary's partial vacatur decision was, "Why is this only a partial?" Ex. 38 at 1 (Feb. 17 9:22 am)

3    – a striking statement given that 50,000 Haitians already had employment authorization documents

4    (EADs) issued with a February 2026 end date. Ex. 39 at 3 (Feb. 11 2:46 pm). The Secretary

5    ultimately provided that "USCIS will not recall TPS-related documentation previously issued with

6    February 3, 2026, expiration dates and those documents remain valid through the new TPS Haiti

7    designation period expiring on August 3, 2025."  90 Fed. Reg. 10511, 10514 (Feb. 24, 2025). USCIS

8    subject matter experts recognized this as a "unique" scenario not contemplated by the regulations,

9    Ex. 40 at 3-4 (Feb. 12 3:32 pm, 3:49 pm), and raised concerns that "employers and benefit-granting

10   agencies are not going to know what to do." Ex. 21 at 13.

11   **<u>STANDARD OF REVIEW</u>**

12       Defendants are wrong to suggest that, as to their motion for summary judgment against

13   Plaintiffs, Plaintiffs must show "as a matter of law" that Defendants violated the APA, rather than

14   that there are no material disputes of fact based on the administrative record. *See* Dkt. 199 at 7. The

15   cases they cite nowhere state that Rule 56 is inapplicable, and a material factual dispute on the issues

16   Defendants submit for judgment would preclude summary judgment for Defendants. *See Latecoere*

17   *Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1344 (11th Cir. 1994), *as amended* (May 27, 1994)

18   (applying dispute-of-material-fact standard in APA case involving evidence outside "formal

19   record"); *Oberdorfer v. Jewkes*, 583 F. App'x 770, 773–74 (9th Cir. 2014) (applying traditional

20   summary judgment standard in reviewing a challenge to agency decision); *Sierra Club v. Bosworth*,

21   510 F.3d 1016, 1022 (9th Cir. 2007) (same). There is also no question that factual disputes would

22   preclude summary judgment against Plaintiffs' constitutional claim. *See* Dkt. 199 at 21–22; Dkt. 74

23   ¶¶ 212–15; *Washington v. DHS*, No. 4:19-CV-5210-RMP, 2020 WL 4667543, at *6 (E.D. Wash.

24   Apr. 17, 2020) ("Recent Ninth Circuit caselaw supports" non-APA constitutional claims); *see also*

25   *Dubbs v. CIA*, 866 F.2d 1114, 1118 (9th Cir. 1989) (fact disputes precluded summary judgment on

26   claim that CIA unconstitutionally denied "security clearances to all homosexuals").

27       To the extent Defendants argue that, at summary judgment in APA cases, the Court cannot

28

9

1  entertain facts outside the record, they are also incorrect.[5] Dkt. 199 at 7. Where a court appropriately

2  orders that the initial record be supplemented or extra-record discovery be taken—such as where

3  plaintiffs allege bad faith, abuse of authority, or a failure to consider relevant factors—the Court may

4  look at undisputed facts beyond the initial administrative record to grant summary judgment on

5  plaintiffs' claims. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–17, 420

6  (1977) (summary judgment appeal); *accord Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir.

7  2005). Defendants' cases are not to the contrary. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766,

8  769 (9th Cir. 1985) ("*De novo* factfinding" by district court allowed in "limited" situations.).

9  <u>**ARGUMENT**</u>

10  **I.    THIS COURT HAS SUBJECT MATTER JURISDICTION**

11        Defendants recycle their jurisdictional objections, Dkt. 199 at 8-9, but give the Court no

12  reason to abandon its well-reasoned rejection of these same arguments in its ruling on the motion to

13  postpone. Dkt. 93 at 23-27. Defendants suggest the Supreme Court's stay order dictates reversal on

14  jurisdiction, Dkt. 199 at 8 n.15, but, as noted previously, that decision contained no reasoning and

15  therefore necessarily made no law.[6] Moreover, the order itself contemplates continuing litigation

16  from which either side could seek certiorari review, which would make no sense if the stay order

17  itself dictated the result of that litigation. And the second paragraph of the Supreme Court's stay

18  order suggests relief for a subset of TPS holders (which this Court has now granted, Dkt. 162). To

19  the extent one can draw any inference from the Supreme Court's inscrutable order, it would suggest

20  the Court believed there was subject matter jurisdiction to grant that relief.

21        Beyond positing that the Supreme Court's order must have precedential effect as to

22  jurisdiction, Defendants only recycle arguments this Court has already rejected. They read

---

[5] Defendants have waived any objection to consideration of extra-record evidence by failing to file
any response to Plaintiffs' Motion to Consider Extra-Record Evidence. Dkt. 172. Defendants'
passing reference to extra-record evidence in the Standard of Review section of their brief is
insufficient to resurrect the issue.

[6] Defendants cite *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 230 (4th Cir. 2020) on the effect
of a Supreme Court stay, but fail to disclose that the cited panel opinion was subsequently vacated en
banc. *See CASA de Maryland v. Trump*, 981 F.3d 311 (4th Cir. 2020) (granting rehearing en banc
and vacating panel decision). As the Supreme Court itself has repeatedly made clear, its stay orders
have no precedential effect. *See Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J.,
concurring) ("To reiterate: the Court's stay order is not a decision on the merits.").

10

1    "determination" to encompass virtually any TPS decision, but this ignores the statutory context and a

2    large body of law construing that term more narrowly. Dkt. 93 at 25-26 (citing, *inter alia*, *McNary v.*

3    *Haitian Refugee Ctr.*, 498 U.S. 479 (1991); *City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865

4    (9th Cir. 2009)). Defendants' attempts to distinguish these cases based on the text of the TPS statute

5    were also already rejected by this Court, which already explained that the statute's use of "any" and

6    "with respect to" cannot somehow broaden the meaning of "determination." Dkt. 93 at 24 n.8 ("The

7    key is what constitutes 'determination.'"). Defendants' arguments that "determination" has a broader

8    meaning are also contrary to the Secretary's own use of that term in the Register notices at issue. 90

9    Fed. Reg. at 8807 (using "determination" to refer only decisions to extend or terminate TPS); 90

10    Fed. Reg at 10512 (same).

11        Defendants also argue for some vague form of immigration policy deference, but the

12    Supreme Court and Ninth Circuit have repeatedly rejected such arguments both by finding

13    jurisdiction in immigration cases, *see, e.g.*, *Wilkinson v. Garland*, 601 U.S. 209 (2024); and by

14    rejecting the government's attempts to immunize itself from the requirements of the APA in this

15    context. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 806–807 (2022) ("[U]nder the APA, DHS's exercise

16    of discretion within that statutory framework [for paroling asylum seekers into the country from

17    detention in the border region] must be reasonable and reasonably explained."); *DHS v. Regents of*

18    *the Univ. of Cal.*, 591 U.S. 1 (2020) (striking down rescission of DACA under APA).

19        Defendants make an arguably distinct argument that "national interest" determinations are

20    unreviewable because there are no justiciable standards to apply when assessing them. Opp. at 10.

21    However, Plaintiffs do not challenge the propriety of the Secretary's national interest determination;

22    they argue the statute does not permit consideration of national interest in a periodic review process;

23    and that the Secretary's reasons for reaching the conclusion were pretextual. Such claims are plainly

24    cognizable under the APA. *See Dep't of Commerce v. New York*, 588 U.S. 752 (2019) (reversing

25    agency decision because reasons provided were pretextual).

26        Finally, Defendants suggest in passing that Section 1252(f)(1) bars "set aside" relief under

27    the APA, but most of the rationale underlying this Court's holding that Section 1252(f)(1) does not

28    bar postponement relief applies to set asides as well. Indeed, much of the precedent the Court cited

1    involved set asides. Dkt. 93 at 18-19 (citing, *inter alia*, *Monsanto Co. v. Geertson Seed Farms*, 561

2    U.S. 139 (2010); *Texas v. United States*, 40 F.4th 205 (5th Cir. 2022)).

3    **II.      THE CHALLENGED DECISIONS VIOLATED THE APA**

4         **A.      Secretary Noem Lacked Authority to Vacate Venezuela's Extension**

5         The Court should grant summary judgment on the vacatur authority claim for the reasons set

6    forth in its prior detailed opinion on the issue, Dkt. 93 at 44-55, and elaborated in Plaintiffs' motion,

7    Dkt. 165 at 13-15, 20-21. *See also Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-CV-1464

8    (BMC), --- F. Supp. 3d ---, 2025 WL 1808743, at *7-*9 (E.D.N.Y. July 1, 2025) (granting Plaintiffs'

9    motion to set aside partial vacatur of Haiti's TPS designation "[b]ecause Secretary Noem does not

10   have statutory or inherent authority to partially vacate a country's TPS designation"). Defendants

11   concede that a statute authorizing an agency to grant a benefit does not grant implied authority to

12   rescind that benefit if the statute either (a) sets forth a specific statutory process for reconsideration

13   or (b) explicitly limits reconsideration.[7] Dkt. 199 at 10-11. Defendants also acknowledge the TPS

14   statute (a) sets forth a specific statutory process for terminating a TPS designation and (b) explicitly

15   limits when and why termination can occur. *Id.* Nothing more is required to grant summary

16   judgment for Plaintiffs.

17        Nonetheless, Defendants rely on a misleading, altered quotation from *China Unicom (Ams.)*

18   *Ops. Ltd. v. FCC*, 124 F.4th 1128, 1149 (9th Cir. 2024) ("CUA"), to argue that the TPS statute does

19   not foreclose implied reconsideration authority because it does not contain a "statutory procedure for

20   [*a vacatur*] that the agency could be said to be evading by relying on implied authority." Dkt. 199 at

21   11 (quoting *CUA*, 124 F.4th at 1149) (alteration in Defendants' brief) (emphasis added). Defendants'

22

23   ───────────────

     [7] Contrary to Defendants' assertion, Opp. 10, Plaintiffs do very much disagree with how Defendants
24   frame the question of agency reconsideration authority. In Defendants' view, agencies have
     reconsideration authority unless Congress has *foreclosed* that authority. *Id.* But agencies have no
25   authority to do anything—including reconsider a prior decision—unless Congress *grants* that
     authority. *See Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023) ("[I]t is axiomatic
26   that administrative agencies may act only pursuant to authority delegated to them by Congress.");
     *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc) ("The formula the government
27   urges, that what [an agency] can do, [it] can undo, is sometimes true, sometimes not."). This Court
     need not decide which framework is correct, however, because the TPS statute clearly forecloses
28   reconsideration authority.

1    alteration to the quoted language in *CUA* is misleading, because *CUA* does not say implied

2    reconsideration authority is foreclosed only where there is a specific statutory procedure for "a

3    vacatur." Rather, *CUA* says implied reconsideration authority is foreclosed wherever there is a

4    specific statutory procedure for "revo[king]" or "altering an agency's grant of a certificate, waiver or

5    other authorization." 124 F.4th at 1149. The TPS statute provides a process for revoking or altering a

6    country's TPS designation. 8 U.S.C. 1254a(b)(3) (laying out process for periodic review,

7    terminations, and extensions of designations). Accordingly, "[i]t is not reasonable to infer an implied

8    authority that would allow [the] agency to circumvent those statutory procedural protections." *CUA*,

9    124 F.4th at 1149 (internal quotations and citation omitted).

10        Indeed, courts regularly find agencies lack implied reconsideration authority where the

11   governing statute provides a forward-looking mechanism to alter or revoke a certificate or other

12   authorization, without requiring that the statute also either explicitly grant or explicitly limit

13   authority to reconsider prior decisions. *See, e.g*, *Regan*, 67 F.4th 397 (holding that EPA lacked

14   implied authority to rescind decision to regulate chemical where decision triggered obligation to

15   promulgate regulations and statute provided specific process for periodic review and alteration of

16   those regulations); *Am. Methyl Corp. v. EPA*, 749 F.2d 826 (D.C. Cir. 1984) (holding EPA lacked

17   implied authority to revoke waiver permitting sale of new fuel additive where statute set forth

18   process to prohibit sale of fuel additives already in commerce because implied revocation authority

19   would contravene "substantive and procedural safeguards" afforded by prohibition process).

20        Defendants also argue that implied vacatur authority does not contravene the TPS statute's

21   prohibition on terminating a TPS designation before the "expiration of the most recent previous

22   extension" because, they claim, a vacatur does not *itself* terminate a designation prematurely but

23   merely clears the way for premature termination. Dkt. 199 at 12 (quoting 8 U.S.C. 1254a(b)(3)(B)).

24   That contention fails for three reasons. *First*, an order vacating a TPS extension necessarily wipes

25   away that extension, and therefore itself accomplishes a premature termination—even if that

26   termination is later undone by a new extension. *Second*, even if the vacatur could be understood as

27   simply a step on the road to termination, as Defendants argue, the Supreme Court has held implied

28   revocation authority must be rejected wherever it would provide "the lever for nullify(ing) an

13

1    express provision of the Act." *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 328

2    (1961). Defendants do not contest that, absent the vacatur, Venezuela's 2023 TPS designation could

3    not have lawfully been terminated prior to October 2, 2026. Here, at a minimum the vacatur served

4    as the "lever" to get around the statute's express prohibition on premature termination; it therefore

5    contravened the statute and exceeded the Secretary's authority. *Id. Finally*, under *CUA*, the TPS

6    statute's fixed terms for extensions are sufficient *on their own* to foreclose vacatur authority. 124

7    F.4th at 1148 ("The use of a fixed term is … affirmatively inconsistent with positing an implied

8    power to revoke a license at any time."); 8 U.S.C. § 1254a(b)(3)(C) (providing that extensions may

9    last 6, 12, or 18 months). The statute's express prohibition on ending a designation before the

10   expiration of a fixed term only drives home the incompatibility between implied vacatur authority

11   and the statutory scheme.

12        Next, Defendants assert there is no evidence demonstrating that Secretary Noem's purpose in

13   vacating the extension was to undo the prior administration's decision and clear the way for

14   termination. Dkt. 199 at 12. Defendants are incorrect. *First*, as this Court already held, the fact that

15   the Secretary decided to vacate the extension rather than simply deconsolidate the registration

16   process "effectively demonstrat[es] that confusion was not her concern so much as the desire to

17   totally undo Secretary Mayorkas's decision." Dkt. 93 at 59; *see also* Dkt. 60 at 17 (arguing that

18   deconsolidation would not have met the Secretary's goals because it would not have allowed her to

19   make a new decision). *Second*, the evidence confirms that the vacatur decision was just one part of a

20   "project involving termination of [Venezuela's] TPS status." Ex. 10 (Jan. 27 12:33 pm: DHS

21   Assistant Secretary Tony Pham seeking data to support termination). Efforts to terminate TPS for

22   Venezuela *predated* the decision to vacate. *See supra* Background A; *see also* Dkt. 165 at 5-6

23   (evidence that Defendants were preparing to terminate before the vacatur was finalized). Indeed, the

24   vacatur and termination were one and the same in the minds of the officials who worked on them, as

25   demonstrated by a January 26 email among senior DHS officials that referred to an attached draft

26   vacatur notice as a "termination" notice. *See* Ex. 13.

27        Defendants also argue there is nothing wrong with political considerations affecting agency

28   policymaking. Dkt. 199 at 12. But the question here is whether *the TPS statute* provides authority to

1   reconsider a prior decision. On that question, the cases Defendants cite are inapposite, both because

2   they do not address this statute and because they concern *forward-looking* changes. *See Dep't of*

3   *Commerce*, 588 U.S. at 778 (addressing decision to add citizenship question to Census); *ATF v. Fed.*

4   *Labor Relations Auth.*, 464 U.S. 89, 98 n.8 (1983) (addressing agency guidance and stating that an

5   agency may "make policy choices consistent with the congressional mandate … provided … its

6   actions conform to applicable procedural requirements" and the APA). Moreover, even assuming the

7   TPS statute granted some limited implied reconsideration authority (which it does not), such implicit

8   authority would not permit reconsideration merely to implement new policy preferences. Dkt. 165 at

9   14. This is especially true because Congress enacted the TPS statute to constrain executive

10   discretion. Defendants assert Congress's intent is unsubstantiated, Dkt. 199 at 13, but they ignore the

11   context and legislative history. Dkt. 165 at 14. Defendants also concede that they did not conduct

12   any interagency consultation or country conditions review in connection with the vacatur, Opp. 16,

13   but offer no reason Congress would require such procedures in making a decision to extend, but

14   dispense with them in undoing that decision

15        Finally, Defendants persist in asserting the vacatur occurred "before the extension's effective

16   date," Dkt. 199 at 13, as though that would explain away the statute's failure to provide for any such

17   authority. But they do not dispute that Plaintiffs and others had already received benefits under the

18   extension (which this Court has now protected, at the Supreme Court's suggestion). *See* Dkt. 162.

19   Indeed, the vacatur decision itself acknowledges that the "January 17, 2025 extension notice ha[d]

20   been in effect." 90 Fed. Reg. 8805, 8807. Whether or not the extension period began running on

21   January 17, "[t]he extension had real world consequences: it was effective, even if only for a brief

22   period of time." Dkt. 162 at 6.

23   **B.    The Vacatur was Arbitrary and Capricious and Without Observance of**
           **Procedure Required by Law**

24

25        Defendants contend the vacatur was not pretextual because, in their view, a document

26   regarding "Options for Venezuela TPS Extension and Redesignation – September 23, 2023"

27   supports the Secretary's finding that the consolidated registration process announced in the January

28

17, 2025 extension was novel and confusing.[8] Dkt. 199 at 15; Dkt. 199-2. But the document shows the opposite: the dual tracks created by the October 3, 2023 Extension and Redesignation were novel and DHS had worried at the time that they would cause confusion; the consolidation of those dual tracks via the January 17, 2025 Extension restored the typical process and reduced confusion. Dkt. 199-2 (explaining that running the extension and redesignation concurrently would be "[l]ess confusing" and "[c]onsistent with the general practice," whereas continuing two different tracks was "difficult to operationalize" and "may lead to confusion"). *See also* 90 Fed. Reg. 5963 (explaining that Secretary Mayorkas decided to consolidate the filing process because of "[o]perational challenges" and "confusion" resulting from the separate tracks). Other evidence confirms the same: Defendants *tried* to identify concrete problems resulting from the consolidated filing process, but all the evidence showed consolidation was *better* than maintaining dual tracks. *See supra* Background A. This utter lack of any evidence of problems with the consolidated filing process did not deter Secretary Noem from—pretextually—justifying the vacatur based on problems with the consolidated filing process. 90 Fed. Reg. at 8807.

Defendants argue the extensive evidence of pretext in the Venezuela vacatur decision can be understood as simply standard agency preparation in anticipation of a new administration, likening it to the process described in *Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019). Dkt. 199 at 15. But *Saget* found that DHS had "reverse engineered the TPS review process to achieve a desired political outcome" in direct "violat[ion of] the mandatory periodic review process of the TPS statute." 375 F. Supp. 3d at 346. The strong similarity between the process described in *Saget* and the process revealed in this case is a reason to set aside the vacatur, not affirm it.

Finally, Defendants assert that the Secretary considered reliance interests generally, but they do not and cannot claim she considered the unique reliance interests of TPS holders who already received TPS-related documentation pursuant to the January 17, 2025 extension. Dkt. 199 at 14. To the contrary, Defendants apparently took care to ensure the Secretary specifically did *not* receive

---

[8] This document does not appear in the Certified Administrative Record. *See* Dkt. 103. Defendants' reliance on it further undermines any objection they may have to consideration of extra-record evidence.

information about TPS holders who had already received documentation. *See supra* Background A (USCIS intentionally removed references to the number of TPS holders who had already re-registered pursuant to the January 17 extension from the Termination Decision Memo).

Thus, the new evidence at this stage confirms that this Court was correct in finding the Secretary's reasons for the vacatur were likely to be arbitrary and capricious in violation of the APA. See Dkt. 93 at 55-59. Further, Defendants offer no reason for this Court to depart from its prior, well-reasoned conclusion that the vacatur was based on legal error. *Id.*

### C.       The Venezuela TPS Termination Violated the APA

Defendants' arguments regarding the termination are unavailing. The termination violates the APA for three independent reasons. *First*, the termination is unlawful because it was premised on the unlawful vacatur and, in combination with that vacatur, contravened the statute by ending Venezuela's 2023 TPS designation before "the expiration of the most recent previous extension." 8 U.S.C. 1254a(b)(3)(B). Defendants' argument to the contrary is circular. Dkt. 199 at 16-17. If the vacatur was invalid, so too is the termination.

*Second*, the termination is contrary to law because the TPS statute permits consideration of national interest only at the designation stage; subsequent review turns on whether the "*foreign state* … continues to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3)(B), (C) (emphasis added). Defendants fail to acknowledge that, by its plain language, this inquiry is focused on conditions in the foreign state. Dkt. 199 at 17. Defendants also assert a "consistent past practice of considering national interest" in the periodic review process but cite only two examples over 35 years. *Id.* (citing 77 Fed. Reg. 59943 (Oct. 1, 2012); 63 Fed. Reg. 15437 (Mar. 31, 1998)). Neither example includes any detailed discussion of national interest or actually terminates TPS on national interest grounds. *See* 77 Fed. Reg. 59943 (extending Haiti's TPS and stating only that "[p]ermitting eligible Haitians to remain temporarily in the United States is not contrary to the national interest"); 63 Fed. Reg. 15437 (terminating TPS for Liberia because "overall security conditions … have improved," "[e]lections were held," and there was "[i]mproved stability and security"). Both are thus consistent with the agency's past practice of *not* discussing national interest during periodic review and not terminating on national interest grounds. Dkt. 166 ¶ 30.

*Third*, the termination violates the APA because Defendants failed to conduct the required interagency consultation or country conditions review. Defendants claim they observed statutory procedures in terminating Venezuela's TPS designation, Dkt. 199 at 18-19, but the evidence shows otherwise. Defendants assert they fulfilled the TPS statute's requirement to consult with appropriate agencies regarding TPS decisions based solely on Secretary of State Marco Rubio's one-and-a-half page 11th-hour letter recommending termination of Venezuela's TPS designation. *Id.* at 18. But the statute requires the Secretary to consult with other agencies *about country conditions*. Dkt. 165 at 19-20. Secretary Rubio's letter does not satisfy this requirement, both because it does not address conditions in Venezuela, and because it came too late in the process to permit meaningful consultation. *See* Dkt. 104-4 at 75-76; *supra* Background B.

Just three weeks before the termination decision, Secretary Mayorkas had concluded (after extensive internal consultation and review) that "extraordinary and temporary conditions … continue to prevent Venezuelan nationals from returning in safety." 90 Fed. Reg. at 5966. But Secretary Noem came to the exact opposition conclusion: "notable improvements" to conditions in Venezuela "allow for" TPS holders "to be safely returned to their home country." 90 Fed. Reg. at 9042. This about-face occurred because the agency conducted only a rapid-fire, selective review to identify "positive improvements" in Venezuela that would support the decision the Secretary had *already made* to end Venezuela's TPS designation. *See supra* Background B. When the agency could not identify improvements in a particular area—such as political repression and human rights—they simply excised the entire topic from consideration. *Id.* This was unlawful, as "[t]he absence of a reasoned explanation for disregarding the previous factual findings violates the APA." *Organized Village of Kake v. U.S. Dept. of Agriculture*, 795 F.3d 956, 969 (en banc). Plaintiffs do not ask this Court to "re-weigh[] the evidence," Opp. at 18, but rather to recognize that Defendants did not meet their obligations to actually review conditions under the statute.

### D.   The Partial Vacatur of Haiti's TPS Extension and Redesignation Violated the APA

Defendants' arguments regarding the Secretary's authority to partially vacate TPS for Haiti mirror their arguments regarding the Secretary's authority to vacate TPS for Venezuela. They fail for

1    the same reasons described *supra* Section III.A.

2          Defendants make no attempt to reconcile their position that the vacatur of Venezuela's TPS

3    extension was proper because the extension had not entered "into effect" with the fact that the Haiti

4    extension had been in effect for more than six months before they vacated it. Defendants' position

5    confirms they view the Secretary's vacatur authority as effectively limitless, unconstrained by timing

6    or reliance interests. Defendants point to the fact that the vacatur was only "partial" as evidence that

7    Secretary Noem considered reliance interests in making her vacatur decision. Dkt. 199 at 19. But this

8    is nonsensical: "entirely rescinding" the extension would have required going back in time.

9          Defendants next argue that Plaintiffs fail to show a predetermined decision to terminate TPS

10   for Haiti. *Id.* at 20. But they never dispute that *nothing* in the CAR substantiates the reasons the

11   Secretary gave to explain the partial vacatur in the Federal Register. Discovery has further revealed

12   that, as with Venezuela, Defendants made the decision to vacate Haiti's TPS extension first and

13   searched for a rationale after. *See supra* Background C. Defendants also either ignore the statements

14   described in Plaintiffs' Motion—including, e.g., President Trump's assertion that he would

15   "[a]bsolutely" "'revoke [TPS]' for Haitians," Dkt. 165 at 23—or mischaracterize them by asserting

16   that the statements referred only to the administration's general policy goal "to reduce illegal

17   immigration and crime"—a goal with no relation to the lawfully present, highly-vetted TPS holder

18   population.  Dkt. 199 at 20-21, 24.

19         Finally, Defendants argue the Secretary correctly concluded the TPS statute sets forth a

20   default extension period of six months, but they fail to address Plaintiffs' point that the default

21   applies only if the Secretary fails to make any decision at all. *Id.* at 21; Dkt. 165 at 24-25. *See* 8

22   U.S.C. § 1254a(b)(3)(C) (providing for a default six month extension "[i]f the [Secretary] does not

23   determine … that a foreign state … no longer meets the conditions for designation"). In contrast,

24   when the Secretary makes an affirmative decision to extend, there is no thumb on the scales for a

25   six-month time period. *See* 8 U.S.C. § 1254a(b)(3)(A) ("The [Secretary] shall provide on a timely

26   basis for the publication of notice" of her determination about whether conditions for TPS

27   designation continue to be met and "in the case of an affirmative determination, the period of

28   extension of designation"). Further, even if the Secretary's interpretation of the statute were

1  permissible, it is a clear break with past practice. Dkt. 165 at 25 (88% of TPS extensions over the

2  past two decades have been for 18-month period). Defendants do not contest this. Such a dramatic

3  shift without any explanation violates the APA, because the Secretary failed to even "display

4  awareness" of the agency's longstanding practice of preferring 18-month extensions. *Organized

5  Village of Kake*, 795 F.3d at 966.

## III. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT FOR DEFENDANTS ON THE DISCRIMINATION CLAIM

Despite having lost at the preliminary relief stage on the question of whether the record

evidence likely would show that their decisions were motivated by racial animus, *see, e.g.,* Dkt. 93 at

66 (describing Secretary's reasoning as a "classic example of racism"), Defendants now claim they

should win on summary judgment. That claim is particularly ambitious given that a discrimination

plaintiff "need produce very little evidence" to overcome a motion for summary judgment, for "the

ultimate question is one that can only be resolved through a searching inquiry—one that is most

appropriately conducted by a factfinder, upon a full record." *Chuang v. Univ. of Cal. Davis, Bd. of

Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000).

The Court should deny summary judgment on this claim. To put it mildly, the parties

vigorously dispute whether the evidence shows that Secretary Noem's TPS decisions were motivated

by discrimination. Defendants still argue that the statements by Secretary Noem were "plainly non-

discriminatory" and merely "advocated for a reduction of illegal immigration and crime," Dkt. 199

at 21-22, while Plaintiffs contend—supported by extensive expert testimony—that those same

statements reveal impermissible animus against Venezuelan and Haitian TPS holders. *See* Dkts. 22

¶¶ 20, 27-31; 26 ¶¶ 16-22; 27 ¶ 15; 166, Ex. 15; Ex. 41 at 104; Ex. 42 at 3; Ex. 43 at 18; Exs. 44-

48; *see also* Dkt. 93 at 64-68 (listing "discriminatory statements" by Secretary Noem and President

Trump).  That dispute plainly forecloses summary judgment. *See generally Arlington Heights v.

Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977).

Considering the evidence in the light most favorable to Plaintiffs, a reasonable factfinder

could conclude the Secretary's decisions were motivated at least in part by impermissible animus

against Venezuelan TPS holders. *See* Dkt. 129 at 5 (recognizing "significant evidence that the

1  decisions were made in bad faith"). Immediately before and after her Venezuela TPS decisions,

2  Secretary Noem falsely and repeatedly equated Venezuelan immigrants and TPS holders with gang

3  members, criminals, and psychiatric patients. *See* Ex. 41 at 104-05; Ex. 42 at 3; Ex. 43 at 18. The

4  Venezuela TPS termination notice echoed these baseless racist tropes. *See* 90 Fed. Reg. 9042

5  (insinuating TPS allowed members of Tren de Aragua to unlawfully enter the U.S. and settle in the

6  interior). And, as this Court found, the other explanations provided in the Federal Register are

7  entirely lacking in factual support, *see* Dkt. 93 at 55-59, 73-74, suggesting the decisions cannot be

8  explained by anything other than animus.

9         Defendants additionally argue that statements by President Trump and other high-level

10  officials indicating animus against immigrants and TPS holders "should be rejected" because they

11  were "remote in time and made in unrelated contexts," Dkt. 199 at 22 (quoting *DHS v. Regents*, 591

12  U.S. 1, 35 (2020)).[9] The Court need not resolve the relevance of that evidence now unless it finds the

13  other evidence on which Plaintiffs rely insufficient to defeat summary judgment. In any event, it is

14  relevant because those statements were related to the challenged TPS decisions (and, in many cases,

15  were not temporally remote). At minimum, the parties' disagreement on the issue raises genuine

16  disputes of material fact. *See* Dkt. 199, Ex. 19; Ex. 49 at 2; Ex. 50 at 29, 34-35; Ex. 51 at 9-10, 32-

17  34; Ex. 52 at 9, 12; Ex. 53 at 11; Ex. 54 at 4-5, 22-23; Ex. 55; Ex. 56; Ex. 8[10]; Ex. 9[11]; Ex. 32[12]; *see*

18  *also* Dkt. 93 at 66 (recognizing "discriminatory statements" by President Trump "continuing through

19  the start of his second administration").

20

21

---

22  [9] Notably, Defendants do *not* contend that the Court should, as a matter of *law*, reject reliance on
    statements by officials other than Secretary Noem. *See* Dkt. 199 at 22. Therefore, any such argument

23  is waived. *See Oceana, Inc. v. Bryson*, 940 F. Supp. 2d 1029, 1060 (N.D. Cal. 2013) (Chen, J.) (in
    summary judgment motion, moving party "waived the claim by not raising it until its reply").

24  [10] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from
    'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024),

25  https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html.;

26  [11] Sam Levine, *'They've Destroyed the Place': Trump Repeats Racist, Anti-immigrant Lies*, THE
    GUARDIAN (Sept. 13, 2024), https://www.theguardian.com/us-news/2024/sep/13/trump-repeats-
    lies-haitian-immigrants.

27  [12] *Trump Slams Haitians Attempting to Enter U.S., Says They 'Probably Have AIDS,'* ABC 7 (Oct.
    10, 2021), https://abc7.com/haitian-migrants-donald-trump-former-president-

28  immigration/11108741/.

Similarly, the evidence forecloses summary judgment regarding Haiti on the discrimination claim. The Secretary's justifications for the partial vacatur of Haiti TPS were pretextual, raising an inference that she was motivated by animus. In a statement announcing the partial vacatur, Secretary Noem accused Haitian TPS holders of being "[illegal] aliens" who "abused and exploited" the TPS system "for decades," Dkt. 166, Ex. 15, apparently simply by applying and qualifying for TPS in the past. In other words, "the Secretary made sweeping negative generalizations about [Haitian] TPS beneficiaries *in toto*" and "decided to take *en masse* actions against all … TPS beneficiaries"—a "classic example of racism." Dkt. 93 at 66; *see also* Dkt. 129 at 5 (recognizing that "much of the reasoning in [the postponement] order would apply to the decision made with respect to Haiti as well").

The Secretary's decisions were concededly influenced by President Trump—with his Executive Orders providing central justifications for the partial vacatur and the Secretary expressing an intent to satisfy the President's "desire" to see TPS "used properly." Ex. 57; Ex. 49 at 2; 90 Fed. Reg. 8843; 90 Fed. Reg. 8807 n.3 (Venezuela vacatur), 90 Fed. Reg. 9042 n.2 (Venezuela termination), 90 Fed. Reg. 9043 n.10 & 14 (Venezuela termination), 90 Fed. Reg. 10513 (Haiti partial vacatur). Thus, the President's racist statements against Venezuelan and Haitian immigrants and TPS holders are plainly relevant and cannot be so easily disregarded. Ex. 51 at 33; Ex. 52 at 9, 12.

Because Plaintiffs have cited ample evidence for a reasonable factfinder to find in Plaintiffs' favor, Defendants are not entitled to judgment on this claim as a matter of law.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' partial Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment.

Date:  July 17, 2025                          Respectfully submitted,

NATIONAL DAY LABORER ORGANIZING NETWORK

*/s/ Jessica Karp Bansal*

22

Jessica Karp Bansal

Jessica Karp Bansal
Lauren Michel Wilfong (*Pro Hac Vice*)
NATIONAL DAY LABORER ORGANIZING
NETWORK

Emilou MacLean
Michelle (Minju) Y. Cho
Amanda Young
ACLU FOUNDATION
OF NORTHERN CALIFORNIA

Ahilan T. Arulanantham
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW

Eva L. Bitran
Diana Sanchez
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA

Erik Crew (*Pro Hac Vice*)
HAITIAN BRIDGE ALLIANCE

Attorneys for Plaintiffs

### CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

NATIONAL DAY LABORER ORGANIZING NETWORK

*/s/ Jessica Karp Bansal*
Jessica Karp Bansal