1  Ahilan T. Arulanantham (SBN 237841)
   arulanantham@law.ucla.edu
2  CENTER FOR IMMIGRATION LAW AND
   POLICY, UCLA SCHOOL OF LAW
3  385 Charles E. Young Dr. East
   Los Angeles, CA 90095
4  Telephone: (310) 825-1029

5  Emilou MacLean (SBN 319071)
   emaclean@aclunc.org
6  Michelle (Minju) Y. Cho (SBN 321939)
   mcho@aclunc.org
7  Amanda Young (SBN 359753)
   ayoung@aclunc.org
8  ACLU FOUNDATION
   OF NORTHERN CALIFORNIA
9  39 Drumm Street
   San Francisco, CA 94111-4805
10 Telephone: (415) 621-2493
   Facsimile: (415) 863-7832

   Attorneys for Plaintiffs
   *[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R., HENDRINA VIVAS CASTILLO, A.C.A., SHERIKA BLANC, VILES DORSAINVIL, and G.S., <br><br> Plaintiffs, <br><br> vs. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA, <br><br> Defendants. | Case No. 3:25-cv-01766-EMC <br><br> **DECLARATION OF EMILIA GARCIA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date: August 1, 2025 <br> Time: 10:00 a.m. <br> Place: Courtroom 5, 17th Floor |

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong *(Pro Hac Vice)*
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
Diana Sanchez (SBN 338871)
dianasanchez@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*Pro Hac Vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

**DECLARATION OF EMILIA GARCIA**

I, Emilia Garcia, declare:

1. I am over the age of eighteen, and I am competent to make this declaration. I provide this declaration based upon my personal knowledge. If called as a witness, I would and could competently testify to the facts stated herein.

2. I am an investigator at the American Civil Liberties Union Foundation of Northern California ("ACLU"). The ACLU is a nonprofit public interest law firm based in San Francisco, California, that provides free legal services.

3. I make this declaration based on my personal knowledge and conversations and communications with individual TPS holders under Venezuela's 2023 designation, and their family members and friends, who have been affected by the May 19, 2025 Supreme Court decision permitting Defendants to implement the vacatur and termination of Venezuela's 2023 TPS designation while this lititgation proceeds. I am submitting this declaration to provide information about the harms that have befallen indidivudal TPS holders due to the loss of status and benefits.

**Deportation of individuals with approved TPS under the 2023 designation**

4. I am aware of TPS holders under the 2023 designation who have been deported to Venezuela following the Supreme Court stay decision. For example:

    a. D.C. is a TPS holder under the 2023 designation and member of NTPSA who was deported in June 2025, along with her ten year old daughter and 15 month-old U.S. citizen daughter. She came to the United States with her older daughter in 2021. They resided in Washington State with her partner. There, she worked in restaurants and cared for her family. She always paid her taxes and she has no criminal record. In 2023, she became eligible for TPS and her application was approved in 2024. In April 2024, she gave birth to her daughter, a U.S. citizen. In April 2025, she re-registered for her TPS and that of her daughter. After the Supreme Court decision, ICE began to schedule her for check-ins each week. On June 25, 2025 she presented herself to ICE. Her daughters waited in the car with her partner. ICE officers

told her to bring them in. D.C. and her daughters were immediately detained and deported within a day. Their family is now separated, with D.C. and her children in Venezuela, and D.C.'s partner, the father of her 15-month-old daughter, still in the United States. D.C. does not have a home or a job in Venezuela, and is staying with a relative. She does not know what she will do next.

b. M.A. is a TPS holder under the 2023 designation who was deported to Venezuela and is now separated from her 11 month-old U.S. citizen infant daughter and her husband, J.G., who is also a TPS holder. Both M.A. and J.G. are members of the NTPSA. The family lived in Indiana. J.G. worked as a supervisor for a construction company and M.A. worked as a hostess in a restaurant. Their daughter was born in August 2024. M.A. was under an order of supervision since she entered the country in 2022. In June 2025, she appeared at the ICE office for her annual check-in and she was detained, despite her pending TPS renewal and an affirmative asylum application. While detained, she asked for a credible fear interview, but was never given an opportunity to establish her fear of returning to Venezuela. Her immigration attorney tried to advocate for her, but M.A. was transferred several times to different detention centers, and each time, the family and their attorney lost contact with her for several days. She was eventually deported to Venezuela on July 4, 2025, but to this day neither she nor her attorney understand the legal basis for her removal. Alone in the United States, her husband J.G. has not been able to work since his wife was arrested, because he has to care for their baby. Their savings are being quickly depleted and he does not know if they will be able to remain in the country. Since M.A. was deported, her baby daughter has shown increased separation anxiety and becomes distraught if separated, even briefly, from her father. J.G. reports, "My wife was deprived of her right to due process. Venezuela is not a safe place for her, but she was sent there anyway without the slightest consideration for her rights or her safety."

    c. R.O. is a beneficiary of TPS 2023 and member of NTPSA who was deported to Venezuela on June 24, 2025. Before that, he lived in Florida with his wife, and worked as a driver for FedEx. To obtain this job, he had to pass a background check. Since 2022, R.O. reported to ICE annually. In 2025, ICE increased his reporting schedule dramatically. He was forced to wear an ankle monitor and download an application on his phone that tracked his movements. After the Supreme Court's stay decision, he was required to report every few days. On June 9, 2025, he appeared for his required check-in at 8am and was arrested, still wearing his FedEx uniform. He was detained for about two weeks, during which time he slept on the floor and was unable to contact his family for days at a time. R.O. was terrified that he would be deported to CECOT prison in El Salvador. His wife, left behind in the United States, cannot maintain their household without R.O., and has been selling their belongings in order to make ends meet. "I am not a criminal," says R.O., "immigrants like myself come to the United States to work hard and contribute, and instead our families and lives are being torn apart."

    d. R.H., 29 years old, is a TPS holder under the 2023 designation. He worked as an Uber driver in Florida. In April 2025, he was waiting to pick up an order when immigration officers approached his car and asked for his documents. R.H. believes that he was a victim of racial profiling based on the circumstances of his arrest. He was detained and deported about a month later. R.H. left behind all of his savings, which were in cash in his Florida apartment, and has been unable to recuperate them.

**Detention of individuals with approved TPS under the 2023 designation**

5. I am also aware of TPS holders under the 2023 designation who have been detained by immigration officials following the Supreme Court stay decision. Many of these people appeared for immigration court hearings or mandatory ICE check-ins, complying with immigration laws, only to be arrested and detained indefinitely. For example:

a. TPS holder J.R. was arrested by ICE on May 22, 2025 following a hearing in his immigration case. Although his asylum case remains pending, and he has a future court date, ICE agents waiting in the hallway arrested him and took him to an immigration detention center, where he remains detained to this day. His partner, C.B. has been struggling to make ends meet since J.R. was detained. Also a TPS holder, C.B. is now supporting herself and her two children, as well as J.R.'s two children in Venezuela and his elderly mother who has multiple chronic illnesses requiring expensive medications. In addition, C.B. is paying an immigration attorney to represent J.R. in his asylum case and to seek his release on bond. C.B currently works two jobs and drives for Uber following her shifts, working seven days a week. In addition to the economic hardship, C.B is experiencing enormous anxiety and emotional distress due to being separated from her partner and fearing for his well-being.

b. H.S. is a TPS recipient who resides in Austin, Texas. She is 36 years old, with no criminal record in the U.S. or anywhere else. She works as a delivery driver, pays taxes, and supports herself and family members in Venezuela. She attends church regularly and takes English classes. On June 3, 2025, she was detained at her check-in with ICE. She remains in detention, where she has lost weight and is suffering from depression and panic attacks. H.S. has the support of her community. A U.S. citizen friend agreed to sponsor her for bond, but ICE now has taken the position that she is ineligible. H.S. says that immigration officials constantly pressure her to agree to voluntary departure. She refuses because she is afraid for her life in Venezuela, but she is suffering greatly in detention. Her detention has also deprived her family of support. Her elderly mother in Venezuela is gravely ill, and H.S. can no longer provide money for her treatment.

c. In June 2025, TPS recipient J.G. was detained after a traffic stop near his

home in upstate New York. His partner and her two daughters, all TPS holders, were also in the car when it was stopped by police because of an unsecured bag in the back of the truck. After police asked for their documents, ICE officials arrived at the scene. The family was detained on the side of the road for 3 hours. Eventually, J.G. was arrested by ICE and taken to a detention facility, where he remains today. His partner, F.S., is now struggling to support her family without J.G. She reports being in a constant state of fear and distress. F.S. and J.G. are members of the NTPSA.

d. J.R., a TPS holder residing in Kansas, was arrested after his immigration court hearing in May 2025, after the judge dismissed his asylum case at the request of the ICE attorney. He has no criminal record. The day of his hearing, he and his family were planning to celebrate his daughter's high school graduation. J.R. remains in immigration detention to this day, and his partner and his daughter, also a TPS recipient, who relied on him for economic support, are struggling. J.R. cries every day and has lost a lot of weight in detention. The family cannot afford an immigration attorney. His partner says, "we fled a violent dictatorship in Venezuela, only to come here and receive the worst treatment." She does not know how she will pay rent next month. J.R. appealed the dismissal of his removal proceedings, and that appeal was approved, but he now must remain in detention for the duration of his proceedings due to the Trump administration's policy.

e. D.A. is a TPS holder under the 2023 designation and a member of NTPSA. He lives in Texas with his wife and two young children. He is a mechanic. Under an order of supervision with ICE since 2021, he never missed an appointment. In January 2025, he re-registered for TPS. Nevertheless, in January 2025, ICE required D.A. to wear an GPS monitor on his wrist. In June 2025, D.A. presented himself at the ICE office and was detained. His wife, I.L., who was present, asked why he was being detained since he had

re-registered for TPS. The agent replied that if she didn't want her husband to be detained by himself, that she could return with her two children and they would all be arrested at the same time. D.A. remains detained to this day, and feels paralyzed with fear of deportation and being separated indefinitely from his family. I.L. is now struggling to support herself and her two children without her husband. Their youngest son, who is 6 years old, cries every day missing his father. I.L. is terrified that ICE agents will come to her house to arrest and deport her and her children. She fears returning to Venezuela.

f. W.S., a TPS holder under the 2023 designation, was detained by ICE at a check in in San Antonio, Texas on June 3, 2025. She has no criminal history and has never been arrested. She reports that conditions in the detention facility are horrible. There is not enough water, and she feels constantly afraid. The detention facility has become overcrowded and there not enough beds for all of the women detained there. W.S. calls her husband (another TPS holder under Venezuela's 2023 designation) crying almost every day. Her husband R.R. is terrified that he, too, will be detained. He is afraid to leave the house and has trouble sleeping due to anxiety. W.S. was denied a bond hearing. She and her husband are considering withdrawing their asylum application, despite their fear of return to Venezuela, because the situation is unbearable. R.R. says "after my wife's request for a bond hearing was denied, we feel that we have no other option." Both W.S. and R.R. are members of the NTPSA.

**Loss of Employment and Economic Harms**

6. I am aware of many individuals who lost their jobs after they were stripped of work authorization due to the Supreme Court's stay decision. These individuals describe significant hardship to themselves and their families, including U.S. citizen

children. They also lament being unable to work meaningful jobs and contribute to society. For example:

    a. L.D. is a TPS holder under the 2023 designation and a member of the NPTSA. He is 33 years old and resides in Queens, NY, with his partner and their three school-age children. L.D. worked in a truck tire repair shop for nearly two years until he lost his job in May 2025. L.D. and his partner are struggling and using up their savings to pay their rent, utilities, and basic necessities. "I came to this country to do my part and contribute by paying my taxes and working hard." Now, L.D. is afraid to leave the house, feeling vulnerable due to his loss of TPS and work authorization.

    b. G.Q. is a 34 year-old widow, mother of two young children, and NTPSA member, who is now unemployed due to the loss of her TPS status and lack of related work authorization. In April 2025, her husband, an innocent bystander, was struck by a bullet and killed when a gunman opened fire inside a barbershop in a California city. Her two children, ages 11 and 5, were present and witnessed their father's murder. "My husband died protecting his kids," says G.Q. The grieving family's situation worsened further when G.Q. lost her retail job in early June 2025. She now has no way to support herself and her two children. Their survival is day to day. Terrified of being detained and deported to Venezuela, her greatest fear is that she will be separated from her two traumatized sons, who need their mother more than ever. "I am alone in this country with my two children, and now without legal status," says G.Q., adding, "please take my story into account and allow TPS to continue."

    c. C.E., a former teacher for Deaf students, and her husband, J.N., both beneficiaries of TPS 2023 and NTPSA members, reside in Florida. Their 3 adult children and 4 U.S. citizen grandchildren all reside in the United States as well. Prior to the termination of TPS, C.E. and J.N. worked providing specialized transportation services allowing children with disabilities to

attend school. In April, they lost their jobs due to the suspension of TPS. The couple, now in their 70s, are struggling to afford rent and other necessities.

d. E.V. lives near Dallas, Texas along with his mother, stepfather, two siblings, wife, their 6 year old daughter, and three-month-old baby. Everyone in the family relies on TPS, aside from their infant son, who was born in the United States. E.V. worked in a carpet business warehouse for two and a half years, but was let go in April because his work permit expired. His stepfather was also dismissed from his job. The family is now struggling to support themselves. Rent, gasoline, and food are all very expensive and they now have very little income. E.V. laments, "We came to this country fleeing a desperate situation, and we never imagined that everything would be taken away from us." E.V. is a member of the NTPSA.

e. O.R. is a TPS holder under the 2023 designation and a member of the NTPSA. She resides in North Carolina with her four children, three of whom are adults and the youngest of which is in high school. The family fled Venezuela after corrupt police officers attacked and robbed her two teenage sons, hitting them with a car while the boys rode together on a motorcycle. One of her sons survived the attack, but the other, 17 years old at the time, died at the scene from his injuries. Reeling from the tragedy, the family found safety, stability, and a measure of healing in the United States thanks to TPS. However, O.R. and her adult son and daughter all lost their jobs at Walmart due to the Supreme Court stay decision. "All three of us became unemployed," says O.R, a former merchant marine and administrative professional in Venezuela. Her older children also hold professional degrees. "We are useful people in this country," she says. Now, the family unit is suffering psychologically and economically, and are unable to continue supporting themselves without work authorization. O.R. left behind her elderly mother and her developmentally disabled brother in Venezuela, and without work authorization, she is no longer able to support them financially.

They are struggling to survive in dire conditions of insecurity, poverty and without running water.

    f. V.V. is a TPS holder under the 2023 designation. He is a NTPSA member and he resides in Florida. V.V. is the sole provider for his two young daughters and his wife in Venezuela. After being granted TPS and work authorization, he found employment as a builder remodeling houses and was able to earn a good living. "I didn't come here for hand-outs, I came here to work hard," he says. However, in May 2025 he was fired from his job after the termination of TPS went into effect. Now, he is living in his car, which he cannot drive because his license expired and he can no longer renew it. He is working as a day laborer to get by and send some money to his family, but he is terrified that he will be arrested by ICE agents conducting raids targeting day laborers. V.V. has an order of supervision which requires him to check in with ICE every three months. He has done so diligently, but each time he goes to the ICE office, he fears that he will be detained and deported to Venezuela, where he fears for his life.

    g. M.G., a 34-year-old with a degree in poltical science, had learned English after arriving in the U.S. and obtained a certification to work in early childhood education. On June 5 she lost her job in a preschool as a result of her expired work authorization.

    h. G.C. holds a law degree from Venezuela. In the United States, she worked at a food packing plant. She rose to a quality control position before being laid off on May 23 because her work authorization was no longer valid.

    i. L.S. had been working to support himself and save money for surgery for his mother; following the Supreme Court decision, he was laid off and is on the verge of sleeping on the streets.

7. I also have knowledge of individuals who have lost, or are at risk of losing, opportunities to seek other forms of lawful status in the United States due to the termination of TPS. For example:

a. Y.H. is a physician who currently works as a second-year resident in Internal Medicine at a hospital in New York. He is a beneficiary of TPS 2023 and a member of the National TPS Alliance. His employer filed a petition for an H1B visa on his behalf, but this process requires him to retain lawful status throughout the pendency of the application. Despite seeking expedited processing, the visa petition remains pending. Once the termination of TPS 2023 went into effect due to the Supreme Court's decision, Y.H. fell out of status and is now in a state of limbo, unsure of whether his petition will be granted. Y.H. remarks, "as a doctor, I have an ethical duty to treat all my patients with the same respect and dignity, no matter who they are or where they are from. It saddens me that Venezuelans and other immigrants to this country are being mistreated and targeted simply because of where we were born."

b. A.L. is an artist, a beneficiary of TPS 2021, and a member of the NTPSA. She lives in Florida with her husband, also a TPS recipient. Through her work as an artist, she has integrated herself in her community. She teaches art classes for children and has donated several murals to the city in which she resides. In 2022 she was given an Emerging Artist Award, and in 2025 she was named as a Cultural Embassador for her city. Working with an immigration attorney, she began the process of applying for an EB2 visa, based on her exceptional skills. However, to be eligible, she must maintain lawful status throughout the application process, which can take 10 months or more. Due to the expected termination of Venezuela's 2021 TPS designation, she has had to abandon her efforts to adjust her status. "I feel like the door was slammed shut in my face," she laments. In addition, A.L. fears that her artistic expression could result in repression or retaliation. "I use my art as my voice, but now I am afraid that I will be targeted for expressing my political opinions. I feel like I am back in Venezuela."

**Fear of detention and deportation while attending court hearings and ICE check-ins**

8. Other individuals with whom I spoke described severe distress around attending required immigration hearings and ICE check-ins due to the loss of TPS status and fear of being detained. For instance:

    a. W.F. is a beneficiary of TPS under the 2023 designation and a NTPSA member. She resides in Texas with her partner, also a TPS holder, and their 2 year-old U.S. citizen son. Over the last four months, ICE has required her to report for check-ins four separate times. On April 1, 2025, ICE officials required her to submit to GPS monitoring via an ankle monitor. They told her that, if she didn't have any status pending by the next month, she would be detained. The ankle monitor causes her physical and emotional discomfort and she has experienced discrimination due to the visible ankle monitor. She is 23 years old, and has no criminal record. W.F. has a history of depression, and each time she has to report to ICE she experiences severe depressive symptoms and debilitating anxiety. She has nightmares of ICE officers coming to arrest her. She is terrified of being detained, separated from her U.S. citizen toddler, and deported to Venezuela. Each time W.F. leaves the house, she feels afraid that she will be swept up in an immigration raid. W.F.'s son's speech is delayed and he was recently referred to a speech therapist and a neurologist. She worries that the severe stress she is under is impacting her son's development. "I'm not okay," says W.F.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed at Cooperstown, New York, this 17th day of July, 2025.

*Emilia Garcia*

_____

Emilia Garcia