**PAGES 1 - 66**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

NATIONAL TPS ALLIANCE, MARIELA      )
GONZALEZ, FREEDY JOSE ARAPE         )
RIVAS, M.H., CECILIA DANIELA        )
GONZALEZ HERRERA, AHA CECILIA       )
PURICA HERNANDEZ, E.R., and         )
HENDRINA VIVAS CASTILLO,            )
                                    )
          Plaintiffs,               )
                                    )
VS.                                 ) **NO. 3:25-CV-01766-EMC**
                                    )
KRISTI NOEM, in her official        )
capacity as Secretary of            )
Homeland Security, UNITED STATES    )
DEPARTMENT OF HOMELAND SECURITY,    )
and UNITED STATES OF AMERICA,       )
                                    )
          Defendants.               )
_____)

San Francisco, California

Friday, August 1, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

                    ACLU Foundation of Northern California
                    39 Drumm Street
                    San Francisco, California 94111
          **BY:   EMILOU MACLEAN, ATTORNEY AT LAW**
                  **MICHELLE Y. CHO, ATTORNEY AT LAW**

          (Appearances continued on following page)

REPORTED BY:  April Wood Brott, CSR No. 13782, Official United
States Reporter

**APPEARANCES** (continued):

For Plaintiffs:

National Day Laborer Organizing Network
1030 S. Arroyo Parkway, Suite 106
Pasadena, California 91105
BY:   **JESSICA KARP BANSAL, ATTORNEY AT LAW**

Haitian Bridge Alliance
4560 Alvarado Canyon Road
San Diego, California 92120
BY:   **ERIK M. CREW, ATTORNEY AT LAW**

For Defendants:

DOJ-CIV
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
BY:   **WILLIAM H. WEILAND, ATTORNEY AT LAW**

Also Present:  **Lauren Wilfong**

**Friday - August 1, 2025**                                    <u>**10:04 A.M.**</u>

<u>P R O C E E D I N G S</u>

---o0o---

THE COURTROOM DEPUTY:  All rise.  Court is now in session, the Honorable Edward M. Chen presiding.

THE COURT:  Good morning, everyone.  Have a seat.

THE COURTROOM DEPUTY:  Court is calling the case National TPS Alliance, et al. vs. Noem, et al., Case Number 25-1766.

Counsel, please state your appearance for the record, beginning with the Government -- excuse me -- Plaintiffs.

MS. BANSAL:  Good morning, Your Honor.  Jessica Bansal for the plaintiffs.

THE COURT:  All right.  Thank you, Ms. Bansal.

MS. MACLEAN:  Good morning, Your Honor.  Emilou MacLean for the plaintiffs.

THE COURT:  All right.  Thank you, Ms. MacLean.

MS. CHO:  Good morning, Michelle Cho for the plaintiffs.

THE COURT:  Good morning, Ms. Cho.

MR. CREW:  Good morning, Your Honor.  Erik Crew of Haitian Bridge Alliance for the plaintiffs.

THE COURT:  All right.  Thank you, Mr. Crew.

MS. WILFONG:  Good morning, Your Honor.  Lauren Wilfong for the plaintiffs.

**THE COURT:**  All right.  Good morning, Ms. Wilfong.

**MR. WEILAND:**  Good morning, Your Honor.  Will Weiland for the Government.

**THE COURT:**  All right.  Thank you, Mr. Weiland.

All right.  So we have several motions before the Court. They are cross-motions for summary judgment.  There is a motion to dismiss.  I believe that applies to the part of the Haitian TPS group.

So let me just get a sense of what has happened since the last proceeding that I had, and that is I had issued the postponement order, and ultimately that was stayed by the Supreme Court.  What has happened to the group of Venezuelan TPS beneficiaries whose status has since terminated because of the Supreme Court's action?  And I think there were about 300,000 or so.

**MS. BANSAL:**  That's correct, Your Honor.  There were 350,000 Venezuelan TPS holders who held TPS only under the 2023 designation.  There's another group of about 250,000 who had been eligible to extend their status under the vacated extension, but they retained status under the 2021 designation, at least until September.

**THE COURT:**  September 10th, or what's the date?

**MS. BANSAL:**  It's the 9th, Your Honor --

**THE COURT:**  The 9th?

**MS. BANSAL:**  -- is the last day they have status.  So

September 10th would be the day they --

THE COURT:  And there are approximately how many in that --

MS. BANSAL:  250,000, I believe, Your Honor.

THE COURT:  And of the 350 whose status has now been allowed to expire, do we know how many have been deported and how many are left in this country?

MS. BANSAL:  We don't have numbers, Your Honor.  I'm not sure if the Government does, but we've submitted a declaration from Amelia Garcia, which is at Docket 259, which describes the experiences of numerous members of the plaintiff National TPS Alliance who held TPS under the 2023 designation, people who have been fired from their jobs who are now living in their cars and going to food kitchens to feed their children, people who have been deported, for example.

And TPS member MA was detained at a routine ICE check in June.  She was deported July 4th, and she's now separated from her 11-month-old U.S. citizen children.  It also includes stories of individuals who have pending applications for other relief that have been imperiled by their loss of status.

THE COURT:  But there are still people in the country -- and I ask because their interests may be affected by what we do on the summary judgment question.

MS. BANSAL:  Their interests are intimately affected, Your Honor.  Their ability to continue to live in this country,

to be released from detention to be with their families will be affected by this decision.

**THE COURT:**  All right.  Does anyone have any other information about the status of the 350,000 or so former TPS beneficiaries?

**MR. WEILAND:**  No, Your Honor.  I can ask my client for numbers if that's something the Court is interested in, but I do not have that.

**THE COURT:**  Okay.  Well, it's not critical, but I think I did want to know whether there are significant numbers of people whose rights may be affected and may have an interest in our proceeding.  And it sounds like there are still folks.

**MR. WEILAND:**  Yes, sir, I think that's a fair statement.

**THE COURT:**  Okay.  Thank you.

Well, let's talk about the jurisdictional issue and review.  That's always kind of a threshold question.  So the first question is the applicability of 1252(f)(1) and its prohibition on injunctions.  It seems to me that that issue was expressly carved out in footnote 10 of CASA, and now in the Ninth Circuit, I think, has clearly ruled, at least for now, under the Immigration Defenders Law Center case that 1252(f)(1) does not bar a court from issuing a vacatur under the APA.

So I know there was a lot of briefing about sort of the looking at the legislative history and this whole question

about chapter 4 or chapter 5 and what it means, but it seems to me I'm pretty much bound by the current Ninth Circuit law.

Is that -- does the Government have a different view on that?  At least as we stand now.  I know everything is subject to review, but as we sit here right now, I take it that the Immigration Defenders Law Center case kind of disposes of the issue?

**MR. WEILAND:**  I think that's a fair statement, Your Honor, and certainly defendants continue to assert that 1252(f)(1) applies.

**THE COURT:**  Sure.

**MR. WEILAND:**  But this court must follow circuit precedent.

**THE COURT:**  Okay.  Well, I appreciate that.  Thank you.

Then we have the question of the 1254a(b)(5)(A) that precludes the Court from reviewing the determination of the agency with respect to designation, termination, or extension of a designation.  I think we briefed that pretty extensively last time, and I did a fairly deep analysis of that.

I think the new argument is -- I think the Government has sort of emphasized the breadth of the term "with respect to."  That might put a different gloss on that, and maybe, Mr. Weiland, if you want to just summarize why you think that changes the -- my prior interpretation of the term

"designation" as within that statute.  Why does the term "with respect to" sort of change the outcome?

**MR. WEILAND:**  Certainly, Your Honor.  Thank you.

We think that it's the two terms together, "any" combined "with respect to" that make the judicial review bar in 1254a(b)(5)(A) particularly broad and in alignment with the language that was under review in *Patel v. Garland*, which Defendants have asserted.

**THE COURT:**  You need to speak a little louder.

**MR. WEILAND:**  Oh, yes, sir, I'm sorry.

**THE COURT:**  Go ahead.

**MR. WEILAND:**  Would you like me to start again?

**THE COURT:**  Yeah.  Why don't you go ahead and --

**MR. WEILAND:**  Yes, sir.

Defendants' assertion is that it's the combination of the two words "any" and "with respect to" that in particular make the judicial review bar under 1254a(b)(5)(A) particularly broad and bring it into alignment with the language that was under review in *Patel v. Garland*, which was any judgment with respect to, I believe is the language in that case.

And therefore, that is the basis upon which the defendants assert that the judicial review bar in this case is sweeping and reflects Congress's intent to leave these determinations that are inherently related to the political branches exercise of its immigration reform policy authorities to the political

branches.

**THE COURT:** Well, I think the previous construction of this court recognized that there is definitely a zone of no judicial review, certainly when it comes to at least sort of the merits analysis of those conditions for designation like country conditions and this sort of thing.

The question here is that section (5)(A), subsection (5)(A), does say any and with respect to, but it also says with respect to the designation, termination, and extension of a designation of a foreign state under the subsection.

And it's obviously -- you know, it seems to me it pertains to those things that the attorney general is supposed to find such as is there an ongoing armed conflict; has there been an earthquake, flood, drought; is the foreign state unable to handle the adequate -- adequately the return, etcetera, etcetera; are there existing extraordinary, etcetera, conditions.

But if the issue is not so much the merits of those factual determinations, but let's say a process, which we know we've been talking about, for instance, whether there's any statutory authority to -- for the Secretary to vacate a prior administration's extension, that doesn't seem to me, even if you say "with respect to," it doesn't have to have anything to do with the actual designation, termination, or extension of a designation.

So those words still -- it still has content, the words designation -- determination of designation, termination, or extension of a designation.

So I don't know if you have any further comments to that.

**MR. WEILAND:** Yes, Your Honor. We understand how the Court may be reading it. The defendants respectfully disagree that it's narrowly tailored. We -- the defendants assert that any determination with respect to a designation, extension, or termination is broad and would sweep in any decision related to any of those.

And in this case, if these were vacaturs, these were determinations with respect to the extensions at issue, and therefore, that is Defendants' -- that's the crux of the legal --

**THE COURT:** Right.

**MR. WEILAND:** -- dispute here.

**THE COURT:** Well, let me hear what the response is. "With respect to" means -- is broad such as anything tangentially related affecting etcetera, etcetera, why wouldn't that sweep in vacatur of an extension?

**MS. MACLEAN:** Your Honor, we don't think that this argument is an argument that hasn't been addressed before. This is an argument that has come up in your previous order, and it also is addressed in McNary. There's nothing about the "with respect to" language that should change your court's

ruling with regard to the limits of the jurisdiction-stripping provision.

**THE COURT:** All right. Then let's talk briefly about sort of a new argument about -- that the Government asserts with respect to potential limitation on judicial review, and that's the section 701(a) of the APA committed to the discretion by law or agency action is committed to discretion of the agency by law. And that, I think the courts have said is kind of a rare exception to judicial review, and it applies when there is, quote, "no meaningful standards."

And here, the -- at least with respect to the question of statutory authority and the process to be followed, for the reasons that I had found previously, there were some definite markers in there -- at least that was the reasoning of this court why, for instance, the Secretary did not have the ability to not follow the timeframe set forth in the act and to enact a vacatur of a previous extension.

Whether that's right or wrong, it seems to me there are real markers there, and you can make a judgment of that. So I'm trying to figure out why is there no, quote, "meaningful standard" in that regard, or does your lack of meaningful standard only apply to the definition of finding of the definition of national interest?

**MR. WEILAND:** Certainly, Your Honor, it does apply to the definition of a finding of national interest. We think

there's no meaningful standard by which this court can assess that.  The statute itself not only confers broad authority upon the Secretary, but it must be noted that this exercise of authority doesn't occur in a vacuum.  It also occurs within the executive general authority to manage immigration and foreign policy affairs, and so...

**THE COURT:**  That doesn't mean any decision made with respect to immigration is not subject to judicial review?  I mean --

**MR. WEILAND:**  No.  Certainly there are decisions that are subject to judicial review, but in this particular context, where we're talking about the designation of countries, nations, for whether or not they have -- should be designated as under the TPS statute, we think that is a standard broadly beyond this court's -- there's no meaningful way to review that by this court, whether or not a case -- a country should be designated, extended, or terminated.

And so it's a bit broader than the national interest assertion, but it's pretty sweeping within the context of USC 1254a.

**THE COURT:**  So how much broader a national interest is it then?  It's a bit broader, but can you define the boundaries of that?

**MR. WEILAND:**  No, Your Honor, and I suppose that's why it's a bit beyond a manageable standard such that it would fall

within this prohibition.

THE COURT: Okay. Well, let me ask the plaintiffs. If part of the findings -- and I'm trying to distinguish now in my mind between the vacatur decision and the termination decision. I think it's the termination decision where the national interest was invoked?

MS. MACLEAN: That's correct, Your Honor.

THE COURT: That was based on alleged procedural irregularities by Secretary Mayorkas, as I recall.

MS. MACLEAN: Yes, Your Honor.

THE COURT: Okay. So if we're just talking in the realm of determination, what about the argument -- I mean, do you agree that a finding or not of a national interest itself is one of those 701(a) kind of findings that's not subject to judicial review?

MS. MACLEAN: Your Honor, it's our view that we wouldn't have to make that judgment call today because that is not a challenge that we make. Plaintiffs are not challenging the Secretary's assessment of national interest. Plaintiffs are challenging whether the Secretary had the authority to make a determination about national interest at the time that she did.

But as Your Honor noted, the Supreme Court has made clear, including the Department of Commerce, that section 701(a)(2) is to be narrowly construed and only where there is no meaningful

standard.  My opposing counsel on the other side seems to be making an argument that is broader today than in the brief.

In the briefing, it seems that the -- as I think Your Honor was suggesting, the limitation that the Government was suggesting about where 701(a)(2) could limit APA relief in this context was only about the analysis of national interest, and it would be -- it's our view that the Government's argument there misunderstands our claim as well as the way courts have narrowly construed national interest.

It seems that the Government may now also be saying that there is some way in which 701(a)(2) also limits APA judicial review over the analysis of country conditions.  We also don't believe that we need to address that now because I think the parties agree that the 1254a(b)(5), jurisdiction stripping provision limits judicial review of Your Honor's -- of the Secretary's ultimate decision with regard to country conditions.

**THE COURT:**  All right.  So you are not challenging necessarily the substantive merits of determination but its procedural invocation?

**MS. MACLEAN:**  Absolutely, Your Honor.

**THE COURT:**  And as I understand your argument that it is properly considered -- maybe considered under (b)(1)(C), which is the initial designation but not upon periodic review?

**MS. MACLEAN:**  Yes, Your Honor.

**THE COURT:** So I'm trying -- I guess that takes some statutory parsing, which I'm not sure I fully understand because if you look at periodic review, which is under subsection 3 -- is there somebody else?

**MS. MACLEAN:** Would you give me a moment just to get my papers?

**THE COURT:** Yeah, yeah, yeah.

So under subsection A, periodic review, you know, at least 60 days before the end, etcetera, etcetera, the Secretary shall review the conditions in the foreign state or part of the such foreign state for which designation is in effect under the subsection and shall determine whether the conditions for such designation under this subsection continues to be met.

Is that the part where you're saying those conditions really refer to conditions in the foreign state only and not the general conditions, which would encompass both (A), (B), and (C) of (b)(1)?

**MS. MACLEAN:** That language, Your Honor, coupled with the language before that, which describes what a periodic review process is supposed to consist of. At the earlier part of subsection (b)(3)(A), it instructs the Secretary to consult with appropriate agencies of the Government and review the conditions in the foreign state. That is the purpose of the periodic review process.

**THE COURT:** So it's the words, the predicate, that

says "shall review the conditions in the foreign state for which the designation is in effect."  It doesn't say conditions in the foreign state and, if applicable, the national interest of the United States.  Is that your argument?

**MS. MACLEAN:**  Yes.

**THE COURT:**  Confining?

**MS. MACLEAN:**  Yes, Your Honor.

**THE COURT:**  Let me ask why -- I guess I understand that textual argument.  So it's pinned on the words "shall review the conditions in the foreign state" as a predicate to the "determined whether the conditions of such designation under this subsection continue to be met," although it does say "under this subsection," and the subsection, I assume, applies to the entirety of B designations?

**MS. MACLEAN:**  Yes, that's correct.

**THE COURT:**  And then --

**MS. MACLEAN:**  Or that's our --

**THE COURT:**  So the counterargument would be under the subsection it has some weight, under the subsection which includes (b)(1)(A), (B), and (C).  That would be the counterargument.

**MS. MACLEAN:**  The statute is very clearly limited in terms of where national interests can be considered at all.  As Your Honor is aware, there's only one category of designation for which the national interest is even an issue, and it is

expressly referenced when national interests can be considered at the time of the initial designation.

Within the context of (b)(3)(A), the specific reference is to the review of the conditions in the foreign state, not the review of all of the reasons why a state might be designated. It is express within the language of (b)(3)(A) that the review concerns specifically the conditions in the foreign state.

THE COURT:  And so what would be the logic of allowing national interests, sort of countervailing interests, to be considered in the initial designation but not in the periodic review?

MS. MACLEAN:  At the initial designation, there's greater deference and discretion for the Secretary.  The Secretary may or may not designate a state that could otherwise meet the conditions for designation.

At the periodic review process, the -- there is no discretion, if the conditions are met, to continue -- the conditions in a foreign state are such that the designation should be continued.  The designation must be continued.

The legislative history of the statute requires -- or the legislative intent behind the statute was to limit excessive discretion from the executive, and so that's one of the reasons why we think that there's --

THE COURT:  Well, that explains the entire TPS superstructure, not just the periodic review and designation.

I guess, still, the logic is if there are terrible conditions, under subsection C, there exists extraordinary and temporary conditions that prevent folks from returning home safely, but if there's a contrary national interest, that would still allow -- well, but there are national interests nonetheless, notwithstanding those conditions, the designation can be denied, right?

So I guess that's interesting.  So if there's a -- that allows, the national interest would come into play for the denial.  Normally you would grant temporary status because of the extraordinary conditions in the home, but it says unless the attorney general finds that permitting them to remain would be contrary to national interests.

So the national interest comes into play under subsection C to deny TPS status, which would otherwise obtain.  So actually, there wouldn't be a periodic review, would there?

**MS. MACLEAN:**  There wouldn't be a periodic review if there was found to not be a national interest for --

**THE COURT:**  So then the question is -- I guess your argument is the periodic review presumes there was no such national interest, compelling national interest, that would upset the apple cart?

**MS. MACLEAN:**  Exactly, Your Honor.  And it's worth noting also that the category of people does not change at a periodic review process unless there's a new designation.  And

in the context where there's a new designation, then the Secretary, if it's a designation based on extraordinary and temporary conditions, the Secretary has the authority to consider national interests and to deny a new designation or a re-designation on the ground of national interest.

But the Secretary has already made that determination at the initial designation or any re-designation that it was not contrary to the national interest, and there's no larger group of people.  There's no population expansion at the stage of a periodic review.

Also, the statute has inbuilt mechanisms to deal with concerns that are individualized.  Once TPS has been designated for a country -- and those are provisions that allow for and, in fact, require the withdrawal of TPS for individuals who have either disqualifying criminal convictions -- which are, you know, almost any criminal convictions, anything more than a single misdemeanor -- or are a security threat.

**THE COURT:**  So the same people who would be subject to a periodic review under subsection 3 is confined to those for whom there was a designation in subsection 1.  If there are new groups coming in, they would need a new designation.

**MS. MACLEAN:**  Correct, Your Honor.

**THE COURT:**  And therefore, (b)(1)(C) could apply in that instance.  So then the question is what is the likelihood -- I mean, one question that could arise -- what's the

likelihood that the same group of people for which there was no finding of national interests could that change in 6, 12, 18 months such that at the time of periodic review, there is now a national interest?

I mean, that's the one thing that you would be saying, is that the Secretary would not have the power to consider intervening discovery of a national interest for that group.

MS. MACLEAN:  Correct, Your Honor.  There are concerns about the Government's assertions here about the vague and expansive national interest standard.

If it is left to apply in this way at a periodic review process, it would completely undermine the intent of the TPS statute to have clearly defined, objective factors to consider and for individuals who have TPS to have certainty about the length of their designation and the fact that if conditions in their country continue to be unsafe and it continues to be unsafe for them to return home, the certainty that the extension will be continued as the statute requires.

THE COURT:  Well, there's no certainty, even without the national interest, that periodic review -- I mean, periodic review contemplates that it could end.

MS. MACLEAN:  Periodic review certainly contemplates that it would end, but it does not provide discretion to the Secretary if the country conditions are such that TPS should be extended.  There is discretion at the initial designation

stage.  There is not that discretion at the periodic review stage.

What the statute says in (b)(3)(B) is the -- or sorry -- (b)(3)(C) is if the attorney general does not determine that a foreign state no longer meets the conditions, the period of designation is extended.  So the extension is mandatory if the conditions are such that it is unsafe for individuals to return and there still are conditions in the foreign state that are -- that would require TPS to be extended.

THE COURT:  So you find that less discretion, that tiered discretion resides and is manifest in subsection C of 3?

MS. MACLEAN:  Yes, as compared with the initial designation provisions, which don't -- which do -- which uses the word "may" so that even if there's civil war in a country or a massive natural disaster or the kinds of country conditions that currently exist in Venezuela and Haiti, the Secretary, any prior secretary, could make a decision to designate that country for TPS or to not designate that country for TPS.

That same level of discretion does not exist during a periodic review process.

THE COURT:  Is there any case law that points out this -- that sort of finds that there is this differential degree of discretion between initial designation and periodic review, or is it based just on your reading?

**MS. MACLEAN:**  Your Honor has made --

**THE COURT:**  I don't mean "just," but I mean --

**MS. MACLEAN:**  Your Honor has made much of the case law in this area, as now there's a number of other cases.  But as I think Your Honor is aware, prior to the first Trump administration, there were not cases challenging TPS termination, so this had not come up.

I think that this is novel, but there certainly is, you know, clear case law about the different levels of discretion that the Secretary or another actor would have when a statute uses language such as "may" as compared to language such as "is" --

**THE COURT:**  All right.

**MS. MACLEAN:**  -- extended.

**THE COURT:**  All right.  Mr. Weiland, do you have any -- I'd like your reaction to the statutory interpretation.  Why isn't there a textual support for the plaintiffs' position that in subsection 3(a) it says "shall review conditions in the foreign state" and then "shall determine whether the conditions of such designation of this subsection continue to be met," there's no reference in periodic review to considering national interests?

**MR. WEILAND:**  Yes, Your Honor.  Obviously the parties have a diametrically opposed interpretation of the language of the statute.  The review encompasses not only a review of the

conditions in the state but also the conditions that form the basis for designation.  It specifically refers back, as Your Honor noted, to subsection (b)(1), and of note, under paragraph (3)(B), with regards to termination, if the --

**THE COURT:**  So you're putting emphasis on the under this subsection language?

**MR. WEILAND:**  Yes.  There is --

**THE COURT:**  Implicitly incorporating (b)(1)?

**MR. WEILAND:**  Yes, Your Honor.  And also, if you look at paragraph (b)(3)(B), you know, no longer continues to meet the conditions for designation under paragraph 1, it's, again, internally referring back to paragraph 1.  And in there, in that instance, it says that the Secretary shall terminate.  And if I might, Defendants assert that this sort of narrow interpretation that Plaintiffs advance is really quite extraordinary in the context of the exercise of authority over the national interest, foreign policy, immigration affairs.

Defendants assert there is plenty of case law that sheds light on the sweeping discretion held by the executive over these matters, held by the political branches over these matters.  That's Fiallo, Harisiades, Hawaii.  They all point to this being a matter of significant authority under -- for the executive.  And so for -- to read national interest out of any review would significantly tie the hands of the executive.

**THE COURT:**  Well, tie the hands in the context of

periodic review, not in the initial designation.

MR. WEILAND:  Yes, sir, but could never be terminated. Could last for decades because the national interest could never be considered.  That is an extraordinary interpretation of the statute, and given the context in which it arises and the confluence of both executive and congressional authority over these matters, we think it's not the appropriate reading of this.

THE COURT:  Okay.  Thank you.  Let me ask with respect to sort of the pretext argument, which I believe in this case is being made -- maybe correct me if I'm wrong -- applies to the vacatur decision but not the termination decision, or are you making that the sort of pretext argument for both?  And this goes to the arbitrary and capricious part.

MS. BANSAL:  Yeah.  Your Honor, in the context of the vacatur, we make a pretext determination, and it matters for two reasons:  One, because a decision based on pretext is arbitrary and capricious; and two, even if there were some implicit statutory authority to reconsider, Supreme Court precedent in American Trucking says that that authority can't be used simply to change a prior decision because of a policy dispute.

And our pretext argument is that while the reasons given in the case of Venezuela were confusion with the registration, really it was an end run around the statutory temporal

limitation on when you can terminate, and same as to Haiti. And so again, that goes to the arbitrary and capricious APA claim, and it also is a limitation on any implicit reconsideration authority that could be found in the statute.

**THE COURT:** I'm sorry. What's the last part, did you say?

**MS. BANSAL:** It also is a limitation -- I mean, this court has found that there is no implied reconsideration authority, but this claim, you only get to assuming there were, and courts have held that even where an agency has implied reconsideration authority, it can't exercise that authority to change a decision simply because it disagrees with a policy.

**THE COURT:** All right. So it goes to the vacatur?

**MS. BANSAL:** Correct, Your Honor. And I'll let my -- I had planned to discuss the vacatur and my co-counsel the termination, so I'll let her answer as to the termination if that's all right.

**THE COURT:** All right. So I want to make sure I understand the argument. So is there an argument about pretext with respect to if you get to the termination decisions?

**MS. BANSAL:** The argument with respect to the termination is that it was predetermined and not based on the statutorily required country conditions review. So there's an element of pretext because to the extent the termination talks about country conditions that we argue is pretextual, but the

claim is a failure to observe procedure as required by law to follow the TPS statute, which requires that decisions be based on country conditions.

**THE COURT:**  So pretext is relevant to whether or not the procedures were properly followed, including obtaining country conditions report, etcetera?

**MS. BANSAL:**  Correct, Your Honor.

**THE COURT:**  All right.  So do you have anything to add?  Okay.

So let me ask the Government this question.  I know you take issue with any factual assertion of pretext, but as Judge Thompson found in a sort of parallel case yesterday that it appears that the termination decision with respect to other countries was sort of preordained, given the timeline, the process that was followed, the communications that went back and forth.

It seems to me that for the reasons I stated earlier and some of the communications that have come to light that certainly with respect to the Venezuelan vacatur and followed by the termination, I mean, that machinery was started even before Secretary Noem took office, and so there's a good argument about pretext.

So my question to you -- or being preordained, in Judge Thompson's words -- if such a finding were made, is that relevant?  Would you agree that that would -- that it's

relevant to the determination of whether or not the decision of the Secretary to vacate and then terminate were arbitrary and capricious, or do you take the position that it's totally irrelevant?

**MR. WEILAND:**  I'm sorry, Your Honor.  I didn't hear that last statement.

**THE COURT:**  So the question -- would a finding that there was pretext and the decision was preordained and that everything else that was done was sort of window dressing, was not, you know, a genuine effort, would that be relevant?  Would that inform the question of whether or not the Secretary's actions were arbitrary and capricious under the APA?

**MR. WEILAND:**  No, Your Honor.  Defendants pushed back pretty vigorously against this concept of pretext under the APA.

**THE COURT:**  I know factually you contest that vigorously.  I'm just saying if hypothetically if I were to find that there was indeed pretext and the decisions were preordained even before they got started, would that be relevant?

**MR. WEILAND:**  I don't think so, Your Honor, and here's why:  I think the definition of pretext in the defendant's assertion is that the definition of pretext has morphed beyond what arose in the Department of Commerce case.  These cases, this case, is almost a perfect example of the kind of case that

Justice Thomas forecast might result from the holding in Department of Commerce.

In Department of Commerce, that was -- a reason given was and the only reason given was determined to be I think the Court found it was a fabrication. Here, Plaintiffs are attempting to convert that into well, folks had a policy preference, had a policy inclination that they began acting upon, and that's a pretext. And defendants certainly pushed back vigorously on that concept of pretext.

There is nothing inappropriate about a new administration taking office and coming in with policy preferences, policy ideas, policy review objectives. That's not preordained or --

THE COURT: What if the finding were more than an inclination, that an actual decision had been made even before the evidence was gathered and that the evidence was gathered to support a predetermined decision? Would that constitute pretext? I know it's different from Department of Commerce, but...

MR. WEILAND: Your Honor, I think the defendants would assert that a decision can be largely made and staffed. There's no requirement that the Secretary enter into office as a completely blank slate. And so the argument that is being advanced is that there can be no consideration. There can be no inclination. There can be no even close to final determination prior to beginning to consider and make the final

decision.

And that's not what the statute requires, and we don't think that's consistent with the exercise of the authority that the executive has inherently in immigration and foreign policy and also as recognized by Congress in this statute.

THE COURT:  All right.  So it's sort of a question of degree, and once you start getting into how strongly an inclination is, you're getting into kind of a black hole that pretext can sort of morph, is what you're arguing, into something much broader because it's not unusual for an agency or an administration to have some initial inclination.  And you can see the other extreme, where if the decision was made and the evidence shows that the decision was well, go out and find the evidence to support the decision I've already made, I mean, there's sort of a continuum there, right?

MR. WEILAND:  Yes, sir, and I wouldn't say it's not unusual -- I think it would be expected that a new administration would come in with a different view, and they could be very forward-leaning in those views, and there's nothing pretextual about that.  The Department of Commerce case was a very narrow factual situation, and it is being turned into a broader, amorphous invitation for Your Honor to get into where in that black hole the Secretary was, and --

THE COURT:  But the Department of Commerce does establish there is a point where it's problematic?

**MR. WEILAND:** Yes, Your Honor.

**THE COURT:** And the question is where -- how far from slight inclination to basically fabrication and sort of coming up post facto explanations justify that, there's a bit of a spectrum there.

**MR. WEILAND:** Yes, Your Honor, and I would circle back to why, in this context, Defendants assert Congress has specifically barred judicial review, right? This is a much different context than the census question that was at issue in Department of Commerce. And so to the extent that Your Honor is being invited to get into where on the spectrum, for lack of a better term, this falls, that is exactly the kind of review that defendants are asserting is barred by 1254a(b)(5)(A).

**THE COURT:** Okay. Let me hear the response to that, that the less clear -- that there was basically fabrication but really, you know, some inclination, maybe very strong inclination, maybe a 90 percent decision had been made -- I mean, does the Court have to draw the line between something that was 95 percent certain, 90 percent certain, 80 percent certain? And if so, does that not get us into this whole area of 1254a and whether the Court should be -- because it's getting close to kind of second-guessing the merits. How do I negotiate that?

**MS. BANSAL:** Two reasons Your Honor, and with the Court's permission, I'll speak to the vacaturs, and my

co-counsel will speak to the termination.

We're not close.  We're not 95 percent with the vacaturs. This case is on all fours with the Department of Commerce, and actually, with the Venezuela vacatur, I would say even more extreme.  Since we were here last arguing the postponement motion, at which time the Court recognized that confusion didn't appear to be the Secretary's real reason, the evidence has confirmed that.

So we've cited in our brief to an email sent on January 25th from a senior USCIS official to an employee at the Service Center Operations -- it's Exhibit 3 in Docket 258.  The email says, "The Secretary will be vacating.  There's some talk of operational challenges.  Can you summarize them for me?" That's essentially what the email says.  So the decision to vacate has been made, and they're looking for reasons.

That's on all fours with Department of Commerce.  Where it gets even more extreme than Department of Commerce is the response to that, which is at Exhibit 5 from the Service Center Operations personnel.  It describes the opposite of challenges with the consolidation.  It says that it has been a problem if we don't take steps to remedy the disparity between the two groups.

And it's drawing on the last exhibit I'll mention, Your Honor, which is Exhibit 7 at that same docket, 258, which is a docket prepared in September 2023, right before the decision

that created the two separate tracks for Venezuela.  It's not a decision that's at issue in this case, but USCIS there said two tracks is going to be confusing for everyone, and it's going to create operational problems.  One would be easier.

That was all the evidence before the agency.  So it's almost as if in Department of Commerce, the Secretary said to DOJ, Can you say you need this for the Voting Rights Act?  And the DOJ said no, and the Secretary still said THAT that was the reason.  That evidence before the agency was not only an absence of evidence confusion, but it was the contrary.

With respect to the Haiti partial vacatur, Your Honor, the reasons that the Secretary gave there were similarly ministerial or sort of technical.  There were no reasons related to the national interest for the vacatur.

What she said was that Secretary Mayorkas had failed to explain why he chose an 18-month period rather than some other time period, that he had failed to elaborate on his finding that it wasn't contrary to the national interest to permit Haitians to remain in the U.S., and that he had cited in the decision both contemporary sources and some sources that were one or two years old.

That describes every single TPS extension essentially, Your Honor, in the history of the program.  So that's as if I'm standing before a barrel of red apples, and I pick one, and I say, "I picked this one because it's red."  It doesn't explain

what happened.

But we do have an explanation.  It's at Exhibit 15 to Docket 166.  It's the press release explaining that decision. It says this is part of the president's promise to rescind policies that are magnets for illegal immigration and contrary to law.  That's the real reason.  And so in both cases, we're not at 90 or 95 percent, Your Honor.  We have as strong or stronger evidence of pretext than Department of Commerce.

And the last thing I'll say that distinguishes this case, I think, is that the Secretary -- it's not a blank slate for her to decide whatever she wants with respect to extension.  As my counsel discussed, this is a statute that's designed to provide some measure of insulation against sort of political changes to humanitarian refugees in this country.

And it says your decision has to be based on country conditions.  So it's not just a freestanding pretext claim.  To the extent the decision is pretextual, it also violates the statute, Your Honor.

**THE COURT:**  Okay.  What about the termination?

**MS. MACLEAN:**  Your Honor, with regard to the termination, as my co-counsel identified, we have framed that not just as a -- we're not just challenging that as preordained and pretextual, but also as not observing the procedures that are required by law.  That obviously is unavailable with regard to the vacatur because there's no legal guidelines with regard

to the vacatur.  There is no vacatur authority within the statute.

Pursuant to 706(2)(D), the termination decision must be set aside for that reason.  This includes that the defendants started the periodic review process at the end point, drafting the Federal Register notice terminating TPS before any country conditions analysis or State Department consultation.  My friend on the other side identified that there is room for a new administration to come in with new policy choices.  That doesn't allow the new administration to come in and disregard the statutory obligations.

THE COURT:  Where is the statutory obligation, for instance, to receive that kind of documentation and evidence by the Secretary like country conditions report?

MS. MACLEAN:  Under section (b)(3), there's a requirement of the -- and I apologize, Your Honor.  I need to get my statutory language as well.

Back at section, subsection (b)(3) of the statute where we were looking before, the statute requires the Secretary -- here it's listed as the attorney general from the prior iteration -- after consultation with appropriate agencies of the government, to review the conditions in the foreign state.

So the two fundamental aspects of any periodic review process are consulting with the appropriate agencies of the Government, which has been consistently the State Department.

That's included within the GAO report that is entered into evidence. And the Court and Saget identified the State Department as providing critical information about country conditions, and the statute is clear that the determination that the Secretary is supposed to be making during the periodic review process is about country conditions. So the consultation with appropriate agencies --

**THE COURT:** Well, you're reading into the statute. You're interpreting it because it says, after, quote, "consultation with appropriate agencies of the government." It doesn't say what kind of a consultation. It doesn't say which agency. It just says "appropriate agencies," and you -- I think you're relying on sort of the practices of over 35 years to inform that; is that correct?

**MS. MACLEAN:** Relying on the practice over 35 years, but also the language of the statute. And the language must be read in the context of the statute where the statute, where that provision, (b)(3) requires the Secretary to be making a determination about country conditions after consultation with relevant agencies. The consultation with relevant agencies which should be about the factors that the Secretary is tasked to consider, which are country conditions.

And the State Department has been recognized for over 35 years as the entity that has the direct information about country conditions on the ground. The Ninth Circuit has

recognized, including in California Wilderness Coalition, that the consultation requirement, when consultation is written into the statute, is an affirmative duty.  It must be meaningful, and it must come prior to a decision being made.  So what --

THE COURT:  What cite is this for a consultation must be meaningful?

MS. MACLEAN:  It's California Wilderness Coalition. We've cited it in our brief.  I don't have the pincite, but I can get that for you.

THE COURT:  But that was not a case under 1254, I take it?

MS. MACLEAN:  No, it was not under 1254.  However --

THE COURT:  So it's by analogy, another statute that talks about agency consultation?

MS. MACLEAN:  It's by analogy to another statute, but it's also clearly elaborated in the Saget case, which, after a trial, considered the historical practice and also the reverse engineering during the first Trump administration of the TPS termination of Haiti.

And in Saget, the Court recognized the critical nature of both the country conditions -- the sort of three fundamental aspects of any periodic review process.  State Department consultation, because of the direct -- the specific information that the State Department has about country conditions, the USCIS RAIO country conditions report that has consistently

provided an analysis of country conditions, and the decision memo that has been consistently provided by USCIS subject matter experts in the termination --

**THE COURT:**  So you read this statute as requiring at a minimum those three specific things occur as part of the consultation?

**MS. MACLEAN:**  The two specific things that we read as required by the statute are consultation with the state -- during a periodic review process -- are consultation with the State Department about country conditions and analysis of country conditions.  And we do not see either of those things happening here.  So that is both because of the process, decision-making process that was preordained and pretextual, but also a complete disregard of statutory obligations.

**THE COURT:**  So you're saying the record establishes there was no consideration of country conditions?

**MS. MACLEAN:**  There was effectively no consideration of country conditions.  What the Secretary did, similar to what my colleague was describing with the vacatur process, is come up with a shell termination notice even before the vacatur decision had been -- the vacatur package had been sent to the Secretary.  That's in Exhibit 11 of ECF 258.

The office of general counsel that was managing the process of drafting both the Federal Register notice for the vacatur and the federal register notice for the termination

said in a single email the day before the Secretary signed the vacatur, "I'm working on a memo for the vacatur notice, and I'm circulating a shell of the termination notice based on the Haiti termination," presumably from the previous Trump administration.

And then from there, we've seen from the extra-record discovery that's available in this case, efforts by the decision-makers to fill in cherry-picked examples that would support termination in the termination notice. There's no request for a country conditions review from the RAIO country conditions experts. Instead, what we've seen is a request to the country condition experts to find cherry-picked examples of positive improvements. That's a direct quote --

**THE COURT:** So that goes to the -- that's really the preordained argument, that it was already preordained and that looking for evidence to support that as opposed to -- you're not saying there was no consideration. Maybe there was post-facto consideration and not a genuine consideration.

**MS. MACLEAN:** There's not a genuine, good faith consideration, and that has been addressed in the 1254a consideration in the Saget case where the Court in Saget recognized that the statute as written presumed and required and had the intent for a genuine, good faith, objective review of country conditions, and we certainly do not see that here from either looking at the administrative record or --

**THE COURT:** All right. So your position is not that there was zero consideration, but it was not good faith. It was post facto consideration. And that applies both to Haiti -- well, of course the Haiti termination is on a motion to dismiss before this court, not a summary judgment.

**MS. MACLEAN:** Yes, Your Honor.

**THE COURT:** It applies to both countries.

**MS. MACLEAN:** Yes. Essentially what we're seeing here is complete disregard for the country conditions review that is written into the statute. To the extent that, you know, you could have a secretary say, you know, I watched a TV program about what's going on in Venezuela, and therefore, I've considered country conditions.

That's certainly not what the statute either says or what is the underlying intent of the statute. The statute requires an evaluation of country conditions at the periodic review process.

**THE COURT:** Well, let me ask -- and I want to give your opponent a chance to respond, but along these same lines but maybe slightly different, there's a change in practice, certainly, at the release, that compressing the timeline that would normally take months into days and not the full country conditions report, not the full consultation, etcetera, etcetera, decision memo.

Does that change in practice, even though if it's not

codified in a regulation or a formal rule -- is that enough to trigger the sort of heightened scrutiny under the APA?  I forget what case that is that says if there's a change in rule, that requires some additional justification and explanation. Does that apply to a practice?

MS. MACLEAN:  It does apply to a practice.  Your Honor considered that extensively in Ramos, and we do believe that that could be at issue.  We have not briefed that here, but we certainly do believe that the change in practice is enough to -- could be enough to also be an APA violation.

THE COURT:  Has there been any case law since my now five-year-old or whatever decision or whatever in Ramos that addresses this -- whether change in practice, not formal regulation or rulings subject to sort of this heightened scrutiny or additional justification?

MS. MACLEAN:  I believe that the Saget case also considered a change in agency practice and that that postdated Your Honor's decision in Ramos.  And there's certainly other APA case law that addressed this issue outside of the 1254a context.

THE COURT:  Okay.  All right.  Let me hear from Mr. Weiland.  The argument -- first of all, sort of the factual argument that here this is like the Department of Commerce because things were so clearly decided and preordained.  It's not a 90 percent decision.  It was a hundred percent decision.

And then I'd like you to address whether heightened scrutiny applies because this is a change -- at least procedurally, this was a different process that was followed than the usual months-long solicitation of the country conditions report, etcetera, etcetera.

**MR. WEILAND:**  Yes, Your Honor.  There's a lot to unpack here, so please forgive me if I bounce around a bit.

I'd like to begin by focusing on what consultation should be about, and this is essentially the heart of the plaintiff's case.  They are arguing that this court should determine and should instruct the Secretary what the consultation should be about, and it should be about particular aspects of the country conditions.  The record is clear, both the administrative record and the Federal Register notice, that the country conditions were considered.

What they're asking you to do is weigh or reweigh how those country conditions should come out, and that is -- again, not to circle back to it over and over again, but, again, this is a reason why the Government has --

**THE COURT:**  Well, to be fair, I don't think the argument is that I should reweigh the merits of the decision.  The question is whether there was actual consideration, whether this was just window-dressing or whether a decision had already been made uninformed by country conditions.  It's almost a binary question, not a kind of more amorphous question of was

it a decision or not.

**MR. WEILAND:**  At its extreme limit, yes, Your Honor, I wouldn't dispute that.  But what's not a part of this -- and this is, again, getting back to the earlier conversation we had, and I don't intend to rehash it, but this is also about national interest.  That is a consideration.  And that is something that consultation with appropriate agencies is contemplated or at least a topic of conversation that the consultation can cover, and that's what the record reflects in this case as well.

So it's not just about whether or not country conditions review occurred, which the defendants assert did.  The determination that came out as a result was something other than what plaintiffs wanted to see balanced, but also about the national interest.  With regards to the --

**THE COURT:**  The national interest wasn't invoked with respect to the vacatur.

**MR. WEILAND:**  No, Your Honor.

**THE COURT:**  It was about the termination.

**MR. WEILAND:**  Yes.  With regard to the vacatur -- and Your Honor has heard these arguments, I think, already, and so I don't mean to -- in the context of its consideration of the 705 postponement motion.  Certainly, Defendants continue to assert that the Secretary had the authority to reconsider the extension for both countries.  It's on its most firm footing

with regard to the Venezuela vacatur because Defendants continued to assert that it had not taken effect until April. But I understood this conversation to be a bit about the termination as well.

THE COURT: Well, okay. So I think your argument, as I understand it, that even if I were to put aside whether there was proper consideration or not of country conditions, the consideration of national interest could have sort of trumped everything else, and that was something that was considered?

MR. WEILAND: Yes, sir, in consultation with the appropriate agencies.

And if I might, with regards to the vacatur, there's -- and this gets back to the authority the Secretary has and whatnot, but there's no requirement that country conditions be considered in that context. That's not in the statute. That is just the Secretary exercising her authority to administer foreign policy and immigration policy.

So to the extent they are asserting that there should have been some consultation that occurred, country conditions should have been considered with regard to the vacatur, none of that is required by the statute. That's all related to a decision under periodic review to terminate in this instance.

With regards to the shell notice, Your Honor, that's just staff work. That's what staffs do. They put together documents in anticipation of what they think their boss is

going to do, and they build it out.  And in particular --

**THE COURT:**  But doesn't that suggest that evidence was lacking by the time that notice was directed to be drafted and all that?  Obviously a decision was made, it seems like, in order to conclude to give the notice, but the content of those communications suggests it's just evidence that there had not been consideration of a number of things and when the decision had already been made.

It has evidentiary value.  I know that's what staff does, but isn't it unusual to tell the staff, "Well, come up with reasons, substantive reasons," not "Here are the reasons.  Put it in a notice"?  It's the inverse here.

**MR. WEILAND:**  No, Your Honor.  I don't think that's unusual.  Defense would push back on that as well.  Asking your staff to put together a package and giving them an understanding of what direction you're intending -- or inclined to go is not hunting for things.  It's not a pretext.  It's not that the decision was already made.  It's the staff doing its job.

And this is -- and what you see in these communications again, Your Honor, this is up to the court's interpretation of the evidence, defendants assert that it reflects the staff give and take on putting this together, and on a short timeline, as Your Honor noticed, but that's just because there was an impending deadline, and so the staff was working quickly and

with some alacrity did you want --

THE COURT:  Well, wasn't that deadline self-imposed?
I mean...

MR. WEILAND:  Well, no, Your Honor, it wasn't, at
least with regard to the Venezuela vacatur, it wasn't because
the deadline was based on the 2023 extension.  What -- if -- I
don't know how you would, the agency would allow the 2025
extension to go forward and then --

THE COURT:  Well, you do a partial vacatur like was
done with Haiti, I mean, instead of saying we're going to
vacate to the extent it goes beyond X, and you give a 60-day
notice, and you calibrate that.  So I'm not sure what the
deadline was other than a rush to get it done.

MR. WEILAND:  Yes, Your Honor.  Defendants assert
there's no problem with moving quickly.  And yes, Your Honor,
Defendants assert that she has the authority to act on a
partial vacatur.  Certainly, we think she's on her strongest
footing, the agency's on its strongest footing with regards to
an extension that had yet to take effect.

THE COURT:  What about the -- my question about
whether there was a change in practice here with respect to
the -- you know, the compressing of the timeline and the
truncated manner in which the consideration was given to
country conditions, etcetera, etcetera.  Doesn't that
constitute a change in practice or policy that then requires

under the APA the Secretary explain why the change?

MR. WEILAND:  Not in this context, Your Honor.  This is a discretionary decision left to the Secretary.  There's no process mandated in particular by the statute.  There's no requirement that she file the process followed by her predecessor.

THE COURT:  That's true in all those cases.  I mean, there's a change in policy.  The argument is not that that was necessarily prohibited, but when you reverse a policy because of their reliance interest, ability, etcetera, etcetera, the burden is usually put upon the agency to at least explain the change.  Doesn't say you can't do it.  You've just got to explain it.  Why doesn't that apply here?

MR. WEILAND:  Because those cases don't arise in this context.  This is the -- a very particular statute with regards to the designation of countries for protected statuses.  The case -- this is right at the height of the executive authority for determining foreign policy and immigration policy.  And so many of the cases that are addressing matters that are not in that arena are really, defendants would assert, inapposite.

THE COURT:  Although if we're being specific, the statute does say "after consulting with appropriate agencies of the Government."  So some kind of consultation is required.  So it's not just totally discretionary, secretary can do what it wants.  There is some directive by Congress here.  And so if

there's a change in that process, it's not just we've had sort of unbounded discretion.  We're doing it one way.  Now we're going to do it another way.  Here, there was -- in carrying out this statutory mandate, there was a change.  Doesn't that give some force to requiring the Secretary to come up with some explanation for why the change?

**MR. WEILAND:**  No, Your Honor.  Defendants would not concur with that.

**THE COURT:**  Okay.

**MR. WEILAND:**  The consultation is required.  The consultation occurred.  That is all the process --

**THE COURT:**  But not in the way it had been done for the last 30-some-odd years.

**MR. WEILAND:**  And the statute doesn't require that, and in this arena, this is not something that is...

**THE COURT:**  All right.  Let me talk about if there is relief, the whole question now of scope of relief in view of CASA, in view of Immigration Defenders case.  As we know, CASA left open, the Supreme Court left open in footnote 10 APA whether you can have a nationwide vacatur under 706 and reserve that question.  And as we previously briefed, that question had been sort of reserved in prior decisions.

We now have the most recent decision from the Ninth Circuit on immigration defenders, which says that -- not directly governed by CASA but that some of the consideration

should apply here, although that was in the context of a preliminary -- I think it was a postponement, if I'm not mistaken. Not clear whether those considerations apply with the same force with respect to a final vacatur decision as opposed to postponement, 706 as opposed to 705.

What's your view of the appropriateness or inappropriateness of nationwide relief if I were to grant summary judgment for the plaintiffs in this case on, let's say for instance, the APA claim?

**MR. WEILAND:** Yes, Your Honor. The defendants view is that universal relief, in light of CASA, would be inappropriate, even in the 706 construct. Admittedly, the Supreme Court declined to speak to that in the CASA case, but immigrant defenders did recognize the appropriate conceptualization of complete relief, which is what the issue really is, complete relief, is what the Court may provide. And universal relief is, in this context, not appropriate or necessary. The Court's order should limit relief to the parties.

And I think it's important, at least to note for the record -- the Government has made this argument in other cases -- that 706 does not create a new form of relief. Relief under the APA is governed by 703, and that embodies or encompasses -- or imports maybe is the better word -- the equitable principles that were at play in CASA. And 703 does not authorize

universal vacaturs of agency actions.

**THE COURT:** What is the language that imports the history of equity? You said 703 imports --

**MR. WEILAND:** Yes, sir. This imports the common law, the principles that were at issue in CASA.

**THE COURT:** Can you read me the language of 703 that says that?

**MR. WEILAND:** I don't have that language in front of me, unfortunately, Your Honor. I can provide it to you though, or I --

**THE COURT:** But your position then is that all the discussion about historic equity and its roots --

**MR. WEILAND:** Yes, sir.

**THE COURT:** -- going way back have been essentially imported into the APA?

**MR. WEILAND:** Yes, sir. 703 is the mechanism by which that -- as I understand it, 703 is the mechanism by which that occurs. And Section 706, which governs the Court's review, doesn't in and of itself create a new remedy in the form of universal vacatur of a decision. And therefore, to the extent that the principles that apply or were applied in CASA were recognized as informative by the Ninth Circuit in immigrant defenders, those apply with equal force here.

**THE COURT:** All right. Let me -- well, do you want to add anything to that?

**MR. WEILAND:** No, Your Honor, other than just to address *Washington v. Trump*. I think you asked as well that the parties be prepared.

**THE COURT:** Yeah.

**MR. WEILAND:** And in that context, the unique nature of the parties being states distinguishes *Washington v. Trump* from immigrant defenders in that context, and we don't have states as parties here.

**THE COURT:** But is there an analogy here -- I know states have sovereign power and all this, but here we have the association of the plaintiff is a nationwide association with folks all over the country. So how would relief -- if relief were to be granted look like that wherever they reside, the members of the association would get the benefit of the vacatur but those who are not? And how would that actually be enforced? Would ICE just have to go around and ask for proof of membership, or would there be a membership list? How would that work?

**MR. WEILAND:** Yes, sir. This question came up recently, and what I was informed by the agency is that no, ICE wouldn't have to determine someone's membership. The association who's asserting associational standing here knows who their members are, and those members could be identified and provided documentation by the agency that shows they have continuing protected status.

**THE COURT:**  But the individual members would have to be identified somehow?

**MR. WEILAND:**  Yes, sir.  I mean, that's the crux of associational standing.  They're standing in the shoes of their members.  Certainly, they know.  They identified some, but certainly they know who the others are.  They would be identified and then provide --

**THE COURT:**  That would begin to impinge upon associational rights and privacy rights and First Amendment rights.

**MR. WEILAND:**  No, Your Honor.  They've brought this lawsuit as an association.  If they want the relief for the members of their association, they should -- I don't think it would be inappropriate to say then identify who those members are so that they may receive the relief you're seeking on your behalf.

**THE COURT:**  Well, when they brought this suit, it wasn't clear that that would be required, but...

**MR. WEILAND:**  Yes, Your Honor, and I suppose if they don't want the relief, they could ask the association not to advance their name.

**THE COURT:**  So it would be their choice, is what you're saying?  Someone would have to choose between giving up their identity at some risk, whatever might happen, including possible retaliation, versus getting the relief of a vacatur?

**MR. WEILAND:**  Your Honor, the Government would not accept the formulation that by identifying themselves as a party in this case they are somehow going to be subjected to retaliation or anything along those lines.

**THE COURT:**  Okay.  All right.  Let me hear the response.  And in particular, what do we do -- what should the Court -- how should the Court treat the Ninth Circuit's decision in the context -- admittedly, this is not a preliminary.  This is not a postponement but an ultimate vacatur.  Does that make a difference under the Ninth Circuit's recent decision?

**MS. BANSAL:**  It makes all the difference, Your Honor.  Section 706 relief is a set-aside.  It's not an injunction.  The text of Section 706 says that the reviewing court, if it finds the agency action violated the APA, shall hold unlawful and set aside.  There are decades of precedent from the Supreme Court, the D.C. Circuit, this court, affirming vacaturs under Section 706 of the APA.

The authority in the Ninth Circuit is the East Bay Sanctuary case.  ImmDef does not mention that case when it discusses scope of relief.  It's not possible, Your Honor, that the Ninth Circuit intended to overrule these decades of precedent to reinterpret the text of Section 706 and to trigger --

**THE COURT:**  What's the strongest -- give me the cites

for the -- you say decades of precedent.  What would be your most on-point cite for that?

**MS. BANSAL:**  In the Supreme Court's decision in Corner Post, Your Honor, Justice Kavenaugh writes a concurrence in which he collects the strongest examples of this.  And he explains that it would be a sea change in administrative law, and it would render entire categories of agency action essentially unreviewable if courts were to hold that vacatur is not -- no longer the appropriate remedy under Section 706.  I can get you the citation for that case.

**THE COURT:**  But that was addressing nationwide scope of vacaturs, not just vacaturs.

**MS. BANSAL:**  Yes, Your Honor.  So that case says set aside means you set aside the rule.  So it's not a nationwide injunction.  It's almost like a veto of the rule.  The rule no longer exists, and that's as to everyone.  And in many Administrative Procedure Act cases, as Justice Kavenaugh discussed, that's the only way parties can get relief.

Chief Justice Roberts recently described, you know, the argument that my friend, opposing counsel, is making is an argument that they can make to the Supreme Court.  Chief Justice Roberts described it as a fairly radical argument recently in *Biden v. Texas*, but it's not available to this court.  This court is bound by the precedent in East Bay Sanctuary regarding --

THE COURT:  How do you -- I mean, I'm reading it. Maybe I'm reading it too closely, the Immigration Defenders case.  The decision does say that the guidance from CASA is informative because factors used determine of whether the issue, if 705 stay has the same equitable factors you use to consider whether to issue a preliminary injunction.  So it is clear in that context.

But there's also sort of general language about well, although the APA was reserved in CASA, quote, "its complete relief principle for crafting injunctive relief provides some useful guidance for crafting" -- it does say "interim equitable relief."  So you would emphasize the interim?

MS. BANSAL:  And that equitable, Your Honor.  So Section 705 is sort of disjunctive.  It says that courts can postpone agency action or preserve status and rights to prevent irreparable injury.  And I think -- and, you know, we had previously argued to the Court at the 705 motion that all 705 relief is a lesser form of Section 706 relief.  I think that argument is foreclosed by ImmDef.  It says at least this Section 705 postponement motion is a form of equitable relief.

Set-aside is not an injunction, Your Honor, and it's not guided by those same principles.

THE COURT:  And so if unlawful action is found, invalid action is found under 706, the Court doesn't -- at that point issues the vacatur without weighing the typical equity

factors?

MS. BANSAL:  That's correct, Your Honor.  There's no --

THE COURT:  What's the best cite for that?

MS. BANSAL:  That's Section 706 yourself, Your Honor. Any aggrieved party can seek review of an action.  You don't have to show irreparable injury to win Section 706 --

THE COURT:  Has a court held that you don't have to show, quote, irreparable injury to get relief vacatur under 706?

MS. BANSAL:  I believe so, Your Honor.  I'd have to check that East Bay is the correct case.  But all these cases, all this precedent -- they don't ask if there's irreparable injury before they grant set-aside.  The standing for the APA claim is established based on being aggrieved by the agency action, and then if the agency action is unlawful, the Court shall set it aside.

I should say, Your Honor, also that in the wake of CASA, district courts in the D.C. circuit and elsewhere, including in immigration cases, have rejected the argument presented by opposing counsel and have continued to order set-aside as the appropriate relief.

THE COURT:  What's your view of counsel's argument that 703 essentially imports equity into the APA?

MS. BANSAL:  Your Honor, that's an argument that he's

free to make to the Supreme Court, but I think that argument has been rejected by the Ninth Circuit in East Bay.  My understanding is that the APA incorporates existing administrative remedies available at that time, but I think that this issue is --

THE COURT:  What did East Bay reject, specifically the idea of importation of equity?

MS. BANSAL:  The idea that 706 is an equitable remedy, that you have to meet the Winters factors in order to get a set-aside under the APA.

THE COURT:  So if, in fact, there is case law that says you don't consider the equity factors like irreparable injury, balance of hardships or any of that, that would be sort of proof positive that 706 is divorced from equity?

MS. BANSAL:  Yes, Your Honor.  In all these cases, again, there's no analysis of irreparable harm when these courts are granting set-aside.

THE COURT:  Is there anything in the language of 703 that causes you pause?

MS. BANSAL:  No, Your Honor.  I think Section 706 is where the remedy is.  Section 706 is what directs the Court what the appropriate remedy is for an APA violation.  This sort of new and novel argument that opposing counsel is presenting is not one that's been accepted by the courts before, to my knowledge, by any courts, including after CASA.

**THE COURT:**  Okay.  All right.  Let me ask about where this case goes if the Court were to find, were to grant your motion on the APA claim, whether it's on the vacatur or the vacatur and/or termination.  I don't know if I have to -- you know, I'm going to have to see.  You know, I am going to take this under submission.

But if the Court were to grant relief, what would happen -- what would remain which would be un-adjudicated?  And if I were to deny the defendants' motion for summary judgment on the equal protection claim because there are factual issues here, it seems to me it could be a fact-based determination and there's enough evidence, in my view, for reasons stated in my earlier order, that suggests there is racial animus here.

If I deny that, that claim is still alive.  The termination of the -- if I were to deny the motion to dismiss the termination claim of the Haitian TPS beneficiaries, so that termination decision would not have been adjudicated, but the vacatur -- for instance, if I find vacatur was unlawful and without statutory authority, which would affect both groups, Haitian and Venezuelans, and I were to issue a 706 vacatur order, what is your view as to what happens to the rest of the case?

We saw what happened before Judge Cogan in New York with respect to the Haitian equal protection claim.  What's your view what should happen?

**MS. BANSAL:** I mean, our view, Your Honor, is that the Court should proceed to decide the equal protection claims because the decision on the other claims would be subject to potential appeal, and --

**THE COURT:** So it would not be moot?

**MS. BANSAL:** Correct, Your Honor.

**THE COURT:** I mean, in a way, if you got complete relief, it's sort of moot, although that's conditionally moot because that's conditioned on that relief surviving appeal. So your assertion would be since it's not final, final in the sense that it's not over, that the Court should adjudicate all claims?

**MS. BANSAL:** Correct, Your Honor.

**THE COURT:** And how would you propose to proceed on the equal protection claims?

**MS. BANSAL:** I think we, you know, can provide a written proposal to Your Honor if you wish. I think to the extent the Court doesn't grant our motion for summary judgment and denies Defendants' -- sorry. Pardon me. We haven't moved for summary judgement on the claim. To the extent the Court denies the Government's motion for summary judgment on that claim, there would need to be an evidentiary hearing on that claim at some point.

**THE COURT:** Or trial. And what would that -- well, I don't know how far you've gotten down that road, but what would

that look like?

**MS. BANSAL:**  We haven't gotten far on that road, Your Honor.  We'd be happy to present a proposal to the Court about what that would look like.

**THE COURT:**  So I take it your proposal would be if I were to grant your summary judgment on the APA claim, I enter a judgment pursuant to Rule 54(b)?

**MS. BANSAL:**  On that partial summary judgment, Your Honor?  Is that...

**THE COURT:**  And what about the same on the question of termination of the Haitian TPS claim?

**MS. BANSAL:**  So if the Court were to hold that the -- you know, to set aside the vacatur, then the termination is unlawful is one of our claims because it's premised on the unlawful vacatur, both in terms of the timing.

**THE COURT:**  What about the other bases of asserted unlawfulness of the termination?

**MS. BANSAL:**  We think that the Court could continue to reach a decision on those other bases.

**THE COURT:**  So you would want the Court to rule on everything?

**MS. BANSAL:**  Yes, Your Honor.

**THE COURT:**  What do I do also with respect to the fact that the Eastern District of New York, Judge Cogan has issued relief for the Haitians?  Is it proper for me to opine?

**MS. BANSAL:** I think it's proper, Your Honor, again, because that decision is not final. I mean, if the time for appeal were to run and the Government were to not appeal, that might change, but as of now, that decision could be appealed, and that protection could be revoked at any time. So it's our position --

**THE COURT:** When does the appeal time run?

**MS. BANSAL:** I believe the Court entered a final judgment on July 15th, Your Honor, so it would be somewhere around September 15th. I don't know if opposing counsel...

**THE COURT:** If I were to -- I'm just thinking ahead. If I were to proceed with adjudication, including the constitutional claims, which would not be an APA 706 but a permanent injunction is what you would be seeking, I take it, then we do run into the CASA thing squarely. And would it be your intent to, for instance, seek class certification, or what would -- what lies ahead here?

**MS. BANSAL:** Your Honor, I don't think we've made a firm decision on that question. I think regarding the relief on the constitutional claim, even if -- with, you know, just on the constitutional claim, not in APA set-aside land, it's our position that universal relief is necessary to provide complete relief to the plaintiff in National TPS Alliance. We won this argument yesterday.

**THE COURT:** So I actually do want you to respond to

the Government's argument that you can get complete relief by turning over the list of all the members and they would be immunized under, you know, some injunction or some vacatur order.  Why doesn't that afford complete relief to the plaintiff association?

**MS. BANSAL:**  A few things, Your Honor.  I mean, as the Court recognized, the First Amendment concerns are serious there.  The Supreme Court says in *NAACP v. Alabama*, that infringes First Amendment rights when a membership organization is required to give its list of members to the Government.  I think --

**THE COURT:**  There's a waiver argument that the Government -- if you're going to participate in a suit, or you could -- the individual members can not disclose.  If they ask for a nondisclosure, they just wouldn't get the protection.  So it's a little different than a unilateral decision forcing, you know, turnover of lists.

**MS. BANSAL:**  Right, Your Honor.  At a minimum, we do think we'd be in that second world where the TPS Alliance -- you know, even setting aside this chilling concern, generally keeps its members' information private.  And so they would need to ask their members for permission to share that information. We're talking about upwards of 200,000 TPS holders, Your Honor. The TPS Alliance is committed to protecting its members as best as possible.

I spoke to Mr. Palma, who's the co-coordinator of the TPS Alliance, you know, sort of about this question. They have one full-time staff, Your Honor. They have two part-time staff. To set up a system by which 200,000 people need to waive any First Amendment right to sharing their information with the Government and then to merge those files, Your Honor. I mean, the TPS Alliance maintains information about its members, their names, contact information, their zip codes. They don't have street addresses. They don't have personally identifying information.

The process of merging that information accurately with whatever records immigration has to make sure people receive timely notices, you know, that opposing counsel has indicated that they would send out inevitably will result in errors, Your Honor, and this was part of the reason for Judge Thompson's decision.

People will be detained, Your Honor, in direct violation of the statute, who are members of the alliance, because of the time it takes, the incredible burden that this would put on the National TPS Alliance, and mistakes that result from merging two different data systems, Your Honor. So to the extent the Court is considering this -- and I know, you know, we're talking about down the line -- we would request the opportunity to put that into evidence declaration and brief it.

THE COURT: Okay. Thank you.

Let me hear from Mr. Weiland, your thoughts about if the Court were to grant vacatur on the APA claims and enter a judgment on Rule 54(c) that would leave the other matters that haven't been adjudicated, if I were to deny the motion for summary judgment, for instance on the equal protection claim, what are your thoughts about where we would go?

MR. WEILAND:  On the future proceedings in this case, Your Honor?

THE COURT:  Yeah.

MR. WEILAND:  I think it's important to note at that point the plaintiffs would have received all the relief they've requested.  They would -- you would have wiped out the vacatur and the -- of the extension, and the extension would take legal effect.  So continuing proceedings in this matter would just be for the purpose of having the proceedings themselves as opposed to granting any relief, and we don't think that's a basis to get beyond mootness.

I will readily acknowledge that the defendants are likely to ask Your Honor if you are to rule against them that you stay your ruling while we seek authorization or whether or not authorization to appeal will be granted.  I suspect that would be the outcome of that motion in light of the assumption that you would have already granted relief here.

And then in that instance, while it's pending appeal, the defendants would say if the case is not dismissed as moot since

all the relief had been granted that you --

**THE COURT:** I'm sorry. Say that again?

**MR. WEILAND:** That if the case had not been dismissed as moot, in that instance that you at least stay the case pending the outcome of the appeal. There seems to be very little to be gained and a lot of resources to be wasted litigating a case that does not -- where the end result may be to get no more relief from the plaintiffs than they already have received from this court.

**THE COURT:** So if you were to obtain -- let's say I ruled in favor on the APA claim in favor of the plaintiffs and granted a vacatur, but then it's stayed, whether by me or by the Ninth Circuit or by the Supreme Court, would that then un-moot the equal protection claim?

**MR. WEILAND:** It certainly would call into doubt whether or not they have the relief they've demanded before the Court, Your Honor.

**THE COURT:** Okay.

**MR. WEILAND:** I haven't yet confronted or looked into that question. I imagine it would require -- or we would ask to be heard in some briefing context on that, but there is a logic to it.

**THE COURT:** Okay. All right. Well, this has been helpful. I appreciate the -- oh. You have a comment?

**MS. BANSAL:** Could I be heard on the stay question

just briefly, Your Honor?

THE COURT:  I'm sorry.  What's that?

MS. BANSAL:  Could I respond to what the Government just said about staying your order --

THE COURT:  Yeah.

MS. BANSAL:  -- if you were to grant, just briefly, Your Honor?

THE COURT:  Yeah.

MS. BANSAL:  You heard our discussion of the declaration of Amelia Garcia every day since May 19th.  Members of Plaintiff TPS Alliance are being detained, are being deported.  That possible damage from a stay is a key factor to be considered under Landis, Your Honor.  It's the reason that the Court has in the past denied motions to stay and reconsider this case.

The Supreme Court, you know, prior stay order doesn't change that, Your Honor.  It doesn't provide any reasoning, so it cannot be precedent.  You cannot follow something that gives no reasons, Your Honor.  And under the traditional stay standards, it's clear that the harm to Plaintiffs --

THE COURT:  Okay.  I haven't been -- there's been no motion to stay.  There's been no order of this court, nothing to stay yet.  Obviously I'll give you a chance if there is -- if I do grant relief, and there's a motion to stay, you'll have a chance to respond.

**MS. BANSAL:**   Thank you.

**THE COURT:**   And I have some familiarity with the arguments, but I would welcome full briefing at that point, if we get there.

All right.   With that, I will take the matter under submission.   Thank you.

**THE COURTROOM DEPUTY:**   This hearing is concluded.

(The proceedings concluded at 11:41 A.M.)

---o0o--

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Friday, August 15, 2025

_____

April Wood Brott, CSR No. 13782