UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL TPS ALLIANCE, et al.,

Plaintiffs,

v.

KRISTI NOEM, et al.,

Defendants.

Case No. 25-cv-01766-EMC

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND DENYING DEFENDANTS' MOTIONS TO DISMISS**

Docket Nos. 122, 165, 199, 172, 262

At issue in this case are the rights of hundreds of thousands of nationals from Venezuela and Haiti who temporarily reside legally in the United States under a law passed by Congress in 1990. That law, the Temporary Protected Status ("TPS") statute, affords temporary relief to nationals from designated countries who cannot safely return to their home countries due to extraordinary and temporary conditions such as armed conflict, earthquakes, floods, drought, and epidemics. For 35 years, the TPS statute has been faithfully executed by presidential administrations from both parties, affording relief based on the best available information obtained by the Department of Homeland Security ("DHS") in consultation with the State Department and other agencies, a process that involves careful study and analysis. Until now. This case arose from action taken post haste by the current DHS Secretary, Kristi Noem, to revoke the legal status of Venezuelen and Haitian TPS holders, sending them back to conditions that are so dangerous that even the State Department advises against travel to their home countries. The Secretary's action in revoking TPS was not only unprecedented in the manner and speed in which it was taken but also violatates the law. For the reasons explained below, the Court find that the Secretary's

actions in vacating the orders of the prior administration and terminating TPS exceeded the Secretary's statutory authority and was arbitrary and capricious, and thus must be set aside under the Administrative Procedure Act ("APA").

## I. INTRODUCTION

In 1990, Congress enacted the TPS statute, codified at 8 U.S.C. § 1254a, to bring coherence, discpline, and predicatability to the extended volutary departure process that existed prior to 1990. *See National TPS Alliance v. Noem*, No. 25-2120, 2025 U.S. App. LEXIS 22269, at *10 (9th Cir. Aug. 29, 2025) [hereinafter *NTPSA*] (emphasizing that "Congress designed a system of temporary status that was predictable, dependable, and insulated from electoral politics"). Prior to 1990, extended voluntary departure was "the primary mechanism by which the federal government allowed groups of nationals to remain in the United States for humanitarian reasons." *Ramos v. Wolf*, 975 F.3d 872, 879 (9th Cir. 2020), *vacated for rehearing en banc*, 59 F.4th 1010 (9th Cir. 2023); *see also NTPSA*, 2025 U.S. App. LEXIS 22269, at *11 (noting that, for about three decades before the enactment of the TPS statute, "presidential administrations exercised prosecutorial discretion to grant protection from deportation to certain groups of noncitizens on an ad hoc basis," which was called extended voluntary departure). "Because administrations granted [extended voluntary departure] on an *ad hoc* basis without 'any specific criterion or criteria,' the practice led to arbitrary results and drew widespread criticism." *Ramos*, 975 F.3d at 879. Accordingly, Congress prescribed in the TPS statute the criteria and the process that the Secretary of DHS is to follow in deciding whether to designate a country for TPS, thus allowing residents of such country to remain temporarily in the United States.[1] Congess specified the kind of country conditions severe enough to warrant a designation under the statute. *See* 8 U.S.C. § 1254a(b)(1). It also prescribed the specific time frame for any such designation. *See id.* § 1254a(b)(2). And it prescribed with specificity the process for periodic review of a TPS designation, *i.e.*, whether to

[1] The TPS statute "originally provided the Attorney General with this authority," but, "[w]ith the Homeland Security Act of 2002, the former Immigration and Naturalization Service was transferred to the Department of Homeland Security, and the responsibiltiy for administering the TPS was transferred from the Attorney General to the Secretary of DHS." *Ramos*, 975 F.3d at 879 n.1.

terminate or extend such a designation. *See id.* § 1254a(b)(3). Significantly, in both the original designation and periodic review process, Congress expressly required the Secretary of DHS to engage in "consultation with appropriate agencies." *Id.* § 1254a(b)(1); *id.* § 1254a(b)(3)(A).

In view of the gravity of TPS decisions – which profoundly affect the lives of non-U.S. citizens faced with the risk of dangerous or extraordinary conditions were they to return to their home countries – past administrations have for years engaged in a methodical process to carry out the TPS program. This process, consistent with the express directive of the statute, has long included consultation with agencies that have information and expertise on country conditions which inform the designation criteria under the statute – agencies such the Department of State. As described in a 2020 report prepared by the U.S. Government Accountability Office, which was tasked with reviewing the TPS decisionmaking process, *see* MacLean Decl., Ex. 16 (GAO TPS Rpt. at 18) (in reviewing the collection of information by DHS, taking into account "26 TPS decisions for . . . eight selected countries"), DHS collects country conditions information from both USCIS (an internal DHS agency) and the Department of State. The State Department process for collecting information in turn involves getting input from the relevant regional bureau of the Bureau of Population, Refugees, and Migration, as well as from the relevant overseas post, which has "on-the-ground" information on the country at issue. As is evident from this brief description, this process is deliberative and takes time. *Cf.* 8 U.S.C. § 1254a(b)(3) (providing that the Secretary shall conduct the periodic review "at least 60 days before end of the initial period of designation, and any extended period of designation," which is "*after* consultation with appropriate agencies") (emphasis added).

For the first time in the 35-year history of the TPS program, the Trump Administration and DHS Secretary Noem took the extraordinary and unusual act of vacating TPS extensions that had already been granted – specifically, extensions given by the prior administration to Venezuela and Haiti. *See NTPSA*, 2025 U.S. App. LEXIS 22269, at *54 (emphasizing that "the Government has never, in the thirty-five-year history of TPS, sought to vacate a prior extension of TPS"). They did so even though this action is not, as the Ninth Circuit has strongly indicated, statutorily authorized. *See id.* at *39 (stating that "Plaintiffs are likely to succeed in their claim that Congress has

displaced any inherent revocation authority by explicitly providing the procedure by which a TPS designation is terminated").  And they did so so that they could then terminate the TPS designations on an unprecedentedly rapid timeline.  The decisionmaking process was highly truncated and condensed, taking place over a short period of time (in the case of Venezuela, just days) and, apparently, without the consultation of the appropriate agencies.

Specifically:

- In January 2025, days after the second Trump Administration took over, Secretary Noem vacated a TPS extension for Venezuela that had been given by her predecessor, Secretary Alejandro Mayorkas of the Biden Administration.  As discussed below, the decision to vacate the extension was made and steps towards implementation were put in place even before Secretary Noem took office.  No meaningful review process took place.  Days later, Secretary Noem terminated Venezuela's TPS designation.

- In February 2025, following on the heels of the Venezuela termination decision, Secretary Noem partially vacated a TPS extension/redesignation for Haiti that had been given by Secretary Mayorkas – shortening the TPS period from 18 to 12 months.  As discussed below, this decision appeared to be pre-ordained without any real review of whether there was a basis for vacatur.  Subsequently, in July 2025, Secretary Noem terminated the TPS designation for Haiti.

Plaintiffs have filed suit challenging each of the above decisions by Secretary Noem.  Plaintiffs allege that, in issuing her decisions, the Secretary violated both the APA and the Equal Protection Clause of the U.S. Constitution.

Now pending before the Court are several motions: (1) two motions to dismiss filed by the government; (2) Plaintiffs' motion for summary judgment on the APA claims only; and (3) the government's motion for summary judgment on both the APA and Equal Protection claims.  In addition, in conjunction with their summary judgment briefs, Plaintiffs have filed a motion to consider extra-record evidence.  Having considered the papers submitted as well as the oral argument of counsel, the Court hereby **GRANTS** Plaintiffs' motion to consider extra-record

evidence; **GRANTS** Plaintiffs' motion for summary judgment on the APA claims; **DENIES** the government's motion for summary judgment on the APA and Equal Protection claims; and **DENIES** the government's motions to dismiss.

## II. <u>BACKGROUND ON TPS</u>

As part of the Immigration Act of 1990, Congress created the TPS program. The TPS program is a humanitarian program. The governing statute is codified at 8 U.S.C. § 1254a. Under § 1254a,

> [t]he [DHS Secretary], after consultation with the appropriate agencies of the Government, may designate any foreign state [for TPS] only if
>
> (A) the [Secretary] finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (B) the [Secretary] finds that –
>
> (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
> (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
> (iii) the foreign state officially has requested designation under this subparagraph; or
>
> (C) the [Secretary] finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1). The initial period of a TPS designation "is the period, specified by the [Secretary], of not less than 6 months and not more than 18 months." *Id.* § 1254a(b)(2).

Once a foreign country is designated for TPS, individuals from that country may apply for immigration status. If granted, they may not be removed from the United States; in addition, they are given authorization to work in the United States. *See id.* § 1254a(a)(1).

For individuals to become TPS holders, there are specific requirements that must be met.

United States District Court
Northern District of California

For example, an individual must have "been continuously physically present in the United States since the effective date of the most recent designation of that [foreign] state." *Id.* § 1254a(c)(1)(A)(i). In addition, an individual must be "admissible as an immigrant." *Id.* § 1254a(c)(1)(A)(iii). An individual is not admissible if, *e.g.*, they have been convicted of certain crimes (such as a crime involving moral turpitude or drugs) or are a member of a terrorist organization. *See id.* § 1182(a)(2)-(3). Moreover, an individual is expressly deemed ineligible for TPS if they have "been convicted of any felony or 2 or more misdemeanors committed in the United States." *Id.* § 1254a(c)(2)(B). The Secretary "shall withdraw [TPS] granted to an alien . . . if [the Secretary] finds that the alien was not in fact eligible for such status." *Id.* § 1254a(c)(3)(A).

After a foreign country has been designated for TPS, that designation is subject to periodic review to determine if the designation should be terminated or extended. The TPS statute provides as follows with respect to periodic review.

> (A) Periodic review
>
> At least 60 days before end of the initial period of designation, and any extended period of designation, of a foreign state . . . under this section the [Secretary of DHS], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met.

*Id.* § 1254a(b)(3).

The options of termination and extension are then described in the TPS statute as follows:

> (B) Termination of designation
>
> If the [Secretary of DHS] determines under subparagraph (A) that a foreign state . . . no longer continues to meet the conditions for designation under [§ 1254a(b)(1)], the [Secretary] shall terminate the designation by publishing notice in the Federal Register of the determination under this subparagraph (including the basis for the determination). Such termination is effective in accordance with [§ 1254a(d)(3)[2]], but shall not be effective earlier than 60 days after the

[2] Section 1254a(d)(3) provides:

> If the [DHS Secretary] terminates the designation of a foreign state . . . under [§ 1254a(b)(3)(B)], such termination shall only apply to documentation and authorization issued or renewed after the effective date of the publication of notice of the determination under

> date the notice is published or, if later, the expiration of the most recent previous extension under [§ 1254a(b)(3)(C)].
>
> (C) Extension of designation
>
> If the Attorney General does not determine under [§ 1254a(b)(3)(A)] that a foreign state . . . no longer meets the conditions for designation under paragraph (1), the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months).

*Id.*

There is no dispute that a country may be given more than one TPS designation. A TPS designation for a country that is already designated for TPS is called a redesignation. When a redesignation is given, that "'generally has the effect of expanding the pool of potential beneficiaries to include individuals who came to the United States after the country was first designated for TPS.'" Docket No. 93 (Order at 5).

There is also no dispute about the general process that DHS has long followed when a TPS designation is subject to periodic review. In or about 2020, the U.S. Government Accountability Office ("GAO") was asked to review the TPS decision-making process and, after reviewing documentation and data related to TPS decisions and interviewing agency officials, published a report titled "Temporary Protected Status, Steps taken to Inform and Communicate Secretary of Homeland Security's Decisions." *See* MacLean Decl., Ex. 6 (GAO TPS Rpt.). As explained in the GAO TPS Report, DHS's practice is to collect four documents to inform each TPS decision (whether the initial designation or review of an existing designation):

> (1) a country conditions report compiled by USCIS (an agency within DHS);
>
> (2) a memo with a recommendation from the USCIS Director to the DHS Secretary;
>
> (3) a country conditions report compiled by the State Department; and
>
> (4) a letter with a recommendation from the Secretary of State to the Secretary of DHS.

---

> that subsection (or, at the [Secretary's] option, after such period after the effective date of the determination as the [Secretary] determines to be appropriate in order to provide for an orderly transition).

8 U.S.C. § 1254a(d)(3).

United States District Court
Northern District of California

United States District Court
Northern District of California

*See* GAO TPS Rpt. at 18.[3] Each document is generally compiled as follows:

- *USCIS country conditions report.* The Office of Policy & Strategy ("OP&S") (a division within USCIS) reaches out to the Refugee, Asylum, and International Operations Directorate ("RAIO") (another division in USCIS) to get input on country conditions. RAIO prepares a country conditions report after collecting information from, *e.g.*, other U.S. agencies, foreign governments, international organizations, nongovernmental organizations, and news articles. The country conditions report is then given to OP&S. *See* GAO TPS Rpt. at 20-22.
- *State Department country conditions report and recommendation from the Secretary of State to the DHS Secretary.* USCIS reaches out to the State Department's Bureau of Population, Refugees, and Migration ("PRM"). *See* GAO TPS Rpt. at 21. PRM asks the relevant regional bureau to communicate with the overseas post to get information about country conditions. The regional bureau has a questionnaire on country conditions for the post to fill out, and the post provides responses to the questionnaire, plus a recommendation, to the regional bureau. Other agencies represented at the overseas post (*e.g.*, the U.S. Agency for International Development) may also provide information to the post to include as part of its input on country conditions. After the regional bureau gets the information from the post, it drafts a country conditions report and recommendation and then works with PRM to compile a joint action memo. PRM provides the joint action memo, which includes a country conditions report, to the Secretary of State. After the Secretary of State determines what the State Department will recommend, a final country conditions report and recommendation letter is provided to the DHS Secretary and OP&S. *See* GAO TPS Rpt. at 22-23.

[3] *See also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) (describing the same general process). The government provides no evidence suggesting the GAO TPS Report or *Ramos* was inaccurate. It cites no instance, prior to the current Administration taking office, where the general procedure of reviewing TPS deviated in any substantial way from that described by the GAO.

United States District Court
Northern District of California

- *USCIS recommendation to the DHS Secretary*. After USCIS receives the input from both RAIO and the State Department, USCIS finalizes its country conditions report and prepares a recommendation memo for the DHS Secretary. *See* GAO TPS Rpt. at 21.

Before the four documents above are given to the DHS Secretary, the documents are reviewed by other components within DHS as part of the standard departmental clearance process. This includes the Office of Strategy, Policy, and Plans; the Office of the General Counsel; and the Management Directorate. *See* GAO TPS Rpt. at 26. In addition, input from other agencies or other entities may be provided to the Secretary or USCIS. *See* GAO TPS Rpt. at 25 (providing as examples U.S. Customs and Border Protection, the Department of Defense, the Centers for Disease Control and Prevention, members of Congress, foreign government officials, and nongovernmental organizations).

Before making a final decision, the DHS Secretary may hold briefings or meetings on TPS reviews, both internally and externally (*e.g.*, with White House officials, foreign government officials, nongovernmental organizations, and advocacy groups). *See* GAO TPS Rpt. at 25-26.

Below is a flow chart from the GAO TPS Report that summarizes the above process.

/ / /



United States District Court
Northern District of California

**Figure 6: Information Collected for the Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)**

GAO TPS Rpt. at 20.

Finally, there is no dispute that a "key factor motivating Congress at the time of the passage of the TPS was the shortcomings of the Extended Voluntary Departure program," which "allowed the Executive to use its discretion to grant administrative stays of removal for nationals of designated countries." *Nat'l TPS Alliance v. Noem*, No. C-25-5687 TLT (N.D. Cal.) (Docket No. 73) (Order at 9); *see also NTPSA*, 2025 U.S. App. LEXIS 22269, at *13-14 (taking note of legislators' concern "about granting unbridled deference to the Executive branch in determining the country designations and time periods for relief" and the TPS statute's "explicit guidelines, specific procedural steps, and time limitations" that replaced the "prior ad hoc framework"); *Ramos*, 975 F.3d at 879 (noting that "[t]he impetus for the establishment of the TPS program stemmed from concerns with the 'extended voluntary departure' (EVD) process, which was the primary mechanism by which the federal government allowed groups of nationals to remain in the

United States for humanitarian reasons prior to TPS"). "Because administrations granted EVD on an *ad hoc* basis without 'any specific criterion or criteria,' the practice led to arbitrary results and drew widespread criticism." *Id.*; *see also NTPSA v. Noem*, No. C-25-5687 TLT (Docket No. 73) (Order at 9) (noting that "members of Congress were unhappy with the wide discretion EVD gave to the executive and the arguably arbitrary standards for which EVD designation could be withheld"). The point of the TPS statue was to bring coherence and discipline to the previous process which was ad hoc and undisciplined.

## III. VACATUR AND TERMINATION DECISIONS FOR VENEZUELA

As noted above, Plaintiffs challenge two decisions made by Secretary Noem with respect to Venezuela's TPS designation: (1) a decision to vacate and (2) a decision to terminate. As demonstrated below, these decisions were made with incredible haste and without any meaningful consultation with appropriate agencies. The relevant events leading up to those decisions are as follows.

In **March 2021**, Secretary Mayorkas first designated Venezuela for TPS (the "2021 TPS Designation" or "2021 Designation"). See Docket No. 93 (Order at 5). The 2021 Designation was extended two times. The second extension gave TPS holders under the 2021 Designation legal status and work authorization through September 10, 2025. *See* Docket No. 93 (Order at 5-6).

In **October 2023**, Secretary Mayorkas redesignated Venezuela for TPS (the "2023 TPS Designation" or "2023 Designation"). *See* Docket No. 93 (Order at 6). The redesignation gave TPS holders under the 2023 Designation legal status and work authorization through April 2, 2025. "While the 2021 Designation allowed individuals who had been in the United States since March 2021 to apply, [the 2023] [D]esignation . . . allowed individuals to apply if they had continuously resided in the United States since July 31, 2023, and had continuously been physically present since October 3, 2023." Docket No. 93 (Order at 6).

On **January 17, 2025**, shortly before the second Trump Administration was to begin, Secretary Mayorkas extended the 2023 Designation by 18 months, through October 2, 2026. *See* Docket No. 93 (Order at 7). In the extension, Secretary Mayorkas also streamlined the filing

United States District Court
Northern District of California

United States District Court
Northern District of California

processes for the 2021 and 2023 Designations by consolidating them. This meant that 2021 TPS holders also had the opportunity to register and get the benefit of the same October 2, 2026, date. *See* Docket No. 93 (Order at 7-8).

On **January 20, 2025**, President Trump began his second administration. *See* Docket No. 93 (Order at 8).

Just four days later, on **January 24, 2025**, DHS began drafting the decision to vacate the TPS extension that had been given by Secretary Mayorkas. *See* Bansal Reply Decl., Ex. 1 (email) ("We are drafting the TPS vacatur notice [for Venezuela] this evening. We need some input from you, especially operational matters related to TPS. [¶] . . . Joseph Mazzara asked that we submit the document to him by 1pm on Sunday [i.e., within two days].")[4] The draft of the vacatur decision was begun before Secretary Noem was confirmed as the DHS Secretary.

On **January 25, 2025**, Secretary Noem was confirmed. That same day, the Office of General Counsel within DHS stated that it was "not at all interested in revisiting the substance of whether [the vacatur] should go forward." Bansal Reply Decl., Ex. 2 (email). In effect, the decision to vacate was already made.

The following day, **January 26, 2025**, DHS began to prepare and/or circulate the decision to *terminate* Venezuela's TPS. *See* MacLean Decl., Ex. 5 (privilege log) (NTPSA-DHS 211); *see also* Bansal Reply Decl., Ex. 7 11 (email, dated 1/27/2025) ("I created a shell for a termination notice. Can you start drafting? (I'm going to work on the memo for the vacatur notice.)"). In other words, even before the decision to vacate was finalized, DHS was preparing to terminate Venezuela's TPS. Furthermore, the draft on the termination decision was being prepared before any country conditions analysis was conducted. *See* Bansal Reply Decl., Ex. 15 (email) (providing the "DOS [Department of State] country report" for Venezuela – one prepared in September 2024 during the Biden Administration – on January 29, 2025, *i.e.*, three days after the above email).

[4] The email was from Christina McDonald, who appears to be part of the Office of General Counsel to, *inter alia*, Joseph Edlow. At the time, Mr. Edlow was a Senior Advisor (nominated to be, and as of mid-July 2025, USCIS Director). *See* Docket No. 132-1.

On **January 27, 2025**, the vacatur decision was put into final form. *See* MacLean Decl., Ex. 2 (email).

On **January 28, 2025**, Secretary Noem signed off on the vacatur decision. *See* Docket No. 103-1 (ECF Page 5) (administrative record for vacatur); MacLean Decl., Ex. 3 (email); *see also* MacLean Decl., Ex. 4 (DHS Clearance Record). *That same day*, DHS staff was asked to "focus on any improvements in Venezuela," implicitly to advance and support termination of Venezuela's TPS. *See* Bansal Reply Decl., Ex. 17 (email).

On **January 30, 2025**, DHS staff exchanged email indicating that it was urgent to finalize the termination decision. *See* MacLean Decl., Ex. 9 (email)[5]; *see also* Bansal Reply Decl., Ex. 14 (email) (in response to email noting upcoming publication of the vacatur notice in the Federal Register, stating: "Great. Where are we with [Venezuela] termination?").

On **January 31, 2025**, Secretary of State Rubio sent a one-and-a-half page letter to Secretary Noem, recommending termination of TPS for Venezuela on the basis that "permitting nationals of Venezuela to remain temporarily in the United States under 8 U.S.C. 1254a is contrary to the national interest of the United States." Docket No. 104-4 (ECF Page 75) (administrative record for termination). The letter stated in relevant part:

> Under Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first." Designating Venezuela under 8 U.S.C. 1254a(b)(l) does not champion core American interests or put America and American citizens first, therefore it is contrary to the foreign policy and the national interest of the United States.
>
> In particular, I have determined that the first priority of the foreign policy of the United States is that "we must curb mass migration and secure our borders. The State Department will no longer undertake any activities that facilitate or encourage mass migration. Our diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants."
>
> The designation of Venezuela under 8 U.S.C. 1254a(b)(l) facilitates and encourages mass migration because it causes more than 600,000

[5] The title of the email was: "VZ Draft FRN – Due by 3pm TODAY [*i.e.*, January 30, 2025]." One email, timestamped 4:21 p.m., stated: "For your viz, here is the version I am submitting to OGC now."

> Venezuelan beneficiaries to remain in the United States.
>
> Moreover, organizations like the Venezuelan transnational criminal organization Tren De Aragua commit "campaigns of violence and terror in the United States and internationally" that "are extraordinarily violent, vicious," and "threaten the stability of the international order in the Western Hemisphere."  Under Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, "it is the policy of the United States to ensure the total elimination of these organizations' presence in the United States and their ability to threaten the territory, safety, and security of the United States."

Docket No. 104-4 (ECF Pages 75-76).  Secretary Rubio's letter did *not* address country conditions, nor did the State Department provide any country conditions report to USCIS.

Also on **January 31, 2025**, USCIS recommended termination to Secretary Noem.  *See* Dichter Decl., Ex. 2 (memo).  The memo stated in relevant part as follows:

> Conditions in Venezuela remain challenging, but notable improvements indicate that the conditions that precipitated the initial TPS designation no longer continue.  Venezuela no longer continues to meet the statutory requirements for its TPS designation.  As such, the statute requires that the TPS designation be terminated.  Additionally, USCIS believes that it may be contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States.  This determination differs from the [Department of State] recommendation [provided in September 2024, during the Biden Administration].  Given the noted criminal activity of some Venezuelan nationals, we recommend the Secretary terminate the TPS designation of Venezuela.

Dichter Decl., Ex. 2 (Memo at 5).  The memo did *not* explain how USCIS could rely on the Biden Administration country conditions report – which led Secretary Mayorkas to *extend* TPS for Venezuela – to conclude that conditions had improved to such an extent that TPS should be terminated.

On **February 1, 2025** – just three days after Secretary Noem signed off on the vacatur decision – Secretary Noem signed off on the termination decision.  *See* Docket No. 104-1 (administrative record for termination) (ECF Page 6).

On **February 3, 2025**, the vacatur decision was published in the Federal Register.  *See* 90 Fed. Reg. 8805 (Feb. 3, 2025).

On **February 5, 2025**, the termination decision was published in the Federal Register.  *See*

90 Fed. Reg. 9040 (Feb. 5, 2025). As a formal matter, only the 2023 Designation for Venezuela was terminated – specifically, as of April 7, 2025. The 2021 Designation was not terminated but will expire on September 10, 2025. As noted above, the termination of the 2023 Designation was possible at that time only because Secretary Noem had vacated the extension given by Secretary Mayorkas.

The reason for the vacatur of the extension was stated in the Federal Register as follows: "The Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation." 90 Fed. Reg. at 8807.

> The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]"). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.

*Id.*

As for the termination of the 2023 Designation, the reason therefor was stated in the Federal Register as follows: "Overall, certain conditions for the 2023 TPS designation of Venezuela may continue; however, there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country." 90 Fed. Reg. at 9042. But, "even assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States." *Id.*

> [First,] TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States, and the sheer numbers have

United States District Court
Northern District of California

> resulted in associated difficulties in local communities where local resources have been inadequate to meet the demands caused by increased numbers. Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua. Tren de Aragua has been blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants. The United States has sanctioned the gang and placed it on a list of transnational criminal organizations. In Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, the President determined that Tren de Aragua's campaign of violence and terror poses threats to the United States. The Secretary accordingly has considered these important immigration and national interests in terminating the Venezuela parole process.
>
> Second, President Trump observed, referring to CHNV [the parole program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans"] and other policies and processes, that "[o]ver the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States," including millions who crossed U.S. borders or were allowed to fly to a U.S. airport of entry and allowed to settle in American communities. The prolonged presence of these aliens in the United States "has cost taxpayers billions of dollars at the Federal, State, and local levels." For example, over 180,000 illegal aliens have settled in New York City, approximating that this will cost the city $10.6 billion through the summer of 2025. Additionally, although mayors from cities across the United States are attempting to accommodate Venezuelan illegal aliens, city shelters, police stations, and aid services are at a maximum capacity.
>
> . . . .
>
> Third, President Trump declared a national emergency at the southern border. As the Attorney General and DHS have long understood, the potential "magnet effect" of a TPS determination is a permissible factor under the TPS statute, especially with respect to a redesignation. The same is true for Venezuela. . . . Fourth, as the President directed in Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first." Continuing to permit Venezuelans under the 2023 TPS designation to remain in the United States does not champion core American interests or put American interests first. U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration.

*Id.* at 9042-43.

The government has not submitted any evidence substantiating "there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country." And, as this Court found in its

postponement order, the government failed to provide any evidence that Venezuelan TPS holders constitute a threat to national security.  *See* Docket No. 93 (Order at 41-44); *see also NTPSA*, 2025 U.S. App. LEXIS 22269, at *53 n.13 (in affirming postponement order, taking note of the absence of evidence to support the government's claimed national security concerns).  Since that order, the government has submitted zero additional evidence in this regard.

## IV.    VACATUR AND TERMINATION DECISIONS FOR HAITI

As with Venezuela's TPS, Plaintiffs challenge two decisions made by Secretary Noem with respect to Haiti's TPS: (1) a decision to partially vacate and (2) a decision to terminate.  The relevant events leading up to those decisions are as follows.

In **January 2010**, Haiti was first designated for TPS (based on an earthquake).  *See* 75 Fed. Reg. 3476 (Jan. 21, 2010).

Thereafter, through **2018**, Haiti's TPS was extended or there was a redesignation of its TPS.  *See* Opp'n at 5 n.9 (identifying notices published in the Federal Register).

In **January 2018**, the first Trump Administration terminated the TPS designation for Haiti. *See* 83 Fed. Reg. 2648 (Jan. 18, 2018).  However, the termination did not take effect because of litigation that was brought thereafter challenging the termination.

In **August 2021**, following the assassination of the Haitian President, Haiti was given a new TPS designation by the Biden Administration.  *See* 86 Fed. Reg. 41863 (Aug. 3, 2021).

In **January 2023**, Secretary Mayorkas extended and redesignated TPS for Haiti.  *See* 88 Fed. Reg. 5022 (Jan. 26, 2023).

In **July 2024**, Secretary Mayorkas again extended and redesignated TPS for Haiti.  Under that decision, Haiti's TPS designation would last for 18 months, *i.e.*, until February 3, 2026.  *See* 89 Fed. Reg. 54484 (July 1, 2024).

Approximately six months later, on **January 20, 2025**, President Trump began his second administration.

On **January 25, 2025**, Secretary Noem was confirmed as DHS Secretary.

On **February 7, 2025** – just two days after the Venezuela termination was published in the Federal Register – DHS prepared and/or circulated a draft decision partially vacating Secretary

United States District Court
Northern District of California

Mayorkas's most recent extension/redesignation of TPS for Haiti. See MacLean Decl., Ex. 6 (privilege log) (NTPSA-DHS 2112).

Approximately a week later, from **February 14-17, 2025**, high-level staff within DHS signed off on the partial vacatur. *See* Docket No. 110-3 (ECF Page 27) (administrative record for partial vacatur) (DHS Clearance Record).

On **February 18, 2025**, Secretary Noem approved the partial vacatur. *See* Docket No. 110-2 (ECF Page 6) (administrative record for partial vacatur).

On **February 20, 2025**, DHS issued a press release announcing the partial vacatur. *See* MacLean Decl. ¶ 16 & Ex. 15 (press release). The language in the press release implicitly pointed to an anticipated termination of Haiti's TPS, stating, *e.g.*, that the partial vacatur was "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law"; that, "[f]or decades the TPS system has been exploited and abused"; and that, "[l]ast month, Secretary Noem similarly rescinded the previous administration's Venezuela TPS extension." MacLean Decl., Ex. 15.

On **February 24, 2025**, the partial vacatur decision was published in the Federal Register. Under the decision, the length of Haiti's TPS designation was shortened from 18 months to 12 months; *i.e.*, the designation would now expire on August 3, 2025, instead of February 3, 2026. *See* 90 Fed. Reg. 10511 (Feb. 24, 2025). Secretary Noem did not have the option of shortening the designation to 6 months because that would have put the expiration date on February 3, 2025 – a date that had already passed.

On **July 1, 2025**, Secretary Noem terminated the TPS designation for Haiti. *See* 90 Fed. Reg. 28760 (July 1, 2025). Under that decision, Haiti's TPS designation will terminate on September 2, 2025.

The reason for the partial vacatur of Secretary Mayorkas's extension/redesignation was stated in the Federal Register as follows:

> First, there is no discussion in the July 1, 2024, Federal Register notice of why the 18-month period was selected in lieu of a 6- or 12-month period. Nor does the administrative record underlying the June 3, 2024, decision and July 1, 2024, notice bear any discussion of why the 18-month period was chosen. Allowing aliens from a

given country, including aliens who entered the United States illegally or overstayed their authorized period of admission, to remain in the United States temporarily with employment authorization is an extraordinary act. Congress recognized the gravity of such action under the TPS statute by setting the default extension period at 6 months, underscoring the uniqueness of this authority, and limiting its own authority to enact legislation allowing TPS recipients to adjust to lawful permanent resident status. Accordingly, determinations of how long a new designation should remain in effect and whether to depart from the default six-month period for an extension of an existing designation should take into account important considerations relating to the purpose of the statute and specific country and country conditions at issue and should not rest alone on administrative convenience. Here, there was no explanation whatsoever of why the 18-month period was selected.

Second, and similarly, the July 1, 2024, notice is bereft of any justification of why permitting the ever-increasing population of Haitian TPS recipients, particularly those who entered the country unlawfully, to remain temporarily in the United States is not contrary to the U.S. national interest. The notice simply states that "it is not contrary to the national interest of the United States." The administrative record underlying Secretary Mayorkas' June 4, 2024, decision likewise lacks any discussion of the critical national interest criterion. Such conclusory determinations do not accord with the gravity of TPS decisions under the INA. "National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities). Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

Third, although the July 1, 2024, notice cites some country conditions reports that are relatively proximate to the June 4, 2024, decision, several others date back to early 2023, 2022, or even earlier. And certain sources upon which DHS relied indicated that significant developments were taking place in 2024 that might result in an improvement in conditions. For example, as stated in the July 1, 2024, Federal Register notice, the United Nations had recently authorized a Multinational Security Support (MSS) mission to deploy in Haiti in 2024 and support the Haitian National Police in capacity building, combatting gang violence, and provide security for critical infrastructure. The Department of State likewise underscored that significant development. Thus, both DHS and the Department of State contemplated the real possibility of an improvement in conditions with the deployment of the United Nations MSS mission, yet that important development was not expressly factored into the determination of the length of the extension and designation period.

United States District Court
Northern District of California

> Eighteen months is the maximum period of designation or extension authorized under the TPS statute. Neither the 2021 new designation, the 2023 extension and new designation, nor the 2024 extension and new designation contained any discussion of national interest considerations or why the 18-month (vs. 6 or 12-month) periods were granted. Given the protracted duration of the "extraordinary and temporary conditions"-based designation for Haiti, the absence of any meaningful appraisal of national interest factors or justification for the 18-month extension, and the fact that eligible Haitians were able to register for TPS under the July 1, 2024, notice for over seven months, the Secretary has determined that a 12-month period is warranted. Abbreviating the period from 18 to 12 months will allow for a fresh review of country conditions in Haiti and of whether such conditions remain both "extraordinary" and "temporary," whether Haitian may return in safety, and whether it is contrary to the U.S. national interest to continue to permit the Haitian nationals to remain temporarily in the United States.

90 Fed. Reg. at 10513-14. Other than this notice contained in the Federal Register, the government has submitted no evidence about the "real possibility of an improvement in conditions with the deployment of the United Nations MSS mission," or what has transpired in Haiti since that deployment described nearly a year before, in July 2024.

As for the termination of Haiti's TPS, the reason given in the Federal Register was as follows:

> President Trump clearly articulated policy imperatives bearing upon the national interest in his immigration and border-related executive orders and proclamations. In Proclamation 10888 ''Guaranteeing the States Protection Against Invasion,'' President Trump emphasized that Congress has established a complex and comprehensive framework under the INA to regulate the entry and exit of aliens and goods across U.S. borders. Under normal conditions, this framework supports national sovereignty by enabling the admission of aliens whose presence serves the national interest and excluding those who may pose risks to public health, safety, or national security. However, in a high-volume border environment – particularly when the system is overwhelmed – this screening process can become ineffective. Limited access to critical information and significant processing delays hinder the ability of federal officials to reliably assess the criminal histories or national security threats posed by aliens attempting to enter the U.S. illegally. As a result, public safety and national security risks are significantly heightened in such conditions.
>
> In Executive Order (E.O.) 14161 "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats," President Trump instructed the Secretary of State, Attorney General, Secretary of Homeland Security, and Director of National Intelligence to jointly submit to the President a report that identified countries throughout the world "for which vetting and

> screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries." In Proclamation "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats," President Trump determined to fully restrict and limit the entry of nationals from Haiti following his review of the requested report. In support of this decision, President Trump outlined that "according to the overstay report, Haiti had a B-1/B-2 visa overstay rate of 31.38 percent and an F, M, and J visa overstay rate of 25.05 percent . . . as is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States."
>
> . . . .
>
> Prior to FY2025, U.S. Border Patrol recorded a consistent year-over-year increase in encounters with Haitian nationals: 56,596 in FY2022, 163,781 in FY2023, and 220,798 in FY2024. . . . [A] report states: "the continuation of a devastating political, environmental, social, and economic situation . . . in Haiti guarantees an unbroken chain migration, particularly to the United States and Canada; and when combined with already heavy backlogs in processing resident status changes, a large and growing flow of Haitians will persist." This pattern of large-scale irregular migration as a result of "pull factors" has continued for years. . . .

90 Fed. Reg. at 28762.

In addition to the above, the Secretary claimed that, per DHS records, "there are Haitian nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security." *Id.* The Secretary called out gang members in particular.

> Widespread gang violence in Haiti is sustained by the country's lack of functional government authority. This breakdown in governance directly impacts U.S. national security interests, particularly in the context of uncontrolled migration. As previously outlined, when immigration flows exceed our capacity to properly vet aliens at the border, the risks are compounded by the inability to access reliable law enforcement or security information from the alien's country of origin. The joint assessment by the Secretary of State, Secretary of Homeland Security, and Director of National Intelligence has found that Haiti lacks a functioning central authority capable of maintaining or sharing such critical information. Coupled with the serious threat posed by Haitian gangs – such as those designated by the State Department as Foreign Terrorist Organizations – continuing TPS for Haiti is not in the national interest. This lack of government control has not only destabilized Haiti internally but has also had direct consequences for U.S. public safety. Haitian gang members have already been identified among those who have entered the United States and, in some cases, have been apprehended by law enforcement for committing serious and violent

crimes.

*Id.* Again, other that the notice itself, there is nothing else in the public record supporting its stated reasons.

## V. PROCEDURAL BACKGROUND

Plaintiffs initiated this lawsuit on February 19, 2025. *See* Docket No. 1 (complaint). At the time, Plaintiffs challenged only the vacatur and termination decisions that Secretary Noem had made with respect to Venezuela. (The Secretary had not yet made her vacatur and termination decisions on Haiti.) The following day, Plaintiffs moved to postpone the decisions on Venezuela pursuant to § 705 of the APA. *See* 5 U.S.C. § 705 ("On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.").

On March 31, 2025, this Court granted Plaintiffs' motion to postpone. *See* Docket No. 93 (order). The government promptly appealed the postponement order to the Ninth Circuit. *See* Docket No. 94 (notice of appeal). After the Court denied the government's motion to stay the postponement order pending appeal, *see* Docket No. 102 (order), the government sought a stay from the Ninth Circuit. The appellate court denied the request for a stay. *See* Docket No. 113 (Order at 1) ("Appellants have not demonstrated that they will suffer irreparable harm absent a stay.").

The government then sought relief from the Supreme Court. On May 19, 2025, the Supreme Court granted the government's request for a stay of the postponement order. The Supreme Court did not provide any specific rationale for its decision but did state that

> [t]his order is without prejudice to any challenge to Secretary Noem's February 3, 2025 vacatur notice [on Venezuela] insofar as it purports to invalidate EADs [employment authorization documents], Forms I-797, Notices of Action, and Forms I-94 issued with October 2, 2026 expiration dates [*i.e.*, the date provided for by Secretary Mayorkas's extension]. *See* 8 U.S.C. § 1254a(d)(3).[6]

[6] Section 1254a(d)(3) provides in relevant part as follows: "If the [Secretary] terminates the designation of a foreign state . . . under subsection (b)(3)(B), such termination shall only apply to documentation and authorization issued or renewed *after* the effective date of the publication of

Based on the paragraph above, Plaintiffs filed with this Court a motion to preserve status and rights for certain Venezuelan TPS holders pursuant to § 705. The Court granted in part and denied in part the motion to preserve. The Court held that the Secretary had exceeded her authority when, on February 3, 2025 (as part of the vacatur decision), she effectively canceled TPS-related documentation that had *already* been issued based on Secretary Mayorkas's extension of Venezuela's TPS to October 2, 2026. *See* 90 Fed. Reg. 8805 (Feb. 3, 2025) (vacatur decision for Venezuela). The Court granted relief for "those Venezuelan TPS holders who received TPS-related documentation based on the Mayorkas extension anytime up to and including February 5, 2025 – when the Secretary published notice that the 2023 TPS Designation was being terminated." Docket No. 162 (Order at 10).

Meanwhile, on March 20, 2025, Plaintiffs had amended their complaint to include the partial vacatur decision on Haiti. *See* Docket No. 74 (FAC). This was about a week after a case was filed in the Eastern District of New York, also challenging the partial vacatur decision for Haiti. Several months later, on July 1, 2025, the New York court granted the plaintiffs' motions for summary judgment and for postponement of agency action. The court addressed only part of the plaintiffs' APA claims – *i.e.*, that the Secretary lacked the authority to vacate Secretary Mayorkas's extension/redesignation. The court did not adjudicate the constitutional claims asserted by the plaintiffs (based on the Due Process and Equal Protection Clauses). *See Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-cv-1464 (BMC), 2025 U.S. Dist. LEXIS 125511 (E.D.N.Y. July 1, 2025). Subsequently, the New York court entered a final judgment in favor of the plaintiffs, thus staying the partial vacatur decision on Haiti. *See Haitian Evang.*, No. 25-cv-1464 (BMC) (Docket No. 65) (final judgment).

On July 8, 2025, Plaintiffs filed an amended/supplemental complaint. This complaint added allegations and claims challenging Secretary Noem's decision to terminate Haiti's TPS.

Now pending before the Court are (1) two 12(b)(6) motions filed by the government and (2) two motions for summary judgment, one filed by each party. Both the motions to dismiss and

---

notice of the determination under that subsection . . . ." 8 U.S.C. § 1254a(d)(3) (emphasis added).

United States District Court
Northern District of California

the motions for summary judgment address the Venezuela vacatur and termination decisions. Both the motions to dismiss and the motions for summary judgment also address the Haiti partial vacatur decision. Only one motion to dismiss addresses the Haiti termination decision.

The Court held a hearing on the above motions on August 1, 2025. Subsequently, the Court temporarily stayed adjudication of the motions because of the pending appeal of the postponement order before the Ninth Circuit. *See* Docket No. 276 (order). On August 29, 2025, the Ninth Circuit issued its decision. The Ninth Circuit affirmed the Court's postponement order, holding, *inter alia*, that it had jurisdiction to hear the appeal and that Plaintiffs were likely to succeed on their claim that Secretary Noem lacked the authority to issue the Venezuela vacatur. *See generally NTPSA*, 2025 U.S. App. LEXIS 22269.

## VI. <u>JURISDICTION</u>

As noted above, pending before the Court are two motions to dismiss filed by the government and two summary judgment motions, one filed by each party. In both the 12(b)(6) and summary judgment motions, the government argues that the Court lacks jurisdiction to consider Plaintiffs' claims, whether brought under the APA or the Equal Protection Clause. As it did before (when opposing Plaintiffs' motion to postpone under § 705), the government argues there are several jurisdictional bars to Plaintiffs' suit, including 8 U.S.C. § 1254a(b)(5)(A) and § 1252(f)(1). The government also adds a new jurisdictional argument based on § 701(a)(2) of the APA. For the reasons stated below, the Court rejects each of the government's contentions that jurisdiction is lacking.

### A. <u>Section 1254a(b)(5)(A)</u>

Section 1254a(b)(5)(A) is part of the TPS statute. It provides as follows: "There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A). The government argues that the vacatur and termination decisions, both for Venezuela and Haiti, are subject to § 1254a(b)(5)(A).

The Court addressed this issue in its postponement order, holding that § 1254a(b)(5)(A) is

not a bar to either Plaintiffs' APA claims or their Equal Protection claims.[7] The Court's views remain the same, particularly in light of the Ninth Circuit's ruling affirming the postponement order.

First, as the panel herein held, there is a strong presumption of judicial review of agency action. *See NTPSA*, 2025 U.S. App. LEXIS 22269, at *29 (stating that "Courts strongly presume that Congress intends judicial review of administrative actions"; also stating that the government's claim that § 1254a(b)(5)(A) bars "substantial statutory and constitution claims is . . . extreme") (internal quotation marks omitted); *see also* Docket No. 93 (Order at 24) (citing, *inter alia*, *KOLA, Inc. v. United States*, 882 F.2d 361, 363 (9th Cir. 1980), and *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)). This presumption applies whether Plaintiffs have sought relief under the APA or the Constitution. As the panel decision herein noted, the presumption of judicial review is particularly strong "[w]here, as here, [there is a] claim . . . that 'agency action [was] taken in *excess* of delegated authority." *NTPSA*, 2025 U.S. App. LEXIS 22269, at *29 (emphasis added). Indeed, the panel underscored that barring judicial review where there is a claim that the Secretary exceeded her authority would lead to absurd results. *See id.* at *32 n.7 ("[H]olding that we lack jurisdiction to review questions of statutory interpretation would make unreviewable a Secretary's decision to authorize a statutorily prohibited thirty-year TPS period.").

Second, even if Secretary Noem did not exceed her statutory authority in deciding to vacate, her decisions to vacate are still subject to judicial review because § 1254(a)(b)(A) bars judicial review of substantive TPS decisions only. As this Court noted in its postponement order, "§ 1254a(b)(5)(A) was narrowly designed to bar judicial review of substantive country-specific conditions in service of TPS designations, terminations, or extensions of a foreign state – not [*e.g.*] judicial review of general procedures or collateral practices related to such." Docket No. 93 (Order at 25) (citing, *inter alia*, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991) (individual denials on the merits were not challenged but rather the process under which denials

[7] The Court's postponement order technically addressed only the vacatur and termination decisions for Venezuela. However, the jurisdictional analysis is the same, whether Venezuela or Haiti is at issue.

were determined).  Courts have consistently held such, including the panel in *Ramos*, 975 F.3d at 872, *vacated for rehearing en banc*, 59 F.4th at 1010, and multiple district courts.  *See* Docket No. 93 (Order at 25-26) (citing decisions).  Judge Cogan of the Eastern District of New York recently held the same as well.  *See Haitian Evangelical Clergy Ass'n*, No. 25-cv-1464 (BMC), 2025 U.S. Dist. LEXIS 125511, at *16 (holding that § 1254a(b)(5)(A) "does not prevent courts from reviewing and setting aside agency action that is procedurally deficient[;] . . . 'it is clear from context that the judicial review provision in the TPS statute refers to an individual designation, termination, or extension of a designation with respect to a particular country, not to Defendants' determination practices or adoption of general policies or practices employed in making such determinations'").  The challenge here is directed in the first instance to procedural actions taken by the Secretary in vacating orders issued by the prior administration.

That is, Plaintiffs' challenge to the Secretary's vacatur decisions is based solely on procedural arguments: that the Secretary did not have the authority, statutory or otherwise, to vacate a prior extension of TPS and that her vacatur decision was arbitrary and capricious for procedural reasons, *e.g.*, in failing to consult with the appropriate agencies.  These are matters which are entirely collateral to the substantive decision to designate, extend, or terminate a particular country's TPS based on statutory conditions.  *See* Docket No. 93 (Order at 24) (noting that, even in the panel decision in *Ramos*, the Ninth Circuit held that "the scope of § 1254a(b)(5)(A)'s bar on judicial review was limited to 'inquiring into the underlying considerations and reasoning employed by the Secretary in reach[ing] her country-specific TPS determinations'[;] [i]t does not apply to, *e.g.*, a pattern or practice that is 'collateral to and distinct from the specific [country] TPS decisions and their underlying rationale'").  Moreover, it is worth noting that Secretary Noem's vacatur decisions themselves were based purely on procedural concerns: for Venezuela, Secretary Noem criticized Secretary Mayorkas for, *e.g.*, taking a novel approach and causing confusion, *see* Docket No. 93 (Order at 26); for Haiti, she criticized Secretary Mayorkas for, *e.g.*, not explaining why he extended TPS for 18 months (as opposed to 6 or 12), not explaining why it was not contrary to the U.S. national interest to give an extension,

and not explaining why he could rely on older country conditions reports.[8]

Third, the Secretary's termination decisions are subject to judicial review because Plaintiffs are not challenging the *substance* of those decisions (based, *e.g.*, on an assessment of country conditions) *per se*, but rather the *procedure* by which those decisions were reached. For example, Plaintiffs contend that the terminations were predicated on unlawful vacaturs; that, per the text of the TPS statute, "national interest" is a consideration only at the time of the initial TPS designation and not on periodic review; and that the Secretary failed to consult, meaningfully or otherwise, with government agencies or conduct a meaningful country conditions review.

In its papers, the government largely makes the same arguments that it did previously in conjunction with the postponement proceedings. There is, in the motions now pending, one slight variation. Instead of focusing solely on the use of the word "any" in § 1254a(b)(5)(A), the government now points to the use of the phrase "with respect to." *See* 8 U.S.C. § 1254a(b)(5)(A) ("There is no judicial review of any determination of the Attorney General *with respect to* the designation, or termination or extension of a designation, of a foreign state under this subsection.") (emphasis added). The government emphasizes that the phrase "with respect to" has an expansive meaning, similar to "related to." *See, e.g.*, *Lamar, Archer & Cofrin LLP v. Appling*, 584 U.S. 709, 716-17 (2018) (considering the use of the term "respecting" in a bankruptcy statute; noting that, "[a]s a matter of ordinary usage, 'respecting' means 'in view of: considering; with regard or relation to: regarding; concerning,'" and "[u]se of the word 'respecting' in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject"). According to the government, a vacatur is literally a determination "with respect to" – *i.e.*, related to – an extension or designation since in this case, it is a procedural predicate thereto. The government notes that Congress could have used narrower language in § 1254a(b)(5)(A) – *e.g.*, "[t]here is no judicial review of a determination to designate, or terminate or extend" – but it did not. *See* Docket No. 190 (Reply at 4) (omitting use of the

[8] As the Court stated in its postponement order, it is also clear that Plaintiffs' challenge to the vacatur decisions is collateral in nature based on the factors identified in *Mace v. Skinner*, 34 F.3d 854 (9th Cir. 1994). *See* Docket No. 93 (Order at 26-27).

United States District Court
Northern District of California

phrase "with respect to").

The government's position gives short shrift to how the word "determination" or "determine" is used in the TPS statute. When "determination" or "determine" is used in connection with periodic review, the term describes the *substantive assessment of country conditions in reaching a decision on whether to extend or terminate TPS*. For example:

- The provision on periodic review provides as follows: "Periodic review. At least 60 days before end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall **determine** whether the conditions for such designation under this subsection continue to be met. The [Secretary] shall provide on a timely basis for the publication of notice of each such **determination** (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A) (emphasis added).
- The provision on termination states: "Termination of designation. If the [Secretary] **determines** under subparagraph (A) that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the [Secretary] shall terminate the designation by publishing notice in the Federal Register of the **determination** under this subparagraph (including the basis for the determination). Such termination is effective in accordance with subsection (d)(3), but shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C). *Id.* § 1254a(b)(3)(B) (emphasis added).
- And the provision on extension states: "Extension of designation. If the [Secretary] does not **determine** under subparagraph (A) that a foreign state (or part of such foreign state) no longer meets the conditions for designation under paragraph (1),

the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C) (emphasis added).

- Finally, the provision on the effective date of a termination provides: "Effective date of terminations. If the [Secretary] terminates the designation of a foreign state (or part of such foreign state) under subsection (b)(3)(B), such termination shall only apply to documentation and authorization issued or renewed after the effective date of the publication of notice of the **determination** under that subsection (or, at the [Secretary's] option, after such period after the effective date of the **determination** as the [Secretary] determines to be appropriate in order to provide for an orderly transition." *Id.* § 1254a(d)(3) (emphasis added),

As reflected by the above, the term "determination" is used repeatedly to describe the substantive TPS decision on the status of a given country based on the statutory criteria. *See also Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1102 (N.D. Cal. 2018) ("The statute does not define 'determination,' but it is evident from the statutory context that this provision refers to the designation, termination, or extension of a country for TPS. The statute uses the word 'determines' or 'determination in connection with the Secretary's initial designation, periodic review, and termination of a TPS foreign-state designation."). So understood, the vacaturs at issue here are not covered by § 1254a(b)(5)(A) because they did not render substantive TPS decisions based on country conditions. A "decision to vacate is, literally and textually, not a 'designation, or termination or extension of a designation, of a foreign state.'" Docket No. 93 (Order at 25) (quoting § 1254a(b)(5)(A)). As noted above, the Secretary's vacaturs were based on *procedural* concerns (allegedly, a use of a novel and confusing process or an insufficiently explained extension by the prior administration).

The government suggests that this interpretation of "determination" makes the phrase "with respect to" redundant. However, given context, it is clear that "with respect to" is simply a connector – *i.e.*, the phrase simply points to what is being "determined." *See* 8 U.S.C. § 1254a(b)(5)(A) ("There is no judicial review of any determination of the Attorney General with

respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.”).

The distinction between the propriety of judicial review of the Secretary’s substantive assessment of country conditions and judicial review of procedural errors makes common sense and accords with the purpose and structure of the TPS statute. To shield any procedural nonconformity from any judicial review would undermine the purpose of the statute of imposing coherence and discipline to the process. Furthermore, under the government’s position, there could be no judicial review even if the government were to blatantly violate the statute, *e.g.*, by granting an extension exceeding 18 months or failing to provide the minimum 60 days’ notice of a termination decision. Each of these violations would, in the government’s view, be “with respect to” an extension of termination decision. The government’s interpretation of “with respect to” is thus too sweeping. In short, the purpose of § 1254a(b)(5)(A) is “not to render all aspects of the TPS program unreviewable.” *NTPSA*, 2025 U.S. App. LEXIS 22269, at *32.

Finally, the Court notes that, to the extent Plaintiffs are asserting constitutional violations, the presumption of judicial review is particularly strong. *See* Docket No. 93 (Order at 27) (citing *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 317 (D. Md. 2018)).

For the reasons previously stated in the postponement order and herein, § 1254a(b)(5)(A) does not preclude judicial review of Plaintiffs’ claims herein.

B. <u>Section 1252(f)(1)</u>

Section 1252 is titled “Judicial review of orders of removal.” Section 1252(f) specifically is titled “Limit on injunctive relief.” It provides in relevant part as follows:

> In general. Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, *no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II [8 U.S.C. §§ 1221 et seq.], as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996*, other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.

8 U.S.C. § 1252(f)(1) (emphasis added).

In its papers, the government makes some of the same arguments that it did previously.

The government, however, now spends more time arguing that a vacatur order under §706 of the APA would *functionally* be equivalent to an injunction is subject to § 1252(f)(1). *See* Mot. at 13 ("Regardless of how Plaintiffs frame the relief sought, an order that would have the effect of enjoining or restraining DHS's implementation of the TPS provisions in § 1254a, is jurisdictionally barred under § 1252(f)(1)."); Docket No. 262 (Mot. at 14) (same).

The Court's postponement order addressed the government's attempt to equate an injunction with an APA vacatur (*i.e.*, setting aside of agency action). *See* Docket No. 93 (Order at 16-22). The Court rejected the government's position, noting first that there is a strong presumption of judicial review of agency action. *See* Docket No. 93 (Order at 17). The Court then pointed out that every court to consider the issue (including the Fifth Circuit and multiple district courts) had also rejected the government's position. *See* Docket No. 93 (Order at 16, 18). The Court expressed agreement with the Fifth Circuit's analysis that invalidation of agency action is a less drastic remedy than an injunction because it does not compel nor restrain further agency decision making. *See* Docket No. 93 (Order at 18). The Court also pointed out other differences between a vacatur and an injunction: among other things, "[w]hile a court may only enter a vacatur to re-establish the status quo absent the unlawful agency action, it has 'broad latitude in fashioning equitable relief [through an injunction] when necessary to remedy an established wrong.'" Docket No. 93 (Order at 19). Also, injunctions may apply not just to parties but also nonparties (specifically, those who act in concert with parties), and both parties and nonparties may be held in contempt for violating an injunction. *See* Docket No. 93 (Order at 19). Furthermore, injunctions may prohibit lawful conduct (not just unlawful conduct) and may evolve and change over time. *See* Docket No. 93 (Order at 20). In short, there are material differences between APA vacaturs and conventional injunctions.

Since the Court issued its postponement order, both the Supreme Court and Ninth Circuit have issued decisions supporting the conclusion that there is a difference between injunctions and vacaturs of agency action under the APA. In *Trump v. CASA, Inc.*, 156 S. Ct. 2540 (2025), the Supreme Court indicated in a footnote that its holding on nationwide or universal injunctions did not resolve the distinct question of whether the APA authorizes courts to vacate federal agency

action.  *See id.* at --- n.10 (stating that "[n]othing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action"; citing 5 U.S.C. §706(2) which authorizes courts to "'hold unlawful and set aside agency action'"); *see also Haitian Evangelical*, 2025 U.S. Dist. LEXIS 125511, at *20 (taking note of the same).

Following *Trump v. CASA*, the Ninth Circuit held in *Immigrant Defenders Law Center v. Noem*, No. 25-2581, 2025 U.S. App. LEXIS 17884 (9th Cir. July 18, 2025) [hereinafter *IDL*], that § 1252(f)(1) does not bar a court from staying agency action under § 705 of the APA.  The Ninth Circuit pointed out that, in *Biden v. Texas*, 597 U.S. 785 (2022), the Supreme Court stated that § 1252(f)(1) is narrow in scope.  *See IDL*, 2025 U.S. App. LEXIS 17884, at *26.  Furthermore, the court noted that the Supreme Court has "distinguished stays from injunctive relief":

> "When a court employs 'the extraordinary remedy of injunction,' it directs the conduct of a party, and does so with the backing of its full coercive powers." . . . A stay, by contrast, "achieves this result by temporarily suspending the source of authority to act – the order or judgment in question – not by directing an actor's conduct."  A stay "simply suspend[s] judicial alteration of the status quo.'"

*Id.* at *27 (also noting the Fifth Circuit's comment in *Texas v. United States*, 40 F.4th 205 (5th Cir. 2022), that vacatur is a less drastic remedy compared to an injunction).  The court also took into account that § 1252(f)(1) refers to injunctive relief only and

> makes no mention of stays nor other forms of relief under the APA.  Congress knows . . . how to limit relief under the APA in other statutory schemes such as the Magnuson-Stevens Act and the Clean Air Act.  *See Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 668 n.4 (D.C. Cir. 2016) ("The review provision of the Magnuson-Stevens Act also expressly makes § 705 of the APA 'not applicable.'" (quoting 16 U.S.C. § 1855(f)(1)(A)); *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 562 n.1 (D.C. Cir. 2015) (Kavanaugh, J., dissenting in part) ("The Clean Air Act expressly provides that several provisions of the APA – 5 U.S.C. § 553-557 and 706 – 'shall not, except as expressly provided in this subsection, apply . . . .'" (quoting 42 U.SC. § 7607(d)(1)).  Congress made no mentioning of limiting APA claims in § 1252(f)(1) and instead only explicitly limits injunctive relief.

United States District Court
Northern District of California

*Id.* at *27-28.[9]

Should there be any doubt, the Ninth Circuit, in its recent decision affirming this Court's postponement order, reaffirmed its holding in *IDL*. *See NTPSA*, 2025 U.S. App. LEXIS 22269, at *33-34 (pointing out that, in *IDL*, the Ninth Circuit "held that section 1252(f)(1) does not prohibit relief in the form of a stay or postponement of agency action under the APA").

Though *IDL* technically addressed a stay of agency action under § 705, such a ruling as to stays under § 705 applies equally, and indeed with even more force, to a final judgment of vacatur setting aside agency action (whether under § 706 of the APA or another statute or law). As discussed in greater detail below, a vacatur under §706 is, if anything, less akin than postponement under §705 to the equitable remedy of a preliminary injunction. Hence, the holding of *IDL* and the Ninth Circuit's decision in this case that § 1252(f)(1) does not bar relief applies *a fortiorari* to vacaturs. In sum, *IDL* and *NTPSA* constitute binding precedent on this Court – a point that the government conceded at the hearing with respect to *IDL*.[10] Accordingly, the Court holds that §

---

[9] In this regard, it is worth noting that § 1252(f)(1) was enacted well after § 706 of the APA, which provides for the setting aside of agency action. *See Garland v. Gonzalez*, 596 U.S. 543, 562 (2022) (noting that Congress enacted § 1252(f)(1) in 1996); 80 Stat. 378, 392-93 (1966) reflecting addition of § 706 of the APA in 1966). If Congress had intended § 1252(f) to bar a vacatur of agency action under § 706, it could easily have used language to that effect, but it did not do so, instead limiting the reach of the statute to injunctive relief only.

[10] In its papers, the government cited to *Abderdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procs.*, 422 U.S. 289 (1975), in support of its position, but that case is distinguishable. There, the issue was whether the Supreme Court had jurisdiction over an appeal based on 28 U.S.C. § 1253, which allows for an appeal of a preliminary or permanent injunction. The Supreme Court found that the lower court had issued an injunction because the agency (the Interstate Commerce Commission) had been directed to perform certain acts. *See id.* at 307-08. That is not the situation here. Although there was language in *Aberdeen* that suggested the Supreme Court read § 1253 broadly to afford appellate jurisdiction, *see id.* at 308 n.11, § 1253 is not at issue in the case at bar. More on point is the more recent decision in *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010), which this Court cited in its postponement order. There, the Supreme Court stated that

> [a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course. If a less drastic remedy (*such as partial or complete vacatur* of APHIS's deregulation decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.

*Id.* at 165-66 (emphasis added). *Monsanto* thus makes a distinction between an injunction and a vacatur (or set aside), a distinction now crystalized in the Ninth Circuit's decision in *IDL*.

United States District Court
Northern District of California

1252(f)(1), which limits injunctive relief in some circumstances,[11] does not preclude this Court from ordering a vacatur setting aside of agency action under the APA.

Even if a court were to disagree with *IDL* and find that § 1252(f)(1) could limit review of actions under §§ 705 and 706 of the APA, § 1252(f)(1)'s reach would not bar Plaintiffs' suit in its entirety. Rather, as recognized by the Ninth Circuit in its recent decision affirming this Court's postponement order, § 1252(f)(1) has no impact on Plaintiffs' claim that the Secretary's actions exceeded her statutory authority. *See NTPSA*, 2025 U.S. App. LEXIS 22269, at *34 (stating that, "even if the district court's [postponement] order does 'enjoin or restrain,' it is not barred by section 1252(f)(1) if it affects only agency actions that exceed the agency's statutory authority").

C. Section 701(a)(2)

In moving for summary judgment, the government makes a new jurisdictional argument based on § 701(a)(2) of the APA. The full text of § 701(a) is as follows:

> This chapter applies, according to the provisions thereof, except to the extent that –
>
> (1) statutes preclude judicial review; or
>
> (2) *agency action is committed to agency discretion by law*.

5 U.S.C. § 701(a) (emphasis added).

Here, the government invokes § 701(a)(2). The Supreme Court has commented on that provision as follows:

> The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof," 5 U.S.C. § 702, and we have read the APA as embodying a "basic presumption of judicial review," *Abbott Laboratories v.*

[11] Notably, Section 1252(f)(1) focuses on *individual* orders of removal, as indicated by the title of § 1252 ("Judicial review of orders of removal."). It appears to bar judicial review of other *individualized* determinations such as (1) cancellation of removal and adjustment of status for a noncitizen who is determined to be of good moral character and for whom removal would pose an exceptional and extremely unusual hardship, *see* 8 U.S.C. § 1229b(b); and (2) voluntary departure for a noncitizen of good moral character. *See id.* § § 1229c(b). TPS differs from such individualized determinations; it is a broader systemic decision, similar to a regulation. Plaintiffs also advance additional arguments as to why §1252(f)(1) does not apply here, arguments the Court need not reach.

> *Gardner*, 387 U.S. 136, 140 (1967). This is "just" a presumption, however, *Block v. Community Nutrition Institute*, 467 U.S. 340, 349 (1984), and under § 701(a)(2) agency action is not subject to judicial review "to the extent that" such action "is committed to agency discretion by law." As we explained in *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), § 701(a)(2) makes it clear that "review is not to be had" in those *rare* circumstances where the relevant statute "is drawn so that a court would have *no meaningful standard against which to judge the agency's exercise of discretion*." *See also Webster v. Doe*, 486 U.S. 592, 599-600 (1988); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). "In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Heckler, supra*, at 830.

*Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (emphasis added).

According to the government, § 701(a)(2) precludes judicial review of the Secretary's decisions on Venezuela and Haiti's TPS inasmuch as those decisions were predicated on what was in the "national interest" of the United States.[12] *See* 8 U.S.C. § 1254(b)(1)(C) (providing that a country may be given TPS if the Secretary "finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States"). The government asserts that "[t]he determination of 'national interest' is one that calls upon the Secretary's 'expertise and judgment' and is not a manageable legal standard." Mot. at 12.

In support, the government cites, *inter alia*, *Poursina v. USCIS*, 936 F.3d 868 (9th Cir. 2019), where the Ninth Circuit stated that "the invocation of the 'national interest' is a core example of a consideration that lacks a judicially manageable standard of review." *Id.* at 871; *see also Webster v. Doe*, 486 U.S. 592, 600 (1988) (noting that § 102(c) of the National Security Act "allows termination of an Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States,' not simply when the dismissal *is* necessary or advisable to those interests[;] [t]his standard fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review")

---

[12] *See* Docket No. 12 (Mot. at 12) ("The determination of 'national interest' is one that calls upon the Secretary's 'expertise and judgment' and is not a manageable legal standard.").

United States District Court
Northern District of California

(emphasis in original).

There are several problems with the government's argument. First, § 701(a)(2) would at most apply to Plaintiffs' APA claims; it would not apply to their Equal Protection claims.[13] *See San Francisco Unified Sch. Dist. v. AmeriCorps*, No. 25-cv-02425-EMC, 2025 U.S. Dist. LEXIS 77652, at *15-16 (N.D. Cal. Apr. 23, 2025) (stating that, "absent clear congressional intent to preclude review of a constitutional claim, § 701(a)(2) does not bar review of colorable constitutional claims arising from agency actions 'committed to agency discretion by law'"; citing *Webster* in support); *see also Webster*, 486 U.S. at 601, 603 (stating that "the language and structure of § 102(c) [of the National Security Act] indicate that Congress meant to commit individual employee discharges to the Director's discretion, and that § 701(a)(2) accordingly precludes judicial review of these decisions under the APA"; but then going on to state that "[w]e do not think § 102(c) may be read to exclude review of constitutional claims").

Second, as to the APA claims, Plaintiffs have not asserted that the Secretary made an erroneous finding that the national interest weighed against extending TPS. Rather, Plaintiffs have made legal or procedural arguments – *e.g.*, that "national interest" is a factor that may be considered only at the time of initial designation, and not as part of the periodic review used to determine whether to extend or terminate TPS. *See* Opp'n at 7 (arguing that "[t]he APA's provision limiting review of discretionary decisions does not bar claims that challenge the agency's failure to apply the proper statutory criteria"); *cf.* Docket No. 93 (Order at 24) (concluding that § 1254a(b)(5)(A) "does not apply to, *e.g.*, a pattern or practice that is 'collateral to and distinct from the specific [country] TPS decisions and their underlying rationale'"). In other words, Plaintiffs have brought legal challenges to the Secretary's action that are independent of the Secretary's assertion of national interest in justifying her termination decisions. Moreover, the Secretary has not asserted national interest whatsoever in justifying her vacatur decisions.

Therefore, § 701(a)(2) is not a bar to judicial review of the claims asserted here.

---

[13] And, at most, it would only apply to the extent the termination decisions were at issue, as the Secretary invoked national interest in those decisions alone, and not in the vacatur decisions. As discussed below, the infirmity of the Secretary's decision to terminate TPS for Venezuela does not hinge on the correctness of her determination of national interest.

United States District Court
Northern District of California

## VII. MOTIONS FOR SUMMARY JUDGMENT

Having rejected the government's jurisdictional arguments, the Court now turns to the merits of Plaintiffs' case. The Court first addresses the parties' motions for summary judgment. Plaintiffs have moved for summary judgment on their APA claims only. The government has moved for summary judgment on both the APA claims and the Equal Protection claims.[14]

### A. Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a plaintiff moves for summary judgment on claims that it has brought (*i.e.*, for which it has the burden of proof), it "must prove each element essential of the claims . . . by undisputed facts." *Cabo Distrib. Co. v. Brady*, 821 F. Supp. 601, 607 (N.D. Cal. 1992); *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor") (emphasis omitted).

---

[14] The Court acknowledges that the government has filed two 12(b)(6) motions. In a typical case, the Court would address a motion to dismiss before a motion for summary judgment. In this case, however, the motions to dismiss largely overlap with the motions for summary judgment, with one notable exception. Specifically, the second motion to dismiss discusses the Haiti termination; the other motions do not because, at the time they were filed, the Secretary had not yet terminated Haiti's TPS. Given the significant overlap between the motions to dismiss and the motions for summary judgment, to the Court evaluates the merits of Plaintiffs' case through the lens of summary judgment, at least for the vacatur and termination decisions for Venezuela and the partial vacatur decision for Haiti.

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

B. Motion to Consider Extra-Record Evidence

In conjunction with summary judgment, Plaintiffs have filed a motion asking that the Court extra-record evidence. In the motion, Plaintiffs implicitly acknowledge that an APA claim is usually adjudicated based on the administrative record. *See Cty. of Amador v. United States DOI*, 872 F.3d 1012, 1020 (9th Cir. 2017) ("'In general, a court reviewing agency action under the APA must limit its review to the administrative record.'"). However, Plaintiffs contend, it is appropriate to consider evidence outside the administrative record because (1) they have made a showing of bad faith on the part of DHS/Secretary Noem and (2) such evidence is necessary to determine whether DHS/the Secretary considered all relevant factors and explained the TPS decisions. *See Lands Council v. Powell*, 395 F.3d 1019, 1029-30 (9th Cir. 2005) (noting that there are "narrow exceptions" to the "general rule that courts reviewing an agency decision are limited to the administrative record"; "district courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine 'whether the agency has considered all relevant factors and has explained its decision,' (2) if 'the agency has relied on documents not in the record,' (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter,' or (4) 'when plaintiffs make a showing of agency bad faith'").

As Plaintiffs point out, this Court previously allowed Plaintiffs to take extra-record discovery precisely because of the *Lands Council* standard and Plaintiffs' "significant evidence that the [TPS] decisions were made in bad faith, including repeated discriminatory statements by Secretary Noem and President Trump, the short timeframe in which decisions were made, the lack of legal and/or evidentiary support for the decisions, and the unprecedented nature of the decisions." Docket No. 129 (Order at 5); *see also* Docket No. 129 (Order at 4) ("If any extra-record evidence is admissible under the circumstances [identified in *Lands Council*], then extra-record discovery should be permitted under the same circumstances."); Docket No. 135 (Order at

5) ("In the Court's prior order, it did not categorically bar extra-record discovery for Plaintiffs' APA claim precisely because there was a factual basis for Plaintiffs' assertion that Secretary Noem had acted in bad faith and/or with a discriminatory animus.").

The extra-record evidence that Plaintiffs seek to introduce here falls within this scope. The Court, therefore, does not limit Plaintiffs to the administrative record in evaluating the APA claims. This is especially true given that the government did not file a formal opposition to Plaintiffs' motion, simply stating in its cross-motion for summary judgment that "Plaintiffs' reliance on the Court-ordered extra-record discovery is unavailing, as the existing administrative record already makes clear that the agency acted within its legal authority." Opp'n at 2.

Relevant evidence outside the administrative record is admissible to assess the Equal Protection claims.

C. <u>APA Claim – Venezuela Vacatur</u>

Plaintiffs have asserted APA claims challenging the Secretary's vacatur and termination decisions for both Venezuela and Haiti. The Court addresses first the APA claim related to the vacatur decision for Venezuela.

For this decision, Plaintiffs argue that (1) Secretary Noem did not have the authority to vacate the extension that had been given by Secretary Mayorkas; (2) even if she did, she exceeded her authority to vacate; and (3) even if she did have the authority to vacate and did not exceed her authority to vacate, her decision was arbitrary and capricious.

1. <u>Lack of Authority to Vacate</u>

In her decision vacating Secretary Mayorkas's extension of the 2023 Designation, Secretary Noem asserted that she had the authority to vacate. *See* 90 Fed. Reg. at 8806. Plaintiffs argue that the Secretary lacked the authority. In its decision upholding this Court's issuance of the postponement order, the Ninth Circuit held that Plaintiffs were likely to succeed on the merits of this claim. *See generally NTPSA*, 2025 U.S. App. LEXIS 22269. This Court is guided by the Ninth Circuit's analysis and reaffirms its reasoning in its postponement order.

"It is well settled that an agency may only act within the authority granted to it by statute. This principle is a recognition of the nature of an administrative agency as a 'creature of statute,

having no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress.'" *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108 (2d Cir. 2018) (emphasis omitted).  Where an agency is given the power to decide, that power is "*normally* accompanied by the power to reconsider," *NRDC v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023) (emphasis added); that is, generally speaking, "administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely manner." *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014).  However, "'Congress . . . undoubtedly can limit an agency's discretion to reverse itself.'" *NRDC*, 67 F.4th at 401.  "[W]here Congress has spoken as to the proper procedure for reversing a decision, agencies lack the inherent authority to circumvent the statute." *NTPSA*, 2025 U.S. App. LEXIS 22269, at *37; *see also Ivy Sports*, 767 F.3d at 86 (noting that "an agency may not rely on inherent reconsideration authority 'when Congress has provided a mechanism [in the governing statute that is] capable of rectifying mistaken actions'").

Whether an agency has the power to reconsider and revoke prior agency action turns on what the governing statute provides, either expressly or implicitly; this is a matter of statutory construction.  Or, as the Court stated in its postponement order, "[t]o determine whether an agency has the statutorily implicit authority to reconsider an earlier action depends on the statute and whether such legislative intent to confer such authority can be inferred."  Docket No. 93 (Order at 47).

Here, Secretary Noem's contention that she has the implicit authority to reconsider a TPS decision lacks merit.  As the Ninth Circuit indicated in its decision affirming the postponement order herein,

> Congress has displaced any inherent revocation authority by explicitly providing the procedure by which a TPS designation is terminated.  The Secretary's assertion of such a power is, as the district court noted, "at odds with the structure of the TPS statute."  The TPS statute specifically addresses the time frame within which a TPS designation may be terminated.  Section 1254a(b)(3)(B) provides that a termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension."  It expressly provides that the termination of a TPS designation can be no earlier than the expiration of the most recent extension.  The statute does not permit

> the Secretary to terminate a designation "midstream," but that is exactly what the Secretary purports to do here. And while the statute expressly sets forth in detail procedures for "designation," "extension," and "termination," it nowhere mentions a process for "vacatur," which, in this case, has the practical effect of a "termination" of a TPS designation.

*NTPSA*, 2025 U.S. App. LEXIS 22269, at *39-40; *see also* Docket No. 93 (Order at 50-51) (providing the same reasoning). "A reading of the [TPS] statute that allows for vacatur would render [the above] terms – and Congress's design – meaningless." *NTPSA*, 2025 U.S. App. LEXIS 22269, at *10; *see also id.* at *41 (explaining that "allowing rescission or vacatur of the TPS designation here, would empower the agency to indirectly take three separate actions that are prohibited by statute: designating countries for TPS for a time period under six months, 8 U.S.C. § 1254a(b)(2)(B), (b)(3)(C), terminating TPS before the expiration of the last extension, § 1254a(b)(3)(B), and terminating TPS with less than sixty days' notice").

The Ninth Circuit's decision in *China Unicom (Ams.) Ops. Ltd. v. FCC*, 124 F.4th 1128 (9th Cir. 2024) [hereinafter *CUA*], underscores that the Secretary does not have the inherent authority to vacate here. In *CUA*, the Ninth Circuit emphasized that, where a statute provides for a right or benefit for a fixed term, such as a license, "[t]he use of a fixed term is . . . *affirmatively inconsistent* with positing an implied power to revoke [that] license at any time." *Id.* at 1147-48 (emphasis added). Here, the TPS statute has "clear stated terms for extensions and terminations of TPS designations," which are "likewise 'affirmatively inconsistent with positing an implied power to revoke . . . at any time.'" Docket No. 93 (Order at 51); *see also Haitian Evangelical*, 2025 U.S. Dist. LEXIS 125511, at *26 (noting that the TPS statute "provides specific instructions for how to reconsider a TPS designation, and it provides a timeline for doing so"). Furthermore, "[t]o permit the Secretary unconstrained discretion to revoke, at any time, a prior TPS designation would not be consistent with Congress's general intent to cabin such discretion." Docket No. 93 (Order at 52); *see also Ramos*, 975 F.3d at 890 (stating that "Congress enacted the TPS statute to curb and control the executive's previously unconstrained discretion under the [extended voluntary departure] process"); *Nat'l TPS Alliance v. Noem*, No. C-25-5687 TLT (N.D. Cal.) (Docket No. 73) (Order at 9) (taking note of "congressional dissatisfaction with EVD" – *e.g.*, "members of Congress were unhappy with the wide discretion EVD gave to the executive and the arguably

United States District Court
Northern District of California

arbitrary standards for which EVID designation could be withheld”).

In its papers, the government suggests that the statutory scheme implicitly gives the Secretary broad discretion to act (which would include the ability to reconsider) because the TPS statute gives her discretion in (1) deciding how long an extension/designation should last and (2) deciding when to conduct the periodic review (so long as it is done at least 60 days in advance of the expiration of the designation). The government’s argument is not convincing. These facts underscore that the Secretary does have discretion, but only in limited areas. That the Secretary has discretion on these limited matters – in deciding prospectively the length of an extension and whether to make that decision (but not actual termination) earlier than 60 days in advance of the current expiration date – does not say anything about whether the Secretary has the authority to revoke an existing TPS designation or extension, a much more significant act. Inferring broader authority based on the limited discretion would be inconsistent with the statute’s express directive, and would have a retrospective effect, potentially upsetting reliance interests of those affected. Indeed, the panel decision in the instant case expressly noted that “[t]he structure and temporal limitations of the TPS statute protect the important reliance interests of individual TPS holders.” *NTPSA*, 2025 U.S. App. LEXIS 22269, at *41.

The Court thus holds, consistent with the Ninth Circuit’s decision in *NTPSA* upholding the postponement order, that Secretary Noem lacked the statutory authority to vacate Secretary Mayorkas’s extension.[15]

2. <u>Exceeding Statutory Authority to Vacate as to Documents Already Issued</u>

As to the subset of Venezuelan TPS beneficiaries who were issued documentation under the Mayorkas extension, Secretary Noem clearly exceeded the scope of her authority. This Court so held in its preservation order. *See generally* Docket No. 162 (order).

As previously explained, in her decision to vacate issued on February 3, 2025, Secretary

[15] In upholding this Court’s postponement order, the Ninth Circuit analyzed only the claim that the Secretary lacked authority to vacate and did not address Plaintiffs’ other arguments. This Court does address many of Plaintiffs’ arguments placed at issue by the cross-motions for summary judgment, particularly because it is now evaluating whether Plaintiffs are entitled to permanent relief.

Noem stated that "USCIS will invalidate EADs [employment authorization documents]; Forms I-797, Notice of Action (Approval Notice); and Forms I-94, Arrival/Departure Record (collectively known as TPS-related documentation) that have been issued with October 2, 2026 expiration dates under the Mayorkas Notice [issued on January 17, 2025]." 90 Fed. Reg. at 8805. But the TPS statute does not contain any provision allowing the Secretary to invalidate already-issued TPS documentation. In fact, "§ 1254a(d)(3), the provision in the TPS statute cited by the Supreme Court in its stay order, underscores that such action is not permissible because the provision recognizes that TPS holders have reliance interests when issued TPS-related documentation." Docket No. 162 (Order at 4); *cf. NTPSA*, 2025 U.S. App. LEXIS 22269, at *41 ("The structure and temporal limitations of the TPS statute protect the important reliance interests of individual TPS holders, and the Government must adhere to these statutory constraints."); *id.* at *46 ("TPS holders began to rely upon the extension of their protected status at the opening of this registration period, giving rise to the strong reliance interests here at stake.").

Therefore, even if Secretary Noem had some implicit authority to vacate, she clearly exceeded the scope of any such authority by effectively canceling TPS documentation that had already issued under the Mayorkas extension. *See also* Docket No. 162 (Order at 6) (holding that the cancelation of already-issued TPS documentation was also arbitrary and capricious: TPS holders "had a protectible reliance interest or vested right"). That being said, only a subset of Venezuelan TPS holders were so affected by the Secretary's unlawful conduct in this regard. *See* Docket No. 162 (Order at 10) ("grant[ing] relief to those Venezuelan TPS holders who received TPS-related documentation based on the Mayorkas extension up to and including February 5, 2025 – when the Secretary published notice that the 2023 TPS Designation was being terminated").[16]

---

[16] The Court acknowledges that Plaintiffs have offered a separate argument as to how the Secretary exceeded any authority she had under the TPS statute. Specifically, Plaintiffs contend that the Secretary exceeded her authority because reconsideration is not permitted simply because a new administration wants to adopt new policies. *See Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 145-46 (1958) (stating that "the power to correct ministerial errors may not be used as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies"). Ultimately, the Court views this argument as a variant of Plaintiffs' arguments that the Secretary lacked the implicit authority to vacate and/or that she did

United States District Court
Northern District of California

3. Arbitrary and Capricious

Finally, Plaintiffs challenge the Venezuela vacatur decision on the ground that, even assuming arguendo the Secretary had the authority to vacate and did not exceed her statutory authority to vacate, her decision was still arbitrary and capricious under the APA. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (stating that the APA "requires agencies to engaged in 'reasoned decisionmaking' and directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious'").

a. Asserted Novelty, Confusion, and "Thin" Explanation

Plaintiffs assert that Secretary Noem's vacatur decision was not reasoned decision making. When Secretary Mayorkas extended the 2023 Designation for Venezuela, he also streamlined the filing processes for the 2021 and 2023 Designations by consolidating them. This meant that 2021 TPS holders, not just 2023 TPS holders, could get the benefit of the October 2, 2026, extension date. In her decision vacating the Mayorkas extension, Secretary Noem characterized the extension as "novel" because of the consolidation. According to Secretary Noem, Secretary Mayorkas had "implicitly negat[ed] the 2021 Venezuela designation by effectively subsuming it within the 2023 Venezuela TPS designation." 90 Fed. Reg. at 8807. Secretary Noem maintained that

> [t]he Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]"). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.

*Id.*

---

not engage in reasoned decisionmaking.

Plaintiffs assert that the Secretary's decision was arbitrary and capricious because the Mayorkas extension, which included the consolidation of the 2021 and 2023 Designation filing processes, was not novel, did not engender confusion, and was not "thin" in explanation. For the reasons stated in its postponement order, the Court agrees.

First, "[a]s a factual matter, it was not 'novel' for different tracks to be streamlined as part of a TPS process. Plaintiffs have pointed out that there has been similar streamlining for both the Sudan and Haiti TPS designations." Docket No. 93 (Order at 57).

Second, as a legal matter, consolidation was not novel because – as Secretary Noem failed to recognize –

> a TPS beneficiary under the 2021 Designation was necessarily a TPS beneficiary under the 2023 Designation.
>
> [E]very earlier designation is "subsum[ed]" by a later one because redesignation expands the pool of potential beneficiaries to include not only those who qualified under an earlier designation, but also those who arrived after their country was first designated.

Docket No. 93 (Order at 56) (emphasis omitted).

Third, "streamlining the two tracks for the two designations into one . . . would tend to eliminate, not create, confusion – *i.e.*, confusion that could arise based on the fact that there are two tracks." Docket No. 93 (Order at 57). Notably, the panel decision affirming this Court's postponement order agreed with this Court on this very point. As it explained, "Secretary Noem 'failed to recognize that a TPS beneficiary under the 2021 Designation was necessarily a TPS beneficiary under the 2023 Designation.' Secretary Mayorkas's extension thereof consolidated the two designations, combining the two tracks, thus lessening confusion rather than 'creating' confusion as Secretary Noem apparently believed." *NTPSA*, 2025 U.S. App. LEXIS 22269, at *47 n.12. Indeed, evidence that the *government* submitted in conjunction with the summary judgment proceedings demonstrates that the Biden Administration consolidated the process for the 2021 and 2023 TPS holders precisely to *avoid* confusion. *See* Opp'n, Ex. 1 (Biden Administration's "Options for Venezuela TPS Extension and Redesignation – September 23, 2023") (in "Option 1 – Concurrent Extension/Redesignation Date," noting as a "pro" in favor of the option, that it would be "[l]ess confusing for employers in that they will not have to try to distinguish between TPS

beneficiaries with varying EAD end dates"; and, in "Option 2 – Two different designation dates for Venezuela TPS," noting as a "con" that "[i]t will be difficult to operationalize differentiating these two groups of Venezuela TPS beneficiaries in our existing systems" which "may lead to confusion").

Fourth, although Secretary Noem criticized "the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, [as] thin and inadequately developed," 90 Fed. Reg. at 8807, that criticism is rooted in Secretary Noem's failure to recognize that 2021 TPS holders were necessarily 2023 TPS holders and that consolidation would thereby tend to avoid confusion and streamline the filing process.

Hence, there is no factual or legal support for the Secretary's asserted reason for the vacatur. *See Lands Council*, 395 F.3d at 1026 ("An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law.").

b. Failure to Consider Alternatives

Moreover, as the Court held in its postponement order, the Secretary failed to consider alternatives short of vacatur when she revoked the Mayorkas extension. *See* Docket No. 93 (Order at 58). "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), but "when an agency rescinds a prior policy[,] its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). Here, Secretary Noem considered no alternatives to complete vacatur. And the context demonstrates she had no interest in doing so: "if Secretary Noem was truly concerned about confusion arising from Secretary Mayorkas's decision to allow 2021 TPS holders to register as 2023 TPS holders, she easily could have chosen to 'deconsolidate' the registration process and keep the 2021 and 2023 Designations on two different tracks – with the 2021 Designation ending in September 2025 and with the 2023 Designation still ending in

October 2026." Docket No. 93 (Order at 59). That the Secretary did not do so "effectively demonstrat[es] that confusion was not her concern so much as the desire to totally undo Secretary Mayorkas's decision." Docket No. 93 (Order at 59). This is also substantiated by the timing of the vacatur and the termination decisions: most notably, the termination decision was drafted even before the vacatur decision was finalized, and then was formally issued within days of the publication of the vacatur decision.

c. Failure to Consider Reliance Interests

Plaintiffs further argue that the Secretary's vacatur decision was arbitrary and capricious because, as part of that decision, she invalidated (*i.e.*, canceled) TPS-related documentation that had already been issued pursuant to the Mayorkas extension. According to Plaintiffs, this action was arbitrary and capricious because the Secretary failed to consider reliance interests, interests which the panel in this case recognized. The Court agrees. This is particularly true of those who had already been issued the TPS documentation based on the extension. The analysis in Part VII.C.2, *supra*, is largely applicable here.

d. Failure to Consult with Government Agencies or Review Country Conditions

According to Plaintiffs, the Secretary also acted arbitrarily and capriciously because she made the decision to vacate the Mayorkas extension without first consulting with government agencies or reviewing country conditions.[17] *Cf.* 8 U.S.C. § 1254a(b)(3)(A) (providing that, on periodic review, the Secretary, "*after consultation with appropriate agencies of the Government*, shall review the conditions in the foreign state . . . for which a designation is in effect under this subsection and shall determine whether the conditions for such designation continue to be met") (emphasis added). In response, the government argues that interagency consultation and review of country conditions is required only where the Secretary is making a decision on an extension or

[17] The administrative record for the vacatur decision contains no contemporaneous country conditions report – *i.e.*, a report prepared in conjunction with the vacatur decision made by Secretary Noem. Instead, the administrative record includes only a country conditions report from the Biden era (dated August 2024), which supported the Mayorkas extension. *See* Docket No. 103-5 (ECF Pages 162-92) (RAIO report).

termination: "The vacatur was neither." Opp'n at 16. For purposes of this decision, the Court need not resolve this dispute. Even if the government's position has some merit, the Secretary's failure to consult is still relevant to Plaintiffs' pretext argument which is addressed below.

e.    Vacatur Decision Based on Pretext

Finally, the Secretary's decision to vacate was arbitrary and capricious because it was pretextual – *i.e.*, it was not animated by a concern about, *e.g.*, novelty or confusion as professed, nor was it otherwise the result of reasoned agency decision making. Instead, the Secretary – acting with unprecedented haste and in an unprecedented manner – issued the vacatur for the preordained purpose of expediting termination of Venezuela's TPS.

DHS began drafting the decision to vacate within days after President Trump began his second administration. There is no indication that the Secretary or DHS consulted any other government agencies or conducted an internal evaluation as part of this process. In fact, just two days after a draft of the vacatur decision was prepared and/or circulated, *see* MacLean Decl., Ex. 1 (email), a draft of the termination decision was prepared and/or circulated. *See* MacLean Decl., Ex. 5 (privilege log) (NTPSA-DHS 211). Vacatur (and termination) was a *fait accompli* from the outset. The draft of the termination notice was prepared even *before* the vacatur decision was finalized. The same day that Secretary Noem signed off on the vacatur decision, DHS staff was asked to "focus on any improvements in Venezuela," implicitly to advance and support termination of Venezuela's TPS. *See* Bansal Reply Decl., Ex. 17 (email). Within days of the Secretary's approval of the vacatur decision, DHS staff indicated that it was urgent to finalize the termination decision. The termination decision was approved just three days after the vacatur approval. Altogether, the decision making process for the vacatur through the termination took place over a span of days. *Cf. Dep't of Commerce v. N.Y.*, 588 U.S. 752, 782-83 (2019) ("The evidence showed that the Secretary was determined to reinstate a citizenship question from the time he entered office; instructed his staff to make it happen; waited while Commerce officials explored whether another agency would request census-based citizenship data; subsequently contacted the Attorney General himself to ask if DOJ would make the request; and adopted the Voting Rights Act rationale late in the process.").

United States District Court
Northern District of California

The pretextual nature of Secretary's asserted rationale for the vacatur is demonstrated by the fact that her criticism of Secretary Mayorkas's extension and the alleged confusion it caused was entirely baseless as noted above. And there is no evidence of any reasoned decision making behind Secretary Noem's vacatur. The failure to consult with agencies in regard to the termination decision which ensued immediately after the vacatur – a failure which was highly unusual and unprecedented (as discussed below) – further evinces the pretextual nature of Secretary Noem's purported rationale for the vacatur.

4. Summary

As a matter of law, the Secretary lacked the implicit authority to vacate. Even if she had such authority, there is no genuine dispute that she exceeded that authority. Furthermore, even if the Secretary had the authority to vacate, there is no genuine dispute that her decision to vacate was arbitrary and capricious for several reasons as set forth above. Accordingly, the Court grants Plaintiffs' motion for summary judgment on the APA claim related to the Venezuela vacatur decision, and denies the government's cross-motion.

D. APA Claim – Venezuela Termination

Plaintiffs' second APA claim focuses on the termination decision for Venezuela. According to Plaintiffs, the decision to terminate TPS for Venezuela was unlawful because it was predicated on the unlawful vacatur. Plaintiffs further argue that the termination decision was arbitrary and capricious because it was based on an assessment of the national interest, but national interest is a factor that may be considered only at the time of the original TPS designation, and not on periodic review. Finally, Plaintiffs contend that the termination decision was arbitrary and capricious because the decision was made without any meaningful consultation with other government agencies, nor was there a meaningful review of country conditions.

1. Predicated on Unlawful Vacatur

Plaintiffs' first argument has merit. As noted above, the vacatur and termination decisions essentially went hand in hand: Secretary Noem made the decision to vacate in order to advance her ability to terminate. Because termination was predicated on vacatur of the existing extension, Plaintiffs are entitled to relief from the termination decision.

United States District Court
Northern District of California

2. Failure to Consult with Government Agencies or Review Country Conditions

Plaintiffs are entitled to relief from the termination decision for an additional reason. Secretary Noem failed to comply with the statutory directive to consult with appropriate agencies in deciding whether to terminate Venezuela's TPS. As noted above, the TPS statute expressly requires that the DHS Secretary "consult[] with appropriate agencies of the Government" as part of the periodic review and that consultation implicitly includes review of country conditions. It provides: "[T]he [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . and shall determine whether the conditions for such designation . . . continue to be met." 8 U.S.C. § 1254(b)(3)(A). Moreover, the requirement to consult is not an empty obligation; rather, a consultation required by a statute means that there must be a "meaningful exchange of information." *Cal. Wilderness Coalition v. U.S. DOE*, 631 F.3d 1072, 1086 (9th Cir. 2011); *see also id.* at 1088 (characterizing a statutory requirement to consult as an "'affirmative duty'" and stating that the consultation must be "meaningful").

As an initial matter, the Court finds that the Secretary violated the TPS statute because she effectively made the decision to terminate *before* consultation with any government agency. As noted above, the TPS statute requires that a decision be made only *after* consultation – *i.e.*, the consultation is designed to inform the Secretary's decision-making. But here, the day after Secretary Noem was confirmed, DHS began to draft the decision to terminate. *See* MacLean Decl., Ex. 5 (privilege log) (NTPSA-DHS 211); *see also* Bansal Reply Decl., Ex. 7 11 (email, dated 1/27/2025) ("I created a shell for a termination notice. Can you start drafting? (I'm going to work on the memo for the vacatur notice.)"). There is no evidence that there was any consultation with, *e.g.*, the State Department prior to the initial drafting of the termination decision.

Moreover, as reflected by the evidence of record, even though DHS belatedly sought input from the State Department and assuming *arguendo* the final decision had not already been made prior to seeking that input, there was no meaningful consultation with the State Department or, for that matter, any other government agency. There is no dispute that the consultation required by the TPS statute typically involves at least the State Department. That has been the practice of DHS, as demonstrated by the GAO TPS Report discussed above. Furthermore, the State

United States District Court
Northern District of California

Department is the government agency that conducts foreign policy and thus is one of the agencies most likely to have information about conditions in a foreign country. Here, although DHS did reach out to the State Department to get its input (belatedly), the Secretary of State simply provided a one-and-a-half page letter; importantly, the analysis therein failed to include *any* information on country conditions in Venezuela. Instead, it focused solely on the national interests of the United States.

To the extent the government points to a State Department country conditions report from September 2024, that report was prepared by the Biden Administration, in conjunction with Secretary Mayorkas's TPS decision to *extend* TPS. *See* Docket No. 104-4 (ECF Pages 53-74) (letter from Secretary of State Blinken). Here, the new administration failed to provide a country conditions report from the State Department that was prepared contemporaneously in conjunction with Secretary Noem's termination decision. Nor did the administration obtain any contemporaneous country conditions report from RAIO. Instead, it appears that the Secretary could have relied at most on a RAIO country conditions report from the Biden era. *See* Docket No. 104-9 (ECF Pages 45-75) (RAIO report, dated August 2024, from the Biden era). Given the RAIO report was part of the Biden administration's decision to *extend* TPS for Venezuela, it seems ironic, if not disingenuous, for Secretary Noem to now rely on that report to *terminate* TPS. In fact, she cited nothing specific in the report from the Biden administration to justify her decision to vacate and terminate Venezuela's TPS.

The above demonstrates not only a failure to engage in a meaningful consultation with government agencies but also a failure to conduct a meaningful country conditions review, a rudimentary element of the consultation contemplated by the statute. This not only violates the TPS statute, but also constitutes arbitrary and capricious action by the Secretary. *See Lands Council*, 395 F.3d at 1026 ("An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law.").

United States District Court
Northern District of California

Furthermore, Secretary Noem's decision-making was arbitrary and capricious because it reversed DHS's established practices for TPS decision-making, as described in the 2020 GAO TPS Report,[18] without providing any explanation for that reversal. *See generally* MacLean Decl., Ex. 16 (GAO TPS Rpt.). As discussed above, the GAO TPS Report reviews the four documents that DHS typically collects for TPS decision-making:

(1) a country conditions report compiled by USCIS (an agency within DHS);

(2) a memo with a recommendation from the USCIS Director to the DHS Secretary;

(3) a country conditions report compiled by the State Department; and

(4) a letter with a recommendation from the Secretary of State to the Secretary of DHS.

DHS did not obtain a contemporaneous or updated country conditions report from the State Department, nor did it obtain a contemporaneous country conditions report from USCIS (including RAIO, a division within USCIS). A contemporaneous and updated report from the State Department would have been included input from the relevant regional bureau for PRM and the relevant overseas post – which implicitly would have had concrete, reliable on-the-ground information about country conditions. The failure to do so represented a reversal in practice and procedure long followed by previous administrations in enforcing the TPS statute.

Although "[a]gencies are free to change their existing policies," they must "provide a reasoned explanation for the change." *Encino Motorcars*, 579 U.S. at 221; *see also FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) (stating that "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position[;] [a]n agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books," and "the agency must show that there are good reasons for the new policy") (emphasis in original); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1089 (N.D. Cal. 2018) (in TPS case involving terminations of TPS for multiple countries, stating that "[t]he APA constrains an agency's ability to change its practices or policies without

[18] As indicated above, there is no dispute about what this process entails. The government has not objected to the GAO TPS Report, nor has it argued that the report's description of the TPS decision-making process is incorrect.

acknowledging the change or providing an explanation), *vacated by Ramos*, 975 F.3d at 872, *vacated for rehearing en banc*, 59 F.4th at 1010; *cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. St. Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that an agency must "examine the relevant data and articulate a satisfactory explanation for its action"). Here, Secretary Noem has not provided any explanation for her reversal of established practices on TPS decision-making.

Given the Court's rulings above, it need not reach Plaintiffs' additional argument that the termination decision was unlawful because it was predicated on an assessment of national interest, which is a factor to be considered only at the time of initial designation, and not as part of a periodic review. Plaintiffs' argument is based on a textual reading of the TPS statute which presents a closer call.

3. <u>Summary</u>

As a matter of law, the Secretary's decision to terminate the 2023 Designation was unlawful because it was based on the unlawful decision to vacate. Even if the Secretary had the authority to vacate the Mayorkas extension, did not exceed her statutory authority in vacating, and engaged in reasoned decisionmaking with respect to the vacatur of the Mayorkas extension, there is no genuine dispute that her subsequent decision to terminate was unlawful and/or arbitrary and capricious because the Secretary failed to engage in a meaningful consultation with government agencies or explain her reversal of well-established agency practice.

The Court thus grants Plaintiff's motion for summary judgment on the APA claim based on the Venezuela termination decision, and denies the government's cross-motion.

E. <u>APA Claim – Haiti Partial Vacatur</u>

Plaintiffs' third APA claim concerns the partial vacatur of Haiti's TPS designation – pursuant to which Secretary Noem shortened the extension/redesignation given by Secretary Mayorkas from 18 to 12 months. Plaintiffs' challenge to the partial vacatur for Haiti overlaps in part with their challenge to the vacatur for Venezuela.

1. <u>Lack of Authority to Vacate and Exceeding Authority to Vacate</u>

The Court agrees with Plaintiffs that the partial vacatur was unlawful because Secretary Noem lacked the implicit authority to partially revoke the Mayorkas extension/redesignation. *See*

Part VII.C.1, *supra*. Furthermore, even if the Secretary had such authority, she exceeded the scope of that authority by invalidating TPS-related documentation that had *already* issued based on the February 3, 2026, date given by the Mayorkas extension/redesignation. *See* Part VII.C.2, *supra*. The analysis of these issues on the Venezuela vacatur decision is equally applicable here.[19]

2. Arbitrary and Capricious

Even if the Secretary had the implicit authority to partially vacate, and did not exceed her authority to vacate, the vacatur decision is nonetheless problematic, because it was arbitrary and capricious.

The reasons given for the partial vacatur were stated in the Federal Register as follows:

> First, there is no discussion in the July 1, 2024, Federal Register notice of why the 18-month period was selected in lieu of a 6- or 12-month period. Nor does the administrative record underlying the June 3, 2024, decision and July 1, 2024, notice bear any discussion of why the 18-month period was chosen. Allowing aliens from a given country, including aliens who entered the United States illegally or overstayed their authorized period of admission, to remain in the United States temporarily with employment authorization is an extraordinary act. Congress recognized the gravity of such action under the TPS statute by setting the default extension period at 6 months, underscoring the uniqueness of this authority, and limiting its own authority to enact legislation allowing TPS recipients to adjust to lawful permanent resident status. Accordingly, determinations of how long a new designation should remain in effect and whether to depart from the default six-month period for an extension of an existing designation should take into account important considerations relating to the purpose of the statute and specific country and country conditions at issue and should not rest alone on administrative convenience. Here, there was no explanation whatsoever of why the 18-month period was selected.
>
> Second, and similarly, the July 1, 2024, notice is bereft of any justification of why permitting the ever-increasing population of Haitian TPS recipients, particularly those who entered the country unlawfully, to remain temporarily in the United States is not contrary to the U.S. national interest. The notice simply states that

[19] Plaintiffs also argue that the Secretary exceeded her authority because "the Secretary's timing for the partial vacatur contravenes the statutory mandate that the Secretary 'shall' decide whether to extend or terminate a TPS designation '[a]t least 60 days *before*' the end of the previous period of designation." Mot. at 21 (emphasis added). It is not altogether clear what Plaintiffs' contention is here. If Plaintiffs' point is that Secretary Mayorkas properly made his decision to extend/redesignate *before* the August 3, 2024, expiration date for Haiti's TPS, but Secretary Noem did not (*i.e.*, because her vacatur decision was made months later on February 18, 2025), the Court agrees that Secretary Noem failed to comply with the timing provided for in the TPS statute.

> "it is not contrary to the national interest of the United States." The administrative record underlying Secretary Mayorkas' June 4, 2024, decision likewise lacks any discussion of the critical national interest criterion. Such conclusory determinations do not accord with the gravity of TPS decisions under the INA. "National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities). Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.
>
> Third, although the July 1, 2024, notice cites some country conditions reports that are relatively proximate to the June 4, 2024, decision, several others date back to early 2023, 2022, or even earlier. And certain sources upon which DHS relied indicated that significant developments were taking place in 2024 that might result in an improvement in conditions. For example, as stated in the July 1, 2024, Federal Register notice, the United Nations had recently authorized a Multinational Security Support (MSS) mission to deploy in Haiti in 2024 and support the Haitian National Police in capacity building, combatting gang violence, and provide security for critical infrastructure. The Department of State likewise underscored that significant development. Thus, both DHS and the Department of State contemplated the real possibility of an improvement in conditions with the deployment of the United Nations MSS mission, yet that important development was not expressly factored into the determination of the length of the extension and designation period.
>
> Eighteen months is the maximum period of designation or extension authorized under the TPS statute. Neither the 2021 new designation, the 2023 extension and new designation, nor the 2024 extension and new designation contained any discussion of national interest considerations or why the 18-month (vs. 6 or 12-month) periods were granted. Given the protracted duration of the "extraordinary and temporary conditions"-based designation for Haiti, the absence of any meaningful appraisal of national interest factors or justification for the 18-month extension, and the fact that eligible Haitians were able to register for TPS under the July 1, 2024, notice for over seven months, the Secretary has determined that a 12-month period is warranted. Abbreviating the period from 18 to 12 months will allow for a fresh review of country conditions in Haiti and of whether such conditions remain both "extraordinary" and "temporary," whether Haitian may return in safety, and whether it is contrary to the U.S. national interest to continue to permit the Haitian nationals to remain temporarily in the United States.

90 Fed. Reg. at 10513-14.

None of these reasons reflect reasoned agency decision making. For example, the

Secretary claimed that the Mayorkas extension/redesignation should have given specific reasons why the period was set at 18 months, particularly when the default was only 6 months. But 6 months is the default only if the Secretary does *not* affirmatively make a decision on whether to extend or terminate. *See* 8 U.S.C. § 1254a(b)(3)(C) ("If the [Secretary] does not determine under subparagraph (A) that a foreign state (or part of such foreign state) no longer meets the conditions for designation under paragraph (1), the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months)."). That was not the situation here: Secretary Mayorkas did make an affirmative decision – *i.e.*, to extend. Furthermore, Secretary Noem failed to acknowledge that, in prior TPS decision making spanning the course of the 35 years, there typically has been no explanation as to why a certain period of time was chosen. *See* MacLean Decl. ¶ 30 (testifying that TPS decisions over the course of 35 years were reviewed, and, "in virtually all instances where a DHS Secretary announced the length of a TPS designation or extension, they did so without elaborating their reasons for choosing that duration and not another duration length[;] [t]here are only exceedingly rare instances where Secretaries have provided any explanation for the duration of a designation or extension"). The government has provided no evidence to the contrary. Thus, there is nothing in the record that suggests the absence of a specific justification for the length of an extension, once the decision to extend has been made, is unusual or impermissible.

Secretary Noem's criticism that the Mayorkas extension/redesignation failed to explain why it was not contrary to national interest to extend TPS suffers from the same basic flaw. That is, in prior TPS decision making, DHS Secretaries typically have not given explanations as to why allowing TPS holders to remain in the United States is not contrary to the national interest. *See* MacLean Decl. ¶ 30 ("Secretaries have never explained their conclusion that 'permitting [TPS beneficiaries] to remain temporarily in the United States' is not 'contrary to the national interest.'").[20] The government presents no evidence that the Mayorkas decision was contrary to established practice.

[20] Plaintiffs also fairly note that this would require a Secretary to prove a negative.

United States District Court
Northern District of California

In addition to the above, the partial vacatur decision arbitrary and capricious because (like the vacatur decision for Venezuela) it was preordained without any meaning analysis and review. It was, *inter alia*, made without consultation with government agencies or country conditions review. As with the administrative record for the Venezuela vacatur, there was no contemporaneous country conditions report in the administrative record for the Haiti partial vacatur. Rather, there was only a country conditions report from the Biden era that *supported* the Mayorkas extension/redesignation. *See* Docket No. 110-5 (RAIO report, dated January 2024) (ECF Pages 29-43). As in the case of Venezuela, it is ironic, if not disingenuous, for Secretary Noem to rely on a report which supported the Mayorkas extension/redesignation to *vacate* that extension/redesignation. She has cited nothing specific in those reports to support her decision to vacate, with a single exception: reference to that fact that the United Nations had authorized a Multinational Security Support (MSS) mission to deploy in Haiti in 2024. But Secretary Noem cited no evidence on the status of the deployment and if so whether by 2025 it has had any real impact on the crime and lawlessness which had plagued Hait in recent years. There is no evidence that she obtained or even requested a current update on the MSS mission. Simply put, in deciding to partially vacate the TPS extension, Secretary Noem had no regard for the facts and actual conditions.

Instead, like her decision to vacate Venezuela's TPS, the Secretary's decision to partially vacate was simply driven by her predetermined desire to terminate Haiti's TPS on a hastened timeline. DHS began to draft the vacatur decision within days of the Venezuela termination. The decision to vacate was made approximately two weeks later. A press release, dated February 20, 2025, announcing the partial vacatur included statements that the vacatur was "part of President Trump's promise to *rescind* policies that were magnets for illegal immigration and inconsistent with the law" – effectively noting that termination would be forthcoming. MacLean Decl., Ex. 15 (press release) (emphasis added; also asserting that, "[f]or decades the TPS system has been exploited and abused" and pointing out that, "[l]ast month, Secretary Norm similarly rescinded the previous administration's Venezuela TPS extension").

To be sure, the timeline for Haiti is, on its face, not as stark as that for Venezuela – *i.e.*, it

does not appear as compressed; this might suggest that there was less of an urgency to terminate than in the case of Venezuela. However, a closer look establishes that the path laid out for Haiti was not materially different from that carried out for Venezuela. Secretary Noem was able to effectuate a full vacatur of the Mayorkas extension for Venezuela only because the period for the extension had not yet begun. (The period for the extension would have run from April 2025 to October 2026. Secretary Noem vacated the extension in February 2025.) The full vacatur is what enabled the Secretary to then immediately terminate. In contrast, Secretary Noem was not able to do a full vacatur of the Mayorkas extension/redesignation for Haiti because the period for that extension/redesignation had already begun (starting in August 2024) by the time she made the decision to vacate in February 2025. Nor did Secretary Noem have the option of shortening the extension/redesignation to 6 months (instead of 12) for the partial vacatur because that deadline had already passed as well. Thus, Secretary Noem was effectively forced to do a partial vacatur that shortened the extension/redesignation period to 12 months (instead of 18, as provided for by Secretary Mayorkas). Once that 12-month period was soon due to expire, Secretary Noem did not waste time in proceeding with the termination of Haiti's TPS.

3. Summary

The Court grants Plaintiffs' motion for summary judgment on the APA claim related to the partial vacatur for Haiti, and denies the government's cross-motion. The Secretary lacked the authority to partially vacate and/or exceeded her authority to vacate. Even if she had statutory authority to vacate, the decision to partially vacate was arbitrary and capricious.

F. Equal Protection Claims

Only the government has moved for summary judgment on the Equal Protection claims; Plaintiffs have not.[21] The Court denies the government's motion for summary judgment because, consistent with its postponement order, it holds that *Trump v. Hawaii*, 585 U.S. 667 (2018), does not provide the governing standard. *See* Docket No. 93 (Order at 60-61) (distinguishing *Trump v.*

---

[21] Although the APA provides that a court shall set aside agency action that is "contrary to constitutional right," 5 U.S.C. § 706(2)(B), Plaintiffs' complaint does not appear to expressly allege a violation of the APA predicated on a constitutional violation. Rather, Plaintiffs seem to have asserted constitutional claims separate from and independent of the APA claims.

United States District Court
Northern District of California

*Hawaii* because it dealt with the admission and exclusion of foreign nationals whereas TPS holders are already present in the United States; adding that the *Ramos* panel invoked similar reasoning).

Under the applicable analytical framework set forth in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977), the Court finds that there is a genuine dispute of material fact as to whether the decisions to vacate and terminate were based on racial, ethnic, and/or national origin animus. Such animus can reasonably be inferred from the discriminatory statements made by Secretary Noem and/or President Trump alone. *See* Docket No. 93 (Order at 64-69) (surveying some of the discriminatory statements – *e.g.*, statements by Secretary Noem that "Venezuela didn't send us their best" but rather sent "criminals" and that the TPS program resulted in Venezuelan gang members being present in the United States); *see also* Docket No. 93 (Order at 70-71) (noting that President Trump influenced TPS policy and/or decision-making). Notably, at least some of these statements were made when the Secretary or President was discussing TPS, either expressly or implicitly.

For example, during a January 29, 2025, interview on Fox, when Secretary Noem announced the vacatur decision for Venezuela, the Secretary stated:

> [F]or 18 months, they were going to extend this protection to people that are in temporary protected status, which meant they were going to be able to stay here and violate our laws for another 18 months, and we stopped that. Today we signed an executive order within the Department of Homeland Security in a direction that we were not going to follow through on what he did to tie our hands, that we are going to follow the process, evaluate all of these individuals that are in our country, including the Venezuelans that are here and members of [TdA]. Listen, I was in New York City yesterday and the people of this country want these dirt bags out.

MacLean Decl., Ex. 18 (transcript). As noted in the Court's postponement order, Secretary Noem's generalization of the alleged acts of a few (for which there is little or no evidence) to the entire population of Venezuelan TPS holders who have lower rates of criminality and higher rates of college education and workforce participation than the general population is a classic form of racism. *Cf. Hirabayashi v. United States*, 320 U.S. 81, 96-99 (1943) (describing why Japanese Americans as a group, despite the fact that most were American citizens, were susceptible to

disloyalty and thus constitute a security threat, relying on assumed stereotypes); *Korematsu v. United States*, 323 U.S. 214, 233, 235 (1944) (Murphy, J., dissenting) (characterizing the majority decision upholding the mass internment of Japanese Americans as falling into the "ugly abyss of racism"; noting that the "forced exclusion [of Japanese Americans] was the result in good measure of the erroneous assumption of racial guilt . . ."). The government has suggested that the Secretary was simply calling the members of the TdA gang members "dirt bags," but there is at the very least ambiguity as to whether she was calling only gang members dirt bags, or instead referring to the larger Venezuelan TPS population in the United States. *See* Docket No. 93 (Order at 65 n.26). In any event, even if the government were right, a reasonable jury could still infer racial animus from the Secretary's statement because she was choosing to strip legal status from all Venezuelan TPS holders – numbering in the hundreds of thousands – based off her assessment of a limited number of individuals, and with no proof that any alleged gang member was a TPS holder.

As for President Trump, his comments included derogatory and baseless claims that Haitian immigrants in Springfield, Ohio – TPS holders – were eating people's pets. *See* Docket No. 129 (Order at 5); *see also* MacLean, Decl., Ex. 19 (article, dated October 2024; Docket No. 93 (Order at 67). Also, during his first administration – when there were also a number of attempts to terminate TPS – there was a discussion about protecting immigrants from Haiti, El Salvador and African countries, and President Trump asked: "Why are we having all these people from shithole countries come here?" Docket No. 93 (Order at 66) (internal quotation marks omitted). He then suggested that the "United States should instead bring more people from countries such as Norway . . . ." Docket No. 93 (Order at 66) (internal quotation marks omitted).

To be clear, the record from which a reasonable inference of animus can be made consists of more than just the discriminatory statements of Secretary Noem and President Trump, some of which were proximate in time to the decisions challenged herein. As discussed in the Court's postponement order, a number of other *Arlington Heights* factors suggest animus including "the anomalous procedures followed (the highly compressed time in which the decisions to vacate and then terminate were made and the precedential and unique nature of the decisions made), and the lack of bona fides for the decisions to vacate and then terminate." Docket No. 93 (Order at 75).

The government's motion for summary judgment on the Equal Protection Claims is denied.

## VIII. MOTIONS TO DISMISS

### A. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

### B. Termination of Haiti's TPS

The government has filed two motions to dismiss. The original motion to dismiss and briefing related thereto were all completed before the Secretary terminated Haiti's TPS. After Haiti's TPS was terminated, the parties stipulated that Plaintiffs could file an amended/supplemental complaint to include the termination. Plaintiffs did so, after which the government filed a new motion to dismiss. The new motion to dismiss is largely the same as the original motion to dismiss, except that it also addresses the Haiti termination.

As an initial matter, Plaintiffs argue that their filing of a supplemental complaint did not moot out the original motion to dismiss. Practically speaking, this procedural issue is not material. Plaintiffs do not argue that the government should be barred from moving to dismiss with respect

United States District Court
Northern District of California

United States District Court
Northern District of California

to the Haiti termination. Thus, the Court can consider the government's arguments in favor of dismissal, whether in the original motion to dismiss or in the new one.

As for those arguments, those related to the Venezuela vacatur, Venezuela termination, and Haiti partial vacatur lack merit for the reasons discussed in the Court's summary judgment analysis.

Turning to the Haiti termination, the government's arguments in favor of dismissal also lack merit. Indeed, because the Court has found the Haiti partial vacatur unlawful, the Haiti termination – which was possible only because of the vacatur – is necessarily unlawful too. Plaintiffs' APA and Equal Protection claims related to the Haiti termination are also plausible as there are allegations in the operative complaint suggesting pretext. For example, Plaintiffs have alleged that, on June 7, 2025, DHS announced in a press release that Haiti's TPS would be terminated, *both* because country conditions had improved and because allowing Haitians to remain temporarily in the United States was against national interest. *See* FASC ¶ 106. However, on July 1, 2025, when the decision to terminate was published in the Federal Register, no mention was made of improved conditions; the decision rested on a national interest assessment alone. *See* FASC ¶ 107. Country conditions were referenced only indirectly in the context of the Secretary's national interest findings – and here there was no mention of any improved conditions; rather, the clear suggestion that there was significant instability in the country. *See, e.g.*, 90 Fed. Reg. at 28763 (stating that "[g]ang violence in Haiti persists as armed groups operate with impunity, enabled by a weak or effectively absent central government"; "[w]idespread gang violence in Haiti is sustained by the country's lack of functional government authority"); *id.* at 28762 (stating that "'Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States'"). As Plaintiffs argue, "Defendants' simultaneous promulgation of two directly contradictory explanations for the Haiti termination suffices to demonstrate, at least for purposes of a motion to dismiss, that the reasons given were pretextual." Docket No. 264 (Opp'n at 3). Pretext may further be inferred from the facts discussed above in regard to the partial vacatur.

The motions to dismiss are, therefore, denied.

## IX.    SCOPE OF RELIEF

Because the Court has granted Plaintiffs' summary judgment motion on the APA claims related to the Venezuela vacatur, the Venezuela termination, and the Haiti partial vacatur, the Court must also consider the to which relief Plaintiffs are entitled.  Section 706 of the APA specifies that a court "shall . . . hold unlawful and set aside agency action . . . found to be," *e.g.*, arbitrary or capricious, not in accordance with the law, in excess of statutory authority, and without observance of procedure required by law.  5 U.S.C. § 706(2).  Based on this statutory language, the Court sets aside, or vacates, each of the above decisions made by Secretary Noem.

The Court first rejects the government's contention that relief as a legal matter should categorically be limited in scope to only Plaintiffs – *i.e.*, the individual plaintiffs and the members of the National TPS Alliance ("NTPSA").  As noted above, in *Trump v. CASA*, where the Supreme Court addressed the viability of nationwide or universal injunctions, it expressly stated its holding therein did not "resolve[] the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."  *Trump v. CASA*, 156 S. Ct. at --- n.10.  The government has also cited no authority to suggest that § 706 of the APA incorporates equitable principles, which were the basis of the Supreme Court's holding in *Trump v. CASA*.  In fact, the Fifth Circuit has stated that

> vacatur under § 706 is, as we have repeatedly described it, the "default" remedy for unlawful agency action.  Thus, contrary to what the Government and the amici represent, we do not read our precedent to require consideration of the various equities at stake before determining whether a party is entitled to vacatur.

*Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024), *rev'd and remanded on other grounds sub nom. Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427 (2025); *see also Cabrera v. U.S. DOL*, No. 25-cv-1909 (DLF), 2025 U.S. Dist. LEXIS 141992, at *23-24 (D.D.C. July 25, 2025) (noting that, "[i]n non-APA cases, 'background equitable principles may control' because 'Congress has rarely authorized courts to act directly on federal statutes or to prohibit their enforcement against nonparties,'" but "the APA permits courts to act directly on agency actions"); *Ksanka Kupaqa XA v. U.S. Fish & Wildlife Serv.*, 534 F. Supp. 3d 1261, 1273 (D. Mont. 2021) (rejecting defendant's argument that plaintiff had to show irreparable harm: "[t]hat

argument misses the mark" because "the APA directs that the 'reviewing court shall . . . set aside agency action, findings, and conclusions found to be' arbitrary, capricious, or contrary to law").

Furthermore, the Court finds persuasive Justice Kavanaugh's concurrence in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 603 U.S. 799 (2024). There, Justice Kavanaugh rejected the government's contention that "the APA's authorization to 'set aside' agency action [under § 706] does not allow vacatur, but instead permits a court only to enjoin an agency from enforcing a rule against the plaintiff." *Id.* at 827 (Kavanaugh, J., concurring). Justice Kavanaugh characterized that argument as "far-reaching," "novel," and "wrong. It 'disregards a lot of history and a lot of law.'" *Id.* He then explained that the APA does in fact authorize vacatur of unlawful agency action, including agency rules, based on "the text and history of the APA, the longstanding and settled precedent adhering to that text and history, and the radical consequences for administrative law and individual liberty that would ensue if vacatur were suddenly no longer available." *Id.* at 829. In short, it is hard to imagine, textually and logically, how a singular rule or order issued by an agency which has uniform national application can be "held unlawful and set aside" under § 706 only as to some and not others equally subject to and affected by such unlawful rule or order.

At the hearing in the instant case, the government argued for the first time that § 703 defines the authority of the court to issue relief, and not § 706. That argument was not raised in the government's papers and therefore has been waived. In any event, on the merits, the argument is without merit for the reasons stated in Justice Kavanaugh's concurrence in *Corner Post*.

> Section 703 determines the "form of proceeding" for suits under the APA and identifies the federal actors against whom an "action for judicial review may be brought." But "no court has ever held that Section 703 implicitly delimits the kinds of remedies available in an APA suit. For good reason: As explained above, the ordinary meaning of "set aside" in §706(2) has long been understood to refer to the remedy of vacatur. The conclusion that §706 governs remedies is also supported by §706(1), which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed" – unmistakably a remedy. By contrast, the text of §703 "speaks to venue and forms of proceedings, not to remedies, and regardless, its listing of the available forms of proceedings is nonexhaustive."

*Id.* at 838-39.[22]

The government contends that the Ninth Circuit's recent decision in *IDL*, 2025 U.S. App. LEXIS 17884, precludes this Court from setting aside the Secretary's orders in their entirety and requires the Court to limit relief to Plaintiffs herein. The Court disagrees. The plaintiffs in *IDL* filed suit challenging the implementation of the Trump Administration's "Remain in Mexico" policy (also known as the Migrant Protection Protocols or MPP). Under the policy, persons from Mexico seeking asylum in the United States had to remain in Mexico pending adjudication of their asylum proceedings – even though this made it difficult for the individuals to access counsel to represent them in their asylum proceedings. The plaintiffs moved for a stay of the implementation of the policy pending the conclusion of the litigation. The district court granted a nationwide stay pursuant to 5 U.S.C. § 705. The government appealed that decision.

On appeal, the government argued, *inter alia*, that the stay should be limited to only the organizational plaintiff's clients. The Ninth Circuit agreed with the government, stating that, "*at this stage in the litigation*, . . . limiting the district court's order to [IDF]'s current and future clients is the more equitable approach 'to preserve status [and] rights pending conclusion of the review proceedings.'" *Id.* at *41 (emphasis added; quoting § 705). The Ninth Circuit acknowledged that, in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), the Supreme Court expressly stated that "[n]othing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id.* at 945 n.10 (citing § 706). However, the Ninth Circuit stated that *Trump v. CASA* still provided some guidance in the

[22] A number of lower courts have agreed with Justice Kavanaugh, whether explicitly or implicitly. *See, e.g.*, *N.Y. Legal Assistance Grp. v. Cardona*, No. 20 Civ. 1414 (LGS), 2025 U.S. Dist. LEXIS 51632, at *10 (S.D.N.Y. Mar. 20, 2025) (citing, *inter alia*, Justice Kavanaugh's concurrence in rejecting defendant's interpretation of §§ 706 and 703); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306 (RDM), 2025 WL 1825431, at *50 (D.D.C. July 2, 2025) (stating that "[t]he D.C. Circuit has 'made clear that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their application to the individual petitioners is proscribed"'"). Nevertheless, the Court acknowledges that not all Justices on the Supreme Court are in agreement with Justice Kavanaugh. Justice Gorsuch, for example, seems to agree with the government's position. *See United States v. Texas*, 599 U.S. 670, 696-98 (2023) (Gorsuch, J., concurring) (asserting that "[t]here are many reasons to think § 706(2) uses 'set aside' to mean 'disregard' rather than 'vacate'"; also asserting that § 703 "is where the APA most clearly discusses remedies" and it does not provide for vacatur).

United States District Court
Northern District of California

context of that case "because the factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." *IDL*, 2025 U.S. App. LEXIS 17884, at *42.

*IDL* does not require that relief in this case – a final judgment under § 706, not an interim postponement order under § 705 – be limited to the individual plaintiffs and members of the plaintiff National TPS Alliance. *IDL*'s holding was clearly informed by the procedural posture of that case, where the plaintiffs were seeking *preliminary* relief to preserve the status quo under § 705. *IDL*'s ruling applies to preliminary relief where such relief is predicated on equitable considerations similar to that which apply to preliminary injunctions under *Winter v. NRDC*, 555 U.S. 7 2008; *see also Colorado v. United States EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (stating that the preliminary injunction "factors also determine when a court should grant a stay of agency action under section 705 of the APA"); *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020) (stating that the standard for a stay under § 705 is "the same" as the standard for a preliminary injunction); *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529 (N.D. Cal. 2020) (stating that factors considered in determining whether to postpone pursuant to § 705 "'substantially overlap with the . . . factors for a preliminary injunction'"). That similarity makes *CASA* apposite to stays under § 705, but inapposite to the instant case where final relief under § 706 is not anchored to the equitable *Winter* factors. Section 706 directs that the court "must" "[h]old unlawful and set aside agency actions" if they are unlawful for the reasons set forth in § 706(2). *Trump v. CASA*, informed by historic equitable remedies, does not apply to § 706 of the APA which contains a clear statutory directive.

Even if, as a legal matter, *Trump v. CASA*'s restriction on the scope of relief were to guide the scope of relief under § 706, the Ninth Circuit – in affirming this Court's postponement order – indicated that relief should be nationwide in scope *in this case* because (1) full relief for the NTPSA and its tens of thousands of members who reside in all fifty states and the District of Columbia could not be obtained otherwise and (2) limiting relief as proposed by the government was not a workable solution under the TPS statute. *See NTPSA*, 2025 U.S. App. LEXIS 22269, at *56. The court stated as follows:

Plaintiffs have demonstrated that a postponement of the Vacatur Notice, effective nationwide, is the only remedy that provides complete relief to the parties before the court and complies with the TPS statute.  First, Plaintiff NTPSA, a membership organization, brings this challenge on behalf of its more than 84,000 members who are Venezuelan TPS holders in all fifty states and the District of Columbia.  As the district court reasoned, "[f]ull relief for the NTPSA and its members cannot be obtained absent application to all fifty states and the District of Columbia."

Second, limiting the relief to individual plaintiffs and NTPSA members is not a workable solution under the TPS statute.  Plaintiffs challenge a single act: Secretary Noem's vacatur of the prior extension of Venezuelan TPS.  They do not challenge the eligibility determination for any particular TPS holder.  Limiting Secretary Noem's decision to affect only certain individuals would effectively mean rewriting it in a way that does not comply with the TPS statute.  Although the TPS statute contemplates only a single binary determination for each country's TPS designation, we would be replacing Secretary Mayorkas's positive determination, and Secretary Noem's negative determination, with a judicially created patchwork.

These statutory constraints distinguish this appeal from those arising in otherwise similar contexts. In *Immigrant Defenders*, the plaintiff organization challenged the enrollment of asylum seekers in the "Remain in Mexico" program.  There, we limited the scope of the order postponing the implementation of the "Remain in Mexico" program to the organization's individual clients, as doing so awarded the plaintiffs complete relief.  The statute at issue in *Immigrant Defenders* stated that the Secretary of Homeland Security "may return the [noncitizen]" to Mexico pending removal proceedings.  Thus, the statute did not prohibit the Secretary from adopting a piecemeal approach by returning some, but not all, noncitizens to Mexico.  Indeed, the statute specifically contemplated separate actions for each individual asylum seeker, so the piecemeal approach was consistent with the statute's design and purpose.  Similarly, the challenge in *East Bay v. Barr* was to a rule limiting the eligibility of certain noncitizens for asylum.  We held that the "nationwide scope" of the injunction was "not supported by the record" at that stage in the litigation because the district court failed to discuss why nationwide relief was necessary to remedy Plaintiffs' harm.  Again, since the rule at issue dealt with asylum eligibility, it was possible to apply the rule to asylum applicants in some areas but not others, because each person's asylum eligibility is an individual determination.

"Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown."  Here, relief cannot be structured on an individual basis.  Postponing the rule for just some individuals would require rewriting the statute itself, and a narrower construction is not possible.  TPS does not allow for partial determinations; no Secretary has the authority to designate a country for TPS when it comes to California residents, but not for Pennsylvania residents.  And we do not claim the authority to do so

United States District Court
Northern District of California

judicially.

*Id.* at *56-59. The Ninth Circuit's analysis is dispositive as to the scope of properly relief herein.

The Court further notes that limiting relief to the individual plaintiffs and the members of NTPSA only would be highly problematic for additional reasons. For example, limiting relief to the members of the organization would require that identification of the members be provided to DHS which would raise serious concerns about privacy and associational rights. *Cf. NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958) (noting that "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as the forms of governmental action"). Moreover, there may also be insurmountable practical problems given that NTPSA has members numbering in the tens of thousands, if not in the hundreds of thousands, throughout the country. At the time of the Court's postponement order, NTPSA's members included over 84,000 Venezuelan TPS holders alone. *See* Docket No. 93 (Order at 2). Contacting all members in a short time span within which their rights must be protected may be impossible as a practical matter.

## X. CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for summary judgment on the APA claims related to the Venezuela vacatur, the Venezuela termination, and the Haiti partial vacatur. It finds those decision of Secretary Noem are unlawful and sets aside each of those agency actions. The Court denies the government's motion for summary judgment on the same APA claims. It further denies the government's motion for summary judgment on the Equal Protection claims and its motion to dismiss on the APA claims related to the Haiti termination.

In addition, given the likelihood of an appeal to the Ninth Circuit and possibly the Supreme Court, and the significant rights of the Venezuelan and Haitian TPS holders who have lost or will lose status in the absence of relief and the consequential need for expeditious final adjudication, the Court directs entry of a final judgment under Rule 54(b) on the APA claims for which the Court has granted summary judgment in favor of Plaintiffs. There is no just reason for delay. *See* Fed. R. Civ. P. 54(b) ("When an action presents more than one claim for relief . . . , the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties

United States District Court
Northern District of California

only if the court expressly determines that there is no just reason for delay."). **The Clerk of the Court is directed to enter a final judgment in favor of Plaintiffs on the APA claims related to (1) the Venezuela vacatur, (2) the Venezuela termination, and (3) the Haiti vacatur.**[23]

As for the remaining claims – *i.e.*, (4) the APA claim related to the Haiti termination, (5) the Equal Protection claim related to the Venezuela TPS decisions, and (6) the Equal Protection claim related to the Haiti TPS decisions – the Court temporarily stays continued litigation. Given the prior proceedings in this case, it seems likely that the government will appeal this order. A temporary stay will help conserve judicial and party resources and further will allow the appellate courts to adjudicate most of the statutory claims before the constitutional ones.[24] *Cf. Califano v. Yamasaki*, 442 U.S. 682, 692 (1979) (stating that "[a] court presented with both statutory and constitutional grounds to support the relief requested usually should pass on the statutory claim before considering the constitutional question").

This order disposes of Docket Nos. 122, 165, 199, 172, and 262.

**IT IS SO ORDERED**.

Dated: September 5, 2025

EDWARD M. CHEN
United States District Judge

[23] The Court acknowledges the Supreme Court's order staying enforcement of the postponement order. However, the Supreme Court's order only concerns the preliminary relief ordered by this Court in postponing agency action. The Supreme Court's order did not bar this Court from adjudicating the case on the merits and entering a final judgment issuing relief under § 706 of the APA.

[24] The APA claim based on the Haiti termination is not a constitutional claim, but, as discussed above, the Haiti termination will be unlawful if the Haiti vacatur is deemed unlawful.