**Pages 1 - 15**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | |
|---|---|
| NATIONAL TPS ALLIANCE, et al.,         ) ) ) | |
|       Plaintiffs,    ) ) | |
|   VS.                  ) | **NO. 25-CV-01766-EMC** |
| KRISTI NOEM, et al.,     ) ) | |
|       Defendants.   ) _____) | |

San Francisco, California
Thursday, September 11, 2025

<u>TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS</u>

<u>APPEARANCES:</u>

For Plaintiffs:

> ACLU OF NORTHERN CALIFORNIA
> 39 Drumm Street
> San Francisco, CA 94111
> BY:  **EMILOU H. MACLEAN, ATTORNEY AT LAW**
>
> NATIONAL DAY LABORER ORGANIZING NETWORK
> 1030 S Arroyo Parkway, Suite 106
> Pasadena, CA 91105
> BY:  **JESSICA K. BANSAL, ATTORNEY AT LAW**
>
> UCLA SCHOOL OF LAW
> 385 Charles E Young Drive East
> Los Angeles, CA 90095
> BY:  **AHILAN T. ARULANANTHAM, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE NEXT PAGE.)**

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
Official United States Reporter

APPEARANCES: (Continued)

For Defendants:

                    UNITED STATES DEPARTMENT OF JUSTICE
                    Civil Division
                    P.O. Box 868
                    Ben Franklin Station
                    Washington, DC 20044-0868
              BY:   WILLIAM WEILAND, SENIOR LITIGATION COUNSEL

Thursday - September 11, 2025                                3:13 p.m.

                        P R O C E E D I N G S

                              ---o0o---

        THE COURTROOM DEPUTY:  This Court is now in session, the Honorable Edward M. Chen presiding.

        Calling Civil Case Number 25-1766, National TPS Alliance, et al. v. Kristi Noem, et al.

        Will counsel please state your appearances, starting with plaintiffs' counsel.

        MS. BANSAL:  Good afternoon.  Jessica Bansal for plaintiffs.

        THE COURT:  All right.  Thank you, Mr. Bansal -- Ms. Bansal.

        MR. ARULANANTHAM:  And, Your Honor, Ahilan Arulanantham for the plaintiffs.

        THE COURT:  Thank you, Mr. Arulanantham.

        MS. MACLEAN:  Good afternoon, Your Honor.  Emi MacLean also for the plaintiffs.

        THE COURT:  All right.  Thank you, Ms. MacLean.

        MR. WEILAND:  Good afternoon, Your Honor.  Will Weiland for the defendants.

        THE COURT:  All right.  Good afternoon, Mr. Weiland.

        Okay.  We have an issue regarding compliance with a court order.  I guess I want to find out from the parties exactly where we sit right now.  I will state preliminarily that, first

of all, as a legal matter, the issue has been raised about whether my final judgment with respect to the APA claim took effect immediately or not in the application of Rule 62. My view is that Rule 62 did not permit the immediate effect of the order.

I think it's clear from the legislative history and from Ninth Circuit authority that the focus of Rule 62 really was about requiring supersedeas bonds for money judgment. And although it uses the word "injunction," certainly in cases like *NLRB v. Westphal* in 1988, I think the Ninth Circuit made it clear that something doesn't have to be denominated as an injunction. It could be order, quote, "directing compliance" with an NLRB subpoena, for instance, or some other manner. And so as long as it's not a money judgment is the main point.

And if there's any doubt, I think the advisory notes make clear that Rule 62(a) is related and kind of dovetails with 28 USC 1292(a)(1). And as you all know, in this case, as well as the *Immigrant Defenders* case, the Ninth Circuit has found that there was appellate jurisdiction, even though we're dealing with an APA order under the APA that was not an injunction -- certainly not an injunction within the meaning of 1252.

Nonetheless, review and appellate jurisdiction obtained. And, therefore, that's a further indication that Rule 62 -- its use of the word "injunction" really meant something broader

than that and is not tied to the definition of "injunction" under other statutes, but it was meant to be something that was to be different and it differentiated from money judgments.

So my view is that -- and I will affirm this in a supplemental order today -- that the order was effective immediately.  And if there's any doubt, Rule 62(a) also says -- gives the Court the authority to make that doubly clear.  And so I'm making that triply clear at this point.

So my view is that the order was effective immediately.  And if there's any doubt, I'm reaffirming that.  That's why we went through the whole stay process.  So that way now the Government can, you know, do whatever it wants to do with regard to the stay, knowing that at least my view is that Rule 62(a) is not an impediment.  There's no sort of automatic stay.

So that's my rule -- my view over the application of Rule 62.  I guess why we're here today is to find out what -- I know there's been some back-and-forth.  What is there -- what are the parties asking me to do at this point?

MS. BANSAL:  Thank you, Your Honor.

Two primary things:  One, is to order the Government to update its website to accurately reflect the current status of Venezuela's TPS designation.  So the public employers, TPS holders rely on that website to understand if people continue to have status and employment authorization.

And, right now, that website should say that the Venezuela 2023 designation is extended through October 2nd, 2026, because the January extension is back in effect.  And that employment authorization is automatically extended through April 2nd, 2026.  That's the first thing, Your Honor, to make sure the website accurately reflects the Court's order.

THE COURT:  And you're saying it doesn't reflect that now?

MS. BANSAL:  It does not, Your Honor.  We submitted a -- I believe it's Exhibit A to Ms. MacLean's declaration. And the motion reflects what the, you know, website looked like when we filed our compliance motion.  I checked it right before the hearing, and it looks the same.

The second category, Your Honor, is this issue with the reregistration.  We filed a supplement to our motion yesterday, which the Government didn't address in their opposition.  So under the January extension, TPS holders from Venezuela were eligible to reregister through yesterday, through September 10th, and they had to do so to extend their status, pursuant to that extension.

Yesterday morning, very early, East Coast time, we began receiving messages from legal service providers -- dozens -- telling us that the online application system eliminated the option to choose Venezuela as your TPS country.  And so hundreds, if not thousands, of Venezuelan TPS holders who were

trying to register yesterday were unable to do so.

At around 3:30 p.m., as we said in our supplement, the option to choose Venezuela reappeared.  That's 3:30 Pacific.  However, apparently USCIS -- the time zone for their website is UTC Time Zone.  It's nine hours ahead of California.  So, in essence, that means there was only, like, one hour California time during the day yesterday, and zero hours Eastern Time or anywhere else in the country, where Venezuela TPS holders could actually reregister.

And so what we're asking the Court to do is to order the Government to reopen the online registration for 24 hours, to give plaintiffs at least four hours' notice so we can let people know, and to accept applications that are dated through the end of that 24 hours.  So if it starts tomorrow morning, they need to accept reregistration applications that are dated September 12th as timely, even though the registration period was supposed to end September 10th.

THE COURT:  Okay.

Mr. Weiland, your response?

MR. WEILAND:  Yes, Your Honor.  I have some information that's a bit different than what Ms. Bansal said.

There was an outage yesterday from 4:00 a.m. Eastern Time to 4:00 p.m.  When it was brought to our attention, DHS looked at it, and it looks like this is a coding issue that arose from when it was set up.  It's not quite clear how the bug was in,

but it was set to terminate on the date of expiration. It's normally set to terminate at 11:59 p.m. For some reason it turned off at 4:00 a.m. They turned it back on.

I don't have numbers, but I do have -- I am informed by the agency that folks were able to register after 4:00 p.m., and that it stayed open until 9:00 a.m. this morning, when it was manually turned off, being the 11th of September.

THE COURT: And so those who registered up to 9:00 -- 9:00 this morning Eastern Time or 9:00 which time?

MR. WEILAND: Between 12:00 a.m. -- yeah, Eastern Time, Your Honor -- between 12:00 a.m. and 9:00 a.m. Eastern, I understand that three people were able to register.

THE COURT: Okay. That means for the Western people, that would have been 9:00 p.m. to 6:00 a.m., a three-hour difference?

MR. WEILAND: Yes. I do believe that's correct, Your Honor.

THE COURT: And three people registered during that period?

MR. WEILAND: Yes, Your Honor.

THE COURT: Okay. And those --

MR. WEILAND: I don't have --

THE COURT: Those registrations will be accepted?

MR. WEILAND: I can confirm that with my client. I didn't ask them that question specifically.

**THE COURT:**  Okay.  So you're saying there was an inadvertent outage -- or coding error -- some kind of --

**MR. WEILAND:**  Yes, Your Honor.  When these are -- registration periods are open, as I understand -- what's been explained to me -- they're normally set to run for the entire period.  This one stayed open from January until 4:00 a.m. yesterday, when it auto- -- when it turned off.  The agency was alerted.  They sent their IT people in there.  And they identified the bug and were able to turn it on at 4:00 p.m.

**THE COURT:**  So there was about a 12-hour period that -- because it was -- should have run until 11:59 p.m.?

**MR. WEILAND:**  Yes, Your Honor.  The extension was set to -- the registration period set in the extension by Secretary Mayorkas was set to run through September 10th.

**THE COURT:**  Right.

**MR. WEILAND:**  So at midnight on the -- when it rolls over from the 10th to the 11th, it would have turned off.

**THE COURT:**  Okay.  So the critical period that people who wanted to try to sign -- your kind of normal hours would have been in the morning yesterday through the afternoon -- they would have had a problem.

**MR. WEILAND:**  They would have had a problem.

**THE COURT:**  Okay.  What about the reregistration -- well, so that's reregistration.

And what about updating the website?  I know there's a

move to stay and all that.  But, I mean, pending any stay from either the Ninth Circuit or the Supreme Court, doesn't that have to be -- doesn't the website have to be updated?

MR. WEILAND:  Given Your Honor's ruling just a few moments ago, the agency will have to take action to -- that is what they have done in the past, is update the website to reflect this Court's ruling.  And so they have taken preparatory steps to do that.  I don't know where that is in the approval process.  But they should be able to do so relatively quickly.

THE COURT:  Okay.  So then let me go back, Ms. Bansal. If that occurs, hopefully soon, on the first issue, until and unless -- then that would stay in effect until -- or unless there's a stay coming from a higher court -- that just leaves the reregistration outage problem; correct?

MS. BANSAL:  That's correct, Your Honor.

And I will say that the facts that Mr. Weiland just shared are a bit inconsistent with what we've heard from people regarding the times that the site was open.  And it also doesn't address this problem that, on the last day of reregistration, the site was just down.

THE COURT:  Okay.  Well, that's what I was going to go back to.  Regardless of the hour -- exact hours -- there was some outage, and not insubstantial.  At least 12 hours, according to the Government's position, during a period of the

last day, which is a critical day.

What's -- what's your response, Mr. Weiland, to the proposal that reregistration, in light of that problem, sort of be reopened and give people a chance -- I don't know if you call it nunc pro tunc or something -- to register because of this outage problem?

**MR. WEILAND:**  I have not consulted with my client on nunc pro tunc, Your Honor.  I will note that despite Secretary Noem's vacatur order, it stayed open for several months, from January onward.  So the registration period, even though she said they weren't accepting, was open.  So we're -- I'd have to -- if this Court is going to issue an order requiring the agency to do that, they'll certainly comply.

**THE COURT:**  Okay.  Well, it does seem to me this is an unusual situation.  But whether it was intended or not, or negligence, or whatever happened -- act of God -- it does appear that there was some significant period, at least 12 hours that we know of, during a critical day.  So it does seem appropriate, you know, to grant that relief.

So what I will do, in addition to my order reaffirming my view of Rule 62 and the immediate effect of my final judgment, will be to direct the agency to go ahead and make the changes to the website, pending any further, you know, stay from any other court, to reflect the updates regarding employment authorization and the Venezuela TPS designation.

And I think it is a -- the request is a modest one: Simply reopen with -- what? -- four hours' notice to the plaintiff that it's going to happen so they can get the word out.  And open it for a 24-hour period.  And that those -- anybody that files in that 24-hour period will be kind of deemed -- I don't know if we want to call it nunc pro tunc -- but effective back during the outage period.

MR. WEILAND:  Yes, certainly.  I understand the Court's inclination.  And if that's the order, that's the order.

I will note, for the record, that if the plaintiff -- or if the defendants succeed in their appeal, that may cause an issue, particularly as this is happening after the extension set by Secretary Mayorkas.  So there may be -- this may be an issue that we raise further.  But to the extent this Court has issued an order, I would expect my client to comply with it.

THE COURT:  All right.  Appreciate that.

Yes, everybody reserves their rights on anything -- everything -- in this case it seems.  I'm not surprised.

MR. WEILAND:  Yes, sir, just not able to concede or waive anything.

THE COURT:  I understand.

MS. BANSAL:  Your Honor, if I may, on two points?

THE COURT:  Yeah.

MS. BANSAL:  If the Government intends to potentially

appeal on this issue of the reregistration periods, I mean, we have put in factual declarations about what our clients experienced.  We would ask Mr. Weiland put in -- you know, the Government put in -- a declaration explaining what Mr. Weiland just said so there are facts in the record about what happened.

And then as to the website update, this is obviously very urgent for TPS holders, so we would ask the Court direct the update to happen by a time certain.

THE COURT:  What would you suggest?

MS. BANSAL:  It's a website update, Your Honor.  I can't see why it would take more than a day.

THE COURT:  So by the end of business day tomorrow --

MS. BANSAL:  Yes.

THE COURT:  -- Eastern Time?

Let's say 5:00 p.m. Eastern Time tomorrow.  I think that's fair.  It seems like -- you've done this before, so it shouldn't take much time to update that.

MR. WEILAND:  Yes, Your Honor.

I will just note that their proposed order asked for two business days.  We would certainly ask that at least we have that.

THE COURT:  Any objection?  That would give it until Monday, I guess.

MR. ARULANANTHAM:  That was a day ago, Your Honor.

THE COURT:  Oh.

**MR. ARULANANTHAM:**  I mean, there's people detained, losing their jobs.  I mean, it's -- is it that hard?

**THE COURT:**  I think a business day tomorrow, given that there was notice about what the request was.  So I will designate 5:00 p.m. tomorrow.

And then can you -- how do you feel about submitting, for the record, Mr. Weiland -- really, it's a courtesy to you. I'll give you a chance if you want to submit -- if you're going to appeal this, or thinking about appealing, you probably want a record.  So I'll leave the record open.  Tomorrow -- within -- again, by business day tomorrow, if you want to submit a declaration or something, you can add that to the record.  Otherwise, the record is the record.

**MR. WEILAND:**  Yes.  Thank you for the consideration, Your Honor.  I'm not certain a declaration is necessary to preserve our ability to challenge an order of the Court.  But I will --

**THE COURT:**  Okay.  Depends what the basis is.

**MR. WEILAND:**  Yes, sir.

**THE COURT:**  If it's a legal basis, you may not.  If it's a fact-based something -- but I'm going to give you that option --

**MR. WEILAND:**  Yes, sir.  Thank you.

**THE COURT:**  -- to file something.

All right.  Then I will get out an order.

Is there anything else?

MS. BANSAL:  Not from plaintiffs, Your Honor.  Thank you.

THE COURT:  All right.  Thank you, everyone.

MR. WEILAND:  Thank you, Your Honor.

MR. ARULANANTHAM:  Thank you, Your Honor.

THE COURT:  Take care.  Thanks.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings adjourned at 3:31 p.m.)

---oOo---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Thursday, September 25, 2025

_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court