couples chose to live together in long-term relationships similar to common-law marriage. The government did not formally recognize common-law marriages, although children born to those couples could be recognized as the legal children of both parents.

**Sexual Exploitation of Children:** The law prohibited the sale or use of children for commercial sexual exploitation, including sex trafficking. The law did not address or prohibit grooming of children for such purposes. The minimum age for consensual sex was 18, and the law had special provisions for rape of a person 16 or younger. The maximum penalty for human trafficking with aggravating circumstances, which included cases involving the exploitation of children, was life imprisonment. Enforcement, however, was rare due to impunity and a lack of resources.

## ANTISEMITISM

The Jewish community numbered fewer than 100 persons, and there were no reports of antisemitic incidents.

## TRAFFICKING IN PERSONS

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## ACTS OF VIOLENCE, CRIMINALIZATION, AND OTHER ABUSES BASED ON SEXUAL ORIENTATION, GENDER IDENTITY OR EXPRESSION, OR SEX CHARACTERISTICS

**Criminalization:** No laws criminalized consensual same-sex sexual conduct between adults. There were "public decency" laws that criminalized sexual activities in public places; some activists and human rights organizations stated these laws were used disproportionately against LGBTQI+ persons.

**Violence and Harassment:** There were no reports of violence against LGBTQI+ individuals by police or other government agencies. Armed gangs targeted LGBTQI+ individuals based on their sexuality. LGBTQI+ organizations reported many LGBTQI+ individuals, including transgender individuals, sought to leave the country by both legal and irregular pathways to avoid targeted violence. There were no official actions taken to investigate, prosecute, or punish those complicit in violence and abuses by nonstate actors against LGBTQI+ persons. Violence against LGBTQI+ persons remained underreported, but there were at least 10 known cases in Port-au-Prince during the year.

Kay Trans Haiti, a shelter and social services organization for transgender youth, reported one transgender person was raped and beaten by

HaitiTPSAR000401

members of the 400 Mawozo gang during a kidnapping on July 30.

**Discrimination:** The law did not prohibit discrimination by state and nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics and did not recognize LGBTQI+ individuals, couples, or their families. Human rights activists reported LGBTQI+ persons, especially transgender persons, faced discrimination by employers. Same-sex marriages were not recognized; the law required marriage to be between a man and a woman.

There were few laws that infringed upon LGBTQI+ persons' rights, but many individuals and groups were openly hostile towards LGBTQI+ persons. Individual politicians frequently used inflammatory anti-LGBTQI+ language in radio broadcasts or in other media outlets. Religious leaders also publicly denounced LGBTQI+ persons as "not Haitian."
A 2017 study of public opinions on stigma and discrimination towards vulnerable groups showed 71 percent of the individuals surveyed responded "hate" was the most appropriate term to express their attitude toward LGBTQI+ persons, and 90 percent of the adult population rejected the idea of equal rights for sexual minorities.

Local attitudes, particularly in Port-au-Prince, remained hostile toward LGBTQI+ persons who made their sexual orientation or gender identity public and visible. Some politicians, social leaders, and organizations actively opposed the social integration of LGBTQI+ persons or any discussion of their rights. LGBTQI+ advocacy groups in Port-au-Prince reported a greater sense of insecurity and less trust of government authorities than did groups in rural areas.

**Availability of Legal Gender Recognition:** Changing government identification documents required a modified birth certificate, which could be obtained with the assistance of a lawyer. The process to modify a birth certificate, however, was lengthy and expensive, and it required the applicant to appear in person. One LGBTQI+ activist reported civil servants often refused to issue modified birth certificates or passports to transgender persons, and there was little enforcement to verify they did so. Once applicants had a modified birth certificate, they could change other forms of identification. Transgender individuals reported they were able to change their gender and names on identification documents, but several individuals reported meeting resistance from employees at government agencies when they attempted to obtain forms of identification. There was no option of identifying as nonbinary, intersex, or gender nonconforming on government identification documents. Intersex individuals were assigned identification markers based on recommendations by medical experts, often through genetic testing.

**Involuntary or Coercive Medical or Psychological Practices:** BINUH reported armed groups employed "corrective rape," especially against LGBTQI+ women. Armed groups often carried out this violent practice in public spaces. Human rights activists reported religious groups commonly prayed for the "conversion" of LGBTQI+ persons. There were no reports that medically unnecessary and irreversible "normalization" surgeries were performed on children or on nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no laws that prevented activists from speaking out in favor of LGBTQI+ rights or holding Pride events, but activists stated they often believed it was unsafe to do so. Activists condemned a "culture of intolerance" fueled by religious leaders and some politicians, who often used channels or other media sources to incite violence against LGBTQI+ individuals.

## PERSONS WITH DISABILITIES

The constitution stipulated persons with disabilities should have adequate means to provide for their autonomy, education, and independence. The law required all public buildings and spaces to be accessible to persons with disabilities. The law banned discrimination against persons with disabilities and stipulated they had the right to basic services such as health, education, and justice. The law prohibited discrimination in employment practices against persons with disabilities, required the government to integrate such persons into the state's public services, and imposed a quota of 2 percent for persons with disabilities in the private-sector workforce. The quota was not met, and the government did not enforce these legal protections, particularly regarding education, health services, public buildings, employment, and transportation.

Individuals with disabilities faced significant social stigma, exclusion, and discrimination due to their disabilities. For instance, families often left their family members with disabilities isolated at home. Local disability rights advocates stated persons with disabilities faced significant obstacles to voting and civic participation. Persons with disabilities had difficulty obtaining national identification cards required for voting because the National Identification Office was inaccessible to them.

Establishments including government offices, churches, and schools did not routinely make services accessible for persons with disabilities. Opportunities to access services often depended on the economic status of the family. Persons with mental, developmental, or physical disabilities were marginalized and neglected. Deaf and blind citizens also faced

HaitiTPSAR000403

marginalization and neglect and did not routinely receive necessary services.

Nationwide, some children with disabilities were mainstreamed into regular schools, depending on the severity of the disability and the economic status of the family. A small number of schools provided specialized education for children whose disabilities did not allow them to be mainstreamed. Disability activists reported students with disabilities had less access to secondary education.

Some disability rights activists noted social services available to persons with disabilities were inadequate and persons with disabilities had significant problems accessing quality medical care. Hospitals and clinics in Port-au-Prince were rarely accessible to persons with disabilities and often refused to treat them.

**Institutionalized Children:** The Ministry of Social Affairs' Institute for Social Well-Being and Research had official responsibility for monitoring and accrediting the country's residential children's homes and care centers. According to the international NGO Lumos, an estimated 26,000 children lived in residential children's homes and care centers. Children in these institutions were vulnerable to human trafficking.

## OTHER SOCIETAL VIOLENCE OR DISCRIMINATION

Stigma against persons with HIV or AIDS remained strong and widespread and, in some cases, discouraged persons with HIV from seeking medical treatment. In a 2020 report published by the UN Program on HIV and AIDS, 63 percent of adults surveyed in the country responded they would not purchase vegetables from a seller known to be HIV-positive, while 54 percent believed students with HIV should not attend school.

The prevalence rate of HIV among girls and women ages 15 to 29 was nearly triple that of their male peers; experts believed this was because of the high rate of sexual violence against young women.

Results from the donor-supported Community-Led Monitoring initiative indicated stigma and discrimination remained high at both the community and facility levels. Persons with HIV faced discrimination from health-care providers. As a result, some persons dropped out of care or sought medical treatment outside their community. The monitoring group highlighted a need for capacity building and stigma reduction at national, departmental, and facility levels.

## Section 7.

## Worker Rights

## A. FREEDOM OF ASSOCIATION AND THE RIGHT TO COLLECTIVE BARGAINING

The law provided for the right of some workers, excluding public-sector employees, to form and join unions of their choice and to strike, with restrictions. The law allowed for collective bargaining, stating employers had to conclude a collective contract with a union if that union represented at least two-thirds of the workers and requested a contract. Strikes were legal if, among other requirements, they were approved by at least one-third of a company's workers. The law prohibited firing workers for union activities, but it was unclear whether employers could be penalized for each violation. The law set very low fines for dismissing trade union members despite the legal prohibition and did not explicitly provide for reinstatement as a remedy.

The law stated a strike was legal when carried out by a group of workers representing at least one-third of the staff and no fewer than five persons. The purpose was to exclusively promote or defend the common economic, professional, social, or moral interests of workers, and when it occurred within the formalities of labor code. The law outlined four types of strikes: a closed strike, or stopping work while remaining at workstation; a warning strike, or striking without abandoning the institution; a walk out, or walking out and abandoning the institution; and striking in solidarity with another strike. To be legal, a silent strike could not exceed 24 hours, a warning or walkout strike could not exceed one hour, and a solidarity strike was legal only if the initial strike was legal.

Public-utility service workers and public-sector enterprise workers could not strike because the law defined public-utility service employees as unable to suspend their activities without causing serious and immediate harm to individual health and public safety. A 48-hour notice period was compulsory for all strikes, and one party in a strike could request compulsory arbitration to halt the strike.

The labor court, located in Port-au-Prince, was under the supervision of the Ministry of Social Affairs and adjudicated private-sector workplace conflicts. Outside of Port-au-Prince, plaintiffs could use municipal courts for labor disputes. The law required ministry mediation before cases could be filed with the labor court.

The government did not effectively enforce the law, and penalties were not commensurate with those for other laws involving denials of civil rights. Judicial procedures were subject to lengthy delays and appeals,

HaitiTPSAR000405

and many courts were not functioning due to social conflicts. Penalties were rarely applied against violators.

Government and private employers did not respect freedom of association and collective bargaining. Labor monitors cited suspensions, terminations, and other retaliation by employers against labor union members for their involvement in strikes or alleged incitement of violence without being able to substantiate claims of the workers' involvement. The collective bargaining agreement between the government, employers, and workers mandated that all factories register their employees with the Employment Injury, Sickness and Maternity Insurance Office for maternity and health insurance. Many employers did not complete this registration, which prevented workers from receiving government-mandated health benefits and making employers noncompliant with the collective bargaining agreement.

## B. PROHIBITION OF FORCED OR COMPULSORY LABOR

See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## C. PROHIBITION OF CHILD LABOR AND MINIMUM AGE FOR EMPLOYMENT

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings .

## D. DISCRIMINATION (SEE SECTION 6)

## E. ACCEPTABLE CONDITIONS OF WORK

**Wage and Hour Laws:** The law provided for a national minimum wage. Minimum wages were usually set by the government based on official macroeconomic indicators on at least an annual basis and generally remained above the national poverty line. The National Salary Council, a government, labor union, and private-sector body, was responsible for recommending a minimum wage every September based on the rate of inflation. Despite increased inflation and stagnant wages, the council failed to convene due to difficulties finding representatives to fill the council. Following numerous strikes demanding the minimum wage be adjusted for inflation, discussions between the Ministry of Social Affairs, the Office of the Labor Ombudsperson, and labor union leaders led to the May implementation of a government transportation and food stipend program to support workers.

On June 13, the government issued a decree suspending the 3×8 law, which organized and regulated work over a 24-hour period divided into

HaitiTPSAR000406

three eight-hour shifts, prohibiting employees from working past eight hours. The law also provided for one hour of paid lunch, which employers found difficult to calculate due to day rates for production and health benefit payments. The publication of the new decree suspended all provisions of the 3×8 law.

The 26th BWH *Biannual Synthesis Report*, covering June 2022 to June 2023, found 71 percent of textile factories paid annual leave incorrectly and 77 percent of factories did not correctly pay maternity leave.

**Occupational Safety and Health:** The law established minimum occupational safety and health (OSH) regulations, including rules for onsite nurses at factories, medical services, and annual medical checks. It provided for appropriate standards in the main industries. The law allowed workers to notify the employer of any defect or situation that could endanger worker health or safety, and to call the Ministry of Social Affairs and Labor or police if the employer failed to correct the situation. The government did not respond to workers complaints. Observers stated OSH standards needed reform, including new policies and programs to mitigate persistent and emerging OSH risks, reinforce health promotion at work, and develop compliance programs enforced by the government. Standards were rarely enforced. In its 26th *Biannual Synthesis Report*, BWH noted 84 percent of factories failed to properly label chemical products.

**Wage, Hour, and OSH Enforcement:** The Ministry of Social Affairs and Labor was responsible for enforcing wage and hour requirements and OSH regulations, but it did not effectively enforce the law. Penalties were not commensurate with those for similar crimes, such as fraud, and were rarely applied. There were no prosecutions of individuals accused of violating the regulations for minimum wage, hours of work, or safety. The number of inspectors was sufficient; however, they failed to enforce compliance.

Labor inspectors received little support from law enforcement authorities. Inspectors did not have the authority to make unannounced inspections or initiate sanctions. Despite operational difficulties due to lack of resources such as vehicles or fuel, the ministry was able to conduct inspections across all sectors; the majority of inspections were in the garment sector due to facilitation support from BWH.

According to the World Bank, informal workers accounted for 87 percent of the labor force. The government did not enforce the law in this sector.

___

ecoi.net description:

Annual report on human rights in 2023

Country:

Haiti

Source:

USDOS – US Department of State    (Author)

Published:

23 April 2024

Original link:

https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/haiti/

Document type:

Periodical Report

Language:

English

Available on ecoi.net since:

23 April 2024

Document ID:

2107721

Austrian Red Cross
Austrian Centre for
Country of Origin and
Asylum Research and
Documentation
(ACCORD)

Wiedner Hauptstraße
32, 1041 Wien
T +43 1 589 00 583
F +43 1 589 00 589
info@ecoi.net

Contact
Imprint & Disclaimer
F.A.Q.
Data Protection Notice

ecoi.net is run by the Austrian Red Cross (department ACCORD) in cooperation with Informationsverbund Asyl &
Migration. ecoi.net is funded by the Asylum, Migration and Integration Fund, the Austrian Ministry of the Interior
and Caritas Austria. ecoi.net is supported by ECRE & UNHCR.









**Schultz, Megan**

| | |
|---|---|
| **From:** | Chretien, Spencer <█████████████████> |
| **Sent:** | Friday, September 5, 2025 5:48 PM |
| **To:** | Law, Rob |
| **Subject:** | RE: [External] FW: State Consultation - Haiti TPS |

> This email is from an external US Government agency.

Hi Rob,

State believes that there would be no foreign policy concerns with respect to a change in the TPS status of Haiti.

**Spencer Chretien**
Senior Bureau Official
Bureau of Population, Refugees, and Migration

 U.S. DEPARTMENT of STATE

SENSITIVE BUT UNCLASSIFIED

**From:** LAW, ROB <████████████████>
**Sent:** Friday, September 5, 2025 4:55 PM
**To:** Chretien, Spencer <████████████████>
**Subject:** [External] FW: State Consultation - Haiti TPS

Spencer,

Due to the litigation, we are re-reviewing country conditions in Haiti based on the original TPS deadline. Can you advise on State's views on the matter?

Thanks,
RTL

Rob Law
Senior Counselor, Office of the Secretary
U.S. Department of Homeland Security
████████████████

**From:** Deshommes, Samantha L <████████████████████████>
**Sent:** Friday, September 5, 2025 4:47 PM

HaitiTPSAR000409

**To:** BURKE, RORY ██████████████ NEWMAN, EMILY ████████████████████ >; GUNDUZ, IHSAN ████████████████ Chulapakorn, Adrienne ██████████████████████ LAW, ROB
████████████████████████
**Cc:** Good, Andrew R ██████████████████ Stiefel, Nathaniel I < █████████████████ >
**Subject:** State Consultation - Haiti TPS

Good Afternoon,

I'm emailing to request that PLCY reach out to Department of State to satisfy the consultation requirement for S1's consideration (again) of TPS Haiti. Following the Secretary's June 4th decision, USCIS published the FRN terminating Hait's TPS designation on July 1st. Haiti's TPS was therefore slated to terminate on Sept. 2nd. However, on July 15th, a U.S. District Court judge for the Eastern District of New York issued a final order that states that the effective date of any termination can be no earlier than Feb. 3, 2026. With the court order, S1 now has to make a decision 60-days prior to Feb. 3, 2026 on TPS designation for Haiti; the statutory deadline is thus Dec. 5, 2025.

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

Happy to chat further if there are questions/desire to discuss.

I hope everyone has a great weekend!

~ Sam

*Samantha Deshommes*
*Chief Regulatory Officer*
*Regulatory Coordination Division, Office of Policy & Strategy*
*U.S. Citizenship & Immigration Services, DHS*
████████████████

*This email, along with any attachments, is intended solely for the use of the addressee(s) and may contain information that is sensitive or protected by applicable law. Unauthorized use or dissemination of this email and any attachments is strictly prohibited. If you are not the intended recipient, please notify the sender and delete or destroy all copies.*

HaitiTPSAR000410

An official website of the United States Government Here's how you know

**FEDERAL GOVERNMENT SHUTDOWN**    ✕

Due to the Democrat-led shutdown, website updates will be limited until full operations resume.

Home  >  ...  >  Deportation Actions Against U.S. Legal Permanent...

# Deportation Actions Against U.S. Legal Permanent Residents Affiliated With Haitian Foreign Terrorist Organization Viv Ansanm

**PRESS STATEMENT**

**MARCO RUBIO, SECRETARY OF STATE**

JULY 21, 2025

I am pleased to announce the latest U.S. actions against individuals whose presence and activities in our country have potentially serious adverse foreign policy consequences for the United States.

Specifically, the Department of State has determined that certain individuals with U.S. lawful permanent resident status have supported and collaborated with Haitian gang leaders connected to Viv Ansanm, a Haitian Foreign Terrorist Organization (FTO). Viv Ansanm is a driver of the violence and criminality in Haiti contributing to the island's instability. The United States will not allow individuals to enjoy the benefits of legal status in our country while they are facilitating the actions of violent organizations or supporting criminal terrorist organizations.

With this determination, the Department of Homeland Security can pursue the removal of these individuals under section 237(a)(4)(C) of the Immigration and Nationality A... is

Cookie Settings

HaitiTPSAR000411

demonstrate the Trump Administration's firm commitment to protecting the American people, advancing our national security interests, and promoting regional security and stability.

---

TAGS

Bureau of Counterterrorism     Bureau of Western Hemisphere Affairs     Counterterrorism

Haiti     Office of the Spokesperson     The Secretary of State

Terrorism and Terrorist Organizations

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250

HaitiTPSAR000412

☐

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

HaitiTPSAR000413

An official website of the United States Government    Here's how you know

Home  >   ...   > Designation of Viv Ansanm and Gran Grif

# Designation of Viv Ansanm and Gran Grif

**FACT SHEET**

**OFFICE OF THE SPOKESPERSON**

MAY 2, 2025

The United States remains committed to protecting our national security interests and dismantling violent criminal gangs terrorizing the Haitian people.

Today, the Department of State announces the designation of Viv Ansanm and Gran Grif as Foreign Terrorist Organizations (FTOs) and Specially Designated Global Terrorists (SDGTs).

> Viv Ansanm is a group formed in September 2023 as a coalition of gangs through an alliance between the two main gang factions operating in Port-au-Prince, G-9 and G-Pép.
>
> The groups provide a unified platform for criminal groups to use violence to destabilize Haiti and quash actions aimed at restoring state control. Viv Ansanm has launched coordinated attacks on critical infrastructure in Haiti, including prisons, government buildings, and Haiti's main airport in Port-au-Prince as part of a campaign that, among other things, forced the resignation of former Haitian Prime Minister Ariel Henry.
>
> Gran Grif is the largest gang in Haiti's Artibonite department, a region that is home to much of the country's rice fields. Since 2022, Gran Grif has been responsible for 80 percent of civilian death reports in Artibonite. Gran Grif has attacked Haitian National Police and the UN-authorized Multinational Security Support (MSS) mission, including in the February 2025 attack that killed a Kenyan MSS mission officer.

Cookie Settings

HaitiTPSAR000414

Terrorist designations expose and isolate entities and individuals, denying them access to the U.S. financial system and the resources they need to carry out attacks.

All property and interests in property of those designated today that are in the United States or that are in possession or control of a U.S. person are blocked. U.S. persons are generally prohibited from conducting business with sanctioned persons.

Persons, including American citizens, that engage in certain transactions or activities with these entities, or these individuals may expose themselves to sanctions risk. Notably, engaging in certain transactions with the organizations designated today entails risk of secondary sanctions pursuant to counterterrorism authorities.It is a crime to knowingly provide material support or resources to these organizations, or to attempt or conspire to do so. Moreover, terrorist designations can assist law enforcement actions of other U.S. agencies and governments.

Today's actions are taken pursuant to section 219 of the Immigration and Nationality Act, as amended, and Executive Order 13224, as amended. FTO designations go into effect upon publication in the Federal Register.

Petitioners requesting removal of those designated today from the Specially Designated Nationals and Blocked Persons List should refer to the Department of State's **Delisting Guidance page**.

---

TAGS

**Bureau of Counterterrorism**     **Haiti**     **Office of the Spokesperson**

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250

---

☐

---

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

## Haiti Travel Advisory

| Travel Advisory<br>September 18,<br>2024 | Haiti – Level 4: Do Not<br>Travel |  |

*Updated to reflect additional information on crime.*

Do not travel to Haiti due to **kidnapping**, **crime**, **civil unrest**, and **limited health care.**

**Country Summary:** Since March 2024, Haiti has been under a State of Emergency. Crimes involving firearms are common in Haiti. They include robbery, carjackings, sexual assault, and kidnappings for ransom. Kidnapping is widespread, and U.S. citizens have been victims and have been hurt or killed. Kidnappers may plan carefully or target victims at random, unplanned times. Kidnappers will even target and attack convoys. Kidnapping cases often involve ransom requests. Victims' families have paid thousands of dollars to rescue their family members.

Protests, demonstrations, and roadblocks are common and unpredictable. They often damage or destroy infrastructure and can become violent. Mob killings and assaults by the public have increased, including targeting those suspected of committing crimes.

The airport in Port-au-Prince can be a focal point for armed activity. Armed robberies are common. Carjackers attack private vehicles stuck in traffic. They often target lone drivers, especially women. As a result, the U.S. embassy requires its staff to use official transportation to and from the airport.

Do not cross the border by land between Haiti and the Dominican Republic due to the threat of kidnapping and violence. These dangers are present on roads from major Haitian cities to the border. The U.S. embassy cannot help you enter the Dominican Republic by air, land, or sea.  U.S. citizens who cross into the Dominican Republic at an unofficial crossing may face high immigration fines if they try to leave. The U.S. Coast Guard has concerns about security in the ports

of Haiti. Until those are addressed, the Coast Guard advises mariners and passengers traveling through the ports of Haiti to exercise caution.

The U.S. government is very limited in its ability to help U.S. citizens in Haiti. Local police and other first responders often lack the resources to respond to emergencies or serious crime. Shortages of gasoline, electricity, medicine, and medical supplies are common throughout the country. Public and private medical clinics and hospitals often lack trained staff and basic resources. In addition, they require prepayment for services in cash.

U.S. government personnel are subjected to a nightly curfew and are prohibited from walking in Port-au-Prince. Personnel movement is restricted throughout Haiti. U.S. government personnel in Haiti are also prohibited from:

- Using any kind of public transportation or taxis.
- Visiting banks and using ATMs.
- Driving at night.
- Traveling anywhere after dark.
- Traveling without prior approval and special security measures in place.

Read the country information page for additional information on travel to Haiti.

If you decide to travel to Haiti:

- Avoid demonstrations and crowds. Do not attempt to drive through roadblocks.
- Arrange airport transfers and hotels in advance, or have your host meet you upon arrival.
- Do not give personal information to unauthorized people to include those without uniforms or credentials. Individuals with bad intent may frequent areas at the airport, including near immigration and customs.

HaitiTPSAR000418

- If you are being followed as you leave the airport, drive to the nearest police station immediately.

- Travel by vehicle to reduce walking in public.

- Travel in groups or at least do not travel alone.

- Always keep vehicle doors locked and windows closed when driving.

- Be cautious and alert. This is especially important when driving through markets and other crowded areas.

- Do not fight back during a robbery. It increases the risk of violence and injury to you.

- Purchase travel insurance with medical evacuation coverage ahead of time.

- Review information on Travel to High-Risk Areas.

- Enroll in the Smart Traveler Enrollment Program (STEP) to receive Alerts and make it easier to locate you in an emergency.

- Follow the Department of State on Facebook ⬀ and X/Twitter ⬀.

- Review the Country Security Report on Haiti.


Prepare a contingency plan for emergency situations. Review the Traveler's Checklist.

HaitiTPSAR000420

# Monthly Nonimmigrant Visa Issuance Statistics

The reports below contain preliminary data which are subject to change.

The Visa Office has changed its methodology for calculating visa data beginning with the Fiscal Year (FY) 2019 annual *Report of the Visa Office* and continuing with FY 2020 data, to reflect the greater access to application-level data attained during FY 2019. Our previous methodology was based on a count of workload actions, which were not linked by application. The new methodology more accurately reflects final outcomes from the visa application process during a specified reporting period. The new methodology follows visa applications, including updates to their status (i.e., issued or refused), which could change as the fiscal year progresses, or result in slight changes in data for earlier years.  Therefore, beginning with FY 2020, individual monthly issuance reports should not be aggregated, as this will not provide an accurate issuance total for the fiscal year to date.  Instead, refer to our annual *Report of the Visa Office* for final full Fiscal Year statistics.

While the new methodology is more accurate, it does not mean that our prior methodology was flawed.  The two are simply not comparable.  However, based on our analysis, the discrepancies between the methodologies are minor.  For example, the difference between reported issuances of NIVs and IVs in FY 2018 (legacy methodology) and those in FY 2019 (new methodology) is less than one percent worldwide.

Please note that the new methodology is only being applied to the monthly NIV issuance reports below, beginning with the October 2019 reports.

### Fiscal Year 2017



- [March 2017 - NIV Issuances by Nationality and Visa Class](#)
- [March 2017 - NIV Issuances by Post and Visa Class](#)
- [April 2017 - NIV Issuances by Nationality and Visa Class](#)

April 2017 - NIV Issuances by Post and Visa Class📄

May 2017 - NIV Issuances by Nationality and Visa Class📄

May 2017 - NIV Issuances by Post and Visa Class📄

June 2017 - NIV Issuances by Nationality and Visa Class📄

June 2017 - NIV Issuances by Post and Visa Class📄

July 2017 - NIV Issuances by Nationality and Visa Class📄

July 2017 - NIV Issuances by Post and Visa Class📄

August 2017 - NIV Issuances by Nationality and Visa Class📄

August 2017 - NIV Issuances by Post and Visa Class📄

September 2017 - NIV Issuances by Nationality and Visa Class📄

September 2017 - NIV Issuances by Post and Visa Class📄

**Fiscal Year 2018**

October 2017 - NIV Issuances by Nationality and Visa Class📄

October 2017 - NIV Issuances by Post and Visa Class📄

November 2017 - NIV Issuances by Nationality and Visa Class📄

November 2017 - NIV Issuances by Post and Visa Class📄

December 2017 - NIV Issuances by Nationality and Visa Class📄

December 2017 - NIV Issuances by Post and Visa Class📄

January 2018 - NIV Issuances by Nationality and Visa Class📄

January 2018 - NIV Issuances by Post and Visa Class📄

February 2018 - NIV Issuances by Nationality and Visa Class📄

February 2018 - NIV Issuances by Post and Visa Class📄

March 2018 - NIV Issuances by Nationality and Visa Class📄

March 2018 - NIV Issuances by Post and Visa Class

April 2018 - NIV Issuances by Nationality and Visa Class

April 2018 - NIV Issuances by Post and Visa Class

May 2018 - NIV Issuances by Nationality and Visa Class

May 2018 - NIV Issuances by Post and Visa Cass

June 2018 - NIV Issuances by Nationality and Visa Class

June 2018 - NIV Issuances by Post and Visa Cass

July 2018 - NIV Issuances by Nationality and Visa Class

July 2018 - NIV Issuances by Post and Visa Cass

August 2018 - NIV Issuances by Nationality and Visa Class

August 2018 - NIV Issuances by Post and Visa Cass

September 2018 - NIV Issuances by Nationality and Visa Class

September 2018 - NIV Issuances by Post and Visa Cass

**Fiscal Year 2019**

October 2018 - NIV Issuances by Nationality and Visa Class

October 2018 - NIV Issuances by Post and Visa Class

November 2018 - NIV Issuances by Nationality and Visa Class

November 2018 - NIV Issuances by Post and Visa Class

December 2018 - NIV Issuances by Nationality and Visa Class

December 2018 - NIV Issuances by Post and Visa Class

January 2019 - NIV Issuances by Nationality and Visa Class

January 2019 - NIV Issuances by Post and Visa Class

February 2019 - NIV Issuances by Nationality and Visa Class

February 2019 - NIV Issuances by Post and Visa Class

March 2019 - NIV Issuances by Nationality and Visa Class

March 2019 - NIV Issuances by Post and Visa Class

April 2019 - NIV Issuances by Nationality and Visa Class

April 2019 - NIV Issuances by Post and Visa Class

May 2019 - NIV Issuances by Nationality and Visa Class

May 2019 - NIV Issuances by Post and Visa Class

June 2019 - NIV Issuances by Nationality and Visa Class

June 2019 - NIV Issuances by Post and Visa Class

July 2019 - NIV Issuances by Nationality and Visa Class

July 2019 - NIV Issuances by Post and Visa Class

August 2019 - NIV Issuances by Nationality and Visa Class

August 2019 - NIV Issuances by Post and Visa Class

September 2019 - NIV Issuances by Nationality and Visa Class

September 2019 - NIV Issuances by Post and Visa Class

**Fiscal Year 2020**

October 2019 - NIV Issuances by Nationality and Visa Class

October 2019 - NIV Issuances by Post and Visa Class

November 2019 - NIV Issuances by Nationality and Visa Class

November 2019 - NIV Issuances by Post and Visa Class

December 2019 - NIV Issuances by Nationality and Visa Class

December 2019 - NIV Issuances by Post and Visa Class

January 2020 - NIV Issuances by Nationality and Visa Class

HaitiTPSAR000424

[January 2020 - NIV Issuances by Post and Visa Class](#)

[February 2020 - NIV Issuances by Nationality and Visa Class](#)

[February 2020 - NIV Issuances by Post and Visa Class](#)

[March 2020 - NIV Issuances by Nationality and Visa Class](#)

[March 2020 - NIV Issuances by Post and Visa Class](#)

[April 2020 - NIV Issuances by Nationality and Visa Class](#)

[April 2020 - NIV Issuances by Post and Visa Class](#)

[May 2020 - NIV Issuances by Nationality and Visa Class](#)

[May 2020 - NIV Issuances by Post and Visa Class](#)

[June 2020 - NIV Issuances by Nationality and Visa Class](#)

[June 2020 - NIV Issuances by Post and Visa Class](#)

[July 2020 - NIV Issuances by Nationality and Visa Class](#)

[July 2020 - NIV Issuances by Post and Visa Class](#)

[August 2020 - NIV Issuances by Nationality and Visa Class](#)

[August 2020 - NIV Issuances by Post and Visa Class](#)

[September 2020 - NIV Issuances by Nationality and Visa Class](#)

[September 2020 - NIV Issuances by Post and Visa Class](#)

## Fiscal Year 2021

[October 2020 - NIV Issuances by Nationality and Visa Class](#)

[October 2020 - NIV Issuances by Post and Visa Class](#)

[November 2020 - NIV Issuances by Nationality and Visa Class](#)

[November 2020 - NIV Issuances by Post and Visa Class](#)

[December 2020 - NIV Issuances by Nationality and Visa Class](#)

December 2020 - NIV Issuances by Post and Visa Class 📄

January 2021 - NIV Issuances by Nationality and Visa Class 📄

January 2021 - NIV Issuances by Post and Visa Class 📄

February 2021 – NIV Issuances by Nationality and Visa Class 📄

February 2021 – NIV Issuances by Post and Visa Class 📄

March 2021 – NIV Issuances by Nationality and Visa Class 📄

March 2021 – NIV Issuances by Post and Visa Class 📄

April 2021 – NIV Issuances by Nationality and Visa Class 📄

April 2021 – NIV Issuances by Post and Visa Class 📄

May 2021 - NIV Issuances by Nationality and Visa Class 📄

May 2021 - NIV Issuances by Post and Visa Class 📄

June 2021 - NIV Issuances by Nationality and Visa Class 📄

June 2021 - NIV Issuances by Post and Visa Class 📄

July 2021 - NIV Issuances by Nationality and Visa Class 📄

July 2021 - NIV Issuances by Post and Visa Class 📄

August 2021 - NIV Issuances by Nationality and Visa Class 📄

August 2021 - NIV Issuances by Post and Visa Class 📄

September 2021 - NIV Issuances by Nationality and Visa Class 📄

September 2021 - NIV Issuances by Post and Visa Class 📄

**Fiscal Year 2022**

October 2021 - NIV Issuances by Nationality and Visa Class 📄

October 2021 - NIV Issuances by Post and Visa Class 📄

November 2021 - NIV Issuances by Nationality and Visa Class 📄

HaitiTPSAR000426

November 2021 - NIV Issuances by Post and Visa Class

December 2021 - NIV Issuances by Nationality and Visa Class

December 2021 - NIV Issuances by Post and Visa Class

January 2022 - NIV Issuances by Nationality and Visa Class

January 2022 - NIV Issuances by Post and Visa Class

February 2022 - NIV Issuances by Nationality and Visa Class

February 2022 - NIV Issuances by Post and Visa Class

March 2022 - NIV Issuances by Nationality and Visa Class

March 2022 - NIV Issuances by Post and Visa Class

April 2022 - NIV Issuances by Nationality and Visa Class

April 2022 - NIV Issuances by Post and Visa Class

May 2022 - NIV Issuances by Nationality and Visa Class

May 2022 - NIV Issuances by Post and Visa Class

June 2022 - NIV Issuances by Nationality and Visa Class

June 2022 - NIV Issuances by Post and Visa Class

July 2022 - NIV Issuances by Nationality and Visa Class

July 2022 - NIV Issuances by Post and Visa Class

August 2022 - NIV Issuances by Nationality and Visa Class

August 2022 - NIV Issuances by Post and Visa Class

September 2022 - NIV Issuances by Nationality and Visa Class

September 2022 - NIV Issuances by Post and Visa Class

## Fiscal Year 2023

October 2022 - NIV Issuances by Nationality and Visa Class - (Excel)

HaitiTPSAR000427

October 2022 - NIV Issuances by Post and Visa Class - (Excel)

November 2022 - NIV Issuances by Nationality and Visa Class - (Excel)

November 2022 - NIV Issuances by Post and Visa Class - (Excel)

December 2022 - NIV Issuances by Nationality and Visa Class - (Excel)

December 2022 - NIV Issuances by Post and Visa Class - (Excel)

January 2023 - NIV Issuances by Nationality and Visa Class - (Excel)

January 2023 - NIV Issuances by Post and Visa Class - (Excel)

February 2023 - NIV Issuances by Nationality and Visa Class - (Excel)

February 2023 - NIV Issuances by Post and Visa Class - (Excel)

March 2023 - NIV Issuances by Nationality and Visa Class - (Excel)

March 2023 - NIV Issuances by Post and Visa Class - (Excel)

April 2023 - NIV Issuances by Nationality and Visa Class - (Excel)

April 2023 - NIV Issuances by Post and Visa Class - (Excel)

May 2023 - NIV Issuances by Nationality and Visa Class - (Excel)

May 2023 - NIV Issuances by Post and Visa Class - (Excel)

June 2023 - NIV Issuances by Nationality and Visa Class - (Excel)

June 2023 - NIV Issuances by Post and Visa Class - (Excel)

July 2023 - NIV Issuances by Nationality and Visa Class - (Excel)

July 2023 - NIV Issuances by Post and Visa Class - (Excel)

August 2023 - NIV Issuances by Nationality and Visa Class - (Excel)

August 2023 - NIV Issuances by Post and Visa Class - (Excel)

September 2023 - NIV Issuances by Nationality and

Visa Class - (Excel)

September 2023 - NIV Issuances by Post and Visa Class - (Excel)

## Fiscal Year 2024*

October 2023 - NIV Issuances by Nationality and Visa Class - (Excel)

October 2023 - NIV Issuances by Post and Visa Class - (Excel)

November 2023 - NIV Issuances by Nationality and Visa Class - (Excel)

November 2023 - NIV Issuances by Post and Visa Class - (Excel)

December 2023 - NIV Issuances by Nationality and Visa Class - (Excel)

December 2023 - NIV Issuances by Post and Visa Class - (Excel)

January 2024 - NIV Issuances by Nationality and Visa Class - (Excel)

January 2024 - NIV Issuances by Post and Visa Class - (Excel)

February 2024 - NIV Issuances by Nationality and Visa Class - (Excel)

February 2024 - NIV Issuances by Post and Visa Class - (Excel)

March 2024 - NIV Issuances by Nationality and Visa Class - (Excel)

March 2024 - NIV Issuances by Post and Visa Class - (Excel)

April 2024 - NIV Issuances by Nationality and Visa Class - (Excel)

April 2024 - NIV Issuances by Post and Visa Class - (Excel)

May 2024 - NIV Issuances by Nationality and Visa Class - (Excel)

May 2024 - NIV Issuances by Post and Visa Class - (Excel)

June 2024 - NIV Issuances by Nationality and Visa Class - (Excel)

June 2024 - NIV Issuances by Post and Visa Class - (Excel)

July 2024 - NIV Issuances by Nationality and Visa Class - (Excel)

HaitiTPSAR000429

Class - (Excel)

July 2024 - NIV Issuances by Post and Visa Class - (Excel)

August 2024 - NIV Issuances by Nationality and Visa Class - (Excel)

August 2024 - NIV Issuances by Post and Visa Class - (Excel)

September 2024 - NIV Issuances by Nationality and Visa Class - (Excel)

September 2024 - NIV Issuances by Post and Visa Class - (Excel)

*March-September reports updated in December 2024

## Fiscal Year 2025

October 2024 - NIV Issuances by Nationality and Visa Class - (Excel)

October 2024 - NIV Issuances by Post and Visa Class - (Excel)

November 2024 - NIV Issuances by Nationality and Visa Class - (Excel)

November 2024 - NIV Issuances by Post and Visa Class - (Excel)

December 2024 - NIV Issuances by Nationality and Visa Class - (Excel)

December 2024 - NIV Issuances by Post and Visa Class - (Excel)

January 2025 - NIV Issuances by Nationality and Visa Class - (Excel)

January 2025 - NIV Issuances by Post and Visa Class - (Excel)

February 2025 - NIV Issuances by Nationality and Visa Class - (Excel)

February 2025 - NIV Issuances by Post and Visa Class - (Excel)

March 2025 - NIV Issuances by Nationality and Visa Class - (Excel)

March 2025 - NIV Issuances by Post and Visa Class - (Excel)

April 2025 - NIV Issuances by Nationality and Visa Class - (Excel)

April 2025 - NIV Issuances by Post and Visa Class - (Excel)

(Excel)

📄 [May 2025 - NIV Issuances by Nationality and Visa Class](#)📄 - ([Excel](#))

📄 [May 2025 - NIV Issuances by Post and Visa Class](#)📄 - ([Excel](#))

For definitions of nonimmigrant visa classification symbols, please [click here](#)📄.

An official website of the United States Government  Here's how you know

**FEDERAL GOVERNMENT SHUTDOWN**                                           ✕

Due to the Democrat-led shutdown, website updates will be limited until full operations resume.

Home  >   ...   >  On the Next Steps to Restoring Security in Haiti

# On the Next Steps to Restoring Security in Haiti

**PRESS STATEMENT**

**MARCO RUBIO, SECRETARY OF STATE**

OCTOBER 1, 2025

The United States welcomes the adoption of the United Nations Security Council resolution transitioning the Multinational Security Support (MSS) mission to a Gang Suppression Force (GSF) and authorizing the establishment of a UN Support Office in Haiti (UNSOH).

We will work closely with others in the Standing Group of Partners to ensure the swift deployment of the GSF.  This force will address Haiti's immediate security challenges and lay the groundwork for long-term stability.  We commend the efforts of Kenya, and all countries deployed under the MSS mission to address rampant insecurity in Haiti.  Moving forward, the GSF, with support from the UNSOH, will transition to an international burden-sharing model with the sufficient resources needed to fight the gangs.

The message from the Security Council is clear:  the era of impunity for those who seek to destabilize Haiti is over.  The United States remains committed to working with international stakeholders to support Haiti's path toward peace, stability, and democratic governance. We call on all nations to join us in this critical effort.

Cookie Settings

HaitiTPSAR000432

TAGS

Bureau of Western Hemisphere Affairs    Haiti    Office of the Spokesperson

The Secretary of State    United Nations Security Council (UNSC)

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250

☐

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

HaitiTPSAR000434

An official website of the United States Government   Here's how you know

**FEDERAL GOVERNMENT SHUTDOWN**                                         ✕

Due to the Democrat-led shutdown, website updates will be limited until full operations resume.

Home  >  …  > Secretary of State Marco Rubio with Ainsley Erhar...

# Secretary of State Marco Rubio with Ainsley Erhardt, Brian Kilmeade, and Lawrence Jones of Fox and Friends

**INTERVIEW**

**MARCO RUBIO, SECRETARY OF STATE**
**LOTTE PALACE HOTEL**
**NEW YORK CITY, NEW YORK**

SEPTEMBER 23, 2025

**QUESTION:**  Let's bring in the Secretary of State Marco Rubio.  Mr. Secretary, thanks so much for joining Fox and Friends this morning.

**QUESTION:**  Thank you.

**SECRETARY RUBIO:**  Thank you.  Good morning.

**QUESTION:**  So Mr. Secretary, we were hoping that you can give us a preview.  Apparently, the President wants his famous message of peace through strength today at the UN.  What do you anticipate him saying?

Cookie Settings

HaitiTPSAR000435

**SECRETARY RUBIO:** Well, I think one of the things the President is going to have to address, and is going to address, is the UN itself, and that is: Why do we still have a UN? It has tremendous potential. The UN is an organization that has the potential to do some great things around the world, but it's not doing it. If you look at Russia and Ukraine, you have a war going on there. It's the President that's been carrying the burden of trying to bring it to an end. The UN is playing no role. If you look at what's happening in Gaza with Hamas and everything that's happened there with Israel taking them on, what role is the UN playing? None.

We're going to try here in the – even close to home in the Western Hemisphere, in a place like Haiti that's been overrun by gangs that control that country and has destabilized the region, the U.S. is asking for the UN to step up and play a very important role. We have a lot of support, but it looks like China might stand in the way of this effort to bring that about. The UN will play no role if they do that.

So I think what the President is going to do is challenge the UN to find its meaning and its purpose and its utility as an organization, because it doesn't seem to be doing the job and it's pretty good at spending a lot of money. I think the – you can anticipate the President will point to his own history with the UN going back to his time here as a developer, where he actually offered to fix the UN building, and instead they chose to go in another direction, wasted a bunch of money, and really didn't achieve on the building's perspective what needed to happen. And I think it's emblematic of how feckless the UN has become as an organization; it's just a place where once a year a bunch of people meet and give speeches and write out a bunch of letters and statements, but not a lot of good, important action is happening.

So again, the UN has a lot of potential but it's not living up to it right now.

**QUESTION:** So the Turkish leader Erdogan sat down with Bret Baier yesterday. We got two topics to talk to you about that, one of which was asked about the war in Russia. He's basically – he's indifferent, he likes both guys. And in Gaza. But he seems to take a shot at President Trump. Listen:

**PRESIDENT ERDOGAN:** *(Via interpreter) I can only say this: Mr. Trump, you might remember, he used a term when he said I will finish the Russia-Ukraine war. Did it end? It still goes on. Similarly, he said I will finish the war in Gaza. Did it end? No. That means once we start*

HaitiTPSAR000436

*analyzing the issue, there are prices to pay. And when we look at the hostage exchange, that was done. It goes on.*

**QUESTION:** So he says the President doesn't get it done. This is a NATO Ally. Your thoughts.

**SECRETARY RUBIO:** Well, look, I didn't hear the entirety of the interview. I can only tell you that on both of those issues – on the case of Russia-Ukraine, the only leader in the world that has any chance of bringing it to an end is President Trump, and which is why he has put more time and energy into it than anybody else. All of these other countries, including Türkiye by the way, are begging us to be involved. They want us to be involved. Look, these people go out and say what they want to say, but at the end of the day when they want something done, they come – they want to come to the White House. President Erdogan is coming to the White House this week to meet with the President. They all come to the White House, they all want to speak to President Trump, they all want President Trump to fix it.

So they can say whatever they want to say. The truth of the matter is that we have leaders – we have meetings going on today that we have leaders begging to be a part of it. They are calling and saying: Can we be included? Can you bring us in? Can you get me five minutes to shake the President's hand? He is the indispensable leader in the world right now. He is the only one who has any chance of not just brokering a deal to end the war with Russia and Ukraine, but also bringing about the war that's going – and getting all the hostages released in Gaza.

And I think he has put more time and energy into peace proposals and peace initiatives than anybody else in the world, and he's had the most success of anybody else in the world. He doesn't get a lot of credit, but let's not forget the DRC and Rwanda had a war going on; it's the President that's brokered that. Azerbaijan and Armenia – it's the President that brought that about. Thailand and Cambodia – it's the President that brought the end to that about. India and Pakistan.

That's just four right off the top of my head in the last few months. And the President is the one that did that, not any other leader in the world and not the UN.

HaitiTPSAR000437

**QUESTION:**  Mr. Secretary, Fox is exclusively reporting that Hamas wrote a letter directly to President Trump asking for a pause in fighting for 60 days in exchange for half of the hostages.  Do you know if this letter has been delivered yet, and will the President entertain this idea?

**SECRETARY RUBIO:**  I don't know who they gave that letter to.  It wouldn't have mattered, though, because the President has been clear, and that is that we haven't seen the letter, we don't have that letter, and even if we did, it wouldn't matter.  The President has already made clear he's not interested in 60 days, 10 people.  He wants all the hostages out, all 48, including the 20 who are alive, the 28 who are deceased.  He wants them all out.

There should have never been any – why are we even talking about hostages?  Why do we still have to talk about hostages at this point?  There shouldn't be any.  They should all be released immediately, period.  That's the President's position, and so he would have rejected that offer had it come, but we haven't seen that letter.  I think they gave it to the media or somebody, but they haven't given it to us.

**QUESTION:**  Mr. Secretary, the President sent a final warning to Hamas.  What does that mean?

**SECRETARY RUBIO:**  Well, I mean, you've got Israel is right at the doorstep of Gaza City.  I mean, they've begun an operation to go in.  And all of the leaders of Hamas, all of the main leaders inside of Gaza and Hamas, are all concentrated in Gaza City.  It may take a while, but they're not going to survive the Israeli push.

Now, what we would hope to see is that it doesn't have to happen because Hamas surrenders, they lay down their arms, they release all the hostages, and then the important work of sort of rebuilding Gaza and providing a place where Palestinians can live prosperously and peacefully – that work can begin.  But that work can't begin until the hostages are released and Hamas no longer exists.  And so the sooner that happens, the sooner peace will begin.

**QUESTION:**  I want to make sure to get this in because I know your time is tight.  You were brilliant, as in so many speakers, saluting the life of Charlie Kirk.  Here's a little of the moments a lot of people are talking about.  Watch:

HaitiTPSAR000438

**SECRETARY RUBIO:** *Because he took on that death, because he carried that cross, we were freed from the sin that separated us from him. And when he returns, there will be a new heaven and a new Earth, and we will all be together, and we are going to have a great reunion there again with Charlie and all the people we love.*

**QUESTION:** It looks like that was coming from the heart, not the prompter. Can you bring us back to that moment?

**SECRETARY RUBIO:** Well, look, Charlie – I think what makes this situation so unique is that Charlie Kirk wasn't just a figure involved in American politics and political discourse. Charlie was a friend to a lot of people in the White House and a lot of people in this administration, like on a personal level. He is someone that I had just been interacting with just a few days before he died, because he had just – he was in South Korea and was eager to come back home and tell me what he had seen while he was there. And a lot of other people – the Vice President was very close to him personally. A lot of members of the staff. It's just – so I think it adds a new element to this.

Obviously, this is a major story, a horrific tragedy before everyone in the age of social media. Everyone saw it instantly. And so I think it impacted people across the country. But I think it had a particularly special impact, in addition to all of that, because of the personal connection here. And I thought that on Sunday was a very unique opportunity for many of us not just to pay tribute to the life that Charlie Kirk lived, but the way he lived it and the core of his message. And his faith was at the core of his message.

I think Charlie, if he was here with us, would here – to say that politics is important, what we do in government is important, these debates on issues are important, but the most important thing of all is our faith and our family. And that – and Charlie lived that, and he believed it, and it was at the core of his message. He had an extraordinary amount of wisdom for a 31-year-old young man. He really did. I mean, it usually takes a lifetime to acquire the kind of wisdom that he had.

**QUESTION:** Mm-hmm. And the President did a beautiful job speaking there, and so did his wife. The President – what is his reaction? What's the administration's reaction about our allies? We have France, we have the UK, we have Australia and Canada recognizing the Palestinian state. What does that say about our influence?

HaitiTPSAR000439

**SECRETARY RUBIO:**  Well, these countries are doing it, frankly, because of domestic political pressure in their own countries, because of migration policies or countries have been flooded with foreigners who have become politically active and are insisting that their governments do these sorts of things.  And so that's what they're responding to.

But look, it's irrelevant.  It's going to get a little bit of attention, but there is no Palestinian state.  You can put all the – it's kind of emblematic of what the President says about the UN.  You can put out all the paper in the world you want.  The only way there's ever going to be a permanent solution to this challenge between Palestinians and Israelis is a negotiated settlement, one in which the Palestinians are going to have a territory and they're going to govern it, but it cannot be one that's going to be used as a launchpad for attacks against Israel.  And that's something that has to be negotiated with Israel.  It isn't going to exist without Israel's participation.  That's what these leaders should have spent their time working on: ending this war, eliminating Hamas, so you can get to that stage of talks about that topic.

But for them, and for some of them in particular more than others, it's sort of a vanity project that's trying to make themselves relevant.  But here's the bottom line and here's the truth, okay?  When it comes to actually getting peace done, when it comes to actually stopping this, they're not going to any of these other countries.

**QUESTION:**  Of course.

**SECRETARY RUBIO:**  They're coming to us.  They're going to President Trump and they're asking him to get involved and bring it to an end.  You just asked me about a letter to – from Hamas.  Hamas didn't send a letter to France.  Hamas didn't send a letter to any of these countries on your list.  Hamas apparently, supposedly, sent the letter to President Trump.  Because everyone knows – even an evil group like Hamas – that he is the only one with the power and the influence to make something happen.

**QUESTION:**  It's such a good point.  And I don't want to put you in a bad position, but do any of these countries ever tell you why they're not willing to accept any of the refugees that's coming from Gaza, from the Palestinian Authority?  Because we hear publish (inaudible) sometime —

**SECRETARY RUBIO:**  Sure they tell me.

**QUESTION:**  What do they say?

**SECRETARY RUBIO:**  They say:  Well, we can't take any more people, we already have too many.  They say, frankly, what any country should say, which is – in fact, I think if they – they won't say it publicly.

**QUESTION:**  Right.

**SECRETARY RUBIO:**  But they'll say it privately.  And not just these countries in Europe.  I mean, the countries in the Middle East.

**QUESTION:**  Egypt.

**SECRETARY RUBIO:**  Look, it's not like every country in the Middle East is raising their hand and saying:  Okay, we'll take 100,000 refugees.  It goes back to the migratory debates we've had in this own country.  I mean, every country in the world thinks open borders is crazy.  Egypt does not have open borders; Jordan does not have open borders; Europe does, or has had for a long time.  But none of these countries in the – most countries in the world do not have open borders because it's crazy.  It's lunacy.  And only we had that under President Biden, and now that's been fixed.  And I think the President will point to that in his speech today.  America had a migratory crisis unlike any in the world, and we fixed it very quickly under President Trump.

**QUESTION:**  All right.  Real quick, Mr. Secretary.  What are you going to do about the Russian breaches into NATO territories?  They need a muscular response.  I haven't seen any.

**SECRETARY RUBIO:**  Well, NATO is responding the way it should.  If a drone comes in over your airspace, you shoot it down.  That happened.  We've seen flights – and this is not new, by the way.  This has happened – maybe not at the frequency we've seen, but a Russian jet or a Russian bomber goes into your defense zone.  You send your planes up there to intercept it.  That's been happening.  We've had to do that off the coast of Alaska repeatedly in many cases.

So NATO is going to respond.  Yesterday at the United Nations, his first day on the job, Mike Waltz, our new ambassador here, spoke at the Security Council.  He made clear our position, which is that when it comes to NATO, we're going to defend every inch of it.  It's an

important Alliance.  We had the best NATO summit maybe in history just a few months ago in which, with President Trump there, all these countries made their 5 percent pledge except for one, Spain, who doesn't want to do it.  But – and you know what?  At the end of the day, that – so that issue is what it is.

On the Russia-Ukraine war, look, no one has worked harder or done more to bring this to an end, and it appears Putin may not be serious about peace.  The President has expressed his deep disappointment about it, and he knows what his options are at some point here to have to impose additional costs, but he's also said that before we do that, Europe needs to do it.  They're demanding all these things of us, and yet you have countries in Europe still buying massive amounts of oil and natural gas from Russia and funding and fueling the Russian aggression campaign.  So I think it's important for them to step up.

**QUESTION:**  Mr. Secretary, thank you so much.

**QUESTION:**  Thank you, sir.

**QUESTION:**  All right, get stuff done.  Thanks, Mr. Secretary.

**SECRETARY RUBIO:**  Thank you.

---

TAGS

Bureau of European and Eurasian Affairs    Bureau of Near Eastern Affairs

Bureau of Western Hemisphere Affairs    Haiti    Israel    Media Engagement

Office of the Spokesperson    Official Domestic Travel    Palestinian Territories    Russia

Russia-Ukraine War    The Secretary of State    Situation in the Middle East    Ukraine

UNGA80    United Nations (UN)

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250

---

☐

---

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

HaitiTPSAR000443

 U.S. Embassy in Haiti

# Security Alert: U.S. Embassy Port-au-Prince, Haiti (March 18, 2024)

**Location:**  Port-au-Prince

**Events:**  The airport in Port-au-Prince remains closed. We are exploring departure options for U.S. citizens from Port-au-Prince to Santo Domingo, Dominican Republic, assuming it is safe to do so.

If you need assistance to depart Haiti, please fill out our intake form at https://mytravel.state.gov/s/crisis-intake. If you have already filled out the form, do not fill it out again; you will receive an email from us with further information. **Only U.S. citizens will be eligible for departure assistance at this time.**  From the Dominican Republic, U.S. citizens must make their own travel arrangements to their final destination.

You will need to make your own way to the departure point inPort-au-Prince.  You should assess your own safety when deciding whether to travel.  The U.S. Embassy will be unable to provide overland transit.

U.S. citizens who choose to depart using U.S. government coordinated flights must sign a promissory note agreeing to reimburse the U.S. government for the cost of the flight.

**Departure from Other Parts of Haiti**

The airport in Cap-Haïtien has opened periodically for departingcommercial flights, although destinations and availability may be very limited.

U.S. citizens can enter the Dominican Republic through a land border with a valid U.S. passport. U.S. citizens should assess their own safety and security when deciding whether to travel by road in Haiti.

If you need assistance to depart from other parts of Haiti, please fill out our intake form at https://mytravel.state.gov/s/crisis-intake to receive updated information when it becomes available.

The security situation in Haiti is unpredictable and dangerous. Travel within Haiti is conducted at your own risk. The U.S. government cannot guarantee your safety traveling to airports, borders, or during any onward travel. You should consider your personal security situation before traveling anywhere in Haiti. Only attempt to depart Haiti or travel within Haiti if you believe it is safe for you to do so. Cookie Settings

HaitiTPSAR000444

**Actions to take**:

Do not travel to Haiti.

If you are in Haiti:

- Avoid crowds.
- Monitor local media for updates and avoid areas where violence, demonstrations, or disruptions are reported to be happening.
- Keep a low profile.
- Be aware of your surroundings.
- Be prepared to shelter in place for an extended time period.
- Avoid being outside after dark.
- Stay alert in areas frequented by foreign visitors.
- Review your personal security plans.
- Have travel documents up-to-date and easily accessible.
- Carry proper identification.

**Assistance:**

- U.S. Embassy Port-au-Prince, Haiti
  Tabarre 41, Route de Tabarre
  Emergencies: +509-2229-8000
  Non-emergency inquiries: acspap@state.gov
  Website: https://ht.usembassy.gov/
- Contact the State Department's Bureau of Consular Affairs
  1-888-407-4747 toll-free from the United States and Canada
  1-202-501-4444 from other countries
- Haiti Country Information
- Enroll in the Smart Traveler Enrollment Program (STEP) to receive security updates
- Follow us on Facebook and Twitter

This is the official website of the U.S. Embassy in Haiti. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.



An official website of the United States Government  Here's how you know

Home  >  Terrorist Designations of Viv Ansanm and Gran Grif

# Terrorist Designations of Viv Ansanm and Gran Grif

**PRESS STATEMENT**

**MARCO RUBIO, SECRETARY OF STATE**

MAY 2, 2025

Today, I am announcing the State Department's designation of Viv Ansanm and Gran Grif as Foreign Terrorist Organizations and Specially Designated Global Terrorists. The age of impunity for those supporting violence in Haiti is over.

Haitian gangs, including the Viv Ansanm coalition and Gran Grif, are the primary source of instability and violence in Haiti. They are a direct threat to U.S. national security interests in our region. These gangs have killed and continue attacking the people of Haiti, Haitian security forces, and Multinational Security Support (MSS) mission personnel, and are committed to overthrowing the government of Haiti. Their ultimate goal is creating a gang-controlled state where illicit trafficking and other criminal activities operate freely and terrorize Haitian citizens. Terrorist designations play a critical role in our fight against these vicious groups and are an effective way to curtail support for their terrorist activities. Engaging in transactions with members of these groups entails risk in relation to counterterrorism sanctions authorities, not only for Haitians but also for U.S. lawful permanent residents and U.S. citizens. Individuals and entities providing material support or resources to Viv Ansanm or Gran Grif could face criminal charges and inadmissibility or removal from the United States.

HaitiTPSAR000446

Case 3:25-cv-01766-EMC    Document 357-3    Filed 01/01/26    Page 47 of 50

We commend the extraordinary bravery of the Haitian National Police and all international partners supporting the MSS mission for their ongoing efforts to establish stability and security in Haiti. We urge all of Haiti's political leaders to prioritize the security of the Haitian people, find solutions to stop the violence, and make progress toward the restoration of democracy through free and fair elections. The United States stands with the Haitian people as they seek a secure, stable future for their country and citizens.

Today's actions taken by the State Department demonstrate the Trump Administration's commitment to protecting our national security interests and countering these dangerous gangs. For more information about today's announcement, see the Department of State's **fact sheet**.

---

TAGS

**Bureau of Counterterrorism**    **Bureau of Western Hemisphere Affairs**    **Haiti**

**Office of the Spokesperson**    **The Secretary of State**    **Terrorist Designation**

---

White House

USA.gov

Office of the Inspector General

Archives

HaitiTPSAR000447

Contact Us

☐

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

HaitiTPSAR000448

 An official website of the United States government

**Official websites use .gov**
A **.gov** website belongs to an official government organization in the United States.

**Secure .gov websites use HTTPS**
A **lock** (🔒) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

🌐 En Español    🖥 Contact Us    🔗 Quick Links


**U.S. Immigration and Customs Enforcement**

Search

**Call** 1-866-DHS-2-ICE    Report Crime

ICE    NEWSROOM

JANUARY 24, 2025 • BOSTON, MA • ENFORCEMENT AND REMOVAL

# ICE ERO Boston arrests Haitian gang member with numerous convictions



Officers with ICE ERO Boston arrest a Haitian gang member with 17 criminal convictions in Boston Jan. 22

BOSTON – U.S. Immigration and Customs Enforcement's Enforcement and Removal Operations Boston apprehended an illegally present 25-year-old Haitian national who has

HaitiTPSAR000449

17 criminal convictions in Massachusetts. ICE officers from ERO Boston arrested Wisteguens Jean Quely Charles, a member of a violent Haitian street gang, in Boston Jan. 22. Charles' convictions include multiple drug, weapons, and assault and battery crimes.

> "Mr. Charles is illegally present in the United States and has consistently broken our laws causing significant harm to the residents of Massachusetts," said acting Field Office Director Patricia H. Hyde. "ERO Boston will not tolerate the repeated victimization of our New England neighborhoods. We will continue our mission to apprehend such illegal alien offenders and remove them from our communities."

Charles entered the U.S. lawfully July 13, 2013 in Miami, Florida; however, he violated the terms of his lawful admission.

Charles has been arrested, charged, and convicted for 17 crimes between Aug. 16, 2022, and Aug. 14, 2024, including both possession of and possession to distribute controlled substances, distribution of controlled substances, trespassing, carrying dangerous weapon to wit brass knuckles, possession of a firearm without a permit and possession of ammunition without a permit, assault and battery with a dangerous weapon, assault and battery, and resisting arrest.

ICE ERO encountered Charles April 15, 2023, following one of these arrests. ERO Boston issued an immigration detainer against Charles with the Norfolk House of Correction in Massachusetts. However, the correctional facility released Charles Oct. 20, 2023, without honoring the immigration detainer.

Officers with ICE ERO Boston arrested Charles Jan. 22, in Boston and issued him a Notice to Appear before a DOJ immigration judge, and he remains in ICE custody.

As one of ICE's three operational directorates, ERO is the principal federal law enforcement authority in charge of domestic immigration enforcement. ERO's mission is to protect the homeland through the arrest and removal of those who undermine the safety of U.S. communities and the integrity of U.S. immigration laws, and its primary areas of focus are interior enforcement operations, management of the agency's detained and non-detained populations, and repatriation of aliens who have received final orders of removal. ERO's workforce consists of more than 7,700 law enforcement and non-law enforcement support personnel across 25 domestic field offices and 208 locations

   HaitiTPSAR000450