nationwide, 30 overseas postings, and multiple temporary duty travel assignments along the border.

Members of the public with information regarding child sex offenders can report crimes or suspicious activity by dialing the ICE Tip Line at 866-DHS-2-ICE (866-347-2423) or completing the online tip form.

Learn more about ERO Boston's mission to increase public safety in our New England communities on X, formerly known as Twitter, at @EROBoston.

---

## FOLLOW US

@EROBoston

Updated: 03/12/2025

## MEDIA INQUIRIES

For media inquiries about ICE activities, operations, or policies, contact the ICE Office of Public Affairs at ICEMedia@ice.dhs.gov.

**About Us**

**Immigration Enforcement**

**Combating Transnational Crime**

**Newsroom**

    


**U.S. Immigration and Customs Enforcement**

**ICE Contact Center**

Report suspicious activity: 1-866-DHS-2-ICE

HaitiTPSAR000451



ICE.gov

**An official website of the U.S. Department of Homeland Security**

| About ICE | Archive | The White House |
| Accessibility | No FEAR Act Data | DHS Components |
| FOIA Requests | Site Links | USA.gov |
| Privacy Policy | Performance Reports | |
| DHS.gov | Inspector General | |

**National Terrorism Advisory System**

HaitiTPSAR000452

 An official website of the United States government

🏛 **Official websites use .gov**
A **.gov** website belongs to an official government organization in the United States.

🔒 **Secure .gov websites use HTTPS**
A **lock** ( 🔒 ) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

⊕ En Español   ▯ Contact Us   ⊘ Quick Links

| INFO
Due to the lapse in federal funding, this website will not be actively managed. More info

 **U.S. Immigration and Customs Enforcement**

Search

Call 1-866-DHS-2-ICE          Report Crime

ICE   NEWSROOM

SEPTEMBER 25, 2025 • MIAMI, FL • ENFORCEMENT AND REMOVAL, LAW ENFORCEMENT, NATIONAL SECURITY

## ICE arrests illegal alien from Haiti connected to criminal terrorist organizations

*Haitian engaged in a campaign of violence and gang support that contributed to Haiti's destabilization*



MIAMI — On Sept. 23, ICE arrested Dimitri Vorbe, an illegal alien and citizen of Haiti, for violating the Immigration and Nationality Act and contributing to the destabilization of Haiti. This case was investigated by ICE's Homeland Security

HaitiTPSAR000453

Investigations and Enforcement and Removal Operations, with the U.S. Department of State's Diplomatic Security Service and U.S. Citizenship and Immigration Services' Fraud Detection and National Security Directorate.

The Department of State determined that Vorbe's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States, providing a basis for the charge of removability. Specifically, officials determined that he engaged in a campaign of violence and gang support that contributed to Haiti's destabilization.

He is currently in ICE custody pending removal proceedings.

This demonstrates the Trump administration's firm commitment to protecting the American people, advancing our national security interests, and promoting regional security and stability.

Updated: 09/25/2025

MEDIA INQUIRIES

For media inquiries about ICE activities, operations, or policies, contact the ICE Office of Public Affairs at ICEMedia@ice.dhs.gov.

**About Us**                                              **Immigration Enforcement**

**Combating Transnational Crime**                         **Newsroom**



    

**ICE Contact Center**

Report suspicious activity: 1-866-DHS-2-ICE

 ICE.gov
**An official website of the U.S. Department of Homeland Security**

About ICE              Archive                The White House
Accessibility          No FEAR Act Data       DHS Components
FOIA Requests          Site Links             USA.gov
Privacy Policy         Performance Reports
DHS.gov                Inspector General

**National Terrorism Advisory System**





# Haiti in Crisis: What Role for a Multinational Security Support Mission?

## Updated December 27, 2024

Haiti's political and security situation continued to deteriorate in 2024. According to the United Nations, more than 5,350 people were killed and more than 2,155 others injured by gang violence in 2024, compared with an estimated 4,789 killed in 2023. The gangs—some of which are aligned with political elites—amassed control over territory and illicit markets amid the deeply unpopular government of former Prime Minister Ariel Henry, who assumed office following the July 2021 assassination of then-President Jovenel Moïse. Henry resigned in April 2024 after the formation of a Transitional Presidential Council (TPC).

The TPC initially selected Garry Conille to serve as acting prime minister until elections could be convened, if possible, by 2026. The TPC has been plagued by corruption allegations, which have challenged its perceived legitimacy. In November 2024, the TPC removed Conille and appointed Alix Didier Fils-Aimé as prime minister, amid worsening violence and alleged power struggles between Conille and the TPC. Some Members of Congress have expressed concerns about the gang violence (including attacks on commercial aircraft) and political instability in Haiti.

The Biden Administration has sought to support Haiti, in part, by helping fund a UN-authorized, Kenya-led Multinational Security Support Mission (MSS) to address gang violence and promote security. Some Members have supported the MSS; others have criticized what they viewed as inadequate planning for the mission. Six months after the first Kenyan police officers arrived, experts assess that the MSS remains underfunded, undermanned, and unable to quell gang-related violence.

## Origins of the Multinational Security Support Mission

In October 2022, then-Prime Minister Henry requested the deployment of an international force to help the Haitian National Police (HNP) quell insecurity and facilitate humanitarian aid. Canada, Brazil, and other Western Hemisphere countries, some of which participated in the UN Stabilization Mission in Haiti (MINUSTAH; 2004-2017), declined U.S. requests to lead such a force. MINUSTAH remains controversial in Haiti due to alleged sexual abuse by some of its forces and its inadvertent introduction of cholera into the country.

**Congressional Research Service**

https://crsreports.congress.gov

IN12331

In July 2023, Kenya announced it would consider leading a multinational force in Haiti and sending up to 1,000 police, if authorized by the UN Security Council (UNSC). Whereas U.S. and Caribbean Community (CARICOM) officials praised Kenya, some analysts questioned the human rights record of the Kenyan police and whether they could overcome language and cultural barriers. Others opposed any international security force, arguing that previous foreign interventions in Haiti had failed.

In October 2023, the UNSC adopted Resolution 2699 authorizing a non-UN-conducted multinational force, financed by voluntary contributions, to provide security for critical infrastructure and operational support to the HNP for 12 months.

## Current Status

Kenya's deployment of the MSS was delayed until June 2024 amid debate in Kenya about the deployment's constitutionality and the need to conclude a court-ordered bilateral security agreement with Haiti. Kenya also delayed deployment until a new Haitian government took power.

As of November 2024, the MSS consisted of over 380 personnel from Kenya, some 25 from Jamaica, and 2 from Belize. In addition to U.S. funding (see below), UN officials report at least $96.8 million in donations, primarily from Canada.

MSS leaders have developed an operational plan and created an oversight mechanism to monitor the mission's conduct. Participating personnel are subject to UN vetting, and those receiving U.S. support are to complete U.S. human rights vetting pursuant to the Leahy Laws (22 U.S.C. §2378d and 10 U.S.C. §362). Some human rights experts have advocated additional training and mechanisms to prevent and punish human rights violations. Others have raised concerns about a perceived lack of transparency on the MSS's rules of engagement.

Some observers express concerns about Haiti's increasingly complex security situation, suggesting the MSS mission may need to be strengthened. The MSS's partner, the HNP, is weak, and at times allegedly complicit with criminal groups. In September 2024, a top UN expert on Haiti stated that the MSS has been inadequately equipped and insufficiently resourced.

The Biden Administration discussed the possibility of transitioning the MSS into a traditional UN peacekeeping operation (PKO) with Kenya, Haiti, and others at the UNSC. On September 30, 2024, the UNSC adopted Resolution 2751, extending the current MSS mandate for another 12 months. At a November 2024 UNSC meeting, Russia and China opposed conversion of the MSS into a PKO.

## U.S. Funding and Congressional Considerations

The United States has pledged at least $380 million to support the MSS. In October 2023, Secretary of State Antony Blinken announced $100 million in foreign assistance for the MSS and $100 million in Department of Defense (DOD) funds for enabling support; in March 2024, Blinken announced the DOD commitment had doubled to $200 million. Additionally, via presidential drawdown authority (22 U.S.C. §2318(a)(2)), President Biden authorized the transfer of at least $70 million in defense articles and services from U.S. stocks to Haiti—$10 million in March and $60 million in April. Haiti and/or Kenya may receive additional DOD funding. U.S. support for the MSS is intended to complement assistance provided to train and equip the HNP through bilateral U.S. programs and the multi-donor UN Basket Fund.

The United States allocated $230.9 million to Haiti in FY2023, including $45 million in International Narcotics Control and Law Enforcement (INCLE) assistance focused primarily on the HNP. The Administration requested $356.7 million in bilateral aid to Haiti in FY2025, including $169 million in INCLE funding—$100 million of which would support the MSS.

In addition to evaluating the FY2025 budget request, Congress may consider whether to provide funding for Haiti and the MSS and/or whether to shape how prior year appropriations are used in Haiti.

The House-passed version of the FY2025 Department of State, Foreign Operations, and Related Programs (SFOPS) Appropriations act, 2025 (H.R. 8771/H.Rept. 118-554), recommends the Department of State continue building the HNP's capacity to counter violent gangs, among other recommendations and reporting requirements. The Senate-introduced version of the FY2025 SFOPS bill (S. 4797/S.Rept. 118-200) would require the Secretary of State to submit a report on the MSS detailing the funding, cost, duration, objectives, exit strategy, U.S. national interest, objectives achieved, lessons learned, and any allegations of misconduct and steps taken to hold perpetrators accountable.

## Author Information

Karla I. Rios
Analyst in Latin American Affairs

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

HaitiTPSAR000457





# Haiti in Crisis: Developments Related to the Multinational Security Support Mission

## Updated June 3, 2025

Haiti's political and security situation has continued to deteriorate in 2025 despite the 2024 deployment of a Kenya-led, UN-authorized Multinational Security Support Mission (MSS) that the U.S. government has helped train and equip. Between January and March 2025, 1,617 people were killed after 5,600 deaths were recorded in 2024, most attributed to gang-related violence. The gangs—some of which are aligned with political elites—amassed control over territory and illicit markets amid political instability following the 2021 assassination of then-President Jovenel Moïse. Since April 2024, Haiti has been governed by a Transitional Presidential Council (TPC). The TPC, tasked with governing until elections can be convened, has been plagued by allegations of corruption and infighting.

The Biden Administration sought to support Haitian-led efforts to restore political stability and security and the MSS; the Trump Administration has highlighted the increasing violence in Haiti and has suggested options for regional bodies and countries to take the lead on combating gang violence. The 119th Congress may consider options for addressing violence and instability in Haiti, including potential appropriations for the MSS or other security efforts.

## Origins of the Multinational Security Support Mission

In October 2022, then-Prime Minister Ariel Henry requested the deployment of an international force to help the Haitian National Police (HNP) quell insecurity and facilitate humanitarian aid. Canada, Brazil, and other Western Hemisphere countries, some of which participated in the UN Stabilization Mission in Haiti (MINUSTAH; 2004-2017), declined U.S. requests to lead such a force. MINUSTAH remains controversial in Haiti due to alleged sexual abuse by some of its forces and its inadvertent introduction of cholera into the country.

In July 2023, Kenya announced it would consider leading a multinational force in Haiti and sending up to 1,000 police, if authorized by the UN Security Council (UNSC). Whereas U.S. and Caribbean Community (CARICOM) officials praised Kenya, some analysts questioned the human rights record of the Kenyan police and whether they could overcome language and cultural barriers. Others opposed any international security force, arguing that previous foreign interventions in Haiti had failed.

**Congressional Research Service**

https://crsreports.congress.gov

IN12331

In October 2023, the UNSC adopted Resolution 2699 authorizing a non-UN-conducted multinational force, financed by voluntary contributions, to provide security for critical infrastructure and operational support to the HNP for 12 months; the mission's mandate was extended, through Resolution 2751, until October 2, 2025.

## Current Status

Kenya's deployment of the MSS was delayed until June 2024 amid debate in Kenya about the deployment's constitutionality and the need to conclude a court-ordered bilateral security agreement with Haiti. Kenya also delayed deployment until the TPC replaced Prime Minister Henry.

MSS leaders have developed an operational plan and created an oversight mechanism to monitor the mission's conduct. Participating personnel are subject to UN vetting, and those receiving U.S. support are to complete U.S. human rights vetting pursuant to the Leahy Laws (22 U.S.C. §2378d and 10 U.S.C. §362).

As of May 2025, the United Nations reported there was $110.9 million—primarily from Canada—in the Haiti MSS Trust Fund. As of March 2025, the MSS mission consisted of just over 1,000 personnel from Kenya, Jamaica, Belize, Guatemala, and El Salvador.

Some observers suggest the MSS mission may need to be strengthened. In an October 2024 letter to the Secretary-General, the TPC president requested that the MSS be transformed into a UN peacekeeping mission; the Secretary-General asserted in February 2025 that such a transition is "not assessed as a feasible option." The Secretary-General specified that, "such a transition could be considered once significant progress has been made in substantially reducing gang territorial control." Reportedly, up to 90% of Port-au-Prince is controlled by gangs. In April 2025, the UN Special Representative to Haiti stated that Haiti is on the verge of "total chaos." Most recently, the TPC reportedly has begun using drones to combat criminal gangs.

## U.S. Policy

The Biden Administration sought to support Haiti, in part, by funding the MSS to help address gang violence and promote security. Some Members of Congress have supported the MSS; others have criticized what they view as inadequate planning for the mission. Almost a year after the first Kenyan police officers arrived, experts assess that the MSS remains underfunded, understaffed, and unable to quell gang-related violence.

On February 6, 2025, Secretary of State Marco Rubio stated that the United States "will continue to support the mission" and that he had issued a waiver to allow approximately $40 million of security assistance to flow to the MSS mission and the Haitian National Police amid the Trump Administration's foreign assistance "pause." In May 2025, the Administration designated the Viv Ansanm gang coalition and the Gran Grif gang as Foreign Terrorist Organizations and Specially Designated Global Terrorists. Further, in May 20 testimony before the Senate Foreign Relations Committee, Secretary Rubio suggested that the Organization of American States (OAS) could play a larger role in Haiti and potentially coordinate a security mission, asserting that the MSS "alone will not solve this problem." The Secretary also stated that the Trump Administration is "prepared to play a leading role" in supporting the OAS but that buy-in would be necessary from other partners in the region.

## Congressional Considerations

During the Biden Administration, the United States pledged at least $380 million to support the MSS. That total included $100 million in foreign assistance and $200 million in Department of Defense

enabling support. U.S. support for the MSS aimed to complement assistance provided to train and equip the HNP through bilateral U.S. programs and the multi-donor UN Basket Fund.

Congress did not specifically designate any U.S. foreign assistance for Haiti to help quell insecurity or support the MSS mission or the HNP in FY2024 or FY2025 appropriations legislation. Congress may consider whether to designate funding for such activities during the FY2026 appropriations process. Congress also may examine how the Trump Administration's foreign assistance policies, including allocations, reprogramming, and/or recissions of funds, may impact the situation in Haiti. Additionally, Congress may consider legislation that could complement U.S. security assistance efforts, such as bills to impose sanctions on those who collude with Haitian gangs (e.g., H.R. 2643, S. 1854).

## Author Information

Karla I. Rios
Analyst in Latin American Affairs

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

HaitiTPSAR000460

Cite as 26 I&N Dec. 884 (AAO 2016)                Interim Decision #3882

# Matter of DHANASAR, Petitioner

*Decided December 27, 2016*

U.S. Department of Homeland Security

U.S. Citizenship and Immigration Services

Administrative Appeals Office

USCIS may grant a national interest waiver if the petitioner demonstrates: (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that he or she is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the job offer and labor certification requirements. *Matter of New York State Dep't of Transp.*, 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998), vacated.

ON BEHALF OF PETITIONER:  Gerard M. Chapman, Esquire, Greensboro, North Carolina

In this decision, we have occasion to revisit the analytical framework for assessing eligibility for "national interest waivers" under section 203(b)(2)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(2)(B)(i) (2012). The self-petitioner, a researcher and educator in the field of aerospace engineering, filed an immigrant visa petition seeking classification under section 203(b)(2) of the Act as a member of the professions holding an advanced degree. The petitioner also sought a "national interest waiver" of the job offer otherwise required by section 203(b)(2)(A).

The Director of the Texas Service Center denied the petition under the existing analytical framework, concluding that the petitioner qualifies for classification as a member of the professions holding an advanced degree but that a waiver of the job offer requirement would not be in the national interest of the United States. Upon de novo review, and based on the revised national interest standard adopted herein, we will sustain the appeal and approve the petition.

## I.  LEGAL BACKGROUND

Subparagraph (A) of section 203(b)(2) of the Act makes immigrant visas available to "qualified immigrants who are members of the professions holding advanced degrees or their equivalent or who because of their exceptional ability in the sciences, arts, or business, will substantially benefit prospectively the national economy, cultural or educational

HaitiTPSAR000461

interests, or welfare of the United States." Under subparagraph (A), immigrant visas are available to such individuals only if their "services in the sciences, arts, professions, or business are sought by an employer in the United States."

Before hiring a foreign national under this immigrant classification, an employer must first obtain a permanent labor certification from the United States Department of Labor ("DOL") under section 212(a)(5)(A)(i) of the Act, 8 U.S.C. § 1182(a)(5)(A)(i) (2012). *See also* 8 C.F.R. § 204.5(k)(4)(i) (2016). A labor certification demonstrates that DOL has determined that there are not sufficient workers who are able, willing, qualified, and available at the place where the alien is to perform such skilled or unskilled labor, and the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed. In its labor certification application, the employer must list the position's job requirements consistent with what is normally required for the occupation. *See* 20 C.F.R. § 656.17(h)(1) (2016). Moreover, the job requirements described on the labor certification application must represent the actual minimum requirements for the job opportunity. *See* 20 C.F.R. § 656.17(i)(1). That is, the employer may not tailor the position requirements to the foreign worker's qualifications; it may only list the position's minimum requirements, regardless of the foreign worker's additional skills that go beyond what is normally required for the occupation. The employer must then test the labor market to determine if able, willing, or qualified U.S. workers are available with the advertised minimum qualifications. If such U.S. workers are found, the employer may not hire the foreign worker for the position, even if the foreign worker clearly has more skills (beyond the advertised qualifications). If the employer does not identify such U.S. workers and DOL determines that those workers are indeed unavailable, DOL will certify the labor certification. After securing the DOL-approved labor certification, the employer may then file a petition with DHS requesting the immigrant classification.

Under subparagraph (B) of section 203(b)(2), however, the Secretary of Homeland Security may waive the requirement of a "job offer" (namely, that the beneficiary's services are sought by a U.S. employer) and, under the applicable regulations, of "a labor certification." 8 C.F.R. § 204.5(k)(4)(ii).[1] That subparagraph states, in pertinent part, that the

---

[1] While appearing to limit national interest waivers to only aliens possessing exceptional ability in the sciences, arts, or business, 8 C.F.R. § 204.5(k)(4)(ii) was superseded in part by section 302(b)(2) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, 105 Stat. 1733, 1743

(continued . . .)

HaitiTPSAR000462

Secretary "may, when the [Secretary] deems it to be in the national interest, waive the requirements of subparagraph (A) that an alien's services in the sciences, arts, professions, or business be sought by an employer in the United States."[2] Section 203(b)(2)(i) of the Act.

USCIS may grant a national interest waiver as a matter of discretion if the petitioner satisfies both subparagraphs (A) and (B). Thus, a petitioner who seeks a "national interest waiver" must first satisfy subparagraph (A) by demonstrating that the beneficiary qualifies as a member of the professions holding an advanced degree or as an individual of exceptional ability. *See* 8 C.F.R. § 204.5(k)(1)–(3) (providing definitions and considerations for making such determinations); *see also* section 203(b)(2)(C) of the Act (providing that possession of requisite academic degree or professional license "shall not by itself be considered sufficient evidence of exceptional ability"). The petitioner must then satisfy subparagraph (B) by establishing that it would be in the national interest to waive the "job offer" requirement under subparagraph (A).[3] *See* 8 C.F.R. § 204.5(k)(4)(ii). This two-part statutory scheme is relatively straightforward, but the term "national interest" is ambiguous. Undefined by statute and regulation, "national interest" is a broad concept subject to various interpretations.

In 1998, under the legacy Immigration and Naturalization Service, we issued a precedent decision establishing a framework for evaluating national interest waiver petitions. *Matter of New York State Dep't of Transp.* ("*NYSDOT*"), 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998).

_____

("MTINA"). Section 302(b)(2) of MTINA amended section 203(b)(2)(B)(i) of the Act by inserting the word "professions" after the word "arts," and thereby made the national interest waiver available to members of the professions holding advanced degrees in addition to individuals of exceptional ability.

[2]  Pursuant to section 1517 of the Homeland Security Act ("HSA") of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2311 (codified at 6 U.S.C. § 557 (2012)), any reference to the Attorney General in a provision of the Act describing functions that were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. *See also* 6 U.S.C. § 542 note (2012); 8 U.S.C. § 1551 note (2012).

[3]  To do so, a petitioner must go beyond showing the individual's expertise in a particular field. The regulation at 8 C.F.R. § 204.5(k)(2) defines "exceptional ability" as "a degree of expertise significantly above that ordinarily encountered" in a given area of endeavor. By statute, individuals of exceptional ability are generally subject to the job offer/labor certification requirement; they are not exempt by virtue of their exceptional ability. Therefore, whether a given petitioner seeks classification as an individual of exceptional ability, or as a member of the professions holding an advanced degree, that individual cannot qualify for a waiver just by demonstrating a degree of expertise significantly above that ordinarily encountered in his field of expertise.

HaitiTPSAR000463

The *NYSDOT* framework looks first to see if a petitioner has shown that the area of employment is of "substantial intrinsic merit." *Id.* at 217. Next, a petitioner must establish that any proposed benefit from the individual's endeavors will be "national in scope." *Id.* Finally, the petitioner must demonstrate that the national interest would be adversely affected if a labor certification were required for the foreign national. *Id.*

Based on our experience with that decision in the intervening period, we believe it is now time for a reassessment. While the first prong has held up under adjudicative experience, the term "intrinsic" adds little to the analysis yet is susceptible to unnecessary subjective evaluation.[4] Similarly, the second prong has caused relatively few problems in adjudications, but occasionally the term "national in scope" is construed too narrowly by focusing primarily on the geographic impact of the benefit. While *NYSDOT* found a civil engineer's employment to be national in scope even though it was limited to a particular region, that finding hinged on the geographic connections between New York's bridges and roads and the national transportation system. Certain locally or regionally focused endeavors, however, may be of national importance despite being difficult to quantify with respect to geographic scope.

What has generated the greatest confusion for petitioners and adjudicators, however, is *NYSDOT*'s third prong. First, this prong is explained in several different ways within *NYSDOT* itself, leaving the reader uncertain what ultimately is the relevant inquiry. We initially state the third prong as requiring a petitioner to "demonstrate that the national interest would be adversely affected if a labor certification were required." *NYSDOT*, 22 I&N Dec. at 217. We then alternatively describe the third prong as requiring the petitioner to demonstrate that the individual "present[s] a national benefit so great as to outweigh the national interest inherent in the labor certification process." *Id.* at 218. Immediately thereafter, we restate the third prong yet again: the petitioner must establish that the individual will "serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications."[5] *Id.* Finally, in what may be construed as either a fourth restatement of prong three or as an explanation of how to satisfy it, we state that "it clearly must be established that the alien's past record justifies projections of future benefit to the national interest." *Id.* at 219. A footnote

---

[4] *Cf., e.g.*, *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) ("'Intrinsic value' is an inherently subjective and speculative concept.").
[5] Other, slight variations of the third prong emerge later in the decision. *See NYSDOT*, 22 I&N at 220 ("to a greater extent than U.S. workers"); *see also id.* at 221 ("considerably outweigh").

HaitiTPSAR000464

to this statement clarifies that USCIS seeks "a past history of demonstrable achievement with some degree of influence on the field as a whole." *Id.* at 219 n.6. Although residing in footnote 6, this "influence" standard has in practice become the primary yardstick against which petitions are measured.[6]

Second, and a more fundamental challenge than parsing its several restatements, *NYSDOT*'s third prong can be misinterpreted to require the petitioner to submit, and the adjudicator to evaluate, evidence relevant to the very labor market test that the waiver is intended to forego. The first iteration of prong three, that the national interest would be adversely affected if a labor certification were required, implies that petitioners should submit evidence of harm to the national interest. The third iteration, that the individual will serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications, suggests that petitioners should submit evidence comparing foreign nationals to unidentified U.S. workers. These concepts have proven to be difficult for many qualified individuals to establish or analyze in the abstract. It has proven particularly ill-suited for USCIS to evaluate petitions from self-employed individuals, such as entrepreneurs. In *NYSDOT*, we even "acknowledge[d] that there are certain occupations wherein individuals are essentially self-employed, and thus would have no U.S. employer to apply for a labor certification." *Id.* at 218 n.5. Nonetheless, we did not modify the test to resolve this scenario, which continues to challenge petitioners and USCIS adjudicators. Lastly, this concept of harm-to-national-interest is not required by, and unnecessarily narrows, the Secretary's broad discretionary authority to grant a waiver when he "deems it to be in the national interest."

## II. NEW ANALYTICAL FRAMEWORK

Accordingly, our decision in *NYSDOT* is ripe for revision. Today, we vacate *NYSDOT* and adopt a new framework for adjudicating national interest waiver petitions, one that will provide greater clarity, apply more flexibly to circumstances of both petitioning employers and self-petitioning

---

[6] While this "influence" standard rests upon the reasonable notion that past success will often predict future benefit, our adjudication experience in the years since *NYSDOT* has revealed that there are some talented individuals for whom past achievements are not necessarily the best or only predictor of future success.

HaitiTPSAR000465

individuals, and better advance the purpose of the broad discretionary waiver provision to benefit the United States.[7]

Under the new framework, and after eligibility for EB-2 classification has been established, USCIS may grant a national interest waiver if the petitioner demonstrates by a preponderance of the evidence:[8] (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that the foreign national is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. If these three elements are satisfied, USCIS may approve the national interest waiver as a matter of discretion.[9]

The first prong, substantial merit and national importance, focuses on the specific endeavor that the foreign national proposes to undertake. The endeavor's merit may be demonstrated in a range of areas such as business, entrepreneurialism, science, technology, culture, health, or education. Evidence that the endeavor has the potential to create a significant economic impact may be favorable but is not required, as an endeavor's merit may be established without immediate or quantifiable economic impact. For example, endeavors related to research, pure science, and the furtherance of human knowledge may qualify, whether or not the potential accomplishments in those fields are likely to translate into economic benefits for the United States.

In determining whether the proposed endeavor has national importance, we consider its potential prospective impact. An undertaking may have national importance for example, because it has national or even global implications within a particular field, such as those resulting from certain improved manufacturing processes or medical advances. But we do not evaluate prospective impact solely in geographic terms. Instead, we look for broader implications. Even ventures and undertakings that have as their focus one geographic area of the United States may properly be considered to have national importance. In modifying this prong to assess "national

---

[7]   Going forward, we will use "petitioners" to include both employers who have filed petitions on behalf of employees and individuals who have filed petitions on their own behalf (namely, self-petitioners).

[8]   Under the "preponderance of the evidence" standard, a petitioner must establish that he or she more likely than not satisfies the qualifying elements. *Matter of Chawathe*, 25 I&N Dec. 369, 376 (AAO 2010). We will consider not only the quantity, but also the quality (including relevance, probative value, and credibility) of the evidence. *Id.*

[9]   Because the national interest waiver is "purely discretionary," *Schneider v. Chertoff*, 450 F.3d 944, 948 (9th Cir. 2006), the petitioner also must show that the foreign national otherwise merits a favorable exercise of discretion. *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *cf. Matter of Jean*, 23 I&N Dec. 373, 383 (A.G. 2002).

HaitiTPSAR000466

importance" rather than "national in scope," as used in *NYSDOT*, we seek to avoid overemphasis on the geographic breadth of the endeavor. An endeavor that has significant potential to employ U.S. workers or has other substantial positive economic effects, particularly in an economically depressed area, for instance, may well be understood to have national importance.

The second prong shifts the focus from the proposed endeavor to the foreign national. To determine whether he or she is well positioned to advance the proposed endeavor, we consider factors including, but not limited to: the individual's education, skills, knowledge and record of success in related or similar efforts; a model or plan for future activities; any progress towards achieving the proposed endeavor; and the interest of potential customers, users, investors, or other relevant entities or individuals.

We recognize that forecasting feasibility or future success may present challenges to petitioners and USCIS officers, and that many innovations and entrepreneurial endeavors may ultimately fail, in whole or in part, despite an intelligent plan and competent execution. We do not, therefore, require petitioners to demonstrate that their endeavors are more likely than not to ultimately succeed. But notwithstanding this inherent uncertainty, in order to merit a national interest waiver, petitioners must establish, by a preponderance of the evidence, that they are well positioned to advance the proposed endeavor.

The third prong requires the petitioner to demonstrate that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. On the one hand, Congress clearly sought to further the national interest by requiring job offers and labor certifications to protect the domestic labor supply. On the other hand, by creating the national interest waiver, Congress recognized that in certain cases the benefits inherent in the labor certification process can be outweighed by other factors that are also deemed to be in the national interest. Congress entrusted the Secretary to balance these interests within the context of individual national interest waiver adjudications.

In performing this analysis, USCIS may evaluate factors such as: whether, in light of the nature of the foreign national's qualifications or proposed endeavor, it would be impractical either for the foreign national to secure a job offer or for the petitioner to obtain a labor certification;[10]

---

[10] For example, the labor certification process may prevent a petitioning employer from hiring a foreign national with unique knowledge or skills that are not easily articulated in a labor certification. *See generally* 20 C.F.R. § 656.17(i). Likewise, because of the nature of the proposed endeavor, it may be impractical for an entrepreneur or

(continued . . .)

HaitiTPSAR000467

whether, even assuming that other qualified U.S. workers are available, the United States would still benefit from the foreign national's contributions; and whether the national interest in the foreign national's contributions is sufficiently urgent to warrant forgoing the labor certification process. We emphasize that, in each case, the factor(s) considered must, taken together, indicate that on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.

We note that this new prong, unlike the third prong of *NYSDOT*, does not require a showing of harm to the national interest or a comparison against U.S. workers in the petitioner's field. As stated previously, *NYSDOT*'s third prong was especially problematic for certain petitioners, such as entrepreneurs and self-employed individuals. This more flexible test, which can be met in a range of ways as described above, is meant to apply to a greater variety of individuals.

## III.  ANALYSIS

The director found the petitioner to be qualified for the classification sought by virtue of his advanced degrees. We agree that he holds advanced degrees and therefore qualifies under section 203(b)(2)(A). The remaining issue before us is whether the petitioner has established, by a preponderance of the evidence, that he is eligible for and merits a national interest waiver.

The petitioner proposes to engage in research and development relating to air and space propulsion systems, as well as to teach aerospace engineering, at North Carolina Agricultural and Technical State University ("North Carolina A&T"). The petitioner holds two master of science degrees, in mechanical engineering and in applied physics, as well as a Ph.D. in engineering, from North Carolina A&T. At the time of filing the instant petition, he also worked as a postdoctoral research associate at the university. The record reflects that the petitioner's graduate and postgraduate research has focused on hypersonic propulsion systems (systems involving propulsion at speeds of Mach 5 and above) and on computational fluid dynamics. He has developed a validated computational model of a high-speed air-breathing propulsion engine, as well as a novel numerical method for accurately calculating hypersonic air flow. The petitioner intends to continue his research at the university.

The extensive record includes: reliable evidence of the petitioner's credentials; copies of his publications and other published materials that

---

self-employed inventor, when advancing an endeavor on his or her own, to secure a job offer from a U.S. employer.

HaitiTPSAR000468

cite his work; evidence of his membership in professional associations; and documentation regarding his research and teaching activities. The petitioner also submitted several letters from individuals who establish their own expertise in aerospace, describe the petitioner's research in detail and attest to his expertise in the field of hypersonic propulsion systems.

We determine that the petitioner is eligible for a national interest waiver under the new framework. First, we conclude that the petitioner has established both the substantial merit and national importance of his proposed endeavor. The petitioner demonstrated that he intends to continue research into the design and development of propulsion systems for potential use in military and civilian technologies such as nano-satellites, rocket-propelled ballistic missiles, and single-stage-to-orbit vehicles. In letters supporting the petition, he describes how research in this area enhances our national security and defense by allowing the United States to maintain its advantage over other nations in the field of hypersonic flight. We find that this proposed research has substantial merit because it aims to advance scientific knowledge and further national security interests and U.S. competitiveness in the civil space sector.

The record further demonstrates that the petitioner's proposed endeavor is of national importance. The petitioner submitted probative expert letters from individuals holding senior positions in academia, government, and industry that describe the importance of hypersonic propulsion research as it relates to U.S. strategic interests. He also provided media articles and other evidence documenting the interest of the House Committee on Armed Services in the development of hypersonic technologies and discussing the potential significance of U.S. advances in this area of research and development. The letters and the media articles discuss efforts and advances that other countries are currently making in the area of hypersonic propulsion systems and the strategic importance of U.S. advancement in researching and developing these technologies for use in missiles, satellites, and aircraft.

Second, we find that the record establishes that the petitioner is well positioned to advance the proposed endeavor. Beyond his multiple graduate degrees in relevant fields, the petitioner has experience conducting research and developing computational models that support the mission of the United States Department of Defense ("DOD") to develop air superiority and protection capabilities of U.S. military forces, and that assist in the development of platforms for Earth observation and interplanetary exploration. The petitioner submitted detailed expert letters describing U.S. Government interest and investment in his research, and the record includes documentation that the petitioner played a significant role in projects funded by grants from the National Aeronautics and Space

HaitiTPSAR000469

Administration ("NASA") and the Air Force Research Laboratories ("AFRL") within DOD. [11]    Thus, the significance of the petitioner's research in his field is corroborated by evidence of peer and government interest in his research, as well as by consistent government funding of the petitioner's research projects.  The petitioner's education, experience, and expertise in his field, the significance of his role in research projects, as well as the sustained interest of and funding from government entities such as NASA and AFRL, position him well to continue to advance his proposed endeavor of hypersonic technology research.

Third and finally, we conclude that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.  As noted above, the petitioner holds three graduate degrees in fields tied to the proposed endeavor, and the record demonstrates that he possesses considerable experience and expertise in a highly specialized field.  The evidence also shows that research on hypersonic propulsion holds significant implications for U.S. national security and competitiveness.  In addition, the repeated funding of research in which the petitioner played a key role indicates that government agencies, including NASA and the DOD, have found his work on this topic to be promising and useful.  Because of his record of successful research in an area that furthers U.S. interests, we find that this petitioner offers contributions of such value that, on balance, they would benefit the United States even assuming that other qualified U.S. workers are available.

In addition to conducting research, the petitioner proposes to support teaching activities in science, technology, engineering, and math ("STEM") disciplines.  He submits letters favorably attesting to his teaching abilities at the university level and evidence of his participation in mentorship programs for middle school students.    While STEM teaching has substantial merit in relation to U.S. educational interests, the record does not indicate by a preponderance of the evidence that the petitioner would be engaged in activities that would impact the field of STEM education more broadly.  Accordingly, as the petitioner has not established by a preponderance of the evidence that his proposed teaching activities meet the "national importance" element of the first prong of the new framework, we do not address the remaining prongs in relation to the petitioner's teaching activities.

---

[11] Although the director of North Carolina A&T's Center for Aerospace Research ("CAR") is listed as the lead principal investigator on all grants for CAR research, the record establishes that the petitioner initiated or is the primary award contact on several funded grant proposals and that he is the only listed researcher on many of the grants.

HaitiTPSAR000470

Cite as 26 I&N Dec. 884 (AAO 2016)                    Interim Decision #3882

# IV.  CONCLUSION

The record demonstrates by a preponderance of the evidence that: (1) the petitioner's research in aerospace engineering has both substantial merit and national importance; (2) the petitioner is well positioned to advance his research; and (3) on balance, it is beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.  We find that the petitioner has established eligibility for and otherwise merits a national interest waiver as a matter of discretion.

In visa petition proceedings, it is the petitioner's burden to establish eligibility for the immigration benefit sought.  Section 291 of the Act, 8 U.S.C. § 1361 (2012).  The petitioner has met that burden.

**ORDER:**  The appeal is sustained and the petition is approved.

HaitiTPSAR000471

Cite as 23 I&N Dec. 572 (A.G. 2003)                      Interim Decision #3488

# In re D-J-, Respondent

### *Decided April 17, 2003*

### U.S. Department of Justice
### Office of the Attorney General

(1)  The Attorney General has broad discretion in bond proceedings under section 236(a) of the Immigration and Nationality Act, 8 U.S.C. § 1226(a) (2000), to determine whether to release an alien on bond.

(2)  Neither section 236(a) of the Act nor the applicable regulations confer on an alien the right to release on bond.

(3)  In determining whether to release on bond undocumented migrants who arrive in the United States by sea seeking to evade inspection, it is appropriate to consider national security interests implicated by the encouragement of further unlawful mass migrations and the release of undocumented alien migrants into the United States without adequate screening.

(4)  In bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, Immigration Judges and the Board of Immigration Appeals shall consider such interests.

(5)  Considering national security grounds applicable to a category of aliens in denying an unadmitted alien's request for release on bond does not violate any due process right to an individualized determination in bond proceedings under section 236(a) of the Act.

(6)  The denial of the respondent's release on bond does not violate international law.

(7)  Release of the respondent on bond is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of the respondent and other similarly situated undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002; further, the respondent failed to demonstrate adequately that he does not present a risk of flight if released and should be denied bond on that basis as well.

## IN BOND PROCEEDINGS

The respondent is an undocumented alien from Haiti who was taken into custody and detained by the Immigration and Naturalization Service ("INS") on October 29, 2002, while attempting to evade lawful immigration procedures and enter the United States illegally.  He arrived aboard a vessel that sailed into Biscayne Bay, Florida, on that date, carrying 216 undocumented aliens from Haiti and the Dominican Republic.  He and other passengers on the vessel were apprehended ashore after the vessel sought to

572

HaitiTPSAR000472

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

evade coastal interdiction by the United States Coast Guard and after many of the aliens sought to evade law enforcement authorities ashore. *See* INS Brief in Support of Bond Appeal, Exh. A ("INS Brief"). Respondent was placed in removal proceedings and charged as being an inadmissible alien under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2002) ("INA"). He is now seeking asylum in the United States and has applied for bond, which would allow his release into the community pending disposition on removal or asylum.

On November 6, 2002, an Immigration Judge ("IJ") granted respondent's application for release on bond (set at $2,500) over the objections of the INS. The INS argued, inter alia, that the release of respondent, and of other members of the undocumented migrant group of October 29, would stimulate further surges of such illegal migration by sea and threaten important national security interests. The INS then appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA dismissed the appeal, concluding, inter alia, that the broad national interests invoked by INS were not appropriate considerations for the IJ or the BIA in making the bond determination, "[a]bsent contrary direction from the Attorney General." Decision of the Board of Immigration Appeals, *In re D-J-*, at 2 (March 13, 2003) ("BIA Dec."). Exercising authority transferred to the Department of Homeland Security ("DHS") by the Homeland Security Act of 2002 ("HSA"), and pursuant to the provisions of 8 C.F.R. § 1003.1(h)(1)(iii), the Under Secretary for Border and Transportation Security has now referred the BIA's decision to me for review.[1] This referral automatically stayed the BIA's order pending my decision. *See* 8 C.F.R. § 1003.19(i)(2).

On February 12, 2003, the IJ denied respondent's application for asylum. His appeal of that decision is pending before the BIA.

Although authority to enforce and administer the INA and other laws related to the immigration and naturalization of aliens has recently been transferred to the Secretary of Homeland Security by the HSA, the Attorney General retains his authority to make controlling determinations with respect

---

[1] On March 1, 2003, the INS was transferred from the Department of Justice to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178. The Executive Office for Immigration Review, however, remains in the Department of Justice. On February 28, 2003, the Attorney General published a technical rule that moved 8 C.F.R. § 3.1(h) (2002) to 8 C.F.R. § 1003.1(h). *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9332 (Feb. 28, 2003) (to be codified at 8 C.F.R. § 1003.1(h)). The authority of the INS Commissioner to refer Board decisions to the Attorney General is now vested in the Secretary of Homeland Security, or in "specific officials of the Department of Homeland Security designated by the Secretary with the concurrence of the Attorney General." 8 C.F.R. § 1003.1(h)(iii).

HaitiTPSAR000473

to questions of law arising under those statutes.[2] This statutory framework is consistent with the Attorney General's traditional role as the primary interpreter of the law within the Executive Branch. *See generally* 28 U.S.C. §§ 511-13 (2000).

Pursuant to the authority and discretion vested in me under the provisions of section 236(a) of the INA, 8 U.S.C. § 1226(a) (2000),[3] I have determined that the release of respondent on bond was and is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of respondent and other undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002. I further determine that respondent has failed to demonstrate adequately that he does not present a risk of flight if released on bond and that he should be denied bond on that basis as well. *See* 8 C.F.R. § 236.1(c)(8) (2002). Accordingly, I order that the BIA's decision and order be vacated, and that respondent be denied bond and detained pending appropriate disposition and proceedings respecting his status under the immigration laws.

---

[2] *See* section 103(a)(1) of the INA, 8 U.S.C. § 1103(a)(1), *as amended by* Homeland Security Act of 2002 Amendments, Division L of Pub. L. No. 108-7, § 105(a)(1), 117 Stat. 531 (2003), which provides:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

[3] Section 1102 of the HSA, 116 Stat. at 2274, added a new subsection (g) to section 103 of the INA, providing as follows:

> The Attorney General shall have such authorities and functions under this Act and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

The Attorney General's authority to detain, or authorize bond for aliens under section 236(a) of the INA is one of the authorities he retains pursuant to this provision, although this authority is shared with the Secretary of Homeland Security because officials of that department make the initial determination whether an alien will remain in custody during removal proceedings. *See* sections 103(a), (g) of the INA, *as amended*; 8 C.F.R. §§ 236.1(c), (d), 287.3(d) (2002).

HaitiTPSAR000474

## I.

My review of the BIA's decision in this case is *de novo*; it is not confined to reviewing the decisions of the BIA or the IJ for legal or factual error. *See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations."). In making their decisions in this matter, both the IJ and the BIA were exercising limited authority that is dependent upon delegation from the Attorney General. *See id.* at 4. When I undertake review of such decisions pursuant to a referral under 8 C.F.R. § 1003.1(h), the delegated authorities of the IJ and BIA are superseded and I am authorized to make the determination based on my own conclusions on the facts and the law. The recent promulgation of 8 C.F.R. § 1003.l(d)(3), which precludes the BIA from engaging in de novo review of an IJ's findings of fact, does not affect the de novo standard articulated in *Doherty* because that regulation does not govern the authority of the Attorney General to review BIA decisions.

I now turn to the question of whether respondent should have been detained or released on bond under the authority of section 236(a) of the INA.

## II.

### A.

The law governing the detention or release of aliens such as respondent (i.e., aliens arrested and detained pending a decision on removal) is set forth in section 236(a) of the INA. It provides that the Attorney General may (1) continue to detain the alien; or (2) release the alien on bond or conditional parole. *See* section 236(a) of the INA.[4] Conditional parole is not placed in issue here, so the only question is whether the respondent should be detained or released on bond.

As recognized by the Supreme Court, section 236(a) does not give detained aliens any *right* to release on bond. *See Carlson v. Landon*, 342 U.S. 524, 534 (1952). Rather, the statute merely gives the Attorney General the authority to grant bond *if* he concludes, in the exercise of broad discretion, that the alien's release on bond is warranted. The extensive discretion granted the Attorney General under the statute is confirmed by its further provision that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review." Section 236(c) of the INA. Even apart from that provision, the courts have consistently recognized that the Attorney General has extremely broad discretion in

---

[4] *See supra* n.3.

HaitiTPSAR000475

determining whether or not to release an alien on bond under this and like provisions. *E.g.*, *Carlson*, 342 U.S. at 540; *United States ex rel. Barbour v. District Dir. of INS*, 491 F.2d 573, 577-78 (5th Cir.), *cert. denied*, 419 U.S. 873 (1974). Further, the INA does not limit the discretionary factors that may be considered by the Attorney General in determining whether to detain an alien pending a decision on asylum or removal. *See, e.g.*, *Carlson*, 342 U.S. at 534 (Attorney General's denial of bail to alien is within his lawful discretion as long as it has a "reasonable foundation"); *Barbour*, 491 F.2d at 578 (INS finding that alien was a threat to national security warranted denial of bond, applying "reasonable foundation" standard); *see also Sam Andrews' Sons v. Mitchell*, 457 F.2d 745, 748 (9th Cir. 1972) (Attorney General's exercise of discretionary authorities under the INA must be upheld if they are founded "on considerations rationally related to the statute he is administering").

Further discretionary authority for the release on bond of aliens such as respondent is found in subpart A, section 236.1 of the INS regulations governing "Detention of Aliens Prior to Order of Removal." *See* 8 C.F.R. § 236.l(c)(8). This regulation provides:

> Any officer authorized to issue a warrant of arrest *may, in the officer's discretion*, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

*Id.* (emphasis added). This provision gives the DHS discretionary authority to release a covered alien on bond if, and only if, the alien makes a satisfactory demonstration with respect to the stated criteria. Like section 236(a), it does not establish any right to release on bond.

## B.

I will now briefly summarize the pertinent facts and contentions of the parties indicated in the record.

As noted above, respondent arrived off the shores of Florida in an overloaded vessel with 216 undocumented aliens from Haiti and the Dominican Republic on October 29, 2002. After the vessel sought to evade the orders and interdiction efforts of a U.S. Coast Guard ("USCG") vessel, some of the alien passengers jumped from the vessel and swam ashore. After the migrant vessel ran aground, the remaining passengers disembarked and, despite the order of USCG officers to stop, ran ashore and fled from law enforcement officers before they were apprehended. *See* INS Brief, Exh. A (Declaration of Captain Mark J. Kerski, USCG) ("Kerski Declaration"). I find nothing in the record showing that respondent was not among the alien

HaitiTPSAR000476

migrants who disobeyed the orders of, and sought to evade, USCG or law enforcement officers ashore in an effort to enter the United States unlawfully.

The respondent offered limited evidence and information in the proceedings below in support of his claims that he did not present a danger to the community, a risk of flight, or a threat to national security. Respondent testified that he has not been arrested or convicted of a crime; and that, if released, he would live with an uncle residing in New York, New York, who would provide him with food, shelter, and transportation while he applied for asylum. Memorandum Decision of the Immigration Judge, *In re D-J-*, at 2 (Dec. 12, 2002) ("IJ Dec.").

Respondent's brief before the BIA asserts that he was "willingly taken into INS custody." Respondent's Brief in Support of the Immigration Judge's Custody Determination at 3 ("Respondent's Brief"). That assertion, however, does not address whether the respondent was among the migrants who sought to evade USCG and other law enforcement officers after coming ashore, as indicated in the USCG's Kerski Declaration. Respondent's brief further asserts that, because he does not speak or understand English, he could not be expected to obey any orders from English-speaking law enforcement officers at the time he came ashore. That assertion, however, does not address the likelihood, indicated by the content of the Kerski Declaration, that the circumstances in which those orders were issued were such that their meaning would have been clear in context, without regard to the particular words uttered by the officers. *See* INS Brief, Exh. A, ¶¶ 4-6.

In opposing respondent's contentions, the INS submitted declarations from officers of the Coast Guard, the Department of State, and the Department of Defense ("DOD") as exhibits before the IJ and the BIA.[5] INS maintains that these declarations show that there are strong concerns of national security requiring the continued detention of the respondent and similarly situated undocumented migrants pending removal proceedings. Two general areas of concern are implicated. First, there is a concern that the release of aliens such as respondent and the other October 29 migrants would tend to encourage further surges of mass migration from Haiti by sea, with attendant strains on national and homeland security resources. Such mass migrations would also place the lives of the aliens at risk. Second, in light of the terrorist attacks of September 11, 2001, there is increased necessity in preventing undocumented aliens from entering the country without the screening of the immigration inspections process.

---

[5] The exhibits submitted with the INS brief included: Declaration of Captain Mark J. Kerski, USCG (Exhibit A); Memorandum from the United States Department of State (Exhibit B); Declaration of Captain Kenneth A. Ward, USCG (Exhibit C); Declaration of Johnny Williams (Exhibit D); Supplemental Declaration of Captain Kenneth A. Ward, USCG (Exhibit E); and Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations (Exhibit F).

HaitiTPSAR000477

The first area of national security concern advanced by INS is the threat of further mass migration. INS asserts that reports and rumors of successful entry into the United States by Haitian migrants have fueled recent migration surges and the perception of further successful entries could encourage further mass migration attempts.[6] In support of this contention, INS has submitted a memorandum issued by the State Department supporting detention of the migrants who landed in Florida on October 29, 2002, in order to prevent further mass migrations. The memorandum states in relevant part:

> The disposition of those detained in the October 29 arrival will spur further migration if they are released into the U.S. Such treatment would create a perception in Haiti of an easing in U.S. policy with respect to admission of migrants. For this reason, the Department of State strongly recommends that the 216 migrants (207 Haitians, 9 Dominicans) from the boat which reached Key Biscayne on October 29 be detained while they undergo processing. The migrants should be detained unless and until they demonstrate a well-founded fear of persecution. Those who cannot do so should continue to be held, absent a compelling humanitarian reason for release, until they can be expeditiously repatriated.

INS Brief, Exh. B (State Department Memorandum). The State Department memorandum sets forth extensive and detailed information documenting the relationship between perceptions in Haiti of successful U.S. entry by seagoing migrants and the likelihood of further mass migrations. *Id.*

The declarations submitted from the Coast Guard (*see supra* n.6) and the Defense Department express corroborating statements regarding this concern. The Coast Guard states that "[a]necdotal reporting and operational experience strongly suggests that detaining and swiftly repatriating those who illegally and unsafely attempt to enter the United States by sea is a significant deterrent to surges in illegal immigration and mass migration." INS Brief, Exh. C, ¶ 9 (Declaration of Captain Kenneth A. Ward, USCG). Similarly, the Department of Defense declaration states that "[a]ctual or even *perceived* changes in U.S. immigration policy can trigger mass migration events by encouraging other potential illegal migrants." *See* INS Brief, Exh. F, ¶ 5 (Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations).

The INS submissions also outline an additional national security implication of encouraging future mass migrations by sea from Haiti. The Coast Guard declaration asserts that continued mass migrations from Haiti have "heavily taxed Coast Guard capacity and capabilities," while "reducing

---

[6] Following the successful landing of more than 200 Haitians on October 29, 2002, on November 7, 2002, and again on November 9, 2002, the USCG successfully interdicted three groups of undocumented Haitian migrants attempting to transit to the United States via the Bahamas. In all, 264 Haitian migrants were interdicted on these dates. Such incidents are "typical of a surge in Haitian migrant departures following similar successful landings and demonstrates the 'pull' factor that successful landing can have." INS Brief, Exh. E, ¶ 3 (Supplemental Declaration of Captain Kenneth A. Ward, USCG).

HaitiTPSAR000478

responsiveness in other mission areas." INS Brief, Exh. C, ¶ 7. The Department of Defense, which is also involved in efforts to contain such overseas migrations, also asserts that the demands of mass migrations from Haiti "would create a drain on scarce assets that are being used in or supporting operations elsewhere." INS Brief, Exh. F, ¶ 8.

The declarations submitted by INS also substantiate a national security concern raised by the prospect of undocumented aliens from Haiti being released within the United States without adequate verification of their background, associations, and objectives. Thus, the State Department declaration asserts that it has "noticed an increase in third country nations (Pakistanis, Palestinians, etc.) using Haiti as a staging point for attempted migration to the United States. This increases the national security interest in curbing use of this migration route." INS Brief, Exh. B, ¶ 11. Relatedly, the Coast Guard's supplemental declaration asserts that the boatloads of interdicted Haitians have included persons previously deported for drug trafficking and subject to outstanding felony warrants. INS Brief, Exh. E, ¶ 4 (Supplemental Declaration of Captain Kenneth A. Ward, USCG). The Coast Guard further asserts that "because maritime migrants are typically undocumented and carry little or no identification, it is often difficult to ascertain the identity and background of interdicted persons, particularly in large groups, which presents potential threats to officer safety, as well as national security." *Id.*

III.

Having considered the record and the briefs of the parties, and exercising my authority under section 236(a) of the INA, I have determined that the release of respondent on bond is unwarranted.

I conclude that releasing respondent, or similarly situated undocumented seagoing migrants, on bond would give rise to adverse consequences for national security and sound immigration policy. As demonstrated by the declarations of the concerned national security agencies submitted by INS, there is a substantial prospect that the release of such aliens into the United States would come to the attention of others in Haiti and encourage future surges in illegal migration by sea. Encouraging such unlawful mass migrations is inconsistent with sound immigration policy and important national security interests. As substantiated by the government declarations, surges in such illegal migration by sea injure national security by diverting valuable Coast Guard and DOD resources from counterterrorism and homeland security responsibilities. Such national security considerations clearly constitute a "reasonable foundation" for the exercise of my discretion to deny release on bond under section 236(a). *See Carlson*, 342 U.S. at 534; *Barbour*, 491 F.2d at 578.

579

HaitiTPSAR000479

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

I have noted the BIA's suggestion that the INS's recent adoption of a policy placing certain aliens (including many undocumented aliens who arrive by sea and are not admitted or paroled) in expedited removal proceedings in which affected aliens, with limited exceptions, would be automatically detained without review by an IJ or the BIA tends to negate the INS's concern regarding the encouragement of migration surges. BIA Dec. at 2 n.3; *see* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924-26 (Nov. 13, 2002). The offsetting effect suggested by the BIA would presumably be due to the prospect that the new expedited removal policy will be so restrictive that potential Haitian migrants would learn of that and be deterred from future migration attempts, regardless of respondent's fate and that of the other October 29 migrants. While the expedited removal policy may reduce the incidence of seagoing Haitian migrants being released on bond pending removal, it hardly provides airtight assurance against future successful entries by such migrants through legal and extra-legal maneuvers, or the encouragement of additional maritime migrations likely to arise from such entries. I note, for example, that the policy's strict detention provision is entirely inapplicable to aliens who are admitted or paroled. In any event, even if the new policy somewhat reduced the expectations of further successful U.S. entries, the release of respondent and hundreds of others from the October 29 migrant group would strongly undercut any resultant deterrent effect arising from the policy. The persistent history of mass migration from Haiti, in the face of concerted statutory and regulatory measures to curtail it, confirms that even sporadic successful entries fuel further attempts. I therefore am not persuaded that the new expedited removal policy negates the migration "surge" consideration.

I further conclude that the release on bond of undocumented seagoing migrant aliens from Haiti without adequate background screening or investigation presents a risk to national security that provides additional grounds for denying respondent's release on bond. This consideration is fortified by the State Department's assertion that it has observed an increase in aliens from countries such as Pakistan using Haiti as a staging point for migration to the United States. Under the current circumstances of a declared National Emergency, the Government's capacity to promptly undertake an exhaustive factual investigation concerning the individual status of hundreds of undocumented aliens is sharply limited and strained to the limit. Under these circumstances, it is reasonable to make a determination that aliens arriving under the circumstances presented by the October 29 influx should be detained rather than released on bond. There is substantial risk that granting release on bond to such large groups of undocumented aliens may include persons who present a threat to the national security, as well as a

HaitiTPSAR000480

substantial risk of disappearance into the alien community within the United States.

I note that the BIA has acknowledged the seriousness of INS's arguments that the detention or release of these aliens implicates important national security interests. *See* BIA Dec. at 2. The BIA determined, however, that such considerations fall "outside the scope of Immigration Judge bond proceedings as such proceedings are currently constituted," except where individual considerations show that the respondent is not likely to appear or presents a danger to the community. The BIA then stated: "Absent contrary direction from the Attorney General, we therefore agree with the Immigration Judge's focus on the respondent's individual likelihood to appear and individual danger to the community." *Id.* This opinion provides the BIA and Immigration Judges with the "contrary direction" to which the BIA referred. In future proceedings involving similarly situated aliens, this opinion constitutes binding precedent, requiring the BIA and IJs to apply the standards set forth herein, including consideration of national security interests. *See generally Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law"). Further, in all future bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, IJs and the BIA shall consider such interests.

Finally, I conclude that respondent has not individually demonstrated that he satisfies the prerequisites to discretionary release on bond under the provisions of 8 C.F.R. § 236.l(c)(8). INS may (but is not required to) grant release under that provision if the alien demonstrates to its satisfaction that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding. I do not find that respondent has adequately demonstrated that he is likely to appear at future proceedings for purposes of granting release on bond pursuant to section 236(a)(2) of the INA or 8 C.F.R. § 236.l(c)(8). There are strong indications in the record that respondent was among those aliens who sought to evade Coast Guard and law enforcement officers in a determined effort to effect illegal entry into the United States. Because such evasive behavior does not provide reassuring evidence of respondent's likely reliability in appearing for future proceedings, it was incumbent upon respondent to produce substantial countervailing evidence as to that criterion. I conclude that the minimal showing made by respondent on this point was insufficient to demonstrate the likelihood of his appearance for future proceedings.[7]

_____
[7] The INS also offered evidence disputing respondent's claim that, individually, he does not
(continued...)

HaitiTPSAR000481

In addition, I note that the respondent was denied asylum by the Immigration Judge on February 12, 2003. The respondent appealed that decision to the BIA on March 14, 2003, and that appeal remains pending. The IJ's denial of the respondent's application for asylum increases the risk that the respondent will flee if released from detention. "A respondent with a greater likelihood of being granted relief from deportation has a greater motivation to appear for a deportation hearing than one who, based on a criminal record or otherwise, has less potential of being granted such relief." *Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987).

## IV

Although neither the IJ nor the BIA chose to address the issue, respondent contends that he is constitutionally entitled on due process grounds to an "individualized determination" of his request for release on bond and that denying bond on broad national security grounds that are generally applicable to the October 29 migrants would somehow violate such a right. Respondent's Brief at 6-8. In that regard, I note that several federal appellate courts have recently held that a *lawful permanent resident alien* has a due process right to an individualized hearing and determination on whether he poses a risk of flight or a danger to the community when subjected to the mandatory detention provisions of section 236(c) of the INA. *See Kim v. Ziglar*, 276 F.3d 523 (9th Cir.), *cert. granted sub nom. Demore v. Hyung Joon Kim*, 536 U.S. 956 (2002); *Patel v. Zemski*, 275 F.3d 299, 314-15 (3d Cir. 2001); *see also Hoang v. Comfort*, 282 F.3d 1247, 1256 (10th Cir. 2002). Another federal appeals court has reached a contrary conclusion on that issue, *see Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999), and the Supreme Court has granted the Government's petition for a writ of certiorari and heard oral argument in *Kim.*

I first note that the decisions in *Kim* and *Patel* were specifically addressed to the *mandatory* detention provisions of section 236(c) of the INA and are therefore fundamentally distinguishable from the procedures afforded under section 236(a). Section 236(c) requires nondiscretionary detention as a categorical statutory mandate for those aliens covered by it, whereas section 236(a) affords aliens to whom it applies the opportunity to seek discretionary relief (bond or conditional parole) in a hearing before an Immigration Judge. *See Kim*, 276 F.3d at 533.

More significantly, however, the holdings in *Kim* and *Patel* were premised upon the petitioner's status as a lawful permanent resident alien. *See Kim*, 276 F.3d at 528, 534; *Patel*, 275 F.3d at 307. In contrast, respondent has not

---

[7] (...continued)
pose a danger to the community and is likely to appear in future proceedings. *See* INS Brief at 14-15.

HaitiTPSAR000482

even been admitted to the United States, let alone acquired the status of a lawful permanent resident alien. Respondent's status is that of an undocumented alien, charged as being inadmissible as an alien present in the United States without having first been admitted or paroled. *See* section 212(a)(6)(A)(i) of the INA. As an alien who has "not yet gained initial admission to the United States," he does not qualify for the limited due process protection extended to "admitted" aliens under the sharply distinguishable circumstances presented in *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001) ("We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question."). As explained by the court in *Gisbert v. United States Attorney General*, 988 F.2d 1437, 1440 (5th Cir.), *amended on other grounds*, 997 F.2d 1122 (5th Cir. 1993): "Although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Accord United States v. Lopez-Vasquez*, 227 F.3d 476, 484-85 (5th Cir. 2000); *Zheng v. INS*, 207 F.Supp.2d 550, 552 (E.D. La. 2002) ("The detention of aliens who have been denied initial admission into the United States does not implicate the Fifth Amendment, even if such aliens were subsequently paroled or released within the country.").

Even if the respondent *were* entitled to an individualized hearing, however, such a conclusion would not support a contention that this respondent's request for release on bond must be determined exclusively on the basis of his individual situation, rather than on the basis of general considerations applicable to a category of migrants, as a matter of constitutional due process. The mere fact that general considerations are introduced does not negate the individual nature of the hearing. The Attorney General is broadly authorized to detain respondent, and deny his request for bond, based on any reasonable consideration, individualized or general, that is consistent with the Attorney General's statutory responsibilities. *See Reno v. Flores*, 507 U.S. 292, 313-14 & n.9 (1993) (rejecting juvenile aliens' demands for an "individualized custody hearing" and upholding INS use of "reasonable presumptions and generic rules" in such cases).

In any event, I have given full consideration to the individual aspects of respondent's claim for bond based on the record in this proceeding. I find nothing in respondent's individual case that warrants granting him release on bond when balanced against the above-described compelling factors that militate against such release in the case of undocumented aliens attempting illegal entry into the United States under the circumstances presented by the October 29 influx.

HaitiTPSAR000483

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

Finally, I note that respondent argued to the BIA that an INS policy of detaining Haitian migrants in order to deter other Haitians from migrating to the United States seeking asylum violates international law. *See* Respondent's Brief at 8-9. In support of his argument, he invokes the right to asylum protected by Article 14 of the Universal Declaration of Human Rights ("UDHR") and an advisory opinion of the United Nations High Commission for Refugees stating that "asylum seekers should not be detained for purposes of deterrence." *Id.* at 8. The BIA did not address respondent's arguments on this point in its decision.

This argument is without merit. First, the UDHR is merely a nonbinding expression of aspirations and principles, rather than a legally binding treaty. *See Haitian Refugee Center v. Gracey*, 809 F.2d 794, 816 n.17 (D.C. Cir. 1987) (UDHR "is merely a nonbinding resolution, not a treaty"). In any event, the application of U.S. law to protect the nation's borders against mass migrations by hundreds of undocumented aliens violates no right protected by the UDHR or any other applicable rule of international law. As the Supreme Court has recognized, "'[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments . . . .'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). The authority to expel aliens is meaningless without the authority to detain those who pose a danger or a flight risk during the process of determining whether they should be expelled. The national security interests invoked in this opinion are directed at unlawful and dangerous mass migrations by sea, not the right to seek asylum. Aliens who do arrive in the United States, including the respondent himself, are afforded the right to apply for asylum and have those applications duly considered.[8]

---

[8]    I note that a regional official of the United Nations High Commissioner for Refugees ("UNHCR") has sent me a letter volunteering certain comments on this proceeding. Letter for The Honorable John Ashcroft, Attorney General of the United States, from Guenet Guebre-Christos, Regional Representative, United Nations High Commissioner for Refugees, *Re: Matter of D-J-, Advisory Opinion on Detention of Asylum Seekers* (March 28, 2003). In brief, the UNHCR letter makes certain arguments invoking purported obligations arising under the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (Jan. 31, 1967) ("Protocol"), and the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968) ("Convention"). The United States is not a party to the Convention, but it is a party to the Protocol, which incorporates by reference Articles 2 through 34 of the Convention. The Protocol is not self-executing, but Congress has incorporated into the INA, through the Refugee Act of 1980, the appropriate requirements of the Protocol. Consequently, the Protocol does not afford respondent any rights beyond what he is afforded under the federal immigration laws, as applied in this decision. *See Abdelwahed v. INS*, 22 Fed.Appx. 811, 815, 2001 WL 1480651 (9th Cir. 2001) (stating that "the Protocol does not give [the petitioner] any rights beyond what he already enjoys under the immigration statutes"); *Legal Obligations of*

(continued...)

HaitiTPSAR000484

Cite as 23 I&N Dec. 572 (A.G. 2003)                    Interim Decision #3488

## CONCLUSION

I have determined that respondent's release on bond under the provisions of section 236(a) of the INA is unwarranted. The BIA's Order of March 13, 2003, is hereby vacated and respondent is to be detained pending decision on removal.

---

[8] (...continued)
*the United States under Article 33 of the Refugee Convention*, 15 Op. O.L.C. 86, 87 (1991) ("[T]he Protocol by which the United States adhered to the Convention is not self-executing for domestic law purposes. Accordingly, the Protocol itself does not create rights or duties that can be enforced by a court.").

585

HaitiTPSAR000485

An official website of the United States government    Here's how you know  ⌄

 UNITED STATES COAST GUARD NEWS

# DUE TO A LAPSE IN FEDERAL FUNDING, THIS WEBSITE WILL NOT BE ACTIVELY MANAGED.



## For more information, please visit our CURRENT STATUS page.

NEWS HOME  ›  PRESS RELEASES

Skip to main content (Press Enter).

HaitiTPSAR000486



**PRESS RELEASE** | Sept. 2, 2025

# Coast Guard repatriates 191 aliens to Haiti

### Coast Guard Southeast - 786-367-7649

MIAMI – Coast Guard Cutter Spencer's crew repatriated 191 aliens to Haiti, Tuesday, following an interdiction approximately 40 miles north of Cap Haitien, Haiti.

Spencer's crew notified Coast Guard Southeast District watchstanders, Friday, of an overloaded vessel disabled in international waters.

"The Coast Guard is committed to our mission to safeguard America by securing our maritime borders and preventing illegal entry into the United States and its territories," said Lt. Cmdr. Cory Arsenault, Coast Guard liaison officer to U.S. Embassy Port-au-Prince. "Anyone attempting to enter the United States illegally by sea will be interdicted and repatriated, consistent with U.S. law and policy."

Once aboard a Coast Guard cutter, aliens are processed to determine their identity and are provided food, water, shelter, and basic medical attention before repatriation.

Skip to main content (Press Enter).

HaitiTPSAR000487

to their country of origin or return to the country of their departure.

The Coast Guard, along with its Operation Vigilant Sentry partners, maintains a continued presence with air, land, and sea assets in the Florida Straits, the Windward Passage, the Mona Passage, and the Caribbean Sea. Operation Vigilant Sentry's combined, multi-layered approach is designed to protect the safety of life at sea while preventing unlawful maritime entry to the United States and its territories.

Since the beginning of fiscal year 2025, on Oct. 1, Coast Guard crews repatriated 603 aliens to Haiti, compared to 857 aliens to Haiti in FY24.

To learn more about the OVS mission, watch these videos:

- **Coast Guard executes Operation Vigilant Sentry in the Caribbean Basin**

- **Coast Guard maritime interdiction and repatriation b-roll video**

- **HSTF-SE OVS maritime detection and interdiction b-roll video**

Visit our **Newsroom** for Coast Guard Southeast District press releases. Visit our **DVIDS account** for Coast Guard Southeast District imagery.

For breaking news, follow us on **X (formerly Twitter)**. For additional information, find us on **Facebook** and follow us on **Instagram**.

-USCG-

---



SHARE



PRINT

 USCGFeatured   Coast Guard Cutter Spencer (WMEC 905)   law enforcement   Operation Vigilant Sentry   Illegal Migration   USCG



Skip to main content (Press Enter).

HaitiTPSAR000489


**U.S. EMBASSY IN HAITI**

## IMMIGRANT VISAS

By **U.S. EMBASSY HAITI**

**CONSULAR OPERATING STATUS**

The U.S. Embassy in Port-au-Prince is on Ordered Departure status. The reduction in staff impacts our ability to provide routine consular services. The Immigrant Visa (IV) Unit will continue to prioritize cases for adopted children of U.S. citizens, cases in which an applicant would otherwise "age out" of a visa category, and certain emergency cases.

Due to staffing constraints, our consular section has suspended IV case requests from NVC.  Limited DNA collection for IV and USCIS cases continues, as conditions permit.  For information about your IV case, please contact us (toll free) +1(800)759-6238 (0018007596238 directly from Haiti) or, if calling within the United States, +1(703)249-4685, or email: Haiti.Visas@gdit-gss.com.  Those wishing to transfer an IV case to Nassau or another country of legal residence should contact NVC here. (NVC Contact Information )

**PRESIDENTIAL PROCLAMATION**

Pursuant to the Presidential Proclamation on Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats, which took effect at 12:01 a.m. eastern daylight time on June 9, 2025, the United States fully suspends or limits entry and visa issuance to nationals of certain countries, including Haiti.  Applicants who are subject to this Presidential Proclamation may still submit visa applications and attend scheduled interviews, but they may be ineligible for visa issuance or admission to the United States.  For additional details, visit travel.state.gov .

The full text of the Proclamation is available here:

https://www.whitehouse.gov/presidential-actions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/ .

?

Help us improve

**U.S. MISSION TO THE ORGANIZATION OF AMERICAN STATES**

**U.S. MISSION TO THE ORGANIZATION OF AMERICAN STATES**

## U.S. REMARKS: CALL FOR COORDINATED UN ACTION IN SUPPORT OF HAITI

By **U.S. MISSION OAS**

SEPTEMBER 11, 2025

Colleagues, friends, and members of the press,

Today is a profoundly sad day for the United States, reflecting not only on the horrors of yesterday, but also the events of September 11, 2001.

Twenty-four years ago, terrorists attacked our country in an attempt to destroy our way of life—and our neighbors across the Americas stood with us in grief and resolve.

This day carries deep meaning not only for the United States but for our entire region.

On that same date, the nations of this hemisphere also adopted the Inter-American Democratic Charter, affirming democracy as fundamental.

Today, we draw on that same unity and determination as we confront Haiti's crisis against terrorism and gang violence in the Western Hemisphere.

The United States proudly joins Secretary General Ramdin, Haiti, Panama, and all OAS member states in endorsing today's joint statement on Haiti.

Every flag in this room speaks with one voice: we stand united with the Haitian people and urge the United Nations Security Council to act without delay.

This call builds on the unanimous resolution adopted at the OAS General Assembly in Antigua and Barbuda –proof that our hemisphere's support for Haiti is enduring and united.

Escalating terrorist and insurgent gang violence is devastating Haiti: more than 1.3 million people—half of them children—are displaced, communities are under siege, and children are being forcibly recruited or subjected to sexual violence.

The territorial expansion of these criminals and murderers threatens to erase the hard-fought battles for national sovereignty by the under-resourced Haitian security forces, including the Haitian National Police (HNP) and the Haitian armed forces (FAd'H).

Despite the courageous efforts of the Multinational Security Support (MSS) mission and the resolve of the Kenyan contingent and our hemispheric partners, who stepped up, and continue to risk their lives on the ground, the continued existence of the Haitian state remains more imperiled today than when the Security Council first envisioned a way to support.

We must come together as a region now to deliver an appropriately resourced force with the scope and scale needed to take the fight to the gangs.

The United States has taken decisive steps:  designating Viv Ansanm and Gran Grif as Foreign Terrorist Organizations and Specially Designated Global Terrorists; offering a $5 million reward for information leading to the arrest of Jimmy Cherizier (Barbecue); and promoting accountability for criminals and those supporting gangs through indictments, arrests, sanctions, arms seizures, and visa and U.S. residency restrictions.

The era of impunity in Haiti is over.

We commend Kenya for its courageous leadership of the MSS mission under harrowing circumstances.

We thank The Bahamas, Belize, El Salvador, Guatemala, Jamaica, and Canada for their generous contributions.

We also recognize Panama's engaged leadership through diplomacy in New York as a vital partner on supporting Haiti through this time of unparalleled crisis and the draft Security Council resolution –and Guyana, as another regional champion of this effort on the Council.

Today, we call on the Security Council to authorize what Haiti has said they need urgently:  a new Gang Suppression Force or GSF—with a dedicated UN Support Office (UNSOH) to provide the logistical backbone and resources this mission needs to succeed.

The GSF must be empowered to secure territory, secure critical infrastructure, dismantle gangs, and work alongside Haiti's own security forces to restore baseline security for its people.

Help us improve

HaitiTPSAR000491

In parallel, the members of the OAS must work together to disrupt gang financing, arms trafficking, and other illicit flows fueling mass instability across Haiti and the region.

We ask our fellow OAS members to heed Haiti's call for additional voluntary contributions to the UN Trust Fund and complementary support through the OAS SECURE-Haiti platform to ensure the new force is properly resourced.

Burden-sharing will be key—every capable partner must lean in, whether through the contribution of personnel or similarly vital resources.

But restoring security alone will not bring lasting peace. Haiti's recovery depends on a return to elected governance through institutions that respond to the needs and demands of the Haitian people.

The international community cannot fulfill this role from the outside.

The time to build the Haiti that Haitians long to experience within their lifetimes is now.  We must see Haitians seize this moment to command their own future.

On the anniversary of the Inter-American Democratic Charter, we are reminded that democracy cannot flourish where criminals sow violence to rule through fear.

The OAS, CARICOM, and the United Nations must act swiftly and in full coordination to ensure coherence, legitimacy, and effectiveness.

Every OAS member state has spoken.  We urge the United Nations Security Council to hear our united voices and act without delay.

Haiti cannot wait—the time for urgent, coordinated action is now. Thank you.

HaitiTPSAR000492

UNITED STATES MISSION TO
THE UNITED NATIONS

By **UNITED STATES MISSION TO THE UNITED NATIONS**

OCTOBER 17, 2025

## EXPLANATION OF VOTE FOLLOWING THE ADOPTION OF A UN SECURITY COUNCIL RESOLUTION ON HAITI

Ambassador Jennifer Locetta
Alternative Representative for Special Political Affairs
New York, New York

AS DELIVERED

Thank you, President.

First, I would like to thank our co-penholder Panama for their constructive leadership on this resolution.

We welcome the extension of the mandate of the Haiti Panel of Experts and the renewal of the travel ban, asset freeze, and arms embargo measures for a further year.

These sanctions are key components of a broader international effort to promote peace and stability in Haiti – and within the region.

Just a few weeks ago, this Council passed a resolution for a Gang Suppression Force and a UN Support Office. These measures will restore security in Haiti and bring gangs to their knees.

Efforts to tackle immediate security threats in Haiti support a broader approach to address the multi-faceted drivers of instability.

That approach includes holding accountable those fueling further violence.

We welcome designating two individuals today:

Kempes Sanon, the leader of the Bel Air gang, who has played a significant role in consolidating gang power in Port au Prince, and Dimitry Herard, who has played a key role in enabling the activities of criminal networks and gangs in Haiti.

These designations complement action the United States took earlier today, when we domestically sanctioned Dimitri Herard for his support to the Haitian terrorist gang coalition, Viv Ansanm, and Kempes Sanon, whose Bel Air gang is one of the constituent gangs in the Viv Ansanm terrorist alliance.

While we applaud the Council for designating these individuals, the list is not complete. There are more enablers of Haiti's insecurity evading accountability.

We call on Council Members to provide full and unqualified support to these designations as we move forward.

Haiti deserves better.

Colleagues, we will continue pressing for more designations through the Security Council and its subsidiary bodies to ensure the sanctions lists are fit for purpose.

We are committed to the people of Haiti. And we intend to work closely with the Haitian government, fellow Council members, and all stakeholders to facilitate peace and prosperity for the country and the region.

Thank you.

###

**UNITED STATES MISSION TO**
**THE UNITED NATIONS**

# REMARKS AT A UN SECURITY COUNCIL BRIEFING ON HAITI

By **UNITED STATES MISSION TO THE UNITED NATIONS**

OCTOBER 22, 2025

Ambassador Mike Waltz
U.S. Representative to the United Nations
New York, New York

AS DELIVERED

Thank you, Mr. President. Thank you, Special Representative Massieu for your briefing, good to see you.

We agree, Haiti, which has had a long and difficult history, truly stands at a crossroad. The country faces an unprecedented crisis, as you laid out in your report, Special Representative, we have gangs that are terrorizing communities, extorting families, recruiting children to commit horrors on behalf of the gang leaders. The spillover effects of this violence threaten not only Haiti but the stability of the wider Caribbean and the Western Hemisphere.

The U.S. applauds the Council's adoption of the resolution transitioning the MSS mission to a Gang Suppression Force that's supported by, now, what will become a UN Support Office in Haiti, as well as the renewal of the sanctions regime on those leaders.

The U.S. is working closely with others in the Standing Group of Partners on the Suppression Force's swift expansion. This force will concentrate on Haiti's immediate, critical security challenges and lay the groundwork for what we hope to see, long-term stability.

The United States thanks in particular Panama and our co-pen, and thanks in particular to Kenya for its longstanding role, and all countries that have contributed and deployed under the former MSS mission to address this rampant, out-of-control insecurity that's going on in Haiti.

Going forward, the Gang Suppression Force and the Support Office will bolster Haiti's immediate security response, but long-term recovery will depend on the Haitian people. The era of impunity is over for these gang leaders who promote violence and undermine the country's stability and governance. Stability and security is the oxygen that any type of investment economy or governance needs to move forward.

The United States will remain relentless in pursuing those who undermine Haitian security and arm and finance these terrorist gangs. We will expand our use of all available tools, using all means necessary, including indictments, arrests, financial sanctions, arms seizures, visa and other immigration restrictions, to counter the impunity that robs Haitian children of their futures.

Now we will continue to support the Panel of Experts' work on sanctions targets to support Haiti. UN asset freezes and travel bans remain an important tool to promote maximum accountability of those contributing to, or complicit in, destabilizing activities in Haiti.

The international community must stand with Haiti as it takes back control of its country and restores democratic governance. The GSF, we are confident, will do its part to support security. However, the political class and private sector in Haiti must do their parts as well in support of a democratically elected government. We renew our call for all stakeholders to engage constructively and expeditiously to find a path forward. And again, we appreciate your work, sir. The particulars of that future, however, are a matter for the Haitian people to decide.

Colleagues, this is not a crisis that can be ignored or deferred. It demands urgent, coordinated, and decisive action. The people of Haiti cannot wait.

I thank you.

###

U.S. EMBASSY IN HAITI

# REMARKS AT A UN SECURITY COUNCIL BRIEFING ON HAITI

By **U.S. EMBASSY HAITI**

August 28, 2025
Ambassador Dorothy Shea
Acting U.S. Representative
New York, New York

**AS DELIVERED**

Thank you, Mr. President, and thank you Secretary-General António Guterres, Executive Director Catherine Russell, and Mr. Jean Jean Roosevelt for your briefings.

The United States remains concerned about escalating levels of violence in Haiti. The territorial expansion of the gangs threatens to undermine gains made by both the Haitian National Police and the Multinational Security Support mission.

We continue to condemn the recruitment of children in armed gangs and the disproportionate impact of gang violence on children. In 2024, Haiti was reported as one of the countries with the most violations and abuses against children, with the large majority committed by the Viv Ansanm coalition, which for the first time was listed in the Secretary-General's report on children and armed conflict.

Due to the violence, over 1.3 million people – half of them children – have been displaced. Children face constant risks of being killed or injured during gang attacks, police operations, or acts of mob justice. Forced recruitment by gangs and recurring incidents of sexual violence rob children of the peaceful lives they deserve.

Corruption and indiscriminate violence remain major issues. We have taken concrete steps to counter impunity for those supporting violence in Haiti with the United States' designation of Viv Ansanm and Gran Grif as Foreign Terrorist Organizations and Specially Designated Global Terrorists. We applaud this Council for the recent designation of Viv Ansanm and Gran Grif as well. This sends an important message from the international community that we hold bad actors and entities to account.

The United States recently announced a $5 million reward for information leading to the arrest of gang leader Jimmy Cherizier, also known as Barbecue. In addition, we remain committed to the removal and prosecution of criminals and enablers hiding in the United States who contribute to the violence and destruction in Haiti.

These significant steps taken by the United States demonstrate the Trump Administration's commitment to countering these criminal gangs and foreign terrorist organizations.

Mr. President, food insecurity also remains a pressing concern. Active humanitarian and lifesaving assistance awards continuing in Haiti include U.S.-grown emergency food aid, nutrition support, logistics, shelter, clean water, and medical services for crisis-affected Haitians. This sort of programming addresses critical needs like food, shelter, medical care for violence-affected children and survivors of sexual violence, cholera treatment and prevention, hygiene, and malnutrition treatment for families and children.

In June, the Organization of American States (OAS) General Assembly and the United States co-sponsored a resolution which passed unanimously to galvanize action for Haiti and to complement efforts here at the UN. Moreover, the United States continues to work with the OAS as it proceeds with its roadmap for Haiti. This is an important step towards the regional leadership we expect on such shared regional challenges.

Mr. President, with respect to the MSS mission, the United States thanks Kenya for its dedication, leadership and support for over the past year. Kenya answered Haiti's call at a critical moment, demonstrating an enormous compassion and courage, putting its people in harm's way thousands of miles from home, and preventing a complete collapse of the Haitian state. Without the presence of the MSS mission, the gangs would have been even more emboldened in their ambitions and brazen atrocities against civilians in Haiti.

We would also like to thank The Bahamas, El Salvador, Belize, Guatemala, and Jamaica, for contributing personnel towards this effort, and to Canada for its sizable contribution to the UN Trust Fund and to the planning efforts. As we look to combat the threat of terrorist gangs looking to topple the State, we must ensure an even greater share of the international community is invested in the fight.

To address this, today, the United States and Panama are sharing a draft UN Security Council resolution with this Council to help address the growing violence by establishing a Gang Suppression Force and creating a UN Support Office to provide logistical support to [...]rts on the ground. We urge Council members: join us – join us in responding to the call from the Haitian government, as we forge a [...]ath towards peace and security, and establish the UN Support Office to properly, and sustainably, resource this effort. This will [...]ure the mission has the tools at its disposal to take the fight to the gangs and ensure that the Haitian state can meet the foundational needs of its people.

Help us improve

President, we note the next international force must be resourced to hold territory, secure infrastructure, and complement the Haitian National Police. In parallel, a comprehensive approach is required to disrupt gang financing, arms trafficking, and other illicit flows fueling instability.

To make meaningful progress on this collective challenge, we need international stakeholders and donors to come to the table and join the United States, Panama, and others who have demonstrated their commitment to Haiti's security, in meaningful burden sharing to help promote stability in Haiti. We stand with the Haitian people as they seek a secure, stable future for their country. We remain committed to working with the international community to drive progress forward in Haiti, and call on all Council members to take concrete action in support of this effort.

I thank you.

**UNITED STATES MISSION TO THE UNITED NATIONS**

## U.S. REPRESENTATIVE TO THE UNITED NATIONS, AMBASSADOR MIKE WALTZ'S, INTERVIEW WITH MARTHA MACCALLUM ON FOX NEWS

By **UNITED STATES MISSION TO THE UNITED NATIONS**

OCTOBER 1, 2025

Ambassador Mike Waltz
U.S. Representative
New York, New York

AS DELIVERED

**MARTHA MACCALLUM:** With that, we bring in U.S. Ambassador to the United Nations, Michael Waltz, also retired Green Beret, of course, and great to have you here Ambassador Waltz. Thank you very much for being here.

**AMBASSADOR MIKE WALTZ:** Thanks, Martha.

**MACCALLUM:** I'm hoping to get a few different topics in here, but let me get your **–** first your take on what has happened here, and if you think there is real momentum, and why would Hamas give up the only leverage that they have, which are these 20 human beings?

**AMBASSADOR WALTZ:** Well, what a **–** I mean, just what a change. What a shift, just in the last week that only President Trump, Secretary Rubio, Steve Witkoff and his team could pull off. Just a week ago, you had Macron, and the Brits, and others recognizing some sort of Palestinian state, I don't know. All the pressure on Israel. And now, just a short time later, you have all of the Arab nations, you have Muslim-majority countries like Indonesia and Türkiye, all agreeing to President Trump's plan. A real plan, 20 points put on the table to end the war, free the hostages, rebuild Gaza, and importantly **–** as we've said in the UN today **–** make sure this never happens again, with the disarming of Hamas, and the destruction of Hamas.

So, look, at the end of the day, it's going to be about making sure this can never happen again. And the message that came loud and clear from the Oval Office this week **–** where, by the way, the President had Prime Minister Netanyahu call the Qataris and apologize right there from the Oval Office for that strike **–** is that this has to get done, and it's going to get done, as the President said, the easy way or the hard way.

**MACCALLUM:** So, the suggestion in the *Axios* reporting is this, "Trump told Bibi (Netanyahu), in no uncertain terms: Take it or leave it. And leave it means we walk away from you," in terms of agreeing to this plan. You know, this is the plan, and there were some changes made on the edges by both sides in terms of what we understand. But it appears, according to this piece, that the President has lost some patience with the leadership in Israel and that he wants this done, and he does not want to hear that they're not going to stand by this plan. What do you say to that?

**AMBASSADOR WALTZ:** Well, Prime Minister Netanyahu said it right there, from, you know, right there, from the White House. No president has been better for Israel ever, and certainly in his lifetime, between recognizing Jerusalem as the capital, the Golan Heights, taking out Iran's nuclear program, and on and on. So, certainly, President Trump has been good for Israel, unlike any other president, and when he says, 'Look, you've got to swallow some tough pills so that we end this war, we end the suffering, we get the hostages out.' I think Prime Minister Netanyahu is wise to listen.

**MACCALLUM:** Yeah. Interesting. I want to play this from President Trump at the UN, you know, sort of scolding the body last week. Let's watch.

***PRESIDENT DONALD J. TRUMP:*** *I ended seven wars, dealt with the leaders of each and every one of these countries, and never even received a phone call from the United Nations offering to help... Later, I realized that the United Nations wasn't there for us. They weren't there... What is the purpose of the United Nations?*

**MACCALLUM:** That's an excellent question. So now you are there. We're very glad to have you here in New York. What is the purpose of the United Nations, Ambassador Waltz?

**AMBASSADOR WALTZ:** Well, as President Trump said, and I've said to my colleagues all week long, we have to get the UN **–** and said to the Secretary-General **–** we have to get the UN back to basics of promoting peace, enforcing peace, preventing wars. We have to cut out all of this other nonsense. They have seven agencies, independent agencies, focused on climate. There's this kind of war with the SG on American energy and fossil fuel producers, this obsession with gender **–** and I mean we see this in our own government. It's on steroids here in the UN.

**MACCALLUM:** Is there openness to that at the UN?

**UNITED STATES MISSION TO THE UNITED NATIONS**

President of peace. He puts diplomacy first. And the UN is that forum, should be that forum. And I think under his leadership, he can be again, and I'd be proud with my team to be the tip of the spear for President Trump's diplomacy.

There's also, very importantly, there's all kinds of these international bodies that affect our economy, that touch standards for AI, aviation, space, telecommunications, international shipping. If we're not present there, blocking and tackling the Chinese, the Russians, and the rest of the world will be. So, you know, just as we want to deregulate, keep the federal government out of their way, we certainly want to keep this globalist, multinational governments out of the way, too.

**MACCALLUM:** Two quick things before we let you head back to over there to Turtle Bay. Maduro, Nicolas Maduro facing criminal charges in the United States, according to the Secretary of State, Marco Rubio. He calls him a fugitive from American justice. Where is this going?

**AMBASSADOR WALTZ:** Well, look, I think the President's been clear. Secretary Rubio has been clear that these cartels, these gangs, these drugs that are killing hundreds of thousands, if not millions over time, of Americans, are a clear national security threat. It's a priority for the President and the Secretary. We in the UN Security Council just took action yesterday on the gangs that have taken over Haiti, right off Florida's shores. These gangs are in coordination with all of these transnational groups. They're shipping drugs, money, weapons. They're destabilizing the entire region.

**MACCALLUM:** Will we be bombing those boats too, from Haiti?

**AMBASSADOR WALTZ:** Well, we just created under the umbrella of the UN, the Gang Suppression Force, and two principles there: one, unlike the past, we're going to go on offense. When you have gang leaders like Barbecue that are destabilizing so much of our region, right off our shores. But number two, the burden sharing. The U.S. shouldn't have to do all of this alone. So, we have the Kenyans, Panama, countries from the region also stepping up, and that's a key principle. The President's America First policy is help out – and everyone needs to step up.

**MACCALLUM:** Decades ago, the UN was involved in military action. Would the UN support taking out these gang boats from Haiti that are bringing these dangerous things to our shores?

**AMBASSADOR WALTZ:** Well, that's the action of our great U.S. Navy, but they did just authorize – the Security Council just authorized yesterday — a mandate and rules of engagement to go on offense on these gangs.

**MACCALLUM:** All right, we look forward to seeing your work at the United Nations, and we hope you'll come back soon to talk about it with us. Thank you very much, Ambassador Waltz.

###

# Haiti's Many Problems and Very Few Solutions, Explained

A search for a solution to the crisis in Haiti is growing more urgent as gangs gain territory and thousands more flee their homes.

 ▶  **Listen to this article · 10:01 min**  Learn more

**By Frances Robles**

Reporting from Florida

Nov. 17, 2024

Haiti, a nation rocked by gang cruelty and plagued with political infighting, has — so far this year — had three prime ministers, seen at least 4,000 people killed and experienced brutality from armed groups so intense that it forced an extended closure of its international airport, twice.

But despite $600 million spent by Washington on an international police force to restore order, an explosion of violence last week underscored the enormity of a crisis so severe that the Federal Aviation Administration has barred U.S. aircraft from flying under 10,000 feet in Haitian airspace to avoid being shot at by gangs.

With another interim prime minister in place, but gangs gaining territory every day, Haitians are desperate for relief. Efforts to stabilize Haiti are floundering, and the country presents a dangerous and disastrous challenge as President-elect Donald J. Trump prepares to take office.

Few people seem to have answers.

"I am at a complete loss," said Susan D. Page, a University of Michigan Law professor and former United Nations official in Haiti. "Everyone is just kind of astounded."

HaitiTPSAR000499

Case 3:25-cv-01766-EMC   Document 257-4   Filed 01/01/26   Page 50 of 50

# What's going on?



The inside of an armored vehicles as Kenyan officers, who make up the largest part of a multinational force, patrolled near the National Palace.   Adriana Zehbrauskas for The New York Times

Haiti has experienced a long-simmering crisis for about 15 years, a period marked by a devastating earthquake, squandered aid dollars, tarnished international interventions and flawed presidential elections.

In 2021, the president, Jovenel Moïse, was assassinated in his house. The United States played a hand in deciding who would become the next prime minister, but many Haitians opposed the choice, Ariel Henry. During his three-year tenure, killings and kidnappings by well-armed gangs surged.

HaitiTPSAR000500