LIVE: Trump administration    LIVE: Illegal gambling cases    East Wing demolition    Mortgage rates    US stocks

WORLD NEWS

# Haiti's first domestic flight takes off since gangs halted commercial air travel last year

BY EVENS SANON

Updated 4:53 PM EDT, June 12, 2025

Leer en español

PORT-AU-PRINCE, Haiti (AP) — Haiti's first commercial flight in seven months took off Thursday from the capital and headed to the northern city of Cap-Haitien, where excited passengers hoped to reunite with friends, relatives and business associates.

The Sunrise Airways flight of 19 passengers was the first such flight departing from Port-au-Prince since gang violence halted the airport's operations in November. So far, only domestic flights are resuming, with no timetable yet for international ones.

"It's been over a year since I've traveled," James Jean-Charles said. "The country is infested with gangs. You can't go by road."

Jean-Charles, 41, smiled wide when he explained he was going to visit his parents and cousins in the coastal city after struggling to stay in touch with them via phone because of poor connectivity.

Inside the Guy Malary terminal, which is used for domestic flights, people gathered around a restaurant serving coffee, goat, chicken and plantains.

Awaiting Sunrise Airway's second flight of the day was Garry Jean-Pierre, a computer technician.

HaitiTPSAR000701

"I finally found a way to get there and not lose the contracts I had," he said of his upcoming trip to Cap-Haitien.

**RELATED STORIES**



**FAA extends ban on US commercial flights to Haiti's capital to March**



**Haitians mourn at collective funeral after deadly drone attack**

HaitiTPSAR000702



**Haitians warily welcome a new international force as concerns persist**

It's been a year since he last visited, but it never crossed his mind to travel by road, where gang members are known to open fire randomly on vehicles.

"I would not take the risk," he said. "You don't know when they'll decide to kill."

Outside the Guy Malary terminal, the parking lot was packed with cars as workers hauled luggage and men working in the black market exchanged U.S. dollars and Haitian gourdes.

"This is very good," said taxi driver Marc Jean-Baptiste as he observed people bustling. "I couldn't properly care for my family."

He said he hoped that international flights to Port-au-Prince would restart soon, but that's unlikely to happen.

The Toussaint Louverture airport in Port-au-Prince closed in mid-November for the second time last year after gangs opened fire on a Spirit Airlines flight as it prepared to land, striking a flight attendant who suffered minor injuries.

Other commercial planes were hit that day, prompting Spirit, JetBlue and American Airlines to cancel their flights to Port-au-Prince. None of those flights have resumed.

While the main international airport reopened in December, there were no commercial flights operating until Thursday.

The resumption of domestic flights marks a rare success in Haiti's fight against gangs that control at least 85% of Port-au-Prince.

A powerful gang federation previously forced the main international airport to close for nearly three months in early 2024.

HaitiTPSAR000703



**Trump levies new sanctions on Russian oil giants in a push on Putin to end Ukraine war**

## MOST READ



1  US hits $38 trillion in debt, after the fastest accumulation of $1 trillion outside of the pandemic

2  NBA head coach and player charged in sprawling sports betting and Mafia-backed poker schemes

3  Prime Minister Mark Carney says Canada will double its non-US exports as Canadians can't rely on US

4  Maine Senate candidate Platner says tattoo recognized as Nazi symbol has been covered

5  Vance calls Israel's parliament vote on West Bank annexation an 'insult'

HaitiTPSAR000704

## SUGGESTED FOR YOU





**How is PMI U.S. Invested in America? Learn more.**

Advertisement: U.S. businesses of PMI Inc.



**Leverage a powerful platform designed for self-directed traders.**

Advertisement: TradeStation



**What makes infrastructure an attractive asset class? Find out here.**

Advertisement: Stonepeak



**Here Are 29 of the Coolest Gifts for This 2025**

Advertisement: Consumerbags

NEW: The Effects of the US Foreign Aid Freeze on Freedom House



FREEDOM IN THE WORLD 2024

Donate

# Haiti

NOT FREE

## 30

/100

| Political Rights | 11 /40 |
|---|---|
| Civil Liberties | 19 /60 |

LAST YEAR'S SCORE & STATUS

31 /100  ● Not Free

A country or territory's Freedom in the World status depends on its aggregate Political Rights score, on a scale of 0–40, and its aggregate Civil Liberties score, on a scale of 0–60. See the methodology.



*Share*  

# Overview

Worsening breakdowns of the Haitian electoral system in recent years have led to a series of expired mandates and constitutional impasses, leaving citizens without proper political representation. The government's ability to function was further impacted by the 2021 assassination of President Jovenel Moïse; Prime Minister Ariel Henry, whom Moïse appointed before his death, rules by decree and has not made progress in preparing new elections. Rampant corruption and violence by armed criminal groups undermine basic services and contribute to pervasive physical insecurity. The judiciary and law enforcement agencies lack the resources, independence, and integrity to uphold due process and the rule of law and are additionally targeted by criminal groups. Antigovernment protests often result in excessive use of force by police.

# Key Developments in 2023

- In February, Prime Minister Henry installed the High Transition Council (HCT) to prepare for elections expected in 2024. The

HaitiTPSAR000706

council was considered ineffective be civil society and its secretary general was kidnapped in October.

- In October, the UN Security Council voted in favor of a multinational force to provide security in Haiti, after the Kenyan government said it would provide 1,000 police officers for that mission in late July. That multinational force was not deployed by year's end, however.
- Criminal violence continued to rise in Haiti. A UN report counted 4,789 homicides in the country in 2023, a 119.4 percent increase over 2022. Kidnappings, meanwhile, increased by 83 percent from 2022 to 2023.
- In April, the Bwa Kalé vigilante movement began lynching suspected gang members, sometimes benefiting from police support; Bwa Kalé members killed 420 people in the first nine months of the year. Gangs went on to retaliate by engaging in revenge killings and by forming the Zam Kalé to counter the vigilante movement.

# Political Rights

## A. Electoral Process

| **A1**  0-4 pts | |
|---|---|
| Was the current head of government or other chief national authority elected through free and fair elections? | 1 / 4 |

In Haiti's semipresidential system, the president is directly elected for a five-year term. The prime minister is appointed by the president and confirmed by Parliament. Jovenel Moïse of the Haitian Tèt Kale Party (PHTK), the handpicked successor of Michel Martelly, won the 2015 presidential election, but the results were nullified due to extensive fraud. Moïse won a repeat election in 2016, taking 55.6 percent of the vote. The events surrounding the repeat election later resulted in a political and legal dispute over whether Moïse's term expired in February 2021, five years after the end of Martelly's term, or February 2022, five years after Moïse's inauguration.

Moïse frequently replaced the prime minister during his tenure, but after the terms of most lawmakers expired in early 2020, his appointees were unable to obtain parliamentary approval in keeping with the constitution. In 2021, after Claude Henry submitted his resignation, Moïse appointed Ariel Henry through a decree published in the official state newspaper, *Le Moniteur*.

Moïse was assassinated days after naming Henry, who had not been installed. The assassination set off a dispute among local political, civic, and economic actors as to who should head the executive branch, but key diplomatic representatives in the country—known as the Core Group—called on Henry to lead the government, and Claude Joseph stepped down. Henry dismissed the Provisional Electoral Council (CEP) and postponed already-overdue general elections in late 2021. Henry remained in his post at the end of 2023.

| **A2**  0-4 pts | |
|---|---|
| Were the current national legislative representatives elected through free and fair elections? | 0 / 4 |

The directly elected, bicameral Parliament is composed of a Senate, with 30 members who serve six-year terms, and a Chamber of Deputies, with 119 members who serve four-year terms. The 2015 legislative elections were plagued by disorder, fraud, and violence; runoff polls held in 2016 were marred by fraud and low turnout.

The legislative branch in Haiti is effectively nonexistent. Parliament was dissolved in 2020, and the mandate of 10 senators expired in January 2023, leaving no elected legislators. Elections have not yet been organized.

| **A3**  0-4 pts | |
|---|---|
| Are the electoral laws and framework fair, and are they implemented impartially by the relevant election management bodies? | 2 / 4 |

HaitiTPSAR000707

The CEP was established in the late 1980s as a temporary body. Despite constitutional safeguards against executive dominance of the CEP, the executive asserted significant control in practice. In 2020, Moïse appointed a new CEP by decree which human rights observers called unconstitutional. Plans to hold a constitutional referendum and elections in 2021 were scuttled that September; Henry dismissed the CEP and pledged to assemble a new council with broader legitimacy.

In 2021, political and civil society leaders produced the Montana Accord, under which a transitional government would preside over new polls. In late 2022, Henry signed on to a different document that called for polls in 2023 and the 2024 installation of an elected government. Henry installed the HCT in February 2023 with the aim of preparing elections that were expected in 2024, later than envisioned in the late-2022 agreement. Civil society actors consider the HCT to be ineffective. In October, HCT secretary general Anthony Virginie Saint-Pierre was kidnapped in Port-au-Prince. The incident exacerbated tensions between the HCT and Henry, who was criticized by the other members of the council for the government's response to the kidnapping.

# B. Political Pluralism and Participation

| **B1**  0-4 pts | |
|---|---|
| Do the people have the right to organize in different political parties or other competitive political groupings of their choice, and is the system free of undue obstacles to the rise and fall of these competing parties or groupings? | **1** / 4 |

Legal and administrative barriers that prevented some parties from registering or running in past elections have largely been eliminated. The number of members required to form a political party was reduced from 500 to 20 in 2014, leading to the creation of dozens of parties. However, pervasive insecurity, repressive authorities, and criminal violence impair political activity. Political actors have long employed criminal gangs to impede their opponents, further restricting competition.

Criminal violence is pervasive. The United Nations reported 2,490 kidnappings in a report covering events in 2023, 83 percent more than the 1,359 recorded in 2022. Gangs continue to control neighborhoods and strategic roads connecting Port-au-Prince to the rest of the country, with 200 and 300 armed groups controlling over 75 percent of territory in the capital. This remains a significant obstacle to political organization, as these groups are generally controlled by political actors.

| **B2**  0-4 pts | |
|---|---|
| Is there a realistic opportunity for the opposition to increase its support or gain power through elections? | **1** / 4 |

Haiti has a poor record of peaceful democratic transfers of power. It remains difficult for the opposition to increase its support or gain power through elections, which are regularly disrupted by violence, marred by accusations of fraud, and postponed. The February 2023 creation of the HCT has not presaged an improvement.

| **B3**  0-4 pts | |
|---|---|
| Are the people's political choices free from domination by forces that are external to the political sphere, or by political forces that employ extrapolitical means? | **1** / 4 |

Haitians' political choices are marginalized by corrupt patronage networks, organized crime, and foreign actors. Many politicians have relied on money linked to drug trafficking, gang activity, and other illegal sources to finance their campaigns. The PHTK and opposition parties have enlisted armed criminal groups to either incite or halt residents' involvement in protests and other political activities, according to local human rights activists.

Citizens' democratic autonomy was further harmed by the assassination of President Moïse and its aftermath. In addition to the violence and criminality associated with the murder itself, many observers decried the role of the Core Group—comprising ambassadors or representatives from Brazil, Canada, France, Germany, Spain, the United States, the European Union, the Organization of American States, and the United Nations—in accepting Henry as prime minister.

HaitiTPSAR000708

In some areas, armed criminal groups exert explicit control over people in the territory they control. In a report covering the third quarter of 2023, the UN Integrated Office in Haiti (BINUH) reported incidents where people were detained or executed for disobeying armed groups' instructions.

| **B4** 0-4 pts | |
|---|---|
| Do various segments of the population (including ethnic, racial, religious, gender, LGBT+, and other relevant groups) have full political rights and electoral opportunities? | **2** / 4 |

Haitian women are underrepresented in political life, with only four parliamentary seats held by women from 2017 to 2019. The constitution mandates that 30 percent of public officials be women, but there are no penalties for noncompliance. Election-related violence and social and cultural norms discourage women from participating in politics. Due to societal discrimination, the interests of LGBT+ people are not represented in the political system, and there are no openly LGBT+ politicians.

# C. Functioning of Government

| **C1** 0-4 pts | |
|---|---|
| Do the freely elected head of government and national legislative representatives determine the policies of the government? | **1** / 4 |

The current head of government has not been freely elected, and there are no national legislative representatives to determine government policy. The prime minister and his self-appointed and approved cabinet make policy unilaterally, and Henry rules by decree. Ariel Henry's 2021 appointment to the premiership was not approved by Parliament, which was dissolved in 2020 as most of its members lost their electoral mandates. Before his assassination, Moïse attempted to rule by decree; the legitimacy of his actions was questioned, since only members of Parliament have the constitutional authority to pass laws.

Corruption, instability, and security threats hinder the government's ability to carry out its own policies and provide basic services. In late 2022, for example, the G9 an Fanmi e Alye (Family and Allies) alliance of gangs blockaded the country's main fuel terminal after the Henry government announced a reduction in fuel subsidies. The government reclaimed control of the terminal after reportedly negotiating with the armed groups.

In October 2022, Henry called for other countries to send troops into the country. The UN Security Council showed its support for a multinational force in an October 2023 vote, after Kenya's government said it would provide 1,000 police officers for that mission. The force, which was not deployed by year's end, had some popular support within Haiti but also received criticism from residents, members of the diaspora, and civil society for want of a representative government to call on or manage such a force.

| **C2** 0-4 pts | |
|---|---|
| Are safeguards against official corruption strong and effective? | **1** / 4 |

The country's anticorruption framework is weak and corruption is widespread in Haiti, as are allegations of impunity for government officials. Anticorruption bodies remain targets for violence committed by armed groups.

A 2017 law reduced the independence and powers of the Central Financial Intelligence Unit (UCREF), which investigated money-laundering cases. Also in 2017, Moïse replaced the heads of the Anticorruption Unit (ULCC) and the UCREF with political allies and former members of the Michel Martelly administration. Under a 2020 decree, procurement-related opinions issued by the Superior Court of Audits and Administrative Disputes were made advisory and nonbinding. In a 2022 report, the ULCC warned that corruption remained widespread in national and local government bodies.

In June 2023, the US State Department prevented former prime minister Laurent Lamothe from entering the United States, saying he was involved in corruption. In its September update to the UN Security Council, a panel of experts noted that few cases sent to the

HaitiTPSAR000709

judiciary from the UCREF and ULCC resulted in convictions. The panel also noted that official corruption remained pervasive, affecting the judiciary and the police.

| C3  0-4 pts | |
|---|---|
| Does the government operate with openness and transparency? | **1** / 4 |

Haitians' general distrust of the government stems in large part from the absence of transparency and accountability measures that are needed to reduce corruption. There are no access-to-information laws, and it is reportedly very difficult to obtain government documents and data in practice. A 2020 presidential decree that created the National Intelligence Agency (ANI) granted it total secrecy and the ability to conduct surveillance on individuals and businesses at any time, even if there is no relevant ongoing investigation.

# Civil Liberties

# D. Freedom of Expression and Belief

| D1  0-4 pts | |
|---|---|
| Are there free and independent media? | **1** / 4 |

The constitution includes protections for press freedom and the media sector is pluralistic, but the work of journalists is constrained by threats and violence, government interference, and a lack of financial resources. Journalists have died at the hand of police forces and criminal groups while on assignment.

In October 2023, the special rapporteur for freedom of expression at the Inter-American Commission on Human Rights (IACHR) said that three journalists had been killed in circumstances related to insecurity over the year to date. The IACHR's rapporteur additionally reported that at least 12 journalists had fled their homes in Carrefour-Feuilles over the preceding month. Also in October, the Committee to Protect Journalists (CPJ) reported that at least six journalists had been kidnapped and released in the preceding eight months, with journalistic activity being a common motive for those crimes.

| D2  0-4 pts | |
|---|---|
| Are individuals free to practice and express their religious faith or nonbelief in public and private? | **3** / 4 |

Freedom of religion is constitutionally guaranteed, and religious groups generally practice freely. However, the traditionally dominant Roman Catholic and Protestant churches and schools receive certain privileges from the state, while Vodou religious leaders have experienced social stigmatization and violence for their beliefs and practices. The government has denied registration to the country's small Muslim communities.

While worshippers are not targeted by armed groups for their religious beliefs, criminal activity is impacting the freedom to practice religion peacefully. Armed groups have increasingly targeted churches and other gathering places for kidnappings, doing so openly and with little to no police response. In October 2023, for example, armed men wearing police uniforms kidnapped several worshippers at a church in Port-au-Prince, killing a police officer as they escaped; police later killed an individual who was allegedly involved in the kidnapping.

| D3  0-4 pts | |
|---|---|
| Is there academic freedom, and is the educational system free from extensive political indoctrination? | **2** / 4 |

HaitiTPSAR000710

Educational institutions and academics choose their curriculum freely, but university associations and student groups that protest government actions are often met with police violence. Academic freedom is also negatively affected by the general climate of insecurity, and some scholars may self-censor to avoid conflicts with powerful groups or individuals.

| D4 | 0-4 pts | |
|---|---|---|
| Are individuals free to express their personal views on political or other sensitive topics without fear of surveillance or retribution? | | 2 / 4 |

There are some formal constraints on the expression of personal views, including criminal defamation laws. The risk of violent reprisal also serves as a deterrent to unfettered discussion of sensitive issues such as corruption, gangs, and organized crime. The government has been accused of using criminal gangs to help suppress dissent. Private discussion is also constrained by the risk of kidnapping, which is a common occurrence in Haiti.

# E. Associational and Organizational Rights

| E1 | 0-4 pts | |
|---|---|---|
| Is there freedom of assembly? | | 2 / 4 |

Freedom of assembly is constitutionally enshrined but often violated in practice. Police have used excessive force including live rounds of ammunition to disperse protesters. Criminal violence has also affected the ability to demonstrate.

In August 2023, several thousand protesters demonstrated against gang-related violence in Port-au-Prince, with some protesters destroying official vehicles. Police used tear gas in response. Later that month, protesters in Port-au-Prince marched in an area controlled by an armed criminal group to demonstrate against gang-related violence; several protesters were shot and killed. Police later said that the protesters ignored security arrangements and confronted gang members.

| E2 | 0-4 pts | |
|---|---|---|
| Is there freedom for nongovernmental organizations, particularly those that are engaged in human rights– and governance-related work? | | 1 / 4 |

Numerous domestic and international nongovernmental organizations (NGOs) operate in Haiti, but human rights defenders and activists who address sensitive topics are subject to threats and violence, which creates a climate of fear. The National Human Rights Defense Network (RNDDH) claimed that a gang leader and a politician plotted to kill its director in a 2022 meeting.

Violence against activists is rarely investigated or prosecuted. Among other high-profile cases, the 2020 assassination of Port-au-Prince Bar Association head Monferrier Dorval remained unsolved in 2023.

Human rights and good governance groups continue to face threats due to the nature of their work. In August 2023, the RNDDH said that a police officer attacked its offices after the group accused the National Police and the government of complicity in rising violence to justify a call for foreign intervention.

| E3 | 0-4 pts | |
|---|---|---|
| Is there freedom for trade unions and similar professional or labor organizations? | | 1 / 4 |

The right to unionize is legally protected and strikes are not uncommon. However, the union movement in Haiti is weak and lacks collective bargaining power in practice. Most citizens are informally employed. Workers who engage in union activity frequently face harassment, suspension, termination, and other repercussions from employers, though union workers enjoy public support.



HaitiTPSAR000711

# F. Rule of Law

| **F1**  0-4 pts | |
|---|---|
| Is there an independent judiciary? | **1** / 4 |

The Haitian judiciary faces a multitude of challenges including corruption, safety concerns, a lack of accountability, political interference, and arbitrariness in operations, rendering the justice system ineffective by any standard. The judiciary system struggles with internal corruption but also struggles to uphold accountability and carry out its functions as defined by the law. As president, Jovenel Moïse made judicial appointments beyond the authority of his office and interfered with judges who investigated politically sensitive matters.

After Moïse's 2021 assassination, a number of judges assigned to the case resigned for security-related reasons. Other officials who were involved in the investigation received death threats. In December 2023, Judge Marthel Jean Claude, who was presiding over the Monferrier Dorval case, stepped aside for security-related reasons. Jean Claude was the third judge hearing that case to do so.

In an October 2023 report that covered a 2022–23 reporting period, the RNDDH noted the unconstitutional appointment of judges to the Supreme Court and the arbitrary firing and replacement of magistrates.

| **F2**  0-4 pts | |
|---|---|
| Does due process prevail in civil and criminal matters? | **1** / 4 |

Constitutionally protected due process rights are regularly violated in practice. Arbitrary arrest is common, as are extortion attempts by police and at all levels of the legal system. Most suspects do not have legal representation. Those who do suffer from long delays and case mismanagement. In its third-quarter 2023 report, the BINUH said 84 percent of all detainees were held on a pretrial basis as of September 30. Many have never appeared before a judge despite the legal requirement of a court hearing within 48 hours of arrest, and some detainees have waited years for a trial.

Prison conditions are especially poor. Facilities are overcrowded and understaffed. The BINUH reported a cell-occupancy rate of 331 percent at the end of the third quarter of 2023. In a June article, the Associated Press reported that prisoners were facing malnourishment and illness. A 2022 UN report said that 185 inmates had died that year, many due to malnutrition.

In 2021, Prime Minister Henry dismissed the justice minister and a chief prosecutor after investigators under their supervision uncovered evidence that appeared to link Henry to a top suspect in the Moïse assassination, prompting accusations that Henry was obstructing justice. Some progress on the case was reported in Haiti and elsewhere in 2023. Haitian police arrested Joseph Félix Badio, a former justice official, in connection with the case in October. In December, a US judge handed a life sentence to former Haitian senator John Joël Joseph for conspiring to kill Moïse. Haitian prosecutors were preparing to interview Henry over the case that same month.

| **F3**  0-4 pts | |
|---|---|
| Is there protection from the illegitimate use of physical force and freedom from war and insurgencies? | **0** / 4 |

A culture of impunity in law enforcement leaves civilians in Haiti with little protection from the illegitimate use of force, and police and civilians are subject to lethal attacks by heavily armed criminal groups.

A UN report counted 4,789 homicides in Haiti in 2023, a 119.4 percent increase over the number of homicides counted in 2022. The Cité Soleil and Carrefour-Feuilles sections of Port-au-Prince remain under the control of armed groups, which have expanded into other areas like the department of Artibonite.

HaitiTPSAR000712

Armed groups, faced by a weak and corrupt police force, now attack churches, schools, shops, and private homes. Homes are often set on fire, contributing to mass internal displacement. According to the International Organization for Migration (IOM), over 310,000 people were internally displaced as of December 2023, many of them due to violence.

In April 2023, the Bwa Kalé, a spontaneous vigilante movement, began lynching suspected gang members. According to the Office of the UN High Commissioner for Human Rights, Bwa Kalé participants killed over 420 people in the first nine months of the year, sometimes with police support. Gangs went on to retaliate by engaging in revenge killings and forming the Zam Kalé to counter the vigilantes.

Armed groups subject women, girls, and LGBT+ people to sexual violence.

Police are regularly accused of abusing suspects and detainees. Police have also been known to use extreme force to repress protests. Police are rarely held accountable for their use of physical force.

*Score Change: The score declined from 1 to 0 due to a continued rise in killings, kidnappings, and other criminal acts throughout the country.*

| F4 0-4 pts | |
|---|---|
| Do laws, policies, and practices guarantee equal treatment of various segments of the population? | 1 / 4 |

Discrimination against women, the LGBT+ community, and people with disabilities is pervasive. Among other problems, women face bias in employment and disparities in access to financial services.

A reformed yet highly contested penal code was published in 2020 by executive decree and was set to take effect in 2022, but its implementation was delayed to 2024. It prohibits gender-based violence, sexual harassment, and discrimination on the basis of sexual orientation, which occur regularly in practice. Conservative cultural and religious groups objected to the new code in part because it lowered the age of consent.

# G. Personal Autonomy and Individual Rights

| G1 0-4 pts | |
|---|---|
| Do individuals enjoy freedom of movement, including the ability to change their place of residence, employment, or education? | 1 / 4 |

The government generally does not restrict travel or place limits on the ability to change one's place of employment or education. However, insecurity has prevented free movement, particularly in Port-au-Prince, as most roads are controlled by criminal groups, and many residents avoid unnecessary travel due to widespread gang violence. Haitians' ability to leave the country has also been impacted by an increase in passport processing prices.

The IOM counted over 310,000 internally displaced people as of December 2023, many of whom fled Port-au-Prince due to violence. Many displaced Haitians live in particularly poor conditions.

| G2 0-4 pts | |
|---|---|
| Are individuals able to exercise the right to own property and establish private businesses without undue interference from state or nonstate actors? | 1 / 4 |

Although the legal framework protects property rights and private business activity, it is difficult in practice to register property, enforce contracts, and obtain credit. Poor record-keeping and corruption contribute to inconsistent enforcement of property rights.

Business owners regularly face intensive extortion efforts on the part of criminal gangs. Criminal gangs are also known to demand

HaitiTPSAR000713

bribes or other support from officials. NGOs, meanwhile, have had to negotiate with criminal groups for access to territory and are pressured into providing financial assistance or hiring gang members. Businesses, particularly small businesses, frequently close due to insecurity.

| **G3**  0-4 pts | |
|---|---|
| Do individuals enjoy personal social freedoms, including choice of marriage partner and size of family, protection from domestic violence, and control over appearance? | **2** / 4 |

Basic freedoms related to marriage, divorce, and custody are generally respected. However, there are no laws specifically addressing domestic violence, which is a widespread problem. Both domestic violence and rape are underreported and rarely result in successful prosecutions. Spousal rape is not recognized as a criminal offense. Sexual violence has also become more common due to insecurity.

The government postponed the implementation of a reformed penal code in 2022, largely due to negative public reaction but also due to a lack of follow-through on its own part. It included provisions that would lower the consent age to 15 and decriminalize abortion in the first 12 weeks of pregnancy in cases of rape, incest, or harm to the pregnant woman.

| **G4**  0-4 pts | |
|---|---|
| Do individuals enjoy equality of opportunity and freedom from economic exploitation? | **0** / 4 |

Socioeconomic mobility is obstructed by entrenched poverty and inequality. Legal protections against exploitative working conditions in formal employment are weakly enforced, and most workers are informally employed. After workers protested for better pay, the government introduced new minimum wages for three wage classes in early 2022.

As many as 300,000 children work as domestic servants, often without pay or access to education; they are especially vulnerable to physical or sexual abuse. Other forms of child labor are common.

To escape dire social and economic conditions at home, many Haitians have risked human trafficking and dangerous land and sea journeys to reach countries including The Bahamas, Brazil, Chile, the Dominican Republic, Mexico, and the United States.

**On Haiti**
See all data, scores & information on this country or territory.
See More

*Country Facts*

Population
**11,580,000**

Global Freedom Score
**24** /100    ● Not Free

*Other Years*

2025

HaitiTPSAR000714



Join the Freedom House weekly newsletter

Subscribe

Our Issues                                    News & Perspectives
Countries                                     Reports
Policy Recommendations                        Events
Explore the Map                               About
Donate                                        Careers

ADDRESS

1850 M St. NW Floor 11
Washington, DC 20036

GENERAL INQUIRIES

PRESS & MEDIA

FOLLOW

Site Map                                      Privacy Policy
Contact Us                                    Content Permissions
Manage Subscriptions                          Disclosure Statements

@2025 FreedomHouse

HaitiTPSAR000715



HaitiTPSAR000716

# Global education fund announces $2.5 million grant for Haiti



© UNICEF/Ralph Tedy Erol A schoolgirl in Port-au-Prince holds up a sign in French which reads 'peace'.

**26 July 2024** Culture and Education

A UN-backed global fund that supports education in emergencies will provide $2.5 million to ensure that thousands of children affected by gang violence in Haiti can attend school in safety.

Yasmine Sherif, Executive Director of Education Cannot Wait (ECW), announced the grant on Friday in the capital, Port-au-Prince, during a high-level UN mission to the Caribbean country.

The aim is to reach nearly 75,000 children and adolescents in the hard-hit departments of Ouest, home to the capital city, and Artibonite.

## The power of education

Ms. Sherif urged world leaders not to turn their backs on the boys and girls of Haiti.

"With the power of education, we can protect these girls and boys from the grave risks of sexual violence, forced recruitment in armed groups and other human rights violations," she said.

"With the power of education, we can lift up an entire nation from a never-ending cycle of hunger, poverty, economic uncertainty and violence."

The UN Children's Fund (UNICEF) will deliver the grant in collaboration with the UN World Food Programme (WFP), and other local and international partners.

The funding will support back-to-school incentives, school feeding programmes, early childhood education, disability inclusion, mental health and psychosocial support, cash transfers to families in

HaitiTPSAR000717

need, and other support, to enable children's access to safe learning environments.

# Dire humanitarian needs

Haiti is experiencing unprecedented levels of lawlessness and brutality at the hands of coalitions of armed groups. The situation is compounded by climate change, recurring cyclones and earthquakes, including a devastating one in 2021 that claimed over 2,300 lives and caused severe damage.

Nearly half the population, some 5.5 million people, are dependent on humanitarian aid, while five million are facing acute hunger. Nearly 580,000 Haitians are displaced, a 60 per cent increase since the end of February.

The armed groups are targeting schools and hospitals, with concerning reports of ruthless forms of sexual violence, including gang rape. They are also accused of forced recruitment of children, with estimates that 30 per cent to 50 per cent of their members could be children.

# Education crisis unfolding

Furthermore, estimates indicate that 1.2 million school-aged children urgently need quality education.

Schools are being closed or used as displacement centres across the country. Around 919 schools are closed in Ouest and Artibonite departments alone, representing 10 per cent of all schools in these areas.

"The education crisis unfolding in Haiti is seriously close to becoming an education tragedy," said Bruno Maes, UNICEF Representative in the country.

"While enrolment rates were already low before the latest escalation of violence, school closures and mass displacement are robbing thousands more children of their opportunity to learn."

# Expanding investment globally

The grant brings total ECW funding in Haiti to more than $15.8 million.

Despite the urgent needs, ECW said the $30 million requirement for education response in Haiti – part of an overall humanitarian plan for the country - is less than 30 per cent funded, according to the UN humanitarian affairs office, OCHA.

ECW supports quality education for refugee, internally displaced and other crisis-affected children. The fund and partners are calling on world leaders to urgently mobilize an additional $600 million toward its three-year strategic plan.

These new resources will allow the fund to expand investments in Haiti and other crisis regions, to reach 20 million girls and boys.

♦ Receive daily updates directly in your inbox - **Subscribe here** to a topic.

♦ Download the UN News app for your **iOS** or **Android** devices.

**HAITICHILDREN**

HaitiTPSAR000718

GLOBAL
INITIATIVE
AGAINST TRANSNATIONAL
ORGANIZED CRIME

# A CRITICAL MOMENT

## HAITI'S GANG CRISIS AND INTERNATIONAL RESPONSES

ROMAIN LE COUR GRANDMAISON | ANA PAULA OLIVEIRA | MATT HERBERT

FEBRUARY 2024

**ACKNOWLEDGEMENTS**

The authors would like to thank the people in Haiti who made this investigation possible. Although for security reasons their names cannot appear in the report, their support and openness has been crucial to this work. The authors would also like to thank Mark Shaw for his comments, the editor and the Global Initiative Against Transnational Organized Crime (GI-TOC)'s Publications team for their support in reviewing and developing the report.

**ABOUT THE AUTHORS**

**Romain Le Cour Grandmaison** is a senior expert at the GI-TOC. His work focuses on criminal organizations, the state and violence in Haiti, Mexico and Central America. He has a PhD in political science from Sorbonne University.

**Ana Paula Oliveira** is a senior analyst in the GI-TOC's Global Policy team. She provides analysis on a range of international policy issues, including the impact of organized crime on human rights law and policy, human rights responses to transnational organized crime, cybercrime and organized crime violence in the context of illicit economies. Ana Paula has an LL.M. cum laude in international law from the Graduate Institute of International and Development Studies in Geneva.

**Matt Herbert** is the head of research for North Africa and the Sahel at the GI-TOC, overseeing applied field research and analysis on the political economy of organized crime in the two regions. He also co-leads the GI-TOC initiative on the use of targeted sanctions as tools to counter transnational organized crime and corruption. He has a PhD in international relations from the Fletcher School of Law & Diplomacy, Tufts University, with a sub-specialization in security studies, and law and development.

© 2024 Global Initiative Against Transnational Organized Crime
All rights reserved.

No part of this publication may be reproduced or transmitted in any form or by any means without permission in writing from the Global Initiative.

Cover photo: *Ricardo Arduengo/AFP via Getty Images*
Cartography: Rudi de Lange

Please direct inquiries to:
The Global Initiative Against Transnational Organized Crime
Avenue de France 23
Geneva, CH-1202
Switzerland

www.globalinitiative.net

HaitiTPSAR000720

# CONTENTS

Abbreviations and acronyms ............................................................................................................ 2

## Executive summary ...................................................................................................................... 3
Methodology ................................................................................................................................ 5

## Haiti's gangs: from territorial control to criminal governance ............................................. 6
The professionalization of gangs ............................................................................................... 6
Firearms proliferation and tactical training: The new reality ................................................... 12
Gangs, vigilantes and strongmen: The new ecosystem of violence ......................................... 13
The new logics of territorial control and rent extraction ......................................................... 17

## The international response to gangs in Haiti ......................................................................... 22
Sanctions: Developing the regime to buttress the deployment ............................................... 24
The Multinational Security Support mission: A new model of international intervention
against organized crime ........................................................................................................... 29
Potential risks and challenges for the mission ........................................................................ 33

## Conclusion and recommendations ........................................................................................ 38
Coordination and planning between the MSS mission, Sanctions Committee and Panel of Experts ............... 38
Target criminal ecosystems to counter gangs ......................................................................... 39
Expedite sanctions designations .............................................................................................. 39
Continually map criminal ecosystems ..................................................................................... 40
Human rights and community at the centre .............................................................................. 40
Fine-tune and repeat messaging .............................................................................................. 40

Notes ............................................................................................................................................ 41



## FROM VISION TO ACTION: A DECADE OF ANALYSIS, DISRUPTION AND RESILIENCE

The Global Initiative Against Transnational Organized Crime was founded in 2013. Its vision was to mobilize a global strategic approach to tackling organized crime by strengthening political commitment to address the challenge, building the analytical evidence base on organized crime, disrupting criminal economies and developing networks of resilience in affected communities. Ten years on, the threat of organized crime is greater than ever before and it is critical that we continue to take action by building a coordinated global response to meet the challenge.

HaitiTPSAR000721

# ACRONYMS AND ABBREVIATIONS

**BINUH**          United Nations Integrated Office in Haiti

**BSAP**           Brigade de Sécurité des Aires Protégées (Protected Areas Security Brigade)

**EU**             European Union

**G9**             G9 Fanmi e Alye (G9 Family and Allies), criminal federation of gangs

**G-Pèp**          G-People, criminal federation of gangs

**HNP**            Haitian National Police

**MINUJUSTH**      United Nations Mission for Justice Support in Haiti

**MINUSTAH**       United Nations Stabilization Mission in Haiti

**MSS**            Multinational Security Support Mission in Haiti

**UN**             United Nations

**UNSC**           United Nations Security Council

**UNSG**           United Nations Secretary General



# EXECUTIVE SUMMARY

Over the course of 2023 and early 2024, security has continued to deteriorate alarmingly in Haiti's capital, Port-au-Prince, and in rural areas in the centre and south of the country.[1] Criminal gangs, the main drivers of this degradation, have grown in strength and capacity, enabling them to supplant in part or in full the control of government forces.[2]

The gangs' domination of critical infrastructure, such as commercial and oil port terminals, major roads, and population centres has heightened their influence over Haiti's economy and political system. The gangs have also imposed governance on major parts of Port-au-Prince, leading both to rising criminal predation and human rights violations, including gender-based violence.[3] Moreover, 2023 saw the development of particularly strong vigilante movements while the first weeks of 2024 witnessed the rise of violent political leaders, adding to an already disastrous security situation. As one United Nations (UN) report bluntly noted: 'The situation is unravelling.'[4]

The Haitian crisis worsened critically in 2023. UN reports indicate that in 2023, over 4 789 people were murdered, 1 698 injured and 2 490 kidnapped, with a 2023 homicide rate of 40.9 per 100 000, more than double the 2022 rate.[5] Besides these figures, the nature of the criminal actors has been profoundly transformed, posing a series of challenges to international intervention. Over the past five years, gangs have undergone a radical evolution, going from rather unstructured actors dependent on resources provided by public or private patronage to violent entrepreneurs who have been able to convert their territorial power into governance capabilities. This shift has been fuelled by the gangs' unprecedented access to firearms and the Haitian state's inability to halt their expansion, profession-alization and propensity to impose their rule over ever larger territories, as well as by ongoing collusion by elements of the country's political and economic elites.

In October 2023, the United Nations Security Council (UNSC) adopted a resolution authorizing a non-UN multinational security support (MSS) mission to Haiti. After long negotiations, the Kenyan government agreed to lead the deployment, aimed at supporting the Haitian National Police (HNP) in addressing gang violence and re-establishing security,[6] although the planned operation is currently being challenged in the Kenyan courts.[7] This resolution came after the UNSC agreed a sanctions regime for Haiti in October 2022, and the subsequent imposition of sanctions on key gang leaders, businessmen and politicians. The UN sanctions have been supplemented by unilateral designations issued by Canada, the US, and the European Union (EU). Further UN sanctions were levied on gang leaders in December 2023, as the preparations accelerated for the MSS deployment.

HaitiTPSAR000723


**Homicide rate
40.9 per 100 000**
(more than double the 2022 rate
of 18.1 per 100 000)


**Homicides
4 789, including 465 women,
93 boys and 48 girls**
(+119.4% compared to 2022)


**48 police officers**
have been killed and 75 injured


**Kidnappings
2 490 victims**
(+83% compared to 2022)


**Detainees in prison
11 822**
(rate occupancy of 307%)


**146 584
internally displaced persons**


**More than 4.35 million people**
(more than 40% of the population),
**are facing acute food insecurity.**

**FIGURE 1** Violence, crime and drivers of insecurity in Haiti, 2023.

SOURCE: BINUH report (S/2024/62), 15 January 2024

Intervention by the UN in Haiti is not new, with the embryonic MSS mission representing the third initiative in as many decades. However, the proposed international mission stands out, both for Haiti and more broadly for international responses to organized criminal violence. Historically, the UN has become involved in Haiti in response to political crises, worsening insecurity and repeated natural disasters.[8] While the 2004-2017 United Nations Stabilisation Mission in Haiti (MINUSTAH) engaged in counter-gang operations, largely in and around Port-au-Prince, this came after the force had been on the ground for several years and was generally intermittent.[9]

In contrast, the prospective 2024 intervention will be conducted outside the auspices of the UN and has been motivated by, and focuses on, criminal gangs as the main threat to peace and security. This reflects the substantial change in gangs' power, structure and capacity for territorial governance since the MINUSTAH era. These entities are nowadays far more economically autonomous and territorially powerful, making them less controllable. As one Haitian entrepreneur described the contemporary evolution of the gangs: 'We saw a lion being born, we fed it and watched it grow, we tried to domesticate it, but the animal eventually escaped from the cage, and here we are.'[10]

Nonetheless, the focus by the UNSC on profit-oriented criminal entities as primary conflict actors in their own right, in both the resolutions setting up the sanctions regime and the MSS mission, is a substantial conceptual shift for the UN.[11] Given the growth of transnational organized crime, and expansion of instability and violence linked to such crime, situations like the present one in Haiti are likely to become more common. The UN's current initiatives on Haiti potentially augur a new international approach to how organized crime actors can be tackled both from a security and human rights perspective. Ensuring international tools are effective in mitigating harm caused by gangs in Haiti is therefore vitally important for the people of the country, and for the international community.

HaitiTPSAR000724

The situation presents an extremely difficult test. Haitian armed groups today are more militarily powerful, networked, and resilient than those during the MINUSTAH intervention. It is therefore essential that the various international tools be tailored to the rapidly evolving criminal and violence dynamics on the ground, and be implemented in a strategically coordinated fashion. Meetings between Kenyan and Haitian police teams have taken place, as well as trainings, and vetting processes prior to deployment. However, the proposed mission, the UNSC and the Haitian government have yet to present a public plan and strategy for the intervention, either for short-term engagement on the ground or for a long-term political solution.[12]

This policy report is intended to further efforts to tailor both the MSS mission and the sanctions regime to the current operational challenges in Haiti, support Haitian and international decision-makers in their mission, and provide strategic backing to the country's civil society.

It begins by detailing the current situation on the ground, including gangs and other violent groups' operations, governance and territorial domination. The next section details the mandate and operations of the two primary international tools, the sanctions regime and the MSS mission. The third section flags key issues which need to be considered for both the sanctions regime and the international force, and presents opportunities to align the two more comprehensively, to strengthen public security responses and public policy initiatives so as to resolve the crisis.

This report is the first of several planned publications on the political economy of violence in Haiti and the international cooperation that seeks to uproot it. It follows a 2022 Global Initiative Against Transnational Organized Crime (GI-TOC) report on gang evolution and a 2023 GI-TOC report on gender-based violence in the country.[13]

## Methodology

The methodology for this report is primarily qualitative, combining fieldwork observation and interviews conducted in Haiti in November 2023, and desk research. It is based on 36 interviews with UN officials, Haitian civil society members, public and private sector actors, politicians, police forces, humanitarian actors, diplomats and other locals, and the wider international community. It also draws on UN Security Council resolutions, reports by UN agencies and the Haiti Panel of Experts, and research conducted by think tanks and academics on gang dynamics and instability. Finally, the study also draws on broader research and analysis conducted by the GI-TOC on organized crime in Haiti, UN action against organized crime, and the use of sanctions to address transnational organized crime. All interviews and fieldwork activities were conducted by GI-TOC teams. For security reasons, the names of the interviewees are not given.

HaitiTPSAR000725



# HAITI'S GANGS: FROM TERRITORIAL CONTROL TO CRIMINAL GOVERNANCE

**G**angs in Haiti are a longstanding phenomenon.[14] They link to a tradition of non-state armed groups that stretches back to the 1950s, with the development of the Tonton Macoutes by President François (Papa Doc) Duvalier.[15]

However, the nature of Haiti's gangs has changed drastically in recent years. Writing during the MINUSTAH era, in 2008, analysts flagged that 'Haitian gangs proved to be collections of individuals who formed around brutal and charismatic leaders, unlike the hierarchical, tightly organized turf-based institutions found in the United States.'[16]

This framing of weak, disarticulated gangs is no longer accurate. Although a vast number of Haiti's gangs remain small organizations, the major ones – those which control substantial territory and are responsible for most current instability – are well-structured, well-armed and operationally competent entities.[17] While links to politicians and businesspeople remain, the relationship is more even, with the growing capacity of gangs allowing them to self-fund and put a considerable amount of pressure on the political and economic system.

As a result, the international community and MSS planners confront a very different and, in many ways, far more difficult situation than existed under MINUSTAH. This subsection maps out key ground dynamics, delving first into gang evolution, then gang operations, before finally touching on the formal and informal Haitian actors arrayed against gangs.

## The professionalization of gangs

Gangs have grown significantly in size and diversity in comparison to the 2000s and 2010s. As of early 2024, estimates peg the number of gangs in Haiti at around 200,[18] and they operate mainly in the metropolitan area of Port-au-Prince, including the communes of Port-au-Prince, Delmas, Cité Soleil, Tabarre, Carrefour and Pétion-Ville. Their size ranges substantially, from a dozen men to several thousands.

HaitiTPSAR000726



**FIGURE 2** Haiti.

Some gangs that had 50 or 100 active members during the MINUSTAH period now stretch to 1 500 to 2 500 members.[19] The most powerful gangs of today did not even exist a decade ago, while new cliques emerge every week.

Gang leaders are well known in Haiti. These men combine extensive experience as gang members and access to political and economic networks that provide them with patronage and funding, contacts within the police and justice system, and connections capable of trafficking high-calibre weapons or drugs.

In many cases, leaders have served in Haiti's security forces or in political parties or movements. For example, Jimmy Chérizier (aka Barbecue), head of the G9 Fanmi e Alye (G9 Family and Allies or G-9) coalition, is a former police officer, while Chery Christ-Rois (aka Krisla), head of Ti Bwa Gang, is a former political activist.

Increasingly, however, Haiti's gang leaders have begun to emerge via hierarchic advancement within the gangs themselves, either to control established entities or leveraging their experience to found splinter groups. Leaders such as Johnson André (aka Izo or Izo 5 Segond), head of the Village de Dieu – 5 Segond Gang, or Renel Destina (aka Ti Lapli), who leads the Gran Ravine Gang, have been 'gang soldiers' for most of their lives.

HaitiTPSAR000727



**FIGURE 3** Port-au-Prince, showing some urban locations discussed in the report.

These 'young veterans', as one interviewee called them, have learned from mistakes made by their former bosses, and thus run much more sophisticated organizations than their predecessors. They resemble – in their ability to administer territories, extract resources, conduct well-designed military-type operations, and organize, deploy and pay hundreds of men – relatively sophisticated drug cartels, militias, or paramilitary groups, rather than the low-capacity gangs that operated in Haiti in the 2000s and early 2010s.

Our contacts indicate that across the board, criminal structures in Haiti are much more hierarchical and strict than before.[20] The larger gangs operate with a leadership team and exploit an organized division of labour – from soldiers to financial officers and political advisors – while maintaining command and control structures in field areas.[21] Further, for large and well-known gangs in Port-au-Prince, recruitment processes have been developed and entail discrete taskings and tests, making it more difficult to join gangs' ranks, parallel to forced recruitment. Members who have sought to leave gangs, including children, risk being killed.[22]

HaitiTPSAR000728

## Gang control: From urban to rural areas

Historically, gangs in Haiti have been an urban phenomenon, with most operating in and around Port-au-Prince. This broadly remains the case today. At least 23 major gangs operate in the Port-au-Prince metropolitan area (West department), clustered around two main coalitions: the G9 and the G-Pèp (G-People) alliance. Alongside these, another seventy smaller and independent gangs undertake opportunistic alliances, both among themselves and with either G9 or G-Pèp.[23] Collectively, the gangs exert control or substantial influence over 80% of the city, as well as the zones immediately outside it. To travel in and out of Port-au-Prince, one must take the risk of driving through a criminal checkpoint; the alternative, for the few who can afford it, is to board a small plane.

A major development in the geography of violence is the rapid expansion of gangs' presence and control in peri-urban and rural areas, a phenomenon that started around 2015. However, it has substantially accelerated over the last two years. While gang members in rural areas are overwhelmingly local to those regions, they are also allied with or connected to large urban structures based in Port-au-Prince. This geographic expansion of major gangs' influence risks triggering the genre of attacks and gender-based violence that were previously largely confined to Port-au-Prince.

The core of Haiti's rural gang challenge is the Artibonite department, which is located roughly 100 kilometres north of the capital (see Figure 2). There, gangs such as Gran Grif and Kokorat San Ras appeared publicly in 2015, allegedly fuelled by candidates in that year's legislative elections who sought to instrumentalize them for political success.[24] Since then, however, the gangs have become more autonomous and increasingly powerful, with Gran Grif (also known as the Savien gang) exponentially enlarging its area of control and influence since 2022.[25] As of 2023, more than 20 criminal structures, including gangs and vigilante groups, operated in the department.[26]

The gangs' expanding presence has led to a sharp increase in violence in Artibonite, including torture, assassinations, extortion, kidnappings for ransom, sexual violence and forced displacement.[27] Between January 2022 and October 2023, more than 1 690 people were killed, injured or kidnapped in the department.[28] In a three-month stretch, the Artibonite accounted for 27% of all victims of killings, injuries and kidnappings throughout Haiti.[29] Violence mainly involved inter-gang competition, including efforts to conquer rivals' territories, rather than being due to expansion into areas previously free of gang control.

| G9 Alliance | G-Pèp Federation and allies |
|---|---|
| Delmas 6 Gang | Nan Brooklyn Gang |
| Baz Krache Dife | Village de Dieu/5 Segond |
| Baz Pilat | Fontamara |
| Nan Ti Bwa | Kraz Baryè |
| Simon Pelé's Gang | 400 Marozo |
| Baz Nan Chabon | Grand Ravine Gang |
| Was Jérémie | Canaan Gang |
| Nan Boston | |
| Belekou Gang | |
| Chen Méchan | |

FIGURE 4 Haiti's main gang alliances.

HaitiTPSAR000729

Violence in the Artibonite also emerged along key roads. Gangs have repeatedly targeted travellers on National Road 1, the main south-north route connecting Port-au-Prince with Gonaïves and Cap-Haïtien, kidnapping at least 515 people in a three month stretch in Artibonite and the neighbouring commune of Croix-des-Bouquets.[30] Incidents of sexual violence and targeted killings have also arisen along the road. Such violence clearly undermines the feasibility of travel between major Haitian cities, potentially posing future risks to commerce and aid delivery should gangs seek to permanently control sections of National Road 1 and other key routes in the Artibonite.

While rural gangs generally engage in a similar range of predatory activities as urban ones – including kidnap for ransom and checkpoint robberies – there has been some specific adaptation to the rural environment. Most notably, gangs in the Artibonite have increasingly invaded farmland, threatened farmers and landowners and demanded payment in return for leaving.[31] This new tactic has driven substantial rural displacement, and impacted agricultural production in Artibonite, with land under cultivation falling from 5 800 hectares in 2018 to 2 400 hectares in 2022.[32] Cultivation likely declined further in 2023. This dynamic has national implications, since Artibonite is key to food supply. Food prices in Port-au-Prince, for example, have sharply increased, while food insecurity, already immense in the country, has continued to worsen.[33]

## Vigilante uprising in rural Haiti

The gangs' presence also provoked the growth of existing vigilante groups and the creation of new ones in parts of Artibonite, triggering heightened violence and confrontations between citizens and gangs akin to that prevalent in Port-au-Prince. In September 2023, the deployment of Izo's 5 Segond gang members to Mirebalais, 35 kilometres north of the capital, led to clashes between vigilantes and gang members. Thirty were killed, with more than a dozen wounded. At least 800 families in turn fled their homes. Reports indicate several cases where vigilante groups have caught Izo's soldiers and lynched them or burned them alive.[34]

The territorial expansion of the Village de Dieu Gang and the G-Pèp coalition has also fed into new forms of violence, along with these groups' capacities to move armed men by sea, across the bay of Port-au-Prince, to avoid territories controlled by their enemy G9. Moreover, the ability of Village de Dieu to operate at sea poses a major and unaddressed tactical challenge to the international intervention, which is envisaged as operating largely inland, within the capital. Finally, the 'ruralization' of violence does not only concern gangs' direct presence. Sources in southern departments have indicated that some local schools have been saturated by children sent by their families from Port-au-Prince to study away from the capital, amid the relative calm that was still found in this part of the country until recently.

## Gang alliances: Franchises at the service of territorial expansion

A key facet of Haitian gangs' evolution has been the emergence of rival blocs, notably G9 and G-Pèp. G9 formed first, through the work of Jimmy Chérizier; it is an alliance of nine gangs allegedly linked to the Haitian Tèt Kale Party. G-Pèp was then created by Ti Gabriel, of the Nan Brooklyn Gang, largely in reaction.[35] These two blocs include major gangs which are formally linked, medium-sized gangs which are looser affiliates of either of the blocs, and smaller gangs and independent actors who engage opportunistically. It is important to stress that gang alliances remain loose, with tensions and occasional clashes occurring within alliance blocs, as well as against external adversaries. Moreover,

HaitiTPSAR000730



**Burnt-out car next to the remains of a barricade in Delmas, Port-au-Prince, November 2023.** *Photo: Romain Le Cour Grandmaison/GI-TOC*

rivalries between gang leaders do not prevent them from exchanging on WhatsApp groups, according to our interlocutors.

The gang alliance system was mainly a dynamic of Port-au-Prince. However, there are some indications – as underscored by Izo's move into Artibonite – that the capital's gangs are looking to develop similar alliance structures nationally.[36]

For the gangs, the development of alliances is a fluid phenomenon that serves several purposes.

First, in operational terms, the development of alliances reflects the extreme territorialization of gangs, who tend to be rooted in specific neighbourhoods or areas, some of which are small areas. Although their localized roots constitute a strength, constant confrontations and their endless list of enemies prevent most groups from readily operating outside their turf. A gang leader, for example, would generally not risk leaving his stronghold for fear of being targeted by a rival or by the police. As a result, only the most powerful gangs – such as Izo's or Chérizier's – are usually able to operate or profiteer outside their fiefdoms.

This is when alliances come into play. When gangs go to war, seek to expand their territory or to protect themselves from rivals' attacks, alliances enable the provision or receipt of quick support, with allied gangs dispatching 'soldiers'. This was the case during peaks of violence in Carrefour and Mariani, for example, or after the death of Iscard Andrice (Iskar), a prominent G9 leader in November 2023, in Cité-Soleil. Here, at least 166 people were killed in brutal confrontations that lasted for three days, while more than 1 000 were displaced, with local sources reporting that armed reinforcements were mobilized by rival gangs over the course of a week.[37]

Second, the creation of public alliances feeds an image of power for the gangs and a dynamic of 'branding' that fuels the creation of new small groups. It is not just a question of clashes between groups, but also of who has the upper hand, G9 or G-Pèp. According to several interviewees who have direct access to the gangs, the alliances function as 'brands' that new (often small) groups seek to join, both to receive the potential protection of the 'gang families' and to establish their own reputation. Being

HaitiTPSAR000731

able to announce that one is affiliated with G9 or G-Pèp enables the newly created group to raise its profile and its attractiveness to potential recruits.

In this way, the 'blocs' created by G9 and G-Pèp are a powerful communication, recruitment and expansion tool, enabling them to extend their influence by supporting and integrating new cells. This creates a political dynamic, making the expansion of influence by gang leaders far easier than in the past, with territorial conquest giving way to expansion through franchising.

## Firearms proliferation and tactical training: The new reality

Present-day gangs enjoy a much higher degree of military capacity than those a decade ago, which is reflected in the increasing violence seen in Port-au-Prince, the Artibonite and the south. This has largely been driven by gangs' ability to acquire high-calibre weapons.

Over the past decade, firearms have completely transformed the ecosystem of violence. Ten years ago, according to interviews, it was rare to find semi-automatic weapons in the hands of street soldiers, who in some cases were forced to share handguns between several members. Weapons availability was limited enough that provision of guns was a key form of support by elites to gangs, creating a degree of dependency and control.

This has changed, as a variety of weapons trafficking networks – allegedly tied to US, Jamaican, Dominican and Haitian intermediaries, and corrupt authorities and military personnel – have emerged to drive a robust black market in trafficked firearms.[38] Larger gangs are readily able to acquire AK-47, AR-15 or IMI Galil assault rifles, with local sources suggesting they have stockpiled them.[39] Information from different gang-controlled areas also suggests the presence of .50 calibre rifles and tripod-mounted weapons, while there are rumours of the acquisition of M50 and M60 assault rifles.

The increasing availability of weapons has spurred recruitment, in the shape of gangs reportedly promising prospective recruits a personal weapon. Finally, local sources have explained how gang members sometimes ask victims of their extortion rackets, especially companies that operate within their territory, to pay them in ammunition or firearms, rather than cash.



A sign reading 'firearms are prohibited' at the entrance to a hotel in Pétion-Ville, Port-au-Prince, November 2023. *Photo: Romain Le Cour Grandmaison / GI-TOC*

HaitiTPSAR000732

### Gangs' tactical improvements build on weapons acquisition

The operational capacity of gangs has also been buttressed by tactical training. Ex-soldiers and police-men have been recruited both as fighters and trainers, transforming the ability of gangs to operate. The most powerful gangs now 'move and fight differently' to five years ago, one source said. 'You can tell from the way they carry their rifles, they know how to use them, some are well-trained ... [and they display] intimate knowledge of their territories, streets, houses.'[40]

This increased operational capability has shifted how gangs operate. They are capable of and willing to confront police (including special tactics squads), leading to a growing trend of direct assaults on stations and outposts.[41] Recent gang offensives have also involved the use of counterfeit police uni-forms and high-calibre weapons capable of destroying armoured vehicles.[42]

The gangs have also shifted how they secure their territory, hedging more against incursions by heavily armed rivals and the police. Ahead of the potential deployment of the international force, sources contacts indicate that major gangs are stepping up operations to gather information and intelligence.

Overall, gangs' rising capacity – including the proliferation of firearms and development of tactical training – is transforming the nature of confrontations, making them ever more violent. The armed groups can confront the police (and will be able to confront MSS forces) in a way they did not during the MINUSTAH era. However, this does not mean that all gangs hold the same capacity of sustained confrontation. Several interviewees pointed out that in contrast to the generally high capability outlined above, some gangs have difficulty paying, feeding, and arming their soldiers. This fragility, in turn, could mean that the application of heightened strategic pressure by the international mission and HNP could collapse those gangs' capabilities more rapidly and to a greater degree than commonly perceived.

Moreover, several sources close to gang leaders told us that most of the groups were not ready to go into battle against the MSS mission, seeing the international deployment as too powerful a rival, which whom it would be smarter to negotiate rather than fight. However, while this evaluation is also fairly prevalent within international civil society, caution should abound, especially given the determination shown by gangs in their battles against the HNP.

## Gangs, vigilantes and strongmen: The new ecosystem of violence

While the behaviour of Haiti's gangs is the most visible manifestation of violence, these entities are nevertheless part of a broader violent ecosystem that is continually expanding.

### Smaller gangs, deportees and freelancers

The vast majority of the 200 cells operating in the country are cliques of dozens of men, much less well armed than the major gangs and in some cases unable to pay regular wages to their members. These groups are looking to become bigger, usually under the protection of a major gang, and they are often assigned specific tasks – checkpoint surveillance or kidnappings, for example – in the service of the latter.

There are also several 'freelance' gangs and groups of individuals that specialize in highly valued skills or services. These include gangs composed of ex-police officers, including from special tactics units, as well as military or security trained personnel. They can provide armed support to both alliances –

HaitiTPSAR000733

G9 and G-Pèp – during conflicts, as well as personnel able to operate heavier weapons, offer sharper shooting skills, and aid in the design of tactically complex operations. One example is the Galil Gang, a group which delivers strategic support to other gangs. Present in several Caribbean countries, Galil also provides 'counsel' to violent partners, according to interviewees, working as intermediaries to help gain access to specific, hard to penetrate markets, for example specific firearms such as M-4 machine guns or Negev light machine guns.[43]

Finally, one specific category has gained crucial importance in Haiti's criminal ecosystem in the past years: the 'deportees', gang members and criminals that had been arrested, jailed, and then deported from the United States. Because they bring expertise in the use of firearms, possible contacts in the US and Latin America for drug and weapons trafficking, and experience in bigger gangs or criminal structures, these individuals are extremely valuable for Haitian criminals. Carefully recruited and allegedly better paid than locals, these men work alongside ex-police or military trained personnel in providing tactical training to young gang members, for example.

## Bwa Kale

In the spring of 2023, a major transformation of violence occurred in Port-au-Prince, with the development of a vigilante movement called 'Bwa Kale' (peeled wood), mobilizing several hundreds of individuals at key moments of uprising.

At the core of Bwa Kale lies the citizens' will to restore order and security, take justice into their own hands, and punish enemies – gang members or not – through physical violence. The latter includes public lynching and executions, of which more than 600 cases have been registered since April 2023, according to local sources.

Although most media outlets have portrayed Bwa Kale as a momentary, spectacular outburst of citizens' anger against gangs' harassment and the government's inability to provide security, this arguably represents only part of the picture. Rather than a proper organization or group, Bwa Kale might be best understood as a renewed set of old practices of community surveillance and patrolling that intersect with neighbourhood 'brigades' and 'baz' (bases).

These terms both refer to a modality in which citizens have organized within their communities – usually in contact with state authorities and police forces – via small informal or formal structures, with fluctuating levels of sophistication, focusing on public security, social and religious activities, political rallying, and electoral tasks.[44] In Port-au-Prince, dozens of brigades and baz currently operate with strongmen, or a group of them, at their head. These men act as community leaders and crucial brokers, serving as the interface between neighbourhoods and public or private stakeholders.

Bwa Kale can also be understood as a fluid 'mob' response that can be activated in specific circumstances, such as gang attacks. People can be heard saying that they're going to 'make a Bwa Kale', for example. In addition, 'Bwa Kale' graffiti have appeared in dozens of neighbourhoods around the capital.[45] Any group of citizens can act under the auspices of Bwa Kale, claiming its right to punish and discipline. This is why lynching have repeatedly been committed over the last year, besides the April and May 'Bwa Kale moment' of uprising.

Bwa Kale is usually mobilized on a very small territorial scale, operating on a neighbourhood basis. Delimiting the perimeter of action of the vigilantes, through the installation of checkpoints, for example, serves to socially and territorially divide the interior from the exterior; what is safe from what is a

HaitiTPSAR000734

menace, while vigilante practices include patrolling – people are armed with sticks, stones, machetes or, increasingly, different types of firearms. Whenever the vigilantes identify a threat, it takes only a few minutes to mobilize the population – mainly through WhatsApp groups or even more spontaneous street alerts – to close the doors or the checkpoints, chase down the threat and, in many cases, summarily punish the suspect.

Finally, because of its popularity within the Port-au-Prince population, Bwa Kale has re-sparked the creation of neighbourhood brigades, and the installation of barricades, massive metal doors, and barriers at the entrances to dozens of areas of the capital. These are guarded, or at least monitored day and night. In certain areas, the brigades went as far as to build concrete surveillance outposts. Moreover, Bwa Kale movements have also spread out in Port-au-Prince, for example in the Artibonite department.

Without going into the complex history of these vigilante movements here, several local groups have gained substantial power through the provision of security in their area. This is the case around the Port-au-Prince sectors of Laboule 12, Thomassin, Duplan 2 and Fort Jacques, above Pétion-Ville, where different sources said that local vigilante groups played a crucial role in evicting Carlo Petit-Homme's (aka Ti Makak) gang, in April of 2023, and bringing order to the area.[46]

There are also historic precedents, however, for vigilantes converting their social power into political and violent capital, in so doing transforming into criminal gangs. Baz Pilat for example, active around Carrefour Feuilles, in the south of the capital, has become a major gang-vigilante structure. Its alleged leader, Ezéchiel Alexandre, a former divisional inspector in the HNP, was arrested in June 2022. The gang remains central to ongoing violence in the area.

## Vigilante movements and their relationships with the police

It is important to underscore that in Baz, brigades, Bwa Kale, and other manifestations of vigilantism, the nature of the activities is intimately linked to police forces, both institutionally or personally.

In vigilante movements, taking justice into one's hands is presented as a moral imperative: when the government is not doing its job to combat criminal groups, people must act and protect their communities. In that sense, the vigilantes seek to fulfil the role that the state fails to play in protecting them from violence, while still calling upon the government to support them politically, financially, and militarily. This is the paradox of self-defence groups, in Haiti and elsewhere: usually professing to emanate from a tradition of self-help, vigilantes at the same time seek to satisfy community demands for more state presence, public accountability and greater police intervention.[47]

Vigilantes' tactics for controlling territory enables them to cooperate with the police, particularly to hunt down gang members, while by securing their turf, leaders earn legitimacy in the eyes of local inhabitants. In return, by collaborating with these movements, public authorities and police forces can increase their local acceptance, gather intelligence on the local dynamics of violence, develop a network of allied strongmen, or, at least, guarantee a presence through a proxy partner.

The vigilante structures tend to include police officers who support, tolerate and/or participate in the movements, usually on an informal basis. According to our interviewees, this is first linked to an individual logic: police officers live in the same neighbourhoods where vigilante groups operate, which makes them both exposed and involved, as citizens as well as police officers, in community protection. A policeman can therefore perform its public duty, in uniform, during one part of the day, before becoming a vigilante, dressed as a civilian, during another.

HaitiTPSAR000735

Secondly, the provision of security by vigilante groups, which is central to vigilantism well beyond Haiti, is rapidly becoming a supplementary task for public forces.[48] The latter can delegate surveillance of the territory to these groups, collaborate with them discreetly and informally, and establish links between the vigilantes and the police institution. At one surveillance outpost that we visited, the armed vigilantes were standing a few meters from the neighbourhood police station, illustrating the tacit cohabitation between them.

For public authorities, tolerating vigilante movements, or even establishing formal agreements with them might appear efficient in the short term – for example, if it contributes to improving the territorial foothold of the HNP or of the MSS mission. However, in the long run, it tends to further de-legitimize the state as the sole guarantor of order and security, posing threats to political stabilization and violence reduction. Moreover, while gang activities and violent crimes are a strong driver for the creation of vigilante groups, it is not uncommon for them to gradually become more involved in illicit activities, especially extortion-rackets, and different forms of trafficking, while their leaders tend to accumulate more and more personal power.

## Avengers, strongmen or political leaders? The new rebels and their militias

A final group of actors deserves crucial attention. It concerns strongmen who straddle the line between vigilante leaders and political bosses, accumulating considerable power and articulating it with open calls for popular rebellion against the government of Ariel Henry.

In the western and southern communes of Nippes, Aquin and Les Cayes, Jean-Ernest Muscadin, Commissioner of Miragoâne, has been leading for more than two years a large vigilante-style group that he presents as an organ of moral justice and stronger public security in the absence of the state.[49] His men, often equipped with automatic weapons, partly regulate life in the municipalities where they operate, in addition to eliminating the gang members they track down, including in disputed territories outside Muscadin's jurisdiction. The Ministry of Justice reportedly blamed the commissioner for extending its mandate in December 2023.[50] According to interviews conducted for this study, Muscadin enjoys considerable popularity, both with the population living in these three communes and within the diaspora in the United States. His ability to maintain order, despite videos allegedly showing him executing suspected gang members in broad daylight, has turned him into a key figure in local security and a potential political player to be reckoned with at the national level, although several human rights organizations have called for his impeachment.[51]

In recent weeks, an even more important figure has reappeared on the Haitian political scene: Guy Philippe. Philippe was police chief in Cap Haïtien during the 1990s, before he was accused of planning a coup against former president Jean-Bertrand Aristide. He was dismissed in 2000, and fled to the Dominican Republic.[52] Having received special forces training from the US during his police career, he helped to set up a paramilitary group, the Front Pour la Libération et la Reconstruction Nationales (Front for National Liberation and Reconstruction), aimed at overthrowing the Aristide government.[53] That government was toppled in 2004, allegedly with the support of personnel still loyal to Philippe.[54] Despite being elected senator, he was arrested and extradited to the United States in January 2017.[55] Charged with money laundering and drug trafficking, he spent six years in prison. Philippe was finally released and deported to Haiti in December 2023.[56]

In the first weeks of 2024, Philippe has rekindled his profile by organizing several demonstrations across the country, including the capital, the border area with the Dominican Republic and the far west, in Jérémie. These events, held in departments several hundred kilometres apart, underscore

HaitiTPSAR000736

his continued capacity for mobilization. Philippe has released a video in which he urges a 'revolution' and 'civil disobedience' to free Haiti.[57]

Several of Philippe's demonstrations were protected by heavily armed men in uniform or plain clothes, many of them members of the Brigade de Sécurité des Aires Protégées (Protected Areas Security Brigade, BSAP). Created in 2006 and falling under the authority of the Ministry of Environment, the BSAP is supposedly tasked with the management of protected environmental areas and ecological sites in Haiti. However, sources have told Haitian media that the government is not able to confirm how many BSAP members are officially registered – our sources range from 2 000 to 6 000 – nor to assess how they are paid and armed.[58] Contacts were also unable to detail how agents are currently being recruited, trained or paid.[59] Nevertheless, the force clearly has a degree of capacity, with the men appearing with Philippe over the past weeks carrying military gear, and semi-automatic rifles.[60]

The mobilization of the BSAP, the inability of Haitian politicians to say who controls it, and the connections to Phillipe are all troubling. They point to a risk that the BSAP could be shifting towards a hybrid-type group – nominally part of the government, but largely operating outside of the control of public officials. The mobilizing power of Guy Philippe, who is said to have been joined in his movement by Commissaire Muscadin, seems particularly strong. Clashes, street closures and occupation of public institutions have been reported, including in the capital, since 12 January 2024.

The profile of these men has been greatly underestimated by analyses to date. Capable of conducting political activities with the support of armed militias, including governmental ones, they pose a major challenge to the weakened authority of the Haitian government, and a different type of challenge than the gangs to the prospective MSS mission and the international community.

## The new logics of territorial control and rent extraction

As the operational capacity and territorial reach of Haiti's gangs and gang alliances has grown, their approach to governance has also deepened in important ways, with implications for social and territorial control, as well as profit generation.

### Gang entrenchment

Because Port-au-Prince and Artibonite are home to hundreds of bosses that act like local sovereigns, the logics of territorial control, street by street, district by district, road by road, create a fragmented geography that is in constant evolution and will pose crucial challenges to the MSS mission.

Control over the main roads across and outside the capital (the RN1, RN8, RN3 and the 101) has been one of the most strategic goals and a constant source of clashes, especially since autumn 2023. The same logic applies to the road network in and around Carrefour-Feuilles and Mariani. Roads serve as physical divides between criminal territories, as well as indispensable axes for drug trafficking, kidnapping and extortion. The roads that cross Port-au-Prince from north to south-west, amounting to just over 45 kilometres in total, are controlled by dozens of different gangs, divided into small sections over which each group regulates movements, imposes extortion and exerts constant surveillance. The same dynamic has expanded into Artibonite.

Within the gangs' fiefdoms, the objective of control is slightly different. The aim is not only to monitor movement, but also to prevent people entering or exiting their zone. In recent years, gangs have emptied entire areas that separate their territory from that of a rival group, displacing populations

HaitiTPSAR000737

and razing houses to establish and maintain buffer zones and no man's land. Similarly, gangs build trenches and high walls to protect fiefdoms against 'invasions' and, more recently, from sniper fire. These defences are also intended to protect them from police operations and, potentially, MSS forces.

Life in the worst gang-controlled areas amounts to living in an urban war zone, where constant stress and anxiety causes deep psychological trauma. Living conditions are at times near apocalyptic. In Cité Soleil, for example, some neighbourhoods contend with garbage immersed in up to a metre of stagnant water, with no access to even the most basic hygiene facilities. The restrictions on movement imposed by gangs mean these zones are becoming open air prisons that only gang-members or local inhabitants can even begin to navigate.

In recent months, this mosaic of fiefdoms and fortresses has continued to evolve, shaped by the expansion of gangs, as well as the development of vigilante groups and brigades created to fight them. The result is a tendency for territories to become more and more entrenched. The intensifying fragmentation of territory, proliferation of trenches and semi-permanent barriers, and the difficulty in moving freely in the metropolitan area represent clear operational constraints for the proposed international force, to the point where it risks being unable to traverse the capital.

## Extreme violence at the service of criminal governance

While there are variations in the social and territorial control practices of different groups, common dynamics emerge. For example, closed turf reinforce the mutual surveillance of residents. As a result, it is virtually impossible to enter a neighbourhood without being seen and identified either as a 'local' or a 'foreigner.' Some gangs are characterized by much stricter and violent social control than others. In certain zones, residents are forbidden from leaving the area, a measure that is even more strictly enforced during bouts of armed confrontation with other gangs.

In these cases, gangs might only allow women and children to depart (at their own risk). Moreover, local sources have reported that gang members posted at some checkpoints routinely demand residents show them their cell phones, to monitor conversations and to check their photos and videos. Gangsters try to find out whether residents are transmitting information about the neighbourhood and the gang to outsiders. If so, they face punishment.

Extreme violence, including the display of corpses in the street and other serious human rights violations, have become near-daily occurrences in gang-controlled areas. Residents live in constant fear. Sexual violence against women and girls, for example, works as a central practice of gang control. According to interviewees that live in gang-controlled areas or interact daily with leaders, some gangs have authorized their soldiers to carry out mass rapes, an instrument of terror that also serves to discipline populations. In certain cases, rapes are committed in public, in front of large groups of civilians, or even the victims' families. For women and girls living in controlled areas, the threat of rape permeates every moment. Buffer zones between territories are particularly exposed, leaving the way open for a group to assault women by abducting them on their way to work, for example.

Accounts of atrocities in Port-au-Prince, some of which cite sexual slavery, involving repeated rapes and torture over a period of weeks, underline the systemic aspect of sexual violence, and the challenge that lies ahead for rebuilding social fabric, supporting victims and pacifying the city. In general, territorial fragmentation and severe social control imposed by violent groups adds to the city's complex geography, generating an atmosphere of incessant pressure, risk and fear. All these aspects must feed into any appraisal of the prospective MSS mission's capacity to operate meaningfully on the ground, in terms of its ability to provide effective security and protection to the population.

HaitiTPSAR000738



Graffiti referencing the G-9 Gang Alliance, Port-au-Prince, November 2023.
*Photo: Romain Le Cour Grandmaison/GI-TOC*

## Extortion and protection rackets: Bureaucratization of crime

The social control exerted by gangs is primarily geared towards maximizing access to resources, both financial and political, licit and illicit. Contrary to what their leaders might tell the media, most gangs no longer aim to rekindle the hope of living together, but rather to maximize the opportunities offered by their territorial control.

The first source of revenue lies in protection rackets and other forms of extortion. In the most obvious of examples, the gangs impose taxation in return for protection of business activities. This is particularly true for G9 groups. The control they exert on the capital's ports and oil terminals, and the Delmas area, where commercial activities, warehouses, markets and corporate headquarters are located, has allowed them to extract considerable revenue from private companies. One prominent businessman who maintains interests in the port said:

> Every container, every landing is gang-controlled. From the ship to the landing, then the transport, then the storage warehouse, right through to the exit, everything is in the hands of the gangs, before passing under police protection. But sometimes the gangs are more efficient and cheaper than the police, because of course you have to pay the police, on the side, to get good service. When you have a business in Haiti, you're used to paying for everything, any kind of security or protection, we've been living for decades in a checkpoint society, privatizing public force, you pay the police for anything and everything, that's how it works here, and I'm not sure the international force can do anything about it.[61]

Local sources say that these protection rackets are managed through well-known brokers who organize the negotiations and payments between gangs and the private sector. In some cases, business operations are said to be paying from US$5 000 to US$20 000 per week for the right to operate, as well as a percentage fee on every container coming off the ships. Finally, locals have reported that the gangs sometimes ask the brokers to arrange weapons and ammunition deliveries, instead of cash payments.

## The business of checkpoints, the industry of kidnapping

Checkpoints represent the second key avenue for rent extraction. Scores of them are installed throughout the metropolitan area. The checkpoints and the rackets attached to them have evolved into a highly

19

pppp

structured and bureaucratized activity. At the most sophisticated ones, transporters who move goods or people, and who pass checkpoints daily, can ask for a card to pay extortion once a week, instead of being delayed day upon day. The chauffeur must present himself to a 'tutor' who works from a dedicated office, not far from the checkpoints. According to interviewees, the toughest checkpoints are located at the entrance and exit points of Port-au-Prince (on the road to Artibonite), in Canaan, and in Martissant (in the southwest province). According to interviews, and BINUH reports, some checkpoints are reported to collect millions of Haitian Gourdes per day (between US$ 6 000 and 8 000, depending on the source).[62] Although bureaucratization offers a degree of certainty for commuters and transporters, journeys remain extremely dangerous, exposing residents to threats, physical violence, theft and kidnappings.

The latter has emerged as one of the most important criminal markets in and around the capital. Whether wealthy or poor, virtually everybody in Port-au-Prince knows at least one person who has been kidnapped over the past two years. According to the Center for Analysis and Research on Human Rights (CARDH), 857 abductions were recorded in 2022, compared with 1 009 in 2021 (a decrease of 15.1%); however, in 2023, the third quarter of the year alone saw 362 reports of kidnappings, an increase of 141.3% compared to the second quarter.[63] The CARDH acknowledges that these figures underestimate the true extent of the problem, due to the fear of reporting and the lack of judicial support in dealing with kidnappings. Drawing on anecdotal evidence, contacts estimate that the true number could be 50 times higher, especially if one considers the rise of 'collective kidnappings', involving the abduction of entire busloads of passengers, for example.[64]

Kidnapping has become an 'industry' generating millions of dollars per year.[65] Besides the permanent threat that kidnappings create for the people of Port-au-Prince, the activity has a crucial link with the gangs' territorial control. Not only do the strongest groups need to maintain dozens of people in captivity, and therefore to control safe houses, they also crucially need operators – internal or external to the gangs – to carry out abductions, and to transport the victims to them.

When kidnappings occur on the main gangs' turf, or within the vicinity, transport is easier. However, the need to extract bigger rents has led gangs to abduct people far from their territories, including in wealthier areas. In this case, the group responsible for the kidnapping must pay subcontractors that are in control of the routes used to transport the victim, through to the destination. In some cases, released victims recalled being transported by groups, each tasked with a specific role and geographic segment of transfer, prior to the abductees being handed over to the principal gang. The will to cut these overheads feeds into gangs competing to achieve monopolistic control over the roads.

Secretly renting portions of their roads also allows certain groups to publicly distance themselves from kidnappings, considered a deeply unpopular activity. The arrangement sees them receive a toll for each abducted person, while they still can point the authorship of the abduction to another group. Yet, these deals tend to provoke more and more disputes and clashes between gangs, including in Carrefour-Feuilles this year. They also spark violent vigilante reactions from locals against kidnappers. The returns on offer from the kidnapping business, the deadly competition surrounding it and the need to control strategic routes, make it akin to the trade in narcotics.

Finally, several local sources have indicated that certain gangs have recently turned to organ trafficking, especially in Cité Soleil and Canaan. Although this topic needs further investigation, witnesses during this study cited cases of corpses missing vital organs and left on the streets – both in Port-au-Prince and in rural areas where gangs have attacked and kidnapped people. Finally, local sources within hospitals have confirmed some such cases, adding that some gangs now also operate their own clinics, not only to treat their soldiers, but also to extract organs from abductees.

HaitiTPSAR000740

## Police (in)capacity: An institution in distress

A final key element which has a direct bearing on the success or failure of international efforts to counter Haiti's gangs is the HNP's institutional weakness. On paper, at a national level, the force numbers 13 816 officers.[66] While not as low as in the early 2000s and 2010s, the force strength nonetheless remains critically small.[67] In practice, the number of personnel available for active patrolling is around 3 300, less than a quarter of the overall force.[68]

HNP personnel gaps have been further exacerbated by gang attacks. This has in part involved direct assaults on on-duty and off-duty officers, killing more than 40 and wounding 55 between January and September 2023.[69] In one case, a special tactics unit was ambushed, with several officers killed amid calls for backup. Further, gangs have become increasingly willing to attack and at times storm police posts and stations, causing serious damage, destroying the posts or driving the HNP to abandon them.[70]

Gangs' coercion of police has also increased. According to police sources, between 2022 and 2023, dozens of officers were forced to leave their homes because of direct threats and violence directed against them by both gangs and vigilante groups. Others regularly choose not to wear their uniforms or go to work due to threats. Contacts within the force say that over 900 officers fled the country during 2023, often through humanitarian migration programmes set up by the US or Canada, while the police academy has just resumed training new recruits, after more than a year of paralysis. Moreover, our interviewees decried the lack of financial resources allocated by authorities, and delayed or completely unpaid salaries. They also pointed to the absence of social security and protection mechanisms for officers and their families, in the event of injury or death. Police stations, like other security and penal institutions, are generally dilapidated, having received almost no recent support.

Meanwhile, the Haitian Coast Guard reportedly operates with less than 200 officers, and only one functioning vessel. As a result, patrolling to counter the import of weapons and other contraband, or to prevent the maritime movements of gangs, particularly in the bay of Port-au-Prince, is virtually non-existent. This constraint will be significant for the prospective MSS mission, itself conceived only as a land-based mission.[71]

The same dynamic exists on borders; these are likewise barely controlled, with the HNP units relatively small and challenged by limited transportation. As a result, clandestine crossings between the Dominican Republic and Haiti are common, with some sources flagging the existence of over 70 informal border crossings, compared with nine official ones.

The institutional fragility of the police is also reflected in the accusations of corruption and extra-legal violence that are rife in discussions in Haiti. When asked about collusion between gangs and the HNP, one officer said that the phenomenon is 'obvious' – 'you see gangsters arrested and immediately released ... Or you set up an operation, launch it, and realize that the gang had received all the confidential information about it. How can we work like this? How can we guarantee information security? You can't trust your colleague.'[72]

Several sources close to the police also reported deep internal conflicts within the force, notably due to established or presumed complicities between some officers and armed groups or vigilante groups. This dynamic will prove particularly crucial when it comes to coordination between the MSS mission and the HNP. Maintaining confidentiality in such an institutional context and with little or no police control will prove difficult, although our interlocutors claimed that the remaining police officers are prepared to do anything to regain some prestige and respect.

HaitiTPSAR000741



# THE INTERNATIONAL RESPONSE TO GANGS IN HAITI

Facing the deteriorating situation in Haiti, the UN Security Council has slowly and steadily increased its focus on the country and provided authorization for international efforts to stabilize the situation, through resolutions for both a sanctions regime and the MSS mission.

The UNSC was briefed on a rapidly worsening humanitarian situation, largely driven by the actions of criminal gangs, including through the targeting of civilians, gender-based violence and blockades on critical infrastructure. Haiti's stalled political transition was also a key element of discussion, as well as popular unrest and rioting linked to government subsidy removal.

At the time, Ariel Henry, Haiti's prime minister, urged the international community to pay attention to the risks of a humanitarian crisis driven by dwindling supplies of water, fuel and basic goods, and characterized also by a resurgence of cholera.[73] He further requested the deployment of a specialized international force and technical assistance for the HNP to address gang violence.[74]

In response, two resolutions were presented by the US and Mexico to the UNSC on 17 October 2022.[75] The first resolution was for the creation of a sanctions regime, while the second authorized the deployment of a non-UN international security force. On 21 October, the sanctions resolution was passed, while the second resolution was paused, only to be revived and passed on 2 October 2023, authorizing the MSS mission.

The UNSC's actions on Haiti are largely in line with responses by the international community to peace and security challenges in the post Cold War era. These have typically hinged on targeted sanctions and/or a peace keeping mission.

This broad similarity, however, masks an international effort which is relatively novel and potentially trend setting in several areas. First, the focus of the mission is on gangs, criminal actors whose under-lying interest is financial profiteering, rather an effort to seize political control. This stands in contrast to most previous UN missions, which have sought to intercede in situations in which armed actors are motivated ostensibly by political goals, even if key leaders or fighters simultaneously engage in economic profiteering and predation. Historically, the UNSC has been relatively loath to engage in

HaitiTPSAR000742

direct action on criminal issues, in part because of opposition by the five permanent members of the council which see organized crime as a domestic issue to be resolved accordingly.

The UNSC's overall support for sanctions and intervention in Haiti then is notable, likely reflecting the very real concerns that if the situation is unaddressed it could result in organized crime groups causing state collapse.[76] It could also be portentous, both given the precedent it offers for action against criminals and, more pressingly, the likelihood that the rising power of organized crime groups globally could result in more dire situations akin to that in Haiti.

The second novel facet of the UNSC's response is authorization of a non-UN security force for the intervention. UN authorized multinational forces have been used in a handful of instances since the 1990s, including during the intervention in Haiti in 1993 and in 2004. However, in most cases multinational force interventions have been relatively short and have been then supplanted by UN-led peacekeeping missions. However, there have been exceptions to this rule, most prominently the International Security Assistance Force in Afghanistan. The multinational force for Haiti, if it goes ahead, may be another exception.

It is likely that non-UN multinational deployments will become more common. In part this is due to the setbacks faced by large UN peacekeeping operations, notably in Mali and the Democratic Republic of the Congo, which have fuelled calls for new approaches.[77] These calls have been reflected in the UN Secretary General's 'New Agenda for Peace' briefing paper, which calls for a new model of peace enforcement more geared towards international authorization and financing of interventions by regional bodies.[78]



Road in Tabarre, Port-au-Prince, November 2023. *Photo: Romain Le Cour Grandmaison/GI-TOC*

HaitiTPSAR000743

Due both to the focus of the sanctions regime and the nature of the prospective MSS mission, the results in Haiti are likely to be closely watched for evidence of success and failure, with either outcome likely resulting in further knock-on effects.

The novelty of the approach, however, also creates opportunities for a new model of engagement and interaction to be developed between the Sanctions Committee on Haiti and the MSS force. Such engagement is arguably both needed and eminently feasible, with potentially substantial benefits for the broader efforts by the international community to assist Haiti and Haitians.

This section first details the structure and focus of the two main intervention tools: the sanctions regime and the MSS mission. It then details key points for consideration in the coordination of the two initiatives, and ways in which both could be better tailored to address the realities of the criminal ecosystem menacing peace and security in Haiti.

## Sanctions: Developing the regime to buttress the deployment

Since the end of the Cold War, targeted financial and travel sanctions have emerged as a primary instrument used by the UN when threats to peace and security emerge. They have accompanied most UN peacekeeping missions, or occasionally served as a standalone response.[79]

Traditionally, they have primarily been directed at political actors – including government officials and armed group leaders – or those politically or financially supporting criminal actors. This latter category has increasingly encompassed organized crime figures, such as diamond smugglers, drug traffickers and particularly abusive human smugglers.[80]

Embodied in Resolution 2653, the UN's Haiti sanctions regime stands out for its explicit focus on criminal actors as the primary threats to peace and security and because it enables the designation of those supporting them or supporting select criminal markets in Haiti more broadly. The resolution also set up a targeted arms embargo, and explicitly enabled the designation of actors circumventing it (see Figure 5).

In theory, the UN sanctions regime is robustly designed, enabling the targeting of both gangs and the criminal and political ecosystems which have fuelled and enabled them. In approving the resolution, the UNSC framed the sanctions threat as a clear political message to Haiti's gangs, and an indication of international willingness to respond to the peace and security challenges in the country.

In practice, however, the UN regime has moved relatively slowly. From October 2022 to December 2023, only one actor was sanctioned: Jimmy Chérizier, the leader of the G9 gang coalition, who stands accused of various human rights abuses and criminal activities. While Chérizier and the G9 are key actors in Haiti, the analysis above underscores that they are simply one aspect of a multifaceted and worsening problem.

In December 2023, the UN designated four additional gang leaders under the sanctions regime:

- Johnson André (aka 'Izo'), leader of the 5 Segond gang and a key player within G-Pèp
- Renel Destina, leader of the Grand Ravine gang and an important ally of G-Pèp and Izo
- Wilson Joseph, leader of the 400 Mawozo gang
- Vitelhomme Innocent, leader of the Kraze Barye gang

HaitiTPSAR000744



**2001**
UNSCR 1343 (Liberia)

**2005**
UNSCR 1643 (Côte d'Ivoire)

**2008**
UNSCR 1857 (Democratic Republic of Congo)
UNSCR 1844 (Somalia)

**2012**
UNSCR 2048 (Guinea-Bissau)

**2015**
UNSCR 2213 (Libya)

**2014**
UNSCR 2134 (Central African Republic)

**2016**
UNSCR 2293 (Democratic Republic of Congo)

**2017**
UNSCR 2374 (Mali)

**2018**
UNSCR 2399 (Central African Republic)

**2020**
UNSCR 2521 (South Sudan)

**2022**
UNSCR 2653 (Haiti)

 Link between diamonds and conflict funding

 Criminal actors can be designated if linked to conflict actors or spoilers

 Those providing support for armed groups or criminal networks via natural resource crime can be designated

 Armed groups and criminal networks involved in illicit exploitation or trade of natural resources leading to destabilization can be designated

 Those engaging in or supporting criminal activities and violence involving armed groups and criminal networks that promote violence can be designated

**FIGURE 5** Select UN Security Council resolutions salient to sanctions and organized crime.

SOURCE: Convergence zone: The evolution of targeted sanctions usage against organized crime, GI-TOC, September 2023

HaitiTPSAR000745

15. Decides that the provisions [...] shall apply to individuals and entities, as designated for such measures by the Committee [...], as responsible for or complicit in, or having engaged in, directly or indirectly, actions that threaten the peace, security or stability of Haiti;

16. Decides that such actions [...] include, but are not limited to:
   a. Engaging in, directly or indirectly, or supporting criminal activities and violence involving armed groups and criminal networks that promote violence, including forcible recruitment of children by such groups and networks, kidnappings, trafficking in persons and the smuggling of migrants, and homicides and sexual and gender-based violence;
   b. Supporting illicit trafficking and diversion of arms and related materiel, or illicit financial flows related thereto;
   c. Acting for or on behalf of or at the direction of or otherwise supporting or financing an individual or entity designated in connection with the activity described [...] above, including through the direct or indirect use of the proceeds from organized crime, including proceeds from illicit production and trafficking in drugs and their precursors originating in or transiting through Haiti, the trafficking in persons and the smuggling of migrants from Haiti, or the smuggling and trafficking of arms to or from Haiti;
   d. Acting in violation of the arms embargo established in paragraph 11 of this resolution, or as having directly or indirectly supplied, sold, or transferred to armed groups or criminal networks in Haiti, or as having been the recipient of, arms or any related materiel, or any technical advice, training, or assistance, including financing and financial assistance, related to violent activities of armed groups or criminal networks in Haiti;
   e. Planning, directing, or committing acts that violate international human rights law or acts that constitute human rights abuses, including those involving extrajudicial killing, including of women and children, and the commission of acts of violence, abduction, enforced disappearances, or kidnappings for ransom in Haiti;
   f. Planning, directing or committing acts involving sexual and gender-based violence, including rape and sexual slavery, in Haiti;
   g. Obstructing delivery of humanitarian assistance to Haiti or access to, or distribution of, humanitarian assistance in Haiti;
   h. Attacking personnel or premises of United Nations missions and operations in Haiti, providing support for such attacks[.]

These designations remain relatively narrowly focused, encompassing top leaders of gangs in the Port-au-Prince region. The UN's Panel of Experts on Haiti, which was established to support the work of the Sanctions Committee, issued a report in September 2023 that traces in detail the activities of the criminal networks enabling gangs (notably weapons traffickers) and the politicians and businessmen who allegedly financially support them.

However, the UN Security Council has not imposed sanctions on these actors.[81] This is arguably a missed opportunity, since politicians and businesspeople are more internationally connected, and hence stand to lose more in the event of asset freezes and travel bans.

However, the UN sanctions regime has been complemented by unilateral designations by other jurisdictions, mainly Canada and the United States. Between late 2022 and early 2024, Canada has unilaterally designated 28 individuals under the Special Economic Measures (Haiti) Regulations, focusing mainly on politicians and businessmen linked to the gangs.[82] The US, in turn, has issued nine designations under thematic regimes such as the Global Magnitsky Human Rights Accountability Act and Executive Order 14059, which deals with the global illicit drug trade.[83] There has been substantial bilateral coordination on the designations, with the US and Canada repeatedly issuing sanctions on the same actors. The US has also banned several Haitian actors from entering its territory, under the Department of State 7031(c) authorization, an approach also used by the Dominican Republic, which has banned entry by 52 Haitians.[84]

**FIGURE 6** Designation criteria for the Haiti regime of sanctions.

SOURCE: UN Security Council Resolution 2653, 2022

HaitiTPSAR000746

The EU has established its own framework for issuing designations separate from the UN regime, focused on entities and individuals 'threatening peace, security or stability ... or undermining democracy or the rule of law in Haiti.' However, to date the bloc has not undertaken any such autonomous action.[85]

Notably, US and Canadian authorities have been willing to designate politically powerful individuals. This includes senior officials in the administration of former president Jovenel Moïse, who were then dismissed from the administration, and the president of Haiti's senate.

There is some evidence that UN sanctions and unilateral actions by other jurisdictions are having an effect on the ground. The UN Panel of Experts cites contacts (both Haitians and relevant international personnel) as perceiving a 'relative impact, most notably in terms of change of behaviour, in particular of several political and financial actors.'[86] Recent GI-TOC fieldwork in Haiti indicates that the focus by Canada and the US on businesspeople accused of working with or financing gangs has led to particular concern within the business and political communities, with Haitian banks increasingly limiting services to those designated.[87]

Businessmen who have not yet been targeted said that they were afraid, and were acting in ways designed to mitigate the risk they faced. 'Sanctions provoke fear; fear of losing money, of losing access to dollar bank accounts, of losing local clout, reputation, friendships,' said one prominent Haitian businessman. 'Sanctions are seen as a sword of Damocles, [or] a spider's web that elites cannot control.'[88] Such concern is understandable, given the reliance by the business community on access to international finance and the importance of being able to travel for their work.

Evidence of a net negative impact on the gangs themselves, however, is limited. There may be an impact on how gangs are funded, with businessmen eschewing patronage, but this could prompt the gangs to rely increasingly on kidnappings.[89] Largely, the gang leaders in Haiti are internal actors with a generally limited need to travel abroad or keep funds abroad. While many have extensive international contacts, these are primarily used to facilitate criminal activities and financial profiteering within Haiti, limiting the influence of the current designations.

Added to this, there has been no comprehensive effort to sanction any of the gangs' secondary and tertiary leaders, enablers or logisticians. Rather, the UN and international community have generally followed a similar approach to that taken in more conventional conflict zones; designating in a politically even-handed way key leaders of competing groups. Such a strategy is sensible in a situation defined by political contestation, ensuring sanctions are not interpreted as biased against one side or the other, and hence complicating negotiations.

It is arguably less valuable in a situation of criminal contestation. In such a situation, efforts to designate a range of individual leaders of different gangs arguably lessens the impact sanctions have on each gang overall. In effect, the leader may face difficulties, but the impact on a gang's operations overall is likely to be limited. This stands in contrast to potentially more substantial disruption that can emerge when sanctions are levied comprehensively on senior and mid-level leaders, enablers, logisticians and supporters.

The question of how sanctions on Haiti's gangs are designed – contrasting breadth in targeting numerous gangs as opposed to in-depth focus on one or two – has salience beyond the targeted organizations themselves. The impact of sanctions on the operations of gangs in turn influences how other, non-targeted gangs interpret the threat of sanctions, and influences whether they assess the need to shape their actions so as to avoid the risk of being designated in the future. As previous

HaitiTPSAR000747



**FIGURE 7** Designation objectives and strategic goals of sanctions on criminal actors.

SOURCE: Hard targets: Identifying a framework of objectives for targeted sanctions on illicit economies, GI-TOC, December 2023

GI-TOC research has underscored, this shaping of criminal ecosystems can be an important strategic goal of sanctions approaches on organized crime (see Figure 7).[90]

Finally, there has been limited focus by the relevant international authorities on players in the broader criminal ecosystem that gangs operate within, such as weapons traffickers, meaning that crucial gang logistical networks remain unscathed in their ability to facilitate gangs' continued operations.

Despite the muted impact of designations thus far imposed on gangs, the UN Panel of Experts flagged that many Haitians were keen to see an expansion of UN sanctions. This is a valuable sign of support, and one that is in stark contrast with many other contexts where UN sanctions are seen as an unwelcome imposition.[91] It underscores the need to move aggressively on further designations, both to leverage the current moment of support and validate the expectations of Haitians in the efficacy of the sanctions tool.

HaitiTPSAR000748



Crossroads between Tabarre and Delmas, Port-au-Prince, November 2023. *Photo: Romain Le Cour Grandmaison/GI-TOC*

## The Multinational Security Support mission: A new model of international intervention against organized crime

The second key policy tool developed by the UN and the broader international community to address the challenge posed by gangs in Haiti is the MSS mission, authorized by the UNSC in Resolution 2699 (2023).

It is important to underscore that the drive for the MSS mission came from multiple actors, notably including the Haitian government, with the administration of Ariel Henry detailing in writing and in speeches a desire for an international force to help address gang violence.[92]

The concept of an international mission also received broad support from the UN Secretary General (UNSG) and regional community even before its authorization. On 8 October 2022, the UNSG, António Guterrez, outlined a non-UN mission to support the HNP in a letter addressed to the UNSC.[93] In January 2023, in a declaration issued in Buenos Aires, the heads of state and government of the Community of Latin American and Caribbean States (CELAC), the regional bloc, encouraged member states to consider participating in the multinational force.[94] Following Kenya's announcement that it would consider leading a multinational security support mission to Haiti, the Organization of American States and Caribbean Community (CARICOM) both issued statements in support of this prospect.[95]

Haitian civil society organizations also pressed for an international force to be authorized. In February 2023, a survey presented by the civil society organization Diagnostic and Development Group and a private sector group called the Alliance pour la Gestion des Risques et la Continuité des Activités announced that 79% of respondents (45% of whom were women) favoured assistance in the form of an international armed force.[96] Following meetings with the CARICOM delegation, two Haitian civil society groups issued statements strongly requesting the deployment of international forces.[97]

As the situation in the country continued to deteriorate, the UNSG received a second letter (dated 7 June 2023) from Haiti's prime minister reiterating the request for robust support to Haitian security forces to re-establish peace and security in the country.[98] In response, the UNSG expressed its support for an authorization under Chapter VII of the UN charter in a report to the UNSC .[99] Taking into account the Secretary General's 8 October 2022 letter to the UNSC, a report of the UNSG dated 14 April 2023[100] and a statement issued by Jamaica on behalf of CARICOM in support of the multinational security efforts, the Security Council decided to take action.[101]

HaitiTPSAR000749

| Authorization | The UNSC authorizes member states to form and deploy a Multinational Security Support (MSS) mission in compliance with international law, including international human rights law |
|---|---|
| Lead country | Kenya |
| Duration | 12 months (reviewed after 9 months) |
| Costs of implementation | Voluntary contributions and support from member states and regional organizations |
| Means | Providing operational support for planning and conducting joint security operations to counter gangs<br>Providing support for the provision of security for critical infrastructure and transit locations (airports, ports, schools, hospitals) |
| Urgent temporary measures (including arrest and detention) | Allowed on an exceptional basis<br>Limited scope and time<br>Consistent with the authorization and proportionate<br>Full compliance with international law, including international human rights law<br>Updates to the UNSC when adopted |
| Rules of engagement and directives on the use of force | At the discretion of the leadership of the MSS |
| Arms embargo | Member states shall take all appropriate measures to prevent the direct or indirect supply, sale or transfer to Haiti of small arms, light weapons and ammunitions |
| Other requests | Adoption of appropriate wastewater management and other environmental controls<br>Cooperation with BINUH and other UN agencies<br>Highest standard of transparency, conduct and discipline<br>Information on the scope of operations to be provided to the UNSC prior to deployment |
| Reporting to UNSC | Every three months as part of regular reporting |

**FIGURE 8** The Multinational Security Support mission framework.

## An atypical intervention force

The non-UN form of the MSS intervention is atypical and sets a precedent as a potential new model for international cooperation in security matters. It is the first time that the UNSC has invoked Chapter 7 for a non-UN mission to address organized crime and violence associated with it. Traditionally, Chapter 7 has been used to set out the UNSC's powers to maintain peace by recognizing a threat to security, a breach to peace or aggression.[102] This generally means a deployment of UN blue helmets with a mandate to take military and nonmilitary action to 'restore international peace and security'. When non-UN missions have been deployed since the Cold War, generally they have been very temporary, giving way to a UN peacekeeping mission. This is not the case with the MSS mission, which is envisioned as a sole intervention force.

Notably, the resolution does not detail UN leadership of the mission. This does not mean the UN is not involved with the implementation of the mission. The UN will provide logistical and operational support to the MSS mission. The Resolution also establishes detailed reporting requirements by the MSS mission to the UNSC.[103] It requests that the mission continuously coordinate with the United Nations Integrated Office in Haiti (BINUH), which is mandated to promote and strengthen political

HaitiTPSAR000750