**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL TPS ALLIANCE; MARIELA GONZALEZ; FREDDY ARAPE RIVAS; M.H.; CECILIA GONZALEZ HERRERA; ALBA PURICA HERNANDEZ; E. R.; HENDRINA VIVAS CASTILLO; VILES DORSAINVIL; A.C.A.; SHERIKA BLANC, | No. 25-5724 D.C. No. 3:25-cv-01766-EMC |
| *Plaintiffs - Appellees*, | |
| v. | |
| KRISTI NOEM; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES OF AMERICA, | OPINION |
| *Defendants - Appellants*. | |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted January 14, 2026
Pasadena, California

Filed January 28, 2026

Before: Kim McLane Wardlaw, Salvador Mendoza, Jr., and
Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Wardlaw;
Concurrence by Judge Mendoza

## SUMMARY[*]

### Immigration / APA § 706 Set Asides

The panel affirmed the district court's judgment setting
aside, under Administrative Procedure Act ("APA") § 706,
Secretary of Homeland Security Kristi Noem's vacatur and
termination of Venezuela's Temporary Protected Status
("TPS") designation and her partial vacatur of Haiti's TPS
designation, holding that the Secretary exceeded her
statutory authority in taking these actions.

Secretary Noem vacated the prior administration's
extension of TPS for Venezuela, which had extended that
status through October 2, 2026 ("Venezuela Vacatur"), and
terminated Venezuela's TPS effective April 3, 2025
(Venezuela Termination"). Secretary Noem also partially
vacated the prior administration's extension of Haiti's TPS
such that the designation would expire in August 2025,
instead of February 2026 ("Haiti Partial Vacatur").

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

The panel rejected the Government's argument that it was bound by the Supreme Court's determinations that the Government was likely to succeed on the merits. The panel explained that the Supreme Court's two emergency stay orders did not expressly decide that issue; rather, the Court may have granted the stay based on the balance of the equities or the parties' respective irreparable harms.

The panel held that Plaintiffs' APA challenges to the Secretary's statutory authority were not barred by 8 U.S.C. § 1254a(b)(5), which bars judicial review of "any determination" of the Secretary with respect to designation, termination or extension of TPS. The panel noted that it had rejected the same argument in *National TPS Alliance v. Noem*, 150 F.4th 1008 (9th Cir. 2025) ("*NTPSA I*").

As the panel had also concluded in *NTPSA I*, it held that 8 U.S.C. § 1252(f)(1), which bars courts (other than the Supreme Court) from enjoining of restraining the operation of certain immigration provisions, does not bar set-aside relief under § 706 of the APA.

As to the Venezuela Vacatur, the panel explained that Secretary Noem, finding no support in the TPS statute for her claim of authority to vacate a prior designation or extension, argued that she has "inherent authority" to reconsider and vacate the TPS extensions. The panel rejected this argument, concluding that there is no explicit, implied, or inherent authority to vacate a prior TPS determination.

Accordingly, as to the Venezuela Vacatur—which vacated the prior administration's extension of TPS for Venezuela through October 2, 2026—the panel concluded that the Secretary exceeded her authority under the TPS statute.

As to the Venezuela Termination, the panel also concluded that that Secretary Noem exceeded her authority under the TPS statute. Because the prior administration's extension remains in effect until October 2, 2026, Secretary Noem's attempt to terminate Venezuela's TPS with an April 2025 effective date violated the plain text of the TPS statute, which provides that a termination cannot be effective earlier than the expiration of the most recent previous extension.

As to the Haiti Partial Vacatur, the panel held that Secretary Noem lacked the statutory authority for the same reasons that she lacked the authority with respect to the Venezuela Vacatur.

Finally, the panel held that the district court did not abuse its discretion by setting aside the Secretary's unlawful actions in full under APA § 706(2). The panel explained that relief could not be limited to NTPSA's members because Plaintiffs did not simply challenge the application of the actions to themselves, they challenged the Secretary's very authority to act.

Because of the exigencies presented by this case, the panel provided that the mandate shall issue seven days after the publication of this decision.

Judge Mendoza concurred, joined by Judge Wardlaw as to Parts I and II. In Part I, Judge Mendoza concluded that neither 8 U.S.C. § 1254a(b)(5)(A) nor 8 U.S.C. § 1252(f)(1) barred review of whether the actions were arbitrary and capricious. In Part II, Judge Mendoza concluded that Secretary Noem's actions were arbitrary and capricious, as even a cursory review of the record indicates that her decisions were both preordained and rooted in pretext. In Part III, Judge Mendoza wrote that the pretext here was cloaking animus on the basis of race and national origin,

which was amply evident in the record in the Secretary's and President's remarks that diagnosed immigrants from Venezuela and Haiti as dangerous criminals or mentally unwell.

---

## COUNSEL

Ahilan T. Arulanantham (argued), Center for Immigration Law and Policy, UCLA School of Law, Los Angeles, California; Diana Sanchez and Eva L. Bitran, American Civil Liberties Union Foundation of Southern California, Los Angeles, California; Michelle Y. Cho, Emilou MacLean, and Amanda Young, American Civil Liberties Union Foundation of Northern California, San Francisco, California; Jessica K. Bansal and Lauren M. Wilfong, National Day Laborer Organizing Network, Pasadena, California; Erik M. Crew, Haitian Bridge Alliance, San Diego, California; for Plaintiffs-Appellees.

Sarah Welch (argued), Counsel to the Assistant Attorney General; Carlton F. Sheffield, Jeffrey M. Hartman, Eric M. Snyderman, Craig A. Newell Jr., and Lauren Bryant, Trial Attorneys; Drew C. Ensign, Deputy Assistant Attorney General; William H. Weiland, Acting Assistant Director; Office of Immigration Litigation; Yaakov M. Roth, Principal Deputy Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Christopher J. Hajec, Matt A Crapo, and Jonathon P. Hauenschild, Federation for American Immigration Reform,

Washington, D.C., for Amicus Curiae Federation for American Immigration Reform.

Annabelle C. Wilmott, Brandy Doyle, and Jesse Basbaum, Deputy Attorneys General; Vilma Palma-Solana, Supervising Deputy Attorney General; Michael Newman, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, Sacramento, California; Cleland B. Welton II, Assistant Solicitor General; Zoe Levine, Special Counsel for Immigrant Justice; Judith N. Vale, Deputy Solicitor General; Barbara D. Underwood, Solicitor General; Letitia James, New York Attorney General; Office of the New York Attorney General, New York, New York; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Brian L. Schwalb, District of Columbia Attorney General, Office of the District of Columbia Attorney General, Washington, D.C.; Anne E. Lopez, Hawaiʻi Attorney General, Office of the Hawaiʻi Attorney General, Honolulu, Hawaiʻi; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Andrea J. Campbell, Massachusetts Attorney General, Office of the Massachusetts Attorney General, Boston, Massachusetts; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Dan Rayfield, Oregon Attorney General, Office of the Oregon

Attorney General, Salem, Oregon; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Nicholas W. Brown, Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; for Amici Curiae States of California, New York, Colorado, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, Oregon, Vermont, Washington, and the District of Columbia.

Vincent Levy, Colin A. Mark, and Torrell E. Mills, Holwell Shuster & Goldberg LLP, New York, New York, for Amici Curiae Economists.

Daniel R. Suvor, O'Melveny & Myers LLP, Los Angeles, California; Adam Cederbaum, Corporation Counsel, Boston, Massachusetts; Ben Pearlman, County Attorney, Boulder, Colorado; Megan B. Bayer, City Solicitor, City of Cambridge Law Department, Cambridge, Massachusetts; Hydee F. Soto, City Attorney, Los Angeles, California; Heather Ferbert, City Attorney, San Diego, California; Kristyn Anderson, City Attorney, Minneapolis, Minnesota; Muriel Goode-Trufant, Corporation Counsel, New York, New York; Ryan Richardson, City Attorney, Oakland, California; Robert Taylor, City Attorney, Portland, Oregon; Lyndsey M. Olson, City Attorney, St. Paul, Minnesota; David Chiu, City Attorney, San Francisco, California; Tony Lopresti, County Counsel, San Jose, California; Lauren Langer, City Attorney, Best Best & Krieger LLP, Los Angeles, California; for Amici Curiae 14 Local Governments.

Anne Lai, UC Irvine School of Law, Irvine, California; Jaya Ramji-Nogales, Beasley School of Law, Temple University, Philadelphia; Andrew I. Schoenholtz, Georgetown University Law Center, Washington, D.C.; for Amici Curiae Immigration Law Scholars.

Stephen J. Van Stempvoort and Amanda L. Rauh-Bieri, Miller Johnson, Grand Rapids, Michigan; Robert S. Chang and Shaleen Shanbhag, Fred T. Korematsu Center for Law and Equality, UC Irvine School of Law, Irvine, California; Rose Cuion-Villazor, Center for Immigrant Justice, Rutgers Law School, Newark, New Jersey; for Amici Curiae Members of Congress.

---

## OPINION

WARDLAW, Circuit Judge:

We again consider the National TPS Alliance's and individual Temporary Protected Status ("TPS") beneficiaries' (collectively, Plaintiffs) challenge to Department of Homeland Security ("DHS") Secretary Kristi Noem's vacatur and termination of Venezuela's TPS designation. We also consider Plaintiffs' challenge to Secretary Noem's partial vacatur of Haiti's TPS designation. The district court held that the Secretary's actions exceeded her statutory authority under the TPS statute, 8 U.S.C. § 1254a, and that the Secretary acted in an arbitrary and capricious manner. The district court therefore set aside the Venezuelan vacatur and termination, and the Haitian partial vacatur. We affirm.

Congress created TPS to provide stability, predictability, and a brief reprieve from deportation to qualifying citizens of designated countries. The catch: that reprieve is guaranteed for no more than 18 months at a time. *See* 8 U.S.C. § 1254a(b)(2)(B), (b)(3)(C). The TPS statute grants the Secretary of Homeland Security significant discretion and authority in designating, extending, and terminating a country's TPS. But by its plain language, the statute does not grant the Secretary the power to vacate an existing TPS designation. Secretary Noem exceeded her statutory authority by vacating and terminating Venezuela's TPS designation, and by partially vacating Haiti's TPS designation.

The Secretary's unlawful actions have had real and significant consequences for the hundreds of thousands of Venezuelans and Haitians in the United States who rely on TPS. The record is replete with examples of hard-working, contributing members of society—who are mothers, fathers, wives, husbands, and partners of U.S. citizens, pay taxes, and have no criminal records—who have been deported or detained after losing their TPS. Other TPS beneficiaries have lost their jobs after the Secretary stripped them of their work authorization forms, leaving them with no ability to provide for their families. Some beneficiaries, unable to work legally, have now lost their homes, rendering them and their families homeless. The Secretary's actions affect physicians, artists, automotive mechanics, food service employees, construction workers, students, and thousands of others who "didn't come [to the United States] for hand-outs," but "to work hard." The Secretary's actions have left hundreds of thousands of people in a constant state of fear that they will be deported, detained, separated from their

families, and returned to a country in which they were
subjected to violence or any other number of harms.

The Secretary's actions fundamentally contradict
Congress's statutory design, and her assertion of a raw,
unchecked power to vacate a country's TPS is irreconcilable
with the plain language of the statute. The district court
correctly set aside the Secretary's unlawful actions.

## I. FACTUAL BACKGROUND

### A. History of Temporary Protected Status

The TPS statute was Congress's solution to the
unprincipled and largely unchecked power that presidents
enjoyed through the extended voluntary departure ("EVD")
program. EVD was a discretionary power of the president
to allow foreign nationals to remain in the United States for
humanitarian reasons. As we explained in *National TPS
Alliance v. Noem*, 150 F.4th 1000, 1008 (9th Cir. 2025)
("*NTPSA I*"), in creating the TPS statutory program,
"Congress designed a system of temporary status that was
predictable, dependable, and insulated from electoral
politics." In effect, Congress codified the executive branch's
existing EVD powers, but added guardrails and provided
guidance on the circumstances in which Congress deemed it
appropriate to permit foreign nationals to remain in the
United States. Once a country is designated for TPS, foreign
nationals of that country may apply for immigration status,
which, if granted, prevents them from being removed from
the U.S. and enables them to obtain authorization to work

during the period of designation. *See* 8 U.S.C. § 1254a(a)(1).[1]

The TPS statute did not replace EVD. In fact, after the TPS statute was enacted, President George H.W. Bush created Deferred Enforced Departure ("DED"), another extra-statutory discretionary power of the president to provide work authorization and protection from deportation to certain foreign nationals. *See NTPSA I*, 150 F.4th at 1009 (citing Andrew I. Schoenholtz, *The Promise and Challenge of Humanitarian Protection in the United States: Making Temporary Protected Status Work as a Safe Haven*, 15 NW. J. L. & SOC. POL'Y 1, 5 (2019)). DED protections have been authorized for several countries across multiple presidential administrations. *Id.* Unlike EVD and DED, however, Temporary Protected Status is, as its name suggests, temporary. *See* § 1254a(b)(2)(B), (c)(3)(C). TPS can be granted or extended only when specified country conditions exist, such as armed conflict, natural disaster, significant instability, or other "extraordinary and temporary conditions in the foreign state." *See* § 1254a(b)(1). And TPS is constrained by procedural requirements that the Secretary must follow before designating, extending, or terminating a country's TPS. *See generally* § 1254a.

Since the TPS statute was enacted in 1990, more than twenty countries have received TPS designations. TPS has been used to address Ebola outbreaks in Guinea and Sierra Leone, genocide in Rwanda, and civil war in Somalia.[2] TPS

---

[1] Unless otherwise specified, statutory citations are to Title 8 of the U.S. Code.

[2] *See* Designation of Guinea for Temporary Protected Status, 79 Fed. Reg. 69511 (Nov. 21, 2014); Designation of Sierra Leone for Temporary Protected Status, 79 Fed. Reg. 69506 (Nov. 21, 2014); Designation of

designations have been extended for countries with
persisting qualifying country conditions and terminated for
countries in which conditions have improved.[3]  In the thirty-
five-year history of TPS, however, no presidential
administration had ever asserted the power to vacate an
existing TPS designation, until the Second Trump
Administration did so in 2025.

### B. Venezuela's TPS Designation, Extension, Vacatur, and Termination

In March 2021, then-Secretary Mayorkas designated
Venezuela for TPS ("2021 Designation").  86 Fed. Reg.
13574 (Mar. 9, 2021).  This designation was extended twice.
*See* 87 Fed. Reg. 55024 (Sept. 8, 2022); 88 Fed. Reg. 68130
(Oct. 3, 2023).  Secretary Mayorkas's second extension
simultaneously re-designated Venezuela for TPS ("2023
Designation"), expanding the pool of Venezuelans eligible
for protection.  88 Fed. Reg. 68130 (Oct. 3, 2023).  The
second extension of the 2021 Designation "allow[ed]
existing TPS beneficiaries to retain TPS through" the
expiration of the extension but required them to "re-register
during the re-registration period."  *Id.* at 68130.  The
eligibility criteria for TPS beneficiaries did not change.  In
other words, the population of Venezuelan citizens eligible
for TPS under the 2021 Designation would also be eligible
for TPS under the 2023 Designation.  *Id.*  However, as of

Rwanda Under Temporary Protected Status Program, 59 Fed. Reg.
29440 (June 7, 1994); Designation of Nationals of Somalia for
Temporary Protected Status, 56 Fed. Reg. 46804 (Sept. 16, 1991).

[3] *See, e.g.*, Extension of the Designation of Somalia for Temporary
Protected Status, 83 Fed. Reg. 43695 (Aug. 27, 2018); Termination of
the Designation of Angola Under the Temporary Protected Status
Program, 68 Fed. Reg. 3896 (Jan. 27, 2003).

October 2023, existing 2021 Designation beneficiaries re-registered for TPS separately from beneficiaries of the 2023 Designation. *Id.* The 2021 Designation, as extended, was set to expire on September 10, 2025, and the 2023 Designation was set to expire on April 2, 2025. *Id.* at 68134.

On January 17, 2025, Secretary Mayorkas extended the 2023 Designation by eighteen months, through October 2, 2026 ("2025 Extension").[4]   90 Fed. Reg. 5961 (Jan. 17, 2025).   The extension was set to become effective on April 3, 2025.   *Id.* at 5962.   Because the 2021 and 2023 Designations had resulted in two distinct registration and filing processes, Secretary Mayorkas consolidated them. *Id.* at 5963.   Secretary Mayorkas found that "[o]perational challenges in the identification and adjudication of Venezuela TPS filings and confusion among stakeholders exist because of the two separate TPS designations," and consolidated the filing processes to "decrease confusion[,] . . . ensure optimal operational processes, and maintain the same eligibility requirements." *Id.*

President Trump's second term began on January 20, 2025.  His administration immediately began the process of vacating the 2025 Extension.

On January 24, 2025, DHS began drafting the decision to vacate the TPS extension.  Secretary Noem was confirmed the next day.  On January 25, 2025, DHS told lawyers who had been involved in the 2025 Extension that DHS was "not at all interested in revisiting the substance of whether [the vacatur] should go forward."   The vacatur decision was

---

[4] The 2021 Designation was not extended, but beneficiaries of the 2021 Designation could re-register under the 2025 Extension, and receive TPS through October 2, 2026, as a result.  90 Fed. Reg. at 5962.

finalized on January 27, 2025, and signed by Secretary Noem on January 28, 2025.  The vacatur decision ("Venezuela Vacatur") was published in the Federal Register on February 3, 2025.  90 Fed. Reg. 8805.

The Venezuela Vacatur described the 2025 Extension as "novel[,] . . . thin and inadequately developed," and concluded that "vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance."  90 Fed. Reg. at 8807.  As support for its conclusion, the Venezuelan Vacatur cited President Trump's January 20, 2025, Executive Order entitled "Protecting the American People Against Invasion."  *Id.* at 8807 n.3 (citing Exec. Order No. 14159, *reprinted in* 90 Fed. Reg. 8443 (Jan. 29, 2025)).  The vacatur did not include any analysis of country conditions evidence.  *Id.*

On January 26, 2025, before the vacatur was finalized, DHS began drafting a termination of Venezuela's TPS. Secretary Rubio provided recommendations to Secretary Noem on January 31, 2025, in a one-and-a-half-page letter. The letter addressed only the United States' national interest in terminating TPS for Venezuela and did not discuss country conditions.   United States Citizenship and Immigration Services ("USCIS") recommended termination that same day.  Secretary Noem signed off on the termination on February 1, 2025, and the termination decision ("Venezuela Termination") was published in the Federal Register on February 5, 2025.  90 Fed. Reg. 9041–42.  The Secretary terminated the 2023 Designation, which was set to expire on October 2, 2026, but not the 2021 Designation, which had only been extended to September 10, 2025.  *Id.* at 9042, 9044.

The Venezuela Termination concluded that "it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States." 90 Fed. Reg. at 9042. The Termination stated that "there are notable improvements in several areas such as the economy, public health, and crime that allow for [Venezuelan] nationals to be safely returned to their home country." *Id.* However, it also stated that, "even assuming the relevant [country] conditions in Venezuela remain[ed] both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation [was] required" because the Secretary concluded that "it [was] contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States." *Id.* Secretary Noem ultimately declined to make any factual findings as to the country conditions in Venezuela, explaining that she was "not required to make findings on issues the decision of which is unnecessary to the results [she] reach[ed]." *Id.* at 9042 n.3 (quoting *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam)). In other words, the Secretary confirmed that she was relying solely on the national interest ground for terminating Venezuela's TPS. *Id.*

C. Haiti's TPS Designation, Extension, and Partial Vacatur

Haiti has been designated for TPS for sixteen years. Haiti was initially designated for TPS in 2010, after a 7.0 magnitude earthquake "destroyed most of the capital city" and crippled its critical infrastructure. Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476, 3477 (Jan. 21, 2010). DHS concluded that "there clearly exist[ed] extraordinary and temporary conditions preventing Haitian nationals from returning to Haiti in safety" "[g]iven the size of the destruction and humanitarian challenges." *Id.*

Case: 25-5724, 01/28/2026, DktEntry: 74.1, Page 16 of 78
Case 3:25-cv-01766-EMC   Document 374   Filed 01/28/26   Page 16 of 7

16                NATIONAL TPS ALLIANCE V. NOEM

Haiti's TPS was repeatedly extended due to ongoing complications caused by the earthquake, as well as a cholera epidemic. *See, e.g.*, 77 Fed. Reg. 59943, 59944 (Oct. 1, 2012) (extending Haiti's TPS due to continued extraordinary conditions caused by the earthquake, as well as a "deadly cholera outbreak"). The First Trump Administration extended Haiti's TPS designation once, for six months.[5] *See* Extension of the Designation of Haiti for Temporary Protected Status, 82 Fed. Reg. 23830 (May 24, 2017). The Administration then attempted to terminate Haiti's TPS designation, effective as of July 22, 2019. *See* Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2648 (Jan. 18, 2018). A district court enjoined that termination, *Saget*, 375 F. Supp. 3d at 379, and the new Biden Administration withdrew the Government's pending appeal of the order enjoining the termination, *see Saget v. Biden*, 2021 WL 12137584 (Oct. 5, 2021).

Haiti was designated again for TPS in August 2021. *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41863 (Aug. 3, 2021). Secretary Mayorkas extended and redesignated Haiti's TPS in 2023, *see* 88 Fed. Reg. 5022 (Jan. 26, 2023), and again in 2024, *see* 89 Fed. Reg. 54484 (July 1, 2024). The July 2024 re-designation and extension was set to expire on February 3, 2026. *Id.*

On February 7, 2025, DHS prepared and circulated a draft decision partially vacating Secretary Mayorkas' July 2024 extension. The draft decision was reviewed and signed off by DHS staff between February 14 and 17 and signed by Secretary Noem on February 18, 2025. DHS announced the

---

[5] It was already clear as of the May 2017 extension that Haiti's TPS would soon be terminated. *See Saget v. Trump*, 375 F. Supp. 3d 280, 312 (E.D.N.Y. 2019).

Case: 25-5724, 01/28/2026, DktEntry: 74.1, Page 17 of 78
Case 3:25-cv-01766-EMC   Document 374   Filed 01/28/26   Page 17 of 7

NATIONAL TPS ALLIANCE V. NOEM                    17

vacatur in a press release on February 20, 2025, and it was
published in the Federal Register on February 24, 2025
("Haiti Partial Vacatur").  *See* Partial Vacatur of 2024
Temporary Protected Status Decision for Haiti, 90 Fed. Reg.
10511 (Feb. 24, 2025).

The Haiti Partial Vacatur explained that it was
shortening Haiti's TPS designation period "from 18 months
to 12 months," such that the designation would expire on
August 3, 2025, instead of February 3, 2026. *Id.* DHS
offered three reasons for the Partial Vacatur of Secretary
Mayorkas's extension: first, Secretary Mayorkas's July 1,
2024, notice failed to explain why an 18-month TPS period
was selected instead of a 6- or 12-month period; second, the
notice did not explain why permitting Haitians to remain in
the United States was not contrary to the national interest of
the United States; and third, the country conditions reports
on which Secretary Mayorkas relied actually suggested "an
improvement in conditions." *Id.* at 10513.  Secretary Noem
subsequently terminated Haiti's TPS, effective September 2,
2025 ("Haiti Termination").[6]  *See* 90 Fed. Reg. 28760 (July
1, 2025).

## II.  Procedural History

Plaintiffs filed suit in the United States District Court for
the Northern District of California on February 19, 2025.
The district court granted Plaintiffs' motion to postpone the
Venezuela Vacatur on March 31, 2025. *National TPS
Alliance v. Noem*, 773 F. Supp. 3d 807 (N.D. Cal. 2025).
The Government sought a stay of the district court's order
from our court, which we denied. *National TPS Alliance v.
Noem*, 2025 WL 1142444 (9th Cir. Apr. 18, 2025).  The

---

[6] This appeal does not concern the Haiti Termination.

Government then turned to the Supreme Court, which granted the Government's emergency request to stay the district court's order on May 19, 2025. *National TPS Alliance v. Noem*, 145 S. Ct. 2728 (Mem.) (2025). We affirmed the district court's postponement order on August 29, 2025. *NTPSA I*.

On September 5, 2025, the district court granted partial summary judgment to Plaintiffs on their Administrative Procedure Act ("APA") claims, and set aside both the Secretary's vacatur and termination of Venezuela's TPS designation, and the partial vacatur of Haiti's TPS designation under APA § 706. *National TPS Alliance v. Noem*, 798 F. Supp. 3d 1108 (N.D. Cal. Sept. 5, 2025). We denied the Government's emergency stay request on September 17, 2025. *National TPS Alliance v. Noem*, --- F.4th ---, 2025 WL 2661556 ("*NTPSA II*"). The Supreme Court granted a stay of the district court's set aside order on October 3, 2025. *Noem v. National TPS Alliance*, 606 U.S. ---, 2025 WL 2812732 (2025). The Government timely appealed the September 5, 2025, partial summary judgment order.

### III.  Standard of Review

"We review the district court's grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to the non-moving party." *Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1127 (9th Cir. 2020) (quoting *Cohen v. City of Culver City*, 754 F.3d 690, 694 (9th Cir. 2014)).

Case: 25-5724, 01/28/2026, DktEntry: 74.1, Page 19 of 78
Case 3:25-cv-01766-EMC   Document 374   Filed 01/28/26   Page 19 of 7

NATIONAL TPS ALLIANCE V. NOEM                19

## IV.  Effect of the Supreme Court's Emergency Stay Orders

At the outset, we address the Government's argument that we are bound by the Supreme Court's twice determination that the Government is likely to succeed on the merits.  However, the Supreme Court's emergency stay orders did not expressly decide the issue of whether the Government was likely to succeed on the merits of this case, so we reject the Government's argument that the stay orders control our determination of this case.  *See Noem v. National TPS Alliance*, 606 U.S. ---, 2025 WL 2812732, at *1 (Mem.) (2025) ("Although the posture of the case has changed, the parties' legal arguments and relative harms generally have not.  The same result that we reached in May is appropriate here.").

Unlike *NTPSA I* and *NTPSA II*, our opinion today for the first time addresses solely the merits of Plaintiffs' claims.  Because "[w]e can only guess as to the Court's rationale when it provides none," we are wary of the possibility that the Court granted the Government's emergency stay application due to its assessment of the balance of the equities or the parties' respective irreparable harms, rather than its assessment of the merits.  *NTPSA II*, 2025 WL 2661556, at *2–3.

The Supreme Court's unreasoned stay orders were "not conclusive as to the merits."  *Trump v. Boyle*, 606 U.S. ---, 145 S. Ct. 2653, 2654 (2025).   While they may have informed "how [we] should exercise [our] equitable discretion in like cases," in this appeal, we are confronted with legal questions, not equitable ones.  *Id.*; *cf. Noem v. National TPS Alliance*, 2025 WL 2812732, at *2 (Jackson, J., dissenting) (arguing that the Court "misjudge[d] the

irreparable harm and balance-of-the-equities factors," rather than addressing the merits). We therefore conclude that the Supreme Court's October 3, 2025, stay order is not controlling as to the outcome of this case.

## V. Structure of the TPS Statute

Under the TPS statute, 8 U.S.C. § 1254a, the Secretary of Homeland Security may designate any foreign state for TPS, permitting qualifying foreign nationals of the designated state to apply for protection from removal and work authorization.[7] The statute sets forth the following procedure for designating a country for TPS:

> (1) The [Secretary], after consultation with appropriate agencies of the Government, may designate any foreign state (or any part of such foreign state) under this subsection only if--
>
> (A) the [Secretary] finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (B) the [Secretary] finds that--
>
> (i) there has been an earthquake, flood, drought, epidemic, or other

---

[7] The TPS statute originally granted this authority to the Attorney General. *See generally* 8 U.S.C. § 1254a. The Attorney General subsequently delegated the responsibility for administering the statute to the Secretary of Homeland Security. *See Nat. TPS Alliance*, 798 F. Supp. 3d at 1117 n.1.

> environmental disaster in the state
> resulting in a substantial, but
> temporary, disruption of living
> conditions in the area affected,
> (ii) the foreign state is unable,
> temporarily, to handle adequately the
> return to the state of aliens who are
> nationals of the state, and
> (iii) the foreign state officially has
> requested designation under this
> subparagraph; or
> (C) the [Secretary] finds that there exist
> extraordinary and temporary conditions
> in the foreign state that prevent aliens
> who are nationals of the state from
> returning to the state in safety, unless the
> [Secretary] finds that permitting the
> aliens to remain temporarily in the United
> States is contrary to the national interest
> of the United States.

§ 1254a(b)(1).   Under the statute, the Secretary may
designate a foreign state for TPS for a minimum of six
months and a maximum of eighteen months. *Id*. Before the
period of designation expires, the Secretary is required to
follow the following procedures to determine whether the
designation should be extended or terminated:

> (A) Periodic review
> At least 60 days before end of the initial
> period of designation, and any extended
> period of designation, of a foreign state (or
> part thereof) under this section the
> [Secretary], after consultation with

appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met. The [Secretary] shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register.

(B) Termination of designation

If the [Secretary] determines under subparagraph (A) that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the [Secretary] shall terminate the designation by publishing notice in the Federal Register of the determination under this subparagraph (including the basis for the determination). Such termination is effective in accordance with subsection (d)(3), but shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C).

(C) Extension of designation

If the [Secretary] does not determine under subparagraph (A) that a foreign state (or part of such foreign state) no longer meets the

> conditions for designation under paragraph
> (1), the period of designation of the foreign
> state is extended for an additional period of 6
> months (or, in the discretion of the
> [Secretary], a period of 12 or 18 months).

§ 1254a(b)(3).  The statute also sets forth the procedure by
which foreign nationals of TPS-designated states can qualify
and apply for work authorization and protection from
removal, as well as the Secretary's authority to withdraw a
foreign national's TPS.  *See* § 1254a(a)(1), (c)(1)–(3).

### VI.  Venezuela Vacatur

A.  8 U.S.C. § 1254a(b)(5)(A) – Judicial Review Bar

Section 1254a(b)(5)(A) provides: "There is no judicial
review of any determination of the [Secretary] with respect
to the designation, or termination or extension of a
designation, of a foreign state" for TPS.  The Government
argues that this subsection forecloses judicial review of all
of Plaintiffs' APA challenges.  We rejected this argument in
*NTPSA I* and do so again here.  150 F.4th at 1016–1018.

We begin with the strong presumption "that Congress
intends judicial review of administrative actions."  *NTPSA I*,
150 F.4th at 1016 (citing *Hyatt v. Off. of Mgmt. & Budget*,
908 F.3d 1165, 1170–71 (9th Cir. 2018)).  "This
presumption can only be overcome by 'clear and convincing
evidence of a contrary legislative intent.'"  *Id.* (quoting
*Hyatt*, 908 F.3d at 1171).  We therefore ask whether "the
congressional intent to preclude judicial review is fairly
discernible in the statutory scheme."  *Id.* (quoting *Hyatt*, 908
F.3d at 1171).  As we explained in *NTPSA I*, the presumption
of reviewability is particularly strong where the claim is that
agency action was taken in excess of delegated authority.  *Id.*

"The assertion that a statute bars substantial statutory and constitutional claims is 'an extreme position.'" *Id.* (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 680–81 (1986)).

"When interpreting a statute, we are guided by the fundamental canons of statutory construction and begin with the statutory text." *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015). "We interpret statutory terms in accordance with their ordinary meaning, unless the statute clearly expresses an intention to the contrary." *Id.* "We must 'interpret the statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.'" *Id.* (quoting *Boise Cascade Corp. v. United States E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991) (citation modified)). "Our analysis can begin and end with [the statutory] text." *Bottinelli v. Salazar*, 929 F.3d 1196, 1199 (9th Cir. 2019).

The Government argues that the plain text of the statute "forecloses judicial review of 'any' TPS 'determinations,' regardless of the kind of challenge to the determination." In the Government's view, the statute's use of "determination" means that *any* "decision" related to a TPS designation, extension, or termination by the Secretary is entirely unreviewable. As we explained in *NTPSA I*, however, the scope and "extent of statutory authority granted to the Secretary is a first order question that is not a 'determination . . . with respect to the designation, or termination or extension' of a country for TPS." 150 F.4th at 1017 (quoting § 1254a(b)(5)(A)). Thus, the plain language of the statute does not bar judicial review of challenges to the Secretary's statutory authority.

If Congress had intended the statute to preclude judicial review of all the Secretary's actions, it could have used broader language. In *McNary v. Haitian Refugee Center, Inc.*, the Supreme Court considered the scope of the judicial review bar in 8 U.S.C. § 1160(e)(1), a provision of the Immigration Reform and Control Act of 1986 ("IRCA") which provided that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection."  498 U.S. 479, 491–92 (1991).  The Court rejected the argument that the statute operated as a total bar, holding that "had Congress intended the limited review provisions . . . to encompass challenges to [Immigration and Naturalization Service] procedures and practices, it could easily have used broader statutory language," such as language precluding review of "all causes . . . arising" under the IRCA, or of "all questions of law and fact." *Id.* at 494

Similarly, in *Reno v. Catholic Social Services, Inc.*, the Court addressed a challenge to the INS's narrow interpretation of a provision of the IRCA determining eligibility for a temporary resident to apply for permanent status.  509 U.S. 43, 47 (1993) ("*CSS*").  The Court rejected the Government's argument that another judicial review bar in the IRCA, which precluded "judicial review of a determination respecting an application for adjustment of status," 8 U.S.C § 1255a(f)(1), precluded judicial review of plaintiffs' statutory interpretation claim, *id.* at 55.  In both *McNary* and *CSS*, the Court concluded that the judicial review bars did not apply to challenges to a "practice or procedure employed in making decisions." *CSS*, 509 U.S. at 56 (quoting *McNary*, 498 U.S. at 492). Applying *McNary* and *CSS* to the case at hand, it is clear that

§ 1254a(b)(5)(A)'s bar on judicial review of "any determination . . . with respect to the designation, or termination or extension" cannot apply to a claim that the Secretary exceeded her statutory authority.[8]

Moreover, the Government's interpretation produces absurd results. *See United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013) (the canon against absurdity provides that "[s]tatutory interpretations which would produce absurd results are to be avoided" (citation omitted)). As we explained in *NTPSA I*, "the TPS statute limits each TPS designation period to between six and eighteen months, but holding that we lack jurisdiction to review questions of statutory interpretation would make unreviewable a Secretary's decision to authorize a statutorily prohibited thirty-year TPS period." 150 F.4th at 1018 n.7 (internal citation omitted). When confronted with this reality at oral argument, the Government argued that "the review bar would cover" a challenge to a thirty-year TPS designation and that "Congress would have expected" the bar to apply in this manner. If that's true, then it's difficult to see why Congress bothered to limit the period of a designation at all, or why it included any of the statute's other procedural and substantive limits on the Secretary's authority. *See Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012) (the "canon against surplusage . . . favors that interpretation which *avoids* surplusage").

The Government characterizes the nature of Plaintiffs' APA claims at a high level of generality: because Plaintiffs

---

[8] Indeed, our holding is much more modest than *McNary* and *CSS*. We decide only that a challenge to the Secretary's statutory authority is reviewable. We save for another day whether other aspects of Plaintiffs' APA challenges would be reviewable under the TPS statute.

challenge the Secretary's vacatur, they challenge a decision about a TPS designation; and because a decision about a TPS designation is the same as a "determination . . . with respect to the designation, or termination or extension of a designation, of a foreign state," the review bar applies. Yet there is no limiting principle to the Government's argument. For example, if a Secretary decided to sell TPS designations, that decision would be unreviewable under the Government's interpretation because that action could be characterized as a decision about a TPS designation. The same is true for a Secretary's decision to limit TPS designations to countries with perceived favored racial or ethnic populations. As we have explained, the TPS statute was designed to constrain executive authority by adding guardrails to the unchecked power of administrations over the EVD program. *See NTPSA I*, 150 F.4th at 1017–18. It was not meant to be a blank check.

Section 1254a(b)(5)(A) simply cannot bear the weight of the Government's expansive interpretation. And the Government's arguments are certainly insufficient to overcome the strong presumption of judicial reviewability that applies in this case. *See Hyatt*, 908 F.3d 1165, 1170–71. We hold that § 1254a(b)(5)(A) does not bar judicial review of a claim that the Secretary exceeded her statutory authority. Because we resolve this case on that basis alone, we need not decide whether other types of APA challenges would be subject to the statute's review bar.

B.  8 U.S.C. § 1252(f)(1) – Impermissible Restraint

8 U.S.C. § 1252(f)(1), as enacted in the Immigration and Naturalization Act,[9] provides that:

> In general. Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II [8 U.S.C. §§ 1221 et seq.], as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.

The district court set aside the Secretary's vacatur under § 706 of the APA.  Under that provision, a reviewing court may "hold unlawful and set aside agency action" where that action is "found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).  On appeal, the Government argues that relief under § 706 "impermissibly restrains the Secretary from exercising her authority under the TPS statute, compels the expenditure of finite governmental resources implementing TPS designations that are contrary to the national interest, and precludes Executive officials from

---

[9] Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, Div. C, § 306(a)(2), 110 Stat. at 3009–611–12 (1996); *See NTPSA I*, 150 F.4th at 1018 n.8 (noting that "[w]e rely on the enacted text, which differs slightly from the U.S. Code version located at 8 U.S.C. § 1252").

enforcing immigration laws in the way the Executive Branch deems appropriate," in violation of 8 U.S.C. § 1252(f)(1). We rejected an identical challenge to the district court's postponement of the Secretary's vacatur under § 705 of the APA in *NTPSA I*. 150 F.4th at 1018–19. For similar reasons, we conclude that set-aside relief under § 706 is not barred by 8 U.S.C. § 1252(f)(1).**[10]**

### i. Prior Authority

We previously explained that two opinions of our court—*Ali v. Ashcroft*, 346 F.3d 873 (9th Cir. 2003) and *Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010)— supported our holding that § 1252(f)(1) does not bar courts from issuing relief under the APA. *NTPSA I*, 150 F.4th at 1018–19. *Ali v. Ashcroft* was subsequently vacated on unrelated grounds, *see Ali v. Gonzales*, 421 F.3d 795, 796 (9th Cir. 2005), but we adopt our reasoning that "[w]here . . . a petitioner seeks to enjoin conduct that . . . is not even authorized by the statute, the court is not enjoining the operation of part IV of subchapter II, and § 1252(f)(1) therefore is not implicated." 346 F.3d at 886; *see also Rodriguez*, 591 F.3d at 1120 (reaffirming *Ali v. Ashcroft*'s holding).

The Government also argues that we erred in *NTPSA I* by relying on *Rodriguez*, because the Supreme Court remanded *Rodriguez* to "decide whether [we] continue[d] to have jurisdiction despite 8 U.S.C. § 1252(f)(1)." *See Jennings v. Rodriguez*, 583 U.S. 281, 312 (2018). But the Government omits that the Supreme Court acknowledged

---

[10] While the principles of *Immigrant Defenders Law Center v. Noem*, 145 F.4th 972, 990–91 (9th Cir. 2025), counsel in favor of this holding, unlike in *NTPSA I*, we do not view *Immigrant Defenders* as controlling.

and declined to overrule our holding that § 1252(f)(1) "did
not affect [our] jurisdiction over . . . *statutory* claims because
those claims did not 'seek to enjoin the operation of the
immigration detention statutes, but to enjoin conduct . . . not
authorized by the statutes.'" *Id.* at 313 (quoting *Rodriguez*,
591 F.3d at 1120). *Jennings* noted that "[t]his reasoning
does not seem to apply to an order granting relief on
*constitutional* grounds," and therefore remanded the case to
consider "whether [we] may issue classwide injunctive relief
based on [the] constitutional claims." *Id.* (emphasis added).
The Court further acknowledged our power to issue
declaratory relief, even as to the constitutional claims. *Id.*

This case is several steps removed from *Jennings*. In this
appeal, we consider Plaintiffs' statutory claims, not their
constitutional claims. We do not consider an injunction, but
rather set-aside relief under the APA. We conclude,
therefore, that *Rodriguez* remains good law on this question.

### ii. Plain Meaning

Even if we were starting from scratch, we would still
hold that set-aside relief under APA § 706 does not "enjoin"
or "restrain" the Secretary's actions in violation of
§ 1252(f)(1). Set-aside relief under § 706 does not violate
§ 1252(f)(1) because the plain text of § 1252(f)(1)'s judicial
review bar is limited to injunctive relief, and § 706 set asides
are not injunctions. *See Trump v. CASA*, 606 U.S. 831, 847
n.10 (2025) (distinguishing between universal injunctions
and relief under the APA, the latter of which the opinion
expressly declined to reach); *id.* at 873 (Kavanaugh, J.,
concurring) (noting that "setting aside or declining to set
aside an agency rule under the APA" remained an available
remedy to district courts in lieu of a universal injunction).

Case: 25-5724, 01/28/2026, DktEntry: 74.1, Page 31 of 78
Case 3:25-cv-01766-EMC   Document 374   Filed 01/28/26   Page 31 of 7

NATIONAL TPS ALLIANCE V. NOEM                 31

The plain meaning of § 1252(f)(1) confirms our reading. In *Garland v. Aleman Gonzalez*, the Supreme Court explained that the statute's use of "enjoin" refers to "an 'injunction,' which is a judicial order that 'tells someone what to do or not to do.'" 596 U.S. 543, 549 (2022) (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009)).[11] On the other hand, "'restrain' sometimes has a 'broad meaning' that refers to judicial orders that 'inhibit' particular actions, and at other times it has a 'narrower meaning' that includes 'orders that stop (or perhaps compel)' such acts." *Id.* (quoting *Direct Marketing Ass'n v. Brohl*, 575 U.S. 1, 12–13 (2015)). Because the "object of the verbs 'enjoin or restrain' is the operation of certain provisions of federal immigration law" which "charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens," the Court concluded that § 1252(f)(1) is "best understood to refer to the Government's efforts to *enforce or implement*" these statutes. *Id.* at 549–50 (citation modified). Accordingly, "§ 1252(f)(1) generally prohibits lower courts from entering injunctions that *order federal*

---

[11] Although the clear holding of *Aleman Gonzalez* is that § 1252(f)(1) applies only to injunctions, the Court was careful not to reach the issue of whether relief under APA § 705 and § 706 amounted to an injunction. *Id.* Concurring in part, Justice Sotomayor wrote that "the Court does not purport to hold that § 1252(f)(1) affects courts' ability to 'hold unlawful and set aside agency action, findings, and conclusions' under the Administrative Procedure Act." *Id.* at 571 (quoting 5 U.S.C. § 706) (Sotomayor, J., concurring). Justice Barrett, joined by Justices Thomas, Alito, and Gorsuch, wrote just a few weeks later that the Court was "avoid[ing] a position on whether § 1252(f)(1) prevents a lower court from vacating or setting aside an agency action under the Administrative Procedure Act," which was a "complex" question that should be first addressed by the lower courts. *Biden v. Texas*, 597 U.S. 785, 839–40 (2022) (Barrett, J., dissenting).

*officials to take or to refrain from taking actions* to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 550 (emphasis added); *see also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) ("By its plain terms, and even by its title, [§ 1252(f)(1)] is nothing more or less than a limit on injunctive relief.").

"When Congress enacted the APA in 1946, the phrase 'set aside' meant 'cancel, annul, or revoke.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (Kavanaugh, J., concurring) (quoting Black's Law Dictionary 1612 (3d ed. 1933)). As Justice Kavanaugh explained, the vacatur or set aside of agency action under the APA is a distinct remedy from an injunction. *Id.* at 828. Textually, it would be difficult to square the plain meaning of a "set aside"—to "cancel, annul, or revoke"—with the plain meaning of an injunction—"a judicial order that 'tells someone what to do or not to do.'" *Compare id.* at 829 *with Aleman Gonzalez*, 596 U.S. at 549 (quoting *Nken*, 556 U.S. at 428).

Moreover, a set aside is functionally identical to a vacatur, which we have already held falls outside the scope of § 1252(f)(1). In *Immigrant Defenders*, 145 F.4th at 990, we agreed with the Fifth Circuit that unlike an injunction, vacatur "does nothing but re-establish the status quo absent the unlawful agency action," *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022). Most significantly, "[a]part from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Texas*, 40 F.4th at 220. Because set asides and vacaturs operate in a functionally identical manner in this respect, set asides are no more like injunctions than are vacaturs. *See Mont.*

*Wildlife Fed'n v. Haaland*, 127 F.4th 1, 28 n.8 (9th Cir. 2025) (acknowledging the similarity of a set aside and vacatur under the APA).

By its plain terms, a set aside does not affect the Government's future actions. It merely declares that a past agency action was unlawful and returns the world to the status quo, before that unlawful action. Here, Secretary Noem remains free to terminate TPS within the confines of the TPS statute. A set aside under § 706 of the APA does not enjoin or restrain the Secretary from doing anything. *Aleman Gonzalez*, 596 U.S. at 548–49. Secretary Noem is free to "enforce, implement, or otherwise carry out" the TPS statute. *Id.* at 550. By setting aside the Secretary's vacatur and termination of Venezuela's TPS, the district court did no more than return the country to the status quo. To hold that the narrow limitation of § 1252(f)(1), *see Biden v. Texas*, 579 U.S. at 798, bars relief under § 706 would nullify the checks Congress placed on the Secretary's authority in the TPS statute. It would also leave no legal recourse for blatant violations of the TPS statute, such as a Secretary's decision to designate a country for TPS for 10 years. Congress did not intend such an absurd result. *See Aleman Gonzalez*, 596 U.S. at 571 (Sotomayor, J., concurring in part). And, as we explained in *Immigrant Defenders*, "Congress knows . . . how to limit relief under the APA in other statutory schemes," and chose not to do so here. 145 F.4th at 990. Set aside relief under the APA is thus not barred by § 1252(f)(1).

## C.  Inherent Vacatur Authority

Finding no support in the TPS statute for her claim of authority to vacate a prior designation or extension, Secretary Noem argues that she has the "inherent authority to reconsider and vacate the TPS extension[] for Venezuela."

Case: 25-5724, 01/28/2026, DktEntry: 74.1, Page 34 of 78
Case 3:25-cv-01766-EMC   Document 374   Filed 01/28/26   Page 34 of 78

34                NATIONAL TPS ALLIANCE V. NOEM

We reject the Secretary's arguments for three reasons. First, an agency may correct clerical or ministerial mistakes but cannot use this authority to smuggle in substantive policy changes. *See, e.g.*, *Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 145 (1958). Second, we have been more likely to find inherent authority to reconsider or revoke past agency decisions where Congress has been silent as to the exercise of the authority that the agency purports to possess, *see, e.g.*, *China Unicom (Ams.) Ops. Ltd. v. FCC (CUA)*, 124 F.4th 1128 (9th Cir. 2024), but here Congress spoke clearly as to the Secretary's power to designate, or extend or terminate a designation of, a foreign state for TPS. Third, the remaining authorities on which the Government relies are either readily distinguishable or outright favor the Plaintiffs. As we explained in *NTPSA I*, "the power to do does not necessarily encompass a power to undo. The structure and temporal limitations of the TPS statute protect the important reliance interests of individual TPS holders, and the Government must adhere to these statutory restraints." 150 F.4th at 1021.

### *i.* Clerical Errors and Ministerial Mistakes

First, the Supreme Court has endorsed only a limited authority to reconsider or revoke an agency's past actions in the absence of express or implied statutory authority to do so. In *American Trucking*, the Supreme Court held that a "broad enabling statute . . . authorize[d] the correction of inadvertent ministerial errors," and that such power "has long been recognized." 358 U.S. at 145. The Court compared this administrative power to courts' inherent authority "to correct judgments which contain clerical errors or judgments which have issued due to inadvertence or mistake." *Id.* (citing *Gagnon v. United States*, 193 U.S. 451 (1904)). The Court was careful to clarify that "the power to

correct inadvertent ministerial errors may not be used as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies." *Id.* at 146.

The *American Trucking* Court relied on *United States v. Seatrain Lines*, 329 U.S. 424 (1947) and *Watson Bros. Transp. Co. v. United States*, 132 F. Supp. 905 (D. Neb. 1955), *aff'd United States v. Watson Bros. Transp. Co.*, 350 U.S. 927 (1957). In *Seatrain Lines*, the Court held that the Interstate Commerce Commission ("ICC") lacked authority to reconsider a previously granted certificate to transport goods along two water routes where it was "apparent that" the reconsideration was initiated "not to correct a mere clerical error, but to execute [a] new policy." 329 U.S. at 437. Similarly, in *Watson Bros. Transp. Co.*, a three-judge panel of the district court enjoined an attempt by the ICC to limit the scope of a certificate which authorized the transportation of general commodities on certain routes. 132 F. Supp. at 909. The *Watson* court explained that even if the Commission had inherent authority "to correct clerical errors," the ICC had far exceeded that authority by attempting "to revoke and change a certificate duly issued." *Id.*

Relying on these authorities and the lack of any contrary language in the Interstate Commerce Act, the *American Trucking* Court held that the statute permitted "the correction of inadvertent errors," but "not the execution of a newly adopted policy." 358 U.S. at 146. *American Trucking* therefore articulates an exceedingly narrow inherent power: agencies may correct clerical mistakes, but not substantive ones, and may do so only if not prohibited by statute. *Id.*

The Venezuela Vacatur was, by its own terms, a substantive decision. Secretary Noem explained that she was vacating the 2025 Extension "to untangle the confusion" caused by consolidating the filing processes for TPS beneficiaries, and to "provide an opportunity for informed determinations regarding the TPS designations and clear guidance." 90 Fed. Reg. 8805, 8807 (Feb. 3, 2025). The Vacatur notice did not claim that the 2025 Extension contained any clerical error. Instead, the Vacatur was carried out to provide the Secretary the opportunity to "execute [a] new policy." *Seatrain Lines*, 329 U.S. at 437. The power the Secretary claims has no basis in Supreme Court precedent.

### ii. Congressional Guidance

Second, an agency cannot claim the inherent authority to reconsider or revoke past actions where Congress has addressed the agency's power to do so in the underlying statute. *See NTPSA I*, 150 F.4th at 1019 ("[A]gencies lack the authority to undo their actions where, as here, Congress has spoken and said otherwise."). "Where Congress does not explicitly address the subject, agencies have some authority to reconsider prior decisions." *Id.*

The Government again argues that it has an "implied incidental authority to revoke" past decisions related to a TPS designation, extension, or termination. It analogizes this claimed authority to the implied revocation power we considered in *China Unicom (Americas) Operations Ltd. v. FCC*, 124 F.4th 1128 (9th Cir. 2024). But we have already rejected the Government's analogy to *China Unicom* in *NTPSA I*, and the Government offers no compelling argument for holding otherwise. 150 F.4th at 1019–20.

In *China Unicom*, we held that the Communication Act of 1934's silence on the Federal Communication Commission's ("FCC") ability to revoke telecommunications certificates, combined with the fact that the certificates were issued for an indefinite period, weighed in favor of finding an implied power of revocation. 124 F.4th at 1148. Significantly, we contrasted the unlimited duration of telecommunications certificates with the fixed, eight-year renewable period for broadcast licenses under the Act, finding that while the former situation supported a finding of inherent revocation authority, the latter did not. *Id.* ("The use of a fixed term is thus affirmatively inconsistent with positing an implied power to revoke a license at any time," while "[b]y contrast, . . . silence on the temporal duration of common-carrier certificates, which have traditionally been open-ended in length, is a factor that weighs in *favor* of an implied power of revocation."). Because the TPS statute permits designations for only a maximum of an 18-month period and provides an explicit process for terminating a designation, *China Unicom* hurts, rather than helps, the Government. *See* § 1254a(b)(2)(B).

The Government next points us to *Haig v. Agee*, in which the Supreme Court held that the Secretary of State had inherent authority to revoke a passport due to national security concerns where the Passport Act was silent on the Secretary's authority to revoke a passport. 453 U.S. 280, 290 (1981). The Court relied on a presumption that "in the areas of foreign policy and national security . . . congressional silence is not to be equated with congressional disapproval." *Id.* at 291. *Haig* answered only the narrow question of whether the Secretary of State could revoke a single individual's U.S. passport, while still providing "a statement of reasons and an opportunity for a prompt

postrevocation hearing." *Id.* at 310. And, just as in *China Unicom*, the key in *Haig* was Congress' silence on the matter.

Because Congress provided an explicit procedure for terminating a TPS designation, we cannot contravene Congressional intent by permitting the Secretary to exercise an unchecked and standardless vacatur power devoid of any of those statutory procedures. Congress provided the Secretary with two avenues if she disfavors a TPS designation. First, she can withdraw TPS status granted to an individual noncitizen for a variety of reasons, *see* § 1254a(c)(2)(B), including national security concerns, *see* § 1158(b)(2)(A). Second, because TPS designations are temporally limited, the Secretary can terminate a country's TPS, effective upon the expiration of the current TPS designation period. *See* § 1254a(b)(3)(B). Congress clearly knew how to authorize the Secretary to withdraw a prior designation or extension. Indeed, it authorized the Secretary to "withdraw temporary protected status granted to" individual foreign nationals under certain conditions. *See* § 1254a(c)(3). But it provided a different procedure for terminating a TPS designation.

The TPS statute is simply not silent as to the Secretary's remedies if she disfavors a TPS designation. The Secretary seeks to exercise authority that Congress chose not to grant her.[12] If the Secretary believes that she should be entitled to

---

[12] At oral argument, the Government insisted that it must have the inherent power to vacate a prior determination because otherwise, "a plainly erroneous assessment of country conditions . . . can't be fixed by the Secretary." The Government misses the purpose of the statute. TPS determinations were designed to "provide stability for those with temporary status by insulating them from shifting political winds." *NTPSA I*, 150 F.4th at 1023. As written, the TPS statute does not allow

unchecked power in the administration of the TPS statute, it is Congress, not the courts, to whom that argument should be directed.

### *iii.* Other Authority

Third, the Government argues, citing several out-of-circuit cases, that an "administrative agency has inherent or statutorily implicit authority to reconsider and change a decision if it does so within a reasonable period of time if Congress has not foreclosed this authority by requiring other procedures." But none of these authorities suggest that such a power could be used to enact sweeping policy changes despite clear language in the statute to the contrary.

We previously concluded that *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014), favored the Plaintiffs' argument rather than the Government's. *See NTPSA I*, 150 F.4th at 1020. As then-Judge Kavanaugh explained, although "administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion," this "inherent

---

for the revocation of designations or extensions based on mere disagreements between administrations over the proper assessment of country conditions evidence. *Id.* Indeed, the statute provides that, upon finding certain conditions in a foreign state, the Secretary "*may* designate [the] foreign state" for TPS. § 1254a(b)(1) (emphasis added). Congress recognized and expressly allowed for the possibility that the Secretary might determine that a set of circumstances present the "extraordinary and temporary conditions" that justify designating a country for TPS, while a subsequent Secretary would draw the opposite conclusion. § 1254a(b)(1)(C). Such is the nature of discretion. The fact that a subsequent administration may have strong disagreements with its predecessor as to the proper assessment of country conditions, and therefore be stuck with a designation with which it disagrees, is a feature, not a bug, of the statute.

Case: 25-5724, 01/28/2026, DktEntry: 74.1, Page 40 of 78
Case 3:25-cv-01766-EMC   Document 374   Filed 01/28/26   Page 40 of 7

40          NATIONAL TPS ALLIANCE V. NOEM

reconsideration authority does not apply in cases where Congress has spoken." 767 F.3d at 86.

In *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977), the D.C. Circuit acknowledged an agency's power to reinstate an employee after concluding that the initial termination procedure violated the employee's procedural due process rights.  In our view, however, the ability of an agency to reconsider the termination of a single employee due to an unconstitutional initial process is not analogous to the situation at hand.  The Government does not argue that Secretary Mayorkas acted unconstitutionally with respect to the 2025 Extension determination.

In *Belville Mining Co. v. United States*, the Sixth Circuit suggested in dicta that the inherent "power to correct inadvertent ministerial errors," might permit the reconsideration of prior action that was affected by "serious procedural and substantive deficiencies."  999 F.2d 989, 998 (6th Cir. 1993).  However, the Sixth Circuit specifically distinguished those circumstances from a situation in which the agency "was attempting to change existing policy rather than to correct [an] erroneous . . . determination[]." *Id.* Here, as we have explained, it is indisputable that the Secretary vacated the 2025 Extension in an attempt to change existing policy because of the Trump Administration's immigration priorities.

The Government's remaining authorities are similarly distinguishable.  *Macktal v. Chao* held narrowly that an Administrative Law Judge's ("ALJ") order of attorney's fees could be reconsidered where a party's brief had been misaddressed and thus not considered by the ALJ.  286 F.3d 822, 824–25 (5th Cir. 2002).  *Albertson v. F.C.C.* held that where a statutory right to file a motion to reconsider and

appeal a decision of the agency existed, the agency had the implied power to reconsider its decision during the statutory appeal period of twenty days. 182 F.2d 397, 399 (D.C. Cir. 1950). Lastly, in *The Last Best Beef, LLC v. Dudas*, the Fourth Circuit held that the U.S. Patent and Trademark Office had the inherent authority to cancel trademarks for a phrase after a subsequent act of Congress prohibited the phrase from being trademarked. 506 F.3d 333, 340–41 (4th Cir. 2007). These cases are several steps removed from the facts at hand, and do not lend support to the Government's argument.

At best, *Mazelski*, *Ivy Sports Medicine*, *Belville*, *Macktal*, *Albertson*, and *Last Best Beef* support the proposition that administrative agencies have the inherent authority to revisit determinations as to individuals, but not as to broad policy decisions. For example, had the TPS statute not provided a mechanism for withdrawing TPS protections from individual foreign nationals, this line of authority, were we to adopt it, might support the Government's claim of inherent authority to do so. But there is simply no argument that the same authority can be read to permit broad policy changes to be smuggled in through vacatur when Congress has expressly declined to grant that authority to the Secretary. *Am. Trucking*, 358 U.S. at 146.

The Secretary lacks the inherent authority to revoke or reconsider a prior designation, or extension or termination of a designation, of TPS to a foreign state.

D.  Venezuela Vacatur – Lack of Statutory Authority

Because the Secretary has no express, implied, or inherent power to vacate a prior TPS designation, or extension or termination of a designation, the district court correctly "[held] unlawful and set aside" the Vacatur on the

Case: 25-5724, 01/28/2026, DktEntry: 74.1, Page 42 of 78
Case 3:25-cv-01766-EMC   Document 374   Filed 01/28/26   Page 42 of 7

42             NATIONAL TPS ALLIANCE V. NOEM

grounds that it was "in excess of statutory . . . authority."  5 U.S.C. § 706(2).

The Government offers one final argument: because § 1254a(b)(3)(B), which defines the Secretary's authority to terminate a TPS designation, applies only to an active designation, the statute is silent as to the Secretary's authority to vacate an extension that has not yet taken effect. Specifically, the Government argues that because the 2025 Extension would cover a period from April 3, 2025, to October 2, 2026, but the TPS statute only provides a mechanism for canceling a currently effective designation, the Secretary's February 3, 2025, vacatur of the 2025 Extension was not contrary to Congress's intent.   That argument fails for several reasons.[13]

First, as we have already explained, the 2025 Extension was effective as of January 17, 2025, because the re-registration period opened as of that date and the filing processes for the 2021 and 2023 Venezuela Designations were immediately consolidated. *See NTPSA I*, 150 F.4th at 1024 n.12.   Indeed, the Secretary's vacatur notice acknowledged that the 2025 Extension "ha[d] been in effect"

---

[13] We express some reservations about the Government's interpretation of the statute.   While § 1254a(b)(3)(A) requires the Government to "consult[] with appropriate agencies of the Government" and "review the conditions in the foreign state . . . for which a designation is in effect" before "determin[ing] whether the conditions "for such designation . . . continue to be met," it is not clear that this review must occur during the most recent period of extension. Indeed, even if the Secretary determines that a condition for designation continues to be met, an extension of TPS is discretionary.  As such, the Secretary might have been able to, after following the appropriate procedures, terminate Venezuela's TPS designation in February 2025, effective as of the expiration of the 2025 Extension (October 2026).  Nevertheless, we decline to resolve this issue today.

and that vacatur would "restore the status quo preceding [the] notice." 90 Fed. Reg. 8805, 8807 (Feb. 3, 2025).

Second, § 1254a(b)(2)(B) provides that a "designation of a foreign state . . . shall remain in effect until the effective date of the termination of the designation under paragraph (3)(B)." This language would not only be superfluous if the Secretary had the power to vacate a prior designation or extension of TPS, but such a power would also directly contradict this subparagraph.

Third, the TPS statute contemplates that an extension or termination of an existing designation will take effect during the period of designation preceding the extension or termination. In other words, because an extension must be published in the Federal Register while the "designation is in effect," and "[a]t least 60 days before end of the [current] period of designation," there will always be a period of time after the Secretary has announced an extension, but before the period of extension commences. § 1254a(b)(3)(A). Similarly, a termination cannot be "effective earlier than 60 days after . . . [publication in the Federal Register] or, if later, the expiration of the most recent previous extension." § 1254a(b)(3)(B). The Government's suggestion that it could change its mind during this period would contravene the entire purpose of such a notice period. *Id.*

We conclude that there is no explicit, implied, or inherent authority to vacate a prior TPS determination. The Secretary exceeded her authority under the TPS statute, and the district court properly set aside the Venezuela Vacatur. Because that conclusion resolves this claim, we decline to reach the remainder of Plaintiffs' APA challenge.

## VII. Venezuela Termination

### A. 8 U.S.C. § 1254a(b)(5)(A) – Judicial Review Bar

For the same reasons already stated, we hold that the judicial review bar in § 1254a(b)(5)(A) does not preclude us from reviewing Plaintiffs' claim that the Secretary acted in excess of her statutory authority by terminating the 2025 Extension.

### B. 8 U.S.C. § 1252(f)(1) – Impermissible Restraint

The district court set aside Secretary Noem's termination of the 2025 Extension under APA § 706.  As we have already explained, § 1252(f)(1) does not apply to set aside relief.

### C. Venezuela Termination – Lack of Statutory Authority

The TPS statute explicitly provides that a "designation of a foreign state . . . shall remain in effect until the effective date of the termination of the designation under paragraph (3)(B)."  § 1254a(b)(2)(B).  The statute sets forth a specific procedure that the Secretary must follow to terminate a TPS designation or extension.  § 1254a(b)(3)(B).  Importantly, even if all statutory procedures are followed, a termination cannot be effective earlier than "the expiration of the most recent previous extension." *Id.*

As of January 17, 2025, Venezuela's TPS was extended through October 2, 2026.  Secretary Noem acted in excess of her statutory authority when she purported to vacate the 2025 Extension, and that Extension therefore remained in effect when she attempted to effectuate the Venezuela Termination.  Congress could not have been clearer: the Secretary could terminate Venezuela's TPS with at least sixty days' notice and with an effective date no earlier than

October 2026. *See NTPSA II*, at 1022 n.9 ("By codifying the
TPS statute, Congress . . . balanced predictability and
stability with temporal limits—TPS holders can rely on the
security of their status but only for a limited period of time.
And, the [Secretary] may terminate that status, but only with
sixty days' notice and not prior to the expiration of the
current designation."). That is the beginning and end of the
inquiry.

We hold that Secretary Noem exceeded her authority
under the TPS statute by attempting to terminate
Venezuela's TPS, as extended by the 2025 Extension.
Because the 2025 Extension remains in effect until October
2, 2026, Secretary Noem's attempt to terminate Venezuela's
TPS with an effective date of April 7, 2025, violated the
plain text of the TPS statute. *See* § 1254a(b)(3)(B) (a
termination cannot be effective earlier than "the expiration
of the most recent previous extension"). The Venezuela
Termination was predicated on and inextricably intertwined
with the Venezuela Vacatur; therefore, the illegality of the
Vacatur must be fatal to the Termination. Because, again,
that conclusion resolves this claim, we decline to reach the
remainder of Plaintiffs' APA challenge.

## VIII. Haiti Partial Vacatur

Plaintiffs' challenge to the Haiti Partial Vacatur overlaps
substantially with their challenge to the Venezuela Vacatur.
For the same reasons already stated, § 1254a(b)(5)(A) does
not bar any aspect of our review of the Haiti Partial Vacatur.
And, again for the same reasons stated, the district court's
grant of set aside relief does not violate § 1252(f)(1).

As to the merits, Secretary Noem lacked the statutory
authority to partially vacate Secretary Mayorkas's July 2024
extension of Haiti's TPS for the same reasons that she lacked

the authority to entirely vacate Secretary Mayorkas's January 2025 extension of Venezuela's TPS. Although the Secretary has discretion to determine whether a foreign state's TPS should be extended for a period of six, twelve, or eighteen months, nothing in the statute permits the Secretary to reduce the period of extension at a later date. *See* § 1254a(b)(3)(C). As we have already explained, such a power would displace the carefully designed TPS termination procedures that Congress chose to proscribe in the statute. *See* § 1254a(b)(3)(B). It would defy logic to read such a significant loophole into the statute absent corresponding Congressional intent, and we decline to do so here.

Secretary Noem exceeded her statutory authority by partially vacating Haiti's TPS. Accordingly, the district court did not err by setting aside the Haiti Partial Vacatur. Because, again, that conclusion resolves this claim, we need not reach the remainder of Plaintiffs' APA challenge.

## IX. Universal Relief

The Government argues that the district court abused its discretion by granting "universal vacatur extending to non-parties." We acknowledge that there are difficult and unanswered questions related to the limits of APA relief under *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). *CASA* declined to reach these questions, though Justice Kavanaugh suggested that district courts retained the ability to "set aside an agency rule under the APA," even if such relief would be the "functional equivalent of a universal injunction." *Id.* at 873 (Kavanaugh, J., concurring); *see also id.* at 847 n.10 ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal

courts to vacate federal agency action." (citing 5 U.S.C.
§ 706(2)).  We need not resolve this question for our circuit.

As we have already twice explained, Plaintiffs complain
of "injuries for which it is all but impossible for courts to
craft relief that is complete *and* benefits only the named
[P]laintiffs."  *Id.* at 852 n.12; *see also NTPSA II*, 2025 WL
2661556 at *6 ("[I]t is impossible to structure relief on an
individual basis or to impose any relief short of nationwide
set asides under APA § 706 of Secretary Noem's vacatur and
termination of Venezuela's [and Haiti's] TPS."); *NTPSA I*,
150 F.4th at 1028 (explaining that postponement was the
"only remedy that provides complete relief to the parties
before the court and complies with the TPS statute").  Relief
cannot be limited to NTPSA's members because Plaintiffs
do not simply challenge the application of the vacaturs or
termination to them, they challenge the Secretary's very
authority to act.  *Id.*  Because the Secretary lacked authority
to act in the manner that she did, the proper remedy under
APA § 706(2) is to set aside her actions and restore the status
quo.

The Government proposes that we "limit [relief] to
Plaintiffs and their members at the time their complaint was
filed."  The Government makes no attempt to explain how
such an order could be enforced.  The National TPS Alliance
has more than 84,000 members in all fifty states and the
District of Columbia.  *NTPSA I*, 150 F.4th at 1028.  Would
members need to carry a National TPS Alliance membership
card?  Would they need to provide evidence that they joined
the organization at the appropriate time?  If so, how?  By
signing   a   declaration?       Subjecting   themselves   to
interrogation?  The Government has no answer to these
questions.  It would be impossible to grant complete relief to
the Plaintiffs short of a full set aside of the Secretary's

unlawful Venezuela Vacatur, Venezuela Termination, and Haiti Partial Vacatur.  *CASA*, 606 U.S. at 852.

Lastly, we reject the Government's argument that "[t]he challenged order exemplifies the significant problem created when an organization—like Plaintiff NTPSA—litigates based on speculative harms or generalized grievances rather than *actual injury*."  The harms caused by the abrupt and unexpected vacaturs and termination are not speculative.  As we have explained, foreign nationals with TPS who, absent the Secretary's unlawful actions, would be protected from deportation and could receive work authorization, have suffered immense harms that are both concrete and particularized.  The record is replete with stories of mothers separated from their children (many of whom are U.S. citizens); families struggling to make ends meet after losing the support of the breadwinner; and hard-working people who become homeless or are left to live day-to-day after losing their jobs as preschool teachers, automotive mechanics, warehouse and grocery store employees, and day laborers.[14]  Others have been detained for months or weeks in squalid, overcrowded facilities, where they are forced to sleep on the ground, aren't given enough water to drink, and are deprived of the ability to contact their family or attorney for days or weeks at a time.  There are stories of detainees being moved repeatedly from facility to facility and eventually being deported, despite the attempts of their attorneys and families to advocate for them and the fact that

---

[14] Indeed, "[t]he real people affected by the Secretary's actions are spouses and parents of U.S. citizens, neighbors in our communities, and contributing members of society who have 'lower rates of criminality and higher rates of college education and workforce participation than the general population.'"  *NTPSA II*, 2025 WL 2661556, at *1 (quoting *Nat'l TPS Alliance v. Noem*, 2025 WL 2578045, at *35).

Case: 25-5724, 01/28/2026, DktEntry: 74.1, Page 49 of 78
Case 3:25-cv-01766-EMC    Document 374    Filed 01/28/26    Page 49 of 78

NATIONAL TPS ALLIANCE V. NOEM                    49

they have pending asylum applications.   Hundreds of thousands of TPS holders are living in a state of constant fear, wondering whether they will be next to be detained and deported to a place where the Government promised—at least temporarily—it would not send them.  If these are not actual injuries, what are?

The district court did not abuse its discretion by setting aside each of the Secretary's unlawful Venezuela Vacatur, Venezuela Termination, and Haiti Partial Vacatur in full.

## X. Conclusion

Congress designed the TPS statute, carefully and deliberately, to restrain the Secretary's authority to designate, or extend or terminate an existing designation of, a foreign nation for TPS.  The statute contains numerous procedural safeguards that ensure individuals with TPS enjoy predictability and stability during periods of extraordinary and temporary conditions in their home country.   But the statute contemplates that this stability would last only a short while: the protective guarantees of TPS are subject to termination at most every 18 months.  At bottom, this case comes down to the Secretary's failure to conform to the strictures of the TPS statute.  The Secretary attempted to exercise powers Congress simply did not provide under the statute.  Because that conclusion resolves this case in full, we need not, and do not, reach any other aspects of Plaintiffs' claims.

**AFFIRMED.**[15]

---

[15] Because of the exigencies presented by this case, the mandate shall issue seven days after the publication of this decision.  *See* Fed. R. App. P. 41; 9th Cir. Gen. Ord. 4.6.

Mendoza, Circuit Judge, with whom Wardlaw, Circuit Judge, joins as to Parts I and II, concurring:

I wholeheartedly agree with Judge Wardlaw's opinion and its conclusion that Secretary of Homeland Security Kristi Noem exceeded her authority under 8 U.S.C. § 1254a when she vacated and terminated Temporary Protected Status ("TPS") for Venezuela and Haiti. I believe Judge Wardlaw's explanation is sufficient to dispose of this case.

However, I write separately to underscore why we must not permit government agencies to justify their actions with pretext, especially when that pretext is cloaking animus on the basis of race or national origin. When decision-makers repeatedly broadcast their impermissible reasons for making a decision, we should heed the fitting words of Maya Angelou and "believe them the first time." Maya Angelou, Oprah Winfrey Show (Harpo Productions broadcast, June 18, 1997). And as the Supreme Court cautions, we cannot allow agencies to eschew their obligation to engage in reasoned decision-making and instead use administrative procedure to reach preordained outcomes. I therefore author this concurrence to explain why the Secretary's actions would not stand had we reached the merits of Plaintiffs' Administrative Procedure Act ("APA") claims.

I.

Although I focus on the inexplicable procedures, reasoning, and animus underlying the Secretary's vacatur actions, the question of judicial reviewability is foundational and must be resolved before reaching the merits of Plaintiffs' APA claims.

Contrary to the Government's assertion, neither 8 U.S.C. § 1254a(b)(5)(A) nor 8 U.S.C. § 1252(f)(1) bars judicial

review of whether the Secretary's vacatur actions were arbitrary and capricious. Section 1254a(b)(5)(A) narrowly bars review of "determination[s] . . . with respect to the designation, or termination or extension of a designation, of a foreign state," *not* of a claimed vacatur power (which exceeds the Secretary's authority).[1] *See Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1018–19 (9th Cir. 2025). To assume that § 1254a(b)(5)(A) would apply to even non-existent powers falling outside the scope of congressionally defined TPS procedures would lead to absurd outcomes whereby the Secretary would be free to disregard the binding text of the TPS statute while simultaneously being insulated from judicial review. *See* 8 U.S.C. § 1254a(b)(3)(B) (dictating that a termination of a TPS designation "*shall* not be effective earlier than 60 days after the date the notice is published or, *if later*, the expiration of the most recent previous extension under subparagraph (C)." (emphases added)).[2]

---

[1] To further reiterate, even *if* the Secretary had some implied or inherent power to vacate a prior TPS designation (which she does not), I would find that her power falls outside the narrow bounds of the statutory bars on judicial review. In the context of the TPS statute, vacatur is *not* a "determination . . . with respect to the designation, or termination or extension of a designation, of a foreign state." 8 U.S.C. § 1254a(b)(5)(A). We may therefore reach the merits of Plaintiffs' APA claims even *if* we assumed that the Secretary had an implied or inherent vacatur power.

[2] Imagine that the Secretary extended a TPS designation for 100 months, in contravention of § 1254a(b)(3)(C)'s mandate that TPS extensions will last "for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months)." Would prospective plaintiffs be barred from raising an APA claim against the Secretary's extension on the grounds that § 1254a(b)(5)(A) bars review of *all* TPS

Section 1252(f)(1) also does not bar courts from reviewing the Secretary's vacatur actions because that provision similarly does not apply to manufactured acts of vacatur that exceed the Secretary's authority. *Ali v. Ashcroft*, 346 F.3d 873, 886–87 (9th Cir. 2003), *opinion withdrawn on denial of reh'g sub nom. Ali v. Gonzales*, 421 F.3d 795 (9th Cir. 2005), *as amended on reh'g* (Oct. 20, 2005); *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1119–21 (9th Cir. 2010) (narrowing the scope of the terms "enjoin or restrain" in light of other, more expansionary, phrases found in other statutes), *abrogated on other grounds by Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022).

And, as Judge Wardlaw explains, set-aside relief under § 706 does not violate § 1252(f)(1) because that bar is limited to *injunctive* relief. APA § 706 relief is distinct from injunctive relief and neither "enjoins" nor "restrains" the Secretary's actions. It simply restores the status quo ante to the time before the Secretary took her unlawful action. Though the Supreme Court has declined to reach this issue, *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), logically supports the conclusion that APA § 706 set-asides are distinct from injunctions, and our sister circuits have essentially held as much. *See, e.g.*, *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) ("[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action. Apart from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making.").

Accordingly, the presumption of reviewability governs here, and nothing in these statutes insulates the Secretary's

---

determinations, no matter how brashly those determinations flout the TPS statute?

vacatur decisions from APA scrutiny. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22 (2018) ("The Administrative Procedure Act creates a 'basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" (alteration in original) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)).  We are therefore empowered to review agency action for arbitrariness and capriciousness when an agency acts beyond the confines of bars on judicial review or in excess of its authority, as holding otherwise would defy the APA's presumption of reviewability and open the floodgates to unchecked agency action insulated from accountability. *See Salinas v. U.S. R.R. Ret. Bd.*, 592 U.S. 188, 197 (2021) ("To the extent there is ambiguity in the meaning of 'any final decision,' it must be resolved . . . under the 'strong presumption favoring judicial review of administrative action.'" (internal citation omitted)).

Having concluded that no statutory bar on judicial review would shield the Secretary's vacatur actions from our scrutiny, I turn to why those actions would not survive the APA's requirement of reasoned and non-arbitrary decision-making.

II.

Secretary Noem's vacatur actions would fail on the independent ground that they were arbitrary and capricious in contravention of the APA, as even a cursory review of the record indicates that her decisions were both preordained and rooted in pretext.  Courts must be wary of situations in which the record "reveal[s] a significant mismatch between the decision the Secretary [makes] and the rationale [she] provide[s]." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019).  In particular, where "the evidence tells a story that

54                NATIONAL TPS ALLIANCE V. NOEM

does not match the explanation the Secretary [gives] for [her] decision," such that the "stated reason" for a policy change "seems to have been contrived," courts may set aside such action under the APA. *Id*. at 784.

The APA "instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* at 771 (citation omitted). "In order to permit meaningful judicial review, an agency must disclose the basis of its action." *Id*. at 780 (internal quotation marks and citation omitted). In short, "[o]ur task is simply to ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotation marks and citation omitted).

The APA's reasoned-explanation requirement exists to "ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. at 785. "Accepting contrived reasons" or post hoc rationalizations "would defeat the purpose of the enterprise" of administrative review. *Id*. So while our review of agency action is typically deferential, we are "not required to exhibit a naiveté from which ordinary citizens are free." *Id*. (internal citation omitted). Therefore, when "the evidence tells a story that does not match the explanation the Secretary gave for [her] decision," we must demand "something better than the explanation offered." *Id*. at 784–85.

This foundational principle of administrative law obliges us to look beyond an agency's purported rationale when that rationale is pretext or a cloak for improper motive. And

although judicial review ordinarily focuses exclusively on an agency's contemporaneous record and explanation, it is well established that a court may inquire into the "mental processes of administrative decisionmakers" upon a "strong showing of bad faith or improper behavior." *Id.* at 781 (citation omitted). In sum, while the APA *does not* license courts to second-guess policy judgments duly entrusted to the executive branch, it *does* require us to police the bounds of reasoned agency decision-making and to set aside actions founded on implausible and illegitimate justifications.

The district court's thorough findings detail multiple, serious defects in the process behind the Secretary's TPS vacatur and termination.  First, the Secretary's primary vacatur rationale was unsupported and affirmatively contradicted by Plaintiffs' evidence of past practice.  An agency acts arbitrarily and capriciously when it "offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Secretary's assertion that the prior administration's 2023 TPS consolidation was "novel," "confus[ing]," or unlawful was based on a fundamental misreading of prior agency action and does not align with the sweeping action taken.  As the district court observed, there was nothing novel about streamlining dual TPS extension tracks for the same country, as similar procedures had been used for other countries.  As a legal matter, TPS beneficiaries under the 2021 designation were *necessarily* TPS beneficiaries under the 2023 designation.  And streamlining tracks tended to eliminate confusion, since it would otherwise be difficult for

employers to distinguish between TPS beneficiaries with varying employment authorization document end dates. The Secretary's mischaracterization of the prior TPS consolidation and extension as irregular and confusing was therefore not only entirely unsupported but was affirmatively contradicted by Plaintiffs' evidence of past practice.

Second, the district court correctly determined that the Secretary failed to consider reasonable alternatives or more moderate approaches before resorting to the unprecedented step of vacatur. Agencies must consider feasible alternatives and articulate a rational connection between the facts found and the choice made. *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("*Regents*") ("[W]hen an agency rescinds a prior policy its reasoned analysis must consider the alternative[s] that are within the ambit of the existing [policy]." (alterations in original) (internal quotation marks and citation omitted)).

Here, the Secretary provided no explanation for why simply de-consolidating the prior administration's dual-track filing procedure would not have addressed her concerns of administrative confusion, as opposed to completely nullifying the TPS extensions altogether. Similarly, with respect to her claims that criminals are abusing the TPS system, it is worth noting that the Secretary could have considered simply revoking TPS status for individuals who have committed crimes rather than wiping away thousands of lawful TPS holders' protections. *See* § 1254a(c)(2)(B) (noting that an individual is ineligible for TPS if they have "been convicted of any felony or 2 or more misdemeanors committed in the United States"); § 1254a(c)(3). The complete absence of any consideration of less disruptive options underscores the preordained and

pretextual character of the Secretary's decision and the disingenuity of her official reasoning.

Third, as the district court noted, the Secretary ignored the reliance interests of TPS beneficiaries and their families, who have structured their livelihoods around the continuation of TPS under the prior designations and extensions. When an agency changes course and alters a policy on which regulated parties have depended, it is required to at least assess the existence and strength of any serious reliance interests and weigh those interests in its decision. *See Regents*, 591 U.S. at 30 ("When an agency changes course, as DHS did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" (citation omitted)); *Nat'l TPS All.*, 150 F.4th at 1021 ("The structure and temporal limitations of the TPS statute protect the important reliance interests of individual TPS holders.").

Judge Wardlaw's opinion compellingly describes the devastating impact of the Secretary's unprecedented action on TPS holders. And, as the district court explained, by "canceling TPS documentation that had already issued" under the prior extension without first addressing the hardship it would inflict, the Secretary "failed to consider [the] reliance interests" of people who had been assured of protection until the original TPS end date. Far from accounting for such reliance interests, the Secretary perfunctorily dismissed those whose very livelihoods depend on TPS as having "negligible" reliance interests. This conclusory statement does not satisfy the agency's duty of providing a "*reasoned* explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (emphasis added); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (noting that an

agency must meaningfully engage with the reliance interests engendered by prior policy in providing an explanation for agency action). This is particularly so given the profound disruption that stripping TPS protections would visit upon thousands of immigrants.[3]

The abrupt policy changes at issue in this case "radiate outward to [TPS beneficiaries'] families, including their . . . U.S.-citizen children, to the schools where [they] study and teach, and to the employers who have invested time and money in training them." *Regents*, 591 U.S. at 31. Additionally, "excluding [TPS beneficiaries] from the lawful labor force may . . . result in the loss of . . . economic activity and . . . tax revenue." *Id*. In sum, "DHS may determine . . . that other interests and policy concerns outweigh any reliance interests. Making that difficult decision was the agency's job, but the agency failed to do it." *Id*. at 32. By failing to consider these concerns, the Secretary disregarded her obligation to consider the significant reliance interests of those impacted.

Fourth, the Secretary's decision-making process deviated dramatically from established Department of

---

[3] Though the Government does not appeal the district court's decision "to the extent that it preserved '[Employment Authorization Documents], Forms I-797, Notices of Action, and Forms I-94 issued with October 2, 2026 expiration dates' through February 5, 2025—the effective date of Secretary Noem's Venezuela vacatur," we may still view the Secretary's failure to consider these reliance interests as evidence of pretext. Additionally, the Secretary's bare-bones vacatur order does not meaningfully consider the reliance interests of *all* TPS holders (including those who had not yet received documentation) and certainly does not provide any reasoned explanation for why vacatur was necessary despite those interests. *Fox Television Stations*, 556 U.S. at 515.

Homeland Security ("DHS") norms and procedures for TPS determinations, without any coherent explanation. Under the TPS statute and longstanding practice, decisions to extend or terminate a country's TPS designation are informed by inter-agency consultation and review of up-to-date country conditions by expert staff. *See* § 1254a(b)(3)(A)–(C). A 2020 Government Accountability Office report documenting DHS's standard TPS decision-making practices explains that DHS typically collects (1) a country conditions report compiled by U.S. Citizenship and Immigration Services ("USCIS"); (2) a memorandum with a recommendation from the USCIS Director to the Secretary; (3) a country conditions report compiled by the State Department; and (4) a letter with a recommendation from the Secretary of State to the Secretary of Homeland Security.

Here, the Secretary hastily ordered the vacatur and prepared to terminate TPS without first seeking meaningful input from the State Department or other agencies, and without obtaining any new TPS country conditions analysis from her own department. In fact, the administrative record for the Secretary's vacatur contained only a report from August 2024 that was prepared during the prior administration to affirmatively *support* Secretary Mayorkas's TPS extension. It defies logic that Secretary Noem could point to the *very same* country conditions report, without explanation, as somehow justifying her decision to vacate and terminate that TPS designation. *See Fox Television Stations*, 556 U.S. at 515 ("[W]hen . . . [an agency's] new policy rests upon factual findings that contradict those which underlay its prior policy," "the agency [must] provide a more detailed justification.").

Then-acting USCIS Director Jennifer Higgins did *eventually* circulate a memorandum recommending that the

TPS designation be terminated, but this was *after* the vacatur decision was prepared and circulated. Notably, USCIS officials have indicated that they ordinarily begin the review process for an existing TPS designation about six months to a year *before* the end date of the country's current designation. Here, USCIS sent its recommendation just eleven days after President Trump took office. DHS also belatedly reached out to the State Department, which provided a one-and-a-half-page letter that contained no information on country conditions in Venezuela.

An agency acts arbitrarily when it "depart[s] from a prior policy *sub silentio* or simply disregard[s] rules that are still on the books" without acknowledgment or explanation. *Id*. The issue before us is not whether we normatively agree with Secretary Noem's departure from TPS decision-making policy—the problem is that Secretary Noem did not provide *any* reasoned explanation for departing from the normal fact-gathering process. The record here indicates that the Secretary's TPS procedures were exactly such an inexplicable departure from DHS's established process.

Finally, the record supports the district court's conclusion that the Secretary's vacatur and termination of TPS were predetermined well in advance and that the official justifications given in the Federal Register were therefore merely a pretext for her true motives. The timeline is strikingly suspicious: DHS began drafting the Venezuela TPS vacatur within days of President Trump's inauguration, and a draft termination notice was prepared even *before* the vacatur decision was made. The same day Secretary Noem approved the vacatur, DHS staff were directed to "focus on any improvements in Venezuela"—effectively manufacturing an after-the-fact termination rationale—and a

Case: 25-5724, 01/28/2026, DktEntry: 74.1, Page 61 of 78
Case 3:25-cv-01766-EMC   Document 374   Filed 01/28/26   Page 61 of 78

NATIONAL TPS ALLIANCE V. NOEM                61

sense of urgency was conveyed to finalize the termination decision immediately.

Indeed, the termination was formally approved just *three days* after the vacatur, with the entire process from vacatur drafting to termination completion spanning only a few days. Such haste and sequencing are unprecedented for TPS decision-making, and they belie any notion that the Secretary engaged in or relied on a genuine reassessment of country conditions or policy analysis. Instead, as the district court found, the Secretary's vacatur was a means to the preordained end of blanketly terminating TPS designations and extensions for Venezuela as quickly as possible.

In sum, the district court rightly identified a litany of APA defects, each of which render the Secretary's actions arbitrary and capricious. Taken together, these deficiencies paint a picture of agency action that was not the product of reasoned decision-making, but of a rushed and pre-determined agenda masked by pretext.

## III.

But even this should not be the end of our analysis. I find it necessary to address the ample evidence of racial and national origin animus in the record, which reinforces the district court's conclusion that the Secretary's actions were preordained and her reasoning pretextual. This case presents one of the rare situations where the strong showing of bad faith needed to look beyond the administrative record is easily met.

We cannot ignore the backdrop of extraordinary statements by direct decision-makers when assessing whether the agency's proffered rationale was genuine or merely a pretext for an ulterior (and impermissible) motive.

The record is replete with public statements by Secretary
Noem and President Donald Trump that evince a hostility
toward, and desire to rid the country of, TPS holders who are
Venezuelan and Haitian.  And these were not generalized
statements about immigration policy toward Venezuela and
Haiti or national security concerns to which the Executive is
owed deference.  Instead, these statements were overtly
founded on racist stereotyping based on country of origin.

Stereotyping on the basis of race or country of origin can
never form the basis of "reasoned decision making" nor can
it provide a "rational connection between the facts found and
the choice made" necessary to survive review under the
APA.  *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493
(9th Cir. 2023) (internal quotation marks and citations
omitted) ("The touchstone of 'arbitrary and capricious'
review under the APA is reasoned decisionmaking."
(alterations and internal quotation marks omitted) (quoting
*Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061,
1080 (9th Cir. 2019))).

Animus based on race or national origin can *never*
qualify as a "political consideration[]" or "Administration
priorit[y]" that falls beyond a court's scrutiny of agency
decision-making.  *Dep't of Com.*, 588 U.S. at 781; *see Vill.
of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.
252, 265–66 (1977) ("[I]t is because legislators and
administrators are properly concerned with balancing
numerous competing considerations that courts refrain from
reviewing the merits of their decisions, absent a showing of
arbitrariness or irrationality.  But racial discrimination is not
just another competing consideration.  When there is a proof
that a discriminatory purpose has been a motivating factor in
the decision, this judicial deference is no longer justified.").

Here, the Secretary's statements are neither isolated nor stray. They are numerous, specific, and closely tied to the agency action at issue. *Cf. Trump v. Hawaii*, 585 U.S. 667, 701-02 (2018). Many of the assertions were made within days or hours of the Secretary's decision to vacate TPS for Venezuela and Haiti. Here, the Secretary's and President's statements of ethnic hostility and prejudice toward TPS holders who are Venezuelan and Haitian reveals the ugly truth of bad faith and impermissible animus.[4]

For example, on January 15, 2025, during Secretary Noem's confirmation hearing, she stated that "the program was intended to be temporary. **This extension [of TPS] of over 600,000 Venezuelans . . . is alarming when you look at what we've seen in different States, including Colorado with gangs doing damage and harming the individuals and the people that live there.**" *Nomination of Hon. Kristi Noem: Hearing Before the Comm. on Homeland Security and Governmental Affairs*, 119th Cong. 37 (2025) (emphasis added); *see also* Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing, at 1:52:01 (Jan. 27, 2025), https://www.c-span.org/program/senate-committee/homeland-security-secretary-nominee-governor-kristi-noem-testifies-at-confirmation-hearing/654484.

---

[4] The Government has argued that these extra-record statements should not be considered in evaluating whether the Secretary's actions were arbitrary or capricious. However, as explained *infra*, the district court correctly granted Plaintiffs' Motion to Consider Extra-Record Evidence, which included these statements. Although the district court relied on these statements to deny the Government's motion for summary judgment as to Plaintiffs' equal protection claims, these statements are also relevant to the merits of Plaintiffs' APA claims.

On January 29, 2025, Secretary Noem explained in a nationally televised interview that she was vacating Secretary Mayorkas's extension of TPS status because his extension "**meant [Venezuelan TPS holders] were going to be able to stay here and violate our laws for another eighteen months.**" Kristi Noem, *Fox and Friends*, (Fox News television broadcast, Jan. 29, 2025) (emphasis added), https://www.instagram.com/reel/DFaf8JTxU-o.   Secretary Noem announced that she had signed an executive order directing DHS not to "follow through" on the prior administration's TPS extension for Venezuelans, vowing instead to "evaluate all of these individuals that are in our country" because "**the people of this country want these dirtbags out**" and "want their communities to be safe." *Id.* (emphasis added).  She explicitly described ending TPS for Venezuelans as part of the new administration's plan to "make sure that we're protecting America, keeping it safe again, just like President Trump promised." *Id.*

On February 2, 2025, Secretary Noem stated in a "Meet the Press" interview that "the TPP [sic] program has been abused, and it doesn't have integrity right now." Kristi Noem, *Meet the Press* (NBC television broadcast, Feb. 2, 2025),     https://www.nbcnews.com/meet-the-press/meet-press-february-2-2025-n1311457.  Secretary Noem went on to state that "**folks from Venezuela that have come into this country are members of [Tren de Aragua].  And remember, Venezuela purposely emptied out their prisons, emptied out their mental health facilities and sent them to the United States of America.  So we are ending that extension of that [TPS] program, adding some integrity back into it.  And this administration's evaluating all of our programs to make sure that they truly are something that's to the benefit of the United**

States, so they're not for the benefit of criminals." *Id.* (emphasis added).[5]

President Trump's statements echoed and amplified the same animus toward TPS holders who are Venezuelan and Haitian.   In a December 16, 2023, campaign speech, President Trump stated that "**[illegal immigrants] are poisoning the blood of our country.**"   Donald Trump, Campaign Speech in Durham, New Hampshire, at 0:14 (Dec.   16,   2023)   (emphasis   added),   https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439. At an October 11, 2024, rally, he accused his political opponent of having "**decided to empty the slums and prison cells of Caracas**" and other places into the United States, forcing Americans to "**live with these animals**"—a situation he promised would not last long. Donald Trump, Campaign Speech in Aurora, Colorado, at 41:06,   41:55   (Oct.   11,   2024)   (emphases   added), https://www.youtube.com/watch?v=_xguaneoZ5A.   And in a televised interview just one week into his second term, President Trump claimed that "jails and mental institutions from other countries and gang members . . . are being brought to the United States . . . and emptied out into our

---

[5] This statement is perhaps the most damning for the Secretary.   It is unclear how one could view this statement as anything other than stating that the Secretary decided to end TPS for Venezuela *because of* her belief that "Venezuela purposely emptied out their prisons, emptied out their mental health facilities and sent them to the United States of America." Generalizing hundreds of thousands of TPS holders as criminals and mentally unwell *on the basis of* their country of origin is a textbook example of animus-ridden stereotyping.   A reliance on animus can never be viewed as "reasonable" decision-making.   *See Nw. Ecosystem All.*, 475 F.3d at 1140.

country." Donald Trump, *Fox News*, at 18:26 (Fox News television broadcast, Jan. 22, 2025), https://www.youtube.com/watch?v=mQUmy6gkwWg.

Even if we examined only the statements that *specifically* reference TPS designations and extensions for Venezuelans and Haitians, those statements would be sufficient in demonstrating a clear "bad faith" motive to eliminate TPS protections in order to facilitate the removal of people from two countries whom the decision-makers openly generalized as undesirable "criminals" and as coming from "mental health facilities."[6] These pronouncements alone, many of which were delivered contemporaneously with the TPS policy moves, leave no doubt as to the bad faith mindset and

---

[6]     *See Stereotype*, Britannica Dictionary, https://www.britannica.com/dictionary/stereotype (last visited Jan. 23, 2025), ("[A]n often unfair and untrue belief that many people have about all people or things with a particular characteristic."); *see also Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1108, 1157 (N.D. Cal. 2025) ("Secretary Noem's generalization of the alleged acts of a few (for which there is little or no evidence) to the entire population of Venezuelan TPS holders who have lower rates of criminality and higher rates of college education and workforce participation than the general population is a classic form of racism."); Ran Abramitzky et al., *Law Abiding Immigrants: The Incarceration Gap Between Immigrants and the US-Born, 1870-2020* (2023, *revised* 2024), https://www.nber.org/system/files/working_papers/w31440/w31440.pdf, (finding that immigrants have consistently had lower incarceration rates compared to U.S.-born individuals—a trend that has held true for 150 years); Michael Light et al., *Comparing Crime Rates Between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas* (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7768760/pdf/pnas.202014704.pdf, (finding that undocumented immigrants are roughly half as likely to be arrested for violent and property crimes than people born in the United States).

objectives motivating the administration's rush to vacate and terminate TPS for Venezuela and Haiti.

But we must not view each statement in a silo. To do so would require an astonishing level of naiveté. Many of the TPS-related statements were made against a broader backdrop of rhetoric expressing animus toward Venezuelan and Haitian immigrants based on their country of origin. And unlike in *Regents*, 591 U.S. at 35, where the Supreme Court gave little weight to generalized statements that were untethered to specific government action, this case is unique in that the decision-makers were explicit in explaining their actual motives for vacating TPS extensions for Venezuela. *See Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982) ("[O]fficials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority."); *Cook County v. Wolf*, 461 F. Supp. 3d 779, 794 (N.D. Ill. 2020) ("Most people know by now that the quiet part should not be said out loud.").

The Secretary's decision expressly rested on the administration's perception of TPS holders from Venezuela as being "criminals" or coming from "mental health facilities." To ignore the obvious relationship between the Secretary's and President's collective statements demonstrating animus toward Venezuelans and Haitians and the Secretary's rushed and abnormal process of vacating TPS extensions for those very same individuals would be to bury our heads in the sand. Many commentators and

stakeholders have similarly pointed out the clear connection between the statements made and action taken.[7]

When decision-makers so brazenly broadcast their racially charged reasons for reaching a decision, we should take them at their word. To insist otherwise is to render judicial review of agency action a nullity. Under the APA, courts have a duty to scrutinize the agency's stated rationale where there is evidence that the official justification may conceal an unlawful purpose. And this skepticism should be heightened when it appears that the outcomes are driven by invidious motives such as racial or national origin animus.

---

[7] *See, e.g.*, *Mass Deportation: Analyzing the Trump Administration's Attacks on Immigrants, Democracy, and America*, American Immigration Council (July 23, 2025), https://www.americanimmigrationcouncil.org/report/mass-deportation-trump-democracy/ (noting that the Trump administration has "invent[ed] millions of nonexistent migrants and accus[ed] them of inherent criminality," and that "while the federal government cannot turn immigrants into bad people just by saying they are, it does have the power to strip legal status from individuals" through ending the TPS program); Elliot Young, *Racism and Classism at the Heart of Rescission of Venezuelan TPS*, Border Criminologies, University of Oxford (May 5, 2025), https://blogs.law.ox.ac.uk/border-criminologies-blog/blog-post/2025/05/racism-and-classism-heart-rescission-venezuelan-tps ("The irresponsible and unfounded comments by politicians and other officials about Venezuelan immigrant criminality should not be used as an excuse to rescind TPS protections for Venezuelans. Rather, they should be understood within the context of a long history of racist and classist tropes characterizing immigrants as diseased, mentally ill, and criminals."); Dominique Espinoza, *Trump Administration's Heartless Termination of TPS for Venezuelans Sparks Legal Showdown*, Coalition on Human Needs (Apr. 8, 2025), https://www.chn.org/voices/trump-administrations-heartless-termination-of-tps-for-venezuelans-sparks-legal-showdown; Amnesty International (@amnestyusa), X (Feb. 2, 2025, 11:12 a.m. PST) ("This [TPS] decision reeks of President Trump's racism towards Venezuelans.").

Case: 25-5724, 01/28/2026, DktEntry: 74.1, Page 69 of 78
Case 3:25-cv-01766-EMC   Document 374   Filed 01/28/26   Page 69 of 7

NATIONAL TPS ALLIANCE V. NOEM                    69

It is clear that the Secretary's vacatur actions were not actually grounded in substantive policy considerations or genuine differences with respect to the prior administration's TPS procedures, but were instead rooted in a stereotype-based diagnosis of immigrants from Venezuela and Haiti as dangerous criminals or mentally unwell.  The American public is able to see the true reason behind the Secretary's vacatur of TPS protections for Venezuelans and Haitians. We should too.

In sum, had we reached the merits of whether the Secretary's actions were arbitrary and capricious, I would have found that the Secretary's and President's remarks provide ample compelling evidence of pretextual reasoning and a preordained outcome.  Though the district court primarily considered these statements within the context of its equal protection analysis, we may consider the statements as an additional evidentiary basis on which to affirm the district court's grant of summary judgment on Plaintiffs' APA claims, too.  *See McSherry v. City of Long Beach*, 584 F.3d 1129, 1131 (9th Cir. 2009) ("We may affirm the district court's grant of summary judgment on any basis supported by the record." (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1030 (9th Cir. 2004)).

Under settled administrative law principles, a strong showing of bad faith or improper motive can warrant probing behind an agency's stated reasons.  *Dep't of Com.*, 588 U.S. at 781–85; *Overton Park*, 401 U.S. at 420.  The Supreme Court has been clear that the "bad faith" standard is met when there is evidence that the "official" rationale in the administrative record was not the agency's actual basis for acting.  *Dep't of Com.*, 588 U.S. at 781–85.

Case: 25-5724, 01/28/2026, DktEntry: 74.1, Page 70 of 78
Case 3:25-cv-01766-EMC   Document 374   Filed 01/28/26   Page 70 of 7

70             NATIONAL TPS ALLIANCE V. NOEM

Accordingly, the APA's deferential standard does not require courts to cover their eyes to clear indicia of pretext. *Id.* at 785. In light of the evidence that Secretary Noem's official reasons for vacating TPS extensions for Venezuela and Haiti were not the true motivations behind her actions, there is ample evidence of bad faith and pretext to justify an examination of Secretary Noem's extra-record statements. This case is not a difficult one where the decision-makers were at least aware that the "quiet part should not be said out loud." *Cook County*, 461 F. Supp. 3d at 783. Instead, the decision-maker herself repeatedly expressed that "[f]olks from Venezuela that have come into this country are members of [Tren de Aragua]" and that "Venezuela purposely emptied out their prisons, emptied out their mental health facilities and sent them to the United States of America . . . *so* we are ending that extension of that [TPS] program." Kristi Noem, *Meet the Press* (NBC television broadcast, Feb. 2, 2025) (emphasis added), https://www.nbcnews.com/meet-the-press/meet-press-february-2-2025-n1311457.

At oral argument, the Government repeatedly asserted that we should disregard or discount the above statements of animus because some (though not all) were made before the Secretary and President assumed office or are otherwise outside the four corners of the agency's formal decision record. It relies on *Trump v. Hawaii* and *Regents* to contend that courts are barred from considering pre-office or extra-record remarks. But those cases are readily distinguishable, and the Government's argument is unavailing.

*Trump v. Hawaii* did not establish any brightline rule forbidding courts from considering such statements in an APA context. In that case, Plaintiffs brought an Immigration and Nationality Act and First Amendment Establishment

Clause challenge to a presidential proclamation that barred
nationals from certain countries from entering the United
States. *Trump*, 585 U.S. at 673–76. The Supreme Court
upheld the policy after applying a form of rational-basis
review that examined whether the policy could be upheld on
its stated national-security justification, despite the
President's history of anti-Muslim statements. *Id*. at 706–
10.

Crucially, the Court did *not* hold that a decision-maker's
inflammatory statements were entirely irrelevant to its
analysis; to the contrary, the Court recounted the President's
statements and declined to lay down a rule insulating them
from scrutiny. Instead, the Court proceeded to note that "the
issue before us is not whether to denounce the statements,"
but rather "the significance of those statements in reviewing
a Presidential directive, neutral on its face, addressing a
matter within the core of executive responsibility." *Id.* at
701–02. The key to *Trump v. Hawaii*'s result was that, even
*accounting* for the troubling statements, the policy on its face
was supported by a lengthy inter-agency review and satisfied
the deferential standard applicable to the exclusion of
foreign nationals in the national-security realm and under the
Establishment Clause. Not so here. *Trump v. Hawaii* is also
distinguishable because it did not involve any agency
decision-making and was instead a direct challenge to the
Executive itself. *Id*. at 701–05. And despite the *Trump v.
Hawaii* plaintiffs' claims that the ban targeted Muslims
specifically, the Supreme Court noted that the policy
impacted only a small fraction of the world's Muslim
population and that not all of the countries included were
majority-Muslim. *Id.* at 706.

In sum, *Trump v. Hawaii* was decided in an entirely
different legal and factual context from this case, and largely

stands for the unrelated proposition in the Establishment Clause context that a facially neutral executive policy will not be set aside as unconstitutional *solely* due to a leader's generalized rhetoric, so long as the policy can otherwise pass a legitimate-purpose test. It does not insulate government agencies from all inquiry into impermissible motive when the APA's standard of review demands a genuine, non-pretextual justification for the action.

Likewise, the Supreme Court in *Regents* did not categorically bar consideration of extra-record statements. The majority declined to invalidate the rescission of Deferred Action for Childhood Arrivals ("DACA") based on an equal protection claim, reasoning that the plaintiffs had not plausibly connected President Trump's generalized remarks about Mexicans to the agency's decision, especially given that the rescission was ostensibly based on the Attorney General's legal determination about DACA's unlawfulness. *Regents*, 591 U.S. at 35. The Court noted that there was "nothing irregular" about the history or process leading to the DACA rescission and that the decision-makers' actions could be explained without attributing them to animus. *Id.* at 34.

Importantly, the *Regents* Court did *not* hold that such statements are flatly irrelevant to a court's analysis. Even the majority did not avoid consideration of the statements; it expressly reviewed the remarks made by the President but characterized them as being largely irrelevant in *time* and *context* to the specific action taken *in that case*. *Id.* at 34–35. Here, unlike in *Regents*, the administrative process was highly irregular and devoid of a consistent non-discriminatory rationale, and the nexus between the leadership's animus-laden statements and the challenged action is uniquely direct and specific.

Secretary Noem's own remarks show that, from day one, she set out to end TPS for Venezuela and Haiti specifically because she stereotyped TPS holders *from those countries* as dangerous, criminals, and otherwise undesirable. This was a view she expressed repeatedly and tied explicitly to her TPS decisions. These statements were made by the official exercising the agency's power, as well as by the President who influenced and directed the policy, and many of the statements concerned the very subject matter of the decision in question.

Taken together, the agency's rushed and abnormal procedure, coupled with the Secretary's and President's bad faith statements of animus toward TPS holders who are Venezuelan and Haitian, make clear that the official concerns cited by the Secretary were not the driving forces behind her actions. Rather, those reasons were pretextual. Simply put, "the evidence tells a story that does not match the explanation the Secretary gave for [her] decision." *Dep't of Com.*, 588 U.S. at 784.

The true impetus for the Secretary's actions was the illegitimate one of vacating TPS protections for disfavored groups that were stereotyped as criminals, mentally unwell, and gang members based on their country of origin. The APA does not tolerate such an overt deception of the judicial and public audience. As the Supreme Court has observed, the "evidence showed that the Secretary was determined" to reach a particular result from the time she entered office, and only later "adopted [a] rationale" to justify it; allowing an agency to proceed in such a manner would reduce judicial review to an "empty ritual" and undermine the rule of law. *Id*. at 782–83, 785.

Case: 25-5724, 01/28/2026, DktEntry: 74.1, Page 74 of 78
Case 3:25-cv-01766-EMC   Document 374   Filed 01/28/26   Page 74 of 7

74                NATIONAL TPS ALLIANCE V. NOEM

In my view, to ignore this evidence would be to ignore what is obvious. Nothing in *Trump v. Hawaii* or *Regents* mandates judicial blindness in the face of clear pretext. To the contrary, our case law demands that we consider an official's bad faith statements when they strongly suggest that the official reason given is not the true motive behind the action taken. The APA does not permit us to uphold agency action on the basis of post hoc or contrived justifications.[8]

A court cannot shirk its duty to conduct judicial review of agency action under the APA. *Cf. Cohens v. State of Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) ("With whatever doubts, with whatever difficulties, a case may be

---

[8] It is worth repeating that the statutory bars on judicial review do not apply under these circumstances. Specifically, § 1254a(b)(5)(A) should be viewed as barring only determinations with respect to the Secretary's actual assessment of "whether the conditions for [a country's] designation" are met given "the conditions in the foreign state." § 1254a(b)(3)(A); *see also* § 1254a(b)(3)(B). It does not shield the Secretary from judicial scrutiny where, as here, Plaintiffs allege that she acted unlawfully by vacating a designation midstream, departed from required procedures, and offered a rationale that was patently pretextual. To interpret § 1254a(b)(5)(A) as foreclosing all APA review of TPS-related actions—no matter how procedurally irregular or facially implausible—would yield outcomes Congress could not have intended. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). Imagine, for example, a decision-maker publicly announcing that she would rescind a TPS designation for a country solely on account of those TPS holders' race, then listing a transparently inconsistent or baseless rationale as the official justification. On the Secretary's reading of § 1254a(b)(5)(A), courts would be powerless to intervene under the APA. That reading not only defies logic but erases the judiciary's essential role under the APA in ensuring reasoned and lawful agency action.

attended, we must decide it, if it be brought before us. We
have no more right to decline the exercise of jurisdiction
which is given, than to usurp that which is not given."); *see
also Marbury v. Madison*, 5 U.S. 137, 177 (1803). For
judicial review of agency action to be meaningful, we must
consider evidence that suggests agency action is contrived.
To recall the Supreme Court, "we are not required to exhibit
a naiveté from which ordinary citizens are free." *Dep't of
Com.*, 588 U.S. at 785 (internal quotation marks and citation
omitted). And here, there is a compelling record showing
that the Secretary's justification was pretextual and that the
TPS vacaturs were driven by impermissible animus and
preconceived outcomes. I therefore believe that, in addition
to grossly exceeding her statutory authority, the Secretary's
actions were arbitrary and capricious under the APA.

In reaching this conclusion, I do not probe the wisdom
of the Secretary's or President's broader immigration policy
preferences or the correctness of their beliefs on immigration
or the conditions in Venezuela or Haiti. After all, "[i]t is
hardly improper for an agency head to come into office with
policy preferences and ideas, discuss them with affected
parties, sound out other agencies for support, and work with
staff attorneys to substantiate the legal basis for a preferred
policy." *Id.* at 783. Rather, in this instance, we are enforcing
the basic point that an agency must exercise its decision-
making process in a reasoned manner and in accordance with
the law, not for preordained reasons infected by pretext,
prejudice, or false expediency. The record here reveals that
the reasoning listed by the Secretary was not her true
motivation and does not align with the sweeping action
taken. Instead, the Secretary was motivated by stereotypes

of individuals on the basis of their country of origin in order
to vacate TPS designations for those countries.[9]

In reviewing agency action, courts ensure that agency
decisions are the result of reasoned decision-making and
prevent agencies from using administrative procedure as a
cloak to pursue impermissible objectives. Judicial review
maintains the integrity of administrative governance and the
trust of the public. And while a reviewing court should not
lightly impute bad faith to agency officials, the evidence in
this case is as stark as any in recent memory. Indeed, if the
APA's mandate of genuine, non-arbitrary decision-making
means anything, it surely means that an agency cannot
openly express stereotype-based animus toward a group of
immigrants from certain countries and a predetermined
intent to sweep away their protections, and then expect a
court to blindly accept a post hoc rationalization that its
decision was actually the product of a technical
administrative concern. We as the judiciary should not
pretend to be blind to what the American public can easily
observe for themselves.

Because Judge Wardlaw's opinion resolves the appeal
solely on the basis that the Secretary exceeded her authority,

---

[9] I do not dispute that TPS determinations necessarily involve country-
specific evaluations—indeed, that is what the statute requires. A
prospective plaintiff could not simply allege animus on the basis that a
TPS determination as to a specific country has the impact of affecting
persons who are from that country. But there is a fundamental difference
between terminating TPS for a country based on objective, evidence-
based assessments of conditions on the ground, and doing so *because of*
generalized and derogatory stereotypes about *the people* who have
emigrated from that country. The former is entirely lawful and expected,
while the latter is unlawful and antithetical to the principles of reasoned
decision-making required by the TPS statute and APA.

reaching the merits of the APA issues is not necessary to the judgment.  However, we are free to affirm the district court's summary judgment on any ground supported by the record, and I believe it important to make clear that the outcome in this case would be independently justified by the APA's arbitrary-and-capricious standard, too.  *See McSherry*, 584 F.3d at 1131.  In my view, the administrative record of procedural abnormalities, augmented by permissible extra-record evidence of bad faith and racial and national origin animus, demonstrates that the Secretary's stated reasons were not the true motivating factors behind her vacatur of TPS for Venezuela and Haiti, and that her vacatur was impermissibly preordained.  Therefore, the Secretary's actions cannot withstand even the deferential scrutiny applied under the APA's arbitrary-and-capricious framework.

At its core, the APA enshrines a fundamental principle: agencies of the federal government "must pursue their goals reasonably" and in a manner that is transparent to the people they serve.  *Dep't of Com.*, 588 U.S. at 785.  When executive officials short-circuit statutory guardrails or base decisions on hidden motives, it is not a mere technical lapse but an affront to the rule of law.  Judicial vigilance in these circumstances is essential to ensure that regulatory power remains tethered to law and reason, not the whims of hidden motives or prejudice.

In sum, while the Executive may certainly shape an agency's policy within the scope granted by Congress, it may not do so by subverting the APA's requirements or by smuggling racial or national origin animus into the administrative process.  Animus is never a legitimate basis for agency action and will always constitute arbitrary and capricious decision-making.

The law's promise of accountability demands no less than candor and reasoned decision-making from those entrusted with immense regulatory powers.    Here, that promise was betrayed, and it is our duty to say what is already plainly known to the public.