**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

MAR 11 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| NATIONAL TPS ALLIANCE; MARIELA GONZALEZ; FREDDY ARAPE RIVAS; M.H.; CECILIA GONZALEZ HERRERA; ALBA PURICA HERNANDEZ; E. R.; HENDRINA VIVAS CASTILLO; VILES DORSAINVIL; A.C.A.; SHERIKA BLANC, <br><br> Plaintiffs - Appellees, <br><br> v. <br><br> KRISTI NOEM; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES OF AMERICA, <br><br> Defendants - Appellants. | No. 25-5724 <br><br> D.C. No. 3:25-cv-01766-EMC <br> Northern District of California, San Francisco <br><br> ORDER |

Before: Kim McLane Wardlaw, Salvador Mendoza, Jr., and Anthony D. Johnstone, Circuit Judges.
Concurrence by Judge Wardlaw
Dissent by Judge Bumatay
Concurrence by Judge Mendoza
Dissent by Judge R. Nelson

Judges Wardlaw, Mendoza, and Johnstone voted to deny the petition for

rehearing en banc. The full court was advised of the petition for rehearing en banc.

A judge requested a vote on whether to rehear the matter en banc. The matter

failed to receive a majority of the votes of the non-recused active judges in favor of

en banc consideration.  Fed. R. App. P. 40.    The Petition for Rehearing En Banc

is **DENIED**.  An Amended Order with separate writings may be filed on Friday,

March 13, 2026.  If an Amended Order is filed, the mandate shall issue forthwith

upon the filing of the Amended Order.[1]  *See* Fed. R. App. P. 41(b).  If an Amended

Order is not filed on Friday, March 13, 2026, the mandate shall issue on that date

at 11:59 P.M.  *Id.*

---

[1] The portion of our February 4, 2026, Order, *see* Dkt. No. 77, indicating that the
mandate would issue immediately upon the denial of the petition for rehearing en
banc is **VACATED**.

FILED

MAR 11 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

WARDLAW, J., joined by MENDOZA, J., and JOHNSTONE, J., concurring in the

denial of rehearing en banc:

      This concurrence in the denial of rehearing en banc briefly reiterates that we

have jurisdiction to entertain this case and that we properly set aside former

Department of Homeland Security Secretary Kristi Noem's unlawful actions.  I

also call attention to the continuing harms at issue.

      1.     In this case we held that 8 U.S.C. § 1254a(b)(5)(A) does not bar

judicial review of Plaintiffs' claim that Secretary Noem exceeded her statutory

authority by vacating Haiti's and Venezuela's Temporary Protected Status ("TPS")

and terminating Venezuela's TPS.[1]  *NTPSA III*, 166 F.4th at 755–58.  This holding

comports with the plain meaning of the statute, reflects Congress's stated intent to

provide "a system of temporary status that was predictable, dependable, and

insulated from electoral politics," *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1008

(9th Cir. 2026), and conforms with the holdings of every other court to have

addressed the issue.[2]

---

[1] As we explained, "[t]he Venezuela Termination was predicated on and inextricably intertwined with the Venezuela Vacatur; therefore, the illegality of the Vacatur must be fatal to the Termination."  *Nat. TPS All. v. Noem*, 166 F.4th 739, 766 (9th Cir. 2026) ("*NTPSA III*").  We therefore refer primarily to the Secretary's Vacatur in discussing the scope of the judicial review bar.

[2] *See, e.g., Miot v. Trump*, No. 26-5050, 2026 WL 659420 (D.C. Cir. March 6, 2026), *denying stay pending appeal of* No. 25-cv-02471, 2026 WL 266413 (D.D.C. Feb. 2, 2026); *Doe v. Noem*, No. 25-2995, 2026 WL 544631 (2d Cir. Feb. 17, 2026), *denying stay pending appeal of* No. 25-CV-8686, 2025 WL 4477179

Congress did not immunize *ultra vires* acts of the Secretary from judicial review.  Our dissenting colleagues suggest that the Secretary's vacatur—a power expressly *not* granted to the Secretary in the TPS statute, 8 U.S.C. § 1254a—of a TPS designation or extension is a "determination with respect to the designation, or termination or extension of a designation, of a foreign state['s]" TPS, *id.* § 1254a(b)(5)(A).  As we have already explained, the "strong presumption" of judicial review, combined with the Supreme Court's interpretation of strikingly similar judicial review provisions in *McNary v. Haitian Refugee Center*, 498 U.S. 479 (1991), and *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993), undermine the dissents' entirely-atextual reading of the statute.  *NTPSA III*, 166 F.4th at 755–57.

Moreover, as in *McNary* and *Reno*, our holding does not rest on any fact unique to the Secretary's vacatur of Venezuela or Haiti's TPS.  A plain reading of the statute demonstrates that the Secretary lacks the express, implied, or inherent power to vacate a TPS designation regardless of the country.  This case is not about

---

(S.D.N.Y. Nov. 19, 2025); *Afr. Communities Together v. Noem*, 2026 WL 395732 (D. Mass. Feb. 12, 2026); *Doe v. Noem*, 2026 WL 184544 (N.D. Ill. Jan. 23, 2026); *Nat'l TPS All. v. Noem*, 2025 WL 4058572 (N.D. Cal. Dec. 31, 2025); *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576 (D. Md. 2025); *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255 (E.D.N.Y. 2025); *Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018); *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393 (D. Mass. 2018).

the Secretary's "determination with respect to" a specific designation or extension.

8 U.S.C. § 1254a(b)(5)(A).  It is about "the scope and extent of statutory authority

granted to the Secretary," which is "a first order question."  *NTPSA III*, 166 F.4th at

756 (internal quotation marks and citation omitted).  We have no doubt that the

judicial review bar precludes a wide variety of challenges to the Secretary's

actions.  For example, courts may not second-guess the Secretary's procedurally

proper assessment of country conditions to substitute their own judgment as to the

appropriate TPS determination based on that evidence.  But Congress chose not to

use "'broader statutory language,' such as language precluding review of 'all

causes . . . arising' under [the TPS statute], or of 'all questions of law and fact'"

arising thereunder.  *NTPSA III*, 166 F.4th at 756 (quoting *McNary*, 498 U.S. at

494).  Thus, the strong presumption of judicial review is not overcome in this case,

and we may review the plain text of the statute to determine whether the Secretary

exceeded her authority in vacating TPS designations for Venezuela and Haiti.

    2.    To the extent that our dissenting colleagues believe that the Supreme

Court has hinted that we lack jurisdiction, they are mistaken.  The Supreme Court

has explained that its unreasoned stay orders are "not conclusive as to the merits"

but merely "inform how [we] should exercise [our] equitable discretion in like

cases."  *Trump v. Boyle*, 606 U.S. ---. 145 S. Ct. 2653, 2654 (2025).  As we

explained in *NTPSA III*, the two stay orders that lack explicit reasoning in this case

may have rested on the Court's "assessment of the balance of the equities or the parties' respective irreparable harms, rather than its assessment of the merits."  166 F.4th at 754.  Indeed, the Court acknowledged in granting its second stay that the "relative harms generally ha[d] not" "changed," which would be irrelevant if the Court believed it, and we, lacked jurisdiction to review Plaintiffs' challenge.  *See Noem v. Nat'l TPS All.*, --- U.S. ---, 146 S. Ct. 23, 24 (2025) (Mem.).  Justice Jackson's dissent to the stay order further suggests that the Court was concerned with the equities, not our jurisdiction.  *Id.* at 26 (Jackson, J., dissenting) (arguing that the Court "misjudge[d] the irreparable harm and balance-of-the-equities factors," rather than addressing the merits).  We do not know how the Supreme Court will ultimately resolve the merits in this case.  But by now, at least a dozen courts have had the opportunity to consider some or all of the issues that our decision determined, and none has adopted the Government's and our dissenting colleagues' atextual interpretation of the TPS statute's judicial review bar.  *Supra* n.2.  In the absence of further guidance from the Supreme Court, we do not read its stay orders to suggest that we lack jurisdiction.

3.  As to the merits, our opinion has been only strengthened in the month since it was published.  As the Supreme Court recently explained, "[t]he omission" of a particular power in a statute "is notable in light of the significant but specific powers Congress [*does*] go to the trouble of naming."  *Learning Resources v.*

*Trump*, 607 U.S. ---, --- S. Ct. ---, 2026 WL 477534, at *10 (2026). "It stands to reason that had Congress intended to convey the distinct and extraordinary power to" vacate a prior lawful designation or extension, "it would have done so expressly." *Id.*

To hold to the contrary would reduce the TPS statute's procedural requirements to a nullity. Why would Congress explicitly require that a termination "shall not be effective earlier than 60 days after the date the notice is published [in the Federal Register] or, if later, the expiration of the most recent previous extension," if it simultaneously empowered a Secretary to simply vacate a prior extension whenever she wanted instead of waiting to terminate it? 8 U.S.C. § 1254a(b)(3)(B). We do not think Congress gave such unconstrained authority to the Secretary.

4.    In these circumstances, 5 U.S.C. § 706 of the Administrative Procedure Act ("APA") provided a clear remedy: we set aside the Secretary's unlawful action. *NTPSA III*, 166 F.4th at 767–68. We did not enjoin the Secretary from terminating any country's TPS in accordance with the statutory guardrails prescribed by Congress in the TPS statute. *See id.;* 8 U.S.C. § 1254a(b)(3). We did not require her to do or proscribe her from doing anything. *NPTSA III*, 166 F.4th at 767–68. *Trump v. CASA, Inc.*, expressly declined to alter lower courts' ability to set aside administrative action under the APA. 606 U.S. 831, 847 n.10

5

(2025).  And, as our dissenting colleagues acknowledge, set aside relief has been afforded under the APA for decades.  *See, e.g., Corner Post Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 826–27 (2024) (Kavanaugh, J., concurring).  Our opinion is consistent with decades of administrative law precedent, and *CASA* did nothing to change that.  606 U.S. at 847 n.10.

5.     Our ruling in *NTPSA III* clarified the rights of hundreds of thousands of people, and every day that this case lingers unnecessarily in our court is another day that one of those people may have been wrongfully "detained and deported to a place where the Government promised—at least temporarily—it would not send them."[3]  *NTPSA III*, 166 F.4th at 768.  We should not sanction further delay.

---

[3] In addition to the extraordinary harms described in *NTPSA III*, we have seen many other examples of the detention of TPS holders after their TPS was terminated.  *See, e.g., Colina-Rojas v. Noem*, 2026 WL 412138, at *1 (W.D. Ky. Feb. 13, 2026) (Colina-Rojas, a native and citizen of Venezuela and TPS holder, was arrested on December 2, 2025, two weeks after having her TPS terminated, as part of Operation Metro Surge.  Immigrations and Customs Enforcement ("ICE") officers pulled her out of her car and broke her nose during her arrest.  She was detained for more than two months before her detention was ruled unlawful.); *Segundo Sangronis v. Unknown Party*, 2026 WL 362790, at *2 (W.D. Mich. Feb. 10, 2026) (Segundo Sangronis, a native and citizen of Venezuela and TPS holder, was arrested at a scheduled ICE check-in appointment on September 9, 2025, before he lost his TPS on November 20, 2025.  He spent five months in custody before his detention was ruled unlawful.); *Quintero v. Francis*, 2026 WL 265921, at *2–3 (S.D.N.Y. Feb. 2, 2026) (Quintero, a native and citizen of Venezuela and TPS holder, was arrested two weeks after her TPS was terminated on November 21, 2025.  She alleged that she suffers from diabetic kidney disease, among other health conditions, and has been denied treatment while detained.  She remains in custody.); *see also Reyes Medina v. Raycraft*, 2026 WL 591844 (W.D. Mich. Mar. 3, 2026); *Osorio Ortega v. Chestnut*, 2026 WL 539377 (E.D. Cal. Feb. 26, 2026).

The exceptionally important issues in this case will likely be litigated at the Supreme Court in the coming months. In the interim, our Government's promise not to detain and deport hundreds of thousands of Venezuelan and Haitian TPS holders will continue to ring hollow. Many will lose their jobs, suffer detention under poor, if not brutal conditions, and face deportation to a country where they have suffered violence, poverty, instability, or other extraordinary humanitarian crises. Our duty is to say what the law requires and to not look away from the devastating consequences when the law is ignored. That is precisely what we have done here.

FILED

MAR 11 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*National TPS Alliance, et al. v. Noem, et al.*, No. 25-5724

BUMATAY, Circuit Judge, joined by CALLAHAN, BENNETT, R. NELSON, COLLINS, LEE, BRESS, VANDYKE, and TUNG, Circuit Judges, dissenting from the denial of rehearing en banc:

Federal courts are not all powerful. Under our Constitution, Congress has the authority to preclude judicial review of certain matters and lower courts are bound to follow Congress's will. *See Patchak v. Zinke*, 583 U.S. 244, 252 (2018) (plurality opinion). Judges may not serve as "Platonic Guardians" of our nation's immigration policies. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 687 (9th Cir. 2021) (Bumatay, J., dissenting from the denial of rehearing en banc) (quoting L. Hand, The Bill of Rights 73 (1958)). So when Congress entrusts an immigration matter to the Executive and tells the Judiciary to restrain itself, we ought to listen.

With this understanding in mind, this case should have been an easy one. Congress enacted a broad jurisdiction-stripping provision in the Temporary Protected Status ("TPS") statute. TPS protects certain aliens from removal if the Secretary of Homeland Security designates a foreign state for protection under the program. Congress straightforwardly commanded that "[t]here is no judicial review of any determination of the [Secretary of Homeland Security] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A). In this case, the Secretary decided to (1) vacate an extension of TPS designation for Venezuela, (2) terminate the TPS designation of

1

Venezuela, and (3) shorten the extension of TPS designation for Haiti.  Ordinary users of the English language understand that all these decisions were "determination[s] . . . with respect to the . . . termination or extension of a designation."  8 U.S.C. § 1254a(b)(5)(A).  So under a plain reading of the statute, we should have dismissed the plaintiffs' claims challenging these determinations. Federal courts simply lack jurisdiction over them.

But that's not what the panel did.  Instead, it created a loophole to the sweeping judicial-review bar, claiming that challenges to "the scope and extent of statutory authority granted to the Secretary" under the TPS statute are immune from the jurisdiction-stripping provision.  *Nat'l TPS All. v. Noem*, 166 F.4th 739, 756 (9th Cir. 2026) (simplified).  So in the panel's view, all TPS determinations are reviewable by federal courts so long as plaintiffs also challenge the "Secretary's statutory authority."  *Id.*  This exception appears nowhere in the text of the statute. In short, the panel made it up.  Even more, this loophole will swallow the § 1254a(b)(5)(A) rule, allowing all TPS challenges to go forward with simple pleading.  I understand this issue may elicit strong reactions.  *See, e.g.*, *Nat'l TPS All.*, 166 F.4th at 769 (Mendoza, J., concurring) (quoting Maya Angelou's appearance on daytime T.V. to establish that the Secretary's decisions were "inexplicable" and "cloak[ed with] animus on the basis of race or national origin"). But that's no excuse to sidestep the plain meaning of a limit on our authority.

What's worse, the panel has ignored strong hints from the Supreme Court that we've gotten this wrong. Twice now, the Supreme Court has intervened and effectively reversed the Ninth Circuit *in this very case* by granting stays that this court had denied. *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728, 2728–29 (2025); *Noem v. Nat'l TPS All.*, 146 S. Ct. 23, 24 (2025). The panel should have seen the writing on the wall. *See Miot v. Trump*, 2026 WL 659420, at *5 (D.C. Cir. Mar. 6, 2026) (Walker, J., dissenting) (explaining that the judicial-review bar tips the equities in the government's favor). Instead, it turned a blind eye.

Because the panel made itself the Platonic Guardian of our immigration laws rather than neutral interpreters of the law, I respectfully dissent from the denial of rehearing en banc.

## I.

## Background

### A.

Congress was very clear about the limits of judicial review over the TPS program. Under the program, the government may grant aliens from designated "foreign state[s]" work authorization and protection from removal. 8 U.S.C. § 1254a(a)(1)(A)–(B). To grant this benefit, the government must determine that the aliens cannot safely return to the foreign state because of "ongoing armed conflict,"

natural disaster, or other "extraordinary and temporary conditions." *Id.* § 1254a(b)(1), (A)–(C).

Before it can designate a foreign state for TPS, the government must publish notice in the Federal Register. *Id.* § 1254a(b)(1)(C). For the "initial period of designation," the government can specify a period of "not less than 6 months and not more than 18 months." *Id.* § 1254a(b)(2)(B). At least 60 days before the end of the initial designation period, the government must review country conditions in the designated foreign state and either terminate or extend the TPS designation. *Id.* § 1254a(b)(3). The Secretary of Homeland Security has responsibility for the TPS program. *See* 8 U.S.C. § 1103(a), 6 U.S.C. § 557.

Congress then directed that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A).

## B.

***Venezuela***—During the Biden Administration, in March 2021, then-Department of Homeland Security ("DHS") Secretary Alejandro Mayorkas designated Venezuela for TPS. *Nat'l TPS All.*, 166 F.4th at 750. Secretary Mayorkas extended this 2021 Designation twice, with the second extension set to expire on September 10, 2025. *Id.* at 750–51.

In 2023, Secretary Mayorkas separately "re-designated" Venezuela for TPS, which "expand[ed] the pool of Venezuelans eligible for protection." *Id.* at 750. This 2023 Venezuela Designation was set to expire on April 2, 2025. *Id.* at 751. Three days before the end of the Biden Administration, on January 17, 2025, then-Secretary Mayorkas extended the 2023 Venezuela Designation again. *Id.* This 2025 Venezuela Extension would begin on April 3, 2025, and run through October 2, 2026. *Id.* (citing 90 Fed. Reg. 5961, 5962 (Jan. 17, 2025)). Secretary Mayorkas did not expressly extend or terminate the 2021 Designation and instead allowed all eligible Venezuela TPS beneficiaries under either the 2021 or 2023 Designations to obtain TPS through the 2025 Extension. 90 Fed. Reg. 9040, 9041 (Feb. 5, 2025).

President Donald J. Trump took office on January 20, 2025. On February 3, 2025, DHS Secretary Kristi Noem announced in the Federal Register that she was vacating the 2025 Venezuela Extension. *See Nat'l TPS All.*, 166 F.4th at 751 (citing 90 Fed. Reg. 8805 (Feb. 3, 2025)). And then on February 5, 2025, Secretary Noem filed notice that she was terminating the 2023 Venezuela Designation, which would have taken effect 60 days later. *Id.* at 751–52 (citing 90 Fed. Reg. 9040, 9041–42).

*Haiti*—Although Haiti was first designated for TPS in 2010 after a major earthquake, the Biden Administration newly designated Haiti for TPS in 2021. *Id.* at 752. Then-Secretary Mayorkas extended and re-designated Haiti for TPS in 2023 and 2024. *Id.* This 2024 Haiti Extension was an 18-month extension set to expire

on February 3, 2026.  *Id.*  On February 24, 2025, Secretary Noem issued a notice

partially vacating the 2024 Haiti Extension.  *Id.* at 752–53.  The order shortened the

TPS extension from 18 months to 12 months, meaning that Haiti's TPS designation

would expire on August 3, 2025, rather than February 3, 2026.  *Id.* at 753 (citing 90

Fed. Reg. 10511 (Feb. 24, 2025)).  On July 1, 2025, Secretary Noem terminated

Haiti's TPS designation, effective September 2, 2025.  *Id.*

## C.

National TPS Alliance and several individual TPS beneficiaries (collectively,

"Plaintiffs") sued the Trump Administration in February 2025.  *Id.* at 748, 753.  They

alleged that Secretary Noem lacked vacatur authority under the TPS statute and that

her Venezuela and Haiti decisions violated the Administrative Procedure Act

("APA") and the Constitution's Equal Protection Clause.  *Nat'l TPS All. v. Noem*,

798 F. Supp. 3d 1108, 1118 (N.D. Cal. 2025); *see id.* at 1143, 1150, 1153.  On March

31, 2025, the district court granted Plaintiffs' motion to postpone the vacatur of the

2025 Venezuela Extension and the termination of the 2023 Venezuela Designation.

*See Nat'l TPS All.*, 166 F.4th at 753.  The Ninth Circuit then denied a motion to stay

the district court's March 31 order pending appeal.  *Id.*  The Supreme Court

intervened and granted the government's emergency application for a stay.  *Nat'l

TPS All.*, 145 S. Ct. at 2728–29.

The case then returned to the district court.  On September 5, 2025, the district court granted Plaintiffs summary judgment on their APA claims and set aside the Venezuela vacatur, the Venezuela termination, and the Haiti partial vacatur.  *Nat'l TPS All.*, 798 F. Supp. 3d at 1164.  The district court left Plaintiffs' Equal Protection claims undecided and stayed proceedings while the government appealed the APA claims.  *Id.*  The government then sought a stay pending appeal of the order setting aside the Venezuela TPS decisions.  *Nat'l TPS All.*, 166 F.4th at 753.  Once again, this court denied the government's request.  *Id.*  And once again, the Supreme Court granted the government's emergency stay application.  *Nat'l TPS All.*, 146 S. Ct. at 24.

The government then appealed the district court's summary judgment order.  *Nat'l TPS All.*, 166 F.4th at 753.  The panel affirmed.  *Id.* at 769.  It held that the TPS statute's judicial-review bar did not apply to Plaintiffs' APA claims because Plaintiffs were challenging the Secretary's authority to issue the vacaturs and termination.  *Id.* at 756–57.  On the merits, the panel held that Plaintiffs were entitled to summary judgment because Secretary Noem lacked statutory authority to issue the vacaturs and termination.  *Id.* at 766–67.

## II.

## Congress Bars Judicial Review of TPS Determinations

Federal courts cannot act without jurisdiction.  A faithful reading of the TPS statute's judicial-review bar makes clear that we lack jurisdiction here.  The panel's conclusion that the judicial-review bar did not apply is egregiously wrong and should have been corrected en banc.

## A.

Congress enacted a sweeping jurisdiction-stripping provision in the TPS statute.  It instructed that there would be "no judicial review of *any determination* . . . *with respect to* the designation, or termination or extension of a designation[.]"  8 U.S.C. § 1254a(b)(5)(A) (emphasis added).  "[A]ny," "determination," and "with respect to" are capacious terms that signal Congress's desire to completely exclude federal courts from second-guessing the Secretary's decision to "designat[e]," "terminat[e]," or "exten[d]" TPS.  In other words, Congress sent a clear message to federal courts: "Stay out."

First, the term "any" has an "expansive meaning" that applies to determinations "of whatever kind."  *Patel v. Garland*, 596 U.S. 328, 338 (2022) (quoting Webster's Third New International Dictionary (1993)); *see also* Merriam-Webster's Collegiate Dictionary 53 (10th ed. 2000) ("Merriam-Webster's") (defining "any" as "one or more indiscriminately of whatever kind"); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 419, 423 (2012) (classifying Merriam-Webster's as among "the most useful and authoritative [dictionaries] for

8

the English language" in the early 1990s).  So "Congress' use of 'any' to modify

['determination'] is most naturally read to mean [determinations] of whatever kind."

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 220 (2008).  Thus, the "provision does

not restrict itself to certain kinds of decisions," *Patel*, 596 U.S. at 338, and instead

applies to *all* decisions of whatever kind regarding the designation, termination, or

extension of TPS.

Second, the term "determination" itself could be read broadly.  It refers to "a

single act . . . in making decisions."  *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S.

479, 492 (1991).  It is "[t]o settle or decide by choice of alternatives or possibilities."

*Black's Law Dictionary* (6th ed. 1990); *see also* Merriam-Webster's at 315 ("the act

of deciding definitively and firmly").  So the term "determination" could apply to

any "single act" that "firmly" decides an issue.

Finally, "with respect to" is another all-embracing phrase.  It only requires

"relation to," Merriam-Webster's at 995, or "reference to," *see* The Concise Oxford

Dictionary of Current English 1025 (8th ed. 1990), the subject—not just the subject

itself.  Courts thus typically read the phrase "expansively."  *Lamar, Archer & Cofrin,*

*LLP v. Appling*, 584 U.S. 709, 717 (2018) (interpreting the term "respecting").  So

"in a legal context," the phrase "generally has a broadening effect, ensuring that the

scope of a provision covers not only its subject but also matters relating to that

subject."  *Id.*  It does not encompass only the ultimate determination to designate,

extend, or terminate, but also any determination "*relating to*" the designating, extending, or terminating of TPS.  *See Patel*, 596 U.S. at 339.

Together, then, the plain text of § 1254a(b)(5)(A) bars judicial review of any definitive decision of the Secretary—of whatever kind—that relates to a TPS "designation," "extension," or "termination."  The challenged actions here easily fall within this category of determinations barred from judicial review.  First, the Secretary's decision to vacate the 2025 Venezuela Extension constitutes a "determination" related to the "extension" of TPS.  Second, the Secretary's decision to terminate the 2023 Venezuela Designation is a "determination" related to the "termination" of TPS.  Finally, the Secretary's decision to shorten the 2024 Haiti Extension was another "determination" related to the "extension" of TPS.  Thus, all these decisions fall within § 1254a(b)(5)(A)'s bar.

So we have no jurisdiction to review any of Plaintiffs' APA claims—the only claims on appeal.  Indeed, the APA doesn't apply where, as here, "statutes preclude judicial review."  5 U.S.C. § 701(a)(1).  This should have been an open-and-shut case.  The panel simply had no business second-guessing the Secretary's decisions.

Even more, the 2024 Haiti Extension expired on February 3, 2026—a few days after the panel rushed to release its opinion on January 28, 2026.  *See* Termination of Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 54733 (Nov. 28, 2025).  Despite the panel's rush, the mandate has not issued, so its

10

decision to enjoin the shortening of the 2024 Haiti Extension is now moot. That's yet another reason we should have taken this case en banc—to vacate the panel's decision on the moot claim. *See In re Pattullo*, 271 F.3d 898, 900–01 (9th Cir. 2001) ("Even after an appellate court has issued its decision, if it has not yet issued its mandate and the case becomes moot, the court will vacate its decision and dismiss the appeal as moot.").

## B.

The panel thwarted Congress's clear command in three steps. First, it used a creative textual analysis to create a carveout to § 1254a(b)(5)(A)'s sweeping judicial-review bar. Second, the panel misread precedent to justify its atextual interpretation. Finally, it introduced a parade of horribles to avoid a plain reading of the text. None of these moves are convincing.

## 1.

The panel evaded Congress's jurisdiction-stripping provision by inventing a non-existent carveout from its scope. It began by invoking what it called a "strong presumption" of "judicial review of administrative actions." *Nat'l TPS All.*, 166 F.4th at 755 (simplified). Whatever the strength of that presumption, it is easily overcome with § 1254a(b)(5)(A)'s clear language. The presumption is defeated when "specific language" in the statutory scheme shows Congress's intent to preclude judicial review. *Traynor v. Turnage*, 485 U.S. 535, 542 (1988) (simplified);

*see also* Nicholas Bagley, *The Puzzling Presumption of Reviewability*, 127 Harv. L. Rev. 1285, 1290 (2014) (noting that the presumption of judicial review doesn't apply when Congress has "foreclosed" judicial review in "explicit terms"). One struggles to think of more "specific language" than Congress saying: "[t]here is no judicial review of any determination . . . with respect to" a TPS termination, extension, or designation. 8 U.S.C. § 1254a(b)(5)(A).

And the presumption can't be used to justify the tortured reading of the plain text the panel employed. Recall that Plaintiffs expressly asked the district court to "[s]et aside" the order vacating the 2025 Venezuela Extension, the order terminating the 2023 Venezuela Designation, and the order shortening the 2024 Haiti Extension. As stated earlier, the panel should have easily found that these APA claims challenge a "determination . . . with respect to . . . the termination or extension" of TPS and disclaimed jurisdiction. Instead, the panel manufactured a loophole to the jurisdictional bar—it claimed that "the scope and extent of statutory authority granted to the Secretary is a first order question that is not a determination with respect to the designation, or termination or extension of a country for TPS." *Nat'l TPS All.*, 166 F.4th at 756 (simplified). According to the panel, then, § 1254a(b)(5)(A)'s text somehow doesn't extend to any claims that include challenges to "the scope and extent" of the Secretary's statutory authority. And because Plaintiffs asserted that the "Secretary exceeded her statutory authority," the

12

panel felt free to ignore the jurisdiction-stripping provision. *Id.* at 757. Ironically, despite § 1254a(b)(5)(A)'s sweeping language, the panel concluded that Congress needed to use "broader language" for the judicial-review bar to mean what it says. *Id.* at 756.

But the panel's reasoning can't be squared with § 1254a(b)(5)(A)'s text. It applies broadly to "any determination . . . with respect to" the termination or extension of TPS—no matter the theory of why those determinations should be set aside. It doesn't exempt claims from the jurisdiction-stripping provision simply because Plaintiffs believe that the "Secretary exceeded her statutory authority." Nor does it exempt so-called "first order question[s]" that relate to TPS determinations. So even if we were to read "determination" narrowly to mean only specific country TPS "determination[s]" under § 1254a(b), these claims would still fall within the judicial-review bar. At bottom, Plaintiffs are challenging specific determinations with respect to the "extension" and "termination" of specific TPS designations. The alleged reasons *why* these "determinations" are unlawful doesn't remove them from § 1254a(b)(5)(A)'s scope. Indeed, even if the Secretary did exceed her statutory authority in vacating the extensions early, such acts are still "determinations. . . with respect to" an extension and termination. Had Congress intended to exclude "first order question[s]"—whatever that means—from § 1254a(b)(5)(A)'s broad sweep, Congress could have done so by, for example, excepting "challenges to the

13

Secretary's authority."  "But Congress did not use such narrow language."  *Lamar,*

*Archer & Cofrin, LLP*, 584 U.S. at 719.

In the end, the panel created a roadmap for the complete evasion of § 1254a(b)(5)(A).  Going forward in the Ninth Circuit, all a plaintiff must do is use the password—"the Secretary exceeded her authority"—and the plaintiff will receive an automatic ticket into federal court.  All contrary to Congress's will.

## 2.

Precedent is even less useful to the panel's position.  The panel relied on *McNary*, 498 U.S. 479, and *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993) to justify its atextual carveout.  But neither *McNary* nor *Reno* dealt with specific individual determinations by the Secretary, as here, and so they don't support the panel's reading.

Rather than a challenge to an individual agency determination, *McNary* addressed a constitutional claim against an agency's practices.  *McNary* considered an immigration statute that prohibited "judicial review of a determination respecting an application for adjustment of status[.]"  498 U.S. at 491 (citing 8 U.S.C. § 1160(e)(1)).  "[T]he only question" for *McNary* was whether the judicial-review bar applied to a class action "alleging a pattern or practice of procedural due process violations by the Immigration and Naturalization Service (INS) in its administration of" an INS program.  *Id.* at 483.  *McNary* emphasized several times that the class

14

action didn't challenge any "individual determination" under the program. *See id.*
at 488, 491–92. Given this, *McNary* concluded that the judicial-review bar didn't
apply because the class action involved "general collateral challenges to
unconstitutional practices and policies used by the agency[.]" *Id.* at 492. *McNary*,
however, made clear that federal courts would have no jurisdiction over "the denial
of an individual application" under the statute. *Id.* So *McNary* merely recognizes
that a challenge to an agency's pattern or practice—divorced from an "individual
determination"—was not covered by the jurisdiction-stripping provision. But
Plaintiffs are challenging three "individual determination[s]" here—(1) the order
vacating the 2025 Venezuela Extension, (2) the order terminating the 2023
Venezuela Designation, and (3) the order shortening the 2024 Haiti Extension. Thus,
*McNary* doesn't help the panel.

Reno is similar. It too considered a statute prohibiting judicial review of
"determination[s] respecting an application for adjustment of status[.]" *Reno*, 509
U.S. at 54 (citing 8 U.S.C. § 1255a(f)(1)). Drawing on *McNary*, *Reno* concluded
that the judicial-review provision didn't prohibit suits "challenging the legality of a
regulation without referring to or relying on the denial of any individual
application." *Id.* at 56. Because the challenges there had nothing to do with "any
individual application," the jurisdiction-stripping provision didn't apply. *Id.* *Reno*
is thus limited to claims *unrelated* to a specific application. But unlike in *Reno*,

Plaintiffs' APA claims "refer[] to" and "rely[] on" three specific determinations of the Secretary—her determinations to shorten or terminate the Venezuela and Haiti TPS designations. *See id.*

### 3.

Because text and precedent do not support its view, the panel resorts to sensationalism. We can't follow the text's plain meaning, according to the panel, because doing so invites a parade of sensational and "absurd" horribles. *See Nat'l TPS All.*, 166 F.4th at 757. Say the Secretary authorized a 30-year TPS period! *Id.* Or what if the Secretary sold TPS designations? *Id.* Imagine that the Secretary made TPS determinations based on "perceived favored racial or ethnic populations." *Id.* Because these hypotheticals are all decisions about a TPS designation, the panel feared that they would be unreviewable under the plain meaning of § 1254a(b)(5)(A). Because this scenario would be "absurd" in the panel's eyes, the panel concluded that we must read § 1254a(b)(5)(A) contrary to its ordinary meaning. *See id.* ("Section 1254a(b)(5)(A) simply cannot bear the weight of the Government's expansive interpretation.").

But the panel's argument fails for two reasons. First, it proves too much. Even under the panel's atextual reading of § 1254a(b)(5)(A), some of these examples would be unreviewable. Take the hypothetical that the Secretary could "limit TPS designations to countries with perceived favored racial or ethnic populations." *Id.*

16

Even if the Secretary did select a country for TPS based on some sort of bias, that is simply a "determination . . . with respect" to a designation. It has nothing to do with "first order question[s]" or questions about "the scope and extent of statutory authority granted to the Secretary[.]" *Id.* at 756 (simplified). Thus, under the panel's own interpretation, this "absurd" result is unreviewable. Indeed, at an earlier stage, the panel admitted that § 1254a(b)(5)(A) "restrict[s] review of the Secretary's determinations of whether to grant TPS in a particular situation[.]" *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1017 (9th Cir. 2025) (simplified). So it makes no sense to disregard the most natural reading of § 1254a(b)(5)(A) because of a hypothetical that even the panel agreed falls within its scope.

Second, the parade of horribles only matters if one accepts the panel's flawed view of the judicial role. Simply, the federal judiciary doesn't exist to remedy every wrong. Lower courts are courts of limited jurisdiction. We only decide cases and controversies *over which Congress has given us jurisdiction*. And we must faithfully adhere to the limits Congress places on us. *See Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850) ("Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies."); *see generally* Richard H. Fallon, Jr. et al., Hart and Wechsler's The Federal Courts and the Federal System 307–314 (7th ed. 2015) (canvassing authorities on Congress's jurisdiction-stripping power).

The panel was right in one respect—the TPS statute "was not meant to be a blank check." *Nat'l TPS All.*, 166 F.4th at 757. But lower courts aren't the bank— policing every transaction. Sometimes Congress decides that the political process is the proper forum for remedying improper conduct. For example, if the Secretary were to sell TPS designations, the political branches have several remedies: (1) she could be charged with bribery, *see* 18 U.S.C. § 201; (2) Congress could impeach her, U.S. Const. art. II, § 4; or (3) Congress could refuse to fund the agency she leads, *id.* art. I, § 9, cl. 7. Faithful adherence to the plain meaning of our jurisdictional limits is not absurd—it's our job. After all, the absurdity canon "does not license courts to improve statutes . . . substantively, so that their outcomes accord more closely with judicial beliefs about how matters ought to be resolved." Caleb Nelson, Statutory Interpretation 96 (2d ed. 2024) (quoting *Jaskolski v. Daniels*, 427 F.3d 456, 461 (7th Cir. 2005) (Easterbrook, J.)).

## III.

Creative textual analysis, off-point precedent, and sensational hypotheticals cannot defeat the plain meaning of the words that survived bicameralism and presentment. Try as it might, the panel cannot avoid the clear results: vacating an extension is a determination with respect to that extension, and terminating a designation is a determination with respect to a termination. The panel's conclusion to the contrary "strains credulity for even the most casual user of words." *McDonald*

*v. City of Chicago*, 561 U.S. 742, 811 (2010) (Thomas, J., concurring in part and concurring in the judgment).

Because the panel opinion strikes a blow to Congress's authority over federal courts and to "speaker[s] of ordinary English," *Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 980 (2021) (Roberts, C.J., respecting the denial of certiorari), I respectfully dissent from the denial of rehearing en banc.

FILED

MENDOZA, J., joined by WARDLAW, J., concurring in the denial of rehearing en banc:

MAR 11 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

I.

We write only to address the arguments contained within Part II of Judge Nelson's dissent from the denial of rehearing en banc ("dissental").[1] At the outset, we make one thing clear: Judge Nelson's sweeping characterizations of the concurrence and its reach are his alone. He does not speak for us. We stand only by what is written in the panel opinion, the concurrence, and this statement. What the concurrence did was straightforward. It acknowledged what the record plainly revealed. The Administrative Procedure Act does not require courts to shut their eyes and ears to unreasoned and pretextual explanations. And it certainly does not require courts to ignore evidence that bad faith animus was the driving factor behind an agency's decision. Judge Nelson would prefer a rule of deliberate blindness to decisions even when driven by racism and national origin animus. We decline to adopt it.

---

[1] We do not address the arguments contained in Part I of Judge Nelson's dissental given that they are addressed in Judge Wardlaw's statement concurring in the denial of rehearing en banc. Additionally, Judge Wardlaw takes no position with respect to the concurrence's Part III's arguments, because she did not join the discussion of animus.

1

II.

Judge Nelson's dissental rests on a curious premise: although he publicly maintains that the concurrence is nonbinding and therefore does not control future cases, he nonetheless spends a great deal of time evaluating its analysis as part of his broader justification for en banc review.[2]

Those positions cannot be reconciled. If, as the dissental asserts, the concurrence carries no precedential effect and the panel opinion alone resolves the case, then there is nothing for the en banc court to "correct" as to the concurrence. En banc review is neither a vehicle for litigating personal grievances with the nonbinding reasoning of another judge nor a means of issuing sweeping advisory opinions on issues entirely unnecessary to the disposition. And if the concurrence carries binding precedential weight, that would not aid the dissental either, because the analysis it criticizes reflects nothing more than an application of settled Administrative Procedure Act principles. Either way, Judge Nelson's position identified no error warranting rehearing.

---

[2]    If *this* concurrence is as plainly nonbinding as Judge Nelson publicly maintains, it is unclear why *this* case would be an appropriate vehicle on which to expend the Court's en banc resources. Perhaps it is because Judge Nelson actually believes that the concurrence carries precedential weight. Judge Nelson further suggests that we do not object to his characterization of the concurrence's precedential force. Because the dissental repeatedly misconstrues the opinion and the concurrence, we reiterate that we have only agreed to what is stated in the opinion, concurrence, and this statement—nothing else.

2

The dissental's merits critique fares no better.  According to Judge Nelson, the concurrence improperly "commingled doctrines" by considering several *State Farm* deficiencies to determine that the Secretary's explanation was pretextual and that the decision-making process reflected a preordained outcome.  But the concurrence did nothing of the sort; nowhere in the concurrence is there a finding that only when considering the pretext and preordained evidence "together" does the Secretary's actions amount to a violation of the APA.[3]  Instead, we applied the familiar framework articulated in *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), and reaffirmed in *Department of Commerce v. New York*, 588 U.S. 752 (2019).  Those cases both stand for the proposition that courts must set aside agency action where the agency

---

[3]    Judge Nelson misconstrues the words "[t]aken together" in our concurrence to suggest that we were "commingl[ing] doctrines."  But he should read the full paragraph to understand that we were discussing the evidence that, "[t]aken together," reveals pretext:

> In sum, the district court rightly identified a litany of APA defects, ***each of which*** render the Secretary's actions arbitrary and capricious.  Taken together, these deficiencies paint a picture of agency action that was not the product of reasoned decision-making, but of a rushed and pre-determined agenda masked by pretext.

*Nat'l TPS All. v. Noem*, 166 F.4th 739, 774 (9th Cir. 2026) (Mendoza, J., joined by Wardlaw, J., concurring) (emphasis added).

fails to consider important aspects of the problem, offers explanations that run

counter to the evidence before it, or provides rationales so implausible that they

cannot be attributed to agency expertise.

When multiple such evidentiary indicators appear in the administrative

record, it is neither novel nor improper for a court to evaluate them collectively in

assessing whether the agency's stated rationale is pretextual.  The Supreme Court

in *Department of Commerce* undertook precisely that holistic inquiry, examining

the "evidence as a whole" and concluding that "[s]everal points, taken together,

reveal a significant mismatch between the Secretary's decision and the rationale he

provided."  588 U.S. at 783.[4]  And *Department of Commerce* never imposed any

sort of categorical sequencing rule requiring courts to isolate each *State Farm*

deficiency before considering whether the record as a whole reveals pretext.  In

any event, the administrative record in this case did not support the Secretary's

stated rationale.

Beyond the concurrence, Judge Nelson fundamentally misunderstands

pretext and preordained decision-making as siloed doctrines that must never be

considered in tandem.  That is not how APA review operates.  Instead, pretext and

preordained decision-making are both evidence of the same thing: arbitrariness and

---

[4]      *See also Dep't of Com.*, 588 U.S. at 782 ("We accordingly review the
District Court's ruling on pretext in light of all the evidence in the record before
the court, including the extra-record discovery.").

capriciousness. Where there is evidence that a decision-maker is hiding their true reasons for taking action behind a faulty explanation, that is pretext. And where there is evidence that an agency decided to take action prior to any reasoned and official decision-making process, that is preordained reasoning. Evidence of preordained outcomes is *itself* evidence that an agency's post-factum official reason for taking action was not the driving motive, and vice versa. Judge Nelson's conceptualization of arbitrary and capricious review would allow for agencies to sprinkle in just enough (but not too much!) pretext and just enough (but not too much!) preordained decision-making to skirt the APA's reasoned decision-making requirement.

Judge Nelson also accuses the concurrence of substituting its policy judgment for that of the agency. To the contrary, the concurrence repeatedly emphasized that courts may not second-guess policy choices entrusted to the Executive. *See, e.g.*, *Nat'l TPS All.*, 166 F.4th at 781 (Mendoza, J., concurring). The defect identified was not the Secretary's national security or policy preferences, but the absence of a reasoned explanation connecting those preferences to the statutory criteria and the agency's own decision-making processes. Recognizing that an agency decision may be both "preordained" *and* unsupported by the rationale offered does not expand arbitrary-and-capricious review; it simply acknowledges the commonsense principle that courts need not

accept explanations that the record itself patently undermines.  *See Dep't of Com.*,
588 U.S. at 785 ("Accepting contrived reasons would defeat the purpose of the
enterprise.  If judicial review is to be more than an empty ritual, it must demand
something better than the explanation offered for the action taken in this case.").[5]

Judge Nelson's criticism of the concurrence's discussion of extra-record
evidence is similarly futile.  First, we reiterate that the concurrence evaluated the
administrative record itself and concluded that the Secretary's stated rationale
failed under the ordinary *State Farm* framework on that record alone.  *See, e.g.*,
*Nat'l TPS All.*, 166 F.4th at 771 (Mendoza, J., joined by Wardlaw, J., concurring).
The additional discussion addressed whether Secretary Noem's statements
reflecting discriminatory animus could illuminate the context of the agency's
decision-making, a question the Supreme Court has repeatedly recognized may
arise when there is a "strong showing of bad faith or improper behavior."  *Dep't of
Com.* 588 U.S. at 781 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401
U.S. 402, 420 (1971)).

---

[5]     Judge Nelson's accusation that "[t]he Majority Concurrence used its pretext
finding as a license to disregard the agency's valid rationale" stands in contrast to
what the concurrence actually does.  The concurrence expressly provides that it
does not evaluate the merits of the Secretary's policy preferences and it instead
concludes that the Secretary's stated reasons for vacating TPS designations for
Venezuela and Haiti do not amount to "a satisfactory explanation" for its action in
light of plethora of nonsensical contradictions contained in the record.  *F.C.C. v.
Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

The dissental's suggestion that courts must categorically ignore such damning evidence whenever a decision-maker throws out the words "national security" with no further explanation misreads that precedent. *Department of Commerce* did not require courts to blind themselves to clear evidence of improper motive; it only cautioned that inquiry into decision-makers' mental processes should not occur lightly. *See id.* The concurrence expressly noted that understandable reluctance but also recognized that caution does not mean courts must pretend that plainly relevant extra-record evidence does not exist. *Nat'l TPS All.*, 166 F.4th at 771 (Mendoza, J., joined by Wardlaw, J., concurring).

The rule the dissental appears to propose would lead to an absurd result: courts would be required to accept a proffered rationale at face value even where the surrounding record and the decision-maker's own extra-record public statements clearly undermine its authenticity. This would eviscerate the fundamental precepts of judicial review of agency decision-making, notwithstanding its inherently deferential review. *See Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) ("Our task is simply to ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made.") (internal quotation marks and citation omitted); *Cook County v. Wolf*, 461 F. Supp. 3d 779, 794 (N.D.

7

Ill. 2020) ("Most people know by now that the quiet part should not be said out loud."). Administrative law has never demanded such studied naiveté.

Indeed, Judge Nelson does not object to the fact that the Secretary's statements directly tied her decision to vacate TPS status for Venezuela to racist stereotypes surrounding TPS holders' nation of origin. Nor does he object to the fact that the Secretary publicly categorized all Venezuelan TPS holders as criminals and mentally unwell and stated that those stereotypes were the basis of her decision to vacate TPS status for Venezuela. Instead, the dissental appears to contend that the extra-record statements here just weren't enough to show "bad faith." *Cf.* Kristi Noem, Meet the Press (NBC television broadcast, Feb. 2, 2025) ("Folks from Venezuela that have come into this country are members of [Tren de Aragua]. And remember, Venezuela purposely emptied out their prisons, emptied out their mental health facilities and sent them to the United States of America. So we are ending that extension of that [TPS] program, adding some integrity back into it. And this administration's evaluating all of our programs to make sure that they truly are something that's to the benefit of the United States, so they're not for the benefit of criminals."). There could not possibly be a stronger showing of "bad faith" and "improper behavior" to consider these extra-record statements. *Dep't of Com.*, 588 U.S. at 781. The relevance of this evidence arises not from its political

ramifications or character but from its obvious bearing on whether the agency's stated rationale reflects reasoned decision-making.

## III.

Judicial review under the APA requires courts to ensure that agencies offer genuine explanations for their actions, not contrived ones. Judge Nelson's reasoning, by contrast, would require the judiciary to cover its ears even where decision-makers brazenly say "the quiet part" out loud and publicly announce their animus-laden reasons for taking an action against a specific subset of immigrants. The denial of rehearing en banc reaffirms that Judge Nelson's approach is one that we are unwilling to follow.

FILED

MAR 11 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*National TPS Alliance v. Noem, et al.*, No. 25-5724

R. NELSON, Circuit Judge, dissenting from the denial of rehearing en banc:

When reviewing the Executive's Temporary Protected Status (TPS) decisions, the judicial role is highly constrained. The first constraint is jurisdictional. Judge Bumatay correctly explains why 8 U.S.C. § 1254a(b)(5)(A) bars judicial review of Plaintiffs' Administrative Procedure Act (APA) claims. I fully join Judge Bumatay's dissent from the denial of rehearing en banc. Congress unambiguously precluded review of "any determination" of the Secretary "with respect to the designation, or termination or extension of a designation." § 1254a(b)(5)(A). This forecloses Plaintiffs' APA challenge to the Secretary's TPS decisions. *See Ramos v. Wolf*, 975 F.3d 872, 891–900 (9th Cir. 2020), *reh'g en banc granted*, *opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

While our court lacked statutory jurisdiction to decide this case, because the panel reached the merits, I address those errors as well. First, the panel granted universal relief without properly analyzing the legal authority to do so. In *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), the Supreme Court restricted universal relief to prevent enforcement of governmental policies to three potential circumstances: (1) class actions; (2) complete relief for injuries to state plaintiffs; or (3) statutory "set aside" relief under 5 U.S.C. § 706(2). Although the Court reserved the question, Justices disagreed about whether the third option is authorized by statute. The Ninth Circuit has not decided this question, either. And the panel did not take up the open

1

question.  Instead, the panel conflated the doctrines, invoking the equitable "complete relief" principle (option two) while purporting to act under statutory "set aside" authority (option three).  The panel thus revived arguments for equitable remedial powers foreclosed in *CASA*.  The panel should have picked a lane.  Its refusal gives future courts a roadmap around *CASA*'s limits.

Second, given the other en banc-worthy questions in this case, we should have decided whether a majority concurrence is binding precedent to avoid any future confusion.  By its terms, however, the Majority Concurrence in this case is not binding.  Still, the Majority Concurrence concluded that the Venezuela Vacatur was arbitrary and capricious by substituting its own policy judgment for the agency's reasoning.  It improperly disregarded the agency's stated rationale as "pretext."  But the administrative record falls well short of what *Department of Commerce v. New York*, 588 U.S. 752 (2019), demands for this finding.

# I

The panel's grant of universal relief flouts the Supreme Court's decision in *CASA*.  The panel conflated options open after *CASA*.  Only the "set aside" option could be relevant to universal relief.  But rather than decide that issue, the panel concluded that "the proper remedy under APA § 706(2) is to set aside [the Secretary's] actions and restore the status quo."  *Nat'l TPS All. v. Noem*, 166 F.4th 739, 767 (9th Cir. 2026).  While the panel perhaps could have granted relief under

§ 706(2), it never analyzed whether the phrase "set aside" grants that power. *See id*. It even disclaims deciding the question—while exercising power under the very provision it refuses to interpret. *See id.* ("We need not resolve this question for our circuit.").

Worse, the panel invokes the need for "complete relief"—an equitable concept. *See id.* Granting enforceable equitable relief to nonparties is generally outside the inherent powers of the federal courts. *See CASA*, 606 U.S. at 841. By grafting equitable considerations onto a statutory "set aside" question, the panel skirted both theories. The result is analytically incoherent and opens the floodgates for future courts to grant universal injunctions in situations foreclosed by *CASA*.

An equitable injunction is a precise concept. Courts issue prohibitory injunctive relief through an order preventing a government officer from enforcing a statute or administrative decision against a plaintiff. *See, e.g.*, *id.* at 853; *Ex parte Young*, 209 U.S. 123 (1908). The statute or rule remains legally in effect and may even be enforced if the court dissolves the injunction. *See* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 987 (2018).

A universal injunction goes a step further by enjoining the government from enforcing the statute or rule against anyone, even nonparties. This is "relief that extend[s] beyond the parties." *CASA*, 606 U.S. at 843. Such relief was unheard of at equity and is not part of the courts' equitable powers. *Id.* at 847. Thus, the

Supreme Court held in *CASA* that Congress did not grant the Judiciary the power to impose universal injunctions when it gave the Judiciary equitable powers in the Judiciary Act of 1789. *See id.* at 841 & n.4.

The Court left open the possibility that some other statute may authorize relief that prevents the government from enforcing a statute or rule against nonparties. *See id.* at 841, 855–56. The most likely candidate is § 706(2). *See id.* at 847 n.10. That provision provides that the reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be" arbitrary, capricious, or an abuse of discretion. § 706(2).

But setting aside a rule is not an equitable injunction. Many courts have suggested that "set aside" means the courts can vacate agency action itself. *See, e.g.*, *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97–98 (D.C. Cir. 2002). For decades, the D.C. Circuit has used § 706(2) to strip agency rules of legal effect, without enjoining agency officials from enforcing the vacated rule. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) (citing *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)). "[V]acatur neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022). The relief does not carry the threat of contempt and does not require the courts to maintain continuing jurisdiction to ensure compliance. *See, e.g., Horne v. Flores*, 557 U.S.

433, 447–48 (2009); *see also Mi Familia Vota v. Petersen*, 152 F.4th 1153, 1156 (9th Cir. 2025) (R. Nelson, J., dissenting from the denial of rehearing en banc).

Had the panel explained why the phrase "set aside" supports this kind of relief, its conclusion may have been defensible.  Still, Justices have questioned that conclusion, and the panel never analyzed the issue.  *Compare United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring in the judgment) (expressing skepticism that § 706(2) authorizes universal set aside relief), *with Corner Post*, 603 U.S. at 826 (Kavanaugh, J., concurring) (defending the D.C. Circuit's practice of setting aside rules under the APA).

Rather than answer the textual question, the panel asserted that universal relief was necessary to give Plaintiffs "complete relief."  But complete relief "is not a guarantee"—it is "the maximum a court can provide" under its inherent equitable powers.  *CASA*, 606 U.S. at 854.  Complete relief is not an automatic indicator of what Congress authorized with the statutory phrase "set aside" agency action.  The answer to that question can come only from the text.  The panel's failure to determine what the text authorizes warrants en banc review.[1]

The panel's extended discussion of "complete relief" is more problematic for an additional reason.  The panel did not provide injunctive relief.  *See* Panel

---

[1] I express no view whether decisions finding statutory authority are correctly decided after *CASA*—only that the conclusion must be analytically defensible.

Concurrence at 5.  But that highlights the potential confusion its analysis of equitable considerations will cause for future courts purporting to act under § 706(2).  *See Nat'l TPS All.*, 166 F.4th at 767–68.  Carefully recognizing the differences between these remedies is important for our court and the lower courts.

The concept of complete relief is a "principle" of what a "court of equity may fashion."  *CASA*, 606 U.S. at 850.  The panel invokes equitable relief each time it references "complete relief."  But injunctive relief imposed against the government is inherently disruptive.  "[I]njunctions issued in such cases often remain in force for many years, and the passage of time frequently brings about changed circumstances . . . that warrant reexamination of the original judgment."  *Horne*, 557 U.S. at 447–48.  Once a permanent injunction is entered, a federal court may shape policy outcomes for decades, either through direct orders or through governmental officials' caution to avoid possible sanctions.  *See id.* at 448.  *CASA* sought to correct this dynamic.

With the advent of forum-shopping, plaintiffs could rush to a single favorable district court and obtain an injunction affecting national policy.  And the odds were stacked against the government: "A plaintiff must win just one suit to secure sweeping relief," but "the Government must win everywhere."  *See* 606 U.S. at 855.  This gave a single district court judge unilateral ability to shape and control policy set by the political branches.  The only recourse was emergency stays, forcing us and

6

the Supreme Court to resolve issues of national importance on expedited briefing and truncated schedules. *See id.* at 870 (Kavanaugh, J., concurring). By collapsing vacatur and equitable relief principles into a single "complete relief" rationale, the panel reopens a door *CASA* closed.

While "set aside" relief under the APA may be the "functional equivalent of a universal injunction" from a plaintiff's perspective, *Nat'l TPS All.*, 166 F.4th at 767 (quoting *CASA*, 606 U.S. at 873 (Kavanaugh, J., concurring)), it is not from the courts' perspective. Requiring "district courts to follow proper legal procedures when awarding such relief" means courts must look to Congress for the legal authorization. *CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring). This restores some power to Congress, who can strip jurisdiction from overbearing courts. *See, e.g.*, *Patchak v. Zinke*, 583 U.S. 244, 253 (2018) (plurality opinion).

Vacating an agency rule is also less intrusive than enjoining the government from enforcing it. Set aside relief acts against the unlawful agency action itself, not the agency's decision maker. *See Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring) (citing Mitchell, *supra*, at 1012). This "does nothing but re-establish the status quo absent the unlawful agency action." *Texas*, 40 F.4th at 220. Agency decision makers are thus free to implement new policies.

The upshot is that if we enter set aside relief under § 706(2) (assuming support in the text), courts must not do so based on equitable principles. By giving future

courts the potential to use § 706(2) to consider equitable principles, the panel garbled

the Supreme Court's decision in *CASA*.  We should have corrected that error.

II

Part II of the Majority Concurrence is also nonbinding and wrong.

A

We should have clarified whether a majority concurrence—a relatively rare

occurrence—is binding.  Some members of our court have noted this potential issue.

*See Truth v. Kent Sch. Dist.*, 551 F.3d 850, 851 n.1 (9th Cir. 2008) (Bea, J., dissenting

from the denial of rehearing en banc) ("This is no standard concurrence . . . because

two of the three members of the panel concur in it.").  Given the other en banc worthy

questions in this case, we should have clarified this issue to avoid any future

confusion.

By its own terms, the Majority Concurrence is not binding.  Indeed, the

Majority Concurrence addressed an issue that the unanimous panel "decline[d] to

reach"—"the remainder of Plaintiffs' APA challenge."  *Nat'l TPS All.*, 166 F.4th

at 766.  The unanimous panel thus does not adopt the analysis of the Majority

Concurrence.  And the concurrence expressly noted that the panel's "explanation is

sufficient to dispose of this case" and that it only addressed the APA claims "had we

reached the merits."  *Nat'l TPS All.*, 166 F.4th at 769 (Mendoza, J., concurring).  By

its own terms—which my colleagues stand by, *see* Majority En Banc Concurrence

8

at 1—the Majority Concurrence never purports to be binding. And the Majority En Banc Denial Concurrence does not provide any reason to conclude otherwise. As a result, the Majority Concurrence is nonbinding; it does not control future district court and panel decisions.

B

Because the Majority Concurrence addresses a recurring issue in our court, it is worth noting that it is wrong in any event. It concluded that Secretary Noem's vacatur of the Venezuela designation was "arbitrary and capricious in contravention of the APA." *Nat'l TPS All.*, 166 F.4th at 771 (Mendoza, J., and Wardlaw, J., concurring). Under the APA's "narrow" "arbitrary and capricious" standard, courts may only set aside agency action when the agency fails to examine "the relevant data" or cannot give "a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). A court may not "substitute its judgment for that of the agency." *Id.*

But the Majority Concurrence dismissed the agency's rationale—not because the administrative record contradicts or fails to support the rationale—but because the Majority Concurrence found that the Secretary's "decisions were both preordained and rooted in pretext." *Nat'l TPS All.*, 166 F.4th at 771 (Mendoza, J., and Wardlaw, J., concurring). The Majority Concurrence never found support from

9

a single doctrine to justify its finding but claimed commingled doctrines may be "[t]aken together" to find agency action was "masked by pretext."  *Id.* at 774. Indeed, the Majority Concurrence repeatedly reviewed standard *State Farm* principles and then used them to support its pretext finding.  *See, e.g.*, *id.* at 771 ("[A] cursory review of the record indicates that her decisions were both preordained and rooted in pretext."); *id.* at 772 (a review of the agency's consideration of alternatives "underscores the preordained and pretextual character of the Secretary's decision"); *id.* at 773 n.3 ("[W]e may still view the Secretary's failure to consider these reliance interests as evidence of pretext.").

No court has aggregated individual *State Farm* deficiencies in this way to support a pretext finding.  "[A] court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."  *Dep't of Com.*, 588 U.S. at 780 (citing *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978)).  This principle "reflects the recognition that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided."  *Id.* at 780–81 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)); *see also Ramos*, 975 F.3d at 900 (R. Nelson, J., concurring) ("[T]he record-review requirement is not just a

meaningless procedural hurdle to overcome, but a fundamental constitutional protection to government agency action.").

The corollary is that courts must generally accept the rationale provided by the agency so long as it is supported by the administrative record. That rule applies with added force when the agency is acting "within the core of executive responsibility." *Trump v. Hawaii*, 585 U.S. 667, 701–02 (2018). Only on a strong evidentiary showing of bad faith may the courts disregard the valid, stated reason. *Dep't of Com.*, 588 U.S. at 780.

By commingling doctrines, the Majority Concurrence improperly expanded the exceptions. *Nat'l TPS All.*, 166 F.4th at 771. *Department of Commerce* does not support this approach. There, the Supreme Court reviewed emails showing that the rationale offered by the agency was adopted "late in the process," because a leading member of the project knew "the Secretary wished to reinstate the question," and "saw it as his task to 'find the best rationale.'" 588 U.S. at 783.[2]

---

[2] Unlike the Majority En Banc Concurrence's characterization of *Department of Commerce* (Op. at 4), the Supreme Court did not use *State Farm* discrepancies to disregard the valid rationale supported by the administrative record. Instead, the Court found that the agency stated a valid rationale under ordinary arbitrary or capricious review. *Dep't of Com.*, 588 U.S. at 777. The Court disregarded that valid rationale only after reviewing evidence of bad faith in an expanded administrative record. *Id.* at 783–84. And because the Court disregarded the "sole stated reason," it found the action was arbitrary or capricious. *Id.* at 784. The Court never suggests that some evidence of political or ulterior motivations mixed with valid stated reasons is grounds to find that an agency action is arbitrary or capricious. The

The closest the Majority Concurrence came to evidence of pretext is its assertion that the "timeline is strikingly suspicious." *Nat'l TPS All.*, 166 F.4th at 774. But it "is hardly improper for an agency head to come into office with policy preferences and ideas." *Dep't of Com.*, 588 U.S. at 783. Presidents are elected with mandates to implement their own policy preferences, *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010) (citing 1 Annals of Cong., at 499 (J. Madison)), and the rush to implement those preferences is not arbitrary or capricious.

The Majority Concurrence used its pretext finding as license to disregard the agency's valid rationale. The agency stated the vacatur was "warranted to untangle the confusion and provide an opportunity for informed determinations regarding the TPS designations and clear guidance," after Secretary Mayorkas's prior decision caused internal agency confusion. Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8805, 8807 (Feb. 3, 2025). The Majority Concurrence glossed over these concerns because, in its view, "streamlining tracks tend[s] to eliminate confusion." *Nat'l TPS All.*, 166 F.4th at 772. So too for the Majority Concurrence's conclusion that Secretary Noem should have considered "de-consolidat[ion]" or individually revoking designations for beneficiaries. *Id.*

---

Majority Concurrence never relies on the type of evidence that *Department of Commerce* cited as a prerequisite.

Every time, the Majority Concurrence substituted its own judgment of how to run an agency.

Finally, the Majority Concurrence found that the "Secretary's decision-making process deviated dramatically from established" agency "norms and procedures" based on a Government Accountability Office (GAO) report. *Nat'l TPS All.*, 166 F.4th at 773. The GAO report does not appear in the administrative record, and the Government opposed its consideration on appeal. The Majority Concurrence considered the GAO report without a threshold finding of bad faith under *Department of Commerce*. *See* 588 U.S. at 780.

The Majority Concurrence's pretext finding stretched *Department of Commerce* beyond its breaking point.[3] The Secretary stated valid national security concerns which the Majority Concurrence disregarded. *See Ramos*, 975 F.3d at 896 (maj. op.). We should have corrected that error en banc.

### III

Our role is to say what the law is. The panel opinion and the Majority Concurrence (nonbinding as it is) commingle and misconstrue Supreme Court

---

[3] The sole concurrence highlights the danger in extending *Department of Commerce* to "inquire into the 'mental processes of administrative decisionmakers.'" *Nat'l TPS All.*, 166 F.4th at 771 (Mendoza, J., and Wardlaw, J., concurring) (quoting *Dep't of Com.*, 588 U.S. at 781). The sole concurrence wrongly looked to extra-record evidence and, along with the other errors, would have benefitted from en banc review. *Cf. Ramos*, 975 F.3d at 900–02 (R. Nelson, J., concurring).

13

precedent to invite judicial interference in the Executive's decisions about national

security.  I respectfully dissent from the denial of rehearing en banc.