UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL TPS ALLIANCE, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants.

Case No. 25-cv-01766-EMC

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR LEAVE TO AMEND**

Docket No. 455

Pending before the Court is Plaintiffs' motion for leave to amend the operative complaint. The operative complaint consists of two different documents: (1) the first amended and supplemental complaint (Docket No. 250) and (2) the second supplemental complaint (Docket No. 355). "Plaintiffs seek to amend the [operative] complaint to eliminate claims which are no longer viable [based on the Supreme Court's decision in *Mullin v. Dahlia Doe*, 146 S. Ct. 2121 (2026)] and raise three new claims. Defendants stipulate to amendment to eliminate claims, but oppose amendment to raise new claims." Mot. at 2. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Plaintiffs' motion for leave to amend. The motion is granted to the extent Plaintiffs ask to eliminate already pled claims but denied to the extent Plaintiffs seek to add the three new constitutional claims.

## I. FACTUAL & PROCEDURAL BACKGROUND

As noted above, the operative complaint consists of two different documents: (1) the first amended and supplemental complaint (Docket No. 250) and (2) the second supplemental complaint (Docket No. 355). In the documents, Plaintiffs assert seven different causes of action.

United States District Court
Northern District of California

Counts 1-5 are listed in the first amended and supplemental complaint, and Counts 6-7 in the second supplemental complaint. The seven causes of action are as follows:

(1) Violation of the APA – Venezuela TPS, January 2025 vacatur.[1]

(2) Violation of the APA – Venezuela TPS, February 2025 termination.[2]

(3) Violation of the APA – Haiti TPS, February 2025 partial vacatur.[3]

(4) Violation of the APA – Haiti TPS, July 2025 termination.[4]

(5) Violation of Equal Protection (for all administrative acts in Counts 1-4 above, both Venezuela and Haiti).

(6) Violation of the APA – Haiti TPS, November 2025 termination.[5]

(7) Violation of Equal Protection – Haiti TPS, November 2025 termination.

The parties agree that, because of the *Dahlia Doe* decision, **Counts 4 and 6** above (the APA challenges to the July 2025 and November 2025 terminations of Haiti TPS) are no longer viable. Under *Dahlia Doe*, the Court lacks jurisdiction to review the terminations.

The parties also agree that, at least at this point, Plaintiffs still have two equal protection claims – *i.e.*, **Counts 5 and 7**. The equal protection claims cover all of the decisions to vacate and terminate.

/ / /

---

[1] On January 15, 2025, shortly before the second Trump Administration was to begin, Secretary Mayorkas extended the 2023 TPS designation for Venezuela – from April 2, 2025, to October 2, 2026. On January 28, 2025, Secretary Noem signed off on the decision to vacate Secretary Mayorkas's extension. *See* Docket No. 279 (SJ Order at 11, 13).

[2] On February 1, 2025, Secretary Noem signed off on the decision to terminate Venezuela's TPS. *See* Docket No. 279 (SJ Order at 14). Under Secretary Noem's action, the TPS designation would end on April 2, 2025.

[3] In July 2024, Secretary Mayorkas extended TPS for Haiti – until February 3, 2026. On February 18, 2025, Secretary Noem approved the partial vacatur of Secretary Mayorkas's extension. The TPS designation period was shortened: from February 3, 2026, to August 3, 2025. *See* Docket No. 279 (SJ Order at 17-18).

[4] On July 1, 2025, Secretary Noem terminated Haiti's TPS. Specifically, the designation would end on August 3, 2025. *See* Docket No. 279 (SJ Order at 18).

[5] The termination of Haiti's TPS did not take place on August 3, 2025, because of judicial relief obtained in another district court. On November 28, 2025, Secretary Noem published a notice terminating Haiti's TPS as of February 3, 2026. *See* Docket No. 355 (2d Supp. Compl. ¶¶ 1-2).

United States District Court
Northern District of California

Finally, the parties agree that the claims still on appeal are the APA claims related to the decisions to *vacate* (as opposed to the decision to refuse to extend) TPS status: **Count 1** (Venezuela TPS vacatur); **Count 2** (Venezuela TPS termination, but Plaintiffs agree there is no jurisdiction over this claim *except* to the extent the termination is predicated on the unlawful vacatur, *see* Mot. at 2 n.1); and **Count 3** (Haiti TPS partial vacatur).

Plaintiffs move to amend (1) to drop Counts 4 and 6 (barred under *Dahlia Doe*) and (2) to add three new constitutional claims. The proposed claims are as follows:

> (1) that the challenged vacaturs and terminations violate the Constitution's **Due Process clause** because Defendants failed to follow congressionally mandated TPS processes (proposed Fifth Claim); (2) that the challenged vacaturs and terminations violate the Constitution's **equal protection guarantee** because Defendants were motivated by bare animus and a desire to harm TPS holders (proposed Sixth Claim)[[6]]; and (3) that the challenged vacaturs and terminations constituted illegal **ultra vires action** as the Secretary lacked statutory authority to execute TPS decisions, a power that lies exclusively with the Attorney General (proposed Seventh Claim).

Mot. at 3 (emphasis added). The government does not oppose eliminating Counts 4 and 6 but does oppose the proposal to add the three new constitutional claims. Given the government's position, the Court focuses on the proposed new constitutional claims only.

## II. DISCUSSION

Under Federal Rule of Civil Procedure 15(a), "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). In considering whether to give leave to amend, a court typically considers five factors: "(1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiff has previously amended his complaint." *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004). "Undue delay by itself . . . is insufficient to justify denying a motion to amend." *Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir.

[6] As one district court has explained, the bare animus equal protection claim "is based on the principle that 'a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.'" *Doe v. Mullin*, No. 25 C 15483, 2026 U.S. Dist. LEXIS 176732, at *33-34 (N.D. Ill. Aug. 7, 2026) (emphasis in original; quoting *Romer v. Evans*, 517 U.S. 620 (1996)).

1999). By contrast, futility of amendment or prejudice to the opposing party can, by itself, justify the denial of a motion for leave to amend. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) (futility); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (prejudice).

A. Undue Delay and Prejudice

For purposes of the pending motion, the Court assumes that Plaintiffs did unduly delay in seeking to add the three new constitutional claims. But even with this assumption, undue delay by itself does not suffice to deny a motion to amend. There must also be a showing of, *e.g.*, prejudice.

Here, there is an insufficient showing of prejudice. At the hearing, the government suggested prejudice because discovery on the existing claims is in its end stages and to add three new claims would essentially reopen and extend discovery. But that is not the case. Plaintiffs confirmed at the hearing that the only matters on which they still seek discovery are all related to already existing claims. While such discovery would also be pertinent to some or all of the proposed new claims, denial of the proposed amendment would not mean Plaintiffs would thereby abandon the discovery as it is still needed for their existing claims. In short, Plaintiffs represent they need no new discovery particular to these proffered claims.

B. Futility

In the absence of prejudice, the critical issue for the Court is whether the proposed new claims are futile.[7] As the government points out, there are several different courts presiding over TPS cases where the plaintiffs have had or sought to add one or more of the same claims that Plaintiffs seek to add here.

/ / /

[7] Plaintiffs maintain that futility is a high bar and that, if there are any uncertainties about futility, they should be fleshed out through a 12(b)(6) motion instead of the pending motion to amend. While Plaintiffs' position is not without any merit, the approach does not make sense in this case, particularly when Plaintiffs have an interest in moving matters forward, the issues have been sufficiently briefed (before not only this Court but also other district courts), and the Court has allowed for supplemental briefing after Plaintiffs requested such. In short, for purposes of this case, the Court's assessment of futility is tantamount to an analysis of whether Plaintiffs have failed to state a claim for relief for 12(b)(6) purposes.



United States District Court
Northern District of California

United States District Court
Northern District of California

- *NTPSA v. Mullin*, No. 25-5687 TLT (N.D. Cal.) (Judge Thompson, covering Honduras, Nepal, and Nicaragua).
- *Doe v. Mullin*, No. C-25-15483 (N.D. Ill.) (Judge Kennelly, covering Burma).
- *African Comms. Together v. Mullin*, No. C-25-13939 PBS (D. Mass.) (Judge Saris, covering South Sudan).
- *African Comms. Together v. Mullin*, No. C-26-10278-BEM (D. Mass.) (Judge Murphy, covering Ethiopia).
- *African Comms. Together v. Mullin*, No. C-26-11201 ADB (D. Mass.) (Judge Burroughs, covering Somalia).
- *Abdo Doe v. Mullin*, No. C-26-2280 (DEH) (S.D.N.Y.) (Judge Ho, covering Yemen).

The courts above have all rejected the ultra vires and due process claims. Those courts that have considered the equal protection bare animus claim have also rejected it.

1. Jurisdiction

As an initial matter, the Court addresses the government's contention that *all* of the new claims are futile because they not subject to judicial review – *i.e.*, the Court lacks jurisdiction over the claims. *See* 8 U.S.C. § 1254a(b)(5) ("There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."). The government's argument is not persuasive.

Two of the claims – the due process and bare animus equal protection claims – are based on the Constitution. *Dahlia Doe* held that "[t]he TPS statute bars consideration of [the plaintiffs'] *non-constitutional* claims." *Dahlia Doe*, 146 S. Ct. at 2127 (emphasis added). It did not hold that the TPS statute bars consideration of *constitutional* claims. *See id.* at 2137 (acknowledging that, "'where Congress intends to preclude review of constitutional claims[,] its intent to do so must be clear,'" but "we need not resolve whether the TPS statute meets that clear-statement rule because we conclude that *Miot* [plaintiffs'] constitutional claim is unlikely to succeed on the merits"). While Plaintiffs' proposed due process claim tracks the APA claims that are now foreclosed by *Dahlia Doe*, *see* Mot. at 3 (asserting that "the challenged vacaturs and terminations violate the

Constitution's Due Process clause because Defendants failed to follow congressionally mandated TPS processes"), the due process claim is technically still founded on the Constitution. *See, e.g.*, *African Comms.*, 2026 WL 2364398, at *5 ("In the absence of compelling evidence to the contrary, the Court will not conclude that Congress departed from over two hundred years of history by denying all remedies for constitutional claims when it passed [the TPS statute] 8 U.S.C. § 1254a."); *Doe v. Mullin*, 2026 WL 2279577, at *9 ("It is true that the plaintiffs' due process claim relies exclusively on statutory violations. But if the plaintiffs are right that the statutory procedures are required by due process – a floor set by federal constitutional law – the claims are distinct.").

As for the third claim – the ultra vires claim – several of the courts above have persuasively explained why there is jurisdiction over this claim. For example, the Illinois district court explained that, "[i]n stating that the jurisdictional bar applied to all nonconstitutional claims, the Supreme Court *assumed* the undisputed premise that the jurisdictional bar, whatever its scope, applied to the Secretary's determinations." *Doe v. Mullin*, 2026 WL 2279577, at *6 (emphasis added). The court acknowledged that, "if the plaintiffs' reading is wrong [*i.e.*, the Secretary does in fact have the authority to make TPS determinations], then the jurisdictional bar *does* apply. [But] [t]he jurisdictional issue is intertwined with the merits of the statutory interpretation issue, and the default rule in situations of intertwinement is to proceed to the merits." *Id.* (emphasis added). One of the Massachusetts courts reached the same conclusion for the same reasons. *See African Comms.*, 2026 WL 2364398, at *11 ("The Court has jurisdiction over this final claim because the judicial-review bar only applies to decisions by the statutorily authorized decision-maker. . . . [W]here the question of jurisdiction 'entirely overlap[s] with the merits, the Court may decide the jurisdictional issue, even if its conclusion could 'in effect deprive [it] of jurisdiction.'").

The Court agrees with these decisions and rejects the government's assertion that judicial review of the claims is improper. It thus turns to the merits of each claim.

2. Ultra Vires Claim

In the ultra vires claim, Plaintiffs assert that that "the challenged vacaturs and terminations constituted illegal ultra vires action as the Secretary lacked statutory authority to execute TPS

decisions, a power that lies exclusively with the Attorney General." Mot. at 3. In support of their position, Plaintiffs rely on the plain language of the TPS statute. *See* 8 U.S.C. § 1254a(b)(3)(B) (stating that, "[i]f the *Attorney General* determines . . . that a foreign state . . . no longer continues to meet the conditions for designation . . . , the *Attorney General* shall terminate the designation") (emphasis added).

The Court concludes the ultra vires claim is futile. The TPS statute, § 1254a, cannot be evaluated in a vacuum. In 2002, the Homeland Security Act was enacted, "which created the Department of Homeland Security and assigned or transferred to the Secretary of Homeland Security many of the functions previously exercised by the Attorney General." *Molino v. Soto*, No. 25cv16880 (EP), 2025 U.S. Dist. LEXIS 231938, at *6 (D.N.J. Nov. 25, 2025). Title 8 U.S.C. § 1103 provides in relevant part:

> The *Secretary of Homeland Security* shall be charged with the administration and enforcement of this Act and all other laws relating to the immigration and naturalization of aliens, *except* insofar as this Act or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers . . . .

8 U.S.C. § 1103(a)(1) (emphasis added). Generally speaking, the functions that were transferred to the Department of Homeland Security were those that had been carried out by the Immigration and Naturalization Service ("INS"), which was part of the Department of Justice and thus under the oversight of the Attorney General. *See Mestanek v. Jaddou*, 93 F.4th 164, 170-71 (4th Cir. 2024) ("Before the Homeland Security Act, federal immigration laws and regulations were administered by the Immigration and Naturalization Service (INS), which was housed in the Department of Justice and overseen by the Attorney General."). There is no suggestion that the INS was not responsible for TPS. Thus, responsibility for TPS was transferred over to the Department of Homeland Security.

Not surprisingly, Plaintiffs focus on the *exception* to the transfer of authority in § 1103: the statute specifies that, where "this Act" confers certain power on the Attorney General, then the Attorney General retains that power and there is no transfer to the Secretary, and the TPS statute *is* part of "this Act." Essentially, Plaintiffs are relying on the fact that the language of the TPS

statute (§ 1254a) was not amended with the passage of the Homeland Security Act, *i.e.*, to replace the reference to the Attorney General with a reference to the Secretary.

But the fact that the text of § 1254a was not amended does not establish that Congress meant to carve out TPS as an immigration area over which the Attorney General retained authority. "Congress did not go through the INA and change specific references to the Attorney General to instead refer to the Secretary." *Doe v. Mullin*, 2026 WL 2279577, at *8. Instead, the route that Congress followed was to "broadly reassign[] functions [*i.e.*, with § 1103] and [then] add[] a [statutory] provision that 'deem[s]' references to other officers to refer to the Secretary." *Id.* Title 6 U.S.C. § 557 is one statutory provision that deems references to other officers to refer to the Secretary. It states:

> With respect to any function transferred by or under this Act . . . and exercised on or after the effective date of this Act, reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.

6 U.S.C. § 557. Title 6 U.S.C. § 552(d) is another such provision. The statute provides:

> References relating to an agency that is transferred to the Department in statutes, Executive orders, rules, regulations, directives, or delegations of authority that precede such transfer or the effective date of this Act shall be deemed to refer, as appropriate, to the Department, to its officers, employees, or agents, or to its corresponding organizational units or functions. . . .

6 U.S.C. § 552(d). And notably, in *Dahlia Doe*, the Supreme Court cited both § 557 and § 552(d) in stating that "[r]esponsibility for TPS decisions rests with the Secretary of Homeland Security, 6 U. S. C. §§ 552(d), 557 . . . ." *Dahlia Doe*, 146 S. Ct. at 2129. Given the authorities cited above, Plaintiffs' ultra vires claim lacks merit.

Finally, two other considerations weigh in favor of the Secretary, and not the Attorney General, having authority over the TPS scheme. First, "[l]ongstanding practice confirms that TPS authority lies with the Secretary. . . . [I]t is unlikely that everybody has misinterpreted the allocation of immigration authority in the HSA for the past two decades and that Congress has simply let it slide." *Doe v. Mullin*, 2026 WL 2279577, at *8; *cf.* 68 Fed. Reg. 9824, 9827 (Feb. 28, 2003) (final rule issued by DOJ in 2003, titled "Aliens and Nationality; Homeland Security;

United States District Court
Northern District of California

Reorganization of Regulations") (noting the need for "further refinement to clarify the authority of [the] Secretary of Homeland Security to designate countries for temporary protected status purposes"). Plaintiffs argue that longstanding practice does not establish legality; but if Congress did not mean to delegate TPS authority to the Secretary, something would have been said over the past two decades. It did not.

Second,

> even if the plaintiffs' reading of the statute were correct, it would defeat their own claim to relief. The portion of the TPS statute authorizing designations, like the portion addressing termination, refers to the Attorney General. The plaintiffs' reading would therefore mean that the Secretary lacked authority to designate [a country] for TPS in the first place.

*Doe v. Mullin*, 2026 U.S. Dist. LEXIS 176732, at *23.

Because the proposed ultra vires claim is futile, the Court does not permit amendment.

3. <u>Due Process Claim</u>

Plaintiffs' next proposed claim is one for violation of due process. In the proposed second amended complaint ("SAC"), Plaintiffs allege that: (1) they have "substantial, protected liberty and property interests in their TPS status and consequent benefits, including employment authorization and protection from detention and removal," Prop. SAC ¶ 278; (2) the process they "are guaranteed [under the Due Process Clause] – at minimum – [is] the process Congress made available to them by statute," Prop. SAC ¶ 282; and (3) "Defendants' failure to follow the baseline process Congress guaranteed to protect the liberty and property interests of TPS holders violates Plaintiffs' right to due process of law." Prop. SAC ¶ 283. At the hearing, Plaintiffs confirmed that their due process claim is founded on procedural due process. *See also* Prop. SAC ¶ 281 (alleging that, "[o]nce Congress . . . mandates the provision of a benefit, the government must provide due process before taking it away") (emphasis omitted).

For purposes of the pending motion, the Court assumes that Plaintiffs have a cognizable property or liberty interest protected by the due process clause. *See Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1121 (N.D. Cal. 2018) (noting that "[t]he Secretary is given broad discretion in deciding whether to make an initial TPS designation" but "[t]he same is not true with respect to

extensions and terminations" where the TPS statute states the Secretary "shall" terminate TPS only if it determines that a foreign state no longer continues to meet the conditions for designation). But even with this assumption, the Court holds that the proposed due process claim is futile.

First, Plaintiffs are asking for the kind of process that is required where government conduct is adjudicative in nature rather than legislative. *See African Comms.*, 2026 U.S. Dist. LEXIS 176637, at *12-13 (noting that, "if a protected interest 'is affected by generally-applicable legislative action,' the interest-holder is 'not entitled to notice above and beyond the notice provided by the enactment and publication of the statute' at issue"; in contrast, "'individual adjudications . . . require more specific procedures, as well as more specific notice'"). But there is a good argument that the government conduct at issue here is more legislative than adjudicative. *See Gallo v. United States Dist. Court*, 349 F.3d 1169, 1182 (9th Cir. 2003) (noting that, when a court evaluates whether government action is legislation or adjudication, "[t]he three primary considerations are: (1) whether the government action applies to specific individuals or to unnamed and unspecified persons; (2) whether the promulgating agency considers general facts or adjudicates a particular set of disputed facts; and (3) whether the action determines policy issues or resolves specific disputes between particular parties"). *See, e.g.*, *id.* at 1182-83 (holding that state bar rule requiring that all attorneys be members of the state bar was legislation because, even though it did have retroactive application, it resembled legislation in every other way; noting that "[t]he effect of the law is to revoke a general class of licenses, but unlike a disbarment proceeding, the ground for doing so is not individual attorney misconduct"); *African Comms.*, 2026 U.S. Dist. LEXIS 176637, at *13-14 (in TPS case, stating that "Plaintiffs do not assert a denial of individual benefits under South Sudan's TPS designation" but instead "bring a programmatic challenge against the termination of the designation altogether" which is "closer to a challenge to a 'generally applicable' agency action"). While Plaintiffs have cited cases where "'[c]ourts have applied procedural due process protections to determinations that affect large groups of people at once,'" those cases "involved government action that *directly* impacted individuals' due process rights. . . . Neither case supports Plaintiffs' contention that a procedural due process claim may be

premised on alleged procedural errors in the government's termination of an entire program pursuant to a validly enacted statute." *Id.* at *14 n.5 (emphasis added). The alleged error here affected the government's ultimate decision to end TPS status, which, in turn, affected a large group of individuals. *Cf. Mercatus Group LLC v. Lake Forest Hosp.*, 695 F. Supp. 2d 811, 819 (7th Cir. 2010) ("Generally, action is legislative in nature if it involves 'the promulgation of general or prospective legislation or establish[es] guidelines by which the future conduct of certain groups is to be judged,' while actions are adjudicative if they 'involve the application of already enacted ordinances or recognized policies to specific instances.'"). There was no deprivation of a process to which individual TPS beneficiaries were personally entitled. The action is thus more akin to a legislative rather than adjudicatory process, and thus the applicability of due process seems dubious.

Second, in any event, Plaintiffs have failed to demonstrate that the Constitution would require the specific process Plaintiffs seek here – *i.e.*, the process afforded by the TPS statute itself.[8] Plaintiffs' suggestion that a due process claim is always viable if it simply seeks the process required by a statute is not tenable. Under Plaintiffs' position, every statutory claim would automatically give rise to a constitutional claim. Thus, there is merit to the government's argument that Plaintiffs' due process claim is simply a repackaged APA claim which the Supreme Court has held that the Court lacks the jurisdiction to review.

Plaintiffs' reliance on *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), is unavailing. As explained in *Doe v. Mullin*, 2026 WL 2279577, that case at most

> establish[es] that whatever processes Congress provides for the lawful admission of noncitizens into the United States automatically satisfy due process. [But] [i]t does not follow that a failure to follow statutorily prescribed procedures also always violates due process. In other words, compliance with statutory procedures in this context is sufficient but not always necessary for due process.

*Id.* at *10. That the statutory process was found in *Thuraissigiam* to satisfy the Constitution does not mean the statute itself sets the constitutional floor. *Cf. Ching v. Mayorkas*, 725 F.3d 1149,

---

[8] At the hearing, Plaintiffs stated that they were not asserting a due process claim based on anything other than – or anything less than – the process required by the TPS statute.

1157 (9th Cir. 2013) (stating that "'due process is flexible and calls for such procedural protections as the particular situation demands'"; "[b]ecause of its inherent differences from the judicial process, administrative proceedings in particular must be carefully assessed to determine what process is due given the specific circumstances involved[,] [a]nd we must do so on a case by case basis").

Because the due process claim proposed by Plaintiffs is futile, amendment is not warranted.

4. Equal Protection Bare Animus Claim

Finally, Plaintiffs propose to add a new equal protection claim to the suit – a bare animus claim. In *Trump v. Hawaii*, 585 U.S. 667 (2018), the Supreme Court indicated that a bare animus equal protection claim is essentially an equal protection claim predicated on rational review.

> [I]t should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny. On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose *other than a "bare . . . desire to harm a politically unpopular group*." *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). In one case, we invalidated a local zoning ordinance that required a special permit for group homes for the intellectually disabled, but not for other facilities such as fraternity houses or hospitals. We did so on the ground that the city's stated concerns about (among other things) "legal responsibility" and "crowded conditions" rested on "an irrational prejudice" against the intellectually disabled. *Cleburne v. Cleburne Living Center, Inc.*, 473 U. S. 432, 448-450 (1985) (internal quotation marks omitted). And in another case, this Court overturned a state constitutional amendment that denied gays and lesbians access to the protection of antidiscrimination laws. The amendment, we held, was "divorced from any factual context from which we could discern a relationship to legitimate state interests," and "its sheer breadth [was] so discontinuous with the reasons offered for it" that the initiative seemed "inexplicable by anything but animus." *Romer v. Evans*, 517 U. S. 620, 632, 635 (1996).

*Id.* at 705-06 (emphasis added); *cf. Lawrence v. Texas*, 539 U.S. 558, 582 (2003) ("Moral disapproval of [a] group, like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause.").

/ / /

/ / /

/ / /



United States District Court
Northern District of California

United States District Court
Northern District of California

In their proposed SAC, Plaintiffs allege that the bare animus harbored by the government here is to TPS holders (*i.e.*, regardless of their race).[9] *See* Prop. SAC ¶ 288 ("Defendants' decisions to vacate and terminate the TPS designations of Venezuela and Haiti are unconstitutional because they were motivated by explicit animosity and a desire to harm TPS holders."). But the bare animus cases decided by the Supreme Court are markedly different in nature from the case at bar. The Supreme Court cases reflect clear targeting of a identified group of persons (*e.g.*, intellectually disabled persons, gays/lesbians, and "hippies") for which there was no other credible reason other than animosity and a desire to harm that group. In contrast, here, there may well have been animosity with respect to the Biden administration's TPS policies, *see* Prop. SAC ¶ 176 (alleging that, "[o]n February 9, 2026, Secretary Noem again repeated inaccuracies about TPS and TPS holders, tweeting: 'Temporary Protected Status *was abused* to allow violent terrorists, criminals, and national security threats into our nation'") (emphasis added) – perhaps even animosity against TPS writ large – but "there is a distinction between bare desire to harm TPS *holders* and animus against TPS *policy* (and immigration as a whole)." *Doe v. Mullin*, 2026 WL 2279577, at *12 (emphasis added). Although Plaintiffs have alleged animosity against TPS holders specifically and not policy, those allegations are, in effect, conclusory. It is unclear, for instance, whether such animosity differed from that which may have been based on, *e.g.*, animosity toward immigrants generally, immigrants in the U.S. without other current documented status, immigrants from countries of color or from particular countries. Nor, more generally, have Plaintiffs alleged any concrete facts to show the challenged action was based on animosity against TPS holders as opposed to hostility to the TPS program generally.

The Court, accordingly, concludes that the proposed equal protection bare animus claim is futile. Amendment is therefore not justified.

## III. <u>CONCLUSION</u>

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion for leave to amend. Plaintiffs have leave to amend so as to eliminate the claims now barred by *Dahlia*

[9] At the hearing, Plaintiffs indicated they were not claiming bare animus against a broader group such as immigrants.

*Doe*. Plaintiffs are not permitted to amend to add the three proposed new constitutional claims. Plaintiffs shall file an amended complaint consistent with the rulings in this order by October 21, 2026.

In addition, the Court sets a status conference for the case for November 17, 2026, at 2:30 p.m. The parties shall file a joint status report one week in advance of the conference. The parties shall be prepared to discuss case management deadlines, including but not limited to deadlines for dispositive motions and trial.

This order disposes of Docket No. 455.

**IT IS SO ORDERED**.

Dated: October 14, 2026

EDWARD M. CHEN
United States District Judge