Ahilan T. Arulanantham (SBN 237841)
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493
Facsimile: (415) 863-7832

Attorneys for Plaintiffs
*[Additional Counsel Listed on Next Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R., HENDRINA VIVAS CASTILLO, A.C.A., SHERIKA BLANC, VILES DORSAINVIL, and G.S.,

*Plaintiffs*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA,

*Defendants*.

Case No. 3:25-cv-1766-EMC

**SECOND AMENDED COMPLAINT**

**Administrative Procedure Act Case**

Additional Counsel for Plaintiffs

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*Pro Hac Vice*)
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Mohammad K. Tajsar (SBN 280152)
MTajsar@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*Pro Hac Vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

**INTRODUCTION**

1. This lawsuit presents a challenge to Department of Homeland Security ("DHS") Secretary Kristi Noem's decisions to deprive 600,000 Venezuelans and 500,000 Haitians protected by Temporary Protected Status ("TPS") of the right to live and work legally in the United States for the eighteen-month periods lawfully authorized by her predecessor. Secretary Noem's attempt to "vacate" this statutorily authorized humanitarian protection for more than a million people who rely on it for their safety and livelihood is unprecedented and unlawful.

2. Secretary Noem took two illegal actions concerning Venezuela's TPS within one week of assuming her role at the head of DHS. Three days after her confirmation, she "vacated" an extension of TPS protections for Venezuelans residing in the United States, just weeks after the extension was duly published in the Federal Register. Two days later, she terminated TPS for the Venezuelans who initially registered in 2023. These actions have the effect of robbing 600,000 Venezuelan TPS holders of the right to live and work in this country. Secretary Noem announced the vacatur decision in an exclusive interview she gave to Fox News, saying that "the people of this country want these dirt bags out."

3. On February 20, 2025—less than a month into her tenure—Secretary Noem announced a third unlawful TPS decision, this time for Haiti, by enacting a "partial vacatur" of the July 1, 2024 extension and redesignation of Haiti for TPS. Under the July 2024 decision, Haitian TPS holders were entitled to protection until February 3, 2026. Secretary Noem cut Haiti's designation period from eighteen months to twelve months, advancing the end of TPS for eligible Haitian nationals to August 3, 2025.

4. The Secretary then followed the earlier February 2025 partial vacatur, which had already shortened the extension period for Haitian TPS holders, and officially terminated Haiti's designation for TPS on July 1, 2025, effective September 2, 2025. Secretary Noem's July 1, 2025 termination of TPS for Haiti did not go into effect on September 2, 2025 as planned due to court orders that set aside the February 20, 2025 "partial vacatur." *See Haitian Evangelical Clergy Ass'n. v. Trump,* 789 F. Supp. 3d 255, 273 (E.D.N.Y. 2025); Dkt. 279. On November 28, 2025, Secretary Noem published a notice in the Federal Register terminating Haiti's TPS designation

effective February 3, 2026. 90 Fed. Reg. 54,733 (Nov. 28, 2025). The notice purports to "supersede[]" the July 1 termination notice.

5. The termination of Haiti's TPS designation affects an estimated 500,000 Haitian nationals who currently rely on TPS for lawful status and work authorization in the United States, some of whom have lived lawfully in the United States for 15 years.

6. Secretary Noem's action was in keeping with President Donald Trump's threats and false claims about Haiti. During his campaign, in response to a question about Haitian TPS holders, President Trump asserted he would "revoke" TPS to remove people who were "destroy[ing] our country." President Trump also repeatedly amplified the false and racist claim that Haitian TPS holders were eating dogs and cats.

7. Plaintiffs in this case are the National TPS Alliance ("NTPSA"), a member-led organization representing TPS holders across the country, including individuals from Venezuela and Haiti who have TPS ("Individual Plaintiffs"). These individuals cannot return safely to their country of origin. TPS allows them to live and work lawfully in the United States. They represent the diverse population of Venezuelans and Haitians who have relied on TPS to provide them the most basic forms of human security—a stable place to live and a chance to work for a living during this time of severe crisis in their home countries. They are educators, laborers, health care workers, caretakers, and advocates; parents, students, and children. They live all across the country, with homes, children, families, jobs, and deep community ties. If Secretary Noem's TPS termination goes into effect, they will be subject to deportation yet unable to return safely to their home countries; and without legal authorization to live or work in the United States.

8. The Secretary's actions are illegal for multiple reasons. At the outset, DHS has no authority to "vacate" a prior TPS extension—in whole or in part. The TPS statute tightly regulates the conditions under which TPS decisions can be made, setting time periods and other procedural rules that must be followed for both extensions and terminations. The agency does not have implicit authority to accomplish the same objectives on whatever timeframe it wants, and without following the requisite procedures. Further, by failing to follow statutorily prescribed process, the agency deprived TPS holders of due process, in violation of the Fifth Amendment.

9. Even if DHS did have vacatur authority, the reasons provided by the Secretary to vacate the extensions are arbitrary and capricious, contrary to law, pretextual, and inexplicably deviate from past practice in violation of the Administrative Procedure Act ("APA"). For instance, contrary to the claims made in the Federal Register, there was nothing unusual about either the timing of the now-vacated extension for Venezuela or the justifications provided for the July 2024 extension and redesignation of Haiti. Nor did the prior decisions on Venezuela and Haiti's TPS designations suffer from any of the other purported defects on which Secretary Noem relied to justify her decisions—defects which, in any event, should have been resolved by alternatives short of vacatur.

10. The unlawful orders suffer from additional defects as well. The Secretary's decisions were motivated at least in part by intentional race- and national-origin-based animus, in contravention of the Fifth Amendment. That is clear from statements the Secretary made when announcing the Venezuela decisions themselves, labeling Venezuelan TPS holders as "dirtbags"—an expression of racism made by the official decisionmaker as part of her explanation for the decision. Making matters worse, that statement is just one among a torrent of similar racist statements that Secretary Noem, President Trump, and members of the Trump campaign and administration have made to attack and marginalize non-white immigrants generally, and the Venezuelan and Haitian TPS communities in particular.

11. Even if the Secretary's decisions cannot be characterized as *racially* motivated, the actions and statements of Secretary Noem, President Trump, and other key decisionmakers demonstrate bare animus toward TPS holders in violation of the Fifth Amendment.

12. In addition, the termination of Venezuela and Haiti's TPS were unlawful because they were not based on an objective review of country conditions, as statutorily required, but instead the product of an arbitrary, preordained decision to terminate TPS and search for a rationale to support the end result. By failing to follow the statutorily prescribed process for terminating TPS in these important respects, the agency deprived TPS holders of due process, in violation of the Fifth Amendment.

13. Finally, the Secretary's termination decisions were *ultra vires*. Congress granted the power to terminate a TPS designation to the Attorney General only. *See* 8 U.S.C. 1254a(b)(3)(B). Because the Secretary issued the terminations without statutory authority to do so, the purported terminations are invalid.

14. For each of these reasons, this Court should set aside the agency's unlawful vacatur and termination orders, and reinstate the prior extensions.

**JURISDICTION AND VENUE**

15. This Court has jurisdiction under 28 U.S.C. 1331 because this action arises under the Constitution and laws of the United States. This Court has additional remedial authority under the Declaratory Judgment Act[1] and the Administrative Procedure Act.[2] Article III and the Fifth Amendment independently grant this Court subject matter jurisdiction over Plaintiffs' Fifth Amendment claims.

16. The federal government has waived its sovereign immunity and permitted judicial review of agency action under 5 U.S.C. 702.[3] In addition, sovereign immunity does not bar claims against federal officials seeking to prevent violations of federal law (rather than monetary relief).[4]

17. Venue is proper in the Northern District of California under 28 U.S.C. 1391(e)(1) because at least one Plaintiff resides in this judicial district and each Defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

**INTRADISTRICT ASSIGNMENT**

18. Assignment is proper in the San Francisco division because the claims of Plaintiffs that reside in this judicial district arise in Alameda and San Mateo Counties.[5]

---

[1] *See* 28 U.S.C. 2201 *et seq.*

[2] 5 U.S.C. 701–706.

[3] *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989).

[4] *See, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

[5] Civil L.R. 3-2(d) and 3-5(b).

## THE PARTIES

**Plaintiffs**[6]

19. **Plaintiff National TPS Alliance (NTPSA)** is a member-led organization whose mission is to defend the TPS program and win a path to permanent residency for TPS holders. NTPSA is fiscally sponsored by the Central American Resource Center - CARECEN - of California, a non-profit organization headquartered in Los Angeles, California, which has worked for more than four decades to provide immigrant integration programs, deliver immigration legal services, and foster civic participation and community engagement on immigration policy, education reform, and workers' rights.

20. NTPSA advocates to defend TPS and win a path to permanent status for TPS holders, organizes actions to raise public awareness about TPS and the contributions TPS holders make to this country, facilitates community and civic engagement by TPS holders, and provides access to timely and accurate TPS-related information and services to its members. Membership in the NTPSA is free and voluntary. Individuals can become NTPSA members either by joining a local NTPSA committee or by submitting an individual membership application. NTPSA's members set the organization's priorities, lead and participate in NTPSA's local committees and working groups, and select and serve on NTPSA's Executive Committee.

21. NTPSA brings this action on behalf of its members. The vast majority of NTPSA's members are TPS holders, including TPS holders from Afghanistan, Burma (Myanmar), Cameroon, El Salvador, Haiti, Honduras, Lebanon, Nepal, Nicaragua, Sudan, Ukraine, Venezuela, and Yemen; the rest are family members of TPS holders and other individuals who wish to support the TPS community. The NTPSA has over 130,000 Venezuelan and Haitian TPS holder members living in all 50 states and the District of Columbia. They face irreparable harm from the challenged vacatur and termination.

---

[6] Throughout this Complaint, factual allegations with respect to Plaintiffs, members of the National TPS Alliance, and other TPS holders describe the facts as they stood at the time this litigation was filed. *See Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014) ("When evaluating whether [the standing] elements are present, we must look at the facts as they exist at the time the complaint was filed.") (quoting *Am. Civil Liberties Union of Nev. v. Lomax*, 471 F.3d 1010, 1015 (9th Cir.2006)).

22. **Plaintiff Mariela González** is a Venezuelan who has TPS under the 2021 designation and, as a result of the challenged vacatur, is at risk of losing her TPS and work authorization on September 10, 2025. She is a resident of San Mateo County, California, and has lived in the United States for the past fourteen years. Mariela works as an instructional coach with an urban school district. Her mother, father, brother, sister, and nephews all live in the United States and are U.S. citizens. She is an NTPSA member.

23. **Plaintiff Freddy Jose Arape Rivas** is a Venezuelan who has TPS under the 2023 designation and, as a result of the challenged vacatur and termination, is at risk of losing his TPS on April 7, 2025. He applied to renew his TPS and work authorization on January 17, 2025, pursuant to the now-vacated extension of TPS for Venezuelans. USCIS already automatically extended his employment authorization for up to 540 days in response to his application. But the new Federal Register notice vacating the January 17 extension provides that "USCIS will invalidate EADs" and TPS-related documentation issued pursuant to the January extension. Thus, Freddy's work authorization is at risk of expiring on April 2, 2025. Freddy lives in Collin County, Texas, and works for a technology company. He has family in Texas, including a cousin who, along with his wife and seven-year-old daughter, also have TPS. He is an NTPSA member.

24. **Plaintiff M.H.** is a Venezuelan who has TPS under the 2023 designation and, as a result of the challenged vacatur and termination, is at risk of losing her TPS status on April 7, 2025. Her work authorization expires on April 2, 2025. She lives in a Tennessee suburb with her husband and two children. Her seven-year-old daughter also has TPS. Her husband, an engineer, is a U.S. citizen employed by a government subcontractor, and together they have a two-year-old U.S. citizen son. M.H. is a full-time caregiver for her two young children. Her driver's license expires when her TPS does, and she depends on it for her daily needs. She is an NTPSA member.

25. **Plaintiff Cecilia Daniela González Herrera** is a Venezuelan who has TPS under the 2021 designation and, as a result of the challenged vacatur, is at risk of losing her TPS on September 10, 2025. She lives with her parents and younger brother in Kissimmee, Florida, and is a derivative applicant on her parents' long-pending asylum application. She is a student at the University of Central Florida and expects to graduate with a bachelor's degree in May. She is also

employed as the Voting Rights Advocacy Coordinator for Latino Justice PRLDEF. She is an NTPSA member.

26. **Plaintiff Alba Cecilia Purica Hernández** is a Venezuelan who has TPS under the 2023 designation and, as a result of the challenged vacatur and termination, is at risk of losing her work authorization on April 2, 2025 and TPS on April 7, 2025. She had been a university student in Venezuela. She lives in San Leandro, California and works as a childcare provider. She is an NTPSA member.

27. **Plaintiff E.R.** is a Venezuelan who has TPS under the 2023 designation and is at risk of losing her TPS on April 7, 2025 and her work authorization on April 2, 2025. She is a single parent to a twelve-year-old daughter, who is also a TPS holder. She lives in New York, where she works in a factory. She relies on TPS for her work authorization and legal status. She is an NTPSA member.

28. **Plaintiff Hendrina Vivas Castillo** is a Venezuelan who has TPS under the 2023 designation, and, as a result of the challenged vacatur and termination, is at risk of losing her TPS on April 7, 2025. Her work permit expires on April 2, 2025. She lives in Culver City, California and works as a delivery driver. She is an NTPSA member.

29. **Plaintiff A.C.A.** is a Haitian TPS holder living in Miami, Florida who has TPS pursuant to the 2021 designation of Haiti. A.C.A. has lived in the United States since he was fifteen years old; he is now thirty. His mother and brothers are U.S. citizens or lawful permanent residents. A.C.A. works in healthcare administration and attends college, where he studies accounting on a full scholarship. Without TPS, A.C.A. would be left without work authorization, protection against deportation, or the ability to attend college, where he relies on TPS for in-state tuition. A.C.A. is an NTPSA member.

30. **Plaintiff Sherika Blanc** is a Haitian TPS holder living in Kentucky who has TPS under the 2010 designation of Haiti for TPS. She is the mother of four U.S. citizen children and is married to a U.S. citizen spouse. Sherika is 34 years old and has lived in the United States since she was eight. She is a certified nursing assistant and works as a medical coordinator. She also

owns her own nail salon. She relies on TPS for legal status and work authorization. Sherika was a plaintiff in *Ramos v. Nielsen*, Case No. 3:18-cv-1554 (EMC), and is an NTPSA member.

31. **Plaintiff Viles Dorsainvil** is a Haitian TPS holder living in Springfield, Ohio, who has TPS under the 2021 designation of Haiti for TPS. He is a former pastor and the director of the Haitian Community Help & Support Center, a nonprofit founded to assist the Haitian immigrant community in Springfield. Viles has emerged as a national leader for the Haitian community, speaking out against the targeted and repeated attacks by President Trump and Vice President Vance against Haitian TPS holders in Springfield during the 2024 presidential campaign. Viles relies on TPS for work authorization and protection against deportation. He is an NTPSA member.

32. **Plaintiff G.S.** is a Haitian who has TPS under the 2024 designation of Haiti for TPS. He is a 30-year-old medical doctor trained in Haiti who hopes to someday become licensed to practice medicine in the United States. Currently, he works as a case manager for the State of Massachusetts, assisting low-income residents in securing housing. G.S., fluent in English, Creole, and French and proficient in Spanish, works with many immigrants and utilizes his language skills to assist his clients. He relies on TPS for his legal status. He is an NTPSA member.

**Defendants**

33. **Defendant Markwayne Mullin**, sued in his official capacity, is the Secretary of Homeland Security. As the highest-ranking officer for DHS, Defendant Mullin purports to exercise ultimate statutory authority over all TPS extension, termination, and designation decisions.

34. **Defendant U.S. Department of Homeland Security** is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. 551(1). DHS includes various component agencies, including the U.S. Citizenship and Immigration Services ("USCIS"). DHS, together with all of its component agencies, is responsible for administering and enforcing the TPS program.

35. **Defendant United States of America** includes all other government agencies and departments responsible for the implementation, administration, and change in policy concerning the TPS program.

## STATUTORY FRAMEWORK

36. Congress established the Temporary Protected Status program in the Immigration Act of 1990.[7] TPS is a form of humanitarian relief, providing lawful immigration status to eligible foreign nationals who cannot safely return home to war-torn or disaster-stricken countries. By enacting the TPS statute, which is codified at 8 U.S.C. 1254a, Congress established formal criteria for relief and set forth predictable procedures.[8]

37. The TPS statute authorizes the Attorney General to make a "designation" decision for a given country.[9] After consulting with "appropriate" government agencies, the Attorney General may designate a foreign state, or any part of that state, for TPS based on: (A) an "ongoing armed conflict within the state" that would "pose a serious threat" to the "personal safety" of the foreign nationals of that state; (B) an "earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions," which makes the foreign state "unable, temporarily, to handle adequately the return to the state" of its nationals, and where the foreign state has "officially" requested a designation; or (C) the existence of "extraordinary and temporary conditions in the foreign state" that prevent

[7] Pub. L. No. 101-649, § 302, 104 Stat. 4978, 5030–36.

[8] Before Congress created TPS, the Executive Branch previously used *ad hoc* enforcement mechanisms to allow individuals to remain in the United States for humanitarian reasons. *See* Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 501–03 (2009) (discussing use of the "parole power," which is currently codified at 8 U.S.C. 1182(d)(5)); Lynda J. Oswald, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157-60 (1986) (discussing use of "Extended Voluntary Departure"). Presidents have continued to employ such programs even after the creation of TPS. For example, President Trump exercised his discretion to designate Venezuela for "Deferred Enforced Departure" in 2020. Somewhat like TPS, deferred enforced departure allows foreign nationals to remain and work in the United States lawfully while conditions in their homeland are unsafe or return is impracticable.

[9] The agency has long recognized authority to designate a country more than once, which is called "redesignation." *See* Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program, 62 Fed. Reg. 16608, 16609 (Apr. 7, 1997) (concluding that the TPS statute "explicitly contemplates more than one designation" for one country because 8 U.S.C. 1254a(c)(1)(A)(i) refers to "the most recent designation of the state"). A TPS designation for a country that is already designated for TPS is called a "redesignation." Redesignation generally has the effect of expanding the pool of potential beneficiaries to include individuals who came to the United States after the country was first designated for TPS.

foreign nationals from safely returning, and where the temporary presence of those foreign nationals in the United States is not "contrary to the national interest of the United States."[10]

38. An initial designation period for a given country lasts for six, twelve, or eighteen months, at the Attorney General's discretion.[11] Before the designation can become effective, the Attorney General must publish a notice in the Federal Register that includes, among other things, a statement of findings, the effective date of the designation, and a tally of eligible foreign nationals.[12] Once the designation is ordered, it "shall remain in effect" for a period "of not less than 6 months," and remains operative until terminated under procedures specified in the statute.[13]

39. Once the Attorney General has designated a particular country for TPS, individuals from that country (or persons without nationality who last habitually resided in that country) may apply for immigration status under the program. To be eligible for TPS, however, individuals from a designated country must meet stringent requirements. These requirements include, among other things, continuous physical presence in the United States from the most recent date of designation; continuous residence in the United States from a (potentially earlier) date designated by the Attorney General; satisfaction of the criteria for admissibility as an immigrant; lack of disqualifying criminal history (where more than one misdemeanor or a single felony is disqualifying); and submission of an application, extensive documentation, and fees.[14]

40. Congress ensured that individuals who are ultimately granted protected status could enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, an individual who receives and maintains TPS "shall [be] authorize[d]" to engage in employment in the United States; "shall not be detained" on the basis of immigration status; and "shall not [be] remove[d]" from the United States.[15]

---

[10] 8 U.S.C. 1254a(b)(1).

[11] 8 U.S.C. 1254a(b)(2), (b)(3)(C).

[12] 8 U.S.C. 1254a(b)(1)(C).

[13] 8 U.S.C. 1254a(b)(2).

[14] 8 U.S.C. 1254a(c)(1); 8 C.F.R. 244.2, 244.4, 244.9.

[15] 8 U.S.C. 1254a(a)(1), (d)(4).

41. The TPS statute requires the Attorney General to periodically re-evaluate country designations. At least 60 days before a particular designation expires, the Attorney General must "review the conditions in the foreign state . . . for which a designation is in effect" and determine whether the country still meets the conditions for TPS.[16] The review requires "consultation with appropriate agencies of the Government" and, ultimately, publication of notice in the Federal Register.[17]

42. The review and consultation process typically begins months before the 60-day deadline. First,

> RAIO [the Refugee, Asylum and International Operations Directorate] (a division within USCIS) provides a Country Conditions Memo. In addition, OP&S [Office of Policy and Strategy] (another division within USCIS) drafts a Decision Memo that contains USCIS's recommendation on what to do about the TPS designation. Once the Decision Memo is finalized, the USCIS Director passes it on to the DHS Secretary. The State Department provides further input (*e.g.*, country conditions, recommendations). At times, input can also come from other government sources, but the above is the information consistently provided to the DHS Secretary.[18]

43. The Attorney General must terminate TPS only if the designated country "no longer continues to meet the conditions for designation."[19] The statute does not permit consideration of other grounds for termination. The effective date of any TPS termination must be at least 60 days after publication of an official notice of termination, and may not precede the expiry of "the most recent previous extension."[20] In other words, the statute does not permit the Attorney General (or anyone else) to cut short a TPS period. The Attorney General may, however, extend the period "to provide for an orderly transition."[21]

44. If the Attorney General does not terminate TPS for a particular country, either because he affirmatively finds that the country continues to meet the conditions for designation or

---

[16] 8 U.S.C. 1254a(b)(3)(A).

[17] *Id.*

[18] *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018).

[19] 8 U.S.C. 1254a(b)(3)(B).

[20] *Id.*

[21] 8 U.S.C. 1254a(d)(3).

because he simply fails to make a decision, then the designation "is extended" for a period of six months, or by discretion of the Attorney General, for a period of twelve or eighteen months.[22]

45. When a designation for a particular country is terminated, an individual TPS holder's status will typically revert back to their original immigration status so long as that status remains valid.

## THE EXCLUSIVE AUTHORITY OF THE ATTORNEY GENERAL TO TERMINATE TPS DESIGNATIONS

46. The TPS statute authorizes the Attorney General, and the Attorney General only, to designate foreign states for TPS, and to terminate their TPS designations. 8 U.S.C. 1254a(b)(1), 1254a(b)(3)(B) ("The Attorney General . . . may designate" and "shall terminate."). The TPS regulations provide for no delegation of that authority conferred exclusively upon the Attorney General. *See* Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991) (codified at 8 C.F.R. 244.1) ("State means any foreign country or part thereof as designated by the Attorney General pursuant to section 244A(b) of the Act.").

47. For the thirty-six years that the TPS statute has been in effect, Congress has never transferred the authority to designate or terminate foreign states for TPS from the Attorney General to any other person or entity.

48. In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, Congress created DHS, which absorbed many of the functions of the former Immigration and Naturalization Service (INS). However, nothing in the law establishing DHS, or in any subsequent law, transferred the authority to designate or terminate foreign states for TPS from the Attorney General to the DHS Secretary.

49. In fact, the Homeland Security Act expressly preserved the authority of the Attorney General to administer and enforce laws which conferred upon the Attorney General certain "powers, functions, and duties[,]" even while it otherwise charged the DHS Secretary "with the administration and enforcement of [the Immigration and Nationality Act] and all other laws

[22] 8 U.S.C. 1254a(b)(3)(C).

relating to the immigration and naturalization of aliens." 8 U.S.C. 1103(a)(1) (excluding from transfer to the DHS Secretary "such laws [which] relate to the powers, functions, and duties conferred upon the . . . Attorney General").

50. Beginning in spring 2003, and through to the present, the DHS Secretary began to issue foreign-state designations, extensions and terminations, ostensibly pursuant to the Attorney General's authority under 8 U.S.C. 1254a, despite the lack of any express transfer of this authority. *See* DHS, Extension of the Designation of Honduras Under Temporary Protected Status Program, 68 Fed. Reg. 23474 (May 5, 2003); DHS, Extension and Re-designation of Temporary Protected Status for Sudan, 69 Fed. Reg. 60168 (Oct. 7, 2004).

## IN UNPRECEDENTED ACTIONS, DHS VACATED LAWFUL TPS EXTENSIONS FOR VENEZUELA AND HAITI; AND TERMINATED TPS FOR VENEZUELAN TPS HOLDERS TO WHOM THE GOVERNMENT HAD GRANTED RENEWED PROTECTION ONLY WEEKS EARLIER

### Venezuela TPS Designations

#### Venezuela 2021 and 2023 TPS Designations

51. Venezuelans living in the United States first received temporary protection from removal on January 19, 2021, when President Trump—on the last day of his first Administration—directed the Secretaries of State and Homeland Security to "take appropriate measures to defer for 18 months the removal of any national of Venezuela . . . who is present in the United States as of January 20, 2021," with limited exceptions, and "to take appropriate measures to authorize employment for aliens whose removal has been deferred, as provided by this memorandum, for the duration of such deferral."[23]

52. In designating Venezuela for Deferred Enforced Departure, President Trump declared:

> [T]he Maduro regime is responsible for the worst humanitarian crisis in the Western Hemisphere in recent memory. A catastrophic economic crisis and shortages of basic goods and medicine have forced about five million Venezuelans to flee the country, often under dangerous

[23] Deferred Enforced Departure for Certain Venezuelans, 86 Fed. Reg. 6845, 6845 (Jan. 19, 2021).

> conditions. . . . The deteriorative condition within Venezuela, which presents an ongoing national security threat to the safety and well-being of the American people, warrants the deferral of the removal of Venezuelan nationals who are present in the United States.[24]

53. On March 9, 2021 (under the Biden Administration), DHS designated Venezuela for TPS based on the Secretary's determination that "extraordinary and temporary conditions in the foreign state prevent [Venezuelans] from returning safely" and "permitting [Venezuelans] to remain temporarily in the United States" is not "contrary to the national interest of the United States."[25] The Secretary found that "Venezuela is currently facing a severe humanitarian emergency" and:

> [H]as been in the midst of a severe political and economic crisis for several years . . . marked by a wide range of factors including: Economic contraction; inflation and hyperinflation; deepening poverty; high levels of unemployment; reduced access to and shortages of food and medicine; a severely weakened medical system; the reappearance or increased incidence of certain communicable diseases; a collapse in basic services; water, electricity, and fuel shortages; political polarization; institutional and political tensions; human rights abuses and repression; crime and violence; corruption; increased human mobility and displacement (including internal migration, emigration, and return); and the impact of the COVID-19 pandemic, among other factors.[26]

54. Also on March 9, 2021, via the same Federal Register notice, DHS provided employment authorization for Venezuelans covered by Deferred Enforced Departure.[27]

55. The 2021 Venezuela Designation allowed eligible Venezuelans who had continuously resided in the United States since March 8, 2021 and been physically present in the United States since March 9, 2021 to apply for TPS.[28]

---

[24] *Id.*

[25] Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure, 86 Fed. Reg. 13574, 13575 (Mar. 9, 2021) ("2021 Venezuela Designation").

[26] *Id.* at 13576 (internal citation and quotation marks omitted).

[27] *Id.* at 13579.

[28] *Id.* at 13575.

56. On July 11, 2022, DHS issued a press release announcing then-Secretary Alejandro Mayorkas's decision to extend Venezuela's TPS designation. The press release instructed:

> Venezuelans who are currently eligible for TPS under the existing designation but may have not yet applied with U.S. Citizenship and Immigration Services (USCIS) should file their applications prior to the September 9, 2022, application deadline, including those Venezuelans who are covered under the January 2021 grant of Deferred Enforced Departure (DED). Venezuela's DED is set to expire July 20, 2022.[29]

57. Venezuela's Deferred Enforced Departure expired on July 20, 2022. Every person who had been eligible for it was by then eligible for TPS, provided they could satisfy the more stringent background check criteria required for TPS.

58. On September 8, 2022, DHS extended Venezuela's TPS designation for eighteen months, through March 10, 2024.[30] The Secretary found that extension was warranted due to ongoing "[e]xtraordinary and temporary conditions that prevent Venezuelan nationals from returning in safety includ[ing] severe economic and political crises ongoing within Venezuela, which have an impact across sectors, including limited access to food, basic services, and adequate healthcare, and the deterioration of the rule of law and protection of human rights."[31] The Secretary also determined that "it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily."[32] However, because the decision was only an extension, and not also a redesignation, it did not provide protection to Venezuelans who had arrived in the United States after March 9, 2021.

59. On October 3, 2023, DHS again extended the 2021 designation of Venezuela for eighteen months, and also redesignated Venezuela for TPS for eighteen months.[33] The extension

---

[29] *See* Press Release, *DHS Announces Extension of Temporary Protected Status for Venezuela*, DHS (July 11, 2022), https://www.dhs.gov/archive/news/2022/07/11/dhs-announces-extension-temporary-protected-status-venezuela.

[30] Extension of the Designation of Venezuela for Temporary Protected Status, 87 Fed. Reg. 55024, 55024 (Sept. 8, 2022).

[31] *Id.* at 55026.

[32] *Id.* at 55027.

[33] Extension and Redesignation of Venezuela for Temporary Protected Status, 88 Fed. Reg. 68130, 68130 (Oct. 3, 2023) ("2023 Venezuela Designation").

of the 2021 designation ran from March 11, 2024 to September 10, 2025. The new 2023 redesignation ran from October 3, 2023 through April 2, 2025. The Secretary found that:

> [E]xtraordinary and temporary conditions continue to prevent Venezuelan nationals from returning in safety due to a severe humanitarian emergency which has resulted in food insecurity and the inability to access adequate medicine, healthcare, water, electricity, and fuel. Additionally, human rights violations and abuses, high levels of poverty, high levels of crime and violence, and heavy rains and flooding prevent Venezuelan nationals from returning in safety and permitting Venezuelan noncitizens to remain in the United States temporarily would not be contrary to the interests of the United States.[34]

60. In order to qualify under the 2023 Venezuela Designation, TPS applicants had to prove that they had continuously resided in the United States since July 31, 2023 and had been continuously physically present since October 3, 2023.[35]

61. All individuals who were eligible for TPS under the 2021 Designation were also eligible for TPS under the 2023 Designation, provided they registered in accordance with DHS instructions.

62. DHS estimated that 243,000 Venezuelan TPS beneficiaries who first registered for TPS under the 2021 Venezuela Designation were eligible to re-register for TPS under its extension.[36]

63. In addition, DHS estimated "approximately 472,000 additional individuals may be eligible for TPS under the redesignation of Venezuela. This population includes Venezuelan nationals in the United States in nonimmigrant status or without immigration status."[37] Such individuals were not eligible under the first designation because they arrived after March 9, 2021.

[34] *Id.* at 68134.

[35] *Id.*

[36] *Id.*

[37] *Id.*

**January 2025 TPS Extension for Venezuela**

64. On January 17, 2025, Secretary Mayorkas extended the 2023 Venezuela Designation by eighteen months, through October 2, 2026.[38] The Secretary found that extraordinary and temporary conditions in Venezuela continued to prevent nationals from returning in safety. He explained:

> Venezuela is experiencing a complex, serious and multidimensional humanitarian crisis. The crisis has reportedly disrupted every aspect of life in Venezuela. Basic services like electricity, internet access, and water are patchy; malnutrition is on the rise; the healthcare system has collapsed; and children receive poor or no education. Inflation rates are also among the highest in the world. Venezuela's complex crisis has pushed Venezuelans into poverty, hunger, poor health, crime, desperation and migration. Moreover, Nicolas Maduro's declaration of victory in the July 28, 2024 presidential election—which has been contested as fraudulent by the opposition—has been followed by yet another sweeping crackdown on dissent.[39]

65. The Secretary also determined that "it is not contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States temporarily."[40]

66. The extension was effective immediately. The registration period opened that day and extended through September 10, 2025.[41]

67. The January 2025 Extension also explained that there would no longer be two separate filing processes for TPS designations for Venezuela. Rather:

> To decrease confusion among stakeholders, ensure optimal operational processes, and maintain the same eligibility requirements, upon publication of this Notice, individuals registered under either the March 9, 2021 TPS designation or the October 3, 2023 TPS designation will be allowed to re-register under this extension. This would not, however, require that a beneficiary registered under the March 9, 2021 designation [] re-register at this time. Rather, it would provide such individuals with the option of doing so. Venezuela TPS beneficiaries who appropriately apply for TPS or re-register under this Notice and are approved by USCIS will obtain TPS through the same extension date of

---

[38] Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 5961, 5961 (Jan. 17, 2025) ("January 2025 Extension").

[39] *Id.* at 5963 (internal quotation marks and citations omitted).

[40] *Id.*

[41] *Id.* at 5968.

October 2, 2026.[42]

68. The January 2025 Extension also automatically extended relevant employment authorization documents. The notice instructed TPS holders that "if you already have an EAD with a 'Card Expires' date of September 10, 2025, April 2, 2025, March 10, 2024, or September 9, 2022, this Federal Register notice automatically extends it through April 2, 2026 without any further action on your part."[43] It further instructed employers that they "should accept" an expired EAD accompanied by a copy of the January 17, 2025 Federal Register notice as proof of work authorization through April 2, 2026.[44]

69. DHS estimated that, as of January 17, 2025, there were 607,000 beneficiaries under the 2021 and 2023 Venezuela Designations combined.[45]

**Vacatur of TPS Extension Three Days After Secretary Noem's Confirmation**

70. On January 20, 2025, President Trump was sworn in as President of the United States.

71. That same day, President Trump issued an Executive Order titled "Protecting the American People Against Invasion."[46] The "invasion" referenced in the order was the purported "unprecedented flood of illegal immigration into the United States."[47] The Order mandated that TPS designations be "appropriately limited in scope" in order to ameliorate the "continued presence of illegal aliens in the United States":

> The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to . . . ensuring that designations of Temporary Protected Status are consistent with the provisions of section

---

[42] *Id.* at 5963.

[43] *Id.* at 5967.

[44] *Id.* at 5969–70.

[45] *Id.* at 5966.

[46] Exec. Order No. 14159 (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/.

[47] *Id.* § 1.

> 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute[.][48]

72. On January 25, 2025, Secretary Noem was sworn in as DHS Secretary.

73. On January 28, 2025, Secretary Noem vacated the January 2025 Extension for Venezuela, rendering more than 600,000 Venezuelans vulnerable to the loss of legal status and associated benefits in April or September 2025.[49] By the vacatur, Secretary Noem "revert[ed] to the TPS redesignation and extension guidance" which had been announced in October 2023.[50]

74. Secretary Noem's decision was the first vacatur of a TPS extension in the 35-year history of the TPS statute.

75. On February 3, 2025, DHS formally published a notice in the Federal Register vacating the January 2025 Extension.[51]

76. The vacatur asserted that the Secretary has "inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination."[52]

77. In the vacatur, Secretary Noem did not find any error in Secretary Mayorkas's conclusion that Venezuela continued to meet the conditions for TPS designation. Instead, her sole reason for vacating the extension was her objection to the registration requirement procedures established by Secretary Mayorkas, specifically his decision to permit individuals who initially applied for TPS under the 2021 Venezuela Designation to re-register under the 2023 Designation. Secretary Noem did not consider alternatives short of vacatur to resolve this purported problem.

78. Secretary Noem also implied that Secretary Mayorkas' January 2025 extension notice was inconsistent with the statute, which requires that a designation "remain in effect until

---

[48] *Id.* § 16(b).

[49] USCIS, *Temporary Protected Status Designated Country: Venezuela*, https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-venezuela.

[50] *Id.*

[51] Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8805-01 (Feb. 3, 2025).

[52] *Id.* at 8806.

the effective date of the termination of the designation."[53] But it is Secretary Noem's vacatur, and not the January 2025 Extension, which results in the designation being terminated prematurely.

79. The vacatur states that it vacates: "(1) [the] extension of the Venezuela 2023 TPS designation, (2) the consolidation of filing processes for both designations, which, in effect, resulted in the extension of the 2021 TPS designation, and (3) the EADs that were extended."[54]

80. The vacatur further rescinds the automatic extension of employment authorization granted by the January 2025 extension, invalidates employment authorization and approval notices already granted, and cancels the ongoing processing of applications already filed. The notice states:

> Pursuant to this vacatur, USCIS will no longer accept Venezuela TPS re-registration applications (Form I-821) and associated Applications for Employment Authorization (Form I-765) filed under the [January 2025 Extension]. For TPS beneficiaries who have already filed applications to re-register for TPS pursuant to the [January 2025 Extension] and paid any fees associated with their applications, USCIS will cease processing their applications, and issue refunds of any fees paid by those aliens. Additionally, USCIS will invalidate EADs; Forms I-797, Notice of Action (Approval Notice); and Forms I-94, Arrival/Departure Record (collectively known as TPS-related documentation) that have been issued with October 2, 2026 expiration dates under the [January 2025 Extension]. USCIS will provide refunds to any fees paid by these aliens as well.
>
> Additionally, pursuant to this vacatur the automatic EAD extensions provided in the [January 2025 Extension] are hereby rescinded. USCIS will provide additional guidance regarding the two Venezuela TPS designations on a future date in accordance with applicable laws.[55]

**<u>Fast-Track Termination of TPS for 350,000 Venezuelans</u>**

81. On February 1, 2025, Secretary Noem "decided to terminate" the 2023 Venezuela Designation, ordering an end to the legal status of approximately 350,000 Venezuelans, effective in April.[56]

---

[53] *Id.* at 8807 (citing 8 U.S.C. § 1254a(b)(2)(B)).

[54] *Id.*

[55] *Id.*

[56] USCIS, *Temporary Protected Status Designated Country: Venezuela*, https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-venezuela.

82. On February 5, 2025, DHS published a notice in the Federal Register terminating the 2023 Venezuela Designation.[57]

83. The termination notice does *not* contend that the crisis conditions supporting the 2023 Venezuela Designation have ended, assuming instead that "the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary.'"[58] Secretary Noem nonetheless "determined that Venezuela no longer continues to meet the conditions for the 2023 designation" because "it is contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the United States."[59]

84. But the statute does not allow the Secretary to terminate a TPS designation based on national interest. While the statute directs the Secretary to consider "the national interest of the United States" when *designating* a country for TPS based on extraordinary and temporary conditions,[60] subsequent review of the designation for purposes of either extension or termination is to be based solely on "the conditions in the foreign state," not conditions in this country.[61] There is no precedent in the 35-year history of the TPS program for any designation being terminated on national interest grounds.

85. In her review of whether TPS for Venezuela is in the national interest, Secretary Noem cited President Trump's directives—his Executive Order, "Protecting the American People Against Invasion," his "recent, immigration and border-related executive orders and proclamations [which] clearly articulated an array of policy imperatives bearing upon the national interest," his declaration of a "national emergency at the southern border," and his directive to put "America and American citizens first."[62]

---

[57] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9040-01 (Feb. 5, 2025).

[58] *Id.* at 9042.

[59] *Id.* at 9041.

[60] 8 U.S.C. § 1254a(b)(1)(C).

[61] 8 U.S.C. 1254a(b)(3)(A); *see also* 8 U.S.C. 1254a(b)(3)(B) (requiring termination if the Secretary determines "that *a foreign state* . . . no longer continues to meet the conditions for designation under paragraph (1)") (emphasis added).

[62] 90 Fed. Reg. at 9042–43.

86. Most TPS holders lack *any* criminal history. Indeed, individuals are ineligible for TPS if they have more than a single misdemeanor conviction. Yet the termination notice justifies terminating the status of nearly 350,000 Venezuelan TPS holders because alleged members of a Venezuelan gang have been "blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants," and because President Trump recently placed that gang on a "list of transnational criminal organizations."[63] In elaborating her finding that extension is not in the national interest, the notice provides:

> TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States[.] . . . Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua.[64]

87. Although the termination notice issued only two days after the vacatur notice (and less than two weeks after Noem took office), the notice proclaims that the decision to terminate the 2023 Venezuela Designation followed "consultation with the appropriate U.S. Government agencies," a review of "country conditions," and a "consider[ation of] whether permitting Venezuelan nationals covered by the 2023 designation is contrary to the national interest."[65]

88. The termination takes effect April 7, 2025 or 60 days after the publication of the termination notice. This is the earliest possible date of termination allowed by law.[66] While the termination notice recognizes the discretionary authority of the DHS Secretary to provide for an "'orderly transition' period if she determines it to be appropriate," it rejects one as improper here.[67] The termination notice justifies this in light of the Secretary's determination that the

---

[63] *Id.* at 9042.

[64] *Id.*

[65] *Id.* at 9040–41.

[66] 8 U.S.C. 1254a(b)(3)(B) (termination may be effective no earlier than 60 days after publication in the Federal Register or, "if later, the expiration of the most recent previous extension").

[67] *See* 8 U.S.C. 1254a(d)(3) (Secretary may establish an orderly transition period); 90 Fed. Reg. at 9042.

termination is compelled in the "national interest," and her finding that there are limited "putative reliance interests."[68]

89. The termination notice does *not* extend the employment authorization documents for 2023 Venezuela registrants beyond the date permitted by the original 2023 Designation. Thus, TPS holders protected by the 2023 Venezuela Designation have TPS-related work authorization only until April 2, 2025—five days prior to the expiry of their legal status—even though the statute requires that individuals protected by TPS have "effective" work authorization "throughout the period [they are] in temporary protected status."[69]

## Haiti TPS Designations

### Haiti's 2010 and 2011 Designations

90. Haiti was first designated for TPS on January 21, 2010 when the DHS Secretary found that "extraordinary and temporary conditions" in Haiti warranted TPS designation for eighteen months following a 7.0 magnitude earthquake that affected three million people, about one-third of Haiti's population.[70] Haiti was redesignated for eighteen months the following year, on May 19, 2011, allowing more recently arrived Haitians to register for TPS.[71]

91. TPS for Haiti was extended four times between 2010 and the beginning of the first Trump administration—in May 2011 (along with the redesignation), October 2012, March 2014, and August 2015. Each time, DHS determined, after consultation with the State Department, that it remained unsafe for Haitian TPS holders to return, and extended TPS for Haiti for eighteen months.[72]

---

[68] 90 Fed. Reg. at 9042–44.

[69] 8 U.S.C. 1254a(a)(2).

[70] Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476-02, 3477 (Jan. 21, 2010).

[71] Extension and Redesignation of Haiti for Temporary Protected Status, 76 Fed. Reg. 29000 (May 19, 2011).

[72] *Id.* at 29001; Extension of the Designation of Haiti for Temporary Protected Status, 77 Fed. Reg. 59943, 59944 (Oct. 1, 2012); Extension of the Designation of Haiti for Temporary Protected Status, 79 Fed. Reg. 11808, 11809 (Mar. 3, 2014); Extension of the Designation of Haiti for Temporary Protected Status, 80 Fed. Reg. 51582, 51583 (Aug. 25, 2015).

92. Under the first Trump Administration, Secretary John Kelly initially extended Haiti's TPS designation in May 2017, but did so for the minimum six months allowed by statute. That decision foreshadowed imminent termination, advising Haitian TPS holders to "prepare for their return to Haiti."[73] Six months later, on January 18, 2018, Acting Secretary Elaine Duke terminated TPS for Haiti on the ground that country conditions in Haiti "no longer support its designation for TPS."[74] Acting Secretary Duke provided for an eighteen-month period for the termination to enter into effect to "provide time for an orderly transition," as permitted by statute.[75]

93. This 2018 termination of TPS for Haiti never entered into effect due to legal challenges. On October 3, 2018, in *Ramos v. Nielsen*, this Court preliminarily enjoined the Haiti termination and three others, finding that the plaintiffs had shown a likelihood of success on their Administrative Procedure Act claim that the Trump Administration's terminations arose from an unexplained change in DHS practice, and serious questions on the merits of their Equal Protection claim that the decisions were motivated by racism towards non-white, non-European immigrants.[76]

94. On April 11, 2019, in *Saget v. Trump*, a federal district judge in the Eastern District of New York also enjoined the defendants from implementing the Haiti TPS termination. After a week-long hearing, that court similarly concluded that Plaintiffs were likely to prevail on their APA claim and had raised serious questions on the merits of their Equal Protection claims. It found evidence "suggestive of a pre-determined outcome not anchored in an objective assessment, but instead a politically motivated agenda" and of "a discriminatory purpose of removing non-white immigrants from the United States."[77]

---

[73] Extension of the Designation of Haiti for Temporary Protected Status, 82 Fed. Reg. 23830 (May 24, 2017).

[74] Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2648, 2648 (Jan. 18, 2018).

[75] *Id.*

[76] *Ramos*, 336 F. Supp. 3d at 1097-98, 1108.

[77] *Saget v. Trump*, 375 F. Supp. 3d 280, 372, 374 (E.D.N.Y. 2019).

95. To comply with these preliminary injunctions, DHS automatically extended TPS for Haiti six times – from October 31, 2018 through June 30, 2024.[78]

**Secretary Mayorkas' 2021, 2023, and 2024 Haiti Decisions**

96. On August 3, 2021, in the wake of the assassination of Haitian President Jovenel Moïse, Secretary Mayorkas newly designated Haiti for TPS for an eighteen-month period on the basis of extraordinary and temporary conditions that prevented Haitian nationals from returning to Haiti in safety.[79] Secretary Mayorkas cited Haiti's "deteriorating political crisis, violence and a staggering increase in human rights abuses" as well as rising food insecurity and malnutrition, waterborne disease epidemics, and "high vulnerability to natural hazards, all of which have been further exacerbated by the coronavirus disease 2019 (COVID-19) pandemic."[80]

97. On January 26, 2023 Secretary Mayorkas extended Haiti's 2021 designation for eighteen months and also redesignated Haiti for TPS. After a "thorough review" the Secretary concluded that "Haiti is experiencing economic, security, political, and health crises simultaneously," including gang violence, a humanitarian crisis, and political upheaval, and that these extraordinary and temporary conditions continued to prevent Haitian nationals from returning to Haiti in safety.[81] The Secretary also concluded that "redesignation is not contrary to the national interest of the United States."[82]

98. On July 1, 2024, DHS again extended and redesignated Haiti for TPS on the basis of extraordinary and temporary conditions. Secretary Mayorkas found that "Haiti continues to experience simultaneous economic, security, political, and health crises," including the continuing threat of gang violence, the dysfunctional and worsening political situation, and limited access of

---

[78] Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for Sudan, Nicaragua, Haiti, and El Salvador: 83 Fed. Reg. 54764 (Oct. 31, 2018); 84 Fed. Reg. 7103 (Mar. 1, 2019); 84 Fed. Reg. 59403 (Nov. 4, 2019); 85 Fed. Reg. 79208 (Dec. 9, 2020); 86 Fed. Reg. 50725 (Sept. 10, 2021); 87 Fed. Reg. 68717 (Nov. 16, 2022).

[79] Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41863, 41864 (Aug. 3, 2021).

[80] *Id.* at 41864.

[81] Extension and Redesignation of Haiti for Temporary Protected Status, 88 Fed. Reg. 5022, 5025 (Jan. 26, 2023).

[82] *Id.*

citizens to healthcare, food, and water.[83] He further found that "it is not contrary to the national interest of the United States to permit Haitian TPS beneficiaries to remain in the United States temporarily."[84]

99. The July 2024 Federal Register notice announced that Haiti's TPS extension and redesignation "will remain in effect for 18 months, ending on February 3, 2026."[85]

**Secretary Noem's February 2025 Partial Vacatur of TPS for Haiti**

100. Former Secretary Noem acted soon after taking office to terminate Haiti's TPS designation. This has been a three-step process. First, she purported to shorten the TPS protections for Haitian TPS holders with an unprecedented partial vacatur. Then she moved to terminate TPS for Haiti in July 2025, relying on the partial vacatur. After a court enjoined the partial vacatur of Haiti's TPS designation, USCIS again recommended terminating TPS for Haiti in November 2025. USCIS treated the November termination of Haiti as an "addendum" to the July termination, incorporating the July analysis and decision.

101. On February 20, 2025, DHS issued a press release titled "Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status."[86] The release announced that Secretary Noem had "vacated a decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."[87] The release asserted that "[f]or decades the TPS system has been exploited and abused" and claimed that "Biden and Mayorkas attempted to tie the hands of the Trump administration by extending Haiti's Temporary Protected

[83] Extension and Redesignation of Haiti for Temporary Protected Status, 89 Fed. Reg. 54484, 54487 (July 1, 2024).

[84] *Id.* at 54491.

[85] *Id.* at 54485.

[86] Press Release, DHS, Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status.

[87] *Id.*

Status by 18 months."[88] The release makes this assertion despite that the 2024 Haiti redesignation and extension notice was from July, well before the election of Donald Trump as president.

102. Later that same day, DHS "pre-published" a Federal Register notice entitled "Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti."[89] In the notice, Secretary Noem explains that she had "reconsider[ed]" the July 2024 Haitian Redesignation and Extension in light of the directive in President Trump's Executive Order 14159, *Protecting the American People Against Invasion*, "to ensure that the TPS designations are consistent with the TPS statute and 'are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute.'"[90]

103. Secretary Noem further announced that she was "partially vacating the June 4, 2024,[91] decision to reduce the designation and extension period from eighteen months to twelve months and to make a corresponding change to the initial registration period for new applicants under the 2024 designation," cutting that registration period short by six months.[92]

104. Under the partial vacatur, Haiti's TPS designation was set to end on August 3, 2025, unless extended. The Federal Register notice instructs:

> [e]mployers, and Federal, State and local government agencies (such as Departments of Motor Vehicles) that previously accepted or are presented with an EAD with the TPS category code of A-12 or C-19 that expires on February 3, 2026 must update their records to note that the validity date of the document is through August 3, 2025.[93]

---

[88] *Id.*

[89] Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10511-01 (Feb. 24, 2025).

[90] *Id.* at 10513.

[91] Secretary Noem refers to the July 1, 2024 Haiti Extension and Redesignation as the "June 4, 2024 decision" throughout the Federal Register notice, although the decision was published on July 1, 2024 and was apparently first announced on June 28, 2024. *See* Press Release, DHS, Secretary Mayorkas Announces Extension and Redesignation of Haiti for Temporary Protected Status (June 28, 2024), https://www.dhs.gov/archive/news/2024/06/28/secretary-mayorkas-announces-extension-and-redesignation-haiti-temporary-protected.

[92] 90 Fed. Reg. at 10514.

[93] *Id.*

105. As justification for the partial vacatur, the Federal Register notice stated that the 2024 extension was invalid because it did not specify why an eighteen-month period was selected for extension, as opposed to a six- or twelve-month period, and asserted that the congressionally authorized "default extension period" is six months.[94] The notice also asserted that Secretary Mayorkas did not provide enough detail as to why TPS for Haitians was not "contrary to the national interest," particularly as applied to "those who entered the country unlawfully."[95] Additionally, Secretary Noem said that the 2024 Extension cited statistics from 2022-2023, in addition to earlier years, suggesting that these were outdated statistics, albeit acknowledging that the July 2024 notice "cites some country conditions reports that are relatively proximate to the [] decision."[96]

106. DHS estimates that 521,000 Haitian nationals rely on TPS for legal status and work authorization.[97] The Secretary described this unprecedented action to eliminate six months of legal status and work authorization for over 500,000 people as "modest."[98] She considered that her actions adequately contemplated any "putative reliance interests" in the July 2024 decision because Haitians have been able to register for the extension for seven months; and because she made the decision to only partially vacate the extension rather than vacate it in its entirety.[99]

107. Secretary Noem stated that DHS would not recall existing TPS-related documentation, including work permits with a February 3, 2026 end date (which many Haitian TPS holders have), but stated that these documents will only remain valid through August 3, 2025, contrary to the express language on the documents.[100] *Id.*

---

[94] *Id.* at 10513–14.

[95] *Id.* at 10513.

[96] *Id.*

[97] *Trump Administration Cuts Duration of Deportation Protections for 521,000 Haitians*, REUTERS (Feb. 20, 2025), https://www.reuters.com/world/americas/trump-administration-cuts-duration-haitian-deportation-protections-august-2025-02-20/.

[98] 90 Fed. Reg. at 10514.

[99] *Id.*

[100] *Id.*

108. Secretary Noem's justifications for the partial vacatur of TPS for Haiti have no support in either the historical record of TPS determinations or statutory language. First, the TPS statute authorizes Secretaries to designate or extend TPS for six-, twelve-, or eighteen-month durations, but does not create any separate requirement that a Secretary must explain the reason to choose a particular duration (beyond her implicit judgment as to how long conditions are likely to remain unsafe).[101] Over the 35-year history of the statute, in virtually all cases in which Secretaries designated or extended TPS for a country, they announced the length of the designation without elaborating their reasons for choosing *that* duration and not another. Indeed, Secretary Noem's partial vacatur is itself consistent with that practice; it does not explain why it chose a twelve-month period.

109. In the context of Haiti, no Secretary has ever explained in the Federal Register why they chose a particular duration rather than an alternative. Even when Secretary Kelly announced the atypical six-month extension of TPS in 2017, he did not elaborate on his reasoning for choosing that duration, or explain why a longer duration was not appropriate.[102]

110. Contrary to Secretary Noem's statement in the Federal Register, there is no default period for an affirmative decision to extend a TPS designation; the six-month default applies only if the Secretary fails to make any determination. Of the more than 200 TPS extensions that have occurred since 1990, TPS has been extended for a six-month period on only a handful of occasions—for instance, in Secretary Kelly's atypical six-month extension of TPS for Haiti, a few times when an automatic extension was granted due to the failure of a Secretary to make a timely determination, and in a few other instances, such as during the short-lived Ebola crisis.[103]

---

[101] *See* 8 U.S.C. § 1254a(b)(2), (b)(3)(C) (initial designation or extension for period of 6, 12 or eighteen months, at the "discretion of the [Secretary]").

[102] *See* 82 Fed. Reg. at 23830-01.

[103] *See id.* (Secretary Kelly's 2017 six-month extension of TPS for Haiti prior to termination); 65 Fed. Reg. 52789-02, 65 Fed. Reg. 15016, and 82 Fed. Reg. 59630-02 (automatic six-month extensions of TPS for Bosnia-Herzegovina, Guinea Bissau & Honduras due to the failure to make a timely determination); 61 Fed. Reg. 29428 and 61 Fed. Reg. 58425, (six-month extensions of TPS for Rwanda); 81 Fed. Reg. 15339, 81 Fed. Reg. 15328, 81 Fed. Reg. 15334 (six-month extensions of TPS for Guinea, Liberia, and Sierra Leone in context of Ebola crisis).

111. Second, while Section 1254a(b)(1)(C) prohibits the Secretary from designating a country for TPS if she finds that doing so "is contrary to the national interest of the United States,"[104] the statute does *not* require that a Secretary elaborate the reasons why a designation is *not* contrary to the national interest. Further, national interest is relevant only to whether a country should be designated for TPS initially, not whether an existing designation should be extended.[105]

112. The historical practice is consistent with the statute's mandate: when explaining designations pursuant to Section 1254a(b)(1)(C), Secretaries typically assert that the designation is "not contrary to the national interest," but do not elaborate further. And Secretary Noem's February 1, 2025 termination of TPS for Venezuela is the only instance in the 35-year history of TPS in which a Secretary has terminated a TPS designation due to a finding that the designation was *no longer* in the national interest.

113. Lastly, Secretary Noem's stated concern that the July 2024 notice considered outdated statistics is supported by neither the statute nor historical practice—the statute does not limit what kinds of evidence may be considered, and Secretaries have traditionally considered facts both close in time to and further from the determination, as the July 2024 notice also does.

**Secretary Noem's Early Termination of TPS for Haiti**

114. On June 27, 2025, DHS announced through a press release that it had terminated TPS for Haiti. The press release stated that Secretary Noem "determined that, overall, country conditions have improved to the point where Haitians can return home in safety," and "that permitting Haitian nationals to remain temporarily in the United States is contrary to the national interest of the United States."[106] A DHS spokesperson described the decision as one to "restore[] integrity in our immigration system and ensure[] that Temporary Protective Status is actually temporary." *Id.*

---

[104] 8 U.S.C. § 1254a(b)(1)(C).

[105] *See* ¶ 84, *supra*.

[106] Press Release, DHS, DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status" (June 27, 2025), https://www.dhs.gov/news/2025/06/27/dhs-terminates-haiti-tps-encourages-haitians-obtain-lawful-status

115. On July 1, 2025, DHS published the Federal Register notice formally terminating TPS for Haiti.[107] Notably, where the press release asserted that the Secretary determined that country conditions had improved to the point where Haitians could safely return home, and despite the legal requirement that DHS "determine whether the conditions" for designation "continue to be met" in its periodic reviews, the Federal Register notice contained no determination regarding country conditions. Instead, the notice cites the "national interest" clause of 8 U.S.C. 1254a(b)(1)(C) as the exclusive basis for termination. The Secretary only analyzes country conditions in the context of its "national interest" findings. *Id.* There, the Secretary acknowledges the catastrophic conditions—"'a devastating political, environmental, social, and economic situation . . . in Haiti'"; "Gang violence in Haiti persists as armed groups operate with impunity, enabled by a weak or effectively absent central government"; and "'Haiti is in the grip of severe humanitarian and human rights crisis.'" 90 Fed. Reg. at 28762-63. While acknowledging that "[t]he current situation in Haiti is concerning," Secretary Noem nonetheless determined that termination was warranted because "the United States must prioritize its national interests[.]" 90 Fed. Reg. at 28763.

116. In the Secretary's view, because Haiti was designated for TPS on the grounds of extraordinary and temporary conditions (rather than natural disaster or war), she did not *need to* find improved conditions in order to terminate Haiti's TPS, but instead could simply terminate TPS based on a finding that extension is not in the national interest. She claimed that crisis-level conditions actually *required* termination because continuing TPS for a country facing total societal collapse is contrary to the U.S. national interest. *Id.*

117. The Secretary's national interest justifications rely heavily on President Trump's Executive Orders "Protecting the American People Against Invasion" and "America First Policy Directive," as well as his Presidential Proclamations "Guaranteeing the States Protection Against Invasion" and "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats." 90 Fed. Reg. at 28762-

---

[107] 90 Fed. Reg. 28760 (July 1, 2025).

63. These Executive Orders and Proclamations characterized Haitian immigrants who were admitted or paroled lawfully into the United States during the previous administration as "illegal" and their admission into the country, and the presence of TPS holders and other non-European immigrants, as a "flood" and "invasion."[108]

118. The Federal Register notice also slanders Haitians and Haitian TPS holders with racist tropes using overbroad generalizations of criminality and gang participation using *one* Haitian (who is *not* reported to be a TPS holder) convicted of crimes to assert a "broader risk posed by rising Haitian migration." 90 Fed. Reg. at 28763. The Federal Register notice lacks any examples or data suggesting or finding that Haitian *TPS holders* have been convicted of crimes or that Haitians in the U.S. are associated with criminality.

119. The termination of TPS for Haiti is only the second termination in the history of the statute which relies on "national interest" to terminate a TPS designation. The first was Venezuela five months prior. As was true then, the statute does not allow a termination to be on the basis of national interest, but only on the conditions in the foreign state. *See* ¶ 84, *supra*.

120. The Secretary refused to provide an orderly transition period for Haitian TPS holders beyond the 60 days mandated by statute. As a result, 500,000 Haitians stand to lose their legal status and work authorization on September 2, 2025. Many will be at risk of removal to a country which the U.S. acknowledges is in the midst of societal collapse.

121. Secretary Noem's termination of TPS for Haiti reflects a periodic review process which deviated dramatically from past practice without explanation; and with clear signs that the decisionmaking was pretextual and outcome-determined, in violation of the TPS statute and the law.

---

[108] Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) (claiming an "unprecedented flood of illegal immigration into the United States" and that "[m]illions of illegal aliens" had been "allowed to settle in American communities"); Proclamation No. 10888, 90 Fed. Reg. 8333 (Jan. 20, 2025) (claiming an "ongoing influx of illegal aliens" and declaring "an invasion . . . ongoing at the southern border"); Proclamation No. 10949, 90 Fed. Reg. 24497 (June 4, 2025) (claiming "hundreds of thousands of illegal Haitian aliens flooded into the United States during the Biden Administration").

122. In DHS's July termination of Haiti's TPS designation, the agency neither consulted with the State Department nor based the decision on country conditions in Haiti. Both are statutorily required. Secretary Noem based her July termination for Haiti on the U.S. national interest alone. This is contrary to statute and was unprecedented.

123. On May 29, USCIS leadership typically responsible for reviewing country conditions (RAIO) and making TPS recommendations (OP&S) "cleared" a draft Decision Memo which recommended an autoextension of Haiti's TPS designation in part due to the lack of statutorily required consultation with the State Department. The next day USCIS Director Nominee Joe Edlow abruptly reversed the recommendation. USCIS then provided a recommendation to then Secretary Noem to "terminate" TPS for Haiti solely relying on an analysis of U.S. national interest.

124. On June 4, Secretary Noem signed the Decision Memo, purporting to terminate Haiti's TPS designation on the ground that "permitting the Haitian nationals to remain temporarily in the United States is contrary to the U.S. national interest."

125. DHS publicly announced this decision with a press release and Federal Register notice on July 1. The Federal Register notice for the July termination includes no analysis of country conditions, but described the determination to end TPS for Haiti as based on a consideration of U.S. national interest alone.

126. The State Department provided no analysis or recommendation regarding Haiti's TPS designation in advance of the July termination. Though this was false, former Secretary Noem posted in the formal announcement of the decision in the Federal Register that she had engaged in the requisite interagency consultation. The DHS press release announcing the termination also falsely affirmed that there had been a State Department consultation where there was none.

127. The State Department had ceased to provide country conditions analyses soon after Kristi Noem took office as DHS Secretary. Beginning with the first TPS decisions made by Secretary Noem, the State Department stopped providing country conditions memoranda. With the earliest decisions of the second Trump administration, Secretary of State Rubio provided a

letter with his TPS recommendation for a given country, though the letter was focused exclusively or almost exclusively on U.S. policy priorities and not on country conditions.

128. Around the time of the announced July termination of TPS for Haiti, Secretary Rubio stopped providing any recommendation letter at all. For a period of time in the summer of 2025, the State Department did not provide any communication to DHS regarding a country's TPS designation. Soon after that, in connection with TPS periodic reviews, the State Department communication consisted only of a cursory one-line statement about U.S. "foreign policy" from a subordinate. The State Department no longer provided any analysis of, or statement regarding, country conditions, no matter how cursory.

**Secretary Noem's 'Superseding' Termination Decision**

129. Secretary Noem's July 1, 2025 termination of TPS for Haiti did not go into effect on September 2, 2025 as planned due to court orders that set aside the February 20, 2025 "partial vacatur," thereby preserving Haiti's current TPS designation through February 3, 2026. *See Haitian Evangelical Clergy,* 789 F. Supp. at 273; Dkt. 279.

130. On November 28, 2025, Secretary Noem published a notice in the Federal Register terminating Haiti's TPS designation effective February 3, 2026. 90 Fed. Reg. 54,733 (Nov. 28, 2025). The notice purports to "supersede[]" the July 1 termination notice. It states that DHS is "newly announc[ing]" the termination of Haiti's TPS designation, which "[b]ecause of interference by a federal district court judge . . . is set to expire on February 3, 2026."

131. The "Reasons for . . . Termination" section of the November 28 termination notice repeats, nearly verbatim, the entirety of the "Reasons for . . . Termination" section in the July 1 termination notice, including its reliance on President Trump's executive orders and overbroad generalizations and stereotypes of Haitians relating to criminality.

132. In addition to repeating the reasons for termination provided in the July 1 termination notice, the November 28 termination notice includes several new paragraphs. Two address country conditions; one describes supposedly unlawful visa overstays by Haitian immigrants; and one addresses alleged criminal activity by an unspecified number of lawful permanent residents and one individual identified only as a "Haitian alien."

133. In contrast to the July 1 termination notice, which was based solely on the Secretary's conclusion that "it is contrary to the national interest . . . to permit Haitian nationals . . . to remain temporarily in the United States," the November 28 notice states both that "the Secretary has determined that there are no extraordinary and temporary conditions in Haiti that prevent Haitian nationals … from returning in safety" and that, even if it were unsafe for Haitian nationals to return to Haiti, the Secretary would still terminate Haiti's designation as contrary to the national interest.

134. The Secretary did not consult with the State Department regarding country conditions in Haiti before deciding to terminate TPS for Haiti via the November 28 termination notice. Instead, in connection with the November termination of TPS for Haiti, a State Department subordinate provided only that "State believes that there would be no foreign policy concerns with respect to a change in the TPS status of Haiti."

135. In or around March 2025, the State Department ceased providing country conditions information as part of the TPS periodic review process. *See* Exhibits in Support of Plaintiffs' Motion for Summary Judgment, Dkt. 176-22 at 1504; Dkt. 176-27 at 1524; Dkt. 176-28 at 2342, *Nat'l TPS All. v. Noem*, Case No. 3:25-cv-05687-TLT (N.D. Cal. July 7, 2025) ("*NTPSA II*").

136. Defendants did not conduct an objective review of country conditions in Haiti before deciding to terminate TPS for Haiti. Instead, they searched for "positive developments," 90 Fed. Reg. at 54,735, cherry picked to support the Secretary's "predetermined desire to terminate Haiti's TPS." Dkt. 279 at 57. For example, the termination notice relies on a United Nations article quoting the UN General Secretary as identifying "emerging signals of hope" for Haiti's future, but fails to acknowledge that the same article also quotes the General Secretary describing *current* conditions in Haiti as "a life-and-death emergency." 90 Fed. Reg. at 54,735 (quoting United Nations, "The people of Haiti are in a perfect storm of suffering,' warns UN chief," Aug. 28, 2025, https://news.un.org/en/story/2025/08/1165738).

137. Defendants' decision to terminate Haiti's TPS designation was based on new DHS guidance providing that "generalized crime/violence" are "not sufficient" to support a TPS designation based on extraordinary and temporary conditions. *See NTPSA II*, Dkt. 176-2 at 1693.

This guidance reflects an unacknowledged and unexplained break with past practice, whereby generalized crime and violence *could* support a TPS designation based on extraordinary and temporary conditions. *See, e.g.,* 89 Fed. Reg. 54,484, 54,488-90 (July 1, 2024) (redesignating Haiti for TPS based in part on generalized crime and violence).

138. Defendants' decision to terminate Haiti's TPS designation was based on new DHS guidance providing that TPS periodic reviews should "[f]ocus on conditions described in the original designation," *NTPSA II*, Dkt. 176-2 at 1693, while disregarding intervening conditions, in an arbitrary and unexplained return to the "new rule" found unlawful during the first Trump Administration. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

139. Both the July 1 and November 28 termination notices identify supposedly high rates of Haitian nationals overstaying nonimmigrant visas as a factor supporting the conclusion that extending Haiti's TPS designation is contrary to the national interest. The November 28 notice asserts that "[o]verstaying the terms of the nonimmigrant visa is a violation of U.S. immigration laws," but fails to acknowledge that, under the July 1, 2024 redesignation of Haiti for TPS, Haitian nationals who had been residing in the U.S. since June 3 of that year—including pursuant to nonimmigrant visas—were eligible to apply for TPS, so would have had a lawful basis to stay in the country after their nonimmigrant visas expired. This error reflects Defendants' ongoing—and erroneous—assumption that TPS is itself illegal and that Haitians with TPS are in the U.S. illegally.

140. The November 28 termination notice repeats the July 1 termination notice's assertion that the actions of one Haitian national (who is not reported to be a TPS holder) are indicative of "a broader risk posed by rising Haitian migration." It also newly makes the same claim on the basis of the deportation of an unspecified number of unidentified lawful permanent residents allegedly affiliated with Viv Ansanm, designated by the State Department as a terrorist organization, and the immigration arrest of one "Haitian alien" with alleged gang connections.

141. Between July 1, 2025 and the present, Defendants have noticed ten new TPS terminations, including the termination of Venezuela's 2021 designation. In all, since the second Trump Administration took office, Defendants have terminated TPS for every country that has come up for review, for a total of fifteen termination decisions for thirteen countries (including two terminations each for Venezuela and Haiti).[109] Defendants' termination decisions repeatedly assert that foreign nationals can safely return to the terminated countries even though the majority, including Venezuela and Haiti, remain so dangerous the State Department advises against any travel there.[110]

142. President Trump announced in November, via social media, his intent to terminate TPS for Somalia.[111] Shortly thereafter, he publicly described Somali nationals as "garbage," declaring, "we don't want them in our country."[112]

143. On December 1, 2025, Secretary Noem posted on social media regarding a recommended travel ban on 19 predominantly non-white countries (including Haiti). The Secretary described the countries as "flooding our nation with killers, leeches, . . . entitlement

---

[109] *See* 90 Fed. Reg. 9040 (Feb. 3, 2025) (Venezuela 2023); 90 Fed. Reg. 20309 (May 13, 2025) (Afghanistan); 90 Fed. Reg. 23697 (June 4, 2025) (Cameroon); 90 Fed. Reg. 24151 (June 6, 2025) (Nepal); 90 Fed. Reg. 28760 (July 1, 2025) (Haiti); 90 Fed. Reg. 30089 (July 8, 2025) (Honduras); 90 Fed. Reg. 30086 (July 8, 2025) (Nicaragua); 90 Fed. Reg. 43225 (Sept. 8, 2025) (Venezuela 2021); 90 Fed. Reg. 45398 (Sept. 22, 2025) (Syria); 90 Fed. Reg. 50484 (Nov. 6, 2025) (South Sudan); 90 Fed. Reg. 53378 (Nov. 25, 2025) (Burma); 90 Fed. Reg. 54733 (Nov. 28, 2025) (Haiti); 90 Fed. Reg. 58028 (Dec. 15, 2025) (Ethiopia); 91 Fed. Reg. 1547 (Jan. 14, 2026) (Somalia); 91 Fed. Reg. 10402 (Mar. 3, 2026) (Yemen).

[110] *See id. See also, e.g.,* State Department Travel Advisory, Venezuela at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-advisory.html; State Department Travel Advisory, Haiti, at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html; State Department Travel Advisory: South Sudan, at https://travel.state.gov/en/international-travel/travel-advisories/south-sudan.html.

[111] *See* Nicholas Bogel-Burroughs, *Trump Moves to End Temporary Protected Status for Somalis*, NY TIMES (Nov. 23, 2025), https://www.nytimes.com/2025/11/23/us/trump-somali-tps-protected-minnesota.html.

[112] *See* Zolan Kanno-Youngs and Shawn McCreesh, *Trump Calls Somalis "Garbage" He Doesn't Want in the Country*, NY TIMES (Dec. 2, 2025), https://www.nytimes.com/2025/12/02/us/politics/trump-somalia.html.

junkies" and "foreign invaders" coming "to slaughter our heroes, suck dry our hard-earned tax dollars, or snatch the benefits owed to AMERICANS."[113]

144. On December 10, 2025, President Trump declared that he had "announced a permanent pause on Third World migration, including from hellholes like Afghanistan, Haiti, Somalia and many other countries."[114] In response to an individual in the audience who called out, "shithole," President Trump subsequently confirmed and reiterated comments he made during his first administration denigrating immigrants, including Haitian TPS holders, from what he described as "shithole countries" and asking, "Why can't we have some people from Norway, Sweden – just a few – let us have a few. From Denmark – do you mind sending us a few people? Send us some nice people."[115]

## THE TRUMP ADMINISTRATION PUBLICLY COMMITTED TO END TPS PROTECTIONS AND DESTROY THE TPS PROGRAM

### Secretary Noem, President Trump, and Vice President Vance Promised to Terminate TPS

145. Secretary Noem, President Trump and Vice President Vance have repeatedly characterized TPS itself as illegal, and committed to terminate TPS long before the Secretary had any opportunity to consider the factors required by the statute. Secretary Noem's Venezuela and Haiti decisions treat the program itself, and those protected by it, as illegal.

146. DHS never acknowledged or explained the departure from the agency's prior recognition that Congress lawfully authorized TPS designations, that TPS is itself legal, and that individual TPS designations may be in the national interest.

147. Both prior to and since assuming her position running DHS, Secretary Noem has reiterated her view that TPS, as it has been used, is illegal. At her confirmation hearing, Secretary

---

[113] Kristi Noem (@Sec_Noem), X (Dec. 1, 2025), https://x.com/Sec_Noem/status/1995642101779124476 (last visited Dec. 10, 2025).

[114] *See* Alexandra Marquez, *Trump Revives Slur While Discussing Immigrants From Somalia and Other "Disgusting" Nations*, NBC NEWS (Dec. 10, 2025), https://www.nbcnews.com/politics/donald-trump/trump-immigrants-somalia-slur-rcna248395

[115] *See* Daniel Dale, *Almost Eight Years Later, Trump Confirms He Used the Phrase "Shithole Countries*", CNN (Dec. 10, 2025), https://www.cnn.com/2025/12/10/politics/donald-trump-shithole-countries-phrase.

Noem stated that "[TPS] has been abused and manipulated by the Biden Administration and that will no longer be allowed . . . and these extensions going forward the way that they are, the program was intended to be temporary[.]"[116]

148. Secretary Noem defined TPS holders as law violators just by virtue of having this humanitarian status. In announcing her decision to end TPS for Venezuela, Secretary Noem said the termination "stopped" former Secretary Mayorkas from letting Venezuelan TPS holders "stay here and violate our laws for another 18 months."[117]

149. In a February 2, 2025 "Meet the Press" appearance the day the Venezuela vacatur was published, Secretary Noem said, "[T]he TPP *[sic]* program has been abused, and it doesn't have integrity right now."[118]

150. In her February 20, 2025 press statement announcing the partial vacatur of TPS for Haiti, Secretary Noem elaborated, with emphasis, that "TPS is a type of immigration status available to nationals of certain designated countries that allows aliens, **even if they entered the country illegally**, the ability to reside **temporarily** in the U.S."[119] The press statement reiterated what Secretary Noem asserted at her confirmation hearing—her belief that "[f]or decades the TPS system has been exploited and abused." DHS used as an "example" of the "exploit[ation]" of the system that "Haiti has been designated for TPS since 2010"; and that "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension." (Here, she presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit). DHS also stated that, by partially vacating the lawfully granted extension, it was "returning integrity to the TPS system," and "returning TPS to its original status: temporary." The press statement also referenced the rescission of the previous administration's extension of TPS for Venezuela, apparently linking these two vacaturs to the same goal.

[116] Dkt. 37-12 at 104.

[117] Dkt. 37-14 at 2–3.

[118] Dkt. 37-15 at 18.

[119] Press Release, *Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS*, DHS (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphasis in original).

151. President Trump, Vice President Vance, and Trump surrogates have likewise championed the view that TPS designations are "illegal"—or, in the Vice President's words, a "magic government wand."[120] They have made clear their intent to target TPS and/or TPS designations for termination.

152. President Trump, while campaigning, said that he would personally revoke TPS and that he did not consider it legal. President Trump responded to an interviewer's question as to whether Haitian TPS holders in Springfield, Ohio were "legal or illegal" and whether he would "revoke TPS status" by saying: "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal. . . . Absolutely I would revoke [TPS]."[121]

153. Though TPS holders in Springfield, Ohio were welcomed by local officials and employers, and legally authorized to live and work in the United States through the TPS program, President Trump decried TPS as a "little trick," asserting Haitian migrants "are illegal immigrants as far as I'm concerned. They're destroying the towns. . . . [T]hey'll end up destroying the state!"[122] He asserted he would "do large deportations in Springfield, Ohio," despite having acknowledged that the Haitians in Springfield about which he was speaking were TPS holders.[123]

154. Vice President Vance, during the campaign, expressed a goal of ending TPS: "We're going to stop doing mass grants of Temporary Protected Status. Of course, you're going to have

---

[120] *See* Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html; Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans, Haitians*, N.Y. TIMES (Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.

[121] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,'* NEWSNATION (Oct. 2, 2024) at approx. 12:00, https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/; Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[122] Edith Olmstead, *Trump Is Now Threatening All Immigrants, "Illegal" or Not,* THE NEW REPUBLIC (Oct. 9, 2024), https://newrepublic.com/post/186961/donald-trump-racist-attacks-springfield-ohio-lie ("[L]ook at Springfield, where 30,000 illegal immigrants are dropped, and it was, they may have done it through a certain little trick, but they are illegal immigrants as far as I'm concerned.").

[123] Alexandra Ulmer *et al.*, *Trump Pledges to Deport Haitians in Ohio City if Elected*, REUTERS (Sept. 14, 2024), https://www.reuters.com/world/us/biden-says-attacks-haitian-immigrants-have-stop-2024-09-13/.

people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."[124] Given that TPS is, by statute, designed to *be* a mass grant for all eligible individuals (unlike asylum and other forms of fear-based immigration relief), this statement can only be understood as an attack on TPS itself.

155. Vice President Vance expressed this view repeatedly. In a September 2024 CNN interview, he disputed the anchor's characterization of TPS holders as being in the United States legally. The future vice president called TPS designations a "magic amnesty wand . . . giving [migrants] legal status. . . . That is not to say they are here legally. That is a terrible indictment of [Vice President Kamala Harris's] amnesty policies." The anchor responded that Mr. Vance "might not agree with the [TPS] policy," but "it is the law." Mr. Vance replied that Vice President Harris "granted amnesty at a mass level."[125]

156. At a campaign rally a couple of days later, Mr. Vance doubled down, assailing what he called a "media and Kamala Harris fact check" about Haitian TPS holders. He stated:

> The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way . . . they are here legally. And what they mean is that Kamala Harris used two separate programs, mass parole and temporary protective status. She used two programs to wave a wand and to say we're not going to deport those people here. Well, if Kamala Harris waves the wand illegally and says these people are now here legally, I'm still going to call them an illegal alien. An illegal action from Kamala Harris does not make an alien legal.[126]

157. According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the

---

[124] Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html.

[125] Interview of Senator J.D. Vance, CNN (Sept. 16, 2024) at approx. 5:00, http://youtube.com/watch?v=djpTr5r0zMQ.

[126] Speech by Senator J.D. Vance at Raleigh, North Carolina Campaign Event, C-Span (Sept. 18, 2024) at approx. 41:00, https://www.c-span.org/program/campaign-2024/senator-jd-vance-campaigns-in-raleigh-north-carolina/649012.

revocation of TPS as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[127]

158. Project 2025, "the 2025 Presidential Transition Project," a product of current and former Trump political appointees, also called for the "[r]epeal [of] TPS designations"—without elaboration as to any consideration of country conditions or any other review criteria or processes.[128]

159. President Trump's motivation to terminate TPS is not new. During the first Trump Administration, DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pretextual terminations of TPS designations for nearly everyone who held the status. Those termination decisions were ultimately struck down in litigation.[129]

160. Secretary Noem's actions follow this familiar pattern, and show that she was motivated in part in response to a clear mandate from President Trump and other Trump administration immigration officials. This is evident by her reliance on President Trump's policy objections to support both her determination that extending TPS for Venezuela was not in the national interest and her partial vacatur of the Haiti designation and extension.

---

[127] Charlie Savage *et al.*, *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. TIMES (Nov. 11, 2023), https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

[128] Paul Dans & Steven Groves, eds., "Mandate for Leadership: The Conservative Promise," at 150, https://static.project2025.org/2025_MandateForLeadership_FULL.pdf.

[129] *Ramos*, 336 F. Supp. 3d at 1081 (granting preliminary injunction enjoining implementation of TPS terminations for Sudan, Haiti, El Salvador, and Nicaragua); *see also Saget*, 375 F. Supp. 3d at 379 (finding Plaintiffs likely to succeed on claims that 2018 termination of Haiti's TPS designation violated the APA and the equal protection component of the Fifth Amendment Due Process Clause and issuing preliminary injunction); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 416 (D. Mass. 2018) (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees"); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 312–13, 329 (D. Md. 2018) (denying motion to dismiss because plaintiffs plausibly alleged equal protection and APA challenge).

**SECRETARY NOEM AND PRESIDENT TRUMP EXPRESSED DISCRIMINATORY AND BARE ANIMUS TOWARDS VENEZUELAN AND HAITIAN TPS HOLDERS**

161. Secretary Noem's vacatur and termination decisions were motivated in significant part by animus against Venezuelans and Haitians, including animus based on their perceived race, ethnicity, and national origin. Secretary Noem, President Trump and other Trump administration officials have repeatedly made statements and taken actions that indicate discriminatory and bare animus toward TPS holders. A limited number of those statements and actions are described herein. They leave no doubt as to the speaker's discriminatory motives against non-white, non-European immigrants in general and Venezuelans and Haitians in particular and bare animus toward TPS holders.

**Secretary Noem's Racist, Hostile Statements And Actions Towards Non-White, Non-European Immigrants and TPS Holders**

162. In announcing the vacatur of the Venezuela TPS extension in a "Fox and Friends" interview on January 29, 2025, Secretary Noem described Venezuelans in the United States as "dirt bags": "Today we signed an executive order within the Department of Homeland Security in a direction that we were not going to follow through on what he [former Secretary Mayorkas] did to tie our hands, that we are going to follow the process, evaluate all of these individuals that are in our country, including the Venezuelans that are here and members of TdA. Listen, . . . the people of this country want *these dirt bags* out. They want their communities to be safe. . . . So, this is part of our plan to make sure that we're protecting America, keeping it safe again, just like President Trump promised."[130]

163. This was not an isolated occurrence. Secretary Noem has repeatedly described immigrants, and particularly those from Venezuela, as "dirt bags."[131]

---

[130] Dkt. 37-14 at 3 (emphasis added).

[131] @Sec_Noem, X (Jan. 28, 2025, 7:35 AM), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, CBS MORNINGS (Jan. 29, 2025) at approx. 1:10, https://www.youtube.com/watch?v=tODarHnNiNs

164. The vast majority of Venezuelan TPS holders have no criminal history, and in general people are ineligible for TPS if they have more than a single misdemeanor conviction. Nonetheless, Secretary Noem has also sought to disparage Venezuelan TPS holders as "criminals." At her confirmation hearing, Secretary Noem said: "[T]his extension [of TPS] of over 600,000 Venezuelans [] is alarming when you look at what we've seen in different states, including Colorado with gangs doing damage and harming the individuals and the people that live there."[132]

165. She has also repeatedly conflated Venezuelan TPS holders with members of a Venezuelan gang which the Trump administration designated as a foreign terrorist organization. On the January 29 "Fox and Friends" interview, Secretary Noem described ending TPS for Venezuelans as necessary in order to "evaluate all of these individuals that are in our country, including the Venezuelans that are here and members of TdA," referring to Tren de Aragua.[133]

166. Secretary Noem also conflated TPS holders and Tren de Aragua gang members in the Venezuela termination notice itself. For instance, she asserted that "TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States," and that "[a]mong these Venezuelan nationals . . . are members of the Venezuelan gang known as Tren de Aragua."[134] The notice makes no assertion that any TPS holders are TdA members; and DHS has provided no evidence of that on any occasion. The notice does not even make any assertion that there is a large number of TdA members in the United States; and DHS has never asserted that either.

---

("These guys are dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter who accompanied Secretary Noem on New York City raids she references reported that nearly half of those arrested had no criminal history.

[132] Dkt. 37-12 at 104–05.

[133] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, FOX AND FRIENDS (Jan. 29, 2025) at approx. 1:10, https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad686037.

[134] 90 Fed. Reg. at 9042.

167. On February 2, 2025, the publication date of the Federal Register notice announcing the vacatur, Secretary Noem appeared on NBC News' "Meet the Press" and said:

> [F]olks from Venezuela that have come into this country are members of TdA. And remember, Venezuela purposely emptied out their prisons, emptied out their mental health facilities and sent them to the United States of America. So we are ending that extension of that program, adding some integrity back into it. And this administration's evaluating all of our programs to make sure they truly are something that's to the benefit of the United States, so that they're not to the benefit of criminals.[135]

168. Secretary Noem's baseless assertion that Venezuela emptied out prisons and mental institutions to send people to the United States long predates her term as Secretary. She has made this false claim repeatedly.[136] One year before she was named DHS Secretary, Noem already targeted Venezuelans for deportation, saying "Venezuela didn't send us their best. They emptied their prisons and sent criminals to America. Deportations need to start on DAY ONE of [President Trump's] term" in office.[137]

169. In a CBS News interview on March 5, 2024, Secretary Noem asserted that the "invasion" by Venezuelan (and Cuban) immigrants constituted an existential threat to the country. "We've seen these countries that hate us empty out their prisons, their mental institutions. They've given us their responsibilities and some of the most dangerous people in the world have made their

---

[135] Dkt. 37-15 at 18–19.

[136] @KristiNoem, X (Feb. 26, 2024, 11:19 AM), https://x.com/KristiNoem/status/1762195636491825295 ("Nations like Venezuela are emptying their prisons of dangerous criminals to send them to America. They are happy to let America's open border be the solution to their problem."); @KristiNoem, X (Feb. 27, 2024, 5:26 PM), https://x.com/KristiNoem/status/1762650522920652828 (Venezuela didn't send us their best. They emptied their prisons and sent criminals to America."); @KristiNoem, Instagram (Mar. 6, 2024), https://www.instagram.com/kristinoem/reel/C4ML17eRBYr/ ("Countries like Venezuela are emptying their prisons, their mental institutions, and sending them to America. The White House is facilitating this invasion. They're doing it on purpose."); @KristiNoem, X (Mar. 14, 2024, 9:24 AM), https://x.com/KristiNoem/status/1768312288560247199 ("At least 300,000 illegal immigrants from Venezuela have been encountered at the border. Remember, Venezuela emptied their prisons and told them to come to America."); @KristiNoem, Instagram (Dec. 9, 2024), https://www.instagram.com/kristinoem/reel/DDVjJnURRqw/ ("[N]ations like Venezuela are using our open border to solve their own crime and mental health crises.").

[137] @KristiNoem, X (Feb. 27, 2024, 5:26 PM), https://x.com/KristiNoem/status/1762650522920652828.

way to the United States of America. . . . [C]ountries such as Venezuela and Cuba have been emptying out their prisons. . . . So we know for a fact that this was facilitated, that the White House has this invasion happening on purpose, and it is to remake the foundation of this country."[138]

170. Secretary Noem's assertions are not just unsubstantiated; they are false. Tren de Aragua's "reputation" is overblown, and not matched by "its actual presence in the United States."[139] "[N]early no claims made by U.S. law enforcement about crimes committed by purported members of TdA have been substantiated by hard evidence that directly connects the accused with the organization in Venezuela."[140]

171. When investigative journalists sought to study claims about the gang's activity last year, "none of the [numerous] national, state, and local law enforcement agencies contacted in the U.S. reported any significant presence of Tren de Aragua" in their jurisdictions.[141] A 2024 review of state and federal legal databases found zero "U.S. criminal cases mentioning Tren de Aragua."[142] The Republican mayor and a Republican City Council member of the Colorado town that President Trump and Secretary Noem claimed had been ravaged by the gang each thoroughly refuted that assertion, with the mayor instead identifying a delinquent property manager as the

---

[138] *South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race*, CBS NEWS (Mar. 5, 2024) at approx. 3:58, https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/.

[139] Venezuela Investigative Unit, *What We Know About Tren de Aragua's US Presence*, INSIGHT CRIME (Oct. 4, 2024), https://insightcrime.org/news/what-we-know-about-tren-de-araguas-us-presence/.

[140] Charles Larratt-Smith & John Polga-Hecimovich, *How Much of a Threat is Tren de Aragua in the U.S.?*, AMERICAS QUARTERLY (Dec. 9, 2024), https://americasquarterly.org/article/how-much-of-a-threat-is-tren-de-aragua-in-the-u-s/ ("[I]t's unlikely the group has much power or reach in the U.S., where other organized criminal organizations pose much more of a threat to citizens and TdA itself.").

[141] Venezuela Investigative Unit, *Is Venezuela's Tren de Aragua 'Invading' the US?*, INSIGHT CRIME (Apr. 1, 2024), https://insightcrime.org/news/is-venezuelas-tren-de-aragua-invading-us/ ("Police agencies in major urban areas across the United States – including Los Angeles, Phoenix, Dallas, San Antonio, and Denver – told InSight Crime that they had no reports of crimes committed by Tren de Aragua in their jurisdictions.").

[142] *Id.*

primary culprit for dilapidated properties, not widespread gang activity.[143] And a *Washington Post* investigation laid bare the fallacy of DHS's claim that it had transferred to Guantanamo Tren de Aragua members it described as the "worst of the worst." *The Washington Post* found no evidence that those transferred were even Tren de Aragua members, and experts have consistently rejected the assertion that there were more than a few hundred TdA members in the United States at all.[144]

172. DHS itself identified only 600 Venezuelan migrants "who may have connections" to Tren de Aragua—including not just members, but also victims, witnesses, or subjects of interest.[145] After transferring approximately 200 Venezuelans to El Salvador without due process, based on an assertion that most were members of TdA, a DHS Acting Field Office Director provided in sworn declarations that: 1) most of those transferred had no criminal records; and 2) there were only 258 alleged TdA members in U.S. custody at all—most of whom were not detained at all but in removal proceedings on the non-detained docket.[146] Lawyers and family members contested the allegations that even these targeted individuals subject to removal to a third country on untested gang allegations alone had any association with TdA at all.[147]

173. The claim that Venezuelan prisons and mental health facilities are being emptied out to send their residents to the United States is also false. "There is no evidence that the Venezuelan

[143] Jonathan Weisman, *How the False Story of a Gang 'Takeover' in Colorado Reached Trump*, N.Y. TIMES (Sept. 15, 2024), https://www.nytimes.com/2024/09/15/us/politics/trump-aurora-colorado-immigration.html.

[144] Silvia Foster-Frau *et al.*, *Relatives and Records Cast Doubt on Guantánamo Migrants Being 'Worst of the Worst'*, WASH. POST (Feb. 16, 2025), https://www.washingtonpost.com/immigration/2025/02/16/trump-guantanamo-migrants-deportations-venezuela/.

[145] Julia Ainsley, *DHS Is Seeking More than 600 Migrants for Possible Ties to Venezuelan Gang*, NBC NEWS (Oct. 23, 2024), https://www.nbcnews.com/news/dhs-identified-600-migrants-possible-ties-venezuelan-gang-rcna176020.

[146] Declaration of Robert L. Cerna, Mar. 17, 2025, ¶ 9 ("many of the TdA members removed under the [Alien Enemies Act] do not have criminal records in the United States"), Dkt. 26-1, Case No. 25-cv-766 (D.D.C.); Declaration of Robert L. Cerna, Mar. 18, 2025, ¶ 6 (identifying 54 purported TdA "members" detained by ICE, 172 purported "members" in removal proceedings on the non-detained docket, and approximately 32 in criminal custody), Dkt. 28-1, Case No. 25-cv-766 (D.D.C.).

[147] *See, e.g.*, Jazmine Ulloa & Zolan Kanno-Youngs, *Trump Officials Say Deportees Were Gang Members. Few Details Were Disclosed*, Mar. 18, 2025, N.Y. TIMES, https://www.nytimes.com/2025/03/18/us/trump-deportations-venezuela-gang.html.

government is systemically or selectively releasing prisoners and expelling them from the country."[148] Nor has President Trump provided any substantiation for this repeated assertion.[149] Experts contend that there simply *aren't* psychiatric hospitals filled with mentally ill people in Venezuela to be released.[150]

174. DHS consistently publicly echoed Secretary Noem's discriminatory statements and naked animus towards immigrants and TPS holders. In August 2025, for instance, DHS posted an ICE recruitment ad with the caption: "Serve your country! Defend your culture!"[151] In fall 2025, DHS posted images calling for "report[ing]" and "deport[ing]" "all foreign invaders."[152]

175. On December 1, 2025, Secretary Noem posted on social media regarding a recommended travel ban on predominantly non-white countries. The Secretary described the countries as "flooding our nation with killers, leeches, . . . entitlement junkies" and "foreign invaders" coming "to slaughter our heroes, suck dry our hard-earned tax dollars, or snatch the benefits owed to AMERICANS."[153] The ban ultimately included a total of 39 countries, including numerous TPS-designated countries—Burma, Afghanistan, Sudan, South Sudan, Venezuela,

---

[148] Jorge Valencia, *Trump Says Venezuela Sends Criminals to the U.S. Here's What to Know*, N.Y. TIMES (July 31, 2024), https://www.nytimes.com/2024/07/31/world/americas/trump-crime-venezuela-us.html (describing the lack of any evidence for the assertion that Venezuela is emptying prisons and expelling prisoners to the United States, and considering it "highly unlikely").

[149] Daniel Dale, *Fact Check: Trump's Own Campaign Can't Find Proof for His 'Mental Institutions' Immigration Story*, CNN (Apr. 29, 2023), https://www.cnn.com/2023/04/29/politics/fact-check-trump-mental-institutions-migrants-doctor/index.html.

[150] Maria Ramirez Uribe & Amy Sherman, *Trump's Ridiculous Claim that 'Millions' of Immigrants Came Illegally from Jails, Mental Facilities*, POLITIFACT (June 6, 2024), https://www.politifact.com/factchecks/2024/jun/06/donald-trump/fact-check-trumps-ridiculous-claim-that-millions-o/ (quoting an immigrant behavioral health expert to conclude that President Trump's assertion that Venezuela was emptying mental health facilities and sending residents to the United States "does not make sense because those numbers are not there").

[151] Homeland Security (@DHSgov), X (Aug. 5, 2025), https://x.com/DHSgov/status/1952718231455592667.

[152] U.S. Dep't of Homeland Security (@homelandgov.bskysocial), BLUESKY (Oct. 18, 2025), https://bsky.app/profile/homelandgov.bsky.social/post/3m3iec6j2xs2m; U.S. Dep't of Homeland Security (@homelandgov.bskysocial), BLUESKY (Nov. 7, 2025), https://bsky.app/profile/homelandgov.bsky.social/post/3m52jswz7d22e.

[153] Kristi Noem (@Sec_Noem), X (Dec. 1, 2025), https://x.com/Sec_Noem/status/1995642101779124476 (last visited July 22, 2026).

Somalia, Yemen, and Haiti.[154] Twenty-six of the thirty-nine countries are African, all are majority non-white, and none are European.[155]

176. On February 9, 2026, Secretary Noem again repeated inaccuracies about TPS and TPS holders, tweeting: "Temporary Protected Status was abused to allow violent terrorists, criminals, and national security threats into our nation."[156]

177. Secretary Noem's statements reflect baseless stereotypes and inaccurate statements about immigrants and TPS holders—demonstrating discrimination based on race, national origin, and ethnicity, and bare animus toward them simply because of their status as TPS holders.

**<u>President Trump's Racist, Hostile Statements And Actions Towards Non-White, Non-European Immigrants and TPS Holders</u>**

178. From his candidacy for his first term as president through the present, President Trump has repeatedly denigrated people perceived to be non-white immigrants. He has specifically targeted both TPS holders generally and Venezuelans and Haitians.

179. President Trump's repeated statements denigrating immigrants perceived to be non-white, and targeting TPS holders in particular, have not functioned merely as hateful rhetoric. They have also worked as a call to action for those serving him.

180. Secretary Noem's reliance on President Trump's objectives in justifying her vacatur and termination decisions demonstrated her adoption of President Trump's animus as well as her response to pressure from President Trump and the White House to reach a quick decision to end TPS protections. Indeed, when publicizing the Venezuela TPS vacatur in a January 29, 2025 interview, Secretary Noem explained that the vacatur reflected President Trump's "desire" to make sure TPS was "used properly," adding that "when the President gives a directive, the

---

[154] Proclamation No. 10998, Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States (Dec. 16, 2025), https://www.whitehouse.gov/presidential-actions/2025/12/restricting-and-limiting-the-entry-of-foreign-nationals-to-protect-the-security-of-the-united-states/.

[155] Tobi Raji et al., *All the Countries Affected by Trump's Expanded Travel Ban*, WASH. POST (Dec. 17, 2025), https://www.washingtonpost.com/world/2025/12/16/trump-travel-ban-countries-list/.

[156] Kristi Noem (@EnvoyNoem), X (Feb. 9, 2026), https://x.com/EnvoyNoem/status/2020983211673952504 (last visited July 22, 2026).

Department of Homeland Security will follow it . . . [a]nd he is pausing this program to re-evaluate."[157] The February 5, 2025 termination notice for Venezuela and the February 24, 2025 partial vacatur notice for Haiti both explicitly cite President Trump's immigration policy agenda as justifications.[158]

181. During his prior administration, President Trump repeatedly denigrated immigrants from countries designated for TPS, including Haiti, El Salvador, and Honduras. Most infamously, he referred to countries designated for TPS as "shithole" countries in a conversation with legislators about TPS, saying "Why do we need more Haitians?" He asked officials to "take them out" of the immigration proposal. He expressed a preference, instead, for immigrants from countries "such as Norway."[159]

182. During his recent campaign, President Trump defended these remarks, reiterating comparisons between "nice countries, you know like Denmark, Switzerland" and "Norway," and "unbelievable places and countries, countries that are a disaster," when speaking about immigrants.[160]

183. President Trump has sought to dehumanize immigrants, including TPS holders in particular, through other statements. For months, he repeated and amplified the false claim that Haitian TPS holders were "eating the dogs" and "eating the cats," "eating the pets of the people that live" in Springfield, Ohio.[161] President Trump called Haitians in Springfield with lawful TPS

---

[157] @Sec_Noem, X (Jan. 29, 2025), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s (statement appears in posted video clip from CNN interview).

[158] 90 Fed. Reg. at 9042; 90 Fed. Reg. at 10513.

[159] Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, WASH. POST (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

[160] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[161] *See, e.g.*, Dkt. 37-8 at 29.

status "illegal migrant[s]" who "descended upon a town of 58,000 people, destroying their way of life."[162] Shortly after these statements, there were several bomb threats against hospitals, government buildings, and schools in Springfield.[163]

184. President Trump has also repeatedly, and falsely, claimed that Haitians "all have AIDS."[164] In 2021, he stated that Haiti had a "tremendous problem with AIDS" and that "[m]any of those [Haitian] people will probably have AIDS and they're coming into our country and we don't do anything about it. We let everybody come in. It's like a death wish for our country."[165]

185. President Trump has often compared immigrants to snakes that will bite and kill anyone foolish enough to shelter them.[166] He has also described non-white immigrants as

---

[162] Sam Levine, *'They've Destroyed the Place': Trump Repeats Racist, Anti-immigrant Lies*, THE GUARDIAN (Sept. 13, 2024), https://www.theguardian.com/us-news/2024/sep/13/trump-repeats-lies-haitian-immigrants; *see also* Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,'* NEWSNATION (Oct. 2, 2024) at approx. 12:45, https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ ("Springfield is such a beautiful place. Have you seen what's happened to it? It's been overrun. You can't do that to people. . . . I'd revoke [TPS], and I'd bring [the migrants] back to their country.").

[163] Edward Helmore, *More Bomb Threats Hit Springfield, Ohio, after Trump Elevates False Claims about Haitians*, THE GUARDIAN (Sep. 14, 2024), https://www.theguardian.com/us-news/2024/sep/14/more-bomb-threats-hit-springfield-ohio-after-trump-elevates-false-claims-about-haitians.

[164] *Saget*, 375 F. Supp. 3d at 371 (citing President Trump's statements that "Haitians 'all have AIDS'" as evidence of racial animus).

[165] *Trump Slams Haitians Attempting to Enter U.S., Says They 'Probably Have AIDS,'* ABC 7 (Oct. 10, 2021), https://abc7.com/haitian-migrants-donald-trump-former-president-immigration/11108741/.

[166] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, VOX (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMES (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border…. And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.].")

"animals."[167] For example, President Trump said about some undocumented immigrants during a March 2024 rally, "I don't know if you call them people. In some cases they're not people, in my opinion, but I'm not allowed to say that[.]"[168]

186. President Trump has repeatedly described immigrants in the United States as an "invasion," repeatedly conflating migrants with "criminals, gang members and terrorists."[169]

187. President Trump, while campaigning in 2023, repeatedly decried non-white immigrants for "poisoning the blood of our country."[170]

188. In October 2024, during an interview with conservative radio host Hugh Hewitt, President Trump further emphasized the genetic inferiority of non-white immigrants. He said: "How about allowing people to come to an open border . . . . Many of them murdered far more than one person, and they're now happily living in the United States." He stated: "You know, now a murderer, I believe this, it's in their genes. And we got a lot of bad genes in our country right

---

[167] Miriam Valverde, *In Context: Donald Trump's Comments about Immigrations, 'Animals,'* POLITIFACT (May 17, 2018), https://www.politifact.com/truth-o-meter/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

[168] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/.

[169] *See, e.g.*, Donald Trump, *Donald Trump: This Is How I Will End Joe Biden's Border Disaster on Day One*, DES MOINES REGISTER (Jan. 3, 2024), https://www.desmoinesregister.com/story/opinion/columnists/caucus/2024/01/03/donald-trump-joe-biden-border-disaster/72093156007/ ("I am the only candidate who will stop this invasion."); TIME, *Read the Full Transcripts of Donald Trump's Interviews with TIME*, Apr. 2024, https://time.com/6972022/donald-trump-transcript-2024-election/ ("This is an invasion of our country. An invasion like probably no country has ever seen before. They're coming in by the millions."); *see also* Ben Zimmer, *Where Does Trump's 'Invasion' Rhetoric Come From?*, THE ATLANTIC (Aug. 6, 2019), https://www.theatlantic.com/entertainment/archive/2019/08/trump-immigrant-invasion-language-origins/595579/ (tracing the historical "roots of the 'immigration invasion' rhetoric that President Donald Trump has championed"); id. (discussing, for example, nineteenth-century rhetoric about a Chinese immigrant "invasion" "leading to" the passage of the Chinese Exclusion Act of 1882).

[170] Dkt. 37-7 at 2; Raheem Kassam, Raheem Kassam Interviews Donald Trump, YOUTUBE (Sept. 2023) at approx. 1:34 to 1:45, https://www.youtube.com/watch?v=v283kLQbe1M&t=89s.

now." In contrast, when addressing a predominately white crowd at a campaign rally in Minnesota, he told them that they have "good genes."[171]

189. At a rally one week before the 2024 election, President Trump described the country as "occupied" by criminal migrants—heaping scorn on "savage" Venezuelan gang members in particular. "We're not going to have a country any longer. That's who we're allowing in. The United States is now an occupied country, but it will soon be an occupied country no longer. . . . November 5th, 2024 . . . will be Liberation Day in America. . . . I will rescue every city and town that has been invaded and conquered."[172]

190. During his first term in office, President Trump also conflated large groups of immigrants, and sometimes even all of them, with members of the MS-13 gang.[173] In his first State of the Union address, he suggested that the Deferred Action for Childhood Arrivals ("DACA") program, recipients of which are immigrants first brought to the United States as children many years ago, contributed to the spread of MS-13.[174]

191. During his first term, when referencing 40,000 Nigerian immigrants, he complained that they would "never go back to their huts" in Africa, expressing his disdain for Black immigrants.[175]

192. During a January 2025 interview on Fox News, President Trump falsely claimed that people from "jails and mental institutions from other countries and gang members, right off

---

[171] Jack Traylor *et al.*, *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC NEWS (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271.

[172] Dkt. 37-10 at 12.

[173] Terry Gross, *Trump Uses MS-13 To 'Sell Draconian Overhauls of Border Issues,' Journalist Says*, NPR (Feb. 15, 2018), https://www.npr.org/2018/02/15/585937834/trump-uses-ms-13-to-sell-draconian-overhauls-of-border-issues-journalist-says.

[174] Liz Robbins*, Why Was MS-13 Targeted in Trump's Speech?*, N.Y. TIMES (Jan. 31, 2018), https://www.nytimes.com/2018/01/31/nyregion/ms-13-gang-trump.html.

[175] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. TIMES (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html.

the streets of the toughest cities in the world, are being brought to the United States of America and emptied out into our country."[176] There is no basis for this claim.[177]

193. In the same interview, President Trump underscored his prejudice by stating that "you can look at" "some" migrants "and you can say 'could be trouble, could be trouble.'."[178]

194. Like Secretary Noem, President Trump has singled out Venezuela for particular opprobrium. He has contended that Venezuelans have "destroyed the fabric of our country."[179]

195. President Trump has used dehumanizing language and repeatedly called Venezuelan immigrants "animals." For instance, in 2024 he asserted that, "[e]very day, Americans . . . are living in fear all because [former Vice President] Kamala Harris decided to empty the slums and prison cells of Caracas [Venezuela] and many other places . . . . And we have to live with these animals, but we're not going to live with them for long, you watch."[180] He also stated that he was "talking a lot about Venezuela because Aurora [Colorado] is really infected by Venezuela."[181] Local officials rejected these assertions.[182] One analysis by Axios of 109 of President Trump's

---

[176] Dkt. 37-13 at 23.

[177] *See* ¶ 173, *supra*.

[178] *Id.* at approx. 19:10.

[179] *See also* CBS NEWS, *Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024) at approx. 33:40, https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 ("They allowed people to come in, drug dealers, to come into our country, and they're now in the United States. And told by their countries like Venezuela don't ever come back or we're going to kill you. . . . There's never been anything done like this at all. They've destroyed the fabric of our country. Millions of people let in.").

[180] Dkt. 37-9 at 32–33; Fox News, *Donald Trump Delivers Remarks at Rally in Reading, PA*, YOUTUBE (Oct. 9, 2024) at approx. 29:55, 30:07, https://www.youtube.com/live/QuoT6T3fbU0?t=1791s (similar).

[181] Dkt. 37-9 at 34.

[182] *See* ¶ 171, *supra*; Jonathan Weisman, *How the False Story of a Gang 'Takeover' in Colorado Reached Trump*, N.Y. TIMES (Sept. 15, 2024), https://www.nytimes.com/2024/09/15/us/politics/trump-aurora-colorado-immigration.html (quoting the Republican mayor of Aurora, Colorado, along with a Republican City Council member, decrying gang takeover narrative as "simply not true").

speeches, debates, and interviews found that he called Venezuelan migrants "criminals" at least seventy times between September 1, 2023 and October 2, 2024.[183]

196. In March 2025, the Trump administration dramatically escalated its rhetoric and actions against Venezuelans, relying on purported TdA membership as justification for deporting more than 200 Venezuelans to a Salvadoran terrorist detention center, in apparent violation of a court order.[184] The administration cited the Alien Enemies Act—a 1798 law that facilitates deportation during wartime—despite the lack of armed conflict between Venezuela and the United States. In a March 15, 2025 "Proclamation"—"Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua"—President Trump asserted that TdA members "are conducting irregular warfare and undertaking hostile actions against the United States" and proclaimed them "Alien Enemies" subject to immediate and summary apprehension, detention and removal if they are not U.S. citizens or lawful permanent residents.[185] President Trump applauded the deportations on social media, using dehumanizing language. He posted a video of deported Venezuelans being roughly hustled off a plane in El Salvador in the dark of night, bent over, amid a massive security presence, describing the Venezuelans as "monsters."[186]

197. President Trump has a long history of making false statements associating Venezuelan refugees with criminality. He has falsely stated that Venezuelan "prisons are . . . at the

---

[183] Russell Contreras, Delano Massey, & Erin Davis, *Trump keeps calling Venezuelan and Congolese migrants criminals*, AXIOS (Oct. 5, 2024), https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.

[184] *President Trump Delivers Justice to Terrorists, Security for Americans*, THE WHITE HOUSE (Mar. 17, 2025), https://www.whitehouse.gov/articles/2025/03/president-trump-delivers-justice-for-terrorists-security-for-americans/#:~:text=America%20First%20Legal%3A%20%E2%80%9CPresident%20Trump,the%20country's%20maximum%2Dsecurity%20prison ("America First Legal: 'President Trump has deported 238 criminals in the violent Venezuelan gang Tren de Aragua to El Salvador to be imprisoned in CECOT, the country's maximum-security prison.'"); Trump Administration Deports Hundreds of Immigrants Even as a Judge Orders their Removals Be Stopped, A.P. (Mar. 17, 2025), https://apnews.com/article/trump-venezuela-el-salvador-immigration-dd4f61999f85c4dd8bcaba7d4fc7c9af.

[185] Donald J. Trump, Proclamation: Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, Mar. 15, 2025, https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/.

[186] @realDonaldTrump, TRUTH SOCIAL (Mar. 16, 2025), https://truthsocial.com/@realDonaldTrump/posts/114173862724361939.

lowest point in terms of emptiness that they've ever been[]" because Venezuela was "taking their people out of those prisons by the thousands" and sending them to the United States.[187]

198. President Trump has also made disparaging remarks about Latin American countries and people, frequently relying on crude and derogatory stereotypes to stoke fear about immigration.

199. President Trump has also repeatedly "retweeted" avowed white nationalists, such as @WhiteGenocideTM, as well as publicly dined with prominent, self-declared white supremacists, thereby endorsing their racist views and amplifying their racist message.[188]

200. The Trump Administration has not shown similar opposition to immigrant populations perceived as white or European (ethnically and ancestrally). On the contrary, on February 7, 2025 President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, 90 Fed. Reg. 9497, on February 7, 2025, which directs Secretary Noem (among others) to:

> [T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination.

201. The White House referred to Afrikaner activists who lobbied for the Trump Administration's support as "civil rights leaders."[189] Trump's Executive Order to protect white South Africans yet again makes clear that his administration strongly prefers white immigrants over those perceived as non-white.

202. President Trump's Executive Order to protect white South Africans—encouraging their resettlement in the U.S., while stripping non-white TPS holders of protection—yet again

---

[187] Dkt. 37-12 at 11 (December 2024 interview).

[188] Benjy Sarlin, *Donald Trump Retweets Apparent Neo-Nazi Supporter*, NBC NEWS (Jan. 22, 2016), https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, *Trump amplifies racist lies, giving neo-Nazis 'real power.' Where are GOP leaders?* USA TODAY (Sep. 23, 2024), https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

[189] John Eligon, *Trump Tries to Use White South Africans as Cautionary Tale*, NY TIMES (March 15, 2025), https://www.nytimes.com/2025/03/15/world/africa/south-africa-whites-trump.html.

makes clear that his administration strongly prefers white and European immigrants over those perceived as non-white or non-European.[190] In March 2025, President Trump posted on Truth Social that "any Farmer (with family!) from South Africa, seeking to flee that country for reasons of safety, will be invited into the United States of America with a rapid pathway to Citizenship. This process will begin immediately!"[191] The White House referred to white Afrikaner activists who lobbied for the Trump administration's support as "civil rights leaders."[192]

203. After shutting down refugee admissions entirely, Trump opened them again to allow the admission of thousands of white South Africans—and only white South Africans—as refugees.[193] In October 2025, the administration announced it was restricting the number of refugees to an annual cap of 7,500—down from the prior year's cap of 125,000—and reserving the spots to "primarily be allocated among Afrikaners from South Africa."[194] In May 2026, the administration raised the cap by 10,000 and specified that the additional admissions were only for white South Africans.[195]

204. By contrast, President Trump has consistently sought to target non-white, non-European immigrants and TPS holders through restrictive, harmful policies. On June 4, 2025, the President issued a proclamation fully suspending entry of nationals from twelve countries, six of

---

[190] *See* N. Hollfelder et al., *Patterns of African and Asian Admixture in the Afrikaner population of South Africa*, BMC Biol. (2020), doi: 10.1186/s12915-020-0746-1 (finding that the "Afrikaner population has a predominant European composition" and "the majority of Afrikaner ancestry (average 95.3%) came from European populations").

[191] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Mar. 7, 2025), https://truthsocial.com/@realDonaldTrump/posts/114121529754059509.

[192] John Eligon, *Trump Tries to Use White South Africans as Cautionary Tale*, N.Y. TIMES (Mar. 15, 2025), https://www.nytimes.com/2025/03/15/world/africa/south-africa-whites-trump.html.

[193] Rebecca Santana & Seung Min Kim, *Trump Administration Raises US Refugee Cap, but Only for White South Africans*, AP (May 26, 2026), https://apnews.com/article/trump-refugees-white-south-africa-border-cap-bfe3974adf6c655eca7a5c30c1f9197f; Alex Nguyen, *US Accepts Only White Refugees for Sixth Consecutive Month*, MOTHER JONES (June 6, 2026), https://www.motherjones.com/politics/2026/06/south-africa-white-genocide-afrikaner-refugees-asylum/.

[194] Presidential Determination on Refugee Admissions for Fiscal Year 2026, 90 Fed. Reg. 49005 (Oct. 31, 2025); *see* Rebecca Santana, *Trump Limits Annual U.S. Refugees to 7,500. It'll Be Mostly White South Africans*, PBS NEWS (Oct. 30, 2025), https://www.pbs.org/newshour/nation/trump-limits-annual-refugees-to-u-s-to-7500-itll-be-mostly-white-south-africans.

[195] Emergency Presidential Determination on Refugee Admissions for Fiscal Year 2026, 91 Fed. Reg. 31645 (May 21, 2026).

which are TPS countries, including Burma, Afghanistan, Haiti, Somalia, Sudan, and Yemen, and partially suspending entry of nationals from seven countries, including Venezuela.[196]

205. Days after issuing the initial travel ban in June 2025, President Trump posted on social media: "Illegals and Criminals . . . will turn us into a bankrupt Third World Nation. America was invaded and occupied. I am reversing the Invasion. It's called Remigration . . . . America will be for Americans again!"[197] He then directed the "entire Administration to put every resource possible behind this effort, and reverse the tide of Mass Destruction Migration that has turned once Idyllic Towns into scenes of Third World Dystopia," pledging that "[o]ur Federal Government will continue to be focused on the REMIGRATION of Aliens" while "REAL Americans are cheering ["Brave ICE Officers"] on every day."[198]

206. The term "remigration," echoed by DHS in a subsequent tweet,[199] "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism" and the replacement theory, and "has been seen as a euphemism for ethnic cleansing."[200]

207. Addressing the United Nations General Assembly on September 23, 2025, President Trump denounced international humanitarian aid for migrants as "funding an assault on Western

---

[196] Proclamation No. 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats (June 4, 2025).

[197] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (June 12, 2025), https://truthsocial.com/@realDonaldTrump/posts/114672816056718064.

[198] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (June 15, 2025), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

[199] Dep't of Homeland Security (@DHSgov), X (Oct. 14, 2025), https://x.com/DHSgov/status/1978175527329358094.

[200] Connor Greene, *Trump's Department of Homeland Security Embraces a Word with Ties to White Nationalism*, TIME (Oct. 16, 2025), https://time.com/7326233/trump-remigrate-homeland-security/; Chelsea Bailey, *DHS Issued a Call to 'Remigrate.' Here's the History of the Term Often Associated with Far-Right Groups*, CNN (Oct. 19, 2025), https://www.cnn.com/2025/10/19/us/remigrate-dhs-explained; *see also* Center for the Study of Organized Hate, *Remigration: The Rise of a Fringe Idea into the Political Mainstream* (Jan. 20, 2026), https://www.csohate.org/wp-content/uploads/2026/01/Remigration_The-Rise-of-a-Fringe-Idea-into-the-Political-Mainstream_CSOH.pdf (tracing the modern history and meaning of "remigration").

countries and their borders," warning that "immigration and their suicidal energy ideas will be the death of Western Europe."[201]

208. On Thanksgiving in 2025, President Trump posted on social media that he would "permanently pause migration from all Third World Countries," remove noncitizens deemed not to be a "net asset" to the United States, terminate federal benefits for noncitizens, "denaturalize migrants who undermine domestic tranquility," and deport noncitizens "non-compatible with Western Civilization."[202] He also falsely claimed that "most" of the "United States Foreign population" is "on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels." *Id.*

209. In November 2025, President Trump announced, via social media, his intent to terminate TPS for Somalia, even before Somalia's TPS designation was subject to periodic review and where the President is not personally or institutionally authorized to make a TPS determination.[203] Shortly thereafter, he publicly described Somali nationals as "garbage," declaring, "[w]hen they come from hell and they complain and do nothing but bitch, we don't want them in our country."[204] He claimed Somalis were "taking over" Minnesota and that Somali gangs were "roving the streets looking for 'prey.'" *Id.*

210. During a cabinet meeting on December 2, 2025, President Trump also declared: "I don't want [Somalis] in our country. Their country is no good for a reason. Their country stinks. And we don't want them in our country. I could say that about other countries too . . . We don't want them."[205]

---

[201] *Trump Speaks at U.N.*, REV, https://www.rev.com/transcripts/trump-speaks-at-un (last visited Dec. 18, 2025).

[202] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Nov. 27, 2025), https://truthsocial.com/@realDonaldTrump/posts/115625427648743414.

[203] Nicholas Bogel-Burroughs, *supra* note 111.

[204] *See* Zolan Kanno-Youngs & Shawn McCreesh, *supra* note 112.

[205] Associated Press, *WATCH: Trump Says He Doesn't Want Somali Migrants in the U.S., Calls People 'Garbage'*, PBS News (Dec. 2, 2025), https://www.pbs.org/newshour/politics/watch-trump-says-he-doesnt-want-somali-migrants-in-the-u-s-calls-people-garbage.

211. In December 2025, the President expanded his travel ban to thirty-nine countries, including additional TPS-designated countries like Syria and South Sudan.[206] Consistent with the administration's animus towards non-European immigrants and TPS holders, USCIS has frozen pending benefit requests from nationals of these countries and directed officers to re-review already approved benefits, thus preventing TPS holders with pending immigration applications from obtaining permanent or otherwise stable status.[207]

212. While discussing his expanded travel ban at a rally on December 9, 2025, President Trump declared that he had "announced a permanent pause on Third World migration, including from hellholes like Afghanistan, Haiti, Somalia and many other countries."[208] In response to an individual in the audience who called out, "shithole," President Trump subsequently confirmed and reiterated comments he made during his first administration denigrating immigrants, including Haitian TPS holders, from what he described as "shithole countries."[209] He asked: "Why can't we have some people from Norway, Sweden – just a few – let us have a few. From Denmark – do you mind sending us a few people? Send us some nice people." *Id.* He contrasted these European countries with "places that are a disaster [like Somalia]" which are "filthy, dirty, disgusting, ridden with crime." *Id.*

213. In late December, President Trump again denigrated Somalians, describing Somalia as "perhaps the worst, and most corrupt, country on earth" and claiming that "[m]uch of the Minnesota Fraud, up to 90%, is caused by people that came into our Country, illegally, from

---

[206] Proclamation No. 10998, *supra* note 154.

[207] USCIS Memorandum, Hold and Review of All Pending Asylum Applications and All USCIS Benefit Applications Filed by Aliens From High Risk Countries, PM 602-0192 (Dec. 2, 2025); USCIS Memorandum, Hold and Review of USCIS Benefit Applications Filed by Aliens From Additional High-Risk Countries, PM-602-0194 (Jan. 1, 2026).

[208] *See* Alexandra Marquez, *supra* note 114.

[209] *See* Daniel Dale, *Almost Eight Years Later, Trump Confirms He Used the Phrase "Shithole Countries*", *supra* note 115.

Somalia" and echoing earlier claims that "Somali gangs are terrorizing the people of that great State, and BILLIONS of Dollars are missing."[210]

214. On January 21, 2026, the Department of State paused the issuance of all immigrant visas to applicants who are nationals of certain countries.[211] Thirteen out of seventeen countries with TPS designations are subject to the pause, including Nepal and Nicaragua. *Id.*

215. Whether or not President Trump's repeated statements disparaging immigrants and people from TPS-designated countries can be described as motivated by race discrimination, or discrimination based on ethnicity or nationality, they clearly demonstrate bare animus toward the populations of people targeted, including TPS holders generally.

216. Coupled with his statements denigrating TPS holders, President Trump's actions—including terminating TPS for over a dozen non-white, non-European countries, providing insufficient notice of termination for people who have lived lawfully in the United States for years, and freezing adjudication of many TPS holders' applications for other immigration relief—demonstrate a naked desire to harm TPS holders and cannot be explained by mere policy preferences or disagreement with the TPS program or its implementation.[212]

**<u>Statements of Trump Surrogates</u>**

217. Like President Trump, prominent officials who exerted influence to ensure that DHS's decision-making process on TPS favored termination also harbor animus, including racial animus, against immigrants perceived as non-white in general and Venezuelans and Haitians in particular. These officials have been motivated by their animosity to intervene in and influence the TPS decision-making process towards termination.

---

[210] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Dec. 31, 2025), https://truthsocial.com/@realDonaldTrump/posts/115814993074933464; Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Nov. 21, 2025), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464.

[211] Dep't of State, *Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public Benefits Reliance* (Feb. 2, 2026), https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-processing-updates-for-nationalities-at-high-risk-of-public-benefits-usage.html.

[212] As of July 2026, only four countries have active, unsuspended TPS designations: El Salvador, Lebanon, Sudan, and Ukraine.

218. For example, Vice President Vance has repeatedly amplified unfounded rumors about Haitian immigrants eating pets. Despite the lack of corroborating evidence, he declared that if he "ha[s] to create stories" about Haitian migrants "so that the American media actually pays attention to the suffering of the American people, then that's what I'm going to do."[213]

219. Additionally, Vice President Vance disparaged Haitian TPS holders with longstanding stereotypes[214] of immigrants as dangerous criminals and spreaders of disease. He accused Haitians in Springfield of triggering "a massive rise in communicable diseases, rent prices, car insurance rates, and crime," stating "[t]his is what happens when you drop 20,000 people into a small community."[215] He specifically stated that Haitians caused "TB and HIV" to be "on the rise."[216]

220. Stephen Miller, Deputy Chief of Staff to the President, has long expressed support for white nationalism, "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[217] Miller lauded historical immigration laws that imposed quotas based on

---

[213] Kit Maher & Chris Boyette, *JD Vance Defends Baseless Rumor About Haitian Immigrants Eating Pets*, CNN (Sept. 15, 2024), https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv/index.html; *see also* Rachel Leingang, *Republicans Spread Baseless Slurs about 'Cat-Eating Migrants' in Ohio City*, THE GUARDIAN (Sept. 9, 2024), https://www.theguardian.com/us-news/article/2024/sep/09/republicans-haitian-migrants-pets-wildlife-ohio.

[214] Dkt. 22 ¶¶ 20, 22, 23, 25 (expert declaration of Professor Elliott Young tracing the historical use of these tropes).

[215] J.D. Vance (@JDVance), X (Sept. 13, 2024), https://x.com/jdvance/status/1834584115825226087?s=46; *see also* WCNC, *JD Vance Has Heated Exchange Over Claims Migrants Are Eating Pets in Ohio*, YOUTUBE (Sept. 11, 2024), https://www.youtube.com/watch?v=LqjLoSNkyDs ("That small migrant community has caused a lot of problems. It's led to higher rates of communicable diseases, that's a verifiable fact. It's led to animals disappearing, many of my constituents have said that has been happening.").

[216] J.D. Vance (@JDVance), X (Sept. 10, 2024), https://x.com/jdvance/status/1833505359513661762?s=46.

[217] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SOUTHERN POVERTY LAW CENTER (Nov. 12, 2019), https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails.

racist assumptions.[218] For years, Miller promoted the ideas that non-white immigrants were uniquely violent and targeted Americans with that violence.[219]

221. Miller has been described as an "early architect[] of the Trump administration's immigration policies," and has prioritized curtailing both legal and illegal immigration.[220] When he was the senior advisor to the President during Trump's first term in office, Miller repeatedly called DHS officials to urge termination of TPS.[221] In November 2025, he wrote on social media that "[a]t scale, migrants and their descendants recreate the conditions, and terrors, of their broken homelands."[222]

222. Secretary of State Marco Rubio, who was purportedly consulted in Secretary Noem's review of the Venezuela and Haiti TPS designations, has demonstrated how Trump surrogates respond to his call to action. In 2022, when he was Senator, Rubio *advocated* for the extension of TPS for Venezuela, calling it "absolutely essential" to avoid a "very real death sentence for countless Venezuelans who have fled their country."[223] He even co-sponsored

---

[218] Adam Serwer, *Trump's White-Nationalist Vanguard*, THE ATLANTIC (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . show Miller praising racist immigration restrictions from a century ago, while bitterly lamenting the law that repealed them.").

[219] Nicole Narea, *Stephen Miller sought to link immigrants to crime and terrorism in private emails to Breitbart,* VOX (Nov. 25, 2019), https://www.vox.com/policy-and-politics/2019/11/12/20961458/stephen-miller-white-supremacist-anti-immigrant-emails-breitbart-southern-poverty-law-center.

[220] THE CHARLIE KIRK SHOW, *Sweeping Raids, Mass Deportations: Donald Trump's 2025 Plan to Fix the Border* (Nov. 14, 2023), https://thecharliekirkshow.com/podcasts/the-charlie-kirk-show/sweeping-raids-mass-deportations-donald-trumps-202; *see also* Lauren Villgran, *Who is Stephen Miller, architect of Donald Trump's mass deportation plans?*, USA TODAY (Nov. 25, 2024), https://www.usatoday.com/story/news/politics/elections/2024/11/21/stephen-miller-trumps-mass-deportation-architect/76260908007/; Elliot Spagat, *Trump picks a pair of experienced advisers motivated to carry out his immigration crackdown*, ASSOCIATED PRESS NEWS (Nov. 12, 2024), https://apnews.com/article/immigration-deportation-homan-miller-trump-border-abb1a75497d11c978c369cb20016eecb.

[221] *See Ramos*, 336 F. Supp. 3d. at 1098.

[222] Hamed Aleaziz, *Stephen Miller Cites Children of Immigrants as a Problem*, N.Y. TIMES (Dec. 23, 2025), https://www.nytimes.com/2025/12/23/us/politics/stephen-miller-trump-immigrants.html.

[223] Senators Marco Rubio & Robert Menendez, *Letter to Secretary Alejandro Mayorkas* (Mar. 31, 2022), https://www.foreign.senate.gov/imo/media/doc/menendez-rubio-letter-to-dhs-re-venezuela-tps-april12022.pdf.

legislation to redesignate TPS for Venezuela.[224] However, more recently, Secretary Rubio embraced President Trump's racist talking points about Venezuela, espousing in 2024 the "exaggerate[ed]" depiction of Tren de Aragua as "an invading criminal army from a prison in Venezuela that has spread their brutality and chaos to U.S. cities and small towns."[225]

**The Trump Administration's Previous Racist Attempts to End TPS**

223. This is not the first time that an administration guided by President Trump has embarked on an unlawful campaign to destroy TPS in violation of the APA, the Equal Protection Clause, and the Due Process Clause.

224. During President Trump's first term, every federal district court to consider the question found "evidence that President Trump harbors an animus against non-white, non-European aliens which influenced his (and thereby the Secretary's) decision to end the TPS designation[s]" for El Salvador, Haiti, Sudan, and Nicaragua in 2017 and 2018.[226]

225. The evidence adduced in those cases further illustrates that the conduct challenged here is part of a premeditated effort to terminate TPS without regard to applicable law or standards, and to further a racist agenda.[227]

---

[224] *See* Venezuela Temporary Protected Status Act of 2021, S. 50, 117th Cong. (2021-2022).

[225] Charles Larratt-Smith & John Polga-Hecimovich, *How Much of a Threat is Tren de Aragua in the U.S.?*, AMERICAS QUARTERLY (Dec. 9, 2024), https://americasquarterly.org/article/how-much-of-a-threat-is-tren-de-aragua-in-the-u-s/.

[226] *Ramos*, 336 F. Supp. 3d at 1100; *see also Centro Presente*, 332 F. Supp. 3d at 415 ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras); *Saget*, 375 F. Supp. 3d at 372 (finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti).

[227] *See, e.g.*, *Ramos*, 336 F. Supp. 3d at 1101, 1104 (describing how, *i.e.,* "[t]he record evidence indicates that, after receiving Decision Memos from career DHS employees, higher-level DHS employees – *i.e.*, the political appointees – were 'repackaging' the memos in order to get to the President/White House's desired result of terminating TPS"; and how "Acting Secretary Duke expressly acknowledged that the terminations of TPS designations were 'a strong break with past practice,' . . . – designed to fit the President's objectives on immigration which would put 'America first.'"); *Saget*, 375 F. Supp. 3d at 322.

226. Political appointees during the first Trump administration also sought to paint TPS holders as criminals and to manufacture evidence to support this impossible claim—to justify the termination of designations, and the undermining of the TPS program. A federal district court found that Acting Secretary Duke decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute.[228] Acting Secretary Duke specifically sought out a rationale to "separate" out Haiti.[229] Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance, despite the fact that virtually any criminal record is disqualifying for TPS.[230] Secretary Kelly and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest."[231] A federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – *i.e.*, that non-whites commit crimes and are on the public dole."[232]

227. During President Trump's first term in office, the pressure from President Trump and the White House on the DHS Secretary's TPS decision-making was less evident and public than here. The federal district court nonetheless found that "Acting Secretary Duke's writings suggest that she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS."[233] There, Acting Secretary Duke, in separate personal writings, expressed that her TPS decision-making was based on "an America first view," a term that invoked then-President Trump's racist views preferring immigration from majority-white

---

[228] *Saget*, 375 F. Supp. 3d at 343, 347–48, 359–62.

[229] *Id.*

[230] *Ramos*, 336 F. Supp. 3d at 1104–05; *Saget*, 375 F. Supp. 3d at 307–09.

[231] 8 U.S.C. §§ 1254a(c)(2)(B), § 1254a(b)(1)(C); *Saget*, 375 F. Supp. 3d at 353.

[232] *Ramos*, 336 F. Supp. 3d at 1105.

[233] *Id.* at 1099.

European countries.[234] Here, by contrast, Secretary Noem has included President Trump's "America First" objectives expressly in the published Federal Register notice terminating TPS.

**THE TERMINATION OF TPS STATUS IMPOSES EXTRAORDINARY AND IRREPARABLE HARM ON TPS HOLDERS, THEIR FAMILIES, AND THEIR COMMUNITIES**

228. More than 1.1 million TPS holders will lose TPS status as a result of Defendants' vacaturs and terminations. The scale of the harm wrought by Defendants' actions to eliminate TPS protection for Venezuelans and Haitians will be massive if not reversed.

**Loss of Legal Status, Employment Authorization, and Drivers' Licenses**

229. TPS holders are facing the loss of legal status, and as a result, are already being forced to make the impossible choice whether to return to a country in crisis, remain in the United States without lawful immigration status, or uproot themselves again to try to find refuge in some third country. For most, this is hardly a choice at all. Venezuelan and Haitian TPS holders cannot safely return to their countries of origin.[235]

230. Moreover, due to the lack of diplomatic relations between the United States and Venezuela, Venezuelan TPS holders without valid passports lack the requisite documentation to travel voluntarily to Venezuela or a third country.[236]

---

[234] *Id.* at 1099–1100, 1104; Brief of Amici Curiae, The Anti-Defamation League, *et al.*, *Ramos v. Nielsen,* Case No. 18-16981, ECF No. 31 at 21 (9th Cir. Feb. 7, 2019).

[235] Both Venezuela and Haiti have the highest level "Do Not Travel" advisories from the U.S. government due to serious security risks, instability, and lack of health care infrastructure. *See, e.g.*, *Venezuela*, U.S. STATE DEPARTMENT BUREAU OF CONSULAR AFFAIRS (Sep. 24, 2024), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Venezuela.html; *Haiti*, U.S. STATE DEPARTMENT BUREAU OF CONSULAR AFFAIRS (Sep. 18, 2024), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html.

[236] *A Painful Passport Paradox Is Trapping Venezuelans Living Abroad*, BLOOMBERG, Oct. 14, 2024, https://www.bloomberg.com/news/articles/2024-10-14/venezuela-election-fallout-traps-migrants-in-passport-limbo.

231. The U.S. Federal Aviation Administration has a flight ban to Haiti, and numerous airlines have indefinitely suspended flights to Haiti, in light of security risks from armed gangs and planes being hit by gunfire while attempting to land.[237]

232. Without TPS, many Venezuelans and Haitians will be at immediate risk of deportation to unsafe countries. Venezuela has experienced an exodus of one-fourth of its population in the past decade. Thousands of refugees have also fled Haiti, as it suffers from political chaos, severe gang violence, systemic human rights violations, and widespread deprivation of basic healthcare, clean drinking water, and food supplies.

233. Some Venezuelan and Haitian TPS holders may currently be seeking other legal avenues to remain in this country (such as asylum or adjustment of status). However, due to the yearslong asylum backlog, affirmative asylum applications remain long-pending, and do not guarantee an individual protection from either detention or deportation in the interim. Defendants' actions also threaten detention and deportation for TPS holders who do not presently have alternative paths to legal status, even though TPS was established expressly to serve this population—individuals who cannot safely return but may not fit the specific legal requirements of asylum. The loss of TPS in some instances also limits the possibility of acquiring a permanent legal status for which an individual would otherwise be eligible, but for which present legal status is a prerequisite.[238] TPS holders who lose their status may also face a years-long statutory bar to re-entry whether they depart on their own or are deported.[239]

234. Venezuelan and Haitian TPS holders also face the prospect of losing employment authorization. This may result in their summary dismissal from their place of work, jeopardizing their and their families' financial stability. Without stable employment, some TPS holders risk

---

[237] *FAA Extends US Flight Ban to Haiti's Capital Through Summer 2025*, THE HAITIAN TIMES, Mar. 12, 2025, https://haitiantimes.com/2025/03/12/faa-extends-u-s-flight-ban-to-haitis-capital-through-summer-2025/, Tania Francois, *FAA Prohibits Flights to Haiti for 30 Days After 3 Jets Hit By Gunfire*, CBS NEWS, Nov. 13, 2024, https://www.cbsnews.com/miami/news/airlines-cancel-flights-to-haiti-after-two-planes-were-hit-by-gunfire/.

[238] *See* Temporary Protected Status: An Overview, AMERICAN IMMIGRATION COUNCIL (Jan. 2025), https://www.americanimmigrationcouncil.org/sites/default/files/research/temporary_protected_status_-_an_overview_1-16-2025.pdf (noting some TPS recipients may be eligible to adjust status).

[239] 8 U.S.C. 1182(a)(9)(A)(ii), (B)(i)(II).

losing their homes or other material assets, leading to further economic harm. Many Venezuelan and Haitian TPS holders also face the imminent loss of their drivers' licenses and, with them, their mobility and freedom of movement, because in many states drivers' licenses are limited to those with legal status.[240] Moreover, because the Secretary's termination decision goes into effect so quickly, Venezuelan TPS holders have been afforded almost no time to make alternative arrangements for themselves and their families, including by applying for other forms of immigration relief, employment authorization, or drivers' licenses for which they are eligible.

**Other Harms to TPS Holders: Family Separation, Psychological Harm, and Stigma**

235. The loss of legal status renders TPS holders vulnerable to separation from U.S. citizen children and other loved ones. There are many Venezuelan and Haitian TPS holders in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens or Green Card holders. These TPS holders face the risk of being forced to leave their family members behind, or bringing their U.S. citizen children (or other family members) to a country in economic and political ruin, where severe repression is pervasive.

236. Venezuelan and Haitian TPS holders have been experiencing tremendous emotional and psychological harm since the challenged decisions. This has resulted in heightened anxiety, trauma, insomnia, and depression, in some cases severe enough to result in acts of self-harm. The psychological harms resulting from Defendants' actions will only increase as the effective date approaches.

237. Venezuelan and Haitian TPS holders have also suffered the additional constitutional harm of being subject to an administrative action motivated by racial, ethnic, or national-origin discrimination. Many describe the emotional pain of being subjected to racist attacks by high-ranking U.S. government officials. Some also live in fear of leaving the house, speaking their native language, or disclosing their nationality due to the racist targeting of Venezuelans, Haitians, and other non-white migrants.

---

[240] *See, e.g.*, California DMV, REAL ID Checklist, https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

**Harm to Plaintiffs**

238. **Plaintiff National TPS Alliance** has over 130,000 Venezuelan and Haitian TPS holder members. These members are anxious and desperate. Many are making plans to sell homes and cars, end leases, and collect their belongings in preparation to leave the country, if needed. But they do not believe they can safely return to Venezuela or Haiti because they remain politically unstable, unsafe, and repressive, and because the economies of these countries are in total collapse. If the United States will not allow them to stay, they do not know where they will go or what they will do. Among them:

a) NTPSA member **A.V.** has TPS under Venezuela's 2023 designation. He lives in Alabama and works full-time on the night shift at an auto parts manufacturer. As the 2024 presidential election drew near, A.V. began struggling with severe anxiety and fears that he would lose his TPS status. News reports about President Trump's plans to deport all immigrants awakened a deep sense of dread in him, as he is terrified to return to Venezuela. As a result of Defendants' actions, in April 2025 he faces the loss of his job, driver's license, and legal right to remain in the United States. His uncle, uncle's wife, and their three-year-old son all rely on TPS. Another cousin relies on TPS, and lives with her two U.S. citizen children.

b) NTPSA member **M.R.** has TPS under Venezuela's 2021 designation. She lives in West Virginia and works two jobs—full-time in the health care sector and part-time at McDonald's. She is the sole provider for her two minor children and elderly mother. As a result of Defendants' actions, in September 2025 M.R. faces the loss of her legal status, work authorization, and driver's license, as well as health care for her chronically ill daughter and mother. Her twelve-year-old daughter and elderly mother also rely on TPS for their legal status; her five-year-old daughter is a U.S. citizen and faces the prospect of being separated from her family if their TPS is terminated.

c) NTPSA member **Laura Guerrero** has TPS under Venezuela's 2021 designation. She has been waiting over nine years with a pending asylum application. She fears being in limbo—with limited access to employment, without legal status, and at risk of deportation—if her

TPS is terminated. Her elder daughter, a TPS holder, is currently in her first year as an undergraduate at a prestigious music school, but stands to lose the full scholarship that TPS affords her. Laura has suffered panic attacks since the vacatur announcement.

d) NTPSA member **C.D.**, a 60-year-old father of three, holds TPS under Venezuela's 2021 designation. He lives in Houston, Texas with his wife, where they own their home. They have consistently paid their taxes. C.D. works for a temporary staffing agency and was recently diagnosed with prostate cancer. If, due to Defendants' actions, he loses his TPS in September 2025, he will lose his job and be unable to pay for his mortgage and health care, which would be economically devastating for him and his wife. Losing TPS would also expose C.D. to the risk of being deported from the United States, which would inflict many harms, including preventing him from accessing the medical care he needs to treat his cancer.

e) NTPSA member **Stanley Louis** holds TPS under Haiti's 2023 designation. Stanley became an orphan at the age of seven. He is now 40 years old and lives in Seattle, Washington where he studies International Business and Trade at a local college. Stanley applied to extend his TPS pursuant to the July 2024 extension and received TPS-related documentation confirming his legal status and work authorization through February 3, 2026. However, the partial vacatur purports to move up the expiration date for his work authorization and lawful status to August 3, 2025. Stanley recently interviewed for a security position at the airport but can no longer accept the job because it requires employment authorization valid for at least six months, which Stanley can no longer show. Stanley is afraid that Secretary Noem will terminate TPS for Haiti, as she did with Venezuela, regardless of conditions in Haiti that make it impossible for Stanley to safely return. TPS is Stanley's only source of work authorization and protection against deportation.

f) **D.F.** is 28 years old, a member of NTPSA, and lives in the Northeast. Born in Haiti, she has resided in the United States since the age of nine and has had TPS since 2010. Her mother, father, sister, and several other relatives also rely on TPS. She has one younger brother who

is a U.S. citizen. D.F. holds a Bachelor's degree in health science and a Master's degree in healthcare administration. She worked full time to put herself through undergraduate and graduate school, and now works as a program manager for a mobile healthcare unit, providing medical and dental care to underserved populations in the state she now calls home. TPS is what has allowed D.F. to work, obtain an advanced degree, and pursue a meaningful and impactful career in community healthcare. She has no other form of protection or relief from deportation. If she loses her TPS status, D.F.'s career will be irreparably harmed as she will be unable to continue working. She will be left without a means to support herself, and many of her family members will be in similarly desperate circumstances. At the same time, D.F. feels it is impossible for her to return to Haiti, where the current government, unable to protect the people who live there, is obviously incapable of safely receiving the hundreds of thousands of Haitians who have been residing in the United States under TPS.

g) **J.P.L.** is a 24-year-old Haitian TPS holder and NTPSA member who resides in Florida. She speaks four languages, is employed as a paralegal, and hopes to someday become an attorney. TPS is her only protection from deportation. She has several family members in the United States, including her grandparents who are U.S. citizens. Her husband is also a TPS holder. If TPS for Haiti is terminated in August, J.P.L. will no longer be able to work to support herself in the United States and will be left with no legal status. However, J.P.L. cannot safely return to Haiti. There, she experienced violence and threats and the police refused to protect her. Since the decision to shorten the timeframe of TPS for Haiti was announced, J.P.L. has been experiencing constant fear and anxiety, making it hard to focus on her work, education, and even her personal well-being.

h) **B.P.** is a Haitian TPS holder and member of the NTPSA. He has lived in the Northeast since 2021 with his family. He sought asylum at the border with his wife and son and has a pending asylum application with USCIS. B.P. and his wife received TPS in 2023 and extended their TPS in 2024. Their son is enrolled in elementary school, where he has quickly learned English and made friends. Their family welcomed a daughter in 2023. Now

15 months old, B.P.'s daughter is a U.S. citizen. B.P. was working at a gas station until he became sick. He is currently receiving medical treatment for a neurological issue—treatment he believes would be impossible to access in Haiti. His wife is a home health aide, providing vital care to seniors. If B.P. and his wife lose their TPS, they would be vulnerable to detention and deportation proceedings, risking family separation. B.P. and his wife cannot go back to Haiti, a country their children do not know and where they believe their lives would be in danger. B.P. struggles to sleep at night thinking about what his family will do if they lose TPS.

i) **Esther** (a pseudonym) is a Haitian TPS holder and member of the NTPSA. She was lawfully admitted to the U.S. on a tourist visa with her family before the COVID-19 pandemic. Shortly after arriving, Esther's young brother got very sick and was diagnosed with multiple sclerosis, a chronic disease that can be debilitating, especially without treatment, which he would not be able to receive in Haiti. Then the pandemic unfolded, and travel became impossible. Esther's brother relies on TPS to qualify for his health insurance, which covers his chronic care, helping him manage his symptoms enough to graduate high school this year. Esther's mother relies on her work authorization to support the family. Esther also relies on her work authorization to support herself and save to go back to school. After taking English classes and other general education requirements, Esther was accepted into a nursing program last fall. She accepted the offer based on her eighteen-month TPS extension, assured she would be able to complete at least the first year of the program under her current TPS status. Now she faces the uncertainty that she could lose her TPS after just one semester, putting into jeopardy all of her hard work.

239. **Plaintiff Mariela González**, a long-time educator, has lived in the United States for fourteen years and is currently employed by an urban school district. She faces termination of her legal status and work authorization in September 2025 as a result of Defendants' actions. She lacks a valid passport and could not legally travel even if she could safely return to Venezuela, which she cannot. Moreover, all of Mariela's immediate family—her parents, siblings, and nephews—reside in the United States and have permanent status.

240. **Plaintiff Freddy Jose Arape Rivas** fled Venezuela due to worsening conditions, including rising repression and violence against opposition members, and a collapsing economy where it became impossible to obtain basic necessities. He works in the IT sector in Texas. He will lose his legal status, employment authorization, and driver's license in April 2025 as a result of Defendants' actions. He also fears he will lose the possibility of an H-1B visa, for which he has a pending application through his employer, because he has been told he will no longer be eligible without lawful status.

241. **Plaintiff M.H.** lives in Tennessee, graduated from a Venezuelan university with a nursing degree, and is currently the primary caregiver for her two children—the elder a TPS holder, and the younger a U.S. citizen with severe asthma. M.H.'s husband works full-time for a government subcontractor. M.H.'s two-year-old son faces an uncertain fate should TPS be terminated—unable to live safely in Venezuela, particularly with a serious and chronic health condition, but facing the possibility of being separated from his mother and sister following the termination of their TPS in April 2025 as a result of Defendants' actions. M.H. has a mandatory check-in with ICE in May 2025, the month after she is scheduled to lose her TPS.

242. **Plaintiff Cecilia González Herrera** came to the United States in 2017, at the age of 18, and has lived her entire adult life in this country. She was a student activist in Venezuela, and now attends university and works as a voting rights advocate in Florida. Her mental health has suffered as a result of Defendants' actions, and she faces the loss of the ability to pay in-state tuition for university, which TPS affords her. She has also abandoned the prospect of postgraduate education as a result of the uncertainty created by the termination announcement. And because of Defendants' repeated statements targeting Venezuelans as "dirtbags" and gang members, she feels unwanted in a country that has been her home for eight years.

243. **Plaintiff Alba Cecilia Purica Hernández** is a childcare provider in San Leandro, California. Her deportation proceedings were terminated on account of her TPS registration. However, she risks losing her legal status and employment authorization in April 2025 as a result of Defendants' actions. She cannot safely return to Venezuela. Nor can she practically return as she lacks a valid Venezuelan passport. Alba has felt sad, scared and adrift since the announcement

of the termination of TPS for Venezuela, and feels that the decision is reflective of a perception at the highest levels of the U.S. government that Venezuelans and non-white migrants are less than human.

244. **Plaintiff E.R.** and her twelve-year-old daughter live in New York where E.R. works the night shift in a makeup packaging factory to be able to take her daughter to and from school. E.R. has legal status and employment authorization only through TPS and risks losing her employment on April 2, 2025 as a result of Defendants' actions. She is the sole provider for her twelve-year-old daughter, who also has TPS. As a result of an accident which required her to get twenty staples in her head, E.R. requires medical care which she would not be able to get in Venezuela. She and her daughter have a mandatory check-in with ICE in June 2025, two months after they are scheduled to lose their TPS status.

245. **Plaintiff Hendrina Vivas Castillo** is a mother and former business owner who works as a delivery driver in Los Angeles, California. In Venezuela, the economic crisis forced her to shut down her business and she faced mounting political repression, including the arrest of her business's co-owner. As a result of Defendants' actions, she risks losing her TPS and employment authorization in April 2025. Hendrina is terrified of going back to Venezuela and does not know what she will do if her TPS is terminated.

246. **Plaintiff A.C.A.** is a Haitian TPS holder in Florida who has lived in the United States for fifteen years, including as a high school student and during his entire adult life. A.C.A. has many family members in the United States. His mother and two brothers are all U.S. citizens or lawful permanent residents. His U.S. citizen brother filed a visa petition for A.C.A., but due to the backlog, it will be many years before he is eligible to apply for a green card. A.C.A. works in healthcare administration and relies on TPS for his work authorization as well as his legal status. He is currently in college studying accounting at a public university and also relies on TPS for in-state tuition, covered by a full scholarship. Florida Governor Ron DeSantis recently signed a law prohibiting undocumented students from paying in-state tuition at Florida colleges and universities. As a result, higher education would be prohibitively expensive for A.C.A. if he were to lose his TPS status because of Defendants' actions. A.C.A. is afraid to return to Haiti due to the

violence and instability which has not abated in the fifteen years since he left. Since the decision to shorten the timeframe for TPS for Haiti was announced, he has been experiencing severe anxiety and nightmares about being deported.

247. **Plaintiff Sherika Blanc** lives in Kentucky. She has four U.S. citizen children and is married to a U.S. citizen. Sherika also has other family in the United States, including her parents, who have TPS, and a brother who has applied for a green card. She is now 34 years old, and has not returned to Haiti since she was eight. Sherika has had TPS or DACA since 2010. Her TPS status provided her with the opportunity to work, buy a car, rent a house, and raise a family in the United States. She is a certified nursing assistant and works as a medical coordinator. She also owns her own nail salon. Sherika is a primary financial supporter for her daughters and depends on TPS for her work authorization, in addition to her legal status. Without TPS, Sherika would not be able to provide for her four U.S. citizen children. If she is unable to remain in the United States, Sherika would be forced to choose between leaving her U.S. citizen children and husband behind and returning to Haiti alone, or bringing her family to Haiti to live under the constant threat of deadly gang violence while facing conditions of crippling poverty and food and housing insecurity. Sherika was a plaintiff in *Ramos v. Nielsen*.

248. **Plaintiff Viles Dorsainvil** has been a resident of Springfield, Ohio since 2021 and a TPS holder from Haiti. He is the director and co-founder of the Haitian Community Help & Support Center, a nonprofit founded to assist the Haitian immigrant community in Springfield. Viles holds a Master of Divinity degree from The United Theological College of the West Indies in Jamaica and served as the Executive Director of the Haitian Association of the United Nations for seven years. Viles is deeply committed to advancing the well-being of immigrants and refugees, particularly the Haitian community in Clark County, Ohio. In 2024, when, as candidates, Vice President J.D. Vance and President Trump began spreading false accusations about the Haitian immigrant community in Springfield, Viles saw and felt the harm, fear, and threats of violence that followed. He felt compelled to speak out and publicly denounced the hate and racism that Trump and his supporters aimed at Haitian immigrants. Viles, like many of the community members served by the Haitian Community Help & Support Center, relies on TPS for work

authorization and protection from deportation. If TPS for Haiti is terminated, Viles will lose the ability to work and live in the United States. However, he fears returning to Haiti, where widespread violence makes it impossible to live and work safely.

249. **Plaintiff G.S.** is a Haitian-trained medical doctor who works as a housing case manager for the State of Massachusetts, providing essential housing assistance to low-income residents of the state. If TPS for Haiti expires in August, G.S. will lose his protection from deportation and only form of legal status in the United States. However, he fears returning to Haiti, having left his country due to widespread gang violence. The uncertainty of his TPS status has left G.S. feeling hopeless and drained of motivation.

**Harm to Communities and the Public**

250. TPS holders are an integral part of the economic and social fabric of U.S. communities, and they give back to the country in countless ways. Venezuelan and Haitian TPS holders are health care providers, factory workers, engineers, agricultural workers, childcare providers, educators, and students. They are active in civic life and volunteer at schools, neighborhood and work organizations, and religious institutions. They pay federal, state, and local taxes, and support government social welfare programs. Summarily withdrawing hundreds of thousands of people from the workforce will strain the social safety net and have economic repercussions on citizen and noncitizen communities alike.

251. Recognizing the diverse public benefits of designating countries for TPS when they are in the midst of crisis, the mayors of 33 cities urged Secretary Mayorkas in 2023 to extend TPS for Venezuela and other countries. Among the public benefits these local leaders emphasized were adding eligible workers to the workforce, taking pressure off the social safety net by allowing beneficiaries to secure work and be self-sufficient, and helping to clear the asylum backlog.[241]

252. In this litigation, 17 states and the District of Columbia ("the Amici States")—collectively home to at least 99,900 Venezuelan immigrants—filed an amicus brief in support of postponing the effective date of the Venezuela vacatur pending adjudication of Plaintiffs'

[241] Letter from Cities for Action Mayors to Secretaries Mayorkas and Blinken (Sept. 6, 2023), https://www.citiesforaction.us/expand_tps_protections.

claims.[242] The Amici States explain that the public interest favors postponement because Defendants' actions would inflict massive harm.[243] First, the unlawful vacatur would separate families, "devastate children," and "fracture Amici States' communities and schools."[244] The Amici States note that, as of 2022, "approximately 54,000 U.S. citizen children and 80,000 U.S. citizen adults [throughout the United States] lived with a Venezuelan TPS holder."[245] Thus, over "130,000 U.S. citizens lived in 'mixed status' households with [Venezuelan] individuals whom DHS seeks to unlawfully strip of their legal status—and this figure does not account for the hundreds of thousands of Venezuelans who were newly eligible under the 2023 designation."[246] Deportations of TPS members would directly tear apart families, schools, and communities while burdening U.S. citizen children with "financial instability, housing and food insecurity, and disruptions in their education."[247] Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones. Such fear can cause members of affected communities—"including those born in the United States"—to refrain from important activities such as driving, attending religious services, participating in afterschool activities, and seeking medical care.[248]

253. Second, the Amici States emphasize that the unlawful Venezuela vacatur would deplete their economies and workforces.[249] They estimate that "[t]he annual economic contribution of TPS-eligible Venezuelans is $11.5 billion."[250] Moreover, they note that "TPS holders from all countries [including Venezuela, Haiti, and other nations] paid $3.1 billion in federal taxes, contributing to programs like Social Security and Medicare, and paid $2.1 billion in

---

[242] Dkt. 62 at 2.
[243] *Id.* at 3.
[244] *Id.* at 4 (cleaned up).
[245] *Id.*
[246] *Id.*
[247] *Id.* at 4–6.
[248] *Id.* at 5–7.
[249] *Id.* at 7.
[250] *Id.*

state and local taxes."[251] Unlawfully eliminating TPS designations threatens these valuable contributions.

254. Third, the Amici States stress how Defendants' actions would compromise public health and increase health care costs.[252] They explain that eliminating hundreds of thousands of TPS holders' work authorizations "would deprive many of those individuals and their families of their employer-sponsored health insurance," thus increasing the number of people on public health insurance and "increasing public expenditures on emergency care provided to uninsured patients."[253] Moreover, the aforementioned fear of deportation would harm public health by discouraging former TPS holders from seeking treatment or preventative care (including vaccinations).[254]

255. Fourth, the Amici States highlight how Defendants' unlawful actions and the resulting fear of deportation would inflict yet another harm: undermining law enforcement.[255] "Fear of removal, or of having a family or community member removed, makes victims and witnesses reluctant to come forward, to testify in court, and even to seek safety in a domestic violence shelter."[256] The Amici States point out that "[w]hen law enforcement is unable to obtain evidence of crimes and maintain witness cooperation at trial, public safety suffers."[257]

256. TPS for Venezuela and Haiti is serving the exact purpose intended by Congress—providing nationality-based humanitarian immigration relief due to the severe instability of these countries, regardless of whether individuals meet the narrow eligibility requirements for other forms of humanitarian protection, such as asylum.[258]

---

[251] *Id.* at 8.

[252] *Id.* at 9–12.

[253] *Id.* at 9.

[254] *Id.* at 10–12.

[255] *Id.* at 12–13.

[256] *Id.* at 12.

[257] *Id.*

[258] *See generally* Brief of Amici Curiae, Immigration Law Scholars, *Ramos v. Nielsen,* Case No. 18-16981, ECF No. 30-2 at 2 (9th Cir Feb. 7, 2019).

## CLAIMS FOR RELIEF

### FIRST CLAIM

### Violation of the Administrative Procedure Act (Venezuela Vacatur)

### (*Plaintiff NTPSA and Individual Venezuelan Plaintiffs Against All Defendants*)

257. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

258. The Administrative Procedure Act[259] ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."[260] Judicial review is generally limited to "final agency action for which there is no other adequate remedy in a court."[261]

259. The APA empowers the federal courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law."[262] The right of review under the APA includes a right to judicial review of "legal question[s] of statutory authority,"[263] and review of "executive agency action for procedural correctness."[264] To engage in procedurally appropriate decision-making, an agency must ordinarily "display awareness that it *is* changing position."[265] Agencies "may not . . . depart from a prior policy *sub silentio* or simply disregard

[259] 5 U.S.C. 701 *et seq.*

[260] 5 U.S.C. 702.

[261] 5 U.S.C. 704.

[262] 5 U.S.C. 706(2)(A), (C), (D).

[263] *In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1222 (9th Cir. 2019).

[264] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

[265] *Id.* at 515.

rules that are still on the books."[266] And the APA requires a "more detailed justification . . . for disregarding facts and circumstances that underlay . . . the prior policy."[267]

260. Defendants' February 3, 2025 vacatur of the TPS extension for Venezuela constitutes "final agency action for which there is no other adequate remedy in a court," pursuant to 5 U.S.C. 704, because the Defendants' vacatur has resulted in all of the individual Venezuelan Plaintiffs and tens of thousands of members of Plaintiff NTPSA losing TPS protection until October 2026, which had been granted to them pursuant to the January 17, 2025 extension, "automatically and without further notice or right of appeal."[268]

261. Defendants' vacatur of the TPS extension decision made on January 17, 2025 exceeded their statutory authority and was arbitrary and capricious, contrary to law, pretextual, and deviated from past practice, including because, among other things:

a) The TPS statute carefully regulates the length of TPS extensions, the conditions under which TPS may be terminated, and the timetable for doing so. Defendants had no authority to annul a TPS extension under the timetable and procedures they utilized here.

b) Defendants objected to the January 2025 extension for allowing 2021 TPS holders to re-register under the 2023 extension, but failed to consider that 2021 TPS holders were necessarily eligible for TPS under the 2023 designation as well.[269]

c) Defendants' decision rested on a misinterpretation of the TPS statute's flexible registration requirements and failed to "consider the alternatives that are within the ambit of the existing policy" before vacating the January 17, 2025 extension in its entirety.[270]

---

[266] *Id.*

[267] *Id.* at 515–16.

[268] 8 C.F.R. 244.19.

[269] *See San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 100 F.4th 1039, 1055–56 (9th Cir. 2024) ("An agency action is arbitrary and capricious if . . . the agency has . . . entirely failed to consider an important aspect of the problem.") (citation omitted).

[270] *DHS v Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up, citation omitted); *see Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case[.]").

d) The decision assumed that TPS designations, including the 2023 Venezuela Designation, are themselves illegal.

e) The decision assumed that TPS holders are present in the United States illegally.

f) The decision presupposed that prior TPS designations or extensions can be rescinded merely because of policy disagreements between administrations.

g) The decision occurred under circumstances and a timeline that reflect that it was pretextual.[271]

h) To the extent Defendants engaged in any process, it was so deficient as to amount to no process at all, defeating the purpose of the TPS statute and deviating from past practice and rules regarding the applicable process.

262. Venezuelan Plaintiffs (including Venezuelan NTPSA members) will suffer irreparable injury from the unlawful vacatur.

**SECOND CLAIM**

**Violation of the Administrative Procedure Act (Venezuela Termination)**

**(*Plaintiff NTPSA and Individual Venezuelan Plaintiffs Against All Defendants*)**

263. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

264. The order terminating the 2023 TPS designation for Venezuela constitutes "final agency action for which there is no other adequate remedy in a court" under 5 U.S.C. 704 because it will result in TPS holders' loss of TPS "automatically and without further notice or right of appeal."[272]

265. Defendants' termination of the 2023 Venezuela Designation exceeded their statutory authority and was arbitrary and capricious, contrary to law, pretextual, and deviated from past practice, including because:

---

[271] *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 784–85 (2019) (reversing agency action because stated reason for decision was pretextual).

[272] 8 C.F.R. 244.19.

a) The decision assumed that TPS designations, including the 2023 Venezuela Designation, are illegal.

b) The decision assumed that TPS holders are present in the United States illegally.

c) The decision relied entirely on a determination that an extension of TPS would be "contrary to the national interest," but that factor is only relevant at the time of designation; it is not a valid consideration when assessing whether to extend or instead terminate TPS.

d) The research, consultation, and review process leading up to the decision deviated dramatically from past practice without explanation.

e) The decision occurred under circumstances and a timeline that reflect that it was pretextual.[273]

f) To the extent Defendants engaged in any process, it was so deficient as to amount to no process at all, defeating the purpose of the TPS statute.

266. Venezuelan Plaintiffs (including Venezuelan NTPSA members) will suffer irreparable injury from the unlawful termination.

**THIRD CLAIM**

**Violation of the Administrative Procedure Act (Haiti Partial Vacatur)**

**(*Plaintiff NTPSA and Individual Haitian Plaintiffs Against All Defendants*)**

267. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

268. Defendants' February 24, 2025 partial vacatur of the TPS extension and redesignation for Haiti constitutes "final agency action for which there is no other adequate remedy in a court," pursuant to 5 U.S.C. 704, because the Defendants' partial vacatur has cut short the TPS protection that had been granted to all of the individual Haitian Plaintiffs and Haitian TPS holder members of Plaintiff NTPSA pursuant to the July 1, 2024 extension and redesignation, "automatically and without further notice or right of appeal."[274]

---

[273] *Cf. Dep't of Com.*, 588 U.S. at 784–85 (reversing agency action because stated reason for decision was pretextual).

[274] 8 C.F.R. 244.19.

269. Defendants' partial vacatur of the TPS extension and redesignation published in the July 1, 2024 notice exceeded their statutory authority and was arbitrary and capricious, contrary to law, pretextual, and deviated from past practice, including because:

a) Defendants had no authority to annul a TPS extension and redesignation under the timetable and procedures they utilized here.

b) The decision assumed that TPS designations, including the 2024 Haiti redesignation, are themselves illegal.

c) The decision assumed that TPS holders are present in the United States illegally.

d) The decision presupposed that prior TPS designations or extensions can be rescinded merely because of policy disagreements between administrations.

e) The decision assumed prior TPS designations or extensions can be rescinded merely because a new administration deemed prior Federal Register notices insufficiently detailed.

f) The decision assumed that the Secretary has an obligation to explain specifically why the particular length of any TPS extension was chosen.

g) The decision rests on the erroneous legal conclusion that six months is the "default" period for TPS extensions, such that any deviation from it requires separate justification.

h) The decision rests on the erroneous legal conclusion that Secretary Mayorkas was required to consider whether extending Haiti's TPS designation was contrary to the national interest of the United States, when that factor is relevant only to a new designation, not to an extension.

i) The decision assumed that the Secretary has an obligation to specifically explain why a designation is not contrary to the national interest.

j) The decision occurred under circumstances and a timeline that reflect that it was pretextual.[275]

k) To the extent there is any authority to vacate a TPS extension, and to the extent Defendants engaged in any process for review of the prior TPS extension for Haiti, that process was so

---

[275] *Cf. Dep't of Com.*, 588 U.S. at 784–85 (reversing agency action because stated reason for decision was pretextual).

deficient as to amount to no process at all, defeating the purpose of the TPS statute and deviating from past practice and rules regarding the applicable process.

270. Haitian Plaintiffs (including Haitian NTPSA members) will suffer irreparable injury from the unlawful partial vacatur.

**FOURTH CLAIM**

**Violation of the Equal Protection Guarantee of the Due Process Clause of the Fifth Amendment (Venezuela Vacatur, Venezuela Termination, Haiti Partial Vacatur, Haiti July 2025 Termination, Haiti November 2025 Termination)**

**(*All Plaintiffs Against All Defendants*)**

271. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

272. The Fifth Amendment contains an implicit guarantee of equal protection that invalidates any official action that in part reflects a racially discriminatory intent or purpose. Classifications based on race, ethnicity, or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race.[276]

273. Defendants' decisions to vacate the January 2025 TPS extension for Venezuela, terminate the 2023 Venezuela Designation, partially vacate the July 2024 TPS extension and redesignation for Haiti, and terminate the Haiti TPS designation are unconstitutional because they were motivated, at least in part, by intentional discrimination based on race, ethnicity, or national origin.

274. Plaintiffs (including Venezuelan and Haitian NTPSA members) will suffer irreparable injury resulting from the illegal vacatur and termination of the 2023 Venezuela Designation; the illegal partial vacatur of the 2024 Haiti extension and redesignation; and the illegal termination of the Haiti TPS designation.

---

[276] *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

**PRAYER FOR RELIEF**

Plaintiffs ask this Court to grant the following relief:

275. Declare that Defendants' vacatur of the January 17, 2025 TPS extension for Venezuela, purported termination of TPS for Venezuela on February 5, 2025, and partial vacatur of Haiti's July 1, 2024 TPS extension and redesignation were unlawful under the APA.

276. Declare that Defendants' vacatur of the January 17, 2025 TPS extension for Venezuela, purported termination of TPS for Venezuela on February 5, 2025, partial vacatur of Haiti's July 1, 2024 TPS extension and redesignation, purported termination of TPS for Haiti on July 1, 2025, and purported termination of TPS for Haiti on November 28, 2025 were unconstitutional under the Equal Protection guarantee of the Due Process Clause of the Fifth Amendment;

277. Declare that Defendants have no authority to vacate a TPS extension under 8 U.S.C. 1254a;

278. Declare that the January 17, 2025 TPS extension for Venezuela and the July 1, 2024 TPS extension and redesignation for Haiti remain in effect under the terms specified in that decision, 90 Fed. Reg. 5961 and 89 Fed. Reg. 54484;

279. "Set aside" Defendants' vacatur order of February 3, 2025, termination order of February 5, 2025, and partial vacatur order of February 24, 2025 as beyond Defendants' authority and/or unlawful under the APA;

280. Postpone or stay the vacatur order of February 3, 2025, termination order of February 5, 2025, and partial vacatur order of February 24, 2025;

281. Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them from enforcing the vacatur order of February 3, 2025, termination order of February 5, 2025, partial vacatur order of February 24, 2025, termination order of July 1, 2025, and termination order of November 28, 2025;

282. Order Defendants to take all steps necessary to ensure that Venezuela and Haiti's TPS designations remain in full force and effect;

283. Grant an award of attorneys' fees and costs; and

284. Grant any other and further relief that this Court may deem fit and proper.

Date: October 21, 2026

Respectfully submitted,

NATIONAL DAY LABORER ORGANIZING NETWORK

/s/* *Jessica Karp Bansal*
Jessica Karp Bansal
Lauren Michel Wilfong (*pro hac vice*)

ACLU FOUNDATION OF NORTHERN CALIFORNIA

/s/ *Emilou MacLean*
Emilou MacLean
Michelle (Minju) Y. Cho
Amanda Young

CENTER FOR IMMIGRATION LAW AND POLICY, UCLA SCHOOL OF LAW

/s/ *Ahilan T. Arulanantham*
Ahilan T. Arulanantham

ACLU FOUNDATION OF SOUTHERN CALIFORNIA

/s/ *Mohammad K. Tajsar*
Mohammad K. Tajsar

HAITIAN BRIDGE ALLIANCE

/s/ *Erik Crew*
Erik Crew (*pro hac vice*)

Attorneys for Plaintiffs

* Filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.